# IN THE UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

_____

UNITED STATES OF AMERICA,

           Respondent,

           v.

DAVID PAUL HAMMER,

           Petitioner.

_____

:
:
:    Criminal No. 4:CR–96-239
:
:    Judge Muir
:
:
:
:
:
:
:
:

**PETITIONER'S MOTION FOR RECONSIDERATION OF THIS
COURT'S ORDER OF NOVEMBER 12, 2004 DENYING IN PART
HIS *SECOND POST-CONVICTION DISCOVERY MOTION***

_____

Petitioner, DAVID PAUL HAMMER, through his undersigned counsel, hereby moves pursuant to Local Rule 7.10 for reconsideration of this Court's November 12, 2004 order denying portions of *Petitioner's Second Post-Conviction Discovery Motion* and in support of this motion, states the following.

**Relevant Procedural History**

1. Following informal discovery between the parties, on October 15, 2004 Petitioner through counsel filed *Petitioner's Second Post-Conviction Discovery Motion* (document # 983) (hereafter, *Discovery Motion*). The *Discovery Motion*

1

addressed a number of outstanding discovery disputes between the parties, including Petitioner's request for "any correspondence or memorandum between representatives of the United States Attorney and [] B.O.P. mental health providers, or their supervisors" (*Discovery Motion*, ¶ 6) (hereafter, *Conflict Memos*).

2.      The Government filed a *Brief in Opposition* to the *Discovery Motion* on October 29, 2004 (document # 994).  On November 8, 2004 Petitioner filed a *Reply* to the *Brief in Opposition* (document # 998).

3.      On November 12, 2004 this Court issued an order granting one aspect of the relief sought but denying the bulk of Petitioner's requests (document # 1004).

4.      One portion of this Court's order is based upon mistakes of fact and law. The mistaken portion of the order relates to Petitioner's request for the *Conflict Memos* (*Motion* at ¶¶ 6-8).  Because this Court has misapprehended the relevant facts and law, reconsideration is appropriate based upon the following allegations, the history and record of this litigation, and the legal standard governing reconsideration addressed in the accompanying *Memorandum of Law*.

### The *Conflict Memos*

5.      The operative pleadings before the Court are Petitioner's *Amended Motion to Vacate and Set Aside Conviction and Sentence Pursuant to 28 U.S.C. 2255* (hereafter, *First Motion*) filed on September 30, 2002 (document # 785), and

Petitioner's *Second Amended Motion to Vacate and Set Aside Conviction and Sentence Pursuant to 28 U.S.C.* (hereafter, *Second Motion*) filed on July 9, 2003 (document # 817).

6.     The Court's order characterized Petitioner's discovery request as "clearly overbroad" because the only conflict of interest claims "relating to individuals associated with the prosecution set forth in the second amended § 2255 motion are found at page 31, Ground XIV. . ." relating to the provision of monetary rewards to some B.O.P. personnel.  Thus, this Court granted access only memos related to the granting of monetary rewards.  While the question of the monetary awards is an important and worthy issue, and Petitioner appreciates this aspect of the Court's order, the question of the monetary rewards is far from the only, or even most significant, conflict of interest pled by Petitioner.

7.     In fact, in both the *First Motion* and *Second Motion*, Petitioner pled that the evaluations of his competency to plead guilty and to waive his appellate rights, and the evaluations related to his criminal responsibility, were fatally infected by "a variety of conflicts of interest" (*Motion*, ¶ 6).  These conflicts impacted upon the impartiality of the B.O.P. personnel who treated Petitioner, who evaluated him, and who testified against him at various hearings and at trial. Accordingly, these conflicts impact upon this Court's competency determinations, Petitioner's subsequent waiver

