**Donald N. Bersoff, Ph.D., J.D.**
**780 College Avenue**
**Haverford, PA 19041**

**610/649-8448**

Michael Wiseman, Esq.
Capital Habeas Corpus Unit
Defender Association of Philadelphia
Suite 545 West
Curtis Center
Philadelphia, PA 19106

**RE:  United States v. Hammer**

Dear Mr. Wiseman:

You have asked me to determine whether there are any ethical problems raised by the work of certain mental health professionals in the evaluation, diagnosis, and treatment of your client, David Paul Hammer, during his incarceration in various federal prisons from about 1994 to date, including his trial and various hearings conducted in 1998.  I am pleased to respond to that request.

**Introduction**

In sum, as I explain more fully below, it is my opinion, to a reasonable professional certainty, that the professional behavior of Drs. Mitchell, Wolfson, Karten, and Dubin raise significant ethical issues.  In arriving at this opinion, I reviewed the following documents:

Bureau of Prison (BOP) reports related to Mr. Hammer from 1994-2000, written by psychologists John Mitchell, PsyD, Stephen Karten, PhD, and others[1]

BOP Program Statement (Health Services Manual) dated September 15, 1996

Dr. Wolfson's 143-page forensic report of December 1997

---

[1]These psychologists include PR Magaletta, PhD, Gilbert Sanders, EdD, Mark Skrade, PsyD, John Worley, PhD, Teri White, PhD, Andrew Millar, PhD, James Watterson, PhD, Michael Morrison, PhD, Bill Elliot, PhD, Ted Moretz, PhD, CA Bigler, PhD, and David Wedeking, PhD.  Their work, with the brief exception of Dr. Magaletta (explained below) is not germane to this analysis.

Dr. Wolfson's sworn affidavit of February 3, 2003

Transcripts of testimony before Judge Muir (MD Pa) in 1998 by:

> Jill Miller, MSW
> Robert Sadoff, MD
> James Wolfson, MD
> John Mitchell, PsyD
> Stephen Karten, PhD
> Michael Gelbort, PhD

United States v. Hammer, 25 F.Supp.2d 518 (MD Pa 1998)
United States v. Hammer, 226 F.3d 229 (3rd Cir. 2000)
United States v. Hammer, 239 F.3d 302 (3rd Cir. 2001)
United States v. Hammer, No. 04-9001 (3rd Cir. June 3, 2004)

## Applicable Principles I:  Multiple Relationships

The major concern and most ubiquitous ethical problem that emerges from the foregoing documents is that of multiple relationships.  "The most comprehensive definition of multiple relationships includes those situations in which the psychologist functions in more than one professional relationship . . . (p. 336)."[2]  In the context of treatment, "A dual relationship in psychotherapy occurs when the therapist is in another, significantly different relationship with one of his or her patients (p. 22)."[3]  According to the code of ethics of psychologists applicable to the time period at issue here, "A psychologist refrains from entering into . . . another . . . professional relationship . . . if it appears likely that such a relationship reasonably might impair the psychologist's objectivity or otherwise interfere with the psychologist's effectively performing his or functions as a psychologist, or might harm or

---

[2]Sonne, J.  (1994).  Multiple relationships:  Does the new ethics code answer the right questions? Professional Psychology: Research and Practice, 25, 336-343.  Similarly, the 2002 ethics code of the American Psychological Association (APA) states a "multiple relationship occurs when a psychologist is in a professional role with a person and (1) at the same time is in another role with the same person . . . (p. 1065)."  American Psychological Association (2002).  Ethical principles of psychologists and code of conduct. American Psychologist, 57, 1060-1073 [hereinafter 2002 APA Code].

[3]Pope, K.  (1991).  Dual relationships in psychotherapy. Ethics and Behavior, 1, 22-34.

exploit the other party (Standard 1.17, p. 1601).[4]

As is evident from these various formulations, a key factor in the definition of unethical multiple relationships is risk. Multiple relationships are proscribed even if in a specific case the behavior did not actually result in a negative outcome. It is the risk of harm that is determinative.[5]

The issue of multiple relationships is seen as a particularly important problem in the provision of forensic mental health services. It is generally agreed within the field that a treating therapist may be called upon to serve as a fact witness but it is also generally agreed that the therapist should not be compelled, nor volunteer, to act as an expert witness with regard to the mental status of his/her patient:

> Clinical, ethical, and legal concerns arise when the treating expert offers psycholegal assessment--an assessment for which the treating expert does not have

---

[4]American Psychological Association (1992). Ethical principles of psychologists and code of conduct. *American Psychologist*, <u>47</u>, 1597-1611 [hereinafter 1992 APA Code]. Similar language appears in the current APA code: "A psychologist refrains from entering into a multiple relationship if the multiple relationship could reasonably be expected to impair the psychologist's objectivity, competence, or effectiveness in performing his or her functions as a psychologist, or otherwise risks exploitation or harm to the person with whom the professional relationship exists." 2002 APA Code (Standard 3.05(a)), at 1065.

[5]There is no congruent set of proscriptions in the general ethical code of psychiatrists. The following principle, however, is applicable:

> Physicians generally agree that the doctor-patient relationship is such a vital factor in effective treatment of the patient that preservation of optimal conditions for development of a sound working relationship between a doctor and his/her patient should take precedence over all other considerations (Section 6(1), p. 8).

