EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA,  : | |
|  : | Criminal No. 4:CR–96-239 |
| Respondent,  : | |
|  : | Judge Muir |
| v.  : | |
|  : | |
| DAVID PAUL HAMMER,  : | |
|  : | |
| Petitioner.  : | |
|  : | |
|  : | |

**MOTION FOR LEAVE TO FILE SUPPLEMENTAL AND THIRD AMENDED MOTION TO VACATE AND SET ASIDE CONVICTION AND SENTENCE PURSUANT TO 28 U.S.C. 2255 BY A PERSON IN FEDERAL CUSTODY AND FOR LEAVE TO FILE AMENDED PETITION IN EXCESS OF PAGE LIMIT**

# EXHIBIT "A"

# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | Criminal No. 4:CR–96-239 |
| Respondent, | : | |
| | : | Judge Muir |
| v. | : | |
| | : | |
| DAVID PAUL HAMMER, | : | |
| | : | |
| Petitioner. | : | |
| | : | |
| | : | |

## SUPPLEMENTAL AND THIRD AMENDED MOTION TO VACATE AND SET ASIDE CONVICTION AND SENTENCE PURSUANT TO 28 U.S.C. 2255 BY A PERSON IN FEDERAL CUSTODY

1.    The court which entered the judgment of conviction under attack is the United States District Court for the Middle District of Pennsylvania.

2.    Mr. Hammer was sentenced Nov. 4, 1998.

3.    He received a death sentence.

4.    Mr. Hammer was convicted of first degree murder pursuant to 18 U.S.C. §1111.

5.    Mr. Hammer initially plead not guilty. His plea was changed to "guilty" mid-trial.

6.    Mr. Hammer had a jury trial for the determination of sentence.

7.    Mr. Hammer did not testify at trial.

8.    An appeal was initiated after Mr. Hammer was sentenced. After briefs were filed, Mr. Hammer sought to withdraw his appeals and that request was granted.

9.    The appeal was originally submitted to the U.S. Court of Appeals for the Third Circuit. The Court allowed Mr. Hammer to withdraw his appeals on August 3 1,2000. U.S. v. David Paul Hammer, 226 F.3d 229 (3rd Cir. 2000), cert. den. 532 U.S. 959 (2001). A motion seeking to reinstate the appeal and withdraw the mandate was denied. Rehearing was denied. U.S. v. David Paul Hammer, 239 F.3d 302 (3rd Cir. 2001), cert. den. 122 S. Ct. 75.

10.    Hammer has previously filed petitions with respect to this judgment in federal court.

11.    Information regarding the previously filed petitions is as follows:

(a) (1) Name of court:

(A) U. S. Court of Appeals for the Third Circuit; and (B) Supreme Court of the United States.

(2) Nature of the proceeding: (A) Motion to Recall Mandate; and (B) Petition for Writ of Certiorari

(3) Grounds raised: See above.

(4) No evidentiary hearing was had

(5) Result: both motions were unsuccessful.

(6) Date of result: (A) Oct. 3 1,2000; (B) October 1,200 1.

## 12.    GROUNDS FOR RELIEF

**Ground One**: **Hammer's guilty plea was accepted in violation of the 5th, 6th, 8th and 14th Amendments to the Constitution of the United States of America, and Fed. R.Crim.Pro., Rule 11.  It was accepted without an adequate factual basis, and the factual basis provided was false and misleading; the plea was not knowingly, voluntarily and intelligently entered and was accepted without sufficient inquiry into medications.  The plea was accepted without appropriate safeguards given a variance in Hammer's diagnoses.  Hammer was functionally coerced into pleading guilty and the plea was predicated upon an unreliable competency proceeding, among other reasons and counsel was ineffective in failing to object to the court's use of conflicted mental health professionals; failing to adequately challenge the testimony of the mental health professionals selected by the Court; failing to consult with defense experts; failing to request a non-conflicted mental health evaluation; or, at the least, present the opinions of those mental health experts the defense had retained at the time of trial.**

A.    Hammer entered a plea pursuant to *North* Carolina *v.* Alford, 400 U.S. 25 (1970).

3

1.     He personally admitted only that his "hands" killed Andrew Marti.

2.     No factual basis for the mens rea elements was provided by Hammer.

3.     It is unclear on which statements (Hammer's or the Government's) the Court found a factual basis. Ground 5 and supporting facts are incorporated herein.

4.     Additional *Alford* plea requirements were not undertaken.

B.     Hammer was not advised of all consequences of his guilty plea, including:

1.     that a plea to the charge amounted to an admission of an aggravating factor.

2.      that a guilty plea abandoned conviction for a lesser included offense, including 2nd degree murder. See Beck v. Alabama, 447 U.S. 625 (1980).

C.     There was insufficient inquiry into Hammer's medications.

1.     Dr. Wolfson ("Wolfson") testified at the plea hearing that records showed no recent change to Hammer's psychiatric medications (he did not name them) but Hammer's thyroid medication (synthroid) was altered.

2.     Hammer testified that he was taking only synthroid. Synthroid affects certain persons with manic-depressive illness. BOP psychiatrists and others diagnosed Hammer with that illness.

4

3.    The Court did not inquire into the variance in testimony about medication.

4.    A defendant not taking his prescribed psychiatric medicines is the functional equivalent of a defendant who has taken nonprescription drugs prior to entry of the plea.

D.    Hammer's plea of guilty was not knowingly, intelligently or voluntarily entered because it was a product of medical, chemical and psychological mismanagement of Hammer's condition and a direct and substantial result of Hammer's mental frailties.

1.    Hammer was diagnosed with Major Depressive Disorder, Recurrent, around the time of his guilty plea.

2.    Hammer's clinically significant depression outwardly manifested itself in various forms, including via (1) swallowing razor blades; (2) overwhelming sadness and crying; (3) constant wavering on whether to plead guilty and request the death sentence or whether to contest the Government's request for death. This was also evidence of Hammer's deep sense of remorse over and trauma resulting from Andrew Marti's death.

3.    Hammer's Major Depressive Disorder was not discussed at the guilty plea hearing.

4.      Depression is part of another of Hammer's diagnoses (manic-depression or bipolar disorder).  Proper care and patient information was not provided about this illness.  Proper care and information was not provided about his thyroid medication.  Medical and psychiatric mismanagement caused, alternatively significantly contributed to, Hammer's actions (including entering a guilty plea) and Andrew Marti's death.

5.      Hammer viewed his options while handicapped by cognitive deficits. Dr. Michael Gelbort, a neuropsychologist retained by the defense at the time of Mr. Hammer's trial, concluded to a reasonable degree of psychological and neuropsychological certainty that Mr. Hammer suffers from brain dysfunction, cognitive and emotional impairments.  Dr. Gelbort concluded that Mr. Hammer's brain dysfunction is focused in the frontal lobe and the temporal lobe.  Mr. Hammer suffers from visual spatial attention deficit; sensory deficits; frontal lobe impairments including impulsivity, disinhibition and idiosyncratic and affected reasoning and judgment.  As a result, Mr. Hammer suffers from deficits in reasoning and judgment as well as impulsivity and disinhibition that rendered him incapable of making a knowing, intelligent and voluntary waiver of rights.

