2.    Dr. Harper viewed the clothing and bedding under an Ultralite ALS, a light source designed to reveal human biological material such as semen, blood, urine and saliva which may not be visible to the naked eye.  He found evidence of human biological material on Government's Exhibit 15 (two pillows, on white and one salmon colored); Government's Exhibit 16 (salmon colored bed sheet); Government's Exhibit 17 (two salmon colored bed sheets); Government Exhibits 9,10,24 and 107 (various pieces of torn sheets); Government Exhibit 19 (a salmon colored sock); Government Exhibit 25 (piece of a T-shirt); Government's Exhibit 28.2 (decedent Marti's boxer shorts); Government's Exhibit 28.3 (second pair of decedent Marti's boxer shorts); Government's Exhibit 26 (sneakers); Government's Exhibit 26.3 (salmon boxer shorts and socks); Government's Exhibit 26.4 (Hammer's T-shirt); Government's Exhibit 26.5 (towel). *Declaration of Dr. Albert Harper* at ¶¶ 5-7.

3.    Dr. Harper further found that the penile slide and the oral slide prepared from swabs taken from the decedent during the autopsy can be tested to determine the presence of human biological material and DNA. *Id.* at ¶ 10.

H.    It is also unknown if the clothes removed from Andrew Marti and David Hammer were tested and if so the results of those tests.  If those items were destroyed their materiality was apparent, alternatively, their usefulness was

apparent.

1.   As Dr. Harper's report/declaration indicates, there exists human biological material on the physical evidence presented by the government at trial that can be tested to determine the presence of semen, blood and DNA.

2.   Physical evidence indicating the presence of semen supports a theory of circumstances leading up to the death of decedent Marti that contradicts the government's theory and intentional murder and supports a theory of accidental death or non-intentional murder resulting from erotic asphyxiation.

I.   The Government and/or its agents destroyed latex gloves recovered inside of Cell 103. Their materiality was apparent to any theory regarding a sexual encounter (which Hammer submits the F.B.I. and BOP suspected all along), alternatively, potential usefulness was apparent.

1.   Latex gloves are commonly used by inmates as condoms. Hammer utilized latex gloves as condoms.

J.   The Government suppressed favorable evidence material to guilt and punishment discovered in Winter 2000 in the form of what appears to be a Government memo indicating among other things that Mr. Marti specifically requested to cell with Hammer (letters regarding this were exchanged between Mssrs. Travis and Fred Martin 10/27/00 to 12/18/00).

51

K.     The Government suppressed favorable evidence material to guilt and/or punishment which disputed facts alleged by the Government and/or impeached Government witnesses.  Hammer has recently learned that the Government received information from James Hauser, an inmate known to Hammer.  To the best of counsel's current knowledge Mr. Hauser supplied information to the Government regarding his conversations with Hammer. This information was reportedly not disclosed to defense counsel because, *inter alia,* it was contradictory to the prosecution and/or information provided by inmates at the Allenwood Penitentiary.

1.     Hammer has likewise learned that other inmates contacted prosecution and prison authorities and likewise provided contradictory versions of the circumstances leading up to the death of Mr. Marti that would have provided defense counsel with impeachment evidence and evidence directly contradicting the reliability and credibility of statements Hammer purportedly made to inmate witnesses presented by the government at trial and to authorities, all of which were relied upon by the government in its statement of facts in support of the guilty plea and in arguing for death during the penalty hearing.

L.     Alternatively, trial counsel's failure to investigate, develop and present the above evidence directly contradicting the false and misleading

52

evidence presented by the government in support of the factual basis for the guilty plea and the sentencing determination constitutes prejudicial deficient performance in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.

M.    Hammer is entitled to a new trial. Ground Six and supporting facts are incorporated herein.

**Ground Eight: Hammer's waiver of counsel for purposes of post-trial motions and direct appeal did not comport with the 5th, 6th, 8th and 14th Amendments because he was not properly advised about the risks of proceeding pro se.**

*Supporting Facts*:

A.    At the 10/1/98 hearing, Hammer was told he had a right to self-representation.

B.    Through questioning by the Court and Government counsel, it became known that Hammer had previously gone *pro se* but Hammer was not advised about the risks of proceeding *pro se.* These are separate concepts. The former provides information to the court so it can determine whether to accept the waiver, the latter provides information to the defendant so he can decide whether he truly wishes to waive his right to counsel.

C.    Counsel's failure to raise, preserve and litigate the Court's failure to properly advise Hammer on the risks of proceeding *pro se* constitutes prejudicially

53

deficient performance in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.

    <u>D.</u>    Hammer is entitled to a new appeal. <u>Grounds One, Two and Three and supporting facts are incorporated herein.</u>

**Ground Nine : The Due Process requirement that the trial court inquire *sua sponte* as to a defendant's competence in every case in which there exists a reason to doubt the defendant's competence was not followed; a new trial is required.**

*Supporting Facts*:

    A.    Confirmed by x-ray, the Court learned that during jury selection Hammer swallowed two razor blades. The Court was aware of this via conference with the Allenwood physician.

    B.    Hammer requested to waive presence that afternoon.

    C.    The Court refused Hammer's request. Attorney Ruhnke indicated that based upon his knowledge of Hammer it was possible that Hammer might lose control if he was required to stay in the courtroom. The Court again refused the request.

    D.    The day Hammer swallowed the razor blades, BOP placed him on special watch because of a concern he was suicidal; he was given medications, including: anti-anxiety medication and a tripled dose of synthroid (which may

54

have been for his thyroid condition).

E.    This was reasonable cause to inquire into competency. But see

Factual Finding #1 at 25 F. Supp.2d 5 18.  <u>Grounds One, Two and Three and</u>

<u>supporting facts are incorporated herein.</u>

**Ground Ten: Hammer was constructively and functionally denied counsel when the Court failed to honor trial counsels' request to withdraw based upon a conflict of interest and to appoint counsel to investigate Hammer's competency to waive counsel, proceed *pro se* and waive appeals.**

*Supporting Facts*:

A.    Hammer informed all he desired to discharge counsel and waive his

appeals.

B.    Hammer's defense counsel (Mr. Travis and Mr. Ruhnke) asked to

withdraw their appearances because of a conflict created in the attorney-client

relationship. Counsels' ethics dictated that they could not assist Hammer in taking

a course they believed to be horribly dangerous nor could they violate his wishes

and contest his position. A motion to withdraw was filed 8/5/98. The Court denied

defense counsels' request. Hammer was appointed another attorney (Mr. Smith) to

advocate the position which Mr. Travis and Mr. Ruhnke could not ethically

support. Smith was appointed by Order dated 811 0198.

C.    Hammer was left with counsel (Mr. Ruhnke and Mr. Travis) whose

ethics forbade them from advocating a position contrary to Hammer's desire to waive his appeals but also forbade them from actively taking action to support Hammer's position.

D.    For example, at the 10/11/98 competence hearing to determine whether Hammer would be permitted to waive counsel and his appeal, defense counsel were asked whether they had any evidence to present. Counsel asked the Court to take notice of Dr. Sadoff's prior testimony. The Court refused to do so. Instead it said counsel could argue the salient facts. Counsel were functionally discharged by the conclusion of that hearing and, thus, counsel did not make argument regarding additional facts which showed that Hammer should not have been permitted to waive counsel & appeal.

E.    A person suffering from DID and/or manic-depression may be competent to waive counsel or his appeal one moment and incompetent later. Even if Hammer was competent at the relevant moment on 10/11/98, that does not mean his status remained constant throughout appellate proceedings.

