This Court further held that "[t]he implementation of Mr. Hammer's sentence of death is required to be consistent with the procedures set forth in §§ 3001 through 3008, Title 61 of the Pennsylvania Statutes[.]" *Id.* at 800.[4] As described more fully below, the method of execution as provided in the Pennsylvania statute, even in view of the clarifications described by the Government in prior filings, demonstrates that the method of execution in Hammer's case violates the First, Fifth, Sixth, Eighth and Fourteenth Amendments.

B.     Also in a prior order, this Court concluded that prior claims raised by Mr. Hammer did not involve the constitutionality of lethal injection under the federal death penalty statute. *Order* May 19, 2004 (Document Number 900) at 2-3. In reaching this conclusion, this Court noted that the Government's argument that Hammer's prior filings should have been raised in Section 2255 proceedings "would have arguable merit" if those filings raised a claim regarding the constitutionality of the method of execution. *Id.* Although the Supreme Court's recent decision in *Nelson v. Campbell*,     U.S.    , 124 S.Ct. 2117, 2122-23 (2004), may conflict with this Court's finding of "arguable merit" that the

---

[4]This Court has also previously ruled on claims raised by Mr. Hammer regarding the use of the "cut-down" procedure, witness attendance and Hammer's final statement before the execution. *See Orders* May 19, 2004, May 26, 2004, June 2, 2004.

constitutionality of the method of execution must be raised in Section 2255 proceedings, Hammer files this claim in an effort to ensure that he receives a full and fair review of his claim that the method of execution in his case violates the First, Fifth, Sixth, Eighth and Fourteenth Amendments.

C.    As described above, this Court has concluded that Pennsylvania's "method of execution" is required in Hammer's case.  Pennsylvania law states the following:

> (a) Injection – The death penalty shall be inflicted by injecting the convict with a continuous intravenous administration of a lethal quantity of an ultrashort-acting barbiturate in combination with chemical paralytic agents approved by the department [of corrections] until death is pronounced by the coroner.  The coroner shall issue the death certificate.  The execution shall be supervised by the superintendent or his designee of the correctional institution designated by the department for the execution.
>
> (b) Injection agents – Notwithstanding [35 P.S. § 780-113], known as the Controlled Substance, Drug, Device and Cosmetic Act, the secretary [of corrections] or his designee may obtain the injection agents directly from a pharmacist or manufacturer.

61 P.S. § 3004.

D.    While the Government has not provided the full protocol for the lethal injection procedures employed by the Bureau of Prisons, it has stated that:

> [T]he Bureau uses a three-chemical combination continuously administered to the condemned person, consisting of sodium Pentothal, pancuronium bromide and potassium chloride.  The chemicals are continuously

101

administered via a single line, with introduction of saline between chemicals to clear the line. The purpose of clearing the line with saline between administration of chemicals is to prevent flocculation which could impact on the administration of the lethal chemicals.

*Government's Supplemental Opposition to Hammer's Motion Relating to Implementation of the Sentence of Death*, 5/11/04 (Document 895) at 6.

E.    Even after this clarification, there are many significant questions that remain, raising substantial questions about the actual method of execution. For example:

*    How are the drugs obtained, stored, labeled, etc.?

*    What dosages of each drug are used?

*    How are the dosages determined?

*    For what length of time is the prisoner subjected to each drug?

*    How are the prisoner's vital signs monitored?

*    How is the prisoner's condition monitored to ensure that the procedure is not inflicting unnecessary pain and suffering?

*    By what means is death determined?

*    What are the minimum qualifications and expertise of the persons performing the various tasks involved in the lethal injection process (e.g., choosing drugs, choosing injection devices, obtaining drugs, storing drugs, deciding dosages, deciding order of injection, inserting needles, injecting drugs, monitoring vital signs, monitoring for unnecessary pain and suffering)?

102

Thus, as described more fully below, the Government's general averments identifying the drugs used does not alter the constitutional problems is lurking in the secret protocols with respect to administering the lethal drugs.

F.    Moreover, there is no indication whether the Bureau follows record-keeping requirements regarding the use of controlled substances; follows generally accepted professional medical standards in regard to the drugs and devices used for lethal injection; or, allows persons who are not licensed by any appropriate state board to use those drugs and devices, under Pennsylvania law, the agency conducting the execution is exempt from such requirements. *See* 61 P.S. § 3004 (b).

G.    Likewise, just because the "method of execution" is allegedly that used in  Pennsylvania does not provide Hammer with any competent information that the "method" conforms with the Constitution.  Given the many questions left open by Pennsylvania's lethal injection statute, and given that the statute explicitly negates the precautions and safeguards that normally surround the use of controlled substances and devices, any reliable evaluation of Pennsylvania's lethal injection methods depends on knowledge of how the DOC actually carries out executions.  The DOC, however, keeps that information secret.  The "DOC has acknowledged that it has a manual ... that describes in detail the actual procedures

for lethal injection." Travaglia v. Department of Corrections, 699 A.2d 1317, 1321 (Pa.Cmwlth.), appeal denied, 705 A.2d 1313 (Pa. 1997) (table). The DOC, however, "regards [the manual] as confidential," and refuses to release it or the information it contains. Id.

