**Donald N. Bersoff, Ph.D., J.D.**
**780 College Avenue**
**Haverford, PA 19041**

**610/649-8448**

Michael Wiseman, Esq.
Capital Habeas Corpus Unit
Defender Association of Philadelphia
Suite 545 West
Curtis Center
Philadelphia, PA 19106

**RE:  United States v. Hammer**

Dear Mr. Wiseman:

You have asked me to determine whether there are any ethical problems raised by the work of certain mental health professionals in the evaluation, diagnosis, and treatment of your client, David Paul Hammer, during his incarceration in various federal prisons from about 1994 to date, including his trial and various hearings conducted in 1998.  I am pleased to respond to that request.

**Introduction**

In sum, as I explain more fully below, it is my opinion, to a reasonable professional certainty, that the professional behavior of Drs. Mitchell, Wolfson, Karten, and Dubin raise significant ethical issues.  In arriving at this opinion, I reviewed the following documents:

Bureau of Prison (BOP) reports related to Mr. Hammer from 1994-2000, written by psychologists John Mitchell, PsyD, Stephen Karten, PhD, and others[1]

BOP Program Statement (Health Services Manual) dated September 15, 1996

Dr. Wolfson's 143-page forensic report of December 1997

---

[1]These psychologists include PR Magaletta, PhD, Gilbert Sanders, EdD, Mark Skrade, PsyD, John Worley, PhD, Teri White, PhD, Andrew Millar, PhD, James Watterson, PhD, Michael Morrison, PhD, Bill Elliot, PhD, Ted Moretz, PhD, CA Bigler, PhD, and David Wedeking, PhD.  Their work, with the brief exception of Dr. Magaletta (explained below) is not germane to this analysis.

1

Dr. Wolfson's sworn affidavit of February 3, 2003

Transcripts of testimony before Judge Muir (MD Pa) in 1998 by:

>Jill Miller, MSW
>Robert Sadoff, MD
>James Wolfson, MD
>John Mitchell, PsyD
>Stephen Karten, PhD
>Michael Gelbort, PhD

United States v. Hammer, 25 F.Supp.2d 518 (MD Pa 1998)
United States v. Hammer, 226 F.3d 229 (3rd Cir. 2000)
United States v. Hammer, 239 F.3d 302 (3rd Cir. 2001)
United States v. Hammer, No. 04-9001 (3rd Cir. June 3, 2004)

## Applicable Principles I:  Multiple Relationships

The major concern and most ubiquitous ethical problem that emerges from the foregoing documents is that of multiple relationships.  "The most comprehensive definition of multiple relationships includes those situations in which the psychologist functions in more than one professional relationship . . . (p. 336)."[2]  In the context of treatment, "A dual relationship in psychotherapy occurs when the therapist is in another, significantly different relationship with one of his or her patients (p. 22)."[3]  According to the code of ethics of psychologists applicable to the time period at issue here, "A psychologist refrains from entering into . . . another . . . professional relationship . . . if it appears likely that such a relationship reasonably might impair the psychologist's objectivity or otherwise interfere with the psychologist's effectively performing his or functions as a psychologist, or might harm or

---

[2]Sonne, J.  (1994).  Multiple relationships:  Does the new ethics code answer the right questions? _Professional Psychology: Research and Practice_, _25_, 336-343.  Similarly, the 2002 ethics code of the American Psychological Association (APA) states a "multiple relationship occurs when a psychologist is in a professional role with a person and (1) at the same time is in another role with the same person . . . (p. 1065)."  American Psychological Association (2002).  Ethical principles of psychologists and code of conduct. _American Psychologist_, _57_, 1060-1073 [hereinafter 2002 APA Code].

[3]Pope, K.  (1991).  Dual relationships in psychotherapy. _Ethics and Behavior_, _1_, 22-34.

exploit the other party (Standard 1.17, p. 1601).[4]

As is evident from these various formulations, a key factor in the definition of unethical multiple relationships is risk. Multiple relationships are proscribed even if in a specific case the behavior did not actually result in a negative outcome. It is the risk of harm that is determinative.[5]

The issue of multiple relationships is seen as a particularly important problem in the provision of forensic mental health services. It is generally agreed within the field that a treating therapist may be called upon to serve as a fact witness but it is also generally agreed that the therapist should not be compelled, nor volunteer, to act as an expert witness with regard to the mental status of his/her patient:

> Clinical, ethical, and legal concerns arise when the treating expert offers psycholegal assessment--an assessment for which the treating expert does not have

---

[4]American Psychological Association (1992). Ethical principles of psychologists and code of conduct. _American Psychologist_, _47_, 1597-1611 [hereinafter 1992 APA Code]. Similar language appears in the current APA code: "A psychologist refrains from entering into a multiple relationship if the multiple relationship could reasonably be expected to impair the psychologist's objectivity, competence, or effectiveness in performing his or her functions as a psychologist, or otherwise risks exploitation or harm to the person with whom the professional relationship exists." 2002 APA Code (Standard 3.05(a)), at 1065.

[5]There is no congruent set of proscriptions in the general ethical code of psychiatrists. The following principle, however, is applicable:

> Physicians generally agree that the doctor-patient relationship is such a vital factor in effective treatment of the patient that preservation of optimal conditions for development of a sound working relationship between a doctor and his/her patient should take precedence over all other considerations (Section 6(1), p. 8).

American Psychiatric Association (1985). _The principles of medical ethics with annotations especially applicable to psychiatry_. Washington, DC: American Psychiatric Association [hereinafter _Psychiatry Ethics_]. As is recognized, acting in multiple professional relationships risks impairing psychotherapy.

3

adequate professional basis, for which there are inherent role conflicts, and for which there will almost certainly be negative implications for continued therapy (p. 51).[6]

As is made explicit in the title of the Shuman & Greenberg article cited in the foregoing footnote, acting as both therapist and expert witness regarding the same patient is seen as an "irreconcilable conflict." The former president of the American Academy of Psychiatry and the Law agreed, calling these functions incompatible and noting in a lead editorial:

> When clinical and forensic roles are combined in the course of treatment, information gathered with the understanding that it will be used only for the patient's benefit is turned to other purposes. Regardless of the psychiatrist's intent, that information may redound to the patient's detriment. Alternatively, if patients are made aware at the outset of treatment that the therapist will also be performing a forensic function, it is difficult to imagine how open communication and effective treatment can take place. In either event, the outcome is unfair to the patient (p. 446).[7]

---

[6]Greenberg, S. & Shuman, D. (1997). Irreconcilable conflict between therapeutic and forensic roles. _Professional Psychology: Research and Practice_, _28_, 50-57. An association of forensic psychiatrists agree. A specific set of guidelines discourages psychiatrists from simultaneously performing both clinical and forensic roles. See American Academy of Psychiatry and the Law (1995). _Ethical guidelines for the practice of forensic psychiatry_. Bloomfield, CT: AAPL:

> A treating psychiatrist should generally avoid agreeing to be an expert witness or to perform an evaluation of his patient for legal purposes because a forensic evaluation usually requires that other people be interviewed and testimony may adversely affect the therapeutic relationship.

As with the APA's code of ethics, AAPL's guidelines emphasize risk, _i.e._, "may adversely affect the therapeutic relationship."

[7]Appelbaum, P. (1997). Ethics in evolution: The incompatibility of clinical and forensic functions. _American Journal of Psychiatry_, _154_, 445-446 (Editorial). See Strasburger, L., Gutheil, T., & Brodsky, A. (1997). On wearing two hats: Role conflict in serving as both psychotherapist and expert witness. _American Journal of Psychiatry_, _154_, 448-456 (dual roles of treater and evaluator should be avoided whenever possible).

For some forensic scholars, the issue of dual or multiple roles is so problematic they argue that it should be banned absolutely:

> Our immodest proposal is a rule imposing a clear, impenetrable boundary between therapeutic and forensic roles within a single case. Under such a rule, across the judicial spectrum, therapists would not be permitted to testify about their patients _even if the parties or the court requested it_ (p. 514) (emphasis added).[8]

Although much of the focus in the professional literature concerns the conflict between therapeutic and expert witness roles, as the earlier definitions and discussions of multiple relations make clear, there are other incompatible roles that raise serious ethical issues. It is generally considered quite problematic for a forensic expert to testify for one party, _e.g._, the prosecution, and to testify in the same case for another, _e.g._, the court or the defense. Forensic clinicians are cautioned to "avoid providing professional services to parties in a legal proceedings with whom they have . . . professional relationships that are inconsistent with the anticipated relationship (Section IV(D)), p. 659).[9]

### Applying the Principles to the Facts of this Case I

Psychologists Mitchell and Karten and psychiatrist Wolfson all engaged in multiple relationships that, in my opinion, are incompatible with sound ethical practice. I will take each in turn.

Dr. Mitchell performed three significantly different roles as a prison psychologist: Assessor of Mr. Hammer's mental state; Mr. Hammer's long term therapist; and expert witness as to Mr. Hammer's competency in two hearings. He first saw Mr. Hammer on May 23, 1995, for an intake evaluation when Mr. Hammer was transferred to Allenwood. He saw him monthly during his stay at Allenwood, assessing his mental status and potential for violence to himself or others while Mr. Hammer was in the Special Housing Unit,

---

[8]Shuman, D., Greenberg, S., Heilbrun, K. & Foote, W. (1998). An immodest proposal: Should treating mental health professionals be barred from testifying about their patients? _Behavioral Sciences and the Law_, 16, 509-523. The statement is particularly germane in this case because, as I describe more fully below, both Mr. Hammer and the presiding judge approved of Drs. Mitchell and Wolfson testifying as expert witnesses as to Mr. Hammer's competency to plead guilty and waive counsel and appeals.

[9]Committee on Ethical Guidelines for Forensic Psychologists (1991). Specialty guidelines for forensic psychologists. _Law and Human Behavior_, 15, 655-665 [hereinafter CEGFP].

5

including a specific suicide risk assessment on August 24, 1995. Three days after Mr. Hammer admitted to killing Mr. Marti, Dr. Mitchell wrote a short psychological report during which he stated that Mr. Hammer did not appear to have psychotic symptoms and was able to distinguish between right and wrong.

Dr. Mitchell's major contact with Mr. Hammer, however, was as his therapist. He saw his patient weekly or biweekly during 1995 and 1996, including many times subsequent to the killing, and many times in 1997 and 1998. Although at first Dr. Mitchell considered Mr. Hammer as having a genuine mental illness, on October 30, 1996, he recommended that his patient no longer be given a mental illness code in his records because, according to Dr. Mitchell, it became apparent to him "that the inmate's difficulties stem not from any Axis I diagnostic syndromes but from his severe antisocial personality features and other problematic personality traits."[10]

It is significant that less than a month later, on November 27, 1996, Mr. Hammer told Dr. Mitchell that he was concerned that his therapist would testify "in a negative way in his murder case." Dr. Mitchell sought to allay his patient's concerns and promised that he "would simply report what I had observed or heard from him." This turned out to be, of course, an empty promise when he later testified as an expert witness offering an opinion (not merely his observations) as to Mr. Hammer's competency. A couple of weeks later, on December 12, Mr. Hammer again expressed "his growing concern" about retaining Dr. Mitchell "as his therapist given that I [Dr. Mitchell] will in all likelihood testify concerning his mental status."

These interactions raise ethical issues beyond that of multiple relationships. Under the applicable 1992 APA ethics code Standard 1.21, (p. 1602):

> (a)  When a psychologist agrees to provide services to a person . . . at the request of a third party [here, the prison], the psychologist clarifies to the extent feasible, at the outset of the service, the nature of the relationship with each party. This clarification includes the role of the psychologist (such as therapist, . . . diagnostician, or expert witness), the probable uses of the services provided or the information obtained, and the fact that there may be limits to confidentiality.
>
> (b)  If there is a foreseeable risk of the psychologist being called upon to perform conflicting roles because of the involvement of a third party, the psychologist

---

[10]See text at n. 31, and note itself for further discussion of this issue.

clairifes the nature and direction of his or her responsibilities, keeps all parties appropriately informed as matters develop, and resolves the situation in accordance with this Ethics Code.

In addition to Dr. Mitchell's failure to anticipate that he might act in conflicting roles, he noted on May 7, 1997, that he was contacted by the prosecution informing him that he "may be called on at some point to speak to Hammer's competency to defend himself." Although he saw Mr. Hammer just two days later for a counseling session, and many times after that for treatment, he never informed Mr. Hammer of the potential for his testifying at the behest of the prosecution. In my opinion, immediately after receiving the communication on May 7th, he had an ethical duty to inform Mr. Hammer that he might be testifying as an expert, with concomitant limits on confidentiality.[11]

Mr. Hammer continued to express his concerns about Dr. Mitchell's loyalty and fidelity. Six weeks after Dr. Mitchell spoke to the prosecution, on June 27, 1997, he noted that Mr. Hammer "expressed concern over whether he could trust me; this apparently stemmed from my writing a control unit referral report without notifying him." Two weeks later, Dr. Mitchell wrote (see July 8, 1997, summary of a counseling session), Mr. Hammer refused to see anybody from the psychology unit because he "will not be involved with those of you who are actually working as agents for assistant U.S. Attorney Fred Martin in his endeavors to murder me." A month later, on August 5, 1997, Mr. Hammer, cancelled his therapy sessions with Dr. Mitchell because of his concerns "about some records" that Dr. Mitchell was "keeping on him." Just a bit more than two weeks after that, Dr. Mitchell attended Mr. Hammer's hearing to determine the validity of his desire to plead guilty. Dr. Mitchell was scheduled to testify as an expert on his competency to do so.[12]

---

[11]See Standard 4.01, p. 1605 (Structuring the Relationship) in the 1992 APA ethics code:

> Psychologists discuss with clients or patient as early as is feasible in the therapeutic relationship appropriate issues, such as . . . confidentiality.

