- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription ___4/17/96___

DAVID PAUL HAMMER, inmate, UNITED STATES PENITENTIARY-ALLENWOOD (USP-A), White Deer, Pennsylvania, Registry Number 24507-077, incarcerated in the Special Housing Unit (SHU), Cell #103 at the USP-A, was contacted for interview within the interview room of the SHU.

Prior to interview, HAMMER was advised of the identity of the interviewing agent, Special Agent (SA) CARLYLE R. THOMPSON, FEDERAL BUREAU OF INVESTIGATION (FBI), Philadelphia Division, WILLIAMSPORT, Pennsylvania, RESIDENT AGENCY, accompanied by Lieutenant MARK TRAXLER, Special Investigative Supervisor, U.S. BUREAU OF PRISONS (BOP); Lieutenant FRANCISCO SANTOS, Special Investigative Supervisor, U.S. BOP; and, DON C. TROUTMAN, Unit Manager, U.S. BOP, all assigned to the USP-A, White Deer, Pennsylvania, and the nature of the intended interview relative to the death of HAMMER's cell mate, ANDREW HUNT MARTI, who was found dead by institution authorities at approximately 2:53 a.m. on Saturday, April 13, 1996.

Prior to interview, HAMMER was orally advised of his rights as read to him by SA THOMPSON from form entitled, Interrogation; Advice of Rights (FD-395). Upon completion of reading HAMMER his rights, SA THOMPSON inquired as to if HAMMER understood his rights to which HAMMER responded, "Yes."

SA THOMPSON thereafter attempted to provide HAMMER with the Interrogation; Advice of Rights form, to which HAMMER responded that he was aware of his rights on this form; however, refused to read it or sign the form, stating, "I will talk to you, but I won't sign the form."

The Interrogation; Advice of Rights form was thereafter witnessed and retained.

DAVID PAUL HAMMER provided the following information:

HAMMER questioned SA THOMPSON as to if MARTI was dead and was informed by SA THOMPSON that he is no longer with us. HAMMER then stated, "What do you want to start at?"

Investigation on __4/13/96__ at __White Deer, Pennsylvania__

File # __90A-PH-79493 (WRA)__

by __SA CARLYLE R. THOMPSON:sac__ Date dictated __4/15/96__

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

90A-PH-79493 (WRA)

Continuation of FD-302 of DAVID PAUL HAMMER         , On   4/13/96   , Page   2  

       HAMMER and MARTI celled together in a two-man cell, Number 103 within the SHU since April 9, 1996.

       HAMMER advised that at approximately 1 a.m. on Saturday morning, April 13, 1996, correctional officers came through the SHU, conducting a count. MARTI went up on his bunk, the top bed, and acted like he was asleep. After the count, MARTI took a shower in the cell. HAMMER then, in a very fast excited narrative, described how he tied MARTI to HAMMER's lower bunk bed and began to strangle him. At this point, SA THOMPSON stopped HAMMER, requesting that he start from the beginning in a slower narrative so as to allow SA THOMPSON time to write the interview down.

       HAMMER stated that MARTI came (moved) into his cell (SHU #103 on Tuesday of this week). MARTI came at the written and verbal request of HAMMER who wanted him to be his cell mate. HAMMER told inmate First Name Unknown (FNU), CLASSEN, who, at the time, celled with HAMMER, that HAMMER was going to have MARTI move into his cell so that he (HAMMER) could kill him. FNU CLASSEN is presently located in the institution's administrative detention Cell #215. HAMMER also recalled telling inmate LEONARD YAGER, SHU inmate orderly for the past month, that he (HAMMER) was going to kill MARTI.

       Approximately two weeks ago, HAMMER informed Officer FNU BOON (phonetic), that he (HAMMER) wanted MARTI as a cell mate, and if Officer BOON could arrange it, HAMMER would do something to MARTI. Correctional Officer BOON said to HAMMER, "I hear nothing."

       Last week, HAMMER again asked BOON how long MARTI had in disciplinary segregation, to which the officer responded, "Not much longer." HAMMER told the officer that he wanted him (MARTI) moved in with HAMMER so that he could fuck him up. Officer BOON said to HAMMER to do a good job so that he (MARTI) can get to the outside hospital and so that BOON can get some overtime. HAMMER stated BOON probably thought that HAMMER was joking.

