## AFFIDAVIT/DECLARATION OF NEIL BLUMBERG, M.D.
## PURSUANT TO 28 U.S.C.§ 1746 AND Pa. C.S. § 4904

I, Dr. Neil Blumberg, M.D., do hereby declare and verify as follows:

1.      I am a physician licensed to practice medicine in the states of Pennsylvania, Maryland, Virginia, Georgia and Florida. I specialize in general and forensic psychiatry. I am board certified in psychiatry and in forensic psychiatry. I have been on the clinical faculty of The University of Maryland School of Medicine since 1981. I am also engaged in the private practice of psychiatry in Timonium, Maryland. I am a Fellow of the American Psychiatric Association and a member of the American Academy of Psychiatry and the Law. During the course of my career, I have conducted in excess of five thousand forensic psychiatric examinations, for both the defense and prosecution. I have also testified a number of times as a court expert. I have been qualified as an expert witness in the areas of forensic and general psychiatry in excess of five hundred occasions in both state and federal court, including as an expert witness in capital cases.

2.      I conducted a forensic psychiatric evaluation of David Paul Hammer. This evaluation consisted of a clinical interview which took place on October 21, 2004, at the United States Federal Penitentiary in Lewisburg, Pa. lasting approximately three hours and thirty-five minutes.

3.      I reviewed a wealth of information related to Mr. Hammer, including most of the trial transcripts, the penalty phase transcripts, motion transcripts, transcript from the oral argument of Mr. Hammer before the Third Circuit Court of Appeals, Federal Bureau of Prison records pertaining to Mr. Hammer, including medical and psychiatric records, reports by Drs.

1



Sadoff and Wolfson, the video-tape of the hypnosis session conducted by Drs. Dubin and Sadoff, and the testimony of Jill Miller, M.S.W., pertaining to Mr. Hammer's background and his prior hospitalizations.

4.    Mr. Hammer is the oldest of three children. He comes from a family with a history of depression, alcoholism, prescription drug abuse, seizures and attention deficit/hyperactivity disorder. His maternal grandfather had been institutionalized and subsequently committed suicide by a self-inflicted gunshot wound. His paternal grandmother was institutionalized with diagnoses of Schizophrenia and mental retardation.

5.    His parents lived a nomadic life style, moving frequently. They were sporadically employed and at times, the entire family lived in a car. Mr. Hammer reported attending twenty-one different schools before dropping out in the tenth grade. Mr. Hammer was the victim of severe verbal, emotional, physical and sexual abuse throughout his childhood. His mother, who died on May 10, 1989, was the primary perpetrator of the verbal, emotional and physical abuse. She routinely verbally berated the defendant and often threatened to put him and his siblings up for adoption. Mr. Hammer viewed the verbal abuse as more painful than the beatings he sustained. His mother frequently told him that he was "worthless," "no good" and "a bastard." She also severely beat Mr. Hammer with extension cords, belts, switches and "anything that was handy."

6.    The physical abuse was severe, out of proportion to any misbehavior by Mr. Hammer and totally unpredictable. Mr. Hammer's mother engaged in bizarre disciplinary practices that I would view as deliberate torture reflecting her own severe psychopathology. Mr. Hammer was punished with scalding hot water enemas as well as enemas containing tabasco

2

remained in the hospital for five weeks and was diagnosed with an adjustment reaction of adolescence and a schizoid personality. His prognosis was described as "guarded."

20. Mr. Hammer left home for good around the age of fourteen. By this time, he began abusing a wide variety of drugs in order to escape from the haunting memories of his abusive background. His drug of choice was phencyclidine (PCP), which was the most effective means of escaping the memories of his chaotic past.

21. Mr. Hammer was subsequently incarcerated at age nineteen for a variety of offenses, and after a series of escapes and subsequent crimes of violence, he received a prison sentence in excess of twelve-hundred years (1200).

22. While in prison, Mr. Hammer continued to abuse a variety of substances, including Heroin. His substance abuse was a means by which he lessened intense feelings of depression, loneliness, anger and the intrusive and distressing recollections of his traumatic past. He reported discontinuing his abuse of drugs by 1995.

