# COPY OF TRANSCRIPT

## UNITED STATES COURT OF APPEALS
### FOR THE THIRD CIRCUIT
### NO-4-9001



**GOVERNMENT EXHIBIT**

_1_

**UNITED STATES OF AMERICA**

**V**

**DAVID PAUL HAMMER**

> Monica Foster and Rhonda
> Long-Sharp, on behalf of
> David Paul Hammer,*
>         Appellants
> *Pursuant to Rule 12(a),F.R.A.P.

### Motion For Certificate Of Appealability

### Remand And Related Relief

Transcript from the audio tapes of the oral argument held Thursday, May 27, 2004, at the United States Court House, 601 Market Street, Philadelphia, Pennsylvania. This transcript was produced by James DeCrescenzo, a Registered Diplomate Reporter, an Approved Reporter of the United States District Court, and Notary Public.

BEFORE:

> THE HONORABLE DOLORES K. SLOVITER
>
> THE HONORABLE MARJORIE O. RENDELL
>
> THE HONORABLE MARYANNE TRUMP BARRY
> (VIA VIDEOCONFERENCE)

## James DeCrescenzo Reporting
Pennsylvania's Leader in Information and Technology Management

215.564.3905
phone

1700 Sansom Street, 5th Floor.
Philadelphia, PA 19103
www.jdreporting.com

215.751.0581
fax

2

Appearances:

DAVID A. RUHNKE, ESQUIRE
RUHNKE & BARRETT
47 Park Street
Montclair, New Jersey 07042
Attorney for Appellants

GWYNN X. KINSEY, JR., ESQUIRE
UNITED STATES DEPARTMENT OF JUSTICE
CRIMINAL DIVISION, CAPITAL CASE UNIT
Room 336
1331 F Street, N.W.
Washington, D.C. 20530
Attorney for Appellee

**James DeCrescenzo Reporting**
Pennsylvania's Leader in Technology and Information Management
215.564.3905     1700 Sansom Street, 6th Floor     fax 215.751.0581
Philadelphia, PA 19103
www.JDReporting.com

3

THE COURT: Good afternoon. The court is assembled with Judge Rendell and myself, Judge Sloviter, sitting on the bench and Judge Barry sitting with us out of the Newark courthouse.

THE COURT: Good afternoon, Judge Sloviter and Judge Rendell.

THE COURT: Good afternoon, Judge Barry. Nice to see you. We can see you really nicely with the big monitor.

We are here today, and I want to be sure everybody agrees, on two motions. One is the motion for a certificate of appealability, remand and related relief. And also, although it doesn't show on the minute page, motion for stay of execution. Those are the motions.

The appellant agrees?

MR. RUHNKE: Yes, your Honor.

THE COURT: Government agrees.

MR. KINSEY: Yes, your Honor.

THE COURT: Okay. Mr. Ruhnke.

MR. RUHNKE: Good afternoon. May it please the Court, I'm David Ruhnke on behalf of David Hammer. With me at counsel table are my partner, Jean Barrett, and my co-counsel, Ronald Travis.

**James DeCrescenzo Reporting**
Pennsylvania's Leader in Technology and Information Management

215.564.3905          1700 Sansom Street, 5th Floor
Philadelphia, PA 19103
www.JDReporting.com          Fax 215.751.0581

4

With permission from the court I would like to reserve three minutes for my rebuttal.

THE COURT: That's certainly granted.

MR. RUHNKE: Your Honors, in very broad terms, this case is about whether a federal prisoner under a federal sentence of death will be executed in about ten days without ever having the validity of that sentence reviewed.

It's about whether David Hammer's life is going to be extinguished because on a particular day in January 2004 his wish to die was in ascendency over his will to live.

THE COURT: I think it was like the 14th or the 16th at the hearing.

MR. RUHNKE: I haven't counted them, but there have been numerous changes of heart. And it is our core position that someone shouldn't be executed because their wish to die happened to coincide with a court date. And that's what this case is about.

There isn't a district court --

THE COURT: Well, you complain, Mr. Ruhnke, that the case has never been reviewed by any court, but that is not the court's fault, is it? Your client continually filed motions to withdraw requests

5

for relief that had been previously made, did he not?

MR. RUHNKE: Judge Barry, I'm having a little bit of difficulty hearing you because of the level of the audio, but it is not the court's fault in the sense that this court accepted Mr. Hammer's waiver four years ago, after he represented --

THE COURT: As did Judge Muir.

MR. RUHNKE: Yes, and as did Judge Muir.

THE COURT: So how can you call it, as you do in your memo in support of the certificate of appealability, a mockery of justice? Those are very --

MR. RUHNKE: It was a mockery of justice below --

THE COURT: Those are very strong words.

MR. RUHNKE: When counsel, who are representing Mr. Hammer, are relegated to a role where they can't participate, Ms. Long-Sharp and Ms. Foster --

THE COURT: These are what are called the Section 2255 counsel in the papers?

MR. RUHNKE: Yes, Section 2255 counsel.

THE COURT: But you represented Mr. Hammer on the direct appeal.

**James DeCrescenzo Reporting**
Pennsylvania's Leader in Technology and Information Management
215.564.3905    1700 Sansom Street, 5th Floor
Philadelphia, PA 19103    Fax 215.751.0581
www.JDReporting.com

6

MR. RUHNKE:  That's correct.

THE COURT:  Didn't you?

MR. RUHNKE:  Yes, I did.

THE COURT:  There was no direct appeal, was there?

MR. RUHNKE:  There was no direct appeal.

THE COURT:  The waiver of direct appeal.

MR. RUHNKE:  That's right.  That's right.  I was counsel, as was Mr. Travis, and Mr. Hammer was also pro se at the same time when the direct appeal was waived in 2000.

I want your Honors to consider the following:  If during the proceedings that took place in Williamsport in January someone had asked Mr. Hammer --

THE COURT:  What year?

MR. RUHNKE:  2004, the proceedings at issue here.  If somebody had asked Mr. Hammer why he was doing this and what the response would have been had he said I cannot abide the conditions in the United States Penitentiary at Lewisburg.  The thought of having to endure those conditions for the many months that it will take for this matter to be resolved is unbearable.

**James DeCrescenzo Reporting**
Pennsylvania's Leader in Technology and Information Management

215.564.3905          1700 Sansom Street, 6th Floor          Fax 215.751.0581
                      Philadelphia, PA 19103
                      www.JDReporting.com

7

THE COURT: Whose obligation --

THE COURT: Well, Terre Haute is not the Taj Mahal.

MR. RUHNKE: Compared to the conditions at United States Penitentiary at Lewisburg, they are the Taj Mahal, your Honor.

THE COURT: Whose obligation was it to ask that question?

MR. RUHNKE: I believe it was the district court's obligation to ask that question, or Mr. Hammer's counsel to ask that question. In the affidavit that Ms. Foster and Ms. -- Ms. Foster's affidavit at paragraph seven she brought that issue up. Had counsel been allowed to --

THE COURT: Well, those are two very different answers though; the district court or counsel. Is counsel for Mr. Hammer supposed to take an adversarial standpoint with respect to his own client's desires?

MR. RUHNKE: I think the district court had an obligation to hear from all counsel who represented Mr. Hammer at that moment. Not from just everybody who was on the same page. The government wanted him to --

8

THE COURT:  What was the function of that counsel?  Mr. Smith, right?

MR. RUHNKE:  Yes.

THE COURT:  They called him waiver counsel.  He's certainly -- I read the hearing.  He certainly did not take what one would call an adversarial position on behalf of Mr. Hammer's life.  Quite the contrary.  Was it clear what his role was?

