# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,          :

                Respondent,          :          Criminal No. 4:CR–96-239

                     :          Judge Muir

                  v.          :

                     :

DAVID PAUL HAMMER,          :

                     :

                Petitioner.          :

                     :

---

## PETITIONER'S BRIEF
## IN SUPPORT OF SUPPLEMENTAL AND THIRD
## AMENDED MOTION TO VACATE AND SET ASIDE
## CONVICTION AND SENTENCE PURSUANT TO
## 28 U.S.C. 2255 BY A PERSON IN FEDERAL CUSTODY

---

# TABLE OF CONTENTS

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Standard Regarding Claims of Ineffective Assistance of Counsel . . . . . . . . . . . . 3

Grounds One, Two, Three and Eight: Claims Related to Petitioner's
Guilty Plea and Waiver of Appellate Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    A.    Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    B.    Counsels' Acquiescence To the Court's Utilization of
            Conflicted Mental Health Expert Witnesses . . . . . . . . . . . . . . . . . . 7

            1.    Dr. Mitchell's Conflict Based Upon his Dual Roles . . . . . . . . 8

            2.    Dr. Wolfson Also Assumed Multiple and
                 Conflicting Roles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

            3.    Dr. Wolfson's Lack of Expertise With Regard To
                 Dissociative Identity Disorder (DID) . . . . . . . . . . . . . . . . . . 16

            4.    Dr. Mitchell's Inexperience With DID and
                 Questions of Competency . . . . . . . . . . . . . . . . . . . . . . . . . . 19

i

5.    Mitchell and Wolfson's Conflict of Interest Due To Potential BOP Liability For the Death of Andrew Marti . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

6.    Conclusion with Regard to Conflicts – Court Error and Counsel's Ineffective Assistance . . . . . . . . . . . . . . . . . . 22

C.    Petitioner Received Ineffective Assistance of Counsel When his Trial Counsel Failed to Present Available and Significant Evidence Bearing on his Lack of Capacity to Enter a Knowing, Intelligent and Voluntary Guilty Plea, and When Counsel Failed to Object to the Court's Reliance on Conflicted Expert Witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

1.    Counsel's Failure To Investigate Impact of DID, Brain Damage, Cognitive Impairment, Conditions of Confinement, Posttraumatic Stress Disorder And Borderline Personality Disorder On Petitioner's Competency To Plead Guilty . . . . . . . . . . . . . . . . . . . . . . . . 24

a.    Evidence Presented During Competency Proceedings . . . . . . . . . . . . . . . . . . . . . . . 26

b.    Evidence of Incompetence Ignored By Trial Counsel and Not Presented to this Court . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

D.    The Waiver of Appellate Rights Was Also Invalid . . . . . . . . . . . . . 46

Grounds Six and Nineteen: Petitioner is a Serial False Confessor. The Government Violated Due Process When it Failed to Disclose Evidence Showing this, and Counsel was Ineffective for Failing to Investigate and Present this Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

Ground Seven: Government Suppression of Exculpatory Evidence . . . . . . . . . . 55

ii

Grounds Ten and Thirteen:  Petitioner was Constructively Denied
Counsel During the Competency Proceedings at trial and Regarding
Direct Appeal, Owing to Trial Counsels' Conflict of Interest and
by this Court's Decision to Conduct Competency Proceedings
Immediately Upon Learning of Petitioner's Desire to Plead Guilty . . . . . . . . . . . 55

Ground Fourteen:  The Impact of the Rewards Provided to BOP Personnel . . . . 56

Ground Eighteen:  Counsels' Ineffective Failure to Raise and Litigate
the Various Claims for Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

Ground Twenty-Two:  Counsels' Ineffective Failure to Insist that the
Jury be Shown the Entire Tape of the Hypnosis Session . . . . . . . . . . . . . . . . . . 57

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

## PRELIMINARY STATEMENT

This Brief is submitted in support of Petitioner's Third Amended Motion for relief under 28 U.S.C. § 2255. It addresses only those claims, facts and legal theories that were not previously addressed in earlier Section 2255 motions or supporting briefs. The absence of any claim, fact or legal theory from this brief should not be construed as a waiver or abandonment of such claim, fact or legal theory. Rather, counsel is complying with this Court's direction to brief the claims, facts and theories that were not previously briefed.

References to the transcript of prior proceedings in this case, will be cited as "NT" followed by the date and page. All emphasis is supplied unless otherwise noted.

## STATEMENT OF THE CASE

Petitioner incorporates by reference the Statement of Facts and Procedural History contained in his *Supplemental and Third Amended Motion to Vacate and Set Aside Conviction and Sentence Pursuant to 28 U.S.C.§ 2255 By a Person In Federal Custody* (hereafter, "*Third Motion*") filed on November 30, 2004.

Petitioner updates that history as follows: On November 29, 2004, undersigned counsel filed a *Motion for Leave to File Supplemental and Third Amended Motion* (hereafter, *Motion for Leave*) for relief under 28 U.S.C. § 2255 (document # 1012).

1

Attached to the *Motion* was the proposed *Third Motion* which raised twenty-two claims for relief. Following briefing on Petitioner's *Motion for Leave*, on January 27, 2005, this Court issued an Opinion and Order granting it in part and denying it in part (document # 1042). Specifically, this Court granted Petitioner's leave to amend as it pertained to grounds one, two, six, seven, eight, ten, thirteen, fourteen and nineteen. The Court provisionally granted Petitioner's motion for leave to amend pertaining to grounds three, eighteen and twenty-two, and denied the remainder of his motion to amend.

The Court also ordered that Petitioner file his memorandum of law in support of his supplemental and third amended §2255 motion on or before February 18, 2005, and extended this time until February 25, 2005. Accordingly, this memorandum will address the amendments that were granted, as well as those provisionally granted. As to those proposed amendments that were not permitted by the Court, Petitioner does not address them herein. However, that fact should not be construed as a waiver or abandonment of those claims, but rather as compliance with this Court's directives.

2

**ARGUMENT**

**STANDARD REGARDING CLAIMS OF INEFFECTIVE ASSISTANCE OF COUNSEL.**

As the bulk of Petitioner's amended claims are grounded in allegations that all prior counsel were ineffective, Petitioner submits this statement regarding the standards governing such claims.[1]

———————————

[1] Petitioner has alleged that trial counsel were ineffective because: they failed to object to this Court's reliance on conflicted mental health experts, Drs. Wolfson and Mitchell; failed to consult with the retained defense experts regarding Petitioner's competency; failed to investigate and present the evidence of Petitioner's incompetency; failed to raise an ethical challenge to the dual, conflicting roles played by both Drs. Wolfson and Mitchell; failed to investigate and present evidence of Petitioner's prior false confessions to murders he did not commit, and the related mental health evidence surrounding Petitioner's propensity to falsely confess; failed to investigate and present evidence of statements of inmates other than those presented by the Government as witnesses against Petitioner that contradict the Government's evidence; failed to investigate and present physical evidence contradicting the Government's claim of premeditation and supporting a defense that the death occurred as a result of accidental (erotic) asphyxiation; failed to raise, preserve and litigate this Court's failure to properly advise Petitioner about the risks of proceeding *pro-se*; failed to investigate and present evidence that Dr. Mitchell received a financial award for his participation in the prosecution of Petitioner; and failed to request this Court appoint a non-conflicted mental health professional to assess Petitioner's competency.

Additionally, Petitioner has alleged that prior section 2255 counsel failed to raise all or portions of the claims contained in the *Third Motion*.

3

Under clearly established United States Supreme Court precedent, a defendant's Sixth Amendment right to the effective assistance of counsel is violated whenever counsel provides professionally deficient representation that results in prejudice. <u>Strickland v. Washington</u>, 466 U.S. 668 (1984); <u>Williams v. Taylor</u>, 529 U.S. 362, 395 (2000); <u>Wiggins v. Smith</u>, 539 U.S. 510 (2003) (2003).

Under the Sixth Amendment's two-prong test, first set forth in <u>Strickland</u>, Petitioner must show:  (1) counsels' deficient performance, <u>i.e.</u>, that counsels' performance fell below "an objective standard of reasonableness," <u>id.</u> at 688; and (2) prejudice, <u>i.e.</u>, that confidence in the result of the original proceeding is undermined due to counsels' deficiencies, <u>id.</u> at 694.

The prejudice prong of the <u>Strickland</u> test requires Petitioner to show only that "there is a *reasonable* probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Strickland</u>, 466 U.S. at 694.  As the United States Supreme Court has stressed:  "the adjective is important . . . The question is not whether the defendant would <u>more likely than not have received</u> a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." <u>Kyles v. Whitley</u>,

4

514 U.S. 419, 434 (1995)[2]; see also Strickland, 466 U.S. at 693 ("a defendant need

not show that counsel's deficient conduct more likely than not altered the outcome

in the case"); Nix v. Whiteside, 475 U.S. 157, 175 (1986) ("a defendant need not

establish that the attorney's deficient performance more likely than not altered the

outcome in order to establish prejudice").  Thus, a "reasonable probability of a

different result" is less than a preponderance of the evidence.  It is present when an

evaluation of all of the evidence that should have been before the jury is "sufficient

to undermine confidence in the outcome." Strickland, 466 U.S. at 693.

| | |
|---|---|
| **GROUNDS ONE, TWO, THREE AND EIGHT:** | **CLAIMS RELATED TO PETITIONER'S GUILTY PLEA AND WAIVER OF APPELLATE RIGHTS.** |

### A.    Introduction.

In Grounds One and Two of the *Third Motion* Petitioner has alleged a series

of errors related to the Court's acceptance of his plea of guilty to first degree murder.

Prior to accepting the plea, the Court found Petitioner competent to plead guilty in

proceedings that were flawed in two respects:  1 ) the Court relied upon expert

witnesses who testified while under profound conflicts of interest; and 2) counsel

were ineffective for (a) failing to litigate these conflicts; and (b) for failing to provide

---

[2] In Kyles, the Court applied the identical prejudice standard in the Brady context, granting a new trial in a capital case as a result of government suppression of exculpatory information. See Brady v. Maryland, 373 U.S. 83 (1963).

5

the Court with significant evidence relating to Petitioner's lack of capacity to enter a knowing, intelligent and voluntary guilty plea.

Thus, the competency proceeding which served as the predicate for this Court's acceptance of the guilty plea did not put the competency question to a true adversarial test. This is so because of the conflicts and counsels' failure to litigate the significance of these conflicts, and failure to present mental health evidence relating to Petitioner's capacity to plead guilty. Accordingly, the proceeding and its results could not serve as the proper basis for a finding of competence to plead guilty.

