TAM:FEM:jmm 2002R00295

### IN THE UNITED STATES DISTRICT COURT
### FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Civil No.  4:CV-02-510 |
| | : | Crim. No.  4:CR-96-239 |
| v. | : | |
| | : | (Muir, J.) |
| DAVID PAUL HAMMER | : | |

## BRIEF IN OPPOSITION TO THIRD AMENDED MOTION
## TO MODIFY SENTENCE OR FOR RELIEF
## UNDER SECTION 2255

Respectfully submitted,

THOMAS A. MARINO
United States Attorney

FREDERICK E. MARTIN
Assistant United States Attorney
Herman T. Schneebeli Federal Bldg.
240 West Third Street, Suite 316
Williamsport, PA 17701
Telephone:  (570) 326-1935
FAX:  (570) 326-7916

GWYNN X. KINSEY, Jr., Esquire
U.S. Department of Justice
Room 336
1331 F Street, N.W.
Washington, DC 20530
Telephone:  (202) 353-9721
FAX:  (202) 353-9779

Procedural History.

Petitioner, following thirteen days of trial, pleaded guilty in the United States District Court for the Middle District of Pennsylvania on June 22, 1998, to first-degree murder within the special territorial jurisdiction of the United States, in violation of 18 U.S.C. § 1111.  A separate capital sentencing hearing followed, in which a jury returned a verdict recommending a death sentence.

Before imposing sentence pursuant to that verdict, this Court held an evidentiary hearing on a post-verdict motion by petitioner to discharge his counsel, proceed *pro se*, and decide for himself whether to pursue a direct appeal.  *United States v. Hammer*, 25 F. Supp. 2d 518, 519-23 (M.D. Pa. 1998).  Finding petitioner competent to decide whether to appeal, this Court thereafter sentenced petitioner to death.  *Hammer*, 25 F. Supp. 2d at 527-34.

Petitioner's then-discharged counsel filed a notice of appeal, but petitioner later moved to dismiss the appeal.  On August 31, 2000, the Court of Appeals for the Third Circuit entered its judgment granting a dismissal.  *United States v. Hammer*, 226 F.3d 229 (3rd Cir. 2000).  On September 6, 2000, petitioner moved for the mandate to issue forthwith, and, on September 13, 2000, the court of appeals granted the motion and issued the mandate.  On November 29, 2000, petitioner timely

1

filed a petition for a *writ of certiorari* to the Supreme Court. The Court denied the petition on April 2, 2001.    *Hammer v. United States*, 532 U.S. 959 (2001).

Meanwhile, on October 26, 2000, Hammer moved in the Third Circuit to recall the mandate and reinstate his direct appeal. On October 31, 2000, the court of appeals denied the motion.  On November 1, 2000, petitioner filed a petition for rehearing and rehearing *en banc* of his motion to recall the mandate.  On January 5, 2001, the Third Circuit denied rehearing.  *United States v. Hammer*, 239 F.3d 302 (3rd Cir. 2001).

With the assistance of newly-appointed attorneys, on March 29, 2002, David Paul Hammer filed a Motion to Vacate Sentence, pursuant to 28 U.S.C. § 2255.  On October 1, 2002, this Court allowed Hammer's counsel to file an amended petition. This Court allowed the pleadings to be modified a second time on July 9, 2003.

Hammer sought on his own to discontinue the proceedings, which this Court, after conducting a hearing on January 16, 2004, allowed.  However, on petitioner's behalf a timely notice of appeal was filed which ultimately he ratified and subsequently requested that the Third Circuit reinstate the collateral proceedings.

The Court of Appeals in the unpublished opinion on June 3, 2004, granted relief and remanded the matter for further

proceedings.  On June 17, 2004, the Federal Public Defender's Office assumed responsibility as counsel for future proceedings.

On November 30, 2004, Hammer's new § 2255 counsel filed a motion for leave to file a supplemental and third amended collateral attack on the conviction and sentence.  Following briefing, this Court, in an order dated January 27, 2005, allowed for some aspects of that pleading to be filed, provisionally allowed three other aspects to be filed pending further development of the record, and denied consideration of the three aspects of that submission.  Hammer's counsel were directed to file a brief in support of that pleading which occurred on February 25, 2005.  Herewith presented are arguments[1] in opposition to that request for relief.

Counter-Statement of Facts.

Petitioner was an inmate at the Allenwood Federal Correctional Complex, United States Penitentiary in White Deer, Pennsylvania, where he was serving sentences totaling 1,232 years.  At approximately 3:00 a.m. on April 13, 1996, during a routine bed-check, a correctional officer discovered petitioner's

---

[1]  Petitioner's pleadings filed on February 25, 2005, seek to incorporate by reference the legal arguments filed by predecessor counsel on November 14, 2004.  See Brief in Support of Supplemental and Third Amended Motion to Vacate Sentence, p. 1.  Consequently, the United States for the sake of clarity will refer to the previously legal arguments as "First Memorandum" and the most recent submission as "Second Memorandum."

cell-mate, Andrew Marti, dead.  Physical evidence showed that Marti had been bound to his bed, gagged, and strangled.  The cell possessed a duress alarm which was not activated.  The only possible weapon found in it, apart from a garotte, was a set of nail clippers.  Petitioner in admissions to law enforcement personnel stated that his motive was retribution for disrespect that Marti had shown to petitioner shortly after petitioner's arrival at the penitentiary.  A handwritten note by Hammer contained this as well as other reasons for the killing.

Before accepting petitioner's guilty plea tendered during the government's rebuttal case at his trial, this Court conducted a competency hearing and determined that petitioner was competent to plead guilty.  *Hammer*, 25 F. Supp. 2d at 520.  Following the jury's verdict at the capital sentencing hearing recommending a death sentence, petitioner moved to discharge his counsel and have sentence imposed forthwith.  The District Court conducted a second competency evaluation.  *Hammer*, 25 F. Supp. 2d at 521-527. On October 9, 1998, the District Court issued its order finding "by clear and convincing evidence" that "[petitioner] is competent to discharge [counsel of record] as his legal representatives, proceed pro se and decide on his own whether to appeal."  *Hammer*, 25 F. Supp. 2d at 528.  This Court further found that "[petitioner's] request to discharge counsel, proceed *pro se* and decide on his own whether to appeal is made knowingly,

4

intelligently and voluntarily and not as the result of coercion or duress."  This Court discharged petitioner's attorneys, but allowed the two to remain in the limited capacity of standby counsel.  On November 4, 1998, this Court imposed a sentence of death.

Pertinent details have been presented in argument. Previously attached to pleadings were sworn statements, as authorized by Rule 5 of the Rules Governing Section 2255 Proceedings, regarding matters outside of the record which are included in response to Hammer's pleadings.  Two other attachments, correspondence to and from Hammer and his counsel, are included.  (Government Exhibits 5 and 6.)  In light of the imminent hearing in this case, further materials or testimony, which will be introduced then, are alluded to in argument.

Arguments.

1.  **THIS COURT'S AUTHORITY TO REVIEW HAMMER'S PETITION INITIALLY IS LIMITED BY THE STATUTE OF LIMITATIONS, BY THE PROCEDURAL DEFAULT DOCTRINE, BY HAMMER'S GUILTY PLEA WHICH ELIMINATES FROM CONSIDERATION ERRORS PRECEDING THAT ACT, BY THE TERMS OF § 2255 THAT PRECLUDE ALL BUT CONSTITUTIONAL ERRORS FOR REVIEW AND, TO THE EXTENT THAT CONSTITUTIONAL CLAIMS ARE PRESENTED, BY THE *TEAGUE v. LANE* NON-RETROACTIVITY DOCTRINE.**

There are six different legal hurdles which Petitioner must overcome, in the view of the United States, before this Court properly can consider the merits of his various arguments.

Consequently, these will be presented before addressing the details of Hammer's § 2255 Motion.

**A.    Hammer's Multiple Claims of Deficient Performance by Trial Counsel Are Limitations-Barred.**

In its ruling on January 27, 2005, Hammer's motion for leave to file the Third Amended Motion, the Court denied leave to amend some claims on the ground that they were limitations-barred, provisionally allowed some claims subject to factual development of the issue of equitable tolling of limitations, and granted leave to amend with regard to other claims.  The provisionally-allowed claims included ineffective assistance of counsel allegations contained under amended Grounds Three, Eighteen, and Twenty-two.  *Id.*  As explained below, the discovery that the government obtained from the defense last week demonstrates that Hammer's ineffective assistance claims are limitations-barred, except for his claims that counsel were "conflicted" (timely presented in Grounds Ten and Eleven of the original Motion) and that the Court "functionally deprived" Hammer's counsel right (under Ground Thirteen, discussed *infra*).  The provisionally-allowed claims are untimely because the discovery shows that Hammer and prior Section 2255 counsel affirmatively rejected those claims prior to the filing of the Third Amended Motion. The remaining ineffective assistance claims are also barred because the recent disclosures show that, contrary to this

6

Court's January 27th order, Hammer never raised or intended to raise claims of deficient attorney performance, apart from the "limited" claims presented in Grounds Ten, Eleven, and Thirteen.

### 1. Chronology of Hammer's Initial, Affirmative Decision Not to Attack Mr. Ruhnke's and Mr. Travis's Performance

This Court in its January 27, 2005, order ruled that Hammer's Second Amended Motion effectively presented a majority of the ineffective assistance claims contained in the Third Amended Motion.  The order, quoted *infra*, noted that many of Hammer's claims referred to violations of the "6th Amendment," and that some claims alleged various acts or omissions that may have been attributable to defense trial counsel.  However, with only one exception (Ground Thirteen, discussed *infra*), all of the claims identified in the Court's January 27th order have been alleged by Hammer beginning with his original 2255 Motion.  As the recent defense-provided discovery and the original Motion make plain, moreover, only Ground Thirteen raises a claim of actual, deficient performance by trial counsel.  (Grounds Ten and Eleven, in contrast, alleged that trial counsel became "conflicted" only in the wake of Hammer's *post-sentencing* decision to discharge counsel and waive appeals.)

On March 29, 2002, Hammer filed his initial Section 2255 motion challenging his conviction and sentence.  Much like the

amended and second amended motion that followed, that motion was replete with claims of violations of the Sixth Amendment and other provisions, but did not expressly or implicitly allege that Mr. Ruhnke and Mr. Travis performed deficiently at the trial and sentencing.  The Court's order summarizing the pertinent portions of Grounds One through Eleven of the Second Amended Motion also applies verbatim to Hammer's original Motion:

> Ground One of the . . . Motion states in part that "Hammer's guilty plea was accepted in violation of the . . . 6th . . . Amendment[] to the Constitution . . . ."  Ground One further states that "the plea was predicated on an unreliable competency proceeding among other reasons."

> Ground Two states in part that "[t]he proceedings used to determine Hammer's competence, waive counsel and appeals were conducted in violation of the . . . 6th . . . Amendment[].  The proceedings were both procedurally and substantively flawed in numerous respects including . . . the experts were conflicted; . . . Dr. Wolfson, at all times, had a direct and substantial conflict of interest . . . ."

> Ground Three states in part that "[t]he dismissal of Hammer's Appeal was . . . permitted in violation of the . . . 6th . . . Amendment . . . ."

> Ground Six of the states in part that "[t]he Government knew or should have known that Hammer's statement was materially false and unreliable, yet it presented it [to] the jury and judge (at the guilty plea) without correcting the false misleading impression . . .  The Government (and/or agents) concealed favorable evidence from the defense, namely the physical facts which prove that Hammer's statements are unreliable, if not false . . .  All of the above violates the . . . 6th . . . Amendment[]."

> Ground Seven states in part that "the Government suppressed documentary evidence, suppressed physical

evidence and/or destroyed readily apparent material evidence or potentially useful evidence, all in contravention of the . . . 6th . . . Amendment[]."

Ground Eight states in part that "Hammer's waiver of counsel for purposes of post-trial motions and direct appeal did not comport with the . . . 6th . . . Amendment[] because he was not properly advised about the risks of proceeding pro se."

Ground Ten states in relevant part that "Hammer was constructively and functionally denied counsel . . . ."  Under the supporting facts section of this ground for relief Hammer states that he was "constructively denied counsel when the Court denied counsels' withdrawal request and failed to appoint counsel to investigate, and if necessary pursue, competency issues even though same was contrary to Hammer's stated desires.  Hammer was entitled to counsel who could ethically protect his substantive and procedural due process rights.  Such investigation would have been fruitful."

Ground Eleven states in part that "[t]he Court's failure to inquire on the record into an actual conflict of interest when alerted to the same violated the . . . 6th . . . Amendment[]."  Under the supporting facts section Hammer states "because of the conflict, the mismanagement of Hammer's psychiatric and medical condition was not investigated.  The conflict had an adverse effect on the representation."

Order dated January 27, 2005, at 6-8 (ellipsis and additions in Order).

The above quoted claims from the original Motion and also the Amended and Second Amended Motions clearly did not advance any claim of deficient, ineffective assistance of counsel.  As recently-provided discovery makes clear, Hammer specifically prohibited prior Section 2255 counsel from raising such claims, and counsel agreed.  Hammer's directives to Ms. Foster and Ms.

9

Long-Sharp were unambiguous.  Following the filing of the initial

Section 2255 motion, Hammer threatened to fire both attorneys

because "[m]y insistence that an IAC claim not be pursued has

been ignored."   Letter from Hammer to counsel, dated June 13,

2002, at 2.  (Government Exhibit 5.)   Ms. Foster replied as

follows:

> You note that we have ignored your insistence that an
> IAC claims not be "pursued" (this word may be
> "presented" – I couldn't read your writing).  <u>As you
> know, no ineffective assistance claim has been
> presented</u>.  If the word is pursued, you will agree that
> both Rhonda and I have told you that a full blown IAC
> claim would be fruitless, and perhaps harmful, in your
> case.  However, we have also told you that we are
> looking into a more limited IAC claim.  We are
> ethically obligated to investigate all claims that
> appear to have merit and to then give you our best
> advice regarding them.  It is you who makes the
> decision regarding whether they are ultimately plead.
> We can only advise.  Finally, you will recall that it
> was you who suggested at our last meeting that we draw
> up an IAC allegation for you to review.  Rhonda and I
> have discussed the claim but have not yet come up with
> a draft for you to review.

Letter from Ms. Foster to Hammer, dated June 17, 2002 (emphasis

added).  (Government Exhibit 6.)

On September 30, 2002, three months after the foregoing

exchange, Ms. Foster and Ms. Long-Sharp filed the Amended

Motion.[2]  Consistent with Ms. Foster's proposal of a "more

---

[2]  According to Hammer, the Section 2255 one-year limitations period expired the day after the Amended Motion was filed, i.e., October 1, 2002.  <u>See</u> Hammer's Traverse to Government's Brief, filed May 19, 2003, at 11 n.1.

limited IAC claim," the Amended Motion added, in addition to

several claims not pertinent here, Ground Thirteen, which alleged

as follows:

> Hammer was functionally deprived of his constitutional
> right to counsel at all critical stages of the
> proceedings when the court set the hearing on Hammer's
> competency to plead guilty within hours of Hammer's
> stated desire to plead guilty such that no competent
> attorney could investigate and be adequately prepared
> for said hearing.  Alternately and separately, Hammer
> claims he was deprived of the effective assistance of
> counsel by counsels' failure to investigate the
> veracity of Hammer's confession and the physical and
> medical facts upon which it relied.

Amended Motion at 29.  Thus, this claim initially argued not that

Mr. Ruhnke and Mr. Travis performed deficiently, but rather that

no attorney could have afforded proper representation given the

constraints the Court imposed.  Alternatively, the claim attacked

counsel's performance on the ground that counsel had not

adequately prepared a challenge to Hammer's competency and to the

veracity of his confessions.  *Id.* at 29-31.

By an order dated July 9, 2003, the Court accepted Hammer's

Second Amended Motion.  The motion did not raise new, separate

grounds for relief independent of those set forth in the Amended

Motion.

### 2.    Hammer's Attempt to Transform His Section 2255 Action Through the Third Amended Motion

There can be no question that Hammer's Third Amended Motion,

filed on November 30, 2004, significantly expanded his attacks on

11

trial counsel's performance.  The Court has noted that several ineffective assistance claims (Grounds Three, Seventeen, Eighteen, Twenty, and Twenty-two) contained in the Third Amended Motion "do not relate[] to any of the claims raised in the second amended motion"; the Court denied leave to add Grounds Seventeen and Twenty outright and allowed Grounds Three, Eighteen, and Twenty-two to proceed subject to Hammer's establishing his entitlement to "equitable tolling" of these claims.  Order dated January 27, 2005, at 10-26.  Additionally, as explained *infra*, the Third Amended Motion contains several additional ineffectiveness assertions that Hammer and prior 2255 counsel affirmative intended not to allege prior to this latest amendment.

### 3.    Hammer's Equitable Tolling Theory Fails

The Court provisionally granted Hammer leave to amend Grounds Three, Eighteen, and Twenty-two in light of his assertion "that the failure to allege [the] claims was the result of the neglect of attorneys Foster and Long-Sharp coupled with his mental condition."  Order dated January 27, 2005, at 10-26. Equitable tolling is generally reserved for extraordinary circumstances, which ordinarily do not include deficient performance by federal collateral counsel.  *Johnson v. Hendricks*, 314 F.3d 159, 163 (3rd Cir. 2002).  In capital cases, similarly, an allegation of error by collateral counsel does not

automatically trigger equitable tolling.  *See Fahy v. Horn*, 240 F.3d 239 (3rd Cir. 2001).  Hammer is not remotely entitled to equitable tolling, especially in light of the recent defense-provided discovery revealing that Hammer and prior Section 2255 counsel deliberately rejected the affected claims prior to the filing of the Third Amended Motion.

Hammer's assertion that he is "mentally infirm" falls far short of the showing required to equitably toll limitations, especially given the prior adjudications of his competency and the defense stipulations concerning his competency.  *Nara v. Frank*, 264 F.3d 310, 319-20 (3rd Cir. 2001), held that even actual incompetence was not a per se reason to toll limitations, and reiterated that there must be a showing of incompetence plus an actual effect of the incompetence on the petitioner's ability to timely present his claims.  In finding that Nara had made such a showing, the Court noted that Nara had previously been adjudicated incompetent in the course of the case under review, and apparently had suffered from "ongoing, if not consecutive, periods of mental incompetency."  *Id*. at 320.

Here, no court has found Hammer incompetent at any stage of the relevant proceedings.  In the most recent appeal to the Third Circuit, counsel made quite clear that no one suggested that Hammer had ever been incompetent, and instead argued that this Court had failed to conduct an adequate inquiry to ensure that

13

Hammer had knowingly, intelligently, and voluntarily waived his right to post-conviction review.  5/27/04 Argument Tr. 21-22. Indeed, the panel of that Court stopped the government short from continuing to address competency, which the Court deemed not an issue.  5/27/04 Argument Tr. 55-56.  In remanding the case to this Court, the Third Circuit specifically noted that there was no issue of Hammer's competency, only whether he had entered a knowing, intelligent, and voluntary waiver of further review. *United States v. Hammer*, No. 04-9001, slip op. at 6.  In the most recent hearing in this Court, the Federal Public Defender's office stipulated that Hammer was making a competent, knowing, intelligent, and voluntary election to proceed with his ineffective assistance of counsel claims.

Given this stipulation and the prior proceedings, Hammer's mental status cannot provide a basis for equitable tolling. *Nara's* equitable tolling rule specifically involved a defendant who was legally incompetent to proceed.  Here, in contrast, the prior litigation regarding Hammer's mental status has concerned not whether Hammer is competent (he clearly is), but rather whether he in fact on a particular date made a knowing, intelligent, voluntary, and rational election to forego review. *United States v. Hammer*, No. 04-9001, slip op. at 6.  The Federal Public Defender simply cannot be allowed to pick and chose

14

whether to assert Hammer's competency based on what better suits that office's strategic whim.

Hammer cites *Fahy v. Horn* for the proposition that in a capital case, errors by his prior Section 2255 counsel constitute "extraordinary circumstances" justifying equitable tolling. Reply in Support of Motion to Amend at 12-14.  In fact, *Fahy* specifically noted, consistent with *Johnson v. Hendricks*, that deficient performance by federal collateral counsel does *not* amount to an extraordinary circumstance.  *Fahy*, 240 F.3d at 245. Instead, the Court allowed equitable tolling based solely on the fact that in that capital case, the attorney had made a misjudgment in an unsettled area of law that, if not excused, would prevent Fahy from receiving any federal habeas review whatsoever.  *Id.* at 244-46.  The Court also emphasized that Fahy had diligently sought to assert all of his claims.  *Id.*

Here, unlike in *Fahy*, the alleged errors would not deny Hammer review outright, and, most importantly, Hammer has not exercised diligence in asserting his claims.  To the contrary, the reason why Hammer has not presented his ineffective assistance claims under Grounds Three, Eighteen, and Twenty-two is that he consciously prohibited prior counsel from making such assertions, and counsel agreed with this directive for tactical reasons, as discussed *supra*.  Under these circumstances, the

15

alleged error by prior 2255 counsel does not justify equitable tolling.

### 4. Additional Ineffective Assistance Assertions in the Third Amended Motion Are Also Limitations-Barred

Although the Court disallowed several of Hammer's proposed amended ineffective assistance claims and only provisionally allowed others, the Court nevertheless overruled the government's objection that certain additional ineffectiveness assertions improperly expanded the prior Motions and thus were limitations-barred. The recent defense-provided discovery justifies revisiting these rulings.

As noted *supra*, Hammer and his prior counsel by mutual agreement raised no claim that Mr. Ruhnke's and Mr. Travis's performance was deficient, except for the "more limited IAC claim" presented as Ground Thirteen (*i.e.*, that trial counsel provided ineffective assistance in connection with the guilty plea hearing by failing "to investigate the veracity of Hammer's confession and the physical and medical facts upon which it relied"), and the "conflicted counsel" allegations of Grounds Ten and Eleven. The Third Amended Motion, in contrast, raised a broad array of ineffective assistance claims extending far beyond the conceivable bounds of those "more limited IAC claims."

