IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA :
                                    :
        v.                          :   No. 4:CR-96-239
                                    :
DAVID PAUL HAMMER           :   (Judge Muir)

ORDER
August 12, 2005

THE BACKGROUND OF THIS ORDER IS AS FOLLOWS:

On November 4, 1998, this court sentenced David Paul Hammer to die by lethal injection for the first degree murder of Andrew Marti.   On July 14, 2005, a hearing commenced on Mr. Hammer's third amended § 2255 motion.   The hearing so far has lasted 13 days and the 14th day is scheduled to commence on August 15, 2005.

At trial, the defense raised by Mr. Hammer was insanity, i.e., he suffered from Dissociative Identity Disorder (formerly referred to as Multiple Personality Disorder).   The contention was that an "alter personality", Jocko, killed Mr. Marti.

On June 22, 1998, almost at the conclusion of the guilt phase of the trial, Mr. Hammer entered a plea of guilty to first degree murder.[1]   One of the primary contentions of Mr. Hammer in

---

[1]The Government's case in chief commenced on June 3, 1998, and concluded on June 11, 1998. The Government called the following 16 witnesses during its case in chief: on June 3rd – Timothy Devane, Stephen Jones, Thomas Abraham, Curtis Hufnagle, and Jack Luhrman; on June 4th – Muhammed Chaudhri, Saralee Funke, Ronald L. Jury, and Guy Fleck; on June 8th – Guy Fleck (continued), Thomas F. Callaghan, Leonard Yager, and Mark Traxler; on June 9th – Mark Traxler (continued), Jeannette Bunch, and Stephen Classen; on June 10th – Stephen Classen (continued) and  Carlyle Thompson; on June 11th – Carlyle Thompson (continued) and Anthony S. Malocu. The Defense commenced its case on June 11, 1998 and concluded on June 17, 1998.  The Defense called the following 13 witnesses during its case: on June 11th –

the third amended § 2255 motion is that he was not competent to enter a plea of guilty. He also contends that the factual basis for the plea relied on by the prosecution and the Court was false.

The intention of the court is to render a correct decision based on the evidence presented by the parties. However, in our opinion counsel for both the Government and Hammer have failed or declined to ask some highly relevant questions of the witnesses called on behalf of Mr. Hammer. To explain the basis for this opinion we will first have to outline what occurred at the change of plea proceeding on June 22, 1998, paying specific attention to the factual basis for Mr. Hammer's plea of guilty to first degree murder and then we will review portions of the reports prepared by two experts recently retained by Mr. Hammer which give an indication of Mr. Hammer's present version of the homicide.

During the change of plea proceeding on June 22, 1998,

---

James Boone and Billy Joe Webb; on June 12th – Mike Smith, George Yandle, Rev. Charles Story, and Gary McLaughlin; on June 15th – Paul Reed, Mark Oberg, Mark Jordan, and Jill Miller; on June 16th – Jill Miller (continued) and Dr. Robert Sadoff; on June 17th – Dr. Robert Sadoff (continued), Anthony Malocu and Mark Traxler. The Government commenced its rebuttal case on June 17, 1998, by calling Dr. James Wolfson and concluded the direct examination of Dr. Wolfson at 3:52 p.m. on June 18, 1998. The cross-examination of Dr. Wolfson commenced on June 19, 1998, and ran from 10:00 a.m. until 12:20 p.m. After lunch two witnesses, Nicole Tadross-Weaver and Chaplain Glenn Crook, were taken out of turn. At the conclusion of their testimony Dr. Wolfson resumed the witness stand and attorney Travis continued with cross-examination. At 3:04 p.m. an afternoon break was taken. Court resumed at 3:19 p.m. at which time counsel approached the bench and reported that attorney Travis was suffering from exhaustion and requested that court adjourn for the day. Because attorney Ruhnke was not prepared to continue with the cross-examination of Dr. Wolfson, the jury was excused for the day and directed to report on Monday morning at the regular time.

