IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA :
                         :
       v.                :   No. 4:CR-96-239
                         :
DAVID PAUL HAMMER        :   (Judge Muir)

ORDER
August 18, 2005

THE BACKGROUND OF THIS ORDER IS AS FOLLOWS:

On November 4, 1998, this court sentenced David Paul Hammer to die by lethal injection for the first degree murder of Andrew Marti.  On July 14, 2005, a hearing commenced on Mr. Hammer's third amended § 2255 motion.  The hearing so far has lasted 16 days and the 17th day is scheduled to commence on August 29, 2005.

At trial, the defense raised by Mr. Hammer was insanity, i.e., he suffered from Dissociative Identity Disorder (formerly referred to as Multiple Personality Disorder).  The contention was that an "alter personality", Jocko, killed Mr. Marti.

On June 22, 1998, almost at the conclusion of the guilt phase of the trial, Mr. Hammer entered a plea of guilty to first degree murder.  One of the primary contentions of Mr. Hammer in the third amended § 2255 motion is that he was not competent to enter a plea of guilty.  He also contends that the factual basis for the plea relied on by the prosecution and the Court was false. He has also raised claims that his trial counsel were ineffective.

Rule 7 of the Rules Governing Section 2255 Proceedings for the United States District Courts states as follows:

> (a) In General.  If the [§ 2255] motion is not
> dismissed, the judge may direct the parties to

expand the record by submitting additional materials relating to the motion.  The judge may require these materials be authenticated.

(b) Types of Materials.  The materials that may be required include letters predating the filing of the motion, documents, exhibits, <u>and answers under oath to written interrogatories propounded by the judge</u>.  Affidavits also may be submitted and considered as part of the record.

(c) Review by the Opposing Party.  The judge must give the party against whom the additional materials are offered opportunity to admit or deny their correctness.

(Emphasis added.)  The purpose of this order is to direct David A. Ruhnke, Esquire, to answer in writing and under penalty of perjury the questions set forth below and file the answers with the court. The questions are as follows:

**1.** Did you have any conversations with Mr. Hammer regarding his version of the homicide of Andrew Marti?

**2.** How many conversations did you have with Mr. Hammer about the facts of the case?

**3.** When and where did the conversations take place and how long did the conversations take?

**4.** Did Mr. Hammer ever reveal to you the substance of any conversations he had with Andrew Marti?

**5.** The trial transcripts reveals that Andrew Marti was moved from Special Housing Unit cell 215 to cell 103 in which Mr. Hammer was housed on April 9, 1996, at 1:55 p.m.  Did Mr. Hammer ever reveal to you what activities he and Mr. Marti engaged in from April 9 until April 13, 1996, at 2:00 a.m.?  If so, what did he reveal to you?

**6.** Did Mr. Hammer ever reveal to you what occurred  between the hours of 2:00 a.m. and 3:00 a.m. on April 13, 1996?  If so, what did he reveal to you?

**7.** Did Mr. Hammer tell you that he had told certain inmates prior to the incident that he was going to kill Andrew Marti?

**8.** What did he tell you about his contacts or conversations  with inmates Classen and Yager?

**9.** There was testimony during trial about an alleged conversation Mr. Hammer had with Correctional Officer Boone about Andrew Marti.  What did Mr. Hammer tell you about his contacts or conversations with Correctional Officer Boone?

**10.** After court adjourned on June 19, 1998, when did you learn that Mr. Hammer desired to plead guilty?

**11.** After learning of Mr. Hammer's desire to plead guilty, did you have any discussions with Mr. Travis regarding whether or not Mr. Hammer was competent to enter a guilty plea?

**12.** Did you have any conversations with Mr. Travis about whether or not Mr. Hammer had the ability to enter a knowing, voluntary and intelligent plea?

**13.** Did you contact Dr. Sadoff or Dr. Gelbort to obtain their input on whether M. Hammer was competent to enter a guilty plea?  And if you did, what did they state?

**14.** And if you did not contact Dr. Sadoff and Dr. Gelbort relating to Mr. Hammer's competency to enter a guilty plea, explain why you did not contact them?

**15.** On  June 22, 1998, before we excused the jury for the day and before Mr. Hammer was examined by Drs. Wolfson and Mitchell   you stated initially when questioned regarding Mr. Hammer's competency that "I have no view on his competency.  I am not a psychiatrist."  When asked again whether you believed he was competent, you then stated "As a lawyer, and not a psychiatrist, I believe he's competent."    When I asked you that question did you consider contacting Dr. Sadoff or Dr. Gelbort regarding the issue?  In answering that question you should bear in mind that at one point I suggested "it's even possible we ought to adjourn for

the day." Transcript at page 14.   And if you did not consider it, explain why not?

**16.**  The trial transcript reveals that you were given an opportunity to speak with Mr. Hammer on the morning of June 22, 1998.  During that conversation, did Mr. Hammer reveal to you anything about the offense with which he was charged?

**17.**   Prior to 2:36 p.m. on June 22, 1998, which is the date and time the court reconvened to take Mr. Hammer's change of plea,  what was your understanding of the circumstances which led to Mr. Marti's death – specifically with respect to premeditation and  Mr. Hammer's intent in performing the acts which led to Mr. Marti's death?

**18.**  After you were appointed to represent Mr. Hammer, did you have any discussion with either Mr. Travis, Dr. Gelbort or Dr. Sadoff regarding whether or not Mr. Hammer suffered from Borderline Personality Disorder or Post Traumatic Stress Disorder?  And if so, what were those discussions and what steps did you take to determine whether or not Mr. Hammer had those disorders?

**19.**  In these proceedings, there has been some suggestion  that you, Attorney Travis or Mr. Hammer felt that the jury was not impressed with the testimony of  Dr. Wolfson and that there was a good chance that there would be a verdict of not guilty by reason of insanity.

Is that true?  What was your view on June 19, 1998, regarding the likelihood of such a verdict?

And what was  Mr. Hammer's view on that subject on  June 19, 1998?

**(Only if Mr. Hammer was of the view that a verdict of  not guilty by reason of insanity was a likely verdict answer the following questions.)**

**20.**  On June 22, 1998, in response to a question regarding whether there was any discussion with Mr. Hammer as to whether or not he feared a verdict of not guilty by reason of insanity Dr. Wolfson testified that Mr. Hammer "seemed to think it was

unlikely." Also, Dr. Mitchell testified that Hammer's "estimate" of a verdict of not guilty by reason of insanity "was quite small."

How do you reconcile Mr. Hammer's view on June 19, 1998, with what he apparently told Drs. Wolfson and Mitchell during the examination on June 22, 1998?

**21.** Did you consider bringing to the court's attention, the change in Mr. Hammer position from that which he held on June 19, 1998, to that which he held on June 22, 1998?

NOW, THEREFORE, IT IS HEREBY ORDERED THAT:

Attorney Ruhnke shall answer in writing and under penalty of perjury the questions set forth in the background of this order and file the answers with the court by 4:00 p.m. on the last working day before the date on which he is called to testify or September 8, 2005, whichever shall first occur.

s/Malcolm Muir

MUIR, U.S. District Judge

MM:gs