FILED
WILLIAMSPORT
AUG 3 0 2005
~~Per~~
~~OAK~~
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA  :
                          :
    v.                    :    No. 4:CR-96-239
                          :
DAVID PAUL HAMMER         :    (Judge Muir)

### ANSWERS BY DAVID A. RUHNKE TO QUESTIONS POSED BY THE COURT IN ITS ORDER OF AUGUST 18, 2005

David A. Ruhnke, under penalty of perjury, hereby provides the following answers to the questions set forth in the Court's order of August 18, 2005.

### Preliminary statement

It has been seven years since this case was tried and I no longer have a detailed recollection of many of the facts and circumstances of the trial or of events that took place in the time that elapsed between my appointment by the Court to represent Mr. Hammer in the fall of 1996 and the trial in 1998. In the intervening seven years I have tried six other capital cases to a verdict. Mindful that I am responding under penalty of perjury, I have endeavored in this statement not to be specific unless I believe I have an actual and accurate present recollection of the facts that are responsive to the particular question asked. It is possible – even likely – that my recollection of many of the relevant facts, as to which I have no present recollection, can be refreshed by presenting me with notes, transcripts, discovery, or other documentary materials that bear upon the areas into which the

Court wishes to inquire. With the above in mind, I will answer the Court's question by reference to the numbers of the questions themselves.

1.    I recall one specific conversation with Mr. Hammer regarding his version of the homicide of Andrew Marti.

2.    I presently recall only one conversation about the actual homicide of Mr. Marti. There were numerous conversations about other "facts of the case," including facts relevant to both the guilt- and potential penalty-phase.

3.    The conversation I recall took place early in my representation of Mr. Hammer, most likely in October or November 1996. My best recollection is that the conversation took place at FCI/Allenwood, but I may be mistaken about that. The conversation was brief, less than one minute.

4.    I have no current recollection of any specific conversation with my client where Mr. Hammer told me about conversations he had with Mr. Marti. I believe that it is likely that such conversations did take place, I just have no present recollection of any particular conversation.

5.    I have no present recollection of any such conversation.

6.    I have no present recollection of any such conversation.

7.    I have no present recollection of any such conversation.

8.    I have only the vaguest of recollections as to who inmates Classen and Yager are and what role they played in the case. It is highly likely that I spoke to Mr. Hammer about them,

but I have no present recollection of any such conversation.

9.    I do not recall who Correctional Officer Boone is or the role he played in the case.  Assuming he played a significant role, it is likely I would have discussed that role with Mr. Hammer. However, I have no present recollection of any such conversation.

10.    Assuming June 19, 1998  was the Friday that Court ended early because Mr. Travis felt unwell, I believe I learned about Mr. Hammer's desire to plead guilty on Sunday, June 21, 1998.

11.    With regard to the issue of competency, the only thing I recall specifically during my initial conversation with Mr. Travis (which took place, if I am remembering correctly, via car phone while I was driving back to Williamsport on June 21) is that if we were not able to convince Mr. Hammer that pleading guilty was a mistake, that the Court would likely want to conduct some sort of competency hearing before taking the plea.

12.    I have no present recollection of any such conversation.

13.    I  have  no  present  recollection  of  contacting  or attempting to contact either Dr. Sadoff or Dr. Gelbort regarding Mr. Hammer's competency to enter a guilty plea.

14.    I have no present recollection of giving any thought at all to contacting Dr. Sadoff or Dr. Gelbort and, therefore, cannot answer "why" I did not contact them.

15.    I have no present recollection of considering contacting either Dr. Sadoff or Dr. Gelbort on June 22, 1998.  Since I have no recollection of considering the contact inquired about, I cannot

answer "why" I did not make the contact.

16.    I am assuming that the conversation took place.  However, I have no present recollection of the specifics of any such conversation.

17.    The fullest explanation I can presently recall receiving regarding the death of Mr. Marti, and Mr. Hammer's intent, was during the video-taped hypnosis session.  My personal belief and understanding, based upon the testimony and analysis of Dr. Sadoff, is that Mr. Marti was killed by an alter personality, "Jocko," and that, as such, Mr. Hammer was not criminally responsible for Mr. Marti's death.  That I accepted Dr. Sadoff's analysis, however, plainly does not mean that is the way it really happened.  I do recall Mr. Hammer's somewhat cryptic statement during the plea colloquy to the effect that "these hands killed Andrew Marti."

18.    I have no present recollection of any such conversations. I know I had discussions with the mental health experts, but I do not presently recall the specifics of those discussions or whether alternative, congruent, or overlapping diagnoses were discussed.

19.    I was not impressed with Dr. Wolfson's qualifications or testimony and it was my hope that the jury would perceive Dr. Wolfson as I did.  I did not, however, believe that a verdict of not guilty by reason of insanity was ever likely.  As I try to recall Mr. Hammer's view on the subject, I recall one, in general terms, or more conversations as the case was winding down, and earlier in the representation when we were discussing the pluses

4

and minuses of presenting an insanity defense, where Mr. Hammer expressed the concern that he might be found not guilty by reason of insanity and be sent to Springfield or that the federal government might return him to Oklahoma, neither of which he wanted to have happen. I have no present recollection of precisely when these conversations took place, although I do believe this was a topic our discussion during the period immediately before Mr. Hammer entered his guilty plea as well as in earlier stages of the case.

20. Without committing myself to the specific dates set forth in the Court's question, I do not see anything contradictory or in need of reconciling. I was always of the view that Mr. Hammer believed that the chances were "quite small" that he would be acquitted by reason of insanity. He was, however, concerned about the impact of such a verdict, no matter how unlikely, since neither Mr. Travis nor myself could assure him that such a verdict was impossible or guarantee what would happen if such a verdict was returned.

21. I never detected a change in Mr. Hammer's position on this issue. Again, without committing myself to the specific dates set forth in the Court's question, I do not recall ever believing that Mr. Hammer thought he had a good chance of the defense winning an insanity verdict. He was nonetheless concerned about the impact on him should such a verdict be returned, however remote the chance.

22. I declare, under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct. Executed on August 29, 2005.

DAVID A. RUHNKE

Dated:    Montclair, New Jersey
          August 29, 2005