## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Respondent,<br><br>v.<br><br>DAVID PAUL HAMMER,<br><br>Petitioner. | :<br>:<br>:  Criminal No. 4:CR–96-239<br>:<br>:  Judge Muir<br>:<br>:<br>:<br>:<br>:<br>:<br>: |

## PETITIONER'S PROPOSED FINDINGS OF FACT
## PART I

## CONTENTS

| | | |
|---|---|---|
| I. | Dr. Michael Gelbort | 1 |
| II. | Dr. Ruben Gur | 14 |
| III. | Dr. Daniel Martell | 25 |
| IV. | Monica Foster, Esq. | 44 |
| V. | Rhonda Long-Sharp, Esq. | 49 |
| VI. | Christopher Nolan | 51 |
| VII. | Timothy Noone | 52 |
| VIII. | Saundra Ask-Carlson | 54 |
| IX. | Carlyle Thompson | 56 |
| X. | Dr. John Mitchell | 60 |

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


UNITED STATES OF AMERICA    : Crim. No. 4:CR-96-263
                       : Civil No. 4:CV-02-510
        v.             :
                       : (Muir, J.)
DAVID PAUL HAMMER        : **ELECTRONICALLY FILED**


### CERTIFICATE OF SERVICE

    I hereby certify that I caused a true and correct copy of the foregoing

**PETITIONER'S PROPOSED FINDINGS OF FACT
PART I AS ANNOTATED BY FREDERICK E. MARTIN, ESQUIRE**

to be electronically mailed on October 3  , 2005 to:

ADDRESSEE:
        Anne L. Saunders, Esquire
        Anne_Saunders@fd.org

        Michael Wiseman, Esquire
        Michael_Wiseman@fd.org



                       s/Frederick E. Martin
                      FREDERICK E. MARTIN
                      Assistant United States Attorney

## I.    Dr. Michael Gelbort

1.    Dr. Michael M. Gelbort testified during the trial in this case.

✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

2.    At trial and during the Section 2255 proceedings, the Government did not object to Dr. Gelbort's qualification as an expert in neuropsychology.

✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

3.    The Court finds Dr. Gelbort qualified as an expert in neuro-psychology for purposes of these Section 2255 proceedings.

✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

4.    Prior to trial, Dr. Gelbort conducted a neuropsychological xamination of Mr. Hammer.

✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

5.    Prior to his trial testimony, Dr. Gelbort reviewed materials regarding Mr. Hammer's background and history and conducted a forensic  neuro-psychological examination.

✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

6.    During his pretrial evaluation, Dr. Gelbort administered a number of psychological and neuropsychological tests that were listed in his report and covered in his trial testimony.

1

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

7.    Dr. Gelbort conducted a further evaluation of Mr. Hammer in 2004.

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

8.    Dr. Gelbort credibly and reliably concluded to a reasonable degree of psychological and neuropsychological certainty that Mr. Hammer suffers from brain dysfunction, cognitive and emotional impairments.

___ Undisputed          ___✓ Disputed          ___ Undisputed But Objected To

9.    Dr. Gelbort credibly and reliably found that Mr. Hammer's brain dysfunction localize and lateralize on the right side of the brain

___ Undisputed          ___✓ Disputed          ___ Undisputed But Objected To

10.    The damage to Mr. Hammer's brain is primarily focused in the frontal lobe and the temporal lobe.

___ Undisputed          ___✓ Disputed          ___ Undisputed But Objected To

11.    As a result of the frontal lobe impairments, Mr. Hammer's executive functions are impaired.

___ Undisputed          ___✓ Disputed          ___ Undisputed But Objected To

12.    The frontal lobes are the part of the brain that synthesize thoughts.

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

13.    The frontal lobes are the part of the brain that initiates and inhibits

2

behavior.

\_\_\_\_ Undisputed        ✓ Disputed        \_\_\_ Undisputed But Objected To

14.    The frontal lobes are the part of the brain that control reasoning and judgment.

\_\_\_\_ Undisputed        ✓ Disputed        \_\_\_ Undisputed But Objected To

15.    The frontal lobe area of the brain serves as a source of initiation and inhibition of behavior.

✓ Undisputed        \_\_\_ Disputed        \_\_\_ Undisputed But Objected To

16.    As a result of his frontal lobe impairments, Mr. Hammer has difficulties with inhibition, impulsivity and judgment.

\_\_\_\_ Undisputed        ✓ Disputed        \_\_\_ Undisputed But Objected To

17.    As a result of his frontal lobe dysfunction, Mr. Hammer acts before thinking, thus causing him to respond to stimuli before he fully processes information.

\_\_\_\_ Undisputed        ✓ Disputed        \_\_\_ Undisputed But Objected To

18.    Mr. Hammer's temporal lobe dysfunction impairs his memory and perception.

\_\_\_\_ Undisputed        ✓ Disputed        \_\_\_ Undisputed But Objected To

19.    Mr. Hammer's brain dysfunction also impairs his ability to

synthesize information.

___ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

20. Dr. Gelbort's testing and evaluation also demonstrated that Mr. Hammer's emotions are poorly modulated.

___ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

21. Dr. Gelbort opined that Mr. Hammer's brain dysfunction causes him to respond to his emotions in an abnormal manner.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

22. The testing and evaluation conducted by Dr. Gelbort demonstrated that, while Mr. Hammer is a logical person, his emotions control his behavior more often than rational thought.

___ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

23. The testing and evaluation conducted by Dr. Gelbort demonstrated Mr. Hammer's visual perception to be within normal limits.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

24. The testing and evaluation conducted by Dr. Gelbort showed however, that Mr. Hammer's ability to visually integrate is impaired.

___ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

25. Mr. Hammer's impaired ability to visually integrate means that he

4

cannot make sense out of, or put together, information obtained visually.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

26.    The testing and evaluation conducted by Dr. Gelbort demonstrated that Mr. Hammer impressionistically respond to the "whole picture" while missing some of the important or salient aspects of visually obtained information.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

27.    While unimpaired individuals strike a balance between emotionality and cognition when making decisions, Mr. Hammer's impairments skew the balance in a way that his emotions predominate his decision making.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

28.    Mr. Hammer can reach appropriate decisions when provided verbally-based, concrete, non-emotionally laden problems.

__✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

29.    The fact that Mr. Hammer's left-brain functioning, including intelligence, is average does not diminish the impact of his right-brain and frontal lobe impairments on his decision-making.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

30.    The behavioral impact of all of Mr. Hammer's brain impairments are exacerbated during periods of stress.

5

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

31.    Due to his brain impairments, even low levels of stress can cause Mr. Hammer to act on emotions rather than rational thoughts.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

32.    Subjecting an individual with Mr. Hammer's combined emotional and brain impairments to isolated conditions, exacerbates the behavioral impacts of his brain impairments.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

33.    The behavioral manifestations of Mr. Hammer's emotional and brain deficits are exacerbated by the emotional trauma he suffered as a result of his horrific and abusive upbringing.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

34.    Mr. Hammer's emotional scars and brain dysfunction were further exacerbated by years of significant substance abuse.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

35.    Dr. Gelbort credibly concluded to a reasonable degree of neuropsychological certainty that testing demonstrated clear indicators of frontal lobe and temporally located neurocognitive dysfunction correlated with deficits in reasoning and judgment as well as impulsivity and disinhibition.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

36.    Dr. Gelbort credibly concluded to a reasonable degree of psychological and neuropsychological certainty that the etiology of Mr. Hammer's cognitive dysfunction, emotionality and personality impairments, significantly impacted, and continues to impact, Mr. Hammer's reasoning and judgment.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

37.    Dr. Gelbort credibly concluded to a reasonable degree of psychological and neuropsychological certainty that the impairments suffered by Mr. Hammer would render it difficult, if not impossible, for him to take into account multiple non-emotional factors and reach conclusions based on reason, especially about complex matters.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

38.    Dr. Gelbort credibly concludes to a reasonable degree of psychological and neuropsychological certainty that these impairments would also hinder his abilities to process non-verbal information as part of his reasoning process.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

39.    Dr. Gelbort credibly and reliably concludes that Hammer's intelligence does not diminish the impact of his cognitive and brain impairments

7

on his ability to make a rational decision.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

40.    Dr. Gelbort credibly and reliably concludes that, during the times in which Mr. Hammer expressed a willingness to plead guilty, the records demonstrate that those were times that were emotionally charged and highly stressful, with resultant high anxiety.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

41.    Due to the stress, anxiety and highly emotional content of the trial at the time of his guilty plea, Mr. Hammer's decisions to plead guilty was driven by the his emotions, anxiety and stress, rather than by reasoned judgment.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

42.    After reviewing the records and conducting a follow-up evaluation, Dr. Gelbort credibly concludes to a reasonable degree of neuropsychological and psychological certainty that, given his substantial impairments in reasoning, judgment and impulse control, combined with his emotionality, Mr. Hammer lacked capacity to make a knowing, voluntary, and intelligent decision to plead guilty or waive his rights to post-verdict litigation, and appeal.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

43.    Dr. Gelbort credibly concludes to a reasonable degree of

8

neuropsychological and psychological certainty that, as a result of his organic impairments, Mr. Hammer was unable to synthesize or analyze all the factors involved in making a reasoned decision.

