# IN THE UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | Criminal No. 4:CR–96-239 |
| Respondent, | : | |
| | : | Judge Muir |
| v. | : | |
| | : | |
| DAVID PAUL HAMMER, | : | |
| | : | |
| Petitioner. | : | |
| | : | |
| | : | |

## PETITIONER'S PROPOSED FINDINGS OF FACT
## PART II[1]

## CONTENTS

| XI. | Ronald C. Travis, Esq. | 74 |
|---|---|---|
| XII. | Stuart Grassian, M.D. | 85 |
| XIII. | Dr. Donald Bersoff | 96 |
| XIV. | Neil Blumberg, M.D. | 120 |
| XVI. | Randy D. Vanderschaaff | 136 |
| XVII. | Rodney W. Archambault | 141 |
| XVIII. | Terry D. Sittig | 144 |
| XIX. | Werner U. Spitz, M.D. | 147 |

---

[1]All numbers are sequential and continue from *Petitioner's Proposed Findings of Fact, Part I.*

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Crim. No. 4:CR-96-263 |
| | : | Civil No. 4:CV-02-510 |
| v. | : | |
| | : | (Muir, J.) |
| DAVID PAUL HAMMER | : | **ELECTRONICALLY FILED** |


## CERTIFICATE OF SERVICE

I hereby certify that I caused a true and correct copy of the foregoing

**PETITIONER'S PROPOSED FINDINGS OF FACT
PART II AS ANNOTATED BY FREDERICK E. MARTIN, ESQUIRE**

to be electronically mailed on October __3__, 2005 to:

ADDRESSEE:

      Anne L. Saunders, Esquire
      Anne_Saunders@fd.org

      Michael Wiseman, Esquire
      Michael_Wiseman@fd.org


       s/Frederick E. Martin
       FREDERICK E. MARTIN
       Assistant United States Attorney

## XI.    Ronald C. Travis, Esq.

374.        Ronald C. Travis in an attorney admitted to practice in the Commonwealth of Pennsylvania and in this Court.

___✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

375.    He was appointed by this Court to represent Mr. Hammer in US v. Hammer, 96-239 (M.D. Pa.) in June, 1996.

___✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

376.    Mr. Travis was one of two attorneys appointed by this Court to represent Mr. Hammer.  The second, who was appointed after Mr. Travis in September, 1996, was David Runkhe, Esq.

___✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

377.    Mr. Travis had been a practicing attorney for twenty three years at the time of his appointment and had extensive experience representing criminal defendants.

___✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

378.    Mr. Travis' representation of Mr. Hammer was his first capital case in federal court.

___✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

379.    Mr. Travis and Mr. Ruhnke ultimately hired Dr. Robert Sadoff, M.D.,

74

a nationally renowned forensic psychiatrist, to evaluate Mr. Hammer for potential

guilt phase defenses and for mental health based mitigating evidence.

____ Undisputed          ✓ Disputed          ___ Undisputed But Objected To

380.   On December 22, 1996, Mr. Travis accompanied Dr. Sadoff to the

United States Penitentiary at Allenwood and observed Dr. Sadoff's first face-to-

face meeting between Dr. Sadoff and Mr. Hammer.

✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

381.   At the conclusion of Dr.Sadoff's initial assessment of Mr. Hammer,

Dr. Sadoff informed Mr. Travis that he believed Mr. Hammer suffered from

Dissociative Identity Disorder (DID).

✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

382.   Mr. Travis testified that throughout the course of his representation of

Mr. Hammer, Mr. Hammer adamantly eschewed any suggestion he was mentally

ill and denied that he suffered from DID or any other form of mental illness.

✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

383.   Mr. Travis fully accepted Dr. Sadoff's diagnosis based upon his

knowledge of Mr. Hammer's history of childhood sexual, physical and emotional

abuse, his knowledge of Mr. Hammer's prior psychiatric history, interviews with

individuals who had been previously incarcerated with Mr. Hammer in Oklahoma

fifteen years earlier, and his understanding of the factors Dr. Sadoff believed supported a diagnosis of DID.

___✓ Undisputed         ___ Disputed         ___ Undisputed But Objected To

384.   Dr. Sadoff, with the assistance of Dr. Dubin, subsequently hypnotized Mr. Hammer.

___✓ Undisputed         ___ Disputed         ___ Undisputed But Objected To

385.   The hypnosis session was videotaped.

___✓ Undisputed         ___ Disputed         ___ Undisputed But Objected To

386.   Dr. Sadoff believed that during the hypnosis session one of Mr. Hammer's alter personalities, Jocko, appeared.

___✓ Undisputed         ___ Disputed         ___ Undisputed But Objected To

387.   It appeared to Mr. Travis that Jocko is an aggressive personality who was responsible for Mr. Hammer's aggressive and impulsive behaviors.

___✓ Undisputed         ___ Disputed         ___ Undisputed But Objected To

388.   Dr. Sadoff concluded that as a result of Mr. Hammer's diagnosis of DID, he was not criminally responsible for the death of Mr. Marti because it was Mr. Hammer's alter personality, Jocko, who killed Mr. Marti.  According to Dr. Sadoff, Mr. Hammer was not in control when Jocko killed Mr. Marti.

___✓ Undisputed         ___ Disputed         ___ Undisputed But Objected To

389.  Mr. Travis testified that throughout the course of his representation of Mr. Hammer he had extensive contact with him, including numerous face-to-face interviews, telephone conversations and written correspondence.

__✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

390.  Mr. Travis often that Mr. Hammer's mental illness drove his decision-making.

____ Undisputed        __✓ Disputed        ___ Undisputed But Objected To

391.  Mr. Travis "[a]lways had a nagging concern in [his] mind that it's Jocko driving" the decisions to waive trial, plead guilty, admit aggravating factors and forego the presentation of mitigating evidence.

____ Undisputed        __✓ Disputed        ___ Undisputed But Objected To

392.  Throughout the course of his representation of Mr. Hammer, Mr. Hammer vacillated wildly between wanting to litigate and wanting to give up and die.

____ Undisputed        __✓ Disputed        ___ Undisputed But Objected To

393.  Mr. Travis viewed these vacillations as "irrational" and perceived them as "government assisted suicide."

____ Undisputed        __✓ Disputed        ___ Undisputed But Objected To

394.  Mr. Travis described many of Mr. Hammer's decisions as impulsive

and reported that Mr. Hammer exhibited mood changes throughout the course of Mr. Travis' representation of Mr. Hammer.

___ Undisputed    ___ Disputed    ___ Undisputed But Objected To

395. Mr. Travis reported that there were occasions when speaking with Mr. Hammer when he believed Mr. Hammer's personality had "switched" and he was speaking with one of Mr. Hammer's alter personalities.

___ Undisputed    ___ Disputed    ___ Undisputed But Objected To

396. There were times when Mr. Travis "[h]ad a sense, an impression that [he] was not speaking to the same personality, that it was a different personality, primarily because of the manner of speaking and the tone of the voice."

___ Undisputed    ___ Disputed    ___ Undisputed But Objected To

397. Mr. Travis experienced Mr. Hammer's personality "switches" on at least six occasions prior to trial and on a number of other occasions after Mr. Hammer entered his plea of guilty.

___ Undisputed    ___ Disputed    ___ Undisputed But Objected To

398. Mr. Travis first learned of Mr. Hammer's intent to waive his right to stand trial and enter a plea of guilty on Sunday evening, June 21, 1998, after Mr. Hammer had reported his intentions to Mr. Travis' paralegal, Mr. David Sprout.

___ Undisputed    ___ Disputed    ___ Undisputed But Objected To

399.    After learning of Mr. Hammer's desire to pled guilty, Mr. Travis spoke with Mr. Hammer on the phone "in excess of two hours" but was unable to convince Mr. Hammer to change his mind and continue with the trial.

___✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

400.    While speaking with Mr. Hammer about his decision to plead guilty, Mr. Travis was concerned that the Jocko personality was making this decision and was dominating Mr. Hammer's thoughts and actions.

___ Undisputed        ___✓ Disputed        ___ Undisputed But Objected To

401.    Mr. Travis contacted Mr. Ruhnke, who was in route from New Jersey back to Williamsport, and informed him of Mr. Hammer's intent to waive trial and enter a plea of guilty.

___✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

402.    At the time of Mr. Hammer's announcement that he was going to plead guilty, Mr. Travis and Mr. Ruhnke did not have any discussions regarding whether they should investigate Mr. Hammer's then current competency to make a knowing, intelligent and voluntary guilty plea.

___ Undisputed        ___✓ Disputed        ___ Undisputed But Objected To

403.    Neither Mr. Travis nor Mr. Ruhnke articulated any strategic or tactical reason as to why they should or should not investigate and/or challenge

Mr. Hammer's then current competency to waive trial and enter a plea of guilty.

____ Undisputed      ✓ Disputed      ___ Undisputed But Objected To

404.   Mr. Travis did not have a strategic or tactical reason for not investigating and challenging Mr. Hammer's competency to waive trial by pleading guilty.

____ Undisputed      ✓ Disputed      ___ Undisputed But Objected To

405.   Mr. Travis did not give any thought to contacting Drs. Sadoff, Gelbort or Grassian concerning Mr. Hammer's then current competency to enter a plea of guilty and that this failure to consider contacting Drs. Sadoff, Gelbort and Grassian was not a tactical decision.

____ Undisputed      ✓ Disputed      ___ Undisputed But Objected To

406.   Mr. Travis believed that Mr. Hammer's decision to plead guilty was motivated by his mental illness (DID), and his adamant desire to avoid returning to the Federal Medical Center at Springfield because of what Mr. Hammer perceived to be the intolerable living conditions and his reports of mistreatment by Springfield staff members.

____ Undisputed      ✓ Disputed      ___ Undisputed But Objected To

407.   Mr. Travis believed that Mr. Hammer perceived that the testimony of Dr. Sadoff was persuasive while the testimony of Dr. Wolfson "[w]as not being

80

received by the jury in the same manner"and "[t]hat he may well have believed...my God, we're actually going to win this case on a mental illness defense, and I would rather be dead than at Springfield."

_✓_ Undisputed          ___ Disputed          ___ Undisputed But Objected To

408.   Mr. Travis believed that Mr. Hammer would rather be executed than labeled mentally ill or insane.

_✓_ Undisputed          ___ Disputed          ___ Undisputed But Objected To

409.   Mr. Travis became aware of Mr. Hammer's conditions of confinement within the Oklahoma Department of Corrections and while incarcerated within the Bureau of Prisons.  Mr. Hammer spent years in total isolation including a specially built underground bunker designed specifically to isolate Mr. Hammer from the rest of the inmate population, limit his contact with staff, and limit almost completely his contact with the outside world.

_✓_ Undisputed          ___ Disputed          ___ Undisputed But Objected To

410.   Mr. Travis was also aware of Mr. Hammer's conditions of confinement while being held pretrial in this case at the United States Penitentiary at Allenwood.  Mr. Hammer was held in the special housing unit and was totally isolated from the rest of the prison population.  He took all meals in his cell; showered in his cell; did not have access to a television; had limited reading

materials; and was allowed out for recreation a few times a week in a "dog run" with no other inmates.

___ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

411.   During the course of his testimony Mr. Travis reviewed a memorandum dated July 1, 1974, from the Oklahoma Commissioner regarding the isolation unit at McAlester State Penitentiary in Oklahoma where Mr. Hammer was held.  This memoranda noted that he committee found "[t]hat there are definite adverse mental and physiological effects from isolation" that warrant further study before such punishments were re-instituted in Oklahoma.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

412.   Had Mr. Travis been aware of this information prior to Mr. Hammer's decision to waive trial and plead guilty, he would have wanted to bring to this Court's attention the additional concern about  Mr. Hammer's competency at that time based upon his long history of onerous conditions of confinement and the adverse long-term psychological consequences caused by such conditions.

___ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

413.   Mr. Travis testified that he did not believe that the rendition of events leading up to the death of Mr. Andrew Marti contained in Mr. Hammer's 302 FBI statement were accurate.

82

✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

414. Mr. Travis believed that Mr. Hammer's confession was false because of Mr. Hammer's prior documented history of making false confessions, including numerous instances where Mr. Hammer confessed to murders he clearly did not commit.

