# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,

        Respondent,

    v.

DAVID PAUL HAMMER,

        Petitioner.

:
:
:
:
:
:
:
:
:
:
:

Criminal No. 4:CR–96-239

Judge Muir

## PETITIONER'S PROPOSED FINDINGS OF FACT
## PART III[1]

## CONTENTS

| | | |
|---|---|---|
| XX. | David A.Ruhnke, Esq. | 163 |
| XXI. | Robert Sadoff, M.D. | 181 |
| XXII. | Louis Bullock, Esq. | 186 |
| XXIII | Richard P. Kluft, M.D. | 195 |
| XXIV | Martin Hammer | 222 |
| XXV | Mark O'Berg | 226 |
| XXVI | Randy L. White | 231 |

[1]All numbers are sequential and continue from *Petitioner's Proposed Findings of Fact, Part II.*

XXVII        Nicole Weaver . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 235

XXVIII       Donn Troutman . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 237

XXIX         Ronald L. Jury . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 240

XXX          Daniel J. Ellis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 241

XXXI         James K. Wolfson, M.D. . . . . . . . . . . . . . . . . . . . . . . . . . . 245

XXXII        Dr. John Mitchell (Supplemental Findings) . . . . . . . . . . . . . . . . . . 259

XXXIII       Randy Gonzales . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 260

XXXIV        Dr. Phillip Magaletta . . . . . . . . . . . . . . . . . . . . . . . . . . . 262

XXXV         Dr. Kenneth H. Kessler . . . . . . . . . . . . . . . . . . . . . . . . . . 263

XXXVI        Ronald Travis, Esquire (supplemental findings) . . . . . . . . . . . . . 270

XXXVII       Dr. Daryl Matthews . . . . . . . . . . . . . . . . . . . . . . . . . . . . 280

XXXVIII      Dr. Saralee Funke . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 296

XXXIX        Harry Montville . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 308

## XX.  David A. Ruhnke, Esq.

778.  Petitioner presented the testimony of David A. Ruhnke, Esquire, who, along Ronald Travis, Esquire, were appointed by this Court to represent Mr. Hammer during his capital trial commencing June, 1998.

√ Undisputed        ___ Disputed        ___ Undisputed But Objected To

779.  Mr. Runke has been licensed to practice law since 1975 and specializes in criminal law.

√ Undisputed        ___ Disputed        ___ Undisputed But Objected To

780.  Mr. Ruhnke was appointed by this Court to represent Mr. Hammer in the fall of 1996.

√ Undisputed        ___ Disputed        ___ Undisputed But Objected To

781.  Mr. Ruhnke testified that the defense he and Mr. Travis presented to the jury on Mr. Hammer's behalf was an insanity defense predicated on Dr. Sadoff's diagnosis of Mr. Hammer as suffering from Dissociative Identity Disorder.

√ Undisputed        ___ Disputed        ___ Undisputed But Objected To

782.  Mr. Ruhnke testified that he was ordered by this Court to answer a series of twenty-two interrogatories concerning his representation of Mr. Hammer

163

and that his answers to these interrogatories were filed with the Clerk of the Court on the day before he testified in these proceedings.

_✓_ Undisputed        ___ Disputed        ___ Undisputed But Objected To

783.    Mr. Ruhnke testified, and this Court so finds, that the only time he heard from Mr. Hammer a full version of what transpired the night Mr. Marti died was during the hypnosis session conducted of Mr. Hammer by Drs. Sadoff and Dubin.

_✓_ Undisputed        ___ Disputed        ___ Undisputed But Objected To

784.    Mr. Ruhnke further testified that he has no present recollection of having any conversations with Drs. Gelbort, Sadoff and Grassian regarding whether Mr. Hammer suffered from Borderline Personality Disorder or Post-Traumatic Stress Disorder.

_✓_ Undisputed        ___ Disputed        ___ Undisputed But Objected To

785.    Mr. Ruhnke recalls that Mr. Hammer's records indicate that a psychiatrist who treated Mr. Hammer at the United States Penitentiary at Lompac believed Mr. Hammer suffered from Post-Traumatic Stress Disorder and dissociative reactions.

____ Undisputed        _✓_ Disputed        ___ Undisputed But Objected To

786.    Mr. Ruhnke testified, and the Court finds, that at the time Mr.

164

Hammer entered his waiver and guilty plea and at the time he waived his direct appeal, Mr. Ruhnke harbored serious doubts about Mr. Hammer's competency to make a knowing, intelligent and voluntary waiver of his rights, based upon Dr. Sadoff's diagnosis.

____ Undisputed          ✓ Disputed          ___ Undisputed But Objected To

787.   The Court credits Mr. Runke's testimony that "[Mr. Runke] always had a level of doubt about his competency to enter a guilty plea or to waive an appeal based on the whole constellation of information that [Mr. Runke] had about Mr. Hammer's background, the mental health history that started when he was a young boy at the age of fourteen."

____ Undisputed          ✓ Disputed          ___ Undisputed But Objected To

788.   Mr. Ruhnke recalled that Mr. Hammer, at age fourteen, tried to sign himself into a psychiatric clinic "because he felt he was losing his mind"

✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

789.   Mr. Ruhnke credibly and reliably testified that he had "never come across anything like that in [his] experience."

____ Undisputed          ✓ Disputed          ___ Undisputed But Objected To

790.   Mr. Ruhnke also testified that depression was a constant factor in Mr. Hammer's presentation and was present throughout the course of his (Mr.

165

Runke's) representation of Mr. Hammer.

__✓__ Undisputed          ___ Disputed          ___ Undisputed But Objected To

791.   Mr. Ruhnke testified, and the Court finds, that throughout the course of his representation, Mr. Hammer did not present a steady, fluid personality: "I had never knew or never had a full appreciation for what I was going to get from Mr. Hammer on a particular day."

____ Undisputed          ✓ Disputed          ___ Undisputed But Objected To

792.   Mr. Ruhnke credibly and reliably observed a wide spectrum of extreme emotions from Mr. Hammer including "slipping from one emotion into another; anger, tears, depression, resignation."

____ Undisputed          ✓ Disputed          ___ Undisputed But Objected To

793.   Mr. Ruhnke testified and the Court finds that Mr. Hammer's emotional 'lability' was a 'constant' throughout the course of Mr. Runke's representation and "it made discussing issues [with Mr. Hammer] difficult."

____ Undisputed          ✓ Disputed          ___ Undisputed But Objected To

794.   Mr. Ruhnke testified, and the Court finds, that Mr. Hammer's mood swings influenced his decision-making.

____ Undisputed          ✓ Disputed          ___ Undisputed But Objected To

795.   Mr. Ruhnke credibly and reliably testify that Mr. Hammer was

166

impulsive and at times irrational.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

796.  Although Mr. Hammer was diagnosed by Dr. Sadoff as suffering from Dissociative Identity Disorder, and despite the fact that this diagnosis supported Mr. Hammer's insanity defense, Mr. Ruhnke testified that Mr. Hammer never embraced any diagnosis of mental illness and did not want others to perceive him as mentally ill.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

797.  Mr. Ruhnke also credibly testified that as the trial progressed, Mr. Hammer became increasingly concerned about the likelihood of prevailing on his insanity defense.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

798.  The prospect of succeeding on the insanity defense "was discussed between Mr. Hammer and [Mr. Runke] and Mr. Travis."

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

799.  Mr. Hammer would ask counsel during meetings what would happen if he was found not guilty by reason of insanity and expressed concerns that he would be sent to Springfield or back to Oklahoma.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

167

800.  Mr. Hammer sought from counsel guarantees that he would not be sent back to Springfield or returned to Oklahoma if found not guilty by reason of insanity.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

801.  As Mr. Ruhnke credibly and reliably noted: "[I]t sounds a little perverse to say that Mr. Hammer hoped we didn't win.  But for him, he was in jail for the rest of his life anyway.  And he did not want to be labeled mentally ill.  He did not want to go to a hospital, particularly Springfield.  He was particularly opposed to ever winding up in Springfield.  And then he was concerned, scared about being sent back to Oklahoma State Penitentiary because of the experiences he had already had at Oklahoma State Penitentiary."

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

802.  Mr. Ruhnke also testified, and the Court finds, that during the course of his representation of Mr. Hammer, Mr. Runke learned that Mr. Hammer had "different sides" to himself.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

803.  As time went on, Mr. Hammer provided the names of these "different sides" including Jocko, Jasper, Wilbur and Tammy to Mr. Runke.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

168

804.    Mr. Hammer also told Mr. Runke that Jocko was responsible for various statements contained in Mr. Hammer's FBI 302 Statement and that Jocko added certain parts "just to make it worse."

✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

805.    Mr. Ruhnke learned from Mr. Hammer that the aspect of his confession about his dislocated shoulder was the product of Jocko, not Mr. Hammer.

___ Undisputed          ✓ Disputed          ___ Undisputed But Objected To

806.    Mr. Hammer told Mr. Ruhnke that if his shoulder had actually dislocated he would have been in excruciating pain and unable to put it back in by himself.

___ Undisputed          ✓ Disputed          ___ Undisputed But Objected To

807.    Mr. Ruhnke credibly testified that, during the course of his representation of Mr. Hammer, the alter personalities were active on a day-to-day basis.

___ Undisputed          ✓ Disputed          ___ Undisputed But Objected To

808.    As a result of the constant presence of alters, Mr. Ruhnke was concerned about how Mr. Hammer interpreted information and made decisions.

___ Undisputed          ✓ Disputed          ___ Undisputed But Objected To

809. Mr. Ruhnke also testified, and the Court finds, that as the stress of the trial or trial preparations increased, the emergence of Mr. Hammer's alter personalities caused him – Mr. Hammer – great distress.

_____ Undisputed      ✓ Disputed      ___ Undisputed But Objected To

810. Mr. Ruhnke also credibly described a phone conversation with one of Mr. Hammer's alter personalities – Wilbur – during the course of his representation of Mr. Hammer.

_____ Undisputed      ✓ Disputed      ___ Undisputed But Objected To

811. The reliability of Mr. Runke's belief that he held a conversation with Wilbur is further corroborated by Mr. Hammer's inability to recall the conversation.

_____ Undisputed      ✓ Disputed      ___ Undisputed But Objected To

812. During the course of Mr. Ruhnke's testimony, many of his file notes documenting conversations with Mr. Hammer were reviewed.

✓ Undisputed      ___ Disputed      ___ Undisputed But Objected To

813. These notes indicate that Mr. Hammer repeatedly reported to Mr. Ruhnke that his alter personalities, particularly Jocko, were active during the course of his representation of Mr. Hammer, and often caused Mr. Hammer great distress, and made his life "hell."

____ Undisputed        ✓ Disputed        ____ Undisputed But Objected To

814.    Mr. Ruhnke testified that,"The fullest explanation I ever got from David [regarding his vacillations and various desires to waive his rights] is that Jocko wants to take over, that Jocko believed that if he killed David that Jocko would go on and the whole plan was for David to get the death penalty so Jocko could live on."

____ Undisputed        ✓ Disputed        ____ Undisputed But Objected To

815.    Mr. Runke testified and the Court finds that while Mr. Hammer's vacillations over how to proceed with his case stemmed from a wide variety of sources, the explanation given to Mr. Ruhnke by Mr. Hammer indicates Jocko sought to kill Mr. Hammer in order to take over and have full control.

____ Undisputed        ✓ Disputed        ____ Undisputed But Objected To

816.    Mr. Ruhnke also credibly and reliably testified that Mr. Hammer had described for him his experiences at Springfield: Mr. Hammer "really hated Springfield" because it was "dirty, antiquated;" because Hammer "had been physically abused;" because he was unable to sleep as a result of people "screaming all night long;" and, because Mr. Hammer "couldn't sleep . . . couldn't do anything because of the din, the debilitating noise that's part of a prison, at Springfield in particular."

171

___ Undisputed    ✓ Disputed    ___ Undisputed But Objected To

817.    Mr. Ruhnke testified that "the living conditions at Springfield were so detestable to [Mr. Hammer] and so repugnant to him that he would do almost anything to not go back to Springfield."

___ Undisputed    ✓ Disputed    ___ Undisputed But Objected To

818.    Similarly, Mr. Ruhnke testified that Mr. Hammer "was very adamant about what a hell hole, his words, Oklahoma State Penitentiary was...They built a special cell within a cell so that he could have no contact virtually with anybody" and that Mr. Hammer was held under such conditions for a long time.

✓ Undisputed    ___ Disputed    ___ Undisputed But Objected To

819.    In answer to the questions posed to him by this Court, and in response to counsel's questioning during the course of his testimony during the § 2255 proceedings, Mr. Ruhnke testified, and the Court finds, that he did not give any thought to contacting Drs. Sadoff and Gelbort regarding Mr. Hammer's competency to waive trial and plead guilty.

___ Undisputed    ✓ Disputed    ___ Undisputed But Objected To

820.    Referring to the competency proceedings, Mr. Ruhnke credibly and reliably testified that he "gave no thought . . . of calling anybody in to do the evaluation."

172

___ Undisputed        ✓Disputed        ___ Undisputed But Objected To

821.  Mr. Ruhnke also testified, and the Court finds, that his failure to give any thought as to whether to contact Drs. Sadoff, Gelbort and Grassian and seek their participation in the pending competency evaluation was neither tactical nor strategic.

___ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

822.  Mr. Ruhnke testified that he has no recollection of discussing with Mr. Travis whether Mr. Hammer had the capacity to enter a knowing, intelligent and voluntary waiver and guilty plea.

___ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

823.  Mr. Ruhnke testified, and the Court finds, that while he was aware that Mr. Hammer had a history of making false confessions and harbored doubts about the veracity of various aspects of Mr. Hammer's confession in this case, he did not investigate either the history of false confessions, nor did he investigate those areas of Mr. Hammer's confession that Mr. Ruhnke believed were untrue.

___ Undisputed        ✓Disputed        ___ Undisputed But Objected To

824.  Mr. Runke acknowledged, and the Court finds, that pursuing a challenge to the veracity of various aspects of Mr. Hammer's confession in this case would not have conflicted with the insanity defense based upon Dr. Sadoff's

173

diagnosis of Dissociative Identity Disorder.

___ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

825.   Mr. Ruhnke acknowledged, and Court finds, that counsel did not consider attacking the veracity of various aspects of Mr. Hammer's confession and that counsel "never went far enough down that road to have thought about that all the way through."

___ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

826.   Mr. Ruhnke also testified, and the Court finds that, after trial, counsel filed a Freedom of Information Act (FOIA) request seeking information from the Federal Bureau of Prisons for use in a clemency petition.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

827.   On page fifteen of the information received as a result of the FOIA request, Mr. Ruhnke learned for the first time that the Government had information that "on April 9, 1996, Marti requested to move in with Hammer. There was no reported separation concerns between the two inmates and staff moved Marti in with Hammer."

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

828.   Mr. Ruhnke acknowledged that the information outlined in the FOIA document was "certainly inconsistent with what was contained in" Mr. Hammer's

174

302 statement.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

829.   Mr. Ruhnke testified, and the Court finds, that counsel did not have this information prior to, or during, Mr. Hammer's capital trial and sentencing hearing.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

830.   Mr. Runke's testimony is corroborated by Mr. Martin's averment during cross-examination of Mr. Runke that he (Mr. Martin) "would stipulate that we never gave you this document."

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

831.   Mr. Ruhnke testified, and the Court finds, that this information would have been helpful during the guilt-stage of the trial.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

832.   Mr. Ruhnke testified, and the Court finds, that this information would have been helpful during the penalty-phase of the trial.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

833.   Mr. Ruhnke testified that during the course of the penalty phase hearing, the Court acknowledged that its failure to colloquy Mr. Hammer about his insanity defense and what occurred during the video-taped hypnosis session vis-a-

175

vis his plea of guilty was a "grave oversight."

___ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

834.   Mr. Ruhnke credibly and reliably testified that he raised this issue on direct appeal because he believed that the issue of intent had not been adequately covered during the plea colloquy.

___ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

835.   Mr. Ruhnke testified that prior to trial in this case, the defense filed both a discovery request and a request for all Brady evidence in the possession of the Government.

___ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

836.   Despite having filed a Brady request with the Government, Mr. Ruhnke testified, and the Court finds, that at no time during the course of his representation of Mr. Hammer did he ever see or receive the FBI 302 statements from Mr. Johnson (dated June 3, 1998 and December 6, 1996), Mr. Royce Lee Fowler (dated June 3, 1998) and Mr. Gaylon Don Ball (dated June 3, 1998).

___ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

837.   Mr. Ruhnke testified that a seasoned prosecutor would have recognized that the previously undisclosed 302 statements constitute Brady material that must be disclosed to the defense prior to trial.

176

___ Undisputed          ✓ Disputed          ___ Undisputed But Objected To

838.   Mr. Ruhnke testified and the Court finds that the statements of Mr. Johnson, Mr. Fowler and Mr. Ball constitute <u>Brady</u> evidence that should have been disclosed by the Government prior to trial.

___ Undisputed          ✓ Disputed          ___ Undisputed But Objected To

839.   Mr. Ruhnke testified that the suppressed 302 statements of Mr. Johnson, Mr. Fowler and Mr. Ball were material and relevant to Mr. Hammer's guilt phase defense and investigation.

___ Undisputed          ✓ Disputed          ___ Undisputed But Objected To

840.   Mr. Ruhnke testified and the Court finds that the suppressed 302 statements of Mr. Johnson, Mr. Fowler and Mr. Ball were relevant to the penalty phase defense and investigation.

___ Undisputed          ✓ Disputed          ___ Undisputed But Objected To

841.   Mr. Ruhnke testified and the Court finds that these statements were material, relevant and critical to counter the Government's argument concerning substantial preplanning and premeditation during the penalty phase of this case.

___ Undisputed          ✓ Disputed          ___ Undisputed But Objected To

842.   Mr. Ruhnke testified and the Court finds that because the Government failed to disclose the above discussed <u>Brady</u> material, neither Mr.

Ruhnke nor Mr. Travis had the opportunity to discuss with Mr. Hammer the import and relevance of this information to Mr. Hammer's decision whether or not to waive trial and plead guilty.

\_\_\_\_ Undisputed　　　✓ Disputed　　　\_\_\_ Undisputed But Objected To

843. Mr. Ruhnke testified and the Court finds the suppressed statements of Mr. Johnson and the statement of Mr. Fowler would have been critical information to have prior to trial in order to rebut the Government's penalty phase argument concerning substantial premeditation and planning.

\_\_\_\_ Undisputed　　　✓ Disputed　　　\_\_\_ Undisputed But Objected To

844. Mr. Ruhnke also testified and the Court finds that the failure of the Government to disclose to defense counsel the suppressed 302 statements interfered with defense counsel's ability to effectively investigate and contest the Government's argument at penalty phase concerning substantial planning and premeditation.

\_\_\_\_ Undisputed　　　✓ Disputed　　　\_\_\_ Undisputed But Objected To

845. Mr. Ruhnke testified that the Government argued vehemently that there was no consensual sex between Mr. Marti and Mr. Hammer the night of Mr. Marti's death and that the braiding of the ropes demonstrates "substantial planning" because "you have to factor in what time it took to make heavy duty

restraints to keep a six foot four, two hundred pound man in place" (see Notes of Testimony, 7/21/98 at 89), and that the tying of Mr. Marti to the bed was "essential preplanning."

