IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | : Crim. No. 4:CR-96-263 |
| | : Civil No. 4:CV-02-510 |
| v. | : |
| | : (Muir, J.) |
| DAVID PAUL HAMMER | : **ELECTRONICALLY FILED** |

**UNITED STATES' POST-HEARING BRIEF**

**Procedural History.**

This Court, beginning on July 14, 2005, and continuing through September 29, 2005, conducted a hearing on David Paul Hammer's Third Amended § 2255 petition. In an order dated September 29, 2005, this Court allowed the parties to file supplemental legal briefs.

Certain of the issues raised in the Third Amended Petition have been addressed already by previous order of this Court. For other issues, such as number 16 of that petition, no evidence was presented. Finally, this Court in an order dated September 27, 2005, *sua sponte* raised issues to be addressed at closings. The following legal memorandum is submitted on issues raised for which it is believed a supplemental presentation regarding the law applicable may be appropriate and helpful for this Court.

**Arguments.**

1. The Effectiveness of Trial Counsel on June 22, 1998.

With respect to the first and thirteenth issues raised by Hammer in the Third Amended § 2255 petition, a more detailed

focus, now that the evidence has been presented, will be made on claims that his trial counsel were ineffective on June 22, 1998. The following brief recapitulation of facts with pertinent law is presented.

No mental health expert to have examined Hammer at any time prior to June 22, 1998, indicated that Hammer was incompetent to proceed.  This included Drs. Gelbort, Sadoff, and Grassian, all defense experts.  Moreover, Hammer, although twice indicating an interest during 1997 to enter a guilty plea, never in fact did so.  His April 1997, effort was described by Dr. Mitchell as Hammer engaging in theatrics while the August 1997, pleading was described by one or more of his defense attorneys as an opportunity for Hammer to receive attention or express his disgruntlement that he was not receiving sufficient attention from them at that time.

Hammer apparently did not make up his mind to enter his guilty plea until after proceedings ended on June 19, 1998.  He did not convey his interest in doing so until sometime on June 21, 1998, first to paralegal Dave Sprout, and then to Ronald Travis, Esquire, in telephone conversations with them.

Travis, in turn, spoke with Ruhnke.  Their belief and hope on that Sunday evening was that after Hammer had gotten a good night's sleep or had an opportunity to think over his decision, he would, as he had on previous occasions, change his mind.

Notwithstanding discussions which Travis had with him on June 21, 1998, and both Travis and Ruhnke had with Hammer on the morning of June 22, 1998, they were not able to convince Hammer to change his mind and, in fact, Hammer persisted in his belief and desire to enter a guilty plea.

In determining whether Ruhnke and Travis then acted in accordance with the Sixth Amendment, it is appropriate to review their actions according to an objective standard of reasonableness, maintaining a presumption that defense counsel's performance was adequate. *Strickland v. Washington*, 466 U.S. 668, 688-89 (1984). One should bear in mind that the appropriate inquiry in assessing counsel's choices or actions is not whether they were "strategic." Instead and disregarding any self-labeling, "[T]he relevant question is not whether counsel's choices were strategic, but whether they were reasonable." *Bullock v. Carver*, 297 F.3d 1036, 1047-48 (10th Cir.), *cert. denied*, 537 U.S. 1093 (2002).

That Hammer did not change his mind about the plea, after having discussions with counsel and having an opportunity to mull over the matter, should not be equated with the conclusion that what Travis and Ruhnke pursued was not a reasonable strategy. *Graham v. Dormire*, 212 F.3d 474, 440 (8th Cir. 2000). Stated in another fashion, counsels' actions were not deficient merely because "through the fabled 20-20 vision of hindsight,' a better

course of action becomes apparent." *Murtishaw v. Woodford*, 255 F.3d 926, 946 (9th Cir. 2001), *cert. denied*, 535 U.S. 935 (2002). At the risk of repetition, the focus is on the reasonableness of trial counsel's actions in light of existing law and facts known at the time. *Cf. Revilla v. Gibson*, 283 F.3d 1203, 1221 (10th Cir.), *cert. denied sub nom. Revilla v. Mullin*, 537 U.S. 1021 (2002) (failure to secure psychiatric expert for mitigation not ineffective assistance).

It is submitted that it was reasonable for Travis and Ruhnke to maintain hope that Hammer would change his mind. Nonetheless, Hammer made it clear to them that he wished to proceed to enter the guilty plea on June 22, 1998. His instructions to counsel also should be considered in determining whether counsel violated the Sixth Amendment in failing to contact any of the prior mental health defense experts to assess Hammer's competence which perforce would include requesting delays since none of their experts were located in the Williamsport area. *King v. Kemna*, 266 F.3d 816, 824 (8th Cir. 2001), *cert. denied*, 535 U.S. 934 (2002) (Counsel's failure to seek evidence of client's incompetence was not deficient performance because defendant instructed that he wished not to be found incompetent).

