IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIM. NO. 4:cr-96-00239 |
| | : | Civil No. 4:CV-02-00510 |
| v. | : | (Judge Muir) |
| | : | |
| DAVID PAUL HAMMER | : | **ELECTRONICALLY FILED** |

**UNITED STATES' BRIEF IN OPPOSITION TO PETITIONER'S
MOTION FOR LEAVE TO FILE SUPPLEMENTAL AND
FOURTH AMENDED MOTION TO VACATE AND SET ASIDE
CONVICTION AND SENTENCE PURSUANT TO 28 U.S.C. § 2255
BY A PERSON IN FEDERAL CUSTODY**

Procedural History.

On November 4, 1998, this Court sentenced David Paul Hammer to die by lethal injection for the first degree murder of Andrew Marti. On September 26, 2005, near the conclusion of a § 2255 hearing which began on July 14, 2005, petitioner's counsel filed a proposed Fourth Amended Petition as well as a Motion for Leave to file that document. Simultaneously, a brief supporting that request was submitted. Herewith presented is the prosecution's opposition to such relief.

Counter-Statement of Facts.

To avoid the obvious effect of the one-year Statute of Limitations, which otherwise would bar their proposed fourth modification of Hammer's § 2255 petition, present counsel assert that "Despite diligent efforts to uncover the existence of the [FBI 302] documents through independent investigation and appropriate discovery motions, [present] counsel did not learn of

the existence of these documents until the government's disclosure on September 22, 2005."  (Defendant's Brief in Support of Motion, p. 2.)  The United States is in no position to concede this issue under the circumstances.  Instead, several factors suggest that this may not be the case and further exposition or inquiry is thought to be warranted before permission for the amendment should be given.

Attorney Travis testified that he exchanged, prior to the 1998 trial, correspondence with one of the people alluded to in the 302's, Tony Jones, when he testified at the § 2255 hearing on September 28, 2005.  And yet there was no disclosure to the prosecution of any such documentation in the attorney-client materials ordered released by this Court's previous order relating to the waiver of that privilege by Hammer.  Indeed, Attorney Travis indicated in earlier § 2255 testimony that he sent numerous letters to potential inmate witnesses prior to trial.  Whether this included Fowler, Johnson, and Ball, whose 302s recently were released, is unknown.

Hammer's predecessor counsel, Attorneys Foster and Long-Sharp, are known from previously released documentation (correspondence to Hammer) to have written numerous letters to potential inmates including, but not limited to, inmates Rodney Archambeault and Terry Sittig, both of whom testified at the § 2255 hearing.  (Defendant's § 2255 Hearing Exhibit 16.1 at p.

2

325.) Whether those attorneys also contacted any of the inmates whose 302's were released and what, if any, response they received from them also remains unknown.

Royce Fowler appears to have been a potential witness for the defense at Hammer's original trial.  Prison SENTRY records indicate that he was returned to this area in May 1998, as a result of issuance of a Writ.  Indeed, he was interviewed by the FBI only after his return here at the Lewisburg Penitentiary where he temporarily was housed.  Why he was not called as a witness by Hammer is unknown.  However, his viability as a potential witness for the defense is apparent and requires explanation by Hammer's counsel to determine what information he provided about any of Hammer's defenses to Attorneys Travis and Ruhnke.

What is known is that present counsel for Hammer were aware of inmates Ball, Fowler, and Jones having been interviewed by the FBI.  They indicated as much in pleadings filed with this Court on November 8, 2004.  Government Exhibit 2.  When this knowledge first became available to them and what was included in it have never been stated.

Also it appears that further contact has occurred, at least with inmate Ball, since his name was listed as a potential defense witness in June 2005 by Hammer's attorneys.  See

Government Exhibit 3.  Again what that inmate told present or previous defense counsel and when also remain unknown.

