UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Respondents, | : | No. 96-239 |
| | : | |
| v. | : | Honorable Malcolm Muir, USDJ |
| | : | |
| DAVID PAUL HAMMER, | : | Electronically Filed |
| | : | |
| Petitioner. | : | |
| | : | |

**PETITIONER'S POST-HEARING BRIEF
IN SUPPORT OF RELIEF UNDER
28 U.S.C. SECTION 2255**

Anne L. Saunders
Asst. Federal Public Defender
Office of the Federal Public Defender
Middle District of Pennsylvania
100 Chestnut Street, Suite 306
Harrisburg, PA 17101
717-782-3843

Michael Wiseman
James McHugh
James Moreno
Federal Court Division
Capital Habeas Corpus Unit
Suite 545 West – The Curtis Center
Philadelphia, PA 19106
215-928-0520

Counsel for Petitioner
David Paul Hammer

Dated:      Philadelphia, PA
            October 17, 2005

**TABLE OF CONTENTS**

I.    PRELIMINARY STATEMENT ........................................ 1

II.   STATEMENT OF CLAIMS BEFORE THE COURT ........................ 2

III.  THE GOVERNMENT'S FAILURE TO DISCLOSE STATEMENTS
      OF ALBERT RAY JOHNSON, ROYCE LEE FOWLER, GAYLON
      DON BALL AND MARTIN GUERRERO, JR., AND A BUREAU
      OF PRISONS DOCUMENT,  MATERIALLY PREJUDICED
      MR. HAMMER'S ABILITY TO PRESENT A DEFENSE, VIOLATED
      HIS RIGHTS TO DUE PROCESS, EFFECTIVE ASSISTANCE OF
      COUNSEL AND TO BE FREE FROM CRUEL AND UNUSUAL
      PUNISHMENT, WARRANTING A NEW TRIAL AND/OR
      PENALTY HEARING ........................................... 4

      A.    Introduction ........................................ 4

      B.    The Relevant Law .................................... 7

      C.    The Withheld Evidence .............................. 15

            1.    The Albert Johnson 302 Statements ........... 16
            2.    The Royce Lee Fowler 302 Statement .......... 20
            3.    The Gaylon Don Ball 302 and Handwritten Notes ........ 23
            4.    The Martin Guerrero 302 Statement and the BOP
                  Document .................................... 25

      D.    These Brady Claims Must be Reviewed on the Merits, and Must
            Result in a Vacation of Mr. Hammer's Guilty Plea and Restoration of
            His Appellate Rights ............................... 28

            1.    Guilt Phase ................................. 28
            2.    Penalty Phase ............................... 32

      E.    Conclusion ......................................... 36

IV.   TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE
      IN VIOLATION OF PETITIONER'S RIGHTS UNDER THE
      SIXTH AMENDMENT .......................................... 38

      A.   Each of Mr. Hammer's Claims of Ineffective
           Assistance of Trial Counsel are Cognizable in
           Section 2255 Proceedings ............................... 38

      B.   The Governing Sixth Amendment Standards ................. 39

      C.   Counsels' Ineffectiveness with Regard to Petitioner's
           Trial Competency and to his Capacity Make Knowing,
           Intelligent and Voluntary Waivers of His Rights .............. 42

      D.   Trial Counsel Rendered Ineffective Assistance By
           Failing To Investigate And Present Mr. Hammer's
           Long History Of False Confessions and Using this
           History to Challenge the Veracity of his Alleged
           FBI Confession to the Marti Killing, Which Itself
           Contained Numerous Falsehoods ......................... 57

      E.   Trial Counsel Rendered Ineffective Assistance By
           Failing To Investigate And Present The Defense Of
           Erotic Asphyxiation ................................... 68

      F.   Counsel Ineffectively Failed to Litigate the Fifth
           and Sixth Amendment Violations Attendant to the
           Government's Use of Mr. Hammer's Psychology
           File ................................................ 71

      G.   Counsel Ineffectively Acquiesced to the Court's Use
           of Conflicted Mental Health Witnesses Relevant to
           Competency and Criminal Responsibility ................... 75

V.    AS A RESULT OF HIS MENTAL, EMOTIONAL AND COGNITIVE
       IMPAIRMENTS MR. HAMMER WAS NOT COMPETENT TO WAIVE
       HIS RIGHTS AT TRIAL AND ON DIRECT APPEAL AND HIS WAIVERS
       AT TRIAL AND ON DIRECT APPEAL WERE NOT VOLUNTARY  . . . . . . . . . . .  85

       A.    Introduction  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

       B.    The Relevant Law  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

       C.    The Facts:  Mr. Hammer Suffers from Multiple Mental,
              Emotional and Cognitive Impairments – and Suffered from
              These Impairments at All Times Relevant to this Court's
              Inquiry  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

       D.    Mr. Hammer's Mental, Emotional and Cognitive Impairments
              Rendered Him Incompetent and His Waiver of Rights
              Involuntary  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

       E.    Dr. Matthews' Testimony Contradicting a Finding of
              Incompetence and Involuntariness is Unreliable
              and Incredible  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

VI.   PETITIONER'S RESPONSES TO THE COURT'S QUESTION  . . . . . . . . . . . . . 113

VII.  CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116

I.    **PRELIMINARY STATEMENT.**

Petitioner, David Paul Hammer, submits this Post-Hearing Brief pursuant to this Court's order of September 29, 2005.[1]

This Brief will supplement the legal and factual arguments contained in Petitioner's prior submissions made in support of the Third Amended Motion, i.e. *Brief in Support* (document # 1049) and *Reply Brief in Support* (document #1064). In particular, Petitioner will address the particular facts elicited at the evidentiary hearing and show how they entitle him to merits review of his claims, and ultimately relief.[2]

Transcripts of all prior proceedings in this Court will be cited as "NT" followed by the date, and page citation.

All emphasis in this brief is provided unless otherwise noted.

---

[1]A procedural history is dispensed with, except to note that this Court conducted an extensive evidentiary hearing covering weeks of testimony. The first day of testimony was July 14, 2005 and the evidentiary proceedings concluded on September 29, 2005.

[2]As this Brief only addresses facts that were adduced at the evidentiary hearing on Petitioner's Section 2255 Motion, it does not again address legal issues that were previously pled in these proceedings, but which were not subject to the hearing. Therefore, the absence of a discussion of any such legal issue should not be taken as a waiver or abandonment of it.

1

II.    **STATEMENT OF CLAIMS BEFORE THE COURT.**

Due to the complex procedural and factual history of this litigation, Petitioner will first list those claims that are before the Court and that were subject of the evidentiary hearing.

Prior section 2255 counsel filed a *Second Amended Motion for Section 2255 Relief* (hereafter, *Second Motion*) (document #785). This *Second Motion* was filed on September 30, 2002 and it raised sixteen substantive claims for relief.

As noted in this Court's order of January 27, 2005 (document # 1042), the Government never moved to dismiss any of the claims contained in the *Second Motion* on the ground that they were untimely under Section 2255's one year limitations period, and they are properly before the Court. See United States v. Hammer, 96-239 (M.D. Pa. Jan. 27, 2005) slip opinion at 5, n2.

On November 30, 2004 Petitioner, through undersigned counsel, filed a *Motion for Leave to File Supplemental and Third Amended Motion to Vacate and Set Aside Conviction and Sentence Pursuant to 28 U.S.C. 2255* (document # 1012) (hereafter, *Third Amendment*) to include additional factual allegations and additional claims for relief contained in the *Second Motion*. The parties briefed the question of whether Petitioner should be permitted to amend the *Second Motion*, after which this Court issued an order permitting some of the

2

amendments, denying others, and provisionally granting still others. <u>See</u> Order of January 27, 2005 at page 27. In particular, this Court permitted the proposed factual amendments to claims One, Two, Six, Seven, Eight, Ten, Thirteen and Nineteen. The Court provisionally granted amendment as to claims Three, Eighteen and Twenty-two. Amendment/addition of these claims were provisionally granted pending resolution at the evidentiary hearing of whether these claims were timely filed, and if not, whether Petitioner was entitled to equitable tolling.

Following briefing on the *Third Amendment*, this Court issued orders dismissing two additional claims and parts of a third. In an order of May 11, 2005 (document # 1066) the Court dismissed claim Fifteen. In an order of June 1, 2005 (document # 1072) the Court dismissed that portion of claim Three related to ineffective assistance of appellate counsel, and claims Eighteen and Twenty two.

With the order of June 1, 2005 this Court fully disposed of all claims to which amendment had been "provisionally" granted, i.e. claims Eighteen, Twenty Two and a portion of Three.[3]

On September 26, 2005, Petitioner through counsel filed *Petitioner's Motion*

---

[3]The portion of Claim Three that was subject to "provisional" amendment was contained at page 39, paragraph 5. <u>See</u> Court's Order of June 1, 2005 at page 2.

*for Leave to File Fourth Amended Section 2255 Motion Based upon Recently*

*Disclosed Exculpatory F.B.I. Reports* (document # 1171) addressing the disclosure

by the Government of exculpatory documents just as the hearing was nearing its

end.  Petitioner filed a *Brief in Support* of his *Motion for Leave to File a Fourth*

*Amendment* on September 27, 2005 (document # 1175).  Although the

Government has not filed a brief in opposition to the *Motion* and this Court has

not decided the *Motion*, or established a briefing schedule on the merits of the

*Fourth Amendment*, Petitioner will nonetheless take this opportunity to address the

significant legal impact of the late disclosure of those documents upon these

proceedings.

## ARGUMENT

**III.  THE GOVERNMENT'S FAILURE TO DISCLOSE STATEMENTS OF ALBERT RAY JOHNSON, ROYCE LEE FOWLER, GAYLON DON BALL AND MARTIN GUERRERO, JR., AND A BUREAU OF PRISONS DOCUMENT,  MATERIALLY PREJUDICED MR. HAMMER'S ABILITY TO PRESENT A DEFENSE, VIOLATED HIS RIGHTS TO DUE PROCESS, EFFECTIVE ASSISTANCE OF COUNSEL AND TO BE FREE FROM CRUEL AND UNUSUAL PUNISHMENT, WARRANTING A NEW TRIAL AND/OR PENALTY HEARING.**

### A.    Introduction.

On September 22, 2005 – as this 2255 hearing was about to end – the

Government for the first time provided defense counsel with thirty-three (33)  FBI

302 witness statements and related handwritten notes.  Prior to this date, a number

of these documents were never provided to any lawyer representing Mr. Hammer, including his trial counsel.

These documents contain information and evidentiary leads that are material and exculpatory.

First, they directly support a defense that Mr. Hammer was not guilty of intentionally killing Mr. Marti. These documents support the defense that Mr. Marti was bound to the bed in cell 103 as part of consensual sexual activity, and not as part of a fake hostage ruse (as argued by the trial prosecutor). These documents would have allowed defense counsel to present evidence directly, or through cross-examination of Government expert and lay witnesses, showing that Mr. Hammer had a history of engaging in **consensual** sexual bondage using braided sheets, and of **consensual** sadomasochism.

These documents thus would have been material to the partially presented alternative trial defense that Mr. Marti was killed during "kinky sex." They are also material to this defense as it was fully developed during these section 2255 proceedings.[4]

_____

[4]The failure of the Government to disclose these documents violated Petitioner's <u>Brady</u> rights, as discussed below. To the extent that they impeded his ability to present a defense, they also violated due process of law. <u>Chambers v. Mississippi</u>, 410 U.S. 284 (1973) ("The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the

Second, these documents and the leads that would have flowed from them, would have armed trial defense counsel with the means of rebutting the Government's presentation during the guilt phase that Mr. Hammer "intentionally" killed Mr. Marti.

Third, these documents and the leads that would have flowed from them would have provided defense counsel with potent ammunition with which to rebut two critical sentencing issues.  They would have permitted the defense to counter the so-called intent factor required by the Federal Death Penalty Act (hereafter, FPDA) (see 18 U.S.C. § 3591(a)(2)(A)).  They would have also permitted counsel to rebut the Government's sentencing argument that Petitioner's braiding of the ropes evidenced his "substantial planning and premediation," which is an aggravating circumstance under the FDPA (see 18 U.S.C. § 3592 (c)(9)).

Fourth, these documents show that the prosecutor violated due process of law when he argued that the killing was intentional in both the guilt and penalty phases of trial and that the "substantial planning and premeditation" aggravating factor existed, because these documents tended to show that these arguments were not true.

_____

State's accusations.  The rights to confront and cross-examine witnesses and to call witnesses in one's own behalf have long been recognized as essential to due process.").

The Government also failed to disclose  a Federal Bureau of Prisons ("BOP") document which directly contradicted the Government's theory of the case and specifically portions of Mr. Hammer's statement to Special Agent Carlyle Thompson made on the night in question that the death of Mr. Marti was premeditated.

As will be shown, these documents were withheld from the Petitioner and his counsel despite multiple requests for their production, and were material to the defenses that were presented and which could have been presented.  Thus, the Government's failure to provide them violated Mr. Hammer's right to due process of law, and requires that his conviction and sentence be vacated.

### B.    The Relevant Law.

The due process clause of the Fifth Amendment to the United States Constitution states that no person may be "deprived of life, liberty or property, without due process of law . . ."  The Unites States Supreme Court has long held that the right to due process requires a federal prosecutor to disclose favorable evidence that is material to either guilt or sentencing.  Brady v. Maryland, 373 U.S. 83, 87 (1963); Giglio v. United States, 405 U.S. 150, 153-56 (1972); United States v. Bagley, 473 U.S. 667, 676 (1985); Kyles v. Whitley, 514 U.S. 419, 437 (1995); Banks v. Dretke, 540 U.S. 668 (2004).

The prosecution's "duty to disclose evidence favorable to a defendant can trace its origins to early 20th-century strictures against misrepresentation and is of course most prominently associated with this Court's decision in Brady v. Maryland." Kyles, 514 U.S. at 432.   A prosecutor's duty to disclose exculpatory evidence is especially important in a capital case, as is this Court's duty to review claims of non-disclosure.  Kyles, 514 U.S. at 422 (in assessing a Brady claim the court acknowledged that its "duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case").[5]

Kyles also sets forth the long-standing and indisputable constitutional standard governing the circumstances requiring a new trial or sentencing based upon withheld exculpatory – that is, when such evidence is "material."  The "touchstone of materiality is . . . not whether the defendant would more likely or not have received a different verdict with the [suppressed] evidence, but whether in its absence he received a fair trial. . . ." Kyles, 514 U.S. at 434.  Thus, to show materiality, Petitioner need not demonstrate that the non-suppressed evidence would have been inadequate to convict – "sufficiency of [the remaining] evidence

_____

[5]See also Beck v. Alabama, 447 U.S. 625 (1980); Ake v. Oklahoma, 470 U.S. 68 (1985); Caldwell v. Mississippi, 472 U.S. 320 (1985); Ford v. Wainwright, 477 U.S. 399, 414 (1986) (each holding that a capital case requires heightened judicial review and enforcement of procedural safeguards).

[is not] the touchstone" of materiality.  Id., at 435 n.8.  Instead, materiality is

established when a defendant demonstrates:

> [A] 'reasonable probability' of a different result, and the adjective is
> important.  The question is not whether the defendant would more likely
> than not have received a different verdict with the evidence, but whether in
> its absence he received a fair trial, understood as a trial resulting in a verdict
> worthy of confidence.  Accordingly, a 'reasonable probability' of a different
> result is shown when the Government's evidentiary suppression
> 'undermines confidence in the outcome of the trial.'

Kyles, id. at 434, quoting United States v. Bagley, 473 U.S. 667, 678 (1985).

Thus, materiality exists when the withheld evidence could have provided a

"reasonable doubt" about Petitioner's guilt.  California v. Trombetta, 467 U.S.

479, 485 (1984) ("the prosecution has a constitutional duty to turn over

exculpatory evidence that would raise a reasonable doubt about the defendant's

guilt"); United States v. Hill, 976 F.2d 132, 135 (3d Cir. 1992) (same); or when

the withheld evidence had "any adverse effect" upon the defendant's ability to

prepare for trial or present a defense.  Bagley, 473 U.S. at 683 ("the reviewing

court may consider directly any adverse effect that the prosecutor's failure to

respond might have had on the preparation or presentation of the defendant's

case").  The Third Circuit has held that in the context of a Brady violation:

> A defendant is entitled to a new trial where there is a reasonable
> probability that, had the evidence been disclosed to the defense, the
> result of the proceeding would have been different.  A reasonable

9

probability is [defined as] a probability sufficient to undermine confidence in the outcome.  This court has recognized that the Bagley inquiry requires consideration of the totality of the circumstances, <u>including possible effects of non-disclosure on the defense's trial preparation.</u>

<u>United States v. Perdomo</u>, 929 F.2d 967, 972 (3d Cir. 1991) (internal citations omitted).  <u>See</u> <u>also</u> <u>Wilson v. Whitley</u>, 28 F.3d 433, 438 (10th Cir. 1994) ("<u>Bagley</u> evidences concern with any adverse effect that the prosecutor's failure to respond [to the discovery request] might have had on the preparation or presentation of the defendant's case") (quotations and citations omitted); <u>United States v. Spagnoulo</u>, 960 F.2d 990, 994 (11th Cir. 1992) (<u>Brady</u> violation found when withheld evidence "could have" altered defense strategy);  <u>Smith v. Secretary</u>, 50 F.3d 801, 827 (10th Cir. 1995) (same).

The due process requirements of the <u>Brady</u> doctrine also apply to evidence that can be utilized to impeach the prosecutor's theory or witnesses.  <u>Bagley</u>, 473 U.S. at 676 (<u>Brady</u>'s disclosure requirements apply to any materials that, whatever their other characteristics, can be used to develop impeachment of a prosecution witness); <u>Napue v. Illinois</u>, 360 U.S. 264, 269 (1959) ("[t]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence").

Because the vote for life of even a single juror in the sentencing phase of a

10

capital trial results in the imposition of a life sentence, the materiality inquiry related to sentencing should focus on the question of whether the withheld evidence would have had an effect on even a single juror. Wiggins v. Smith , 539 U.S. 510, 537 (2003)("Had the jury been able to place petitioner's excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance."); Frey v. Fulcomer, 974 F.2d 348, 368 (3d Cir. 1992) (prejudice means reasonable probability that "at least one juror would have decided differently and held out for a verdict of life imprisonment"); Jermyn v. Horn, 266 F. 3d 257, 309 (3rd Cir. 2001) ("Because the jury's decision must be unanimous, Jermyn can show prejudice . . . if there is a reasonable probability that the evidence of childhood abuse and neglect as a mitigating factor would have convinced one juror to find the mitigating factors to outweigh the aggravating factor").[6]  If even a single juror reasonably could have found a mitigating circumstance that was not found, or might have differently balanced the aggravating and mitigating circumstances, confidence in the outcome

---

[6]See also Emerson v. Gramley, 91 F.3d 898, 907 (7th Cir. 1996) (Posner, C.J.) (prejudice evaluated in light of "need to convince only one of twelve jurors to refuse to go along with a death sentence"); Kubat v. Thieret, 867 F.2d 351, 371 (7th Cir.) ("even if only one juror had been confused, the reliability of the verdict is undermined"), cert. denied, 493 U.S. 874 (1989); Harris v. Blodgett, 853 F. Supp. 1239, 1270 (W.D. Wash. 1994), aff'd, 64 F.3d 1432 (9th Cir. 1995).

is undermined and a new penalty phase is required.

