IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA   :
                             :
      v.                :  No. 4:CR-96-239
                             :
DAVID PAUL HAMMER      :  (Judge Muir)

OPINION

MUIR, District Judge.

TABLE OF CONTENTS

I. Introduction ..................................... 4

II.  Findings of Fact ............................. 29

A.  The Change of Plea and Waiver of Counsel Proceedings.

Findings of Fact 1 through 96.

B.  Mr. Ellis's Involvement with and Observations of Mr. Hammer.

Findings of Fact 97 through 108.

C.  Mr. Montville's Involvement with and Observations of Mr. Hammer.

Findings of Fact 109 through 114.

D.  The Razor Blade Incident.

Findings of Fact 115 through 118.

E.  The Evaluation of Mr. Hammer by Government Experts Drs. Matthews and Martell.

Findings of Fact 119 through 263.

F.  Dr. Mitchell's Involvement with and Assessment of Mr. Hammer.

Findings of Fact 264 through 332.

G.  Dr. Sadoff's Involvement with and Assessment of Mr. Hammer.

Findings of Fact 333 through 347.

H.  Dr. Wolfson's Involvement with and Assessment of Mr. Hammer.

      Findings of Fact 348 through 372.

I.  Dr.  Blumberg's Involvement with and Assessment of Mr. Hammer.

      Findings of Fact 373 through 431.

J.  Dr. Gelbort's Involvement with and Assessment of Mr. Hammer.

      Findings of Fact 432 through 477.

K.  Dr. Gur's Involvement with and Assessment of Mr. Hammer.

      Findings of Fact 478 through 542.

L.  Dr. Grassian's Involvement with and Assessment of Mr. Hammer.

      Finding of Fact 543 through 583.

M.  Dr.  Kluft's Involvement with and Assessment of Mr. Hammer.

      Findings of Fact 584 through 687.

N.  The Alleged Ethical Violations of Drs. Wolfson, Mitchell, Karten and Dubin.

      Findings of Fact 688 through 840.

O.  Mr. Hammer's History of False Confessions and Reports.

      Findings of Fact 841 through 917.

P.  Testimony and Evidence Relating to the Murder of Andrew Marti.

      Findings of Fact 918 through 1075.

Q.  The Testimony of Forensic Pathologists Spitz and Funke.

      Findings of Fact 1076 through 1194.

R.  Andrew Marti's History of Autoerotic Sexual Asphyxia.

      Findings of Fact 1195 through 1212.

S.  Attorneys Travis's and Ruhnke's Involvement with and Observations of Mr. Hammer.

      Findings of Fact 1213 through 1242.

T.   Attorneys Foster's and Long-Sharp's Involvement with and
     Observations of Mr. Hammer.
          Findings of Fact 1243 through 1264.

U.   Mr. Snyder's Involvement with and Observations of Mr. Hammer.
          Findings of Fact 1265 through 1284.

V.   Mr. Gonzales's Involvement with Mr. Hammer.
          Findings of Fact 1285 through 1290.

W.   Mr. Halloran's Involvement with and Observations of Mr. Hammer.
          Findings of Fact 1291 through 1326.

X.   Mr. White's Involvement with and Observations of Mr. Hammer.
          Findings of Fact 1327 through 1355.

Y.   Dr. Nolan's Involvement with and Observations of Mr. Hammer.
          Findings of Fact 1356 through 1373.

Z.   Dr. Elliot's Involvement with and Observations of Mr. Hammer.
          Findings of Fact 1374 through 1388.

AA.  The Bureau of Prisons' Awards Program.
          Findings of Fact 1389 through 1429.

BB.  The Quality of Mental Health Care Provided to Mr. Hammer
     While Incarcerated in the Oklahoma Prison System.
          Findings of Fact 1430 through 1488.

CC.  Martin Hammer's Observations of David Paul Hammer as
     a Child.
          Findings of Fact 1489 through 1507.

DD.  Mr. Oberg's Involvement with and Observations of Mr. Hammer.
          Findings of Fact 1508 through 1543.

EE.  Other Inmates' Involvement with and Observations of Mr.

Hammer.

Findings of Fact 1544 through 1583.

FF.  The Undisclosed FBI 302 Statements.

Findings of Fact 1584 through 1696.

GG.  The Erroneous Findings Relating to Mitigating Circumstances.

Findings of Fact 1697 through 1705.

III.  Discussion ...................................   256

IV.  Conclusions of Law ..............................   276

## I.  Introduction.

We address in this opinion David Paul Hammer's fourth amended § 2255 motion filed as permitted by our order of October 18, 2005.

On September 18, 1996, a Grand Jury sitting in Williamsport, Pennsylvania, returned an Indictment charging Mr. Hammer with first degree murder.  Mr. Hammer was charged with killing his cellmate, Andrew Marti, while housed in Cell 103 of the Special Housing Unit at the Allenwood United States Penitentiary, White Deer, Pennsylvania.  The killing occurred on April 13, 1996, sometime between the hours of 2:00 and 3:00 a.m.  On April 9, 1997, the Government filed a notice of its intent to seek the death penalty.

On September 24, 1997, Mr. Hammer filed a notice of intent to rely upon an insanity defense at the time of trial.  On October 7, 1997, the Government filed a motion pursuant to 18 U.S.C. §§

4242(a) and 4247(b) to conduct a psychiatric evaluation at either the United States Medical Center for Federal Prisoners, Springfield, Missouri, or the Federal Correctional Center for Federal Prisoners, Butner, North Carolina.  On October 9, 1997, we granted the Government's motion and Mr. Hammer was evaluated at the United States Medical Center for Federal Prisoners, Springfield, Missouri.  He arrived at that facility on October 23, 1997, and he was discharged to the custody of the United States Marshals Service for return to this jurisdiction on December 10, 1997.

This case was placed on the May, 1998, trial list.  Mr. Hammer was represented by David A. Ruhnke, Esquire, and Ronald C. Travis, Esquire, two highly experienced criminal defense attorneys. Jury selection commenced on May 5, 1998, with a pool of 250 potential jurors and lasted fourteen (14) days.  During that period an additional 205 potential jurors were called.

A jury of 12 jurors and 6 alternates was impaneled on June 2, 1998, and on the next day the Government commenced its case on the guilt phase.  On June 11, 1998, the Government rested and the defense commenced its case.  Mr. Hammer presented an insanity defense.  Robert M. Sadoff, M.D., a forensic psychiatrist, testified for the defense that Mr. Hammer suffered from dissociative identity disorder, a form of mental illness which was previously known as multiple personality disorder.  Dr. Sadoff further testified that Mr. Hammer has four alter personalities: (1) Jocko, a violent personality, (2) Tammy, a female personality, (3) Wilbur, a child personality and (4) Jasper, a chimpanzee.  In sum,

5

Dr. Sadoff testified that Jocko committed the killing of Mr. Marti and that Mr. Hammer was not legally responsible for the killing.

On June 17, 1998, the defense rested and the Government commenced its rebuttal on the question of guilt by calling James K. Wolfson, M.D., a forensic psychiatrist employed at the Medical Center for Federal Prisoners, Springfield, Missouri.  Dr. Wolfson's testimony was the opposite to that of Dr. Sadoff, i.e., that Mr. Hammer did not suffer from dissociative identity disorder and that he was responsible for his actions.

The Government called the following 16 witnesses during its case in chief on the issue of guilt: on June 3rd –  Timothy Devane, Stephen Jones, Thomas Abraham, Curtis Hufnagle, and Jack Luhrman; on June 4th – Muhammed Chaudhri, Dr. Saralee Funke, Ronald L. Jury, and Guy Fleck; on June 8th – Guy Fleck (continued), Thomas F. Callaghan, Leonard Yager, and Mark Traxler; on June 9th – Mark Traxler (continued), Jeannette Bunch, and Stephen Classen; on June 10th – Stephen Classen (continued) and FBI Special Agent Carlyle Thompson; on June 11th – Carlyle Thompson (continued) and FBI Special Agent Anthony S. Malocu.

The Defense commenced its case on June 11, 1998 and concluded on June 17, 1998.  The Defense called the following 13 witnesses during its case: on June 11th – James Boone and Billy Joe Webb; on June 12th – Mike Smith, George Yandle, Rev. Charles Story, and Gary McLaughlin; on June 15th – Paul Reed, Mark Oberg, Mark Jordan, and Jill Miller; on June 16th – Jill Miller (continued) and

6

Dr. Robert Sadoff; on June 17th – Dr. Robert Sadoff (continued), Special Agent Malocu and Mark Traxler.

The Government commenced its rebuttal case on June 17, 1998, by calling Dr. Wolfson and concluded the direct examination of Dr. Wolfson at 3:52 p.m. on June 18, 1998. The cross-examination of Dr. Wolfson commenced on Friday, June 19, 1998, and ran from 10:00 a.m. until 12:20 p.m.  After lunch two witnesses, Nicole Tadross-Weaver and Chaplain Glenn Crook, were taken out of turn.  At the conclusion of their testimony Dr. Wolfson resumed the witness stand and attorney Travis continued with cross-examination.  At 3:04 p.m. an afternoon break was taken.  Court resumed at 3:19 p.m. at which time counsel approached the bench and reported that attorney Travis was suffering from exhaustion and requested that court adjourn for the day.  Because attorney Ruhnke was not prepared to continue with the cross-examination of Dr. Wolfson, the jury was excused for the day and directed to report on the following Monday morning, June 22, 1998, at the regular time.

On June 22, 1998, before the cross-examination of Dr. Wolfson was resumed, the court was notified that Mr. Hammer desired to plead guilty.  Prior to entering into a guilty plea colloquy with Mr. Hammer, the court required that Mr. Hammer be evaluated to determine whether he was competent to plead guilty.  That evaluation was conducted by Dr. Wolfson and John R. Mitchell, Psy.D., a psychologist at the Allenwood United States Penitentiary,

White Deer, Pennsylvania.[1]  The court than heard testimony from both Drs. Wolfson and Mitchell which established that Mr. Hammer was competent to enter a guilty plea.

At the conclusion of the testimony from Drs. Wolfson and Mitchell,  Mr. Hammer entered a plea of guilty to the intentional, premeditated murder of Mr. Marti in violation of Title 18, United States Code, Section 1111.  The evaluation of Mr. Hammer, testimony of Drs. Wolfson and Mitchell as to competency of Mr. Hammer and change of plea proceeding occurred on June 22, 1998.

During the change of plea proceeding, Government counsel was asked to "give us a brief summary of the evidence."  Government counsel in response to that request stated in relevant part as follows:

> Mr. Hammer solicited Mr. Marti as a cellmate.  Once Mr. Marti was his cellmate he persuaded him to engage in a hostage scenario, whereby Mr. Marti would allow himself to be tied to the bed in an effort to have Mr. Marti transferred more quickly to another federal institution.
>
> Mr. Hammer persuaded, or succeeded in persuading Mr. Marti to do this.  Also prepared items, including cloth restraints, to facilitate the ruse, and when Mr. Marti was tied, all of his limbs were tied to various aspects of the cell, he indicated -- he basically put a sock in Mr. Marti's mouth, then put him in a sleeper hold and rendered him unconscious.
>
> And after doing so he took a cloth, a piece of cloth, a strip of cloth, and used that to finally strangle Mr. Marti to death.  Mr. Hammer had said to several inmates that that what – that is what he intended to do.  And they have testified to that effect in this proceeding.

---

1.  Attorney Travis, after consulting with Mr. Hammer, stated that Mr. Hammer desired to be evaluated by both Drs. Wolfson and Mitchell. Doc. 488, Transcript, Vol. 14, page 20.

> He also wrote letters after the fact, after the killing of Mr. Marti, basically saying that I did what I told you I was going to do, and that was to strangle Mr. Marti, and all of these – the pre-planning and the statements to the inmates, as well as Mr. Hammer's written statements following the murder support the prosecution – prosecution's conclusion that this murder occurred in cold blood with premeditation.

Doc. 488, Transcript, Vol. 14, pages 112-113. After this summary, we asked Mr. Hammer whether or not he agreed with the prosecutor's summary to which he responded in pertinent part as follows:

> I agree with Mr. Martin's rendition of the facts in substance, but – not in the exact detail in which he put it.
>
> \*      \*      \*      \*      \*      \*      \*
>
> The bottom line is I did in fact with these hands kill Andrew Marti . . . .

Transcript, pages 113-114.  We then asked Mr. Hammer how he disagreed with Government counsel's summary to which he responded as follows:

> Well, the fact that I solicited Andrew to move into my cell.  It was a – it was a mutual decision for him to move in there with me, and the ruse for the hostage scenario, that was not accurate.  That's something I told the FBI I did, along with Marti, braid sheets, braid restraints, but we used them for other purposes.
>
> The bottom line is I tied him up, I tied him to the bed and I killed him.  And I'm responsible for that.

Transcript, page 114.  The only portions of Government counsel's summary with which Mr. Hammer disagreed were (1) that he solicited Mr. Marti to be his cellmate and (2) the hostage scenario or ruse. Mr. Hammer did not dispute that he tied Mr. Marti to the bed, put a sock in Mr. Marti's mouth, put Mr. Marti in a sleeper hold,

rendered him unconscious, and then took a piece of cloth and strangled him to death.  Mr. Hammer did not deny that he told inmates prior to the incident that he was going to kill Mr. Marti. The portions of Government counsel's summary which Mr. Hammer did not deny compelled the court to find intent to kill (malice) and premeditation.

As a result of the guilty plea, the penalty phase of the trial commenced on June 30, 1998.  The Government called the following 14 witnesses during its case in chief: on June 30th – Thomas Upton, David Walter, Dr. Saralee Funke, Dr. Stephen Karten, and Brad Peiffer; on July 1st – Donn C. Troutman, William Louis Earl Keel, Michael Marti, Robert Marti, and Dr. Stephen Karten (recalled); on July 6th – James Elliot, Thomas Woodby, Mark Traxler, and Muhammed Chaudhri; on July 7th – FBI Special Agent Malocu. After presenting the testimony of Special Agent Malocu, the Government rested.

The Defense commenced presenting evidence in mitigation on July 7, 1998.  The Defense called the following 15 witnesses: on July 7th – Martin Hammer and Sherry Watson; on July 8th – Dr. Michael M. Gelbort, Larry D. Miller, Marilynn Herring, and Dr. John Mitchell; on July 9th – Dr. John Mitchell (continued), and Karen Billing; on July 10th – Karen Billing (continued), Vince Parsons, Jesse Trentadue, Andy D. Thomas, Guy Fleck, and Donn Troutman; on July 13th – Donn Troutman (continued), Patrick W. Keohane, and Dr. Wolfson (continuation of cross-examination by attorney Travis); on

10

July 14th – Dr. Wolfson (continued) and Bill Story.   On July 15th the defense submitted a stipulation and rested.

The Government then presented rebuttal evidence.  The Government presented the following five rebuttal witnesses:  Lee Mann, Gayle Krien, Dr. Wolfson, Ronald Jury and Special Agent Malocu.

On July 16 and 17, 1998, the court heard argument regarding points for charge and the Special Findings Form to be submitted to the jury.

On July 21st the court gave the closing instructions to the jury.  Each side was entitled to 4 hours for closing arguments and those arguments concluded on July 23, 1998.  The jury was presented with a document entitled "Special Findings Form Regarding the Punishment to be Imposed Upon David Paul Hammer for the Killing of Andrew Marti" and was sent to the jury room to begin deliberations.

The Special Findings Form consisted of the following six parts: Part One – Intent Factors; Part Two – Statutory Aggravating Factors; Part Three – Non-Statutory Aggravating Factor Future Dangerousness; Part Four – Non-Statutory Aggravating Factor Impact on Family; Part Five – Mitigating Factors; and Part Six – Sentence.

Under the Federal Death Penalty Act of 1994, in deciding to recommend a sentence of death, the jury was required to pass through several stages.  Initially, during the penalty phase deliberations the jury was required to determine whether Mr. Hammer had the requisite "intent" in committing the offense to warrant imposing the death penalty.  18 U.S.C. § 3591(a)(2). The jury was

required to decide whether Mr. Hammer "intentionally killed Andrew Marti" or "intentionally inflicted serious bodily injury on Andrew Marti that resulted in the death of Andrew Marti."  The jury determined beyond a reasonable doubt that Mr. Hammer had intentionally killed Mr. Marti and, therefore, proceeded to the second stage.  If the jury had not found the requisite intent, the deliberations would have been concluded and the death penalty could not have been recommended.

In the second stage of the deliberations, the jury was required to consider the statutory aggravating factors set forth in the Government's notice of intent to pursue the death penalty.  18 U.S.C. § 3592(c).  For the death penalty to be recommended, the jury was required to find that the Government had proven beyond a reasonable doubt at least one statutory aggravating factor.  The jury was required to consider the following two statutory aggravating factors: (1) whether or not Mr. Hammer had previously been convicted of two or more state or federal offenses punishable by a term of imprisonment for more than one year, involving the use or attempted or threatened use of a firearm, and (2) whether or not Mr. Hammer committed the murder of Andrew Marti after substantial planning and premeditation.

The jury determined beyond a reasonable doubt that Mr. Hammer had previously been convicted of the requisite number of felony offenses involving the use of a firearm and that he had committed the murder of Andrew Marti after substantial planning and premeditation.  The jury therefore proceeded to the third and

12

fourth stages of deliberations, that is consideration of the non-statutory aggravating factors: future dangerousness and the impact on the family of Andrew Marti.  If the jury had not found at least one statutory aggravating factor, the deliberations would have been concluded and the death penalty could not have been recommended.

With respect to the non-statutory aggravating factors the jury determined beyond a reasonable doubt that Mr. Hammer "represent[ed] a continuing danger to the lives and safety of others in the future because he is likely to commit criminal acts of violence" and that he "caused harm to the family of Andrew Marti as a result of the impact of the killing upon the family."

After unanimously determining that the non-statutory aggravating factors had been proven beyond a reasonable doubt, the jury was obliged to consider any mitigating evidence. The jury was presented with the following possible 15 mitigating factors to consider:

> (1) At the time of the offense, Mr. Hammer's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired, regardless of whether his capacity was so impaired as to constitute a defense to the charge;
>
> (2) At the time of the offense, Mr. Hammer was under unusual and substantial duress, regardless of whether the duress was of such a degree as to constitute a defense to the charge;
>
> (3) Mr. Hammer committed the offense under severe mental or emotional disturbance;
>
> (4) Mr. Hammer presently suffers from a major mental disease or defect;
>
> (5) Mr. Hammer suffers from cognitive deficits;

13

(6) Mr. Hammer is the product of a violent, abusive and chaotic childhood;

(7) As a child, Mr. Hammer was a victim of sexual abuse;

(8) As a young person, Mr. Hammer attempted to seek help for mental difficulties;

(9) Mr. Hammer will be sentenced to life in prison without the possibility of release if a sentence of death is not imposed;

(10) The United States Bureau of Prisons and the Oklahoma Department of Corrections are capable of fashioning conditions of confinement such that Mr. Hammer is unlikely to commit criminal acts of violence in the future;

(11) Mr. Hammer, even though incarcerated for most of his life, has managed to do some good things;

(12) Friends and family members of Mr. Hammer will be affected if he is sentenced to death;

(13) Mr. Hammer is remorseful for having caused the death of Andrew Marti;

(14) By pleading guilty to the murder of Mr. Marti, Mr. Hammer has demonstrated acceptance of responsibility for his offense;

(15) Any other factor in Mr. Hammer's background, record, or character or any other circumstance of the offense that mitigate against the imposition of the death sentence.

The jury was required to consider the above listed mitigating factors and determine whether or not Mr. Hammer had proved any of them by a preponderance of the evidence. If any of the mitigating factors were proven by a preponderance of the evidence, the jury was then to consider that factor in the final stage of the deliberations.

In the final stage the jury was required to (1) weigh the statutory and non-statutory aggravating factors which the jury had

found to exist beyond a reasonable doubt by a unanimous vote against any mitigating factors and (2) decide whether the aggravating factors outweigh all the mitigating factors found to exist.[2]  "Based upon this consideration, the jury by a unanimous vote" was required to recommend either death or life imprisonment. 18 U.S.C. § 3593(e).

In the instant case after the jury found two statutory and two non-statutory aggravating factors the jury considered whether any mitigating factors existed.

Twelve jurors concluded that Mr. Hammer failed to prove by a preponderance of the evidence that (1) at the time of the offense his capacity to appreciate the wrongfulness of his conduct or conform his conduct to the requirements of the law was significantly impaired, (2) at the time of the offense he was under unusual and substantial duress, and (3) he suffers from a major mental disease or defect.

Eleven jurors concluded that Mr. Hammer failed to prove by a preponderance of the evidence that he (1) committed the offense

---

2.  18 U.S.C. § 3593(c) provides in relevant part that "[t]he burden of establishing the existence of any mitigating factor is on the defendant, and is not satisfied unless the existence of such a factor is established by a preponderance of the evidence." Section 3593(d) states in relevant part as follows:

> A finding with respect to a mitigating factor may be made by 1 or more members of the jury, and any member of the jury who finds the existence of a mitigating factor may consider such factor established for purposes of this section regardless of the number of jurors who concur that the factor has been established.

under severe emotional disturbance, (2) suffers from cognitive deficits, (3) is remorseful for having caused the death of Mr. Marti, and (4) has demonstrated acceptance of responsibility for the offense.

Twelve jurors found by a preponderance of the evidence that (1) Mr. Hammer is the product of a violent, abusive and chaotic childhood, (2) that as a young person he attempted to seek help for mental difficulties, (3) that he would be sentenced to life in prison without the possibility of release if a sentence of death is not imposed, and (4) friends and family members of Mr. Hammer would be adversely affected if he were sentenced to death.

Six jurors concluded that Mr. Hammer failed to prove by a preponderance of the evidence that as a child he was a victim of sexual abuse.

Nine jurors concluded that Mr. Hammer failed to prove by a preponderance of the evidence that the United States Bureau of Prisons and the Oklahoma Department of Corrections are capable of fashioning conditions of confinement such that Mr. Hammer is unlikely to commit criminal acts of violence in the future.[3]

Finally, seven jurors concluded that Mr. Hammer failed to prove by a preponderance of the evidence that even though

---

3. At the time of the murder of Mr. Marti, Mr. Hammer was only subject to sentences of imprisonment totaling in excess of 1200 years imposed by the State of Oklahoma and was serving those sentences in a Federal Bureau of Prisons institution pursuant to an Intergovernmental Agreement between the State of Oklahoma and the Federal Bureau of Prisons.

incarcerated for most of his life he has managed to do some good things.

The jurors then balanced the aggravating factors against the mitigating factors and concluded that because the aggravating factors sufficiently outweighed the mitigating factors a sentence of death was justified.[4]

On July 24, 1998, the jury recommended that Mr. Hammer be sentenced to death.  On July 31, 1998, Mr. Hammer filed a pro se motion to discharge counsel and to determine for himself whether to file an appeal.  On August 3, 1998, a hearing was held on Mr. Hammer's motion.  At that hearing the Government requested that Mr. Hammer be evaluated to determine whether he was competent to discharge counsel and determine for himself whether to file an appeal.  On August 4, 1998, an order was issued directing that Mr.

---

4.  Part Six of the Special Findings Form Regarding the Punishment to be Imposed Upon David Paul Hammer for the Killing of Andrew Marti required each juror to sign an Understanding which stated as follows:

We understand that we are to consider whether the aggravating factor or factors unanimously found by us to exist sufficiently outweigh any mitigating factor or factors found to exist to justify a sentence of death, or in the absence of mitigating factors, whether the aggravating factor or factors are themselves sufficient to justify a sentence of death.  We also understand that a finding with respect to a mitigating factor may be made by any one or more of the members of the jury, and any member of the jury who finds the existence of a mitigating factor may consider such factor established for purposes of his or her weighing of the aggravating factor or factors and mitigating factor or factors regardless of the number of jurors who concur that a particular mitigating factor has been established.  We also understand that a jury is never required to impose a death sentence and that a sentence of death cannot be imposed except by unanimous vote.

Hammer undergo a competency evaluation at the Medical Center for Federal Prisoners, Springfield, Missouri, to determine whether he could proceed pro se and whether he could decide for himself whether to appeal.  Mr. Hammer was evaluated at that facility from August 13 to September 18, 1998, and the court received a report from Dr. Wolfson on September 22, 1998.

On October 1, 1998, we held a hearing with respect to whether or not Mr. Hammer was competent to discharge counsel and to determine for himself whether to file an appeal.  On October 9, 1998, we entered an opinion and order finding Mr. Hammer competent, discharging Mr. Hammer's counsel, appointing stand-by counsel for him, and setting a date for sentencing.  United States v. Hammer, 25 F.Supp.2d 518 (M.D.Pa. 1998).  On November 4, 1998, this court sentenced Mr. Hammer to die by lethal injection for the first degree murder of Mr. Marti.

On November 12, 1998, Mr. Hammer filed a notice of appeal. Subsequently, Mr. Hammer vacillated regarding whether to pursue the direct appeal.  Ultimately pursuant to Mr. Hammer's request, the Court of Appeals on August 31, 2000, dismissed Mr. Hammer's direct appeal.  The Court of Appeals issued the mandate on September 13, 2000.  On October 26, 2000, Mr. Hammer filed a motion to recall the mandate.  The Court of Appeals denied that motion on October 31, 2000.

On November 14, 2000, Mr. Hammer filed a petition for rehearing en banc of the order denying his motion to recall the mandate, to reinstate his direct appeal and to relinquish pro se

18

status in the Court of Appeals.  Mr. Hammer then on November 29, 2000, filed a petition for writ of certiorari in the United States Supreme Court with respect to the order issued on October 31, 2000, by the Court of Appeals denying his motion to recall the mandate.  On January 5, 2001, the Court of Appeals denied the petition for rehearing en banc with one judge dissenting.  <u>United States v. Hammer</u>, 239 F.3d 302 (3d Cir. 2001).  The Supreme Court on April 2, 2001, denied Mr. Hammer's petition for writ of certiorari which he had filed on November 29, 2000.  <u>Hammer v. United States</u>, 532 U.S. 959 (2001).  On April 4, 2001, Mr. Hammer then filed a petition for writ of certiorari in the Supreme Court with respect to the January 5, 2001, decision of the Court of Appeals.  That petition was denied by the Supreme Court on October 1, 2001.  <u>Hammer v. United States</u>, 534 U.S. 831 (2001).

By order of December 21, 2000, we appointed Monica Foster, Esquire, and Rhonda Long-Sharp, Esquire, to represent Mr. Hammer with respect to any post-conviction proceedings.  Both attorneys Foster and Long-Sharp were licensed to practice law in the state of Indiana and were specially admitted in this district to represent Mr. Hammer.

On September 30, 2002, Mr. Hammer filed a document entitled "Amended Motion to Vacate and Set Aside Conviction and Sentence Pursuant to 28 U.S.C. § 2255 by a Person In Federal Custody." On July 9, 2003, Mr. Hammer filed a document entitled "Second Amended Motion to Vacate and Set Aside Conviction and Sentence Pursuant to 28 U.S.C. 2255 by a Person in Federal Custody."

On February 26, 2003, Mr. Hammer filed a document entitled "Petitioner's Pro Se Motion to Dismiss Section 2255 Petition and Request for Order Scheduling the Date for Implementation of Sentence."  In that document Mr. Hammer requested the appointment of a psychiatrist to evaluate whether he was competent.  He specifically requested that attorney Stephen C. Smith be appointed to represent him with regard to the motion.[5]  Attorney Smith was appointed to represent Mr. Hammer with respect to the motion by order of March 6, 2003.

On or about April 4, 2003, attorney Smith filed a status report in which he stated that Mr. Hammer now "desires to go forward with his 2255 motion and has confirmed same with Monica Foster, Esquire, who is aiding Mr. Hammer" with regard to that motion.  On April 30, 2003, we issued an order deeming withdrawn Mr. Hammer motion entitled "Petitioner's Pro Se Motion to Dismiss

---

5.  Attorney Smith had previously been appointed to represent Mr. Hammer in connection with the proceedings in which Mr. Hammer had requested to proceed pro se and determine on his own whether to file an appeal.  The impetus for appointing attorney Smith was a motion filed by attorneys Ruhnke and Travis who indicated in that motion as follows:

> It is apparent that Mr. Hammer's objective in this case is his own swift execution with no appeals and no post-verdict motions.  This is an objective which is morally and legally repugnant to both Mr. Hammer's current attorneys. Neither attorney will assist Mr. Hammer in achieving his objective.

See Doc. 587, Motion by Defense Counsel to Withdraw or, In the Alternative for the Appointment of Additional Counsel, paragraph 8.

Section 2255 Petition and Request for Order Scheduling the Date for Implementation of Sentence."

On December 1, 2003, Mr. Hammer filed a second motion to withdraw his § 2255 motion. Stephen C. Smith, Esquire, was appointed to represent Mr. Hammer with respect to that motion. A hearing on Mr. Hammer's motion to withdraw the second amended § 2255 was held on January 16, 2004. On that same date we issued an order deeming Mr. Hammer's second amended § 2255 motion withdrawn. Attorneys Foster and Long-Sharp attended that hearing but did not participate in it other than to respond affirmatively to the court's question as to whether Mr. Hammer understood the issues raised in the second amended § 2255 motion.

On February 2, 2004, attorneys Foster and Long-Sharp filed a document entitled "Motion to Alter or Amend Judgment Pursuant to F.R.C.P. 59(e)." In that motion attorneys Foster and Long-Sharp asked us to set aside the judgment of January 16, 2004, and return Mr. Hammer to the position he occupied prior to the January 16th proceeding. Attorneys Foster and Long-Sharp admitted in the motion that they were filing it without the consent of Mr. Hammer. By order of February 3, 2004, we denied the motion.

After we denied the motion to alter or amend judgment, the Warden at the United States Penitentiary, Terre Haute, Indiana, advised Mr. Hammer by letter dated February 10, 2004, that June 8, 2004, was the date set by the Director of the Federal Bureau of Prisons for Mr. Hammer's execution by lethal injection.

21

On March 4, 2004, attorneys Foster and Long-Sharp filed a notice of appeal of our order of February 3, 2004.  On March 5, 2004, Mr. Hammer filed a pro se document entitled "Defendant's Pro Se Motion for an order directing attorneys Foster and Long-Sharp not to file any further pleadings on his behalf."  On the same day that the motion was filed we issued an order discharging attorneys Foster and Long-Sharp as counsel for Mr. Hammer and revoking their special admission in this district.  Subsequently, Mr. Hammer acquiesced in the pursuit of the appeal and attorneys Travis and Ruhnke were appointed to represent Mr. Hammer by the Court of Appeals.  On June 3, 2004, the Court of Appeals remanded the case to us for further proceedings with respect to the second amended § 2255 motion.  After the case was remanded new counsel – the Federal Public Defender –  was appointed to represent Mr. Hammer.  The Federal Public Defender was authorized to designate an attorney in his office or on the Criminal Justice Act Panel to represent Mr. Hammer.  The Federal Public Defender assigned the case to attorneys Anne L. Saunders and Michael Wiseman.[6]

---

6.  Attorney Travis was also initially assigned by the Federal Public Defender to represent Mr. Hammer.  However, once Mr. Hammer elected not to withdraw the ineffective assistance of counsel claims attorney Travis was discharged as counsel. Attorney Wiseman is from the Capital Habeas Corpus Unit, Defender Association of Philadelphia.  Attorney Saunders is employed by the Federal Public Defender's Office for the Middle District of Pennsylvania, in that office's recently created Capital Habeas Corpus Unit.  On June 1, 2005, attorney James J. McHugh, and on June 30, 2005, attorney James Moreno entered appearances on behalf of Mr. Hammer.  Both attorneys are from the Capital Habeas Corpus Unit, Defender Association of Philadelphia.

On November 30, 2004, new counsel filed a motion for leave to file a supplemental and third amended § 2255 motion and a brief in support thereof.  The Government filed a brief in opposition on December 10, 2004. Mr. Hammer filed a reply brief on December 20, 2004.  On January 4, 2005, after being granted leave to do so, the Government filed a sur-reply brief.  On January 19, 2005, Mr. Hammer filed a brief responding to the Government's sur-reply brief.

On January 27, 2005, we issued an order which granted in part and denied in part Mr. Hammer's motion for leave to file a supplemental and third amended § 2255 motion ("hereinafter referred to as "the third amended § 2255 motion").  Mr. Hammer filed a brief in support of the third amended § 2255 motion on February 25, 2005, The Government filed a brief in opposition on April 20, 2005.  Mr. Hammer filed a reply brief on May 9, 2005.

The Federal Death Penalty Act of 1994, as noted above, is a weighing statute, i.e., a jury in deciding whether to recommend the imposition of the death penalty is obliged to weigh the aggravating circumstances and mitigating circumstances and only to recommend the imposition of the death penalty if the aggravating circumstances sufficiently outweigh the mitigating circumstances. Under a weighing statute such as the Federal Death Penalty Act of 1994, the failure appropriately to consider mitigating circumstances can have an adverse affect on the weighing process and result in an inappropriate sentencing outcome.  Errors regarding either aggravating factors or mitigating factors

23

"conceivably could distort the weighing process, thus calling into question the propriety of a death sentence." Lisa R. Duffet, Habeas Corpus and Actual Innocence of the Death Sentence After Sawyer v. Whitley: Another Nail Into the Coffin of State Capital Defendants, 44 Case W. Res. L. Rev. 121, 148 (1993).

Mr. Hammer has raised several claims in his third amended § 2255 motion.  The claims can be grouped into five general categories.  First, there are claims relating to the validity of the change of plea proceeding which was held on June 22, 1998. Second, there is a challenge to the proceedings which permitted Mr. Hammer to discharge counsel and decide on his own whether or not to pursue a direct appeal. Third, there are numerous claims of ineffective assistance of counsel.  Fourth, there is a claim that there will be a miscarriage of justice if we do not review Mr. Hammer's conviction and the propriety of the sentence.  Mr. Hammer has raised a claim in Ground Three of the third amended § 2255 motion "that disposition of his direct appeal issues would result in vacation of his conviction and sentence" and that "[a] manifest injustice would result if review of all issues is not had."  In Ground Three he lists the direct appeal issues.  One of the issues which were raised in the withdrawn direct appeal was that the jury at the end of the penalty phase made erroneous factual findings with respect to certain mitigating factors.  More specifically, Mr. Hammer contends that "[t]he jury failure to find, consider and weigh undisputed or conceded mitigating factors is a circumstance that render's Hammer's sentence arbitrary."  Fifth, there is a

claim that the Government failed to disclose Brady[7] material which was relevant to both the guilt and penalty phases of the trial.

On July 14, 2005, a hearing commenced on Mr. Hammer's third amended § 2255 motion. As a result of materials turned over to Mr. Hammer's counsel on September 22, 2005, which was the 29th day of the evidentiary hearing, counsel for Mr. Hammer filed on September 26, 2005, a motion for leave to file a fourth amended § 2255 motions asserting additional Brady violations.  The materials which were provided to counsel for Mr. Hammer on September 22, 2005, were thirty-three previously undisclosed FBI 302 statements which summarized interviews with prison inmates.

The Government contended at trial that part of Mr. Hammer's substantial planing and premeditation was the braiding of sheets into ropes.  As noted above Mr. Hammer during the guilty plea colloquy stated that the hostage ruse was something he concocted and that the ropes braided from sheets were used for other purposes.  Some of the 302's contained statements by inmates indicating that Mr. Hammer in the past had engaged in sexual bondage, that he had previously braided sheets into ropes for sexual purposes and that Mr. Hammer had revealed that he had been sexually abused by his father.  The revelation to one other inmate relating to sexual abuse by his father occurred before the killing of Andrew Marti.

With respect to the penalty phase, Mr. Hammer contends that the Brady violations impact the jury's determination that he

---

7.  See Brady v. Maryland, 373 U.S. 83 (1963).

committed the offense after substantial planning and premeditation. Mr. Hammer also contends that the failure to turn over the information relating to Mr. Hammer's sexual abuse as a child draws into question the propriety of six jurors failing to find that he was sexually abused as a child.  By order of October 18, 2005, we granted Mr. Hammer's motion for leave to file a fourth amended § 2255 motion.

During the hearing Mr. Hammer called the following 22 witnesses some of whom were called on more than one occasion: on July 14th – Ronald C. Travis, Esquire; on July 15th – Randy Vanderschaaff and attorney Travis (continued); on July 18th – Dr. Michael M. Gelbort; on July 19th – Rodney W. Archambault, Terry D. Sittig and Mark C. Oberg; on July 20th - Dr. Donald N. Bersoff; on July 21st – Dr. Bersoff (continued), and Martin L. Hammer; on July 25th – Dr. Werner U. Spitz and Dr. John R. Mitchell; on July 26th – Dr. Stuart Grassian; on July 27th – Dr. Mitchell (continued); on July 28th – Dr. Robert L. Sadoff; on August 9th – Dr. Ruben C. Gur; on August 10th – Monica Foster, Esquire, Rhonda Long-Sharp, Esquire, and Louis Bullock, Esquire; on August 15th – Dr. Neil Blumberg; on August 16th – Dr. Richard P. Kluft; on August 17th – Dr. Christopher Nolan, Timothy Noone, and attorney Travis (recalled); on August 30th – David A. Ruhnke, Esquire; on September 1st – Bernard E. Halloran; on September 7th – Dr. Kluft (continued); and  on September 28th – attorneys Travis and Ruhnke (recalled).  The Government called the following 25 witnesses some of whom were called on more than one occasion: on August 29th – Dr. Daniel A. Martell (called out of

order); on September 1st – Randy L. White (called out of order); on September 6th – Dr. James K. Wolfson (called out of order); on September 8th – Dr. Wolfson (continued), Daniel Ellis, Ronald Jury and Randy Gonzales; on September 9th – Dr. Christopher Nolan, Kimberly S. Ask-Carlson, Richard Lynn Snyder and Donn Troutman; on September 12th – Dr. William N. Elliot, Nicole Weaver, and Timothy D. Devane; on September 13th – Dr. Saralee Funke; on September 14th – Dr. Philip R. Magaletta, Caryle R. Thompson and Rev. Glenn Crook; on September 15th – Dr. Kenneth H. Kessler and Guy A. Fleck; on September 20th – Jack P. Luhrman and Anthony Malocu; on September 21st – Anthony Malocu (continued) and Dr. Daryl Matthews; on September 22nd – Dr. Matthews (continued); on September 26th – Harry Montville, Anthony Malocu (recalled); Dr. John R. Mitchell and Charles P. Austin.  The evidentiary phase of the hearing concluded on the 31st trial day, September 29, 2005.

Mr. Hammer submitted 1673 proposed findings of fact and the Government submitted 1802 for a total of 3475 proposed findings of fact.  On October 13th and 17th counsel filed briefs totaling 156 pages.  On November 10, 2005, counsel for Mr. Hammer and the Government appeared before the court for closing arguments.

Section 2255 provides federal prisoners with the statutory vehicle for collaterally challenging the lawfulness of their convictions.  That section states in relevant part as follows:

> A prisoner in custody under sentence of a court
> established by Act of Congress claiming the right
> to be released upon the ground that the sentence was
> imposed in violation of the Constitution or laws of
> the United States, or that the court was without
> jurisdiction to impose such sentence, or that the

sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

*      *      *      *      *      *      *

If the court finds that the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate.

28 U.S.C. § 2255.

As a general rule, relief under § 2255 is limited to errors which were jurisdictional, rose to the level of a constitutional violation, resulted in a "complete miscarriage of justice," or led to proceedings which were "inconsistent with the rudimentary demands of fair procedure." United States v. Timreck, 441 U.S. 780, 783-84 (1979), citing Hill v. United States, 368 U.S. 424 (1962).

The issues raised in this section 2255 proceeding will require us to consider numerous matters, including the mental state of Mr. Hammer at the time of the offense and trial, the history developed during the hearing of Mr. Hammer falsely confessing to other crimes, the evidence relating to Mr. Hammer's mental condition and sexual abuse as a child presented at trial and whether the jury properly considered that evidence, the failure of the Government to deliver to defense counsel many 302's and whether those documents could have impacted the sentencing outcome, and

whether a combination of the claims asserted by Mr. Hammer requires us to grant a new trial or vacate Mr. Hammer's sentence.

As the finder of fact in this case the undersigned is the sole and exclusive judge of the credibility of the witnesses called to testify and has the discretion to believe all of a witness's testimony, only a portion of it, or none of it.  The following are the court's findings of fact, discussion and conclusions of law.

## II.  FINDINGS OF FACT.[8]

**A.    The Change of Plea and Waiver of Counsel Proceedings.**

1.  Mr. Travis first learned of Mr. Hammer's intent to waive his right to stand trial and enter a plea of guilty on Sunday evening, June 21, 1998, after Mr. Hammer had reported his intentions to Mr. Travis' paralegal, Mr. David Sprout. (Undisputed, hereinafter referred to as "U")

2.  After learning of Mr. Hammer's desire to plead guilty, Mr. Travis spoke with Mr. Hammer on the phone "in excess of two hours" but was unable to convince Mr. Hammer to change his mind and continue with the trial. (U)

3.  Mr. Travis contacted Mr. Ruhnke, who was in route from New Jersey back to Williamsport, and informed him of Mr. Hammer's intent to waive trial and enter a plea of guilty. (U)

---

8.  The 3475 findings of fact prepared by the parties were annotated at the direction of the court as "Disputed," "Undisputed" or "Undisputed but Objected to."  To the extent that we have included findings designated "Undisputed but Objected to" we have overruled the objections thereto.  Many of the undisputed proposed findings of fact contained grammatical errors but were incorporated into this opinion without being corrected.

4.   During the proceedings on June 22, 1998, and prior to Mr. Hammer being evaluated by Drs. Wolfson and Mitchell, attorney Ruhnke in response to questions from the court stated:

> I believe [Mr. Hammer] is capable of consulting with counsel and of understanding the proceedings, so I do not believe he is incompetent.
>
> *     *     *     *       *       *         *
>
> As a lawyer, and not a psychiatrist, I believe he's competent.

5.   With respect to the issue of competency, Mr. Travis prior to the evaluation stated:

> From a – legal definition of competency, I believe that he would satisfy the legal definition of competency as I understand it, which is basically he needs to be able to understand the proceedings, and he needs to be able to assist defense counsel.  Based on that, I believe he is competent. Speaking as a lawyer.

6.   Attorney Travis subsequently elaborated on Mr. Hammer's desire to enter a plea of guilty as follows:

> [T]here were two prior efforts by Mr. Hammer to proceed pro se and enter pleas that were withdrawn before they actually came to the hearing stage, in essence. This – this is serious.  This is, I'm going to do it, I intend to do it, you know, I understand what you're saying, but it's my decision, I'm going to.  This is not one of those instances where there's any fluctuation.
>
>    And I can tell the Court, I spent a considerable amount of time on the phone with him last night, listening to what he had to say, offering my observations on what he had to say, and I'm not going to get into that.
>
> *     *     *     *       *       *         *
>
> And I am convinced in my heart and in my mind that this is a sincere effort on his part, and that assuming there is a finding of competency, that he will go forward with the entry of the guilty plea.
>
> *     *     *     *       *       *         *

30

> As far as the evaluation, one suggestion that was made by Mr. Hammer, and I don't know how Mr. Martin feels about this, there is a psychologist at USP Allenwood, Dr. John Mitchell, that Mr. Hammer has been regularly counseling with for lack of a better term, and if there is going to be an evaluation by Dr. Wolfson, it makes some degree of sense to me that Dr. Mitchell also be part of that.

7.  Prior to the evaluation Mr. Hammer was asked under oath whether he objected to having Drs. Wolfson and Mitchell evaluate him and Mr. Hammer stated he had no objection.

8.  On June 22, 1998, Drs. Wolfson and Mitchell interviewed Mr. Hammer for approximately one hour and twenty minutes.

9.  At the start of the interview Drs. Wolfson and Mitchell ascertained whether Mr. Hammer understood (1) the lack of confidentiality with respect to the interview and (2) the purpose of the interview.

10.  Mr. Hammer acknowledged the lack of confidentiality and explained that an issue had been raised about whether or not he was competent to enter a plea of guilty.

11.  Mr. Hammer made the comment to the effect that it seemed somewhat ironic because his competence to proceed with the trial had not been questioned.

12.  Mr. Hammer further acknowledged that "one needed to proceed with abundance of care" in light of the circumstances.

13.  During the interview Mr. Hammer was calm, friendly and "his affect . . . his emotional state as conveyed by facial expressions and bodily demeanor tracked with the content of the conversation, responded to social niceties and to levity."

14.   During the interview Mr. Hammer denied being depressed and stated that his decision to plead guilty was made after careful thought.

15.   Drs. Wolfson and Mitchell determined that Mr. Hammer understood the concepts of being found guilty, not guilty and not guilty by reason of insanity.

16.   Mr. Hammer's remarks to Drs. Wolfson and Mitchell revealed that Mr. Hammer understood the "different actors in the courtroom and issues."

17.   Mr. Hammer told Drs. Wolfson and Mitchell that "his medications were not changed in terms of adding or subtracting any psychiatric meds."

18.   Mr. Hammer stated to Drs. Wolfson and Mitchell that his mood has fluctuated but "did not describe any lasting perturbations of his mood."

19.   Mr. Hammer described to Drs. Wolfson and Mitchell the testimony presented during the trial as a "sobering experience."

20.   Mr. Hammer stated to Drs. Wolfson and Mitchell that "he didn't like the word remorse in particular, but he was experiencing regret, and particularly regret over the way Mr. Marti appeared to be characterized as a – as an instrumentality I guess would be the way to put it in the proceedings."

21.   Mr. Hammer was questioned about periods of unconsciousness or blackouts by Drs. Wolfson and Mitchell and answered that he had no such periods since his last clinical

contact with Dr. Mitchell which was on June 15, 1998, one week prior to the change of plea proceeding.

22.  Mr. Hammer was fully oriented during his examination by Drs. Wolfson and Mitchell and he denied having any problems with memory or concentration.

23.  Mr. Hammer to Drs. Wolfson and Mitchell characterized his sleep as erratic and that he continued to have headaches but not any more than usual and that his appetite has been good.

24.  Mr. Hammer stated to Drs. Wolfson and Mitchell that "he did not believe there was any force compelling him to make this decision to enter a plea of guilty" and "denied hallucination" to them.

25.  Mr. Hammer was asked by Drs. Wolfson and Mitchell "specifically if either any external force or any individual part of him was compelling him to make a decision like this, and he told [Drs. Wolfson and Mitchell] very explicitly that the decision he had reached was one that he had come to after a great deal of forethought and consideration, and it was his decision rather than any one part of him compelling him to decide what he wanted to do."

26.  Mr. Hammer made it clear to Drs. Wolfson and Mitchell that he was not pleading guilty merely to avoid the possibility of an insanity verdict and being sent to a mental facility.

27.  Mr. Hammer was asked by Drs. Wolfson and Mitchell "if his decision and any internal discussion of it resembled more a debate between different identities or if it more resembled the ambivalence a person might have when they can think of several

33

potential courses, each with their (sic) own pitfalls and potential advantages and ambiguity in an ability to be certain precisely what would happen.  And [Mr. Hammer] characterized the decision to [Drs. Wolfson and Mitchell] as one that he had made, all of him had made, with an understanding of what might happen, with a feeling that you know, of some expectation of what the jury might ultimately decide but with an understanding and awareness that he could not predict that with certainty, and that there might be an adverse finding. And he described that as a decision that he endorsed as his own, rather than being compelled by any individual portion of him or compelled by any circumstance to choose that course of action."

28.  This explanation by Mr. Hammer made Dr. Wolfson conclude that he had sufficiently covered the possibility that Mr. Hammer was being influenced by an alter personality or by a dissociative identity disorder.

29.  Dr. Wolfson "did not see signs of a new or resurgent mental illness that would serve as a basis for finding of a lack of competence[.]"

30.  Dr. Wolfson concluded to reasonable degree of medical certainty that there was no disturbance that was preventing Mr. Hammer from understanding the nature and consequences of the proceedings against him and that Mr. Hammer displayed no impairments in the capacities to assist counsel.

31.  Dr. Wolfson saw Mr. Hammer display the ability to comprehend and manipulate information rationally, the ability to communicate in an articulate, reflective, intelligent fashion, the

ability to recall relevant information and the ability to make rational decisions.

32.   Mr. Hammer stated to Drs. Wolfson and Mitchell that he was aware that his decision to plead guilty could "backfire, that the jury could return a death penalty sentence.  But that he was determined to deal with that if and when that occurred, and that he would remain hopeful and continue fighting."

33.   Mr. Hammer during the interview stated that his decision to enter a plea of guilty "was a thought-out decision and one of the most important decisions he's ever made in his life."

34.   Mr. Hammer during the interview stated that "his main motivation [for pleading guilty] was to take responsibility for what occurred.  He made a comment that pleading guilty won't bring back Andrew Marti, or even him dying won't bring back Andrew Marti, but that he felt it was his responsibility to enter this plea and to take responsibility for what happened.  He also made the comment that if he did so, he could more fully invest emotionally into the second part of the trial, which would be the sentence arguments, and that he would feel more comfortable fighting for that in a sense, having – being able to invest more of himself into proceedings that he fully believes in."

35.   Mr. Hammer affirmed to Drs. Wolfson and Mitchell that his decision to plead guilty was not the result of irrational forces such as having a "death wish."

35

36.  Dr. Wolfson testified that "[o]ne concern one might possibly – is this an attempt – all simply a death wish, and he told us, once again very clearly, that it was not."

37.  Dr. Wolfson concluded to a reasonable degree of psychiatric certainty that Mr. Hammer was competent to enter a guilty plea.

38.  Dr. Mitchell concluded to a reasonable degree of psychological certainty that Mr. Hammer was competent to enter a guilty plea.

39.  During the court's questioning of Mr. Hammer, he stated that he had had ample time to consult with his attorneys, that he was satisfied with their services and that he had "extensively" discussed with them the charge of first degree murder to which he intended to plead guilty.

40.  The court advised Mr. Hammer of the elements of the offense and the concepts of presumption of innocence and reasonable doubt.

41.  Mr. Hammer stated that he understood the elements of the offense: that he killed Andrew Marti, that the killing occurred within the special maritime and territorial jurisdiction of the United States, that he acted with malice aforethought, and that he acted with premeditation.

42.  Mr. Hammer stated that he understood the concepts of presumption of innocence and reasonable doubt.

43.    Mr. Hammer stated that he understood that the maximum penalty was a sentence of death and that the minimum sentence was life imprisonment.

44.    Mr. Hammer's trial rights were explained to him, including the right against compelled self-incrimination and the right to compulsory process.

45.    Mr. Hammer was advised that the jury which heard the evidence during the guilt phase of the trial would also hear the evidence relating to the penalty to be imposed and recommend either a sentence of death or life imprisonment.

46.    Mr. Hammer stated that he was willing to waive and give up his right to a trial as to the guilt phase.

47.    During the change of plea proceeding held on June 22, 1998, Mr. Hammer was articulate and coherent.

48.    During the change of plea proceeding Mr. Hammer did not evidence any signs of mental incompetence and expressed a strong desire to plead guilty.

49.    Emotional lability is a term used to describe a person whose emotions go in and out of control.

50.    During the change of plea proceeding Mr. Hammer did not exhibit emotional lability.

51.    Mr. Hammer's counsel did not believe that Mr. Hammer was incompetent to enter his plea of guilty on June 22, 1998.

52.    Mr. Hammer's competence up until June 22, 1998, had never been in serious dispute either by the prosecution, Dr. Sadoff

or even in the reports of other defense experts Drs. Gelbort and Grassian.

53.   Mr. Hammer was interviewed by Dr. Sadoff on two separate occasions.

54.   The first occurred on December 23, 1996, at which time Dr. Sadoff spent about three hours with Mr. Hammer at the United States Penitentiary at Allenwood.

55.   At the conclusion of Dr. Sadoff's initial assessment of Mr. Hammer, Dr. Sadoff informed Mr. Travis that he believed Mr. Hammer suffered from Dissociative Identity Disorder (DID). (U)

56.   Mr. Travis testified during the section 2255 hearing that throughout the course of his representation of Mr. Hammer, Mr. Hammer adamantly eschewed any suggestion that he was mentally ill and denied that he suffered from DID or any other form of mental illness.

57.   Mr. Travis fully accepted Dr. Sadoff's diagnosis based upon his knowledge of Mr. Hammer's history of childhood sexual, physical and emotional abuse, his knowledge of Mr. Hammer's prior psychiatric history, interviews with individuals who had been previously incarcerated with Mr. Hammer in Oklahoma fifteen years earlier, and his understanding of the factors Dr. Sadoff believed supported a diagnosis of DID. (U)

58.   The second interview of Mr. Hammer by Dr. Sadoff occurred on September 17, 1997, also at USP-Allenwood, lasted about three hours, and was conducted with the help of Dr. Louis Dubin, who purportedly put Mr. Hammer under hypnosis.

59.   The second interview, including the hypnosis session, was videotaped.

60.   Dr. Sadoff believed that during the hypnosis session one of Mr. Hammer's alter personalities, Jocko, appeared. (U)

61.   It appeared to Mr. Travis that Jocko is an aggressive personality who was responsible for Mr. Hammer's aggressive and impulsive behaviors. (U)

62.   Dr. Sadoff concluded that as a result of Mr. Hammer's diagnosis of DID, he was not criminally responsible for the death of Mr. Marti because it was Mr. Hammer's alter personality, Jocko, who killed Mr. Marti.  According to Dr. Sadoff, Mr. Hammer was not in control when Jocko killed Mr. Marti. (U)

63.   Mr. Travis testified during the section 2255 hearing that throughout the course of his representation of Mr. Hammer he had extensive contact with him, including numerous face-to-face interviews, telephone conversations and written correspondence.

64.   Mr. Travis at times had a concern that Mr. Hammer's mental illness drove his decision-making.

65.   Throughout the course of Mr. Travis' representation of Mr. Hammer, Mr. Hammer vacillated between wanting to litigate and wanting to give up and die.

66.   Mr. Travis described many of Mr. Hammer's decisions as impulsive and reported that Mr. Hammer exhibited mood changes throughout the course of Mr. Travis' representation of Mr. Hammer. (U)

67.   Mr. Travis reported that there were occasions when speaking with Mr. Hammer when he believed Mr. Hammer's personality had "switched" and he was speaking with one of Mr. Hammer's alter personalities.   (U)

68.   There were times when Mr. Travis "[h]ad a sense, an impression that [he] was not speaking to the same personality, that it was a different personality, primarily because of the manner of speaking and the tone of the voice." (U)

69.   Mr. Travis experienced Mr. Hammer's personality "switches" on at least six occasions prior to trial and on a number of other occasions after Mr. Hammer entered his plea of guilty. (U)

70.   Mr. Travis stated Mr. Hammer "switched" probably during the jury selection process, sometime during that month when they were engaged in jury selection. (U)

71.   On April 28 and 29, 2005, Mr. Hammer was interviewed by the Government's mental health experts at United States Penitentiary, Terre Haute, Indiana.

72.   Those interviews were videotaped.

73.   During the September 17, 1997, interview, Mr. Hammer exhibited emotional distress.

74.   During the April 28 and 29, 2005, interviews, Mr. Hammer exhibited emotional distress.

75.   During the testimony of Dr. Richard P. Kluft, one of Mr. Hammer's experts, on August 16, 2005, when the videotape of the hypnosis session was played, Mr. Hammer exhibited emotional distress.

76.    During the change of plea proceeding Mr. Hammer's affect (facial expressions and bodily demeanor) did not resemble the affect depicted in the videotape of the hypnosis session, that depicted in the videotape of the interviews conducted by the Government's experts or that exhibited during the testimony of Dr. Kluft on August 16, 2005, when Mr. Hammer requested to leave the courtroom during the playing of the videotape of the hypnosis session.

77.    During the discussion with Mr. Hammer on the morning of June 22, 1998, attorney Travis did not observe any behavior of Mr. Hammer similar to that depicted on the videotape of the hypnosis session.

78.    During the discussion with Mr. Hammer on June 22, 1998, Mr. Travis did not observe any "switching" of personalities.

79.    Mr. Travis did not consider Mr. Hammer's decision to plead guilty as an impulsive one.

80.    During the court's colloquy with Mr. Hammer on October 1, 1998,  Mr. Hammer did not evidence any signs of mental incompetence and expressed a strong desire to discharge counsel and proceed pro se.

81.    During that colloquy, Mr. Hammer was highly articulate and coherent.

82.    During that colloquy, Mr. Hammer expressed his position and arguments as least as well, if not better, than some attorneys who appear before this court.

83.  Although the attorney for Mr. Hammer, Stephen Smith, Esquire, did not testify at the § 2255 hearing, the transcript from the October 1, 1998, hearing reveals that attorney Smith then believed that Mr. Hammer was competent to waive counsel.

84.  When the court asked attorney Smith whether he had any doubt as to Mr. Hammer's competency to elect to proceed pro se, attorney Smith answered that he had no doubt.

85.  Dr. Wolfson spent numerous hours with Mr. Hammer at the United States Medical Center for Federal Prisoners and never observed what he considered credible signs of Dissociative Identity Disorder in him.

86.  Dr. Mitchell spent numerous hours with Mr. Hammer while he was incarcerated at the United States Penitentiary at Allenwood and never observed what he considered credible signs of Dissociative Identity Disorder in him.

87.  Dr. Sadoff in his report noted the various medicines which Mr. Hammer ingested but found no problems regarding Mr. Hammer's competency and opined that he was competent.

88.  The medication in question in Mr. Hammer's case, Snythroid, in 1998, was not prescribed for mental health purposes.

89.  Synthroid is utilized to treat a thyroid condition. (U)

90.  Dr. Wolfson testified at the October 1, 1998, competency hearing on Mr. Hammer's history of Synthroid use as well as the potential effect resulting from refusing to take that medication might have on his mental capacity.

91.   Dr. Wolfson testified that Synthroid, even in combination with other medications, "would not . . . have any deleterious effect on Mr. Hammer's ability to reason or think."

92.   During the § 2255 hearing on July 27, 2005, Dr. Mitchell testified that he did not have any doubt or doubts about the correctness of the opinion that he gave on June 22, 1998, relating to the competency of Mr. Hammer to enter a guilty plea on that date.

93.   During the § 2255 hearing Dr. Mitchell testified that he did not have any doubt or doubts about his previous conclusion regarding Mr. Hammer's ability to make a knowing, voluntary, and rational or intelligent decision to enter a guilty plea on June 22, 1998.

94.   Dr. Mitchell was aware of and took into consideration the DID diagnosis by Dr. Sadoff of Mr. Hammer, but nonetheless concluded that Hammer was competent to enter his plea of guilty on June 22, 1998.

95.   During the § 2255 hearing Dr. Wolfson testified that nothing in the reports or testimony of Mr. Hammer's experts causes him to doubt the opinions he rendered in 1998 regarding Mr. Hammer's competence.

96.   The testimony of Drs. Wolfson and Mitchell on June 22 and October 1, 1998, with respect to whether Mr. Hammer was competent and acting knowingly, voluntarily and intelligently was credible.

**B.   Mr. Ellis's Involvement with and Observations of Mr. Hammer.**

97.   Daniel J. Ellis, a former Deputy United States Marshal, is currently a Senior Special Agent with the Inspector General's Office of Investigation for the United States Department of Housing and Urban Development. (U)

98.   Mr. Ellis was employed as Deputy United States Marshal in Williamsport, Pennsylvania from January of 1997 until September of 1999. (U)

99.   Mr. Ellis was assigned to transport Mr. Hammer to and from court beginning in 1997 through the end of Mr. Hammer's capital trial in 1998. (U)

100.   Mr. Ellis transported Mr. Hammer to and from court during the competency hearing and at various other times during the trial proceedings. (U)

101.   When Mr. Ellis was moving Mr. Hammer back to the holding cell on June 22, 1998, he asked him why he had pled guilty and – after so long of saying he was not guilty by reason of insanity, and then asked Mr. Hammer "What about the monkey, I thought the monkey did it?"

102.   Mr. Hammer responded by stating that he had made the monkey up and that he did not want to live.

103.   Mr. Ellis acknowledged that at the time he initiated questioning of Mr. Hammer, he – Mr. Ellis – was a law enforcement officer and Mr. Hammer was represented by counsel and facing a capital sentencing hearing. (U)

104.  Mr. Ellis testified that despite his training, he did not believe he needed to provide Mr. Hammer with Miranda warnings prior to initiating questioning designed to elicit a response and did not need to consult with Mr. Hammer's attorneys prior to any such questioning. (U)

105.  Mr. Ellis acknowledged that he believed the information Mr. Hammer told him in response to Mr. Ellis' questioning was important enough from a law enforcement perspective to immediately report it to the prosecutor. (U)

106.  There are no written documents corroborating Mr. Ellis' report. (U)

107.  Mr. Ellis testified that Mr. Hammer did not appear to be incompetent on June 22, 1998.

108.  Although Mr. Ellis was asked by the Government whether he believed Mr. Hammer appeared incompetent at the time of his waiver and plea of guilty, Mr. Ellis acknowledged both that he had no formal training in assessing competency and has no formal training in psychiatry.  (U)

**C.  Mr. Montville's Involvement with and Observations of Mr. Hammer.**

109.  Harry Montville, also known as "Chip," served as a Deputy U.S. Marshal in this District in 1998. (U)

110.  Mr. Montville, together with Deputy United States Marshals Hardy and Ellis, were primarily responsible for transporting Mr. Hammer back and forth from the courthouse to the Allenwood Penitentiary. (U)

111.   Mr. Montville had recollections of transporting either by driving or serving as escort officer in the same car as Mr. Hammer on his trips to and from court in 1998. (U)

112.   Mr. Montville recalled an incident in which correctional personnel at the Allenwood Penitentiary tightened Mr. Hammer's handcuffs so tight that he, in Montville's view, had a legitimate complaint which complaint was addressed within minutes after leaving the Allenwood Penitentiary by the deputy's loosening the handcuffs which a correctional official at Allenwood initially had set. (Undisputed, but objected to, hereinafter "UO")

113.   During the times Mr. Hammer was in Mr. Montville's presence, Mr. Montville never saw Mr. Hammer acting in any fashion which would suggest that Mr. Hammer was suffering from a mental condition that precluded him from understanding what was going on.

114.   Mr. Montville did not recall an instance during the trial where Mr. Hammer was unresponsive or did not understand directions given to him by the Marshals.

D.   The Razor Blade Incident.

115.   On or about May 14, 1998, prior to being transported to Court for the ongoing selection of the jury, Mr. Hammer swallowed a razor blade.

116.   While swallowing a razor blade might signify "reasonable cause" to believe a defendant is incompetent, Mr. Hammer had engaged in "antics" in the past including attempts to plead guilty to the murder of Mr. Marti with self-dictated conditions on two occasions.

117.   Mr. Hammer swallowed only one razor blade, not multiple ones, as suggested by the defense, and it had exceedingly small dimensions.  Doc. 690, Jury Selection, Transcript, Vol. 8, pages 20-25.

118.   The transcript of Mr. Hammer's appearance on May 14, 1998, which proceeding was delayed by the razor incident, reflects this Court's monitoring of his behavior and evidences no facts which suggested to <u>any</u> participants at the trial that his action was a symptom of, or prelude to, any significant mental problems. Id., page 264.[9]

**E.   The Evaluation of Mr. Hammer by Government Experts, Drs. Matthews and Martell.**

119.   Dr. Daryl Matthews in conjunction with Dr. Daniel A. Martell, evaluated Mr. Hammer on April 28 and 29, 2005, at the request of the Government.

120.   Dr. Matthews graduated from John Hopkins University in 1969 with a Bachelor of Arts degree in psychology and human biology.

121.   He graduated from John Hopkins University Medical School in 1973 with an M.D.  He also received a Ph.D. in sociology from John Hopkins University in 1977.

---

9.  Mr. Hammer's conduct may have been a manifestation of his Borderline Personality Disorder.  <u>See</u> <u>infra</u> Findings of Fact 414 through 420.  However, no evidence was presented that on May 14, 1998, or subsequent thereto Mr. Hammer did not understand the proceedings or was unable to assist counsel.

122.  Dr. Matthews did a residency in psychiatry at John Hopkins from 1973 through 1976 and a fellowship in psychiatry at the University of Virginia in 1981 and 1982.

123.  Dr. Matthews is licensed to practice medicine in Arkansas, Hawaii and Tennessee.

124.  Dr. Matthews is Board Certified in forensic psychiatry.

125.  Dr. Matthews is a professor of psychiatry at the University of Hawaii School of Medicine and the Director of the Forensic Psychiatry program at the University of Hawaii.

126.  Dr. Matthews has been practicing forensic psychiatry for 20 years.

127.  Dr.  Matthews testified as an expert at the section 2255 hearing without objection from Mr. Hammer.

128.  Dr. Matthews spent only the first day in Mr. Hammer's presence while Dr. Martell engaged in tests with Mr. Hammer on the second day. (U)

129.  Dr. Matthews testified that vacillation by Mr. Hammer is not necessarily a sign of a mental problem.

130.  Dr. Matthews prepared a written report relating to his evaluation of Mr. Hammer.

131.  Dr. Matthews reviewed in detail in his report the testimony of Drs. Wolfson and Mitchell on June 22, 1998.

132.  Dr. Matthews also reviewed in his report the guilty plea colloquy of Mr. Hammer held on June 22, 1998, and found nothing in Mr. Hammer's responses to this Court's questions which

suggested he was incompetent to enter a plea of guilty on that date.

133.  Dr. Matthews concluded that Drs. Wolfson and Mitchell had conducted an adequate review of Mr. Hammer's mental competency on June 22, 1998.

134.  Dr. Matthews also concluded that Drs. Wolfson and Mitchell had conducted an adequate review of Mr. Hammer's mental competency to waive his right to counsel on October 1, 1998.

135.  Dr. Matthews after reviewing Mr. Hammer's responses to this Court's questions on October 1, 1998, concluded that Mr. Hammer was fully competent to waive his right to counsel on that date.

136.  Dr. Matthews also reviewed the transcript of the argument held on July 18, 2000, before the Court of Appeals for this circuit.

137.  Dr. Matthews found nothing in Mr. Hammer's presentation to the three judge panel in July 2000 which suggested that he was incompetent or that any mental disease or defect was impacting his actions before the Court of Appeals.

138.  Dr. Matthews concluded that Mr. Hammer was fully competent to waive his right to appeal when he argued his case before the Court of Appeals for this circuit.

139.  Dr. Matthews asked Mr. Hammer regarding his views on whether he had been competent during his previous legal proceedings.

140.   Mr. Hammer acknowledged to Dr. Matthews that he was competent to plead guilty and waive a jury trial because he knew how the system worked, knew the procedure, and knew that the jury would have to return with a verdict.

141.   Dr. Matthews concluded that based upon the record, Mr. Hammer's own testimony, and the observations and findings of forensic examiners, that Mr. Hammer was not functionally impaired at the time he pled guilty and could knowingly, voluntarily, and intelligently enter the plea which he did on June 22, 1998.

142.   Dr. Matthews concluded similarly that Mr. Hammer was not impaired on October 1, 1998, when he waived his right to counsel and he was not impaired in July of 2000 when he withdrew his direct appeal.

143.   Prior to the section 2255 hearing, Mr. Hammer was evaluated by Drs. Michael M. Gelbort and Ruben C. Gur.

144.   Both Drs. Gelbort and Gur prepared reports relating to whether Mr. Hammer suffered from a brain injury.

145.   Dr. Matthews, although aware of the reports of Drs. Gelbort and Gur relating to Mr. Hammer's brain injury concluded, and the court so finds, that the injury did not impact Mr. Hammer's competence to (1) enter a guilty plea on June 22, 1998, (2) waive his right to counsel on October 1, 1998, and (3) withdraw his appeal in July, 2000.

146.   The testimony of Dr. Matthews is credible with respect to his conclusion that Mr. Hammer was competent on June 22, 1998, when he entered a plea of guilty, on October 1, 1998, when he

waived his right to counsel, and in July 2000 when he withdrew his direct appeal.

147.  The testimony of Dr. Matthews is also credible with respect to Mr. Hammer acting knowingly, intelligently and voluntarily on June 22, 1998, when he entered a plea of guilty, on October 1, 1998, when he waived his right to counsel, and in July 2000 when he withdrew his direct appeal.

148.  Dr. Matthews concluded to a reasonable degree of forensic psychiatric certainty that Drs. Mitchell and Wolfson conducted an adequate mental competency evaluation of Mr. Hammer on June 22, 1998.

149.  Dr. Matthews has taught for many years mental health professionals the techniques of performing competency evaluations.

150.  Dr. Matthews concluded, and the court so finds, that Mr. Hammer was competent to enter a guilty plea on June 22, 1998, regardless of suggested diagnoses of Dissociative Identity Disorder and Posttraumatic Stress Disorder or Depression.

151.  Dr. Matthews opined, and the court so finds, that Mr. Hammer's reasons for entering the guilty plea and waiving an appeal were rational and did not suggest any mental incompetence.

152.  Dr. Matthews concluded, and the court so finds, that there were no physical conditions, including a thyroid condition or diabetes, which would have affected Mr. Hammer and rendered him incompetent to enter a guilty plea on June 22, 1998, or to discharge counsel on October 1, 1998, or to waive appellate rights in July of 2000.

153.  Dr. Matthews concluded, and the court so finds, that Mr. Hammer suffered from Borderline Personality Disorder, but that that condition did not affect his ability to enter a guilty plea on June 22, 1998, discharge counsel in October 1998, or withdraw his appeal in July 2000.

154.  Dr. Matthews testified, and the court so finds, that an individual with Dissociative Identity Disorder, Posttraumatic Stress Disorder, or Borderline Personality Disorder still can knowingly, voluntarily and intelligently enter a plea of guilty.

155.  Dr. Matthews indicated that there are a small group of individuals who suffer from a disorder which he does not clearly understand and which may have many characteristics of DID. (U)

156.  Dr. Martell received his Ph.D. in clinical psychology from the University of Virginia in 1989.  He did a fellowship at the New York University School of Medicine and Bellevue Hospital in New York City from 1986 to 1987 and a fellowship in forensic psychology at the same school and hospital in 1987 and 1988.

157.  Dr. Martell is licensed as a psychologist in the states of New York and California.

158.  Dr. Martell is a fellow in the American Academy of Forensic Psychology and the American Academy of Forensic Sciences where he currently is the Chairman of the Psychiatry and Behavioral Sciences Section.

159.  Dr. Martell testified as an expert at the section 2255 hearing on August 29, 2005, without objection from Mr. Hammer.

160.  Dr. Martell concluded to a reasonable degree of psychological certainty that Mr. Hammer suffers from Cognitive Disorder Not Otherwise Specified, primarily affecting sensory-perceptual functions.

161.  Dr. Martell also concluded that Mr. Hammer's brain disorder was primarily "in the right hemisphere, the right side of his brain, and . . . the central and further back areas on the right, not so much frontal, but temporal, parietal and occipital."

162.  Cognitive Disorder Not Otherwise Specified is an Axis I diagnosis under the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision (2000).

163.  The major mental disorders of an acute as well as a chronic nature are included under Axis I.

164.  Dr. Martell further concluded that Mr. Hammer suffers from Borderline Personality Disorder, with dissociative periods.

165.  Borderline Personality Disorder is an Axis II diagnosis under the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision.

166.  Personality disorders and mental retardation are reported under Axis II.

167.  Borderline Personality Disorder is a mental disorder characterized by a pervasive pattern of instability of interpersonal relationships, self-image, and affects, and marked impulsivity beginning by early adulthood and presents in a variety of contexts.

168.  The Comprehensive Textbook of Psychiatry, Sixth

Edition, published in 1995 (editors Harold I. Kaplan, M.D., and

Benjamin J. Sadock, M.D.), describes the clinical features of

Borderline Personality disorder as follows:

> Patients with borderline personality disorder are severely dysfunctional. Their clinical presentation is intimately connected to the interpersonal context in which they are observed; most of the disorder's observable features are highly sensitive to interpersonal stress.  For example, within the context of a supportive relationship (or within a structured holding environment), appealing, waiflike, dysthymic features are evident.  Yet the perception of the impending loss of such a relationship or structure can produce sudden rage, devaluation or paranoid accusations, and self-destructive acts designed to provoke protective responses.  In the absence of a relationship, dissociative episodes, substance abuse, and desperate impulsive behavior can occur.
>
> The relationships of persons with borderline personality disorder tend to be unstable, intense, and stormy. Contributing to that instability and storminess are sudden and dramatic shifts in their views of others; the views may alternate between extremes of idealization and devaluation or of seeing others as beneficent supports and then as cruelly punitive. . . . The patient's profound abandonment fears often occur in response to what is likely to be a transient separation – for example, a therapist's vacation – and reflect an intolerance of being alone.  Such persons need to have people around them, even if they do not like them or interact with them.  Efforts to avoid aloneness and abandonment can be frantic and extreme, taking the form of impulsive activities, inappropriate anger, self-destructive behavior, and suicide threats.  Or the efforts may be benign, involving the use of a transitional object (for example, an inanimate object or a pet) which may diminish feelings of aloneness and insecurity.

See Defendant's Exhibit 3.1.

169.  The Comprehensive Textbook of Psychiatry also reveals

that

> Axis II disorders commonly associated with borderline personality disorder . . . are antisocial, avoidant, histrionic, and narcissistic personality disorders.

Common comorbid Axis I disorders include dysthymic disorder, major depressive disorder, substance abuse and dependence, eating disorders (primarily bulimia nervosa) and posttraumatic stress disorder.

170.  In 1997 Dr. Wolfson issued a forensic report in which he concluded that Mr. Hammer malingered or faked Dissociative Identity Disorder.

171.  In view of Dr. Wolfson's conclusion that Mr. Hammer malingered during his 1997 forensic evaluation, Dr. Martell was particularly concerned as to whether Mr. Hammer malingered during his 2005 neuropsychological evaluation.  (U)

172.  Dr. Martell administered a number of tests to Mr. Hammer designed to detect malingering. (U)

173.  The tests designed to detect malingering that were administered by Dr. Martell were the Test of Memory Malingering, the Validity Indicator Profile and the Personality Assessment Inventory. (U)

174.  Based upon Mr. Hammer's performance on the tests of malingering, Dr. Martell concluded that Mr. Hammer did not malinger in any respect during the 2005 evaluation. (U)

175.  On one of the tests for malingering (the Personality Assessment Inventory), Mr. Hammer was identified as attempting to mask any mental health pathology.

176.  Despite Mr. Hammer's attempts to mask mental health pathology, the Personality Assessment Inventory was able to identify potential areas of pathology, including the impact of traumatic events, thoughts of death and suicide, moodiness, compulsiveness and rigidity, poor control over anger, history of

anti-social behavior, poor sense of identity, failures in close relationships and impulsivity.

177.  Dr. Martell saw evidence in his evaluation consistent with the problem areas identified by the Personality Assessment Inventory.

178.  Dr. Martell testified that Mr. Hammer's attempts to mask his pathology were similar to the attempts identified by the psychological testing administered in 1997 at the request of Dr. Wolfson.

179.  Dr. Martell believed that the emotional distress showed by Mr. Hammer on the portion of the videotape that depicted Mr. Hammer discussing his history of childhood sexual, physical and emotional abuse, was a genuine display of emotional distress. (U)

180.  The emotional distress displayed by Mr. Hammer and depicted on the videotape was genuine.

181.  The display of emotional distress evidenced on the videotape was consistent with the Personality Assessment Inventory test's indicator that Mr. Hammer displayed pathology related to "traumatic events."

182.  Mr. Hammers suffers from emotional lability.

183.  The evidence of emotional lability identified by Dr. Martell included Mr. Hammer weeping in court during testimony and during evaluations when the subject of his childhood abuse arose.

184.  Dr. Martell testified that the frontal lobes of the brain are responsible for taking in and analyzing information.

185.   Dr. Martell testified that the frontal lobes are responsible for organizing, controlling and directing behavior.

186.   Dr. Martell testified that the frontal lobes are integral to the higher cognitive processes, which include problem solving, emotional control and learning from one's experiences.

187.   Dr. Martell testified that once information is analyzed by the brain's frontal lobes, the frontal lobes then dictate the course of action to be taken by the person based upon the information.

188.   Dr. Martell testified that emotional lability can occur as a result of frontal lobe damage.

189.   Dr. Martell testified that this lability arises in people with damaged frontal lobes because when damaged that area of the brain is not able properly to perform the function of controlling emotions in response to particular situations that arise.

190.   The three areas related to competency are 1) intelligence, 2) memory and 3) reasoning and complex problem solving. (U)

191.   Dr. Martell administered three tests relevant to Mr. Hammer's frontal lobe functioning: 1) the Stroop, 2) Trails B and 3) the Categories Test. (U)

192.   Although Dr. Martell testified that the "letter-number" sequencing sub-test of the Wechsler Memory Scale Battery is also relevant to frontal lobe functioning, he did not include this test in the section of his report (Government's Exhibit 205, page

1) wherein he listed the three above described tests as related to frontal lobe functioning. (U)

193. Trails B and the Categories Test are part of the Halstead-Reitan Neuropsychological Battery. (U)

194. The Halstead-Reitan Neuropsychological Battery is a test for brain damage.  It is widely used and is a reliable identifier of brain damage.

195. Dr. Martell did not administer the full Halstead-Reitan Neuropsychological Battery due to time constraints. (U)

196. The authors of the Halstead-Reitan Neuropsychological Battery  are Dr. Halstead, who is deceased, and Dr Reitan, who is alive. (U)

197. Dr. Martell testified that Dr. Reitan is "absolutely" an authority in the field of neuropsychology. (U)

198. Dr. Martell testified that there is a controversy in the field of neuropsychology over the use of "norms" when scoring the Halstead-Reitan Neuropsychological Battery to determine the presence or absence of brain impairment. (U)

199. The controversy relates to whether to apply the so-called "Heaton" norms or the norms created by the Battery's originator, Dr. Reitan. (U)

200. The "Heaton" norms adjust the raw data obtained from the Halstead-Reitan Neuropsychological Battery to take account of the subject's gender, age, education and race. (U)

201.  Dr. Martell partially applied the Heaton norms (i.e. he adjusted the scores for age, gender and education, but not for race). (U)

202.  Dr. Martell did not adjust for race because he has not yet purchased the newest version of the Heaton norms which make race-based adjustments. (U)

203.  Dr. Gelbort applied the norms generated by Dr. Reitan. (U)

204.  Defendant's exhibit 196 is an article written by Dr. Reitan which summarizes and addresses the controversy over the use of the Heaton norms.  (U)

205.  In interpreting the article, Dr. Martell stated "if you take a test that's the most sensitive to brain damage globally, age and education shouldn't matter, and that may be true." (U)

206.  Dr. Martell acknowledged that the Categories Test is such a test, i.e. it is a measure of global brain function. (U)

207.  Defendant's Exhibit 195 contains excerpts from the Halstead-Reitan Neuropsychological Battery, Second Edition, written by Dr. Reitan and Dr. Deborah Wolfson. (U)

208.  Defendant's Exhibit 195 is the manual for the administration and scoring of the Halstead-Reitan Neuropsychological Battery. (U)

209.  The Halstead-Reitan Neuropsychological Battery manual contains two methods for determining the presence and extent of brain damage. (U)

210.  The first method is called the "Impairment Index." (U)

211.   The Halstead-Reitan Neuropsychological Battery manual states that:

> In a large number of studies the Impairment Index has consistently been shown to be the single most sensitive variable in differentiating groups with and without cerebral damage.  Thus, over the years it has proved to be a very useful measure for summarical purposes.

(U)

212.   The second method contained in the Halstead-Reitan Neuropsychological Battery manual is called the General Neuropsychological Deficit Scale. (U)

213.   Dr. Reitan and Dr. Deborah Wolfson view the General Neuropsychological Deficit Scale as an improvement over the older Impairment Index. (U)

214.   Under the Impairment Index, the cutoff for impairment on the Categories Test is 51 errors, that is 51 and above is considered evidence of impairment.

215.   On Dr. Martell's administration of the Categories Test, Mr. Hammer scored 57 errors.

216.   57 errors on the Categories Test is considered "impaired" when the Impairment Index is applied.

217.   The General Neuropsychological Deficit Scale places test scores in a range from 0-3.  Scores in the range of a "two" indicate that the subject suffers from mild to moderate impairment. (U)

218.   Mr. Hammer's score of 57 errors on the Categories Test places him in range "two," which is in the mild to moderately impaired range. (U)

219.   Mr. Hammer's score on Trails B also placed him in range "two," which is in the mild to moderately impaired range.

220.   Dr. Martell agreed that if Dr. Reitan were scoring Mr. Hammer's performance on the Categories Test and Trails B (two of the three tests that Dr. Martell used to determine that Mr. Hammer does not have frontal lobe damage), using either the Impairment Index or the General Neuropsychological Deficit Scale, he would have been considered to be mild to moderately impaired. (U)

221.   Muriel Lezak is an authority in the field of neuropsychology and she wrote the text, *Neuropsychological Assessment*. (U)

222.   *Neuropsychological Assessment* is an authoritative text in the field of neuropsychology.

223.   In his administration of the Stroop test, Dr. Martell used a version that is not approved of by Dr. Lezak in her text.

224.   Dr. Martell's administration of the Stroop contains a so-called "interference trial."  (U)

225.   Although there exist a number of Stroop tests that are used in the field, Dr. Martell administered the only version containing an "interference trial."  (U)

226.   With the interference trial, Mr. Hammer was not impaired on this test.  (U)

227.   Had the test been administered and scored in accordance with the method advocated by Dr. Lezak (i.e. without an interference trial), Mr. Hammer would have been severely impaired

on this measure (i.e. between two and three standard deviations below the norm in some measures).

228.  Dr. Martell was a prosecution expert in a case that he wrote about in an article marked as Defendant's Exhibit 186. (U)

229.  The defendant in that case was referred to in the article by the pseudonym, "Mr. Cystkopf."  (U)

230.  Mr. Cystkopf offered a defense of not guilty by reason of mental disease or defect in a homicide prosecution in New York State. (U)

231.  Among other things, the article addressed Mr. Cystkopf's defense that due to his frontal lobe damage he was unable to control his emotions and therefore he was not able to "mark" his emotions and properly control them.  (U)

232.  Dr. Martell rejected this defense because it related to an inability to conform conduct to the requirements of law, which was not the insanity standard in New York State.  (U)

233.  Since Mr. Cystkopf understood the nature of his actions, and was able to distinguish between right and wrong, Dr. Martell did not consider his inability to control his emotions to be relevant under the New York insanity statute. (U)

234.  However, Dr. Martell wrote that in a "volitional" insanity jurisdiction – in which the relevant question is whether one has capacity to conform his behavior to the requirements of the law – Mr. Cystkopf's defense would have been "viable." (U)

235.  The Benton Facial Recognition Test is a test of memory recall.

236.   Mr. Hammer was in the range of mild impairment on the Benton Facial Recognition Test, as recorded by Dr. Martell on Government's Exhibit 205. (U)

237.   The Benton Visual Retention Test is a test of several areas, including memory.  (U)

238.   Dr. Martell testified that memory impairment is important to a competency determination. (U)

239.   Mr. Hammer scored two standard deviations below the norm on one portion of the Benton Visual Retention Test administered by Dr. Martell.

240.   Mr. Hammer scored between 1 and 2 standard deviations below the norm, on another portion of the Benton Visual Retention Test also administered by Dr. Martell. (U)

241.   Dr. Martell agreed that there is a clinically significant correlation between childhood sexual, physical and emotional abuse and the development of Borderline Personality Disorder. (U)

242.   Dr. Martell agreed that childhood sexual, physical and emotional abuse can constitute the trauma predicate that causes Posttraumatic Stress Disorder. (U)

243.   Dr. Martell testified that Posttraumatic Stress Disorder is a common co-morbid Axis I diagnosis for those with Borderline Personality Disorder. (U)

244.   The criteria for Dissociative Identity Disorder set forth in the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision, are as follows:

(1) The presence of two or more distinct identities or personality states (each with its own relatively enduring pattern of perceiving, relating to, and thinking about the environment and self);

(2) At least two of these identities or personality states recurrently take control of the person's behavior;

(3) Inability to recall important personal information that is too extensive to be explained by ordinary forgetfulness;

(4) Not due to direct physiological effects of a substance (e.g., blackouts or chaotic behavior during alcohol intoxication) or a general medical condition (e.g., complex seizures).  Note: In children, the symptoms are not attributable to imaginary playmates or other fantasy play.

245.  Dr. Martell testified that Dissociative Identity Disorder is caused by trauma, including childhood sexual, physical and emotional abuse. (U)

246.  Dissociative Identity Disorder is seen in patients with Borderline Personality Disorder. (U)

247.  According to Kaplan & Sadock's *Comprehensive Textbook of Psychiatry*, Sixth Edition:

The behavior and pattern of relationships of patients with dissociative identity disorder often have a marked similarity to what is observed in persons with borderline personality disorder, but the latter lacks the telltale presence of distinct alternating personalities separated by an amnestic barrier that is the hallmark of the former.  (U)

248.  Kaplan & Sadock also states:

The diagnosis of borderline personality disorder is often made when [Posttraumatic Stress Disorder] is a more appropriate diagnosis or at least a necessary concomitant diagnosis.  A clinician who makes the diagnosis of borderline personality disorder must inquire further into possible early trauma and ensuing symptoms.   (U)

249.  Dr. Martell diagnosed Mr. Hammer with having Borderline Personality Disorder. (U)

250.  Dr. Martell did not review the report/affidavit

64

of Neil Blumberg, M.D., who is one of Defendant's expert witnesses. (U)

251.  Under circumstances of stress, people with Borderline Personality Disorder can decompensate into a psychotic state. (U)

252.  People with Borderline Personality Disorder are severely dysfunctional.

253.  The observable features of Borderline Personality Disorder are highly sensitive to interpersonal stress.

254.  When a person with Borderline Personality Disorder is under stress, the symptoms of the disorder appear in more significant ways.  (U)

255.  Stress can cause a person with Borderline Personality Disorder to lapse into a dissociative state.  (U)

256.  A person with Borderline Personality Disorder who is in a dissociative state may be incompetent for trial.  (U)

257.  Dr. Martell acknowledged that while intelligence is relevant to a competency determination, it is not determinative of the question.  (U)

258.  Dr. Martell acknowledged that a person can be a "genius" and still be incompetent if due to a mental disorder, the person is unable to understand the court proceedings or is unable to cooperate with counsel.  (U)

259.  Mr. Hammer described himself as homosexual during the interview by Drs. Matthews and Martell. (U)

260.  Mr. Hammer to Drs. Matthews and Martell said that he

65

and Andrew Marti were participating in consensual sexual activity around the time of the murder. (U)

261.  Mr. Hammer received a mildly impaired score for grip strength in the left hand. (U)

262.  Mr. Hammer's self reports as well as the observations of others suggest that he has experienced dissociative periods. (U)

263.  Such dissociative episodes would be consistent with the dissociative symptoms of Borderline Personality Disorder.

**F.  Dr. Mitchell's Involvement with and Assessment of Mr. Hammer.**

264.  John Mitchell is a psychologist employed by the United States Bureau of Prisons. (U)

265.  From May, 1995 until January, 1999, Dr. Mitchell conducted psychotherapy with David Paul Hammer while Mr. Hammer was incarcerated at the United States Penitentiary at Allenwood. (U)

266.  During his Intake Screening, Dr. Mitchell orally advised Mr. Hammer of his right in regard to confidentiality of information provided to Dr. Mitchell. (U)

267.  Dr.  Mitchell testified that inmates are warned that there is essentially no inmate confidentiality in the Bureau of Prisons.

268.   Dr. Mitchell testified that inmates are advised about the lack of confidentiality at the first time they are seen upon intake.

269.  Dr. Mitchell advised Mr. Hammer on their first interview that there was no confidentiality as to communications by Mr. Hammer to him.

270. In a note regarding their first contact, Dr. Mitchell indicated that Mr. Hammer had depression, tension and nervousness. (U)

271. In their first counseling session (conducted on July 12, 1995), Mr. Hammer told Dr. Mitchell that he was angry and anxious, and that he was subjected to childhood sexual abuse. (U)

272. In a session of August 24, 1995, Mr. Hammer related to Dr. Mitchell that he had a plan to commit suicide. This resulted in Dr. Mitchell's completion of a Suicide Risk Assessment on that same date. In that document, he related that Mr. Hammer suffered from depressed mood. (U)

273. Mr. Hammer again discussed his abusive upbringing in counseling sessions with Dr. Mitchell on August 31 and September 7, 1995. (U)

274. Mr. Hammer related to Dr. Mitchell episodes of childhood abuse, including beatings, enemas, sexual abuse (in the form of his father forcing him into sexual relations with his sister). (U)

275. Dr. Mitchell believed that Mr. Hammer's accounts of this abuse were genuine. (U)

276. Dr. Mitchell believed that Mr. Hammer suffered genuine psychological pain when he discussed accounts of childhood abuse with Dr. Mitchell. (U)

277. Dr. Mitchell believed that Mr. Hammer suffered anxiety, tension, stress and nervousness partly as a result of the

childhood abuse, all of which is not unusual for a person subjected to the type of childhood abuse suffered by Mr. Hammer.

278.  Dr. Mitchell learned about Mr. Hammer's history of childhood sexual, physical and emotional abuse in sessions with Mr. Hammer prior to the death of Mr. Marti. (U)

279.  In view of the fact that Mr. Hammer related his sexual and physical childhood abuse to Dr. Mitchell prior to the death of Mr. Marti, the Court finds that Mr. Hammer's reports of childhood abuse are credible. (Undisputed, but objected to, hereinafter "UO")

280.  Dr. Mitchell believed that there was a relationship between the childhood abuse suffered by Mr. Hammer and his problems with impulse control, impaired judgment, and establishing trusting relationships with others. (U)

281.  Mr. Hammer was not generally inclined to discuss his personal feelings with Dr. Mitchell within earshot of other prisoners.

282.  Dr. Mitchell had approximately 150 contacts with Mr. Hammer which included therapy sessions, SHU reviews, and risk assessments. (U)

283.  Dr. Mitchell saw Mr. Hammer for therapy sessions bi-weekly, or on an as needed basis for about three and one half years. (U)

284.  After the killing of Mr. Marti, Dr. Mitchell did advise Mr. Hammer that if he wanted to continue therapeutic contacts with him, then Mr. Hammer should be aware that anything –

any type of contact could be used not only as part of his defense but also as part of the prosecution.

285.  Mr. Hammer is well-versed in Bureau of Prisons' rules, regulations and policies.

286.  Mr. Hammer was well-aware of the limits of confidentiality and had no confusion regarding the lack of confidentiality with respect to his communications to Dr. Mitchell.

287.  Dr. Mitchell diagnosed Mr. Hammer with an Axis I diagnosis of Major Depressive Disorder, recurrent. (U)

288.  Dr. Mitchell never diagnosed or concluded that Mr. Hammer malingered in regard to mental health issues.

289.  Dr. Mitchell believed that Mr. Hammer's diagnosis of Major Depression, recurrent, was attributable, in part, to the childhood abuse he experienced. (U)

290.  Dr. Mitchell observed an extraordinary number of vacillations in Mr. Hammer's desire to litigate his case.

291.  Dr. Mitchell observed pressured speech when Mr. Hammer would discuss his capital case both pre and post trial. (UO)

292.  Dr. Mitchell had a clinical contact with Mr. Hammer on June 10, 1998.  At that time, Mr. Hammer expressed considerable distress over the trial and was going back and forth over the question of whether to plead guilty in order to end his trial.  Dr. Mitchell's note from that date indicated that Mr. Hammer's distress was getting worse. (U)

293.  Dr. Mitchell saw Mr. Hammer again on June 12, 1998 and noted that Mr. Hammer indicated that he was in a bad frame of mind.

In this session, Mr. Hammer was more emotional than normal.  Dr. Mitchell also noted that he was concerned about the "intensity of the emotional distress" he appeared to be experiencing.  He characterized Mr. Hammer's risk of suicide as "moderate" and ordered 15 minute suicide checks over the ensuing weekend. (U)

294.  Mr. Hammer's mental state on June 12, 1998 was related to betrayal he felt from some adverse testimony from prisoners whom he perceived to be friends.  According to Dr. Mitchell a person who was subjected to the type of childhood abuse suffered by Mr. Hammer would possibly have a stronger feeling of betrayal than someone who was not subjected to that type of abuse.

295.  Dr. Mitchell believed that his note of June 12, showed that Mr. Hammer's stress and depression was worsening even from the note of June 10, and that he was generally expressing a "more severe intensity of emotions" than usual for him.  (U)

296.  Dr. Mitchell saw Mr. Hammer again on June 15, 1998 – one week before he pled guilty.  He continued to be sad and depressed as a result of the trial. (U)

297.  Dr. Mitchell acknowledged that Mr. Hammer has a history of acting out when his stress and depression are causing him unbearable psychological pain. (U)

298.  As of the time of Mr. Marti's death, Dr. Mitchell considered that he had established a clinical and therapeutic relationship with Mr. Hammer. (U)

299.  Dr. Mitchell had a therapy session with Mr. Hammer on April 16, 1996. (U)

300.  Following the session of April 16, 1996, Dr. Mitchell wrote a note memorializing this session. (U)

301.  In addition to the therapy note, Dr. Mitchell wrote a Psychological Report dated April 16, 1996 (Defendant's Exhibit 31.7 at page 24). (U)

302.  The April 16, 1996 Psychological Report was written by Dr. Mitchell because of the "crime that took place."  (U)

303.  Dr. Mitchell was motivated to write the Report because "at that time it wouldn't be too great of a leap to assume that there might be some questions as to whether Mr. Hammer ever evidenced psychosis during our clinical contacts." (U)

304.  Dr. Mitchell was aware when he wrote this Report that Mr. Hammer's ability to distinguish right from wrong would likely be an issue in an expected prosecution, should Mr. Hammer raise a mental health defense.  (U)

305.  In writing the April 16, 1996, Report, Dr. Mitchell concluded that Mr. Hammer had not shown "delusional thinking, hallucinations, or an inability to distinguish between right and wrong."  (U)

306.  This conclusion was based on the entirety of Dr. Mitchell's therapy sessions he had been conducting with Mr. Hammer. (U)

307.  Dr. Mitchell did not disclose to Mr. Hammer that he wrote the Psychological Report because he did not see a "clinical need" to do so. (U)

308. Dr. Mitchell viewed in open court an 18 minute segment of a videotape of the forensic evaluation conducted by Government experts Drs. Martell and Matthews.  (Defendant's Exhibit 54) (U)

309. The portion of the video viewed by Dr. Mitchell depicted Mr. Hammer discussing his childhood sexual, physical and emotional abuse. (U)

310. Dr. Mitchell concluded that on the portion of the video that he viewed, Mr. Hammer became "very emotionally upset" and required a break in the evaluation.  Dr. Mitchell concluded that the level of emotional upset, was "significant emotional distress." (U)

311. The accounts of the childhood abuse discussed on the videotape were consistent with the accounts of childhood abuse that Mr. Hammer related to Dr. Mitchell during their therapy sessions.

312. The degree of emotional distress shown by Mr. Hammer on the videotape was comparable to the level of emotional distress shown by Mr. Hammer during his discussions of this topic during his therapy sessions with Dr. Mitchell. (U)

313. Following Mr. Marti's death, Mr. Hammer was housed in a single cell in the Allenwood Penitentiary.  He received his meals in his cell, had no access to ice, showered in his cell, wore only prison issue clothing, took recreation by himself, was on limited correspondence status for periods of time and had no access to a television. (U)

314. Dr. Mitchell attempted to intervene on Mr. Hammer's behalf with prison officials regarding some of the conditions of

confinement inasmuch as he was concerned about the psychological impact they were causing on Mr. Hammer.  In March, 1997 Dr. Mitchell was concerned that Mr. Hammer might "act out" as a result of these stressors, including "ending his life." (U)

315.   Dr. Mitchell indicated that during his time treating Mr. Hammer, that he evidenced emotional lability, which at times was severe.  This lability was a sign of "distress" and evidence that Mr. Hammer had "less emotional control." (U)

316.   Dr. Mitchell opined that there is a correlation between emotional lability and dissociation. (U)

317.   As Dr. Mitchell's relationship with Mr. Hammer progressed, Mr. Hammer became more concerned that Dr. Mitchell would testify against him, and/or that what he said in their sessions would be used against him. (U)

318.   At some point, Mr. Hammer decided to terminate his therapeutic relationship with Dr. Mitchell. (U)

319.   Mr. Hammer resumed his relationship following the various cessations because the sessions were helpful to him. (U)

320.   Dr. Mitchell's interviews with Mr. Hammer when the inmate was in general population ran 30 minutes to an hour. (U)

321.   Dr. Mitchell's therapeutic relationship with Mr. Hammer was described as good by Dr. Mitchell. (U)

322.   Dr. Mitchell stated that Mr. Hammer had more than one episode of depression. (U)

323.   Dr. Mitchell took those accounts as being genuine. (U)

73

324. Dr. Mitchell stated Mr. Hammer talked about how important mail was to him, as it was his only link to people and relating to others. (U)

325. Dr. Mitchell reviewed raw data generated by Dr. Gelbort at the time of trial or before trial at the prosecution's request. (U)

326. Dr. Mitchell recalled that Mr. Hammer in 1997 had a valid concern, which appeared that staff were kind of giving him the runaround, so to speak, and not answering his requests as to why he was on restriction with any specificity. (U)

327. Dr. Mitchell sent a note to Mr. Troutman, the unit manager, to try to get a little more clarity for Hammer on a particular issue. (U)

328. Dr. Mitchell stated Mr. Hammer welcomed a potential transfer to Florence or Terre Haute from Allenwood. (U)

329. Dr. Mitchell was aware in 1997 or 1998 that certain psychology records or copies of psychology records were being sought by either the prosecution or the defense. (U)

330. Dr. Mitchell recalled that the prosecution sought certain psychology records or copies of psychology records and also that Mr. Hammer's attorneys at that time also sought them. (U)

331. Dr. Mitchell stated that prior to Mr. Hammer's guilty plea, he had discussions with the prosecution that he would with certainty testify as well as discussions with the defense that he would also testify for them. (U)

332.   Dr. Mitchell was aware of and took into consideration Dr. Gelbort's opinion and raw data relating to Mr. Hammer's cognitive disorder, and still concluded that Hammer was competent to enter a guilty plea on June 22, 1998.

**G.   Dr. Sadoff's Involvement with and Assessment of Mr. Hammer.**

333.   Dr. Sadoff testified at trial as a defense expert and previously diagnosed Mr. Hammer as suffering from Dissociative Identity Disorder. (U)

334.   Dr. Sadoff was accepted by this Court as an expert in forensic psychiatry. (U)

335.   Dr. Sadoff testified that he evaluated Mr. Hammer in December of 1996 and that he also reviewed numerous records pertaining to Mr. Hammer that had been provided to him by Mr. Ruhnke and Mr. Travis. (U)

336.   Dr. Sadoff testified, as reflected in his report concerning Mr. Hammer dated September, 1997, that at that time Mr. Hammer was competent to stand trial. (U)

337.   Dr. Sadoff testified, and the Court finds, that competency is a fluid concept and that the fact Mr. Hammer was deemed competent to stand trial by Dr. Sadoff in September of 1997 does not mean Mr. Hammer was competent to waive trial and enter a plea of guilty in June of 1998. (U)

338.   Dr. Sadoff also testified, and the Court finds, that his competency evaluation of Mr. Hammer in September of 1997 did not include a determination whether Mr. Hammer could make a

knowing, voluntary and intelligent waiver of rights since it was not an issue at that time. (U)

339.   Dr. Sadoff testified that neither Mr. Ruhnke nor Mr. Travis asked him to conduct a forensic competency examination of Mr. Hammer in June of 1998 or in October of 1998. (U)

340.   Dr. Sadoff testified that if counsel had asked him to conduct such an evaluation he would have been willing to do so. (U)

341.   Dr. Sadoff did not learn of Mr. Hammer's waivers and plea of guilty until after they had happened. (U)

342.   Dr. Sadoff testified that Mr. Hammer has a significant family history of physical and sexual abuse that formed the factual predicate for his diagnosis of Dissociative Identity Disorder. (U)

343.   Dr. Sadoff testified that given the diagnoses and stressors that Mr. Hammer was under at the time of trial, there exist substantial concerns about Mr. Hammer's mental state at the time he entered his guilty plea.

344.   Dr. Sadoff explained that the bases for his concerns involve both the DID diagnosis as well as consideration of Mr. Hammer's Post-Traumatic Stress Disorder (PTSD), depression, other diagnoses of characterological or personality disorder that he has had most of his life. (U)

345.   Dr. Sadoff during the section 2255 hearing testified that he was concerned about which of Mr. Hammer's personalities was driving his decision to waive trial, plead guilty and waive direct appeal. (U)

346.  Dr. Sadoff also testified, and the Court finds, that it is not unusual that victims of sexual abuse will often have recollections of the abuse they endured triggered by external factors, such as letters or conversations discussing the abuse or related factors. (U)

347.  Dr. Sadoff during the section 2255 hearing did not provide an opinion to a reasonable degree of psychiatric certainty regarding whether or not Mr. Hammer was competent on June 22, 1998.

**H.   Dr. Wolfson's Involvement with and Assessment of Mr. Hammer.**

348.  Dr. James K. Wolfson evaluated Mr. Hammer in 1997 at the request of the Government.

349.  Dr. Wolfson graduated with a Bachelor of Arts degree from the University of Chicago in 1982.

350.  In 1985 Dr. Wolfson graduated with a Masters of Science degree in Human Biology from the University of Chicago and in 1987 graduated from Washington University Medical School in St. Louis, Missouri.

351.  After receiving his medical degree, he completed a residency in psychiatry at Barnes Hospital and Washington University.

352.  Dr. Wolfson is a Board Certified Forensic Psychiatrist and has been employed in the field of forensic psychiatry by the Federal Bureau of Prisons since 1992.

353.  At the time of his evaluation of Mr. Hammer in 1997, he had personally written approximately 200 forensic reports.

354.  Dr. Wolfson's diagnosis in relevant part was as follows:

> Axis I:   Malingering
> Claimed Dissociated Identity Disorder (Multiple Personality Disorder), doubtful validity.
> Query Major Depression, in remission.
> History of Polysubstance Abuse
>
> Axis II:  Antisocial Personality Disorder with histrionic features (primary diagnosis).

See Forensic Report dated December 19, 1997, page 127 (Defendant's Exhibit 139.1).

355.  Dr. Wolfson believes that Mr. Hammer does have mental health pathology. (U)

356.  Dr. Wolfson agrees with Dr. Mitchell's diagnosis of Mr. Hammer on Axis I as having a Major Depressive Disorder, Recurrent. (U)

357.  Dr. Wolfson has no disagreement with Dr. Martell's diagnosis of Mr. Hammer as having an Axis I diagnosis of Cognitive Disorder, Not Otherwise Specified. (U)

358.  Mr. Hammer was subjected to psychological testing while at the United States Medical Center for Federal Prisoners at Springfield in 1997. (U)

359.  Dr. Richard Frederick performed psychological testing and interpreted it for Dr. Wolfson. (U)

360.  Dr. Wolfson thought that Dr. Matthew's and Dr. Martell's diagnosis of Mr. Hammer as having a Borderline Personality Disorder was "reasonable" and that he would not "quibble" with it.  (U)

361.    Dr. Wolfson believes that those subject to childhood abuse "show an elevated prevalence of all mental illnesses, except schizophrenia." (U)

362.    Dr. Wolfson is unsure of the relationship between childhood trauma and the development of Borderline Personality Disorder. (U)

363.    Dr. Wolfson believes that "what most people think" is that the absence of stable relationships in childhood retards the normal maturation process.

364.    Dr. Wolfson believes that a "prevalent model" in the mental health field holds that childhood abuse causes Borderline Personality Disorder. (U)

365.    Dr. Wolfson believes that the mainstream of the mental health professions believes that childhood abuse also can cause Posttraumatic Stress Disorder.  (U)

366.    Dr. Wolfson believes that those with Dissociative Identity Disorder may manifest Posttraumatic symptoms or Posttraumatic Stress Disorder. (U)

367.    Dr. Wolfson believes that taking Mr. Hammer's history of childhood physical and sexual abuse as true, it qualifies as the type of trauma that could cause either Borderline Personality Disorder, Posttraumatic Stress Disorder or Dissociative Identity Disorder. (U)

368.    Dr. Wolfson believes that Mr. Hammer suffered from childhood abuse as described in the records and interviews he reviewed. (U)

369.   Dr. Wolfson testified that Mr. Hammer: "reported to me sexual molestation at the hands of multiple people . . . physical abuse at the hands of multiple people [] [and] a particularly distorted, disturbed relationship with his mother."  (U)

370.   According to Dr. Wolfson, Mr. Hammer did not malinger on either the Minnesota Multiphasic Personality Inventory, Validity Indicator Profile or "dot counting" tests administered by Dr. Frederick at United States Medical Center for Federal Prisoners at Springfield in 1997. (U)

371.   According to Dr. Wolfson, Mr. Hammer "appeared overly invested in looking good" on the psychological testing administered by Dr. Frederick. (U)

372.   Dr. Wolfson stated in his second forensic report (written in 1998) that Mr. Hammer's stated reasons for wishing to waive his post-trial rights and direct appeal was a concern for Mr. Marti, his family and general remorse.  (U)

**I.  Dr.  Blumberg's Involvement with and Assessment of Mr. Hammer.**

373.   During the § 2255 hearing, Mr. Hammer presented the testimony of Neil Blumberg, M.D., a Board Certified forensic psychiatrist with extensive experience in forensic evaluations in capital cases and in cases involving competency and criminal responsibility. (U)

374.   Dr. Blumberg graduated with highest honors from Emory University, Atlanta, Georgia, in 1973, with a Bachelor of Arts degree in Psychology.

375.  Dr. Blumberg received his medical degree in 1977 from George Washington University School of Medicine, Washington, D.C.

376.  Dr. Blumberg is licensed to practice medicine in Maryland, Pennsylvania, Virginia, Georgia and Florida.

377.  Dr. Blumberg is a Fellow in the American Psychiatric Association, a member of the American Academy of Psychiatry and the Law and has been a clinical assistant professor of psychiatry since 1981 at the University of Maryland School of Medicine, Department of Psychiatry. (U)

378.  Dr. Blumberg has participated in over four thousand (4000) forensic psychiatric evaluations in the criminal context and has been qualified as an expert in forensic psychiatry in state and federal court on over five hundred (500) occasions.  In capital prosecutions, he has testified for both the Government and the defense.

379.  Dr. Blumberg has participated in the forensic psychiatric evaluation of over one hundred and forty (140) capital defendants and has testified as an expert in approximately thirty to thirty five capital cases. (U)

380.   Dr. Blumberg presently has a private practice in both general and forensic psychiatry.  However, the bulk of his practice is forensic consultation, both in the criminal and civil areas.

381.  With respect to the criminal areas, Dr. Blumberg receives referrals from defense attorneys, prosecutors' offices, as well as serving as an independent expert called by the courts.

382.   Dr. Blumberg receives regular referrals from the United States District Courts in Baltimore and Greenbelt, Maryland, and Alexandria, Virginia.

383.   Dr. Blumberg testified in the fall of 2004 in a case where he was an expert for the United States Attorney's office in the Greenbelt office in Maryland.

384.   Dr. Blumberg is currently involved in two capital cases for the United States Attorney's Office in Greenbelt, Maryland.

385.   Dr. Blumberg testified for the prosecution in a case in Maryland state court where the defendant was executed.

386.   Dr. Blumberg conducted a forensic psychiatric evaluation of Mr. Hammer on October 21, 2004, at the United States Penitentiary in Lewisburg, Pennsylvania.  His evaluation of Mr. Hammer lasted approximately three hours and thirty-five minutes. (U)

387.   Dr. Blumberg also reviewed the following documents and records pertaining to Mr. Hammer: trial transcripts, motions transcripts, transcripts of Mr. Hammer's argument in Court of Appeals for the Third Circuit; Mr. Hammer's Bureau of Prison (BOP) records; BOP psychiatric mental health evaluations; videotape of the interviews conducted by Drs. Matthews and Martell; videotape of the hypnosis session with Drs. Sadoff and Dubin; testimony and report of Jill Miller; records from the Oklahoma Department of Corrections; mental health records predating Mr. Hammer's

incarceration; and the reports of Drs. Wolfson, Grassian, Gur, Kluft, Gelbort, Martell and Matthews.

388.   As a result of his review of the above records and his evaluation of Mr. Hammer, Dr. Blumberg reached the following diagnoses to a reasonable degree of medical and psychiatric certainty: Posttraumatic Stress Disorder, Chronic; Borderline Personality Disorder; Antisocial Personality Disorder and Cognitive Disorder, Not Otherwise Specified. (U)

389.   This Court finds Dr. Blumberg's diagnoses of Mr. Hammer as set forth in the proceeding finding to be credible.

390.   Dr. Blumberg testified, and this Court so finds, that the predicate facts supporting his diagnoses of Borderline Personality Disorder and Posttraumatic Stress Disorder, Chronic, are Mr. Hammer's history of severe childhood trauma, including "physical, verbal, emotional and sexual abuse throughout his childhood."

391.   According to Dr. Blumberg, Mr. Hammer's mother, who was his primary abuser, inflicted upon Mr. Hammer "bizarre, torturous types of punishments" that included "giving him an enema with scalding hot waters, at times enemas with Tabasco sauce and other irritants" in order "to burn the evil out of him."  (U)

392.   The Court finds this aspect of Dr. Blumberg's testimony credible.

393.   Dr. Blumberg reported, and this Court so finds, that Mr. Hammer's history of sexual abuse dates back to age five years and includes sexual victimization at the hands of a maternal uncle,

a maternal cousin, a friend of his uncle's, molestation by his mother and sexual relations with his sister orchestrated and witnessed by his father.

394.   The Court also finds that the sexual abuse of Mr. Hammer continued throughout Mr. Hammer's childhood and into his teenage years.

395.   Dr. Blumberg was of the opinion, and the Court so finds, that because Mr. Hammer's abusers were his parents and family members, the psychiatric trauma he endured as a result of the abuse was even more severe than if the abuse had been inflicted by a stranger or a non-family member.

396.   Dr. Blumberg testified that Mr. Hammer's family history includes a history of alcoholism, depression, prescription drug abuse, seizures and Attention Deficit Disorder.   Instability was also a family trademark throughout Mr. Hammer's childhood evidenced in part by the fact that he attended many different schools before dropping out at the tenth grade.

397.   Records reviewed by Dr. Blumberg indicate that Mr. Hammer first sought mental health treatment in Oklahoma when he was fourteen years old.   These records describe Mr. Hammer as tense, nervous, failing in school, unable to concentrate and as having been recently sexually abused by an older man.   Mr. Hammer also reported that he had attempted suicide by turning on the gas and cutting himself with a razor.   Mr. Hammer's parents failed to heed the advice of the treating psychiatrist who recommended ongoing

therapy.  This Court finds this aspect of Dr. Blumberg's testimony credible.

398.  Records reviewed by Dr. Blumberg also reflect Mr. Hammer received out-patient mental health treatment at age seventeen years and was diagnosed with depressive neurosis and a possible explosive or epileptical personality disorder. He was later hospitalized at Baptist Hospital in Oklahoma as a result of depression, suicidal and homicidal thoughts and impulsive anger. This aspect of Dr. Blumberg's testimony is also credited by this Court. (U)

399.  Dr. Blumberg also noted, and this Court so finds, that in 1976, Mr. Hammer was diagnosed as suffering from Borderline Schizophrenia, a diagnosis that was later reclassified as Borderline Personality Disorder, the diagnosis reached of Mr. Hammer by both defense and prosecution mental health experts in this case. (U)

400.  By age fourteen, Mr. Hammer was abusing a wide variety of drugs, including Phencyclidine (PCP), which often causes psychotic symptoms. (U)

401.  Dr. Blumberg noted that Mr. Hammer's drug use continued after his incarceration in the Oklahoma Department of Corrections where Mr. Hammer began abusing Heroin.  According to Dr. Blumberg, Mr. Hammer's use of both PCP and heroin was a form of self-medication that Mr. Hammer used to cope with the overwhelming pain, anxiety and depression resulting from his childhood abuse.

402.    Mr. Hammer reported to all mental health evaluators that his mother subjected him to physical and emotional abuse during his childhood.

403.    Mr. Hammer reported beatings, painful enemas, as well as emotional abuse. (U)

404.    Mr. Hammer reported that his father sexually abused his sister and coerced him into sexual activity with her at an early age. (U)

405.    Mr. Hammer's mother was also sexually inappropriate with him, inspecting his genitalia routinely.

406.    During the interview session with Drs. Dubin and Sadoff on September 17, 1997, prior to Dr. Dubin's attempt to hypnotize Mr. Hammer, Mr. Hammer outlined some of the abuse as follows:

> DPH:    A lot of the things that's most difficult to deal with is having to do with my mom.  I hated her and then I loved her.  She's dead now, and she did a lot of things to me.  Things that kid's shouldn't have done to them.  And I try to just block it out, but you can't, and a lot of it's – I've had to talk about a lot of it and deal with it because of what's going on and the more – I mean I see pictures and it just brings back things.

> Dubin: Anything you want to talk about, . . . .

> DPH:    She beat me, . . . .  I mean for no reason. But as bad as the physical things, was the verbal and emotional – telling me that you're worthless, you're no good, you're dirty, you know, I mean never showing you love or – it wasn't all, I mean, it wasn't always like that, she –

> *    *    *    *    *    *    *

> Dubin: What else did she do, David?

> DPH:    She used to give me enemas all the time.  She used

to make me – she'd make me – I'd be naked and she'd give me enemas.  She had this bottle, this red thing and she'd – the water would be hot, I'd be telling her mom, please stop, it's too hot.  Sometimes, she'd put hot sauce in it be burning.  (sic) And then when I'd be going all over the place, I couldn't hold it any more, and she'd, she'd go, shame, shame, shame, shame.

\*     \*     \*     \*     \*     \*     \*

Dubin:  Did she have a good relationship with your dad?

DPH:    She, who my momma?  She was the dominant one in the family.  She was – she called the shots.  When I was 8 years old, 9 years old, we had these puppies.  My cousin's dog, \_\_\_\_\_ had puppies, and we lived out in the country and had to ride a school bus to school, my sister and I, my little brother was too young, He wouldn't going to school yet.  And we had to walk about a quarter of a mile down this little trail to catch the school bus.  And the dogs would, you know the puppies, they were just like Heinz 57 puppies.  And so they would follow us to the school bus.  So one morning I go to school and when I come home that afternoon, the bus left me off, and my momma's got this shovel.  We get off the school bus, my sister and I, and the bus goes on, and my momma calls me to the side and says to my little brother to go to our house with my sister.  And then pulls me over to the side and there's a dog, a little puppy that got ran over, it's my little brother's puppy.  We each one had one, my sister and I and my little brother.  So she made me take the shovel and bury the puppy.  She tell's me it's my fault that the puppy got ran over.  Said he got ran over that morning when we went to school.  I didn't see it get run over.  So then we go up past the house, and she grabs up my little sister's puppy and she makes me get my puppy and we walk about a quarter of a mile the other direction from the house and there's a pond.  And she still got the shovel in one hand and then she's got a toe sack, a gunnysack, and – we get down there by the pond, and she takes the puppies and she puts the puppies in the sack, the toe sack, and ties it up, and then she – I'm asking her what she's doing.  She says I'm teaching you a lesson.  And then she takes the shovel and goes to beat on the doggies, a bunch of times, and blood soaks through the sack, and then she picks up one end of the sack and makes me pick up the other end of the sack, and she throws it off

87

> into the pond.  You know the sack.  She said that if my little brother couldn't have a puppy, then me and my sister couldn't either.

Government Exhibit 36, pages 9-11.

407.  Dr. Blumberg agreed with the fact that, as a young person, Mr. Hammer's parents encouraged him to engage in fraudulent behavior. (U)

408.  Mr. Hammer specifically shared with Dr. Blumberg information about his mother asking him to engage in fondling and other sexual activities. (U)

409.  This information regarding his mother asking him to engage in fondling was not presented at the time of trial in 1998.

410.  Dr. Blumberg testified, and this Court so finds, that childhood victims of  physical, sexual, verbal and emotional abuse such as that endured by Mr. Hammer can lead to the development of Posttraumatic Stress Disorder, depression and impairment in character structure or personality, each of which are present in Mr. Hammer.  (U)

411.  Dr. Blumberg testified, and this Court so finds, that Mr. Hammer suffers from the following characteristics of Posttraumatic Stress Disorder, Chronic: he was exposed to numerous traumatic events; his response to these traumatic events included fear, helplessness and horror; he suffers from recurrent and intrusive, distressing recollections of the trauma; he suffers from nightmares; persistent symptoms of increased arousal; sleep disturbance; irritability; difficulty concentrating; hypervigilence and displays both the psychological distress and physical symptoms

of anxiety when he thinks about the trauma he endured or is reminded of the abuse.

412.   Dr. Blumberg testified, and this Court so finds, that Posttraumatic Stress Disorder and Borderline Personality Disorder may be caused by severe trauma, abuse and neglect.

413.   Dr. Blumberg testified, and this Court so finds, that Mr. Hammer also suffers from dissociative symptoms that are associated with Posttraumatic Stress Disorder.

414.   Dr. Blumberg concluded that Mr. Hammer suffers from a severe identity disturbance which he included under the diagnosis of Borderline Personality Disorder.

415.   Dr. Blumberg did not, however, diagnose Mr. Hammer with Dissociative Identity Disorder because he did not observe distinct personalities and there was a question about Mr. Hammer's reliability in this regard.

416.   Dr. Blumberg was of the opinion that Mr. Hammer's character structure was irrevocably damaged by the severe trauma that he sustained during his childhood and adolescence.

417.   Dr. Blumberg defined the essential characteristics of Borderline Personality Disorder as follows: "a pervasive pattern of instability of interpersonal relationships, self image and affects and marked impulsivity beginning by early adulthood and present in a variety of contexts."  The Court accepts this definition.

418.   Dr. Blumberg testified, and the Court so finds, that a Borderline Personality Disorder is a debilitating form of mental illness.

89

419.    Dr. Blumberg testified, and this Court so finds, that Mr. Hammer is severely debilitated by his Borderline Personality Disorder and his other deficits.

420.    This Court credits Dr. Blumberg's testimony that the symptoms of Borderline Personality Disorder present in Mr. Hammer include: frantic efforts to avoid real or imagined abandonment; failure to establish a close nurturing relationship with parental figures; a pattern of unstable and intense interpersonal relationships; identity disturbance; markedly and persistently unstable sense of self; impulsivity in areas that are potentially self-damaging; recurrent suicidal behavior or gestures; affective instability (meaning a dramatic fluctuation in emotions); chronic feelings of emptiness; inappropriate, intense anger; difficulty controlling anger; paranoid thinking and severe dissociative symptoms.

421.    Dr. Blumberg stated almost everybody agreed on the antisocial personality disorder diagnosis in Mr. Hammer's case. (U)

422.    Dr. Blumberg testified, and this Court so finds, that Mr. Hammer currently manifests active symptoms of both Post-Traumatic Stress Disorder, Chronic, and Borderline Personality Disorder, and he did so during the trial and post trial proceedings before this Court.

423.    Dr. Blumberg testified, and this Court so finds, that Mr. Hammer suffers from a severe identity disturbance and that individuals who suffer from a Borderline Personality Disorder often

suffer "severe dissociative symptoms and even transient psychotic symptoms under great stress."

424.  Dr. Blumberg testified, and the court so finds, that the active symptoms of Posttraumatic Stress Disorder wax and wane.

425.  Dr. Blumberg testified that retrospective competency evaluations are difficult.

426.  Dr. Blumberg testified that not all people with Borderline Personality Disorder are incompetent to proceed legally.

427.  Dr. Blumberg testified that Mr. Hammer's conditions of confinement did not cause his Posttraumatic Stress Disorder.

428.  Dr. Blumberg concluded that Mr. Hammer was not competent on June 22, 1998.

429.  Dr. Blumberg admitted there was nothing specific in the transcript of the June 22, 1998, proceeding which supports his conclusion.

430.  During the § 2255 hearing, Dr. Wolfson did not dispute Dr. Blumberg's Axis I diagnosis of Mr. Hammer as having Posttraumatic Stress Disorder.

431.  Although we find Dr. Blumberg credible with respect to his psychiatric evaluation of Mr. Hammer, we do not find credible Dr. Blumberg's conclusion that Mr. Hammer was not competent and not acting voluntarily, intelligently and rationally at the time of (1) the change of plea proceeding, (2) the proceeding where he discharged counsel and was authorized to decide on his own whether to pursue an appeal and (3) the proceeding before the Court of Appeals  when he withdrew his appeal.

**J.   Dr. Gelbort's Involvement with and Assessment of Mr. Hammer.**

432.   Dr. Michael M. Gelbort testified during the trial in this case. (U)

433.   In 1977 Dr. Gelbort graduated from Grinnell College, Grinnel, Iowa, with a Bachelor of Arts degree in psychology and general sciences.

434.   In 1984 he received a Ph.D. in clinical psychology with a minor in applied human neuropsychology from Texas Tech University, Lubock, Texas.

435.   After receiving his Ph.D. from Texas Tech University he served a post-doctoral fellowship in neuropsychology for one year at the Rehabilitation Institute of Chicago

436.   Dr. Gelbort is a licensed clinical psychologist in the states of Illinois and Indiana, and has an inactive license in the state of Texas.

437.   Dr. Gelbort has conducted a clinical and neuropsychological private practice in Illinois since 1989.

438.   At trial and during the Section 2255 proceedings, the Government did not object to Dr. Gelbort's qualification as an expert in neuropsychology. (U)

439.   The Court finds Dr. Gelbort qualified as an expert in neuropsychology for purposes of these Section 2255 proceedings. (U)

440.   Prior to trial, Dr. Gelbort conducted a neuropsychological examination of Mr. Hammer. (U)

441.    Prior to his trial testimony, Dr. Gelbort reviewed materials regarding Mr. Hammer's background and history and conducted a forensic neuropsychological examination. (U)

442.    During his pretrial evaluation, Dr. Gelbort administered a number of psychological and neuropsychological tests that were listed in his report and covered in his trial testimony. (U)

443.    Dr. Gelbort conducted a further evaluation of Mr. Hammer in 2004. (U)

444.    Dr. Gelbort concluded to a reasonable degree of psychological and neuropsychological certainty that at the time of trial in 1998 Mr. Hammer suffered from brain dysfunction and cognitive and emotional impairments.

445.    He also concluded that Mr. Hammer presently suffers from brain dysfunction and cognitive and emotional impairments.

446.    Dr. Gelbort found that by and large Mr. Hammer's deficits localize and lateralize on the right side of the brain.

447.    Dr. Gelbort concluded that the damage to Mr. Hammer's brain is primarily focused in the frontal lobe and to a lesser degree the temporal lobe.

448.    Dr. Gelbort testified that "when [Mr. Hammer] has to size up a situation . . . and to problem solve, there are times when he may present with normal abilities, and there are times where he will present with impaired or abnormal abilities."

449.    The frontal lobes are the part of the brain that synthesize thoughts. (U)

450.    The frontal lobes are the part of the brain that initiate and inhibit behavior.

451.    The frontal lobes are the part of the brain that control reasoning and judgment.

452.    The frontal lobe area of the brain serves as a source of initiation and inhibition of behavior.   (U)

453.    As a result of his frontal lobe impairments, Mr. Hammer has some difficulties with inhibition, impulsivity and judgment.

454.    As a result of the frontal lobe impairments, Mr. Hammer demonstrates (1) some difficulties in terms of problem solving and reasoning and (2) impulsivity.

455.    As a result of his frontal lobe dysfunction, Mr. Hammer sometimes acts before thinking, thus causing him to respond to stimuli before he fully processes information.

456.    Mr. Hammer's brain dysfunction at times also impairs his ability to synthesize information.

457.    Dr. Gelbort was of the opinion that Mr. Hammer's emotions are poorly modulated.

458.    Dr. Gelbort opined that Mr. Hammer's brain dysfunction causes him to respond to his emotions in an abnormal manner. (U)

459.    The testing and evaluation conducted by Dr. Gelbort demonstrates that, while Mr. Hammer is a logical person, his emotions sometimes control his behavior.

460.  The testing and evaluation conducted by Dr. Gelbort demonstrated Mr. Hammer's visual perception to be within normal limits. (U)

461.  Dr. Gelbort testified that Mr. Hammer's "verbal processing abilities again and again were better than his visual-spatial.  He thinks better when he's using words as the medium rather than when he's using images or concepts as the medium."

462.  Dr. Gelbort testified that "[t]here certainly are times when his emotions are well modulated, but there are other times when his emotions appear to be poorly modulated. . . we normally look at people making decisions based on cognition or thinking skills as well as their emotional response to a situation. It appears from the unbridled emotionality that was shown in some of the testing as well as review of records and interactions with Mr. Hammer that there will be episodes when he reacts very emotionally and may not take cognition or thinking as much into account as most people do."

463.  Dr. Gelbort testified that the fact that Mr. Hammer's left-brain functioning, including intelligence, is average does not diminish the impact of his right-brain and frontal lobe impairments on his decision-making.

464.  The behavioral impact of all of Mr. Hammer's brain impairments can be exacerbated during periods of stress.

465.  The behavioral manifestations of Mr. Hammer's emotional and brain deficits are exacerbated by the emotional

trauma he suffered as a result of his horrific and abusive upbringing.

466.   Mr. Hammer can reach appropriate decisions when provided verbally-based, concrete, non-emotionally laden problems. (U)

467.   Dr. Gelbort concluded to a reasonable degree of neuropsychological certainty that testing revealed frontal lobe and temporally located neurocognitive dysfunction which correlates with deficits in reasoning and judgment as well as impulsivity and disinhibition.

468.   Dr. Gelbort concluded that Mr. Hammer was not competent on June 22, 1998, when he enter a plea of guilty, on October 1, 1998, when decided to proceed pro se, and in July of 2000 when he requested that the Court of Appeals dismiss his appeal.

469.   Dr. Gelbort stated he had learned that Mr. Hammer had entered a guilty plea in 1998 when he was at the penalty phase in July 1998 to testify. (U)

470.   Dr. Gelbort had spoken with attorneys Travis and Ruhnke at the time of his testimony about Mr. Hammer having trouble with his thinking. (U)

471.   Dr. Gelbort indicated that Mr. Hammer had some sensory problems with his left hand. (U)

472.   Dr. Gelbort stated Mr. Hammer could not identify consistently which finger was being touched when he wasn't looking. (U)

473.   Dr. Gelbort indicated that a person who has numbness in both hands, can be competent to be tried. (U)

474.   Dr. Gelbort stated there are six to eight cases in which he testified which were federal death penalty cases. (U)

475.   Dr. Gelbort indicated that in 1997 Mr. Hammer was oriented times four when he spoke with him. (U)

476.   Dr. Gelbort stated it may well have been appropriate for Mr. Hammer to be tearful at times when his abusive past was brought out. (U)

477.   Although we find Dr. Gelbort credible with respect his psychological evaluation of Mr. Hammer, we do not find credible Dr. Gelbort's conclusion that Mr. Hammer was not competent and not acting voluntarily, intelligently and rationally at the time of (1) the change of plea proceeding, (2) the proceeding where he discharged counsel and was authorized to decide on his own whether to pursue an appeal and (3) the proceeding before the Court of Appeals when he withdrew his appeal.

**K.   Dr. Gur's Involvement with and Assessment of Mr. Hammer.**

478.   Dr. Ruben C. Gur testified during the section 2255 hearing regarding various brain imaging tests that were performed on Mr. Hammer.

479.   In 1970 Dr. Gur graduated from the Hebrew University of Jerusalem, Israel, with a Bachelor of Arts degree in psychology and philosophy.

97

480.  Dr. Gur graduated from Michigan State University in 1971 with a Masters of Arts in clinical psychology and in 1973 with a Ph.D. in clinical psychology.

481.  After graduating from Michigan State University with a Doctor of Philosophy Dr. Gur received a fellowship appointment at Stanford University, Stanford, California, in clinical psychology.

482.  Dr. Gur has been on the faculty of the University of Pennsylvania School of Medicine, Philadelphia, Pennsylvania, since 1981.

483.  Dr. Gur presently holds the position of Professor of Psychiatry, Neurology and Radiology at the University of Pennsylvania School of Medicine.

484.  Dr. Gur is also the Director of Neuropsychology and the Brain Behavior Laboratory, Department of Psychiatry, at the Hospital of the University of Pennsylvania.

485.  Dr. Gur is certified by the American Board of Professional Psychology in clinical neuropsychology.

486.  The Court finds that Dr. Ruben Gur is a qualified expert in neuropsychology and neuroimaging.  (U)

487.  Dr. Gur explained that visual information moves from the rear to the front of the brain (the frontal lobes) which analyzes the information and decides the course of action the individual will take.

488.  There are two streams the information follows to the front of the brain: the parietal and temporal streams.

489.  The parietal stream interprets information relative to the individual's needs and the temporal stream interprets information relative to the individual's memory.

490.  Dr. Gur testified that within the temporal stream is the temporal hippocamus which is the part of the brain that compares stimuli to memories and decides whether or not the person needs to act on the information.

491.  Also within the temporal stream is the limbic system, including the amygdala, which is the part of the brain that regulates emotional responses to information.

492.  After passing through these sections of the brain, the information goes to the frontal lobe – the part of the brain that puts the information into context and makes judgments about what action to take.

493.  The temporal lobe is also the area of the brain that integrates and interprets sounds.

494.  The left temporal area identifies the words or sounds while the right temporal area relates more to the tone or interpretation of those sounds.

495.  As with visual stimuli, auditory stimuli also are processed through the hippocampus and the amygdala (the part of the brain that determines threatening information) and then sent to the frontal lobe for context and interpretation.

496.  Dr. Gur conducted a forensic neuropsychological evaluation of Hammer.

497.  Dr. Gur conducted and supervised forensic neuroimaging of Mr. Hammer's brain. (U)

498.  As part of his evaluations, Dr. Gur reviewed background materials that included prior institutional records, the testimony from Mr. Hammer's trial and mental health evaluations conducted by Drs. Gelbort, Sadoff, Grassian, Mitchell and Wolfson. (U)

499.  Dr. Gur's neuroimaging of Mr. Hammer included high resolution volumetric Magnetic Resonance Imaging [MRI]; a positron emission tomography scan [PET]; and computerized neuropsychological testing. (U)

500.  The MRI conducted by Dr. Gur is utilized in a number of hospitals across the country.  (U)

501.  The protocols and processes for the MRI conducted by Dr. Gur have been peer-reviewed.

502.  The quantitative MRI conducted by Dr. Gur differs from a routine MRI intended to detect brain tumors or other abnormalities.

503.  Unlike a normal MRI, the MRI conducted by Dr. Gur measures the volume of the brain tissues, gray matter and white matter.

504.  The MRI conducted by Dr. Gur calculates the combination of the volumes to develop a three dimensional model.

505.  Because the quantitative MRI conducted by Dr. Gur calculated the volumetric measure of the entire brain, it is more likely to identify lesions in addition to tumors.

506.   The MRI conducted by Dr. Gur on Mr. Hammer indicated that his brain is abnormally small. (U)

507.   The reduced size of the brain is not attributable to normal aging because Mr. Hammer's ventricles are not enlarged.

508.   When viewing an MRI cross-section of the brain the ventricles are "semi-moonlike shapes in the center of the brain" which contain the cerebral spinal fluid.

509.   As an individual ages the ventricles become larger because brain cells die and cerebral spinal fluid fills the void.

510.   The abnormally small size of Mr. Hammer's brain is the result of dystrophy, i.e. a failure to develop.

511.   The etiology of the abnormalities in Mr. Hammer's brain is consistent with organic causes such as pre-natal maternal alcohol use and failure to thrive, as well as external causes, such as abuse and neglect.

512.   The quantitative reading indicated that Mr. Hammer has reduced volume in both the left and right frontal lobes. (U)

513.   The quantitative reading indicated that, while Mr. Hammer was within normal limits in the temporal region, his right temporal lobe was abnormal.

514.   The quantitative reading indicated reduced volumes in the parietal lobe, both left and right.

515.   Dr. Gur was of the opinion to a reasonable degree of scientific certainty that the brain abnormality revealed by the quantitative analysis of the MRI is indicative of Mr. Hammer's cognitive processing deficits.

516.   Dr. Gur also conducted a quantitative Positron Emission Tomography or PET scan on Mr. Hammer. (U)

517.   The PET examines the physiological processes in the brain. (U)

518.   The PET examines the actual pulses that run through the brain or the activity of the brain.

519.   The clinical reading of the PET scans by Dr. Newberg, a medical doctor, indicated impairments in the thalamus, the right frontal lobe, the temporo-parietal region, and the temporo-occipital lobe.

520.   The protocols and processes of the PET conducted by Dr. Gur are peer-reviewed.

521.   Dr. Gur described the quantitative PET analysis as follows:

> What that entails is taking Mr. Hammer's – Mr. Hammer's actual scan and apply to it a standard set of regions of interest that are routinely examined.  There are 36 of those regions on each side.  And then basically you punch a button and you get the numbers for those regions.  These numbers indicate the metabolic rate in those regions. In order to – in order to compare the regional differences, what we routinely do is we take each region and divide it by the value of the whole brain. So that when you do that, it's a similar exercise to the Z scores, you get one, meaning average, and anything above or below one is above or below the average.  What we do here is we take our sample of healthy people and plot them together with the standard deviation, so we know whether any particular scan deviates from the regional distribution of metabolic activity relative to our sample of healthy people.

522.   Dr. Gur testified that the quantitative analysis indicated damage in Mr. Hammer's frontal lobe region.

523.   The quantitative analysis also revealed abnormal activation in the hippocampus (the part of the brain that compares stimuli to memories), parahippocampal gyrus and the amygdala.

524.   According to Dr. Gur, the quantitative analysis also found abnormalities in the posterior cingulate gyrus which is the part of the brain that refines emotions and in the lateral part of the basil ganglia, the hippocampus, and the pons.

525.   The PET results indicate to Dr. Gur that Mr. Hammer had abnormal brain function which existed at the time of the offense, trial and during post-trial proceedings.

526.   Dr. Gur's PET and MRI results were largely consistent with the results of Dr. Gelbort's neuropsychological testing.

527.   Dr. Gur also conducted computerized neuropsychological testing of Mr. Hammer.  That type of testing has been peer-reviewed.

528.   The computerized testing indicated damage in Mr. Hammer's frontal, limbic, right parietal and right temporal areas.

529.   In addition, Dr. Gur evaluated the data from Dr. Gelbort's neuropsychological testing with a behavioral imaging algorithm.

530.   The results of that evaluation are consistent with Dr. Gelbort's results, indicating damage in the occipital parietal area, the posterio-temporal area and the frontal and dorsolateral prefrontal areas, extending further medially.

531.  More recently, Dr. Gur was provided with the report and raw data of testing conducted by the Government's expert, Dr. Martell.

532.  Dr. Gur processed the raw data from Dr. Martell's testing through the behavioral imaging algorithm.

533.  Dr. Martell's testing image shows even more frontal lobe damage than that produced by the behavioral imaging from Dr. Gelbort's testing.

534.  Parietal region anatomic abnormalities are linked to dissociative symptomatology.

535.  Frontal lobe anatomic abnormalities may impact judgment and modulation.

536.  Temporal lobe anatomic abnormalities may impact and impair perception and processing of information.

537.  The results of the tests conducted by Dr. Gur provide a strong basis for concluding that Mr. Hammer suffers from cognitive deficits.

538.  Dr. Gur also concluded to a reasonable degree of scientific certainty that Mr. Hammer's impairments have resulted in deficits in impulse control, judgment, memory, sense of self and emotional lability.

539.  Mr. Hammer suffered cognitive deficits at the time of trial and presently suffers from such deficits.

540.  The deficits suffered by Hammer involve impulse control and modulation as well as fundamental sensory processes.

541.  Dr. Gur concluded that Mr. Hammer was not competent on June 22, 1998, when he enter a plea of guilty, on October 1, 1998, when decided to proceed pro se, and in July of 2000 when he requested that the Court of Appeals dismiss his appeal.

542.  Although we find Dr. Gur credible with respect to his psychological evaluation and neuroimaging of Mr. Hammer, we do not find credible Dr. Gur's conclusion that Mr. Hammer was not competent and not acting voluntarily, intelligently and rationally at the time of (1) the change of plea proceeding, (2) the proceeding where he discharged counsel and was authorized to decide on his own whether to pursue an appeal and (3) the proceeding before the Court of Appeals when he withdrew his appeal.

**L.  Dr. Grassian's Involvement with and Assessment of Mr. Hammer.**

543.  Stuart Grassian is a medical doctor who is Board Certified in psychiatry, forensic psychiatry and addiction psychiatry.  Dr. Grassian completed his psychiatry residency in 1977 and began his forensic psychiatric work in 1979.  Dr. Grassian was on the faculty of the Harvard Medical School from 1977 until approximately 2002.  He also received his Juris Doctorate degree from Suffolk University in 1985. (U)

544.  Dr. Grassian has a full-time clinical practice and also specializes in the psychiatric consequences of stringent conditions of confinement, addictive disorders and has extensive experience evaluating and teaching about the psychiatric effects of childhood sexual abuse and childhood trauma. (U)

545.  Dr. Grassian also has experience evaluating

individuals held in stringent conditions of confinement.

546.  Dr. Grassian was accepted by this Court as an expert in the field of the psychiatric impact of conditions of confinement and forensic psychiatry. (U)

547.  Dr. Grassian testified that he was initially contacted by defense counsel for Mr. Hammer in either 1996 or 1997.  Defense counsel subsequently retained Dr. Grassian and he conducted two phone interviews of Mr. Hammer in September, 1997 totaling five hours. (U)

548.  During their five hours of conversation, Dr. Grassian explored with Mr. Hammer his experiences in prison, the difficulties he had endured at various times while incarcerated and briefly discussed with Mr. Hammer the death of Mr. Marti.  (U)

549.  Dr. Grassian also talked at length with Mr. Hammer about the conditions of confinement Mr. Hammer endured in Oklahoma and the conditions of confinement he endured while being held pretrial in this case at the United States Penitentiary at Allenwood. (U)

550.  Subsequently, in December, 2004, Dr. Grassian conducted a four-hour psychiatric evaluation of Mr. Hammer at the United States Penitentiary, Lewisburg, Pennsylvania.

551.  During the course of this evaluation, Dr. Grassian discussed with Mr. Hammer his experiences at the Federal Bureau of Prisons Medical Center and again reviewed the conditions of confinement Mr. Hammer endured pretrial and during his incarceration in Oklahoma. (U)

552.   Dr. Grassian testified that he also reviewed numerous records and documents pertaining to Mr. Hammer, including the reports of Drs. Kluft, Sadoff, Gelbort, Matthews, Martell and Wolfson; the trial testimony of Drs. Wolfson, Mitchell and Sadoff; the penalty phase transcripts; the transcripts from the competency proceedings held in this case; records from the Oklahoma Department of Corrections; records from the Federal Bureau of Prisons; records from the Baptist Hospital in Oklahoma; records from Oklahoma Memorial Hospital; records from St. Anthony's Hospital; records from Eastern State Hospital; records from Griffith Memorial Hospital; the medical records of Mr. Hammer's grandmother; and a memoranda from the warden of the Oklahoma State Penitentiary regarding Mr. Hammer's conditions of confinement. (U)

553.   Based upon his review of the relevant medical/psychiatric literature and his examination of numerous prisoners exposed to stringent conditions of confinement, Dr. Grassian opined that conditions of confinement that include sensory deprivation, isolation and limited exposure to other people inexorably lead to difficulties in thinking, concentration, memory, emotional and cognitive impairments, hyper-responsivity, impulsivity, obsessional thinking, confusional psychosis, intense agitation and paranoia and dissociative states. (U)

554.   Dr. Grassian testified that there is substantial medical evidence that prisoners "who have been in solitary confinement for a long period of time can have long lasting effects" impacting their later psychiatric functioning. (U)

555.   Following April, 1996 and through the time of his trial, Mr. Hammer was confined in a single-cell. (U)

556.   Following April, 1996, Mr. Hammer ate his meals in the single cell. (UO)

557.   Following April, 1996 and through the time of his trial, Mr. Hammer showered in a his single cell. (U)

558.   Following April, 1996 and through the time of his trial, Mr. Hammer was provided five hours of recreation per week. (U)

559.   Following April 1996 and through the time of his trial, the recreation occurred in a cage where Mr. Hammer was the sole occupant. (U)

560.   Before being escorted to the recreation cage, Mr. Hammer was strip-searched. (U)

561.   The strip-search occurred in the presence of at least three correctional officers. (U)

562.   Social visits for Mr. Hammer were non-contact. (U)

563.   Mr. Hammer was subjected to strip-searches before and after social visits, in the presence of at least three correctional officers. (U)

564.   Following April, 1996 and through the time of his trial, Mr. Hammer was not permitted to attend religious services. (U)

565.   Following April 1996 and through the time of Mr. Hammer's trial, the number of books Mr. Hammer could have was limited. (UO)

566. Following April 1996 and through the time of his trial, Mr. Hammer was restricted in the personal property he could keep in his cell. (U)

567. Based upon his review of Mr. Hammer's incarceration history, Dr. Grassian believes that Mr. Hammer has a long history of being held in solitary confinement both in Oklahoma and in the Federal Bureau of Prisons. (U)

568. Dr. Grassian was of the opinion that Mr. Hammer's prior conditions of confinement while in Oklahoma and while incarcerated pretrial at the United States Penitentiary at Allenwood were "extremely harsh and would certainly have had a highly negative impact on [Mr. Hammer's] emotional cognitive capacity."

569. Dr. Grassian opined that various "vulnerability factors" would exacerbate pre-existing mental illness and cognitive dysfunction in prisoners held under stringent conditions of confinement in addition to the sequella of symptomology associated with solitary confinement. (U)

570. Dr. Grassian identified Mr. Hammer as having those "vulnerability factors" for enhanced psychiatric trauma from stringent conditions of confinement. (U)

571. These vulnerability factors included Mr. Hammer's history of childhood physical and sexual abuse; cognitive impairments, Borderline Personality Disorder, DID, and depression. (U)

572. Dr. Grassian opined that dissociation is very common in individuals who suffer from a Borderline Personality Disorder

such as Mr. Hammer and "at least in part does reflect the fact that many people with Borderline Personality Disorder grew up with severe childhood sexual and physical abuse and emotional abuse." (U)

573. Dr. Grassian also testified that there is a significant overlap diagnostically between DID and Borderline Personality Disorder. He further noted that Mr. Hammer's background of physical and sexual abuse is clinically associated with the development of a dissociative disorder. (U)

574. Dr. Grassian could not recall ever testifying for the prosecution. (UO)

575. Dr. Grassian stated that from time-to-time at least since 1994 he had been involved in death penalty cases. (UO)

576. Dr. Grassian stated he had been consulted on a number of death penalty cases, about a dozen or so. (UO)

577. Other than the Florida Department of Corrections – Dr. Grassian always testifies on behalf of prisoner/plaintiffs. (UO)

578. Dr. Grassian stated he had never worked regularly in a prison, state or federal. (UO)

579. Dr. Grassian stated he did not hold himself out as an expert on stressors of criminal trials.

580. The information from the June 22, 1998, transcript did not support nor was it relied upon by Dr. Grassian in reaching his opinions.

581. Dr. Grassian was of the opinion that Mr. Hammer prior to June 22, 1998, was impaired but to what extent did not know, because he never really explored that in any detail.

582. Dr. Grassian testified that to a reasonable degree of medical and psychiatric certainty Mr. Hammer's waiver of his right to stand trial, his entry of a guilty plea, and his waiver of direct appeal was "not an intelligent and knowing and rational, voluntary decision."

583. This Court does not find Dr. Grassian's opinion set forth in the last prior finding of fact to be credible.

**M.  Dr.  Kluft's Involvement with and Assessment of Mr. Hammer.**

584. Richard P. Kluft is a medical doctor who is Board Certified in Psychiatry and Neurology.  (U)

585. Dr. Kluft is a Clinical Professor of Psychiatry at Temple University, a lecturer at Harvard Medical School's continuing education series and a member of the faculty of the Philadelphia Center for Psychoanalysis.   (U)

586. Dr. Kluft has written over 200 articles in the last 30 years, including numerous peer-reviewed articles on dissociation and Dissociative Identity Disorder ("DID"), including articles in the American Psychiatric Association's Textbook of Psychiatry. (U)

587. Dr. Kluft described Dissociative Identity Disorder as follows:

> [A] dissociative identity disorder can be diagnosed when there is the presence  of two or more distinct identities or personality states, each with their own relatively enduring pattern of perceiving, relating to, and thinking about the environment, and then thinking about the self.
>
> There's another criterion that at least two of these have to recurrently take control of the person's behavior.  Then there is an amnesia criterion, the inability to recall certain important personal information that is too extensive to be explained by ordinary forgetfulness.  And,

fourth, there is a criterion that the manifestations are not due to some drug or some medical illness.

588.  The issues explored in the peer-reviewed articles written by Dr. Kluft include the diagnosis and treatment of patients with DID; covert manifestations of dissociation and DID; differentiating DID from other mental disorders; simulation and dissimulation of DID; malingering and iatrogenic aspects of DID. (U)

589.  Dr. Kluft defined "iatrogenic" disorders as "physician caused" disorders.

590.  One peer-reviewed article involved a study of the potential for iatrogenesis and diagnoses of DID.(U)

591.  That study found that "a person with a condition just short of a multiple personality disorder, such as a dissociative disorder not otherwise specified . . . could sometimes be shaped into someone who would actually then go on and behave as an overt multiple personality disorder patient."

592.  Dr. Kluft also found that there was "strong evidence to indicate that inappropriate treatment can generate additional personalities, and sometimes those personalities will be shaped along the basis of what the clinician is leading the patient to talk about."

593.  Dr. Kluft was invited to be a member of the committee of the Diagnostic and Statistical Manual of Mental Disorders ("DSM") and participated in the review and development of the DSM's diagnostic criteria. (U)

594.  Dr. Kluft has been awarded the Pierre Janet Award for Writing in the Field of Dissociation; the Erickson Award for Excellence in Scientific Writing; and the Award for Distinguished Teaching by the American Psychiatric Association.  (U)

595.  In addition to his research, Dr. Kluft has a clinical practice where 90 percent of his patients have DID or related disorders. (U)

596.  Over the course of his professional career, Dr. Kluft has diagnosed and treated hundreds of persons with DID, and related disorders. (U)

597.  Dr. Kluft has been qualified as an expert in psychiatry in state and federal court between three and four dozen times.

598.  Dr. Kluft has been qualified as an expert in psychiatry in criminal cases "somewhere between 12 and 18" times.

599.  During the § 2255 hearing Dr. Kluft was qualified as an expert in psychiatry and in the diagnosis and treatment of DID and related dissociative disorders.

600.  Dr. Kluft explained that child sexual abuse results in trauma that can form the predicate for a number of trauma-related mental health disorders. (U)

601.  People who have suffered trauma as a result of child abuse are much more likely to have a lowered immunity. (U)

602.  Dr. Kluft stated that there are a number of trauma-related disorders, including Dissociative Identity Disorder, Posttraumatic Stress Disorder, and Borderline Personality Disorder.

603.  Persons overwhelmed by trauma are likely to encounter problems with identity, self-regulation, planning and impulse control.  (U)

604.  Those who suffer trauma as a result of child abuse develop ingenious and resourceful fantasies to undo or modify those aspects of the abuse that cannot be coped with by the victim's mind. (U)

605.  Dissociation is a defense mechanism employed by a trauma victim in response to trauma. (U)

606.  Dr. Kluft conducted an evaluation of Mr. Hammer for the purposes of determining whether or not Mr. Hammer suffers from Dissociative Identity Disorder.

607.  In addition to the evaluation, Dr. Kluft reviewed a number of records including reports of Drs. Sadoff, Gelbort, Gur, Blumberg, Grassian, Wolfson, Matthews and Martell. (U)

608.  The reports of Drs. Gelbort, Gur and Martell indicated the presence of brain damage. (U)

609.  Dr. Kluft testified that frontal lobe dysfunction is associated with both Dissociative Identity Disorder and Posttraumatic Stress Disorder.

610.  Dr. Kluft also reviewed the videotape of the hypnosis session conducted by Drs. Sadoff and Dubin and the videotape of the evaluation conducted by Drs. Matthews and Martell.  (U)

611.  During his evaluation, Dr. Kluft administered the Eye Roll Section of the Hypnotic Induction Profile. (U)

612.  This testing does not require hypnosis and is not the same as hypnosis.

613.  Instead, the testing simply determines an individual's susceptibility to hypnosis.

614.  Mr. Hammer scored a four on the Eye Roll.

615.  Dr. Kluft testified that a score of four suggests that Mr. Hammer is highly hypnotizable.

616.  Dr. Kluft further testified that in assessing a person for Dissociative Identity Disorder a low score on the Eye Roll test would indicate faking.

617.  In addition to the Eye Roll, Dr. Kluft administered the Dissociative Experiences Scale-II ("DES-II") and the Structured Clinical Interview for the Diagnosis of DSM-IV Dissociative Disorders Revised ("SCID-D-R").

618.  The DES-II is a screening test, not a diagnostic tool.

619.  An average score on the DES-II is 12.

620.  A score of 30 and above suggests that the individual may be suffering from Dissociative Identity Disorder.

621.  A score of 50 or higher would suggest possible malingering.

622.  According to Dr. Kluft a high score on the DES-II is 50 or above.

623.  Not all of the questions of the DES-II could be asked of Mr. Hammer in October, 2004, by Dr. Kluft. (UO)

624.  Dr. Kluft had done on-site modifications of the DES-II prior to the time he examined Mr. Hammer. (UO)

625.  Instead of asking 28 questions, Dr. Kluft asked 26.

626.  Mr. Hammer did not achieve the score of 50 on DES-II but did score a 47 which would have been on 26 questions as opposed to 28.

627.  Dr. Kluft stated Hammer got a high score on finding himself dressed in clothes that he does not recall putting on.

628.  Dr. Kluft testified that he did not know whether Mr. Hammer has many options in terms of what clothes he can wear in prison.

629.  Dr. Kluft stated that Mr. Hammer mentioned in passing that perhaps his commissary orders were not being correctly taken care of by correctional personnel.

630.  Mr. Hammer told Dr. Kluft that he sees himself as if he were watching another person and basically Dr. Kluft accepted Mr. Hammer's explanation.

631.  Dr. Kluft stated that DES-II is a completely self report instrument. (U)

632.  Mr. Hammer prior to the evaluation by Dr. Kluft had substantial background and knowledge of Dissociative Identity Disorder.

633.  Dr. Kluft stated that some people have said that a high score on the DES-II test suggests malingering or faking.

634.  Dr. Kluft testified that he was not sure whether Mr. Hammer was "legitimately under hypnosis" during the session with Drs. Dubin and Sadoff in September of 1997.

635.  Dr. Kluft testified that the vast majority of individuals who have Dissociative Identity Disorder are competent to stand trial.

636.  Dr. Kluft also conducted the SCID-D-R.  (U)

637.  The SCID-D-R is a semi-structured clinical interview where certain questions are always asked and, based on the answers there are alternative questions that may be asked. (U)

638.  There are eight sections of the SCID-D-R: (1)  the history section; (2) an evaluation of amnesia; (3) an evaluation of depersonalization; (4) an evaluation of derealization; (5) an evaluation of identity confusion; (6) an evaluation of identity alteration; (7) an evaluation of signs not within the DSM criteria but associated with Dissociative Identity Disorder; and (8) the follow-up section.

639.  Only the amnesia, depersonalization, derealization, identity confusion and identity alteration sections are scored.

640.  The possible maximum score is 20.

641.  For statistical reasons, no dissociative phenomena is scored as 1; 2 is a mild amount of phenomenon; 3 is moderate; and 4 is a strong indication of phenomenon.

642.  Mr. Hammer scored a 4 on the amnesia section, a 4 on the depersonalization section, a 2 on the derealization section, a 4 on the identity confusion section and a 4 on the identity alteration section.

643.  Mr. Hammer's score was 18 out of 20. (U)

644.   According to Dr. Kluft, Mr. Hammer's score indicates that it is overwhelmingly likely that he suffers from a chronic severe dissociative disorder.

645.   Following the testing and structured interview, Dr. Kluft made direct efforts to request the emergence of personalities.

646.   Dr. Kluft stated that he sought the emergence of the personalities in order to assess how those personalities presented in order to observe consistencies or discrepancies with the data in the videotapes.

647.   Dr. Kluft testified that even before the testing he observed signs of alters.

648.   Dr. Kluft testified that those signs included demeanor and facial expressions and changes that indicated the possibility that he was observing co-presences.

649.   As a result of his observations and review of the background materials, Dr. Kluft first asked to speak with the alter "Wilbur" because Dr. Kluft believed it was Wilbur who was co-presenting and attempting to intrude into the interview. (U)

650.   Dr. Kluft believed that speaking with Wilbur would result in the appearance of "Jocko" because Jocko had been characterized as Wilbur's protector.  (U)

651.   Dr. Kluft testified that he spoke with Wilbur for 12 to 15 minutes.

652.   Dr. Kluft also testified that he observed brief intrusions of angry expressions consistent with Jocko as well as co-presences between Wilbur and Mr. Hammer or Wilbur and Jocko.

653.   Dr. Kluft stated that after brief bursts of a very angry appearance followed by a more direct and prolonged emergence, Jocko did engage in dialogue with Dr. Kluft.

654.   According to Dr. Kluft, Jocko was very eruptively loud, very angry, very belligerent and rushed at the physical divider between Dr. Kluft and Mr. Hammer, then realizing that the divider was there, paced back and forth evincing frustration.

655.   Dr. Kluft stated that in the midst of all the anger displayed by the Jocko alter there were also expressions of fear and anger.

656.   According to Dr. Kluft, when he asked Jocko about his display of fear, Jocko acknowledged it but minimized it.

657.   Dr. Kluft testified that the Jocko alter is "a scared kid flailing about desperately with an adult's strength who comprehends only minimally what's going on and is very quick to react to try to drive away anything that he finds threatening."

658.   Dr. Kluft testified that the Jocko-type alters know they are impotent, and they lash out in order to deny their impotence.

659.   The Jocko alter, according to Dr. Kluft, also engaged in heated expressions of anger and paranoia about psychiatrists and has the perception that everyone thinks there's a good David Paul Hammer and a bad Jocko which perception is not inconsistent with the fear of integration that occurs with persons with DID.

660.   In his review of the videotapes of the hypnosis session with Drs. Dubin and Sadoff and the evaluation conducted by

119

Drs. Matthews and Martell, Dr. Kluft stated he observed co-presences and emergence of alters not previously identified by expert testimony.

661.  Dr. Kluft testified that the hypnosis videotape reveals indications of more than one alter and the presence of Wilbur at times prior to the hypnosis that Drs. Dubin and Sadoff attributed to David Hammer.

662.  While viewing the tape in open-court, Dr. Kluft identified what he believed were the appearances of alter personalities, including Wilbur.

663.  These observations occurred before the hypnosis began and during the conversation between Mr. Hammer and the doctors about his background and history of abuse.

664.  During the playing of this videotape, Mr. Hammer became visibly emotional and distressed in the courtroom to the point that he asked to be removed.  (U)

665.  Mr. Hammer exhibited extreme emotional distress during the viewing of the videotape.

666.  Dr. Kluft opined that Mr. Hammer was undergoing personality switching as he watched the videotape in open-court.

667.  Mr. Hammer requested that he be subjected to additional physical restraints when he returned to the courtroom.

668.  Dr. Kluft testified that the presence of a non-human alter is not indicative of malingering and is common in persons with Dissociative Identity Disorder.

669. Dr. Kluft is a clinician who has done a lot of research and work in the area of dissociative disorders and trauma but he is not a Board Certified forensic psychiatrist.

670. Over 95 percent of Dr. Kluft's practice is clinical. (U)

671. Under 5 percent of Dr. Kluft's practice is forensics or relating mental health issues to legal proceedings. (U)

672. Dr. Kluft was among the early proponents of the position that Multiple Personality Disorder or Dissociative Identity Disorder was underdiagnosed and helped form the International Society for the Study of Multiple Personalities and Dissociation.

673. Dr. Kluft indicated that there is great value in prolonged interviews of people suspected of Dissociative Identity Disorder.

674. Dr. Kluft testified that he has recommended that interviews last "for four or even eight hours . . . during which interviewees should be prevented from taking a break to regain their composure in order for the alter to appear."

675. Dr. Kluft's interview with Mr. Hammer lasted 2.5 hours.

676. At one time, Dr. Kluft stated the hypothetical average multiple personality disorder patient is abused twice a week, 50 weeks out of the year for ten years for an average of 1000 exploitations.

677. Dr. Kluft stated that controversy surrounds Dissociative Identity Disorder.

678.  Dr. Kluft's interview of Mr. Hammer was not videotaped.

679.  Dr. Kluft stated it generally was defense attorneys who have brought him into cases although for one or two of the cases, long ago, he may have reviewed a case at the request of the prosecution.  (UO)

680.  Dr. Kluft agreed that all trials are stressful to some degree. (U)

681.  The primary focus of Dr. Kluft's career has been on the clinical setting as opposed to the forensic setting. (U)

682.  Dr. Kluft testified that it is possible for a defendant with Dissociative Identity Disorder to enter a voluntary, intelligent and knowing guilty plea.

683.  Dr. Kluft testified that Mr. Hammer's plea of guilty was intelligent and "partially knowing" but not voluntary.

684.  Dr. Kluft concluded that Mr. Hammer suffered from Dissociative Identity Disorder; Posttraumatic Stress Disorder; Major Depression, recurrent; Polysubstance abuse by History; and Antisocial Personality Disorder.

685.  Dr. Kluft's conclusion that Mr. Hammer suffers from Dissociative Identity Disorder is suspect in light of Mr. Hammer's history of fraudulent behavior.

686.  Although we accept some of the testimony of Drs. Blumberg, Gelbort, Gur, Grassian, and Kluft, their testimony to the effect that Mr. Hammer was not competent on June 22, 1998, when he entered a plea of guilty, on October 1, 1998, when he waived his

right to counsel, and in July 2000 when he withdrew his direct appeal is not credible.

687.   Although we accept some of the testimony of Drs. Gelbort, Gur, Grassian, Blumberg, and Kluft, their testimony to the effect that Mr. Hammer was not acting knowingly, intelligently and voluntarily on June 22, 1998, when he entered a plea of guilty, on October 1, 1998, when he waived his right to counsel, and in July 2000 when he withdrew his direct appeal is not credible.

**N.   The Alleged Ethical Violations of Drs. Wolfson, Mitchell, Karten and Dubin.**

688.   Donald N. Bersoff is a lawyer and a psychologist licensed to practice in the Commonwealth of Pennsylvania. (U)

689.   Dr. Bersoff is a professor emeritus at the Villanova Law School, where he specializes in professional ethics for psychologists, and has received awards for his work in this area. (U)

690.   Dr. Bersoff has trained psychologists and psychiatrists in professional ethics. (U)

691.   Dr. Bersoff was past legal counsel for the American Psychological Association (hereafter, "APA"). (U)

692.   Dr. Bersoff has served as an ethics expert for multiple governments and government agencies. (U)

693.   Dr. Bersoff was accepted by the Court as an expert witness in the interpretation and application of ethics in the mental health fields. (U)

694.   Dr. Bersoff conducted a review of the proceedings and record in the case of United States v. David Paul Hammer, (96-CR-239) (hereafter, "Hammer") in order to determine the presence or absence of violations of ethical standards by mental health professionals associated with the litigation. (U)

695.   Based upon Dr. Bersoff's review of the Hammer record he concluded to a reasonable degree of professional certainty that the professional behavior of Drs. John Mitchell, Karten, Wolfson and Dubin violated a variety of ethical rules. (U)

696.   Dr. Bersoff's conclusions regarding ethical violations by psychiatrists involved in Hammer, were guided by the Principles of Medical Ethics, Annotated for Psychiatry. (U)

697.   There is no facial discrepancy or conflict between the APA Standards and the BOP Standards. (U)

698.   While the APA does not have direct enforcement authority regarding its Standards, the Standards can be enforced by state licensing boards, and the APA can refer a therapist to a state licensing board for perceived violations of its Standards. (U)

699.   The BOP Standards regarding privacy and confidentiality of psychological records and psychological communications are governed by the ethical principles set forth in the APA Standards, by federal statute (viz, 5 U.S.C. § 552 (a) (the Privacy Act of 1974), and § 552 (the Freedom of Information Act of 1974)). (U)

700.   A BOP prisoner/patient's psychology records are maintained on a BOP database called the Psychology Data System

(hereafter, PDS).  Professional contacts between a BOP therapist and a prisoner/patient are to be documented in the PDS. (U)

701.  The BOP Standards require that a BOP therapist advise a prisoner/patient in advance of the provision of services of the above described limits on confidentiality.  (U)

702.  The BOP Standards acknowledge that BOP therapists "work for many clients," and therefore the best practice is for the therapist to define for whom he/she is working and warn the prisoner/patient when the therapist is not "working" alone for the prisoner/patient. (U)

703.  The BOP Standards also address what are called "role conflicts."  Such conflicts arise when a therapist has "dual relationships" i.e. a duty of loyalty to more than one entity. (U)

704.  The BOP Standards require that a therapist avoid exploiting the trust and dependency of prisoner/patients and should make every effort to avoid dual relationships that could impair their professional judgment or increase the risk of the exploitation of the prisoner/patient. (U)

705.  There exists an inherent potential conflict of interest in most relationships between a BOP therapist and a prisoner/patient because a BOP therapist always owes a duty of loyalty to the prisoner/patient and to the BOP. (U)

706.  The BOP standards warn that violating the prohibition against dual relationships can be viewed as a violation of the APA Standards, and should these be violated, the therapist runs the

125

further risk of exclusion from the APA, as well as loss of his/her professional licence. (U)

707.   The BOP Standards require that before a BOP mental health professional may act as a forensic evaluator, he/she must be trained to perform a forensic role, or else work under the direct supervision of another person who is so trained and experienced. (U)

708.   Trust between patient and therapist is essential to effective psychotherapy, and this trust can be breached when the therapist acts in a forensic role. (U)

709.   Dr. Bersoff was of the opinion that Dr. Mitchell engaged in prohibited multiple roles in three respects: as Mr. Hammer's long-term psycho-therapist; as an expert witness as to Mr. Hammer's competency to plead guilty and to waive his post-trial and appellate rights; and as an assessor of his mental state at the time of the offense.

710.   On June 6, 1995 Dr. Karten generated a so-called "Treatment Plan" relevant to Mr. Hammer (Defendant's Exhibit 31.8 at page 7). (U)

711.   This Treatment Plan states in relevant part: "I also understand that material discussed in these sessions is confidential except where otherwise agreed or in cases where potential harm to self or others, major security issues or court requests are involved."

712.   These warnings were consistent with the APA and BOP Standards in this area. (U)

713.   Mr. Hammer expressed concerns regarding Dr. Mitchell's

126

fidelity, i.e. whether what was said in therapy would be used against him.  See Defendant's Exhibit 31.7, at page 50 (note of December 12, 1996). (U)

714.  Dr. Mitchell saw Mr. Hammer for an "Individual Therapy Session" on April 16, 1996 (three days after Mr. Marti's death). (U)

715.  This session is noted in Defendant's Exhibit 31.7 at page 25.  The note of this session indicates that Dr. Mitchell was concerned with Mr. Hammer's then-current "thoughts and feelings" about the death. (U)

716.  In a "Psychological Report" dated April 16, 1996 (Defendant's Exhibit 31.7, at page 24), Dr. Mitchell noted that Mr. Hammer had not demonstrated delusions, psychosis or "an inability to distinguish between right and wrong" (U)

717.  Dr. Wolfson relied on Dr. Mitchell's April 16, 1996 Psychological Report in forming his conclusions regarding Mr. Hammer's criminal responsibility and competence to waive rights.  It is quoted in his 1997 Forensic Report (Defendant's Exhibit 139.1) (U)

718.  Dr. Wolfson relied on the entire BOP Psychology File including the therapy notes generated by Dr. Mitchell. (U)

719.  Dr. Mitchell did not obtain or receive written or oral consent from Mr. Hammer prior to disclosing Mr. Hammer's psychology file to Dr. James K. Wolfson.  (U)

720.  On May 7 and 8, 1997, and June 5, 1998,  Dr. Mitchell spoke with the prosecutor about the possibility that he would

testify at a hearing to address Mr. Hammer's competency to plead guilty.   (Defendant's Exhibit 31.7 at pages 78, 79 and 125).   (U)

721.   On a number of occasions, Mr. Hammer expressed concern that Dr. Mitchell would testify or work against his interests, while at the same time expressing an on-going need for therapy.   See e.g. Defendant's Exhibit 31.7 at page 92. (U)

722.   In multiple therapy sessions between Dr. Mitchell and Mr. Hammer, issues regarding Mr. Hammer's ongoing murder case were discussed.   See, Defendant's Exhibit 31.7 at pages 34, 35, 44, 54, 57, 63, 66, 77, 80, 82, 83, 93, 101, 104, 110, 115, 116, 118, 124, 126, 129, 132, 134, 140, 141, 160, 163, 166, 168, 170, 175. (U)

723.   These sessions covered, among other topics, Mr. Hammer's feelings about pursuing or discontinuing his defense, Mr. Hammer's feelings about his counsel, and his views of how the case was proceeding. (U)

724.   Dr. Bersoff believed that there existed a clinical reason for Dr. Mitchell to cover the issues related to the ongoing legal case, as the case was causing Mr. Hammer significant emotional and psychological distress. (U)

725.   Dr. Bersoff believed that the clinical interactions with Mr. Hammer were appropriate in view of Mr. Hammer's need to discuss them. (U)

726.   Dr. Bersoff believed that the discussions in therapy of Mr. Hammer's legal case, and his various decisions regarding the case, were particularly ethically inappropriate in view of Mr. Mitchell's performance of multiple roles, i.e. as Mr. Hammer's

therapist and his subsequent role as a forensic evaluator of Mr. Hammer's mental state and competency to waive rights. (U)

727.  Dr. Bersoff believed that Dr. Mitchell engaged in ethically prohibited multiple roles when he discussed Mr. Hammer's case with Mr. Hammer because he was employed by the BOP, which is a division of the United States Department of Justice, which was prosecuting Mr. Hammer. (U)

728.  Dr. Bersoff believes that Dr. Mitchell's employment by the Department of Justice, which is the same entity that is prosecuting Mr. Hammer and seeking his execution, raises at least an appearance of impropriety and therefore constitutes an ethical violation. (U)

729.  Dr. Bersoff opined to a reasonable degree of psychological and professional certainty that Dr. Mitchell's behavior violated the APA and BOP Ethical Standards regarding multiple roles. (U)

730.  Dr. Mitchell continued as Mr. Hammer's psycho-therapist when he was transferred from the Allenwood Penitentiary to the Allenwood Correctional Institution. (U)

731.  The continuation of the same therapist had a beneficial therapeutic component. (U)

732.  Dr. Bersoff was of the opinion that Dr. Karten engaged in multiple roles when he acted as Mr. Hammer's therapist for a short time, when he acted as Mr. Marti's therapist, when he assessed Mr. Hammer's mental state on several occasions, and when he acted as

an expert witness for the Government with regard to whether Mr. Hammer had DID.

733.   According to Dr. Bersoff, Dr. Wolfson engaged in multiple roles in that he served as Mr. Hammer's treating physician, his forensic evaluator, as a court expert and then a prosecution expert.

734.   Dr. Bersoff was of the opinion that Dr. Dubin violated an ethical rule when during the interview on September 17, 1997, Dr. Dubin told Mr. Hammer that what he said during the hypnosis session would be confidential.

735.   Dr. Kenneth Kessler testified on behalf of the Government during the § 2255 hearing as an expert with respect to the ethical issues involved in this case

736.   Dr. Kessler is a psychologist licensed in 1996 in Illinois. (U)

737.   Dr. Kessler is a professor at a Chicago-based forensic psychology school as a teacher in ethics to the graduate students who are enrolled in the forensic psychology program. (U)

738.   Dr. Kessler is an adjunct professor at the Rosalind Franklin University of Health Sciences where he teaches an advanced ethics course to those graduate students at the doctoral level. (U)

739.   Dr. Kessler is in his third year of teaching ethics. (U)

740.   Dr. Kessler was the President of the Illinois State Psychological Association through which he began taking more

seminars and doing more reading on ethics, and then that became an area of focus for his teaching. (U)

741.  Dr. Kessler was appointed by the Governor of Illinois to the Psychologist Licensing and Disciplinary Board in which his first appointment was in 1999 and as a result became more familiar with ethics and professional practice issues.

742.  Dr. Kessler was reappointed to the Illinois Board in 2005. (U)

743.  Dr. Kessler stated the Licensing and Disciplinary Board determines which psychologists qualify for licensure by examination or other means and considers complaints that may have been filed by the public against a psychologist. (U)

744.  Dr. Kessler stated if a member of the public or another psychologist believes that someone has done something wrong, that person can file a complaint with the Department of Financial and Professional Regulations, and that complaint has to be investigated and considered. (U)

745.  Dr. Kessler stated employees of the State of Illinois would serve as prosecuting attorneys for the Board. (U)

746.  There are seven board members by statute, one of the board members is a public member who has nothing to do with psychology and the remaining six are psychologists according to Dr. Kessler. (U)

747.  Dr. Kessler stated at the initial point of a complaint coming in, one board member is assigned to work with the case and prosecuting attorney to determine whether no apparent violation has

occurred or whether maybe a violation has occurred or definitely a violation has occurred. (U)

748.   Dr. Kessler stated if it looks like a violation has occurred, then the case would go forward to an informal case conference when the psychologist would be brought in and an informal conference would be held.   (U)

749.   Dr. Kessler stated then that would go before an Administrative Law Judge and the ALJ would render his or her findings and then those would be sent back to the entire board of seven for deliberation and consideration at which point the board could accept the findings of the ALJ, create their own independent findings, then all of that goes to the director of the Department of Financial and Professional Regulations. (U)

750.   Since 1999, approximately one hundred cases have come to Dr. Kessler's attention which involved multiple roles in breaches of confidentiality, poor practice patterns, and nonrecognized practice among other issues. (U)

751.   Dr. Kessler, as a newly licensed psychologist, was working for a group practice in rural Illinois where he had a general caseload of clients. (U)

752.   Dr. Kessler opened his own practice when he had enough experience professionally to begin to focus in more of a forensic psychological arena and most of his work was of a forensic nature at that time. (U)

753.   Dr. Kessler does forensic activities work for an agency of the United States government, routinely serving as an

expert witness to the court of the Office of Hearings and Appeals which hears Social Security disability appeals. (U)

754.   Dr. Kessler was routinely appointed as the court's witness in the 19th Judicial Circuit, which is Lake County, Illinois on mental health issues. (U)

755.   The majority of cases in which Dr. Kessler testified have been civil but there would be six to ten other cases where Dr. Kessler had been retained to form some type of an expert opinion depending upon what the case required. (U)

756.   Dr. Kessler testified in criminal proceedings to help determine whether there was some mental impairment that would have affected a young patient's judgment. (U)

757.   Dr. Kessler reviewed defendant's exhibit 78.2 which provided the ethical guidance to psychologists in their activities in 1997 and 1998. (U)

758.   Dr. Kessler agreed that the American Psychological Association prepared defendant's exhibit 78.2.

759.   Dr. Kessler stated the ethical principles or general principles set forth in defendant's exhibit 78.2 are not in and of themselves enforceable rules but are what psychologists should consider when they decide on what particular course of action they should take.

760.   Dr. Kessler stated that the manner in which ethical issues  are dealt with varies by state.

761. Dr. Kessler stated "psychologists seek to promote integrity in the science, teaching, and practice of psychology [and] avoid improper and potentially harmful dual relationships." (U)

762. Dr. Kessler stated, "psychologists provide services, teach, and conduct research only within the boundaries of their competence, based on their education, training, supervised experience, or appropriate professional experience." (U)

763. Dr. Kessler stated psychologists, whenever feasible, should refrain from taking on professional or scientific obligations when preexisting relationships with a patient would create a risk of harm.

764. Dr. Kessler stated if there is a foreseeable risk of the psychologist being called upon to perform conflicting roles because of the involvement of a third party, the psychologist clarifies the nature and direction of his or her responsibilities, keeps all parties appropriately informed as matters develop, and resolves the situation in accordance with the Ethics Code. (U)

765. Dr. Kessler stated that third party requests include institutional settings such as prison settings.

766. With respect to forensic matters, psychologists provide written or oral forensic reports or testimony of the psychological characteristics of an individual only after they have conducted an examination of the individual adequate to support their statements or conclusions but when, despite reasonable effort, such an examination is not feasible, psychologists clarify the impact of their limited information on the reliability and validity of their

134

reports and testimony, and they appropriately limit the nature and extent of their conclusions or recommendations. (U)

767.  While a prior professional relationship with a party does not preclude psychologists from testifying as fact witnesses or from testifying to their services to the extent permitted by applicable law, psychologists appropriately take into account ways in which the prior relationship might affect their professional objectivity or opinions and disclose a potential conflict to the relevant parties. (U)

768.  The types of documentation that Dr. Kessler considered are listed on page one of his report (which was admitted as defendant's exhibit 145), as well as interviews conducted on the telephone with Drs. Wolfson and Mitchell.

769.  Dr. Kessler's interview with Dr. Wolfson was about 30 minutes. (U)

770.  Dr. Kessler's interview with Dr. Mitchell was about 20 to 25 minutes. (U)

771.  Dr. Kessler noted that the June 22, 1998, request to examine Mr. Hammer's competence came about somewhat unexpectedly during proceedings wherein Dr. Wolfson was present, a potential competency issue arose, and he was then ultimately ordered to perform the evaluation.

772.  According to Dr. Kessler, Dr. Wolfson's primary role on all three occasions was that of an evaluator, in addition, on the two occasions when Mr. Hammer was at Dr. Wolfson's facility, Dr. Wolfson assumed responsibility for monitoring and prescribing

psychoactive medications to Mr. Hammer and addressing any pressing clinical needs that might arise during his stay in Springfield.

773.   According to Dr. Kessler, "Dr. Wolfson was essentially continuing with medications Inmate Hammer was taking when transferred to his facility."

774.   According to Dr. Kessler, evaluations and monitoring of Mr. Hammer's medications were all done with Mr. Hammer being fully informed of Dr. Wolfson's roles and responsibilities, as well as the limitations of confidentiality.

775.   Dr. Kessler stated Dr. Wolfson's actions were simply a continuation of what somebody else had put in place and while that was a treatment role, Dr. Kessler distinguished that differently from Dr. Wolfson taking a more active role in terms of making numerous determinations and recommendations, adjusting medications and providing psychotherapy of his own and matters of that nature.

776.   Dr. Wolfson's work with Mr. Hammer was that of an evaluating doctor rather than a therapist or a treating doctor.

777.   Dr. Mitchell was ordered to conduct a competency evaluation of Mr. Hammer in June and August of 1998 and as a matter of informed consent prior to conducting these evaluation, Dr. Mitchell discussed the matter with Mr. Hammer who was himself not alleging any form of incompetency.

778.   According to Dr. Kessler, Dr. Wolfson appropriately was the lead evaluator in the impromptu competency evaluation that came about on June 22, 1998.

779. Dr. Mitchell deferred to Dr. Wolfson in terms of lead evaluator.

780. Dr. Wolfson informed Mr. Hammer of his role and duties in the case.

781. Dr. Wolfson did serve in the roles of evaluating doctor as well as treating doctor, as explained on page two of his December 1997 and September 1998 reports. There is no evidence whatsoever, according to Dr. Kessler, to indicate that Dr. Wolfson's acting in these capacities in any way compromised his objectivity or served to exploit Mr. Hammer.

782. According to Dr. Kessler, when examining dual roles or multiple roles, it is advisable to conceptualize a two part test: a multiple relationship and, as a result of that, did something untoward occur, was there exploitation, harm to the person, or impaired judgment on the part of the psychologist.

783. Dr. Kessler was of the opinion that there was no compromising of Dr. Wolfson's objectivity on June 22, 1998.

784. According to Dr. Kessler, the documentation, interviews and allegations, do not reveal that Mr. Hammer was exploited in any manner.

785. The APA ethical guidelines for psychologists do not require some written notification to a person about disclosure of roles.

786. Dr. Mitchell fully disclosed the procedures to be followed and nature of his role and duties, as well as the fact that there was no doctor-patient privilege that would protect Mr.

Hammer's confidentiality with regard to the information discussed by him and Mr. Hammer.

787.  Dr. Mitchell prior to responding to Dr. Wolfson's request for information sought a legal opinion as to whether the confidentiality privilege enjoyed in the private sector applied within the Bureau of Prisons.

788.  While Dr. Kessler observed that the facts indicated that Dr. Mitchell did act in more than one role in Mr. Hammer's case, Dr. Kessler saw no evidence whatsoever to indicate that Dr. Mitchell's acting in these capacities in any way compromised his objectivity in completing the evaluations or served to exploit the client.

789.  Dr. Mitchell's actions on June 22, 1998, according to Dr. Kessler, may have had some negative effect on his efficacy as a therapist for Mr. Hammer for therapeutic services occurring after that time.

790.  Reports that Dr. Mitchell tendered as well as the transcripts, and then to a lesser extent Dr. Kessler's phone conversation with Dr. Mitchell, demonstrated to Dr. Kessler that Dr. Mitchell's objectivity was not compromised.

791.  In Dr. Kessler's view, Dr. Mitchell appropriately sought advice from other individuals and was aware of the possibility that this could be problematic and that is why he wanted to check out the institutional rules or laws with which he was obliged to comply, and whether his compliance with the requests by

Dr. Wolfson was in accordance with the institutional policies and laws.

792.   There is no evidence, in Dr. Kessler's view, that Dr. Karten acted unethically while working with Mr. Hammer.

793.   Dr. Karten's contact with Hammer after the murder was only brief and for the purpose of an emergency suicide assessment.

794.   There is no evidence that Dr. Karten's suicide assessment was biased and since Dr. Karten was on call that night it was prudent for him to conduct the emergency assessment and then, as he did, refer Mr. Hammer to his usual treating therapist, Dr. Mitchell, for follow-up.

795.   According to Dr. Kessler, temporal factors are appropriately considered when evaluating a mental health provider who may have engaged in multiple roles.

796.   As to time sensitive matters, Dr. Kessler noted that it is incumbent upon the psychologist to do the evaluation, at least in a preliminary manner, and then if further work is necessary, seek other individuals when there is less of an emergent need, which is why Dr. Karten may have referred Mr. Hammer to the treating therapist for follow-up.

797.   In Dr. Kessler's view, these evaluations were for competency at a then present state, not, for example, to evaluate mental state at some point in the past which is far more complex.

798.   In Dr. Kessler's view, as a trained and licensed psychologist working in a forensic setting, Dr. Mitchell was competent to complete such a competency evaluation without

additional training ancillary to that which would qualify him to work in a prison setting.

799.   In Dr. Kessler's view, the evaluation conducted by Dr. Mitchell essentially required him to determine if Mr. Hammer was at that time suffering from a mental disorder that would impair his ability to make a knowing, voluntary, and intelligent decision which fell within the training of most psychologists.

800.   Dr. Kessler stated a forensic setting is where the world of psychology interfaces with the world of law, whether it is in a prison, for a court system, for a police department or something similar.

801.   A mental competency evaluation is distinguished, according to Dr. Kessler, from other evaluations such as criminal responsibility.

802.   In Dr. Kessler's opinion, a competency evaluation is a present state evaluation which is a very straightforward evaluation.

803.   Dr. Kessler observed that lack of confidentiality of mental health records within an institution is commonly seen within prison settings where security is an issue.

804.   In Dr. Kessler's view, it was not unethical for the mental health professionals who evaluated Mr. Hammer to comment as to whether, in the course of their evaluations and work with him, they saw signs and symptoms of a dissociative identity disorder, and, in doing so, to state whether they agreed or disagreed with another professional's opinion with regard to this particular

diagnosis, especially since they had an understanding of the diagnostic criteria.

805.   In Dr. Kessler's view, Drs. Mitchell, Karten, and Wolfson had sufficient time with Mr. Hammer to allow them to observe him and comment as to whether they saw signs and symptoms of Dissociative Identity Disorder.

806.   In Dr. Kessler's view, the fact that Mr. Hammer acted out violently on April 13, 1996, does not suggest an incompetent assessment by Dr. Karten about whether Mr. Hammer posed a danger to others.

807.   Dr. Karten's records, as reviewed by Dr. Kessler, indicated that he was making the best assessment he could based on the data that was available to him at the time.

808.   According to Dr. Kessler, there is no indication, for example, that Dr. Karten ignored the data.

809.   In Dr. Kessler's view, there was no indication that there was anything untoward that came from Dr. Karten's evaluation of Mr. Hammer and his opinion as a result of the previous relationship.

810.   On April 16, 1996, Dr. Mitchell prepared a psychological report or mental status examination on Mr. Hammer which stated in part that "[a]t no time in our sessions has he demonstrated delusional thinking, hallucinations, or an inability to distinguish right from wrong."  Defendant's Exhibit 31.7, page 24.

811.   With respect to Dr. Mitchell's April 16, 1998, psychological report on Mr. Hammer, Dr. Kessler was of the opinion

that on April 13, 1996, a big event had occurred and Dr. Mitchell was acting in a clinical role where he needed to document Mr. Hammer's mental state, how he was doing, whether he was ill and in need of some kind of treatment.

812.   Mr. Hammer at times exercised his right not to see a psychologist and everybody respected that right.

813.   Allenwood mental health practitioners did not continue to try to collect information or treat Mr. Hammer or make any records with respect to him after he expressed his desire not to be seen by them.

814.   If there was a problem with Dr. Mitchell evaluating Mr. Hammer, Dr. Kessler would have expected Mr. Hammer's attorneys on June 22, 1998, to object to his involvement and do whatever they could to prevent that from happening.

815.   To Dr. Kessler it is significant that Mr. Hammer's attorneys were comfortable with Dr. Mitchell's involvement and that Mr. Hammer requested that Dr. Mitchell participate in the examination as to Mr. Hammer's competency to enter a guilty plea.

816.   Dr. Kessler did not see any evidence in the transcript of the June 22, 1998, proceeding which suggested that there was exploitation or impaired judgment on the part of Mr. Hammer's mental health evaluators.

817.   Dr. Bersoff was of the view that the American Psychological Association rules were applicable to forensic psychiatry, but Dr. Wolfson strongly disagreed with that contention as it relates to the practice of forensic psychiatry.

818.    According to Dr. Wolfson, there is no absolute rule on keeping clinical and forensic roles distinct the way Dr. Bersoff articulated it, but it is an issue as to which forensic psychiatrists are sensitive.

819.    According to Dr. Wolfson, surprisingly few suggestions or pressures are on a forensic psychiatrist to come up with a particular result or a conclusion.

820.    According to Dr. Wolfson, when he does an evaluation his integrity matters more to him than some institutional goal, and he does not make findings to protect the Bureau of Prisons, or its employees from liability.

821.    Dr. Bersoff is not a forensic psychologist.

822.    Dr. Bersoff did not contact Dr. Wolfson regarding the dual role issues that he raised with respect to Dr. Wolfson's behavior.

823.    Dr. Wolfson strongly disagrees with Dr. Bersoff that a clinical relationship which would bar a forensic interaction was established during the two times Mr. Hammer was at Springfield.

824.    According to Dr. Wolfson, there is no rule against mixing clinical and forensic roles in psychiatry.

825.    Dr. Wolfson testified that there is no consensus in psychiatry about the propriety of engaging in dual roles.

826.    On a handful of occasions Dr. Wolfson has had to point out that he is not a handmaiden or partisan consultant expert to the Department of Justice.

827.  Dr. Mitchell testified, and the court so finds, that at the outset of Dr. Mitchell's professional relationship with Mr. Hammer, Dr. Mitchell advised Mr. Hammer of the limits of confidentiality in the Federal Prison System.

828.  Dr. Wolfson testified, and the court so finds, that at the outset of Dr. Wolfson's professional relationship with Mr. Hammer, Dr. Wolfson advised Mr. Hammer of the limits of confidentiality in the Federal Prison System.

829.  Disclosure was made as to procedures to be followed and the nature of Dr. Wolfson's role and duties as well as the fact that there was no doctor/patient privilege that would protect Mr. Hammer with regard to information which he provided.

830.  In only the strictest sense did Dr. Wolfson serve in the roles of evaluating doctor as well as treating doctor in 1997.

831.  There is no evidence whatsoever which indicates that Dr. Wolfson's acting in these capacities in 1997 in any way compromised his objectivity or served to exploit Mr. Hammer.

832.  Dr. Mitchell did act in more than one role in Mr. Hammer's case.

833.  There is no evidence whatsoever to indicate that Dr. Mitchell acting in these capacities in any way compromised his objectivity in completing the evaluations or served to exploit Mr. Hammer.

834.  The multiple roles that Drs. Mitchell and Wolfson engaged in did not impact the opinions they rendered on June 22 and October 1, 1998, regarding Mr. Hammer's competency to enter a plea

of guilty and discharge counsel and determine on his own whether to pursue an appeal.

835.   The testimony presented by Dr. Wolfson on June 22 and October 1, 1998, relating to Mr. Hammer's competency was credible.[10]

836.   The testimony presented by Dr. Mitchell on June 22 and October 1, 1998, relating to Mr. Hammer's competency was credible.

837.   The fact that Dr. Mitchell received an award from the Bureau of Prisons after testifying in Mr. Hammer's case did not impact or influence his testimony.

838.   The dual roles of Drs. Wolfson and Mitchell did not compromise the reliability of the court's competency determinations rendered on June 22 and October 9, 1998.

839.   The testimony of Drs. Kessler and Wolfson with respect to the ethical issues involved in this case is credible.

840.   The opinions of Dr. Bersoff with respect to the ethical issues involved in this case are not credible for several reasons, including most importantly the fact that Dr. Bersoff incorrectly assumed that Mr. Hammer was not advised of the limits of confidentiality.

---

10.   Although we find Dr. Wolfson credible with respect to his testimony relating to Mr. Hammer's competency on June 22 and October 1, 1998, we conclude that his diagnosis of Mr. Hammer's mental condition set forth in the Forensic Report dated December 19, 1997, was not complete.  Dr. Wolfson did not diagnose Mr. Hammer with several illnesses which were found by Drs. Blumberg, Matthews and Martell.

**O.   Mr. Hammer's History of False Confessions and Reports.**

841.   In June, 1972, Mr. Randy D. Vanderschaaff became employed as a Deputy Sheriff with the Chautauqua County Sheriff's Department in Chautauqua, New York. (U)

842.   In August, 1985 his rank changed to that of Criminal Investigator. (U)

843.   As a criminal investigator his duties included the investigation of serious crimes such as homicides, rapes and robberies that took place in Chautauqua County. (U)

844.   On December 6, 1983 a female body was discovered in Chautauqua County, New York. (U)

845.   The female had been shot several times. (U)

846.   In August, 1985 Investigator Vanderschaaff was assigned as the lead investigator to oversee the investigation of this "Jane Doe" homicide case. (U)

847.   The case was labeled "Jane Doe" because the victim was unidentified. (U)

848.   Jane Doe's body was discovered in the eastbound section of then Route 17, now Interstate 86, in the southern part of Chautauqua County. (U)

849.   Investigator Vanderschaaff made extensive efforts to identify the body including publishing the story in numerous publications and airing it on television. (U)

146

850.  An article concerning the Jane Doe investigation was published in True Detective Magazine which is circulated in the United States. (U)

851.  On July 1, 1988 – after the story had appeared in True Detective Magazine – Investigator Vanderschaaff received a letter from Petitioner, David Paul Hammer. (U)

852.  In this letter Mr. Hammer confessed to the Jane Doe murder. (U)

853.  After receiving the letter from Mr. Hammer, Investigator Vanderschaaff conducted a telephone interview with Mr. Hammer who was incarcerated at that time in the Oklahoma State Penitentiary. (U)

854.  In this telephone interview Mr. Hammer again confessed to the Jane Doe murder. (U)

855.  As a result of the letter and the telephone interview, Investigator Vanderschaaff and his partner Lieutenant Dale VanBlack traveled to Oklahoma State Penitentiary to interview Mr. Hammer. (U)

856.  During this interview Mr. Hammer again confessed to the Jane Doe homicide. (U)

857.  During the interview Mr. Hammer was shown the picture of Jane Doe that had appeared in the True Detective Magazine. (U)

858.  The picture of Jane Doe that appeared in the True Detective Magazine had been retouched. (U)

859.  Mr. Hammer identified this picture as being that of Jane Doe. (U)

860.   Mr. Hammer was then shown an untouched picture of Jane Doe and was asked if that was also the victim Jane Doe whom he had killed. (U)

861.   Mr. Hammer looked at both pictures for five minutes and then said the untouched picture was not Jane Doe. (U)

862.   At that point in the interview his demeanor changed dramatically. (U)

863.   Mr. Hammer then proceeded to describe inaccurately the geographical location where the body had been dumped, the terrain of the area where the body had been dumped and the proximity of the gun to the victim's wounds.

864.   At the conclusion of the interview Mr. Hammer was not arrested because both Investigator Vanderschaaff and his partner, Lieutenant VanBlack, concluded that Mr. Hammer was lying when he had confessed to this murder. (U)

865.   During this interview Mr. Hammer also admitted to killing a male associate by the name of "Mark."  (U)

866.   Investigator Vanderschaaff contacted the Hagerstown, Maryland police who advised him that no such male victim existed and no such case existed. (U)

867.   While in Oklahoma, Investigator Vanderschaaff received information from the Oklahoma prison personnel that Mr. Hammer was a con artist. (U)

868.   On April 13, 1999 Investigator Vanderschaaff received a second letter from Mr. Hammer. (U)

869.   In this letter Mr. Hammer again confessed to the Jane Doe murder. (U)

870.   In this letter Mr. Hammer also admitted to the murder of the male associate but this time he called him by the name of "Ronnie" instead of "Mark." (U)

871.   Mr. Hammer was not arrested in 1999 for the murders of Jane Doe or Ronnie/Mark because Investigator Vanderschaaff concluded that he was again lying. (U)

872.   Mr. Vanderschaaff retired from the Chautauqua County Sheriff's Department on September 29, 2004. (U)

873.   Mr. Hammer has never been charged with the murders of Jane Doe or Ronnie/Mark. (U)

874.   Former Detective Vanderschaaff has concluded that Mr. Hammer did not commit either of these murders. (U)

875.   Terry Sittig is presently incarcerated in the Stringtown Correctional Facility in Stringtown, Oklahoma, serving a sentence of life imprisonment. (U)

876.   Terry Sittig read a newspaper article to the effect that Mr. Hammer basically said that Sittig was not involved in the killings at Enid but Mr. Hammer's statement to the press was not true. (U)

877.   Mr. Sittig was convicted of the June, 1985 murders of Carl Singer and Bobby Joe Bickham. (U)

878.   These murders took place in the City of Enid in Norfolk County, Oklahoma. (U)

879.  Mr. Sittig was arrested two months after the murders and pursuant to a plea agreement pled guilty to two counts of murder. (U)

880.  Mr. Sittig's friend Ricky Don Blackmon was also involved in these murders. (U)

881.  Mr. Sittig testified as a prosecution witness against Ricky Don Blackmon at the penalty phase of Mr. Blackmon's trial. (U)

882.  Mr. Sittig testified that Ricky Don Blackmon took part in these murders of Singer and Bickham and that no one else besides himself and Mr. Blackmon were involved. (U)

883.  Mr. Blackmon received the death penalty and was executed. (U)

884.  Mr. Sittig testified as part of a cooperation agreement with the prosecutor.

885.  As a result of his cooperation, Mr. Sittig avoided the death penalty.

886.  Mr. Sittig does not know David Hammer (U)

887.  Mr. Sittig never met David Hammer. (U)

888.  This Court finds that David Hammer was not involved in the killings of Carl Singer and/or Bobby Joe Bickham. (U)

889.  The murders of Carl Singer and Bobby Joe Bickham received coverage in the newspapers. (U)

890.  Mr. Hammer was quoted in a newspaper article to have stated that Mr. Sittig was not involved in the murders of Mr. Singer or Mr. Bickham. (U)

891.    Mr. Sittig testified and this Court finds that Mr. Hammer's statement in the newspaper that Terry Sittig had nothing to do with the murders of Carl Singer and Bobby Joe Bickham is not true. (U)

892.    Mr. Hammer's trial attorneys stated in a letter dated June 21, 1997, from Attorney Ruhnke that they possessed "some information . . . that Mr. Hammer had a habit of <u>falsely</u> implicating himself in various crimes for his own purpose."   (Emphasis supplied.)   (U)

893.    Mr. Hammer's trial attorneys in the same June 21, 1997 letter specifically made a request that [the prosecution] disclose any and all information which the government has developed (or is chargeable with knowledge of pursuant to *Kyles*) of such situations [in which Mr. Hammer may have confessed falsely to other crimes]." (U)

894.    In response to the request for exculpatory materials, the prosecution listed in its letter to Attorney Ruhnke, dated June 27, 1997, several examples of instances in which it indicated that Mr. Hammer's statements to law enforcement personnel were false but indicated that it had not yet determined to what extent Mr. Hammer's contacts with law enforcement official in the past involved false "statements" and indicated that it would "provide as many details as is possible about matters to which Mr. Hammer claimed involvement or knowledge. . . ." (U)

895.    Mr.  Hammer's trial attorneys received from the prosecution through a cover letter dated December 16, 1996,

documents from the Oklahoma Department of Corrections which *inter alia* referred to Mr. Hammer's unsubstantiated and false claims that he was responsible for the death of Carl I. Singer of Enid, Oklahoma, in June 1985, had a hand in the killing of Kenneth Kenner in Tennessee, was involved in the murder of Karen Silkwood, and was responsible for the 1993 murder of an unidentified Youngstown, Ohio, man. (U)

896.   Mr. Hammer's trial attorneys received as an attachment to a letter from the prosecution dated January 15, 1997, an article from "The Advocate," a gay newspaper, dated April 17, 1987, in which not only is there reference to Mr. Hammer's purported involvement in the Kenner homicide in Tennessee, but also involvement in the killing of Carl Singer of Enid, Oklahoma, and his friend, Bobbie Bickham of Oklahoma City, in the Summer of 1985, as well as the killings of two girls in the 1970's, none of which were substantiated by law enforcement officials.

897.   Mr. Hammer's counsel knew that their client had apparently been interviewed by someone about the Karen Silkwood murder.

898.   Mr. Hammer has had a substantial history of falsely confessing to crimes, including the murder of Carl I. Singer and the murder of a Kenneth Kenner.

899.   Agent Maluco investigated Mr. Hammer's involvement in the Kenneth Kenner murder for use as an aggravating factor in the Marti murder trial.   (U)

900.  Agent Maluco determined that Mr. Hammer had falsely implicated himself in this murder.  (U)

901.  The Government advised trial counsel by letter dated September 17, 1997 of this determination.  (U)

902.  Mr. Hammer falsely confessed to the murder of Kenneth Kenner. (U)

903.  No evidence was ever found to support the claim concerning Silkwood.  (U)

904.  Mr. Hammer falsely confessed to being involved in the Silkwood murder.

905.  In 1993 Mr. Hammer alleged he had hired someone to murder a Youngstown, Ohio man, and to prove his involvement had instructed the killer to place a quarter in the victim's mouth.  (U)

906.  Mr. Hammer referred to this as the "two bit killing". (U)

907.  No evidence was ever found to support this claim. (U)

908.  Mr. Hammer's confession to this murder was false.

909.  During the section 2255 hearing, agent Maluco read from an Oklahoma Police Department Report dated August 20, 1986 which summarized a telephone call with Mr. Hammer during which he confessed to the murder of Donna Laughton: "the victim's name was Donna Laughton and she was carried as Jane Doe for three months. . . . Hammer used two names of that victim.  Terry was one name and LaDonna was the other. . . .  Hammer couldn't have killed Donna Laughton because she was still alive two days after Hammer was put into jail.  That was confirmed during the original investigation.

Therefore, approximately two years ago when Hammer confessed, he was confronted with the important fact that he couldn't have killed Donna Laughton because of the times.  Hammer finally admitted that he didn't want to spend 1240 years in jail and wanted to die.  This is the reason he confessed." (U)

910.  Mr. Hammer falsely confessed to the murder of Donna Laughton in August, 1986.

911.  Prior to 1996, Mr. Hammer claimed to have knowledge as to the identity of the Unabomber.  (U)

912.  These claims were investigated by the FBI and determined to be false. (U)

913.  Mr. Hammer's statements regarding the Unabomber were false.

914.  In November 9, 1989 Mr. Hammer claimed to have planted bombs in the Oklahoma State Capitol Building and the Oklahoma County Courthouse. (U)

915.  The FBI investigated those claims and determined they were false  –  no bombs were ever discovered.  (U)

916.  Mr. Hammer's claims to have planted bombs in the Oklahoma State Capitol Building and the Oklahoma County Courthouse were false.

917.  Mr. Hammer's trial attorneys were provided prior to trial with FBI reports documenting Mr. Hammer's false claims.

**P.  Testimony and Evidence Relating to the Murder of Andrew Marti.**

918.  Nicole Weaver is presently employed as a case manager at the Federal Correctional Institution, Butner, North Carolina. (U)

919.   In April, 1996, Ms. Weaver was employed at USP-Allenwood as a senior officer specialist. (U)

920.   Ms. Weaver was the correctional officer on duty in the special housing unit at USP-Allenwood on the night Andrew Marti was killed. (U)

921.   At 2:53 a.m. Ms. Weaver, while doing the 3 a.m. inmate count, looked into Mr. Hammer's cell. (U)

922.   Ms. Weaver is certain this is the time she arrived at the cell and she recorded this time in the daily unit log. (U)

923.   Ms. Weaver was accompanied by Lt. Timothy Devane.

924.   The count at 3:00 a.m. required the correctional officer to verify the presence of the inmates.

925.   The last such prior count was at 1:00 a.m.

926.   However, a correctional officer walked through the Special Housing Unit approximately every 30 minutes.

927.   Ms. Weaver did inmate counts at 1 a.m., 3 a.m. and 5 a.m.  Ms. Weaver also did a unit walkthrough every half hour. (U)

928.   Ms. Weaver heard Mr. Hammer say "My cellee's dead". Mr. Hammer began to speak to Ms. Weaver but she could not understand what he was saying. (U)

929.   Ms. Weaver turned the light on to cell 103 and observed Mr. Hammer walk over to the lower bunk and pull a sheet off of Mr. Marti.

930.   Ms. Weaver observed that Mr. Marti was lying face down and his hands and feet were tied to the lower bunk.

931. Ms. Weaver asked Mr. Hammer why Mr. Marti was tied up and he stated "Don't worry, he's dead; it was easier that way."

932. Ms. Weaver asked a second time why he was tied up and Mr. Hammer stated "Ma'am, it was easier that way."

933. Ms. Weaver asked what was easier and Mr. Hammer responded "Ma'am, cause I killed him."

934. Ms. Weaver than went off the range, called a lieutenant by phone for assistance and then returned to cell 103 and waited for others to arrive so that the cell could be opened.

935. On April 13, 1996, Jack Luhrman was on duty as the compound officer at USP-Allenwood. (U)

936. Mr. Luhrman as the compound officer was the only one who held the segregation keys on April 13, 1996.

937. Officer Luhrman responded to the call for assistance.

938. At some point Ms. Weaver also asked Mr. Hammer why he had not told her about Mr. Marti when she made rounds at 2:25 a.m. and Mr. Hammer responded "Cause he wasn't dead yet."

939. All of Ms. Weaver's conversations with Mr. Hammer were through the closed cell door. (U)

940. While waiting for others to arrive Ms. Weaver observed an object in Mr. Hammer's hand.

941. After the cell door was opened the object was determined to be toenail clippers with tape wrapped around one end.

942. Ms. Weaver had never spoken or seen Mr. Hammer before this night and was not familiar with his normal tone of voice or the normal pace with which he spoke. (U)

943.   Displayed on the outer shower wall of Mr. Hammer's cell, very near the bunk beds, were numerous pornographic pictures.

944.   Mr. Hammer did not tell Ms. Weaver anything about using taped up toenail clippers as part of a hostage scenario or a hostage taking ruse. (U)

945.   Ms. Weaver had no way of knowing if Mr. Marti and Mr. Hammer were engaging in homosexual sex during the periods between her inmate counts and her unit walkthroughs.

946.   Officer Luhrman unlocked the door of cell 103, helped secure Hammer and helped cut the restraints off of Mr. Marti's arms and legs. (U)

947.   Mr. Hammer was wearing undershorts, undershirt, and flip-flops on April 13, 1996.

948.   Mr. Hammer was moved to a nearby recreation cell.

949.   When Officer Luhrman entered cell 103, he could see that Mr. Marti's hands and legs were tied to the bed.

950.   Officer Luhrman observed that the homemade ropes were so tightly applied that he could not untie them but, instead, had to cut them with scissors.

951.   An officer took a Polaroid photograph of Mr. Marti in Special Housing Unit Cell 103 at approximately 3:00 a.m. which showed that he was in the lower bed of a bunk bed with his face down and lying on his stomach. (U)

952.   At that time, Officer Luhrman's instructions were to wait for the lieutenant for instructions on the crime scene.  (U)

953.  According to Officer Luhrman, none of the officers who responded to cell 103 smoked.

954.  Neither Lt. Devane nor officer Weaver recalled anyone smoking in SHU cell 103 on April 13, 1996. (U)

955.  According to Officer Luhrman, no one, while after entering cell 103, had flushed the toilet.

956.  Prior to and while Mr. Marti was being removed from the cell a physician's assistant attempted to revive Mr. Marti.

957.  Officer Luhrman helped remove Mr. Marti from the cell on a stretcher.

958.  Officer Luhrman gave his key to Lt. Devane.

959.  Officer Luhrman left nothing in cell 103 after responding to the scene. (U)

960.  Officer Luhrman saw no one leave any items in cell 103. (U)

961.  Mr. Luhrman testified and this Court finds that it is common knowledge that homosexual activity takes place in the penitentiary. (U)

962.  Mr. Luhrman did not see any signs of a struggle inside cell 103.

963.  Guy Fleck is a federal correctional officer with the Bureau of Prisons. (U)

964.  In April of 1996 Mr. Fleck was a special investigative support technician at the United States Penitentiary in Allenwood. (U)

965.   According to Correctional Officer Fleck neither he nor Lt. Santos smoked on April 13, 1996, in SHU cell 103 (U)

966.   According to Correctional Officer Fleck, neither he nor Lt. Santos flushed the toilet or did anything with the toilet in Special Housing Unite cell 103. (U)

967.   Following the efforts to revive Mr. Marti, cell 103 was closed by Lt. Devane and not opened until the morning of April 13, 1996, by Guy Fleck and Lt. Santos to take photographs.  (U)

968.   On April 13, 1996, at approximately 6:18 a.m. FBI Special Agent Carlyle R. Thompson commenced an interview with Mr. Hammer.

969.   Mr. Thompson retired from the FBI in 2002.

970.   Special Agent Thompson had no prior familiarity with Mr. Hammer except as had been provided by the brief information he received from prison officials on the morning of April 13, 1996. (U)

971.   Former Agent Thompson took notes during the interview and after the interview prepared a summary of the interview which was presented as Defendant's Exhibit 33.[11]

972.   Defendant's Exhibit 33 states in part as follows;

> HAMMER and MARTI celled in a two-man cell, Number 103 within the SHU since April 9, 1996.
> HAMMER advised that at approximately 1 a.m. on Saturday morning, April 13, 1996, correctional officers came through the SHU, conducting a count. . . .   HAMMER stated that MARTI came (moved) into cell . . . MARTI came at the written and verbal request of HAMMER who wanted him to be his cell mate. . . . On Thursday evening, April 11, 1996, MARTI told HAMMER that he would go ahead with the

---

11.   The interview was not recorded either by audiotape or videotape.

hostage scenario.  Also, on Thursday evening, Hammer wrote a letter on MARTI's behalf to MARTINE GERRERO (phonetic) via mailing it to a third party located at Post Office Box 234, Three Rivers, Michigan.  HAMMER had doubts at the time in his own mind as to whether he was going through with what he planned.  HAMMER told GERRERO in the letter that he (HAMMER) knew MARTI for some time, did not believe the rumors, and to give MARTI a chance, to spread the word and do it as a personal favor for me. After MARTI agreed, HAMMER started talking with him as to the time and scenario.  HAMMER had a general idea of how to proceed with the hostage scenario, but had no specifics. . . . HAMMER continued that at the time, he did not think or know if he was going to kill MARTI, or just take him hostage and make an ass out of myself to get attention. . .

At approximately 1:00 a.m. to 1:30 a.m., April 13, 1996, correctional officers in the SHU conducted the inmate count. . . After the count, MARTI took a shower.  At approximately 2:00 a.m. exactly, HAMMER stated a radio station at LYCOMING COLLEGE, Williamsport, Pennsylvania, went off the air. . . . HAMMER than started to tie MARTI up.  Marti was lying on HAMMER's bunk . . . HAMMER had MARTI lay on his stomach, face down, and tied his left leg with the braided rope around his ankle and secured it to a restraint ring nearest the commode. . . . HAMMER then tied his right leg, around the ankle, in the same manner. . . .  HAMMER then tied MARTI's left arm at the wrist to the restraint ring in the middle of the bed, which is located against the wall. . . . HAMMER then secured MARTI's right wrist in the same manner. . . .

HAMMER then lit a cigarette, one he obtained from a pack of his Camel's, the pack still located on the desk in the cell.  After lighting the cigarette, HAMMER placed the lit cigarette to MARTI'S lips, allowing him to take a couple of drags off of it. HAMMER then threw the lit cigarette in the toilet. He then stuffed a sock in MARTI's mouth and used a strip of sheet, HAMMER told MARTI to bite down on the sock as he tied it around his head.  MARTI could still talk because the gag was not tight. HAMMER stated that this was exactly 2:17 a.m. when he completed the process of tying up MARTI.  He knows the exact time by looking at the clock radio in the cell window. . . .

[HAMMER] then straddled MARTI's back, facing the back of MARTI's head.  HAMMER started strangling MARTI by raising his head up off of the pillow with his right hand and inserting his left arm under his

Adam's apple and the pillow, so that his neck was resting in the crook of HAMMER'S elbow. HAMMER then placed his right forearm under his left forearm, simultaneously pulling MARTI's head backwards and applying choke pressure. MARTI struggled by moving his head. After a period of choking MARTI, HAMMER released pressure to get a better grip. MARTI said, "No, please, no." HAMMER regained a better choke hold in the same position and applied pressure again. MARTI jerked in the restraints, grabbing at HAMMER'S legs, even though restrained. The hold HAMMER had on him was a sleeper hold and he recalled that the second time in this hold was over three minutes. MARTI became really violent, jerking and grabbing at HAMMER, even though MARTI's hands were tied in the restraint rings on the sides of the bed. HAMMER advised that MARTI's body then relaxed; he expelled gas, all the while HAMMER continued the choke hold. He advised that MARTI did not make much movement, just intermittent shuttering. (sic)

After no further movement, which was approximately six minutes, HAMMER got up off of MARTI and went and got a string off of MARTI's bed. The string-like rope was removed previously from a stitched seam of institutional clothing.

HAMMER then sat on MARTI, not straddling him, and put the string around his neck and started choking him, pulling it really tight, with HAMMER'S hands pulling in opposite directions. This resulted in Hammer receiving cut burns along the sides of both palms of his hands. HAMMER continued this choking of MARTI for approximately three or four minutes.

After observing no movement or shutters (sic) by MARTI, HAMMER got up. He was sweating profusely and went to the wash basin, washing his face and hands. HAMMER after drying himself, went back and checked MARTI's wrist pulse. There was no pulse. HAMMER then got a clean sheet from under his bed and covered MARTI up. HAMMER then combed his hair and walked back and forth in the cell.

HAMMER stated that he looked to see what time it was. It was 2:40 a.m. He heard officers coming in for the count. At 2:46 a.m., the officers (a female officer and another officer, First Name Unknown JONES) came to his cell door.

HAMMER told the officers, "My cellie is dead," or something to that effect. The female officer said, "He's what?" HAMMER responded "He's dead. Turn on the lights to check." HAMMER simultaneously to saying this to the officers, pulled the sheet off MARTI so

161

that the officers could see that he was tied up. The female officer asked why he was tied. HAMMER told her, "To make it easier." She said, "Easier for what?" HAMMER responded, "To kill him."

973. Initially during the interview, Mr. Hammer's speech was so rapid that former Agent Thompson had to stop him and ask him to slow down.

974. Mr. Hammer told former Agent Thompson that he was able to determine the time because he looked at the clock-radio seized from Mr. Hammer's cell following Mr. Marti's death. (U)

975. Mr. Hammer told former Agent Thompson that he had told Correctional Officer Boone one week prior to the murder that he (Hammer) wanted Marti as a cellmate so that he could "fuck him [Marti] up." (U)

976. Former Agent Thompson subsequently learned that Mr. Boone did not agree with Mr. Hammer's statement that he had told Boone that he wanted to assault Marti. (UO)

977. Mr. Hammer told former Agent Thompson that he started talking with Mr. Marti about a hostage ruse so that Marti could obtain a transfer. (U)

978. Mr. Hammer told former Agent Thompson that he (Hammer) sweetened the deal to do the favor for Mr. Marti by promising Mr. Marti that he would give him $500.00. (U)

979. Former Agent Thompson did not ask Mr. Hammer why he would need to sweeten a deal that involved Mr. Hammer doing Mr. Marti a favor. (U)

980. Mr. Hammer told former Agent Thompson that there was a contract out on Mr. Marti. (U)

981.  Former Agent Thompson never verified that there actually was a contract on Mr. Marti. (U)

982.  Mr. Hammer told Former Agent Thompson that he made ropes from sheets. (U)

983.  Mr. Hammer did not illustrate with his hands how he strangled Marti since he was in restraints.  (U)

984.  Former Agent Thompson found torn material under the pillow of Mr. Marti's bunk. (U)

985.  After he took Mr. Hammer's statement, Former Agent Thompson conducted a videotaped inspection of the crime scene. (U)

986.  The videotape of the examination of SHU cell 103 shows items in the toilet which had not been flushed including the match, cigarette, and two pieces of paper. (U)

987.  The videotape of the examination of cell 103 shows Special Agent Thompson finding a package of latex gloves on a desk as well as a glove on the top bunk. (U)

988.  The videotape of cell 103 shows that it was neatly maintained and not the apparent scene of any recent struggle. (U)

989.  Former Agent Thompson seized from the crime scene the clock radio because Mr. Hammer had mentioned it in his statement. (U)

990.  Former Agent Thompson did not determine whether or not the clock radio had a light. (U)

991.  Former Agent Thompson seized from the crime scene a razor blade because Mr. Hammer had mentioned it in his statement.

992. Former agent Thompson seized the ropes because Mr. Hammer had mentioned them. (U)

993. Former Agent Thompson did not seize or test the rubber glove(s) found on Mr. Marti's bed.

994. While Former Agent Thompson visually observed the glove(s), he did not subject those gloves to any on-site or other testing. (U)

995. Although Mr. Hammer stated that he had the radio on until 2:00 am, Former Agent Thompson did not ask either staff or inmates if they heard a radio playing in the cell. (UO)

996. In his statement Mr. Hammer told Former Agent Thompson that he began attacking Mr. Marti at 2:17 am. (U)

997. Mr. Hammer's version to Former Agent Thompson described the process of tying up Marti taking a total of 17 minutes and the process of killing Mr. Marti taking a total of 23 minutes.

998. On or about April 14, 1996, FBI Agent Anthony Maluco was assigned as the case agent to investigate the death of Mr. Marti.

999. As case agent, Agent Maluco was in charge of the investigation into the death of Mr. Marti. (U)

1000. At the time of this assignment Agent Maluco had been an FBI Agent for less than five months. (U)

1001. Prior to becoming an FBI Agent, Agent Maluco had no previous law enforcement experience. (U)

1002.   Prior to the Marti investigation, Agent Maluco had not been trained in the area of accidental death due to erotic asphyxiation. (U)

1003.   Prior to the Marti investigation, Agent Maluco had never handled a case where the cause of death was found to be accidental due to erotic asphyxiation. (U)

1004.   Prior to the Marti investigation, Agent Maluco had never handled a case where an insanity defense had been raised. (U)

1005.   Agent Maluco had been assigned sometime in 1995 one other homicide case.

1006.   Agent Maluco did not visit the scene – cell 103 – during the first week of the investigation.  (U)

1007.   Agent Maluco made attempts to verify the information Mr. Hammer had provided to FBI Agent Carlyle Thompson in his statement on the night in question.  (U)

1008.   Agent Maluco determined that some of the things Mr. Hammer told Agent Thompson could be authenticated and others could not be authenticated. (U)

1009.   Agent Maluco was the only FBI Agent to attend Mr. Marti's autopsy. (U)

1010.   At the time of the autopsy Agent Maluco had not received training in the type of evidence to be collected at an autopsy.

1011.   At the autopsy, Dr. Funke collected penile, anal and oral swabs from the decedent's body. (U)

1012.   The oral swabs were taken from the throat and gums. (U)

1013.   Agent Maluco submitted the penile and anal swabs to the FBI laboratory for a comparative DNA analysis.

1014.   Agent Maluco did not submit the oral swabs taken from both the gums and throat for testing. (U)

1015.   Agent Maluco did not submit the oral swabs for testing because he thought that the chances of Mr. Hammer and Mr. Marti engaging in oral sex at the time of death to be "pretty slim."

1016.   During the section 2255 hearing Agent Maluco testified that bondage is consistent with erotic asphyxia.

1017.   Agent Maluco testified that lack of evidence of semen is not inconsistent with erotic asphyxia.

1018.   After the killing of Mr. Marti, evidence was obtained in the form of several letters and notes written by Mr. Hammer indicating that Mr. Hammer intended to kill Mr. Marti.

1019.   Two inmates, Leonard M. Yager and Stephen J. Classen, provided statements to the authorities indicating that Mr. Hammer told them prior to the killing that he intended to kill Mr. Marti.

1020.   Both Messrs. Yager and Classen testified during the Government's case in chief with respect to the guilt-phase of the trial.

1021.   Mr. Yager testified that he was Mr. Hammer's cell mate for 30-45 days in the later part of 1995 and for about 30 days in January and February of 1996.

1022.  Mr. Yager testified that Mr. Hammer would look out the cell window and observe Mr. Marti in the recreation pens.

1023.  According to Mr. Yager "[i]t seemed [Mr. Hammer] was infatuated with [Mr. Marti]."

1024.  With respect to the second time that Mr. Yager celled with Mr. Hammer, the subject of Mr. Marti came up "[a]lmost every day."

1025.  Mr. Yager testified "I know that [Mr. Hammer] had affections for [Mr. Marti]."

1026.  After moving out of Mr. Hammer's cell, for a period of time Mr. Yager acted as an orderly in the Special Housing Unit and had contact with Mr. Hammer three or four times a day.

1027.  According to Mr. Yager, after Mr. Marti moved in with Mr. Hammer, Mr. Hammer was "a little jollier or whatever."

1028.  According to Mr. Yager, Mr. Hammer "was more satisfied with Marti."

1029.  After Mr. Marti moved in with Mr. Hammer, Mr. Yager observed Mr. Hammer at the cell door braiding some sheets into ropes.

1030.  At that time, Mr. Marti was in the cell at the desk.

1031.  Mr. Yager asked Mr. Hammer what he was doing and Mr. Hammer smiled and did not answer but apparently gestured by looking over his shoulder and moving his thumb across his throat.

1032.  When asked at trial what he understood Mr. Hammer to be indicating Mr. Yager stated "I didn't pay it no attention" and "I said he was crazy or something, and yeah, I kept moving."

167

1033.  After Mr. Marti was killed, Mr. Yager observed Mr. Hammer in the recreation pen and Mr. Hammer made the same gesture and purportedly told Yager that he should tell the truth because he had told the truth.

1034.  Mr. Yager testified he had a subsequent conversation with Mr. Hammer wherein he asked Mr. Hammer why he did it and Mr. Hammer purportedly stated "I told you that I was."

1035.  Mr. Yager also testified that when he was Mr. Hammer's cell mate in January and February of 1996, Mr. Hammer talked about having sex with Mr. Marti but also "said he was going to kill him" but Mr. Yager did not "put much stock" in the statement.

1036.  At the time of trial in 1998, Mr. Yager was serving a 15-year mandatory sentence for being a convicted felon in possession of a firearm.

1037.  The offense involved Mr. Yager selling firearms.

1038.  While incarcerated Mr. Yager used heroin and consumed alcohol.

1039.  Mr. Yager's criminal record includes a conviction for second degree murder.

1040.  At the time of Mr. Yager's testimony, he was aware that the prosecutor "had written a letter to his counterpart in the Western District of Tennessee about [his] case" and that "there [had] been some kind of communication about getting a reduction [in his] sentence."

1041.  Mr. Yager was "certainly" hoping that his sentence would be reduced.

1042.  At the time of trial, Mr. Yager testified that on the exact day that Mr. Marti moved in with Mr. Hammer, he told four correctional officers – Pazinetti (phonetic), Woody, Bell and Hicks – that Mr. Hammer was going kill Mr. Marti.

1043.  None of those officer testified at the time of trial or during the section 2255 hearing.

1044.  After Mr. Marti was killed, Mr. Hammer provided Mr. Yager with a letter indicating he intended to kill Mr. Marti.

1045.  With respect to the letter Mr. Yager testified on cross-examination as follows:

> Q: Did you immediately recognize the letter as something you might be able to turn to your advantage.
>
> A: Something that I may be able to turn to my advantage?
>
> Q: Yes, sir.
>
> A:  Well, at first when I got it I wasn't even going to give it.  The first day I got it I wasn't even going to give it to the – the FBI or whoever it was that interviewed me.  And the second time they come by I just changed my mind and gave it to them.
>
>   I knew that it could be to my advantage or something, I guess I did, because I gave it to them and I didn't hold nothing back, because he had told me to tell the truth about everything, so I gave it to them.
>
> Q: When you say he told you to tell the truth about everything, who are you talking about?
>
> A: David
>
> Q: So Mr. Hammer gave you the letter and said, next time you're talking to the FBI, you just tell them the truth about everything, correct?
>
> A: No, he didn't tell me that day.  When he gave me the

letter I don't think there was any words exchanged because I was moving fast.

Q: He had earlier told you –

A: Yes.

1046.   Mr. Classen testified for the Government on June 9 and 10, 1998.

1047.   At the time of his testimony, he was serving a federal sentence for conspiracy to introduce drugs into a prison.

1048.   Mr. Classen arrived at USP-Allenwood in March of 1996.

1049.   After arriving at USP-Allenwood, he was housed with Mr. Hammer in Cell 103 for approximately two weeks.

1050.   Mr. Classen moved out of Cell 103 so that Mr. Marti could move in with Mr. Hammer.

1051.   When Mr. Classen moved in with Mr. Hammer, Mr. Hammer told Mr. Classen that he would have problems with the prison gang, the Dirty White Boys.

1052.   When Mr. Classen moved out, Mr. Hammer told him that he made up the story that Mr. Classen would have problems with the Dirty White Boys.

1053.   Mr. Classen testified as follows with respect to the story regarding the Dirty White Boys:

> Q: Did he ever tell you why he made up a story that you would have trouble with the Dirty White Boys at the Allenwood Penitentiary?
>
> A: Because he wanted my company, he enjoyed – I mean, just from what we talked at first, that he enjoyed my personality, I guess.

170

1054.  Mr. Classen while celled with Mr. Hammer observed pornographic photos of girls on the cell wall and in the center of those photos was a picture of a monkey.

1055.  According to Mr. Classen, Mr. Hammer referred to the monkey as Jasper and would talk to the monkey when he was losing at cards.

1056.  Mr. Classen testified that Mr. Hammer sent Mr. Marti a "kite" or note.

1057.  Mr. Classen testified that he remembered Mr. Hammer receiving a "kite" from Mr. Marti in which Mr. Marti stated "I really want to be your cellee" and along with that was a "cop out" or request from Mr. Marti to move in with Mr. Hammer for Mr. Hammer to give to prison staff.

1058.  According to Mr. Classen, Mr. Marti was to move in with Mr. Hammer on April 8, 1996.

1059.  The move was delayed because on April 8, 1996, a fight occurred in the recreation cage.

1060.  Mr. Classen testified that Mr. Hammer "started screaming at everybody that there was a fight in the rec. cage."

1061.  Mr. Classen observed one inmate with "blood all running down his face and stuff."

1062.  Mr. Classen testified that "Hammer looked – looked over at me, and I think I was kind of white-faced, because I didn't like seeing that anyways, and he said that, I'm going to kill Marti. And I just looked at him.  And I don't know what kind of expression I had, but the next thing he says, point to me, he goes, Got you,

like that.  And anyways, that – that stopped us from moving.  It was the next day that we ended up moving."

1063.  After the killing of Mr. Marti, Mr. Classen received a "kite" from Mr. Hammer.

1064.  Mr. Classen found the "kite" on the floor of his cell, Saturday morning, April 13, 1996, and destroyed the "kite" by flushing it down the toilet.

1065.  With respect to that "kite," Mr. Classen testified as follows:

> Q: And what – again, you said that you didn't read the whole thing.  What was it that you did read?
>
> A: Well, he said that he was serious about what he was going to do, that he was going to kill Marti.  That's really all that I could remember specific, and then I said, oh, I don't want this; and I threw it away.

1066.  During Mr. Classen's testimony the Government presented a letter (Government Exhibit 35.2) purportedly written by Mr. Hammer to Mr. Classen.

1067.  The letter was dated April 14, 1996.

1068.   The letter stated in part "Steve, I don't care what you say to the FBI or SIS.  There isn't anything that can hurt me because their case is pretty open and shut.  I'm sure you were surprised to learn that I had done what I told you I was going to with Marti."

1069.  Mr. Classen's criminal record includes a conviction for bank robbery.

1070.  At the time of Mr. Classen's testimony, Mr. Classen was aware that the prosecutor would be writing a letter on his behalf to the prosecutor in his case.

1071.  Mr. Classen was hoping that his sentence would be reduced.

1072.  With regard to Mr. Marti moving in with Mr. Hammer on April 9, 1996, Correctional Officer Brad Peiffer at the time of trial testified on direct examination by Government counsel on June 30, 1998, as follows:

> Q: Let me show you what's been marked Government Exhibit 31.3 Mr. Peiffer, and ask you if this photocopy is of documentation which may be – which may have related to your work back in the special housing unit back in April of 1996?
>
> A: Yes, that's a – a logbook that we have people who enter segregation are moved from cell to cell, or get released from the special housing.
>
> Q: With respect to the handwriting that's on that exhibit, are you familiar with it?  Not that it's yours, but do you know whose handwriting it might be?
>
> A: Yes.
>
> Q: Whose is that?
>
> A: You have Officer Matthews, Passonetti, and myself.
>
> Q: What handwriting is yours?
>
> A: From –
>
> Q: Well, let's stay, excuse me, to the April 9, the top entry with Mr. Marti being moved.  Whose handwriting is that, sir?
>
> A: That's Officer Matthews.
>
> Q: And again, he was the officer in charge?
>
> A: Correct.
>
> Q: Do you have any firsthand information about the

request of Mr. Marti or the request of Mr. Hammer to cell together?

A: I was receiving request forms from both Inmate Hammer and Marti probably – I'd take a guess of probably a week in advance from both of them, both of them requesting to cell together.

Q: How often would you have received from David Paul Hammer a request – I mean, how often during that week would you have received a request from David Paul Hammer to have Mr. Marti serve as his cellmate?

A: A couple – if I didn't receive a request form from them, it was through verbal, they would ask me verbally, both of them, as I would be up and down the range.

Q: And did finally, according to that document, and based upon you recollection, did the two of them finally get to cell together?

A: Yes.

Q: Did you have any role or responsibility or observations when the two of them were put together?

A: I did help escort Inmate Marti in the cell with Inmate Hammer.

Q: And upon placing Mr. Marti in Mr. Hammer's cell, what was the reaction, if anything, you observed between the two?

A: I notice both of them were really smiling, and I can't recall – one of them stated something like, I can't believe we're finally together, or something to that [effect].

1073.   Mr. Hammer testified under oath on June 22, 1996, that the story he told the FBI relating to the hostage scenario was not accurate and the braided sheets were used for other purposes.

1074.   The videotape of the hypnosis session reveals that Mr. Hammer when he stated "other purposes" during the guilty plea colloquy was referring to sexual bondage.

1075.  Mr. Hammer while purportedly under hypnosis stated as follows:

> DPH: I'm in my cell, cell 103. And, we were having a good time.  We already talked about doing some other things that we hadn't done before.

> Dubin: You're talking about it right now, right?

> DPH: Yes.

> Dubin: Tell me what you're talking about.  I'd like to hear it.

> DPH: Talking about sexual things.  We're talking about things that Andrew likes to do and things that I haven't tried before.

> Dubin: Do you want to discuss these things, or -?

> DPH: He likes to get off while he's, while he has pressure applied to his neck.  Not to where he passes all the way out, but just gets on the edge, he says it helps him to have a better orgasm.

> Dubin: Okay. Go ahead, David.

> DPH: And I like, I get a sexual thing out of seeing people tied up.  It makes them, it makes it more like I have power, I'm in control, like I'm dominant

Government Exhibit 36, pages 32-33.

## Q.  **The Testimony of Forensic Pathologists Spitz and Funke.**

1076.  Dr. Werner Spitz is a medical doctor and board-certified forensic pathologist. (U)

1077.  Dr. Spitz received his medical degree in 1953 from Hebrew University, Hadassah Medical School in Jerusalem. (U)

1078.  Dr. Spitz was board-certified by the American Board of Pathology in anatomic pathology in 1961 and was board-certified by the American Board of Pathology in forensic pathology in 1965. (U)

1079.  Dr. Spitz worked as a medical examiner for the Office of the Chief Medical Examiner for the state of Maryland from 1959 to 1961. (U)

1080.  Dr. Spitz served as the Deputy Chief Medical Examiner for the state of Maryland for approximately six years. (U)

1081.  In 1972 Dr. Spitz left the position as Maryland's Deputy Chief Medical Examiner to become the Chief Medical Examiner for the County of Wayne (Detroit), Michigan. (U)

1082.  Dr. Spitz held the position as Chief Medical Examiner for Wayne County until October, 1988. (U)

1083.  Dr. Spitz also served as the medical examiner for Macomb County, Michigan, until September, 2004 when he retired. (U)

1084.  During the course of his career Dr. Spitz has either performed or supervised approximately 55,000 to 60,000 autopsies. (U)

1085.  Dr. Spitz has held several faculty positions in the area of forensic pathology. (U)

1086.  Dr. Spitz was an associate professor, teaching forensic pathology, at the University of Maryland School of Medicine in Baltimore and at the Johns Hopkins University. (U)

1087.  Dr. Spitz was also an associate professor, teaching forensic pathology, at Wayne State University School of Medicine. (U)

1088.  Dr. Spitz is a member of the National Association of Medical Examiners and a fellow of the American Academy of Forensic Sciences. (U)

1089.   Dr. Spitz served on the committee of the American Academy of Forensic Sciences that is presently updating the guidelines for the practice of forensic pathology in the United States. (U)

1090.   Dr. Spitz is also a fellow of the Detroit Academy of Medicine. (U)

1091.   Dr. Spitz has lectured for the Federal Bureau of Investigation ("FBI") and the New York Police Department in the area of forensic pathology. (U)

1092.   Dr. Spitz teaches an annual course in Detroit, Michigan, attended by some 300 FBI agents, police investigators, detectives and laboratory personnel in the area of forensic pathology.  (U)

1093.   Dr. Spitz has also lectured and continues to give lectures to coroners and medical examiners in the area of forensic pathology. (U)

1094.   Dr. Spitz has published approximately 94 articles and papers in peer reviewed journals in the area of forensic pathology. (U)

1095.   Dr. Spitz authored and edited the textbook Medicolegal Investigation of Death: Guidelines for the Application of Pathology to Crime Investigation, Third Edition.  (U)

1096.   Dr. Spitz stated that the textbook is probably the largest English language textbook on the topic of forensic pathology and is used in medical schools and police academies.

1097.   This textbook is a leading reference work in the field of forensic pathology. (U)

1098.   Dr. Spitz personally wrote the chapter of this treatise titled "Asphyxia" which includes a section entitled "Sex-Associated Asphyxia."

1099.   Dr. Spitz has testified as an expert witness in the area of forensic pathology in state and federal court in both civil and criminal proceedings innumerable times.  (U)

1100.   Dr. Spitz has also testified as an expert in the area of forensic pathology before Congress pursuant to hearings investigating the assassinations of President John F. Kennedy and the Reverend Martin Luther King, Jr. (U)

1101.   Dr. Spitz has never been found unqualified to testify as an expert in any court. (U)

1102.   Dr. Spitz testified on behalf of the plaintiffs in the O.J. Simpson civil trial. (U)

1103.   Dr. Spitz assisted the City of Boulder Colorado Police Department in the infamous Jon Bennet Ramsey murder investigation. (U)

1104.   Dr. Spitz testified for the prosecution in the Robert Chambers case in New York known as the "preppie murder" case. (U)

1105.   Dr. Spitz testified that in the Robert Chambers case the defense asserted a defense of accidental choking due to rough sex.

1106.   Dr. Spitz has personally handled cases where the death was caused by sexual or erotic asphyxia and has been to numerous scenes where the death was caused by erotic asphyxia.

1107.   This Court found Dr. Spitz qualified to testify as an expert in the field of forensic pathology. (U)

1108.   Dr. Spitz reviewed the many documents and materials related to the death of Andrew Marti, including:  autopsy photographs, medical report of the physician's assistant Muhammed Chaudhri, the trial testimony of Mr. Chaudhri, the Bode Laboratory Report, the expert report of Dr. Saralee Funke, the autopsy report prepared by Dr. Funke, the trial testimony of Dr. Funke, the video tape of cell 103 and the photographs of Mr. Hammer taken shortly after the incident.  (U)

1109.   Drs. Spitz and Funke testified and this Court so finds that Andrew Marti died of ligature strangulation. (U)

1110.   Dr. Spitz testified and this Court so finds that Dr. Funke's autopsy report noted the presence of innumerable petechial hemorrhages in the capillaries of the heart, the lungs, the upper eyelids, the lower eyelids, the whites of the eyes and the cheeks of Andrew Marti. (U)

1111.   Dr. Spitz testified and this Court so finds that the petechial hemorrhages indicate that intermediate pressure was applied to the neck sufficient to cut off the venous flow of blood draining from the head but insufficient to block the arterial flow of blood to the head. (U)

1112.  Dr. Spitz testified and this Court so finds that an artery is much thicker than a vein and therefore a vein is much easier to compress. (U)

1113.  Dr. Spitz testified and this Court so finds that Dr. Funke's autopsy report describes hemorrhages under the abrasions on the front of the neck. (U)

1114.  Dr. Spitz testified and this Court so finds that Dr. Funke's autopsy report describes no injury to Andrew Marti's airways. (U)

1115.  Dr. Spitz testified and this Court so finds that the autopsy photographs clearly show the presence of innumerable petechia. (U)

1116.  On the morning of April 13, 1996, Muhammed Chaudhri, a Physician's Assistant, attempted to revive Andrew Marti.

1117.  Dr. Spitz testified and this Court so finds that the report of Mr. Chaudhri describes the presence of bloody froth in the upper airway and mouth of Andrew Marti. (U)

1118.  Dr. Spitz testified and this Court so finds that Dr. Funke's autopsy described no trauma whatsoever – exterior or interior –  to the back of Mr. Marti's neck.

1119.  Dr. Spitz testified and this Court so finds there was no sign of trauma at all to the back of Mr. Marti's neck. (U)

1120.  Dr. Spitz testified and this Court finds that sexual asphyxia death scenes usually involve bizarre and unusual circumstances.  (U)

180

1121.  Dr. Spitz testified and this Court finds that in sexual asphyxia deaths sometimes sperm is present and sometimes it is not. (U)

1122.  With respect to details about Mr. Hammer's background, Dr. Spitz stated the only information about Mr. Hammer's background was the statement he gave to the FBI. (U)

1123.  Dr. Spitz agreed it was fair to say that he had no information about Mr. Marti's background. (U)

1124.  Dr. Spitz stated sexual asphyxiation need not involve masochism or intentionally hurting the person beyond what force is needed to cut off oxygen to the brain. (U)

1125.  Dr. Spitz spoke by phone with two attorneys from Indiana about Mr. Hammer's case but could not recall their names. (U)

1126.  Dr. Spitz stated he had no notes of the conversation with them. (U)

1127.  In the autopsy report of Mr. Marti (Defendant Exhibit 105) Dr. Funke under the section entitled "Final Pathologic Diagnosis" lists the following findings: abrasions on the neck consistent with ligature, small hemorrhages in and around neck muscles, petechial hemorrhages on eyelids, on conjunctivae, on the pleural surfaces of the lungs, and on epicardial surface of the heart, petechial hemorrhages beneath the vocal cords, submucosal hemorrhage on the inside of lower lip, tongue hemorrhage consistent with biting, and evidence of binding with abrasions and contusions

on wrists associated with subcutaneous hemorrhage, and abrasions on ankles.

1128.  Dr. Funke testified, and the Court so finds, that Mr. Marti's death was attributed to asphyxia resulting from neck compression due to ligature strangulation with small injuries inside the lower lip indicating the possibility of a manual component at some time during the assault.

1129.  Dr. Funke testified, and the court so finds, that marks on the wrists and ankles were evidence of having been bound or tied up, and the hemorrhage under those marks indicates that Mr. Marti struggled against the restraints.

1130.  Dr. Funke testified that all of the abrasions were associated with deep underlying hemorrhage underneath the skin which she was able to demonstrate by making small incisions over the individual injuries.

1131.  Dr. Funke stated on the surface of Mr. Marti's left ankle was an area that was lightly abraded, and on the back part of his right ankle was another area that was abraded or scraped. (U)

1132.  Dr. Funke made incisions into each of the two areas and saw that on the left side there was only a very small amount of bleeding associated with this abrasion and underneath the abrasion on the right ankle there was basically no bleeding whatsoever. (UO)

1133.  The autopsy report stated that there was a 0.7 centimeter region of submucosal hemorrhage inside the lower lip. (U)

1134.   The autopsy report stated there was a 1.0 centimeter hemorrhage associated with a small bite mark on the epithelium of the tongue. (U)

1135.   The presence of numerous petechia in various areas suggests that there was a slow strangulation of Mr. Marti, according to Dr. Funke's findings.

1136.   There was a bruise on the inside of Mr. Marti's lower lip. (U)

1137.   The front of Mr. Marti's neck had an abrasion that was five inches long, it was slanted somewhat, such that the right end of it was lower than the left end and was about 3/16 to 4/16 inches wide. (U)

1138.   A sideways view of the human head showed on Mr. Marti an interrupted or an incomplete area of abrasion that slanted downward and was three and a half inches long. (U)

1139.   Government Exhibit 13 was an example of the kind of ligature made of a material that if pressed against the neck or rubbed against the neck could abrade the skin and was a thickness that could have produced a ligature mark of the thickness that Dr. Funke saw on Mr. Marti's neck. (U)

1140.   At the time of the autopsy Mr. Marti's clothing consisted, in part, of a T-shirt, which had been cut off and was present only on the arms, was pastel orange in color, and size XXL.

1141.   Mr. Marti was wearing two pairs of boxer shorts, both pastel orange. (U)

1142.    Dr. Funke stated standard procedure is to do a rape kit in this sort of death where there were two individuals in a cell, both of them male and one dead.

1143.    Dr. Funke did a visual examination of Mr. Marti's buttocks.

1144.    Dr. Funke "saw no evidence of sexual intercourse in the sense that [she] saw no drainage, no blood or bloody secretions, nothing unusual at all in or around his buttocks or his anus, which [she] looked at because [she] had to swab that area as part of the rape kit."

1145.    Dr. Funke stated she prepared swabs and smears from Mr. Marti's gums, throat, anus and penis.

1146.    Dr. Funke stated "swabs" were sterile "Q-tips" and she used the end of a sterile Q-tip and put it under both of Marti's lips to obtain samples for testing from the gums.

1147.    Dr. Funke swabbed the entire penis in the same manner as she had performed other swabs and touched those swabs to the slide.

1148.    In his book, *Medicolegal Investigation of Death*, Dr. Spitz states that injury to the skin as a result of a choke hold is usually absent, except if a police baton or large metal flashlight were used.

1149.    In his book, Dr. Spitz states that "a *carotid sleeper hold* does not constrict the airway.  The crock (sic) of the arm is placed over the midline of the neck, while the arm and forearm apply pressure to the sides of the neck.  The free hand can

be used to pull on the wrist of the constricting forearm to increase compression . . .  Both external and internal evidence of injury is usually minimal or absent.  The carotid sleeper hold causes rapid onset of unconsciousness. . .  blood flow to the head is reduced by an average of 85 percent in approximately six seconds.  Release of a carotid hold restores blood flow to the head and complete recovery in a few seconds. A carotid hold, which is not released immediately upon incapacitation, may cause permanent injury and death."

1150.  Dr. Spitz also states in his book that "[m]ovement during a struggle may turn a sleeper hold into choke hold with serious, even fatal, consequences."

1151.  On April 13, 1996, at approximately 6:18 a.m. Mr. Hammer was interviewed by FBI Agent Carlyle Thompson.  During that interview, Mr. Hammer explained how he had killed Mr. Marti.

1152.  Mr. Hammer's description was that he initially put his left arm under Mr. Marti's Adam's apple to apply a choke hold.

1153.  Dr. Funke was not clear whether Mr. Hammer was grabbing Mr. Marti's arm by grabbing his wrist or grabbing his forearm as it was around Mr. Marti's neck and the difference was that if the crook of Mr. Hammer's arm was around Mr. Marti's neck, then that was what was known as a carotid sleeper hold, which can produce unconsciousness if correctly applied quickly, in ten seconds or so. (U)

1154.  Dr. Funke stated a choke hold would have been Mr. Hammer's forearm resting against Mr. Marti's throat area producing a lot of damage. (U)

1155.   Dr. Funke could not determine from Mr. Hammer's statement to the FBI whether he applied a choke hold or a sleeper hold.

1156.   Dr. Funke testified that in this case "there [were] internal areas on the muscles of the neck that were bruised bleeding" and that bruising "could have been produced by an improperly applied carotid sleeper hold that got changed into a choke hold."

1157.   Dr. Funke further testified that "the areas of bleeding on the inside of the neck could have been produced by other means as well; for instance, hands or a ligature."

1158.   In a properly applied carotid sleeper hold there is minimal damage.

1159.   Dr. Funke has a definition in her mind of what straddling is but is unclear what Mr. Hammer meant in his statement to the FBI. (U)

1160.   Dr. Funke described straddling as Mr. Hammer having one knee by Mr. Marti's right waist and the other knee by the left waist and Mr. Hammer's body over Mr. Marti.

1161.   Under those circumstances, Mr. Marti would have had some ability to move his ankles and feet but would be less likely to sustain contusions because there would be limitation on the degree to which Mr. Marti's feet could move by virtue of the weight of another human being sitting on his buttock area.

1162.   The strangulation event occurred sometime between approximately 2:17 a.m. to approximately 2:40 a.m. and Dr. Funke's autopsy findings were consistent with that.

1163.   On June 22, 1998, as noted in the Introduction to this opinion, Mr. Hammer did not disagree with the Government's statement that he put Mr. Marti in a sleeper hold and rendered him unconscious and then took a piece of cloth and strangled him to death.

1164.   The autopsy findings are consistent with that version of the killing.

1165.   The autopsy findings are consistent with Mr. Hammer's statement that Mr. Marti struggled in the restraints when he was attempting to apply a choke or sleeper hold.

1166.   Witnesses at the scene observed "bloody froth" on the pillow near Mr. Marti's mouth.

1167.   The observation of the blood on the pillow is consistent with the autopsy finding of an injury to Mr. Marti's tongue and inside lower lip.

1168.   The observation of "bloody froth" on the pillow is consistent with Mr. Hammer having rendered Mr. Marti unconscious without obstructing Mr. Marti's air passage.

1169.   The autopsy findings and the evidence observed at the scene are consistent with (1) Mr. Hammer injuring Mr. Marti's tongue and inside lower lip during an initial struggle, (2) Mr. Hammer attempting a sleeper hold without success and resulting in a violent

struggle and (3) Mr. Hammer then rendering Mr. Marti unconscious after a sleeper hold was properly applied.

1170. The observation of petechial hemorrhages during the autopsy of Mr. Marti does not establish that Mr. Hammer's rendition of the killing which was elicited during the change of plea proceeding is inaccurate.

1171. Such petechial hemorrhages are consistent with Mr. Hammer rendering Mr. Marti unconscious using a choke hold followed by a successful sleeper hold and then using a piece of braided sheet to strangle Mr. Marti.

1172. Dr. Funke testified and the court so finds that petechial hemorrhages can be found in individuals who die by manual strangulation and ligature strangulation.

1173. Dr. Spitz testified that the ligature had to be applied in a harness-type fashion.

1174. Dr. Funke found no evidence of any trauma whatsoever to the back of Mr. Marti's neck. (U)

1175. Dr. Funke agrees with Dr. Spitz that the ligature had to be open ended in the back of the neck – not touching the back of Mr. Marti's neck. (U)

1176. Dr. Funke's opinion was "[t]he marks on decedent Andrew Marti's neck [we]re ligature marks [and] they do not have the characteristic inverted V appearance that would be seen in a hanging." (U)

1177.   According to Dr. Funke, "Wrapping a ligature around someone's neck and pulling or twisting hard enough to produce death will not cause bruises on the inside of the victim's mouth."

1178.   Dr. Funke stated bruising on the inside of Mr. Marti's mouth and his bitten tongue indicate that something in addition to a ligature was used.

1179.   A hand or forearm pressed tightly against the mouth or a blunt focal impact to the jaw are ways in which such mouth injuries may be sustained according to Dr. Funke.

1180.   There was slight hemorrhaging around Mr. Marti's ankles.

1181.   Dr. Funke said that if someone were to strangle Mr. Marti by ligature while simultaneously sitting on his back, there might not be any bleeding underneath the ligatures around his ankles.

1182.   Mr. Hammer in his statement to the FBI provided details which explained why Dr. Funke found abrasions and contusions on Mr. Marti's wrists and ankles.

1183.   Mr. Hammer in his statement indicated that Mr. Marti struggled violently in the restraints.

1184.   At trial the evidence revealed that during the autopsy of Mr. Marti, Dr. Funke obtained swabs "[f]rom his mouth, from his genital region, and from his anal region."

1185.   Prior to the section 2255 hearing the gum swabs used by Dr. Funke were tested by Bode Laboratories for the presence of biological materials, including DNA.

189

1186.   Bode Laboratories is a forensic DNA laboratory accredited by the American Society of Crime Lab Directors/Laboratory Accreditation Board and the National Forensic Science Technology Center.

1187.   During the section 2255 hearing the Government and Hammer submitted a document to the court entitled "Stipulated Findings of Fact Relating to DNA Testing."  Defendant's Exhibit 14.

1188.   Paragraph 16 of the stipulation stated as follows:

> "Specifically, this analysis consisted of [Short Tandem Repeat] testing for the presence of DNA. To a reasonable degree of scientific certainty these tests as they related to the gum swabs (2S05-061-12A) were positive for the presence of <u>sperm fractions</u> and non-sperm fractions matching Marti's DNA profile."

1189.   Mr. Marti's sperm fractions were found in his mouth.

1190.   At the section 2255 hearing Dr. Funke was asked whether finding the sperm fractions were consistent with very recent sexual activity and she answered as follows:

> Well, I don't know that it's consistent with homosexual sex, but it's certainly consistent with ejaculation on his part.

1191.   Dr. Funke further testified that she did not have the expertise to give an opinion as to how long the sperm was in Mr. Marti's mouth.

1192.   Based on the stipulation (Defendant's Exhibit 14) entered into between the Government and Mr. Hammer, the testing by Bode Laboratories establishes that Mr. Marti engaged in sexual activity within a relatively short period of time prior to Mr.

Hammer rendering him unconscious by means of a sleeper or choke hold.

1193.   There is no evidence in the record as to how Mr. Marti's own sperm fraction got on his gum line.  However, it is highly suggestive of recent sexual activity.

1194.   Dr. Spitz testified that Andrew Marti died of ligature strangulation incurred during a sexual experience in which a harness like ligature was pulled from the back.  The court does not find Dr. Spitz's testimony credible to the extent that he testified that death occurred during a sexual experience.

**R. Andrew Marti's History of Autoerotic Sexual Asphyxia.**

1195.   Rodney W. Archambault, who is presently incarcerated in the United States Penitentiary at Florence, Colorado and has a release date sometime in the year 2012, testified during the section 2255 hearing.

1196.   Mr. Archambault was convicted of using the mail to file fraudulent tax returns and was sentenced to twenty-five years in federal prison. (U)

1197.   Mr. Archambault was incarcerated at the United States Penitentiary at Allenwood from January, 1995 to October, 1995. (U)

1198.   While incarcerated at United States Penitentiary at Allenwood, Mr. Archambault shared a cell for three to four weeks with Mr. Marti.

1199.   While they were cellmates Mr. Archambault and Mr. Marti had sexual relations during which Mr. Archambault performed oral sex on Mr. Marti.

1200.   Mr. Marti could not have an orgasm while he and Mr. Archambault were having sexual relations.

1201.   Mr. Marti told Mr. Archambault that he could reach an orgasm by masturbating after they had engaged in sexual relations.

1202.   Mr. Archambault observed Mr. Marti masturbating after they had engaged in sexual relations.

1203.   While Mr. Archambault and Mr. Marti were cellmates, Mr. Marti used ropes suspended from Archambault's bunk to control his breathing while masturbating.

1204.   Mr. Marti made these ropes by tearing up sheets.

1205.   Mr. Archambault could hear Mr. Marti gasping while he (Marti) used the ropes and breathing irregularly while he masturbated.

1206.   When Marti reached a climax he needed a great deal of air.

1207.   Mr. Archambault was aware that prisoners sometimes cut off the fingers of rubber gloves and use them as condoms.

1208.   Rodney Archambault told the court his Illinois convictions were for tax fraud, use of the mails to commit tax fraud, which occurred while he was in prison.(U)

1209.   Rodney Archambault stated he was convicted of forgery. (U)

1210.   Rodney Archambault stated he was convicted of theft. (U)

1211.   Rodney Archambault stated that in 1996 he was not aware of whom Mr. Hammer had murdered. (U)

1212.   Rodney Archambault knew Mr. Hammer from Leavenworth. (U)

**S.   Attorneys Travis's and Ruhnke's Involvement with and Observations of Mr. Hammer.**

1213.   Ronald C. Travis in an attorney admitted to practice in the Commonwealth of Pennsylvania and in this Court. (U)

1214.   He was appointed by this Court to represent Mr. Hammer in US v. Hammer, 96-239 (M.D. Pa.) in June, 1996. (U)

1215.   Mr. Travis was one of two attorneys appointed by this Court to represent Mr. Hammer.  The second, who was appointed after Mr. Travis in September, 1996, was David Ruhnke, Esq. (U)

1216.   Mr. Travis had been a practicing attorney for twenty three years at the time of his appointment and had extensive experience representing criminal defendants.  (U)

1217.   Mr. Travis' representation of Mr. Hammer was his first capital case in federal court. (U)

1218.   Mr. Ruhnke has been licensed to practice law since 1975 and specializes in criminal law. (U)

1219.   Mr. Travis and Mr. Ruhnke ultimately hired Dr. Robert Sadoff, M.D., a renowned forensic psychiatrist, to evaluate Mr. Hammer for potential guilt phase defenses and for mental health based mitigating evidence.

1220.   On December 22, 1996, Mr. Travis accompanied Dr. Sadoff to the United States Penitentiary at Allenwood and observed Dr. Sadoff's first face-to-face meeting between Dr. Sadoff and Mr. Hammer. (U)

1221.  Mr. Travis believed that Mr. Hammer perceived that the testimony of Dr. Sadoff was persuasive while the testimony of Dr. Wolfson "[w]as not being received by the jury in the same manner" and "[t]hat he may well have believed...my God, we're actually going to win this case on a mental illness defense, and I would rather be dead than at Springfield."  (U)

1222.  Mr. Travis believed that Mr. Hammer would rather be executed than labeled mentally ill or insane. (U)

1223.  Mr. Travis became aware of Mr. Hammer's conditions of confinement within the Oklahoma Department of Corrections and while incarcerated within the Bureau of Prisons.  Mr. Hammer spent years in total isolation including a specially built underground bunker designed specifically to isolate Mr. Hammer from the rest of the inmate population, limit his contact with staff, and limit almost completely his contact with the outside world. (U)

1224.  Mr. Travis testified that he did not believe that the rendition of events leading up to the death of Mr. Andrew Marti contained in Mr. Hammer's 302 FBI statement were accurate. (U)

1225.  Mr. Travis believed that Mr. Hammer's confession regarding Mr. Marti was false because Mr. Travis believed that Jocko killed Mr. Marti.

1226.  Mr. Travis believed that Mr. Hammer's confession regarding Mr. Marti was false because the ruse mentioned therein – that Mr. Marti agreed to be tied to the bed in order to perpetrate a false hostage scene so Mr. Marti would be transferred out of the institution – was inconsistent with his understanding of Bureau of

Prison practice of transferring the aggressor and not the victim of internal prison violence. (U)

1227.  Mr. Travis did not consult with a pathologist to ascertain whether the physical evidence was consistent with Mr. Hammer's confession.

1228.  Mr. Travis further acknowledged that had he done so and had he discovered that the physical evidence was inconsistent with Mr. Hammer's confession, he would have presented that information to the jury.

1229.  Mr. Travis and Mr. Ruhnke did not have discussion relevant to challenging the participation of Dr. Mitchell, Wolfson and Karten in Mr. Hammer's case based upon ethical concerns.  (U)

1230.  Mr. Ruhnke testified that the defense he and Mr. Travis presented to the jury on Mr. Hammer's behalf was an insanity defense predicated on Dr. Sadoff's diagnosis of Mr. Hammer as suffering from Dissociative Identity Disorder.  (U)

1231.  Mr. Ruhnke testified, and this Court so finds, that the only time he heard from Mr. Hammer a full version of what transpired the night Mr. Marti died was during the hypnosis session conducted of Mr. Hammer by Drs. Sadoff and Dubin. (U)

1232.  Mr. Travis also testified that the only time he heard a full version of what transpired the night Mr. Marti was killed was during the hypnosis session.

1233.  Mr. Ruhnke further testified that he has no present recollection of having any conversations with Drs. Gelbort, Sadoff

and Grassian regarding whether Mr. Hammer suffered from Borderline Personality Disorder or Post-Traumatic Stress Disorder. (U)

1234.  Mr. Ruhnke recalled that Mr. Hammer, at age fourteen, tried to sign himself into a psychiatric clinic "because he felt he was losing his mind" (U)

1235.  Mr. Ruhnke also testified that depression was a constant factor in Mr. Hammer's presentation and was present throughout the course of his (Mr. Ruhnke's) representation of Mr. Hammer. (U)

1236.  Although Mr. Hammer was diagnosed by Dr. Sadoff as suffering from Dissociative Identity Disorder, and despite the fact that this diagnosis supported Mr. Hammer's insanity defense, Mr. Ruhnke testified that Mr. Hammer never embraced any diagnosis of mental illness and did not want others to perceive him as mentally ill. (U)

1237.  The prospect of succeeding on the insanity defense "was discussed between Mr. Hammer and [Mr. Ruhnke] and Mr. Travis." (U)

1238.  Mr. Ruhnke also testified, and the Court finds, that during the course of his representation of Mr. Hammer, Mr. Ruhnke learned that Mr. Hammer had "different sides" to himself. (U)

1239.  As time went on, Mr. Hammer provided the names of these "different sides" including Jocko, Jasper, Wilbur and Tammy to Mr. Ruhnke. (U)

1240.  Mr. Hammer also told Mr. Ruhnke that Jocko was responsible for various statements contained in Mr. Hammer's FBI 302

Statement and that Jocko added certain parts "just to make it worse." (U)

1241.  During the course of Mr. Ruhnke's testimony, many of his file notes documenting conversations with Mr. Hammer were reviewed. (U)

1242.  Mr. Ruhnke testified that Mr. Hammer "was very adamant about what a hell hole (sic), his words, Oklahoma State Penitentiary was...They built a special cell within a cell so that he could have no contact virtually with anybody" and that Mr. Hammer was held under such conditions for a long time. (U)

**T.   Attorneys Foster's and Long-Sharp's Involvement with and Observations of Mr. Hammer.**

1243.  Ms. Foster has been an attorney since 1983 and has represented over 20 capital defendants. (U)

1244.  During her representation of Mr. Hammer, Ms. Foster came to believe that Mr. Hammer suffered from severe mental illness.

1245.  During her representation of Mr. Hammer, Ms. Foster noted that Mr. Hammer at times was highly emotional, moody, irrational and impulsive.

1246.  During her representation of Mr. Hammer, Ms. Foster observed that Mr. Hammer vacillated between his desire to litigate and waive his rights.

1247.  Based on her experience and contact with Mr. Hammer, Ms. Foster believed that his vacillations were the result of his emotions, moods and mental illness rather than reasoned judgment.

197

1248.  In Ms. Foster's experience, Mr. Hammer's decision-making was also impacted by the conditions of his confinement.  (U)

1249.  The concerns surrounding his conditions of confinement were another factor impacting Mr. Hammer's vacillations to waive or litigate. (U)

1250.  During her representation of Mr. Hammer, Ms. Foster at times found communicating with Mr. Hammer difficult because his perceptions were impaired by his mental infirmities.

1251.  During her representation of Mr. Hammer, Ms. Foster at times found that Mr. Hammer's decision-making was also impaired as a result of his mental infirmities.

1252.  As a result of her years of experience with capital defendants and her numerous contacts with and observations of Mr. Hammer, Ms. Foster concluded that Mr. Hammer's desires to forego raising claims in his section 2255 proceedings were the result of environmental factors as well as his mental, emotional and cognitive impairments, rather than any reasoned judgment.

1253.  Also during her representation, Mr. Hammer expressed a desire on more than one occasion to waive his right to post-conviction relief altogether.  (U)

1254.  As Mr. Hammer had done pretrial, during trial and during the appellate proceedings, Mr. Hammer vacillated regarding whether or not he wished to waive his post-conviction rights.  (U)

1255.  In Ms. Foster's experience, Mr. Hammer's inconsistent decisions to waive or litigate during the Section 2255 proceedings arose out of mental health problems.

1256.   In Ms. Foster's experience, Mr. Hammer's inconsistent decisions regarding whether or not to litigate his Section 2255 petition was based on, or at the least affected by, Mr. Hammer's environment, his mental illness and/or emotional dysfunction.

1257.   During the course of her representation, Ms. Foster had conversations regarding the nature and extent of ineffective assistance of counsel claims that would be raised in the Section 2255 petition. (U)

1258.   The issues upon which Mr. Hammer and counsel agreed there would be an ineffective assistance of counsel facet were reflected in the Petition and Amended Petition filed by counsel. (U)

1259.   To the extent that the claims do not properly plead ineffective assistance of counsel claims as agreed to by counsel and Mr. Hammer, counsel had no strategic or tactical reason for omitting those allegations.

1260.   Rhonda Long-Sharp has been an attorney since 1984 and has represented 15 to 20 capital clients in state and federal court.  (U)

1261.   Ms. Long-Sharp was appointed by this Court as co-counsel in Mr. Hammer's section 2255 proceedings.

1262.   Ms. Long-Sharp conducted the record review and identification of issues in Mr. Hammer's case. (U)

1263.   Ms. Long-Sharp noted very early on in her representation that Mr. Hammer had symptoms of serious mental

illness, including emotionality, blowing minor things out of proportion, unpredictability, mood swings and pressured speech.

1264.   Prior to the scheduled evidentiary hearing, Mr. Hammer became even more irrational because he did not want to return to the conditions of confinement at the Lewisburg, Pennsylvania, facility.

**U.   Mr. Snyder's Involvement with and Observations of Mr. Hammer.**

1265.   Richard Lynn Snyder is a counselor at the United States Penitentiary in Allenwood, Pennsylvania. (U)

1266.   Mr. Snyder's duties as inmate counselor include housing assignments, work assignments, processing inmate visit requests, processing inmate telephone lists, handling administrative remedies and addressing inmate requests of staff members. (U)

1267.   Mr. Snyder testified that Mr. Hammer was assigned to his caseload and that he worked as Mr. Hammer's counselor from July of 1995 through 1999, when Mr. Hammer was transferred to a different facility. (U)

1268.   Mr. Snyder testified that as counselor, he made daily rounds on the cell block and saw Mr. Hammer daily.  (U)

1269.   Mr. Snyder testified that Mr.  Hammer appeared "depressed" during the course of his capital trial and "seemed very upset when he did receive the death penalty." (U)

1270.   Mr. Snyder told this Court that his caseload included one hundred and twenty inmates in general population and about five to thirty-five in the Special Housing Unit for a total of one

hundred and twenty five to one hundred and fifty-five inmates on his caseload on any given day. (U)

1271. Mr. Snyder's responsibilities included participating as a member of the Unit Disciplinary Committee that conducts reviews of inmate complaints. (U)

1272. Mr. Snyder was also responsible for "mainline duty" three days a week. (U)

1273. Mainline duty is where the counselor is present in the dining area during the noon meal to address any issues from inmates on his caseload.  (U)

1274. This task would take forty-five minutes to an hour each of the three days he was responsible for fulfilling this duty. (U)

1275. Mr. Hammer was also not allowed to have a television in his cell. (U)

1276. Mr. Snyder testified that although Mr. Hammer never complained about his single cell status, such complaints would have been futile since Mr. Hammer would never have been allowed to have a cellmate. (U)

1277. Mr. Snyder testified that almost all of his interactions with Mr. Hammer occurred with Mr. Hammer on one side of his cell door and Mr. Snyder on the other.  (U)

1278. Mr. Snyder acknowledged that his interactions with Mr. Hammer were generally fairly short in duration. (U)

1279.  Mr. Snyder told this Court that he has observed Mr. Hammer depressed, sad, upset, agitated and witnessed Mr. Hammer crying. (U)

1280.  He also reported Mr. Hammer could be cooperative at times and was "very moody."

1281.  Mr. Snyder acknowledged that he observed this moodiness on the part of Mr. Hammer on a fairly regular basis over a period of years.

1282.  According to Counselor Snyder, Mr. Hammer's cell was very clean and very neat.  (U)

1283.  According to Counselor Snyder, Mr. Hammer used the other bunk in his cell for storage of his legal materials and kept it in very well order.  (U)

1284.  According to Counselor Snyder, Mr. Hammer knew where to find his paperwork in his cell because he was very well organized. (U)

## V.  Mr. Gonzales's Involvement with Mr. Hammer.

1285.  Randy Gonzales of Springfield Federal Medical Facility testified regarding records of the Springfield facility during the time that Mr. Hammer was confined for purposes of evaluation pursuant to this Court's order. (U)

1286.  Included within those records was a videotape of Mr. Hammer on various dates in October, 1997.  (U)

1287.  Mr. Hammer raised complaints of guard abuse arising out of incidents that took place in October, 1997. (U)

1288.  Although the guards involved in the assaults were named by Mr. Hammer, Mr. Gonzales had no records of any interviews or statements by these guards.  (U)

1289.  The allegations of abuse were unsubstantiated.

1290.  The portion of the videotape relating to the time of the alleged abuse did not reveal any physical abuse by correctional officers.

**W.  Mr. Halloran's Involvement with and Observations of Mr. Hammer.**

1291.  In December, 1997, Lt. Bernard Halloran was employed at the Springfield Federal Medical Facility.  (U)

1292.  Lt. Halloran was responsible for transporting Mr. Hammer to a clinic for purposes of an MRI. (U)

1293. Mr. Hammer was on elevated security status while at Springfield. (U)

1294.  Mr. Hammer was not told of the date and time of the transport. (U)

1295.  The transport was scheduled for 4:00 am. (U)

1296.  Ten officers were assigned to the transport.(U)

1297.  All the officers were armed. (U)

1298.  All officers were armed with .9 millimeter handguns and the perimeter officers were armed with Colt submachine guns (the .9 millimeter version of the M-16). (U)

1299.  A minimum of three officers responded to Mr. Hammer's cell to begin the transport. (U)

1300.  Lt. Halloran could not recall whether or not the team wore black fatigues or correctional uniforms. (U)

1301.  Lt. Halloran wore black fatigues on many transports. (U)

1302.  Mr. Hammer was taken from his cell to the Receiving and Discharge section prior to the transport. (U)

1303.  In the R&D section, all inmates are processed, change clothes and placed in temporary restraints. (U)

1304.  Inmates are also strip-searched in the presence of a minimum of three officers. (U)

1305.  Mr. Hammer was secured in full correctional restraints including handcuffs, leg-irons, a Martin chain, the black box padlock and a stun belt. (U)

1306.  A stun belt involves a device in which, in cases where the inmate gets out of control, an officer can push a button that incapacitates the inmate with electricity from a battery pack on the inmate's waist.  (U)

1307.  If the stun belt is activated, there is a possibility that the inmate will self-defecate, self-urinate or be incapacitated for a period of time.  (U)

1308.  Inmates are informed of the potential reactions to activating the stun belt.  (U)

1309.  Lt. Halloran had control of the stun belt on Mr. Hammer's transport. (U)

1310.  After processing Mr. Hammer through R&D, Mr. Hammer was taken to the transport vehicles.  (U)

1311.  Five vehicles were used for Mr. Hammer's transport. (U)

1312.  The officers outside with the vans were the officers in possession of the Colt submachine guns. (U)

1313.  There were at least two armed advanced guards at the hospital. (U)

1314.  When they arrived at the clinic where Mr. Hammer was to undergo the MRI, Mr. Halloran left the van without Mr. Hammer. (U)

1315.  Mr. Hammer purportedly believed that the individual controlling the stun belt had to remain in close proximity to the inmate or the stun belt would be activated automatically.

1316.  Mr. Hammer's alleged belief was incorrect.

1317.  Mr. Hammer purportedly became upset when Lt. Halloran left the van.

1318.  Lt. Halloran stated he had been involved in dozens of hospital trips from Springfield to community facilities, including St. Johns Regional Health Center which was about five miles away. (U)

1319.  Lt. Halloran stated Mr. Hammer's elevated security status was considered in every escort trip to determine the required staffing by factors in his file, his history of violence, and his pending sentence among other factors. (U)

1320.  Lt. Halloran had been involved in many trips in Springfield which required as many as ten escort officers. (U)

1321.  Lt. Halloran stated a high profile trip included ten staff members which number included an advance team. (U)

1322.   Lt. Halloran stated a circuitous route was taken rather than going directly to the clinic in Springfield which was no more than ten minutes travel time. (U)

1323.   Lt. Halloran stated Mr. Hammer would have been made aware of the capability of the stun belt in writing. (U)

1324.   Lt. Halloran stated Mr. Hammer would not be informed for security reasons when he was going to the clinic until the moment Lt. Halloran showed up to pick him up.(U)

1325.   Lt. Halloran stated an inmate is required to sign a Conditions of Escorted Trip form which explains to the inmate prior to departing the institution that he is still bound by institution rules and regulations. (U)

1326.   Lt. Halloran stated that prior to the authorization of a stun belt, health services staff advise if an individual has a health condition which would preclude it. (U)

**X.   Mr. White's Involvement with and Observations of Mr. Hammer at the United States Penitentiary, Terre Haute, Indiana.**

1327.   Randy L. White is employed at the Unites States Penitentiary at Terra Haute, Indiana, as a unit manager. (U)

1328.   In March, 2001 Mr. White became unit manager for the special confinement unit which is the unit that houses all federal prisoners sentenced to death.  Mr. Hammer is housed on this unit. (U)

1329.   In addition to the special confinement unit Mr. White is the unit manager for the code program overseeing approximately 140 to 150 inmates. (U)

1330.  In addition to the special confinement unit Mr. White is the unit manager for the holdover unit overseeing approximately 30 to 40 inmates. (U)

1331.  Mr. White also has responsibilities associated with the Cuban classification unit overseeing approximately 70 inmates.

1332.  Overall Mr. White is responsible for approximately 300 prisoners in addition to the special confinement unit.

1333.  Mr. White also has administrative duties that take up a significant amount of his average workday.

1334.  Mr. White is responsible for processing all inmate grievances filed by the approximately 300 inmates he oversees.

1335. Mr. White is responsible for overseeing approximately 600 reviews of inmate classifications per year.

1336.  Mr. White is the chairperson of the unit disciplinary committees for each unit he supervises.

1337.  When staffing shortages arise, Mr. White also performs correctional post duty and perimeter security. (U)

1338.  All of these additional duties take Mr. White away from the time he has available to spend on the special confinement unit.  Mr. White does weekly rounds wherein he walks through all of the units he supervises and spends a short time interacting with the many prisoners on these units.

1339.  Mr. White would see Mr. Hammer approximately one or two times a week during his rounds in the special confinement unit. (U)

1340.   Mr. White is not at the prison during the overnight hours. (U)

1341.   Inmates at USP-Terra Haute are instructed when they arrive at the prison that if they need medical attention they should put in a sick call slip with the health services department. (U)

1342.   Mr. White does not supervise the health services department and would not be made aware if Mr. Hammer complained of, or was treated for, headaches. (U)

1343.   Mr. White did not review Mr. Hammer's mail nor did he monitor his phone calls. (U)

1344.   There are no cameras in Mr. Hammer's cell so the only firsthand knowledge Mr. White has concerning Mr. Hammer's actions are when he sees him during his weekly rounds. (U)

1345.   Mr. White has witnessed fluctuations in Mr. Hammer's emotions from upbeat to depressed to angry.

1346.   Mr. White has also observed that Mr. Hammer's emotional fluctuations increase as the stress level in the special housing unit increases.

1347.   Mr. White has also seen Mr. Hammer act impulsively.

1348.   Mr. White's observations of Mr. Hammer are not inconsistent with Drs. Matthews and Martell's diagnosis of Borderline Personality Disorder, with dissociative states.

1349.   Mr. White stated in March 2001, there were approximately 20 inmates in the special confinement unit where Mr. Hammer was housed. (U)

1350.  Mr. White stated all inmates upon arrival are placed in Phase I where they remain for a minimum of 12 months. (U)

1351.  Mr. Hammer was never placed in Phase II at the special confinement unit because he had not earned it by having twelve consecutive months of clear conduct. (UO)

1352.  Mr.  White stated Mr. Hammer had the most immaculate cell since he's been in that unit. (U)

1353.  Mr. White stated Mr. Hammer would order art supplies from time-to-time with which to paint pictures. (U)

1354.  Mr. White stated there was an incident where Mr. Hammer flooded his cell. (U)

1355.  Mr. White stated that Mr. Hammer did receive disciplinary actions from staff members which would make Hammer upset. (U)

**Y.  Dr. Nolan's Involvement with and Observations of Mr. Hammer.**

1356.  Dr. Christopher Nolan is a psychologist at the United States Penitentiary, Terre Haute, Indiana.

1357.  Dr. Nolan's first documented note regarding Mr. Hammer was November 9, 2000. (U)

1358.  Dr. Nolan's primary responsibility beginning in November 2000 was to conduct routine rounds in the special confinement unit going cell-to-cell which was also a shared responsibility.

1359.  Dr. Nolan shared special confinement unit responsibility with Dr. Elliott, who was the chief psychologist and

Dr. Nolan's supervisor, as well as Dr. Cynthia Bigler, who was a staff psychologist at the penitentiary as well. (U)

1360.  Dr. Nolan stated weekly rounds were required to be conducted by the three mental health providers. (U)

1361.  Dr. Nolan took on primary responsibility of making the weekly special confinement unit rounds in June 2001. (U)

1362.  On June 10, 2001, Mr. Hammer attempted suicide by injecting insulin directly into a vein.

1363.  The Suicide Risk Assessment prepared by Dr. Nolan after the incident states in part as follows:

> At approximately 8:45 p.m., I was notified by Lt. Breckbill that inmate Hammer ... attempted to inject his insulin directly into a vein in the presence of the nurse who provided him with the medicine. [The nurse] reported that inmate Hammer politely accepted the needle and medicine in the routine manner, but then took a step backwards, away from the cell front, stated, "I'm sorry I have to do this to you," and then proceeded to "mainline."  Eventually he cooperated with the emergency response of staff, but stated to them he wished to die.

Defendant's Exhibit 31.19, page 4.

1364.  Dr. Nolan testified that Mr. Hammer maintained that in a moment of acute despair and anger related to the imminent execution of a fellow condemned inmate, he impulsively chose his course of action and repeatedly proclaimed he was not suicidal and pledged no further acting-out behavior. (U)

1365.  Dr. Nolan recalled Hammer having a sense of frustration with his conditions of confinement. (U)

1366.  Dr. Nolan stated in a special confinement unit 30-Day review dated July 18, 2001, that Mr. Hammer had recently requested a cell change and his request was granted. (U)

1367.   Dr. Nolan stated that conditions of confinement were very important to Mr. Hammer who felt he should have been granted more privileges than he was being provided on August 16, 2001. (U)

1368.   Dr. Nolan testified that Mr. Hammer had been cordial but more distant and that was likely due to the recent denial by his unit team of his request to advance to Phase Two, a situation which afforded him more privileges and freedom than Phase One. (U)

1369.   On January 22, 2002, Dr. Nolan was contacted by the Case Manager regarding Mr. Hammer. (U)

1370.    As a result of that contact, Dr. Nolan spoke with Mr. Hammer. (U)

1371.   In the course of that discussion, Dr. Nolan learned that Mr. Hammer received a letter that brought out overwhelming intrusive memories of his childhood abuse. (U)

1372.   Mr. Hammer was visibly angry and upset by those memories of abuse. (U)

1373.   Dr. Nolan did not recall if Mr. Hammer's recollections of childhood abuse had to do with his mother. (U)

**Z.   Dr. Elliot's Involvement with and Observations of Mr. Hammer.**

1374.   William N. Elliot, Ph.D., is the former Chief Psychologist at the United States Penitentiary at Terra Haute. (U)

1375.   Dr. Elliot received his Doctor in Philosophy, Counseling Psychology from Indiana State University, Terra Haute, Indiana in 1985. (U)

1376.   Dr. Elliot has no formal training in forensic psychology. (U)

1377.  Dr. Elliot testified that he is not board certified in forensic psychology. (U)

1378.  Dr. Elliot testified, and the Court so finds, that he is not a forensic psychologist and was not called upon by the Government to conduct a forensic evaluation of Mr. Hammer. (U)

1379.  Dr. Elliot testified that while employed by the Bureau of Prisons, he never conducted a clinical or forensic psychological evaluation designed to diagnose and identify mental illness.

1380.  Dr. Elliot described his contact with Mr. Hammer as "generally routine in nature" and added that most, if not all, of his interactions with Mr. Hammer occurred through the food slot in Mr. Hammer's cell door. (U)

1381.  Dr. Elliot admitted that he never evaluated or even questioned Mr. Hammer about symptoms related to Posttraumatic Stress Disorder or Dissociative Identity Disorder.

1382.  Dr. Elliot's contacts with Mr. Hammer were primarily limited to weekly rounds and monthly status checks.

1383.  Monthly status checks do not involve a forensic psychological evaluation.

1384.  Monthly status checks involve determining whether or not there are obvious signs of pathology rather than clinical or forensic diagnosis. (U)

1385.  Dr. Elliot admitted that he never inquired about Mr. Hammer's background, social history, family history or prior mental health diagnoses. (U)

1386.  Dr. Elliot admitted that he was unaware that Mr. Hammer had previously been diagnosed as suffering from Dissociative Identity Disorder or Post-Traumatic Stress Disorder until contacted by the prosecutor. (U)

1387.  Dr. Elliot did not see any signs of DID during Mr. Hammer's stay at Terre Haute, including pressured speech, amnesia, or any other symptomology.

1388.  Dr. Elliot acknowledged, as stated in his written report, that it was difficult for him to recall specific interactions with Mr. Hammer during the years in question – 1999 through 2001.

**AA.  The Bureau of Prisons' Awards Program.**

1389.  Sandra Ask-Carlson was an assistant to the Warden of Allenwood Penitentiary in 1998. (U)

1390.   Ms. Ask-Carlson was responsible for generating the letters of awards to Chaplain Crook, Mr. Troutman and Dr. Mitchell.

1391.  The Bureau of Prisons Policy regarding the presentation of awards to employees is on the BOP website. (U)

1392.  Employees were aware of the BOP policy and the internal policy of Allenwood through the website and internal policy memoranda. (U)

1393.  While the public can access the website for the general policy regarding awards, they cannot obtain access of awards presented to individual employees. (U)

1394.  Ms. Ask-Carlson's duties were to assist the warden in letter writing, review of policy, applications of policies, administrative remedy coordinator, and other functions as assigned.

1395.  Ms. Ask-Carlson worked for Warden Fanello from September 1997 until December 1999. (UO)

1396.  Ms. Ask-Carlson stated both before and after this time Mr. Troutman received similar awards. (U)

1397.  Ms. Ask-Carlson did not see any correspondence or paperwork from the warden which suggested that prior to the trial he was going to present any awards to Mr. Troutman, Reverend Crook, or Dr. Mitchell.

1398.  Ms. Ask-Carlson stated Warden Fanello often recognized staff for acts of heroism and for the discovery of contraband. (U)

1399.  Ms. Ask-Carlson stated she herself had received several special act awards but none related to litigation. (UO)

1400.  In 1998, the warden would have relied upon Assistant Warden Ask-Carlson to prepare correspondence advising staff employees of special act awards by the warden at least 40 times. (UO)

1401.  Ms. Ask-Carlson stated most awards were consistent, either $300 or $500. (UO)

1402.  Ms. Ask-Carlson indicated that Warden Fanello had given awards to other persons who were involved in another homicide but it was given for heroism rather than participation in any criminal prosecution. (U)

1403.  Ms. Ask-Carlson made weekly rounds in the Special Housing Unit at USP-Allenwood. (UO)

1404.  Chaplain Crook's testimony served only to rebut the defense claim that Mr. Hammer suffered from Dissociative Identity Disorder on April 13, 1996.

1405.  Chaplain Glenn Crook testified that he provided pastoral counseling to Mr. Hammer from 1996 through 1998. (U)

1406.  Chaplain Crook indicated that he would sit on the floor of the Special Housing Unit and speak to Mr. Hammer through a wicket, at times exceeding one-half hour, in order to allow Mr. Hammer to express his views and receive pastoral care. (U)

1407.  Chaplain Crook received a special act award in October 1998 from Warden Fanello. (U)

1408.  Chaplain Crook indicated that the special act award received from Warden Fanello was not anticipated and had no effect on any of his testimony as a rebuttal witness at the trial.

1409.  Chaplain Crook would talk to Mr. Hammer about Mr. Hammer's life, family, and religious issues, but sometimes Mr. Hammer did not want to talk to him at all. (U)

1410.  Chaplain Crook indicated that he was motivated only to help Mr. Hammer's soul rather than any opportunity to receive remuneration for his actions at the Allenwood Penitentiary or at trial.

1411.  Mr. Donn Troutman is employed as a unit manager with the Federal Bureau of Prisons. (U)

1412.   Mr. Troutman was the unit manager at USP-Allenwood at the time of the death of Andrew Marti as well as at the time of Mr. Hammer's trial. (U)

1413.   Mr. Troutman testified as a government witness during the guilt phase portion of Mr. Hammer's trial. (U)

1414.   In the 1980's and 1990's Mr. Troutman had received several Special Act Awards for his involvement in various Bureau of Prison matters. (U)

1415.   Mr. Troutman was aware, prior to Mr. Hammer's trial, that his participation in Bureau of Prison matters, including testimony in court, could make him eligible for a monetary Special Act Award. (U)

1416.   Mr. Troutman was present when Mr. Hammer gave his statement to FBI Agent Thompson after Mr. Marti's death. (U)

1417.   Mr. Troutman testified as a penalty phase witness to rebut the defense claim that Mr. Hammer suffered from Dissociative Identity Disorder.

1418.   Mr.  Troutman provided limited information about the backgrounds of Andrew Marti and David Paul Hammer as well as the latter's statements and behavior on April 13, 1996, which did not comport with the DID defense.

1419.   The length of Mr. Troutman's cross examination approximated his direct testimony.

1420.   Defense counsel asked that Mr. Troutman return to testify extensively in the penalty phase of the case.

1421.   The awards, which Chaplain Crook, Mr. Troutman, and

Dr. Mitchell received from the Warden, were part of the Bureau of Prisons' policy and specifically former Program Statement No. 3451.03 which was available to the public upon request. (U)

1422. Chaplain Crook, Mr. Troutman, and Dr. Mitchell testified in the past for the prosecution in other cases and did not receive any monetary award for their testimony even though a Bureau of Prisons' Program Statement allowed for such actions.

1423. Individuals within the Bureau of Prisons believed that monetary rewards were justified for these employees, none of whom even served in a direct law enforcement capacity in this case.

1424. Chaplain Crook, Mr. Troutman, and Dr. Mitchell provided valuable assistance to the Allenwood Penitentiary, including staff and inmates, following the events of April 13, 1996, as well as their testimony over two years later.

1425. The prosecution communicated with the Warden to advise him of his three employees' actions at trial.

1426. Mr. Troutman received a Special Act Award letter dated October 27, 1998, but this was not the first time in his career that he had received such an award. (U)

1427. Mr. Troutman understood his award was for the professional way that he and other staff members handled Mr. Hammer prior to and during the trial, not merely his testimony. (U)

1428. Mr. Troutman saw a range of emotions from Mr. Hammer. (U)

1429. Based upon the timing and other factors, such a potential award did not affect the testimony which Chaplain Crook,

Mr. Troutman, and Dr. Mitchell presented at trial, whether for the prosecution or the defense.

**BB.  The Quality of Mental Health Care Provided to Mr. Hammer While Incarcerated in the Oklahoma Prison System.**

1430.   Louis Bullock is an attorney admitted to practice law in the State of Oklahoma. (U)

1431.   His primary area of practice is civil rights and institutional reform law. (U)

1432.   Mr. Bullock was appointed by the Governor of Oklahoma as a special prosecutor to look into allegations of campaign finance violations and he also has represented the State of Oklahoma in environmental litigation. (U)

1433.   Mr. Bullock was lead counsel in the case of <u>Battle v. Anderson</u>, from October 1975 until its termination in 2001. (U)

1434.   <u>Battle</u> was a comprehensive class action suit related to prison conditions. (U)

1435.   <u>Battle</u> was filed in 1972 in the United States District Court for the Eastern District of Oklahoma.

1436.   At a point before the initial trial of the case, the United States Department of Justice intervened on behalf of the prisoner class. (U)

1437.   The case was initially tried in March, 1974 before the Honorable Luther Bohanon. (U)

1438.   Following the trial, on May 30, 1974 Judge Bohanon issued a decision finding for the prisoner class on all issues. (U)

1439.   In his decision following trial, Judge Bohanon found that there was no "professional psychiatric staff" available on a regular basis, and that in the absence of such staff, the only treatment offered to mentally ill prisoners was sedation. (U)

1440.   Although Judge Bohanon's initial findings related only to the Oklahoma State Penitentiary, the resulting injunction was applied to all Oklahoma prison facilities. (U)

1441.   As part of the district court's initial findings and order, the defendants were given 60 days to formulate a "comprehensive plan" for remedying the unconstitutional conditions identified by the Court. (U)

1442.   The defendants did not appeal the order and subsequent injunction. (U)

1443.   From 1976 through 1983, Mr. Bullock monitored the defendant's compliance with the injunction. (U)

1444.   As a result of his monitoring efforts, he became familiar with the provision of mental health care at all Oklahoma prisons. (U)

1445.   In a document filed in 1976 by the United States Department of Justice related to compliance issues, it was indicated that a comprehensive remedial plan had not been presented to the court. (U)

1446.   The DOJ document alleged that "no prison" in Oklahoma had yet established "adequate health care staff to administer to the . . . psychological needs of the inmate populations." (U)

1447.   Following the filing of the DOJ document, the court

conducted a compliance hearing in 1978. (U)

1448.   Following the compliance hearing, the court issued a decision in September, 1978 noting that the defendants had still not presented to the court a comprehensive plan to remedy the mental health deficiencies identified by the court. (U)

1449.   The 1978 compliance decision was affirmed by the Court of Appeals for the Tenth Circuit. (U)

1450.   During the course of monitoring compliance the parties retained various expert witnesses who periodically toured the prisons. (U)

1451.   One such expert, Dr. Solomon, issued a report in 1981 noting that mental health care was not yet constitutionally adequate and "virtually non-existent." (U)

1452.   Another such expert witness, Dr. Rundle, also issued a report in 1981 in which he found the provision of mental health care to also be constitutionally inadequate. (U)

1453.   Dr. Rundle noted serious deficiencies in terms of adequate staffing and adequate facilities. (U)

1454.   A third expert witness, Dr. Marvin Heller, also filed a report in 1981. (U)

1455.   Dr. Heller's report referenced a report by another of the defendants' experts, that noted the "psychiatric coverage" at the Oklahoma State Penitentiary was "grossly lacking." (U)

1456.   Dr. Heller confirmed "the shortage of essential mental health services, which is one of the subjects of the present court litigation." (U)

1457.   The district court rendered a decision on compliance on March 4, 1981 stating: "One important issue which still needs to be addressed is the provision of mental health services for the incarcerated population.  As the testimony has clearly indicated, there exists a critical need for proper mental health care, a system providing remedial counseling and treatment and not mere isolative segregation." (U)

1458.   In Mr. Bullock's view, as of the date of the 1981 order, the defendants were still not in compliance with those aspects of the injunction related to the provision of mental health care. (U)

1459.   Mr. Bullock continued to monitor compliance with the court's injunction throughout his tenure as class counsel. (U)

1460.   Among other deficiencies in the provision of mental health care, Mr. Bullock noted that until the late 1990s, the defendants did not have any psychiatrists on staff, and that all psychiatric services were provided by part-time roving providers. (U)

1461.   Mr. Bullock reviewed Mr. Hammer's places of confinement while in Oklahoma and described the mental services available at each location. (U)

1462.   Mr. Hammer was incarcerated at the Oklahoma State Penitentiary on June 21, 1978.  Government Exhibit 55.1-10.

1463.   On November 16, 1978, Mr. Hammer was transferred to the Joseph Harp Correctional Center, Lexington, Oklahoma. Id.

1464.   On October 16, 1981, Mr. Hammer escaped from the Joseph Harp Correctional Center. Id.

1465.   On October 26, 1981, Mr. Hammer was returned to the Joseph Harp Correctional Center. Id.

1466.   On November 16, 1981, Mr. Hammer was transferred to the Lexington Assessment and Reception Center (Maximum Security). Id.

1467.   On December 7, 1981, Mr. Hammer was transferred to the Oklahoma State Reformatory, Granite, Oklahoma. Id.

1468.   On July 26, 1982, Mr. Hammer was transferred to the Connor Correctional Center. Id.

1469.   On August 30, 1983, Mr. Hammer was transferred to the Oklahoma State Penitentiary.  Government Exhibit 55.1-9.

1470.   On October 6, 1983, Mr. Hammer was transferred to the Oklahoma State Reformatory. Id.

1471.   On October 28, 1983, Mr. Hammer escaped from the Oklahoma State Reformatory, and remained at large until December 24, 1983. Id.

1472.   On January 5, 1984, Mr. Hammer was transferred from the Oklahoma State Reformatory to the Lexington Assessment and Reception Center (Maximum Security). Id.

1473.   On January 26, 1984, Mr. Hammer was transferred to the Oklahoma State Penitentiary. Id.

1474.   On December 16, 1993, Mr. Hammer was transferred to the custody of the Federal Bureau of Prisons.  Defendant's Exhibit 139.1, page 52.

1475. Mr. Bullock testified, and the court so finds, that during the period June 21, 1978 to September 6, 1978, Oklahoma State Penitentiary had "virtually no mental health" services.

1476. Mr. Hammer was incarcerated at the Eastern State Hospital in Vinita, Oklahoma, from September 6, 1978 until October 18, 1978.

1477. Mr. Bullock testified, and the court so finds, that during that period of time Eastern State Hospital's provision of mental health care to prisoners was "very sparse."

1478. Mr. Hammer was incarcerated at the Joseph Harp Correction Center from November 16, 1978 until October, 1981.

1479. Mr. Bullock testified, and the court so finds, that during that period of time, mental health treatment was inadequate as outlined in the expert reports filed with the federal district court in Oklahoma in 1981.

1480. In particular, during that period, psychiatric services were provided, if at all, by a consulting psychiatrist who visited the facility one morning per week.

1481. Mr. Hammer was incarcerated at the Oklahoma State Reformatory at Granite from December, 1981 until June, 1982.

1482. Mr. Bullock testified, and the court so finds, that during this period there were "virtually no" mental health services provided at Granite.

1483. Mr. Hammer was next incarcerated at the Connor Correctional Center from June, 1982 until August, 1983.

1484.  Mr. Bullock testified, and the court so finds, that mental health services were better at Connor than at the other facilities.

1485.  Mr. Hammer was moved back to the Oklahoma State Penitentiary in January 1984 where he stayed until his transfer to the Federal Bureau of Prisons.

1486.  Mr. Bullock testified, and the court so finds, that during this period of time monitoring of the Battle litigation continued with the injunctions still in place. (U)

1487.  Mr. Bullock testified, and the court so finds, that during the period from 1984 through the time of Mr. Hammer's transfer to federal custody, the Oklahoma State Penitentiary continued to be plagued by severe staffing shortages in the provision of mental health services.

1488.  Mr. Bullock testified, and the court so finds, that the provision of mental health services were also impeded by the on-going lock down of the Oklahoma State Penitentiary which occurred following the riot of 1973.

**CC.  Martin Hammer's Observations of David Paul Hammer as a Child.**

1489.  Martin Hammer is David Paul Hammer's younger brother. (U)

1490.  Martin Hammer is five years younger that David Hammer. (U)

1491.  Martin Hammer is currently disabled and receives Social Security Disability as a result of a psychiatric disability. (U)

1492.    During his testimony on July 21, 2005, Martin Hammer described a long family history of mental illness that includes Schizophrenia and Depression.

1493.    Martin Hammer testified that David Paul Hammer suffered from inexplicable mood shifts ranging from friendly to angry and scary.

1494.    Martin Hammer explained that David Paul Hammer "would have periods were he would go into trances" and his eyes became glassy and he did not seem to know what he was doing.

1495.    Martin Hammer testified that when David Paul Hammer emerged from these trance-like states, he would have no recollection of what had transpired.

1496.    Martin Hammer testified there were occasions when David Paul Hammer would go into these trance-like states and then hit him.

1497.    Martin Hammer testified that he would ask David Paul Hammer why he had hit him and David Paul Hammer would have no recollection of hitting his brother.

1498.    On many occasions, David Paul Hammer would go into a closet and scream in what Martin Hammer characterized as "a mean voice."

1499.    Martin Hammer testified that David Paul Hammer's voice would change and become very deep and scary.

1500.    Martin Hammer also testified that he shared a room with David Paul Hammer while growing up and that he remembers occasions when David Paul Hammer would be talking as if he were in

a two-way conversation when in fact there was no one else in the room with whom he was speaking.

1501. David Paul Hammer not only carried on his end of the conversation but appeared to pause and listen as if the other person — who was not really present - was talking.

1502. Martin Hammer recalls once asking David Paul Hammer to whom he was talking and was told he was talking to "another part of him."

1503. Martin Hammer testified that he told his parents about his brother's disturbing behavior and they did not appear to understand what was happening with their oldest son. (U)

1504. Martin Hammer testified that the first time he heard the name "Jocko" was when he was nineteen or twenty years old and David Paul Hammer was incarcerated at the Granite Reformatory in Oklahoma.

1505. During a phone call with his brother, David Paul Hammer related that he had been involved in an incident with another inmate and that "when it happened he felt like somebody else took over."

1506. David Paul Hammer stated that he called this part of himself "Jocko." (U)

1507. Martin Hammer's description of David Paul Hammer's behavior is consistent with Drs. Matthews and Martell's diagnosis of Borderline Personality Disorder, with dissociative states.

**DD.  Mr. O'Berg's Observations of Mr. Hammer.**

1508.  Mark O'Berg was incarcerated in USP-Allenwood in the 1990s. (U)

1509.  Mr. O'Berg testified at the trial in 1998 and during the section 2255 hearing.

1510.  For two weeks, Mr. O'Berg was a cellmate with Mr. Hammer in cell 103.  (U)

1511.  In the cell was a small, Sony Walkman radio type clock.  (U)

1512.  Mr. O'Berg identified Defendant's Exhibit 73 as the clock radio that was in the cell. (U)

1513.  The clock sat on the windowsill of the cell. (U)

1514.  The clock did not have a light. (U)

1515.  The clock was not self-illuminating. (U)

1516.  Mr. O'Berg testified that the clock had a small liquid crystal display screen.

1517.  Mr. O'Berg testified that you could not see the face of the clock on the windowsill at night. (U)

1518.  Mr. O'Berg testified that the light from the yard did not illuminate the clock face because the light was coming from the back and, as a result, it silhouetted objects on the windowsill.

1519.  During Mr. O'Berg's testimony, the Court viewed Defendant's Exhibit 73. (U)

1520.  The clock, Defendant's Exhibit 73, had no light or any other type of illumination.

1521. The Court finds that the section of the clock with the numbers was no larger than an eighth or three-sixteenths of an inch. (U)

1522. Mr. O'Berg testified that he found Mr. Hammer to be one of the strangest individuals he had ever met.

1523. Mr. O'Berg testified that he observed Mr. Hammer's demeanor change without warning.

1524. According to Mr. O'Berg there were times when Mr. Hammer would become withdrawn, shut down, on the verge of tears, and exhibit child-like conduct.

1525. According to Mr. O'Berg other changes in Mr. Hammer occurred gradually where he would become increasingly more depressed or angry and isolated.

1526. It appeared to Mr. O'Berg that Mr. Hammer's personality changed.

1527. Mr. O'Berg testified there were times when Mr. Hammer would abruptly go into a corner sniffling, crying and talking to himself like he was a child.

1528. Mr. O'Berg testified that when Mr. Hammer experienced these changes, his tone of voice, the volume of his voice and the tenor of his voice as well as his physical bearing would also change.

1529. According to Mr. O'Berg, he noticed these changes daily.

1530.   According to Mr. O'Berg, at times during these mood changes, Mr. Hammer would display anger and rage at himself, things, people in his past including family members.

1531.   It appeared to Mr. O'Berg that Mr. Hammer held conversations with a picture of a small boy or a picture of an ape which he had in the cell.

1532.   Mr. O'Berg testified that he observed that Mr. Hammer's  tone when talking would at times be like a child who had been reprimanded.

1533.   According to Mr. O'Berg during these events, Mr. Hammer did not seem to be aware that Mr. O'Berg was there and when Mr. O'Berg would interrupt him, he would appear to be coming out of a dream.

1534.   Mr. Hammer told Mr. O'Berg that he had an ugly side. (U)

1535.   Mr. O'Berg had sex with Mr. Hammer on one occasion while they were cellmates.   (U)

1536.   Mr. O'Berg testified that after the sexual encounter, he heard Mr. Hammer talking to himself.

1537.   Mr. O'Berg testified that Mr. Hammer was saying things like "there, that wasn't so bad."

1538.   According to Mr. O'Berg, Mr. Hammer's voice sounded like an abusive parent or guardian trying to convince an abused child that the abused child was okay.

1539.   Mr. O'Berg testified that it sounded like Mr. Hammer was having a conversation with someone else.

1540.   According to Mr. O'Berg, Mr. Hammer did not appear aware of Mr. O'Berg's presence during this exchange.

1541.   Mr. O'Berg's description of Mr. Hammer's behavior is consistent with Drs. Matthews and Martell's diagnosis of Borderline Personality Disorder, with dissociative states.

1542.   Mark O'Berg was in the custody of the Federal Bureau of Prisons for approximately eight (8) years for armed bank robbery. (U)

1543.   Mark O'Berg during his § 2255 testimony referred to Hammer as "David." (U)

**EE.   Other Inmates' Involvement with and Observations of Mr. Hammer.**

1544.   Billy Joe Webb testified on June 11, 1998, regarding his observations of Mr. Hammer.

1545.   At the time of his testimony, Mr. Webb was serving a sentence for first degree murder in an Oklahoma prison.

1546.   Mr. Webb first met Mr. Hammer in 1979 at the Joseph Harp Correctional Center and had contact with him for approximately four months.

1547.   At that time Mr. Hammer was incarcerated in a unit "to hold people that have mental problems" and known by the prisoners as "Fantasy Island."

1548.   Mr. Webb also had contact with Mr. Hammer at the Oklahoma State Penitentiary for several years.

1549.   Mr. Webb was never Mr. Hammer's cellmate.

1550. Mr. Webb resided in the same unit or living area as Mr. Hammer.

1551. Mr. Webb testified that there were times when Mr. Hammer was aggressive, belligerent and "really feisty" and there were time when he would act in a feminine manner.

1552. Mr. Webb was aware of the names Jocko, Tammy and Wilbur.

1553. Mr. Webb testified there were times when Mr. Hammer would "reflect back on the part of his life when he was a – abused as a child."

1554. Mike Dale Smith testified on June 15, 1998, regarding his observations of Mr. Hammer.

1555. At the time of his testimony he was serving a sentence for robbery at Holdenville prison in Oklahoma.

1556. Mr. Smith first met Mr. Hammer in 1982 at the Connors Correction Center, a medium security prison.

1557. Mr. Smith had contact with Mr. Hammer at that facility for approximately a year.

1558. Mr. Smith also had contact with Mr. Hammer at the Oklahoma State Penitentiary from 1983 to 1986.

1559. Mr. Smith was Mr. Hammer's cellmate for approximately four or five months at the Oklahoma State Penitentiary.

1560. Mr. Smith also for a period of time lived across the hall from Mr. Hammer.

1561. Mr. Smith observed both an aggressive and feminine side to Mr. Hammer.

1562.  Mr. Smith testified that "some days he'd act like a little kid, you know, want to be affectionate and stuff like that there."

1563.  Mr. Smith testified that Mr. Hammer "had headaches, had stomach problems" and would wake up in the middle of the night talking to himself.

1564.  Mr. Smith was aware of the names of Wilbur, Tammy and Jasper.

1565.  Mr. Smith testified that Mr. Hammer kept a photograph of an orangutan and referred to the orangutan as Jasper.

1566.  Mr. Smith testified that Mr. Hammer had a cellmate who was a homosexual.

1567.  Mr. Smith further testified that he observed Mr. Hammer "tie up a couple of his cellees . . . As far as watching them engage in sexual activity, I didn't watch, you know what I mean.  I'd go by, like I said, he lived across the hall from me and you could see right from my cell into their cell, and they'd have to put their blanket up over the door, and every now and then it would come down.  But occasionally, yeah, he'd have them tied up in there . . . ."

1568.  George R. Yandle testified on June 12, 1998, regarding his observations of Mr. Hammer.

1569.  At the time of his testimony he was serving a sentence for first degree rape at a private prison in Oklahoma.

1570.  Mr. Yandle first met Mr. Hammer in 1988 at the Oklahoma State Penitentiary.

1571.  Mr. Yandle was Mr. Hammer's cellmate for approximately one year.

1572.  Mr. Yandle testified it was his opinion that Mr. Hammer has "split personalities" and that "his moods would switch as far as his voice, as far as his personality and so forth."

1573.  Mr. Yandle recalled a feminine personality, Tammy; a violent or aggressive personality, Jocko; and a little boy personality, Wilbur.

1574.  Mr. Yandle testified that he moved out of Mr. Hammer's cell because he "couldn't handle the personalities."

1575.  Mr. Yandle testified that he observed Mr. Hammer talking to a picture of a monkey.

1576.  Paul E. Reed testified on June 15, 1998, regarding his observations of Mr. Hammer.

1577.  At the time of his testimony he was serving a sentence for conspiracy to commit kidnaping and murder at the United States Penitentiary at Allenwood.

1578.  Mr. Reed was Mr. Hammer's cellmate on two occasions.

1579.  The first occasion was only for a period of 7 hours when Mr. Reed first arrived at USP-Allenwood.

1580.  The second occasion was for approximately two weeks.

1581.  Mr. Reed observed a picture of a monkey or orangutan on Mr. Hammer's cell wall,

1582.  Mr. Reed observed Mr. Hammer talking to the picture.

1583.  Mr. Reed testified regarding Mr. Hammer's behavior as follows:

> I seen – I seen Hammer laugh at those pictures, I've
> seen him cry with those pictures, I've seen him set up
> and talk to them until two or 3 o'clock in the morning.
> I've seen him argue with them, just like he was having
> just regular conversation just like you and I.
> He made me really scared of him so I just stayed away
> from him.

**FF.   The Undisclosed FBI 302 Statements.**

1584.   On October 15, 2004, Mr. Hammer filed a motion for discovery in which he requested, inter alia, that the Government turn over all 302 Reports and BOP witness interviews.

1585.   On November 12, 2004, we issued an order denying the motion in which we stated in pertinent part as follows:

> The final item in dispute is a request by Hammer that
> the Government disclose "all previously undisclosed
> 302 witness statements, interview summaries and BOP
> witness reports, summaries or related documentation."
> The Government prior to trial was required to provide
> Hammer with any exculpatory evidence under Brady v.
> Maryland, 373 U.S. 83 (1963).  Moreover, prior to
> a Government witness testifying on cross-examination
> at trial the Government was and is required
> to provide the defense with any documents revealing
> prior statements of the witness.  These documents are
> commonly referred to as 302 witness statements or
> Jenks Act materials.
>
> There is no indication that the Government has
> not complied with the requirements of <u>Brady</u> or
> its progeny.  Furthermore, Mr. Hammer has not
> demonstrated that the Government failed to provide
> Jencks Act materials.  We see no reason to order
> the Government to do something which it was and is
> required to do under the law when there is nothing
> other than pure speculation and unsupported
> allegations by Hammer that the Government failed to
> comply with <u>Brady</u> and the Jenks Act.

1586.   In footnote 2 of the order we stated that "[t]he Government has [a] continuing duty to disclose Brady material."

234

1587.   Agent Maluco believed, prior to trial, that a defense of accidental death due to autoerotic sexual activity was highly likely.

1588.   Agent Maluco testified that he probably shared his opinion (that he believed that a defense of accidental death due to autoerotic sexual asphyxia was highly likely) with the prosecuting attorney.

1589.   Agent Maluco interviewed a number of inmates in federal and state prison who had contact with Mr. Hammer prior to 1996. (U)

1590.   Agent Maluco prepared written accounts of the interviews he conducted during the course of this investigation and these written accounts are identified as "302" documents.  (U)

1591.   Agent Maluco kept a copy of the 302 documents  he prepared and, prior to at least the penalty phase of the trial, provided a copy of all of these 302's to the assistant United States attorney prosecuting Mr. Hammer.

1592.   During the course of the Marti investigation Agent Maluco received documents prepared by the Federal Bureau of Prisons. (U)

1593.   These documents were provided, prior to trial, to the assistant United States attorney prosecuting Mr. Hammer.

1594.   As a result of a Court order during the evidentiary hearing, Agent Maluco turned over a number of 302's to Mr. Hammer's counsel that had not previously been disclosed to counsel at the

time of trial or during the appellate and Section 2255 proceedings. (U)

1595.   Included in those mid-hearing disclosed 302's were two 302's reflecting Agent Maluco's pretrial interviews with an inmate by the name of Albert Johnson.  (U)

1596.   Mr. Johnson was interviewed on December 6, 1996, and May 27, 1998.

1597.   Agent Maluco specifically questioned Johnson about Mr. Hammer's sexual practices.

1598.   Mr. Johnson told agent Maluco that Mr. Hammer was a homosexual who was into bondage. (U)

1599.   He told Agent Maluco that Mr. Hammer and his sexual partners would tie each other up and whip each other with rope or electrical cord. (U)

1600.   Mr. Johnson also told Agent Maluco that Mr. Hammer and his cellmate would tie each other up and bite each other.  (U)

1601.   Mr. Johnson told Agent Maluco that Mr. Hammer and his cellmate would beat each other up for the pain. (U)

1602.   The summary (302) of the December 6, 1996, interview states in relevant part as follows:

> JOHNSON  believes that he lived next to HAMMER at Allenwood for about two weeks, but less than a month. Both were in the "hold" as both had problems in the past.  Apparently HAMMER's problem was at Lompoc while JOHNSON's problem was with the Aryan Brotherhood at Allenwood.  At Allenwood, HAMMER was extremely paranoid.  HAMMER was actually placed in population at one time, however, was back within hours.  HAMMER did not like being in the general population.
>
> HAMMER had a cell partner "TONY LNU", a white male

approximately 26 years of age.  TONY had black hair,
skinny build and was homosexual.  TONY and HAMMER
would beat up each other periodically for the pain,
as both were sadomasochist.  JOHNSON's cellmate was
JESSE LATSON (phonetic) a black male, approximately
34 years of age.  LATSON may have heard much of what
HAMMER told JOHNSON through the vent, however,
LATSON was in his own world most of the time.

Defendant's Exhibit 221.

1603.  The summary (302) of the May 27, 1998, interview

states in relevant part as follows:

JOHNSON's first experience with HAMMER occurred at
the OKLAHOMA STATE PENITENTIARY (OSP) which JOHNSON
identified as a lock down facility.  After the riot
which occurred in 1985, the OSP became a 23 hour lock
down facility with one hour of recreation time
available to inmates.  While incarcerated at OSP,
JOHNSON knew HAMMER, who was celled across the hall.
The cells at that time were the old style cells with
bars which allowed JOHNSON to view and speak with
HAMMER all day long if he wished.

JOHNSON indicated that HAMMER was a homosexual and
was into bondage.  He and his homosexual cell mates
would tie each other up and whip each other with rope
or electrical cord.  HAMMER and his sexual partners
would come to the cell door playing with each other.
JOHNSON identified two of HAMMER'S cell mates and
sex partners as JOHNNY PIDGEON (Phonetic) and VAN
SUTTON (Phonetic), two inmates who were observed
by JOHNSON to have engaged in homosexual activity
with HAMMER.

*     *     *     *     *     *     *

JOHNSON and HAMMER met up again at the UNITED
STATES PENITENTIARY (U.S.P.)- ALLENWOOD in 1995.  They
had known each other there for a couple of months.
In May or June 1995, JOHNSON left U.S.P.-ALLENWOOD FOR
U.S.P.-ATLANTA.

*     *     *     *     *     *     *

While incarcerated in the Special Housing Unit,
HAMMER engaged in sexual activity with his cell mate
who was identified as a white male with a first name
TONY, having long, stringy hair.  JOHNSON never really
talked to HAMMER'S cell mate, but did talk with HAMMER

237

on many occasions.  HAMMER and his cell mate would tie each other up and bite each other.  They would yell over to JOHNSON's cell and make a lot of noise.  HAMMER and his cell mate would typically stay up all night engaging in sexual activity.  They would tie each other up using braided sheets.  When one would fall asleep, the other would tie him up.

JOHNSON used to make braided sheets and used them as clotheslines in his cell.  JOHNSON recalls making them and providing them to HAMMER.  He would tie a battery to one end and fish the braided rope to HAMMER, thus providing it to him.  JOHNSON had told HAMMER how to make the rope, by telling him that all you need to do was braid some sheets.

Defendant's Exhibit 220.

1604.  Prior to trial, Agent Maluco  provided a copy of Johnson's 302 reports to the assistant United States attorney prosecuting Mr. Hammer.  (U)

1605.  During the pre-trial investigation Agent Maluco also interviewed an inmate by the name of Royce Lee Fowler.  (U)

1606.  Agent Maluco specifically questioned Fowler about Mr. Hammer's sexual practices.

1607.  Mr. Fowler told agent Maluco that Mr. Hammer told him that he liked bondage and wanted to be tied up during sex.  (U)

1608.  Mr. Hammer also told Fowler that his father abused him and his sister and brother when they were children.

1609.  Mr. Hammer told Fowler that Mr. Hammer's dad would make him "suck his Peter" and would do the same to his sister and brother. (U)

1610.  Mr. Fowler was interviewed by Agent Malocu on May 27, 1998.

1611.  The summary (302) of the May 27, 1998, interview states in relevant part as follows:

> Fowler had lived with HAMMER in the Special Housing Unit (The Hole) of the USP-LEAVENWORTH, Leavenworth, Kansas, as HAMMER's cell mate for approximately nine months.  This occurred sometime in 1995.
>
> *      *      *      *      *      *      *
>
> FOWLER indicated that HAMMER had told him that his father had started to abuse HAMMER and his brother and sister when they were children.  HAMMER was approximately five or six years old.  HAMMER never talked about his mother and never discussed being abused by her.
>
> *      *      *      *      *      *      *
>
> HAMMER did not talk about his family very often and led FOWLER to believe that he (HAMMER) does not like his brother.  Out of the blue, on one occasion, HAMMER told FOWLER about being sexually abused by his father.  HAMMER had informed FOWLER that his daddy would have HAMMER "suck his peter."  He would do the same thing to his brother and sister.
>
> *      *      *      *      *      *      *
>
> FOWLER has had the same girlfriend for the past 20 years.  Her name is NANCY.  On one occasion when he was telling HAMMER about how he wanted to tie NANCY up with her pantyhose, HAMMER informed FOWLER about his liking bondage and wanting to be tied up during sex.

Defendant's Exhibit 222.

1612.  Prior to trial,  Agent Maluco  provided a copy of this 302 report to the assistant United States attorney prosecuting Mr. Hammer.  (U)

1613.  Also included in the mid-evidentiary hearing disclosed 302s was a 302 indicating an interview with Martin Guerrero.  (U)

1614.   As noted previously, Mr. Hammer was interviewed by FBI Special Agent Thompson on April 13, 1996.  During that interview Mr. Hammer stated that he wrote a letter to "Martine Gerrero (phonetic)" in an attempt to persuade Mr. Guerrero to refrain from taking some adverse action against Mr. Marti.

1615.   Agent Malocu interviewed Mr. Guerrero on August 27, 1996.

1616.   When Agent Malocu interviewed Mr. Guerrero,  Mr. Guerrero stated that he knew David Hammer. (U)

1617.   In that interview, Mr. Guerrero stated that he did not receive a letter from David Hammer either directly or through a third party.  (U)

1618.   The summary (302) of the August 27, 1996, interview states in relevant part as follows:

> Guerrero advised that he knew inmate DAVID PAUL HAMMER because Hammer was an inmate at the United States Penitentiary, Leavenworth, Kansas, sometime prior to Hammer's transfer to the United States Penitentiary-Allenwood (U.S.P.-A). Guerrero advised he never received any letter from Hammer or Andrew Hunt Marti.  Guerrero stated he had never heard of the inmate Andrew Hunt Marti.  Guerrero stated that he never received any mail from a third party located in Michigan.  Guerrero advised he never heard of Maurice Young or knew anyone from Three Rivers, Michigan.  Guerrero advised he was from Texas and most of his friends and family reside around the San Antonio area.

Defendant's Exhibit 225.

1619.   Mr. Guerrero's statement appears to contradict Mr. Hammer's statement to FBI Special Agent Thompson in the following two respects: (1) Guerrero denied that he knew Mr. Marti and thus by implication was not planning to take some type of action against

Mr. Marti; and (2) that he did not receive a letter from Mr. Hammer which would arguably suggest that Mr. Hammer did not send such a letter.

1620.  Prior to trial, Agent Maluco provided a copy of the 302 report of the interview of Martin Guerrero to the assistant United States attorney prosecuting Mr. Hammer.

1621.  Mr. Guerrero's statement was not provided to the defense prior to trial or during the appellate proceedings. (U)

1622.  During the pre-trial investigation Agent Maluco interviewed an inmate by the name of Gaylon Don Ball.

1623.  The interview took place on June 26, 1996.

1624.  Agent Maluco specifically questioned Mr. Ball about Mr. Hammer's sexual practices.

1625.  The summary (302) of the June 26 1996, interview states in relevant part as follows:

> During his stay at U.S.P.-[Allenwood], HAMMER would occasionally ask BALL if he needed any cigarettes or magazines.  BALL did not like to associate with HAMMER due to the fact that he was homosexual.  It is BALL's opinion that HAMMER was having sexual relations with MARTI, although he had no facts to back up his opinion.  The first knowledge BALL had regarding the death of inmate MARTI occurred when he heard a female's voice outside HAMMER'S CELL on the morning that MARTI was murdered.

Defendant's Exhibit 223.

1626.  Prior to trial Agent Maluco provided a copy of this 302 report to the assistant United States attorney prosecuting Mr. Hammer. (U)

1627.   The assistant United States attorney never provided copies of the 302 reports relating to the interviews with Albert Johnson, Royce Lee Fowler, Martin Guerrero, and Gaylon Don Ball to the defense.

1628.   On September 28, 2005, Mr. Hammer recalled Mr. Ronald Travis, Esquire. (U)

1629.   Mr. Travis testified that during the course of their representation of Mr. Hammer, he and Mr. Ruhnke filed requests for discovery and specifically requested all evidence pursuant to <u>Brady v. Maryland</u>, 373 U.S. 83, 87 (1963).  (U)

1630.   Mr. Travis testified that current § 2255 counsel provided him with the two FBI 302 statements from Mr. Johnson and the statements from Mr. Fowler,  Mr. Ball and Mr. Guerrero.  (U)

1631.   Handwritten notes from Agent Malocu were disclosed to Mr. Hammer's counsel just prior to the commencement of Mr. Travis' testimony.  (U)

1632.   Mr. Travis also reviewed these handwritten notes. (U)

1633.   Mr. Travis testified that the undisclosed statements were material and relevant to both Mr. Hammer's guilt phase defense and to counter the Government's argument concerning substantial planning and premeditation during the penalty phase of this case.

1634.   Mr. Travis also testified that the undisclosed evidence contained in the statements and documents outlined above impacted the voluntariness of Mr. Hammer's guilty plea because counsel was unable to discuss the import of the undisclosed materials with Mr. Hammer.

1635.  During Mr. Travis' opening statement to the jury during the guilt phase, he argued to the jury that Mr. Marti was voluntarily tied to the bed during sexual bondage: "[i]t was developed that the tying was voluntary and the tying was part of some plan; kinky homosexual activity between Mr. Hammer and between Mr. Marti."  (U)

1636.  During penalty phase closing arguments, Mr. Travis reminded the jury on two separate occasions that Mr. Marti was bound to the bed as a result of consensual "sexual bondage." (U)

1637.  The Government during its penalty-phase opening statement argued as follows:

> This was an elaborate scheme.  The nail clippers were wrapped with tape, needed for the hostage scenario or do you need that to clip your toe nails.  The restraints had to be made, and that didn't happen like that. (Snaps fingers.)  It all took time.  It was a salesman job, plus a lot of preparation.  The salesman was David Paul Hammer.  The poor dupe that accepted that was Andrew Marti.
>
>  Not only was there a problem of preparing it, doing the necessary lulling of Mr. Marti into a false sense of security, like I'm going to Atlanta, this guy is taking good care of me, et cetera, et cetera, et cetera, but then once the restraints were prepared, then he had to tie him down  . . . .

Doc. 667, Transcript, Volume 15, June 30, 1998, page 33 (emphasis added).

1638.  The Government during its closing argument emphasized the braiding of the sheets into ropes as an important aspect of the substantial planning and premeditation as follows:

> Again, what you've got is Mr. Hammer lulling him into the belief that you get yourself into this position, Andrew, and we'll get out of here; I'm not worried about myself, but I will take care

of it, and you will get to Atlanta.

But the lulling, the scheming, again the two themes, scheming is only part of this.  We needed, Mr. Hammer needed equipment, he needed ropes, he needed ties, he needed more than just strips of cloth.  You can't just tie the sheet, because you might be able to break that if you're six foot four, 200 pounds and you exercise a lot, which is the undisputed facts that we have in this case.  Even if you're not the brightest man you might be able to wrench your arm free.  So we needed heavy-duty restraints.  We needed something more than just, you know, a little strip of cloth to keep you in place.

We needed some thing heavy duty.  And the more heavy duty that you get into it, the more time it takes to make the heavy duty precedence. (Sic) It takes time to braid things.

Now, for you ladies, it might take a little less time than it would for us gentlemen.  And there's nothing to suggest in the record that Mr. Hammer is an accomplished plater.  I think "plating" was the word that Mr. Yager used.  It takes time to make these things.  And again, not knowing what his experience is, we don't -- we can't say whether it took ten minutes, two hours, whatever.  But when you are talking about substantial planning, you have to factor in what time it took to make heavy duty restraints . . . .

From the fair, from the immutable pieces of evidence in that cell you can determine that it was the hostage scenario that was going on at that time, not anything else. . . .

Again, think about the essentials in this case, the fact that it took place in the special housing unit, the extreme measures that were needed to get the plan going in the terms of the fraud.  And then the extreme measures that were needed to effectuate the killing. All of them were essential, the fake knife, the sock, the restraints, they were all part and parcel of the killing of Andrew Marti.

Again, you may infer from the testimony and you can infer from the physical evidence in cell 103 that there was substantial planning and premeditation.

1639.   The Government argued that the sock placed in Mr. Marti's mouth was "part and parcel of the hostage scenario not sex, not anything else."

1640.   The Government argued that the toenail clipper with tape wrapped around it which Mr. Hammer possessed at the time the door to cell 103 was opened at or about 3:00 p.m. on April 13, 1996, was part of the hostage scenario or ruse.

1641.   With respect to that "fake knife" the Government argued as follows: "[W]hat does this have to do with safe sex? What does this have to do with anything other that a hostage scenario . . . ."

1642.   During the Government's rebuttal argument, the prosecutor argued:

> If you buy off that that sock was put into his mouth for sexual purposes, then the death penalty is not appropriate.  But if however you use your common sense and realize that this sock was part of a hostage scenario, . . . .

1643.   Mr.  Travis testified that if he had been aware of the evidence indicating Mr. Hammer had a history of engaging in sexual bondage, he would have investigated such evidence as it was relevant and material to the Mr. Hammer's defense.

1644.   Mr. Travis also testified that the penultimate paragraph of the portion of Mr. Johnson's May 27, 1998 statement above referred to was critical and material to Mr. Hammer's defense at both guilt and sentencing phases of the trial.

1645.   Mr. Travis testified that if he had been aware of Mr. Hammer's history of participating in sexual bondage while

incarcerated at the Special Housing Unit at the United States Penitentiary in Allenwood, Pennsylvania, he would have investigated this information and that it is "the type of information [he] would have wanted to present to the jury."

1646.  Mr. Travis also testified that if he had been aware that a witness who had been incarcerated with Mr. Hammer in Oklahoma could have provided testimony that Mr. Hammer had engaged in sexual bondage years before the death of Mr. Marti, he would have investigated and presented such evidence.

1647.  Mr. Travis testified that the evidence contained in the undisclosed FBI 302 statements was consistent with the rendition of events leading up to the death of Mr. Marti contained in the Sadoff/Dubin hypnosis video statement of Mr. Hammer.

1648.  Mr. Travis testified that had he been aware of this type of information, he would have wanted to investigate it and present it during both the guilt and penalty phases of Mr. Hammer's capital trial.

1649.  Mr. Travis testified and the Court finds that Mr. Johnson's knowledge about Mr. Hammer's prior usage of braided sheets for sexual activity would have supported Mr. Travis' opening statement.

1650.  Mr. Travis testified and the Court finds that Mr. Johnson's knowledge about Mr. Hammer's prior usage of braided sheets for sexual activity would have been relevant and material evidence at the penalty phase to counter the Government's argument

that the braiding of the sheets demonstrated substantial planning and premeditation.

1651.  Mr. Travis testified and the Court finds that prior to receiving the undisclosed FBI 302 statements discussed above, he was unaware that Mr. Hammer had previously used braided sheets for sexual bondage while incarcerated in the Special Housing Unit at USP-Allenwood.

1652.  Mr. Travis was not aware at any time during the course of his representation of Mr. Hammer that the Government was in possession of a witness statement indicating that Mr. Hammer had a history of using sheets braided into ropes for sexual purposes.

1653.  Mr. Ruhnke was not aware at any time during the course of his representation of Mr. Hammer that the Government was in possession of a witness statement indicating that Mr. Hammer had a history of using sheets braided into ropes for sexual purposes.

1654.  Mr. Travis testified that the undisclosed FBI 302 statement relating to Mr. Royce Lee Fowler constitutes <u>Brady</u> evidence that should have been disclosed prior to trial.

1655.  Mr. Travis testified that he would have wanted to investigate evidence that while incarcerated at USP-Leavenworth a full year before the death of Mr. Marti, Mr. Hammer had revealed that he participated in sexual bondage.

1656.  Mr. Travis testified and the Court finds that prior to the disclosure by the Government on September 22, 2005, of the thirty-two previously undisclosed FBI 302 statements, he had never seen the 302 from Mr. Martin R. Guerrrero, Jr. (U)

1657.   Mr. Travis testified that the evidence contained in the FBI 302 statement from Mr. Guerrero is information he would have investigated.

1658.   Mr. Travis also testified that the Government never provided him with the FBI 302 statement from Mr. Gaylon Don Ball dated June 3, 1998. (U)

1659.   Mr. Travis testified that had he been aware of Mr. Ball's statement to the FBI, he would have wanted to interview him in order to ascertain what he knew and what other information he may have been able to provide the defense.

1660.   On the morning of Mr. Travis' testimony regarding the undisclosed FBI 302 statements, the Government provided counsel for Mr. Hammer with Agent Malocu's handwritten notes, which in turn were reviewed by Mr. Travis. (U)

1661.   Mr. Travis observed and the Court finds that Agent Malocu's handwritten notes differ from his type-written FBI 302 statement.  (U)

1662.   While Agent Malocu noted in his formal 302 statement that Mr. Ball stated "he had no facts to back up his opinion" that Mr. Marti and Mr. Hammer were sexual partners, his handwritten notes do not indicate that Mr. Ball actually stated he had "no facts to back up his opinion." (U)

1663.   Rather, Agent Malocu's handwritten notes (Defense Exhibit 224) merely state "it is Ball's opinion that Hammer was having sexual relations with Marti although this is only his opinion."  (U)

1664.  Mr. Ball's FBI 302 statement indicates that he became aware that something had occurred in cell 103 when he heard a female's voice approximately one hour before he learned about the murder.  (U)

1665.  Mr. Travis would have wanted to investigate, whether the female voice heard by Mr. Ball was that of one of Mr. Hammer's alter personalities, Tammy.

1666.  Mr. Travis testified that the 302 statement and the handwritten notes are in conflict because Agent Malocu's handwritten notes suggest that Mr. Ball heard a female voice an hour before the commotion outside of Mr Hammer's cell once the body of Mr. Marti was discovered.

1667.  Mr. Travis testified that he would have wanted to investigate this information further and would have wanted to have provided this information to Dr. Sadoff and Dr. Wolfson.

1668.  Mr. Travis also testified, and the Court finds, that the portion of Mr. Royce Lee Fowler's statement wherein he told Agent Malocu that Mr. Hammer, long before the offense in this case, related aspects of his history of sexual abuse as a child is evidence Mr. Travis would have investigated in order to rebut the Government's argument that Mr. Hammer's background "[was] not as severe as he would like you to believe."  Doc. 670, Trial Transcript, July 21, 1998, page 149.

1669.  Mr. Ruhnke testified, and the Court finds, that after trial, counsel filed a Freedom of Information Act (FOIA) request

seeking information from the Federal Bureau of Prisons for use in a clemency petition. (U)

1670.  On page fifteen of the information received as a result of the FOIA request, Mr. Ruhnke learned for the first time that the Government had information that "on April 9, 1996, Marti requested to move in with Hammer.  There was (sic) no reported separation concerns between the two inmates and staff moved Marti in with Hammer."  (U)

1671.  Mr. Ruhnke's testimony is corroborated by the prosecutor's averment during cross-examination of Mr. Ruhnke that he (the prosecutor) "would stipulate that we never gave you this document." (U)

1672.  During the section 2255 hearing, the document obtained pursuant to the FOIA request, Defendant's Exhibit 197, was admitted into evidence.

1673.  In 1996 Mr. Ronald L. Jury was a special investigative agent at USP-Allenwood. (U)

1674.  Defendant's Exhibit 197, pages 15 and 16 is a Federal Bureau of Prisons document prepared by either the Federal Bureau of Prisons regional intelligence office or central intelligence office for either the Regional Director or the Director of the Federal Bureau of Prisons. (U)

1675.  Mr. Jury does not know if Defense Exhibit 197 pages 15 and 16 was turned over to Mr. Hammer or his defense attorneys prior to trial. (U)

1676.   Mr. Jury testified that Defense Exhibit 197 page 15 looked like a briefing, a synopsis for executive staff type review for a regional director.

1677.   Mr. Jury stated that the document in question was not the writing style of individuals whom he supervised in 1996, such as Mr. Fleck, Mr. Santos or Mr. Traxler.

1678.   Mr. Jury stated that the document in question would have been regional office intelligence or central office intelligence for a regional director or director of the Federal Bureau of Prisons.

1679.   Mr. Jury stated that the Special Investigative Services would not have prepared the document.

1680.   Despite having filed a Brady request with the Government, Mr. Ruhnke testified, and the Court finds, that at no time during the course of his representation of Mr. Hammer did he ever see or receive the FBI 302 statements from Mr. Johnson (dated June 3, 1998 and December 6, 1996), Mr. Royce Lee Fowler (dated June 3, 1998) and Mr. Gaylon Don Ball (dated June 3, 1998).

1681.   Mr. Ruhnke testified, and the Court finds, that the statements of Mr. Johnson, Mr. Fowler and Mr. Ball constitute Brady evidence that should have been disclosed by the Government prior to trial.

1682.   Mr. Ruhnke testified that the undisclosed 302 statements of Mr. Johnson, Mr. Fowler and Mr. Ball were material and relevant to Mr. Hammer's guilt phase defense and investigation.

1683.   Mr. Ruhnke testified, and the Court finds, that the

undisclosed 302 statements of Mr. Johnson, Mr. Fowler and Mr. Ball may well have been relevant to the penalty phase defense and investigation.

1684.  Mr. Ruhnke testified, and the Court finds, that these statements were material, relevant and critical to counter the Government's argument concerning substantial planning and premeditation during the penalty phase of this case.

1685.  Mr. Ruhnke testified, and the Court finds, that the undisclosed statements of Mr. Johnson and of Mr. Fowler would have been relevant and material information to have prior to trial in order to rebut the Government's penalty phase argument concerning substantial planning and premeditation.

1686.  Mr. Ruhnke also testified, and the Court finds, that the failure of the Government to disclose to defense counsel the 302 statements interfered with defense counsel's ability effectively to investigate and contest the Government's argument at the penalty phase concerning substantial planning and premeditation.

1687.  Mr. Ruhnke testified that the Government argued vehemently that there was no consensual sex between Mr. Marti and Mr. Hammer the night of Mr. Marti's death and that the braiding of the ropes demonstrates "substantial planning" because "you have to factor in what time it took to make heavy duty restraints to keep a six foot four, two hundred pound man in place" (see Notes of Testimony, 7/21/98 at 89), and that the tying of Mr. Marti to the bed was "essential preplanning."

1688.   Mr. Ruhnke testified, and the Court finds, that the failure of the Government to disclose the 302 statements materially interfered with defense counsel's ability adequately to conduct their investigation and their ability to prepare and present the best defense available to Mr. Hammer.

1689.   Mr. Ruhnke testified that had he been aware of Mr. Hammer's long-standing history of sexual bondage and sexual practices, he would have investigated the possible defense of erotic asphyxiation and very likely would have presented such evidence to the jury during both the guilt and penalty phases of Mr. Hammer's capital trial.

1690.   Mr. Ruhnke testified, and the Court finds, that the undisclosed 302 statements at issue would have been relevant and material information to provide to Dr. Sadoff and to use in the cross examination of Dr. Wolfson and other Government witnesses.

1691.   Mr. Ruhnke also testified that he believed the evidence contained in the undisclosed 302 statements concerning Mr. Hammer's prior history of sexual bondage and prior use of braided sheets for sexual activity while incarcerated in the Special Housing Unit at USP-Allenwood would have provided corroborative facts supporting the version of events of the death of Mr. Marti as revealed by Mr. Hammer in the Sadoff/Dubin hypnosis videotape.

1692.   Mr. Ruhnke testified that he would have investigated Mr. Fowler's statement concerning Mr. Hammer's revelation a year prior to the offense in this case concerning his history of abuse at the hands of his father.

1693.   Mr. Ruhnke testified that this was important and material evidence he would have wanted to investigate, develop and present in support of the defense and to counter the Government's argument that Mr. Hammer's background was not as severe as he reported to Dr. Sadoff.

1694.   Attorney Travis prior to trial in this case filed both a discovery request and a request for all Brady material in the possession of the Government.

1695.   Attorney Travis prior or during the trial of Mr. Hammer was not provided with the 302 interview summaries of Albert Ray Johnson, Jr., Royce Lee Fowler, Gaylon D. Ball or Martin Guerrero.  Defendant's Exhibits 220, 221, 222, 223 and 225.

1696.   Attorney Ruhnke prior or during the trial of Mr. Hammer was not provided with the 302 interview summaries of Albert Ray Johnson, Jr., Royce Lee Fowler, Gaylon D. Ball or Martin Guerrero.  Defendant's Exhibits 220, 221, 222, 223 and 225.

**DD.   The Erroneous Findings Relating to Mitigating Circumstances.**

1697.   During the Government's  closing argument on July 21, 1998, the prosecutor stated that "Mr. Hammer has no cognitive disorders."

1698.   No evidence was presented at the time of trial in 1998 directly rebutting Dr. Gelbort's testimony that Mr. Hammer suffered from cognitive disorders or deficits.

1699.   Although the testimony of Dr. Gelbort relating to cognitive disorders or deficits was not rebutted by the Government, eleven jurors concluded that Mr. Hammer failed to prove by a

preponderance of the evidence that he suffered from cognitive deficits.

1700.   Although the evidence presented at the trial indicating that Mr. Hammer was sexually abused as a child was not rebutted by any evidence presented by the Government, six jurors concluded that Mr. Hammer failed to prove by a preponderance of the evidence that as a child he was a victim of sexual abuse.

1701.   Although the Government during its closing on July 21, 1998, conceded that Mr. Hammer had done certain good deeds in his life, seven jurors concluded that Mr. Hammer failed to prove by a preponderance of the evidence that even though incarcerated for most of his life he had managed to go some good things.   See Doc. 670, Transcript of closing argument, page 147.

1702.   During the penalty-phase proceeding on July 9, 1998, Dr. Mitchell was asked the following question:

> Based on your knowledge of Mr. Hammer to a reasonable degree of scientific certainty and psychological certainty, does he right now suffer from a major mental disease or defect as characterized in the DSM?

Doc. 528, Trial Transcript, Vol. 20, page 77.

1703.   Dr. Mitchell answered that question in the affirmative and stated that his diagnosis was major depressive disorder.   Id.

1704.   No evidence was presented at the time of trial rebutting Dr. Mitchell's testimony that Mr. Hammer suffered from a major mental disease or defect.

1705.   Although no evidence was presented by the Government rebutting Dr. Mitchell's diagnosis, twelve jurors concluded that

255

Mr. Hammer failed to prove by a preponderance of the evidence that he suffers from a major mental disease or defect.

### III.  Discussion.

We will first address Mr. Hammer's claims of ineffective assistance of counsel.  The Supreme Court has held that to establish a claim of ineffective assistance a petitioner must show that his attorneys' performance was objectively deficient and such deficient performance prejudiced his defense.  Strickland v. Washington, 466 U.S. 668, 687 (1984).  Specifically, the Supreme Court stated:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or  . . . sentence has two components.  First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.  Unless a defendant makes both showings, it cannot be said that the conviction or  . . . sentence resulted from a breakdown in the adversary process that renders the result unreliable.

Id.  It is axiomatic that if the claim or claims that counsel failed to raise are devoid of legal merit, a defendant suffers no prejudice and cannot establish a claim of ineffective assistance of counsel.  Id.  In the case where a defendant enters a plea of guilty, the defendant in order to obtain § 2255 relief must show that (1) his or her counsel's representation fell below an objective standard of reasonableness demanded of attorneys in

criminal cases, and (2) there is a reasonable probability that, but for counsel's errors, he or she would have proceeded to trial instead of pleading guilty.  See Hill vs. Lockhart, 474 U.S. 52, 56-59 (1985).

Mr. Hammer's principal arguments are that his counsel were ineffective for failing to investigate his competence to waive trial and plead guilty, failing to investigate and challenge Mr. Hammer's competence to discharge counsel and waive his direct appeal, failing to challenge the participation of Drs. Mitchell and Wolfson in the competency proceeding, failing to challenge the factual basis for the plea and failing to investigate and present Mr. Hammer's long history of false confessions.  We will address these claims in that order.

With respect to the alleged failure of counsel to investigate Mr. Hammer's competence, if Mr. Hammer were in fact competent, counsel can not be found to have rendered deficient performance.  In order to establish this claim of ineffective assistance,  Mr. Hammer must prove that he was incompetent at the time of the change of plea proceeding, at the time he waived his right to counsel or at the time he withdrew his direct appeal.

At the time of trial Dr. Sadoff was of the view that Mr. Hammer suffered from Dissociative Identity Disorder.  Such a disorder is a major mental disease or defect.  Dr. Mitchell did not conclude that Mr. Hammer suffered from such a disorder.  Instead, it was his opinion that Mr. Hammer suffered from Major Depression, recurrent. Such a condition is also a major mental disease or

257

defect.  Dr. Wolfson in his report concluded that Mr. Hammer was malingering or faking Dissociative Identity Disorder but did not dispute Dr. Mithchell's diagnosis of Major Depression, recurrent.

At the section 2255 hearing, Mr. Hammer presented several psychiatric experts, including Dr. Blumberg who testified that Mr. Hammer suffered from Posttraumatic Stress Disorder, Chronic; Borderline Personality Disorder; and Cognitive Disorder Not Otherwise Specified, affecting frontal lobe function.

We now know from the testimony of the Government's experts called at the section 2255 hearing that Mr. Hammer suffers from Borderline Personality Disorder, with dissociative periods, and Cognitive Disorder Not Otherwise Specified, primarily affecting sensory-perceptual functions.  At the time of trial, the Government contended Mr. Hammer had no cognitive deficits although no experts were called by the Government to dispute the testimony of Dr. Gelbort at the trial that Mr. Hammer suffered from Cognitive Disorder Not Otherwise Specified, affecting frontal lobe function. The Government's experts now concede that Mr. Hammer suffered from mental problems more significant than those testified to by the Government's experts at the time of trial in 1998.

Although it is clear that Mr. Hammer suffers from major mental problems, the experts who testified on behalf of Mr. Hammer at the section 2255 hearing conceded that an individual suffering from Dissociative Identity Disorder, Posttraumatic Stress Disorder, Borderline Personality Disorder, Major Depression, or Cognitive

Disorder Not Otherwise Specified could still be competent to enter a guilty plea.

A defendant may only plead guilty to a charge or waive counsel or appellate rights if he is mentally competent to do so. Godinez v. Moran, 509 U.S. 389, 396 (1993).  Mental competence for purposes of entering a guilty plea or waiving counsel or appellate rights requires that the defendant understand the proceedings against him and have the present ability to make a knowing, voluntary and intelligent decision. Id. at 396-97.

When a defendant raises a competency claim after pleading guilty to a charge or after waiving his right to counsel or appellate rights, the defendant has the burden of proving by a preponderance of the evidence that he was incompetent at the time he entered the plea or waived his right to counsel or appellate rights.  Vogt v. United States, 88 F.3d 587, 591 (8th Cir. 1996). Based on the findings of fact set forth in part II of this opinion it is clear that Mr. Hammer was competent at the time of the change of plea proceeding, at the proceeding in which he waived his right to counsel and at the proceeding before the Court of Appeals where he requested that his appeal be dismissed.  Consequently, counsel cannot be guilty of ineffective assistance of counsel for failing to investigate and challenge Mr. Hammer's competence at those proceedings.  Furthermore, because Mr. Hammer was competent on October 1, 1998, when he discharged counsel, he cannot raise a claim of ineffective assistance of counsel with respect to the

dismissal of his appeal on August 31, 2000, by the Court of Appeals because he was representing himself at that time.

Mr. Hammer's claim regarding the participation of Drs. Mitchell and Wolfson in the competency proceedings is likewise defective. Based on the findings of fact set forth in part II of this opinion it is clear that the conduct and participation of Drs. Mitchell and Wolfson did not render the proceedings unreliable. Based on the testimony of Drs. Matthews and Martell and our own observations of Mr. Hammer on June 22, 1998, and on October 1, 1998, we are convinced that he was competent on those dates. There have been times when Mr. Hammer has exhibited emotional lability and impulsive behavior.[12]  However, he did not exhibit any such behavior on June 22 and October 1, 1998.

With regard to Mr. Hammer's claim that attorneys Ruhnke and Travis failed to investigate adequately the factual basis of the charges, based on the findings of fact set forth in part II of this opinion it is clear that there was a firm, substantial factual basis for the charge of first degree murder. It is also clear that counsel did adequately investigate the basis for the charge and appropriately relied on Mr. Hammer's admissions during the change of plea proceeding. Mr. Hammer during the change of plea proceeding did deny some of the prosecutor's summary of the factual basis for the charge, i.e., he denied the hostage ruse or scenario and stated that the sheets braided into ropes were used for other

---

12.  E.g., such behavior was exhibited twice during the section 2255 hearing.

purposes.  These denials did not detract from the factual basis for the plea.  The autopsy findings are consistent with the facts summarized by the prosecutor and admitted by Mr. Hammer during the change of plea proceeding.

Mr. Hammer's present counsel has focused on Mr. Hammer's statement to FBI Agent Thompson on the morning of April 13, 1996. Counsel contend that Mr. Hammer during the April 13th interview made many false statements.  Their contention may be true.  However, there is no reason to doubt the essential admissions of Mr. Hammer made under oath at the guilty plea hearing on June 22, 1998.  In fact this court has concluded that Mr. Hammer testified truthfully on June 22, 1998, when he stated that the sheets braided into ropes were used for other purposes.

Prior to the change of plea proceeding, counsel were well aware of Mr. Hammer's history of making false confessions. However, based on the autopsy findings and Mr. Hammer's statements under oath during the change of plea proceeding, there was no reason for counsel to doubt the veracity of Mr. Hammer's admissions during the change of plea proceeding that he had put Mr. Hammer in a sleeper hold,  rendered him unconscious and had then taken a piece of cloth and strangled him.  These admissions by Mr. Hammer were sufficient to establish malice and premeditation.

Mr. Hammer has also raised two other claims of ineffective assistance of counsel.  First, Mr. Hammer claims that counsel were somehow deficient with respect to their performance at the time Mr. Hammer swallowed a razor blade on or about May 14, 1998, prior to

261

being transported to Court for the ongoing selection of the jury. They contend that counsel should have insisted that the court at that time inquire regarding Mr. Hammer's competence.  As noted in the findings of fact, the court monitored the situation and observed nothing which suggested that Mr. Hammer was not competent to proceed with jury selection.  Furthermore, the issue of competence at jury selection on or about May 14, 1998, was rendered moot by the competency and change of plea proceeding held on June 22, 1998.

The remaining claim of alleged incompetence of counsel relates to a statement by the undersigned to counsel at sidebar on June 30, 1998.  During defense counsel's penalty-phase opening statement, counsel appeared to suggest that Mr. Hammer during the change of plea proceeding did not admit the element of malice required for first degree murder.  The court interrupted the opening statement and counsel approached the bench at which time the court stated as follows:

> THE COURT: I don't recall him saying in this courtroom that these hands did it.  I found that he said that he did it.
>
> MR. RUHNKE: He said, These hands did it.  And he also said, I tied him up.
>
> THE COURT: Well, I don't want a lot of obfuscation here. Now, this man pled guilty, and if you want me to revoke his plea I'll do it.
>
> MR. RUHNKE: I'm not asking you to revoke the plea, Your Honor, but it's undeniably the case, as Mr. Martin has pointed out –
>
> THE COURT: What?
>
> MR. RUHNKE: It's undeniably the case that the government

has to prove he acted intentionally.

\*      \*      \*      \*      \*      \*      \*

THE COURT: Do you have any comments?

MR. MARTIN: No, Your Honor.

THE COURT: All right, okay, let's go.

Doc. 697, Partial Transcript, June 30, 1998, pages 4-5.

Mr. Hammer appears to contend that counsel were ineffective by failing to advise him of the court's statement.  However, Mr. Hammer had the burden at the section 2255 hearing to prove and failed to do so that he was not aware of his right to move to withdraw his guilty plea and that counsel did not advise him of the court's statement.  Mr. Hammer during the penalty phase was permitted to argue that the Government failed to prove that he intentionally killed Mr. Marti and the jury was required to find that Mr. Hammer intentionally killed Mr. Marti before it could consider any aggravating circumstances.[13]  Furthermore, assuming for purposes of discussion that counsel failed to inform Mr. Hammer of the court's statement, Mr. Hammer has failed to establish that he was prejudiced by that failure or if so informed he would have moved to withdraw his guilty plea.

The next issue which we will address is Mr. Hammer's claim that the Government violated his rights under Brady v. Maryland,

---

13.  As we indicated in footnote 2 of our opinion of October 9, 1998, the statutory requirement that the Government during the penalty phase of the trial convince the jury beyond a reasonable doubt that a defendant "intentionally killed the victim" appears to provide the defendant who pled guilty to first degree murder with  "a second bite at the apple."  United States v. Hammer, 25 F.Supp. 2d 518, 520 n.2 (M.D. Pa. 1998).

373 U.S. 83 (1963).  The Court of Appeals for this circuit has stated that

> due process requires the prosecution to inform the defense of evidence material to guilt or punishment. *See Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).  The prosecution must also disclose evidence that goes to the credibility of crucial prosecution witnesses. *See Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *United States v. Starusko*, 729 F.2d 256, 260 (3d Cir. 1984). However, the prosecution's failure to disclose such evidence amounts to a violation of due process only if there is a reasonable probability that the jury would have returned a different verdict if the information had been disclosed, or, stated differently, if "the Government's evidentiary suppression undermines the confidence in the outcome of the trial." *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). "The Constitution is not violated every time the government fails or chooses not to disclose evidence that might prove helpful to the defense." *Id*. at 436-37, 115 S.Ct. 1555; *see also United States v. Pelullo*, 14 F.3d 881, 886 (3d Cir. 1994)("a *Brady* violation . . . does not mandate automatic reversal . . . A reversal is warranted only where the suppression of the *Brady* evidence undermines confidence in the outcome of the trial.").  In evaluating whether the government's failure to turn over *Brady* or *Giglio* material undermines confidence in the outcome of the trial, the suppressed evidence is "considered collectively, not item-by-item."  *Kyles*, 514 U.S. at 436, 115 S.Ct. 1555.

Buehl v. Vaughn, 166 F.3d 163, 181 (3d Cir. 1999)(opinion by Judge Alito).

A prosecutor's duty to disclose Brady material is especially important in a capital case, as is this Court's duty to review claims of non-disclosure.  Kyles, 514 U.S. at 422 (in assessing a Brady claim the court acknowledged that its "duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case.") see also Beck v. Alabama, 447 U.S. 625, 637 (1980); Caldwell v. Mississippi, 472 U.S. 320, 329-30 91985); Ford v. Wainwright, 477 U.S. 399, 414 (1986)(each

indicating that capital cases require heightened judicial review and enforcement of procedural safeguards).

There are two aspects to Mr. Hammer's <u>Brady</u> claim: first, whether the <u>Brady</u> violations entitle Mr. Hammer to withdraw his guilty plea and second, if he is not entitled to withdraw his guilty plea, whether the <u>Brady</u> violations entitle him to a new penalty-phase trial.

In determining whether the <u>Brady</u> violations impact Mr. Hammer's guilty plea, the standard of review is whether there is a reasonable probability that but for the failure to disclose the <u>Brady</u> material, Mr. Hammer would have refused to plead guilty and instead would have proceeded with the guilt-phase trial.  <u>See</u> <u>Kyles v. Whitley</u>, 514 U.S. at 435; <u>United States v. Nagra</u>, 147 F.3d 875, 881 (9th Cir. 1998).

In assessing the impact of <u>Brady</u> violations on the penalty-phase proceedings, the question is whether the withheld evidence would have had an effect on even a single juror because the vote for life of one single juror in the sentencing phase of a capital trial results in the imposition of a life sentence. <u>See</u> <u>Wiggins v. Smith</u>, 539 U.S. 510, 537 (2003); <u>Frey v. Fulcomer</u>, 974 F.2d 348, 368 (3d Cir. 1992).  If the undisclosed evidence could have convinced one juror to find that the Government failed to prove beyond a reasonable doubt that Mr. Hammer engaged in substantial planning and premeditation, the confidence in the outcome is undermined and a new penalty phase is required or the death sentence is required to be reduced to life imprisonment without the

possibility of parole.  In light of these standards, we will now address the Brady violations.

The bulk of the information which the Government failed to turn over relates to Mr. Hammer's reason for braiding sheets into ropes and the truthfulness of Mr. Hammer's story that he convinced Mr. Marti to engage in a hostage ruse so that Mr. Marti could be transferred to the United States Penitentiary, Atlanta, Georgia.

The information from Albert Ray Johnson, Royce Lee Fowler and Gaylon Ball would have supported Mr. Hammer's contention that the sheets were braided into ropes for the purpose of being used as part of a consensual sexual activity involving bondage. See Findings of Fact Nos. 1595 through 1696.  The testimony of Martin Guerrero would have bolstered  Mr. Hammer's position that the hostage scenario was untrue.  Mr. Hammer when interviewed by FBI Special Agent Thompson stated that Mr. Marti was viewed by other inmates as an informant and that he had sent a letter to Martin Guerrero in which he informed Mr. Guerrero that he knew Mr. Marti, that he did not believe the rumors about Mr. Marti and that Mr. Guerrero should give Mr. Marti "a chance" and "to spread the word and do it as a personal favor for [Mr. Hammer]."   An FBI Agent interviewed Mr. Guerrero at the United States Penitentiary, Leavenworth, Kansas, on August 27, 1996.  The 302 statement of that interview was not disclosed to trial counsel. During that interview Mr. Guerrero told the FBI Agent that "he never received any letter from Hammer or Andrew Hunt Marti" and "he had never heard of inmate

<u>Andrew Hunt Marti</u>." (Emphasis added.) The prosecutor during his closing argument stated as follows:

> Mr. Hammer was trading on his reputation for hostage taking.  That's how he got Andrew Marti into the position that ended up killing Andrew Marti.  That wasn't it entirely, though. . . . Mr Marti was trying to solve his gang problems, which is why he would have or asked to have sent a letter by Mr. Hammer claiming to be some shot caller in his own right, sending a letter to Martine, whoever that fellow was, trying to tell Mr. Marti's associates that Mr. Marti is a stand-up con.
>
> So you've got a whole <u>lulling system put into effect</u> by David Paul Hammer, <u>letters</u>, money, orders, radios, you name it . . . .

Doc. 670, Transcript, Volume 27, July 21, 1998, pages 87-88 (emphasis added). The letter sent to Mr. Guerrero was allegedly part of Mr. Hammer's scheme to get Mr. Marti to agree to the hostage ruse.

Mr. Hammer has argued that Royce Lee Fowler's 302 statement would have bolstered his insanity defense.  Mr. Fowler during the interview with Special Agent Malocu stated that sometime in 1995 Mr. Hammer had told him that Mr. Hammer's father had started to abuse him and his brother and sister when they were children.  The contention is that Mr. Hammer's disclosure to Mr. Fowler many months before Mr. Marti's death would have significantly undercut the Government's argument that the abuse was not genuine and would have supported Dr. Sadoff's conclusion the Mr. Hammer suffered from Dissociative Identity Disorder.

The information which the Government failed to disclose does not appear to have any relevance to Mr. Hammer's decision to plead guilty to first degree murder.  During the change of plea

proceeding on June 22, 1998, Mr. Hammer denied the accuracy of the hostage ruse and indicated that the sheets braided into ropes were used for other purposes.  Consequently, information suggesting that the hostage ruse was untrue or that the ropes were used for other purposes would not have deterred Mr. Hammer from entering a plea of guilty.

With regard to Mr. Fowler's statement relating to child abuse, such information as it relates to Mr. Hammer's decision to plead guilty appears to be cumulative.  Mr. Hammer had information from several witnesses, including Martin Hammer and Dr. Mitchell, which supported Mr. Hammer's claim that he was abused as a child. Mr. Hammer made such revelations to Dr. Mitchell many months prior to the murder of Mr. Marti.  We are not convinced that this information from Mr. Fowler would have deterred Mr. Hammer from entering a plea of guilty to first degree murder.

Mr. Hammer also contends that the handwritten notes of FBI Special Agent Malocu's interview with Gaylon Don Ball support his DID defense.  In the typewritten 302 statement of Mr. Ball, Agent Malocu stated that "[t]he first knowledge Ball had regarding the death of inmate Marti occurred when he heard a female's voice outside Hammer's cell on the morning that Marti was murdered."  In contrast the handwritten notes state that

> [i]t is Ball's opinion that Hammer was having sexual
> relations with Marti although this is only his
> opinion
> approx 1 hr before he heard female voice
> Didn't know Marti or talk to him other that to
> say hello.

It is argued that this suggests that one hour before the discovery of Mr. Marti's body, Mr. Ball heard a female voice coming from Mr. Hammer's cell and it is further argued that the female voice was one of Mr. Hammer's alter personalities.  Prior to the change of plea proceeding, the Government had presented testimony that a female correctional officer had discovered Mr. Marti's body.  It is highly likely that the jury would have concluded that the female voice Mr. Ball heard was that of the female correctional officer. Such likelihood would have weighed in favor of Mr. Hammer entering a plea of guilty.  We are not convinced that the handwritten note would have deterred Mr. Hammer from entering a plea of guilty to first degree murder.

It is also alleged that the Government failed to provide the defense with a Bureau of Prisons document (Defense Exhibit 197 at page 15) indicating that Mr. Marti had gang related problems and as a result of these problems it was Mr. Marti who had requested to cell with Mr. Hammer.  Mr. Hammer argues that this document was important because the Government argued in its penalty-phase closing that Mr. Hammer's request to have Mr. Marti cell with him was part of the substantial planning leading up to the murder of Mr. Marti.

The BOP document was in a packet of documents provided to attorney Ruhnke on October 20, 2000, pursuant to a Freedom of Information Act request for documents concerning the dates and locations of all incidents where an inmate had killed another inmate in a Bureau of Prisons facility.  The response provided to

attorney Ruhnke is a group of documents summarizing homicide incidents.  The specific document in question is at page 15.

During the trial evidence was presented that both Mr. Hammer and Mr. Marti requested to be housed together.  The individual who drafted the BOP document may have overlooked information indicating that both Mr. Hammer and Mr. Marti requested to cell together or the author may have decided it was not relevant for the purpose of summarizing a homicide incident.  We are not convinced that the BOP document would have deterred Mr. Hammer from entering a plea of guilty to first degree murder.  Nor are we convinced that the documents relating to Johnson, Fowler, Ball and Guerrero and the BOP document (Defense Exhibit 197 at p. 15) as a whole would have deterred Mr. Hammer from entering a plea of guilty to first degree murder.

We will now address the impact of the Brady violations on the penalty-phase proceedings.  The Government has argued that the information in question is not Brady material because Mr. Hammer was aware of the information.  The cases relied on by the Government are inapposite.  See United States v. Diaz, 922 F.2d 998, 1007 (2d Cir. 1990)(the alleged Brady violation was the failure of the prosecutor to advise defendant in advance that a witness would testify); United States v. Zuazo, 243 F.3d 428, 430-31 (8th Cir. 2001)(the alleged Brady violation was the failure of the prosecutor to disclose to defendant his co-conspirator's proffer statement which was not exculpatory); Fullwood v. Lee, 290 F.3d 663, 684-87 (4th Cir. 2002)(the alleged Brady violation was the

failure of the prosecutor to disclose to defendant his own statement which he had given to police officers shortly after a stabbing incident); West v. Johnson, 92 F.3d 1385, 1398-99 (5th Cir. 1996)(the alleged Brady violation was the failure of the prosecutor to disclose evidence that defendant's confession was fabricated);[14] United States v. Pellulo, 399 F.3d 197, 211-12 (3d Cir. 2005)(the alleged Brady violation was the failure of the prosecutor to disclose defendant's own business records).

In the present case the information the Government failed to disclose primarily relates to statements of third parties regarding what they knew and observed about Mr. Hammer. The Government presented no evidence during the section 2255 hearing indicating that prior to trial in 1998 Mr. Hammer knew that Messrs. Johnson, Fowler, Ball and Guerrero were interviewed by the FBI. Also, the Government presented no evidence that Mr. Hammer knew what those inmates' observations were regarding Mr. Hammer's behavior or what they had told the FBI regarding his statements or conduct. Furthermore, the Government presented no evidence that Mr. Hammer prior to trial understood the significance of his history of engaging in sexual bondage to the penalty phase proceedings, specifically as it related to the aggravating circumstance of substantial planning and premeditation. The significance of such information could only be discerned by learned counsel, attorneys

---

14.  In West v. Johnson the Court of Appeals concluded that there was no evidentiary support for the alleged Brady violation.

Ruhnke and Travis.  However, counsel were not provided with the documents.

The Government in this case failed to disclose evidence from third parties regarding Mr. Hammer's history of engaging in sexual bondage, including evidence that in the past he had braided sheets into ropes to be used in consensual aberrant sexual activity.

With respect to the aggravating circumstance of substantial planning and premeditation, Mr. Hammer's history of sexual bondage became relevant when the prosecutor during his penalty-phase opening statement emphasized the braiding of the sheets into ropes. See Finding of Fact 1637.  Also, the prosecutor during his closing argument contended that the braiding of the sheets into ropes was evidence of substantial planning and premeditation.  The prosecutor stated "you have to factor in what time it took to make heavy duty restraints to keep a six foot four, two hundred pound man in place."  Doc. 670, Transcript, Vol. 27, July 21, 1998, page 89. The prosecutor also argued that the tying down of Mr. Marti was part of Mr. Hammer's plan to prevent Mr. Marti from reaching the duress button in Cell 103.  Id. at 84.  The Government also argued that the hostage ruse was essential to the plan because "how many people would willingly want to be tied down by another inmate who they've only met for, what less than four or five days."  Id. at 85.  The prosecutor argued that the tying was "essential preplanning" warranting the death penalty. Id. at 84.

Both attorneys Ruhnke and Travis testified at the section 2255 hearing that the undisclosed 302 statements of Johnson and

Fowler were relevant to counter the Government's argument concerning substantial planning and premeditation during the penalty phase of the trial.  Attorneys Ruhnke and Travis testified that if they had been aware of the evidence they would have investigated it and would have considered presenting it during the penalty phase.

In this case the jury found two aggravating circumstances and multiple mitigating circumstances.  Under the Federal Death Penalty Act of 1994, aggravating circumstances play a dual role: they make a defendant eligible for the death penalty, and they guide the jury in reaching its verdict "insofar as they are weighed or balanced" against the mitigating circumstances. Flamer v. Delaware, 68 F.3d 736, 767 n.6 (3d Cir. 1995)(en banc).  Under a weighing statute such as the Federal Death Penalty Act of 1994,  a death sentence resulting from a tainted aggravating circumstance cannot stand. Sochor v. Florida, 504 U.S. 527, 532 (1992); Espinosa v. Florida, 505 U.S. 1079, 1081 (1992).

The Brady violations in this case taint the jury's determination that Mr. Hammer committed the offense after substantial planning and premeditation.  The failure of the Government to disclose the 302 statements undermines our confidence in the jury's determination that Mr. Hammer engaged in substantial planning and premeditation and the jury's sentencing recommendation.  Mr. Hammer's death sentence will be vacated on that basis.

As noted in the introduction to this opinion, Mr. Hammer has raised a claim "that disposition of his direct appeal issues would result in the vacation of his conviction and sentence" and that "[a] manifest injustice would result if review of all issues is not had." Mr. Hammer contends that it would be a miscarriage of justice if he were executed and in support of that contention focuses on several matters, including the allegedly erroneous jury findings relating to mitigating factors. We are unaware of any court opinion setting forth the standard to be applied for determining whether or not a miscarriage of justice would result if a death sentence imposed on a defendant under the Federal Death Penalty Act of 1994 were carried out. The cases cited by the Government are inapposite. The majority of the cases either deal with defendants convicted under state law or non-capital federal convictions. See, e.g., Sawyer v. Whitley, 505 U.S. 333, 335 (1992), Schlup v. Delo, 513 U.S. 298, 323 (1995); Bousley v. United States, 523 U.S. 614 (1998). The one case cited but the Government, United States v. Quinones, 313 F.3d 49 (2d Cir. 2002) which involves the Federal Death Penalty Act has nothing to do with the standard to be applied with respect to collateral review of a death sentence. That case dealt with the constitutionality of the Federal Death Penalty Act. The Court of Appeals for the Second Circuit reversed a decision of the district court which struck the Government's notice of intent to seek the death penalty and held "that the [Federal Death Penalty Act] violates the Due Process Clause of the Fifth Amendment because DNA testing has demonstrated

that 'innocent people are convicted of capital crimes with some frequency.'" 313 F.3d at 52.  The Government has pointed to no case from the Court of Appeals for this circuit which delineates the standard to be applied under the particular circumstances of this case.

Because Mr. Hammer withdrew his direct appeal there has been no complete review of the propriety of the death sentence imposed in this case.  When a defendant does not pursue an appeal, generally any issues that could have been raised on appeal are waived and cannot be raised in a § 2255 proceeding.  However, the claims are not waived if the defendant can show cause for the waiver and prejudice resulting from the waiver, or a miscarriage of justice or manifest injustice.  Refusing to review Mr. Hammer's claims regarding the erroneous jury's findings relating to mitigating factors appears to us to be unwarranted.  Such refusal would result in a miscarriage of justice or manifest injustice. Based on our review of the trial testimony and the evidence developed at the section 2255 hearing many of the jury's findings relating to mitigating circumstances set forth in the Special Findings Form are erroneous, including the finding of 12 jurors that at the time of trial Mr. Hammer did not suffer from a major mental disease or defect, the finding of 11 jurors that he did not suffer from cognitive deficits, and the finding of 6 jurors that as a child he was not the victim of sexual abuse.  The newly presented evidence relating to mental illness and the erroneous jury findings

lead us to conclude that Mr. Hammer is entitled to a new penalty-phase trial.

IV.    Conclusions of Law.

1.    Mr. Hammer has failed to prove by a preponderance of the evidence that he was not competent on June 22, 1998, when he entered a plea of guilty to first degree murder, on October 1, 1998, when he waived his right to counsel or on July 18, 2000, when he requested that the Court of Appeals dismiss his appeal.

2.    Mr. Hammer has failed to prove by a preponderance of the evidence that counsel rendered ineffective assistance prior to and at the time of the change of plea proceeding on June 22, 1998, or at the proceeding on October 1, 1998, when Mr. Hammer waived his right to counsel.

3.    Mr. Hammer has failed to prove by a preponderance of the evidence that the performance of attorneys Ruhnke and Travis fell below an objective standard of reasonableness demanded of attorneys in criminal cases.

4. Mr. Hammer has failed to prove by a preponderance of the evidence that there is a reasonable probability that, but for counsel's alleged errors, he would have proceeded with the trial instead of pleading guilty.

5.    Mr. Hammer has failed to prove by a preponderance of the evidence that attorneys Ruhnke or Travis in any manner whatsoever rendered ineffective assistance of counsel.

6. Mr. Hammer has failed to prove by a preponderance of the evidence that there is a reasonable probability that but for the

failure of the Government to disclose (1) the 302 statements of Albert Ray Johnson, Jr., Royce Lee Fowler, Gaylon Don Ball, and Martin Guerrero, (2) Agent Malocu's handwritten notes of the interview of Mr. Ball, and (3) the BOP document obtained by attorney Ruhnke on October 20, 2000, pursuant to a Freedom of Information Act request, he would not have entered a plea of guilty to first degree murder.

7.    Mr. Hammer has proved by a preponderance of the evidence that the Government failed to disclose relevant and material information to which he was entitled relating to the appropriate penalty to be imposed in this case in violation of Brady v. Maryland, 373 U.S. 83 (1963).

8.    Failure of the prosecutor to disclose the 302 statements of Albert Ray Johnson, Jr., Royce Lee Fowler, Gaylon Don Ball and Martin Guerrero renders the penalty phase of the trial defective.

9.    As a result of the Brady violations, Mr. Hammer is entitled to a retrial of the penalty phase.

10.    The jury's defective answers with respect to mitigating factors renders the penalty phase of the trial defective.

11.    As a result of the jury's defective answers with respect to mitigating factors, Mr. Hammer is entitled to a retrial of the penalty phase.

An appropriate order will be entered.

s/Malcolm Muir
MUIR, U.S. District Judge

DATED: December 27, 2005

277

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA     :
                                  :
        v.                :   No. 4:CR-96-239
                                    :
DAVID PAUL HAMMER,        :   (Judge Muir)

ORDER
December 27, 2005

       1.   Mr. Hammer's motion filed on September 14, 2005, to strike the testimony of former Deputy United States Marshal Ellis (Doc. 1156) is denied.

       2.   Mr. Hammer's fourth amended section 2255 motion is granted in part and denied in part as set forth below.

       3.   The sentence of death imposed on Mr. Hammer on November 4, 1998, is vacated and set aside.

       4.   In all other respects Mr. Hammer's fourth amended section 2255 motion is denied.

       5.   The Government within 60 days of the date hereof may file a motion to have this case placed on a trial list for a new penalty-phase trial.

       6.   Failure of the Government to file such a motion within 60 days will result in the court resentencing Mr. Hammer to a term of life imprisonment without the possibility of release on parole.

                              s/Malcolm Muir
                              MUIR, U.S. District Judge

MM:gs