# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA    :

    :      NO. 4:96-CR-00239

    :

v.    :

    :      (Judge Muir)

DAVID PAUL HAMMER    :

    :

    Defendant    :      (Electronically Filed)

## BRIEF IN SUPPORT OF MOTION FOR ACCESS OF VIDEOGRAPHER TO SPECIAL CONFINEMENT UNIT AT UNITED STATES PENITENTIARY TERRE HAUTE

## A.    BACKGROUND

At the present time the Hammer defense team is in the process of putting together a presentation to be submitted to the United States Attorney for the Middle District of Pennsylvania and ultimately to the Capital Crimes Unit in Washington, D.C.  The presentation to be submitted concerns the question of whether the federal government should seek to retry the penalty phase of the

instant case in order to ask jurors to unanimously vote for the imposition of a sentence of death on David Paul Hammer. As part of the defense presentation, a determination has been made to put together a video presentation in order to support the argument that the changes which have occurred in David Paul Hammer since the sentence of death verdict was returned on July 24, 1998, constitute compelling reasons why it is appropriate for the government to not seek death, but rather to allow the court to impose a sentence of life imprisonment without the possibility of release.

At the current time the defense team is in the process of conducting videotaped interviews of various individuals who have become associated with David Paul Hammer since July of 1998. As the court knows, neither at the trial in June/July of 1998 nor at the evidentiary hearing on the 2255 Motion did David Paul Hammer take the stand and testify concerning the death of Andrew Marti and his sense of remorse arising out of that incident. As part of the videotape, the defense wants to have the opportunity to videotape David Paul Hammer concerning the changes in his life since July 24, 1998, and the sense of guilt and remorse he lives with on a daily basis as a result of the death of Andrew Marti.

Counsel for David Paul Hammer requested the Warden at United States Penitentiary Terre Haute agree to allow the retained videographer to enter the institution with appropriate equipment for the purpose of videotaping David Paul

2

Hammer discussing the aspect of the case which he is in the best position to comment on. The Warden declined to agree to allow the videographer entrance to the institution for the purpose of videotaping David Paul Hammer.

Because the Warden has refused to agree to allow the videographer to enter the institution, a Motion has been filed asking this court to order such access. This brief is being submitted in support of the Motion.

## B.   THERE EXISTS NO LEGITIMATE PENALOGICAL BASIS FOR DENIAL OF THE PENDING REQUEST

Throughout the course of the litigation of the instant case, there have been occasions when the defense has sought concurrence of the Bureau of Prisons in changing some of the procedures being employed with respect to Mr. Hammer and, when the Bureau of Prisons has refused to make such changes, it generally asserts "security concerns" as a justification for not agreeing to the request. Counsel for David Paul Hammer assumes that the refusal of the Warden to allow the videographer to enter the Special Confinement Unit, with appropriate equipment, in order to record the desired video of David Paul Hammer is "security" based. Security concerns appear to be the Bureau of Prisons fallback position whenever counsel for David Paul Hammer has sought something out of the ordinary. The initial issue addressed by this court concerning a request which was denied based upon alleged "security concerns" took place when David Paul Hammer advised counsel that he preferred not to have personal visits because of

3

the number of strip searches he had to go through in conjunction with contact visits at United States Penitentiary Allenwood. According to "policy," for any legal visit David Paul Hammer would have to undergo a strip search when he left his cell. After undergoing the initial strip search, he would then be escorted in handcuffs and leg irons through an empty corridor to the visitation area. During this walk, Hammer was accompanied by at least two staff members walking beside him and physically touching him. Additionally, at least one supervising officer was also involved in the escort. Once David Paul Hammer arrived at the visitation area, he would undergo another strip search before he was allowed to enter the visitation room. During the visitations, he remained in leg chains, with a Martin chain around his waist and with his hands handcuffed in front of him and the handcuffs attached to the Martin chain. The staff members who escorted him to the visiting area would remain seated outside of the visiting room where they were able to observe the entirety of the visit through a large picture window. At the conclusion of the visit, David Paul Hammer would be removed from the visiting room and would have to undergo a third strip search before being escorted back to his cell in the Special Housing Unit. The staff members would escort Hammer back to the Special Housing Unit through a deserted corridor in the same manner he was escorted on the way to the visiting area. Once he returned to the Special Housing Unit, he underwent a fourth strip search before being returned to his cell. As a

