IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Criminal No. 4:CR-96-0239 |
| | : | |
| v. | : | (Muir, J.) |
| | : | |
| DAVID PAUL HAMMER | : | **ELECTRONICALLY FILED** |

**UNITED STATES' BRIEF IN OPPOSITION TO
DEFENDANT'S MOTION FOR ACCESS OF VIDEOGRAPHER TO
SPECIAL CONFINEMENT UNIT
AT UNITED STATES PENITENTIARY TERRE HAUTE**

**Procedural History.**

Relevant procedural history for purposes of considering the issue raised herein begins on August 27, 2009.  On that day, this Court allowed until April 28, 2010 for defendant through counsel to present information to the United States Attorney as well as Capital Crimes Unit why the death penalty should not be sought at any future sentencing hearing.

In conjunction with those proceedings, on December 21, 2009, defendant filed a motion and supporting brief seeking access by a videographer to the Special Housing Unit at the United States Penitentiary at Terre Haute where defendant presently is incarcerated.  On December 23, 2009, this Court allowed for an extension of time until January 15, 2010, within which the prosecution could respond to this request.  Herewith presented is the position of the United States in this matter.

**Counter-Statement of Facts.**

Attached are several documents.  One is an Affidavit from the Captain at Terre Haute which addresses the security issues raised by defendant's request and distinguishes past circumstances where videotaping was allowed.  Government Exhibit 1.  Also attached is a decision of the Tenth Circuit Court of Appeals.  Government Exhibit 2.  It reversed authority advanced by defendant and attached to his brief.

Finally, for the Court's convenience attached is a previous trial exhibit.  In that transcript of a 1997 videotape at various times, Hammer expresses regret over Marti's death.

**Issue.**

Whether this Court should authorize the disruption of activities at federal death row by allowing a videographer to enter and make a visual presentation by David Paul Hammer which possibly could be used by his counsel in their presentation to Department of Justice officials in proceedings which are not established by any provision of federal statutory or constitutional law.

**Argument.**

<u>Introduction</u>

Hammer's attorneys provide in their pleadings a long retrospective on what has occurred in his case, including his possible execution.  (Brief of Defendant at 3-10.)  They also

allude to other claimed, similar circumstances as well as past practices of the Bureau of Prisons at the Terre Haute, Indiana Penitentiary and at the ADX in Florence, Colorado at different times.  (Brief of Defendant at 11-14.)

Their thoroughness obscures, in the view of the prosecution, an appropriate analysis of the issue presented to this Court.  It is submitted that this Court in reviewing this request should consider the present phase of proceedings, the reasons advanced by defendant why a videographer is needed, as well as the decidedly negative impact of allowing the defense request on that facility.  All of these factors, in the prosecution's view, lead to the conclusion that this Court should deny Hammer's request for relief.

1.    Where The Case Now Stands

It is advisable to compare proceedings as they are now with the instances of past videotaping in several situations referenced by the defense to determine whether those circumstances are similar.  In this respect, we start with prior videotaping in conjunction with this case.

Not only in September 1997 but also in early 2005, were videotapes of Hammer authorized and conducted.  (Brief of Defendant at 12-13.)  In both instances, these were made only in

conjunction with mental health evaluations of Hammer.[1]  The videotapes were aids for the triers-of-fact to determine the accuracy of testing or examining undertaken by Drs. Sadoff, Dubin, and Martell.  In the instant case, there is no mental health evaluation planned, merely a videographer to gather defendant's comments.

Hammer purportedly also was subject of a videotaped deposition, sometime in 2008 or 2009, in conjunction with the Utah-based Freedom of Information Act proceeding in federal court.  That proposed proceeding was sanctioned by Rules 27 and 30(a)(2), Federal Rules of Civil Procedure.  Those provisions are inapplicable to the instant situation.

Defense pleadings imply that Hammer was deposed at the Special Confinement Unit (hereinafter "SCU"), a fact which presumably he would know since individuals usually do not participate in multiple video depositions during their lives. (Brief of Defendant at 7-8.)  However, that event never occurred. Instead, the United States pursued an appeal of the September 25, 2008, order of Judge Dale A. Kimball to the United States Court of Appeals for the Tenth Circuit.  That ruling was reversed by a

---

[1]  Hammer also participated in an oral argument via video facilities before the Court of Appeals in 2000.  At that time, he was proceeding *pro se* and the panel of Circuit Judges felt it was advisable and necessary for them to hear directly from that most affected party. *United States v. Hammer*, 226 F.3d 229, 232-34 (2000).  In the present circumstances, defendant has able counsel to present his views.

panel of judges.  Government's Exhibit 2.  Contrary to the implication that proceedings in Utah support defendant's request, the Circuit Court, in a situation not distinct from the present one, concluded pursuant to Rule 26(b)(2)(C)(iii), Federal Rules of Civil Procedure, that Judge Kimball abused his discretion in ordering such invasive discovery when there was little likelihood for meaningful discovery to occur and where a significant burden would be thereby placed on the Bureau of Prisons. Government's Exhibit 2 at 28-29.

