## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | NO. 4:96-CR-00239 |
| | : | |
| v. | : | |
| | : | (Judge Muir) |
| DAVID PAUL HAMMER | : | |
| | : | |
| Defendant | : | (Electronically Filed) |

## <u>REPLY BRIEF</u>

## <u>INTRODUCTION</u>

In the Brief in Opposition filed by the government, the government sets forth its response in a manner which differs from the format used in the original Supporting Brief filed by Hammer.  This Reply Brief will attempt to track the arguments raised by the government by following the format as used by the government.

1.      <u>Where the Case Now Stands</u>

On Pages 3 through 8 of the Government Brief in Opposition, the government appears to be suggesting that this court lacks the authority to enter an Order authorizing the videotaping which has been requested.  A similar type of assertion was made by the government back when the autopsy issue was being litigated and this assertion was properly rejected by this court.  At the present time the Hammer case is pending before this court and by agreement, approved by the court, the case is once again going through the authorization process.  This court has jurisdiction with respect to this prosecution and absolutely has the authority to enter an Order authorizing the taking of the videotaped statement of David Paul Hammer if the court finds it appropriate to do so.  The suggestion that this court should conclude it has no authority to order the requested video recording because the case is at the authorization is patently absurd.  While it is true that according to decisional authority the Death Penalty portion of the United States Attorneys' Manual has been held not to create any "rights," these internal policies are mandatory with respect to the Department of Justice.  Under these mandatory procedures, the defense team of the individual going through the authorization process has certain obligations to ensure that the procedures are meaningful.  Among the obligations of the defense team is for the defense team to create and submit a presentation to demonstrate why the instant prosecution should not be

pursued as a capital prosecution. In the instant case, the authorization road was previously traveled and the conclusion was the prosecution should be authorized as a capital prosecution. Exactly what factors led to that conclusion on the part of former Attorney General Reno is not known. However, with the prior authorization and the prior jury verdict, counsel believes that Attorney General Holder, as well as the currently acting United States Attorney for the Middle District and the Capital Crimes Unit will be well aware of the "history" of the instant case. In fact, on the last three occasions Attorney Travis appeared before the Capital Crimes Unit, AUSA Kinsey, who has been intimately involved with the appeals and the §2255 litigation, has been present for the defense presentations. Putting together a presentation which ultimately causes Attorney General Holder to sign off on the prosecution not being a death penalty prosecution is a daunting task. Although the government asserts that neither the present acting U.S. Attorney nor the Capital Crimes Unit has specifically sought a videotape presentation, no one knows what may or may not be significant to Attorney General Holder. From his own personal experience, Attorney Travis is able to share with the court the fact that he currently has pending a capital prosecution before Judge McClure in which Attorney General Holder rejected the local recommendation that the case not be a capital prosecution and has directed the pursuit of the death penalty, notwithstanding the recommendation of the local office. Apparently the concept of

what type case should be pursued as a capital prosecution is somewhat different in the eyes of Attorney General Holder than in the view of the local United States Attorney.

Charged with the daunting responsibility of attempting to ultimately convince Attorney General Holder that there should be no penalty phase retrial, the defense team has spent significant time in attempting to put together a compelling presentation which hopefully will lead to that result. As part of the presentation to be made, the defense team would like to have the option of presenting via video statements directly from David Paul Hammer, the most affected party.

In order for the defense attorneys to comply with the ABA standards and in order for David Paul Hammer to be effectively represented during the authorization process, the good faith videotaping request made by the defense attorneys serves as a legitimate basis for this court to exercise its discretion in determining whether to allow the requested videotaping. Certainly the request currently under consideration is a more legitimate request than that of CBS to take electronic equipment in to interview Timothy McVeigh, or the arrangements made to televise the execution from Indiana to Oklahoma City, neither of which was founded on any particular "right." The request for authority to videotape David Paul Hammer at the very least is as legitimate as Dr. Martell creating a videotape

in the living quarters of the SCU in conjunction with his mental health evaluation of David Paul Hammer.

