UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | : | No. 4:96-CR-239 |
| v. | : | Honorable Joel H. Slomsky |
| DAVID PAUL HAMMER, | : | Capital Case |
| Defendant | : |  |

**BRIEF IN SUPPORT OF HOLDING THE FDPA UNCONSTITUTIONAL FOR ITS FAILURE TO PROVIDE THE STRUCTURE WHICH PERMITS JURORS TO MAKE A REASONED CHOICE BETWEEN THE SENTENCE OF LIFE IN PRISON WITHOUT THE POSSIBILITY OF RELEASE, AND DEATH**

The FDPA has created a scheme that mixes concepts, burdens of proof, and an overall process which is likely incomprehensible to jurors.  In the penalty phase of the trial, jurors:

- indoctrinated in the traditional culture of unanimity will be expected to understand that, unlike in the guilt phase, a lack of unanimity is not a failure but a legally cognizable outcome;

- schooled in the burden of proof in the guilt phase, *beyond a reasonable doubt*, will be expected in the penalty phase to apply that burden to aggravating factors and another burden, *preponderance of the evidence*, to mitigating factors;

- will be expected to segregate the mental state threshold factors from aggravating and mitigating factors;

1

- will be expected to segregate the mental state threshold factors from the weighing process; and,

- are required, under the FDPA, to determine at what point aggravating factors outweigh mitigating factors "sufficiently" to justify a sentence of death.

It is unreasonable to expect even the most conscientious and reasonably intelligent jurors to parse this melange of concepts and come out with an understanding of the process or a principled verdict.  The probability of confusion renders the FDPA to be unconstitutional.  In short, capital determinations under the FDPA have returned to the era of un-guided discretion.

Because death is qualitatively different from other forms of punishment, the greater need for the reliability of the process by which a death sentence is arrived at has been long recognized.  E.g., Woodson v. North Carolina, 428 U.S. 280, 303-05 (1976).  The Eighth and Fourteenth Amendments therefore require that "where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." Gregg v. Georgia, 428 U.S. 153, 189 (1976) (opinion of Stewart, Powell, and Stevens, JJ.).

A death penalty sentencing scheme that creates an unreasonable risk that jurors will misunderstand their role and their assignments violates the Eighth Amendment

and the Due Process Clause.  See Simmons v. South Carolina, 512 U.S. 154 (1994).

In order for a jury's decision to impose a death sentence to withstand Eighth

Amendment scrutiny, the jury's discretion must be "suitably directed and limited so

as to minimize the risk of wholly arbitrary and capricious action."  Godfrey v.

Georgia, 446 U.S. 420, 427 (1979).

Numerous studies demonstrate that jurors, no matter how sincere and well-

intentioned, misunderstand what they are supposed to do during the penalty phase of

a capital trial.  In one study the authors interviewed 57 capital jurors from 19 trials

conducted under the California system that is very similar to the FDPA construct.  See

C. Haney, L. Sontag and S. Constanzo, *Deciding to Take a Life: Capital Juries,*

*Sentencing Instructions, and the Jurisprudence of Death*, 50 JOURNAL OF SOCIAL

ISSUES 149-176 (1994).  The study found, in part:

- One third of the California jurors sampled focused in the penalty phase discussion solely on the nature of the crime itself in a way that essentially created a presumption of death;

- For many of the jurors, the absence of mitigation was the only reason given for the imposition of a death sentence, shifting the burden to the accused;

- The sampled jurors used their instructions to limit their consideration of some of the evidence admitted during the penalty phase, and to insulate themselves from the impact of their decision;

- Many of the sampled jurors dismissed mitigation evidence outright because they believed that mitigation evidence failed to "fit into" the

3

rubric contained in the instructions, indicating a failure to understand what constituted mitigating evidence;

• 80% of the sampled jurors rejected mitigation evidence from their consideration because it did not directly reduce the defendant's responsibility for the crime;

• 60% of the sampled jurors rejected mitigation evidence because it did not completely account for the defendant's actions;

• Less than one third of the interviewed jurors demonstrated a workable understanding of what constituted mitigation evidence; and

• 80% of the juries returning a death verdict did so believing that life imprisonment without the possibility of parole did not really mean life without parole.

