UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | No. 4:96-CR-239 |
| v. | : | Honorable Joel H. Slomsky |
| DAVID PAUL HAMMER, | : | Capital Case |
| Defendant | : | |

**BRIEF IN SUPPORT OF MOTION TO DECLARE THE
FEDERAL DEATH PENALTY ACT UNCONSTITUTIONAL**

David Paul Hammer, by his counsel, pursuant to the Fifth, Sixth and Eighth

Amendments to the United States Constitution, respectfully submits this Brief in

Support of Motion to Declare the Federal Death Penalty Act Unconstitutional.

A.    **More than Two Decades of Experience with the Federal Death Penalty
Has Demonstrated That it Operates in an Arbitrary, Capricious, and
Irrational Manner, this Court Should Declare the FDPA Unconstitutional.**

In 1972, the United States Supreme Court, struck down all existing death-

penalty schemes as incompatible with the guarantees of the Eighth and Fourteenth

Amendments to the United States Constitution after concluding that the imposition

of capital punishment was an arbitrary and capricious imposition of capital

punishment.  Furman v. Georgia, 408 U.S. 238 (1972).  Although the decision was

1

a one paragraph *per curiam* opinion, five justices authored concurring opinions outlining their reasoning.  As the Court has recognized for more than 25 years, the comparison drawn by Justice Stewart in Furman between receiving a sentence of death and being struck by lightning formed the basis for the Furman Court's conclusion:

> These death sentences are cruel and unusual in the same way that being struck by lightning is cruel and unusual.  For, of all the people convicted of rapes and murders, . . . many just as reprehensible as these, the petitioners are among a capriciously selected handful upon whom the sentence of death has in fact been imposed. My concurring Brothers have demonstrated that, if any basis can be discerned for the selection of these few to be sentenced to die, it is the constitutionally impermissible basis of race . . .  I simply conclude that the Eighth and Fourteenth Amendments cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be so wantonly and so freakishly imposed.

Furman, 408 U.S. at 309-10 (Opinion of Stewart, J., concurring; citations and footnotes omitted).[1]  Members of the Furman Court also took note that the death

---

[1]In Zant v. Stephens, 462 U.S. 862 (1983), the Court stated:

> A fair statement of the consensus expressed by the Court in *Furman* is that "where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action."

Id. at 874, *quoting* plurality opinion of Justices Stewart, Powell and Stevens in Gregg v. Georgia, 428 U.S. 153, 189 (1976).

penalty was often sought selectively, "feeding prejudices against the accused if he is poor and despised, and lacking political clout, or if he is a member of a suspect or unpopular minority . . . ." Furman, 408 U.S. at 255 (Douglas, J., concurring). Justice White cited the infrequent utilization of the death penalty as an important factor contributing to his vote to strike down capital punishment:

> That conclusion, as I have said, is that the death penalty is exacted with great infrequency even for the most atrocious crimes and that there is no meaningful basis for distinguishing the few cases in which it is imposed from the many cases in which it is not.

408 U.S. at 313 (White, J., concurring). See also Walton v. Arizona, 497 U.S. 639, 658 (1990), *overruled on other grounds*, Ring v. Arizona, 536 U.S. 584 (2002) (Scalia, J. concurring) (noting that the key opinions in Furman "focused on the infrequent and seeming randomness with which, under the discretionary state systems, the death penalty was imposed"). In Gregg v. Georgia, 428 U.S. 153, 182, n. 26 (plurality opinion), the plurality reiterated this understanding of Furman, noting, "[i]t has been estimated that before *Furman* less than 20% of those convicted of murder were sentenced to death in those States that authorized capital punishment." See also Woodson v. North Carolina, 428 U.S. 280, 295, n. 31 (1976). See also Furman, 408 U.S. at 386, n. 11 (Burger, C.J., dissenting) (noting that the statistics cited indicated that approximately 15-20% of convicted murderers and rapists were

actually sentenced to death in those jurisdictions where the death penalty was available for such offenses).

