UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Criminal No. 4:CR-96-0239 |
| | : | |
| v. | : | (Judge Slomsky) |
| | : | |
| DAVID PAUL HAMMER | : | **ELECTRONICALLY FILED** |

**BRIEF IN OPPOSITION TO DEFENDANT'S
MOTION TO PRECLUDE THE GOVERNMENT FROM PROCEEDING
WITH A CAPITAL PROSECUTION BECAUSE IT'S(sic) DECISION
NOT TO DE-AUTHORIZE THIS CASE, VIOLATED IT'S(sic)STANDARDS
FOR CAPITAL PROSECUTIONS IN VIOLATION OF THE FIFTH,
<u>SIXTH, AND EIGHTH AMENDMENTS</u>**

**Procedural History.**

Relevant procedural history for purposes of considering the issue discussed herein begins on September 18, 1996, when the grand jury returned an indictment against defendant, David Paul Hammer.  He was charged *inter alia* with killing Andrew Marti at the Allenwood Federal Correctional Complex, United States Penitentiary, White Deer, Pennsylvania on April 13, 1996, in violation of 18 U.S.C. § 1111.

On April 9, 1997, the United States, in accordance with 18 U.S.C. § 3593(a) filed its notice of intent to seek the death penalty.  The District Court, the Honorable Malcolm Muir, on August 24, 1997, allowed defense counsel to file various pleadings challenging multiple aspects of death penalty proceedings, by June 18, 1997.  Hammer's attorneys filed approximately thirteen (13) motions.

The prosecution filed its responses.  In a series of orders beginning on September 19, and continuing through October 9, 1997, the court granted Hammer some relief while denying other motions which sought to limit or preclude the death penalty proceeding from going forward.

Following jury selection for both a guilt and penalty phase, trial began on June 2, 1998, and continued until June 22, 1998. On that day, after fourteen (14) days of trial, defendant, with the assistance of counsel, withdrew his prior not guilty plea and admitted his guilt to having killed Marti with premeditation and malice aforethought.

The hearing contemplated by 18 U.S.C. § 3593(b) to determine whether the death penalty should be imposed began on June 30, 1998, and continued until July 20, 1998.  Counsel presented closing arguments on July 21, 22, and 23, 1998.  The jury began its deliberations on July 23, 1998, and returned its death penalty verdict on July 24, 1998.  Ultimately, after denying new trial motions, Judge Muir on November 4, 1998, imposed the death penalty.

On direct appeal, the Third Circuit granted Hammer's motion for voluntary dismissal of the appeal, *United States v. Hammer*, 226 F. 3d 229 (2000), *cert. denied*, 532 U.S. 959 (2001), and denied his rehearing petition seeking reinstatement of the appeal. *See United States v. Hammer*, 239 F.3d 302 (3d Cir.),

2

*cert. denied*, 534 U.S. 831 (2001).  The Supreme Court denied certiorari.  *Hammer v. United States*, 534 U.S. 831 (2001).

On March 29, 2002, Hammer sought relief by proceedings under 28 U.S.C. § 2255.  After multiple revisions of pleadings, as well as pre-hearing motions, Judge Muir conducted an evidentiary proceeding beginning on July 14, 2005, and continuing intermittently until September 29, 2005.  Ultimately, in an opinion dated December 27, 2005, denied Hammer's request to withdraw his guilty plea but granted him a new penalty phase hearing on two separate bases.  *United States v. Hammer*, 404 F. Supp. 2d 676 (M.D. Pa. 2005).

Both the prosecution and defendant timely appealed aspects of that decision to the Court of Appeals.  On May 11, 2009, the Third Circuit concluded that it lacked jurisdiction to review Judge Muir's § 2255 order due to the absence of a final judgment in the underlying criminal prosecution and remanded proceedings for another penalty hearing pursuant to § 3593. *United States v. Hammer*, 564 F.3d 628 (3d Cir. 2009).

Hammer subsequently submitted a voluminous request for the Department to reconsider its prior decision to seek the death penalty. *See United States Attorneys' Manual* (USAM) 9-10.150 (providing for reconsideration of decision to seek the death penalty based on a showing of changed circumstances). On January

7, 2011, the United States Attorney filed notice of the Department's decision to continue to seek the death penalty.

