```
              UNITED STATES DISTRICT COURT
         FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA    :  Criminal No. 4:CR-96-0239
                            :
        v.                  :  (Judge Slomsky)
                            :
 DAVID PAUL HAMMER          :  ELECTRONICALLY FILED
```

**BRIEF IN OPPOSITION TO DEFENDANT'S
MOTION TO PRECLUDE THE CAPITAL PROSECUTION
OR, IN THE ALTERNATIVE, DISMISS THE INTENT FACTORS
AND/OR SUBSTANTIAL PLANNING AND PREMEDITATION
AGGRAVATING FACTORS BECAUSE THE GOVERNMENT'S
DELIBERATE FAILURE TO DISCLOSE EXCULPATORY MATERIALS
DIRECTLY DISPUTING THE GOVERNMENT'S CASE
<u>VIOLATED MR. HAMMER'S FIFTH, SIXTH, AND EIGHTH AMENDMENTS</u>**

**Procedural History.**

Relevant procedural history for purposes of considering the issue discussed herein begins on September 18, 1996, when the grand jury returned an indictment against defendant, David Paul Hammer. He was charged *inter alia* with killing Andrew Marti at the Allenwood Federal Correctional Complex, United States Penitentiary, White Deer, Pennsylvania on April 13, 1996, in violation of 18 U.S.C. § 1111.

On April 9, 1997, the United States, in accordance with 18 U.S.C. § 3593(a) filed its notice of intent to seek the death penalty. The District Court, the Honorable Malcolm Muir, on August 24, 1997, allowed defense counsel to file various pleadings challenging multiple aspects of death penalty proceedings, by June 18, 1997. Hammer's attorneys filed approximately thirteen (13) motions.

The prosecution filed its responses.  In a series of orders beginning on September 19, and continuing through October 9, 1997, the court granted Hammer some relief while denying other motions which sought to limit or preclude the death penalty proceeding from going forward.

Following jury selection for both a guilt and penalty phase, trial began on June 2, 1998, and continued until June 22, 1998. On that day, after fourteen (14) days of trial, defendant, with the assistance of counsel, withdrew his prior not guilty plea and admitted his guilt to having killed Marti with premeditation and malice aforethought.

The hearing contemplated by 18 U.S.C. § 3593(b) to determine whether the death penalty should be imposed began on June 30, 1998, and continued until July 20, 1998.  Counsel presented closing arguments on July 21, 22, and 23, 1998.  The jury began its deliberations on July 23, 1998, and returned its death penalty verdict on July 24, 1998.  Ultimately, after denying new trial motions, Judge Muir on November 4, 1998, imposed the death penalty.

On direct appeal, the Third Circuit granted Hammer's motion for voluntary dismissal of the appeal, *United States v. Hammer*, 226 F. 3d 229 (3d Cir. 2000), *cert. denied*, 532 U.S. 959 (2001), and denied his rehearing petition seeking reinstatement of the appeal. *See United States v. Hammer*, 239 F.3d 302 (3d Cir.),

*cert. denied*, 534 U.S. 831 (2001).  The Supreme Court denied certiorari.  *Hammer v. United States*, 534 U.S. 831 (2001).

On March 29, 2002, Hammer sought relief by proceedings under 28 U.S.C. § 2255.  After multiple revisions of pleadings, as well as pre-hearing motions, Judge Muir conducted an evidentiary proceeding beginning on July 14, 2005, and continuing intermittently until September 29, 2005.  Ultimately, in an opinion dated December 27, 2005, denied Hammer's request to withdraw his guilty plea but granted him a new penalty phase hearing on two separate bases.  *United States v. Hammer*, 404 F. Supp. 2d 676 (M.D. Pa. 2005).

Both the prosecution and defendant timely appealed aspects of that decision to the Court of Appeals.  On May 11, 2009, the Third Circuit concluded that it lacked jurisdiction to review Judge Muir's § 2255 order due to the absence of a final judgment in the underlying criminal prosecution and remanded proceedings for another penalty hearing pursuant to § 3593. *United States v. Hammer*, 564 F.3d 628 (3d Cir. 2009).

Hammer subsequently submitted a voluminous request for the Department to reconsider its prior decision to seek the death penalty. *See United States Attorneys' Manual* 9-10.150 (providing for reconsideration of decision to seek the death penalty based on a showing of changed circumstances). On January 7, 2011, the

United States Attorney filed notice of the Department's decision to continue to seek the death penalty.

