IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


IN RE:  GRAND JURY MISC 95-142
        Case #93R8063


IN THE MATTER OF THE UNITED STATES ATTORNEY'S OFFICE


LOCATION:          240 West 3rd Street
                   Courtroom #2
                   Williamsport, Pennsylvania 17701


DATE:              Wednesday, July 24, 1996, 11:45 a.m.

WITNESSES:         SPECIAL AGENT ANTHONY S. MALOCU

REPORTER:          Roy Keffer

COUNSEL:           FREDERICK MARTIN, ESQUIRE
                   ASSISTANT UNITED STATES ATTORNEY


YORK STENOGRAPHIC SERVICES, INC.
34 North George St.
York, PA 17401
(717) 854-0077

Opposition Brief to Indictment Challenge
Government Exhibit 2
Page 1 of 119

INDEX TO WITNESSES

Martin

Special Agent Malocu                    3

Agent Malocu (Recalled)                15

INDEX TO EXHIBITS

Grand Jury Exhibit:

                                                        Page

#1 - Note handwritten by Mr. Hammer              15
#2 - Letter from Mr. Hammer to Rock              15
#3 - Letter from Mr. Hammer to Mr. Kahle         17
#4 - Letter from Mr. Hammer to Mr. Claussen      17

YORK STENOGRAPHIC SERVICES, INC.
34 North George St.
York, PA 17401
(717) 854-0077

**Opposition Brief to Indictment Challenge**
**Government Exhibit 2**
**Page 2 of 119**

3

*  *  *

July 24, 1996

[11:45 a.m.]

MR. MARTIN:

Have you previously been sworn before this Grand Jury?

AGENT MALOCU:

I believe so.

*  *  *

SPECIAL AGENT ANTHONY S. MALOCU, called as a witness, having previously been duly sworn, testified as follows:

BY MR. MARTIN:

Q.   By way of reintroduction, could you tell the Grand Jury who you are.

A.   My name is Anthony S. Malocu, M-A-L-O-C-U.  I am an agent with the Federal Bureau of Investigation.

Q.   And how long have you been with the FBI?

A.   I have been with the FBI for approximately 12 months.

Q.   And beginning April 14th or 13th of this year, did you investigate a homicide at the Allenwood Penitentiary?

A.   Yes, I did.

Q.   And who was the suspect in the homicide?

YORK STENOGRAPHIC SERVICES, INC.
34 North George St.
York, PA 17401
(717) 854-0077

Opposition Brief to Indictment Challenge
Government Exhibit 2
Page 3 of 119

4

A.    The suspect was David Paul Hammer.

Q.    And who was the victim of the homicide?

A.    The victim's name was Andrew Hunt Marti.

Q.    And the spelling of Marti?

A.    M-A-R-T-I.

Q.    Now before we get too much further into this, you hear so much on TV or you think you know so much about some key phrases. Key phrases or legal phrases are "Malice Aforethought" and "Premeditation." So we will take it out of the book right now and listen to this, and then as you hear the facts see whether the facts support the findings of malice and premeditation.

Malice is the state of mind that would cause a person to act without regard to the life of another. To satisfy the element, the Defendant must have acted consciously with the intent to kill another person. In order to establish this element, the government must prove that the Defendant acted willfully with a bad or evil purpose to break the law. However, the government need not prove spite, malevolence, hatred or ill will to the victim.

Another concept of importance is premeditation which is different than malice. Premeditation is -- an act is done with premeditation if it is done upon deliberation. In order to satisfy this element, the government must prove that the Defendant killed the victim only after thinking

**Opposition Brief to Indictment Challenge
Government Exhibit 2
Page 4 of 119**

the matter over deliberating whether to act before committing the crime. There is no requirement that the government prove that the Defendant deliberated for any particular period of time in order to show premeditation. It is sufficient to satisfy this element if you find that before he acted, the Defendant had a period of time to become fully aware of what he intended to do and to think it over before he acted.

So with those two concepts in mind -- because this is your first murder case, is it not? I mean, we heard about Mr. McCullough and we heard from the other witnesses in the other killing in the federal correctional institution, the medium, but this is a case that will probably require you to return or to consider returning an indictment for first degree murder. We hadn't gotten to that phase in that other case so this one may require that so that's why we are giving you these concepts early on. And they will be repeated if and when an indictment is solved.

With respect to -- again, you have indicated who the individuals are, the victim and the suspected murderer. When did it take place?

A. This took place...

Q. You will have to talk much louder. I had to talk louder too. The fans are...

Opposition Brief to Indictment Challenge
Government Exhibit 2
Page 5 of 119

6

A.    At approximately 3 a.m. on April 13th of this year.

Q.    And that was at the Allenwood Penitentiary?

A.    At the Allenwood Penitentiary.

Q.    What part of the Allenwood Penitentiary?

A.    In the special housing unit which is where-- some people call it the hole, segregation, in the administrative detention section.  There are two sections.  There is disciplinary, segregation and administrative detention.

