4

should be as accurate as possible because if you provide false information to the Grand Jury, that is a potential criminal violation.

By the same token, as you can see there is no Judge here. There is no -- I guess the Grand Jury foreman is the one who is keeping order, but it's a rather informal setting in the sense that, you know, there is not going to be a formal question and answer situation from me to the point that you can add anything you want to to any of your answers that you might give or you can qualify any of the answers that you give.

And the Grand Jurors have a right to ask you questions too. And you know, again, even with their questions you can modify any answers you give to them or whatever else is appropriate. So it's kind of an informal proceeding not like a courtroom where there is going to be objections made or a judicial officer presiding at this particular endeavor. Do you understand that, sir?

A.   Yes.

Q.   And again, before you testify, this Grand Jury should know several things about, first of all, any understandings between us and also have some background with respect to you before we get into the facts. Are you, first of all, sir, willing to testify before this Grand Jury?

**Opposition Brief to Indictment Challenge**
**Government Exhibit 2**
**Page 41 of 119**

5

A.    Yes.

Q.    Now with respect to the conversations that you and I have had about what our office, the U.S. Attorney's office, will do in the case, I have indicated or you have indicated to me that you would like to be transferred from the Allenwood Penitentiary to a lower security facility, a federal correctional institution.  And you have indicated two areas, and I am not going to get into those specifics as to where those two places are.  That was one request that you made to me, is that correct?

A.    Yes sir.

Q.    Another request that you made to me was that since you are serving a sentence for an offense out of the -- I guess it's the Western District of Tennessee, you asked that I contact the prosecutor's office there to see if they would approach your sentencing judge to possibly shorten or reduce your sentence on a Rule 35 motion, is that correct?

A.    Yes.

Q.    Have any other promises been made to you either by my office or by the Bureau of Prisons or by the FBI or anyone in law enforcement about your testimony here today?

A.    No.

Q.    Do you again understand what's going on here

Opposition Brief to Indictment Challenge
Government Exhibit 2
Page 42 of 119

6

today?

A.   Yes sir.

Q.   And you are presently serving a sentence for an offense out of the Western District of Tennessee, is that correct?

A.   Yes.

Q.   What is that offense so that the jury knows what it is that you are doing time for, sir?

A.   924A, Felony and Possession of Firearm.

Q.   So you possessed a firearm, and you had a prior felony conviction, is that correct?

A.   Yes.

Q.   And what was the sentence you received for that?

A.   Fifteen years.

Q.   And that's a mandatory minimum, is that correct?

A.   Yes sir.

Q.   And you have still a number of years left before you reach the end of that term?

A.   I have done nine, and I have got five -- four-and-a-half and five left.

Q.   But again, do you have any other questions or concerns before I ask you questions about either Mr. Marti or Mr. Hammer or the penitentiary at Allenwood?

Opposition Brief to Indictment Challenge
Government Exhibit 2
Page 43 of 119

7

A.    No.

Q.    Okay, with that in mind, you arrived at the Allenwood Penitentiary to serve your sentence there, is that correct?

A.    I arrived there to do...

Q.    To do your time?

A.    Yes.

Q.    You were previously in federal custody in other locations?

A.    Yes sir.

Q.    Was the Allenwood Penitentiary the first place that you ever met David Paul Hammer?

A.    Yes.

Q.    Was the Allenwood Penitentiary the first place you ever met Andrew Marti?

A.    Yes.

Q.    When, if you can recall -- again, the killing as we understand it took place on April 13.  When in time prior to April 13th would you have met either Mr. -- well, we will start with Mr. Hammer.  When would you first have met Mr. Hammer?

A.    Probably about the first week of September.

Q.    Of 1995?

A.    Right.

Q.    Okay, were you in the special housing unit

**Opposition Brief to Indictment Challenge
Government Exhibit 2
Page 44 of 119**

8

then or were you in the general population?

A.   No, the general population.

Q.   And with respect to Mr. Marti, when would have been the first time you met him?

A.   Probably September also.  We were in the same housing unit.

Q.   And again, that was out in the general population?

A.   Right.

Q.   There came a time when you went into the special housing unit, is that correct?

A.   Yes sir.

Q.   And what caused you to go into the special housing unit?  Were you voluntarily placed there or did you -- were you put in there?

A.   No, it was my own request.

Q.   And that was a concern about what, your safety?

A.   Yes.

Q.   And did there come a time when once you were in the special housing unit -- or first of all, when you were out in the general population with either Mr. Hammer or Mr. Marti, did either or those two fellows talk about the other?  In other words, did Mr. Marti...

