43

## CERTIFICATE

I certify that these are the original notes and records recorded by me of the testimony taken and the proceedings held in the case before the Grand Jury held in the District Court of the United States for the Middle District of Pennsylvania on July 24, 1996.

_____
Official Reporter

Date:   ___AUG 0 5 1996___

YORK STENOGRAPHIC SERVICES, INC.
34 North George St.
York, PA 17401
(717) 854-0077

**Opposition Brief to Indictment Challenge**
**Government Exhibit 2**
**Page 80 of 119**

IN THE DISTRICT COURT OF THE
UNITED STATES FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA


IN RE: GRAND JURY NO. 95-142
IN THE MATTER OF THE UNITED STATES ATTORNEY'S OFFICE
FILE NO. 96R8063


LOCATION:        U. S. FEDERAL COURTHOUSE
                 240 W. THIRD STREET
                 WILLIAMSPORT, PA 17793


DATE:            AUGUST 28, 1996


WITNESS:         STEVE CLASSEN


REPORTER:        JANICE L. MAULFAIR


COUNSEL:         FREDERICK E. MARTIN
                 ASSISTANT U. S. ATTORNEY


JANICE L. MAULFAIR, COURT REPORTER
116 HIGH STREET
DUNCANNON, PA 17020


**Opposition Brief to Indictment Challenge
Government Exhibit 2
Page 81 of 119**

2

(At 2:50 p.m. the following occurred before the Grand Jury.)

(Steve Classen was admitted to Grand Jury Room.)

MR. MARTIN: Stand by the blue chair and the Grand Jury Foreperson will swear you in.

GRAND JURY FOREPERSON: Do you solemnly swear that all the testimony you are about to give in the case now before the Grand Jury will be the truth, the whole truth, and nothing but the truth, so help you God?

MR. CLASSEN: Yes I do.

STEVE CLASSEN, a witness, being duly sworn before the Grand Jury, testified as follows:

DIRECT TESTIMONY

BY MR. MARTIN:

Q.    Before I ask you any questions I'm going to set the stage. I'm going to repeat many of the things I said to you. It's good for you to hear it. It's good for the Grand Jury to hear it and it's good for it to be on the record. That's why I'm going to repeat some of what I said to you already.

A.    All right.

Q.    The Grand Jury here is investigating the

**Opposition Brief to Indictment Challenge**
**Government Exhibit 2**
**Page 82 of 119**

3

murder of Mr. Marti at the Penitentiary at Allenwood back in April of this year.

You are not thought to be involved in any criminal wrongdoing at all, but because of your associations and knowledge and being present in the Special Housing Unit you are thought to be a witness who may have relevant information. So you are not a target of any investigation, I can tell you that right now.

What you're going to say is going to be taken down by a stenographer and there will be a full record of it. From the oath that you gave you know this is a serious proceeding in the sense that if you intentionally give this Grand Jury false information you can be prosecuted for providing false information or for perjury, things of that sort. Do you understand that?

A.    Yes I do.

Q.    And again, I know you have spoken to law enforcement officials in the past but at those times you weren't put under oath. So it's more important, it's especially important to tell us the truth and regardless of your prior statements to this Grand Jury today when you are under oath.

This is a secret proceeding. We, anyone in

**Opposition Brief to Indictment Challenge**
**Government Exhibit 2**
**Page 83 of 119**

4

this room if they say they saw Steve Classen in front of the Grand Jury testifying today we could go to jail. There is a strict secrecy and this proceeding will not be released unless there's Court authorization for that to take place. So that you can speak in somewhat confidence that no one will go out in an authorized fashion and say what you said to this Grand Jury.

Do you understand that?

A.    Yes I do.

Q.    Now again, you are not thought to be involved. You asked me a question whether or not you thought you needed talk to a lawyer before proceeding and I said I didn't think so, because you're not a target of this probe. By the same token if there are - and I said this upstairs and I'll keep saying it - if there are some questions that you feel uncomfortable answering we'll try and skirt around those questions and we'll talk about it off the record, and if you feel uncomfortable we'll discuss it but we won't make you answer any uncomfortable feeling type questions. Okay?

A.    Yes.

Q.    The other thing that has come up and,

5

again, we say this right up front, is you, and this is a rather recent development that's come to your attention and my attention as well, you face some criminal charges in the District of Oregon. Is that right?

A.    Yeah. I found out last Thursday.

Q.    And I indicated that I would tell the U. S. Attorney's Office as well as your attorney out in Oregon of your testimony here today, and they can give that consideration in terms of wherever they think is appropriate, whether it's in what charges you face or what sentence you get or things related to that.

