1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


United States of America,    :
      Plaintiff            :
                     :
   vs                         :    4:96-CR-00239-JHS-1
                     :
                     :
                     :
David Paul Hammer,           :    Capital Case
      Defendant              :


    BEFORE:        Honorable Joel H. Slomsky

    PLACE:         Scranton, Pennsylvania

    PROCEEDINGS:   Hearing on Pretrial Motions
               For Penalty Phase

    DATE:          Thursday, June 30, 2011


APPEARANCES:

For the United States:   Frederick E. Martin, AUSA
                   Herman T. Schneebeli Federal Bldg.
                   240 West Third Street
                   Suite 316
                   Williamsport, PA  17701-6465

                   Steven D. Mellin, Esq.
                   Capital Case Unit
                   1331 F St. NW
                   Washington, DC  20530

For the Defendant:       Ronald C. Travis, Esq.
                   Rieders Travis
                   161 W. Third Street
                   Williamsport, PA  17701

                   Michael Wiseman, Esq.
                   Defender Association of Philadelphia
                   Capital Habeas Corpus Unit
                   The Curtis Center, Suite 545-W
                   Independence Square West
                   Philadelphia, PA  19106

2

James J. McHugh, Esq.
Federal Court Division
Defender Association of Philadelphia
Capital Habeas Corpus Center -
Suite 545 West
Independence Square West
Philadelphia, PA  19106

James Moreno, Esq.
Capital Habeas Corpus Unit
Federal Court Division
Defender Association of Philadelphia
Suite 545 West, Curtis Building
Independence Square West
Philadelphia, PA  19106

Anne L. Saunders, Esq.
Federal Public Defender's Office
Suite 300
100 Chestnut Street
Harrisburg, PA  17101

3

(11:00 a.m., convene.)

THE COURT:  Good morning everyone.

THE DEPUTY CLERK:  Judge, we don't have the defendant on the line yet.

THE COURT:  All right.  Can we bring the defendant in?

(Pause.)

THE COURT:  This is the case of the United States of America v. David Paul Hammer.  Criminal No. 4-96-239 in the Middle District of Pennsylvania.  And we are here for a hearing on pretrial motions for the penalty phase in this case, the motions being filed by the defense.  And before we proceed I think we should have Mr. Hammer on the -- in our presence.  He is going to appear via a videotape hookup to the institution where he is incarcerated.

THE DEPUTY CLERK:  Judge, I think we're connected now.

MR. ROYER:  Good morning.

THE COURT:  Good morning.  I just stated to counsel that we are awaiting Mr. Hammer's connection to the courtroom from the institution where he is incarcerated, and I see on the monitor -- I can see Mr. Hammer.  I believe that's Mr. Hammer.  This is the first time I'm seeing him.  And who is seated next to Mr. Hammer?  Can that person identify herself?

MS. TRIVELPIECE:  Janel Trivelpiece.

4

THE COURT: I'm sorry. One more time?

MS. TRIVELPIECE: Janel Trivelpiece.

THE COURT: All right. And standing behind Mr. Hammer I assume is someone from the institution.

MR. ROYER: That's correct. And I am going -- Your Honor, I'm going to step out of the room. I just wanted to make sure that we got the connection correct, okay?

THE COURT: Yes. I can see you. And can I just have your name for the record?

THE WITNESS: Tom Royer.

THE COURT: All right. And I opened, Mr. Hammer, by saying this is the case of the United States v. David Paul Hammer, Criminal No. 4:96-239. And I'd like counsel, who are present in court, to identify themselves. For the government?

MR. MELLIN: Good morning, your Honor. Steve Mellin for the United States along with Fred Martin.

THE COURT: All right. And for the defense?

MR. WISEMAN: Yes, good morning, your Honor, good morning Mr. Hammer.

DEFT. HAMMER: Good morning.

MR. WISEMAN: Michael Wiseman for Mr. Hammer, along with Mr. Travis.

MR. TRAVIS: Good morning, your Honor; good morning David.

MR. WISEMAN: Mr. Moreno, M-O-R- --

THE COURT:  Let me ask you to speak a little lower -- a little slower, not lower.  One more time give me the names, I want to write them down.

MR. WISEMAN:  Mr. Travis, at the table with me.

THE COURT:  All right.

MR. WISEMAN:  In the back row Mr. James Moreno, M-O-R-E-N-O.  Seated next to him is James McHugh, M-C-H-U-G-H.  And next to him is Anne Saunders, S-A-U-N-D-E-R-S.

THE COURT:  All right.  And could you spell your name?

MR. WISEMAN:  Oh, sure.  Wiseman, W-I-S-E-M-A-N.

THE COURT:  Wiseman, that's right.  I recognize everyone.  Mr. Hammer, can you see me all right?

DEFT. HAMMER:  Yes, sir, I can see you and the clerk and the people sitting in front of me just fine.

THE COURT:  All right.  And when counsel spoke at the podium, could you see counsel?

DEFT. HAMMER:  Yes, we could see them fairly well.  I can hear them well.

THE COURT:  All right.

DEFT. HAMMER:  We can only see like a portion of their upper body, like their heads.

MS. TRIVELPIECE:  Just the top of their head.

DEFT. HAMMER:  Just the very top of their heads.

THE COURT:  All right.  As long as you can hear and

understand everything that's occurring here in the courtroom. Now, we are here today for a hearing on the pretrial motions in the case that have been filed by Mr. Hammer.

And I would just note for the record that in 1998 there was a trial in this case.  Mr. Hammer entered a guilty plea to Count 1, if I'm not mistaken.

DEFT. HAMMER:  Yes, your Honor.

THE COURT:  Count 1 of the indictment, which charged an offense occurring on April 13, 1996, at the Allenwood Federal Correctional Complex, United States Penitentiary, White Deer, Lycoming County, Pennsylvania.  And I'm reading it.  "On land acquired for the exclusive use of the United States and within the Middle District of Pennsylvania, and the jurisdiction of this court, the defendant, David Paul Hammer, did with premeditation and malice aforethought did kill Andrew J. Marti by strangling him with a cloth cord or homemade garotte in violation of Title 18, United States Code, Section 7, parentheses, three and 1111.  And just confirm with me, that's the offense to which Mr. Marti entered his guilty plea, correct?

MR. WISEMAN:  Mr. Hammer, yes, your Honor.

THE COURT:  Mr. Hammer entered his guilty plea.  All right.  And after the guilty plea was entered the jury proceeded to deliberate on the penalty, returned a -- what was a death sentence, and on or about January 4, 2006, Judge Muir,

7

the Honorable Malcolm Muir of the Middle District of Pennsylvania, pursuant to a motion filed under 28 USC Section 2255, upheld the guilty plea but vacated the death sentence essentially for the reason that Brady material had not been turned over to the defense.  I have read Judge Muir's opinion in part.  It's 120 pages or so.  And it's cited at 404 F.Supp. 2d 676.

And thereafter, the government filed an election to proceed in this case with the death penalty, and Judge Muir was no longer able to handle the matter, and I was assigned to handle the matter for the penalty phase, and I have been specially assigned to this matter.  And I am a judge sitting in the United States District Court for the Eastern District of Pennsylvania.  We are in the Middle District now.

And one of the matters that I discussed with counsel was whether or not we could handle the penalty phase hearing pursuant to 18 United States Code Section 3593(b) in the Eastern District of Pennsylvania.  I sit in the courthouse in Philadelphia, Pennsylvania.  And pursuant to my inquiry, the defendant filed a notice of election by David Paul Hammer to be tried in the Eastern District of Pennsylvania.  And that was filed at document No. 13 -- as document No. 1308 in the record on March 21, 2011.

And attached to that document was -- or I change that, an additional document was filed, which is document 1313

in the record on April 20, 2011. I just have a copy, but it's titled Waiver of Venue. And it appears to be signed by Mr. Hammer and Mr. Travis, his counsel, waiving venue in the Middle District of Pennsylvania and agreeing to proceed in the Eastern District of Pennsylvania.

I also have what's been filed of record as Document 1310. The response of the United States to the Notice of Election by David Paul Hammer to be tried in the United States District Court for the Eastern District of Pennsylvania. And the government has agreed that this matter can be heard in the Eastern District of Pennsylvania. And that's the state of the record at this point.

And I just have several questions. With counsel's permission, I'd like to question Mr. Hammer about the waiver of record and insure everyone that he wishes to proceed in the Eastern District of Pennsylvania. I don't know whether Mr. Hammer has the original waiver of venue in front of him or any copy of the waiver.

DEFT. HAMMER: Your Honor, I don't have a copy in front of me. But I do know what it said and I did sign it and provide it to Mr. Travis for filing with the court.

THE COURT: All right. Well, let me ask you several questions. First of all. Under the provisions of the Sixth Amendment to the United States Constitution under Article 3 of the United States Constitution and pursuant to Rule 18 of the

9

Federal Rules of Criminal Procedure, you have a right to be tried in the state and district in which the crime was committed, the state and district being the State of Pennsylvania, district being the Middle District of Pennsylvania.  And this is a constitutional right one has.

And we're all assuming that the same right would apply to a sentencing hearing, or in this case it would be a penalty hearing pursuant to a statute, which we call the Federal Death Penalty Act, and the hearing provisions are contained in what I mentioned before, 18 United States Code Section 5935 -- I'm sorry, 3593(b).  Do you understand what I just said, Mr. Hammer?

DEFT. HAMMER:  Yes, I do.

THE COURT:  All right.  And the -- that being said, you can give up your right to be -- to have this penalty phase hearing held in the Middle District of Pennsylvania, and be held in the Eastern District of Pennsylvania.  But it's a decision that only you can make.  Do you understand?

DEFT. HAMMER:  Yes, sir.  I do have an inquiry I'd like to make of the Court.

THE COURT:  Sure.

DEFT. HAMMER:  By agreeing to waive venue and have my re-sentencing penalty phase in the Eastern District, does that mean that the jury that we pick from, the pool of jury people will also be from the Eastern District of Pennsylvania?

THE COURT:  Yes, yes.

DEFT. HAMMER:  Okay.  I just wanted to make sure about that, because I wasn't sure.

THE COURT:  We would select a jury of eligible jurors in the Eastern District of Pennsylvania, and after going through the process of selecting a jury, those are the jurors that would make the ultimate decision in the case.  Do you understand?

DEFT. HAMMER:  Okay.  Thank -- yes, sir.  Thank you.

THE COURT:  All right.  Now, have you discussed with your lawyer either -- and I know there are five here in court today -- but have you discussed with any of your lawyers your right to have this penalty phase hearing occur in the Middle District of Pennsylvania, and giving up that right and allowing it to proceed in the Eastern District of Pennsylvania?

DEFT. HAMMER:  Yes, sir.  I've discussed it with most of my counsel at one time or another before we filed the waiver.

THE COURT:  All right.  And the waiver I have in front of me, that is -- is that signed by you?

DEFT. HAMMER:  Yes, sir.

THE COURT:  All right.  And Mr. Travis, you've signed it?

MR. TRAVIS:  I did, your Honor.

THE COURT:  All right.  Now, can we consider this

waiver an original, the one I have in front of me?

MR. TRAVIS:  Yes, your Honor.

THE COURT:  All right.  Mr. Hammer, did -- did you read the waiver before you signed it?

DEFT. HAMMER:  Yes, sir.

THE COURT:  And did you go over it with your lawyer?

DEFT. HAMMER:  Yes, sir.

THE COURT:  All right.  And has your lawyer answered any questions you may have had about waiving or giving up your right to have the penalty phase hearing in the Middle District of Pennsylvania and proceeding in the Eastern District of Pennsylvania?

DEFT. HAMMER:  Yes, he did.  The only question that he wasn't able to answer with certainty was the one that I addressed with the Court a few minutes ago.  I had discussions at length with Mr. Travis, and also with Ms. Saunders.  So they explained all my rights that -- what would happen if the case would be moved to the Eastern District for the purpose of re-sentencing, so I'm well aware of the procedures, sir.

THE COURT:  All right.  Do you have any questions that you would want to ask your attorney at this point about giving up that right?

DEFT. HAMMER:  Hum, no, sir.

THE COURT:  All right.  Do you need any additional time to make a decision on giving up the right to have the

12

penalty phase hearing in the middle -- in the Eastern District of Pennsylvania.

DEFT. HAMMER:  No, I'm in agreement with that.

THE COURT:  All right.  So that you're in agreement to give up your right to have your penalty phase hearing transferred from the Middle District of Pennsylvania to the Eastern District of Pennsylvania?

DEFT. HAMMER:  Yes, sir, I am.

THE COURT:  All right.  Now, I just want to read for the record the waiver of venue that you have signed.  It reads, "I, David Paul Hammer, the above-named defendant who is accused of first degree murder on exclusive federal enclave at Allenwood Federal Correctional Complex, being advised of the nature of the charge and of my rights pursuant to Federal Rule of Criminal Procedure 18, as well as the Sixth Amendment to the Constitution and Article III of the Constitution, to attend any criminal prosecution in the United States District Court for the Middle District of Pennsylvania, where the offense was committed hereby waives in open court on -- and I'm going to put in today's date.  There is a blank.  And today's date is June 30, 2011.

And going back, it says, "-- where the offense was committed, hereby waives in open court on June 30, 2011.  And next to that I'm going to just put in parentheses videotaped -- videotaped appearances in the United States District Court for

the Middle District of Pennsylvania, and consents that further hearings, including but not limited to a capital re-sentencing hearing may take place in the United States District Court for the Eastern District of Pennsylvania." And your signature appears and Mr. Travis's signature appears. And it says, "Before a judicial officer", and I'm going to sign my name. And we will have the Waiver of Venue form filed of record. All right?

Now, do you have any questions at all about waiving venue of the penalty phase hearing and agreeing to allow it to take place in the Eastern District of Pennsylvania rather than the Middle District of Pennsylvania?

DEFT. HAMMER: No, sir. I do have one request.

THE COURT: Yes?

DEFT. HAMMER: I would request that your Honor issue some type of order directing that I be brought back to the Eastern District of Pennsylvania so that I can attend further hearings in person. This -- I understand there was some controversy over my restraints and stuff this time. I'm trying -- I have a hand free where I can write. But if possible I would ask that I be brought back -- I would also be closer to my attorneys where they can visit me more frequently, and there's a lot of stuff for us to do in the next ten months before the re-sentencing. And I think it would be more convenient for everyone, including myself, if I was there in

the Eastern District of Pennsylvania.

THE COURT: All right. What I will do Mr. Hammer is I will confer with your counsel and government counsel, and the appropriate authorities at the Borough of Prisons and the Marshals Service and see whether or not we can -- the smoothest way to effectuate your request, to see whether or not it can be accomplished. I'm not sure whether or not there will be a need for any additional court hearings. There may be before we actually begin the penalty phase hearing. But that being said, we'll see what arrangements can be made. I can't say for sure at this time that that will happen. You can appreciate, given the time you've been incarcerated, the logistics of moving someone. So, we will attempt to comply with your wish as best we can. But as I sit here now I can't make that decision. All right?

DEFT. HAMMER: Yes, sir.

THE COURT: All right. Now, I just want to make a finding that you have knowingly, voluntarily and intentionally given up your right to have the penalty phase hearing pursuant to the Federal Death Penalty Act and the provisions for the hearing at 18 USC Section 3593(b) on the capital murder charge contained in Count 1 of the indictment that was filed against you, take place in the Middle District of Pennsylvania, where the offense was committed, and agreed to have the penalty phase hearing in the Eastern District of Pennsylvania, and that would

be specifically in Philadelphia, Pennsylvania, where I sit.

Does any counsel have any questions in regard to the waiver of venue or whether or not Mr. Hammer has knowingly, intentionally and voluntarily waived his right to have the case proceed in the Middle District of Pennsylvania and is giving up that right and allowing it to proceed in the Eastern District of Pennsylvania?  Mr. Wiseman?

MR. WISEMAN:  Yes.  None for defense counsel, your Honor.

THE COURT:  All right.  Mr. Martin is it?

MR. MARTIN:  Yes, your Honor.  We would bring a couple of matters to the court's attention.  First of all, Mr. Hammer was not placed under oath, and I'm not sure how important, if it is important at all, that he had given the statements to the Court under oath.

THE COURT:  All right.

MR. MARTIN:  The second issue is, I'm not sure he has been questioned, whether he freely and voluntarily wishes to change venue in the sense that whether any promises or threats have been made to him to induce him to waive venue.  And the third thing is, your Honor, with respect to Mr. Hammer and Mr. Travis and I having been there from the beginning, and I'm sure Mr. Hammer will concede this as well, he has been known to change his mind.  And I'm not sure how the Court wants to treat that particular issue, if today is an irrevocable waiver or if

the Court wants to give some outer point in time at which Mr. Hammer can no longer change his mind and he must stay with the proceeding in Philadelphia and not go back on his word.

THE COURT:  All right.

MR. MARTIN:  Those are the matters that we think should be considered.

THE COURT:  All right.  Mr. Hammer, did you hear what Mr. Martin said?

DEFT. HAMMER:  Yes, sir.

THE COURT:  All right.  As a result of what Mr. Martin said, I think it -- I think it is appropriate that I ask you just several more questions while you are under oath.  So, I'm going to ask you to raise your right hand, and I'm going to administer an oath to you now, okay?

DEFT. HAMMER:  Yes.

THE COURT:  Do you swear that the answers that you give to my questions will be the truth, the whole truth and nothing but the truth, so help you God?

DEFT. HAMMER:  I do.

THE COURT:  All right.  I have already asked you a series of questions about giving up your right to waive venue in the Middle District of Pennsylvania, and agree to have the penalty phase hearing in the Eastern District of Pennsylvania. You remember all the questions I asked you?

DEFT. HAMMER:  Yes, sir.

THE COURT:  All right.  If I asked you the exact same questions that I asked you before while you weren't under oath and I ask those questions now while you are under oath, would you give me the exact same answers?

DEFT. HAMMER:  Yes, sir.

THE COURT:  All right.

DEFT. HAMMER:  Your Honor, I would also say in open court here that I'm willing to make this waiver a irrevocable waiver so that there's no further doubt in the future about me changing my mind.  I'm willing to state that under oath and to accept the Court's ruling on that.  I have no intentions of changing my mind.

I can understand Mr. Martin's concerns in bringing it up.  You know, I have changed my mind on whether I wanted to die or live in the past.  But the last time I changed my mind was in 2004, and I've been steadfast in doing everything I can to fight this case since then.  So, I am willing, for the Court to know that this is a permanent waiver.  And make whatever ruling you deem necessary.

THE COURT:  All right.  Let me ask you just one or two more questions while you're under oath.  Has anybody threatened you or made any promises to you to get you to waive venue in the Middle District of Pennsylvania and proceed in the Eastern District of Pennsylvania on the penalty phase hearing?

DEFT. HAMMER:  No, sir.

18

THE COURT:  All right.  And after conferring with counsel, is this a decision you're making of your own free will?

DEFT. HAMMER:  Yes, sir, it is.

THE COURT:  All right.  And is there anything else anyone else wants to inquire of Mr. Hammer about?

