UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | No. 4:96-CR-239 |
| | : | |
| v. | : | Honorable Joel H. Slomsky |
| | : | |
| DAVID PAUL HAMMER, | : | Capital Case |
| | : | |
| Defendant | : | |
| _____ | :_____ | |

**DEFENDANT'S POST-ARGUMENT SUBMISSION**

Mr. Hammer, through counsel, herein submits his *Post-Argument Submission* addressing questions raised during the oral argument on June 30, 2011. For the Court's convenience, counsel addresses the post-argument submissions for each of his motions in one document and limits their discussion to only those motions in which counsel believed supplemental information was necessary.  As to all other motions, counsel relies on the arguments presented in the prior submissions and during oral argument.

I.     **MOTION TO PRECLUDE THE CAPITAL PROSECUTION OR, IN THE ALTERNATIVE, DISMISS THE INTENT FACTORS AND/OR SUBSTANTIAL PLANNING AND PREMEDITATION AGGRAVATING FACTOR BECAUSE THE GOVERNMENT'S DELIBERATE FAILURE TO DISCLOSE EXCULPATORY MATERIALS DIRECTLY DISPUTING THE GOVERNMENT'S CASE VIOLATED MR. HAMMER'S FIFTH, SIXTH AND EIGHTH AMENDMENT RIGHTS**

During the oral argument, the Court asked about the contents of the previously

undisclosed 302 reports forming the basis for Judge Muir's finding that the government had violated Mr. Hammer's Federal Due Process rights. NT 6/30/11 at 36. Mr. Hammer attaches those documents herein as Exhibit 1. The Court also asked about the significance of Martin Guerrero's 302 statement to the government's theory during the initial sentencing. NT 6/30/11 at 32. One aspect of Mr. Hammer's statement (attached as Exhibit 2), relied on by the government as proof of intent and the substantial planning aggravation involved his claim that he had written Mr. Guerrero in a purported attempt to convince Mr. Guerrero to lift a "contract" on Mr. Marti's life. Mr. Guerrero's statement to the FBI, however, directly contradicted this theory. He stated that he did not know Mr. Marti, had not had any communication with Mr. Hammer, had not received any letter from Mr. Hammer, and he knew nothing about any alleged contract on Mr. Marti's life. Exhibit 1. Thus, as Judge Muir found, the government argued that Mr. Hammer's statement regarding this claimed letter to Martin Guerrero was credible and supported both the intent factor and the substantial planning aggravator knowing full well that it had proof directly contradicting that argument and also knowing that it had failed to disclose that proof to Mr. Hammer's counsel.[1]

---

[1]As it did during the Section 2255 proceedings, the government argued before this Court that there is no harm because Mr. Hammer should have known of these statements because the individuals described Mr. Hammer's sexual

The Court also asked about the document regarding Mr. Marti's transfer obtained post-trial through the Freedom of Information Act inquiry. NT 6/30/11 at 33-34. The Court asked whether or not the prosecutor had that document prior to the penalty hearing. Counsel was not able to answer that question and the government did not provide a response, however, counsel would note that the investigation in this case was a joint investigation between the Bureau of Prisons investigative team, the Federal Bureau of Investigation and the United States Attorney's Office. Under these

---

activities. NT 6/30/11 at 51-52. Judge Muir specifically rejected the government's contention:

> In the present case the information the Government failed to disclose primarily relates to statements of third parties regarding what they knew and observed about Mr. Hammer. The Government presented no evidence during the section 2255 hearing indicating that prior to trial in 1998 Mr. Hammer knew that Messrs. Johnson, Fowler, Ball and Guerrero were interviewed by the FBI. Also, the Government presented no evidence that Mr. Hammer knew what those inmates' observations were regarding Mr. Hammer's behavior or what they had told the FBI regarding his statements or conduct. Furthermore, the Government presented no evidence that Mr. Hammer prior to trial understood the significance of his history of engaging in sexual bondage to the penalty phase proceedings, specifically as it related to the aggravating circumstance of substantial planning and premeditation. The significance of such information could only be discerned by learned counsel, attorneys Ruhnke and Travis. However, counsel were not provided with the documents.

