# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA  :

  :   NO. 4:96-CR-00239
  :   Capital Case

v.  :

  :   (Judge Slomsky)

DAVID PAUL HAMMER  :

  :

Defendant  :   (Electronically Filed)

## DEFENDANT'S REPLY BRIEF TO GOVERNMENT'S BRIEF IN OPPOSITION TO DISQUALIFY AND PRECLUDE ADMISSION OF EVIDENCE

### A.   DISCUSSION OF FACTS

The brief in opposition filed by the government on August 3, 2011, raises more questions than it answers. As part of the government filing, it submitted as an In-Camera *ex parte* exhibit, #2, a videotape of the range on which Mr. Hammer was housed as of July 12. It is impossible for the defense team to comment on the content of this video. It is the position of Mr. Hammer that the asserted "security" explanation for the In-Camera *ex parte* submission is meritless. In light of the oral representations made during argument on June 30, that the government will not

"hide the ball" (6/30/11 p.132) or engage in "trial by ambush" (Id. p.133), the In-Camera *ex parte* filings are a concern. The earlier In-Camera *ex parte* filing turned out to be documents concerning contacts with the Marti family which supported the conclusion that the Marti family, did not want the litigation to continue. Notwithstanding these documents, the government brief asserted the defense team misunderstood the position of the Marti family, even though the In-Camera *ex parte* documents were totally consistent with the defense team's understanding of the family's position. When questioned by the Court about this In-Camera filing, counsel for the government indicated the submitted documents would be made available to the defense. (Id. p.90-91).

In its brief the government submits that the video is submitted In-Camera *ex parte* "For security reasons involving the operation of SCU, as well as parity." (Brief of Government at P. 2). The government's assertion of a "security" reason for non-disclosure to the defense is makeweight at best. Other than using the word "security," the government offers no explanation in either its brief or the Declaration of T. Royer how disclosure of the video to the defense attorneys would violate any security need. Mr. Hammer has lived on federal death row for over 10 years, and has been housed on various ranges of the newly constructed SCU. Based on his movement in and out of his cell and on and off the range, he is well aware of what is involved in entering and exiting not only a particular range but his

2

assigned cell. How allowing the defense attorneys to view the video creates a security issue demands an explanation beyond the government merely offering up the phrase "security." The government's security assertion implies that one of Mr. Hammer's attorneys will see something on the video which can be passed along to some unidentified person to be used in some unspecified manner to potentially cause a security problem. Such an implication is totally unwarranted.

If there exists some legitimate reason the video should not be shared with Mr. Hammer, a reason which is not set forth in either the government brief or the Royer Declaration, all the government needed to do was request the defense lawyers not make the video available to Mr. Hammer, or ask the Court for a protective order to keep the video from being displayed to Mr. Hammer. In fact, as part of the ongoing discovery process in the case, government counsel has provided certain discovery information by way of documents and asked counsel to redact certain information if the documents were going to be provided to Mr. Hammer or, in some instances, that the contents of certain FBI reports (302s) not be disclosed. These requests have been agreed to and complied with. The bald, unsupported assertion that security reasons justify the In-Camera *ex parte* submission of the videotape should be found to be meritless and the Court should direct the government to provide to the defense a copy of the In-Camera *ex parte*

3

submission and extend to the defense the opportunity to file a supplemental brief, if appropriate, after reviewing the video.

The government's second assigned reason for the In-Camera *ex parte* filing, parity, is totally baffling to Mr. Hammer. The secret filing does not serve to promote equality; in fact it does just the opposite. Without the defense having the opportunity to review and comment on the content of the video, the withholding of the video certainly does not promote the concept of the parties being in an equal factual position. This is especially true when one compares the content of the Royer Declaration with the official response to a written complaint filed by Mr. Hammer concerning the cell incident. Mr. Hammer did file what is commonly called a BP8 concerning the cell incident. In response to this written complaint, the SCU Counselor, John Edwards, on July 18, 2011, wrote "The attorneys are federal government employees. They were escorted to all ranges on the upper floor and did not stop at your cell for any reasons other than walking the range." (A copy of this written response is being forwarded to counsel by Mr. Hammer via mail. If the written response is received before the filing due date, it will be attached to this brief as an exhibit. Otherwise, counsel will submit the written response to the Court when it is received.) In this answer, it is clearly asserted they merely walked the range and did not even stop at Mr. Hammer's cell. However, in the Royer Declaration, it is acknowledged that not only did the attorneys stop at

4

Mr. Hammer's cell, but that Mr. Hammer's cell magically was open, Mr. Royer entered the cell and the two attorneys were able to visually inspect the cell to see what a "typical cell" looked like for an SCU inmate. This conflicting information shows the problem frequently encountered when the government secures and submits Declarations without the other side having an opportunity to cross examine and test the credibility of the contents of the Declaration.

