A Partnership

*Rieders, Travis, Humphrey, Harris,*
*Waters & Waffenschmidt*

161 West Third Street
P.O. Box 215
Williamsport, Pennsylvania 17703-0215
lawoffices@riederstravis.com
www.riederstravis.com

FAX:
(570) 323-4192
(570) 567-1025

PHONE:
(570) 323-8711

Jeffrey C. Dohrmann
Gary T. Harris
John M. Humphrey
Clifford A. Rieders*
PA., N.Y. & D.C. Bars
Ronald C. Travis
Thomas Waffenschmidt
C. Scott Waters

*Board Certified in Civil
Trial Advocacy, N.B.T.A.

Pamela L. Shipman
Donald F. Martino
David R. Chludzinski

Kimberly A. Paulhamus
Firm Manager
Jacquelyn J. Dixon
Human Resources

July 16, 2012

The Honorable Joel H. Slomsky
5614 U.S. Courthouse
601 Market Street
Philadelphia, PA  19106

Re:    U.S. vs. Hammer  -- Letter Brief

Dear Judge Slomsky:

Pursuant to the argument held on July 9 I am submitting this letter brief in support of the various requests for Bureau of Prisons records or data which the court indicated it would take under advisement as we move through requests 32 through 77 which are still in dispute.  All of the disputed items pertain to information which is being sought in conjunction with the government's assertion that if not executed Mr. Hammer will be a threat to the safety of staff and other inmates.  As the court well knows, at the time of the death of Andrew Marti, both Mr. Marti and Mr. Hammer were sentenced criminals being held in custody at the United States Penitentiary (USP) at Allenwood, Pennsylvania.

The death of Mr. Marti at the hands of Mr. Hammer is not the only instance where an inmate has been exposed to possible capital punishment if convicted of first degree murder of another inmate.   By reviewing the dockets in other federal death penalty prosecutions, when the government has made a claim of future dangerousness in its filed Notice of Intent, the litigation with respect to the future dangerousness aggravating factor has been extensive.   The litigation has included requests for informational outlines, and discovery disputes concerning the defense efforts to obtain access to Bureau of Prisons information which is readily available to government counsel for use in cross examining defense experts and also readily available to government rebuttal experts to support the testimony of the government experts or to criticize the testimony of the defense experts based on the statistics provided by the Bureau.  Both the defense and government use as experts former Bureau employees and, while the government resists providing the statistical information for the defense, the data is made available to the government's experts through the Office of General Counsel for the Bureau, or through the Bureau of Research Department.  It is this

The Honorable Joel H. Slomsky
July 16, 2012
Page 2

disparity in data availability which occasions the discovery disputes in federal capital prosecutions.

Since the Court has not been the trial judge in a federal capital proceeding, a brief explanation of what usually occurs with regard to the parties' presentation of information on the future dangerousness aggravator will be set forth:

1. As the party with the burden of proof the government will present whatever information it seeks to present in order to attempt to prove the validity of the future dangerousness assertion. Since we have not yet received the Informational Outline with respect to the future dangerousness aggravator we do not know precisely what evidence the government would attempt to offer at the scheduled trial. Since the case was first tried in 1998, through various court decisions the future dangerousness concept has been refined and counsel believes it is undisputed that the information to be offered to support the future dangerousness aggravator is limited to information supporting the assertion that the Defendant will represent a future danger to the lives and safety of institutional staff and/or other inmates. As a result of the decisional authority on the future dangerousness aggravator the defense team believes that a significant amount of the information offered during the first trial in 1998 is no longer relevant and further believes a significant amount of the information offered in 1998 should be excluded because of the age of the conduct. Essentially the government will present prior conduct on the part of Mr. Hammer which it believes relevant to the issue of his potential future dangerousness if a sentence of death is not imposed.

2. Assuming the government is able to satisfy its proof obligation with respect to the future dangerousness aggravator, as part of the defense presentation the defense usually calls and qualifies an expert to testify with respect to where within the federal system an inmate convicted of first degree murder would be housed, the security available at such institutions, methods available for the Bureau of Prisons to control an inmate's conduct, and other subjects relevant to the particular defendant. As part of the cross-examination of the defense experts the transcripts establish that the prosecutor challenges the defense expert by referencing events which have happened within the Bureau of Prisons, even though the person on trial is not the person who was involved in the conduct. A review of the transcript of the cross examination of defense future dangerousness experts discloses that government counsel will usually reference violent conduct engaged in by incarcerated inmates, other than the person on trial, to impeach the conclusion of the defense expert that the Bureau is able to fashion conditions of confinement to eliminate the potential future danger of the individual on trial. It is not uncommon for government counsel to reference an incident which occurred at USP Marion in the early 1980s when two federal inmates housed in that facility each killed a correctional officer in separate incidents. The two inmates referenced are Tommy Silverstein, currently at ADX, and Clayton Fountain, now deceased. Each individual, while being escorted

