# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA       :

                         :       NO. 4:96-CR-00239

                         :

        v.                 :

                         :

DAVID PAUL HAMMER               :

                         :

        Defendant       :       (Electronically Filed)

## **EXHIBITS TO DEFENDANT HAMMER'S LETTER BRIEF ON DISCOVERY**

**Exhibit 2** – Transcript of the oral argument on discovery in *United States vs. Watland* on August 9, 2011.

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 11-cr-00038-JLK

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

GARY WATLAND,

    Defendant.

_____

REPORTER'S TRANSCRIPT
MOTION HEARING
_____

        Proceedings before the HONORABLE JOHN L. KANE, JR.,
Senior Judge, United States District Court for the District of
Colorado, commencing at 10:08 a.m., on the 9th day of August,
2011, in Courtroom A802, United States Courthouse, Denver,
Colorado.

**APPEARANCES**

For the Government                MICHAEL CAREY, ESQ.
                                  KURT BOHN, ESQ.
                                  United States Attorney's Office
                                  1255 17th Street
                                  Denver, Colorado

For the Defendant                PATRICK BURKE, ESQ.
                                    999 18th Street
                                    Denver, Colorado
                                    NATHAN CHAMBERS, ESQ.
                                    Chambers Dansky & Mulvahill
                                    1601 Blake Street
                                    Denver, Colorado
                                    GAIL KATHRYN JOHNSON, ESQ.
                                    Johnson & Brennan
                                    1401 Walnut Street
                                    Boulder, Colorado

THERESE LINDBLOM, Official Reporter
901 19th Street, Denver, Colorado 80294
Proceedings Reported by Mechanical Stenography
Transcription Produced via Computer

PROCEEDINGS

THE COURT: Thank you.  Good morning, and be seated, please.

I note that the defendant and Mr. Burke are present by video.  Other counsel of record are here, with the exception of Mr. Kahan.

Is that how you pronounce his last name?

MR. CAREY: Kahan.

THE COURT: All right.  And the matter comes up for hearing on motions.

I wish to apologize to all of you for the cancellation of the previous hearing.  And about all I can tell you to ameliorate that situation is that I was a lot more uncomfortable than you were.

Before proceeding further, I would like to see after this hearing, very briefly, defense counsel in chambers on one of the ex parte matters required by statute regarding the expenditure of defense funds.  It's nothing that you require preparation for.  I just want to advise you of something that has happened.

Okay.

I suppose, Mr. Burke, you're not going to be in chambers, but we'll proceed without you.

MR. BURKE: I'm sure it will be ably handled by co-counsel.

THE COURT:  I'm sure of that.  And I'll be innocuous, as well.

Okay.  What is the present status, Mr. Carey, of discovery?

MR. BURKE:  Your Honor, may I raise one matter preliminarily?

THE COURT:  Yes.

MR. BURKE:  I am requesting and move that Mr. Watland's right hand be uncuffed so that he can make notes if he so desires during the hearing.

THE COURT:  Yes.

MR. BURKE:  I would note, for security purposes, that there are three very healthy and fit gentlemen from the Bureau of Prisons here.  And my client also has a 50,000-watt device on his left leg, so that there shouldn't be any security issues if his right hand was freed so he could make notes during the hearing.

THE COURT:  Your request is granted.

And for the benefit of the security personnel there, I'll tell you that Mr. Watland needs to be able to take notes as part of this proceeding, and he needs to be able to communicate with his attorney.  And we have to respect that more than we do any possibility of any avid risk of violence.  I doubt seriously with the three of them there and the ankle bracelet, that that's a risk anyway.

Mr. Watland, you behave yourself, and the guards will remove the handcuff.

THE DEFENDANT: Yes, sir.

THE COURT: All right. Mr. Carey.

MS. ROBERTS: Excuse me, Your Honor. It's going to take us a few minutes, because we have to get --

THE COURT: What? I can't hear anything.

MS. ROBERTS: I'm trying to adjust myself.

I'm Carmen Roberts, I'm a paralegal.

THE COURT: Yes.

MS. ROBERTS: And to get that approved, we have to go through the warden --

THE COURT: No, you don't.

MS. ROBERTS: Because of our security procedures here.

THE COURT: This is a courtroom. You don't need approval from anybody. I'm ordering it now. If you, the warden, or anyone else tries to interfere with a court proceeding by saying you need somebody else's approval, then I'm going to hold the whole bunch of you in contempt. This is a court proceeding. This is not a prison proceeding.

Remove it now. Now.

MS. ROBERTS: I understand that, sir. But I'm going to have to get somebody else in here.

THE COURT: I don't care who you get in, remove it now. I'm ordering you to do that. And I will call the

marshals if you don't.

MS. ROBERTS: I'll be right back.

THE COURT: Is it removed?

MR. BURKE: It is not removed yet. Ms. Roberts went, I believe, to get the key.

And, Your Honor, it would -- she's now back in the courtroom.

THE COURT: I understand that there is a three- to four-second delay before we can get an answer, so we should modify our presentations accordingly.

MR. CAREY: I understand, Your Honor.

THE COURT: All right. Mr. Burke, are we ready now?

MR. BURKE: Your Honor, thank you very much.

THE COURT: We're ready.

Please go ahead.

MR. CAREY: As to the present status of discovery. The Government has produced approximately 7,500 pages of material. In addition to that, there are about 20 videos that have been produced to the defense. This material was current to mid December of 2010. An update has been requested, and the Bureau of Prisons has updated each of the sections. I have not received the update yet. It is due in my office today. And as soon as it is Bates numbered and downloaded, it will be produced to the defendants.

THE COURT: What's your anticipation of the time that

will take?

MR. CAREY:  Of the update material?

THE COURT:  Yes.

MR. CAREY:  One day.

THE COURT:  How much is there, do you know?

MR. CAREY:  There are about 450 pages, if I recall correctly.

THE COURT:  Okay.

MR. CAREY:  It is simply updates to material.  For instance, it's the update of the medical records log, things like that.

THE COURT:  Right.

MR. CAREY:  There is updates in terms of disciplinary hearings or matters since December 10 of 2010, I think is the date.

So that's the present status of discovery, of the matters produced.

There are -- there is a discovery motion that we have pending today.

THE COURT:  Yes.

MR. CAREY:  As to that motion, I divide the motion into two parts.  Part one is that material that the Government has agreed to produce.  That material, the Government requested that BOP, even in the absence of the court order, begin the assembly and collection of that material.  And that process is

ongoing right now.

The second set, or the second part of that discovery, that is the discovery that the Government objects to pending the Court order, that has not been assembled or collected pending a court order.

THE COURT:  All right.  Thank you.

There is a continuing duty to disclose under existing law.  But for the benefit of the record, I will make that an order, that all the *Brady* materials, *Giglio* material, must be disclosed.  And I -- so far, you are complying with that.  I don't have any reason to enter the order, other than to formalize this.

And I think it's necessary to do that for a number of reasons, which we need not to go into in detail.  But, certainly, the Bureau of Prisons needs to know that it is under a court order to produce this information to the U.S. Attorney's Office with the greatest dispatch.

It also relates, I think, to *Strickland v. Washington* issues, and I want the order written for that purpose as well.

Now, having said that, do defense counsel know which items the Government is opposing?  And can we confine your arguments to that, since they're already producing the others?

Ms. Johnson.

MS. JOHNSON:  Yes, Your Honor, thank you.

Your Honor, if I could interject one procedural

matter.

It appears to me that Mr. Burke and perhaps Mr. Watland are having trouble hearing both the Court and Mr. Carey. Could we check in with them for a moment to see if that is true?

THE COURT: Yes. Are you having any problem hearing me?

MR. BURKE: It is very difficult. We can barely hear.

MS. JOHNSON: Your Honor, I can --

MR. BURKE: But we can hear.

THE COURT: Have you been able to hear -- is this better?

MR. BURKE: Much better.

THE COURT: All right. I'll try to accommodate the technology that was created much after my birth.

MS. JOHNSON: Thank you, Your Honor. And in light of that, I will also lean forward into the microphone. I have a standing request that Mr. Carey do the same to assist Mr. Burke and Mr. Watland.

THE COURT: All right.

MS. JOHNSON: Your Honor, in terms of the status of discovery, of course, we plan to confine our comments today to the matters that are in dispute. I simply want to highlight for the Court that, although the Government filed its response more than six weeks ago, agreeing to produce a number of

categories, because we do not yet have any of that production -- with the sole exception of, I believe, a small amount of video footage of assaults that also took place on August 10, 2008, the date of the alleged offense -- because we don't have any of the other materials, it's impossible for us to assess the Government's compliance, what that will look like.  There may be additional issues that will rise from that.

THE COURT:  Well, if that happens, you can raise them after you have the chance to look at the discovery.

MS. JOHNSON:  Of course, Your Honor.

Your Honor, the framework for my remarks today on the discovery motion -- is that where the Court would like to go?

THE COURT:  Yes.

MS. JOHNSON:  As a framework for my remarks on that, I just want to -- I don't think there is a dispute about the breadth of mitigation.  But I do think that because capital cases -- discovery in capital cases is so unusually broad and it derives directly from not only the Eighth Amendment but also the Federal Death Penalty Act.

Your Honor, when I was preparing for this hearing, I discovered that there was actually a new case that just came out interpreting the Federal Death Penalty Act from the Sixth Circuit last week.  I provided a copy to Mr. Carey.

If I may approach, I have a copy for the Court.

Your Honor, the case that I've handed up is United

States v. *Gabrion II*.  It's not currently in the Federal Reporter, but the Westlaw cite is 2011 WL 3319532.

I know that the Court has a hefty opinion in its hands, and I'm not expecting the Court to digest it.

*THE COURT:*  I can only tell you, first of all, I haven't read the opinion.  But I have read about the opinion, so I know it's there.  That's about the extent of it, and I know Judge Merritt fairly well.  I have a high regard for him.

*MS. JOHNSON:*  Your Honor, the point that I wanted to focus on from the *Gabrion* opinion today is that the Sixth Circuit in *Gabrion*, as well as apparently some other district courts around the country, have found that the scope of the mitigating factors under the Federal Death Penalty Act is actually broader than under the Eighth Amendment.  When I went back and looked at our motion, I believe I was relying largely on constitutional grounds.  So I just want to make sure the Court and the Government are clear today, the course we're moving for discovery and our interpretation of the breadth of mitigating factors that are relevant in this case, also under the Federal Death Penalty Act, specifically 18 U.S.C. 3592.

