## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA      :

                        :       NO. 4:96-CR-00239

                        :

      v.                  :

                        :

DAVID PAUL HAMMER      :

                        :

      Defendant      :       (Electronically Filed)

## EXHIBITS TO DEFENDANT HAMMER'S LETTER BRIEF ON DISCOVERY

**Exhibit 3** – Transcript pages of testimony concerning Silverstein or Fountain

    3.1. Page 76 from the testimony of Witness Harshburger in *United States vs. Richardson* (ND of GA, Atlanta Division) No. 1:08-CR-139, dated April 23, 2012.

    3.2. Testimony of Witness Harshburger at Pages 188, 208, and 209 in *United States vs. Caro* (W.D. Va.) No. 06-CR-0001 (date presently unknown).

    3.3. Pages 176-177 cross examination of Witness Cunningham in *United States vs. Sampson* (D.C. Mass.) No. CR-01-10384, December 4, 2003.

    3.4. Pages 32 and 55-56 cross examination of Witness Bezy in *United States vs. Phillips*, (E.D. of Pa.) No. 07-549, April 22, 2009.

    3.5. Page 2351 cross examination of Witness Cunningham in *United States vs. McGriff* (E.D. N.Y.) CR-04-966, February 7, 2006.

3.6.   Page 2232 cross examination of Witness Romine in *United States vs. LeCroy* (N.D. Ga.) 2:02-CR-38, March 5, 2004.

3.7.   Page 173 cross examination of Witness Cunningham by AUSA Mellin in *United States vs. Hager* (E.D. Va.) 1:05-CR-264, October 25, 2007.

76

A.    Yes.

Q.    Now, Tommy Silverstein, what was he in the Control Unit at Marion for?  Why was he there the day that he committed the murder of the staff at the Control Unit?

A.    Well, he was sent to Marion because he had killed an inmate at USP-Leavenworth.  And then I'm not sure whether he killed the next two inmates at Marion, I think it was he was at Marion -- he may have went to the Control Unit for that but then there were two additional murders in the Control Unit apart from the officer.

Q.    That Silverstein committed?

A.    That Silverstein committed.

Q.    And then he was able to commit the murder of a correctional officer?

A.    That's correct.

Q.    And at the time that this occurred back in the 1980s was there a federal death penalty statute?

A.    No, there was not.

Q.    So was the death penalty an option for punishment for Mr. Silverstein?

A.    It was not an option.

Q.    BOP have any option about transferring Mr. Silverstein anywhere else in the world, frankly?

A.    Well, no.  These events occurred in the most secure units we had in the Bureau of Prisons at that time.

3.1

Control Unit something that's new with ADX, or has there been, has the Bureau of Prisons used Control Units in the past?

A    Well, we've used a Control Unit for a number of years.  I don't know the exact year that it started, but we used a Control Unit back at Marion when Marion had the mission that the ADX now has.  So, it's been a number of years.

Q    The conditions of confinement similar at Marion before they moved it to ADX Florence?

A    Yes, they were.

Q    Okay.  And based on your experience were there problems with inmates committing crimes or engaging in disruptive behavior at Marion?

A    Yes.  We, we had some problems at Marion. Perhaps the most significant was we had two officers murdered in the Control Unit in two separate incidents on the same day, and two staff members very seriously wounded in those attacks.

Q    In response to those did the Bureau of Prisons implement policy to make sure that did not happen again?

A    Well, we looked at what happened.  I wasn't in a position to be on an after-action at that point because it was early in my career, but what the

Hershberger - Redirect

Q    And I wanted to ask you about Silverstein.  Do you recall when it was he was convicted of his first murder?

A    Well, he had -- no, I don't recall when that happened.  It was probably in the late seventies.

Q    Late seventies.  Was that Leavenworth?

A    I believe it was at Leavenworth, and then he was sent to Marion and he had one or two other murders at Marion.

Q    Let me start, first of all, at Leavenworth, his first murder.  Who did he murder in Leavenworth?  Was it an inmate or was it staff?

