# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA       :

                                    :       NO. 4:96-CR-00239

                                    :

             v.                      :

                                    :

DAVID PAUL HAMMER       :

                                    :

           Defendant             :       (Electronically Filed)

## EXHIBITS TO DEFENDANT HAMMER'S LETTER BRIEF ON DISCOVERY

**Exhibit 4** – Lewisburg Killings Ordered Out of ADX

    4.1.    Page 14 cross examination of Defense Witness Bezy in *United States vs. Aquart* (D.C. Conn.) 6-CR-160, Volume 27, June 6, 2011.

    4.2.    Page 37 cross examination of Defense Witness Bezy in *United States vs. Phillips* (E.D. Pa.) 07-549, April 22, 2010.

    4.3.    Page 500 cross examination of Defense Witness Cunningham in *United States vs. Umana* (W.D. of N.C.) 3:08-CR-1311-2, April 26, 2010.

    4.4.    Page 2351, cross-examination of Witness  Cunningham in *United States vs. McGriff* (E.D. NY), CR-04-966, February 7, 2006.

Case 4:96-cr-00239-JHS    Document 1478-4    Filed 07/16/12    Page 2 of 5
Case 2:05-cr-00924-RB    Document 1299-1    Filed 09/07/11    Page 14 of 26
5401

prior to the day that the guard was stabbed in the eye, correct?

A.   I can't speak, I wasn't there.

Q.   Okay.  And then in 2006, Tyler Bingham and Barry Mills, I believe you are familiar with him, were both convicted for racketeering and conspiracy for ordering assaults and murders from their cells at the Florence supermax, correct?

A.   Right.

Q.   And just in December of 2010, two guards were assaulted by an inmate in supermax, right?

A.   I'm not aware of it.  It's possible, yes.

Q.   So even in a really secure prison, inmates, if they want to, can attack a guard?

A.   It's possible.

Q.   And so you also talked about infractions in prison, like the failure to stand for a count.  Not every infraction sends a prisoner to SHU, correct? To the special housing unit?

A.   No, there is different levels.  There is the 100 level through 400 level.  And depending on the level of the severity of the incident, sometimes it's automatic lookup, sometimes it's not, it's a lower level.

Q.   I'm sorry, go ahead.

April 22, 2010

Page 37

Prisons where messages have gone from an inmate in a high-security situation to others that ordered the killing of prisoners in other institutions? That's occurred, hasn't it? The Aryan brothers?

A. Brotherhood.

Q. Brotherhood. There were actually a number of them, right?

A. I believe there were two.

Q. Murders?

A. Yes.

Q. That were directly linked from messages from one inmate in one facility to another inmate in another facility, correct?

A. That's what they allege, correct.

Q. They were convicted, correct? You don't know?

A. I don't know.

Q. Let me ask you, sir, there have been instances where individuals have gotten messages out and things have happened on the outside, not necessarily within the confines of another prison.

A. Can you be a little more specific?

Q. Let me see whether I can give you an example. Are you or do you have any familiarity

Page 38

with an individual by the name of Kaboni Savage?

A. No.

MS. BARRETT: Objection, Your Honor.

THE COURT: What's your basis for the objection?

MS. BARRETT: I don't believe that the institution in that case was a penitentiary or any -- or a high-security facility.

THE COURT: You'll have an opportunity to redirect. Very well.

BY MS. McCARTNEY:

Q. An individual by the name of Kaboni Savage who was being housed --

MS. BARRETT: Objection, Your Honor. He said no.

THE COURT: That's right.

BY MS. McCARTNEY:

Q. Sir, are you familiar with instances where prisoners that are being housed within the BOP have been able to reach out to communicate with others on the outside and harm has come to people as a result of that?

A. Me personally?

Q. Yes.

Page 39

A. No.

Q. Have you, with your familiarity within your experience at the BOP, have you not heard of anything like that occurring?

MS. BARRETT: Objection, Your Honor.

THE COURT: Overruled. It asks for his experience and knowledge that you offered and proffered this witness as.

THE WITNESS: Again, it's possible.

BY MS. McCARTNEY:

Q. Sir, you are familiar with the fact that prisoners -- given your vast experience, prisoners can be manipulative; is that right?

A. Yes.

Q. Prisoners can be creative; is that right?

A. You betcha.

Q. Pretty much as a warden I'm sure you've had some experience with -- with every time a rule was put into place someone was looking to try to break it, and so you were always battling against that; is that correct?

A. It wasn't a battle. I mean, we were in control. We controlled the facility. I mean, their actions led to my actions. Every action on my part.

Page 40

I mean, I ran my prisons.

Q. I don't mean to imply that you didn't, sir, so please don't interpret my question as that being the case.

My point is, you had a very difficult job because somebody was always trying to break a rule that you had in place; is that right?

A. Basically nobody wanted to be there, yes.

Q. And prisoners can be -- you're familiar with the fact that sometimes individuals speak to one another either in the prison context or speak to people on the outside in coded language.

A. Yes.

Q. And sometimes people are able to communicate by letters using coded type of language; is that right?

A. Yes.

Q. And that's always a difficulty, although attempts are made to control that, that's always a concern that the BOP has; is that right?

A. Yes.

Q. That there's able to be communications that are happening by way of codes.

A. That's why we have staff that scrutinize the mail. We break codes. We have the FBI we use as

10 (Pages 37 to 40)

42

500

A.    Yes, ma'am.  Potentially, again, defeating those communication restrictions.  If they call somebody in the community, and then somebody else from another prison calls that person, then the information could be relayed.  Or if letters might be rerouted or recopied from one person to another.

Q.    And in fact, in your studies, did you not learn about inmates who ordered murders on inmates in other facilities?

A.    Not in our studies.  I have -- I'm aware that there have been concerns with that.  I'm not familiar with the state of those investigations.  But I'm aware that there have been allegations regarding that.

Q.    And individuals who have contact with the outside community, have the opportunity to direct, or to -- well, to direct a murder to occur outside the facility?

A.    Yes, ma'am.  If they have the resources to do that, and an organization that will do their bidding, that's what these communication units were designed to defeat.  That's what special communication restrictions that may be ordered by the Department of Justice or by the court are intended to defeat.

Q.    And they had to create those because of that problem?

A.    Because a concern could occur, yes, ma'am.

Q.    And your statistics here do not reflect murders that have been ordered or have occurred as a result of a request

Laura Andersen, RMR 704-350-7493

2351

for that data.  I've asked for the data on inmate-on-inmate homicides and the intelligence --

THE COURT:  You don't have that?

THE WITNESS:  I don't have it.

THE COURT:  Any data at all as to whether or not people in jail are somehow able to tell people out of jail to commit crimes of violence?

THE WITNESS:  That has happened.  I'm aware of prosecutions for that.  It is a rare event as best we understand it.

THE COURT:  That's the best information you have?

THE WITNESS:  Yes, sir.

Q    Those people who ordered those murders, the Aryan Brotherhood, where were they incarcerated?

A    Some of those were incarcerated at ADX Florence.

Q    That was the super maximum security prison you told us about?

A    Yes, sir.  Part of what this was dealing with was the communication that inmates were having in code from within ADX.

Q    Not just in code, sending out letters that had a visible link on them ordering murders elsewhere, right?

A    That's what I meant in code.

Q    What do you know about the Supreme Team?

MR. RUHNKE:  I object.