# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA     :

                            :     NO. 4:96-CR-00239

                            :

         v.                  :

                            :

DAVID PAUL HAMMER         :

                            :

       Defendant        :     (Electronically Filed)

## EXHIBITS TO DEFENDANT HAMMER'S LETTER BRIEF ON DISCOVERY

**Exhibit 6** – Factual Inaccuracies Contained in Government Cross-Examination Questions

      6.1.     Page 10, cross-examination of Witness Bezy in *United States vs. Aquart*, Supra.

      6.1(a).     Page 11, cross-examination of Witness Bezy in *Aquart*, both highlighted questions are factually incorrect.

      6.2.    Pages 55-57, cross-examination of Witness Bezy in *United States vs. Phillips*, (E.D. Pa.) 07-549, April 22, 2010.

      6.3.    Pages 187-189, cross-examination of Witness Cunningham in *United States vs. Hager*, Supra.

Case 4:96-cr-00239-JHS    Document 1478-6    Filed 07/16/12    Page 2 of 7
Case 2:05-cr-00924-RB    Document 1299-1    Filed 09/07/11    Page 10 of 26
5397

incident reports, misbehavior issues, they look at their association with staff, that's a big key thing, and whether the offense that put them in the ADX has been mitigated enough to warrant their moving through the program.

Q. Okay. And people in fact do step down and go to lesser programs, right?

A. Some.

Q. You mentioned in fact that there are some inmates at supermax who you put there in 1995, right?

A. Yes, ma'am, I moved them there, yes.

Q. But that's only two, correct?

A. No, I checked. There is a few more than two.

Q. But not all 449?

A. No.

Q. Okay. And even though Florence, which I'm using Florence and supermax interchangeably, is very secure, there are still assaults and homicides there; is that correct?

A. I believe there has been one homicide there.

Q. Okay.

A. But then they changed the operation based

on that, too.

Q.    Is that the 2005 murder of Manuel Torrez?

A.    Correct.

Q.    And he was beaten to death in the yard at supermax, correct?

A.    Correct.

Q.    By Richard Santiago and Silvestre Rivera?

A.    Yes.

Q.    And Santiago was at supermax because he killed a prison guard in Fresno, right?

A.    I'm not aware of what he did.

Q.    And in fact there was another murder at supermax in 2008, Gary Douglas Watland killed somebody.

A.    That was at USP, it wasn't the ADX.

Q.    But at Florence?

A.    There are four facilities there.  They each have their own warden.  There are four distinct separate facilities.  They do not all have the ADX function, they all have their own function there.

Q.    But this would have been the place, for instance, if he stepped down from supermax, he would go, for instance, to the USP, right, at Florence?

A.    There is one unit there at the USP that is set aside for their step program, step-down program.

April 22, 2010

Page 53

Control Unit?

A.    No. They have individual recreation enclosures.

Q.    And in the regular general population before the step-down program, do they rec with other inmates there?

A.    No. They have -- they have individual rec now.

Q.    Do they get to sit down and play cards and watch TV?

A.    In the step-down units there's time for that, but in general population, no.

Q.    And their phone minutes, are they restricted?

A.    Yes. Their phone calls are limited per month.

Q.    If the BOP believed that an inmate presented a danger to others, would a lack of space be an issue?

A.    No.

MS. BARRETT:  Thank you.

MS. McCARTNEY:  Very briefly, if I might, Your Honor.

THE COURT:  Yes.

RECROSS-EXAMINATION

Page 54

BY MS. McCARTNEY:

Q.    Sir, you're aware of the fact that there's a -- probably a couple thousand Assistant United States Attorneys currently employed by the Department of Justice; is that right?

A.    Yes.

Q.    It's not -- I want to be clear about something.

It's really not your testimony that if a request came in from any one of them at any point in time with regard to a recommendation about where an inmate that had been convicted or an individual that had been convicted should be sentenced, that the BOP would honor that request?

