**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA     :

                            :     NO. 4:96-CR-00239

                            :

        v.                 :

                            :

DAVID PAUL HAMMER        :

                            :

      Defendant       :     (Electronically Filed)

**EXHIBITS TO DEFENDANT HAMMER'S LETTER BRIEF ON
DISCOVERY**

**Exhibit 7** – Data Sources of Government Rebuttal Witnesses

     7.1.   Page 102, testimony of Expert  Shaw in *United States vs. Roman-Villegas*, (D.C. P.R.) CR-02-1117, April 13, 2005.

     7.2.   Page 49, testimony of Expert Hershberger in *United States vs. Richardson*, (D.C. N.D. of Ga.) 1:08-CR-139, April 23, 2012.

     7.3. Page 88, testimony of Expert Rardin in *United States vs. O'Reilly* (E.D. MI) 05-80025, August 19, 2010.

     7.4.   Pages 40-41, 47-48, and 55, testimony of Expert Dodrill in *United States vs. Lujan* (D of NM) CR-5-924, September 27, 2011.

102

Q    I'm sorry?

A    All of these charts I derived from Bureau of Prisons data.

Q    And do any of those other charts change any of the answers that you have provided to the members of the jury today?

A    No.

Q    Sir, after having responded to all of Mr. Potolsky's questions, has your opinion that most of the violent acts, assaults, and murderers committed within Bureau of Prisons correctional facilities are committed by inmates with a violent history that are housed in high security penitentiaries, has that opinion changed?

A    No, it has not.

Q    Has the data supporting that opinion changed?

A    No.

MS. DOMINGUEZ:  I have no further questions.

THE COURT:  Any other questions?

MR. POTOLSKY:  No, Your Honor.

THE COURT:  Thank you.  You are excused.

Next witness.

7.1

49

been provided to me, I would certainly review it.

Q.   Okay.  Well, if you're going to come in here and testify on behalf of the government are you not in a position to ask them to obtain data for you to inform your expert opinion?

MR. MCKINNON:  Your Honor, the question has been asked and answered.  Mr. Hershberger is not familiar with this additional information.

MS. KEARNS:  He said that he wasn't able to obtain it because he couldn't subpoena it, Your Honor.  I think I can follow up on that question.

THE COURT:  I'll let him answer.  Go ahead.

Q.   (By Ms. Kearns)  Mr. Hershberger, were you not in a position to request the government to produce data for you if it would help inform your expert opinion?

A.   Yes.

Q.   You talked about the integrity of the lieutenant who didn't turn in -- well, who didn't write up a disciplinary report when an inmate turned in two weapons to him.  Do you recall that?

A.   Yes.

Q.   And what would you expect of someone under your watch, an officer under your watch, to do if they intercepted a written communication that they believe to be a threat against another inmate?

A.   I would expect them to share that with their supervisor.

7.2

88

A. Yes.

Q. Do you remember how many times you repeated that number to me as we talked over the last few days?

A. Oh, I have repeated that number on several occasions, probably as many as a dozen times.

Q. Okay. And having given me that number, is there any question in your mind that I believed what you were telling me?

A. No, there was no question in my mind, because you hired me as an expert to give you accurate information and I failed -- I made a mistake in that regard.

Q. Okay. And the Court is interested in exactly how the mistake was made, if you can kind of just explain.

A. In my preparation for providing expert testimony for this case, for the matter in the Eastern District of Michigan, as a former official for the Federal Bureau of Prisons, I contacted the Research Department in BOP headquarters on my way here traveling here on Tuesday.

Judy Garrett, a Research Analyst for the Federal Bureau of Prisons, provided me with the assault rate data that I asked for and, indeed, at that point, you had not asked for.

Q. This was something you kind of volunteered during our discussions?

A. Yes. I thought that this information may be useful with regard to providing an understanding of what went on in

7.3

A.  Less problems.  Everybody likes their freedom, likes their privacy.  Having one to a cell is a whole lot better than having four that you're dealing with, with the adjunct facilities in the cell, and sometimes showers are in the area.

Q.  Okay.  And you talked about problems.  What kind of problems?

A.  When you get high security inmates packed into an area, tensions will tend to explode at times.  If you're locked into a cell, an 8 by 8 cell, overnight with another human being, that's not necessarily going to go well all the time, especially if it's somebody not of your choosing, and eventually the tempers will flare.

Q.  And Mr. Bezy said this morning -- I think it was on re-cross, towards the end -- that he thinks there's a low rate of violence in the prisons.  But is there violence in the prisons?

