UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,            )
                                     )
                Plaintiff,           )   4:96-CR-00239-JHS
                                     )
          vs.                        )   Philadelphia, PA   FILED
                                     )   July 9, 2012    SCRANTON
DAVID PAUL HAMMER,                   )
                                     )                   MAR 2 5 2013
                Defendant.           )

                                         PER _____
                    PARTIAL TRANSCRIPT        DEPUTY CLERK
          TRANSCRIPT OF MOTION FOR DISCOVERY
        BEFORE THE HONORABLE JOEL H. SLOMSKY
              UNITED STATES DISTRICT JUDGE

APPEARANCES:
For the Plaintiff:          STEVEN D. MELLIN, ESQ.
                            U.S. DEPARTMENT OF JUSTICE
                            CAPITAL CASE UNIT
                            1331 F. Street, N.W.
                            Washington, DC 20530

                            JOHN C. GURGANUS, ESQ.
                            U.S. ATTORNEY'S OFFICE
                            311 Federal Building
                            Scranton, PA 18501

For the Defendant:          RONALD C. TRAVIS, ESQ.
                            (TELEPHONICALLY)
                            RIEDERS, TRAVIS, HUMPHREY, HARRIS,
                            WATERS & WAFFENSCHMIDT
                            161 West Third Street
                            Williamsport, PA 17701

                            JAMES J. MCHUGH, ESQ.
                            JAMES MORENO, ESQ.
                            DEFENDER ASSOCIATION OF PHILADELPHIA
                            601 Walnut Street
                            Suite 545 West
                            Philadelphia, PA 19106

APPEARANCES: (cont'd)
For the Defendant:
                              JAMES V. WADE, ESQ.
                              ANNE L. SAUNDERS, ESQ.
                              FEDERAL PUBLIC DEFENDER
                              100 Chestnut Street
                              Suite 306
                              Harrisburg, PA 17101

ESR OPERATOR:                 CONNIE S. FLORES

Proceedings recorded by electronic sound recording.

                Veritext National Court Reporting Company
                        Mid-Atlantic Region
                  1801 Market Street - Suite 1800
                      Philadelphia, PA 19103
                          888-777-6690

I N D E X

| RULINGS: | PAGE | LINE |
|---|---|---|
| Item 10 and 17 denied | 9 | 7 |
| Item 11 granted | 12 | 23 |
| Item 25 documents requested by December 1, 2012 | 24 | 25 |
| Item 32 taken under advisement | 39 | 8 |
| Items 33, 34, 35 taken under advisement | 39 | 8 |
| Items 36 and 37, Government required to search for information and relay it | 49 | 24 |
| Items 49-51 taken under advisement | 57 | 8 |
| Item 53, Government to provide information as to whether or not changes in procedure have been made | 65 | 7 |
| Item 61 taken under advisement | 65 | 7 |
| Items 66 and 67 taken under advisement | 65 | 16 |
| Items 71, 72, 73, Government not required to provide details of the program for range 13 | 68 | 7 |
| Items 75 and 76, Government to answer yes or no to changes in security | 68 | 25 |

THE COURT:  This is the case of the United States v. David Hammer, criminal number 96-239.  We are on the record. I am in chambers and with me in chambers is -- for the defendant, Mr. Hammer, is James McHugh from the Federal Court Division of the Defender Association of Philadelphia.  And on the telephone attending this conference is Ronald Travis.  And also in chambers representing the government is -- let's see, we have Steven Mellin --

MR. MELLIN:  Correct, Your Honor.

THE COURT:  -- Esquire.  Welcome everyone.

The conference was requested to my understanding because there are some discovery issues that the parties wish to discuss.  Obviously, this has been listed now for a hearing on the death penalty for February 5th, 2013.  Who wishes to take the lead?

MR. MCHUGH:  Your Honor, this is Jim McHugh.  The way that the defense broke this down was of our discovery motion that we filed and the government responded to that government -- to that discovery motion with -- in various ways whether they agreed to turn over the information or they objected or they partially objected and partially agreed.  So the way that the defense is prepared to proceed today is I was prepared to handle request 1 through 31 and then Mr. Travis was going to carry on from 32 to the end of the motion for discovery.  So I think probably it would make sense if I went

first from our prospective.

THE COURT:  All right.  And have all these requests been discussed with Mr. Mellin?

MR. MCHUGH:  Yes.  Either they were discussed with him or we were satisfied with the -- what was provided to us. So when I say I'm going to discuss 1 through 31, there's enough -- most of those have been taken care of.

THE COURT:  All right.

MR. MCHUGH:  But that's my range is the 1 to 31.

THE COURT:  All right.  And I would like to also say that I have received another ex parte request from Mr. Travis to obtain information and after we convene, after we finish this hearing, Mr. Travis, stay on the line --

MR. TRAVIS:  I will.

THE COURT:  -- so I can deal with that.

MR. TRAVIS:  I will do that, Your Honor.

THE COURT:  All right?  Now, Mr. McHugh?

MR. MCHUGH:  Yes.  Okay.

Your Honor, what was left after we had our litigation, in other words the filing of the motion and then the response by the government was the following in my section, the 1 through 31, the following were still at issue and I'll give you -- those have been winnowed down even further but I'll give you the ones that were left and then how we've resolved or resolved to argue in front of Your Honor.

Request in paragraph 10, paragraph 11, paragraph 12, paragraph 15, paragraph 16, paragraph 17, paragraph 24, 25, 26, 27 and 29.  So of the 1 through 31 that we originally requested, we still had issues with those paragraphs.  Since Mr. Mellin and I have had further discussions, the paragraph 15 is no longer an issue because Mr. Mellin has stated that he would be able to provide us with that.

THE COURT:  Can I ask you to just pull a microphone a little closer.

MR. MCHUGH:  Yes.

THE COURT:  Okay.

MR. MCHUGH:  So I would like -- if the Court -- if it's appropriate with the Court, I can go through in order with those remaining and state our position.  Some of them, we've agreed to argue and some of them we've agreed to a modified request.

THE COURT:  Okay.  Let's start with number 10.

MR. MCHUGH:  Okay.  Paragraph 10 of our request was asking for communications between the government and witnesses in the case that were prisoners.  We are satisfied but the government is aware of their Brady and discovery obligations in this case and Mr. Mellin, obviously, has assured us that they know they have an ongoing obligation.  What we specifically were asking for -- and we have received a number of discovery in response to that.

We were specifically asking for in this request that's left, I guess, for Your Honor's decision or not is that in some of the discovery received, there was what I would call very familiar or friendship relationship that was apparent between the prosecutor and the prisoner witness. So although the government has agreed that anything concerning favorable treatment they're certainly going to turn over to us, we were also thinking that under Giglio and impeachment that it would also be required to turnover anything that would show this strong relationship or a familiar relationship between the prosecutor and the prisoner witnesses if it hasn't already been turned over.

And so, I should say, Your Honor, that exact argument is for paragraph 10 and for paragraph 17 which is asking for more -- basically Brady and Jenks and that type of discovery with some specific prisoner witnesses. So the exact same argument if there's any discovery besides just favorable treatment that would tend to show a strong familiar or friendship relationship with the prosecutor, we think that that would be appropriate under Giglio.

MR. MELLIN:  Your Honor --

THE COURT:  Mr. Mellin?

MR. MELLIN:  -- while I understand and appreciate the government's obligation under Brady and Giglio to turn over any information about plea agreements or any type of benefits

that are being provided to witnesses, I don't think it goes so far as to extend to familiar relationships or friendly relationships or anything like that.  So I don't think that the government is obligated to provide that information.  But we will and have provided the plea agreements or any other types of benefits that have been provided to the witnesses.

THE COURT:  All right.  Mr. McHugh, in the forty plus years I've been involved in the federal criminal law, it's -- I'm not aware of that kind of information being required to be turned over.

Whenever a prosecutor is in a situation where there is Brady or Giglio material that has to be turned over, to some extent they have a prior existing relationship with the witness.  But the degree of that relationship is subject to cross-examination at the hearing.  As long as the prosecutor turns over information dealing with all promises or agreements they made with the party, whether it was made over one day, two days, a week, et cetera, is what has to be turned over. And Mr. Mellin is representing that all of that information will be turned over.

So to the extent that you're requesting a special category of information that deals -- that shows some sort of what's the terminology you use, special familiarity?

MR. MCHUGH:  Familiar or friendly relationship had developed.

THE COURT: I -- to the extent you're requesting that, I'll deny it. I see no support in the law to the extent that's part of a -- part of Brady or Giglio material, Mr. Mellin will turn it over. All right?

MR. MCHUGH: Yes. Thank you, Your Honor.

THE COURT: And that goes to 10 -- request 10 and 17.

MR. MCHUGH: Yes.

THE COURT: All right?

MR. MCHUGH: Your Honor, as to request number 11, the -- this goes to the issue of whether or not there's any -- the basically other inmates that were investigated as complicit in this matter besides just Mr. Hammer. And what we're asking for there is the -- that information we would argue that it is relevant to both the gateway specific intent factor as well as just a general mitigating factor if others were involved or at least there was evidence that others might have been involved in addition to Mr. Hammer. So that's our argument as to paragraph 11.

I will say, and I know Mr. Mellin, obviously, can speak for himself that Mr. Mellin when we discussed this said he was completely unaware of any other infor -- of information like that but that we would at least put our request on the record before the Court.

THE COURT: Do I understand you're asking for all memos or teletypes prepared by an FBI agent who was

investigating the death in this case and --

MR. MCHUGH:  And I guess one --

THE COURT:  -- and involvement of persons in that death other than Mr. Hammer?

MR. MCHUGH:  That's how we sort of narrowed the issue in our re -- in our discussions with counsel.  And so, what we were asking for is anybody else that was in -- complicit with Mr. Hammer in this --

THE COURT:  Has any of that information ever been turned over in the past?

MR. MCHUGH:  Your Honor, I think there was an issue with an inmate by the name of Brad Hasselkress (ph.), that there was some information that after the fact he may have been involved in this but what we want to make sure that in case there was other information of others implicit -- complicit in this with Mr. Hammer that we, at least, were given an opportunity to review that.

THE COURT:  All right.  Mr. Mellin?

MR. MELLIN:  Your Honor, I'm unaware of any information that would address this concern.  But I will attempt to locate the Brad Hasselkress 302 and if there is one I'll provide that for counsel if he's not already been provided a 302.

I am somewhat perplexed by the request given the fact that the defendant pled guilty and there really has never been

any evidence that anyone else was involved in this killing.

THE COURT:  Well, the issue goes to -- and again, I may be paraphrasing -- the issue goes to intent and I'm a little unclear, Mr. McHugh, as to what you mean by that.

MR. MCHUGH:  Well, I would say, obviously, we're talking about a penalty phase here because as Mr. Mellin talked -- you mentioned that it is a guilty plea.  But the issue, the gateway factor of specific intent in the penalty phase but also what I would argue is that if this information did exist, it would be relevant arguably for that as well as in mitigation as an overall mitigation that others involved it would be potential mitigation that we would certainly want to review and investigate.

THE COURT:  Do you mean in the sense that I did it at the request of somebody else or --

MR. MCHUGH:  I think it could be --

THE COURT:  -- that someone else was involved and --

MR. MCHUGH:  -- someone else shared some of the penalty --

THE COURT:  Some responsibility?

MR. MCHUGH:  Yes.  Exactly.

THE COURT:  All right.

MR. MELLIN:  Your Honor, to the extent that that exists, I agree with Mr. McHugh that that would be information he would be entitled to.

I have never seen that in any of the files that I've seen in this case. But if he believes there was information out there with this man, Mr. Hasselkress, I would look into that and I would provide the 302 of Mr. Hasselkress.

THE COURT: All right. Mr. Mellin, what you have to be alert to is that -- and I assume you know this from your experience, the agents may have interviewed countless number of inmates over this and there may be some stray comment in there that could have relevancy to this request.

MR. MELLIN: And I appreciate that issue, Your Honor. That's always the concern we have is that some stray comment is made and then later on someone says there was a comment made by this one witness. So I will try to -- I've tried to find a way to pull together all of the 302s that have been prepared in this case and I believe those have all been provided to Mr. McHugh and Mr. Travis by this point in time. Maybe Mr. Travis has a better comment on that. But that request was made and I believe he received a CD of all the 302s.

THE COURT: All right. Well, under those circumstances, the request will be granted by agreement. All right? And that's number 11.

MR. MCHUGH: Your Honor, moving on, I believe, paragraph 12 and 25 can be addressed together.

What Mr. Mellin and I have resolved as far as these

two paragraphs are concerned is that it's Mr. Mellin's position that paragraph 12 and paragraph 25 have been satisfied.  That this information has been provided to the defense by the government.  And we have agreed to accept that from Mr. Mellin with the caveat that once we receive the informational outlines that the Court has ordered, that we would be able to, if necessary, readdress this and make a more specific request along the lines of paragraph 12 and paragraph 25 once the informational outlines are received.

MR. MELLIN:  I have no objection to that, Your Honor.

THE COURT:  All right.  Then 12 and 25 have been resolved and I'll certainly allow any supplemental requests after you obtain the informational outlines.

MR. MCHUGH:  Paragraph 15, as I mentioned, we have resolved.  Mr. Mellin has agreed to provide us with the report that had previously been provided by the government but which amongst all the defense counsel we were unable to locate a copy of.  So that one is taken care of.

THE COURT:  Number 16?

MR. MCHUGH:  16 has been modified.  We have our original request for all reviews of laboratories.  Upon objection by the government to that as -- I'll summarize and say it's unduly burdensome and probably also that he threw in there that it was not relevant.  In any event, in response to that objection, what we have now asked for is information

involving any deficiencies found in these laboratories.  So we've narrowed our request.  And it's my understanding that this is one that that we would argue so I don't know if the Court wants us to argue this today at this time or not but this is one that we would argue.  And we -- I think I can tell the Court it's our position that this is something that would be relevant in this case if there were deficiencies and it would fall under the parameters of discoverable material.

THE COURT:  When you say deficiencies, can you give me some examples of what you have in mind?

MR. MCHUGH:  I tried to come up with a word by using the term "deficiencies" that would cover findings.  Something where there's been a finding that the lab did not -- and I didn't want to limit myself to just a violation of standards or things of that nature or -- because I'm not sure exactly what the wording would be as far as whether there was a formal finding of the lab not meeting the requirements, if the inspector general did a report made a finding.  I've been familiar with different reviews by government agencies so I would say that in using the term "deficiencies" areas in which the lab was found to not have met the protocols either internally or externally that were in place during a relevant time frame.

THE COURT:  Well, it says 1995 to the present.  Now, are we dealing with one laboratory in this case or two

laboratories?  What are we dealing with?

MR. MCHUGH:  I'm not sure exactly how many -- I know, obviously, I think we're dealing with the FBI lab in Washington.  I don't know if that would cover any type of handwriting analysis as well as any type of forensic analysis that would have been done.  But what I would ask for is, I guess, if the time frame is unwieldy is -- the reason we cover that area is obviously the present would be if someone's coming in as a current witness from that lab that I think that any deficiency that the lab had in up to the date of -- up to the time of their testimony would be relevant.  And then, obviously, we're talking of going back far enough to at least cover the area when the relevant time frame of when the testing was done in this case.  So that's really why we're looking at that type of a range in time.

THE COURT:  Mr. Mellin?

MR. MELLIN:  Your Honor, we do object to that request and it's unduly burdensome, it's irrelevant and it's immaterial.  It -- this is a case in which the defendant has pled guilty and admitted that he killed Mr. Marti.  So any lab testing that may have been done is completely irrelevant at this point.  We're talking about now not even the guilt phase, we're talking about a sentencing phase where the government's going to put on evidence of the statutory aggravating factors in this case.  I don't see how any testing that was done

really will even be implicated that much in the case but certainly not to a degree that would permit the defense to then get into questioning the protocols of the FBI lab and whether they were followed in every instance.

The defense had a chance in this case, Your Honor, to receive the items that were tested and did their own testing with the Bode Laboratory. So they have their own experts that can testify about the DNA. I don't quite understand how -- why they believe they're entitled to this information in this case.

THE COURT: Have you made a decision as to what evidence source from a laboratory you're going to introduce at the penalty phase?

MR. MELLIN: As I sit here right now, Your Honor, I can't even think of anything that necessarily will be tied to a laboratory. There may be rebuttal evidence because I believe that the defense is seeking to do some further DNA testing at this time and so we may need to rebut that to some extent. But I really don't recall or cannot say whether or not I can think of any DNA testing that's in dispute.

I know that there was semen found on certain items and things like that but I don't believe that those issues are even in dispute.

THE COURT: Is there anything in dispute as to -- Mr. McHugh, as to what you're aware of?

MR. MCHUGH: Well, I guess maybe one of the things that the Court was getting at as far as -- I don't know if it's in dispute if I don't know if the laboratory is following the proper protocols. But I guess this could be an area where we might be able to reserve our request for -- since the government is saying it's unduly burdensome, when we see the informational outline if the government is not intending to introduce any evidence from any lab -- I mean I'm not, obviously, privy to know how the government intends to prove their case, but if we see that there's no witnesses or evidence from any lab, then maybe we would withdraw the request but maybe we could revisit it if it is in the informational outline.

THE COURT: When is the informational outline due to be filed?

MR. MELLIN: I believe it was --

MR. MCHUGH: November 1st.

MR. MELLIN: -- November 1st.

MR. MCHUGH: So I mean it is a bit of a tight time frame because I think we're scheduled for jury selection the beginning of February.

THE COURT: All right.

MR. MELLIN: But, Your Honor, the informational outlines won't deal with anything that has to do with the labs. The informational outlines have to do with future

dangerousness and the victim impact evidence not with anything to do with proof of the intent factors.

THE COURT:  Well, let's -- let me throw out a hypothetical so I could explain to you at least what I'm thinking about.

Let's assume and I'm not an expert in DNA but let's assume you're going to introduce DNA evidence to somehow tie Mr. Hammer to the -- to the cell, the same cell taken at the time or shortly after the -- after the death and that DNA evidence was analyzed.  And for some reason, it turns out that the laboratory which I assume goes through a periodic -- what's the term -- periodic --

MR. MCHUGH:  Peer reviews and --

THE COURT:  -- peer reviews and things of that nature, which is standard.  This is not because of some impropriety but which is standard, it was discovered that the way they were doing DNA testing was improper.  I think that would be the kind of evidence that would have to be turned over.