of rights, the validity of his guilty plea, and Petitioner's waiver of his appellate rights, which violated a variety of his rights under the Fifth, Sixth Eighth and Fourteenth (equal protection clause) Amendments to the United States Constitution.  See e.g. *First Motion* at Ground I, page 3 (Petitioner's guilty plea was "predicated upon an unreliable competency proceeding); at page 5 (referencing Dr. Mitchell's "conflicted status" as one of the reasons for the unreliability of the competency proceedings); *First Motion* at Ground II, page 8 ("Dr. Wolfson, at all times, had a direct and substantial conflict of interest"); at page 11 ("While serving as a Court's expert, Mitchell was having ongoing counseling sessions with Hammer . . .The Government expressed concerns that this might be a conflict. . . .Numerous factors, including those list above, created the risk that these conflicts affected the motivations, performance, opinions and tasks of the Court's witnesses and thus ran afoul of basic notions of fairness. . ."); at 12 ("The conflicted and unreliable testimony of Wolfson is based upon incomplete questioning or knowledge, lack of awareness of salient medical and psychiatric facts regarding and affecting Hammer's mental state, and/or the unavailability of material evidence.").  These allegations and claims were repeated in the *Second Motion* at page 4 (Mitchell could not counsel Hammer because of his conflicted status leading to a coerced guilty plea); at Ground II, page 8; at page 10 (Wolfson conflicts); and at page 11 (Mitchell conflicts).

8.    The scope of the conflicts were further discussed in *Hammer's Traverse to Government's Brief in Opposition to Second Motion* (filed May 19, 2004) (document # 805) <u>see</u> <u>e.g.</u> pages 16 - 17 (arguing that there was a conflict regarding B.O.P. mental health employees because the killing took place in a B.O.P. facility thus presenting "rather stark issues of potential civil liability").

9.    The Government appears to appreciate and understand the full scope of the conflicts as evidenced by, *inter alia*, the content of the Declaration from Dr. Wolfson attached as Exhibit 2 to the Government's *Brief in Opposition* to the *Second Motion* (filed on February 4, 2003 (document # 791)).   At pages 7-8, Dr. Wolfson decried the conflict of interest claims as predicated upon "deliberate disingenuity" or a "worryingly fundamental lack of sophistication" on the part of defense counsel. Obviously Dr. Wolfson, and by extension the United States Attorney, understand that the conflicts alleged by Petitioner go far beyond the monetary awards provided to some B.O.P. personnel.

10.    Obviously this Court's ruling that the conflicts of interest pled by Petitioner relate only to the monetary rewards is quite wrong, and apparently the scope and true nature of the mental health conflicts under which the B.O.P. personnel labored have been lost on the Court.  This Court's  failure to identify the full scope of the conflicts that have been pled, in turn, clearly colored its view of the merits of

that portion of Petitioner's *Discovery Motion* seeking the *Conflict Memos*, and thus constitutes the mistake of fact and law that underpins the Court's November 12, order. Since this is neither a minor, nor academic error, but rather goes to the very heart of Petitioner's claims regarding the conflict of interest, reconsideration is required.

11.   To facilitate the Court's proper review of this *Motion*, and what will hopefully be the reconsideration of the *Discovery Motion*, and to drive home and make plain the actual scope of Petitioner's conflict claims, counsel hereby set forth in detail, and proffer, the full extent of their conflict of interest claims as related to the role of the B.O.P. mental health providers in this case.

### Petitioner's Proffer Regarding the Mental Health Conflict

12.   Petitioner has retained Dr. Donald Bersoff, a mental health ethicist. Dr. Bersoff is a Professor of Law at Villanova Law School. He has decrees in both law and a Ph.D. in Psychology. His attached curriculum vitae shows that he has written extensively in the area of the ethics of forensic mental health, and has been past-legal counsel to the American Psychological Association.

13.   Counsel commissioned Dr. Bersoff to review the potential ethical issues presented by various circumstances in this case related to Petitioner's forensic mental health claims. His opinions are contained in the attached report. These opinions

show that the proceedings before this Court as they related to Petitioner's mental health (i.e., his competency, his criminal responsibility, and his "treatment" and "evaluation" at the hands of various B.O.P. mental health personnel) were scarred by profound ethical violations which impact upon the opinions rendered by the conflicted B.O.P. personnel.  Thus, as a matter of law, these conflicts of interest also worked to violate a number of Petitioner's rights under the United States Constitution.

14.    In order to insure that this Court fully appreciates the scope of Petitioner's conflict claims, Petitioner hereby proffers and summarizes Dr. Bersoff's views.  At the hearing, Petitioner will present proof of the following:

A.    Dr. John Mitchell was Mr. Hammer's long-term treating therapist while he was in B.O.P. custody.  He served in a number of conflicting roles.

B.    Dr. Mitchell evaluated Mr. Hammer for competency to plead guilty and, later, to waive his appellate rights, and testified to the same at two separate court proceedings.

C.    Dr. Mitchell assessed and noted Mr. Hammer's mental state as it related to the offense for which he was being tried (i.e., he assessed and then noted his opinion that Mr. Hammer could distinguish between "right and wrong").