American Psychiatric Association (1985). <u>The principles of medical ethics with annotations especially applicable to psychiatry</u>. Washington, DC: American Psychiatric Association [hereinafter <u>Psychiatry Ethics</u>]. As is recognized, acting in multiple professional relationships risks impairing psychotherapy.

adequate professional basis, for which there are inherent role conflicts, and for which there will almost certainly be negative implications for continued therapy (p. 51).[6]

As is made explicit in the title of the Shuman & Greenberg article cited in the foregoing footnote, acting as both therapist and expert witness regarding the same patient is seen as an "irreconcilable conflict." The former president of the American Academy of Psychiatry and the Law agreed, calling these functions incompatible and noting in a lead editorial:

> When clinical and forensic roles are combined in the course of treatment, information gathered with the understanding that it will be used only for the patient's benefit is turned to other purposes. Regardless of the psychiatrist's intent, that information may redound to the patient's detriment. Alternatively, if patients are made aware at the outset of treatment that the therapist will also be performing a forensic function, it is difficult to imagine how open communication and effective treatment can take place. In either event, the outcome is unfair to the patient (p. 446).[7]

---

[6]Greenberg, S. & Shuman, D. (1997). Irreconcilable conflict between therapeutic and forensic roles. Professional Psychology: Research and Practice, 28, 50-57. An association of forensic psychiatrists agree. A specific set of guidelines discourages psychiatrists from simultaneously performing both clinical and forensic roles. See American Academy of Psychiatry and the Law (1995). Ethical guidelines for the practice of forensic psychiatry. Bloomfield, CT: AAPL:

> A treating psychiatrist should generally avoid agreeing to be an expert witness or to perform an evaluation of his patient for legal purposes because a forensic evaluation usually requires that other people be interviewed and testimony may adversely affect the therapeutic relationship.

As with the APA's code of ethics, AAPL's guidelines emphasize risk, i.e., "may adversely affect the therapeutic relationship."

[7]Appelbaum, P. (1997). Ethics in evolution: The incompatibility of clinical and forensic functions. American Journal of Psychiatry, 154, 445-446 (Editorial). See Strasburger, L., Gutheil, T., & Brodsky, A. (1997). On wearing two hats: Role conflict in serving as both psychotherapist and expert witness. American Journal of Psychiatry, 154, 448-456 (dual roles of treater and evaluator should be avoided whenever possible).

For some forensic scholars, the issue of dual or multiple roles is so problematic they argue that it should be banned absolutely:

> Our immodest proposal is a rule imposing a clear, impenetrable boundary between therapeutic and forensic roles within a single case. Under such a rule, across the judicial spectrum, therapists would not be permitted to testify about their patients _even if the parties or the court requested it_ (p. 514) (emphasis added).[8]

Although much of the focus in the professional literature concerns the conflict between therapeutic and expert witness roles, as the earlier definitions and discussions of multiple relations make clear, there are other incompatible roles that raise serious ethical issues. It is generally considered quite problematic for a forensic expert to testify for one party, _e.g._, the prosecution, and to testify in the same case for another, _e.g._, the court or the defense. Forensic clinicians are cautioned to "avoid providing professional services to parties in a legal proceedings with whom they have . . . professional relationships that are inconsistent with the anticipated relationship (Section IV(D)), p. 659).[9]

**Applying the Principles to the Facts of this Case I**

Psychologists Mitchell and Karten and psychiatrist Wolfson all engaged in multiple relationships that, in my opinion, are incompatible with sound ethical practice. I will take each in turn.

Dr. Mitchell performed three significantly different roles as a prison psychologist: Assessor of Mr. Hammer's mental state; Mr. Hammer's long term therapist; and expert witness as to Mr. Hammer's competency in two hearings. He first saw Mr. Hammer on May 23, 1995, for an intake evaluation when Mr. Hammer was transferred to Allenwood. He saw him monthly during his stay at Allenwood, assessing his mental status and potential for violence to himself or others while Mr. Hammer was in the Special Housing Unit,

---

[8]Shuman, D., Greenberg, S., Heilbrun, K. & Foote, W. (1998). An immodest proposal: Should treating mental health professionals be barred from testifying about their patients? _Behavioral Sciences and the Law_, _16_, 509-523. The statement is particularly germane in this case because, as I describe more fully below, both Mr. Hammer and the presiding judge approved of Drs. Mitchell and Wolfson testifying as expert witnesses as to Mr. Hammer's competency to plead guilty and waive counsel and appeals.

[9]Committee on Ethical Guidelines for Forensic Psychologists (1991). Specialty guidelines for forensic psychologists. _Law and Human Behavior_, _15_, 655-665 [hereinafter CEGFP].

including a specific suicide risk assessment on August 24, 1995. Three days after Mr. Hammer admitted to killing Mr. Marti, Dr. Mitchell wrote a short psychological report during which he stated that Mr. Hammer did not appear to have psychotic symptoms and was able to distinguish between right and wrong.

Dr. Mitchell's major contact with Mr. Hammer, however, was as his therapist. He saw his patient weekly or biweekly during 1995 and 1996, including many times subsequent to the killing, and many times in 1997 and 1998. Although at first Dr. Mitchell considered Mr. Hammer as having a genuine mental illness, on October 30, 1996, he recommended that his patient no longer be given a mental illness code in his records because, according to Dr. Mitchell, it became apparent to him "that the inmate's difficulties stem not from any Axis I diagnostic syndromes but from his severe antisocial personality features and other problematic personality traits."[10]

It is significant that less than a month later, on November 27, 1996, Mr. Hammer told Dr. Mitchell that he was concerned that his therapist would testify "in a negative way in his murder case." Dr. Mitchell sought to allay his patient's concerns and promised that he "would simply report what I had observed or heard from him." This turned out to be, of course, an empty promise when he later testified as an expert witness offering an opinion (not merely his observations) as to Mr. Hammer's competency. A couple of weeks later, on December 12, Mr. Hammer again expressed "his growing concern" about retaining Dr. Mitchell "as his therapist given that I [Dr. Mitchell] will in all likelihood testify concerning his mental status."

These interactions raise ethical issues beyond that of multiple relationships. Under the applicable 1992 APA ethics code Standard 1.21, (p. 1602):

> (a) When a psychologist agrees to provide services to a person . . . at the request of a third party [here, the prison], the psychologist clarifies to the extent feasible, at the outset of the service, the nature of the relationship with each party. This clarification includes the role of the psychologist (such as therapist, . . . diagnostician, or expert withess), the probable uses of the services provided or the information obtained, and the fact that there may be limits to confidentiality.