6.      The trial and events discussed therein, such as Hammer's turbulent upbringing and Marti's death, individually and collectively served as psychosocial

stressors and trauma triggers (in the psychological sense) rendering Hammer unable to chose a course other than one which would avoid reminders of the traumatic events, that is, avoidance by guilty plea. Proper medical, psychiatric care and counseling would have mitigated this problem. The only psychologist made available to Hammer was Dr. Mitchell ("Mitchell"). Mitchell could not meaningfully counsel Hammer because of his conflicted status.

7.     Ground 2 and supporting facts are incorporated herein.

E.     The guilty plea was accepted without implementation of required safeguards.

1.     It is generally accepted that to be knowingly, intelligently and voluntarily entered, a guilty plea entered by a non-English speaking defendant must be accompanied by use of an interpreter. [DELETED]

1.     Dr. Robert Sadoff, M.D. ("Sadoff"), a highly respected psychiatrist, opined under oath that David Hammer suffers from dissociative identity disorder (hereafter "DID"). Sadoff's qualifications and experience in forensic psychiatry, see TR 5 174-5 189, far exceed those of Wolfson, see TR 5375-5408.

2.     The most contested issue in Hammer's case was his mental state.

3.     Sadoff s DID diagnosis required the acceptance of any guilty plea to be accompanied with assistance from a licensed mental health professional

7

experienced in dealing with persons suffering from DID so that a determination as to whether the plea was knowingly, voluntarily and intelligently entered could be reliably made.

4.      DID is a complicated disorder and is often mistaken for other disorders. An experienced mental health professional is more likely to reach a reliable determination of whether DID is infecting the free will of a defendant than one reached by a lay person. Accepting a guilty plea by one who might suffer from DID requires greater care than acceptance of a guilty plea from a person who does not suffer from DID.

5.      Dr. Richard P. Kluft, M.D., an expert in Dissociative Disorders, has also diagnosed Mr. Hammer as suffering from Dissociative Identity Disorder. Dr. Kluft further concludes that "the dissociative identity disorder disrupted [Mr. Hammer's] capacity to have knowledge of his circumstances, [and] the ability to access and utilize his intelligence . . ." and his conduct during the guilty plea, post-trial and appellate proceedings was "driven by the fragmentation and compromised control associated with dissociative identity disorder." *Report of Richard P. Kluft, M.D.* at 11.

6.      Despite its centrality to the trial and Hammer's mental state, no inquiry was made into the topic of whether Sadoff had been misled by Hammer.

8

F.      Hammer was functionally coerced into foregoing the insanity defense and hence pleading guilty because of the conditions of his confinement at Springfield.

1.      Hammer decided to plead guilty amidst Wolfson's cross-examination; the defense perceived Wolfson as unqualified. At that time the defense perceived that Sadoffs conclusions would likely prevail with the jury since Wolfson's credentials and testimony seemed unimpressive to the jury.  This was Hammer's belief as well.

2.      If the jury believed Sadoff it was reasonable to assume that Hammer might be found not guilty by reason of insanity (NGRI).  If found NGRI, Hammer could be forced to return to Springfield. Hammer's previous experiences at Springfield were maddening, indeed horrific. These include: Hammer was transported to testing cites by masked persons in the middle of the night while chained to a wheel chair; he was forced to wear a stun belt which, if activated, even accidentally, can fatally electrocute the person wearing it; Hammer was subjected to having excrement thrown at him; he was kept awake by the howls of other committed persons; Hammer felt harassed by Springfield staff; he was deprived of any privacy whatsoever and was treated with unnecessary rigor.

3.      Hammer's mood was constantly agitated; he was demanding of those

9

outside the institution that he be removed; he constantly complained of the horrific conditions. He told others he never wanted to return to Springfield, indeed he indicated at one point he would rather die than return there. Hammer also wanted out of U.S.P. Allenwood and wanted a transfer to A.D.X., Florence.

4.     Wolfson said Hammer's concerns about Springfield did not factor into his decision to plead guilty.  Mitchell's recollection of the same interview was different.

> a. Any statements Hammer made to Wolfson about the impact of his Springfield experience on his decision to plead are unreliable. Hammer wanted to plead guilty; he did, against counsels' advice. An admission that the plea was to avoid an NGRI verdict was contrary to Hammer's goal to have his plea accepted.
>
> b. This, among other factors, required Wolfson and Mitchell to discuss this matter with outside sources to insure that Hammer's representations about his motivations were accurate before they were relied upon. (Wolfson previously testified that Hammer was in essence an habitual liar and a manipulative individual who would do or say about anything just to get what he wanted).
>
> c. The Court had an obligation to inquire, at least of counsel, whether avoidance of an NGRI verdict might be motivating the plea.

5.     A plea entered because of the fear of being treated inhumanely at the hands of the government if "acquitted" is an involuntary plea.

6.     Another expert retained by the defense at the time of trial, Dr. Stuart Grassian, who specializes in the psychiatric impact of long term solitary

10

confinement on an individual's cognitive abilities and rational decision-making, has concluded that, as a result of his pre-existing neurocognitive damage, Mr. Hammer is most severely affected by the psychological consequences associated with solitary confinement – the conditions in which Mr. Hammer was confined at the time of trial, post-trial, appeal and the Section 2255 proceedings. Consistent with the conditions of confinement suffered by Mr. Hammer are disorientation, intense agitation and paranoia. Dr. Grassian concluded that Mr. Hammer suffered many of these classic negative symptomology associated with the conditions of his confinement.

G.    The constellation of these events, disabilities and mental frailties, among other things, forced Hammer to plead guilty. These factors simply overbore his will.

1.    Dr. Gelbort concludes that Mr. Hammer was incapable of knowingly, intelligently and voluntarily waiving his right to stand trial, enter a plea of guilty, discharge counsel and waive his direct appeal. Dr. Gelbort further concludes that, as a result of Mr. Hammer's organic impairments, Mr. Hammer did not have the capacity to appreciate his position and make a rational choice or, at the very least, that Mr. Hammer's impairments substantially affected his capacity to appreciate his position and make a rational choice:

11

> After reviewing the records and conducting a follow-up evaluation, it is my opinion, to a reasonable degree of neuropsychological and psychological certainty that, given his substantial impairments in reasoning, judgement and impulse control, combined with his emotionality, Mr. Hammer was incapable of making a knowing, voluntary and intelligent decision as to these waivers of rights. As a result of his organic impairments, he did not connect all the factors involved in making a reasoned decision and his waivers were the product of, and substantially affected by, his psychological, emotional and cognitive impairments. At a minimum, Mr. Hammer's neuropsychological impairments have substantially affected his ability to waive his legal rights.

*Declaration of Michael M. Gelbort*, at 5.