F.    Hammer was constructively denied counsel when the Court denied counsels' withdrawal request and failed to appoint counsel to investigate, and if necessary pursue, competency issues even though same was contrary to Hammer's stated desires.  Hammer was entitled to counsel who could ethically protect his

56

substantive and procedural due process rights. Such investigation would have been fruitful.

Grounds One, Two and Three and supporting facts are incorporated herein.

G.    Alternatively, absent appointment of un-conflicted counsel in order to investigate and pursue competency issues, trial counsel was ineffective in failing to consult with defense experts who had already evaluated Hammer, in failing to request evaluation by un-conflicted mental health professionals for purposes of making a competency determination; and, failing to adequately challenge the testimony of conflicted mental health professionals constituted ineffective assistance of counsel and deprived Hammer of his 5th, 6th, 8th and 14th Amendment rights.

H.    Because trial counsel failed to investigate Petitioner's competency and failed to have Petitioner examined by an independent mental health evaluator, neither this Court nor the Third Circuit Court of Appeals were aware that at the time Petitioner discharged counsel and waived his direct appeal, he was laboring under the following psychiatric and psychological deficits: intense agitation and paranoia, an exacerbation of his pre-existing mental illness and neurocognitive deficits, impaired judgement, and reasoning, emotional impairments, impulsivity, disinhibition, an exacerbation of his Posttraumatic Stress Disorder, Chronic, and

was "driven by the fragmentation and compromised control associated with dissociative identity disorder." *Report of Richard P. Kluft, M.D., at 11. See also Declaration of Michael Gelbort, Ph.D., Declaration of Neil Blumberg, M.D.*

I.      Grounds One, Two and Three and supporting facts are incorporated herein.

**Ground Eleven: The Court's failure to inquire on the record into an actual conflict of interest when alerted to same violated the 5th, 6th, 8th and 14th Amendments.**

*Supporting Facts*:

A.      The Court was alerted to a conflict by trial counsels' motion to withdraw filed August 5, 1998. Ground 10 and supporting facts are incorporated herein.

B.      Counsel unambiguously informed the Court that their ethics forbade them from actively pursuing a course contrary to Hammer's stated desires. The Court erroneously refused counsels' request to withdraw. A timely objection, without inquiry into the issues is problematic. Counsels' ethical "catch-22" prevented them from factually investigating facts which if produced would be contrary to Hammer's wishes. Because of the conflict, the mismanagement of Hammer's psychiatric and medical condition was not investigated. The conflict had an adverse effect on the representation. Grounds 1,2 and 7 and the supporting

58

facts are incorporated herein.

C.    Hammer must be placed back in the position he was in when the

Court was alerted to the conflict. Once there, Hammer asserts he no longer wishes

to waive counsel or his appeals.

**Ground Twelve: The cumulative impact of all the errors alleged requires a new trial.**

*Supporting Facts*:

All of the above grounds and the amended grounds added below and supporting

facts for each are incorporated herein.

**Ground Thirteen: Hammer was functionally deprived of his constitutional right to counsel at all critical stages of the proceedings when the court set the hearing on Hammer's competency to plead guilty within hours of Hammer's stated desire to plead guilty such that no competent attorney could investigate and be adequately prepared for said hearing.  Alternatively and separately, Hammer claims he was deprived of the effective assistance of counsel at said competency hearing and was independently deprived of his right to effective assistance of counsel by counsels' failure to investigate the veracity of Hammer's confession and the physical and medical facts upon which it relied.**

*Supporting Facts*:

A.    Hammer pled not guilty by reason of insanity at trial.

B.    Mid-trial, Hammer - against the advice of counsel - entered a plea of

guilty.

C.    The court correctly determined that a competency hearing was

59

necessary.

D.      The competency to plead guilty hearing was held the very same day that Hammer stated his desire to plead guilty and within hours of the time that Hammer's desires were communicated to the Court.

E.      No reasonably competent attorney could adequately represent Hammer at this proceeding given the severe time limitations. The inordinate amount of documentary information available regarding Hammer's then-relevant medications and psychiatric status could not be reviewed and digested during the limited period of time, nor was there sufficient time for an independent expert to be appointed and consulted.

F.      Hammer was functionally deprived of counsel at this hearing.

G.      Alternatively and separately, Hammer's counsels' omissions in not obtaining records regarding Hammer's medications and treatment and failure to consult an independent expert regarding same was below the norm.  But for this omission there is a reasonable probability that the result of the competency proceeding would have been different in numerous scenarios, including: (a) Hammer would have been found incompetent at the time to enter a guilty plea; and/or (b) delay in the proceedings due to questions about his competence (and proper medication) would have altered Hammer's desire to plead guilty against

counsels' advice.

1.    Trial counsel's failure to have Petitioner evaluated by an independent mental health expert prior to Petitioner's hearing to determine his competency to plead guilty is particularly egregious in light of facts known to counsel at the time, such as knowledge of Petitioner's cognitive and emotional impairments, as well as awareness of the psychological impact of the conditions of confinement endured by Petitioner and its impact on his ability to make a rational, knowing, intelligent and voluntary decision.

2.    Petitioner's defense to the charge of Murder in the First Degree was that at the time of the murder, he was insane:

> [t]his case really comes down to one word: I-N-S-A-N-I-T-Y, insanity, the state of mind of David Paul Hammer.
>
> *    *    *    *
>
> The defense does not dispute that Andrew Marti died as a result of strangulation.  What the defense disputes is whether David Paul Hammer is legally responsible for that death.

N.T. 6/3/98 at 23 (Opening statement of Ronald Travis, Esq.).

3.    Mr. Travis told the jury that Petitioner suffers from a "severe mental disease" and has "[b]een diagnosed with a severe mental disease for many, many years." *Id.* at 26.  Counsel informed the jury that prior to his incarceration in

Oklahoma, Petitioner "[w]as in and out of mental facilities being treated for mental health problems." *Id.* Counsel explained that while incarcerated, Petitioner has been treated with a wide variety of psychiatric medications over the years and suffers from multiple personality disorder. *Id.* As a result of Petitioner's multiple personality disorder, counsel argued to the jury that at the time of the murder, Petitioner "was mentally absent; he was not there at the time the act took place." *Id.* at 29.

4.    Trial counsel also told the jury that the predicate for Petitioner's development of a multiple personality disorder was the extreme physical, sexual and emotional abuse he endured as a child: "[t]he man you see in this courtroom is the product of that physical, emotional and sexual abuse, and that his mental health condition is a product of that mental, physical, emotional abuse." *Id.* at 33.

5.    Finally, counsel argued to the jury that Petitioner's alter personality, Jocko, killed Mr. Marti while Petitioner and Mr. Marti were involved in consensual "kinky homosexual activity." *Id.* at 25.

6.    In penalty phase closing arguments, trial counsel again emphasized that Petitioner's mental illness governed his actions, arguing that Petitioner's medical records "make an overwhelming case for madness, for mental illness," *N.T. 7/22/98* at 59, and that Petitioner's behavior the night of the murder was "an

62

act of abject insanity, an act of craziness." *Id.* at 22.

7.    Indeed, counsel told the jury that Petitioner's mental illness was so severe and so long-standing that it was almost impossible to adequately control:

> [d]octor after doctor after doctor after mental health professional after psychiatrist after treating professional, has seen Mr. Hammer and they have seen evidence of mental illness, have attempted to control it with medication, and it just hasn't happened, and the reason it just hasn't happened is because his symptoms are something unusual, rare, difficult to diagnose, things like antipsychotic medication aren't going to do it.