H.    Moreover, the DOC's own description of its secret lethal injection "manual" raises more concerns about its lethal injection practices. The DOC says that its "manual" only "set[s] guidelines and goals, not obligations for its personnel," it "fix[es] no obligations or duties of personnel," and it "do[es] not carry any penalties for deviation from the [manual's] suggestions." Travaglia, 699 A.2d at 1321. Thus, the DOC's admits that there actually are no rules governing lethal injection in Pennsylvania. At most, there are "suggestions" that may be ignored at the whim of the participants.

## Constitutional Violations

I.    Pennsylvania's secret and under-regulated method of lethal injection violates the First, Eighth and Fourteenth Amendments to the United States Constitution, for several reasons.

J.    The secret lethal injection protocol and the limits on what the witnesses are allowed to view, violate the First Amendment's guarantee of public and press access to governmental proceedings.

104

K.     The secret lethal injection protocol, the limits on who can witness a lethal injection, and the limits on what the witnesses are allowed to view, violate the Eighth Amendment prohibition against cruel and unusual punishments because such a veil of secrecy would not have been allowed at the time of the adoption of the Bill of Rights.

L.     The lethal injection statute and the further information provided by the Government in prior filings are unconstitutionally vague, in violation of the Eighth Amendment, the due process clause of the Fourteenth Amendment.

M.     The secrecy of lethal injection protocols violates core principles of due process, guaranteed by the due process clause of the Fourteenth Amendment, which prohibit the deprivation of life or liberty on the basis of secret information that the prisoner has no opportunity to examine or challenge.  These due process concerns are especially weighty in a capital case, where the Eighth Amendment demands heightened procedural protections.

N.     Placement of unfettered discretion in the hands of the BOP, especially when coupled with no indication of binding standards for those participating in the process, makes lethal injection arbitrary and capricious, in violation of the due process clause of the Fourteenth Amendment and the Eighth Amendment.

O.     The lethal injection method violates the Eighth Amendment because

105

it creates an unacceptable risk for the infliction of unnecessary pain and suffering. Given the secrecy surrounding the protocols, it is impossible for Hammer to fully know or describe the risks of pain and suffering associated with that process, and it is impossible for this Court to have any confidence that the method satisfies the Eighth Amendment's prohibition against cruel and unusual punishments. For those reasons alone, this Court should order discovery and an evidentiary hearing on these issues.

P.    Moreover, even the limited information that is available through the statute itself and the information supplied by the Government shows that the method of execution violates the Eighth Amendment.

Q.    As described by the Government, the method utilized by the BOP involves three drugs: soduim pentathol; pancurium bromide; and, potassium chloride. There is no indication of the dosages of any of these drugs. The drugs are administered through a single IV line, using a saline solution between the administration of each drug.

R.    Sodium pentothal is commonly used during surgery as an *introductory anesthetic*. It is a short-acting barbiturate that renders the patient unconscious for only a few minutes. Thus, the patient may re-awaken and breathe on his or her own power if any complications arise in inserting a breathing tube

106

pre-surgery. Pentothal will dissipate after five to seven minutes. *See Drug Companies and Their Role in Aiding Executions*, available at www.ncadp.org/html/ report.htm, *quoting* Dr. Lawrence Egbert, Visiting Assistant Professor of Anesthesiology, Johns Hopkins Medical School (sodium pentothal "begins to wear off almost immediately, rendering the person conscious within minutes"). Thus, there is a strong likelihood that the pentothal utilized in the method utilized by the BOP would not provide a sedative effect throughout the entire execution process[5].

S.    Pancurium bromide is a derivative of curare that acts as a neuromuscular blocking agent. In short, it paralyzes the body and collapses the

----

[5]While Pennsylvania has maintained the secrecy of its protocol, two 1997 Florida Reports recount Pennsylvania's partial response to Florida's telephone survey regarding methods of execution: a 1997 report by the Committee on Criminal Justice, the Florida Senate, entitled, *A Monitor: Methods of Execution & Execution Protocols* (hereinafter "Monitor"), www.fcc.state.fl.us/fcc/reports/monitor/intromon.html, and an excerpt from the Florida Corrections Commission's 1997 *Supplemental Report*, captioned "Execution Methods Used by States" (hereinafter "Supplemental Report"), www.fcc.state.fl.us/fcc/reports/methods/ emstates.html. The Supplemental Report recounts that the DOC maintained that its written lethal injection protocol of the DOC is confidential. Still, the Monitor reports that Pennsylvania estimated that 30 minutes elapse between the time the prisoner is restrained to the time that death is determined, placing Pennsylvania behind Arizona for the greatest amount of time elapsed. A 30 minute time-lapse while using a short-acting anesthetic creates yet further evidence of the likelihood that the method utilized by the BOP results in constitutionally prohibited excruciating pain and suffering.

organs, causing suffocation. While the drug paralyzes skeletal muscles, including the diaphragm, it has no effect on the consciousness or the perception of the pain and/or suffering. Thus, while the patient may appear sedated, he or she is consciously aware yet incapable of notifying personnel of the slow, lingering asphyxiation, and excruciating pain caused by the drug. Untrained witnesses to a lethal injection utilizing this method are completely unaware of the conscious pain and torture experienced by the inmate.