See also Standard 5.02, p. 1606 (Maintaining Confidentiality)

> Psychologists have a primary obligation to take reasonable precautions to respect the confidentiality rights of those with whom they work . . . .

[12]Ultimately, Dr. Mitchell did not testify at this time because Mr. Hammer withdrew his plea. But it is clear that Mr. Hammer's concerns about his therapist's potential multiple roles disrupted

7

These concerns by Mr. Hammer, whether ultimately valid or not, exemplify why multiple relationships, particularly in a forensic setting, are to be avoided if at all possible. As the U.S. Supreme Court recognized:

> Effective psychotherapy . . . depends upon an atmosphere of confidence and trust in which the patient is willing to make a frank and complete disclosure of facts, emotions, memories, and fears. . . . [T]he mere possibility of disclosure may impede development of the confidential relationship necessary for successful treatment . . . . (p. 10).[13]

Clearly, Mr. Hammer varied in the level of trust he felt with his therapist. Dr. Mitchell responded by incorrectly promising he would not testify as an expert, eventually met with both the defense and prosecuting attorneys regarding his clinical impressions of Mr. Hammer (see note of June 5, 1998), evaluated his therapy patient to determine his competency to plead guilty (see note of June 22, 1998), subsequently testified as an expert as to his competency to plead guilty (see transcript [Tr.] of July 8, 1998), conducted an evaluation on August 3, 1998, to determine Mr. Hammer's competency to dismiss counsel and waive appeals, and testified as an expert on that issue on October 1, 1998.[14]

---

his ongoing treatment.

[13]*Jaffee v. Redmond*, 518 U.S. 1 (1996).

[14]Further muddying the waters was the fact that during therapy sessions Dr. Mitchell had with Mr. Hammer after the death of Mr. Marti, Mr. Hammer expressed significant and persistent concerns about the conduct of his capital trial (both during and after conviction), including his relationship to his attorneys, and whether to plead guilty, waive appeals, and ask for an execution date. See, e.g., Dr. Mitchell's notes of April 14, 17, 1998; May 1, 18, 1998; June 1, 10, 15, 1998; July 26, 27, 1998; September 29, 1998, November 3, 21, 1998; and December 3, 24, 1998). Although Dr. Mitchell had a professional obligation to discuss these topics because they were causing his patient emotional distress, it raises countervailing ethical concerns given the multiple roles Dr. Mitchell played and would play in Mr. Hammer's trial, including testifying on behalf of the prosecution. Although Dr. Mitchell acted primarily as Mr. Hammer's therapist, he was also an employee of the BOP (and ultimately of the U.S. Department of Justice). Thus, Dr. Mitchell should have either avoided altogether discussion of legal matters relevant to Mr. Hammer's case, referred him to another mental health professional who would not be testifying, or informed him of the limits of confidentiality with regard to these matters. See Standard 4.01 of the 1992 APA Code.

8

Dr. Mitchell's testimony on June 22, 1998, was at the behest of defense counsel. But in the hearing on October 1, 1998, to determine Mr. Hammer's competency to dismiss counsel and waive appeals, he testified for the prosecution. Dr. Mitchell acknowledged that he had been in a "clinical relationship" (Tr. at p. 93) with Mr. Hammer but then, contrary to ethical principles, testified as an expert, i.e., to a reasonable psychological certainty as the the ultimate opinion question, that Mr. Hammer, according to his evaluation, was competent to discharge counsel and waive appeals (see Tr. at pp. 107-108).

Although the use of Dr. Mitchell (and Dr. Wolfson) as an expert at these hearings was instigated by the court (who would not necessarily be as aware of the ethical implications as should the witnesses) and agreed to by Mr. Hammer, that alone did not warrant Drs. Mitchell and Wolfson testifying. First, it borders on the oxymoronic to ask Mr. Hammer if he consented to the competency evaluations by Drs. Mitchell and Wolfson when the sole purpose of these evaluations was to determine Mr. Hammer's cognitive capacity to make knowing, intelligent, and voluntary decisions regarding his legal fate.[15] Second, Dr. Mitchell was not the only psychologist at Allenwood. As he testified on July 8, 1998, at the first competency hearing, Dr. Magaletta had been at Allenwood since June 1996 (see Tr. at pp. 135-136). Third, although a witness may be called upon by the court to testify as an expert, if the witness does not feel competent to do so or asserts ethical obligations not to do so, the witness cannot be compelled to so testify:

> The clinician who does testify as a fact witness should rigorously maintain role boundaries by declining to perform the functions of an expert witness . . . . A therapist who is asked to give expert testimony about a patient can respond to an an attorney's request, a subpoena, or (at a last resort) courtroom questioning with a disclaimer such as this: "Having observed the

---

[15]In addition, there is always the question whether the consent of a prisoner is truly voluntary. See, e.g., 46 C.F.R. Sec. 46.302 (pertaining to research with prisoners). This concern is compounded by the fact there is general agreement that there is an undue power differential between the therapist and the client, leading the client to want to please the therapist. This would also have an impact on the voluntariness of a client's decision. See, e.g., Psychiatric Ethics, Section 2(a):

> The psychiatrist should diligently guard against exploiting information furnished by the patient and should not use the unique position of power afforded him/her by the psychotherapeutic situation to influence the patient in any way not directly relevant to the treatment goals.

patient only from the vantage point of a treating clinician, I have no objective basis for rendering an expert opinion, with a reasonable degree of medical certainty, on a legal as opposed to a clinical question" (p. 454).[16]

To a less pervasive extent, Dr. Karten, the former chief psychologist at Allenwood, also engaged in multiple roles. Although Dr. Mitchell was Mr. Hammer's primary therapist, Dr. Karten also served in a therapeutic role (see p. 115 of Dr. Wolfson's forensic report [hereinafter Wolfson Report). In fact, in Dr. Karten's testimony at the behest of the prosecution, he noted that he talked at some length with Mr. Hammer about the latter's return from the Special Housing Unit to the general prison population (see Tr., June 30, 1998, at pp. 49-50; see also Tr., July 1, 1998, at pp. 187, 200).[17]    In addition to his role as treater, Dr. Karten also served as an assessor. Most particularly, he evaluated Mr. Hammer for suicide risk the day he killed Mr. Marti (see Suicide Risk Assessment, April 13, 1996).    He acknowledged, however, that Mr. Hammer was reluctant to speak to him because he had also served as a therapist to Mr. Marti (see Tr., June 30, 1998, at p. 88). He also conducted several Special Housing Unit evaluations (see Tr., June 30, 1998, at p. 52).

Dr. Karten not only served in mixed roles as assessor and therapist, but, as importantly, also testified as an expert witness for the prosecution with regard to criminal responsibility, stating he disagreed with the defense's psychiatrist expert, Dr. Sadoff, that Mr. Hammer suffered from the serious mental illness of dissociative identify disorder (see Tr., June 30, 1998, p. 55; United States v. Hammer, 25 F.Supp.2d 518, 522 (MD Pa. 1998).

Dr. Wolfson, a forensic psychiatrist employed by the Federal Bureau of Prisons at Springfield, Mo., also engaged in multiple and incompatible professional roles.  His initial major task was to assess Mr. Hammer's criminal responsibility after defense counsel filed a notice of intent to assert an insanity defense (see Wolfson Report at pp. 1-2).  His evaluation was conducted from October 23-December 10, 1997, culminating in a 143-page report dated December 19, 1997. Although Dr. Wolfson correctly informed Mr. Hammer that information he gleaned from him would not be confidential because he was acting as a "nonpartison expert," he also informed Mr.

_____

[16]See Strasburger et al., at n. 7.

[17]"He was very much stressed when he first came to USP Allenwood.  And that was when I had spent a fair amount of time with him, helping him to adjust.  And that's when I had done the single cell assignment, had done the treatment plan for him, had made a referral for him to the psychiatrist, etc" (Tr., July 1, 1998, at p. 200).

Hammer "I would also serve, at least temporarily, as his attending psychiatrist of record should any pressing clinical needs arise during his stay" (Wolfson Report, at p. 2). As noted above, these roles are incompatible, particularly in light of the abrogation of confidentiality. A patient in Mr. Hammer's position would be inhibited from disclosing any material related to his psychological status that might be antagonistic to his asserted defense, and thus interfere with a sound and helpful therapy relationship.

On June 17, 1998, Dr. Wolfson testified for the prosecution, asserting that Mr. Hammer was not, in his expert opinion, insane at the time of the killing of Mr. Marti. Just five days later, when Mr. Hammer made known his desire to plead guilty and have an execution date set, Dr. Wolfson testified at the behest of the court as to Mr. Hammer's competency to so plead. Defense counsel argued that he did "not believe that the government's witness should be the person to do that" (Tr., June 22, 1998, at p. 11), and suggested that other forensic experts in the Williamsport area "could be appointed by the Court as a completely neutral expert" (Tr., at p. 12).[18] The court was concerned about delay and engaged in a colloquy with Dr. Wolfson as to his views on conducting a competency evaluation and testifying as to its results. Dr. Wolfson replied that "some aspects of the notion of having me do that make me uncomfortable" (Tr. at p. 15) and stated what he saw as the difficulties in engaging in this task. "I certainly began this endeavor as a neutral third-party expert, which is how I strive to continue to be. But Mr. Hammer has heard me giving damaging information about him now for several days" (Tr. at p. 15). Dr. Wolfson clearly understood the professional implications of his engaging in this dual role: "I do not wish to do anything that approaches appearance of being unethical" (Tr., at p. 16). Yet, he did not summarily abstain from acting in these dual roles, but made his evaluation and testimony contingent on Mr. Hammer's consent, the problematic nature of this solution about which I have already commented on above.

Again, to his credit, Dr. Wolfson appeared to be sensitive to the ethical implications of acting in two professional capacities with a patient. In discussing his procedure when conducting a insanity defense evaluation, he testified that he informed Mr. Hammer about the absence of confidentiality and "that I wasn't on

---

[18]Dr. Wolfson admitted that there were other competent professionals who could have performed the required evaluations. In discussing the assessment of Mr. Hammer's competency to plead guilty, Dr. Wolfson stated, "At the time, I was indeed (and I remain) the only psychiatrist posted full-time on the forensic service here, though there were two other psychiatrists present at the facility at the time who would have been qualified to perform Mr. Hammer's evaluation" Wolfson Affidavit, February 3, 2003, at para. 6.

his side.  That unlike a therapeutic relationship where I would be in the role of helping him and be his advocate, that instead I was in the role with a responsibility of finding out what the truth was, which is <u>fundamentally quite different</u>" (Tr., June 18, 1998, at p. 129; emphasis added).[19]  On cross-examination the next day, he acknowledged that acting as a defense expert and the treating professional in the same case "is a little undesirable" (Tr. June 19, 1998, at p. 19).  He also recognized that if the issue of competency to be executed arose he would "make arrangements for a different clinician to be the one that actually articulated an opinion about" that issue (Tr., October 1, 1998, at p. 82).

In sum, despite Dr. Wolfson's misgivings and knowledge of what he should do, what he did do was act as Mr. Hammer's treating psychiatrist while at Springfield, evaluated him with regard to criminal responsibility putatively as a nonpartisan expert, testified for the prosecution with regard to that evaluation, and then testified as the court's "neutral" expert witness as to Mr. Hammer's competence to plead guilty, dismiss counsel, and waive appeals--all leading to Mr. Hammer's execution.[20]  Dr. Wolfson forcefully asserted in his affidavit that, despite performing these

_____

[19]Dr. Wolfson later reiterated this significant difference: [T]he goal of a forensic evaluation is to discern the truth about an <u>evaluee</u>, rather than to bring about the clinical benefit of a <u>patient</u>."  Wolfson Affidavit, February 3, 2003, at para. 4 (emphasis in original).  Later on in the affidavit, Dr. Wolfson expressed "an additional concern relating to privileged information."  He speculated that while being evaluated for his competency to plead guilty, Mr. Hammer might be tempted to discuss how his trial was faring, leading Dr. Wolfson to state he "was unsure whether either of us would be able to keep such discussion disentangled from prior or current issues of his desired defense strategy" (para. 5).

[20]Dr. Wolfson freely admits to engaging in all these roles. In his February 3, 2003, affidavit he states:

I am familiar with Defendant Hammer from multiple contacts with him.  He was committed to the U.S. Medical Center for Federal Prisoners in Springfield, Missouri, in the fall of 1997 for evaluation of criminal responsibility . . . and committed here a second time in the fall of 1998, following his conviction, for evaluation of his competence to waive or dismiss his attorneys and represent himself, his competence to waive post-verdict and post-sentencing motions in his trial courts, and his competence to waive subsequent federal appeals.  I prepared a report following each of these commitments . . . .

12

multiple roles that he followed BOP policy of "working for the court," not the prosecution or defense (Wolfson Affidavit, February 3, 2003, para. 9). But he misses the fundamental ethical point. Regardless of written policies, statutes, or case law requiring BOP mental health professionals who conduct evaluations to be neutral, ethical standards are established, not only to protect against actual harm to a patient, but against the risk of harm. If Dr. Wolfson, as well as Drs. Mitchell and Karten, had avoided the appearance of impropriety, they would have ensured the integrity of the process and protected themselves against any reasonable concerns that their opinions were tainted by conflict, bias, or external pressure. Preventing the appearance of impropriety is particularly important when forensic clinicians are involved in a death penalty prosection.[21]

Thus, three clinicians all engaged in multiple and incompatible professional roles in their interaction with Mr. Hammer. The misuse of their expertise could have been avoided by the exercise of sound professional discretion. They had a duty to avoid having their professional expertise and judgment misused by the legal system and, above all, to do no harm. They failed in all three of these ethical obligations.[22] The result has been lengthy delays in resolving this case, the squandering of judicial resources, and a life in limbo.