       MARTI wanted to move in with HAMMER, according to HAMMER. He (MARTI) has had problems in here (referring to the USP-A in that other inmates called him names and thought of him as an informant). Being labeled as an informant and working for the Special Investigative Supervisor, a contract hit was put out on MARTI. HAMMER stated that the contract hit had nothing to do or motivated him for what he did to MARTI.

       HAMMER again stated that MARTI moved in with him on Tuesday, April 9, 1996, into Cell #103. After moving in, MARTI

90A-PH-79493 (WRA)

Continuation of FD-302 of  DAVID PAUL HAMMER                              , On   4/13/96   , Page   3

continued talking about how bad he was, convictions, and being shot five times, as a member of the NORTHE (phonetic) gang out of Stockton, California.

At approximately 1 a.m., or 1:30 a.m. on Thursday, April 11, 1996, HAMMER started talking to MARTI, knowing that HAMMER had taken hostages before and while incarcerated in Oklahoma, authorities found one of his cell mates hanging. MARTI wanted to know how to get to the USP, Atlanta, Georgia. HAMMER told him that if HAMMER took him hostage, hurt him a little bit, that he might have a chance to go. HAMMER sweetened the offer by telling him that HAMMER would give him $500, plus commissary. The money breakdown consisted of $200 to MARTI's account under Number 58008-065 and $300 through another source. HAMMER declined to identify as to who the unidentified source is.

TROUTMAN asked HAMMER if yesterday, if he (HAMMER) was told that he was designated to another institution, would this have happened? HAMMER responded, "Yes."

HAMMER stated that MARTI wanted to know when the hostage scenario would take place? He was told by HAMMER that it would be soon. HAMMER stated that he is providing this information during the course of this interview because he, "wanted to show premeditation, wanted to show that I planned what I had done so there will be no doubt."

HAMMER told MARTI to think about it, referring to the hostage scenario.

HAMMER then stated, "What did I have to lose?"

On Thursday evening, April 11, 1996, MARTI told HAMMER that he would go ahead with the hostage scenario. Also, on Thursday evening, HAMMER wrote a letter on MARTI's behalf to MARTINE GERRERO (phonetic) via mailing it to a third party located at Post Office Box 234, Three Rivers, Michigan. HAMMER had doubts at the time in his own mind as to whether he was going through with what he planned. HAMMER told GERRERO in the letter that he (HAMMER) knew MARTI for some time, did not believe the rumors, and to give MARTI a chance, to spread the word and do it as a personal favor for me.

After MARTI agreed, HAMMER started talking with him as to the time and scenario. HAMMER had a general idea of how to proceed with the hostage scenario, but had no specifics.

90A-PH-79493 (WRA)

Continuation of FD-302 of  DAVID PAUL HAMMER                              . On    4/13/96    . Page    4

At this point during the interview, HAMMER told
TROUTMAN, "I would like to see a psychologist when this is all
over." TROUTMAN told HAMMER that the Chaplain was here, also.
HAMMER said, "I would like to see him, too."

HAMMER continued that at the time, he did not think or
know if he was going to kill MARTI, or just take him hostage and
make an ass out of myself to get attention.

Friday afternoon, after the institution's team meeting,
MARTI and HAMMER started to discuss how to do it. HAMMER started
to braid torn up sheets into ropes. MARTI also had an idea that
he wanted HAMMER to cut him on his neck to make it look good.

HAMMER stated that when it got time to do it, HAMMER
told MARTI, "It's time." He recalled that MARTI wanted him to
use a razor blade that was still in the cell, to cut his neck.

At approximately 1:00 a.m. to 1:30 a.m., April 13,
1996, correctional officers in the SHU conducted the inmate
count. We (referring to MARTI and HAMMER) laid in our bunks.
MARTI was in the top bunk. After the count, MARTI took a shower.
At approximately 2:00 a.m. exactly, HAMMER stated a radio station
at LYCOMING COLLEGE, Williamsport, Pennsylvania, went off the
air. He recalled that a disc jockey named JEREMY runs a program
from 12 midnight to 2:00 a.m., after which time the station goes
off the air.

HAMMER then started to tie MARTI up. MARTI was lying
on HAMMER's bunk after he took his shower. HAMMER had MARTI lay
on his stomach, face down, and tied his left leg with the braided
rope around his ankle and secured it to a restraint ring nearest
the commode. All along, MARTI is lying face down on his chest on
the bed. HAMMER then tied his right leg, around the ankle, in
the same manner.