23. Mr. Hammer stated that Mr. Marti became his cell mate shortly before the murder. Mr. Hammer consented to having Mr. Marti as his cell mate and agreed to provide protection as well as financial resources, such as commissary, in exchange for sexual favors. He noted that they engaged in consensual sexual activity regularly prior to the offense. Mr. Hammer stated that Mr. Marti expressed the desire to be partially asphyxiated while receiving anal sex in order to increase his sexual pleasure. Mr. Hammer stated that they engaged in this activity on two or three occasions prior to the offense.

24. On the day of the offense, Mr. Marti expressed the desire to be tied up during sexual relations as his pleasure was further enhanced by being totally dominated. Both Mr.

6

Hammer and Mr. Marti made restraints that were later used to bind Mr. Marti's hands and legs to Mr. Hammer's bunk.

25.     On the evening of the offense, Mr. Marti was lying prone and initially requested Mr. Hammer to tickle him in order to increase his degree of excitement. As a result of Mr. Marti laughing too loudly, they both agreed to place a sock in Mr. Marti's mouth to decrease the noise. Mr. Hammer then bound Mr. Marti's hands to the side of the bunk and bound his legs to the bottom of the bunk, as they agreed. Mr. Hammer stated he then pulled down Mr. Marti's boxer shorts and began stimulating his anus with a lubricated finger. He then engaged in anal intercourse with Mr. Marti during which time he partially asphyxiated Mr. Marti as he had previously done on other occasions. After they were finished, and Mr. Hammer was cleaning himself, he became overwhelmed with what had just occurred and began experiencing extremely intense shame, guilt, and anger. Mr. Hammer stated that upon talking with the authorities later, he provided a different and false rendition of events "so others wouldn't view me as a sicko."

26.     Mr. Hammer denied any thought or intention of harming Mr. Marti prior to accepting him as a cell mate until losing control at the time of the actual offense. He described their sexual activities as entirely consensual. He denied any previous involvement in bondage, partial asphyxiation or any other sado-masochistic activities.

27.     As a result of my forensic psychiatric evaluation of David Paul Hammer, it is my opinion, to a reasonable degree of medical certainty, that on April 13, 1996, David Paul Hammer was suffering from the following mental disorders: Posttraumatic Stress Disorder, Chronic, (DSM-IV-TR 309.81); Borderline Personality Disorder (DSM-IV-TR 301.83); Antisocial Personality Disorder (DSM-IV-TR 301.7).

7

reasonable degree of medical certainty, that Mr. Hammer was experiencing severe emotional distress as a result of an exacerbation of his Posttraumatic Stress Disorder, Chronic, and Borderline Personality Disorder. The cumulative stress of hearing testimony concerning the severe abuse he sustained during his childhood and adolescence caused him to reexperience those traumatic experiences. When faced with the possibility that he would be labeled mentally ill and committed to the Federal Medical Center in Springfield, Mr. Hammer was psychologically overwhelmed, leading to his impulsive decision to plead guilty and abandon his defense of Not Guilty By Reason Of Insanity. In short, he was under extreme emotional distress at the time he pled guilty, causing his judgement to be seriously impaired.

33. It is also my opinion to a reasonable degree of medical certainty that Mr. Hammer's vacillation between waiving his appeals and going forward with his appeals is a direct manifestation of the emotional instability, ambivalance and impulsivity that is characteristic of his Borderline Personality Disorder. It is my opinion to a reasonable degree of medical certainty that Mr. Hammer's Borderline Personality Disorder and Posttraumatic Stress Disorder, Chronic, seriously impaired his capacity to make a reasoned and rational decision about whether to pursue further appeals in his case.

34. I am aware that at least one other defense expert has diagnosed Mr. Hammer as suffering with Dissociative Identity Disorder (DSM-IV-TR 300.14). Although I did not make this diagnosis myself, DID generally develops as a result of severe emotional, physical and sexual abuse during childhood and represents the most severe disruption in an individual's personality structure. The severe trauma that Mr. Hammer sustained during his childhood and adolescence could cause a disintegration of his psyche to the extent that separate and distinct

9

other personalities may have developed. However, regardless of the exact diagnostic label applied to Mr. Hammer, his character structure was irrevocably damaged by the severe trauma that he sustained during his childhood and adolescence, leading to my conclusion that he suffers from Posttraumatic Stress Disorder, Chronic, Borderline Personality Disorder, and Antisocial Personality Disorder.

35.    I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge and belief, subject to 28 U.S.C. § 1746 and Pa. C.S. § 4904.

Neil Blumberg, M.D.

10