MR. RUHNKE:  His role was to represent Mr. Hammer.  And I think it was clearly understood that he was to advocate Mr. Hammer's wish to waive his pursuit of a Section 2255.  Had other --

THE COURT:  All right.  Should there be other counsel appointed to inform Mr. Hammer to advocate against that?  Is that what you want us to find?

MR. RUHNKE:  There were counsel -- no, your Honor, respectfully.  You do not need to go that far, although other courts have.  But you --

THE COURT:  Counsel who asked to come in, the two women, and they were told to sit in the spectators' section; is that right?

MR. RUHNKE:  That's right.  And the two counsel, Ms. Foster and Ms. Long-Sharp had been

**James DeCrescenzo Reporting**
Pennsylvania's Leader in Technology and Information Management
215.564.3905          1700 Sansom Street, 5th Floor          fax 215.751.0581
Philadelphia, PA 19103
www.JDReporting.com

9

representing Mr. Hammer for two years. They had grave concerns about the reasons this waiver was being put forward. They asked, they asked to participate in the proceedings and to bring to the court's attention matters that might have caused the court to have pause about a waiver.

THE COURT: How did they do that? I know the papers say they did. But I haven't seen that.

MR. RUHNKE: They did it by way of a, a filing in the district court which stated that there were matters that they wished to bring to the court's attention having to do with Mr. Hammer's fear of the conditions of confinement at Lewisburg, that Mr. Hammer had requested that, that he not be required to personally attend the 2255 hearing and that essentially if he hadn't been required to attend that 2255 hearing he would not have waived that, his participation in the 2255 in the sense of letting it go forward.

THE COURT: That was the proffer that was filed and served on January 15th.

MR. RUHNKE: That's correct.

THE COURT: And when is the hearing?

10

MR. RUHNKE:  January 16th.

THE COURT:  16th.  So the court had this.

THE COURT:  Well, it was more than that, Mr. Ruhnke.  I think there was also this discussion, and I know you've mentioned it in your papers, that he was making arrangements to publish his two books and he couldn't do it at Lewisburg because he couldn't have the outside contact that he could have at Terre Haute.

MR. RUHNKE:  The issue is whether that's a rational basis for waiving your right to have, for the very first time, a court consider the validity of the sentence of death.

This is his first Section 2255 petition, none had been filed.  The direct appeal had been waived, a decision that Mr. Hammer regretted shortly thereafter and sought to reinstate.

THE COURT:  Back and forth.

MR. RUHNKE:  Back and forth.

THE COURT:  You have three pages.

THE COURT:  But we've given him -- he's gotten everything he's asked for all along the way. And you say it shouldn't have been given to him.

11

MR. RUHNKE: I think framing the issue of whether Mr. Hammer got what he wanted I think leads to an erroneous result.

The issue is whether we can stand back from what's gone on and say do we have confidence that what has occurred in this case is that Mr. Hammer truly wishes to waive any challenges to his appeal -- I'm sorry, to his conviction or sentence of death, a contention that's belied by the fact that I'm standing here today in this courtroom, accepting as Mr. Hammer's final word on this issue --

THE COURT: How do we know it's final?

MR. RUHNKE: Pardon me?

THE COURT: How do we know it's final?

MR. RUHNKE: We don't know it's final, and the remedy for that is suggested in the cases. And I cited the *St. Pierre against Cowan* case, and the *Smith against Armontrout* case, to say essentially it stops here. That's the final word. It will be pursued, there will be no further changes of heart entertained and that's the end of the matter.

When we were here four years ago the government had taken the position in their papers that Mr. Hammer's waiver of his direct appeal should not be

**James DeCrescenzo Reporting**
Pennsylvania's Leader in Technology and Information Management
215.564.3905    1700 Sansom Street, 5th Floor
Philadelphia, PA 19103
www.JDReporting.com    fax 215.751.0581

12

accepted by the court and that the matter should proceed and the issues raised on the direct appeal should be resolved, and this court rejected that point of view.

Albeit the government backtracked somewhat from that during oral argument. But that had been their position, that this matter should go forward and reach a resolution.

This is a sentence of death that --

THE COURT: But when do we believe your client? Your client also said -- I mean you admit, you argue he's falsely confessed to at least seven murders, he made false statements to law enforcement, he's lied to this court, he's lied to the district court.

Now you say he's actually innocent. Who's going to prove that claim to us and why should we believe him now?

MR. RUHNKE: It's not a question of belief and I don't think it's a question of having lied to the district court or to anybody else in this process.

It's a question of a person whose will to live or die fluctuates. And I'll answer your

13

question directly. Accept it today, stop the litigation about the vacillation. Let's litigate the 2255 petition and find out whether --

THE COURT: Now the question before us is whether we should give a certificate of appealability and remand.

MR. RUHNKE: That's correct, your Honor. That's one question. Assuming that a COA is actually required, but yes.

THE COURT: Well, yes, let's for the moment assume that a COA is required.

MR. RUHNKE: Yes.

THE COURT: Why should we grant a certificate of appealability? Let's put it in those legal terms.

MR. RUHNKE: You should grant a certificate of appealability because reasonable jurists can debate the process which took place below.

THE COURT: And what's wrong with the process?

MR. RUHNKE: What's wrong with the process below particularly was, one, the wholly nonadversarial nature of the proceedings and the district court's decision to exclude from the

**James DeCrescenzo Reporting**
Pennsylvania's Leader in Technology and Information Management
215.564.3905        1700 Sansom Street, 5th Floor        215.751.0581
Philadelphia, PA 19103
www.JDReporting.com

14

proceedings counsel who were already there, who were already representing Mr. Hammer, who said they had relevant information to bring to the process on whether this was a knowing and voluntary act on Mr. Hammer's part. And they were essentially told --

THE COURT: The act was the waiver?

MR. RUHNKE: The waiver.

THE COURT: The prior waiver?

MR. RUHNKE: No, the waiver that was going on in January of 2004.

THE COURT: Okay. What else? What other reasons?

MR. RUHNKE: What led up to, it was December 1, 2003 when the motion was filed and the hearing was held on January 16, 2004, six weeks later. And his counsel were basically saying to the court we have relevant information to bring to this process. And the court silenced those counsel, sat them behind the rail and --

THE COURT: I'm curious about your use of the word "adversarial." The Eighth Circuit talks about making sure that all facts are brought forward and from that standpoint adversarial.

But the idea that we have to have lots

15

of different counsel arguing at point and counterpoint and cross purposes here is difficult for me.

And I'm wondering why you are not arguing that, much like we require when a defendant waives the right to counsel in terms of going to trial and we find that the court has an independent duty to assure itself.

Here you had a court that had a proffer, that raised issues with respect to whether there was proper reasons for Mr. Hammer proceeding.

It would seem to me that substantive due process requires that the court have an independent duty to inquire about any facts that it is aware of, or at least ask why he wants to do what he is saying he wants to do in order to find knowing and voluntary.

I mean I'm a little bit put off by your adversarial comments. I'm not sure where that goes.

MR. RUHNKE: Perhaps an adversarial, the use of the term "adversarial" was used in the sense of somebody who can bring to the fact-finding process all the facts, not the ones that simply support what, quote/unquote, waiver counsel wanted to do and Mr. Hammer wanted to do and the government wanted.

**James DeCrescenzo Reporting**
Pennsylvania's Leader in Technology and Information Management
215.564.3905          1700 Sansom Street, 5th Floor          215.751.0581
Philadelphia, PA 19103
www.JDReporting.com

16

THE COURT: You haven't really answered my prior question though, as to what was Mr. Smith's role. It's not clear to me. He didn't seem to act as an adversary in support of life, let me put that it way.