In Grounds Three and Eight of the *Third Motion*, Petitioner alleges that the same flaws that permeated the earlier competency proceedings also rendered invalid the competency proceedings relevant to his surrendering of his right to direct appeal.

Petitioner will first discuss the flaws in the proceeding related to conflicts of interest that undergird the expert witnesses relied upon by the Court (Part B). Then, Petitioner will demonstrate that counsel ineffectively failed to present available and significant evidence showing that Petitioner lacked capacity to enter a knowing, intelligent and voluntary guilty plea, and ineffectively failed to object to the Court's reliance on the conflicted experts (Part C). Finally, Petitioner will show how the proceedings related to his waiver of his appellate rights were flawed in the same ways (Part D).

6

**B.    Counsels' Acquiescence To the Court's Utilization of Conflicted Mental Health Expert Witnesses.**

A criminal defendant unquestionably possesses a due process right not to be subjected to criminal proceedings when he is incompetent. Cooper v. Oklahoma, 517 U.S. 348, 354 (1996); Drope v. Missouri, 420 U.S. 162, 171-72 (1975); Pate v. Robinson, 383 U.S. 375, 378 (1966).  Because competency to proceed is so central to due process and the integrity of a criminal proceeding, Courts must employ adequate procedures to protect this right.  Pate, id. (procedures for determining competency must be adequate to protect a defendant's due process right not to proceed while incompetent); Drope, id. ("failure to observe procedures adequate to protect a defendant's right to not be tried or convicted while incompetent ... deprives him of his due process right to a fair trial."); Hull v. Kyler, 190 F.3d 88, 105 (3d Cir. 1999) ("failure to provide adequate procedures to ensure that the Dusky[3] [competency] test is met deprives a defendant of his constitutional right to a fair trial" citing Pate); U.S. v. Hollis, 569 F.2d 199, 205 (3d Cir. 1977) (same).

The safeguards which should have insured that Petitioner had adequate capacity to enter a knowing, intelligent and voluntary plea, were shattered by this Court's reliance on conflicted expert witnesses, and by counsels ineffective failure

---

[3] Dusky v. U.S., 362 U.S. 402 (1966)

7

to challenge that reliance.

As this Court is aware, it's competency determination was based entirely, or almost entirely, upon the opinions of Dr. James Wolfson and Dr. John Mitchell. U.S. v. Hammer, 25 F.Supp.2d 518, 519 (M.D. Pa. 1998).    Although trial counsel expressed mild reservations about the propriety of Dr. Wolfson's utilization in this regard, a formal objection was not lodged.    Nor did counsel investigate and cross examine Drs. Wolfson and Mitchell on any of the following areas which relate to each evaluators' conflicts of interest – each of which should have precluded the Court's reliance upon their opinions.

### 1.    Dr. Mitchell's Conflict Based Upon his Dual Roles.

Prior to his involvement as a witness regarding Petitioner's competency to plead guilty, Dr. Mitchell had been Petitioner's treating therapist. Dr. Mitchell admitted that he had formally counseled Petitioner in this relationship on as many as one hundred and fifty occasions between June, 1995 and the time of trial.    See NT 6/23/98,  76, 90; NT 10/1/98, 93.[4]

---

[4] Dr. Wolfson also testified that Dr. Mitchell's role in reference to Petitioner was that of "treating clinician." Id. at 24 (Dr. Wolfson) (discussing Dr. Mitchell's potential involvement in the competency evaluation: "Now, that's pulling Dr. Mitchell out of his usual role a bit, too, from a treating clinician to a forensic evaluator"); Id. at 47 (Mitchell's "last clinical contact with Mr. Hammer had been a week ago Monday").

8

Dr. Mitchell's role as treating clinician for Petitioner continued throughout Petitioner's trial. NT 6/22/98, 92. Not only did Dr. Mitchell continue to counsel Petitioner, he also discussed with him during these counseling sessions Petitioner's "considerable ambivalence about how to proceed and about the whole mental illness defense." Id. Dr. Mitchell's clearly delineated therapist-patient relationship with Petitioner was incongruent with his later role as forensic evaluator on the issue of Petitioner's competency.

The relevant records and documents pertaining to this case and in particular to these events have been reviewed by Dr. Donald Bersoff, Ph.D., J.D., a mental health ethicist with degrees in both psychology and law. Dr. Bersoff has concluded that Dr. Mitchell impermissibly engaged in multiple professional relationships with Petitioner, in clear violation of relevant ethical rules:

> The issue of multiple relationships is seen as a particularly important problem in the provision of forensic mental health services. It is generally agreed within the field that a treating therapist may be called upon to serve as a fact witness but it is also generally agreed that the therapist should not be compelled nor volunteer, to act as an expert witness with regard to the mental status of his/her patient.

Report of Donald N. Bersoff, Ph.D, J.D.(hereafter, Bersoff Report), at 3. Dr. Bersoff further reports that "acting as both therapist and expert witness regarding the same patient is seen as an irreconcilable conflict." Id. at 4. Indeed, as he points out, the

9

former president of the American Academy of Psychiatry and the Law called such competing functions incompatible:

> When clinical and forensic roles are combined in the course of treatment, information gathered with the understanding it will be used only for the patient's benefit is turned to other purposes. Regardless of the psychiatrist's intent, that information may redound to the patient's detriment.

Id.

This conflict was so apparent that even Petitioner voiced his concerns directly to Dr. Mitchell that he – Dr. Mitchell – would use the information he gathered about Petitioner during their therapy sessions to Petitioner's detriment. Extraordinarily, instead of appropriately responding to this red-flag raised by his patient by alleviating the conflict, Dr. Mitchell tried to assuage Petitioner by assuring him that he would only testify to what he "observed and heard" but not to opinions. This of course turned out not to be true – as Dr. Bersoff noted, "this turned out to be, of course, an empty promise when he later testified as an expert witness offering an opinion (not merely his observations) as to Mr. Hammer's competency." Id. at 6. Thus, when this nascent conflict was spotted by Petitioner, Dr. Mitchell did not rectify it – instead he misled his patient.

Even more, after being alerted to his conflicting roles by Petitioner's inquiry, Dr. Mitchell continued to act improperly:

10

Mr. Hammer continued to express his concerns about Dr. Mitchell's loyalty and fidelity. Six weeks after Dr. Mitchell spoke to the prosecution, on June 27, 1997, he noted that Mr. Hammer "expressed concern over whether he could trust me; this apparently stemmed from my writing a control unit referral report without notifying him." Two weeks later, Dr. Mitchell wrote (see July 8, 1997, summary of counseling session), Mr. Hammer refused to see anybody from the psychology unit because he "will not be involved with those of you who are actually working as agents for assistant U.S. Attorney Fred Martin in his endeavors to murder me." A month later, on August 5, 1997, Mr. Hammer cancelled his therapy sessions with Dr. Mitchell because of his concerns "about some records" that Dr. Mitchell was "keeping on him."

In addition to Dr. Mitchell's failure to anticipate that he might act in conflicting roles, he noted on May 7, 1997, that he was contacted by the prosecution informing him that he "may be called on at some point to speak to Hammer's competency to defend himself." Although he sees Mr. Hammer just two days later for a counseling session and many times after that for treatment, he never informed Mr. Hammer of the potential for his testifying at the behest of the prosecution. In my opinion, immediately after receiving the communication on May 7th, he had an ethical duty to inform Mr. Hammer that he might be testifying as an expert, with concomitant limits on confidentiality.

Id. at 7. No such "warnings" occurred. Instead, Dr. Mitchell provided Mr. Hammer with false information regarding his future role, and accordingly acted unethically.

There is another dimension to this aspect of Dr. Mitchell's conflict. It is unquestionable that when a forensic evaluator assesses a criminal defendant, the evaluator must give, in effect, Miranda warnings to the defendant. The evaluator must alert the defendant that there is no privilege that usually attends a doctor-patient relationship, but – to the contrary – what the defendant tells the evaluator can and will

11

be used against the defendant.  See generally Estelle v. Smith, 451 U.S. 454, 462-63 (1981).  However, rather than providing Mr. Hammer with the appropriate warnings, Dr. Mitchell provided him with false information: that he would only report what he saw and heard, but would not provide an opinion.  Under these circumstances, that false information violated Petitioner's right to remain silent and against self-incrimination under the Fifth Amendment and his right to counsel under the Sixth Amendment.[5]  Accordingly, the testimony offered by Dr. Mitchell in both the guilt phase of the trial and during the two competency proceedings, was obtained in part in violation of Petitioner's Fifth and Sixth Amendment rights.

In a related vein, Dr. Mitchell's dual roles took on an added conflict when – in his role as therapist, counselor, and confidant – he discussed with Petitioner sensitive and confidential topics regarding Petitioner's feelings about waiving his rights, pleading guilty, foregoing his appeals, and his relationship with his lawyers.  While these were all perfectly appropriate topics for a therapist to discuss with a patient, they were grossly inappropriate topics for a BOP-employed evaluator and future Government/Court witness to discuss with a prisoner.  Dr. Mitchell had an ethical and

---

[5] Dr. Mitchell's missteps impacted not just his opinions, but those of Dr. Wolfson, who relied upon information and opinions gathered by Dr. Mitchell in both his guilt phase testimony, and during his evaluation during the competency proceedings.

12

legal obligation not to discuss these sensitive and confidential matters with a capital

defendant:

> Further muddying the waters was the fact that during therapy sessions Dr. Mitchell had with Mr. Hammer after the death of Mr. Marti, Mr. Hammer expressed significant and persistent concerns about the conduct of his capital trial (both during and after conviction), including his relationship to his attorneys and whether to plead guilty, waive appeals, and ask for an execution date. See e.g., Dr. Mitchell's notes of April 14, 17, 1998; May 1, 18, 1998; June 1, 10, 15, 1998; July 26, 28, 1998; September 29, 1998; November 3, 21, 1998; and December 3, 24, 1998. Although Dr. Mitchell had a professional obligation to discuss these topics because they were causing his patient emotional distress, it raises countervailing ethical concerns given the multiple roles Dr. Mitchell played and would play in Mr. Hammer's trial, including testifying on behalf of the prosecution. Although Dr. Mitchell acted primarily as Mr. Hammer's therapist, he was also an employee of the BOP (and ultimately the U.S. Department of Justice). Thus, Dr. Mitchell should have either avoided altogether discussion of legal matters relevant to Mr. Hammer's case, referred him to another mental health professional who would not be testifying, or informed him of the limits of confidentiality with regard to these matters. See Standard 4.01 of the 1992 APA Code.