The entirely new claims contained in the Third Amended Motion included:

Ground One:
L. Nonetheless, when Petitioner announced his surprise intent to waive his right to stand trial and to enter a plea of guilty to the charge of first degree murder, . . . counsel . . . failed to attend the competency evaluation conducted by Drs. Mitchell and Wolfson.
M. As a result, counsel did not witness the evaluation and hear first hand the questions asked of Petitioner or his responses. Nor did they ensure that a full and fair exploration of the factors motivating Petitioner's 'decision' were adequately explored during the evaluation. See *Appel v. Horn* 250 F.3d 203, 216-17 (3rd Cir. 2001) ('Nor do we believe it would impose an undue burden on defense counsel to require some investigation into the defendant's competency, especially in a capital murder case where the trial court has ordered a competency evaluation and hearing'); *id.* ('under the circumstances in this case, [defense] counsel should have investigated, advocated, or otherwise acted to ensure that there was 'meaningful adversarial testing'').

Ground Two:
DD. Counsel's failures to investigate, develop and present the claims arising from the conflicts [of Drs. Wolfson, Mitchell, and Karten], and the unreliable and improper competency proceedings and findings was constitutionally ineffective.
Ground Twenty and supporting facts are incorporated herein.

Ground Eight:
C. Counsel's failure to raise, preserve and litigate the Court's failure to properly advise Hammer on the risks of proceeding pro se constitutes prejudicially deficient performance in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments.

Ground Fourteen:
E. Alternatively, counsel was ineffective for failing to adequately investigate, develop and present evidence of the employees' consideration for awards. Counsel's deficient performance prejudiced Hammer in that, as a result of counsel's omission, Hammer was denied compelling evidence of bias, conflict and unreliability with respect to these witnesses.

17

All of the foregoing ineffectiveness assertions are limitations-barred because Hammer and counsel affirmatively elected not to attack trial counsel's performance except within the confines of the "conflicted counsel" allegations of Grounds Ten and Eleven and the "more limited IAC claim" contained in Ground Thirteen, quoted *supra.* The quoted allegations of Grounds One, Two, Eight, and Fourteen extend far beyond these more limited allegations and are therefore limitations-barred. Equitable tolling does not apply for the reasons previously stated.

> **B.    The Doctrine of Procedural Default Bars All of Hammer's Claims Not Based on Ineffective Assistance of Counsel.**

If a convicted person does not present a claim on direct review (other than claims that cannot be presented on direct review, *e.g.*, ineffectiveness assertions), he is in dire straits because he has committed what is called a "procedural default." A defaulted claim generally cannot be heard on collateral review unless the applicant shows "cause" for each failure to raise the claim and "actual prejudice" resulting from the error he alleges. See *United States v. Frady*, 456 U.S. 152, 170 (1982).

This "cause and prejudice" standard requires Hammer to show, not only that "some objective factor external to the defense" impeded his efforts to raise the issue as required by each relevant procedural rule, *Coleman v. Thompson*, 501 U.S. 722, 753

18

(1991), but also that the error he alleges "worked to his actual and substantial disadvantage, infecting his entire trial with error," (emphasis in original). *Frady*, 456 U.S. at 170.  If he cannot show cause and prejudice, petitioner cannot have his claim considered unless he shows "actual innocence." *Bousley v. United States*, 523 U.S. 614, 623, 118 S. Ct. 1604, 1611 (1998).

A settled rule of federal appellate practice is that issues not raised on appeal are forfeited.  *E.g.*, Fed. R. App. P. 28(a)(9); *United States v. Carruth*, 699 F.2d 1017, 1021 n.5 (9th Cir. 1983), *cert. denied*, 464 U.S. 1038 (1984).  The Supreme Court in *Bousley v. United States*, 523 U.S. 614, 622, 118 S. Ct. 1604, 1610 (1998), found a procedural default where a federal prisoner failed to challenge the voluntariness of his guilty plea on direct appeal.  It cannot be seriously doubted, after *Bousley*, that Hammer's failure to raise an issue, either at trial or on appeal, is a procedural default.  His request to withdraw or discontinue his appeal, which the Third Circuit granted, just as if he had never filed a timely appeal, precludes this Court generally from considering the issues raised in his Amended Motion.

To be sure there may be claims that cannot be procedurally defaulted.  Some courts of appeals have held that "jurisdictional" claims, which are not subject to forfeiture on

19

direct appeal, are also immune from procedural default on collateral review.  In *Kelly v. United States*, 29 F.3d 1107 (7th Cir. 1994), the defendant's drug sentence was enhanced based on a prior conviction, but the government did not serve notice of the prior conviction as required by 21 U.S.C. § 851(a).  *Kelly* raised the Section 851 claim for the first time on collateral review, but the court of appeals considered it anyway, without a finding of cause and prejudice.  *Id*. at 1112.  The court reasoned that the Section 851 error was jurisdictional, and that "a jurisdictional defect cannot be procedurally defaulted."  *Id*. at 1113.  The Eleventh Circuit followed *Kelly* in *Harris v. United States*, 149 F.3d 1304, 1307-1308 (11th Cir. 1998).  The Tenth Circuit has also stated that "jurisdictional" claims cannot be defaulted.  *United States v. Burch*, 169 F.3d 666, 668 (10th Cir. 1999) ("Challenges to a district court's subject matter jurisdiction may be raised at any time, including in a § 2255 motion").  It is submitted that none of Hammer's arguments could be fairly construed as attacks on this Court's jurisdiction.

Ordinarily, a procedural default is fatal, because it bars the court from even considering the merits of the prisoner's defaulted claims.  To overcome the default and have the claims heard, the defendant must show "cause" and "actual prejudice."  *See United States v. Frady*, 456 U.S. 152, 167 (1982).  It is well

to bear in mind that whatever else "cause and prejudice" means, it raises "a significantly higher hurdle" than the plain-error standard of Fed. R. Crim. P. 52 and *United States v. Olano*, 507 U.S. 725 (1993). *Frady*, 456 U.S. at 166.

In *Murray v. Carrier*, 477 U.S. 478, 488 (1986), the Court explained that "the existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the * * * procedural rule" that was violated. The Court held that ineffective assistance of counsel provides "cause" for the failure to raise a claim. *Id*. at 488-489. Establishing "cause" on the grounds of ineffective assistance of counsel entitles the defendant not merely to have his defaulted claim heard, but to relief from the conviction.

Hammer at one instance refers to "cause" by claiming that his failure to appeal was justified by the medical and psychiatric "mismanagement [of his case] by the BOP throughout the proceedings." (Third Amended Motion, p. 38.) It is incumbent upon him to prove this in some fashion with documentation and expert opinion before proceeding to consider the merits of his claims. Ambivalence or an eleventh-hour change of heart <u>not</u> to be executed cannot be equaled with "cause." *Murray v. Carrier*, 477 U.S. at 492. So too, his other generic assertions of "cause" (Third Amended Motion, p. 125), should not

21

allow this Court to proceed to the merits of most, if not all, of his arguments.

Courts will also find "cause" where "a constitutional claim is so novel that its legal basis is not reasonably available to counsel." *Reed v. Ross*, 468 U.S. 1, 16 (1984). That kind of novelty requires more than mere contrary circuit precedent. As the Court held in *Engle v. Isaac*, 456 U.S. 107, 130 n.35 (1982), "futility cannot constitute cause if it means simply that a claim was unacceptable to that particular court at that particular time." Indeed, in *Bousley v. United States*, 523 U.S. 614, 623, 118 S. Ct. 1604, 1611 (1998), the Court found no cause for a defendant's failure, in 1990, to anticipate the Supreme Court's December 1995 holding in *Bailey v. United States*, 516 U.S. 137 (1995), which effectively overruled the interpretation of 18 U.S.C. § 924(c) that governed in all of the regional courts of appeals. The Court in *Bousley* explained that in 1990 other defendants had argued (unsuccessfully) for the result later reached in *Bailey*, and that *Bousley* therefore could not show cause for his own lawyer's failure to do so. *Bousley v. United States*, 118 S. Ct. at 1611 & n.2. Of course, if Hammer prevails under this exception, he will have to demonstrate why this "new rule" should be retroactively applied to his case. See Argument 1 D, *infra*.

In *Strickler v. Greene*, 119 S. Ct. 1936 (1999), the Supreme Court came as close as it has ever come to defining "prejudice." There, the State *habeas* petitioner raised a claim under *Brady v. Maryland*, 373 U.S. 83 (1963), conceding that the claim was procedurally defaulted. *Strickler v. Greene*, 119 S. Ct. at 1949. Thus, the question before the Court was "whether that default is excused by an adequate showing of cause and prejudice." *Id*. The Court found that the defendant could show "cause," because, *inter alia*, the State withheld the *Brady* evidence, *Id*. at 1952, but it held that the defendant could not show "prejudice," and it used the *Brady* standard for "materiality" in conducting the prejudice inquiry. Relying on *Kyles v. Whitley*, 514 U.S. 419 (1995), a *Brady* case, the Court held that the defendant "must convince us that there is a reasonable probability that the result of the trial would have been different if the suppressed documents had been disclosed to the defense." *Strickler v. Greene*, 119 S. Ct. at 1952 (internal quotation omitted). The Court went on to explain, again quoting from *Kyles*, that the "question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id*. (internal quotation omitted). That is also the "prejudice" requirement for

23

establishing ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 694 (1984).  Only where an error undermines confidence in the outcome of the proceeding has there been a showing of prejudice.

Because *Strickler* was itself a *Brady* case, there may be room to argue that the *Brady* "materiality" standard does not define "prejudice" in all cases.  As the Fifth Circuit explained in *Felder v. Johnson*, 180 F.3d 206, 215 n.12 (5th Cir. 1999), "[i]t is not clear whether *Strickland* prejudice would be sufficient to meet the prejudice required to overcome a procedural default in *habeas*," and not clear whether *Brady* "materiality" would be sufficient in all cases.

As to "prejudice," Hammer asserts that the issues which he pursued in his initial, but abandoned, appeal "brief" as well as sixteen issues raised in the Amended Motion would have been "meritorious."  (Third Amended Motion, p. 38.)  As for the former arguments, Hammer previously took a different position on their efficacy, and the Third Circuit hardly was moved by them so as to refuse to dismiss the appeal in the "interests of justice." *United States v. Hammer*, 226 F. 3d at 233, n.4 and 237.  With respect to issues raised in the Third Amended Motion, it is submitted that they also lack substantial legal support.  In short, Hammer has failed to overcome the procedural default bar

which flows from his request to discontinue his appeal to the Third Circuit.

If a person cannot establish cause and prejudice for his procedural default, he can have his claim heard on collateral review if he establishes "actual innocence."  *See Bousley v. United States*, 523 U.S. 614, 623, 118 S. Ct. 1604, 1611 (1998); *McCleese v. United States*, 75 F.3d 1174, 1177-1178 (7th Cir. 1996).  But Hammer does not deny having strangled Marti, even in his Third Amended Motion (page 46).  He now claims that the killing was "accidental" which, when read in conjunction with common sense and the pathologist's testimony, simply strains credulity.  *See Bousley*, 118 S. Ct. at 1611; *Knox v. Iowa*, 131 F.3d 1278, 1282 (8th Cir. 1997); *cf. Ortiz v. Stewart*, 149 F.3d 923, 931 (9th Cir. 1998).  Further, his allegation does not remotely show "innocence of" (*i.e.*, ineligibility for) the death penalty.  Hammer does not dispute that he physically killed Andrew Marti, and his present speculation that the killing was an accident occurring in the midst of a sexual encounter is one that is factually unsustainable.  The trial record and recent defense-provided discovery reveal that the accidental killing defense was considered and rejected by trial counsel, for sound factual and tactical reasons.

Finally, the concept of actual innocence has a special meaning in the context of a guilty plea.  In *Bousley*, the Court

25

held that the defendant could not show cause and prejudice for failing to challenge his conviction under Section 924(c), but that a remand was appropriate to determine if he could show actual innocence.  The Court stated:

> It is important to note in this regard that 'actual innocence' means factual innocence, not mere legal insufficiency.  In other words, the Government is not limited to the existing record to rebut any showing that petitioner might make.  Rather, on remand, the Government should be permitted to present any admissible evidence of petitioner's guilt even if that evidence was not presented during petitioner's plea colloquy and would not normally have been offered before our decision in *Bailey*.

*Bousley v. United States,* 118 S. Ct. at 1611-1612 (citations and footnote omitted).  That aspect of the opinion in *Bousley* was quite conventional.  It is well established that actual innocence means factual innocence, and that the government is not limited to the record at the time of the district court proceedings.  The point of the actual innocence test is to determine, in real life rather than in the constrained and sometimes fictional world of criminal justice, whether the defendant committed the crime or not.  This, it is submitted, Hammer cannot do.

**C.  Hammer's Guilty Plea Precludes This Court From Considering Purported Errors Which Preceded That Act.**

During the colloquy on June 22, 1998, the following exchange occurred between Hammer and this Court:

26

THE COURT:  By pleading guilty you waive your right to appeal all defenses in other matters relating to the crime with which you are charged and which you propose to plead guilty up to this time and date.  Do you understand that?

DEFENDANT HAMMER:  Yes, sir, I do.

(Trial Transcript, hereinafter referred to as "TT," TT Vol. 14, p. 110.)  This exchange hardly was meaningless and now precludes Hammer from raising those arguments which are based upon events before that plea.  This includes at least Grounds 1 and 2 (in part) 9, 13, 15 (in part), and 22.

Most convictions in the federal system are based on guilty pleas, and some defendants who decide to plead guilty later change their mind about the wisdom of that decision.  Collateral attacks brought by such defendants are subject to special limits, however, because the government's interest in the finality of a conviction is even more pronounced when the conviction rests on a guilty plea.  *See United States v. Timmreck*, 441 U.S. 780, 784 (1979).

The basic rule is that "a voluntary and intelligent plea of guilty made by an accused person who has been advised by competent counsel, may not be collaterally attacked."  *Mabry v. Johnson,* 467 U.S. 504, 508 (1984).  That is, the only claims that such a prisoner can make are (1) that his plea was not voluntary

and intelligent, and (2) that he received ineffective assistance of counsel prior to entering the plea.

The Supreme Court's clearest statement of the basic rule against collateral attacks on guilty pleas came in *Tollett v. Henderson*, 411 U.S. 258 (1973).  There, the defendant pleaded guilty to murder and later filed a *habeas corpus* petition based on the fact that black persons had been excluded from the grand jury that indicted him, in violation of *Strauder v. West Virginia*, 100 U.S. 303 (1880).  Neither the defendant nor his attorney had known of the *Strauder* violation at the time of the guilty plea.  *United States v. Timmreck*, 411 U.S. at 266. Relying on its prior decisions in *Brady v. United States*, 397 U.S. 742 (1970), *McMann v. Richardson*, 397 U.S. 759 (1970), and *Parker v. North Carolina*, 397 U.S. 790 (1970), the Court in *Tollett* held a guilty plea "forecloses independent inquiry into the claim of discrimination in the selection of the grand jury." *United States v. Timmreck*, 411 U.S. at 266.

Several of the claims advanced by Hammer antedate the entry of his guilty plea on June 22, 1998.  This Court should not consider their merits under the circumstances.  *United States v. Timmreck, supra*.

> **D.    Alleged Non-Constitutional Errors Cannot Be Considered In Collateral Proceedings.**

Plainly some of Hammer's issues, including but not limited, in whole or in part, to Grounds 1, 2, 3, 5, 7, 8, and 22 appear to be based upon alleged violations of rules, statutes, and other non-constitutional provisions of law.  While these could have been raised on direct appeal to attain relief, they cannot be brought to this Court's attention in this proceeding.

There are many kinds of claims that Hammer cannot raise under Section 2255.  As the Supreme Court held in *United States v. Addonizio*, 442 U.S. 178, 184 (1979), "[i]t has, of course, long been settled law that an error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment."  Based on *Addonizio* and its progeny, it is submitted that this Court first must determine "whether [the] error [alleged] * * * is sufficiently fundamental to come within those narrow limits."  *Id.* at 184-185.

Section 2255 provides redress for jurisdictional or harmful constitutional errors.  It also applies in rare circumstances to some non-jurisdictional and non-constitutional errors of federal law; but it does so only if those errors involve a "fundamental defect which inherently results in a complete miscarriage of justice."  *Addonizio*, 442 U.S. at 185; *see Reed v. Farley*, 512 U.S. 339, 353-354 (1994); *United States v. Timmreck*, 441 U.S. 780, 784 (1979); *Davis v. United States*, 417 U.S. 333, 346

(1974); *Hill v. United States*, 368 U.S. 424, 428 (1962); *Rose v. Lundy*, 455 U.S. 509, 548 n.18 (1982) (Stevens, J., dissenting); see also Rules Governing Section 2255 Proceedings, Rule 1, Advisory Committee's Note (citing *Davis*).  Thus, even if Hammer demonstrates a rule or statutory violation, he will not be entitled to collateral relief unless the violation is a fundamental defect  --  not merely a technical one  --  that amounts to a complete miscarriage of justice --  not merely to legal error.

Under this rigorous standard, of course, most non-constitutional violations of federal law are not cognizable on collateral review.  *See, e.g., Addonizio*, 442 U.S. at 186 (institution of parole guidelines); *Timmreck*, 441 U.S. at 783-784 (violation of Fed. R. Crim. P. 11); *Hill*, 368 U.S. at 429 (violation of Fed. R. Crim. P. 32); *United States v. Anderson*, 987 F.2d 251, 259-260 (5th Cir.) (erroneous jury instructions), *cert. denied*, 510 U.S. 853 (1993); *United States v. Pollard*, 959 F.2d 1011, 1028 (D.C. Cir.) (violation of plea agreement by government), *cert. denied*, 506 U.S. 915 (1992); *United States v. Stevens*, 851 F.2d 140, 143-144 (6th Cir. 1988) (violation of Fed. R. Crim. P. 32); *Fiumara v. United States*, 727 F.2d 209, 213 (2nd Cir.) (wiretapping violation), *cert. denied*, 466 U.S. 951 (1984).

Recently, in *Peguero v. United States*, 526 U.S. 23, 119 S. Ct. 961 (1999), the Supreme Court held that "a district court's failure to advise a defendant of his right to appeal as required by the Federal Rules of Criminal Procedure [does not] provide[] a basis for collateral relief * * * when the defendant was aware of his right to appeal when the trial court omitted to give the advice." *Peguero,* 119 S. Ct. at 963.  Relying on *Hill* and *Timmreck*, the Court held that a violation of Rule 32(a)(2) would not create a cognizable claim in the absence of prejudice. Consequently, this Court should cull out and deny in accordance with *United States v. Addonizio, supra*, those non-constitutional and non-jurisdictional errors noted by Hammer as beyond the ambit of § 2255.

### E.    Claims Based on New Constitutional Rules May Not be Applied Retroactively.

Certain of Hammer's claims, namely Grounds 3, 4, 6, 7, 8, 14, 15, and 22 relate to requests for relief based upon novel interpretations of the Constitution.  Even assuming that these claims are correct, nonetheless, Hammer may not appropriately receive any relief.

To be sure collateral review is not a substitute for direct appeal, and that it has never been defined "by reference to a perceived need to assure that an individual accused of crime is afforded a trial free of constitutional error."  *Kuhlmann v.*

*Wilson*, 477 U.S. 436, 447 (1986) (plurality opinion).  One important point derived from that general principle is that collateral review is designed to ensure that courts conduct their proceedings in a manner consistent with the law in existence at the time, or in this case June and July 1998, "and not to provide a mechanism for the continuing reexamination of final judgments based upon later emerging legal doctrine."  *Teague v. Lane*, 489 U.S. 288, 308 (1989) (plurality opinion).  That distinction between old and new law is critical, because "[a]pplication of constitutional rules not in existence at the time a conviction became final seriously undermines the principle of finality which is essential to the operation of our criminal justice system."  *Id.* at 309.

In *Teague v. Lane* and its progeny, the Supreme Court strengthened that new-rule principle in order to "validate[] reasonable, good-faith interpretations of existing precedents made by [lower] courts even though they are shown to be contrary to later decisions."  *Butler v. McKellar*, 494 U.S. 407, 414 (1990); *see Saffle v. Parks*, 494 U.S. 484, 488 (1990).  In essence, a defendant may not rely on "new" rules of "procedure" in seeking to overturn his conviction on collateral review.  *See Teague*, 489 U.S. at 310.

32

The Supreme Court has set out a fairly mechanical test to be employed.  The Court has explained that "[t]he *Teague* inquiry is conducted in three steps."  *O'Dell v. Netherland*, 521 U.S. 151, 155 (1997).

"First, the date on which the defendant's conviction became final is determined."  *O'Dell*, 521 U.S. at 156.  A conviction is "final" when the possibility of further direct appellate review is exhausted.  See *Griffith v. Kentucky*, 479 U.S. 314, 321 n.6 (1987).  Where, as here, Hammer filed a petition for *certiorari*, the conviction becomes final when *certiorari* is denied.  *Id*. In this case that pertinent date would be approximately April 2, 2001.

"Next, the *habeas* court considers whether a * * * court considering the defendant's claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule he seeks was required."  *O'Dell*, 521 U.S. at 156 (alterations and internal quotations omitted).  It is important to emphasize the word "compelled."  The Court in *Teague* defined a "new rule" as one that "breaks new ground or imposes a new obligation on the States or the Federal Government."  *Teague v. Lane*, 489 U.S. at 301 (plurality opinion).  Put another way, a new rule is one that was not "dictated by precedent existing at the time the defendant's conviction became final."  *Id*. (emphasis

33

in original); *see also Graham v. Collins*, 506 U.S. 461, 466-467 (1993); *Glock v. Singletary*, 65 F.3d 878, 884-889 (11th Cir. 1995)(*en banc*).  Subsequent decisions have made clear that a rule may be "new" despite the fact that earlier cases supported it, *Sawyer v. Smith*, 497 U.S. 227, 236 (1990), "or even control or govern" it, *Saffle v. Parks*, 494 U.S. at 491.  Unless a legal principle is compelled by existing precedent – *i.e.*, not susceptible to reasonable debate – it will be treated as a "new" rule.  *Butler v. McKellar*, 494 U.S. at 415.

If a court considering the defendant's claim at the time his conviction became final would not have been compelled by existing precedent to conclude that the rule he seeks was required, "then the rule is new." *O'Dell*, 521 U.S. at 156.  In almost all cases, if the rule is "new," it is unavailable to the defendant on collateral review.  That is the basic doctrine of *Teague*.