Government counsel was asked to "give us a brief summary of the evidence."   Government counsel in response to that request stated in relevant part as follows:

> Mr. Hammer solicited Mr. Marti as a cellmate.  Once Mr. Marti was his cellmate he persuaded him to engage in a hostage scenario, whereby Mr. Marti would allow himself to be tied to the bed in an effort to have Mr. Marti transferred more quickly to another federal institution.
>
> Mr. Hammer persuaded, or succeeded in persuading Mr. Marti to do this.  Also prepared items, including cloth restraints, to facilitate the ruse, and when Mr. Marti was tied, all of his limbs were tied to various aspects of the cell, he indicated -- he basically put a sock in Mr. Marti's mouth, then put him in a sleeper hold and rendered him unconscious.
>
> And after doing so he took a cloth, a piece of cloth, a strip of cloth, and used that to finally strangle Mr. Marti to death.  Mr. Hammer had said to several inmates that that what – that is what he intended to do.  And they have testified to that effect in this proceeding.
>
> He also wrote letters after the fact, after the killing of Mr. Marti, basically saying that I did what I told you I was going to do, and that was to strangle Mr. Marti, and all of these – the pre-planning and the statements to the inmates, as well as Mr. Hammer's written statements following the murder support the prosecution – prosecution's conclusion that this murder occurred in cold blood with premeditation.

Doc. 488, Transcript, Vol. 14, pages 112-113. After this summary, we asked Mr. Hammer whether or not he agreed with the prosecutor's summary to which he responded in pertinent part as follows:

> I agree with Mr. Martin's rendition of the facts in substance, but – not in the exact detail in which he put it.
>
> *   *   *   *   *   *   *   *   *   *
>
> The bottom line is I did in fact with these hands kill Andrew Marti . . . .

3

Transcript, pages 113-114.  We then asked Mr. Hammer how he disagreed with Government counsel's summary to which he responded as follows:

> Well, the fact that I solicited Andrew to move into my cell.  It was a – it was a mutual decision for him to move in there with me, and the ruse for the hostage scenario, that was not accurate.  That's something I told the FBI I did, along with Marti, braid sheets, braid restraints, but we used them for other purposes.
>
> The bottom line is I tied him up, I tied him to the bed and I killed him.  And I'm responsible for that.

Transcript at 114.  The only portions of Government counsel's summary with which Mr. Hammer disagreed were (1) that he solicited Mr. Marti to be his cellmate and (2) the hostage scenario or ruse. Mr. Hammer did not dispute that he tied Mr. Marti to the bed, put a sock in Mr. Marti's mouth, put Mr. Marti in a sleeper hold and rendered him unconscious, and then took a piece of cloth and strangled Mr. Marti to death.  Mr. Hammer did not deny that he told inmates prior to the incident that he was going to kill Mr. Marti. The portions of Government counsel's summary which Mr. Hammer did not deny compelled the court to find intent to kill (malice) and premeditation.

Attached to Mr. Hammer's third amended § 2255 motion is a declaration from Neil Blumberg, M.D., a psychiatrist who was retained by Mr. Hammer's present counsel to perform a retrospective competency evaluation of Mr. Hammer.  In sum, Dr. Blumberg concluded that Mr. Hammer was not competent on June 22, 1998, and that he was not able to make a reasoned and rational decision.

Also, in his declaration Dr. Blumberg outlined Mr. Hammer's version

of the homicide, in relevant part, as follows:

> 23.   Mr. Hammer stated that Mr. Marti became his cell mate shortly before the murder.  Mr. Hammer consented to having Mr. Marti as his cell mate and agreed to provide protection as well as financial resources, such as commissary, in exchange for sexual favors.  He noted that they engaged in consensual sexual activity regularly prior to the offense.  Mr. Hammer stated that Mr. Marti expressed the desire to be partially asphyxiated while receiving anal sex in order to increase his sexual pleasure.  Mr. Hammer stated that they engaged in this activity on two or three occasions prior to the offense.

> 24.   On the day of the offense, Mr. Marti expressed the desire to be tied up during sexual relations as his pleasure was further enhanced by being totally dominated.  Both Mr. Hammer and Mr. Marti made restraints that were later used to bind Mr. Marti's hands and legs to Mr. Hammer's bunk.