\_\_\_\_ Undisputed        ✓ Disputed        \_\_\_ Undisputed But Objected To

44.    Dr. Gelbort credibly concludes to a reasonable degree of neuropsychological and psychological certainty that Mr. Hammer's waivers were the product of, and substantially affected by, his psychological, emotional and cognitive impairments.

\_\_\_\_ Undisputed        ✓ Disputed        \_\_\_ Undisputed But Objected To

45.    Dr. Gelbort concluded that, at a minimum, Mr. Hammer's neuropsychological impairments substantially affected his capacity to waive his legal rights.

\_\_\_\_ Undisputed        ✓ Disputed        \_\_\_ Undisputed But Objected To

46.    Dr. Gelbort credibly concludes to a reasonable degree of neuropsychological and psychological certainty that Mr. Hammer's vacillation between waiving his appeals and going forward with litigation is a direct manifestation of his emotionality, impulsivity, disinhibition and impaired judgment characteristic of his brain dysfunction.

\_\_\_\_ Undisputed        ✓ Disputed        \_\_\_ Undisputed But Objected To

9

47.    That Mr. Hammer was articulate during the guilty plea colloquy and the appellate argument is not inconsistent with Dr. Gelbort's opinion that Mr. Hammer's decision-making was significantly impaired and that his decisions to waive his rights were driven by his cognitive, emotional and psychological deficits as opposed to a reasoned determination of the salient factors and consequences.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

48.    Dr. Gelbort credibly concludes to a reasonable degree of neuropsychological and psychological certainty that Mr. Hammer's intellect does not undermine his conclusion that he suffers from brain dysfunction, emotionality and personality impairments.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

49.    Dr. Gelbort credibly concludes to a reasonable degree of neuropsychological and psychological certainty that these impairments affect Mr. Hammer's ability to adequately comprehend a given situation, to reflect and reason before making decisions and to fully recognize the consequences of those decisions.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

50.    While Mr. Hammer may be articulate, he remains impaired and those impairments directly affected his ability to make rational decisions.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

51. Trial counsel did not consult with Dr. Gelbort prior to Mr. Hammer's entry of his guilty plea.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

52. Trial counsel did not consult with Dr. Gelbort during the competency proceedings prior to Mr. Hammer's entry of his guilty plea.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

53. At no time did trial counsel did trial counsel consult with Dr. Gelbort regarding whether or not Mr. Hammer's brain dysfunction and emotional and psychological impairments would have an affect Mr. Hammer's capacity to make a knowing, intelligent and voluntary decision to waive his right to a trial and enter a guilty plea.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

54. Trial counsel did not consult with Dr. Gelbort regarding the impact of Mr. Hammer's brain dysfunction and his emotional and psychological impairments on Mr. Hammer's ability to make rational decisions with respect to waiving his rights to appeal.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

55. Trial counsel did not consult with Dr. Gelbort regarding the impact of

Mr. Hammer's brain dysfunction and his emotional and psychological impairments on Mr. Hammer's ability to make rational decisions with respect to waiving his rights during post-conviction proceedings.

\_\_\_\_ Undisputed          ✓ Disputed          \_\_\_ Undisputed But Objected To

56.    Dr. Gelbort credibly concludes to a reasonable degree of neuropsychological and psychological certainty that, given his substantial impairments in reasoning, judgment and impulse control, combined with his emotionality, Mr. Hammer lacked capacity to make a knowing, voluntary, and intelligent decision as to any waiver of his rights.

\_\_\_\_ Undisputed          ✓ Disputed          \_\_\_ Undisputed But Objected To

57.    Dr. Gelbort credibly concludes to a reasonable degree of neuropsychological and psychological certainty that Mr. Hammer's waivers were the product of, and substantially affected by, his psychological, emotional and cognitive impairments.

\_\_\_\_ Undisputed          ✓ Disputed          \_\_\_ Undisputed But Objected To

58.    Dr. Gelbort credibly concludes to a reasonable degree of neuropsychological and psychological certainty that Mr. Hammer's vacillation between waiving his appeals and going forward with litigation is a direct manifestation of his emotionality and the impulsivity, disinhibition and impaired

judgment characteristic of his brain dysfunction.

\_\_\_\_ Undisputed          ✓ Disputed          \_\_\_ Undisputed But Objected To

59.    That Mr. Hammer was articulate during the guilty plea colloquy and the appellate argument does not diminish Dr. Gelbort's opinion that Mr. Hammer's decision-making was significantly impaired and that his decisions to waive his rights were driven by his cognitive, emotional and psychological deficits as opposed to a reasoned determination of the salient factors and consequences.

✓ Undisputed          \_\_\_ Disputed          \_\_\_ Undisputed But Objected To

60.    Dr. Gelbort credibly concludes to a reasonable degree of neuropsychological and psychological certainty that Mr. Hammer's intellect does not preclude a conclusion that he suffers from brain dysfunction, emotionality and personality impairments.

\_\_\_\_ Undisputed          ✓ Disputed          \_\_\_ Undisputed But Objected To

61.    Dr. Gelbort credibly concludes to a reasonable degree of neuropsychological and psychological certainty that these impairments affect Mr. Hammer's ability to adequately comprehend a given situation, to reflect and reason before making decisions and to fully recognize the consequences of those decisions.

\_\_\_\_ Undisputed          ✓ Disputed          \_\_\_ Undisputed But Objected To=

## II.    Dr. Ruben Gur

62.    The Court finds that Dr. Ruben Gur is a qualified expert in neuropsychology and neuroimaging.

_✓_ Undisputed        ___ Disputed        ___ Undisputed But Objected To

63.    Dr. Gur explained that visual information moves from the rear to the front of the brain (the frontal lobes), which analyzes the information and decides the course of action the individual will take.

___ Undisputed        _✓_ Disputed        ___ Undisputed But Objected To

64.    There are two streams the information follows to the front of the brain: the parietal and temporal streams.

___ Undisputed        _✓_ Disputed        ___ Undisputed But Objected To

65.    The parietal stream interprets information relative to the individual's needs and the temporal stream interprets information relative to the individual's memory.

___ Undisputed        _✓_ Disputed        ___ Undisputed But Objected To

66.    Within the temporal stream is the temporal hippocampus, which is the part of the brain that compares stimuli to memories and decides whether or not the person needs to act on the information.

___ Undisputed        _✓_ Disputed        ___ Undisputed But Objected To

14

67.    Also within the temporal stream is the limbic system, which includes the amagdala, which is the part of the brain that regulates emotional responses to information.

____ Undisputed        ✓ Disputed        ____ Undisputed But Objected To

68.    After passing through these sections of the brain, the information goes to the frontal lobe – the part of the brain that puts the information into context and makes judgments about what action to take.

____ Undisputed        ✓ Disputed        ____ Undisputed But Objected To

69.    The temporal lobe is also the area of the brain that integrates and interprets sounds.

____ Undisputed        ✓ Disputed        ____ Undisputed But Objected To

70.    The left temporal area identifies the words or sounds while the right temporal area relates more to the tone or interpretation of those sounds.

____ Undisputed        ✓ Disputed        ____ Undisputed But Objected To

71.    As with visual stimuli, auditory stimuli also is processed through the hippocampus and the amygdala and then sent to the frontal lobe for context and interpretation.

____ Undisputed        ✓ Disputed        ____ Undisputed But Objected To

72.    Dr. Gur conducted a forensic neuropsychological an evaluation of

Hammer.

____ Undisputed      ✓ Disputed      ___ Undisputed But Objected To

73.    Dr. Gur conducted and supervised forensic neuro-imaging of Mr.

Hammer's brain.

✓ Undisputed      ___ Disputed      ___ Undisputed But Objected To

74.    As part of his evaluations, Dr. Gur reviewed background materials

that included prior institutional records, the testimony from Mr. Hammer's trial

and mental health evaluations conducted by Drs. Gelbort, Sadoff, Grassian,

Mitchell and Wolfson.

✓ Undisputed      ___ Disputed      ___ Undisputed But Objected To

75.    Dr. Gur's neuroimaging of Mr. Hammer included high resolution

volumetric Magnetic Resonance Imaging [MRI]; a positron emission tomography

scan [PET]; and computerized neurpsychological testing.

✓ Undisputed      ___ Disputed      ___ Undisputed But Objected To

76.    The MRI conducted by Dr. Gur is utilized in a number of hospitals

across the country.

✓ Undisputed      ___ Disputed      ___ Undisputed But Objected To

77.    The protocols and processes for the MRI conducted by Dr. Gur have

been peer-reviewed and accepted in the scientific community.

___ Undisputed          ✓ Disputed          ___ Undisputed But Objected To

78.    The quantitative MRI conducted by Dr. Gur differs from a routine MRI intended to detect brain tumors or other "hard" brain articfacts.

___ Undisputed          ✓ Disputed          ___ Undisputed But Objected To

79.    Unlike a normal MRI, the MRI conducted by Dr. Gur measures the volume of the brain tissues, grey matter and white matter.