___ Undisputed          ✓ Disputed          ___ Undisputed But Objected To

415. Mr. Travis believed that Mr. Hammer's confession to Mr. Marti murder was false because the hypnosis session conducted by Dr. Sadoff revealed that the incident leading up to Mr. Marti's death was consensual homosexual activity, including the binding of Mr. Marti to the bed, which Mr. Travis admitted neither he nor Mr. Ruhnke investigated.

___ Undisputed          ✓ Disputed          ___ Undisputed But Objected To

416. Mr. Travis believed that Mr. Hammer's confession regarding Mr. Marti was false because Jocko killed Mr. Marti

✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

417. Mr. Travis believed that Mr. Hammer's confession regarding Mr. Marti was false because the ruse mentioned therein – that Mr. Marti agreed to be tied to the bed in order to perpetrate a false hostage scene so Mr. Marti would be

transferred out of the institution – was inconsistent with his understanding of Bureau of Prison practice of transferring the aggressor and not the victim of internal prison violence.

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

418.  Mr. Travis testified that he and Mr. Ruhnke did not discuss any strategic or tactical reason why they should not challenge the veracity of Mr. Hammer's statement to the FBI in this case.

___ Undisputed          ___✓ Disputed          ___ Undisputed But Objected To

419.  Mr. Travis did not have a tactical or strategic reason for not challenging the veracity of Mr. Hammer's confession.

___ Undisputed          ___✓ Disputed          ___ Undisputed But Objected To

420.  Mr. Travis did not consult with a pathologist to ascertain whether the physical evidence was consistent with Mr. Hammer's confession.

___ Undisputed          ___✓ Disputed          ___ Undisputed But Objected To

421.  Mr. Travis further acknowledged that had he done so and had discovered the physical evidence was inconsistent with Mr. Hammer's confession, he would have presented that information to both the jury and this Court.

___ Undisputed          ___✓ Disputed          ___ Undisputed But Objected To

422.  Mr. Travis did not have a tactical or strategic reason for not

challenging the ethical violations engendered by the participation of Dr. Mitchell, Wolfson and Karten in Mr. Hammer's case as contained in Mr. Hammer's pending Section 2255 petitions.

____ Undisputed          _✓ Disputed          ___ Undisputed But Objected To

423.   Mr. Travis and Mr. Ruhnke did not have discussion relevant to challenging the participation of Dr. Mitchell, Wolfson and Karten in Mr. Hammer's case based upon ethical concerns.

__✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

424.   Mr. Travis was unaware that the Bureau of Prisons had promulgated professional and ethical standards governing the conduct and practice of Bureau of Prisons mental health professionals.

____ Undisputed          ✓ Disputed          ___ Undisputed But Objected To

425.   Mr. Travis stated that had he been aware of the BOP Ethical Standards, he would have brought them to the attention of the Court and would have challenged the participation of Dr. Mitchell, Wolfson and Karten and the ethical violations alleged in the pending section 2255 litigation.

____ Undisputed          ✓ Disputed          ___ Undisputed But Objected To

## XII.   Stuart Grassian, M.D.

426.   Stuart Grassian is a medical doctor who is Board Certified in

psychiatry, forensic psychiatry and addiction psychiatry. Dr. Grassian completed his psychiatry residency in 1977 and began his forensic psychiatric work in 1979. Dr. Grassian was on the faculty of the Harvard Medical School from 1977 until approximately 2002. He also received his Juris Doctorate degree from Suffolk University in 1985.

_✓_ Undisputed         ___ Disputed         ___ Undisputed But Objected To

427. Dr. Grassian has a full-time clinical practice and also specializes in the psychiatric consequences of stringent conditions of confinement, addictive disorders and has extensive experience evaluating and teaching about the psychiatric effects of childhood sexual abuse and childhood trauma.

_✓_ Undisputed         ___ Disputed         ___ Undisputed But Objected To

428. Dr. Grassian also has extensive experience evaluating individuals held in stringent conditions of confinement and assessing the impact of such conditions on their ability to make knowing, intelligent and voluntary decisions about their legal cases.

___ Undisputed         _✓_ Disputed         ___ Undisputed But Objected To

429. Dr. Grassian was accepted by this Court as an expert in the field of the psychiatric impact of conditions of confinement and forensic psychiatry.

_✓_ Undisputed         ___ Disputed         ___ Undisputed But Objected To

430.  Dr. Grassian testified that he was initially contacted by defense counsel for Mr. Hammer in either 1996 or 1997.  Defense counsel subsequently retained Dr. Grassian and he conducted two phone interviews of Mr. Hammer in September, 1997 totaling five hours.

√ Undisputed          ___ Disputed          ___ Undisputed But Objected To

431.  During their five hours of conversation, Dr. Grassian explored with Mr. Hammer his experiences in prison, the difficulties he had endured at various times while incarcerated and briefly discussed with Mr. Hammer the death of Mr. Marti.

√ Undisputed          ___ Disputed          ___ Undisputed But Objected To

432.  Dr. Grassian also talked at length with Mr. Hammer about the conditions of confinement Mr. Hammer endured in Oklahoma and the conditions of confinement he endured while being held pretrial in this case at the United States Penitentiary at Allenwood.

√ Undisputed          ___ Disputed          ___ Undisputed But Objected To

433.  Subsequently, in December, 2004, Dr. Grassian conducted a four hour face-to-face psychiatric evaluation of Mr. Hammer at the United States Penitentiary at Lewisburg.

___ Undisputed          √ Disputed          ___ Undisputed But Objected To

434. During the course of this evaluation, Dr. Grassian discussed with Mr. Hammer his experiences at the Federal Bureau of Prisons Medical Center in Springfield, Illinois and again reviewed the conditions of confinement Mr. Hammer endured pretrial and during his incarceration in Oklahoma.

✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

435. In addition, Dr. Grassian testified that he also reviewed numerous records and documents pertaining to Mr. Hammer, including the reports of Drs. Kluft, Sadoff, Gelbort, Matthews, Martell and Wolfson; the trial testimony of Drs. Wolfson, Mitchell and Sadoff; the penalty phase transcripts; the transcripts from the competency proceedings held in this case; records from the Oklahoma Department of Corrections; records from the Federal Bureau of Prisons; records from the Baptist Hospital in Oklahoma; records from Oklahoma Memorial Hospital; records from St. Anthony's Hospital; records from Eastern State Hospital; records from Griffith Memorial Hospital; the medical records of Mr. Hammer's grandmother; and a memoranda from the warden of the Oklahoma State Penitentiary regarding Mr. Hammer's conditions of confinement.

✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

436. Based upon his review of the relevant medical/psychiatric literature and his examination of numerous prisoners exposed to stringent conditions of

confinement, Dr. Grassian opined that conditions of confinement that include

sensory deprivation, isolation and limited exposure to other people inexorably lead

to difficulties in thinking, concentration, memory, emotional and cognitive

impairments, hyper-responsitivity, impulsivity, obsessional thinking, confusional

psychosis, intense agitation and paranoia and dissociative states.

__✓__ Undisputed        ___ Disputed        ___ Undisputed But Objected To

437.    Dr. Grassian testified that there is substantial medical evidence that

prisoners "who have been in solitary confinement for a long period of time can

have long lasting effects" impacting their later psychiatric functioning.

__✓__ Undisputed        ___ Disputed        ___ Undisputed But Objected To

438.    Based upon his review of Mr. Hammer's incarceration history, Dr.

Grassian believes that Mr. Hammer has a long history of being held in solitary

confinement both in Oklahoma and in the Federal Bureau of Prisons.

__✓__ Undisputed        ___ Disputed        ___ Undisputed But Objected To

439.    Mr. Hammer's prior conditions of confinement while in Oklahoma and

while incarcerated pretrial at the United States Penitentiary at Allenwood were

"extremely harsh and would certainly have had a highly negative impact on [Mr.

Hammer's] emotional cognitive capacity."

____ Undisputed        __✓ Disputed        ___ Undisputed But Objected To

440.   Dr. Grassian believes that the conditions of solitary confinement endured by Mr. Hammer are among the harshest conditions he has seen experienced by a prisoner.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

441.   Dr. Grassian opined that various "vulnerability factors" would exacerbate pre-existing mental illness and cognitive dysfunction in prisoners held under stringent conditions of confinement in addition to the sequella of symptomology associated with solitary confinement.

___✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To Dr.

442.   Grassian identified Mr. Hammer's as having those "vulnerability factors" for enhanced psychiatric trauma from stringent conditions of confinement.

___✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

443.   These vulnerability factors included Mr. Hammer's history of childhood physical and sexual abuse; cognitive impairments, Borderline Personality Disorder, DID, and depression.

___✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

444.   According to Dr. Grassian, the above "vulnerability factors" diminished Mr. Hammer's ability to tolerate the stringent conditions of confinement he endured pretrial and while in Oklahoma and increased the

90

likelihood he would lapse into confusional dissociative states during prolonged exposure to solitary confinement.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

445.    Dr. Grassian observed that in the days leading up to Mr. Hammer's guilty plea, he was suffering enhanced emotional distress, as evidenced in Dr. Mitchell's psychology notes.

_✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

446.    Dr. Grassian believes that the stressors at work at the time of Mr. Hammer's guilty plea included his reliving and confronting his abusive childhood experiences through the testimony of various witnesses.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

447.    As a result of the stringent conditions of confinement endured by Mr. Hammer, and in conjunction with his pre-existing mental and cognitive impairments, Mr. Hammer suffered from obsessional symptoms, dissociative states, confusional dissociative psychosis, episodes of paranoia and mental stupor.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

448.    Dr. Grassian opined that dissociation is very common in individuals who suffer from a Borderline Personality Disorder such as Mr. Hammer and "at least in part does reflect the fact that many people with Borderline Personality

Disorder grew up with severe childhood sexual and physical abuse ane emotional abuse."

___✓___ Undisputed        ___ Disputed        ___ Undisputed But Objected To

449.   Dr. Grassian also testified that there is a significant overlap diagnostically between DID and Borderline Personality Disorder.  He further noted that Mr. Hammer's background of physical and sexual abuse is clinically associated with the development of a dissociative disorder.

___✓___ Undisputed        ___ Disputed        ___ Undisputed But Objected To

450.   Dr. Grassian testified that neither Mr. Ruhnke nor Mr. Travis asked him at any point in time to evaluate Mr. Hammer regarding his competency to waive proceedings, plead guilty and waive his direct appeal.  Had they done so, he would have been willing to evaluate Mr. Hammer regarding his competency as noted above.

___✓___ Undisputed        ___ Disputed        ___ Undisputed But Objected To

451.   Dr. Grassian testified that to a reasonable degree of medical and psychiatric certainty Mr. Hammer's waiver of his right to stand trial, his entry of a guilty plea, and his waiver of direct appeal was "not an intelligent and knowing and rational, voluntary decision."

___✓___ Undisputed        ___ Disputed        ___ Undisputed But Objected To

452.  This Court finds Dr. Grassian's opinion in this regard to be credible.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

453.  Dr. Grassian opined that Mr. Hammer's emotional and cognitive impairments, in conjunction with the stressors detailed in Dr. Mitchell's contemporaneous psychology notes, and the psychiatric impairments caused by Mr. Hammer's conditions of confinement impaired his ability to rationally assist counsel and participate meaningfully in his own defense.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

454.  This Court finds that Dr. Grassian's opinion in regard to the impact of the stressors upon Mr. Hammer's capacity to make a knowing, intelligent and voluntary waiver of rights to be credible.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

455.  Dr. Grassian also opined that because of the impact of Mr. Hammer's dissociative tendencies, he cannot fully integrate his personality and thus, according to Dr. Grassian, lacks the capacity to engage in a "balanced, thoughtful, sober decision-making process."

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

456.  The Court finds Dr. Grassian's opinions in this regard to be credible.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

457.   Dr. Grassian also expressed his belief that Mr. Hammer's "preexisting mental and emotional illness, exacerbated by long periods of isolation, wreak havoc on a person's ability to regulate emotion and impulse controls.  Therefore, when a person is confronted with negative stressful events in their lives, their decision-making process becomes severely impaired to the point where they are not, from a clinical perspective, competent to make rational decisions.  That is what occurred to Mr. Hammer throughout this litigation."

__✓_ Undisputed          ___ Disputed          ___ Undisputed But Objected To

458.   The Court finds Dr. Grassian's opinion in this regard to be credible.

___ Undisputed          _✓_ Disputed          ___ Undisputed But Objected To

459.   Dr. Grassian opined that Mr. Hammer's fear of returning to the Federal Medical Center at Springfield if his insanity defense succeeded, where he previously endured horrific conditions of confinement, also exacerbated the above discussed mental and cognitive impairments that had a deleterious impact on his ability to make a competent decision regarding his waiver of trial, plea of guilty and waiver of direct appeal.