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

846.    Mr. Ruhnke testified that because the Government failed to disclose the evidence regarding Mr. Hammer's history prior to the death of Mr. Marti of using braided bed sheets for sexual activity, the defense was unable to adequately rebut the Government's argument that the use of the braided sheets in this case represented evidence of substantial premeditation, planning and intent.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

847.    Mr. Ruhnke testified that it was particularly concerning that the Government would premise its argument regarding substantial premeditation, planning and intent on the issue of the braided bed sheets while at the same time suppressing evidence in its possession that would have provided Mr. Hammer with pointed evidence contesting this critical element of the Government's burden of proof.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

848.    Mr. Ruhnke testified and the Court finds that the failure of the Government to disclose the suppressed 302 statements materially interfered with

179

defense counsel's ability to adequately conduct their investigation and their ability to prepare and present the best defense available to Mr. Hammer.

____ Undisputed    ✓ Disputed    ___ Undisputed But Objected To

849.   Mr. Ruhnke testified that had he been aware of Mr. Hammer's long-standing history of sexual bondage and sexual practices, he would have investigated the possible defense of erotica asphyxiation and very likely would have presented such evidence to the jury during both the guilt and penalty phases of Mr. Hammer's capital trial.

____ Undisputed    ✓ Disputed    ___ Undisputed But Objected To

850.   Mr. Ruhnke testified and the Court finds that the suppressed 302 statements at issue would have been relevant and material information to provide to Dr. Sadoff and to use in the cross examination of Dr. Wolfson and other Government witnesses.

____ Undisputed    ✓ Disputed    ___ Undisputed But Objected To

851.   Mr. Ruhnke also testified that he believed the evidence contained in the suppressed 302 statements concerning Mr. Hammer's prior history of sexual bondage and prior use of braided sheets for sexual activity while incarcerated in the Special Housing Unit at USP Allenwood would have provided corroborative facts supporting the version of events of the death of Mr. Marti as reported in the

180

Sadoff/Dubin hypnosis videotape.

____ Undisputed    ✓ Disputed    ___ Undisputed But Objected To

852.    Mr. Ruhnke testified that he would have investigated Mr. Fowler's statement concerning Mr. Hammer's revelation a year prior to the offense in this case concerning his history of abuse at the hands of his father.

____ Undisputed    ✓ Disputed    ___ Undisputed But Objected To

853.    Mr. Ruhnke testified that this was important and material evidence he would have wanted to investigate, develop and present in support of the defense and counter the Government's argument that Mr. Hammer's background was not as severe as he reported to Dr. Sadoff.

____ Undisputed    ✓ Disputed    ___ Undisputed But Objected To

## XXI.  Robert Sadoff, M.D.

854.    Dr. Sadoff testified at trial as a defense expert and previously diagnosed Mr. Hammer as suffering from Dissociative Identity Disorder.

✓ Undisputed    ___ Disputed    ___ Undisputed But Objected To

855.    Dr. Sadoff was accepted by this Court as an expert in forensic psychiatry.

✓ Undisputed    ___ Disputed    ___ Undisputed But Objected To

856.    Dr. Sadoff testified that he evaluated Mr. Hammer in December of

181

1996 and that he also reviewed numerous records pertaining to Mr. Hammer that had been provided to him by Mr. Ruhnke and Mr. Travis.

✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

857.   Dr. Sadoff testified, as reflected in his report concerning Mr. Hammer dated September, 1997, that at that time Mr. Hammer was competent to stand trial.

✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

858.   Dr. Sadoff testified, and the Court finds, that competency is a fluid concept and that the fact Mr. Hammer was deemed competent to stand trial by Dr. Sadoff in September of 1997 does not mean Mr. Hammer was competent to waive trial and enter a plea of guilty in June of 1998.

✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

859.   Dr. Sadoff also testified, and the Court finds, that his competency evaluation of Mr. Hammer in September of 1997 did not include a determination whether Mr. Hammer could make a knowing, voluntary and intelligent waiver of rights since it was not an issue at that time.

✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

860.   Dr. Sadoff testified that neither Mr. Ruhnke nor Mr. Travis asked him to conduct a forensic competency examination of Mr. Hammer in June of 1998 or in October of 1998.

182

_✓_ Undisputed　　　___ Disputed　　　___ Undisputed But Objected To

861.　Dr. Sadoff testified that if counsel had asked him to conduct such an evaluation he would have been willing to do so.

_✓_ Undisputed　　　___ Disputed　　　___ Undisputed But Objected To

862.　Dr. Sadoff did not learn of Mr. Hammer's waivers and plea of guilty until after they had happened.

_✓_ Undisputed　　　___ Disputed　　　___ Undisputed But Objected To

863.　Dr. Sadoff testified that Mr. Hammer has a significant family history of physical and sexual abuse that formed the factual predicate for his diagnosis of Dissociative Identity Disorder.

_✓_ Undisputed　　　___ Disputed　　　___ Undisputed But Objected To

864.　Dr. Sadoff testified, and the Court finds, that given the diagnoses and stressors that Mr. Hammer was under at the time of trial, there exist substantial concerns about Mr. Hammer's mental state at the time he entered his waivers.

___ Undisputed　　　_✓_ Disputed　　　___ Undisputed But Objected To

865.　Dr. Sadoff explained that the bases for his concerns involve both the DID diagnosis as well as consideration of Mr. Hammer's Post-Traumatic Stress Disorder (PTSD), depression, other diagnoses of characterological or personality disorder that he has had most of his life.

183

✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

866.    Dr. Sadoff credibly and reliably testified that he (Dr. Sadoff) was better situated to conduct an adequate forensic psychiatric competency examination of Mr. Hammer, as opposed to Dr. Wolfson, because if Dr. Wolfson "doesn't believe in DID . . . then it would certainly keep him from making such a diagnosis because it's one that he doesn't believe in."

___ Undisputed          ✓ Disputed          ___ Undisputed But Objected To

867.    Dr. Sadoff also testified, and the Court finds, that the combined impact of Mr. Hammer's mental disorders and his brain damage added an additional layer of substantial concern regarding his competency and capacity to waive his rights.

___ Undisputed          ✓ Disputed          ___ Undisputed But Objected To

868.    Dr. Sadoff credibly and reliably concluded that the brain damage suffered by Mr. Hammer raises concerns about Mr. Hammer's decision making.

___ Undisputed          ✓ Disputed          ___ Undisputed But Objected To

869.    Dr. Sadoff credibly testified that he was concerned about which of Mr. Hammer's personalities was driving his decision to waive trial, plead guilty and waive direct appeal.

✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

870. Dr. Sadoff credibly concluded that stress exacerbates the dissociative tendencies that are part of the Dissociative Identity Disorder diagnosis.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

871. Dr. Sadoff stated that it is wholly consistent with the DID diagnosis for an alter personality to influence the host's behavior and decision-making even in the absence of overt manifestations that a third person might notice.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

872. Dr. Sadoff testified, and the Court finds, that dissociative states can cause breaks with reality and can have an impact on competency and the ability of an individual to make a rational, knowing, intelligent and voluntary decision.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

873. Dr. Sadoff testified, and the Court finds, if Mr. Hammer's decision-making was driven by his alter personality, Jocko, then his decision to waive trial, plead guilty and waive direct appeal would be an incompetent decision.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

874. Dr. Sadoff testified, and the Court finds, that when under stress, a person with Borderline Personality Disorder can experience a break with reality and become psychotic.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

185

875.   Dr. Sadoff also testified, and the Court finds, that it is not at unusual that victims of sexual abuse will often have recollections of the abuse they endured triggered by external factors, such as letters or conversations discussing the abuse or related factors.

___✓___ Undisputed          ___ Disputed          ___ Undisputed But Objected To

876.   Dr. Sadoff reasonably concluded that Mr. Hammer's discussion with Dr. Blumberg about the sexual abuse inflicted on him by his mother could have been triggered by the letter he received from his sister after his conviction and sentence in this case (and after Dr. Sadoff's evaluation of Mr. Hammer) and that such phenomena is not unusual for victims of sexual abuse.

____ Undisputed          _✓_Disputed          ___ Undisputed But Objected To

## XXII.      Louis Bullock, Esq.

877.   Louis Bullock is an attorney admitted to practice law in the State of Oklahoma.

___✓Undisputed          ___ Disputed          ___ Undisputed But Objected To

878.   His primary area of practice is civil rights and institutional reform law.

___✓___ Undisputed          ___ Disputed          ___ Undisputed But Objected To

879.   Mr. Bullock was appointed by the Governor of Oklahoma as a special

prosecutor to look into allegations of campaign finance violations and he also has represented the State of Oklahoma in environmental litigation.

___✓___ Undisputed        ___ Disputed        ___ Undisputed But Objected To

880.  Mr. Bullock was lead counsel in the case of Battle v. Anderson, from October 1975 until its termination in 2001.

___✓___ Undisputed        ___ Disputed        ___ Undisputed But Objected To

881.  Battle was a comprehensive class action suit related to prison conditions.

___✓___ Undisputed        ___ Disputed        ___ Undisputed But Objected To

882.  Battle was filed in 1972.

___✓___ Undisputed        ___ Disputed        ___ Undisputed But Objected To\

883.  The American Civil Liberties Union was co-counsel in the litigation.

_____ Undisputed        ___ Disputed        ___✓ Undisputed But Objected To

884.  At a point before the initial trial of the case, the United States Department of Justice intervened on behalf of the prisoner class.

___✓_Undisputed        ___ Disputed        ___ Undisputed But Objected To

885.  The case was initially tried in March, 1974 before the Honorable Luther Bohanon.

___✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

886. Following the trial, on May 30, 1974 Judge Bohanon issued a decision finding for the prisoner class on all issues.

__✓__ Undisputed        ___ Disputed        ___ Undisputed But Objected To

887. In his decision following trial, Judge Bohanon found that there was no "professional psychiatric staff" available on a regular basis, and that in the absence of such staff, the only treatment offered to mentally ill prisoners was sedation.

__✓__ Undisputed        ___ Disputed        ___ Undisputed But Objected To

888. Although Judge Bohanon's initial findings related only to the Oklahoma State Penitentiary, the resulting injunction was applied to all Oklahoma prison facilities.

__✓__ Undisputed        ___ Disputed        ___ Undisputed But Objected To

889. As part of the district court's initial findings and order, the defendants were given 60 days to formulate a "comprehensive plan" for remedying the unconstitutional conditions identified by the Court.

__✓__ Undisputed        ___ Disputed        ___ Undisputed But Objected To

890. The defendants did not appeal the order and subsequent injunction.

__✓__ Undisputed        ___ Disputed        ___ Undisputed But Objected To

891. From 1976 through 1983, Mr. Bullock monitored the defendant's

188

compliance with the injunction.

___✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

892.   As a result of his monitoring efforts, he became familiar with the

provision of mental health care at all Oklahoma prisons.

___✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

893.   In a document filed in 1976 by the United States Department of

Justice related to compliance issues, it was indicated that a comprehensive

remedial plan had not been presented to the court.

___✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

894.   The DOJ document alleged that "no prison" in Oklahoma had yet

established "adequate health care staff to administer to the . . . psychological needs

of the inmate populations."

___✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

895.   Following the filing of the DOJ document, the court conducted a

compliance hearing in 1978.

___✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

896.   Following the compliance hearing, the court issued a decision in

September, 1978 noting that the defendants had still not presented to the court a

comprehensive plan to remedy the mental health deficiencies identified by the

189

court.

_✓_ Undisputed          ___ Disputed          ___ Undisputed But Objected To

897. The 1978 compliance decision was affirmed by the Court of Appeals for the Tenth Circuit.

_✓_ Undisputed          ___ Disputed          ___ Undisputed But Objected To

898. During the course of monitoring compliance the parties retained various expert witnesses who periodically toured the prisons.

_✓_ Undisputed          ___ Disputed          ___ Undisputed But Objected To

899. One such expert, Dr. Solomon, issued a report in 1981 noting that mental health care was not yet constitutionally adequate and "virtually non-existent."

_✓_ Undisputed          ___ Disputed          ___ Undisputed But Objected To

900. Another such expert witness, Dr. Rundle, also issued a report in 1981 in which he found the provision of mental health care to also be constitutionally inadequate.

_✓_ Undisputed          ___ Disputed          ___ Undisputed But Objected To

901. Dr. Rundle noted serious deficiencies in terms of adequate staffing and adequate facilities.

_✓_ Undisputed          ___ Disputed          ___ Undisputed But Objected To

190

902. A third expert witness, Dr. Marvin Heller, also filed a report in 1981.

___✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

903. Dr. Heller's report referenced a report by another of the defendants' experts, that noted the "psychiatric coverage" at the Oklahoma State Penitentiary was "grossly lacking."

___✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

904. Dr. Heller confirmed "the shortage of essential mental health services, which is one of the subjects of the present court litigation."

___✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

905. The district court rendered a decision on compliance on March 4, 1981 stating: "One important issue which still needs to be addressed is the provision of mental health services for the incarcerated population. As the testimony has clearly indicated, there exists a critical need for proper mental health care, a system providing remedial counseling and treatment and not mere isolative segregation."

___✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

906. In Mr. Bullock's view, as of the date of the 1981 order, the defendants were still not in compliance with those aspects of the injunction related to the provision of mental health care.

191

✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

907.  Mr. Bullock continued to monitor compliance with the court's injunction throughout his tenure as class counsel.

✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

908.  Among other deficiencies in the provision of mental health care, Mr. Bullock noted that until the late 1990s, the defendants did not have any psychiatrists on staff, and that all psychiatric services were provided by part time roving providers.

✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

909.  Mr. Bullock reviewed Mr. Hammer's places of confinement while in Oklahoma and described the mental services available at each location.

✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

910.  Mr. Hammer was incarcerated at the Oklahoma State Penitentiary (OSP) from June 21, 1978 until September 6, 1978.

___ Undisputed          ✓ Disputed          ___ Undisputed But Objected To

911.  Mr. Bullock testified and this Court finds that during that period of time OSP had "virtually no mental health" services.

___ Undisputed          ✓ Disputed          ___ Undisputed But Objected To

912.  Mr. Hammer was incarcerated at the Eastern State Hospital in Vinita

192

from September 6, 1978 until October 18, 1978.

____ Undisputed        ⟍✓ Disputed        ____ Undisputed But Objected To

913.  Mr. Bullock testified and this Court finds that during that period of

time Eastern State Hospital's provision of mental health care to prisoners was

"very sparse."

____ Undisputed        ✓ Disputed        ____ Undisputed But Objected To

914.  Mr. Hammer was incarcerated at the Joseph Harp Correction Center

from November 16, 1978 until October, 1981.

____ Undisputed        ✓ Disputed        ____ Undisputed But Objected To

915.  Mr. Bullock testified and this Court finds that during that period of

time, mental health treatment was inadequate as outlined in the expert reports filed

with the Court in 1981.

____ Undisputed        ✓ Disputed        ____ Undisputed But Objected To

916.  In particular, during that period, psychiatric services were provided, if

at all, by a consulting psychiatrist who visited the facility one morning per week.

____ Undisputed        ✓ Disputed        ____ Undisputed But Objected To

917.  Mr. Hammer was incarcerated at the Oklahoma State Reformatory at

Granite from December, 1981 until June, 1982.

____ Undisputed        ⟍✓ Disputed        ____ Undisputed But Objected To

193

918. Mr. Bullock testified and this Court finds that during this period there were "virtually no" mental health services provided at Granite.

____ Undisputed          ✓ Disputed          ___ Undisputed But Objected To

919. Mr. Hammer was next incarcerated at the Connor Correctional Center from June, 1982 until August, 1983.

____ Undisputed          ✓ Disputed          ___ Undisputed But Objected To

920. Mr. Bullock testified and this Court finds that mental health services were better at Connor than at the other facilities.

____ Undisputed          ✓ Disputed          ___ Undisputed But Objected To

921. Mr. Hammer was moved back to the OSP in January 1984 where he stayed until his transfer to the Federal Bureau of Prisons.

____ Undisputed          ✓ Disputed          ___ Undisputed But Objected To

922. Mr. Bullock testified that during this period of time monitoring of the Battle litigation continued with the injunctions still in place.

✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

923. Mr. Bullock testified and this Court finds that during the period from 1984 through the time of Mr. Hammer's transfer to federal custody, OSP continued to be plagued by severe staffing shortages in the provision of mental health services.

194

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

924.   Mr. Bullock testified and this Court finds that the provision of mental health services were also impeded by the on-going lock down of OSP which occurred following the riot of 1973.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

## XXIII    Richard P. Kluft, M.D.

925.   Richard P. Kluft is a medical doctor who is Board Certified in Psychiatry and Neurology.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

926.   Dr. Kluft is a Clinical Professor of Psychiatry at Temple University, a lecturer at Harvard Medical School's continuing education series and a member of the faculty of the Philadelphia Center for Psychoanalysis.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

927.   Dr. Kluft has written over 200 articles in the last 30 years, including numerous peer-reviewed articles on dissociation and Dissociative Identity Disorder ("DID"), including articles in the American Psychiatric Association's Textbook of Psychiatry.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

928.   The issues explored in the peer-reviewed articles written by Dr. Kluft

195

include the diagnosis and treatment of patients with DID; covert manifestations of dissociation and DID; differentiating DID from other mental disorders; simulation and dissimulation of DID; malingering and iatrogenic aspects of DID.

__✓__ Undisputed         ___ Disputed         ___ Undisputed But Objected To

929.   One peer-reviewed article involved a study of the potential for iatrogenesis and diagnoses of DID.

__✓__ Undisputed         ___ Disputed         ___ Undisputed But Objected To

930.   That study found that, while there is strong evidence for iatrogenic worsening of the condition, there is no evidence supporting the theory that DID can be created iatrogenically.

___ Undisputed         __✓__ Disputed         ___ Undisputed But Objected To

931.   Dr. Kluft was invited to be a member of the committee of the Diagnostic and Statistical Manual of Mental Disorders ("DSM") and participated in the review and development of the DSM's diagnostic criteria.

__✓__ Undisputed         ___ Disputed         ___ Undisputed But Objected To

932.   Dr. Kluft has been awarded the Pierre Janet Award for Writing in the Field of Dissociation; the Erickson Award for Excellence in Scientific Writing; and the Award for Distinguished Teaching by the American Psychiatric Association.

196

___✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

933.  In addition to his research, Dr. Kluft has a clinical practice where 90 percent of his patients have DID or related disorders.

___✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

934.  Over the course of his professional career, Dr. Kluft has diagnosed and treated hundreds of persons with DID, and related disorders.

___✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

935.  Dr. Kluft has been qualified as an expert in psychiatry and DID in state and federal court between three and four dozen times.

___ Undisputed        ___✓ Disputed        ___ Undisputed But Objected To

936.  Dr. Kluft is accepted by the Court as an expert in psychiatry and in the diagnosis and treatment of DID and related dissociative disorders.

___✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

937.  Dr. Kluft explained that child sexual abuse results in trauma that can form the predicate for a number of trauma-related mental health disorders.

___✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

938.  Trauma makes its victims more vulnerable to a range of mental health diagnoses.

___✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

197

939.   People who have suffered trauma as a result of child abuse are much more likely to have a lowered immunity.

__✓__ Undisputed          ___ Disputed          ___ Undisputed But Objected To

940.   As Dr. Kluft credibly testified there are a number of trauma-related disorders, including acute stress disorder; somatoform disorder; pain disorder; various dissociative disorders; post-traumatic stress disorder ("PTSD"); and borderline personality disorder ("BPD").