An additional consideration for this Court to consider in determining counsel's effectiveness is whether the presence of any of the defense experts would have made a difference. In that

regard, this Court heard from previous defense experts Dr. Gelbort as well as Dr. Grassian, who opined that Hammer was not competent on June 22, 1998.  But this Court need not accept their opinions unless persuaded by the manner in which they arrived at those conclusions.  Moreover, Dr. Matthews, on behalf of the prosecution, indicated in his review of the same proceedings that Hammer was competent on that day.  If this Court determines that it believes the testimony of Drs. Wolfson and Mitchell, supplemented by the prosecution's later-retained expert, Dr. Matthews, that Hammer was, in fact, competent, then it is Hammer who has failed to demonstrate that he suffered any prejudice from the failure of Travis and Ruhnke to call Drs. Grassian or Gelbort or even Dr. Sadoff to testify in the proceedings, assuming they were available.  *Cf. Whitney v. Horn*, 280 F.3d 240, 261 (3rd Cir. 2002), *cert. denied sub nom. Whitney v. Beard*, 537 U.S. 1195 (2003) (Counsel's failure to object was not prejudicial in light of overwhelming evidence).

Hammer's present counsel expressly stipulated at the hearing on October 6, 2004, that Hammer was entering a competent, knowing, intelligent, voluntary, and rational decision to proceed on his Section 2255 motion.  (Transcript of 10/6/04, pp. 4 & 11.) Counsel nevertheless suggested that Hammer's competency could "wax and wane," *Id*., but none of Hammer's experts has explained with particularity why Hammer was competent on October 6, 2004,

and not at the entry of the guilty plea.  Dr. Gur, for example, was not even aware of counsel's stipulation, (Transcript of 8/9/05, p. 154), and his assertion that Hammer was incompetent to plead guilty was based on conditions that Dr. Gur maintained were "stable" over time. (Transcript of 8/9/05, p. 165.)  Counsel additionally suggested that their stipulation of Hammer's competency was controlled by a different legal standard than would apply to competency to plead guilty, (Transcript of 8/9/05, p. 153), but the Supreme Court has expressly held that no greater level of competency is required for a guilty plea (or waiver of an appeal) than is required for standing trial in general. *Godinez v. Moran*, 509 U.S. 389, 397-98 & n.9 (1993) (discussing *Rees v. Peyton*, 384 U.S. 312 (1966)).

2.  Claimed Ethical Violations by Bureau of Prisons Mental Health Providers.

The second issue raised by Hammer in his pleadings encompass claims that violations by Drs. Wolfson, Mitchell, and Karten of pertinent ethical guidelines for mental health practitioners undermined this Court's finding that Hammer was competent on June 22, 1998, to enter his guilty plea or at other times to waive his rights.

With respect to factual development at the hearing, it is submitted that Hammer presented no new facts with respect to the backgrounds of Drs. Wolfson, Mitchell, and Karten.  Rather, the

only novel information came from the clash of expert opinions on whether those Bureau of Prisons' mental health providers violated either the American Psychological Association or some other ethical guidelines.  The significance of this recapitulation is that this Court largely knew the background of the mental health evaluators, their relative experience, or lack of experience, their past interaction with Hammer, their diagnoses, and their employment association with the Bureau of Prisons prior to June 22, 1998, and certainly during the trial.  Stated in another fashion, through hearing the testimony of Dr. Wolfson before the jury, prior to Hammer's expressed desire to enter a plea of guilty, as well as listening to his statements at the mental health competency proceeding on June 22, 1998, and testimony from Dr. Mitchell on that same day, it is submitted that this Court was in a position so as to assess fairly their credibility, the competence of their evaluations and the value of their opinions.

The premise of Hammer's argument, which is not thought to be supported by significant decisional law, is that because Drs. Wolfson, Mitchell, and Karten may have violated ethical considerations, their opinions were significantly flawed, inherently unreliable, and violated Hammer's Due Process rights. (3rd Amended Petition, p. 26.)  But even as Attorney Travis indicated, he was aware of no legal authority in 1998, nor even today, which supports such a purported Due Process violation.

It is submitted that by analogy, assuming *arguendo* that Drs. Mitchell, Wolfson, and Karten violated one or more aspects of the Bureau of Prisons' program statement or A.P.A. ethical considerations, it does not follow that a denial of Due Process took place. That is, there is a body of decisional law which has developed which suggests that employees' failure to follow internal procedures or guidelines in law enforcement situations, does not thereby deprive a person of any Fifth Amendment right.

As a general rule, "internal guidelines of a federal agency," which are not promulgated as regulations and which "are not mandated by statute or the constitution, do not confer substantive rights on any party." *United States v. Craveiro*, 907 F.2d 260, 264 (1st Cir.), *cert. denied*, 498 U.S. 1015 (1990); *see United States v. Caceres*, 440 U.S. 741, 749-57 (1979). While ethical considerations are laudatory, they are not mandated by the Fifth Amendment. Even if Hammer possibly could have pursued an action against the mental health providers with state boards which regulated those practitioners, it is a leap of logic and law to conclude that their testimony had little or no value, particularly when there has been full disclosure of the challenged relationships. *United States v. Caceres,* 440 U.S. at 754 (that another remedy may exist does not suggest that a constitutional violation has occurred).