<u>Issues.</u>

1.  Whether this Court in accordance with Rule 7 of the Rules Governing Section 2255 Proceedings should require Hammer's present and prior defense counsel to demonstrate that they exercised due diligence, as required by 28 U.S.C. § 2255(4), and had no prior contact with inmates Ball, Fowler, Johnson, and Jones or had contact which failed to reveal that they had exculpatory information for Hammer and had spoken with FBI agents.

2.  Whether this Court should allow a fourth modification of the § 2255 petition, to include claims that the prosecution failed to release *Brady* materials in the form of FBI 302s, since the contents of these three interviews did not constitute exculpatory material, and addition of their proposed pleadings otherwise would be futile.

<u>Arguments.</u>

**1.  Introduction.**

Hammer relies primarily upon two subsections of 28 U.S.C. § 2255 to allow for his amendment which otherwise would be time barred by the general one (1) year Statute of Limitations for pursuing collateral relief.  (Brief of Petitioner, p. 2.)  The second subsection of the time limit starts the clock ticking on

> the date on which the impediment to making a
> [Section 2255] motion created by governmental
> action in violation of the Constitution or
> laws of the United States is removed, if the
> movant was prevented from making such a
> motion by such governmental action.

Hammer's attorneys cite no cases on point or even in analogous situations.  (Brief of Petitioner, pp. 2-4.)  Indeed, all of the authority upon which they rely antedates the effective date of the Antiterrorism and Effective Death Penalty Act (hereinafter "AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996).  The few published decisions involving subsection two have generally declined to find an impediment sufficient to toll the time limit.  *See Minter v. Beck*, 230 F.3d 663, 665-66 (4th Cir. 2000) (futility of seeking relief under state law not impediment that justified untimely filing of habeas petition); *Akins v. United States*, 204 F.3d 1086, 1090 (11th Cir.), *cert. denied*, 531 U.S. 971 (2000) (rejecting impediment claim based on prison lockdown that prevented prisoner from using law library where prisoner failed to prove that lockdown "was not reasonably related to legitimate penological interests").

Subsection (2) might apply if, for example, prison officials unconstitutionally placed Hammer in an isolation cell, thereby preventing him from contacting the outside world and from filing a Section 2255 motion. The same would be true if the prison otherwise denied him access to the courts, *e.g.,* by unconstitutionally closing the law library or forbidding inmate-

to-inmate assistance in writing applications for collateral review. See *Whalem/Hunt v. Early*, 233 F.3d 1146, 1148 (9th Cir. 2000) (en banc) (reversing dismissal of habeas petition and remanding for further development of record on prisoner's claim that unavailability of AEDPA in prison law library was impediment to his filing petition); *see also Bounds v. Smith*, 430 U.S. 817 (1977); *Johnson v. Avery*, 393 U.S. 483 (1969).  But there is nothing in the record to suggest that Hammer's confinement at Terre Haute acted in such a disruptive fashion.  Indeed, the § 2255 hearing reflected indicated Hammer's frequent communication with counsel.  Consequently, Subsection 2 does not appear to be applicable to his request for a fourth amendment to his petition.

The other provision upon which Hammer relies is subsection four of § 2255.  That provision allows for filing of a collateral challenge on:

> (4) the date on which the facts supporting the claim or claims presented <u>could</u> have been discovered through the <u>exercise of due diligence</u>.

(Emphasis supplied.)  This extension on the time limit is a relatively straightforward, newly-discovered evidence provision. It starts the clock ticking on "the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence."  *See Wims v. United States*, 225 F.3d 186, 188 (2nd Cir. 2000) (time period runs from when facts supporting claim could have been discovered,