This Court should take note that the prosecutor's <u>Brady</u> obligation does  not end with the jury's verdict.  The duty to disclose is ongoing through <u>all</u> stages of the appellate and post-conviction process.  <u>Pennsylvania v. Ritchie</u>, 480 U.S. 39, 60 (1987)("the duty to disclose is ongoing");  <u>Imbler v. Pachtman</u> 424 U.S. 409, 427 n.25 (1976) ("[A]fter a conviction the prosecutor . . .  is bound by the ethics of his office to inform the appropriate authority of after-acquired or other information that casts doubt upon the correctness of the conviction.") (citing ABA Code of Professional Responsibility § EC 7-13 (1969); ABA Standards for Criminal Justice, Prosecution and Defense Function § 3.11 (1971); <u>Thomas v. Goldsmith</u>, 979 F.2d 746, 750 (9th Cir. 1992) ("We do not refer to the state's duty to turn over exculpatory evidence at trial, <u>but to its present duty to turn over exculpatory evidence relevant to the instant [post-conviction] proceeding</u>.").[7]

---

[7]In regard to the on-going nature of a prosecutor's <u>Brady</u> obligations, it must be noted that Section 2255 counsel previously requested all undisclosed FBI 302 statements.  On October 15, 2004 Petitioner filed his *Second Motion for Discovery* with an accompanying *Memorandum in Support* (document #s 983 and 987).  In these submissions, Petitioner sought, <u>inter alia</u>, the disclosure of all previously undisclosed FBI 302.  He attached a list of all 302 that had previously been disclosed.  <u>See</u> *Motion* at 4-5; *Memorandum in Support* at 8-9.

The Government opposed this request.  *United States Brief in Opposition* (filed on October 29, 2004) (document # 994-1) at pages 13-16.  Petitioner filed a *Reply to the Government's Brief in Opposition* on November 8, 2004 (document #

It is also clear under <u>Brady</u> and its progeny that the Government has a duty to provide exculpatory or favorable evidence regardless of whether the defense made a specific request for the item in question.  See <u>Banks v. Dretke</u>, 540 U.S. 668 (2004) ("Our decisions lend no support to the notion that defendants must scavenge for hints of undisclosed <u>Brady</u> material when the prosecution represents that all such material has been disclosed.  . . .  A rule thus declaring 'prosecutor may hide, defendant must seek' is not tenable in a system constitutionally bound to accord defendants due process.  Ordinarily we presume that public officials have properly discharged their official duties.") <u>quoting</u> <u>Strickler</u>, 527 U. S. at

---

998) in which he reiterated the relevance of this request and his entitlement to the undisclosed 302 reports.

This Court, in reliance on the good faith of the prosecutor and in recognition of the prosecutor's on-going <u>Brady</u> obligations, denied the request.  In an order dated November 12, 2004 (document # 1004) this Court held that:

> There is no indication that the Government has not complied with the requirements of <u>Brady</u> or its progeny.  Further, Hammer has not demonstrated that the Government failed to provide Jenks Act materials.  We see no reason to order the Government to do something which it was and is required to do under the law . . .

> The Government has a continuing duty to disclose <u>Brady</u> material.

Document 1004 at 4-5 and n. 2.
Thus, Petitioner did all that he could to ferret out the suppressed reports.

13

281.[8]

Finally, the failure to disclose all material evidence favorable to an accused violates due process whether or not the prosecutor acted in good faith or whether the evidence was actually in the possession of the prosecutor. Brady, 373 U.S. at 87. The prosecutor is responsible for "any favorable evidence known to the others acting on the government's behalf, including the police." Kyles, 514 U.S. at 437. See also id. at 438 (knowledge of favorable evidence "known . . . to police investigators and not to the prosecutor" is imputed to the trial prosecutor). As the United States Supreme Court has recently reiterated, a prosecutor is "responsible for 'any favorable evidence known to others acting on the government's behalf in the case, including the police,'" even if the failure to disclose is legitimately inadvertent. Strickler v. Greene, 527 U.S. at 275 n.12 (1999) (citing Kyles, 514 U.S. at 437).

With these principles in mind, Petitioner will now review the withheld exculpatory evidence and demonstrate his entitlement to relief.

---

[8]Even though Brady and its progeny require disclosure even absent a specific request, Petitioner mentions this aspect of Brady in view of the Government's oft-repeated suggestions during the section 2255 hearing that the FBI 302 statements were not disclosed because they were not relevant to requests made by either trial and/or section 2255 counsel.

14

### C.    The Withheld Evidence.

The Government in this case withheld from trial counsel, and post-conviction counsel information from Albert Ray Johnson, Royce Lee Fowler and Gaylon Don Ball that would have:  1) affirmatively bolstered Mr. Hammer's defense that Mr. Marti was bound to the bed as part of consensual sexual activity; 2) directly contradicted the Government's theory of "substantial planning and premeditation"; 3) also contradicted the Government's proof in the penalty phase of the intent factor that the killing was intentional; and 4) provided potent ammunition to defense counsel for use during their cross examination of Government expert and lay witnesses at both the guilt and penalty phases of the trial.

The Government withheld these documents despite the fact that the assigned case agent FBI Special Agent Anthony Maluco knew long before the start of trial that there was a "high likelihood" that a defense of accidental death due to sexual asphyxiation would be presented by the Petitioner.  NT 6/11/98, 106.

The Government also failed to disclose an FBI 302 witness statement from inmate Martin R. Guerrero, Jr. and a BOP document both of which directly contradicted the Government's theory of "substantial planning and premeditation" as well as Mr. Hammer's statement to Special Agent Carlyle Thompson on the

15

night in question.

### 1.     The Albert Johnson 302 Statements.

On June 3, 1998, FBI Special Agent Malocu and BOP investigator Traxler conducted an interview of Albert Ray Johnson, Jr., who was incarcerated at the Great Plains Correctional Facility in Hinton, Oklahoma.  Mr. Johnson had served time with Mr. Hammer in Oklahoma and at USP-Allenwood.

Mr. Johnson told the Government agents that while he was incarcerated with Mr. Hammer in Oklahoma, Hammer engaged in consensual sexual activities that included bondage and sadomasochism:

> JOHNSON indicated that HAMMER was a homosexual and was into bondage.  He and his homosexual cell mates would tie each other up and whip each other with rope or electrical cord. Hammer and his sexual partners would come to the cell door playing with each other.

302 FBI Statement of Albert Ray Johnson dated 6/3/98 at 1.

Mr. Johnson also told the Government that he again met Mr. Hammer in 1995 at USP-Allenwood and that his sexual activities and consensual bondage continued:

> While incarcerated in the Special Housing Unit, HAMMER engaged in sexual activity with his cell mate who was identified as a white male with a first name of TONY, having long stringy hair. JOHNSON never really talked to HAMMER's cell mate, but did talk with HAMMER on many occasions.  HAMMER and his cell mate would tie each other up and bite each other.  They would yell over to

16

> JOHNSON's cell and make a lot of noise.  HAMMER and his cell mate would typically stay up all night engaging in sexual activity.  They would tie each other up using braided sheets. When one would fall asleep, the other would tie him up.

Id. at 3.

Mr. Johnson also told the Government that he (Johnson)  had braided sheets

and provided them to Hammer.  He also told the Government that he had shown

Hammer how to braid these sheets while incarcerated in the SHU at USP-

Allenwood:

> JOHNSON used to make braided sheets and used them as clotheslines in his cell.  JOHNSON recalls making them and providing them to Hammer.  He would tie a battery to one end and fish the braided rope to HAMMER, thus providing it to him.  JOHNSON had told HAMMER how to make the rope, by telling him that all you needed to do was braid some sheets.

Id. at 3.

Mr. Johnson also told the Government that Hammer was a sadomasochist:

> HAMMER had a cell partner "TONY LNU", a white male approximately 26 years of age...TONY and HAMMER would beat up each other periodically for the pain, as both were sadomasochist.

302 Statement of Albert Ray Johnson dated 12/6/96 at 2.  None of these

statements were disclosed to trial counsel.

Thus, the Government was told by Mr. Johnson that Mr. Hammer had

regularly engaged in consensual bondage and related sexual activities; that he

he – Johnson – had provided Hammer with braided sheets and also taught Mr.

Hammer how to braid them; and that the use of braided sheets were part of Mr.

Hammer's consensual sexual activities.

The information contained within the Johnson statements are consistent

with the partially developed and partially presented defense theory that Mr.

Marti's death occurred as an accident during consensual sexual activity.  Trial

defense counsel presented glimpses of this defense during both his guilt phase

opening statement and in his closing penalty argument.  In his opening statement,

Mr. Travis told the jury:

> The evidence in the this case in the mental health field is going to
> show that as part of the evaluation and assessment that was done by
> Dr. Robert Sadoff...And during the hypnotic session he relived the
> early morning hours of April 13, 1996.  <u>And as part of that process, it
> was developed that the tying was voluntary and the tying was part of
> some plan; kinky homosexual activity between Mr. Hammer and
> between Mr. Marti.</u>

NT 6/3/98, 5.  Similarly, during his penalty phase closing argument, Mr. Travis

suggested to the jury on two occasions that Mr. Marti was bound to the bed not as

the result of a ruse, but as a result of consensual "sexual bondage." NT 7/23/98 at

3- 4.

As the record shows, Mr. Travis had scant, if any, evidence to support these

arguments.  However, had the Government provided the Johnson material to

counsel, counsel would have been able to develop and present a fuller version of this defense, and it would have found evidentiary support.

The Government sat on this information while making several arguments that were directly refuted by the Johnson statements.   For instance, the Government argued vehemently that there was no evidence of consensual sex and that the tying down and braiding of the sheets demonstrated "substantial planning" for murder because "you have to factor in what time it took to make heavy duty restraints to keep a six foot four, two hundred pound man in place."  NT 7/21/98, 89.  The Government also argued that the tying down of Marti was part of Petitioner's plan to prevent Mr. Marti from reaching the distress button in the cell.  NT 7/21/98, 84.  The Government also argued that the hostage ruse was essential to the plan because "how many people would willingly want to be tied down by another inmate who they've only met for, what less than four or five days."  Id. at 85.   Indeed, the Government urged the jury to find that the tying of Mr. Marti to the bed was "essential preplanning" warranting the death penalty.  NT  7/21/98, 84.

Both Mr. Travis and Mr. Rhunke testified at the 2255 hearing that the suppressed Johnson material was material and relevant to both Mr. Hammer's guilt phase defense and to counter the Government's argument concerning substantial

19

planning and premeditation during the penalty phase of this case.   Specifically,

Mr. Travis and Mr. Rhunke testified that if they had been aware of this evidence

that Mr. Hammer had a history of engaging in sadomasochistic sex and braiding

sheets for use in consensual acts of sexual bondage, they would have investigated

such evidence as it was relevant and material to Mr. Hammer's guilt phase and

penalty phase defense and they would certainly have presented it to the jury at

both of these trial stages.

Finally, Both Mr. Travis and Mr. Rhunke testified that the Government's

failure to provide this information at the time of trial prevented them from

discussing with Mr. Hammer the import and relevance of this information to Mr.

Hammer's decision whether or not to plead guilty thus vitiating any claim that his

guilty plea was knowing, intelligent and voluntary.[9]

### 2.    The Royce Lee Fowler 302 Statement.

The FBI 302 statement of  Royce Lee Fowler was also disclosed to

undersigned counsel for the first time on September 22, 2005.  Mr. Fowler, like

Mr. Johnson, was interviewed by FBI Special Agent Malocu and BOP investigator

Traxler on June 3, 1998.  This interview took place at USP-Lewisburg.   Mr.

Fowler had served time with Mr. Hammer at USP-Leavenworth.

---

[9]This argument is addressed below in section III D.

Mr. Fowler told the Government that he lived with Mr. Hammer in the Special Housing Unit at USP- Leavenworth for approximately nine months in 1995.  Mr. Fowler stated that Mr. Hammer was a homosexual with a preference for bondage during sex:

> FOWLER has had the same girlfriend for the past 20 years.  Her name is NANCY. On one occasion when he was telling HAMMER bout how he wanted to tie NANCY up with her pantyhose, HAMMER informed FOWLER about his liking bondage and wanting to be tied up during sex.

302 Statement of Royce Lee Fowler dated 6/8/98 at 1, 3.

Mr. Fowler's statement is consistent with Mr. Johnson's statement and would have provided trial counsel with two sources of independent evidence that could have been presented to the jury establishing that Mr. Hammer's sexual practices were consistent with the consensual binding of Mr. Marti on the night of April 13, 1996 for sexual activity purposes.

Mr. Fowler also gave the Government information that directly refuted the Government's argument that Mr. Hammer's description of his childhood experiences "is not as severe as he would like you to believe" NT 7/21/98, 149.

Specifically, Mr. Fowler told Special Agent Malocu and Investigator Traxler that Mr. Hammer had revealed to him in 1995 that he was sexually abused as a child:

> HAMMER had told him that his father had started to abuse
> HAMMER and his brother and sister when they were children.
> HAMMER was approximately five or six years old.

*   *   *   *

> Out of the blue, on one occasion, HAMMER told FOWLER about
> being sexually abused by his father.  Hammer informed FOWLER
> that his daddy would make HAMMER "suck his peter."  He would do
> the same thing to his brother and sister.

Id. at 2.

Mr. Fowler's statement is consistent with Mr. Hammer's description of his

childhood to the various mental health experts (defense and prosecution) and

refutes the Government's assertion at the penalty phase of trial that his history of

childhood sexual abuse "is not as severe as he would like you to believe." NT

7/21/98, 149.  Indeed, Mr. Fowler's conversation with Mr. Hammer about the

childhood sexual abuse he suffered at the hands of his father took place a full year

before Mr. Marti's death and is consistent with what he told Drs. Sadoff, Mitchell

and Wolfson.

Mr. Travis and Mr. Rhunke testified at the 2255 hearing that had Fowler's

302 been provided to them prior to trial, they would have investigated whether

there was still other evidence of Mr. Hammer's having engaged in consensual

sexual bondage.  They also testified that the portion of Fowler's statement wherein

22

he told Agent Malocu and Investigator Traxler that Mr. Hammer, long before Mr.

Marti's death, related aspects of his history of sexual abuse as a child is evidence

they would have presented in order to rebut the Government's argument that Mr.

Hammer's background "was not as severe as he would like you to believe." NT

7/21/98, 149.

### 3.     The Gaylon Don Ball 302 and Handwritten Notes.

At the time of the trial the Government had in its possession a 302 statement

from Gaylon Don Ball.  Mr. Ball had served time with Hammer at USP-

Allenwood.  The Government also had Agent Maluco's handwritten notes of this

interview.  Again, these documents were not provided to the defense until

September 22, 2005.

These documents revealed that Mr. Ball told the Government that he  had

known Hammer for several years and that:

> HAMMER was having sexual relations with MARTI, although he
> had no facts to back up his opinion.  The first knowledge BALL had
> regarding the death of inmate MARTI occurred when he heard a
> female's voice outside HAMMER'S cell on the morning that MARTI
> was murdered.

302 Statement of Gaylon Don Ball dated 6/27/96 at 1.

Mr. Travis and Mr. Rhunke  testified at the 2255 hearing that had they been

aware of Ball's statement to the FBI, they would have wanted to interview him in

23

order to ascertain what he knew and what other information he may have been able to provide the defense.

Moreover, in Mr. Ball's FBI 302 statement, he indicates that he became aware that something had occurred in cell 103 when he heard a female's voice. Mr. Travis testified he would have wanted to investigate, whether the female voice heard by Mr. Ball was that of one of Mr. Hammer's alter personalities, Tammy. Mr. Travis testified that he would have wanted to not only investigate this information further, but he would have wanted to provide this information to Dr. Sadoff and Dr. Wolfson.

When Mr. Travis compared Agent Maluco's formal 302 statement of Mr. Ball with Agent Maluco's handwritten notes of the interview another glaring contradiction between these two documents became evident. According to Agent Maluco's handwritten notes, Mr. Ball stated "Hammer was having sexual relations with Marti although this is only his opinion  approx 1 hr before he heard females voice."  The handwritten notes suggest that Hammer and Marti were engaged in sexual relations an hour before Ball heard a female voice.  If the female voice was that of Correctional Officer Nicole Weaver – it is reasonable to conclude that Hammer was having sexual relations with Marti at the exact time –  according to the Government's theory –  that Hammer was supposed to be murdering Marti.

24

Mr. Travis also testified that when he reviewed the Agent's notes, he immediately thought that the female voice may have been one of Mr. Hammer's alter personalities – Tammy – and that he would have investigated and presented this information in support of the insanity defense.

### 4. The Martin Guerrero 302 Statement and the BOP Document.

At the time of trial the Government had in its possession a 302 statement from Martin Guerrero, who had served time with Hammer at USP-Allenwood. This document was not provided to the defense until September 22, 2005. Mr. Guerrero's 302 statement directly and materially contradicts the statement Mr. Hammer gave to FBI Special Agent Carlyle Thompson on the night of Mr. Marti's death. On April 13, 1996, Mr. Hammer told the FBI that:

> On Thursday evening, April 11, 1996, . . . HAMMER wrote a letter on MARTI's behalf to MARTINE GUERRERO (phonetic) via mailing it to a third party located at Post Office Box 234, Three Rivers, Michigan. HAMMER had doubts at the time in his own mind as to whether he was going through with what he planned. HAMMER told GERRERO in the letter that he (HAMMER) knew MARTI for some time, did not believe the rumors, and to give MARTI a chance, to spread the word and do it as a personal favor for me.

302 Statement of David Paul Hammer dated 4/13/98 at 3.

However, Mr. Guerrero in his interview with Agent Maluco when

25

specifically asked about receiving a letter from Mr. Hammer told Agent Maluco that "he never received any letter from Hammer" nor had he "received any mail from a third party located in Michigan." 302 Statement of Martin Guerrero dated 9/4/96.

In its penalty phase closing argument, the Government reminded the jury of Hammer's statement concerning this letter and argued it was further evidence of Mr. Marti's gullibility. NT 7/21/98, 88. Both Mr. Travis and Mr. Rhunke testified that the they would have investigated the evidence contained in the FBI 302, and had they been aware of it, they would have presented it to the jury.

The Government also failed to provide the defense with a BOP document that contained information that directly and materially contradicts the statement Mr. Hammer gave to FBI Special Agent Carlyle Thompson on the night in question.[10] On April 13, 1996, Mr. Hammer told Agent Thompson that:

> HAMMER stated that MARTI came (moved) into his cell and (SHU 3103 on Tuesday of this week). MARTI came at the written and verbal request of HAMMER who wanted him to be his cell mate.
>
> Marti wanted to move in with HAMMER according to HAMMER.

---

[10]This undated BOP document was received by trial counsel in a post-trial Freedom of Information Act request. It was marked and admitted into evidence at the 2255 hearing as Defendant's Exhibit 197. The relevant portions of Exhibit 197 are found on page 15.

302 Witness Statement of David Paul Hammer dated 4/13/98 at 2.

In its penalty phase closing argument, the Government argued that Hammer's request to have Marti cell with him was part of his plan to kill Marti. He further argued that in furtherance of this plan Hammer submitted written requests known as "copouts" to the prison officials requesting such a move. Specifically, Mr. Martin reminded the jury that a fight in the SHU "held up Hammer's plans to have Marti move in with him by a day" and that "we had first of all Mr. Hammer constantly peppering individuals, whether it was Brad Pfeiffer, the officer who testified, or even Mr. Classen and Mr. Yeager, they all said the copouts kept going." NT 7/21/98, 74, 85.