4

result of having to undergo these multiple strip searches, David Paul Hammer requested, via counsel, that the number of strip searches be limited to two, one as he left SHU and one as he left the visitation area. The Bureau of Prisons, citing security concerns, would not agree and therefore a Motion was filed requesting this court grant the relief sought. After an evidentiary hearing and briefing, the court found that the number of strip searches being conducted "according to policy" was excessive and limited to three the number of strip searches to be conducted in conjunction with legal visits (Opinion of 12/5/1996).

The "security concern" issue was next addressed by the court in a Motion filed on December 6, 1996, seeking the establishment of a telephone protocol and a mail protocol when the Bureau of Prisons would not agree to such protocols due to "security concerns." Essentially David Paul Hammer was attempting to get the Bureau of Prisons to deal with his special mail in accordance with his own policy, to treat mail from the court and from the Third Circuit as "special mail" and to allow the use of conference calls on an unmonitored phone in order to allow David Paul Hammer to confer with experts approved by the court to assist in the preparation of a defense. Additionally, David Paul Hammer sought leave of court to participate as a third party in telephone calls involving defense counsel and potential inmate witnesses so that David Paul Hammer could orally authorize these inmate witnesses to speak with defense counsel. The changes from normal policy

which were being requested were resisted by the Bureau of Prisons for reasons of security, although the Bureau of Prisons also asserted that the "mail policy" was being complied with, notwithstanding the fact that at the hearing and in exhibits submitted to the court it was conclusively shown that there were several instances where appropriately marked correspondence from defense counsel had been opened outside of Hammer's presence, a clear violation of the "special mail" policy. The evidence presented also showed that court mail was also being opened outside of Hammer's presence. After briefing and presentation of evidence, the court entered an Order dated March 31, 1997, granting in part the Motion filed on December 6, 1996, directing the Bureau of Prisons to abide by its "special mail" policy, directing that mail from the Third Circuit Court of Appeals as well as the United States District Court be treated as "special mail" and authorizing the involvement of Hammer in unmonitored conference calls with any individual appointed by the court to render expert services concerning the pending criminal case. The request that Hammer be authorized to participate in unmonitored calls involving defense counsel and potential inmate witnesses was denied on "security" grounds because of a concern that during such calls Hammer would be able to speak in code and further Hammer could give authorization to the potential witnesses via correspondence and therefore there was no need for him to directly speak with these potential witnesses.

6

In granting the relief requested in these two prior instances, this court recognized that legitimate penological objectives, such as security, may serve as a legitimate basis for denying certain inmate requests pursuant to *Turner vs. Safely*, 482 U.S. 78 (1987). However, these two prior decisions in the instant case also show that the relief requested may appropriately be granted notwithstanding asserted "security concerns."

Although David Paul Hammer was not a party to the litigation, he is aware of a decision in the United States District Court for the District of Utah, Central Division, as he was one of the parties to potentially be deposed at United States Penitentiary Terre Haute, along with an individual who was being housed at the Administrative Maximum institution in Florence, Colorado. Attached hereto as Exhibit 1 is the Court Order of September 20, 2007, authorizing the taking of the videotaped deposition of Hammer and the videotaped deposition of Nichols and ordering the respective federal correctional institutions to cooperate in allowing the depositions to be taken. Attached to the brief is a copy of an Order of September 25, 2008, denying the government's Motion for reconsideration of the September 2007 Order permitting the videotaped depositions (Exhibit 2). From reading the two Orders it appears that during the litigation which resulted in the entry of the September 20, 2007, Order, the FBI did not assert that there were any security concerns with respect to the taking of the videotaped depositions at Administrative