As noted by defense counsel, a person facing imposition of a death sentence, Juan Garza, had a videotape taken in conjunction with his request for clemency.  (Brief of Defendant at 13.)  Those proceedings in early 2001 at the old SCU occurred, pursuant to 28 C.F.R. § 1.10 *et seq.*  Presumably the Pardon Attorney or Attorney General, pursuant to 28 C.F.R. §§ 1.1 and 1.6(a), explicitly or implicitly determined that in those ultimate circumstances it was appropriate to receive such information from a person facing execution.  That is not Hammer's present circumstances.  Moreover, neither the present U.S. Attorney nor the Capital Crimes Unit specifically seek a videotaped presentation from Hammer.

As this Court is aware, pending at this time is the invitation by the U.S. Attorney's Office and Capital Crimes Unit (hereinafter "CCU"), to revisit their past decisions in 1997 and

1998 regarding whether it is appropriate to pursue the death penalty in defendant's case.  This procedure is not established by the Constitution or any federal law.  Instead, it is referenced in the United States Attorney's Manual (hereinafter "manual) at §§ 9-10.010-10.190.  However, even in that document, defendant's circumstances are somewhat unique and not specifically covered since he effectively with the consent of the United States is seeking reconsideration of decisions made more than a decade ago by former U.S. Attorney David Barasch and former Attorney General Janet Reno.

Decisional law has reviewed, both in the death penalty context as well as in other circumstances, the legal effect of the Justice Department's internal policies or Manual on criminal proceedings.  Most recently the Court of Appeals for the First Circuit in *United States v. Lopez-Matias*, 522 F.3d 150-155-56 (2008), reviewed a district court's order dismissing a death penalty notice, pursuant to 18 U.S.C. § 3593(a) for failing to comply with the Manual, and observed as follows:

> We need not consider whether counsel had [an opportunity to present evidence and argument in mitigation]. The Manual by its terms makes those procedures mandatory. But the first page of that manual warns that the guidelines do not create any rights.
>
> The Manual provides only internal Department of Justice guidance. It is not intended to, does not, and may not be relied upon to create any rights, substantive or

6

procedural, enforceable at law by
any party in any matter civil or
criminal. Nor are any limitations
hereby placed on otherwise lawful
litigative prerogatives of the
Department of Justice.

United States Attorneys' Manual, § 1.100. As
the district court acknowledged, we have held
that similar Department of Justice
guidelines, 'not mandated by statute or the
constitution, do not confer substantive
rights on any party.' *United States v.
Craveiro,* 907 F.2d 260, 264 (1st Cir.1990).
Other Circuits have held the same to be true
of the Manual. *See United States v. Lee,* 274
F.3d 485, 493 (8th Cir.2001) (United States
Attorneys' Manual not enforceable by
individuals); *Nichols v. Reno*, 124 F.3d 1376,
1376 (10th Cir.1997) (defendant has no
'protectable interest' in enforcement of
death penalty protocols); *United States v.
Myers,* 123 F.3d 350, 355-56 (6th Cir.1997)
('[A] violation by the government of its
internal operating procedures, on its own,
does not create a basis for suppressing . . .
grand jury testimony.'); *United States v.
Gillespie,* 974 F.2d 796, 800-02 (7th
Cir.1992); *United States v. Busher,* 817 F.2d
1409, 1411-12 (9th Cir.1987). While some
administrative regulations do create rights
in third parties, *see United States ex rel.
Accardi v. Shaughnessy,* 347 U.S. 260, 267, 74
S. Ct. 499, 98 L. Ed. 681 (1954), those
governing prosecutors enjoy greater
flexibility because the exercise of
prosecutorial discretion is a 'core executive
constitutional function,' *United States v.
Armstrong,* 517 U.S. 456, 465, 116 S. Ct.
1480, 134 L. Ed. 2d 687 (1996).

We conclude that a violation of the
Manual, by itself, would not give rise to the
sanction imposed here. We are reluctant to
interfere with internal prosecutorial
measures by elevating internal guidelines to
the level of a guarantee to defendants. Our
reluctance stems from a respect for the

> separation of powers, and also from practical
> concerns. If the government were to be
> punished for violations of its own internal
> guidelines, it would be more likely to write
> less exacting guidelines, or none at all.