On Page 8 of its brief, the government points out that the Hammer team has no enforceable right to demand that the local United States Attorney or the Capital Crimes Unit consider any particular form of mitigating evidence. What the United States Attorney or the CCU chooses to review is in fact out of the control of the defense team. If the local United States Attorney or the CCU refuses to review the video presentation which the Hammer team is in the process of creating, all the Hammer team can say is, "Shame on you." The defense team cannot believe that anyone charged with the responsibility of being part of the decision making process as to whether another human lives or may potentially be executed would not want to review anything and everything which is submitted for consideration. According to the protocol established, which creates no "rights" for David Paul Hammer, the entire mitigation submission submitted on behalf of David Paul Hammer becomes part of the information which ultimately ends up in the hands of Attorney General Holder. One would hope that at the very least Attorney General Holder would want to look into the eyes of David Paul Hammer as he listened to the words being uttered, rather than relying on some written submission.

The government also discusses the Tenth Circuit decision handed down with respect to the Trentadue litigation and seems to suggest that the decision by Judge

Kimball was reversed by the Tenth Circuit on the basis that it was inappropriate to order the depositions for reasons of security. While it is true that the Court of Appeals for the Tenth Circuit reversed the Order of the District Court in Utah insofar as having authorized the depositions, a review of Exhibit 2 attached to the government's brief in opposition shows that the Tenth Circuit did not do so because it found that the security interest belatedly raised before the District Court were meritorious and served as a legitimate basis for not allowing a deposition of David Paul Hammer to be taken at the SCU. Although the Tenth Circuit notes that the government argued that the court should prohibit the video recording of the depositions out of concern for prison security, the Tenth Circuit gives no weight to this assertion in determining the District Court should be reversed. The basis for the reversal is that there is no showing the ordered depositions would actually produce relevant evidence. Since there was no showing that the depositions would likely produce relevant evidence, the Tenth Circuit found it to be an abuse of judicial process for the depositions to be ordered. The government eludes to the "invasive discovery" ordered by the judge and appears to imply that it was the ordering of the depositions at the two federal facilities which was found to be the "invasive discovery" ejected by the Tenth Circuit (Pg. 5 of Government Brief in Opposition). However, a review of the Tenth Circuit opinion fails to show any language in the 30 page opinion which is critical of Judge Kimball's Order

directing the Nichols deposition at ADX or the Hammer deposition at the SCU.  To the extent the holding of the depositions is discussed, the discussion concerns the fact that neither of the individuals to be deposed would have any knowledge with regard to FBI procedures in filing and searching for records and that this "knowledge" is the only relevant information in FOIA litigation (Government Exhibit 2 at 29).

Since the Trentadue litigation in Utah appears to be the most recent decision by a district court on a similar subject, Hammer has secured a copy of the belated declaration of Thomas B. Smith submitted in conjunction with the "security concern" assertions in the Trentadue case.  A copy of the Smith declaration is attached to this Reply Brief as Exhibit 1.  A comparison of the Smith declaration to the Joyner declaration will assist the court in assessing the legitimacy of the "security concerns" being asserted via the Joyner declaration and the government brief.

It is interesting to note that the Declaration submitted in the Trentadue case the language of Paragraph 12 is the exact same language which was inserted in the Joyner declaration at Paragraph 14, including the identical laundry list.  Nowhere in the declaration submitted in the Trentadue case is it asserted there was any potential for damage to the equipment or a potential for contraband to be secreted in the equipment as set forth in Paragraph 15 of the Joyner declaration.  In the

declaration from the Trentadue case assertions similar to what are found in Paragraph 16 of the Joyner declaration are absent.   Finally, the declaration submitted in the Trentadue case does not assert any concern about equal treatment of other individuals in the SCU, other inmates expecting similar requests to be approved, or an enhancement of the level of notoriety of Hammer.   Since the person to be videoed in both instances was David Paul Hammer, the physical location where the video was to take place is the same, and the same entry process for the equipment and the operator would be the same, one has to wonder why the Smith declaration submitted in Trentadue is devoid of the "security concerns" found in the Joyner declaration.   One explanation for the difference in the declaration content is that the Smith declaration did not serve to convince Judge Kimball to reconsider and deny the deposition taking the BOP came up with some additional "security concerns" to support its opposition to the request for permission to videotape David Paul Hammer.