Other studies have demonstrated a similarly alarming and comprehensive misunderstanding of the sentencing mission in general, and mitigation in particular, among jurors deciding death penalty cases. See, e.g., C. Haney and M. Lynch, *Comprehending Life and Death Matters: A Preliminary Study of California's Capital Penalty Instructions*, 18 LAW AND HUMAN BEHAVIOR 411-436 (1994); *Dictionaries and Death: Do Capital Jurors Understand Mitigation?*, UTAH LAW REVIEW 1 (1995); J. Luginbuhl, *Comprehension of Judges' Instructions in the Penalty Phase of a Capital Trial: Focus on Mitigating Circumstances*, 16 LAW AND HUMAN BEHAVIOR 203 (April 1992); M. Constanzo and S. Constanzo, *Jury Decision Making in the Capital Penalty Phase: Legal Assumptions, Empirical Findings and a Research Agenda*, 16 LAW AND HUMAN BEHAVIOR 185 (1992).

Juries in capital cases often believe, completely erroneously, that once an aggravating factor has been found, death is mandatory.  See, e.g., U. Bentele and W.J. Bowers, *How Jurors Decide on Death: Guilt is Overwhelming; Aggravation Requires Death; and Mitigation is No Excuse*, 66 BROOKLYN L.REV. 1011, 1031-41 (2001).[1]

Indeed, statistically valid surveys of capital-case jurors show that a substantial number of jurors who actually serve on capital cases *automatically* vote for death if the defendant is found guilty of murder.  See, e.g., W. S. Geimer & J. Amsterdam, *Why Jurors Vote Life or Death: Operative Factors in Ten Florida Death Penalty Trials*, 15 AM. J. CRIM. L. 1, 41 (1989), ("A significant number of jurors in death penalty cases believed that the death penalty was mandatory or presumed for first degree murder" . . . "In the cases in which the jury  recommended death, over half of the jurors believed that death was to be the punishment for first degree murder, or at least that death was to be presumed appropriate unless defendant could persuade the jury otherwise");  S. P. Garvey, *Aggravation and Mitigation in Capital Cases: What do Jurors Think?*,  98 COLUMBIA L.REV. 1538 (1998) ("Many jurors wrongly think

---

[1] The article draws on the findings of the Capital Jury Project, an ongoing study funded by the National Science Foundation of decision-making by actual jurors in capital cases.  As noted in the article, at the time it was written, the ongoing CJP had completed interviews of 1,155 capital jurors from 340 trials in 14 states.  66 BROOKLYN L.REV. at 1017.  For a full description of the Project, and its methodology, see W.J. Bowers, *The Capital Jury Project: Rationale, Design & Preview of Early Findings*, 70 IND. L.J. 1043, 1079 (1995).

they must return a death sentence if they find the defendant's crime was especially heinous, or the defendant is especially likely to present a risk of future danger"); T. Eisenberg, S. P. Garvey & M. T. Wells, *Jury Responsibility in Capital Sentencing: An Empirical Study*, 44 BUFF. L. REV. 339, 360 (1996) ("Nearly one-third of the jurors were under the mistaken impression that the law required a death sentence if they found heinousness or dangerousness, a result replicated in the multi-state study of the interview data"); W. S. Bowers, *The Capital Jury Project: Rationale, Design and Preview of Early Findings*, 70 IND.L.J. 1043, 1091, n. 32 (1995) ("Many jurors believe that the death penalty is mandatory if the crime is heinous or vicious"); W. J. Bowers, M. Sandys & B. Steiner, *Foreclosing Impartiality in Capital Sentencing: Jurors' Predispositions, Attitudes and Premature Decision-Making*, 83 CORNELL L.REV. 1476 (1998) ("There appears to be a presumption that clear unequivocal proof of guilt justifies the death penalty); T. Eisenberg and M. T. Wells, *Deadly Confusion: Juror Instructions in Capital Cases*," 79 CORNELL L. REV. 1, 12; 38, *n*. 12 (1992) ("There is a 'presumption of death'"). These and other studies show that jurors in death penalty cases misunderstand what they are permitted to consider much more often than not, and that instructions rarely cure the profound misunderstandings.