After more than two decades of experience (1988-2011) with a post-<u>Gregg</u> federal death penalty, it is a simple truth that the federal death penalty is sought and imposed far more rarely than in the cases examined by <u>Furman</u>.[2]  Being sentenced to

---

[2]The argument that the federal death penalty should be struck down because it is so infrequently sought or imposed should not be misunderstood as an argument calling for profligate use of the federal death penalty.  As Justice Brennan stated in *Furman*:

> The States claim, however, that this rarity is evidence not of arbitrariness, but of informed selectivity.
>
> Informed selectivity, of course, is a value not to be denigrated. Yet, presumably the States could make precisely the same claim if there were 10 executions per year, or five, or even if there were but one.  That there may be as many as 50 per year does not strengthen the claim. When the rate of infliction is at that low level, it is highly implausible that only the worst criminals who commit the worst crimes are selected for this punishment. No one has yet suggested a rational basis that could differentiate in these terms the few who die from the many who go to prison.  Crimes and criminals simply do not admit of a distinction that can be drawn so finely as to explain, on that ground, the execution of such a tiny sample of those eligible.  Certainly the laws that provide for this punishment do not attempt to draw that distinction; all cases to which the laws apply are necessarily "extreme."

408 U.S. at 293-94 (Brennan, J., concurring).

death in the federal system is truly akin to being struck by lightning.[3]  Indeed, a review of the history of the federal death penalty clearly establishes there is no meaningful basis that may be discerned for distinguishing those cases – even among the most extreme – where death is imposed from those cases in which it is not.

The current state of the federal death penalty – after more than 20 years of experience – is summarized in the following table:

**THE STATUS AND DISPOSITION OF ALL POTENTIAL FEDERAL CAPITAL CASES FROM 1988 TO MARCH 29, 2010[4]**

- TOTAL POTENTIAL CASES . . . . . . . . . . . . . . . . . . . . . . . . 3,138
- PENDING REVIEW BY THE DEPARTMENT OF JUSTICE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  252
- CASES AUTHORIZED FOR CAPITAL PROSECUTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  465
- PENDING OR IN TRIAL . . . . . . . . . . . . . . . . . . . . . . . . . .  38
- TRIAL: LIFE SENTENCE. . . . . . . . . . . . . . . . . . . . . . . . .  132
- TRIAL: DEATH SENTENCE.  . . . . . . . . . . . . . . . . . . . . . . .  68
- EXECUTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3
- CLEMENCY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1
- FED. DEATH ROW, ACTIVE DEATH SENTENCES . . . . . . .  57

---

[3]The August 2006 edition of *National Geographic* published a chart on the odds of dying by various means.  For example, there is a 1 in 5 chance of dying from heart disease, and a 1 in 84 chance of dying in a car accident.  Far down the list is the chance of dying by lethal injection, 1 in 62,468.  The very next item on the list sets the odds of being killed by lightning as 1 in 79,746.  *Id*. at p. 21.

[4]See Declaration of Attorney Kevin McNally submitted in United States v. Jacques, 2:08-cr-117 (USDC Vermont).  (Attached as Exhibit A).

The Furman decision finding the death penalty system to be an arbitrary, capricious and a decidedly "unusual" infringement of Eighth Amendment protections  because fewer than 20% of defendants convicted of capital crimes were actually sentenced to death leads to the inescapable conclusion that the FDPA is constitutionally infirm.

In the federal system, the figure is lower by a factor of 10.   In fact, far fewer than 20% of those eligible for federal capital punishment are even *exposed* to the death penalty, by way of capital authorization, let alone actually sentenced to death.  Taking the highest figure for actual death sentences returned against federal defendants by federal juries at 68,  approximately 2.3% (68/2915) of all potentially death-eligible federal defendants are actually sentenced to death.  In terms of actual federal executions to date – three – the figure is infinitesimal.  In terms of decisions reached by juries and judges, even among the "worst of the worst" targeted for the federal death penalty, life sentences result in two-thirds (132/200) of the cases that proceed to a penalty-phase.

Thus, utilizing an analysis that was persuasive to the Furman Court, the federal death penalty is sought and imposed in an arbitrary, capricious and "unusual" manner.  Cf., Roper v. Simmons, 543 U.S. 551, 567 (2005) (execution of juveniles violates the Eighth Amendment, in part because of "the infrequency

of its use even where it remains on the books."); <u>Atkins v. Virginia</u>, 536 U.S. 304, 316 (2002) (execution of mentally retarded violates the Eighth Amendment, in part because "even in those states that allow the execution of mentally retarded offenders, the practice is uncommon."). This Court should strike the FDPA.