The Honorable Malcolm Muir on January 7, 2011, entered an order re-assigning this case to another judge.  This Court thereafter received the case and in an order dated January 26, 2011, established a briefing schedule for special pre-hearing motions.  Hammer's attorneys, beginning on May 18 and continuing through May 23, 2011, filed a series of motions and supporting briefs. Herewith presented is the opposition submitted to defendant's motion to preclude the government from proceeding with a capital prosecution because its decision not to de-authorize this case, contravened its standards for capital prosecutions and thereby violated the Fifth, Sixth, and Eighth Amendments.

**Counter-Statement of Facts.**

Hammer's argument rests on two factual assumptions or premises which the government roundly disputes.[1]  In their written presentation in May 2010 to the United States Attorney, defense counsel alluded *inter alia* to two matters, the position of the Marti family on the death penalty as well as a comparison chart of prison and non-prison homicides in the Middle District of Pennsylvania and throughout the United States.  With respect

---

[1]  The prosecution does not believe any evidentiary hearing is needed under the circumstances despite this position.  *See* Fn. 2 for details.

to the victim's family statement, no information was included in their submission about who prepared the document, let alone how it was secured.  No information in those respects was augmented orally in meeting with the United States Attorney for the Middle District of Pennsylvania on May 14, 2010.

Hammer argues that in light of the Department's January 2011 decision to continue to seek the death penalty notwithstanding the defense-submitted statement of the Marti family, "it became apparent to [defense] counsel that the DOJ had no contact with the victim's family while it was deciding whether to continue this matter as a capital case."  (Motion ¶ 7 at 3-4.)  At no time during recent exchanges did Hammer's attorneys inquire with the United States Attorney's Office whether such contact had occurred although they made inquiries about many other issues.[2]

In this regard, the Government is submitting for this Court's *in camera* examination Government Exhibit 1, which

---

[2]  Defense counsel also claim that "the DOJ [did not] notify the family that, despite their clearly stated desire, the government intended to pursue the death penalty against Mr. Hammer."  (Motion ¶ 7 at 4.)  This assertion has <u>nothing</u> to do with the recertification process but relates to the continuing responsibility to advise victims of the status of criminal cases. Laurie Reiley, Victim-Witness Coordinator for the Middle District of Pennsylvania, spoke with the Marti family on or about April 15, 2011, regarding the future of proceedings and sent a letter to them dated April 5, 2011, a copy of which is attached as Government Exhibit 2.  Regardless of why, details from the undisclosed but "suitably trained victim outreach specialist" utilized by the defense are not correct or even relevant to disposition of defendant's claim.

consists of documentation of the Government's prior contacts with the Marti family in connection with the defense death penalty withdrawal request.  These writings unequivocally document that well before Hammer's attorneys secured a written statement from the Marti family, the prosecution, in accordance with USAM § 9-10.070, contacted them about this issue.

The other mainstay of Hammer's argument is his five page listing of prison murder cases.  Defendant Exhibit B.  In their presentation to the Department of Justice in May 2010, this was listed as their attachment 14.  It purports to be a listing of all prison murder cases since 1996 ("Since 1996 there have been six completed, prosecutions of prisoner deaths in the Middle District of Pennsylvania and one is pending.").  Based upon court records, it is significantly incomplete.

There have been at least two or three other murder prosecutions in the Middle District which were not included in that listing.  One entry involved an attorney from the Federal Public Defender's Office in Harrisburg which now serves as one of Hammer's counsel.  These include: *United States v. McCalla,* M.D. Pa. Crim. No. 4:CR-96-136 (knifing at FCI-Allenwood)(sentence of 105 months imprisonment for a violation of 18 U.S.C. § 1112); *United States v. Holmes*, M.D. Pa. Crim. No. 4:CR-03-248 (knifing at USP-Allenwood) (sentence of 327 months for violation of second degree murder); and *United States v. Morton*, M.D. Pa. Crim. No.

4:CR-09-345 (strangling and stomping at USP-Allenwood on or about August 1, 2007)(not guilty jury verdict on July 2, 2010).

**Argument.**

A.   THE DEPARTMENT OF JUSTICE DEATH PENALTY PROTOCOL DOES NOT CONFER ANY LEGAL RIGHT ON A DEFENDANT FOR THIS COURT TO REVIEW THE ATTORNEY GENERAL'S DECISION.