The Honorable Malcolm Muir on January 7, 2011, entered an order re-assigning this case to another judge.  This Court thereafter received the case and in an order dated January 26, 2011, established a briefing schedule for special pre-hearing motions.  Hammer's attorneys, beginning on May 18 and continuing through May 23, 2011, filed a series of motions and supporting briefs. Herewith presented is the opposition submitted to defendant's motion to preclude brief in opposition to defendant's motion to preclude the capital prosecution or, in the alternative, dismiss the intent factors and/or substantial planning and premeditation aggravating factors because the Government's deliberate failure to disclose exculpatory materials directly disputing the Government's case violated Mr. Hammer's Fifth, Sixth, and Eighth Amendments.

**Counter-Statement of Facts.**

The prosecution will rely upon evidence presented during the trial and § 2255 proceedings.  This includes aspects of the District Court's opinion.  *United States v. Hammer*, 404 F. Supp. 2d 676 (M.D. Pa. 2005).  In addition, the prosecution will allude to facts confirming assertions by defense counsel.

It is undisputed that former federal prison inmates Gaylon Don Ball, Martin Guerrero, and Royce Lee Fowler have died.

(Motion ¶ 17).   Their dates of passing respectively occurred on May 13, 2008 (liver cancer at FCI Edgefield, SC), December 7, 2008 (heart failure at FCI Fort Worth), and August 8, 2005 (unknown causes at Perry County, Arkansas).   Government Exhibit 1, 2, 3.   There had been communications in the Spring of 1998 about Ball's willingness to testify for the prosecution.   This exchange is referenced at Government Exhibit 4.

**Argument.**

Hammer mounts the same argument presented near the conclusion of § 2255 proceedings regarding the non-disclosure of allegedly exculpatory FBI interviews of three inmate/witnesses. Both parties filed competing appeals which unfortunately the Third Circuit did not consider due to jurisdictional considerations inherent in the verbiage of § 2255.

Defense counsel effectively renew their effort to derail or substantially preclude the re-sentencing hearing based solely upon the deaths of the three inmates whose interviews were disclosed in 2005 and cannot testify at any future proceeding. The prosecution submits as it did before the Circuit, that no Fifth Amendment violation occurred.   Moreover, Hammer's attorneys not only failed to act with due diligence in preserving the claimed important information, but are presenting only limited details about those witnesses' utility.   Beyond that, the remedy

which defendant seeks is wholly out of proportion to any wrong which may have occurred or prejudice suffered.

1.   ASSUMING *ARGUENDO* THE IMPORTANCE OF TESTIMONY FROM THE THREE INMATE WITNESSES, DEFENDANT COULD HAVE PRESERVED TESTIMONY OF TWO BEFORE THEIR DEATH AND HAS UNDISCLOSED DETAILS FROM THE THIRD.

If one were to read uncritically Hammer's pleadings regarding the importance of testimony to be offered by Gaylon Don Ball, Martin Guerrero, and Royce Lee Fowler, as reflected in their pleadings and the remedies they seek for non-disclosure of the FBI interviews until September 2005, the logical step for defense counsel to take thereafter would have been to contact promptly at least two individuals and firm up the significant details which they knew about the case.  This action could have been done for Ball and Guerrero by any of the four attorneys, or even a paralegal, working for Hammer.  They lived in federal prisons until May 2008 and December 2008.  There is no suggestion that the prosecution prevented the defense from speaking with them or that Hammer's attorney's could not have with due diligence located them since Ball and Guerrero remained in the Bureau of Prisons.

Upon learning of their existence and their presumed ill health, pursuant to Federal Rule of Criminal Procedure 15(a)(1), Hammer's legal representatives could have sought to depose and preserve their testimony.  *See e.g., United States v. Keithan*, 751 F.2d 9, 12 (1st Cir. 1984); *Furlow v. United States*, 644 F.2d

767 (9th Cir. 1981)(depositions allowed to preserve testimony from ill witnesses).