Q.    And it was discovered close to 3 a.m. on April 13, is that correct?

A.    Correct.

Q.    And where -- in what cell was the murder discovered or what aspect of the special housing unit?

A.    It was in cell 103.

Q.    And how many people lived or resided in cell 103?

A.    In cell 103, David Paul Hammer and Andrew Hunt Marti were cell mates.

Q.    And when would have been the last time that Mr. Marti was seen alive prior to 3 a.m. on April 13?

A.    Between 1 and 1:30 a.m. when the correctional officer conducted a count on the unit.

Q.    With respect to again the discovery of the

**Opposition Brief to Indictment Challenge**
**Government Exhibit 2**
**Page 6 of 119**

body, who made the discovery if you know the officers' names or...

A. Correctional Officer Cadros, I believe, was about -- she was conducting a count approximately 3 a.m. And inmate Marti -- I am sorry, inmate Hammer notified her and told her that his cell mate was dead.

Q. And what did she say after he was -- he advised her that his cell mate was dead? What did she do?

A. She shown the flashlight into the cell, and she saw inmate Marti laying face down, bound to his bed.

Q. Did Mr. Marti -- or did she say anything to Mr. Marti about the circumstances of the death of Mr. -- or did she say anything to Mr. Hammer about the circumstances of Mr. Marti's death?

A. Yes. I think -- I am sorry, she asked him if he was dead, and Hammer responded, yes, he is dead.

Q. And did she ask why he was tied down?

A. Yes, and Hammer responded it was easier that way.

Q. Easier to do what?

A. Easier to kill him.

Q. Correctional officers then entered the cell, is that correct?

A. Correct.

Q. And Mr. Hammer was taken out of the cell first

YORK STENOGRAPHIC SERVICES, INC.
34 North George St.
York, PA 17401
(717) 854-0077

Opposition Brief to Indictment Challenge
Government Exhibit 2
Page 7 of 119

8

of all, is that correct?

A.   Yes, Hammer was taken out of the cell.

Q.   And when they went to investigate the condition of Mr. Marti who was face down and tied to his bed, what did they discover in terms of his health?

A.   Inmate Marti was dead.

Q.   All right.  Did they try to do some things for him there in the cell?

A.   Yes, they tried to resuscitate him, but they were unsuccessful.

Q.   And with respect, did they take him to an outside hospital?

A.   They took him to -- yes, Evangelical Hospital.

Q.   And was he pronounced dead at that location?

A.   Yes, he was.

Q.   When the officers again initially entered the cell, what did they have to do, if anything, to remove Mr. Marti from the cell?

A.   They had to cut the rope that was used to tie him to the bed, the bed frame.

Q.   Okay, now were all four of his limbs tied?

A.   Yes, they were.

Q.   You used the word "rope."  Could you describe the physical item that was found by the correctional officers on the scene?

**Opposition Brief to Indictment Challenge
Government Exhibit 2
Page 8 of 119**

A.    The rope appeared to be sheets that were torn into strips and braided to make it a rope.

Q.    Was an autopsy conducted in Mr. Marti's death?

A.    Yes, yes it was.

Q.    And what was the cause of death found according to the autopsy?

A.    Ligature strangulation.

Q.    Was an item or was anything found in the cell which supported a finding that there was a garroting or strangulation with some item rather than with someone's hands?

A.    Yes.  Items found in the cell were consistent with the strangulation marks left on Marti's neck.

Q.    Now again, the item that was used to do the actual strangling, was that different than the bed sheet?

A.    I am sorry, repeat that.

Q.    Was that also a bed sheet that was used for the actual garrote or that was pulled around the neck or was some other item used to strangle him, if you know, if you can recall.

A.    I am not sure if it was a string or a rope.  I am not sure if it was a bed sheet or not.

Q.    With respect to -- again, Mr. Marti was dead and he was found bound and they cut him loose, is that correct?

YORK STENOGRAPHIC SERVICES, INC.
34 North George St.
York, PA 17401
(717) 854-0077

Opposition Brief to Indictment Challenge
Government Exhibit 2
Page 9 of 119

A. Correct.

Q. Then investigation ensued, and a number of inmates came forward or were questioned about this, is that correct?

A. Yes.

Q. Could you tell the jury, again, give them kind of a physical description of what cell 103 looked like in terms of whether other inmates were around or who would have access to cell 103.

A. Cell 103, like all the cells in the special housing unit, are approximately 10 x 15, relatively small cells with an iron door. The orderly who worked in the unit which was a Leonard Morris Yager, had access to -- he worked on the floor. He would bring the inmates towels, socks. He would mop the floors. So he had basically free rein to the special housing unit.