A.   No.

Opposition Brief to Indictment Challenge
Government Exhibit 2
Page 45 of 119

9

Q.    ...talk about Hammer or did Hammer talk about Marti?

A.    No.

Q.    Did you see Hammer and Marti together in the compound?

A.    No sir.

Q.    Okay, beginning in the special housing unit, when would you have seen Mr. Hammer?

A.    I lived next door to him, October 11.

Q.    And...

A.    Then I moved in the room with him in December.

Q.    In December of 1995?

A.    Right.

Q.    And how long -- again, if you can estimate because sometimes it's hard to keep days and months straight whether you are in prison or not in prison. How long would you have celled with Mr. Hammer?

A.    Thirty or forty-five days that time.

Q.    Okay, and then was there another time that you were with Mr. Hammer?

A.    Yes sir.

Q.    And when was that?

A.    Maybe the end of February or something of '96.

Q.    And for how long on that second occasion would you have been with Mr. Hammer in his cell?

YORK STENOGRAPHIC SERVICES, INC.
34 North George St.
York, PA 17401
(717) 854-0077

Opposition Brief to Indictment Challenge
Government Exhibit 2
Page 46 of 119

10

A.    Maybe 25 or 30 days, something like that.

Q.    And beginning -- or actually, when was it that you became the orderly in the special housing unit?

A.    In January.

Q.    Okay, and that gave you an opportunity to move up and down the cell corridor, is that correct?

A.    Yes, yes.

Q.    Just again for the Grand Jury's benefit, what all were you required to do as the orderly?

A.    Sweep, mop, pass out clothes, things like that, pass out cleaning supplies.

Q.    And you were supervised by correctional officials.  In one sense they could observe you if they wanted to, but you could also go up and down the range, is that correct?

A.    Well, when you pass out clothes, you put them on the bars and I also put some in the slot.  They put-- you know, it's one-one exchange for clothes.  But cleaning supplies, the officers did all that.  I just fixed it, you know, and stuff like that.

Q.    So when you were the orderly, you got out of your cell more for a longer period of the day than the rest of the people that were in that unit, is that correct?

A.    From 6 in the morning till 9 at night.

Q.    And, I guess, they would bring you out

Opposition Brief to Indictment Challenge
Government Exhibit 2
Page 47 of 119

whenever they needed your help, is that basically it?

A.    Yes.

Q.    Some days they would need you more than others?

A.    Right.

Q.    During the first time that you stayed with Mr. Hammer, the first 30 to 45 days -- and again, we are not trying to box you into that, did Mr. Hammer ever talk to you about Mr. Marti on that occasion?

A.    Yes sir.

Q.    Okay, what did he say about Mr. Marti, to the best of your recollection?

A.    You know, that he wanted to, you know, to have sex with him, that he wanted him in his room with him and that he wanted to hurt him.

Q.    With respect to the sex business, did Mr. Hammer tell you whether he was a homosexual or not or did you discover whether he was a homosexual?

A.    Yes, he told me.

Q.    And he wanted to have a homosexual relationship with Mr. Marti, is that correct?

A.    Yes.

Q.    Was Marti at that point in time in the special housing unit or do you know?

A.    No, he was.

Opposition Brief to Indictment Challenge
Government Exhibit 2
Page 48 of 119

12

Q.   And you also said that he wanted to hurt him, is that correct?

A.   Yes, he said he was going to have one -- he said he was going to kill him.

Q.   Okay, well, there is quite a difference between hurting and killing.

A.   Yes, I know.  Well, he said kill him.

Q.   Okay, did he ever tell you why he wanted to kill him, at least again at that time?

A.   Not at that time, no.

Q.   And again, you remember him saying that he wanted to kill Mr. Marti, not just hurt him?

A.   No, he didn't say it in those words now; I said it in those words.  He said he wanted to kill him.  I said not just hurt him.

Q.   Okay, so that he just said he wanted to kill Marti.

A.   He said he was going to if he got a chance.

Q.   Did he indicate, again, during the first time or even the second time that he was with you did he indicate an interest in killing anyone else who was at the Allenwood Penitentiary...

A.   No.

Q.   ...any other inmates?

A.   No.

YORK STENOGRAPHIC SERVICES, INC.
34 North George St.
York, PA 17401
(717) 854-0077

Opposition Brief to Indictment Challenge
Government Exhibit 2
Page 49 of 119

13

Q. So this Marti was the only person that he said, I would like to kill that guy or words to that effect?

A. That he wanted to be in the room with him. He wanted to have a good time with him, and he wanted to kill him.

Q. At the time that he made those statements to you, did you consider his interest in killing Mr. Marti...

A. No, not at all.

Q. ...serious or not?

A. Not at all. It went through this ear and out that ear, that -- you know, because in prison a person always says something, especially with something about having sex or something that they will do. They just say something to be talking, you know.