A.    Yes.

Q.    Are there any other agreements or understandings that anyone in law enforcement has with you about your testimony today?

A.    No, not at all. I told you, I believe I would be testifying even if I didn't have that in Oregon because I don't think what happened is right.

Q.    Right. And again, just so the Grand Jury understands, you made a statement to the FBI earlier and at that time you didn't even know you were going to be prosecuted in Oregon?

**Opposition Brief to Indictment Challenge
Government Exhibit 2
Page 85 of 119**

A.   No, I didn't. I just found out.

Q.   Again, you were hoping maybe that you wouldn't be prosecuted in Oregon.

A.   Yeah.

Q.   Do you have any questions of me, Mr. Classen, before I ask any questions of substance about this procedure or about what the Grand Jury is doing?

Again, apart from the Court Reporter who is taking everything down and me, everyone else is Grand Jurors here and they can ask questions just as well as I can. Just, again, so that you understand that.

Q.   Yes.

Q.   Do you have any other questions before we proceed?

A.   No. I just want to get it over with. I'm nervous.

Q.   I think the Grand Jury agrees with getting it over with but maybe for different reasons.

We'll get to the point. You came to the Allenwood Penitentiary you think sometime in March of this year?

A.   March of this year. I believe it was March 25th, a Monday.

**Opposition Brief to Indictment Challenge
Government Exhibit 2
Page 86 of 119**

7

Q.   And at that time were you immediately put in the cell with Mr. Hammer?

A.   Yeah, that night. It was a Monday night.

Q.   Had you ever met him before?

A.   No, never met him before.

Q.   Okay. And how long was it that you were with Mr. Hammer?

A.   I'm thinking it was close to three weeks or a little over. I don't have a calendar but at least I believe it was three weeks.

Q.   And there came a time when you stopped being his cellmate and someone else took over?

A.   Yeah. Yeah, it was about three weeks later because where we were was in the hole, which is not the compound. But the next day after I got there, March 26th, I went to see the Captain and he decides who is going to the compound and what not, and he told me that I had to stay in the hole until some other people talked to me about going to the compound. So when I went back to the cell Hammer said, well, you know, we talked, I only knew him a few hours at this time but in prison you know people quick, you talk and stuff. We talked and he said well, you know, but once somebody gets off DS, which is disciplinary

**Opposition Brief to Indictment Challenge**
**Government Exhibit 2**
**Page 87 of 119**

8

segregation, I want him to move into this cell. And I said, well, you know, I don't care, I'm easy going.

Q. So you stayed with him. Did he tell you then that the person that he wanted was Mr. Marti?

A. Yeah, he did tell me that. He said I got my friend and sometimes he called him Crow and sometimes and I didn't know.

Q. Crow?

A. Yeah. I just remembered that now just at this instant. I don't know why he called him that but, yeah, a couple times. As a matter of fact he even had what they call copouts and Marti had filled out one of those.

Do you know what a copout is?

Q. Yes. That's a request by an inmate for something to the Administration.

A. Right. Yeah. So this is like now I'm two weeks down the road, you know, this was after Marti was off DS, and he had sent Hammer one of those that said I want to move in with you. I, you know, I want to be your celly and stuff. And I think that was the weekend before the Tuesday I moved out.

Q. Did you ever meet Marti?

**Opposition Brief to Indictment Challenge**
**Government Exhibit 2**
**Page 88 of 119**

9

A.    No. No, just when we switched cells. I never met him or anything.

Q.    Never spoke to him?

A.    I went into his cell and he went into my cell.

Q.    And that was earlier in the week just prior to the killing?

A.    Yeah, that was on a Tuesday.

Q.    And Mr. Marti you saw had something in writing from him where he said he wanted to stay with Hammer?

A.    Yeah.

Q.    And Hammer told you verbally that he wanted to go in with Marti?

A.    Yeah.

Q.    Did he ever say why, although, again in prison I imagine if you ask too many questions people don't appreciate that, but did he ever volunteer why he wanted to be with Crow or Marti, or whatever he called him?

A.    Yeah, but at the time I didn't know he was serious. Me and Hammer talked a lot and we got to be close. Well, I thought we were pretty close but, you know, I don't think I really knew him reflecting back on it. But it was the day before I

10

moved out and we were looking out the window, they have a little recreation cage for the people in the hole and there's like six cages there and there was two guys from different cells, they were fighting, and they had a knife and it was pretty bloody and stuff and it was just like, you know. I mean I have never done that much time anyways in jail or anything. I've never been in a U.S.P. before so, you know, I'm like wow, just awed by this. I said I'm never going to rec and stuff. And he told me he said, "Yeah, I'm going to kill Marti when he comes down." And I think it might have been the way I looked at him, like disbelief. And all he said was, "Gotcha." And I guess I just didn't want to believe it, you know, and then I just shoved it off or something and just blocked it out. And then that following Saturday the FBI came and talked to me and I told them what I'm saying now, the same thing I think, pretty much. More now, but, you know, it's the same thing, so.