MR. WISEMAN:  No, your Honor.

MR. MELLIN:  No, your Honor.

THE COURT:  All right.  Mr. Martin, have I covered all the points that you raised?

MR. MARTIN:  Absolutely.  Yes, thank you, your Honor.

THE COURT:  All right.  Again, I'll make the finding that after hearing from Mr. Hammer now under oath that he's knowingly and voluntarily and intentionally giving up his right to have the penalty phase hearing pursuant to the Federal Death Penalty Act and the provisions of 18 USC Section 3593(b) on the capital murder charge contained in Count 1, take place in the Middle District of Pennsylvania where the offense was committed.  And he has agreed that the case can proceed in the Eastern District of Pennsylvania.

All right.  Anything -- do we need to do anything further on this aspect of the case?

MR. WISEMAN:  Not from our perspective, your Honor.

THE COURT:  From the government?

MR. MELLIN:  No, your Honor.  Nothing further.

THE COURT:  All right.  Mr. Hammer, do you have any questions at this point?

DEFT. HAMMER:  No, sir.

THE COURT:  All right.  Now, I have in front of me a series of motions.  And again, I've set the matter for a hearing in April of 2012 in the Eastern District of Pennsylvania.  And I have in front of me a series of motions that have been filed by the defendant, and I will tell counsel that I have given considerable review of those motions.  They are all well -- well prepared and they have certainly set forth clearly and concisely the matters that counsel is raising, and I've also read the government's response and reviewed reply briefs.  And I have spent, again, considerable time reviewing these motions.  But that being said, is there any order in which defense counsel would like to proceed on these motions?

MR. WISEMAN:  Yes, your Honor.  We had an order that we would prefer.  Obviously it's your Honor's call.  I think -- would the Court like to hear the entire order?  Or should we just start --

THE COURT:  Well, maybe I can arrange my file according to --

MR. WISEMAN:  Okay.  Absolutely.

THE COURT:  -- which is first, second and third.

MR. WISEMAN:  Sure.  Our preference would be to start with the motion to preclude the capital prosecution because of

the Brady violations.  That would be docket No. 1334 and 1335.

THE COURT:  All right.

MR. WISEMAN:  And after that we would like to argue the motion to bar the capital prosecution because of the problems with the indictment.  Sir, if I can hand up my copy if you'd like?  That would be Docket 1332 and 33.

THE COURT:  All right.

MR. WISEMAN:  The third motion we'd like to argue would be the motion to preclude the capital proceeding because of the government's violation of its own protocols.  No. 1326 and 27.

THE COURT:  All right.

MR. WISEMAN:  And then we would like to move to the motion to declare the Federal Death Penalty Act unconstitutional, which is motion -- or docket No. 1343.

THE COURT:  All right.

MR. WISEMAN:  No. 5 would be the motion to strike the non-statutory aggravating factor of victim impact.  That's Docket 1336.

THE COURT:  All right.

MR. WISEMAN:  Followed by our motion for ruling that the confrontation clause shall apply at the penalty retrial.  That's docket 1330.

THE COURT:  All right.

MR. WISEMAN:  No. 7 is Defendant's motion to strike

the statutory aggravating factor of substantial planning and premeditation, which is at 1338.

THE COURT:  All right.

MR. WISEMAN:  And No. 8 would be our motion to strike the nonstatutory aggravating factor of future dangerousness at Docket 1340.

THE COURT:  All right.

MR. WISEMAN:  No. 9 would be our motion for an informational outline, which is at 1328.

THE COURT:  All right.

MR. WISEMAN:  The last two motions are also to have the Federal Death Penalty Act ruled unconstitutional, and they would be argued along with the fourth one that I indicated.

THE COURT:  Okay.

MR. WISEMAN:  Shall we proceed?

THE COURT:  Yes.

MR. WISEMAN:  May it please the Court, good morning. Michael Wiseman again.  I will be arguing the first motion to preclude the capital prosecution, or alternatively, to preclude the government from moving forward on the intent factor and the aggravated factor of substantial planning and premeditation.

I think it's appropriate to start by noting that this case and these proceedings are unusual in many respects.  And I think this notion of we're doing the retrial before the appeal and such, and circumstances under which we're here are somewhat

unusual. And I think that's important to keep in mind, because the relief that we seek in this motion is -- is an amalgamation of several theories and applying facts to those theories.

THE COURT: Mr. Wiseman --

MR. WISEMAN: Yes, your Honor.

THE COURT: -- before you proceed, I just want counsel to know, I do have a hookup of everything that's being said back to my chambers in Philadelphia. And I have at the very least a law clerk and an intern who are listening to the argument today.

MR. WISEMAN: Very well.

THE COURT: All right.

MR. WISEMAN: We have four discrete legal theories under which we believe we are entitled to the relief we're requesting. The first is our double jeopardy rights, which we believe have been violated under these circumstances. The second is our Sixth Amendment right to present a defense, which we think is at issue here. Third is because the Eighth Amendment in a death penalty case requires heightened reliability, we believe that the circumstances, which I'll outline in a moment, weigh in favor of the relief we seek.

And fourth, we seek to invoke the Court's supervisory powers. I think that last one is an important one, because I think at the core of what we're seeking here is really fairness based on what's happened with these issues, and to make Mr.

Hammer whole for the violation of his rights that Judge Muir found.

So, I know the Court is aware, but for the record, let me just outline what the relevant facts are. A number of 302 reports were disclosed very late during the 2255 hearing. They were disclosed pursuant to Judge Muir's order. They were disclosed after the government earlier claimed there were no disclosable documents remaining. And Judge Muir accepted that representation.

And it was only during Mr. McHugh's examination of Agent Malocu, M-A-L-O-C-U, who was the investigative agent in this case, that there had been in fact a number of prisoners who he had interviewed, particularly relevant to the question of Mr. Hammer's sexual practices because of the -- his investigative belief that Mr. Hammer's sexual practices might become an issue in the case, from his perspective.

Four of the 302 reports that were disclosed spoke to those issues. And I think it's important for the Court to understand and appreciate the framework under which these disclosures were made. Certainly Judge Muir appreciated them and they formed the basis for his Brady ruling. That the government's theory here was that this was a hostage ruse where Mr. Hammer had lured Mr. Marti to be tied up so that he could present this as a hostage-taking situation to accomplish some sort of a prisoner transfer.

What the undisclosed -- or I should say late disclosed 302 shows is that the same type of restraining of people was part of Mr. Hammer's sexual practices for the many years he had been in prison.  And it put a very different light on the government's theory and it specifically spoke to the intent factors and the aggravating factor that we think are also at issue here.

So, while the government was arguing that this was a hostage ruse and it took great time for Mr. Hammer to braid ropes and such, that in reality ropes had been previously given to Mr. Hammer by one of the witnesses mentioned in the 302s, and that such, for lack of a better phrase, sexual bondage was part of regular sexual practices.

THE COURT:  Let me ask you one or two questions --

MR. WISEMAN:  Sure.

THE COURT:  -- about the statements that were withheld.  My sense is that it was statements of -- well, 32 had turned over, I believe I read --

MR. WISEMAN:  Correct.

THE COURT:  -- pursuant to Judge Muir's order after the penalty phase hearing.  And specific mention made of FBI 302s of Witnesses Ball, Guerrero and Fowler.

MR. WISEMAN:  Correct.

THE COURT:  And at least now they are deceased.

MR. WISEMAN:  That's right.

THE COURT:  And there was a fourth person, I forget that person's name --

MR. WISEMAN:  It would be Mr. Johnson.

THE COURT:  Mr. Johnson.  He's not deceased.  You've raised an issue, double jeopardy issue, at least citing Oregon v. Kennedy.

MR. WISEMAN:  Yes.

THE COURT:  And what I am wondering is, the Court would have to make a finding that prosecutors engaged in conduct intended to subvert the protections afforded by the double jeopardy clause.  You know, assuming I agree that Oregon v. Kennedy would apply to a penalty phase hearing, you referred to testimony or cross examination by Mr. McHugh.  What evidence do you want me to consider in making this finding?  Is it just the mere fact that I looked at the statements and they weren't turned over?

MR. WISEMAN:  No, it --

THE COURT:  Or is there anything additional that you want me to look at?

MR. WISEMAN:  We do not intend every time there is a Brady violation that double jeopardy is involved.  That's clearly not the law and it's not our position.  Our position is that what we have here is a course of conduct -- I'm sorry, a course of conduct on behalf of the government intentionally failing to disclose these documents while making arguments that

are -- that were contradicted by the documents.

THE COURT:  Was there any testimony about why these documents were withheld at the 2255 hearing before Judge Muir?

MR. WISEMAN:  Judge Muir did not find the need to reach that issue, because for purposes of Brady, Brady qua Brady, there is no need to explore the government's intent. So, he never sought such testimony, he never asked Mr. Martin. I think we can tell from the government's submissions what their view is, that they don't think this is Brady.

THE COURT:  What about at this stage, where you're asking me to preclude based upon a finding of double jeopardy, double jeopardy violation?  And the standard is how egregious or what was the intentional -- what -- did the government act with an intent to undermine a double jeopardy clause?  What evidence do you want me to consider on that?

MR. WISEMAN:  Despite having spent 14 weeks litigating the hearing with Mr. Martin I can't profess to know what was in his mind at the time.  I can tell you that our view is that it was the ongoing refusal to disclose these documents, even when their significance became obvious during the 2255 that we believe shows a course of intentional misconduct on behalf of the government, and we think that that speaks to the finding you would need to make under Oregon v. Kennedy to find a preclusive effect based on the government's action.

I would add -- and I started out by saying these are

unusual facts here -- I would add that added to the double jeopardy argument is the fact that three of the four witnesses are deceased, aren't available, and we think that that goes to the overall harm caused Mr. Hammer by the government's Brady, and if the Court is looking for a rule, I think the rule can be -- and of course there's no case out there that says this because these circumstance are so unusual, we think the rule could be that when the government intentionally withholds material and that results in a new trial, and the witnesses that were the subject of that withholding are no longer available, that those factors combined should result in a preclusion of the retrial, or in this case of the penalty hearing.

And let me just add that I don't think there's any question that double jeopardy applies in the penalty phase.  I think the trend of the United States Supreme Court has certainly been to afford more rights to -- more trial like rights to a defendant, and certainly there are a number of cases that I can't recall off the top of my head, but there are a number of cases that apply double jeopardy in the penalty phase, and we can certainly provide just a list of citations.

THE COURT:  Assuming I agree to that, and it seems difficult to perceive that the government engaged in this conduct with the notion that knowing how long these proceedings lasts until there's an ultimate determination by a jury that

they intended to do it, knowing that witnesses would pre-decease the date of a hearing.

MR. WISEMAN:  Sure.

THE COURT:  The fact that these -- did these witnesses testify at the 2255 hearing?

MR. WISEMAN:  They did not.

THE COURT:  I'm talking about Fowler and Guerrero and Ball?

MR. WISEMAN:  They did not.  One of the witnesses was deceased before the 302s were even disclosed, so we would have no reason to even think to call him.  That would be Mr. Fowler, who died on August 5, 2005, according to the government's representation, which we have no reason to dispute.

THE COURT:  Right.

MR. WISEMAN:  And as to the other two, I think the Court has to appreciate what was going on at this -- at this hearing.  We were winding down a 14-week hearing.  These 32 302s were finally disclosed.  We scrambled literally overnight to draft an amendment to the 2255.  Judge Muir accepted it.  The hearing was over.  And he made his rulings.  And you know, the thought at that time of calling these witnesses, frankly, didn't occur to any of us at the 2255.  Obviously we thought we'd want to call them in any subsequent retrial.

THE COURT:  Is there any deposition of these witnesses?  Is there any other way, other than the FBI 302 that

the testimony or statements are memorialized?

MR. WISEMAN: None that the defense is aware of. We -- no depositions were taken. And I think, you know, perhaps the Court is interested in the government's suggestion that we were somehow less than diligent in not seeking to take the provisional testimony of these witnesses subsequent to Judge Muir's grant of relief. I think we've pointed out in our reply the substantial jurisdictional problem that we would have been confronted with. The case was not before the District Court once the appeal was filed. We had no way to do what the government suggests we should have done. And I think that same theory would apply to any type of deposition or any type of examination of these witnesses, the case simply wasn't before the court at that time.

THE COURT: Now --

MR. WISEMAN: The impact of the government's withholding -- you know, there is a line out of Kyles v. Whitley, which is a fairly well-known Brady case out of the Supreme Court from I believe 1995. It talks about, you know, prosecutors tacking too close to the wind I think is the phrase. I may be butchering it a little bit, but that's the concept.

And I think, you know, when the government withholds evidence that -- you know, whether it's intentional or negligent or whatever the state of mind of the government --

when a government does withhold evidence, they have to suffer the consequences if that evidence is revealed ultimately and it's found to be material, as Judge Muir has found.

THE COURT:  The consequence was a new penalty phase hearing.

MR. WISEMAN:  Yes.  But what I was about to suggest is that those consequences don't necessarily end there.  You know, and we're talking about fairness here.  We're talking about settling into Mr. Hammer's right to present a defense.

THE COURT:  What's the state of mind under Brady that the Court has to find in terms of -- the state of mind of the prosecutor in order to find that there's been a Brady violation?

MR. WISEMAN:  There is no state of mind requirement under Brady.

THE COURT:  What's the state of mind under Oregon v. Kennedy in interpreting the double -- under the double jeopardy clause?

MR. WISEMAN:  Certainly there is an intentional state of mind the government was seeking to fend off the acquittal.

THE COURT: All right.  So it may well be that the Brady violation is applicable in one situation, but the withholding of that evidence may -- when the court evaluates it may not rise to the level of the state of mind to trigger a double jeopardy violation under the Fifth Amendment.

MR. WISEMAN:  Clearly the Court has to make that finding, make a finding about state of mind for us to prevail on the double jeopardy claim, and that's certainly what Oregon v. Kennedy and two other circuit cases we've cited would indicate.  But again, I think that added to that state of mind are the unusual facts of this case, which is that the government's harm or the harm resulting from the government's misconduct, even if it was unintentional, is substantial, and we think that, you know, we're here before you in a trial posture, pretrial posture, and this court has the ability, the authority under each of the four legal bases that we have offered to preclude the re-prosecution of the capital prosecution to end the case.

THE COURT:  Let me ask you this question:  Assume for the sake of argument that I disagree with your position and we -- at the penalty phase hearing we can introduce the FBI 302s of those three witnesses?

MR. WISEMAN:  Well, I imagine that would be if we lose all of our applications with respect to this set of circumstances, we would do our best to get that information before the jury.  But I dare say that presenting a piece of paper is -- or stipulation as to what that paper or what the witness would say is very different than bringing in live witnesses before a jury.  And I think our view is that that would be a -- not an adequate substitute.  We would certainly

32

work with what we have, and if that's all we can do, we'll do that.  But we don't think that makes Mr. Hammer whole.

THE COURT:  Refresh my recollection about Mr. Guerrero's statement.

MR. WISEMAN:  Yes.

THE COURT:  I thought I read that he denied that he received any communication, any writing, any letter from Mr. Hammer when he was interviewed by the FBI, and certainly there's some dichotomy there between what Mr. Hammer told the FBI when he was interviewed and what Mr. Guerrero said.

MR. WISEMAN:  I'm just checking my file here to make sure that -- what the Court said is correct, that Mr. Guerrero's value to the defense is that he disputed ever having received the letter from Mr. Hammer, which was a significant point that the government made as to why Mr. Hammer had engaged in this substantial planning and premeditation.  The letter supported the government's view of that.  I'm not seeing any other -- if I can just consult counsel?

THE COURT:  Yes.

(Pause.)

MR. WISEMAN:  My colleagues remind me that Agent -- I'm just digressing for a moment -- Agent Malocu at the 2255 hearing testified that he provided all of these 302s to the government lawyers.  So, I think that speaks to the intentionality question of, you know, this wasn't just

something -- sometimes the police know something that the prosecutor doesn't.  Brady charges the prosecutor with that knowledge, but there's not really an intent factor.

THE COURT:  Let me just say to all counsel that sometimes at oral argument the Court may ask some questions that were not anticipated, and I do this in every case.  I afford both sides the opportunity to file one more supplemental brief on the issues that are raised in the motions.  And I would ask that they be filed simultaneously.  I don't want reply briefs.  I'll give you a week or two weeks, whatever you think is appropriate to file a reply brief, if you want you can order a copy of the transcript.  And based upon my questions or anything else that is said during the course of this hearing, you can supplement the briefs.

MR. WISEMAN:  We appreciate that.  Thank you.

THE COURT:  Now, one additional question I have is a Freedom of Information Act request was made.  And the defense learned that there was a document which indicated that I think Mr. Marti voluntarily agreed to room with -- be housed in the same cell with -- or requested to be in the same cell with Mr. Hammer.  Somehow you believe that corroborates a theory that you have.

MR. WISEMAN:  Well, I think it disputes the theory that the government put forward, which is that Mr. Hammer was the aggressor, he wanted to bring Mr. Marti into his cell.

34

THE COURT:  Is there any evidence that that document was in the hands of the prosecutor before the -- before the sentencing phase hearing?

MR. WISEMAN:  We do not know that for a fact.  That would be an interesting question.  Perhaps Mr. Martin or Mr. Mellin can shed light on.  We don't know that to be a fact, unlike the 302s, which were in their possession.

THE COURT:  I'm assuming we covered the Fifth Amendment, and you also raised Sixth and Eighth Amendment arguments.

MR. WISEMAN:  Yes.

THE COURT:  Can you just go over them for me?

MR. WISEMAN:  Sure, sure.  Obviously the Sixth Amendment presents a criminal defendant with the right to present a full defense.  We submit that applies in the penalty phase.  And the simple fact of the matter is, is that our ability to present that defense is hampered, if not obliterated, certainly significantly hampered by the fact that these witnesses are no longer available to us.  And they're no longer available because the government hid their significance from the defense until 2005.  And we think that's an important concept in this mix, because there is no requirement to find intentionality on the government's part.  It's simply the result of misconduct.

And again, we think that this Court ought to fashion

a remedy.  We've suggested what we think those remedies are alternatively to make Mr. Hammer whole as best that can be done under these circumstances.

THE COURT:  All right.  And the Eighth Amendment.

MR. WISEMAN:  Yes.  The Eighth Amendment again is another -- another tool that we've presented to the Court that we think is available to do justice in this instance on these facts.  And that essentially suggests that the Eighth Amendment indisputably requires heightened reliability in capital sentencing.  Heightened reliability means all of the relevant facts should be before the Seventh Circuit.  We can't present all of the relevant exculpatory facts for obvious reasons, that these witnesses are no longer available, and so we think the Eighth Amendment provides that remedy as well.