United States v. Hammer, 404 F. Supp. 2d 676,798-99 (2006). That finding is law of the case.

circumstances, the prosecution was charged with actual or constructive knowledge of this document and its contents.  See Kyles v. Whitley, 514 U.S. 419, 437 (1995) (prosecutors have "a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police"); United States v. Risha, 445 F.3d 298 (3d Cir. 2006).

Also during the oral argument, the government indicated that it was not aware of a case standing for the proposition that double jeopardy applies to a capital sentencing hearing. NT 6/30/11 at 46.  It does.  See Sattazahn v. Pennsylvania, 537 U.S. 101, 106 (2003); Bullington v. Missouri, 451 U.S. 430, 439 (1981).

This Court also asked the government what reason it had provided to Judge Muir for failing to disclose these 302s. NT 6/30/11 at 64.  Assistant United States Attorney Martin responded that "part of the reason" was the government's concern regarding disclosure of inmate statements and the risk of putting that inmate "in serious jeopardy."  Mr. Martin went on to state that during the Section 2255 hearing Judge Muir reviewed "a great many, many 302s and only released these three or four." NT 6/30/11 at 65.  Each of these statements are directly contradicted by the record.

The circumstances leading up to the disclosure of the 302s occurred during the testimony of Agent Malocu.  On cross-examination, Agent Malocu indicated that he

had interviewed certain inmates regarding Mr. Hammer and his sexual practices and that he generated a 302 report for each of these witnesses and that he had turned those reports over to the government. The first disclosure occurred when counsel requested disclosure of the reports of interviews discussed by Agent Malocu on cross-examination. NT 9/21/05 at 15-17. The only question raised by the government at that time was whether or not the reports were accessible, otherwise, Mr. Martin had no objection to the disclosure. Id. at 16. Those seven 302 reports were disclosed over the lunch break. Id. at 19.[2]

Following further cross-examination, counsel learned that there were additional 302 reports of other inmates interviewed by Agent Malocu. Counsel again asked for disclosure of those reports. Id. at 20. Mr. Martin did object, arguing that it was not "the time for wholesale disclosure of every 302." Id. Judge Muir, without viewing any of the 302s, ordered that they be turned over to defense counsel. Id. At the end of the day, Mr. Martin informed Judge Muir that the government had turned over the additional 302s to defense counsel but moved to preclude counsel from disclosing those 302 reports to Mr. Hammer. Id. at 152. Mr. Hammer's counsel objected to that request and, as a result, Judge Muir ordered that those 302 reports be turned over to

---

[2]The seven reports involved interviews of Leonard Kahle, Chester Larimore, John Darko, Aldrich Ames, Anthony Battiste, Stephen Classen, and Gaylon Don Ball. NT 9/21/05 at 19.

the Court for review to determine that question.  The next morning, Judge Muir ordered that, of the twenty-six provided to him for review,[3] because fifteen did not have possible exculpatory evidence, those could not be disclosed to Mr. Hammer, but the other eleven could be disclosed to him.   NT 9/22/05 at 5.

These circumstances dispute Mr. Martin's representations to this Court on a number of fronts.  First, there was no objection to disclosure of these 302s to defense counsel on the basis of inmate security.[4]  While there was a subsequent request that counsel be ordered not to disclose the second group of reports to Mr. Hammer, that was the extent of Mr. Martin's discussion on that issue.  After reviewing the reports, Judge Muir ordered eleven (not three or four as Mr. Martin argued to this Court) be disclosed to Mr. Hammer.  Nor, as Mr. Martin alluded, did Judge Muir engage in an in-camera review of the reports before ordering that the thirty-three 302 reports be disclosed to defense counsel.  Instead, Judge Muir directed the government to provide all the reports to counsel.

---

[3] Judge Muir's review did not include the seven 302 reports initially disclosed.

[4] Nor was a concern for safety raised as a reason for non-disclosure of inmate 302 reports during any of the discovery requests prior to the Section 2255 evidentiary hearing.  Instead, the government argued that "wholesale disclosure" was not appropriate.   Doc. 994 at 15 (failing to argue concerns for safety and, instead, relying on its "wholesale disclosure" objection).