In addition to the conflict with respect to the content of the Royer Declaration and the written response to the BP8, the wording of the Royer Declaration raises some interesting questions. The Declaration asserts that Mr. Hammer's cell "happened to be open." The cell in question is Cell 4, Upper, on Range C. Based upon his years of living on death row, Mr. Hammer is aware that when he exits his cell, for whatever reason, the door to his cell is closed behind him and automatically locked. It is Mr. Hammer's experience that doors to the cells occupied by the death row inmates are not left open and unlocked. The representation that the door just "happened" to be open is totally inconsistent with the security procedures employed at federal death row. This assertion needs to be tested by an evidentiary hearing with a right of cross examination of the guard or guards who escorted Mr. Hammer from his cell to the visitation area on July 12.

The Royer Declaration also maintains that he used Mr. Hammer's cell to "show them what a typical cell looked like for an SCU inmate." Neither in the

5

Royer Declaration nor in the government brief is there any explanation as to why the two attorneys would have a need to observe what a "typical cell" looked like, nor any explanation offered as to why Mr. Royer believed it was necessary to make such an observation. As part of the §2255 litigation, while certain government retained experts conducted mental health testing with respect to Mr. Hammer, a video of the cell in which Mr. Hammer was housed was made. Since AUSA Martin was counsel with respect to the 2255, he was well aware of what a "typical cell" looked like and this knowledge was also available to AUSA Mellin by reviewing the video. Again, it is suggested that an evidentiary hearing to explore this component of the Royer Declaration would assist the Court.

The assertion "It was pure happenstance that it was Inmate Hammer's cell that was the first vacant cell we came to" also is incorrect. (Government's Exhibit 1, p.1, paragraph 3). Federal death row consists of three ranges, A, B, and C, with a total of 120 cells. The government does not set forth in its brief nor does Mr. Royer set forth in his Declaration how the tour was conducted. One would assume the logical method of conducting the tour would have started on Range A, proceeded to Range B, and ended at Range C, where Mr. Hammer's cell was located. So that the Court can understand housing at the SCU, Range A consists of 32 cells in total. The cells consist of 16 on the lower range and 16 on the upper range. The cells are set up in a railroad type arrangement, rather than there being

6

cells on both sides of the range. When one enters Range A Lower, the first cell encountered is 1 and it is followed sequentially by the other 15 cells. The upper range is set up in the same fashion. The 32 cells on Range A are commonly referred to ADX cells in that there is an inner grill and an outer door for each of the cells. Range B consists of 48 total cells, 24 on the lower range and 24 on the upper range. The cells on Range B are laid out differently from the Range A cells in that they are numbered 1 through 24 with cells 1 through 12 on the left hand side as one enters the range, and cells 13 through 24 on the right hand side. Walking the range one would find cells 1 through 12 on the left hand side, and walking from the end of the range back towards the entry, the cell numbers would be 13 through 24, so that the first cell on Range B to the left would be cell 1 and the last cell on the right would be cell 24. The cell numbering and the layout is the same on both the lower and upper range. On Range C where Mr. Hammer's cell was located on July 12, there are a total of 40 cells, and they are set up the same as the cells in Range B, with cells 1 through 10 being on the left and cells 12 through 20 being on the right. As one enters either the upper or lower Range C housing unit, cell 1 would be to the left and cell 20 would be to the right. The total number of cells in the SCU is 120 and, since there are not 120 death sentenced individuals housed in the SCU, it is clear that before arriving at Range C the attorneys and Mr. Royer had to pass numerous "vacant" cells. The claim Mr. Hammer's cell was "vacant" is incorrect.