The Honorable Joel H. Slomsky
July 16, 2012
Page 3

down the corridor in the housing unit, with his hands handcuffed in front of him, stuck his hands through the bars of another inmate's cell, the handcuffs were unlocked, and a homemade prison knife was given to the now hands free inmate and the inmate proceeded to stab to death the unarmed guard. The government also brings to the attention of the jury that both Silverstein and Fountain had previously committed a murder while in custody and both were serving life sentences as a result of the previous murders. The government also frequently brings up the Mills-Bingham incident where these two Aryan Brotherhood leaders, while housed at ADX, communicated via a coded written letter with Aryan Brotherhood members housed at USP Lewisburg to go to war with a Black prison gang. Based on this coded communication, two African American inmates were stabbed to death in August of 1998 at Lewisburg Penitentiary. Recently, the cross examination has also frequently included questions about two murders which have occurred at the ADX facility in 2005. Counsel is submitting to the Court trial transcript pages documenting these three subject areas of cross examination with references to the case where the questions were asked. Exhibit 3 will be questions concerning the Silverstein/Fountain killings, Exhibit 4 are questions concerning the Aryan Brotherhood killings, and Exhibit 5 is questions concerning the ADX killings. In addition to these three areas of cross examination, depending upon the case, different Assistant United States Attorneys also asked questions about other specific acts of violence and have occasionally made purported factual assertions in the form of a question where what is being asserted is totally incorrect and inaccurate. Attached at Exhibit 6 are pages from transcripts in *United States vs. Phillips*, where it was inaccurately asserted that Tommy Silverstein, while at ADX, sent a message out of ADX ordering the murder of inmates at Lewisburg, and the transcript from *United States vs. Hager*, where AUSA Mellin incorrectly "suggested" in cross examination that the killing of Federal Judge Wood was ordered by the Mexican Mafia.

3.   In addition to cross examining the defense expert, the government also frequently calls a rebuttal witness on the issue of future dangerousness. Reviewing the transcripts of government rebuttal experts shows that the government rebuttal experts are essentially able to secure any data which is sought. Attached at Exhibit 7 are transcript pages from government rebuttal testimony presented in various capital prosecutions.

The primary case relied upon by Mr. Hammer is the Order entered by Senior Judge John L. Kane, Jr., in the United States District Court for the District of Colorado in the case of *United States of America v. Gary Watland* (11-cr-00038-JLK). The *Watland* case is an inmate-on-inmate killing which occurred on the Florence Correctional Complex in Colorado. The killing occurred at the United States Penitentiary at Florence, which is physically located across the street from the Administrative Maximum facility, commonly referred to as ADX. The initial discovery motion filed on behalf of Mr. Watland was twenty (20) pages long and was divided into seventy-nine (79) topic paragraphs which with subdivisions constituted 550 discovery requests. In responding

Case 4:96-cr-00239-JHS    Document 1478    Filed 07/16/12    Page 4 of 6

to the defense motion the government set forth four groups as follows:   Group 1 included information previously provided; Group 2 identified documents that would be provided, assuming they exist; Group 3 which the government objected to on the basis that defense had not shown "the materiality of the document;" and Group 4 documents that is disclosed would present a risk to the safe administration of not only the Florence Complex but also other BOP institutions."   On August 9, 2011, oral argument on the discovery items in dispute was held.   The government asserted lack of materiality, the burdensome obligation, and security concerns.   At the conclusion of the oral arguments the court issued an Order granting in the entirety the defense discovery requests.   From the transcript of the hearing on August 9, 2011, counsel has attached to this letter as Exhibit 1, Pages 55 through 61 of the transcript of the August 9, 2011, proceeding.   This exhibit will be identified as *Watland* Order.   Counsel also attaches as Exhibit 2 a copy of the entirety of the transcript of the August 9, 2011 proceeding which is 77 pages in length and does deal with matters other than the discovery motion.

Based upon the explanation of how future dangerousness has been litigated in other federal capital cases, it is respectfully suggested that the approach taken in the *Watland* case should be adopted and applied in the current case.   Historically, government counsel has secured from the BOP data not available to the defense and has used this data to its best advantage in cross-examining the defense witness and has occasionally put before the jurors, in question form, information which is inaccurate.   To remove the concept of gamesmanship from the litigation of the future dangerousness issue before the jury the court should grant the discovery request pertaining to Bureau of Prisons data subject to a protective order to address any legitimate safety or security concerns.