Your Honor, in the *Gabrion* opinion, that discussion occurs -- if the Court looks at the page numbers on the lower right corner of the Westlaw printout, it's pages 5 and 6.  And as the Court may recall, essentially, the holding in *Gabrion*, the death sentence was vacated.  And one of the factors was

that the defense was precluded from arguing to the jury that in the state of Michigan, where the offense had occurred, had the crime -- the homicide occurred on state land rather than federal land, the death penalty would not have been available because Michigan has abolished the death penalty.

Obviously, that is not at issue here so much as the Court's discussion of the fact that under the statute, mitigating factors include any reason that may give a single juror a reason for finding that the appropriate sentence is life rather than death.

So I just wanted to set that framework before we get into the nitty-gritty today, Your Honor.

THE COURT: All right.

MS. JOHNSON: Your Honor, in the reply that we filed in support of our discovery motion -- the reply is Docket 133 -- I strove to make this proceeding more efficient by grouping and categorizing our requests based on the nature of the Government's objection and the nature of the request. And so what I would propose today, if that is acceptable to the Court, is to proceed by talking about these groups of requests, rather than going singly one by one, unless the Court prefers otherwise.

THE COURT: No, that's fine.

MS. JOHNSON: So, Your Honor, I think the Government has a global objection to our use of the phrase "any and all

documents relating to."  Many of our requests use that phrase. I think it's a phrase that is commonly used in criminal and civil discovery, in federal and state courts around the country, and I don't think it's ambiguous.  But I am asking the Court to overrule that objection today so that there is no ambiguity that the Government is -- for example, if we say, any and all documents relating to the Hitler Day riots, including but not limited to, then we enumerate five or six items, I think we need a clear court order that the Government is bound by the initial request and cannot simply produce documents in response to those items.  There may be other documents that we don't know about.  That's part of the nature of discovery.

Would the Court like me to argue through the entire --

THE COURT:  Yes.

MS. JOHNSON:  -- motion?

Okay.  The Hitler Day riots is the next category. This is addressed on pages 3 through 5 of our reply.

Your Honor, to place this in temporal context for the Court, the crime alleged in the Indictment, the killing of Mark Baker, occurred on August 10, 2008.  Mr. Watland had only arrived at the U.S.P. Florence in -- I believe it was January 2008.  He spent time in the SHU, as all incoming inmates do before they're released to general population, was released, went back into the SHU, came out a few days before August 10.  All of that occurred in the context of the --

I'm sorry, I misspoke.  He went in June -- he arrived -- Mr. Watland arrived at the U.S.P. Florence within a few weeks of the Hitler Day riots on April 20, 2008.  April 20, 2008 was a massive security riot.  There were multiple stabbings.  There was clearly a sort of race or gang war going on in the yard, and people -- inmates were shot by the guards in the towers.  It was an unusual event.  It had a large impact on the culture of that prison.  And the prison administration responded by shipping out a number of inmates and bringing in a number of new inmates.

And we know that that context is relevant to the culture, the conditions, the security issues that existed at U.S.P. Florence at the time that Mr. Watland is alleged to have killed Mr. Baker on August 10, 2008, because it's in the after-action report for this August 10 incident involving Mr. Watland.

The after-action report is a report that is prepared by the Bureau of Prisons itself.  And those -- it's a committee of people.  It's a number of high-level officials.  And those people looked at this incident and determined and recognized that that was an important factor.  And specifically, that's quoted on page 4 of our reply, Your Honor.

So we think that's both discovery and *Brady*, Your Honor, in terms of penalty phase.

Your Honor, the next category that we address on page

5 and 6 of our reply are requests where the Government has raised a security objection, but no other objection. Those are requests 21, 44 and 53C.

And, Your Honor, as we said in our reply, there is an easy answer for that. That's what we have a protective order for. The Government can produce such materials under the protective order if they have a security concern. That will allow us to do our job of defending Mr. Watland in this very serious case, and it should satisfy the Government's security concerns.

If I may have a moment, Your Honor.

Your Honor, on page 6 of our reply, the next category that we've identified are requests that are related to anti-gay prejudice and conduct within the U.S.P. Florence. That's request 69 and 70. The Government has refused to produce such materials, challenging the materiality of such items.

Your Honor, Mr. Watland is gay. And the discovery that we've received to date suggests and indicates that the Nazi Low Riders, NLR, which we believe Mr. Baker, the alleged victim, was a member of, they were in the process of trying to force another gay inmate at U.S.P. Florence off the yard, meaning that he wouldn't be allowed to recreate with the other inmates or, essentially, live in general population. He would be forced to go into the SHU for his own protection. And that that was happening, Your Honor, just before the three incidents

that occurred on August 10, 2008 occurred.  So it's absolutely material in this case, Your Honor.

Your Honor, the next category addressed on pages 7 and 8 of our reply is Request No. 8.

To summarize, Your Honor, this involves BOP investigation of inmate-on-inmate homicides at U.S.P. Florence before the date of the incident charged in the Indictment. There is a number of categories there that are included, but that's a non-exclusive list.

Your Honor, the Government objects on materiality grounds.  But, obviously, this is highly relevant to the preparation of Mr. Watland's defense, not only of guilt/innocence, but also at the penalty phase.  The kinds of documents that we're looking for include after-action reports in other inmate-on-inmate homicides.  Those after-action reports, Your Honor, include recommend -- very specific recommendations to institutions for what kinds of corrective actions they can take to prevent such inmate-on-inmate homicides happening in the future.

Your Honor, if an inmate-on-inmate homicide happens, for example, at a federal penitentiary out in California, the after-action report for that incident, Your Honor, is distributed to the wardens of the federal facilities nationwide.  They're all on notice of them.

We have a right to discover that information so that

we can present a narrative to the jury that may speak to institutional failures, the failures of the administration to keep the prison safe and to prevent inmate-on-inmate homicides from occurring.

And, Your Honor, to be clear about the self-defense implications in this case, there is a number of documents provided in discovery to date that demonstrate that Mr. Watland was operating under the view at the time on August 10, 2008, that he was in a kill or be killed situation.  Mr. Baker had explicitly threatened him, and he believed he had no choice.  These issues are what this case is all about, and we absolutely have a right to discover them.

Your Honor, the next request is Request No. 20.  This asks for various categories, again, of BOP documents, including posted picture files, STG files, security threat group files, AIMS information, disruptive group validation packages, cell time records, presentence reports for a number of inmates.

Your Honor, I'll just note here, we have a number of requests in our discovery motion that list the same list of inmates.  The Government has not drawn any distinctions or said, certain inmates are material, other inmates aren't material, so we are going to treat them en masse as the Government has done.  I don't think the Government perceives any distinction there.  They're either willing to produce the kind of document for the listed inmate or they're not.

Your Honor, again, I don't think this is at all burdensome.  The Government hasn't said it's burdensome.  These kinds of documents would paint a picture for the jury and for the defense, help the defense develop a scene of who was involved that day.  There were, again, three assaults. Mr. Watland was involved -- you know, alleged to be involved on videotape in the killing of Mark Baker.  There were two other assaults, inmate-on-inmate assaults, that occurred that same day, close in time.  Many of the listed inmates who were either the alleged perpetrators or the alleged victims of those are among those listed, as well as anyone else that appears to have been involved, based on our analysis of the discovery received to date.

So information regarding their gang affiliation or, more specifically, the Bureau of Prisons' perception and documentation and investigation of their gang affiliation, who was living where, who was friends with who, how they had validated their gang membership, is highly relevant in this case.

And, Your Honor, specifically, to highlight, again -- I know the Court is at a disadvantage here, because the Court hasn't reviewed discovery.  Discovery contains allegations that Mr. Watland -- we are -- some inmates say that Mr. Watland was being threatened, being coerced by Mr. Baker to make knives for the Nazi Low Riders, by Mr. Baker, who was a member of the Nazi

Low Riders.  Gang issues permeate this case.

Your Honor, I will separately address the issue of the presentence investigation reports.  That, obviously, is somewhat a separate category of documents that's included in here.  The Government apparently would like us to go around the country separately litigating the disclosure of presentence reports for all of these inmates in the jurisdictions where they were convicted of the crimes that sent them to the Bureau of Prisons.

Your Honor, we believe this Court, obviously, has the inherent authority to order such disclosure.  If disclosure need be made under protective order, so be it.  But we think it is unreasonable and would obviously delay and only run up the costs in this case if we need to separately litigate the disclosure of each of these presentence reports around the country.  And I believe that is the only objection the Government has raised, Your Honor.

Your Honor, the next request is Request No. 23, for any and all SENTRY records, S-E-N-T-R-Y, for the group of inmates that we have listed.  This is addressed on pages 11 through 13 of our reply.

Your Honor, I will -- I'm looking forward to hearing Mr. Carey's response today, because his response that he filed in June on this motion was to say, oh, no, it's impossible for us to -- for the BOP to print SENTRY records for individual

inmates.  Your Honor, I think Mr. Carey is simply mistaken in that regard.  In fact, we've received documents in discovery that appear to be SENTRY records for specific inmates.  We have done our own investigation, and it is our understanding that you absolutely can run those queries and print out SENTRY records for individual inmates.

Your Honor may recall, attached as Exhibit 2 to our reply, actually a PowerPoint that one of Mr. Carey's colleagues in the U.S. Attorney's Office, Marcy Cook, put together in November of 2009, which also, I think, indicates that the SENTRY records can be generated for a particular inmate.  I don't think that objection is well taken, Your Honor.

Your Honor, the next request I think is again very brief, Request 28.  This was an example where we simply made a mistake.  I apologize to the Court and the Government.  In my motion, I had said Inmate Management System.  Really, it's called the Information Management System.  But I think it should be clear and probably has been clear to the Government what we're asking for.  It's certainly clear, since we filed a reply.  We have yet to receive any kind of response or documents that are responsive to this request.