A    No, it was an inmate.

Q    Okay.  Did he receive a life sentence for that?

A    I believe he did.

Q    Okay.  And after receiving that life sentence you say he went to Marion?

A    Yes.

Q    Was he put in the Control Unit at Marion?

A    I don't believe he went into the Control Unit initially, but my memory is not real good on that exact sequence.

Q    Okay.  But did he murder, after getting this life sentence, and being sent to Marion, did he murder another inmate at Marion?

3.2

A    Well, I know he murdered another inmate at Marion in the Control Unit.

Q    Okay.

A    And that's not supposed to happen, either, but it did.

Q    Was he punished for that?  Did he receive an additional term of confinement?

A    I believe he did receive another life sentence for that.  But again, my memory is a little hazy on his sentencing.

Q    Were there alternatives, were there laws in effect at the time that would allow something greater than life back then?

A    There was no federal death penalty for murdering inmates or staff at that time.

Q    So, when he murdered the second person there was no death penalty as an option?

A    No.

Q    After murdering the second person did Silverstein murder yet again after being punished for the second murder?

A    Yes, that's when he murdered our staff member at Marion.

Q    Was there any death penalty at the time he committed his third murder?

173

THE COURT: I'll see counsel at side bar.

MR. WORTMANN: Your Honor, I'll move on.

THE COURT: If you're going to get to the matter we discussed at the break at side bar, I want to see you before you ask any questions.

Q. Now, another thing that you discussed is the use of searches within the Bureau of Prisons, to search cells, correct?

A. Yes, sir.

Q. And why is that required?

A. That's a part of good security, that you are patting prisoners down, that you are strip searching, that you're doing orifice checks, that you are searching their cells. That's part of the enforcement that deters them from contraband, whether it's drugs or alcohol or hoarding food or weapons that they might otherwise have. So that process of continual searching is part of good security.

Q. Happens frequently, does it not?

A. Yes, sir, the searches are very frequent.

Q. And, notwithstanding that, every year, there are more people who are assaulted with weapons, correct?

A. There are not more people every year.

Q. There are additional people who are assaulted?

A. There are people who are assaulted with weapons in prison each year.

174

Q. Because prisoners are very good at hiding things?

A. They attempt to secret things. The staff is very effective at discovering hiding places and conducting effective searches. There are instances where inmates are able to still maintain a weapon, avoid that kind of search.

Q. Now, another point you rely on in your testimony was the use of three-point holds?

A. Three-man holds, yes, sir.

Q. Right. Now, in the first instance, what percentage of prisoners in the Federal Bureau of Prisons are moved on a day-to-day basis the way we saw in that video, using the three-man hold?

A. That would be a minority of inmates. That would include everybody who's on the control unit at ADX, which is approximately 65 inmates there, and in any other facility where there is a secured housing unit or administrative segregation where a three-man rather than a two-man escort is identified as being necessary.

Q. And as a percentage basis, would it be less than ten percent?

A. A total inmate movement, of course, because most of your inmates are in a general prison population, and the doors are open in the morning, and they come out, and they're not being shackled when they're routinely moving

175

during the day.

Q. Less than one percent?

A. Approximately ten percent of the -- of USP cells, as I understand it, are administrative segregation, administrative detention in nature, so I think that -- it is a minority of movement that's like that. I wouldn't go as far as one percent.

Q. And it is true that the three-man hold does not eliminate all possibility of injury, is that correct?

A. I suppose nothing is impossible. It profoundly reduces the likelihood of serious injury. I suppose an inmate could still throw his head into a staff member, but their ability to seriously injure a staff member has been profoundly restricted.

Q. Well, there are people who -- head butts and biting?

A. Head butts, yes, that can occur.

Q. Pushing a guard down the stairs, for example?

A. I'm not familiar with that. As I have looked at the assaults that have occurred on the control units, since the facility opened, I think there were a couple of attempted head butts. There was some throwing of some fluids. There were attempting to pull away at the cuffs so that it scraped the officer's hand a little bit. But there is not -- there haven't been any instances there of three-man holds where somebody has pushed the officer

176

down the stairs. I'm not familiar with that happening in a three-man hold.