A.    Did you say an AUSA or U.S. Attorney?

Q.    Assistant US Attorney.

A.    It would probably come from the U.S. Attorney, which is much smaller.

Q.    Are you talking about Eric Holder who is the United States Attorney General?

A.    I'm talking about the appointed U.S. Attorneys in the districts.

Q.    That would be something that would be considered; is that right?

Page 55

A.    Yes. That would be heavily considered.

Q.    Now, sir, you indicated at one point to Ms. Barrett's questions that you always respond to or the BOP tries to always respond to situations that occur; is that right?

A.    Yes.

Q.    Implicit in that, if I'm correct -- correct me if I'm wrong, is that you respond and the response would be after something had happened that would require the response; is that right?

A.    Again, not -- we do -- we are reactive, but we are also proactive, too. We change constantly to meet the demands of the incarcerated people.

Q.    And the demands because every person -- there are individuals who present continuing problems for the BOP; is that right?

A.    Yes.

Q.    And you have to respond to those problems?

A.    Yes.

Q.    Now and because sometimes things can happen, as we already discussed; is that right, sir?

A.    Correct.

Q.    And even in situations like ADX Florence, you're familiar with an inmate that was housed there by the name of Tommy Silverstein; is that right?

Page 56

A.    I had him in Leavenworth for three and a half years first.

Q.    And Tommy Silverstein, he murdered a correctional officer while he was in Marion?

A.    Yes.

Q.    And while he was confined to ADX Florence, under the tightest security possible, he was able to send a message outside that institution in invisible ink that ordered the murder of several other inmates at Lewisburg; is that correct?

A.    Silverstein?

Q.    Yes.

A.    Not to my recollection. It didn't come from him. He would have been at Leavenworth at that time, anyway.

Q.    He was at Florence, right?

A.    He went from Marion to the basement of Leavenworth and then when they constructed the new Special Housing Unit, they built a special wing for him. He just recently went the last year or two -- went out to ADX.

Q.    But wasn't he, at some point in time, sir, able to send a message to outside of the prison under very tight security systems in invisible ink that ordered the murder of other prisoners?

14  (Pages 53 to 56)



April 22, 2010

Page 57

A.    I don't think that was him.
     MS. McCARTNEY:  Thank you.
     MS. BARRETT:  No further questions.
     THE COURT:  You may step down now, and watch your step.

Kaplan, Leaman and Wolfe Court Reporters
1-800-295-7571

A.    Yes, sir.

I described the rates of that in my testimony.

Q.    And, in fact, you talked about the Cairo case or the kay-ro (phonetics) case, correct?

A.    Yes, sir, that's correct.

Q.    That's a case where Mr. Cairo was sent to the SHU, the special housing unit, because he assaulted one inmate, correct?

A.    Yes, sir.

Q.    And while in the SHU he killed his cell mate with a towel; isn't that correct?

A.    Yes, sir.

He was double-celled in a SHU, rather than being single-celled.

Q.    You would agree with me that inmates still have privileges, like the phone privilege, even in the SHU, correct?

A.    Yes, sir, that's correct.

Unless they have demonstrated that they are going to use that to effect criminal purposes, they could still have periodic phone access; much restricted, but periodic.

Q.    And you are aware that inmates in the past have used telephones to direct hits on people at other facilities; isn't that correct?

189

the direction of an inmate.

Q.    You are from Abilene; is that right?

A.    Yes, sir, I am.

Q.    Have you ever been to San Antonio?

A.    Yes, sir, I have.

Q.    Have you testified in San Antonio?

A.    I don't think so.

Q.    Do you know the name of the federal courthouse in San Antonio?

A.    No, sir.

Q.    If I told you it was the John H. Wood Federal Courthouse, would that mean anything to you?

A.    No, sir.  I'm sorry.

Q.    Did you know that John H. Wood was a federal judge in San Antonio?

A.    No, sir.

Q.    Did you know that he was killed by an individual named Charles Harrelson, the father of Woody Harrelson?

A.    No, sir.

Q.    And do you know that that hit was direct by the Mexican mafia out of the jail?

A.    No, sir.  I'm unfamiliar with those circumstances.

Q.    Now, Dr. Cunningham, you have testified in how many capital cases?

A.    Approximately 125.