A.  There is violence in prisons.

Q.  Let's just talk about penitentiaries.

A.  Okay.

Q.  Is there violence in penitentiaries?

A.  Yes.

Q.  Have you had the opportunity to review statistics regarding violence in the penitentiaries?

A.  Yes.

JULIE GOEHL, RDR, CRR, RPR, RMR, NM CCR #95
333 Lomas Boulevard, Northwest
Albuquerque, New Mexico 87102

41

Q. How did you get those statistics?

A. In conjunction with this hearing, we got some statistics from the Bureau of Prisons concerning violence.

Q. Okay. And do you know where they came from in the Bureau of Prisons?

A. Some of them came from General Counsel's Office, Legal Office, and Central Office. And some came from ADX Florence.

Q. Okay. I'm going to show you what's been marked as Government's Exhibit 435. Would you take a minute to page through, take a brief look at each page. Tell me, have you seen that document before?

A. Yes, I have.

Q. What is it?

A. This is a list of homicides, escapes, and assaults at all USPs.

Q. Okay. And from what time frame?

A. And the ADX. I'm sorry. From 2005 to the present.

Q. Okay. And you've reviewed these statistics before?

A. Yes.

Q. These are the ones you've talked about coming from General Counsel?

A. I believe these came from Florence and probably the legal person at that institution.

Q. Okay. Thank you.

JULIE GOEHL, RDR, CRR, RPR, RMR, NM CCR #95
333 Lomas Boulevard, Northwest
Albuquerque, New Mexico 87102

7.4

47

A.  Put it down flat.  I can't see that.  Okay.  One escape.  I've got two columns here.  I don't understand what the two columns are.  Oh, it's adding everything up. So it's zero escapes, two homicides, nine serious assaults, and 95 less serious assaults.

Q.  Okay.  And that last row was adding everything up from 2005 to 2009, correct?

A.  Correct.

Q.  And then we move on to a full calendar year of 2009.

A.  Zero escapes, six homicides, 363 serious assaults, 1805 less serious assaults.

Q.  And calendar year 2010?

A.  Zero escapes, 12 homicides, 298 serious assaults, and 1860 less serious assaults.

Q.  Finally, 2011 so far.  Let me straighten this out.

A.  Zero escapes, four homicides, 82 serious assaults, and 662 less serious assaults.

Q.  Okay.  Is that bottom row -- does that bottom row encompass the last two years?

A.  Yes.

Q.  Okay.  Thank you, sir.  Now, have you also had the opportunity to review statistics regarding violence committed by inmates serving life sentences?

A.  Yes.

Q.  Okay.  And where did you get those statistics?

A.    Those came from the Office of General Counsel.

Q.    All right.  Okay.  And when did you -- let me move on. Have you also had the opportunity to review statistics regarding -- well, let me ask a foundation question first. You've heard of the gang -- have you heard of the gang Barrio Azteca?

A.    Yes.

Q.    And we've heard about disruptive groups, the security threat groups, correct?

A.    Correct.

Q.    And tell us the distinction.

A.    Disruptive groups are old prison, established prison gangs that have been around for a long time that continually, over the years, caused great disruption in the institution, so we started tracking them better, as mentioned before, some of the ways we did that.

        The security threat groups -- all other gangs fall under the security threat group area.  We track membership and rates of incident to see if they're going to get to the point where we have to do more monitoring than just the regular person.

Q.    How do you know if someone is in one of the gangs, that goes into a STG or DG?

A.    There's a validation process coordinated through the Sacramento intelligence unit.  They take each individual,

7.4a

55

A.   With the non-BA inmates, it was 11.60 percent committed a 100-level act, compared to 18.18 percent of the Barrio Aztecas committed a 100-level act.

Q.   What about the year 2010?

A.   10.18 percent of the remainder population committed a 100-level act, compared to 21.93 percent of the Barrio Aztecas committed a 100-level act in that year.

Q.   So almost twice as many?

A.   Yes.

Q.   Percentage-wise?

A.   Yes.  More than twice.

Q.   All right.  And we don't have to go through the stats, but the 200-level, that's the next level down, and the comparisons are on there?

A.   Yes.

Q.   Okay.

MR. WARBEL:  Judge, could I have one moment, please?

Q.   Mr. Dodrill, have you reviewed records regarding specific incidents of homicide that have occurred in the BOP in the last -- in the recent years?

A.   Yes.

Q.   Where did you get those?

A.   That was from Office of General Counsel.

Q.   Okay.  And what exactly did you review?