So on the other hand, if it was discovered that there were only sixteen piles of paper towels when there should have been seventeen piles of paper towels in the laboratory as part of its inventory that would not go to the heart of what the deficiency would be.  So if there is any kind of scientific evidence that it's going to be used and I don't think, unless

I'm wrong, the reference was made to handwriting samples, but with respect to any kind of laboratory, any kind of deficiency that would go to the credibility of the result of the laboratory, it's going to be used in evidence in this case. I think that's the kind of evidence that would have to be turned over if it exists. So that we'll hold this in abeyance but I wanted to give Mr. Mellin some direction as to my thought process if any such evidence exists out there. All right, Mr. McHugh?

MR. MCHUGH: Yes, Your Honor.

Paragraph 17 has been dealt with along with paragraph 17 (sic) so that would bring us to paragraph 24. And here, Your Honor, again, we had asked for the complete personnel files for the BOP witnesses. And we've modified our request here because there was an objection as to the various materials that would be contained in those files that would be -- were not appropriate for discovery. And so, really what we're asking for here is any evidence of disciplinary action or termination or resignation from the BOP. And we specifically advised Mr. Mellin by way of e-mail that we did not request the information described in the government's objections which was a number of various irrelevant personal data that would be concerning the employee.

Again, I know Mr. Mellin can speak for himself but I believe that Mr. Mellin has agreed to provide us with copies

of any disciplinary write-ups that these witnesses would have. And at this time, that would be sufficient for us.  Once we see that we might readdress it but I believe that's what the government has agreed to do is provide us with any copies of disciplinary write-ups.

THE COURT:  Mr. Mellin?

MR. MELLIN:  Well, disciplinary write-ups going to the issues of --

MR. MCHUGH:  Oh, I'm sorry.  Yes.

MR. MELLIN:  -- veracity or truthfulness.  If there was some type of penalty imposed for some fraudulent action or for a false statement by one of the employees, we will certainly turn that over, Your Honor.  We don't believe that the defense is entitled to the information why someone was terminated or why someone resigned from the bureau.

THE COURT:  All right.

MR. MCHUGH:  I would like to just comment on that.  I meant to mention that it goes to the veracity -- I believe your term was veracity.  What I would also argue and so we are in a dispute on this one, is the issues I would say that goes to the witness's credibility not just veracity.  So, for example, if the witness was not just the finding had to do with veracity but if it had to do with currying favor with an agency such as the Bureau of Prisons or the Department of Justice, then we would argue that that also should be included

in that.

And specifically, the example I would give the Court if someone had a prior write-up for improper use of force which would not in my opinion go to veracity, it would not be a so-called crim and falsey (ph.) violation but it would still be possible that the witness because of his prior finding and a prior disciplinary action would be currying favor with the government or the Bureau of Prisons.  So we would ask for a wider range of findings of disciplinary infractions.

THE COURT:  You mean to protect his job?

MR. MCHUGH:  Exactly.

MR. MELLIN:  Your Honor, I would object to that.  I don't think that in any other case counsel is entitled to that information.  I think that if someone was using the example Mr. McHugh just cited that they had improperly used forced, there's no reason to believe initially he has any reason to incur any favor for the government in that case.  In fact, it may be just the opposite.

So I don't think they're entitled to that.  I do think they're entitled to any false statements or any improper conduct that goes to a tendency to provide false information.

THE COURT:  If the information would possibly affect the credibility of the witness to testify favorably to the government as beyond him just being a mere government employee, then I think it might have some evidentiary value

going to his credibility.

What I'd like you to do is to -- if there is any information in these files that falls within the category that Mr. McHugh has outlined, I'd like you to submit that to me in camera and I'll make an initial decision as to whether or not that information may affect the credibility of the witness at trial.

MR. MELLIN:  All right.

THE COURT:  And I'll make a decision whether or not it should be turned over.

Now, this information may be of a very delicate nature so submit it in camera first.  I'd like to see it and then we'll make a decision as to whether or not the matter should be turned over.  I don't know how many witnesses there are in this -- that would fall within this category but perhaps you can do the review and -- how long would it take you to do the review and to possibly get it into my hands?

MR. MELLIN:  Your Honor, it shouldn't take me that long.

THE COURT:  If the ---

MR. MELLIN:  I mean I really do think there's only one witness that the defense is focusing on, and Mr. Travis, maybe if you could weigh in as well, but I believe it's just one in particular that they really are concerned about.

THE COURT:  Mark Traxler --

MR. MELLIN:  Correct.

THE COURT:  -- who's identified in number 24?

MR. MELLIN:  Yes.

THE COURT:  Is that correct?

MR. MCHUGH:  Well, but we would, obviously, be faced with the same request with anybody who comes forward to testify.

THE COURT:  Who's an employee of the BOP.

MR. MCHUGH:  Of the BOP or had been at the time or something like that.  So I think it -- I mean certainly Mr. Traxler or someone who he could identify make some specific request concerning, and I believe -- I didn't mention this but Mr. Mellin had agreed that that was something he would provide.  But because there may be other BOP officials -- employees testifying, we would not just limit it Mr. Traxler.

THE COURT:  All right.

MR. MELLIN:  And, Your Honor, my only concern in answering the Court's question is that I haven't had a chance to really determine the exact number of BOP officials we are going to call in this case.  So I certainly, well, once we make a decision and we're going to call an individual, we will review the personnel file and get that information to the Court.

THE COURT:  All right.  Could you -- do you want to put a deadline on it or --

MR. MELLIN:  I would rather not.

THE COURT:  All right.  Well, just be aware that there's a trial date of February 5th --

MR. MELLIN:  Understood, Your Honor.

THE COURT:  -- and if any information is being turned over, you have to turn over what's in the file and hopefully it's not the kind of information that will necessitate a huge investigation that could delay the trial.  Because it --

MR. MELLIN:  I don't think it could cause delay, Your Honor.  I think it'd be information the defense would want to use to impeach the witness but other than that --

THE COURT:  Right.

MR. MELLIN:  -- I don't think they could do anything else with it.

THE COURT:  All right.  It's going to be --

MR. MCHUGH:  But we would like it sooner than later, obviously.

THE COURT:  Right.

MR. MELLIN:  I will provide Mr. Traxler's information relatively soon, Your Honor.

THE COURT:  All right.

MR. MELLIN:  I've already reviewed his personnel file.

THE COURT:  Okay.  I would say try your level-headed best to get the information by December 1 if you can.

MR. MELLIN:  I will, Your Honor.

THE COURT:  All right?

Number 26 is next.

MR. MCHUGH:  Yes, Your Honor.

Basically, this appears to be a simple request that seems to lead us in many directions whenever we discuss it amongst counsel.

So my understanding is this.  The government objected to our request to see Mr. Hammer's entire BOP file and basically the two main objections where they didn't want to provide personal information concerning people that are on his visiting list or phone list or e-mail list and we, obviously, are not requesting that.  So that objection is not a problem with us.

The second part of their objection was that Mr. Hammer in his file obviously have some separations and -- of other prisoners in the BOP and we're not requesting that either.  So as far as our request included those materials, we are -- we're conceding that that's not part of our request.  But we do want access to the rest of his file.

And then, specifically, and this is where I think it gets -- can get a little tricky is our information is that sometimes when there's write-ups and incident reports concerning a prisoner like Mr. Hammer, like every prisoner, that the special investigating supervisors does a report but

it may not travel with the entire file.  It may be at the individual institution.  It may stay there.  So I believe again, speaking for Mr. Mellin that he had agreed to provide us with those reports, and those reports are, I think, quite obviously relevant in the fact that it's probably something that Mr. Mellin's reviewing for purposes of future dangers and may very well be using.  And so, I believe that he has agreed as to those specific reports that they will be provided.  And then, again, we would just like access to his file minus the information that the government has brought up.

THE COURT:  And there may be information in the file that deals with the issue of security in an institution.  I think that should also be examined.

MR. MCHUGH:  Okay.

MR. MELLIN:  I agree, Your Honor.  We will turn over the -- any investigative reports dealing with Mr. Hammer that's in the BOP files regarding any disciplinary problems that he's had.  I think those reports, frankly, have already been provided but I will go back through them and make sure we have those.

THE COURT:  All right.  Again, Mr. Mellin said investigative reports.  I think you want everything other than what's in those --

MR. MCHUGH:  Yes.

THE COURT:  -- three exemptions -- exceptions.

MR. MCHUGH:  And the reason we specified those reports is because it's possible that -- I'm not a BOP expert. I don't profess to be and I know Mr. Mellin has told me many times he's not either; neither of us are, but there's a file possibly from Mr. Hammer at a central location and then he's been at various institutions throughout his time and there may be reports that stayed at the institutions that didn't make it to his file.  So I believe what we've agreed upon is that we'd have access to his file as well as any of those special investigative supervisors, SIS final reports concerning disciplinary and corrections.

THE COURT:  How many different federal institutions has he been incarcerated at over the years?

MR. MCHUGH:  Leavenworth, Terre Haute --

MR. TRAVIS:  Lompoc.

MR. MCHUGH:  -- Lewisburg, Allenwood, Lompoc.  He's been at Oklahoma Transfer Center many times.  I don't know if he's been at ADX.  Do you know if he has, Mr. Travis?

MR. TRAVIS:  Yes.  He was at ADX and Canaan.

MR. MCHUGH:  Cannan, that's right.

THE COURT:  All right.  Well, Mr. Mellin, you have a big burden here to contact all those places.

MR. MELLIN:  I think I can do that, Your Honor.  I just want to make sure we're clear because as I understood where we were, Mr. McHugh, was that at the end of this you

were just requesting the SIS final reports.

MR. MCHUGH:  Yes.  But what I'm making clear, I guess, for the record is that it's possible that these are not in his file.  That they stayed at the institutions where he was at.

THE COURT:  All right.

MR. MCHUGH:  And then, I think if there is a David Hammer BOP file minus the information that we've conceded and the Court has brought up today, we would at least like to have access to that to be able to sit down and go through it.

MR. MELLIN:  I object, Your Honor, to the entire file.  I mean we -- I thought we had come to the agreement that the final report should be turned over for -- concerning any disciplinary actions.  But to the extent that counsel's now requesting the entire file, we object because there are law enforcement concerns in those files.  There's other information that we wouldn't want to turn over.

THE COURT:  Well, we're exempting law enforcement concerns.  We're exempting anything that would deal with security issues in any way, shape or form.  So we'll go through the files and make a judgment.

MR. MELLIN:  Okay.

THE COURT:  All right?

MR. MCHUGH:  Thank you, Your Honor.

THE COURT:  All right?

MR. MCHUGH:  So the next one I think we've worked out which is paragraph 27.

We asked for a -- we limited -- some of the -- a significant amount of 27 has been provided.  The last thing that we requested was --

THE COURT:  Let me just interrupt you one second.

MR. MCHUGH:  Yes.

THE COURT:  And if you have any doubt, Mr. Mellin, submit it to me in camera.

MR. MELLIN:  I will, Your Honor.

THE COURT:  And I'll read it and make a judgment whether it's required to be turned over.

Go ahead, Mr. McHugh.  I'm sorry.

MR. MCHUGH:  And if he could just let us know when it's ready to be reviewed -- no, the file --

THE COURT:  Okay.

MR. MCHUGH:  -- so that will take some time.

The paragraph 27 has been significantly complied with except we made one final request which was the specific escort instructions for the October 2011 trip.  So as of today we discussed that further and what Mr. Mellin has agreed to do is allow us access to interview the BO -- one or two or whatever of the BOP employees, the COs, who transported Mr. Hammer and ask them that rather than get into getting a copy of the specific escort instructions.  And if they won't talk to us,

then Mr. Hamm -- Mr. Mellin said we can readdress this request.  So what we've agreed to do is to interview the BOP person who I guess will make available to us to identify, see if we can get the information we need and, if not, we'll readdress.

THE COURT:  All right.

MR. MCHUGH:  Okay.  And then --

THE COURT:  Mr. Mellin, agreeable?

MR. MELLIN:  Yes, Your Honor.

THE COURT:  All right.

MR. MCHUGH:  And I guess I should speak for Mr. Mellin here.  There was a concern here about security.  That was why this was modified in this way.

THE COURT:  Right.

MR. MCHUGH:  Okay.

And the last one that I was going to discuss with Your Honor is paragraph 29.

Now, in this paragraph, Your Honor, we specifically used the term "after action review" of the homicide involving David Hammer.  And we use that term because we felt that that had significance in a BOP setting.  That after an incident of this nature, they do what's known as an after action review.

The response from the government was an after action review does not exist.  So in our discussions with Mr. Mel -- with the government, I just made clear to him that if we're

using the wrong terminology, really what we're looking for here is the -- not each individual investigative report that was prepared as a result of this case, because there's plenty that have been turned over, interviews, but if there was a final report summarizing the investigation, Mr. Mellin advised me that he is not aware of a final report summarizing the investigation. The best he can think of or what he thinks comes closest to that was prepared by Mr. Traxler. And so, he's agreed to provide us with a copy of Mr. Traxler's report.

But again I just want to state for the record, what we're looking for here is a Bureau of Prisons, not an FBI but a Bureau of Prisons final report summarizing this investigation and not the individual investigation reports that were prepared by either the FBI or the Bureau of Prisons.

MR. MELLIN: Your Honor, as Mr. McHugh said, I don't believe that exists in this case but I will make further inquiry. We already have made inquiry under that point but we'll make further inquiry and make sure we're correct.

But we have provided the investigative reports in this case and I think that's the closet thing that exists to satisfy this request.

THE COURT: All right. It would seem to me logical that the Bureau of Prisons may have put some report in his file following the homicide. I don't know whether it's called an after action review report or summary or whatever it's

called but if it does exist I think it should be turned over as part of his file.

MR. MELLIN: Understood, Your Honor. And we're not getting hung up over the terminology of it if it's called an after action report or something else. It's just I believe that Mr. McHugh assumed that after this homicide in the prison there must have been some type of internal investigation of this matter and I don't believe that's the case.

THE COURT: All right. Mr. Travis, you have numbers you want to go over in the discovery motion?

MR. TRAVIS: Yes, Your Honor. And before I start talking about the specific request, I'd just like to talk generally about the request that I'm going to cover.

The request from 32 through the end are requests for information from the Bureau of Prisons concerning operative procedures at the Bureau of Prisons because whatever the outcome of the retrial is going to be it's clear that Mr. Hammer will spend the rest of his life in the custody of the Bureau of Prisons. And the information we're seeking is generally information that we believe material and relevant to the concept of future dangerousness. The government taking the position that if he does -- if Mr. Hammer does not receive a sentence of death, that he will be a future danger for the rest of his natural life to other inmates or other staff.

And we think that the various items that I'll go

through with the Court are relevant and material information that we're obligated to seek out in order to satisfy various burdens on the defense team in a death penalty case.

One is the ABA standards with respect to mitigation investigation which cover not only discovery of and location of information that is mitigating, but also information that is helpful to defend against aggravation which is going to be offered up in support of a sentence of death.

Secondly, we believe that some of the information has potential Brady and Giglio implications as far as evidence that will be presented by the government either in its case-in-chief or possibly in its rebuttal in order to guard against the misrepresentations of what life in a federal penitentiary is like.

Thirdly, we think that under Rule 16(a)(1)(E)(i) that the information sought is material.

And finally, we believe that the information sought is necessary information to be of assistance to our proposed expert in the field of corrections for testimony to be given at the time of trial.

The litigation, with respect to getting access to BOP material is always a hot subject matter in these inmate cases, and there are some that have gone on -- there have been rulings in discovery and there's some that are still pending where there has been discovery rulings. And I would suggest

to the Court that a good place for the Court to start, at least from our perspective, in determining what BOP information to give to us, is a case that's ongoing in the District of Colorado called the United States vs. Watland, that's W-A-T-L-A-N-D and it's 11-cr-00038.  And on August 9 of last year Judge Cane, in that case, essentially entered an order granting to the defense all discovery with respect to all requests for information concerning Bureau of Prisons statistics, essentially saying that when it comes to a death penalty case, in his judgment based upon his review of appellate decisions and the reversals that come about because of the failure of defense counsel to present mitigating evidence and so on, that no stone should be left unturned as far as authorizing the defense to receive statistics and information that the Bureau of Prisons has available to it for purposes of defense preparation and trial presentation.

And that Watland case follows closely a decision, and I don't have the date of it, that was handed down in the Guerrero and Sablan case, which is out of the -- I think it's the Eastern District of California and it's -- yeah, the Eastern District of California.  It's 08-cr-00259.  And Guerrero and Sablan, that's two inmates charged with killing a guard employed by the Bureau of Prisons.  So both of those cases are on point as far as what is at issue in the discovery that's being sought.

That having been said, starting with number 32 --

MR. MELLIN:  Your Honor, can I briefly respond to that --

MR. TRAVIS:  Sure.

MR. MELLIN:  -- the legal argument portion?

THE COURT:  Yes.

MR. MELLIN:  While Watland is clearly an outlier case and it stands for exactly what Mr. Travis said and the Court in that case imposed a tremendous burden on the government to provide almost every piece of information Mr. Travis is talking about in this case, it's the government's position that that case was wrongly decided and that there's a number of other cases that the Court should look to, in particular the Fourth Circuit's opinion in Karo, which is cited in the government's brief.  Also the Umar (ph.) case, the Troia (ph.) case, the Luhan (ph.) case, all of those stand for the position that this information has to be material and relevant.  And in each of those cases the Court held that in fact the information from the BOP was not material and not relevant because there was no showing that the information would be favorable to the defendant.  And that's the case we're at right now.

The defense is asking for discovery as a type of a fishing expedition to hopefully find something that might be favorable to the defendant.  But they are citing examples of

no information that they're aware of that shows that this -- these BOP manuals or statistics of facts concerning other killings would, in any way, benefit their client.

So I would just ask the Court to read carefully the Karo opinion in which the Fourth Circuit discusses this issue in detail and makes a finding that there's no Brady obligation on the government to provide this information. It's a -- when you look under Rule 16 that the information is not material to the defense in light of all of the other information.