D.    Dr. Mitchell's progress notes of his therapy sessions – conducted both before and after Marti's death – were shared with other B.O.P. evaluators (including Dr. Wolfson) who assessed Petitioner for competency to waive rights, plead guilty and for criminal responsibility.

E.     Petitioner expressed concern to Dr. Mitchell that he would testify against Petitioner in a negative way.  Dr. Mitchell's response was that he would only testify to what he "observed and heard."  At that time Dr. Mitchell did not warn Petitioner that his diagnostic impressions and opinions would be shared with other evaluators and that, in fact, Dr. Mitchell would himself testify to more than observation, but would provide his professional opinions as to Petitioner' mental health.

F.     Dr. Mitchell was aware of the possibility that he would be called upon to provide an opinion regarding Petitioner's competency to proceed, to enter waivers of rights, and of Petitioner's criminal responsibility.  At one point, he even discussed this possibility with the prosecutor.  Nonetheless, he failed to advise Petitioner of this possibility and instead affirmatively mislead Petitioner to conclude that he would only be a fact witness.

G.     During therapy sessions, Dr. Mitchell repeatedly discussed with Petitioner his relationship with his attorneys and his desire to waive his appellate rights.

H.     Dr. Stephen Karten also served in multiple and conflicting roles.  He was also Petitioner's B.O.P. therapist, and evaluated him on a number of occasions related to his placement in the Special Housing Unit, for suicide risk and for future dangerousness.

I.     Dr. Karten's progress notes were shared with Dr. Wolfson for use in his assessment of competency and criminal responsibility.

J.     Dr. Karten also served as an expert prosecution witness who offered opinions regarding criminal responsibility.

K.     Dr. James K. Wolfson also served in multiple and conflicting roles.  He was primarily responsible for assessing Petitioner's criminal responsibility, competency to plead guilty and competency to waive his appeal.  These roles conflicted with his role as primary treating physician for Petitioner during his lengthy stays at MCFP at Springfield, Missouri.

L.      His role as non-partisan expert conflicted with his role as prosecution expert on the question of criminal responsibility. Similarly, his role as prosecution expert on criminal responsibility conflicted with his role as court expert on the question of competency to plead guilty and waive appellate proceedings.

M.      Drs. Mitchell, Karten and Wolfson each provided expert testimony outside of their areas of expertise. Dr. Mitchell testified as to Petitioner's competency to plead guilty and waive appellate rights, when he had no formal training or prior experience with these concepts. Dr. Wolfson and Dr. Karten each offered testimony on the question of Mr. Hammer's criminal responsibility, which was based in large part upon their opinions regarding the disease of Dissociative Identity Disorder. Neither had anything approaching the level of clinical expertise or training necessary to determine the presence or absence of this illusive illness.

L.      Dr. Mitchell and Dr. Karten each assessed Mr. Hammer's likely danger to others on a number of occasions prior to the Marti killing. Most of these assessments placed his risk at "low" although some put it at "moderate." None noted that his risk was "high." This incompetent failure to properly assess Mr. Hammer's risk to other prisoners or staff (and particularly his cell mate), constituted an ethical breach of the duty of competence. Moreover, this ethical breach was compounded when these same evaluators, and Dr. Wolfson, all of whom were B.O.P. personnel, were called upon to render opinions in a case in which a prisoner killing occurred in a B.O.P. facility.

M.      The ethical violations related to the evaluators' professional competence and multiple roles are intertwined. This is because the failure of B.O.P. personnel to competently assess Petitioner's risk of danger arguable left the B.O.P., its agents, and employees, subject to civil law liability. Therefore, it was in their respective interests, and in the interest of the B.O.P., to find that Petitioner did not suffer from mental health impairments. Such a finding would place sole blame for the killing on Petitioner and would absolve the B.O.P. mental health professionals from any liability.