> (b) If there is a foreseeable risk of the psychologist being called upon to perform conflicting roles because of the involvement of a third party, the psychologist

---

[10]See text at n. 31, and note itself for further discussion of this issue.

clairifes the nature and direction of his or her responsibilities, keeps all parties appropriately informed as matters develop, and resolves the situation in accordance with this Ethics Code.

In addition to Dr. Mitchell's failure to anticipate that he might act in conflicting roles, he noted on May 7, 1997, that he was contacted by the prosecution informing him that he "may be called on at some point to speak to Hammer's competency to defend himself." Although he saw Mr. Hammer just two days later for a counseling session, and many times after that for treatment, he never informed Mr. Hammer of the potential for his testifying at the behest of the prosecution. In my opinion, immediately after receiving the communication on May 7th, he had an ethical duty to inform Mr. Hammer that he might be testifying as an expert, with concomitant limits on confidentiality.[11]

Mr. Hammer continued to express his concerns about Dr. Mitchell's loyalty and fidelity. Six weeks after Dr. Mitchell spoke to the prosecution, on June 27, 1997, he noted that Mr. Hammer "expressed concern over whether he could trust me; this apparently stemmed from my writing a control unit referral report without notifying him." Two weeks later, Dr. Mitchell wrote (see July 8, 1997, summary of a counseling session), Mr. Hammer refused to see anybody from the psychology unit because he "will not be involved with those of you who are actually working as agents for assistant U.S. Attorney Fred Martin in his endeavors to murder me." A month later, on August 5, 1997, Mr. Hammer, cancelled his therapy sessions with Dr. Mitchell because of his concerns "about some records" that Dr. Mitchell was "keeping on him." Just a bit more than two weeks after that, Dr. Mitchell attended Mr. Hammer's hearing to determine the validity of his desire to plead guilty. Dr. Mitchell was scheduled to testify as an expert on his competency to do so.[12]

---

[11]See Standard 4.01, p. 1605 (Structuring the Relationship) in the 1992 APA ethics code:

Psychologists discuss with clients or patient as early as is feasible in the therapeutic relationship appropriate issues, such as . . . confidentiality.

See also Standard 5.02, p. 1606 (Maintaining Confidentiality)

Psychologists have a primary obligation to take reasonable precautions to respect the confidentiality rights of those with whom they work . . . .

[12]Ultimately, Dr. Mitchell did not testify at this time because Mr. Hammer withdrew his plea. But it is clear that Mr. Hammer's concerns about his therapist's potential multiple roles disrupted

These concerns by Mr. Hammer, whether ultimately valid or not, exemplify why multiple relationships, particularly in a forensic setting, are to be avoided if at all possible. As the U.S. Supreme Court recognized:

> Effective psychotherapy . . . depends upon an atmosphere of confidence and trust in which the patient is willing to make a frank and complete disclosure of facts, emotions, memories, and fears. . . .    [T]he mere possibility of disclosure may impede development of the confidential relationship necessary for successful treatment . . . . (p. 10).[13]

Clearly, Mr. Hammer varied in the level of trust he felt with his therapist. Dr. Mitchell responded by incorrectly promising he would not testify as an expert, eventually met with both the defense and prosecuting attorneys regarding his clinical impressions of Mr. Hammer (see note of June 5, 1998), evaluated his therapy patient to determine his competency to plead guilty (see note of June 22, 1998), subsequently testified as an expert as to his competency to plead guilty (see transcript [Tr.] of July 8, 1998), conducted an evaluation on August 3, 1998, to determine Mr. Hammer's competency to dismiss counsel and waive appeals, and testified as an expert on that issue on October 1, 1998.[14]

---

his ongoing treatment.

[13]Jaffee v. Redmond, 518 U.S. 1 (1996).

[14]Further muddying the waters was the fact that during therapy sessions Dr. Mitchell had with Mr. Hammer after the death of Mr. Marti, Mr. Hammer expressed significant and persistent concerns about the conduct of his capital trial (both during and after conviction), including his relationship to his attorneys, and whether to plead guilty, waive appeals, and ask for an execution date. See, e.g., Dr. Mitchell's notes of April 14, 17, 1998; May 1, 18, 1998; June 1, 10, 15, 1998; July 26, 27, 1998; September 29, 1998, November 3, 21, 1998; and December 3, 24, 1998). Although Dr. Mitchell had a professional obligation to discuss these topics because they were causing his patient emotional distress, it raises countervailing ethical concerns given the multiple roles Dr. Mitchell played and would play in Mr. Hammer's trial, including testifying on behalf of the prosecution. Although Dr. Mitchell acted primarily as Mr. Hammer's therapist, he was also an employee of the BOP (and ultimately of the U.S. Department of Justice). Thus, Dr. Mitchell should have either avoided altogether discussion of legal matters relevant to Mr. Hammer's case, referred him to another mental health professional who would not be testifying, or informed him of the limits of confidentiality with regard to these matters. See Standard 4.01 of the 1992 APA Code.

Dr. Mitchell's testimony on June 22, 1998, was at the behest of defense counsel. But in the hearing on October 1, 1998, to determine Mr. Hammer's competency to dismiss counsel and waive appeals, he testified for the prosecution. Dr. Mitchell acknowledged that he had been in a "clinical relationship" (Tr. at p. 93) with Mr. Hammer but then, contrary to ethical principles, testified as an expert, i.e., to a reasonable psychological certainty as the the ultimate opinion question, that Mr. Hammer, according to his evaluation, was competent to discharge counsel and waive appeals (see Tr. at pp. 107-108).