2.      Dr. Kluft, diagnosed Mr. Hammer as suffering from Dissociative Identity Disorder, Posttraumatic Stress Disorder, Antisocial Personality Disorder, R/O Major Depression, Recurrent, Moderate By History, and Polysubstance Abuse By History, and has concluded that Mr. Hammer's plea of guilty and waiver of his right to trial, direct appeal and counsel was "driven by the fragmentation and compromised control associated with dissociative identity disorder." *Report of Richard P. Kluft, M.D.*, at 11. Dr. Kluft further concluded that, as a result of his mental illness, Mr. Hammer did not have the capacity to appreciate his position and/or make a rational choice at the relevant times (trial, post-trial, direct appeal), or, at the very least, his mental illness substantially affected Mr. Hammer's capacity to make a rational choice.

12

3.     Dr. Neil Blumberg, M.D., a forensic psychiatrist has diagnosed Mr. Hammer as suffering from Posttraumatic Stress Disorder, Chronic, Borderline Personality Disorder and Antisocial Personality Disorder. *Declaration of Neil Blumberg, M.D.*, at 7.  Dr. Blumberg also concludes that Mr. Hammer's mental illnesses and impairments rendered him incapable of appreciating his position and/or making a rational choice with respect whether or not he should abandon litigation at the time of trial, post-trial and on direct appeal and that Mr. Hammer was unable to make a rational, knowing, intelligent and voluntary decision:

> At the time of his guilty plea for the murder of Andrew Marti, it is my opinion to a reasonable degree of medical certainty that Mr. Hammer was experiencing severe emotional distress as a result of an exacerbation of his Posttraumatic Stress Disorder, Chronic, and Borderline Personality Disorder. The cumulative stress of hearing testimony concerning the severe abuse he sustained during his childhood and adolescence caused him to reexperience those traumatic experiences.  When faced with the possibility that he would be labeled mentally ill and committed to the Federal Medical Center in Springfield, Mr. Hammer was psychologically overwhelmed, leading to his impulsive decision to plead guilty and abandon his defense of Not Guilty By Reason Of Insanity.  In short, he was under extreme emotional distress at the time he pled guilty, causing his judgement to be seriously impaired.

*Id.* at 8-9.

4.     Dr. Grassian, who evaluated Hammer prior to trial, has concluded that individuals with pre-existing neurocognitive damage, such as Hammer, are most severely affected by the psychological consequences associated with solitary

13

confinement. The syndrome is associated with self-destructive behavior and overt psychotic disorganization. Individuals such as Hammer, who have a pre-existing history of mental illness, often suffer from severe exacerbation of their mental illness. Dr. Grassian concluded that Petitioner suffered many of the classic negative symptomology associated with his conditions of confinement.

H.    The Government should not have used Hammer's statements for the factual basis.

1.    As described elsewhere in this *Petition*, Hammer's statements are directly contradicted by the physical evidence. Grounds 6 ,7 and 19 and supporting facts are incorporated herein.

2.    The government knew or should have known that the statements by Hammer were false and contradicted by the physical evidence. Grounds 6,7 and 19 and supporting facts are incorporated herein.

I.    The plea was accepted in reliance on the invalid and unreliable competency proceeding which preceded it.

3.    Ground 2 and supporting facts are incorporated herein.

J.    A manifest injustice would result if claims are not reviewed on their merits.

1.    Ground III.L.and supporting facts are incorporated herein.

14

K.     Trial counsel alleged throughout the course of Petitioner's guilt phase proceeding that at the time of the offense, Petitioner was legally insane.  The factual bases for Petitioner's insanity defense included a diagnosis of Dissociative Identity Disorder (DID) and Petitioner's long documented history of profound mental illness and history of abuse.

L.     Nonetheless, when Petitioner announced his surprise intent to waive his right to stand trial and to enter a plea of guilty to the charge of first degree murder, counsel failed to move to have Petitioner evaluated for competency by an independent mental health professional, failed to consult their own mental health experts – experts who found Hammer cognitively and emotionally impaired and mentally ill – and counsel also failed to attend the competency evaluation conducted by Drs. Mitchell and Wolfson.

M     As a result, counsel did not witness the evaluation and hear first hand the questions asked of Petitioner or his responses.  Nor did they ensure that a full and fair exploration of the factors motivating Petitioner's "decision" were adequately explored during the evaluation. *See Appel v. Horn* 250 F.3d 203, 216-17 (3d Cir. 2001) ("Nor do we believe it would impose an undue burden on defense counsel to require some investigation into the defendant's competency, especially in a capital murder case where the trial court has ordered a competency

15

evaluation and hearing"); *id.* ("under the circumstances in this case, [defense] counsel should have investigated, advocated, or otherwise acted to ensure that there was 'meaningful adversarial testing'").

N.    Counsel's failure to consult with defense experts available at the time of the competency proceedings; failure to challenge the Court's use of conflicted mental health professionals; failure to challenge the opinions and testimony of the Court's mental health professionals; failure to request an un-conflicted mental health professional to conduct the evaluation; failure to request that the defense trial experts participate in the competency evaluation; and, counsel's failure to preserve and litigate the above issues constitutes prejudicially deficient performance in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.

**Ground Two: The proceedings used to determine Hammer's competence to plead guilty, waive counsel and appeals were conducted in violation of the 5th (substantive and procedural due process and fundamental fairness), 6th, 8th and 14th (equal protection) Amendments, 18 U.S.C. s2241 et. seq. The proceedings were both procedurally and substantively flawed in numerous respects, including:  the expert's determination was a forgone conclusion given the particular expert selected to determine competency; the expert(s) were conflicted; the results reached were unreliable and incorrect; the proceeding was erroneously expedited and its adverse affect on the penalty phase amounted to judicial comment on the central disputed issue.  The conduct of the competency proceedings directly impacted each of Hammer's waivers, his constitutional rights and the penalty verdict. Dr. Wolfson, at all times, had a direct and substantial conflict of interest and his testimony at all proceedings (trial and competency) deprived Hammer of a fair trial.**

*Supporting Facts*

A.    Wolfson examined Hammer at the Government's request.

B.    Wolfson is an employee of the BOP and an agent of the Government. Andrew Marti's death occurred in the BOP. BOP was improperly treating and housing Hammer at the time that Andrew Marti died.

C.    The Government had the authority to use the services of a psychiatrist or psychologist not employed by the BOP but did not do so here.

D.    When a request for evaluation comes into the U.S. Medical Center at Springfield, a somewhat random assignment is made. That procedure was not followed here.

1.    Wolfson was not the person originally assigned to evaluate Hammer on the US. Attorney's motion.

2.    Upon learning that a psychologist was assigned to evaluate Hammer, the US. Attorney's Office used its influence and/or authority over the BOP to alter the course of the "random" assignment.

3.    The U.S. Attorney's Office succeeded in its efforts to have the previously assigned psychologist removed from Hammer's case.

4.    The U.S. Attorney's Office had the psychologist replaced with a psychiatrist as a trial tactic and/or strategy - it insisted on a psychiatrist because of

17

a concern related to the trial of this matter - specifically that the expert it called would have less education than the defense expert.

5.    If not before, Wolfson became the US. Attorney's agent when the random assignment practice was altered at the U.S. Attorney's insistence.