*Id.* at 58-59.

8.    During the course of the defense presentation at trial, Petitioner presented the testimony of Dr. Robert Sadoff, M.D., who told the jury that at the time of the murder, Petitioner was insane and not legally responsible for his actions. Specifically, Dr. Sadoff told the jury that at the time of the murder, Petitioner's alter personality, Jocko, was "in full control" and that Petitioner was unaware of what Jocko was doing at the time of the murder. *N.T. 6/17/98* at 29.

9.    Trial counsel also presented evidence during the penalty phase that Petitioner suffers from brain dysfunction, including frontal lobe dysfunction or deficits. *See N.T. 7/8/98* at 6585 (testimony of Michael M. Gelbort, Ph.D., neuropsychologist). Dr. Gelbort concluded that Petitioner also suffers from cognitive and emotional impairments, impulsivity, disinhibition and idiosyncratic

and affected reasoning and judgement. *See Declaration of Michael M. Gelbort*, at 2.

10.    Trial counsel also had in their possession information pertaining to Petitioner received from Dr. Stuart Grassian, M.D., who specializes in the psychiatric impact of long term solitary confinement on an individual's cognitive abilities and rational decision-making, including the capacity to make knowing, intelligent and voluntary decisions.  Dr. Grassian has studied the impact solitary confinement also has on an individual's capacity to rationally assist counsel and assess information rationally prior to making important decisions.

11.    Dr. Grassian, who evaluated Petitioner prior to trial, has concluded that, in light of his pre-existing neuro-cognitive impairments, Petitioner is most severely affected by the psychological consequences associated with solitary confinement.  The syndrome is associated with self-destructive behavior and overt psychotic disorganization.  As a result, Petitioner suffers from severe exacerbation of his already compelling mental illnesses.

12.    At the time of Petitioner's trial, it was well-known that the conditions of confinement endured by Petitioner cause disorientation, intense agitation and paranoia.  Individuals suffering from the psychiatric consequences of this type of onerous conditions of confinement often do not recall events which occurred

64

during the course of the confusional psychosis.

13.    Dr. Grassian concluded that Petitioner suffered these classic negative symptomology associated with his conditions of confinement.

14.    Nonetheless, when Petitioner announced his decision to enter a plea of guilty to the charge of first degree murder and face a capital sentencing hearing, counsel did not move to have Petitioner evaluated by an independent mental health professional. Nor did counsel present any of the evidence, outlined above, to the Court during the course of Petitioner's competency hearing.

15.    Had counsel presented the evidence outlined above to an independent mental health expert, they would have discovered that under Petitioner's then existing state of mind, he was not competent to plead guilty.

16.    For example, trial counsel did not consult with Dr. Gelbort about Petitioner's expressed desire to plead guilty to first degree murder and whether, in Dr. Gelbort's opinion, Petitioner was competent to make such a decision. If they had, they would have learned that Dr. Gelbort believes Petitioner was not competent to knowingly, intelligently and voluntarily waive his right to stand trial, enter a plea of guilty, discharge counsel and waive his direct appeal:

> After reviewing the records and conducting a follow-up evaluation, it is my opinion, to a reasonable degree of neuropsychological and psychological certainty that, given his substantial impairments in

65

reasoning, judgement and impulse control, combined with his emotionality, Mr. Hammer was incapable of making a knowing, voluntary and intelligent decision as to these waivers of rights. As a result of his organic impairments, he did not connect all the factors involved in making a reasoned decision and his waivers were the product of, and substantially affected by, his psychological, emotional and cognitive impairments. At a minimum, Mr. Hammer's neuropsychological impairments have substantially affected his ability to waive his legal rights.

*Declaration of Michael M. Gelbort,* at 5. Trial counsel's failure to inquire of Dr. Gelbort whether, given his test results, he had an opinion as to Petitioner's competency to plead guilty constitutes ineffective assistance.

17.    Dr. Richard P. Kluft, M.D., an expert in Dissociative Disorders, has also concluded that Petitioner was not competent to discharge counsel and forego his direct appeal or waive his right to a trial and plead guilty to first degree murder. Dr. Kluft, who diagnosed Petitioner as suffering from Dissociative Identity Disorder, Posttraumatic Stress Disorder, Antisocial Personality Disorder, R/O Major Depression, Recurrent, Moderate By History, and Polysubstance Abuse By History, has concluded that Petitioner's plea of guilty and waiver of his right to trial, direct appeal and counsel was "driven by the fragmentation and compromised control associated with dissociative identity disorder." *Report of Richard P. Kluft, M.D.,* at 11.

18.    Dr. Kluft also concludes that "the dissociative identity disorder

66

disrupted this man's capacity to have knowledge of his circumstances, [and] the ability to access and utilize his intelligence..." *Id.*

19.    Petitioner has also been evaluated by Dr. Neil Blumberg, M.D., a forensic psychiatrist.  Dr. Blumberg diagnosed Petitioner as suffering from Posttraumatic Stress Disorder, Chronic, Borderline Personality Disorder and Antisocial Personality Disorder. *Declaration of Neil Blumberg, M.D., at 7.*

20.    Dr. Blumberg has also concluded that at the time of Petitioner's plea of guilt, Petitioner was unable to make a rational, knowing, intelligent and voluntary decision:

> At the time of his guilty plea for the murder of Andrew Marti, it is my opinion to a reasonable degree of medical certainty that Mr. Hammer was experiencing severe emotional distress as a result of an exacerbation of his Posttraumatic Stress Disorder, Chronic, and Borderline Personality Disorder. The cumulative stress of hearing testimony concerning the severe abuse he sustained during his childhood and adolescence caused him to reexperience those traumatic experiences.  When faced with the possibility that he would be labeled mentally ill and committed to the Federal Medical Center in Springfield, Mr. Hammer was psychologically overwhelmed, leading to his impulsive decision to plead guilty and abandon his defense of Not Guilty By Reason Of Insanity.  In short, he was under extreme emotional distress at the time he pled guilty, causing his judgement to be seriously impaired.

*Id.* at 8-9.  None of the readily available evidence of Petitioner's incompetency to enter a plea of guilty, outlined above, was investigated and presented to this Court prior to the acceptance of Petitioner's guilty plea.

21.    The District Court's competency proceedings and result were unreliable not only because of trial counsel's failure to present the above-described evidence of Petitioner's mental illness and resulting incompetency, but also due to their failure to marshal this same evidence for use during cross examination of conflicted mental health professional, and their failure to impeach and challenge the admissibility of the conflicted mental health professionals' testimony on the grounds of the conflict of interest.  Grounds One, Two and Three and supporting facts are incorporated herein.

22.    Because trial counsel failed to investigate and present evidence of his incompetence and failed to have him evaluated by an independent mental health expert prior to his plea of guilty, he was deprived of his right to the effective assistance of counsel at all critical stages of the proceedings.  Thus, counsel's omissions, as outlined above, rendered his waiver of appellate counsel and his right to appeal his sentence of death invalid because at the time of this waiver, Petitioner was incompetent.  Accordingly, his waiver of appellate counsel and of his direct appeal was not knowing, intelligent and voluntary.