T.    Potassium chloride destroys the inmate's organs. Absent sufficient anaesthesia, the result is extreme pain as the drug burns through the inmate's organs.

U.    The Government acknowledges that the chemicals are administered seriatim, with a saline flush used between the administration of each drug. This procedure increases the risk that the anesthetic effect of the ultra-short acting sodium pentothal will abate during the execution process, thus increasing the likelihood that the pain and physical distress that are caused by the potassium chloride (and such pain and physical distress are acute if potassium chloride is administered when a subject is not properly and deeply under anesthesia) will be entirely masked by a paralytic agent such as pancuronium.

V.    Thus, through use of an ultra-short acting anesthetic in combination

with a paralytic agent (pancuronium), there remains a real and substantial risk that the effects of the anesthetic will have abated before death is actually induced. The prisoner slowly suffocates, experiencing excruciating pain while no one observing the procedure will be aware of the prisoner's suffering, because the paralytic agents prevent the prisoner from moving, crying out or otherwise communicating his agony. Onlookers are presented with a sterile, peaceful scene, while the condemned suffers.

W.    The United States Court of Appeals for the District of Columbia Circuit has carefully examined the "use of barbiturates and paralytics as capital punishment devices," and has found that "the known evidence concerning lethal injection ... strongly indicates that such drugs pose a substantial threat of torturous pain to persons being executed." *Chaney v. Heckler*, 718 F.2d 1174, 1177 (D.C. Cir. 1984), *rev'd on other grounds*, 470 U.S. 821 (1985).

X.    "[U]sing barbiturates and paralytics to execute human beings," as required by Pennsylvania law, "poses a serious risk of cruel, protracted death" because "[e]ven a slight error in dosage or administration can leave a prisoner conscious but paralyzed while dying, a sentient witness of his or her own slow, lingering asphyxiation." *Chaney*, 718 F.2d at 1191 (citing ROYAL COMMISSION ON CAPITAL PUNISHMENT, 1949-1953 Report (1953)).

109

Y.    The "serious risk of cruel, protracted death" posed by "slight error" in the use of these drugs is heightened by the fact that a physician does not participate in the lethal injection procedures[6] and the medical profession's ethical rules *prohibit* physician participation in executions.

Z.    In addition to the "serious risk of cruel, protracted death" posed by "slight error" in use of the chemicals, lethal injection may cause severe physical and mental anguish when untrained or poorly trained personnel try to locate veins for insertion of the IV lines.

AA.    Additionally, the protocol utilized includes a cut-down procedure in the event of difficulty obtaining venous access. David L. Nelson's challenge to Alabama's proposed use of the cut-down procedure to execute him was the subject of *Nelson v. Campbell*, 124 S. Ct. 2117 (2004), in which the United States Supreme Court held that a request for temporary injunctive relief staying the

---

[6]Pennsylvania law *used to* specifically allow for physician presence at lethal injections – former 42 Pa. C.S. § 9711(l)(2) provided that "[n]o person except the following shall witness any execution" and included among those who were permitted to "witness" the execution "[a] qualified physician." The Legislature, however, repealed this provision on June 18, 1998, *see* P.L. 622, No. 80, and replaced it with current 61 P.S. § 3005 (quoted above) which does not allow for a physician's presence.

110

execution would state a proper claim under 42 U.S.C. § 1983.[7]

BB.    Experts opine that lethal injection is the *most commonly botched* method of execution.  There have been several studies of botched lethal injections. *See, e.g.*, Deborah W. Denno, *Getting to Death: Are Executions Unconstitutional?*, 82 IOWA L. REV. 319 (1997) ("Denno-1"); Deborah W. Denno, *When Legislatures Delegate Death: the Troubling Paradox Behind State Uses of Electrocution and Lethal Injection and What it Says about Us*, 63 OHIO ST. L.J. 63 (2002) ("Denno-2"); Michael L. Radelet, Post-Furman Botched Executions, Death Penalty Information Center, available at http:// www. deathpenaltyinfo. org ("Radelet"); Michael Radelet, "On Botched Executions" Peter Hodgkinson and William Schabas (eds.), CAPITAL PUNISHMENT: STRATEGIES FOR ABOLITION (Cambridge University Press, 2001) and Stephen Trombley, THE EXECUTION PROTOCOL (1992).  Some of the results are described below:

> **Charles Brooks, Jr.** (December 7, 1982, Texas): The executioner had a difficult time finding a suitable vein.  The injection took seven minutes to kill.  Witnesses stated that Brooks "had not died easily."  *See* Denno-1 at 428-29; Denno-2 at 139.