**Applicable Principles II: Competence**

A second serious ethical issue in this case is that of competence. Both psychology and psychiatry recognize that mental health professionals should only provide services they are qualified to perform. For example, under the applicable 1992 APA Code psychologists are required to "provide services . . . only

---

[21]As the applicable 1992 APA Code, states:

Psychologists take reasonable steps to avoid harming their patients or clients . . . and to minimize harm where it is foreseeable and unavoidable.

1992 APA Code, Standard 1.14 (Avoiding Harm), p. 1601.

[22]See Perrin, G., & Sales, B. (1994). Forensic standards in the American Psychological Association ethics code. Professional Psychology: Research and Practice, 25, 376-382:

[P]roviders of forensic services must be aware of, and sensitive to, the potential conflicts between . . . roles of examiner, therapist, and consultant; between the legal roles of expert witness and fact witness, and between the roles of advocate for the client and advocate for a professional opinion (p. 377).

within the boundaries of their competence, based on their education, training, supervised experience, or appropriate professional experience" (Standard 1.04(a), p. 1600).[23] When they do not have the requisite qualifications, psychologists "provide services . . . in new areas or involving new techniques only after first undertaking appropriate study, training, supervision, and/or consultation from persons who are competent in those areas or techniques" (Standard 1.04(c), p. 1664. Under the Principles of Medical Ethics, Section 1 dedicates physicians to "providing competent medical service."

More particularly, the policy that guides forensic psychologists clearly states that such clinicians should "provide services only in areas . . . in which they have specialized knowledge, skill, experience, and education" (Section III(A), p. 658).[24] When testifying, "they have an obligation to present to the court . . . the boundaries of their competence, the factual bases (knowledge, skill, experience, training, and education) for their qualifications as an expert, and the relevance of those factual bases to their qualification as an expert on the specific matters at issue" (Section III(B), p. 658).[25]

## Applying the Principles to the Facts of this Case II

The first issue related to competence concerns Dr. Wolfson's qualifications to evaluate Mr. Hammer's mental status with regard to the possible diagnosis of Dissociative Identity Disorder. During the cross-examination by Mr. Hammer's counsel of his qualifications to testify as an expert, Dr. Wolfson admitted that he had never treated any patient with a diagnosis of multiple personality disorder (MPD) or dissociative identify disorder (DID), as it is now called (see Tr., June 17, 1998, at p. 127). Although he asserted that a psychiatrist could correctly diagnose DID even if one had never seen a case, he did agree that a scholarly article in a respected peer-reviewed journal stated that because diagnosing DID in a forensic context was so complicated it "precludes the participation of a novice clinician who has never seen a bona fide case of MPD" (Tr., June 17, 1998, at p. 129). Finally, during this

---

[23]The 2002 APA Code is almost identical:

Psychologists provide services . . . only within the boundaries of their competence, based on their education, training, supervised experience, consultation, study, or professional experience.

2002 APA Code, Standard 2.01(a), at p. 1063.

[24]CEGFP.

[25]CEGFP.

same cross-examination Dr. Wolfson admitted that of 231 hours of a course in forensic psychiatry, less than one hour was devoted to MPD (see Tr., at p. 137).[26]

In light of his significant inexperience with the diagnosis of DID in either a clinical or forensic context, it is not surprising that Dr. Wolfson stated in his forensic report that "I have significant reservations about the construct of multiple personality disorder as a diagnosis, both in the psychiatric literature, and especially in the legal literature" (p. 140). Given that bias and his lack of training in this area, the ethical thing to have done was to demur engaging in the evaluation in the first place.[27]

Dr. Karten also testified with regard to Mr. Hammer's diagnosis although he admitted he was not a forensic psychologist (Tr. July 1, 1998, pp. 178, 194), had never seen a case of DID (see Tr. at p. 194), and more importantly, had never examined Mr. Hammer for DID (see Tr., at p. 179). Yet, he testified that he was ruling out DID as a possible diagnosis for Mr. Hammer (see Tr., at p. 179). Although he did not respond directly to defense counsel's question as to whether "it's ethical for a psychologist to reach a diagnosis on someone, even to rule out diagnosis, without having examined that person for the particular disorder?" (Tr., at p. 193), the answer to that question is clearly yes:

> Forensic psychologists avoid giving written or oral evidence about the psychological characteristics of particular individuals when they have not had an opportunity to conduct an examination of the individual adequate to the scope of the statements, opinions, or conclusions to be issued. Forensic psychologists make every reasonable effort to conduct such examinations. When it is not possible or feasible to do so, they make clear the impact of such limitations on the reliability and validity of their professional products, evidence, or

---

[26]Dr. Wolfson went on to say about that experience:

Calling it a course is a little bit of a misnomer. I got academic credit for it but what I was doing there was I was posed with the unit that does forensic evaluations and we saw no defendants during that period of time who had or claimed to have that illness, and so I didn't have any experience with it, other than reading, I'm sure.

Tr., June 17, 1998, at p. 137.

[27]"A psychiatrist who regularly practices outside his/her area of professional competence should be considered unethical." Psychiatry Ethics (Section 2(3), at p. 4.

15

testimony (Section VI(H), p. 663).[28]

This cautionary message is echoed in the more general standards of the 1992 APA Code:

> [P]sychologists provide written or oral forensic reports or testimony of the psychological characteristics of an individual only after they have conducted an examination of the individual adequate to support their statments or conclusions.
>
> When, despite reasonable efforts, such an examination is not feasible, psychologists clarify the impact of their limited information on the reliability and validity of their reports and testimony, and they appropriately limit the nature and extent of their conclusions or recommendations (Standard 7.02(b) & (c), at p.1610).[29]

Given that Dr. Karten never performed a formal evaluation of Mr. Hammer with regard to criminal responsibility nor the specific diagnosis of DID, he also should have demurred from testifying about these topics. In the very least, he should have clearly indicated the very limited reliability and validity of his opinion.

Dr. Mitchell also engaged in professional conduct for which he was not trained. Recall that Judge Muir asked Dr. Wolfson to conduct an evaluation of Mr. Hammer to determine whether he was competent to plead guilty (Tr. June 22, 1998). The defense suggested that Dr. Mitchell, his long term therapist, should do the evaluation along with Dr. Wolfson, to which the prosecution agreed. Although, unfortunately, neither the court nor the parties' lawyers understood the ethical implications of acting in these dual roles, Dr. Wolfson did have an inkling of the problem, stating during the hearing, "Now, that's pulling Dr. Mitchell out of his usual role a bit, too, from a treating clinician to a forensic evaluator" (Tr., June 22, 1998, at p. 24). But that problem is only compounded by the fact that conducting a competency evaluation was not a normal part of his job as a prison psychologist, as Dr. Mitchell admitted (Tr., at p. 77). Nevertheless, Dr. Mitchell volunteered his expert opinion that Mr. Hammer "was competent mentally to enter a guilty plea" (Tr., July 8, 1998, p. 164).

Another area in which the competence of the BOP's mental health professionals may be questioned is in the evaluation of Mr. Hammer's risk of violence to another. Beginning in March 1994, Mr. Hammer was placed in a Special Housing Unit, first at Leavenworth, then Lompoc, and finally at Allenwood, beginning on or about May

---

[28]CEGFP.

[29]1992 APA Code.

16

30, 1995, where he was first seen by Dr. Mitchell. At Leavenworth, Mr. Hammer's intake screening summary of January 13, 1994, specifically noted that he "has an intensive history of violence and poor adjustment." The psychologists there consistently concluded that Mr. Hammer's threat of violence to others was "MODERATE." Similarly, when he arrived at Lompoc, the staff psychologist in her intake summary (November 10, 1994) also cited his "extensive" history of violence, including hostage taking and kidnapping. On the same day, a psychiatrist who saw Mr. Hammer, quoted him as saying "I've taken hostages twice--an officer overnight and a psychologist once." On March 22, 1995, Mr. Hammer saw the same psychiatrist to ask for psychotropic medication, after once again informing him, "I took my cell partner hostage and I was within inches of killing him."

Mr. Hammer was transferred to Allenwood in late May 1995. Once again, the intake summary (written by Dr. Mitchell) duly noted that Mr. Hammer had "taken hostages at other institutions, including a psychologist and a celly on separate occasions" and had a history of PCP and heroin use while in prison (see Intake Screening Summary, May 23, 1995). On June 6, 1995, Dr. Karten noted, after Mr. Hammer had been placed in the SHU, that he would follow his patient "monthly in management group" and fill out the required form "indicating a mental disability." Three days later, Dr. Karten informed prison personnel that Mr. Hammer had a history of mental illness, needed special programming, mental health treatment, and placement in a single cell.

Despite all this history of violence and mental illness, Dr. Karten on June 23, 1995, in his SHU Review, estimated that Mr. Hammer's threat of violence was "LOW." But there seems to be countervailing evidence in that regard.

Dr. Mitchell saw Mr. Hammer on July 12, 1995, for counseling because Mr. Hammer disclosed that, among other concerns, he had "anger control problems." Apparently, Mr. Hammer was once again placed in the SHU in September 1995. In October, during the monthly review of his SHU placement, Mr. Hammer's risk of danger to others was once again assessed as "LOW." Yet, on November 21, 1995, Dr. Mitchell saw Mr. Hammer for individual therapy, noting that Mr. Hammer reported to him that he was "punching his shower walls," and that "he was hurt and angry over his celly." Nevertheless, Dr. Karten's monthly reviews (December 14, 1995, January 14, 1996, February 14, 1996) continued to assess his threat of violence to others as "LOW." There continued to be, however, clear indications that Mr. Hammer was having difficulty in controlling his emotions. Dr. Mitchell noted in his individual therapy session on February 20, 1996, that "Hammer . . . has been experiencing building frustrations but that he has been able to not 'blow up' by thinking about consequences and feeling 'tired' of losing control of his behavior like he has in the past." Three weeks later, Dr. Mitchell described Mr. Hammer as engaging in a

17

"tirade" during a crisis intervention session on March 8, 1996, during which he "let him blow off a lot of steam . . . ." Apparently, all this information led Dr. Karten to revise his estimate of Mr. Hammer's estimate of his threat of violence to others as "MODERATE" on March 14, 1996, just one month before Mr. Hammer admitted to killing his cellmate.[30] In fact, the last entry before that killing is on March 20, 1996, by a physician who noted that Mr. Hammer disclosed "difficulty in handling anger" and acting "impulsively." As a result, Mr. Hammer was given a prescription for a psychotropic drug. Three weeks later, with no apparent intervention since the visit on March 20th, Mr. Hammer killed his cellmate on April 13, 1996.

Thus, despite a plethora of evidence of a history of violence to others--including to prison employees and to a cellmate--, referral to psychiatrists for medication, and increasing contemporary signs of percolating anger, Mr. Hammer was consistently assessed as having a low to moderate threat of violence to another and was placed in a cell with another inmate. His threat level was never labeled as severe and he was not placed in a single cell at any time prior to the killing, despite BOP's own psychologist, Dr. Karten, making that recommendation.

The assessment of the risk of violence is not an easy task but there were persistent indications from both Mr. Hammer's history and his then current mental state, that he was in a psychological crisis. There were several separate assessments of Mr. Hammer's suicide potential, but none of his homicide risk (other than the monthly SHU's boilerplate remarks). If Drs. Mitchell and Karten, and other BOP mental health professionals, had acted more competently by evaluating more diligently Mr. Hammer's violence potential and placed him in a cell by himself, it is would have been more difficult for Mr. Hammer to kill Mr. Marti, his cellmate; it would have been impossible to do so in his cell.[31]

---

[30]There are two ways to evaluate this elevation from Low to Moderate. First, the elevation should have alerted prison personnel to take precautions to protect others, like his cellmate, from Mr. Hammer's perceived increased level of violence, which they did not do. In the alternative, Dr. Karten and others failed to evaluate the threat correctly and only evaluated the threat as Moderate when it should have been Severe. In either case, the competence of BOP mental health professionals and prison authorities is placed into question.

[31]It is curious that despite a long history of mental illness, referrals to psychiatry for medication, and a treatment plan for providing psychotherapy on a weekly or biweekly basis, that Dr. Mitchell decided on October 30, 1996, subsequent to Mr. Marti's death, that Mr. Hammer was no longer to be coded as mentally ill, but rather simply as "a severe antisocial personality disorder."

18

Given the analysis above, the issues of multiple relationships and competence become intertwined. The BOP's arguable failure to prevent the death of Mr. Marti evokes the potential for individual and institutional civil liability. Thus, it raises the ethical question of whether it was appropriate for any BOP mental health professionals, and particularly those who treated and assessed Mr. Hammer prior to the killing, to have been involved at all in the forensic evaluations conducted in this matter subsequent to the killing.[32]

## Applicable Principles III:    Confidentiality

Except for the ultimate precept--above all, do no harm--there is probably no ethical value in the mental health professions that is more inculcated than confidentiality. For example, in medicine, including psychiatry, a physician is required to "safeguard patient confidences within the constraints of the law" (Section 4, p. 5).[33] More particularly, psychiatrists are taught that "confidentiality is essential" and they "may release confidential information only with the authorization of the patient or under proper legal compulsion" (Section 4(1)(2), p. 5). In the legal arena, psychiatrists "must fully describe the nature and purpose and lack of confidentiality to the examinee at the beginning of the examination" (Section 4(6), p. 5. In psychology, clinicians "have a primary obligation and take reasonable precautions to respect the confidentiality rights of those with whom they work or consult . . ." (Standard 5.02, p. 1606)[34] and if there are limits to

_____

It would be interesting to discover whether there was any institutional pressure on Dr. Mitchell after the killing to alter the diagnosis of his long time patient. See prior discussion of this issue at p. 6 of this report.