HAMMER stated that he is confused as to the actual
sequence, but then recalled that he first tied MARTI's right leg
to the restraint ring, and then his left leg nearest the wall to
the other restraint ring. HAMMER then tied MARTI's left arm at
the wrist to the restraint ring in the middle of the bed, which
is located against the wall. HAMMER described that after placing
the braided rope around MARTI's left wrist, running the rope
through the middle restraint ring, then again around his left
wrist, looping it around the wrist again and pulling the rope
tight, tying it off again. HAMMER then secured MARTI's right
wrist in the same manner. After tying MARTI, HAMMER told him to
attempt to get up, to pull against the restraints to make sure

90A-PH-79493 (WRA)

Continuation of FD-302 of DAVID PAUL HAMMER _____ , On __4/13/96__ , Page __5__

that they were secure.  HAMMER told him, "It's got to look real."
MARTI complied and attempted to break free of the restraints.

HAMMER then lit a cigarette, one he obtained from a
pack of his Camel's, the pack still located on the desk in the
cell.  After lighting the cigarette, HAMMER placed the lit
cigarette to MARTI's lips, allowing him to take a couple drags
off of it.  HAMMER then threw the lit cigarette in the toilet.
He then stuffed a sock in MARTI's mouth and used a strip of sheet
to secure the sock gag.  While securing the strip of sheet,
HAMMER told MARTI to bite down on the sock as he tied it around
his head.  MARTI could still talk because the gag was not tight.

HAMMER stated that this was exactly 2:17 a.m. when he
completed the process of tying up MARTI.  He knows the exact time
by looking at the clock radio in the cell window.

At this time, during the course of the interview,
HAMMER was allowed to go to the bathroom.

After returning to the interview, the interview of
HAMMER continued.

He related that he recalled that the Camel cigarette
came from a pack of cigarettes still located in his cell.

At this time, just prior to HAMMER beginning to
strangle MARTI, he recalled that MARTI started to twitch and jump
around.  HAMMER asked him what was wrong, to which MARTI told him
that he (MARTI) was having flashbacks to when he got shot.
HAMMER related that MARTI had been shot in the back of the head.
MARTI then began to whimper.

HAMMER then said, "Oh yeah?"  And then straddled
MARTI's back, facing the back of MARTI's head.  HAMMER started
strangling MARTI by raising his head up off of the pillow with
his right hand and inserting his left arm under his Adam's apple
and the pillow, so that his neck was resting in the crook of
HAMMER's elbow.  HAMMER then placed his right forearm under his
left forearm, simultaneously pulling MARTI's head backwards and
applying choke pressure.  MARTI struggled by moving his head.
After a period of choking MARTI, HAMMER released pressure to get
a better grip.  MARTI said, "No, please, no."  HAMMER regained a
better choke hold in the same position and applied pressure
again.  MARTI jerked in the restraints, grabbing at HAMMER's
legs, even though restrained.  The hold HAMMER had on him was a
sleeper hold and he recalled that the second time in this hold
was for over three minutes.  MARTI became really violent, jerking

90A-PH-79493 (WRA)

Continuation of FD-302 of  DAVID PAUL HAMMER                              . On   4/13/96   . Page    6

and grabbing at HAMMER, even though MARTI's hands were tied in the restraint rings on the sides of the bed.

HAMMER advised that MARTI's body then relaxed; he expelled gas, all the while HAMMER continued the choke hold. He advised that MARTI did not make much movement, just intermittent shuttering.

After no further movement, which was approximately six minutes, HAMMER got up off of MARTI and went and got a string off of MARTI's bed. The string-like rope was removed previously from a stitched seam of institutional clothing.

HAMMER then sat on MARTI, not straddling him, and put the string around his neck and started choking him, pulling it really tight, with HAMMER's hands pulling in opposite directions. This resulted in HAMMER receiving cut burns along the sides of both palms of his hands. HAMMER continued this choking of MARTI for approximately three or four minutes.

After observing no movement or shutters by MARTI, HAMMER got up. He was sweating profusely and went to the wash basin, washing his face and hands. HAMMER, after drying himself, went back and checked MARTI's wrist pulse. There was no pulse. He then checked MARTI's neck pulse. There was no pulse. HAMMER then got a clean sheet from under his bed and covered MARTI up. HAMMER then combed his hair and walked back and forth in the cell.

HAMMER stated that he looked to see what time it was. It was 2:40 a.m.. He heard officers coming in for the count. At 2:46 a.m., the officers (a female officer and another officer, First Name Unknown JONES) came to his cell door.