Was that his role? I thought he was sort of like just almost a friend of the court sitting there. I'm not sure what his role was.

MR. RUHNKE: Well, he was appointed by the court, as I understand it, because he was willing to advocate Mr. Hammer's waiver, understanding that would lead to his execution. That was --

THE COURT: Why did we need, why did the court need him when we had the two other lawyers? Because they would have taken a different position?

MR. RUHNKE: I think they would have certainly brought to the process all the facts and circumstances that would satisfy, as Judge Rendell is suggesting, the court's independent obligation.

THE COURT: Is there a Supreme Court decision that you look to, that anybody looks to, that says the court has to appoint a waiver counsel?

MR. RUHNKE: I know of no such opinion. There are Supreme Court opinions that hold very

**James DeCrescenzo Reporting**
Pennsylvania's Leader in Technology and Information Management
215.564.3905 · 1700 Sansom Street, 5th Floor
Philadelphia, PA 19103
www.JDReporting.com
Fax 215.751.0581

17

clearly that a court should not accept a waiver, especially when it's leading to a sentence of death.

THE COURT: That's not knowing, voluntary or intelligent.

MR. RUHNKE: That's right. And that is also rational.

THE COURT: Okay. Now, you were going through the list of what supports a COA. So you told us one. The proceeding was nonadversarial and we went off on that. What other reason? I want to keep you on line.

MR. RUHNKE: Nonadversarial and that the fact-finding was therefore not reliable, if you want to take that out of the context of the word adversary, that's perfectly fine, but that the court did not entertain all the facts and circumstances of the case.

The other aspect of it has to do with the fact that the district court did not have enough information to make a finding that this was a rational decision on Mr. Hammer's part. The district court clearly found him competent, and there was evidence that he was mentally competent to make such a decision.

18

THE COURT: Sure, there was a psychiatrist.

THE COURT: Are you challenging that finding? Are you challenging that finding, assuming that everything else is all right?

MR. RUHNKE: In our papers we do not challenge the finding of competency.

THE COURT: The competency. Yes, okay.

MR. RUHNKE: There was only one doctor who appeared at the proceeding.

THE COURT: O'Brien, I think.

MR. RUHNKE: Dr. O'Brien appeared at the proceeding, who has appeared in other cases under similar circumstances.

THE COURT: Did you say that -- did I understand your briefs right that he appeared in the Heidnik case also?

MR. RUHNKE: I believe he appeared, yes, he appeared in the Heidnik case.

THE COURT: That's what he testified, O'Brien.

MR. RUHNKE: Yes. He testified in the Heidnik case as --

THE COURT: And that finding there was

**James DeCrescenzo Reporting**
Pennsylvania's Leader in Technology and Information Management
215.564.3905     1700 Sansom Street, 5th Floor     Fax 215.751.0581
Philadelphia, PA 19103
www.JDReporting.com

19

not accepted by this court.

MR. RUHNKE:  That finding was not accepted by this court on appeal.

The other COA issue, major COA issue has to do with the standard that was utilized by the district court to make a finding of the waiver being acceptable, and that is that it was, no finding was made it was rational; no inquiry was made whether it was coerced or brought about because of outside circumstances.

And had that question been asked, the colloquy that I had hypothetically put forward earlier, would have ensued, that this was a decision premised in part on a desire, irrational, to avoid the conditions of confinement at Lewisburg.

My red light is on now and I've used up my rebuttal time.

THE COURT:  No.  No.  Go ahead.  We're asking.  You're on our time.

MR. RUHNKE:  And there is a clear finding of competency.  There's a clear statement that he's competent to make that kind of decision.

But when it comes time to say is it a rational decision, is it a knowing and intelligent and

20

voluntary decision, the factual predicate for that is not present.

There's not a district court judge in this country who would take a guilty plea from a defendant without ascertaining that it wasn't the result of coercion or other outside forces. And none of that was brought before the court. None of that.

THE COURT: He is going to tell us, you posit, you have proffered, or the women lawyers earlier had proffered, that the conditions of confinement in which he would be placed at Lewisburg were so offensive to him, and he could not conduct his business, et cetera, et cetera, that he preferred to stay at Terre Haute and be videoconferenced in.

MR. RUHNKE: That's correct.

THE COURT: But again, we have to take his word for that. And you've told us we really can't take his word on much, if anything.

MR. RUHNKE: I haven't said you can't take his word for much of anything. What I've said is that his desire and his will to live waxes and wanes. And a person shouldn't be executed because the government catches him in court on a bad day. That's the core point here.

**James DeCrescenzo Reporting**
Pennsylvania's Leader in Technology and Information Management

215.564.3905        1700 Sansom Street, 6th Floor        215.751.0581
                    Philadelphia, PA 19103
                    www.JDReporting.com

21

THE COURT:  I understand your papers to suggest, if they don't actually say, I can't point to it, that the three pages of what's happened that are in your memorandum shows that he's really not competent, that he has some kind of mental deficiency.

MR. RUHNKE:  He has been diagnosed with any number of mental diseases over the years, ranging from major depression, bipolar, to dissociative identity disorder.

THE COURT:  But the government says we're estopped.  There's a judicial estoppel because our court said he was competent.

MR. RUHNKE:  This court meaning in the year 2000?

THE COURT:  The Becker Greenberg panel.

MR. RUHNKE:  I think competency is obviously something that can change on a day-by-day basis.  And I think a four-year-old competency finding can't ever be judicial estoppel, or the subject of judicial --

THE COURT:  You just said you didn't challenge competency for the purposes of the certificate of appealability.

MR. RUHNKE:  That's right.  We did not

22

challenge competency.

THE COURT: So you're not now challenging his competence.

MR. RUHNKE: We're not now challenging --

THE COURT: Or as -- all right.

THE COURT: Competency to do what? I'm still not sure what we're talking -- you're not talking about competency to have committed whatever act was committed.

MR. RUHNKE: No, that's way, way back in the distant past.

THE COURT: Yes, okay. So competency to --

THE COURT: To waive.

THE COURT: -- to waive?

MR. RUHNKE: Competency to waive.

THE COURT: Now to waive what? To waive the appeal? To waive the 2255? There are several steps along the way.

MR. RUHNKE: There are several steps and we've been down, we've been unfortunately, have walked several of those steps down to a point where now the issue is --

**James DeCrescenzo Reporting**
Pennsylvania's Leader in Technology and Information Management

215.564.3905              1700 Sansom Street, 5th Floor              Fax 215.751.0581
                          Philadelphia, PA 19103
                          www.JDReporting.com

23

THE COURT: You have to waive those -- I mean you have to more than walk, you have to wobble. Go ahead.

MR. RUHNKE: That's right. Yes. You're going back and forth. There's no straight line. But we're in a situation where you have a finding, and the only doctor who saw him was selected by the waiver counsel, and in fact was selected by Mr. Hammer, if you look at the papers.

THE COURT: Selected by Mr. Hammer.

MR. RUHNKE: Yes. Selected by Mr. Hammer.

THE COURT: Yes. And he found, he found Mr. Hammer to be a manipulative individual capable of taking advantage of even adverse circumstances. His own expert.

MR. RUHNKE: Well, it's his own expert in the sense that he selected him and Mr. Smith, the waiver counsel, arranged for him to be retained. I don't think it's any accident that it was Dr. O'Brien who was selected.

Dr. O'Brien's own testimony is that for some reason 70 or 80 percent of his testimony is on behalf of prosecutors.

24

At the moment Mr. Hammer selected Dr. O'Brien he wanted to die, and he wanted to select an expert who would help him in that process.

There was no counter expert.