Bersoff Report at 8, n.14.

Such interaction between an agent of the Government and a criminal defendant,

that takes place in the context of a therapeutic relationship, shocks the conscience and

violates the due process clause of the Fifth Amendment, and violates Petitioner's

Sixth Amendment right to counsel. Massiah v. U.S., 377 U.S. 201 (1964); U.S. v.

Henry, 447 U.S. 268 (1980); Maine v. Moulton, 474 U.S. 159 (1985). When the right

to counsel has attached, as clearly it had during Dr. Mitchell's sessions with Petitioner, the deliberate eliciting of information by a government agent violates the Sixth Amendment, and constitutes an invasion of the defense camp.

Accordingly, Petitioner's Fifth and Sixth Amendment rights were violated by the Court's reliance on information received from Petitioner by Dr. Mitchell, as well as opinions that were formed based upon this information. This violation of the Constitution renders the competency proceedings infirm, and require that Petitioner's guilt plea be vacated.

### 2.    Dr. Wolfson Also Assumed Multiple and Conflicting Roles.

James Wolfson, M.D., is a psychiatrist employed by the Bureau of Prisons at Springfield, Missouri. He assessed Petitioner's criminal responsibility after Petitioner's trial counsel filed a notice of intent to assert an insanity defense. Contrary to his repeated insistence that he was a "nonpartisan expert," Dr. Wolfson testified as the Government's chief mental health expert in opposition to Petitioner's asserted insanity defense.

Almost immediately, Dr. Wolfson assumed two wholly incompatible roles:

> Although Dr. Wolfson correctly informed Mr. Hammer that information he gleaned from him would not be confidential because he was acting as a "nonpartisan expert," he also informed Mr. Hammer that he, Dr. Wolfson, "would also serve, at least temporarily, as [Petitioner's] attending psychiatrist of record should any pressing clinical needs arise

14

during his stay." (Wolfson report, at p.2). As noted above, these roles are incompatible, particularly in light of the abrogation of confidentiality.

Bersoff Report at 10-11.

Dr. Wolfson seemed to believe that if Petitioner acquiesced in his participation as the "Court's witness" for purposes of competency, the conflicts would dissipate, however, as Dr. Bersoff aptly observed: "it borders on the oxymoronic to ask Mr. Hammer if he consented to the competency evaluations by Drs. Mitchell and Wolfson when the sole purpose of these evaluations was to determine Mr. Hammer's cognitive capacity to make knowing, intelligent and voluntary decisions regarding his legal fate." Id. at 9.[6]

Upon learning of Petitioner's allegations that he behaved unethically, Dr. Wolfson responded that he in fact followed the Bureau of Prisons policy of "working for the court," not the prosecution or defense. See Affidavit of James Wolfson, M.D., dated February 3, 2003, at ¶ 3. However, as Dr. Bersoff notes, Dr. Mitchell's protestations that he acted ethically – and clearly he did not – miss the boat:

------

[6] Interestingly, when Dr. Wolfson testified as to Petitioner's competency to waive his direct appeal a few months later, he stated, as if it mattered at that point, that despite having already assumed dual and incompatible roles in this case, if the issue of Petitioner's competency to be executed arose, he would "make arrangements for a different clinician to be the one that actually articulated an opinion" concerning Petitioner's competency. Id. at 12. See also NT 10/1/98, 82.

[Dr. Wolfson] misses the fundamental ethical point. Regardless of written policies, statues, or case law requiring BOP mental health professionals who conduct evaluations to be neutral, ethical standards are established, not only to protect against actual harm to a patient, but against risk of harm. If Dr. Wolfson, as well as Drs. Mitchell and Karten, had avoided the appearance of impropriety, they would have ensured the integrity of the process and protected themselves against any reasonable concerns that their opinions were tainted by conflict, bias, or external pressure. Preventing the appearance of impropriety is particularly important when forensic clinicians are involved in a death penalty prosecution.

Bersoff Report at 12-13.

Finally, Dr. Wolfson's reliance on the information provided by Dr. Mitchell also violated Petitioner's rights under the Fifth and Sixth Amendments, and due process of law.

### 3. Dr. Wolfson's Lack of Expertise With Regard To Dissociative Identity Disorder (DID).

Dr. Wolfson's also acted unethically when he provided opinions regarding Petitioner's primary mental health diagnosis – Dissociative Identity Disorder (DID).

At the time Dr. Wolfson testified against Petitioner, he had never treated a patient with DID and had never assessed such a patient. Moreover, he admittedly had absolutely no training regarding DID. Id. at 14-15. In fact, his only exposure to DID, prior to his involvement in this case, was less than an hour lecture on the subject: "Calling it a course is a little bit of a misnomer. I got academic credit for it but what

16

I was doing there was posed with the unit that does forensic evaluations and we saw no defendants during that period of time who had or claimed to have that illness, and so I didn't have any experience with it, other than reading, I'm sure." NT 6/17/98, 137. Moreover, as Dr. Wolfson acknowledged he had no clinical experience with this illness.

This lack of experience and knowledge, alone, should have caused Dr. Wolfson to recuse himself from this assignment. But there was more. Not only did Dr. Wolfson opine that Petitioner did not suffer from DID, but he doubted that the disease existed at all. In both his pre-trial report and in his trial testimony, Dr. Wolfson opined that Petitioner was not mentally ill – his primary Axis I diagnosis was that Petitioner was a "malingerer." See, Report of James Wolfson, M.D. (dated December 19, 1997) (hereafter "*Wolfson Report*") at page 126. However, as that report makes clear, Dr. Wolfson was predisposed against Petitioner's mental health claims. He did not believe that the primary diagnosis upon which Petitioner's counsel relied – DID – was a true and viable mental health condition generally, much less one that Petitioner suffered from. See, e.g. *Wolfson Report* at page 140 ("I have significant reservations about the construct of multiple personality disorder as a diagnosis, both in the psychiatric literature, and especially in the legal literature.").

17

As Dr. Bersoff concluded, under these circumstances (inexperience with the diagnosis and "significant reservations" that the illness existed in any patient) Dr. Wolfson had an ethical obligation to decline the Court's request to evaluate Petitioner's competency:

> In light of his significant inexperience with the diagnosis of DID in either a clinical or forensic context, it is not surprising that Dr. Wolfson stated in his forensic report that "I have significant reservations about the construct of multiple personality disorder as a diagnosis, both in the psychiatric literature, and especially in the legal literature." Given that bias and his lack of training in the this area, the ethical thing to have done was to demur to engaging in the evaluation in the first place.

Bersoff Report, at 15. Indeed, the governing ethical precepts should have precluded Dr. Wolfson's role as Court witness: "A psychiatrist who regularly practices outside his/her area of professional competence should be considered unethical." Psychiatry Ethics (Section 2(3)) at 4.

The same ethical considerations should have prevented Dr. Wolfson from opining on Petitioner's competency inasmuch as he clearly believed Petitioner was not mentally ill, but was a malingerer. Having a doctor as biased as that against a defendant's mental health case, hardly comports with the "adequate procedures" envisioned by the Supreme Court. Pate.

### 4. Dr. Mitchell's Inexperience With DID and Questions of Competency.

Moreover, Dr. Mitchell was not qualified to assess Petitioner's competency. Indeed, he acknowledged that he lacks "forensic credentials" and has no experience conducting competency evaluations "in a forensic sense." NT 10/1/98, 93.

### 5. Mitchell and Wolfson's Conflict of Interest Due To Potential BOP Liability For the Death of Andrew Marti.

Both Drs. Wolfson and Mitchell had additional ethical conflicts which should have disqualified them from playing any role in this case. Bureau of Prison records indicate that BOP mental health professionals, including Drs. Mitchell and Karten, fluctuated in their evaluation of Petitioner's risk of violence to others while incarcerated in federal prison. Indeed, the initial assessment of Petitioner's risk of violence to others concluded his risk was "MODERATE" because of his "intensive history of violence and poor adjustment." See Bersoff Report at 17. Upon his transfer to Lompoc, the staff psychologist who conducted the intake assessment of Petitioner also noted his "extensive history of violence, including hostage taking and kidnapping." Id. Petitioner is reported to have told this psychologist that "I've taken hostages twice – an officer overnight and a psychologist once." Id. A few months later, Petitioner told this same psychologist, while requesting psychotropic medication, that he "took my cell partner hostage and I was within inches of killing

19

him." Id.

Indeed, when Petitioner was transferred to the United States Penitentiary at Allenwood, Dr. Mitchell noted in his intake summary that Petitioner had a history of hostage taking and a history of heroin and PCP usage while in prison. Id. Less than one month later, Dr. Karten recommended that Petitioner be placed in a single cell because of his history of mental illness and need for special programming. Id.

Although Dr. Karten assessed Petitioner's risk of violence to others as "LOW" the records indicate this may have been a mistake. For example, in a series of notes after counseling sessions with Petitioner, Dr. Mitchell, noted Petitioner's increasing difficulty with anger management and his ability to control his emotions. In July of 1995, Dr. Mitchell noted Petitioner had "anger control problems." Id. In November of 1995, Petitioner told Dr. Mitchell that he was "punching his shower walls" and that "he was angry and hurt over his celly." Id. In March of 1996 Dr. Mitchell reported that Petitioner had a "tirade" during a crisis intervention session. One week later, Dr. Karten changed Petitioner's risk assessment from "LOW" to "MODERATE." Three weeks later, Mr. Marti died.

The last entry in Petitioner's psychiatric record prior to the death of Mr. Marti shows concern with Petitioner's self-described problem controlling his anger and impulsivity:

20

> In fact, the last entry before that killing is on March 20, 1996, by a physician who noted that Mr. Hammer disclosed "difficulty in handling anger" and acting "impulsively." As a result, Mr. Hammer was given a prescription for a psychotropic drug. Three weeks later, with no apparent intervention since the visit on March 20th, Mr. Hammer killed his cellmate on April 13, 1996.

Bersoff Report at 18.