The third inquiry concerns the *Teague* exceptions.  "If the rule is determined to be new, the final step in the *Teague* analysis requires the court to determine whether the rule nonetheless falls within one of the two narrow exceptions to the *Teague* doctrine." *O'Dell*, 521 U.S. at 156-157.  The first exception is "for new rules forbidding criminal punishment of certain primary conduct and rules prohibiting a certain category of punishment for a class of defendants because of their status

34

or offense." *Id*. at 157 (alterations and internal quotations omitted). It is important to note that this first exception involves constitutional prohibitions on punishment. It is to be distinguished from a rule construing a statute, which turns solely on legislative intent.

The second *Teague* exception, which is "even more circumscribed" than the first, is for "watershed rules of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding." *O'Dell*, 521 U.S. at 157. The example used by the Court to illustrate what this second exception means is *Gideon v. Wainwright*, 372 U.S. 335 (1963), the decision that gave indigent felony defendants the right to counsel. The exception is reserved for genuine "bedrock" rules that are essential to basic fairness. *O'Dell*, 521 U.S. at 167. It is submitted that Hammer's assertions do not fit within these two exceptions. Moreover, there is no decisional law in existence on April 2, 2001, which could have "compelled" this Court to afford Hammer relief. For these reasons alleged, novel constitutional grounds advanced by him simply fail to justify any relief requested.

>    **F.    Hammer is Not Entitled to Relitigate Claims Foreclosed by the Third Circuit's Dismissal of the Direct Appeal.**

Three of Hammer's claims (Grounds Three, Eight, and Eighteen) effectively seek to relitigate issues necessarily resolved by the Third Circuit's decision dismissing his direct appeal.  Hammer may not relitigate claims already resolved by the direct appeal, and these three grounds should be rejected on this additional procedural basis.

Unlike habeas corpus, which permits lower federal courts in limited circumstances to reject the legal analysis of state courts, *see* 28 U.S.C. § 2254(d); *cf. Lambrix v. Singletary*, 520 U.S. 518, 522-523 (1997), Section 2255 does not generally require a federal court to second-guess itself.  Accordingly, where a claim is actually decided on direct review, it cannot be relitigated under Section 2255 except in unusual circumstances. *See Withrow v. Williams*, 507 U.S. 680, 720-721 (1993) (Scalia, J., concurring) (collecting cases); *United States v. DeRewal*, 10 F.3d 100, 105 n.4 (3rd Cir. 1993), *cert. denied*, 511 U.S. 1033 (1994).  The only notable exception is an intervening change in the governing substantive law, *Davis v. United States*, 417 U.S. 333 (1974), which ordinarily would be barred by the non-retroactivity doctrine, *supra*.

In most cases, then, a decision on the merits on direct appeal has a preclusive effect on collateral review under Section 2255.  Thus, Hammer's Grounds Three, Eight, and Eighteen are barred insofar as they effectively seek to relitigate issues

36

necessarily resolved by the Third Circuit's decision dismissing his direct appeal.

2.    **THE DISTRICT COURT DID NOT ERR IN ACCEPTING DEFENDANT'S GUILTY PLEA SINCE IT WAS SUPPORTED BY A FACTUAL BASIS IN THE RECORD, IT WAS VOLUNTARY, AND COMPETENTLY ENTERED.**

Defendant's guilty plea was supported by a sufficient factual basis in the record, voluntary, competently made and with an understanding of its direct consequences as required by constitutional provisions. Nonetheless, Hammer finds fault in his guilty plea in four respects. (Third Amended Motion, pp. 3-16.) As indicated *supra*, Hammer's challenges to his guilty plea are barred as a threshold matter by the procedural default doctrine due to his forfeiture of his direct appeal, and by the *Teague v. Lane* non-retroactivity doctrine given that authority in effect at the time his conviction became final did not dictate a grant of relief on his claim. The application of the procedural default doctrine does not turn on whether his waiver of the appeal was knowing and voluntary or the like; the mere failure to raise a claim in an appeal is sufficient to bar the claim on collateral review. Further, Hammer cannot show that his claims fall within any exception to either the procedural default doctrine or *Teague* non-retroactivity. Under these circumstances, his claims are barred under each of these independent doctrines.

Even if not barred, Hammer fails to present any valid constitutional claim for relief and the non-constitutional claims he advances are not cognizable *supra*.  It is important to recognize at the outset that Hammer had a right under then existing Federal Rule of Criminal Procedure 32(e) to withdraw his guilty plea up to the jury's return of its sentencing recommendation, if he could have demonstrated "any fair and just reason" for so doing.  To prevail at this stage, however, Defendant must show more than a failure to comply with any formal requirements of Rule 11.  *United States v. Timmreck*, 441 U.S. 780, 785 (1979).

### A.   Factual Basis for Plea.

Hammer's challenge to the sufficiency of the factual basis for the plea plainly fails to present a cognizable basis for section 2255 relief.  In contrast with the requirement that the court engage in a colloquy with the defendant personally to ensure that he understands the nature of the charges to which he is pleading guilty, Fed. R. Crim. P. 11(c), the Rule 11(f) requirement of a sufficient "factual basis for the plea" is not constitutionally mandated and is intended merely to ensure the accuracy of the plea through some evidence that an offense actually occurred.  1A Charles A. Wright, *Federal Practice and Procedures*, Section 174, at 206-07(1999); *United States v. Tunning*, 69 F.3d 107, 111 (6th Cir. 1995).  Hammer offers no

clarification of how his claim would satisfy the requirements for cognizability in light of its non-constitutional character.

Even if cognizable, his claim is barred by the "invited error" doctrine (which is operates as a bar independent of the procedural default doctrine).  During defense counsel's opening statement at the sentencing hearing, counsel emphasized Hammer's reference to "these hands" having committed the murder as evidence that Hammer himself was not truly responsible for the murder. (Hammer's "these hands" statement parroted, in turn, defense counsel's opening statement at the guilt/innocence trial.)  In response to Mr. Ruhnke's sentencing phase opening statement, this Court advised counsel, out of the hearing of the jury, that if counsel intended to question the sufficiency of the factual basis for Hammer's plea of premeditated murder, the court would revoke Hammer's guilty plea and resume the guilt/innocence trial forthwith.  (TT Vol. 15, pp. 4-5.)  After Mr. Ruhnke responded that he was not seeking to have the plea withdrawn, this Court allowed the defense to proceed.  Under these circumstances, Hammer affirmatively waived his claim.  As indicated previously, the sufficiency of the factual basis for a plea is not a claim immune to waiver because, unlike the plea itself, it does not require affirmative, knowing, intelligent and voluntary action by the defendant personally.

Even if the claim is cognizable and not barred, this Court did not abuse its discretion in finding a sufficient factual basis for the plea. *United States v. Hammer*, 25 F. Supp. 518, 536 (1998) (denying post-verdict motion for a new trial for this reason). Given that the Rule 11(f) requirement of a sufficient "factual basis for the plea" is not constitutionally mandated and is intended merely to ensure the accuracy of the plea through some evidence that an offense actually occurred, 1A Charles A. Wright, *Federal Practice and Procedures,* Section 174, at 206-07 (1999); *Tunning*, 69 F.3d at 111, this Court was entitled to satisfy itself through <u>any</u> source, not limited to the defendant's admissions, that an offense was committed. *United States v. Defusco*, 949 F.2d 114, 120 (4th Cir. 1991), *cert. denied*, 503 U.S. 997 (1992); *United States v. Davis*, 470 F.2d 1128, 1129 n.2 (3rd Cir. 1972). This is true where the court already has heard the prosecution's evidence underlying the plea, *Knight v. United States,* 611 F.2d 918 (1st Cir. 1979). Indeed, where the record reflects strong evidence to support a finding of the required elements, the court may find a sufficient factual basis for the guilty plea despite the defendant's continuing protestations that the element in question was lacking. *United States v. Trott*, 779 F.2d 912, 914 & n.1 (3rd Cir. 1986); *United States v. Hecht*, 638 F.2d 651, 653 (3rd Cir. 1981).

Here, Hammer, in connection with his plea, did not expressly deny the element of premeditation and indeed indicated basic agreement with the Government's factual proffer. (TT Vol. 14, pp. 113-114.)  Further, and in any event, there was ample evidence in the trial testimony to support a finding of premeditation. Indeed, this Court could rely solely[3] upon the testimony of Dr. Funke that strangulation simply requires at least 90 seconds to cut off blood flow to the brain and, hence, establish premeditation. (TT Vol. 3, pp. 84-85.)  This Court properly considered this antecedent evidence.  *Knight v. United States*, 611 F.2d 918, 920 (1st Cir. 1979).

The Court of Appeals for this Circuit considered, in a somewhat analogous case, Due Process requirements regarding the underlying factual basis of a guilty plea.  In *Meyers v. Gills*, 93 F.3d 1147 (1996), the Third Circuit addressed the issue when facts must be placed on the record to support a guilty plea. After reviewing pertinent decisional law on guilty pleas consistent with the Fifth Amendment, Judge Alito noted as follows:

> Neither the district court nor petitioner has cited any authority to the contrary. Moreover, our own research has not disclosed

---

[3]  Additional "strong" evidence of premeditation is supported as well by the testimony of inmates Classen and Yager, aspects of his admissions to FBI Agent Thompson and even the circumstances surrounding the discovery of Marti's body.

41

> any authority that supports the district
> court's categorical holding that a state
> court guilty plea without the prior
> development of a factual basis supporting the
> plea renders the plea invalid as a matter of
> federal law in the habeas corpus context,
> and, in any event, we reject that
> proposition.

*Id.* at 1152.  Following the somewhat flexible principle that a factual basis from the Defendant must be in the record at sometime, then the introduction of the entirety of Hammer's confessional note to Leonard Yager, which was never refuted or contested by Defendant, provides, to the extent that it is needed, a factual basis which supports his entry of a guilty plea.  In short, that Hammer never used the word "premeditated" when admitting his guilt, does not indicate that a Fifth Amendment violation occurred.  *Cf. Meyers v. Gills*, *supra*.

### B.  Involuntary Plea.

Hammer claims that he was "functionally coerced into pleading guilty and foregoing the insanity defense due to his fear of being returned to the Medical Center for Federal Prisoners at Springfield, Missouri. (Third Amended Motion, pp. 9-10.)  His claims are procedurally barred and *Teague*-barred for the reasons set forth *supra*, and lack validity for multiple additional reasons.

Defendant claims that his defense was going well due to the superior credentials of his expert, Dr. Sadoff (Third Amended

Motion, pp. 9-10).  The prosecution disagrees with this assessment[4].  Bearing in mind that Hammer's videotaped interview with that expert, supposedly under hypnosis, in which he would inconsistently use the present tense to describe past events, it is submitted that the mental health defense was foundering badly. Regardless, an intelligent plea must stand even if a Defendant "did not correctly assess every relevant factor entering his decision."  *Brady v. United States*, 397 U.S. 742, 756-57 (1970).

Even assuming that he had some subjective belief of his return to Springfield, this does not render a plea involuntary. That is, a person's concern about where a sentence is to be served does not render a plea invalid, as the First Circuit observed in *United States v. Wess*, 433 F.2d 400, 403-04 (1970), *cert. denied,* 401 U.S. 958 (1971).  Moreover, the record does not substantiate the claim that this entered into the reasons why Hammer admitted his guilt.

This argument, of course, is fundamentally flawed by the fact that Hammer was not a sentenced federal offender.  Instead, he was allowed into the Federal System pursuant to 18 U.S.C. § 5003.  *See generally, Howe v. Smith*, 452 U.S. 473, 485-87 (1981) (statute is a "broad charter" allowing transfer).  This fact and

---

[4]  The jury's rejection of defense-proposed mitigating factors on mental health issues underscores this fact.  (TT Vol. 30, pp. 18-20.)

43

its impact on Hammer's belief was brought out in the testimony from Dr. Wolfson <u>prior</u> to entry of the guilty plea.  (TT Vol. 14, pp. 71-72.)  There was a greater likelihood that, if an insanity verdict was returned by the jury, Defendant would have been returned to Oklahoma to allow that sovereign to deal with the supposed Disassociative Identity Disorder (hereinafter referred to as "DID"), or other mental maladies.  The contract between the Oklahoma Department of Corrections and the Bureau of Prisons, which Hammer's counsel received, allowed for such a disposition.  Moreover, there is no statute or decisional law on insanity verdicts for "contract prisoners" with lengthy sentences, such as Hammer, which would require continued federal incarceration.  *But see* 18 U.S.C. § 4243(a).

### C.  **Knowledgeable Entry of a Plea**.

This aspect of Hammer's challenge to his plea is procedurally barred and *Teague*-barred as indicated *supra*.  Further, as indicated *supra*, his claim is predicated entirely or almost entirely on non-constitutional law and does not otherwise provide a cognizable basis for collateral relief.

David Paul Hammer was no neophyte to the criminal justice system.  His sophistication is appropriate to consider in determining whether he understood the consequences of a plea.  *United States v. Casallas*, 59 F.3d 1173, 1177 n.7 (11th Cir. 1995).  Moreover, he had the advice of two experienced attorneys.

Defendant claims that he was unaware of two important matters.  This included the effect of the guilty plea in the death penalty proceeding as well as his waiver of a lesser included offense. (Third Amended Motion, p. 4.)

First, one should consider whether these consequences are direct or collateral.  Rule 11 requires only knowledge of the former, not the latter.  *United States v. Salmon*, 944 F.2d 1106, 1130 (3rd Cir. 1991), *cert. denied*, 502 U.S. 1110, (1992).  But, since this Court advised defendant that he continued to face the death penalty, (TT Vol. 14, pp. 106-08), compliance with Rule 11 took place.  *Id.*  Stated alternatively, "Due Process does not require that a defendant be advised of 'collateral, but foreseeable, adverse consequences of the entry of a guilty plea.'" (Citations omitted.) *Id.*  Regardless, this Court allowed the defense a "second bite at the apple" to continue to argue that the threshold finding of premeditated murder had not been established simply with the guilty plea.  *United States v. Hammer*, 25 F. Supp. 2d at 520 n.2.

Defense counsel mysteriously refer to *Beck v. Alabama*, 447 U.S. 625 (1979). (Third Amended Motion, p. 4.)  But that case involved the Alabama State death penalty system, not the federal one, as it related to the court's failure to instruct a jury on finding a lesser included offense, not entry of a guilty plea.

*Beck v. Alabama*, 447 U.S. at 628-30.  Moreover, nowhere in Rule 11(c), Federal Rules of Criminal Procedure, is there a requirement that a Court must advise a Defendant of his waiver of any lesser included offenses.

Finally, a recent decision by the Third Circuit, *United States v. Thomas*, 389 F.3d 424 (2004), rejected any expansive reading of Federal Rule of Criminal Procedure 11(c).  If in that case it was not error to fail to advise a defendant of a potential defense, it hardly is any mistake to omit reference to a lesser included offense.  *United States v. Thomas*, 389 F.3d at 429.

### D.  Competence to Enter a Plea.

Defendant challenges this Court's determination about his competence to enter a plea in two respects.  This aspect of Hammer's challenge to his plea is procedurally barred and *Teague*-barred as indicated *supra*.  Further, as indicated *supra*, his claim of prejudicial constitutional error fails and, to the extent that he asserts claims of non-constitutional error, does not identify any cognizable basis for collateral relief.

Hammer's allegations of incompetence at the outset include his diagnosis as suffering from Disassociative Identity Disorder, as well as purportedly inadequate inquiries into medications which he took then. (Third Amended Motion, pp. 4-7.)

46

With respect to his DID claim, it is presumably premised on the belief that DID, like a foreign language, entitles a defendant to have only an expert in that field "interpret" the proceedings to him in Court. (Third Amended Motion, pp. 7-8.)  In one sense, Hammer advocates that his practitioner must be present and serve as almost a full partner in any plea colloquy.  But there is no case law which supports this novel view.  *Cf.* Federal Rule of Criminal Procedure 28 (Interpreters).  Moreover, as previously stated, the DID diagnosis hardly had evidentiary support which compelled that such a safeguard be employed.

This Court paid appropriate attention to Hammer's competence as well as medications.  *See United States v. Cole*, 813 F.2d 43, 46 (3rd Cir. 1987).  It remains noteworthy that Hammer's competence up until June 22, 1998, had never been in serious dispute by either the prosecution or even Dr. Sadoff[5].  Government Exhibit 1, Report of September 22, 1997, p. 8; *United States v. Hammer*, 25 F. Supp. 2d at 522, finding no. 1.  Moreover, Hammer's counsel did not believe that their client was incompetent to enter his plea of guilty.  (TT Vol. 14, p. 11.)  Rather, this Court ordered an evaluation largely as a

---

[5]  Hammer's claim, which relies so much on his ingestion of Synthroid, is not the first time when questions were raised about the drug and its effect on his competency.  Dr. Sadoff noted that various medicines which defendant ingested but found no problems regarding Hammer's competency.  Government Exhibit 1 at pp. 2; 8.

prophylactic measure.  *Godinez v. Moran*, 509 U.S. 389, 401 n.13 (1993).

Beyond that, nothing which occurred during the colloquy, or Defendant's demeanor and behavior on that day or succeeding days suggests that Hammer did not know what was occurring or could not assist his counsel.  (TT Vol. 14, pp. 99-122.)  This Court need not serve as a "super pharmacist" or a "super doctor."  It is not controlling that every possible question about a particular medication was not asked.  *See United States v. Savinon-Acosta*, 232 F.3d 265, 268-69 (1st Cir. 2002); *United States v. Marks*, 85 F.3d 396, 397 (8th Cir. 1996).  Moreover, attempts to determine *nunc pro tunc* a person's mental status and after-the-fact analysis of medications are not necessarily useful.  *Cf. Drope v. Missouri*, 420 U.S. 162, 183 (1974).  And yet that is the precise thrust of Hammer's newly hired experts as well as two previously retained experts, Drs. Grassian and Gelbort.

Normally, a Court might inquire directly of a defendant about what medications they are taking and hopefully obtain an honest answer as well as disclaimer from Defendant of its lack of effect or, hopefully, on its own possess the knowledge of its effect.  In the instant case, the medication in question, Synthroid, was not even for psychological purposes.  Government Exhibit 2, Sworn Statement of Dr. Wolfson.  Rather, it related to

a thyroid[6] condition.  (TT Vol. 14, p. 101.)  Additionally, this Court, instead of hearing only from a defendant regarding the effects of the medication, received testimony from a medical doctor about that item as well as his opinion on Hammer's competency.  (TT Vol. 14, pp. 44, 66.)  After receiving the testimony of two experts in the field of mental illness, as well as from defendant himself, this Court concluded that Hammer was competent to enter a guilty plea.  (TT Vol. 14, p. 120.)  It was the opinions of Drs. Wolfson and Mitchell as to Defendant's competence, as well as this Court's assessment of Hammer at the colloquy, that are significant, not whether further questions on medication could have been asked.  When is it that a lawyer cannot think of another question that should have been asked?

But Hammer has not even fairly put this issue into dispute. There is no factual basis for such a claim except for Hammer's inexpert opinions on Synthroid, (Third Amended Motion, p. 4), which is insufficient to present the issue under the

---

[6]  Dr. Wolfson elaborated at the October 1, 1998, competency hearing on Hammer's history of Synthroid use as well as potential effect which refusing to take that medication might have on his mental capacity (Hearing Transcript, hereinafter referred to as "HT," 10/1/98 pp. 13-17.)  His most significant finding is that "the [thyroid] illness takes a fair amount of time to develop. . . . ." *Id.* at p. 16.  Not surprisingly, even though Hammer may have erratically taken his Synthroid in August 1998, he nonetheless was found to be competent since that drug, even in combination with others "would not . . . have any deleterious effect on his ability to reason or think."  (HT 10/1/98 p. 18.)

circumstances.  *Cf. Hayes v. United States*, 399 F.2d 691 (5th Cir. 1968).

It is true, as Hammer's counsel notes, that "Hammer was diagnosed with Major Depressive Disorder, Recurrent, around the time of his guilty plea."  (Third Amended Motion, p. 5.)  What defendant does not state is that Hammer's trial counsel knew of this diagnosis, because they presented it as evidence from one of their chosen witnesses in the penalty phase, Dr. Mitchell, whose opinions otherwise petitioner criticizes on other, sundry bases. But even if this diagnosis was not known to the defense, it is of no moment whatsoever since it <u>long</u> has been recognized that a person can simultaneously suffer from such a condition and still be competent under 18 U.S.C. § 4241(a).  *Crawn v. United States*, 254 F. Supp. 669, 673 (M.D. Pa. 1966).

Hammer's recent pleadings contain further references by both new and old mental health experts which suggest that petitioner could not have competently entered a guilty plea.  (Third Amended Motion, pp. 8, 10-16.)  As to the previous experts, Drs. Gelbort and Grassian, among other shortcomings of their views are that they did not conclude in 1997 or 1998, when they examined Hammer, that he was then incompetent, but in late 2004 they were able to determine that on June 22, 1998, petitioner then was so beset by mental problems that he could not have relinquished his right to trial.  As to the new experts, Drs. Kluft, Gur, and Blumberg,

they disagree as to the mental disease or defect from which Hammer purportedly suffered.  Moreover, under close examination their analyses are based on mistaken assumptions as well as other shortcomings which will be brought out at the upcoming hearing. In short, particularly when two mental health providers reviewed Hammer contemporaneously as a prophylactic measure and confirmed that which was observable by all in the courtroom -- that Hammer knew what he was doing when he admitted his guilt -- this Court should reject Hammer's attempt to withdraw his plea.

**E.    Effective Assistance of Trial Counsel.**

Finally, citing *Appel v. Horn,* 250 F.3d 203, 216-17 (3rd Cir. 2001), Hammer's present counsel claim that Attorneys Ruhnke and Travis provided ineffective assistance during the competency hearing which preceded the guilty plea.  (Third Amended Motion, pp. 15-16.)  This ineffectiveness assertion is limitations-barred for the reasons set forth *supra*.  Further, *Appel* does not stand for the broad propositions which Hammer claims, such as counsel sitting in with mental health experts while a competency examination is being conducted.  *Cf. Re v. Snyder*, 293 F.3d 678, 682 (3rd Cir.), *cert. denied*, 537 U.S. 979 (2002) (no 6th Amendment right to counsel at competency evaluation).  Even had Travis and Ruhnke on June 22, 1998, consulted with Drs. Grassian, Sadoff, and Gelbort, nowhere did those experts suggest in their reports that Hammer was incompetent.  Indeed, Dr. Sadoff reached

51

the opposite conclusion and also was able to see Hammer in the Courtroom as late as five days prior to entry of the guilty plea. Thus, in the absence of prejudice to Hammer, there simply was no Sixth Amendment violation.