> 25.   On the evening of the offense, Mr. Marti was lying prone and initially requested Mr. Hammer to tickle him in order to increase his degree of excitement. As a result of Mr. Marti laughing too loudly, they both agreed to place a sock in Mr. Marti's mouth to decrease the noise.  Mr. Hammer then bound Mr. Marti's hands to the side of the bunk and bound his legs to the bottom of the bunk, as they agreed.  Mr. Hammer stated he then pulled down Mr. Marti's boxer shorts and began stimulating his anus with a lubricated finger.  He then engaged in anal intercourse with Mr. Marti during which time he partially asphyxiated Mr. Marti as he had previously done on other occasions.[2]  After they were finished, and Mr. Hammer was cleaning himself, he became overwhelmed

---

[2]We assume that when Mr. Hammer told Dr. Blumberg that he partially asphyxiated Mr. Marti, that Mr. Hammer was indicating that Mr. Marti was still alive after the sexual encounter. We also assume that Mr. Hammer was indicating to Dr. Blumberg that he was the "David" host personality during the sexual encounter and not the "Jocko" alter personality. The contention appears to be that the stress (i.e., shame, guilt, anger for engaging in the sexual encounter) triggered the emergence of "Jocko" who according to testimony already presented in this case is homophobic.

with what had just occurred and began experiencing extremely intense shame, guilt, and anger.  Mr. Hammer stated that upon talking with the authorities later, he provided a different and false rendition of events "so other's wouldn't view me as a sicko."

26.  Mr. Hammer denied any thought or intention of harming Mr. Marti prior to accepting him as a cell mate until losing control at the time of the actual offense.  He described their sexual activities as entirely consensual.  He denied any previous involvement in bondage, partial asphyxiation or any other sado-masochistic activities.

During the present hearing neither Mr. Hammer's counsel nor Government counsel have questioned Mr. Hammer's former attorneys regarding what Mr. Hammer told them about the homicide. Such questions are highly relevant for several reasons.

First, both attorneys Ruhnke and Travis were asked if they knew of "any reason why the defendant should not plead guilty" and they responded as follows:

Mr. RUHNKE: Other than I think it's an extremely foolish decision, Your Honor, no.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

MR. TRAVIS: I've got a number of reasons why he should not, Your Honor, but unfortunately its his decision, and he's got to do what he thinks is the appropriate thing to do.

Transcript, page 117.  Counsel's knowledge of the circumstances of the homicide is relevant to whether they conducted themselves in a competent and professional manner with respect to the proceedings in which they were involved, including whether or not they failed to correct erroneous information which Hammer or the Government provided the court during the change of plea proceeding.

Second,  what Mr. Hammer told counsel is relevant to

6

Hammer's motivation for pleading guilty and waiving appeal and whether or not he was acting in a voluntary, intelligent and knowing manner.

Third, one of Mr. Hammer's recently retained experts, Richard P. Kluft, M.D., a forensic psychiatrist, in a letter attached to the third amended § 2255 motion has stated as follows:

> <u>David and Jocko's memories became confluent only over the passage of time. At the time of Jocko's aggressive behavior, the total human being David Paul Hammer was not able to be aware of what was transpiring and control his behavior.</u> The dissociative identity disorder disrupted this man's capacity to have the knowledge of his circumstances, the ability to access and utilize his intelligence, and the capacity to form a true voluntary intent to commit an act of murder.  His actions were driven by the fragmentation and compromised control associated with dissociative identity disorder.
>   The same observations pertain to his difficulties in coming to a decision about whether to plead guilty and whether to oppose the imposition of the death penalty. His different personalities have different values and motivations. They form different intents, and then try to impose them on one another.

(Emphasis added.)  This passage may suggest that Mr. Hammer may have suffered from amnesia and may have only over time remembered what occurred between 2:00 and 3:00 a.m. on April 13, 1996, the date and time of the homicide.  Questioning of Mr. Hammer's prior counsel is relevant to a determination of whether or not Dr. Kluft's opinion may be correct.

We normally do not interject ourselves into the manner in which counsel present a case.  However, it is extremely important that we arrive at the truth with respect to this matter.

NOW, THEREFORE, IT IS HEREBY ORDERED THAT:

Counsel for either Mr. Hammer or the Government shall

before the conclusion of the evidentiary hearing call attorneys Travis and Ruhnke and question them regarding their knowledge of the circumstances of the homicide, including what Mr. Hammer related to them about it.

s/Malcolm Muir
_____
MUIR, U.S. District Judge

MM:gs