___ Undisputed          ✓ Disputed          ___ Undisputed But Objected To

80.    The MRI conducted by Dr. Gur calculates the combination of the volumes to develop a three dimensional model.

___ Undisputed          ✓ Disputed          ___ Undisputed But Objected To

81.    Because the quantitative MRI conducted by Dr. Gur calculated the volumetric measure of the entire brain, it is more likely to identify lesions in addition to tumors.

___ Undisputed          ✓ Disputed          ___ Undisputed But Objected To

82.    The MRI conducted by Dr. Gur on Mr. Hammer indicated that his brain is abnormally small.

✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

83.    Even the more limited clinical evaluation of Mr. Hammer's MRI indicated abnormalities, including that the brain was abnormally small.

17

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

84.    The reduced size of the brain is not attributable to normal aging because Mr. Hammer's ventricles are not enlarged.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

85.    The abnormally small size of Mr. Hammer's brain is the result of dystrophy, i.e. a failure to develop.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

86.    The etiology of the abnormalities is consistent with organic causes such as pre-natal maternal alcohol use and failure to thrive as well as external causes, such as abuse and neglect.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

87.    The quantitative reading indicated that Mr. Hammer has reduced volume in both the left and right frontal lobes.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

88.    The quantitative reading indicated that, while Mr. Hammer was within normal limits in the temporal region, his right temporal lobe was damaged.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

89.    The quantitative reading indicated reduced volumes in the parietal lobe, both left and right.

18

___ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

90.    It is Dr. Gur's credible and reliable opinion to a reasonable degree of scientific certainty that the brain damage documented on the quantitative analysis of the MRI demonstrates Mr. Hammer's cognitive processing deficits.

✓ Disputed

91.    It is Dr. Gur's credible and reliable opinion to a reasonable degree of scientific certainty that Mr. Hammer's affective impairments have resulted in deficits in impulse control, judgment, memory, sense of self and emotional lability.

___ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

92.    Dr. Gur also conducted a quantitative PET on Mr. Hammer.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

93.    The PET examines the physiological processes in the brain.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

94.    The PET examines the atual pusles that run through the brain.

___ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

95.    The protocols and processes of the PET conducted by Dr. Gur are peer reviewed and accepted within the scientific community.

___ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

96.    The clinical reading of the PET indicated impairments in the

19

thalamus, the right frontal lobe, the temporo-parietal region, and the temporo-occipital lobe.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

97.    The quantitative analysis indicated damage in Mr. Hammer's dosomedial frontal region, including those regions involved with processing complex configurations.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

98.    The quantitative analysis also found abnormal activation in the hippocampus (the part of the brain that compares stimuli to memories), parahippocampal gyrus and the amygdla (the part of the brain that determines threatening information).

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

99.    The quantitative analysis also found abnormalities in the posterior cingulate gyrus which is the part of the brain that refines emotions.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

100.    The quantitative analysis also found abnormalities in the lateral part of the basil ganglia, the hippocampus, and the pons.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

101.    In Dr. Gur's credible and reliable opinion, the abnormalities indicated

20

metabolic changes consistent with the MRI results, including abnormalities in the frontal, temporal and parietal regions.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

102.   In Dr. Gur's credible and reliable opinion, the PET results indicate that Hammer has significantly abnormal brain function and significant organic brain injury that existed at the time of the offense, trial and during post-trial proceedings.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

103.   In Dr. Gur's credible and reliable opinion, the abnormalities found with respect to Hammer have severe consequences for behavior because frontal lobe activation is needed to modulate limbic stimulation and the lack of modulation results in reduced impulse control and diminished ability to plan and to place behavior in a rational context.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

104.   Dr. Gur also conducted computerized neuropsycholgical testing that has been peer reviewed and accepted in the scientific community.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

105.   The computerized testing indicated damage in the frontal, limbic, right parietal and right temporal areas.

___ Undisputed       _✓_ Disputed       ___ Undisputed But Objected To

106.   In addition, Dr. Gur evaluated the data from Dr. Gelbort's neuropsychological testing with a behavioral imaging algorithm.

_✓_ Undisputed       ___ Disputed       ___ Undisputed But Objected To

107.   The results of that evaluation are consistent with Dr. Gelbort's results, indicating damage in the occipital parietal area, the posterio-temporal area and the frontal and dorsolateral prefrontal area, extending further meidally.

___ Undisputed       _✓_ Disputed       ___ Undisputed But Objected To

108.   More recently, Dr. Gur was provided with the report and raw data of testing conducted by the Government's expert, Dr. Daniel Martell.

_✓_ Undisputed       ___ Disputed       ___ Undisputed But Objected To

109.   Dr. Gur processed the raw data from Dr. Martell's testing through the behavioral imaging algorithm.

___ Undisputed       _✓_ Disputed       ___ Undisputed But Objected To

110.   Dr. Martell's testing image shows even more frontal lobe damage than that produced by the behavioral imaging from Dr. Gelbort's testing.

___ Undisputed       _✓_ Disputed       ___ Undisputed But Objected To

111.   As a result of the testing and evaluation, Dr. Gur reliably and credibly concludes to a reasonable degree of certainty that Mr. Hammer's brain damage

22

results in difficulties identifying the context of his actions; modulating impulses; adapting his attentional capacity to complex situations; and integrating his sense of self.

\_\_\_\_ Undisputed          \_✓\_ Disputed       \_\_\_ Undisputed But Objected To

112.   The parietal region anatomic abnormalities suffered by Hammer impacts and impairs Hammer's sense of self and concept of self and is linked to dissociative symptomatology.

\_\_\_\_ Undisputed          \_✓\_ Disputed       \_\_\_ Undisputed But Objected To

113.   The frontal lobe anatomic abnormalities suffered by Hammer impacts and impairs his judgment and modulation.

\_\_\_\_ Undisputed          \_✓\_ Disputed       \_\_\_ Undisputed But Objected To

114.   The temporal lobe anatomic abnormalities suffered by Hammer impacts and impairs his perception and processing of information.

\_\_\_\_ Undisputed          \_✓\_ Disputed       \_\_\_ Undisputed But Objected To

115.   In Dr. Gur's credible and reliable opinion, the testing results converge to provide a strong basis for concluding that Hammer suffers from moderate to severe brain damage reflected in his brain anatomy, physiology and behavior.

\_\_\_\_ Undisputed          \_✓\_ Disputed       \_\_\_ Undisputed But Objected To

116.   In Dr. Gur's credible and reliable opinion, the deficits suffered by

Hammer impact and impair impulse control.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

117.  In Dr. Gur's credible and reliable opinion, the deficits suffered by Hammer impact and impair his judgment.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

118.  In Dr. Gur's credible and reliable opinion, the deficits suffered by Hammer involve both impulse control and modulation as well as fundamental sensory processes.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

119.  Mr. Hammer's brain damage impacts and impairs his capacity to adequately assess situations and make reasoned judgments.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

120.  In Dr. Gur's credible and reliable opinion, these deficits existed at the times that Mr. Hammer sought to waive his rights and impacted and impaired Hammer's capacity to make a reasoned decision with respect to the waiver of his rights.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

121.  At the very least, the impairments create a significant and substantial doubt regarding Mr. Hammer's competency and his capacity to make a knowing

intelligent and voluntary waiver.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

122.    Although Mr. Hammer has average intelligence and intact left-brain functioning, that does not diminish the impact of the brain damage and the resulting impact of those impairments on his reasoning, judgment, perception and impulsivity.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

123.    Dr. Gur credibly and reliably concludes that, although Mr. Hammer's intellect resulted in his ability to articulate and present arguments in support of his prior decisions to waive his rights, that fact does not diminish the adverse impact his impairments had on his ability to make a competent, knowing, intelligent and voluntary decision.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

## III.    Dr. Daniel Martell

124.    In view of Dr. James K. Wolfson's conclusion that Mr. Hammer malingered during his 1997 forensic evaluation, Dr. Martell was particularly concerned as to whether Mr. Hammer malingered during his 2005 neuropsychological evaluation.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

25

125.    Dr. Martell administered a number of tests to Mr. Hammer designed to detect malingering.

✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

126.    The tests designed to detect malingering that were administered by Dr. Martell were the TOMM, VIP and PAI.

✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

127.    Based upon Mr. Hammer's performance on the tests of malingering, Dr. Martell concluded that Mr. Hammer did not malinger in any respect during the 2005 evaluation.

✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

128.    On one of the tests for malingering (the PAI), Mr. Hammer was identified as attempting to mask any mental health pathology.

___ Undisputed          ✓ Disputed          ___ Undisputed But Objected To

129.    The PAI further concluded that despite Mr. Hammer's attempts to mask mental health pathology, the test was able to identify potential areas of pathology, including the impact of traumatic events, thoughts of death and suicide, moodiness, compulsiveness and and rigidity, poor control over anger, history of anti-social behavior, poor sense of identity, failures in close relationships and

26

impulsivity.

____ Undisputed        √ Disputed        ___ Undisputed But Objected To

130.   Dr. Martell saw evidence in his evaluation consistent with the problem areas identified by the PAI.

____ Undisputed        √ Disputed        ___ Undisputed But Objected To

131.   Dr. Martell testified that Mr. Hammer's attempts to mask his pathology were similar to the attempts identified by the psychological testing administered in 1997 at the request of Dr. Wolfson.