___ Undisputed          _✓_ Disputed          ___ Undisputed But Objected To

460.   The Court finds Dr. Grassian's opinion in this regard to be credible.

___ Undisputed          _✓_ Disputed          ___ Undisputed But Objected To

94

## XIII. **Dr. Donald Bersoff**

461.   Donald N. Bersoff is a lawyer and a psychologist licensed to practice in the Commonwealth of Pennsylvania.

___✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

462.   Dr. Bersoff is a professor emeritus at the Villanova Law School, where he specializes in professional ethics for psychologists, and has received awards for his work in this area.

___✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

463.   Dr. Bersoff has trained psychologists and psychiatrists in professional ethics.

___✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

464.   Dr. Bersoff was past legal counsel for the American Psychological Association (hereafter, "APA").

___✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

465.   Dr. Bersoff has served as an ethics expert for multiple governments and government agencies.

___✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

466.   Dr. Bersoff was invited by then Chief Judge Solvitor to participate on a task force regarding race and gender bias in the federal courts of the Third

Circuit.

_✓_ Undisputed          ___ Disputed          ___ Undisputed But Objected To

467.  Dr. Bersoff was accepted by the Court as an expert witness in the interpretation and application of ethics in the mental health fields.

_✓_ Undisputed          ___ Disputed          ___ Undisputed But Objected To

468.  Dr. Bersoff conducted a review of the proceedings and record in the case of United States v. David Paul Hammer, (96-cr-239) (hereafter, "Hammer") in order to determine the presence or absence of violations of ethical standards by mental health professionals associated with the litigation.

_✓_ Undisputed          ___ Disputed          ___ Undisputed But Objected To

469.  Based upon Dr. Bersoff's review of the Hammer record he concluded to a reasonable degree of professional certainty that the professional behavior of Drs. John Mitchell, Karten, Wolfson and Dubin violated a variety of ethical rules.

_✓_ Undisputed          ___ Disputed          ___ Undisputed But Objected To

470.  In reaching his conclusions regarding the presence of ethical violations by psychologists in this case, he was guided by the ethical standards promulgated by the APA, Ethical Standards governing the provision of mental health services generated by the United States Bureau of Prisons (hereafter, "BOP Standards"), and relevant state and federal case law.

97

___ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

471.   Dr. Bersoff's conclusions regarding ethical violations by psychiatrists involved in <u>Hammer</u>, were guided by the Principles of Medical Ethics, Annotated for Psychiatry.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

472.   The BOP Standards incorporate and are governed by the APA's Ethical Standards, including specialty standards governing the practice of forensic psychology.

___ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

473.   There is no facial discrepancy or conflict between the APA Standards and the BOP Standards.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

474.   While the APA does not have direct enforcement authority regarding its Standards, the Standards can be enforced by state licensing boards, and the APA can refer a therapist to a state licensing board for perceived violations of its Standards.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

475.   The BOP Standards regarding privacy and confidentiality of psychological records and psychological communications are governed by the

ethical principles set forth in the APA Standards, by federal statute (<u>viz</u>, 5 U.S.C. § 552 (a) (the Privacy Act of 1974), and § 552 (the Freedom of Information Act of 1974)).

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

476.  A BOP prisoner/patient's psychology records are maintained on a BOP database called the Psychology Data System (hereafter, PDS).  Professional contacts between a BOP therapist and a prisoner/patient are to be documented in the PDS.

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

477.  The BOP Standards require that A) when psychology records are disclosed, a signed release – executed by the patient/prisoner – must be maintained in the patient/prisoner's BOP psychology file; and B) if the release of information is oral, then a memorandum memorializing the release of information must be maintained in the patient/prisoner's psychology file.

___ Undisputed          ___✓ Disputed          ___ Undisputed But Objected To

478.  The BOP Standards warn that violations of these privacy standards are punishable by civil and criminal penalties.

___ Undisputed          ___ Disputed          ___✓ Undisputed But Objected To

479.  The BOP Standards regarding the "Inmate/Therapist Relationship"

are governed by the APA Standards and <u>Jaffe v. Redmond</u>, 518 U.S. 1 (1996) (hereafter, "<u>Jaffe</u>").

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

480.   The BOP standards – incorporating the APA Standards – and <u>Jaffe</u> require that a BOP therapist maintain as confidential any information obtained during the course of the therapeutic relationship unless the patient consents to the disclosure or disclosure is other wise mandated by law.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

481.   Disclosure is mandated by law when the information is related to: 1) an imminent threat of harm to "self or others" (also known as a <u>Tarasoff</u> warning); 2) instances where alleged child abuse is suspected; and 3) when disclosure is ordered by a court.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

482.   The BOP Standards have two additional instances when otherwise confidential records may be disclosed without the consent of the prisoner/patient.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

483.   The two additional circumstances covered by the BOP Standards relate to information relevant to the proper, orderly and safe operation of the prison, and upon a court order.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

484.    The BOP Standards require that a BOP therapist advise a prisoner/patient in advance of the provision of services of the above described limits on confidentiality.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

485.    The BOP Standards acknowledge that BOP therapists "work for many clients," and therefore the best practice is for the therapist to define for whom he/she is working and warn the prisoner/patient when the therapist is not "working" alone for the prisoner/patient.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

486.    The BOP Standards contain a model form for a prisoner/patient to authorize the release of otherwise confidential mental health records.  This form comports with the APA's standards regarding confidentiality.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

487.    The BOP Standards also address what are called "role conflicts." Such conflicts arise when a therapist has "dual relationships" i.e. a duty of loyalty to more than one entity.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

488.    In the prison context, such dual relationships exist when a therapist

101

has loyalties to the prisoner/patient and the Bureau of Prisons.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

489.    The BOP Standards require that a therapist avoid exploiting the trust and dependency of prisoner/patients and should make every effort to avoid dual relationships that could impair their professional judgment or increase the risk of the exploitation of the prisoner/patient.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

490.    There exists an inherent potential conflict of interest in most relationships between a BOP therapist and a prisoner/patient because a BOP therapist always owes a duty of loyalty to the prisoner/patient and to the BOP.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

491.    In order to avoid the harmful impact of these potential conflicts, the BOP Standards require that a BOP therapist avoid conflicting roles when possible; that if the conflict is unavoidable that the prisoner/patient be advised of the nature of the relationship which exists between the therapist and prisoner/patient, and the potential conflict regarding the therapist's duty to the BOP. This advice includes warnings regarding limits to confidentiality that normal attain to the patient-therapist relationship.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

492.   The BOP standards warn that violating the prohibition against dual relationships can be viewed as a violation of the APA Standards, and should these be violated, the therapist runs the further risk of exclusion from the APA, as well as loss of his/her professional licence.

__✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

493.   The BOP Standards require that before a BOP mental health professional may act as a forensic evaluator, he/she must be trained to perform a forensic role, or else work under the direct supervision of another person who is so trained and experienced.

__✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

494.   The BOP Standards caution that "whenever possible" a forensic evaluator should not provide therapy or otherwise oversee a prisoner/patient's treatment.

___ Undisputed        __✓ Disputed        ___ Undisputed But Objected To

495.   Any therapist who acts as a forensic evaluator acts in a multiple relationship.

___ Undisputed        __✓ Disputed        ___ Undisputed But Objected To

496.   When a therapist acts in the role of a forensic evaluator, he/she necessarily uses information that was obtained for the benefit of the patient for

other purposes.

____ Undisputed        _✓_ Disputed        ___ Undisputed But Objected To

497.   When a therapist acts in such dual roles, it compromises the efficacy

of the therapy, as well as the reliability of the forensic endeavor.

____ Undisputed        _✓_ Disputed        ___ Undisputed But Objected To

498.   Trust between patient and therapist is essential to effective

psychotherapy, and this trust can be breached when the therapist acts in a forensic

role.

_✓_ Undisputed        ___ Disputed        ___ Undisputed But Objected To

499.   Ethical standards (including the APA and BOP Standards) prohibit

such dual roles, with the exception that a therapist may testify as a "fact witness,"

but may not offer opinions generated and formed during the course of the therapy

relationship.

____ Undisputed        _✓_ Disputed        ___ Undisputed But Objected To

500.   Dr. Mitchell engaged in prohibited multiple roles in three

respects: as Mr. Hammer's long-term psycho-therapist; as an expert witness as to

Mr. Hammer's competency to plead guilty and to waive his post-trial and appellate

rights; and as an assessor of his mental state at the time of the offense.

____ Undisputed        _✓_ Disputed        ___ Undisputed But Objected To

104

501.   In addition to the rules regarding confidentiality of therapy sessions imposed by the APA and BOP Standards, Dr. Mitchell specifically promised Mr. Hammer (as reflected in his note of the "Individual Therapy Session" of November 27, 1996 (Defendant's Exhibit 31.7 at page 47) that he would testify to only to what he "observed and heard," thus assuring Mr. Hammer that he would not ren der opinions, or that his opinions would not be used against Mr. Hammer.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

502.   From the time of Mr. Hammer's entry into BOP custody until June, 6, 1995 there were no other written advisements regarding the limits on confidentiality.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

503.   On June 6, 1995 Dr. Karten generated a so-called "Treatment Plan" relevant to Mr. Hammer (Defendant's Exhibit 31.8 at page 7).

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

504.   This Treatment Plan is the first written advisement to Mr. Hammer detailing the contours of the confidentiality he could expect during his therapy and other sessions with BOP providers.  It states in relevant part: "I also understand that material discussed in these sessions is confidential except where otherwise agreed or in cases where potential harm to self or others, major security issues or

105

court requests are involved."

____ Undisputed        ✓ Disputed        ____ Undisputed But Objected To

505.   These warnings were consistent with the APA and BOP Standards in this area.

✓ Undisputed        ____ Disputed        ____ Undisputed But Objected To

506.   Mr. Hammer's right to confidentiality in therapy sessions was violated when Dr. Mitchell sent his PDS (Psychology Data System) notes to Dr. Wolfson without obtaining prior written consent from Mr. Hammer.

____ Undisputed        ✓ Disputed        ____ Undisputed But Objected To

507.   Transmittal of the PDS notes to Dr. Wolfson violated Mr. Hammer's confidentiality rights because most of the material in the PDS file was obtained from Mr. Hammer in the course of psycho-therapy.

____ Undisputed        ✓ Disputed        ____ Undisputed But Objected To

508.   Dr. Wolfson's use of and reliance upon the PDS file, containing information obtained during confidential therapy sessions, violated Mr. Hammer's right to confidentiality.

____ Undisputed        ✓ Disputed        ____ Undisputed But Objected To

509.   Mr. Hammer again expressed concerns regarding Dr. Mitchell's fidelity, i.e. whether what was said in therapy would be used against him. See

Defendant's Exhibit 31.7, at page 50 (note of December 12, 1996).

_____ Undisputed        ___ Disputed        ___ Undisputed But Objected To

510.   Dr. Mitchell saw Mr. Hammer for therapy sessions bi-weekly, or on an as needed basis for about three and one half years.

_____ Undisputed        ___ Disputed        ___ Undisputed But Objected To

511.   Dr. Mitchell saw Mr. Hammer for an "Individual Therapy Session" on April 16, 1996 (three days after Mr. Marti's death).

_____ Undisputed        ___ Disputed        ___ Undisputed But Objected To

512.   This sessions is noted in Defendant's Exhibit 31.7 at page 25.  The note of this session indicates that Dr. Mitchell was concerned with Mr. Hammer's then-current "thoughts and feelings" about the death.

_____ Undisputed        ___ Disputed        ___ Undisputed But Objected To

513.   The session of April 16, 1996 was a clinical therapy interaction and, as such, was covered by the BOP and APA Standards governing confidentiality.

_____ Undisputed        _✓_ Disputed        ___ Undisputed But Objected To

514.   Despite its clinical character, information obtained and opinions formed during that session and in all of the prior therapy sessions, Dr. Mitchell wrote a second note, called "Psychological Report" (Defendant's Exhibit 31.7, at page 24).