____ Undisputed          __✓__ Disputed          ___ Undisputed But Objected To

941.   Trauma is a primary cause of psychological dissociation.

____ Undisputed          __✓__ Disputed          ___ Undisputed But Objected To

942.   Trauma disrupts the ability of the victim to use the most synthetic and highly organizing aspects of mental functioning.

____ Undisputed          __✓__ Disputed          ___ Undisputed But Objected To

943.   Trauma arising out of child abuse can overwhelm the mind of the victim, which in turn causes dissociative states.

____ Undisputed          __✓__ Disputed          ___ Undisputed But Objected To

944.   Persons overwhelmed by trauma are likely to encounter problems with identity, self-regulation, planning and impulse control.

__✓__ Undisputed          ___ Disputed          ___ Undisputed But Objected To

945.   Those who suffer trauma as a result of child abuse develop ingenious and resourceful fantasies to undo or modify those aspects of the abuse that cannot be coped with by the victim's mind.

_✓_ Undisputed        ___ Disputed        ___ Undisputed But Objected To

946.   Dissociation is a defense mechanism employed by a trauma victim in response to trauma.

_✓_ Undisputed        ___ Disputed        ___ Undisputed But Objected To

947.   Amnesia associated with traumatic events is likewise a defense mechanism.

___ Undisputed        _✓_ Disputed        ___ Undisputed But Objected To

948.   Dissociation is the failure to integrate aspects of mental function and perception in a normal manner.

___ Undisputed        _✓_ Disputed        ___ Undisputed But Objected To

949.   When a person dissociates, the mind isolates bits of information from other bits of information.

___ Undisputed        _✓_ Disputed        ___ Undisputed But Objected To

950.   Dissociation is a mechanism that the mind employs in order to function in light of the impact of trauma, like childhood abuse.

___ Undisputed        _✓_ Disputed        ___ Undisputed But Objected To

199

951. Individuals with PTSD and BPD, like those with DID, experience dissociative states.

___ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

952. The dissociation experienced by individuals with DID, PTSD and BPD are defense mechanisms to avoid the thoughts and impact of trauma.

___ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

953. DID is a complex chronic posttraumatic dissociative disorder.

___ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

954. Individuals suffering from DID generally have experienced severe childhood trauma.

___ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

955. Individuals suffering from DID commonly suffer severe concomitant anxiety.

___ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

956. Individuals suffering from DID demonstrate phenomena associated with a high degree of hypnotizability.

___ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

957. Unlike other forms of dissociation, DID requires both dissociativity and hypnotizability.

___ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

958. DID patient's auto-hypnotic capabilities are used to create and maintain the amnesia barriers and separateness of personalities, as a means of compartmentalizing and thus coping with trauma.

___ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

959. DID patients learn to do things auto-hypnotically in order to survive and block out uncomfortable sensations arising out of the trauma.

___ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

960. Peer-reviewed studies demonstrate that the dissociative style of coping consistent with DID remains covert to the lay outside observer or mental health professional who is not suitably experienced with the illness.

___ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

961. As a result of the covert nature of DID's symptomotology, persons with DID are in the mental healthcare system for an average of 6.8 years and have received at least three other incorrect diagnoses prior to being found to suffer from DID.

___ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

962. Patients suffering from DID are generally terrified of discovery because everything they have worked in their mind to keep hidden is threatened by

a revelation that they have the disease.

____ Undisputed        _✓_ Disputed        ___ Undisputed But Objected To

963.  Because the disease is a covert one, lay persons encountering persons with DID likely will not recognize the symptomotology.

____ Undisputed        _✓ Disputed        ___ Undisputed But Objected To

964.  The masked symptoms are especially prominent in situations where individuals come into limited contacts with a person suffering from DID because the patient attempts to, and in most cases is able to, mask the symptoms for the limited time of the contact.

____ Undisputed        _✓_ Disputed        ___ Undisputed But Objected To

965.  As an example of the covert nature of the illness, Dr. Kluft explained that in his clinical practice he has encountered spouses of a DID patient who were unaware of the existence of alter personalities.

____ Undisputed        _✓ Disputed        ___ Undisputed But Objected To

966.  The covert nature of the disease is especially prominent with persons in a prison environment for reasons of self-preservation.

____ Undisputed        _✓ Disputed        ___ Undisputed But Objected To

967.  Individuals suffering from DID often manifest phenomena associated with BPD.

202

\_\_\_ Undisputed        ✓ Disputed        \_\_\_ Undisputed But Objected To

968.  In some instances BPD is a true comorbid diagnosis with DID.

\_\_\_ Undisputed        ✓ Disputed        \_\_\_ Undisputed But Objected To

969.  In other instances the appearance of BPD features is an epiphenomenon of conflict and switching by the alter system intrinsic to DID itself.

\_\_\_ Undisputed        ✓ Disputed        \_\_\_ Undisputed But Objected To

970.  Individuals suffering from DID also have a full range of comorbid symptoms of PTSD.

\_\_\_ Undisputed        ✓ Disputed        \_\_\_ Undisputed But Objected To

971.  Dr. Kluft conducted a forensic evaluation of Mr. Hammer for the purposes of determining whether or not Mr. Hammer suffers from DID.

\_\_\_ Undisputed        ✓ Disputed        \_\_\_ Undisputed But Objected To

972.  In addition to the evaluation, Dr. Kluft reviewed a number of records including reports of Drs. Sadoff, Gelbort, Gur, Blumberg, Grassian, Wolfson, Matthews and Martell.

✓ Undisputed        \_\_\_ Disputed        \_\_\_ Undisputed But Objected To

973.  The reports of Drs. Gelbort, Gur and Martell indicated the presence of brain damage.

203

___ Undisputed      ___ Disputed      ___ Undisputed But Objected To

974.  As Dr. Kluft explains, frontal hypoperfusion – such as that identified in Mr. Hammer – is associated with both DID and PTSD.

___ Undisputed      _✓_ Disputed      ___ Undisputed But Objected To

975.  Where the frontal and parietal areas of the brain are damaged – such as in Mr. Hammer's case – the person's ability to control emotions is compromised (i.e. the person is emotionally labile).

___ Undisputed      _✓_ Disputed      ___ Undisputed But Objected To

976.  Such brain damage also impacts upon the person's ability to engage in the process of thinking, synthesizing information, regulation of identity and impulse control are compromised.

___ Undisputed      _✓_ Disputed      ___ Undisputed But Objected To

977.  Dr. Kluft also reviewed Mr. Hammer's institutional and background records including Bureau of Prisons records, records from Oklahoma hospitals and prisons.

___ Undisputed      _✓_ Disputed      ___ Undisputed But Objected To

978.  Dr. Kluft also reviewed the videotapes of the hypnosis session conducted by Drs. Sadoff and Dubin and the videotapes of the evaluation conducted by Drs. Matthews and Martell.

204

___✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

979. Based on his review of the records, Dr. Kluft found symptomotolgy consistent with that commonly found in the mental health histories of persons suffering from DID.

___ Undisputed        ___✓ Disputed        ___ Undisputed But Objected To

980. Such symptomotology includes adjustment reaction disorder; anxiety; fearfulness; and borderline personality disorder (formerly known as borderline schizophrenia).

___ Undisputed        ___✓ Disputed        ___ Undisputed But Objected To

981. During his evaluation, Dr. Kluft administered the Eye Roll Section of the Hypnotic Induction Profile.

___✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

982. This testing does not require hypnosis and is not the same as hypnosis.

___ Undisputed        ___✓ Disputed        ___ Undisputed But Objected To

983. Instead, the testing simply determines an individual's susceptibility to hypnosis.

___ Undisputed        ___✓ Disputed        ___ Undisputed But Objected To

984. Scores of three or four on the Eye Roll test highly correlate to a

205

person's susceptibility to the development of a chronic complex dissociative disorder like DID.

____ Undisputed        ✓ Disputed        ____ Undisputed But Objected To

985.   Because the premise behind the test is a fixed biological property, individuals can malinger a low score, but not a high score.

____ Undisputed        ✓ Disputed        ____ Undisputed But Objected To

986.   The inability to "malinger high" on the Eye Roll is a well-established principle in the field.

____ Undisputed        ✓ Disputed        ____ Undisputed But Objected To

987.   Mr. Hammer scored a four on the Eye Roll, is highly hypnotizable, and thus susceptible to the development of DID.

____ Undisputed        ✓ Disputed        ____ Undisputed But Objected To

988.   In addition to the Eye Roll, Dr. Kluft administered the Dissociative Experiences Scale-II ("DES-II") and the Structured Clinical Interview for the Diagnosis of DSM-IV Dissociative Disorders Revised ("SCID-D-R").

✓ Undisputed

989.   The DES-II is a screening test, not a diagnostic tool.

____ Undisputed        ✓ Disputed        ____ Undisputed But Objected To

990.   Dr. Kluft was particularly cautious in administering the DES-II because in his experience it can be malingered.

206

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

991.   An average score on the DES-II is 12.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

992.   A score of 30 and above indicates symptomotology consistent with

posttraumatic or dissociative disorder.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

993.   Mr. Hammer scored 47 on the DES-II.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

994.   A score of 47 is above all the cutoffs for the likely presence of DID or

related disorders, but is below the "super high" scores that are often associated

with malingering.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

995.   Dr. Kluft also conducted the SCID-D-R.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

996.   The SCID-D-R is a semi-structured clinical interview where certain

questions are always asked and, based on the answer there are alternative

questions that may be asked.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

997.   There are seven or eight sections of the SCID-D-R:  the history

207

section; an evaluation of amnesia; an evaluation of depersonalization; an evaluation of derealization; an evaluation of identity confusion; evaluation of signs not within the DSM criteria but associated with DID; and, the follow-up section.

__✓__ Undisputed        ___ Disputed        ___ Undisputed But Objected To

998.    The maximum score on each part is 20.

__✓__ Undisputed        ___ Disputed        ___ Undisputed But Objected To

999.    For statistical reasons, no dissociative phenomena is scored as one; two is a mild amount of phenomenon; three is moderate; and four is a strong indication of phenomenon.

____ Undisputed        __✓__ Disputed        ___ Undisputed But Objected To

1000. Qualitative studies of those individuals whom are known to be suffering from DID and those who meet the criteria for DID based on available data indicates that the SCID-D-R has certain findings and patterns that are associated with DID and allied forms of dissociative disorder not otherwise specified.

____ Undisputed        __✓__ Disputed        ___ Undisputed But Objected To

1001. Malingerers on the SCID-D-R have been found not to score in some of the areas that are not immediately apparent with DID and, thus, will not score

208

reasonably in all five areas.

____ Undisputed        _✓_ Disputed        ___ Undisputed But Objected To

1002. Mr. Hammer's testing indicated honest answering, including the weak performance on derealization which is something the evaluators find more often than not.

____ Undisputed        _✓_ Disputed        ___ Undisputed But Objected To

1003. Mr. Hammer's score was 18 out of 20.

_✓_ Undisputed        ___ Disputed        ___ Undisputed But Objected To

1004. Mr. Hammer's score indicates that it is overwhelmingly likely that he suffers from a chronic severe dissociative disorder.

____ Undisputed        _✓_ Disputed        ___ Undisputed But Objected To

1005. Although Jill Miller conducted a different dissociative detection scale, the Dissociative Disorders Interview Schedule ("DDIS"), that does not diminish or skew the results of Dr. Kluft's testing because Dr. Kluft's credible and reliable testimony demonstrates that while there may be evidence of iatrogenic worsening of an already existing condition, there is no evidence that DID can be iatrogenic created or induced.

____ Undisputed        _✓_ Disputed        ___ Undisputed But Objected To

1006. Following the testing and structured interview, Dr. Kluft made direct

209

efforts to request the emergence of personalities.

___✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

1007. Dr. Kluft sought the emergence of the personalities in order to assess how those personalities presented in order to observe consistencies or discrepancies with the data in the videotapes.

___ Undisputed        ___✓ Disputed        ___ Undisputed But Objected To

1008. Even before the testing, Dr. Kluft observed signs of alters.

___✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

1009. Those signs included demeanor and facial expressions and changes that indicated the possibility that Dr. Kluft was observing co-presences.

___ Undisputed        ___✓ Disputed        ___ Undisputed But Objected To

1010. There are documented physiological changes that occur when one personality emerges and the other recedes.

___ Undisputed        ___✓ Disputed        ___ Undisputed But Objected To

1011. The physiological changes have been documented by Dr. Frank Putnam, employed at the National Institutes of Health (and one of the experts relied upon by Dr. Wolfson in his 1997 forensic study of Mr. Hammer).

___ Undisputed        ___✓ Disputed        ___ Undisputed But Objected To

1012. During the SCID-D-R, there were not only many instances of facial

210

and demeanor changes but also episodes of inter-interview amnesia.

____ Undisputed       ✓ Disputed       ___ Undisputed But Objected To

1013. In addition to the facial expressions, demeanor changes and inter-interview amnesia, Mr. Hammer would pick at his forearms indicating trichotillomania.

____ Undisputed       ✓ Disputed       ___ Undisputed But Objected To

1014. While not primarily associated with trauma or dissociative disorders, trichotillomania is connected to dissociative disorders because many persons with DID and associated disorders induce pain in themselves in order to overcome their feelings of depersonalization.

____ Undisputed       ✓ Disputed       ___ Undisputed But Objected To

1015. As a result of his observations and review of the background materials, Dr. Kluft first asked to speak with the alter "Wilbur" because Dr. Kluft believed it was Wilbur who was co-presenting and attempting to intrude into the interview.

✓ Undisputed       ___ Disputed       ___ Undisputed But Objected To

1016. The method of requesting to speak with an alter during the evaluation is not unorthodox and is a necessary facet of a reliable diagnosis.

____ Undisputed       ✓ Disputed       ___ Undisputed But Objected To

211

1017. Relying on spontaneous switching is not reliable because of the time involved in developing a situation where an alter might spontaneously appear.

___ Undisputed    ✓ Disputed    ___ Undisputed But Objected To

1018. Dr. Kluft believed that speaking with Wilbur would result in the appearance of "Jocko" because Jocko had been characterized as Wilbur's protector.

✓ Undisputed    ___ Disputed    ___ Undisputed But Objected To

1019. Dr. Kluft spoke with Wilbur for 12 to 15 minutes.

___ Undisputed    ✓ Disputed    ___ Undisputed But Objected To

1020. Dr. Kluft also observed brief intrusions of angry expressions consistent with Jocko as well as co-presences between Wilbur and Mr. Hammer or Wilbur and Jocko.

___ Undisputed    ✓ Disputed    ___ Undisputed But Objected To

1021. Following brief bursts of a very angry appearance followed by a more direct and prolonged emergence, Jocko did engage in dialogue with Dr. Kluft.

___ Undisputed    ✓ Disputed    ___ Undisputed But Objected To

1022. Jocko was very eruptively loud, very angry, very belligerent and rushed at the divider then, realizing that the divider was there, paced back and forth evincing frustration.

212

___ Undisputed        √ Disputed        ___ Undisputed But Objected To

1023. In the midst of all the anger displayed by the Jocko alter was also expressions of fear and anger.

___ Undisputed        √ Disputed        ___ Undisputed But Objected To

1024. When Dr. Kluft asked Jocko about his display of fear, Jocko acknowledged it but minimized it.

___ Undisputed        √ Disputed        ___ Undisputed But Objected To

1025. This admission of fear by saying that fear is a weakness is a perfect case of "trance logic" which is the holding and awareness of simultaneously, mutually incompatible constructs.

___ Undisputed        √ Disputed        ___ Undisputed But Objected To

1026. Trance logic is a phenomenon that is seen consistently with DID patients.

___ Undisputed        √ Disputed        ___ Undisputed But Objected To

1027. In Dr. Kluft's credible and reliable opinion, the Jocko alter is a scared child with an adult's strength who has minimum comprehension and is very quick to react to drive away anything that he finds threatening.

___ Undisputed        √ Disputed        ___ Undisputed But Objected To

1028. In Dr. Kluft's credible and reliable opinion, Jocko-type alters know

213

they are impotent, and they lash out in order to deny their impotence.

___ Undisputed        _✓_ Disputed        ___ Undisputed But Objected To

1029. The Jocko alter also engaged in heated expressions of anger and paranoia about psychiatrists and the perception that there's a good David and a bad Jocko, not inconsistent with the fear of integration that occurs with persons with DID.

___ Undisputed        _✓_ Disputed        ___ Undisputed But Objected To

1030. In his review of the videotapes of the hypnosis and the evaluation conducted by Drs. Matthews and Martell, Dr. Kluft observed co-presences and emergence of alters not previously identified by expert testimony.

___ Undisputed        _✓_ Disputed        ___ Undisputed But Objected To

1031. As Dr. Kluft explains, during the hypnosis videotape, there were indications of both co-presences of more than one alter and the presence of Wilbur at times prior to the hypnosis that Drs. Dubin and Sadoff attributed to David Hammer.

___ Undisputed        _✓_ Disputed        ___ Undisputed But Objected To

1032. While viewing the tape in open-court, Dr. Kluft credibly and reliably identified and explained over twenty occurrences of alters and/or co-presences of alters.

214

___ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

1033. These observations occurred before the hypnosis began and during the conversation between Mr. Hammer and the doctors about his background and history of abuse.

___ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

1034. During the playing of this videotape, Mr. Hammer became visibly emotional and distressed in the courtroom to the point that he asked to be removed.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

1035. Dr. Kluft credibly and reliably concluded that Mr. Hammer was undergoing personality switching as he watched the tape in open-court.

___ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

1036. Mr. Hammer requested to leave the court room during the viewing of the video-tape because of the intense emotional pain caused by it, and the attempted emergence of the Jocko personality.

___ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

1037. Mr. Hammer requested that he be subjected to additional physical restraints when he returned to the courtroom because he feared that he would lose control and Jocko would fully emerge.

215

\_\_\_ Undisputed        \_✓\_Disputed        \_\_\_ Undisputed But Objected To

1038. The presence of a non-human alter is not indicative of malingering and is common in persons with DID.

\_\_\_ Undisputed        \_✓\_ Disputed        \_\_\_ Undisputed But Objected To

1039. Dr. Kluft testified, and this Court finds, that Dr. Wolfson's conclusions reached in 1997 and reaffirmed in 2005 that Mr. Hammer malingered DID were incorrect.

\_\_\_ Undisputed        \_✓\_Disputed        \_\_\_ Undisputed But Objected To

1040. The basis for Dr. Kluft's opinion that Dr. Wolfson's 1997 opinion regarding Mr. Hammer are based upon "inaccurate assumptions" about DID that have been challenged in the mental health literature since 1987.

\_\_\_ Undisputed        \_✓\_Disputed        \_\_\_ Undisputed But Objected To

1041. Among Dr. Wolfson's errors are inaccurate assumptions about how a genuine dissociative disorder person would behave and how the individual would be seen by others.

\_\_\_ Undisputed        \_✓\_ Disputed        \_\_\_ Undisputed But Objected To

1042. Dr. Wolfson's assumptions are drawn from a literature that starts from the premise that DID is probably fraudulent.

\_\_\_ Undisputed        \_✓\_Disputed        \_\_\_ Undisputed But Objected To

216

1043. Dr. Wolfson's opinions did not respect the literature that described how DID actually presents.

____ Undisputed        ✓ Disputed        ____ Undisputed But Objected To

1044. Much of Dr. Wolfson's conclusions that Mr. Hammer malingered DID is actually consistent with the natural history and presentation of the illness.