8

3.   The Government's Reliance on Hammer's Statement to the Federal Bureau of Investigation.

Hammer suggested that the government has always maintained that his statement in its entirety was accurate.  However, that was never the case, as Special Agent Malocu indicated: certain aspects of the statement were verified and certain aspects of it were not verified.  There is thought to be no known decisional law which indicates that if the prosecution believes that some aspects of a statement are not true, then none of the statement or admissions made by a defendant can be utilized at trial without offending fundamental fairness.  Since a jury is not required to accept "all or nothing" regarding a witness' testimony, so too the prosecution can rely on what it believes in good faith are accurate aspects of a statement which may not be entirely truthful.  Federal Jury Practice, 5th Ed., § 15.01 at 350 (2000).

The thrust of the defense argument was that the government possessed knowledge that Hammer accidently killed Marti during erotic asphyxiation. (3rd Amended Petition, p. 43.)  But Special Agent Malocu testified without contradiction, even once his interviews were released to Hammer's counsel, that no one with whom he spoke provided such information to him.  Indeed, in this regard, the only evidence presented at the § 2255 hearing to support such a claim came from Rodney Archambeault who suggested

that Marti may have engaged in bondage and expressed an interest in being choked.[1]  Archambeault's name was linked to a tax fraud investigation of which defense counsel was fully aware and which involved Hammer.  It certainly would be understandable why, given Archambeault's background, neither attorney Travis nor Ruhnke would want to present such a witness in support of the claimed accidental killing of Marti.  *Duncan v. Morton*, 256 F.3d 189, 201 (3rd Cir.), *cert. denied*, 534 U.S. 919 (2001)(failure to call witness reasonable trial strategy).

    4.   <u>Purported Destruction of Pertinent Evidence</u>.

Hammer suggested, and originally faulted the government for destroying evidence, such as the slides or swabs, taken from Marti during the autopsy, which, in fact, remained in existence. (3rd Amended Petition, p. 49.)  They also complained that initial trial counsel should have conducted additional testing.  (3rd Amended Petition, p. 48.)  But what has new counsel for Hammer gained by testing the items of physical evidence?  Nothing.  Even with the Bode Laboratory analysis, Hammer's sperm fractions were found on Hammer's own items and none were located on Marti.

---

[1]  In the appeal from Hammer's attempt to dismiss his Section 2255 motion, Ruhnke argued that a stay of execution and remand to this Court was needed to ensure that the government was not about to execute an innocent man.  Attorney Ruhnke emphasized, among other items, an affidavit from fellow inmate Mark Jordan, presently on trial for a federal prison murder of his own.  This Court allowed Jordan to testify in this proceeding via video-teleconference, but Hammer's present counsel have elected as a tactical matter not to call Mark Jordan.

Thus, Hammer was not prejudiced, even assuming that Ruhnke and Travis should have conducted more testing of the evidence. *Battle v. Delo*, 19 F.3d 1547, 1557 (8th Cir. 1994), *modified*, 64 F.3d 347 (1995), *cert. denied sub nom. Battle v. Bowersox*, 517 U.S. 1235 (1996).

As to the latex gloves seen in the video of SHU cell 103, (3rd Amended Petition, p. 51), apart from the testimony of O'Berg at the § 2255 hearing and the testimony at trial of Yager, there was no evidence whatsoever that anyone connected with the prosecution thought latex gloves would serve as makeshift inmate condoms. Every correctional officer who was asked the question indicated that he was unaware of latex gloves serving as condoms. Moreover, this Court heard that the gloves in question were thoroughly examined by at least Agent Thompson and Guy Fleck and found to have no probative value before they were disposed of or thrown away in April 1996.

In order to demonstrate a Due Process violation, Hammer had to prove that law enforcement officials, in disposing of the items of evidence, acted in bad faith at the time of the destruction. *Arizona v. Youngblood*, 488 U.S. 50, 58 (1988). This hurdle even on the facts developed at trial and at the hearing, cannot be overcome.

5. <u>The Purported Purchase of Witness' Testimony</u>.

At issue 14, Hammer claimed that exculpatory material relating to three trial witnesses, Donn Troutman, Reverend Glenn Crook, and Dr. John Mitchell, was not provided by the prosecution or alternatively that attorneys Ruhnke and Travis failed to provide effective assistance in not discovering such factors. (3rd Amended Petition, pp. 70-71.)  It is undisputed that all three received monetary awards from Warden Fanello in October 1998, following the conclusion of Hammer's trial and in so awarding alluded *inter alia* to the fact that the prosecution indicated that they testified in the proceedings.

All three individuals were asked whether they knew in advance of any anticipated financial reward for testifying.  All three indicated that no such relationship had existed.  Rather, the Warden's former executive assistant indicated that the awards were pursuant to a public Bureau of Prisons' policy and that two of the named individuals had received awards in other situations in matters unrelated to any trial testimony.  Simply put, the basis upon which these awards were given does not rise to the level of a *Brady* violation.  *United States v. Shea*, 150 F.3d 44, 49 (1st Cir. 1998)*, cert. denied*, 525 U.S. 1030 (1998) (merit reward for FBI agent not *Brady* material).