"regardless of whether petitioner actually discovers the relevant facts at a later date"). This provision may correspond to the gatekeeping exception for new-fact cases, 28 U.S.C. § 2255 ¶ 8(1). *See Libby v. Magnusson*, 177 F.3d 43, 48 (1st Cir. 1999). One question raised by subsection (4) is when to start the clock if the prisoner undertakes a lengthy investigation that uncovers several pieces of new evidence over time. The statutory language does not suggest a rigid cut-off date, but the Fifth Circuit has stated that the time limit does not "convey a statutory right to an extended delay * * * while a [prisoner] gathers every possible scrap of evidence that might * * * support his claim." *Flanagan v. Johnson*, 154 F.3d 196, 199 (5th Cir. 1998) (interpreting state-prisoner time limit). It is submitted that this provision puts the onus on Hammer's counsel to demonstrate that they have "exercise[d] due diligence" in pursuing relevant evidence from the three persons at issue. It is submitted that this requires more than a "talismanic" reference to that provision, under the particular circumstance of this case. As will be discussed in Argument 2 *infra*, this Court should utilize the multiple and flexible discovery provisions relating to § 2255 proceedings require defense counsel to verify their diligence and timeliness.

It is undisputed that Hammer, as to certain issues, filed a timely Section 2255 Petition in 2002. He seeks to amend his pleadings long after the one-year period has expired. (Brief of

7

Petitioner, pp. 2-4.)  A claim raised in a motion to amend a Section 2255 motion filed after the expiration of the one-year limitation period is deemed to have been filed within the one-year period only if the claim "relates back" to the prisoner's original Section 2255 motion under Fed. R. Civ. P. 15(c).  *Mayle v. Felix*, 125 S. Ct. 2562, 2569 (2005); *see United States v. Hicks*, 283 F.3d 380, 387-88 (D.C. Cir. 2002); *United States v. Saenz*, 282 F.3d 354, 355-56 (5th Cir. 2002); *United States v. Espinoza-Saenz*, 235 F.3d 501, 504-05 (10th Cir. 2000); *Davenport v. United States*, 217 F.3d 1341, 1345-46 (11th Cir. 2000) (citing cases); *see also Fama v. Commissioner of Correctional Services*, 235 F.3d 804, 814-16 (2nd Cir. 2000) (applying Rule 15(c) to motion to amend habeas petition). Rule 15(c)(2) provides that a claim raised in an amended pleading relates back to the original pleading only when the claim "arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." Fed. R. Civ. P. 15(c)(2); *see Mandacina v. United States*, 328 F.3d 995, 999-00 (8th Cir. 2003). The question is begged by Hammer's effort: do the claims contained in the Fourth Amended Petition "relate back" to the pleadings submitted in 2002?

    **2.**  During these proceedings, this Court has relied upon the flexible discovery provisions of Rule 7 of the Rules applicable to § 2255 hearings to secure needed documents, such as Hammer's

appellate brief, and require Hammer's trial counsel to provide interrogatory responses or testimony on specific questions of interest.  It is submitted that these same provisions should be utilized by this Court to require Hammer's past and present attorneys to demonstrate to what extent, if any, they were unaware of supposedly favorable information from at least three (3) inmate witnesses and "exercise[d] due diligence" in pursuing claims of purportedly unknown and withheld exculpatory evidence.

There is a legitimate basis for this request.  Testimony presented at the § 2255 hearing, as recounted in the Counter-Statement of Facts, revealed that Hammer's trial counsel as well as their Indiana successors had sent correspondence to multiple inmates.  None of those communications with these persons was revealed to the prosecution in the court-ordered disclosure of attorney/client materials, perhaps appropriately.  However, in seeking to amend the petition as requested, it is submitted that some affirmative demonstration now should be required from them regarding their claimed lack of knowledge that Ball, Fowler, and Johnson had not revealed to them their contact with the FBI and allegedly exculpatory information.

Present counsel for Hammer most clearly, have been in contact with at least inmates Fowler, Jones, and Ball.  When this occurred and the details of any communication with them should be

9

disclosed.  Whether they have been in touch with Johnson is unknown but also should be verified.