The suppressed BOP document that was provided to defense counsel long after trial revealed that Marti had gang related problems and as result of these problems it was <u>Marti who had requested to cell with Hammer</u>:

> Inmate Marti was placed in SHU on December 26, 1995 STG records indicate Marti was affiliated with the Nortenos. Due to the recent incidents between the Mexican Mafia and the Mexikami inmates, a large number of both groups are locked down in SHU. Since all three groups are rival gangs, Marti was experiencing difficulties housing with other inmates due to the tension among the other gangs.

> Also in the interview it was discovered that on Tuesday, April 9, 1996, Marti requested to move in with Hammer. There was no reported separation concerns between the two inmates and staff moved Marti in with Hammer.

27

Defense Exhibit 197 at 15.

The BOP document directly and materially contradicts a critical part of the Government's theory of substantial planning and premeditation. This document establishes that Marti was motivated by fear to move out of his cell and in with Hammer and as a result of this fear Marti – not Hammer – requested that they cell together.

> **D.    These <u>Brady</u> Claims Must be Reviewed on the Merits, and Must Result in a Vacation of Mr. Hammer's Guilty Plea and Restoration of His Appellate Rights.**

The above described withheld exculpatory documents have an impact on both the guilt and penalty phases of trial. Petitioner will now show that the <u>Brady</u> claim is cognizable as to both guilt and penalty and that Petitioner is entitled to relief.

> **1.    Guilt Phase.**

As to the guilt phase, these documents would have provided trial defense counsel with investigative leads and would have lent significant support to the defense of erotic asphyxia. The report that Mr. Hammer disclosed to another prisoner a full year before Mr. Marti's death, that he was abused as a child, would have significantly undercut the Government's skepticism that Mr. Hammer's abuse was genuine, and would therefore have bolstered the insanity defense that

Mr. Hammer was suffering from Dissociative Identity Disorder (DID).  This report would have also assisted Mr. Hammer's penalty phase presentation.  Also as to penalty phase, these documents would have provided counsel with significant support to challenge both the intent factor and one of the aggravating circumstances (substantially planning and premeditation) set forth by the Government and found by the jury.

Thus viewed, neither Mr. Hammer's guilty plea nor his subsequent waiver of his appellate rights acted as a waiver of these Brady claims.  Put in other words, the revelation of these documents in the course of the post-conviction evidentiary hearing render Mr. Hammer's prior waiver of his rights unknowing, unintelligent and involuntary.

The United States Supreme Court's latest treatment of the impact of discovering exculpatory evidence following a guilty plea, shows that Mr. Hammer's guilty plea did not act to waive these Brady claims; that they must be reviewed on the merits despite Mr. Hammer's guilty plea and subsequent waiver of his appellate rights; and that he is entitled to review and relief.  In United States v. Ruiz, 536 U.S. 622 (2003) the Court addressed the question of whether a defendant could bargain away his right to impeachment material in a pre-trial plea bargain. The Court held a defendant could do so, because the policy interests

served by plea bargaining would be significantly undercut by requiring the

Government to search for and disclose mere impeachment material when the

defendant wished to plead guilty.  Id. at 631 ("a constitutional obligation to

provide impeachment information during plea bargaining, prior to entry of a guilty

plea, could seriously interfere with the Government's interest in securing those

guilty pleas that are factually justified, desired by defendants, and help to secure

the efficient administration of justice").

Two distinctions between the Brady claims in this case, and those discussed

in Ruiz, are readily apparent.  First, while Ruiz addressed a defendant's right to

receive Brady material related to "impeachment" (i.e. material that would be

disclosable at trial pursuant to Giglio v. United States, 405 U.S. 150, 153-56

(1972)), the material at issue in Mr. Hammer's case relates to actual innocence,

and to his death eligibility.   The Court recognized the critical distinction between

mere impeachment material and evidence of actual innocence, and the resulting

constitutional requirements for disclosure, even in the setting of a negotiated plea

bargain.  It noted that the plea agreement in Ruiz in fact called for disclosure of

evidence showing "innocence," and relied upon this fact as an important

protection against innocent defendants being permitted to plead guilty.  Id. 631

("[T]he proposed plea agreement at issue here specifies, the Government will

provide 'any information establishing the factual innocence of the defendant' regardless. That fact, along with other guilty plea safeguards . . . diminishes the force of Ruiz's concern, in the absence of impeachment information, innocent individuals, accused of crimes, will plead guilty."). Thus, Ruiz cannot be read as permitting the prosecutor to withhold Brady material relevant to "innocence" in the context of a guilty plea – the Ruiz prosecutor did not do so and the Court did not countenance such conduct in Ruiz.

The second distinction between Ruiz and Mr. Hammer's case, is that Mr. Hammer – unlike Ruiz – never "bargained" away his right to receive exculpatory information. Unlike Ruiz, Mr. Hammer's guilty plea did not occur before trial, but at the very end of the Government's rebuttal case. Thus, the policy reasons articulated in Ruiz that militated against a requirement that the Government look for and disclose impeachment evidence in the context of a pre-trial plea negotiation, are absent in Mr. Hammer's case. Mr. Hammer had a right to the exculpatory evidence that transcends pre-trial rights.

In the truest sense, Mr. Hammer's waiver of his rights to complete his trial and pursue his direct appeal were not knowing, intelligent and voluntary. In fact, as a result of the Government's non-disclosures, he did not know many things. He did not know that several prisoners had told authorities about his sexual behaviors,

31

and the use of sheets; he did not know that at least one prisoner related that Mr.

Hammer disclosed his childhood abuse one year before Mr. Marti's death; he did

not know that the authorities had proof that Mr. Marti requested to cell with Mr.

Hammer, and not the other way around; and he did not know that several aspects

of his confession to the authorities were contradicted by information provided by

these prisoners.

The law is abundantly clear and long-standing: a waiver of a constitutional

right may not stand absent a showing that the right was surrendered in a knowing,

intelligent and voluntary manner.  See e.g. Johnson v. Zerbst, 304 U.S. 458

(1938).  Applying this standard, Mr. Hammer's waivers are flawed, and his rights

must be restored.

>           2.      **Penalty Phase.**

Even if Ruiz could be read as finding a waiver of Mr. Hammer's Brady

rights because he pled guilty – which for the above reasons, it cannot be – such a

reading would have no bearing on Mr. Hammer's right to obtain this Brady

material for use in the penalty phase.  See Bradshaw v. Stumpf, 125 S.Ct. 2398

(2005) (due process violation that is waived by guilty plea at guilt phase is not

waived at penalty hearing).

The suppressed information could have had an impact on the penalty phase

in several respects.

First, as this Court pointed out in its order of September 27, 2005 (document # 1179) at 1, following a finding of guilt of first degree murder, a federal jury must determine if there exists a statutory intent factor pursuant to 18 U.S.C. § 3591 (a)(2).  In this case, the intent factor was that Mr. Hammer committed the murder "intentionally."  Thus, even if Mr. Hammer's <u>Brady</u> claim was waived as to the guilt phase – which it was not – he still could have mounted challenges to the jury's finding of the intent factor, based upon all of the above described <u>Brady</u> material.

Second, his guilty plea did not waive the <u>Brady</u> claim as it relates to his ability to challenge the Government's contention that the crime satisfied the "substantial planning and premeditation" aggravating factor.  Since the jury here found two aggravating circumstances, and multiple mitigating circumstances, the instant challenge to one of the aggravating circumstances requires a new sentencing hearing.[11]

---

[11]In <u>United States v. Hammer</u>, 25 F.Supp.2d 518, 520-22 (M.D. Pa. Oct. 9, 1998) this Court noted that the jury found two aggravating and multiple mitigating circumstances and then weighed them in arriving at the death sentence:

> The jury also found beyond a reasonable doubt the following two statutory aggravating factors:  (1) Mr. Hammer previously had been convicted of two or more State or Federal offenses punishable by a term of imprisonment for

In a death penalty jurisdiction with a statute that requires the jury to weigh aggravating and mitigating circumstances, aggravating circumstances play a dual role: they make a defendant death eligible, and they guide the jury in reaching its verdict "insofar as they are weighed or balanced." Flamer v. Delaware, 68 F.3d 736, 767 n.6 (3d Cir. 1995) en banc ("[A]ggravating circumstances in 'weighing'

---

more than one year and (2) Mr. Hammer committed the murder of Mr. Marti after substantial planning and premeditation.   These two statutory aggravating factors are supported by the record.

    *                                    *                                      *

One juror found that Mr. Hammer committed the offense under severe mental or emotional disturbance, suffers from cognitive deficits, is remorseful for having caused the death of Mr. Marti and has demonstrated acceptance of responsibility for his offense.   Twelve jurors found that Mr. Hammer is the product of a violent, abusive and chaotic childhood, that as a young person he attempted to seek help for mental difficulties, that he will be sentenced to life in prison without the possibility of release if a sentence of death is not imposed, and friends and family members of Mr. Hammer will be adversely affected if he is sentenced to death.   Six jurors found that as a child Mr. Hammer was a victim of sexual abuse.   Three jurors found that the United States Bureau of Prisons and the Oklahoma Department of Corrections are capable of fashioning conditions of confinement such that Mr. Hammer is unlikely to commit criminal acts of violence in the future. Finally, five jurors found that Mr. Hammer even though incarcerated for most of his life has managed to do some good things.

    *                                    *                                      *

The jurors then balanced the aggravating factors against the mitigating factors and concluded that because the aggravating factors sufficiently outweighed the mitigating factors a sentence of death was justified.

34

states perform two functions.  Not only do they set the death-eligible threshold,

they also guide the jury's decision beyond that point insofar as they are weighed or

balanced by the jury against mitigating circumstances in order to arrive at a

sentence.").[12]

Because of the dual role played by aggravating circumstances in a weighing

jurisdiction, the United States Supreme Court has never permitted a jury

consideration (i.e., weighing) of a tainted aggravating circumstance to stand, even

if there were sufficient remaining untainted circumstances.  To the contrary, the

Court has clearly and repeatedly condemned death sentences resulting from a

jury's weighing of a tainted aggravating circumstance, even when other untainted

circumstances are present.  Sochor v. Florida, 504 U.S. 527, 532 (1992) ("In a

weighing State like Florida, there is Eighth Amendment error when the sentencer

weighs an 'invalid' aggravating circumstance in reaching the ultimate decision to

impose a death sentence. . . . Even when other valid aggravating factors exist,

merely affirming a sentence reached by weighing an invalid aggravating factor

deprives a defendant of the individualized treatment . . ." required by the Eighth

_____

[12]As this Court has recognized, the FDPA is a weighing statute.  See United States v. Hammer, 96-239 (M.D. Pa.), order of September 27, 2005 (document # 1179) at page 3 ("The Federal Death Penalty Act of 1994 . . . is a weighing statute").

Amendment.); <u>Espinosa v. Florida</u>, 505 U.S. 1079, 1081 (1992) (Where one of four aggravating circumstances was found invalid, the Court stated "Our cases establish that, in a State where the sentencer weighs aggravating and mitigating circumstances, the weighing of an invalid aggravating circumstance violates the Eighth Amendment. . . . [the sentencer] must [not] be permitted to weigh invalid aggravating circumstances"); <u>Stringer v. Black</u>, 503 U.S. 222, 232 (1992) (where only one of three aggravating circumstances found invalid, Court stated "when the sentencing body is told to weigh an invalid [aggravating] factor in its decision, a reviewing court may not assume it would have made no difference if the thumb had been removed from death's side of the scale."); <u>Hameen v. Delaware</u>, 212 F.3d 226, 249 (3d Cir. 2000).

Thus, to the extent that the <u>Brady</u> violation contributed to the jury's finding of the "substantial planning and premeditation" aggravating circumstance, the death penalty is invalid, and Mr. Hammer is entitled to a new sentencing proceeding.

**E.    Conclusion.**

There can be no serious dispute but that the Government withheld information that could have been affirmatively used by Petitioner to present a defense that the killing was not intentional.  Thus, Petitioner's right to present a

defense secured by the due process clause was violated.  <u>Chambers v. Mississippi</u>, 410 U.S. 284 (1973).  The evidence could have also been used by Petitioner to rebut the Government's presentation regarding the intent factor and the aggravating factor of "substantial planning and premeditation."  The suppression of this information is also disturbing in light of the prosecutor's affirmative arguments that contradicted information contained in the suppressed materials. The due process clause is offended when a prosecutor presents evidence that is false (<u>Napue v. Illinois</u>, 360 U.S. 264, 269 (1959)), particularly when he is holding on to information that he knows can rebut that information, because the defendant is entitled to an opportunity to rebut it.  <u>Garnder v. Florida</u>, 430 U.S. 349, 362 (1977), <u>Skipper v. South Carolina</u>, 476 U.S. 1 (1986); <u>Simmons v. South Carolina</u>, 512 U.S. 154, 161 (1994).

The Government's failure to provide these exculpatory reports seriously damaged Petitioner's rights, and requires that his guilty plea be vacated, and/or that he be afforded a new sentencing hearing.

IV. **TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE UNDER THE SIXTH AMENDMENT.**

Petitioner has alleged and presented evidence demonstrating that trial counsel were ineffective in multiple aspects of their representation, including the following:

- For failing to investigate Mr. Hammer's competency to waive trial and plead guilty; their failure to investigate and challenge Mr. Hammer's competency to discharge counsel and waive his direct appeal; including their failure in both instances to obtain opinions from defense experts regarding Mr. Hammer's capacity to waive these rights.

- For failing to investigate and challenge the ethical impropriety of the participation of both Drs. Mitchell and Wolfson in the competency proceedings, and in regard to determining Mr. Hammer's criminal responsibility, in light of their multiple conflicts of interest, and for failing to challenge the Government's use of Mr. Hammer's confidential therapy notes during trial.

- For failing to challenge the veracity of his alleged confession and failure to investigate and present evidence that Mr. Hammer is a serial false confessor and that many aspects of his confession in this case were – consistent with his history of confessing falsely – factually wrong and easily shown to be such.

- For failing to investigate and present evidence that Mr. Marti's death was accidental – caused by erotic asphyxia.

A. **Each of Mr. Hammer's Claims of Ineffective Assistance of Trial Counsel are Cognizable in Section 2255 Proceedings.**

In Massaro v. United States, 538 U.S. 500 (2003), the Supreme Court

38

squarely held that claims of ineffective assistance of trial counsel are properly pursued in a motion filed under 28 U.S. § 2255. Id. at 504 ("The better-reasoned approach is to permit ineffective-assistance claims to be brought in the first instance in a timely motion in the district court under § 2255."). This is so, even if the petitioner could have raised the claim on direct appeal. Id. ("We hold that an ineffective-assistance-of-counsel claim may be brought in a collateral proceeding under § 2255, whether or not the petitioner could have raised the claim on direct appeal").

The application of Massaro to Petitioner's case means that all of his section 2255 claims of ineffective assistance of trial counsel are properly before this Court. Massaro also means that Petitioner's waiver of his direct appeal has no procedural bearing on this Court's duty to review the merits of each of his claims of ineffective assistance of counsel claims.

**B.     The Governing Sixth Amendment Standards.**

Sixth Amendment ineffective assistance of counsel claims are evaluated under the two-prong test of Strickland v. Washington, 466 U.S. 668 (1984). Mr. Hammer must show: (a) counsel's deficient performance, i.e., that his attorney's performance fell below "an objective standard of reasonableness," id. at 688; and (b) prejudice, i.e., that confidence in the result of the original proceeding is

undermined due to counsel's deficiencies, id. at 694.

The United States Supreme Court has repeatedly emphasized that capital counsel has an enhanced duty to investigate.  See Williams v. Taylor, 529 U.S. 362 (2000); Wiggins v. Smith, 539 U.S. 510 (2003); Rompilla v. Beard, 125 S.Ct. 2456 (2005).

In assessing counsels' deficient performance, this Court should also be guided by practice guidelines for the performance of capital counsel promulgated by the American Bar Association.  Rompilla v. Beard, 125 S.Ct. at 2466 ("[W]e long have referred [to these ABA Standards] as 'guides to determining what is reasonable'"); Wiggins v. Smith, 539 U.S. at 524 (quoting Strickland v. Washington, 466 U.S., at 688)).

The ABA GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES, revised, 2003 (hereafter, ABA Guidelines) are of particular importance to this case in regard to trial counsels' deficient failure to conduct a proper investigation into several areas.  The ABA Guidelines require that defense counsel thoroughly investigate all potential issues and defenses.  Specifically, ABA Guideline 10.7 – Investigation – provides in pertinent part:

A.    Counsel at every stage have an obligation to

conduct thorough and independent investigations relating to the issues of both guilt and penalty.

1.    The investigation regarding guilt should be conducted regardless of any admission or statement by the client concerning the facts of the alleged crime, or overwhelming evidence of guilt, or any statement by the client that evidence bearing upon guilt is not to be collected or presented.

Additionally, Guideline 10.8 – <u>The Duty To Assert Legal Claims</u>, provides:

A.   Counsel at every stage of the case, exercising professional judgement in accordance with these guidelines, should:

1.    Consider all legal claims potentially available; and

2.    Thoroughly investigate the basis for each potential claim before reaching a conclusion as to whether it should be asserted.

Similarly, in reference to a plea of guilty, Guideline 10.9 – <u>Entry of A Plea</u>

<u>Of Guilty</u>, provides in pertinent part:

1.    Prior to the entry of the plea, counsel should:

A.    make certain that the client understands the rights to be waived by entering the plea and that the client's decision to waive those rights is knowing, voluntary and intelligent.

Trial counsel's performance in critical areas of this case did not comport

41

with what is required by the Constitution, well-established United States Supreme Court precedent and the ABA Guidelines.

Counsels' deficient performance in this case, caused Mr. Hammer's Strickland prejudice. The Strickland prejudice prong is satisfied when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. A "reasonable probability of a different result" is thus less than a preponderance of evidence. Hull v. Kyler, 190 F.3d 88, 110 (3d Cir. 1999) (Strickland's prejudice standard "is not a stringent one. It is less demanding than the preponderance standard."). Petitioner will now demonstrate how counsels' deficient performance caused Mr. Hammer prejudice and why he is therefore entitled to relief in multiple respects.

### C.    Counsels' Ineffectiveness with Regard to Petitioner's Trial Competency and his Capacity Make Knowing, Intelligent and Voluntary Waivers of His Rights.[13]

As a result of trial counsel's failure to investigate and challenge Mr. Hammer's competency to waive trial, enter a plea of guilty, and waive his direct

---

[13]In this section, Petitioner will demonstrate counsels' ineffectiveness with regard to his lack of competence to waive various rights. In a later portion of this *Brief* (section V, below), he will review the evidence produced at the evidentiary hearing showing that he was actually not competent for these purposes.

appeal rights, this Court's determination of Mr. Hammer's competency at those

critical junctures of these capital proceedings was flawed.

A defendant who is mentally incompetent cannot waive his rights.  See

Cooper v. Oklahoma, 517 U.S. 348, 354 (1996); Rees v. Payton, 384 U.S. 312

(1966) (per curiam).  As the United States Supreme Court has explained, an

erroneous determination that an incompetent defendant has waived his rights

"threatens a 'fundamental component of our criminal justice system' -- the basic

fairness of the trial itself."  Cooper, 517 U.S. at 364.  Accordingly, trial counsel

has a duty to vigilantly protect his client and ensure that he/she does not enter into

such a waiver while mentally lacking capacity to make a knowing, intelligent and

voluntary waiver of his rights.

In Mr. Hammer's case, trial counsel admittedly did not investigate

Petitioner's competency to plead guilty.  This constitutes deficient performance.