Maximum, where Nichols was housed, or at the Special Confinement Unit, where Hammer was housed.  However, as part of the Motion for reconsideration, the FBI asserted security concerns based upon the determination by the BOP that a video recording posed a threat to the security of the institutions where the individuals are confined.  In addressing this "security concern," the court limited the video recording to only the room in which the deposition was to take place and, based upon Affidavits submitted by BOP personnel, the court prohibited the use of video equipment at any location other than the specific room where the deposition was to be taken and prohibited the videoing of any images of any person other than the subjects to be deposed.  Finally, the court indicated that the plaintiff should meet with BOP personnel at some designated location, outside the facility, and the BOP person could take possession of the equipment and transport it from that location to the place within the institution where the deposition was to take place.  Counsel assumes that the BOP will make the same security assertions in the instant case which were rejected by the District Court in *Trentadue*.

David Paul Hammer had an execution date set for November 15, 2000.  In conjunction with the November 2000 execution date, an issue arose concerning the plans of the BOP to conduct an autopsy on the body of David Paul Hammer subsequent to his actual execution.  Counsel for David Paul Hammer attempted to get the BOP to agree that the conducting of the autopsy was inappropriate and

unnecessary, but the BOP refused to so agree. The position advanced by the BOP was conducting the autopsy would serve to preclude a surviving Hammer family member from instituting litigation alleging that Hammer had been the subject of physical abuse in conjunction with the carrying out of the execution. Although members of Hammer's immediate family agreed to execute releases concerning the possible filing of civil litigation, the BOP remained steadfast in its decision that an autopsy would be conducted. Litigation with respect to the autopsy issue resulted in the entry of an Order precluding the conducting of an autopsy and directing the United States Marshal to specifically preclude an autopsy on the body of David Paul Hammer.

Another execution date was established for David Paul Hammer on June 8, 2004. In conjunction with the scheduled execution on June 8, 2004, counsel for David Paul Hammer raised questions concerning the procedure which was going to be followed in implementing the sentence of death. As a result of discussions with the Warden at Terre Haute concerning the procedure to be followed, counsel for David Paul Hammer filed various motions litigating multiple issues pertaining to the BOP plans for carrying out the sentence of death. In arguing against the relief sought on behalf of David Paul Hammer, the government, on behalf of the BOP, attempted to support the BOP refusals by referencing "policy" and "security" concerns. Although David Paul Hammer did not prevail on all issues, the court did

exercise its discretion and enter an Order directing that the planned "cut down" procedure not be undertaken, directing the government reimburse the expenses of Hammer's execution witnesses, and modified the access of counsel to David Paul Hammer during the timeframe immediately preceding the implementation of the execution.  Historically this court has exercised its discretion to look beyond the assertion of "policy" or "security concerns" in order to modify positions being taken by the BOP based on policy or security concerns.  It is respectfully requested that the court exercise its discretion and transform the warden's "No" into "Yes," subject to appropriate restrictions on where the video equipment can be operated and who may be videotaped.

In light of the Orders entered by the District Court in Utah (Exhibits 1 and 2 to this brief) and the history of unsuccessful policy and security assertions made by the BOP in the instant case, it is indeed extremely troubling that the request for video access to David Paul Hammer was summarily rejected.  David Paul Hammer is the individual who will be most effected by the decision reached concerning authorization as he truly is the individual whose life may be at risk.  In another potential death penalty prosecution in the Middle District involving an inmate defendant, United States Attorney Marino specifically asked counsel to obtain current photographs of the individual, Tommy Meeks, so that he could put a face to the factual information being submitted to support the defense position that the

death penalty not be sought.  In the instant case, the defense team beliefs it to be appropriate that it have available the option of including in the video presentation comments made by the individual most effected by the authorization decision.  The defense team is not asking for the opportunity to give David Paul Hammer a forum to discuss nationwide his views on various matters as was permitted for Timothy McVeigh in a 60 Minutes program which originated from federal death row at Terre Haute Penitentiary.  David Paul Hammer is also not asking court authorization for individuals to be admitted to the institution and in particular to the Special Confinement Unit for the purpose of filming locks or other security items or for the purpose of filming staff or inmates other than David Paul Hammer. What is being requested is crew and equipment access at a location which can be selected by the Bureau of Prisons if the defense suggestion of the one of the contact visiting rooms is deemed an inappropriate locale.