It is appropriate to note as well that courts have acknowledged a lack of authority even to require the United States Attorney to grant any specified period of time within which to submit mitigation materials before the United States Attorney may send a recommendation to the Review Committee pursuant to U.S.A.M. 9-10.080; *United States v. Jackson*, 2008 W.L. 59559 at 2 (S.D.N.Y. 2006).  (Copy attached.)

In other contexts, notably the Petite Policy, which also is based on internal Department of Justice rules, courts, including Judge McClure of this Court, have concluded that criminal defendants have no enforceable rights.  *United States v. Jackson*, 327 F.3d 273, 295 (9th Cir. 2003)(affirming death penalty sentence); *United States v. Perales*, 838 F. Supp. 196, 200 (M.D. Pa. 1993).  Consequently, Hammer's request for a videographer is built on a dubious legal foundation.  He simply has no enforceable right to demand that the United States Attorney or the Review Committee consider any particular <u>form</u> of mitigating evidence.  Thus, this Court should not require the Warden at Terre Haute to acquiesce to their demand that a videographer be used for their presentation.

2.    The Basis For The Request

Since October of last year, defense counsel have suggested to the prosecution that they may wish to have a videotape taken of their client.  This could be used for inclusion in their presentation to the United States Attorney or the Capital Crimes Unit of the Justice Department relating to the Death Penalty protocol.

Defense counsel appropriately have been candid with all in that they are unsure whether the footage taken by a videographer will, in fact, be utilized.  (Motion at 1; 7 ("recording may be used" "possible inclusion;"); Brief of Defendant at 11 ("have available the option of . . . the video presentation."))  Up until the filing of the brief, the precise reasons for the videotaping had not been stated.  However, defense counsel stated their rationale as follows:

> As part of the videotape [presentation of mitigating evidence], the defense wants to have the opportunity to videotape David Paul Hammer concerning the changes in his life since July 24, 1998, and the sense of guilt and remorse he lives with on a daily basis as a result of the death of Andrew Marti.

(Brief of Defendant at 2.)  It is true, as Hammer's attorneys state that

> [N]either at the trial in June/July of 1998 nor at the evidentiary hearing on the 2255 Motion did [defendant] take the stand and testify concerning the death of Andrew Marti and his sense of remorse arising out of that incident.

(Brief of Defendant at 2.)  That defendant also alludes to July 24, 1998, when the jury returned its death recommendation, presumably is purposeful.  In fact the prosecution has an earlier videotape of Hammer expressing remorse about the victim's passing, and other, contemporaneous expressions of regret to consider.[2]

The videotape made in September 1997, the existence of which the defense makes passing reference (Brief of Defendant at 13), contained in addition to the hypnotic session which the jury saw at trial, "out takes."  These included Hammer's expressions of remorse at the death of Marti in the cell which they shared on April 13, 1996.  These may be found in Government Exhibit 36, a transcript utilized at both the trial and in the § 2255 proceedings.  A copy is attached for the Court's convenience.  At various times, Hammer expresses responsibility and regret for Marti's murder.  Government Exhibit 36 at 19; 22; 34.

Thus, to the extent that a former U.S. Attorney wanted in another case to have a face with a name (Brief of Defendant at 10), the deciders already possesses that information.  In fact, the prosecution has a videotape of Hammer as he appeared five years ago.  Under the circumstances, the need for a current view

---

[2]  Hammer also expressed remorse for killing Marti at his sentencing on November 4, 1998.  (Sentencing Transcript at 6-8.) This also occurred in passing during his presentation to the Third Circuit.  *United States v. Hammer*, 226 F.3d at 234.

or video of Hammer expressing remorse for an act committed almost 14-years ago is at best slight.

To the extent that any "update" is needed (Brief of Defendant at 2) from Hammer, this can be provided in written form.  As this Court may recall, shortly following the killing of Marti, Hammer wrote multiple letters to persons in the community, as well as notes to fellow inmates, about the sequalae of Marti's death.  Trial Exhibit Nos. 32; 33.1; 34.1; 35.2; 50-55. Consequently, this intelligent and articulate inmate, with the assistance or review of his counsel, is more than able to express his feelings in writing short of having them be preserved on and presented in the more intrusive method (from the Bureau of Prisons' perspective) of a videotape.