Although the government suggests the defense was attempting to "imply" that the approved deposition for Hammer was actually taken, (Brief of government at Pg. 4) this conclusion by the government is totally inaccurate. The discussion of the Trentadue litigation by the defense was for the purpose of advising the court that the "security concern" issue was belatedly raised before the District Court in Utah, these concerns were addressed by the federal court in posing limitations on

8

what could be videoed as part of the taking of the depositions.  See Exhibit 2 to original brief.  In the Declaration of Hector Joyner (Government Exhibit 1 to its Brief in Opposition) Paragraph 14 contains a laundry list of items which could be photographed.  None of the items listed in Paragraph 14 (a) through (m) are items which the Hammer defense team has any interest in recording.  The list is the same list from paragraph 12 of the Smith Declaration.  When this concern about the photographing of various items was raised in the Trentadue litigation, the court disposed of the express concern by specifically prohibiting the video equipment being used anywhere on the complex except in the specific room where the deposition was to be taken.  The District Court in Utah offered additional protection against filming unauthorized items by allowing BOP personnel to meet the individuals who would be using the equipment at a location outside the complex and at that point the BOP staff could take possession of the equipment and be in charge of the equipment from that point until it arrived at the location where the deposition was to be recorded.  Hammer certainly has no objection to similar type of restrictions being imposed in conjunction with the videotaping of his comments.

The Joyner affidavit also alludes to the possibility that during the videotaping the privacy of other individuals may be violated.  An order that the

9

videoing not record the image of any person other than Hammer will solve this concern.

The Joyner affidavit also alludes to the fact that there would be a potential for damage to the equipment when it is required to go through the x-ray machine as part of the security check.  Although the SCU is currently located in a different building from where it was located at the time the McVeigh 60 Minute interview occurred, the Garza videotaping occurred, and the Dr. Martell videotaping occurred, according to counsel's recollection, the x-ray machine procedure is essentially the same at the new SCU as it was at the old building.  Hammer would assume that this same "potential for damage" existed with respect to those filming opportunities, but nonetheless they went forward.  Hammer assumes that the equipment used in conjunction with the McVeigh interview, the Garza videotaping and the Martell videotaping made it through the x-ray machine intake procedure without any damage or otherwise the fact there was damage would have found its way into the Joyner declaration.  Hammer would submit that the equipment which would be necessary to videotape David Paul Hammer is significantly less than the equipment CBS would have brought into the old SCU for purposes of the 60 Minutes segment.  If the BOP is seriously concerned that the equipment will be damaged, accidentally, when it passes through the x-ray machine and thus the BOP

would be exposed to litigation, the Hammer team would secure a release for accidental damage from the owner of the equipment.

The Joyner affidavit also asserts the possibility that some sort of contraband could be secreted in the equipment. Hammer assumes this same concern existed with respect to the equipment used in conjunction with the McVeigh, Garza and Martell videotaping which occurred at the old SCU. Once again, Hammer assumes that no contraband was found to be secreted in any of the equipment brought in, in conjunction with any of those recordings or otherwise this information would have been part of the Joyner affidavit. The Hammer defense team understands that the equipment would be subject to thorough search by employment of the x-ray machine as well as via physical inspection of the equipment. The Hammer team has absolutely no reason to believe that the individuals who would be involved in the recording of the video statement are individuals who would have any desire to try to smuggle in contraband. The entrance area for individuals traveling to the SCU is the same entrance area used by visitors who will be interacting with individuals housed at the United States Penitentiary. Additionally, mail consisting of letters and packages arrive at the facility on a daily basis and are subjected to screening before allowed into the institution. Counsel for Hammer has not observed the mail screening process at United States Penitentiary Terre Haute, but at other United States Penitentiaries the screening process for incoming mail

11

appears to be that the mail is run through the x-ray machine in order to determine whether any sort of contraband is contained within the mail.  Aside from the fact the defense team believes it to be unreasonable for the BOP to have a concern that the individuals who would be involved in the videotaping would try to smuggle in contraband, the contraband detection devices in place are an adequate guard against contraband being smuggled in with the equipment.