The Capital Jury Project (CJP), is a consortium of studies of the methods of death penalty juries over a long period of time. Supported by the National Science

Foundation, the CJP had, by 2003, interviewed 1201 members of 354 different juries sitting in death penalty cases in 14 states.  See W. Bowers and W. Foglia, *Still Singularly Agonizing: Law's Failure to Purge Arbitrariness from Capital Sentencing,* 39 CRIM. LAW BULLETIN 51 (2003) [2]

Those findings include:  the propensity (more than 50% of the time) by juries to decide the penalty issues before the penalty phase begins, meaning that the jurors never allow mitigation into their deliberations; a comprehensive lack of understanding of what constitutes mitigation and how it applies; a broad-based lack of understanding of the instructions given by the judge; and that the jury decision-making process in death penalty cases is so flawed that it violates constitutional principles.  For example, the CJP's comprehensive, on-the-ground, research on these issues demonstrate that even in jurisdictions in which the jurors are specifically instructed that they do not have to unanimously find mitigating factors, or that mitigating factors are not restricted to a statutory list, a terrifying percentage of the jurors never grasped those critical features of the law.  39 CRIM. LAW BULLETIN at 68-69.

The CJP's findings provide a window into a process which has been designed with as much care as this politically sensitive issue permits, but which in practice is

---

[2] In June of 2007, a New Mexico state district judge dismissed the "death notice" in a case, in part, because of the findings of the CJP.  See State v. Dominguez, D-0101-CR 200400521, State v. Good, D-0101-CR-00522, order entered June 8, 2007.

grossly arbitrary, unfocused and very often influenced by racial factors. The CJP underscores what seems obvious – that this process is insufficiently narrowed and focused to be constitutional. A jury's decision on whether or not a defendant should be put to death appears to have little to do with the instructions given by the court or the care with which the process has been constructed or managed.

The Supreme Court's decisions in various death penalty cases are based on assumptions shown by the CJP's research to be unfounded. For example, in <u>Boyde v. California</u>, 494 U.S. 370 (1990), the Court's decision was based on inaccurate assumptions about how the jurors assessed categories of information presented during trial. Likewise, the court's decision in <u>Tuilaepa v. California</u>, 512 U.S. 967, 976 (1994) included the conclusion that instructions given to the penalty phase jurors to guide their handling of aggravating factors, mitigating factors and the various burdens of proof were "phrased in conventional and understandable terms." Conventional as the instructions may be, the CJP research clearly demonstrates that they are not understandable to jurors.

In <u>Tuilaepa</u>, the Court said that whether a penalty phase instruction is constitutional depends on whether it has a "common sense core of meaning . . . that criminal juries should be capable of understanding." <u>Id.</u> 512 U.S. at 975. The perhaps

most shocking lesson from the CJP is that capital juries are incapable of understanding and applying the trial court's instructions.

For each of these reasons, the complex and confusing process under the FDPA violates Due Process and the Eighth Amendment. This Court should declare the FDPA unconstitutional and vacate the capital prosecution.

Respectfully submitted,

/s/ Ronald C. Travis, Esquire
Ronald C. Travis, Esquire
Rieders, Travis, Humphrey, Harris,
Waters & Waffenschmidt
161 West Third Street
PO Box 215
Williamsport, PA  17703-0215
(570) 323-8711 (telephone)
(570) 323-4192 (facsimile)
rtravis@riederstravis.com

/s/ Anne Saunders, Esquire
Anne Saunders, Esquire
Assistant Federal Defender
Federal Public Defender
Middle District of Pennsylvania
100 Chestnut Street, Ste. 300
Harrisburg, PA  17101
(717) 782-3843 (telephone)
(717) 782-3966 (facsimile)
Anne_Saunders@fd.org

/s/ Michael Wiseman, Esquire
Michael Wiseman, Esquire
James McHugh, Esquire
James Moreno, Esquire
Federal Community Defender
Eastern District of Pennsylvania
Suite 540 – The Curtis Center
Philadelphia, PA  19106
(215) 928-1100 (telephone)
(215) 928-0826 (facsimile)
Michael_Wiseman@fd.org
James_McHugh@fd.org
James_Moreno@fd.org

Date:  May 23, 2011

## Certificate of Service

I, Michael Wiseman, hereby certify that the foregoing was served upon counsel for the Government concurrently with its filing, by filing the same with this Court's ECF system and by email.

/s/      Michael Wiseman

Michael Wiseman