**B.    The Use of the Sufficiency Standard During the Selection Phase of the Trial Violates the Sixth Amendment.**

During the penalty phase trial there are actually two components to the assessment of whether the sentence should be life without the possibility of release or death. The two phases are the eligibility phase and the selection phase. During the eligibility phase the government is obligated to prove beyond a reasonable doubt that the accused possessed one of the noticed mental states and also must prove beyond a reasonable doubt the existence of at least one noticed statutory aggravating factor.

If, but only if, the United States satisfies its beyond the reasonable doubt burden is the accused deemed eligible. If there is a finding beyond a reasonable doubt that the accused is eligible, the jurors then move to making a determination of whether all of the aggravating factors found beyond a reasonable doubt to exist "sufficiently outweigh" all the mitigating factors found to exist to justify a sentence of death, or, in the absence of any mitigating factors, whether the

aggravating factor or factors alone are "sufficient" to justify a sentence of death. 18 U.S.C. § 3593(e).

Thus, as a precondition to authorizing death, the selection-phase jury must find that the aggravating factor or factors "sufficiently outweigh the mitigating factors" and also find that a sentence of death is "justified."  Since part of the selection-phase requires the jury to find a sentence of death to be "justified," this determination is a factual finding separate from the weighing determination.  This is so, as the jury retains the freedom to impose a sentence less than death, even if it finds the aggravating factors outweigh the mitigating factors as the jury may, under those circumstances, still find that a death sentence is unjustified.

Although these two factual determinations are necessary to result in a recommendation for the imposition of a sentence of death, the FDPA does not require the jury to make these findings beyond a reasonable doubt.  This lesser standard of proof violates the United States Supreme Court decisions in Blakely v. Washington, 542 U.S. 296 (2004) and United States v. Booker, 543 U.S. 220 (2005).  Without the jury's finding that the aggravators outweigh the mitigators and that a sentence of death is justified, the District Court cannot order a death sentence absent the jury recommendation of a death sentence.  18 U.S.C. § 3594. Since these findings are essential to the ultimate punishment, the rule annunciated

in <u>Apprendi v. New Jersey</u>, 530 U.S. 466, 490 (2000) should be applied to the proof standard the government needs to satisfy during the weighing process. See <u>Blakely</u>, 542 U.S. at 301; <u>Booker</u>, 125 S.Ct. at 756; <u>Ring v. Arizona</u>, 536 U.S. 584, 602 (2002) (applying <u>Apprendi</u> to capital sentencing proceedings).

Indeed, in <u>Johnson v. State</u>, 59 P.3d 450 (2002), the Supreme Court of Nevada agreed that *Apprendi/Ring* applied to the weighing determination embodied in that state's capital sentencing statute. <u>Id.</u> at 460. Nevada is not the only jurisdiction to conclude that the weighing process constitutes a factual determination. See <u>Missouri v. Whitefield</u>, 107 S.W. 3d 253, 256, 259 (Mo. 2003) (*en banc*) (applying *Ring* because, *inter alia*, the step in Missouri's capital sentencing statute that instructs a jury to weigh mitigating factors against aggravating factors requires a factual determination); <u>Woldt v. Colorado</u>, 64 P.3d 256, 266 (Colo. 2003) (*en banc*) (same). Applying the holdings of *Blakely*, *Booker,* and *Ring* to the factual findings to be made during the weighing process mandates that the reasonable doubt standard be applied.

Because the "sufficiency" burden of proof employed by the FDPA at § 3593(e) does not comport with the reasonable doubt standard, it is in violation of the Sixth Amendment. Therefore, this Court should find the FDPA to be unconstitutional.

**C.    The Absence of a Principled Basis for Distinguishing Between Cases Where the Federal Death Penalty Is Imposed from Cases Where it Is Not Imposed Renders the Federal Death Penalty Unconstitutional.**

The Supreme Court has held that the constitution will not tolerate sentences of death that are imposed in a manner that is arbitrary or capricious.  In Eddings v. Oklahoma, 455 U.S. 104, 112 (1982), the Court referred to the other side of this approach, requiring "that capital punishment be imposed fairly, and with reasonable consistency, or not at all."  In Kennedy v. Louisiana, 555 U.S. 407, 420 (2008) the Court warned, "[w]hen the law punishes by death, it risks its own sudden descent into brutality, transgressing the constitutional commitment to decency and restraint."   For that reason, the Court reiterated the Roper Court's admonition that the ultimate penalty "be limited to those offenders who commit 'a narrow category of the most serious crimes' and whose extreme culpability makes them 'the most deserving of execution.'" Id. (citing Roper, 543 U.S. at 568 (quoting Atkins, 536 U.S. at 319)).   The FDPA has failed to meet this constitutional standard.