**1. The Protocol Does Not Create Enforceable Rights**

Hammer in effect contends that he is entitled to enforce the Department's Death Penalty Protocol, USAM §§ 9-10.010 to 9-10.190, including provisions relating to nationwide decision standards and consultation with the victim's family.  As a threshold matter, the overwhelming majority of the courts that have considered Protocol-related issues have agreed that the Protocol does not confer any such entitlement.  *See United States v. Lee,* 274 F.3d 485, 493 (8th Cir. 2001) (the Department's death penalty Protocol does not create substantive or procedural rights enforceable by individuals); *United States v. Torres-Gomez*, 62 F. Supp. 2d 402, 404-07 (D.P.R. 1999) ("The accused neither obtains nor possesses any rights at the DOJ's Death Penalty Committee hearing"); *United States v. Feliciano*, 998 F. Supp. 166, 168-69 (D. Conn. 1998) (death penalty protocol does not create enforceable right to discovery of mitigating evidence in anticipation of Justice Department's capital authorization procedures); *United States v. McVeigh*, 944 F. Supp. 1478, 1483 (D. Colo. 1996) ("The Protocol did not create any individual

right or entitlement subject to the due process protections applicable to adjudicative or quasi-adjudicative administrative action"); *Nichols v. Reno*, 931 F. Supp. 748, 751-52 (D. Colo. 1996) (the Attorney General's discretion to seek the death penalty "is not adjudicative in nature" and, like other prosecutorial determinations, is "presumptively unreviewable by the courts"), *aff'd*, 124 F.3d 1376 (10th Cir. 1997); *United States v. Boyd*, 931 F. Supp. 968 (D.R.I. 1996) (death penalty protocol does not create an adjudicative process to which the right of counsel attaches); *United States v. Roman*, 931 F. Supp. 960, 963-64 (D.R.I. 1996) ("the protocol does not create substantive or procedural rights"); *Walker v. Reno*, 925 F. Supp. 124, 135 (N.D.N.Y. 1995) (finding that "the language and content of the Protocol itself neither circumscribes the Attorney General's discretion nor provides meaningful and judicially manageable standards").  *Cf. United States v. Pena-Gonzalez*, 62 F. Supp. 2d 358 (D.P.R. 1999) (protocol process constitutes a critical stage of the prosecution at which prospective capital defendants have enforceable rights, including the right to the assistance of counsel "learned" in capital jurisprudence).

The majority view, finding no legal rights under the Protocol, is consistent with the approach the courts have applied to claims involving another part of the USAM, the "Petite policy."  *In re United States*, 197 F.3d 310, 315 (8th Cir. 1999).

As a general rule, "internal guidelines of a federal agency," which are not promulgated as regulations and which "are not mandated by statute or the constitution, do not confer substantive rights on any party." *United States v. Craveiro*, 907 F.2d 260, 264 (1st Cir.), *cert. denied*, 498 U.S. 1015 (1990); *see United States v. Caceres*, 440 U.S. 741, 749-57 (1979).[3] Furthermore, the Government's mere "admitting the existence of a policy or its pedigree is not tantamount to conceding its enforceability by third parties." *Jackson v. Culinary School of Washington, Ltd.*, 27 F.3d 573, 583 (D.C. Cir. 1994) (citing the Government's <u>Petite</u> policy requiring Department approval of successive state and federal criminal prosecutions, contained in the USAM, as an example of an internal policy not enforceable by criminal defendants), *vacated on other grounds*, 515 U.S. 1139 (1995), *reinstated in pertinent part on remand*, 59 F.3d 254 (D.C. Cir. 1995). "The touchstone for enforceability is agency intent." *Id.* at 584; *see Sullivan v. United States*, 348 U.S. 170, 173-74 (1954). This analysis applies to internal rules affecting "personal rights" as well as other internal rules.

---

[3] A narrow exception to this rule exists under *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954), which involves a doctrine of non-constitutional administrative law governing "adjudicative or quasi-adjudicative action by officers of government" and does not apply to the Government's decisions to pursue criminal charges and to seek the death penalty. *Nichols v. Reno*, 931 F. Supp. at 752. "By definition a prosecutorial decision is not adjudicative in nature." *Id.*

*Jackson*, 27 F.3d at 583-84 & n.21; *see United States v. Delay*, 602 F.2d 173, 177-78 (8th Cir. 1979) (finding no right of a criminal defendant to enforce the Department's Petite policy), *cert. denied*, 444 U.S. 1012 (1980).