Defense counsel appear to be well aware of this means for saving information from important witnesses.  Indeed, this Court on April 13, 2011, approved Hammer's request to depose two infirmed and/or elderly witnesses who may not be able to attend the April 2012 proceeding.  Having based their request on claims of fundamental fairness under the Due Process Clause, defense counsel hardly can sit on their hands when their action could have avoided a problem from arising.  By analogy to Federal Rule of Criminal Procedure 33(b)(1), this Court should require due diligence from Hammer's attorneys if they are relying on fundamental fairness as a basis for relief.  *See generally, United States v. DeRewal*, 10 F.3d 100, 104 (3d Cir. 1993), *cert. denied*, 511 U.S. 1033 (1994), *on remand to* 1995 WL 505947 (E.D. Pa. 1995).  Thus, assuming the importance of testimony from Ball and Guerrero, defense counsel's inaction and the availability of a Fed. R. Crim. P. 15 remedy preclude this Court from granting relief on grounds of laches.  Moreover, as will be stated in Argument 2, Hammer's attorneys have more information about Royce Lee Fowler's scope of testimony which should be disclosed prior to awarding any relief.

2.    THE EXTREME REMEDY SOUGHT BY DEFENDANT SHOULD BE
      DENIED.

   A.    **The Prospective Witnesses' Testimony Had Minimal,
         if Any, Value to the Defense**

This Court has knowledge of, but did not preside over,
the § 2255 proceedings.  Consequently, some background is
essential to assess the background of these persons, the
knowledge of defense counsel about their existence as it effected
the case, the circumstances of their interview by the FBI, and
the overall importance of their potential testimony at
proceedings.

   I.    **Gaylon Don Ball**.  This inmate resided in the
Allenwood Federal Correctional Complex, United States
Penitentiary, White Deer, Pennsylvania, Special Housing Unit
("SHU") prior to and on the day Hammer killed Marti.  Ball, like
many other inmates in the Unit, was interviewed by the FBI, after
the murder.

      This inmate's name, as well as all of the others housed
in SHU, was disclosed to defense counsel at least by February
1997, if not earlier.  Whether defense counsel, or a
representative of Hammer, ever spoke with Ball or other SHU
inmates is unknown.  In point of fact, the inmate in 1998
indicated his willingness to cooperate with the prosecution.  *See*
Government Exhibit 4.  However, since the United States Attorney,
who originally prosecuted Ball, refused to consider a Federal

8

Rule of Criminal Procedure 35(b)(2) reduction of sentence, the inmate declined to be debriefed on his knowledge of the homicide or the backgrounds of Hammer and Marti.

The value of Ball's testimony, according to the defense, in the § 2255 proceedings, was two-fold.  He heard a female[1] voice outside the cell where the killing took place.  Indeed a woman officer first spoke with Hammer about what took place within the crime scene.  *United States v. Hammer*, 404 F. Supp. 2d at 746.

The primary purported value of Ball's testimony was his belief or "opinion" that homosexual activity occurred at some unspecified time between Marti and Hammer.  (Motion ¶ 10 at 7.) The fact that defendant constantly thought of (and engaged in whenever possible) homosexual activities with his cellmates was uncontested.  It is illustrated by testimony from prosecution witness Leonard Yager and defense witness Michael Smith.  *United States v. Hammer*, 404 F. Supp. 2d at 752, 780.  Indeed, the *voir dire* prepared for the 1998 proceedings included questions asking prospective jurors if they could be fair and impartial despite the fact that defendant frequently engaged in homosexual activities.

---

[1]  Defense, at first, suggested that the voice heard by Ball may have been one of Hammer's alters, the female "Tammy." However, during the September 1997 video hypnosis session with Drs. Dubin and Sadoff present, Hammer indicated that only "Jocko" appeared on April 13, 1996.

II.  **Martin Guerrero**.  Hammer's statement to the FBI on April 14, 1996, referenced the name of this inmate (in the original 302 "Martine Gerrero (phonetic)") as well as several others.  *United States v. Hammer*, 404 F. Supp. 2d at 748.  Supposedly, defendant wrote a letter[2] to Guerrero which he sent through an intermediary as part of the "sweeteners" offered to Marti to allow himself to engage in the "hostage ruse."

Defense counsel early in discovery in late 1996 received a copy of the 302 which memorialized Hammer's confession to the FBI.  However, the agent provided only a phonetic spelling of the inmate's first and last name[3].  *Id.*  It does not appear that Hammer's attorney ever contacted Guerrero.  By the same token, the prosecution <u>never</u> vouched for the accuracy of Hammer's statement to the FBI in all respects and in other respects defense counsel pointed out other falsehoods contained in the April 13, 1996, admissions.