Q. He was nonetheless supervised by correctional officers, is that correct?

A. Yes.

Q. At 2 or 3 o'clock in the morning, he wouldn't have been out?

A. No, he would not have been out. I think his shift ended about 6 p.m.

Q. But he was one individual whom you identified as a potential witness in this case, is that correct?

Opposition Brief to Indictment Challenge
Government Exhibit 2
Page 10 of 119

A.   Yes.

Q.   And we are going to have him testify right now unless there are some -- there is a lot more to this case, but again, for timing purposes we wanted to give you a slight introduction and then have Mr. Yager testify, and then Mr. Malocu will be back to provide more details.

Are there any questions you have now, just again to set the scene before Mr. Yager testifies?

*  *  *

GRAND JUROR:

What's the difference between a disciplinary section and your segregation sections?

THE WITNESS:

The difference between disciplinary segregation and administrative detention is that when someone has placed an administrative detention it's for an administrative purpose.  They may have fear for their life out on the compound.  Someone may be after them or for some other reason they are being put in there with their own consent and of their own free will.

Disciplinary segregation, they are being placed in there for a disciplinary reason.  And basically, they are being placed against their will.

MR. MARTIN:

YORK STENOGRAPHIC SERVICES, INC.
34 North George St.
York, PA 17401
(717) 854-0077

12

Does that answer your question? And also, I believe the people in disciplinary segregation don't have as many privileges as people in the administrative detention unit.

THE WITNESS:

Correct.

***

BY MR. MARTIN:

Q. So it's a status -- one is a punishment, one is just a removal from the general population, is that correct?

A. Administrative purpose. Correct.

***

GRAND JUROR:

Are the cells just one floor? I imagine it's small then. Is it just one cell then, right?

THE WITNESS:

All cells have the capability of putting two inmates inside. Some don't -- some are not placed with another cell mate. Some have two...

***

BY MR. MARTIN:

Q. For example, there is a famous fellow that the Grand Jury might know by the name of Aldrich Ames at the penitentiary, and he is in a single cell status, is that

YORK STENOGRAPHIC SERVICES, INC.
34 North George St.
York, PA 17401
(717) 854-0077

**Opposition Brief to Indictment Challenge**
**Government Exhibit 2**
**Page 12 of 119**

13

correct?

A. Correct. He uses a single cell status. He was approximately two cells down from the incident.

* * *

GRAND JUROR:

And Mr. Marti was in the distance when they were administrating?

THE WITNESS:

Correct.

MR. MARTIN:

As was Mr. Hammer, is that correct?

THE WITNESS:

Yes, yes.

MR. MARTIN:

Any other preliminary questions?

GRAND JUROR:

You said the cells are 10 x 15.

THE WITNESS:

Approximately.

GRAND JUROR:

That's not big. The don't -- they have nothing to...

THE WITNESS:

Well, for a shower and...

MR. MARTIN:

YORK STENOGRAPHIC SERVICES, INC.
34 North George St.
York, PA 17401
(717) 854-0077

Opposition Brief to Indictment Challenge
Government Exhibit 2
Page 13 of 119

14

Yes, included in that space are what, a shower?

THE WITNESS:

A shower.

MR. MARTIN:

Two beds and a desk?

THE WITNESS:

A desk, a dresser.

MR. MARTIN:

What we will try and do in the future is to get you a picture of the actual cell so you can visualize it.

All right.  We will excuse Mr. Malocu for now, and I will speak to Mr. Yager to see if he has any last minute trepidations because sometimes these things occur so give me a couple minutes.  If he is ready to go, we will go right in.  If there is a little delay, we will do the best we can.

[End of testimony of Special Agent Malocu at 11:50 p.m.]

***

[AGENT MALOCU, RECALLED at 1:37]

***

SPECIAL AGENT ANTHONY MALOCU,

recalled as a witness, having previously been duly sworn, testified as follows:

BY MR. MARTIN:

YORK STENOGRAPHIC SERVICES, INC.
34 North George St.
York, PA 17401
(717) 854-0077

Opposition Brief to Indictment Challenge
Government Exhibit 2
Page 14 of 119

15

Q. I think Mr. Yager who was in the Grand Jury has identified this document as Grand Jury Exhibit 1, but we will ask you if you have seen that in any fashion and where you first saw it.

A. Yes, I have seen that document. That document was provided to me by Mr. Yager during -- well, after an interview with him down at the USP Allenwood.

Q. Now I believe you have also gathered, or the Bureau of Prisons has gathered other correspondence possibly written by Mr. Hammer as well, is that correct?