Q. So at the time you didn't put much stock in it?

A. No, no.

Q. Was also the fact that Mr. Hammer never gave you a reason for killing him...

A. Yes.

Q. ...another factor in you not putting much stock into it?

A. Well, I would ask him why would you say that? And he would say, it's just something I want to do. So he

Opposition Brief to Indictment Challenge
Government Exhibit 2
Page 50 of 119

14

would never give me the reason, no.

Q. But you asked him for the reason and he didn't give you any?

A. Yes, yes.

Q. During that time frame which again was November/December of 1995 into early January, did you see Mr. Marti at that time?

A. Yes, he was on the same range at that time that he was next door to me. Hammer wasn't in the room with me when Marti was next door to me. So Marti moved over next door to Hammer, and that's when they got, you know, talking and the conning game began or something. You know, he would give him tobacco, pass him stuff from the commissary, buy him different things, you know.

Q. Who would do what? I mean, we have got two...

A. Hammer would buy for Marti.

Q. Okay, did you observe this or did you hear this? You know, there is a difference.

A. No, I observed it because I had -- I have passed tobacco, you know, potato chips things like that, you know.

Q. Okay, was it always Mr. Hammer giving things to Mr. Marti...

A. Yes.

Q. ...or was it vice versa ever?

YORK STENOGRAPHIC SERVICES, INC.
34 North George St.
York, PA 17401
(717) 854-0077

Opposition Brief to Indictment Challenge
Government Exhibit 2
Page 51 of 119

15

A.   No, Hammer always was giving him.   Marti didn't really have anything.

Q.   Did Marti ever talk to you about what he thought Mr. Hammer was up to?

A.   No, Marti -- I mean, Marti and I hardly ever talked, you know.   I don't ever remember talking to him other than him asking me -- depending on I ask him what size clothes he wear, he would tell me medium.   We didn't ever really talk about anything, no.

Q.   Okay, again, that was just the first time that you celled with Mr. Hammer that he said he was going to kill or intended to kill Mr. Marti?

A.   Yes, right.

Q.   The second time that you celled with him, did the subject come up again or was that any different than the first time?

A.   The second time we were in a different situation in the unit.   We could see the rec yard, you know.

Q.   From your cell?

A.   From our cell, yes, we could see the rec yard so he would see him out there doing pull-ups and stuff. And he was standing there in the window watching him about the whole time, the whole hour he was out there, you know, talking about him and talking about his long legs and his

Opposition Brief to Indictment Challenge
Government Exhibit 2
Page 52 of 119

16

body and stuff that he just had to get in the room with him.

Q. Okay, and the reason that he said that he wanted to get in the room with him that time, was that about sex or was that about killing or both?

A. His first -- every time he would say sex, but then he would say he was going to kill him or I am going to hurt him real bad. You know, it was just something like that, but it would always be a kill, you know.

Q. So it was both sex and something violent?

A. Right.

Q. And again, did you put any stock into what he said the second time you were with him?

A. No, because I was his roommate two different times, see, and we talked about a whole bunch of different things, you know. And you know, he just didn't seem like-- you know, I could catch him in different things at different times, you know, but he just didn't seem like he was serious about killing him, do you know what I mean. It just didn't seem like no serious base, you know. Because I knew he was homosexual, you know. I didn't -- I just didn't put it in it, you know.

Q. Did there come a time again when you saw Mr. Marti and Mr. Hammer together in the same cell?

A. Yes sir.

Opposition Brief to Indictment Challenge
Government Exhibit 2
Page 53 of 119

Q. Okay, how long do you think they celled together if you want to approximate?

A. I thought it was a couple of weeks or so.

Q. Okay, and during the time that you saw Marti and Hammer together, how did they seem to be getting along?

A. They seemed like two perfect roommates.

Q. Did you ever see them engaging in any homosexual activities?

A. No sir.

Q. Did there ever come a time when you saw some rope or cloth or some other items in the cell in which the two of them occupied?

A. Yes sir.

Q. Would you tell the Grand Jury about what you saw and when.

A. Okay, I saw Mr. Hammer setting on the bed plaiting up a homemade rope out of a sheet, you know, that he had tore up. And he had it about that long or something. I don't know, or it might have been a noose or it might have been held around his hand or something.

Q. Okay, now you gestured it was about two or three feet, is that...

A. Right.

Q. Okay.

A. And I said, what's that for? Well, Marti was

Opposition Brief to Indictment Challenge
Government Exhibit 2
Page 54 of 119

18

setting at the table, and Hammer was at the door. They are right here, and Hammer was setting at the bed at first. And Marti was seeing him plait this whole time, you know, so still it don't seem like nothing, you know. So I said, what are you going to do with that? He said (gesturing) -- just like that, you know.

Q. Well, again for the record -- I am going to have to stop you, Mr. Yager. The Grand Jury just saw what you did, but we got to try and put in words what you did, okay.