Q.   And again you remember one time him saying he wanted to kill Marti?

A.   Yeah, he said that right to me, you know. And I don't think he liked my reaction and then he just said "Gotcha" like it was a joke, like he was

**Opposition Brief to Indictment Challenge**
**Government Exhibit 2**
**Page 90 of 119**

11

joking and it wasn't a joke.

Q.    You didn't know if he was joking or not?

A.    I thought he was joking, you know, but yeah, because if I did, you know, I would have said something to the staff because, you know, I'm in prison but murder, I don't think murder is right, you know. I like to think I have some scruples, you know. But-- I forgot what you said.

Q.    Sometimes I forget myself.

A.    But yeah, he told me and I thought he was kidding and he just didn't like the reaction I had, you know, I think he figured I would tell someone so he just said "Gotcha."

Q.    You said, again we talked upstairs briefly and you were talking about the fact that after about the second week you were starting to feel uncomfortable with Mr. Hammer. And again, you don't have to go into a great deal of detail about it but what made you uncomfortable with Mr. Hammer?

A.    All right. This is like, okay, I moved out on Tuesday, this is like the Friday before I moved out, like I said, I'm there about two weeks at this time, almost two weeks or maybe it's over two weeks, and he started what they call in prison sex

12

play, making sexual jokes, you know. And I thought he was joking, a lot of guys do it, right. But after a couple days I looked at him and I said, "You're serious, aren't you?" He said, "Yeah, I'm serious." He wanted to do some sex. Well, you know, I'm going to have to really move out now because I'm not like that. But he was really serious and I think that was on a Saturday we had that little confrontation. And Sunday they don't do any moves because I wanted to move then because he seemed to be getting more stressed out. Sunday he was pretty stressed and then Monday we were going to move that Monday but they had that fight in the rec cage I was telling you about, then they couldn't move us. Then the following Tuesday I said, "Hey, I've got to move." And they said, "Yeah, if we got time." Then Hammer said "You'll move him today." And they had asked him, the staff asked him, "Well, who can we move in here? Marti's okay?" Because they kind of gave him who he wanted. And he said, "Yeah, I want Marti in here." And then they moved Marti in.

Q. And for a while Marti couldn't move in because he was doing the DS time?

A. The DS time, yeah. There's two different

13

sections, AD where you're supposed to have a bunch of good stuff and then DS where like you get your sanctions, you can't smoke and all that stuff. So, yeah, Marti was on the DS side.

Q.  But then he finished his time so then he was eligible to come in with him?

A.  Right. Yeah, that's what happened.

Q.  After you separated from Marti, or after you separated from Hammer did you ever speak to Hammer in those seven days prior to the murder but after you stopped being his roommate?

A.  I bought some cigarettes Thursday. It was a Thursday, and I didn't tell you this, but, you know, this is nothing, he asked me to buy him some cigarettes, I had a little bit of money, so I bought him like a carton of cigarettes and, you know, the cops took it down. But that was only then.

Q.  Again, there was only this one time referenced by him about killing Marti?

A.  Yeah, right.  Yeah, until, you know, afterwards.

Q.  And we're getting to the afterwards now. This Grand Jury on an earlier occasion saw this Grand Jury Exhibit No. 4, which is a letter to

14

you, right?

A.    Yeah, it's a letter to me.

Q.    Can you explain how this came about or what the sequence of events was how you got it?

A.    Yeah. You said these guys read this, huh?

Q.    They have heard parts of it.

A.    Okay.

Q.    So you don't have to read it to them.

A.    Yeah, I wasn't going to read it. I just didn't know if they heard it or not. I don't remember the day for sure but I think it was the day that the FBI came. They have orderlies or whatever that bring these little kites here, letters, and they slide them under your door or whatever. And I had gotten this one and I don't remember right now like I said the date. I mean the date's right here, you know, it says Monday but in my mind I don't really remember the date for sure.

But anyway, I went to bed early that night and when I woke up there was a kite under my door, and I had just put it under my bed and I was going to read it later because I went back to bed. And then when I picked it up it was this one here and I didn't even read the whole thing, you know, when

15

I got down to here and then I had tore it up because I didn't like what it was saying. And this was after I had talked to the FBI. So I did see this but, you know, I didn't read the whole thing.