And I think, you know, the Court's supervisory powers, as we have termed them, don't just apply to the double jeopardy or the Sixth Amendment or the Eighth Amendment basis for our seeking relief here.  It allows this Court at its discretion to make sure that Mr. Hammer is made whole.  And I think that is clearly from our perspective the key here.  You know, the government did something wrong.  Whatever their intent was at the time they did it, Judge Muir has found it. It's the law of the case.  And Mr. Hammer shouldn't have to face a second penalty hearing.  And if he does, the government should -- should suffer some sanctions, some consequence and

we've suggested the alternative ones other than barring the prosecution altogether, which is to, you know, get right to the heart of the matter.  The withheld evidence in this case speaks to Mr. Hammer's intent, speaks to whether he substantially planned and premeditated.

And we think that the appropriate sanction, alternative of course to the barring of the prosecution, would be to prevent the government from taking tactical advantage of the fact that we will not be able to meet their case in the way we could have but for their misconduct.  I hope that makes sense.

THE COURT:  No, I understand your position.  And 3593 says, "The defendant may present any information relevant to a mitigating factor."  Certainly the presence of these people would -- might be considered differently by a jury.  Although the FBI reports -- the language I reviewed, that are quoted in Judge Muir's opinion that -- I'm not sure whether -- did you attach the actual FBI 302s to --

MR. WISEMAN:  I believe we did, yes.

THE COURT:  All right.  Then --

MR. WISEMAN:  And if not, we'll get them to you.

THE COURT:  They're in the record.  I probably read them, but I've read so much --

MR. WISEMAN:  Yes, yes.

THE COURT:  -- that as I sit here I can't focus on

specifically reading those 302s.  I probably did, but I certainly saw what the content was from Judge Muir's opinion. And the question is, can you -- they are so specific that -- and not subject to cross examination to be somehow refuted that that evidence would be before the jury.  It's not as if that evidence would be excluded.  I understand what you're saying about credibility, et cetera, but I think sometimes you want a statement rather than a witness, a fair statement.

MR. WISEMAN:  Well, sure.  I mean, you know, these situations are like snow flakes, no two are the same.  I think, that, you know, our view is that we are -- were entitled, we would have presented live witnesses to talk about these important issues.  And again, we don't think just putting these documents into evidence would be sufficient.  I would add that -- and I'm not addressing this point, but I know one of the issues that we presented to the Court is, you know, whether -- actually I was going to talk about the confrontation clause.  I guess that doesn't apply.  The government's right to confront, which they don't necessarily have, and obviously the government would have to agree to the admission of these documents in lieu of live testimony.  Obviously the documents are hearsay and the Court would have to make some sort of ruling on that.

But you know, we really think that is a, you know, respectfully an inadequate remedy under the circumstances, given the stakes involved here.  You know, some sanction.  You

know, why not preclude substantial planning and premeditation? The government has very little to go on to begin with other than this braiding of the ropes and the writing of the letter. They didn't have much at the time of trial to rest that on.

If that gets taken away by the Court, they can still proceed to penalty with the other aggravating factor, which has to do with Mr. Hammer's prior convictions.  That would be a far preferable remedy from our perspective than simply saying, Well, you can put these documents in.  I'm sure the jury is going to have a mound of paper by the time this thing is done, and will see a mound of paper.  I'm not sure, you know, three 302s in the mix are going to make Mr. Hammer whole.

Telling the government they can proceed on substantial planning and premeditation, which is already a very thin aggravating factor for them.  They don't have much, and what they have is refuted, if not obliterated by these -- by Brady.  That's why Judge Muir granted relief.  And we think that would be a far more preferable and appropriate and just remedy here.

The last point I wanted to make, and I don't know what the government is going to say about it, if anything, we really -- you know, we treated in the paragraph --

(Whereupon, a loud beeping sound was heard in the courtroom.)

THE DEPUTY CLERK:  That's on their side.  It's not on

our side.

THE COURT:  Go ahead.

MR. WISEMAN:  We treated it in a paragraph in our reply brief, but you know, this argument that this wasn't really a Brady violation and the Third Circuit would have done something about it, and you know, these weren't really important witnesses, you know, that's all, you know, not really before your Honor.  You know, Judge Muir's ruling is the law of the case.  I don't think there's any real dispute about that.

Where, you know, if the Third Circuit ever gets to this matter again and decides that it wasn't a Brady violation, well, you know, that's irrelevant to your decision right now, because your decision right now has to assume the validity of Judge Muir's Brady finding.  We prevailed on that.  These were deemed material.  Judge Muir wrote pages and pages about how important these document were.  And I needn't remind your Honor, Judge Muir, you know, for all of his decades on the bench --

THE COURT:  You've raised a unique issue.  And what if there is a hearing and the jury does not impose a death penalty, I guess at that point there wouldn't be an appeal, but had there been an appeal and Court of Appeals had said Judge Muir is wrong, we're not in a position where it would be reinstated, that's for sure.

MR. WISEMAN:  Well, you know, we -- I think both

sides have racked their brains trying to look that far into the future when the case was before the Third Circuit, the jurisdictional impediment was discussed with the Court of Appeals. I don't have an answer for you standing here today what will happen.

What I do know is that it's irrelevant respectfully to your Honor's decision-making with regard to this issue. You have to assume the validity of the Brady finding, just like you would if you made a ruling and, you know, it hasn't been appealed yet.

THE COURT: All right. Perhaps we should hear from the government after each one.

MR. WISEMAN: Sure.

THE COURT: And I originally had another matter scheduled for ten o'clock, and that matter has to be continued until this afternoon. I -- I have to break at 12:30 for an hour. So we'll come back at that point. I would have to speak to the authorities at the institution over the video monitoring to make sure that at 1:30 we can have Mr. Hammer back on the video. They probably anticipated it, I don't know. But obviously the arguments are going to take a considerable period of time.

I'm assuming the other matter I have may take about an hour. It may be at the end of the day or we may do it sooner, depending upon what the status of this hearing is. But

I just wanted to give counsel in the other matter some indication that certainly we're not going to proceed, I would say, before 1:30, two o'clock at the earliest, and it could be later this afternoon.  All right?

MR. TRAVIS:  Your Honor, if I may interrupt.  Based on what I've heard, you need to check with the institution about the availability of the video conferencing.  It might be a good time now to have Janel or ask Janel to call one of the staff members in so that she can let them know what's happening and they can --

THE COURT:  All right.

MR. TRAVIS:  -- scurry around and try to get an answer for us.

THE COURT:  All right.  I'm going to call her by her first name too, Janel?

MR. TRAVIS:  Janel.

THE COURT:  Can you ask --

MS. TRIVELPIECE:  Hold on one second and I'll see if I can get someone.

(Pause.)

THE COURT:  Mr. Hammer, have you heard everything?

DEFT. HAMMER:  Yes, sir.

THE COURT:  All right.

DEFT. HAMMER:  I can -- we can also see now since they adjusted the screen, we can see the attorneys as well.

42

THE COURT:  All right.

(Pause.)

MS. TRIVELPIECE:  They're going to continue until 12:30 and then I think they're going to break until 1:30.

MR. ROYER:  Okay.

MR. TRAVIS:  Your Honor, this is Mr. Royer.  I think he may be able to answer your question.

THE COURT:  All right.  I would like to break at 12:30 and then resume at 1:30.  I scheduled this to begin at eleven knowing that it would take a long time, but I think I've got to afford everybody the opportunity for a lunch break. Would that be satisfactory?

MR. ROYER:  Yes, your Honor.

THE COURT:  All right.  So let's continue then, and we'll recess at 12:30 and we'll start promptly at 1:30.  Just one second.  Oh.  You're at Terre Haute, Indiana.  Is there a time difference?

MS. TRIVELPIECE:  No.

MR. ROYER:  Your Honor, it is currently, according to my watch, ten after 12.

THE COURT:  All right.  So that you're in the same time zone as we are.

MR. ROYER:  Yes, sir.

THE COURT:  All right.  I thank you.  Thank you.

MR. ROYER:  Okay.

43

THE COURT:  All right.  Mr. Martin.

MR. MELLIN:  Actually I'm Mr. Mellin.

THE COURT:  Mr. Mellin, I'm sorry.

MR. MELLIN:  Your Honor, I'd like to begin where Mr. Wiseman ended, with the point of it is the law of the case. That is precisely the point for the government in this case. Judge Muir had a chance to hold a hearing on this issue to hear about what he determined after being -- as Brady violations and to impose the appropriate sanction.  He has done that in this case.  There's no reason to go beyond that.  The defense didn't ask Judge Muir to reconsider his position.  The government asked Judge Muir to reconsider his position, and Judge Muir denied that in January of 2006.

Now the defense is coming before your Honor asking for yet another bite at this apple.  They're saying, Okay, well now we've got a Brady violation and now we have a re-sentencing.  Well, we'll take that, but now we want to go one step farther.  And we want to --

THE COURT:  What's the point of the double jeopardy clause?  The point is to -- the point of double jeopardy is to prevent a second hearing.  In other words, there was no -- you know, there was one penalty phase hearing, and then they -- there was disclosure of these -- of these 302s that were withheld, reports of interview, and I guess at that point the defense had the opportunity to not only raise the Brady

violation to overturn the sentence of death, but also at that point to request that there be no second hearing.

MR. MELLIN:  Correct.

THE COURT:  Was that request made?

MR. MELLIN:  I am unaware of that request ever being made, your Honor.  And they certainly didn't make the request after Judge Muir issued his order saying that he was going to make a finding of a Brady violation and that we was going to have the defendant resentenced.

THE COURT:  Were they required to make that request?

MR. MELLIN:  Well, I think if they're making the point to your Honor that there's a need for a dismissal based on alleged Brady violations then yes, it goes directly to their -- to undercut their argument that this information was so egregious and that Judge Muir made some type of finding of egregious conduct, which Judge Muir did not make.

THE COURT:  Judge Muir said in his opinion -- I'm looking at page 118 in my printout from Westlaw -- he said when a -- he doesn't cite a case for this proposition.  But he does say when a defendant does not pursue an appeal, generally any issues that could have been raised on appeal are waived and cannot be raised in a 2255 proceeding.

And I'm wondering whether or not that logic -- he doesn't cite a case to that proposition.  But I'm wondering whether or not that's an accurate statement of the law, and

whether or not it's -- that kind of logic would apply to this kind of situation.  Whereas there is -- there's always a potential for arguing a waiver in these kinds of situations where so much is happening, I would say so fast during the course of a hearing, when Brady material is disclosed sometimes counsel thinks of issues, sometimes they don't.  Just human nature, not to be able to think of everything at every given point in time, that's the nature of lawyering, so to speak.  But --

MR. MELLIN:  I would agree with that, your Honor, except with the caveat that in cases where there are claims of Brady violation, in my experience every single time that comes up the defense quickly asks for a dismissal, and then the next request is for some other sanction.  So the defense clearly had a chance to ask for and seek this remedy in front of Judge Muir, and they did not, even after he issued his order.  So I do think that that's an issue that goes to show that this information we're talking about is not as critical as the defense --

THE COURT:  Let me ask this question.  When did you file the notice -- the recent notice I believe it is, to seek the death penalty?

MR. MELLIN:  Hum, off the top of my head your Honor I'm not sure.  I believe it's February of --

(Pause.)

MR. MELLIN:  I believe it's 2011, your Honor, but I don't have it off the top of my head.

THE COURT:  So why would the defense have to raise double jeopardy if they don't know yet whether or not you're going to seek the death penalty?

MR. MELLIN:  No, I'm saying at the time that Judge Muir is making a finding and there is a hearing on this point. They are not asking for a dismissal or Judge Muir denies the dismissal, and at that time he -- they, the defense, does not request reconsideration asking for a dismissal.

The other point on double jeopardy, your Honor, is I don't even believe double jeopardy applies in this situation because jeopardy really for all intents and purpose is not attached.  There's not a situation where you have a finding in one case and then there's a decision made that the defendant should be charged again for the exact same type of conduct.  I mean, this is a very peculiar situation, to say the least.

THE COURT:  Doesn't the double jeopardy clause apply to sentencing?

MR. MELLIN:  Frankly, your Honor, I don't have a case off the top of my head that stands for that proposition, and I don't believe the defense ever cited one, and I frankly don't know the answer.

THE COURT:  I mean, it's traditionally known to preclude a trial.

MR. MELLIN:  Correct.

THE COURT:  There's nothing in the constitution about a death penalty hearing.  But if you look at the -- the Fifth Amendment, it says, Nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb.  And you know, certainly it's a very broad concept as written.

MR. MELLIN:  It is, your Honor.  It's not frankly a point that I have investigated.  I don't know the answer to that question.

THE COURT:  All right.  Again, I'm going to give the parties an opportunity to supplement with briefs.  It's certainly something that comes up when the courts ask questions.  All right.

MR. MELLIN:  I think the biggest point of the double jeopardy is, your Honor, there has been no finding of any type of egregious conduct by the government in this case.  Judge Muir did not find that.  At no point in his opinion does he indicate that.  He does say that he finds it's a Brady violation, but he does not say that there was intentional misconduct by the government or egregious conduct or anything like that.

THE COURT:  Can I ask you to speak up just a little bit more.

MR. MELLIN:  Okay.  That he does not at any time say that there is egregious conduct or intentional egregious

48

conduct which would warrant this -- request for a dismissal. And I am frankly unaware of any case, and I have attempted to do as much research as I can, and I believe the defense even acknowledges, there is not a case out there that stands for the proposition that a Brady violation results in the dismissal of a case.

THE COURT:  How do I treat the death of the three witnesses with the Brady -- who did have Brady information?

MR. MELLIN:  With all due respect, your Honor, and I'm not here to relitigate that issue.  And I believe that it is the law of the case.  I believe that there is a finding by Judge Muir that there is a Brady violation and he imposed the sanction he thought was appropriate.  But that being said, I do not believe there's a Brady violation because we're talking about information that was in the possession of the defendant.

As I quoted and wrote down exactly what Mr. Wiseman said.  He said the information was relevant to the defendant's sexual practices.  The defendant is clearly aware of his own sexual practices.  He is in possession of all of that information.  So, under the cases the government has cited, it is not a Brady violation because that's information the defendant possesses.  But putting that aside, your Honor, as to the Court's questioning about -- and I raised that because I think that it also goes to show that there is no need for further sanction in this case.

49

THE COURT:  Let me ask this question.  First of all, Brady is a case that puts on obligation on the government, not the defense, regardless of what the defense knows.  If the government has exculpatory evidence, they're required to turn it over.  Obviously a defendant may know about it.  I guess you'd have to look at it in the totality of the circumstances.  But in this case the reports of interview by the agent weren't turned over.  If there's a hearing held, a new death penalty hearing, is the government going to object to the defense reading those to the jury?

MR. MELLIN:  Not at all, your Honor.  And another point they can do, and I'm willing to agree to right now, they can call the agent.  They were saying that they don't have a witness on the stand.  That they don't like reading the 302.  I have no objection to the witness being the agent.  And they can, to the extent that they wish, question the agent about what information did they -- did the agent receive from these three witnesses.

THE COURT:  All right.

MR. MELLIN:  As your Honor has raised, the reality is is most of these witnesses don't have information that is that helpful to the defense.  And so there's a reason why the 2255, when this information became available, that the defense did not call those witnesses at the 2255.  They certainly had every opportunity right then to call a time out, ask Judge Muir to

stop the proceedings and to have the opportunity to call the witnesses and have them testify to the 2255.  They did not.  So they didn't preserve it then.  As the Court has asked counsel already, they did not depose these witnesses after the fact. I'm unaware that they've even interviewed the witnesses at any time.  So, they had -- certainly had numbers of opportunities to talk to these witness, and apparently they did not do that. So, I think that that also goes to show that this information is not as critical as they try to claim, but it also goes to show that the decision made by Judge Muir to try to fashion a remedy, that he considered all of that and came up with the right call, which was to have a --

THE COURT:  Doesn't Brady require the evidence to be material?

MR. MELLIN:  It does.

THE COURT:  Well, material means it must have some effect on the outcome of the proceeding, unless it's not Brady material.  I mean, if it's not important and it wouldn't affect the outcome of the proceeding, then it wouldn't be Brady.  But Judge Muir found that it did violate Brady.  So that it's -- it's clear from Judge Muir's opinion that he believed that if these reports of interview had been given to the defense that it could affect the outcome of the proceeding and it was material.

MR. MELLIN:  Agreed, your Honor, there's no dispute

that's what Judge Muir found.  I'm talking about what the defense did after this information came to light.

THE COURT:  You're also arguing that it wouldn't have changed the outcome of the proceeding.  We don't know ultimately what would have happened, but --

MR. MELLIN:  We don't, your Honor.

THE COURT:  On the surface is Judge Muir found that Mr. Hammer was deprived of due process because these statements were not made available pursuant to Brady and they were material.  Not a decision I can second guess, it's really the law of the case at this point, I agree with that.  The question is does the clause for -- the situation involving the double jeopardy clause at this point?

MR. MELLIN:  Your Honor, as to the -- what other avenues are available to the defense.  As I said, the government would have no objection to the agent testifying or the 302s coming in as evidence.  I don't -- the Court asked about Mr. Ball and Mr. Guerrero.  Mr. Ball in fact was an individual who at one time indicated he wished to cooperate with the government.  And the Court is correct, that as to Mr. Guerrero the reading of the statement covers the point as to whether or not he received the information.  There really is no other point to his testimony.  So, their rights -- the defendant's right is adequately protected by just being permitted to introduce that evidence.

52

(Pause.)

MR. MELLIN:  Your Honor, the Court asked one question about whether or not -- if the government has the information and is Brady information, does the government necessarily then have to provide it if the defendant knows of it?  And I think the cases are clear on that.  If the defendant is in possession of the information, that there's not an obligation on the government to have to disclose that because he knows the information.

THE COURT:  I think you're right, that's a factor.  I may have been mistaken before.  We'll take a close look at that.

MR. MELLIN:  I would cite to the Lambert case, which is at 387 F.3d 210, a Third Circuit opinion, as well as there's a Fourth Circuit opinion, which I believe that Judge Muir cites in addition, which is Fullwood.  It's 290 F.3d 663, which is a Fourth Circuit opinion of 2002.  And there were a couple of other Third Circuit opinions along those same lines, that if the defendant knows of or should have known of the evidence, that there cannot be then a finding that it's Brady violation by the government.

One other point that I think is lost in some of this discussion, your Honor, is the procedural posture that we're at in this case.  The defendant has pled guilty, and the defendant admitted that he intentionally killed Mr. Marti.  So, this idea

that this was all just accidental sexual asphyxiation during playing around is completely undercut by exactly where we are in this case.

The defendant has admitted that he intentionally killed Mr. Marti. It wasn't by accident, it wasn't by mistake. So I think that also goes to the points the Court is raising, and also goes to show that this argument, or this information, although -- and Judge Muir found it's clearly relevant and should be presented -- is not the type of information that would lead to a finding by this Court that there has been egregious misconduct by the government that would warrant a dismissal.

THE COURT: Well, what the defense is arguing is that -- and I think you would agree -- there's a clear difference between intent, premeditation -- well, let's say intent under the statute and substantial planning and premeditation.

MR. MELLIN: Agreed.

THE COURT: There's a difference. And certainly these statements go to whether or not there was substantial planning and premeditation.