In short, at no time did the government express concerns for inmate safety as a basis for precluding disclosure. Indeed, the government had provided 302 reports of other inmates (those supporting the government's theory), pretrial. For each of these reasons, this Court should reject the government's present claimed concerns for inmate security as a basis for failing to disclose exculpatory evidence.[5] Moreover, the newly offered "explanation" by government counsel adds weight to the argument that the non-disclosure was intentional as opposed to negligent, requiring dismissal of the capital prosecution.

II.     **MOTION TO BAR CAPITAL PROSECUTION  BECAUSE THE GOVERNMENT FAILED TO INDICT ON EITHER THE STATUTORY INTENT FACTORS OR STATUTORY AGGRAVATING FACTORS**

As this Court correctly noted, the Fifth Amendment specifically requires that "No person shall be held to answer for a capital . . . crime unless on a presentment or indictment of a grand jury." U.S. CONST. AMEND. V. As set forth in the prior submissions and during argument, the government's failure to present either the intent

---

[5]Indeed, were safety concerns an issue, all the government had to do was what it did during the 2255 proceedings, request an order precluding counsel from disclosing the reports to Mr. Hammer. In the Middle District, excluding drug cases, a large majority of criminal matters involve crimes committed within prisons. As a result, the government routinely encounters the issue of providing inmate 302s to defense counsel. The government has provided those 302s in those cases and, where there were issues of inmate security, has also requested a protective order.

factors or the aggravation to the grand jury requires dismissal of the capital prosecution.

During argument, the government argued that this Court should conduct a harmless error analysis and, in support of its contention that any error is harmless, contended that the second count of the indictment, ultimately dismissed, involved the commission of a murder while serving an effective life sentence and, therefore supported aggravation. NT 6/30/11 at 75. Contrary to the government's contention, even if a harmless error analysis is appropriate, and it is not, nothing in Count 2 saves the constitutionally flawed indictment. Count 2 provided that Mr. Hammer was serving an "effective" sentence of life imprisonment at the time of the murder. The prior conviction aggravators relied on by the government, on the other hand, required not just proof of prior convictions, but also proof that those prior convictions involved either the use, attempted or threatened use of a firearm, (18 U.S. C. § 3592(c)(2)); or, the attempt or infliction of serious bodily injury or death, (18 U.S. C. § 3592(c)(4)). None of these requirements were contained in the indictment.

The government's request that this Court consider selected evidence that was presented to the Grand Jury is similarly meritless. Regardless of what may or may not

have been presented to the Grand Jury, the only findings made were those contained in the indictment. As nothing in the four corners of the indictment includes either the intent factors or aggravating factors, dismissal of the capital prosecution is required.

The government also asked that this Court consider Judge Muir's prior decision in <u>United States v. O'Driscoll</u>, 203 F. Supp. 2d 334, 350-52 (2002), rejecting the premise that any factor other than the elements of first degree murder must be presented to, and found by, the grand jury. The Court decided that opinion on February 15, 2002, without the benefit of the United States Supreme Court's decision in <u>Ring v. Arizona</u>, 536 U.S. 584 (2002), decided on June 24, 2002. Thus, it is inapplicable. As Mr. O'Driscoll was ultimately sentenced to life without parole, there was no need for Judge Muir to reconsider his decision in light of the <u>Ring</u> decision.

III. **MOTION TO PRECLUDE THE GOVERNMENT FROM PROCEEDING WITH A CAPITAL PROSECUTION BECAUSE IT'S DECISION NOT TO DE-AUTHORIZE THIS CASE, VIOLATED IT'S STANDARDS FOR CAPITAL PROSECUTIONS IN VIOLATION OF THE FIFTH, SIXTH AND EIGHTH AMENDMENTS**

As noted in the pleadings, during the de-authorization proceedings, counsel provided to the United States Attorney and the Department of Justice a statement signed by the family representative indicating that the family wanted the litigation to end. Despite the family's views and the Department of Justice Protocols requiring that the government consult with the family, the government elected to proceed with

a resentencing hearing.

In its reply to Mr. Hammer's motions, the government filed certain documents *ex parte* and under seal.  During the argument, this Court asked the government why it could not disclose those documents to counsel.  The government indicated that it would.  NT 6/30/11 at 91.  Following the argument, the government turned over two documents: a letter from Mr. Martin to Michael Marti and a copy of email exchanges between Mr. Martin and Mr. Michael Marti.  Nothing in those documents contradict the signed family statement indicating that the family wanted the litigation to end and did not want the government to proceed with a resentencing.  Instead, those documents confirm that the family did not want to be contacted about this case any further.