While it is true that Mr. Hammer's cell was "unoccupied," it was not vacant. Further, Mr. Hammer was not out of his cell for "unrelated reasons" (Government brief at P.3), but rather Mr. Hammer was out of his cell for a pre-scheduled defense team visit. In any event, even if one considers that Mr. Hammer's non-presence in his cell because of a defense team visit rendered his cell "vacant" and even if the tour started on Range C, Mr. Hammer's cell was not, "the first vacant cell we came to." (Government's Exhibit 1, Page 1). On the date in question, on the range where Mr. Hammer was housed, Cell 2, was empty. On the opposite side from Cell 4, Cells 20, 18 and 17 were also vacant. Thus, to get to Mr. Hammer's cell, the two attorneys and the tour guide had to pass four "empty" cells to do so. The factual inaccuracies in the submitted Declaration demonstrates why an evidentiary hearing should be scheduled.

In its brief and in the Royer Declaration, no explanation is offered as to why the purported tour would have to proceed to Range C, if Range B was toured before they proceeded to Range C. The layout of the cells on B and C are the same, and the cells themselves are the same. The only possible reason to go to Range C after walking through B would be for the specific purpose of seeing where Mr. Hammer was being housed.

In its brief as well as in the Declaration, the events of July 12, are described as a "tour." Tours are not an infrequent occurrence at federal death row, but it is

the experience of Mr. Hammer that all cell doors are closed and locked during a tour. It is further Mr. Hammer's experience that such tours do not involve either finding an unlocked cell door or unlocking a cell door to allow those on tour to observe the interior of what a typical cell looked like. Assuming that the visit by the prosecuting attorneys on July 12, is properly classified as a tour it was not conducted in standard fashion.

The government also asserts that the defense claims that a detailed and systematic search of Mr. Hammer's cell was conducted and that privileged documents were examined. (Government brief, P.3). Such claims were not made in the Motion. The filed Motion does note the presence of attorney/client communications and attorney work-product being in Mr. Hammer's cell; however, nowhere in the Motion is it asserted what the government claims to be asserted. What was known was that while Mr. Hammer was absent from his cell meeting with a member of the defense team, without any prior notice, the prosecuting attorneys were on Range C and at or about his cell. The purpose for filing this Motion was to determine what exactly did occur.

On Page 2 of its brief, the government contends that the July 12th tour was for "informational purposes, specifically fact-finding so that the government would be able to respond to the question from this Court on June 30, 2011." (Government Brief, p.2-3). While this offered reason for the "tour" sounds laudable and

9

harmless, the reality is that as a result of its informational fact finding mission, the government not only totally ignores the Court's question of June 30th, it offers not one word concerning the conditions of confinement of Mr. Hammer since April 13, 1996. Since Mr. Hammer offered to the Court an extensive explanation concerning his conditions of confinement, as well as multiple exhibits relating to those conditions, one would think that since the government claims it expressly undertook this informational fact-finding mission, at least one found fact or one informational word would have been provided to the Court. Based on the government's failure to provide any found-facts, Mr. Hammer is unwilling to accept the innocent and laudable explanation proffered by the government.

Based upon the contents of its brief as well as the content of the Royer Declaration, it is submitted that it is appropriate for the Court to hold an evidentiary hearing in order to determine the correct facts concerning why the prosecuting attorneys came to be standing in front of Mr. Hammer's cell and were afforded the opportunity to, at the very least, make observations concerning that cell.

B.    <u>DISCUSSION OF LAW</u>

In the portion of the government's submission discussing cited decisional authority, it attempts to argue that the cited authority is inapplicable to Mr. Hammer because he is a convicted murderer. Since Mr. Hammer is not under a

sentence of death, or any other federal sentence, his current federal status is as a pre-trial detainee. The fact that the government has chosen to "mislabel" Mr. Hammer's status renders misguided its efforts to distinguish the holding in *Cohan*, as both Cohan and Mr. Hammer have the same status, unsentenced federal detainee. Furthermore, the government's efforts to apple-pick language from *Bull vs. City & County of San Francisco*, 595 F.3d 964 (9th Cir. 2010) is unavailing because the *Bull* case dealt with the issue of whether a §1983 action could be maintained based upon an adopted San Francisco policy. Finding the policy did not violate the arrestee's Fourth Amendment rights, the court concluded the district court had erroneously denied the Defendant's Motion for Summary Judgment based on qualified immunity and improperly granted the Plaintiff's Motion for Partial Summary Judgment. The Ninth Circuit holding that the policy did not give rise to a §1983 action is a far cry from holding that an unsentenced detainee's cell can be searched for non-penological reasons.