In reviewing transcripts for the purpose of creating the various exhibits, counsel's review of a portion of the transcript in *United States vs.  O'Reilly* further supports the request for the BOP information was discovered.   In *O'Reilly*, the defense had called as an expert witness on conditions of confinement James Aiken, a retired correctional employee.   During cross examination the AUSA had confronted Mr. Aiken with an assertion that there were 1,791 serious assaults in BOP high security penitentiaries in 2009.   The underlying data to support this assertion had not been provided to the defense and all Witness Aiken could do was testify that he believed those numbers were inaccurate numbers.   The numbers used by the AUSA for cross examination had been provided to him through the government's proposed rebuttal expert witness, David Rardin.   It turns out that the correct number of serious assaults during calendar year 2009 was 326, and according to Mr. Rardin, he was receiving the assault data via phone call placed to the Bureau Research Department, while he was driving, and he had incorrectly written down the numbers.   Counsel submits as Exhibit 8 to this letter a portion of the transcript of the *O'Reilly* case where the explanation for the inaccurate figures used on cross examination was offered by Mr. Rardin.   This incident establishes that without the data which is sought by the defense in the instant case, grossly inaccurate information can be put in front of the jurors via questions asked containing asserted factual data and the defense is unable to challenge the asserted factual data. The review of cross examination transcripts of the defense experts shows multiple

The Honorable Joel H. Slomsky
July 16, 2012
Page 5

instances where the AUSA makes data assertions in questions and elicits responses that the defense expert is not familiar with the data.

During the oral argument concerning the discovery requests, the court asked about certain items of discovery and, in particular, what would be included in those requested items. With respect to Request 36 for "post orders" and 37 correctional service department rosters, undersigned counsel offered his understanding of those documents. Insofar as post orders, these are the expectations for the officer assigned to the particular unit or particular post. These orders detail the daily duties which are required of someone manning that particular post. The rosters show how many correctional staff are assigned to each area of the institution. These rosters show where the staff are located and the hours they work. By securing this information, the defense is able to compare "what was" with "what should have been" which may create mitigating information supportive of institutional failure, mitigation which has been found in multiple inmate capital prosecution cases. With respect to Requests 75 and 76, reference is made to "after-action reports." AAR or Board of Inquiry reports are reports created by the BOP and essentially constitute an internal investigation insofar as how a particular event occurred. Contained within these reports are recommendations for eliminating the circumstances surrounding a killing, if a killing is what triggered the internal investigation. For example, as a result of the Silverstein/Fountain killings at Marion, the after-action report recommended that when inmates are removed from their cell and escorted, the hands are to be cuffed behind the inmate's back, instead of in front, which gives the guard better control. Talking about an inmate killing another inmate or a staff member without disclosing whether recommendations to eliminate that type of conduct in the future were recommended and the recommendations implemented do not give the jurors the correct information to assess whether the conduct engaged in by some other inmate is conduct Mr. Hammer could engage in, if given a life sentence. Although AUSA Mellin stated multiple times that the "focus" of the future dangerousness case will be on the conduct of Mr. Hammer, counsel believes that just as he did in *United States vs. Hager,* AUSA Mellin will confront the defense expert with the Silverstein/Fountain killings, the Aryan Brotherhood killings, the killing of Judge Wood, and the killing in *United States vs. Caro.*

Counsel is submitting this correspondence and attached exhibits via email.

Very truly yours,

RIEDERS, TRAVIS, HUMPHREY, HARRIS,
WATERS & WAFFENSCHMIDT

Ronald C. Travis, Esquire

RCT/srb
Enclosures

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA     :

          :     NO. 4:96-CR-00239

          :

v.           :

          :     (Judge Slomsky)

DAVID PAUL HAMMER     :

          :

    Defendant           :     (Electronically Filed)

## CERTIFICATE OF SERVICE

AND NOW, comes Ronald C. Travis, Esquire, attorney for Defendant Hammer, and certifies that a copy of the foregoing Letter Brief and Exhibits (8) has been served upon AUSA Steven D. Mellin, and John Gurganus, Jr., Trial Attorney for the Capital Case Unit, via electronically filing, this 16th day of July, 2012.

> RIEDERS, TRAVIS, HUMPHREY, HARRIS,
>        WATERS & WAFFENSCHMIDT
> /s/ Ronald C. Travis, Esquire
> _____
> Ronald C. Travis, Esquire
> Attorney for Defendant
> PA ID#: 08819
> 161 West Third Street
> PO Box 215
> Williamsport, PA 17703-0215
> (570) 323-8711 (telephone)
> (570) 323-4192 (facsimile)
> rtravis@riederstravis.com