Your Honor, the next request is Request No. 29, addressed on pages 13 and 14 of our reply.  Request 29 seeks the staff duty officer reports for U.S.P. Florence for basically the year prior to the incident alleged in the

Indictment.  The Government objects on the grounds of materiality.

Your Honor, we believe and are aware that the Government has produced such documents in other cases, including other federal capital cases.  This -- the function, Your Honor, of the staff duty officer in the prison is to sort of be the eyes and ears of the warden.  The staff duty officer is physically present in many different parts of the institution and makes sort of live reports back to the warden.  There are these weekly written reports, and that's what we are seeking.  And the written reports would note any observations of unusual activity, strange groupings, concerns about gang tensions rising, et cetera.

So these are necessary and material to the preparation of our defense.  They're also necessary, Your Honor, as sort of raw material for our correct -- defense corrections expert to be able to review in developing his or her opinion as may be relevant at either guilt or penalty phase, Your Honor.

Your Honor, the Request No. 30, addressed on page 14 of our reply, is in a similar category.  These are documents relating to monthly lieutenants meetings.  Again, we're only seeking the one year prior to the August 10, 2008 incident.  I don't believe this is a large volume of documents.  The Government has objected solely on materiality grounds.  Again, these are the kinds of documents that provide an important

amount of insight to the defense on the culture, the conditions, and particularly, I'm sure, relate and reflect some of the disruption that was going on with -- in the wake of the Hitler Day riots, as well as the Hitler Day riots themselves.

Again, they could also serve as the basis for an opinion for a defense correctional expert.

Your Honor, the next request that is disputed is Request No. 31. It's addressed on pages 14 and 15 of our reply. Your Honor, this is documents relating to policies, procedures, and practices by which U.S.P. Florence would be placed on lockdown status. We've been seeking a three-year period prior to the incident.

Your Honor, the Government's response is, they'll give us one year -- they'll give us the year 2008, but they will not give us anything prior to that. And their objection is solely on materiality grounds.

Your Honor, this is critical to understanding the events as they unfolded on August 10, 2008 and whether the Baker homicide could have been prevented by the Bureau of Prisons. If U.S.P. Florence had been placed on lockdown status following the first assault in the hobby craft area, an inmate-on-inmate assault that Mr. Watland had nothing to do with, or an inmate-on-inmate assault in unit C-A, again, an inmate-on-inmate assault, if U.S.P. Florence had been locked down following either of those two incidents, Mr. Baker would

22

likely be with us today.  Because if everyone had been placed on lockdown, it wouldn't have been possible for this homicide to have occurred.

So, obviously, the policies, procedures, and practices regarding when and how to place the institution on lockdown is material to the preparation of our defense, again, both as to guilt phase and as to penalty.

It's also *Brady*, and also may form the basis for our correctional expert's opinion.

Your Honor, Request 34 is very similar.  It has to do with official criticism of the fact that specifically on that date, August 10, 2008, the facility was not locked down.  The Government objects on materiality grounds.  I don't see how they can say that's not material, for the reasons I've just stated.

And, Your Honor, I think the Government's response actually may just be factually confused.  They say something about, in the absence of a showing of materiality of information to a time period when Watland and Baker were not at U.S.P. Florence.  This request, Your Honor, has to do with August 10, 2008, the date of the homicide.  They were clearly both at U.S.P. Florence that day.  So I think the Government just may be confused about the nature of the request.

Your Honor, the next request that is disputed is Request No. 35.  This seeks documents relating to Code 101

violations within the BOP for a three-year period, including graphs, supporting data and other supporting documentation. This is addressed, Your Honor, on pages 16 and 17 of our reply.

Your Honor, the Government makes the same sort of confusing objection under the materiality grounds and then talking about when Watland or Baker were not at U.S.P. Florence. Your Honor, certainly, for part of this time period, they both were at U.S.P. Florence. So, again, I think the Government may be in error. Code 101 violations are serious assaults.

Your Honor, at the end of the day, the jury is going to be asked, I am anticipating, to assess this homicide and why it happened, the circumstances in which it happens, and what was going on in Mr. Watland's mind when it happened. There is a big difference, Your Honor, between a culture where people are generally safe, law enforcement can be trusted, assaults don't happen, the police police the streets, and people don't have to take or even perceive that they might have to take matters into their own hands to protect themselves. There is a big difference, Your Honor, between a culture like that and a culture where the inmates are running the asylum, where violence is rampant, where gangs are in control, where staff are deferring to gangs about decisions about people coming in and out of the SHU, where people are stabbed multiple times, live to survive, and retaliate.

We obviously need to be able to discover this information. It's material to the preparation of the defense, and it's certainly *Brady* material in this case, both as to guilt and penalty phase.

Your Honor, similar argument with respect to Request No. 36, which is addressed on page 17 of our reply. That request seeks documents for Code 104 violations which relate to possession of weapons.

Your Honor, my understanding from other federal capital cases is, when these kinds of documents are produced, what the defense is able to show the jury is that the institution is awash in weapons. That's relevant material in *Brady*.

Your Honor, Request 37 seeks BOP after-action reports for a three-year period preceding the Baker homicide. The Government objects solely on grounds of materiality.

Your Honor, I discussed this earlier, and I won't belabor it. But these after-action reports, as the Court can see from the sample that we've attached as Exhibit 1 to our reply, contain a wealth of information about the BOP's own analysis of what went wrong when an inmate-on-inmate homicide or other inmate -- staff homicide or other kind of serious riot-like incident occurs. It provides a wealth of information that the jury is entitled to know about the running of that institution, about institutional failure, about potential BOP

25

negligence, about what could have been done differently.

And to the extent that the warden of U.S.P. Florence was on notice of problems that were similar at other facilities that have been disclosed in other after-action reports preceding the Baker homicide, to the extent that they had all been on notice of corrective actions that they should take to prevent something like this from happening, and they didn't do so, that is information that we intend to present to the jury.

Your Honor, our reply also spends some time addressing U.S.P. Beaumont. U.S.P. Beaumont is important in this case, Your Honor, because Mr. Watland was in the federal system at the border from the state of Maine. He does not have a federal conviction. He has Maine state convictions. He was sent initially into the BOP by U.S. Marshals holding in Oklahoma and was sent -- initially designated to U.S.P. Beaumont. He had a disciplinary report there. He was sent out of U.S.P. Beaumont and sent to U.S.P. Florence.

But it's clear that the Government in this case will be, Your Honor, trying to use Mr. Watland's conduct at U.S.P. Beaumont as aggravation in seeking a death sentence. So we need that information for the additional reason that we need to be able to show the jury what conditions were specifically at U.S.P. Beaumont to be able to rebut that aggravation.

Your Honor, there is two instances I can highlight for the Court. When Mr. Watland first arrived at U.S.P. Beaumont,

there is information in discovery, and the Government alleges that he self-identified to the staff as a member of the NLR. Your Honor, the defense position is and will be that Mr. Watland did that out of fear, because he knew Beaumont's reputation. Beaumont at that time was known, Your Honor, as Bloody Beaumont. It was probably the worst U.S. penitentiary nationwide at that time. They had a lot of problems. And Mr. Watland was legitimately afraid when he was sent in for his first time in a federal prison, in the middle of his life.

So, Your Honor, we need this information to be able to rebut and explain why Mr. Watland might falsely identify himself as a member of the NLR, namely, because he knew then he would be kept in protective custody, wouldn't be sent out to the yard, where he could be vulnerable to inmate attacks. And also why he might commit a disciplinary violation, an assault, to try and, again, protect himself from being released to the yard. We have to be able to rebut that aggravation, Your Honor.

Your Honor, the next request -- does the Court have any questions at this juncture?

THE COURT: No, I don't. Thank you.

MS. JOHNSON: Okay. The next request is Request 38. This has to do with documents relating to the BOP's mission critical post initiative.

Your Honor, I'm sure an expert could explain this

27

better than I can. But my understanding is the BOP's mission post critical -- mission critical post initiative was an initiative that came down from on high that shook up staffing. Their concern was that officers were getting too much overtime, and we're going to change how staffing is done around the country. And we'll make sure that these certain mission critical posts are covered, but we need to make sure also we're not spending money on overtime.

So federal prison administrators around the country were forced to rejigger their staffing. And, again, these documents are relevant and material to the preparation of our defense. They may indicate that areas that are significant in this case were severely or even partially understaffed.

And, Your Honor, at this juncture, I'd just remind the Court what I think is wholly unrebutted by the Government in this motion is the numerous verdict forms that we submitted with our initial motion, Your Honor, as exhibits. I believe there were seven or eight of them. Your Honor, those verdict forms show that in federal capital cases, jurors, sometimes one, sometimes seven, anywhere in between, but if any juror finds that, for example, the BOP officers weren't doing their job or the BOP was negligent, that may be a mitigating factor that may form the basis for a juror finding that the appropriate sentence would be life and not death.

And that gets back to, Your Honor, the sort of broad

spectrum of relevance and materiality that we have in this capital case, based on the nature of the determination that the jury will be asked to make.

Your Honor, Request 39, which is addressed on pages 20 and 21 of our reply, relates to a particular GOP -- I'm sorry, GAO report to Congress involving policies concerning staffing at the Bureau of Prisons. And I would sort of --

THE COURT: Isn't that available to you?

MS. JOHNSON: Your Honor, the report is available. We're asking for documents relating to that. And there is -- for example, drafts of the report, documents relating to the letter. There is a reference in the report to a systematic assessment that was supposed to happen. We don't have any documents on that. Those are not publicly available.

Category C asks for any documents referencing modification of correctional services program review guidelines, which, again, are referenced in Mr. Lappin's letter. We have Mr. Lappin's letter, to be sure, but we don't have any documents relating to modification of the correctional services program review that he references. Similarly, Category D, relating to documents that would reflect the regularly scheduled reviews of institutions that were supposed to happen.

All of those documents, Your Honor, in addition to being material and *Brady* material, could be the basis for our

correctional expert's opinion.

But to be clear, we're certainly not seeking the letter itself or the report itself, which we do have online, and I believe which we filed as Exhibit 3.

Your Honor, moving on to Request 45. This seeks any and all documents that U.S.P. Beaumont used to validate Mr. Watland as an NLR associate, including, without limitation, SIS documents.