Q. How about a two-man hold?

A. I'm not familiar with the specific occurrence of that happening.

Q. And you are aware of instances in which inmates have gotten out of two-man holds and in fact killed guards, is that not true?

A. I don't know that that has happened as you have described it.

MR. WORTMANN: Your Honor, can we approach, please?

THE COURT: Yes.

AT THE BENCH:

MR. WORTMANN: Your Honor, I'm aware of prior testimony in which Doctor Cunningham has acknowledged the Clayton Fountain incident. I don't know why he's not answering, but I want to focus in on that, and that would just be the easiest way for me to introduce it rather than try to figure out why my description is not accurate.

MR. RUHNKE: Your Honor, I believe the Clayton Fountain situation -- Clayton Fountain was an inmate at Marion in 1983, 20 years ago, and I believe he broke out of a three-man hold, which may have been the confusion. I'm going to object to the specific incident. It's 20 years ago.

THE COURT: And I've been doing -- we discussed this a bit. It's in the bin Laden case. I've been both thinking about the issue further in general, but particularly in the cross-examination, which I think has been great, and I'm not going to permit any questioning about specific incident. Mr. Ruhnke a number of times, you know, let me know, and I know in the bin Laden case, you can see there's a violent issue because of Ted Kazinski. See, this one (sci), and I don't think that goes to Mr. Sampson's risk of danger, and I think this is the flip side of that. And, in fact, there's -- the fact

to the extent that it's not identified with particular people, it's even harder to get at. But, in general, I think there's been very effective cross-examination so far of this witness, and the risk of unfair prejudice or the risk of opening the door to my having to reconsider whether to let in something about all these dangerous people, all these people that did horrible things in prison is too great, so I'm --

MR. WORTMANN: Okay.

(Bench conference ends.)

BY MR. WORTMANN:

Q. You'll agree with me, though, that the three-point hold is only as good as the ability to keep the inmate in the three-man hold?

A. Yes, sir. If the three that are holding him relinquish their hold and close their eyes and turn their back, then that's not a very effective escort.

Q. And it has little or no relevance to the vast majority of prisoners in high security at United States penitentiaries who don't get transported on a regular basis in that manner?

A. That's correct. It only has relevance for those inmates who the Bureau of Prisons believe that a USP level security is not enough. The folks that are in general population in USP have been placed there because the estimate of the professionals who are evaluating them is that this is somebody who can be safely maintained or isn't going to have a disproportionate incident of violence in that setting. If they believe that someone requires greater security than that, then they can bring whatever degree of security they believe is necessary to provide for security and safety of inmates and staff.

Q. And, very often, Doctor, those kinds of procedures are only used after it's too late, after somebody has been harmed, correct?

A. It can be done afterwards. It can be a preventive intervention if someone is engaged to represent a disproportionate risk. And there are times when (sic) Bureau of Prisons acts preemptively to bring security to bear.

Q. And there are many more instances in which it's done only after an injury has occurred or an assault has occurred with or without a weapon, correct?

A. Sometime it happens after the event's occurred.

Q. How many murderers are there incarcerated in the federal system?

A. There are -- I can tell you homicide, aggravated assault, and kidnapping offenses, there are 5,139 or about 3.3 percent. I don't have a break-out for homicide alone.

Q. And what's the capacity of the ADX?

A. ADX has a capacity, I was told, for 90. The video said for 80. There are 385 there now.

Q. And, in fact, that's by design, is it not?

A. To provide room for additional individuals, yes, sir.

Q. And, generally, it ranges in the high threes or the low fours?

A. That's correct.

Q. And that's in case there's a major prison disturbance, there will be room to bring people?

April 22, 2010

Page 29

A.   Good morning.

Q.   Can I assume that he had a prior history in the system before he went to Super Max?

A.   He was -- as far as I know, he was a direct core commitment, and he was placed -- the judge ordered him basically into solitary.