So I would just ask the Court to critically analyze the Watland decision and compare that to the Fourth Circuit's opinion in Karo and the other cases that are cited therein.

THE COURT: All right. Mr. Travis?

MR. TRAVIS: Okay. Starting with number -- and I'll tell you ahead of time that not all of the rest of the items are still in dispute. It's not as if we're going to go through with another forty here.

In 32 we're asking for a list of homicides of inmates where there were inmate victims or staff victims which have occurred since 1990. This is information that, at least according to the filings in Watland has been compiled and has been provided to the defense in that case.

The reason that we think that this information is material is that as a general proposition the government is going to assert that Mr. Hammer will remain a future danger

and he will be dangerous to other inmates and staff members, can cause them physical harm and/or kill them. We think the statistics showing the number of killings which have occurred in the federal system since 1932 will, in fact, enable us to show how infrequent that type of conduct is and that it has bearing on whether in fact Mr. Hammer represents a true future danger or not.

And essentially that's all I have to say on 32.

THE COURT: Mr. Mellin?

MR. MELLIN: Your Honor, I think this is going to become the same response to 32 through probably 34 or 35. But we don't believe that it does tend to either establish the materiality of the request or that there's any type of exculpatory evidence out there. And I would hand the Court the Luhan order that just came down, and Mr. Travis I provided a copy to Mr. McHugh but if I could just, Your Honor, hand that to the Court?

And in the Luhan case they're talking about a killing by a gang member and a defense that -- a claim that the defendant was a future danger and the defense requested all of the information concerning any killings done by any of the related gang members. And if the Court could turn to page 4 at the top, the Court in the Luhan case said, "Defendant's current request for information which would require the government to sift through five years of prison records in all

of the federal prisons to compile examples of the misconduct by the gang members is not exculpatory evidence in the government's possession and is not material to his case for mitigation."  And the court there cites the Karl (ph.) opinion.

I believe it's just going to be the same argument throughout, Your Honor.  If you turn to page 5, in the first full paragraph, in the middle of that paragraph the Court goes on to say, "It is unlikely that the defendant could have shown that statistical evidence is material," and then quotes, "For the defendant to show materiality under Rule 16 there must be some indication that the pre-trial disclosure of the disputed evidence would have enabled the defendant significantly to alter the quantum of proof in his favor," citing Karl.  And at the end it says, "The defendant has presented nothing to indicate that the statistical evidence would significantly alter the quantum of proof in his favor."

That's exactly the case here, Your Honor.  Just because Mr. Hammer is claiming to see all of the potential killings that have occurred in other federal penitentiaries. It does nothing to establish his future dangerousness.  It's all about what he is going to do not what others have done. So I think that it's just not material to his defense.

THE COURT:  All right.  Obviously I can't make a ruling right now on number 32.  I'd like to read the Karo

decision and, Mr. Travis, if you want to submit to me anything that another judge has ordered in the Watland case or the other case that you named, why don't you get it to me within a week.

MR. TRAVIS:  Okay.

THE COURT:  And I'll make a ruling on number 32.  And I assume, based upon what I'm hearing, that I would have to study the issues on 33, 34 and 35.

MR. TRAVIS:  Yes.  I would agree that 32 through 35 all essentially go together.  It's the same type -- it's the same type of information that we're requesting, basically for the same reasons.  And I will -- excuse Mr. Mellin, did you say that you gave to Mr. McHugh a copy of what you were quoting from Karo?

MR. MELLIN:  Yes, correct.  That was from Luhan.

MR. TRAVIS:  Oh, okay.  All right.

THE COURT:  The Karo case has cited a district court case and affirmed in a court of appeals.

MR. MELLIN:  Correct.

THE COURT:  Which -- is it the court of appeals opinion that --

MR. MELLIN:  The Karo opinion?  Yes, Your Honor.  It's the Fourth Circuit.

THE COURT:  All right.  I'll take a look at that and I'll do my own analysis and I'll rule on it.

MR. TRAVIS:  Okay.

THE COURT:  And that'll apply to -- third paragraphs 32 to 35.  And why don't you submit to me whatever you're going to submit with a copy to Mr. Mellin.

MR. TRAVIS:  I will.

THE COURT:  Within a week?

MR. TRAVIS:  I will do that, Your Honor.

THE COURT:  All right.

MR. TRAVIS:  All right.  Thirty-six --

MR. MELLIN:  Mr. Travis -- can I just jump in, Your Honor, the cases I was citing are cited in our brief.  I'm not sure of the docket -- document 1428 and it's on page 6.

THE COURT:  1428?

MR. MELLIN:  Is the United States brief in opposition of the defendant's motion for discovery.  I believe it was filed December 19th of 2011.

THE COURT:  I have that in front of me and I see the Karo cite, the Umana (ph.) cite and the Troia (ph.) cite.  All right.

MR. TRAVIS:  Your Honor, with respect to 36 and 37 we can deal with those together in my view.  The government did provide to us the requested information, the post orders and also the daily rosters but only with respect to ADX.  They did not provide that information for USP Terre Haute or USP Canaan.

And we asked whether that information would be provided.  My understanding, Mr. Mellin said it would not be provided.  We asked for that information on those two institutions because those are institutions where Mr. Hammer has been housed since the time of this killing.

One of the processes that happens in these cases, while we're talking about future dangers, is the government presents their case, the defense presents their case and usually presents an expert that talks about ADX and the controls there and so on.  And the government presents evidence, yeah, but he's not going to be ADX for the rest of his life, he's going to go back into other institutions and he's going to go back into open populations.  And so we think that the post orders and the daily roster information that we're asking for, that was provided with respect to ADX, is relevant and material with respect to other institutions to which he may go if, in fact, he does go to ADX and completes the step-down process.

THE COURT:  What does ADX stand for?

MR. TRAVIS:  That's the administrative maximum in Florence, Colorado.  It's called the Alcatraz of the Rockies, bad actors within the prison get sent there for some period of time and they have different programs that they call step-down programs.  That when they've been in, I'll say, tier one, just because I don't remember off the top of my head, tier one for

a period of time, if they do everything they're supposed to do they get transferred to tier two.  And then when they've been there for a period of time, if they've done everything and they're reviewed, they can go to the pre-transfer unit. They're there for a period of time and if they do everything they're supposed to do and they're ultimately approved by an executive committee, they can then leave ADX complex and go back to an open population prison.

THE COURT:  And what does USP stand for?

MR. TRAVIS:  United States Penitentiary.

THE COURT:  As opposed to FCI?

MR. TRAVIS:  Yes.

THE COURT:  Why do they call one a U.S. penitentiary and another one a federal correctional institution?

MR. TRAVIS:  It's security levels.

MR. MELLIN:  USP is the highest.

MR. TRAVIS:  They have a low --

THE COURT:  All right.  I understand.

MR. TRAVIS:  And then FCI is medium and then the USP. And I don't really think there's any dispute, and I don't think there'll be any dispute at trial, that because of the nature of the offense that Mr. Hammer entered his plea to, that his classification is going to either put him in ADX or put him at a United States penitentiary.  He's not -- he may go to ADX and he may move down from ADX but once he gets to a

USP he's never going to move down below a USP.

THE COURT:  Now in 36 and 37 you're asking for post orders for all housing units and rosters?

MR. TRAVIS:  Yes.

THE COURT:  What are post orders?

MR. TRAVIS:  Post orders are orders that, as I understand it, set the guidelines for how a housing unit is run, managed, policed, for lack of a better term.  What inmates are allowed to have, when they're allowed out of the unit, how they are obligated to behave when they're within the unit.

THE COURT:  And when you say a roster I don't know what you mean.

MR. TRAVIS:  I'm trying to remember that one myself, Your Honor.

THE COURT:  It says, "Department rosters, both daily and quarterly."

MR. TRAVIS:  Yeah.

THE COURT:  You don't want a list of every inmate in death row in each -- in every institution.

MR. TRAVIS:  No.  Those are staffing rosters.

THE COURT:  Staffing rosters.

MR. TRAVIS:  Staffing rosters, as I understand it.  They're correctional service department rosters.  So that tells how a housing unit is manned.

THE COURT:  And why is this information relevant?

MR. TRAVIS:  Well, again, I think it's relevant to the concept that at some point in time Mr. Hammer will step down from the most secure facility, which is ADX, to the less-secure facility, which is the USP and that that would give him the opportunity to act out his homicidal tendencies or behaviors because of the difference in custody.  And I think that the details of how someone is housed in an open population institution and how the institution is staffed negates the argument that once Mr. Hammer steps down from ADX, if that ever happens, it's -- he's free to do most anything he wants, including kill again.

THE COURT:  Mr. Mellin?

MR. MELLIN:  Your Honor, we object to this as completely irrelevant.  Counsel can make the argument that the defendant may or may not be stepped down without getting into any of this information.  This isn't institution security issues; it's private, personal information.  It's talking about the names of individuals who work at the Bureau of Prisons.  There's just no reason for this request.

The issue in dispute is going to be the defense claiming that the defendant is not a future danger because he can be put in ADX and be put away in a box somewhere and no one will ever have any type of interaction with him.  The response to that is that never occurs and that's not, in fact,

the way the system works.  But in responding to that the government isn't going to bring out names of individuals who are guards at various places who are going to say that, as Mr. Travis just laid out, that there are times that you are stepped down and it may be in fact that in a number of years Mr. Hammer will be in a general population and he will, at that time, be exposed to other inmates.

So counsel is attempting to get all of this private law enforcement sensitive information frankly for no reason.

THE COURT:  Well --

MR. TRAVIS:  Your Honor, as far as the -- we do not need the names of the individuals.  All we need to know is, numerically, the individuals.  And I would also point out that, you know, to the extent that it's being argued that this is some secret stuff that we shouldn't know, we've already been provided both the post orders and the daily rosters, that I recall.

MR. MELLIN:  For ADX.

MR. TRAVIS:  For ADX.  And as I recall, I do not recall seeing any redactions of the daily rosters that we got from ADX.  But we're not interested in it's John Jones and Steve Smith, we're interested in it's two in number, if that makes any sense.

MR. MELLIN:  And Your Honor, so the information has been provided because it's just a fight that has come up in

other cases and it's just a decision made that the battleground in these cases is over ADX. And so we've provided that information about ADX so the defense can make their points. But they're not then entitled to the information from USP Terre Haute, FCI Terre Haute and USP Canaan just because we provided the information about ADX.

THE COURT: Well, what information? It's still a little unclear to me exactly what's being sought here.

MR. MELLIN: Well, as for 37 they're requesting the names or the numbers of correctional staff that are on duty at any particular point in time, during the day or quarterly.

THE COURT: So is --

MR. MELLIN: So that they can make an argument that there's no way David Hammer can be a danger to the community or danger to anyone in the jail because there's twenty-eight staff that are on call at that point in time. And so, they have that information for ADX, they don't need the information for any other facility. We don't even know if David Hammer would leave ADX at any point in time, nor do we know what facility he would go to. So all of that information is irrelevant.

He has -- counsel has been provided the information about ADX because it's been disclosed in other cases and there's no need not to just disclose it here. And so they can make their point, they can make their argument that there are

correctional officers in the facility who can provide some level of security to everyone. Of course it leaves open the point that they can never guarantee anyone's safety.

THE COURT: Well Mr. Travis, you could certainly argue that a correctional institution is always going to be staffed to a point to ensure the safety of everyone at the institution. I don't see the need for precise numbers of security guards or post orders. Post orders being again -- Mr. Mellin, what do you understand post orders to be?

MR. MELLIN: I'm not exactly sure what he's -- what counsel is calling the post order.

MR. TRAVIS: Post orders, as I understand it, for example, Your Honor, at Allenwood Federal Penitentiary when inmates enter into housing units and exit from housing units they go through metal detectors. They have post orders that tell the staff how they're supposed to monitor movement of inmates in and out of a housing unit. For example, you're going to open the doors at 6:30 for breakfast, turn the metal detector on at 6:15 and stand there and watch the inmates go through the metal detector, make sure they go through the metal detector and if they rang put them up against the wall and shake them down, that sort of thing.

THE COURT: Well, you can --

MR. TRAVIS: That's a post order.

THE COURT: -- you can bring this information out at

the hearing without getting specific documents to show that.

MR. TRAVIS: I know I can, Your Honor. But I don't --

THE COURT: Isn't there -- I mean, there must be some witness you're going to call to talk about security within the Bureau of Prisons that show he's not a future danger -- he's not a future danger to anyone. I don't see what the relevancy, beyond that, of these specific requests are.

MR. TRAVIS: Well, two things. One, if I have post orders I have something I can put a sticker on and use it as an exhibit. Two, I'm not a Bureau of Prisons employee so I don't know what all the post orders are, okay. I don't know what the orders are that are in place within an institution that allows for security to protect people from Mr. Hammer if the jury believes that he would be a potential future danger.

THE COURT: All right. Why don't we do this, Mr. Mellin why don't you check, within the Bureau of Prisons, and see whether or not they have a guideline as to minimum number of guards at these institutions and how they would handle someone in Mr. Hammer's situation? Apparently this information has been given out for ADX Florence and we're talking -- again, we don't know where he's going to be housed in the future or when he'd ever stepped down to these other institutions but perhaps there's some regulation that might cover this request.

MR. MELLIN: The objection I have, Your Honor, is it's irrelevant in this case concerning Mr. Hammer's defense and you're talking about now breaching law enforcement sensitive information. I don't understand why the defense believes they're entitled to this information about how a federal penitentiary is run and the specifics of exactly at 6:00 you do this and 6:15 you do that.

THE COURT: I don't want you to get down to that level. I just want to know whether or not there is some published regulation that Mr. Travis may not be aware of that concerns security of inmates that may somehow show that there is enough controls within the Bureau of Prisons to prevent Mr. Hammer from being a threat in the future. There may not be and I'm certainly not going to require the Bureau of Prisons to turn over number -- what would be sensitive information in terms of the number of guards that are posted at every institution. It seems to me that goes to security issues and also down to the details of what an inmate does from 6:00 a.m. one day to 6:00 a.m. the next day, in a twenty-four hour period, how many times they have to go through a metal detector or something like that, unless you're comfortable that it's public information, that Mr. Hammer may not -- that Mr. Travis may not be aware of.

So to that extent, I would ask you to do a search and if such information is not available then there's nothing to

turn over.  But there may be some information that exists that the Bureau of Prisons is comfortable that doesn't violate security concerns that could be turned over.

MR. MELLIN:  Your Honor, most of the time the defense already has that type of public information through their defense experts that they call in these types of cases.  I'm not sure who counsel is calling in this case, if it's Mr. Cunningham or Dr. Cunningham or someone else.  But those individuals already have sufficient information in their possession to make these arguments.

So I will do as the Court has directed and I will try to find other published information that is out there.  But it is not like Mr. Travis is going to be left in a position where he can't make this argument without this information and I do believe the information he's seeking is very sensitive.

THE COURT:  I understand.  It's a discovery request of the government and on the government and I'm trying to make sure that all evidence relating to future dangerousness is made available.

Mr. Travis, I think if you're aware of some published information --

MR. TRAVIS:  Yes.

THE COURT:  -- that -- I don't want to put Mr. Mellin in a gotcha kind of position here, I think that would be unfair.  So why don't you discuss with Mr. Mellin what you

have and he'll see if there's anything else available.

MR. TRAVIS:  Okay.

THE COURT:  All right?

MR. TRAVIS:  I will do that, Your Honor.

THE COURT:  I don't think that's intruding on defense strategy to make that request.

MR. TRAVIS:  No.  No.  That's fine, Your Honor.

THE COURT:  All right?

MR. TRAVIS:  That's fine.

THE COURT:  Okay.  Next?

MR. TRAVIS:  All right.  Numbers 38 through 48, inclusive, are all taken care of.  Okay.

49, 50 and 51, I think we can discuss those as a group.

Essentially the information that's being sought with respect to 49, 50 and 51 is to address two issues.  Issue number one is that consistent throughout the testimony presented in inmate cases that I've had the opportunity to review, and I've reviewed a number of transcripts in a number of trials, the government rebuttal suggests that well even if the client, whoever the client is and in this case it's Mr. Hammer but it might have been some other inmate in another case, is going to go to ADX, that the step down process only lasts three years and he'll be back in open population within three years and then potentially all heck will break loose

when he's no longer under these secure conditions.

We believe that the information concerning a three-year program, and it's going to be a three-year program that applies to anybody who has committed a homicide within the Bureau of Prisons, is a gross misrepresentation. I could probably name fifteen individuals that I'm aware of who have been at ADX since it opened and they're still there and that's well in excess of fifteen years.

And they have data, the Bureau of Prisons has data as to where every inmate in the system has been housed, when they got to a particular institution, when they left a particular institution, it's called a sentry system. And they know when inmates have gone to ADX and when inmates have been released from ADX and we believe that this information is important to show that this suggested concept of a three-year step down program is just grossly inaccurate. And I've seen it time and again in inmate cases and non-inmate cases when ADX is an issue, where a government expert gets on the stand and talks about the three-phase step down, each one lasting twelve months and you're out in thirty-six months. This information, I believe, is grossly misleading to the jurors.

The second thing is that the government argues that once they get out of ADX, after this three-year bit, then of course all bets are off and they're free to go about whatever they're going to go about doing. And so we're looking for

data concerning you've released X number of people, how many of them have come back to ADX?  How many of them have engaged in dangerous or inappropriate behavior that leads them to be returned to ADX and that would, in 51, talks about trying to determine those released, who of those released have engaged in serious acts of violence which are a 101 category of disciplinary action in the federal system.

And again, this data is data -- I admit that I do not believe that the Bureau of Prisons creates a report as such but I believe that under the sentry system they have that data and they can supply that data.  I think that it's highly material and relevant concerning this whole concept that Mr. Hammer, if he goes to ADX, is going to be there for three years, then he's going back into open population and then he's going to be this --

THE COURT:  All right.  I understand, Mr. Travis. Mr. Mellin?