15.    The following legal claims arise from the above summarized facts, and will be pressed by Petitioner at the appropriate time in these proceedings:

A.    The assumption by all of the B.O.P. mental health providers of multiple and ethically conflicting roles violated Petitioner's rights to due process of law secured by the Fifth Amendment;

B.    The assumption by and performance by B.O.P. mental health providers of multiple and ethically conflicting roles violated Petitioner's rights to due process of law secured by the Fifth Amendment, and renders the Court's competency determinations invalid;

C.    These same ethical conflicts rendered Petitioner's guilty plea unknowing, unintelligent and involuntary in violation of the Fifth, Sixth and Eighth Amendments;

D.    B.O.P. personnels' failures to warn Petitioner that what he said during his ongoing therapy sessions would be used against him; that therapists' observations and diagnostic opinions would also be used against him; and the act of the therapist(s) to affirmatively mislead Petitioner to believe that these statements, observations and diagnoses would not be used against him, violated his right to counsel secured by the Sixth Amendment; his right to remain silent and not be a witnesses against himself and the right to due process, each secured by the Fifth Amendment.

F.    The discussion by Petitioner's B.O.P.-employed therapists of Petitioner's relationship with his attorneys and whether he should waive rights (including his "decision" to plead guilty and to forego appellate review and agree to be executed), violated his right to due process of law secured by the Fifth Amendment, his right to counsel secured by the Sixth Amendment, and of his right to be free of cruel and unusual punishment secured by the Eighth Amendment, and constituted a Government invasion of the defense camp also in violation of the Fifth Amendment;

G.  The testimony by Mitchell, Karten and Wolfson was far outside their respective areas of expertise and professional competence, and therefore was ethically inappropriate.  The use of such ethically-challenged testimony invalidates both the competency portion of the proceedings, as well as entry of the guilty plea (which was induced in part by Wolfson's opinion that Petitioner was not mentally ill, but was a malingerer).

H.  The multiple evaluations of Petitioner for competency and criminal responsibility violated Petitioner's right to due process of law and to be free of cruel and unusual punishments inasmuch as all B.O.P. personnel were ethically prevented from assessing these factors because of the conflict of interest presented by the fact that the killing occurred in a B.O.P. facility; where these same evaluators had previously failed to accurately assess Petitioner's risk of danger to others (which constituted a proximate cause of Mr. Marti's death), and where consequently the B.O.P., its agents and employees were subject to civil liability for this failure.

**Reconsideration of the Court's Decision Regarding the Conflict Memos**

16.  This Court's decision regarding the request for the *Conflict Memos* was predicated on the assumption that the conflict of interest claim was limited to the provision of monetary awards to some B.O.P. personnel.  As the above citations to the *First Motion* and *Second Motion* for relief; the above summary and proffer of what Petitioner will prove at the hearing; the legal claims arising from this proof; and the attached report of Dr. Bersoff, all demonstrate that the conflict of interest claims are far more extensive than this Court appreciated.  The requested documents are highly relevant to the true conflict of interest claims.

17.     Accordingly, this Court should reconsider its decision denying Petitioner access to the *Conflict Memos*. Upon such reconsideration, this Court should dispense with the Government's feeble and procedurally inadequate assertion of privilege and order that the documents be provided.

WHEREFORE, Petitioner requests that this Court reconsider its previous denial of his *Discovery Motion*, and upon such reconsideration that it order the Government to provide access to copies of the previously described *Conflict Memos*. Respectfully Submitted,


s/ Michael Wiseman
MICHAEL WISEMAN, ESQUIRE
Supervising Assistant Federal Defender
Attorney ID#PA 75342
Defender Association of Philadelphia
Federal Court Division-Capital Habeas Unit
Suite 545 West – The Curtis Center
Philadelphia, PA 19106
Tel. No. (215)928-0520
(Michael_Wiseman@fd.org)

s/ Anne L. Saunders
ANNE L. SAUNDERS, ESQUIRE
Asst. Federal Public Defender
Attorney ID #PA 48458
100 Chestnut Street, Suite 306
Harrisburg, PA 17101
Tel. No. (717) 782-3843
(Anne_Saunders@fd.org)

## CERTIFICATE OF SERVICE

I, Michael Wiseman, of do hereby certify that on this date I served a copy of the foregoing ***Petitioner's Motion for Reconsideration of this Court's Order of November 12, 2004 Denying in Part His Second Post-Conviction Discovery Motion***, via Electronic Case Filing upon:

Frederick E. Martin, Esquire
United States Attorney's Office
Federal Building, Room 217
228 Walnut Street
Harrisburg, PA 17108

Gwynn X. Kinsey, Jr., Esquire
United States Department of Justice
Criminal Division, Capital Case Unit
1331 F. Street, N.W.
Washington, D.C. 20530

Date: November 18, 2004

Michael Wiseman

s/ Michael Wiseman