Although the use of Dr. Mitchell (and Dr. Wolfson) as an expert at these hearings was instigated by the court (who would not necessarily be as aware of the ethical implications as should the witnesses) and agreed to by Mr. Hammer, that alone did not warrant Drs. Mitchell and Wolfson testifying. First, it borders on the oxymoronic to ask Mr. Hammer if he consented to the competency evaluations by Drs. Mitchell and Wolfson when the sole purpose of these evaluations was to determine Mr. Hammer's cognitive capacity to make knowing, intelligent, and voluntary decisions regarding his legal fate.[15] Second, Dr. Mitchell was not the only psychologist at Allenwood. As he testified on July 8, 1998, at the first competency hearing, Dr. Magaletta had been at Allenwood since June 1996 (see Tr. at pp. 135-136). Third, although a witness may be called upon by the court to testify as an expert, if the witness does not feel competent to do so or asserts ethical obligations not to do so, the witness cannot be compelled to so testify:

> The clinician who does testify as a fact witness should rigorously maintain role boundaries by declining to perform the functions of an expert witness . . . . A therapist who is asked to give expert testimony about a patient can respond to an an attorney's request, a subpoena, or (at a last resort) courtroom questioning with a disclaimer such as this: "Having observed the

---

[15]In addition, there is always the question whether the consent of a prisoner is truly voluntary. See, e.g., 46 C.F.R. Sec. 46.302 (pertaining to research with prisoners). This concern is compounded by the fact there is general agreement that there is an undue power differential between the therapist and the client, leading the client to want to please the therapist. This would also have an impact on the voluntariness of a client's decision. See, e.g., Psychiatric Ethics, Section 2(a):

> The psychiatrist should diligently guard against exploiting information furnished by the patient and should not use the unique position of power afforded him/her by the psychotherapeutic situation to influence the patient in any way not directly relevant to the treatment goals.

patient only from the vantage point of a treating clinician, I have no objective basis for rendering an expert opinion, with a reasonable degree of medical certainty, on a legal as opposed to a clinical question" (p. 454).[16]

To a less pervasive extent, Dr. Karten, the former chief psychologist at Allenwood, also engaged in multiple roles. Although Dr. Mitchell was Mr. Hammer's primary therapist, Dr. Karten also served in a therapeutic role (see p. 115 of Dr. Wolfson's forensic report [hereinafter Wolfson Report). In fact, in Dr. Karten's testimony at the behest of the prosecution, he noted that he talked at some length with Mr. Hammer about the latter's return from the Special Housing Unit to the general prison population (see Tr., June 30, 1998, at pp. 49-50; see also Tr., July 1, 1998, at pp. 187, 200).[17] In addition to his role as treater, Dr. Karten also served as an assessor. Most particularly, he evaluated Mr. Hammer for suicide risk the day he killed Mr. Marti (see Suicide Risk Assessment, April 13, 1996). He acknowledged, however, that Mr. Hammer was reluctant to speak to him because he had also served as a therapist to Mr. Marti (see Tr., June 30, 1998, at p. 88). He also conducted several Special Housing Unit evaluations (see Tr., June 30, 1998, at p. 52).

Dr. Karten not only served in mixed roles as assessor and therapist, but, as importantly, also testified as an expert witness for the prosecution with regard to criminal responsibility, stating he disagreed with the defense's psychiatrist expert, Dr. Sadoff, that Mr. Hammer suffered from the serious mental illness of dissociative identify disorder (see Tr., June 30, 1998, p. 55; United States v. Hammer, 25 F.Supp.2d 518, 522 (MD Pa. 1998).

Dr. Wolfson, a forensic psychiatrist employed by the Federal Bureau of Prisons at Springfield, Mo., also engaged in multiple and incompatible professional roles. His initial major task was to assess Mr. Hammer's criminal responsibility after defense counsel filed a notice of intent to assert an insanity defense (see Wolfson Report at pp. 1-2). His evaluation was conducted from October 23-December 10, 1997, culminating in a 143-page report dated December 19, 1997. Although Dr. Wolfson correctly informed Mr. Hammer that information he gleaned from him would not be confidential because he was acting as a "nonpartison expert," he also informed Mr.

---

[16]See Strasburger et al., at n. 7.

[17]"He was very much stressed when he first came to USP Allenwood. And that was when I had spent a fair amount of time with him, helping him to adjust. And that's when I had done the single cell assignment, had done the treatment plan for him, had made a referral for him to the psychiatrist, etc" (Tr., July 1, 1998, at p. 200).

Hammer "I would also serve, at least temporarily, as his attending psychiatrist of record should any pressing clinical needs arise during his stay" (Wolfson Report, at p. 2). As noted above, these roles are incompatible, particularly in light of the abrogation of confidentiality. A patient in Mr. Hammer's position would be inhibited from disclosing any material related to his psychological status that might be antagonistic to his asserted defense, and thus interfere with a sound and helpful therapy relationship.

On June 17, 1998, Dr. Wolfson testified for the prosecution, asserting that Mr. Hammer was not, in his expert opinion, insane at the time of the killing of Mr. Marti. Just five days later, when Mr. Hammer made known his desire to plead guilty and have an execution date set, Dr. Wolfson testified at the behest of the court as to Mr. Hammer's competency to so plead. Defense counsel argued that he did "not believe that the government's witness should be the person to do that" (Tr., June 22, 1998, at p. 11), and suggested that other forensic experts in the Williamsport area "could be appointed by the Court as a completely neutral expert" (Tr., at p. 12).[18] The court was concerned about delay and engaged in a colloquy with Dr. Wolfson as to his views on conducting a competency evaluation and testifying as to its results. Dr. Wolfson replied that "some aspects of the notion of having me do that make me uncomfortable" (Tr. at p. 15) and stated what he saw as the difficulties in engaging in this task. "I certainly began this endeavor as a neutral third-party expert, which is how I strive to continue to be. But Mr. Hammer has heard me giving damaging information about him now for several days" (Tr. at p. 15). Dr. Wolfson clearly understood the professional implications of his engaging in this dual role: "I do not wish to do anything that approaches appearance of being unethical" (Tr., at p. 16). Yet, he did not summarily abstain from acting in these dual roles, but made his evaluation and testimony contingent on Mr. Hammer's consent, the problematic nature of this solution about which I have already commented on above.