6.    Wolfson got Hammer's BOP records without going through the court or parties; a defense expert could not have done this.

F.    Wolfson testified at trial as a Government's witness.

G.    Wolfson's primary function was to explore, and if possible debunk, the DID diagnosis reached by Sadoff - a disorder which Wolfson did not believe existed.

H.    Had Wolfson diagnosed Hammer with a troubling mental disorder previously overlooked by BOP mental health staff, he would have subjected his employer to liability.

I.    Wolfson was not detached, neutral or conflict free.

J.    After his testimony for the Government, Wolfson was appointed by the Court to serve as a Court's expert to evaluate Hammer's competency to plead guilty (and later to waive counsel and appeals).

K.    Wolfson was appointed as a Court's expert after he testified for the Government that Hammer was faking mental illness. Because Wolfson had already

18

determined that Hammer had no disorder, his appointment as a Court's expert for competency purposes dictated the result of that proceeding. A doctor who found Hammer was "just fine" and who served as a Government witness was more likely to find Hammer competent than a doctor who found Hammer suffered from a mental illness or a doctor with no pre-existing opinion. A central issue at trial was whether Hammer suffered from a mental disorder. The Court appointed the expert known to have concluded Hammer was simply malingering.

L    Wolfson's conflict in serving as a Court's witness for the competency evaluation had adverse effects on the quality and quantity of information he provided. The conflict is reflected in numerous acts and omissions (in both his competency and criminal responsibility evaluations), including: ignoring and/or downplaying the role the BOP played in mismanaging Hammer's medical and psychiatric symptoms and disorders, ignoring the significance of Hammer's thyroid medication, assessing the existence of and significance of Hammer's manic-depressive illness, factoring in the role of depression and other diagnoses in the responses received.

M.    Mitchell, another BOP employee, accompanied Dr. Wolfson during the evaluations to determine competency to plead guilty, waive counsel and appeals determinations

1.      Mitchell, a psychologist, had never conducted a competency evaluation and was unfamiliar with the legal standards governing the analysis.

2.      Mitchell received an award and monetary compensation from the BOP for his participation in the proceedings which resulted in Hammer's death sentence.

3.      Had Mitchell, in his competency assessment, determined Hammer suffered from a mental illness sufficient to render Hammer incompetent to plead guilty, waive counsel or his appeal, Mitchell would have subjected his employer to potential liability and may have exposed himself personally to professional and legal scrutiny.

4.      Mitchell had previously counseled Andrew Marti and had a counseling session with him as recently as 6 weeks prior to Marti's death.

5.      While serving as a Court's expert, Mitchell was having ongoing counseling sessions with Hammer at Allenwood. The Government expressed concerns that this might be a conflict.

6.      Mitchell was the only mental health professional allowed to counsel Hammer in a private setting at Allenwood after Hammer was sentenced to death.

7.      Mitchell was not, neutral, detached or conflict-free.

N.      Numerous factors, including those listed above, created the risk that

20

these conflicts affected the motivations, performance, opinions and tasks of the Court's witnesses and thus ran afoul of basic notions of fairness required by law.

O.    Mitchell and Wolfson testified at the final competency hearing on October 1, 1998.  On August 3,1998 the Government asserted Mitchell was too inexperienced to evaluate Hammer and raised concerns about Mitchell's ongoing counseling sessions.

P.    The testimony of Mitchell and Wolfson at the 10/11/98 hearing reflect the same conflicts which existed previously and their conclusions are unreliable.

Q.    The conflicted and unreliable testimony of Wolfson is based upon incomplete questioning or knowledge, lack of awareness of salient medical and psychiatric facts regarding and affecting Hammer's mental state, and/or the unavailability of material evidence. Ground 7 and supporting facts are incorporated herein.

R.    The actual, potential and probable adverse affects of the conflicts create a risk that the proceedings cannot be relied upon to have produced a reliable result.

S.    Dr. Donald Bersoff, a mental health ethicist with a degree in law and a Ph.D. in Psychology has reviewed the relevant records and documents in this

21

case surrounding the conflict of interest issue with respect to BOP mental health employees and concluded that there exist a number of conflicts arising out of the use of the BOP mental health professionals by the prosecution and as "court" witnesses during the competency proceedings.   Those conflicts include:

1.    Dr. John Mitchell was Mr. Hammer's long-term treating therapist while he was in B.O.P. custody.  He served in a number of conflicting roles.

2.    Dr. Mitchell evaluated Mr. Hammer for competency to plead guilty and, later, to waive his appellate rights, and testified to the same at two separate court proceedings.

3.    Dr. Mitchell assessed and noted Mr. Hammer's mental state as it related to the offense for which he was being tried (i.e., he assessed and then noted his opinion that Mr. Hammer could distinguish between "right and wrong").

4.    Dr. Mitchell's progress notes of his therapy sessions – conducted both before and after Marti's death – were shared with other B.O.P. evaluators (including Dr. Wolfson) who assessed Petitioner for competency to waive rights, plead guilty and for criminal responsibility.

5.    Petitioner expressed concern to Dr. Mitchell that he would testify against Petitioner in a negative way.  Dr. Mitchell's response was that he would only testify to what he "observed and heard."   At that time Dr. Mitchell did not

22

warn Petitioner that his diagnostic impressions and opinions would be shared with other evaluators and that, in fact, Dr. Mitchell would himself testify to more than observation, but would provide his professional opinions as to Petitioner' mental health.

6.     Dr. Mitchell was aware of the possibility that he would be called upon to provide an opinion regarding Petitioner's competency to proceed, to enter waivers of rights, and of Petitioner's criminal responsibility.  At one point, he even discussed this possibility with the prosecutor.  Nonetheless, he failed to advise Petitioner of this possibility and instead affirmatively mislead Petitioner to conclude that he would only be a fact witness.

7.     During therapy sessions, Dr. Mitchell repeatedly discussed with Petitioner his relationship with his attorneys and his desire to waive his appellate rights.

8.     Dr. Stephen Karten also served in multiple and conflicting roles.  He was also Petitioner's B.O.P. therapist, and evaluated him on a number of occasions related to his placement in the Special Housing Unit, for suicide risk and for future dangerousness.

9.     Dr. Karten's progress notes were shared with Dr. Wolfson for use in his assessment of competency and criminal responsibility.

23

10.    Dr. Karten also served as an expert prosecution witness who offered opinions regarding criminal responsibility.

11.    Dr. James K. Wolfson also served in multiple and conflicting roles. He was primarily responsible for assessing Petitioner's criminal responsibility, competency to plead guilty and competency to waive his appeal. These roles conflicted with his role as primary treating physician for Petitioner during his lengthy stays at MCFP at Springfield, Missouri.

12.    His role as non-partisan expert conflicted with his role as prosecution expert on the question of criminal responsibility. Similarly, his role as prosecution expert on criminal responsibility conflicted with his role as court expert on the question of competency to plead guilty and waive appellate proceedings.