30.    All prior counsel were ineffective for failing to investigate and present the readily available evidence of Petitioner's incompetence to waive his right to stand trial, plead guilty, waive appellate counsel and waive his right to a

direct appeal of his conviction and sentence of death.

H.    Counsels' failure to investigate the veracity of Hammer's statements made to authorities after Mr. Marti's body was discovered and to otherwise investigate the veracity of conclusions drawn regarding the physical evidence and pathology findings was below prevailing norms of reasonably competent counsel. The failure to investigate and present evidence concerning the veracity of Hammer's confession and to challenge the Government's reliance upon it was below prevailing norms. But for these omissions there is a reasonable probability that the result of numerous proceedings would have been different. Those proceedings include:  the government's decision to authorize the filing of a death charge, the motion to dismiss that charge, the entry of Hammer's guilty plea, the jury's verdict at the penalty phase, and the decisions to permit Hammer to waive his appeals and counsel.

1.    Counsel failed to investigate and interview other inmate witnesses although there were other inmate witnesses who had spoken with authorities and given those authorities versions of the death of decedent Marti that directly conflicted with Hammer's confession and prosecution inmate testimony relied upon by the government in support of the facts supporting the guilty plea and in support of the government's argument in favor of a death sentence during the

69

penalty hearing. Grounds 3,6,7 and supporting facts are incorporated herein.

2. Counsel failed to have the physical evidence examined by forensic experts and, as a result, failed to discover and present evidence directly disputing the version of events presented by the government through Hammer's confessions and inmate testimony and supported the more reliable and accurate version that decedent Marti's death resulted from circumstances other than intentional murder. Grounds 3,6,7 and supporting facts are incorporated herein.

3. Counsel's deficient performance resulted in an unreliable guilt and penalty determination in violation of Hammer's Fifth, Sixth, Eighth and Fourteenth Amendment rights.

**Ground Fourteen: Hammer's conviction and sentence are violative of the 8th and 14th Amendments to the Constitution of the United States because the Government suppressed exculpatory material relevant to Hammer's competence (at all phases), guilt, and penalty. Alternatively, fundamental fairness was violated when Hammer's various competence determinations were predicated upon the testimony of witness who received a monetary award from the Federal Government for his participation in Hammer's case.**

*Supporting Facts*:

A. At least three Government witnesses, one of whom also served as the Court's witness at the various competency hearings, received monetary rewards for their participation in the investigation and prosecution of Petitioner Hammer. These witnesses include: John Mitchell, Don Troutrnan and Chaplin B. Crook.

70

B.     The Government did not advise trial counsel of these rewards or that these persons were being considered for such awards.

C.     But for the Government's suppression of this material information there exists a reasonable probability that the result of the various proceedings (named above) would have been different.

D.     The facts supporting Grounds 6,7 and supporting facts are incorporated herein by reference.

E.     Alternatively, counsel was ineffective for failing to adequately investigate, develop and present evidence of the employees' consideration for awards.  Counsel's deficient performance prejudiced Hammer in that, as a result of counsel's omission, Hammer was denied compelling evidence of bias, conflict and unreliability with respect to these witnesses.

**Ground Fifteen: Hammer's sentence was imposed in violation of the 5th, 6th, 8th and 14th Amendments because the FDPA is unconstitutional in that it permits prosecution for the death penalty without first requiring a grand jury to indict on all essential elements of the offense and because it permits traditionally inadmissible evidence to be introduced at the penalty phase in support of essential elements.  Had a jury been impaneled and required to consider whether there was sufficient evidence to support a capital murder charge, they would have rejected a death penalty prosecution.**

*Supporting Facts*:

A.     On September 18, 1996 Hammer was indicted in two counts for

71

violations of 18 U.S.C. 8 11 1 1 (first degree murder within the territorial jurisdiction of the United States) and 18 U.S.C. § 1118 (murder by a federal prisoner serving a life sentence). The §1118 charge was dismissed pretrial.

B.    On April 9, 1997, the United States filed a Notice of Intent to Seek the Death Penalty alleging additional elements - specifically, intent and various aggravators - supporting a prosecution for capital murder.

C.    The elements referred to in paragraph B above were never submitted to a grand jury.

D.    18 U.S.C.A. §3593 (C) directs the Court to ignore the rules of evidence when determining the admissibility of evidence at the penalty phase. Evidence is admissible so long as it is relevant and its probative value outweighs the danger of creating unfair prejudice, confusing the issues, or misleading the jury." This standard was utilized at Hammer's trial.

**Ground Sixteen: Hammer's 6th and 14th Amendment rights were violated when the Government placed its agent in a position to obtain information from Hammer concerning the killing of Andrew Marti after the right to counsel had attached.**

*Supporting Facts*:

A.    James Hauser was encouraged by the Government to obtain information from Hammer regarding the death of Andrew Marti after Hammer had

72

been indicted in this matter.  Hauser did obtain information and provided same to the Government during the pendency of this case.

**Ground Seventeen:  Granting the government's request for commitment in order to conduct an extensive evaluation and study of Mr. Hammer in light of the notice of insanity defense while not providing defense experts the same access to Mr. Hammer and permitting the government to capitalize on the disparity during trial compromised the reliability of the plea proceedings and the sentencing determination; deprived Mr. Hammer of his Fifth, Sixth, Eighth and Fourteenth Amendment rights.**

A      Following the defense notice of insanity, the Government moved pursuant to 18 U.S. C. § 4242 and 4247 and Federal Rules of Criminal Procedure 12.2 (c)(1) for Mr. Hammer's commitment and evaluation by a Government expert.  Without benefit of a hearing, written objections and response of defense counsel or consideration of available alternatives, the Court accepted the averments of the Government that the commitment was necessary and ordered that Mr. Hammer be committed for at least forty-five days for a "study" by mental health experts employed by the United States Bureau of Prisons ("BOP").

B      By ordering the extensive and unfettered access to BOP experts which could not possibly be matched by defense experts, this Court's commitment order rendered Sections 4242 and 4247 unconstitutional as applied to Mr. Hammer and denied Mr. Hammer of his right to a fair trial, confrontation and cross-examination, due process, effective assistance of counsel, adequate expert

73

assistance and equal protection in violation of the Fifth, Sixth Eighth and Fourteenth Amendments.  Moreover, the Court's failure to conduct the required hearing and consideration of available alternatives before subjecting Mr. Hammer to the extensive, unnecessary commitment which could not possible be matched by defense experts similar access and evaluation placed the Government at an unfair and unconstitutional advantage and denied Mr. Hammer of his rights to effective assistance of counsel, adequate expert assistance, confrontation and cross-examination, a fair trial and due process under the Fifth, Sixth and Eighth Amendments.  Similarly, counsel's failure to properly object to the commitment, raise and litigate these issues constitutes prejudicially deficient performance in violation of the Fifth, Sixth and Eighth Amendments.

For each of these reasons, Mr. Hammer is entitled to relief.

C.    The Court's application of Sections 4242 and 4247 in this case rendered those provisions unconstitutional

4.    The purpose and intent of Sections 4242 and 4247 is to provide the Government with an opportunity to challenge expert evidence supporting an insanity defense. *See In re Newchurch*, 807 F.2d 404, 411 (1986).  As a result, Rule 12.2 requires pretrial notice by the defense of intent to seek the insanity defense and access to the defendant for an evaluation upon the Government's

request. See Fed. R. Crim. Proc. 12.2, Advisory Committee Notes ("This rule requires pretrial notice to the government of an insanity defense, thus permitting it to prepare to meet the issue").