> **James Autry** (March 14, 1984, Texas): Autry took ten minutes to die,

---

[7]To the extent that this Court has previously ruled on the use of the cut-down procedures, *see Order*, May 26, 2004, Mr. Hammer respectfully requests reconsideration in light of the evidence and law proffered in this claim and the Supreme Court's decision in *Nelson v. Campbell*.

complaining of pain throughout.  Officials suggested that faulty equipment or inexperienced personnel were to blame.  *See* Denno-1 at 429; Denno-2 at 139.

**Thomas Barefoot** (October 30, 1984, Texas): A witness stated that after emitting a "terrible gasp," Barefoot's heart was still beating after the prison medical examiner had declared him dead.  *See* Denno-1 at 430; Denno-2 at 139.

**Stephen Morin** (March 13, 1985, Texas): It took almost 45 minutes for technicians to find a suitable vein, while they punctured him repeatedly, and another eleven minutes for him to die.  *See* Denno-1 at 430; Denno-2 at 139; Radelet.

**Randy Woolls** (August 20, 1986, Texas): Woolls had to assist execution technicians in finding an adequate vein for insertion.  He died seventeen minutes after technicians inserted the needle.  See Denno-1 at 431; Denno-2 at 139; Radelet; "Killer Lends A Hand to Find A Vein for Execution," L.A. TIMES, Aug. 20, 1986, at 2.

**Elliot Johnson** (June 24, 1987, Texas): Johnson's execution was plagued by repetitive needle punctures and took executioners thirty-five minutes to find a vein.  See Denno-1 at 431; Denno-2 at 139; Radelet; "Addict Is Executed in Texas For Slaying of 2 in Robbery," N.Y. TIMES, June 25, 1987, at A24.

**Raymond Landry** (December 13, 1988, Texas): Executioners "repeatedly probed" his veins with syringes for forty minutes.  Then, two minutes after the injection process began, the syringe came out of Landry's vein, "spewing deadly chemicals toward startled witnesses."  A plastic curtain was pulled so that witnesses could not see the execution team reinsert the catheter into Landry's vein.  "After 14 minutes, and after witnesses heard the sound of doors opening and closing, murmurs and at least one groan, the curtain was opened and Landry appeared motionless and unconscious."  Landry was pronounced dead twenty-four minutes after the drugs were initially injected.  *See* Denno-1 at 431-32; Denno-2 at 139; Radelet.

112

**Stephen McCoy** (May 24, 1989, Texas): In a violent reaction to the drugs, McCoy "choked and heaved" during his execution. A reporter witnessing the scene fainted. *See* Denno-1 at 432; Denno-2 at 139; Radelet.

**George Mercer** (January 6, 1990, Missouri): A medical doctor was required to perform a surgical "cutdown" procedure on Mercer's groin. *See* Denno-1 at 432; Denno-2 at 139.

**George Gilmore** (August 31, 1990, Missouri): Force was used to stick the needle into Gilmore's arm. *See* Denno-1 at 433; Denno-2 at 139.

**Charles Coleman** (September 10, 1990, Oklahoma): Technicians had difficulty finding a vein, delaying the execution for ten minutes. *See* Denno-1 at 433; Denno-2 at 139.

**Charles Walker** (September 12, 1990, Illinois): There was a kink in the IV line, and the needle was inserted improperly so that the chemicals flowed toward his fingertips instead of his heart. As a result, Walker's execution took eleven minutes rather than the three or four contemplated by the state's protocols, and the sedative chemical may have worn off too quickly, causing excruciating pain. When these problems arose, prison officials closed the blinds so that witnesses could not observe the process. *See* Denno-1 at 433-34; Denno-2 at 139; Radelet; Niles Group Questions Execution Procedure, UNITED PRESS INTERNATIONAL, Nov. 8, 1992 (Lexis/Nexus file).

**Maurice Byrd** (August 23, 1991, Missouri): The machine used to inject the lethal dosage malfunctioned. *See* Denno-1 at 434; Denno-2 at 140.

**Rickey Rector** (January 24, 1992, Arkansas): It took almost an hour for a team of eight to find a suitable vein. Witnesses were separated from the injection team by a curtain, but could hear repeated, loud moans from Rector. See Denno-1 at 434-35; Denno-2 at 140; Radelet; Joe Farmer, "Rector's Time Came, Painfully Late," ARKANSAS DEMOCRAT GAZETTE, Jan. 26, 1992, at 1B; Marshall Frady, "Death in Arkansas," THE NEW YORKER, Feb. 22, 1993, at 105.

**Robyn Parks** (March 10, 1992, Oklahoma): Parks violently gagged, jerked,

spasmed and bucked in his chair after the drugs were administered. A news reporter witness said his death looked "painful and inhumane." *See* Denno-1 at 435; Denno-2 at 140; Radelet.

**Billy White** (April 23, 1992, Texas): White's death required forty- seven minutes because executioners had difficulty finding a vein that was not severely damaged from years of heroin abuse. *See* Denno-1 at 435-36; Denno-2 at 140; Radelet.