[32]For example, the 2002 APA Code states at Standard 3.06 (Conflict of Interest):

> Psychologists refrain from taking on a professional role when personal, scientific, professional, legal, financial, or other interests or relationships could reasonably be expected to (1) impair their objectivity, competence, or effectiveness in performing their functions as psychologists or (2) expose the person or organization with whom the professional relationship exists to harm or exploitation (p. 1065).

This language is reflected in the 1992 APA Code (Standard 1.17), cited in the first paragraph of Applicable Principles I.

[33]Psychiatric Ethics.

[34]1992 APA Code.

19

confidentiality, patients must be so informed as early as feasible in the relationship (Standard 4.01, p. 1605). It is particularly important to discuss limitations regarding disclosure of information gleaned in a forensic context at the beginning of the professional relationship:

> Forensic psychologists have an obligation to be aware of the legal standards that may affect or limit the confidentiality or privilege that may attach to their services or products, and they conduct their professional activities that respects those known rights of privileges.
>
> . . .
>
> Forensic psychologists inform their patients of the limitations to the confidentiality of their services and their products . . . by providing them with an understandable statement of their rights, privileges, and the limitations of confidentiality (Section V(A),(B), p. 660.[35]

## Applying the Principles to the Facts of this Case III

The principles cited above apply to what is reported to be statements made by Lewis Dubin, described by Dr. Wolfson in his report as having MA, PhD, and DDS degrees (although his precise major profession is not identified). Dr. Dubin, according to Dr. Wolfson's report and subsequent testimony, hypnotized Mr. Hammer in the presence of Dr. Sadoff, a psychiatrist retained by the defense. The hynotic interview was videotaped. Dr. Dubin apparently did not testify. According to Dr. Wolfson, he was concerned that Dr. Dubin appeared "to be mixing forensic and therapeutic styles in his interaction with the defendant" (Wolfson Report at p. 104). When Mr. Hammer asked Dr. Dubin if what he was relating was "in confidence," Dr. Wolfson reported that Dr. Dubin responded, "Yes, sir" (Wolfson Report at p. 104). Of course, given that this was a forensic examination, such reassurance was misplaced and clearly wrong.[36]

In fact, Dr. Wolfson in his testimony for the prosecution amplified on the concerns raised in his forensic report about by Dr. Dubin's behavior. Dr. Wolfson called "disturbing" Dr. Dubin's statement to Mr. Hammer that what he said during hypnosis would be

---

[35]CEGFP.

[36]Dr. Wolfson called this reassurance "absurd" (Wolfson Report at 104). Dr. Wolfson suspected that Mr. Hammer was sophisticated enough to know that this was false, but it is not Mr. Hammer's obligation to understand the limits of confidentiality; it is the ethical obligation of the forensic examiner to communicate this information.

confidential (see Tr., June 18, 1998, at p. 129). Apparently, such false reassurance in a forensic context violated guidelines of the American Society for Clinical Hypnosis (see Tr., at p. 131). As Dr. Wolfson testified:

> And part of what should be explicitly made clear [under the guidelines] is that it's not confidential . . . . And yet, right on the tape, once I believe perhaps even twice, at least the one time, what Mr. Hammer says on the tape is, Is this confidential, or I assume this is confidential, something like that, and Dr. Dubin answers, Yes.

> And I just didn't see how he could--where something like that could could come . . . . [A]s I said, its disturbing. Tr., June 18, 1998, at pp. 131-132.

But the interaction between Drs. Wolfson and Mitchell prior to the former's writing of his forensic report is also disturbing. Dr. Wolfson had access to all of Dr. Mitchell's therapy and counseling notes he had prepared on Mr. Hammer. And, he noted that he interviewed Dr. Mitchell by telephone on December 12, 1997 (see Wolfson Report at p. 8). Although Dr. Wolfson disclosed that the information Dr. Mitchell would give about Mr. Hammer would not be confidential, Dr. Mitchell agreed to the interview. Neither professional, however, thought of asking Mr. Hammer whether he agreed to the disclosure of these progress notes. It was, after all, his interests at stake, not Dr. Mitchell's.[37]


## Conclusion

Three bedrock ethical principles that should be known to the average, competent mental health professional working in a correctional and forensic context were, in my opinion, violated in the situations under review. It should be clear to such professionals that one engages only in those services that one is competent to deliver, that preserving confidences, or informing patients of the limits of confidentiality, is essential to securing and maintaining trust in evaluation and treatment relationships, and that engaging in incompatible and potentially harmful multiple relationships are damaging to beneficial assessment and therapeutic relationships. Reliance on these fundamental principles is particularly important when the life of one's patient is at stake.

---

[37]It is noteworthy that Dr. Wolfson also called Steven Wakeford, Ph.D., Mr. Hammer's former psychologist at the Oklahoma State Penitentiary, for information about his client. When Dr. Wakfeford was informed that what he said would not be kept confidential, "Dr. Wakeford elected not to be interviewed" (Wolfson Report at p. 7).

Ultimately, it is up to a professional association's ethics committee or state licensing board to formally make a finding of unethical conduct. And, although I recognize some, though not most, of the problematic conduct by Dr. Wolfson and Mitchell, was stimulated by the court, it is the responsibility of the professionals to make known their commitment to their respective ethical codes and resist external pressures to violate them. Thus, it is my opinion, after reviewing the documents you have provided me, and based on my own knowledge of ethical principles, and applicable published ethical codes, that Drs. Wolfson, Mitchell, Karten, and Dubin all engaged in professional behavior that fell below the standard of care for practitioners engaged in correctional and forensic work because they did not adhere to their professions' ethical constraints.

Thank you for referring this case to me. Please let me know if you need any further information or require my future involvement in this interesting case.

Sincerely yours,

Donald N. Bersoff, Ph.D., J.D.

22

## AFFIDAVIT/DECLARATION OF NEIL BLUMBERG, M.D.
## PURSUANT TO 28 U.S.C.§ 1746 AND Pa. C.S. § 4904

I, Dr. Neil Blumberg, M.D., do hereby declare and verify as follows:

1.    I am a physician licensed to practice medicine in the states of Pennsylvania, Maryland, Virginia, Georgia and Florida. I specialize in general and forensic psychiatry. I am board certified in psychiatry and in forensic psychiatry. I have been on the clinical faculty of The University of Maryland School of Medicine since 1981. I am also engaged in the private practice of psychiatry in Timonium, Maryland. I am a Fellow of the American Psychiatric Association and a member of the American Academy of Psychiatry and the Law. During the course of my career, I have conducted in excess of five thousand forensic psychiatric examinations, for both the defense and prosecution. I have also testified a number of times as a court expert. I have been qualified as an expert witness in the areas of forensic and general psychiatry in excess of five hundred occasions in both state and federal court, including as an expert witness in capital cases.

2.    I conducted a forensic psychiatric evaluation of David Paul Hammer. This evaluation consisted of a clinical interview which took place on October 21, 2004, at the United States Federal Penitentiary in Lewisburg, Pa. lasting approximately three hours and thirty-five minutes.

3.    I reviewed a wealth of information related to Mr. Hammer, including most of the trial transcripts, the penalty phase transcripts, motion transcripts, transcript from the oral argument of Mr. Hammer before the Third Circuit Court of Appeals, Federal Bureau of Prison records pertaining to Mr. Hammer, including medical and psychiatric records, reports by Drs.

1

Sadoff and Wolfson, the video-tape of the hypnosis session conducted by Drs. Dubin and Sadoff, and the testimony of Jill Miller, M.S.W., pertaining to Mr. Hammer's background and his prior hospitalizations.

4.      Mr. Hammer is the oldest of three children. He comes from a family with a history of depression, alcoholism, prescription drug abuse, seizures and attention deficit/hyperactivity disorder. His maternal grandfather had been institutionalized and subsequently committed suicide by a self-inflicted gunshot wound. His paternal grandmother was institutionalized with diagnoses of Schizophrenia and mental retardation.

5.      His parents lived a nomadic life style, moving frequently. They were sporadically employed and at times, the entire family lived in a car. Mr. Hammer reported attending twenty-one different schools before dropping out in the tenth grade. Mr. Hammer was the victim of severe verbal, emotional, physical and sexual abuse throughout his childhood. His mother, who died on May 10, 1989, was the primary perpetrator of the verbal, emotional and physical abuse. She routinely verbally berated the defendant and often threatened to put him and his siblings up for adoption. Mr. Hammer viewed the verbal abuse as more painful than the beatings he sustained. His mother frequently told him that he was "worthless," "no good" and "a bastard." She also severely beat Mr. Hammer with extension cords, belts, switches and "anything that was handy."

6.      The physical abuse was severe, out of proportion to any misbehavior by Mr. Hammer and totally unpredictable. Mr. Hammer's mother engaged in bizarre disciplinary practices that I would view as deliberate torture reflecting her own severe psychopathology. Mr. Hammer was punished with scalding hot water enemas as well as enemas containing tabasco

2

sauce and other irritants in order to "burn all the evil out of me." When Mr. Hammer's brother's puppy was accidentally run over by a car, his mother punished Mr. Hammer by putting his puppy and his sister's puppy in a gunney sack and beating them to death with a shovel in his presence. She them made Mr. Hammer help throw the dead puppies into a pond. Mr. Hammer was eight years old at the time of this incident. On another occasion, Mr. Hammer reported that his parents made him shoot one of his pet dogs because it barked too loudly.

7.    Mr. Hammer had a more positive relationship with his father, who was not physically abusive to him. However, his father failed to protect him from the severe abuse inflicted upon him by his mother, encouraged him to engage in fraudulent activities, sexually molested Mr. Hammer's sister and orchestrated incestuous activities between Mr. Hammer and his sister.

8.    Both parents sent all of the children door to door pretending to collect money for charity while using it instead for their own support.

9.    Mr. Hammer was the victim of sexual abuse throughout his childhood. At the age of five, he was molested by a maternal uncle who was in his late teens at the time. Mr. Hammer reported that these sexual activities, which included several occasions of anal intercourse, took place over a six month period. His uncle threatened to harm him and his siblings he if ever reported the abuse.

10.    Between the ages of ten and fourteen, a different maternal uncle and his uncle's friend, both of whom were in their latter teenage years, sexually abused Mr. Hammer through coercion. They told him "this is what guys do." Mr. Hammer continued to engage in these activities because it made him feel both needed and wanted.

3

11.    Between the ages of ten and fourteen, Mr. Hammer was sexually abused and verbally and emotionally humiliated by his mother, who made him fondle her, lick her vagina and suck her breasts. He noted that his mother ridiculed him for not having pubic hair until the age of fourteen and often dressed him as a little girl with a wig, lipstick and makeup. Mr. Hammer submitted to his mother's wishes in the hopes of pleasing her.

12.    At the age of eleven, Mr. Hammer saw his father and sister naked and engaged in sexual activity. Shortly thereafter, his father had Mr. Hammer and his sister take their clothes off and taught them how to engage in sexual activities. Mr. Hammer was instructed on kissing, hugging, and having oral sex. These incestuous activities continued on a regular basis and at the age of thirteen, after having his father instruct him how to perform intercourse on his sister, he and his sister began engaging in sexual intercourse. Mr. Hammer and his sister continued to intermittently engage in incestuous activities through the time he was seventeen, even after both of them were married to others.

13.    Mr. Hammer stated that he began working in the fields at the age of seven. During inclement weather he performed other indoor work in order to help support his family. He acknowledged "I never had a childhood."

14.    Mr. Hammer first sought mental health treatment at the age of fourteen. He was first seen on May 11, 1973 at the out-patient clinic of Oklahoma General Hospital. He was described as tense, nervous, failing school, unable to concentrate and recently sexually abused by an older man. He acknowledged having attempted to kill himself by turning on gas and cutting himself with a razor. He reported being afraid that he might be crazy given his family history of severe mental illness and was afraid of losing control as a result of nearly suffocating his three

4

year old female cousin when she would not stop crying. On-going therapy was recommended although Mr. Hammer's family refused to transport him for such treatment.

15.  Mr. Hammer next received out-patient mental health treatment between February 13, 1976 and April 30, 1976. He was seventeen years old, had been married for fourteen months and reported distress concerning his financial situation and his unhappy marriage. After arguing with his wife, he tried to choke her, was unable to understand this drastic act of violence and felt terribly guilty about his behavior. Additional stressors included his wife's recent miscarriage, unemployment, lack of supportive adults and having experienced a materially and emotionally deprived childhood. There is also a history of substance abuse and involvement in delinquent activities. He was diagnosed with depressive neurosis, a possible inadequate personality disorder and a possible explosive or epileptical personality disorder.

16.  Mr. Hammer was seen at Baptist Hospital from May 5 - 7, 1976. He was admitted with complaints of depression, suicidal ideation, homicidal ideation and impulsive anger. He was discharged against medical advice.

17.  Mr. Hammer was readmitted to Baptist Hospital on October 10, 1976, after he overdosed on Heroin. He was described as delusional and hallucinating and was transferred for further treatment to St. Anthony's Hospital.