HAMMER told the officers, "My cellie is dead," or something to that effect. The female officer said, "He's what?" HAMMER responded, "He's dead. Turn on the lights to check." HAMMER simultaneously to saying this to the officers, pulled the sheet off of MARTI so that the officers could see that he was tied up. The female officer asked why he was tied. HAMMER told her, "To make it easier." She said, "Easier for what?" HAMMER responded, "To kill him."

While HAMMER was talking to the officers, he was holding a pair of toenail clippers with masking tape securing it in the opened position, to give it the appearance of being a weapon. The female officer asked HAMMER what he had, to which he responded that it had nothing to do with him (referring to

90A-PH-79493 (WRA)

Continuation of FD-302 of DAVID PAUL HAMMER                          . On   4/13/96   , Page   7

MARTI). He advised that the toenail clippers were made up to look like a knife, as part of his rouse in the hostage scenario.

Shortly thereafter, more officers and a Lieutenant responded and asked HAMMER if he would cuff up. HAMMER responded, "Yes." He was then restrained and removed from the cell. Thereafter, he was strip-searched, examined by a Physician's Assistant and photographed.

HAMMER stated that he failed to tell us during the interview the reason why he had to stop strangling MARTI the first time in the sleeper hold was because HAMMER's left shoulder dislocated from the pressure he was applying. HAMMER advised that he had problems with his left shoulder since December, 1994, and knew that when it pops out, he would have to immediately stop whatever he was doing and get the shoulder back into its socket. HAMMER did this after his shoulder dislocated and after adjusting his hold on MARTI, continued to strangle him.

SA THOMPSON questioned HAMMER as to why or what motivated him to kill MARTI. HAMMER responded that he did it for reasons between MARTI and himself. HAMMER was not motivated over MARTI's contract, and not because HAMMER wanted the death penalty. HAMMER related that he is serving 1232 years incarceration.

HAMMER then stated, "I'm just tired. When somebody fucks over me, I'm not going to sit back and take it. I'll never forget." HAMMER then indicated that he and MARTI had a run-in when HAMMER first got to the USP-A, White Deer, Pennsylvania, in that MARTI was one of a group that made HAMMER lose face. He (MARTI) was one of them. "I don't go running my head to people. All that killing shit."

HAMMER has been in the hole (SHU) for seven months. HAMMER stated, "I fucked up here, my problem isn't with the other inmates or SHU staff."

The following physical description was obtained during observation and interview:

| | |
|---|---|
| Name: | DAVID PAUL HAMMER |
| Race: | White |
| Sex: | Male |
| Age: | 37 |
| Date of Birth: | October 9, 1958 |
| Place of Birth: | Holdenville, Oklahoma |
| Social Security | |

FD-302a (Rev. 11-15-83)

90A-PH-79493 (WRA)

Continuation of FD-302 of  DAVID PAUL HAMMER                              . On    4/13/96    . Page    8

           Account Number:           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
           Inmate Registry Number:   24507-077

      HAMMER advised that he has been incarcerated within the
U.S. BOPs' federal system since December 16, 1993, as an Oklahoma
STATE DEPARTMENT OF CORRECTION's prisoner and has been
incarcerated in the Oklahoma prison system since June, 1978.
HAMMER is serving 1232 years incarceration for 13 separate felony
convictions.

      Upon completion of interview, HAMMER stated, "I had
better get me a lawyer."

      The interview of DAVID PAUL HAMMER was terminated at
this time.

INTERROGATION; ADVICE OF RIGHTS

## YOUR RIGHTS

Place _USP, Allenwood, PA_
Date _4/13/96_
Time _6:18 a.m._

Before we ask you any questions, you must understand your rights.

You have the right to remain silent.

Anything you say can be used against you in court.

You have the right to talk to a lawyer for advice before we ask you any questions and to have a lawyer with you during questioning.

If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer.

## WAIVER OF RIGHTS

I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

Signed _____

Witness: _Carlyle R Thompson, Special Agent, FBI, Williamsport, PA_ 4/13/96
Witness: _Francis W. Gentry Special Investigative Supervisor, USP Allenwood, PA_ 4/13/
_John C. Frautman_ , UNIT MANAGER I/II , USP ALLENWOOD , PA  4-13-96
Time: _6:24 a.m._

_David Paul Hammer, Reg. # 24507-077, acknowledged by saying "Yes" when questioned after reading the above form to him by SA Thompson if he Hammer understood his rights. Hammer refused to read the form stating "I will talk to you, but I won't sign the form"._

FBI/DOJ