THE COURT: Weren't there two psychiatrists before then at some point in this case? Hadn't there been anybody else who saw him? I recall that there were two other psychiatrists somewhere along --

MR. RUHNKE: In this court's opinion in 2000 reference is made to Dr. Wolfson and Dr. Mitchell as psychiatrists. In fact Dr. Mitchell is a staff psychologist at the Bureau of Prisons, he's not a psychiatrist. He also had been seen by Dr. Sadoff who diagnosed him with dissociative identity disorder.

Dr. Mitchell at the time of his 1998 capital murder trial testified as a penalty phase witness for the defense and told the jury that Dr. Mitchell's own diagnosis was that Mr. Hammer suffered from major depressive disorder, an Axis I very serious mental disorder, and that was back at the time of the trial in 1998.

THE COURT: But for the purposes before us, does everybody agree that the competency

determination was made by one psychiatrist, and that was Dr. O'Brien?

MR. RUHNKE: That's correct, there was no other --

THE COURT: And you're not challenging whatever it is Dr. O'Brien said?

MR. RUHNKE: There's no basis in the record for me to challenge it. There was no other opinion, there was no other evaluation, there's no, there's no ethical basis in this record for me to challenge that. I have nothing to point to except a long history --

THE COURT: If you got to the 2255 --

MR. RUHNKE: Yes, Judge Sloviter.

THE COURT: -- would you be in a position, would you be allowed and would you be in a position then to challenge and say we have new evidence that shows, or new psychiatrists? Or is that foreclosed? I'm trying to figure out what is your position in that regard. And Judge Barry has been asking you, also.

MR. RUHNKE: Our position on that is that the proceedings below heard essentially from one side or one point of view. Or perhaps to put it more

**James DeCrescenzo Reporting**
Pennsylvania's Leader in Technology and Information Management
215.564.3805          1700 Sansom Street, 6th Floor          Fax 215.751.0581
Philadelphia, PA 19103
www.JDReporting.com

26

accurately, the district court judge, in looking at the universe of facts that he had before him upon which to exercise a judgment as to whether this is a valid waiver, heard only from people who were of a same mind and of a like mind.  The government was happy to --

THE COURT:  Well, who is supposed to come in?  I go back to the question that my colleagues asked you before.  Given that this was the district court, what was the district court supposed to do, go find somebody who would say to the contrary?

MR. RUHNKE:  I think what the district court should have done, at a minimum, was to have listened and considered the factual circumstances that the lawyers who had been representing him at that point for a couple years --

THE COURT:  You mean by the 2255 people?

MR. RUHNKE:  The 2255 attorneys who were there --

THE COURT:  I thought he, he said they were finished before, right before that.  They were out of the case.

MR. RUHNKE:  Well, he did not rule them out of the case.  In fact, they remained in the case

**James DeCrescenzo Reporting**
Pennsylvania's Leader in Technology and Information Management
215.564.3905          1700 Sansom Street, 5th Floor          215.751.0581
Philadelphia, PA 19103
www.JDReporting.com

27

until they had, went ahead and filed a motion to amend the judgment and a notice of appeal.

THE COURT: And he questioned whether that was ethical under the Pennsylvania rules.

MR. RUHNKE: And he questioned whether that was ethical, in fact withdrew their privileges to practice *pro hac vice* in the Middle District of Pennsylvania.

THE COURT: Now, you want us to grant a certificate of appealability and summarily remand under 27.4 for changed circumstances?

MR. RUHNKE: That's one aspect of our petition, yes, ma'am.

THE COURT: What do we have before us as to proof of changed circumstances?

MR. RUHNKE: You have, of changed circumstances, certainly you have Mr. Hammer's acquiescence, written acquiescence in this appeal. Mr. Hammer had originally started off filing in the district court a motion to dismiss the notice of appeal that had been filed. The district court --

THE COURT: How can that be a changed circumstance when it comes from him? It's not that he found new evidence and it's not that something

28

happened from outside. It's just he changed his mind.

And has anybody held that's a changed circumstance?

MR. RUHNKE: I think this case is unique in many ways. But I would cite to the Eighth Circuit, *Smith against Armontrout* decision, where in a similar case the court said look, you know, we're not going to entertain this appeal, we accept this as the last word, we accept the waiver, actually, of 2254 proceedings. However, should Mr. Armontrout change his mind again, we will then entertain that and send it back. And he did and they did.

THE COURT: If we were to send this back, would there not need to be another hearing to make absolutely certain that this waiver is being withdrawn, to make absolutely sure that there are these changed circumstances and we're not going down another path again?

Because we have a letter from him, but as far as we know today he can say tomorrow that as of today he really wanted to, wanted to waive. It's just such a slippery slope.

MR. RUHNKE: The problem is exactly, it is a slippery slope when somebody waxes and wanes this

way on a will to live or die. And what I urge upon the court and suggest to the court is a solution that other courts have found to this problem, which is, and which the government was willing to advocate at one point, that we say stop.

We will entertain no more changes of heart. Just as a court, when you have a vexatious litigant who files a hundred suits every month, enters an order that a litigant will not be permitted to file any additional --

THE COURT: Yes, but that's not what you want us to do. You don't want us to say he can't file anything else or nobody can file on his behalf.

You want us to stop the clock now and to say as of now, because he came before us and wants to proceed with his challenge to the proceedings or the death penalty and his waiver, we should accept that as the last word.

The government's going to get up and say no, you should accept as the last word his withdrawal, his contrary position.

MR. RUHNKE: Right, but --

THE COURT: And so you want us really to say we will favor the life option rather than the

30

death option.  And that's where it stops.

MR. RUHNKE:  Yes.  And I think that's a fair, a fair way of looking at a case like this.

When we have someone whose mind changes the way it has, and I don't mean to even sound facetious, but what I said before, he's going to be executed because the government caught him in court on a day he wanted to die, as opposed to a day he wanted to live.

THE COURT:  Well that's not quite fair --

THE COURT:  Please.

THE COURT:  -- because three of our colleagues sat here and listened to him.  I mean they actually -- we didn't want to do that today because we didn't think that we wanted to take testimony from him.

But we have three colleagues who said there's no question, I think there's no question of competence in this case is something that Judge Greenberg said right at the beginning of his opinion.

MR. RUHNKE:  I was here that day also. And what doesn't work its way into the court's opinion on the waiver is after having accepted Mr. Hammer's

final word, within the five weeks or so between oral argument and the issuance of the decision, he changed his mind twice again.

THE COURT:  So you're telling us stop the clock now.  Whatever else he says, stop the clock now is basically what you're saying.

MR. RUHNKE:  Respectfully, that's what I'm saying, your Honor.

THE COURT:  And that's a little inconsistent with what the Supreme Court has said in other cases.

MR. RUHNKE:  I don't know if it's inconsistent with what the Supreme Court has said in other cases.  I think this case, I've read some of the Supreme Court cases on --

THE COURT:  You read them all, let's face it.

MR. RUHNKE:  Yes, on some of the vacillation cases.  And I think courts do have a right and a responsibility, given the magnitude of the punishment that's at issue here, to say we can stop the clock.  We can say this case will be remanded, the district court will entertain no further changes of heart and we'll litigate this through.

32

THE COURT:  Okay.  I think if --

THE COURT:  Mr. Ruhnke, I have one question.

THE COURT:  Go ahead, Maryanne.

I'm not sure if I misspoke earlier. You're not looking for a certificate of appealability and summary remand.  That's an either/or, isn't it?

MR. RUHNKE:  That's an either/or, yes.

THE COURT:  But we may have to grant a certificate of appealability in order to consider the case.

MR. RUHNKE:  That's right, because of the jurisdictional nature, arguable jurisdictional nature of the COA.

THE COURT:  You don't want to pursue the appeal.  You don't want to go to briefing on the appeal.