Thus, the BOP doctors who testified as both the Government's expert witnesses at trial and the Court's witnesses as to competency, were conflicted as outlined above because of the possible legal ramifications stemming from why Petitioner was housed with other inmates given his long psychiatric history and his history of both assaulting cellmates and hostage-taking. In a nut shell, if Petitioner's actions were caused by a mental health infirmity, the BOP, and Dr. Mitchell personally and professionally, faced civil liability for their failure to predict this violence and to protect Mr. Marti. On the other hand, if the violence was caused not by a mental health deficit, but was a volitional act done by Petitioner, then there would be either no or less potential liability. Thus, there existed great incentives for BOP mental health employees and Dr. Mitchell to conclude that Petitioner was mentally healthy.

Of course all of the above recounted information regarding Petitioner's risk of violence was contained in Petitioner's BOP psychiatric records. It should have alerted trial counsel to this potential conflict, and should have caused counsel to move

21

for the exclusion of any BOP mental health personnel from participating in the evaluation of Petitioner either at trial or regarding competency.

### 6.    Conclusion with Regard to Conflicts – Court Error and Counsel's Ineffective Assistance .

The witnesses relied upon by this Court to make its competency determination were obviously significantly conflicted.  The nature of some of these conflicts were apparent to the Court, and to the extent that this Court relied upon such conflicted witnesses, this Court erred.  To be sure, however, the bulk of the conflicts were not readily apparent to the Court because trial counsel ineffectively failed to realize and /or point them out to this Court.  Counsel were accordingly ineffective.

The Third Circuit has made plain that when a competency proceeding is tinged with constitutional error, relief is required:

> The Supreme Court has consistently held there should be a new trial if there has been some constitutional defect regarding the defendant's competency. See, e.g., Drope v. Missouri, 420 U.S. 162, 183 . . . (1975) (granting a new trial when trial court refused to conduct a hearing to determine the defendant's competence to stand trial); Pate, 383 U.S. at 386-87. . .(ordering a new trial for a defendant who did not receive an adequate competency hearing).

Appel v. Horn, 250 F.3d 203, 217-18 (3d Cir. 2001).  Any fair reading of this record shows that significant constitutional errors occurred during this Court's competency proceedings, and accordingly Petitioner's plea must be vacated.

22

**C.**   **Petitioner Received Ineffective Assistance of Counsel When his Trial Counsel Failed to Present Available and Significant Evidence Bearing on his Lack of Capacity to Enter a Knowing, Intelligent and Voluntary Guilty Plea, and When Counsel Failed to Object to the Court's Reliance on Conflicted Expert Witnesses.**

As described below, trial counsel did not investigate Petitioner's competency to plead guilty. This constitutes deficient performance. It is well-settled that the observations of counsel, who are not trained mental health professionals, are not dispositive of the issue regarding whether counsel was ineffective for failing to request a competency evaluation or challenge a defendant's competency to stand trial or waive his rights. See Odle v. Woodford, 238 F.3d 1084, 1089 (9th Cir. 2001) (counsel is not a trained mental health professional and his failure to challenge petitioner's competency "[d]oes not establish that petitioner was competent"). Nor can counsel "depend on his or her own evaluation of someone's [competency] once he has reason to believe an investigation is warranted." Bouchillon, 907 F.2d at 597. Accord Hull v. Freeman, 932 F.2d 159, 168 (3d Cir. 1991) (when there are indicia that the defendant might have mental health problems, counsel's failure to question the court psychiatrist who concluded that the defendant was competent, or to investigate and develop additional evidence calling that conclusion into question was not excused by counsel's "belie[f] [that the defendant was] competent to stand trial based on his own observations"); see also Pate, 383 U.S. at 386 (defendant's

23

apparently competent demeanor "cannot be relied upon to dispense with a hearing on that very issue"); <u>Griffin v. Lockhart</u>, 935 F.2d 926. 931 (8th Cir. 1991)(same).

Instead, counsel must take steps to determine whether the defendant is competent. Here, there were numerous "reason[s] to believe an investigation [was] warranted," yet no such investigation took place. <u>See</u> <u>Appel v. Horn</u>, 250 F.3d at 216-17 ("Nor do we believe it would impose an undue burden on defense counsel to require some investigation into the defendant's competency, especially in a capital murder case where the trial court has ordered a competency evaluation and hearing."); <u>id</u>. ("under the circumstances in this case, [defense] counsel should have investigated, advocated, or otherwise acted to ensure that there was 'meaningful adversarial testing.'"). Counsel's duty to investigate is even more significant in a case where, as here, the defendant suffers from a severe mental illness (Dissociative Disorder), which is difficult – even for a licenced practitioner– to diagnosis.

      1.    **Counsel's Failure To Investigate Impact of Dissociative Disorder, Brain Damage, Cognitive Impairment, Conditions of Confinement, Posttraumatic Stress Disorder And Borderline Personality Disorder On Petitioner's Competency To Plead Guilty.**

At the time Petitioner expressed a desire to forego his insanity defense and enter a guilty plea – thus ensuring that he would be in the unenviable position of facing a death sentence – counsel knew that Petitioner suffered from DID, brain

damage and the psychological, emotional and mental impairments associated with long-term confinement under onerous conditions. As a result of the trial testimony of their own expert, Dr. Sadoff, counsel knew at the time of the competency proceedings that DID impacts an individual's understanding of the nature and quality of their actions; ability to form intention; and, involves the manifestation of multiple personalities and/or co-presences that assume executive control of the individual's functioning. NT 6/16/98, 88; 103-07 (testimony of Dr. Sadoff describing the symptomotology of Dissociative Identity Disorder).

As a result of the trial testimony of another defense expert, Dr. Gelbort, counsel knew at the time of the competency proceedings that, as a result of Petitioner's brain damage, he lacked impulse control; acted without thinking; responded before he was able to process information; and, was driven by emotionality that disrupts and confuses his ability to think and act logically and rationally. NT 7/18/98, 18; 31-2 (testimony of Dr. Gelbort). Finally, as a result of their pretrial retention of another mental health expert, Dr. Stuart Grassian, counsel was aware at the time of the competency proceedings that the conditions of confinement like those in which Petitioner was subjected over lengthy periods of time, prior to and during the trial in this case, results in significant and compelling psychological, emotional and mental impairments and that Petitioner exhibited the symptomotology consistent with these

25

disorders. See Report of Dr. Grassian .

Thus, there is no question that counsel was aware at the time of the competency proceedings that there existed significant reasons to believe that an investigation into the state of Petitioner's competency at the time he sought to enter a guilty plea was warranted – indeed constitutionally required. Nevertheless, counsel failed to investigate, develop and present the clear evidence calling into question Petitioner's competency.

In short, the competency proceedings were a one-sided affair; absent any indicia of the adversarial testing that is required when such compelling constitutional interests hang in the balance and the skewed proceedings resulted from trial counsel's ineffective failure to marshal the available evidence and object to the Court' reliance on the conflicted, unqualified experts.

### a.    Evidence Presented During Competency Proceedings.

On June 22, 1998, trial counsel informed this Court that after consultation with Petitioner, and against advice of counsel, Petitioner was changing his plea to guilty: "The net result of that conversation is Mr. Hammer is firmly resolved to enter a guilty plea to the count in the indictment, that is the only count under consideration." NT 6/22/98, 9 . S hortly thereafter, the Court expressed its intent to have Petitioner evaluated by Dr. Wolfson for a determination of competency:

26

> We have a psychiatrist in the courtroom who has examined Mr. Hammer in the past, and before I'm going to take any guilty plea...from him or engage in any colloquy, I want him examined as of 10:48 a.m. on June 22, 1998, as to whether he's competent to enter a guilty plea. What do you think about that?

Id. at 11. Mr. Ruhnke expressed his concern that the evaluation should be conducted by a "completely neutral expert." Id at 11-12. The prosecutor, on the other hand, opined that Dr. Wolfson was appropriate, barring any suggestions to the contrary from defense counsel. The Court's concern, however, was not only who did the evaluation, but when:

> All right. Well, what worries me about the suggestion of defense counsel, that Dr. Wolfson is not the right one. I don't have the slightest idea how we're going to get another one. And if we get another one, when that person is going to examine the defendant. It seems to me that this could result in a very considerable delay, and that's highly inadvisable.

Id. at 13. At the time, the jury was in an adjoining conference room awaiting the continuation of Petitioner's trial.

Not surprisingly, even Dr. Wolfson expressed apprehension about the ethical implications of his testifying for the prosecution and then evaluating Petitioner for competency as a "neutral" expert:

> I have some misgivings about this, that may partly be solved by Mr. Hammer's views on the issues. The first one is that although I began this endeavor as a neutral third-party expert and strive to stick to that orientation, Mr. Hammer has now heard me give damaging information

27

about him for several days. And because of that I'm not certain that I'm necessarily the best choice of someone for him to open up to again.

Id. at 16. However, Dr. Wolfson added that "if Mr. Hammer considers me suitable for this purpose that would probably address some of my concerns about this..." Id. Drs. Wolfson and Mitchell subsequently, and with Petitioner's ostensible "consent" evaluated Petitioner for competency and testified as the "Court's witnesses." Id. at 37.

The competency evaluation of Petitioner took one hour and twenty minutes and was conducted in the marshal's office at the federal courthouse. Id. at 39. Dr. Wolfson testified that Petitioner's mood was calm, affect appropriate and that he denied being depressed at that time. Id. at 41. Petitioner acknowledged that his moods "had ups and downs" and that the trial was particularly "stressful." Id. Petitioner characterized the testimony presented thus far during the course of his trial as "a sobering experience." Id. at 45.

Dr. Wolfson described Petitioner as "fully oriented" and noted that Petitioner "did not believe there was any force compelling him to make this decision..." Id. at 48. Dr. Wolfson stated that Petitioner chose his words very carefully when addressing whether he was experiencing hallucinations, stating "he had not experienced anything in the form of psychotic hallucinations." Id. Petitioner also told Dr. Wolfson that he experienced an "internal struggle, different parts of him

28

deciding what he ought to do" and that he, Dr. Wolfson, did not interpret this as "verbatim arguments between alter personalities..." Id. at 48-49, which of course, Dr. Wolfson does not believe exist in any person, and especially not in David Hammer.[8]

Dr. Wolfson testified that Petitioner stated the decision to plead guilty was his decision "rather than any one part of him compelling him to decide what he wanted to decide." Id. at 49.

Petitioner also told Dr. Wolfson that he believed if he were to be found not guilty by reason of insanity, he would be sent back to the Medical Center at Springfield. Id. at 62. However, according to Dr. Wolfson, this was not the motivating factor behind Petitioner's decision to plead guilty. Id.