Hammer's counsel set out at length Sixth Amendment considerations regarding the "prejudice prong" of *Strickland v. Washington*, 466 U.S. 668 (1984).  (Second Memorandum, pp. 4-5.) It is well to keep in mind, guiding principles regarding the "performance prong" of that same decision.  Two are particularly noteworthy.

To begin with, there is a "strong presumption" that the action taken by Hammer's prior counsel fall within the range of reasonable professional assistance.  *Strickland v. Washington*, 466 U.S. at 689.  This must be overcome with proof, not mere speculation.  Moreover, speaking for the Court, Justice O'Connor also observed that even apparent behavior below such standards may be excused for multiple reasons.  *Id.* at 691.  It, thus, remains to be seen what the circumstances counsel faced in the Summer of 1998.  In any event, we know from this Court's recent ruling that counsel had no right to attend the examination, so trial counsel's performance was not deficient and caused no prejudice to Hammer.  Order dated April 5, 2005.

     3.   **THE ISSUE OF HAMMER'S COMPETENCE, ON JUNE 22, 1998, AND OCTOBER 1, 1998, GIVEN DEFENSE INPUT INTO THE PROCESS,**

**WAS FAIRLY AND THROUGHLY CONSIDERED BY THIS COURT AND NOT CLEARLY ERRONEOUS.**

Hammer presents a multi-faceted attack on this Court's conclusions, following entry of a guilty plea, that defendant was competent to admit his involvement in the killing of Andrew Marti and later was competent to waive his appellate rights.  (Third Amended Motion, pp. 16-30.)  This aspect of Hammer's collateral challenge is procedurally barred and *Teague*-barred as indicated *supra*.  No case precedent in effect at the time his conviction became final dictated relief on his claim, and none of the exceptions to non-retroactivity applies.  Further, as indicated *infra*, his claim of prejudicial constitutional error fails and, to the extent that he asserts claims of non-constitutional error, does identify any cognizable basis for collateral relief.

It is true that the United States Attorney's Office asked that a psychiatrist, rather than a psychologist, perform an evaluation of defendant following Dr. Sadoff's examination, pursuant to 18 U.S.C. § 4242(a).  Had the defense utilized the services of a psychologist, instead of a psychiatrist, such request would not have been made as the need for a medical doctor to respond to the opinion of another medical doctor would not have existed.  That the prosecution sought parity with the defense should not be considered a violation of Due Process.  *Cf.* Federal Rules of Criminal Procedure 12.1(c) and 16(b).

Defendant claims that, by seeking a level playing field, Dr. Wolfson became "the U.S. Attorney's agent."  (Third Amended Motion, pp. 18.)  But this belief is rejected by case law. *United States v. Rinshack*, 820 F.2d 1557, 1565 fn.10 (11th Cir. 1987).  Moreover, it is contrary to Dr. Wolfson's testimony, as well as relevant Bureau of Prisons' regulations relating to his conduct as an employee of that agency.  See Government Exhibit 2, Program Statement No. 6000.05 at p. 4 (09/15/96).  (TT Vol. 14, p. 15.)  Indeed, such an "agent" was curiously reluctant at first to involve himself in that process.  (TT Vol. 14, pp. 15-22.) Dr. Wolfson did not agree to participate until Hammer insisted that Dr. Mitchell sit in with him at all times.  (TT Vol. 14, p. 23.)

That Dr. Wolfson disagreed with Dr. Sadoff's diagnosis of Disassociative Identity Disorder did not transform him into a government agent.  No one from the prosecution, which provided necessary raw data[7] – which the defense also did – told him what diagnosis to reach or conclusion to draw.  Indeed, although after-the-fact, Dr. Wolfson advised the jury and this Court on

---

[7]  It is true that Dr. Wolfson may have had an easier time in obtaining Bureau of Prisons' records.  (Third Amended Motion, p. 18.)  However, the defense had no difficulty in obtaining those records or those from the State of Oklahoma.  The ease of obtaining materials plainly is immaterial regarding the objectivity of an expert.

July 13, 1998, that he did not consider himself a pawn of the United States Attorney's Office.  (TT Vol. 22, pp. 146-149.)

It is true that Dr. Wolfson rebuked DID at trial.  For that matter, that Dr. Blumberg also does not believe that Hammer primarily suffers from DID hardly suggests that he too is a government "agent."  Regardless of diagnosis, such a conclusion is distinct from the test implicit in 18 U.S.C. § 4241(a). Indeed, the criteria for an insanity defense is set out in wholly different provisions. Compare 18 U.S.C. §§ 17 and 4242.

There is no disqualification of Dr. Wolfson merely because he was familiar previously with the case. *United States v. Green*, 544 F.2d 138, 145 (3rd Cir. 1976), *cert. denied*, 430 U.S. 910 (1977); *cf. In Re Hammon*, 425 F.2d 916, 918 (1st Cir. 1970). Indeed, such familiarity may be advantageous.  *United States v. Green*, 544 F.2d at 145.  As was noted in that decision, "Any bias or predisposition of [the physician] to adhere improperly to his early conclusion that the defendant was competent could have been demonstrated by the defense on cross-examination, as ample opportunity existed to do so."  *Id.*  So too any predispositions could have been pursued by defense counsel.  Hammer's attorneys focused on what questions Dr. Wolfson asked their client about DID (*Id.* at pp. 51-55), as well as what concerns Defendant raised about returning possibly to Springfield.  (TT Vol. 14, pp. 49-50; 61-64.)  His inquiries with Hammer showed appropriate restraint,

not that, as claimed, he was "conflicted" and "unreliable." (Third Amended Motion, p. 21.)

Defendant also complains of Dr. Mitchell's fairness. (Third Amended Motion, pp. 19-21.) But it was Hammer and his counsel who sought his participation. *United States v. Hammer,* 25 F. Supp. 2d at 520. Again, that he had prior contact with defendant does not act as a, *per se*, disqualifying factor. *United States v. Green, supra.*

In the final analysis, a District Court's determination, whether it properly concluded that a person was competent, is subject to review by the Court of Appeals under a clearly erroneous standard. *McFadden v. United States*, 814 F.2d 144, 146 (3rd Cir. 1987). That Hammer may have had mental health issues does not necessarily indicate that he was incompetent to enter a plea of guilty. *United States v. Leggett*, 162 F.3d 237, 244 (3rd Cir. 1998), *cert. denied*, 528 U.S. 868, 120 S. Ct. 167 (1999); *Gluzman v. United States*, 124 F. Supp. 2d 171, 175-76 (S.D.N.Y. 2000); *United States v. Teague*, 956 F.2d 1427, 1431-32 (7th Cir. 1992) (major depression). Hammer's new attorneys still point out nothing in the record of the pre-guilty plea hearing or the subsequent guilty plea colloquy which seriously undermines this Court's finding of competency. *McFadden v. United States*, 814 F.2d at 147. It remained this Court's decision whether to

believe the experts or not.  Stated in other words, a competency examination cannot be equated with a finding of competency. *McFadden v. United States*, 814 F.2d at 147; *United States v. Rudisill*, 43 F. Supp. 2d 1, 4 (D.D.C. 1999) (disbelieving expert testimony).

As additional procedural objections, defense counsel claim that the competency evaluations were scheduled too quickly and no defense expert was secured.  But Hammer decided when to enter a guilty plea during the rebuttal stage of proceedings after the jury had heard 13 days of testimony.  This Court, taking into consideration those circumstances, was well within its discretion in asking Drs. Wolfson and Mitchell to assist.  *Cf. United States v. Goines*, 988 F.2d 750, 782 (7th Cir. 1993), *cert. denied, sub nom. Daniels v. United States*, 510 U.S. 887 (1994) (timing of request considered).  Moreover, this Court retained the discretion not to conduct multiple evaluations even had the defense sought such relief.  *Gov't of Virgin Islands v. Williams*, 892 F.2d 305, 312 (3rd Cir. 1989), *cert. denied*, 495 U.S. 949 (1990).

Defendant's almost exclusive legal authority to support his position is the 1972[8] decision of the Third Circuit in *United States v. Pogany*, 465 F.2d 72.  (First Memorandum, p. 16.) However, it is submitted that the gravamen of that decision was, not that the examiner was biased but, that no competency <u>hearing</u> at all was conducted when the issue was in dispute.  *United States v. Pogany*, 465 F.2d at 78-79.  Indeed, the author of the opinion, the late Circuit Judge Hunter, mused that "it is impossible for us to ascertain with any degree of certainty whether Dr. Stice submitted his report as an officer of the Court or as the Government's expert witness."  *Id*. at 79. Consequently, this language undercuts claims by Hammer that because an expert works for the United States or is sought by the prosecution to respond to defense-initiated reports from other experts, such a person's fairness is *per se* cast into doubt.

---

[8]  While age does not necessarily undercut the validity of case law, defense counsel, again relying upon *United States v. Pogany, supra*, argues that Dr. Mitchell was incompetent to conduct any evaluation since he was only a psychologist.  (First Memorandum, p. 17.)  However, the statutory framework was amended in 1984 to allow for "Psychiatric <u>or psychological</u> examination or report" on competence.  (Emphasis supplied.)  18 U.S.C. § 4241(b); Pub. L. 98-473, Title II § 403(a), 98 Stat. 2059.

Defense counsel provides little additional arguments[9] with respect to this Court's second finding of competence for Hammer to waive counsel on October 9, 1998.  (Third Amended Motion, p. 21; Second Memorandum, pp. 46-47.)  To be sure, the prosecution had misgivings about Dr. Mitchell <u>solely</u> doing an evaluation of defendant[10].  (HT 8/3/98 p. 15.)  However, that hardly undermines the proceedings.  Moreover, that the Court discounted Dr. Sadoff's testimony was within its prerogatives.  *McFadden v. United States, supra; United States v. Rudisill, supra.*  Under the circumstances, particularly when there is no suggestion as to how this Court's findings of competence were clearly erroneous, his claims in this respect should be rejected.

Hammer's most recent pleadings include references by a newly retained expert, Dr. Bersoff, that all three Bureau of Prisons' mental health employees, Drs. Wolfson, Mitchell, and Karten, were

---

[9]  Without reference to the record, defense counsel claims that the jury learned that Dr. Wolfson testified as to Hammer's competence to enter a guilty plea and that this served as "a judicial comment [to the jury] on Hammer's mental state in the determination of whether the opinion of Drs. Wolfson or Sadoff should prevail."  (First Memorandum, p. 17.)  But this Court said nothing to that effect.  (TT 06/30/98, pp. 1-14.)  Instead, it was defense counsel who brought these facts to the jury's attention.  (TT Vol. 22, p. 119.)  Thus, Hammer cannot complain of any purported oblique judicial comment in light of the doctrine of invited error.

[10]  Again, under the invited error doctrine, Hammer may be barred from complaining about Dr. Mitchell's participation in the second competency hearing since the defense specifically sought his inclusion in the process.  (HT 8/3/98 at pp. 9-10 and 13.)

conflicted and otherwise their behavior violated ethical

standards for mental health providers.  (Third Amended Motion,

pp. 22-27; Second Memorandum, pp. 8-22.)  A point-by-point

refutation will not be provided at this time.  There are some

responses to this presentation, however, that are appropriate.

   That Drs. Wolfson, Mitchell[11], and Karten were employees of

the Bureau of Prisons is a factor obvious to all present,

including this Court and the jury.  Moreover, their experience or

lack thereof in various situations, whether with DID diagnosed

patients or past participation in competency hearings, also was

presented to the appropriate fact-finders.  Whether one dresses

up this information in allegations of ethical violations or not,

they simply go to the weight to be given such testimony, not

---

[11]   Defense counsel claims that Dr. Mitchell's involvement
in the case "shocks the conscience and violates the Due Process
clause of the Fifth Amendment, and violates petitioner's Sixth
Amendment right to counsel.  *Massiah v. United States*, 377 U.S.
201 (1964); *United States v. Henry*, 447 U.S. 268 [sic] (1980);
*Maine v. Moulton*, 474 U.S. 159 (1985)."  (Second Memorandum, p.
13.)  Those cases condemn governmental interference with a
defendant's consultation with counsel.  It is unclear whether
petitioner is claiming that Dr. Mitchell served as a
surreptitious "listening post" for the United States to actively
determine details of Hammer's proposed defense or to obtain
admissions about how he killed Marti.  *United States v. McHenry*,
447 U.S. at 273-74.  If that is their claim, it will be refuted
by Dr. Mitchell's forthcoming testimony.  If their claim is that
Hammer, merely by voluntarily speaking with a government employee
who provided him with services, had his Sixth Amendment rights
thereby violated, such a conclusion is unsupported by law.  *Cf.
United States v. McHenry,* 447 U.S. at 272; *Buchanan v. Kentucky*,
483 U.S. 402, 422-24 (1987) (No Fifth Amendment violation to
rebut a proffered defense).

their admissibility.  *See generally, United States v. Ruggiero*, 928 F.2d 1289, 1304-05 (2nd Cir.), *cert. denied sub nom. Gotti v. United States*, 502 U.S. 938 (1991).

Finally, Hammer criticizes the actions of Attorneys Travis and Ruhnke for failing to "investigate, develop, and present the claims arising from the conflict; and the unreliable and improper competency proceedings and findings."  (Third Amended Motion, p. 29; Second Memorandum, pp. 23-46.)[12]  With the benefit of months of time to secure an expert and review transcripts, Hammer's present counsel present Dr. Bersoff who effectively has reported the obvious.[13]  But Attorneys Travis and Ruhnke did not have the luxury of such time.  Nonetheless, those attorneys presented to the triers of fact alleged shortcomings or pertinent information during the examinations of all three mental health witnesses employed by the Bureau of Prisons.  They did not possess any

---

[12]  Hammer's ineffectiveness assertions with regard to this Ground are all limitations-barred for the reasons set forth *supra*.

[13]  Hammer's counsel concede that "[t]he nature of some of these conflicts were apparent to the court. . . ."  (Second Memorandum, pp. 22 & 30.)  In point of fact, this Court heard testimony from Dr. Wolfson over parts of three days prior to the change of plea proceeding and, consequently, was well familiar with his background and purported deficiencies.  (TT Vol. 11, 12, & 13.)  While it is true that this Court was not as familiar with Dr. Mitchell, the defense and Hammer himself knew about him and yet asked him to participate in the proceedings.  Now they merely second-guess their decision, which change of tactics does not support relief.

reports by <u>any</u> experts that Hammer was incompetent.  Nor were they aware, as none existed, of contemporaneous anecdotal details which would support such a conclusion.  *But see Hull v. Freeman*, 932 F.2d 159, 167-70 (3rd Cir. 1991).  Thus, they did all that could be done under those circumstances and provided effective assistance.

Albeit at a different aspect of their latest pleadings, counsel put forth an argument that prior counsel were ineffective at the competency hearings but for a somewhat different reason. That is, Hammer's present attorneys claim:

> That [Sixth Amendment] right [to counsel during competency proceedings] was also violated when this Court decided to move into competency proceedings immediately upon learning of Petitioner's stated-desire to plead guilty.  No lawyer could have provided adequate representation on the competency question in the constricted time frame during which this Court decided this question.

(Second Memorandum, p. 56; see also Second Memorandum, p. 31.)

It is submitted that Hammer's choice to plead guilty on June 22, 1998, left this Court with few viable options, as it correctly observed.  (TT Vol. 14, pp. 11-12.)  Indeed, petitioner's counsel simply do not suggest what other reasonable measures would have been appropriate given the circumstances. Consequently, it is submitted that this Court correctly proceeded as it did, particularly having received Hammer's direct concurrence.  (TT Vol. 14, pp. 25-26.)

Hammer's trial counsel also are faulted for expressing only "mild reservations" to what this Court proposed on June 22, 1998. (Second Memorandum, p. 8.)  But an objection, whether yelled or otherwise presented by counsel, preserves any claims of error. Federal Rule of Evidence 103(a).  While they recount the actions on that day leading up to the evaluation (Second Memorandum, pp. 26-28), they omit referring to the fact that Hammer himself and under oath agreed to proceed with a joint competency evaluation by Drs. Mitchell and Wolfson.  (TT Vol. 14, pp. 23-25.)

Additionally, present counsel assert that there was abundant evidence available to Attorneys Ruhnke and Travis which they should have presented.  (Third Memorandum, pp. 32-37.)  While they claim this information was at "counsel's disposal" (Second Memorandum, p. 37), they acknowledge that Drs. Gelbort and Grassian did not reach their conclusions until 2004.  (Second Memorandum, pp. 33-36.)  Among other factors, *Strickland v. Washington*, 466 U.S. at 689, focuses only on what was reasonable and available on June 22, 1998, not six years after the fact.

Attorneys Travis and Ruhnke finally are faulted for their failure to press the DID diagnosis as undermining any competency finding.  (Second Memorandum, p. 38.)  But the appearances of "Jocko" were indeed rare even for those defense counsel who last apparently encountered that alter in September 1997, at approximately the time of Dr. Sadoff's videotaped interview.

(Memorandum, p. 39.)  Defense counsel accurately note in other contexts that mental illnesses "wax and wane."  (First Memorandum, p. 39.)  But counsel were asked whether they believed then that Hammer was competent to enter a guilty plea, to which they replied affirmatively twice.  (TT Vols. 10, 11, & 14, pp. and 117.)  Notwithstanding the addition of materials from Drs. Gur, Kluft, and Blumberg (Second Memorandum, pp. 41-46), they fail to provide any references to the record which suggest that their various diagnoses and conclusions about Hammer's mental state on June 22, 1998, are correct or seriously undermine this Court's competency finding.

4.    **THE THIRD CIRCUIT'S DECISION THAT ALLOWED HAMMER TO WITHDRAW HIS APPEAL WAS NOT ERRONEOUS EITHER FROM A LEGAL OR FACTUAL PERSPECTIVE.**

Hammer's third collateral challenge (presented as multiple subclaims) is procedurally barred and *Teague*-barred as indicated *supra*.  No case precedent in effect at the time his conviction became final dictated relief on his claim, and none of the exceptions to non-retroactivity applies.  His claim also seeks to relitigate issues effectively resolved by the Third Circuit on direct appeal and, thus, is barred for that additional reason. Further, his claim of prejudicial constitutional error fails and, to the extent that he asserts claims of non-constitutional error, does not identify any cognizable basis for collateral relief.

Before addressing defendant's third claim of error, it is best to put in perspective what is not at issue.  (Third Amended Motion, pp. 30-39.)  Doing so reveals Hammer's faulty reasoning.

To the sure, this Court found Hammer competent to waive his right to counsel especially as it would impact on future appellate proceedings on October 9, 1998.  However, that finding was somewhat premature since Hammer on November 12, 1998, utilized Attorney Ruhnke to file an appeal.  *United States v. Hammer*, 226 F.3d at 229.  Indeed, defendant's competence in criminal proceedings for over twenty years had never been called into question.  *United States v. Hammer*, 25 F. Supp. 2d at 522.  Finding Nos. 1-4.  Indeed, this conclusion was not challenged even through Hammer's second appeal with the Third Circuit in May 2004.

Hammer was well aware of the appellate issues raised by his counsel, who served in a stand-by capacity, in briefs filed with the Court of Appeals.  *Id.* at 232 and 233 n.4.  These included challenges to jury selection, as well as the plea colloquy.  Thus, even if Circuit Judge Greenberg advised[14] him on July 18,

---

[14]   Defense counsel attempt to liken the Circuit Court's argument in which they heard Hammer's reasons for not pursing an appeal, as either a competency examination or waiver colloquy. It simply was neither being within the Court's prerogative to hear argument, pursuant to Federal Rule of Appellate Procedure 34, as well as exercise its authority under Federal Rule of Appellate Procedure 42(b).

65

2000, that the best he could hope for was a new penalty phase (Third Amended Motion, p. 34), Hammer knew otherwise.

Defendant suggests that the wrong standard for review of competence to waive appeal was utilized by the Court of Appeals. (First Memorandum, pp. 18-24.)  According to Hammer's attorneys, it is "assuming a person's disorder does not prevent him from understanding his legal position and the options available to him, does that disorder prevent him from making a rational choice among the options which are available to him?"  (Third Amended Motion, p. 31.)  Defense counsel further suggests that the "correct standard is more exacting than the competence to stand trial or [sic] plead guilty standard employed in prior proceedings."  *Id.*  This argument appears to be an effort to resurrect the different standards' argument which the Supreme Court rejected in *Godinez v. Moran*, 509 U.S. 389 (1993).  As the Court noted:

> The standard adopted by the Ninth Circuit is whether a defendant who seeks to plead guilty or waive counsel has the capacity for 'reasoned choice' among the alternatives available to him.  How this standard is different from (must less higher than) the *Dusky* standard – whether the defendant has a 'rational understanding' of the proceedings – is not readily apparent to us.
>
>        \*　　\*　　\*　　\*　　\*
>
> But even assuming that there is some meaningful distinction between the capacity

> for 'reasoned choice' and a 'rational
> understanding' of the proceedings, we reject
> the notion that competence to plead guilty or
> to waive the right to counsel must be
> measured by a standard that is higher than
> (or even different from) the *Dusky* standard.

*Id.* at 397-98.

More importantly, defense counsel assume that the Third Circuit directly determined Hammer's competence (a fact-finding function which otherwise they eschew).  Instead, it is submitted that the Court of Appeals relied upon this Court's multiple, uncontradicted findings that defendant always had the mental capacity to make decisions at that level.  To be sure, as an aid to its decision-making authority, the Third Circuit considered additional materials submitted directly by Hammer, defendant's own presentation at oral argument, and "the advice of all counsel (including stand-by counsel) [none of whom] suggested that there was <u>any</u> question about Hammer's competence."  *United States v. Hammer*, 226 F.3d at 232 n. 2 (emphasis supplied).  These actions did not transform the Third Circuit's oral argument into a competency examination and were within that Court's jurisdiction to pursue.  *Cf. Rees v. Peyton*, 384 U.S. 312, 313-14 (1966).