____ Undisputed        √ Disputed        ___ Undisputed But Objected To

132.   The evaluation of Mr. Hammer conducted by Dr. Martell and Matthews in 2005 at the Government's request was video tapped.

___ Undisputed        ___ Disputed        ___ Undisputed But Objected To

133.   Dr. Martell believed that the emotional distress showed by Mr. Hammer on the portion of the video tape that depicted Mr. Hammer discussing his history of childhood sexual, physical and emotional abuse, was genuine display of emotional distress.

√ Undisputed        ___ Disputed        ___ Undisputed But Objected To

134.   The display of emotional distress evidenced on the video was consistent with the PAI test's indicator that Mr. Hammer displayed pathology

27

related to "traumatic events."

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

135.   Dr. Martell saw evidence in his review of Mr. Hammer's record, that he suffers from emotional liability.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

136.   The evidence of emotional lability identified by Dr. Martell included Mr. Hammer weeping in court testimony or in evaluations when the subject arose of his childhood abuse.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

137.   Emotional lability is a term used to describe a person whose emotions go in and out of control.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

138.   Dr. Martell testified that the frontal lobes of the brain are responsible for taking in and analyzing information.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

139.   Dr. Martell testified that the frontal lobes are responsible for organizing, controlling and directing behavior.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

140.   Dr. Martell testified that the frontal lobes are integral to the higher

cognitive processes, which include problem solving, emotional control and learning from one's experiences.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

141.  Dr. Martell testified that once information is analyzed by the brain's frontal lobes, the frontal lobes then dictate the course of action taken by the person based upon the information.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

142.  Dr. Martell testified that emotional lability can occur as a result of frontal lobe damage.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

143.  Dr. Martell testified that this lability arises in people with damaged frontal lobes because when damaged, that area of the brain is not able to properly perform the function of controlling emotions in response to particular situations that arise.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

144.  Dr. Martell testified that frontal lobe damage combined with emotional lability could render a person incompetent to stand trial.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

145.  Dr. Martell testified that a person who could not cooperate with

29

counsel due to frontal lobe damage and emotional lability could be incompetent to stand trial.

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

146.   Dr. Martell testified that a person who pled guilty due to frontal lobe damage and who has a history or pattern of emotional lability, would have been incompetent to enter the guilty plea.

___ Undisputed          ___✓ Disputed          ___ Undisputed But Objected To

147.   Dr. Martell identified three areas of Mr. Hammer's functioning that are relevant to his conclusion that he was competent to stand trial.

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

148.   The three areas related to competency are 1) intelligence, 2) memory and 3) reasoning and complex problem solving.

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

149.   Dr. Martell testified that reasoning and complex problem solving relevant to a competency determination are governed by frontal lobe function.

___ Undisputed          ___✓ Disputed          ___ Undisputed But Objected To

150.   Dr. Martell administered three tests relevant to Mr. Hammer's frontal lobe functioning: 1) the Stroop, 2) Trails B and 3) the Categories Test.

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

30

151.   Although Dr. Martell testified that the "letter-number" sequencing sub-test of the Wechsler Memory Scale Battery is also relevant to frontal lobe functioning, he did not include this test in the section of his report (Government's Exhibit 205, page 1) wherein he listed the three above described tests as related to frontal lobe functioning.

__✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

152.   Trails B and the Categories Test are part of the Halstead-Reitan Neuropsychological Battery (hereafter, "HRB").

__✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

153.   The HRB is a gold standard test for brain damage.  It is widely used and is a reliable identifier of brain damage.

___ Undisputed          _✓_ Disputed          ___ Undisputed But Objected To

154.   Dr. Martell did not administer the full HRB due to time constaints.

__✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

155.   The authors of the HRB are Dr. Halstead, who is deceased, and Dr. Reitan, who is alive.

__✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

156.   Dr. Martell testified that Dr. Reitan is "absolutely" an authority in the field of neuropsychology.

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

157.  Dr. Martell testified that there is a controversy in the field of neuropsychology over the use of "norms" when scoring the HRB to determine the presence or absence of brain impairment.

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

158.  The controversy relates to whether to apply the so-called "Heaton" norms or the norms created by the Battery's originator, Dr. Reitan.

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

159.  The "Heaton" norms adjust the raw obtained from the HRB to take account of the subject's gender, age, education and race.

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

160.  Dr. Martell partially applied the Heaton norms (i.e. he adjusted the scores for age, gender and education, but not for race).

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

161.  Dr. Martell did not adjust for race because he has not yet purchased the newest version of the Heaton norms which make race-based adjustments.

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

162.  Dr. Gelbordt applied the norms generated by Dr. Reitan.

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

32

163.   Defendant's exhibit 196 is an article written by Dr. Reitan which summarizes and addresses the controversy over the use of the Heaton norms.

✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

164.   In interpreting the article, Dr. Martell stated "if you take a test that's the most sensitive to brain damage globally, age and education,[1] shouldn't matter, and that may be true."

✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

165.   Dr. Martell acknowledged that the Categories Test is such a test, i.e. it is a measure of global brain function.

✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

166.   Defendant's Exhibit 195 contains excerpts from the Halstead-Reitan Neuropsychological Battery, Second Edition (hereafter, "HRB Manual"), written by Dr. Reitan and Dr. Deborah Wolfson.

✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

167.   Defendant's Exhibit 195 is the manual for the administration and scoring of the HRB.

---

[1]This quote is taken from the notes of testimony of August 29, 2005 at page 100, lines 1-3. Defendant submits that the transcript inaccurately states "identification" when the word should be "education."

__✓_ Undisputed          ___ Disputed          ___ Undisputed But Objected To

168. The HRB Manual contains two methods for determining the presence and extent of brain damage.

__✓_ Undisputed          ___ Disputed          ___ Undisputed But Objected To

169. The first method is called the "Impairment Index."

__✓_ Undisputed          ___ Disputed          ___ Undisputed But Objected To

170. The HRB Manual states that:

In a large number of studies the Impairment Index consistently been shown to be the single most sensitive variable in differentiating groups with and without cerebral damage. Thus, over the years it has proved to be a very useful measure for summarical purposes.

__✓_ Undisputed          ___ Disputed          ___ Undisputed But Objected To

171. The second method contained in the HRB Manual is called the General Neuropsychological Deficit Scale (hereafter, GNDS).

__✓_ Undisputed          ___ Disputed          ___ Undisputed But Objected To

172. Dr. Reitan and Dr. D. Wolfson view the GNDS as an improvement over the older Impairment Index.

__✓_ Undisputed          ___ Disputed          ___ Undisputed But Objected To

173. Under the Impairment Index, the cutoff for impairment on the Categories Test is 51 errors.

___ Undisputed          ✓ Disputed          ___ Undisputed But Objected To

174.  On Dr. Martell's administration of the Categories Test, Mr. Hammer scored 57 errors.

___ Undisputed          ___ Disputed          ___ Undisputed But Objected To

175.  57 errors on the Categories Test is considered "impaired" when the Impairment Index is applied.

___ Undisputed          ✓ Disputed          ___ Undisputed But Objected To

176.  The GNDS places test scores in a range from 0-3.  Scores in the range of a "two" indicate that the subject suffers from mild to moderate impairment.

___ Undisputed          ___ Disputed          ___ Undisputed But Objected To

177.  Mr. Hammer's score of 57 errors on the Categories Test places him in range "two," which is in the mild to moderately impaired range.

___ Undisputed          ✓ Disputed          ___ Undisputed But Objected To

178.  Mr. Hammer's score on Trails B also placed him in range "two," which is in the mild to moderately impaired range.

___ Undisputed          ✓ Disputed          ___ Undisputed But Objected To

179.  Dr. Martell agreed that if Dr. Reitan were scoring Mr. Hammer's performance on the Categories Test and Trails B (two of the three tests that Dr. Martell used to determine that Mr. Hammer does not have frontal lobe damage),

using either the Impairment Index or the GNDS, he would have been considered to be mild to moderately impaired.

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

180.   Muriel Lezak is an authority in the field of neuropsychology and she wrote the test, *Neuropsychological Assessment*.

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

181.   *Neuropsychological Assessment* is an authoritative text in the field of neuropsychology.

___ Undisputed          ___✓ Disputed          ___ Undisputed But Objected To

182.   In his administration of the Stroop test, Dr. Martell used a version that is not approved of by Dr. Lezak in her text.

___ Undisputed          ___✓ Disputed          ___ Undisputed But Objected To

183.   Dr. Martell's administration of the Stroop contains a so-called "interference trial."

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

184.   Although there exist a number of Stroop tests that are used in the field, Dr. Martell administered the only version containing an "interference trial."

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

185.   With the interference trial, Mr. Hammer was not impaired on this test.

___✓_Undisputed          ___ Disputed          ___ Undisputed But Objected To

186.  Had the test been administered and scored in accordance with the method advocated by Dr. Lezak (i.e. without an interference trial), Mr. Hammer would have also been severely impaired on this measure (i.e. between two and three standard deviations below the norm in some measures).

____ Undisputed          _✓_Disputed          ___ Undisputed But Objected To

187.  Dr. Martell was a prosecution expert in a case that he wrote about in an article marked as Defendant's Exhibit 186.