___ Undisputed          ✓ Disputed          ___ Undisputed But Objected To

515.   In this report, Dr. Mitchell noted that Mr. Hammer had not demonstrated delusions, psychosis or "an inability to distinguish between right and wrong"

✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

516.   The quoted section of the April 16, 1996 Mitchell report had no clinical purpose.

___ Undisputed          ✓ Disputed          ___ Undisputed But Objected To

517.   Dr. James K. Wolfson relied on Dr. Mitchell's April 16, 1996 Psychological Report in forming his conclusions regarding Mr. Hammer's criminal responsibility and competence to waive rights.  It is quoted in his 1997 Forensic Report (Defendant's Exhibit 139.1)

✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

518.   Dr. Wolfson relied on the entire BOP Psychology File including the therapy notes generated by Dr. Mitchell.

✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

519.   Dr. Mitchell's notes of May 1, 1996 and May 16, 1996 (Defendant's Exhibit 31.7 at a pages 26 and 28) each contain observations relevant to a forensic evaluation and were relied upon by Dr. Wolfson.

____ Undisputed        _✓_ Disputed        ____ Undisputed But Objected To

520.   Dr. Mitchell acted in a forensic capacity when he evaluated Mr. Hammer for competency to plead guilty and waive his post-trial rights, and then testified to his conclusions in that regard.  These dual roles violated both BOP and APA Standards, and Mr. Hammer's right to confidential therapy sessions.

____ Undisputed        _✓_ Disputed        ____ Undisputed But Objected To

521.   Dr. Mitchell made these disclosures in the absence of a court ordered request.

____ Undisputed        _✓_ Disputed        ____ Undisputed But Objected To

522.   The disclosures were made without a court order or request, and without there having been any threat to institutional security, or on the basis that Mr. Hammer was a threat to himself or others.

____ Undisputed        _✓_ Disputed        ____ Undisputed But Objected To

523.   Dr. Mitchell failed to advise Mr. Hammer of the potential that he might be required to assume multiple roles, and accompanying limits on confidentiality.  This failure also resulted in violations of Mr. Hammer's right and expectation of privacy.

____ Undisputed        _✓_ Disputed        ____ Undisputed But Objected To

524.   Dr. Mitchell was not professionally competent to perform a forensic

competency determination and he did so in violation of APA and BOP Standards.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

525.    On May 7 and 8, 1997, and June 5, 1998 Dr. Mitchell spoke with AUSA Fred Martin about the possibility that he would testify at a hearing to address Mr. Hammer's competency to plead guilty.  (Defendant's Exhibit 31.7 at pages 78, 79 and 125).

___ ✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

526.    Dr. Mitchell was under an ethical obligation to report these conversations to Mr. Hammer, but he did not, even though Mr. Hammer continued to express concerns about Dr. Mitchell's fidelity.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

527.    On a number of occasions, Mr. Hammer expressed concern that Dr. Mitchell would testify or work against his interests, while at the same time expressing an on-going need for therapy.  See e.g. Defendant's Exhibit 31.7 at page 92.

___ ✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

528.    Conditioning Mr. Hammer's receipt of needed therapy on either an implicit or explicit waiver of this right to confidentiality, and with the understanding that what he said in therapy would be used against him, rendered the

110

waiver of confidentiality involuntary.

___ Undisputed        _✓_ Disputed        ___ Undisputed But Objected To

529.   Mr. Hammer's on-going concerns about Dr. Mitchell's fidelity caused a deterioration in the trust that Mr. Hammer had for Dr. Mitchell, which rendered the subsequent competency determination unreliable.

___ Undisputed        _✓_ Disputed        ___ Undisputed But Objected To

530.   In multiple therapy sessions between Dr. Mitchell and Mr. Hammer, issues regarding Mr. Hammer's ongoing murder case were discussed.  See, Defendant's Exhibit 31.7 at pages 34, 35, 44, 54, 57, 63, 66, 77, 80, 82, 83, 93, 101, 104, 110, 115, 116, 118, 124, 126, 129, 132, 134, 140, 141, 160, 163, 166, 168, 170, 175

_✓_ Undisputed        ___ Disputed        ___ Undisputed But Objected To

531.   These sessions covered, among other topics, Mr. Hammer's feelings about pursuing or discontinuing his defense, Mr. Hammer's feelings about his counsel, and his views of how the case was proceeding.

_✓_ Undisputed        ___ Disputed        ___ Undisputed But Objected To

532.   Dr. Bersoff believed that there existed a clinical reason for Dr. Mitchell to cover the issues related to the ongoing legal case, as the case was causing Mr. Hammer significant emotional and psychological distress.

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

533. Dr. Bersoff believed that the clinical interactions with Mr. Hammer were appropriate in view of Mr. Hammer's need to discuss them.

___ Undisputed          ___ Disputed          ___ Undisputed But Objected To

534. This Court credits this belief.

___ Undisputed          _✓_ Disputed          ___ Undisputed But Objected To

535. Dr. Bersoff believed that the discussions in therapy of Mr. Hammer's legal case, and his various decisions regarding the case, were particularly ethically inappropriate in view of Mr. Mitchell's performance of multiple roles, i.e. as Mr. Hammer's therapist and his subsequent role as a forensic evaluator of Mr. Hammer's mental state and competency to waive rights.

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

536. The Court credits this belief.

___ Undisputed          _✓_ Disputed          ___ Undisputed But Objected To

537. Dr. Bersoff believed that Dr. Mitchell engaged in ethically prohibited multiple roles when he discussed Mr. Hammer's case with Mr. Hammer, because he was employed by the BOP, which is a division of the United States Department of Justice, which was prosecuting Mr. Hammer.

___✓ Undisputed          _✓_ Disputed          ___ Undisputed But Objected To

538. The Court credits this belief.

___ Undisputed        _✓_ Disputed        ___ Undisputed But Objected To

539. Dr. Bersoff believes that Dr. Mitchell's employment by the Department of Justice, which is the same entity that is prosecuting Mr. Hammer and seeking his execution, raises at least an appearance of impropriety and therefore constitutes an ethical violation.

_✓_ Undisputed        ___ Disputed        ___ Undisputed But Objected To

540. The Court credits this belief.

___ Undisputed        _✓_ Disputed        ___ Undisputed But Objected To

541. The risk of harm caused by Dr. Mitchell's employment with the BOP and the Department of Justice is that he could have acted as a conduit for information between Mr. Hammer and the prosecution.

___ Undisputed        _✓_ Disputed        ___ Undisputed But Objected To

542. In view of Dr. Mitchell's multiple roles, and the conflicts attendants to them, the most ethically appropriate course would have been to limit his role to being Mr. Hammer's therapist, and to warn Mr. Hammer that anything said could be used against him.

___ Undisputed        _✓_ Disputed        ___ Undisputed But Objected To

543. Dr. Mitchell never advised Mr. Hammer of his multiple contacts with

the Office of the United States Attorney regarding Mr. Hammer's prosecution.

___ Undisputed        _✓_ Disputed        ___ Undisputed But Objected To

544.    Dr. Mitchell was ethically required to advise Mr. Hammer of his multiple contacts with the office of the United States Attorney regarding Mr. Hammer's legal case.

___ Undisputed        _✓_ Disputed        ___ Undisputed But Objected To

545.    Dr. Bersoff opined to a reasonable degree of psychological and professional certainty that Dr. Mitchell's behavior violated the APA and BOP Ethical Standards regarding multiple roles.

_✓_ Undisputed        ___ Disputed        ___ Undisputed But Objected To

546.    This Court accepts Dr. Bersoff's opinion in that regard.

___ Undisputed        _✓_ Disputed        ___ Undisputed But Objected To

547.    Dr. Mitchell's ethical violations were exacerbated by his receipt of a BOP reward for his work in this case.

___ Undisputed        _✓_ Disputed        ___ Undisputed But Objected To

548.    Dr. Mitchell's receipt of a BOP reward for his work in this case raises at least an appearance of a conflict of interest and therefore violates ethical concerns.

___ Undisputed        _✓_ Disputed        ___ Undisputed But Objected To

114

549. Dr. Mitchell continued as Mr. Hammer's psycho-therapist when he was transferred from the Allenwood Penitentiary to the Allenwood Correctional Institution.

_✓_ Undisputed        ___ Disputed        ___ Undisputed But Objected To

550. The continuation of the same therapist had a beneficial therapeutic component.

_✓_ Undisputed        ___ Disputed        ___ Undisputed But Objected To

551. However, the continuation of Dr. Mitchell as therapist to Mr. Hammer following this transfer raised a risk of harm to Mr. Hammer (i.e. that Dr. Mitchell continued his therapy in order to glean information from Mr. Hammer that would have been useful to the prosecution) and therefore violated the BOP and APA Standards.

___ Undisputed        _✓_ Disputed        ___ Undisputed But Objected To

552. Because of this risk, Dr. Mitchell's continuation as Mr. Hammer's therapist constituted an ethical violation under the BOP and APA Standards.

___ Undisputed        _✓_ Disputed        ___ Undisputed But Objected To

553. Dr. Karten engaged in multiple roles when he acted as Mr. Hammer's therapist for a short time, was Mr. Marti's therapist, when he assessed Mr. Hammer's mental state on several occasions, and as an expert witness for the

Government with regard to whether Mr. Hammer has DID.

___ Undisputed        _✓_ Disputed        ___ Undisputed But Objected To

554.   Dr. Karten's opinions that were rendered at trial as to Mr. Hammer's mental health was based on information obtained through his clinical interactions with Mr. Hammer.

___ Undisputed        _✓_ Disputed        ___ Undisputed But Objected To

555.   Because Dr. Karten's opinions were based upon confidential clinical information, and he was ethical obliged to maintain the confidential character of this information, Dr. Karten's testimony violated Mr. Hammer's right to confidentiality.

___ Undisputed        _✓_ Disputed        ___ Undisputed But Objected To

556.   Dr. Karten's testimony as to his opinion that Mr. Hammer did not have DID also constituted a conflicted multiple role.

___ Undisputed        _✓_ Disputed        ___ Undisputed But Objected To

557.   Dr. Wolfson engaged in multiple roles in that he served as Mr. Hammer's treating physician, his forensic evaluator, as a court expert and then a prosecution expert.

___ Undisputed        _✓_ Disputed        ___ Undisputed But Objected To

558.   Given Mr. Hammer's history of violence in and out of prison, Dr.

116

Mitchell performed incompetently when he failed to predict, anticipate and prevent Mr. Hammer from being double celled.

____ Undisputed        __✓ Disputed        ___ Undisputed But Objected To

559.   Given Mr. Hammer's history of violence in and out of prison, Dr. Karten performed incompetently when he failed to predict, anticipate and prevent Mr. Hammer from being double celled.

____ Undisputed        __✓ Disputed        ___ Undisputed But Objected To

560.   Dr. Mitchell, Dr. Karten and the Bureau of Prisons faced the potential for civil liability for the death of Mr. Marti.

____ Undisputed        __✓ Disputed        ___ Undisputed But Objected To

561.   Had Mr. Hammer been found guilty, i.e. his insanity defense had been rejected, the potential civil liablity of the BOP and its employees would have been reduced.

____ Undisputed        __✓ Disputed        ___ Undisputed But Objected To

562.   Had Mr. Hammer been found not guilty due to a mental disease or defect, the potential civil liablity of the BOP and its employees would have been increased.

____ Undisputed        __✓ Disputed        ___ Undisputed But Objected To

563.   Since the BOP and its employees potential for civil liablity would

have increased in the event that Mr. Hammer was found not responsible due to a mental disease or defect, the BOP and its employees had an interest in seeing Mr. Hammer be convicted. ___ Disputed

564. This interest rendered them ethically impaired in assessing Mr. Hammer for criminal responsiblity.

___ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

565. In view of their potential for civil liability, it constituted an ethical breach to permit the a BOP-employed psychiatrist to conduct the forensic evaluation conducted by Dr. Wolfson.

___ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

566. In view of Dr. Mitchell's potential for civil liability over the death of Mr. Marti, his change of Mr. Hammer's MDS code from one indicating mental illness to one that did not indicate mental illness (Defendant's Exhibit 31.7, at page 45) raised an appearance of impropriety and was therefore violative of the APA and BOP Standards.

___ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

567. Since the note contained at Defendant's Exhibit 31.7 at page 45 was written in violation of the APA and BOP Standards, Dr. Wolfson's reliance upon it also constituted an ethical breach.

____ Undisputed    ✓ Disputed    ____ Undisputed But Objected To

568.  Dr. Mitchell's performance of two competency evaluations of Mr. Hammer constituted an ethical breach inasmuch as he was not suitably qualified or competent to perform such a forensic evaluation.