____ Undisputed        ✓ Disputed        ____ Undisputed But Objected To

1045. Dr. Wolfson's assumption that in a genuine case of DID there would be many documentable observations of the condition's overt manifestations is wrong.

____ Undisputed        ✓ Disputed        ____ Undisputed But Objected To

1046. Dr. Wolfson assumed that in a genuine case of DID there would be many observations of the florid presentation of the disease is incorrect because DID is a covert condition.

____ Undisputed        ✓ Disputed        ____ Undisputed But Objected To

1047. Dr. Kluft's opinions regarding Dr. Wolfson's incorrect assumptions are based upon the 25 to 30 years of experience in diagnosing and treating persons with DID and allied conditions.

____ Undisputed        ✓ Disputed        ____ Undisputed But Objected To

1048. Dr. Kluft's opinions regarding Dr. Wolfson's incorrect assumptions

are also based upon his own research in following 236 patients over time.

____ Undisputed        _✓_ Disputed        ___ Undisputed But Objected To

1049. Dr. Kluft's research in which he followed 236 people with DID over time was aimed at understanding why if the illness was thought to be so florid in its presentation, that it took on average almost 7 years in mental health treatment for a patient to be diagnosed with DID.

____ Undisputed        _✓_ Disputed        ___ Undisputed But Objected To

1050. Based upon his research, Dr. Kluft determined that only about 6% of patients were florid in their presentation of DID – in the remainder the manifestation of the illness was covert or subtle.

____ Undisputed        _✓_ Disputed        ___ Undisputed But Objected To

1051. Dr. Kluft also criticized Dr. Wolfson's reliance upon what he perceived to be inconsistent physical symptoms surrounding the presentation of alter personalities.

____ Undisputed        _✓_ Disputed        ___ Undisputed But Objected To

1052. Whereas Dr. Wolfson expected to find a consistency in the physical presentation of alters, in reality the research shows that the physical presentations are quite variable and inconsistent.

____ Undisputed        _✓_ Disputed        ___ Undisputed But Objected To

1053. Dr. Kluft also believed that Mr. Hammer's history of diagnoses in the mental health system was entirely consistent with the presentation of the illness as set forth in Ross' *Dissociative Identity Disorder.*

____ Undisputed        ✓ Disputed        ____ Undisputed But Objected To

1054. Dr. Kluft opined that if a patient appeared in his office with a history similar to that of Mr. Hammer, but who was not floridly presenting with DID or related illness, he would expect the patient to be suffering from DID or allied illnesses.

____ Undisputed        ✓ Disputed        ____ Undisputed But Objected To

1055. Dr. Kluft testified and this Court finds, that Mr. Hammer's mental health and medical history is a "classic cluster" of prior misdiagnoses.

____ Undisputed        ✓ Disputed        ____ Undisputed But Objected To

1056. Dr. Kluft was also critical of Dr. Wolfson's apparent lack of awareness of the dissociative surface.

✓ Undisputed        ____ Disputed        ____ Undisputed But Objected To

1057. The dissociative surface takes account of the more subtle presentations of the illness, the fact that multiple alters can appears simultaneously (e.g. co-presences), and generally organizes dozens of well known observations about what the clinician sees when he interviews a person with DID, but who is

not floridly presenting.

____ Undisputed          ✓ Disputed          ___ Undisputed But Objected To

1058. The video tapes observed by Dr. Kluft are replete with examples of the more subtle phenomena of DID.

____ Undisputed          ✓ Disputed          ___ Undisputed But Objected To

1059. The fact that about 94% of DID patients present in a subtle – i.e. non-florid manner – has been reflected in the evolution of the DSM over the last 25 years.

____ Undisputed          ✓ Disputed          ___ Undisputed But Objected To

1060. In Dr. Kluft's view, Dr. Wolfson's reliance on the lack of a diagnose of DID in two prior forensic evaluations conducted on Mr. Hammer was not reasonable.

____ Undisputed          ✓ Disputed          ___ Undisputed But Objected To

1061. Dr. Wolfson's reliance on the lack of diagnosis in the two prior forensic evaluations conducted on Mr. Hammer was unreasonable because they were conducted in the early 1980s, which was a time when there was little interest in, awareness of, or concern with DID.

____ Undisputed          ✓ Disputed          ___ Undisputed But Objected To

1062. This Court finds the opinions of Dr. Kluft to be credible.

220

____ Undisputed          ✓ Disputed          ___ Undisputed But Objected To

1063. To the extent the opinions expressed by Dr. Wolfson conflict with those of Dr. Kluft, this Court finds that Dr. Kluft is more knowledgeable and experienced in the diagnoses and treatment of DID and related illnesses, and therefore this Court credits Dr. Kluft's opinions.

____ Undisputed          ✓ Disputed          ___ Undisputed But Objected To

1064. As a result of his evaluation and review of records and prior evaluations, Dr. Kluft credibly and reliably concludes to a reasonable degree of psychiatric certainty that Mr. Hammer suffers from DID; PTSD; Antisocial Personality Disorder; Major Depression, recurrent; and Polysubstance Abuse Disorder.

____ Undisputed          ✓ Disputed          ___ Undisputed But Objected To

1065. As a result of his evaluation and review of the records, Dr. Kluft credibly and reliably concludes to a reasonable degree of psychiatric certainty that as a result of mental disease or defect at the time of Mr. Hammer's guilty plea and subsequent waivers, he did not have the capacity to make a knowing, intelligent and voluntary waiver because his decision-making was impacted by his mental illness.

____ Undisputed          ✓ Disputed          ___ Undisputed But Objected To

221

1066. As a result of his evaluation and review of the records, Dr. Kluft credibly and reliably concludes to a reasonable degree of psychiatric certainty that as a result of a mental disease or defect, at the time of the offense, Mr. Hammer was incapable of conforming his conduct to the law or distinguishing right from wrong.

____ Undisputed        ✓ Disputed        ____ Undisputed But Objected To

1067. Dr. Kluft opined that stress increases the likelihood of dissociation in a patient with DID.

____ Undisputed        ✓ Disputed        ____ Undisputed But Objected To

1068. Dr. Kluft opined that stress increases the likelihood of dissociation in a patient with BPD.

____ Undisputed        ✓ Disputed        ____ Undisputed But Objected To

## XXIV    Martin Hammer

1069. Martin Hammer is David Paul Hammer's younger brother.

✓ Undisputed        ____ Disputed        ____ Undisputed But Objected To

1070. Martin Hammer is five years younger that David Hammer.

✓ Undisputed        ____ Disputed        ____ Undisputed But Objected To

1071. Martin Hammer is currently disabled and receives Social Security Disability as a result of a psychiatric disability.

_✓_ Undisputed        ___ Disputed        ___ Undisputed But Objected To

1072. Martin Hammer described for this Court a long family history of mental illness that includes Schizophrenia and Depression.

___ Undisputed        _✓_ Disputed        ___ Undisputed But Objected To

1073. Martin Hammer testified that his entire immediate family – mother, father, sister and brother – all suffer from major mental illness.

___ Undisputed        _✓_ Disputed        ___ Undisputed But Objected To

1074. Martin Hammer credibly and reliably testified that David Paul Hammer suffered from inexplicable mood shifts ranging from friendly to angry and scary.

___ Undisputed        _✓_ Disputed        ___ Undisputed But Objected To

1075. Martin Hammer explained that David Paul Hammer "would have periods were he would go into trances" and his eyes became glassy and he did not seem to know what he was doing.

___ Undisputed        _✓_ Disputed        ___ Undisputed But Objected To

1076. On many occasions, David Paul Hammer would go into a closet and scream in what Mr. Martin Hammer characterized as "a mean voice."

___ Undisputed        _✓_ Disputed        ___ Undisputed But Objected To

1077. Martin Hammer testified that David Paul Hammer's voice would

change and become very deep and scary.

\_\_\_\_ Undisputed        ✓ Disputed        \_\_\_ Undisputed But Objected To

1078. Martin Hammer testified that when David Paul Hammer emerged from these trance-like states, he would have no recollection of what had transpired.

\_\_\_\_ Undisputed        ✓ Disputed        \_\_\_ Undisputed But Objected To

1079. There were occasions when David Paul Hammer would go into these trance-like states and then hit Martin Hammer.

\_\_\_\_ Undisputed        ✓ Disputed        \_\_\_ Undisputed But Objected To

1080. When Martin Hammer would ask David Paul Hammer why he had hit him, David Paul Hammer had no recollection of hitting his brother.

\_\_\_\_ Undisputed        ✓ Disputed        \_\_\_ Undisputed But Objected To

1081. Martin Hammer also testified that he shared a room with David Paul Hammer while growing up and that he remembers occasions where David Paul Hammer would be talking as if he were in a two-way conversation when in fact there was no one else in the room with whom he was speaking.

\_\_\_\_ Undisputed        ✓ Disputed        \_\_\_ Undisputed But Objected To

1082. David Paul Hammer not only carried on his end of the conversation but appeared to pause and listen as if the other person — who was not really

224

present – was talking.

____ Undisputed          √ Disputed          ____ Undisputed But Objected To

1083. Martin Hammer recalls once asking David Paul Hammer who he was talking to and was told he was talking to "another part of him."

____ Undisputed          √ Disputed          ____ Undisputed But Objected To

1084. Martin Hammer testified that he told his parents about his brother's disturbing behavior and they did not appear to understand what was happening with their oldest son.

√ Undisputed          ____ Disputed          ____ Undisputed But Objected To

1085. Martin Hammer testified that the first time he heard the name "Jocko" was when he was nineteen or twenty years old and David Paul Hammer was incarcerated at the Granite Reformatory in Oklahoma.

____ Undisputed          √ Disputed          ____ Undisputed But Objected To

1086. During a phone call with his brother, David Paul Hammer related that he had been involved in an incident with another inmate and that "when it happened he felt like somebody else took over."

____ Undisputed          √ Disputed          ____ Undisputed But Objected To

1087. David Paul Hammer stated that he called this part of himself "Jocko."

√ Undisputed          ____ Disputed          ____ Undisputed But Objected To

225

1088. The Court credits the testimony of Mr. Martin Hammer.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

## XXV Mark O'Berg

1089. Mark O'Berg was incarcerated in USP Allenwood in the 1990s.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

1090. For two weeks, Mr. O'Berg was a cellmate with David Paul Hammer in cell 103.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

1091. In the cell was a small, Sony Walkman radio type clock.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

1092. Mr. O'Berg identified Defendant's Exhibit 73 as the clock radio that was in the cell.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

1093. The clock sat on the windowsill of the cell.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

1094. The clock did not have a light.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

1095. The clock was not self-illuminating.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

226

1096. The clock had a small liquid crystal display screen.

___ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

1097. Mr. O'Berg testified that you could not see the face of the clock on the windowsill at night.

___ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

1098. The light from the yard did not illuminate the clock face because the light was coming from the back and, as a result, it silhouetted objects on the windowsill.

___ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

1099. During Mr. O'Berg's testimony, the Court viewed Defendant's Exhibit 73.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

1100. The Court finds that the clock had no light or any other type of illumination.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

1101. The Court finds that the section of the clock with the numbers was no larger than an eighth or three-sixteenths of an inch.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

1102. Mr. O'Berg found that Mr. Hammer was one of the strangest

individuals he had met.

\_\_\_ Undisputed        \_✓ Disputed        \_\_\_ Undisputed But Objected To

1103. Mr. O'Berg found Mr. Hammer's entire presence and demeanor would change without warning.

\_\_\_ Undisputed        ✓ Disputed        \_\_\_ Undisputed But Objected To

1104. There were times that Mr. Hammer would become withdrawn; shut down; on the verge of tears; and exhibit child-like conduct.

\_\_\_ Undisputed        ✓ Disputed        \_\_\_ Undisputed But Objected To

1105. Some of Mr. Hammer's changes were abrupt.

\_\_\_ Undisputed        ✓ Disputed        \_\_\_ Undisputed But Objected To

1106. Other changes in Mr. Hammer occurred gradually where he would become increasingly more depressed or angry and isolated.

\_\_\_ Undisputed        ✓ Disputed        \_\_\_ Undisputed But Objected To

1107. It appeared to Mr. O'Berg that there was a different personality during these changes.

\_\_\_ Undisputed        ✓ Disputed        \_\_\_ Undisputed But Objected To

1108. There were times when Mr. Hammer would abruptly go into a corner sniffling, crying and talking to himself like he was a child.

\_\_\_ Undisputed        ✓ Disputed        \_\_\_ Undisputed But Objected To

228

1109. When Mr. Hammer experienced these changes, his tone of voice, the volume of his voice and the tenor of his voice as well as his physical bearing would also change.

____ Undisputed        √ Disputed        ___ Undisputed But Objected To

1110. Mr. O'Berg noticed these changes daily.

____ Undisputed        √ Disputed        ___ Undisputed But Objected To

1111. At times during these mood changes, Mr. Hammer would display anger and rage at himself, things, people in his past and family members in his past.

____ Undisputed        √ Disputed        ___ Undisputed But Objected To

1112. It appeared to Mr. O'Berg that Mr. Hammer held conversations with a picture of a small boy or a picture of an ape he had in the cell.

____ Undisputed        √ Disputed        ___ Undisputed But Objected To

1113. His tone when talking would at times be like a child who had been reprimanded.

____ Undisputed        √ Disputed        ___ Undisputed But Objected To

1114. During these experiences, Mr. Hammer did not appear aware that he (Mr. O'Berg) was there and when Mr. O'Berg would interrupt him, he would appear as if he was coming out of a dream.

229

____ Undisputed         _✓_ Disputed         ___ Undisputed But Objected To

1115. Mr. Hammer told Mr. O'Berg that he had an ugly side.

_✓_ Undisputed         ___ Disputed         ___ Undisputed But Objected To

1116. Mr. O'Berg had sex with Mr. Hammer on one occasion while they were cellmates.

_✓_ Undisputed         ___ Disputed         ___ Undisputed But Objected To

1117. Afterwards, Mr. O'Berg heard Mr. Hammer talking to himself.

____ Undisputed         _✓_ Disputed         ___ Undisputed But Objected To

1118. Mr. Hammer was saying things like "there, that wasn't so bad."

____ Undisputed         _✓_ Disputed         ___ Undisputed But Objected To

1119. His voice sounded to Mr. O'Berg like an abusive parent or guardian trying to convince an abused child that it was okay.

____ Undisputed         _✓_ Disputed         ___ Undisputed But Objected To

1120. It sounded like Mr. Hammer was having a conversation with someone else.

____ Undisputed         _✓_ Disputed         ___ Undisputed But Objected To

1121. Mr. Hammer did not appear aware of Mr. O'Berg's presence during this exchange.

____ Undisputed         _✓_ Disputed         ___ Undisputed But Objected To

230

1122. Mr. O'Berg requested to leave Mr. Hammer's cell.

____ Undisputed        ✓ Disputed        ____ Undisputed But Objected To

1123. When he requested to move, Mr. O'Berg told the prison officials about Mr. Hammer's snapping and the times Mr. Hammer would appear not to know others were around.

____ Undisputed        ✓ Disputed        ____ Undisputed But Objected To

1124. The Court credits the testimony of Mr. O'Berg.

____ Undisputed        ✓ Disputed        ____ Undisputed But Objected To

## XXVI    Randy L. White

1125. Randy L. White is employed at the Unites States Penitentiary at Terra Haute, Indiana as a unit manager.

✓ Undisputed        ____ Disputed        ____ Undisputed But Objected To

1126. In March, 2001 Mr. White became unit manager for the special confinement unit which is the unit that houses all federal prisoners sentenced to death. Mr. Hammer is housed on this unit.

✓ Undisputed        ____ Disputed        ____ Undisputed But Objected To

1127. In addition to the special confinement unit Mr. White is the unit manager for the code program overseeing approximately 140 to 150 inmates.

✓ Undisputed        ____ Disputed        ____ Undisputed But Objected To

231

1128. In addition to the special confinement unit Mr. White is the unit manager for the holdover unit overseeing approximately 30 to 40 inmates.

✓ Undisputed      ___ Disputed      ___ Undisputed But Objected To

1129. In addition to the special confinement unit Mr. White is the unit manager for the Cuban classification unit overseeing approximately 70 inmates.

___ Undisputed      ✓ Disputed      ___ Undisputed But Objected To

1130. Overall Mr. White is responsible for approximately 300 prisoners in addition to the special confinement unit.

___ Undisputed      ✓ Disputed      ___ Undisputed But Objected To

1131. Mr. White also has administrative duties that take up a significant amount of his average workday.

___ Undisputed      ✓ Disputed      ___ Undisputed But Objected To

1132. Mr. White is responsible for processing all inmate grievances filed by the approximately 300 inmates he oversees.

___ Undisputed      ✓ Disputed      ___ Undisputed But Objected To

1133. Mr. White is responsible for overseeing approximately 600 reviews of inmate classifications per year.

___ Undisputed      ✓ Disputed      ___ Undisputed But Objected To

1134. Mr. White is the chairperson of the unit disciplinary committees for

232

each unit he supervises.

___ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

1135. When staffing shortages arise, Mr. White also performs correctional post duty and perimeter security.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

1136. All of these additional duties take Mr. White away from the time he has available to spend on the special confinement unit.

___ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

1137. Mr. White does weekly rounds wherein he walks through all of the units he supervises and spends a short time interacting with the many prisoners on these units.

___ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

1138. Mr. White would see Mr. Hammer approximately one or two times a week during his rounds in the special confinement unit.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

1139. Mr. White is not at the prison during the overnight hours.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

1140. Inmates at USP- Terra Haute are instructed when they arrive at the prison that if they need medical attention they should put in a sick call slip with

the health services department.

___✓___ Undisputed       ___ Disputed       ___ Undisputed But Objected To

1141. Mr. White does not supervise the health services department and would not be made aware if Mr. Hammer complained of, or was treated for, headaches.

____ Undisputed       ___✓ Disputed       ___ Undisputed But Objected To

1142. Mr. White did not review Mr. Hammer's mail nor did he monitor his phone calls.

___✓ Undisputed       ___ Disputed       ___ Undisputed But Objected To

1143. There are no cameras in Mr. Hammer's cell so the only firsthand knowledge Mr. White has concerning Mr. Hammer's actions are when he sees him during his weekly rounds.

___✓ Undisputed       ___ Disputed       ___ Undisputed But Objected To

1144. The Court finds Mr. White's ability to observe Mr. Hammer's daily demeanor, moods and mental stability is limited in light of his other responsibilities.

____ Undisputed       ___✓ Disputed       ___ Undisputed But Objected To

1145. Even in those limited contacts, Mr. White has witnessed fluctuations in Mr. Hammer's emotions from upbeat to depressed to angry.

234

___ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

1146. Even in those limited contacts, Mr. White has also observed that Mr. Hammer's emotional fluctuations increase as the stress level in the special housing unit increases.

___ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

1147. Even in those limited contacts, Mr. White has also seen Mr. Hammer act impulsively.

___ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

1148. During one particularly stressful time, Mr. Hammer injected his daily insulin needle directly into his muscle.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

1149. The Court finds that Mr. White's testimony does not dispute the Petitioner's averments and proof regarding Mr. Hammer's mental illnesses and instability and, instead, supports Petitioner's proof.

___ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

## XXVII    Nicole Weaver

1150. Nicole Weaver is presently employed as a case manager at the FCI-Butner in North Carolina.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

1151. In April, 1996 Ms. Weaver was employed at the USP- Allenwood as a senior officer specialist.

__✓__ Undisputed        ___ Disputed        ___ Undisputed But Objected To

1152. Ms. Weaver was the correctional officer on duty in the special housing unit at USP- Allenwood on the night Andrew Marti was killed.

_____✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

1153. At 2:53 a.m. Ms. Weaver, while doing the 3 a.m. inmate count, looked into Mr. Hammer's cell.

___✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

1154. Ms. Weaver is certain this it the time she arrived at the cell and she recorded this time in the daily unit log.

___✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

1155. Ms. Weaver heard Mr. Hammer say "My cellee's dead". Mr. Hammer began to speak to Ms. Weaver but she could not understand what he was saying.

___✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

1156. All of Ms. Weaver's conversations with Mr. Hammer were through the closed cell door.

__✓__ Undisputed        ___ Disputed        ___ Undisputed But Objected To

236

1157. Ms. Weaver had never spoken or seen Mr. Hammer before this night and was not familiar with his normal tone of voice or the normal pace with which he spoke.

✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

1158. Displayed on the outer shower wall of Mr. Hammer's cell, very near the bunk beds, were numerous pornographic pictures.

___ Undisputed          ✓ Disputed          ___ Undisputed But Objected To

1159. Mr. Hammer did not tell Ms. Weaver anything about using taped up toenail clippers as part of a hostage scenario or a hostage taking ruse.

✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

1160. Ms. Weaver had no way of knowing if Mr. Marti and Mr. Hammer were engaging in homosexual sex during the periods between her inmate counts and her unit walkthroughs.

___ Undisputed          ✓ Disputed          ___ Undisputed But Objected To

1161. Ms. Weaver did inmate counts at 1 a.m., 3a.m. and 5 a.m.  Ms. Weaver also did a unit walkthrough every half hour.

✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

## XXVIII    Donn Troutman

1162. Mr. Donn Troutman is employed as a unit manager with the Federal

Bureau of Prisons.

___✓ Undisputed         ___ Disputed         ___ Undisputed But Objected To

1163. Mr. Troutman was the unit manager at USP-Allenwood at the time of the death of Andrew Marti as well as at the time of Mr. Hammer's trial.

___✓ Undisputed         ___ Disputed         ___ Undisputed But Objected To

1164. Mr. Troutman testified at a government witness during the guilt phase portion of Mr. Hammer's trial.

___✓ Undisputed         ___ Disputed         ___ Undisputed But Objected To

1165. By letter dated October 27, 1998 from Mr. John Fanello, Warden of USP-Allenwood to Mr. Troutman, Mr. Troutman received a Special Act Award, in the amount of $300 in part for his testimony at Mr. Hammer's trial.

___ Undisputed         ___✓ Disputed         ___ Undisputed But Objected To

1166. In the 1980's and 1990's Mr. Troutman had received several Special Act Awards for his involvement in various Bureau of Prison matters.

___✓ Undisputed         ___ Disputed         ___ Undisputed But Objected To

1167. Mr. Troutman was aware, prior to Mr. Hammer's trial, that his participation in Bureau of Prison matters, including testimony in court, could make him eligible for a monetary Special Act Award.

___✓ Undisputed         ___ Disputed         ___ Undisputed But Objected To

238

1168. Mr. Troutman was aware, prior to Mr. Hammer's trial, that the warden would consider recommendations by the Assistant United States Attorney when determining a Bureau pf Prison employees' eligibility for a monetary Special Act Award.

____ Undisputed        _✓_ Disputed        ___ Undisputed But Objected To

1169. Mr. Troutman was present when Mr. Hammer gave his statement to FBI Agent Thompson after Mr. Marti's death.

__✓_Undisputed        ___ Disputed        ___ Undisputed But Objected To

1170. Mr. Hammer began speaking to Agent Thompson at approximately 6 a.m. over 3 hours after Mr. Marti's body had been discovered.

__✓_Undisputed        ___ Disputed        ___ Undisputed But Objected To

1171. When he began speaking to Agent Thompson, Mr. Hammer was speaking so rapidly that Agent Thompson had to tell Mr. Hammer to stop speaking and start over.

____ Undisputed        _✓_Disputed        ___ Undisputed But Objected To

1172. From 1996 through the time of trial, Mr. Troutman observed a range of emotions from Mr. Hammer, including anger, frustration, depression and upbeat feelings.

____ Undisputed        _✓_ Disputed        ___ Undisputed But Objected To

239

1173. Mr. Troutman observed Mr. Hammer in a depressed state after he entered his guilty plea but before the start of the penalty hearing.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

1174. During the trial, Mr. Troutman had only sporadic contact with Mr. Hammer.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

1175. Mr. Hammer was instructed when he entered USP-Allenwood to make all medical complaints to the medical services department by submitting a sick call slip.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

1176. Mr. Troutman, as unit manager, did not oversee the health services department and would not review sick call slips submitted by inmates.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

## XXIX    Ronald L. Jury

1177. In 1996 Mr. Ronald L. Jury was a special investigative agent at USP-Allenwood.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

1178. Mr. Mark Traxler was the lead investigator into the death of Andrew Marti and Mr. Jury was Mr. Traxler's supervisor.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

1179. Defense Exhibit 197, pages15 and 16 is a Federal Bureau of Prisons document prepared by either the Federal Bureau of Prisons regional intelligence office or central intelligence office for either the Regional Director or the Director of the Federal Bureau of Prisons.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

1180. Defense Exhibit 197, pages 15 and 16 was prepared by someone with access to the documents prepared by the Special Investigative Unit at USP-Allenwood.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

1181. All documents prepared by the Special Investigative Unit at USP-Allenwood concerning the death of Andrew Marti were turned over to either the FBI or the U.S. Attorney's Office.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

1182. Mr. Jury does not know if Defense Exhibit 197 pages 15 and 16 was turned over to Mr. Hammer or his defense attorneys prior to trial.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

**XXX Daniel J. Ellis**

1183. Daniel J. Ellis, a former Deputy United States Marshal, is currently a

Senior Special Agent with the Inspector General's Office of Investigation for the United States Department of Housing and Urban Development.

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

1184. Mr. Ellis was employed as Deputy United States Marshal in Williamsport, Pennsylvania from January of 1997 until September of 1999.

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

1185. Mr. Ellis was assigned to transport Mr. Hammer to and from court beginning in 1997 through the end of Mr. Hammer's capital trial in 1998.

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

1186. Mr. Ellis transported Mr. Hammer to and from court during the competency hearing and at various other times during the trial proceedings.

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

1187. Following the entry of Mr. Hammer's plea of guilty on June 22, 1998, Mr. Ellis initiated questioning of Mr. Hammer regarding why he had just entered a plea of guilty.

___ Undisputed          ___✓ Disputed          ___ Undisputed But Objected To

1188. This interrogation occurred as Mr. Ellis was transporting Mr. Hammer from the courtroom back to the cell block in the Marshal's office.

___ Undisputed          ___✓ Disputed          ___ Undisputed But Objected To

242

1189. Mr. Ellis testified that he immediately reported Mr. Hammer's response to his questioning to Assistant United States Attorney Frederick Martin.

____ Undisputed        ✓ Disputed        ____ Undisputed But Objected To

1190. There are no written documents corroborating Mr. Ellis' report.

✓ Undisputed        ____ Disputed        ____ Undisputed But Objected To

1191. The Court finds the absence of any contemporaneous report bears against the credibility of Mr. Ellis' testimony that Mr. Hammer disparaged the insanity defense.

____ Undisputed        ✓ Disputed        ____ Undisputed But Objected To

1192. The Court finds it is equally possible that any comment by Mr. Hammer disparaging the insanity defense was the result of his mental illness and the desire to conceal that mental illness that is common with persons suffering from mental illness.

____ Undisputed        ✓ Disputed        ____ Undisputed But Objected To

1193. Mr. Ellis acknowledged that at the time he initiated questioning of Mr. Hammer, he – Mr. Ellis – was a law enforcement officer and Mr. Hammer was represented by counsel and facing a capital sentencing hearing.

✓ Undisputed        ____ Disputed        ____ Undisputed But Objected To

1194. Mr. Ellis testified that despite his training, he did not believe he

243

needed to provide Mr. Hammer with Miranda warnings prior to initiating questioning designed to elicit a response and did not need to consult with Mr. Hammer's attorneys prior to any such questioning.

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

1195. Mr. Ellis' rationale – which this Court rejects – is that because he "was not conducting an independent investigation" and Mr. Hammer "was not under any other pending charges" the constitutional protections afforded a criminal defendant did not apply.

___ Undisputed          ___✓ Disputed          ___ Undisputed But Objected To

1196. Mr. Ellis acknowledged that he believed the information Mr. Hammer told him in response to Mr. Ellis' questioning was important enough from a law enforcement perspective to immediately report it to Mr. Martin.

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

1197. Mr. Ellis also acknowledged that at the time he initiated questioning of Mr. Hammer, there was still an ongoing prosecution of Mr. Hammer regarding whether or not Mr. Hammer faced execution.

___ Undisputed          ___✓ Disputed          ___ Undisputed But Objected To

1198. Although Mr. Ellis was asked by the Government whether he believed Mr. Hammer appeared incompetent at the time of his waiver and plea of

guilty, Mr. Ellis acknowledged both that he had no formal training in assessing competency and has no formal training in psychiatry.

__✓_ Undisputed      ___ Disputed      ___ Undisputed But Objected To

1199. Mr. Ellis also admitted that at the time he questioned Mr. Hammer and reported his statement to Mr. Martin, he was not concerned about Mr. Hammer but rather, was attempting to assist the Government in its case against Mr. Hammer.

____ Undisputed      _✓ Disputed      ___ Undisputed But Objected To

1200. Mr. Ellis further testified that Mr. Hammer told him that he (Hammer) did not want to live following the entry of his guilty plea.

_✓ Undisputed      ___ Disputed      ___ Undisputed But Objected To

1201. The Court finds that Mr. Hammer did tell Mr. Ellis that he entered a guilty plea because he did not want to live.

____ Undisputed      _✓ Disputed      ___ Undisputed But Objected To

## XXXI      James K. Wolfson, M.D.

____1202. Dr. Wolfson has very limited experience in the diagnoses and/or treatment of dissociative identity disorder (DID).

____ Undisputed      _✓ Disputed      ___ Undisputed But Objected To

1203. Prior to his evaluation of Mr. Hammer, Dr. Wolfson had forensic

experience with only three other purported cases.

____ Undisputed          ✓ Disputed          ____ Undisputed But Objected To

1204. Subsequent to Mr. Hammer's evaluation, he encountered only two other forensic cases.

____ Undisputed          ✓ Disputed          ____ Undisputed But Objected To

1205. At most, Dr. Wolfson may have seen one case of genuine DID in the forensic setting.

____ Undisputed          ✓ Disputed          ____ Undisputed But Objected To

1206. Dr. Wolfson believed that the one "genuine" case of DID he encountered in the forensic setting was iatrogenically introduced.

____ Undisputed          ✓ Disputed          ____ Undisputed But Objected To

1207. Dr. Wolfon's clinical DID-experience is limited to one case from when he was a medical student.

✓ Undisputed          ____ Disputed          ____ Undisputed But Objected To

1208. Dr. Wolfson believes that Mr. Hammer's performance on intelligence testing places him in the average to high average range of intellectual functioning.

✓ Undisputed          ____ Disputed          ____ Undisputed But Objected To

1209. Dr. Wolfson testified that the medical library at the USMCFP at Springfield contains two books on DID.

246

__✓__ Undisputed     ___ Disputed     ___ Undisputed But Objected To

1210. One of the books in the library is *Dissociative Identity Disorder*, by Colin Ross, M.D.

__✓__ Undisputed     ___ Disputed     ___ Undisputed But Objected To

1211. Dr. Wolfson relied upon and cited this book in drafting his 1997 forensic report on Mr. Hammer.

__✓__ Undisputed     ___ Disputed     ___ Undisputed But Objected To

1212. He acknowledged that Dr. Ross is "well published" and is one of the "top names" in the DID field.

__✓__ Undisputed     ___ Disputed     ___ Undisputed But Objected To

1213. Dr. Wolfson spoke with Dr. Ross about Mr. Hammer.

___ Undisputed     __✓__ Disputed     ___ Undisputed But Objected To

1214. Dr. Wolfson's 1997 report also twice cited Dr. Richard Kluft.

__✓__ Undisputed     ___ Disputed     ___ Undisputed But Objected To

1215. Dr. Wolfson heard Dr. Kluft speak on one occasion.

__✓__ Undisputed     ___ Disputed     ___ Undisputed But Objected To

1216. Dr. Wolfson considers Dr. Kluft to be an "authoritative voice" in the field of DID.

__✓__ Undisputed     ___ Disputed     ___ Undisputed But Objected To

247

1217. Dr. Wolfson considers Kaplan & Sadock's *Comprehensive Textbook of Psychiatry* to "generally" be an authoritative source; a "legitimate" text book of psychiatry and as "useful" resource.

\_\_\_\_ Undisputed          ✓ Disputed          \_\_\_ Undisputed But Objected To

1218. Dr. Wolfson believes that the DSM-IV-TR is a standard reference work in the mental health field.

\_\_\_ ✓ Undisputed          \_\_\_ Disputed          \_\_\_ Undisputed But Objected To

1219. In working on Mr. Hammer's case Dr. Wolfson called another DID expert, Dr. Frank Putman, who is employed at the National Institute of Mental Health.

\_\_\_ ✓ Undisputed          \_\_\_ Disputed          \_\_\_ Undisputed But Objected To

1220. Dr. Wolfson asked Dr. Putnam whether non-human "alters" were a common phenomena in cases of DID, and Dr. Putnam told him that they were.

\_\_\_ ✓ Undisputed          \_\_\_ Disputed          \_\_\_ Undisputed But Objected To

1221. Despite being told by Dr. Putnam that non-human alters were common, Dr. Wolfson failed to mention this fact in his 1997 report or in his court testimony.

\_\_\_\_ Undisputed          \_\_\_ ✓ Disputed          \_\_\_ Undisputed But Objected To

1222. Instead of relaying what Dr. Putnam had told him about non-human

248

alters, Dr. Wolfson's 1997 report states that Mr. Hammer's report of Jasper

"would seem a further bit of surreality."

✓ Disputed

1223. Dr. Wolfson's report in this regard was misleading.

___ Undisputed          ___ Disputed          ___ Undisputed But Objected To

1224. When Dr. Wolfson concluded in 1997 that Mr. Hammer "malingered"

this was a reference only to the diagnosis of DID.

___ Undisputed          ✓ Disputed          ___ Undisputed But Objected To

1225. Dr. Wolfson believes that Mr. Hammer does have mental health

pathology.

✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

1226. Dr. Wolfson agrees with Dr. Mitchell's diagnosis of Mr. Hammer on

Axis I as having a Major Depressive Disorder, Recurrent.

✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

1227. Dr. Wolfson has no disagreement with Dr. Martell's diagnosis of Mr.

Hammer as having an Axis I diagnosis of Cognitive Disorder, Not Otherwise

Specified.

✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

1228. Mr. Hammer was subjected to psychological testing while at the

USMCFP at Springfield in 1997.

249

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

1229. The 1997 psychological testing was conducted by Dr. Frederick.

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

1230. Dr. Frederick did not administer neuropsychological testing to Mr. Hammer.

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

1231. Dr. Wolfson thought that Dr. Matthew's and Dr. Martell's diagnosis of Mr. Hammer as having a Borderline Personality Disorder (BPD) was "reasonable" and that he would not "quibble" with it.

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

1232. Dr. Wolfson had no disagreement with Dr. Blumberg's Axis I diagnosis of Mr. Hammer as having Post-Traumatic Stress Disorder (PTSD).

___ Undisputed          ✓ Disputed          ___ Undisputed But Objected To

1233. Dr. Wolfson believes that those subject to childhood abuse "show an elevated prevalence of all mental illnesses, except schizophrenia."

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

1234. Dr. Wolfson is unsure of the relationship between childhood trauma and the development of BPD.

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

250

1235. Dr. Wolfson believes that "what most people think" is that the absence of stable relationships in childhood retards the normal maturation process.

____ Undisputed        ✓ Disputed        ____ Undisputed But Objected To

1236. Dr. Wolfson believes that a "prevalent model" in the mental health field holds that childhood abuse causes BPD.

✓ Undisputed        ____ Disputed        ____ Undisputed But Objected To

1237. Dr. Wolfson believes that the mainstream of the mental health professions believes that childhood abuse also can cause PTSD.

✓ Undisputed        ____ Disputed        ____ Undisputed But Objected To

1238. Dr. Wolfson believes that those with DID may manifest post-traumatic symptoms or PTSD.

✓ Undisputed        ____ Disputed        ____ Undisputed But Objected To

1239. Dr. Wolfson agrees that those with DID engage in self mutilative and impulsive behaviors.

____ Undisputed        ✓ Disputed        ____ Undisputed But Objected To

1240. Dr. Wolfson believes that those who have DID and who experience sudden and intense relationships, may warrant a concurrent diagnosis of BPD.

____ Undisputed        ✓ Disputed        ____ Undisputed But Objected To

1241. Dr. Wolfson believes that BPD is frequently misdiagnosed.

251

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

1242. Dr. Wolfson believes that taking Mr. Hammer's history of childhood physical and sexual abuse as true, it qualifies as the type of trauma that could cause either BPD, PTSD or DID.

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

1243. Dr. Wolfson believes that Mr. Hammer suffered from childhood abuse as described in the records and interviews he reviewed.

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

1244. Mr. Hammer has a history of abuse that is consistent with the data from five studies of DID patients reported in *Dissociative Identity Disorder*, by Ross (Defendant's Exhibit 5 at 19).

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

1245. The similarities between Mr. Hammer's history of sexual abuse and those set forth in Ross, include a history of "hand - genital" contact, fondling, performing oral sex on a male, and a male performed oral sex on Mr. Hammer.

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

1246. Dr. Wolfson testified that Mr. Hammer: "reported to me sexual molestation at the hands of multiple people . . . physical abuse at the hands of multiple people [] [and] a particularly distorted, disturbed relationship with his

252

mother."

___✓___ Undisputed          ___ Disputed          ___ Undisputed But Objected To

1247.  Mr. Hammer's abuse was also consistent with the cases studied in Ross, in regard to the relationships between the abuser and the victim.

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

1248. Dr. Wolfson's basis for concluding that Mr. Hammer malingered DID in 1997 was that there was an absence of prior identification of symptoms, there was an inadequate opportunity to view the alters and Mr. Hammer has a history of deceit.

____ Undisputed          _✓ Disputed          ___ Undisputed But Objected To

1249. In assessing whether Mr. Hammer had DID in 1997, Dr. Wolfson did not explore whether Mr. Hammer was highly hypnotizable.

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

1250. Dr. Wolfson acknowledged that Ross recommends reliance on high hypnotizablity as measure for identifying DID in patients with a history of childhood abuse.