It is, of course, for this Court to determine the credibility of all witnesses.  It is submitted that the circumstances outlined above, if determined to be true, indicate

that there was no need for attorneys Ruhnke and Travis to examine each and every Bureau of Prisons' employee to determine if they were aware of a national program statement and possibly anticipated receiving some remuneration for their participation at trial.  Had they done so, all Bureau of Prisons' employees would have answered the same question in the same fashions.  Consequently, Hammer would not be prejudiced by the failure to conduct such an examination or investigation.  *Whitney v. Horn, supra*.

6.    Hammer's False Murder Confessions.

Hammer's nineteenth ground, as stated in his pleadings, was that counsel did not receive from the prosecution all information regarding Hammer's supposedly false confessions or, alternatively, if they did, they did not investigate and present those false confessions at the time of trial.  (3rd Amended Petition, pp. 89 & 95.)  The following brief recapitulation of facts is presented.

The prosecution, in various forms, including newspaper articles, advised Hammer's attorneys of multiple false confessions by Hammer.  These included information about the homicides in Enid, Oklahoma, the two women Hammer purportedly murdered in Oklahoma; his involvement in the Karen Silkwood case; his involvement in the Kenneth Kenner killing in Tennessee; his involvement in the self-described "two bit murder" in Ohio; and

13

even his involvement in the alleged murder of a person and his mother at an unknown location, as reported in *The Advocate*, a gay-oriented newspaper.  About the only murder which the FBI and prosecution did not provide information to trial counsel was the "Jane Doe" murder in Chataqua, New York.  However, the testimony from the chief investigator in that case, who testified at the § 2255 hearing, did not even suggest that the FBI was aware of that murder.

During examination, attorney Ruhnke was asked and disclosed that he learned from Hammer during the pretrial discussions with him of the Chataqua, New York killing and its false character. Similar revelations were made about the Karen Silkwood murder by Hammer to counsel.  The prosecution conceded to the defense also during pretrial discovery that Hammer probably lied about his involvement in the Kenner killing.

What is important is that both Ruhnke and Travis indicated that, after discussing the matter with their client, they did not wish to present this evidence to the triers of fact, such a decision based upon concerns that the jury would either disbelieve other claims made by Hammer (including his mental state) or they might believe in part that he actually was involved in other murders and impose the death penalty for that reason.  Of course, a third similarly unpleasant inference was possible: the triers of fact could have thought that Hammer

frequently had thoughts of murder, whether he acted on them or not, which suggests future dangerousness.  It is submitted that the decision of attorneys Ruhnke and Travis not to introduce all of the false murder confessions, none of which were remotely, factually similar to the events of April 13, 1996, was a well-considered one about which second-guessing may occur, but upon which this Court should not find a violation of Hammer's Sixth Amendment right to effective counsel.  *Bell v. Cone*, 535 U.S. 685, 702 (2002) (tactical decision about which competent lawyers might disagree does not qualify as objectively unreasonable).

Additionally, Ruhnke and Travis did not provide ineffective assistance in failing to investigate Hammer's false claims of murder.  Their client's candor in telling them about their false character eliminated the need for any further inquiry by them. *Neal v. Acevedo*, 114 F.3d 803, 806 (8th Cir. 1997) (defense counsel could rely on statements by their client regarding what investigations could be fruitful).

7.  Putative *Brady* Violations for Non-Disclosure of FBI 302s or Notes.

In *United States v. Bagley*, 473 U.S. 667, 682 (1985), the Supreme Court further defined what material must be disclosed to the defense if a request for exculpatory material under *Brady v. Maryland*, 373 U.S. 83 (1963), is made.  The *Bagley* court held that evidence is material and should be disclosed if there is

reasonable probability that disclosure of the evidence would have changed the outcome of the proceeding.  A "reasonable probability is defined as a probability sufficient to undermine confidence in the outcome."  *Bagley*, 473 U.S. 682.

In reaching this determination any assessment of the effective non-disclosure must take account of the cumulative effect of the suppressed evidence in light of other evidence, not merely the probative value of the suppressed evidence standing alone.  *See Marshal v. Hendricks*, 307 F.3d 36, 62-63 (3rd Cir. 2002) (no *Brady* violation though the prosecution suppressed two pieces of alleged impeachment evidence because confidence in verdict not shaken if evidence was viewed cumulatively).  *Allen v. Lee,* 366 F.3d 319, 324-25 (4th Cir. 2004) (no *Brady* violation despite failure to disclose jail medical records because defendant personally was aware of what medication he received).

It is submitted that in analyzing a Fifth Amendment claim, pertinent also is what information the prosecution in *toto* turned over to the defense as well as what specific requests were made by defense counsel for its disclosure.  For example, the defense knew of Martin Guerrero as a potential witness, even though his name was misspelled, when Hammer's statement to the FBI was released.  When asked specific questions by Hammer's trial counsel for discoverable material, specific answers were provided by the prosecution.  This included lists of inmates who may have

16

had contact with Hammer in Allenwood's SHU on or prior to the killing, including Gaylon Don Ball.