Most troubling is the apparent knowledge by Hammer's trial counsel of the availability of Royce Fowler as a potential defense witness.  Prison records reflect that he was taken pursuant to a Writ of *Habeas Corpus Ad Testificandum* from his designated place of incarceration to the Lewisburg Penitentiary in 1998.  Presumably to justify this action, Hammer's attorney complied with Federal Rule of Criminal Procedure 17(b) and filed, in accordance with that provision, on an *ex parte* basis "the necessity of the witness's presence for an adequate defense."  At a minimum, this presentation, which presently remains under seal, should be disclosed to determine what counsel then knew of potential helpful information from Fowler to justify the writ, as well as any contacts with the FBI.  If the proffer includes the same details as contained in the 302, this would demonstrate not only a lack of prompt action taken on Hammer's part, as required by the § 2255 time limit, but also undermines any assertion that the government wrongly withheld favorable information from the defense when, in fact, the defense already knew of such details and, therefore, suffered no adverse consequences from any non-disclosure.  Indeed, such disclosure also would reveal whether attorneys Travis and Ruhnke acted in an effective fashion, a position which Hammer's present counsel claim to the contrary.

10

**3.**  The Third Circuit has observed in *Riley v. Taylor*, 62 F.3d 86, 92 (1995), in the context of proceedings under 28 U.S.C. § 2254, that "An 'amendment of the complaint [or collateral challenge] is futile if the original complaint or if the amended complaint cannot withstand a renewed motion to dismiss' (citations omitted)."  It is submitted that since a dispassionate and thorough review of the Fourth Amended Petition fails to state a claim of relief, that permission should not be given for its filing.

The prosecution believes that it complied with Due Process requirements in responding to the general defense request for materials disclosable pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), prior to Hammer's trial.  Stated in another fashion, it is not believed that the Fifth Amendment required disclosure of the FBI interviews of the three inmates in question since they did not contain information favorable to the defense at Hammer's original trial and, particularly, did not cause him any prejudice at that proceeding.

Speaking for the Third Circuit in 1984, Circuit Judge Aldisert described the rule of *Brady v. Maryland*, in the following terms.

> Unlike Rule 16 and the *Jencks Act*, however *Brady* 'is not a discovery rule, but a rule of fairness and minimum prosecutorial obligation.'  *United States v. Beasley*, 576 F.2d 626, 630 (5th Cir. 1978), *cert. denied*, 440 U.S. 947, 99 S. Ct. 1426, 59 L. Ed. 2d

11

636 (1979). There can be no violation of *Brady* unless the government's nondisclosure infringes the defendant's fair trial right. *[United States v.] Higgs*, 713 F.2d [39] at 42, 43 [93rd Cir. 1983)]. To constitute a *Brady* violation, the nondisclosure must do more than impede the defendant's ability to prepare for trial; it must adversely affect the court's ability to reach a just conclusion, to the prejudice of the defendant. *United States v. Campagnuolo*, 592 F.2d 852, 861-62 (5th Cir. 1979). 'No denial of Due Process occurs if *Brady* material is disclosed in time for its effective use at trial.' *Higgs,* 713 F.2d at 44; *see also* [*United States v.] Kaplan*, 554 F.2d [577] at 580 [(3rd Cir. 1977)]. Moreover, 'the government is not obliged under *Brady* to furnish a defendant with information which he already has or, with any reasonable diligence, he can obtain himself.' *Campagnuolo*, 592 F.2d at 861.

Here, because the defendant suffered no prejudice from the government's failure to disclose the report, there was no *Brady* violation. Defense counsel's independent discovery of the statement -- fortuitous though it was -- negates any argument that the defendant was deprived of rights assured by the Constitution. Absent a showing of prejudice, we conclude that the district court abused its discretion in basing its preclusion order on a violation of *Brady*.

*United States v. Starusko*, 729 F.2d 256, 262 (3rd Cir. 1984). The Third Circuit recently reaffirmed the validity of its holding in *Starusko* in *United States v. Pelullo*, 399 F.3d 197, 215 (2005). Under the circumstances, the prosecution will first allude to what Hammer's trial counsel apparently knew about potential witnesses, what the substance of the potential witnesses' testimony would have been, the extent to which those

12

matters were important and disputed, and the impact, if any, which nondisclosure of the interviews would have had on aspects of the trial or proceedings.