Counsel "cannot depend on his or her own evaluation of someone's [competency]

once he has reason to believe an investigation is warranted."  Bouchillon v.

Collins, 907 F.2d 589, 597 (5th Cir. 1990); accord Hull v. Freeman, 932 F.2d 159,

168 (3d Cir. 1991) (when there are indicia that the defendant might have mental

health problems, counsel's failure to question the court psychiatrist who concluded

that the defendant was competent or to investigate and develop additional

43

evidence calling that conclusion into question was not excused by counsel's "belie[f] [that the defendant was] competent to stand trial based on his own observations").

The observations of trial counsel, who are not trained mental health professionals, is not dispositive of the issue of whether counsel rendered effective assistance by failing to request a competency evaluation by defense psychiatrists and to actively challenge Petitioner's competency to stand trial. See Hull v. Freeman, 932 F.2d at 168 ("[f]ew lawyers possess even a rudimentary understanding of psychiatry ... [and] therefore are wholly unqualified to judge the competency of their clients"); Odle v. Woodford, 238 F.3d 1084, 1089 (9th Cir. 2001) (counsel is not a trained mental health professional and his failure to challenge petitioners competency does not establish that petitioner was competent).

Instead, counsel must take steps to determine whether the defendant is competent. Here, there were numerous "reason[s] to believe an investigation [was] warranted." Yet no such investigation took place. See Appel v. Horn, 250 F.3d 203, 216-17 (3d Cir. 2001) ("Nor do we believe it would impose an undue burden on defense counsel to require some investigation into the defendant's competency, especially in a capital murder case where the trial court has ordered a

competency evaluation and hearing."); id. ("under the circumstances in this case, [defense] counsel should have investigated, advocated, or otherwise acted to ensure that there was meaningful adversarial testing.").

Counsel's duty to investigate competency to waive trial, plead guilty and waive direct appeal in a capital case is even more significant where the defendant suffers from a constellation of mental illnesses, including Dissociative Identity Disorder, Borderline Personality Disorder, Post-Traumatic Stress Disorder and organic brain damage.

On June 21, 1998, Mr. Hammer contacted Mr. Travis and informed him that he had decided to waive his right to stand trial and enter a guilty plea. Mr. Travis advised Mr. Ruhnke of this development and on the morning of June 22, 1998, they met with Mr. Hammer and unsuccessfully attempted to persuade him to continue with his trial and not enter a plea of guilty.

On June 22, 1998, this Court permitted Drs. Wolfson and Mitchell to conduct a competency evaluation of Mr. Hammer. The evaluation took place in the Office of the United States Marshal on the Third Floor of the Federal Court house in Williamsport, Pennsylvania. The evaluation lasted roughly ninety (90) minutes after which this Court heard the testimony of Drs. Wolfson and Mitchell, who both opined that Mr. Hammer was competent to waive his right to stand trial

45

and enter a plea of guilty.

The post-conviction testimony of both Mr. Travis and Mr. Ruhnke was clear that neither contacted or consulted with their mental health experts, Dr. Sadoff, Dr. Gelbordt or Dr. Grassian to determine their views of whether Mr. Hammer was then competent to plead guilty.

This Court subsequently found Mr. Hammer competent to waive trial and plead guilty. Accordingly, this Court conducted a colloquy of Mr. Hammer and accepted his plea of guilty to the charge of murder in the first degree.

During the course of Mr. Hammer's § 2255 evidentiary hearing, he presented testimony from Drs. Gelbort, Blumberg, Gur, Kluft and Grassian, who all opined that at the time of Mr. Hammer's waiver of trial, entry of a plea of guilty, and waiver of direct appeal he was incompetent due to his profound mental illness. NT 7/18/05, 32 (Dr. Gelbort) (Mr. Hammer's cognitive and emotional impairments rendered him incompetent to make a knowing, intelligent, voluntary and rational decision at the time of his guilty plea and waiver of direct appeal); NT 8/15/05, 68 (Dr. Blumberg) ("[i]t really is a combination of the different diagnoses and the particular stressors that he was under at the time...in my opinion that leads to my finding that he was incompetent to assist in his defense at that time"); NT 7/26/05, 86, 91(Dr. Grassian) (harsh conditions of confinement suffered by Mr.

Hammer exacerbated his pre-existing mental illness and brain damage and impacted his ability to make rational voluntary decisions; to a reasonable degree of medical and psychiatric certainty, Mr. Hammer's waiver and plea of guilty as well as waiver of direct appeal "was not an intelligent and knowing and rational, voluntary decision"); NT 8/16/05, 152 (Dr. Kluft) (Mr. Hammer lacked the capacity to make a knowing, intelligent and voluntary waiver of his legal rights, including direct appeal, and lacked the capacity to enter a knowing, intelligent, voluntary and rational plea of guilty); NT 8/9/05, 122 (Dr. Gur) (Mr. Hammer's brain dysfunction and abnormalities create a substantial and significant doubt concerning Mr. Hammer's ability to make a rational and competent decision to plead guilty and waive appellate rights).

Dr. Sadoff added that he had serious concerns about Mr. Hammer's competency to waive trial and plead guilty despite his earlier conclusion that Mr. Hammer was competent to proceed because of the real possibility that one of Mr. Hammer's alter personalities was dictating Mr. Hammer's decision-making at that time. Moreover, Dr. Sadoff expressed further concern about the voluntariness of Mr. Hammer's plea of guilty and waiver of direct appeal:

> The basis again was that he had these several diagnoses. The major one that I made was the DID, but there was also consideration of post traumatic stress disorder, depression, other kinds of diagnoses, and of

47

course this long characterological or personality disorder that he has had most of his life

NT 7/28/05, 12. Dr. Sadoff added that because Dr. Wolfson did not believe in the validity of the DID diagnosis, it would have been difficult, if not impossible, for Dr. Wolfson to find that Mr. Hammer suffered from DID and thus compromised his ability to consider the impact of this diagnosis on Mr. Hammer's competency.

Drs. Gelbort, Grassian and Sadoff all testified that trial counsel never consulted with them about Mr. Hammer's competency to waive his rights on or about June 22, 1998. The doctors also all testified that had they been asked to do so, they would have participated in the competency evaluation of Mr. Hammer conducted prior to Mr. Hammer's waiver and plea of guilty and prior to his discharge of counsel and waiver of direct appeal.

Thus, the evidence presented to this Court during the course of Mr. Hammer's § 2255 hearing demonstrates that at the time Mr. Hammer waived his right to continue with his capital trial and plead guilty and later waive his direct appeal, he suffered from the following psychiatric diagnoses and phenomena: Dissociative Identity Disorder; Borderline Personality Disorder; Major Depressive Disorder; Post-Traumatic Stress Disorder; Brain damage; confusional psychosis and related psychiatric sequella from his long history of childhood sexual and

48

physical abuse, all of which were exacerbated by his long term and onerous conditions of confinement and isolation.  The testimony presented by Mr. Hammer's psychiatric experts demonstrates he suffers from irrationality, dramatic mood swings, emotional lability, marked impulsivity, impaired concentration and impaired judgment.

Mr. Hammer also presented the testimony of both trial counsel, Mr. Ronald Travis, Esquire, and Mr. David Ruhnke, Esquire.  Mr. Travis testified that he believed Mr. Hammer's waiver was both irrational and "government assisted suicide." NT 7/14/05, 46.

According to Mr. Travis, up until the commencement of trial, a recurring theme was whether Mr. Hammer was going to plead guilty against advice of counsel.  Mr. Travis told this Court that "when David would indicate that the wanted to just chuck it all, plead guilty, admit aggravators, no mitigation, you know, lay me down on the cart and do it tomorrow...I always had a nagging concern in my mind that it's Jocko driving that decision." Id. at 50.

 Mr. Travis explained that he worried about this possibility because Dr. Sadoff had indicated earlier "that Jocko, the evil personality, wanted to kill the host, the host being David Paul Hammer."  This caused Mr. Travis concern and doubt whenever the subject of pleading guilty arose.  Id. Mr. Travis added that on

49

Sunday, June 21, 1998,when Mr. Hammer informed him of his intent to waive trial and enter a plea of guilty, "running through my mind while we're having this conversation is my concern that it's the Jocko influence." Id. at 82.

Mr. Travis described Mr. Hammer's decision-making as impulsive and his disposition as moody. Id. at 51. Notably, Mr. Travis testified that he believes he experienced Mr. Hammer switching personalities on at least six occasions prior to trial and even more after Mr. Hammer entered his plea of guilty. Id. at 53, 122.

Despite Mr. Travis' concerns about the influence of Mr. Hammer's alter personalities on his decision-making, once Mr. Hammer announced his intent to waive trial and enter a plea of guilty, Mr. Travis did not discuss with Mr. Ruhnke investigating Mr. Hammer's then current competency. Id. at 56.

Mr. Travis stated unequivocally that not only did he not discuss with Mr. Ruhnke any possible strategic reasons to forego an investigation into Mr. Hammer's competency to waive trial, plead guilty and waive direct appeal, but that he did not have a strategic or tactical reason for not doing so. Id. at 57. Nor did Mr. Travis have a strategic or tactical reason for not challenging Mr. Hammer's competency. Id. at 91. Indeed, Mr. Travis admitted that he believed Mr. Hammer's decision to plead guilty was irrational. Id. at 92.

Mr. Travis explained why he believed Mr. Hammer decided to waive trial

and plead guilty:

> I had two concerns as far as the guilty plea is concerned. The one I
> have talked about. That is whether it was a reaction to my physical
> condition. The second concern that I had was interrelated with the
> DID and his clear desire not to go back to Springfield. During the
> course of our relationship and my representation of him, probably the
> rockiest period of that relationship prior to the guilty plea was during
> the period of time he was in Springfield. He just could not stand
> Springfield.

Id. at 87. Mr. Travis added that "I can see that he may well have believed...we're

actually going to win this case on a mental illness defense, and I would rather be

dead than at Springfield." Id. at 88-89.

Finally, Mr. Travis acknowledged that he did not have a strategic or tactical

reason for not engaging the services of Drs. Gelbort, Sadoff or Grassian during the

competency proceedings regarding Mr. Hammer's waiver of trial and plea of

guilty and his waiver of direct appeal:

> But the bottom line is, and I can tell you that when this occurred on
> the morning of June 22, 1998, and the concept of competency was
> raised by the Court, as I recall, that there was at least on my part no
> thought or no effort to contact Dr. Gelbort, Dr. Grassian, or Dr.
> Sadoff, and I...did not avoid trying to contact them for tactical
> reasons.

Id. at 94. Thus, trial counsel's failure to challenge Mr. Hammer's competency, and

utilize their own psychiatric experts was not a strategic or tactical decision.

Mr. Ruhnke also testified that their failure to challenge Mr. Hammer's

51

competency and utilize Drs. Sadoff, Gelbort and Grassian was not a strategic decision. NT 8/30/05, 150.

Indeed, like Mr. Travis, Mr. Ruhnke harbored concerns at the time Mr. Hammer entered his plea of guilty and waived his right to direct appeal that Mr. Hammer's decision-making was governed by his mental illness: "I do have some doubt, and it's engendered by Dr. Sadoff's diagnosis, and that is the doubt I have." NT 10/1/98, 144.

> During his testimony in these proceedings, Mr. Ruhnke added:

> I always had a level of doubt about his competency to enter a guilty plea or to waive an appeal based on the whole constellation of information that I had about Mr. Hammer's background, the mental health history that started when he was a young boy at age 14. I always had doubts that somebody with that kind of history of mental health difficulties was competent to abort a capital trial and plead guilty and then decide to waive appeals once a sentence of death had been imposed.

NT 8/30/05, 20.  To illustrate his concerns, he described an entry in Mr. Hammer's medical records prior to his incarceration in Oklahoma that he believes epitomized Mr. Hammer's history:

> I remember vividly that there was a record that we came across that Mr. Hammer had tried to sign himself in to a psychological clinic in Oklahoma City when he was 14 years old because he felt he was losing his mind...I've never come across anything like that in my experience.

52

Id. at 21.  Mr. Ruhnke also stated that his concern about Mr. Hammer's state of mind stemmed in part from Mr. Hammer's depression and Dr. Mitchell's diagnosis of Major Depressive Disorder.  Id. at 22.

Like Mr. Travis, Mr. Ruhnke described Mr. Hammer as having dramatic mood swings: "I had never knew or never had a full appreciation for what I was going to get from Mr. Hammer on any given day." Id.  Indeed, Mr. Ruhnke stated that "Mr. Hammer had a wide range of emotion, as the psychiatrists call it, lability. Extreme ranges of emotion.  Slipping from one emotion into another; anger, tears, depression, resignation." Id. at 60.  Mr. Ruhnke added that Mr. Hammer's emotional lability was a "constant" throughout the course of his representation of Mr. Hammer. Id.

Mr. Ruhnke also testified that as the stress increased during pretrial preparations and the trial itself, Mr. Hammer reported that his alter personality, Jocko, was exercising more and more influence: "Any my recollection is that as things sort of ratcheted up in terms of pressure, he would talk more and more about things that Jocko was saying or that Jasper was crying or Wilber was crying." Id. at 33. According to Mr. Ruhnke, the emergence of Mr. Hammer's different alter personalities was causing Mr. Hammer distress. Id.

Mr. Ruhnke also testified that Mr. Hammer continually sought assurances

53

that the insanity defense would fail and that as the trial progressed, his anxiety

over their chances of success increased:

> We were trying to win.  It sounds a little perverse to say that Mr.
> Hammer hoped we didn't win.  But for him, he was in jail for the rest
> of his life anyway.  And he did not want to be labeled mentally ill.
> He did not want to go to a hospital, particularly Springfield.  He was
> particularly opposed to ever winding up in Springfield.  And then he
> was concerned, scared about being sent back to Oklahoma State
> Penitentiary because of the experiences he had already had at
> Oklahoma State Penitentiary.

Id. at 27.  After observing the testimony of both Drs. Sadoff and Wolfson, Mr.

Hammer's concern about actually prevailing greatly increased.  Id. at 28.

Mr. Ruhnke also testified that he perceived Mr. Hammer's ostensible desire

to waive trial and plead guilty as driven by his profound mental illness:

> The fullest explanation I ever got from David is that Jocko wants to
> take over, that Jocko believed if he killed David that Jocko would go
> on and the whole plan was for David to get the death penalty so Jocko
> could live on.

Id. at 38.  Indeed, Mr. Ruhnke noted that he believed Mr. Hammer's vacillations

during the course of the case over whether he wanted to live or die were suicidal

gestures.  Id. at 158.  Nonetheless, counsel did not investigate Mr. Hammer's

competency at the time he decided to waive trial, plead guilty and waive direct

appeal.

Like Mr. Travis, Mr. Ruhnke testified that he gave no thought to contacting

and utilizing Drs. Sadoff, Gelbort and Grassian during the competency proceedings for both Mr. Hammer's plea of guilty and waiver of direct appeal. Id. at 48.[14]

Thus, the record developed during the § 2255 proceedings reveal that while both Mr. Ruhnke and Mr. Travis believed that Mr. Hammer's mental illness and fear of returning to Springfield motivated his desire to plead guilty, both failed to act on their concerns and protect Mr. Hammer's rights by investigating Mr. Hammer's competency and by seeking the participation in the competency proceedings of Drs. Sadoff, Gelbort, and Grassian – who were already retained defense experts.  This constitutes ineffective assistance of counsel.

Moreover, since both counsel testified unequivocally that their failure to investigate Mr. Hammer's competency and consult with Drs. Sadoff, Gelbort and

---

[14]Mr. Ruhnke also noted that he believed that the Court did not adequately cover the issue of intent and premeditation during Mr. Hammer's guilty plea colloquy.  See NT 8/30/05, 62 ("I didn't believe intent had been sufficiently covered in the plea colloquy, and that was one of the points presented to the Third Circuit on the direct appeal").  Mr. Runke noted that this Court expressed reservations as to the adequacy of the guilty plea colloquy on the record during penalty phase.  Specifically, this Court noted on the record: "[i]f I had it to do over, I would have asked Mr. Hammer about this insanity defense and how do you explain, if you can, what occurred during the interview which was the subject of the tape? Because it seems to me, although it should be res judicata, when I made the findings I did, it's not res judicata in the light of the statute.  So I just throw it out.  I think that that was a grave oversight on my part." NT 7/7/98, 7.

Grassian concerning Mr. Hammer's competency to waive his right to stand trial, enter a plea of guilty and waive his direct appeal was not strategic or tactical, counsel's performance was constitutionally deficient. See  Jackson v. Herring, 42 F.3d 1350, 1350 (11th Cir. 1995)("case law rejects the notion that a'strategic' decision can be reasonably made when the attorney has failed to investigate his options and make a reasonable choice between them").

As noted above, because counsel failed to consult with Drs. Sadoff, Gelbort, Grassian or another mental health expert, such as Dr. Blumberg, this Court never learned about the impact of Mr. Hammer's diagnoses of Dissociative Identity Disorder, Borderline Personality Disorder, Post-Traumatic Stress Disorder, and brain damage, as well as the documented psychological "stressors" at issue at the time as evidenced by Dr. Mitchell's then contemporaneous therapy session notes, on Mr. Hammer's decision-making and capacity to enter a knowing, intelligent, voluntary and rational waiver of his constitutional rights.

Indeed, Mr. Hammer's documented history of impulsive and irrational behavior correlates with the symptomology of his mental illnesses and cognitive dysfunction and adds weight to the conclusion that as a result of trial counsel's failure to conduct an investigation into Mr. Hammer's competency to plead guilty and waive direct appeal, Mr. Hammer suffered prejudice as defined by Strickland

and its progeny.

**D.    Trial Counsel Rendered Ineffective Assistance By Failing To Investigate And Present Mr. Hammer's Long History Of False Confessions and Using this History to Challenge the Veracity of his Alleged FBI Confession to the Marti Killing, Which Itself Contained Numerous Falsehoods.**

On April 13, 1996, Mr. Hammer was interviewed by Special Agent Carlye Thompson of the Federal Bureau of Investigation.  At that time, Mr. Hammer confessed to the murder of Mr. Marti.  He admitted not only that he killed Mr. Marti, but he provided a series of "facts" in support of his alleged confession that upon examination proved to be false, casting substantial doubt on the veracity and accuracy of Mr. Hammer's rendition of events leading up to the death of Mr. Marti.

This is not surprising given Mr. Hammer's long and storied history of falsely confessing to crimes ranging from murder to bomb threats to murder-for-hire.  During the course of Mr. Hammer's § 2255 evidentiary hearing, undersigned counsel presented uncontested evidence that Mr. Hammer falsely confessed to at least six homicides; confessed to hiring someone to kill Jesse Jackson; confessed to planting bombs at the Oklahoma Court House and the Oklahoma Capitol Building; and claimed to know the identity of the Unabomber.  All of these allegations were investigated by law enforcement officials and all were determined

to be false.

Specifically, Mr. Hammer confessed to the following serious crimes,

including murder:

- The murder of Carl Singer in Enid, Oklahoma in June of 1985;

- The murder of Kenneth Kenner in November of 1986;

- The murder of a man in Hagerstown, Maryland named Ronnie or Mark (See Testimony of Mr. Randy Vanderschaaff, former criminal investigator for the Chataqua County Sheriff's Department);

- The hiring of someone to commit the so-called "two bit" murder of a man in Youngstown, Ohio;

- The murder of Donna Lawton in Oklahoma;

- Claimed involvement and knowledge regarding the death of Karen Silkwood;

- Claimed to have threatened to assassinate Jesse Jackson in 1988;

- Claimed to have planted bombs at the Oklahoma City Court House and Oklahoma Capitol Building in November of 1989.