As David Paul Hammer understands the position taken by the Warden, the answer is no to the defense request but the request would be reconsidered if the government would concur in the request.  This position is highly troubling given the exhibits submitted in conjunction with the Motion which establishes that the Bureau of Prisons held a media tour of the facility and allowed still photographs and video cameras to be used by the media in fashioning the stories created with respect to the facility.  This capturing of areas within the facility apparently did not

11

constitute a security threat at the time the Bureau of Prisons wanted to publicize the Special Confinement Unit. Likewise, the equipment identified in Exhibit 1 was apparently authorized to be brought into the institution by the government experts who ultimately filmed David Paul Hammer in one of the contact visitation rooms and also filmed David Paul Hammer's cell. The request being made on behalf of David Paul Hammer is certainly a less intrusive request than that allowed via the media tour or the government expert's filming. The court must be mindful of the fact that the individual or individuals who employ the video camera will have to pass the standard security clearance for visitors to the Special Confinement Unit and the equipment itself will be subject to physical inspection and presumably will also be subject to x-ray inspection before the equipment would enter from the public area of the lobby entrance into the private area where all visitors go if they pass security clearance. How the equipment identified by Dr. Martell in Exhibit 1 passes muster but the Warden summarily rejects the defense request without even asking for a list of the items to be brought into the Special Confinement Unit or asking any information concerning the identity of the individuals, who will be operating the equipment, is at best illogical.

As has been set forth in the Motion in the instant case, the defense private investigator had access to the Special Housing Unit at USP-Allenwood with still camera and video camera in order to have available for possible use at trial

videotape of the Special Housing Unit or still photographs of the same unit. The FBI also shot a video of the cell in which the killing occurred. The private investigator also brought into USP-Allenwood a video camera for the purpose of recording the hypnosis session involving Drs. Dubin and Sadoff. The same private investigator was granted access to the McAllister Penitentiary in Oklahoma for the purpose of photographing and videotaping the facilities where David Paul Hammer had been housed for a number of years while incarcerated in the Oklahoma system. Further, David Paul Hammer has appeared in open court via videoconferencing before the Third Circuit and also before this court, while housed at the Special Confinement Unit at Terre Haute.

David Paul Hammer also sets forth in his Motion the fact video equipment and camera operators were admitted to the Special Confinement Unit at Terre Haute as part of the 60 Minutes McVeigh interview and also as part of recording a statement from Juan Garza as part of his clemency application. The Motion also sets forth information concerning press tours, expert access, and at least the taking of still photographs depicting various scenes at the administrative maximum facility, including cells, the visitation area, and guard towers. Against this background, it is difficult to understand just what it is about the request submitted on behalf of David Paul Hammer which elicited the answer no.

When the request for video access to David Paul Hammer is put in context, it is respectfully suggested that this court should find that the allowance of the individuals and equipment to engage in the videotaping of David Paul Hammer should not be precluded for reasons of security concerns or reasons of BOP policy. Any true security concerns may be fully addressed by the entry of an Order similar to that of United States District Judge Kimball entered in the Trentadue case on September 25, 2008.

Respectfully submitted,

/s/ Ronald C. Travis, Esquire
Ronald C. Travis, Esquire
PA ID#:  08819
161 West Third Street
PO Box 215
Williamsport, PA  17703-0215
(570) 323-8711 (telephone)
(570) 323-4192 (facsimile)
rtravis@riederstravis.com

/s/ Anne L. Saunders, Esquire
Anne L. Saunders, Esquire
Asst. Federal Public Defender
PA ID#:  48458
100 Chestnut Street, Ste. 306
Harrisburg, PA  17101
(747) 782-3843
Anne_Saunders@fd.org

/s/ Michael Wiseman, Esquire

Michael Wiseman, Esquire
Supervising Assistant Federal Defender
PA ID#:  75342
Suite 545 West – The Curtis Building
Independence Square West
Philadelphia, PA  19106
(215) 928-0520
Michael_Wiseman@fd.org