### 3.   Disruption of SCU

Boldly, Hammer claims that "there exists no legitimate penalogical basis for denial of the pending request."  (Brief of Defendant at 3.)  Their argument in this respect is as insubstantial as the basis for their claim that they have some right to present the mitigation evidence in any form which they deem is appropriate.

Defendant reviews past issues of pre-trial attorney access in 1996 and 1997, as well as those relating to his

scheduled execution[3] in 2004 and presumably derives from those generally successful challenges that "security concerns" of the Bureau of Prisons should be regarded as overblown and need not be seriously taken into consideration by this Court.  (Brief of Defendant at 3-11.)  But it does not follow that once an agency is wrong, its views in any future disputes should be given short shrift.  This is particularly true, since legitimate 6th and 8th Amendment considerations were applicable in those instances, where, as here, Hammer has no enforceable rights to present any particular form of mitigating evidence.  Moreover, the prosecution and Bureau of Prisons had not been involved in any federal execution since 1963, until the mid-1990's when that punishment was reinstated.  Consequently, there was a "learning curve" for all, including the courts and defense counsel.  *See e.g., Hammer v. Ashcroft*, 570 F.3d 798, 802-03 (7th Cir. 2009) (examining changes in death row prison policy on media access).  It is submitted that each issue should be viewed on its own merits.  That would include what is good penalogical practice at the SCU.

In turning to the Terre Haute particulars, it is well to bear in mind that in 2005 the new SCU opened.  (Motion at ¶

---

[3]  Part of Hammer's challenge to his planned execution in 2004, that the "cut away procedure" and injection of various lethal chemicals constituted "cruel and unusual punishment" subsequently has been rejected by the Supreme Court in *Baze v. Rees*, 553 U.S. 35 (2008).

19.)  It is true that a tour of the institution took place before any inmates were present.  Certainly, you cannot disturb with cameras a population of prisoners which does not yet exist.  Moreover, the article, defendant's exhibit 2 attached to the motion and dated February 25, 2005, does not suggest that reporters were allowed pell mell to visit all aspects of the SCU with video equipment.  Instead there were two still pictures taken, one of concertina wire and one of an unoccupied or a "typical" cell, highlighting the bunk, locker, bathroom facilities, and television found therein.  There is no guarantee that only innocuous features of SCU will be captured by the video.

Presently there are approximately fifty (50) inmates on federal death row scheduled for execution.  The affidavit of Captain Joynor indicates how allowing the videographer into the SCU would not only place a significant burden on staff but also have a disruptive influence on a unique population which would be difficult to control given their future.

In furtherance of his claim, defendant asserts that "the requested authorization" will have "no impact on guards, staff, or other inmates," "no impact on the allocation of prison resources" and "create no burden on staff."  (Motion at ¶¶ 28-29.)  While presumably counsel, and Hammer as well, list their experiences in visitation at Terre Haute's SCU (Motion at ¶¶ 30-

13

36), their view does not take into consideration the burdens created by those who supervise such proceedings.  Government Exhibit 1.

Defendant seeks to rely upon occurrences at the ADX when cameras were authorized to further cast doubt on the "security concerns" of Terre Haute's warden.  (Brief of Defendant at 13.)  Often this Court has heard repeated the refrain, "Death is Different."  By the same token the ADX is not to be confused with the SCU.  While the two institutions have many similar concerns, no one in Colorado is facing execution.

Federal courts in Southern Indiana, as well as the Seventh Circuit which supervises that district court, have noted that the SCU and its inhabitants present special and legitimate security concerns for which judicial deference is appropriate. *Hammer v. Ashcroft,* 570 F.3d at 803 (distinct press access policy); *Entertainment Network, Inc. v. Lapin*, 134 F. Supp. 2d 1002, 1018 (S.D. Ind. 2001).  Defense counsel alludes to *Turner v. Safely* 482 U.S. 78 (1987), as the standard by which the Bureau of Prisons' policy may be measured.  (Brief of Defendant at 7.) It is true, as noted by Hammer, "two prior decisions in the instant case also show that the relief requested may appropriately be granted notwithstanding asserted 'security concerns.'" (Brief of Defendant at 7.)  However, this statement does not fully review the *Turner v. Safely* analysis which, when

applied to Hammer's present request, demonstrates that the Bureau of Prisons' position should be upheld.

As observed by Judge Tinder, in *Entertainment Network, Inc. v. Lapin*, 134 F. Supp. 2d at 1017, "Even if it could be concluded that the challenged regulation infringes on a First Amendment Right, the regulation may be upheld."  This, of course, begs the question as to what is the legal basis for Hammer's right to have a videographer bring equipment into the SCU.  At the risk of repetition, the United States Attorney's Manual or the willingness of the prosecution and Department of Justice to consider mitigating evidence does not establish any legally enforceable opportunity to do so.  *United States v. Lopez-Matias, supra*.