Paragraph 16 of the Joyner declaration describes the process which would be employed to allow access to the SCU for the individuals involved in the videotaping.  The process described in Paragraph 16 sounds to the Hammer defense team exactly like the process which is followed when members of the defense team have visited Hammer at the SCU.  It would appear that the escort process for the video operator to travel to the SCU is no different from the process employed with respect to any other visitor to the SCU.  The court should also be aware that if the videotaping is approved, the date and time for the videotaping to take place will be prescheduled with staff at the SCU.  The defense team will schedule the videotaping on a date and time which causes the least disruption of the normal operating procedures of the SCU.  The Joyner declaration also alludes to the videotaping done by the government expert and the Garza videotaping having been conducted under "controlled circumstances."  The declaration does not explain exactly what that phrase means.  However, the Hammer defense team

12

is not opposed to the same type of control being employed with respect to the request to be allowed to shoot the video that the team wants to shoot.

In the Joyner declaration he asserts he has some concern the video of David Paul Hammer will be utilized for some purpose other than the purpose set forth in the Motion. This rank speculation is extremely offensive to the members of the Hammer defense team. We have sought court authority to videotape David Paul Hammer in order to possibly include his statements in the video to be presented as part of the authorization process. For Joyner to essentially assert that the members of the Hammer defense team are lying to the court is outrageous. His comment concerning the existence of the Death Row Speaks website is apparently made to attempt to suggest that the real reason for seeking video access is to create a videotape to be made available to the public via the website. No member of the Hammer Defense team has any intention to turn the footage over to any website. In the same paragraph Joyner also suggests that the shooting of the requested video would have a "disruptive influence" and lead to other inmates making similar requests. Missing from the Joyner declaration is any information that the 60 Minutes broadcast permitted with respect to McVeigh, the Juan Garza videotaping or the videotaping conducted by the government expert served as a "disruptive influence." The declaration also fails to set forth that there is currently housed in the SCU any other prisoner who is going through the authorization process.

13

Frankly, if there are other inmates in the SCU who are going through the authorization process and the defense teams for those inmates believe it is appropriate to create a videotape of the inmate being considered for possible death penalty authorization, they should get authorization to create a video. The totality of the various assertions set forth in Paragraph 12 of the declaration are the rankest type of speculation one could engage in and supports the conclusion that since the BOP cannot set forth a legitimate reason for the denial of the request, let's return to a McCarthy type of attack and hope that the judge will join with us in seeing "communists under the bed." However the court elects to exercise its discretion with respect to the video request, it is hoped that the feeble, totally unsupportable rank speculation included in Paragraph 12 of the declaration is accorded no weight.

2.    The Basis For The Request

In this portion of its submission the government appears to be conceding that David Paul Hammer has acknowledged his remorse over the years and therefore videotaping David Paul Hammer addressing the changes in his life since July of 1998 and the remorse he feels is unnecessary. The Hammer defense team appreciates the concession of remorse by the United States, but this certainly was not something conceded by the government during the first penalty phase trial even though it possessed "that information" according to Government Exhibit 36, Pages 19, 22, and 34.

A review of Page 19 of G36 shows that there is no discussion of remorse. The acceptance of responsibility language, which presumably the government is noting, is responsibility being taken by David Paul Hammer for criminal conduct which occurred earlier in his life. Language whereby David Paul Hammer accepts responsibility for the crimes he committed in the state of Oklahoma can hardly be deemed "possesses that information" as asserted by the government. On Page 22 David Paul Hammer does say he wishes the Marti killing had never happened. On Page 34, there is no real discussion about remorse, but apparently the government takes the position that David Paul Hammer's statement, "He didn't deserve to die" allows the government to "possess that information" concerning the extreme remorse which David Paul Hammer lives with on a daily basis. The suggestion that these limited comments constitute a sufficient basis for the current acting United States Attorney, the Capital Crimes Unit or Attorney General Holder to assess whether David Paul Hammer has genuine and serious remorse or not would be laughable if this was not such a serious case. This "evidence of remorse" which the government argues is a sufficient commentary on the remorse of David Paul Hammer was previously described in closing arguments as "modified, modest and minimal remorse" (Volume 27 of Trial, dated July 21, 1998, Pg. 138 at Lines 15-16). The remorse expressions which the government now asserts are adequate

were demeaned throughout the government's closing when the government urged the jurors to reject the mitigating factor of remorse.