An examination of the federal death penalty in practice shows that there is little consistency or predictability in the manner in which federal juries (and in two cases, federal judges) have imposed, or not, the federal death penalty or, indeed, which cases are allowed to plead out to life terms or less and which proceed to

trial. Included in Exhibit A are thumbnail compilations, prepared by the Federal Death Penalty Resource Counsel Project, of the facts and circumstances of the present status or resolution of every completed authorized federal death penalty case from 1988 to March 29, 2010. These documents demonstrate that there is no rhyme, reason, or predictability to who is sentenced to death and who is not.

Nor can the Government rely on purported difficulties inherent in comparing cases. As review of summaries of the cases puts that simplistic argument to rest. See also Doc. 1326, Exhibit 2 (List of Prosecutions).

By definition, since all of these cases were authorized by the Attorney General of the United States for capital prosecution, these are (or should have been) the "worst of the worst" the federal system has to offer. Indeed, it is likely there is not a crime on the list as to which a prosecutor could not (and probably did) argue in summation, "If this case doesn't call for the death penalty, what case does?" And yet, in case after case – indeed, in the overwhelming *majority* of such cases – juries returned life verdicts and, to an even greater extent, plea agreements were offered and accepted.

One cannot review these chronicles of the many ways in which man can demonstrate his inhumanity to his fellow man without coming to the realization that *all* of the cases are by their own terms horrible, and *all* involved the infliction

of agony on victims and survivors. Yet, for indiscernible reasons, some defendants were sentenced to death, while an overwhelming majority were not.

In Walker v. Georgia, 129 S.Ct. 453 (2008), Justice Stevens, dissenting from the denial of certiorari, noted that Georgia had sharply curtailed the scope of its statutory proportionality review of death sentences, and noted, "The likely result of such truncated review . . . is the arbitrary or discriminatory imposition of death sentences in contravention of the Eighth Amendment." Id. at 457. See also B. Sarma, "*Furman's* Resurrection: Proportionality Review and the Supreme Court's Second Chance to Fulfill *Furman's* Promise," 2009 Cardozo L. Rev. De Novo 238 (2009). Indeed, as argued in the Cardozo article:

> Almost forty years have passed since *Furman*, and nobody seriously argues that the Court's decision to regulate procedure has solved the constitutional problem of arbitrariness. In fact, evidence indicates that the application of the death penalty is just as arbitrary today as it was when the Court decided *Furman*. If *Furman* inspired positive changes in its immediate wake, those changes have been all but eviscerated in the past two decades.

Id. at 242.

A potential solution to the problem of disproportion and arbitrariness in the imposition of the federal death penalty is for this court to declare that the FDPA must be interpreted so as to allow for proportionality and comparative review of the universe of federal death sentences to determine if they are imposed

irrationally.[5]  A finding that such is the case would lead to a conclusion that the

FDPA cannot meet the requirements of Furman and would have to be invalidated

until Congress can devise a mechanism for checking the arbitrary and irrational

imposition of the ultimate punishment.  This court is urged to undertake such a

review and, at its conclusion, void the FDPA.

**D.     The FDPA Violates the Evolving "Standards of Decency" of the Eighth
        Amendment.**

Over 50 years ago Chief Justice Warren explained that "the basic concept

underlying the Eighth Amendment is nothing less than the dignity of man…that

Amendment must draw its meaning from the evolving standards of decency that

marks the progress of a maturity society."  Trop vs. Dulles, 356 U.S. 86 (1958).

The Chief Justice further noted:

> The prohibition against "cruel and unusual punishment," like other
> expansive language in the Constitution, must be interpreted
> according to its text, by considering history, tradition, and precedent,
> with due regard for its purpose and function in the constitutional
> design.  To implement this framework we have established the
> propriety and affirmed the necessity of referring to the evolving
> standards of decency that mark the progress of a maturing society to
> determine what punishments are so disproportionate as to be cruel

---

[5]Although the Supreme court ruled in Pulley v. Harris, 465 U.S. 37 (1984), that proportionality review was not required by the Eighth Amendment, at least in a state (California) that did not permit non-statutory aggravating factors, this Court need not "overrule" Pulley to engage in the review proposed by defendant since its review constitutes nothing more than a determination of the proper application of the FDPA.