In *Nichols v. Reno*, 931 F. Supp. at 751, the district court (and the Tenth Circuit, *see Nichols*, 124 F.3d at 1377) employed precisely this analysis to find that the death penalty Protocol was not enforceable by a criminal defendant.  The courts reasoned as follows:

> The plaintiff does not dispute that presumption [i.e., that Executive Branch charging decisions in criminal cases are discretionary and non-reviewable] but contends that the Attorney General has restricted such discretion by the adoption of the Protocol.  Agency decisions have been reversed for the failure to follow procedures of the agency.  *See, e.g. United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 74 S. Ct. 499, 98 L. Ed. 681 (1954) (deportation decision of Board of Immigration Appeals);  *Service v. Dulles*, 354 U.S. 363, 77 S. Ct. 1152, 1 L. Ed. 2d 1403 (1957) (dismissal of State Department employee);  *Vitarelli v. Seaton*, 359 U.S. 535, 79 S. Ct. 968, 3 L. Ed. 2d 1012 (1959) (dismissal of employee by Secretary of Interior); *Yellin v. United States*, 374 U.S. 109, 83 S. Ct. 1828, 10 L. Ed. 2d 778 (1963) (criminal contempt initiated by Congressional committee) and *Morton v. Ruiz*, 415 U.S. 199, 94 S. Ct. 1055, 39 L. Ed. 2d 270 (1974) (Bureau of Indian

> Affairs denial of general
> assistance benefits).  As discussed
> in the plaintiff's brief, these
> cases are premised on the fair play
> concept embodied in the principle
> that due process of law is required
> for governmental actions that
> affect the rights of individuals.
> The agency decisions were
> adjudications and the agency
> regulations both created the
> interest to be protected and
> defined the process due to protect
> it.
>
> The applicability of this line
> of cases depends upon a finding
> that the Protocol provides Terry
> Nichols with some protectable
> interest.  It does not.  The Manual
> expressly disclaims any intention
> to create any judicially
> enforceable substantive or
> procedural rights in any party in
> any civil or criminal matter.  The
> courts have consistently refused to
> recognize any such rights with
> respect to many of the policies and
> practices prescribed in the Manual.

*Nichols*, 931 F. Supp. at 751-52.

Here, as in *Nichols*, the USAM specifically provides

that it creates no rights enforceable by criminal defendants or

other third parties.  USAM § 1-1.100.  The preamble of the USAM

addresses the issue of enforceability as follows:

> The Manual provides only internal
> Department of Justice Guidance.  It
> is not intended to, does not, and
> may not be relied upon to create
> any rights, substantive or
> procedural, enforceable at law by
> any party in any matter civil or

11

> criminal.  Nor are any limitations
> hereby placed on otherwise lawful
> litigative prerogatives of the
> Department of Justice.

USAM § 1-1.100.

Likewise, the Third Circuit has held, consistently with *Jackson* and *Nichols*, that the USAM is unenforceable by criminal defendants.  *See United States v. Wilson*, 413 F.3d 382, 389 (3d Cir. 2005)(stating that Department of Justice guidelines and policies do not create enforceable rights for criminal defendants); *see also United States v. Gomez*, 237 F.3d 238, 241 n.1 (3d Cir. 2000)(noting that any argument by the defendant that the USAM created rights entitling him to relief "would be against the weight of judicial authority").  Given this authority, Hammer's claim that he has a right to judicial enforcement of the Protocol is plainly without merit.

**2.    The Due Process Clause and Equal Protection Clause do not entitle Hammer to enforce the Protocol.**

Hammer's suggestion that the Due Process Clause and Equal Protection Clause give him an independent right to enforce the Protocol also fails.  His process-related claim presents an issue of "procedural," rather than "substantive," due process. *See Herrera v. Collins*, 506 U.S. 390, 407 n.6 (1993).  Under the procedural due process analysis, the claimed omission cannot be said to offend "some principle of justice so rooted in the traditions and conscience of our people as to be ranked as

12

fundamental." *Medina v. California*, 505 U.S. 437, 445 (1992). To the contrary, the venerable principle informing decisions in this area has been that charging decisions are a core and largely unreviewable function of the Executive Branch. *United States v. Armstrong*, 517 U.S. 456, 464 (1996); *see also McVeigh*, 944 F. Supp. at 1483 (discovery of internal Justice Department documents relevant to death penalty notices denied on grounds that they "are not pertinent . . . to the defendants' motions to strike the death penalty notices because the administrative decision to file them is not judicially reviewable").  Further, any due process claim would fail for the additional reason that Hammer "cannot reasonably contend that he relied on [the Protocol provision involved] or that its breach had any effect on his conduct." *Caceres*, 440 U.S. at 753.