---

[2]  Again, according to the FBI 302, the letter was not, nor could it have been, sent directly to Guerrero who remained in federal custody under Bureau of Prisons' mail rules.  28 C.F.R. § 540.17.  Instead, it was mailed to Hammer's friend in Three Rivers, Michigan, for forwarding to Guerrero.  The defense knew of this person and could have checked with Sam Young to determine if any such correspondence reached him from Hammer.

[3]  The Bureau of Prisons has an inmate locator service.  In 1998, that service included a program called "Soundx" whereby if a person was unsure of spelling of an inmate's first or last name, that program would provide a listing of many similarly sounding first and last names.  Moreover, at no time did the defense ask for the correct spelling of that inmate's name.

The significance of Guerrero's testimony is that he never <u>received</u> the letter to which Hammer alluded in his FBI statement.  That is distinct from being unable to testify from personal knowledge whether defendant ever prepared the letter or that the Postal Service, third parties, or correctional mail-handlers may have lost that item.

III.  **Royce Lee Fowler**.  There is no way from SENTRY or any other prison records systems to determine directly[3] with whomever Hammer might have shared a cell.  The disclosed notes of defense counsel during the § 2255 hearing revealed that Hammer told them with whom he resided at Allenwood, Leavenworth, or Lompoc penitentiary.  This included Fowler.

Defense counsel, pursuant to Federal Rule of Criminal Procedure 17(a), returned Fowler to the Lewisburg Penitentiary via a writ of *habeas corpus ad testificandum*[4] where on the eve of trial as a holdover, the FBI interviewed him.  *United States v. Hammer*, 404 F. Supp. 2d at 783.  Presumably, Hammer's attorneys complied with subsection (b) of that same provision by presenting a summary to the court of the testimony which they expected to receive from the inmate.  The existence or contents of that

---

[3]  All that could be done is to seek SENTRY printouts for each inmate.  One could compare the two to determine if the pair lived together, what the cell was, and for what length of time.

[4]  This can be verified by this Court by examining *ex parte* applications for writs made by the defense in the Spring of 1998.

writing remains unknown to the prosecution although it was requested during the § 2255 proceeding.  Indeed, while Fowler's <u>name</u> probably was referenced in the disclosed notes of Hammer's attorneys, no details were provided (which presumably exist somewhere) about what information the defense thought Fowler would provide at trial (even though he never was called to testify).

The purported value of Fowler's testimony as recounted by defense counsel is two-fold.  (Motion ¶¶ 12 and 15.)  Fowler alluded to Hammer's practice of tying up bed sheets.  Also defendant confided to his former Leavenworth cellmate that he had suffered abuse as a child.  *Id*. at 783-84.

As to the bed sheets, Hammer, through presentation of his guilty plea to the jury, acknowledged that the braids were for purposes other than to kill Marti.  *Id.* at 797.  Moreover, Oklahoma inmate Mike Smith testified that Hammer had used restraints when involved in sex with inmates in that prison system.  *Id*. at 780.  Moreover, Hammer admitted prior to the killing to other correctional personnel, notably Dr. Mitchell the staff psychologist at Allenwood that he had suffered abuse from his family as a child.

B.  **The Defense Overstates Judge Muir's Ruling**

Defense counsel wants to go down a road familiar to them, but not to this Court.  However, their arguments resulted

in only a partial victory before Judge Muir to overturn the jury's sentencing recommendation but not so egregious as to allow Hammer to withdraw his guilty plea.  Compare *United States v. Hammer*, 404 F. Supp. 2d at 795-97 with 798-99.  This ruling hardly lends any support to their request to bar a re-sentencing hearing or presentation of certain aggravating[5] factors to the jury.

Both parties appealed from Judge Muir's decision to the Court of Appeals and neither obtained review.  In part 3 of this argument, the rationale why Judge Muir erred in finding a Due Process violation will be presented in summary form.  But even if this Court believes Judge Muir's ruling was correct, it is incumbent for this Court to consider fundamental fairness under the Fifth Amendment.  That includes consideration of <u>all</u> pertinent factors which due to the lateness of the issue being raised were not presented to the district court's attention in late September 2005, and some of which remain hidden.  Indeed, in a case cited by defendant, *Gov't of Virgin Islands v. Fahie*, 419 F.3d 249, 256 Fn. 10 (3d Cir. 2005), the Third Circuit observed

---

[5]  As a remedy, Hammer seeks this Court to preclude the prosecution from submitting information about the intent factors as well as substantial planning and premeditation aggravating factor or to acquiesce that Hammer had been abused as a child. (Motion ¶ 18.)  But what does Ball's information or opinion about homosexual behavior have to do with those considerations? Defense counsel overestimate the importance of this factor unrelated to an undisputed character trait of defendant.