A. Correct.

Q. And you have a number of items, and you, I guess, will do them numerically. Grand Jury Exhibit 2 is what?

A. Grand Jury Exhibit Number 2 is a letter addressed to Rock...

Q. It's R-O-C-K, right?

A. R-O-C-K at AD 108, meaning Administrative Detention, cell 108.

Q. Okay, now we have done some highlighting of it so rather than to read the whole record or read the whole letter, again, the Grand Jury can take a look at the whole letter if they like. Rock was an inmate, is that correct?

A. Yes, he was.

Q. And this is a letter that was intercepted by

Opposition Brief to Indictment Challenge
Government Exhibit 2
Page 15 of 119

16

someone at the penitentiary from, it is believed, Mr. Hammer to Rock, is that correct?

A.   Correct.

Q.   Okay, if you would read the important highlighted parts there.

A.   Okay. "Rock, I did not have any right to take his life," meaning Marti. "But the obvious fact is I did so. I will pay for what I have done whether it be by spending years more in prison or with my own life, I will pay. My decision was made after careful thought and consideration. I hate that Andrew Marti was sacrificed for my own cause. His past didn't affect me, but he is free now far away from these prison walls. I feel for his family and what they are suffering now because of me so I have much to be judged for."

Q.   And again, members of the Grand Jury, you can compare that letter to what Mr. Yager testified to as to expressions that he made -- Rock is not Mr. Yager, is that correct?

A.   No, he is not.

Q.   It's another inmate?

A.   Yes, Larimore.

Q.   Larimore? Okay, Grand Jury -- and that's L-A-R-I-M-O-R-E?

A.   I can get the correct spelling for you.

Opposition Brief to Indictment Challenge
Government Exhibit 2
Page 16 of 119

17

Q.   As I said, L-A-R-I-M-O-R-E?

A.   Yes, Chester Drew Larimore.

Q.   Okay, the next letter we have, Grand Jury Exhibit 3, or letter and envelope.

A.   Yes, this is Grand Jury Exhibit Number 3.  It is addressed to Lenny Kahle, K-A-H-L-E.

Q.   And is there a part of it that's in two different handwritings actually?

A.   Yes.

Q.   And the shorter part appears to be in handwriting similar to Grand Jury Exhibits 1 and 2, is that correct?

A.   Correct, the handwriting of...

Q.   Would you read the highlighted portion of the handwriting that is similar to Grand Jury Exhibits 1 and 2? I don't think there is very much there.

A.   "It matters not to me what you or anyone else may think.  I am under no illusions where you are concerned and never have been.  There is never a good reason for anyone to be killed, nor is there justification for taking a human life so we do agree with that."

Q.   Okay, and then the last document is Grand Jury 4, is that correct?

A.   Yes.

Q.   And that is an envelope addressed to whom?

Opposition Brief to Indictment Challenge
Government Exhibit 2
Page 17 of 119

18

A.    Steve Claussen, S-T-E-V-E.

Q.    And Mr. Claussen was what to Mr. Hammer?

A.    Claussen was the former cell mate of Mr. Hammer.

Q.    And he was Hammer's cell mate before Marti got there, is that correct?

A.    Correct, correct.

Q.    If you would read any highlighted portions of that document as well.

A.    Please excuse me, it's been copied so many times it's difficult to read.

"Steve, I don't care what you say to the FBI or SIS" -- SIS are the special investigative supervisors at the prison. "There isn't anything that can hurt me because their case is pretty open and shut. I am sure you were surprised to learn that I had done what I told you I was going to do with Marti. In death, Marti"...

Q.    Read it as well as you can.

A.    Okay. "In death, Marti"...

Q.    Spell the word if you can't read it.

A.    I can't -- it's not legible.

Q.    Okay.

A.    "...but rather a new beginning.

Q.    Okay. And we are -- those items have not been sent down either for fingerprints or for handwriting

Opposition Brief to Indictment Challenge
Government Exhibit 2
Page 18 of 119

19

analysis at this point in time?

A.   No, they have not.

Q.   And it would be useful for this Grand Jury to have Mr. Hammer's fingerprints and handwriting samples, is that correct?

A.   Yes.

Q.   And we have not obtained them to this point in time, is that correct?

A.   No, we have not.

Q.   Shortly following the incident, did one of your colleagues obtain a statement from or go out to interview Mr. Hammer?

A.   Yes.

Q.   And was that Rick Thompson or Carlyle Thompson, the fellow that interviewed Mr. Hammer?

A.   Yes, it was.

Q.   Was Hammer advised of his rights prior to a statement being obtained?

A.   Yes.

Q.   Now did Hammer execute a written waiver of his right to remain silent or did he just orally tell the agents that he would give a statement?