A. Okay.

Q. You drew your hand across your neck, is that correct?

A. Yes, it was his thumb, you know.

Q. Or his thumb, all right, across his neck. This is what Mr. Hammer did. And then he pointed at whom?

A. At Marti setting at the table working on a radio.

Q. Okay, did he say any words at that time?

A. No. I mean, we were just still talking, you know, what I mean. But I don't remember the exact words that we said, but it wasn't nothing to that effect, you know.

Q. Okay, and he again, dragged his or put his thumb across his throat?

YORK STENOGRAPHIC SERVICES, INC.
34 North George St.
York, PA 17401
(717) 854-0077

Opposition Brief to Indictment Challenge
Government Exhibit 2
Page 55 of 119

19

A.    Yes.

Q.    Pointed to Mr. Marti, and then he -- did he tilt his head a little?

A.    No, he just -- you know, his facial expression, like blood runs to your face, you know, you grit your teeth or something.  You know what I mean.

Q.    Okay, so that he made a grimacing face?

A.    Right.

Q.    Is that -- again, I am not sure what's the best word...

A.    I don't know either, just a face where, you know, you cut your circulation or something off, it looks like, or something, you know.

Q.    Do you remember when that was?

A.    No.

Q.    Okay, what was Mr. Marti doing at the time that you saw Mr. Hammer make those hand signals?

A.    He was taking the number off the back of a radio that Hammer had bought him from the commissary.  See, when you buy something from the store, you have to put your number on it.  So Hammer bought it and was giving it to him.  So he was scraping the number off of the radio, you know.  But here he was sitting right here, and the door is right here.  So in the bed over here is where Hammer was plaiting the rope at at first so there was no way Marti

Opposition Brief to Indictment Challenge
Government Exhibit 2
Page 56 of 119

20

could have not seen him plaiting it, you know.

Q. Okay, and with respect to the gesture, could Marti possibly have seen the gesture that Mr. Hammer made as well?

A. He possibly could have seen it, but you know, the window is about this wide and about that tall at the door.

Q. Now you were talking, again for the record maybe six inches...

A. Six inches by eighteen or something.

Q. Okay, and...

A. Hammer was standing in that window, but he could have saw him easily, yes.

Q. But you don't know or...

A. No, I don't know if he seen him, but I know he seen him with the rope. About that, I don't know if he saw that or not.

Q. Okay, and with respect -- again, did Mr. Marti make any reaction when Mr. Hammer made the gestures with his hand across his neck?

A. No.

Q. And you used the word "plaiting," right, plating the...

A. Plaiting.

Q. Okay, that's like braiding, is that correct?

**Opposition Brief to Indictment Challenge**
**Government Exhibit 2**
**Page 57 of 119**

21

A.    Yes sir.

Q.    Again, it's just so that we understand what was going on here.  That was one piece of rope that you saw, again, two or three feet.  Did you see any other rope in that cell?

A.    No sir.

Q.    Okay, when -- and again, there was a time when Mr. Hammer was taken out of his cell in the middle of the night, and there was some reference to a killing or some disturbance in the cell where he and Mr. Marti were.  How long prior to that night would you have seen him braiding or plaiting the sheet, the torn sheet that you saw?

A.    You mean the night that it happened that I seen him?

Q.    Right.  How much prior to that time did you see this rope being made?

A.    I don't know, maybe four or five days or something.  I don't really know.

Q.    Okay, did you...

A.    I didn't pay any attention, you know.  I don't know how long it was.

Q.    Did you report the plaiting of the rope...

A.    No sir.

Q.    ...to correctional officers?

A.    No sir.  The only thing I reported was I told

Opposition Brief to Indictment Challenge
Government Exhibit 2
Page 58 of 119

22

them, I said, when they moved him in there, I said that was a mistake because I think that Hammer is going to hurt that guy. He said, well, both of them seem happy. And they did, you know. They seemed like perfect roommates. And he said that they both put in requests, asked them to move together. I said, okay. You know, I am just an inmate to them, you know. I said, well, he is going to hurt him, watch and see.

Q. Okay, so you told correctional -- some correctional official...

A. Yes, several.

Q. ...that -- more than one then?

A. Yes sir.

Q. That there was a potential for harm to Mr. Marti?

A. Yes sir.

Q. And that was based, at least at that time, on his prior statements, Mr. Hammer's prior statements, that he wanted to kill Marti, is that right?

A. Yes, that was what they were based on.

Q. Okay, did the officers ever ask you, well, why would he hurt Mr. Marti?

A. They couldn't believe they got along so good. You know, they got along perfect, you know.

Q. And there is such a thing as called a "keep

Opposition Brief to Indictment Challenge
Government Exhibit 2
Page 59 of 119

23

away," is that correct?