Q.   Again, you never gave this to the FBI?

A.   No, I threw it away right away. I didn't even finish reading it, you know. And then later on, about three or four - I think in May sometime I had told one of the staff guys at the Institution that there was a letter, you know Troxell, and I'm sure he could remember, and I told him and I didn't even know these guys had this. I didn't know you guys had this, I thought it came right to me.

Q.   We work in strange and mysterious ways.

Rather than read the whole thing, there is something in it that says basically I did what I told you I was going to do?

A.   Yeah. Well I guess like the third paragraph says, "Steve, I don't care what you say to the FBI or SIS this isn't anything that can hurt me because their case is pretty open and shut. I'm sure you were surprised to learn that I done what I told you I was going to do with Marti." I mean I didn't read that very good but

**Opposition Brief to Indictment Challenge**
**Government Exhibit 2**
**Page 95 of 119**

16

I'm not a good public speaker.

And then there's another one, you know, but, yeah. And that's about when I threw it away and I had already known anyways. I was still in shock because the FBI had already talked to me.

Q.   Now were you familiar with Hammer's handwriting?

A.   Yeah.

Q.   Is that his handwriting?

A.   Yeah, that's his handwriting. You know, I had a picture of him too but I threw that away too because I'm thinking oh no, man, this guy's nuts, you know. He said that he liked me on the back of the picture and stuff and it's the same writing basically is what I'm saying.

Q.   Again, you got this kite or note after the murder?

A.   Yes.

Q.   After the murder did you speak to Hammer at all?

A.   Did I speak to him at all.

Q.   If you can recall?

A.   No, the only time that I saw him is after I seen the FBI, then he was in the little rec cage and that's it. No.

**Opposition Brief to Indictment Challenge**
**Government Exhibit 2**
**Page 96 of 119**

17

Q.   How far were you moved away from where Cell 103 was?

A.   103, well that's two different levels. I was up in 215 so, you know, I was upstairs. 103 is in the front and downstairs and 215 is upstairs and way in the back. So about as far as you could move basically.

Q.   At least, again, at the time of the murder, so you wouldn't even have known of it at least from people, you know?

A.   No, I didn't know until the FBI came that Saturday, it was like seven or eight, and of course I was still sleeping and they said, "The Lieutenant wants to see you." If I was awake I would have known the Lieutenant didn't want to see me, right. And anyways I said, "Oh, okay." And they cuff you up when you're in the hole so I walk up there and then this guy shows me his badge, FBI, and I'm like.

Q.   So you had no idea what had happened?

A.   No.

Q.   And Mr. Classen I have no other questions for you but the Grand Jury can also ask you questions so we'll open it up to the floor and see if they have any questions of areas that we didn't

18

cover.

I see no questions.

BY MR. MARTIN: (Resuming)

Q. By the way, and we talked about it upstairs briefly. you're doing time now for a drug offense. Is that correct?

A. No, no, for a bank robbery. Actually it was larceny but that's neither here nor there.

Q. How much time did you get for that?

A. Fifty-one months.

Q. Again, it's something the Grand Jury should know in terms of your. And I think you said you were scheduled to be released, what, next year?

A. Yeah, next year, next year, like nine, ten months, something like that.

Q. Again, we appreciate you coming. Is there anything you want to add to your statement, Mr. Classen?

A. No, I don't think so. I think I said more than, you know, I was rambling and stuff.

Q. Well, there is rambling and there is rambling, Mr. Classen, and I think your rambling is better than some we've heard.

A. Well this is a first for me. Usually it's

19

just like pleading guilty or something. I tell the truth, you know, that's me. I mean if I commit a crime and I get caught I don't try and lie. I mean I don't lie. And basically this is the same thing, I had told the FBI the same day that that kid was killed and it was wrong.

Q. Did you have any personal antagonism towards Mr. Hammer other than perhaps that one time when he was telling too many sex jokes?

A. No, uh-uh. He gave me cigarettes when I came in because when I came in because when you transfer you don't have nothing. I came all the way from California, then I was in Oklahoma, then I get here. I have nothing, you know. He made a phone call and, you know, he took care of it. So, no, we got along good. Like I said I thought we got to know each other but then after this happened, you know, I don't think nobody really knows him.

MR. MARTIN: Are there any other questions for Mr. Classen?

(No questions indicated.)

Again, we appreciate your coming and we know you're heading on out to Oregon. We wish you good luck out there.

20

MR. CLASSEN: I think it will work out.

MR. MARTIN:   And I'll go upstairs with you and get that address and phone number.

MR. CLASSEN: Okay.

(At approximately 3:10 p.m. the Witness was excused from the Grand Jury Room and the testimony was concluded.)