MR. MELLIN: I agree with that, your Honor. And that's why I'm saying that the -- I do not object and will not object to him being permitted to have the statements either read or have the agent called as a witness to put on this

54

information.  But, ultimately, I think it probably comes down to determination of substantial versus not substantial. Because under 1111, the intentional killing statute, you have to have premeditation.  So the defendant has admitted premeditation by pleading guilty.

THE COURT:  It's in the indictment --

MR. MELLIN:  Correct.

THE COURT:  -- the word premeditation.

MR. MELLIN:  Correct.  So now we're to the fact that the jury deciding and weighing and hearing the evidence and deciding based on the evidence presented by the government, based on the evidence presented by the defense, as to whether or not there was substantial premeditation and deliberation. And frankly, your Honor, that has always been an issue that should be and has been left to the jury to decide based on the evidence presented.

THE COURT:  What's the difference between substantial planning and the word premeditation?

MR. MELLIN:  Well --

THE COURT:  Is there a difference between those?  Or is it somewhat redundant?

MR. MELLIN:  I believe it's somewhat redundant, frankly, your Honor.

THE COURT:  I didn't write the statute.

MR. MELLIN:  Nor did I, your Honor.  I'm stuck

55

prosecuting it, using it, Your Honor, but I think there's other more eloquent ways to have worded the statute.

THE COURT:  That's what the statute says so that's what we have to look at.

MR. MELLIN:  Correct.

THE COURT:  All right.  Is there -- Mr. Wiseman wants me to exercise my supervisory authority, and I have some sense that the Third Circuit has said do it with ultimate caution before you -- before you exercise it.

MR. MELLIN:  I think that's correct, your Honor.  I don't think this is a case to exercise your supervisory power claim dismissing a capital case because a few 302s were not turned over.  The sanction has been imposed, which is a substantial sanction.  This defendant was found guilty and he was -- the jury returned a death sentence and now we are going to have to go right back to the sentencing phase because of the non-disclosure of these 302s, that's a substantial sanction.

THE COURT:  The defense is arguing that -- really, in looking at the totality of all the circumstances, the need for heightened scrutiny and given the nature of a capital proceeding, that the failure to disclose this exculpatory material will deprive him of a meaningful hearing, and that's something that the Court will have to consider, and certainly the parties have addressed that in the briefs to this point. If they want to submit anything supplemental on that I'll

certainly afford them -- I will afford the opportunity.

Now I have to take a break at this point.  Is there a need for rebuttal on this point Mr. Wiseman?

MR. WISEMAN:  I had a couple points.  I can certainly wait until after lunch.

THE COURT:  All right.  Let's do it at 1:30.

MR. MELLIN:  Your Honor, may I have just one moment to ask Mr. Martin if he has any other points before we break for lunch?

THE COURT:  Yes, sir, unless you want to start when we come back?

MR. MELLIN:  I don't see the point.  If I could have one moment?

THE COURT:  All right.

MR. MELLIN:  No, that's all for the government, your Honor.  Thank you.

THE COURT:  All right.  So, we'll take a recess at this point.  Everyone have a good lunch and we'll start again at 1:30.

THE DEPUTY CLERK:  Please rise.  Court is now in recess.

(Whereupon, a recess was taken from 12:32 p.m. to 1:30 p.m.)

MR. WISEMAN:  Good afternoon, your Honor.

THE COURT:  Good afternoon.

MR. WISEMAN:  I relayed to the Court's deputy what Mr. Travis had learned from the folks in Terre Haute, which is that they need Ms. Trivelpiece to be out of the prison by four o'clock.  So I think they have some time constraints.

THE COURT:  All right.  Mr. Hammer, can you hear us?  Can you see us?

DEFT. HAMMER:  Yes, sir.  And that prison information to have Janel out, they said we could go as late as four o'clock, if the Court can do something like that.

THE COURT:  All right.

MR. WISEMAN:  I'm always happy to be verified by Mr. Hammer.

THE COURT:  All right.

DEFT. HAMMER:  Sorry about that Michael.

MR. WISEMAN:  That's all right.  Your Honor, I just had a couple of quick points.  I know you wanted to move on.  If you look at paragraphs 1 and 5 of our motion --

THE COURT:  I just want to make sure my chambers is connected.

THE DEPUTY CLERK:  He is.

THE COURT:  All right.  Go ahead.

MR. WISEMAN:  If you look at paragraphs one and five of our motion we lay out the -- a couple of Brady requests that were made pretrial and in 2255, which again speaks to intentionality.  Mr. Mellin was talking again about this isn't

really a Brady violation because the defendant knew.  Those arguments were all made to Judge Muir almost verbatim and he rejected them.  Again, law of the case.

As to intent, I think intent relates both to the double jeopardy as well as the appropriateness of the other remedies we're seeking.  If the Court examines the dates on the 302s that are in issue here.  What you'll see is that the statements were taken immediately before and during jury selection.  Mr. Travis opened on the concept that this may have been kinky sex as opposed to an intentional act.  And then, you know, the government responded by saying there's no other reason for having these braided ropes, knowing all the while in their file they had other reasons for having the braided ropes.  So, this is a serious violation.  We think it does show intentionality, which is irrelevant for Brady purposes, but again, is highly relevant for some of the remedies we're seeking today.

There is no waiver here of any sort.  We've litigated this, as your Honor pointed out.  There was nothing much to do until they -- until the government re-noticed the case for death or indicated they would continue to seek death during this calendar year, and obviously we have presented these issues to the Court in an appropriate and timely way.

The last point I wanted to make was that, you know, Mr. Mellin is being asked to be thrown into the briar patch.

59

Call the agent.  Well, the government will be fine if we call the agent to go through these materials, and I think it's a little more complicated than that.  If the Court were to say, you can call the agent, you can submit these documents, these 302s in evidence, I think what we would need to be made whole is an agreement that the statements are offered for the truth and that they are in fact true.  Because otherwise the government will be in a position of being able to contest the truthfulness of what's in those statements or what was told to Agent Malocu without us being able to argue to the jury that they should be believed because look at what these witnesses would have said.  Of course, the witnesses are now deceased.

So it's not adequate to just say put the information before the jury without the government also saying that information is true.  Now, if that information is true, if the government accepts the truth of that information, that Mr. Hammer was using these ropes for other purposes, then there really is nothing left to the substantial planning and premeditation aggravator.  As I mentioned earlier, there was not a lot of proof to support it to begin with, and if there's this other reason for the ropes being braided, then you know, where is their aggravator?  Where is the support of the aggravator?

And I would just say that Mr. Travis is going to speak to our other motion to strike the substantial planning

and premeditation aggravating factor, and I'll ask the Court to think of these two motions in tandem.  You know, we have the sort of due process Eighth Amendment, Sixth Amendment Brady components of why this Court should strike that aggravator.

We have other reasons Mr. Travis will present, and I think when you combine them -- well, certainly separately they're sufficient.  When you combine them I think the position is overwhelming that this aggravator has no place in this retrial under all these circumstances.  And I appreciate the Court's patience.

MR. MELLIN:  Your Honor, may I respond to one point just raised by Mr. Wiseman?

THE COURT:  Yes.

MR. MELLIN:  And that's concerning the information being quote/unquote true as alleged in the 302s.  Your Honor, we would object to that.  That's the province of the jury, to decide what is true and what is not true.  It's not the province of the prosecutor or the defense attorneys or anyone else.  We have no objection to presenting the information to the jury.  They can decide what weight, if any, they give to it.

THE COURT:  What you say is accurate.  And the way I understand what Mr. Wiseman was saying is that are you going to attack the credibility of the persons interviewed at the hearing?  In other words, are you going to argue at the hearing

that the jury should not accept their testimony because they have prior convictions or they're inmates or there's something inherently unreliable about what they said?  Or certainly it would be -- it would seem to be fair game to argue that the -- it's more likely that -- that the ropes, even though they were braided, were still part of the substantial planning --

MR. MELLIN:  Correct.

THE COURT:  -- and that it still has an effect on a substantial planning as opposed to being used for an encounter?

MR. MELLIN:  Yes, your Honor.  And I think that if this was the perfect world, say we can call Mr. Ball again to testify, or if the defense was to call Mr. Ball to testify, the government or the defense would always have the opportunity to attack the credibility of what that person is saying based on their prior convictions or based on other evidence.  So, my suggestion to the Court that we do not object to the information being put forth before the jury for their consideration, but they at the same time should be permitted to consider all of the information that they typically consider about anyone's who's testified.

THE COURT:  I understand, but that's the jury's province.  But in terms of what the government is going to do, is the government's argument going to be even if, and concede that the information is true, and even if there is still substantial planning, based upon other evidence in the case?

62

Or is your argument going to be to the jury rejected in toto?

MR. MELLIN:  I think it could be both, your Honor. Although, as I stand here today, very far removed from the actual trial date, it's hard to take a definitive position, but --

THE COURT:  I understand.

MR. MELLIN:  -- certainly it will be that the information is before you, but there is more information that shows substantial planning and premeditation.  So you can, you know, consider the information, but there is more information that shows the substantial planning and premeditation.

I don't want to indicate to the court that we are conceding that if the agent was called that the agent would be required to say yes, I talked to this witness and yes, I know for a fact that what he told me was the truth.  Because I don't believe an agent can ever say that and I don't believe it's appropriate for an agent to say that.

THE COURT:  All he did was interview the person.  All he can say is this is what the person told me.

MR. MELLIN:  Correct.  And so that's why I disagree with Mr. Wiseman saying that the government should be required to agree that the information was true.

THE COURT:  The Rules of Evidence are very restrictive as to when you can give that kind of opinion testimony, even though this is a sentencing hearing.  But the

Rules of Evidence may not apply.

MR. WISEMAN:  Your Honor, this is an important point. Can I just make one more point about it?

THE COURT:  Yes, yes.

MR. WISEMAN:  Certainly Mr. Mellin knows and your Honor knows that parties stipulate all the time to if so and so were called this is what they'd say.  And that's all I'm suggesting.  Obviously we don't have crystal balls.  We can't know if what Mr. Ball said was true.  We expect it was true, we have no reason to dispute it.  What I would be looking for is the parties saying, you know, if called as a witness this would be the testimony, along with a condition that the government not contest it as a further way of making Mr. Hammer whole, because we can't present a live witness.

The other point is, I think -- I sympathize with Mr. Mellin's statement that he doesn't want to commit himself just yet as to what he's going to do at a trial ten months from now. But the issue is before the Court.  And I think it might be appropriate -- our view is that there is no other real evidence of substantial planning and premeditation other than the hostage ruse and the braiding of the ropes.  If they've got other substantial planning and premeditation evidence let's hear about it, not necessarily this minute but within the context of deciding these motions.

Because if they've got nothing else real, then I

think the Court's course is even more clear that you've got to say all right, look, this is not a very strong aggravator to begin with, we can't have a fair adjudication of it because of the Brady violation, the subsequent deaths of the witnesses, so I'm going to preclude the government from proceeding on that aggravating factor. I think it's a perfectly reasonable and just thing to do, and it makes Mr. Hammer whole and still allows the government to proceed to a penalty phase, and I'll stop now.

THE COURT:  Last word?

MR. WISEMAN:  Well, unless the Court wants to hear more.

THE COURT:  No.  Mr. Mellin looks like he's --

MR. MELLIN:  Again, your Honor, just very briefly, counsel is asking for summary judgement on whether or not there is sufficient evidence to present on this aggravator.  That's up to the jury to decide, not for the court frankly.  That's -- the question is, is did -- did the notice lay this out?  And the information to almost the full extent has been provided to the counsel before in the previous hearings.  So, they know -- I don't want to say everything.  But they certainly know almost everything, if not everything at this point.

THE COURT:  But let me ask you a question.  What reason did you advance Judge Muir as to why the statements weren't turned over?

65

MR. MELLIN:  The Court's indulgence for one moment.

THE COURT:  Mr. Martin, do you want to respond?

MR. MELLIN:  I think it might be wise.

THE COURT:  I think Judge Muir refers to it in his opinion.

MR. MARTIN:  Part of the reason, your Honor, is we are reluctant to turn over inmate interviews by the FBI because for some the fact that they talked to the FBI at all puts an inmate in seri- -- it may put an inmate in serious jeopardy. So, 302s, if there's reason for their disclosure, will be disclosed.  And again, the record shows that Judge Muir read a great many, many 302s and only released these three or four. So, again, part of the reason was we don't like to jeopardize individuals unnecessarily.

THE COURT:  And did you -- before those 32 302s were released to the defense did Judge Muir read them and --

MR. MARTIN:  Oh, yes, he read them all, your Honor, and did not disclose a number of 302s from inmates which he did not think should be disclosed because they didn't have any exculpatory information in them.  And again, exculpatory information is largely in the eye of the beholder, and I think we'll always disagree with the assessment by Mr. Hammer's attorneys that there was much in the way of favorable news that was really new to them in any of the 302s.

THE COURT:  All right.  Can we move on to the next

66

motion?

MR. MORENO:  Good afternoon, your Honor, I am James Moreno, and I'm going to be arguing the flawed indictment motion that we filed on behalf of Mr. Hammer.  And unless something unexpected develops I plan on being a lot shorter than Mr. Wiseman and Mr. Mellin just were on their motions. This particular motion alleges that the government failed to indict on the statutory intent factors and the statutory aggravating factors.  And I think a plain reading of the indictment, of which there is now only one count, makes that clear, that the grand jury was not instructed on or charged with any of the statutory intent or statutory aggravating factors.

Now, in this case, again, you know, it's been noted that we're in a peculiar posture.  We are sort of back at square one.  This case, there was never a final adjudication. As a matter of fact, the Third Circuit Court of Appeals refused to consider the appeals because there wasn't final judgment yet.  And we are back at the prehearing stage.  And the indictment as it stands is the indictment that the government is stuck with.  They haven't filed a superseding indictment.  I think if they were able to they would have.  The jeopardy is attached for purposes of the indictment.

And because the case is in the peculiar posture it's in, and because the case is in the posture of being -- not

having been a final judgment, Ring and Apprendi and Jones and the other cases we cite in our motion, the Sattazahn case, all apply to Mr. Hammer's case.

Now, there's a case, Schiro v. Summerlin, it's a United States Supreme Court case, it's noted in our reply as well.  In that case the Court held that Ring is not retroactive.  It's noted though that it's not retroactive to cases that are final on direct appeal.

Mr. Hammer's case has never been finaled.  And it's very clear, at least in our mind, that these cases in fact do apply to Mr. Hammer.  And as such, the indictment is fatally flawed.

Now, the government makes a number of arguments to try to distinguish not Ring so much, but to argue that, well, in a nutshell you should do a harmless error analysis and that it's appropriate in this case, and they cite a number of cases and I'll talk about those in a minute.

THE COURT:  Let me ask a question, Mr. Moreno, is your argument that the government is supposed to submit to the grand jury evidence of an intent or statutory aggravating factors, and that that be contained in the indictment?  Specifically in the indictment found by the grand jury?

MR. MORENO:  Yes, your Honor.  It is our position that those factors have to be submitted to the grand jury and found by the grand jury.

68

THE COURT:  Now, Apprendi was a case involving sentencing.

MR. MORENO:  Correct.

THE COURT:  And those cases deal with a judge making findings of fact used to increase a sentence based upon facts not found by a trial jury.

MR. MORENO:  That's correct.  Ring, however, is the case really that probably most --

THE COURT:  And Ring stands for what proposition?

MR. MORENO:  Ring stands for the proposition that factors which make a defendant eligible for the death penalty are the, quote, functional equivalent of an element of greater offense.

THE COURT:  Now, do they say that you have to charge those factors in an indictment?

MR. MORENO:  Jones talks about the Fifth Amendment due process guarantee and the notice of jury trial guarantees. But the Sixth Amendment requires that, quote, any fact that increases the maximum penalty for a crime must be charged in an indictment.  Now, it's our contention that those cases apply to this case.  And that under those cases this indictment is fatally flawed and really can't be cured.  So, it's our position that the Court really has no choice but to dismiss the indictment on the grounds that the grand jury was never given an opportunity to consider these factors, and did not indict

Mr. Hammer on these factors.

THE COURT:  Well, we know the indictment itself uses the word premeditation.

MR. MORENO:  It uses the word premeditation.  But the factors that are laid out in the statute have to be intent.  I think there's four or five that are laid out in the statute.  Not a single one of them is included in this indictment.  Under Ring and Jones the government was obligated to actually indict the defendant under those particular -- or one of those particular provisions, at least.

Now, the government argues that this court should engage in harmless error review.  And it's our position that for one, our position is that harmless error review would be inappropriate in this case given that the misconduct that the government engaged in, that Judge Muir granted a new penalty phase hearing on, concerned a lot of the -- well, the statements that are at issue were not aired out before the grand jury.

Agent Malocu, who testified on behalf -- one of the witnesses who testified on behalf of the government at the grand jury had taken some of these statements.  And he had provided them to the prosecuting attorneys in this case.  To go back and look at the grand jury testimony, to see if it fits any of the statutory intent factors or statutory aggravating factors in our mind seems obscene given the misconduct that

70

brought us here in the first place.

That aside, the cases that the government cites, and I cite U.S. v. Davis and they cite U.S. v. Barnett, wherein those cases the court does engage in a harmless error analysis, but they do it a little differently than I think what the government is suggesting by having attached transcripts from the grand jury proceedings.

In Davis the Court looked at the grand jury indictment itself, this, they just looked at this, they didn't go to the transcript.  They did nothing but looked at what had been alleged and presented to the grand -- or what the grand jury found.  And from that document they then try to extrap- -- the Court would extrapolate whether or not if the grand jury had been presented with the explicit statutory language would they have indicted the defendant on those factors?

And in Davis the grand jury indictment had eight separate paragraphs that detailed various acts by the defendants.  And they were very detailed and they went into the facts of the case.  The grand jury indicted on eight of these significant facts.  And the Court looking at that said if you were to have instructed the grand jury on the statutory language of intent and aggravating factors, based on what was contained in the indictment itself it was harmless error because the indictment itself clearly laid out that a -- those factors were found by the grand jury.

In Barnett they did a similar analysis.  Bear with me one moment.  And the Court there also looked and the indictment itself and looked to see if it was supported in the four corners.  And in that case the Barnett Court, which I believe is a Fourth Circuit case, noted that -- they cited a U.S. Supreme Court case, Hagner v. U.S., which I can't even read my own writing, but it's a 1932 case.  And in it the U.S. Supreme Court said an indictment can be upheld if the necessary facts appear with fair construction within the terms of the indictment.

And I don't think there's any argument that this indictment -- any fair construction of this indictment we can infer that the grand jury would have found any of the statutory intent or --

THE COURT:  It's just the one count charging --

MR. MORENO:  That's right.  And that one count --

THE COURT:  -- violation of Section 1111.

MR. MORENO:  Right.  That count says --

THE COURT:  It says with premeditation and malice aforethought.

MR. MORENO:  Right.  With premeditation and malice and aforethought did kill Andrew J. Marti by strangling him with a cloth cord or homemade garotte and it talks about 1111.

THE COURT:  Now let me ask you this question.

MR. MORENO:  Sure.