IV.    **MOTION TO STRIKE THE NON-STATUTORY AGGRAVATING FACTOR OF VICTIM IMPACT**

As described above and in the prior submissions, the family signed a statement indicating that they did not want the government to proceed with resentencing. During the argument, Mr. Mellin indicated that, "in June of 2012 [sic]" he "went out to Oregon and knocked on [the family's] door.  And they are going to be happy to come before Your Honor in April of 2012 and express to your Honor their position on whether or not Mr. Hammer should get the death penalty or whatever issues they

want raised." NT 6/30/11 at 88-89. When this Court reminded Mr. Mellin that the family was precluded from offering an opinion regarding the appropriate sentence, Mr. Mellin responded with what he believed a victim's family member could testify about, but did not indicate what the family actually told him.

Subsequently, this Court asked Mr. Mellin whether there was a report of that encounter or whether or not an agent had accompanied him. Id. at 112. Mr. Mellin responded "no" to both questions. Id. Absent any report, or other contemporaneous record of that encounter, it is impossible for Mr. Hammer to respond to Mr. Mellin's representations, except to say that those representations offered nothing to contradict the signed statement provided by Mr. Hammer's counsel.[6] Counsel will be requesting further information about this encounter in a supplemental discovery request.

V.   **MOTION TO STRIKE THE NON-STATUTORY AGGRAVATING FACTOR OF FUTURE DANGEROUSNESS**

During the oral argument the Court asked what were the conditions of confinement in which Mr. Hammer had been subjected since the 1998 conviction. NT 6/30/11 at 134. Mr. Hammer has been incarcerated at the following institutions:

---

[6]It is, at a minimum, perplexing that Mr. Mellin would interview the victim's family without another Assistant United States Attorney or FBI agent present. In counsel's experience in other cases, the prosecuting attorney was accompanied by another Assistant United States Attorney or the prosecuting FBI agent during interviews with the victim's family.

- United States Penitentiary ("USP") at Allenwood, Pennsylvania until April 16, 1996;

- Special Housing Unit ("SHU") of the Federal Correctional Institution ("FCI") at Allenwood, Pennsylvania from April 16, 1998 until post-indictment, approximately six months later;

- SHU at USP-Allenwood, from approximately October, 1998, until January 15, 1999, with the exception of two trips to the United States Medical Center for Federal Prisoners ("MCFP") at Springfield Missouri for a total of four months time;

- USP-Florence Administrative Maximum Facility ("ADX") in Florence, Colorado, (housed in the SHU area known as "the suites"), from January 15, 1999 until July 13, 1999

Mr. Hammer was one of the first 20 inmates to arrive on the newly activated federal death row on July 13, 1999, located at USP-Terre Haute.  Mr. Hammer remained there until 2005, with the exception of time spent in Pennsylvania from April, 2004 until December, 2004; and again from June, 2005 until October, 2005, when he was transferred to USP-Lewisburg for purposes of the preparation of his Section 2255 litigation and the evidentiary hearing.  While in USP-Lewisburg, Mr. Hammer was housed in an "ADX cell."  On July 12, 2005, federal death row was moved to the new prison located at USP-Terre Haute.  Mr. Hammer has been housed there from October, 2005 until present.

Mr. Hammer has been on single-cell status from April, 1996 until present with one exception.  When he was housed at the Federal Transfer Center ("FTC") at

Oklahoma City for a brief period of time, Mr. Hammer had a cell mate for a day or longer than a day. Counsel became aware of the situation in a phone call from Mr. Hammer and informed AUSA Martin.

All inmates on federal death row are single celled and under various restrictions as set forth in the Institution Supplement, Operation & Security of the Special Confinement Unit. Exhibit 3. The prior death row unit had no air conditioning and the inmates had to be moved to obtain showers. The new unit has air conditioning and showers in the cells.