The government's reliance on the Second Circuit decision in *Willis vs. Artuz*, 301 F.3d 65 (2nd Cir. 2002) is also misplaced. Initially it should be noted that Willis was in fact a sentenced inmate at the time the complained of search was conducted. Furthermore, the decision was made in the context of an appeal of the District Court's dismissal of Willis' §1983 civil action filed as a result of the warrantless search. The decision in *Willis* is actually supportive of the position of

11

Mr. Hammer, as the Second Circuit reaffirms the Fourth Amendment protections afforded an unsentenced pre-trial detainee. The fact that the Court held that a sentenced individual could not maintain a §1983 civil action does nothing to call into question the position advanced by Mr. Hammer.

Continuing with its apple picking, the government asserts to the Court that disqualification of a government attorney is an extreme remedy to be avoided by the Court unless absolutely necessary. In support of this proposition, the government puts before the Court the decision in *United States vs. Bolden*, 353 F.3d 870 (10th Cir. 2003). In *Bolden*, what was being reviewed was the Order of the District Court which disqualified the "entire USA office." In reviewing the disqualification order, the Tenth Circuit looked at cases where "entire offices" had been disqualified and found that every circuit which had considered the disqualification of an entire office had reversed the disqualification. In reversing the order disqualifying the entire office, the Court pointed out that District Court would need to make specific factual findings before disqualifying an attorney. In the instant case, Mr. Hammer does not seek the disqualification of the entire office. What is sought by Mr. Hammer is the disqualification of the two individuals who engaged in the conduct on July 12. The *Bolden* decision would also seem to be supportive of the request for an evidentiary hearing concerning the events of July 12th, as this Court would have a difficult time following what the Tenth Circuit

suggests a district court needs to do, make specific factual findings with regard to the question of disqualification, absent an evidentiary hearing. Reliance on *Matter of Grand Jury Subpoena of Rochon*, 873 F.2d 170 (7th Cir. 1989) is likewise misplaced. In this case, the Circuit was reviewing a disqualification order entered as to AG Thornburgh based on the fact he had been named as a defendant in a civil rights lawsuit, based solely upon his "official capacity." In the instant case, Mr. Hammer does not seek disqualification based upon "official capacity," but rather he seeks disqualification based upon engaged in conduct. In *United States vs. Santiago-Rodriguez*, 993 F.Supp.31 (D.P.R. 1998), the court denied the Motion to Disqualify on the basis that the defendant did not show that the engaged in conduct was vindictive action. See also, *United States vs. Whittaker*, 268 F.3d 185 (3rd Cir. 2001) wherein an Order of Disqualification was reversed on the basis that the complained of conduct was inadvertent, did not constitute an ethical violation, was at worst negligent, and the United States Attorney acted quickly to attempt to correct the inadvertent mistake. Only after an evidentiary hearing and the finding of facts can a determination be made whether what occurred on July 12th falls within the parameters of the type of conduct which the 3rd Circuit has found not to support disqualification.

While the government's general observations concerning the district court decision in *United States vs. Horn*, 811 F.Supp. 739 (D.N.H. 1992) are legitimate

13

observations at this point in time, the observations are made prior to an evidentiary hearing and prior to the factual findings to be made by the Court after the evidentiary hearing is concluded.  As has been pointed out in earlier sections of this brief, exactly what did occur, why it occurred, and why Mr. Hammer's cell was visited, was open, and was entered is not a part of the record before the Court. While Mr. Hammer would certainly hope that the type of conduct engaged in by the prosecutor in *Horn* did not occur, a record needs to be created concerning what did occur.    While the misconduct outlined in *Horn* does appear to have been "several orders of magnitude worse," the *Horn* decision does not stand for the proposition that if, but only if, *Horn*-type misconduct is engaged in, is it appropriate to remove prosecutors.  The Court should be mindful that the only reason it is becoming acquainted with David Paul Hammer is because of prosecution misconduct.  The justification for this misconduct, as presented at the oral argument on June 30, 2011, was that the prosecution intentionally withheld the 302s out of possible safety concerns for the individual inmates who had been interviewed.  The concept that it is appropriate to ignore the government's clearly established Brady/Giglio obligations and ignore Mr. Hammer's constitutional rights because of undocumented, potential safety concerns for interviewed inmates is a chilling proposition.  While the government may suggest that Mr. Hammer and his attorneys are having a paranoid reaction, the Court should be mindful of the

14

fact that prior to Special Agent's disclosure of the withheld 302s, the government had repeatedly represented such 302s did not exist.