Your Honor, the Government's response here is not an objection, but to say that they have previously produced it, namely, in their categorizations that they put this in group one, meaning documents that have already been produced.

And, Your Honor, this just perhaps leads us to a separate problem here. At no time in the Government's response, when they say we've already produced something, did they identify a folder, a Bates number range, date of production, or anything. So we are left with a mass of, as Mr. Carey puts it, 7,500 pages to try to figure out where the documents are that the Government thinks are responsive to this request.

We'd ask that they be required to specify so that we can make a cogent argument to the Court about whether these documents have or haven't been produced.

Your Honor, and I think based on my comments before, it's clear to the Court why this matters. The jury is going to

care whether Mr. Watland truly was an NLR associate or not. And this very much relates to the events as they played out on August 10, and prior to August 10, when Mr. Baker threatened Mr. Watland.

Your Honor, Request 49 seeks documents relating to the BOP's initial acceptance and designation and classification and transportation of Mr. Watland.

Your Honor, the Government asserts that it has -- the Government, I think, maintains its global objection to any documents related to. So, again, with respect to all of those, we're asking the Court to overrule that objection today.

With respect to the specific subcategories that we've enumerated, the Government says that they have already produced the first five, Categories A through E. With respect to Category F, they object on materiality grounds.

Your Honor, Category F is documents reflecting the names of prisoners who were transported with Mr. Watland from Maine to eventually U.S.P. Florence. So that would have been the initial transport from the state of Maine, actually to Oklahoma, then down to U.S.P. Beaumont, then up to U.S.P. Florence.

Your Honor, we need to investigate those people. That is critical to understanding Mr. Watland's state of mind when he came into the federal system at U.S.P. Beaumont, when he was at risk of being thrown on the yard at Bloody Beaumont, what

his thoughts and fears may have been, as well as his understanding of what conditions were like at U.S.P. Florence when he was subsequently transferred up there.

Sorry, Your Honor, I'm recovering from a cold.  If I could have a moment to hydrate, Your Honor.

THE COURT:  Yes, please.

MS. JOHNSON:  Your Honor, the next disputed request is Request No. 53.  It's addressed on pages 24 and 25 of our reply.

Your Honor, Request 53 seeks policy documents relating specifically to U.S.P. Florence, the Florence Correctional Complex, and/or U.S.P. Beaumont.  And it's -- the request only relates to the year 2008, Your Honor, which, again, is the year of the alleged homicide.  This includes institution or complex supplements to BOP program statements, operations memoranda, technical reference manuals, et cetera.

Your Honor, the Government makes two different objections here.  Their objections to Categories A, B, D and E are that it's not material.  Their objection on the technical reference manuals is that that is a security concern.  And then they point out the program statements are public record.

Your Honor, to be sure, the BOP program statements are available online.  That's not what we're seeking here.  We're seeking things like institutional supplements.

And I'm not sure how familiar Your Honor is with how

these program statements and institutional supplements work. But for the program statement, it's applicable nationwide. The institutions around the country are authorized to and frequently do issue a supplement. The supplement is usually coded, Your Honor, with a number that sort of matches up to the particular program statement that it may modify or explain. So we're seeking those kind of documents and other sort of operational memoranda.

Your Honor, again, in terms of the Government's security concerns, I think those can be addressed by producing the documents we seek under protective order so that we can do our job and the security concerns will be satisfied.

Your Honor, I may be told to pound sand for the next one. This is Request 54. It's addressed on page 25 of our reply. Your Honor, there are at least two specific pages of discovery that reference prosecutorial guidelines. And, specifically, this arises in the context of documents addressing the other two assaults that occurred on August 10, 2008, the day of the Baker homicide, the hobby craft assault and the assault in Unit C-A. And both of these documents in discovery, quite tantalizingly, say that no one will be prosecuted because the case does not meet prosecutorial guidelines. And I believe those words are even capitalized.

Of course, we were very interested to find out what the prosecutorial guidelines are. And the Government's

response is, there aren't any responses.

Your Honor, we'd like this to be the subject of the court order. We want the Government to make very sure they have nothing since it relates so specifically to --

THE COURT: I'm a little bit confused.

The Government's response is that there aren't any responses to precisely what? That they have prosecutorial guidelines, and then there is a leap there that I didn't pick up. Can you explain that to me.

You want to know what the prosecutorial guidelines are, and the Government says that there is no response. I just don't follow that.

MS. JOHNSON: Your Honor, I guess where I'm -- where we're coming from is, we find it hard to believe that these don't exist, when they're referenced in capital letters on two pages of discovery.

THE COURT: What are "these?" I don't understand what you're talking about.

MS. JOHNSON: Prosecutorial guidelines themselves, Your Honor.

THE COURT: That's what you want, are the prosecutorial guidelines?

MS. JOHNSON: Exactly. The request is for the prosecutorial guidelines themselves.

THE COURT: All right. I was confused, because the

way you were -- the way I was interpreting what you were saying is, you were asking for responses to the guidelines, and I -- I don't -- I didn't understand that.

MS. JOHNSON:  I apologize if I misspoke, Your Honor. The request is solely for the guidelines themselves.  And it looked like Mr. Carey had a response, and I'm happy to cede the floor if he wants to address it now.

THE COURT:  Yes.  Well, he'll have his turn.

MS. JOHNSON:  Very well, Your Honor.

Your Honor, the next request is for No. 55, addressed on pages 25 and 26 of our reply.  This is the presentence investigation report for Mark Baker.

Your Honor, the Government is correct, this is also encompassed by our earlier request, No. 20, that I addressed. I think the Government's only objection is that the Government takes the position that this particular court doesn't have the authority to order the disclosure of that.  We respectfully disagree.  We think it's material to the preparation of Mr. Watland's defense.  Obviously, it's going to contain a wealth of information about Mr. Baker's criminal history and other information about Mr. Baker and how he came into the BOP.

And it would be, again, very expensive and time consuming and going only -- only going to cause delay if we need to go around the country litigating this in each sentencing court.

Your Honor, the next disputed request is Request 64. Your Honor, this has to do with documents relating to how U.S.P. Florence staff would decide when to release an inmate from the SHU back into general population. And it specifically includes but is not limited to BOP staff's use of information from other U.S. S P Florence inmates in making those decisions.

Your Honor, the Government's response is that they agree to give us, but have not yet given us, documents related to the year 2008. And they refused to give us earlier documents on grounds of materiality.

Your Honor, again, to give the Court some factual context here, there is information provided in discovery that -- well, let me back up. Your Honor, I've referenced a couple of times a threat that was made by Mr. Baker to Mr. Watland. That threat occurred just days prior to the homicide, and that threat occurred just as Mr. Watland was being released from the SHU. He came out of the SHU, heading back into general population, and he was met with a very serious threat from the NLR member, Mark Baker. And that is critical factual context for understanding this request and what this case is going to be about.

So, Your Honor, there are other documents in discovery that indicate that when BOP staff made the decision to release Mr. Watland from the SHU, they consulted with other U.S.P. Florence inmates, including Mr. Baker. This gets back to my

point about the inmates running the asylum. The jury needs to know if that kind of thing is happening, because I anticipate -- and I think the defense can all reasonably anticipate that one of the arguments we are going to hear from the Government is that Mr. Watland, even if he had been threatened by Mr. Baker, did not need to kill Mr. Baker. He shouldn't have taken things into his own hands. He should have checked in. He should have asked for protective custody. He should have gone to the BOP staff and said, I'm scared, Mark Baker threatened me, I need to be taken into protective custody.

Your Honor, Mr. Watland didn't do that. That's not going to be disputed. But we need to be able to explain to the jury the reasons why Mr. Watland might not have done that. And one of the most powerful reasons is that Mr. Watland can't control when he's in and out of the SHU. Mark Baker sometimes controls when Mr. Watland comes in and out of the SHU. And the jury obviously needs to know that.

Again, the Government is not objecting to documents relating to 2008. Certainly, I think we have a right to show this is a long-standing pattern and practice, if it is, at U.S.P. Florence, and it's the kind of thing that is part of the fabric of the culture there, that inmates, including Mr. Watland, knew and would have known about.

Your Honor, the next disputed request is Request No.

66.    This is addressed on pages 27 and 28 of our reply.

Your Honor, this seeks documents for -- I think it's about an 11 1/2 year period, about a decade preceding the homicide and a little bit after, that relate to inmate-on-inmate stabbings at the BOP institutions, including specifically documents that relate to inmates who suffer multiple stab wounds but don't die from those wounds.

Your Honor, the Government says that they are willing to give us some of this information, namely, statistical data concerning inmate-on-inmate assaults involving multiple stab wounds that did not result in death.  Those materials they put in group 2, which are documents they're willing to give us, but are still apparently in production mode.

Your Honor, I don't know that the Government actually objects to the entire request, but then they also make an objection to SIS files and FBI investigative files.  They say their objection is materiality.  I don't think that the origin of the documents properly impacts whether or not the documents are material.  The subject matter impacts whether the documents are material.

And, again, what we anticipate we're going to see in a penalty phase here, Your Honor, is the Court -- the jury and the Court will be seeing videotape of Mr. Watland stabbing Mr. Baker multiple times, both while he's sitting and while he's on the floor bleeding.  And the Government can be

38

anticipated to argue, as aggravation, that the crime was particularly aggravated because of those multiple stabbings.

Your Honor, we, again, need to be able to rebut that aggravation at penalty to show that, you know what, this is -- in the BOP, there are some big guys, and there are some big guys who have been stabbed eight times, ten times, twenty times who live to tell about it, who live to commit other crimes, who live to retaliate. If Mr. Watland was operating under his fear of Mr. Baker and felt like he was in a kill or be killed situation, it's reasonable to think that Mr. Watland stabbed Mr. Baker multiple times to make sure that he was dead and the threat would be gone, as opposed to simply committing a heinous, aggravated crime that is -- that involves a degree of senseless violence that is the kind of thing the jury might impose the death penalty for.

Your Honor, I think our reply cites some specific paragraphs that the notice of intent to seek death penalty as well as Indictment that are implicated there.

Your Honor, the next disputed request is Request No. 68. This is addressed on page 29 of our reply. This is documents relating to the philosophy, practices, and activities of the Nazi Low Riders, or the NLR.