Q.   And he had a prior history, though, within the system, the Federal correctional system; is that correct?

A.   He was under a judge's order for a new sentence.

Q.   Under a judge's order for a new sentence?

A.   Yes.

Q.   So he had a prior history before he went directly --

A.   I can't speak to that.

Q.   Let me ask you this question with regard to direct commitments.

They are very rare; is that right?

A.   Like I said, it's about six percent.

Q.   Would you consider that to be rare?

A.   Well, it's six percent.

Q.   Between four and six percent; is that right?

A.   Yes.

Q.   It's not six. It's between four and six?

Page 30

A.   It depends on who you talk to.

Q.   With regard to a request by the U.S. Attorney's office, you as -- in your familiarity with the BOP, you got them all the time; is that right?

A.   We got them from the -- more from the courts than from the U.S. Attorney's Office, yes.

Q.   And if you got one from the Court, the BOP didn't necessarily have any obligation to honor the request made by the Court; is that correct?

A.   No. Normally from the courts it was for a programming issue and closer-to-home type of issue, but for direct core commit it is usually handled at a higher level than me.

Q.   And there were times that the BOP, based on what their needs and restrictions and its fees were, were not able to accommodate; is that correct?

A.   It's possible, yes.

Q.   So it's not always -- if someone makes a request, even if it comes from a judge, it doesn't necessarily get honored by the BOP; am I right about that?

A.   You're right and wrong. It depends on the power behind the recommendation. A recommendation for a simple placement into a drug treatment program closer to home may -- would not be honored as quick

Page 31

as something that posed a life safety issue.

Q.   I understand that. But it doesn't necessarily have to be honored; is that correct? It's up to the BOP and what they have available; is that right?

A.   We never get full. We just get crowded, you might say. So there's always room someplace for them.

Q.   But my question is, there may not be room in the spot that the judge makes a request on; is that correct? Ultimately, it's the BOP that gets to determine, because they are in charge of the safety of not only the inmates, but the safety of the public from the inmates. They are ultimately the ones that make the call as to where the person is best housed; is that correct?

A.   Correct, but some facilities are never full.

Q.   Now, the reason that the Super Max was built -- before the Super Max in Florence was built, Marion was the most secure institution within the BOP; is that right?

A.   Correct.

Q.   The BOP tries to do their very best and make sure -- in insuring safety of everybody, staff, other inmates and again the public; is that correct?

Page 32

A.   That's correct.

Q.   And sometimes they're not able to do that; am I right about that, sir?

A.   Things happen, yes.

Q.   In fact, there were two killings of correctional officers within the Special Control Unit in Marion on the very same day; is that right?

A.   I think they were a day off.

Q.   One day after the next?

A.   Correct.

Q.   And that was within the most controlled unit within the most controlled institution at the time; is that right?

A.   Yes, but if you looked at the investigation of that, there were some mitigating issues in there. That should have never happened.

Q.   Sir, I'm not blaming the institution. Please don't misinterpret my question. I'm just trying to get the facts out.

The facts are that two officers were killed by two inmates, and the killings themselves took place within the most secure area of the most secure prison in the Bureau of Prisons at the time; is that a correct statement?

Kaplan, Leaman and Wolfe Court Reporters
1-800-295-7571

April 22, 2010

Page 53

Control Unit?

A.    No. They have individual recreation enclosures.

Q.    And in the regular general population before the step-down program, do they rec with other inmates there?

A.    No. They have -- they have individual rec now.

Q.    Do they get to sit down and play cards and watch TV?

A.    In the step-down units there's time for that, but in general population, no.

Q.    And their phone minutes, are they restricted?

A.    Yes. Their phone calls are limited per month.

Q.    If the BOP believed that an inmate presented a danger to others, would a lack of space be an issue?

A.    No.

MS. BARRETT:  Thank you.