MR. MELLIN:  Your Honor, I think this goes to the heart of the legal argument we made earlier, that this material has to be material to the defendant's defense and it's not in this case.  They're seeking all of this data and discovery of information about other individuals and how other individuals acted and how long they were sentenced and when they were released and if they committed criminal acts when they were locked up, all of which has nothing to do with an

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000   ~  302-571-0510   ~   610-434-8588   ~   888-777-6690

individualized sentencing of Mr. Hammer and whether or not he is going to be a future danger. And I think it goes directly to what the court said in Luhan and on page 5 of the court's opinion in Luhan the court says "Further, contrary to defendant's contention, in absence of evidence that other members of the gang have harmed guards or other inmates over the past five years in various federal prisons does not demonstrate that the defendant can be safely housed, managed and controlled by and within the Bureau of Prisons. Information on actual escapes by other inmates says nothing about whether the defendant could have successfully escaped or seriously injure or maim others during such an attempt."

So I think it's directly what the court in Karo and what the court in Luhan was getting to, which is that this information is immaterial to the defense.

THE COURT: Is the government going to bring in evidence or argue or rebuttal to the issue of future dangerousness when you have a defendant like Mr. Hammer who is obviously serving a very, very long sentence over, what is it --

MR. TRAVIS: Twelve hundred.

MR. MELLIN: Twelve hundred and thirty-two years.

THE COURT: Twelve hundred years he'll never see daylight that in three years he'll be -- there's a potential he'll be placed in a less secure institution than an ADX?

MR. MELLIN:  I don't plan on making that argument. I'm not sure what the defense expert is going to say but I believe the battleground will be that ADX will be sufficient to house him and there's no guarantee that he's going to be at ADX but I think that there is every reason to believe he'd go there.  But there are still killings in the ADX, there's still attacks in ADX so -- and I think that's where the argument will be.

But the government is not going to argue that we believe David Hammer is a future danger because of Mr. Karo or because of someone else who did an attack while they were incarcerated.  So I don't believe the defense is entitled to information about other defendants and how they acted and how they responded while they were incarcerated.

The argument's going to be that when Mr. Hammer was incarcerated in Oklahoma and also incarcerated in Pennsylvania, that he attacked other inmates and he had acted out and that's why he is a future danger.

THE COURT:  Well, there may be a middle ground here and that is just to get a statistic on, since the ADX has been open for fifteen years, how many inmates have been released from ADX to a lesser secure facility.

MR. MELLIN:  But again, Your Honor, I don't understand the relevance and the materiality to the defendant in this case.  It doesn't -- if someone else is released to a

lesser facility it's completely irrelevant to the determination of Mr. Hammer's status because it may be someone who didn't kill another inmate that's stepped down and sent to another facility.

Mr. Hammer's in the unique position of being someone who assaulted someone on the outside in another case but then once he's incarcerated kills his cell mate. And so he's in a particular situation, separate from everyone else. So there's no way to compare apples to apples, really. I mean, I believe what you're going to end up doing is having Mr. Hammer compared to a lot of other individuals who are not doing the serious acts that he's doing and has done while he's been incarcerated.

THE COURT: Well, no. I'm not suggesting that that kind of detailed information be made available. I tend to agree with you that we're not comparing apples to apples. All I'm saying is that with respect to future dangerousness the fact that inmates are released from ADX to a lesser facility has some relevance.

Now just as a -- just as a general matter, how does one establish that?

MR. MELLIN: Typically through the testimony of an expert who will just make that statement. It's something that Mr. Travis and I talked about. He can certainly have, and the government certainly has experts that talk about this, you can

certainly have an expert testify that based on his experience in this field people do go through this process, they are stepped down and they do end up at other facilities and they're not always at ADX. ADX only has a few cells where you're essentially locked away for good. That argument can certainly be made without all of this information being disclosed to the defense.

THE COURT: All right. Let me take this one under advisement, 49 to 51. I want to read the opinions carefully and then I'll make a judgment on these.

MR. TRAVIS: Okay.

THE COURT: All right.

MR. TRAVIS: 52 we do have the report, which takes us to 53, which we assume that as a result of the report and the recommendations of the report that there were changes in practices and procedures. And at least according to the crib sheet I have I don't know if the government objected to providing the information in 53, at least there's nothing written in the discovery response section of what I'm looking at. So I don't know if -- if Mr. Mellin agrees that we can know what those changes are or not.

MR. MELLIN: I believe we did object to that, Mr. Travis.

MR. TRAVIS: Okay. Well, I'm just --

MR. MELLIN: For the internal security reasons that

we've already talked about.

MR. TRAVIS:  Okay.  And this takes us back to the after action report that was previously requested, Your Honor. What happens when they have a significant incident such as a homicide is they do either a board of inquiry or an after action report.  And those reports are circulated throughout the United States to all the institutions because they contain recommendations on how to avoid similar type of things in the future.

And so what we're looking for is recommendations and whether recommendations have been followed and implemented because if they're going to point to something -- for example, one of the famous cross-examination questions that I've seen by every Assistant United States Attorney in a future danger assertion is, well isn't it true that Barry Mills in T.D. Bingham ordered the murder of two African American inmates at Lewisburg Prison while they were housed at ADX.

And both males in Bingham were convicted of having given such an order.  But as I understand it this report dealt with how that came to be, how they were able to get messages out of ADX to someone on the outside who then supposedly passed the information along.

THE COURT:  What's the relevancy of all this?

MR. TRAVIS:  Well, what I'm trying to show is that if there was some break in the chain, if there was some security

problem that allowed Mills and Bingham to do what they were convicted of doing this report addressed recommendations as to how to eliminate that as a risk in the future.  And if they have implemented a procedure which eliminates this as a risk, then it seems to me that it's grossly unfair to bring to the attention of a sentencing jury what Mills and Bingham did.

THE COURT:  Who are Mills and Bingham?

MR. TRAVIS:  They are the head of the Aryan Brotherhood and his right-hand man and they were tried in California in that big California Aryan Brotherhood prosecution.

THE COURT:  What does this have to do with Mr. Hammer?  I'm just at a loss.

MR. TRAVIS:  No.  All I'm saying to you, Judge, is that in the cross-examination of the defense experts they're always hit with well, you know, you talk about how secure ADX is, isn't it true that Mills and Bingham did this?  And if they -- if the government has taken steps to correct that break in the custody chain, it seems to me that it's grossly unfair to put out what Mills and Bingham did to cause the jurors to think well Mr. Hammer may do the same thing.

THE COURT:  So you want evidence of any change in security by the Bureau of Prisons as a result of these two other inmates committing a homicide in ADX?

MR. TRAVIS:  No.  As a result of this 2006

investigation and report.

THE COURT:  But you have the report?

MR. TRAVIS:  Yes.

THE COURT:  Doesn't all this go to matters of security at a federal institution?

MR. TRAVIS:  I would not think so but, I mean, the report is out there.

MR. MELLIN:  The report is out there and you have it, Mr. Travis but then you're looking for the changes in procedures and practices and I believe that does go directly to the institutional security concerns.

THE COURT:  Well, you're -- again -- my concern, Mr. Mellin, is if there is cross-examination on this point, the fact that these other two inmates committed a homicide even at an ADX, there may be an element of unfairness here.

MR. MELLIN:  Well the -- Your Honor, I don't intend on going anywhere beyond asking -- I'm assuming the experts that are now called will admit that there have been killings at ADX.  It used to be that other experts, Dr. Cunningham in particular, would act as if he was unaware of the fact that there were killings at ADX.  And so he would put on his presentation, a slide show of ADX and how secure it is and in the cross-examination he would deny that there had ever been a killing there.  And so that -- then the government's left in the situation where you can't just leave that hanging, that

this expert is claiming that he doesn't know anything about these two other killings that have occurred at ADX. So that's when these issues would pop up.

I believe now we're at a point where most defense experts will acknowledge that there have been killings at ADX, that there is not a perfect federal penitentiary in the United States. So I don't have any intention of going beyond just, if that isn't brought out on direct, just bring it out on cross, that there have, in fact, been killings at ADX even though it is the Alcatraz of the Rockies and it's the premier penal institution in the United States. There still are times when killings occur inside of ADX.

THE COURT: And what do you want to bring out, Mr. Hammer -- Mr. Travis, just one more time quickly?

MR. TRAVIS: I don't want to bring it out.

THE COURT: I mean, what do you want in rebuttal?

MR. TRAVIS: Well, my concern is that almost every cross-examination transcript that I've read of a defense expert, they always bring out Tommy Silverstein, which is something that occurred in Marion twenty years ago, Mills and Bingham --

THE COURT: No, I want you to answer my question.

MR. TRAVIS: Okay.

THE COURT: What do you want to -- what evidence do you want to bring out?

MR. TRAVIS:  What I want to find out is whether they have closed the loophole that allowed Mills and Bingham to do what they were proven to have done in 1998.

THE COURT:  All right.  I'll -- Mr. --

MR. TRAVIS:  And they don't have to -- they don't have to necessarily say and this is how we cured the problem, okay.  I'm not asking for anything that discloses to me that we made this change and we made this change and we made this change.  I'm just trying to eliminate what I consider to be an unfair suggestion, that at -- that Mr. Hammer, while he's at ADX, could do the same thing that Mills and Bingham did and that is --

THE COURT:  So you want a yes or no, have procedures been put in place so that'll never happen again in the future.

MR. TRAVIS:  Yes.

MR. MELLIN:  Well Your Honor, I object to that but I can give an answer to that -- his question, which is I'm not going to make that argument nor that suggestion.

THE COURT:  All right.

MR. TRAVIS:  I mean, if he's not going -- if he's not going to cross on the Lewisburg killings then --

MR. MELLIN:  That's not -- that's not what I said but it's -- your point right there was am I -- whether or not I would cross on the change in procedures or if that could still occur today and I'm not going -- not planning on getting to

that level of detail.

THE COURT:  Well, I think what he wants to know is whether -- whether as a result of those homicides other procedures have been put in place without identifying the procedures.  It's a simple request.

MR. MELLIN:  I think that's fair for him to ask our experts and I think that's fair for him to ask his expert that question.

THE COURT:  All right.

MR. MELLIN:  But I don't believe that entitles him to discovery of that information, of the actual changes in procedures and what changes are in place.

THE COURT:  Well, no.  I'm not ordering him to -- ordering you to identify the procedures, just whether or not there were changes, that's a simple yes or no.  And then leave it to the experts to fill in the gaps.

Mr. Travis?

MR. TRAVIS:  That would be fine, Your Honor.

THE COURT:  All right.  So see if you can get that information, all right?

MR. MELLIN:  I will.

THE COURT:  But I don't want to reveal anything that would be a security risk, create security risk.

MR. MELLIN:  Mr. Travis, can I ask you to tell me which homicide you're referring to?  I think you and I are on

two different pages.  I was talking about the killings in 2005 at ADX but you mentioned killings in 1998.

MR. TRAVIS:  No.  Melvin Bingham supposedly sent a letter to Ronnie Slocum and Slocum sent it in to Bridgewater -- and I forget the other guy's name -- to carry out the war with the D.C. Blacks.  That was in 1990 -- August of 1998.  And that was one of the predicate acts under the RICO trial in California that they were convicted of.

THE COURT:  Okay.

MR. MELLIN:  All right.

MR. TRAVIS:  Okay.

THE COURT:  That deals with numbers --

MR. TRAVIS:  53.

THE COURT:  53.  Now how many more numbers do we have, Mr. Travis?

MR. TRAVIS:  Actually, we're not going to have that many more.  It looks to me like 54 through -- let me see.  54 through 60 -- 54 through 60 appear to have been provided, either it's been provided or it's not available.  So we're at 61.

61 deals with basically the same subject matter as 49, 50 and 51.  49, 50 and 51 deal with people who have been released from ADX.  61 deals with individuals who have been released from H unit and to explain what H unit at ADX is, that's the special security unit within ADX.

THE COURT: All right.

MR. TRAVIS: And we're asking for --

THE COURT: I took that under advisement.

MR. TRAVIS: Right.

THE COURT: All right.

MR. TRAVIS: So I would say 61 is -- falls within that same category, okay?

THE COURT: Okay.

MR. TRAVIS: And 62 through 65 we -- are not at issue at this point in time, we have that information.

66 is a request for information concerning incident reports for inmates housed at -- in the control unit, which is V unit at ADX. And again, that's similar to 49, 50 and 51 that you've taken under advisement. And so I would say 66 and 67 would also fall within the under advisement category, Your Honor.

THE COURT: Okay.

MR. TRAVIS: Right? Then 68 through 70, they're taken care of. 71, 72 and 73 all deal with range 13 and I'll have to give you some background information.

At ADX there are four special cells, it's called range 13. And these cells are set up so that there's no physical interaction with staff for purposes of even recreation. They have controls that -- at the front and they have controls at the back where they -- if it's time for the

inmates housed in these four cells that they just press a button and a gate opens and they go outdoors for recreation.

So range 13 is, I guess, the most secure facility -- housing area -- yeah, housing unit within ADX. And we who defend these cases and deal with future dangerousness for years could not even get an acknowledgement that those four cells exist. But they do exist and we were fortunate in a case that was tried up here that Gordon Pugh got transferred to Allenwood. So we subpoenaed him and under oath he acknowledged the existence of these four cells.

So we're trying to get the information concerning how one earns the honor of being housed in one of these four cells on range 13. And that's what 71, 72, 73 deal with.

THE COURT: Why is this relevant?

MR. TRAVIS: Again, it's relevant with respect to the step down concept that the government will be trying to present to the jurors concerning that even if Mr. Hammer goes to ADX he's only going to be there for three years. And then he's going to step down and then he's going to open population because there is a portion of ADX that admittedly does have a step down procedure. But there's also this range 13 that does not.

THE COURT: Mr. Mellin?

MR. MELLIN: Exactly, Your Honor. And that's exactly the point. Range 13 has nothing to do with step down. Range

13 has to do with national security concerns and individuals who need to be put in an area to protect the society overall. It's not even a situation, typically, dealing with someone like Mr. Hammer. But there is no step down issue if you're in range 13. So it's completely irrelevant, it's completely immaterial. It's not going to come into play in this case.

We vehemently object and frankly, Your Honor, I don't know where we would be if the Court were to require disclosure of this information. This is the most highly secure, highly classified, highly protected information in the BOP. And so I don't see any reason why it's relevant to the defendant's defense. I think it's immaterial under Karo and also they can make an argument that there are a number of cells at ADX in which national security defendants are housed and kept and Robert Hanssen, the former FBI agent, is housed there and all of these other situations occur there. But that is the only information they need to know. There's nothing more they need to know about the existence of range 13 or these four units.

MR. TRAVIS: But Your Honor, Mr. Mellin says that national security inmates go into the -- you have to be a national security -- I don't know that.

THE COURT: I don't see the relevancy of this, Mr. Travis. You've got to convince me it's relevant.

MR. TRAVIS: Well, it's relevant if this is a -- an available housing area for Mr. Hammer.

THE COURT: Well, you can argue to a jury that there are -- the Bureau of Prisons has means to -- you can bring out, through an expert, the Bureau of Prisons has means to make sure that he doesn't -- he's not -- he won't be a danger to anyone without getting into all of the possible security issues that the Bureau of Prisons must maintain confidential for security reasons.

So with respect to information about range 13, I'm not precluding you at the trial from -- at the hearing from bringing out that there is a group of cells of this security level, but I'm not going to require the government to provide details as to the program.

MR. TRAVIS: Okay.

THE COURT: All right.

MR. TRAVIS: 74 has been taken care of.

75 and 76 can be discussed together. There have, in fact, been two homicides that I'm aware of at ADX. And my understanding is that there have been after action reports for both of those. And it's further my understanding that as a result of one of the homicides there has been a change, a procedural change, with respect to recreation in order to eliminate the possibility of that type of killing occurring in the future.

THE COURT: All right. This is a yes/no kind of a question, similar to the other request we had today.

MR. TRAVIS:  Right.

THE COURT:  So find out, Mr. Mellin.

MR. MELLIN:  Well, I can answer yes these homicides have occurred.  I don't think, again, we should be required to provide what policy changes have occurred.  I can -- yes, have there been changes, I can certainly get that answer.

THE COURT:  Yeah, that's all I'm asking you to make available.

MR. MELLIN:  All right.

THE COURT:  I'm not asking you to reveal anything that would go to security issues.

Mr. Travis?

MR. TRAVIS:  And the final one is number 77.  And what we're asking for is all incident -- level 101 incident reports concerning, and this concerns serious assaults, that have occurred at ADX during the period of the last, I guess it would be, eight years by the time we go to trial.  And again, this goes, as I understand it, as I perceive it, to the concept of the ability of ADX to safely house individuals.  And when I use the phrase safely house individuals, house individuals a number of whom have committed murders of other inmates by housing them in a way that they don't engage in assaultive behavior.  And I think it goes right to the heart of the future danger of Mr. Hammer.

THE COURT:  Mr. Mellin?

MR. MELLIN: Your Honor, for all the reasons we said before, the government objects for -- and cites the opinion in Karo and also Luhan. I think this is exactly on point with what the court in Luhan was referring to where the court says the fact that another inmate may or may not have acted out when he was in jail has nothing to do with the defendant in this case and that's precisely --

THE COURT: All right. I'll take it under advisement and I'll study the cases and the precedent. Mr. Travis, you'll get me whatever orders or cases you rely upon?

MR. TRAVIS: Yes, I will do that.

THE COURT: Within a week, okay?

MR. TRAVIS: Yes, sir.

THE COURT: You can send it in by letter with a copy of --

MR. TRAVIS: Okay.

THE COURT: -- a letter with attachments, if you wish.

MR. TRAVIS: Okay.

THE COURT: All right.

MR. TRAVIS: No problem.

THE COURT: Okay. So that concludes the matter with respect to the motion. Mr. Mellin, I'm going to ask you to just step out a second. I think if we're done with you for the day you can --

MR. MELLIN:  I think I'm off the hook right now, Judge.

THE COURT:  -- certainly leave.

MR. MELLIN:  Thank you.

THE COURT:  All right.

MR. MELLIN:  I will not wait for Mr. McHugh.

THE COURT:  I appreciate your being here, coming to Philly.  Did you come here from Washington?

MR. MELLIN:  I did.  I did.

THE COURT:  All right.  We thank you.

MR. MELLIN:  Thank you, Judge.

THE COURT:  All right.  Mr. Mellin has left the room.