Again, to his credit, Dr. Wolfson appeared to be sensitive to the ethical implications of acting in two professional capacities with a patient. In discussing his procedure when conducting a insanity defense evaluation, he testified that he informed Mr. Hammer about the absence of confidentiality and "that I wasn't on

---

[18]Dr. Wolfson admitted that there were other competent professionals who could have performed the required evaluations. In discussing the assessment of Mr. Hammer's competency to plead guilty, Dr. Wolfson stated, "At the time, I was indeed (and I remain) the only psychiatrist posted full-time on the forensic service here, though there were two other psychiatrists present at the facility at the time who would have been qualified to perform Mr. Hammer's evaluation" Wolfson Affidavit, February 3, 2003, at para. 6.

his side.  That unlike a therapeutic relationship where I would be in the role of helping him and be his advocate, that instead I was in the role with a responsibility of finding out what the truth was, which is _fundamentally quite different_" (Tr., June 18, 1998, at p. 129; emphasis added).[19]  On cross-examination the next day, he acknowledged that acting as a defense expert and the treating professional in the same case "is a little undesirable" (Tr. June 19, 1998, at p. 19).  He also recognized that if the issue of competency to be executed arose he would "make arrangements for a different clinician to be the one that actually articulated an opinion about" that issue (Tr., October 1, 1998, at p. 82).

In sum, despite Dr. Wolfson's misgivings and knowledge of what he should do, what he did do was act as Mr. Hammer's treating psychiatrist while at Springfield, evaluated him with regard to criminal responsibility putatively as a nonpartisan expert, testified for the prosecution with regard to that evaluation, and then testified as the court's "neutral" expert witness as to Mr. Hammer's competence to plead guilty, dismiss counsel, and waive appeals--all leading to Mr. Hammer's execution.[20]  Dr. Wolfson forcefully asserted in his affidavit that, despite performing these

---

[19]Dr. Wolfson later reiterated this significant difference: [T]he goal of a forensic evaluation is to discern the truth about an _evaluee_, rather than to bring about the clinical benefit of a _patient_."  Wolfson Affidavit, February 3, 2003, at para. 4 (emphasis in original).  Later on in the affidavit, Dr. Wolfson expressed "an additional concern relating to privileged information."  He speculated that while being evaluated for his competency to plead guilty, Mr. Hammer might be tempted to discuss how his trial was faring, leading Dr. Wolfson to state he "was unsure whether either of us would be able to keep such discussion disentangled from prior or current issues of his desired defense strategy" (para. 5).

[20]Dr. Wolfson freely admits to engaging in all these roles. In his February 3, 2003, affidavit he states:

> I am familiar with Defendant Hammer from multiple contacts with him. He was committed to the U.S. Medical Center for Federal Prisoners in Springfield, Missouri, in the fall of 1997 for evaluation of criminal responsibility . . . and committed here a second time in the fall of 1998, following his conviction, for evaluation of his competence to waive or dismiss his attorneys and represent himself, his competence to waive post-verdict and post-sentencing motions in his trial courts, and his competence to waive subsequent federal appeals.  I prepared a report following each of these commitments . . . .

12

multiple roles that he followed BOP policy of "working for the court," not the prosecution or defense (Wolfson Affidavit, February 3, 2003, para. 9). But he misses the fundamental ethical point. Regardless of written policies, statutes, or case law requiring BOP mental health professionals who conduct evaluations to be neutral, ethical standards are established, not only to protect against actual harm to a patient, but against the risk of harm. If Dr. Wolfson, as well as Drs. Mitchell and Karten, had avoided the appearance of impropriety, they would have ensured the integrity of the process and protected themselves against any reasonable concerns that their opinions were tainted by conflict, bias, or external pressure. Preventing the appearance of impropriety is particularly important when forensic clinicians are involved in a death penalty prosection.[21]

Thus, three clinicians all engaged in multiple and incompatible professional roles in their interaction with Mr. Hammer. The misuse of their expertise could have been avoided by the exercise of sound professional discretion. They had a duty to avoid having their professional expertise and judgment misused by the legal system and, above all, to do no harm. They failed in all three of these ethical obligations.[22] The result has been lengthy delays in resolving this case, the squandering of judicial resources, and a life in limbo.

**Applicable Principles II:  Competence**

A second serious ethical issue in this case is that of competence. Both psychology and psychiatry recognize that mental health professionals should only provide services they are qualified to perform. For example, under the applicable 1992 APA Code psychologists are required to "provide services . . . only

---

[21]As the applicable 1992 APA Code, states:

Psychologists take reasonable steps to avoid harming their patients or clients  . . . and to minimize harm where it is foreseeable and unavoidable.

1992 APA Code, Standard 1.14 (Avoiding Harm), p. 1601.

[22]See Perrin, G., & Sales, B.  (1994). Forensic standards in the American Psychological Association ethics code. *Professional Psychology:  Research and Practice*, 25, 376-382:

[P]roviders of forensic services must be aware of, and sensitive to, the potential conflicts between . . . roles of examiner, therapist, and consultant; between the legal roles of expert witness and fact witness, and between the roles of advocate for the client and advocate for a professional opinion (p. 377).

within the boundaries of their competence, based on their education, training, supervised experience, or appropriate professional experience" (Standard 1.04(a), p. 1600).[23] When they do not have the requisite qualifications, psychologists "provide services . . . in new areas or involving new techniques only after first undertaking appropriate study, training, supervision, and/or consultation from persons who are competent in those areas or techniques" (Standard 1.04(c), p. 1664. Under the Principles of Medical Ethics, Section 1 dedicates physicians to "providing competent medical service."