13.    Drs. Mitchell, Karten and Wolfson each provided expert testimony outside of their areas of expertise. Dr. Mitchell testified as to Petitioner's competency to plead guilty and waive appellate rights, when he had no formal training or prior experience with these concepts. Dr. Wolfson and Dr. Karten each offered testimony on the question of Mr. Hammer's criminal responsibility, which was based in large part upon their opinions regarding the disease of Dissociative Identity Disorder. Neither had anything approaching the level of clinical expertise or training necessary to determine the presence or absence of this illusive illness.

24

14.     Dr. Mitchell and Dr. Karten each assessed Mr. Hammer's likely danger to others on a number of occasions prior to the Marti killing.  Most of these assessments placed his risk at "low" although some put it at "moderate."  None noted that his risk was "high."  This incompetent failure to properly assess Mr. Hammer's risk to other prisoners or staff (and particularly his cell mate), constituted an ethical breach of the duty of competence.  Moreover, this ethical breach was compounded when these same evaluators, and Dr. Wolfson, all of whom were B.O.P. personnel, were called upon to render opinions in a case in which a prisoner killing occurred in a B.O.P. facility.

15.     The ethical violations related to the evaluators' professional competence and multiple roles are intertwined.  This is because the failure of B.O.P. personnel to competently assess Petitioner's risk of danger arguable left the B.O.P., its agents, and employees, subject to civil law liability.  Therefore, it was in their respective interests, and in the interest of the B.O.P., to find that Petitioner did not suffer from mental health impairments.  Such a finding would place sole blame for the killing on Petitioner and would absolve the B.O.P. mental health professionals from any liability.

T.     As a result of the above-described conflicts, Hammer is entitled to relief for a number of reasons.

1.    The assumption by all of the B.O.P. mental health providers of multiple and ethically conflicting roles violated Petitioner's rights to due process of law secured by the Fifth Amendment.

2.    The assumption by and performance by B.O.P. mental health providers of multiple and ethically conflicting roles violated Petitioner's rights to due process of law secured by the Fifth Amendment, and renders the Court's competency determinations invalid.

3.    These same ethical conflicts rendered Petitioner's guilty plea unknowing, unintelligent and involuntary in violation of the Fifth, Sixth and Eighth Amendments.

4.    B.O.P. personnels' failures to warn Petitioner that what he said during his ongoing therapy sessions would be used against him; that therapists' observations and diagnostic opinions would also be used against him; and the act of the therapist(s) to affirmatively mislead Petitioner to believe that these statements, observations and diagnoses would not be used against him, violated his right to counsel secured by the Sixth Amendment; his right to remain silent and not be a witness against himself and the right to due process, each secured by the Fifth Amendment.

5.    The discussion by Petitioner's B.O.P.-employed therapists of

Petitioner's relationship with his attorneys and whether he should waive rights (including his "decision" to plead guilty and to forego appellate review and agree to be executed), violated his right to due process of law secured by the Fifth Amendment, his right to counsel secured by the Sixth Amendment, and of his right to be free of cruel and unusual punishment secured by the Eighth Amendment, and constituted a Government invasion of the defense camp also in violation of the Fifth Amendment;

6.    The testimony by Mitchell, Karten and Wolfson was far outside their respective areas of expertise and professional competence, and therefore was ethically inappropriate. The use of such ethically-challenged testimony invalidates both the competency portion of the proceedings, as well as entry of the guilty plea (which was induced in part by Wolfson's opinion that Petitioner was not mentally ill, but was a malingerer).

7.    The multiple evaluations of Petitioner for competency and criminal responsibility violated Petitioner's right to due process of law and to be free of cruel and unusual punishments inasmuch as all B.O.P. personnel were ethically prevented from assessing these factors because of the conflict of interest presented by the fact that the killing occurred in a B.O.P. facility; where these same evaluators had previously failed to accurately assess Petitioner's risk of danger to

27

others (which constituted a proximate cause of Mr. Marti's death), and where consequently the B.O.P., its agents and employees were subject to civil liability for this failure.

U.    The push for a quick evaluation & competency hearing interfered with the adequacy and reliability of the results and conclusions.

V.    Wolfson testified for the Government at the guilt phase before he testified as a Court's expert at the guilty plea competency hearing. After Wolfson testified as a Court's expert at the competency proceeding concerning the guilty plea, he took the stand as the Government's witness in the penalty phase. After Wolfson took the stand as a Government's witness at the penalty phase, Wolfson took the stand as a Court's witness at the 1998 competency proceedings.

W.    The jury was made aware that: Hammer pled guilty as charged; Wolfson testified at that hearing about Hammer's mental state; and the Court heard evidence and accepted the plea. These events had the effect of communicating to the jury that: (1) the Court accepted the opinions espoused by Wolfson on Hammer's mental state; and (2) the Court rejected the opinions of Sadoff as to Hammer's mental state. This amounted to the appearance of judicial comment on the evidence. Wolfson should not have been the Court's competency expert.

28

X.     Hammer's cognitive dysfunction was not explored when determining his competency.  <u>Ground One and supporting facts are incorporated herein.</u>

Y.     On 10/1/98 defense counsel asked the Court to take judicial notice of Sadoff s testimony. The Court indicated it would not consider and did not recall the details of the previously submitted DID evidence but that counsel could highlight the relevant portions at argument. No argument was had because counsel was functionally discharged.

Z.     The wrong competency standard was used in determining whether Hammer was competent to waive his appeals. Ground 3 and supporting facts are incorporated herein.

AA.   Hammer's competence was never reliably tested. His substantive and procedural due process rights to plead only if competent and to have a fair and reliable proceeding to determine his competency were violated.

BB.   Defense counsel objected to Wolfson serving as a Court's expert.

CC.   This error is plain and manifest justice requires review. Ground III.L. is incorporated herein.

DD.   <u>Counsel's failures to investigate, develop and present the claims arising from the conflicts, and the unreliable and improper competency proceedings and findings was constitutionally ineffective.</u>

29

 Ground Twenty and supporting facts are incorporated herein.

**Ground Three: The dismissal of Hammer's Appeal was Arbitrary; Without additional procedures, appellate waiver should not have been permitted after an *Alford* plea; Hammer's waiver of appeal was not knowingly, voluntarily and intelligently entered and was based on unreliable competency evaluations; Hammer was deprived of counsel at various competency proceedings held on appeal; Hammer independently and separately claims that disposition of his direct appeal issues would result in vacation of his conviction and sentence; the above was permitted in violation of the 5th, 6th, 8th and 14th Amendments to the Constitution, 18 U.S.C. 83591 and contemporary standards for reliability and decency. A manifest injustice would result if review of all issues is not had.**

*Supporting Facts*:

A.    Whether Hammer wanted to waive his appeals depended on the day he was asked.

1.    The random date that the oral argument was scheduled in the U.S. Court of Appeals for the Third Circuit determined whether Hammer waived his appeals.

2.    At the October 1, 1998 hearing, AUSA Martin informed Hammer that he could change his mind about waiving counsel at any time.