5.    While access to the defendant for evaluation is permitted, interpreting these provisions as requiring unfettered access that results in unfair advantage to the Government and the denial of the defendant's right to a fair trial renders those provisions unconstitutional.

6.    By subjecting Mr. Hammer to the extensive "study" and evaluation through a forty-five day commitment, the Court transformed the Government's "fair opportunity" into an unfair advantage. As a result, the Government was able to present to the jury an expert, Dr. Wolfson, who spent over twenty hours evaluating and studying Mr. Hammer over a forty-five day period; had a complete forensic staff that was charged with observing Mr. Hammer on a twenty-four hour basis during the forty-five day commitment and instructed to note observations relevant to Dr. Wolfson's study and evaluation; and, who met with an evaluation team daily to review reports, discuss observations and make determinations. NT Vol. 11 at 148-51. The defense expert on the other hand, Dr. Sadoff, conducted a six hour evaluation over two days and had no opportunity for extended evaluation. NT Vol. 10 at 85-86; Vol. 11 at 148. The Government capitalized on these

disparities during its presentation of the prosecution expert, (NT Vol. 11 at 148-51), and in its penalty hearing closing argument, (NT Vol. 29 at 39).

7.    Although the court has limited discretion in ordering an evaluation, commitment to obtain the evaluation is not required.  Instead, the statutory provisions require that, before committing a defendant, the court must determine, following a hearing  subject to cross examination and rebuttal by the defendant, that the government cannot adequately prepare for trial on the insanity issue by having the defendant examined as an outpatient.

8.    These protections were not afforded Mr. Hammer before the Court ordered commitment in this case.  There were constitutional protections which the Court was required to balance against the Government's need to prepare to challenge the insanity defense, including the right to a fair trial, due process, confrontation and cross-examination, effective assistance of counsel, adequate mental health assistance, and the right to present a defense.

9.    Thus, by failing to follow the required procedures in determining whether or not an extensive commitment for evaluation and study was required in order to provide the government a "fair opportunity" to rebut the insanity defense, the Court rendered the application of Sections 4242 and 4247 as applied to Mr. Hammer  unconstitutional.

76

D.    The District Court's failure to conduct an evidentiary hearing on the propriety of commitment violated the requirements of Sections 4242 and 4247.

1.    As described above, before ordering commitment for a forty-five day evaluation, the Court was required to determine whether the extensive study was required in order to provide the Government with a "fair opportunity" to rebut the insanity defense.

2.    Here, the Court relied on general allegations by the Government that it was the Bureau of Prisons Medical Coordinator's opinion, based on concerns for security with respect to Mr. Hammer and the availability of psychiatrists in the Medical Center in the Springfield, Missouri facility and the Mental Health Unit in the Butner, North Carolina facility, that commitment to one of those institutions was necessary.

3.    The Government's motion did not address what specific "security concerns" were present. This allegation is especially suspect in light of absence of any incident during the three defense expert evaluations that occurred in the Allenwood facility.[1] The allegation that transport and commitment for forty-five

[1]Indeed, while at the Springfield facility, "security concerns" did not prevent the government from transporting Mr. Hammer to off-site medical facilities by Bureau of Prison staff in order to obtain the EEG and MRI. At least during the MRI, Mr. Hammer was cuffed with plastic restraints and the observers in the room were precluded from possessing any metal objects (such as restraints

77

days was necessary due to the availability of mental health professionals at the Butner and Springfield facilities is equally suspect. There was no averment that the government was unable to obtain a local mental health professional or arrange to have a psychiatrist from either Springfield or Butner travel to Allenwood to conduct the forensic evaluation.[2] Thus, the "reasons" proffered by the Government were, at best suspect. Had the Court conducted an evidentiary hearing with the benefit of cross-examination and presentation of contradictory evidence, the defense would have been able to demonstrate the questionable nature of these "reasons."

4.    Moreover, in the motion, the government referred to the need to conduct a "study," not a forensic evaluation. The use of the term "study" is telling. The government intended to gain much more than a "fair opportunity" to challenge the defense expert. Instead, the government sought to subject Mr. Hammer to observation and study for a sufficient period of time to bolster the

---

or weapons).

[2]While cost cannot be a consideration in the determination, see Newchurch, 807 F.2d at 412 ("The expense of local examination compared to the cost of commitment to a government institution is not a controlling consideration"), it would appear likely that the cost of transporting Mr. Hammer to Springfield, Missouri and subjecting him to the forty-five day commitment was more than what would have been necessary to retain a local expert or transport an expert to Allenwood for a forensic evaluation.

credibility of its expert testimony and diminish the credibility of the defense expert. As the record demonstrates, that was exactly what happened. Had the Court conducted the required evidentiary hearing with the benefit of cross-examination and witness presentation, the defense would have been able to demonstrate the abject disparity in permitting the government to have access to Mr. Hammer for purposes of conducting a lengthy "study" with a team of forensic and prison personnel guided by the prison psychiatrist while failing to provide similar resources to the defense.

    5.    In short, an evidentiary hearing would have demonstrated that an out-patient[3] forensic evaluation would have been possible and sufficient to provide the government with the required "fair opportunity" to rebut the defense expert evidence. At the very least, an evidentiary hearing would have demonstrated that if the commitment was required, and it was not, that similar resources and accommodations for the defense were required in order to protect Mr. Hammer's constitutional rights.

    E.    The District Court's order of commitment violated Mr. Hammer's

---

[3]Of course, "out-patient" in this case refers to a forensic evaluation conducted in Allenwood prison in the same manner that defense experts conducted their evaluation as opposed to transporting Mr. Hammer to an outpatient mental health facility.

Fifth, Sixth and Eighth Amendment rights.

1.      The Fifth and Sixth Amendments guarantee all criminal defendants a meaningful opportunity to present a complete defense.  That right is grounded in the Due Process, Compulsory Process, and Confrontation Clauses.  Because of the qualitative difference of a death sentence,  the Eighth Amendment requires heightened procedural safeguards in capital cases.  Likewise, an indigent's access to adequate psychiatric assistance to prepare a defense is constitutionally required.

2.      By ordering that Mr. Hammer be subjected to a forty-five day commitment with twenty-four hour observation and access to a team of government mental health professionals for "study" and evaluation which an indigent defendant could never match, the Court deprived Mr. Hammer of each of these fundamental rights.  The resulting prejudice is clearly demonstrated in the record.  During Dr. Wolfson's direct examination, the prosecution made it clear to the jury that Dr. Wolfson and his "team" of mental health and prison employees were in a position to "study" Mr. Hammer for an extensive period of time in contrast to the defense expert's six hour evaluations over two days:

Q[By AUSA Martin]:    And how long was he at Springfield, if you can recall?

A:    Left there 45 days later on December - - is that 45 days? Yeah, on December 10.

80

Q:    With respect to Dr. Sadoff, he indicated that he spent approximately six hours with Mr. Hammer. How many hours did you spend with Mr. Hammer?

A:    That I kept track of. I - - not counting incidental brief meetings with him in his cell door, but just interviews where we pulled him out to an interview room, the sessions I had with him totaled a little over 20 hours.

Q:    And with respect to the 20 hours, how many times would that have occurred? Was it four or five days or can you give us an idea?

A:    Hum, I think I can tell you exactly. Eleven occasions.

Q:    With respect, again, to the circumstances, were they all interview situations in your office or where were these encounters?