**Justin May** (May 7, 1992, Texas): May groaned, gasped and reared against his restraints during his nine-minute death. *See* Denno-1 at 436; Denno-2 at 140; Radelet; Robert Wernsman, "Convicted Killer May Dies," ITEM (Huntsville, Tex.), May 7, 1992, at 1; Michael Graczyk, "Convicted Killer Gets Lethal Injection," HERALD (Denison, Tex.), May 8, 1992.

**John Gacy** (May 10, 1994, Illinois): The lethal injection chemicals solidified, blocking the IV tube. The blinds were closed for ten minutes, preventing witnesses from watching, while the execution team replaced the tubing. *See* Denno-1 at 435; Denno-2 at 140; Radelet; Scott Fornek & Alex Rodriguez, "Gacy Lawyers Blast Method: Lethal Injections Under Fire After Equipment Malfunction," CHICAGO SUN-TIMES, May 11, 1994, at 5; Rich Chapman, "Witnesses Describe Killer's 'Macabre' Final Few Minutes," CHICAGO SUN-TIMES, May 11,1994, at 5; Rob Karwath & Susan Kuczka, "Gacy Execution Delay Blamed on Clogged IV Tube," CHICAGO TRIB., May 11, 1994, at 1 (Metro Lake Section).

**Emmitt Foster** (May 3, 1995, Missouri): Seven minutes after the lethal chemicals began to flow into Foster's arm, the execution was halted when the chemicals stopped circulating. With Foster gasping and convulsing, blinds were drawn so witnesses could not view the scene. Death was pronounced thirty minutes after the execution began, and three minutes later the blinds were reopened so the witnesses could view the corpse. According to the coroner, the problem was caused by the tightness of the leather straps that bound Foster to the execution gurney. Foster did not die until several minutes after a prison worker finally loosened the straps. *See* Denno-1 at 437; Denno-2 at 140; Radelet; "Witnesses to a Botched Execution," ST. LOUIS POST- DISPATCH, May 8, 1995, at 6B; Tim O'Neil,

114

"Too-Tight Strap Hampered Execution," ST. LOUIS POST-DISPATCH, May 5,1995, at B1; Jim Slater, "Execution Procedure Questioned," KANSAS CITY STAR, May 4, 1995, at C8.

**Ronald Allridge** (June 8, 1995, Texas): Allridge's execution was conducted with only one needle, rather than the two required by the protocol, because a suitable vein could not be found in his left arm. *See* Denno-1 at 437; Denno-2 at 140.

**Richard Townes** (January 23, 1996, Virginia): It took twenty-two minutes for medical personnel to find a vein. After repeated unsuccessful attempts to insert the needle through the arms, the needle was finally inserted through the top of Townes' right foot. *See* Denno-1 at 437; Denno-2 at 140; Radelet.

**Tommie Smith** (July 18, 1996, Indiana): It took one hour and nine minutes for Smith to be pronounced dead after the execution team began sticking needles into his body. For sixteen minutes, the team failed to find adequate veins, and then a physician was called. Smith was given a local anesthetic and the physician twice attempted to insert the tube in Smith's neck. When that failed, an angio-catheter was inserted in Smith's foot. Only then were witnesses permitted to view the process. The lethal drugs were finally injected into Smith 49 minutes after the first attempts, and it took another 20 minutes before death was pronounced. *See* Denno-1 at 438; Denno-2 at 140; Radelet.

**Luis Mata** (August 22, 1996, Arizona): Mata remained strapped to a gurney with the needle in his arm for one hour and ten minutes while his attorneys argued his case. When injected, his head jerked, his face contorted, and his chest and stomach sharply heaved. *See* Denno-1 at 438; Denno-2 at 140.

**Scott Carpenter** (May 8, 1997, Oklahoma): Carpenter gasped, made guttural sounds, and shook for three minutes following the injection. He was pronounced dead eight minutes later. *See* Denno-2 at 140; Radelet; Michael Overall & Michael Smith, "22-Year-Old Killer Gets Early Execution," TULSA WORLD, May 8, 1997, at A1.

115

**Michael Elkins** (June 13, 1997, South Carolina): Liver and spleen problems had caused Elkins's body to swell, requiring executioners to search almost an hour – and seek assistance from Elkins – to find a suitable vein. *See* Denno-2 at 140; Radelet; "Killer Helps Officials Find A Vein At His Execution," CHATTANOOGA FREE PRESS, June 13, 1997, at A7.

**Joseph Cannon** (April 23, 1998, Texas): It took two attempts to complete the execution. Cannon's vein collapsed and the needle popped out after the first injection. He then made a second final statement and was injected a second time behind a closed curtain. *See* Denno-2 at 141; Radelet; "1st Try Fails to Execute Texas Death Row Inmate," ORLANDO SENT., Apr. 23, 1998, at A16; Michael Graczyk, "Texas Executes Man Who Killed San Antonio Attorney at Age 17," AUSTIN AMERICAN-STATESMAN, Apr. 23, 1998, at B5.