18.  Mr. Hammer remained at St. Anthony's Hospital from October 11,1976, through October 20, 1976. He was noted to have experienced anxiety, depression, hallucinations and behavioral problems. He was diagnosed with borderline schizophrenia (which is now referred to as borderline personality disorder).

19.  Mr. Hammer was readmitted to St. Anthony's Hospital on June 8, 1977. He

5

remained in the hospital for five weeks and was diagnosed with an adjustment reaction of adolescence and a schizoid personality. His prognosis was described as "guarded."

20. Mr. Hammer left home for good around the age of fourteen. By this time, he began abusing a wide variety of drugs in order to escape from the haunting memories of his abusive background. His drug of choice was phencyclidine (PCP), which was the most effective means of escaping the memories of his chaotic past.

21. Mr. Hammer was subsequently incarcerated at age nineteen for a variety of offenses, and after a series of escapes and subsequent crimes of violence, he received a prison sentence in excess of twelve-hundred years (1200).

22. While in prison, Mr. Hammer continued to abuse a variety of substances, including Heroin. His substance abuse was a means by which he lessened intense feelings of depression, loneliness, anger and the intrusive and distressing recollections of his traumatic past. He reported discontinuing his abuse of drugs by 1995.

23. Mr. Hammer stated that Mr. Marti became his cell mate shortly before the murder. Mr. Hammer consented to having Mr. Marti as his cell mate and agreed to provide protection as well as financial resources, such as commissary, in exchange for sexual favors. He noted that they engaged in consensual sexual activity regularly prior to the offense. Mr. Hammer stated that Mr. Marti expressed the desire to be partially asphyxiated while receiving anal sex in order to increase his sexual pleasure. Mr. Hammer stated that they engaged in this activity on two or three occasions prior to the offense.

24. On the day of the offense, Mr. Marti expressed the desire to be tied up during sexual relations as his pleasure was further enhanced by being totally dominated. Both Mr.

6

Hammer and Mr. Marti made restraints that were later used to bind Mr. Marti's hands and legs to Mr. Hammer's bunk.

25. On the evening of the offense, Mr. Marti was lying prone and initially requested Mr. Hammer to tickle him in order to increase his degree of excitement. As a result of Mr. Marti laughing too loudly, they both agreed to place a sock in Mr. Marti's mouth to decrease the noise. Mr. Hammer then bound Mr. Marti's hands to the side of the bunk and bound his legs to the bottom of the bunk, as they agreed. Mr. Hammer stated he then pulled down Mr. Marti's boxer shorts and began stimulating his anus with a lubricated finger. He then engaged in anal intercourse with Mr. Marti during which time he partially asphyxiated Mr. Marti as he had previously done on other occasions. After they were finished, and Mr. Hammer was cleaning himself, he became overwhelmed with what had just occurred and began experiencing extremely intense shame, guilt, and anger. Mr. Hammer stated that upon talking with the authorities later, he provided a different and false rendition of events "so others wouldn't view me as a sicko."

26. Mr. Hammer denied any thought or intention of harming Mr. Marti prior to accepting him as a cell mate until losing control at the time of the actual offense. He described their sexual activities as entirely consensual. He denied any previous involvement in bondage, partial asphyxiation or any other sado-masochistic activities.

27. As a result of my forensic psychiatric evaluation of David Paul Hammer, it is my opinion, to a reasonable degree of medical certainty, that on April 13, 1996, David Paul Hammer was suffering from the following mental disorders: Posttraumatic Stress Disorder, Chronic, (DSM-IV-TR 309.81); Borderline Personality Disorder (DSM-IV-TR 301.83); Antisocial Personality Disorder (DSM-IV-TR 301.7).

7

28.   It is my further opinion to a reasonable degree of medical certainty that at the time of the current offense, as a result of the previously noted mental disorders, David Paul Hammer's capacity to conform his conduct to the requirements of law was significantly impaired.

29.   It is also my opinion to a reasonable degree of medical certainty Mr. Hammer committed this offense under severe mental or extreme emotional disturbance.

30.   Mr. Hammer's Posttraumatic Stress Disorder, Chronic, Borderline Personality Disorder and Antisocial Personality Disorder were directly caused by the severe verbal, emotional, physical and sexual abuse that he sustained throughout his childhood and adolescence. He continues to manifest active symptoms of all three disorders.

31.   Individuals with this constellation of disorders, such as Mr. Hammer, manifest persistent re-experiencing of the traumatic events, avoidance symptoms and persistent symptoms of increased arousal.  Their personality structure becomes severely damaged as evidenced by a pervasive pattern of instability of interpersonal relationships, self-image, affects and marked impulsivity. Mr. Hammer in particular displays difficulty in coping with real or imagined abandonment, has a pattern of unstable and intense interpersonal relationships, has a markedly and persistently unstable sense of self, displays impulsivity, a history of recurrent suicidal behavior, gestures or threats, affective instability due to a marked reactivity of mood, has chronic feelings of emptiness, has inappropriate, intense anger, or difficulty controlling anger and has transient stress-related paranoid ideation or severe dissociative symptoms.  He has also displayed a pervasive pattern of disregard for and violation of the rights of others occurring since the age of fifteen.

32.   At the time of his guilty plea for the murder of Andrew Marti, it is my opinion to a

8

reasonable degree of medical certainty, that Mr. Hammer was experiencing severe emotional distress as a result of an exacerbation of his Posttraumatic Stress Disorder, Chronic, and Borderline Personality Disorder. The cumulative stress of hearing testimony concerning the severe abuse he sustained during his childhood and adolescence caused him to reexperience those traumatic experiences. When faced with the possibility that he would be labeled mentally ill and committed to the Federal Medical Center in Springfield, Mr. Hammer was psychologically overwhelmed, leading to his impulsive decision to plead guilty and abandon his defense of Not Guilty By Reason Of Insanity. In short, he was under extreme emotional distress at the time he pled guilty, causing his judgement to be seriously impaired.

33.    It is also my opinion to a reasonable degree of medical certainty that Mr. Hammer's vacillation between waiving his appeals and going forward with his appeals is a direct manifestation of the emotional instability, ambivelance and impulsivity that is characteristic of his Borderline Personality Disorder. It is my opinion to a reasonable degree of medical certainty that Mr. Hammer's Borderline Personality Disorder and Posttraumatic Stress Disorder, Chronic, seriously impaired his capacity to make a reasoned and rational decision about whether to pursue further appeals in his case.

34.    I am aware that at least one other defense expert has diagnosed Mr. Hammer as suffering with Dissociative Identity Disorder (DSM-IV-TR 300.14). Although I did not make this diagnosis myself, DID generally develops as a result of severe emotional, physical and sexual abuse during childhood and represents the most severe disruption in an individual's personality structure. The severe trauma that Mr. Hammer sustained during his childhood and adolescence could cause a disintegration of his psyche to the extent that separate and distinct

9

other personalities may have developed. However, regardless of the exact diagnostic label applied to Mr. Hammer, his character structure was irrevocably damaged by the severe trauma that he sustained during his childhood and adolescence, leading to my conclusion that he suffers from Posttraumatic Stress Disorder, Chronic, Borderline Personality Disorder, and Antisocial Personality Disorder.

35.    I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge and belief, subject to 28 U.S.C. § 1746 and Pa. C.S. § 4904.

Neil Blumberg, M.D.

10

## DECLARATION OF DR. MICHAEL M. GELBORT PURSUANT TO
### 28 U.S.C. SUBSECTION 1746

I, Michael Gelbort, Ph.D., do hereby declare and verify as follows:

1.      I am a licensed clinical psychologist, specializing in neuropsychology. I received my Ph.D. in Clinical Psychology with a minor in Applied Human Neuropsychology at Texas Tech University in 1984. I completed a post-doctoral fellowship in neuropsychology and medical psychology at the Medical Rehabilitation Institute in Chicago. Subsequently, I served as the Chief Psychologist, then Director of Psychology at the Institute for Rehabilitation and Research at the Medical Center in Houston. I was also on-staff at Baylor College of Medicine and engaged in private practice, concentrating on psychological and neuropsychological evaluation. After four years, I returned to Chicago to pursue private practice with privileges at several hospitals. My present practice concentrates on psychological and neuropsychological diagnosis and evaluation, and consultation.

2.      I am licensed to practice in three states and have been qualified as an expert in neuropsychology in courts in at least eight states as well as various federal courts.

3.      I testified for the defense during the penalty hearing in United States v. David Paul Hammer in 1998 and was found qualified as an expert in neuropsychology, without objection. Current counsel retained me to conduct a follow-up evaluation and records review.

4.      Prior to my trial testimony, I reviewed materials regarding Mr. Hammer's background and history and I conducted a forensic neuropsychological examination. During my evaluation, I administered a number of psychological and neuropsychological tests that are listed in my report and my testimony from trial, both of which are attached to this affidavit.

5.      As a result of the evaluation and testing, I concluded to a reasonable degree of psychological and neuropsychological certainty that Mr. Hammer suffers from brain dysfunction,

cognitive and emotional impairments. His brain dysfunction is focused in the frontal lobe and to a lesser degree the temporal lobe. Neuropsychological testing indicated that Mr. Hammer suffers from visual spatial attention deficit; sensory deficits; frontal lobe impairments including impulsivity, disinhibition and idiosyncratic and affected reasoning and judgment.

6.    Mr. Hammer also shows evidence of frontal lobe dysfunction which impairs his ability to synthesize information. The frontal lobe area serves as a source of initiation and inhibition of behavior; what starts us, initiates behavior; stops us or inhibits behavior. In Mr. Hammer's case there was indication of frontal lobe dysfunction or deficits. In short, his ability to inhibit at times appears faulty. He tended to act before he thought and responded more quickly than he could process information.

7.    Mr. Hammer's disinhibition and impulsivity appear to as a result of his brain dysfunction. These behavioral deficits are exacerbated by the emotional trauma he endures as a result of his significantly abusive upbringing. Additionally, these emotional scars and brain dysfunction were further exacerbated by years of significant substance abuse.

8.    Similarly, the testing and evaluation demonstrated that Mr. Hammer was much more impressionistic in his responses than most people. Because of his brain dysfunction, he responded in an emotionally charged manner. Emotions are the leading edge of his personality, much more so than non-impaired persons. The emotions are not well modulated. Instead, they are often raw and unprocessed. He tends to respond from his emotions much more than other people. While he is often logical, his emotions tend to break through. In short, his actions are governed far more by emotion than by thought.

9.    While his visual perception was within normal limits, he was impaired on testing

2

related to visual integration indicating that he could recognize things accurately, but his ability to take different pieces of visual information and then make sense out of them or put things together in his own mind to solve a problem was impaired. He responded to his general impression of the whole picture while missing some of the important or salient aspects of the information. As a result of this deficit he is far more likely than an unimpaired individual to behavior in a non-goal direction.

10.    Testing of memory and learning resulted in scattered results. While his cognitive operation showed average to above average levels of functioning, encoding speed on rote memorization was significantly slowed based on the level of performance expected for persons with comparable intellect. Short term verbal memory testing results indicated confabulation or distortions, short term visual memory indicated significant distortions and long term memory showed that the distortions were still present.

11.    As I concluded at the time of trial, Mr. Hammer's data does not conform with patterns expected or seen in normal individuals. Testing demonstrated clear indicators of frontal lobe and temporally located neurocognitive dysfunction correlated with deficits in reasoning and judgment as well as impulsivity and disinhibition.

12.    In short, Mr. Hammer presents with multiple etiologies for his behavioral problems. Both neuropsychological dysfunction and emotional abnormalities give rise to his aberrant behavior.

13.    Although I became aware that Mr. Hammer entered a guilty plea mid-trial, I was not provided the testimony leading up to that guilty plea or the transcript of the colloquy conducted during the plea. Nor did trial counsel consult with me regarding whether or not Mr.

3

Hammer's brain dysfunction and emotional and psychological impairments would have an affect on Mr. Hammer's ability to make a knowing, intelligent and voluntary decision to waive his right to a trial and enter a guilty plea.

14.    Current counsel has provided those records to me. Counsel has also provided to me records indicating that Mr. Hammer has, on a number of occasions, made various decisions to waive his rights on appeal and during the post-conviction proceedings, followed by requests to withdraw those waivers. After reviewing the records and conducting a follow-up evaluation, it is my opinion, to a reasonable degree of neuropsychological and psychological certainty that, given his substantial impairments in reasoning, judgment and impulse control, combined with his emotionality, Mr. Hammer was incapable of making a knowing, voluntary, and intelligent decision as to any of these waivers of rights. As a result of his organic impairments, he did not connect all the factors involved in making a reasoned decision and his waivers were the product of, and substantially affected by, his psychological, emotional and cognitive impairments. At a minimum, Mr. Hammer's neuropsychological impairments have substantially affected his ability to waive his legal rights.

15.    It is also my opinion to a reasonable degree of psychological and neuropsychological certainty that Mr. Hammer's vacillation between waiving his appeals and going forward with litigation is a direct manifestation of his emotionality and the impulsivity, disinhibition and impaired judgment characteristic of his brain dysfunction.

16.    That Mr. Hammer was articulate during the guilty plea colloquy and the appellate argument does not diminish my opinion that his decision-making was significantly impaired and that his decisions to waive his rights were driven by his cognitive, emotional and psychological

4

deficits as opposed to a reasoned determination of the salient factors and consequences. As I explained during my trial testimony, Mr. Hammer's intellect does not preclude a conclusion that he suffers from brain dysfunction, episodic emotional disorganization and personality impairments. These impairments affect his ability to adequately comprehend a given situation, to reflect and reason before making decisions and to fully recognize the consequences of those decisions. In short, while he may be articulate, he remains impaired and those impairments directly affected his ability to make a rational decision.