THE COURT:  On the 2255 merits is what you're saying.

THE COURT:  Go to full briefing on the merits of the waiver.  You would rather summarily go back.

MR. RUHNKE:  In orders of preference, first preference is summarily go back; second

33

preference is following *Miller-El*.  If this court is persuaded that those circumstances exist, that it not reach an adverse decision on the merits without full briefing.

THE COURT:  Okay.  I thought we had a pretty full briefing.  And of course to stay the execution comes first.

MR. RUHNKE:  Yes.  Yes.

THE COURT:  I think we just had a little -- it may come back, this happens.

THE COURT:  Okay.  We lost -- we've been told it goes in and out.

MR. KINSEY:  I'll wait until we're sure.

THE COURT:  Yes, why don't you wait.

(Discussion off the record.)

MR. KINSEY:  Thank you, your Honors.  May it please the court --

THE COURT:  You are?

MR. KINSEY:  Mr. Kinsey from the Department of Justice.  It's a pleasure to be here.

The district court actually has specific evidence before it in terms of, by way of Dr. O'Brien's report of the specific reasons, the reasons why Mr. Hammer wanted to waive the appeal, and

**James DeCrescenzo Reporting**
Pennsylvania's Leader in Technology and Information Management
215.564.3905          1700 Sansom Street, 5th Floor          215.751.0581
Philadelphia, PA 19103
www.JDReporting.com

34

actually had before it specific evidence indicating that the reason we're hearing today after the fact relating to the conditions at Allenwood were not the reason at all.

THE COURT:  Is this in the record?

MR. KINSEY:  It is.  It actually is. Dr. O'Brien's report was admitted as Exhibit 1.

THE COURT:  Has it been submitted to us on this appeal?

MR. KINSEY:  I don't -- was the transcript and the exhibit transmitted?

THE COURT:  Yes, it was.  We have the transcript.

MR. KINSEY:  Judge Barry says she has --

THE COURT:  Some.

THE COURT:  I have a partial transcript and I have his report.

THE COURT:  I do too, in chambers.

THE COURT:  I must have it.

THE COURT:  And it was, and it was before the district court.

MR. KINSEY:  I'd like to read from that report, because it's critical, and it was admitted in evidence at the hearing.

35

THE COURT:  What page is that?

THE COURT:  I don't have it here.  I have it upstairs.  Go ahead.

MR. KINSEY:  I don't have the record reference.

THE COURT:  That's all right.

MR. KINSEY:  But I do --

THE COURT:  I have the report.

MR. KINSEY:  The date of the report is January the 8th, 2004, done shortly before the hearing, just over a week.

Dr. O'Brien says, he discussed the issue -- discussing the reasons for the waiver.  He discussed the issue of control over his demise and the fact that if he were executed he would never be released from prison and commented upon the various medical problems and his desire, his desire not to spend the rest of his life in prison as an aging individual with progressive health problems.

He went on to say that the defendant had reported his having had stressful and depressive periods, specifically identifying a period of time around his mother's birthday, the date of her death as difficult and indicated that he was not, well not

**James DeCrescenzo Reporting**

Pennsylvania's Leader in Technology and Information Management

215.564.3805

1700 Sansom Street, 6th Floor
Philadelphia, PA 19103
www.JDReporting.com

Fax 215.751.0581

being prescribed any medication and such.

Dr. O'Brien went on to say that he presented the base --

THE COURT:  What page are you reading? Counsel, what page are you reading from?

MR. KINSEY:  That was from page four of five of the letter.

THE COURT:  All right.  I have it.

MR. KINSEY:  And then going over to the last page, among the concluding opinions that Dr. O'Brien offered, he presented the basis for his desire to withdraw the Section 2255 petition in an articulate, detailed, rational, using that rational phrase that we're hearing was not satisfied, element that was not satisfied, and coherent manner.

It did not provide the explanation for his decision in any way which suggested that the presence of, or influence of any psychiatric or cognitive symptoms is influential in his decision.

So we have --

THE COURT:  Okay.  Mr. Kinsey.

MR. KINSEY:  Yes, your Honor.

THE COURT:  Is it true that no court, no court has ever heard an appeal from the conviction and

the death sentence?

MR. KINSEY: Yes. Yes. And --

THE COURT: So that your position is that we shouldn't stay the execution even though no one, neither the district court nor this court has ever gotten into the merits of whether the conviction by the jury and the sentence of death were challenged.

THE COURT: It was a plea of guilty, Judge Sloviter.

THE COURT: Pardon?

THE COURT: I'm sorry. It was a plea of guilty.

THE COURT: That's right, it was a plea of guilty. But then in the sentencing portion the jury answered a whole series of questions that were posed. And nobody has ever, nobody thereafter has ever heard whatever merits he may have, whatever objections he may have to the constitutionality of the procedure.

MR. KINSEY: Your Honor, that is a question that was a much more momentous question when the court confronted it on direct appeal. Actually there's legions of courts --

THE COURT: We didn't have a direct

appeal. He withdrew the direct appeal.

MR. KINSEY: Right. But the issue, the court actually appointed Judge Gibbons as amicus curiae.

THE COURT: Well, that was on one issue, as to whether you were allowed under the federal death act to withdraw.

MR. KINSEY: And the constitution.

THE COURT: Yes.

MR. KINSEY: The notion that a defendant --

THE COURT: And Judge Gibbons said no, and the district court didn't buy it.

MR. KINSEY: Correct. Actually there's legions of decisions that say that a defendant can waive 2255 review. It's not that uncommon. Going back to the earliest days of the *Gilmore* and then Mr. Whitmore --

THE COURT: I just wanted to make sure. What about what Mr. Ruhnke said at one point that the government, at least in its papers, argued that there should be, it should maybe go back. I didn't look at that.

MR. KINSEY: Actually I was the attorney

**James DeCrescenzo Reporting**
Pennsylvania's Leader in Technology and Information Management

215.564.3905     1700 Sansom Street, 6th Floor     Fax 215.751.0581
Philadelphia, PA 19103
www.JDReporting.com

39

here.  Our position has always been that the court needs to be in a position to exercise control over the vexatious death penalty litigant who is -- it's not an unusual phenomenon.  We have these defendants who change their minds.

In fact, as Mr. Ruhnke I think notes in his pleadings, it's almost more often than not that you have defendants who ultimately waive review.  But at some point in the course of the litigation have changed their mind.

THE COURT:  Well, the ones I've had usually -- well, this is the first one that's a federal death case.  The ones usually come up from the state courts.  And at least there's been a hearing at some point in the state courts.  Appeal -- we have to worry about AEDPA and those cases.  This is different.

MR. KINSEY:  Right.  This is a -- well, by the same token this is a defendant who pled guilty.

THE COURT:  But do the facts that were brought to the attention of the district court with respect to why he pled guilty and the letter that was submitted with respect to the nature of the murder and his benefiting other prisoners, shouldn't they be

40

examined and shouldn't they be -- shouldn't he be questioned about that and the expert be questioned with respect to whether he knew of those, whether they impact his decision because they, as rational and as reasonable as Mr. Hammer seemed when talking with Dr. O'Brien, he's a con artist.

And shouldn't someone have brought this issue up in connection with that hearing, or look at it at some point?

We have an allegation or possibility here that he pled guilty to a crime that was not murder.

MR. KINSEY: Your Honor, I think that what we have in support of that, actually the record very squarely contradicts all of that.

THE COURT: Well, it may, but nobody's ever asked about it.

MR. KINSEY: Well, let me just --

THE COURT: Or at least not that we have.