Finally, Dr. Wolfson acknowledged that he did not believe that Petitioner was mentally ill but rather, "that he's had a mood disturbance" and should be monitored for depression. Id. at 63.

Most telling, however, was Dr. Wolfson's explanation of his "main agenda" in meeting with Petitioner, which reveals both the narrow focus of his inquiry and the limited range of factors he took into consideration in concluding that Petitioner was competent: "My main agenda in this meeting with Mr. Hammer today was to make

---

[8] As noted above, Dr. Wolfson was not a believer in the diagnosis of Dissociative Disorder, and he testified at trial that Petitioner was not mentally ill, but was a malingerer.

29

certain that he hadn't gotten some idea that he would definitely go to Springfield, and that that was such a horrible alternative that he needed to do anything [] in order to stay away from there." Id. at 64.

Also testifying as the Court's expert witness on competency was Dr. John Mitchell, who at the time of the competency hearing was the chief psychologist at the United States Penitentiary at Allenwood, Pennsylvania. Dr. Mitchell began his testimony by acknowledging his prior role as Mr. Hammer's counselor and therapist. Id. at 76. Indeed, Dr. Mitchell had an ongoing therapeutic relationship with Petitioner since June of 1995. Id. at 90. Dr. Mitchell also acknowledged that he had little, if any experience conducting competency evaluations. Id. at 77.

Although both Drs. Mitchell and Wolfson participated in the competency evaluation of Petitioner, their observations were starkly different. For example, Dr. Mitchell's notes from the evaluation reveal Petitioner indeed feared a return to Springfield: "Wanting to avoid mental illness label so as to avoid Springfield and stay — SPG and staying there." Id. at 78. Dr. Mitchell acknowledged during the course of his testimony that Petitioner was concerned about possibly being sent to Springfield if found not guilty by reason of insanity. Id.

Dr. Mitchell also noted that Petitioner found the trial testimony very difficult to endure from a mental health perspective:

30

> I believe we asked him about how he had been feeling about the testimonies and trial proceedings, and David mentioned that it's been hard for him to hear from family members or friends, or even just any witnesses for that matter who paint him as a very dangerous person and individual. I think for him that was news to him in a sense, particularly coming from certain witnesses.

Id. at 81. Dr. Mitchell's notes also reflected Petitioner's sense of both remorse and recognition that a different "part" of him was responsible for the murder: "Important to acknowledge responsibility of having killed A. Marti regardless of what "part" of him did so. He was responsible." Id. at 83. Dr. Mitchell admitted that Petitioner's reference to different "parts" of himself was not new:  Petitioner frequently told Dr. Mitchell during their counseling sessions that he has "different parts" of himself. Id. at 84. However, Petitioner again expressed his disdain over "being labeled mentally ill." Id. at 83.

Petitioner also acknowledged that he heard voices, just not in the psychotic context: "And when I asked David about whether he had experienced any auditory hallucinations he answered several times no, but he would also put a qualifier in it, such as not in the sense that you're asking, things like that." Id. at 87-88. No further exploration of this issue, or the issue of Petitioner's admitted "different parts" took place. Indeed, Dr. Mitchell testified that while Petitioner has "referred in the past to different parts of himself" he never used the phrase "alternate personalities." Id. at 92.

31

### b.    Evidence of Incompetence Ignored By Trial Counsel and Not Presented to this Court.

The competency hearing held before Petitioner's guilty plea did not comport with due process because of trial counsel's failure to bring forth the available and pertinent information related to Petitioner's then existing state of mind. Indeed, trial counsel did not consult with, retain or present a mental health expert to testify concerning Petitioner's competency at that point in time.

Yet, such experts were readily available: indeed counsel had already retained them and had them evaluate Petitioner. For instance, trial counsel had at their disposal the services of Dr. Gelbort, who, prior to Petitioner's decision to plead guilty, had concluded Petitioner suffers from brain damage and resulting cognitive and emotional impairments. See Declaration of Dr. Michael M. Gelbort, Ph.D., at 1-2. Dr. Gelbort's testing led him to conclude that Petitioner's "disinhibition and impulsivity appear as a result of his brain dysfunction" and that his behavioral deficits are exacerbated by the emotional trauma caused by his abusive upbringing. Id. at 2. At the time of Petitioner's aborted trial, waiver and plea of guilty, Dr. Gelbort believed that as a result of his brain dysfunction, Petitioner's "actions are governed far more by emotion than by thought." Id.

32

Dr. Gelbort's testing revealed that Petitioner suffers primarily from frontal lobe damage with some damage also present in his temporal lobe. These areas of the brain help regulate and control behavior and personality.

As a result of his pre-trial testing of Petitioner, Dr. Gelbort concluded to a reasonable degree of psychological and neuropsychological certainty that the etiology of the cognitive dysfunction and emotional and personality impairments suffered by Petitioner impacts his reasoning and judgment. The cognitive deficits suffered by Petitioner include visual spatial attention deficit; sensory deficits; frontal lobe impairments, including impulsivity, disinhibition and idiosyncratic and affected reasoning and judgment. Id. at 2.

Recently, Dr. Gelbort had an opportunity to re-evaluate Petitioner and to review records and documents pertaining to Petitioner's plea of guilty, including the competency transcripts and Petitioner's colloquy. As a result, Dr. Gelbort opined that Petitioner's ability to enter a knowing, intelligent and voluntary plea of guilty would have been difficult, if not impossible, because Petitioner's impairments impact his ability to assess multiple factors and reach rational conclusions based on rational reasoning concerning complex matters.

If asked, and he was not, Dr. Gelbort would have told trial counsel that Petitioner was not competent to knowingly, intelligently and voluntarily waive his

33

right to stand trial and enter a plea of guilty:

> Current counsel has provided those records to me. Counsel has also provided to me records indicating that Mr. Hammer has, on a number of occasions, made various decisions to waive his rights on appeal and during post-conviction proceedings, followed by requests to withdraw those waivers. After reviewing the records and conducting a follow-up evaluation, it is my opinion, to a reasonable degree of neuropsychological certainty that, given his substantial impairments in reasoning, judgment and impulse control, combined with his emotionality, Mr. Hammer was incapable of making a knowing, voluntary, and intelligent decision as to a waiver of those rights. As a result of his organic impairment, he did not connect all the factors involved in making a reasoned decision and his waivers were the product of, and substantially affected by, his psychological, emotional and cognitive impairments. At a minimum, Mr. Hammer's neuropsychological impairments have substantially affected his ability to waive his legal rights.
>
> It is also my opinion to a reasonable degree of psychological and neuropsychological certainty that Mr. Hammer's vacillation between waiving his appeals and going forward with litigation is a direct manifestation of his emotionality and the impulsivity, disinhibition and impaired judgment characteristic of his brain dysfunction.

Id. at 4. Trial counsel's failure to inquire of Dr. Gelbort whether, given his test results, he had an opinion as to Petitioner's competency to plead guilty constitutes ineffective assistance.[9]

---

[9] Dr. Gelbort also noted that because Petitioner is intelligent, and appeared articulate during his in-court colloquy and during his argument before the Third Circuit Court of Appeals, does not belie his conclusion that Petitioner was nonetheless incompetent to rationally enter a plea of guilty. Despite Petitioner's intelligence, he suffers from cognitive impairments that substantially impact his ability to enter a knowing, intelligent and voluntary decision to plead guilty to

Trial counsel also had at their disposal, Dr. Stuart Grassian, M.D., who also evaluated Petitioner pretrial. Dr. Grassian is a nationally recognized expert on the psychological ramifications of onerous conditions of confinement su ch as those endured by Petitioner, and the impact of such conditions on an individual's cognitive abilities and rational decision-making, i ncluding the capacity to make knowing, intelligent and voluntary decisions. Dr. Grassian evaluated Petitioner near the time of trial and again this past December, 2004. Dr. Grassian is familiar with the conditions of confinement endured by Petitioner during the trial, the conditions of confinement endured by Petitioner during his stay at the Federal Medical Center in Springfield, Illinois, his incarceration in the Oklahoma Department of Corrections and while incarcerated on federal death row.

Dr. Grassian opines that individuals such as Petitioner who have pre-existing neurocognitive damage are most severely affected by the psychological consequences associated with solitary confinement. As noted above, Petitioner suffers from brain damage that predates his incarceration. Dr. Grassian's extensive work in this area of psychiatry demonstrates such conditions exacerbate pre-existing mental illness, and that in this case, Petitioner's conditions of confinement would have exacerbated the various sequella associated with his psychiatric diagnoses.

---

capital murder.

35

Petitioner has been subjected to prolonged periods of solitary confinement and isolation. While incarcerated in the Oklahoma Department of Corrections, Petitioner was held at one time in a specially designed underground cement cell containing no windows and very little lighting. Petitioner was kept isolated from other inmates and had very little contact with anyone other than brief contact with guards. At various times throughout his long history of incarceration Petitioner has been held in solitary confinement.

As a result of his long history of exposure to solitary confinement, Petitioner suffered disorientation, intense agitation and paranoia. Individuals subjected to the type of long-term solitary confinement conditions such as Petitioner also suffer from perceptual distortions, illusions, hallucinations, panic attacks, difficulty with thinking, concentration, memory, intrusive obsessional thoughts, emergence of primitive aggressive ruminations and problems with impulse control.

Dr. Grassian believes that Petitioner suffers from many of these classic negative symptomology associated with the conditions of his confinement. Additionally, Dr. Grassian concluded that the negative psychological ramifications outlined above were exacerbated by Petitioner's overt dread about returning to the Federal Medical Center at Springfield, Illinois. While held at the Federal Medical Center, Petitioner was exposed to horrific conditions that in conjunction with his pre-

36

existing mental illness, brain damage, and the psychological ramifications of solitary confinement, led to his decision to plead guilty.

Dr. Grassian noted that while incarcerated at the Federal Medical Center, Petitioner was subjected to conditions and experiences that both terrified him and were psychologically devastating. Petitioner was transported to various facilities for medical testing in the middle of the night by masked guards and handcuffed to a wheel chair; he was forced to wear a stun belt; while in his cell, subjected to having excrement thrown at him by other inmates; he was also kept awake for days on end by the howling and screams of the other mentally ill prisoners. Dr. Grassian believes that Petitioner would have done anything to avoid a return to the Federal Medical Center, including plead guilty to First Degree Murder and face a sentence of death.