The Court of Appeals noted, and there is no contrary authority, that there is no Eighth Amendment or other

67

constitutional provision[15] which compels a person to pursue a criminal appeal. *United States v. Hammer*, 226 F.3d at 236-37. At most, he possessed a statutory right, pursuant to 18 U.S.C. § 3595(a). *United States v. Khattack*, 273 F.3d 557, 561 (3rd Cir. 2001). Ironically, defense counsel relies upon *Khattack* to suggest that his appeal should be reinstated since otherwise there would be a "manifest injustice." (Third Amended Motion, p. 38.) But the Circuit Court of Appeals, which allowed for this waiver, had before it defendant's "entire record [including both parties opening briefs] and concluded that, in the circumstances, the interests of justice do not require that Hammer be compelled to appeal or that we review the proceedings on the merits." *Id.* at 237. At best, under the rubric of Federal Rule of Appellate Procedure 42(b), there has been no finding of "manifest injustice" in denying a direct appeal. *United States v. Khattack*, 273 F.3d at 563. Moreover, Hammer's decision, unlike the one in *Khattack*, was unilateral and never sought or bargained for by the prosecution. In point of fact, the Court of Appeals had the benefit of reviewing the prosecution's brief which responded to the seventeen issues raised by Hammer. Nothing defense counsel present should alter this conclusion.

---

[15] In point of fact, Hammer, by not pursuing an appeal, disavowed a <u>statutory</u> right only established by 18 U.S.C. § 3595.

68

Defense counsel also assert that Hammer's decision to forego the appeal "was not intentionally, knowingly, and voluntarily made." (Third Amended Motion, p. 33.) Ambivalence, even when coupled with mental health diagnoses, should not be equaled with unintentional, unknowing, or involuntary. To be sure, a court should be confident "whether the defendant actually <u>does</u> understand the significance and consequences of a particular decision and whether the decision is uncoerced." *Godinez v. Moran*, 509 U.S. at 401, n. 12 (emphasis in original). To the extent that the Court of Appeals needed this information to exercise its discretion under Federal Rule of Appellate Procedure 42(a), its decision, which includes extended remarks from Hammer during argument, *United States v. Hammer, supra* at pp. 233-34, reflects intentional, knowing, and voluntary action by defendant to discontinue his appeal.

Finally, defense counsel note that the waiver should not have been allowed by the Court of Appeals since he "had no notice of and no lawyer to represent him on these matters and these rights could not be waived until it was determined that Hammer was indeed competent." (Third Amended Motion, p. 35.) But to the extent that the Court of Appeals needed enlightenment, it was provided by *amicus curiae* as well as the entirety of the record including Hammer's presentation of July 18, 2000. At the risk of repetition, none of the counsel involved, including former

69

Circuit Judge Gibbons who served as *Amicus* and would have had a fresh view of the matter, suggested that Hammer was incompetent. *United States v. Hammer*, 226 F.3d at 232 n.2.

Hammer's recent pleadings contain references to his experts' opinions that he could not have intelligently given up his appeal rights.  (Third Amended Motion, pp. 32, 35.)  But such distant and after-the-fact analyses need not be accepted by this Court. *Cf. Drope v. Missouri*, 420 U.S. at 183.

Finally, for good measure, Hammer claims, regarding Attorneys Travis and Ruhnke, that they "failed to properly raise and litigate meritorious claims and to the extent that there existed additional meritorious bases for those issues raised in the appellate brief requiring relief, he was deprived of his right to effective assistance of counsel'. . . ."  (Third Amended Motion, p. 39.)[16]  But this claim begs the question: Who served as Hammer's appellate counsel which answer is provided by the Third Circuit opinion.  *United States v. Hammer*, 226 F.3d at 233 (Hammer "read stand-by counsel's brief").  Having himself as a client and proceeding *pro se* deliberately, petitioner simply cannot raise a Sixth Amendment claim regarding the adequacy of an appeal brief over which he exercised exclusive control.  *United States v. Windsor*, 981 F.2d 943, 947 (7th Cir. 1992).  Further,

---

[16]  Hammer's ineffectiveness assertions with regard to this Ground are limitations-barred for the reasons set forth *supra*.

70

Hammer cannot show "prejudice" given his own decision to dismiss the appeal.

5. **NEITHER HAMMER'S GUILTY PLEA NOR WAIVER OF APPEAL WERE CONTRARY TO DECISIONAL LAW OR EVOLVING STANDARDS OF DECENCY.**

This aspect of Hammer's collateral challenge is procedurally barred and *Teague*-barred as indicated *supra*. Indeed, Hammer's emphasis of the "evolving" standards of the Eighth Amendment makes clear that he is relying on a "new rule" under *Teague*, and none of the *Teague* exceptions to non-retroactivity applies. Additionally, his claim of prejudicial constitutional error fails and, to the extent that he asserts claims of non-constitutional error, does not identify any cognizable basis for collateral relief.

Defense counsel claims that Hammer's entry of a guilty plea as well as waiver of appeal are contrary to "contemporary standards of decency and ever-growing knowledge that the system can and does condemn people to death, who are innocent . . . ." (Third Amended Motion, p. 39.) They take an absolutist approach that the form of plea that Hammer entered, which they claim is an *Alford* plea, and a waiver of direct appeal can never be countenanced by the law. However, decisional law and statutes clearly suggest otherwise.

71

The Supreme Court in *Hudson v. United States*, 272 U.S. 451 (1926), recognized that a plea of innocence *nolo contendere* is an acceptable way of resolving contested criminal charges.  This was reaffirmed by the High Court in *North Carolina v. Alford,* 400 U.S. 25, 37 (1970).  In both instances the Supreme Court noted that it was to the advantage of the defendant to enter such pleas.  *Id.* 36-38.

There well may be other instances in which defendants, who are facing the death penalty, may believe it is in their interest to bypass the guilt phase of such trials and focus their attention solely on the penalty phase.  Congress plainly contemplated that defendants could enter guilty pleas to charges which authorize the implementation of the death penalty by juries.  18 U.S.C. § 3593(b)(2)(A).  Indeed, individuals who are serving life terms of imprisonment or effective life terms, such as Hammer, would have incentive to do so.  Moreover, such actions may reflect genuine feelings of remorse which even the adversary system should acknowledge as legitimate.  Hammer articulated similar and quite logical reasons to Drs. Mitchell and Wolfson when they conducted their initial competency examination.  (TT Vol. 14, pp. 92-94.)

A similar conclusion is appropriate on the question of appeals.  The right to appeal, like any other core privilege, is one which can be waived.  *See Jones v. Barnes*, 463 U.S. 745, 751

(1983); *Paretz v. United States*, 501 U.S. 923, 936 (1991).
Indeed, other courts of appeals have concluded that in certain
circumstances a waiver of an appeal from a death penalty
conviction is permitted.  *St. Pierre v. Cowan*, 217 F.3d 939 (7th
Cir. 2000); *Smith v. Armontrout*, 865 F.2d 1502 (8th Cir. 1989).
As Circuit Judge Greenburg observed, "After all, in general,
parties to federal litigation, whether civil or criminal, need
not appeal adverse verdicts."  *United States v. Hammer*, 226 F.3d
at 235.  Hammer provided cogent, albeit disputable, reasons for
not pursuing review by the Third Circuit.  *Id*. at 233-34.  That
he now denounces his former rationale does not, it is submitted,
undercut its initial validity.

Congress, in enacting 18 U.S.C. § 3595(a), plainly put the
onus on a defendant to pursue an appeal.  Stated in other terms,
that Legislature did not provide for any "automatic review" of a
death sentence.  *United States v. Hammer*, 226 F.3d at 236-36.
Nothing which occurred during the pendency of this case in the
Court of Appeals, nor any recent decisional law, supports a
defense proposition that this Court should take it upon itself to
reconsider Circuit Judge Greenburg's decision in this case, or
conclude that Circuit Judge Nygaard's dissenting views, 239 F.3d
302, 303-07 (3rd Cir. 2001), when *en banc* review was denied, are
in any way persuasive.

The United States did not ask or bargain for Hammer's guilty plea during the rebuttal phase of the trial.  Defendant offered it and this Court, after engaging in additional and appropriate safeguards, accepted it.  Moreover, while the jury was still empaneled, Defendant could have withdrawn it but did not do so.

The United States did not ask for Hammer to waive his direct appeal nor seek to avoid briefing any issues, *but see United States v. Khattack*, 273 F.3d at 562.  Indeed, as if anticipating this present situation, the prosecution argued before the Court of Appeals that Defendant's waiver should not be accepted, due to his ambivalence, which claim was specifically rejected by the Third Circuit.  *United States v. Hammer*, 226 F.3d at 234-35. This Court should adhere to that precedent and not wrongly reward indecision.

The United States believes it is unnecessary and unfair under the circumstances to turn the clock back to June 22, 1998, or July 18, 2000, as Hammer now requests.  There is virtually no doubt as to Hammer's guilt, having been discovered alone at approximately 3:00 a.m., in the most secure aspect of a federal prison, in which the only other person in the cell, the murder victim, had all of his limbs tied to a bed and died as a result of manual strangulation.  Reference to *Herrera v. Collins*, 506 U.S. 390 (1993), by defense counsel (First Memorandum, p. 28), simply is inapplicable to this situation, since Hammer does not

deny killing Marti, he claims only that it was an unfortunate accident.

Hammer's carefully presented strategic plea ("these hands") does not suggest otherwise.  Moreover, nothing in the circumstances, especially where appointed *Amicus* effectively presented arguments, similar to his present position, before the Third Circuit, support the defense request that "The previous decision [by the Court of Appeals on waiver of direct appeal] to the contrary should be reconsidered." (Third Amended Motion, p. 40.)

Hammer has invoked his rights under 28 U.S.C. § 2255 which allows for the Court to correct errors *inter alia* "that the sentence was imposed in violation of the Constitution on Laws of the United States . . . ."  That is all which "contemporary standards of decency" require.  No new rule advocated by him should be retroactively applied.  *United States v. Sanders*, 247 F.3d 139. 146-51 (4th Cir. 2001).

6.    **NEITHER ANY RULE OF CRIMINAL PROCEDURE NOR ANY PROVISION OF LAW REQUIRED THIS COURT PERSONALLY TO ADVISE HAMMER THAT HE COULD WITHDRAW HIS GUILTY PLEA.**

This aspect of Hammer's collateral challenge is procedurally barred and *Teague*-barred as indicated *supra*.  No case precedent in effect at the time his conviction became final dictated relief on his claim, and none of the exceptions to non-retroactivity

applies.  Further, his claim of prejudicial constitutional error fails and, to the extent that he asserts claims of non-constitutional error, does not identify any cognizable basis for collateral relief.

Federal Rule of Criminal Procedure 11(c) enumerates six (6) different aspects of advice which this Court should have provided to Hammer prior to acceptance of his guilty plea.  Not referenced is a defendant's ability to withdraw a guilty plea.  Rather, then-existing Federal Rule of Criminal Procedure 32(e) sets forth a person's ability to reconsider a guilty plea.  Additionally, while there are other aspects of Rule 32, notably Rule 32(c)(3)(C), which require that a Court personally address a defendant, this does not relate in any fashion to the right to withdraw a guilty plea.

Only when a defendant has not been fully apprized of its consequences, can a guilty plea be challenged under principles enunciated in the Due Process clause.  *Mabry v. Johnson*, 467 U.S. 504, 511 (1984).  Indeed, the Court of Appeals for this Circuit, in *United States v. Salmon*, 944 F.2d at 1130, has indicated that fairness requires only that the direct consequences of a guilty plea be explained to a criminal defendant.  What the defense apparently would have this Court do is to advise Hammer and others of collateral effects in potential situations, for them in the future.  Taking their claim one-step further, this Court

76

should have been required to explain various rights allowed defendants by Title 18, United States Code, Section 3592, as well as the right to be present under Federal Rule of Criminal Procedure 43, and his right to appeal his sentence under Rule 32(c)(5).

Defendant suggests that the failure of the District Court to make statements directly to him violated his right to be present. (Third Amended Motion, p. 41.)  However, Federal Rule of Criminal Procedure 43(c)(3) is applicable.  The side-bar comments by this Court to defense counsel were appropriate and need not have been made directly to defendant.  *United States v. Bertoli*, 40 F.3d 1384, 1397 (3rd Cir. 1994) *reh'g denied,* 74 F.3d 1228 (1995), *cert. denied,* 517 U.S. 1137 (1996).

Finally, Defendant asserts that this Court's remarks to attorney Ruhnke "presented a change in circumstances which Mr. Hammer should have been apprized of on the record.  *See generally, United States v. Harrison*, 241 F.3d 289 (2nd Cir. 2001)."  (First Memorandum, p. 29.)  When viewed correctly, it is submitted that, this Court's reaction to defense counsel's penalty phase opening reflected surprise at their strategy that, notwithstanding Hammer's remarks during the guilty plea proceeding, the defense still was contesting the applicability of 18 U.S.C. § 3591(a)(2)(A).  Regardless of how one characterizes this Court's remarks, Hammer, both directly and through "learned

counsel" who then represented him, knew that Rule 32(e), as it then existed, allowed for a change of heart regarding his plea, but did not wish to invoke that procedure.  Defense counsel simply provides no direct or even closely analogous case law which would have required that this Court directly to advise Hammer of his right to withdraw his guilty plea.  (Third Amended Motion, p. 41; First Memorandum, p. 30.)

7.   **THE PROSECUTION DID NOT PRESENT ANY MISLEADING EVIDENCE REGARDING HAMMER'S KILLING OF MARTI.**

Seeking to maintain the DID defense and cast aspersions on the United States, Hammer's new attorneys pose a dilemma by arguing that the prosecution either did not conduct a "thorough and unbiased investigation" or intentionally provided misleading information in Hammer's statement to the Federal Bureau of Investigation about the events within the cell. (Third Amended Motion, pp. 42-43.)  They set out seven specifics of purportedly incorrect facts, but provide no information why those particular details are important, (Third Amended Motion p. 43), and claim that Hammer falsely confessed to the murder "to cover-up evidence of an accidental killing during a sexual encounter."  (Third Amended Motion, p. 46.)

This aspect of Hammer's collateral challenge is procedurally barred and *Teague*-barred as indicated *supra*.  No case precedent in effect at the time his conviction became final dictated relief

on his claim, and none of the exceptions to non-retroactivity applies.  Additionally, his claim of prejudicial constitutional error fails and, to the extent that he asserts claims of non-constitutional error, does not identify any cognizable basis for collateral relief.

It is well at the outset to review trial circumstances. Repeatedly, defense counsel claim that the entirety of Hammer's purportedly false confession provided an integral aspect of the prosecution's evidence to support both the guilty plea and death sentence.  (Third Amended Motion, pp. 43-44.)  A dispassionate review of the facts presented during the guilty plea colloquy (TT Vol. 14, pp. 112-13), as well as closing arguments in the penalty phase (TT Vol. 27, pp. 60-152), simply does not support this claim.

There is a cogent reason why the prosecution did not significantly rely upon Hammer's admissions at trial.  With his DID defense, the prosecution sought to portray defendant as a manipulator, if not a malingerer.  Even Dr. Sadoff conceded that Hammer was the type of person whose life was marked by many instances of "fraudulent behavior."  (TT Vol. 11, pp. 51-54.)  In short, the jury well knew that many details which Hammer provided to anyone should be accepted with "grains of salt."

The prosecution does not dispute significantly defense counsel's reference to *Napue v. Illinois*, 360 U.S. 264, 269

79

(1959), as a guiding principle of law.  (First Memorandum, pp. 30-31.)  But in criticizing the Government that it "should have known of the falsity of the evidence" (First Memorandum, p. 31), it is important to recall that only two people knew what occurred between approximately 1:00 a.m. and 3:00 a.m. in Special Housing Unit Cell 103 on April 13, 1996.  One is dead and the other is the defendant.

That Marti died in the early morning hours was the subject of the officer's testimony, who conducted the "counts" and discovered the body. (TT Vol. 3, pp. 23-28.)  Whether the time of death was 2:15 a.m. or 15 to 30 minutes earlier, as the defense now seems to claim, is of no materiality.

The reason it is unimportant is that Marti was found as he was.  Dr. Funke indicated that marks on the victim suggest that he struggled in his arm and leg restraints. (TT Vol. 4, pp. 76-77.) Indeed, the officers testified that the homemade rope was so tightly applied they could not untie it but, instead, had to cut it with scissors. (TT Vol. 3, pp. 154-155.)

Hammer, in his statement to officials on the morning of the killing, made no reference one way or the other that he had sex with Marti.  But this claim was not refuted by the pathologist, nor was it disputed by the prosecution, while it was promoted by the defense in their opening remarks.  (TT Vol. 2, p. 25.)  It simply was and remains of no consequence.  Moreover, whether

Marti was precisely was killed and "tied face down," Hammer put "pressure on his back" and whether "the 'hostage' ruse" caused the victim to be in restraints, also are of marginal interest, at best.  (Third Amended Motion, pp. 42-43.)  The marks on Marti's neck and his overall physical condition confirmed that he was strangled, that conclusion of Dr. Funke remaining unassailable.

Of course, to prevail on this claim, David Paul Hammer must testify at a hearing before this Court that he intentionally provided false information to investigating officials.  Moreover, he may have to concede that what he told this Court during the guilty plea colloquy about his actions also was, in part, a lie. (TT Vol. 14, p. 114.)  Defendant's truthfulness on that and other issues is a credibility determination for this Court to make. *Masciale v. United States*, 356 U.S. 386, 388 (1958); *United States v. Paster*, No. 4:CR-96-221, slip. Op. 6-7 (6/10/02). (Copy previously attached.)  Even if such testimony is given, this begs further questions to be asked.  In short, Defendant, if he continues to press this ground, has many substantial hurdles to overcome in order to prevail.

Hammer claims that the prosecution possessed inmate witnesses' statements which contradicted the government's theory of the case which should have been revealed.  (Third Amended Motion, p. 43.)  But at the risk of repetition, there were no eye-witnesses to the killing of Marti except for Hammer.

81

Consequently, if inmates had favorable information which contradicted the seven specifics of intentional falsehood (Third Amended Motion, pp. 42-43), the only way for them to have such knowledge would be for Hammer to advise them.  The prosecution asserts now, as it has maintained all along, that favorable materials have been released.  At the forthcoming hearing, the defense must present witnesses who support their claim rather than rely upon unsupported assertions.

Hammer now faults Attorneys Ruhnke and Travis for failing to investigate and present evidence at trial that Hammer provided "prior false confession to murders that he did not commit. . . ." (Third Amended Motion, p. 44.)  But the defense and prosecution jointly, but in different ways as well as for different purposes, advised the jury that Hammer had lied on multiple occasions.  (TT Vol. 28, pp. 94-101; Vol. 29, pp. 24-25, 30.)  That defense counsel may not have utilized all of their client's past instances of false confessions to murders to challenge his statement to the FBI about Marti's killing, is of no consequence. There well may have been tactical or other reasons[17] for not offering them.  Regardless, Hammer has failed to show that counsel's performance was deficient and resulted in prejudice.

---

[17]  The defense strategy then sought to exclude from the jury's attention all of Hammer's antics.  (TT Vol. 11, p. 52.)

82

Hammer's subsequent, unilateral decision to plead guilty undercuts any claim of prejudice.

8. **THE PROSECUTION DID NOT ENGAGE IN ANY IMPROPER CONDUCT AT TRIAL RELATING TO THE SUPPRESSION OF EVIDENCE FAVORABLE TO THE DEFENSE.**

Not surprisingly, defense counsel claims that the prosecution, in four separate respects, engaged in conduct which violated Due Process and the fairness of proceedings. (Third Amended Motion, pp. 46-53.)  This aspect of Hammer's collateral challenge is procedurally barred and *Teague*-barred as indicated *supra*.  No case precedent in effect at the time his conviction became final dictated relief on his claim, and none of the exceptions to non-retroactivity applies.  Additionally, his claim of prejudicial constitutional error fails and, to the extent that he asserts claims of non-constitutional error, does not identify any cognizable basis for collateral relief.

Assuming *arguendo* that Hammer's references to decisional law are correct, (First Memorandum, p. 33), his claims lack any semblance of a factual basis.  In some, still unexplained[18] fashion (presumably through a FOIA request), the defense following trial received an apparent BOP document.  The importance of the document, according to the defense, was that

---

[18]  Someone from the previous "defense team" should testify at a hearing by what means the document was secured to establish the threshold validity of this claim.  At present, the United States awaits probative testimony to support its authenticity.

Hammer supposedly suffered from Bipolar disorder and, if un-medicated, would likely engage in "irrational behavior."

One cannot disclose something of which one is unaware.  That is the first problem for the defense.  No one on the prosecution team saw that document.  (See previously attached affidavit of Anthony S. Malocu, Special Agent, Government Exhibit 3.)  It has no author and could have come from persons at the Regional or Central Office of the Bureau of Prisons, who must have relied on hearsay.

But regardless, what does it add?  The defense consulted a "renowned expert" who reached another diagnosis to which Hammer apparently still clings.  Indeed, Defendant had been subjected to multiple diagnoses over the years, which fact was presented by Dr. Sadoff in his testimony. (TT Vol. 10, pp. 107-08.)  The variety of diagnoses was repeated in Dr. Wolfson's testimony. (TT Vol. 11, pp. 160-163; TT Vol. 12, pp. 55-81.)  One more diagnosis by an unknown author simply would not have made a difference.

A separate documentary-based claim, relates to the supposed "suppress[ion of] BOP documents from May [14,] 1998 that Hammer had refused various medications . . . ." (Third Amended Motion, p. 47.)  But there is no record of a request for that documentation from the defense.  Government Exhibit 3. Regardless, Hammer's periodic refusal to take medication was

84

something which all parties knew, even from trial testimony. (TT Vol. V, pp. 187-88; Government Exhibit 1.)  Moreover, the critical inquiry remains unanswered: how could it have made a difference to a guilty plea entered on June 22, 1998, as well as subsequent proceedings?