___✓Undisputed          ___ Disputed          ___ Undisputed But Objected To

188.  The defendant in that case was referred to in the article by the pseudonym, "Mr. Cystkopf."

___✓Undisputed          ___ Disputed          ___ Undisputed But Objected To

189.  Mr. Cystkopf offered a defense of not guilty by reason of mental disease or defect in a homicide prosecution in New York State.

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

190.  Among other things, the article addressed Mr. Cystkopf's defense that due to his frontal lobe damage he was unable control his emotions and therefore he was not able to "mark" his emotions and properly control them.

___✓Undisputed          ___ Disputed          ___ Undisputed But Objected To

191. Dr. Martell rejected this defense because it related to an inability to conform conduct to the requirements of law, which was not the insanity standard in New York State.

___✓___ Undisputed       ___ Disputed       ___ Undisputed But Objected To

192. Since Mr. Cystkopf understood the nature of his actions, and was able to distinguish between right and wrong, Dr. Martell did not consider his inability to control his emotions to be relevant under the New York insanity statute.

___✓___ Undisputed       ___ Disputed       ___ Undisputed But Objected To

193. However, Dr. Martell wrote that in a "volitional" insanity jurisdiction – in which the relevant question is whether one has capacity to conform their behavior to the requirements of the law – Mr. Cystkopf's defense would have been "viable."

___✓___ Undisputed       ___ Disputed       ___ Undisputed But Objected To

194. Thus, Dr. Martell's article stands for the proposition that a person with frontal lobe damage and emotional dyscontrol – like Mr. Hammer – can be unable to conform their behavior to the requirements of law.

___ Undisputed       ___✓ Disputed       ___ Undisputed But Objected To

195. By analogy, Mr. Hammer's emotional dyscontrol and frontal lobe damage combined to deprive him of the capacity to make a knowing, intelligent

and voluntary waiver of rights.

___ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

196.   Dr. Martell thought it is "debatable" as to whether Mr. Hammer's guilty plea was the product of his brain impairments and emotional lability, in view of the fact that the plea occurred during the portion of the trial which explored his history of childhood abuse.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

197.   Dr. Martell believed that if a defendant waived a constitutional right in order to end his physical pain, such a waiver would not be voluntary.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

198.   Dr. Martell would have to "study further" whether a waiver of a constitutional right was knowing if it was made to end psychological pain.

___ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

199.   The Benton Facial Recognition Test (BFRT) is a test of memory recall.

___ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

200.   Mr. Hammer was in the range of mild impairment on the BFRT, as recorded by Dr. Martell on Government's Exhibit 205.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

201.  The Benton Visual Retention Test (BVRY)is a test of several areas, including memory.

__✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

202.  Dr. Martell testified that memory impairment is important to a competency determination.

__✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

203.  Mr. Hammer scored two standard deviations below the norm on one portion of the BVRT administered by Dr. Martell.

____ Undisputed          __✓ Disputed          ___ Undisputed But Objected To

204.  Mr. Hammer scored between between 1 and 2 standard deviations below the norm, on another portion of the BVRT also administered by Dr. Martell.

__✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

205.  Dr. Martell agreed that there is a clinically significant correlation between childhood sexual, physical and emotional abuse and the development of a Borderline Personality Disorder (BPD).

__✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

206.  Dr. Martell agreed that childhood sexual, physical and emotional abuse can constitute the trauma predicate that causes Post-Traumatic Stress

40

Disorder (PTSD).

___✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

207.   Dr. Martell testified that Dissociative Identity Disorder (DID) is

caused by trauma, including childhood sexual,physical and emotional abuse.

___✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

208.   Dr. Martell testified that PTSD is a common co-morbid Axis I\

iagnosis for those with BPD.

___✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

209.   DID is seen in patients with BPD.

___✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

210.   According to Kaplan & Sadock's *Comprehensive Textbook of*

*Psychiatry*, Sixth Edition:

> the behavior and pattern of relationships of patients with dissociative
> identity disorder often have a marked similarity to what is observed in
> persons with borderline personality disorder, but the latter lacks the telltale
> presence of distinct alternating personalities separated by an amnestic
> barrier that is the hallmark of the former.

___✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

211.   Dr. Martell did not have an opinion as to whether he agrees with the

quote from Kaplan & Sadock.

___ Undisputed          ✓ Disputed          ___ Undisputed But Objected To

212.  Kaplan & Sadock also states:

The diagnosis of borderline personality disorder is often made when PTSD is a more appropriate diagnosis or at least a necessary concomitant diagnosis.  A clinician who makes the diagnosis of borderline personality disorder must inquire further into possible early trauma and ensuing symptoms.

✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

213.  Dr. Martell diagnosed BPD.

✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

214.  Dr. Martell did not conduct his own inquiry into the presence or absence of PTSD in that regard, but sat in on Dr. Matthews' inquiry.

✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

215.  Dr. Martell could not provide an answer as to why the phrase, "post-traumaticstress disorder" is not contained in his report.

___ Undisputed          ✓ Disputed          ___ Undisputed But Objected To

216.  Dr. Martell did not review the report/affidavit of Neil Blumberg, M.D., who is one of Defendant's expert witnesses.

✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

217.  Dr. Blumberg diagnosed among other things, PTSD.

42

__✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

218.   Although PTSD is neither mentioned nor discussed in his report, Dr.

Martell claims that he considered it as a possible diagnosis.

__✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

219.   Dr. Martell's contention that he considered PTSD is therefore not

credible.

___ Undisputed          __✓ Disputed          ___ Undisputed But Objected To

220.   Under circumstances of stress, people with BPD can decompensate

into a psychotic state.

__✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

221.   People with BPD are severely dysfunctional.

___ Undisputed          __✓ Disputed          ___ Undisputed But Objected To


222.   The observable features of BPD are highly sensitive to interpersonal

stresss.

___ Undisputed          __✓ Disputed          ___ Undisputed But Objected To

223.   When a person with BPD is under stress, the symptoms of the

disorder appear in more significant ways.

__✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

224. Stress can cause a person with BPD to lapse into a dissociative state.

_✓_ Undisputed        ___ Disputed        ___ Undisputed But Objected To

225. A person with BPD who is in a dissociative state may be incompetent for trial.

_✓_ Undisputed        ___ Disputed        ___ Undisputed But Objected To

226. Dr. Martell acknowledged that while intelligence is relevant to a competency determination, it is not determinative of the question.

_✓_ Undisputed        ___ Disputed        ___ Undisputed But Objected To

227. Dr. Martell acknowledged that a person can be a "genius" and still be incompetent if due to a mental disorder, the person is unable to understand the court proceedings or is unable to cooperate with counsel.

_✓_ Undisputed        ___ Disputed        ___ Undisputed But Objected To

228. Dr. Martell has very limited experience with patients with DID.

___ Undisputed        _✓_ Disputed        ___ Undisputed But Objected To

229. Dr. Martell's conclusion that Mr. Hammer does not have damage to the frontal lobes of his brain is not credible.

___ Undisputed        _✓_ Disputed        ___ Undisputed But Objected To

## IV.    **Monica Foster**

230. Monica Foster, Esquire, was appointed by this Court to represent Mr.

Hammer in his Section 2255 proceedings.

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

231.  Ms. Foster has been an attorney since 1983 and has represented over 20 capital defendants.

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

232.  It was apparent to Ms. Foster from the beginning of her representation of Mr. Hammer that he suffered from severe mental illness.

___ Undisputed          ___✓ Disputed          ___ Undisputed But Objected To

233.  Throughout her representation of him, Ms. Foster noted that Mr. Hammer was highly emotional, moody, irrational and impulsive.

___ Undisputed          ___✓ Disputed          ___ Undisputed But Objected To

234.  Throughout her representation, Mr. Hammer frequently vacillated between his desire to litigate or waive his rights.

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

235.  Based on her experience and contact with Mr. Hammer, Ms. Foster believed that his vacillations were the result of his emotions, moods and mental illness rather than reasoned judgment.

___ Undisputed          ___✓ Disputed          ___ Undisputed But Objected To

236.  In Ms. Foster's experience, Mr. Hammer's decision-making was also

impacted by the conditions of his confinement.

✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

237.    The concerns surrounding his conditions of confinement was another factor impacting Mr. Hammer's vacillations to waive or litigate.

✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

238.    Throughout her representation of Mr. Hammer, Ms. Foster found communicating with Mr. Hammer difficult because his perceptions were impaired by his mental infirmities.

___ Undisputed          ✓ Disputed          ___ Undisputed But Objected To

239.    Throughout her representation of Mr. Hammer, Ms. Foster found that Mr. Hammer's decision-making was also impaired as a result of his mental infirmities.

___ Undisputed          ✓ Disputed          ___ Undisputed But Objected To

240.    As a result of her years of experience with capital defendants and her numerous contacts with and observations of Mr. Hammer, Ms. Foster credibly and reliably concluded that Mr. Hammer's desires to forego raising claims in his section 2255 proceedings, were the result of environmental factors as well as his mental, emotional and cognitive impairments, rather than any reasoned judgment.

___ Undisputed          ✓ Disputed          ___ Undisputed But Objected To

241.   Also during her representation, Mr. Hammer expressed a desire on more than one occasion to waive his right to post-conviction relief altogether.