____ Undisputed    ✓ Disputed    ____ Undisputed But Objected To

569.  Dr. Wolfson was not suitably qualified or competent to evaluate Mr. Hammer for DID.

____ Undisputed    ✓ Disputed    ____ Undisputed But Objected To

570.  At the time of his evaluation of Mr. Hammer for criminal responsibility, Dr. Wolfson had not ever seen or treated a case of DID.

____ Undisputed    ✓ Disputed    ____ Undisputed But Objected To

571.  At the time of his evaluation of Mr. Hammer for criminal responsibility, Dr. Wolfson had been trained in DID for only 45 minutes.

____ Undisputed    ✓ Disputed    ____ Undisputed But Objected To

572.  Dr. Wolfson's evaluation of Mr. Hammer for the presence of DID constituted an ethical breach because Dr. Mitchell did not believe that DID was a legitimate disease entity.

____ Undisputed    ✓ Disputed    ____ Undisputed But Objected To

573.  Dr. Karten was not properly qualified or trained to render an opinion

119

about Mr. Hammer and DID.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

## XIV.        Neil Blumberg, M.D.

574.    Petitioner presented the testimony of Neil Blumberg, M.D., a Board Certified forensic psychiatrist with extensive experience in forensic evaluations in capital cases and in cases involving competency and criminal responsibility.

__✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

575.    Dr. Blumberg is a Fellow in the American Psychiatric Association, a member of the American Academy of Psychiatry and the Law and has been a clinical assistant professor of psychiatry since 1981 at the University of Maryland School of Medicine, Department of Psychiatry.

__✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

576.    Dr. Blumberg has participated in over five thousand (5000) forensic psychiatric evaluations and has been qualified as an expert in forensic psychiatry in state and federal court on over five hundred (500) occasions.  In capital prosecutions, he has testified for both the state, the United States Attorney and the defense.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

577.    Dr. Blumberg has participated in the forensic psychiatric evaluation

of over one hundred and forty (140) capital defendants and has testified as an expert in approximately thirty to thirty five capital cases.

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

578.    Dr. Blumberg conducted a forensic psychiatric evaluation of Mr. Hammer on October 21, 2004, at the United States Penitentiary in Lewisburg, Pennsylvania.  His evaluation of Mr. Hammer lasted approximately three hours and thirty five minutes.

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

579.    Dr. Blumberg also reviewed the following documents and records pertaining to Mr. Hammer: trial transcripts, motions transcripts, transcripts of Mr. Hammer's argument in Third Circuit Court of Appeals, Mr. Hammer's Bureau of Prison (BOP) records; BOP psychiatric mental health evaluations; videotape of the interviews conducted by Drs. Matthews and Martell; videotape of the hypnosis session with Drs. Sadoff and Dubin; testimony and report of Jill Miller; records from the Oklahoma Department of Corrections; mental health records predating Mr. Hammer's incarceration; the reports of Drs. Wolfson, Grassian, Gur, Kluft, Gelbort, Martell and Matthews.

___ Undisputed          ___✓ Disputed          ___ Undisputed But Objected To

580.    As a result of his review of the above records and his evaluation of

Mr. Hammer, Dr. Blumberg reached the following diagnoses to a reasonable degree of medical and psychiatric certainty: Post-Traumatic Stress Disorder, Chronic; Borderline Personality Disorder; Antisocial Personality Disorder and Cognitive Disorder, Not Otherwise Specified.

_✓_ Undisputed        ___ Disputed        ___ Undisputed But Objected To

581.   This Court credits Dr. Blumberg's diagnoses of Mr. Hammer as outlined above.

___ Undisputed        _✓_ Disputed        ___ Undisputed But Objected To

582.   Dr. Blumberg testified, and this Court so finds, that the predicate facts supporting his diagnoses of Borderline Personality Disorder and Post-Traumatic Stress Disorder, Chronic, are Mr. Hammer's history of severe childhood trauma, including "physical, verbal, emotional and sexual abuse throughout his childhood."

___ Undisputed        _✓_ Disputed        ___ Undisputed But Objected To

583.   According to Dr. Blumberg, Mr. Hammer's mother, who was his primary abuser, inflicted upon Mr. Hammer "bizarre, torturous types of punishments" that included "giving him an enema with scalding hot waters, at times enemas with Tabasco sauce and other irritants" in order "to burn the evil out of him."

_✓_ Undisputed        ___ Disputed        ___ Undisputed But Objected To

122

584.   The Court credits this aspect of Dr. Blumberg's testimony.

____ Undisputed        _/ Disputed        ___ Undisputed But Objected To

585.   Dr. Blumberg reported, and this Court so finds, that Mr. Hammer's history of sexual abuse dates back to age five years and includes sexual victimization at the hands of a maternal uncle, a maternal cousin, a friend of his uncle's, molestation by his mother and sexual relations with his sister orchestrated and witnessed by his father.

____ Undisputed        _/ Disputed        ___ Undisputed But Objected To

586.   The Court also credits Dr. Blumberg's testimony that this sexual abuse continued throughout Mr. Hammer's childhood and into his teenage years.

____ Undisputed        _/ Disputed        ___ Undisputed But Objected To

587.   Dr. Blumberg opined, and the Court so finds, that because Mr. Hammer's abusers were his parents and family members, the psychiatric trauma he endured as a result of the abuse, was even more severe than if the abuse had been inflicted by a stranger or a non-family member.

____ Undisputed        _/ Disputed        ___ Undisputed But Objected To

588.   Dr. Blumberg testified that Mr. Hammer's family history includes a history of alcoholism, depression, prescription drug abuse, seizures and Attention

Deficit Disorder. Instability was also a family trademark throughout Mr. Hammer's childhood evidenced in part by the fact that he attended twenty-one (21) different schools before dropping out in the tenth grade.

\_\_\_\_ Undisputed        _✓_ Disputed        \_\_\_ Undisputed But Objected To

589. The Court credits this testimony.

\_\_\_\_ Undisputed        _✓_ Disputed        \_\_\_ Undisputed But Objected To

590. Records reviewed by Dr. Blumberg indicate Mr. Hammer first sought mental health treatment in Oklahoma when he was fourteen years old. These records describe Mr. Hammer as tense, nervous, failing school, unable to concentrate and as having been recently sexually abused by an older man. Mr. Hammer also reported that he had attempted suicide by turning on the gas and cutting himself with a razor. Mr. Hammer's parents' failed to heed the advice of the treating psychiatrist, who recommended ongoing therapy. This Court credits this aspect of Dr. Blumberg's testimony.

\_\_\_\_ Undisputed        _✓_ Disputed        \_\_\_ Undisputed But Objected To

591. Records reviewed by Dr. Blumberg also reflect Mr. Hammer received out-patient mental health treatment at age seventeen years and was diagnosed with depressive neurosis and a possible explosive or epileptical personality disorder. He was later hospitalized at Baptist Hospital in Oklahoma as a result of depression,

124

suicidal and homicidal thoughts and impulsive anger. This aspect of Dr.

Blumberg's testimony is also credited by this Court.

__✓__ Undisputed          ___ Disputed          ___ Undisputed But Objected To

592.   Dr. Blumberg also noted, and this Court so finds, that in 1976, Mr.

Hammer was diagnosed as suffering from Borderline Schizophrenia, a diagnosis

that was later reclassified as Borderline Personality Disorder, the diagnosis reached

of Mr. Hammer by both defense and prosecution mental health experts in this case.

__✓__ Undisputed          ___ Disputed          ___ Undisputed But Objected To

593.   By age fourteen, Mr. Hammer was abusing a wide variety of drugs,

including Phencyclidine (PCP), which often causes psychotic symptoms.

__✓__ Undisputed          ___ Disputed          ___ Undisputed But Objected To

594.   Dr. Blumberg noted that Mr. Hammer's drug use continued after his

incarceration in the Oklahoma Department of Corrections, where Mr. Hammer

began abusing Heroin.  According to Dr. Blumberg, Mr. Hammer's use of both

PCP and heroin was a form of self-medication that Mr. Hammer used to cope with

the  overwhelming pain, anxiety and depression resulting from his childhood abuse.

____ Undisputed          __✓__ Disputed          ___ Undisputed But Objected To

595.   Dr. Blumberg testified, and this Court so finds, that childhood victims

of  physical, sexual, verbal and emotional abuse such as that endured by Mr.

125

Hammer can lead to the development of Post-Traumatic Stress Disorder, depression and impairment in character structure or personality, each of which are present in Mr. Hammer.

__✓__ Undisputed          ___ Disputed          ___ Undisputed But Objected To

596.   Dr. Blumberg stated that individuals exposed to the type of trauma endured by Mr. Hammer "may develop Borderline Personality Disorders, even Antisocial Personality Disorder, again, as a coping mechanism to these kinds of traumas and difficulties." The Court also credits this testimony.

____ Undisputed          __✓_ Disputed          ___ Undisputed But Objected To

597.   In describing the sequella of symptoms associated with Post-Traumatic Stress Disorder, Dr. Blumberg testified, and this Court so finds, that "young children who are sexually abused often describe going into a trance-like state to avoid the emotional pain associated with the traumatic event."

____ Undisputed          __✓_ Disputed          ___ Undisputed But Objected To

598.   Dr. Blumberg testified, and this Court so finds, that Mr. Hammer suffers from the following characteristics of Post-Traumatic Stress Disorder, Chronic: he was exposed to numerous traumatic events; his response to these traumatic events included fear, helplessness and horror; he suffers from recurrent and intrusive, distressing recollections of the trauma; he suffers from nightmares;

126

persistent symptoms of increased arousal; sleep disturbance; irritability; difficulty concentrating; hypervigilence and displays both the psychological distress and physical symptoms of anxiety when he thinks about the trauma he endured or is reminded of the abuse.

____ Undisputed        ✓ Disputed        ____ Undisputed But Objected To

599.   Dr. Blumberg testified, and this Court so finds, that Mr. Hammer also suffers from dissociative symptoms that are associated with Post-Traumatic Stress Disorder.

____ Undisputed        ✓ Disputed        ____ Undisputed But Objected To

600.   Dr. Blumberg described this phenomena as "an adaptive coping mechanism" akin to psychological numbing in order to avoid and survive the reliving of the traumatic events. The Court accepts this description.

____ Undisputed        ✓ Disputed        ____ Undisputed But Objected To

601.   Dr. Blumberg added that individuals who suffer from Post-Traumatic Stress Disorder such as Mr. Hammer are more likely to engage in self-destructive behavior and impulsive behavior, particularly when under stress. The Court credits this aspect of Dr. Blumberg's testimony.

____ Undisputed        ✓ Disputed        ____ Undisputed But Objected To

602.   Moreover, the impairments Mr. Hammer suffers as a result of his

Post-Traumatic Stress Disorder, Chronic have a deleterious and profound impact on his judgment.

\_\_\_\_ Undisputed        \_✓ Disputed        \_\_\_ Undisputed But Objected To

603.   Dr. Blumberg also diagnosed, and this Court so finds, that Mr. Hammer suffers from Borderline Personality Disorder.

\_\_\_\_ Undisputed        \_✓ Disputed        \_\_\_ Undisputed But Objected To

604.   Dr. Blumberg defined the essential characteristics of this disorder as follows: "a pervasive pattern of instability of interpersonal relationships, self image and affects and marked impulsivity beginning by early adulthood and present in a variety of contexts." The Court accepts this definition.

\_\_\_\_ Undisputed        \_✓ Disputed        \_\_\_ Undisputed But Objected To

605.   Dr. Blumberg testified, and the Court so finds, that a Borderline Personality Disorder is a debilitating form of mental illness.

\_\_\_\_ Undisputed        \_✓ Disputed        \_\_\_ Undisputed But Objected To

606.   Dr. Blumberg believed, and this Court so finds, that Mr. Hammer is severely debilitated by his Borderline Personality Disorder and his other deficits.

\_\_\_\_ Undisputed        \_✓ Disputed        \_\_\_ Undisputed But Objected To

607.   This Court credits Dr. Blumberg's testimony that the symptoms of Borderline Personality Disorder present in Mr. Hammer include: frantic efforts to

avoid real or imagined abandonment; failure to establish a close nurturing relationship with parental figures; a pattern of unstable and intense interpersonal relationships; identity disturbance; markedly and persistently unstable sense of self; impulsivity in areas that are potentially self-damaging; recurrent suicidal behavior or gestures; affective instability (meaning a dramatic fluctuation in emotions); chronic feelings of emptiness; inappropriate, intense anger; difficulty controlling anger; paranoid thinking and severe dissociative symptoms.