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

1251. Mr. Hammer scored 47 on the DES test (Dissociative Elements Scale) administered by Dr. Kluft.

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

1252. Mr. Hammer has been diagnosed as having a BPD.

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

1253. Given that Dr. Kluft found him to be highly hypnotizable, and that he scored a 47 on his administration of the DES and has a BPD, Mr. Hammer matched Dr. Ross' paradigm for the profile of a patient with DID caused by childhood abuse.

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

1254. Dr. Wolfson believes that many patients identified as having DID have been to many mental health providers and there is a time lag between their first encounter with the mental health system and their ultimate diagnosis with DID.

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

1255. Dr. Wolfson believes that Dr. Richard Kluft was "in large part responsible" for bringing to the attention of the psychiatric community, the conceptualization of DID as a "more subtle phenomenon than the earlier stereotyped descriptions" of the illness.

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

1256. Dr. Wolfson agreed that Ross' *Dissociative Identity Disorder* states

254

that there was a modern resurgence in the study of DID in the scientific community starting in about 1984.

__✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

1257. Dr. Wolfson agreed that Dr. Kluft also dated the modern resurgence of interest in the scientific community about DID to about 1984.

__✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

1258. Dr. Wolfson agreed that as of the time of the offense, Mr. Hammer had spent about 42% of his life in the custody of the Oklahoma prison system.

__✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

1259. Dr. Wolfson does not know if the mental health records from the Oklahoma prison system upon which he relied in making his determination that Mr. Hammer did not have a reported history of symptoms consistent with DID while in the Oklahoma prison system, were generated by unqualified or deficient providers, as indicated in the testimony of Louis Bullock, Esq.

____ Undisputed        __✓ Disputed        ___ Undisputed But Objected To

1260. Dr. Wolfson agreed that Dr. Ross in his *Dissociative Identity Disorder*, believes that even "well-trained, research oriented psychiatrists miss cases of DID on a regular basis."

__✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

255

1261. Dr. Wolfson believes that it would be "unrealistic" to expect that the Oklahoma prison mental health providers would have been able to "put the pieces together" to be able to diagnose DID in Mr. Hammer.

____ Undisputed        _✓_ Disputed        ___ Undisputed But Objected To

1262. Dr. Wolfson believed that Mr. Hammer's mental health history presents a "highly challenging and complex" case which is consistent with Dr. Ross' view of the typical case of DID.

_✓_ Undisputed        ___ Disputed        ___ Undisputed But Objected To

1263. Dr. Ross in his work *Dissociative Identity Disorder* states that patients diagnosed with DID often have prior diagnoses of mood disorder, personality disorder, anxiety disorder, schizophrenia, adjustment disorder, organic mental disorder, somatic complaints of abdominal pain, and Munchausen's Syndrome.

_✓_ Undisputed        ___ Disputed        ___ Undisputed But Objected To

1264. Dr. Wolfson agreed that Mr. Hammer had each of these diagnoses in his mental health and medical history.

_✓_ Undisputed        ___ Disputed        ___ Undisputed But Objected To

1265. Dr. Ross in his work *Dissociative Identity Disorder* states that patients diagnosed with DID often have histories of self destructive behaviors,

256

including recurrent suicidal thoughts, suicide attempts, drug overdoses, and wrist

slashing.

____ ✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

1266. Dr. Wolfson agreed that Mr. Hammer had engaged in each of these

self-destructive behaviors during his lifetime.

____ ✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

1267.  Dr. Ross in his work *Dissociative Identity Disorder* states:

There are a large number of nonspecific diagnostic clues for DID, then, which when they occur together, make DID by far the more likely diagnosis. In fact, I would say that nearly 100% of the patients who present with these features have classical DID:

1.    History of childhood sexual and/or physical abuse.
2.    Female sex.
3.    Age 20-40.
4.    Blank spells.
5.    Voices in the head or other Schneiderian symptoms.
6.    Meets or nearly meets DSM-IV criteria for borderline personality.
7.    Previous unsuccessful treatment.
8.    Self-destructive behavior.
9.    No thought disorder.

(Defendant's Exhibit 5 at page 33).

____ ✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

1268. Dr. Wolfson agreed that Mr. Hammer met 8 of the 9 criteria which

Dr. Ross states is indicative of a classic case of DID, and that the only criteria he

257

did not meet is that of "gender."

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

1269. According to Dr. Wolfson, Mr. Hammer did not malinger on either the MMPI, VIP or "dot counting" tests administered by Dr. Frederick at USMCFP at Springfield in 1997.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

1270. According to Dr. Wolfson, Mr. Hammer "appeared overly invested in looking good" on the psychological testing administered by Dr. Frederick.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

1271. Dr. Wolfson stated in his second forensic report (written in 1998) that Mr. Hammer's stated reasons for wishing to waive his post-trial rights and direct appeal was a concern for Mr. Marti, his family and general remorse.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

1272. Dr. Wolfson agreed that there was a "fundamental inconsistency" between Mr. Hammer's expressions of remorse and concern for Mr. Marti with his diagnosis of anti-social personality disorder, which has at its core a lack of concern for the feelings and rights of others.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

258

**XXXII**    **Dr. John Mitchell** (Supplemental Findings)[2]

1273. Dr. Mitchell testified that he advised Mr. Hammer that one way of trying to manage the trial-related stress was to keep up on correspondence and contacts with family and friends.

___✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

1274. Dr. Mitchell agreed that any limits on Mr. Hammer's ability to keep up his correspondence with family and friends would have increased his stress and would have diminished his ability to manage trial-related stress.

___✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

1275. Dr. Mitchell testified that Mr. Hammer related to him that the amount of stress related to the trial made him feel as though he "did not want to go on."

___✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

1276. Dr. Mitchell testified that during his competency evaluation of Mr. Hammer conducted on June 22, 1998 he explored, among other things, whether Mr. Hammer's decision to plead guilty was the product of depression and/or suicidality.

___✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

---

[2]Findings regarding Dr. Mitchell's testimony are contained in Part I, page 60. These Supplemental Findings relate to his testimony of September 26, 2005.

259

1277. Dr. Mitchell testified that Mr. Hammer's statements to Marshall Ellis just minutes after the guilty plea while en route back to the Marshall's cell area, that Mr. Hammer "did not want to live" was important information as it related to Mr. Hammer's competency to plead guilty.

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

1278. Dr. Mitchell did not conduct neuropsychological testing of Mr. Hammer at any time, including during his June 22, 1998 competency evaluation.

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

## XXXIII    Randy Gonzales

1279. Randy Gonzales of Springfield Federal Medical Facility testified regarding records of the Springfield facility during the time that Mr. Hammer was confined for purposes of evaluation pursuant to this Court's order.

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

1280. Included within those records was a videotape of Mr. Hammer on various dates in October, 1997.

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

1281. Mr. Hammer raised complaints of guard abuse arising out of incidents that took place in October, 1997.

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

260

1282. The videotape presented by Mr. Gonzales only involved one of the dates in question arising out of Mr. Hammer's abuse allegations.

____ Undisputed      ✓ Disputed      ___ Undisputed But Objected To

1283. Even the section of the videotape of the date in question is flawed in that it does not show the areas where Mr. Hammer was assaulted (the shower and the telephone area).

____ Undisputed      ✓ Disputed      ___ Undisputed But Objected To

1284. The Court finds the videotape has no evidentiary value in response to the claims raised by Mr. Hammer in his Amended Petition.

____ Undisputed      ✓ Disputed      ___ Undisputed But Objected To

1285. Although the guards involved in the assaults were named by Mr. Hammer, Mr. Gonzales had no records of any interviews or statements by these guards.

✓ Undisputed      ___ Disputed      ___ Undisputed But Objected To

1286. The absence of any credible, reliable evidence disputing the veracity of Mr. Hammer's allegations of abuse bears against any weight that these allegations of abuse are false or any evidence that the conditions of confinement at the Springfield facility were not as Mr. Hammer described.

____ Undisputed      ✓ Disputed      ___ Undisputed But Objected To

261

## XXXIV    Dr. Phillip Magaletta

1287. Dr. Magaletta testified that BOP psychology files were available to law enforcement officers on a "need to know basis."

_✓_ Undisputed          ___ Disputed          ___ Undisputed But Objected To

1288. Dr. Magaletta's testimony in this regard conflicted with that of Dr. Bersoff, Dr.Kessler, Dr. Mitchell, the document generated by Dr. Karten (Defendant's Exhibit 31.8 at page 7) and the BOP Standards (Defendant's Exhibit 18).

___ Undisputed          _✓_ Disputed          ___ Undisputed But Objected To

1289. This Court finds that Dr. Magaletta's testimony regarding confidentiality was not credible.

___ Undisputed          _✓_ Disputed          ___ Undisputed But Objected To

1290. Dr. Magaletta testified that the various BOP facilities are analogous to satellite offices of one large hospital, and therefore records generated by one are available to personnel at the other branches even without consent of the patient.

___ Undisputed          _✓_ Disputed          ___ Undisputed But Objected To

1291. Dr. Magaletta's testimony in this regard conflicted with that of Dr. Bersoff, Dr.Kessler, Dr. Mitchell, the document generated by Dr. Karten (Defendant's Exhibit 31.8 at page 7) and the BOP Standards (Defendant's Exhibit

18).

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

1292. This Court finds that this aspect of Dr. Magaletta's testimony was not credible.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

1293. Dr. Magaletta testified that in his encounter with Mr. Hammer dated June 11, 1997 (Defendant's Exhibit 31.10 at page 2) that Mr. Hammer related that he believed that his food was being poisoned by a guard and his cell was bugged.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

1294. Dr. Magaletta agreed that there was no chance that these beliefs were true and constituted delusional thinking on Mr. Hammer's part.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

1295. This Court finds that the note of June 11, 1997 constitutes evidence of delusional thinking on Mr. Hammer's part.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

## XXXV    Dr. Kenneth H. Kessler

_____1296. Dr. Kessler agreed that the Bureau of Prison's Professional, Ethical and Legal Issues and Standards (Defendant's Exhibit 18) (hereafter BOP Standards) mentions the APA Standards' requirement that psychologists try to

263

avoid role conflicts.

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

1297. The BOP Standards also require that BOP psychologists avoid exploiting the trust and dependency of clients.

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

1298. Dr. Kessler believes that these requirements are important as BOP psychologists play a "powerful role in the sense that they're seen as a helper and as somebody who the inmate can go to for help with problems or difficulties."

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

1299. Dr. Kessler believes that there exists the potential that a prisoner/patient could become dependent on the services rendered by a BOP psychologist.

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

1300. Dr. Kessler agreed that the BOP Standards warn psychologists that the assumption of dual roles can violate the APA Standards.

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

1301. Dr. Kessler agreed that the BOP Standards require that its providers advise prisoners of potential role conflicts.

___ Undisputed          ___✓ Disputed          ___ Undisputed But Objected To

264

1302. Dr. Kessler agreed that the BOP Standards require that its providers seek to avoid role conflicts, but that if they cannot be avoided, the conflict needs to be explained to the prisoner.

____ Undisputed          ✓ Disputed          ___ Undisputed But Objected To

1303. Dr. Kessler agreed that as circumstances change, a provider is obliged to explain the impact of such changed circumstances on potential conflicts.

✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

1304. Dr. Kessler agreed that the APA Standards have as a "guiding concern" the avoidance of harm and the potential for harm to a patient.

✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

1305. Dr. Kessler believes that if a psychologist finds himself in a conflicted dual role, fails to terminate at least one of the roles that causes the conflict, and does not advise the patient of the conflict, that psychologist acts unethically.

____ Undisputed          ✓ Disputed          ___ Undisputed But Objected To

1306. Dr. Kessler agreed that on page 47 of Defendant's Exhibit 31.7, Dr. Mitchell noted that Mr. Hammer was concerned that Dr. Mitchell might at some point testify against him, and was thereby questioning Dr. Mitchell's fidelity.

____ ✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

265

1307. Dr. Kessler agreed that page 50 of Defendant's Exhibit 31.7 showed that Mr. Hammer had increasing concerns regarding Dr. Mitchell's fidelity.

___✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

1308. Dr. Kessler agreed that pages 78, 79, 94 and 102 of Defendant's Exhibit 31.7 indicated that the trial prosecutor and Dr. Mitchell had contacts regarding Mr. Hammer's prosecution, and about Dr. Mitchell testifying at various points in time.

___✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

1309. Dr. Kessler testified, and this Court finds, that it would have been more appropriate for Dr. Mitchell to have advised Mr. Hammer of these contacts and the failure to do so constituted an ethical violation.

___ Undisputed        ___✓ Disputed        ___ Undisputed But Objected To

1310. Dr. Kessler agreed and this Court finds, that Dr. Mitchell acted in a dual role when he used clinical information obtained during his therapy sessions with Mr. Hammer to generate a forensic opinion as set forth in Defendant's Exhibit 31.7, page 24.

___ Undisputed        ___✓ Disputed        ___ Undisputed But Objected To

1311. Dr. Kessler testified and this Court finds that since Dr. Mitchell was engaged in a dual role when he wrote the report contained in Defendant's Exhibit

266

31.7, page 24, he was ethically obliged to advise Mr. Hammer that he had written the report.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

1312. This Court finds that Dr. Mitchell's failure to advise Mr. Hammer that he wrote the note on page 24 of Defendant's Exhibit 31.7 in fact constitutes an ethical violation.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

1313. A breach of confidentiality qualifies as a type of harm to a patient that can arise from a dual role.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

1314. Dr. Kessler agreed that in a non-prison setting communications between a patient and therapist are confidential, with exceptions relating to harm to self or others.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

1315. Dr. Kessler agreed that the BOP Standards adopt the non-prison setting rules regarding confidentiality, with additional exceptions.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

1316. Dr. Kessler agreed that Dr. Karten advised Mr. Hammer (Defendant's Exhibit 31.8, page 7) of the confidentiality that would attain to his therapy

267

sessions, and that his advisement was consistent with the APA Standards with specific BOP-related exceptions.

✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

1317. The BOP exceptions to the general rule of confidentiality about which Dr. Karten advised Mr. Hammer related to a court request/order and/or institutional security.

___ Undisputed          ✓ Disputed          ___ Undisputed But Objected To

1318. Based on the assumption that Dr. Mitchell's confidentiality advisement to Mr. Hammer mirrored Dr. Karten's, Dr. Kessler agreed, and this Court finds, that Dr. Kessler's report was incorrect when it stated that "there really is no doctor-patient privilege in the federal system."

___ Undisputed          ✓ Disputed          ___ Undisputed But Objected To

1319. Dr. Kessler agreed that Dr. Mitchell released Mr. Hammer's psychology file to Dr. Wolfson for use in his 1997 forensic study of Mr. Hammer.

✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

1320. Dr. Kessler also agreed that Dr. Wolfson relied upon this file in formulating his opinions regarding Mr. Hammer's criminal responsibility.

✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

1321. Dr. Kessler could not identify any exception to confidentiality that

would have permitted Dr. Mitchell to release Mr. Hammer's psychology file to Dr. Wolfson.

\_\_\_ Undisputed        ✓ Disputed        \_\_\_ Undisputed But Objected To

1322. Dr. Kessler agreed that when Dr. Mitchell released Mr. Hammer's psychology file to Dr. Wolfson for use in his 1997 forensic study of Mr. Hammer's criminal responsibility, Dr. Mitchell breached the confidentiality promises he made to Mr. Hammer.

\_\_\_ Undisputed        ✓ Disputed        \_\_\_ Undisputed But Objected To

1323. This Court finds that there was no exception to the general rule of confidentiality regarding patient-therapist communication, and that Dr. Mitchell breached confidentiality when he released Mr. Hammer's records to Dr. Wolfson.

\_\_\_ Undisputed        ✓ Disputed        \_\_\_ Undisputed But Objected To

1324. Dr. Kessler agreed and this Court finds that under the circumstances of Mr. Marti's death, and in view of the potential for liability of the BOP and individual mental health providers involved in Mr. Hammer's therapy and management, it was an unethical dual role for the BOP to conduct the forensic evaluation of Mr. Hammer's criminal responsibility for the death of Mr. Marti.

\_\_\_ Undisputed        ✓ Disputed        \_\_\_ Undisputed But Objected To

1325. Dr. Kessler agreed and this Court finds that Dr. Mitchell's change of

269

Mr. Hammer's MDS code (Defendant's Exhibit 31.7, at page 45) raised an ethical concern, inasmuch as the code change from mentally ill to sociopathic could be viewed as Dr. Mitchell's act of self-protective from liability.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

**XXXVI**    <u>**Ronald Travis, Esquire**</u> (supplemental findings)[3]

1326. On September 28, 2005, Mr. Hammer recalled Mr. Ronald Travis, Esquire.

___ ✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

1327. Mr. Travis testified that during the course of their representation of Mr. Hammer, he and Mr. Ruhnke filed requests for discovery and specifically requested all evidence pursuant to <u>Brady v. Maryland</u>, 373 U.S. 83, 87 (1963).

___ ✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

1328. Mr. Travis testified that current § 2255 counsel provided him with the two FBI 302 statements from Mr. Johnson and the statements from Mr. Fowler, Mr. Ball and Mr. Guerrero.

___ ✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

1329. Handwritten notes from Agent Malocu were disclosed to Mr.

---

[3]These findings reflect further testimony by Mr. Travis on September 28, 2005.

Hammer's counsel just prior to the commencement of Mr. Travis' testimony.

__✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

1330. Mr. Travis also reviewed these handwritten notes.

__✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

1331. Mr. Travis testified and the Court finds that the suppressed statements were material and relevant to both Mr. Hammer's guilt phase defense and to counter the Government's argument concerning substantial preplanning and premeditation during the penalty phase of this case.

___ Undisputed          _✓ Disputed          ___ Undisputed But Objected To

1332. Mr. Travis also testified that the suppressed evidence contained in the statements and documents outlined above impacted the voluntariness of Mr. Hammer's guilty plea because counsel was unable to discuss the import of the suppressed materials with Mr. Hammer

___ Undisputed          _✓ Disputed          ___ Undisputed But Objected To

1333. During Mr. Travis' opening statement to the jury during the guilt phase, he argued to the jury that Mr. Marti was voluntarily tied to the bed during sexual bondage: "[i]t was developed that the tying was voluntary and the tying was part of some plan; kinky homosexual activity between Mr. Hammer and between Mr. Marti."

271

_✓_ Undisputed        ___ Disputed        ___ Undisputed But Objected To

1334. During penalty phase closing arguments, Mr. Travis reminded the jury on two separate occasions that Mr. Marti was bound to the bed as a result of consensual "sexual bondage."

_✓_ Undisputed        ___ Disputed        ___ Undisputed But Objected To

1335. The Government argued that there was no consensual sex and that the braiding of the ropes demonstrates "substantial planning" because "you have to factor in what time it took to make heavy duty restraints to keep a six foot four, two hundred pound man in place."

___ Undisputed        _✓_ Disputed        ___ Undisputed But Objected To

1336. The Government argued that the tying of Mr. Marti to the bed was "essential preplanning."

___ Undisputed        _✓_ Disputed        ___ Undisputed But Objected To

1337. Mr. Travis testified that the following information contained in the statement of Mr. Albert Ray Johnson dated June 3, 1998, was relevant, material Brady evidence:

> JOHNSON indicated that HAMMER was a homosexual and was into bondage. He and his homosexual cell mates would tie each other up and whip each other with rope or electrical cord. Hammer and his sexual partners would come to the cell door playing with each other.