The Supreme Court decision in *United States v. Agurs*, 427 U.S. 97 (1976), considered the rule of *Brady v. Maryland, supra*, in three different situations.  With respect to the situation in Hammer's case, while there was a dragnet request for *Brady* material but no specific request was made for materials relating to David Paul Hammer's sexual practices, the Supreme Court noted that reversal is necessary only if the undisclosed evidence creates a reasonable doubt that did not otherwise exist.  *Agurs*, 427 U.S. at 112.  With respect to the "parameters of prosecution obligations under *Brady*," the Third Circuit in *United States v. Pelullo*, 399 F.3d 197, 215 (3rd Cir. 2005), observed "the well established principle that 'the government is not obliged under *Brady* to furnish a defendant with information which he already has or, with any reasonable diligence, he can obtain himself.' *United States v. Starusko*, 729 F.2d 256, 262 (3rd Cir. 1984) (citation omitted)."  In assessing whether a *Brady* violation occurred in *United States v. Pelullo*, 399 F.3d at 211, important considerations included the respective knowledge of the parties, access by defendant to information and the government's representations.

While the instant case does not entirely involve documentation once owned by Hammer, as in *United States v.*

17

*Pelullo, supra*, the source of the purported exculpatory information with respect to Hammer's past clandestine homosexual practices, would be Hammer himself.  Hammer also provided his defense counsel with names of his prior cellmates, including O'Berg, McLaughlin, and Tony Jones.  By the same token, the Bureau of Prisons did not maintain a continuous log of with whom Hammer shared a cell.  Additionally, the Bureau of Prisons did not have any documentation, whether in the form of discipline proceedings or otherwise, indicative of the fact that Hammer braided sheets, which would constitute a contraband item or engaged in homosexual behavior, which also is against the rules of that agency, had they been asked specifically for such information.

In point of fact, Hammer discussed, at least with attorney Ruhnke, the theory about accidental killing of Marti during rough sex.  Both Ruhnke and Travis considered, but did not rely upon the accidental death during sex theory, when the mental health defense seemed superior and there remained no strong physical evidence supporting erotic asphyxiation.

The prosecution knew by virtue of Hammer's notice, pursuant to Federal Rule of Criminal Procedure 12.2(a), filed on September 24, 1997, that he intended to rely upon an insanity defense.  To be sure, from interviewing inmates such as Classen and Yager, the prosecution was aware Hammer had expressed an interest in having

18

homosexual relations with Marti.  Also the videotaped hypnotic session of Hammer by Drs. Dubin and Sadoff alluded to Hammer's interest expressed then of tying up people, including Marti, as it related to sexual encounters (pp. 25 & 33).  But while that item referred to Hammer's "purpose" and alluded to "talking," there was no explicit reference in that presentation that Hammer and Marti contemporaneously engaged in erotic asphyxiation at the time of Marti's death.  Likewise, Dr. Wolfson's report in Hammer's case does not contain references to homosexual activity contemporaneous with the killing.

The prosecution's *Brady* obligation does not encompass certain information.  That is, the prosecution need not provide merely speculative evidence. such as the Ball 302.  *United States v. Amiel*, 95 F.3d 135, 145 (2nd Cir. 1996) (no *Brady* violation when witness information was merely speculative.)  Regardless through disclosure of the inmate listing, Hammer's counsel knew of Ball's presence near the murder scene.  Finally, Ruhnke knew of Ball from his discussions with Hammer who mentioned his name.

By the same token, the prosecution need not turn over information which is inculpatory.  As to Fowler and Johnson, both witnesses, if called, would have testified against Hammer with respect to his proffered and preferred defense, a mental health claim based on Dissociative Identity Disorder, which both

19

witnesses indicated was unsupported in their experiences with him.

Pertinent also is what information the defense already possessed.  In the instant case, Albert Johnson's interview referred to information which he received from Hammer regarding Hammer's sexual involvement with Tony Jones.  Attorney Travis indicated that he had already been in contact with Tony Jones about potential testimony in the case.  *Spirko v. Mitchell*, 368 F.3d 603, 611 (6th Cir. 2004) (no *Brady* violation despite failure to produce evidence because evidence was available to defense from other sources and defense was aware of the essential facts necessary to obtain the evidence).  Moreover, it appears that Hammer's trial counsel subpoenaed Fowler to appear, although did not present his testimony at trial.  This Court did not allow for further factual development of those contacts, which it is submitted, precludes finding any *Brady* violation on the present record.  Under the circumstances, defense counsel had the opportunity to learn of Hammer's behavior with Jones and Fowler, as they did with O'Berg, McLaughlin, and others who testified and thus were not prejudiced by any failure to reveal Jones' or Fowler's statements to the FBI.

Finally, the trial evidence included information from Oklahoma inmate Mike Smith that Hammer, during the late 1980's, tied up prisoners during his homosexual encounters with them.

Thus, there was no prejudicial impact on the defense in presenting other inmates to testify about the same facts.  *Cf. Zeitvogel v. Delo*, 84 F.3d 276, 282-83 (8th Cir.), *cert. denied sub nom. Zeitvogel v. Bowersox*, 519 U.S. 953 (1996).

The defense implied that Hammer might not have entered his guilty plea had he known of the existence of the 302.  But Hammer maintained even during his guilty plea that the homemade ropes had a purpose other than for a hostage scenario, as thought by the prosecution.  Thus, his plea under these circumstances cannot be said to have been affected adversely by any failure to release additional FBI interviews.  *Parry v. Rosemeyer*, 64 F.3d 110, 118 (3rd Cir. 1995), *cert. denied*, 516 U.S. 1058 (1996).