### A.   WHAT DEFENSE COUNSEL APPARENTLY KNEW

Of the three inmate's 302's which are claimed to have contained exculpatory information, Hammer's trial counsel knew definitely of two individuals as potential witnesses and had information with respect to the substance of the third.  That is to say, the name of Gaylon Don Ball is included in the listing of inmates in the Special Housing Unit on April 13, 1996, at the Allenwood Penitentiary, which was released to trial counsel.  In addition, Ball's name was brought up in conversation by Hammer with his counsel as someone who may have known of purported tape recording efforts by the prosecution directed against Hammer by inmate Yager.

Hammer's trial counsel apparently knew also of potential testimony from Royce Fowler.  He was Hammer's cellmate at the Leavenworth Penitentiary, a fact not known early on by the prosecution and not confirmed until June 1998.  This confirmation took place at the Lewisburg Penitentiary when Fowler had been brought there at the request of the defense as a prospective witness for the defense.

The defense may not have been aware that Albert Ray Johnson contacted the FBI.  That inmate knew Hammer from Oklahoma and

13

lived in a cell next to Hammer's in the Special Housing Unit at the Allenwood Penitentiary.  Nonetheless, Johnson referred to the inmate, who then resided with Hammer, as a person whose last name was unknown, but whose first name was "Tony."  From testimony by Attorney Travis, "Tony" was identified as "Tony Jones," an individual with whom Travis admittedly exchanged at least correspondence.  While Johnson had spoken with Hammer and purportedly provided him with some homemade ropes, Jones, his cellmate, would have been in a better position to have seen what Hammer actually did with those ropes as well as to report firsthand what occurred in their cell.  Attorney Travis presumably knew of Tony Jones' former living arrangements with Hammer and corresponded with him at least about a photograph ostensibly related to Hammer's DID condition.

### B.   THE SUBSTANCE OF NON-DISCLOSED INTERVIEWS

Ball, according to Hammer's counsel, apparently would have provided useful information purportedly to the defense in possibly two respects.  (4th Amended Petition, ¶ 37, p. 11.)  He assumed that Hammer and Marti engaged in sexual relations and also claimed he heard a woman's voice outside Hammer's cell, which incident was his first awareness that Marti had died.  With respect to this latter information, it corresponds to testimony of Nicole Tadross Weaver, given at both the trial and the § 2255

14

hearing, that she was the officer who first learned from Hammer outside his cell that he had killed his cellmate.

The purported value of Fowler's testimony, according to the defense pleadings, was two-fold.  (4th Amended Petition, ¶¶ 35 & 36, p. 10.)  Hammer, according to him, told him that he liked bondage and wanted to be tied up during sex.  Purportedly, Fowler also said that Hammer told him that Hammer's father had engaged in sexual abuse with Hammer directly.  This latter fact is not confirmed by any of Hammer's siblings or any interviews of Hammer by any mental health expert[1], whether for the prosecution or the defense, and whether at trial or even at the § 2255 hearing.

According to Hammer's attorneys, Albert Ray Johnson provided three aspects of information valuable, but claimed to be unknown, to the defense.  (4th Amended Petition, ¶¶ 25-30, pp. 8-9.)  This included the fact that Hammer was engaged in homosexual behavior and bondage while still a prisoner at the Oklahoma Department of Corrections.  At those times, according to Johnson, Hammer and his cellmates would "whip" each other with rope or electrical

---

[1]  Hammer's counsel appears to suggest that Fowler's testimony was important because it verifies that Hammer was abused and admitted it to others prior to April 13, 1996.  (4th Amended Petition, ¶ 83, p. 10.)  This position forgets the fact that Hammer shared his abusive past with Dr. Mitchell during counseling sessions in 1995.  Thus, Fowler's information in this regard was duplicative and, as stated in text, contradicted by every other source of information regarding the role of Hammer's father in any abuse.

cords.  Defense counsel conceded that in Marti's case the autopsy did not reveal such marks on his body.