Indeed, Mr. Hammer's confessions to all of these alleged crimes were found to be

false. See NT 9/20/05, 55-56; 67; 68; 76; 81; 147; 156-157; 158; 159 (Special

Agent Anthony Malocu); and FBI Memoranda dated November 24, 1989

(Defendant's Exhibit 65).

This is not surprising, since in June of 1997 Assistant United States

Attorney Frederick Martin sent a letter to Mr. Ruhnke wherein he stated the Government's position that Mr. Hammer was "a liar of the first water." NT 7/14/05, 65. Indeed, lest there be any doubt as to what the Government's position was concerning Mr. Hammer's veracity, counsel also had in their possession a letter dated December 29, 1989, from the FBI to the Honorable David L. Russell, Judge of the United States District Court for the Western District of Oklahoma, wherein the agent states: "[n]othing he has ever said, he did, was going to do or could do has proven to have any merit." Id. at 67. A similar sentiment concerning Mr. Hammer's veracity was contained in a memo dated November 24, 1989, from the FBI, wherein the author notes "Warden Saffle has characterized Hammer as a chronic liar..." Id. at 70.

Against this backdrop, it is not surprising to learn that many aspects of Mr. Hammers FBI 302 statement dated April 13, 1996, are false. For example, Mr. Hammer told Special Agent Thompson that he discussed with Correctional Officer Boone his intent to harm Marti:

> Approximately two weeks ago, Hammer informed Officer Boon that he (Hammer) wanted Marti as a cell mate, and if Officer Boon could arrange it, Hammer would do something to Marti. Correctional Officer Boon said to Hammer, "I hear nothing."
>
> Hammer told the officer that he wanted him (Marti) moved in with Hammer so that he could fuck him up. Officer Boon said to Hammer

59

> to do a good job so that he (Marti) can get to the outside hospital and so that Boon can get some overtime.

FBI 302 Statement of David Paul Hammer dated April 13, 1996, at 2 (Defendant's Exhibit 33). During the course of Mr. Hammer's trial and during these § 2255 proceedings, it was revealed that not only did Correctional Officer Boone deny making any statements to Hammer regarding harm to Mr. Marti or a desire to get overtime, he denied that Mr. Hammer ever discussed with him his – Mr. Hammer's – desire to have Marti as a cell mate. See NT 6/11/98, 150.

Officer Boone explicitly stated that at the time one of the purported conversations between he and Mr. Hammer is alleged to have occurred, he was not even working in Mr. Hammer's housing unit. Id. Thus, the conversation related to Agent Thompson by Mr. Hammer contained in Mr. Hammer's FBI 302 statement never occurred. See also NT 7/14/05 at 72 (Mr. Ronald Travis, Esq.).

Another "fact" provided by Mr. Hammer to Agent Thompson in his FBI 302 statement that was proven false concerned Mr. Hammer's report that he knew the exact time he finished tying up Mr. Marti:

> Hammer stated that this was exactly 2:17 a.m. when he completed the process of tying up Marti. He knows the exact time by looking at the clock radio in the cell window.

FBI 302 Statement of David Paul Hammer dated April 13, 1996, at 5 (Defendant's

Exhibit 33).  However, the lights were out in Mr. Hammer's cell at 2:17 a.m. and the clock radio in the window cell did not contain a light, was not self-illuminating and was cast in shadows by the light entering from behind the clock from the light towers in the yard. <u>See</u> NT 7/19/05, 36 (the light coming into the cell window did not illuminate the face of the clock; "no absolutely not. It acted to back light the clock and all you could see in the windowsill were silhouettes of the objects sitting in the windowsill...").

And, the clock itself, which was introduced as Defendant's Exhibit 73 in the § 2255 proceedings, was very small with numerals only 1/8 to 3/16 of an inch tall.  <u>Id</u>. at 38.

Mr. Hammer's description of how he allegedly strangled Mr. Marti is also inconsistent with the physical evidence.  In his FBI 302 statement, Mr. Hammer described the following:

> Hammer started strangling Marti by raising his head up off the pillow with his right hand and inserting his left arm under his Adam's apple and the pillow so that the his neck was resting in the crook of Hammer's elbow.  Hammer then placed his right forearm under his left forearm, simultaneously pulling Marti's head backwards and applying choke pressure.
>
> *                              *                              *
>
> After no further movement, which was approximately six minutes, Hammer got up off of Marti and went and got a string off of Marti's

61

bed. The string-like rope was removed previously from a stitched seam of institutional clothing. <u>Hammer then sat on Marti, not straddling him, and put the string around his neck and started choking him, pulling it really tight, with Hammer's hands pulling in opposite directions.</u>

FBI 302 Statement of David Paul Hammer at 5, 6. This story is wholly inconsistent with the physical evidence as interpreted by both Drs. Funke and Spitz. NT 9/13/05, 155 (Dr. Funke) ("But yes, the ligature was not touching the back of his neck, I have no problem with that"); <u>id</u>. at 154 (the ligature <u>was not</u> "[c]ircumferentially around, cinched tight"); <u>id</u>. at 153 ("So there is no evidence that any ligature touched the back of his neck"); NT 7/25/05, 63 (Dr. Spitz) ("There is no such evidence on the body" supporting Mr. Hammer's statement that he wrapped the ligature tightly around Mr. Marti's neck pulling it in opposite directions); <u>id</u>. ("[t]here are no supportive pathological manifestations at the autopsy"); NT 7/25/05, 35 (Dr. Spitz) ("Mr. Marti died of a ligature strangulation...by a harness-like ligature pulled from the back..."). Moreover, Dr. Funke testified that "there is no autopsy evidence to support manual strangulation." NT 9/13/05, 145. This finding also contradicts Mr. Hammer's statement to Agent Thompson.

Mr. Hammer also told Agent Thompson that while he was strangling Mr. Marti, his left shoulder dislocated and he had to "get the shoulder back into its

socket." FBI 302 Statement of David Paul Hammer at 7.  However, Mr. Hammer

told Mr. Ruhnke that this was not true:

> He would talk about things Jocko did.  For example, the 302
> statement of his confession.  There were a couple of points in there
> that he said well, Jocko put that in just to make it worse.  There was a
> discussion of him strangling Mr. Marti and his shoulder dislocating
> and having to stop and put the shoulder back in and continue
> strangling Mr. Marti.  And I know he told me at one point it's just
> something Jocko put in to make it worse.

NT 8/30/05, 31.  Mr. Hammer also told Mr. Ruhnke that if his shoulder had

popped out, "that he would have been in such excruciating pain that the scenario

that he described my shoulder dislocates, I pop it back in, I continue strangling

somebody could never have happened." Id.  Thus, this aspect of Mr. Hammer's

FBI 302 confession is also arguably false.

Mr. Hammer also told Agent Thompson that Marti moved into cell 103 at

the "written and verbal request of Hammer, who wanted him to be his cell mate."

FBI 302 Statement of David Paul Hammer at 2. This too, is factually incorrect.

During these proceedings, Mr. Ruhnke testified that after trial, he filed a

Freedom of Information Act (FOIA) request seeking information from the Federal

Bureau of Prisons for use in a potential clemency petition.  On page fifteen of the

information received as a result of the FOIA request, Mr. Ruhnke learned for the

first time that "on April 9, 1996, Marti requested to move in with Hammer.  There

63

was no reported separation concerns between the two inmates and staff moved

Marti in with Hammer." See Defense Exhibit 197 (Government response to

Freedom of Information Act request by Mr. Ruhnke to the Federal Bureau of

Prisons); NT 8/30/05 at 55-56. Thus, documentation within the control of the

Bureau of Prisons directly contradicts another aspect of Mr. Hammer's alleged

confession.

Mr. Hammer's explanation as to how he convinced Mr. Marti to allow

himself to be tied to the bottom bunk is also factually wrong. Mr. Hammer

explained to Agent Thompson that he tricked Mr. Marti into allowing Mr.

Hammer to tie him to the bottom bunk through a ruse:

> Marti wanted to know how to get to the USP, Atlanta, Georgia.
> Hammer told him that if Hammer took him hostage, hurt him a little
> bit, that he might have a chance to go. Hammer sweetened the offer
> by telling him that Hammer would give him $500.00, plus
> commissary.

FBI 302 Statement of David Paul Hammer at 3. Mr. Travis testified that he always

believed this aspect of Mr. Hammer's confession was false because it was his

understanding that under Bureau of Prisons policy, the aggressor, not the victim, is

the one transferred to a different institution after an act of violence. NT 7/14/05,

78 (Mr. Travis) ("My understanding is that what Mr. Hammer was claiming, the

plan was totally inconsistent with BOP policy. That if there was an act of

64

aggression, the victim of the aggression didn't get moved. The person who perpetrates the aggression got moved because the transfer was a form of punishment imposed on the person for being the aggressor").

Consistent with Mr. Travis's understanding of Bureau of Prisons Policy, in this case, months before his death, Mr. Marti had already been designated for transfer as a result of a disciplinary hearing held in February of 1996. NT 7/1/98, 25, 38. At trial, Mr. Troutman, a Federal Bureau of Prisons Unit Manager, testified that "Inmate Marti was found guilty by the discipline hearing officer, at USP Allenwood, Pennsylvania, of attempted killing, code 100A. He was assessed 54 days disallowance of good conduct time, 60 days disciplinary segregation and a recommendation for a disciplinary transfer." Id. at 39.

In fact, Mr. Troutman testified that Mr. Marti had been explicitly informed that he was being transferred to the United States Penitentiary at Marion, Illinois. Id. at 46. Thus, Mr. Marti would not have been seeking a way out of USP Allenwood since well before April of 1996, he knew he was already awaiting transfer to a different institution as a disciplinary sanction for having attempted to kill another inmate.

As if this is not enough to demonstrate the false nature of Mr. Hammer's confession in this case, suppressed FBI 302 statements provide yet another piece

65

of evidence contradicting "facts" provided by Mr. Hammer.  In his FBI 302

statement, Mr. Hammer stated:

> Also on Thursday evening, Hammer wrote a letter on Marti's behalf
> to Martine Gerrero (phonetic) via mailing it to a third party located at
> Post Office Box 234, Three Rivers, Michigan...Hammer told Gerrero
> in the letter that he (Hammer) knew Marti for some time, did not
> believe the rumors, and to give Marti a chance, to spread the word
> and do it as a personal favor for me.

FBI 302 Statement of David Paul Hammer at 3. Clearly seeking to corroborate as

many facts contained in Mr. Hammer's statement as possible, the FBI located and

interviewed Mr. Martin Guerrero.

Not surprisingly, Mr. Guerrero had no idea what Mr. Hammer was talking

about and disavowed this aspect of Mr. Hammer's confession as false.

Specifically, Mr. Guerrero told the FBI that while he knew Mr. Hammer from a

prior stint at the USP in Leavenworth, Kansas, "he never received any letter from

Hammer" and "stated that he never received any mail from a third party located in

Michigan."  See FBI 302 Statement of Martin R. Guerrero, Jr.

Although trial counsel both testified that they believed that aspects of Mr.

Hammer's confession were false, and they each recognized the obvious

importance of undercutting the accuracy of certain aspects of the confession,

neither embarked upon an investigation aimed at showing the overall falseness of

66

the confession, or how it was consistent with Mr. Hammer's history of

pathological lying.[15]

Trial counsel's failure to investigate Mr. Hammer's long and well-

documented history of falsely confessing to numerous murders and other serious

felonies carrying the death penalty and juxtaposing this documented history with

the numerous falsehoods contained in his FBI 302 statement constitutes

ineffective assistance.  Particularly, counsel's failure to present the fact that Mr.

---

[15]Mr. Travis testified that he and Mr. Ruhnke did not discuss hiring a pathologist to examine whether the facts contained within Mr. Hammer's confession were supported by the physical evidence. Nor, according to Mr. Travis, did they discuss any strategic or tactical reason for failing to do so.  NT 7/14/05, 79, 80.  Mr. Ruhnke testified that while he too, harbored doubts about the veracity of "some" of Mr. Hammer's confession, he stated that he and Mr. Travis failed to investigate any of the facts contained in Mr. Hammer's confession. NT 8/30/05, 53.  Indeed, Mr. Ruhnke acknowledged that pursuing a challenge to the veracity of Mr. Hammer's 302 statement would not in anyway have conflicted with the primary defense presented by counsel based on the diagnosis of Dissociative Identity Disorder.  Id. at 54.   Mr. Ruhnke acknowledged that he and Mr. Travis did not investigate the various false confessions Mr. Hammer made over the years other than the Kenner homicide: "[t]hat is not a defense we considered."  Id. at 116. More to the point, Mr. Ruhnke unequivocally admitted that "we never went far enough down that road to have thought about that all the way through," Id. at 152,  and did not investigate this avenue of defense before rejecting it as an option. Id. at 153. United States v. Gray, 878 F.2d 702, 712 (3d Cir. 1989) ("counsel can hardly be said to have made a strategic choice against pursuing a certain line of investigation when she/he has not yet obtained the facts on which such a decision could be made"); Nealy v. Cabana, 764 F/2d 1173. 1174 (5th Cir. 1985) ("at a minimum, counsel has a duty...to make an independent investigation of the facts and circumstances of the case").

Hammer's rendition of how he allegedly strangled Mr. Marti bore no resemblance to the physical evidence gleaned from the autopsy of Mr. Marti is egregious in that if the jury knew the manner in which Mr. Hammer claims to have killed Mr. Marti was not merely inconsistent with the physical evidence, but physically impossible, the element of specific intent would have been cast into doubt.

When weighed in conjunction with Mr. Hammer's history of falsely confessing to a myriad of serious crimes, the fact that Mr. Hammer's version of how he actually killed Mr. Marti was not true would have added credence to counsel's argument that Mr. Hammer lacked premeditation at the time of Mr. Marti's death. And, finally, it would have allowed counsel to argue persuasively that what Mr. Hammer told the authorities about the death of Mr. Marti has little or no bearing on reality or the truth and would have facilitated a challenge that the factual predicate for his plea of guilty was not true.

### E.    Trial Counsel Rendered Ineffective Assistance By Failing To Investigate And Present The Defense Of Erotic Asphyxiation.

The physical evidence relative to the death of Mr. Marti not only supports the conclusion that Mr. Hammer's rendition of how Mr. Marti died as contained in his FBI 302 statement is false, but that Mr. Marti died during consensual erotic asphyxiation.

68

During the § 2255 evidentiary hearing, Mr. Hammer presented the testimony of Dr. Werner Spitz, M.D., a forensic pathologist. Dr. Spitz testified to a reasonable degree of medical and scientific certainty that Mr. Marti died as a result of ligature strangulation occurring during a sexual experience:

> It is my determination based on all I know that Mr. Marti died of ligature strangulation incurred during a sexual experience...by a harness-like ligature pulled from the back, and that...the ligature was applied in an interrupted way, that is pressure and lack thereof, never a complete or tight-as-possible type of pressure such that pinpoint hemorrhages were scattered all over the face.

NT 7/25/05, 35.  Dr. Spitz testified that he has extensive experience with death caused by erotic asphyxia and has authored a chapter in his treatise on subject. Id. at 35, 36.

Dr. Spitz explained the significance of the pinpoint hemorrhages (also called petechiae) found scattered over Mr. Marti's face is that the presence of the petechiae indicates the pressure on the sides of Mr. Marti's neck was "of an incomplete nature." Id. at 41. Dr. Spitz testified that the autopsy findings support his conclusion that the abrasions on Mr. Marti's neck are consistent with the use of a ligature type harness and "not a circumferential noose; it is a harness, meaning open in the back." Id. at 48. He added that the lack of injury to the airway indicates "that the force was such that it compressed the blood vessels and not the

69

airway." Id. at 52. Finally, Dr. Spitz noted that, similar to how Mr. Marti was found, it is not uncommon for victim's of erotic asphyxiation to be clothed with no suggestion of masturbation or ejaculation. Id. at 91.

Neither the jury not this Court heard any such evidence either during guilt phase, Mr. Hammer's plea colloquy or during the penalty phase.

Mr. Travis testified during these proceedings that he and Mr. Runhke did not consult with a pathologist to determine whether or not the death of Mr. Marti might have been accidental. NT 7/15/05, 102. Nor did they consult with an expert to determine whether Mr. Marti died as a result of erotic asphyxiation. Id. at 103.

Despite testifying that he and Mr. Ruhnke made a decision to proceed without an accidental killing defense, Mr. Travis acknowledged that nonetheless, they presented information to the jury suggesting that the death of Mr. Marti was accidental. Id. at 37.

The law is clear: if counsel is going to present a particular line of defense, they must first investigate the facts and circumstances supporting the defense, and failure to do so constitutes deficient performance. See e.g. Jacobs v. Horn, 395 F.3d 92, 105 (3d Cir. 2005) (counsel rendered ineffective assistance by failing to adequately investigate and discover evidence to support the defense actually presented); United States v. Kaufman, 109 F.3d 186 (3d Cir. 1997) ("while

70

counsel is entitled to substantial deference with respect to strategic judgments, an attorney must investigate when he has cause to do so, in order to provide minimally competent representation"). Thus, counsel rendered ineffective assistance and Petitioner sustained prejudice.

> **F.** **Counsel Ineffectively Failed to Litigate the Fifth and Sixth Amendment Violations Attendant to the Government's Use of Mr. Hammer's Psychology File.**

Petitioner was in need of psychological services both before and after Mr. Marti's death. Indeed, his treating therapist, Dr. John Mitchell, testified that Petitioner's emotional condition was serious and life-threatening, and that his need for services was profound. See e.g. NT 7/27/05, 6-9, 49 (Dr. Mitchell addressing Mr. Hammer's emotional pain).

Mr. Hammer embarked on these services after being warned that what he said in his therapy sessions would be confidential, unless one of three specific exceptions applied: 1) what he said in therapy showed that he posed a danger to himself or others; 2) what he said showed the he posed a threat to institutional security; or 3) upon request or order of a court.

There was no evidence produced at the hearing that any of these exceptions applied to Mr. Hammer at any time during his therapy sessions. Nonetheless, Dr. Mitchell released Mr. Hammer's BOP psychology file to Dr. James K. Wolfson for

use in his 1997 forensic study related to Mr. Hammer's criminal responsibility.

Several core facts relevant to these circumstances are indisputable:

- Petitioner was treated by Dr. John Mitchell in individual therapy sessions prior to and following the death of Mr. Marti;

- What was discussed in those sessions was confidential unless specific enumerated exceptions arose;

- Petitioner was advised by Dr. Mitchell and Dr. Karten prior to the start of those sessions that what he said in them was confidential, unless the enumerated exceptions to confidentiality arose;

- The enumerated exceptions did not arise in Petitioner's case;

- Petitioner's confidential therapy communications were used against him by Dr. Mitchell and Dr. Wolfson in arriving at forensic opinions in this case.

Because the instant Fifth and Sixth Amendment claim relies upon the interpretation and explanation of confidentiality in a therapy setting, Petitioner called an ethicist familiar with these concepts.  Dr. Donald Bersoff opined that Mr. Hammer unquestionably had a right to confidential communications with his therapist.  He further opined that none of the exceptions to confidentiality that would apply either in the civilian world, or even in the context of the warnings provided by the BOP, were extant at the time that Mr. Hammer's confidences were violated by the release of his records.

Even the Government's ethicist, Dr. Kenneth Kessler, had to agree that Dr.