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| JESSE C. TRENTADUE, <br><br> Plaintiff, <br><br> vs. <br><br> FEDERAL BUREAU OF INVESTIGATION and FEDERAL BUREAU OF INVESTIGATION, OKLAHOMA CITY FIELD OFFICE, <br><br> Defendants. | MEMORANDUM DECISION AND ORDER <br><br><br> Case No. 2:04CV772 DAK |

This matter is before the court on Plaintiff Jesse C. Trentadue's Motion to Conduct Discovery. The court has carefully reviewed the written memoranda submitted by the parties. Pursuant to local rule 7-1(f), the court has concluded that oral argument would not be helpful or necessary, and thus the court will determine the motion on the basis of the written memoranda. *See* DUCivR 7-1(f).

Plaintiff filed this action in August 2004, alleging that the FBI had failed to provide certain documents that were responsive to his FOIA request. In the instant motion, Plaintiff seeks an Order from the court allowing him to take–and videotape–the depositions of Terry Lynn Nichols and David Paul Hammer. The FBI contends that this court does not have jurisdiction to award such relief because, among other things, after this court issued its Memorandum decision

EXHIBIT

I

resolving Plaintiff's FOIA claims, there no longer existed any 'case or controversy' sufficient to confer subject matter jurisdiction on this court.

The court, however, disagrees with the FBI's contention.   This case has not yet been closed by the court and remains on the list of the court's active pending cases.   In the court's view, the March 30, 2006 Amended Memorandum Decision did not necessarily end this action.

Specifically, on May 5, 2005, the court found that the FBI's search was not reasonably calculated to discover the requested documents, and the court ordered the FBI to search specific case files, to produce unredacted copies of various documents, and to produce other documents responsive to Plaintiff's FOIA request.   Subsequently, Plaintiff objected to the redactions contained in the documents and argued that the FBI's search was still inadequate.   In response, the FBI claimed that its redactions were appropriate and that it had not even been required to produce these documents because they were not responsive to Plaintiff's FOIA request.   The FBI sought reconsideration of the court's previous determination that the FBI's original search was not reasonably calculated to locate responsive documents.  In addition, the FBI requested a determination that its manual search of five files, and the ZYIndex search of the OKBOMB file fulfilled the FBI's responsibilities to locate responsive documents under FOIA and that no further search was required.

The court specifically stated in its March 29, 2006 Order that it declined to reconsider its previous determination regarding the reasonableness of the FBI's initial search and the need to conduct additional manual searches.   Moreover, the court ordered the FBI to conduct two more

2

Case 2:04-cv-00772-DAK    Document 173    Filed 09/20/2007    Page 3 of 4

limited searches in the OKBOMB file and noted that "it is troubling that so many of the documents produced by the FBI refer to FD-302s that were or should have been prepared, and the disclosed documents also refer to other attachments that at one time appear to have accompanied the document, yet these documents have not been produced. While the FBI's failure to discover documents is not necessarily an indication of bad faith, it is puzzling that *so many* documents could be referenced but not produced." The court, however, declined to order further searches beyond what the court had already specifically ordered.

The court had also noted in its May 5, 2005 Order that "[u]pon Motion, the court will allow Plaintiff to conduct discovery should the FBI fail to produce documents and/or records responsive to this FOIA requests." In light of (1) the court's previous finding that the FBI's original search was not reasonably calculated to locate responsive documents; (2) the troubling absence of documents to which other documents referred; and (3) the information that Plaintiff has thus far discovered from Terry Lynn Nichols and David Paul Hammer, the court is persuaded that it continues to maintain jurisdiction over this action, and, furthermore, that by allowing the requested depositions, Plaintiff may be better able to identify the existence of other records responsive to his FOIA request that have not yet been produced.