Assuming *arguendo* defendant has some statutory or Constitutional right to have himself recorded with video equipment, this analysis should be undertaken.

> *Turner* listed four factors which are relevant to a determination of the reasonableness of prison regulations and practices: 1) Whether there is a valid, rational connection between the prison regulation and the legitimate, neutral governmental interest; 2) If alternative means of exercising the constitutional right remain open to prison inmates; 3) The impact an accommodation of the asserted right would have on the guards and other inmates, and on the allocation of prison resources; and 4) The absence of ready alternatives.  482 U.S. at 89-91, 107 S. Ct. 2254.

15

*Entertainment Network, Inc. v. Lapin*, 134 F. Supp. 2d at 1017. Government Exhibit 1 highlights the difficulties inherent in Hammer's request.  Not only are there problems associated with examining the desired equipment but acceding to will create enmity with others on death row.

The sworn statement also sets forth the impact, if Hammer's request were granted, on prison resources.  Even assuming that this Court discounts the SCU's security concerns and this burden, Hammer by his very nature cannot deny that "alternative means of exercising the constitutional right remain open" to him and "[t]he absence of ready alternatives."  If an inmate can co-found and maintain an Internet website, as defendant has through his "www.deathrowspeaks.info," then he can present written expressions of his present feelings about Marti's death to the United States Attorney and CCU.

**Conclusion.**

For the above-stated reasons, the United States respectfully requests that this Honorable Court deny defendant's request to

16

have a videographer enter the SCU to prepare possible mitigating

information.

                                        Respectfully submitted,

                                        DENNIS C. PFANNENSCHMIDT
                                        United States Attorney




                                        By s/Frederick E. Martin
                                        FREDERICK E. MARTIN
                                        Assistant United States Attorney
                                        PA ID 57455
                                        Herman T. Schneebeli Federal Bldg.
                                        240 West Third Street, Suite 316
                                        Williamsport, PA 17701-6465
                                        Tele: (570) 326-1935
                                        FAX: (570) 326-7916
                                        Electronic Mail:
                                        Fred.Martin@usdoj.gov

Dated:  January   15 , 2010

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA     :   Criminal No. 4:CR-96-0239
                             :
            v.               :   (Muir, J.)
                             :
 DAVID PAUL HAMMER           :   **ELECTRONICALLY FILED**

**CERTIFICATE OF COMPLIANCE**

Pursuant to Local Rule 7.8(b)(2), I hereby certify, based upon the word-count feature of the word processing system used to prepare  UNITED STATES' BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR ACCESS OF VIDEOGRAPHER TO SPECIAL CONFINEMENT UNIT AT UNITED STATES PENITENTIARY TERRE HAUTE  , that this brief complies with the word-count limit described in Local Rule 7.8(b)(2), in that the brief contains fewer than 5,000 words, to wit: 3,505  words.

                              Respectfully submitted,

                              DENNIS C. PFANNENSCHMIDT
                              United States Attorney



                              By s/Frederick E. Martin
                              FREDERICK E. MARTIN
                              Assistant United States Attorney
                              PA ID 547455
                              Herman T. Schneebeli Federal Bldg.
                              240 West Third Street, Suite 316
                              Williamsport, PA  17701-6465
                              Telephone:  (570) 326-1935
                              FAX:  (570) 326-7916
                              E-Mail: Fred.Martin@usdoj.gov

Dated:    January 15    , 2010

19

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


UNITED STATES OF AMERICA      :  Criminal No. 4:CR-96-0239
                             :
         v.              :  (Muir, J.)
                             :
 DAVID PAUL HAMMER        :  **ELECTRONICALLY FILED**


## CERTIFICATE OF SERVICE

     I hereby certify that I caused a true and correct copy of the foregoing

        **UNITED STATES' BRIEF IN OPPOSITION TO
DEFENDANT'S MOTION FOR ACCESS OF VIDEOGRAPHER TO
SPECIAL CONFINEMENT UNIT
AT UNITED STATES PENITENTIARY TERRE HAUTE and
CERTIFICATE OF COMPLIANCE**

to be electronically mailed on January   15  , 2010, to:

ADDRESSEE:      Ronald C. Travis, Esquire
                  rtravis@riederstravis.com

                  Michael Wiseman, Esquire
                  Michael_Wiseman@fd.org



                      S/Frederick E. Martin
                     FREDERICK E. MARTIN
                     Assistant United States Attorney

19