The suggestion by the government that the concept of remorse as experienced and felt by David Paul Hammer can be communicated to the "deciders" in written form with the assistance of the defense team is an absurd concept. At a trial or hearing it is not merely the spoken words, but also the opportunity to view the speaker and to examine the speaker's body language which goes into the credibility determination to be made. As part of the standard jury instructions with regard to credibility, the jurors are told to take into consideration not just the words spoken but also the observations of the speaker as the words are spoken. Submitting something in writing, which may have been edited or ghost written by the defense team, would be devoid of value. The government's argument in this regard seems to be born out of desperation. It is respectfully submitted that the court should assign no weight to the government's assertion that the submission of Pages 19, 22, and 34 from G36 and some other written document signed by David Paul Hammer would be an appropriate substitution for the opportunity to present the spoken words of David Paul Hammer via video recording.

16

3.    Disruption of SCU

The Hammer team agrees with the government position that just because there have been prior occasions in this case where the government's assertion on behalf of the BOP that security concerns and "bureau policy" should not be disturbed, should cause this court to automatically reject expressed security concerns if found to be legitimate.  The Hammer team was not pointing out these prior instances where this court directed that the BOP allow certain things to take place, even though security concerns served as the basis for the BOP saying no, in order to mount a "little boy crying wolf" argument.  The Hammer team understands that the SCU is a special component of the federal penal complex and that there may exist legitimate reasons for restricting access to the SCU.  The Hammer team just does not agree with the perspective of the BOP, as annunciated by the government, that the request which has been made is an intrusive, disruptive request with the potential of violating the privacy of other inmates or staff, will result in creating a video which will allow for the creation of a basic blueprint of the complex and institution so that a plan to assault or escape from the SCU can be fashioned or will result in clamoring by other individuals housed in the SCU to be allowed to create similar videos.    The initial request of the Warden that the videotaping be agreed to was undertaken because the Hammer defense attorneys reasonably believe that the option of having video statements of David Paul

17

Hammer concerning the remorse he feels, the changes he has undergone since July 24, 1998, and the positive activities he has participated in since the death verdict was returned is a necessary part of presenting the most compelling information to the "deciders" in our effort to avoid having to go through the time, emotional distress, and monetary cost of a second penalty phase trial.

The Hammer team does not dispute that the other instances referenced in the Motion and Brief where video or still cameras were used at the SCU or at other federal facilities were different from the current request.  The prior occasions when video equipment and cameras which take still photographs were used by non-BOP personnel were brought to the attention of the court so that the court would be aware of the fact that when it wants to, the BOP has been able to accommodate videotaping as well as the taking of still photographs at the SCU and at other high security federal institutions.  Of interest to the Hammer defense team is that in the government brief as well as in the Joyner declaration there is absolutely no mention made of the 60 Minutes segment involving Timothy McVeigh which was broadcast by CBS nationwide.  The McVeigh television broadcast was not part of a mental health evaluation nor was it part of a clemency proceeding.  Also absent from the Joyner declaration is any reference to the fact the execution of Tim McVeigh was televised from the execution chamber to Oklahoma City so that individuals in Oklahoma City could watch Tim McVeigh be put to death.

Although the Hammer team cannot list with any degree of accuracy the items of equipment which had to be processed, inspected, and apparently approved without being damaged, it is abundantly clear that the electronic equipment would be well in excess of the video equipment which would be needed in order to make the David Paul Hammer video. Somehow the concerns expressed in Paragraphs 14, 15, and 16 were not sufficient to keep the electronic equipment from being allowed into the SCU so that both of the McVeigh activities could be televised. None of these concerns as expressed in the Joyner declaration served as a basis for preventing government expert Dr. Martell from bringing into the institution a video camera with assorted equipment, two briefcases filled with assorted test equipment, a Gateway laptop computer with assorted equipment, and a cellular telephone. The Joyner declaration also alludes to the possibility for disruption and the creation of celebrity status for David Paul Hammer if the videotaping is allowed, yet offers no evidence that either televised session with Tim McVeigh, the videotaping of Juan Garza, or the videotaping back in the housing area at the SCU created any sort of disruption or created any sort of celebrity status for any of the involved inmates that served to cause any sort of disruption within the SCU. When one views the Joyner declaration, in light of what is known to have taken place in the SCU, the expressed concerns would seem to be makeweight. The video access sought by the Hammer team does not involve the video equipment