13

and unusual.

Id. at 100-01.

The Supreme Court found the execution of juveniles and those with mental retardation unconstitutional, employing the "evolving standards of decency" approach in capital cases. Atkins v. Virginia, 536 U.S. 304.311 (2002), Roper v. Simmons, 543 U.S. 551, 560 (2005). In Atkins, the Court overruled its prior decision in Penry v. Lynaugh, 492 U.S. 302 (1989) which had held there was no categorical exemption from a death penalty for the mentally retarded. In Roper, the Court overruled its prior decision in Stanford v. Kentucky, 492 U.S. 361 (1989) which had held that it was constitutionally-permissible to execute persons over 15 years old.

The instruction of the available data arising from the 20 years since the FDPA was passed demonstrates that the evolving standards render the imposition of the death penalty a violation of the Eighth Amendment. This data is substantiated by the legislative and executive determinations throughout the country imposing moratoriums and/or ending the death penalty across the country as well as the increased jury responses to sentence capital defendants to life without parole. When combined with the troubling numbers of exonerations through more advanced scientific methods, there is no question that the imposition

of the death penalty has reached the point that it offends standards of decency and requires that the FDPA be struck as unconstitutional.

**E.     The FDPA Violates the Fifth and Eighth Amendments.**

In <u>Callins v. Collins</u>, 510 U.S. 1140, 1145-46 (1994), Justice Blackmun wrote a dissent from the denial of certiorari in a Texas death penalty case and expressed at great length why his 20 years of experience on the Supreme Court had convinced him that this nation's death penalty schemes – even if theoretically permissible and constitutional – work, in practice and reality, incapable of fair and even-handed application and therefore retain many of the arbitrary and capricious features, including race, ostensibly struck down in <u>Furman</u> and "corrected" by <u>Gregg</u> and its progeny.  Justice Blackmun stated:

> From this day forward, I no longer shall tinker in the machinery of death.  For more than 20 years I have endeavored – indeed, I have struggled – along with a majority of this  Court, to develop procedural and substantive rules that would lend more than the appearance of fairness to the death penalty endeavor.  Rather than continue to coddle the Court's delusion that the desired level of fairness has been achieved, I feel morally and intellectually obligated simply to conclude that the death penalty experiment has failed.  It is virtually self-evidence to me now that no combination of procedural rules or substantive regulations ever can save the death penalty from its inherent constitutional deficiencies.  The basic question – does the system accurately and consistently determine which defendants "deserve" to die? – cannot be answered in the affirmative.  It is not simply that this Court has allowed vague aggravating circumstances to be employed [citation omitted],

> relevant mitigating evidence to be disregarded [citation omitted], and vital judicial review to be blocked [citation omitted].  The problem is that the inevitability of factual, legal, and moral error gives us a system that we know must wrongly kill some defendants, a system that fails to deliver the fair, consistent, and reliable sentences of death required by the Constitution.

510 U.S. at 1145-46.

In a 1995 *en banc* opinion from the Third Circuit, reviewing sentences of death imposed in Delaware, Circuit Judge Lewis, joined by Circuit Judges Mansmann and McKee, expressed agreement with Justice Blackmun's conclusions:

> Although I have concluded that the errors in both trials were not harmless and would, accordingly, reverse the death sentences as to both *Bailey* and *Flamer* and remand for reweighing, the tortuous analytical route it has taken both the majority and me to set out our respective views in these cases compels me to add that I believe they perfectly illustrate – perhaps epitomize – why, in the words of Justice Blackmun, we should "no longer tinker with the machinery of death." See Callins v. Collins, 114 S.Ct. 1127 (Blackmun, J., dissenting).