In sum, neither Hammer nor the courts may enforce the provisions of the Protocol.

### B.    DEFENSE COUNSEL'S FACTUAL ANALYSIS IS FLAWED

Although Hammer has no right to enforce the Protocol, his claim would have failed for the additional reason that the Protocol was never violated.  Defense counsel seek to preclude altogether a retrial of the penalty hearing, claiming that the Department of Justice did not follow its own procedures.

As a threshold matter, Hammer is mistaken regarding the Protocol provisions governing the Department's 2011 decision to

13

continue to seek the death penalty.  His request that the death penalty notice be withdrawn was governed by USAM 9-10.150, which requires a showing of changed circumstances since the Department's 1997 decision to seek the death penalty, which Hammer does not directly challenge.  The circumstances emphasized by Hammer do not amount to the required showing because, among other reasons, they largely involve entirely unrelated cases and not changed circumstances inherent in the present case.

In any event, none of these other cases relate remotely to the instant situation.  Defense counsel rely upon their listing of federal prison murder cases in this district and throughout the United States to suggest that the recertification was constitutionally flawed.  (Brief of Defendant at 4.)  But Court records confirm that their presentation at this level is at best incomplete, which undermines their statistical claim of "[a]n almost 50% authorization rate for prisoner cases, coupled with a zero authorization for civilian cases. . . ."[4]  (Motion ¶ 16 at 7.)  If the defense has it wrong in the Middle District of Pennsylvania, there is little reason to believe that they are correct in every other case detail throughout this country.

---

[4]  Comparing prison and non-prison cases is largely unhelpful.  In the situation of federal inmates who kill there is a great likelihood by virtue of their incarceration in a serious United States institution that statutory aggravating factors will exist in some or multiple fashions.  *See* 18 U.S.C. § 3592(c)(2), (3), (4), (10), and (12)(prior "conviction" for a variety of offenses).

14

Beyond that, their arguments are dissembling.  They refer to cases in which the Death Penalty was authorized but juries, for one reason[5] or another, reached life verdicts.  (Motion ¶¶ 10, 12, 13, & 14 at 5-6.)  All it takes is one disaffected juror to thwart an otherwise well-founded death penalty recommendation which simply does not undermine the rationale for the Attorney General's decision initially to authorize the ultimate punishment.

Even further afield defense counsel refer to non-prison homicides.  (Motion ¶¶ 17-18 at 7-8.)  And yet they claim that these are "applicable and comparable cases."  (Motion ¶ 20 at 8.) *Id*. at 1242.

The danger in relying upon case summaries, such as Defendant's Exhibit B, was well set out by Judge Johnson in *United States v. Taylor*, 648 F. Supp. 2d 1237, 1242 (D.N.M. 2008).  *Albeit* in the context of an attack on the statute itself, he observed

> These case summaries certainly paint a
> vivid picture, however, they are
> ultimately not persuasive. The summaries

---

[5]  In referring to the California RICO prosecution (Motion ¶ 12 at 5) some of these defendants were initially prosecuted in this district but later pursued before Judge Carter.  The undersigned is aware that at least one statutory, mitigating factor existing in that proceeding, 18 U.S.C. § 3592(a)(4), established by the prosecution in <u>this</u> district, is that the death penalty was not pursued against the leader of those killers which in part may have negatively affected the punishment outcomes in those cases.

> are very short-almost all of them are between one and three sentences long. In many cases they do not provide enough detail to allow the reader to determine whether or not the crimes they describe are comparable to each other. Moreover, they do not provide any information about the various aggravating or mitigating factors that existed in those cases and that the juries would have considered under the FDPA when deciding whether or not to impose the death penalty. This was exactly the concern expressed by the First Circuit in *United States v. Sampson,* 486 F.3d 13 (1st Cir. 2007), a case in which the defendant apparently provided similar summaries in support of a similar argument. The *Sampson* court stated, 'The summaries on which Sampson relies to demonstrate inconsistency are devoid of details and fail to account for the objective circumstances of the underlying crimes. . . . [W]e decline Sampson's invitation to ignore individual differences across offenders and offenses.' *Id.* at 25. While the case summaries are compelling, they simply do not constitute evidence of the arbitrary imposition of the death penalty.