"Only if a defendant has demonstrated that his rights were violated and that the violation was willful need a court again consider the degree of prejudice in fashioning an appropriate remedy."  The revised and complete scenario includes the following.

Ball indicated prior to trial through his attorney that he had favorable evidence for the prosecution if he could receive a sentence reduction which fact hardly enhances his credibility as a witness.  Particularly since his testimony related to an undisputed topic, the likelihood of sexual interaction between Marti and Hammer for the four to five days they lived together before the murder, no relief is appropriate.  *See United States v. Price*, 13 F.3d 711, 721-22 (3d Cir. 1994)(no relief from non-disclosure since testimony was incredible and strategy would not have changed).

Guerrero adds little to the case as well.  He did not receive a letter that Hammer promised Marti he would send. Defendant said many things to the FBI on April 13, 1996, some of which could be corroborated (by physical evidence or third party testimony), some of which was contradicted (Officer Boone's involvement), and some of which could not be confirmed one way or the other (the statements he made to the victim in their cell). The only person who knows if Hammer truly promised to send a letter to Guerrero is Andrew Marti.  Moreover, the defense could

have called to testify the third party in Michigan, a person well known to Hammer and his attorneys to whom the letter initially was sent, that he never received it from defendant, if the defense felt such a fact wholly undermined Hammer's admissions.

Finally, with respect to Fowler, Judge Muir had but an aspect of the whole truth about what that witness knew.  Hammer told his attorneys about his former cellmate who then arranged for his return to Lewisburg where the FBI interviewed him.  What did Fowler know that persuaded his defense team in the first instance to ask for his return?  Why was he not used as a witness?  Before awarding any relief on grounds of fundamental unfairness, those questions, and possibly others, should be answered.  *Gov't of Virgin Islands v. Fahie, supra*.

### C.    Dismissal is an Inappropriate Remedy

Defendant relies extensively upon *Gov't of Virgin Islands v. Fahie, supra*.  (Brief of Defendant at 7-8.)  But as Judge Fuentes observed "Our research discloses no case where a federal appellate court upheld dismissal [of charges] with prejudice as a remedy for a *Brady* violation. . . ."  *Id*. at 254 Fn. 6.  Moreover even before considering any prejudice, this Court, following *Fahie, supra*, must first conclude that there was "deliberate misconduct" by the prosecution.  *Gov't of Virgin Islands v. Fahie*, 419 F. 3d at 254-55.  Particularly when the names of all three potential witnesses were disclosed or known by

the defense, and Judge Muir did not order wholesale disclosure of FBI 302s of inmates, *United States v. Hammer*, 404 F. Supp. 2d at 781-82, it is submitted that such a finding cannot be made.

3.   THE PROSECUTION DID NOT VIOLATE THE DEFENDANT'S CONSTITUTIONAL RIGHTS BY NON-DISCLOSURE OF THE FBI INTERVIEWS.

The Defense suggests that the FBI 302 reports indicating that Hammer had a history of sexual bondage supported an accident/erotic asphyxiation defense and undercut the Government's assertion that the "substantial planning and premeditation" aggravating factor was shown by Hammer's pre-murder braiding of Marti's restraints.  *Brady*, however, does not require disclosure of information already known to the defense. Hammer was personally aware of all of the bondage incidents recounted in the FBI 302 reports, as he participated in each of the described bondage episodes.  Trial counsel were likewise aware of Hammer's history of sexual bondage, but quickly changed the subject when defense witness Michael Smith discussed Hammer's sexual bondage on cross-examination.[6]  As noted, an erotic asphyxiation defense conflicted with the previously-selected insanity defense, and evidence of a long history of hedonistic bondage culminating in a deliberate murder could easily be weighed against Hammer at the penalty phase.

---

[6] Defense counsel had also interviewed and presented a number of inmate witnesses for Hammer's insanity defense, who were familiar with Hammer's sexual activity.