A.   He provided a written statement.

Q.   And basically, who was present other than Mr. Thompson if you remember?

**Opposition Brief to Indictment Challenge
Government Exhibit 2
Page 19 of 119**

20

A. Present were SIS, Mark Traxler, special investigative supervisor, and Dawn C. Troutman, unit manager for the Bureau of Prisons.

Q. Okay, where it says -- at the bottom it says, "S. A. Thompson thereafter attempted to bribe Hammer with the Interrogation Advice of Rights Form."

A. Right.

Q. And did Hammer indicate he was aware of his rights?

A. Yes, he did. Yes, he indicated he was aware of his rights.

Q. But did he...

A. He was not willing to sign the form.

Q. Okay, and I guess the interview began with a question as to whether Marti was dead or a statement that Marti was dead, is that correct?

A. Yes. Yes, it did.

Q. And what in response to that did Mr. Hammer say?

A. Where do you want to start?

Q. Okay, in chronological fashion to the extent that you can, did Mr. Hammer make a statement that he wanted to have Mr. Marti cell with him?

A. Yes, he did. He advised that both he and Marti consented to having each other -- they wanted to cell

**Opposition Brief to Indictment Challenge**
**Government Exhibit 2**
**Page 20 of 119**

together, and both provided written and oral statements to correctional officers the previous week.

Q. And did Hammer tell the FBI that he had told anyone that he was going to -- in advance of April 13th that he was going to kill Marti?

A. Yes, he did.

Q. And did he say that he had told Claussen, the fellow that he wrote the letter to, that he was one of the people that he told he would kill Marti?

A. Yes. He stated he told his former cell mate that he was going to kill Marti.

Q. And again, Claussen is different than Yager?

A. Yes, Claussen was the inmate that celled with Hammer before Marti moved in.

Q. According to Hammer's statement, it wasn't until Tuesday, April 9th that Marti moved in with him, is that correct?

A. That's correct.

Q. And following that, when, according to again Mr. Hammer's statement did he begin talking about or doing this business with the braided ropes?

A. That would have been on April 11th, Thursday, April 11.

Q. And how, according to Mr. Hammer, did he introduce Mr. Marti to this concept of being tied up?

**Opposition Brief to Indictment Challenge
Government Exhibit 2
Page 21 of 119**

A.    Marti was aware of Hammer's reputation and his past.    He had taken individuals hostage at other institutions, and the result was that you can -- the individual taken hostage could be transferred to another institution.    Marti...

Q.    And for a fact, have you reviewed Mr. Hammer's records and has he in fact tied up people similar to Mr. Marti in the past?

A.    Yes.

Q.    And was that at the Lompak Penitentiary, the federal penitentiary?

A.    Correct.

Q.    And did Mr. Hammer induce Marti to get himself tied up in any other fashion other than by saying this will get you transferred quicker?

A.    He also offered Marti $500 to go along with the scenario.

Q.    When, according to Mr. Hammer's statement, did Marti agree to go along with this proposal that Marti be tied up?

A.    They discussed it Thursday, the 11th; and shortly after on Thursday, the 11th, Marti agreed to go through with the scenario.

Q.    Okay, next in time I think we go to Friday afternoon.    There was a team meeting, and then after that

**Opposition Brief to Indictment Challenge**
**Government Exhibit 2**
**Page 22 of 119**

Marti and Hammer talked more about how to have the scenario being tied up, is that correct?

A.    Correct.

Q.    And when did -- according to Mr. Hammer's statement, when did the actual tying begin?

A.    The typing of who?

Q.    Of Marti?

A.    Marti?  The tying began at approximately 2:00 a.m. on the 13th of April.

Q.    And again, to summarize, each one of Mr. Marti's limbs were tied to a different part of the bed, is that correct?

A.    That's correct.  Hammer began with the legs, then he went on to tie Marti's arms and his wrists to the bed frame.

Q.    And did Hammer tell Marti to try and get loose just to see how tight the things were?

A.    Yes, he did.

Q.    And did Hammer tell Marti why he told him to try and get loose?

A.    Yes, he wanted it to be more realistic.

Q.    Then following the tying up, did Hammer offer a cigarette to Mr. Marti?

A.    Yes, he put a cigarette into the -- on the lips of inmate Marti.

Opposition Brief to Indictment Challenge
Government Exhibit 2
Page 23 of 119

24

Q.    Then what did he do next with his mouth, with Marti's mouth, if you remember.  And I am on page of the...

A.    Oh, Hammer stuck a sock into Marti's mouth.

Q.    And did he use a strip of sheet to make sure the sock stayed in his mouth?

A.    Yes.  Yes, he did.

Q.    Recovered from the scene, was there a sock with blood on it?

A.    Yes, there was.

Q.    Okay, was there a time frame in which, you know, after a certain point in time that Marti -- or Hammer remembered, you know, going forward with any strangulation or rendering Mr. Marti unconscious?  Was there any time sequence?