A.   Yes.

Q.   They were not keep aways from each other, is that correct?

A.   No sir.

Q.   Now you were a keep away from certain groups, is that correct?

A.   Yes sir.   Yes sir.

Q.   And even Mr. Marti was a keep away from certain groups?

A.   Yes sir.

Q.   But in terms of Mr. Marti and Mr. Hammer, they weren't keep aways from each other a far as you knew?

A.   No, they weren't.   It was called separatees, and they weren't separatees from each other, no sir.

Q.   Okay, keep aways or separatees are the same term?

A.   Yes sir, yes sir.

Q.   Again, that was one instance where you saw the two of them together in the room.   Did there ever come a time when the two of them didn't appear to be getting along well in the room together?

A.   Never.   He lived in 3 cell, and I lived in 8 cell, five cells down.   Every day two or three times I would go by that room, you know.   At nighttime, I would

Opposition Brief to Indictment Challenge
Government Exhibit 2
Page 60 of 119

24

stop and knock on the door and see if they were all right. They were always playing cards or doing push ups together. They was always doing good.

Q. You never saw any problem between the two of them?

A. No.

Q. Now again, we are getting back to the time when you heard that there was some incident down range in the area of 103, is that correct?

A. Yes sir.

Q. Can you tell the jury how it came to your attention?

A. My roommate said, there is something going on down -- something is going on with Hammer down there. So I woke up, and I got down to the door. And I was listening so I heard someone say okay, cuff up Hammer. So then I heard him, Hammer asking them for some water or something. So I hollered under the range. I said, David. He said, yes. I said what's the matter? He said Marti is dead. I said what? He said I killed Marti.

Q. Did you have any conversations with him on that occasion other than he said that he killed Marti?

A. What do you mean?

Q. I mean, did you say anything else about the killing of Mr. Marti or did Mr. Hammer...

Opposition Brief to Indictment Challenge
Government Exhibit 2
Page 61 of 119

25

A.    At that time?

Q.    Yes.

A.    No, that was the end of it.

Q.    Did there come times later that you spoke to Mr. Hammer and the subject of Mr. Marti's death came up?

A.    The next day or so.

Q.    Where did this take place?

A.    On the same range.  He was across the hall from me then.  He was in about 20 cell.

Q.    Okay, you would have been...

A.    And I was still orderly, you know.  And the first thing he said to me was I told you I was going to do it.  You didn't believe me.

Q.    Did he give you at that time a reason why he killed Hammer or why he killed Marti?

A.    At that exact time, no, he didn't, you know. He just said it was something that he was going to do, and he did it.  That's something that he wanted to do, and he did.  He didn't give me no reason at that time, no.

Q.    Okay, later or at some point in time did he ever give you any written reasons why he did it?

A.    Yes, I asked him at the door, I said, David, just tell me why would you do it, man.  And he said, just came back.  So I came back down, and he gave me a little sheet of paper with stuff wrote on it, you know.

Opposition Brief to Indictment Challenge
Government Exhibit 2
Page 62 of 119

26

Q.    Okay, now this is a photocopy, and I know you don't have your glasses today, is that right?

A.    Right.

Q.    It's marked Grand Jury Exhibit 1.  And again, given the fact that you don't have -- and it's a copy.  I don't know if you are able to identify that as the document that Mr. Hammer gave you that one day.

A.    Yes, that's it.

Q.    That's a copy of the document?

A.    I can read it good enough.

Q.    What did you do with that when he gave it to you?

A.    I hid it.

Q.    And how did you hide it?

A.    I hid it in the clothing area where I work at for a while, you know, so -- you know, in the later -- I mean, they asked me about it, and I didn't have it, you know.  I didn't know, you know, the first time they asked me.

Q.    The first time you were interviewed by the FBI?

A.    Interviewed, right.  I didn't know -- I didn't have that, you know.  The second time I did.  I just...

Q.    Okay, so you were interviewed twice by the FBI?

YORK STENOGRAPHIC SERVICES, INC.
34 North George St.
York, PA 17401
(717) 854-0077

Opposition Brief to Indictment Challenge
Government Exhibit 2
Page 63 of 119

A. Yes sir.

Q. And the first time you didn't have that document, but the second time that you were interviewed you did have that document?

A. Yes sir.

Q. So you would have gotten it from Mr. Hammer somewhere between those two times?

A. That Saturday or Sunday. I am not sure which day.

Q. And did you turn it over to the FBI when you received it?

A. I gave it to the FBI in this hand.

Q. And did you ask them to consider this in terms of you wanted to be transferred, and here is some important evidence?

A. Well, they didn't tell me nothing about being transferred or nothing. They knew that I wanted transferred, but they didn't tell me anything about it. I am automatically going to get transferred, you know what I mean. But they didn't tell me anything about, well, we will get you transferred if you give us that, you know, no.

Q. Okay, well, that's why I was trying to find out if there was, you know, if you give me that piece of paper I will transfer you.