*    *    *    *

CERTIFICATION

This is to certify that the attached proceedings before the Grand Jury in the matter of Docket No. 96R8063, held in Grand Jury Hearing Room, Federal Courthouse, Williamsport, Pennsylvania, on August 28, 1996, were held as herein appears, and that this is the original transcript thereof.

Janice L. Maulfair, Court Reporter

1

IN THE UNITED STATES DISTRICT COURT THE MIDDLE
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

IN RE:  GRAND JURY NO. 95-142
IN THE MATTER OF THE UNITED STATES ATTORNEY'S OFFICE
FILE NO.  96R8063

LOCATION:   FEDERAL BUILDING
            240 WEST THIRD STREET
            WILLIAMSPORT, PA 17703

DATE:   SEPTEMBER 18, 1996, 1:40 P.M.

WITNESS:   ANTHONY MALOCU

REPORTER:   JILL M. FRY

COUNSEL:   FREDERICK MARTIN, ESQUIRE
           ASSISTANT U.S. ATTORNEY

JILL M. FRY
R.D. #1
BOX 338
SUNBURY, PA  17801
(717) 988-4650

JILL M. FRY – FREELANCE REPORTER

**Opposition Brief to Indictment Challenge
Government Exhibit 2
Page 102 of 119**

ANTHONY MALOCU:   Called as a witness, having previously been sworn according to law, was examined and testified as follows:

BY MR. MARTIN:

Q.   Actually, first order of business, Mr. Malocu. This morning Mr. Hammer appeared before this grand jury and the foreman on behalf of the grand jury asked him to provide the exemplars.  What happened, if anything?

A.   Mr. Hammer provided to me exemplars, handwriting and hand printing exemplars.

Q.   Now, understanding that you are a lay person, and don't have any, they don't teach handwriting analysis at Quantico, is that a fair statement?

A.   Correct.

Q.   You have seen the various documents and in fact that's, we will also leave Mr. Hammer's various notes for you to look at during your deliberations, you have seen his exemplars and you have seen the prior notes to Rock, to Steve, to Lenny, his list to Mr. Yeager, and how do those compare to you, at least in terms of his handwriting with his exemplars today with those correspondence that I just alluded to?

A.   In my opinion they are the same handwriting and hand printing.

Q.   And, again, for your purposes, these were

JILL M. FRY - FREELANCE REPORTER

**Opposition Brief to Indictment Challenge
Government Exhibit 2
Page 103 of 119**

previously presented to you, anyone who wants to take a look at those letters, feel free to do so. They are a couple of wrap up items from your original presentation, and a couple of new developments that we'll get to in terms of which again what we would like to cover right now. There was a question, or a possible question with respect to whether Mr. Hammer provided an oral or a written statement to Special Agent Thompson following the incident. Do you know which it was?

A. It was an oral statement.

Q. Okay. There was also a question about what particular items may have been used for the actual strangulation as opposed to rendering Mr. Marti unconscious, and do you have that item with you?

A. Yes, I do.

Q. Could you, again, maybe you can pass it around. I would encourage the grand jury not to open up the plastic package for evidentiary purposes but if you just describe what the item is?

A. The item looks to be some type of material consistent with the clothing worn by inmates.

Q. And it looks a seam?

A. It looks to be an inseam for maybe a pair of pants.

Q. And, again, if the grand jury wants to look as

JILL M. FRY - FREELANCE REPORTER

far, this is as far as you know, the murder weapon, so to speak?

A.    Yes.

Q.    We'll just leave it here, anyone who wants to take it look at it may do so.   This appears to be about a roughly, and this is very rough, about a 18 inch to 24 inch strip of cloth?

A.    At least, yes.

Q.    That's orange in color and it appears that a lot of the clothing, if not all of the clothing in the Special Housing Unit is this orange in color?

A.    Yes.

Q.    There was also a question from your first presentation, although it wasn't a major question, you said something about perhaps the inmates are allowed to keep strips of cloth to keep their pillows from falling off their bunks, do you remember that?

A.    Yes, I do.

Q.    Did you look into it a little further and is there a policy or practice down there at the Allenwood Penitentiary about these strips of cloth?

A.    Yes, there is.   According to, according to the Bureau of Prisons strips of cloth used in that fashion to make rope can be construed as a weapon.   The item can be used for escape, so it would be against BOP policy to have

JILL M. FRY - FREELANCE REPORTER

that in the cell.

Q.   And, again, these strips of cloth come from what items normally, or at least in the particular case involving Mr. Hammer and Mr. Marti?