72

THE COURT:  Is there a case that stands for the proposition that the government has to elect at the time an indictment is returned as to whether they'll proceed to seek the death penalty?

MR. MORENO:  Is there a case that says that?

THE COURT:  Is there a case that says when the government has to elect?

MR. MORENO:  Not that I'm aware of.

THE COURT:  All right.  And the statute gives a time period when --

MR. MORENO:  It can supersede after they file their notice of intent but before jury selection.  In this case, contrary to what the government has argued in its brief, they indicted first.  They indicted in I think it's September of 1996, September 18, 1996, and seven months later they filed their statutory notice of intent to seek the death penalty.

THE COURT:  And that's what the statute requires.

MR. MORENO:  In the Davis case the Court found that to be a distinguishing factor as to why even in a presentence case the Court would look at the indictment itself and do a harmless error analysis.  And I also think Jones v. United States requires that those factors that increase the maximum penalty be included in the grand jury indictment.

THE COURT:  Death penalty law, needless to say, has been evolving over the last 20 or 30 years.  And at the time

Article 5 was written it reads "No person shall be held to answer for a capital or otherwise infamous crime unless on a presentment or indictment of a grand jury."

MR. MORENO:  Correct.

THE COURT:  And I know I tend to read the rights a lot, but --

MR. MORENO:  It's a good thing.

THE COURT:  I'm trying to understand, when is the first time any court has ever said that the government has to include in an indictment the sentencing request.

MR. MORENO:  Well, I think that became clear after Jones, certainly.  Jones was in 1999.  So I think there were cases before Jones, however, that were cited in our initial brief in support indicating analogous situations or indicating that these type of factors have to be included, but I think Jones -- certainly after Jones I think the government even began to change how it did its indictments.

THE COURT:  Is Jones retroactive?

MR. MORENO:  It is in this case because there's never been final judgment in this case.  Now, it's the same as with Ring.  Those cases are applicable to Mr. Hammer because his case was not final on direct appeal.  So I think Jones is absolutely applicable to Mr. Hammer's case.  Now, the government also argues that you should take a look at the indictment and that the indictment in and of itself, Count 1 of

the indictment is sufficient to allege substantial planning and premeditation.

And while the indictment certainly does say premeditation, I don't think that this indictment is sufficient on its face for the Court to conclude that the grand jury would have and did entertain substantial planning as well as premeditation.

THE COURT:  But I have to make the judgment initially that the government is required to present to a grand jury their theories of statutory aggravating factors.

MR. MORENO:  Well, and the intent factors.

THE COURT:  And the intent factors.

MR. MORENO:  Yes.  And I think Jones is square on.

THE COURT:  Before the grand jury.

MR. MORENO:  Yes.  I think Jones is square on that those factors have to be included in the grand jury.  And I think the Fifth Amendment supports that as well.  The grand jury is supposed to be the bull work against renegade prosecution, and I'm not suggesting that in this case, but that's kind of the language of the case law.  And in this case the grand jury did not get to vet the government's case on substantial planning and premeditation, or on any of the gateway intent factors, not a single one.  So, I think under Jones clearly the government was required to include that in their statutory -- excuse me, in the grand jury indictment.

THE COURT:  All right.  Let me hear from government's counsel.

MR. MARTIN:  Good afternoon, your Honor.  Fred Martin on this particular issue.

THE COURT:  Mr. Martin, just pull the mic up a little closer.

MR. MARTIN:  Yes, sir.  We begin in 1996.  Moreno was very careful to say "all we have before us now is Count 1".  That is correct.  In 1996 we had two counts.  The other count charged a violation of 18 United States Code Section 1118.  That was ultimately dismissed.  But when we're trying to find out what the grand jury knew or what the grand jury could have done, what was before them, we have more than just Count 1.

The problem partly with Count 2 was Mr. Hammer may feel like he's serving a life sentence, but he isn't technically serving a life sentence, so we ultimately dismissed that count.  But the grand jury did hear, and in fact it was the subject of the first series of motions by the defense in 1997, but they heard that Mr. Hammer was serving sentences for 1423 or whatever the number was, your Honor.

We, out of an abundance of caution, did not tell the grand jury, even though if you look at the transcripts one of the grand jurors asked, What is he doing time for?  We didn't tell them that because we were afraid it would prejudice them and then we'd have an argument, which we did have in 1997, that

76

we were poisoning the well with the grand jury.  So, again, we acted in accordance with the law as it existed in 1996.  The grand jury received many, many more details than just Count 1. And by 1997 they were complaining that we shouldn't have given too much information to the grand jury because it would have been prejudicial.

A fair -- and all this goes more to the harmless error analysis of it, your Honor.  If you're going to consider everything the grand jury is and everything the grand jury heard from, then consider both -- consider all of the evidence. And one bit of evidence -- and again, there was not just one statutory aggravating feature returned -- or noticed by the United States Government.  The other one was the multiple prior convictions involving violence against Mr. Hammer.

We again did not tell the grand jury about those particular details because we were concerned before Judge Muir in 1996 law that we would be accused of poisoning the well. So, I think what we did present was enough for the grand jury, as it's presented with a notice that Mr. Hammer has served or is serving multiple sentences for significant offenses they would have said, How else did he get a 1400 or 1200-year sentence in the first place?

THE COURT:  Is there law to the effect that if the government is going to seek the death penalty, that they have to make that known to the grand jury and present evidence that

would conform to -- what would it be, 3591?

BY MR. MARTIN:  In 1996 --

THE COURT:  -- statutory factor?

MR. MARTIN:  Your Honor, in 1996 there was no such law.  In 1998 when the case began with presentation or selection of the jury, there was no such law.  It is all after the fact that this law developed.  We provided some authority to the Court on this issue, but another case that I saw, because it involved, again, Judge Muir, it also involved Mr. Travis, where the same argument was raised, was a case called Driscoll [ph], and that's at 203 F.Supp.2d at 350-52.

Whenever there are significant changes in the law, there are always cases in the pipeline, such as Mr. Hammer's, and where perhaps the prosecutors did not anticipate down the road the Jones' decision or Apprendi or Ring or anything of that character.  That is why, again, it is appropriate for this Court to consider the situation that existed at the time, rather than to graft upon --

THE COURT:  At least do you want me to consider it under a harmless error analysis?

MR. MARTIN:  Yes, your Honor.

THE COURT:  And Courts of Appeal have upheld harmless error analysis applies?

MR. MARTIN:  Davis is very close on point.  A couple

78

other factors, your Honor, is that Mr. Hammer admitted his guilt.  So, he knew when he pled guilty that he was facing the death penalty.  This in our view suggests further a harmless error or supports harmless error analysis.

And Mr. Moreno was talking about final judgments in this case, and that's an elusive term because final judgment when?  There was a final judgment from November 1998 through December of 2005, and Mr. Hammer knows that only too well because he was about three or four weeks from being executed. So there was a final judgment in this case.  Of course, that was undone in late 2005.

Moreno again talks about 2255, that there is no final judgment in this case.  I'm not sure -- there is no sentence yet imposed in this case, which is the reason why the Court of Appeals remanded the case back to the District Court.  But by the same token, if you're going to go down the 2255 road, let's go down it together on all matters, I believe it's the Fourth Circuit Stitt case, S-T-I-T-T, in which the remedy of 2255 is to put people back in the situation in which they were whenever the error occurred, whether it was a sentencing error, a guilty plea error, a trial error, whatever that is.  So, let us go back under 2255 principles to June or May of 1998, rather than 2000, 2002, whenever the Apprendi/Jones cases came down the pike.

And again, Mr. Hammer could have raised this and did

79

raise it in his initial direct appeal, which was withdrawn. Mr. Hammer could have raised this issue in the 2255 and he did not.  This is the third bite at the apple, your Honor, and we think it's unfair.  We think Davis should be followed, and/or Driscoll for that matter too, which was a similar case occurring just about the time that the -- it was becoming clear in terms of what Jones and Apprendi required the government to do.  But even in that case Judge Muir denied relief.  He cited three other cases in denying relief.  And we think Driscoll and Davis should be followed.  And unless the Court has any questions I'll sit down.

THE COURT:  I have no questions.

MR. MARTIN:  Thank you, your Honor.

THE COURT:  All right.

MR. MORENO:  Briefly, if I may, your Honor.  Your Honor, simply put, we're here because of the Brady violations that occurred, that were uncovered in 2005.  We are mid trial, but I think I misspoke earlier when I said we were pretrial. We're actually mid trial.  And like it or not, the government, whether they like it or not, the Ring and Jones line of cases applies to Mr. Hammer's indictment.  And those cases, while it is true that they don't have to inform the jury that they're seeking the death penalty, they nonetheless have to have the jury indict on the substantial -- excuse me, on the gateway factors such as intent, because that elevates the punishment.

And the cases are very clear, the conduct that elevates the punishment has to be found by the grand jury.  It has to be in the grand jury indictment.  That's what Jones stands for.  And like it or not, given the situation we're in, those cases apply to Mr. Hammer's -- to Mr. Hammer's case.

Now, the issue isn't merely whether there was proper notice to Mr. Hammer, whether Mr. Hammer knew what he was facing.  It's whether or not the gateway intent factors and statutory aggravating factors were presented to the grand jury. Was there presentment?  Did the grand jury get to weigh the state -- the government's evidence and make a conclusion on whether or not they had met their burden and that it would be proper in fact to indict Mr. Hammer on the intent factors. They did not do that in this case.  There is absolutely no evidence to the contrary.

Now, he talked about the multiple aggra- -- multiple convictions aggravator, prior conviction aggravator, which in Count 2 they were seeking the -- initially seeking the aggravating factor, that he had a sentence of life imprisonment.  They titled it effective life imprisonment, and they ultimately withdraw that.

Well, the problem with that argument is that prior conviction isn't the statutory intent factor.  So, the fact that they presented to the grand jury Mr. Hammer's prior convictions or the fact that he had prior convictions and had a

very lengthy prison sentence does not get around the fact that the grand jury was never presented with or indicted on the statutory intent factors.

And I think at the end of the day that's really the bottom line. And the other absolute truism in this case is Ring and Jones apply to this case, and as such there's no getting around this indictment is defective and should be dismissed. Unless the court has any questions, I don't have anything further.

THE COURT: I think you are giving a motion that this is structural as opposed to harmless.

MR. MORENO: That's correct, that it is structural because it's not merely a defect in the grand jury proceedings, it's not like -- there's a case where the grand juror foreman fails to sign the indictment, that's a technical defect. There are a lot of technical defects.

THE COURT: But if the indictment says premeditation with malice aforethought, isn't that evidence that the grand jury focused on intent? In other words, how do you ever -- how do you prove intent before a grand jury, other than presenting the facts to them and presenting an indictment to them and saying see if the evidence conforms to what's contained in the indictment.

MR. MORENO: One, to see if the evidence conforms to the statutory language. That these are the intent factors that

you have to find or that we have to demonstrate you should find so that we can then take it to a jury for a final determination.  Those factors have to be included in the indictment.  They were not.  And now premeditation in and of itself, the phrase premeditation does not meet the statutory requirement and does not lay out for the grand jury each of those independent intent factors, which you know, require different types of fact development.

So, given that, I think it's very clear that the indictment is flawed, regardless of the phrase premeditation.

THE COURT:  All right.  Can we move on to the next motion?

MR. MORENO:  Thank you, your Honor.

MR. McHUGH:  Good afternoon, your Honor.  Jim McHugh. I'm going to be arguing three of the motions that we filed today.  The first one that I'd be arguing is the motion to strike the death penalty because the government failed to follow its own protocols in authorizing Mr. Hammer in January of 2011.  The next two I would be arguing is that the death penalty --

THE COURT:  Help me with the notion that -- I don't believe any court has held that the government's internal standards as to how they proceed is something that creates a right.

MR. McHUGH:  Your Honor, there was a court -- the

83

District of Puerto Rico we cited in our reply brief did find that the government -- in a capital case, in a federal death penalty case, and it was cited in our reply brief. I can -- at the very end. The United States v. Pena-Gonzalez -- it was also in the government's brief as well -- that the violation of the internal protocol in the capital prosecution gave rise to the enforceable right in the defendant because death was different and an appropriate remedy was to bar the government from seeking the death penalty. And that was the -- that is the basis -- and I did readily concede, your Honor, in our reply brief that there is no Third Circuit case and there is no Supreme Court case or District Court case for us or against us on this point. What I will note --

THE COURT: Have other courts though held --

MR. McHUGH: Yes.

THE COURT: -- contrary to what's been held by the District of Puerto Rico in 1999 that --

MR. McHUGH: That is correct.

THE COURT: -- the internal protocol does create a right?

MR. McHUGH: That is correct. But what I would argue to the Court is, and what we base this motion on, is in this particular context -- and I think what's a good point of reference here is the Third Circuit Wilson decision, I believe that was in 2005, when the argument was made when the

84

government failed to follow their petite [ph] protocol, which is the protocol on what standards it has to argue and get approved, Main Justice, for adopting a state prosecution that had been finally resolved in favor of the defendant in the state prosecution, and then they wanted to bring it federally.

And I think if the Court looks at that opinion, clearly that was not a capital prosecution.  So, our distinction between that situation and what we have here today is the Eighth Amendment's clear dictate that death is different.  And I think that's what the district court in Puerto Rico looked at when it ruled in favor of the protocols being enforced by the defense.

I guess I was getting ahead of myself in one way, your Honor, because in this particular case we argue that there was a violation two protocols, the protocol to consult with the victim's family and the protocol to make sure that this prosecution is within the framework of consistent, even-handed national application of federal capital sentencing laws. There's no question that those two protocols apply to government because these protocols are published and they're viewable by the public.

In the reply to our motion the government submitted an in camera document to the Court, which we obviously did not get.  And in my reply to the response we argue that they haven't put forth any type of privilege or any type of

85

confidentiality, a need for confidentiality.  So to fully argue this motion, as I did request in my reply brief, your Honor, that we be provided with that information.  Certainly, we put forward in our motion the fact that the victims have signed a letter indicating that they have changed.  Circumstances have changed.  And that they -- the victim's family -- and they no longer wish to see this case proceed capitally.  They want it to end; they want it finale'd with that.  And so I'm at a disadvantage because we don't know what was submitted to the Court.

What I would say to the Court, your Honor, I read very carefully the government's pleadings on this matter, and what they said was, what they submitted to your Honor proved that they contacted the victims.  And I suggest to your Honor that that's a far cry from consulting with the victim's family.

So, if I take the government at their word in their response to the motion, they have not met, regardless of what they submitted to your Honor, even in their own words, they have not met their protocol, which is to consult with the victim 's family.  So, that would be the first point.

The second point as to this motion is that they failed to take into consideration other cases.  And that this -- this particular prosecution is not within the main stream of the other prosecutions that they are seeking capitally.  And in support of that, your Honor, we cited a list

86

of cases for the Court's consideration.  I just want to highlight one case, the Aryan Brotherhood case which was a federal prosecution where there were 13 prison killings by these individuals.  Each was charged, there were a number of people charged for 13 killings. And the jury returned a verdict of life in that case, in all aspects of all defendants.

So I suggest to the Court when the government is now faced with Mr. Hammer's case in January of 2011 and they're looking over the course of the country as to what is a fair standard application of this, that Mr. Hammer's case pales in comparison of that, where a jury, hearing all the aggravating and mitigating evidence, came back with life verdicts.  I think there's other cases that we submitted to the Court that are equally persuasive but they've been submitted in our pleading and I would ask the court to look at those, but that's just the one I wanted to highlight.

I would emphasize to the court that our motion, although not backed by case law, is supported by the Eighth Amendment,  which argues that death is different and that the government should be required to review the protocols.

And finally, your Honor, on this point, this particular protocol that we're arguing about, the victim's family, is so important in the context of Mr. Hammer's case. Because what is the government doing in January of 2011 or prior to that?  They're deciding what are the circumstances as

we sit here today to decide whether Mr. Hammer should be authorized or not?  And that is a clear changed circumstance.  And as far as we can see, the government did not comply with that protocol.  So it's not just missing some type of insignificant protocol.  This is a critical protocol that the government needed to consider when deciding for a second time whether to authorize Mr. Hammer.  So, on this particular point, your Honor -- on this motion that's all I have.  I could go on to my other two or I could wait for the government's response.

THE COURT:  Let's get the government's response.

MR. McHUGH:  Okay.

MR. MELLIN:  Your Honor, I agree with the Court in questions to counsel, there is no basis and there's no opinion out there that would support the defense's request in this case other than possibly Pena-Gonzalez.  But frankly, your Honor, it's the government's position Pena-Gonzalez got it wrong, and all of the other cases listed by the government in their brief, in fact, we listed Pena-Gonzalez as well, but there are probably 20 different cases listed on page 7 of our brief, rolling over to page 8 talking about how this is not an enforceable right this defendant has .

I am somewhat perplexed by exactly what the defense is arguing on this motion.  Because they are saying that because the government did not consult with the family, the government violated its procedures when it decided whether or

not to seek the death penalty after their filing of their motion to reconsider.  The information before the committee at the time of the decision whether to re- -- reconsider the death penalty was their letter to the family, signed by the family, which said that the family didn't at that time wish to pursue the death penalty.  So, they had everything they wanted before the committee.

There was a consultation.  The consultation was a piece of paper that's been submitted by the defense.  I don't understand exactly how they can claim they were in any way prejudiced or harmed when they draft up a statement of the parents of Andrew Marti and then attach that, in which the Martis say, We want this case to come to an end as soon as possible.  And we do not care about Mr. Hammer receiving the death penalty.

So, the information is before the committee.  So, they can't -- they are attempting now to present the information, yet then claim that the information wasn't before the committee.  And I don't quite understand that argument, your Honor.

THE COURT:  Well, what they're asking you to do is in effect just go out and knock on their door and talk to them.

MR. MELLIN:  Well, and you know, that isn't necessarily required under the statute, your Honor.  But in June of 2012, a few weeks ago, I went out to Oregon and knocked

on their door.  And they are going to be happy to come before Your Honor in April of 2012 and express to your Honor their position on whether or not Mr. Hammer should get the death penalty or whatever issues they want raised.

We don't believe and I don't believe that it's appropriate, and I think we will object if the defense tries to do it, but it's not appropriate for the Martis to take the stand and say they believe in the death penalty or they believe that the defendant's should get the death penalty.  That's not permitted.  But they certainly will come and describe the impact of the loss on their family and the victim impact in this case.

With all due respect, your Honor, I think the government disagrees with the characterization by the defense as to what the Martis' position is on whether or not the government should pursue the death penalty in this case.  If the court wished, we could get into a further hearing but I don't really think it's appropriate or needed.

THE COURT:  The family of the decedent is -- under the law is not permitted to give an opinion?

MR. MELLIN:  I don't believe they're permitted to give an opinion that they think the death penalty is appropriate for Mr. Hammer in this case.  I believe they can give an opinion as to the impact on their family of the incident and killing of their child, but they're not permitted

to say we want the death penalty in this case.

THE COURT:  All right.