Mr. Hammer is classified as a Phase 1 inmate as defined in the Institution Supplement. He cannot move up to Phase 2 because of the nature of his conviction; i.e., death of an inmate. Inmates are escorted at all times in which they are outside their cells. Mr. Hammer is designated as a level one escort, meaning that one staff-member is required to escort him to other areas of the institution. Inmates can be designated as level one, two or three "staff escorts" depending on security concerns surrounding that inmate. Mr. Hammer has always been designated level one.

Mr. Hammer is currently under a medical front-cuff order that was implemented in December, 1994. When he is outside his cell, he is secured by a martin chain and handcuffs, with the handcuffs secured in front.

Inmates are provided limited recreation time outside the cell, but are escorted

13

at all times.  Mr. Hammer is permitted to spend time with other death row inmates but they must be physically separated from each other.  Because of his special knowledge, he has been permitted the opportunity to assist other inmates with legal matters.  Mr. Hammer has been employed as a tier orderly, a law library orderly, a shower orderly, and did other orderly work on the death row unit.

The death row unit has limited programs available, but Mr. Hammer has participated in, and completed, all available educational opportunities.  Mr. Hammer is currently enrolled in Adult Continuing Education classes ("ACE").  Copies of documents showing his educational efforts are attached as Exhibit 4.  There are also limited recreational programs available and Mr. Hammer has participated in various programs including drawing, painting, and fantasy sports programs.   The unit also offers video programs on a variety of topics.  Mr. Hammer has participated in these as well.  See Exhibit 5.   The institution also offers a monitored computer email system through which Mr. Hammer has been able to maintain contact with his legal team, family and friends.  Mr. Hammer avails himself of religious services which include, but are not limited to, attending mass and communion services and spiritual counseling with his minister of record.

During his federal incarceration, Mr. Hammer has received various disciplinary incident reports.   His last incident report was May 14, 2010. A  copy  of  the

chronology of those incident reports as of January, 2011 provided to counsel by the government is attached as Exhibit 6.

VI.  **MOTION FOR INFORMATIONAL OUTLINES**

As described in the prior submissions and during oral argument, the defense acknowledges that it has the transcripts of the prior penalty hearing, but remains concerned regarding any additional theories the government intends to pursue at the resentencing hearing.  From its careful wording in its pleadings and argument, it is abundantly clear that the government has not made a commitment to be restricted to what was presented in 1998.  When the government acknowledged that "maybe there is some more" evidence than that which was presented previously, this Court observed:

> That's the point.  If you know you're going to eliminate something let's be up front about it.

NT 6/30/11 at 131.  The Court further noted:

> The question is is there anything new that's been developed over the last 13 years? And whether there's anything you can in good faith say we're not going to present it.

Id. at 132.  Government counsel responded that he is "not someone who typically believes that we should hide the ball, your Honor."  Id.  If that is the case, counsel presume that the government has no problem providing the outline Mr. Hammer has

requested.

## VII.  CONCLUSION

For the reasons set forth above, in the prior submissions, and during oral argument, Mr. Hammer, through counsel, respectfully requests that this Court grant his motions.

Respectfully submitted,

/s/    Ronald C. Travis

Ronald C. Travis
Rieders, Travis, Humphrey, Harris,
Waters & Waffenschmidt
161 West Third Street
PO Box 215
Williamsport, PA  17703-0215
570-323-8711 (telephone)
570-323-4192 (facsimile)
rtravis@riederstravis.com


/s/    Anne Saunders

Anne Saunders
Assistant Federal Defender
Federal Public Defender
Middle District Pennsylvania
100 Chestnut Street, Suite 300
Harrisburg, PA 17101
717-782-3843 (telephone)
717-782-3966 (facsimile)
Anne_Saunders@fd.org


Dated:        July 26, 2011

/s/    Michael Wiseman

Michael Wiseman
James J. McHugh, Jr.
James Moreno
Federal Community Defender
Eastern District Pennsylvania
Suite 540 – The Curtis Center
Philadelphia, PA 19106
215-928-1100 (telephone)
215-928-0826 (facsimile)
Michael_Wiseman@fd.org
James_McHugh@fd.org
James_Moreno@fd.org

16

## Certificate of Service

I, Michael Wiseman, hereby certify that the foregoing was served upon counsel for the Government concurrently with its filing, by filing the same with this Court's ECF system and by email.

/s/   Michael Wiseman

Michael Wiseman