The government also points to two decisions where the review of documents was inadvertent and one where the Court had ordered disclosure as supporting the proposition that the Court should not grant the request for disqualification. An analysis of these three cited decisions must start with the realization that any improper search which was conducted from outside the cell, by engaging in visual inspection or, by entry into the cell, would not have been an inadvertent search. If one assumes that there existed a legitimate reason for the prosecuting attorneys to view a typical death row cell, even though there existed a videotape commissioned by the government which depicted the inside of such a cell, there existed 119 cells other than Mr. Hammer's which could have been viewed by the prosecuting attorneys. Although the BOP has represented in its written response to the BP8 that the attorneys merely walked the range and did not even stop at Mr. Hammer's cell, the representation in the Royer Declaration as well as in the government brief state to the contrary. Since the defense team has been shut out as far as the video, the only comments which can be factually made at this point in time would be that both prosecuting attorneys were afforded the opportunity to at least visually search Mr. Hammer's cell on July 12, 2011. The search, to whatever extent it was undertaken, was not inadvertent conduct on the part of the prosecuting attorneys.

15

Thus, the government's reliance on *United States vs. Stuart*, 294 F.Supp.2d 490 (S.D.N.Y. 2003) and *United States vs. Walker*, 243 Fed.Appx. 621 (2nd Cir. 2007) are not applicable to consideration of the present issue. In *United States vs. Allen*, 491 F.3d 178 (4th Cir. 2007), at issue was whether the Defendant's Sixth Amendment rights were violated as a result of a court order directing the defense to provide to a government attorney, other than the one preparing a particular witness to testify, a list of prior convictions the witness would be asked about on cross examination. The *Allen* case did not deal with a request to disqualify government counsel, rather it dealt with whether a new trial should be ordered as a result of a Sixth Amendment violation.

Even if one assumes that the prejudice rationale discussed in the *Allen* and *Walker* decisions has application in the instant case, the need to demonstrate prejudice should await the evidentiary hearing and the factual findings concerning the fruits of the search engaged in by the prosecuting attorneys.

**CONCLUSION**

The initial Order this Court should enter concerning the issues raised by the conduct of the prosecuting attorneys on July 12, 2011, is an Order directing the government to provide to the defense team a copy of the In-Camera *ex parte* submission. The Order directing the disclosure of the In-Camera *ex parte* submission should also provide to the defense team a period of time for reporting

back to the Court whether on review of the video the defense maintains that the Court should go forward with scheduling an evidentiary hearing. As a review of the submitted brief shows, there are a number of unresolved and unanswered questions as a result of the government's submission and the Royer Declaration. It is not likely that the videotape will serve to answer the questions. Nonetheless, the Court should direct that the video be provided to the defense team, for review so that a determination can be made concerning whether to proceed with the instant Motion or for the instant Motion to be withdrawn.

Respectfully submitted,

/s/ Ronald C. Travis, Esquire
Ronald C. Travis, Esquire
Rieders, Travis, Humphrey, Harris,
Waters & Waffenschmidt
161 West Third Street
PO Box 215
Williamsport, PA 17703-0215
(570) 323-8711 (telephone)
(570) 323-4192 (facsimile)
rtravis@riederstravis.com

/s/ Anne Saunders, Esquire
Anne Saunders, Esquire
Assistant Federal Defender
Federal Public Defender
Middle District of Pennsylvania
100 Chestnut Street, Ste. 300
Harrisburg, PA 17101
(717) 782-3843 (telephone)
(717) 782-3966 (facsimile)
Anne_Saunders@fd.org

/s/ Michael Wiseman, Esquire
Michael Wiseman, Esquire
James McHugh, Esquire
James Moreno, Esquire
Federal Community Defender
Eastern District of Pennsylvania
Suite 540 – The Curtis Center
Philadelphia, PA  19106
(215) 928-1100 (telephone)
(215) 928-0826 (facsimile)
Michael_Wiseman@fd.org
James_McHugh@fd.org
James_Moreno@fd.org