Your Honor, the Government's response is that they're willing to give us, but have not yet given us, documents relating to U.S.P. Florence. However, they're not willing to

give us documents from all federal correctional institutions.

Your Honor, I think these gangs are nationwide.  There may be local differences, but there is also a nationwide presence.  There is a Nationwide Constitution.  There may be.  We need to discover them.  There may be nationwide membership criteria.  The Government is always welcome to come back and argue, that, oh, what happened in the other state doesn't apply at U.S.P. Florence.  I mean, that's a matter for the jury to decide.  But at this stage, early stage of the case, in terms of discovery and what is material for discovery and what is potentially *Brady*, I believe, is all that needs to be disclosed, given Mr. Baker's association with the NLR, which, again, is revealed in discovery, although I think the Government may dispute that.

The next disputed request is Request 71.  This seeks documents relating to what happens to a BOP inmate who commits a murder in prison, in terms of their institutional conduct following that murder.

I think the Government's response, rejection, is inapposite, Your Honor.  They simply say, we don't maintain records correlated to special findings of capital juries.  But the request is broader than that.  Certainly, the Bureau maintains records to know who in its custody has committed a homicide in the BOP and who has not.  And what we are asking for are documents relating to those BOP inmates who committed a

homicide within the BOP and what their behavior is like afterwards.

Your Honor, this is relevant to the jury's penalty determination, specifically to rebut the aggravator that has been relied on by the Government, future dangerousness. The jury is going to be asked to decide whether or not Mr. Watland poses a future danger. It would be relevant to the jury's determination, if, for example, the documents reveal that on numerous occasions, perhaps the majority of them, BOP inmates who commit homicides, as it turns out, are perfectly capable of conforming their conduct to institutional norms following that homicide, presumably when the perceived threat has been eliminated.

Again, Your Honor, these are the kind of documents that are very relevant and necessary for a defense correctional expert to review.

Your Honor, I would largely defer my comments on this to wait for Mr. Carey's response.

The next one is Request 73. This has to do with our perception we are missing Bates numbered documents, documents the Government collected for this case, Bates numbered, and has not given to us. There are videos that they have now produced. But in terms of the documentary evidence and the ranges that we've identified in our reply, it's not clear to us that they don't have to documents that haven't been produced.

Request 74, Your Honor, addressed on pages 31 and 32 of our reply, seek unredacted documents.

Your Honor, to be clear, there are some documents in discovery that may include five words on a page and then a big black rectangle that has been blacked out. That's not useful to the defense, and that's not discovery. We don't know what that document says. We don't know what is underneath that black. It's impossible for us to sensibly analyze, use that in developing our investigation plan or for use as an exhibit in front of the jury.

So we are asking for unredacted copies of all documents that have been produced in discovery. Again, to the extent the Government needs to produce them subject to a protective order, there is a protective order.

Your Honor, the next disputed request is perhaps surprising to us it's disputed, Request 77. This is an opportunity for the defense team and any defense experts to tour U.S.P. Florence in person, to view the prison, including Unit B-A, which is the unit where the Baker homicide occurred, as well as Unit C-A and the hobby craft area, which are the two locations where the other inmate-on-inmate assaults occurred on August 10, 2008.

THE COURT: Well, it says that the Unit Bravo A has been remodeled and reconfigured and isn't the same.

MS. JOHNSON: That's true, Your Honor. And I would

42

like to point out to the Court and remind the Court -- this is attached to an earlier filing -- but the defense team, in the form of Mr. Burke, first started seeking discovery in this case long before the Indictment. Mr. Burke sent an e-mail to Mr. Carey in June of 2009, more than two years ago, seeking some initial discovery for the case, including an opportunity to view the video of the homicide and an opportunity for him and Mr. Chambers to tour the prison and the unit where the homicide occurred.

Mr. Carey declined to provide that discovery at that time. The only thing he provided was the video of the Baker homicide, an opportunity to view it, not an opportunity to keep a copy.

Your Honor, I don't know from the Government's response -- and perhaps we'll learn today -- when this unit was remodeled. But certainly, it was possible for the Government to give us this opportunity to see this at least more than two years ago.

But, Your Honor, I think the fact that the unit has been remodeled may be a relevant factor that goes to the weight of some evidence regarding our tour that we may present to the jury. Surely, if we want to present an aspect of the physical layout of the unit to the jury that the Government thinks is inappropriate or misleading because it's a reflection of the remodeling that has since happened, they will be entitled to

present that evidence to the jury.  But it doesn't --

remodeling doesn't render the opportunity to tour that unit

completely immaterial.  That's the unit where the homicide

happened, Your Honor.

And I think any -- I know the Court has a history of

practicing criminal defense.  I think any defense lawyer will

tell you, you have to go to the scene.  In a serious felony

case, you have to go to the scene and see it for yourself.

Often you see things that give you a new understanding and

appreciation of the case and your defense themes when you have

the physical layout in mind and you're able to see it in three

dimensions in person.

Your Honor, the Government also argues that this will

be somehow detrimental, including letting us tour the SHU.

Again, my understanding from the time I've spent in federal

prisons is that government officials are routinely touring

federal penitentiaries, U.S.P.s, including their SHUs.  I think

if government officials can be safely given a tour, we can be

safely given a tour.  I don't think that objection is well

taken.

Your Honor, Request 78, I think is simple to resolve.

We seek all photographs of Mark Baker.  The Government says

that -- they reference back to Request No. 2.  I think there is

a particular photograph that they're willing to produce, but

they have not yet produced.  That's the photograph that was

attached to the after-action report that shows Mr. Baker associating with members of the Nazi Low Riders.  So that, they're willing to produce; but we don't yet have it.

And then with respect to the other photographs, they say they've already been provided.  Your Honor, the photographs that we have, respectfully, are grainy and difficult to read in black and white.  We would respectfully ask the Court to order, if the Government is not willing to provide, digital or print color copies of Mr. Baker.

Your Honor, Request 79 similarly seeks photographs of the inmates at U.S.P.Florence who were in Unit B-A and C-A on the date of the homicide charged in the Indictment.  The Government's willing to give us the Unit B-A, but they're not willing to give us Unit C-A.

Again, Your Honor, the events that happened on August 10 are very much intertwined.  The Government's own discovery suggests that the BOP believes that all three of these events were interrelated.  They can't be treated separately.

And, Your Honor, part of the reason we need this, and this is material to the preparation of our defense, is, as the Court knows, we need to investigate a lot of inmates in this case, and we need to be able to talk to inmates about other inmates.  Your Honor, to be frank, we can do that much more efficiently if we have a photograph, because inmates use street

names, they use gang names.  They don't always go by the name we get in discovery.  So if we can show a photograph to an interviewee, often they will say, oh, that's the guy you're talking about.  Yeah, I know him, and then they'll tell us something.

Your Honor, I think I've, at the risk of boring the Court, gone through all the requests that are disputed.  If the Court has any questions, I'd be happy to address them, or I can cede the floor to Mr. Carey.

THE COURT:  You're certainly not boring me.  Thank you very much.  I have no questions at this point, I want to hear from Mr. Carey, and then we'll proceed after that.

MS. JOHNSON:  Thank you, Your Honor.

MR. CAREY:  Your Honor, would you like me to follow the same order, or do you have questions on particular ones, like the prosecutorial policy --

THE COURT:  Well, I do have some questions about that.  But that -- other than that, I think it's probably best to just do this seriatim.

MR. CAREY:  The Government did take the position that all of the material from the riot on April 20 of '08 is not material to this case.  Watland was not there.  There is no showing that he had any knowledge of it.

We have talked about the issues of security, and the defense offers the idea that security could be a disclosure to

defense counsel and apparently not to Defendant Watland. Now, that's an interesting proposition. And if the Court were to enter that order, that is that material that is discovery and that is possibly *Brady* can be disclosed to counsel but not to a defendant in a capital case, that is a difficult position and not one that the Government's familiar with. But if that would be an order in this case, many of these documents could be disclosed to defense counsel.

The reference to the homosexuality of Defendant Watland, the Government initially objected to the production of that material. The objection was based upon conversations going back to 2004 in Maine, talking to Department of Corrections personnel in Maine at the Somerset County Jail, where he was held prior to his plea of guilty in the initial murder. And there was no showing by anyone, and there was no indication by anyone, of Mr. Watland's homosexuality.

On the statement that was produced in the reply by the defense that Mr. Watland is a homosexual, the Government would agree that that material is now -- based upon that showing of materiality, that it should be produced.

You have heard many statements about the posted picture files and the security designations of about 25 other inmates. There are two objections there. One was materiality; and the other, again, is security. We have spoken with BOP personnel at great length about the criteria used to determine

and make the designation that an individual is a security threat, needs to be confined, is in a security group or member of a gang. It is that information, that internal investigative process, that is objected to in the production.

The conclusion that an individual is a member of the Nazi Low Riders or is a member of the Aryan Nation, as an example, that conclusion is not part of the Government's objection. It was the underlying investigative determination, that is those factors that are used, that the Government objects to and suggested that there was a security concern for the production of that information.

The presentence report. Again, the presentence reports are given to the Bureau of Prisons under a very limited disclosure and under an obligation of non-disclosure except for use in the management of the inmate within the Bureau. The Government quoted in its response the section of the presentence report that is common on all presentence reports, that it takes the authority of the sentencing court.

The Government doesn't say that you -- this court doesn't have the authority. We would abide by whatever rule this court sets. But it is the Bureau of Prisons that says they do not have the authority to make this disclosure.

There are references to SENTRY documents. SENTRY is a computer system within the Bureau of Prisons. SENTRY is an archaic system. It is a system that was designed about 20

years ago. It has not been updated, it is a system in which information is entered and can be retrieved only by about 150 inquiries to the system.

The system has no ability, as presently designed, to retrieve all documents related to an inmate. It might be able to retrieve documents related to one of the 150 set inquiries, but it has no ability to retrieve documents in another fashion.

The Government had objected to the production of assaults, 101 code violations, 104 code violations, that were nationwide, that did not pertain to U.S.P. Florence.

If I could address the prosecutorial guidelines for a moment.

THE COURT: Yes, sir.