MS. McCARTNEY:  Very briefly, if I might, Your Honor.

THE COURT:  Yes.

RECROSS-EXAMINATION

Page 54

BY MS. McCARTNEY:

Q.    Sir, you're aware of the fact that there's a -- probably a couple thousand Assistant United States Attorneys currently employed by the Department of Justice; is that right?

A.    Yes.

Q.    It's not -- I want to be clear about something.

It's really not your testimony that if a request came in from any one of them at any point in time with regard to a recommendation about where an inmate that had been convicted or an individual that had been convicted should be sentenced, that the BOP would honor that request?

A.    Did you say an AUSA or U.S. Attorney?

Q.    Assistant US Attorney.

A.    It would probably come from the U.S. Attorney, which is much smaller.

Q.    Are you talking about Eric Holder who is the United States Attorney General?

A.    I'm talking about the appointed U.S. Attorneys in the districts.

Q.    That would be something that would be considered; is that right?

Page 55

A.    Yes. That would be heavily considered.

Q.    Now, sir, you indicated at one point to Ms. Barrett's questions that you always respond to or the BOP tries to always respond to situations that occur; is that right?

A.    Yes.

Q.    Implicit in that, if I'm correct -- correct me if I'm wrong, is that you respond and the response would be after something had happened that would require the response; is that right?

A.    Again, not -- we do -- we are reactive, but we are also proactive, too. We change constantly to meet the demands of the incarcerated people.

Q.    And the demands because every person -- there are individuals who present continuing problems for the BOP; is that right?

A.    Yes.

Q.    And you have to respond to those problems?

A.    Yes.

Q.    Now and because sometimes things can happen, as we already discussed; is that right, sir?

A.    Correct.

Q.    And even in situations like ADX Florence, you're familiar with an inmate that was housed there by the name of Tommy Silverstein; is that right?

Page 56

A.    I had him in Leavenworth for three and a half years first.

Q.    And Tommy Silverstein, he murdered a correctional officer while he was in Marion?

A.    Yes.

Q.    And while he was confined to ADX Florence, under the tightest security possible, he was able to send a message outside that institution in invisible ink that ordered the murder of several other inmates at Lewisburg; is that correct?

A.    Silverstein?

Q.    Yes.

A.    Not to my recollection. It didn't come from him. He would have been at Leavenworth at that time, anyway.

Q.    He was at Florence, right?

A.    He went from Marion to the basement of Leavenworth and then when they constructed the new Special Housing Unit, they built a special wing for him. He just recently went the last year or two -- went out to ADX.

Q.    But wasn't he, at some point in time, sir, able to send a message to outside of the prison under very tight security systems in invisible ink that ordered the murder of other prisoners?

14 (Pages 53 to 56)



2351

for that data.  I've asked for the data on inmate-on-inmate homicides and the intelligence --

THE COURT:    You don't have that?

THE WITNESS:  I don't have it.

THE COURT:    Any data at all as to whether or not people in jail are somehow able to tell people out of jail to commit crimes of violence?

THE WITNESS:  That has happened.  I'm aware of prosecutions for that.  It is a rare event as best we understand it.

THE COURT:    That's the best information you have?

THE WITNESS:  Yes, sir.

Q    Those people who ordered those murders, the Aryan Brotherhood, where were they incarcerated?

A    Some of those were incarcerated at ADX Florence.

Q    That was the super maximum security prison you told us about?

A    Yes, sir.  Part of what this was dealing with was the communication that inmates were having in code from within ADX.

Q    Not just in code, sending out letters that had a visible link on them ordering murders elsewhere, right?

A    That's what I meant in code.

Q    What do you know about the Supreme Team?

MR. RUHNKE:    I object.

2232

FACILITY CAME UNDER GUNFIRE FROM OUTSIDE THE PENITENTIARY IN AN ESCAPE ATTEMPT?