(Mr. Mellin exits)

(Rest of transcript under seal)

(Court is adjourned)

* * * * *

C E R T I F I C A T I O N

I, Ellen S. Kolman, the court approved transcriber, do hereby certify the foregoing is a true and correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

*Ellen S. Kolman*

---

ELLEN S KOLMAN (CET**D-568)          DATE

AAERT Certified Electronic Transcriber

## A

AAERT 72:12
ABA 33:4
abeyance 19:6
ability 69:19
able 6:7 13:7 17:5 28:10 58:20
above-entitled 72:6
absence 54:5
accept 13:4
access 25:20 26:9 27:9 28:10 29:22 33:21
acknowledge 61:5
acknowledged 66:10
acknowledgement 66:6
act 44:6 60:20
acted 53:23 55:13 55:17 70:5
action 19:18 20:11 21:7 30:19,22,23 31:25 32:5 53:7 58:3,6 68:18
actions 28:14
actors 41:22
acts 53:6,24 56:12 64:7
actual 54:10 63:11
addition 9:17
address 10:20 51:16
addressed 12:24 59:2
adjourned 71:15
administrative 41:20
admit 53:8 60:18
admitted 15:20
admittedly 66:20
advised 19:20 31:5
advisement 3:4,5,6 3:8,9 57:9 65:3,14 65:15 70:8
ADX 27:18,19 40:23 41:9,11,15

41:17,19 42:7,23 42:25,25 44:4,10 44:23 45:18,19,21 46:2,3,6,17,19,23 48:21 51:23 52:7 52:13,14,17,23 53:2,4,13 54:25 55:3,5,6,7,20,22 56:18 57:4,4 58:17,21 59:16,24 60:15,19,21,22 61:2,5,9,12 62:11 64:2,23,24,25 65:13,21 66:4,18 66:20 67:13 68:17 69:16,19
affect 21:22 22:6
affirmed 39:18
African 58:16
agencies 14:19
agency 20:24
agent 9:25 67:15
agents 12:7
aggravating 15:24
aggravation 33:7
ago 61:20
agree 11:24 26:15 39:9 56:16
agreeable 30:8
agreed 4:20,21 6:15,15 7:6 13:4 13:15 19:25 20:4 23:13 26:3,7 27:8 29:21 30:2 31:9
agreement 12:21 28:12
agreements 7:25 8:5,16
agrees 57:20
ahead 29:13 36:15
Alcatraz 41:21 61:10
alert 12:6
Allenwood 27:16 47:13 66:9
allow 13:12 29:22
allowed 43:9,9 59:1

62:2
allows 48:14
alter 38:14,17
AMERICA 1:2
American 58:16
amount 29:4
analysis 15:5,5 39:25
analyze 36:10
analyzed 18:10
and/or 37:2
ANNE 2:2
answer 3:10 61:22 62:17 69:3,6
answering 23:18
anybody 10:7 23:6 52:4
anyone's 47:3
apparent 7:4
Apparently 48:20
appeals 39:18,20
appear 64:18
APPEARANCES 1:10 2:1
appears 25:5
appellate 34:11
apples 56:9,9,16,16
applies 52:4
apply 40:2
appreciate 7:23 12:10 71:7
appropriate 6:13 7:20 19:17
approved 42:6 72:3
area 15:8,13 17:4 66:4 67:2,25
areas 14:20
arguably 11:10
argue 5:25 6:15 9:14 11:9 14:3,4,5 20:19,25 47:5 54:17 55:9 68:1
argued 45:14
argues 52:22
argument 7:13,17 9:18 35:5 38:6 44:10,15 46:13,25

50:14 53:19 55:1 55:7 57:5 62:18 67:13
arguments 50:10
argument's 55:15
Aryan 59:8,10
asked 13:25 19:13 29:3 41:1,3
asking 6:19,24 7:1 7:14 9:13,24 10:7 19:18 35:23 36:18 41:15 43:2 60:17 62:7 65:2 69:7,10 69:14
assaulted 56:6
assaultive 69:23
assaults 69:15
assert 36:25
assertion 58:15
assistance 33:18
Assistant 58:14
Association 1:20 4:5
assume 12:6 18:6,7 18:11 39:7 57:14
assumed 32:6
assuming 60:17
assured 6:22
attachments 70:17
attack 55:11
attacked 55:17
attacks 55:7
attempt 10:21 54:12
attempting 45:8
attending 4:6
attention 59:6
Attorney 58:14
ATTORNEY'S 1:14
August 34:5 64:6 72:9
authorizing 34:14
available 30:3 34:15 49:25 50:19 51:1 56:15 64:19 67:25 69:8

avoid 58:8
aware 6:21 8:9 16:25 24:2 31:6 36:1 49:10,23 50:20 52:6 68:17
a.m 49:18,19

## B

back 15:12 26:19 41:12,13 42:8 51:24 53:2,14 58:2 65:25
background 65:20
bad 41:22
Barry 58:15
based 34:10 39:7 57:1
basically 7:15 9:11 25:5,10 39:11 64:21
battleground 46:2 55:3
bearing 37:6
beginning 17:21
behave 43:10
behavior 53:3 69:23
behaviors 44:7
believe 12:15,18,23 16:9,17,22 17:16 19:25 20:3,13,18 21:16 22:23 23:12 26:2,7 27:8 31:16 32:5,8,20 33:9,17 37:12 38:6 40:15 50:15 52:2,14,21 53:9,10 55:3,5,10 55:12 56:9 57:22 60:10 61:4 63:10
believes 12:2 48:15 49:5
benefit 36:3
benefits 7:25 8:6
best 24:25 31:7
bets 52:24
better 12:17 43:8
beyond 21:24 48:8

60:17 61:7
**big** 27:22 59:10
**Bingham** 58:16,18
   59:1,6,7,17,20
   61:21 62:2,11
   64:3
**bit** 17:19 52:23
**Blacks** 64:6
**BO** 29:22
**board** 58:5
**Bode** 16:7
**BOP** 19:14,19 23:8
   23:9,14,19 25:9
   25:17 26:17 27:2
   28:8 29:23 30:2
   30:21 33:21 34:2
   35:19 36:2 67:10
**box** 44:23
**Brad** 10:12,21
**Brady** 6:21 7:15,24
   8:12 9:3 33:10
   36:6
**breaching** 49:3
**break** 51:25 58:25
   59:19
**breakfast** 47:18
**Bridgewater** 64:5
**brief** 35:15 40:11
   40:14
**briefly** 35:2
**bring** 19:12 45:2
   47:25 54:16 59:5
   61:8,13,15,19,25
   68:2
**bringing** 68:10
**broke** 4:17
**Brotherhood** 59:9
   59:10
**brought** 26:10 28:9
   61:8
**Building** 1:14
**burden** 27:22 35:9
**burdens** 33:3
**burdensome** 13:23
   15:18 17:6
**bureau** 20:15,24
   21:8 31:11,12,14

31:23 32:15,16,19
34:8,15,23 44:19
48:6,11,17 49:12
49:14 50:2 52:5,9
53:9 54:9 59:23
68:2,3,6
**button** 66:2

_____
### C

**C** 1:13,16 72:1,1
**California** 34:20
   34:21 59:10,10
   64:8
**call** 7:3 23:20,21
   41:23 42:13 46:16
   48:5 50:6
**called** 31:24 32:1,4
   34:4 41:21 52:12
   60:18 65:21
**calling** 47:11 50:7
**camera** 22:5,12
   29:9
**Canaan** 27:19
   40:25 46:6
**Cane** 34:6
**Cannan** 27:20
**CAPITAL** 1:11
**care** 5:7 13:18
   51:12 65:19 68:15
**carefully** 36:4 57:9
**carry** 4:24 64:5
**case** 1:11 4:1 6:20
   6:22 10:1,15 12:2
   12:15 14:7,25
   15:14,19,25 16:1
   16:5,10 17:10
   19:4 21:13,17
   23:20 31:3,16,20
   32:8 33:3,11 34:3
   34:6,10,17,19
   35:7,9,11,12,15
   35:16,16,21 36:22
   37:18,23 38:3,18
   39:2,3,17,18 41:8
   41:8 49:2 50:7
   51:21,23 53:21
   55:25 56:6 66:8

67:6 70:7
**cases** 33:22 34:24
   35:13,18 36:12
   40:11 41:6 46:1,2
   46:23 50:6 51:18
   52:17,17 66:5
   70:9,10
**category** 8:22 22:3
   22:15 53:6 65:7
   65:15
**cause** 24:9 37:2
   59:20
**caveat** 13:5
**CD** 12:18
**cell** 18:8,8 56:7
**cells** 57:4 65:21,22
   66:1,7,10,12
   67:13 68:10
**Center** 27:17
**central** 27:5
**certain** 16:21
**certainly** 7:7 11:12
   13:12 16:2 20:13
   23:10,20 47:4
   49:14 56:24,25
   57:1,6 69:6 71:3
**Certified** 72:12
**certify** 72:4
**CET** 72:11
**cetera** 8:18
**chain** 58:25 59:19
**chambers** 4:3,3,7
**chance** 16:5 23:18
**change** 59:22 62:8
   62:8,9,24 68:20
   68:21
**changes** 3:7,11
   57:15,21 60:9
   63:11,12,15 69:5
   69:6
**charged** 34:22
**check** 48:17
**Chestnut** 2:3
**Circuit** 36:5 39:23
**Circuit's** 35:14
   36:11
**circulated** 58:6

**circumstances**
   12:21
**cite** 40:18,18,18
**cited** 21:15 35:14
   36:12 39:17 40:11
**cites** 38:4 70:2
**citing** 35:25 38:14
   40:11
**claim** 37:19
**claiming** 38:19
   44:22 61:1
**classification** 42:23
**classified** 67:10
**clear** 27:24 28:2
   30:25 32:17
**clearly** 35:7
**client** 36:3 51:21,21
**closed** 62:2
**closely** 34:17
**closer** 6:9
**closest** 31:8
**closet** 31:20
**Colorado** 34:4
   41:21
**come** 14:11 28:12
   34:11 45:25 53:2
   67:6 71:8
**comes** 23:6 31:8
   34:9
**comfortable** 49:21
   50:2
**coming** 15:9 71:7
**comment** 12:8,11
   12:12,17 20:17
**committed** 52:4
   53:24 60:14 69:21
**committee** 42:7
**committing** 59:24
**communications**
   6:19
**community** 46:14
**Company** 2:23
**compare** 36:11
   56:9
**compared** 56:11
**comparing** 56:16
**compile** 38:1

**compiled** 36:21
**complete** 19:13
**completely** 9:21
   15:21 44:15 56:1
   67:5,5
**completes** 41:17
**complex** 42:7
**complicit** 9:12 10:7
   10:16
**complied** 29:18
**conceded** 28:8
**conceding** 25:19
**concept** 32:21 44:3
   52:15 53:12 66:16
   69:19
**concern** 10:20
   12:11 23:17 30:12
   60:12 61:17
**concerned** 13:1
   22:24
**concerning** 7:6
   19:23 23:12 25:11
   25:24 27:10 28:13
   32:15 34:8 36:2
   37:21 49:2 52:2
   53:1,12 65:11
   66:11,17 69:15
**concerns** 28:16,19
   49:11 50:3 60:11
   67:1 69:15
**concludes** 70:22
**conditions** 52:1
**conduct** 21:21 37:5
**conference** 4:6,11
**confidential** 68:6
**CONNIE** 2:5
**consider** 62:9
**consistent** 51:17
**contact** 27:22
**contain** 58:7
**contained** 19:16
**contention** 54:5
**contrary** 54:4
**control** 65:12
**controlled** 54:9
**controls** 41:10
   49:12 65:24,25

cont'd 2:1
convene 5:12
convicted 58:18
  59:2 64:8
convince 67:23
copies 19:25 20:4
copy 13:18 29:24
  31:9 37:16 39:13
  40:4 70:14
correct 4:9 23:1,4
  31:18 39:15,19
  59:18 72:4
correctional 42:14
  43:24 46:10 47:1
  47:5
corrections 27:11
  33:19
COs 29:23
counsel 10:6,22
  13:17 21:13 25:7
  34:12 44:15 45:8
  46:22 47:11 50:7
counsel's 28:14
countless 12:7
course 47:2 52:24
court 1:1 2:23 4:1,4
  4:10 5:2,8,10,15
  5:17 6:8,11,12,13
  6:17 7:22 8:7 9:1
  9:6,8,23,24 10:3,9
  10:18 11:2,14,17
  11:20,22 12:5,20
  13:6,11,19 14:4,6
  14:9,24 15:16
  16:11,24 17:2,14
  17:22 18:3,14
  20:6,16 21:2,10
  21:22 22:9,20,25
  23:2,4,8,16,23,24
  24:2,5,12,15,18
  24:21,24 25:2
  26:11,21,25 27:12
  27:21 28:6,9,18
  28:23,25 29:6,8
  29:11,16 30:6,8
  30:10,14 31:22
  32:9 33:1 34:1,1

35:6,8,13,18 36:4
36:10,13 37:9,14
37:17,22,23 38:4
38:8,24 39:6,17
39:17,18,20,20,24
40:2,6,8,13,17
41:19 42:9,11,13
42:18 43:2,5,12
43:16,19,22 44:1
44:13 45:10 46:7
46:12 47:4,23,25
48:4,16 49:8
50:11,16,23 51:3
51:5,8,10 53:16
54:3,4,13,14,16
54:23 55:19 56:14
57:8,12 58:23
59:7,12,22 60:2,4
60:12 61:13,16,22
61:24 62:4,13,19
63:2,9,13,19,22
64:9,12,14 65:1,3
65:5,8,17 66:14
66:23 67:8,22
68:1,14,24 69:2,7
69:10,25 70:4,4,8
70:12,14,17,20,22
71:3,5,7,10,12,15
72:3
court's 23:18 54:3
cover 14:12 15:4,7
  15:13 32:13 33:5
  48:25
create 63:23
creates 53:9
credibility 19:3
  20:21 21:23 22:1
  22:6
crib 57:16
crim 21:5
criminal 4:2 8:8
  53:24
critically 36:10
cross 61:9 62:21,24
cross-examination
  8:15 58:13 59:15
  60:13,23 61:18

Cunningham 50:8
  50:8 60:19
cured 62:6
current 15:9 37:24
currying 20:23
  21:7
custody 32:18 44:7
  59:19

------

**D**

------

D 1:10 3:1
daily 40:23 41:14
  43:16 45:16,20
danger 32:23 36:25
  37:7,20 44:22
  46:14,15 48:6,7
  48:15 54:2 55:10
  55:18 58:14 68:4
  69:24
dangerous 37:1
  53:3
dangerousness
  18:1 32:21 38:21
  50:18 54:18 56:17
  66:5
dangers 26:6 41:7
data 19:23 52:9,9
  53:1,8,8,10,11,21
date 15:10 24:3
  34:18 72:11
David 1:5 4:2 28:7
  30:20 46:14,18
  55:10
day 8:17 46:11
  49:19,19 70:25
daylight 54:24
days 8:18
DC 1:12
deadline 23:25
deal 5:15 17:24
  28:19 40:21 64:22
  65:19 66:5,13
dealing 8:16 14:25
  15:1,3 26:16 67:3
deals 8:22 26:12
  64:12,21,23
dealt 19:11 58:19

death 4:14 10:1,4
  18:9 32:23 33:3,8
  34:9 43:20
December 3:3
  24:25 40:16
decided 35:12
decision 7:2 16:11
  22:5,9,13 23:21
  34:17 36:11 39:1
  46:1
decisions 34:11
defend 33:7 66:5
defendant 1:6,16
  2:1 4:4 10:25
  15:19 35:21,25
  37:20 38:9,11,13
  38:15 44:16,22
  54:8,11,18 55:24
  70:6
defendants 55:13
  67:14
defendant's 37:23
  40:15 53:20 54:5
  67:11
Defender 1:20 2:3
  4:5
defense 4:17,22
  13:4,17 16:2,5,17
  20:14 22:22 24:10
  33:3 34:7,12,14
  34:16 35:23 36:9
  36:22 37:19,20
  38:23 41:8 44:21
  46:3 49:2,4 50:4,6
  51:5 53:20 54:15
  55:2,12 57:7
  59:15 61:4,18
  67:12
deficiencies 14:1,7
  14:9,12,20
deficiency 15:10
  18:24 19:2
degree 8:14 16:2
delay 24:8,9
delicate 22:11
demonstrate 54:8
denied 3:2

deny 9:2 60:23
department 1:11
  20:24 43:16,24
described 19:21
detail 36:6 63:1
detailed 56:15
details 3:10 44:8
  49:18 68:12
detector 47:19,20
  47:21 49:21
detectors 47:15
determination 56:2
determine 23:19
  53:5
determining 34:2
developed 8:25
difference 44:7
different 14:19
  27:12 41:23 64:1
direct 61:8
directed 50:11
direction 19:7
directions 25:6
directly 54:2,13
  60:10
disciplinary 19:18
  20:1,5,7 21:7,9
  26:17 27:11 28:14
  53:7
disclose 46:24
disclosed 46:23
  57:7
discloses 62:7
disclosure 38:12
  67:8
discoverable 14:8
discovered 18:16
  18:20
discovery 1:8 4:12
  4:17,19,25 6:21
  6:25 7:3,15,17
  19:17 32:10 33:5
  33:24,25 34:7,24
  35:23 40:15 50:16
  53:22 57:19 63:11
discuss 4:13 5:6
  25:6 30:16 50:25

51:13
discussed 5:3,4
  9:20 29:21 68:16
discusses 36:5
discussions 6:5
  10:6 30:24
dispute 16:20,23,24
  17:3 20:20 36:16
  42:20,21 44:21
disputed 38:12
district 1:1,1,9 34:4
  34:20,21 39:17
Division 4:5
DNA 16:8,17,20
  18:6,7,9,17
docket 40:12
document 40:12
documents 3:3
  48:1
doing 18:17 52:25
  56:10,11,12 59:2
doors 47:18
doubt 29:8
Dr 50:8 60:19
due 17:14
duty 46:10
D-568 72:11
D.C 64:6