More particularly, the policy that guides forensic psychologists clearly states that such clinicians should "provide services only in areas . . . in which they have specialized knowledge, skill, experience, and education" (Section III(A), p. 658).[24] When testifying, "they have an obligation to present to the court . . . the boundaries of their competence, the factual bases (knowledge, skill, experience, training, and education) for their qualifications as an expert, and the relevance of those factual bases to their qualification as an expert on the specific matters at issue" (Section III(B), p. 658).[25]

## Applying the Principles to the Facts of this Case II

The first issue related to competence concerns Dr. Wolfson's qualifications to evaluate Mr. Hammer's mental status with regard to the possible diagnosis of Dissociative Identity Disorder. During the cross-examination by Mr. Hammer's counsel of his qualifications to testify as an expert, Dr. Wolfson admitted that he had never treated any patient with a diagnosis of multiple personality disorder (MPD) or dissociative identify disorder (DID), as it is now called (see Tr., June 17, 1998, at p. 127). Although he asserted that a psychiatrist could correctly diagnose DID even if one had never seen a case, he did agree that a scholarly article in a respected peer-reviewed journal stated that because diagnosing DID in a forensic context was so complicated it "precludes the participation of a novice clinician who has never seen a bona fide case of MPD" (Tr., June 17, 1998, at p. 129). Finally, during this

---

[23]The 2002 APA Code is almost identical:

Psychologists provide services . . . only within the boundaries of their competence, based on their education, training, supervised experience, consultation, study, or professional experience.

2002 APA Code, Standard 2.01(a), at p. 1063.

[24]CEGFP.

[25]CEGFP.

14

same cross-examination Dr. Wolfson admitted that of 231 hours of a course in forensic psychiatry, less than one hour was devoted to MPD (see Tr., at p. 137).[26]

In light of his significant inexperience with the diagnosis of DID in either a clinical or forensic context, it is not surprising that Dr. Wolfson stated in his forensic report that "I have significant reservations about the construct of multiple personality disorder as a diagnosis, both in the psychiatric literature, and especially in the legal literature" (p. 140). Given that bias and his lack of training in this area, the ethical thing to have done was to demur engaging in the evaluation in the first place.[27]

Dr. Karten also testified with regard to Mr. Hammer's diagnosis although he admitted he was not a forensic psychologist (Tr. July 1, 1998, pp. 178, 194), had never seen a case of DID (see Tr. at p. 194), and more importantly, had never examined Mr. Hammer for DID (see Tr., at p. 179). Yet, he testified that he was ruling out DID as a possible diagnosis for Mr. Hammer (see Tr., at p. 179). Although he did not respond directly to defense counsel's question as to whether "it's ethical for a psychologist to reach a diagnosis on someone, even to rule out diagnosis, without having examined that person for the particular disorder?" (Tr., at p. 193), the answer to that question is clearly yes:

> Forensic psychologists avoid giving written or oral evidence about the psychological characteristics of particular individuals when they have not had an opportunity to conduct an examination of the individual adequate to the scope of the statements, opinions, or conclusions to be issued. Forensic psychologists make every reasonable effort to conduct such examinations. When it is not possible or feasible to do so, they make clear the impact of such limitations on the reliability and validity of their professional products, evidence, or

---

[26]Dr. Wolfson went on to say about that experience:

> Calling it a course is a little bit of a misnomer. I got academic credit for it but what I was doing there was I was posed with the unit that does forensic evaluations and we saw no defendants during that period of time who had or claimed to have that illness, and so I didn't have any experience with it, other than reading, I'm sure.

Tr., June 17, 1998, at p. 137.

[27]"A psychiatrist who regularly practices outside his/her area of professional competence should be considered unethical." Psychiatry Ethics (Section 2(3), at p. 4.

testimony (Section VI(H), p. 663).[28]

This cautionary message is echoed in the more general standards of the 1992 APA Code:

> [P]sychologists provide written or oral forensic reports or testimony of the psychological characteristics of an individual only after they have conducted an examination of the individual adequate to support their statments or conclusions.
>
> When, despite reasonable efforts, such an examination is not feasible, psychologists clarify the impact of their limited information on the reliability and validity of their reports and testimony, and they appropriately limit the nature and extent of their conclusions or recommendations (Standard 7.02(b) & (c), at p.1610).[29]

Given that Dr. Karten never performed a formal evaluation of Mr. Hammer with regard to criminal responsibility nor the specific diagnosis of DID, he also should have demurred from testifying about these topics. In the very least, he should have clearly indicated the very limited reliability and validity of his opinion.

Dr. Mitchell also engaged in professional conduct for which he was not trained. Recall that Judge Muir asked Dr. Wolfson to conduct an evaluation of Mr. Hammer to determine whether he was competent to plead guilty (Tr. June 22, 1998). The defense suggested that Dr. Mitchell, his long term therapist, should do the evaluation along with Dr. Wolfson, to which the prosecution agreed. Although, unfortunately, neither the court nor the parties' lawyers understood the ethical implications of acting in these dual roles, Dr. Wolfson did have an inkling of the problem, stating during the hearing, "Now, that's pulling Dr. Mitchell out of his usual role a bit, too, from a treating clinician to a forensic evaluator" (Tr., June 22, 1998, at p. 24). But that problem is only compounded by the fact that conducting a competency evaluation was not a normal part of his job as a prison psychologist, as Dr. Mitchell admitted (Tr., at p. 77). Nevertheless, Dr. Mitchell volunteered his expert opinion that Mr. Hammer "was competent mentally to enter a guilty plea" (Tr., July 8, 1998, p. 164).

Another area in which the competence of the BOP's mental health professionals may be questioned is in the evaluation of Mr. Hammer's risk of violence to another. Beginning in March 1994, Mr. Hammer was placed in a Special Housing Unit, first at Leavenworth, then Lompoc, and finally at Allenwood, beginning on or about May

---

[28]CEGFP.

[29]1992 APA Code.

30, 1995, where he was first seen by Dr. Mitchell. At Leavenworth, Mr. Hammer's intake screening summary of January 13, 1994, specifically noted that he "has an intensive history of violence and poor adjustment." The psychologists there consistently concluded that Mr. Hammer's threat of violence to others was "MODERATE." Similarly, when he arrived at Lompoc, the staff psychologist in her intake summary (November 10, 1994) also cited his "extensive" history of violence, including hostage taking and kidnapping. On the same day, a psychiatrist who saw Mr. Hammer, quoted him as saying "I've taken hostages twice--an officer overnight and a psychologist once." On March 22, 1995, Mr. Hammer saw the same psychiatrist to ask for psychotropic medication, after once again informing him, "I took my cell partner hostage and I was within inches of killing him."