3.    Hammer changed his mind - he wanted a lawyer and to appeal - but he did so on the wrong (arbitrary) day.

4.    This procedure resulted in the arbitrary dismissal of Hammer's direct appeal.

30

B.     Acceptance of each of Hammer's waivers was based in part on each of the tainted competency proceedings.

1.     <u>Grounds 2, 4, 6, 10 and 13 and supporting facts are incorporated herein.</u>

C.     The wrong standard was used by the District Court and the US. Court of Appeals for the Third Circuit when determining whether Hammer was competent to forgo appellate rights.

1.     The correct standard is more exacting than the competence to stand trial or plead guilty standard employed in prior proceedings.

2.     The correct standard has various elements including: assuming a person's disorder does not prevent him from understanding his legal position and the options available to him, does that disorder prevent him from making a rational choice among the options which are available to him?

3.     This inquiry requires that the choices made be unencumbered by mental frailties. The rational choice requirement demands something more than a decision grounded in logic or one that is logical.  Application of this standard to Hammer's appellate waiver shows that he did not meet this test.

4.     Within the 48 months preceding this waiver Hammer was exhibiting the symptoms of, receiving medication for, or had been diagnosed with one or

more of the following: bipolar disorder (manic-depressive illness), post traumatic stress disorder, SHU (special housing unit) Syndrome, DID, Major Depression, seasonal depression, various personality disorders, suicidal ideation and cognitive frailties.

5.    These illnesses were exacerbated by medical conditions, including diabetes and hypothyroidism and by various psycho-social stressors within the meaning of the Diagnostic and Statistical Manual (currently DSM-IV). Hammer was indeed on medication at the time of his appearance before the Third Circuit.

6.    Smart and articulate people can be mentally ill. That Hammer appeared smart and articulate does not mean that his waiver satisfies the test outlined above.  As Dr. Gelbort explains:

> That Mr. Hammer was articulate during the guilty plea colloquy and the appellate argument does not diminish my opinion that his decision-making was significantly impaired and that his decisions to waive his rights were driven by his cognitive, emotional and psychological deficits as opposed to a reasoned determination of the salient factors and consequences. As I explained during my trial testimony, Mr. Hammer's intellect does not preclude a conclusion that he suffers from brain dysfunction, episodic emotional disorganization and personality impairments. These impairments affect his ability to adequately comprehend a given situation, to reflect and reason before making decisions and to fully recognize the consequences of those decisions. In short, while he may be articulate, he remains impaired and those impairments directly affected his ability to make a rational decision.

*Declaration of Dr. Gelbort* at ¶ 16.

32

7.    That Hammer at one time decided to continue his appeals because a notice was inadvertently filed is but one example of the irrationality of the decision-making at work.

8.    The mental health professionals evaluating Hammer's competency also used the wrong standard.

D.    The panel presiding over the waiver argument misapprehended Hammer's comments.

1.    Judge Greenberg stated: "This man came in here and told us he murdered this man and he wanted to be executed." Hammer did not state that he committed first degree murder (premeditation and malice aforethought). Ground 1 and supporting facts are incorporated herein.

E.    A condemned person's waiver of appeal accompanied by a denial of an element of the offense requires, much as an *Alford* plea requires, that the Court be satisfied of the defendant's guilt beyond all doubt.

1.    Grounds 4,6 and 7 plus supporting facts are incorporated herein.

F.    Hammer's decision to waive his appeals was not intentionally, knowingly and voluntarily made.

1.    Like his decision to enter a guilty plea, Mr. Hammer's decision to waive appellate rights was the product of, or at the least substantially affected by,

33

<u>his mental, emotional and cognitive disabilities and the conditions of his</u>

<u>confinement.  Grounds 1,2,4,6,10 and 13 plus supporting facts are incorporated</u>

<u>herein.</u>

G.    Hammer was given inadequate and incorrect advice during the appellate argument:

1.    He was told the most favorable direct appeal remedy was imposition of a sentence of life without the possibility of parole (LWOP) or a new penalty phase (at which a jury would pick either death or LWOP). This is not so.

2.    Several issues, including a challenge to the factual basis for the guilty plea, would have resulted in a new trial.

3.    Given Hammer's contradictory statements regarding this topic (of no chance for success on appeal and that "success" at best meant LWOP), the failure to provide Hammer with correct information makes the waiver invalid. Hammer was personally unaware of the accurate options available to him at the time of the appellate argument.

4.    Without the possibility of a new trial, other options to be considered, such as an acquittal or conviction of a lesser included offense, would be unavailable to Hammer.

H.    To the extent that the proceeding in the US. Court of Appeals for the

34

Third Circuit was also a hearing to determine Hammer's competency to waive appeal and/or his competency to be executed (some questions asked suggest both), then Hammer had no notice of and no lawyer to represent him on these matters and these rights could not be waived until it was determined that Hammer was indeed competent. Hammer contends that the Constitution does not permit counsel to be waived at competency determinations (be that competency to waive appeals or be executed). The Government requested that Hammer undergo a competency evaluation prior to argument; Hammer was not sent for another evaluation.

1.    As described elsewhere in this *Petition*, application of the proper standard for competency to waive appeal rights, Mr. Hammer was not competent and his decision to waive was the product of, or at the least substantially affected by, his mental, emotional and cognitive disabilities and the conditions of his confinement. Grounds 1,2,4,6,10 and 13 plus supporting facts are incorporated herein.

I.    In isolation or combined, these factors show Hammer's waivers, and his inability to retract them, were encumbered by a constellation of factors rendering them involuntary and their enforcement fundamentally unfair & arbitrary.

J.    Hammer asserts he need not show prejudice from acceptance of

invalid waivers.

K.    Hammer alternatively claims that if same is required, Hammer would have been successful on one or more of the following claims presented (this list is taken directly from the table of contents to the Brief of Appellant tendered on direct appeal):

(1) The trial judge fatally confused and mislead the jury on what would occur if it did not reach unanimous agreement;

(2) The trial court's final instruction that the jury could return a sentence of death if "sufficiently persuaded" that death was the appropriate verdict was error that was compounded by the trial court's contradictory instructions during the orientation and just prior to the commencement of the penalty phase;

(3) The jury's failure to find, consider and weigh undisputed or conceded mitigating factors is a circumstance that renders Hammer's sentence arbitrary;

(4) The sentence of death must be vacated since the government relied upon numerous instances of unadjudicated criminal conduct to convince the jury to sentence Mr. Hammer to death;

(5) The trial court lacked authority to "leap frog" its death sentence over the state sentences appellant was serving at the time of his conviction and sentence of death;

(6) The trial court erroneously denied numerous defense challenges for cause;

(7) The trial court should have granted the defense motion for a mistrial when the victim's father broke down in tears on the witness stand;

(8) A federal death-penalty jury should not be allowed to consider non-statutory aggravating factors;

(9) The Government's duplicative use of statutory and non-statutory factors derived from the Upton shooting in 1983 renders the sentence of death invalid;

(10) The trial court should have granted the pretrial motion to dismiss the statutory aggravating factor that the murder was committed in a manner that was especially heinous, cruel or depraved;

(11) The trial court should have granted appellant's mistrial motion based on the trial judge's sua sponte interruption of, and plainly visible anger with, the opening moments of defense counsel's penalty phase summation;

(12) Hammer's sentence of death was imposed in violation of the grand jury clause of the 5th Amendment ... since the indictment did not allege the elements of a capital offense;

(13) The court should have granted a new trial since "purchased" testimony was presented in violation of the anti-gratuity statute, 18 U.S.C. 9201(c);

(14) The court erred in failing to hold a factual hearing on the assertion that Hammer was arbitrarily and capriciously selected for capital prosecution;

(15) Hammer's conviction and sentence must be set aside because the factual basis set forth during the guilty plea colloquy was inadequate to support a plea of guilty...;

(16) The matter should be remanded to the trial court for a factual hearing on a breach of confidential information by the United States Marshals Service, Regarding the names and locations of defense witnesses;

(17) The death penalty constitutes cruel and unusual punishment, and

therefore, Mr. Hammer's sentence of death must be set aside.