A:    Well, they weren't in my actual office. He was on one of the secure units, and the arrangement we have there, since it's a place where prisoners come out of their cells only in handcuffs, we have a small interview room on the unit where there is a metal partition or sort of cage where - - with a gate in it and the prisoner can go in there and then he can have his cuffs taken off without breaking the rules about not being uncuffed around a staff member. And so he would go in there and he would sit down, and there was a small table between us, and I interviewed him there. It was like an office, a little more Spartan.

Q:    And in terms of the unit he was in, was he in the forensic unit?

A:    Well, the unit he was in, which is unit 10E, is a mixture of forensic defendants and what are called diagnostic and observation service patients, those are sentenced prisoners who have been sent to us for diagnostic studies.

Q:    And for a 24-hour period was he always in the view of either a correctional official or a forensic unit employee?

A:    He may not have been in the direct site of someone every minute. But

81

the unit is staffed 24 hours a day, and so there was someone on duty at all times, and numerous opportunities to observe him during the course of the day, and the night.

Q:    What, if any, reporting obligations do the other correctional staff or the, again, members of the unit where Mr. Hammer was in terms of giving you information?

A:    If they see anything unusual or anything they think is remarkable, they can report it directly to us. Security issues are likely to get reported both to the doctor and to the correctional officers' own supervisors. In this particular case - - I'm sorry. In addition, every weekday morning there would be a team meeting, where the nurses and correctional staff would be present with their unit logs, and so we would hear or report both from the units correctional officers and also from the nurses who staff the unit. And so there would be daily communication of that type. In this particular case also, since I had a particular interest in their observations, I guess I always do for forensic studies, but especially in this case I also queried the nursing and correctional staff near the end of Mr. Hammer's stay of the study about their observations of him.

NT Vol. 11 at 148-51.

3.    The prosecutor capitalized on the disparity between the government's extensive study and the defense experts' much less involved forensic evaluations in his penalty-phase closing argument:

[By Mr. Martin]:    With Dr. Wolfson, again, you don't have to resolve the difference between the experts unless you want to. You've got a classic match up os someone who puts in a lot of time, a lot of thought, with someone who comes in with his credentials and again, in terms of the polish and presentation, compare Dr. Sadoff and Dr. Wolfson. Dr. Sadoff has testified before. He is smooth, he is effective, but he's also shooting from the hip, shooting from the hip, suggesting that after three hours he can figure out this guy has dissociative identity disorder, when we are only

talking Wilbur and Jocko and Jasper then, but he knows, he knows. A total of six hours is what he spent with him.

Dr. Wolfson, 19 or 20. Again, 30 – 30 day evaluation at Springfield compared with two trips to the Allenwood penitentiary.

NT Vol. 29 at 39. Thus, the fact that Mr. Hammer entered an invalid mid-trial guilty plea as opposed to pursuing the insanity defense to a verdict does not alter the prejudice inquiry. Similarly, while the jury found mitigation, there is a reasonable likelihood that its consideration of the expert testimony – and the prosecution's unfair advantage in this determination – impacted is failure to find additional mitigation and its weighing process in reaching the determination that death was the appropriate sentence.

4.    It would be one thing if the BOP expert who was given this unequal access was fair and impartial. However, the expert in this case was far from that. Dr. Wolfson opined that he did not believe that DID was a valid diagnosis for any patient. Moreover, this was a conflicted expert. Therefore, this Court essentially vested Mr. Hammer's fate to a doctor who did not believe that his mental illness was a legitimate ailment, and who, in any case, labored under the previously described conflicts.

5.    Under these circumstances, there is no question that the disparity in the resources and access to Mr. Hammer with respect to the government and

83

defense experts resulted in prejudice.

F.     Counsel's failure to raise and litigate these issues, to object to the commitment, to request similar resources and access to Mr. Hammer for defense experts and/or move to preclude the government from capitalizing on its unfair advantage through the Court's erroneous commitment order while failing to provide similar resources to the defense constituted prejudicially deficient performance in violation of the Fifth, Sixth and Eighth Amendments.

1.     As described above, the Court's issuance of the commitment order in violation of the statutory provisions rendered those provisions unconstitutional as applied to Mr. Hammer, violated the requirements under the statute, and denied Mr. Hammer of his Fifth, Sixth, Eighth and Fourteenth Amendment rights. Counsel's failure to raise and litigate the constitutional violations in ordering the commitment constitutes ineffective assistance of counsel.

2.     Sixth Amendment ineffective assistance of counsel claims are evaluated under the two-prong test of Strickland v. Washington, 466 U.S. 668 (1984). Petitioner must show: (A) counsel's deficient performance and (B) prejudice.

3.     As the Government's motion reflects, counsel did not concur in the commitment request. Counsel did not, however, file a written opposition to the

84

commitment; did not request the required hearing to determine whether commitment was necessary to provide the government its' "fair opportunity" to rebut the defense; did not request similar access for defense experts; and, did not move to preclude the government from capitalizing on the disparate access between the government experts and defense experts. Counsel's failure to raise and litigate these issues at any stage of the litigation constitutes deficient performance in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.

**Ground Eighteen: Counsel's failure to properly preserve, raise and litigate meritorious claims requiring relief on appeal constitutes ineffective assistance of counsel in violation of Hammer's Fifth, Sixth, Eighth and Fourteenth Amendment rights.**

A      Counsel's failure to properly investigate and to make the objections and arguments raised throughout this petition constitutes ineffective assistance of counsel in violation of Hammer's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments.

B      To the extent counsel failed to assert or adequately preserve any claims, either at trial, in his post-verdict motions, counsel rendered ineffective assistance of counsel in violation of Hammer's rights under the Sixth, Eighth and Fourteenth Amendments.

C      To the extend that appellate counsel failed to assert or adequately

preserve or litigate any of these claims on direct appeal, counsel rendered

ineffective assistance of counsel in violation of Hammer's rights under the Fifth,

Sixth, Eighth and Fourteenth Amendments.

D    To the extent that appellate counsel failed to adequately preserve,

brief, and litigate those issues raised on direct appeal, including:

(1) The trial judge fatally confused and mislead the jury on what would occur if it did not reach unanimous agreement;

(2) The trial court's final instruction that the jury could return a sentence of death if "sufficiently persuaded" that death was the appropriate verdict was error that was compounded by the trial court's contradictory instructions during the orientation and just prior to the commencement of the penalty phase;

(3) The jury's failure to find, consider and weigh undisputed or conceded mitigating factors is a circumstance that renders Hammer's sentence arbitrary;

(4) The sentence of death must be vacated since the government relied upon numerous instances of unadjudicated criminal conduct to convince the jury to sentence Mr. Hammer to death;

(5) The trial court lacked authority to "leap frog" its death sentence over the state sentences appellant was serving at the time of his conviction and sentence of death;

(6) The trial court erroneously denied numerous defense challenges for cause;

(7) The trial court should have granted the defense motion for a mistrial when the victim's father broke down in tears on the witness stand;

(8) A federal death-penalty jury should not be allowed to consider non-statutory aggravating factors;

(9) The Government's duplicative use of statutory and non-statutory factors derived from the Upton shooting in 1983 renders the sentence of death invalid;

(10) The trial court should have granted the pretrial motion to dismiss the statutory aggravating factor that the murder was committed in a manner that was especially heinous, cruel or depraved;

(11) The trial court should have granted appellant's mistrial motion based on the trial judge's sua sponte interruption of, and plainly visible anger with, the opening moments of defense counsel's penalty phase summation;

(12) Hammer's sentence of death was imposed in violation of the grand jury clause of the 5th Amendment ... since the indictment did not allege the elements of a capital offense;

(13) The court should have granted a new trial since "purchased" testimony was presented in violation of the anti-gratuity statute, 18 U.S.C. 9201(C);

(14) The court erred in failing to hold a factual hearing on the assertion that Hammer was arbitrarily and capriciously selected for capital prosecution;

(15) Hammer's conviction and sentence must be set aside because the factual basis set forth during the guilty plea colloquy was inadequate to support a plea of guilty...;

(16) The matter should be remanded to the trial court for a factual hearing on a breach of confidential information by the United States Marshals Service, Regarding the names and locations of defense witnesses;

(17) The death penalty constitutes cruel and unusual punishment, and

87

therefore, Mr. Hammer's sentence of death must be set aside.

appellate counsel rendered ineffective assistance of counsel in violation of

Appellant's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to

the United States Constitution.