**Genaro Camacho** (August 26, 1998, Texas): Camacho's execution was delayed approximately two hours when executioners could not find a suitable veins in his arms. *See* Denno-2 at 141; Radelet.

**Roderick Abeyta** (October 5, 1998, Nevada): The execution team took twenty- five minutes to find a vein suitable for the lethal injection. *See* Denno-2 at 141; Radelet; Sean Whaley, "Nevada Executes Killer," LAS VEGAS REVIEW-JOURNAL, Oct. 5, 1998, at1A.

**Christina Riggs** (May 3, 2000. Arkansas): The execution was delayed for 18 minutes when prison staff couldn't find a vein. Radelet.

**Bennie Demps** (June 8, 2000, Florida): It took the execution team thirty-three (33) minutes to find suitable veins for the execution. "They butchered me back there," said Demps in his final statement. "I was in a lot of pain. They cut me in the groin; they cut me in the leg. I was bleeding profusely. This is not an execution, it is murder." The executioners had no unusual problems finding one vein, but because the Florida protocol requires a second alternate intravenous drip, they continued to work to insert another needle, finally abandoning the effort after their prolonged failures. *See* Denno-2 at 141; Radelet; Rick Bragg, "Florida Inmate Claims Abuse in Execution," N.Y. TIMES, June 9, 2000, at A14; Phil Long & Steve

116

Brousquet, "Execution of Slayer Goes Wrong; Delay, Bitter Tirade Precede His Death," MIAMI HERALD, June 8, 2000.

**Bert Hunter** (June 28, 2000, Missouri): In a violent reaction to the drugs, Hunter's body convulsed against his restraints during what one witness called "a violent and agonizing death." *See* Denno-2 at 141; Radelet; David Scott, "Convicted Killer Who Once Asked to Die is Executed," ASSOCIATED PRESS, June 28, 2000.

**Claude Jones** (December 7, 2000, Texas):  His execution was delayed 30 minutes while the execution team struggled to insert an IV.  One member of the execution team commented, "They had to stick him about five times.  They finally put it in his leg."  Radelet.

**Joseph High** (November 7, 2001, Georgia): For twenty minutes, technicians tried unsuccessfully to locate a vein in High's arms.  Eventually, they inserted a needle in his chest, after a doctor cut an incision there, while they inserted the other needle in one of his hands.   High was pronounced dead one hour and nine minutes after the procedure began. *See* Denno-2 at 141; Radelet.

CC.    In reading this list of botched executions, it must be kept in mind that the use of paralytic agents masks the actual pain and suffering that the prisoner is experiencing.  Thus, there is no way to know how many prisoners were tortured to death while they appeared to be peaceful and serene.

DD.    This does not inspire confidence in the BOP's ability to apply lethal injection in a humane manner, especially given the secrecy of the procedures.  Discovery and an evidentiary hearing should be allowed.

EE.    The lethal injection method employed by the BOP violates the Eighth

117

Amendment and Article I, § 13 because it is contrary to the "evolving standards of decency that mark the progress of a maturing society." *Atkins v. Virginia*, 536 U.S. 304, 312 (2002) (quoting *Trop v. Dulles*, 356 U.S. 86, 101 (1958)).

FF.    The Eighth Amendment's "evolving standards of decency" analysis is "informed by objective factors," such as "legislation enacted by the country's legislatures" and the views of professional "organizations with germane expertise." *Atkins*, 536 U.S. at 312, 316 n.21 (citations and quotation marks omitted).  When examining state legislation, "[i]t is not so much the number of these States that is significant, but the consistency of the direction of change." *Atkins* at 315.

GG.    Here, the "direction of change" in state legislation and the views of respected professional organizations shows that the BOP's lethal injection practice is not fit for a dog, let alone a human being.

HH.    In the year 2000, the leading professional association of veterinarians promulgated guidelines for animal euthanasia that preclude the use of a sedative in conjunction with paralytic agents. *See* 2000 Report of the American Veterinary Medical Association Panel on Euthanasia, 218 JOURNAL OF THE AMERICAN VETERINARY MEDICAL ASSOCIATION, 669, 680-81 (2001).  Thus, the BOP's lethal injection method would violate professional norms if applied to a dog.  Moreover,