17.    I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information and belief, subject to 28 U.S.C. § 1746.

Michael M. Gelbort, Ph.D.
Clinical Psychologist
Diplomate in Forensic Neuropsychology

5

## AFFIDAVIT/DECLARATION OF STUART GRASSIAN, M.D.
## PURSUANT TO 28 U.S.C.§ 1746 AND Pa. C.S. § 4904

I, Dr. Stuart Grassian, M.D., do hereby declare and verify as follows:

1.      I am a physician licensed to practice medicine in the state of Massachusetts. I specialize in psychiatry and have been Board Certified in Psychiatry since 1979.

2.      I have extensively studied the psychiatric effects of solitary confinement such as that experienced by David Paul Hammer, and the impact of this type of confinement on an individual's capacity to rationally assist counsel, make knowing, intelligent and voluntary decisions and assess information rationally prior to making important decisions.

3.      I have testified in numerous law suits concerning the psychiatric effects of prolonged solitary confinement. The attached document titled "Overview: Psychiatric Effects of Solitary Confinement" generally outlines my proposed testimony in this case, with of course, additional detail pertaining to Mr. Hammer's unique conditions of confinement existing at and around the time of his capital trial in this case, as well as the conditions he endured prior to the present offense.

4,      During the course of my proposed testimony, I will discuss, among other topics, Mr. Hammer's particular neuropsychological vulnerabilities which make him particular susceptible to the adverse psychiatric impacts associated with prolonged solitary confinement, as well as the psychiatric effects of confinement, including acute confusional states. Finally, the impact of these and other well-recognized psychiatric phenomena on Mr. Hammer's ability to rationally make decisions and rationally assist counsel will also be discussed.

5.      Once I have had the opportunity to evaluate Mr. Hammer, I will provide a supplement to the attached overview of the psychiatric effects of solitary confinement.

6.      I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge and belief, subject to 28 U.S.C. § 1746 and Pa. C.S. § 4904.

Stuart Grassian, M.D.

**DECLARATION OF RUBEN C. GUR, PH.D.**

I, Ruben C. Gur, Ph.D., do hereby declare and verify as follows:

1.      I have been licensed as a psychologist in Pennsylvania since 1976. I received a B.A. from the Hebrew University of Jerusalem and an M.A. and a Ph.D. in Clinical Psychology from Michigan State University. I completed Postdoctoral Fellowships at Stanford University and at the University of Pennsylvania. I am a Professor on the Standing Faculty of the University of Pennsylvania, with a primary appointment in Psychiatry and secondary appointments in Neurology and in Radiology. I am currently the Director of Neuropsychology, Department of Psychiatry at the Hospital of the University of Pennsylvania. I am Principal Investigator (API@) of the Neuropsychology Core and the Functional Imaging Core of the federally funded Schizophrenia Center, Co-PI of the functional MRI project of the Conte Center for Neurosciences, and Co-PI and investigator on several individual NIH grants (RO1s) on brain imaging and psychopathology. I am also member of the Biological Basis of Behavior Undergraduate Major Program at the University of Pennsylvania. I have participated in the diagnosis of hundreds of individuals requiring neuropsychological testing and neuroimaging where issues similar to this case were raised. I am a Diplomate in Clinical Neuropsychology of the American Board of Professional Psychology (ABPP/CN), Fellow in the American Psychological Association (APA), the American Psychological Society (APS), the National Academy of Neuropsychology (NAN) and the American College of Neuropsychopharmacology (ACNP), and member of the Psychiatric Research Society (PRS) and the International Neuropsychological Society (INS). I serve on the Editorial Board of scientific peer-reviewed journals including Brain and Cognition and Brain and Language and on the grant review Panel for the National Institutes of Health. I have been accepted as an expert in state, federal and

military courts and testified with respect to my expert opinions in the specialty of Neuroimaging and Neuropsychology. All opinions and conclusions in this Declaration are stated to a reasonable degree of neuropsychological certainty.

2. At the request of Mr. Hammer⁼s current counsel, I reviewed volumes of background materials provided to previous mental health experts and the results of the neuropsychological testing conducted by Dr. Gelbort and psychiatric evaluations conducted by Drs. Wolfson, and Sadoff.

3. The documents that I reviewed provide a significant probability that Mr. Hammer suffers from an organic brain disorder. The main factors in support of this probability are: (1) Multiple instances of trauma; (2) Performance on psychological and neuropsychological tests conducted thus far; (3) Behavior descriptions in the records; and (4) his history of childhood neurological and cognitive impairments.

4. I have reviewed Dr. Gelbort's report and data. The battery of tests that he conducted are appropriate and his conclusions properly follow the results of those tests. It is my opinion, to a reasonable degree of neuropsycholgical certainty, that there is sufficient evidence in the available data indicating brain dysfunction, that Mr. Hammer has organic brain damage and that it probably results in neuropsychiatric illness. It is my opinion that, through the following procedures, it would be possible to further determine the nature and extent of Mr. Hammer⁼s deficits and the effect these deficits had on Mr. Hammer⁼s conduct and decision making at the time of the offense, at the time he gave various statements to authorities, at the time of trial and appeal:

    a. A high resolution volumetric MRI study, including both dual echo sequences proton density and T2-weighted) for optimal resolution of CSF (particularly sulcal) and 3D SPGR scans for gray-white segmentability; and,
    b. A positron emission tomography (PET) scan, including an FDG study of local

glucose metabolism and a study of cerebral blood flow while at rest during activation.

5.    Magnetic Resonance Imaging (MRI) has become the major method for assessing the structural integrity of the brain, namely brain anatomy.  Many brain disorders, formerly requiring clinical procedures for diagnosis, can now be diagnosed by visual inspection of MRI scans.  MRI also permits highlighting of specific features of the brain by changing scan parameters and using contrast agents.

6.    Reading of the printed MRI images is sometimes, unfortunately, insufficient to detect effects of some disorders, particularly those associated with diffuse or subtle loss of tissue.  Such disorders require either the use of clinical procedures or reliable methods for soft tissue segmentation and volumetric analysis, which permit accurate quantitation of global and regional gray matter, white matter, and cerebrospinal fluid compartments.  For these reasons, the fact that a prior Anegative@ MRI was conducted does not change my opinion that the testing I have recommended will yield results indicating impairments.  Clinical MRIs are done to detect injuries rather than the more comprehensive areas of examination I have described.  In addition, while some in the field in the past have attempted to run the protocols I have described on films from a previously conducted MRI, the results from such testing are skewed and unreliable.  For that reason, the practice standards do not recommended testing from prior MRI film.

6.    MRIs are performed under specific protocols.  Because of the nature of the scanning protocols, no metal objects can be permitted in the scanner room during the MRI procedure.  There is an adjacent observation room, where the technologists operate, and where the individual being scanned can be observed at all times.  Security personnel may stay with the inmate inside the scanner room but the personnel cannot have any metal on their person.  In

addition, no metallic restraints can be used on the patient, although plastic restraints would not hamper the process.

7.      Brain activity, a key factor in evaluating brain disorders, is associated with physiologic change, and positron emission tomography (PET) provides the most accurate quantitative measures of several parameters of assessing brain physiology. PET scans were available in 1998. They can assist in evaluating brain anatomy where the brain is intact yet still dysfunctional because of aberrant activity. This is seen in many brain disorders. Although PET is a versatile method enabling the measurement of parameters related to both energy metabolism and neurotransmitter function, most relevant for assessing brain dysfunction is the ability to measure glucose metabolism using F-Flouro-d-2-deoxyglucose (FDG). Normative data are available to detect and document abnormalities. The procedure should include quantitative measurement using arterial or arterialized blood samples. IT is also helpful to perform measurement of cerbral blood flow (CBF) using an appropriate ligand (c.d. OH). CBF should be obtained both at rest and during activation with neurobehavioral probes.

8.      While the presence of metal during the PET study is not a problem, the hands of the patient must be free as he will have a catheter in each arm. Guards can be present in the room during the process so long as they do not interfere with the procedures.

9.      It should be clarified that while MRI and PET results may help document brain dysfunction, scans that appear normal do not rule out the existence of brain abnormality. Both methods have limitations of sensitivity and resolution, and some disorders require longitudinal follow-up data for documentation.

10.     Integration of the clinical neurcanatomic, neurophysiologic and neuropsychological data assists in examining the extent to which brain impairment affected Mr.

Hammer=s behavior. I have experience in such integration and would be able to conduct the procedures I recommend in this affidavit at the University of Pennsylvania facility. I have conducted similar procedures and protocols in other criminal cases, including capital appeals, in the Commonwealth of Pennsylvania and in other states including Arizona, California, Colorado, Florida, Virginia and the District of Columbia.

11.    The assessment procedures I propose are generally accepted in the medical field for evaluating brain disorders of complex behavior, such as exhibited by Mr. Hammer. Our center evaluates, studies and treats patients with such brain disorders and the evaluation process adheres to accepted standards in the field, including those spelled out in the Diagnostic and Statistical Manual (DSM) of the American Psychiatric Association.

I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information and belief, subject to 28 U.S.C. Section 1746.

Ruben C. Gur, Ph.D.

## SUPPLEMENTAL DECLARATION OF RUBEN C. GUR, PH.D.
## PURSUANT TO 28 U.S.C. SUBSECTION 1746 &  18 PA. C. S. SECTION 4904

I, Ruben C. Gur, Ph.D., do hereby declare and verify as follows:

1.      I previously signed a declaration in the case of United States v. Hammer, wherein I outlined my professional qualifications and experience and described my recommendations for further evaluation and testing of Mr. Hammer in order to confirm the existence of, and expand upon the nature and extent of Mr. Hammer's brain dysfunction, including a high resolution volumetric MRI study and a positron emission tomography (PET) scan. My prior affidavit is adopted and incorporated herein.

2.      As I explained in my prior affidavit, most hospitals do not have the requisite equipment, certifications and staff who are qualified to conduct the type of specialized testing that I have recommended. In fact, I know of only two in Pennsylvania that do: the University of Pennsylvania Medical Center in Philadelphia, and the University of Pittsburgh Medical Center.

3.      Although MRIs are routinely done in the clinical setting, the protocols necessary for the quantitative MRI that I have recommended are far more thorough and comprehensive, and are not routinely found in clinical MRI facilities. While it is possible to implement the specialized protocols in a clinical MRI setting, it is highly unlikely that staff at a facility with only clinical MRI capabilities has the expertise necessary to implement those protocols and any results from testing conducted in this manner could be compromised and unreliable.

4.      Regarding the conduct of a PET scan, I know of no facilities between Philadelphia and Pittsburgh with a PET scan. The PET scan necessary for the testing I have recommended requires a cyclotron to generate the short-lived isotopes for blood-flow measurements that only have a half-life of two minutes. Observation and measurement of these short-term isotopes is an integral aspect of this study.

5.      In sum, the only two facilities in the Commonwealth of Pennsylvania with proper equipment, staff experience and certifications necessary to insure a reliable and accurate outcome, are located at Pittsburgh and Philadelphia. I have no preference between the two for conducting Mr. Hammer's testing, and suggested the Philadelphia facility mainly because it is geographically much closer to Lewisburg. Conducting these tests at any other facility will likely lead to a result that is inaccurate, unreliable or otherwise useless for the forensic studies that I have recommended.

Ruben C. Gur, Ph.D.

Dated: 11/8/2004

## DECLARATION/AFFIDAVIT OF DR. ALBERT B. HARPER
## PURSUANT TO 28 U.S.C. § 1746 AND 18 Pa.C.S. § 4904

I, Dr. Albert B. Harper, do hereby declare and verify as follows:

1)      I am the Director of the Henry C. Lee Institute of Forensic Science, University of New Haven, West Haven, CT 06516. I am a forensic scientist and have been qualified as an expert in forensic science in Maine, Connecticut, New York, Florida and Pennsylvania.

2)      On October 26, 2004 at the FBI offices in Williamsport , Pennsylvania I viewed the physical evidence collected at the crime scene in the case of United States v. Hammer.

3)      This evidence included the clothing worn by the victim and defendant on the night in question and the pillows and sheets from the bed on which the victim was found as well as torn strips of bed sheets some of which were braided and knotted. This evidence also included cotton swabs, slides, test tubes, nail clippings and hair samples all of which were preserved and prepared in the course of the autopsy of the victim.

4)      I viewed the clothing and bedding under an Ultralite ALS.  This alternate light source is designed to reveal human biological material such as: semen, blood, urine and saliva which is not visible to the naked eye.  This examination revealed numerous human biological stains that have not been previously identified or tested.

5)      Specifically, I examined under the Ultralite ALS: Govt. Ex. 15 (two pillows, one white and one salmon colored), Govt. Ex. 16 (a salmon colored bed sheet), Govt. Ex. 17 (two salmon colored bed sheets) and Govt. Exhibits 9, 10, 24 and 107 (various pieces of a salmon colored torn sheets). All of these items were positive for human biological material which was not visible to the naked eye.

6)    I also examined under the Ultralite ALS: Govt. Ex. 19 (a salmon colored sock), Govt. Ex. 25 (a piece of a salmon colored thermal shirt sleeve), Govt. Ex. 28.1 (victim Marti's salmon colored T-shirt), Govt. Ex. 28.2 (victim Marti's salmon colored first pair of boxer shorts) and Govt. Ex. 28.3 (victim Marti's second pair of salmon colored boxer shorts worn over the first pair). All of these items were positive for human biological material which was not visible to the naked eye.