MR. KINSEY: The one affidavit from Mr. Jordan, actually all of this evidence has been before Mr. Ruhnke in one form or another, was available to be presented. Mr. Hammer was aware of it and able to

**James DeCrescenzo Reporting**
Pennsylvania's Leader in Technology and Information Management
215.564.3905    1700 Sansom Street, 5th Floor
Philadelphia, PA 19103    Fax 215.751.0581
www.JDReporting.com

41

present it.

Mr. Jordan actually, the affidavit that's presented on appeal -- first of all, I don't think that -- there comes a time that the defense in a death penalty case, we have to say it's too late.

Presenting an affidavit on appeal --

THE COURT:  For death it's too late? What about what the Supreme Court just said last week in the venous cutting case, didn't seem to be too late.

MR. KINSEY:  Well, that relates to the method of execution.

THE COURT:  Well, I understand, but it wasn't too late, and they were going to execute him anyway.  He just wanted to be executed a different way.

MR. KINSEY:  This is an affidavit though of another death penalty -- of another defendant who was just recently indicted, another federal defendant in a maximum security facility who testified for the defense.  Mr. Jordan was a defense witness in this case.

THE COURT:  But can you discount this so readily and say that counsel, you know, time is

42

enough?  2255 counsel that knew about this were basically put behind a rail and told they couldn't speak and the judge had this and didn't inquire about it.  Doesn't someone have to look at this?

MR. KINSEY:  I'm going to address the counsel behind the rail in a moment.  It was actually specifically requested by Mr. Hammer in one of his motions.  He actually asked for the court to control these two attorneys and prevent them, because I've been found competent previously, and I don't want -- I want the court to restrain --

THE COURT:  Forget counsel.  That's my point, too.  Shouldn't the judge, shouldn't this be brought forward in a court of law in open proceedings and determined whether there's any truth to it?

MR. KINSEY:  Your Honor, let me just address -- the answer is it has in effect been addressed.  And let me just take on the question -- the question that he's innocent because this was an autoerotic, that's the theory we're hearing, asphyxiation.

THE COURT:  Asphyxiation.

THE COURT:  No, not autoerotic.  Not autoerotic.  Erotic asphyxiation.

43

THE COURT:  Yes, that's right.

THE COURT:  Thank you.

MR. KINSEY:  Erotic.  Good correction.
It is not autoerotic.  This was actually -- Mr. Ruhnke
cross-examined a government witness about this at the
trial, prior to Mr. Hammer's guilty plea.

Agent Malocu, who was a government
agent, part of his investigation in the early stages
of this case, because of the fact the victim was bound
to a bed, wanted to exclude the fact, the government
assumed at one point that the defense would present
this very theory, that it was some sort of sexual play
that got out of control and therefore it wasn't a
premeditated murder.

Agent Malocu actually had samples taken,
the government actually had samples taken from the
victim's body, found no evidence of sexual activity.

THE COURT:  But I think Judge Rendell's
point was that no court has looked at all this and
made a determination, at least I think that's what her
point was.

THE COURT:  That's my point.

THE COURT:  I'm not sure how to
answer -- you can't blame -- I wouldn't blame counsel

44

in this case.  I mean this is --

MR. KINSEY:  The best that I can say to that, it's true, but you know what?  That could always be true.  The defense could always --

THE COURT:  Well, actually a court has looked at it.  In the opinion of our court from 2000, the court listened to Mr. Hammer testify, they listened to him say how he murdered his cellmate and he said it over and over again to the Third Circuit.

MR. KINSEY:  Yes, your Honor.  And this was, this plea followed, this testimony, this cross-examination by Mr. Ruhnke of Agent Malocu about the possibility that the government had excluded of autoerotic -- so this is a theory that's been around for years and it's one --

THE COURT:  Not auto.

THE COURT:  This is also, when it was on appeal to us is when he clearly wanted to die.

MR. KINSEY:  Absolutely he did.

THE COURT:  So again he's a con artist.

MR. KINSEY:  But you know, I think that Dr. O'Brien's assessment of his desires -- there's one constant element and that is that he wants to exert control over the proceedings.  And the court has got

45

to be in the position of saying that ultimately the court will decide when we will have finality.

So many of his, just from my own experience, so many of his decisions immediately followed either an adverse decision, for example after the jury returned a death sentence the defendant wanted to waive appeals then, after, when the government was in its rebuttal phase at the, in its rebuttal phase of the guilt-innocence trial, he enters a guilty plea.  He --

THE COURT:  Everything that you're arguing goes to the merits of the issue.  And our question is not whether ultimately he should be found to have waived, or ultimately whether there's anything that can be done on his behalf.

Our question, the question before us now is, one, should we stay the execution, and two, send it back to the district court so that somebody can say, make a determination based on what you are telling us or based on what they're arguing.  That's the only question before us.

MR. KINSEY:  Yes, your Honor and --

THE COURT:  Not whether he was guilty of murder or not guilty of murder.

**James DeCrescenzo Reporting**
Pennsylvania's Leader in Technology and Information Management

215.564.3905          1700 Sansom Street, 5th Floor          215.751.0581
                      Philadelphia, PA 19103
                      www.JDReporting.com

46

MR. KINSEY: I guess our position is most of the questions that they're raising today really are foreclosed by the court's prior opinion. The facts that they are --

THE COURT: Our prior opinion?

MR. KINSEY: Yes. For example, Mr. Ruhnke, when he stood up, says, the questions are, the broadest questions are should this case be, proceed to an execution with no court having reviewed it. Well, that really is a necessary issue decided by the prior opinion.

THE COURT: But our court never determined that the hearing on January 16th was a sufficient hearing for purposes of determining whether the waiver was voluntary, knowing and intelligent, right? That's not what they were deciding.

All we were deciding in that case was whether he had waived his right to appeal.

THE COURT: He's waived his right to a direct appeal.

MR. KINSEY: Again I'm addressing Mr. Ruhnke's initial question of whether a case can go to an execution without an appellate court having passed on it.

47

THE COURT:  Okay, but we're asking you --

MR. KINSEY:  Their arguments are there was never any testimony taken on the reasons.  Well, there was evidence taken on the reasons for his desire.

Mr. Hammer actually in his motion --

THE COURT:  But we never, we never dealt with that.  You said all of his arguments are foreclosed by our opinion of August 31st, 2000.

MR. KINSEY:  I mean some -- I guess I'm not saying that every single point was addressed, certainly I'm not saying that, your Honor, so let me correct myself.

THE COURT:  But he raises three points.  He said to us we should have a, he's entitled to a COA because the proceeding was not adversarial, the one on January 16th.

MR. KINSEY:  Yes.

THE COURT:  And you're going to tell us that Mr. Hammer wanted the lawyers who were going to argue, and that he couldn't waive, he wanted them behind the bar.

MR. KINSEY:  Yes.

James DeCrescenzo Reporting
Pennsylvania's Leader in Technology and Information Management
215.564.3905          1700 Sansom Street, 5th Floor
Philadelphia, PA 19103          Fax 215.751.0581
www.JDReporting.com

48

THE COURT:  But that was never -- was that addressed in our opinion?  I don't think that was addressed.

MR. KINSEY:  No.  No.  No.  No.

THE COURT:  No.

MR. KINSEY:  The issue that I -- let me just clarify.

THE COURT:  Go ahead.

MR. KINSEY:  The issue that I'm saying was foreclosed by the prior decision is just the question of whether a defendant -- actually the court in the direct appeal opinion said it's remanded for setting an execution date.  The court contemplated you could have an execution without appellate review of the merits of the case.  That's the only point that I was trying to make.

THE COURT:  But it didn't say that we foreclose a 2255.

MR. KINSEY:  But clearly the implication was, actually it remanded with directions to set a short execution date, an execution date immediately.  So the court anticipated the defendant was not going to pursue further review.