Dr. Grassian has concluded that under these circumstances, Petitioner's decision to forego his insanity defense and plead guilty was not rational; nor was his decision to plead guilty knowing, intelligent and voluntary.

This information was also at counsel's disposal and should have been presented, in conjunction with the evidence of Petitioner's profound mental illness and brain damage, to this Court for consideration when evaluating Petitioner's competency and whether his plea of guilty was knowing, intelligent and voluntary.

Finally, counsel failed to consider the impact of Petitioner's DID on his

37

capacity to plead guilty. This illness not only impacts his personality, but actually alters his primary sense of self and involuntarily replaces it with a personality he cannot control.

Despite believing that Petitioner's actions in killing Mr. Marti were driven by his Dissociative Disorder – Petitioner was not able to control the personality known as "Jocko" – counsel did not consider and evaluate the import of Petitioner's multiple personalities on his decision to plead guilty and face a death sentence.

This is all the more surprising given counsel's reliance on Petitioner's profound mental illness in arguing to the jury that Petitioner was not responsible for his actions: "[t]his case really comes down to one word: "I-N-S-A-N-I-T-Y, the state of mind of David Paul Hammer...What the defense disputes is whether David Paul Hammer is legally responsible for that death." NT 6/3/98 at 23 (Opening statement of Ronald Travis, Esq.). Indeed, counsel told the jury that prior to his incarceration in Oklahoma, Petitioner "was in and out of mental facilities being treated for mental health problems" and that while incarcerated, Petitioner has been treated with a wide variety of psychiatric medications over the years and suffers from multiple personality disorder." Id. at 26.

Not only did counsel believe that Petitioner's actions in killing Andrew Marti were the direct result of Petitioner's Dissociative Identity Disorder, he also noted

38

during the course of his representation of Petitioner that Petitioner reported Jocko's presence and influence on Petitioner's actions and thoughts. For example, in a phone call with Petitioner dated August 13, 1997, Mr. Travis notes "how do you know which personality you're talking to?" Five days later, Petitioner told counsel "Jocko taking over a lot more last few days. Wants to talk with me. Pissed off. Jocko knows what everyone does. DPH doesn't always know what DPH doing." Another notation dated September 19, 1997, indicates Petitioner reported that Jocko was "punishing [Petitioner] severely" for some action by Petitioner that Jocko did not like. Finally, in an undated notation, counsel wrote that Petitioner was "afraid of what Jocko will do now. Will want to get even."

Thus, not only was counsel aware that one of Petitioner's multiple personalities – Jocko – killed Mr. Marti, but that this personality was one Petitioner feared and a personality that exercised influence of over Petitioner's thoughts and actions.

Counsel's notations about Jocko's emergence during the course of counsel's representation of Petitioner, Petitioner's fear of Jocko and the fact that Petitioner often does not know what he – one of his alter personalities – has done, is entirely consistent with Petitioner's diagnosis of Dissociative Identity Disorder and should have made counsel wary about the motivation and impetus behind Petitioner's mid-trial decision to plead guilty. Counsels' failure to incorporate this illness into the

39

Court's consideration of competency, and instead leaving the field to the biased and conflicted Government experts, constituted grossly ineffective assistance.

Moreover, counsel were aware pretrial that Petitioner had a history of making impulsive decisions and then changing his mind. For example, In May, 1997, Mr. Hammer filed *pro se* motions requested to discharge counsel and proceed *pro se*. (Document 104). Subsequently, Mr. Hammer withdrew those motions. See Document 116 (Order granting Hammer's motion to withdraw motion to proceed *pro se*). In August, 1997, Mr. Hammer filed a *pro se* motion to change his plea, stipulate to aggravating factors and waive any and all mitigation evidence, (Document 159), and, again, ultimately changed his mind. Likewise, counsel was aptly aware of the onerous conditions of confinement pretrial because counsel litigated the extent of those conditions pretrial (Document 10).

Having notice of Petitioner's propensity for fluctuation and the onerous conditions in which he was subjected up to and including the time of trial, there is no question that counsel was on notice that Petitioner's might do precisely what he did. Effective counsel would have been prepared for this eventuality during the trial. Such preparation would have included access to the expert witnesses that they retained to opine regarding Petitioner's mental health deficits.

40

Petitioner has since been evaluated by a nationally recognized expert on DID, Dr. Richard Kluft, M.D.  Dr. Kluft conducted a personal psychiatric evaluation of Petitioner on October 24, 2004, at which time he administered two specific tests designed to help identify Dissociative Identity Disorder: the Dissociative Experiences Scale (DES) and the Structured Clinical Interview for DSM-IV Dissociative Disorders - Revised (SCID-D-R).  The DES is not specifically a diagnostic test. Rather, according to Dr. Kluft, it is used to identify those patients who should be considered likely to suffer from a dissociative disorder. Petitioner scored in the range of a serious dissociative disorder and, the test showed, he was not malingering.

On the SCID-D-R test, which Dr. Kluft describes as a semi-structured diagnostic interview, Petitioner's score of eighteen (18) out of twenty (20) is indicative of dissociative identity disorder and/or a closely allied form of dissociative state. Dr. Kluft reports that Petitioner has a history of trauma and childhood sexual abuse that are associated with the development of Dissociative Identity Disorder.

Based upon his evaluation, testing and record review, Dr. Kluft has diagnosed Petitioner as suffering from Dissociative Identity Disorder, Posttraumatic Stress Disorder, Antisocial Personality Disorder, (rule out) Major Depression, Recurrent, Moderate, and Polysubstance Abuse. Dr. Kluft also specifically assessed Petitioner for malingering and concluded that Petitioner did not display any of the typical

41

findings associated with malingering and thus, in his opinion, was not malingering or faking mental illness.

In his evaluation of Petitioner, Dr. Kluft identified the following factors found in Petitioner which are indicative of Dissociative Identity Disorder: Petitioner hears voices inside his head telling him to do things or commenting on things he is doing; does not recall what has happened during travel; finds himself dressed in clothing he does not remember putting on; finds things among his possessions he does not recall buying, such as commissary orders including items he does not recall ordering and that are not to his taste; sees himself as if he were watching another person; experiences people, objects and the world as unreal; experiences his body as if it does not belong to him; and finds evidence he has done things he does not recall doing. Dr. Kluft also noted that Petitioner often feels as if he is being controlled by another personality and powerless to control his behavior.

Dr. Kluft has concluded that at the time Petitioner waived his right to a jury trial and entered a plea of guilty, he was not competent and his waiver was not knowing, intelligent and voluntary because it was "driven by the fragmentation and compromised control associated with dissociative identity disorder." See Report of Richard P. Kluft, M.D., at 11. Indeed, Dr. Kluft added that Petitioner's plea of guilty was not knowing, intelligent and voluntary because in part, "the dissociative identity

42

disorder disrupted this man's capacity to have knowledge of his circumstances, [and] the ability to access and utilize his intelligence..." Id.

Dr. Kluft's conclusion that Petitioner was not competent at the time of his waiver and plea of guilty is supported by the opinion of Dr. Neil Blumberg, M.D., a forensic psychiatrist. Dr. Blumberg, who also reviewed numerous records and conducted a lengthy evaluation of Petitioner, concluded that at the time of Petitioner's plea of guilty, he was unable to make a rational, knowing, intelligent and voluntary decision because of the constellation of mental illnesses that Petitioner suffers, including Posttraumatic Stress Disorder, Chronic, Borderline Personality Disorder and severe emotional distress. Declaration of Neil Blumberg, M.D., at 7.

Dr. Blumberg has concluded that when Petitioner decided to abandon his trial and plead guilty he was experiencing severe emotional distress as a result of an exacerbation of his Posttraumatic Stress Disorder, Chronic, and Borderline Personality Disorder. The cumulative stress of hearing testimony concerning the severe abuse he sustained during childhood and adolescence caused him to re-experience those traumatic experiences.

Dr. Blumberg also found that Petitioner's fear of being labeled "insane" and mentally ill would mean he would be committed again to the Federal Medical Center in Springfield, Illinois, where Petitioner previously endured horrific conditions,

43

overwhelmed Petitioner psychologically and led to his impulsive decision to enter a plea of guilty.

Dr. Blumberg opined that Petitioner's Posttraumatic Stress Disorder, Chronic, Borderline Personality Disorder and Antisocial Personality Disorder were directly caused by the severe verbal, emotional, physical and sexual abuse that he sustained throughout his childhood and adolescence.    Dr. Blumberg noted that Petitioner continues to suffer active symptoms of all three disorders.

In order to provide this Court with demonstrative proof of Petitioner's organic brain dysfunction and the resulting impact upon his ability to make rational decisions, Petitioner was also evaluated by Ruben Gur, Ph.D.  Dr. Gur recently completed a neuroimaging exam of Petitioner's brain and also conducted extensive neuropsychological testing and review of Dr. Gelbort's results.  Dr. Gur concluded that Petitioner suffers from moderate to severe brain damage:

> They converge to provide a strong basis for the opinion that Mr. Hammer suffers from moderate to severe brain damage reflected in his brain anatomy, physiology and behavior.  This deficit is severe and of the kind directly relevant to issues of impulse regulation, judgment and social interaction.

Declaration of Ruben C. Gur, Ph.D., at 7.  Not only was the existence of Petitioner's brain damage confirmed by Dr. Gur's behavioral imaging of Dr. Gelbort's results and his own computerized neuorpsychological testing, the anatomical studies conducted

44

via MRI and PET imaging confirm Petitioner's brain structure is severely abnormal.

For example, Dr. Gur concluded that "Mr. Hammer has a highly unusual brain structure when compared to normal males" and that his brain exhibits regional abnormalities and overall, is abnormally small. Id. at 3.  In short, Dr. Gur's testing reveals Petitioner's brain never fully developed:

> The etiology of this abnormality is consistent with organic causes, such as pre-natal alcohol use and failure to thrive as well as external causes, such as abuse and neglect.  Although occurring during developmental years, inadequate brain development, such as that suffered by Mr. Hammer, results in life-long impairments, including learning disabilities, difficulties with impulse modulation and impaired social interactions.  The specific anatomic abnormalities observed in Mr. Hammer can have severe behavioral consequences.

Id. Moreover, Dr. Gur's testing demonstrates that the areas of Petitioner's brain that are most damaged govern behavior and decision-making relevant to his waiver of trial, appeal and his decision to plead guilty:

> Damage to the frontal and parietal areas has also been associated with deficits in the regulation of emotions, specifically depression and suicidality.  This may have produced the suicidal behavior such as that exhibited by Mr. Hammer during the course of his trial and appellate proceedings.