Next, Hammer complains about physical evidence and the testimony of Special Agent Callaghan.  (Third Amended Motion, p. 48.)  When tests were conducted, the results were provided.  No tests were done of the clothes which Hammer and Marti wore or were comparisons made of the swabs.  The swabs, as well as Hammer's and Marti's clothes in 1998 and through today, exist and can be tested by the defense.  Government Exhibit 3.

As to Special Agent Callaghan's testimony, much is made about virtually nothing.  Only tests for blood and semen were conducted.  Blood was found on a pillow and on a sock.  Both contained Marti's blood. (TT Vol. 4, p. 42.)  No semen was found on any swabs or on "testable" slides. (TT Vol. 4, pp. 43-45.)

To be sure, former defense counsel, in questioning Callaghan, "learned" what they <u>already knew</u>, that Hammer had not been asked to supply any materials for DNA testing. (TT Vol. 4, pp. 53-54.)  With no semen found at all on tested items and with Marti's blood identified on objects near where the victim was found, there was no need for Hammer to be asked to give any blood for analysis purposes.

The latex glove is even more off the mark.  Although one is seen in a videotape of Cell 103, taken after the murder, whether it was brought into the cell by correctional officers who responded to the murder scene or had been unlawfully secured by Marti or Hammer remains unknown.  Moreover, the FBI never received the item as attorneys Ruhnke and Travis knew from discovery given to them.  (Government Exhibit 3.)  Most importantly, the prosecution simply did not dispute Hammer's statement that at some point in time he engaged in sexual relations with Marti in Cell 103.  Consequently, no misconduct[19] occurred.

Finally, according to the defense, they discovered in the Winter of 2000, what appears to be a Government memo indicating, among other things, that "Mr. Marti, specifically requested to cell with Hammer . . . ."  (Third Amended Motion, p. 51.)  But, this was the fair implication of testimony from inmate witnesses, Yager and Classen. (TT Vol. 21, pp. 81-83; TT Vol. 22, pp. 48-49.)  Indeed, a correctional officer testified for the defense

---

[19]  Hammer seeks to have it all ways.  He claims that his statement was false and the prosecution should have known it because it omitted any reference to sex.  (Third Amended Motion, pp. 42-43.)  Hammer then claims that law enforcement officials should have known of the "apparent" importance of retaining the latex glove as evidence of a sexual encounter.  (Third Amended Motion, p. 51.)  To state Hammer's claim of alleged governmental misbehavior is to reveal its labyrinthian and inconsequential character.

that Marti wanted to live with Hammer.  (TT Vol. 7, pp. 148-49.) The prosecution stated that both inmates sought to live together. Thus, this "discovery" is consistent with the evidence adduced at trial and simply does not represent anything remotely novel, let alone exculpatory or "useful," for the defense <u>and</u> intentionally suppressed by the prosecution to Hammer's detriment.

Hammer's recently revised pleadings refer to the failure of Attorneys Ruhnke and Travis to have tested a number of clothes and bed linen for the presence of human "biological material." (Third Amended Motion, p. 51.)  These items, which the defense claimed at one time no longer existed, (Third Amended Motion, p. 50), remain available and are being subjected to analysis. (Third Amended Motion, p. 50; Second Memorandum, p. 55.)  But assuming that the testing confirms the existence of "human biological substances," a term which, according to their expert, could include urine, saliva, semen, or blood, what does that prove?

The prosecution view has not changed over time.  That is, it was conceded in the response filed February 4, 2003, that Hammer and Marti probably engaged in homosexual activities.  (See page 56.)  Indeed, at trial the prosecution conceded in argument that Marti and Hammer probably had engaged in sex.  (TT Vol. 27, p. 132.)  Consequently, there is nothing gained in confirming marginal facts which were not in dispute.

One further observation is pertinent.  With respect to Hammer's most recent claim that he engaged in anal sex with Marti immediately prior to killing him, it is the understanding of the prosecution that even if such testing confirmed the presence of DNA on clothing, there would be no "carbon dating" available.  That is to say, the forensic tests would not reveal whether the homosexual activity occurred on April 9, 10, 11, 12, or just prior to or even after Hammer's supposed accidental killing of Marti early on April 13, 1996.  In short, any testing results will be of no consequence to anyone.  The failure to retain an expert or to conduct such tests, as a corollary, had no prejudicial effect on Hammer's defense whatsoever.

Hammer's attorneys, citing among other cases, *Strickler v. Greene*, 527 U.S. 263 (1999) and *Kyles v. Whitley*, 514 U.S. 419 (1995), claim that governmental ignorance of the existence of documents is no excuse.  (Second Memorandum, pp. 24-25.)  It has yet to be determined that items in question are legitimate documents which existed at the time of trial.  But the reports by Dr. Sadoff and others, <u>including</u> Dr. Wolfson suggest that they thought they had access to Hammer's records.  Thus, if there was a mistake, it affected everyone which suggests that there was no attempt at engaging in any unfair proceedings.

Defense counsel augments his argument and acknowledges that "Hammer's . . . counsel did not request [BOP records from May of

88

1998 through the subsequent waiver proceedings]."  (Second Memorandum, p. 25.)  But what else did defense counsel utilize? The likely preparer of the "BOP records" or at least someone very familiar with these was their witness at the penalty phase with whom they consulted prior to his testimony.  That person was Dr. Mitchell, the "defense representative" during the competency proceedings.  Thus, when <u>all</u> pertinent facts are presented, it is submitted, that defense counsel did not have to ask for documentation when they possessed that information in a different form.  For all of these reasons, Hammer has failed to show that counsel's performance was deficient and resulted in prejudice to the defense.

9.    **THE RECORD DEMONSTRATES HAMMER'S KNOWING WAIVER OF HIS RIGHT TO COUNSEL FOLLOWING THE JURY'S VERDICT.**

This aspect of Hammer's collateral challenge is procedurally barred and *Teague*-barred as indicated *supra*.  No case precedent in effect at the time his conviction became final dictated relief on his claim, and none of the exceptions to non-retroactivity applies.  His claim also seeks to relitigate issues effectively resolved by the Third Circuit on direct appeal and, thus, is barred for that reason.  Finally, his claim of prejudicial constitutional error fails and, to the extent that he asserts claims of non-constitutional error, does not identify any cognizable basis for collateral relief.

Even before October 1, 1998, Hammer knew well of the difficulty and gravity associated with his proposed decisions to proceed *pro se* and proposed refusal to appeal. (HT 8/1/98.) On August 1, 1998, Defendant, who appeared before this Court, had been convicted and ultimately faced automatic imposition of the sentencing recommendation of death by the Court, pursuant to 18 U.S.C. § 3594. At that time, this Court expressed great concern over the "magnitude" and delicacy of Hammer's apparent interest as expressed in his pleadings to discharge counsel. (HT 8/3/98 p. 4.) Defendant later in the hearing acknowledged this. (HT 8/3/98 p. 12.) This was underscored at that proceeding in two fashions. It related to the extended briefing schedule established by this Court on the possible discharge of counsel as well as the prophylactic need to conduct a second competency evaluation to review his rationale. (HT 8/3/98 pp. 4-16.)

Hammer, well before any formal colloquy occurred, acknowledged in pleadings filed by Attorney Smith on September 2, 1998, that he was willing to assume the risks of proceeding without attorney assistance. To further emphasize his willingness to waive counsel, Hammer presented on September 8, 1998, his *pro se* brief, also citing *Faretta v. California*, 422 U.S. 806 (1975), which pleading he authored while undergoing the competency evaluation in Springfield, Missouri.

At this point, his attorney-authored, post-trial motions had already been decided by this Court on September 15, 1998. There was nothing to do except await imposition[20] of sentence. Indeed, neither in their pleadings nor Memoranda does defense counsel suggest what should have been done by counsel. Nonetheless, Hammer submitted a sentencing motion which was denied at sentencing. Attorneys Smith and Ruhnke, moreover, remained available, at least on a "stand-by basis." There simply was no Sixth Amendment violation.

This Court on October 1, 1998, conducted a colloquy with Defendant to ensure that defendant knowingly wished to waive his Sixth Amendment right to counsel. (HT 10/1/98 pp. 121-159.) This Court specifically advised Hammer that his very life hung in the balance regarding his request to proceed without counsel. (HT 10/1/98 pp. 135-141.) Thus, he could hardly have been more impressively aware "about the risks of proceeding *pro se*." (Third Amended Motion, p. 53.) As Defendant's post-trial motions had already been determined, this Court focused appropriately on

---

[20] Defendant's reference to *United States v. Salerno*, 61 F.3d 214 (3rd Cir. 1995), is somewhat instructive. (First Memorandum, p. 38.) When a defendant seeks to waive counsel post-trial, but before sentencing, a colloquy should focus on the intricacies of the Sentencing Guidelines. *United States v. Salerno*, 61 F.3d at 219-21. But as stated in argument and notwithstanding counsel's statement to the contrary, there was nothing for Hammer or his counsel to do in October 1998 except to await formal imposition by the District Court of the jury's sentence recommendation.

potential appellate proceeding and the uses of counsel for those purposes.  Not only did Hammer himself list  potential issues for the Circuit to consider, but also he heard from defense counsel as well as the prosecution.  (HT 10/1/98 pp. 124-135.)  Hammer responded affirmatively when asked whether he possessed an adequate "understanding of the applicable issues in this case." (HT 10/1/98 pp. 135.)  Moreover, this Court plainly advised Hammer that if persisted in his position, he would "be completely on [his] own. . . ."  (HT 10/1/98 p. 139.)

Citing *United States v. Stubbs*, 281 F.3d 109 (3rd Cir. 2002), the defense apparently claims that this Court did not advise him "about the risks of proceeding *pro se*."  (First Memorandum, p. 37.)  But as the above-referenced facts indicate, Hammer knew, if he persisted in his views, the difficult task of writing an appellate brief, fell completely to him with imposition of the death penalty as a consequence if his efforts failed.  Moreover, unlike *United States v. Stubbs*, 281 F.3d at 119, there were no interruptions to Hammer's inquiries or a "glaring and substantive omission."

Defense counsel claim that "[a]lthough Hammer's waiver was for appellate purposes and not pre-trial, . . . the same exacting [colloquy] standards apply, if not greater standards given the qualitative difference in death from all other punishments." (First Memorandum, p. 38.)  But the case upon which they rely,

*United States v. Salerno*, 61 F.3d 214 (3rd Cir. 1995), regarding post-trial waivers of counsel, indicates that the colloquy should address the future proceedings at which counsel will not be present as the petitioner's legal representative, not what already has been resolved before the Court.  *Id*. at 219-21.  Even *United States v. Stubbs*, 281 F.3d at 119, reveals that the District Court's shortcomings for a mid-trial colloquy included "not inform[ing] Stubbs of the possibility of rebuttal and sur rebuttal."  It is submitted that this Court properly focused on the appellate[21] issues and need not have addressed the pitfalls for *pro se* litigants proceeding *ab initio*.

Most importantly, Attorneys Ruhnke and Travis were "reunited" with Hammer following his supposed authorization for them to file an appeal on November 12, 1998.  They prepared the appeal brief, although *eo nomine* of Defendant, as stand-by counsel.  *United States v. Hammer*, 226 F.3d at 231-32.  Under the circumstances Hammer is not "entitled to a new appeal."  (Third Amended Motion, p. 54.)

Hammer's recent pleadings suggest that Attorneys Travis and Ruhnke should have preserved the issue of this Court's

---

[21]  Ironically, 18 U.S.C. § 3595(c) places additional burdens in reviewing death sentences on Courts of Appeals which they otherwise do not have under 18 U.S.C. § 3742 and 28 U.S.C. § 1291.  Using Hammer's reasoning, these ameliorative provisions should have been brought to Defendant's attention.  To state their premise is to reveal the limitations in the argument.

purportedly insufficient colloquy and also failed to advise him of the wishes of proceeding *pro se*. (Third Amended Motion, pp. 53-54.)[22] But no proof has been presented that this advice was not given. Moreover, as stated above, notwithstanding this Court's advice, Hammer did pursue an appeal, had the benefit of counsel to advise him in their stand-by role, and at any time could have sought the full reinstatement of Attorneys Ruhnke and Travis by the Court of Appeals as his counsel of record. Finally, Hammer himself determined what issues to pursue on appeal. He cannot now complain of any omissions in his appellate presentation, especially since he discontinued that proceeding altogether. *United States v. Windsor, supra.* For all of these reasons, Hammer has failed to show that counsel's performance was deficient and resulted in prejudice to the defense.

10.   **THE DISTRICT COURT CORRECTLY DETERMINED HAMMER'S COMPETENCE.**

Defense Counsel faults this Court for failing to initiate on its own motion a competency examination when Hammer on May 14, 1998, allegedly swallowed razor blades at the Allenwood Penitentiary where he then was held. (Third Amended Motion, pp. 54-55.) This aspect of Hammer's collateral challenge is procedurally barred and *Teague*-barred as indicated *supra*. No

---

[22] Hammer's ineffectiveness assertions with regard to this Ground are limitations-barred for the reasons set forth *supra*.

94

case precedent in effect at the time his conviction became final dictated relief on his claim, and none of the exceptions to non-retroactivity applies.  For reasons which follow, his claim of prejudicial constitutional error fails and, to the extent that he asserts claims of non-constitutional error, does not identify any cognizable basis for collateral relief.

Pertinent case law on whether a District Court has such an obligation is one with which this Court is familiar, *United States v. Leggett*, 162 F.3d 237 (3rd Cir. 1998), *cert. denied,* 528 U.S. 868,  120 S. Ct. 167 (1999).  As Judge Roth noted, the test is as follows [for requiring a competency examination]:

> In determining whether a defendant satisfies this two-prong test a court must consider a number of factors, including: 'evidence of a defendant's irrational behavior, [the defendant's] demeanor at trial, and any prior medical opinion on competence to stand trial.'  *Drope*, 420 U.S. at 180, 95 S. Ct. 896.  However, due to the vicissitudes of all cases, a court must be cognizant that '[t]here are . . . no fixed or immutable signs which invariably indicate the need for [a competency hearing].'  *Id*.  There is no predetermined formula for making a finding of reasonable cause.  A court must simply look at the unique circumstances of the case and decide whether the defendant (1) has the capacity to assist in her or his own defense and (2) comprehends the nature and possible consequences of a trial.  If either prong is not met, a court has reasonable cause to order a competency hearing.

*Id.* at 242.

While swallowing a razor blade[23] might signify "reasonable cause" in certain other cases, David Paul Hammer, like Leggett, hardly was the ordinary case.  There had been two prior forensic mental health examinations of Defendant.  Neither suggested that he was incompetent.  Hammer had engaged in "antics" in the past including attempts to plead guilty with self-dictated conditions on two occasions.  While this attention-getting behavior in other circumstances might establish the "reasonable cause" under Title 18, United States Code, Section 4241(a) which, in turn, would trigger a District Court's responsibility, Defendant, before this Court, always appeared lucid, oriented, and retained the ability to "assist in his own defense and . . . comprehend[ed] the nature and possible consequences of trial." *Id.*  Indeed, the transcript of his appearance on May 14, 1998, which was delayed by the razor incident, reflects this Court's monitoring of his behavior and evidences no facts which suggested to <u>any</u> participants at the trial that his action was a symptom of, or prelude to, any significant mental problems.  (Jury Selection, Vol. 8, p. 264.) This is in stark contrast to the events recounted in *United States v. Jones*, 336 F.3d 245, 256-260, when the Third Circuit concluded that an evaluation was warranted.  Under the

_____

[23]  This Court should recall that Hammer swallowed only one razor blade, not multiple ones as suggested by the defense, and it had exceedingly small dimensions.  (Jury Selection, Vol. 8, pp. 20-25.)

circumstances and especially since no adverse consequences occurred at the proceeding, this aspect of Defendant's Motion should be denied. *United States v. Leggett*, 162 F.3d at 245.

Hammer criticizes the prosecution's response for either being too expansive (referring to earlier events in time) or too myopic (referring to the fact that Hammer appeared fine in court on that day.) (Petitioner's Traverse, pp. 28-29.) They also note correctly that "mental illness, in general, waxes and wanes. . . ." To describe their argument is to show that they want it all ways. To be sure, if following May 13, 1998, another of Hammer's "grand standing" incidents, there were further observations that he could not aid counsel or understand what was going on from the Court, from trial counsel, or from the prison, then action may have been appropriate. But Mr. Ruhnke's observations about his client that "I see him as, you know, potentially in an explosive frame of mind" (Second Memorandum, p. 29), still does not trigger 18 U.S.C. § 4241(a). *United States v. Leggett, supra*, *United States v. Jones*, 336 F.3d at 258.

11. **HAMMER UTILIZED THE SERVICES OF COUNSEL FOLLOWING THE JURY'S VERDICT AND IMPOSITION OF SENTENCE.**

Defendant argues that due to a "conflict of interest" which Attorney's Ruhnke and Travis had with their former client, he effectively had no counsel. (Third Amended Motion, pp. 55-58.) This aspect of Hammer's collateral challenge is procedurally

barred and *Teague*-barred as indicated *supra*.  No case precedent in effect at the time his conviction became final dictated relief on his claim, and none of the exceptions to non-retroactivity applies.  Finally, for the following reasons, his claim of prejudicial constitutional error fails and, to the extent that he asserts claims of non-constitutional error, does not identify any cognizable basis for collateral relief.

The details which are of record and which the defense supplies undercut this claim.  In part, timing is critical.  It is true that on July 31, 1998, Hammer filed pleadings which suggested that he wished to proceed *pro se*.  Before action could be taken on this request, Attorneys Travis and Ruhnke nonetheless filed timely motions for a new trial, pursuant to Federal Rule of Criminal Procedure 29(c).  *See United States v. Hammer*, 25 F. Supp. 2d at 534.  These were fully briefed by those defense counsel but denied on September 15, 1998.  *Id.* at pp. 534-37.

While continuing to receive services from those attorneys, this Court recognized that Hammer had wishes which, obviously, were contrary to theirs.  Consequently, on August 10, 1998, this Court deferred ruling on the request of Attorneys Ruhnke and Travis to withdraw but appointed another counsel for Hammer, Stephen C. Smith, Esquire, on that same date.  *United States v. Hammer*, 25 F. Supp. 2d at 522.

When a criminal defendant expresses dissatisfaction with counsel, this Court is empowered to appoint replacement counsel if there appears to be an irreconcilable difference. *Cf. United States v. Goldberg*, 67 F.3d 1092, 1098 (3rd Cir. 1995). This occurred and, as stated above, new - or more aptly described - supplemental counsel was appointed.

That Defendant now or his new legal representatives in this proceeding were unhappy with the representation which Mr. Smith provided in August through November 1998, is of no moment whatsoever. (HT 10/1/98 p. 143.) Simply put, Hammer's election to proceed with new counsel then effectively precludes or estops petitioner from complaining now about his chosen strategy for several months in 1998 when counsel then honored his wishes. *Cf. Strickland v. Washington*, 466 U.S. 668, 689-90 (1984).

Petitioner complains that "counsel were functionally discharged by the conclusion of that [October 1, 1998, competency] hearing. . . ." (Third Amended Motion, p. 56.) But attorneys Smith and Ruhnke continued to serve as Hammer's stand-by legal representative even after this Court's ruling on October 9, 1998, as allowed by the Sixth Amendment for *pro se* litigants.

As to any potential impact from DID and its effects on Hammer, this Court, Attorney Smith and even the prosecution were obligated to act under 18 U.S.C. § 4241(a) if there was "reasonable cause" to call into question Defendant's competence.

99

*United States v. Leggett*, 162 F.3d at 241.  Moreover, this Court, notwithstanding Hammer's outstanding request to proceed *pro se*, still had the ability to determine whether a further competency evaluation was necessary.  *United States v.* George, 85 F.3d 1433, 1437-38 (9th Cir. 1996).  But there was no such behavior evident and consequently no requirement to reinstate Attorneys Ruhnke and Travis, "to investigate . . . competency issues even though same was contrary to Hammer's stated desires." (Third Amended Motion, p. 56.)

Based upon the 2004 experts' reports, Hammer complains that Attorneys Travis and Ruhnke were deficient for failing to investigate his competency beginning in August 1998 and continuing thereafter.  (Third Amended Motion, pp. 57-58.)  But while counsel were experienced, they were not prescientent of evaluations which would be made six years in the future.  Moreover, counsel would have been in contact with their expert witnesses who testified in the penalty phase of proceedings, Drs. Gelbort and Mitchell.  Both mental health reviewers would have known of Hammer's guilty plea as well as had opportunities in trial (and, in Dr. Mitchell's case, at the Allenwood Penitentiary), to bring to counsel's attention any information which they thought reflected on petitioner's incompetence but simply did not do so.  Indeed, that they utilized the services of Dr. Mitchell as their witness at the penalty phase in July

absolves them from criticism of new counsel for "fail[ing] to secure even the most basic information to assess Hammer's competence, his prison psychiatric packet surrounding the time of the purported waivers. . . ."  (Second Memorandum, p. 31.) Consequently, there has been no Sixth Amendment violation on their part.  Hammer has failed to show that counsel's performance was deficient and resulted in prejudice to the defense.

12.    **WITH APPROPRIATE DEFERENCE TO ATTORNEY-CLIENT PRIVILEGES, THIS COURT SUFFICIENTLY INQUIRED INTO HAMMER'S UNHAPPINESS WITH HIS FORMER COUNSEL.**

This aspect of Hammer's collateral challenge is procedurally barred and *Teague*-barred as indicated *supra*.  No case precedent in effect at the time his conviction became final dictated relief on his claim, and none of the exceptions to non-retroactivity applies.  Moreover, as will be discussed, his claim of prejudicial constitutional error fails and, to the extent that he asserts claims of non-constitutional error, does not identify any cognizable basis for collateral relief.

One would think from reading Defendant's eleventh claim of error that Attorneys Ruhnke and Travis did virtually nothing, when on August 3, 1998, this Court considered Hammer's request to remove them as his counsel.  (Third Amended Motion, p. 58-59.) But, the record shows otherwise and suggests that the claimed, "adverse effect on representation" and "ethical 'catch-22'" are a reflection of new counsel's unfamiliarity with the record, as

101

well as contradicted by their claims.  (Third Amended Motion, p. 58.)