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

242.   As Mr. Hammer had done pretrial, during trial and during the appellate proceedings, Mr. Hammer vacillated regarding whether or not he wished to waive his post-conviction rights.

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

243.   In Ms. Foster's experience, Mr. Hammer's contrary and inconsistent decisions to waive or litigate during the Section 2255 proceedings arose out of mental health problems and were therefore unrelated to the litigation.

___ Undisputed          ___✓ Disputed          ___ Undisputed But Objected To

244.   In Ms. Foster's experience, Mr. Hammer's contrary and inconsistent decisions regarding whether or not to litigate his Section 2255 petition was based on, or at the least affected by, Mr. Hammer's environment, his mental illness and/or emotional dysfunction.

___ Undisputed          ___✓ Disputed          ___ Undisputed But Objected To

245.   During the course of her representation, Ms. Foster had conversations regarding the nature and extent of ineffective assistance of counsel claims that would be raised in the Section 2255 petition.

47

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

246. As a result of these conversations, Mr. Hammer agreed to litigate a number of claims of ineffective assistance of counsel, including the following: that Mr. Hammer is actually innocent of first degree, pre-mediated and intentional murder; the waiver and competency proceedings (including ethical violations attendant thereto); the failure to obtain exculpatory evidence; Mr. Hammer's lack of intent; the unreliable nature of the evidence of his guilt; the unreliable nature of the guilty plea, and the question of whether Mr. Hammer's confession was false based upon his history of false confessions, and provable variances between the evidence offered against him and the confession.

___ Undisputed          ___✓ Disputed          ___ Undisputed But Objected To

247. As a result of these conversations, Mr. Hammer agreed to litigate ineffective assistance of counsel claims relating to specific areas: the competency proceedings that arose during and following trial (including ethical violations attendant thereto); the failure to obtain exculpatory evidence; Mr. Hammer's lack of intent; and the question of whether Mr. Hammer's confession was false based upon his history of false confessions.

___ Undisputed          ___✓ Disputed          ___ Undisputed But Objected To

248. The issues upon which Mr. Hammer and counsel agreed there would

be an ineffective assistance of counsel facet were reflected in the Petition and Amended Petition filed by counsel.

__✓__ Undisputed      ___ Disputed      ___ Undisputed But Objected To

249.  To the extent that the claims do not properly plead ineffective assistance of counsel claims as agreed to by counsel and Mr. Hammer, counsel had no strategic or tactical reason for omitting those allegations.

____ Undisputed      __✓__ Disputed      ___ Undisputed But Objected To

## V.    **Ronda Long-Sharp**

250.  Rhonda Long-Sharp has been an attorney since 1984 and has represented 15 to 20 capital clients in state and federal court.

__✓__ Undisputed      ___ Disputed      ___ Undisputed But Objected To

251.  Ms. Long-Sharp was appointed by this Court as co-counsel in Mr. Hammer's section 2255 proceedings.

__✓__ Undisputed      ___ Disputed      ___ Undisputed But Objected To

252.  Ms. Long-Sharp conducted the record review and identification of issues in Mr. Hammer's case.

__✓__ Undisputed      ___ Disputed      ___ Undisputed But Objected To

253.  As a result of this review and consultation with Mr. Hammer, Mr. Hammer agreed to litigate a number of claims of ineffective assistance of counsel,

including the following: that Mr. Hammer is actually innocent of first degree, pre-mediated and intentional murder; the waiver and competency proceedings (including ethical violations attendant thereto); the failure to obtain exculpatory evidence; Mr. Hammer's lack of intent; the unreliable nature of the evidence of his guilt; the unreliable nature of the guilty plea, and the question of whether Mr. Hammer's confession was false based upon his history of false confessions, and provable variances between the evidence offered against him and the confession.

_____ Undisputed        _✓_ Disputed        ___ Undisputed But Objected To

254.    The issues upon which Mr. Hammer and counsel agreed there would be an ineffective assistance of counsel facet were reflected in the Petition and Amended Petition filed by counsel.

_✓_ Undisputed        ___ Disputed        ___ Undisputed But Objected To

255.    To the extent that the claims do not properly plead ineffective assistance of counsel claims as agreed to by counsel and Mr. Hammer, counsel had no strategic or tactical reason for omitting those allegations.

_____ Undisputed        _✓_ Disputed        ___ Undisputed But Objected To

256.    Ms. Long-Sharp noted very early on in her representation that Mr. Hammer had symptoms of serious mental illness, including charged emotionality, blowing minor things out of proportion, unpredictability, mood swings and

pressured speech.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

257.   Prior to the scheduled evidentiary hearing, Mr. Hammer became even more irrational because he did not want to return to the conditions of confinement at the Lewisburg, Pennsylvania facility.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

## VI.   **Christopher Nolan**

258.   In January, 2002, Dr. Christopher Nolan was a psychologist at the Terre Haute United States Penitentiary.

___ ✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

259.   On January 22, 2002, Dr. Nolan was contacted by the Case Manager regarding Mr. Hammer.

___ ✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

260.   As a result of that contact, Dr. Nolan spoke with Mr. Hammer.

___ ✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

261.   In the course of that discussion, Dr. Nolan learned that Mr. Hammer received a letter that brought out overwhelming intrusive memories of his childhood abuse.

___ ✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

262.  Mr. Hammer was visibly angry and upset by those memories of abuse.

___✓___ Undisputed        ___ Disputed        ___ Undisputed But Objected To

## VII.  <u>Timothy Noone</u>

263.  Following April 1996 and through the time of his trial, there were heightened security concerns with respect to Mr. Hammer.

___✓___ Undisputed        ___ Disputed        ___ Undisputed But Objected To

264.  Following April, 1996 and through the time of his trial, Mr. Hammer was confined in a single-cell.

___✓___ Undisputed        ___ Disputed        ___ Undisputed But Objected To

265.  Following April, 1996, Mr. Hammer ate his meals in the single cell.

_____ Undisputed        ___ Disputed        ___✓___ Undisputed But Objected To

266.  Following April, 1996 and through the time of his trial, Mr. Hammer showered in a his single cell.

___✓___ Undisputed        ___ Disputed        ___ Undisputed But Objected To

267.  Following April, 1996 and through the time of his trial, Mr. Hammer was provided five hours of recreation per week.

___✓___ Undisputed        ___ Disputed        ___ Undisputed But Objected To

268.  These five hours occurred only during weekdays.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

269.   Following April, 1996 and through the time of his trial, the recreation occurred in a cage where Mr. Hammer was the sole occupant.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

270.   Normally, there would be no other inmates in cages that were near Mr. Hammer's recreation cage.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

271.   Before being escorted to the recreation cage, Mr. Hammer was strip-searched.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

272.   The strip-search occurred in the presence of at least three correctional officers.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

273.   Social visits for Mr. Hammer were non-contact.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

274.   Mr. Hammer was subjected to strip-searches before and after social visits, in the presence of at least three correctional officers.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

275.   Following April, 1996 and through the time of his trial, Mr. Hammer

was restricted in the number of social phone calls to one every thirty days.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

276. Following April, 1996 and through the time of his trial, Mr. Hammer was not permitted to attend religious services.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

277. Following April 1996 and through the time of Mr. Hammer's trial, the number of books Mr. Hammer could have was limited.

____ Undisputed        ___ Disputed        ✓ Undisputed But Objected To

278. Following April 1996 and through the time of his trial, Mr. Hammer was precluded from receiving newspapers and magazines.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

279. Following April 1996 and through the time of his trial, Mr. Hammer was restricted in the personal property he could keep in his cell.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

## VIII. **Sandra Ask-Carlson**

280. Ms. Ask-Carlson was an assistant to the Warden of Allenwood Penitentiary in 1998.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

281. Ms. Ask-Carlson was responsible for generating the letters of awards

to Dr. Mitchell, Mr. Troutman and Chaplain Crook.

__✓__ Undisputed          ___ Disputed          ___ Undisputed But Objected To

282.    The Bureau of Prisons Policy regarding the presentation of awards to

employees is on the BOP website.

__✓__ Undisputed          ___ Disputed          ___ Undisputed But Objected To

283.    Employees were aware of the BOP policy and the internal policy of

Allenwood through the website and internal policy memoranda.

__✓__ Undisputed          ___ Disputed          ___ Undisputed But Objected To

284.    While the public can access the website for the general policy

regarding awards, they cannot obtain access of awards presented to individual

employees.

__✓__ Undisputed          ___ Disputed          ___ Undisputed But Objected To

## IX.    Carlyle Thompson

285.    Former Agent Thompson obtained the statement from David Paul Hammer regarding the circumstances of Andrew Marti's death.

✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

286.    Initially, Mr. Hammer's speech was so rapid and out of context that former Agent Thompson had to stop him and ask him to slow down.

___ Undisputed          ✓ Disputed          ___ Undisputed But Objected To

287.    Mr. Hammer told former Agent Thompson that he was able to determine the time because he looked at the clock-radio seized from Mr. Hammer's cell following Mr. Marti's death.

✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

288.    Mr. Hammer told former Agent Thompson that he had told Correctional Officer Boone one week prior to the murder that he (Hammer) wanted Marti as a cellmate so that he could "fuck him [Marti] up."

✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

289.    Former Agent Thompson subsequently learned that Mr. Boone did not agree with Mr. Hammer's statement that he had told Boone that he wanted to assault Marti.

___ Undisputed          ___ Disputed          ✓ Undisputed But Objected To

290. Mr. Hammer told former Agent Thompson that he started talking with Marti about a hostage ruse so that Marti could obtain a transfer.

✓ Undisputed \_\_\_ Disputed \_\_\_ Undisputed But Objected To

291. Mr. Hammer told former Agent Thompson that he (Hammer) sweetened the deal to do the favor for Marti by promising Marti that he would give him $500.00

✓ Undisputed \_\_\_ Disputed \_\_\_ Undisputed But Objected To

292. Former Agent Thompson did not ask Hammer why he would need to sweeten a deal that involved Hammer doing Marti a favor.

✓ Undisputed \_\_\_ Disputed \_\_\_ Undisputed But Objected To

293. Hammer told former Agent Thompson that there was a contract out on Marti.

✓ Undisputed \_\_\_ Disputed \_\_\_ Undisputed But Objected To

294. Former Agent Thompson never verified that there actually was a contract on Marti.

✓ Undisputed \_\_\_ Disputed \_\_\_ Undisputed But Objected To

295. Hammer told Former Agent Thompson that he made ropes from sheets.

✓ Undisputed \_\_\_ Disputed \_\_\_ Undisputed But Objected To

57

296.   Former Agent Thompson found torn material under the pillow of Marti's bunk.

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

297.   Hammer told Former Agent Thompson that when he had whatever hold of him, Marti was choking like he was gasping for air.

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

298.   Former Agent Thompson's understanding of what Hammer told him was that the rope he used was wrapped around Marti's entire neck and that Hammer pulled tightly in opposite directions.

___ Undisputed          ___✓ Disputed          ___ Undisputed But Objected To

299.   After he took Hammer's statement, Former Agent Thompson conducted a video-taped inspection of the crime-scene.

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

300.   Former Agent Thompson seized from the crime-scene the clock-radio because Hammer had mentioned it in his statement.

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

301.   Former Agent Thompson did not determine whether or not the clock-radio had a light.

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

302.   Former Agent Thompson seized from the crime-scene the razor blade because Hammer had mentioned it in his statement.

__✓_ Undisputed          ___ Disputed          ___ Undisputed But Objected To

303.   Former Agent Thompson seized the ropes because Hammer had mentioned them.

____ Undisputed          __✓_ Disputed          ___ Undisputed But Objected To

304.   Former Agent Thompson did not seize or test the glove(s) found on Marti's bed.

____ Undisputed          __✓_ Disputed          ___ Undisputed But Objected To

305.   While Former Agent Thompson visually observed the glove(s), he did not subject those gloves to any on-site or other testing.

__✓_ Undisputed          ___ Disputed          ___ Undisputed But Objected To

306.   Although Hammer stated that he had the radio on until 2:00 am, Former Agent Thompson did not ask either staff or inmates if they heard a radio playing in the cell.

____ Undisputed          ___ Disputed          __✓_ Undisputed But Objected To

307.   In his statement Hammer told Former Agent Thompson that he began attacking Marti at 2:17 am.

__✓_ Undisputed          ___ Disputed          ___ Undisputed But Objected To

308.   Hammer's version to Former Agent Thompson described the process as taking a total of 12 to 13 minutes from 2:17 am.

\_\_\_\_ Undisputed        ✓ Disputed        \_\_\_ Undisputed But Objected To

## X.    Dr. John Mitchell

309.   John Mitchell is a psychologist employed by the United States Bureau of Prisons.

\_\_\_ ✓ Undisputed        \_\_\_ Disputed        \_\_\_ Undisputed But Objected To

310.   From May, 1995 until January, 1999 Mr. Mitchell conducted psychotherapy with David Paul Hammer while Mr. Hammer was incarcerated at the United States Penitentiary at Allenwood.

\_\_\_ ✓ Undisputed        \_\_\_ Disputed        \_\_\_ Undisputed But Objected To

311.   Dr. Mitchell had approximately 150 contacts with Mr. Hammer which included therapy sessions, SHU reviews, and risk assessments.

\_\_\_ ✓ Undisputed        \_\_\_ Disputed        \_\_\_ Undisputed But Objected To

312.   Dr. Mitchell diagnosed Mr. Hammer with an Axis I diagnosis of Major Depressive Disorder, recurrent.

\_\_\_ ✓ Undisputed        \_\_\_ Disputed        \_\_\_ Undisputed But Objected To

313.   Dr. Mitchell never diagnosed or concluded that Mr. Hammer malingered in regard to mental health issues.

____ Undisputed          ✓ Disputed          ____ Undisputed But Objected To

314.  Mr. Hammer related to Dr. Mitchell episodes of childhood abuse, including beatings, enemas, sexual abuse (in the form of his father forcing him into sexual relations with his sister).

✓ Undisputed          ____ Disputed          ____ Undisputed But Objected To

315.  Dr. Mitchell believed that Mr. Hammer's accounts of this abuse were genuine.

✓ Undisputed          ____ Disputed          ____ Undisputed But Objected To

316.  Dr. Mitchell believed that Mr. Hammer suffered genuine psychological pain when he discussed accounts of childhood abuse with Dr. Mitchell.

✓ Undisputed          ____ Disputed          ____ Undisputed But Objected To

317.  Dr. Mitchell believed that Mr. Hammer's diagnosis of Major Depression, recurrent was attributable, in part, to the childhood abuse he experienced.

✓ Undisputed          ____ Disputed          ____ Undisputed But Objected To

318.  Dr. Mitchell believed that Mr. Hammer suffered anxiety, tension, stress and nervousness as a result of the childhood abuse, all of which is not unusual for a person subjected to the type of childhood abuse suffered by Mr.

61

Hammer.

___ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

319.   Dr. Mitchell learned about Mr. Hammer's history of childhood sexual, physical and emotional abuse in sessions with Mr. Hammer prior to the death of Mr. Marti.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

320.   In view of the fact that Mr. Hammer related his sexual and physical childhood abuse to Dr. Mitchell prior to the death of Mr. Marti, the Court finds that Mr. Hammer's reports of childhood abuse are credible.

___ Undisputed        ___ Disputed        ✓ Undisputed But Objected To

321.   Dr. Mitchell believed that there was a relationship between the childhood abuse suffered by Mr. Hammer and his problems with impulse control, impaired judgment, and establishing trusting relationships with others.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

322.   Dr. Mitchell observed an extraordinary number of vacillations in Mr. Hammer's desire to litigate his case pre and post-trial.

___ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

323.   Dr. Mitchell observed pressured speech when Mr. Hammer would discuss his capital case both pre and post trial.

____ Undisputed ____ Disputed ✓ Undisputed But Objected To

324. Dr. Mitchell had a clinical contact with Mr. Hammer on June 10, 1998. At that time, Mr. Hammer expressed considerable distress over the trial and was going back and forth over the question of whether to plead guilty in order to end his trial. Dr. Mitchell's note from that date indicated that Mr. Hammer's distress was getting worse.

✓ Undisputed ____ Disputed ____ Undisputed But Objected To

325. Dr. Mitchell saw Mr. Hammer again on June 12, 1998 and noted that Mr. Hammer indicated that he was in a bad frame of mind. In this session, Mr. Hammer was more emotional than normal. Dr. Mitchell also noted that he was concerned about the "intensity of the emotional distress" he appeared to be experiencing. He characterized Mr. Hammer's risk of suicide as "moderate" and ordered 15 minute suicide checks over the ensuing weekend.

✓ Undisputed ____ Disputed ____ Undisputed But Objected To

326. Mr. Hammer's mental state on June 12, 1998 was related to betrayal he felt from some adverse testimony from prisoners whom he perceived to be friends. According to Dr. Mitchell, a person who was subjected to the type of childhood abuse suffered by Mr. Hammer, this feeling of betrayal would be worsened.

63

____ Undisputed        ✓ Disputed        ____ Undisputed But Objected To

327.   Dr. Mitchell believed that his note of June 12, showed that Mr. Hammer's stress and depression was worsening even from the note of June 10, and that he was generally expressing a "more severe intensity of emotions" than usual for him.

____ Undisputed        ____ Disputed        ____ Undisputed But Objected To

328.   Dr. Mitchell saw Mr. Hammer again on June 15, 1998 – one week before he pled guilty.  He continued to be sad and depressed as a result of the trial.

✓ Undisputed        ____ Disputed        ____ Undisputed But Objected To

329.   The trial was causing Mr. Hammer psychological pain, which at times became intense.

____ Undisputed        ✓ Disputed        ____ Undisputed But Objected To

330.   Terminating this intense psychological pain was a motivator for Mr. Hammer's guilty plea.

____ Undisputed        ✓ Disputed        ____ Undisputed But Objected To

331.   Dr. Mitchell acknowledged that Mr. Hammer has a history of acting out when his stress and depression are causing him unbearable psychological pain.