____ Undisputed        ✓ Disputed        ____ Undisputed But Objected To

608.    Dr. Blumberg testified, and this Court so finds, that Mr. Hammer's history of vacillating over whether to appeal or not appeal, and his vacillations over how to proceed with his defense are consistent with his diagnosis of Borderline Personality Disorder.

____ Undisputed        ✓ Disputed        ____ Undisputed But Objected To

609.    Dr. Blumberg noted, and this Court so finds, that individuals who suffer from Borderline Personality Disorder often overreact emotionally to what others would consider to be minor stimuli and that such overreaction can be extreme.  Dr. Blumberg specifically noted that he found this to be true of Mr. Hammer.

____ Undisputed        ✓ Disputed        ____ Undisputed But Objected To

610.  Dr. Blumberg testified, and this Court so finds, that the features of Borderline Personality Disorder present in Mr. Hammer directly impact his decision-making because he is overly reactive to his environment and will often impulsively decide on a course of action that is ultimately self-destructive.

____ Undisputed        _✓_ Disputed        ___ Undisputed But Objected To

611.  Dr. Blumberg described impulsivity as "one of the hallmarks of the Borderline Personality Disorder." Dr. Blumberg expressly stated that he found Mr. Hammer to be impulsive and behave in a manner which undermines his own best interests.  The Court credits this aspect of Dr. Blumberg's testimony.

____ Undisputed        _✓_ Disputed        ___ Undisputed But Objected To

612.  Dr. Blumberg testified, and this Court so finds, that impulsivity "appears to be part of [Mr. Hammer's] impaired decision-making process, both at his trial and in his decision to waive his appeals.

____ Undisputed        _✓_ Disputed        ___ Undisputed But Objected To

613.  Dr. Blumberg testified, and this Court so finds, that another characteristic of Borderline Personality Disorder displayed by Mr. Hammer is that his marked impulsivity worsens when he is under stress.

____ Undisputed        _✓_ Disputed        ___ Undisputed But Objected To

614.   Dr. Blumberg also found that Mr. Hammer suffers from inappropriate and intense anger, which is another recognized characteristic of Borderline Personality Disorder.  This Court credits this testimony.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

615.   Dr. Blumberg testified, and this Court so finds, that there is a synergistic impact between Mr. Hammer's cognitive impairment (brain damage) and the impairments he suffers as a result of his Post-Traumatic Stress Disorder, Chronic, and his Borderline Personality Disorder

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

616.   Dr. Blumberg opined and the Court so finds that the synergistic impact of his various deficits greatly enhances Mr. Hammer's impulsivity, impaired social judgment, disinhibition and significant impairment in behavioral controls.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

617.   Dr. Blumberg testified, and the Court so finds, that Mr. Hammer's mental disorders were exacerbated by his conditions of confinement when he was in isolation and deprived of normal prison stimulation.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

618.   Dr. Blumberg added, and this Court so finds, that the combination of Mr. Hammer's cognitive impairment and mental disorders impairs his ability to

make rational judgments because "it basically short circuits the ability to look before you leap."

____ Undisputed      ✓ Disputed      ___ Undisputed But Objected To

619.   Dr. Blumberg testified, and this Court so finds, that Mr. Hammer currently manifests active symptoms of both Post-Traumatic Stress Disorder, Chronic, and Borderline Personality Disorder, and he did so during the trial and post trial proceedings before this Court.

____ Undisputed      ✓ Disputed      ___ Undisputed But Objected To

620.   Dr. Blumberg also told this Court that during the course of his evaluation of Mr. Hammer and through his review of the various records and documentation pertaining to Mr. Hammer, he saw evidence supporting a diagnosis of Dissociative Identity Disorder.

____ Undisputed      ✓ Disputed      ___ Undisputed But Objected To

621.   According to Dr. Blumberg, his diagnoses of Post-Traumatic Stress Disorder, Chronic, and Borderline Personality Disorder are wholly consistent with the diagnosis of Dissociative Identity Disorder in that "all of these disorders are caused by severe trauma, abuse and neglect...[and] all of them have dissociative features as part of the diagnostic criteria." The Court credits this aspect of Dr. Blumberg's testimony.

132

____ Undisputed        √ Disputed        ___ Undisputed But Objected To

622. Dr. Blumberg found, and this Court so finds, that Mr. Hammer suffers from a severe identity disturbance and that individuals who suffer from a Borderline Personality Disorder often suffer "severe dissociative symptoms and even transient psychotic symptoms under great stress."

____ Undisputed        √ Disputed        ___ Undisputed But Objected To

623. Dr. Blumberg concluded, and this Court so finds, that Mr. Hammer's "character structure was irrevocably damaged by the severe trauma he sustained during his childhood and adolescence."

____ Undisputed        √ Disputed        ___ Undisputed But Objected To

624. Dr. Blumberg concluded, and this Court so finds, that at the time Mr. Hammer waived his right to stand trial and entered his plea of guilty, his ability to think in a rational and self-protective manner and that his capacity to make a reasoned and rational decision about whether to pursue further appeals in his case was significantly impaired.

____ Undisputed        √ Disputed        ___ Undisputed But Objected To

625. Dr. Blumberg testified, and this Court so finds, that at the time Mr. Hammer waived his right to stand trial and entered a plea of guilty, he was experiencing severe emotional distress as a result of an exacerbation of his Post-

Traumatic Stress Disorder, Chronic, and Borderline Personality Disorder, each

caused by the stress of the trial, focused as it was on Mr. Hammer's history of

abuse, and his mental health deficits.

____ Undisputed    ✓ Disputed    ___ Undisputed But Objected To

626.    The cumulative stress of hearing testimony concerning the severe

abuse he sustained during his childhood and adolescence caused him to re-

experience those traumatic events.

____ Undisputed    ✓ Disputed    ___ Undisputed But Objected To

627.    Dr. Blumberg also concluded, and this Court so finds, that "when

faced with the possibility that he would be labeled mentally ill and committed to

the Federal Medical Center in Springfield, Mr. Hammer was psychologically

overwhelmed, leading to his impulsive decision to plead guilty and abandon his

defense."

____ Undisputed    ✓ Disputed    ___ Undisputed But Objected To

628.    Dr. Blumberg also concluded, and this Court so finds, that at the time

of his waiver and entry of his guilty plea, Mr. Hammer was under extreme

emotional distress causing his judgment to be seriously impaired.

____ Undisputed    ✓ Disputed    ___ Undisputed But Objected To

629.    Dr. Blumberg also testified, and this Court so finds, that Dr. Mitchell's

written observations of Mr. Hammer around the time he entered his plea of guilty support the conclusion that Mr. Hammer was under increased stress and pressure and became "severely distraught by listening to the testimony about him" and that he became "psychologically overwhelmed" and led to his experiencing "a whole host of PTSD (Post-Traumatic Stress Disorder) symptoms" which impaired his judgment.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

630.   Dr. Blumberg testified, and this Court finds, that the combination of the diagnoses and the particular stressors Mr. Hammer was suffering at the time of his waiver and plea of guilty rendered him incompetent to assist in his defense at that time.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

631.   Dr. Blumberg testified that Mr. Hammer was not competent to enter a knowing, intelligent and voluntary guilty plea.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

632.   The Court accepts this testimony.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

633.   Dr. Blumberg testified that Mr. Hammer was not competent to make

a knowing, intelligent and voluntary waiver of his post-trial rights or his direct appeal.

_√_ Undisputed        ___ Disputed        ___ Undisputed But Objected To

634.   The court accepts this testimony.

___ Undisputed        _√_ Disputed        ___ Undisputed But Objected To

## XVI.        Randy D. Vanderschaaff

635.   In June, 1972 Mr. Randy D. Vanderschaaf became employed as a Deputy Sheriff with the Chataqua County Sheriff's Department in Chataqua, New York.

_√_ Undisputed        ___ Disputed        ___ Undisputed But Objected To

636.   In August, 1985 his rank changed to that of Criminal Investigator.

_√_ Undisputed        ___ Disputed        ___ Undisputed But Objected To

637.   As a criminal investigator his duties included the investigation of serious crimes such as homicides, rapes and robberies that took place in Chataqua County.

_√_ Undisputed        ___ Disputed        ___ Undisputed But Objected To

638.   On December 6, 1983 a female body was discovered in Chataqua County, New York.

_√_ Undisputed        ___ Disputed        ___ Undisputed But Objected To

639. The female had been shot several times.

___✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

640. In August, 1985 Investigator Vanderschaaf was assigned as the lead investigator to oversee the investigation of this "Jane Doe" homicide case.

___ / Undisputed        ___ Disputed        ___ Undisputed But Objected To

641. The case was labeled "Jane Doe" because the victim was unidentified.

___✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

642. Jane Doe's body was discovered in the eastbound section of then Route 17, now Interstate 86, in the southern part of Chataqua County.

___✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

643. Investigator Vanderschaaf made extensive efforts to identify the body including publishing the story in numerous publications and airing it on television.

___✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

644. An article concerning the Jane Doe investigation was published in True Detective Magazine which is circulated in the United States.

___✓ Undisputed

645. On July 1, 1988 – after the story had appeared in True Detective Magazine – Investigator Vanderschaaf received a letter from Petitioner, David Paul Hammer.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

646.  In this letter Mr. Hammer confessed to the Jane Doe murder.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

647.  After receiving the letter from Hammer, Investigator Vanderschaaf conducted a telephone interview with Mr. Hammer who was incarcerated at that time in the Oklahoma State Penitentiary.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

648.  In this telephone interview Mr. Hammer again confessed to the Jane Doe murder.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

649.  As a result of the letter and the telephone interview, Investigator Vanderschaaf and his partner Lieutenant Dale VanBlack traveled to Oklahoma State Penitentiary to interview Mr. Hammer.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

650.  During this interview Mr. Hammer again confessed to the Jane Doe homicide.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

651.  During the interview Mr. Hammer was shown the picture of Jane Doe that had appeared in the True Detective Magazine.

138

___✓___ Undisputed          ___ Disputed          ___ Undisputed But Objected To

652.  The picture of Jane Doe that appeared in the True Detective Magazine had been retouched.

___✓___ Undisputed          ___ Disputed          ___ Undisputed But Objected To

653.  Mr. Hammer identified this picture as being that of Jane Doe.

___✓___ Undisputed          ___ Disputed          ___ Undisputed But Objected To

654.  Mr. Hammer was then shown an untouched picture of Jane Doe and was asked if that was also the victim Jane Doe whom he had killed.

___✓___ Undisputed          ___ Disputed          ___ Undisputed But Objected To

655.  Mr. Hammer looked at both pictures for five minutes and then said the untouched picture was not Jane Doe.

_____ Undisputed          ___✓___ Disputed          ___ Undisputed But Objected To

656.  At that point in the interview his demeanor changed dramatically.

_____ Undisputed          ___✓___ Disputed          ___ Undisputed But Objected To

657.  Mr. Hammer then proceeded to inaccurately describe: the geographical location where the body had been dumped, the terrain of the area where the body had been dumped, the proximity of the gun to the victim's wounds and the number of shots fired.

_____ Undisputed          ___✓___ Disputed          ___ Undisputed But Objected To

658. At the conclusion of the interview Mr. Hammer was not arrested because both Investigator Vanderschaaf and his partner, Lieutenant VanBlack, concluded that Mr. Hammer was lying when he had confessed to this murder.

_√_ Undisputed        ___ Disputed        ___ Undisputed But Objected To

659. During this interview Mr. Hammer also admitted to killing a male associate by the name of "Mark."

_√_ Undisputed        ___ Disputed        ___ Undisputed But Objected To

660. Investigator Vanderschaaf contacted the Hagerstown, Maryland police who advised him that no such male victim existed and no such case existed.

_√_ Undisputed        ___ Disputed        ___ Undisputed But Objected To

661. While in Oklahoma, Investigator Vanderschaaf received information from the Oklahoma prison personnel that Mr. Hammer was a con artist.