272

____ Undisputed        ____ Disputed        ✓ Undisputed But Objected To

1338. Mr. Travis testified that if he had been aware of this evidence indicating Mr. Hammer had a history of engaging in sexual bondage, he would have investigated such evidence as it was relevant and material to the Mr. Hammer's defense.

____ Undisputed        ✓ Disputed        ____ Undisputed But Objected To

1339. Mr. Travis also testified that the following portion of Mr. Johnson's June 3, 1998 statement was critical and material to Mr. Hammer's defense at both guilt and sentencing:

> While incarcerated in the Special Housing Unit, HAMMER engaged in sexual activity with his cell mate who was identified as a white male with a first name of TONY, having long stringy hair. JOHNSON never really talked to HAMMER's cell mate, but did talk with HAMMER on many occasions. HAMMER and his cell mate would tie each other up and bite each other. They would yell over to JOHNSON's cell and make a lot of noise. HAMMER and his cell mate would typically stay up all night engaging in sexual activity. They would tie each other up using braided sheets. When one would fall asleep, the other would tie him up.

____ Undisputed        ____ Disputed        ✓ Undisputed But Objected To

1340. Mr. Travis testified that if he had been aware of Mr. Hammer's history of participating in sexual bondage while incarcerated at the Special Housing Unit at the United States Penitentiary in Allenwood, Pennsylvania, he

273

would have investigated this information and presented it to the jury.

____ Undisputed        ✓ Disputed        ____ Undisputed But Objected To

1341. Mr. Travis also testified that if he had been aware that a witness who was incarcerated with Mr. Hammer in Oklahoma could have provided testimony that Mr. Hammer had engaged in sexual bondage years before the death of Mr. Marti, he would have investigated and presented such evidence.

____ Undisputed        ✓ Disputed        ____ Undisputed But Objected To

1342. Mr. Travis testified that the evidence contained in the suppressed FBI 302 statements was consistent with the rendition of events leading up to the death of Mr. Marti contained in the Sadoff/Dubin hypnosis video statement of Mr. Hammer.

____ Undisputed        ✓ Disputed        ____ Undisputed But Objected To

1343. Mr. Travis testified that he was particularly troubled by the suppression of Mr. Johnson's statement to Agent Malocu that he – Mr. Johnson – had taught Mr. Hammer how to braid sheets and that Mr. Johnson had prior knowledge predating the offense in this case that Mr. Hammer had previously used braided sheets for sexual activity.

____ Undisputed        ✓ Disputed        ____ Undisputed But Objected To

1344. Mr. Travis testified that had he been aware of this type of

274

information, he would have wanted to investigate it and present it during both the guilt and penalty phases of Mr. Hammer's capital trial.

____ Undisputed      ✓ Disputed      ____ Undisputed But Objected To

1345. Mr. Travis testified and the Court finds that Mr. Johnson's knowledge about Mr. Hammer's prior usage of braided sheets for sexual activity would have supported Mr. Travis' opening statement.

____ Undisputed      ✓ Disputed      ____ Undisputed But Objected To

1346. Mr. Travis testified and the Court finds that Mr. Johnson's knowledge about Mr. Hammer's prior usage of braided sheets for sexual activity would have been critical evidence at penalty phase to counter the Government's argument that the braiding of the sheets demonstrated substantial preplanning and premeditation.

____ Undisputed      ✓ Disputed      ____ Undisputed But Objected To

1347. Mr. Travis testified and the Court finds that prior to receiving the suppressed FBI 302 statements discussed above, he was unaware that Mr. Hammer had previously used braided sheets for sexual bondage while incarcerated in the Special Housing Unit at USP Allenwood.

____ Undisputed      ✓ Disputed      ____ Undisputed But Objected To

1348. Mr. Travis also testified that the suppressed FBI 302 statement from Mr. Royce Lee Fowler constitutes <u>Brady</u> evidence that should have been disclosed

275

prior to trial.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

1349. Mr. Travis testified that he would have wanted to investigate evidence that while incarcerated at USP Leavenworth a full year before the death of Mr. Marti, Mr. Hammer had revealed that he participated in sexual bondage:

> FOWLER has had the same girlfriend for the past 20 years. Her name is NANCY. On one occasion when he was telling HAMMER bout how he wanted to tie NANCY up with her pantyhose, HAMMER informed FOWLER about his liking bondage and wanting to be tied up during sex.

____ Undisputed        ___ Disputed        ✓ Undisputed But Objected To

1350. Mr. Travis also testified and the Court finds that prior to the disclosure by the Government on September 22, 2005, of the thirty-two previously undisclosed FBI 302 statements, he had never seen the 302 from Mr. Martin R. Guerrrero, Jr.

____ ✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

1351. Mr. Travis testified that Mr. Guerrero's statement contradicts a portion of Mr. Hammer's FBI 302 confession.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

1352. In the April 13, 1996 statement, Mr. Hammer told the FBI that on April 11, 1996, he mailed a letter to Mr. Guerrero through a third party in

276

Michigan regarding the alleged "hit" placed on Marti.

___ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

1353. Mr. Guerrero told the FBI that while he knew Mr. Hammer from USP in Leavenworth, Kansas, "he never received any letter from Hammer" and "stated that he never received any mail from a third party located in Michigan."

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

1354. Mr. Travis testified that the evidence contained in the FBI 302 statement from Mr. Guerrero is information he would have investigated and presented to the jury if he had been aware of its existence.

___ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

1355. Mr. Travis also testified that the Government never provided him with the FBI 302 statement from Mr. Gaylon Don Ball dated June 3, 1998.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

1356. Mr. Ball told the FBI that he had known Mr. Hammer for several years.

___ Undisputed        ___ Disputed        ✓ Undisputed But Objected To

1357. Mr. Ball told Agent Malocu that:

> It is BALL's opinion that HAMMER was having sexual relations with Marti, although he has no facts to back up his opinion.

277

___ Undisputed        ___ Disputed        ✓ Undisputed But Objected To

1358. Mr. Travis testified that had he been aware of Mr. Ball's statement to the FBI, he would have wanted to interview him in order to ascertain what he knew and what other information he may have been able to provide the defense.

___ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

1359. On the morning of Mr. Travis' testimony regarding the suppressed FBI 302 statements, the Government provided counsel for Mr. Hammer with Agent Malocu's handwritten notes, which in turn were reviewed by Mr. Travis.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

1360. Mr. Travis observed and the Court finds that Agent Malocu's handwritten notes differ from his type-written FBI 302 statement.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

1361. While Agent Malocu noted in his formal 302 statement that Mr. Ball stated "he had no facts to back up his opinion" that Mr. Marti and Mr. Hammer were sexual partners, his handwritten notes do not indicate that Mr. Ball actually stated he had "no facts to back up his opinion."

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

1362. Rather, Agent Malocu's handwritten notes (Defense Exhibit 224) merely state "it is Ball's opinion that Hammer was having sexual relations with

278

Marti although this is only his opinion."

__✓__ Undisputed          ___ Disputed          ___ Undisputed But Objected To

1363. Mr. Ball's FBI 302 statement indicates that he became aware that something had occurred in cell 103 when he heard a female's voice approximately one hour before he learned about the murder.

__✓__ Undisputed          ___ Disputed          ___ Undisputed But Objected To

1364. Mr. Travis would have wanted to investigate, whether the female voice heard by Mr. Ball was that of one of Mr. Hammer's alter personalities, Tammy.

____ Undisputed          __✓__ Disputed          ___ Undisputed But Objected To

1365. Mr. Travis testified that these two documents are in conflict and that Agent Malocu's handwritten notes suggest that Mr. Ball heard a female voice an hour before the commotion outside of Mr Hammer's cell once the body of Mr. Marti was discovered.

____ Undisputed          __✓__ Disputed          ___ Undisputed But Objected To

1366. Mr. Travis testified that this evidence indicates that Mr. Hammer's mental illness was active at the time of Mr. Marti's death.

____ Undisputed          __✓__ Disputed          ___ Undisputed But Objected To

1367.  Mr. Travis testified that he would have wanted to not only

279

investigate this information further, but he would have wanted to provide this information to Dr. Sadoff and Dr. Wolfson.

____ Undisputed          _✓_ Disputed          ___ Undisputed But Objected To

1368. Mr. Travis also testified and the Court finds that the portion of Mr. Royce Lee Fowler's statement wherein he told Agent Malocu that Mr. Hammer, long before the offense in this case, related aspects of his history of sexual abuse as a child is evidence he would have investigated in order to rebut the Government's argument that Mr. Hammer's background "was not as severe as he would like you to believe."

____ Undisputed          _✓_ Disputed          ___ Undisputed But Objected To

## XXXVII   Dr. Daryl Matthews

1369. Dr. Daryl Matthews was qualified as an expert in forensic psychiatry.

_✓_ Undisputed          ___ Disputed          ___ Undisputed But Objected To

1370. At the request of the Government, Dr. Matthews, with the assistance of Dr. Martell, conducted a forensic evaluation of Mr. Hammer.

_✓_ Undisputed          ___ Disputed          ___ Undisputed But Objected To

1371. Dr. Matthews concluded that Mr. Hammer was not malingering.

_✓_ Undisputed          ___ Disputed          ___ Undisputed But Objected To

1372. Dr. Matthews relied on Dr. Martell for neuropsychological testing

and conclusions.

___✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

1373. Dr. Matthews concluded that Mr. Hammer suffered from Cognitive Disorder Not Otherwise Specified; Polysubstance Dependence in a Controlled Environment; Borderline Personality Disorder ("BPD"); Antisocial Personality Disorder ("ASPD"); Narcissitic Personality Disorder ("NPD").

___✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

1374. Although Dr. Matthews testified that the sensory perception deficits found by Dr. Martell had no impact on Mr. Hammer's competency to enter a guilty plea or waive his rights, that testimony is contradicted by Dr. Matthews testimony that he was not well-versed in brain anatomy and relied on Dr. Martell for the neuropsychological conclusions.

___ Undisputed        ___✓ Disputed        ___ Undisputed But Objected To

1375. Dr. Matthews acknowledged that conditions of confinement can lead to stressors that impact and impair an individual's mental health.

___✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

1376. Dr. Matthews acknowledged that, where an individual is already mentally ill, conditions of confinement can further exacerbate the symptomotology. ___✓ Undisputed        ___ Disputed        ___ Undisputed

281

But Objected To

1377. During the evaluation, Mr. Hammer told Dr. Matthews that the conditions at the Springfield Federal facility and Allenwood were onerous.

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

1378. While he was aware that the Oklahoma Department of Corrections built a special cell for Mr. Hammer and that Mr. Hammer described the conditions in that institution as onerous, Dr. Matthews did not review the videotape of the cell conditions.

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

1379. Dr. Matthews recognized that persons with Borderline Personality Disorder (BPD) are severely dysfunctional.

___ Undisputed          ___✓ Disputed          ___ Undisputed But Objected To

1380. Dr. Matthews acknowledged that persons with BPD are highly sensitive to interpersonal stress.

___ Undisputed          ___✓ Disputed          ___ Undisputed But Objected To

1381. Dr. Matthews acknowledged that persons with BPD can become enraged and self-destructive when experiencing perceived loss in personal relationships.

___ Undisputed          ___✓ Disputed          ___ Undisputed But Objected To

282

1382. Dr. Matthews acknowledged that profound abandonment fears can occur in persons with BPD and that such abandonment fears can occur when an acquaintance does something as harmless as taking a vacation.

___✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

1383. Dr. Matthews acknowledged that individuals with BPD's often develop profound attachments to persons they do not like, as a result of their psychological need to establish personal relationships.

___ Undisputed        ___✓ Disputed        ___ Undisputed But Objected To

1384. Dr. Matthews acknowledge that persons with BPD will take extreme efforts to avoid loneliness.

___✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

1385. Dr. Matthews acknowledged that persons with BPD can exhibit impulsivity; inappropriate anger; self-destructive behavior; and suicide threats.

___✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

1386. Dr. Matthews acknowledged that one feature of BPD is identity disturbance.

___ Undisputed        ___✓ Disputed        ___ Undisputed But Objected To

1387. Dr. Matthews acknowledged that persons with BPD can experience sudden shifts in self-image and, at times, experience feelings that they do not exist

at all.

___ Undisputed         ✓ Disputed        ___ Undisputed But Objected To

1388. Dr. Matthews acknowledged that when under stress, persons with

BPD can experience psychotic-like cognitive impairments; perceptual distortions;

and dissociation.

___ Undisputed         ✓ Disputed        ___ Undisputed But Objected To

1389. Dr. Matthews acknowledged that the impulsive acts of persons with

BPD can be severe.

___ Undisputed         ✓ Disputed        ___ Undisputed But Objected To

1390. Dr. Matthews acknowledged that the impulsive acts of persons with

BPD can occur during dissociated states.

___ Undisputed         ✓ Disputed        ___ Undisputed But Objected To

1391. Dr. Matthews acknowledged that persons with BPD have severe

dyscontrol of mood and impulse.

___ Undisputed         ✓ Disputed        ___ Undisputed But Objected To

1392. Dr. Matthews acknowledged that persons with BPD are profoundly

dysfunctional in important aspects of life and that a murder trial constitutes one

such important aspect of life.

___ Undisputed         ✓ Disputed        ___ Undisputed But Objected To

284

1393. Dr. Matthews acknowledged that people with BPD engage in suicidal threats, gestures and genuine attempts.

__✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

1394. Dr. Matthews acknowledged that Mr. Hammer had a history of suicidal threats, gestures and genuine attempts.

__✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

1395. Dr. Matthews acknowledged that post-traumatic stress disorder (PTSD) is an Axis I disorder.

__✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

1396. Dr. Matthews acknowledged that Mr. Hammer suffered from physical and sexual trauma at the hands of his mother that included: subjecting him to unnecessary enemas; physical abuse; emotional abuse; and sexually inappropriate conduct.

____ Undisputed          _✓ Disputed          ___ Undisputed But Objected To

1397. Dr. Matthews acknowledged that Mr. Hammer suffered from abuse at the hands of his father that included: failure to protect him from other abuse; sexual abuse and coerced sexual behavior between Mr. Hammer and his sister.

____ Undisputed          _✓ Disputed          ___ Undisputed But Objected To

1398. Dr. Matthews acknowledged that Mr. Hammer suffered from sexual

285

abuse at the hands of two uncles.

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

1399. Dr. Matthews acknowledged that Mr. Hammer suffered from intrusive and distressing recollections of childhood abuse.

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

1400. Dr. Matthews acknowledged that Mr. Hammer suffered from difficulties with sleep.

___ Undisputed          ___✓ Disputed          ___ Undisputed But Objected To

1401. Dr. Matthews acknowledged that Mr. Hammer displayed irritability and outbursts of anger.

___ Undisputed          ___✓ Disputed          ___ Undisputed But Objected To

1402. Dr. Matthews acknowledged that Mr. Hammer exhibited responses to the trauma that included fear and helplessness.

___ Undisputed          ___✓ Disputed          ___ Undisputed But Objected To

1403. Dr. Matthews acknowledged that trauma is a consistent feature with PTSD, BPD and DID.

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

1404. Dr. Matthews acknowledged that persons with BPD can also suffer from PTSD.

286

___✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

1405. Although he did not diagnosis Mr. Hammer with PTSD, Dr. Matthews did not rule out the diagnosis.

___✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

1406. Dr. Matthews' reliance on the rule of parsimony as his basis for not diagnosing PTSD is not credible in light of his failure to apply the rule with respect to ASPD and NPD.

___ Undisputed        ___✓ Disputed        ___ Undisputed But Objected To

1407. Dr. Matthews testified that he would accept another expert's view (e.g. Dr. Blumberg) that he (Dr. Matthews) should have included a diagnosis of PTSD.

___ Undisputed        ___✓ Disputed        ___ Undisputed But Objected To

1408. Nevertheless, Dr. Matthews did not consider the impact of Mr. Hammer's PTSD on his competency or his ability to make a knowing, intelligent and voluntary waiver of his rights.

___ Undisputed        ___✓ Disputed        ___ Undisputed But Objected To

1409. Dr. Matthews acknowledged that the circumstances leading up to a guilty plea or waiver of rights were important considerations in determining whether or not the individual was competent or entered a knowing, intelligent and

287

voluntary waiver.

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

1410. Dr. Matthews acknowledged that a key issue of both competency and the ability to make a knowing, intelligent and voluntary waiver is the individual's functioning at or around the time of any waiver.

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

1411. Hospital, Oklahoma Department of Corrections and Bureau of Prisons records were provided to Dr. Matthews in anticipation of his evaluation.

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

1412. Dr. Matthews relied on others to summarize the institutional and hospital records.

___ Undisputed          ___✓ Disputed          ___ Undisputed But Objected To

1413. Of the other individuals relied upon by Dr. Matthews to conduct the records review, only one individual, Dr. Piasecki is a psychiatrist; the others were psychology students.

___ Undisputed          ___✓ Disputed          ___ Undisputed But Objected To

1414. The summary generated by the other individuals is that provided in Defendant's Exhibit 217.

___ Undisputed          ___✓ Disputed          ___ Undisputed But Objected To

288

1415. Defendant's Exhibit 217 begins on page 7.

_✓_ Undisputed          ___ Disputed          ___ Undisputed But Objected To

1416. Dr. Matthews was unable to provide pages one through six of the summary or articulate what was contained in those pages.

___ Undisputed          _✓_ Disputed          ___ Undisputed But Objected To

1417. Although Dr. Matthews claimed to have read various records, he did not have an independent recollection of having read BOP Psychological records that were omitted in the summary (Exhibit 217), specifically the summaries for the months of April through August, 1997 or April through June, 1998.

_✓_ Undisputed          ___ Disputed          ___ Undisputed But Objected To

1418. The psychological summaries of the months of April through May, 1997 are relevant to the determination of whether or not Mr. Hammer's May, 1997 motion to enter a guilty plea was free of any emotional, psychological or mental impairment.

___ Undisputed          _✓_ Disputed          ___ Undisputed But Objected To

1419. Dr. Matthews' failure to review and read the summaries of April and May, 1997 renders unreliable his reliance on Mr. Hammer's prior motion to enter a guilty plea as a basis for his competency and capacity in June, 1998 and thereafter.

289

___ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

1420. The psychological summaries from May, 1997 until August, 1997 describe the circumstances leading up to Mr. Hammer's second motion to enter a guilty plea in August, 1997.

___ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

1421. Dr. Matthews' failure to review and read these psychological summaries renders his reliance on Mr. Hammer's August, 1997 motion to enter a guilty plea as a basis for his competency and capacity in June, 1998 and thereafter unreliable.

___ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

1422. Dr. Matthews' failure to read the psychological summaries from April, 1998 until and including June, 1998 renders his conclusion that Mr. Hammer was competent and held the requisite capacity to enter a guilty plea and subsequently waive his rights to appeal unreliable and incredible.

___ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

1423. In light of Dr. Matthews' failure to read records leading up to the guilty plea, his opinions regarding Mr. Hammer's competency and capacity to make a knowing, intelligent and voluntary waiver is unreliable.

___ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

1424. Dr. Matthews' report does not mention that he was aware that minutes after his June 22, 1998 guilty plea, Mr. Hammer told Marshall Ellis that the reason he pled guilty was that he did not wish to live.

✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

1425. Dr. Matthews did not mention that he was aware of the Ellis statement in his post-conviction testimony.

✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

1426. This Court finds that Dr. Matthews was not made aware that minutes after his June 22, 1998 guilty plea, Mr. Hammer told Marshall Ellis that he pled guilty because he wanted to die.