8.   Standards Applicable to Hammer's Assertions of "Actual Innocence".

The Court has directed presentation of arguments on the proper standard for assessing Hammer's "actual innocence" claims. (Order of 9/27/05, pp. 7-8.)  As explained below, to the extent that Hammer asserts that his conviction of the Marti murder constitutes a miscarriage of justice, he must show that it is more likely than not that no reasonable juror would have convicted him in light of what new evidence Hammer has presented. To the extent that Hammer argues his death sentence constitutes a miscarriage of justice, he must show by clear and convincing

evidence that but for a constitutional error, no reasonable juror would have found Hammer eligible for the death penalty.

As the Court is well aware, an allegation of "actual innocence" in a habeas proceeding is made to invoke a particular exception to the procedural default doctrine, which the government has previously pleaded in response to many of the claims Hammer has raised in his Section 2255 motion.  Although an actual innocence claim[2] does not generally state a free-standing basis for habeas relief, *Herrera v. Collins*, 506 U.S. 390, 417 (1993), such a claim may allow review of an otherwise procedurally-barred constitutional habeas claim where the petitioner shows that "a constitutional violation probably resulted in the conviction of one who is actually innocent." *Schlup v. Delo*, 513 U.S. 298, 327 (1995).  Thus, this exception (also referred to as the "fundamental miscarriage of justice" rule, *id*. at 314-15) is "'not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits.'"  *Id.* at 315.

The Court notes that Hammer advances two types of "actual innocence" claims in his motion, consisting of (a) assertions that he is in fact innocent of murder because the asphyxiation

---

[2]  The Supreme Court has granted *certiorari* in a case involving a claim of actual innocence.  *House v. Bell*, No. 04-8990.

death of Andrew Marti was accidental, and (b) assertions that

"the death penalty is inappropriate under all of the

circumstances."  (Order of 9/27/05, pp. 4-5.)  In *Schlup*, a case

involving federal habeas review of a state death penalty case

pursuant to 28 U.S.C. § 2254, the Supreme Court re-confirmed that

the procedural default decision in *Murray v. Carrier*, 477 U.S.

478 (1986), supplied the proper standard for assessing a claim

under category (a), in which the petitioner asserted that he was

innocent of the crime of which he was convicted:

> The *Carrier* standard requires the habeas petitioner to
> show that "a constitutional violation probably resulted
> in the conviction of one who is actually innocent."  To
> establish the requisite probability, the petitioner
> must show that it is more likely than not that no
> reasonable juror would have convicted him in light of
> the new evidence.

*Schlup*, 513 U.S. at 327 (citations omitted).

In thus restating the *Carrier*'s comparatively generous

standard for claims of "actual innocence of the crime," *Schlup*

took pains to contrast the much more restrictive review accorded

"a petitioner's claims that his death sentence was

inappropriate," *i.e.*, that he is "innocent of the death penalty."

*Id.* at 323.  Referencing the post-*Carrier* decision in *Sawyer v.*

*Whitley,* 505 U.S. 333 (1992), *Schlup* reiterated that a claim of

innocence of the death penalty:

> [M]ust focus on those elements which render a
> defendant eligible for the death penalty.
> However, in addition to defining what it
> means to be 'innocent' of the death penalty,

> the Court departed from *Carrier*'s use of 'probably' and adopted a more exacting standard of proof to govern these claims: The Court held that a habeas petitioner "must show by clear and convincing evidence that but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty.

*Schlup*, 513 U.S. at 323 (quoting *Sawyer,* 505 U.S. at 336, 347).

It was hardly accidental that "innocence of the death penalty" claims were singled out for harsher treatment than "true" innocence claims.  Sawyer explained:

> Insofar as petitioner's standard would include not merely the elements of the crime itself, but the existence of aggravating circumstances, it broadens the extent of the inquiry but not the type of inquiry.  Both the elements of the crime and statutory aggravating circumstances in Louisiana are used to narrow the class of defendants eligible for the death penalty.  And proof or disproof of aggravating circumstances, like proof of the elements of the crime, is confined by the statutory definitions to a relatively obvious class of relevant evidence.  Sensible meaning is given to the term "innocent of the death penalty" by allowing a showing in addition to innocence of the capital crime itself a showing that there was no aggravating circumstance or that some other condition of eligibility had not been met.
>
> But we reject petitioner's submission that the showing should extend beyond these elements of the capital sentence to the existence of additional mitigating evidence. In the first place, such an extension would mean that 'actual innocence' amounts to little more than what is already required to show 'prejudice,' a necessary showing for habeas relief for many constitutional errors. If federal habeas review of capital sentences

> is to be at all rational, petitioner must show something more in order for a court to reach the merits of his claims on a successive habeas petition than he would have had to show to obtain relief on his first habeas petition.
>
> But, more importantly, petitioner's standard would so broaden the inquiry as to make it anything but a 'narrow' exception to the principle of finality that we have previously described it to be.  A federal district judge confronted with a claim of actual innocence may with relative ease determine whether a submission, for example, that a killing was not intentional, consists of credible, noncumulative, and admissible evidence negating the element of intent.  But it is a far more difficult task to assess how jurors would have reacted to additional showings of mitigating factors, particularly considering the breadth of those factors that a jury under our decisions must be allowed to consider.