Johnson also alluded to sexual behavior between Hammer and his then-cellmate, Tony Jones, that involved biting one another. This behavior also involved using braided sheets, which, at least in part, Johnson would supply.  Again, prior defense counsel has conceded that Marti's body had no bite marks on it and that they communicated directly with Jones.

Finally, according to Johnson, Hammer told him that he and Tony Jones would beat each other up periodically.  But the autopsy also failed to reveal any apparent evidence of sadomasochistic injuries to Marti.

### C.  DISPUTED MATTERS AT TRIAL

The prosecution never disputed in its closing remarks at trial that Hammer and Marti probably engaged in sexual relations sometime during the four days they lived together in SHU Cell 103.  (TT, Vol. 27, p. 132.)  Even though there was no mention of sex in Hammer's statement to the FBI, inmates Classen and Yager, who testified for the prosecution, indicated Hammer's interest in having sexual relations with Marti.  Moreover, other inmates who testified for the defense, including O'Berg and Yandle, indicated that Hammer, as their former cellmate, engaged in homosexual behavior.  Finally, both in statements to Drs. Sadoff and Dubin, as well as separately to Dr. Wolfson during his evaluation,

Hammer indicated that he engaged in homosexual behavior with many individuals, including his cellmates and Marti.

What remained in dispute at trial, and remains in dispute as of this time, is whether Hammer engaged in <u>contemporaneous</u> sexual relations with Marti at the time Marti died.  But Ball, Fowler, and Johnson provided no information in that respect.  Indeed, of the three, only Ball was in the Allenwood Penitentiary on the night of the killing and in <u>any</u> position to have first-hand knowledge about it.  Even so, Ball's information was not only repetitive of other sources, but also wholly speculative.  Consequently, it need not have been disclosed.  *United States v. Amiel*, 95 F.3d 135, 145 (2nd Cir. 1996).

It is significant as well to determine what the position of the defense was at trial and what it is now.  At trial, Travis indicated that he referred to Hammer's sexual behavior as a reason why he tied Marti to the bed and to deflect any suggestion that this factor supported premeditation.  Contrary to the assertions of Hammer's present attorneys,(4th Amended Petition, ¶ 19, p. 6), there is nothing in the statements which Hammer gave to Drs. Sadoff and Dubin in September 1997, or for that matter in the separate examination conducted by Dr. Wolfson later that year, in which Hammer, in his own words and prior to the trial, directly indicated that he was contemporaneously engaging in

sexual behavior[2] with Marti at the time Marti died.  The closest

that anyone on the defense team indicated that contemporaneous

sex had occurred at trial was Attorney Ruhnke's interrogation of

Yager regarding the use of gloves as prison condoms.  However, no

condom was recovered in SHU Cell 103 (including its unflushed

toilet) nor were any gloves with missing fingers found in that

area.

The apparent motivation for Ruhnke's questioning of Yager

was to blunt or deflect the fact that even though tests were run

of anal swabs taken from Marti at the autopsy, there was nothing

to suggest the presence of semen.  It was not until 2004 that

Hammer "improved" his memory of April 13, 1996, and specifically

told mental health examiners that he engaged in erotic

asphyxiation.