72

Mitchell's reliance on statements made during therapy to reach forensic conclusions, and the provision of both the therapy notes and the forensic conclusions to Dr. Wolfson violated Mr. Hammer's right to confidential therapy communications.  NT 9/15/05, 95.

The law governing this claim is clear and straight forward.  In Estelle v. Smith, 451 U.S. 454 (1981) the Supreme Court found that the use in a capital penalty phase of statements made by a defendant in the course of a pre-trial psychiatric evaluation violated his rights under the Fifth and Sixth Amendment because "[t]he state trial judge . . . ordered a psychiatric evaluation of [the defendant] for the limited, neutral purpose of determining his competency to stand trial, but the results of that inquiry were used by the State for a much broader objective that was plainly adverse to" to the defendant.  Id., at 465.  As a result, the Court held that the statements made during the competency evaluation should not have been admissible against the defendant, since he was never warned that they could be so used.  Id., at 467.   The Court reached this result, because the examining psychiatrist "went beyond simply reporting to the court on the issue of competence and testified for the prosecution at the penalty phase."  Id. Dr. Mitchell and Dr. Wolfson's actions in this case are materially indistinguish- able.  Dr. Mitchell – like the provider in Estelle – went "beyond simply" providing

therapy, but instead used what was said in therapy sessions against Petitioner once it became apparent that Petitioner would be prosecuted for Mr. Marti's death.

The "use" of Mr. Hammer's therapy statements took several forms. First, the April 16, 1996 Psychological Report authored by Dr. Mitchell (Defendant's Exhibit 31.7, page 24) written just three days after Mr. Marti's death, revealed that Mr. Hammer knew right from wrong, and had suffered no psychotic or delusional thinking in the preceding months. Dr. Mitchell acknowledged that this document was based upon his prior confidential therapy sessions, and that the question of whether Mr. Hammer knew right from wrong, or was psychotic, was likely to be the subject of litigation resulting from Mr. Marti's death. Thus, information gathered from Mr. Hammer before Mr. Marti's death with a promise that it would be maintained in confidence, was "used" by Dr. Mitchell to reach forensic conclusions. As noted above, there was no exception to the confidentiality promise that would have justified the release of this information to Dr. Wolfson.

Second, as Mr. Hammer continued to suspect that his statements made in therapy would be used against him (as reflected in the notes contained in Defendant's Exhibit 31.7), Dr. Mitchell offered Mr. Hammer a Hobson's choice: continue with therapy with the understanding that what he said would continue to be used against him or forego needed therapy which was salving his psychological

74

pain.  Under such conditions, Mr. Hammer's therapy statements were involuntarily

obtained.

**G.    Counsel Ineffectively Acquiesced to the Court's Use of Conflicted Mental Health Witnesses Relevant to Competency and Criminal Responsibility.**

In his Section 2255 petition, Mr. Hammer has also alleged that trial counsel

rendered ineffective assistance by failing to challenge a number of ethical issues

related to the participation of Drs. Mitchell and Wolfson in determining his

criminal responsibility and his competency.  These ethical issues revolve around

various conflicts of interests that raised at least the strong appearance of

impropriety.

Because competency to proceed is so central to due process and the integrity

of a criminal proceeding, Courts must employ adequate procedures to protect this

right.  Pate v. Robinson, 383 U.S. 375, 387 (1966) (procedures for determining

competency must be adequate); Hull v. Kyler, 190 F.3d 88, 105 (3d Cir. 1999 )

("failure to provide adequate procedures to ensure that the Dusky [competency]

test is met deprives a defendant of his constitutional right to a fair trial" citing

Pate).

The safeguards to insure that Mr. Hammer had capacity at the time of his

plea and waiver of direct appeal, to do so knowingly, intelligently and voluntarily,

75

were shattered by counsels ineffective failure to challenge this Court's reliance on the testimony of conflicted expert witnesses.  Similarly, permitting conflicted experts to opine on criminal responsibility likewise violated Petitioner's right to due process of law.

### 1.    Competency to Waive.

This Court's competency determination was based almost entirely upon the opinions of Dr. James Wolfson and Dr. John Mitchell.  Although trial counsel expressed mild reservations about the propriety of Dr. Wolfson's utilization in this regard – after all, Dr. Wolfson was into his third day of debunking the defense's mental health case –  a formal objection was not lodged.  Nor did counsel investigate and cross examine Drs. Wolfson and Mitchell on their prior relationship with Petitioner and on the clear conflict which ethically should have precluded their participation as Court witnesses during the competency proceedings.

During his §2255 evidentiary hearing, Mr. Hammer presented the testimony of Dr. Donald Bersoff relevant to the ethical issues related to the behavior of Drs. Mitchell and Wolfson.[16]  This Court accepted Dr. Bersoff as an expert in the field

_____

[16]Dr. Bersoff is a highly qualified expert on the subject of ethics in the mental health professions.  He is a professor emeritus at the Villanova University School of Law, and is the former director of the Law and Psychology Program at

of the interpretation and application of ethics in the field of mental health. NT 7/20/05, 42.

Dr. Bersoff testified that "certain professional behaviors by Drs. Mitchell, Wolfson, Karten and a dentist named Dr. Dubin raised significant ethical issues." Id. at 46.  Dr. Bersoff identified three major problems: multiple dual relationships; competence; and confidentiality. Id. at 47.

Dr. Bersoff noted that the Federal Bureau of Prisons has promulgated ethical standards and that these standards explicitly prohibit the conduct engaged in by Drs. Mitchell and Wolfson. Id. at 56-59; 61-63; Defendant's Exhibit 18. These guidelines applied to the conduct of Drs. Mitchell and Wolfson at all times during their various interactions with Mr. Hammer, even though they were not followed.

---

Villanova University.  Dr. Bersoff was instrumental in helping the American Psychological Association draft and develop their code of ethics which governs the professional behavior of psychologists.  He has published a book, ETHICAL CONFLICTS IN PSYCHOLOGY, which is a widely used text throughout the country. NT 7/20/05, 19. He is currently drafting a book chapter concerning depositions and the forensic psychologist for a book called the Comprehensive Textbook of Ethics and Law in the Practice of Psychology. Id. at 21. Dr. Bersoff also wrote a chapter on privileged communications for a textbook titled The Role of The Forensic Psychologist. Id. at 22. Additionally, Dr. Bersoff teaches a workshop for the American Academy of Forensic Psychology, which is the organization that evaluates would-be forensic psychologists for board certification, called "ethical issues for the forensic psychologist." Id. at 29.

Dr. Bersoff testified that the Bureau of Prisons guidelines require that "psychologists who are providing clinical services, treatment services to inmates should not be involved in any other kind of roles which may conflict with their role as a therapist to the patient." Id. at 65.  Dr. Bersoff testified that psychologists should refrain from entering the "irreconcilable conflict between therapist role and the forensic role." Id. at 73, 76-77.  He also noted that dual roles reduce the reliability of the clinical and forensic evaluation. Id. at 77.

Dr. Bersoff stated that Dr. Mitchell engaged in a number of impermissible roles regarding Mr. Hammer: an assessor of Mr. Hammer's mental state; Mr. Hammer's long term primary therapist; and as an expert witness on the issue of Mr. Hammer's competency in these capital proceedings. Id. at 83.  Dr. Bersoff opined that Dr. Mitchell's assumption of the above dual roles violated the APA and Bureau of Prisons ethical guidelines. NT 7/21/05, 17.

Dr. Bersoff also concluded that Dr. Wolfson unethically assumed dual roles in relation to Mr. Hammer. Id. at 28. Dr. Wolfson's initial task was to assess Mr. Hammer's criminal responsibility. However, records reveal that Dr. Wolfson also informed Mr. Hammer that "he would serve, at least temporarily, as his attending psychiatrist of record should any pressing clinical needs arise during his stay at Springfield." Id. According to Dr. Bersoff, Dr. Wolfson's dual "roles are

incompatible." Id. at 28-29. Dr. Bersoff also noted that the fact Dr. Wolfson made his participation in the competency evaluation of Mr. Hammer contingent on Mr. Hammer's consent was inherently problematic and an ethically unacceptable solution to the ethical conundrum recognized by Dr. Wolfson. Id. at 32. Dr. Bersoff also testified that Dr. Wolfson was not competent to professionally engage in a competency evaluation of Mr. Hammer:

> My opinion was that he was not trained competent to perform a psychiatric evaluation of a dissociative identity disorder or what used to be called multiple personality disorder. Dr. Wolfson, in fact, admitted that he had never treated any patient with a diagnosis of multiple personality disorder.

Id. at 33. According to Dr. Bersoff, the mere fact that one has a Ph.D. or medical degree with a speciality in psychiatry does not by itself render a person competent to all types of treatment, evaluation and diagnosis. Id.

Finally, Dr. Bersoff testified that the because Dr. Wolfson readily admits that he does not believe in the diagnosis of Dissociative Identity Disorder, his participation in Mr. Hammer's competency evaluation raises issues of bias and was patently unethical:

> Well, it raises the question of bias. If you don't believe something exists, it would be very hard to find it. And if you've no training or very little training – and I would consider 45 minutes of training in a medical career to be a very small amount of experience – that it would not be appropriate to be engaged in an evaluation for that

entity.

Id. at 38.  Thus, both Drs. Mitchell and Wolfson were ethically conflicted and should not have participated in the competency evaluation of Mr. Hammer. Surprisingly, the Government's expert on the ethical standards governing psychologist, Dr. Kenneth Kessler, primarily agreed with the conclusions reached by Dr. Bersoff.  Dr. Kessler testified that Bureau of Prisons ethical guidelines require that correctional institution psychologists refrain from assuming dual roles with an inmate/patient. NT 9/15/05, 69.  Dr. Kessler agreed that the Bureau of Prisons guidelines are not only concerned with actual harm, but the risk of harm. Id. at 73.

Dr. Kessler stated that if a psychologist discovers he or she is in multiple relationship and fails to disclose to the patient that relationship exists, the psychologist would be in violation of the ethical guidelines. Id. at 75-76.  Dr. Kessler testified that upon review of Dr. Mitchell's therapy session notes concerning Mr Hammer, he agreed that Dr. Mitchell was ethically obligated to inform Mr. Hammer of his – Dr. Mitchell's– contacts with the assistant United States Attorney who was prosecuting Mr. Hammer. Id. at 79.

Moreover, Dr. Kessler agreed that shortly after the death of Mr. Marti, Dr. Mitchell's report dated April 16, 1996, wherein Dr. Mitchell addressed whether or

not Mr. Hammer suffered from delusional thinking and hallucinations and whether he could distinguish between right and wrong indicates Dr. Mitchell was aware that Mr. Hammer's ability to distinguish right from wrong might be relevant to a future criminal prosecution for the death of Mr. Marti. Id. at 84. Indeed, Dr. Kessler agreed that Dr. Mitchell's assessment of Mr. Hammer's ability to distinguish right from wrong was based on his clinical contacts with Mr. Hammer – a clear mixing of roles. See Id. at 85, 87. In fact, Dr. Kessler told this Court that as on April 16, 1996, when Dr. Mitchell authored his therapy session note concerning whether Mr. Hammer could distinguish right from wrong, Dr. Mitchell was ethically obligated to inform Mr. Hammer that he – Dr. Mitchell – had embarked on a dual role. Id. at 88.

Dr. Kessler also opined that the confidentiality provisions of the Bureau of Prisons ethical guidelines governing psychologists adopts the APA's ethical principles regarding confidentiality, which provides for distinct and limited exceptions to patient confidentiality. Id. at 92. In fact, Dr. Kessler testified that based upon his reading of the Bureau of Prisons ethical guidelines and Dr. Mitchell's testimony, Dr. Mitchell's disclosure of his therapy session notes regarding Mr. Hammer did not fit within any of the enumerated exceptions to confidentiality and thus violated Mr. Hammer's right to confidentiality. Id. at 95.

Interestingly, Dr. Kessler also opined that it would be unethical for a therapist to be retained by another entity to work in a capacity directly contrary to the interests of the therapist's former patient, id. at 96, – such as the scenario presented by Dr. Mitchell's dual roles in this case.  Dr. Kessler also stated that Mr. Hammer was between a rock and a hard place once he realized Dr. Mitchell might testify against him because his options were to sever his therapeutic relationship with Dr. Mitchell and receive no on-going mental health treatment or continue therapy sessions with a psychologist who was sharing information with the prosecution in his pending murder case.  Dr. Kessler stated the better course of action would have been for the Bureau of Prisons to provide Mr. Hammer with a therapist who could have attended to his mental health needs and not worn the so-called second hat. Id. at 117.

Dr. Kessler testified that if Mr. Hammer's trial attorneys failure to object to the participation of Dr. Mitchell in the competency evaluation was not a strategic and tactical consideration, but rather, was because it just never occurred to them to object to Dr. Mitchell's participation on ethical grounds, the ethical dilemma posed by Dr. Mitchell's assumption of dual roles would not then be obviated. Id. at 118-119.

Dr. Kessler also noted that Dr. Mitchell did not keep his word to Mr.

Hammer when he told Mr. Hammer that he would merely report to the prosecution what he had observed or heard because he actually rendered opinions on the absence of certain mental health diagnoses, rendered an opinion on competency, and disclosed the entirety of his file on Mr. Hammer to Dr. Wolfson. Id. at 119-120.  In short, Dr. Kessler, like Dr. Bersoff, found that the conduct of Dr. Mitchell was contrary to the Bureau of Prisons and APA ethical guidelines.

### 2.    Criminal Responsibility.

Dr. Bersoff also offered opinions regarding the ethical conflicts inherent in having BOP employees engage in assessments of criminal responsibility for an offense that occurred in a BOP facility, and for which BOP personnel could be liable in a civil lawsuit.  These concerns impacted primarily upon the participation of Dr. Mitchell and Dr. Karten in Mr. Hammer's case, although Dr. Wolfson was conflicted as well.

As Dr. Bersoff pointed out in his testimony, Mr. Marti's death could have resulted in a lawsuit against the BOP and its agents for failing to protect Mr. Marti.  Such a failure to protect lawsuit would be impacted by whether BOP mental health professionals failed to properly assess Mr. Hammer's psychological state and his "future dangerousness."  In short, the more mentally ill he was thought to be at the time of the offense, the more likely that the BOP and its agents

would have faced civil liability.  Conversely, to the extent that Mr. Hammer's actions were considered volitional, i.e. the result of free will, the culpability of the BOP and its agents would have been lessened.

This conflict is encapsulated in the document authored by Dr. Mitchell on October 20, 1996 (Defendant's Exhibit 31.7, at page 45).  This "MDS Code Change" was generated six months after Mr. Marti's death.  It changed Mr. Hammer's designation from that of mentally ill and in need of services to being a person with an anti-social personality.  Thus, this change highlights the conflict.

### 3.    Counsel Ineffectively Failed to Identify and Attempt to Remedy these Conflicts.

Neither counsel testified in the evidentiary hearing that they had a tactical or strategic reason for failing to identify and remedy these conflicts of interest in regard to either competency or criminal responsibility.  Counsel merely failed to investigate an obvious conflict – Mr. Hammer's primary therapist and mental health expert testifying against Mr. Hammer's interests with information gleaned from the prior therapeutic relationship.  Counsel's failure to challenge the participation of Dr. Wolfson also falls clearly outside the realm of reasonable strategy and tactics given he did not believe in the very mental illness counsel alleged drove Mr. Hammer's behavior the night of the murder and given that Dr.

Wolfson  had just testified extensively as the Government's expert witness disputing Dr. Sadoff's diagnosis of Dissociative Identity Disorder.

**V.    AS A RESULT OF HIS MENTAL, EMOTIONAL AND COGNITIVE IMPAIRMENTS MR. HAMMER WAS NOT COMPETENT TO WAIVE HIS RIGHTS AT TRIAL AND ON DIRECT APPEAL AND HIS WAIVERS AT TRIAL AND ON DIRECT APPEAL WERE NOT VOLUNTARY.**

### A.    Introduction.

David Paul Hammer is a profoundly disturbed individual.  While the experts who testified at the evidentiary hearing were not uniform in their assessment, all agreed that he suffers genuine pain, mood fluctuations and impulsivity as a result of his multiple mental health pathology.

In this section, Petitioner will review the law relevant to trial competency and the requirements for even a competent defendant to waive constitutional rights.

### B.    The Relevant Law.

A criminal defendant unquestionably has a due process right not to be subjected to criminal proceedings while incompetent.  Cooper v. Oklahoma, 517 U.S. 348, 354 (1996); accord Drope v. Missouri, 420 U.S. 162, 171-172 (1975); Pate v. Robinson, 383 U.S. 375, 378 (1966).  The underlying test for competence to stand trial is whether the defendant "'has sufficient present ability to consult

with his lawyer with a reasonable degree of rational understanding ... [and] a rational as well as factual understanding of the proceedings against him.'" Cooper v. Oklahoma, 517 U.S. at 354 (quoting Dusky v. United States, 362 U.S. 402, 402 (1960) (per curiam)). Where an individual's mental impairments impact his or her rational understanding, competence is not demonstrated.

Even where a defendant meets the Dusky two pronged competency standard, that defendant may not waive any constitutional right (including the right to trial by entering a guilty plea) unless the Government can demonstrate that the relinquishment of the right is knowing, intelligent and voluntary. Godinez v. Moran, 509 U.S. 389, 400-01(1993) ("In addition to determining that a defendant who seeks to plead guilty or waive counsel is competent, a trial court must satisfy itself that the waiver of his constitutional rights is knowing and voluntary"); U.S. v. Peppers, 302 F.3d 120, 131, n9 (3d Cir. 2002) (citing Godinez and stating that even if a defendant is competent it must still be established that the waiver is knowing, intelligent and voluntary").

It has been a long standing rule that whether a waiver of a constitutional right is knowing, intelligent and voluntary, is to be judged against all of the facts and circumstances of a given case. Johnson v. Zerbst, 304 U.S. 458, 464 (1938) ("The determination of whether there has been an intelligent waiver of

86

[constitutional rights] must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused."); see also Wilkins v. Bowersox, 143 F.3d 1006, 1012 (8th Cir. 1998) (the court "must consider the waiver in light of the totality of circumstances, 'including the background, experience, and conduct of the accused'") (quoting Young v. Lockhart, 892 F.2d 1348, 1351 (8th Cir. 1989)).

As Godinez makes clear, the difference between trial competency and the knowing, intelligent and voluntary standard is the difference between whether a defendant is able to understand (trial competency) and whether the defendant actually has an understanding of the rights to be waived. Godinez, 509 U.S. at 401, n12 ("The focus of a competency inquiry is the defendant's mental capacity; the question is whether he has the ability to understand the proceedings . . . The purpose of the 'knowing and voluntary' inquiry, by contrast, is to determine whether the defendant actually does understand the significance and consequences of a particular decision and whether the decision is uncoerced.")

Consideration of the totality of the circumstances includes the individual's mental impairments and the impact of those impairments on the individual's ability to make a voluntary decision. See United States v. Hollis, 569 F.2d 199, 207, n.13 (3d Cir. 1977) ("To say that it is essential that a guilty plea be voluntary

87

is to presuppose that a defendant must be in control of his mental faculties and capable of an act of volition"); Wilkins v. Bowersox, 143 F.3d 1006, 1012 (8th Cir. 1998) ("the mental health of a defendant is also a relevant consideration in assessing whether a waiver of counsel was knowing, intelligent, and voluntary"); Shaffer v. Bowersox, 329 F.3d 637, 652 (8th Cir. 2003) (noting that failure to consider the impact of an individual's "mental disorders on his ability to make knowing and intelligent choices" was contrary to Godinez).