Therefore, for these reasons and the reasons set forth by Plaintiff in his memorandum in support and his reply memorandum, IT IS HEREBY ORDERED that Plaintiff's Motion [docket # 97] is GRANTED. The court notes that it is not compelling Nichols and Hammer to cooperate; rather, the court is permitting Plaintiff to take–and videotape–the depositions, so long as these individuals are willing to cooperate. In addition, the court is ordering the respective

federal correctional institutions to cooperate in allowing Plaintiff to take these depositions.

DATED this 20th day of September, 2007.

BY THE COURT:

DALE A. KIMBALL
United States District Judge

4

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| JESSE C. TRENTADUE,<br><br>Plaintiff,<br><br>vs.<br><br>FEDERAL BUREAU OF INVESTIGATION and FEDERAL BUREAU OF INVESTIGATION, OKLAHOMA CITY FIELD OFFICE,<br><br>Defendants. | ORDER<br><br>Case No. 2:04CV772 DAK |

This matter is before the court on the Federal Defendants' Motion to Reconsider Discovery Order and Request for Oral Argument. The court has carefully reviewed the written memoranda submitted by the parties. Pursuant to local rule 7-1(f), the court has concluded that oral argument would not be helpful or necessary, and thus the court will determine the motion on the basis of the written memoranda. *See* DUCivR 7-1(f). Now, being fully advised, the court renders the following Order.

On September 20, 2007, the court issued granted Plaintiff's Motion to Conduct Discovery. Specifically, the court stated that it would permit Plaintiff to take–and videotape–the depositions of Nichols and Hammer, so long as these individuals are willing to cooperate.

The Federal Defendants argue (1) that this court's Discovery Order exceeds the permissible scope of discovery under FOIA, (2) that the court lacks jurisdiction because the court

**EXHIBIT**

2

there is no longer an Article III case and controversy, (3) there is no question as to the FBI's good faith sufficient to justify the Discovery Order, and (4) the BOP has determined that a video recording poses a threat to the security of the institutions where these individuals are confined.

Defendants, however, asserted the first three arguments in their Memorandum in Opposition. The court rejected those arguments previously and will not reconsider them at this point. As to the BOP's concern that a video recording poses a threat to the security of the institutions, the court will limit the usage of the video recording equipment to only the room in which the deposition is taken. The two affidavits submitted by the Federal Defendants express concerns that various aspects of the prison grounds, security systems, equipment storage, offices, staff, other inmates and various other items might be filmed.

While it is doubtful that Plaintiff intended to video anything other than Nichols and Hammer during their actual depositions, the court hereby orders that no video equipment may be used other than in the specific room where each deposition is taking place, and the video equipment may not record the images of any person other than Nichols and Hammer. In addition, if it would allay the security concerns of the respective prison officials, Plaintiff is directed to make arrangements to meet an designated prison official at a predetermined location outside of the correctional facility and so that the prison official may take possession of the recording equipment and transport it to the proper location where the deposition will take place.

Now that the court has declined to reconsider its Discovery Order and made clear that Plaintiff is entitled to conduct this discovery, the court will now close this case. Plaintiff has stated, however, that he "believes that if he is allowed to depose Nichols and Hammer, these men

2

will be able to provide evidence that will link the informants thus far revealed to the SPLC and, thereby, identify and/or document the existence of records responsive to Plaintiff's FOIA requests that have not been produced." If Plaintiff is correct and through these depositions he discovers the existence of records responsive to Plaintiff's FOIA request, he may file a motion to reopen the case. At that point, the court will determine whether it is appropriate to reopen the case or to direct Plaintiff to file another FOIA request.

Finally, the Federal Defendants have filed an "Objection" to Plaintiff's filing of a "Notice of Release of Documents," along with attached documents. While the court agrees that they are not relevant to the issue of whether Plaintiff is entitled to depose Nichols and Hammer—and the court has not relied on these documents in making its decision—the court declines to strike them from the record, as requested by the Federal Defendants.

## CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED that the Federal Defendants' Motion to Reconsider [docket # 114] is DENIED and their Objection [docket # 130] is OVERRULED. The Clerk of the Court is directed to close this case.

DATED this 25th day of September, 2008.

BY THE COURT:

_____
DALE A. KIMBALL
United States District Judge

3