being taken into the actual housing area where the other residents of SCU are held. Reading Paragraph 9 of the Joyner declaration, it appears that the information given to Joyner concerning the videotaping was either inaccurate or he inaccurately describes what happened.  As part of the Dr. Martell videotaping, not only was there videotaping done of David Paul Hammer outside of the housing area while the mental health evaluation was being conducted, there was also videotaping done at David Paul Hammer's cell.  The videotaping done by Dr. Martell certainly involved more than "the expert put up a tripod and videotaped."  That may have been what occurred at the location where the mental health evaluation took place, but for Dr. Martell to have videotaped David Paul Hammer's cell, the staff would have had to have escorted Dr. Martell, with video equipment, from the visiting area back into the housing area.  The videotaping which is being sought via the Motion will involve much less staff involvement and have much less of an opportunity to cause any sort of disruption than what Dr. Martell was permitted to do.

## CONCLUSION

The entry into the SCU at Terre Haute will involve the same entry procedure which is currently employed with respect to the entry of any other visitor to that unit. The procedure for entry of the individuals to be involved in the videoing will not differ in any way from any other visitors to the SCU, legal or social.  The only difference will be that the video equipment will also be entering the institution.

Judge Kimball established a procedure which would eliminate the security concerns with respect to the videotaping of areas on the complex or in the building itself other than the videotaping of David Paul Hammer. The shutting down of the corridors and the escorting of the individuals and the equipment to the visiting room in the SCU appears to be the exact same procedure which is followed in escorting any visitor to the SCU. Since neither the Smith declaration in Trentadue nor the Joyner declaration submitted in this case indicate that there was any problem with contraband being attempted to be smuggled in during any of the earlier videoing occasions which occurred at the SCU, old or new, the Hammer team assumes that the BOP has the ability to undertake a thorough and proper search of the equipment which will be brought into the institution in conjunction with the videotaping.

It is respectfully requested that this Court enter an Order directing that the requested videotaping be approved under what the Court considers to be appropriate security measures.

Respectfully submitted,

/s/ Ronald C. Travis, Esquire

Ronald C. Travis, Esquire
PA ID#:  08819
161 West Third Street
PO Box 215
Williamsport, PA  17703-0215
(570) 323-8711 (telephone)
rtravis@riederstravis.com

21

/s/ Michael Wiseman, Esquire
_____

Michael Wiseman, Esquire
Supervising Assistant Federal Defender
PA ID#:  75342
Suite 545 West – The Curtis Building
Independence Square West
Philadelphia, PA  19106
(215) 928-0520
Michael_Wiseman@fd.org

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA     :
       :     NO. 4:96-CR-00239
       :
    v.        :
       :     (Judge Muir)
DAVID PAUL HAMMER     :
       :
    Defendant        :     (Electronically Filed)

## CERTIFICATE OF SERVICE

AND NOW comes Ronald C. Travis, Esquire, Attorney for Defendant, and

certifies that a true and correct copy of the foregoing Reply Brief has been served

upon AUSA Frederick Martin, Federal Building, Suite 316, 240 West Third Street,

Williamsport, PA 17701, via ECF, or, if necessary, by first class mail, postage pre-

paid, this 29th day of January, 2010.

          RIEDERS, TRAVIS, HUMPHREY, HARRIS,
            WATERS & WAFFENSCHMIDT

          /s/ Ronald C. Travis, Esquire

          Ronald C. Travis, Esquire
          PA ID#:  08819
          161 West Third Street
          PO Box 215
          Williamsport, PA  17703-0215
          (570) 323-8711 (telephone)
          (570) 323-4192 (facsimile)
          rtravis@riederstravis.com