> To be sure, Justice Blackmun was correct.  I realize that I sit on a court charged with the responsibility of applying the law as it is interpreted by the Supreme Court, and in circumstances such as these, by the highest court of a state.  That is precisely what the majority and I have sought to do, despite out disagreement.  But there are times when it becomes appropriate for a judge to reflect upon the law that he or she is called upon to apply, and to express views, genuine and unfeigned, that reveal a sincere and earnest belief.  And in doing so here, I can only say that more than any I have seen, these cases exemplify the extent to which death penalty jurisprudence has

become so complex and theoretically abstract that the only way to try to understand the reasons for and impact of its many subtle distinctions is to resort to carefully crafted hypotheticals. Something is terribly wrong when a body of law upon which we rely to determine who lives and who dies can no longer, in reality, reasonably and logically be comprehended and applied; when, in examining a statutory scheme and analyzing instructions and interrogatories, we are left to reach conclusions by piling nuance upon nuance; when we cannot even agree upon the appropriate standard of review in cases in which lives hang in the balance. Yet this is how cluttered and confusing our nation's effort to exact the ultimate punishment has become. This cannot be what certain fundamental principles of liberty and due process embodied in our Constitution, principles upon which I need not elaborate here, are all about.

It does not dilute my profound respect for the highest court in the land, an admiration and honor that knows no bounds, to voice an apprehension, sincerely felt, that much more guidance in this serious moral dilemma must be forthcoming. Elusive and complicated distinctions, replete with incomprehensible subtleties of the highest order, must not be the talisman that decides whether one should live or die. Until this guidance is forthcoming, the plaintive voice of Justice Blackmun, truly crying in the wilderness, should continue to haunt and remind us that "the desired level of fairness has [not] been achieved.

Flamer v. Delaware, 68 F.3d 736, 772 (3rd Cir. 1995) (*en banc*) (Lewis, Cir. J.,

dissenting).

Justice Stevens has also expressed grave doubts regarding the

constitutionality of the death penalty. In Herrera v. Collins, 506 U.S. 390 (1993),

Justice Stevens joined former Justice Blackmun to voice "disappointment over this

17

Court's obvious eagerness to do away with any restriction on the State's power to execute whomever and however they please," and expressed "doubt about whether, in the absence of such restrictions, capital punishment remains constitutional at all," describing the execution sanctioned by the Court in <u>Herrera</u> as "perilously close to simple murder." At 446.

The brutal arbitrariness of the modern system of capital punishment in the United States is to review the decision in <u>McCleskey v. Kemp</u>, 481 U.S. 279 (1987) and its aftermath. By a one vote margin, the Supreme Court rejected a study conducted by Professor Baldas as establishing that the Georgia capital sentencing scheme was racially bias. Georgia executed Mr. McCleskey in September of 1991. In the same year Mr. McCleskey was executed, Justice Powell, who authored the <u>McCleskey</u> majority opinion, during an interview, was asked whether he would change his vote in any case. As part of the interview Justice Powell stated, "I have come to believe that capital punishment should be abolished." John C. Jeffries, Jr., Justice Lewis F. Powell, Jr., 451 (Scribners 1994). Mr. Hammer requests this Court declare the FDPA unconstitutional on its face.

WHEREFORE, for the reasons set forth above and in the Motion, Mr.

Hammer, through counsel, respectfully requests that this Court grant his motion.


/s/    Ronald C. Travis

Ronald C. Travis
Rieders, Travis, Humphrey, Harris,
Waters & Waffenschmidt
161 West Third Street
PO Box 215
Williamsport, PA  17703-0215
570-323-8711 (telephone)
570-323-4192 (facsimile)
rtravis@riederstravis.com


/s/    Anne Saunders

Anne Saunders
Assistant Federal Defender
Federal Public Defender
Middle District Pennsylvania
100 Chestnut Street, Suite 300
Harrisburg, PA 17101
717-782-3843 (telephone)
717-782-3966 (facsimile)
Anne_Saunders@fd.org


Dated:        May 23, 2011
              Philadelphia, PA

/s/    Michael Wiseman

Michael Wiseman
James J. McHugh, Jr.
James Moreno
Federal Community Defender
Eastern District Pennsylvania
Suite 540 – The Curtis Center
Philadelphia, PA 19106
215-928-1100 (telephone)
215-928-0826 (facsimile)
Michael_Wiseman@fd.org
James_McHugh@fd.org
James_Moreno@fd.org

**Certificate of Service**

I, Michael Wiseman, hereby certify that the foregoing was served upon counsel for the Government concurrently with its filing, by filing the same with this Court's ECF system and by email.

/s/    Michael Wiseman

Michael Wiseman