Similarly, this Court, as occurred in *Taylor, supra and Sampson, supra*, should eschew any reliance upon defendant's exhibit B as a reason for reviewing the Attorney General's decision in this case. *United States v. Hammer*, 25 F. Supp. 2d 518, 546-47 (M.D. Pa. 1998) ("The mere fact that the government has only sought the death penalty in a de minimus number of murder cases involving federal inmates is not sufficient to demonstrate that the prosecution of [the defendant] is arbitrary and capricious. More is required").

> Finally, defendant claims as follows:
>
> In light of the overwhelming data demonstrating that a capital prosecution is not warranted and inconsistent with national and local standards and practices, there is a compelling likelihood that the determination to capitally prosecute Mr. Hammer arises from bias as opposed to a reasoned decision based on the requisite standards.

(Brief of Defendant at 4.)  But the initial jury's recommendation of death in July 1998 was based upon their following Judge Muir's instruction, pursuant to 18 U.S.C. § 3592(f), that their decision be free of any bias.  Moreover, a fair and dispassionate reading of the District Court's review of the evidence in § 2255 proceedings reveals reasons to pursue the death penalty.  *United States v. Hammer*, 404 F. Supp. at 676.  In short, their argument, based upon a faulty assumption and disregard for other pertinent facts, should be rejected.

Hammer's argument is also flawed at the outset by its mistaken belief that the Marti family had not been contacted. (Brief of Defendant at 3-4.)  This Court is aware from its *in camera* review that compliance occurred with § 9-10.070.

**CONCLUSION.**

Hammer's request to this Court to quash a capital prosecution due to alleged errors by the Department of Justice in reviewing whether a second sentencing hearing should be pursued

is devoid of pertinent legal support. The protocol creates no enforceable rights for Hammer, contrary to the defendants assertion. Further, defendant's primary underpinnings of his motion, the alleged failure to contact the victim's family and the purported completeness and cogency of comparable cases, are simply incorrect or flawed.  Consequently, this Court is urged to deny relief.

Respectfully submitted,

PETER J. SMITH
United States Attorney

By s/Frederick E. Martin
FREDERICK E. MARTIN
Assistant United States Attorney
PA ID 57455
Herman T. Schneebeli Federal Bldg.
240 West Third Street, Suite 316
Williamsport, PA 17701-6465
Tele: (570) 326-1935
FAX: (570) 326-7916
Electronic Mail:
Fred.Martin@usdoj.gov

Steven D. Mellin
Trial Attorney For the
Capital Case Unit
Texas ID 13920380
1331 F Street, N.W.
Washington, D.C. 20530
Tele: 202-514-1224
Electronic Mail:
Steve.Mellin2@usdoj.gov

Dated:    June 17       , 2011

18

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA      :  Criminal No. 4:CR-96-0239
                              :
        v.               :  (Judge Slomsky)
                              :
DAVID PAUL HAMMER        :  **ELECTRONICALLY FILED**

## CERTIFICATE OF SERVICE

    I hereby certify that I caused a true and correct copy of the foregoing

**BRIEF IN OPPOSITION TO DEFENDANT'S
MOTION TO PRECLUDE THE GOVERNMENT FROM PROCEEDING
WITH A CAPITAL PROSECUTION BECAUSE IT'S(sic) DECISION
NOT TO DE-AUTHORIZE THIS CASE, VIOLATED IT'S(sic)STANDARDS
FOR CAPITAL PROSECUTIONS IN VIOLATION OF THE FIFTH,
SIXTH, AND EIGHTH AMENDMENTS**

to be electronically mailed on    June 17   , 2011, to:

ADDRESSEES:    Ronald C. Travis, Esquire
               rtravis@riederstravis.com

               Michael Wiseman, Esquire
               Michael_Wiseman@fd.org

               James J. McHugh, Jr., Esquire
               James_McHugh@fd.org

               James Moreno, Esquire
               James_Moreno@fd.org

               Anne Saunders, Esquire
               Anne_Saunders@fd.org

                       S/Frederick E. Martin
                       FREDERICK E. MARTIN
                       Assistant United States Attorney