Almost as well-established as *Brady* itself is the related corollary that "[e]vidence is not considered to be suppressed if the defendant either knew or should have known of the essential facts permitting him to take advantage of any exculpatory evidence." *United States v. Perdomo*, 929 F.2d 967,973 (3d Cir. 1991).  And, more specifically, the Government has had no obligation to disclose to defense counsel documents setting forth facts that the defendant himself knew or had reason to know.  *United States v. Diaz*, 922 F.2d 998, 1007 (2d Cir. 1990)(holding that the Government did not improperly fail to disclose a witness's account that Diaz was not present at a meeting to set up a drug transaction; "[i]f in fact . . . Diaz was not in [the witness's] apartment during the transaction, Diaz knew that fact"); *United States v. Zuazo*, 243 F.3d 428, 431 (8th Cir. 2001)("Having spent two days together with [the witness whose statements were not disclosed], Salaiza Zuazo was well aware of [the witness] and his potential testimony"); *United States v. Roane*, 378 F.3d 382, 402 (4th Cir. 2004) (because "information actually known by the defendant falls outside the ambit of the Brady rule," Government did not violate *Brady* in failing to disclose statements of witnesses who assuredly could have provided defendant with an alibi, as the defendant "[o]bviously . . . knew who he was with on the evening of the [] murder" and, therefore, "had no need for the Government to

17

provide him with such information"), cert. denied, 546 U.S. 810 (2005); *Fullwood v. Lee*, 290 F.3d 663, 686 (4th Cir. 2002) ("the state did not suppress the information that came out during Fullwood's conversation with Detective Robertson because Fullwood, better than anyone, knew about his cocaine use on the night prior to the stabbing and knew that he recounted that fact to Detective Robertson"); *West v. Johnson*, 92 F.3d 1385, 1399 (5th Cir. 1996) ("Certainly West knew whether or not had taken the necklace [as he had confessed], and necessarily knew that better than the prosecution could have"); *see United States v. Pellulo*, 399 F.3d 197, 216 (3d Cir. 2005); *United States v. Johnson*, 592 F.3d 164, 172 (D.C. Cir. 2010) (recognizing this rule but finding it inapplicable under the facts).

As is obvious, Hammer was well aware of his own long-standing, blatant homosexual practices that involved bondage. These basic facts were fully available to Hammer and undoubtedly known by him; the mere fact that the inmates subsequently reported the facts to investigators did not, in and of itself, provide additional, admissible exculpatory information. Gaylon Ball's mere unsubstantiated suspicion that Hammer and Marti may have engaged in sex at some time when they lived together likewise did not provide additional, admissible exculpatory information that would "undermine confidence" in the jury's finding of substantial planning and premeditation and its

18

imposition of a death sentence, in accordance with the standard of *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

The post-conviction court's efforts to avoid the controlling effect of this principle are unconvincing.  Whether the defendant was aware that several inmates imprisoned with him were interviewed or that they observed his bondage-oriented homosexual activities and mentioned them to investigators is irrelevant for purposes of *Brady*.  The critical factor is that Hammer was well aware of his demonstrated proclivities for bondage-oriented homosexual activities and the identities of the various inmates who had been housed in close proximity to him over his years of incarceration.  Moreover, Hammer had knowledge of his own sexual activities – together with those of his various sex partners – that was far superior to that of the various inmates interviewed by the federal agents.  While the district court states that Hammer's knowledge is irrelevant unless his attorneys shared in that knowledge, the fact remains that Marti was murdered under circumstances that at least suggested homosexual activity, and defense counsel certainly argued that theory to the jury at trial.  In such circumstances, it was hardly unreasonable to expect defense counsel to quiz Hammer about his relationship with Marti and his sexual proclivities.

Defense counsel were, in fact, well aware of Hammer's history of bondage, but deemed it entirely unfavorable, as the cross- and redirect-examination of Michael Smith at trial make clear. Presenting Hammer's sexual bondage as evidence of a defense of accident would have conflicted with the selected defense of insanity. That Hammer had engaged in along pattern of sexual bondage, concluding in a deliberate murder by "Jocko," would only have served to cast the defense case in a bad light before the jury.