A.    Yes.  After inmate Hammer had Marti bound, he got onto the back of inmate Marti and straddled him.  He then -- he placed him in a choke hold and began choking him for approximately three minutes.

Q.    And do you know whether he used his right hand or his left hand according to the statement he gave Mr. Thompson?

A.    I...

Q.    I am not sure that it's in there.

A.    Well, yes, he used his right forearm, placed his right forearm underneath the...

YORK STENOGRAPHIC SERVICES, INC.
34 North George St.
York, PA 17401
(717) 854-0077

Opposition Brief to Indictment Challenge
Government Exhibit 2
Page 24 of 119

25

Q.   Did there come a time when, according to the statement he gave Agent Thompson, that he stopped trying to strangle with his arm Mr. Marti?

A.   Yes.   His shoulder became -- came out of joint.

Q.   And following -- again, I am jumping ahead, was there medical complaints made by Hammer that he had injured his shoulder that night to the physician's assistant?

A.   Yes.

Q.   Okay, after he got up for a while, did he then go back and continue the choking of Marti?

A.   Yes, after he choked Marti for -- and his shoulder came out of joint, he put it back into socket and continued.

Q.   Did he say whether Marti asked him to stop?

A.   Not that I am aware of.

Q.   And did there come a point in time when Marti's body relaxed?

A.   Yes, Marti, after approximately three minutes, began shaking violently, and then his body relaxed and there was no more movement from him.

Q.   And then what did Mr. Hammer do after that?

A.   Mr. Hammer...

Q.   According to his statement?

**Opposition Brief to Indictment Challenge
Government Exhibit 2
Page 25 of 119**

26

A. ...according to his statement, got off the body of Marti and took a ligature, went back to Marti, got on his back and placed a ligature around his neck and pulled the ligature with his arms in a crossing motion and held that for approximately three to four minutes.

Q. And was Mr. Hammer injured as a result of his use of the ligature?

A. Burn marks on his hands, I believe, yes.

Q. And did Mr. Hammer in his statement indicate whether or not he checked for a pulse on Marti?

A. Yes, after that he checked for a pulse and there was none.

Q. Then did Mr. Hammer, did he give Agent Thompson a statement which was fairly similar to the officer's recollection of how the body was discovered?

A. Yes, correct.

Q. In his statement to the officers, what, if any motive did Mr. Hammer give for his actions towards Mr. Marti?

A. In his statements to...

Q. To the FBI, to Agent Thompson...

A. To the FBI.

Q. ...was he asked why he did it and did he give a reason?

A. Yes. Well, one of them was that the reasons

Opposition Brief to Indictment Challenge
Government Exhibit 2
Page 26 of 119

were between he and Marti.

Q. Did he ever make any other statements to Agent Thompson as to whether -- or what his reasons were?

A. Yes.

Q. What were those reasons?

A. Well, it was not motivated over the contract on Marti's life and not because he, Hammer, wanted the death penalty.

Q. It was -- pardon?

A. It was not because Hammer wanted the death penalty.

Q. Okay. Again, he was saying those weren't the reasons for it.

A. Those weren't the reasons.

Q. Did he ever give a reason as to why he again killed Mr. Marti?

A. Yes, his reason was that he had a run in with Marti. When Hammer first arrived at USP Allenwood in 1995, he had a run in with Marti, and Marti disrespected him. He never forgot it, and that was the reason why he killed him.

Q. And disrespect, again, if you can explain that to the Grand Jury, what does disrespect do?

A. Well, in a prison setting, I guess, you know, respect is very important. And Marti, based on Hammer's statement, embarrassed him somehow.

Opposition Brief to Indictment Challenge
Government Exhibit 2
Page 27 of 119

28

Q.    Again, we have got the letters.  You picked up a great deal of physical evidence as well, did you not, from the prison?

A.    Yes.

Q.    Is the physical evidence that you picked up consistent with the statement that Mr. Hammer gave as to the items that were in his cell?

A.    Yes.

Q.    Including the Camel cigarettes?

A.    Yes.

Q.    And again, the Autopsy Report, that's being checked with the doctor to make sure if that is consistent or inconsistent with what Mr. Hammer said was the sequence of events leading to the killing of Mr. Marti, is that correct?

A.    That is correct.

Q.    And there are, in addition to Mr. Brown, two or three other inmate witnesses who may have relevant information including Mr. Claussen, is that correct?

A.    Yes.

***

MR. MARTIN:

At this point in time, I will open up the floor to questions of -- oh, one other question.

***

Opposition Brief to Indictment Challenge
Government Exhibit 2
Page 28 of 119

29

BY MR. MARTIN:

Q.    Without saying what he is doing time for, Mr. Hammer is doing a significant amount of time for offenses in jail, is that correct?