A. No.

Opposition Brief to Indictment Challenge
Government Exhibit 2
Page 64 of 119

28

Q.    Okay, you gave them that piece of paper anyway.  And where had you hidden it?

A.    It was hid in the clothes room, but when they came I had it in my sock on my person.

Q.    And who did you give it to if you remember?

A.    I still don't know his name, the officer who...

Q.    The FBI agent who has...

A.    Was upstairs, yes.

Q.    Okay, and that's not your handwriting, that's Mr. Hammer's handwriting?

A.    Yes sir, that's Mr. Hammer's handwriting.

Q.    As far as you know?

A.    I know it's his handwriting.

Q.    Okay, why do you know that it's his handwriting?

A.    Because I know him.  I was celled with him twice.  I know this is his handwriting.

Q.    Okay, well, again, understand Mr. Yager that the question has to be asked.

A.    Okay.

Q.    Some people can live with someone and they might not necessarily see their handwriting.  Did Mr. Hammer, when he cell mated those two times, did he write letters quite a bit?

Opposition Brief to Indictment Challenge
Government Exhibit 2
Page 65 of 119

29

A.    Maybe six or eight a day.

Q.    Six or eight a day?

A.    A day.

Q.    So it's a fair opportunity to observe someone's handwriting?

A.    Yes.

Q.    Again, you gave that to the FBI?

A.    And he would give me every day, he would give me a little yellow sticker with what he wanted me to do for him, get me some ice water, get me an extra pair of underwear.  I know him perfect.

Q.    Okay, you got along well with him, is that correct?

A.    Perfect, never had a better roommate than Mr. Hammer.  I have been locked up nine years.

Q.    Although by the same token you did a lot of favors for Mr. Hammer, is that correct?

A.    Every day.

Q.    Again, without getting into an exhaustive list, you would give him water and underwear and, you know, things that you as an orderly had access to, is that correct?

A.    Yes.

Q.    At the time that Mr. Hammer gave you that Grand Jury Exhibit 1, did he say anything or did he just

Opposition Brief to Indictment Challenge
Government Exhibit 2
Page 66 of 119

30

give you the document and say this is why I killed him?

A.    You know, I started to open it up.  He said just carry it with you, you know, because he knows I can't see without my glasses too, you know, so he just said just carry it with you.

Q.    Following your receipt of that, did you ever speak to Hammer again about the incident involving Mr. Marti?

A.    Yes, you know, until they moved him, I guess I seen him a couple of times a day, you know.  And I go by, sometimes his head will be down.  And you know, he would tell me how he done it, and exactly how he done it and stuff, and I was just stunned, you know, that he could...

Q.    What did he tell you in terms of how he had done it?

A.    He said that they had been in there talking and messing around and stuff.  And Marti had laid down so he was -- he wouldn't tell me how he conned him into tying him up, but he was telling me how he actually choked him and stuff, you know.  I said, man, that is sick, David.  Man, I can't believe it.  He said, well, you didn't believe it, and I told you.

So he said he got down -- at first he got down on his back and was choking him out.  And his arm gave out so Marti was out, you know what I mean, but he wasn't all the

Opposition Brief to Indictment Challenge
Government Exhibit 2
Page 67 of 119

way out.

So he said he got up and washed his face and combed his hair. He was always real neat, kept his hair, every string, in place. And he was always real neat so he said he got up and washed his face and combed his hair, smoked him a cigarette and looked down at Marti and said he just puts the cigarette out and went on and finished out. And then he pecked on the window and called the officer and said "My roommate is dead."

Q. Okay, did he say how he had finished it?

A. Yes, he got back down on him and choked him again till he just -- he said till his arm just gave out again, he knew he was gone. He said, I knew he was gone.

Q. Okay, did he ever say that he used any string or cord to strangle Mr. Marti with?

A. No, he never said it. He said he done it with his right arm, holding it with his left.

Q. At that time, again when he was telling you how he did it, did he give you any reason for doing it?

A. No, he never gave me any voice reason for doing it other than I told you I was going to do it.

Q. Did he express any remorse over the act or remorse about anything involving Mr. Marti?

A. I wouldn't -- like when after it happened, a day or so after that, he was setting at the table, you

32

know, and his glasses was laying in front of him and he was writing something. And he was like saying I wish I knew how to tell his family that I am sorry. I said, it's too late for that, David.

Q. So he expressed some concern or feeling bad about the family?

A. Yes. Yes. He said he needed it. He said Marti needed killing, you know, stuff like that, you know. I don't know why.

Q. I was going to say, he said he needed killing, but did he say why he needed killing?

A. No.

Q. Did he ever say whether he had homosexual relations or sexual relations with Mr. Marti when the two of them lived together?