A.   The bed sheet.

Q.   And, of course, it is not their bed sheet, it is in one sense the Bureau of Prisons, I guess, the best thing is the Bureau of Prisons federal property, is that correct?

A.   That's correct.

Q.   And inmates aren't allowed to go about tearing up federal property?

A.   No, they are not.  It would also be considered a, they would be destroying federal property, so, again, that would be against the B.O.P. policy.

Q.   Now, with respect, again, to Mr. Hammer's situation I think there was a question the first time through which we did not answer and which will not be answered still, and that was for what sentences he is presently serving or being held but what is the length of time that he is serving now?

A.   He is currently serving a sentence of 1,232 years.

Q.   And, again, that's, those are Oklahoma sentences that were imposed, is that correct?

A.   Correct.

Q.   He has become a contract boarder in the federal

**Opposition Brief to Indictment Challenge
Government Exhibit 2
Page 106 of 119**

system, the State of Oklahoma contracted to have the federal system house him, is that correct?

A.    Yes.

Q.    And is there, I guess, well, I will leave it at that.   There has been a possible development and we don't want to hold up the grand jury's consideration of this case for it because we are not sure which way it is going to go, but there was a letter written by an inmate from Leavenworth that has been received and forwarded to you, is that correct?

A.    Yes.

Q.    And backing up from that, in December of 1995, Mr. Marti got himself in trouble at the Allenwood Penitentiary which resulted in his placement in the Special Housing Unit, is that correct?

A.    That is correct.

Q.    If you could just, again, summarize for the grand jury since they may have forgotten what that incident was and what role, if any, he played in it, Mr. Marti played in it?

A.    Marti was involved in an assault with another gang member.   Marti, the victim of the assault, Marti grabbed him and held him for the assailant to continue assaulting him.

Q.    And the victim was hispanic?

A.    I am unaware.

**Opposition Brief to Indictment Challenge**
**Government Exhibit 2**
**Page 107 of 119**

Q.    And one of the individuals who assisted him was hispanic?

A.    Yes, he was.

Q.    Now, and the letter we got was from an inmate by the name of Mr. McShea, right?

A.    Yes.

Q.    And did he provide another -- well, let me -- did he provide a possible theory or motive for this particular offense?

A.    Yes, he did.

Q.    Okay.  Now, again, to help the grand jury's recollection of things.  Mr. Hammer basically said in his oral statement to Mr. Thompson that he killed him, he killed Marti because of his disrespect of him, is that correct?

A.    That is correct.

Q.    Mr. McShea gives a different viewpoint or motive does he, than that?

A.    Yes, he does.

Q.    What is the thing that Mr. McShea who is, or will shortly be interviewed by the FBI, what does he say as to the reasons for Mr. Marti's killing at the hands of Mr. Hammer?

A.    According to inmate McShea, Hammer owed members of the prison gang believed to be known as the Texas Syndicate. He owed them money for heroin that he had purchased from

JILL M. FRY - FREELANCE REPORTER

them.  Being indebted to them and the Texas Syndicate having a hit out on Marti, Hammer was asked to do the hit and kill Marti and he would no longer be indebted to the Texas Syndicate.

Q.    Now, again, why, why did Mr. McShea know about this hit?

A.    Well, at first McShea was asked, McShea was asked to do the hit prior to Hammer being asked.

Q.    And Mr. McShea turned the hit down, is that correct?

A.    That's correct.

Q.    Again, was there some certain importance about having a caucasian take the contract out on Mr. Marti who is also caucasian, was that something that Mr. McShea said is what the gang wanted to have done?

A.    Yes, according to the letter, yes.

Q.    I think that is, there is one more inmate to present testimony to you today, and we are not going to say much about him other than the fact that this inmate too has provided a letter, has he not, for that he purportedly received from Mr. Hammer?

A.    Yes, what is list name?

Q.    Darby?

A.    Oh, yes, absolutely.

Q.    Shifting gears.  This is the upcoming Mr. Darby

**Opposition Brief to Indictment Challenge
Government Exhibit 2
Page 109 of 119**

and he provided a letter, as well, did he not, that he says came from Mr. Hammer?

A.    Yes, he did.

Q.    And Mr. Darby says that Mr. Hammer has still another motive supposedly for killing Mr. Marti?

A.    Correct.

Q.    And we'll let Mr. Darby tell you what that third or fourth motive is.

GRAND JUROR:  I just have a quick question.

MR. MARTIN:  Go ahead.

GRAND JUROR:  The thousand and some years were state time or federal time?

THE WITNESS:  State time.

GRAND JUROR:  State time in Oklahoma but he is housed in, okay.