MR. MELLIN:  So, I am somewhat completely at a loss to understand exactly what the defense believes they didn't get in this case, when in fact they got more than they should have gotten after consulting with the family.  The information presented to the committee was a statement drafted by the defense that the Martis signed for whatever reason.

THE COURT:  The two documents that are in camera, how do you describe them in the motion?

MR. MELLIN:  How do I --

THE COURT:  In your answer.

MR. MELLIN:  How do we describe them?

THE COURT:  Yeah.  What do you say about them?

MR. MELLIN:  Just a consultation with the family.

THE COURT:  In other words, contact?

MR. MELLIN:  Correct.

THE COURT:  Okay.  All right.  And for some reason you don't want the defense to see those documents?

MR. MELLIN:  The Court's indulgence for one moment.

THE COURT:  Sure.

(Pause.)

MR. MELLIN:  Your Honor, I have no objection to it. They can certainly see the document.

THE COURT:  Well, you've submitted it to me in

camera.

MR. MELLIN:  Yes, your Honor, we did submit it to you in camera.  And upon reflection and, you know, just to completely avoid this issue --

THE COURT:  All right.  I'll ask you to give copies to Mr. McHugh, and if there's any reply brief filed he can address them in a reply brief, all right?

MR. MELLIN:  Thank you, your Honor.

THE COURT:  All right.  The next motion is the --

MR. McHUGH:  Unconstitutionality, your Honor.

THE COURT:  Unconstitutionality.

MR. McHUGH:  Your Honor, can I just reply briefly on that last motion?

THE COURT:  Yes.

MR. McHUGH:  So, now I thought I wasn't confused, but now basically maybe I'm confused.  It's the government's argument now that we got everything that we were deserving because we submitted a document that was reviewed by the authorization committee.  So I think the government is basically saying that the document -- if we submit it they feel is just as good as the government consulting themselves with the victim's family.  Well, if that's the case they're saying we got everything we deserved because we submitted the document to the committee.

Then why in their motion or in their response to our

motion did they cast doubt on that statement?  They said no information was included about who prepared the document, let alone how it was secured.  So on one hand they're saying, Oh, you gave us everything, or, You gave us that letter and we considered it and that's just as good as us going out and seeing the person or consulting.

But on the other hand they're saying, Oh, that letter you gave us, well, there's a lot of problems with that letter. I'm not sure I understand Mr. Mellin's argument.

THE COURT:  Is there any case that defines what consulting with the family means?

MR. McHUGH:  Your Honor, I did not find a case on consulting, but --

THE COURT:  Does consulting mean you've got to see them face to face?  Does it mean you can make a phone call? Does it mean you can send them a letter?  What does it mean?

MR. McHUGH:  I would suggest it requires interaction besides just contacting, which was -- the only thing I saw that the government submitted was a letter that they had sent to the Martis' family advising them of the new court date.  There was no indication from that letter that they had any feedback.  I think what the point of this protocol is to get feedback from the victim's family, see what their position is.  And I think that requires more than contact, which would be sending a letter.

93

THE COURT:  Doesn't your submission to them give feedback to the family.

MR. McHUGH:  Absolutely, and that was our point when we submitted it.  But Mr. Mellin in his response cast doubt on our submission where he's saying, Hey, you didn't tell us who prepared it or how it was secured.  Indicating that the government was taking our submission and not giving it sufficient weight.  That's what I read from this response that he filed to our motion.

THE COURT:  I'm trying to understand what the word consult means in the regulation.  It's pretty broad.

MR. McHUGH:  It's broad, but I would suggest to the court it's more than contact.  It requires if possible, if there's not some other reason, interaction with the family that gets their position on this.

THE COURT:  I don't want to cut anybody short.  It's 2:25 and I know we have to end by four.

MR. McHUGH:  Okay.

THE COURT:  Can we go on to the -- now the motion to declare the death penalty unconstitutional.

MR. McHUGH:  Yes, your Honor.  And I basically have -- I can sort of combine the two arguments.  One, is the death penalty unconstitutional, and then the other one adds an additional reason because it's incomprehensible.  So I would start with the general argument that I -- that we filed in our

motion, that the death penalty is unconstitutional.  And essentially, your Honor, and you touched on it already today, this is an evolving standard.  The constitutionality of the death penalty.  And it's our position that as it stands today the death penalty, and specifically the Federal Death Penalty Act is arbitrary, capricious and irrational.  The one point we make on that is we've again submitted a list of cases that show that the federal death penalty statute is -- is -- of the people that are eligible for the federal death penalty statute, only 2.3 percent actually received the death penalty.

And when you look at it in a different way, when you're authorizing, when the government authorizes, of the authorized cases, two-thirds of the authorized cases do not end in a death penalty.  There are numerous cases, including beginning with Furman, where they talk about the small amount of death penalty return show that it's irrational, capricious, it's not just going to the worst of the worse.  And specifically, your Honor, recently, in Atkins --

THE COURT:  Under the Federal Death Penalty Act?

MR. McHUGH:  I'm sorry?

THE COURT:  These are all cases under the federal law?

MR. McHUGH:  Oh, no, there is not, there is not. We're arguing general death penalty statutes, general death penalty law.  What I will say, Your Honor, is recently in the

95

-- and we would need to have time in order to submit -- we submitted an affidavit from Mr. McNally from 2008 in order to collect the data.  But in Atkins and in Roper the Supreme Court specifically found that because so few death penalties are returned with people for assault, with people with mental retardation or for juveniles, that that in and of itself was a factor to find under the evolving standards was unconstitutional.

THE COURT:  Let me ask this question.  Obviously you're in front of a judge who has had a lot of years involvement in the federal criminal law.  And for years we had an unfairness in the federal sentencing system that if a like defendant went before a like -- had committed a like crime went before one judge he might get one sentence, went before another judge, might get a different sentence.  It was absolutely unfair.  So the way you correct it is, at least Congress attempted to correct it by putting in place the Federal Sentencing Commission and the Federal Sentencing Guidelines. It's far from a perfect system, and I've been operating under this system since 1987, but it's the law and it's what we have.

And certainly the same evolution occurred to some extent in federal death penalty juris prudence.  We had an unfair system and we put in place through case law, beginning with the Furman v. Georgia and Gregg -- the Gregg case and the Supreme Court.  A system which ultimately resulted in 1994 in

the passage of the Federal Death Penalty Act.

So in looking at a statute that's created a court has to say either it complies with the constitution or it doesn't, but statistics are statistics. And you know, we never said that sentencing pre -- well, we may have said it but it wasn't the law, that sentencing pre-1987 was unconstitutional because of the disparity of sentences and the unfairness and statistics could have been gathered.

And I guess what I'm saying is, is that no court has at least held that the statistics substantiate the fact that the Federal Death Penalty Statute should be held unconstitutional. It's -- you know, as an act, at best it's an attempt to bring the ultimate height of fairness to a system that I think under any circumstances is not perfect, but may comply with constitutional mandates. We try to be since perfect because of the heightened standard we have to apply to these cases. And -- at least that's the way I view where we are in terms of this act and that juris prudence. And again, I'm not necessarily going to be the last word on it, but at least that 's the way I viewed the statistics that you presented, which was considerable and compelling. There's no question.

MR. McHUGH: And I understand your Honor's point. And what I would say is that we have a couple bases that the death penalty is unconstitutional, so I'll move on.

97

THE COURT:  I was mostly interested in the concept of the words sufficiently outweighs that you raised.

MR. McHUGH:  That's what I was moving onto next. When you look at -- and this is a Ring argument also.  When you look at the Federal Death Penalty Statute and you get into the weigh- -- and the government made the argument, Well, when you're in the weighing standard and the Ring/Apprendi line of cases did not apply and the jury does not have to find beyond a reasonable doubt the weighing process.

But what I would suggest to your Honor, when you look closely at the language, and as we suggested in our brief of 35 -- I'm sorry, 3593, what the jury does at the selection part, the second part, not the eligibility where the government clearly concedes that it has to be beyond a reasonable doubt to be compliant with Ring, in the selection part the jury has found -- the jury must consider whether all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death.

And so what we suggest there, your Honor, in our pleadings and in our motion, is the fact that the jury, sure, they're weighing the aggravating factors, they're told that it must sufficiently outweigh, which is not -- clearly not proof beyond a reasonable doubt, but then they're doing a second thing.  They're determining whether or not it sufficiently

outweighs to justify a sentence of death, and that's where we hone in with our Ring argument, which is now you're getting into -- you're getting back to an eligibility, you're not getting into a selection standard, and we would argue that under Ring, when you're talking about eligibility and increasing punishment, which the jury is clearly doing at that point, determining whether the weighing process is sufficient to justify a sentence of death, then we would argue that you now have a Ring violation.  So, this is yet a separate basis where we argue that the Federal Death Penalty Act as its written in 1994 is in violation of Ring.

THE COURT:  Is there other language that you would pass constitutional muster?

MR. McHUGH:  There's other language that we challenge here that we would say --

THE COURT:  What do you challenge, other than sufficiently outweigh?

MR. McHUGH:  Uh, the -- I don't believe so in our motions that the sufficiently outweigh, we would argue that that is insufficient to pass constitutional muster under Ring, and that it clearly must be beyond a reasonable doubt, and that's not what the statute requires, and that's our argument as to the language.

THE COURT:  Sufficiently outweighs is insufficient?

MR. McHUGH:  Is insufficient, exactly.  Your Honor, I

would point out that just -- and I don't have the case citation despite effort -- just this last week or two a federal judge in Florida, Judge Jose Martinez found that the Florida death penalty was unconstitutional applying Ring.  And now I understand that the Florida death penalty and the issues involved in that case were because there was a judge deciding aggravating factors is my understanding, and I certainly will provide the Court a copy of that opinion in our --

THE COURT:  I have it and I've read it.

MR. McHUGH:  Okay.

THE COURT:  At least I've read the part of the opinion.

MR. McHUGH:  But the government seem to imply that Ring is dead as far as this stuff is concerned, and just in the last two weeks we have a federal judge looking at Florida's death penalty and finding it doesn't meet constitutional muster.

THE COURT:  Well, the findings of fact were by the judge, not the jury.  And that clearly was a violation of Apprendi and that line of cases.

MR. McHUGH:  And I would say, your Honor, following that theory, the Ring theory, which is what we are arguing here, is that that same argument, the reasonable doubt standard has to apply when you're adding in the Federal Death Penalty Act when you're saying that it's --

100

THE COURT:  What do you want the statute to read? That the aggravating factors beyond a reasonable doubt outweigh the mitigating factors?

MR. McHUGH:  And then also when you get into that to justify a sentence of death, what I would argue there is what the statute needs to say, beyond a reasonable doubt.  The jury has to find that justification beyond a reasonable doubt, and that's clearly not there.

THE COURT:  Any cases that say sufficiently outweighs is unconstitutional?

MR. McHUGH:  Not that I'm aware of, your Honor.  We did cite to the Court the Supreme Courts of three separate states.  I believe it's Missouri, Colorado and New Mexico who had applied Ring to invalidate their death penalty statutes.

Your Honor, I would also -- my final point on this constitutionality issue is the evolving standards of decency. And I cited it in our reply.  In the last four years you've had four states, New York in 2007, New Jersey in 2009, New Mexico in 2009, and Illinois in 2011, that have found that the death penalty is violative -- forget about the language of the statute, the death penalty in and of itself violates our constitution to the Eighth Amendment.

THE COURT:  And you say the states.  Was that by court decision or legislative action?

MR. McHUGH:  Legislative action.

101

THE COURT:  Legis- -- not a judge?

MR. McHUGH:  No.  But I think when you look at Groper and Atkins, that's what the judges on the Supreme Court look at is when they're looking at an evolving standards argument, they're looking at that evidence, evidence of that type.  So I think although it's not a court, our argument goes to the evolving standards.

THE COURT:  All right.  Can I hear from the government or --

MR. McHUGH:  I could go to my second unconstitutional argument.

THE COURT:  You mean the arbitrariness?  And no jury could possibly follow the --

MR. McHUGH:  Incomprehensible.  It kind of goes together.  I don't know if you want me to --

THE COURT:  Why don't you argue it.  I think it's sufficient to go there.

MR. McHUGH:  Your Honor, when you look -- and I know your Honor has looked very carefully at this Federal Death Penalty Act, you're looking at -- you're asking the jury to look at two different stages, the eligibility and the selection stage.  You're asking the jury to look at four possible mental states in the eligibility stage.  Also, when they look at those mental states and when they look at those prior aggravating -- or not aggravating circumstance, prior eligibility

circumstances for a conviction, you're also telling the jury, okay, you found that in the eligibility stage but now you can't consider that in the selection stage. You're looking at -- what I would suggest to the Court is three separate burdens for proof, beyond a reasonable doubt for the aggravators, preponderance of the evidence for the mitigators, and then what we've just discussed, the sufficiency -- sufficiently outweigh.

THE COURT: Let me ask this question: When the jury is charged on the law they have to make a series of findings, Judge Muir went through it, it was in your verdict slip in the last death penalty hearing. Does the jury first get charged on intent, and then if they find the intent factors they are charged again on statutory aggravating factors and they go and deliberate on that, if they find a statutory aggravating factor they come back and then they're charged or -- you know, et cetera? Or are they charged all at one time?

MR. McHUGH: Well, I think that would raise the issue of whether or not the proceedings would be bifurcated or not, and I know we touched on that at our last conference before your Honor. But that is an issue as to -- if the Court bifurcates then I think there would be two separate charges. If there's no bifurcation then I think there would be clearly just one --

THE COURT: Is that up to my discretion?

MR. McHUGH: The bifurcation I believe -- the

103

bifurcation or lack of bifurcation I believe would be something that the Court would decide if the parties can't decide -- or can't agree on their own.

THE COURT:  What do I tell jury, that I'm going to charge you up until this point, and deliberate and return a decision on these points and your work may not be done, without going into anymore detail?  I don't want to influence them by giving a charge on the second points and how they would deliberate on the first point.

MR. McHUGH:  And that's exactly I think the point we're making, is the confusing nature of this, is that you're asking a jury --

THE COURT:  Well, if we reach that point.

MR. McHUGH:  That's right.

THE COURT:  I would certainly be open to any suggestions of counsel as to how to do it, but I think a clear charge to the jury might be a remedy to what you're saying, although in every case there's a potential for confusion, and certainly in a death penalty case there's probably more room for confusion, than what I'll call the less serious criminal case which doesn't involve the death penalty.

MR. McHUGH:  And that's our point, your Honor, and we cite it in our reply in this particular case, we don't even have to speculate.  Judge Muir, decades of experience, learned counsel on both sides labored over the jury charge, and yet

Judge Muir found how many mistakes that this jury made in what would be the most careful of careful proceedings, the death penalty penalty stage proceeding.  The jury made numerous mistakes.  And I would suggest it's directly relevant to the confusing nature of the Federal Death Penalty Act.  Just today you asked a learned counsel from Main Justice in Washington who is an expert in the death penalty, that's all he does is death penalty trials, what's the difference between substantial planning and premeditation?  And he admitted to the Court that he could not understand what the difference would be, and I think he said maybe it could be written in a more eloquent way.

We're asking 12 jurors to hear all these different burdens of proof and states of mind and different factors that they can consider at one stage and they can't consider at another stage?  And it's no wonder that we knew from this case how many errors that the jury made.

And I know your Honor says a careful jury instruction could be formulated or we shouldn't be able to think of that, but I would suggest the standard here, that the government agrees they have to meet under this constitutionality standard, is there a reasonable likelihood that this jury instruction could solve all of these problems?  And I would suggest to your Honor, the proof is in the pudding in this case.  We saw what Judge Muir did very carefully in this case and we saw what he found, how many errors the jury has made.

And I would suggest to your Honor that given the heightened scrutiny and death penalty, that that's not something that this Court should engage in this particular proceeding.  And we have case law where courts have found statutes unconstitutional because they don't give us that heightened level of confidence?

THE COURT:  Can we let Mr. Mellin --

MR. MELLIN:  Very briefly.  Your Honor, going back to the point your Honor asked about substantial planning and premeditation and what's the --

THE COURT:  I'm going to hold you to very briefly now.

MR. MELLIN:  This will be very, very brief.  I do think that one distinction is that as to planning, that is a steps being made by someone to do something, premeditation goes to their intent and what they do intend to do.  So, I do think there is a subtle difference there, and the reason why you have both substantial planning and premeditation, there are steps being made and a person intends to be making those steps.

As to the bifurcation issue, your Honor, I believe it's the trend and certainly it's before your Honor to make the call as to how you wish to do that.  I would think counsel would be able to agree that that's probably the best approach to take, where I know in other cases I have done -- the way we have addressed that is that you have the intent factors and

106

also the statutory aggravating factors listed for the jury to decide all at one time.  And then assuming they come back and find at least one of the intent factors and at least one statutory aggravating factor, then you go to the next phase, you go to the selection phase where the government puts on evidence of any non-statutory aggravating factors, and that the defense at that time is then putting on their mitigation defense.

I think that's the way to completely avoid any issues concerning the eligibility in the selection phase.  So it's a two-step process where in the first step the government does the intent and statutory aggravators all at one time.  And then the jury goes out, they come back, they give their findings, and if they have found at least the intent and at least one statutory aggravator then we go the next step.

THE COURT:  Jurors can always ask questions while they're deliberating, in writing, submit the questions to the judge if they don't understand something.

MR. MELLIN:  Correct.

THE COURT:  All right.

MR. MELLIN:  As to the argument about sufficiently outweighed, your Honor.  There is no case out there that I'm aware of that holds that under 3593 that the government is required to make a showing beyond a reasonable doubt.  The cases have consistently discussed sufficiently outweighed, and

107

not one opinion holds that the government has failed to carry their burden beyond a reasonable doubt.  I would direct the Court to the Davis opinion and some of the other cases cited by the government.  Samson as well.

Counsel made the point about Ring and beliefs that there is a Ring violation.  Your Honor, we completely disagree to the extent that Ring and the other cases, Jones and the cases after that require or at least seem to indicate that the government is required to present these potential sentence enhancement issues to the jury.  The issue is presented through the notes of special findings, through the eligibility phase.  Does the defendant have the intent and also are there statutory aggravating factors that would potentially subject him to the death penalty?

The next phase, the selection phase is what we're talking about now.  There is no increase in punishment during the selection phase.  That's where the jury is simply weighing the evidence and deciding what's the appropriate sentence?  Life or death?  No case has held that Ring spills over into the selection phase.

And there's also no cases that held that sufficiently the language of the statute sufficiently weighing is unconstitutional.

THE COURT:  All right.  Next motion.

MR. TRAVIS:  Good afternoon, your Honor, my name is

Ron Travis.  It's nice to finally put a face to the voice. We've talked on the phone a few times.  I have five I believe motions to deal with.  But before I deal with the remaining motions that were filed, since the Court raised the concept of bifurcation, and government counsel made mention of bifurcation, I would point out to the court that although we filed multiple motions we did not file a motion to bifurcate.