MR. CAREY: The prosecutorial guidelines. The way this comes up is, there is an FBI report. An FBI agent says in his report, based on prosecutorial guidelines, these two assaults, the hobby craft area that you've heard of and the Charlie A unit assault, will not be prosecuted. Prosecutorial guidelines is a phrase used by the FBI agent. There are no set guidelines in the United States Attorney's Office that set forth guidelines on assaults.

You might say, there is a rule of thumb; the agent knew it probably wouldn't be prosecuted. But that's what the Government responded, there are no guidelines. There is no policy within the department -- I'm sorry, there is no policy

within the U.S. Attorney's Office as to that.

THE COURT:  Are there prosecutorial guidelines that the FBI has?

MR. CAREY:  No, Your Honor, there are not.  Not to my knowledge.  I asked that very question.  There are no guidelines of theirs.  They take a case, and they present it to the U.S. Attorney's Office, and the U.S. Attorney's Office on a case-by-case basis either accepts or rejects the case.

THE COURT:  All right.  Thank you.

MR. CAREY:  The reference to the tour.  The Bravo A unit, where this homicide occurred is no longer configured as it was on August 10, 2008.  The Government suggested a tour and is willing to facilitate a tour of the Charlie A unit.  They are set out identically.

The tour of the SHU is a misstatement.  Usually, and it is the common practice, that tours do not include a walk-through of the Special Housing Unit because of management problems.  Those are routinely absent from tours of assistant U.S. attorneys and prison officials and visitors.

As to the Bates numbers, the Government responded to those documents that in the Bates numbers that were referenced in the defense request.  All material has been produced.  It is in general the unlimited nature of the request that the Government has objected to, the nationwide after-action reports, the nationwide searches of records, because there is

no showing of materiality in those.

To say in another case that some court found that staff duty reports were material does not satisfy the materiality requirement in this case.  It simply says that some court found that it was material in another case.

Your Honor, if -- unless there are specific questions, I have nothing further to add.

*THE COURT:*  Thank you, Mr. Carey.

Ms. Johnson, you get the last bite.

*MS. JOHNSON:*  Thank you, Your Honor.

Your Honor, with respect to the Hitler Day riot materials that we are seeking and that the Government is resisting producing, the Government says that there is no evidence that Mr. Watland knew about that.  Your Honor, I think the evidence will play out at trial that everyone knew about that.  It was a pretty big incident.  And certainly, the documents that have been provided in discovery to date indicate that the other inmates knew about it.  In fact, some of the mass interview forms that are filled out very promptly after an incident, where, basically, BOP staff and/or the FBI go to all the inmates in the unit and say, what do you know about Watland?  What do you know about Mr. Baker?  Did you see that happen?  What happened?  Some of those, at least one, and perhaps more, specifically reference the Hitler Day riots as having been part of the factual background of that August 10,

2008 incident.  Other inmates knew about it, and other inmates understood that it was related to what happened between Mr. Watland and Mr. Baker.

Your Honor, in terms of the nature of the protective order, obviously, we are going to be addressing that at some point later today.  We have a motion to modify the protective order on hand.  But I want to clarify my comments.  My suggestion that these documents -- the security concerns that have been articulated by the Government, articulated, can be satisfied by the protection order referred to the system we have in place, in the Court's order in Document 12, as it may be potentially modified by the order that we have requested.

Are there some protective orders that have attorneys' eyes only provisions?  Yes, there are.  That wouldn't be my first choice in this case, nor do I think it's necessary, Your Honor.  So I wanted to clarify the defense position on that.

Your Honor, the defense appreciates the Government's concession regarding anti-gay conduct and that they are willing to produce those two requests, I understand.

Similarly, Your Honor, it's my interpretation of Mr. Carey's comments that with respect to posted picture files, AIMS information, STG files on these particular inmates that we have identified, they are now willing to produce those.  They simply weren't willing to produce the underlying criteria used.

Your Honor, I think there is some confusion, perhaps,

evident in Mr. Carey's comments regarding the SENTRY records. And I don't think this needs to be a difficult order. What we've requested are the SENTRY records for a concrete, finite group of inmates. And what I hear Mr. Carey saying is that he agrees that you could print out 150 different inquiries for each of those inmates, and those would be the SENTRY records for those inmates. That's all we're asking for. We'll take it.

Mr. Carey's objection today seems to be that you cannot use SENTRY to obtain all the documents that make exist at the BOP regarding those inmates. We haven't sought all of those documents. We are seeking SENTRY records. So I think the Court can enter the order we've requested, and it's clear that the Government can comply.

Your Honor, in terms of the statistical indicators of rampant violence, namely assaults and weapons possession in the Bureau of Prisons, we do think a broad brush is relevant in terms of the nationwide scope. We do think the jury's entitled to know that what happened at U.S.P. Florence and what the conditions may have been there may have been typical at the Bureau of Prisons. That may be a reason why one juror decides a life sentence might be appropriate here, so we think it's discoverable.

Your Honor, with respect to the prosecutorial guidelines, it seems to me that Mr. Carey was speaking very

specifically.  And I know the Court followed up and said, well, the U.S. Attorney's Office may not have these guidelines, does the FBI?  I appreciate the Court's inquiry.  I hear Mr. Carey to be saying the FBI does not have such guidelines.  I think the further question would be, does the Bureau of Prisons have such prosecutorial guidelines?  Because something was referenced in those two separate pages of discovery.

Your Honor, to briefly follow up on the issue of the tour.  We do not believe that -- we appreciate the ability to tour Unit C-A, and we certainly do want to tour Unit C-A, but we don't think that's a substitute for touring the unit where the Baker homicide occurred.  And one thing I would suggest to Your Honor is that, one of the things we're going to be looking at, and presumably our expert will be looking at, is the physical location where cameras are placed, where the angles of the security videos that may have been produced were taken, where -- where metal detectors are present.

Your Honor, I think the evidence may play out that there were metal detectors inmates were required to walk through when they before a certain area of the unit, but some inmates just walked around.  That, again, goes to kind of this theme of institutional failure.  And some of those metal detectors and security cameras may be the kind of portable things, where I don't know that the Government is going to be able to go on record today and say every security camera and

every metal detector in Unit C-A in 2011 is exactly the way it was in Unit B-A on August 10, 2008. I question their ability to do that.

Again, if it's been remodeled, we understand that. We'd be happy to take the tour with a BOP official who could take us around and tell us exactly what has changed in the remodeling and when this occurred. Again, perhaps this problem could have been avoided had Mr. Burke and Mr. Chambers been allowed to tour two years ago.

Your Honor, with respect to the Bates numbering, the Government says that all materials have been produced. But they have not produced the specific Bates ranges we identified in our reply. I think their position is, you already have that. But I don't see the harm in ordering them to produce it, to make sure that we have everything they have that they deem relevant to this case.

And, you know, Your Honor, sometimes there are documents -- in my experience with voluminous discovery, there are documents that may appear in different people's files that may have a different origin, that looks similar but may have a different date or may have handwriting on them. Often you have documents that are similar, but slightly modified. And that can be relevant to the preparation of your defense.

Your Honor, Mr. Carey still objects to the nationwide request for the after-action reports, though he does not

respond factually nor rebut factually the argument that I made earlier that one of the reasons those are relevant is that they are distributed nationwide, including to the wardens of U.S.P. Beaumont and U.S.P. Florence.  And on that ground alone, I think they're relevant.  The Government doesn't dispute that.

Your Honor, again, Mr. Carey may be confused with respect to the staff duty reports.  I think his objection today is that these nationwide, and just because some other judge ordered it doesn't make them material here.

Your Honor, the staff duty officers and the lieutenants meeting reports that we have sought in this case, the requests are narrowly tailored to U.S.P. Florence, and I don't want there be to any confusion about that issue.

Your Honor, unless the Court has any other questions, I think that concludes my remarks today.  Thank you.

THE COURT:  Thank you.

There has been reference made by Ms. Johnson to the fact that at one time in my life I was a criminal defense attorney, and that is certainly true.  And it is also true that at one time, I was a deputy district attorney.  Both of those events occurred well more than 35 years ago, however.  And the present state, I did have some involvement with capital cases. But certainly, in those days, there no one who specialized in death penalty cases, to my awareness.  I didn't, that's for sure.  And besides that, the law has changed so much, and

society has changed, the Supreme Court opinions have changed so that my past experience in these matters truly is irrelevant to what is going on.

What I do think is relevant is the -- an experience I had in another case just last week, that bears somewhat on my thinking, although it isn't directly applicable to this case. And that's another death penalty case involving the habeas corpus petition of Nathan Dunlap that -- where a death penalty was imposed by the state of Colorado.

And what occurred is that the -- and I think what is relevant -- well, not relevant, but tangentially important to me -- that expenses of the federally appointed Criminal Justice Act attorneys to appear in entirely state clemency proceedings was authorized, and it -- there was a change in the statute that the -- those expenses were considered by the Court of Appeals. And then the statute was changed, and the matter was remanded to me to make those determinations of what is a reasonable expense under a federally funded criminal justice act for lawyers to appear in what is in what is, essentially, a non-legal proceeding, and that is a petition for clemency to the state governor, assuming that the habeas corpus petition is denied by the Tenth Circuit, and my decision in that case is affirmed, and then apparently, the CJA attorneys will be petitioning the state of Colorado's governor for clemency.

I think that what that suggests to me is the overall

judicial policy as set forth there and also in the Supreme Court opinions and, clearly, in opinions from circuit courts of appeal, that we are to leave no stone unturned in the discovery process of death penalty cases. And I can only say in that regard that the Government seeks the death penalty. That's the Government's right to do so in this case. But when that happens, it -- it sets forth a very -- veritable avalanche of information that defense counsel and their experts must have.

I, therefore, am granting the motion in every particular. But I want to point out a few things in that regard.

And that is that as to, the security objections can only be handled under these -- in this case by the protective order. And we have to trust in the judgment of defense counsel and experts that are employed for the defense, as to how these are used and with discretion. But I'm not about to enter an order saying that an individual charged in a capital case and facing a death penalty is not allowed to see them. That, to me, is -- I know of no such case in which that's happened. And if there is one, it won't be coming from me.

I think the defendant is the -- certainly the most interested person in the outcome of this case and has a right to know what is going on.