A.    YES, THERE WAS.

Q.    WERE YOU THERE THEN OR WAS THAT PRIOR TO YOUR TIME?

A.    I WAS THERE, BUT I WAS ON DAY OFF.

Q.    WERE YOU -- YOUR RÉSUMÉ INDICATES THAT YOU LEFT USP MARION IN 1983.  WERE YOU THERE ON OCTOBER 22ND, 1983?

A.    I LEFT THE WEEK BEFORE.

Q.    DID YOU KNOW -- YOU WERE A SUPERVISOR OF CORRECTIONAL OFFICERS WHEN YOU WERE THERE.

A.    YES, I WAS.

Q.    DID YOU KNOW CORRECTIONAL OFFICER MERLE CLUTTS?

A.    I KNEW BOTH OF THEM.

Q.    AND THE OTHER WAS ROBERT HOFFMAN.

A.    RIGHT.

Q.    TELL THE JURORS WHAT HAPPENED AT THE MOST SECURE FACILITY, USP MARION, ON OCTOBER 22ND, 1983.

A.    THEY WERE BOTH KILLED AND STABBED TO DEATH BY TWO SEPARATE INMATES.

Q.    AND THOSE TWO INMATES WERE INSIDE THE MOST SECURE PART OF USP MARION, WEREN'T THEY?

A.    YES, THEY WERE.

Q.    ONE INMATE WAS SILVERSTEIN, TOMMY SILVERSTEIN?

A.    YES.

Q.    AND HE WAS BEING ESCORTED BY THREE CORRECTIONAL OFFICERS.

2233

A.   BACK TO HIS CELL.

Q.   BACK TO HIS CELL, AND HE WAS HANDCUFFED.

A.   YES.

Q.   AND HE PAUSED IN FRONT OF A CELL OF ANOTHER INMATE, AND THE CORRECTIONAL OFFICERS THERE HEARD A CLICK; AND HE MANAGED TO GET OUT OF HIS CUFFS, DIDN'T HE?

A.   YES, HE DID.

Q.   AND HE THEN TURNED AROUND WITH A SHANK IN HIS HAND?

A.   YES.

Q.   AND WHAT IS A SHANK?

A.   IT'S A HOMEMADE KNIFE.

Q.   AND IS A SHANK THE WEAPON OF CHOICE WITHIN THE U.S. PENITENTIARIES?

A.   IF YOU WANT TO DO SERIOUS BODILY HARM OR YOU WANT TO HAVE ONE FOR PROTECTION.

Q.   AND THEY CAN BE FORMED OUT OF MANY DIFFERENT TYPES OF OBJECTS, CAN'T THEY?

A.   YES, THEY CAN.

Q.   EVEN PLASTIC.

A.   YES, THEY CAN.

Q.   SHARPENED.   AND INMATE SILVERSTEIN STABBED MERLE CLUTTS 22 TIMES?

A.   I BELIEVE SO.

Q.   AND DID HE STATE HIS MOTIVE FOR KILLING MR. CLUTTS?

A.   DISRESPECT.

A.    There are four at ADX.

But most of that facility is full of cells that have double doors, where somebody is single-celled. The only thing that Range 13 does is -- means that you don't have to handle the inmate to take them to rec or that kind of thing.

ATTORNEY MELLIN:  Right.

BY ATTORNEY MELLIN:

Q.    And the reason why Silverstein is in there is because he and, I believe it's Fountain, killed an inmate, originally, at Marion; isn't that right?

A.    I don't recall the specifics of what they did before they each independently killed two different staff members.

ATTORNEY MELLIN:  Correct.

BY ATTORNEY MELLIN:

Q.    And then after that, after they killed an inmate, then they are in these three-man holds. They break free and they each kill a guard; isn't that right?

A.    Yes, sir.

They ran to a cell front that then was an opened set of bars, and obtained a weapon, and then turned on the staff.

ATTORNEY MELLIN:  Thank you.

THE COURT:  Is this a change, or are you going on to -- is this similar testimony?

MICHAEL A. RODRIQUEZ, RPR/CM/RMR

3.7