**E**

E 3:1 72:1
earlier 53:19
earns 66:12
Eastern 34:20,21
eight 69:17
either 5:4 14:21
  25:18 27:4 31:14
  33:11 37:12 42:23
  58:5 64:19
electronic 2:21
  72:5,12
element 60:15
eliminate 59:3 62:9
  68:22
eliminates 59:4
Ellen 72:3,11
employed 34:23

employee 19:23
  21:25 23:8 48:11
employees 20:12
  23:15 29:23
enable 37:4
enabled 38:13
enforcement 28:16
  28:18 45:9 49:3
engage 69:22
engaged 53:2,5
ensure 47:6
enter 47:14
entered 34:6 42:22
entire 25:9 26:1
  28:11,15
entitled 11:25 16:9
  20:14 21:13,19,20
  46:4 49:5 55:12
entitles 63:10
escaped 54:11
escapes 54:10
escort 29:19,25
ESQ 1:10,13,16,19
  1:20 2:2,2
Esquire 4:10
ESR 2:5
essentially 34:6,9
  37:8 39:10 51:15
  57:5
establish 37:12
  38:21 56:21
et 8:18
event 13:24
evidence 9:16 11:1
  15:24 16:12,16
  17:8,11 18:1,7,10
  18:18,25 19:4,5,8
  19:18 33:10 34:13
  37:14 38:2,10,13
  38:16 41:11 50:18
  54:5,17 59:22
  61:24
evidentiary 21:25
ex 5:11
exact 7:13,16 23:19
exactly 11:21 14:15
  15:2 21:11 35:8

38:18 46:8 47:10
  49:6 66:24,24
  70:3
examined 26:13
example 20:22 21:2
  21:14 47:13,17
  58:12
examples 14:10
  35:25 38:1
exceptions 26:25
excess 52:8
exculpatory 37:14
  38:2
excuse 39:12
executive 42:7
exempting 28:18
  28:19
exemptions 26:25
exhibit 48:11
exist 11:10 30:24
  32:1 66:7,7
existence 66:10
  67:18
existing 8:13
exists 11:24 19:6,8
  31:16,20 50:1
exit 47:14
exits 71:13
expedition 35:24
experience 12:7
  57:1
expert 18:6 27:2
  33:19 41:9 52:18
  55:2 56:23 57:1
  61:1,19 63:7 68:3
experts 16:7 50:6
  56:25 59:15 60:17
  60:19 61:5 63:7
  63:16
explain 18:4 64:24
exposed 45:7
extend 8:2
extent 8:13,21 9:1
  9:2 11:23 16:19
  28:14 45:14 49:24
externally 14:22
e-mail 19:20 25:12

**F**

F 1:12 72:1
faced 23:5
facilities 57:3
facility 44:4,5
  46:18,20 47:1
  55:22 56:1,4,18
  66:3
fact 10:13,24 21:17
  26:5 35:19 37:4,6
  41:17 44:25 45:5
  56:18 60:14,20
  61:9 68:17 70:5
factor 9:15,15 11:8
factors 15:24 18:2
facts 36:2
failure 34:12
fair 63:6,7
fall 14:8 22:15
  65:15
falls 22:3 65:6
false 20:12 21:20
  21:21
falsey 21:5
familiar 7:4,10,18
  8:2,24 14:19
familiarity 8:23
famous 58:13
far 8:2 12:25 14:16
  15:12 17:2 25:18
  33:10 34:14,24
  45:11
favor 20:23 21:7,17
  38:14,17
favorable 7:6,17
  35:21,25
favorably 21:23
FBI 9:25 15:3 16:3
  31:11,14 67:15
FCI 42:11,19 46:5
February 4:14
  17:21 24:3
federal 1:14 2:3 4:4
  8:8 27:12 33:13
  37:4 38:1,20
  42:14 47:13 49:6
  53:7 54:7 60:5

61:6
felt 30:20
field 33:19 57:2
fifteen 52:6,8 55:21
fight 45:25
file 23:22 24:6,23
  25:9,16,20 26:1,9
  26:11 27:4,8,9
  28:4,8,12,15
  29:15 31:24 32:2
filed 4:18 17:15
  40:16
files 12:1 19:14,16
  22:3 26:17 28:16
  28:21
filing 5:20
filings 36:21
fill 63:16
final 27:10 28:1,13
  29:19 31:5,6,12
  69:13
finally 33:17
find 12:14 35:24
  50:12 62:1 69:2
finding 14:13,17,18
  20:22 21:6 36:6
findings 14:12 21:9
fine 51:7,9 63:18
finish 5:12
first 5:1 22:12 38:7
fishing 35:24
five 37:25 54:7
Florence 41:21
  48:21
FLORES 2:5
focusing 22:22
followed 16:4
  58:11
following 5:21,22
  17:3 31:24
follows 34:17
force 21:3
forced 21:15
foregoing 72:4
forensic 15:5
forget 64:5
form 28:20

formal 14:16
former 67:15
fortunate 66:7
forty 8:7 36:17
forward 23:6
found 14:1,21
  16:21
four 65:21 66:1,6
  66:10,12 67:18
Fourth 35:14 36:5
  36:11 39:23
frame 14:23 15:7
  15:13 17:20
frankly 26:18 45:9
  67:7
fraudulent 20:11
free 44:11 52:24
friendly 8:2,24
friendship 7:4,19
front 5:25 40:17
  65:24
full 38:8
further 5:24 6:5
  16:17 29:21 31:16
  31:18 54:4 68:19
future 17:25 26:6
  32:21,23 36:25
  37:6,20 38:21
  41:7 44:22 48:6,7
  48:15,23 49:13
  50:18 54:2,17
  55:10,18 56:17
  58:9,14 59:3
  62:14 66:5 68:23
  69:24

—— G ——
gang 37:19,22 38:2
  54:6
gaps 63:16
gate 66:2
gateway 9:14 11:8
general 9:15 14:18
  36:24 45:6 56:20
generally 32:13,20
getting 17:2 29:24
  32:4 33:21 44:16

48:1 54:14 62:25
  68:5
Giglio 7:8,20,24
  8:12 9:3 33:10
give 5:23,24 14:9
  19:7 21:2 34:3
  44:5 62:17 65:20
given 10:17,24
  33:19 48:21 58:19
go 6:13 18:23 19:3
  21:4 26:19 28:10
  28:20 29:13 32:10
  32:25 36:16 39:10
  41:12,13,17,17
  42:4,7,25 46:20
  47:15,19,20 49:20
  51:23 52:24,25
  55:5 57:2 60:4,10
  66:2 67:20 69:11
  69:17
goes 8:1 9:6,10
  11:2,3 18:11
  20:18,20 21:21
  38:8 49:17 53:13
  53:18 54:2 66:17
  69:18,23
going 4:24 5:6 7:7
  15:12,24 16:12
  18:7,25 19:4 20:7
  22:1 23:20,21
  24:15 30:16 32:13
  32:17 33:7 36:16
  36:25 37:10 38:6
  38:22 40:4 41:11
  41:12,13 42:23
  43:1 44:21 45:2,3
  47:5,18 48:5,22
  49:14 50:13 51:23
  52:3,25 53:13,14
  53:15 54:2,16
  55:2,4,9,15 56:10
  58:12 60:17 61:7
  62:18,20,21,25
  64:16 66:18,19,19
  67:6 68:11 70:23
good 34:1 57:5
Gordon 66:8

gotcha 50:24
government 3:5,7,9
  3:10 4:7,18,19
  5:21 6:19,21 7:6
  8:4 13:4,16,22
  14:19 17:6,7,9
  20:4 21:8,17,24
  21:24 25:8 26:10
  30:23,25 32:21
  33:11 35:9 36:7
  36:24 37:25 40:21
  41:7,10 45:2
  50:17,17 51:20
  52:18,22 54:16
  55:9 56:25 57:17
  59:18 66:16 68:11
  70:2
government's 7:24
  15:23 19:21 35:11
  35:15 38:3 60:24
granted 3:3 12:21
granting 34:7
gross 52:5
grossly 52:16,21
  59:5,19
ground 55:19
group 51:14 68:10
guarantee 47:3
  55:4
guard 33:12 34:23
guards 45:3 47:8
  48:19 49:16 54:6
Guerrero 34:19,22
guess 7:2 10:2 15:7
  17:1,4 28:3 30:3
  30:11 66:3 69:16
guideline 48:18
guidelines 43:7
guilt 15:22
guilty 10:25 11:7
  15:20
GURGANUS 1:13
guy's 64:5

—— H ——
H 1:8 64:24,24
Hamm 30:1

Hammer 1:5 4:2,4
  9:12,17 10:4,8,16
  18:8 25:16,24
  26:16 27:5 28:8
  29:23 30:20 32:18
  32:22 36:25 37:6
  38:19 41:4 42:22
  44:3,10 45:6
  46:14,18 48:14
  49:13,22 51:22
  53:13 54:1,18
  55:10,15 56:10
  59:13,21 61:14
  62:10 66:17 67:4
  67:25 69:24
Hammer's 25:9
  48:20 49:2 56:2,5
hand 18:20 37:14
  37:16
handed 34:18
handle 4:23 48:19
hands 22:17
handwriting 15:5
  19:1
hanging 60:25
Hanssen 67:15
happen 62:14
happens 41:6 44:11
  58:4
harm 37:2
harmed 54:6
HARRIS 1:17
Harrisburg 2:4
Hasselkress 10:12
  10:21 12:3,4
Haute 27:14 40:24
  46:5,5
head 41:25 59:8
hearing 4:13 5:13
  8:15 39:7 48:1
  68:9
heart 18:23 53:19
  69:23
heck 51:25
held 35:18
helpful 33:7
he'll 51:1,24 54:23

54:24,25
highest 42:16
highly 53:11 67:9,9
  67:10
hit 59:16
hold 19:6
homicidal 44:6
homicide 30:19
  31:24 32:6 52:4
  58:5 59:24 60:14
  63:25
homicides 36:18
  63:3 68:17,20
  69:3
honor 4:9,16 5:16
  5:19,25 7:13,21
  9:5,9 10:11,19
  11:23 12:10,23
  13:10 15:17 16:5
  16:14 17:23 19:10
  19:13 20:13 21:12
  22:18 23:17 24:4
  24:10,20 25:1,4
  26:15 27:23 28:11
  28:24 29:10 30:9
  30:17,18 31:15
  32:3,11 35:2
  37:10,16 38:7,18
  39:22 40:7,11,20
  43:15 44:14 45:11
  45:24 47:13 48:2
  49:1 50:4 51:4,7
  53:18 55:23 58:3
  60:16 62:16 63:18
  65:16 66:12,24
  67:7,19 70:1
HONORABLE 1:8
Honor's 7:2
hook 71:1
hopefully 24:6
  35:24
hot 33:22
hour 49:19
house 55:4 69:19
  69:20,20
housed 41:5 44:8
  48:22 52:10 54:8

58:17 65:12 66:1
66:12 67:14,15
housing 43:3,7,25
47:14,14,17 66:4
66:4 67:25 69:22
huge 24:7
HUMPHREY 1:17
hundred 54:21,22
54:23
hung 32:4
hypothetical 18:4

**I**

identified 23:2
identify 23:11 30:3
63:14
identifying 63:4
immaterial 15:19
54:15 67:6,12
impact 18:1
impeach 24:11
impeachment 7:8
implemented 58:11
59:4
implicated 16:1
implications 33:10
implicit 10:15
important 52:14
imposed 20:11 35:9
improper 18:17
21:3,20
improperly 21:15
impropriety 18:16
inaccurate 52:16
inappropriate 53:3
incarcerated 27:13
55:12,14,16,16
56:7,13
incident 25:23
30:21 58:4 65:11
69:14,14
included 20:25
25:18
including 44:12
inclusive 51:12
incur 21:17
indicate 38:16

indication 38:12
individual 23:21
26:2 31:2,13
individualized 54:1
individuals 44:19
45:2,12,13 50:9
52:6 53:22,23
56:11 64:23 67:1
69:19,20,21
infor 9:21
information 3:6,7
4:20 5:12 7:25
8:4,9,16,19,22
9:13,21 10:9,13
10:15,20 11:9,24
12:2 13:3,25 16:9
19:21 20:14 21:14
21:21,22 22:3,6
22:11 23:22 24:5
24:7,10,19,25
25:11,22 26:10,11
28:8,17 30:4
32:15,19,20 33:1
33:6,6,9,16,17,18
34:3,8,15 35:10
35:17,19,20 36:1
36:7,8,9,20,23
37:21,24 39:11
40:22,24 41:1,3
41:14 44:1,17,18
45:9,24 46:3,5,6,7
46:17,17,20,22
47:25 48:21 49:4
49:5,15,22,25
50:1,5,9,12,14,15
50:21 51:15 52:2
52:14,20 53:22
54:10,15 55:13
56:15 57:6,18
58:22 63:11,20
65:10,11,20 66:11
67:9,10,17 68:8
informational 13:6
13:9,13 17:7,13
17:14,23,25
infractions 21:9
infrequent 37:5

initial 22:5
initially 21:16
injure 54:12
inmate 10:12 33:22
36:19 43:19 49:18
51:18,22 52:10,17
56:3 70:5
inmates 9:11 12:8
32:24 34:22 36:18
37:1 43:9 45:7
47:14,17,19 49:11
52:13,13 54:6,10
55:17,21 56:18
58:16 59:24 60:14
65:12 66:1 67:20
69:22
inquiry 31:17,17
31:18 58:5
inside 61:12
inspector 14:18
instance 16:4
institution 26:2,12
42:14 43:20 44:9
44:9,17 47:5,7
48:13 49:17 52:11
52:12 54:25 60:5
61:11
institutional 60:11
institutions 27:6,7
27:12 28:4 41:4,4
41:12,16 48:19,24
58:7
instructions 29:20
29:25
intend 60:16
intending 17:7
intends 17:9
intent 9:14 11:3,8
18:2
intention 61:7
interaction 44:24
65:23
interested 45:21,22
internal 32:7 57:25
internally 14:22
interrupt 29:6
interview 29:22

30:2
interviewed 12:7
interviews 31:4
introduce 16:12
17:8 18:7
intruding 51:5
inventory 18:23
investigate 11:13
investigated 9:11
investigating 10:1
25:25
investigation 24:8
31:5,7,13,13 32:7
33:5 60:1
investigative 26:16
26:22 27:10 31:2
31:19
involved 8:8 9:16
9:17 10:14 11:1
11:11,17
involvement 10:3
involving 14:1
30:19
in-chief 33:12
irrelevant 15:18,21
19:22 44:15 46:21
49:2 56:1 67:5
issue 5:22 6:6 9:10
10:5,11 11:2,3,8
12:10 26:12 34:24
36:5 44:21 51:16
52:18 54:17 65:9
67:4
issues 4:12 6:4
16:22 20:8,20
28:20 39:8 44:18
49:17 51:16 61:3
68:6 69:11
Item 3:2,3,3,4,7,8
items 3:5,5,6,9,9,10
16:6,21 32:25
36:15
it'd 24:10
I'm 71:1

**J**

J 1:19

jail 46:15 70:6
James 1:19,20 2:2
4:4
Jenks 7:15
Jim 4:16
job 21:10
JOEL 1:8
John 1:13 45:21
Jones 45:21
judge 1:9 34:6 39:2
59:14 71:2,11
judgment 28:21
29:11 34:10 57:10
July 1:5
jump 40:10
jurors 52:21 59:21
66:17
jury 17:20 48:15
59:6 68:1
Justice 1:11 20:25

**K**

Karl 38:4,14
Karo 35:14 36:5,12
38:25 39:14,17,22
40:18 54:13 55:10
67:12 70:3
kept 67:14
kill 37:2 44:12 56:3
killed 15:20
killing 11:1 34:22
37:18 41:5 60:24
68:22
killings 36:3 37:3
37:21 38:20 55:6
60:18,21 61:2,5,9
61:12 62:21 64:1
64:2
kills 56:7
kind 8:9 18:18,24
19:2,2,5 24:7
50:24 56:15 68:24
know 6:23 9:19
12:6 14:3 15:2,4
16:21 17:2,3,9
19:24 22:14 27:3
27:17,18 29:14

31:24 43:12 45:12 45:14,15 46:18,19 48:2,12,12,22 49:9 52:12 57:17 57:20,21 59:16 61:1 63:2 67:8,17 67:18,21
known 30:22
Kolman 72:3,11

**L**

L 2:2
lab 14:13,17,21 15:3,9,10,20 16:3 17:8,11
laboratories 13:21 14:1 15:1
laboratory 14:25 16:7,12,16 17:3 18:11,22 19:2,4
labs 17:25
lack 43:8
laid 45:4
lasting 52:19
lasts 51:24
law 8:8 9:2 28:16 28:18 45:9 49:3
lead 4:15 25:6
leads 53:3
leave 42:7 46:19 60:25 63:15 71:3
Leavenworth 27:14
leaves 47:2
left 5:19,24 7:2 34:13 50:13 52:11 60:24 71:12
legal 35:5 53:19
lesser 55:22 56:1 56:18
letter 64:4 70:14,17
let's 4:7 6:17 18:3,6 18:6
level 47:2 49:9 63:1 68:11 69:14
levels 42:15
level-headed 24:24

Lewisburg 27:16 58:17 62:21
life 32:18,24 33:13 41:12
light 36:9
limit 14:14 23:15
limited 29:3
line 3:2 5:13
lines 13:8
list 25:12,12,12 36:18 43:19
listed 4:13
litigation 5:20 33:21
little 6:9 11:4 25:22 46:8
locate 10:21 13:17
location 27:5 33:5
locked 53:25 57:5
logical 31:22
Lompoc 27:15,16
long 8:15 22:16,19 53:23 54:19
longer 6:6 52:1
look 12:3 35:13 36:8 39:24
looking 15:15 31:1 31:11 52:25 57:19 58:10 60:9
looks 64:17
loophole 62:2
loose 51:25
loss 59:13
lot 56:11
low 42:17
Luhan 35:16 37:15 37:18,23 39:15 54:3,4,14 70:3,4