Mr. Hammer was transferred to Allenwood in late May 1995. Once again, the intake summary (written by Dr. Mitchell) duly noted that Mr. Hammer had "taken hostages at other institutions, including a psychologist and a celly on separate occasions" and had a history of PCP and heroin use while in prison (see Intake Screening Summary, May 23, 1995). On June 6, 1995, Dr. Karten noted, after Mr. Hammer had been placed in the SHU, that he would follow his patient "monthly in management group" and fill out the required form "indicating a mental disability." Three days later, Dr. Karten informed prison personnel that Mr. Hammer had a history of mental illness, needed special programming, mental health treatment, and placement in a single cell.

Despite all this history of violence and mental illness, Dr. Karten on June 23, 1995, in his SHU Review, estimated that Mr. Hammer's threat of violence was "LOW." But there seems to be countervailing evidence in that regard.

Dr. Mitchell saw Mr. Hammer on July 12, 1995, for counseling because Mr. Hammer disclosed that, among other concerns, he had "anger control problems." Apparently, Mr. Hammer was once again placed in the SHU in September 1995. In October, during the monthly review of his SHU placement, Mr. Hammer's risk of danger to others was once again assessed as "LOW." Yet, on November 21, 1995, Dr. Mitchell saw Mr. Hammer for individual therapy, noting that Mr. Hammer reported to him that he was "punching his shower walls," and that "he was hurt and angry over his celly." Nevertheless, Dr. Karten's monthly reviews (December 14, 1995, January 14, 1996, February 14, 1996) continued to assess his threat of violence to others as "LOW." There continued to be, however, clear indications that Mr. Hammer was having difficulty in controlling his emotions. Dr. Mitchell noted in his individual therapy session on February 20, 1996, that "Hammer . . . has been experiencing building frustrations but that he has been able to not 'blow up' by thinking about consequences and feeling 'tired' of losing control of his behavior like he has in the past." Three weeks later, Dr. Mitchell described Mr. Hammer as engaging in a

17

"tirade" during a crisis intervention session on March 8, 1996, during which he "let him blow off a lot of steam . . . ." Apparently, all this information led Dr. Karten to revise his estimate of Mr. Hammer's estimate of his threat of violence to others as "MODERATE" on March 14, 1996, just one month before Mr. Hammer admitted to killing his cellmate.[30] In fact, the last entry before that killing is on March 20, 1996, by a physician who noted that Mr. Hammer disclosed "difficulty in handling anger" and acting "impulsively." As a result, Mr. Hammer was given a prescription for a psychotropic drug. Three weeks later, with no apparent intervention since the visit on March 20th, Mr. Hammer killed his cellmate on April 13, 1996.

Thus, despite a plethora of evidence of a history of violence to others--including to prison employees and to a cellmate--, referral to psychiatrists for medication, and increasing contemporary signs of percolating anger, Mr. Hammer was consistently assessed as having a low to moderate threat of violence to another and was placed in a cell with another inmate. His threat level was never labeled as severe and he was not placed in a single cell at any time prior to the killing, despite BOP's own psychologist, Dr. Karten, making that recommendation.

The assessment of the risk of violence is not an easy task but there were persistent indications from both Mr. Hammer's history and his then current mental state, that he was in a psychological crisis. There were several separate assessments of Mr. Hammer's suicide potential, but none of his homicide risk (other than the monthly SHU's boilerplate remarks). If Drs. Mitchell and Karten, and other BOP mental health professionals, had acted more competently by evaluating more diligently Mr. Hammer's violence potential and placed him in a cell by himself, it is would have been more difficult for Mr. Hammer to kill Mr. Marti, his cellmate; it would have been impossible to do so in his cell.[31]

---

[30]There are two ways to evaluate this elevation from Low to Moderate. First, the elevation should have alerted prison personnel to take precautions to protect others, like his cellmate, from Mr. Hammer's perceived increased level of violence, which they did not do. In the alternative, Dr. Karten and others failed to evaluate the threat correctly and only evaluated the threat as Moderate when it should have been Severe. In either case, the competence of BOP mental health professionals and prison authorities is placed into question.

[31]It is curious that despite a long history of mental illness, referrals to psychiatry for medication, and a treatment plan for providing psychotherapy on a weekly or biweekly basis, that Dr. Mitchell decided on October 30, 1996, subsequent to Mr. Marti's death, that Mr. Hammer was no longer to be coded as mentally ill, but rather simply as "a severe antisocial personality disorder."

Given the analysis above, the issues of multiple relationships and competence become intertwined. The BOP's arguable failure to prevent the death of Mr. Marti evokes the potential for individual and institutional civil liability. Thus, it raises the ethical question of whether it was appropriate for any BOP mental health professionals, and particularly those who treated and assessed Mr. Hammer prior to the killing, to have been involved at all in the forensic evaluations conducted in this matter subsequent to the killing.[32]

**Applicable Principles III:  Confidentiality**

Except for the ultimate precept--above all, do no harm--there is probably no ethical value in the mental health professions that is more inculcated than confidentiality. For example, in medicine, including psychiatry, a physician is required to "safeguard patient confidences within the constraints of the law" (Section 4, p. 5).[33] More particularly, psychiatrists are taught that "confidentiality is essential" and they "may release confidential information only with the authorization of the patient or under proper legal compulsion" (Section 4(1)(2), p. 5). In the legal arena, psychiatrists "must fully describe the nature and purpose and lack of confidentiality to the examinee at the beginning of the examination" (Section 4(6), p. 5. In psychology, clinicians "have a primary obligation and take reasonable precautions to respect the confidentiality rights of those with whom they work or consult . . ." (Standard 5.02, p. 1606)[34] and if there are limits to

---

It would be interesting to discover whether there was any institutional pressure on Dr. Mitchell after the killing to alter the diagnosis of his long time patient. See prior discussion of this issue at p. 6 of this report.