Once his direct appeal is restored, Hammer will likely also raise other meritorious issues, including issues and subissues included within this petition.

L.    Hammer separately and independently claims each issue should be reviewed on the merits. Whether competent or not when he waived his appeals, a manifest injustice would result within the meaning of US. v. Khattak, 273 F.3d 557 (3d Cir. 2001) if no review is had.

1.    He also asserts that the issues included in the abandoned direct appeal brief present plain errors and that there exists cause and prejudice for their previous exclusion from the direct appeal process.

2.    He also asserts that independent of whether the error would constitute plain error that cause and prejudice exist justifying review now. The "cause" includes but is not limited to: Hammer's medical and psychiatric mismanagement by the BOP throughout the proceedings; his incompetence to waive counsel and his appeals when the proper standard is applied; his various mental illnesses and the untreated psychological trauma which came to bear on Hammer during the proceedings; and the Government's interference of Hammer's decisions through suppression of evidence and presentation of false or misleading evidence.

3.    The prejudice includes but is not limited to the meritorious issues

38

presented in this petition and the brief tendered on direct review.

4.      Hammer also asserts that a manifest injustice of a different kind would occur if his claims are not reviewed on the merits. He asserts a fundamental miscarriage of justice will result if his claims are not reviewed on the merits because it is more likely than not that no reasonable juror would have convicted Hammer in light of the evidence that he falsely confessed.

5.      <u>Hammer further asserts that, to the extent that the appellate brief failed to properly raise and litigate meritorious claims and to the extent that there existed additional meritorious bases for those issues raised in the appellate brief requiring relief, he was deprived of his right to effective assistance of counsel in violation of the 5th, 6th, 8th and 14 Amendments.</u>

6.      <u>Grounds 6, 7 and 18 plus supporting facts are incorporated herein</u>.

**Ground Four: Evolving standards of decency, fundamental fairness and the 5th and 8th Amendments require that Hammer's plea be vacated, alternatively that he be permitted to have a direct appeal.**

*Supporting Facts*:

A.      Given the finality of capital sentences and the Government's functional and physical participation in causing the death of a condemned person, contemporary standards of decency and ever-growing knowledge that the system can and does condemn people to death who are innocent or not guilty, requires

that additional procedures and precautions be taken. It is also accepted that people confess to offenses they did not commit.

B.    Before a condemned person may waive a capital appeal and "agree" to be killed, the appellate court should satisfy itself -- by independent investigation and through use of a higher standard for waiver than those previously announced - that the person is guilty beyond doubt.

C.    Application of this standard to Hammer's case would require Hammer's waivers to be refused on at least two theories.  Ground 6 and supporting facts is incorporated herein.

D.    Hammer entered an *Alford* plea (Ground 1 and supporting facts are incorporated herein) and such pleas are not reliable enough to be used in capital cases where the conviction upon plea substantially amounts to proof of eligibility and an aggravating factor.  The constitution demands that waiver of appellate review may never be accompanied by an *Alford* plea.

E.    A condemned person cannot waive direct appeal. The previous decision in this case to the contrary should be reconsidered.

F.     Review of this claim entitles Hammer to a vacation of his plea, alternatively a new appeal.

Grounds 1, 2, 3, 6, 7, 10 and 13 are incorporated herein.

**Ground Five: The Court's failure to personally advise Hammer that it would grant a motion to withdraw the guilty plea during the penalty phase violated Fed.R.Crim.Proc. 11 & 32, due process, the right to be present and to have the guiding hand of counsel to assist in such decisions.**

*Supporting Facts*:

A.      During opening statement at the penalty phase, the defense argued that although Hammer "pled guilty" to first degree murder and the court accepted that plea, the guilty plea did not amount to an "admission" of the *mens rea* element of first degree murder. Counsel argued:

"[iln pleading guilty to this offense Mr. Hammer used words that you've heard before ... these hands took the life of Andrew Marti." [TR. 59421

B.      Immediately after the above statement was made the Court *sua sponte* ordered the parties to the bench. A discussion took place "between the Court and counsel." [TR. 59421. The Court indicated it had no recollection of such a statement, suggesting it had no recollection of Mr. Hammer's failure to admit the intent element. The Court indicated "Now, this man pled guilty, and if you want me to revoke his plea I'll do it." [TR. 59421. The record reflects that this was not communicated to Hammer.

C.      Hammer's plea must be set aside. Ground III.L. is incorporated herein

**Ground Six: The Government or its agents knew or should have known that Hammer's statement was materially false and unreliable, yet it presented it**

41

**the jury and judge (at the guilty plea) without correcting the false or misleading impression. Had the Government corrected the false or misleading impressions it left there exists a reasonable probability that the decision of the jury could have been affected, that Hammer's decision to plead guilty could have been affected, that the Court's decision to accept the plea could have been different, and that the decision of the Third Circuit to permit an appellate waiver could have been different. Similarly, the Government (and/or agents) concealed favorable evidence from the defense, namely the physical facts which prove that Hammer's statements are unreliable, if not false, such that there exists a reasonable probability that all of the above named proceedings would have been different. All of the above violates the 5th, 6th, 8th and 14th Amendments.**

*Supporting Facts*:

A.    The Government (or its agents) knew or should have known that its evidence and argument was false and/or misleading such that the Government was under a duty to correct it.

B.    To the extent the Government had no actual knowledge of the falsity of the evidence, it should and would have known Hammer's statements and evidence surrounding those statements were false if a thorough and unbiased investigation would have been undertaken.

C.    The Government-sponsored false/misleading evidence includes but is not limited to Hammer's statement that: (1) Andrew Marti was killed after approximately 2: 15 a.m. on the morning of 4/13/96; (2) Hammer strangled Marti while putting pressure on his back; (3) Marti was killed while tied face down in

42

the bed in which his body was found; (4) Marti died as a result of strangulation while he was tied face down in the bed; (5) Hammer killed Andrew Marti while he was tied face down in the bed in furtherance of the "hostage" ruse; (6) Marti died in the position his body was found; and (7) Andrew Marti died in the manner Hammer described.