**Ground Nineteen: Hammer was denied his Fifth, Sixth, Eighth and
Fourteenth Amendment rights where, as a result of governmental failure to
disclose exculpatory evidence and ineffective assistance of counsel, compelling
evidence directly disputing the reliability of Hammer's statements regarding
the circumstances leading up to the decedent's death that were relied upon by
the government in support of the factual basis for the guilty plea and in
support of a death sentence was not developed and presented.**

A.    The government relied on statements made by Hammer to authorities

and other inmates as support for the factual basis for the guilty plea and in support

of its argument in favor of a death sentence.

B.    The government knew of at least one instance where Hammer falsely

confessed to murder.  In its original notice of aggravating factors, the government

referenced Hammer's purported involvement in a prior murder.  Subsequently, the

government withdrew notice of that aggravating factor on the basis that "It appears

that Hammer may have wrongfully admitted his involvement in Kenner's death by

implicating two individuals who did not commit that offense." *United States'*

*Motion to Amend Notice of Intent to Seek Death Penalty* (Document 181), filed

August 29, 1997, ¶ 5

88

C.    The government knew or should have known that Hammer has falsely confessed to at least seven murders.  Nevertheless, the government failed to provide defense counsel with evidence in its possession regarding Hammer's prior false confessions in violation of Brady and its progeny.

D.    Indeed, Hammer has falsely confessed involvement in a number of other murders in numerous jurisdictions across the country, including FBI investigators.

E.    Hammer made false confessions to New York Authorities.

1.    On December 6, 1983, the body of a woman was found in a ditch along the highway in Chautauqua County, New York.  She had been repeatedly shot.  Police were unable to identify the victim, much less locate her killer. When traditional police methods failed to produce an identification or an assailant, police ran adds in True Detective magazine, and other publications, seeking leads.  Some facts were intentionally altered so as to reveal false confessors.

2.    In the summer of 1988, Hammer sent a letter to Chautauqua County law enforcement officials and confessed to killing Jane Doe.  He provided details of his comings and goings prior to and after he allegedly killed this woman.  He provided details of the actual killing. He claimed that another person, an 18 year old male, assisted him in disposing of the body.  Hammer asserted that he later

89

killed this boy and provided information about where he dumped his body. Later, he confessed to Chautauqua County authorities that he had also killed a woman in Colorado and dumped her body in the mountains.

3.    Initially, authorities believed Hammer seemed credible because he correctly described various aspects of the Jane Doe homicide. Additionally, the information he provided concerning his activities before and after the homicide were confirmed.

4.    After conducting an investigation, however, it became apparent to authorities that Hammer was lying. This conclusion was based upon independent police investigative work and a subsequent and unscheduled personal interview of Hammer. A Chautauqua County Sheriff's Department summary of the investigation details aspects of the crime which Hammer was unable to report or reported incorrectly. The investigator concluded that "[d]uring and after the interview it was determined that Hammer was not the individual who killed Jane Doe." Authorities determined that, to the extent Hammer knew some of the facts concerning their Jane Doe homicide, he had learned those facts from information disseminated to the public in detective magazines seeking leads.

5.    In its investigation regarding the boy Hammer was supposed to have killed, Chautauqua County determined that no killing had occurred at all. In the

five years that had passed since the alleged homicide, no body had been discovered. Likewise, Chautauqua County authorities found nothing to corroborate the story of a murder in Colorado. Thus, in addition to confessing to unsolved murders, Hammer also confessed to murders that did not actually occur.

6.    In the course of their investigation, Chautauqua County authorities received information from the Oklahoma prison system that Hammer was a "well known con artist". According to Chautauqua County, "there have been approx 12 different law enforcement agencies talking to Hammer ref to Hammer confession to different crimes." In a letter from the Chautauqua County Sheriff's Department to the Youngstown (Ohio) Vindicator dated March 13, 1989, the Chautauqua County Sheriff's Department stated that "there have been numerous Law Enforcement Agencies in contact with him [Hammer] as he is always confessing to different murders."

7.    In a Supplemental Report dated April 13, 1999, Chautauqua County authorities noted disinterest in Hammer's story because he was "lying." With regard to Hammer's claims of killing the young boy, Chautauqua County wrote in that same report that "no such case exists."

F.    Hammer made false confessions to Louisville Tennessee authorities.

1.    When the Government filed its notice of intent to seek the death

91

penalty in this case, it alleged as a non-statutory aggravating factor, that Hammer should be put to death because he had participated in another uncharged murder. Specifically, the Government claimed that Hammer had ordered the robbery and, if necessary, the killing of Tennessee resident Kenneth Kenner. *See United States' Notice of Intent to Seek the Death Penalty* (Document 93), filed April 9, 1997. On August 29, 1997, the United States amended its death notice, dismissing the Kenner allegation. It said: "It appears that Hammer may have wrongfully admitted his involvement in Kenner's death by implicating two individuals who did not commit that offense." United States' Motion to Amend Notice of Intent to Seek Death Penalty (Document 181), filed August 29, 1997, ¶ 5.

2.    An Oklahoma City FBI report (dated 11/9/89, at pg. 5), indicated that: "During December, 1986, Hammer telephonically interjected himself into a murder investigation taking place in Blount County, Tennessee (located near Knoxville, Tennessee). *Extensive investigation failed to corroborate Hammer's claim that he arranged the killings*." That report further indicated that, during his confession, Hammer persistently volunteered information about premeditation, indicating that it was necessary and important for law enforcement  understand the act was preplanned, noting that Hammer "wanted to show premeditation, wanted to show that [he] planned what [he] had done so there will be no doubt."

92

G.    Hammer made a false confession to a double murder in Enid,

Oklahoma.

1.    On June 15, 1985, the bodies of two men were found stabbed to death

inside a home in Enid, Oklahoma. Hammer subsequently claimed he was involved

in this double homicide.  Terry Dean Sittig was subsequently arrested by Enid

authorities in connection with the double homicide. Sittig confessed prior to trial

and entered a guilty plea on December 12, 1985.

2.    Sittig's accomplice, Ricky Blackmon, was never prosecuted by

Oklahoma. He was, however, subsequently prosecuted by Texas authorities for an

unrelated murder there. In Blackmon's Texas trial, the State offered evidence of

his (Blackmon's) involvement in the Enid double homicide.  Blackmon was

convicted of the unrelated murder, sentenced to death and executed on August 4,

1999.