118

since 1981 at least nineteen states have passed laws that forbid euthanizing animals by using a combination of sedatives and paralytic agents. *See* Tex. Health & Safety Code Ann. § 821.052(a), (b) (Vernon 2003); Fla. Stat. §§ 828.058 and 828.065 (enacted in 1984); Ga. Code Ann. § 4-11-5.1 (enacted in 1990); Me.Rev.Stat. Ann., Tit. 17, § 1044 (enacted in 1987); Md.Code Ann., Criminal Law, § 10-611 (enacted in 2002); Mass.Gen.Laws § 140:151A (enacted in 1985); N.J.S.A. 4:22-19.3 (enacted in 1987); N.Y.Agric. & Mkts § 374 (enacted in 1987); Okla. Stat., Tit. 4, § 501 (enacted in 1981); Tenn.Code Ann. § 44-17-303 (enacted in 2001); 510 Ill. Comp. Stat., ch. 70, § 2.09; Kan. Stat. Ann. § 47-1718(a); La. Rev. Stat. Ann. § 3:2465; 2 CSR 30-9.020(F)(5) (Missouri); R.I. Gen. Laws § 4-1-34, Conn. Gen.Stat. § 22-344a; Del.Code Ann., Tit. 3, § 8001; Ky.Rev.Stat. Ann. § 321.181(17) and 201 KAR 16:090, § 5(1); S.C.Code Ann. § 47-3-420. Thus, the BOP's lethal injection method would violate state law in nineteen states if applied to a dog. Given the consistent trend in professional norms and statutory regulation of animal euthanasia, the method currently practiced by the BOP is outside the bounds of evolving standards of decency.

II.    In addition to forbidding the use of paralytic agents with sedatives, the American Veterinary Medical Association stresses that only persons who are trained and knowledgeable in anesthetic techniques should administer a paralytic

agent in conjunction with any anesthesia.  *See* 2000 Report of the American Veterinary Medical Association Panel on Euthanasia, 218 JOURNAL OF THE AMERICAN VETERINARY MEDICAL ASSOCIATION, 669, 681 (2001).  Given the secrecy and the above discussion regarding the protocols of the BOP's lethal injection procedures, this Court cannot have any confidence that the BOP complies with these minimum humane standards for killing animals.

JJ.    The unmistakable trend over the past two decades condemns the use of paralytic agents in conjunction with sedatives in animal euthanasia.  This is clear evidence that the practice violates the Eighth Amendment.  It can hardly be disputed that if certain euthanasia techniques are banned as overly cruel to animals, those same practices violate our current standards of decency regarding the execution of humans.

KK.    Other factors further support the conclusion that lethal injection, as practiced in Pennsylvania, violates evolving standards of decency.  Most prominent is the position of the American Medical Association ("AMA"), which prohibits physicians' participation in executions.  *See, e.g.*, AMA Council on Ethical and Judicial Affairs, Council Report: Physician Participation in Capital Punishment, 270 JAMA 365, 365 (1993).  Although the AMA's position pertains to all methods of execution, it is uniquely relevant to lethal injection, which is in

120

many respects a medical procedure and which requires more medical skill than other execution methods. *See, e.g.,* Christina Michalos, Medical Ethics and the Executing Process in the United States, 16 J. MED. & L. 125, 126 (1997).

LL.    Lethal injection also violates the right of access to the courts, guaranteed by the due process clause of the Fourteenth Amendment, because it does not allow anyone from the defense team to be present during the lethal injection process; because it does not provide any rules by which the courts can stop an execution that is stayed at the last minute; and because the secrecy of the procedures and lack of actual rules impairs the condemned prisoner's ability to challenge the procedures in court.

MM.    Because the current *veterinary standard* for humane killing exclude the use of neuromuscular blocking agents such as pancuronium; because the lethal injection process proffered by the Government in this case includes the use of a paralytic agent such as pancuronium; and because use of that drug in combination with anesthesia creates a serious risk that death will be excruciatingly painful but the pain and discomfort masked by pancuronium-induced paralysis, there is no justification for exempting the Government's execution process from judicial scrutiny.

NN.    Accordingly, Hammer requests that the BOP's lethal injection

121

protocol be brought into the light, and that he be granted the following discovery:[8]

- The present, unredacted, version of manuals and/or written protocols for execution by lethal injection;

- The process by which the manuals were adopted and/or the protocol was formulated and by whom, including the credentials of those persons involved and those persons consulted in formulating the protocol;

- Any and all correspondence and memoranda relating to the creation/formulation of the protocol, including but not limited to reports and/or studies consulted;

- All prior versions of the manual and/or written protocol; whether and when changes or modifications were made to the protocol; what those changes were; by whom they were made; and any and all correspondence, memoranda, or reports and/or studies consulted relative to those changes or modifications;

- Whether there exists a process for modification or alteration of the protocol; the circumstances under which the process may be modified or altered; when that modification or alteration can occur; who is authorized to modify the protocol and under what circumstances; whether modification or alteration must be approved and, if so, by whom;

- All equipment used to carry out the execution, including but not limited to restraints, blindfolds, equipment used to deliver the drugs, and equipment used to monitor vital signs.  Please include the source and age of any medical equipment and any inspections of it, as well as any documentation relating thereto;

- The credentials of persons who perform the execution and/or each part of the process of execution;

---

[8]Hammer also files by separate motion his formal motion for discovery.