7)    I also examined Govt. Ex. 26.1 (white sneakers), Govt. Ex. 26.3 (salmon colored boxer shorts and socks), Govt. Ex. 26.4 (Hammer's salmon colored T-shirt) and Govt. Ex. 26.5 (a salmon colored towel). All of these items were positive for human biological material which was not visible to the naked eye.

8)    It is my professional opinion to a reasonable degree of scientific certainty that all of these items contain a sufficient amount of biological material that would permit DNA samples to be extracted and testing to be conducted and valid results obtained.

9)    It is also my professional opinion to a reasonable degree of scientific certainty that the finger nail clippings, the anal and penile swabs and slides taken from the victim and prepared as part of the autopsy as well as a tube of his blood can and should be re-tested whether or not the sample was previously tested. The DNA testing performed at that time was a PCR based test that was of limited discriminatory power. It is now possible to test biological samples of limited quantity with highly specific results using more extensive DNA technology.

10)    Finally, my review of the laboratory reports and trial testimony reveals that the penile slide prepared from a swab taken from the victim at the autopsy and the oral slide prepared from a swab taken from the victim at the autopsy were never tested. I examined both of these slides during my review of the evidence. It is my professional opinion to a reasonable degree of

scientific certainty that these slides can be tested to determine the presence of human biological material and, if such material is found, further testing can be conducted to determine DNA.

11)    I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge and belief, subject to 28 U.S.C. § 1746 and Pa. C.S. § 4904.

Dr. Albert B. Harper

**Richard P. Kluft, M.D.**
**111 Presidential Boulevard – Suite 238**
**Bala Cynwyd, PA  19004**
**Telephone:        610-667-3250**
**Fax:     610-667-3374**
**E-Mail:   rpkluft@aol.com**

October 28, 2004

Michael Wiseman, Esq.
Supervisory Assistant Federal Defender
Federal Court Division
Defender Association of Philadelphia
Capital Habeas Corpus Unit
Suite 545 West – The Curtis Center
Independence Square West
Philadelphia, PA  19106

Re:     **David Paul Hammer**

Dear Mr. Wiseman:

At your request I interviewed David Paul Hammer on Sunday, October 24, 2004 at Lewisburg Federal Penitentiary  We met for approximately 2.5 hours, during which I briefly reviewed the circumstances surrounding his current situation, conducted  a limited psychiatric evaluation, and administered the Dissociative Experiences Scale (DES) and the Structured Clinical Interview for DSM-IV Dissociative Disorders –Revised (SCID-D-R).

Prior to my meeting with Mr. Hammer, I had the opportunity to review the following materials:

1) Videotaped Interview of Mr. Hammer by Drs. Dubin and Sadoff
2) Report by Robert L. Sadoff, M.D., dated September 22, 1997
3) Report by James K. Wolfson, M.D., dated December 19, 1997
4) Transcript Volumes 9-13 from Jury Trial United States of America vs David
Paul Hammer

The current report is preliminary and may be expanded to elaborate on its observations and conclusions, and to take into account the findings from further interviews and the review of additional records. At this time I will not summarize data from other sources.

Personal Qualifications

I am a Clinical Professor of Psychiatry at Temple University School of Medicine. I also teach at the Psychoanalytic Center of Philadelphia and serve on the faculty of Harvard University School of Medicine, where I teach in postgraduate continuing education courses in psychiatry. I have served as the President of the American Society of Clinical Hypnosis and the the International Society for the Study of Dissociation. I am currently Secretary of the Society for Clinical and Experimental Hypnosis. I am the former Editor-in-Chief of DISSOCIATION, Clinical Editor of the International Journal of Clinical and Experimental Hypnosis, and Advisory Editor of the American Journal of Clinical Hypnosis. I have been studying and treating dissociative identity disorder for over thirty years. I have evaluated several thousand individuals for this disorder, treated over 160 such patients to complete integration, and was director of a special program for the treatment of dissociative disorders at The Institute of Pennsylvania Hospital between 1989 and 1996. I have published over 175 scholarly articles in peer-reviewed journals and textbook chapters on this disorder, and over 200 in all. I have edited two books on dissociative identity disorder. I was a member of the American Psychiatric Association's Diagnostic and Statistical Manual advisory group for DSM-III-R, DSM-IV, and DSM-IV-TR. I participated in writing the diagnostic criteria in DSM-III-R, and wrote the first draft for this disorder for DSM-IV. My work has received numerous

1

awards here and abroad. In 1987 I wrote "The Simulation and Dissimulation of Multiple Personality Disorder," in which I discussed detecting malingered and factitious representations of dissociative identity disorder, formerly called multiple personality disorder, in the forensic context. I have evaluated over a dozen individuals who were defendants in major cases when dissociative identity disorder was suspected. The diagnostic impressions I have rendered and the discussion to follow are informed by this body of experience.

Psychiatric Evaluation

Due to time restrictions, it was necessary to focus on studying phenomena directly related to clarifying whether Mr. Hammer indeed suffers a dissociative disorder, specifically dissociative identity disorder. With this in mind, after some preliminary discussion, I proceeded directly to an assessment for dissociative disorders.

Dissociative Experiences Scale (DES)

The DES – Version II was administered to Mr. Hammer. The DES, authored by Bernstein and Putnam (1986), is the most widely-utilized instrument for the screening of patients for dissociative difficulties. It is not a diagnostic test, but is useful for identifying which patients should be considered likely to have a dissociative disorder. It consists of 28 questions, each of which inquires about the percentage of time a particular phenomenon is experienced by an individual. The DES is self-administered. The person taking the test is asked to either 1) make a vertical slash along a 100 mm horizontal line ( the DES-I) or 2) to circle a percentage number to indicate the extent to which each experience applies to that individual (the DES II). While it is vulnerable to both malingering and dissimulation, it is nonetheless useful in making an initial inquiry about an individual's experiences of dissociative phenomena. The DES is scored by measuring the lines for each item in millimeters or summing the circled numbers, adding up the values of all 28 items in millimeters or units, and then dividing by 28. It is typical for persons with dissociative identity disorder and allied forms of dissociative disorder not otherwise specified to endorse all items to some extent, and to have average scores of 30 or more across all items. In clinical practice, the score of 20 is often used to trigger further evaluation for a dissociative disorder. Note that while the score is officially rendered in millimeters in the DES - I, those millimeters translate into the percentage (as in the DES – II) of the time that a particular experience prevails.

Some difficulties were encountered in administering the DES – II to Mr. Hammer. Some of the questions make inquiries about situations he cannot experience in the prison setting, where he has spent the vast majority of his adult life. I was able to modify a number of them, but for a few he could not give answers. Nonetheless, his overall score was 47, within the range of a serious dissociative disorder and below the ultra-high scores that some have linked with malingering. He does not recall what has happened during travel (40%); spaces out in conversations and misses what has been said (80%); finds himself dressed in clothes that he does not recall putting on (70%); finds things among his possessions he does not recall buying (demonstrated by his commissary orders including items he does not recall ordering and that often are not to his taste (50%); sees himself as if he were watching another person (75%); is often accused of lying when he does not think he has lies (60%); experiences people, objects, and the world as unreal (35%); experiences his body as if it does not belong to him (50%); remembers things so vividly it is as if he were reliving them (95%); finds familiar places unfamiliar (20%); can ignore pain (60%); spaces out and loses track of time (65%); speaks to himself out loud while alone (95%); acts so differently from one situation that it feels like they are different people (80%); able to easily do some things in one situation that are usually difficult in another (80%); cannot recall whether they have done something or just thought about doing it (75%); finds evidence he has done things he does not recall (90%); finds drawings, writings, or notes among his belongings that he must have done and cannot recall doing (90%); and hears voices inside his head telling him to do things or commenting on things he is doing. Some additional phenomena are reported but not with great prevalence.

Eye Roll Section of the Hypnotic Induction Profile

The eye roll sign (Spiegel & Spiegel, 1977) co-occurs with high hypnotizability, which is found in individuals with true dissociative identity disorder and allied forms of dissociative disorder not otherwise specified. It is part of the Hypnotic Induction Profile, a measure of hypnotizability, and can be tested

2

without inducing hypnosis. It is scored from 0 to 4 based on how much of the iris, the colored part of the eye, is visible when a patient, having looked up as if looking through the top of his or her head, and is asked to let his or her eyelids flutter down and close. For a score of 0, the iris is completely visible; for a score of 4, only sclera, the white part of the eye, is visible. If half the iris is visible, and half obscured, the score is 2, etc. If a person under evaluation for these types of dissociative disorder does not have indicators of high hypnotizability, it is probable that the condition is malingered (Kluft, 1987).

Mr. Hammer demonstrated a 4 eye roll. This indicates that he has the potential for high hypnotizability, and is a legitimate candidate to develop a major dissociative disorder.

I did not do the full Hypnotic Induction Profile, nor did I induce hypnosis.

Structured Clinical Interview for the Diagnosis of DSM-IV Dissociative          Disorders – Revised (SCID-D-R

The SCID-D-R was administered to Mr. Hammer. This is a semi-structured diagnostic interview administered by a clinician reading standard stem questions and constructing follow-ups from a menu of questions with components derived from the original responses. It takes from one to three hours to administer. It was designed by Marlene Steinberg, M.D., in collaboration with Bruce Rounsaville, M.D., and Dante Ciccetti, Ph.D. It incorporated (with permission) many items from an earlier instrument authored by myself, Richard P. Kluft, M.D., the CSDS Diagnostic Instrument. I also participated in the research at Yale validating the SCID-D-R.

The SCID-D-R is considered 90-95% sensitive to populations of patients with dissociative disorders, and recent research allows for its use in the identification of malingerers. False positives are rare. The SCID-D-R obtains some background information, and studies five core dissociative features: amnesia, depersonalization, derealization, identity confusion, and identity alterations. These five are scored from one to 4. The score of 1 indicates the phenomenon is absent; 2 indicates it is minimally present; 3 indicates it is moderately present; and 4 indicates it is strongly present. Thus, a minimal score of five would indicate no dissociative phenomena whatsoever, and a score of 20 would indicate maximal scores in all core features. Scores of 16 and above are characteristic of a severe and chronic or recurrent dissociative disorder. Scores of 8 or less are characteristic of normal populations. Scores up to 12-13 are found in mixed groups of psychiatric patients. The SCID-D-R also elicits phenomena associated with DID and allied forms of DDNOS. Furthermore, the format of the SCID-D-R forces the closer observation of two of nine areas of inquiry in greater depth, the two to be chosen by the interviewer based on which of nine particular areas of inquiry have elicited the answers most suggestive of the presence of alter personalities. It also allows for the description of the clinician's observations of dissociative phenomena, and the tentative diagnosis of a dissociative disorder.

Mr. Hammer achieved an amnesia score of 4, a depersonalization score of 4, a derealization score of 2, an identity confusion score of 4, and an identity alteration score of 4. His total score was 18 out of a possible 20, which is a score associated with dissociative identity disorder and other severe complex chronic dissociative disorders that are similar to dissociative identity disorder but which do not fulfill its diagnostic criteria and are designated under dissociative disorder not otherwise specified. This score indicates that Mr. Hammer is most likely to have a legitimate dissociative identity disorder or a closely allied form of dissociative state.

Under amnesia, he endorsed large gaps in his memory on a daily basis when under stress, and sometimes without stress. For example, he loses a block of time and finds the television tuned to programs he does not watch (i.e., World Championship Wrestling, favored by Jocko, and cartoons, favored by Wilbur). He often loses track of daily activities. For example, he will spend hours in the law library and return to his cell, only to complain that no one has taken him to the law library, and then be shocked that he has been observed to have done something that he does not recall. Prior to incarceration, he has found himself in places and been unable to recall who he was. He assumed it was due to drugs, but realized that it has happened without drugs. His losses of periods of time date from his childhood and continue to the present. His forgetting social obligations has cost him many relationships. He usually lies or makes up something to cover himself.

Under depersonalization, Mr. Hammer sees himself from outside of his body, often watching himself do something he does not want to do yet cannot control and is powerless to stop. He often feels that he is going through the motions of life while the real him is far away and watching. This is a very common experience for him. He also feels like he is two persons, one going about life and the other watching

3

quietly. He also experiences himself as talking, and feeling that the he is not choosing the words that come out of his mouth. He experiences his behavior as out of his control, which drives him "nuts." His episodes of "watching himself" usually last under four hours. He has had this situation since his childhood. He suffered severe symptoms prior to his scheduled execution date.

Under derealization, he has found familiar surroundings or persons unfamiliar. He has had this symptom since childhood. He did not appear to understand some of the other derealization items.

Under identity confusion, he experiences himself as having a struggle going on inside of himself on a daily basis. This includes sexual orientation issues, with a situationally homosexual part in conflict with a homophobic part that is violent. Also daily, he experiences confusion about who he is. Both of these symptoms have been present since adolescence, waxing and waning. These symptoms interfere with his concentration and make him irritable.

Under identity alteration, Mr. Hammer finds himself and is seen by others to be acting like a child. He identifies this as Wilbur, whose laughing and crying is distinct, and commented on by others, Mr. Hammer states. He is aware he acts like a completely different person at times. Others have told his he seems like another person.