THE COURT:  They asked him whether he

49

understood that there would be no more appeals.  And he said yes.

MR. KINSEY:  Yes.  Let me just --

THE COURT:  Let me ask you, if we were to grant a CAP on this issue, was the hearing below sufficient and was his waiver knowing and intelligent? And if the answer to that from this court was yes, there's nothing to go back to the district court with, is there?

MR. KINSEY:  Absolutely, your Honor. That would be a termination of the proceeding, as far as the government is concerned.

THE COURT:  I don't think I understand the question.  I'm not sure I understand the answer.

Let us clarify.  Judge Barry, could you rephrase?  I heard you, but I'm not sure I understood you.

THE COURT:  Repeat what you said.

THE COURT:  Yes.

THE COURT:  The argument is, coming from Mr. Ruhnke, was that the process was insufficiently adversarial, the process which led to the waiver of the 2255.

If we were to grant a CAP as to that

50

issue, and also the other issue Mr. Ruhnke stresses of whether indeed the waiver was knowing and intelligently entered into, and decide those issues against Mr. Hammer, it's over.

THE COURT:  Oh, yes.

THE COURT:  And decide them, right, on appeal, decide that on appeal, then it would be over.

THE COURT:  That's true.

THE COURT:  Then it would be over.

MR. KINSEY:  Absolutely, your Honor.

THE COURT:  Mr. Ruhnke also said the fact-finding was not reliable.  So I guess that would all be subsumed in what you're saying.

MR. KINSEY:  Yes, your Honor.

THE COURT:  Mr. Ruhnke just wants us to send it back.

MR. KINSEY:  He very much wants us to send it back.  But this is a case where the defendant has been examined.  All of the individuals, all of the experts who have looked at this defendant have agreed that this defendant is competent.  This defendant was examined by defense psychiatrists in connection with the trial.

Mr. Ruhnke stipulated it before Judge

51

Muir that this defendant, that none of their experts --

THE COURT:  Mr. Ruhnke's position, as I understand it, is that you don't count Mr. Smith as a defense lawyer, because Mr. -- I think that's what his, I think if asked he would try to -- he would take the two 2255 lawyers, but I don't think he wants to be tied in with Mr. Smith.  We can ask him.  But that's what I understand from his papers.

MR. KINSEY:  It's interesting, but Mr. Smith was first appointed in response to Mr. Ruhnke's motion in the district court for appointment of additional counsel because he, when Mr. Hammer decided that he no longer wanted to pursue litigation of his case, Mr. Ruhnke asked to either withdraw or have the court appoint additional counsel.

So it was actually back in 1998 that Mr. Smith was appointed.

THE COURT:  But the government -- okay.  Let me get the government.  The government opposes a remand or a COA under any circumstances.

MR. KINSEY:  Yes, your Honor, we do.

THE COURT:  Do you agree that there was no testimony and no finding as to why Mr. -- and no

52

questioning at the waiver hearing as to why Mr. Hammer wanted to waive his right?

MR. KINSEY: Well actually there was no testimony in court, but certainly there was evidence.

THE COURT: But there was no questioning and no finding, factual findings made by the court with respect to that; is that correct?

MR. KINSEY: That's correct. However -- well, the court did find the defendant was competent and knowingly, intelligently, voluntarily waived review, which encompassed, I think --

THE COURT: But what testimony supported the knowing and intelligent, other than competence?

MR. KINSEY: Well, the evidence taken from the expert opinion of Dr. O'Brien, which specifically said that he discussed the issue, the reasons for his desire and that he presented the basis for his desire to withdraw his section 22 --

THE COURT: But that was in his report. It wasn't in his actual testimony before the court.

MR. KINSEY: But that was introduced.

THE COURT: Yes, but nobody, nobody questioned on that, cross-examined on that.

MR. KINSEY: Well, it's a lengthy

**James DeCrescenzo Reporting**
Pennsylvania's Leader in Technology and Information Management

215.564.3905          1700 Sansom Street, 5th Floor          Fax 215.751.0581
Philadelphia, PA 19103
www.JDReporting.com

report.  We saw the report when it was vouched for by the witness and admitted in evidence.  I guess we felt we were entitled to rely on it.

THE COURT:  What bothers me, and I'll just put this out front, is I don't care whether you call it adversarial or not, it doesn't sound adversarial to me because there's nobody taking -- let me put it this way.  There's nobody taking the other position, and that to me is what an adversarial hearing is.

And you may very well say well, nobody should be taking the other position, because nobody, Mr. Hammer didn't ask anybody to take that position.  And he says, Mr. Ruhnke says, as I gather, you know, if you got Mr. Hammer on a different day, he would have taken that position.  And we have every reason to believe that if you look at these three pages of vacillations.

MR. KINSEY:  Judge Sloviter, the court, actually in this court -- different panel obviously -- but this --

THE COURT:  We're the same court.

MR. KINSEY:  Same court.

THE COURT:  We're stuck with what they

James DeCrescenzo Reporting
Pennsylvania's Leader in Technology and Information Management
215.564.3905       1700 Sansom Street, 6th Floor       Fax 215.751.0581
Philadelphia, PA 19103
www.JDReporting.com

54

said.

MR. KINSEY: True. This court actually, as your Honor alluded to earlier, conducted what was, something along the lines of an evidentiary hearing, had Mr. Hammer --

THE COURT: We're not supposed to do that. That's not an appellate function.

MR. KINSEY: But they did ultimately have him appear. They actually reiterated the findings that the defendant was competent. The court sent a letter to Mr. Ruhnke and asked him to submit --

THE COURT: Well, all they said is there's no -- I think Judge Greenberg's words were there's no incompetence here. I think that was his language.

MR. KINSEY: They actually said in a footnote, in footnote two of the opinion, we relied, in support of the competency, we relied on essentially the record of the proceedings in the district court.

We also note, however, that we received from Hammer records of subsequent regular psychiatric evaluations made by the medical staff at Lewisburg which essentially established the existence of a continuum in which Mr. Hammer's mental state was

unchanged.

We solicited the advice of all counsel, including standby counsel. They actually sent a letter to Mr. Ruhnke.

THE COURT: But that's direct appeal. He waived his direct appeal. Did he waive in there all his right to habeas ever?

MR. KINSEY: No. But --

THE COURT: Then that wasn't the issue.

MR. KINSEY: I understand, but by the same token we have -- the reasons that he offered in that appeal related to, were basically the same reasons that Dr. O'Brien cited. The reasons have never changed.

The court -- there's never been any contrary evidence. No one has offered any contrary evidence that this defendant is incompetent, that the reasons that he's offered were not rational.

THE COURT: Well, Mr. Ruhnke is not challenging his competency on this application.

THE COURT: Exactly.

THE COURT: So I don't know why you're talking about competency at this point.

MR. KINSEY: Well, I will not.

**James DeCrescenzo Reporting**
Pennsylvania's Leader in Technology and Information Management

215.564.3905          1700 Sansom Street, 5th Floor          215.751.0581
Philadelphia, PA 19103
www.JDReporting.com

56

THE COURT:  I think we've given you equal time.

MR. KINSEY:  Equal time.

THE COURT:  Equal overtime.

MR. KINSEY:  Thank you very much.

THE COURT:  Mr. Ruhnke, you reserved three minutes.

MR. RUHNKE:  Thank you.  I think the response to Judge Barry's observation, which is correct, that when Mr. Hammer appeared --

THE COURT:  She's often correct.

MR. RUHNKE:  Yes, she is.  In this courtroom for many years we have known that.

THE COURT:  You should have said always correct, Judge Sloviter.