Id. at 4.  This information, while readily available, was never presented to this Court for consideration during the competency proceedings.

45

Finally, Dr. Gur found that Petitioner's severely abnormal brain function impacted his behavior and decision-making:

> The abnormalities observed in the PET study establish that Mr. Hammer has significantly abnormal brain function and significant organic injury, which existed at the time of the offense, trial and during post-trial proceedings. The abnormalities have severe consequences for behavior, because frontal activation is needed to modulate limbic stimulation. Lack of such modulation leads to reduced impulse control and diminished ability to plan and place behavior in its context.

Id. at 5. Counsel failed to explore the impact of Petitioner's neuorpsychological impairments on his decision to waive trial and plead guilty to first degree murder, information which was available to them and which directly impacted Petitioner's behavior.

In sum, counsel had many tools at their disposal to counter the testimony of Drs. Mitchell and Wolfson regarding competency – they used none of them. There could have been no tactic or strategy for failing to bring this available expertise to bear on the seminal question of competence and counsels' failure to do so was ineffective.

### D.    The Waiver of Appellate Rights Was Also Invalid.

On October 1, 1998, this Court held a hearing to determine whether Petitioner was competent to waive counsel and waive his right to file a direct appeal challenging his conviction and sentence of death. The prosecution again relied upon the two

46

conflicted mental health professionals, Drs. Wolfson and Mitchell. Again, defense counsel failed to provide constitutionally effective assistance of counsel when they failed to challenge the adequacy of the conflicted mental health professionals and failed to marshal any evidence demonstrating Petitioner's lack of capacity to make a knowing, intelligent and voluntary waiver of his rights.

Given the conflicts and the ineffective assistance of counsel, it came as no surprise that these witnesses came to the same conclusion that they had earlier arrived at: Petitioner was competent to waive his rights. See NT 10/1/98, 13-14 (Dr. Wolfson); id. at 108 (Dr. Mitchell).

Trial counsel's performance in this competency proceeding mirrors their performance in the earlier competency proceeding: they utterly failed to conduct any investigation whatsoever into the various factors impacting Petitioner's competency and failed to bring such factors to the attention of this Court. Counsel rendered ineffective assistance. Petitioner is entitled to the reinstatement of his appellate rights.

**GROUNDS SIX AND NINETEEN:** **PETITIONER IS A SERIAL FALSE CONFESSOR. THE GOVERNMENT VIOLATED DUE PROCESS WHEN IT FAILED TO DISCLOSE EVIDENCE SHOWING THIS, AND COUNSEL WAS INEFFECTIVE FOR FAILING TO INVESTIGATE AND PRESENT THIS EVIDENCE.**

The Government failed to disclose to trial counsel evidence showing that

47

Petitioner falsely confessed to at least seven murders. Trial counsel rendered ineffective assistance by failing to investigate and utilize this information. Taken together, these constitutional violations prejudiced Petitioner with regard to his guilt phase; the penalty phase; the veracity and validity of his guilty plea and the competency proceedings related to his guilty plea and waiver of appellate rights. It cannot be doubted that Petitioner is a disturbed individual as illustrated, *inter alia*, by his persistent attempts to incriminate himself in phantom but serious offenses. Had counsel had this information and/or if the Court was aware of it, it would have placed all of the above-described proceedings in a different light and there is a reasonable probability that it would have altered the outcome of each of these critical phases of the proceedings.

The law governing these issues is well known. The Due Process Clause of the Fourteenth Amendment to the United States Constitution requires a prosecutor to disclose favorable evidence to the accused. Brady v. Maryland, 373 U.S. 83, 87 (1963); Giglio v. United States, 405 U.S. 150, 153-56 (1972); United States v. Bagley, 473 U.S. 667, 676 (1985); Kyles v. Whitley, 514 U.S. 419, 437 (1995). Evidence is "material" under Brady and its progeny when "[t]he favorable evidence could reasonably be taken" to put the case "in such a different light as to undermine confidence in the verdict." Kyles, 514 U.S. at 435. Indeed, the purpose of the Brady

doctrine is "[t]o ensure that a miscarriage of justice does not occur." <u>Bagley</u>, 473 U.S. 675.

The duty to disclose is especially important in capital cases where heightened safeguards, greater protections for the defendant and a heightened scope of judicial review are required by the United States Constitution. <u>See</u>, <u>e.g.</u>, <u>Beck v. Alabama</u>, 447 U.S. 625 (1980); <u>Caldwell v. Mississippi</u>, 472 U.S. 320 (1985).

Material evidence subject to the dictates of <u>Brady</u> and its progeny is not limited to exculpatory evidence "[t]hat reflects upon the culpability of the defendant. Exculpatory evidence includes evidence of an impeachment nature that is material to the case against the accused." <u>Napue v. Illinois</u>, 360 U.S. 264, 269 (1959).

Moreover, counsel have a Sixth Amendment obligation to provide effective assistance in the guilt and penalty phases of trial, as well as during competency proceedings. <u>Strickland</u>, 466 U.S. at 690-91; <u>United States v. Gray</u>, 878 F.2d 702, 710 (3d Cir. 1989). Counsel must make a reasonable effort to obtain available evidence which both diminishes the Government's case and/or supports the defense. <u>Gray</u>, 878 F.2d at 711. Counsel's duty is to make an independent investigation of the facts and circumstances. <u>Nealy v. Cabana</u>, 764 F.2d 1173, 1177 (5th Cir. 1985). Where counsel fails to investigate and interview potential witnesses, he has no reason to discount their worth, and his inaction constitutes negligence, not strategy.

49

Workman v. Tate, 957 F.2d 1339, 1345 (6th Cir. 1992).

The Government knew that Petitioner had a demonstrable propensity to falsely confess to murders he did not commit and murders that never happened. Yet, despite possessing this information, including information related to the infamous murder of activist Karen Silkwood, the Government failed to bring this information to the attention of this Court or Petitioner's defense counsel.

Indeed, in this case itself, the Government initially filed notice of its intent to rely upon Petitioner's alleged murder of Mr. Kenneth Kenner. However, shortly before trial, on August 29, 1997, the Government filed a *Motion To Amend Notice of Intent to Seek Death Penalty* wherein it admitted that Petitioner had falsely confessed: "It appears that Hammer may have wrongfully admitted his involvement in Kenner's death by implicating two individuals who did not commit that offense." Id. at ¶ 5.

The Government also knew that in 1988, Petitioner confessed to the murder of a woman who had been found in 1983 along a highway in Chautauqua County, New York. In his letter detailing the 1983 murder, Petitioner stated that he also killed his accomplice, an eighteen year old male, who allegedly helped him dispose of the woman's body. Not satisfied, Petitioner then told the Chautauqua County investigators that he later murdered a woman in Colorado and dumped her body somewhere in the mountains. After investigation, the Chautauqua County authorities

50

concluded Petitioner was lying: he did not murder the woman found in 1983 and there was absolutely no evidence that the other two murders he confessed to committing actually occurred.

Petitioner also confessed to murders in Louisville, Kentucky, two murders in Oklahoma and, in what was the pinnacle of his history of false confessions, told law enforcement authorities that he ordered the killing of Karen Silkwood.

In short, Petitioner's storied history of false confessions, fed by his unrelenting history of mental illness, including impulsive and self-destructive behaviors, was relevant to his ability to challenge the Government's reliance upon his confession to the Marti murder and the facts Petitioner provided, to the exclusion of all other evidence.

Moreover, this information was not presented to Drs. Wolfson and Mitchell for consideration during the competency proceedings and was not utilized by defense counsel in their cross examination of either doctor at any stage of the proceedings. Such information would have been a powerful tool to demonstrate that Petitioner's decision making is far from rational.

Thus, significant evidence casting substantial doubt on the veracity of Petitioner's confession in this case was in the possession of the Government. Indeed, while routinely couching Petitioner as a liar when he offered confessions to a slew

51

of other murders, the Government in this capital case chose to ignore Petitioner's undeniable history of unreliably providing false details and facts pertaining to his alleged criminal activities and instead accepted what he told them without any further critical examination of the evidence.   Nor was this information presented to this Court prior to its acceptance of Petitioner's plea of guilty.

In addition to the Government's failure to disclose this important information to counsel, counsel was also derelict for not discovering it.   Had trial counsel conducted an adequate investigation into Petitioner's history of false confessions – and in view of the Government's withdrawal of the Kenner aggravating circumstance, they had reasons to be aware of this history – it would have alerted trial counsel to the fact that much of what Petitioner told the authorities about the death of Mr. Marti may have little or no bearing on reality or the truth and that the factual predicate for his plea of guilty was likely not true.

That investigation would not have been difficult.  For example, a memo dated October 1, 1993, contained in Petitioner's Oklahoma Department of Corrections file, includes a synopsis of many of Petitioner's false confessions, including not only murders but bomb plots and assassination attempts, all of which proved to be bogus. Included in this 1993 memo were the following false confessions:

Claimed responsibility for murder of an Enid man, Carl I. Singer in June of 1985;

Claimed responsibility for murder of a Maryville, TN man, Kenneth Kenner, in November of 1986;

In 1993, inmate Hammer alleged he hired someone to murder a Youngstown, Ohio man and to prove his involvement had instructed the killer to place a quarter in the victims mouth. Hammer referred to this as the "two bit killing." No evidence ever found to support this.

Threatening to have Presidential candidate, Jesses Jackson, assassinated in 1988. U.S. Secret Service investigated.

Inmate Hammer also stated at one time he had knowledge concerning murder of Karen Silkwood, and that he was involved. No evidence ever found to support this.

See Interview summary dated October 1, 1993. None of this information was utilized by counsel in formulating their initial guilt phase defense; their challenge to Petitioner's competency to pled guilty or waive appellate rights; in challenging the veracity of his rendition of events in this case that formed the factual predicate for his plea of guilty; or in the penalty phase as evidence of just how ill he is.