To begin with, there was no need for this Court "to inquire into that conflict [of interest]." (Citations omitted.)  (Third Amended Motion, p. 58.)  It was obvious that Hammer wished to have the death penalty imposed which plainly was contrary to the vigorous actions of Attorneys Travis and Ruhnke for the almost two preceding years.  *United States v. Hammer*, 25 F. Supp. 2d at 521-22.  Further questioning would have been pointless.  The following recapitulation of the activities of the previous defense team is presented to debunk the idea that they were so conflicted and that their "ethics" forbade them from actively pursuing a course contrary to Hammer's stated desires.  (Third Amended Motion, p. 58.)

This Court required defense counsel to brief post-verdict issues, which they did on August 14, 1998, as well as on September 11, 1998.  Defense counsel opposed the prosecution's request that Hammer again be sent to Springfield for another competency examination.  (HT 8/3/98 pp. 9-10.)

Indeed, that Travis and Ruhnke were still attorneys who actively represented "Jocko," if not Hammer, is witnessed by this Court's Order of September 1, 1998, which set briefing on whether Defendant could discharge them at all.  With the issue still unresolved, Attorneys Travis and Ruhnke filed, on September 2,

102

1998, legal arguments in support of their earlier filed effort to "bar Defendant from waving new trial motions and his Appeal of his sentence of death."  This would have been a wonderful opportunity at which to raise this claim of supposed "mismanagement by the Bureau of Prisons of Hammer's psychiatric and medical condition," if such facts exited. (Third Amended Motion, p. 58.)

Attorney Travis filed a Status Report on September 4, 1998, while Attorney Smith submitted a Motion to Return Prisoner on September 16, 1998.  Moreover, this Court, by order dated September 18, 1998, invited all counsel, including Travis and Ruhnke, to submit proposed Findings of Fact and Conclusions of Law.  As a result, on October 1, 1998, all attorneys, including Travis and Ruhnke, presented such a submission, as well as their comments, to this Court which, again, could have included such claims.  *United States v. Hammer*, 25 F. Supp. 2d at 527; Findings Nos. 63, 65, & 67.  At the hearing itself neither Attorney Ruhnke nor Attorney Travis took a passive role.  The former cross-examined Dr. Mitchell while the former acted similarly with Dr. Wolfson.  (HT 10/1/98 pp. 109-15 and 43-75.)  Attorney Ruhnke also presented to the Court's attention Dr. Sadoff's testimony. (HT 10/1/98 pp. 121-22.)

As previously stated, part of Hammer's present arguments rely upon information developed in late 2000 by Attorney Travis

following his discharge even while new attorneys had been appointed to represent Hammer in § 2255 proceedings.  That is, it was Attorney Travis, who "discovered" the April 10, 1996, "mystery" memorandum as well as other Bureau of Prisons' documents which form their Ground Seven.  (Third Amended Motion, p. 51; Government Exhibit 3.)

If defense counsel maintain this argument, testimony may have to be presented from Attorneys Travis and Ruhnke regarding their alleged inactivity[24] in this case and their rationale.  It is submitted that, even if Hammer persists, what will be demonstrated is that present defense counsel are merely second-guessing and serving as "Monday morning quarterbacks" for Attorneys Ruhnke and Travis, which hardly demonstrates a Sixth Amendment violation.  *Strickland v. Washington*, 466 U.S. at 689-91.

Hammer's counsel acknowledge the action, which Attorney's Ruhnke and Travis took but note that the submissions "were all filed by order of the Court."  (Second Memorandum, pp. 32-33.) That same observation, of course, can be made of many actions pre-trial.

---

[24]  Explanations also will be required regarding counsels' activities on the appellate level as well as their continuing communications with Hammer at Bureau of Prisons' facilities.

104

To be sure, counsel argue that "what is particularly telling is not what counsel did, but what they failed to do" and then once more alluding to their failure "to secure and review Hammer's institutional psychiatric and medical records from around the time of the purported waiver." (Petitioner's Traverse, p. 34.)  At the risk of repetition, Attorney's Travis and Ruhnke well knew about what occurred then -- they contacted Dr. Mitchell and utilized him as their witness and could have ascertained on October 1, 1998, what that mental health provider had observed during that time frame, if it supported some finding of incompetence.  But Dr. Mitchell, having not made any observation to support such a claim, could not have helped Attorneys Ruhnke and Travis in that regard.

13.  **NONE OF THE GROUNDS ADVANCED BY HAMMER JUSTIFIES A NEW TRIAL.**

Hammer argues that the cumulative sum of his collateral claims is greater than its parts, and warrants a grant of collateral relief even if not otherwise justified.  (Third Amended Motion, p. 59.)  This aspect of Hammer's collateral challenge is procedurally barred and *Teague*-barred as indicated *supra*.  No case precedent in effect at the time his conviction became final dictated relief on his cumulative error claim, and none of the exceptions to non-retroactivity applies.  Finally, his claim of prejudicial constitutional error fails and, to the

extent that he asserts claims of non-constitutional error, does not identify any cognizable basis for collateral relief.

This Court, in its order of September 15, 1998, denied Hammer's first effort to obtain a new trial which included, as one basis, the supposedly inadequate factual basis for the guilty plea, which defense counsel has revived and represented as part of Ground One in these proceedings. *United States v. Hammer*, 25 F. Supp. 2d at 534-37.

The standards for granting new trials have not changed. *Id*. at 543. Even if one were to view cumulatively all of the pinpointed errors presented in this Third Amended Motion, a different result should not be reached as "the interest of justice" does not require further or additional proceedings.

14. **GIVEN A SITTING JURY IN THE REBUTTAL PHASE OF TRIAL, THIS COURT CONDUCTED AN APPROPRIATE INQUIRY WITH COUNSEL REGARDING HAMMER'S COMPETENCY TO PLEAD GUILTY.**

According to defense counsel, someone erred, either this Court or attorneys Ruhnke and Travis, in proceeding with the competency hearing on June 22, 1998. (Third Amended Motion, pp. 59-70.) This aspect of Hammer's collateral challenge is procedurally barred and *Teague*-barred as indicated *supra*. No case precedent in effect at the time his conviction became final dictated relief on his claim, and none of the exceptions to non-retroactivity applies. Moreover, as will be noted, his claim of prejudicial constitutional error fails and, to the extent that he

asserts claims of non-constitutional error, does not identify any cognizable basis for collateral relief.

This is but a variation of Ground One of the same pleadings. However, it is submitted that neither conclusion is appropriate.

It is not as though Defendant's interest in pleading guilty was novel. Twice previously he had threatened to do so. Consequently that Hammer voiced on June 21, 1998, his interest in doing so to Attorney Travis hardly could be described as a "surprise" or an unanticipated development. Indeed, if he had said from 1996 through 1998, such things to Dr. Mitchell, is it not likely that he voiced similar reservations to his counsel? (TT Vol. 14, p. 92.)

Moreover, Hammer's mental health had been thoroughly researched by the defense, which included the retention and presentation of Dr. Robert Sadoff, who apparently never suggested to the defense that Defendant was incompetent. Indeed, albeit in a non-clinical setting, that defense expert had opportunities to discuss the case with defense counsel, as well as observe Hammer in court as late as five days before Defendant entered his guilty plea. (TT Vol. 11, pp. 86-87.)

It was Hammer and his defense attorneys who sought the inclusion of Dr. Mitchell to examine him for the evaluation. (TT Vol. 14, p. 20.) Moreover, Attorney Ruhnke inquired about difficult issues including revelations or manifestations of the

107

DID defense, as well as Defendant's supposed fear of Springfield, which actions conflict with new counsels' claim that he "was functionally deprived of counsel at this hearing."  (Third Amended Motion p. 59.)

The Court of Appeals for this Circuit as well as for others observed that temporal considerations are appropriate in determining the need for or character of competency evaluations. *Gov't of Virgin Islands v. Williams,* 892 F.2d at 312; *United States v. Goines,* 988 F.2d at 782.  Moreover, there are practicalities involved in not having a plethora of forensic psychologists at the ready in the Williamsport area, let alone one who within a reasonable time period could read as well as digest "the inordinate amount of documentary information available regarding Hammer's then-relevant medications and psychiatric status. . . ."  (Third Amended Motion, p. 60.) In short, Hammer received a fair appraisal of a rather basic test: whether he had the capacity to assist in his own defense and understood the nature and possible consequences of entering a plea of guilty.  *Dusky v. United States*, 362 U.S. 402 (1960). Particularly when speculation is offered about what might have been found and the record of proceedings reveals an intelligent, if not crafty, David Paul Hammer responding to the inquiries by Drs. Wolfson and Mitchell and answering this Court's guilty plea colloquy, no relief should be afforded.

To be sure, petitioner's present counsel supply additional expert opinions formulated in 2004 regarding Hammer's purported limited mental capacities in June 1998 when he entered his guilty plea. (Third Amended Motion, pp. 64-68.)  It remains to be seen whether those experts under those circumstances can shed any light on the issues.  Moreover, the prosecution intends to present witnesses at the forthcoming evidentiary hearing who can provide lay and possibly expert testimony that in June 1998, petitioner suffered from no significant mental health frailties as suggested by the new defense witnesses.  It is worth noting Justice O'Connor's observations in *Strickland v. Washington,* 466 U.S. at 690, that a court "deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, <u>viewed as of the time of counsel's conduct</u>."  (Emphasis supplied.)  Moreover, as Judge Stapleton observed in *United States v. Davies*, 394 F.3d 182, 189-90 (3rd Cir. 2005), "[T]he proper standard for [measuring minimum constitutional] attorney performance is that of reasonably effective assistance, *Strickland v. Washington*, 466 U.S. at 687, 104 S. Ct. 2052, and not 'exceptional' assistance, *Brown v. United States*, 311 F.3d 875, 877 (8th Cir. 2002)."

Defense counsel at this juncture, also complain about the purported failure of Attorneys Ruhnke and Travis "to investigate the veracity of Hammer's statements made to authorities after Mr.

109

Marti's body was discovered and to otherwise investigate the conclusions drawn regarding the physical evidence and pathology findings. . . ."  (Third Amended Motion, p. 70.)  These omissions must be supported by new defense counsel with admissible proof, not speculative pleadings.  No details are given regarding what new light would be shed from further investigation into these matters, other than perhaps the existence of human biological material, which relate to undisputed facts.  Moreover, new defense counsel seem to adhere to Hammer's DID defense which Attorneys Ruhnke and Travis vigorously advanced.

Attorneys Ruhnke and Travis also are faulted for not interviewing witnesses, who would have given further details that "directly conflicted with Hammer's confession. . . ."  (Third Amended Motion, p.  69.)  It is anticipated that those attorneys will testify that they interviewed inmate witnesses.  It remains petitioner's burden to present such evidence at trial.

The standard for ineffectiveness of counsel is a two-part test.  Even assuming that there may have been a limited investigation, one must look to see if there were reasons for that and whether Hammer suffered prejudice thereby.  *Strickland v. Washington*, 466 U.S. 668, 693 (1984).  For the reasons stated in response to Ground Seven, the physical evidence of strangulation and restraint remains unassailable, was consistent with testimony of correctional officials, as well as the

pathologist, and aspects of Hammer's statements to authorities. Moreover, with respect to the seven specific claims regarding the purported falseness of Hammer's confession, petitioner still must demonstrate why those aspects were material, let alone the subject of contradictory discussions which petitioner had with other witnesses whom defense counsel did not contact. For all of these reasons, Hammer has failed to show that counsel's performance was deficient and resulted in prejudice to the defense.

15. **THAT THE BUREAU OF PRISONS, AFTER THE TRIAL CONCLUDED, INDEPENDENTLY AWARDED MONETARY PRIZES TO THREE EMPLOYEES WHO TESTIFIED DOES NOT UNDERMINE THE FAIRNESS OF THE PROCEEDINGS.**

This aspect of Hammer's collateral challenge is procedurally barred and *Teague*-barred as indicated *supra*. No case precedent in effect at the time his conviction became final dictated relief on his claim, and none of the exceptions to non-retroactivity applies. Further, as will be discussed, his claim of prejudicial constitutional error fails and, to the extent that he asserts claims of non-constitutional error, does not identify any cognizable basis for collateral relief.

Defense counsel's presentation of the issue initially undermines its merit. It is claimed that "three Government witnesses . . . received monetary awards for their participation in the investigation and prosecution of Petitioner Hammer."

111

(Third Amended Motion, pp. 70-71.)  While it cannot be denied that the three persons identified did receive such an allotment, this was not at the specific request of the prosecution.  A review of the record, as expanded by an affidavit, demonstrates this.  See Government Exhibit 4, Affidavit of Kim Ask-Carlson.

Chaplin Crook was one of the briefest of witnesses at trial. (TT Vol. 13, pp. 120-128.)  His testimony served only to rebut the defense claim that Hammer suffered from Disassociative Identity Disorder on April 13, 1996.  This question is begged: Why should a reward be given when Hammer entered a guilty plea following his testimony?

Another person, Donn Troutman, testified as a penalty phase witness in a fashion similar to Reverend Crook.  (TT Vol. 16, pp. 19-37.)  He provided limited information about the backgrounds of Andrew Marti and David Paul Hammer as well as the latter's statements and behavior on April 13, 1996, which did not comport with the DID defense.  The length of Troutman's cross examination approximated his direct testimony.  (TT Vol. 16, pp. 37-61.)  But more importantly, defense counsel asked that he return to testify extensively in the penalty phase of their case.  (TT Vol. 21, pp. 157-191 and Vol. 22, pp. 5-56.)  It does not follow that his credibility was subject to serious question and the jury would have been effected by knowledge that prison officials felt that he merited some reward in those circumstances.

112

Finally, as to Dr. Mitchell, at the risk of repetition, initially he was brought into the case by the <u>defense</u> on the issue of Hammer's competency.  Thereafter, Dr. Mitchell testified for the <u>defense</u> in the penalty phase.  (TT Vol. 19, pp. 132-185 and Vol. 20, pp. 13-141.)

This brief and irrefutable review of the record dispels any serious implication that the "Government did not advise trial counsel of these rewards or that the persons were being considered for such awards."  (Third Amended Motion, p. 31.) Indeed, what operated and what defense counsel could have discovered by directly contacting prison officials is that the awards were part of the Bureau of Prisons' policy and specifically former Program Statement No. 3451.03.  Supervisory individuals within that organization believed that monetary rewards were justified for these employees, none of whom even served in a direct law enforcement role in this case.  They provided valuable assistance to the Allenwood Penitentiary, including staff and inmates, following the events of April 13, 1996, as well as their testimony over two years later.

It is true that the prosecution may have communicated with the Warden to advise him of his employees' actions at trial.  But this did not fairly imply that monetary awards should be given. If this Court feels that it is necessary, all three individuals will be called as witnesses and asked when they became aware of

113

the possibility of receipt of an award and how, based upon the timing or other factors, such a potential award effected the testimony which they presented at trial, whether for the prosecution or the defense.

The United States was mindful of it obligation to provide appropriate impeachment material.  Indeed, it provided such data for inmate witnesses Yager and Classen.  It strains credulity that those details would be revealed and yet promises of monetary awards for other witnesses, especially these three, would be kept secret.  Under the circumstances, this Court should wholly discount and dismiss this defense claim.

Presenting again an ineffectiveness claim, petitioner argues that his counsel did not provide Sixth Amendment assistance "for failing to adequately investigate, develop, and present evidence of the employee's consideration for awards."  (Third Amended Motion, p. 71.)[25]  If there had been some pre-existing agreement, this argument would have some merit.  But as Government Exhibit 4 indicated, the awards were available under a national Bureau of Prisons policy.  Consequently, <u>every</u> conceivable witness who was an employee of that agency was eligible to receive it and counsel would have had to ask the same question of all such witnesses regarding this factor and possibility.  Consequently, since with

---

[25]  Hammer's ineffectiveness assertions with regard to this Ground are limitations-barred for the reasons set forth *supra*.

114

such a stratagem there is no advantage to make an inquiry, Hammer was not "prejudiced" and "was [not] denied compelling evidence of bias, conflict, and unreliability with respect to these witnesses." (Third Amended Motion, p. 71.) For all of these reasons, Hammer has failed to show that counsel's performance was deficient and resulted in prejudice to the defense.

16. **NO FIFTH AMENDMENT VIOLATIONS OCCURRED WHEN THE GRAND JURY DID NOT RETURN AN INDICTMENT WITH AGGRAVATING FACTORS AND THE EVIDENCE PRESENTED AT THE PENALTY PHASE WAS WHOLLY RELIABLE.**

Defense counsel presents two standard Due Process challenges to recent death penalty verdicts. (Third Amended Motion, pp. 71-72.) This includes the failure to have the Grand Jury return an Indictment with a listing of aggravating factors as well as the purported unreliability of evidence upon which the death penalty decision rests. This aspect of Hammer's collateral challenge is procedurally barred and *Teague*-barred as indicated *supra*. No case precedent in effect at the time his conviction became final dictated relief on his claim, and none of the exceptions to non-retroactivity applies. Finally, his claim of prejudicial constitutional error fails and, to the extent that he asserts claims of non-constitutional error, does not identify any cognizable basis for collateral relief.

Relying primarily on the Supreme Court's decision in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), which occurred

115

almost two years after Hammer's conviction, defense counsel asserts that the failure of the Grand Jury to make findings regarding the specific mental state and statutory aggravating features violated Defendant's Fifth Amendment rights. (First Memorandum, pp. 47-49.)  This argument is somewhat factually incorrect, but, more importantly, lacks merit given subsequent Supreme Court cases interpreting *Apprendi.*

The Grand Jury indicted Hammer for a violation of 18 U.S.C. § 1111, <u>premeditated</u> murder, as that charge specifically states. This finding, by fair implication, indicates that the Grand Jury found that defendant had "intentionally" killed Andrew Marti as required by 18 U.S.C. § 3591(a)(2)(A).

To be sure, the Grand Jury did not consider any aggravating factors in their deliberations or return any notice.  (Third Amended Motion, p. 72.)  It is true also that the Justice Department, to avoid this potential issue and out of an abundance of caution, now requires that at least statutory aggravating factors be presented to a Grand Jury as this Court is aware from presiding over *United States v. O'Driscoll*, M.D. Pa. Crim. No. 4:CR-01-00277 (2001).  (First Memorandum, p. 48.)  But in Hammer's case, relief by this Court still should not be provided.

116

Notwithstanding the filing of multiple pre-trial issues in 1997 by competent[26] and "learned" counsel, *United States v. Hammer*, 25 F. Supp. 2d at 527 n. 8, none of them raised the Fifth Amendment issue or anticipated *Apprendi*.  Consequently, it is appropriate to examine this claim under the plain-error test of Federal Rule of Criminal Procedure 52(b).  *United States v. Olano*, 507 U.S. 725, 731 (1993).  The Supreme Court, in 2002, considered a similar, post-*Apprendi* challenge to a conviction in *United States v. Cotton*, 535 U.S. 625, 122 S. Ct. 1781 (2002).  In that case, the Grand Jury's indictment did not include a specific drug amount as now would be required by *Apprendi*.

It is first advisable to examine the plain error standard in this similar context.  Chief Justice Rehnquist stated it as follows:

> Under that test, before an appellate court can correct an error not raised at trial, there must be (1) 'error,' (2) that is 'plain,' and (3) that 'affect[s] substantial rights.  *Johnson v. United States*, 520 U.S. 461, 466-67, 117 S. Ct. 1544, 137 L. Ed. 2d 718 (1997) (quoting *Olano, supra* at 732, 113 S. Ct. 1770).  If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affect[s] the fairness, integrity, or public reputation of

---

[26]  Defense counsel do not raise a Sixth Amendment claim in this respect.  It is submitted that, given precedent, there was no ineffectiveness in failing to anticipate *Apprendi*.  *United States v. Davies*, 394 F.3d at 189.

> judicial proceedings.  520 U.S. at 467, 117
> S. Ct. 1544 (internal quotation marks
> omitted)(quoting *Olano, supra*, at 723, 113 S.
> Ct. 1770).

*United States v. Cotton*, 122 S. Ct. at 1785.

In applying that test to the instant case, Hammer's argument should be rejected for at least two reasons.  Unlike *United States v. Cotton, supra*, defendant knew from arraignment that he faced the potential imposition of the death penalty.  Consequently, the statutory maximum sentence which this Court could impose was never in doubt.

Beyond that, it is submitted that in defendant's case, "even assuming [defendant's] substantial rights were affected, the error did not seriously affect the fairness, integrity, or public reputation of judicial proceedings."  *United States v. Cotton*, 122 S. Ct. at 1786.  This Court carefully reviewed whether there was factual support for the jury's return of the statutory as well as nonstatutory aggravating factors and concluded that this occurred.  *United States v. Hammer*, 25 F. Supp. 2d at 520-21.  While the defense attempted, notwithstanding the guilty plea, to challenge the intentional killing with the DID defense, it is submitted that this hardly carried the day.  The evidence to support many of the aggravating factors largely was uncontroverted and substantial.  Speaking for the unanimous Court, Chief Justice Rehnquist noted:

> Indeed, the fairness and integrity of the criminal justice system depends on meting out to those inflicting the greatest harm on society the most severe punishments. The real threat then to the 'fairness, integrity, and public reputation of judicial proceedings' would be if respondents, despite the overwhelming and uncontroverted evidence that they were involved in a vast drug conspiracy, were to receive a sentence prescribed for those committing less substantial drug offenses because of an error that was never objected to at trial. *Cf. Johnson, supra*, at 470, 117 S. Ct. 1544 (quoting R. Traynor, The Riddle of Harmless Error 50 (1970)).

*United States v. Cotton*, 122 S. Ct. at 1787. It is submitted that these observations equally can be made in Defendant's case. Consequently, consistent with Federal Rule of Criminal Procedure 52(b) and *United States v. Cotton, supra,* Hammer's Fifth Amendment claim should be denied.

Even if this Court found no procedural bar[27] to consideration of the merits of Hammer's Fifth Amendment Claim of Grand Jury involvement, nonetheless, relief should be denied. In *United States v. Allen*, 247 F.3d 741, 761-764 (8th Cir. 2001), the Eighth Circuit held that the rule in *Apprendi* was inapplicable in federal capital practice and specifically held that *Apprendi* did not require that aggravating factors and mental

---

[27] Hammer's request in this regard also seeks imposition of a "new" rule of law. For the reasons stated by the Fourth Circuit in *United States v. Sanders*, 274 F.3d 139, 146-151 (2001), it is submitted that retroactivity is wholly unwarranted.

culpability factors be alleged in the indictment.  The Eighth

Circuit first held that the indictment at issue "sufficiently

alleged a capital offense against Allen upon which he could be

tried and, if convicted, could be sentenced to death," as each of

the substantive capital offenses charged in that case facially

authorized the death penalty for its violation.  *Id*. at 762.