✓ Undisputed        ____ Disputed        ____ Undisputed But Objected To

332.   Mr. Hammer's decision to plead guilty was such a form of "acting

64

out" in response to his intense psychological pain.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

333.   In a note regarding their first contact, Dr. Mitchell indicated that Mr.

Hammer had depression, tension and nervousness.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

334.   In their first counseling session (conducted on July 12, 1995), Mr.

Hammer told Dr. Mitchell that he was angry and anxious, and that he was

subjected to childhood sexual abuse.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

335.   In a session of August 24, 1995 Mr. Hammer related to Dr. Mitchell

that he had a plan to commit suicide.  This resulted in Dr. Mitchell's completion of

a Suicide Risk Assessment on that same date.  In that document, he related that

Mr. Hammer suffered from depressed mood.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

336.   During his Intake Screening, Dr. Mitchell orally advised Mr. Hammer

of his right in regard to confidentiality of information provided to Dr. Mitchell.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

337.   Dr. Mitchell's oral advisement was identical to the written

advisement given by Dr. Stephen Karten, as reflected in Defendant's Exhibit 31.8

65

at page 7.

____ Undisputed          ✓ Disputed          ___ Undisputed But Objected To

338.   When Mr. Hammer questioned Dr. Mitchell about the possibility that what he related to Dr. Mitchell in therapy sessions might be used against him, Dr. Mitchell advised him that he would only testify to what he observed and heard.

____ Undisputed          ___ Disputed          ✓ Undisputed But Objected To

339.   Implicit in Dr. Mitchell's warning was that Dr. Mitchell would not testify to his opinions, or permit his opinions to be used against Mr. Hammer.

____ Undisputed          ✓ Disputed          ___ Undisputed But Objected To

340.   Dr. Mitchell did not advise Mr. Hammer that he would render mental health opinions if he were called to testify.

____ Undisputed          ✓ Disputed          ___ Undisputed But Objected To

341.   Mr. Hammer again discussed his abusive upbringing in counseling sessions with Dr. Mitchell on August 31 and September 7, 1995.

✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

342.   Mr. Hammer was not generally inclined to discuss his personal feelings with Dr. Mitchell within earshot of other prisoners.

____ Undisputed          ✓ Disputed          ___ Undisputed But Objected To

343.   As of the time of Mr. Marti death, Dr. Mitchell considered that he had

established a clinical and therapeutic relationship with Mr. Hammer.

___ ✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

344. Dr. Mitchell had a therapy session with Mr. Hammer on April 16, 1996.

___ ✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

345. Following the session of April 16, 1996 Dr. Mitchell wrote a note memorializing this session.

___ ✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

346. In addition to the therapy note, Dr. Mitchell wrote a Psychological Report dated April 16, 1996 (Defendant's Exhibit 31.7 at page 24).

___ ✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

347. The April 16, 1996 Psychological Report was written by Dr. Mitchell because of the "crime that took place."

___ ✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

348. The Report was neither a "clinical" note nor a "progress" note, and was not written to "benefit" Mr. Hammer.

___ Undisputed        ___ ✓ Disputed        ___ Undisputed But Objected To

349. Dr. Mitchell was motivated to write the Report because "at that time it wouldn't be too great of a leap to assume that there might be some questions as

to whether Mr. Hammer ever evidenced psychosis during our clinical contacts."

___✓ Undisputed          ✓ Disputed          ___ Undisputed But Objected To

350.  Dr. Mitchell was aware when he wrote this Report that Mr. Hammer's ability to distinguish right from wrong would likely be an issue in an expected prosecution, should Mr. Hammer raise a mental health defense.

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

351.  In writing the April 16, 1996 Report, Dr. Mitchell concluded that Mr. Hammer had not shown "delusional thinking, hallucinations, or an inability to distinguish between right and wrong."

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

352.  This conclusion was based on the entirety of Dr. Mitchell's therapy sessions he had been conducting with Mr. Hammer.

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

353.  Dr. Mitchell did not disclose to Mr. Hammer that he wrote the Psychological Report because he did not see a "clinical need" to do so.

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

354.  Dr. Mitchell did not obtain or receive written or oral consent from Mr. Hammer prior to disclosing Mr. Hammer's psychology file to Dr. James K. Wolfson.

_✓_ Undisputed          ___ Disputed          ___ Undisputed But Objected To

355.  Dr. Mitchell viewed in open court an 18 minute segment of a video

tape of the forensic evaluation conducted by Government experts Drs. Martell and

Matthews.  (Defendant's Exhibit 54)

✓ Undisputed

356.  The portion of the video viewed by Dr. Mitchell depicted Mr.

Hammer discussing his childhood sexual, physical and emotional abuse.

_✓_ Undisputed          ___ Disputed          ___ Undisputed But Objected To

357.  Dr. Mitchell concluded that on the portion of the video that he

viewed, Mr.Hammer became "very emotionally upset" and required a break in the

evaluation.  Dr. Mitchell concluded that the level of emotional upset, was

"significant emotional distress."

_✓_ Undisputed          ___ Disputed          ___ Undisputed But Objected To

358.  The accounts of the childhood abuse discussed on the video were

consistent with the accounts of childhood abuse that Mr. Hammer related to Dr.

Mitchell during their therapy sessions.

___ Undisputed          _✓_ Disputed          ___ Undisputed But Objected To

359.  The degree of emotional distress shown by Mr. Hammer on the video

was comparable to the level of emotional distress shown by Mr. Hammer during

his discussions of this topic during his therapy sessions with Dr. Mitchell.

69

✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

360.  Following Mr. Marti's death, Mr. Hammer was housed in a single cell in the Allenwood Penitentiary.  He received his meals in his cell, had no access to ice, showered in his cell, wore only prison issue clothing, took recreation by himself, was on limited correspondence status for periods of time and had no access to a television.

✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

361.  Between the time of Mr. Marti's death and Mr. Hammer's trial, these conditions of confinement caused Mr. Hammer psychological stress.  The psychological stress resulting from his conditions of confinement were evidenced in Dr. Mitchell's notes of October 11, 1996, January 17, 1997, January 31, 1997, March 7, 1997, and March 14, 1997.

___ Undisputed          ✓ Disputed          ___ Undisputed But Objected To

362.  Dr. Mitchell attempted to intervene on Mr. Hammer's behalf with prison officials regarding some of the conditions of confinement inasmuch as he was concerned about the psychological impact they were causing on Mr. Hammer. In March, 1997 Dr. Mitchell was concerned that Mr. Hammer might "act out" as a result of these stressors, including "ending his life."

✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

70

363.   In March, 1997 Dr. Mitchell was concerned that Mr. Hammer might end his life due to the psychological stress being caused by the capital prosecution.

____ Undisputed        _✓_ Disputed        ___ Undisputed But Objected To

364.   Mr. Hammer expressed that his time in the USMCFP at Springfield, Missouri caused him equivalent stress.

____ Undisputed        _✓_ Disputed        ___ Undisputed But Objected To

365.   Dr. Mitchell indicated that during his time treating Mr. Hammer, that he evidenced emotional lability, which at times was severe.  This lability was a sign of "distress" and evidence that Mr. Hammer had "less emotional control."

_✓_ Undisputed        ___ Disputed        ___ Undisputed But Objected To

366.    Dr. Mitchell opined that there is a correlation between emotional lability and dissociation.

_✓_ Undisputed        ___ Disputed        ___ Undisputed But Objected To

367.   In Dr. Mitchell's opinion, Mr. Hammer's decisions to plead guilty and to waive his post-trial right, including his right to appeal, were influenced by his desire to end the psychological pain caused by the trial and post-trial proceedings.

____ Undisputed        _✓_ Disputed        ___ Undisputed But Objected To

368.   Dr. Mitchell believed that Mr. Hammer's decisions to plead guilty

71

and to waive his post-trial right, including his right to appeal, were influenced by his emotional lability.

_____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

369.   As Dr. Mitchell's relationship with Mr. Hammer progressed, Mr. Hammer became more concerned that Dr. Mitchell would testify against him, and/or that what he said in their sessions would be used against him.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

370.   At some points, Mr. Hammer decided to terminate his therapeutic relationship with Dr. Mitchell.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

371.   Mr. Hammer resume his relationship following the various cessations because the sessions were helpful to him.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

372.   Dr. Mitchell agreed that it would have been ethically preferable to provide Mr. Hammer with an unconflicted therapist (i.e. one not employed by the BOP).

_____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

373.   Dr. Mitchell believed that provision of an unconflicted therapist would not have been logistically feasible.

72

___✔ Undisputed        ___ Disputed        ___ Undisputed But Objected To

Respectfully Submitted,


s/ Michael Wiseman
MICHAEL WISEMAN, ESQUIRE
Supervising Assistant Federal Defender
Attorney ID#PA 75342
Defender Association of Philadelphia
Federal Court Division-Capital Habeas Unit
Suite 545 West – The Curtis Center
Philadelphia, PA 19106
Tel. No. (215)928-0520
(Michael_Wiseman@fd.org)


s/ Anne L. Saunders
ANNE L. SAUNDERS, ESQUIRE
Asst. Federal Public Defender
Attorney ID #PA 48458
100 Chestnut Street, Suite 306
Harrisburg, PA 17101
Tel. No. (717) 782-3843
(Anne_Saunders@fd.org)


Dated:        September 19, 2005
              Philadelphia, PA

73