_√_ Undisputed        ___ Disputed        ___ Undisputed But Objected To

662. On April 13, 1999 Investigator Vanderschaaf received a second letter from Mr. Hammer.

_√_ Undisputed        ___ Disputed        ___ Undisputed But Objected To

663. In this letter Mr. Hammer again confessed to the Jane Doe murder.

_√_ Undisputed        ___ Disputed        ___ Undisputed But Objected To

664. In this letter Mr. Hammer also admitted to the murder of the male

associate but this time he called him by the name of "Ronnie" instead of "Mark."

_√_ Undisputed          ___ Disputed          ___ Undisputed But Objected To

665.  Mr. Hammer was not arrested in 1999 for the murders of Jane Doe or Ronnie/Mark because Investigator Vanderschaaf concluded that he was again lying.

_√_ Undisputed          ___ Disputed          ___ Undisputed But Objected To

666.  Mr. Vanderschaaf retired from the Chataqua County Sheriff's Department on September 29, 2004.

_√_ Undisputed          ___ Disputed          ___ Undisputed But Objected To

667.  Mr. Hammer has never been charged with the murders of Jane Doe or Ronnie/Mark.

_√_ Undisputed          ___ Disputed          ___ Undisputed But Objected To

668.  Former Detective Vanderschaaf has concluded that Mr. Hammer did not commit either of these murders.

_√_ Undisputed          ___ Disputed          ___ Undisputed But Objected To

## XVII.    Rodney W. Archambault

669.  Rodney W. Archambault is presently incarcerated in the United States Penitentiary at Florence, Colorado and is scheduled to be released in the year 2012.

~~Undisputed~~          _√_ Disputed          ___ Undisputed But Objected To

670.  Mr. Archambault was convicted for using the mail to file fraudulent tax returns and was sentenced to twenty-five years in federal prison.

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

671.  Mr. Archambault was incarcerated at the United States Penitentiary at Allenwood ("USPA") from January, 1995 to October, 1995.

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

672.  While incarcerated at USPA, Mr. Achambault shared a cell for approximately four weeks with the decedent in this case, Andrew Marti.

___ Undisputed          ___✓ Disputed          ___ Undisputed But Objected To

673.  While they were cell mates Mr. Archambault and Mr. Marti had sexual relations during which Mr. Archambault performed oral sex on Mr. Marti.

___ Undisputed          ___✓ Disputed          ___ Undisputed But Objected To

674.  Mr. Marti could not have an orgasm while he and Mr. Archambault were having sexual relations.

___ Undisputed          ___✓ Disputed          ___ Undisputed But Objected To

675.  Mr. Marti told Mr. Archambault that he could reach an orgasm by masturbating after they had engaged in sexual relations.

___ Undisputed          ___✓ Disputed          ___ Undisputed But Objected To

676.  Mr. Archambault observed Mr. Marti masturbating after they had

engaged in sexual relations.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

677.   While Archambault and  Marti were cell mates, Marti used ropes suspended from Archambault's bunk to control his breathing while masturbating.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

678.   Mr. Marti made these ropes by tearing up sheets.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

679.   Mr. Archambault could hear Mr. Marti gasping while he (Marti) used the ropes and his breathing was irregular while he masturbated.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

680.   When Marti reached a climax he needed a great deal of air.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

681.   Mr. Achambault was aware that prisoners sometimes cut off the fingers of rubber gloves and use them as condoms.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

682.   Mr. Archambault was told by a prisoner by the name of Mike Faver that Mr. Hammer had been charged with murder and that the incident involved rough sex.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

143

683.  Mr. Archambault was never contacted by attorneys Ronald Travis or David Rhunke or any investigator on their behalf.

____ Undisputed        _✓ Disputed        ___ Undisputed But Objected To

684.  Had Mr. Archambault been contacted by attorneys Travis or Rhunke or their investigator he would have related the above facts, and would have testified at trial.

____ Undisputed        _✓ Disputed        ___ Undisputed But Objected To

## XVIII.    **Terry D. Sittig**

685.  Terry Sittig is presently incarcerated in the Stringtown Correctional Facility in Stringtown, Oklahoma, serving a sentence of life imprisonment.

_✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

686.  Mr. Sittig was convicted of the June, 1985 murders of Carl Singer and Bobby Joe Bickham.

_✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

687.  These murders took place in the City of Enid in Norfolk County, Oklahoma.

_✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

688.  Mr. Sittig was arrested two months after the murders and pursuant to a plea agreement pled guilty to two counts of murder .

144

___✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

689.  Mr. Sittig's friend Ricky Don Blackmon was also involved in these murders.

___✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

690.  Mr. Sittig testified as a prosecution witness against Ricky Don Blackmon at the penalty phase of Mr. Blackmon's trial.

___✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

691.  Mr. Sittig testified that Ricky Don Blackmon took part in these murders of Singer and Bickham and that no one else besides himself and Mr. Blackmon were involved.

___✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

692.  Mr. Blackmon received the death penalty and was executed.

___✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

693.  Mr. Sittig testified as part of a cooperation agreement with the prosecutor, the terms of which resulted in him not being sentenced to death.

___ Undisputed        ___ Disputed        ___ Undisputed But Objected To

694.  Mr. Sittig does not know David Hammer

___✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

695.  Mr. Sittig never met David Hammer.

__✓__ Undisputed        ___ Disputed        ___ Undisputed But Objected To

696.  This Court finds that David Hammer was not involved in the killings of Carl Singer and/or Bobby Joe Bickham.

__✓__ Undisputed        ___ Disputed        ___ Undisputed But Objected To

697.  The murders of Carl Singer and Bobby Joe Bickham received coverage in the newspapers.

__✓__ Undisputed        ___ Disputed        ___ Undisputed But Objected To

698.  Mr. Hammer was quoted in a newspaper article to have stated that Mr. Sittig was not involved in the murders of Mr. Singer or Mr. Bickham.

__✓__ Undisputed        ___ Disputed        ___ Undisputed But Objected To

699.  Mr. Sittig testified and this Court finds that Mr. Hammer's statement in the newspaper that Terry Sittig had nothing to do with the murders of Carl Singer and Bobby Joe Bickham  not true.

__✓__ Undisputed        ___ Disputed        ___ Undisputed But Objected To

700.  Mr. Sittig was never contacted by attorneys Ron Travis or David Rhunke or any investigator on their behalf.

___ Undisputed        __✓__ Disputed        ___ Undisputed But Objected To

701.  Had Mr. Sittig been contacted by these individuals and been asked to testify at Mr. Hammer's trial he would have done so consistently with his testimony

before this Court.

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

## XIX.          Werner U. Spitz, M.D.

702.  Dr. Werner Spitz is a medical doctor and board certified forensic

pathologist.

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

703.  Dr. Spitz received his medical degree in 1953 from Hebrew

University, Hadassah Medical School in Jerusalem.

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

704.  Dr. Spitz was board certified by the American Board of Pathology in

anatomic pathology in 1961 and was board certified by the American Board of

Pathology in forensic pathology in 1965.

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

705.  Dr. Spitz worked as a medical examiner for the Office of the Chief

Medical Examiner for the state of Maryland from 1959 to 1961.

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

706.  Dr. Spitz served as the Deputy Chief Medical Examiner for the state of

Maryland for approximately six years.

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

147

707.   In 1972 Dr. Spitz left the position as Maryland's Deputy Chief Medical Examiner to become the Chief Medical Examiner for the County of Wayne (Detroit), Michigan.

__√__ Undisputed          ___ Disputed          ___ Undisputed But Objected To

708.   Dr. Spitz held the position as Chief Medical Examiner for Wayne County until October, 1988.

__√__ Undisputed          ___ Disputed          ___ Undisputed But Objected To

709.   Dr. Spitz also served as the medical examiner for Macomb County, Michigan until September, 2004 when he retired.

__√__ Undisputed          ___ Disputed          ___ Undisputed But Objected To

710.   During the course of his career Dr. Spitz has either performed or supervised approximately 55,000 to 60,000 autopsies.

__√__ Undisputed          ___ Disputed          ___ Undisputed But Objected To

711.   Dr. Spitz has held several faculty positions in the area of forensic pathology.

__√__ Undisputed          ___ Disputed          ___ Undisputed But Objected To

712.   Dr. Spitz was an associate professor, teaching forensic pathology, at the University of Maryland School of Medicine in Baltimore and at the Johns Hopkins University.

__✓__ Undisputed        ___ Disputed        ___ Undisputed But Objected To

713.   Dr. Spitz was also an associate professor, teaching forensic pathology, at Wayne State University School of Medicine.

__✓__ Undisputed        ___ Disputed        ___ Undisputed But Objected To

714.   Dr. Spitz is a member of the National Association of Medical Examiners and a fellow of the American Academy of Forensic Sciences.

__✓__ Undisputed        ___ Disputed        ___ Undisputed But Objected To

715.   Dr. Spitz served on the committee of the American Academy of Forensic Sciences that is presently updating the guidelines for the practice of forensic pathology in the United States.

__✓__ Undisputed        ___ Disputed        ___ Undisputed But Objected To

716.   Dr. Spitz is also a fellow of the Detroit Academy of Medicine.

__✓__ Undisputed        ___ Disputed        ___ Undisputed But Objected To

717.   Dr. Spitz has lectured for the Federal Bureau of Investigation ("FBI") and the New York Police Department in the area of forensic pathology.

__✓__ Undisputed        ___ Disputed        ___ Undisputed But Objected To

718.   Dr. Spitz teaches an annual course in Detroit, Michigan attended by some 300 FBI agents, police investigators, detectives and laboratory personnel in the area of forensic pathology.

149

__✓__ Undisputed    ___ Disputed    ___ Undisputed But Objected To

719. Dr. Spitz has also lectured and continues to give lectures to coroners and medical examiners in the area of forensic pathology.

__✓__ Undisputed

720. Dr. Spitz has published approximately 94 articles and papers in peer reviewed journals in the area of forensic pathology.

__✓__ Undisputed    ___ Disputed    ___ Undisputed But Objected To

721. Dr. Spitz authored and edited the textbook Medicolegal Investigation of Death: Guidelines for the Application of Pathology to Crime Investigation, Third Edition.

__✓__ Undisputed    ___ Disputed    ___ Undisputed But Objected To

722. This textbook is the largest English language textbook on the topic of forensic pathology and is used in medical schools and police academies.

___ Undisputed    __✓__ Disputed    ___ Undisputed But Objected To

723. This textbook is a leading reference work in the field of forensic pathology.

__✓__ Undisputed    ___ Disputed    ___ Undisputed But Objected To

724. Dr. Spitz personally authored the chapter of this treatise titled "Asphyxia" as well as the sub-chapter titled "Sex-Associated Asphyxia."

150

___ Undisputed          ✓ Disputed          ___ Undisputed But Objected To

725.   Dr. Spitz has testified as an expert witness in the area of forensic pathology in state and federal court in both civil and criminal proceedings innumerable times.

✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

726.   Dr. Spitz has testified as an expert more often for the prosecution than the defense.

___ Undisputed          ___ Disputed          ✓ Undisputed But Objected To

727.   Dr. Spitz has also testified as an expert in the area of forensic pathology before Congress pursuant to hearings investigating the assassinations of President John F. Kennedy and the Reverend Martin Luther King, Jr.

✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

728.   Dr. Spitz has never been found unqualified to testify as an expert in any court.

✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

729.   Dr. Spitz testified on behalf of the plaintiffs in the O.J. Simpson civil trial.

✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

730.   Dr. Spitz assisted the City of Boulder Colorado Police Department in

151

the infamous Jon Bennet Ramsey murder investigation.

__✓__ Undisputed          ___ Disputed          ___ Undisputed But Objected To

731.   Dr. Spitz testified for the prosecution in the Robert Chambers case in

New York known as the "preppie murder" case.

__✓__ Undisputed          ___ Disputed          ___ Undisputed But Objected To

732.   In the Robert Chambers case the defense asserted a defense of

accidental choking due to rough sex.

___ Undisputed          __✓__ Disputed          ___ Undisputed But Objected To

733.   Dr. Spitz has personally handled cases where the death was caused by

sexual or erotic asphyxia and has been to numerous scenes where the death was due

to erotic asphyxia.

___ Undisputed          __✓__ Disputed          ___ Undisputed But Objected To

734.   This Court found Dr. Spitz qualified to testify as an expert in the field

of forensic pathology.