___ Undisputed          ✓ Disputed          ___ Undisputed But Objected To

1427. Dr. Matthews' opinion that Mr. Hammer was competent to enter a knowing, intelligent and voluntary guilty plea on June 22, 1998 is not reliable because he was not made aware of Marshall Ellis' testimony that immediately following the guilty plea Mr. Hammer told him that he pled guilty because he wanted to die.

___ Undisputed          ✓ Disputed          ___ Undisputed But Objected To

1428. Marshall Ellis' testimony that Mr. Hammer did not want to live minutes after his guilty plea, directly contradicts what Mr. Hammer told Dr.

291

Wolfson and Dr. Mitchell during his June 22, 1998 competency exam.

___ Undisputed          _✓_ Disputed          ___ Undisputed But Objected To

1429. Dr. Matthews relied upon the June 22, 1998 testimony of Dr. Mitchell and Dr. Wolfson in making his retrospective determination that Mr. Hammer was competent to plead guilty.

_✓_ Undisputed          ___ Disputed          ___ Undisputed But Objected To

1430. In view of Dr. Matthews' reliance on the testimony of Dr. Mitchell and Dr. Wolfson, which in turn was contradicted by the Ellis statement, Dr. Matthews' opinion that Mr. Hammer was competent to plead guilty is unreliable.

___ Undisputed          _✓_ Disputed          ___ Undisputed But Objected To

1431. Dr. Matthews' report and testimony regarding Mr. Hammer's competency to plead guilty in June, 1998 relied upon his finding that Mr. Hammer had "rational" reasons for pleading guilty.

_✓_ Undisputed          ___ Disputed          ___ Undisputed But Objected To

1432. Among the rational reasons cited by and relied upon by Dr. Matthews was that Mr. Hammer's guilty plea was motivated by his desire to accept responsibility and his feelings of remorse for the victim and his family.

_✓_ Undisputed          ___ Disputed          ___ Undisputed But Objected To

1433. These reasons are squarely contradicted by Mr. Hammer's statement

292

to Marshall Ellis that he pled guilty because he wanted to die.

___ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

1434. These reasons are also squarely contradicted by Dr. Matthews' diagnoses of ASPD and NPD.

___ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

1435. Since Dr. Matthews' opinion that Mr. Hammer was competent to plead guilty was based upon incomplete information (i.e. he was not aware of the Ellis statement) and upon inaccurate information regarding "why" Mr. Hammer wished to plead guilty, his opinion is not accepted by this Court.

___ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

1436. Dr. Matthews testified that he did not "understand" Dissociative Identity Disorder (DID).

___ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

1437. Dr. Matthews has no clinical experience with DID.

___ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

1438. Dr. Matthews had very limited forensic experience with DID.

___ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

1439. Dr. Matthews never treated a person with DID.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

293

1440. Dr. Matthews does not believe that the disease of DID exists as it is set forth in the DSM-IV-TR.

__✓ Undisputed　　　___ Disputed　　　___ Undisputed But Objected To

1441. This Court finds that Dr. Matthews' view that the DSM-IV-TR formulation of DID is not accurate, places his views outside of the mainstream of the mental health professions.

___ Undisputed　　　__✓ Disputed　　　___ Undisputed But Objected To

1442. Dr. Matthews did not conduct any standardized testing or evaluations to determine whether or not Mr. Hammer suffered from DID.

__✓ Undisputed　　　___ Disputed　　　___ Undisputed But Objected To

1443. Dr. Matthews did not conduct the Structured Clinical Interview for the Diagnosis of DSM-IV Dissociative Disorders Revised although this testing is designed to determine the existence of DID under the DSM criteria.

__✓ Undisputed　　　___ Disputed　　　___ Undisputed But Objected To

1444. Although Dr. Matthews claimed that use of such testing as the SCID-D-R creates iatrogenic diagnoses, the credible and reliable peer-reviewed data presented by Dr. Kluft directly disputes this claim.

___ Undisputed　　　__✓ Disputed　　　___ Undisputed But Objected To

1445. Dr. Matthews conducted no testing of hypnotizability, despite the

credible data demonstrating a connection between hypnotizability and dissociative disorders.

____ Undisputed          ✓ Disputed          ____ Undisputed But Objected To

1446. Dr. Matthews' opinions with respect to recommended testing and evaluation for DID described by Dr. Kluft and the connection of those methods with iatrogenic diagnoses are outside of the mental health mainstream and are therefore unreliable and incredible.

____ Undisputed          ✓ Disputed          ____ Undisputed But Objected To

1447. Dr. Matthews testified that there was nothing Mr. Hammer could have done during the evaluation to convince him (Dr. Matthews) that he (Mr. Hammer) suffered from DID.

____ Undisputed          ✓ Disputed          ____ Undisputed But Objected To

1448. Dr. Matthews testified that he has never seen a genuine case of DID.

____ Undisputed          ✓ Disputed          ____ Undisputed But Objected To

1449. In Dr. Matthews' opinion, DID is not a proper mental health disorder and should not be listed as such in the DSM.

____ Undisputed          ✓ Disputed          ____ Undisputed But Objected To

1450. In light of Dr. Matthews' pre-conceived biases that DID does not exist; that there is no reliable method of testing for DID; and that any diagnosis of

DID is either the result of iatrogenesis or malingered, his elimination of DID as a possible diagnosis in Mr. Hammer's case is incredible and unreliable.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

1451. Dr. Matthews' reliance on the statements of counsel on June 22, 1998 regarding Mr. Hammer's competency and capacity to enter a guilty plea and waive his rights is rendered incredible and unreliable in light of counsels' expression of doubts.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

1452. In light of the defects in his evaluation and record review; his unwarranted biases against DID and failure to utilize accepted methods to rule out DID; his failure to consider PTSD as a possible diagnosis despite the overwhelming evidence supporting such a diagnosis, Dr. Matthews' opinions that Mr. Hammer held the requisite competence and capacity to enter a knowing, intelligent and voluntary guilty plea and waive his rights is incredible and unreliable.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

## XXXVIII    Dr. Saralee Funke

1453. Dr. Saralee Funke was Board certified as a forensic pathologist for less than two years at the time she performed the autopsy of Andrew Marti.

296

___ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

1454. Only 1/3 of the autopsies Dr. Funke performs are for homicides and of that 1/3 the vast majority are homicides caused by gunshots.

___ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

1455. Only a very small percent of the homicide autopsies Dr. Funke performed involve deaths caused by asphyxiation.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

1456. Dr. Funke has never been to a crime scene where the cause of death was determined to be erotic asphyxiation.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

1457. Prior to the autopsy in this case, Dr. Funke had only performed two autopsies where the cause of death was determined to be accidental due to erotic asphyxiation.

___ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

1458. Dr. Funke has never published any articles or papers in the area of erotic asphyxia.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

1459. The vast majority of the time Dr. Funke testifies as a prosecution expert.

297

____ Undisputed          ✓ Disputed          ___ Undisputed But Objected To

1460. At the time of the autopsy in this case Dr. Funke had never testified as a defense witness.

____ Undisputed          ✓ Disputed          ___ Undisputed But Objected To

1461. On March 23, 2003 Dr. Funke performed an autopsy in a York County first degree murder case.

____ ✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

1462. The decedent in the York County case was Steven Strickler and the defendant was Dennis Toby.

____ ✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

1463. On May 19, 2004, Dr. Funke had to file an addendum to her autopsy in this York County case because she had made four mistakes:   the decedent, Steven Strickler, had been shot three times not two times; the bullet on his left front side was an entrance wound not an exit wound; the bullet on his back was an entrance wound not an exit wound; and, the trajectory of that  bullet was upwards not downwards.

____ ✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

1464. On December 31, 1998 Dr. Funke did the autopsy on a decedent named Ottomar Schramm who had died at Easton Hospital.

298

___ Undisputed         ___ Disputed         ___ Undisputed But Objected To

1465.  Mr. Schramm had three times the recommended dosage of digoxin in his system – a drug that he was not prescribed nor one that would have been appropriate for his condition.

___ Undisputed         ___ Disputed         ___ Undisputed But Objected To

1466. Dr. Funke stated in her autopsy report that the cause of Mr. Schramm's death was "accidental."

___ Undisputed         ___ Disputed         ___ Undisputed But Objected To

1467. Dr. Funke stated in her autopsy that the cause of death was "accidental" despite admitting that the situation was not clear one way or the other how the digoxin got into his system "whether it was somebody who didn't know what they were doing, somebody who didn't have enough education in their nursing background or somebody deliberately doing this."

___ Undisputed         ___ Disputed         ___ Undisputed But Objected To

1468. Dr. Funke testified and this Court finds that she placed the "accidental" finding in her autopsy report, even though she was not satisfied about it, because she felt the only was to make sure that the case did not get "buried" or "ignored" was to "put accident on it."

___ Undisputed         ___ Disputed         ___ Undisputed But Objected To

1469. In March, 2004 Mr. Charles Cullen pled guilty to first degree murder in the death of Mr. Schramm.

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

1470. Dr. Funke has offered to file an addendum to the Schramm autopsy but has not done so yet.

___ Undisputed          ___ Disputed          ___✓ Undisputed But Objected To

1471. Dr. Funke subscribes to the "American Journal of Forensic Medicine and Pathology."

___✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

1472. Dr. Funke acknowledged that a 2001 article published in the American Journal of Forensic Medicine and Pathology finds that "autoerotic asphyxiation and accidental ligature strangulation by a partner are well-known phenomena described in medical literature, particularly in forensic medicine reports."

___ Undisputed          ___✓ Disputed          ___ Undisputed But Objected To

1473. Dr. Funke also acknowledged that the 2001 article published in the American Journal of Forensic Medicine and Pathology finds that "The basic mechanism of sexual asphyxia is the production of cerebral hypoxia, which in some men appears to produce hallucination of an erotic nature. This hypoxia is

300

most often achieved by a constriction of the neck by a ligature . . . Bondage is common, sometimes involving elaborate and bizarre methods"

_✓_ Undisputed      ___ Disputed      ___ Undisputed But Objected To

1474. Dr. Funke testified and this Court finds that the object of erotic asphyxia is to decrease the oxygen to the brain in hopes of enhancing sexual excitement.

_✓_ Undisputed      ___ Disputed      ___ Undisputed But Objected To

1475. Dr. Funke testified and this Court finds that bondage, ligatures and erotic photographs are consistent with erotic asphyxia.

____ Undisputed      _✓_ Disputed      ___ Undisputed But Objected To

1476. Dr. Funke testified and this Court finds that gags are used in erotic asphyxia.

____ Undisputed      _✓_ Disputed      ___ Undisputed But Objected To

1477. Dr. Funke testified and this Court finds that a latex glove was found in cell 103 and latex gloves may be consistent with sexual activity.

____ Undisputed      _✓_ Disputed      ___ Undisputed But Objected To

1478. Dr. Funke testified and this Court finds that Dr. Spitz' textbook Medicolegal Investigation of Death: Guidelines for the Application of Pathology to Crime Investigation, Third Edition is one of three textbooks that she and other

forensic pathologists routinely use for their education.

___✓ Undisputed         ___ Disputed         ___ Undisputed But Objected To

1479. Dr. Funke acknowledged that the chapter titled "Asphyxia" a section titled "Sex Associated Asphyxias" in Dr. Spitz' textbook <u>Medicolegal Investigation of Death: Guidelines for the Application of Pathology to Crime Investigation, Third Edition</u> described that in erotic asphyxia cases "the victim may be found hanged, strangled or with a plastic bag over his head, binding the extremities, tying wrists or handcuffing are frequent and may be suggestive of bondage. Contrary to expectation, the genitalia are not necessarily exposed. Frequently the body is clothed. There is usually no suggestion of masturbation. ... Within the victim's view may be pornographic pictures . . ."

___✓ Undisputed         ___ Disputed         ___ Undisputed But Objected To

1480. Dr. Funke testified and this Court finds that bondage and sadomasochism can occur during erotic asphyxia.

___ Undisputed         ___✓ Disputed         ___ Undisputed But Objected To

1481. Dr. Funke testified and this Court finds that bondage, pornography and a clothed decedent are consistent with autoerotic asphyxia.

___✓ Undisputed         ___ Disputed         ___ Undisputed But Objected To

1482. Dr. Funke admitted that she does not know if these same factors are

302

consistent with erotic asphyxia.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

1483. Dr. Funke admitted that she did not know whether the object of the actions that caused Andrew Marti's death was erotic asphyxia or whether it was just ligature strangulation.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

1484. Dr. Funke testified that in determining cause of death "the more information the better" and new information can make "a big difference" and will sometimes cause her to change her original opinion as to cause or manner of death.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

1485. Dr. Funke was aware that there were pictures within a foot or two Mr. Marti's head, inside cell 103, but she was not aware that these were pornographic pictures.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

1486. Dr. Funke did not investigate -- nor was she provided with any information concerning -- Andrew Marti's sexual history or background.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

1487. At the time she performed the autopsy she did not know:  Mr. Marti was homosexual; if he had previously participated in erotic asphyxia or autoerotic

303

asphyxia; if he had previously participated in sexual activity with Mr. Hammer; and, she did not know if Mr. Hammer had ever previously participated in erotic asphyxia or autoerotic asphyxia.

____ Undisputed          ✓ Disputed          ___ Undisputed But Objected To

1488. Dr. Funke prepared her autopsy report and determined cause of death in this case before she received the results of the testing done on the anile and penile slides.

✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

1489. Dr. Funke testified and this Court finds that factors such as sexual orientation of the decedent, prior interest or participation in sexual fetishes such as bondage by the decedent and prior participation by the decedent in sexual acts with another that included restraints were all important factors to include in an autopsy.

____ Undisputed          ✓ Disputed          ___ Undisputed But Objected To

1490. Dr. Funke has included all of those factors in at least one other autopsy she performed.

✓ Undisputed          ___ Disputed          ___ Undisputed But Objected To

1491. Dr. Funke included these factors in the autopsy report of a decedent named Fed Abel who died from choking on peanut butter.

304

__✓__ Undisputed        ___ Disputed        ___ Undisputed But Objected To

1492. In the case of Mr. Abel, Dr. Funke did not rule the death a homicide despite the fact that he had been restrained by another male.

___ Undisputed        __✓__ Disputed        ___ Undisputed But Objected To

1493. Instead, Dr. Funke did not determine a cause of death.

___ Undisputed        __✓__ Disputed        ___ Undisputed But Objected To

1494. The case involving Mr. Abel, in which the autopsy was performed in May, 2000, is the only case Dr. Funke has handled involving two people where one person is dead and restraints are involved.

___ Undisputed        __✓__ Disputed        ___ Undisputed But Objected To

1495. Dr. Funke testified and this Court finds that the bruise to Mr. Marti's inner lip could have been caused by biting.

___ Undisputed        __✓__ Disputed        ___ Undisputed But Objected To

1496. In light of Dr. Funke's failure to consider evidence of sexual orientation; sexual fetishes and other physical evidence supporting erotica asphyxiation, the Court finds Dr. Funke's conclusion that the death was not the result of erotic asphyxiation incredible and unreliable.

___ Undisputed        __✓__ Disputed        ___ Undisputed But Objected To

1497. Dr. Funke found no signs of trauma to Andrew Marti's neck veins or

305

arteries.

___✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

1498. Dr. Funke found no broken bones in Mr. Marti's neck.

___✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

1499. Dr. Funke found no evidence of trauma to Mr. Marti's trachea, meaning that his air passages were not closed.

___✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

1500. Dr. Funke did not find any evidence of manual strangulation on Mr. Marti's neck.

___✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

1501. Dr. Funke found no evidence of a choke hold or sleeper hold being applied to Mr. Marti's neck.

___ Undisputed        ___✓ Disputed        ___ Undisputed But Objected To

1502. Dr. Funke testified and this Court finds that the lack of trauma to Mr. Marti's neck is consistent with incomplete or moderate pressure being applied to his neck.

___ Undisputed        ___✓ Disputed        ___ Undisputed But Objected To

1503. Dr. Funke testified and this Court finds that the application of incomplete or moderate pressure being applied to the neck is consistent with erotic

306

asphyxiation – practiced by two partners.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

1504. Dr. Funke testified and this Court finds that the abrasions on the surface of Mr. Marti's neck and the sub-surface hemorrhages on his neck were caused by the ligature.

____ Undisputed        ✓ Disputed        ___ Undisputed But Objected To

1505. Dr. Funke found no evidence on Andrew Marti's neck of anything other than a ligature strangulation.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

1506. Dr. Funke found no evidence of any trauma whatsoever to the back of Mr. Marti's neck.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

1507. Dr. Funke found no evidence of a ligature being wrapped around Mr. Marti's neck and pulled tightly in opposite directions while touching the back of his neck.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

1508. Dr. Funke agrees with Dr. Spitz that the ligature had to be open ended in the back of the neck – not touching the back of Mr. Marti's neck.

✓ Undisputed        ___ Disputed        ___ Undisputed But Objected To

307

1509. Dr. Funke testified that she is independent from the county coroner.

___✓ Undisputed     ___ Disputed     ___ Undisputed But Objected To

1510. Dr. Funke also testified that if asked by the coroner not to mention manner of death because of a continuing investigation she will honor such a request

___✓ Undisputed     ___ Disputed     ___ Undisputed But Objected To

## XXXIX    **Harry Montville**

1511. The Government also presented the testimony of former Deputy United States Marshal Harry Montville. Mr. Montville, who is presently a court security officer in the federal court house in Williamsport, testified that during May of 1996 and one day in July of 1996 he drove the transport van containing Mr. Hammer to and from this Court.

_____ Undisputed    ___✓ Disputed     _____ Undisputed But Objected To

1512. While Mr. Montville, upon questioning from Mr. Martin, stated he saw nothing unusual in Mr. Hammer's behavior, he readily admitted that he had little direct contact with Mr. Hammer and rarely, if ever, had a conversation with him.

_____ Undisputed    ___✓ Disputed     _____ Undisputed But Objected To

1513. Mr. Montville was not part of the Marshal Service transportation

team during the time Mr. Hammer waived his right to stand trial and plead guilty and also did not transport Mr. Hammer during the time Mr. Hammer waived his right to appellate counsel and his direct appeal.

_____Undisputed   __✓_Disputed   _____Undisputed But Objected To

1514. While Mr. Montville was forthright and cordial during his testimony, he unfortunately had nothing of substance to add concerning Mr. Hammer's mental state at the time of his waiver and plea of guilty and his waiver of direct appeal.

_____Undisputed   ___✓_Disputed   _____Undisputed But Objected To

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA  : Crim. No. 4:CR-96-263
            : Civil No. 4:CV-02-510
    v.       :
            : (Muir, J.)
DAVID PAUL HAMMER    : **ELECTRONICALLY FILED**


## CERTIFICATE OF SERVICE

I hereby certify that I caused a true and correct copy of the foregoing

**PETITIONER'S PROPOSED FINDINGS OF FACT**
**PART III AS ANNOTATED BY FREDERICK E. MARTIN, ESQUIRE**

to be electronically mailed and postage paid in the United States mail on October **6**, 2005 to:

ADDRESSEE:

    Anne L. Saunders, Esquire
    Anne_Saunders@fd.org

    Michael Wiseman, Esquire
    Michael_Wiseman@fd.org


              _____
              FREDERICK E. MARTIN
              Assistant United States Attorney