*Sawyer,* 505 U.S. at 345-46 (citations and footnote omitted).

Thus, "innocence of the death penalty" claims focus exclusively on the issue of death penalty eligibility, not mitigating evidence, and must be proven by "clear and convincing" evidence. *Id.* at 350.

The foregoing decisions clearly established the pertinent standards for assessing claims of innocence of the crime and of the death penalty, but what this Court has questioned is whether these decisions even apply here given that they all occurred on federal Section 2254 review of state convictions, whereas this Court is reviewing its own judgment under Section 2255.  (Order of 9/27/05, pp. 5-6.)   The Court noted that the concerns

underlying these decisions, including federal-state comity, federalism and the finality of state court judgments, are not implicated on federal post-conviction review, or at least not to the same extent.  *Id.*

To the extent that the Court questions whether the broader procedural default doctrine (and its "actual innocence of the crime" exception) applies to Section 2255 review, this question was resolved long ago.  Although occasionally referred to as a rule of "federalism," *Coleman v. Thompson*, 501 U.S. 722, 726 (1991), the current formulation of the procedural default doctrine and its exceptions ("cause and prejudice" and "miscarriage of justice" or "actual innocence") traces much of its lineage to Section 2255 review.  *See Carrier*, 477 U.S. at 493-94 (discussing *Wainwright v. Sykes*, 433 U.S. 72 (1977), in which the Court abandoned the former "deliberate bypass" standard for determining whether a state prisoner's federal habeas claim was procedurally barred, in favor of the "cause and prejudice" and "miscarriage of justice" test applied in Section 2255 cases).  In *Daniels v. United States*, 532 U.S. 374 (2001), the Court reiterated that "procedural default rules developed in the habeas corpus context apply in § 2255 proceedings," in which the federal government has a recognized interest in maintaining the finality of its convictions and sentences.  *Id.* at 382-83 (citing *United States v. Frady*, 456 U.S. 152, 167-68 (1982)).  And, in *Bousley*

26

*v. United States*, 523 U.S. 614 (1998), the Court specifically applied the *Carrier/Schlup* actual innocence standard in determining whether Bousley was entitled to pass through that procedural default gateway to obtain review of the merits of his constitutional challenge to his guilty plea.  *Id*. at 623-24.

Although *Bousley* was a non-capital federal prosecution, *Bousley*'s direct application of the actual innocence standards of *Schlup* (a Section 2254 review of a state death penalty conviction) effectively forecloses any assertion that "actual innocence of the crime" is measured differently in federal versus state cases or in capital versus non-capital cases.  Further, there is no basis to conclude that a federal capital defendant's assertion of "innocence of the death penalty" would be entitled to any more permissive standard of review; as the authorities discussed above make clear, claims of actual innocence of the death penalty have been accorded a less-favored status than claims of innocence of the crime insofar as the petitioner must show by clear and convincing evidence that but for a constitutional error, no reasonable juror would have found him eligible for the death penalty.

The Second Circuit recently made plain its view that the established *Carrier/Schlup/Sawyer* framework for evaluating actual innocence claims applies equally to capital prosecutions under the Federal Death Penalty Act.  *See United States v. Quinones*,

313 F.3d 49, 67-69 (2nd Cir. 2002), *cert. denied*, 540 U.S. 1051

(2003).  In rejecting a claim the Federal Death Penalty Act

allowed an unconstitutional risk of executing innocent persons,

*Quinones* quoted from the Supreme Court's *Herrera* decision as

follows:

> The *Herrera* Court recognized that 'a
> petitioner otherwise subject to defenses of
> abusive or successive use of the writ may
> have his federal constitutional claim
> considered on the merits if he makes a proper
> showing of actual innocence.'  *Id*. at 404,
> 113 S. Ct. 853.  It emphasized, however, that
> 'our habeas jurisprudence [thus far] makes
> clear that *a claim of 'actual innocence' is
> not itself a constitutional claim. . . .*'
> *Id*.

*Quinones*, 313 F.3d at 67-68 (emphasis and inserted text in

*Quinones*).  Significantly, as support for the quoted passage, "a

petitioner . . . may have his federal constitutional claim

considered on the merits if he makes a proper showing of actual

innocence," *Herrera* in turn cited the "innocence of the death

penalty" decision in *Sawyer v. Whitley* (discussed above).

*Herrera*, 506 U.S. at 404.  *Quinones*'s reliance on this portion of

*Herrera* in particular reflects the court's recognition that

*Sawyer v. Whitley* applies in Section 2255 review of prosecutions

under the Federal Death Penalty Act.  *Sawyer*, in turn, forecloses

this Court's proposed formulations (1) through (6) of the actual

innocence standard, as set forth on pages 7 and 8 of the Court's

September 27, 2005, Order.