With respect to undisputed items, the physical evidence and

testimony of those officers who responded to SHU Cell 103

indicated that Marti had been tied to the lower bunk.  The

---

[2]  To be sure, during the video-hypnosis defense
presentation, Hammer said that he tied up Marti for bondage
reasons.  (See Government § 2255 Hearing, Exhibit 36 at pp. 25-26
& 33.)  While he did indicate as well that they were "talking
about" and "getting ready to have sex" and possibly engage in
asphyxiation (pp. 26, 33), Hammer never told those evaluators in
1997 that he engaged in any form of sex when Marti died.  Even
when later asked by Dr. Wolfson about this recollection of events
on April 13, 1996, Hammer made similar statements about his
intentions, that he was "gonna have some sexual experiment," but
remained vague at best about any homosexual behavior when Marti
died.  (Defendant's § 2255 Hearing Exhibit 139.1, pp. 135-141.)

autopsy confirmed the use of restraints at the time of death in which Marti was strangled.  The only dispute[3] was for what purpose or purposes Hammer tied Marti.  It is significant that testimony was presented at trial through inmate Mike Smith that Hammer, while in Oklahoma, tied up individuals with whom he engaged in sexual behavior.  (Government § 2255 Hearing Exhibit 87, pp. 28-29.)   Another explanation, pressed by the prosecution at trial, was that Hammer persuaded Marti to be tied up as part of a hostage ruse.  This was supported not only by Hammer's statement to the FBI but also by the fact that Hammer, while at the Lompoc Penitentiary, previously tied up an inmate there in a hostage-type situation.  However, there are only two persons who knew with certainty what caused Marti to allow himself to be restrained, one of whom is dead, and the other is Hammer.

### D.   THE IMPACT OF THE WITHHELD STATEMENTS

Hammer's counsel suggest that withholding the interviews adversely impacted the proceedings in multiple ways.  They suggest that this adversely affected Hammer and may have precluded him from entering his guilty plea.  (4th Amended Petition, ¶ 16, p. 5.)  However, in the record of the June 22,

---

[3]  Since Hammer had bound inmates in Oklahoma for sexual purposes, according to defense witness Mike Smith, and since Hammer told the FBI that he had tied up an inmate at the Lompoc Penitentiary, there was no dispute that prior to coming to Allenwood Hammer and meeting Johnson he knew how to make restraints to tie up cellmates.

1998, change of plea proceeding, Hammer, even though admitting to the premeditated killing of Marti, indicated that the ropes which had been utilized were not for a hostage situation but for other unspecified reasons.  (Government § 2255 Hearing Exhibit 1, pp. 113-114.)  Thus, Hammer maintained even though he entered a plea of guilty to First Degree Murder, that the ropes had other purposes.

What, then, is the overall significance of Hammer's bondage interests?  While it is true the prosecution indicated that the ropes were evidence of substantial planning and premeditation, there were multiple other sources of information which supported this factor, distinct from Hammer's statement.  These included Dr. Funke's testimony regarding how long it would take to choke out and strangle an individual.  (TT, Vol. 3, pp. 84-85.) Inmates Classen and Yager also testified about how Hammer stated to them that he intended to call Marti.  Finally, Hammer, even after he spoke with the FBI, provided multiple reasons in his notes to Yager and other inmates as well as persons in which he claimed the act of killing Marti was one which he earlier had contemplated, not the result of any sexual accident. (See Government § 2255 Hearing Exhibits 2 and 38.)  The prosecution in its closing remarks alluded to <u>all</u> of these separate sources of information.  (TT, Vol. 27, pp. 71-81.)

Hammer's attorneys also indicate that the information withheld would also have been used to challenge Hammer's statement to the FBI insofar as its veracity.  But in that regard, the testimony of Michael Smith was presented regarding the claim that the ropes were used for sexual purposes and not necessarily evidence of premeditation.  Moreover, like the restraints issue, Hammer, during the guilty plea, indicated that his statement to the FBI was not entirely accurate.  Thus, purported details supplied by Johnson, and possibly Fowler,[4] would have been cumulative of information already presented in the record.  *Marshall v. Hendricks*, 307 F.3d 36, 62-63 (3rd Cir. 2002), *cert. denied*, 538 U.S. 911 (2003).