Finally, a defendant is competent to waive appellate rights only if, under the circumstances at the time of the waiver, "he had capacity to appreciate his position and make a rational choice with respect to continuing or abandoning [his rights] or on the other hand whether he is suffering from a mental disease, disorder, or defect which may substantially affect his capacity." Rees v. Peyton, 384 U.S. 312, 314 (1966); cf. Gilmore v. Utah, 429 U.S. 1012, 1015 & n.5 (1976) (Burger, C.J., concurring) (effective waiver when decision was "product of an organized thought process" and defendant had "the mental capacity and the emotional stability to make the necessary decision . . . and to understand the consequences"). As with the waiver at the trial-stage, the inquiry also involves a determination of whether the decision is a knowing, intelligent and voluntary one. See Whitmore v. Arkansas, 495 U.S. 149, 165 (1990) (finding that the prerequisite fo "next friend"

88

standing in state court capital appeal was not satisfied where "an evidentiary hearing shows that the defendant has given a knowing, intelligent, and voluntary waiver of his right to proceed, and his access to court is otherwise unimpeded"); Comer v. Stewart, 215 F.3d 910, 917 (9th Cir. 2000) (noting that decision to forego habeas litigation is invalid if not knowing, intelligent and voluntary); St. Pierre v. Cowan, 217 F.3d 939, 948 (7th Cir. 2000) ("a waiver that literally carries with it life-or-death consequences to be made knowingly and intelligently").

Thus, the Court's consideration in this case is a two-step process:  (1) determining Mr. Hammer's capacity to make a rational choice, and (2) whether the ultimate waiver was knowing, intelligent and voluntary.  Each of these determinations are separate and distinct.  St. Pierre v. Cowan, 217 F.3d at 947 ("there is an important distinction between the question whether a defendant is competent to waive a right and the question whether a given waiver is knowing and voluntary"); O'Rourke v. Endell, 153 F.3d 560, 567 (8th Cir. 1998) ("The two questions -- the competency to waive a right and whether the waiver was knowing and voluntary -- are distinct, although we have noticed in reviewing the record in this case and researching the applicable law that the distinction is not always made clear"); Shaffer v. Bowersox, 329 F.3d 637, 650 (8th Cir. 2003) (same); Comer v. Stewart, 215 F.3d at 917- 18 ("Even if the district court finds that [the petitioner]

89

is competent to withdraw this appeal, it must also determine the separate question of whether the purported decision is voluntary").

As described below, the overwhelming evidence presented during the Section 2255 hearing demonstrates that, as a result of his multiple mental, emotional and cognitive impairments, Petitioner was incompetent at all relevant times and that his waiver of his rights at trial, post-trial and on appeal was not knowing, intelligent and voluntary. All of the experts, including his treating psychologist and therapist agreed that he suffers – and suffered at the time of trial and on direct appeal – from multiple mental, emotional and cognitive impairments. While there may be less than unanimous opinions regarding the impact of these impairments on competency and voluntariness, a full and fair consideration of the relevant circumstances leading up to the guilty plea and the subsequent waivers demonstrates that Mr. Hammer was incompetent and that his waivers were involuntary.

**C.     The Facts:  Mr. Hammer Suffers from Multiple Mental, Emotional and Cognitive Impairments – and Suffered from These Impairments at All Times Relevant to this Court's Inquiry.**

The expert testimony presenting during the Section 2255 overwhelmingly agreed that Mr. Hammer suffered from multiple mental, emotional and cognitive impairments:

- **Dr. Kluft** concluded that Mr. Hammer suffers from Dissociative Identity Disorder ("DID"), Posttraumatic Stress Disorder ("PTSD"), Antisocial Personality Disorder ("ASPD"), Organic Mental Disorder Not Otherwise Specified, Polysubstance Abuse Disorder and a determination that Major Depression, recurrent should be ruled out.  NT 8/16/05, 150-51.

- **Dr. Blumberg** concluded that Mr. Hammer suffers from chronic PTSD, Borderline Personality Disorder ("BPD"), ASPD and Cognitive Disorder, Not Otherwise Specified.  NT 8/15/05, 19.

- **Dr. Sadoff** diagnosed Mr. Hammer as suffering from DID. NT 7/28/05, 8.

- **Dr. Matthews** diagnosed Mr. Hammer as suffering from BPD, ASPD, Narcissistic Personality Disorder ("NPD"), Cognitive Disorder Not Otherwise Specified, and Polysubstance Dependence in a Controlled Environment. NT 9/21/05, 97, 99. Dr. Matthews also testified that he could not rule out PTSD and that he would not argue is another expert (for example Dr. Blumberg) determined that was the appropriate diagnosis.

- **Dr. Gelbort** concluded that Mr. Hammer suffers from organic brain dysfunction, cognitive and emotional impairments.

- **Dr. Gur** concluded that the combined quantitative MRI and PET testing and computerized neuropsychological testing as well as consideration of Dr. Gelbort's and Dr. Martell's neuropsychological testing demonstrates abnormalities in the frontal, temporal and parietal regions of Mr. Hammer's brain. NT 8/9/05, 111.

- **Dr. Martell** concluded that Mr. Hammer suffered from organic brain damage, although he concluded the damage was located in the right temporal, parietal and occipital areas.  NT 8/29/05,

91

57.

• Even **Dr. Wolfson**, who labeled Mr. Hammer as a "malingerer" in 1997, agreed that Mr. Hammer suffers from multiple pathology, including organic brain damage, borderline personality disorder, major depressive disorder, recurrent, and post-traumatic stress disorder.

Despite what the Government will invariably argue are distinctions, there are significant commonalities of symptomotology and features with the primary diagnoses of these experts and those commonalities militate in favor of a finding that Mr. Hammer was not competent and that his waivers were involuntary.

All experts found that Mr. Hammer's background and history was plagued by horrific physical, emotional and sexual abuse. E.g. NT 8/15/05, 19-24 (Dr. Blumberg); NT 7/28/05, 11 (Dr. Sadoff); NT 8/16/05, 34-35 (Dr. Kluft); NT 7/18/05, 41 (Dr. Gelbort); NT 9/21/05, 115-16 (Dr. Matthews); NT 8/29/05, 71-72 (Dr. Martell). Each expert described the trauma Mr. Hammer experienced at the hands of caregivers, including his mother, his father and other extended family members that involved physical abuse (beatings, injection of enemas, etc.); sexual abuse (at the hands of his mother, father and uncle); emotional abuse (including shaming, verbal abuse, and forcing Mr. Hammer to kill pets and engage in illegal activities); failure to protect (father's failure to prevent his mother's abuse and coercion of sexual abuse); and neglect. Id.

All experts recognized that Mr. Hammer's response to these traumatic events included fear, helplessness and horror and that the type of trauma experienced by Mr. Hammer have long-standing effects including:  intrusive distressing recollections of the trauma; nightmares; flashbacks; psychological numbing; intense psychological distress or physiological distress as well as physical symptoms when exposed to events that symbolize or resemble the trauma. E.g. NT 8/15/05, 33 (Dr. Blumberg); NT 8/16/05, 143-44 (Dr. Kluft); NT 7/28/05, 19-20 (Dr. Sadoff); NT 9/21/05, 117-19 (Dr. Matthews).

All experts agreed that children who suffer trauma like that suffered by Mr. Hammer develop methods of avoiding the pain during the course of the abuse and later to avoid the pain of the recollections of that abuse such as detachment, numbing, and dissociation and that trauma like that suffered by Mr. Hammer results in significant impairments in functioning.  E.g. NT 8/15/05 at 28-30 (Dr. Blumberg); NT 8/16/05, 43-46, 48-49, 143-44 (Dr. Kluft); NT 7/28/05, 19-20 (Dr. Sadoff); NT 8/29/05, 131-32 (Dr. Martell); NT 9/21/05, 116 (Dr. Matthews).

Indeed, all of the experts found Mr. Hammer suffered from mental illnesses reflecting the trauma experienced by Mr. Hammer: PTSD, DID, BPD and brain damage.

In addition to recognizing the commonality of cause all of the experts

93

recognized that the trauma-related mental illness diagnoses found – PTSD, DID, BPD and brain damage – also have commonality of features including: impaired functioning; instability of interpersonal relationships; identity disturbance and instability of self image, impulsivity, self-destructiveness, emotional lability, impaired judgment; avoidance of stimuli arising out of the trauma; and, dissociation.  E.g. NT 8/15/05, 56-57 (Dr. Blumberg); NT 8/16/05, 43-46, 48-49, 57, 143-44 (Dr. Kluft); NT 7/28/05, 41 (Dr. Sadoff); NT 9/21/05, 116 (Dr. Matthews); NT 8/29/05, 137-44 (Dr. Martell).

Likewise, all recognized that increased stress exacerbates the dysfunctional features of Mr. Hammer's mental illnesses and cognitive disorders.  E.g. NT 8/15/05, 61 (Dr. Blumberg); NT 8/16/05, 43-46, 48-49, 143-44 (Dr. Kluft); NT 7/28/05, 25-27 (Dr. Sadoff); NT 7/18/05, 25-26 (Dr. Gelbort); NT 8/9/05, 121 (Dr. Gur); NT 9/21/05, 139-42 (Dr. Matthews); NT 8/29/05, 145-466( Dr. Martell). These witnesses also recognized that re-living or re-experiencing the trauma suffered, the painful, hurtful testimony in the capital trial and conditions of confinement are stressors that exacerbate the dysfunctional features of Mr. Hammer's mental and cognitive illnesses.  E.g. NT 8/15/05, 61 (Dr. Blumberg); NT 8/16/05, 43-46, 48-49, 143-44 (Dr. Kluft); NT 7/28/05, 25-27 (Dr. Sadoff); NT 7/18/05, 25-26; NT 7/26/05, 78-79 (Dr. Grassian);  NT 9/21/05, 139-42 (Dr.

Matthews).

Thus, the overwhelming expert testimony demonstrated that Mr. Hammer

suffers from serious mental disorders that directly results in impaired functioning;

instability of interpersonal relationships; identity disturbance and instability of self

image, impulsivity, self-destructiveness, emotional lability, impaired judgment;

avoidance of stimuli arising out of the trauma; and, dissociation.  Whether based

on a diagnosis of DID, PTSD or BPD does not change the functioning that is

impacted by these impairments and does not change the overwhelming evidence

from both Petitioner's and the Government's experts that these features are

exacerbated under stress.  In short, Mr. Hammer suffers multiple mental,

emotional and cognitive impairments that impact his functioning and, as described

below, the circumstances leading up to the guilty plea and waivers further

exacerbated the symptomology of Mr. Hammer's impairments rendering him

incompetent and his waivers involuntary.

> **D.   Mr. Hammer's Mental, Emotional and Cognitive Impairments
> Rendered Him Incompetent and His Waiver of Rights
> Involuntary.**

In order to determine whether or not a waiver is competent and voluntary,

this Court must conduct a "penetrating and comprehensive examination of all the

circumstances under which such a plea [or waiver] is tendered."  <u>Von Moltke v.</u>

Gillies, 332 U.S. 708, 724 (1948).  See also Wilkins, 145 F.3d at 1012.  As described above, there is not doubt that Mr. Hammer suffered from significant mental, emotional and cognitive impairments at the time of each of the waivers in this case.

The question for this Court is, of course, whether or not those impairments rendered Mr. Hammer incompetent and his waivers involuntary.  This is where Petitioner's experts and the Government's experts disagree.  In light of the record evidence of the circumstances leading up to Mr. Hammer's plea and waivers as well as the Government experts' recognition that the nature of Mr. Hammer's impairments includes the exacerbation of the features of his mental, emotional and cognitive illnesses under stressful circumstances, there is also no doubt that Mr. Hammer's decision-making and judgment were so impaired that he was incompetent and that his waivers were involuntary.

As described above, all the experts, recognized that the mental, emotional and cognitive impairments which the experts diagnosed Mr. Hammer as suffering from at the time of the waivers are exacerbated when encountering increased stressors and distress.  Also as described above, those features include impulsivity; impaired functioning; emotional lability; identity disturbance; self-destructive conduct; and, dissociation.

The escalation of the stressors and distress Mr. Hammer was experiencing was well-documented in Dr. Mitchell's notes of his contacts with Mr. Hammer shortly before the guilty plea.  For example, on June 10, 1998, Hammer:

- expressed considerable distress

- expressed feelings of helplessness

- described his distress over hearing "hurtful" testimony

- experienced a high degree of "anger and rage"

- felt impulses to physically vent his anger

- expressed feelings that it "would be to his contentment" if he lost the case and got the death penalty "just to get all of this over with"

Defendant's Exhibit 31.7 at 126.  Dr. Mitchell testified that this entry reflected that "things were getting a little more dire" because Mr. Hammer "was thinking about ... throwing the towel in and hanging it up."  NT 7/25/05, 131.  Dr. Mitchell agreed that, in light of the consequences of Mr. Hammer's 'throwing in the towel,' there was an analogy to the patient out on a ledge with his role being one of trying to get him off the ledge.  Id. at 132.

On June 12, 1998, Hammer:

- reported feeling very confused;

- related that he was in a "bad frame of mind";

- described stressors of the prosecution's comments about him;

- described the stress of having to hear what other inmates who Hammer thought were his friends are saying about him;

- exhibited tearfulness and sadness

- displayed more emotion than he generally exhibited in sessions with Dr. Mitchell.

Defendant's Exhibit 31.7 at 127.

Dr. Mitchell indicated that, on this date, Mr. Hammer was in a bad way, even for him. NT 7/25/05, 135. One indicator of the concern on Dr. Mitchell's part was his elevation of Hammer's suicide risk from low to moderate and placing Hammer on 15-minute suicide checks. Id.[17]

Dr. Mitchell also indicated that Mr. Hammer felt betrayed by the inmates who testified and that his feelings of betrayal were more profound for Hammer given his pre-existing trust issues as a result of his history of child abuse. Id. at 137.

In Dr. Mitchell's view, Mr. Hammer was getting worse in terms of being stressed and depressed and that his emotions were also worsening. Id. at 137-38. Dr. Mitchell also concluded that the trial was causing Mr. Hammer very strong,

---

[17]See also Government's Exhibit 77 at 17(June 12, 1998 medical call indicating complaints of problems with anxiety and ultimate agreement to "try to calm down in [his]cell").

intense psychological pain and that a possible motivator for his plea was, at least in part, to end the pain. Id. at 140. Dr. Mitchell felt that the same motivation – ending psychological pain – were in play during his vacillations on appeal. NT 7/27/05 at 48. Dr. Mitchell also concluded that Mr. Hammer's decision making during these time periods was influenced by his emotional lability. Id. at 52.

Through the testimony of former Marshal Ellis this Court was provided with a bird's eye view of Mr. Hammer's emotional volatility and its impact on his decision making. It will be recalled that Mr. Ellis testified in the 2255 proceedings that just minutes after his guilty plea, Mr. Hammer told him that he wanted to die. This expression that his plea was motivated by a suicidal desire, was something that Dr. Wolfson and Dr. Mitchell both indicated that they would be interested in exploring in competency. Indeed, when told of Mr. Ellis testimony, Dr. Mitchell opined that this was "important" information.

As Dr. Blumberg noted, in light of his mental impairments (PTSD, BPD, Cognitive Disorder) and the overwhelming stressors Mr. Hammer was undergoing, the guilty plea – in an effort to end the psychological pain – was a foregone conclusion:

> The cumulative stress of hearing testimony concerning the severe
> abuse he sustained during his childhood and adolescence caused him
> to re-experience those traumatic events.

99

*                            *                            *

[Mr. Hammer became] severely distraught by listening to the testimony about him, essentially causing him to relive and re-experience the trauma that he experienced as a child.

This became overwhelming to him as he was listening to it, consistent with the exacerbation that one gets of these conditions with PTSD and a borderline personality disorder, when you are re-exposed to events that remind you of the past trauma. So it would lead to him experiencing a whole host of PTSD symptoms; increased irritability, anger, possibly even at times some psychological [numbing], some impairment in his judgment, just basically being psychologically overwhelmed.

It would also lead to his likely – or being more likely to act in a very impulsive way *because he could no longer tolerate the emotions that he was experiencing. Often times people in that situation will do anything that they can to escape from that distress.* And certainly one way to do that would be to plead guilty and just kind of get it over with.

NT 8/15/05, 61-63.[18]

_____

[18]<u>See also</u> NT 8/15/05, 68-69:

[I]t really is a combination of the diagnoses and the particular stressors that [Hammer] was under at the time and in my opinion leads to my finding that he was incompetent to assist in his defense at that time.

The individuals with PTSD, with borderline personality disorder who may also have some cognitive impairment, if they are not dealing with a particularly stressful issue may be otherwise competent.

However, if they are placed in a situation, as Mr. Hammer was and when he was exposed to hearing about his past on and on, that is likely to distress and potentially overwhelm him to the point where he can essentially self

100

Dr. Kluft likewise concluded that Mr. Hammer's mental illness, (DID),

precluded a finding of competency and capacity to make a voluntary waiver:

> I think [Mr. Hammer's] mind is so divided and so much in
> contradiction that he is liable to come to different opinions based on
> the same data depending on what configuration of his mind is
> activated at a given point in time.
>
> If one can be sure that the entire personality system understands and
> concurs in the course of action, that is one thing, but when there's –
> when that is left uncertain or there's reason in the data that surrounds
> the case to discover that one part often will just go off and do
> something inimical to the other or against their best interests, it's very
> hard to say that he can form a reasonable decision as a person would
> if they had access to the full range of their mental resources.

NT 8/16/05, 152-53. When asked about the increased stressors noted by Dr.

Mitchell shortly before the guilty plea, Dr. Kluft noted that with persons with DID,

like Mr. Hammer, increased stress leads to the surfacing of a series of

personalities. NT 9/7/05, 26. Dr. Kluft further concluded:

> The impact [of stressors] goes as follows. With the fluctuations that
> that kind of stress can induce, the person is unable to play with a full
> deck in terms of his knowledge, his affect and his motivations.
> Instead of being able to weigh the evidence, weigh the alternatives,
> and come to a deliberate and thoughtful conclusion, one tends to see a
> jump towards impulsive anxiety-reducing solutions, first one way and
> then the other.

Id. at 27.

---

destruct.

Similarly, Dr. Gelbort concluded that Mr. Hammer's cognitive impairments,

in light of the circumstances, rendered his waivers incompetent and involuntary:

> [Mr. Hammer's] deficits which are with him all the time, they are part of him and impact on his thinking skills as well as his emotional life all the time have apparently come into play when he's making decisions. And while much of the time he makes one decision every once in a while, especially when it appears to be under emotional stress, he will make other decisions. I think that that's strongly influenced by his cognitive as well as his emotional issues.

NT 7/18/05, 32. In response to this Court's inquiry, Dr. Gelbort further explained:

> The times when [Mr. Hammer] has chosen to plead guilty, for example, or to waive his rights. If you looked at him day by day by day and asked him what do you want to do, he would have said or it appears that he would have said plead not guilty, plead not guilty.
>
> On one particular sentence or at one particular point in time he said I will plead guilty. I think that if you again look at what was going on with him, as best as I understand it from reading the records, those were the times that were emotionally charged, where he was very anxious and where his decision making was not as it had been all along, but rather was more influenced by him – his anxiety and his thinking being clouded or not being full in scope and intent but rather looking for just one outcome, which is to get out from under the anxiety rather than necessarily doing what was best for him.