Two further points bear making. First, even setting aside the inconsistency with the insanity defense, it is far from apparent that the FBI 302 reports contain exculpatory information. The post-conviction court believed that the information in the reports could have undercut the basis for the substantial planning and premeditation aggravator by suggesting that Hammer might have gone through the elaborate planning – arranging for Marti to be assigned as his cellmate, braiding the ropes, and carefully tying Marti to the bunk – as a prelude to homosexual activity that included erotic asphyxiation rather than as a prelude to murder. But, while the various FBI reports contain information about bondage and whipping, they do not refer to erotic asphyxiation as part of Hammer's sexual practices. The medical examiner, Dr. Funke, found no evidence that Hammer and Marti were engaged in sexual activity while Marti was restrained;

20

at most, the presence of traces of Marti's sperm along his own lip line suggests that he engaged in antecedent sexual activity. Most importantly, Hammer entered a guilty plea and admitted that he intentionally killed Marti.

Second, in concluding that, if disclosed to the defense, the FBI 302 reports would likely have resulted in a non-death verdict, the defense places undue importance on the role of the substantial planning and premeditation aggravator in the jury's deliberations, while minimizing the evidentiary basis for the factor.  As the Supreme Court made clear in *Strickler v. Greene*, 527 U.S. 263, 289-296 (1999), a defendant's burden of establishing that he was prejudiced by the nondisclosure of exculpatory information is not easily met, even with regard to the penalty phase of a capital trial at which a single juror can prevent imposition of a death sentence.  As the Court stated in *Strickler*, the pertinent question is not whether the undisclosed information might have changed the outcome of the trial; rather, a defendant must convincingly show that "'there is a reasonable probability' that the result of the trial would have been different if the suppressed documents had been disclosed to the defense," thereby placing "the whole case in such a different light as to undermine confidence in the verdict."  *Id*. at 289-92.

21

**CONCLUSION.**

This Court is respectfully urged to deny relief.  With regard to potential witnesses Ball and Guerrero, defense counsel did not act with due diligence in failing to preserve their testimony even though this could easily have been done.  As to potential witness Fowler, this Court should know the complete facts about how valuable his testimony may have been which presently is unknown.

The prosecution did not violate Hammer's Fifth Amendment rights by not disclosing the interviews of those three inmates. Even if that did occur, when the entire record is reviewed, there was no deliberate misconduct.  Finally, the remedy sought by Hammer's attorneys is out of proportion to any prejudice which the defense may have suffered.

Respectfully submitted,

PETER J. SMITH
United States Attorney

By s/Frederick E. Martin
FREDERICK E. MARTIN
Assistant United States Attorney
PA ID 57455
Herman T. Schneebeli Federal Bldg.
240 West Third Street, Suite 316
Williamsport, PA 17701-6465
Tele: (570) 326-1935
FAX: (570) 326-7916
Electronic Mail:
Fred.Martin@usdoj.gov

                              Steven D. Mellin
                              Trial Attorney For the
                              Capital Case Unit
                              Texas ID 13920380
                              1331 F Street, N.W.
                              Washington, D.C. 20530
                              Tele: 202-514-1224
                              Electronic Mail:
                              Steve.Mellin2@usdoj.gov
Dated: _____June 17_____, 2011

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA      :  Criminal No. 4:CR-96-0239
                            :
        v.              :  (Judge Slomsky)
                            :
 DAVID PAUL HAMMER      :  **ELECTRONICALLY FILED**

## CERTIFICATE OF SERVICE

    I hereby certify that I caused a true and correct copy of the foregoing

**BRIEF IN OPPOSITION TO DEFENDANT'S
MOTION TO PRECLUDE THE CAPITAL PROSECUTION
OR, IN THE ALTERNATIVE, DISMISS THE INTENT FACTORS
AND/OR SUBSTANTIAL PLANNING AND PREMEDITATION
AGGRAVATING FACTORS BECAUSE THE GOVERNMENT'S
DELIBERATE FAILURE TO DISCLOSE EXCULPATORY MATERIALS
DIRECTLY DISPUTING THE GOVERNMENT'S CASE
VIOLATED MR. HAMMER'S FIFTH, SIXTH, AND EIGHTH AMENDMENTS**

to be electronically mailed on    June 17   , 2011, to:

ADDRESSEES:    Ronald C. Travis, Esquire
                  rtravis@riederstravis.com

                  Michael Wiseman, Esquire
                  Michael_Wiseman@fd.org

                  James J. McHugh, Jr., Esquire
                  James_McHugh@fd.org

                  James Moreno, Esquire
                  James_Moreno@fd.org

                  Anne Saunders, Esquire
                  Anne_Saunders@fd.org

                  S/Frederick E. Martin
                  FREDERICK E. MARTIN
                  Assistant United States Attorney