A.    Yes, he is.

Q.    Again, the specific number of years or the specific offenses are no material to this Grand Jury other than just to know that a possibility existed that he was doing time in jail for time in the future?

A.    Correct.

***

MR. MARTIN:

Any questions about the investigation so far?

GRAND JUROR:

Nobody knew he had a braided rope; none of the guards knew he had a braided rope?

THE WITNESS:

Yes, other inmates knew he had a braided rope, and correctional officers may have seen the rope. I am unaware of that. The braided rope can be used as a -- the inmates use it to prevent their pillows from falling off the cell -- off of their bed so it's not uncommon that they make these braided ropes.

GRAND JUROR:

So it is allowed in the cell?

**Opposition Brief to Indictment Challenge**
**Government Exhibit 2**
**Page 29 of 119**

THE WITNESS:

Yes.

MR. MARTIN:

Well, I am not sure if it's known that they -- I guess it would depend upon the amount of the braid or...

THE WITNESS:

The purpose?

MR. MARTIN:

Is it contrary to the rules or consistent with the rules to have it or is it just something that's tolerated?  There is three different -- three different ways you can look at it.  And do you know the answer to that?

THE WITNESS:

No, I don't.

GRAND JUROR:

Okay, now if he tied a hand and a hand and a foot and a foot, how much piece of rope did he have?  I mean, you just don't -- he had four different -- I mean, the one guy said he had two feet or something so he had four different sections of two feet?

*** 

BY MR. MARTIN:

Q.   Were four different sections of rope...

**Opposition Brief to Indictment Challenge
Government Exhibit 2
Page 30 of 119**

A.   Yes.

Q.   ...or braided items recovered?

A.   Yes.

                         ***

GRAND JUROR:

        Or actually five because there was one...

MR. MARTIN:

        Well, a braided rope is one thing.  Was there a...

GRAND JUROR:

        Oh, it was a different...

THE WITNESS:

        That was not -- I don't believe that to be braided.

                         ***

BY MR. MARTIN:

        Q.   Okay, what was that?

        A.   That was a -- possibly an inseam to a pair of
-- a piece of clothing.

                         ***

MR. MARTIN:

        Any other questions of Agent Malocu?

GRAND JUROR:

        Is there anything in his background to indicate he
        would be that violent in any way?

MR. MARTIN:

        I think you can -- well, that's a hard question.

Opposition Brief to Indictment Challenge
Government Exhibit 2
Page 31 of 119

We don't want you to -- obviously, the man has been convicted of other offenses. But whether those other offenses would shed light on whether he had malice aforethought or premedication in this case is kind of a far stretch because...

GRAND JUROR:

Actually, it isn't because if he was in there for a murder and he had that kind of instinct, I mean, this could be a person that has a desire to kill somebody but not all the time. But I mean...

MR. MARTIN:

Okay, well, let's -- let me try and answer one of your questions or I will rephrase your question, and then I am going to get -- I will talk to you a little more.

***

BY MR. MARTIN:

Q.    His last conviction, Mr. Hammer's last conviction was in 1984, right?

A.    Um-hum.

***

MR. MARTIN:

So that we are talking 12 years from that last conviction to the time of this murder. And for that reason, it's probably not all that probative

**Opposition Brief to Indictment Challenge**
**Government Exhibit 2**
**Page 32 of 119**

33

as to his mental state to something that he did 12 years earlier, whatever it was that he did 12 years earlier. Do you understand?

Another question?

GRAND JUROR:

When they pick and choose their cell mates, they can just choose whoever they feel like living with or...

THE WITNESS:

That's right.

GRAND JUROR:

...whenever they feel like changing or they have to stay with a certain amount of time or...

THE WITNESS:

There are procedures that occur, but for the most part they can pick and choose. They will -- the correctional officers check to make sure that the individuals are not on a list in that Marti and Hammer were not on a list, separatees, where they were not supposed to be put in the cell with each other. But if they request another inmate, if it's convenient they will make the transfer.

                    ***

BY MR. MARTIN:

Q.  Again, as long as it's not a keep away or a

**Opposition Brief to Indictment Challenge**
**Government Exhibit 2**
**Page 33 of 119**

34

separatee and as long as the two inmates want it, the correctional officers usually acceded to the wish of the inmates, is that correct?

A.    Correct.

Q.    There are some inmates, by the same token-- again, trying to follow up your question, who don't want to cell with anyone and they are called single cell status. And we already talked about Mr. Ames as one of those people, is that correct?

A.    Correct.

Q.    And between the two, the prison would rather have two people living together than one person living alone in the same size cell, is that correct?

A.    Yes.

Q.    Do you understand that there is -- everyone would probably want to live alone if they could, but that the prison administration with capacity considerations and if there is no apparent conflict would prefer to put people together in the same size area?  Is that correct?