A. Yes.

Q. He said that he had?

A. Yes.

Q. Did he say anything else again about his relationship with Mr. Marti?

A. He just said -- no, you know, he drawed pictures of different things and stuff, you know, and he would show me the pictures and stuff. He had a stack, you know, these homosexual things, you know, body parts.

Q. Pornographic type pictures?

**Opposition Brief to Indictment Challenge**
**Government Exhibit 2**
**Page 69 of 119**

33

A.    Yes, yes.

Q.    About his sexual relations?

A.    You know, how good he was, how good Marti was in every respect, you know.  I have been a homosexual.

Q.    Well, again, is there anything else that you think the Grand Jury should know about the relationship between Mr. Marti or between Mr. Marti and Mr. Hammer that again I haven't asked you a question about or have you covered it pretty much?

A.    Everything about them, you know.  I guess so.

* * *

MR. MARTIN:

Are there any questions from the Grand Jury to Mr. Yager here about the circumstances surrounding the death of Mr. Marti?  No.

Mr. Yager, I have no other questions.  Is there anything that you would like to add to your statement at this time or modify in any fashion?  Again, that's not a trick question; it's trying to make sure that the Grand Jury knows or has the most accurate information as possible that you can give them.

THE WITNESS:

No, other than he just, you know, told me if they asked me any questions just to tell the truth about

Opposition Brief to Indictment Challenge
Government Exhibit 2
Page 70 of 119

34

it, you know. That if he -- you know, he gets a chance he is going to do the same thing. He got a whole bunch of time or something, you know.

***

BY MR. MARTIN:

Q. So first of all, he told you that you should tell the truth?

A. Yes.

Q. And he told you that...

A. We were friends, see; if he said don't say nothing, I wouldn't say nothing.

Q. Okay, but he said it was okay to say something?

A. Yes, he said to tell the truth.

Q. And he also said that if he had the chance he would kill someone again?

A. Yes, he said if I get the chance I will do it again.

Q. When did he say that?

A. After it had happened.

Q. Did he talk about doing it to any specific person...

A. No, no.

Q. ...or just a general threat to...

A. No, it was -- it was, you know, not a threat

YORK STENOGRAPHIC SERVICES, INC.
34 North George St.
York, PA 17401
(717) 854-0077

Opposition Brief to Indictment Challenge
Government Exhibit 2
Page 71 of 119

to me.  It was just saying if he was given a chance he would do it again, you know, that it was fun.  I don't know what, it excited him or something, you know.  It stimulated him or something, the way that he did it or something.  I don't know how he put it.  You know, he got -- he was real intelligent.  He just used different words from what I can understand.  I don't know the exact word that he used.

Q.  But at any rate, you took it to understand that he...

A.  It excited him.

Q.  ...that he enjoyed it or...

A.  Yes.

Q.  It wasn't any distasteful thing for him?

A.  No.

               ***

GRAND JUROR:

    Question.

MR. MARTIN:

    Question back there.

GRAND JUROR:

    When you say you were friends with him, did you have that kind of relationship with him also?

THE WITNESS:

    No ma'am.

GRAND JUROR:

Opposition Brief to Indictment Challenge
Government Exhibit 2
Page 72 of 119

Okay.

GRAND JUROR:

Do you, yourself, feel threatened by your friendship, the threats that he made to kill someone else? Has he ever threatened you?

THE WITNESS:

There was a time that when he was in the room with me -- the reason he moved, that someone had asked him to hurt me, and he said I was his friend and he couldn't so he moved out of the room. He told the staff about that, and he moved out of the room with me. But I have never been threatened by David. I never felt threatened by him.

***

BY MR. MARTIN:

Q. Again, just so that we understand, Mr. Hammer on one of the two times that he lived with you said that he -- someone else wanted him to hurt you, and you...

A. I know for a fact that someone else -- see, like I said, our yard faces the rec so I am laying facing this way, and you can see shadows sometimes in the window. Do you know what I mean? When somebody comes up to your window, you can see somebody behind you or whatever. So the guy kicks on the bottom of the outside of the thing, and Hammer is in the window and he says (pause) -- you

Opposition Brief to Indictment Challenge
Government Exhibit 2
Page 73 of 119

37

know.

Q.   Okay, so someone came to Mr. Hammer's...

A.   One of those guys from Oklahoma where he is from. He is one of the reasons that I am locked up. Me and him have a problem. His name -- well, his name is not important I don't guess. But anyway, he came to the window and asked David to beat me up.

Q.   And Mr. Hammer not only didn't beat you up but told you...

A.   He told the staff about it...

Q.   And told you...

A.   ...and moved.

Q.   ...that he wanted to be moved so he wouldn't be in an awkward position of having to beat you up or something like that?

A.   Or wouldn't be a problem with his home boy, yes, something of that sort.

                              ***

GRAND JUROR:

        Are we allowed to hear what was written on that...