MR. MARTIN:  As a matter of law I can tell you there is a federal statute which goes both ways.  Sometimes federal inmates, if they are, especially perhaps federal law enforcement, or Federal Bureau of Prisons people, they contract for those people to go serve their time in a state or local facility, and vice versa, sometimes people who are doing state times, whether it is for protection or for whatever other reasons, are contracted and they are held in the federal system on behalf of the state.   And that's just what the federal law, Title 18, United States Code,

JILL M. FRY - FREELANCE REPORTER

Section 5003 says.

GRAND JUROR:  Thank you.

MR. MARTIN:  Now, we will open up the floor at this time for any potential questions that you may have about Mr. Marti's death, and Mr. Hammer's possible involvement with it?  So, this is the time to ask questions, if you have questions of Agent Malocu, and again, if you have them, fine, if you don't have them, we'll excuse Mr. Malocu and I will charge you as to what the law is.  And sometimes once you hear what the law is, you know, you might have Mr. Malocu come back in and talk about something that, you know, that is stimulated by my charge on the law, or reminds you of, so, are there any further questions of Mr. Malocu?

GRAND JUROR:  I have just come in today on this but I did read the booklet and it is my understanding that these two people twice met up under prison system, is that correct?

MR. MARTIN:  I am not sure what you mean by that?

GRAND JUROR:  They were together in one prison and then later re-met?

MR. MARTIN:  Oh, you mean Mr. Marti and Mr. Hammer? Again, that is a fact question.  Is it that they were in one or two prisons, or two parts of one prison?

THE WITNESS:  I believe it is two parts of one prison.

JILL M. FRY — FREELANCE REPORTER

**Opposition Brief to Indictment Challenge
Government Exhibit 2
Page 111 of 119**

MR. MARTIN: Since this lady doesn't have that much familiarity, and I am not sure if the standard video there illustrated it, there is normally within larger security facilities there are two, there is a prison within a prison, is that correct?

THE WITNESS: Yes.

MR. MARTIN: And if you just tell her what this Special Housing Unit, why it exists and for what reasons?

THE WITNESS: The SHU, Special Housing Unit is broken down into administrative detention section and a discipline disciplinary segregation section. If an inmate is being threatened out on the compound where he can interact with all of the other inmates, he may fear for his life so he requests to be placed into administrative detention. That's a, well, you could be placed in single cell but it has, two inmates can be placed in one cell at the same time also. That was, there is also the disciplinary segregation, if you break a law while you are, or a rule, Bureau of Prisons rule, they will discipline you and put you in the segregation. They are very close to one another. In other words they have their own unit broken down in half into disciplinary segregation and administrative detention.

MR. MARTIN: And to perhaps further illustrate the lady's question, Mr. Marti was being disciplined up through the early part of April of 1996, is that correct and could

JILL M. FRY - FREELANCE REPORTER

not be placed in the administrative detention unit part of the Special Housing Unit?

THE WITNESS:  Correct.

MR. MARTIN:  And then when his punishment for his involvement in that assault on the inmate back in December of 1995 finished, then he was able to go to the administrative end of things, right?

THE WITNESS:   Right.

MR. MARTIN:  And Mr. Hammer was in the administrative part of things and that's how the two of them were able to cell together?

THE WITNESS:  Correct.

GRAND JUROR:  Thank you very much.

MR. MARTIN:  Again, we'll bring you up to speed on any questions like that because I know many of you after your grand jury service will probably open up a prison since you are learning.

GRAND JUROR:  I am here new.  The debt of Hammer to the Texas boys, was that incurred in that prison, or is that from actually the State of Texas?

THE WITNESS:  The gang Texas Syndicate, they, if you want to call it a branch of the gang, there is a branch at the local prison, penitentiary in Allenwood.

MR. MARTIN:  I think this gentleman's question was was the debt that Mr. Hammer incurred as a result of drugs

JILL M. FRY - FREELANCE REPORTER

at the Allenwood Penitentiary as opposed to something in Texas, or on the streets, or something like that?

THE WITNESS: No, to the best of my knowledge it was a debt incurred at U.S.P. Allenwood .

MR. MARTIN: For drug usage by Mr. Hammer or drug possession?

THE WITNESS: Purchases of heroin.

MR. MARTIN: And I think Mr. Darby will illuminate that fact as well whenever he comes. And, again, we'll do the best we can with time. Are there any other questions of Agent Malocu?

GRAND JUROR: The hit on him originated in Texas?

THE WITNESS: That is unknown. It is possible but I am still following up leads, it could have.

MR. MARTIN: Maybe to answer. The gang is called the Texas Syndicate but you don't have to necessarily be in Texas to be a member of the gang?