The question of whether we believe as a defense team it's appropriate to seek bifurcation is one of the questions that we have not yet resolved in-house, so to speak.  I would point out to the Court that there are at least a couple of decisions that I'm aware of where -- I believe it's the Sablan case, as well as the Mills case, which is the Aryan Brotherhood case, where the court in writing the decision concerning confrontation clause raised a question whether there is actual authority to bifurcate.

And to revisit -- if you go to bifurcation, as I understand what you do is you would present -- after the government would present evidence, we would present any defense evidence on the mental health state, the noticed mental health state, and any notice of statutory aggravating factor.  The jurors would then retire and deliberate on those two issues.

If, and only if they found those two factors plus a third one that's really not at issue, and that is that Mr. Hammer was over 18 years of age when this offense was

109

committed, if they found that the government had established beyond a reasonable doubt age, one of the -- at least one of the mental health factors and at least one of the noticed statutory aggravating factors, it would come back and we would go into what some courts refer to as the selection phase. That's where other evidence of statutory aggravating factors or other evidence of non-statutory aggravating factors, evidence of victim impact, evidence of mitigation, all of that would be dumped on him at that point in time.

THE COURT:  The question is, when I charge the jury, we don't want to overlook them.

MR. TRAVIS:  I understand that.

THE COURT:  If we do it in phases, it seems to make the process fairer.

MR. TRAVIS:  The --

THE COURT:  But you can decide that in the future. We don't have to go into it now.

MR. TRAVIS:  I understand.  I just --

THE COURT:  I understand the stages too.

MR. TRAVIS:  I just want to make clear to the Court that we're aware of the bifurcation concept and we intentionally chose not to address that by way of motion at this point in time because, as I say, frankly we have not discussed it in enough detail with our client or the team.

THE COURT:  I understand.

110

MR. TRAVIS:  Okay.  The first motion I want to refer to is the motion concerning victim impact.  And initially I want to clear up some misunderstanding on the part of government counsel.  I recall government counsel holding up the -- what I'll call the Marti letter and saying that we wrote that and got it to sign.  That's clearly not what happened.  A victim outreach individual was hired.  That victim outreach person had the contacts with the Marti family.  The defense did not have contacts with the Marti family.

I was ready to argue to the Court today that based upon our understanding of the content of the submission that we made to the Department of Justice, and a follow-up contact, that the victim outreach person had with the Marti family after the government made the determination to once again seek death, what was reported to us was that the Marti family was extremely angry and upset that the government had chosen to ignore their request to terminate the case, and that the family wanted no further contacts and did not even want to know what was going on.

When we put together our motion we put together based upon the information we had at that point in time.  We obviously were unaware that Mr. Mellin, although I think he said in June of 2012 he went and knocked on their door, I think he must have meant in June of 2011 he went and knocked on their door.  We did in mid April submit a request to the government

111

asking for information on any contacts they had with the Marti family, and we received no response, which led us to the conclusion that there had been no contacts, no conversation with the Marti family.

Based upon what I've heard today and based upon my understanding that the -- whatever was submitted, that we didn't see is going to be disclosed, I'm not going to say anymore about victim impact until I've had an opportunity to see what it is that we have not seen and to make a determination if that has changed our position with respect to victim impact.

The next -- and I don't know, your Honor, if you want the government to --

THE COURT:  Well, is there something that hasn't been disclosed that the government has now agreed to disclose?

MR. TRAVIS:  Whatever the in camera submission was to the court which you --

THE COURT:  On the other motions, oh, okay.  In other words, is there any report of interview of Mr. Mellin's interview with the family?

MR. TRAVIS:  I don't know, your Honor.  As I say, I was totally surprised today to hear him indicate that he had been to their house and knocked on their door in -- sometime this month.  I have not seen anything.  And I assume that what was submitted to the Court in camera lays out in some way what

112

that interaction was, but until I see it --

THE COURT:  Mr. Mellin, is there a report of interview?

MR. MELLIN:  No, your Honor.  It was just a discussion I had with the family, which I've indicated to your Honor what the discussion was.

THE COURT:  Did you go with an agent?

MR. MELLIN:  I did not, no.

THE COURT:  All right.  Confrontation, please.

MR. TRAVIS:  Okay.  Your Honor, with respect to the confrontation clause, at least as I interpret the government's position, and I don't mean to speak for the government, and if I'm wrong I'm sure they'll advise the Court that I'm wrong.  I think that the government and the defense agrees that the confrontation clause clearly applies to what I'll call the eligibility phase, because some courts do call it that.  And every case cited by either side has applied the confrontation clause at least to that aspect of the penalty.

I think where the parties separate and go their divergent ways deals with the question of what some courts have called the selection phase, and whether the constitutional -- excuse me, the confrontation clause should be applied to the selection phase.  We have pointed out to the court cases which we submit are cases that support our position, and that is, that the confrontation clause should apply to the entirety of

113

the penalty phase.

The government has pointed out cases that have held that no, it only applies to part of the penalty phase.  We think that if the Court takes a look at Mills -- United States v. Mills and the United States v. Sablan and also United States v. Stitt, which is a decision that --

THE COURT:  Can you give me those cases again?  Mills.  What was the other one?

MR. TRAVIS:  Sablan, S -- I think it's S-A-B-L-A-N.

THE COURT:  Right.

MR. TRAVIS:  And Stitt, S-T-I-T-T.

THE COURT:  All right.  I remember reading about them.

MR. TRAVIS:  Okay.  So Mills is the Aryan Brotherhood case.  Sablan was another inmate murder case.  And Stitt was a case that was back for a new penalty phase.  And that's why we have highlighted those cases to you, because as you go through, especially the Sablan case, you will see that the Court very carefully walks through the information which the government proposes to present during the penalty phase.

I believe that the Court had ordered informational outlines in that case, or else the government voluntarily had provided outlines of what it intended to do.  And the judge very carefully walks through what they proposed to present, why it does or does not have a testimonial hearsay component to it,

114

and why the confrontation clause should or should not be denied -- applied.  He comes to the conclusion that the confrontational clause should apply to both stages for a number of different reasons.

One, it avoids potential jury confusion.  But he alludes to what I'll call trial by ambush, where the government, as part of the eligibility phase deliberately omits evidence that it knows has a confrontational clause problem and waits until the selection phase to present that evidence.  And in order to avoid that type of game playing, the court concludes that the confrontation clause should apply to the entirety of the case.

THE COURT:  Let me ask a question.  When I read 3593(c), it says that the sentencing hearing information may be presented.  It uses the word information, it doesn't even say evidence.

MR. TRAVIS:  Correct.

THE COURT:  "Information may be presented as to any matter relevant to the sentence", et cetera.  And then it says, "Information presented may include the trial transcript and exhibits if the hearing is held before a jury or judge not present during the trial, or at the trial judge's discretion."  It goes on.  It keeps using the word information, not evidence.

MR. TRAVIS:  Your Honor, that's because the Rules of Evidence do not apply to the sentencing hearing.

115

THE COURT:  But you want the confrontation clause?

MR. TRAVIS:  Yes.  Based upon -- based upon the analysis that has been undertaken by admittedly non-Third Circuit jurisdiction which --

THE COURT:  And the government says it's premature for me to rule on it at this point.  What ruling can I make?

MR. TRAVIS:  You can make -- you can make the ruling that in conjunction with the penalty phase, the confrontation clause will apply to the entirety of the penalty phase.

THE COURT:  Now, does that mean that the defense can't present the reports of interview of the three persons that are deceased?

MR. TRAVIS:  My --

THE COURT:  Or does the confrontation clause only apply to government entities?

MR. TRAVIS:  My understanding, again, based upon my review of confrontation clause cases is that the confrontation clause application only applies to the government's evidence, not to the defense evidence.  And that's basically based upon Lockard case that says any information which might lead one member of the jury to find that life is the appropriate sentence, they have to be allowed to hear and consider.

THE COURT:  All right.  I understand the argument. Can we move on?  Only because of --

MR. TRAVIS:  I'll move aside.

116

THE COURT:  Why don't you make all your arguments and then we'll have --

MR. TRAVIS:  Oh, okay.

THE COURT:  All right.  The next one is the motion to strike the non-statutory aggravating factor of future dangerousness and --

MR. TRAVIS:  Okay.  Your Honor, with respect to the -- actually I think the next one is substantial planning and premeditation, your Honor.

THE COURT:  Oh.  You're right.

MR. TRAVIS:  All right.  With respect to the substantial planning and premeditation.  We have submitted an extensive brief in support and also reply brief.  The government has submitted an extensive brief.  We're not going to rehash what we've had in the brief, but I think that it is very important for the Court to grasp the significance of what did in fact happen in this courtroom earlier this morning.  And that is that when the court was reading from the indictment it mentions the fact that premeditation was used in Count 1.  And it posed to Mr. Mellin the question of isn't substantial planning and premeditation redundant in light of the fact that the indictment talks about premeditation?  To which, as I heard it, Mr. Mellin indicated that it would be, or he thought it would be.

He couldn't be more wrong about that.  Substantial

117

planning and premeditation, according to the case decisions dealing with that statutory aggravating factor, say that it's premeditation plus. It's got to be more than premeditation. The concept that Mr. Mellin, with all his background and his training is seeing no difference between premeditation and substantial premeditation, makes the point that our motion makes. If you look at the cases that have addressed substantial planning and premeditation as an aggravator, the cases talk about, well, yeah, it's true, we don't tell you what substantial means, but it's got a common sense meaning.

Well, any time you're talking about a common sense meaning, you're relying about -- on the jurors to make a choice based upon their concept. If I have a hundred dollars in my pocket, if I'm outside and there is a street person who is homeless, they might think a hundred dollars is a substantial amount of money.

If I happen to run into someone who just leased their land to one of these natural gas drillers and has hundreds of thousands of dollars, they might think I'm almost broke. And the United States Supreme Court has recognized that substantial can have varying and different context.

In the briefing I point out that some cases talk about substantial meaning a higher degree of planning. Some cases talk about considerable in quantity. Some cases talk about more than sufficient to commit the crime. And some talk

118

about significantly large.  So, you have case decisions that are not even uniform in what substantial means for the purpose of making the determination that this aggravating factor has been proven beyond a reasonable doubt.

It is one of the eligibility elements of this offense, is a significant, significant determination, and using the phrase substantial in our view and in the view of our argument, it makes this aggravator constitutionally infirm because it fails to properly direct the jurors, and the result is that it is an invitation for an improper determination that someone should receive the sentence of death.

We've been hearing about the substantial planning and premeditation aggravator.  We started with Mr. Wiseman's argument when we're talking about the Brady violation and that the people who are now dead are people who had relevant information with respect to the so-called rope braiding and with respect to the allegation that there was some sort of plan to pretend that there was a letter being written to Martin Guerrero, who was affiliated with some sort of prison gang, to get him to call off the dogs with respect to Mr. Marti.

Those individuals deny that -- those individuals are important to undercutting the theory that was presented by the government at the first trial.  The theory on substantial planning and premeditation at the first trial was look how these ropes are and how intricate it is.  I believe the words

Mr. Martin was using then was pleating, he was pleating them together. And it took time, and how much time would be involved in that. And the letter to Guerrero, when he sends this letter to lull Marti into a false sense of security, and so on and so forth.

The people who are no longer alive because of the failure to disclose the 302s are essential to the ability to challenge substantial planning and premeditation. So, when you look at what I'll call the muddy water raised because of Brady violations, and when you look at the concept of substantial really having no set meeting that would allow the jurors to properly determine what the bar is -- excuse me. What the ceil- -- the floor is. It's clear from the cases that the starting point that the juror would have to find to -- is planning, okay? Planning is the key to the 1111, Section 1111, first degree murder. It's got to be more than that.

The worse case from our point of view is more, it's got to be more than mere premeditation. You're asking jurors, you're asking 12 individuals, and I don't think any of them will have ever spent any time in a United States penitentiary, in a special housing unit, to make a determination of what planning would establish the bar as far as committing this offense. And then without any guidance and direction, asking them to make a determination that there's more, considerably more, larger, higher degree.

120

And when you consider those two concepts, we would suggest to the Court that this case becomes a whole lot cleaner if the Court would make the determination that substantial planning and premeditation as an aggravating factor should be removed from the case.

THE COURT:  Well, let me ask this question:  Can you remove one but not the other?

MR. TRAVIS:  Substantial planning and premeditation. It's got to be substantial planning, coupled with substantial premeditation.  It can't be substantial planning standing alone, that's not the aggravating factor.  It can't be substantial premeditation standing alone.  It's got to be --

THE COURT:  So, substantial planning -- substantial modifies the word premeditation too.

MR. TRAVIS:  Yes, both.

THE COURT:  Not just substantial planning and premeditation.

MR. TRAVIS:  Yes.  No, it's -- the case decision, as I recall them, your Honor, says that it has to be -- both have to be substantial.  It can't be substantial one or substantial the other.  It's both have to be substantial.  Do you want me to move on to future dangerousness?

THE COURT:  Yes.

MR. TRAVIS:  Okay.  With respect to the future dangerousness concept, and again, we submitted an extensive

121

opening brief and also a reply brief.  And basically what I did is walk through the notice of intent that was filed in this case.

THE COURT:  How old are the convictions, the prior convictions?  How old are the prior convictions?

MR. TRAVIS:  Most of the prior convictions are at least 20 years old, if not 30 years old.

THE COURT:  What's the government's evidence of future dangerousness?  The prior convictions?  Or the manner in which Mr. Marti was killed?  What's the evidence of future dangerousness?

MR. TRAVIS:  The evidence that they presented on future dangerousness at the time of the trial, and at the time this case was tried in 1996 the evolution of the concept of future dangerousness had not been fully developed.  I don't think that there's any question that based on where we are in 2011 and where we will be in 2012 and where we have been for a number of years is that future dangerousness is restricted to conduct and activities that would put at risk staff or other inmates because the alternative to death is life without the possibility of release.

THE COURT:  In the notice of intent to seek the death penalty on page 6.

MR. TRAVIS:  Excuse me, your Honor?

THE COURT:  In the notice of intent to seek the death

122

penalty on page 6, the future dangerousness is described in paragraphs A going over to page 7 to D.

MR. TRAVIS:  Correct.

THE COURT:  And there's no date given for A, Mr. Hammer advised a fellow inmate in a written statement after the murder that given the opportunity I will kill again.  Or we have prior threats to law enforcement people in 1989.  A threat to blow up a public building in Oklahoma in 1989.  And escape on multiple occasions, or attempted escape, has escaped or attempted escape from '81 to '83.  So all of this evidence goes back 20-plus years.  Except I'm not sure about A.  Unless someone can put a timeframe on A.

MR. TRAVIS:  I can do that, your Honor.  In the opening brief that we filed -- I believe it was in the opening brief, maybe it was in the replied brief, I walked through each of the 2A, 2B, 2C, 2D, and set forth what the government had presented during the first trial.  And the timeframe -- the timeframe for 2A, the written statement, that was shortly after the actual killing.

THE COURT:  In this case?

MR. TRAVIS:  In this case.

THE COURT:  So we're dealing with 1990 --

MR. TRAVIS:  Six.

THE COURT:  1996, all right.  So the issue is whether or not, at least to some extent, all of these things going back

123

to 1996 and before is relevant to the issue -- to the issue of future dangerousness?

MR. TRAVIS:  Correct.

THE COURT:  Now, I think you've argued that in 1998, when he was originally tried, that's one issue, but all these years have passed and now it's another issue, as to whether this future dangerousness would be relevant.

MR. TRAVIS:  Correct.  Plus it -- in 1998, when the first penalty phase was going through, was being tried, the cases had not limited future danger to conduct within confinement, okay?  So when they were talking -- when the government was talking about conduct that had occurred during the course of the escape and so on and so forth, we -- that came in.  And that was part of what the jurors were entitled to consider.  You know, for example, one of the arguments was made by Mr. Martin was that Mr. Hammer, although he may be locked up, he's got all of these functionaries on the outside, I think Mr. Martin was kind enough to call them groupies, and that the Hammer groupies can go out and create havoc.

THE COURT:  Well, can you argue evidence of future dangerousness?  It's not designated in the notice of intent.

MR. TRAVIS:  I don't -- I don't believe so, your Honor.

THE COURT:  This is a non-statutory factor.

MR. TRAVIS:  No, these are non-statutory, but I think

124

they're restricted to what's set forth in the notice of intent, and that's part of the reason, the last argument that I have deals with the request for informational outlines.  Because we need to be able to have an understanding of where the government intends to go and what they intend to try to do, so that in your capacity as the gatekeeper with respect to this case we can bring to your attention any information they intend to present, which we don't think passes muster.  And I'll give you an example of why I think it's important for us to get the information we requested and for the Court to have an opportunity to weigh it and make a determination of whether it's going to support the aggravating circumstance or not.

During the first trial, one of the noticed aggravators was vulnerable victim.  And the government called witnesses and attempted to prove beyond a reasonable doubt Mr. Marti, because of his -- I think he had epilepsy but I'm not sure, he had had a series of problems when he was a young child.  They were trying to attempt to show that because of that he had some mental health issues and therefore, even though he was six foot four and 200 pounds, that he was -- and mid 20s he was a vulnerable victim.

Well, the government presented all of that stuff, all of that information.  The jurors heard all of that information, but ultimately Judge Muir concluded that the government had failed to present sufficient evidence to prove beyond a

reasonable doubt that alleged aggravator, and that aggravator did not go to the jury.  But they heard all of that.  And so, that's why I think it is important that we avoid that sort of problem or potential problem in this case, where the government is alleging certain conduct that even if we assume they are going to be able to prove it, that when you add it altogether it's not a sufficient proof beyond a reasonable doubt to support that aggravator, and therefore the aggravator shouldn't go to the jury, and I think that that is that the real problem with the future dangerous non-statutory aggravating factor, the way it's set out.

In the opening brief, I think that if you look at the discussion with respect to paragraph 2B and 2C, which are found on pages seven of the notice of intent, that it's clear that the conduct of sending letters to judges and/or prosecutors, or the conduct of calling in a bomb scare to an Oklahoma building, public building, is not within the parameters of future dangerousness when it does not present a potential risk of violence to either staff or other inmates.

THE COURT:  Well, that's not listed in -- yeah, the letter to Judge Russell.

MR. TRAVIS:  2D -- 2B, excuse me, says --

THE COURT:  Right, I see it.  I have it.

MR. TRAVIS:  And 2C talks about blowing up -- the threat to blow up the building.

126

THE COURT:  Right.

MR. TRAVIS:  Now, forget about the staleness concept. It's the -- if proven it is not probative and not relevant with respect to the concept of future danger in the way Mr. Hammer would be handled if he receives a life sentence.

THE COURT:  Well, we have to consider the heightened reliability standard.

MR. TRAVIS:  Correct.

THE COURT:  And to a certain extent I'll have to examine this in more detail.  The passage of time certainly makes it less reliable that this evidence would be repeated, if it hasn't been repeated.  In other words, let's assume the last act was in '96, this being 16 years later, 15 years later.  And there's been no intervening similar conduct.

MR. TRAVIS:  Right.

THE COURT:  Then there's certainly an element of speculation involved, as to whether or not this conduct would be repeated in the future.  At least as to the element of future dangerousness of the defendant, the staleness argument does seem to be a critical issue.