So the next thing is that the Government has to produce what has been requested. But if it doesn't have it,

then there is -- obviously, it can't produce it. There is no -- apparently, the reference in two of these reports -- on the assaults to the prosecutorial guidelines is something that doesn't exist, other than in the minds or the behavior of FBI agents. If that's the case, and they're not there, they don't exist.

What my concern was when I raised the issue was, if it were -- and apparently it's not -- a document of the Department of Justice itself, with prosecutorial guidelines, that I wanted to figure out whether that was part of an attorney's work product and protect it there. But that doesn't seem to be the case either.

So if the Government says these things don't exist, that's -- as we have to trust defense counsel to use their better judgment in how to handle this information they get, we have to trust the prosecution as well. And it is not by any means a perfect system, but I accept the representation that has been given that these guidelines don't exist.

That raises the next issue, and that is that redacted copies are not responses that are acceptable. And any redacted copies have to be withdrawn and the full copies presented to defense counsel.

If there is a particular special need, and it would have to be an of extraordinary nature, of a specific line item in a document where the Government desires redaction, you're

going to have to file a special motion for that.  But, otherwise, just -- I've seen too many of these documents that are black lined from top to bottom, and that's not acceptable. It isn't even acceptable under the various -- I can't remember the acronym of the cases we did involving security classified documents, to redact everything.  This isn't -- to redact in toto or in major part is the same as not sending anything in, and it becomes a mere formality, and I will not accept that. So the redacted copies have to be resubmitted.

The next request I think is quite reasonable, given the volume of information that we have.  And that is if the Government is saying that a document or a photo or any other kind of discovery has previously been provided to defense counsel, that response should identify where it is.  I can't answer the question about the Bates stamps and where they are, but if the Government says they don't exist and it's a lacuna in the numbering system, then I accept that.  If they have the documents, they will provide them.

With those restrictions, the motion is granted.

Now, this, of course, never ends the controversy, because, if, indeed, there are -- yes, one other thing with regard to Request 77.  If that unit has been remodeled, the Government may provide the plans and drawings showing the location of the cameras in the walls and other things as they existed before the remodel and show the drawings after, and

that will satisfy that discovery request. So that touring something that is no longer in existence or that has been changed is not necessary if those drawings, plans, and specifications can be shown.

As to Request 74 -- we covered that, excuse me. As to the presentence reports from everywhere, I think there is an adequate explanation given by Mr. Carey that there is no real objection except that the Bureau of Prisons received those reports to be used solely by the Bureau of Prisons, and they feel that they can't go beyond that without a court order. And they have the court order. The presentence reports are discoverable in this case. They will be subject to a protective order. And it's not necessary for defense counsel to go before each and every sentencing judge, if still alive, around the country to obtain that permission. It's a legitimate request and will be honored and subject to the protective order.

One of the reasons for this pervasive discovery is mitigation. And I am trying to remain as objective as possible about whatever verdict or verdicts a jury might render in this case. But at the same time, I -- I would hate to think that all of us would go through all of this work and then have the matter -- and all the expense, and then have the matter set aside because there was an insufficient provision of materials necessary for especially the mitigation aspect, if the case

goes to the second stage of determining the death penalty.

Whatever it is, I want to proceed with -- certainly with caution, but also bearing in mind that the present state of the law with respect to what can and cannot be offered and what defense counsel are required pursuant to the Constitution to -- and the decisions of the Supreme Court to make inquiry about are fully available to the defense in the case.

So that's the order on that.

Let's take the next matter up, which is the motion, Document 99, for release of grand jury materials and the related motion for disclosure of grand jury materials, Document No. 100 and Document 112.

The Government's motion is granted, to disclose that material.

Is there anything else that you need to say on this motion, Ms. Johnson?

Mr. Chambers.

MR. CHAMBERS:  Your Honor, we have in our division of labor, I was assigned to handle the grand jury issues.  And Ms. Johnson is going to handle the ministerial --

THE COURT:  Okay.

MR. CHAMBERS:  Your Honor correctly noted that our initial motion was Document 99, where we moved pursuant to Rule 6(e)(3)(E)(i), production of grand jury materials.  And the Government's objection relies primarily on a case from the

Eastern District of Virginia, *Nguyen*, N-G-U-Y-E-N.

First of all, our view is that *Nguyen* incorrectly interpreted and read Rule 6(e)(3)(E)(i) based upon both authority from the U.S. Supreme Court and from the Tenth Circuit. And, indeed, I believe the Government acknowledges that *Nguyen's* interpretation of subsection 1 is incorrect, because in their Document 112, they rely on 6(e)(3)(E)(i), which they could not do if they truly believed that *Nguyen* was properly decided.

And I would also note, Your Honor, that while certainly not binding on either this court or on these individual prosecutors, it's long been the practice in this district that there would be a disclosure of grand jury materials. And it is, indeed, peculiar that in a capital case, where there is to be heightened scrutiny, that the Government is making less disclosure.

I think that the language from the *Dennis* case is apt, where the Court in *Dennis* talked about -- that the Supreme Court had confirmed the trial court's power under Rule 6(e) to direct disclosure of grand jury materials and acknowledged that certainly that's true after the grand jury proceedings are over, and it serves the ends of justice for those disclosures to be made. And then the Court made the interesting observation that this view of Rule 6 is entirely consonant with the growing realization that disclosure, rather than

suppression of relevant materials, produces -- promotes the proper administration of criminal justice.

For that reason, Your Honor, we would ask -- and the other thing about the Government's motion, as is noted in our reply, which is maybe 132, the Government's motion really is to -- their motion 112 is, we'll produce what we want when we want to. And we don't believe that that's adequate. And we would therefore ask that our motion 99 be granted.

Thank you.

THE COURT: Thank you, Mr. Chambers.

MR. CAREY: Your Honor, so there is no misunderstanding, I think the initial defense request was for transcripts, exhibits, colloquy, instructions, and minutes of the grand jury. The Government's motion -- and I wasn't -- don't want to be quoted by it. The Government's motion only addressed the transcripts and exhibits. And I think that the disagreement is as to instructions to the grand jury and the colloquy, if any, existed. And I think that that's really the point of contention as we stand right now, Your Honor.

THE COURT: Well, the judge, I'm quite sure, who convened the grand jury instructed the grand jury, and those instructions are discoverable.

As to the colloquy, I am denying that at this time. It can be raised on a discrete basis after an examination of the grand jury testimony. If defense has something in that

that suggests that they should look at, and we'll do it.  But it will have to be particularized.

          To that extent, the Government's motion is granted.

          MR. CHAMBERS:  Your Honor --

          THE COURT:  Now, with regard --

          MR. CHAMBERS:  I'm sorry, Your Honor.

          THE COURT:  Yes.

          MR. CHAMBERS:  Could I make sure Mr. Carey and I are not talking past each other here.

          THE COURT:  Yes.

          MR. CHAMBERS:  The Government's motion says they request permission to disclose transcripts, exhibits regarding witnesses that they may call at trial.

          THE COURT:  The transcripts of the testimony of the witnesses in this case are discoverable.  All of the witnesses, that -- the transcripts are discoverable.  As to the colloquy of counsel to the grand jury, or of the Court, other than the instructions, that has to be raised on a specific, particularized, discrete basis.

          MR. CHAMBERS:  I understand.

          THE COURT:  I've used three redundancies to make that as clear as I can.

          As to the instructions that are given to the grand jury when they come in and as to the clerk's office activity in summoning the grand jurors, which is part of the motion that

Ms. Johnson was going to argue, those are admissible -- those are discoverable.  You can have those.

MR. CHAMBERS:  Thank you.

MR. CAREY:  Your Honor, as to the -- what I was terming the administrative aspects of the grand jury --

THE COURT:  Yes.

MR. CAREY:  Now, the U.S. Attorney's Office doesn't have those and has no control over those.

THE COURT:  I know.  They have an order from me to authorize the Clerk of the Court to get that information.

MR. CAREY:  And if they are retrieved by the Clerk of the Court and the timing prerequisites of the statute are met, will it be produced to both --

THE COURT:  Yes, you're entitled to it as well.

MR. CAREY:  Thank you.

THE COURT:  As a matter of fact, let's just cut to the chase on that.  If you get stuff from the Clerk's Office under my authority to disclose how the grand jury was selected, the voir dire of the grand jury, those things, and when you make that request, provide the district attorney with what you get.

MR. CHAMBERS:  We will do that.

THE COURT:  Excuse me, the prosecuting attorney.

MR. CHAMBERS:  We will do that, so there is no need for them to attempt to retrieve that.

THE COURT:  All right.  Does that take care of your

66

motion as well?

MS. JOHNSON:  It does.

THE COURT:  Let's go to the timing of the Rule 12.2 motion.  The Government in this case opposes the defendant's request to continue the notification date to coincide with the date of pretrial motions and requests that the Court exercise its inherent power to set rules and deadlines, as well as its authority under Rule 12.2 and issue an order requiring the Defendant Watland to provide the notice of intent to present expert testimony and the identities of all mental health experts the defense intends to call forthwith.  And I quote that.

At the April 15, 2011 status conference, I loosely adopted a proposed timeline offered by Mr. Carey that set a date for 12.2 notification for June 15, 2011.  But I think at the time, I indicated that that was a very loosely set up deadline, or timeline, because we didn't know at that point a lot of the discovery that had taken place.

But I will now set the deadline.  And I grant the Government's motion, and the disclosure must be made by September 9, 2011.

Let's go on to the protective order.  The gist of this motion is that I signed Document 12, which was proposed unilaterally by the Government, without consulting, as I understand it, with defense counsel, as a ministerial exercise.

And now that defense counsel have been working with it for at least three months, I think four now, it needs revision.

The defendant offers a proposed amended protective order which the Government opposes as overbroad and needlessly complicated. Mr. Watland says his order is premised on a similar order entered by Judge Blackburn in United States v. Rivera, Docket No. 10-cr-164. The Government says Mr. Watland's order is premised on orders used in civil cases and is therefore not tailored to capital cases and the privacy access considerations necessary in that context.

The Government's concerned about Mr. Watland having expansive and unsupervised access to information that includes the names of other inmates and potential inmate witnesses, and attaches a letter from Sean Gillespie, who I believe is the inspector for the Bureau of Prisons. Is that correct?