**M**

maim 54:12
main 25:10
maintain 68:6
making 28:2 55:1
males 58:18
man 12:3 59:9
managed 43:8 54:8

manned 43:25
manuals 36:2
Marion 61:20
Mark 22:25
Market 2:24
Marti 15:20
mate 56:7
material 8:12 9:3 14:8 32:20 33:1 33:16,22 35:17,19 36:8,24 38:3,10 38:23 41:16 53:12 53:20,20
materiality 37:13 38:11 55:24
materials 19:16 25:18
matter 9:12 22:13 32:8 33:22 56:20 64:21 70:22 72:6
matters 60:4
maximum 41:20
McHugh 1:19 4:4 4:16,16 5:4,9,17 5:18 6:10,12,18 8:7,24 9:5,7,9 10:2,5,11 11:4,5 11:16,18,21,24 12:16,23 13:14,20 14:11 15:2 16:25 17:1,17,19 18:13 19:9,10 20:9,17 21:11,15 22:4 23:5,9 24:16 25:4 26:14,24 27:1,14 27:16,20,25 28:2 28:7,24 29:1,7,13 29:14,17 30:7,11 30:15 31:15 32:6 37:16 39:13 71:6
mean 11:4,14 17:8 17:19 21:10 22:21 23:10 28:12 43:13 48:4 56:9 60:6 61:16 62:20
means 68:2,3
meant 20:18

medium 42:19
meeting 14:17
Mel 30:24
Mellin 1:10 4:8,9 5:3 6:5,6,22 7:21 7:22,23 8:19 9:4 9:19,20 10:18,19 11:6,23 12:5,10 12:25 13:5,10,15 15:16,17 16:14 17:16,18,23 19:7 19:20,24,25 20:6 20:7,10 21:12 22:8,18,21 23:1,3 23:13,17 24:1,4,9 24:13,19,22 25:1 26:3,15,21 27:3 27:21,23 28:11,22 29:8,10,21 30:1,8 30:9,12 31:5,15 32:3 35:2,5,7 37:9 37:10 39:12,15,19 39:22 40:4,10,14 41:2 42:16 44:13 44:14 45:18,24 46:9,13 47:9,10 48:17 49:1 50:4 50:23,25 53:17,18 54:22 55:1,23 56:22 57:20,22,25 60:8,13,16 62:16 62:22 63:6,10,21 63:24 64:10 66:23 66:24 67:19 69:2 69:3,9,25 70:1,23 71:1,4,6,9,11,12 71:13
Mellin's 13:1 26:6
Melvin 64:3
member 37:19
members 37:1,22 38:2 54:6
memos 9:25
mention 20:18 23:12
mentioned 11:7 13:14 64:2

mere 21:24
messages 58:20
met 14:21
metal 47:15,18,20 47:21 49:20
microphone 6:8
middle 1:1 38:8 55:19
Mid-Atlantic 2:23
Mills 58:15 59:1,6 59:7,17,20 61:20 62:2,11
mind 14:10
minimum 48:18
minus 26:9 28:8
misconduct 38:1
misleading 52:21
misrepresentation 52:5
misrepresentatio... 33:13
mitigating 9:15 33:6 34:12
mitigation 11:11 11:11,12 33:4 38:4
modified 6:16 13:20 19:14 30:13
monitor 47:16
months 52:20,20
MORENO 1:20
motion 1:8 4:17,19 4:24 5:20 32:10 40:15 70:23
move 42:25 43:1
movement 47:16
moving 12:23
murder 58:16
murders 69:21

**N**

N 3:1 72:1
name 10:12 52:6 64:5
named 39:3
names 44:19 45:2 45:12 46:10

narrowed 10:5
    14:2
national 2:23 67:1
    67:14,20,21
natural 32:24
nature 14:15 18:15
    22:12 30:22 42:22
necessarily 16:15
    62:6
necessary 13:7
    33:18
necessitate 24:7
need 16:18 30:4
    45:12,12 46:17,24
    47:7 67:2,17,17
negates 44:10
neither 27:4
never 10:25 12:1
    43:1 44:25 47:3
    54:23 62:14
non-inmate 52:17
November 17:17
    17:18
number 4:2 6:17
    6:24 9:9 12:7,22
    13:19 19:22 23:2
    23:19 25:3 35:1
    35:12 36:14 37:3
    38:25 39:6 45:5
    45:22 48:18 49:15
    49:16 51:17,19,19
    53:1 67:13 69:13
    69:21
numbers 32:9
    46:10 47:7 51:11
    64:12,14
numerically 45:13
N.W 1:12

_____

**O**

_____

O 72:1
oath 66:9
object 15:17 21:12
    28:11,15 44:14
    57:22 62:16 67:7
objected 4:21,21
    25:8 57:17

objection 13:10,22
    13:25 19:15 25:13
    25:15 49:1
objections 19:22
    25:10
objects 70:2
obligated 8:4 33:2
    43:10
obligation 6:23
    7:24 36:6
obligations 6:21
obtain 5:12 13:13
obviously 4:13 6:22
    9:19 11:5 15:3,8
    15:12 17:9 23:5
    24:17 25:12,16
    26:5 38:24 54:19
occur 61:12 62:25
    67:16
occurred 36:20
    37:3 38:20 61:2
    61:20 69:4,5,16
occurring 68:22
occurs 44:25
October 29:20
offense 42:22
offered 33:8
OFFICE 1:14
officers 47:1
official 72:5
officials 23:14,19
Oh 20:9 39:16
okay 5:18 6:11,17
    6:18 24:24 26:14
    28:22 29:16 30:7
    30:15 36:14 39:5
    39:16 40:1 48:12
    51:2,10,12 57:11
    57:24 58:2 61:23
    62:7 64:9,11 65:7
    65:8,17 68:13
    70:12,16,19,22
Oklahoma 27:17
    55:16
once 13:5,9 20:2
    23:20 42:25 44:10
    52:23 56:7

ones 5:24
ongoing 6:23 34:3
open 41:13 42:8
    44:8 47:2,18
    51:24 53:14 55:21
    66:19
opened 52:7
opens 66:2
operative 32:15
OPERATOR 2:5
opinion 21:4 35:14
    36:5,12 38:5
    39:21,22 54:4
    70:2
opinions 57:9
opportunity 10:17
    44:6 51:18
opposed 42:11
opposite 21:18
opposition 40:14
order 6:13 33:2,12
    34:7 37:15 47:11
    47:24 58:19 68:21
ordered 13:6 39:2
    58:16
ordering 63:13,14
orders 40:22 41:14
    43:3,5,6,6 45:16
    47:8,8,9,12,15
    48:10,12,13 70:10
original 13:21
originally 6:3
outcome 32:17
outdoors 66:2
outlier 35:7
outline 17:7,13,14
outlined 22:4
outlines 13:6,9,13
    17:24,25
outside 56:6 58:21
overall 11:11 67:2

_____

**P**

_____

PA 1:4,15,18,22 2:4
    2:24
page 3:2 37:22 38:7
    40:12 54:3

pages 64:1
paper 18:21,22
paragraph 6:1,1,1
    6:2,2,2,2,5,18
    7:14,14 9:18
    12:24 13:2,2,8,8
    13:14 19:11,11,12
    29:2,18 30:17,18
    38:8,8
paragraphs 6:4
    13:1 40:2
parameters 14:8
paraphrasing 11:3
part 9:3,3 18:22
    25:15,19 32:2
parte 5:11
PARTIAL 1:7
partially 4:21,21
particular 22:24
    35:13 46:11 52:11
    52:11 56:8 60:20
parties 4:12
party 8:17
passed 58:22
PAUL 1:5
peer 18:13,14
penal 61:11
penalty 4:14 11:6,8
    11:19 16:13 20:11
    33:3 34:10
pending 33:24
penitentiaries
    38:20
penitentiary 33:13
    42:10,13,24 47:13
    49:6 61:6
Pennsylvania 1:1
    55:17
people 25:11 48:14
    53:1 57:2 64:22
perceive 69:18
perfect 61:6
period 41:22 42:1,3
    42:5 49:20 69:16
periodic 18:11,12
permit 16:2
perplexed 10:24

person 30:3
personal 19:22
    25:11 44:18
personnel 19:13
    23:22 24:22
persons 10:3
perspective 34:2
ph 10:12 21:5
    35:15,15,16 38:4
    40:18,18
phase 11:6,9 15:22
    15:23 16:13
Philadelphia 1:4
    1:20,22 2:24 4:5
Philly 71:8
phone 25:12
phrase 69:20
physical 37:2 65:23
piece 35:10
piles 18:21,22
place 14:22 34:1
    48:13 62:14 63:4
    63:12
placed 54:25
places 27:22 45:3
Plaintiff 1:3,10
plan 55:1
planning 62:25
play 67:6
plea 7:25 8:5 11:7
    42:22
pled 10:25 15:20
plenty 31:3
plus 8:7
point 12:16 15:22
    31:17 34:24 44:3
    45:13 46:11,16,19
    46:25 47:3,6
    58:12 60:13 61:4
    62:23 65:10 66:25
    70:3
points 46:4
policed 43:8
policy 69:5
pop 61:3
population 42:8
    44:9 45:6 51:24

53:14 66:19
**populations** 41:13
**portion** 35:5 66:20
**position** 6:14 13:2
  14:6 32:22 35:11
  35:17 50:13,24
  56:5
**possession** 38:3
  50:10
**possibility** 68:22
**possible** 21:6 27:2
  28:3 68:5
**possibly** 21:22
  22:17 27:5 33:12
**post** 40:22 41:14
  43:2,5,6 45:16
  47:8,8,9,11,12,15
  47:24 48:9,12
**posted** 49:16
**potential** 11:12
  33:10 38:19 48:15
  54:24
**potentially** 51:25
**practices** 57:16
  60:10
**precedent** 70:9
**precise** 47:7
**precisely** 70:7
**precluding** 68:9
**predicate** 64:7
**premier** 61:10
**preparation** 34:16
**prepared** 4:22,23
  9:25 12:15 31:3,8
  31:14
**present** 14:24 15:8
  34:12 66:17
**presentation** 34:16
  60:22
**presented** 33:11
  38:15 51:18
**presents** 41:8,8,9
  41:10
**press** 66:1
**prevent** 49:12
**previously** 13:16
  58:3

**pre-transfer** 42:4
**pre-trial** 38:12
**prior** 8:13 21:3,6,7
**prison** 32:6 37:25
  41:22 42:8 58:17
**prisoner** 7:5,11,16
  25:24,24
**prisoners** 6:20
  25:17
**prisons** 20:24 21:8
  31:11,12,14,23
  32:15,16,19 34:8
  34:15,23 38:1
  44:20 48:6,11,17
  49:12,14 50:2
  52:5,9 53:9 54:7,9
  59:23 68:2,3,6
**private** 44:18 45:8
**privy** 17:9
**probably** 4:25
  13:23 26:5 37:11
  52:6
**problem** 25:13
  59:1 62:6 70:21
**problems** 26:17
**procedural** 68:21
**procedure** 3:7 59:4
  66:21
**procedures** 32:16
  57:16 60:10 62:13
  62:24 63:4,5,12
  63:14
**proceed** 4:22
**proceedings** 2:21
  72:6
**process** 19:8 41:18
  51:23 57:2
**processes** 41:6
**profess** 27:3
**program** 3:10 52:3
  52:3,16 68:12
**programs** 41:23,24
**promises** 8:16
**proof** 18:2 38:14,17
**proper** 17:4
**proposed** 33:18
**proposition** 36:24

**prosecution** 59:11
**prosecutor** 7:5,11
  7:19 8:11,15
**prospective** 5:1
**protect** 21:10 48:14
  67:2
**protected** 67:10
**protocols** 14:21
  16:3 17:4
**prove** 17:9
**proven** 62:3
**provide** 3:7,10 6:7
  8:4 10:22 12:4
  13:15 19:25 20:4
  21:21 23:14 24:19
  25:11 26:3 31:9
  35:10 36:7 40:22
  40:24 47:1 68:11
  69:5
**provided** 5:5 8:1,5
  8:6 10:23 12:16
  13:3,16 26:8,19
  29:4 31:19 36:22
  37:15 41:2,3,15
  45:16,25 46:3,6
  46:22 64:18,19
**providing** 57:18
**public** 2:3 49:22
  50:5
**published** 49:10
  50:12,20
**Pugh** 66:8
**pull** 6:8 12:14
**purposes** 26:6
  34:16 65:23
**put** 9:22 15:24
  23:25 31:23 42:23
  42:24 44:23,23
  47:21 48:10 50:23
  59:20 60:21 62:14
  63:4 67:2

_____
**Q**
**quantum** 38:14,17
**quarterly** 43:17
  46:11
**question** 23:18

61:22 62:17 63:8
  68:25
**questioning** 16:3
**questions** 58:13
**quickly** 61:14
**quite** 16:8 26:4
**quotes** 38:10
**quoting** 39:14

_____
**R**
**R** 72:1
**rang** 47:21
**range** 3:10 5:9
  15:15 21:9 65:19
  65:22 66:3,13,21
  66:25,25 67:5,18
  68:8
**read** 29:11 36:4
  38:25 57:9 61:18
**readdress** 13:7
  20:3 30:1,5
**ready** 29:15
**really** 10:25 15:14
  16:1,19 19:17
  22:21,24 23:19
  31:1 42:20 56:9
**reason** 15:7 18:10
  21:16,16 27:1
  36:23 44:20 45:9
  55:5 67:11
**reasons** 39:12
  57:25 68:7 70:1
**rebut** 16:18
**rebuttal** 16:16
  33:12 51:20 54:17
  61:16
**recall** 16:19 45:17
  45:19,20
**receive** 13:5 16:6
  32:22 34:14
**received** 5:11 6:24
  7:3 12:18 13:9
**recommendations**
  57:15 58:8,10,11
  59:2
**record** 4:2 9:23
  28:3 31:10

**recorded** 2:21
**recording** 2:21
  72:5
**records** 37:25
**recreation** 65:24
  66:2 68:21
**redactions** 45:20
**reference** 19:1
**referring** 63:25
  70:4
**regarding** 26:17
**Region** 2:23
**regulation** 48:24
  49:10
**related** 37:22
**relating** 50:18
**relationship** 7:4,10
  7:10,19 8:13,14
  8:24
**relationships** 8:2,3
**relatively** 24:20
**relay** 3:6
**released** 52:13 53:1
  53:5,5,24 55:21
  55:25 56:18 64:23
  64:24
**relevance** 55:24
  56:19
**relevancy** 12:9
  48:8 58:23 67:22
**relevant** 9:14 11:10
  13:24 14:7,22
  15:11,13 26:5
  32:20 33:1 35:18
  35:20 41:16 44:1
  44:2 53:12 66:14
  66:15 67:11,23,24
**rely** 70:10
**remain** 36:25
**remaining** 6:14
**remember** 41:25
  43:14
**report** 13:15 14:18
  25:25 28:13 31:2
  31:5,6,9,12,23,25
  32:5 53:9 57:13
  57:14,15 58:3,6

58:19 59:2 60:1,2 60:7,8
**Reporting** 2:23
**reports** 25:23 26:4 26:4,8,16,18,22 27:2,7,10 28:1 31:13,19 58:6 65:12 68:18 69:15
**representing** 4:7 8:19
**represents** 37:6
**request** 4:23 5:11 6:1,16,18 7:1 9:6 9:9,22 10:24 11:15 12:9,18,21 13:8,21 14:2 15:17 17:5,12 19:14,21 23:6,12 25:5,9,18,19 29:19 30:2 31:21 32:12,13,14 37:13 37:24 44:20 48:25 50:16 51:6 63:5 65:11 68:25
**requested** 3:3 4:11 6:4 29:5 37:20 40:22 58:3
**requesting** 8:21 9:1 25:13,17 28:1,15 39:11 46:9
**requests** 5:2 13:12 32:14 34:8 48:8
**require** 37:24 49:14 67:8 68:11
**required** 3:5,9 7:9 8:9 29:12 69:4
**requirements** 14:17
**reserve** 17:5
**resignation** 19:19
**resigned** 20:15
**resolved** 5:25,25 12:25 13:12,15
**respect** 19:2 33:4 33:21 34:7 40:20 40:23 41:15,16 51:16 56:17 66:15

68:8,21 70:23
**respond** 35:2
**responded** 4:18 55:14
**responding** 45:1
**response** 5:21 6:25 13:24 30:23 37:11 44:25 57:19
**responsibility** 11:20
**rest** 25:20 32:18,24 36:15 41:11 71:14
**result** 19:3 31:3 57:14 59:23,25 63:3 68:20
**retrial** 32:17
**returned** 53:4
**reveal** 63:22 69:10
**reversals** 34:11
**review** 10:17 11:13 22:16,17 23:22 30:19,22,24 31:25 34:10 51:19
**reviewed** 24:22 29:15 42:4 51:19
**reviewing** 26:6
**reviews** 13:21 14:19 18:13,14
**revisit** 17:12
**RICO** 64:8
**RIEDERS** 1:17
**right** 5:2,8,10,17 8:7 9:4,8 10:18 11:22 12:5,20,22 13:11 16:14 17:22 19:8 20:16 22:8 23:16,24 24:2,12 24:15,18,21 25:2 26:21 27:20,21 28:6,23,25 30:6 30:10,14 31:22 32:9 35:22 36:13 38:24,25 39:16,24 40:8,9,19 42:18 48:16 51:3,8,11 53:16 57:8,12 62:4,19,23 63:9

63:19,20 64:10 65:1,4,5,18 68:14 68:24 69:1,9,23 70:8,20 71:1,5,10 71:12
**right-hand** 59:9
**risk** 59:3,4 63:23 63:23
**Robert** 67:15
**Rockies** 41:21 61:10
**Ronald** 1:16 4:6
**Ronnie** 64:4
**room** 71:12
**roster** 41:14 43:12
**rosters** 40:23 43:3 43:16,21,22,23,24 45:16,20
**row** 43:20
**rule** 33:15 36:8 38:11 39:25
**ruling** 38:25 39:6
**rulings** 3:2 33:24 33:25
**run** 43:8 49:6

---
**S**
---
**S** 2:5 72:3,11
**Sablan** 34:19,22
**safely** 54:8 69:19 69:20
**safety** 47:3,6
**samples** 19:1
**satisfied** 5:5 6:20 13:3
**satisfy** 31:21 33:2
**SAUNDERS** 2:2
**saying** 17:6 34:9 56:17 59:14
**says** 12:12 14:24 38:15 43:16 54:4 54:10 67:19 70:4
**scheduled** 17:20
**scientific** 18:24
**Scranton** 1:15
**seal** 71:14
**search** 3:5 49:24