[32]For example, the 2002 APA Code states at Standard 3.06 (Conflict of Interest):

> Psychologists refrain from taking on a professional role when personal, scientific, professional, legal, financial, or other interests or relationships could reasonably be expected to (1) impair their objectivity, competence, or effectiveness in performing their functions as psychologists or (2) expose the person or organization with whom the professional relationship exists to harm or exploitation (p. 1065).

This language is reflected in the 1992 APA Code (Standard 1.17), cited in the first paragraph of Applicable Principles I.

[33]Psychiatric Ethics.

[34]1992 APA Code.

confidentiality, patients must be so informed as early as feasible in the relationship (Standard 4.01, p. 1605). It is particularly important to discuss limitations regarding disclosure of information gleaned in a forensic context at the beginning of the professional relationship:

> Forensic psychologists have an obligation to be aware of the legal standards that may affect or limit the confidentiality or privilege that may attach to their services or products, and they conduct their professional activities that respects those known rights of privileges.
>
> . . .
>
> Forensic psychologists inform their patients of the limitations to the confidentiality of their services and their products . . . by providing them with an understandable statement of their rights, privileges, and the limitations of confidentiality (Section V(A),(B), p. 660.[35]

## Applying the Principles to the Facts of this Case III

The principles cited above apply to what is reported to be statements made by Lewis Dubin, described by Dr. Wolfson in his report as having MA, PhD, and DDS degrees (although his precise major profession is not identified). Dr. Dubin, according to Dr. Wolfson's report and subsequent testimony, hypnotized Mr. Hammer in the presence of Dr. Sadoff, a psychiatrist retained by the defense. The hynotic interview was videotaped. Dr. Dubin apparently did not testify. According to Dr. Wolfson, he was concerned that Dr. Dubin appeared "to be mixing forensic and therapeutic styles in his interaction with the defendant" (Wolfson Report at p. 104). When Mr. Hammer asked Dr. Dubin if what he was relating was "in confidence," Dr. Wolfson reported that Dr. Dubin responded, "Yes, sir" (Wolfson Report at p. 104). Of course, given that this was a forensic examination, such reassurance was misplaced and clearly wrong.[36]

In fact, Dr. Wolfson in his testimony for the prosecution amplified on the concerns raised in his forensic report about by Dr. Dubin's behavior. Dr. Wolfson called "disturbing" Dr. Dubin's statement to Mr. Hammer that what he said during hypnosis would be

---

[35]CEGFP.

[36]Dr. Wolfson called this reassurance "absurd" (Wolfson Report at 104). Dr. Wolfson suspected that Mr. Hammer was sophisticated enough to know that this was false, but it is not Mr. Hammer's obligation to understand the limits of confidentiality; it is the ethical obligation of the forensic examiner to communicate this information.

confidential (see Tr., June 18, 1998, at p. 129). Apparently, such false reassurance in a forensic context violated guidelines of the American Society for Clinical Hypnosis (see Tr., at p. 131). As Dr. Wolfson testified:

> And part of what should be explicitly made clear [under the guidelines] is that it's not confidential . . . . And yet, right on the tape, once I believe perhaps even twice, at least the one time, what Mr. Hammer says on the tape is, Is this confidential, or I assume this is confidential, something like that, and Dr. Dubin answers, Yes.

> And I just didn't see how he could--where something like that could could come . . . . [A]s I said, its disturbing. Tr., June 18, 1998, at pp. 131-132.

But the interaction between Drs. Wolfson and Mitchell prior to the former's writing of his forensic report is also disturbing. Dr. Wolfson had access to all of Dr. Mitchell's therapy and counseling notes he had prepared on Mr. Hammer. And, he noted that he interviewed Dr. Mitchell by telephone on December 12, 1997 (see Wolfson Report at p. 8). Although Dr. Wolfson disclosed that the information Dr. Mitchell would give about Mr. Hammer would not be confidential, Dr. Mitchell agreed to the interview. Neither professional, however, thought of asking Mr. Hammer whether he agreed to the disclosure of these progress notes. It was, after all, his interests at stake, not Dr. Mitchell's.[37]

## Conclusion

Three bedrock ethical principles that should be known to the average, competent mental health professional working in a correctional and forensic context were, in my opinion, violated in the situations under review. It should be clear to such professionals that one engages only in those services that one is competent to deliver, that preserving confidences, or informing patients of the limits of confidentiality, is essential to securing and maintaining trust in evaluation and treatment relationships, and that engaging in incompatible and potentially harmful multiple relationships are damaging to beneficial assessment and therapeutic relationships. Reliance on these fundamental principles is particularly important when the life of one's patient is at stake.

---

[37]It is noteworthy that Dr. Wolfson also called Steven Wakeford, Ph.D., Mr. Hammer's former psychologist at the Oklahoma State Penitentiary, for information about his client. When Dr. Wakfeford was informed that what he said would not be kept confidential, "Dr. Wakeford elected not to be interviewed" (Wolfson Report at p. 7).

Ultimately, it is up to a professional association's ethics committee or state licensing board to formally make a finding of unethical conduct. And, although I recognize some, though not most, of the problematic conduct by Dr. Wolfson and Mitchell, was stimulated by the court, it is the responsibility of the professionals to make known their commitment to their respective ethical codes and resist external pressures to violate them. Thus, it is my opinion, after reviewing the documents you have provided me, and based on my own knowledge of ethical principles, and applicable published ethical codes, that Drs. Wolfson, Mitchell, Karten, and Dubin all engaged in professional behavior that fell below the standard of care for practitioners engaged in correctional and forensic work because they did not adhere to their professions' ethical constraints.

Thank you for referring this case to me. Please let me know if you need any further information or require my future involvement in this interesting case.

Sincerely yours,

Donald N. Bersoff, Ph.D., J.D.

22