1.    Evidence used to support the factual basis by the Government at the guilty plea hearing as to premeditation and malice was misleading, if not blatantly false.

2.    Statements and testimony by inmate witnesses regarding purported admissions by Hammer to those inmate witnesses were contradicted by statements Hammer purportedly made to other inmates. Hammer avers that the government possessed these statements prior to trial and failed to provide those statements to the defense and, while the defense received one statement (from former inmate Hauser) providing the contradictory version of events, the government still possesses such statements from other inmate witnesses and has failed to provide those statements to the defense, despite its constitutional continuing duty to disclose those statements.

3.    The Government used these statements before legal proceedings were initiated and throughout them in asserting that Hammer was guilty of first degree

43

murder and deserved to be executed.

4.    Unreliability of the statement including the pressured speech when initially giving it also gives rise to claims supporting suppressing the statements.

5.    Testimony by government witnesses relied upon by the government in its statement of facts supporting the guilty plea included misinformation and material misstatements regarding the physical evidence; regarding the existence of physical evidence supporting death as a result of something other than intentional murder; and, regarding the potential for testing such physical evidence in determining the existence of support for a defense that the death occurred by something other than intentional murder. Ground Seven and supporting facts are incorporated herein.

6.    The government knew or should have known that Hammer's prior confessions to murders that he did not commit rendered his statements in this case unreliable. Ground Nineteen and supporting facts are incorporated herein.

7.    Counsel's failure to investigate and develop evidence of statements of other inmates contradicting testimony presented by the government and statements Hammer made to authorities in this case; counsel's failure to investigate, develop and present evidence of Hammer's prior false confessions to murders that he did not commit and the related mental health evidence surrounding his propensity to

44

<u>falsely confess constitutes ineffective assistance of counsel and denied Hammer of his 5th, 6th, 8th and 14th Amendment rights. Ground 19 and supporting facts are incorporated herein.</u>

B.    Accurate facts conflict dramatically with Hammer's false statements. There exists a reasonable possibility that correction of the false and/or misleading impressions could have affected numerous decision-makers and decisions during all proceedings.

1.    The decision-makers impacted include: Hammer; the Court; defense counsel; the jury; members or the Third Circuit; the committee which might authorize dismissal of the death penalty or the charges; and mental health professionals.

2.    The decisions impacted include: the decision to continue Hammer's prosecution and/or pursue his death sentence; decisions regarding Hammer's mental state and all proceedings relevant thereto, such as suppression of statements, competency, possible defenses and what if any criminal act Hammer actually engaged in; whether Hammer would be permitted to and/or desired to plead guilty and/or put up certain mitigating evidence; and what psychiatric treatment and medications Hammer should receive given the events of the morning of 4/1 3/96 (impacting his mental status).

3.    The import of correcting these false and misleading impressions is

significant.

a. Correction of them would have manifested itself in several ways, including, most principally: the statement's blatant inclusion of materially false facts is entirely consistent with a DID black out (and shows that Hammer, while trying desperately to incriminate himself, was singularly unable to recall accurate facts); and

b. are entirely consistent with a false confession to first degree murder to cover up evidence of an accidental killing during a sexual encounter (with the motive to incriminate being both remorse and the fear of reprisal in prison if the encounter was learned by other inmates).

C.    Hammer is entitled to a new trial. Ground Seven and supporting facts

are incorporated herein.

**Ground Seven: The Government presented and failed to correct important evidence which it or its agents knew or should have known was false or misleading such that there exists a reasonable possibility that the result of all proceedings (including Hammer's expressed desire to plead guilty) could have been different. Hammer independently asserts that the Government: suppressed documentary evidence, suppressed physical evidence and/or destroyed readily apparent material evidence or potentially useful evidence, all in contravention of the 5th, 6th, 8th and 14th Amendments. Alternatively, newly discovered evidence requires a new trial.**

*Supporting Facts*:

A.    The Government failed to disclose a BOP document indicating that

Hammer had been diagnosed with bipolar disorder and if unmedicated would

likely engage in "irrational *behavior"* (emphasis added). The document is dated

46

4/10/96. That BOP recognized Hammer's behavior could be irrational if unrnedicated is relevant both to his primary trial and penalty phase defense as well as his unmedicated status at various points in the competency proceedings.

Disclosure of the document would have raised significant questions and spawned further defense inquiry into the BOP'S conduct and its investigation into David Hammer's alleged culpability and Andrew Marti's death. Further inquiry would have produced substantial and serious questions. Grounds 2 and 6 and their supporting facts are incorporated herein. The diagnosis itself required that Wolfson's testimony be corrected because it was false and/or misleading regarding Hammer's diagnoses while incarcerated. Wolfson's misleading and/or false testimony was supplemented by other witnesses who testified about Hammer's mental health issues while incarcerated suggesting that Hammer had not received a diagnosis of the disorder in question. Had the false/misleading testimony been corrected, there exists a reasonable possibility that the result of each proceeding could have been different.

The Government also suppressed BOP documents from May 1998 showing that Hammer had refused various medications which would raise serious questions about his competency, especially in light of the bipolar diagnoses referenced above. The refusal of these medications occurred around the time Hammer

47

swallowed razor blades.

B.     The physical evidence was not consistent with Hammer's statements to authorities or the Government's version of events at the time of trial. The physical evidence supported a defense that the death occurred as a result of erotic asphyxiation as opposed to intentional capital murder. Counsel, however, did not retain a forensic expert; request that a forensic expert conduct testing or otherwise investigate the physical evidence in order to make an informed decision regarding the viability of the defense that the death was not intentional. Counsel's failure to investigate the viable defense constituted prejudicially deficient performance and rendered Mr. Hammer's plea involuntary in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.

C.     Undersigned counsel have retained a forensic expert who has reviewed the physical evidence and discovered that the forensic testimony presented by the Government was false, or at the least, misleading and contrary to the Government's theory regarding the circumstances leading up to Mr. Marti's death.

D.     FBI Agent Callaghan testified that he was not provided with any DNA samples removed from Andrew Marti's mouth. The pathologist testified she took oral swabs.

48

E.    Upon questioning by the Government, Callaghan suggested that tests run on samples removed from oral cavities would have been meaningless since Callaghan would not have had any other DNA samples to compare against the oral samples (i.e., leaving the grossly misleading suggestion that Hammer would not have provided samples or that the Government could not have compelled him to do so).  Callaghan also suggested that testing oral swabs would be somewhat generally meaningless even if they were provided to him.

F.    The false or misleading impressions include:  that oral samples would be unsuitable for comparison; that Hammer would not have provided them; and/or that the Government could not have compelled them (if indeed the Government did not already possess this information).  The Government did not correct this false or misleading impression.

G.    It is unknown if these swabs were destroyed.  If destroyed, their materiality or alternatively their usefulness was apparent.  If tests were done but the results were not disclosed to the defense the Government violated its statutory and constitutional obligation to timely disclose favorable material evidence.

1.    Dr. Albert Harper has reviewed the physical evidence and based on that review has determined that the evidence actually presented by the Government was false, incomplete and therefore misleading.

49