3.    Records indicate that the motive for the killing was apparently

Sittig's.  He was angry at one of the victims because that man had cheated Sittig in

a drug deal and Sittig wanted to get even.  The second victim was in the wrong

place at the wrong time.

4.    Terry Dean Sittig does not even know Hammer.  According to an

Oklahoma City FBI report dated 11/9/89, Hammer's confession to these murders

93

could not be taken seriously. It further noted that Hammer "attempted to confess to a murder which took place while he was confined in prison."

H.    In May of 1992, Hammer reported to the FBI and numerous media outlets that he had ordered the killing of the celebrated anti-nuclear activist, Karen Silkwood. According to Hammer, he hired a person to throw a scare into Ms. Silkwood but the plan went awry, resulting in her death from a traffic accident. No evidence was ever found to support Hammer's claims.

I.    Hammer has also falsely confessed to the murder of Donna Laughton and Lisa Haley.

J.    Hammer's repeated false confessions to murders is directly related to and symptomatic of his mental, emotional and cognitive impairments.

K.    Hammer's prior false confessions to murders that he did not commit directly contradicts the reliability of his statements indicating his involvement in intentional first degree murder and demonstrates that Hammer's mental, emotional and cognitive impairments impacted his conduct following the death of Mr. Marti.

L.    The government's reliance on Hammer's statements in support of the factual basis for the guilty plea and in support of its argument in favor of the death sentence compromised the reliability of the guilty plea proceedings and the sentencing determination in violation of Hammer's Fifth, Sixth, Eighth and

94

Fourteenth Amendment rights. The government's failure to disclose exculpatory evidence directly contradicting the reliability of Hammer's statements denied Hammer his Fifth, Sixth, Eighth and Fourteenth Amendment rights.

M.    As a result of the government's failure to disclose this evidence, counsel was unable to present that evidence to their mental health experts or present expert testimony – at trial and during the penalty hearing – describing for the jury the impact of Hammer's mental, emotional and cognitive impairments on his ability to provide accurate, reliable information to authorities following the death of Mr. Marti. For this reason as well, the government's failure to disclose this evidence violated Hammer's Fifth, Sixth, Eighth and Fourteenth Amendment rights.

N.    Alternatively, counsel was ineffective in failing to adequately investigate, develop and present evidence that Hammer is a serial false confessor and that his false confessions in prior murders are a result of his mental, emotional and cognitive impairments rendering the statements to authorities in this case supporting intentional first degree murder incredible and unreliable. Counsel's prejudicial deficient performance denied Hammer his Fifth, Sixth, Eighth and Fourteenth Amendment rights.

O.    Where, as here, Hammer's statements regarding the circumstances

95

surrounding decedent Marti's death provided the factual basis for Hammer's guilty plea and the sentencing determination, vacation of the guilty plea and death sentence is required in order to prevent a miscarriage of justice.

P.      Grounds 6 and 7 and the supporting facts are incorporated herein.

**Ground Twenty:  Counsel was ineffective in failing to seek a mistrial (or at the least a curative instruction) during penalty phase after the court allowed the government to present evidence of an aggravating factor that the court ultimately did not submit to the jury – but the jury heard the evidence of the aggravating factor.**

A.      One aggravating factor proffered by the Government in support of the death sentence was that "vulnerable victim" aggravating factor pursuant to 18 U.S.C. § 3592(c)(11).

B.      The prosecution argued evidence it expected to present to support that aggravating factor during its opening statement, including: that Mr. Marti was "slow;" that he was "a wonderful pigeon;" that he had epileptic seizures as a child; and, that he wrote letters to his family indicating his impairments.  NT Vol. 15- Partial Transcript at 34-35.

C.      During the penalty hearing, the Government presented evidence throughout its case regarding the features it described during its opening statement which would otherwise have been inadmissible evidence.  For example:

5.      Government witness Donn Troutman testified that the BOP testing

indicated that Mr. Marti was functioning at a fourth grade level of education overall with a seventh grade level for reading comprehension and seventh grade level on spelling. NT Vol. 16 at 16. Mr. Troutman further testified that "it took a long time for [Marti] to process information" and that he "would have to explain things and over explain things so that he would actually be able to comprehend what it was [Troutman] was saying to him." *Id.* at 16-17. Mr. Troutman also testified that "both counselors spent a lot of time talking with Marti basically kind of shepherding him along, trying to help him out." *Id.*

6.    Government witness Michael Marti, the decedent's brother, testified about seizures the decedent had as a small child. This testimony was not limited to the fact that seizures occurred, but also included descriptions of what would happen to the decedent during the seizures, how long they occurred and the medical treatment sought after they began occurring. NT Vol. At 125-28. Mr. Marti also testified that the decedent had difficulties with school subjects; had motor skills difficulties; and in general "wasn't up to speed as far as normal kids." *Id.* at 128-30.

7.    Government witness Robert Marti, the decedent's father, testified in more detail regarding the decedent's seizures and the efforts they went through to obtain the necessary medical care for him. *Id.* at 139-41. Mr. Marti also testified

that the decedent "was always in disability classes and that type of thing," and that he couldn't pass the entrance exam for military service, *id.* at 141-2. Mr. Marti also described a prior incident where the decedent was assaulted by a prisoner in a different prison and read to the jury his letter to the prison expressing his concerns for the decedent's son and giving a more graphic detail of the decedent's difficulties as a child. *Id.* at 163-66.

8.    Government witness Muhammad Chaudhri, the physician's assistant at Allenwood testified that the decedent's history indicated the seizure disorder, that the decedent had suffered a gunshot wound in the past and that the decedent was at various times on medication for sleep disorders, anxiety and post-traumatic stress disorder. NT Vol. 17 at 87-90.

D.    Following the presentation of the evidence during the penalty hearing, the Court concluded that the Government's evidence was insufficient to support this aggravating factor. *See* NT Vol. 26 at 6.

E.    Of course, by the time the Court ruled, the jury had already heard the evidence. The jury's consideration of this evidence in reaching the sentencing determination violated the Fifth, Sixth, Eighth and Fourteenth Amendments.

F.    Nevertheless, counsel failed to request a mistrial or even a cautionary instruction informing the jury that it was not to consider that evidence. Counsel's

failure to do either constitutes deficient performance and, where, as here, counsel's omission resulted in the jury considering impermissible factors in reaching its sentencing determination in violation of the Eighth Amendment, prejudice is demonstrated. *E.g. Freeman v. Class*, 95 F.3d 639, 644 (8th Cir. 1996) (failure to request mistrial where prosecution injected impermissible evidence (post-arrest silence) into the jury's consideration); *id.* (counsel ineffective for failing to request cautionary instruction on accomplice testimony); *Everett v. Beard*, 290 F.3d 500, 514 (3d Cir. 2002) ("counsel must not neglect to suggest instructions that represent the law that would be favorable to his or her client supported by reasonably persuasive authority"); id., 290 F. 3d at 515-16 (finding counsel ineffective for failing to request proper instruction); *Burns v. Gammon*, 260 F.3d 892, 897 (8th Cir.2001) (ineffective assistance where counsel failed to request a curative cautionary jury instruction).

**Ground Twenty One:  The Government's Lethal Injection Method Violates the First, Fifth, Eighth and Fourteenth Amendments to the United States Constitution.**

    A.    This Court has previously ruled that "the sentence of death must be implemented in a manner consistent with the law of the Commonwealth of Pennsylvania." *United States v. Hammer*, 121 F. Supp. 794, 797 (M.D. Pa. 2000).