- The order of administration of the drugs and/or chemicals; the specific dosage of each; the rate of delivery of each drug used;

- The process by which the order of administration, specific dosage, and rate of delivery were determined, including persons involved and/or consulted;

- The number of persons involved in the execution and their credentials;

- A description of the configuration of the execution room(s) and any photographs or design plan of the execution room(s);

- The number/role of persons present in the execution room(s) and whether they are present in the same room as the prisoner during the execution;

- Measures taken in the event IV access is not immediately gained; by whom those measures are taken and their qualifications; and any and all equipment used;

- How, and by whom, death is determined;

- The procedure for selecting witnesses for executions generally, and for Mr. Hammer in particular;

- Any and all correspondence received from witnesses to any prior execution relative to the execution;

- Logs, videotapes, and any and all documentation relating to prior executions, including autopsy reports;

OO.    The disclosure of this information is necessary for a fair

determination of whether the Government's intended means of execution assures

an execution that is as humane as possible, that comports with the evolving

123

standards of a civilized society, and that comports with the requirements of the Eighth Amendment.

PP.    Hammer further requests that he be permitted to present evidence during the evidentiary hearing in support of these claims.

**Ground Twenty-Two: Hammer was denied his Fifth, Sixth, Eighth and Fourteenth Amendment rights where, as a result of Court error and ineffective assistance of counsel, the jury was precluded from viewing the entire videotape of the hypnosis session.**

A.    During trial, the defense sought to show the jury a videotape of the hypnosis session with Drs. Sadoff and Dubin.  While the Court permitted the defense to show part of the videotape, it precluded the defense from showing the entire session.  *See* NT Vol. 10 at 47.  Specifically precluded from the showing was approximately thirty-six minutes prior to the actual hypnosis and eight minutes following the hypnosis.

B.    During trial and the penalty hearing, the defense offered evidence that Mr. Hammer suffered from Dissociative Identity Disorder.  Evidence supporting that diagnosis was, therefore, relevant and material to the jury's consideration.

C.    As Dr. Kluft explains, the portions of the videotape that were excluded contain evidence supporting the Dissociative Identity Disorder.  Indeed, Dr. Kluft notes: "both before and during the hypnosis, the most impressive finding

124

is the picture of fluctuating presences and copresences of David Paul Hammer and Wilbur." *Report of Dr. Kluft* at 5. In Dr. Kluft's opinion, the interview prior to the actual hypnosis was compelling evidence of the presence of dissociative phenomena.

D.    As this evidence provided further support of Dr. Sadoff's diagnoses and conclusions, it was directly relevant to critical issues of the defense at trial and during the penalty hearing. Accordingly, the Court's preclusion of those portions of the videotape denied Hammer his Fifth, Sixth, Eighth and Fourteenth Amendment rights.

E.    Counsel's failure to properly present the relevance and materiality of the excluded portions of the videotape to the Court and their failure to properly raise and litigate the unconstitutional exclusion of those portions of the videotape constitutes prejudicially deficient performance in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.

13.    Reasons that some grounds were not previously presented include but are not limited to: they required proof outside the record, they were not ripe, evidence was suppressed, various waivers of issues were entered while Hammer was being psychiatrically and medically mismanaged, along with each of the

125

reasons set forth above in Ground III. Paragraph L, above.

14.    There is no petition or appeal now pending in any court as to this judgement.

15.    Names and address of each attorney who represented Mr. Hammer is as follows:

(A) At preliminary hearing: unknown

(B) At arraignment and plea:

(1) Ron Travis, Rieders, Travis, Humphry, Harris, Waters & Waffenschrnidt, 161 W. 3rd St., Williamsport, PA 17703;

(2) David Ruhnke, Ruhnke & Barrett; 47 Park St., Montclair, NJ 07042.

(C) At trial: Mssrs. Travis and Ruhnke, addresses above.

(D) At sentencing: Mssrs. Travis and Ruhnke; addresses above.

(E) Mr. Hammer was pro se on direct appeal; Mssrs. Ruhnke and Travis were appointed as standby counsel.

(F) Initial Section 2255 counsel: Attorneys Monica Foster, Esquire and Rhonda Long-Sharp, Esquire, 902 East 66th St. Indianapolis, IN 46220.

(G) Undersigned counsel have been appointed by the Court to represent Mr. Hammer here.

16.    The indictment alleged two counts of murder for the death of a single

person. The second count was dismissed prior to trial. A single death sentence was imposed after a plea of guilty to first degree murder.

17.     Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack? No.

WHEREFORE, David Paul Hammer, by counsel, prays that the Court grant him all relief to which he may be entitled in this proceeding.

Respectfully submitted,

s/ Anne L. Saunders
ANNE L. SAUNDERS, ESQUIRE
Asst. Federal Public Defender
Attorney ID #PA 48458
100 Chestnut Street, Suite 306
Harrisburg, PA 17101
Tel. No. (717) 782-3843
Fax No. (717) 782-3966
(Anne_Saunders@fd.org)

s/ Michael Wiseman
MICHAEL WISEMAN, ESQUIRE
Supervising Assistant Federal Defender
Attorney ID#PA 75342
Defender Association of Philadelphia
Federal Court Division-Capital Habeas Unit
Suite 545 West – The Curtis Building
Independence Square West
Philadelphia, PA 19106
(Michael_Wiseman@fd.org)

Dated:

127