Specifically, if he is confronted, he becomes eruptive. He goes from kind to very vicious within seconds. If saddened, he becomes child-like. He reports that fellow inmates call him schizoid. He is confronted about his behavior changes more than once a week, and sometimes several times per week. He has referred to himself as Jocko, and some people call him Jocko. People have told him of conversations with Jocko. He states that he is addressed as Jocko more than once a week. He has found things in his possession that he cannot account for. Specifically, his commissary orders arrive with food he does not like and cannot recall ordering. Also, many of his orders include Chapstick, which Mr. Hammer hates, despite his dry lips. It reminds him of the lipstick and make-up his mother put on him when she dressed him like a girl. However, Jocko uses chapstick. Mr. Hammer often feels controlled, which causes him great anxiety. He tries to control Jocko, but often is himself controlled. He began to experience himself as a different person for the first time at 18, when Jocko emerged in a violent act. Previously he had known of different others, but they were experienced as inward and not taking over control. He described interpersonal problems associated with Jocko. He is very aggressive, not very intelligent, is street-smart, and generally curses, growls, and acts brutish both to Mr. Hammer and anyone who confronts Mr. Hammer.

Associated Features of Identity Disturbance are not scored in the SCID-D-R, but study phenomena associated with dissociative disorders and suggestive of more elaborated dissociative structures as are found in dissociative identity disorder and allied forms of dissociative disorder not otherwise specified. Mr. Hammer endorsed rapid mood changes without any reason, rapid changes in his level of functioning, experiences in which he felt he was living in the past, and has ongoing dialogues with himself, both silently and out loud. He reports handwriting differences. His dialogues occur daily, and are similar to hearing voices when he is alone. If he is with others, they are experienced more as thoughts.

Follow-Up Sections are done to clarify the possibility of dissociative identity disorder and allied forms of dissociative disorder not otherwise specified. I used the depersonalization and different names sections. Mr. Hammer described watching himself as if in a movie, and specifically cited watching Jocko on his victim's back, and being unable to control him. The visual images he has of himself correspond to his named alters. Jocko is a corn-fed country bumpkin with a boyish face. He is in his early 20s and in good shape. Wilbur is a scared little boy missing one of his front teeth. Tammi is a teenaged girl of about 14 who wears too much make-up and looks kind of whorish. Jasper is a chimpanzee or monkey in appearance, with no tail, black and furry, with big brownish eyes. He stated that Jocko or Wilbur could control how he acted or talked, but the others could not. In dialogues Jasper is happy-go-lucky, Jocko is smart-ass or vulgar and lacks social skills, Tammi is flirtatious with sexually explicit remarks and innuendos. Wilbur is likely to talk about being hungry, frightened, and scared. While the alters have different feelings and behaviors, Mr. Hammer believes that only Jocko has separate memories. Mr. Hammer insisted that he does not believe that he has multiple personalities because they are all parts of himself.

Intra-Interview Dissociative Cues included altered demeanor with overt emergences of scared child-like behavior and angry aggressive harsh-voiced states. There were alterations in identity as both Wilbur and Jocko emerged. Intra-interview amnesia was observed twice in the absence of switches, and also in some switches associated with Jocko's emergence. On numerous occasions Mr. Hammer lapsed into trance-like states.

4

Limited Additional Psychiatric Observations

After the conclusion of the SCID-D-R, I told Mr. Hammer that I would like to speak to the personalities about which he had been speaking, some of which had emerged briefly during the SCID-D-R. Mr. Hammer was very opposed to this, but reluctantly allowed me to ask Wilbur to talk. I had noticed the frequent intrusion of young, sad and fearful facial expressions, and thought Wilbur could be accessed easily, and perhaps might be a better route to Jocko than making an approach through David Hammer. Wilbur emerged, looking fearful, speaking less articulately, and stooped over, with a hint of rocking. Abruptly, the body jerked and David Hammer resumed control, but still maintained some of Wilbur's features. He stated that he felt funny, and massaged his neck apprehensively. His face changed briefly toward Jocko's features, only for there to be another jerk, and a copresence of David and Wilbur was noted, expressing fear of getting in trouble if Jocko emerged. I tried to explain again that I thought it would be important to talk to Jocko, and Jocko emerged, loud, angry, and belligerent, with a coarse and crude pattern of speech. Jocko opposed cooperating with lawyers or those they sent. He stated he was not afraid, and called me a coward. He scorned Wilbur and David's fears. He had some fear, but saw it as a sign of weakness he would not acknowledge. At this point the interviewee began to hyperventilate, and then the Wilbur-David copresence reoccurred. He stated, "I don't think we should be talking about him [Jocko] any more. I can't control him." He expressed fear Jocko would get him in trouble, both in the prison and with me in the interview. I assured Mr. Hammer that I would not be upset if Jocko came out and explained himself, no matter what sort of language he might choose to use. Jocko emerged and raged at me, saying all shrinks were alike. As Jocko tried to speak and Mr. Hammer tried to suppress him, Mr. Hammer's appearance fluctuated across presentations of Mr. Hammer, Wilbur, the David-Wilbur copresence, and Jocko. Headaches accompanied these transitions. Jocko shouted that I was trying to kill them, that all I was doing was a trick. In response to inquiry, I learned that long before the current situation had developed, Jocko had held the view that all therapy was not designed to help David, but to kill him, Jocko.

I pursued the question of whether there are other alternate personalities. I learned that there have been many transient parts formed in the context of stress or abuse, but that none has ever persisted long enough to become elaborated and develop much of an identity. This is a well-known but rarely described aspect of some cases of dissociative identity disorder (Kluft, 1991). Also, I saw and heard hints that cause me to suspect there are additional personalities present.

I then tried to get an account of the events surrounding the death of Mr. Marti. Jocko interrupted this account when Mr. Hammer began to describe what he attributed to Jocko. Jocko gave a strong statement about breaking through and assaulting Mr. Marti in spite of the other parts. At this point, Mr. Hammer was very distressed and wanted to end the interview. I continued, but without pressing for more about the death of Mr. Marti.

I note that Mr. Hammer gave a history both to me and to others of the types of trauma and childhood sexual abuse that are associated with the development of dissociative identity disorder.

Observations on Videotaped Materials

Although the videotaped materials purport to demonstrate the presence of Jocko (also spelled Jacko in some documents) both before and during hypnosis, the most impressive finding is the picture of fluctuating presences and copresences of David Paul Hammer and Wilbur. There was much more evidence of dissociative phenomena than was indicated in either of the reports discussing this taped interview. The Wilbur and copresence phenomena were not noted by other observers.

Diagnostic Impression

This diagnostic impression is necessarily incomplete because I was unable to do a complete psychiatric evaluation and because there are many relevant records which I have not had the opportunity to study.

David Paul Hammer suffers from:
1) Dissociative Identity Disorder
2) Posttraumatic Stress Disorder
3) Antisocial Personality Disorder
4) R/O Major Depression, Recurrent, Moderate, by history
5) Polysubstance Abuse by History

5

Discussion

      Mr. Hammer fulfills diagnostic criteria for Dissociative Identity Disorder both in his general psychiatric evaluation and in his SCID-D-R interview. He manifests two alternate identities, Wilbur and Jocko, and a copresence (simultaneous presence) of Wilbur and David Paul. Wilbur and Jocko recurrently assume executive control. He has a great deal of amnesia. The majority of his dissociative symptoms did not and do not occur as a result of some other disorder or the influence of some chemical. He fulfills criteria for antisocial personality disorder and posttraumatic stress disorder. He fulfills criteria for major depression, recurrent, moderate by history, and the now unofficial but highly useful classification of Polysubstance Abuse by History.

      Mr. Hammer does not display typical findings associated with the malingering of dissociative identity disorder. He did not elaborate on his alters in a manner consistent with lay sources of information. He did not acknowledge that Wilbur was present and active until I confronted him about this. He denied having the diagnosis, did not respond to invitations and questions that offered him the opportunity to demonstrate the phenomena of the disorder. He did not discuss the dissociative identity disorder phenomena in a manner that would be exculpatory. In fact, he freely offered an account of Jocko's first overt act of violence at Mr. Hammer's age 18. While a passenger in a vehicle driven by friends he abruptly seized a small bat that was in the vehicle and struck on the head a complete stranger who was on foot. In his trying to dissimulate more than promote the idea of dissociative identity disorder, he manifested the pattern noted in such individuals in forensic situations described by Kluft (1987).

      Because my conclusions differ so profoundly from those reached by James K. Wolfson, M.D., I would like to comment on the conclusions he reached and how he arrived at those conclusions . Here I will do so briefly, and I may discuss these conclusions in greater depth if this report is expanded.

      Dr. Wolfson has made an extremely conscientious and detailed study of David Paul Hammer. He has argued that Mr. Hammer is a malingerer, and offered pages of arguments to buttress and defend his conclusions.

      It is my opinion that Dr. Wolfson is conscientiously and brilliantly wrong. Dr. Wolfson has established several implicit and explicit tests for determining whether a presentation purporting to be dissociative identity disorder is genuine. Unfortunately, most of the arguments he makes are based on inaccurate assumptions, some of which have been challenged in the literature since 1987. The basic problem is that his constructions of how a genuine dissociative identity disordered individual would behave and how a genuine dissociative identity disordered individual would be seen by others are based on assumptions drawn from a forensic literature that starts with the assumption that the condition is probably fraudulent. They do not respect the clinical literature that describes how the condition actually presents. As a result, much of what he puts forward as evidence that Mr. Hammer is malingering is actually completely consistent with the natural history of the disorder.

      Here I will give only a small sample of the difficulties. Dr. Wolfson is using what biologists call a searching image or finding image for dissociative identity disorder that is seriously flawed. He assumes that in a genuine case, there should be many documentable observations of the condition's overt manifestations by others. His searching image is of the full and florid manifestations of the condition. However, the natural history of this condition is that it is usually covert. Only 6% of dissociative identity disorder patients consistently demonstrate overt symptomatology (Kluft, 1984, 1985). For most there are only occasional windows of diagnosability, usually associated with decompensations under stress, unless one is doing a very sophisticated interview (Kluft, 1985, 1991). Patients in the mental health care delivery system who ultimately are discovered to have dissociative identity disorder have been under observation for an average of 6.8 years before they are correctly diagnosed (Putnam et al., 1986). Most of the time the diagnosis shocks the mates or partners of the individual diagnosed with dissociative identity disorder. They have lived with them, and often have noticed many unusual things, but they have not put them together and considered their partners suffer this condition. Forensic psychiatrist Thomas Gutheil, M.D., of Harvard, observed that dissociative identity disorder (formerly multiple personality disorder) is "a psychopathology of hiddenness" (quoted in Kluft, 1985).

      Furthermore, most dissociative identity disorder patients' symptoms are very much suppressed and/or muted until they are no longer with their families of origin (Kluft, 1985). Therefore Dr. Wolfson's assumption that in legitimate cases of dissociative identity disorder there should be many witnesses who

6

have observed overt dissociative phenomena and interacted with alternate personalities is not grounded in clinical fact. In a typical legitimate case we should expect to hear most people report that they saw little dissociative symptomatology and never encountered particular other personalities. In prison, it is typical for those with this condition to try to conceal it, although inmates tend to notice and comment upon their situations even if they cannot be specific about what they see. For example, Mr. Hammer reported that many of his fellow prisoners described him as schizoid.

Dr. Wolfson was concerned about what he perceived as inconsistencies in the process by which the personalities switched. Specifically, he described hyperventilation as part of one transition into switching. It is far more typical for the nature of a switch to be determined by the expectations and the conflicting forces that surround it that for it to be stereotypically consistent in its nature. While there is a tendency towards similarity, there is no expectation of this being robust enough to use as a diagnostic measure. Putnam (1984a, 1984b) studied switches and found that there are several patterns that occur.

Dr. Wolfson demonstrates an apparent lack of awareness of what I am calling "the dissociative surface" in some work in progress. The dissociative surface concept is not a novel or untried phenomenon, although the term is new. It organizes dozens of well-known observations about what the clinician sees when he or she interviews a dissociative identity disorder patient that is not manifesting overt dissociative identity disorder. These phenomena include personalities intruding into or becoming copresent with others; personalities trying to pass for one another; personalities responding to the orders of others personalities heard as hallucinations, etc. These manifestations are much more common than the phenomena Dr. Wolfson would use in his determinations. The videotape is replete with examples of these more subtle phenomena, which were not noted in the materials I reviewed.

For these and other reasons to be detailed should a more elaborate report be requested, I believe that Dr. Wolfson's inexperience with dissociative disorders, probably reinforced by his skepticism about dissociative identity disorder, exerted influences that caused him to overlook phenomena that might have persuaded him that Mr. Hammer actually suffered dissociative identity disorder, and to accord importance to observations that have very little to do with clinical dissociative identity disorder. It is my professional opinion that Dr. Wolfson, despite the extensive nature of his diagnostic efforts, reached erroneous conclusions.

From my interview with Mr. Hammer and from my review of the available materials it is my opinion that Mr. Hammer's dissociative identity disorder played a major role in his destruction of Mr. Marti. Mr. Hammer could not control the behaviors of the alternate personality or identity described as Jocko, of whose behaviors he often was unaware until long after an event involving Jocko occurred. David and Jocko's memories became confluent only over the passage of time. At the time of Jocko's aggressive behavior, the total human being David Paul Hammer was not able to be aware of what was transpiring and control his behavior. The dissociative identity disorder disrupted this man's capacity to have the knowledge of his circumstances, the ability to access and utilize his intelligence, and the capacity to form a true voluntary intent to commit an act of murder. His actions were driven by the fragmentation and compromised control associated with dissociative identity disorder.

The same observations pertain to his difficulties in coming to a decision about whether to plead guilty and whether to oppose the imposition of the death penalty. His different personalities have different values and motivations. They form different intents, and then try to impose them on one another.

I hold the opinions offered above to a degree of medical certainty.

Very truly yours,

Richard P. Kluft, M.D.
Clinical Professor of Psychiatry
Temple University School of Medicine

7