THE COURT:  Well, I didn't want to say that.  I was very careful.  We don't always take the same position.

MR. RUHNKE:  That's right.

But when Mr. Hammer appeared here in this court via videoconference in the same courtroom many years ago, four years ago, he was in his best I-want-to-die-and-I'm-going-to-give-the-court-what-they-want-to-hear-to-allow-me-to-die mode.  That may

57

account -- and he's been there before.

He told this court in that Oklahoma country boy accent, which he does very well and he comes by honestly, that this was his final word, he wasn't going to seek executive clemency, he wouldn't seek any additional review.  What's the point of the death penalty if it takes a long time to execute people?  This is the only way I'm going to be at peace.

And three weeks later he filed a petition for executive clemency, filed a petition for 2255 relief, filed a petition in this court to vacate and reinstate the appeal.

THE COURT:  But doesn't that mean that a death penalty prisoner can -- I want to use a nonvernacular word, if I can.

THE COURT:  Manipulate.

THE COURT:  -- can manipulate or play with the court?

MR. RUHNKE:  Much as a vexatious litigant can play with the court system, because court systems are open to the idea that citizens ought to be able to come to court and invoke the court's processes and therefore we have an open court.

58

THE COURT:  And the court has a right to protect itself.

MR. RUHNKE:  The court has a right to protect itself.  At some point this merry-go-round has to stop.

THE COURT:  Well, when is that point?

MR. RUHNKE:  I think it stops now, and when you have somebody --

THE COURT:  Well, why didn't it stop with Judge Becker's panel?

MR. RUHNKE:  Because it didn't stop.  Because there were more options that were available.

THE COURT:  But we can't say whether he'll do it tomorrow.  He'll say oh, I heard about the hearing and I really, you know, it's time, let's face it, those three ladies, they don't know what they're doing.

MR. RUHNKE:  I can't guarantee --

THE COURT:  You can't guarantee anyone won't say that.

THE COURT:  Don't say yes, Mr. Ruhnke, you'll get into trouble.

MR. RUHNKE:  That's the last word I would ever say in those circumstances.

James DeCrescenzo Reporting
Pennsylvania's Leader in Technology and Information Management
215.564.3905          1700 Sansom Street, 5th Floor          fax 215.751.0581
Philadelphia, PA 19103
www.JDReporting.com

59

The answer is you could never guarantee that. In fact, when 2255 counsel filed their papers, they said the one thing that's absolutely sure is that Mr. Hammer will change his mind again, and they were prescient in that observation. It doesn't take much to be prescient as to that assertion.

THE COURT: So you mean if we say this is the end, it really is the end?

MR. RUHNKE: If your Honors order this is the end, it certainly is the end.

THE COURT: Because we certainly did in our order when we said you are the lawyer and that's it.

MR. RUHNKE: Yes.

THE COURT: And that was deliberate, I can tell you right now.

MR. RUHNKE: And just a couple of responses. No court has heard the evidence that Mr. Hammer may in fact be innocent of these charges, never been put before a court with a hearing, with witnesses, to make that determination of actual innocence.

THE COURT: And you think if we grant a COA on the grounds that you asked for before, that

60

that would open the door for an actual innocence hearing?

MR. RUHNKE: I think --

THE COURT: I don't know, which of the questions would it fall within?

MR. RUHNKE: One of the allegations in the 2255 petition is that Mr. Hammer is actually innocent. And if that was information --

THE COURT: Who's going to --

UNIDENTIFIED SPEAKER: I lost her.

THE COURT: No. Go ahead. Hold on, Maryanne.

THE COURT: We lost the audio. There you are. You're back.

MR. RUHNKE: No, you're back, Judge Barry.

THE COURT: I have a blank screen. Can you hear me?

MR. RUHNKE: We can hear you.

THE COURT: We can, and we can see you, too.

THE COURT: All right. That's fine.

THE COURT: What you said was "Who's going to --" and it stopped there.

**James DeCrescenzo Reporting**
Pennsylvania's Leader in Technology and Information Management

215.564.3905          1700 Sansom Street, 5th Floor          Fax 215.751.0581
                      Philadelphia, PA 19103
                      www.JDReporting.com

61

THE COURT:  Oops.

THE COURT:  We just lost you, Maryanne.

THE COURT:  Are you there?

THE COURT:  We're back.  Okay.  You didn't finish your question.

THE COURT:  Yes.  On the claim of actual innocence, I have not read anything in these lengthy papers until really now that says it was an accidental killing.  Certainly he didn't say that before our court.

And now all of a sudden we're hearing, I'm hearing for the first time erotic asphyxiation.

MR. RUHNKE:  Well, it was not the first time.  It was part of -- the first time that you've heard it here in the court.  But it was part of the Section 2255 petition that was filed.  And --

THE COURT:  It was in the papers, I understand that, but it hasn't been around for years, has it?  It's always been the assumption, and he said he did it, he killed, he murdered Marti.

MR. RUHNKE:  And that's what Section 2255 counsel did and that's why it's important I think sometimes to have new counsel take a look at a case, because they started to look at the --

**James DeCrescenzo Reporting**
Pennsylvania's Leader in Technology and Information Management

215.564.3905                1700 Sansom Street, 5th Floor              Fax 215.751.0581
                            Philadelphia, PA 19103
                            www.JDReporting.com

62

THE COURT: Who is going to convince us now, or convince the district court that oh yes, it really was an accidental murder? They'd have to believe Mr. Hammer, wouldn't they?

MR. RUHNKE: Well, that the scientific evidence disputes everything he says. And that the witness, Mark Jordan, who has just come forward to say look, we know what was going on here and I'm not going to sit here in jail and let Mr. Hammer be executed when I know what really happened.

And put him before a court. Put an expert pathologist before a court and let's air it out. Maybe we win, maybe we lose. But we certainly win even if we lose by knowing that an innocent person hasn't been executed. And we may be on the verge of executing an innocent person.

THE COURT: Let me ask you, at one point, and I can't remember when, I have the three pages, he withdrew a 2255. Was this actual innocence actually in the original -- was there a prior 2255 motion?

MR. RUHNKE: No, I don't think that's factually correct. He, counsel filed the 2255 a little under a year after his certiorari petition was

decided.  He filed a motion to withdraw it earlier, which he then withdrew.

THE COURT:  Yes, but there was a physical 2255 that's different from the 2255 that was filed.  Were there two 2255s?

MR. RUHNKE:  I know the current 2255 was amended.  I do not believe there were other 2255s, your Honor.  I think there has been one proceeding.

THE COURT:  Do you have anything else?

THE COURT:  No.

THE COURT:  Judge Barry, any more questions?

THE COURT:  No, I have nothing else, Judge Sloviter.

THE COURT:  Okay.  Thank you very much.  Thank you.  We apologize, but we're going to have to lock the courtroom so that we can confer.  We just lost her so --

(End of tape.)

64

CERTIFICATION

I, JAMES DeCRESCENZO, a Registered Diplomate Reporter, Certified Realtime Reporter, Certified Shorthand Reporter of New Jersey, License Number XI 00807, and Notary Public, hereby certify that the foregoing is a true and accurate transcript.

I further certify that I am neither attorney nor counsel for, not related to nor employed by any of the parties to this action; and further, that I am not a relative or employee of any attorney or counsel employed in this action, nor am I financially interested in this case.

James DeCrescenzo
Registered Diplomate Reporter
Certified Shorthand Reporter
Notary Public

**James DeCrescenzo Reporting**
Pennsylvania's Leader in Technology and Information Management

215.564.3905        1700 Sansom Street, 5th Floor        fax 215.751.0581
Philadelphia, PA 19103
www.JDReporting.com