Nor was this the only indication of Petitioner's propensity to falsely confess in possession of trial counsel. In June of 1997, the investigator for trial counsel interviewed Mr. Randy Mercks of the Blount County Sheriff's Department about Petitioner's alleged confession to a murder in Tennessee. Mr. Mercks noted his belief that Petitioner was "lying." Similarly, in a letter dated August 4, 1988 to Petitioner

53

from the Chautauqua County Sheriff's Department, the investigator, Mr. Randy Vander Shaaff, informed Petitioner that they had investigated his confession concerning a "Jane Doe" murder and found nothing to support it. In fact, Mr. Schaaf rhetorically asked: "Due to the fact the name you gave to our victim does not check out, I begin to wonder if this is a con job, which you made me aware of that you are noted for." Id. Finally, in a file note, Petitioner's trial counsel noted Petitioner's confession to the murders of two girls: 8/20/86 - confession of two girls. Murders." Likewise, none of this information was investigated, developed or utilized to challenge the accuracy of Petitioner's confession in this case or his competency.

Thus, the proceedings leading to Petitioner's plea of guilty were not constitutionally reliable. Additionally, this information would have been useful fodder for defense counsel during trial and during penalty phase, when it could have been used to challenge the reliability of the opinions offered by Drs. Wolfson, Mitchell and Karten and could have also been provided to the defense experts for their consideration and use.

Additionally, counsel ineffectively failed to investigate and produce statements from other prisoners who would have undercut the validity of the factual basis for the guilty plea. Other inmates were aware that Petitioner's statements regarding the circumstances leading up to Mr. Marti's death were false; that those witnesses

54

presented by the Government were aware that those statements were false; and, that Hammer's statements to other inmates and the authorities were driven by factors other than presenting an accurate reflection of the circumstances of Mr. Marti's death. Counsel's failure to conduct an independent investigation of other inmate witnesses was prejudicially deficient in violation of the Sixth Amendment and the Government's failure to turn over information regarding the identity of these witnesses violated Petitioner's Due Process rights. For these reasons, Petitioner is entitled to relief.

**GROUND SEVEN:   GOVERNMENT SUPPRESSION OF EXCULPATORY EVIDENCE.**

The amendment of this ground for relief relates to DNA testing that is ongoing. Without the results of this testing, Petitioner is currently unable to brief this issue. Petitioner adopts and incorporates all prior submissions regarding the bases for conducting forensic testing.

**GROUNDS TEN AND THIRTEEN:   PETITIONER WAS CONSTRUCTIVELY DENIED COUNSEL DURING THE COMPETENCY PROCEEDINGS AT TRIAL AND REGARDING DIRECT APPEAL, OWING TO TRIAL COUNSELS' CONFLICT OF INTEREST AND BY THIS COURT'S DECISION TO CONDUCT COMPETENCY PROCEEDINGS IMMEDIATELY UPON LEARNING OF PETITIONER'S DESIRE TO PLEAD GUILTY.**

There is no question but that a criminal defendant has a Sixth Amendment right to counsel during competency proceedings. U.S. v. Cronic, 466 U.S. 648 (1984),

55

<u>Appel v. Horn,</u> 250 F.3d 203 (3d Cir. 2001). That right was violated in this case in two respects. First, as articulated in Ground Ten, Petitioner's counsel announced to the Court that they were conflicted from continuing their representation at the time that Petitioner stated his desire to plead guilty. This Court should have honored their request to be relieved at that time, and should have appointed new, non-conflicted counsel. The failure to do so resulted in the constructive denial of counsel regarding the competency issue before the Court.

That right was also violated when this Court decided to move into competency proceedings immediately upon learning of Petitioner's stated-desire to plead guilty. No lawyer could have provided adequate representation on the competency question in the constricted time frame during which this Court decided this question.

**GROUND FOURTEEN:    THE IMPACT OF THE REWARDS PROVIDED TO BOP PERSONNEL.**

In this claim for relief, Petitioner has asserted that due process was violated when BOP personnel involved in his case were provided rewards, and this fact was not disclosed to counsel. Petitioner has amended this claim to include an allegation that trial counsel were ineffective for not discovering this fact on their own. Petitioner incorporates by reference, the previous discussion of the law of ineffectiveness, and relies upon that discussion.

56

**GROUND EIGHTEEN:**    **COUNSELS' INEFFECTIVE FAILURE TO RAISE AND LITIGATE THE VARIOUS CLAIMS FOR RELIEF.**

Petitioner's trial, appellate and competency proceedings were racked with constitutional error, as set forth above and in prior submissions. Prior counsels' failures to identify, raise and litigate the various errors and omissions discussed throughout were ineffective. Petitioner incorporates his prior discussion of the law of ineffectiveness.

**GROUND TWENTY-TWO:**    **COUNSELS' INEFFECTIVE FAILURE TO INSIST THAT THE JURY BE SHOWN THE ENTIRE TAPE OF THE HYPNOSIS SESSION.**

During trial, the defense sought to show the jury a videotape of the hypnosis session with Drs. Sadoff and Dubin. While the Court permitted the defense to show part of the videotape, it precluded the defense from showing the entire session. *See* NT Vol. 10 at 47. Specifically precluded from the showing was approximately thirty-six minutes prior to the actual hypnosis and eight minutes following the hypnosis.

During trial and the penalty hearing, the defense offered evidence that Mr. Hammer suffered from DID. Evidence supporting that diagnosis was, therefore, relevant and material to the jury's consideration.

As Dr. Kluft explains, the portions of the videotape that were excluded contain evidence supporting DID. Indeed, Dr. Kluft notes: "both before and during the

57

hypnosis, the most impressive finding is the picture of fluctuating presences and copresences of David Paul Hammer and Wilbur." Report of Dr. Kluft at 5. In Dr. Kluft's opinion, the interview prior to the actual hypnosis was compelling evidence of the presence of dissociative phenomena.

As this evidence provided further support of Dr. Sadoff's diagnoses and conclusions, it was directly relevant to critical issues of the defense at trial and during the penalty hearing. Accordingly, the Court's preclusion of those portions of the videotape denied Hammer his Fifth, Sixth, Eighth and Fourteenth Amendment rights.

The United States Supreme Court has declared as "beyond dispute" that a death sentence is constitutionally invalid if the defendant is prevented from presenting mitigating evidence relating to his personal history, background, character, or record, or any aspect of the circumstances of the offense that provide a basis for the jury to spare the defendant's life. Mills v. Maryland, 486 U.S. 367, 374 (1988); see Lockett v. Ohio, 438 U.S. 586, 605 (1978); Eddings v. Oklahoma, 455 U.S. 104, 110-12 (1982); Skipper v. South Carolina, 476 U.S. 1, 4-5 (1986); Hitchcock v. Dugger, 481 U.S. 393, 394 (1987); Sumner v. Shuman, 483 U.S. 66, 75 (1987); Mills v. Maryland, 486 U.S. 367, 374-75 (1988); Penry v. Lynaugh, 492 U.S. 302, 307, 319 (1989) (Penry I); McKoy v. North Carolina, 494 U.S. 433, 442 (1990). The Court has explained that "it is not relevant whether the barrier to the sentencer's consideration

58

of all mitigating evidence is interposed by statute, by the sentencing court, or by an evidentiary ruling," <u>Mills</u>, 486 U.S. at 375.

Likewise, the due process clause of the Fifth Amendment and the compulsory process clause of the Sixth Amendment together guarantee the accused the right to present a recognized defense, and the related right to be heard. <u>Crane v. Kentucky</u>, 476 U.S. 683, 690-91 (1986) ("Whether rooted directly in the Due Process Clause . . . or in the Compulsory Process or Confrontation clause of the Sixth Amendment . . . the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense.") (citations and internal quotations omitted); <u>In re Oliver</u>, 333 U.S. 257, 273 (1948); <u>Washington v. Texas</u>, 388 U.S. 14, 22-23, (1967); <u>Chambers v. Mississippi</u>, 410 U.S. 284 (1973) ("The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations. The rights to confront and cross-examine witnesses and to call witnesses in one's own behalf have long been recognized as essential to due process."); <u>Davis v. Alaska</u>, 415 U.S. 308 (1974); <u>United States v. Cronic</u>, 466 U.S. 648, 656 (1984); <u>Strickland v. Washington</u>, 466 U.S. 668, 684-685 (1984); <u>California v. Trombetta</u>, 467 U.S. 479, 485 (1984)); <u>Rock v. Arkansas</u>, 483 U.S. 44, 51 (1987).

By precluding the defense from presenting the entire videotape, the Court limited Petitioner's defense and mitigation presentation and prevented the defense

from providing a complete picture of Petitioner's mental illness. Counsel's failure to object and properly raise and litigate this claim constitutes prejudicial deficient performance requiring relief.

## CONCLUSION

For the reasons set forth above and those in all prior submissions, this Court should grant Petitioner relief.

Respectfully submitted,

s/ Anne L. Saunders
ANNE L. SAUNDERS, ESQUIRE
Asst. Federal Public Defender
Attorney ID #PA 48458
100 Chestnut Street, Suite 306
Harrisburg, PA 17101
Tel. No. (717) 782-3843
Fax No. (717) 782-3966
(Anne_Saunders@fd.org)

s/ Michael Wiseman
MICHAEL WISEMAN, ESQUIRE
Supervising Assistant Federal Defender
Attorney ID#PA 75342
Defender Association of Philadelphia
Federal Court Division-Capital Habeas Unit
Suite 545 West – The Curtis Building
Independence Square West
Philadelphia, PA 19106
(Michael_Wiseman@fd.org)

Dated:

## <u>CERTIFICATE OF SERVICE</u>

I, Anne Saunders, of the Federal Public Defender's Office do hereby certify that on this date I served a copy of the foregoing *Petitioner's Brief in Support of Supplemental and Third Amended Motion to Vacate and Set Aside Conviction and Sentence Pursuant to 28 U.S.C. 2255 by a Person in Federal Custody* via Electronic Case Filing, or by placing a copy in the United States mail, first class in Harrisburg, Pennsylvania, addressed to the following:

Frederick E. Martin, Esquire
United States Attorney's Office
Herman T. Schneebeli Federal Building
Suite 316
240 West Third Street
Williamsport, PA. 17701-6465

Gwynn X. Kinsey, Jr., Esquire
United States Department of Justice
Criminal Division, Capital Case Unit
1331 F. Street, N.W.
Washington, D.C. 20530

Date: February 25, 2005

Respectfully submitted,

s/ Anne L. Saunders
ANNE L. SAUNDERS, ESQUIRE
Asst. Federal Public Defender
Attorney ID #PA 48458
100 Chestnut Street, Suite 306
Harrisburg, PA 17101
Tel. No. (717) 782-3843
Fax No. (717) 782-3966
(Anne_Saunders@fd.org)

Attorney for David Paul Hammer