Hence, the Eighth Circuit concluded, "the Fifth Amendment's

Indictment Clause [wa]s satisfied."  *Id*.  Next, as a matter of

Eighth Amendment jurisprudence, the Eighth Circuit stated that

the "additional protections for a capital defendant" that are

constitutionally mandated before a sentence of death may be

imposed – including aggravating factors that narrow eligibility

and channel a sentencer's discretion – "do not increase the

maximum sentence set forth in each of the statutes for the

offenses alleged in the indictment and thus do not amount to

separate elements that must be alleged in the indictment."  *Id*.

Nor was a different conclusion required as a Fifth Amendment

matter under *Apprendi*.

In "reject[ing] *Allen*'s contention that aggravating factors

and mental culpability factors must be alleged in the

indictment," the *Allen* court stated that neither category of

factor constituted congressionally-made "elements of the

underlying offense[s]," as "clear[ly] demonstrated by "[t]he

structure" and "plain language" of the two substantive capital

120

statutes.  *Id*. at 762-763.  Nor could the aggravating and mental culpability factors be "deemed elements of the crime by virtue of being facts which are the basis for increasing the maximum punishment."  *Id*. at 763.  *Accord Hoffman v. Arave*, 236 F.2d 523, 542 (9th Cir. 2001).

This Court, long before the death penalty was reinstated eschewed reliance upon Federal Rule of Evidence 1110(d)(3) which generally abrogates those formal Rules of Evidence for sentencing proceedings in <u>ordinary</u> cases.  The defense asserts that this Court relied upon Title 18, United States Code, Section 3593(c), which in turn alludes generally to Rule 1110(d)(3), and "utilized" such a standard "at Hammer's trial."  (Third Amended Motion, p. 72; First Memorandum, p. 49.)

Defense counsel, notwithstanding that the petition twice already has been amended, still fail to point out any instances where, in the penalty phase record, this Court allowed the "relaxed evidentiary rule" set out at 18 U.S.C. § 3593(c) to be used to support one of the aggravating factors found by the jury in their verdict.  It remains the burden of Hammer to demonstrate this supposed reliance.  Until this is done, this Court should conclude that their generic or idle reference to this controversial aspect of death penalty litigation is wholly devoid of merit.

17.  **FORMER INMATE JAMES HAUSER DID NOT SERVE THE PROSECUTION IN ANY CAPACITY BUT INSTEAD SOUGHT TO PROFIT THEREFROM.**

Petitioner also claims error from a presumed Sixth Amendment violation when the prosecution is said to have utilized James Hauser "to obtain information from David Paul Hammer regarding the death of Andrew Marti after Hammer had been indicted in this matter and provided same to the Government during the pending of this case." (Third Amended Motion, pp. 72-73.)

This aspect of Hammer's collateral challenge is procedurally barred and *Teague*-barred as indicated *supra*. No case precedent in effect at the time his conviction became final dictated relief on his claim, and none of the exceptions to non-retroactivity applies. Further, as will be discussed, his claim of prejudicial constitutional error fails and, to the extent that he asserts claims of non-constitutional error, does not identify any cognizable basis for collateral relief.

It is true that Hammer and Hauser both briefly were incarcerated in 1996 at the Federal Correctional Institution of the Allenwood Correctional Complex. However, that is where the truth ends.

Defense provides scant[28] details to support this rather shocking, albeit frequently made, claim of governmental misconduct.  (Third Amended Motion, p. 50.)  This includes the lack of facts which supposedly Hauser learned from Hammer and supplied to the prosecution.

Unfortunately, incidents, such as the Marti killing, spur some inmates, such as Hauser, to "volunteer" on their own, to secure information from putative defendants.  Stated in other terms, the Bureau of Prisons, except in very rare circumstances, is powerless to prevent self-motivated inmates from acting on their own to ask questions of fellow prisoners who may have committed crimes for which they later hope to be "rewarded" in some fashion by a prosecutor.  That was the situation of Hauser.

As indicated in the sworn statement of Special Agent Malocu, he once met Hauser on December 5, 1996, at Hauser's insistence. Government Exhibit 3.  The details which he provided were, at best, superfluous or contradictory to both the defense and prosecution, as well as from other information provided by inmates at the Allenwood Penitentiary.

If defense counsel wish to press this issue further, a hearing at which Hauser will testify about his contacts, actions,

---

[28]  Petitioner does not indicate who in "the Government" utilized Hauser as an informant.  Moreover, it is conceded that any inquiries by that inmate with Hammer about the death of Kenneth Trentadue would not be a Sixth Amendment violation.

and motivations, should be conducted.  At that time, assuming that Hammer persists in this claim, the prosecution looks forward to presenting evidence regarding Hauser's actions to demonstrate that this Sixth Amendment claim of misconduct by "the <u>Government</u>" is baseless.  (Emphasis supplied.)

### 18. HAMMER, WHO MAINTAINED CONTROL OVER WHAT ISSUES WOULD BE PRESENTED ON APPEAL OR PURSUED ON SECTION 2255 PROCEEDINGS, RECEIVED EFFECTIVE ASSISTANCE FROM COUNSEL.

Hammer's present § 2255 counsel make broad claims of ineffectiveness regarding their predecessors (Third Amended Motion, pp. 85-88), but it is submitted that these Sixth Amendment claims largely miss the mark for their failure to take into account the procedural history in this case, especially insofar as it involved Hammer asserting control as his own counsel in these proceedings.[29]  Some allusion to decisional law is appropriate before responding to the specifics.

In pleadings before this Court in September 1998, Hammer cited the Supreme Court's decision in *Faretta v. California*, 422 U.S. 806 (1974), to assert his right to represent himself. However, the Supreme Court noted in that decision the consequences which flowed from the exercise of one's Sixth Amendment right:  "Thus, whatever else may or may not be open to

---

[29]  Hammer's ineffectiveness assertions with regard to this Ground are limitations-barred for the reasons set forth *supra*.

124

him on appeal, a defendant who elects to represent himself cannot thereafter complain that the quality of his own defense amounted to a denial of 'effective assistance of counsel.'" *Faretta v. California*, 422 U.S. at 834-35 fn. 46.

To determine whether Hammer is precluded from complaining about the assistance he received, it is significant to note when he began to assert his right of self-representation since from that point forward he is precluded from complaining about his counsel's services. *United States v. Cochrane*, 985 F.2d 1027, 1029 (9th Cir. 1993) (denial of habeas corpus), *aff'd*, 36 F.3d 1103 (1994). To be sure, the defense is fond of saying "death is different." However, the Supreme Court's decision in *Faretta* did not distinguish between a capital and non-capital prosecution. Thus, even in the context of a *pro se* prisoner who sought to represent himself in capital proceedings, such a person is precluded from claiming counsel's ineffectiveness. *Parker v. Norris*, 859 F.Supp. 1203, 1227-28 (E.D. Ark. 1994), *reversed on other grounds,* 64 F.3d 1178 (8th Cir. 1995), *cert. denied*, 516 U.S. 1095 (1996). As was observed by the judge in that case, "while it is true that Parker at times deferred to stand-by counsel, he clearly was in charge of his defense and, thus, is responsible for any actions which may otherwise have given rise to a claim of ineffective assistance. This is so regardless of

whether these actions were committed by stand-by counsel."
*Parker v. Norris*, 859 F.Supp. at 1228.

As previously stated, Hammer makes broad claims of ineffective assistance of counsel both on appeal and at the District Court level. Consequently, a review of his status at those proceedings is appropriate.

Petitioner represented himself on appeal. That is to say, even at oral argument before the Court of Appeals, neither Attorneys Ruhnke nor Travis spoke on his behalf since their role was that of stand-by counsel. The only participants, other than the prosecution, were *amicus* as well as Hammer himself. *United States v. Hammer*, 226 F.3d at 232-234. Suggesting that Attorneys Travis and Ruhnke served as "appellate counsel" as well as had the final word in determining what issues were to be litigated before the Third Circuit, simply is an incorrect rendition of the record in this case. (Third Amended Motion, pp. 85-86.) Especially given the fact that Hammer voluntarily dismissed his appeal, he cannot claim about appellate counsel's actions in this regard since, although he utilized the services of stand-by counsel to prepare, type, and duplicate the brief, the appeal was pursued and withdrawn *eo nomine*. *United States v. Cochrane, supra; Parker v. Norris, supra.*

Hammer fares no better considering the other aspect of his claims. That is, he asserts that every issue which successor

126

counsel have raised in these proceedings demonstrate ineffective assistance by Attorneys Travis and Ruhnke.  (Third Amended Motion, p. 85.)  But Hammer's voluntary plea of guilty, over the objections of those counsel, extinguished many claims of error or ineffectiveness that could be brought on issues raised prior to June 22, 1998.

Additionally, on October 1, 1998, if not somewhat earlier, Hammer wrested control over the issues to be presented to this Court.  *United States v. Hammer,* 25 F. Supp.2d at 521-527.  To paraphrase *Faretta v. California, supra*, Hammer has only himself to blame since from that time forward, as well illustrated by his "stop and start" pursuit of a § 2255 remedy as well as equivocation, and later pursuit of claims of ineffectiveness against Attorneys Ruhnke and Travis, which did not occur until October 2004, he exercised complete control over what objections were noted or issues were pursued.  For all of these reasons, Hammer has failed to show that counsel's performance was deficient and resulted in prejudice to the defense.

19. **THE PROSECUTION PROVIDED ALL KNOWN AND AVAILABLE INFORMATION IN ITS POSSESSION REGARDING HAMMER'S VERACITY, INCLUDING FALSE CLAIMS OF INVOLVEMENT IN MURDERS.**

Hammer makes a two-pronged attack on both the government and his trial counsel either on Fifth Amendment or Sixth Amendment

127

grounds.   (Third Amended Motion, pp. 88-96.)[30]   Listed at

considerable length are details of seven murders which occurred

in which Hammer supposedly "falsely confessed involvement."

(Third Amended Motion, pp. 89-95.)   Defense counsel acknowledge

that the government apprized former defense counsel of at least

one[31] of these false confessions. (Third Amended Motion, pp. 88;

92.)   It is suggested that the prosecution either failed to fully

investigate matters or held back information regarding the six

other offenses.   (Third Amended Motion, p. 89; Second Memorandum,

p. 50.)

Correspondence to defense counsel will be introduced at the

hearing with attachments, which will demonstrate that among the

materials received by Attorneys Ruhnke and Travis were details of

the false confessions or implications which Hammer made with

respect to the murder of five individuals in Oklahoma.   To be

sure, the prosecution did not turn over any information regarding

two killings in Chataqua County, New York.   Why in such a

physically  nearby jurisdiction, the prosecution should have

---

[30]   Hammer's ineffectiveness assertions with regard to this
Ground are limitations-barred for the reasons set forth *supra*.

[31]   Hammer's present counsel appear to concede that the
defense actually knew of a total of four claimed murders.   In
addition to the Tennessee homicide these include those relating
to the death of two women in Oklahoma (Second Memorandum, p. 54),
as well as the New York offense since those investigators
corresponded directly with Hammer.  (Second Memorandum, pp. 53-
54.)

known that Hammer would have been involved in murders there when he was in <u>Oklahoma</u> custody or briefly on escape status is not explained by defense counsel.  (Third Amended Motion, pp. 89-91.)

It is the position of the prosecution that Hammer had sufficient information, assuming that he wished to utilize it, to suggest that he was a "serial confessor to murders."  At the proceeding, it is believed appropriate for this Court to determine the exact parameters of Hammer's claimed involvement in these homicides.  None of these, at this point, for multiple reasons resemble factually the circumstances in which he found himself in the Special Housing Unit on April 13, 1996.  Stated in other terms, even if the prosecution through an insufficient investigation failed to discover information about Hammer's false confessions to two murders in New York, there were sufficient details provided on five other homicides, which were disclosed, that hardly demonstrates prejudice to the defense in any fashion or, for that matter, that the prosecution intentionally held back information about the New York killings.  Federal Rule of Evidence 403 ("needless presentation of cumulative evidence").

In analyzing a Fifth Amendment claim, pertinent also is what information the prosecution in *toto* turned over to the defense as well as what specific type of request was made by defense counsel for its disclosure.  The Supreme Court decision in *United States v. Augurs*, 427 U.S. 97 (1976), considered the rule of *Brady v.*

129

*Maryland,* 373 U.S. 83 (1963), in three different situations.  It is submitted that the applicable category in Hammer's situation is the third category of nondisclosure set out in *Augurs,* where the defendant failed to request or only generally requested exculpatory evidence.  In those circumstances, reversal is necessary only if the undisclosed evidence "creates a reasonable doubt that did not otherwise exist."  427 U.S. at 112.  While defense counsel did make requests of the prosecution, it is submitted that they did not specifically inquire about murders in which Hammer falsely tried to inject himself.

An additional and important consideration in analyzing any *Brady* claim is what information, if any, the defense itself knew about the proposed exculpatory evidence.  *See United States v. Pelullo*, 399 F.3d 197, 215 (3rd Cir. 2005).  While the instant case does not entirely involve documentation once owned by Hammer, as in *United States v. Pelullo, supra*, the source of the purported exculpatory information is Hammer himself.  Petitioner "opened up" to defense experts about his youth and aspects of his mental health history.  It is not too much to expect, if Hammer spoke to New York or other authorities about false claims of murder involvement, that also he would share those details with defense counsel.  Stated in other terms, Due Process should encourage fairness by the prosecution, not gamesmanship by a defendant.

Regardless of the number or location of homicides in which Hammer falsely implicated himself presentation of this evidence was a "double-edged sword" for the defense.  That is, the prosecution, to counter defense claims that Hammer would remain at the ADX under strict security and pose no future risk, replied with the argument, which was fully documented in Hammer's case, that he had information for that state's prosecutions about a murder in Michigan.  This was to serve as a ruse so that he could be closer to his "friend" Sam.  (TT Vol. 29, pp. 24-25.)

Hammer's counsel now claim that his repeated false confessions to murders is directly related to and symptomatic of his mental, emotional, and cognitive impairment.  (Third Amended Motion, p. 95.)  However, that is but a matter of perspective in that the prosecution believes this phenomena is but one aspect of Hammer's personality in which he enjoys manipulating or "tweaking" the system thereby securing secondary goals for himself, such as travel from restrictive housing, and a classic symptom of his narcissistic character, rather than any serious mental disease or defect.

As previously stated, it is the position of the United States that Hammer's trial counsel and defense witnesses, including Dr. Sadoff, were well aware of the fraudulent behavior of their client in multiple respects.  Moreover, Attorneys Ruhnke and Travis sought to challenge the validity of Hammer's

131

confession in a different respect, comparing the evidence presented at trial with what Hammer said to Special Agent Thompson on the morning following the killing.  This presentation by defense counsel hardly suggests a Sixth Amendment violation particularly since, as stated above, had the triers of fact known that Hammer during the 1980's, when not claiming that he was going to bomb the Oklahoma State capital or kill federal judges in that state, was purportedly involved in murders during that decade, such details have been of little or no advantage to the defense, particularly when Hammer actually killed Marti, even if you believe their theory, accidentally.

**22.  THIS COURT'S DECISION TO EXCLUDE ASPECTS OF THE VIDEOTAPED HYPNOTIC SESSION DID NOT CONSTITUTE AN ABUSE OF DISCRETION.**

Hammer's final claim of error relates to this Court's decision not to allow the jury to review a videotape of the hypnotic session by Drs. Sadoff and Dubin in its entirety. (Third Amended Motion, pp. 124-125.)  But this issue, which was carefully considered by this Court after argument in June 1998, was waived by Hammer's guilty plea.  Further, Hammer's claim is barred by the procedural default doctrine due to his forfeiture of his direct appeal, and by the *Teague v. Lane* non-retroactivity doctrine given that authority in effect at the time his conviction became final did not dictate a grant of relief on his claim.  The application of the procedural default doctrine does

not turn on whether his waiver of the appeal was knowing and voluntary or the like; the mere failure to raise a claim in an appeal is sufficient to bar the claim on collateral review.

At any rate, Hammer cannot show that his claims fall within any exception to either the procedural default doctrine or *Teague* non-retroactivity. Under these circumstances, his claims are barred under each of these independent doctrines. Lastly, as indicated infra, his claim of prejudicial constitutional error fails and, to the extent that he asserts claims of non-constitutional error, does not identify any cognizable basis for collateral relief. This Court correctly excluded aspects of the film.

Having secured a different expert on Disassociative Identity Disorder, this time Dr. Kluft, petitioner asserts that "approximately 36 minutes prior to the actual hypnosis and 8 minutes following the hypnosis" more of the videotape should have been shown to the jury. (Second Memorandum, p. 57.) This is based solely upon the 2004 analysis by Dr. Kluft. But otherwise, present defense counsel claim that Dr. Sadoff had "superior credentials" and yet he apparently never suggested to trial counsel that this additional rationale justified a more extensive presentation of the videotape. To be sure, the defense could find another DID expert in another year who may have an entirely different rationale for allowing presentation of the videotape in

133

its entirety.  However, such after-the-fact rationalization does not justify relief.

Pleadings filed by Attorneys Travis and Ruhnke indicate that the primary reason for having the entire[32] videotape shown was that it had been thoroughly examined by the government expert, Dr. Wolfson.  There is no mention in the submission that certain additional footage was necessary to assure the triers of fact that Hammer was, in fact, under hypnosis.  This Court in its ruling expressly indicated that only the pertinent aspect of the videotape need be presented.  (TT Vol. 10, p. 47.)  That ruling remains astute even in the face of Dr. Kluft's analysis.

Requests to play videotapes are submitted to this and any Court's sound discretion for consideration under Federal Rules of Evidence 401 and 403.  *United States v. Dorrell*, 758 F.2d 427, 434 (9th Cir. 1985); *Sprynczynatyr v. General Motors Corps.*, 771 F.2d 1112, 1124 (8th Cir. 1985).  Recently, the United States Court of Appeals for the Second Circuit in *United States v. George*, 266 F.3d 52, 63 (2001), concluded that certain videotaped aspects of an interview properly were excluded at trial.  As was stated by Circuit Judge Sotomayor, when a District Court excludes

---

[32]  In candor, during that interview, Hammer admitted that he was serving 1200 years of imprisonment.  The defense obviously, and without objection from the prosecution, deleted this aspect of the videotape which suggest some balancing under Federal Rule of Evidence 403 was appropriate in their view.

alleged pertinent evidence which revealed a defendant's personality, the "Court 'will second guess a district court['s 403 determination] only if there is a clear showing that the Court abused its discretion or acted arbitrarily or irrationally.' *United States v. Salameh*, 152 F.3d 88, 110 (2nd Cir. 1998)."  (Further quotations omitted).  *United States v. George*, 266 F.3d at 63.

The jury heard once from Jill Miller about Hammer's upbringing.  They heard about it a second time from Dr. Sadoff.  Indeed, they would have heard a third time from Dr. Wolfson on cross-examination by the defense about Hammer's upbringing had Hammer not entered a guilty plea.

It is submitted that this Court correctly balanced the probative value of the videotape with its potential cumulative and unnecessarily sympathetic affect which it otherwise would have had on the jury.  *United States v. George, supra*.  Consequently, this basis for relief also should be denied by this Court.

Hammer's most recent memorandum, while addressing this issue at some length, contains "more ink than light."  (Second Memorandum, pp. 57-60.)  String citation to Supreme Court cases dealing generally with a person's right in capital proceedings to present evidence does not demonstrate that Federal Rule of Evidence 403 should play no role in federal death penalty

proceedings or that every adverse evidentiary ruling by a court in a penalty phase creates a Constitutional issue.  (Second Memorandum, pp. 58-59.)  Having tactically decided to present Hammer's background first through Jill Miller and then Dr. Sadoff, a third presentation of the same information simply was not warranted, notwithstanding Dr. Kluft's claim that the video reveals "fluctuating presences and co-presences of David Paul Hammer are wilbur."  (Second Memorandum, p. 58.)

136

Conclusion.

Defendant has failed to demonstrate that he is entitled to relief, pursuant to 28 U.S.C. § 2255.  Consequently, his Motion should be denied[33] and this case should be closed.

Respectfully submitted,

THOMAS A. MARINO
United States Attorney


By    s/Frederick E. Martin
FREDERICK E. MARTIN
Assistant United States Attorney
PA 57455
Herman T. Schneebeli Federal Bldg.
240 West Fourth Street, Suite 316
Williamsport, PA 17701-6465
Tele: (570) 326-1935
FAX: (570) 326-7916
Electronic Mail:
Fred.Martin@usdoj.gov

GWYNN X. KINSEY, Jr., Esquire
U.S. Department of Justice
601 D Street, N.W., Room 6131
Washington, DC 20530
Telephone:  (202) 353-9721
FAX:  (202) 353-9779

Dated: April 20 , 2005

---

[33]  Cognizant of its obligation under Rule 8(a) of the Rules Governing Section 2255 Proceedings, it is unclear to what extent, if any, a hearing may be needed on Hammer's Third Amended Motion. Any determination by this Court should await further development of the record, including any further pleadings from defense counsel.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


UNITED STATES OF AMERICA    :  Civil No. 4:CV-02-510
                             :  Crim. No. 4:CR-96-239
        v.                :  (Muir, J.)
                             :
DAVID PAUL HAMMER        :  **ELECTRONICALLY FILED**


## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I caused a true and correct copy of the foregoing

**BRIEF IN OPPOSITION TO THIRD AMENDED MOTION
TO MODIFY SENTENCE OR FOR RELIEF
UNDER SECTION 2255**

to be electronically filed on April   20  , 2005 to:

ADDRESSEE:

       Anne L. Saunders, Esquire
       <u>Anne_Saunders@fd.org</u>

       and

       Michael Wiseman, Esquire
       <u>Michael_Wiseman@fd.org</u>



                  <u>  s/Frederick E. Martin        </u>
                  FREDERICK E. MARTIN
                  Assistant United States Attorney