__✓__ Undisputed          ___ Disputed          ___ Undisputed But Objected To

735.   Dr. Spitz reviewed the many documents and materials related to the

death of Andrew Marti, including:  autopsy photographs, medical report of the

physician's assistant Muhammed Chaudri, the trial testimony of Mr. Chaudri, the

Bode Laboratory Report, the expert report of Dr. Saralee Funke, the autopsy report

152

prepared by Dr. Funke, the trial testimony of Dr. Funke, the video tape of cell 103 and the photographs of Mr. Hammer taken shortly after the incident.

__✓ Undisputed      ___ Disputed      ___ Undisputed But Objected To

736.  Dr. Spitz testified and this Court so finds that Andrew Marti died of ligature strangulation.

__✓ Undisputed      ___ Disputed      ___ Undisputed But Objected To

737.  Dr. Spitz testified and this Court so finds that Andrew Marti died of ligature strangulation incurred during a sexual experience in which a harness like ligature was pulled from the back.

___ Undisputed      __✓ Disputed      ___ Undisputed But Objected To

738.  Dr. Spitz testified and this Court so finds that the pressure of the ligature was applied in an interrupted way and never was never applied as tight as possible.

___ Undisputed      __✓ Disputed      ___ Undisputed But Objected To

739.  Dr. Spitz testified and this Court so finds that Dr. Funke's autopsy report noted the presence of innumerable petechiael hemorrhages in the capillaries of the heart, the lungs, the upper eyelids, the lower eyelids, the whites of the eyes and the cheeks of Andrew Marti.

__✓ Undisputed      ___ Disputed      ___ Undisputed But Objected To

153

740.   Dr. Spitz testified and this Court so finds that the petechiael hemorrhages indicate that intermediate pressure was applied to the neck sufficient to cut off the venous flow of blood draining from the head but insufficient to block the arterial flow of blood to the head.

__✓_ Undisputed          ___ Disputed          ___ Undisputed But Objected To

741.   Dr. Spitz testified and this Court so finds that an artery is much thicker than a vein and therefore a vein is much easier to compress.

__✓_ Undisputed          ___ Disputed          ___ Undisputed But Objected To

742.   Dr. Spitz testified and this Court so finds that the presence of petechia indicates that the heart was still able to pump blood into the head but due to the obstruction of the veins the blood was unable to drain.  This caused hemorrhaging of the smallest of veins (capillaries) resulting in the observed petechia.

____ Undisputed          _✓_ Disputed          ___ Undisputed But Objected To

743.   This Court finds that the presence of the petechia shows that the pressure on Mr. Marti's neck was never as strong as it could have been.

____ Undisputed          _✓_ Disputed          ___ Undisputed But Objected To

744.   This Court finds that the presence of the petechia shows that the pressure on Mr. Marti's neck was interrupted.

____ Undisputed          _✓_ Disputed          ___ Undisputed But Objected To

745. Dr. Spitz testified and this Court so finds that the presence of petechiael hemorrhages indicates that the pressure applied to the neck was of moderate force sufficient to block the veins but not sufficient to block the arteries.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

746. Dr. Spitz testified and this Court so finds that the presence of petechia is consistent with erotic asphyxiation since the goal of erotic asphyxiation is to diminish, but not eliminate, the flow of oxygen and carbon dioxide in the brain.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

747. The only way to accomplish the goal of erotic asphyxiation, without causing death, is by applying moderate pressure.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

748. Dr. Spitz testified and this Court so finds that when cutting off blood flow to the head the time between consciousness and unconsciousness is brief (e.g. as little as 15 seconds).

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

749. Dr. Spitz testified and this Court so finds that in cases of accidental death due to erotic asphyxia the death occurs as result of the pressure being applied for too long.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

750.   Dr. Spitz testified and this Court so finds that almost all cases of erotic asphyxia involve males.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

751.   Dr. Spitz testified and this Court so finds that erotic asphyxia does not involve the cutting off of, or compression of, the air passages but instead involves controlling the amount of oxygen being supplied to the brain by the blood.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

752.   Dr. Spitz testified and this Court so finds that Dr. Funke's autopsy report describes abrasions to the exterior front of the neck which are consistent with a ligature being applied to the neck in a harness like fashion with the ends of the ligature held open on both the left and right sides.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

753.   Dr. Spitz testified and this Court so finds that Dr. Funke's autopsy report describes hemorrhages under the abrasions on the front of the neck.

__✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

754.   Dr. Spitz testified and this Court so finds that Dr. Funke's autopsy report describes no injury to Andrew Marti's airways.

__✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

755.   Dr. Spitz testified and this Court so finds that the hemorrhages to the

156

neck under the abrasions to the front of the neck and the lack of any injury to the airways is also consistent with the application of moderate force which is consistent with erotic asphyxia.

___ Undisputed    ✓ Disputed    ___ Undisputed But Objected To

756.   Dr. Spitz testified and this Court so finds that the autopsy photographs clearly show the presence of innumerable petechia.

✓ Undisputed    ___ Disputed    ___ Undisputed But Objected To

757.   Dr. Spitz testified and this Court so finds that the report of Mr. Chaudri describes the presence of bloody froth in the upper airway and mouth of Andrew Marti.

✓ Undisputed    ___ Disputed    ___ Undisputed But Objected To

758.   Dr. Spitz testified and this Court so finds that the presence of bloody froth in the upper airway and mouth of the decedent indicates the airway was open and the decedent was breathing in a manner consistent with erotic asphyxia.

___ Undisputed    ✓ Disputed    ___ Undisputed But Objected To

759.   Dr. Spitz testified and this Court so finds that Dr. Funke's autopsy described no trauma whatsoever – exterior or interior – to the back of Mr. Marti's neck.

___ Undisputed    ✓ Disputed    ___ Undisputed But Objected To

760.  Dr. Spitz testified and this Court so finds that the complete absence of any sign of trauma to the back of Andrew Marti's neck is consistent with a ligature being applied to the front of the neck, from the back, in a harness like fashion with the ends of the ligature held open in the back on both the left and right sides .

____ Undisputed        _√_ Disputed        ___ Undisputed But Objected To

761.  Dr. Spitz testified and this Court so finds that when a sleeper hold is properly applied, the neck is held in the crook of the arm such that the airway is in the hollow of the crook and breathing continues.  The forearm presses on one side of the neck compressing the blood vessels and the arm on the other side of the neck compresses the blood vessels so that the individual goes to sleep when such pressure is exerted.

____ Undisputed        _√_ Disputed        ___ Undisputed But Objected To

762.  Dr. Spitz testified and this Court so finds that a person in a sleeper hold will not experience a choking sensation and the body will not jerk violently.

____ Undisputed        _√_ Disputed        ___ Undisputed But Objected To

763.  Dr. Spitz testified and this Court so finds that a choke hold or bar arm consists of the forearm of the restrainer being pressed against the airway with force being applied by the other arm.  This hold involves choking and the person will jerk violently because he cannot breath.

____ Undisputed    ✓ Disputed    ____ Undisputed But Objected To

764.   Dr. Spitz testified and this Court so finds that there is no pathological manifestations to support Mr. Hammer's statement to the FBI on the night of the death of Andrew Marti that he wrapped the ligature around Mart's neck and pulled tightly in opposite directions for three or four minutes.

____ Undisputed    ✓ Disputed    ____ Undisputed But Objected To

765.   Dr. Spitz testified and this Court so finds there was no sign of trauma at all to the back of Mr. Marti's neck.

____✓ Undisputed    ____ Disputed    ____ Undisputed But Objected To

766.   Dr. Spitz testified and this Court so finds that one would expect to see trauma in the back of the neck if one were strangled in the manner in which Mr. Hammer stated he killed Mr. Marti in his statement to the FBI on the day of Mr. Marti's death.

____ Undisputed    ✓ Disputed    ____ Undisputed But Objected To

767.   If Mr. Hammer's statement to the FBI regarding the manner in which he choked Mr. Marti were true, one would expect to find trauma in the back of the neck, which is where he claims the ligature overlapped or crossed over when it was pulled in opposite directions.

____ Undisputed    ✓ Disputed    ____ Undisputed But Objected To

768.   Dr. Spitz testified and this Court so finds that there is no evidence to suggest the lack of trauma to Mr. Marti's neck is explained by the link chain that Mr. Marti was wearing at the time of his death.

\_\_\_\_ Undisputed         \_√\_ Disputed         \_\_\_ Undisputed But Objected To

769.   Dr. Spitz testified and this Court finds that the link chain cannot explain the lack of trauma because even if it got in between Mr. Marti's neck and the ligature, it still would have resulted in trauma marks.

\_\_\_\_ Undisputed         \_√\_ Disputed         \_\_\_ Undisputed But Objected To

770.   Dr. Spitz testified to a reasonable degree of scientific certainty and this Court so finds that Andrew Marti's death was the result of erotic asphyxiation.

\_\_\_\_ Undisputed         \_√\_ Disputed         \_\_\_ Undisputed But Objected To

771.   Dr. Spitz testified and this Court finds that sexual asphyxia death scenes usually involve bizarre and unusual circumstances.

\_√\_ Undisputed         \_\_\_ Disputed         \_\_\_ Undisputed But Objected To

772.   Dr. Spitz testified and this Court finds that in sexual asphyxia deaths sometimes sperm is present and sometimes it is not.

\_√\_ Undisputed         \_\_\_ Disputed         \_\_\_ Undisputed But Objected To

773.   Dr. Spitz read from his treatise *Medicolegal Investigation of Death,* Third Edition, and this Court finds that in sexual asphyxia deaths "The victim may

be found . . . strangled . . . [and] binding the extremities, tying the wrists or handcuffing are frequent and may be suggestive of bondage."

\_\_\_\_ Undisputed        ✓ Disputed        \_\_\_ Undisputed But Objected To

774.   Dr. Spitz read from his treatise *Medicolegal Investigation of Death,* Third Edition, and this Court finds that in sexual asphyxia deaths "Contrary to expectation, the genitalia are not necessarily exposed.  Frequently the body is clothed.  There is usually no suggestion of masturbation.  . . . .  Within the victim's view may be pornographic pictures . . ."

\_\_\_\_ Undisputed        ✓ Disputed        \_\_\_ Undisputed But Objected To

775.   Dr. Spitz testified and this Court finds that within a foot or two of where Mr. Marti's head was discovered was a shower wall covered with pornographic pictures.

\_\_\_\_ Undisputed        ✓ Disputed        \_\_\_ Undisputed But Objected To

776.   Dr. Spitz testified and this Court finds that in sexual asphyxia deaths since the death scenes are so diverse the evidence that distinguishes sexual asphyxia from other types of asphyxia is the slow, prolonged and interrupted application of pressure to the blood flow to the head signified by the presence of innumerable petechia.

\_\_\_\_ Undisputed        ✓ Disputed        \_\_\_ Undisputed But Objected To

161

777.   Dr. Spitz testified and this Court finds that in asphyxia deaths it is common to find bite marks inside the mouth and on the tongue.

\_\_\_\_ Undisputed          ✓ Disputed          \_\_\_ Undisputed But Objected To

Respectfully Submitted,


s/ Michael Wiseman
MICHAEL WISEMAN, ESQUIRE
Supervising Assistant Federal Defender
Attorney ID#PA 75342
Defender Association of Philadelphia
Federal Court Division-Capital Habeas Unit
Suite 545 West – The Curtis Center
Philadelphia, PA 19106
Tel. No. (215)928-0520
(Michael_Wiseman@fd.org)

s/ Anne L. Saunders
ANNE L. SAUNDERS, ESQUIRE
Asst. Federal Public Defender
Attorney ID #PA 48458
100 Chestnut Street, Suite 306
Harrisburg, PA 17101
Tel. No. (717) 782-3843
(Anne_Saunders@fd.org)

Dated:       September 25, 2005
             Philadelphia, PA

162

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | : Crim. No. 4:CR-96-263 |
| | : Civil No. 4:CV-02-510 |
| v. | : |
| | : (Muir, J.) |
| DAVID PAUL HAMMER | : **ELECTRONICALLY FILED** |

## CERTIFICATE OF SERVICE

I hereby certify that I caused a true and correct copy of the foregoing

**PETITIONER'S PROPOSED FINDINGS OF FACT**
**PART II AS ANNOTATED BY FREDERICK E. MARTIN, ESQUIRE**

to be electronically mailed on October __3__, 2005 to:

ADDRESSEE:

Anne L. Saunders, Esquire
Anne_Saunders@fd.org

Michael Wiseman, Esquire
Michael_Wiseman@fd.org

 s/Frederick E. Martin
FREDERICK E. MARTIN
Assistant United States Attorney