*Quinones*'s discussion of *Herrera* is significant also in its recognition of the clear limits on a federal court's authority to grant relief on a federal capital defendant's actual innocence claim that falls short of the standards of *Carrier/Schlup* and *Sawyer*.  Apart from these "gateway" exceptions to the procedural default doctrine, "actual innocence" does not state a recognized basis for Section 2255 relief.  "'[C]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding.'"  *Quinones*, 313 F.3d at 67 (quoting *Herrera*, 506 U.S. at 400).  And, while the *Herrera* Court assumed, without deciding, that a "truly persuasive showing" of a defendant's innocence could render his execution unconstitutional even in the absence of an error in the underlying trial, 506 U.S. at 417, *Quinones* reiterated that "'the threshold showing for such an assumed right would necessarily be extraordinarily high.'" *Quinones*, 313 F.3d at 67 (quoting *Herrera*, 506 U.S. at 417). Hammer's assertions of innocence do not remotely amount to such an "extraordinarily high" showing, especially given that there remains to this day no dispute that Hammer in fact killed Mr. Marti.

Citing a Third Circuit decision dealing with the validity and enforceability of an appeal waiver clause in a guilty plea

agreement, *United States v. Khattak*, 273 F.3d 557 (3rd Cir. 2001), Hammer nevertheless implies that he is entitled to relief upon a showing of "manifest injustice," falling short of the actual innocence standards of *Carrier/Schlup*, *Sawyer*, and *Herrera*.  *See* Order of 9/27/05 at p. 4 n.2.  Neither *Khattak* nor any of the subsequent decisions applying it involved a death penalty case.  Hammer in effect proposes application of a new constitutional rule of criminal procedure that is barred by the *Teague v. Lane*, 489 U.S. 288, 310-11 (1989), non-retroactivity doctrine.  *See Bousley*, 523 U.S. at 620-21 (recognizing *Teague* in the context of a Section 2255 motion but finding it inapplicable on the distinct ground that Bousley's argument did not propose a new procedural rule).  His proposed new rule does not fall within either of the two exceptions to *Teague* non-retroactivity, because it does not place a class of offenders or primary conduct beyond the scope of criminal law making authority, and does not constitute a watershed new rule of criminal procedure comparable to *Gideon v. Wainwright*, 372 U.S. 335 (1963).  *See* Government's Brief in Opposition to the Third Amended Section 2255 Motion at 31-35.

    9.    <u>Hammer's Direct Appeal Included a Claim that the Jury Disregarded Undisputed Mitigating Factors</u>.

    This Court's orders dated September 19, 20, and 27, 2005, all focus in part on Hammer's claim on direct appeal that the

sentencing jury erroneously failed to find undisputed mitigating factors.  This claim was briefed by both parties on direct appeal and after the briefs were filed, Hammer moved for dismissal of the appeal, which the Third Circuit granted.  Especially given Hammer's affirmative abandonment of this claim, his present attempt to revive his direct appeal challenge is barred by the procedural default doctrine, and, as explained above, Hammer cannot satisfy either the "cause and prejudice" or the "miscarriage of justice" exceptions to procedural default.  *See* Government's Brief in Opposition to the Third Amended Section 2255 Motion at 18-26.

Further, even had it not been procedurally barred, Hammer's claim in effect proposes a new constitutional rule of criminal procedure that is barred by the *Teague v. Lane* non-retroactivity doctrine.  489 U.S. 288, 310-11 (1989).  As reflected in the government's direct appeal brief on this issue (Government Exhibit 1 attached hereto), authority in effect at the time Hammer's sentence became final on direct review did not dictate that Hammer receive relief on his claim. His proposed new rule does not fall within either of the two exceptions to *Teague* non-retroactivity, because it does not place a class of offenders or primary conduct beyond the scope of criminal law making authority, and does not constitute a watershed new rule of criminal procedure comparable to *Gideon v. Wainwright*, 372 U.S.

31

335 (1963).  *See* Government's Brief in Opposition to the Third Amended Section 2255 Motion at pages 31-35.

Finally, even if not barred, Hammer's claim was without merit in any event.  This point is fully developed in the government's direct appeal brief, as partially reproduced in the attached appendix.

Respectfully submitted,

THOMAS A. MARINO
United States Attorney

By___s/Frederick E. Martin_____
FREDERICK E. MARTIN
Assistant United States Attorney
PA 57455
Herman T. Schneebeli Federal Bldg.
240 West Third Street, Suite 316
Williamsport, PA 17701
Telephone:  (570) 326-1935
FAX:  (570) 326-7916

Dated: October_13___, 2005

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


UNITED STATES OF AMERICA      : Crim. No. 4:CR-96-263
                                : Civil No. 4:CV-02-510
         v.                    :
                                : (Muir, J.)
DAVID PAUL HAMMER             : **ELECTRONICALLY FILED**


## CERTIFICATE OF SERVICE

I hereby certify that I caused a true and correct copy of the foregoing

### UNITED STATES' POST-HEARING BRIEF

to be electronically mailed on October  13  , 2005 to:

ADDRESSEE:

         Anne L. Saunders, Esquire
         Anne_Saunders@fd.org

         Michael Wiseman, Esquire
         Michael_Wiseman@fd.org


                         s/Frederick E. Martin
                         FREDERICK E. MARTIN
                         Assistant United States Attorney