Finally, Hammer's counsel implies that the disclosed 302's support their claim of ineffectiveness or Attorneys Ruhnke and Travis, since the documents "strongly support Petitioner's defense that the death of Mr. Marti arose accidently during consensual sex."  Petitioner's Proposed Fourth Amended Petition, ¶¶ 7 & 8, p. 3.)  But one can search in vain and there are no references in any of the recently disclosed 302's which suggest that Hammer was involved at <u>any</u> time in erotic asphyxiation with inmates.  Moreover, even with the most recent Bode testing there

---

[4]  According to Fowler, Hammer indicated that <u>he</u> wished to be tied.  In point of fact, Hammer tied Marti and there is nothing in the record to suggest that Hammer, in fact, allowed himself at any time to be tied by Marti in SHU Cell 103.

remains no physical evidence supporting Hammer's claim that there was contemporaneous sexual behavior between Marti and him at the time Marti died.

What is significant as well is that Fowler and Jones, while describing Hammer directly or inferentially as "weird," provided no support for his mental health defense.  Since that clearly was the focus of trial testimony by Hammer's witnesses, there was no need under *Brady v. Maryland, supra*, to disclose any and all aspects of his past sexual practices or interests.

In *United States v. Bagley*, 473 U.S. 667, 682 (1985), the Supreme Court further defined what material must be disclosed to the defense if a request for exculpatory material under *Brady v. Maryland*, 373 U.S. 83 (1963), is made.  The *Bagley* court held that evidence is material and should be disclosed if there is reasonable probability that disclosure of the evidence would have changed the outcome of the proceeding.  A "reasonable probability is defined as a probability sufficient to undermine confidence in the outcome."  *Bagley*, 473 U.S. 682.

In reaching this determination any assessment of the effective non-disclosure must take account of the cumulative effect of the suppressed evidence in light of other evidence, not merely the probative value of the suppressed evidence standing alone.  *See Marshall v. Hendricks*, 307 F.3d 36, 62-63 (3rd Cir. 2002), *cert. denied*, 538 U.S. 911 (2003) (no *Brady* violation

though the prosecution suppressed two pieces of alleged impeachment evidence because confidence in verdict not shaken if evidence was viewed cumulatively).  *Allen v. Lee,* 366 F.3d 319, 324-25 (4th Cir. 2004) (no *Brady* violation despite failure to disclose jail medical records because defendant personally was aware of what medication he received).

It is submitted that any complete and dispassionate reading of the trial record demonstrates that the failure to release the interviews of Ball, Fowler, and Johnson would not have undermined confidence in the proceedings including the jury's recommendation or Hammer's actions in 1998 or at later times.

Respectfully submitted,

THOMAS A. MARINO
United States Attorney


By___s/Frederick E. Martin_____
FREDERICK E. MARTIN
Assistant United States Attorney
PA 57455
Herman T. Schneebeli Federal Bldg.
240 West Third Street, Suite 316
Williamsport, PA  17701-6465
Tele:  (570)326-1935
FAX:   (570)326-7916
Electronic Mail:
Fred.Martin@usdoj.gov

Dated: October_17, 2005

23

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA      :   CRIM. NO. 4:CR-96-00239
                                   :   Civil No. 4:CV-02-00510
            v.                 :   (Judge Muir)
                                   :
DAVID PAUL HAMMER           :   **ELECTRONICALLY FILED**

## CERTIFICATE OF SERVICE

I hereby certify that I caused a true and correct copy of the foregoing

**UNITED STATES' BRIEF IN OPPOSITION TO PETITIONER'S
MOTION FOR LEAVE TO FILE SUPPLEMENTAL AND
FOURTH AMENDED MOTION TO VACATE AND SET ASIDE
CONVICTION AND SENTENCE PURSUANT TO 28 U.S.C. § 2255
BY A PERSON IN FEDERAL CUSTODY**

to be electronically filed on October 17 , 2005 to:

ADDRESSEE:     Anne L. Saunders, Esquire
                     Anne_Saunders@fd.org

                     Michael Wiseman, Esquire
                     Michael_Wiseman@fd.org

                            s/Frederick E. Martin
                            FREDERICK E. MARTIN
                            Assistant United States Attorney