Id. at 48. See also id. at 75-76 ("I would suggest that the stress was there earlier

[than June 22, 1998] and more likely than not was building to a point where

eventually, I think the lay term cracked applies pretty well here"); id. at 85 ("[Mr.

Hammer] doesn't have as many cognitive strengths or abilities to avoid going over

102

the edge as a normal person because of his cognitive as well as emotional impairments"). See also NT 8/9/05, 122-25 (testimony of Dr. Gur describing the impact of Mr. Hammer's brain damage on his decision making, competency and capacity to render a voluntary waiver in light of heightened stressors).

In addition, Dr. Mitchell's notes and testimony reflect that the conditions of his confinement adversely impacted Mr. Hammer's mental, emotional and cognitive impairments. E.g. Defendant's Exhibit at 71 (March 28, 1997: Hammer displays flat affect and quiet demeanor; states that he "feels 'tired' of all the petty and trivial situations he finds himself in at this institution;" that he was "thinking of ways to 'get their attention'"); id. at 72 (March 28, 1997: "exacerbated feelings of being alone and emotionally isolated;" "expressed more distress with the restrictions placed on him"); id. at 73 ( April 4, 1997: expressions that winning battles over legal mail and phone privileges "seem to be meaningless to him;" feeling "alone and 'under siege' from the BOP"). Dr. Mitchell found that "depression and his depressive episodes were also very reactive to just everyday stressors about his incarceration, about being in special housing units..." NT 7/25/05, 115. Dr. Mitchell noted incidents where Mr. Hammer exhibited pressured speech connected to the "distress he was experiencing at the hands of the prison system" Id. at 123. In Dr. Mitchell's experience, his conditions of

103

confinement caused Mr. Hammer psychological distress.  NT 7/27/05 at 14.

As Dr. Grassian explained, Mr. Hammer's conditions of confinement further exacerbated his pre-existing mental, emotional and cognitive impairments.  NT 8/7/05, 79-80.[19]  The combined factors also would have an adverse impact on Mr. Hammer's ability to make rational decisions.  Id. at 86:

> [P]reexisting mental and emotional illness exacerbated by long periods of isolation wreak havoc on a person's ability to regulate emotion and impulse controls.  Therefore, whenever such a person is confronted with negative and stressful events in their lives, their decision making process becomes severely impaired to the point where they are not, from a clinical perspective, competent to make rational decisions.  That is what occurred to Mr. Hammer throughout this litigation.

NT 8/7/05, 89-90; NT 7/18/05, 26-27 (Dr. Gelbort: Noting the adverse impact of isolation on individuals with brain damage); NT 9/21/05, 122-23 (Dr. Matthews describing the adverse impact of isolation on individuals, including incompetence and irrationality).

Similarly, as Dr. Mitchell's notes demonstrate, similar escalations of stressors resulted in similar self-destructive, incompetent and impaired decision

---

[19]Accord Comer v. Stewart, 215 F.3d 910, 917 (2000) (noting that conditions of confinement can render a waiver or rights involuntary); Grossclose ex rel Ronald Harries v. Dutton, 594 F. Supp. 949, 961-63 (DC Tenn. 1984) (finding that the conditions of confinement rendered Mr. Harries' waiver involuntary).

making.  For example, on May 2, 1997, Mr. Hammer announced to Dr. Mitchell his intent to enter a guilty plea.  See Defendant's Exhibit 31.7 at 77.  Prior entries by Dr. Mitchell depict escalation of case-related and confinement stressors.  E.g. Id. at 70 (March 14, 1997: Hammer expresses frustration and hopelessness over legal proceedings and thoughts that "ending his life seems to be a viable alternative"); id. at 71 (March 28, 1997: Hammer displays flat affect and quiet demeanor; states that he "feels 'tired' of all the petty and trivial situations he finds himself in at this institution;" that he was "thinking of ways to 'get their attention'"); id. at 72 (March 28, 1997: "exacerbated feelings of being alone and emotionally isolated;" "expressed more distress with the restrictions placed on him"); id. at 73 ( April 4, 1997: expressions that winning battles over legal mail and phone privileges "seem to be meaningless to him;" feeling "alone and 'under siege' from the BOP"); id. at 74 (April 11, 1997:  news that his case was capital combined with the anniversary date left Hammer feeling "depressed"); id. at 75 (April 21, 1997:  Hammer described a 'rough week' because of certain stressors: the death penalty notice; the anniversary dates; the BOP removing Hammer's closest friend from his visitation list; experiencing feelings of anger and frustration; thoughts of people from his past).  Less than two weeks later, Mr. Hammer filed the *pro se* motion to enter a guilty plea that was ultimately

105

withdrawn.

In light of the circumstances leading up to the *pro se* motion, Dr. Matthews' conclusion that this attempt to enter a guilty plea in May, 1997, supports the conclusion that his guilty plea on June 22, 1998 was a rational, well-thought out decision is specious.  Instead, it is more likely, as Drs. Gelbort, Blumberg and Kluft explained, that the stressors combined with Mr. Hammer's mental, emotional and cognitive impairments resulted in a constant battle to remain rational that was overborne at the time of the guilty plea and subsequent waivers.

In short, the circumstances presented during the hearing demonstrate that Mr. Hammer suffers from multiple mental, emotional and cognitive impairments that directly impact his functioning, including his impulse control, emotional lability and rationality; that at the facts and circumstances leading up to his guilty plea and waivers included the type of stressors that further exacerbate the already debilitating impairments; and, any fair consideration of the evidence demonstrates that the combined impact rendered his waivers incompetent and involuntary.

### E.    Dr. Matthews' Testimony Contradicting a Finding of Incompetence and Involuntariness is Unreliable and Incredible.

As described above, Dr. Matthews acknowledged that Mr. Hammer's background and history includes significant debilitating trauma that includes

pervasive physical, sexual and emotional abuse; a family history of mental illness; and a life-long history of psychiatric diagnoses. Dr. Matthews also agreed that Mr. Hammer suffers from BPD, brain damage and most likely also suffers from PTSD. Dr. Matthews also agreed that the features of BPD and PTSD include impaired functioning; dysfunctional interpersonal relationships; impulsivity; emotionality; and, dissociation and that Mr. Hammer's history reflects symptomotology consistent with these features. Dr. Matthews also acknowledged that increased stressors and conditions of confinement exacerbate the symptomotology of the impairments arising out of Mr. Hammer's mental, emotional and cognitive deficits. Finally, Dr. Matthews acknowledged that the issue of competency and voluntariness involves the determination of the individual's functioning at the relevant times. Nevertheless, Dr. Matthews found Mr. Hammer held the requisite competence and capacity to waive his rights.

Dr. Matthews' ultimate conclusion is contrary to the record and fundamentally flawed for a number of reasons. First, while Dr. Matthews claimed to have considered records relevant to the waivers, the purported "record review" was essentially limited to the notes of testimony of the guilty plea, competency hearings and the direct appeal argument. Instead of reviewing the institutional records from the relevant time-periods, Dr. Matthews relied on a summary

provided by others[20] that did not reflect the actual notes from either Dr. Mitchell or the medical records.  As described above, those notes and records contain compelling evidence of the significant and overwhelming stressors Mr. Hammer was under and the impact of those stressors on his functioning.

Dr. Matthews' reliance on Mr. Hammer's statements during the guilty plea hearing, the competency proceedings and the direct appeal argument without also giving meaningful consideration to the institutional records further diminishes the reliability of his ultimate conclusion.[21]  The overwhelming reliable expert testimony – including testimony of Dr. Matthews' colleague, Dr. Martell – demonstrates that Mr. Hammer's intelligence and ability to present articulately is not dispositive on the question of competency and capacity to waive.  See NT 8/29/05 at 84-85 (Dr. Martell acknowledging that a person can be a genius but still incompetent); NT  8/l5/05 at 60 (Dr. Blumberg: "For example, you may be very bright, but if you're depressed, if you're self destructive, if you are overwhelmed with your emotions to the point where you can't utilize your judgment and your

---

[20]The summary was compiled by three individuals:  one psychiatrist with unknown forensic experience and two psychology students.

[21]Dr. Matthews' reliance on Mr. Hammer's statements that he wanted to waive his rights because of his concern for the victim and expressions of remorse is especially incredible in light of his diagnosis of Narcissistic Personality Disorder and Anti-Social Personality Disorder.

intelligence, you can be severe[ly] impaired and possibly incompetent"); NT 8/9/05 at 121-22 (Dr. Gur explaining that, despite Mr. Hammer's average to above-average left-brain functioning, the damage to his right temporal, parietal and frontal lobes nevertheless impacts his judgment, impulse control, perceptions and decision making); 7/18/05 at 47-48 (Dr. Gelbort, same).

Dr. Matthews' reliance on counsels' purported representations that Mr. Hammer was competent was likewise flawed for a number of reasons. First, as the evidence presented in these proceedings demonstrates, counsels' opinions were plagued by their ineffective failure to investigate, develop and present evidence contradicting a competency finding. Second, counsels' representations were not unequivocal. Finally, as described above, those representations are overwhelmingly contradicted by institutional, expert and lay witness testimony.[22]

Dr. Matthews' reliance on Mr. Hammer's protestations of competency is both perplexing and incredible. See Wilkins, 145 F.3d at 1011-12 ("The trial court should not merely take the defendant's statement that he is knowingly and intelligently waiving counsel "at face value.") (citations omitted). Mentally ill

---

[22]Likewise, Dr. Matthews' reliance on this Court's finding of competency during the guilty plea hearing without also addressing the Court's subsequent expression of "grave doubts" regarding its failure to inquire into the impact of the alters on Mr. Hammer's waiver is equally troubling.

persons deny their mental illness and mask the symptomotology.  Indeed, Dr.

Matthews  acknowledged as much, and the testing conducted by Dr. Martell

indicated that Mr. Hammer was "faking good."  See NT 8/29/05 at 68-69.  As Dr.

Kluft aptly noted, persons suffering from DID – like those suffering from other

mental illnesses – are intent on masking the illness for a number of reasons:

> Well, the first thing is that it indicates to them that they're out of
> control, which to most lay people being crazy means being out of
> control.  And if one is clearly having things happen that one hasn't
> voluntarily willed to happen, that's amazingly threatening.
>
> It is stigmatizing to have mental illness; that's a general phenomenon.
> The nature of [DID] and how it shows itself often can be profoundly
> embarrassing because different personalities may have done thing that
> one would really regret or be mortified to have attributed to one's
> self.  And furthermore, the diagnosis opens the door to what the
> person is most traumatized by and most ashamed of, and that is that
> they suffered some profound, painful and humiliating experiences,
> usually at the hands of someone that they were desperate to have love
> them.  So it is a way of – in the patient's mind it's a way of saying I
> wasn't good enough to gain and hold my parents' love, there was
> something wrong with me all along, now everyone in the world
> knows that I'm unloveable, and that all sorts of humiliating things
> have happened to me.  And you pull all that together and the usual
> response upon the diagnosis being made is the patient is denying the
> diagnosis.

NT 8/16/05, 79.

Moreover, as the above-discussion demonstrates, Mr. Hammer is wrong.

In short, just because Mr. Hammer says it is so, does not make it so.

Nor can Dr. Matthews rely on Dr. Martell's conclusions as a basis for finding competency. Dr. Martell concluded that Mr. Hammer's brain damage was focused on the temporal-parietal areas as opposed to the frontal damage found by Drs. Gelbort and Gur. When Dr. Martell's raw data was scored on the standard norms, however, the testing reflected much more extensive frontal lobe damage than Dr. Gelbort's data. See NT 8/9/05, 130. Moreover, contrary to Dr. Matthews' general statement that the damage reflected in Dr. Martell's conclusions do not impact competency or capacity ignores basic brain anatomy. As Dr. Gur explained, information is processed from the back to the front of the brain. The temporal and parietal lobes process the perceived auditory and visual information before it travels to the frontal lobe for impulse and judgment control. NT 8/9/05, 67-70. Thus, if the temporal and parietal perceptions are skewed, the ability to apply proper impulse and judgment control are also skewed. Accordingly, even if Mr. Hammer's brain damage were limited to the areas described by Dr. Martell – and there is overwhelming evidence that it is not – that does not mean that his cognitive deficits do not impact competency and capacity.

Dr. Matthews' reliance on the opinions expressed by Dr. Wolfson and Dr. Mitchell during the competency proceedings is equally flawed. Dr. Wolfson concluded that Mr. Hammer is not mentally ill and was malingering DID. As Dr.

Matthews acknowledged, Dr. Wolfson stands alone in his finding that Mr. Hammer was malingering. Moreover, as Dr. Kluft explained, nothing in Dr. Wolfson's evaluation of Mr. Hammer resulted in a credible or reliable determination of the presence of absence of DID. NT 9/7/05, 15-25

Moreover, Dr. Mitchell's trial opinion is contradicted by his testimony in these proceedings indicating that Mr. Hammer's decision making was impacted by his desire to end the psychological distress and pain, the stressors he was undergoing and the conditions of his confinement.

Finally, Dr. Matthews' belief that DID is not a mental disorder and his lack of understanding of what DID is skews his ultimate competency and capacity determination. Like Dr. Wolfson, Dr. Matthews can hardly assess the impact of DID on Mr. Hammer's competency and capacity if he does not believe it exists as a mental illness. Also like Dr. Wolfson, Dr. Matthews conducted no accepted method for determining the presence or absence of DID in his evaluation of Mr. Hammer. Indeed, Dr. Matthews acknowledged that there was nothing Mr. Hammer could do to convince him (Dr. Matthews) that he (Mr. Hammer) had DID.

For each of these reasons, the opinions of Dr. Matthews, Dr. Martell, Dr. Wolfson and Dr. Mitchell regarding Mr. Hammer's competency and the

112

voluntariness of his waiver of his rights are unreliable. In light of the overwhelming lay, record and expert testimony contradicting those opinions are entitled to no credence and should be disregarded by this Court.

## VI.   PETITIONER'S RESPONSE TO THE COURT'S QUESTION.

In an order of September 27, 2005 (document # 1160) this Court asked counsel to address whether the miscarriage of justice standard for a penalty phase claim is the same in a section 2255 proceeding as it is in a section 2254 proceeding. If there is a difference, this Court has asked counsel for their views on what the standard should be under the FDPA.

### A.   Background.

As this Court notes in its order, it may have to determine whether Petitioner's execution would constitute a miscarriage of justice as that term has been explained by the United States Supreme Court in Sawyer v. Whitley, 505 U.S. 333 (1992) and other cases. Under Sawyer, a capital petitioner can obtain review of an otherwise defaulted penalty phase claim if he can show that the failure to review the claim would result in a miscarriage of justice. Such a miscarriage occurs when a person is executed who is "innocent of the death penalty."

Sawyer, in turn defines "innocence of the death penalty" as the absence of

death eligibility: "Therefore, we must determine if petitioner has shown by clear and convincing evidence that but for constitutional error, no reasonable juror would find him eligible for the death penalty under Louisiana law." Sawyer, 505 U.S. at 348.

In order to show that he is not "eligible" for the death penalty, a capital petitioner must demonstrate that due to constitutional error there are no valid aggravating circumstances. See e.g. Tuilaepa v. California, 512 U.S. 967, 971-72 (1994) ("To render a defendant eligible for the death penalty in a homicide case, we have indicated that the trier of fact must convict the defendant of murder and find one 'aggravating circumstance' (or its equivalent) at either the guilt or penalty phase."). Under the FPDA, a petitioner can also challenge his death eligibility by showing the invalidity of the intent factor. See this Court's order of September 27, 2005 at 1-2 ("If the jury determines beyond a reasonable doubt that the defendant had at least one of the required intent factors set forth in § 3591(a)(2), the jury proceeds to the second stage. However, if the jury does not find the requisite intent, the deliberations are over and the death penalty cannot be imposed"); United States v. Higgs, 353 F.3d 281, 298 (4th Cir. 2003) ("a defendant may be sentenced only to life imprisonment unless the jury finds the existence of at least one intent factor and one statutory aggravating factor").

114

In its order, this Court questioned whether the FDPA should provide for a more generous miscarriage standard inasmuch as the <u>Sawyer</u> standard was developed in regard to the collateral review of a state conviction, with its concerns for comity and federalism that are not present in a federal capital case. The Court proposed six potential standards which should be applied.

## B.    Response.

Of the potential standards, Petitioner submits that a combination of the third and fifth is most appropriate. These potential standards posit that a miscarriage of justice exists if:

> the proceedings which led to the sentence of death were flawed because the Government failed to disclose information to the defense which could have resulted in one or more jurors electing to recommend a sentence of life imprisonment;

Or if:

> a constitutional violation more likely than note resulted in a capital sentence for one who should not have been sentenced to death.

These potential standards are closest to the <u>Sawyer</u> death ineligibility standard, inasmuch as the withheld <u>Brady</u> material discussed above could have resulted in a successful challenge to the intent factor, thereby rendering Petitioner death ineligible.

Petitioner notes however, that in view of the significant <u>Brady</u> violations

discussed herein, there is simply no need for the Court to divine a new standard.

A miscarriage standard is applicable only if a petitioner's claims are defaulted.

Sawyer, 505 U.S. at 339 ("We have previously held that even if a state prisoner

cannot meet the cause and prejudice standard [for overcoming a procedural

default], a federal court may hear the merits of the successive claims if the failure

to hear the claims would constitute a miscarriage of justice.").  Yet, the Brady

claims before the Court and argued in Point III, above, are not defaulted.  Thus, if

this Court finds that the prosecution violated Petitioner's right to due process,

Petitioner has the right to litigate the merits of that claim, and there is no need to

resort to any miscarriage of justice standard.

## VII.  CONCLUSION.

As this Court has now seen, multiple constitutional flaws permeated

Petitioner's trial proceedings before this Court.  He was not competent to plead

guilty or waive appeal because of his emotional and mental health deficits.  Aside

from his mental incapacity, he could not make a knowing, intelligent and

voluntary waiver of those rights, because the prosecutor failed in his duty to

disclose material and exculpatory evidence.  Meanwhile, trial counsel rendered

ineffective assistance in multiple respects  – they failed to consult with their own

mental health experts in regard to the question of competency.  Had they done so,

they would have learned that Petitioner lacked capacity to make a knowing,

intelligent and voluntary waiver of his rights. They failed to investigate a number

of viable avenues of defense, including Petitioner's history of false confessions

and the false aspects of his confession to the authorities in this case. They failed

to appreciate or litigate the accidental nature of the killing as such related to erotic

asphyxia. Finally, they failed to appreciate or litigate the ethical issues and related

breech of Mr. Hammer's right to confidentiality.

Faced with these myriad constitutional flaws, this Court has no choice but to grant the Motion and vacate Mr. Hammer's conviction and sentence of death.

Respectfully Submitted,

/s/

_____

Michael Wiseman
For All Counsel
Anne L. Saunders
James McHugh
James Moreno

Counsel for Petitioner
David Paul Hammer

Dated:      Philadelphia, PA
            October 17, 2005

118

**Certificate of Service**

I, Michael Wiseman, hereby certify that on this 17th day of October, 2005 I served the foregoing upon the following person by electronic filing and/or by United States Mail:

Frederick E. Martin, Esquire
United States Attorney's Office
Federal Building, Room 217
228 Walnut Street
Harrisburg, PA 17108

Gwynn X. Kinsey, Jr., Esquire
United States Department of Justice
Criminal Division, Capital Case Unit
1331 F. Street, N.W.
Washington, D.C. 20530

/s/ Michael Wiseman

_____