A.    Yes.

***

GRAND JUROR:

Would I understand that Mr. -- now some of the guards knew that Mr. Hammer had made threats that he wanted to kill Mr. Marti?

Opposition Brief to Indictment Challenge
Government Exhibit 2
Page 34 of 119

35

GRAND JUROR:

They never knew it.  The guards didn't know anything.

THE WITNESS:

No, not that I am aware of.

GRAND JUROR:

The guards didn't know that?

GRAND JUROR:

The inmates knew about it.

MR. MARTIN:

Well...

GRAND JUROR:

I thought he told us...

MR. MARTIN:

I think -- again, you are talking about Mr. Yager's testimony, and Mr. Malocu wasn't present for that. So it's two different questions, what you heard from Mr....

GRAND JUROR:

I am sorry.

MR. MARTIN:

That's all right.  We are trying to clarify...

***

BY MR. MARTIN:

Q.    In your investigation, have you uncovered the

**Opposition Brief to Indictment Challenge**
**Government Exhibit 2**
**Page 35 of 119**

36

fact that any guard was warned in advance that...

A.    No.

Q.    ...Mr. Hammer meant to do Mr. Marti wrong?

A.    No.

* * *

GRAND JUROR:

Sorry.

MR. MARTIN:

Sorry.    That's why we are here to clarify that. All right, if there are no other questions why don't -- what we will try and do is give you a 10- or 15-minute break.    We will call it 10 minutes. We are going to have to -- you just stay put for a few minutes while we get Mr. Brown, the next witness, here.    Once you hear me knocking on that door, then you have got some time to stretch your legs, relax.    We will put him on, and then that's it for the day.

[END OF TESTIMONY OF ANTHONY MALOCU at 2:05 p.m.]

YORK STENOGRAPHIC SERVICES, INC.
34 North George St.
York, PA 17401
(717) 854-0077

**Opposition Brief to Indictment Challenge
Government Exhibit 2
Page 36 of 119**

## CERTIFICATE

I certify that these are the original notes and records recorded by me of the testimony taken and the proceedings held in the case before the Grand Jury held in the District Court of the United States for the Middle District of Pennsylvania on July 24, 1996.

_Roy C. Kyffer_
_____
Official Reporter


Date:    AUG 0 5 1996
         _____

YORK STENOGRAPHIC SERVICES, INC.
34 North George St.
York, PA 17401
(717) 854-0077

**Opposition Brief to Indictment Challenge**
**Government Exhibit 2**
**Page 37 of 119**

IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


IN RE:  GRAND JURY MISC 95-142
        Case #93R8063-WRT1



IN THE MATTER OF THE UNITED STATES ATTORNEY'S OFFICE


LOCATION:              240 West 3rd Street
                       Courtroom #2
                       Williamsport, Pennsylvania 17701



DATE:                  Wednesday, July 24, 1996, 11:50 a.m.

WITNESSES:             L. YAGER

REPORTER:              Roy Keffer

COUNSEL:               FREDERICK MARTIN, ESQUIRE
                       ASSISTANT UNITED STATES ATTORNEY


YORK STENOGRAPHIC SERVICES, INC.
34 North George St.
York, PA 17401
(717) 854-0077

Opposition Brief to Indictment Challenge
Government Exhibit 2
Page 38 of 119

INDEX TO WITNESSES

Martin

L. Yager                                    3

INDEX TO EXHIBITS

Grand Jury Exhibit:

                                                            Page

#1 - Copy of note handwritten by Mr. Hammer       26

YORK STENOGRAPHIC SERVICES, INC.
34 North George St.
York, PA 17401
(717) 854-0077

3

                                    * * *

                             July 24, 1996

        [11:50 a.m.]

        [Witness sworn]

        THE WITNESS:

                Yes.

                                    * * *

                             L. YAGER,

        called  as  a  witness,  having  first  been  duly  sworn,

        testified as follows:

        BY MR. MARTIN:

                Q.   Again, before I even ask you what your name is

        sir, let me explain to you what is going on here; and it

        will be a repeat of things I have previously said to you

        but it's necessary for the record to do so.

                You see in this room a court reporter who is taking

        down everything that is being said by you or I or anyone

        else.  Everyone else in the room are Grand Jury members.

        This Grand Jury is investigating the murder of Andrew Marti

        at the Allenwood Penitentiary on April 13th of this year.

        It's a federal crime because it was a federal reservation,

        and that's why they think that you might have some

        pertinent testimony or information about that killing.

                By the oath that you have taken, I hope you realize

        or you should realize that what you say is important and

**Opposition Brief to Indictment Challenge**
**Government Exhibit 2**
**Page 40 of 119**