MR. MARTIN:

        I would have Mr. Yager read it, but I -- can you read that, Mr. Yager?

THE WITNESS:

        I think so.

Opposition Brief to Indictment Challenge
Government Exhibit 2
Page 74 of 119

38

MR. MARTIN:

Well, to the extent that you can read it, please read it.

THE WITNESS:

"USPI with the SIS" -- I don't want to use that word, but...

MR. MARTIN:

Well, "F" -- it's the "F"-word.

THE WITNESS:

"F"d me over by failing to go through with investigation into corrupt officials, drug related, in the prison," number one.

Number two, "Marti and" I clear respected -- "Marti and his clique disrespected me and threatened against me when I first arrived here." Marti was in sort of like a clique from California. "Marti had a bounty on his head for alleged assistance with Jury in the SIS gang participant" or something.

"I wanted to make a statement to these prison officials that they cannot treat me like an animal and expect me to like it. I do not fear the death penalty or any other thing the government can do to me. Human life holds very little meaning for me, and anyone can kill or be killed. Given the

Opposition Brief to Indictment Challenge
Government Exhibit 2
Page 75 of 119

                                                                          39

opportunity, I would kill again."

                                ***

BY MR. MARTIN:

Q.   Did you ever question Mr. Hammer about what was on that piece of paper?

A.   No sir.  He didn't stay there that long.  They moved him somewhere.

Q.   To another institution?

A.   Yes sir.

Q.   Okay, and you didn't dictate to him and say write this down, David?  He wrote that all on his own?

A.   Yes sir.   David is a real smart person. Nobody can dictate to David.

Q.   At least you haven't seen that be done?

A.   Yes.

                                ***

GRAND JUROR:

        Can you tell me what he meant by the first
        paragraph?  Do you know what he meant by it?

THE WITNESS:

        By...

MR. MARTIN:

        The corrupt officials, I think.

THE WITNESS:

        Yes, I know what he meant by it.

YORK STENOGRAPHIC SERVICES, INC.
34 North George St.
York, PA 17401
(717) 854-0077

Opposition Brief to Indictment Challenge
Government Exhibit 2
Page 76 of 119

40

GRAND JUROR:

What did he mean?

THE WITNESS:

They -- he was -- they wanted him to set an officer up that was selling -- bringing drugs into the institution. And David had tried to con him into that he had made -- had paid this man to bring him drugs. But once they give him the -- told him that they want him to do it, he didn't have enough time to do it so he backed out. They wouldn't do it like he wanted them to do it so it teed him off, and he backed out of the deal that the SIS and the FBI, I guess, had with him. He wrote them a letter, you know, and backed out of that deal with them.

And he was trying to get to a state -- he is a state prisoner. He was trying to get back into state custody.

***

BY MR. MARTIN:

Q.    Do you know whether the officer that was the subject of that was a corrupt officer?

A.    He was. He is.

Q.    You think he was?

A.    Yes sir.

YORK STENOGRAPHIC SERVICES, INC.
34 North George St.
York, PA 17401
(717) 854-0077

**Opposition Brief to Indictment Challenge**
**Government Exhibit 2**
**Page 77 of 119**

41

Q.    Okay, and I think there was a mention of Jury and that's -- Lt. Jury is the SIS officer.

A.    Right, SIS, he is the senior SIS officer.

***

MR. MARTIN:

Any other questions of Mr. Yager about this document that he just read from?  All right. Seeing there are no other questions, what we will do -- again, is there anything else you wish to add to your statement, Mr. Yager, at this time?

THE WITNESS:

No sir.

MR. MARTIN:

All right.  We will excuse you for now, and we appreciate your coming, and again -- oh, one thing, again we are trying to be -- you asked that I contact your caseworker, Mr. Troutman today...

THE WITNESS:

Unit manager.

MR. MARTIN:

...or unit manager and let him know that you testified.

THE WITNESS:

Yes sir.

MR. MARTIN:

YORK STENOGRAPHIC SERVICES, INC.
34 North George St.
York, PA 17401
(717) 854-0077

Opposition Brief to Indictment Challenge
Government Exhibit 2
Page 78 of 119

42

Is that correct?  And that's again to facilitate your transfer to a lower security facility?

THE WITNESS:

Yes sir.

MR. MARTIN:

Okay, I almost forgot that myself, Mr. Yager.  Is there anything else?  If I can forget it, you might forget some things too.  Anything else that you can recall?

THE WITNESS:

No sir.

MR. MARTIN:

Okay.  Again, we appreciate you coming and you are excused.  Just follow me out the door here.

* * *

[End of testimony of L. YAGER at 12:30]

YORK STENOGRAPHIC SERVICES, INC.
34 North George St.
York, PA 17401
(717) 854-0077

Opposition Brief to Indictment Challenge
Government Exhibit 2
Page 79 of 119