THE WITNESS: No, there are branches of the gang in almost all penitentiaries.

MR. MARTIN: And, again, just to further illustrate, besides the Texas Syndicate we have got the Bloods and the Cryps, and the Mexicana Meed (audible spelling)?

THE WITNESS: The Mexicana Meed, yes.

MR. MARTIN: And maybe you know some others, right.

GRAND JUROR: Yeah, but this letter, where did that

JILL M. FRY - FREELANCE REPORTER

come from, what state penitentiary did that come from?

MR. MARTIN:   Mr. McShea's letter, where did that come from?

THE WITNESS:   That came for U.S.P. Leavenworth, United States Penitentiary, Leavenworth, Kansas.

MR. MARTIN:   And Mr. McShea used to be at the Allenwood Penitentiary and got transferred to Leavenworth?

THE WITNESS:   Yes.

GRAND JUROR:   I was trying to figure out how somebody away from here would know about all of this unless it originated out there somewhere?

MR. MARTIN:   Well, again, I think the testimony is that Mr. McShea was at the Allenwood Penitentiary and could have taken out the contract but declined to do so and then when he got to Leavenworth, that is when he wrote the letter.

THE WITNESS:   Yes, McShea had been in the Special Housing Unit when, you know, for violation that he had committed at the same time that Marti was placed in there for committing the assault.  So, he was at U.S.P. Allenwood this past year.

MR. MARTIN:   And, again, to further illustrate, only people in the Special Housing Unit really would have been in possession, would have been in the position to carry out the contract, not people in the general population.

JILL M. FRY - FREELANCE REPORTER

THE WITNESS:  Absolutely.

GRAND JUROR:  How did you guys get the letter, was it sent to the prison, or sent to somebody else?

MR. MARTIN:  Tell them who got the letter, or to whom it was addressed?

THE WITNESS:  The letter was addressed to Assistant United States Attorney Frederick Martin and --

MR. MARTIN:  And in the letter does it also say that Mr. McShea was prosecuted by this office and by me sometime earlier?

THE WITNESS:  Yes, it did.

MR. MARTIN:  It's a small world.  Any other questions?

(No response.)

MR. MARTIN:  If not, we will allow you to stand outside the door and actually you monitor the phones and if the Marshalls say that Mr. Darby is there, knock on the door and we'll suspend things, but again to make efficient use of our time I will charge you on the law and tell you what the indictment is, and then we'll bring in Mr. Darby, and then we'll ask you to consider returning an indictment.

GRAND JUROR:  It said that through the vent system there was, you could hear in there, would it be four cells that could hear what was going on in there.  I was wondering, nobody heard anything when he was killed, when

JILL M. FRY - FREELANCE REPORTER

Marti was killed?  The guy before was talking about the ventilation system that you could hear through it, it was like they call it the telephone, what did they call it, the phone, and I nobody heard?

MR. MARTIN:  To repeat, actually, Agent Malocu interviewed everyone all around and did any of the people who were around either the top or on either side of that cell 103, did they report hearing anything?

THE WITNESS:  No, they did not.

MR. MARTIN:  Although, again, Mr. Marti when he was found was found spread eagle, did he have the sock in his mouth at that time?

THE WITNESS:  Yes, he did.

MR. MARTIN:  And, again, the basis for him getting in, that was the supposed fashion in which that would get him transferred to another location, that's what Mr. Hammer told him?

THE WITNESS:  Right.

MR. MARTIN:  So, his mouth would have been muffled and his limbs would have been tied at the time the murder was committed, is that a fair statement?

THE WITNESS:  Correct.  And the murder was also in the early morning hours when most inmates were asleep.

MR. MARTIN:  Approximately 2:00 a.m., right.

THE WITNESS:  Yes.

JILL M. FRY - FREELANCE REPORTER

MR. MARTIN:  You talk among yourselves after we, but, those are the facts.

THE WITNESS:  That's right.

MR. MARTIN:  If there are no other questions we'll excuse you and we'll read the indictment, and a charge, and then, again, we are waiting for Mr. Darby and when he gets here we will present him and then you can do, pursue your deliberations.

(The taking of testimony was concluded at 2:03 o'clock, p.m., on Wednesday, September 18, 1996.)

JILL M. FRY - FREELANCE REPORTER

C E R T I F I C A T E

I hereby certify that the proceedings and the evidence in the notes taken by me in the hearing of the above cause are true and correct, and this copy is a correct transcript of the same.

Jill M. Fry
Freelance Reporter
Notary Public

JILL M. FRY - FREELANCE REPORTER

**Opposition Brief to Indictment Challenge**
**Government Exhibit 2**
**Page 119 of 119**