MR. TRAVIS:  And Your Honor, in that regard, the Sablan case that I had talked about earlier, and also the United States v. Davis.  In Sablan the judge excluded prior criminal conduct.  I think it might have been -- even have been adjudicated criminal conduct because it was over 15 years of

127

age, and in Davis they excluded it because it was more than ten years of age.  And -- but again, we think that if you look at both Mills and Sablan as far as what I'll call a template for how to deal with nonstatutory aggravating information, that the government provides it both to the court and to the defense team, and the government, after doing so, excuse me, the defense has the opportunity to say, Wait a second, Judge, we have this problem with this, staleness, not relevant to future danger for an inmate.

(Whereupon, there was a beeping sound heard.)

THE COURT:  You can just ignore that.  Nobody is trying to call in.  Ignore it.

MR. TRAVIS:  The prejudice is -- exceeds the probative value, whatever the argument may be, and if you look at what was done in Mills and Sablan, the judge ahead of time, and not in the pressure of the moment, not while we have 12 people in the box and three or four alternates, and you know, we're in the middle of a trial, the judge has to make a call now, you know, one of those --

THE COURT:  Let me just say generally that given the passage of time since April of 1997, when this notice of intent to seek the death penalty was filed, given the fact that the hearing was held in 1998, it may be entirely appropriate at this point to, you know, given all the litigation in this case, the 2255 hearing, all of the evidence that you have about all

128

the expert witnesses and other evidence that's been introduced, it may be appropriate at this point for the government to hone in as to what they're going to present at the sentencing hearing so you have sufficient opportunity to focus in rather than have to rely upon combing through the whole record.  It may save time, it may save effort here.  I think the request for an informational outline may be appropriate.  I want to take a closer look at it.

But I may decide to ask the government to focus in with more specificity, as much specificity as I can on what they're going to present, because no two hearings are alike. It may have been important at one point, it may not be presented today, and vice-versa.  There may be something here today that the government is focusing on that they want to present that they didn't present in the past.  So, I want to make sure that Mr. Hammer has absolute advance notice.  I think that's the intent of the statute and the intent of the sentencing, the Federal Death Penalty Act, to make sure a defendant has notice of what the government is going to rely upon.

Now, given that we've had so much history in this case, it may be easier to do than one would think, although it seems when you first hear a judge say that it may seem like a daunting task, but in any event I have an open mind about this.

MR. TRAVIS:  Your Honor, just with respect to the

129

informational outlines.  The defense concedes that if the judge directs informational outlines, and if something happens between now and April, that we're not beginning to argue that the government would be restricted to what they provide now. The government seems to be suggesting that it's premature because things can change in the future.  Well, we understand. But we need to know now so that, as you say -- and there's a case, United States v. Roman, and I'm sure it's in our brief, out of again Puerto Rico where actually the defense got chastised in that case for not raising what we're raising now with you.  And a Judge pointed out, you know, it saves time, it saves money, it saves resources.  And frankly, it's easier for me to decide this, you know, outside the heat of battle.

THE COURT:  I understand.

MR. TRAVIS:  Unless the Court has any other questions on any of the other issues, I think I covered everything that I was supposed to cover.

THE COURT:  And with respect to the informational outline, you know, the request is information as to victim impact evidence, substantial planning and premeditation and future dangerousness, these are the statutory and non-statutory factors the government is relying on.

MR. TRAVIS:  Correct.

THE COURT:  The government could probably focus in sooner rather than later as to what the evidence would be on

that.  You're almost asking for a bill of particulars as to what the evidence would be, but maybe we can formulate something here or the government can without precisely holding them to it, giving them some leeway as lawyers need in planning on how they're going to approach a hearing or what evidence they're going to present.  But I just want to make sure that you have sufficient notice.  And obviously, you know, given all the evidence that's presented, you probably do, but I just want to make sure you have sufficient advance notice to properly prepare for the hearing.

MR. TRAVIS:  Your Honor, the reason --

THE COURT:  And not have to prepare for things the government is not going to present at this point too.  All right?

MR. TRAVIS:  The reason we styled it informational outline is because that's a judicially created concept that comes from people filing requests for bill of particulars, and different judges say I'm not necessarily sure that we can give you a bill of particulars with respect to the notice of intent, so what we're going to do is we're going to require informational outlines.  For example --

THE COURT:  It should be done within the confines of the Federal Death Penalty Act.

MR. TRAVIS:  Right.

THE COURT:  There has to be a legal basis for it.

MR. TRAVIS:  Right, right.

THE COURT:  All right.  Thank you.

MR. TRAVIS:  Thank you, your Honor.

THE COURT:  All right.

MR. MELLIN:  Your Honor, if I could just address one issue and then I think I'll defer everything else to Mr. Martin.  But this is not a case where the defense has no idea what the government's evidence is, your Honor.

THE COURT:  Oh, I agree with that.

MR. MELLIN:  This is a retrial.

THE COURT:  Are they even going to present all the evidence you presented at the last hearing.

MR. MELLIN:  I don't know about all of it.  But substantially the same information and maybe there is some more, so we're not talking about --

THE COURT:  That's the point.  If you know you're going to eliminate something let's be up front about it.

MR. MELLIN:  I have no problem doing that, your Honor.  To be frank, though, as I stand here today I cannot make that call.

THE COURT:  All right.  Can I give you a cut-off date though?

MR. MELLIN:  I'm sorry.

THE COURT:  Can I give you a cut-off date?

MR. MELLIN:  You can give me a cut-off date if it's

132

maybe like March of next year or February, your Honor.

THE COURT:  That's going to be tough.  I have a feeling it may depend on the outcome of the double jeopardy argument, but go ahead.

MR. MELLIN:  Understood, your Honor.  But as I get a better sense as to everything that's out there, I will be happy to talk to counsel to try to truncate this as much as we can.  But this is not a case where they have no idea what the government is going to present.  They've already -- Mr. Travis has already done the trial so he knows exactly what the evidence is.

THE COURT:  I agree.  I don't disagree with you.  The question is is there anything new that's been developed over the last 13 years?  And whether there's anything you can in good faith say we're not going to present it.

MR. MELLIN:  Fair enough, your Honor.

THE COURT:  And we're only dealing with these three aggravating factors, one is statutory and two non-statutory at this point.

MR. MELLIN:  I am not someone who typically believes that we should hide the ball, your Honor.  I'm not going to hide the ball in this case.

THE COURT:  I'm not saying --

MR. MELLIN:  As -- the only problem I have as I stand here today is I don't know enough about the case.  I certainly

133

know what I've ready and know from talking to certain witnesses what I know, but there's more to be done on my end before I can make that call, but I will be happy to provide the information to the defense, as we get a better sense as to which of the witnesses we're not going to call, and if there are going to be new witnesses we will be calling. I don't believe -- you will not have to worry about some trial by ambush, Your Honor, that will not happen.

THE COURT: All right.

MR. MELLIN: Your Honor, if I can get back to the future dangerousness issue. The Court has been discussing the staleness concerns and how old all of these things are. But one of the points I would make is that when you try to decide whether or not someone is a future danger, one of the things you looked at is there actions in the past, and how they acted in the past.

In 1996, after killing his cellmate in jail, Mr. Hammer said given the opportunity I will kill again. So, we're talking about an individual who has just -- he's already in jail. He is with someone. He kills that cellmate. And then he says yes, I'm going to do it again. I don't know what better indication there can be that he's a future danger than his own words, after the fact.

THE COURT: Let me ask you this question. He's been in a single cell I assume all these years, right?

134

MR. MELLIN:  I don't know if I can assume that, your Honor, but I will take that --

THE COURT:  He's had cellmates all these years?

MR. MELLIN:  I'm not sure if he has or has not, your Honor.  I frankly do not know exactly how Terre Haute has been --

THE COURT:  Can that be addressed in any subsequent briefs?

MR. MELLIN:  Yes, certainly.

THE COURT:  I think that's important.  That's No. 1. No. 2, my understanding is that he's still considered an inmate that's on death row, even though the death penalty has been vacated in this case the last four or five years.  And which means he's incarcerated for 23 hours a day, and it's one hour out, I believe.  If the death penalty is not imposed I assume the circumstances of his incarceration will change.  All of these factors should be addressed.  I think they're all important.  The fact that one is incarcerated doesn't necessarily mean one is not in danger in the future, but it all has to be addressed within the confines of what you have in the notice of intent to seek the death penalty.

So, I think -- I thought there was some reference I read in the briefs to the circumstances of the incarceration, but I think I should know more, if it can possibly be presented to the court either by stipulation or, you know, by records of

the institution.  I think that would be somewhat helpful, at least on the first issue.  But the other issues really deal with things that happened beyond -- you know, well beyond going back, beyond 1996.

MR. MELLIN:  Correct.  But those are the ones, your Honor, that are indicative and critical in determining whether or not this person could be a future danger.  In particular, if you looked at 2B which talked about Hammer previously had threatened prosecutors and judges who had placed him in prison and denied him release.  This is a man who was convicted in 1984 and five years later is threatening the judge and the prosecutor in the case.  That clearly shows that he's a future danger while he is incarcerated.  He is making steps to threaten people outside of the prison environment.

THE COURT:  Has there been a ruling that perhaps some if not all are admissible as future dangerousness.

MR. MELLIN:  I don't believe there was a limit.

THE COURT:  There's no limit.

MR. MELLIN:  Correct, right.

THE COURT:  In other words, a Court can say, Well, this is admissible and this is not admissible --

MR. MELLIN:  Oh, certainly.

THE COURT:  -- on that point.

MR. MELLIN:  Yes.

THE COURT:  Well, give me -- I know you've made some

very good arguments in the briefs that have already been filed, but I am saying this one issue clearly has raised some points that have really gotten my attention in terms of whether or not this kind of evidence should be admissible.

MR. MELLIN:  That message was well received on my end, your Honor.

THE COURT:  All right.

MR. MELLIN:  But I would draw the Court's attention to the Davis case, and it's the most recent Davis opinion, which is 609 F.3d 663, which is a 5th Circuit opinion in 2010. In that case, if I could just read the paragraph.  The court says, "Davis also places much weight on evidence of his violence-free prison record during the eleven years between his arrest in 1994 and his sentence in 2005.  He is correct that evidence suggesting that he had been a well-behaved and disciplined prisoner is highly relevant to the jury sentencing determination.

"On these facts, however, the length of incarceration without violence is not dispositive to the issue of whether Davis is a threat of future dangerousness while in prison. Stated another way, evidence of Davis's past dangerousness is not negated by nonviolent conduct in prison during a time when he is, quote/unqote, on display while the appeal of his death sentence is pending."

And that's precisely our point in this case, Your

137

Honor.  The fact that Mr. Hammer has acted relatively well, I can't speak to every incident that he has had in the last ten years.  But the fact that he has acted appropriately while on display, while this appeal is pending and while all these matters are pending, does not negate his future dangerousness or negate his bad acts in the past, which a jury can certainly look at to make a determination of whether or not he is a future danger.

THE COURT:  After he withdrew the appeal, how much time passed before the 2255 motion was filed?

MR. MELLIN:  I think it's relatively quick, your Honor.  I don't have a date --

THE COURT:  Was it a year?  Was it six months?  Was it --

MR. MARTIN:  I'm sorry, what was the Court's question?

MS. SAUNDERS:  Your Honor, the 2255 was actually --

THE COURT:  Wait a minute.  This is Ms. Saunders?

MS. SAUNDERS:  I'm sorry, your Honor, this is Anne Saunders.  The 2255 was filed about -- within -- very close to the one year, as I recall.

THE COURT:  Within a year?

MS. SAUNDERS:  Yes.

THE COURT:  All right.  So at least during that one-year period in the timeframe of, what, 2001 or so, during

that one-year period when Mr. Hammer was not in the appeal mode, he certainly didn't display any evidence of future dangerousness when -- you know, when he made a decision that I want to die at this point.

MR. MELLIN:  I agree, your Honor.  I certainly think they can put on that evidence, but that doesn't foreclose the government from being able to say fine, that was how he acted for that short period of time, but look at this longer period of time and what did he do?  And in particular, the facts of this case go to future dangerousness.  He's incarcerated and he kills his cellmate.

THE COURT:  Yeah, but you didn't list that in your -- that's not what you're relying upon is future dangerousness. It's not in the notice of intent under future dangerousness.

MR. MELLIN:  It's not listed as A, B, C or D, your Honor, but I think it's a fact the jury can consider.

THE COURT:  It's a fact the jury can consider in deciding what?

MR. MELLIN:  In deciding whether or not the defendant in this case should -- the death penalty is appropriate.

THE COURT:  Well, it goes to the intent factors, right?

MR. MELLIN:  Correct.

THE COURT:  It has a lot of relevancy here.

MR. MELLIN:  Right.

139

THE COURT:  But it's not listed under substantial --

MR. MELLIN:  Agreed.  But my point is --

THE COURT:  -- as to future dangerousness.

MR. MELLIN:  But my point is to the extent that the Court is considering that there is this period of time where he didn't do anything wrong, therefore, you should exclude any of his bad acts in the past that tend to show potential future dangerousness.

THE COURT:  No, no, no.  I'm not saying -- the only reason I brought up the period of time when he wasn't -- when he was not in any kind of an appeal status is because you said that all these years he was fighting this, and therefore for that reason he's maintained good conduct.  But there was a period of time, at least for one year, when he wasn't in that status, and you know --

MR. MELLIN:  Agreed.

THE COURT:  If his mind was to do bad things, or to write letters or to do the kinds of -- make the kinds of statements that you're relying upon, you may have, he may have made a decision to do so if he still was the kind of person that was displaying future dangerousness.

MR. MELLIN:  Agreed, your Honor.  I believe that the defense can certainly put on evidence that for a period of time he acted this way.  But I believe we should be allowed to put on other evidence to say, well, at other times he acted this

140

way.

THE COURT:  And I'm not saying that you're not entitled to it.  The question is what evidence?  How old is it?  And nature of the evidence.  It may be that some is admissible and others not, or it may be all is admissible.  I don't know at this point.  I'm just expressing some concerns I have, after doing a significant review, and we'll give everyone an opportunity to address it.  All right?

MR. MELLIN:  Thank you.

MR. MARTIN:  Your Honor, I don't know if you want to hear from us at all on the Sixth Amendment or substantial planning and premeditation.

THE COURT:  I think the briefs are sufficient.  And if you want to submit anything else in view of any questions I've asked, because some of the factual matters overlap.  And you may want to go back, and you know, if you want to order this record and see whether or not there's anything you want to address on that you can.  I don't think that there's a need to argue at this point.

MR. MARTIN:  If the Court has no questions, that's fine, your Honor.

THE COURT:  Right.  Mr. Travis, are we done?

MR. TRAVIS:  Excuse me.  We're done as far as I'm concerned, your Honor.

THE COURT:  All right.  Well, counsel, anybody have

141

anything else they want to say at this point?  All right.  Then at this point we'll recess the hearing.  I am going to try my level-headed best to rule on these motions as expeditiously as I can.  I've sort of set a mental date of August 1.  I don't know whether or not I'll be able to achieve that.  But I think there ought to be a ruling as quickly as possible.  And depending upon how I rule it may be necessary to have some follow-up hearing, though we might have to be able to do it with a telephone conference, I don't know.  But I want to make sure that we stay on track and some of the -- you know, I can't say the effect of a ruling at this point on future litigation, but we'll just take it one day at a time.

MR. MARTIN:  Your Honor, might I suggest, if the Court was going to declare the statutes unconstitutional or bar any future prosecutions, that the court try to get those orders out quicker than informational outline, since that will only occur if the proceedings remain.

THE COURT:  The government -- the defendant might like it differently on the double jeopardy question, so --

MR. MARTIN:  All of those early dispositive motions, again, it might be better to do those first and then the rest come with me.

THE COURT:  All right.  No, no, I understand.

MR. WISEMAN:  Your Honor, I just have a question.  Did you want to set a date for the joint submissions -- or the

142

simultaneous submissions.

THE COURT:  That was the next thing I was going to do.  You tell me what you want to do.  How long will it take to order the transcript?

MR. TRAVIS:  Your Honor, I stood up earlier because I was going to ask the Court to direct that a transcript be prepared to save us the trouble of filing the paperwork that has to be done.

THE COURT:  All right.  As permissible in the Middle District of Pennsylvania, I'll direct that the transcript be prepared and submitted to counsel.  All right.

MR. TRAVIS:  And if we can get some idea approximately when --

(Whereupon, there was a brief off-the-record discussion between the court reporter and the Court.)

THE COURT:  Well, when do you want to submit briefs?  Let's assume you can get the transcripts within a week.

MR. WISEMAN:  I think we would like three weeks, if that's --

THE COURT:  Three weeks.  So there goes my August 1 date.  Let's see.

MR. WISEMAN:  We did our best.

THE COURT:  I was acting prematurely.  I was stating that date prematurely.  But why don't I give you until, oh, let's say July 25 or so, would that be all right, to submit

143

supplemental briefs and to --

MR. WISEMAN:  I can live with that.

THE COURT:  I don't know what day of the week July 25 is, but --

MR. TRAVIS:  It's a Tuesday, Your Honor.

THE COURT:  Oh, wait, here's a calendar.  It's a Tuesday or Wednesday.  I do have a calendar.  It's a Monday. Let me give you until July 26.

MR. WISEMAN:  July 26?

THE COURT:  Yes.

MR. WISEMAN:  Very well.

THE COURT:  When I practice law I try to avoid Monday dates in submitting -- all right?

MR. WISEMAN:  All right.  Thank you.

THE COURT:  I'll look forward to the supplemental briefs and I thank all counsel for being so well prepared and so eloquent today in stating their positions.  All right. We'll stand in recess.

Mr. Hammer Janel, I must say I don't have your last name written down, I didn't catch it originally, but I see the person from the institution.  We have concluded the hearing and at this point we're going to stand in adjournment.  I just want to thank the prison for the courtesy and assisting, and allowing Mr. Hammer to participate in the hearing by videotape.

MR. TRAVIS:  David, I'll see you next week.

144

DEFT. HAMMER:  Okay.  Thank you.

THE COURT:  All right.  We'll stand in adjournment.

THE DEPUTY CLERK:  Please rise.  Court is now adjourned.

(3:49 p.m., court adjourned.)

145

REPORTER'S CERTIFICATE

I, DIANA L. GILBRIDE, Official Court Reporter for the United States District Court for the Middle District of Pennsylvania, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing is a true and correct transcript of the within-mentioned proceedings had in the above-mentioned and numbered cause on the date or dates hereinbefore set forth; and I do further certify that the foregoing transcript has been prepared by me or under my supervision.

                              _____
                              Diana L. Gilbride, RMR, FCRR
                              Official Court Reporter

REPORTED BY:

    DIANA L. GILBRIDE, RPR
    Official Court Reporter
    United States District Court
    Middle District of Pennsylvania
    P.O. Box G
    Scranton, PA  18501-0090

        (The foregoing certificate of this transcript does not apply to any reproduction of the same by any means unless under the direct control and/or supervision of the certifying reporter.)