MR. CAREY: Sean Gillespie is an inmate who had been threatened by Mr. Watland.

THE COURT: Different person named Sean, then.

MS. JOHNSON: I'm sorry, Your Honor. I do need to correct that record. I do not believe the document in any way suggests that Mr. Gillespie alleges that he was threatened by Mr. Watland. He alleges he was threatened by other inmates.

THE COURT: Okay. Be that as it may, there are related cross motions and documents 127 and 129, to seal all or portions of the Government's response to Mr. Watland's motion

to modify the February 9, 2011 protective order.  And the Government has -- excuse me, the defendants have provided a chart to show the modifications to the protective order.

I think this is a very delicate matter, and I've alluded to it earlier, about the needs especially with regard to mitigation and the evidence that comes up in a sentencing hearing -- or trial, rather.  And yet the existing protective order is too tight.  It doesn't allow for the paralegals and investigators employed by the defense to share that information with them, and it doesn't provide for the expert witnesses who are retained either to advise or to testify in the case to have access to these materials.  And it would be foolish to suggest that these experts and investigators and paralegals do not need to have that information.

So the protective order will be -- is modified.  And I will call upon counsel to meet and confer and draft a new protective order for this case.  But the order should provide that all of this discoverable information in this case is subject to the protective order, that it may not be shared with anyone for any purpose outside of this case, which includes, by the way, any experts who wish to use this information in their publications.  The data is confined to purposes of this trial and may not be used otherwise.

Now, as to the information that goes directly to Mr. Watland, he is, as we say in civil law, the real party in

interest, and he's entitled to see what it is that he wants to see. Although I have serious doubts that there is much of this data that would be going to experts that he would be interested in seeing. But that's -- he is subject to the protective order as well. And if that means that we have to issue orders later to enforce this, they could well include orders that he examine the documents only in the presence of counsel and that he not retain them.

But unless he abuses the discovery for some purpose, I'm not going to make that an initial requirement.

In regard to the way -- the unfortunate way we began this proceeding, the court proceedings are governed by this Court and not subject to review by the Bureau of Prisons for any reason at all. If there is a court session, my decisions govern, and I'm subject to review by the Court of Appeals, period. If the Bureau of Prisons does not wish to recognize this, it provides them with some difficulty, then what I will do is order the U.S. Marshal to be in attendance and take custody of Mr. Watland for all court proceedings. And whether that means that he has to be brought up here each and every time there is a court hearing, or whether the marshal wants to have deputies at the prison to take custody over him and regulate his conduct during the court hearings is a matter up to the marshal.

So I think I made that clear. No other kind of

70

regulation is tolerable.

Have we covered all the motions, Mr. Carey?

MR. CAREY: I think so, Your Honor.

THE COURT: All right.

MS. JOHNSON: Your Honor, could I have a moment to confer with Mr. Chambers?

THE COURT: Yes.

MS. JOHNSON: Your Honor, if I could just for the sake of efficiency, I'd like to clarify, make sure that both the defense and the Government understand the Court's comments about the modification of the protective order, because we will be meeting and conferring about it.

THE COURT: Yes.

MS. JOHNSON: Your Honor, I thought at one point I heard the Court say that all the documents discovered in this case are subject to protective order.

THE COURT: Yes.

MS. JOHNSON: To be clear, Your Honor, that is not how we have been proceeding to date.

THE COURT: I understand.

MS. JOHNSON: And the Court is modifying -- wants us to modify --

THE COURT: I don't want to have quibbles about whether it's covered or not, so I'm making this procrustean ruling that everything is subject to the protective order. And

71

the protective order should provide a provision in it that if you want to take something out of the protective order by stipulation, you can do that.  If you can't agree, you'll have to file a motion, either side.

MS. JOHNSON:  Thank you, Your Honor, for clarifying.

THE COURT:  Does that make -- I want these experts to have access to whatever it is that they need to form their opinions, on both sides of the case.  And so the discovery, it seems to me, goes to a great extent to that.

The other discovery goes, certainly to the experts, but to defense counsel's ability to prepare evidence for purposes of mitigation, which I think is what the appellate courts seem to be hung up on that.

MS. JOHNSON:  Thank you, Your Honor.  And that's -- I appreciate that clarification.

And my second question is, to be clear, I understood the Court to be saying that the new protective order that the parties will propose to the Court would allow Mr. Watland to take all discoverable material, because it's all protected, to his cell to review it in his cell, and he is subject to the protective order.

THE COURT:  No, I didn't say that.  I said, he can see all of this.  But if he tries to disclose it to other people or use it for other purposes other than this case, I will impose certain restrictions, which might include his only examining

72

them in the presence of counsel and not retaining them. I don't want him to be in a position where he has things in his cell that somebody else in the prison might take.

MS. JOHNSON: Okay.

THE COURT: I'm assuming that there are inmates in that prison that don't respect the laws of property and privacy.

MS. JOHNSON: Without commenting on that, Your Honor, he is single celled, to be clear.

I guess, Your Honor, there is a practical problem that I need to advise the Court of, or make sure I understand. Is the Court saying that he can view them in his cell unless there is a problem, at that time we will modify --

THE COURT: Yes, that's correct.

MS. JOHNSON: Thank you, Your Honor. Because there has been a problem to date. As the Court has seen with the handcuffing of Mr. Watland at his waist, it's been very difficult for him to review discovery. This will improve things immensely, and I appreciate the Court's order.

Your Honor, I believe, then, the only remaining issue for adjudication today is the cross motions to seal, which Mr. Chambers for the defense is going to --

THE COURT: All right.

MR. CHAMBERS: There are competing motions to seal, Your Honor, or -- maybe they're not competing. There are two

different motions to seal.  128 is the Government's motion to seal, and ours is -- no, the Government's 127, and we are 12 --

THE COURT:  123, I think.  Well, that's the Government's motion.

MR. CHAMBERS:  That is actually the motion to seal attachments to 123, Your Honor.

THE COURT:  Right.

MR. CHAMBERS:  Their motion to seal is 127, and ours is 129 and 130.  And I'm happy to address that if you want to.

THE COURT:  Yes.

MR. CHAMBERS:  First of all, I think it's important to put what is going on in here in some context.

First of all, there is the protective order, Document No. 12.  Then there is Local Rule 47.1, which governs motions to seal.  And both of those become relevant to the cross or simultaneous motions to seal the attachments to Document 123.

Document 123 was the Government's response to our motion to modify the protective order.  And we had three attachments.  I should first note that our response to Document 123 contains a typo.  In our brief, 130, we identify on page 3, attachment 2.  We actually identify it as attachment 1.

In any event, let's talk first of all about attachment 2.  Attachment 2 to Document 123 was a document that the Government designated as a protected document.  And that was a decision made by them unilaterally.  They designated attachment

2 as protected when we received it.

It was therefore, in our view, and it was, of course, governed by the existing protective order, protective order, Document 12.

It was clear that the filing of attachment 2 was a violation of the protective order. It's a violation of paragraph D of the protective order. And when we saw this, Ms. Johnson immediately sent an e-mail to Government counsel, and the Court has a copy of that e-mail -- it's document 128-1 -- where she politely and professionally pointed out, hey, guys, are you aware that you filed a protected document as an open record?

In response to that, the Government filed its motion to seal, Document 127. Document 127, the Government's motion to seal, first of all, contains an incomplete account of Ms. Johnson's good faith effort to confer about this document.

Secondly, Document 127 is not filed in compliance with Rule 47.1. And that is particularly troubling to us, because 47.1 says, On motion and appropriate showing set forth in a sealed brief, a motion to seal, a judicial officer may order that a paper file in a case be sealed.

In subsection C, under justification of sealing, again, talks about how the reasons -- the justification for sealing a document should be set forth in a sealed brief. Which is what we did.

And there is a reason for that, Your Honor. The reason is that motions to seal are posted on the website. I've never been a newspaper reporter, nor do I ever hope to be one, but --

THE COURT: They are an endangered species, by the way.

MR. CHAMBERS: I won't lament their passing. But if I was a newspaper reporter, and I saw a document to seal, the first thing I would do is go look at it. Then when you see Document 127 that talks about -- incompletely talking about the defense's concern that if the public sees this, it's going to taint the jury pool, as a newspaper reporter, my interest would be piqued. And so that is why we filed the motion, 129 and 130, with the justification for sealing the documents and the sealed brief.

THE COURT: Okay. So what do we do about it now?

MR. CHAMBERS: Seal the documents.

THE COURT: Okay. The documents are sealed.

Is that agreeable with you, Mr. Carey?

MR. CAREY: That's what we filed our motion for.

THE COURT: All right. All right.

Then let's track -- I keep trying to tell people that this is a court of law, not the CIA. But this sealing stuff just drives me to distraction. Follow the rules the best you can.

Anything else, then?

Ms. Johnson.

MS. JOHNSON:  Your Honor, this is not ripe for adjudication today, but I did want to give the court a heads up about some issues we've been having with healthcare for Mr. Watland provided by the BOP, how that is impacting his ability to participate in his own defense.

THE COURT:  Okay.

MS. JOHNSON:  Your Honor, I anticipate we will soon file a motion on this.  I believe we're going to need to have a hearing where counsel from ADX, the Bureau of Prisons, can be present to address the Court.  I wanted to give the Court a heads up of where I see this going.

Really briefly, Your Honor, Mr. Watland has been diagnosed with a hernia that requires surgery.  Surgery was approved by the, you know, higher ups at the Bureau of Prisons in January of this year.  It's now August, and he has not yet received that surgery.  We're very concerned about that.

THE COURT:  Okay.  File the motion.  We'll have a hearing.

MS. JOHNSON:  Thank you, Your Honor.

THE COURT:  All right.  That is one that I agree with you, that the Bureau of Prisons should be here for.

Okay.  We will be in recess.  And I will see defense counsel about that *ex parte* matter in chambers.  Thank you.

77

MR. CHAMBERS: While we have an opportunity, can I speak with Mr. Burke quickly?

THE COURT: Sure. You can do whatever you like, whatever is good.

(Recess at 12:20 p.m.)

REPORTER'S CERTIFICATE


I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Dated at Denver, Colorado, this 24th day of August, 2011.

s/Therese Lindblom

_____

Therese Lindblom, CSR, RMR, CRR