**second** 25:15 29:6 52:22 70:24
**Secondly** 33:9
**secret** 45:15
**section** 5:22 57:19
**secure** 44:4,5 52:1 54:25 55:22 59:16 60:22 66:3 67:9
**security** 3:11 26:12 28:20 30:12 42:15 44:17 47:2,8 48:5 48:14 49:11,17 50:3 57:25 58:25 59:23 60:5,11 63:23,23 64:25 67:1,14,20,21 68:5,7,10 69:11
**see** 4:7 9:2 15:25 17:6,10 20:3 22:12 25:9 30:3 38:19 40:17 47:7 48:7,18 51:1 54:23 63:19 64:17 67:11,22
**seeing** 45:20
**seek** 33:2
**seeking** 16:17 32:19 50:15 53:21
**seen** 12:1,2 52:16 58:13
**selection** 17:20
**semen** 16:21
**send** 70:14
**sense** 4:25 11:14 45:23
**sensitive** 45:9 49:4 49:15 50:15
**sent** 41:22 56:3 64:3,4
**sentence** 32:23 33:8 54:19
**sentenced** 53:23
**sentencing** 15:23 54:1 59:6
**sentry** 52:12 53:10
**separate** 56:8
**separations** 25:16

**serious** 53:6 56:12 69:15
**seriously** 54:12
**service** 43:24
**serving** 54:19
**set** 43:7 65:22
**setting** 30:21
**seventeen** 18:22
**shake** 47:22
**shape** 28:20
**shared** 11:18
**sheet** 57:17
**shortly** 18:9
**show** 7:9,18 37:5 38:11 48:1,6 49:11 52:15 58:24 60:22
**showing** 35:20 37:3
**shown** 38:9
**shows** 8:22 36:1
**sic** 19:12
**sift** 37:25
**significance** 30:21
**significant** 29:4 58:4
**significantly** 29:18 38:13,16
**Silverstein** 61:19
**similar** 58:8 65:13 68:25
**simple** 25:5 63:5,15
**sir** 70:13
**SIS** 27:10 28:1
**sit** 16:14 28:10
**situation** 8:11 48:20 56:8 60:25 67:3
**situations** 67:16
**sixteen** 18:21
**slide** 60:22
**Slocum** 64:4,4
**SLOMSKY** 1:8
**Smith** 45:22
**society** 67:2
**somebody** 11:15
**someone's** 15:8
**somewhat** 10:24

soon 24:20
sooner 24:16
sorry 20:9 29:13
sort 8:22 10:5
  47:22
sought 33:16,17
  34:25 46:8 51:15
sound 2:21 72:5
source 16:12
so-called 21:5
speak 9:20 19:24
  30:11
speaking 26:3
special 8:21,23
  25:25 27:9 64:25
  65:21
specific 7:16 9:14
  11:8 13:8 23:11
  26:8 29:19,25
  32:12 48:1,8
specifically 6:24
  7:1 19:20 21:2
  25:21 30:18
specifics 49:6
specified 27:1
spend 32:18
staff 32:24 36:19
  37:1 46:10,16
  47:16 65:23
staffed 44:9 47:6
staffing 43:21,22
  43:23
stand 35:16 41:19
  42:9 47:19 52:18
standard 18:15,16
standards 14:14
  33:4
stands 35:8
start 6:17 32:11
  34:1
starting 35:1 36:14
state 6:14 31:10
stated 6:6
statement 20:12
  56:23
statements 21:20
States 1:1,2,9 4:1

34:4 40:14 42:10
  42:24 58:7,14
  61:7,11
statistic 55:20
statistical 38:10,16
statistics 34:9,14
  36:2 37:3
status 56:2
statutory 15:24
stay 5:13 26:2
stayed 27:7 28:4
step 44:3 51:23
  52:15,19 66:16,19
  66:21,25 67:4
  70:24
stepped 44:16 45:5
  48:23 56:3 57:3
steps 44:10 59:18
step-down 41:18,23
Steve 45:22
Steven 1:10 4:8
sticker 48:10
stone 34:13
strategy 51:6
stray 12:8,11
Street 1:12,18,21
  2:3,24
strong 7:10,18
study 39:8 70:9
stuff 45:15
subject 8:14 33:22
  64:21
submit 22:4,12
  29:9 39:1 40:3,4
subpoenaed 66:9
successfully 54:11
sufficient 20:2 50:9
  55:3
suggest 33:25
suggested 52:15
suggesting 56:14
suggestion 62:10
  62:18
suggests 51:20
Suite 1:21 2:4,24
summarize 13:22
summarizing 31:5

31:6,12
summary 31:25
supervisors 25:25
  27:10
supplemental
  13:12
supply 53:11
support 9:2 33:8
supposed 42:1,6
  47:16
supposedly 58:21
  64:3
sure 10:14 14:15
  15:2 26:19 27:24
  31:18 35:4 40:12
  47:10,20 50:7,18
  55:2 68:4
system 37:4 45:1
  52:10,12 53:7,10

---

**T**

T 72:1,1
take 4:15 22:16,18
  29:17 39:24 57:8
  70:8
taken 3:4,5,6,8,9
  5:7 13:18 18:8
  51:12 59:18 65:14
  65:19 68:15
takes 57:13 58:2
talk 29:25 32:12
  48:5 56:25 59:16
talked 11:7 56:24
  58:1
talking 11:6 15:12
  15:22,23 32:12
  35:11 37:18 41:7
  44:18 48:22 49:3
  64:1
talks 41:9 52:18
  53:4
team 33:3
telephone 4:6
TELEPHONIC...
  1:16
teletypes 9:25
tell 14:5 36:15

47:16 63:24
tells 43:25
tend 7:18 37:12
  56:15
tendencies 44:6
tendency 21:21
term 14:12,20
  18:12 20:19 30:19
  30:20 43:8
terminated 20:15
termination 19:19
terminology 8:23
  31:1 32:4
terms 49:16
Terre 27:14 40:24
  46:5,5
tested 16:6
testify 16:8 21:23
  23:7 57:1
testifying 23:15
testimony 15:11
  33:19 51:17 56:22
testing 15:14,21,25
  16:6,18,20 18:17
thank 9:5 28:24
  71:4,10,11
thing 29:4 31:20
  47:22 52:22 59:21
  62:11
things 14:15 16:22
  17:1 18:14 48:9
  58:8
think 4:25 7:19 8:1
  8:3 10:11 11:16
  14:5 15:3,9 16:15
  16:20 17:20 18:17
  18:25 19:5 21:13
  21:14,19,20,25
  22:21 23:10 24:9
  24:10,13 25:21
  26:4,13,18,22
  27:23 28:7 29:1
  31:7,20 32:1,25
  33:15 34:19 36:23
  37:2,10 38:23
  41:13 42:20,21
  44:2,7 50:20,24

51:5,13 53:11,18
  54:2,13 55:5,7
  59:21 60:6 63:2,6
  63:7,25 67:12
  69:4,23 70:3,24
  71:1
thinking 7:8 18:5
thinks 31:7
third 1:18 40:2
Thirdly 33:15
thirty-six 40:9
  52:20
thirty-two 54:22
thought 19:7 28:12
threat 49:13
three 26:25 51:24
  51:25 52:2 53:13
  54:24 66:18
three-phase 52:19
three-year 52:3,15
  52:23
threw 13:23
throw 18:3
tie 18:7
tied 16:15
tier 41:24,25 42:2
tight 17:19
time 12:16 14:4,23
  15:7,11,13,15
  16:18 17:19 18:9
  20:2 23:9 27:6
  29:17 33:20 36:15
  41:5,23 42:1,3,5
  44:3 45:7 46:11
  46:16,19 50:4
  52:16 61:14 65:10
  65:25 69:17
times 27:4,17 45:4
  49:20 61:11
today 4:22 14:4
  28:9 29:20 62:25
  68:25
told 27:3
Tommy 61:19
top 37:23 41:25
towels 18:21,22
transcriber 72:3,12

transcript 1:7,8 61:18 71:14 72:5
transcripts 51:19
Transfer 27:17
transferred 42:2 66:8
transported 29:23
travel 26:1
Travis 1:16,17 4:6 4:23 5:11,13,14 5:16 12:16,17 22:22 27:15,18,19 32:9,11 35:4,8,10 36:13,14 37:15 39:1,5,9,16 40:1,5 40:7,9,10,20 41:20 42:10,12,15 42:17,19 43:4,6 43:14,18,21,23 44:2 45:4,11,19 47:4,12,24 48:2,9 49:10,23 50:13,20 50:22 51:2,4,7,9 51:11 53:16 54:21 56:24 57:11,13,23 57:24 58:2,24 59:8,14,25 60:3,6 60:9 61:14,15,17 61:23 62:1,5,15 62:20 63:17,18,24 64:3,11,13,15,16 65:2,4,6,9,18 66:15 67:19,23,24 68:13,15 69:1,12 69:13 70:9,11,13 70:16,19,21
Traxler 22:25 23:11,15 31:8
Traxler's 24:19 31:9
treatment 7:7,18
tremendous 35:9
trial 22:7 24:3,8 33:20 34:16 42:21 64:8 68:9 69:17
trials 51:20
tricky 25:22

tried 12:13 14:11 59:9 66:8
trip 29:20
Troia 35:15 40:18
true 37:6 58:15 59:17 72:4
truthfulness 20:10
try 12:13 24:24 50:11
trying 43:14 50:17 53:4 58:24 62:9 66:11,16
turn 4:20 7:7,24 9:4 20:13 24:6 26:15 28:17 37:22 38:7 47:18 49:15 50:1
turned 7:12 8:10 8:12,18,20 10:10 18:18 19:5 22:10 22:14 24:5 28:13 29:12 31:4 32:1 50:3
turnover 7:9
turns 8:16 18:10
twelve 52:19 54:21 54:22,23
twenty 61:20
twenty-eight 46:15
twenty-four 49:19
two 8:18 13:1 14:25 25:10 29:22 34:22 41:3 42:2 45:22 48:9,11 51:16 58:16 59:23 60:14 61:2 64:1 68:17
type 7:15,25 15:4,5 15:15 20:11 32:7 35:23 37:5,13 39:10,11 44:24 50:5 58:8 68:22
types 8:6 50:6
typically 56:22 67:3
T.D 58:15

**U**

ultimately 42:6
Umana 40:18
Umar 35:15
unable 13:17
unaware 9:21 10:19 60:20
unclear 11:4 46:8
understand 7:23 9:24 16:8 42:18 43:7,23 47:9,12 49:4 50:16 53:16 55:24 58:19 69:18
understanding 4:11 14:2 25:8 41:2 68:18,19
understood 24:4 27:24 32:3
unduly 13:23 15:18 17:6
unfair 50:25 59:5 59:20 62:10
unfairness 60:15
unique 56:5
unit 1:11 42:4 43:7 43:10,11,25 47:17 64:24,24,25 65:12 65:13 66:4
United 1:1,2,9 4:1 34:4 40:14 42:10 42:24 58:7,14 61:6,11
units 43:3 47:14,14 67:18
unturned 34:13
unwieldy 15:7
use 8:23 21:3 24:11 30:20 48:10 69:20
USP 40:24,24 42:9 42:16,19 43:1,1 44:5 46:5,5
usually 41:9
U.S 1:11,14 42:13

**V**

v 2:2 4:1 65:13
value 21:25
various 4:19 19:15

19:22 27:6 32:25 33:2 45:3 54:7
vehemently 67:7
veracity 20:10,18 20:19,21,23 21:4
Veritext 2:23
victim 18:1
victims 36:19,19
view 40:21
violate 50:2
violation 14:14 21:5
violence 53:6
visiting 25:12
vs 1:4 34:4

**W**

WADE 2:2
WAFFENSCHM... 1:17
wait 71:6
wall 47:21
Walnut 1:21
want 10:14 11:12 14:14 23:24 24:10 25:10,20 26:22 27:24 28:17 31:10 32:10 39:1 43:19 49:8,9 50:23 57:9 59:22 61:13,15,16 61:22,24,25 62:1 62:13 63:22
wanted 19:7
wants 14:4 44:12 63:2
war 64:6
Washington 1:12 15:4 71:8
watch 47:19
WATERS 1:17
Watland 34:4,17 35:7 36:11,21 39:2
way 4:16,22 12:14 18:17 19:20 28:20 30:13 36:3 45:1 46:14 56:9 69:22

ways 4:19
week 8:18 39:4 40:6 70:12
weigh 22:23
Welcome 4:10
went 4:25
West 1:18,21
we'll 19:6 22:13 28:20 30:4 31:18
we're 9:13 11:5 15:3,12,14,22,23 17:20 19:18 23:21 25:17,19 27:24 28:18,19 30:25 31:1,11,18 32:3 32:19 33:2 35:22 36:16,18 39:11 41:7,15 45:21,22 48:21 52:25 56:16 58:10 61:4 64:16 64:19 65:2 66:11 69:14 70:24
we've 5:25 6:15,15 14:2 19:14 27:8 28:8 29:1 30:2 45:15 46:2 58:1
wider 21:9
Williamsport 1:18
winnowed 5:23
wish 4:12 70:18
wishes 4:14
withdraw 17:11
witness 7:5 8:14 12:13 15:9 20:22 21:6,23 22:6,22 24:11 48:5
witnesses 6:19 7:11 7:16 8:1,6 17:10 19:14 20:1 22:14
witness's 20:21
word 14:11
wording 14:16
words 5:20
work 44:19
worked 29:1
works 45:1
wouldn't 28:17

| | | | | |
|---|---|---|---|---|
| **write-up** 21:3 | **16(a)(1)(E)(i)** 33:15 | **37** 3:5 40:20 43:2 | **71** 3:9 65:19 66:13 | |
| **write-ups** 20:1,5,7 | **161** 1:18 | 46:9 | **72** 3:9 65:19 66:13 | |
| 25:23 | **17** 3:2 6:2 7:14 9:6 | **38** 51:11 | **73** 3:9 65:19 66:13 | |
| **written** 57:19 | 19:11,12 | **39** 3:4,5 | **74** 68:15 | |
| **wrong** 19:1 31:1 | **17101** 2:4 | | **75** 3:10 68:16 | |
| **wrongly** 35:12 | **17701** 1:18 | **4** | **76** 3:10 68:16 | |
| **W-A-T-L-A-N-D** | **1800** 2:24 | **4** 37:22 | **77** 69:13 | |
| 34:5 | **1801** 2:24 | **4:96-CR-00239-J...** | | |
| | **18501** 1:15 | 1:3 | **8** | |
| **X** | **19th** 40:16 | **48** 51:11 | **8** 3:4,5,6 72:9 | |
| **X** 3:1 53:1 | **19103** 2:24 | **49** 3:5 51:13,16 | **888-777-6690** 2:25 | |
| | **19106** 1:22 | 57:9 64:22,22 | | |
| **Y** | **1932** 37:4 | 65:13 | **9** | |
| **yeah** 34:20 41:11 | **1990** 36:20 64:6 | **49-51** 3:6 | **9** 1:5 3:2 34:5 | |
| 43:18 66:4 69:7 | **1995** 14:24 | | **96-239** 4:2 | |
| **year** 34:6 52:3 | **1998** 62:3 64:2,7 | **5** | | |
| **years** 8:8 27:13 | | **5** 38:7 54:3 | | |
| 37:25 45:5 51:24 | **2** | **5th** 4:14 24:3 | | |
| 51:25 52:8 53:14 | **2005** 64:1 | **50** 51:13,16 64:22 | | |
| 54:7,22,23,24 | **2006** 59:25 | 64:22 65:13 | | |
| 55:21 61:20 66:6 | **2011** 29:20 40:16 | **51** 51:13,16 53:4 | | |
| 66:18 69:17 | **2012** 1:5 3:4 72:9 | 57:9 64:22,22 | | |
| **yes/no** 68:24 | **2013** 4:14 | 65:13 | | |
| | **20530** 1:12 | **52** 57:13 | | |
| **0** | **23** 3:3 | **53** 3:7 57:14,18 | | |
| **08-cr-00259** 34:21 | **24** 3:3,5 6:2 19:12 | 64:13,14 | | |
| | 23:2 | **54** 64:17,17,18 | | |
| **1** | **25** 3:3,3,10 6:2 | **545** 1:21 | | |
| **1** 3:3 4:23 5:6,9,22 | 12:24 13:2,9,11 | **57** 3:6 | | |
| 6:3 24:25 | **26** 6:3 25:3 | | | |
| **1st** 17:17,18 | **27** 6:3 29:2,4,18 | **6** | | |
| **10** 3:2 6:1,17,18 | **29** 6:3 30:17 | **6** 40:12 | | |
| 7:14 9:6,6 | | **6:00** 49:7,18,19 | | |
| **100** 2:3 | **3** | **6:15** 47:19 49:7 | | |
| **101** 53:6 69:14 | **302** 10:21,23 12:4 | **6:30** 47:18 | | |
| **11** 3:3 6:1 9:9,18 | **302s** 12:14,19 | **60** 64:18,18 | | |
| 12:22 | **306** 2:4 | **601** 1:21 | | |
| **11-cr-00038** 34:5 | **31** 4:23 5:6,9,22 6:3 | **61** 3:8 64:20,21,23 | | |
| **12** 3:3 6:1 12:24 | **311** 1:14 | 65:6 | | |
| 13:2,8,11 | **32** 3:4 4:24 32:14 | **62** 65:9 | | |
| **13** 3:10 65:19,22 | 35:1 36:18 37:8 | **65** 3:7,8,9 65:9 | | |
| 66:3,13,21,25 | 37:11 38:25 39:6 | **66** 3:9 65:11,14 | | |
| 67:1,5,18 68:8 | 39:9 40:3 | **67** 3:9 65:15 | | |
| **1331** 1:12 | **33** 3:5 39:8 | **68** 3:9,10 65:18 | | |
| **1428** 40:12,13 | **34** 3:5 37:11 39:8 | | | |
| **15** 6:2,6 13:14 | **35** 3:5 37:11 39:8,9 | **7** | | |
| **16** 3:9 6:2 13:19,20 | 40:3 | **7** 3:2,7,8,9 | | |
| 36:8 38:11 | **36** 3:5 40:20 43:2 | **70** 65:18 | | |