**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| | : | |
| UNITED STATES OF AMERICA, | : | No. 4:96-CR-239 |
| | : | |
| v. | : | Honorable Joel H. Slomsky |
| | : | |
| DAVID HAMMER, | : | Capital Case |
| | : | |
| Defendant | : | |
| _____ | : | _____ |

**DEFENDANT'S REPLY TO GOVERNMENT'S CONSOLIDATED BRIEF IN OPPOSITION TO DEFENDANT'S MOTION IN LIMINE TO PRECLUDE ADMISSION OF IMPROPER EVIDENCE UNDER THE GUISE OF FUTURE DANGEROUSNESS, VICTIM IMPACT EVIDENCE AND PRIOR CRIMINAL CONVICTIONS AND DEFENDANT'S SECOND MOTION FOR DISCOVERY**

Defendant, David Hammer, through counsel, submits his Reply to the Government's *Consolidated Brief In Opposition To Defendant's Motion In Limine To Preclude Admission Of Improper Evidence Under The Guise Of Future Dangerousness, Victim Impact Evidence And Prior Criminal Convictions And Defendant's Second Motion For Discovery* (Doc. 1550), and in support thereof, states the following:

**A.    Introduction.**

Many, if not most, of the government's arguments are addressed in Defendant's

previous filings. See Doc. 1524, 1526, 1528. Defendant will narrow his focus and offer a reply only to those issues or assertions raised by the government that require further argument.

Contrary to the government's contentions, Defendant's motions are neither an attempt to obtain the government's "litigation playbook," nor are they a request for a "pretrial presentation of the entire government case." *BIO* at 2. Instead, Defendant's motions are narrowly tailored and seek the exclusion of specific evidence noticed by the government on the basis of longstanding constitutional standards, the Federal Death Penalty Act (FDPA) and the rules of evidence. In those cases in which Defendant seeks further clarification or additional information, he does so with specificity and sets forth why this information is necessary in order to adequately prepare his defense. This is a far cry from seeking the government's "playbook" and is nothing other than routine pretrial capital litigation designed to ensure as much as possible the overall fairness of Defendant's pending capital re-sentencing trial.[1]

---

[1]Nor do the cases relied on by the government support any contention that Mr. Hammer's motions are nothing more than an attempt to "misuse" the informational outline process or to obtain the government's "litigation playbook." For example, in United States v. Cooya, 2011 WL 5878383 (M.D. Pa. Nov. 23, 2011), the issue was whether the Court should require the government to file an informational outline under the circumstances of that case, an issue already resolved in Mr. Hammer's favor here. Id. at 1. Moreover, the Court's concern regarding a defense attempt to obtain the government's "litigation playbook" was in response to a defense request for an order "to explain how the United States will

The government's attempt to avoid the exclusion of improper evidence because "more evidence" (*BIO* at 3), is better in a capital resentencing is similarly flawed, as reflected in the authorities cited by the government.  While the Supreme Court did note it is "desirable for the jury to have as much information before it as possible when it makes the sentencing decision" it did so with the caveat that "[s]o long as the evidence introduced and the arguments made at the presentence hearing do not prejudice a defendant." Gregg v. Georgia, 428 U.S. 153, 203-04 (1976).  As set forth in the motions in limine, evidence proffered by the government fails to meet this threshold requirement and violates longstanding constitutional standards as well as the FDPA.  Thus, the government's reliance on "more evidence" is no defense for the admission of constitutionally and statutorily improper evidence and testimony.

**B.**   **Defendant's Motion in Limine to Preclude the Admission of Irrelevant and Constitutionally Improper Evidence In Support of the Prior Criminal Convictions Involving Use or Threat of Violence Aggravator (18 U.S.C. § 3592(c) (2)).**

In his motion, Mr. Hammer argued that the admission of irrelevant, cumulative, speculative and hearsay evidence purporting to support this statutory aggravator is constitutionally and statutorily barred.  The government agrees that hearsay evidence

---

'spin' the facts." Id. at 2.  Mr. Hammer's motions in limine make no such request. Instead, Mr. Hammer merely seeks the exclusion of evidence that is constitutionally or statutorily barred and the disclosure of evidence necessary in order for Mr. Hammer to adequately prepare his defense.

is not admissible to establish an eligibility factor. *BIO* at 4-5. The government does not dispute Mr. Hammer's claim that the government cannot present the testimony of Agent Malocu to read from records regarding prior offenses, (see Doc. 1524 at 5), nor does the government contend that the testimony of reporter David Walter is admissible, (see Doc. 1524 at 6).

In its answer with regard to the prior testimony of the prosecutor and victim of the Thomas Upton shooting, the government contends that "[t]he evidence of the prior conviction is certainly relevant and the prosecutor can certainly testify that the defendant was convicted of the offense in question and the victim can testify about the circumstances of the offenses." *BIO* at 4. That, however, is not the gist of Defendant's concerns with regard to these two witnesses. See Doc. 1524. The prior testimony went much farther than merely the fact that Mr. Hammer was convicted of the offense or the circumstances of that offense. As demonstrated in the motion in limine, the prior testimony far exceeded that which was necessary to prove the fact of the conviction, does not meet the heightened reliability standards required in capital cases, Ford v. Wainwright, 477 U.S. 399, 411 (1986), is not relevant to the issue, and its probative value is outweighed by the danger of creating unfair prejudice. See Doc. 1524 at 2, 5-7. For each of these reasons, this Court should grant Mr. Hammer's motion.

C.      **Hearsay During The Selection Phase.**

The government contends that because of the relaxed evidentiary rules during the selection phase, it is entitled to admit hearsay evidence in support of non-statutory aggravating factors. *BIO* at 4-5.[2] The government further suggests that the weight of authority supports its position. Id.[3] According to the government, "[A]s the cases have clearly stated, the sentencing jury should have more evidence, not less, to rely upon in order to reach the appropriate sentence in this case." Id. at 3. The issue is not quite this simplistic. It is well-established that "[E]vidence supporting aggravating factors must meet a strikingly high level of reliance and reliability." United States v. Merritt,

---

[2] It appears that the government believes that the resentencing hearing will be bifurcated.  Defendant Hammer has not made such a request and does not intend to request that the proceeding be bifurcated.

[3] A few of the cases the government relies upon are inapplicable. In United States v. Brown, 441 F.3d 1330, 1361 (11th Cir. 2006), the court did not address the issue of whether or not hearsay rules apply during the selection phase, deferring to rule on the issue because it held that it need not decide whether or not Crawford applies to a federal sentencing hearing because the testimony at issue was not testimonial in nature. In Jalowiec v. Bradshaw, 2008 WL 312655 (N.D. Ohio 2008), the defendant had been convicted and sentenced to death in Ohio state court. Thus, whether hearsay was admissible in federal capital sentencing proceedings pursuant to the Federal Death Penalty Act was never at issue. In United States v. Higgs, 353 F.3d 281, 324 (4th Cir. 2003), the court did not, as alleged by the government, hold that hearsay evidence is allowed during the selection phase regarding non-statutory aggravating factors. Rather, the court declined to squarely address this issue, noting it was not plain error to admit co-defendant's confession at sentencing.

2013 WL 395458 (E.D. Pa. Feb. 1, 2013) at *4.

While it is true that 18 U.S.C. § 3593(c) allows for the introduction of evidence "regardless of its admissibility under the rules governing the admission of evidence at criminal trials," the constitution is not suspended during the penalty phase. This Court, as gatekeeper, has the inherent "[a]uthority and flexibility under the FDPA to impose upon the parties any standards of admissibility or fairness dictated by the Fifth and Sixth Amendments" to ensure that the information the government seeks to admit is reliable and fair. United States v. Rodriguez, 380 F.Supp. 2d 1041, 1054 (D. ND 2005).

For example, while the court in United States v. Fell, 360 F.3d 135, 143 (2d Cir. 2004), relied upon by the government, held that it is desirable that a sentencing jury have as much information before it as possible, it did not mean that any and all evidence, regardless of whether or not it meets the heightened reliability standards applicable to capital cases, Ford v. Wainwright, 477 U.S. 399, 411 (1986), is particularly relevant to the sentencing decision, or whether its probative value is outweighed by the danger of creating undue prejudice, should be admitted. The court in Fells, like the court in Rodriguez, explicitly held that the FDPA does not eliminate the court's role as "gatekeeper" of constitutionally permissible evidence. Id. at 145.

Indeed, because of the Supreme Court's repeated emphasis on the need for

6

heightened reliability in capital sentencing proceedings, many federal courts have chosen not to adopt a mechanistic application of the relaxation of the rules of evidence during capital sentencing, but rather, have required the government, when appropriate, to prove its aggravating factors without relying on hearsay evidence. See United States v Sampson, 335 F. Supp. 2d 166, 224 (D. Mass. 2004) (excluding incidents of defendant's prison misconduct because they "could not have been established by reliable evidence, such as live testimony"); United States v. O'Driscoll, 250 F.Supp. 2d 432, 436 (M.D. Pa. 2002) ("[W]here the government attempts to use unadjudicated acts of violence and misconduct the heightened standard of reliability applicable to capital sentencing proceedings requires that the hearsay rule be fully applicable to the penalty phase proceeding"); United States v. Sablan, 555 F. Supp. 2d 1205, 1222 (D. Colo. 2007) ("[c]onfrontation clause as interpreted by Crawford is applicable during penalty stage...Testimonial statements must be excluded if they do not meet the requirements for admission of such evidence"); United States v. Davis, 912 F.Supp. 938, 946 n.20 (E.D. La. 1996) (requiring the government prove the defendant's prior misconduct "by direct evidence")[4]; United States v. Pitera, 795 F.Supp. 2d 546, 565 (E.D.N.Y. 1992) ("The

---

[4] Specifically, the court noted that it was "[a]lso concerned with the possible hearsay use of the letters. While § 3953 (c) indicates information is admissible regardless of its admissibility under the rules of evidence, the

heightened standards of reliability applicable to capital proceedings...may demand further indicia of reliability before a court can say that the probative value of any such hearsay evidence outweighs its prejudicial potential").

As the court in United States v. Mills, 446 F. Supp. 2d 1115, 1130 (C.D. Cal. 2006) noted, requiring the government to comply with the dictates of Crawford does not mean it cannot prove its case: "It merely requires the government to provide evidence through witnesses who have first hand knowledge of the events in question, rather than through stacks of silent documents replete with unconstitutional hearsay." In this case, during the first trial, the government relied upon a host of "silent documents replete with unconstitutional hearsay" and propose to do so again.

While the law favors the admission of more evidence, not less, on the aggravating and mitigating factors as codified in the FDPA, "[t]his call to admit more evidence does not sanction the admission of unconstitutional evidence against the defendant. Given the gravity of the decision to be made at the penalty phase, the [government] is not relieved of the obligation to observe fundamental constitutional guarantees." Id. Finally, the court observed that while it "recognizes the policy

---

information, nonetheless, must be shown to be reliable. If the government intends to rely on allegations of misconduct that are cited in these letters, it must establish that misconduct by direct evidence." Id.

reasons encouraging the admission of the maximum quantum of evidence during the selection phase, that policy is insufficient to override Defendants' right to confront witnesses during such a critical portion of the capital trial." Id.

The logic of Mills and the other cases cited above are both reasonable and best protect the Defendant's constitutional rights at this critical stage of the proceedings - the stage where the jury decides whether he lives or dies - and ensures only reliable evidence will be weighed by the jury. The government's request for carte blanche admission of any and all testimonial evidence at the selection phase should be denied.

**D.    Defendant's Motion in Limine to Preclude the Admission of Irrelevant and Constitutionally Improper Evidence Under the Guise of Victim Impact Evidence**.

Defendant does not contend that victim impact evidence is not relevant and appropriate for the jury's determination in a capital case. Nor does he deny the relevance of a victim impact statement that complies with the FDPA and applicable case law. What he does contend is that the evidence the government seeks to present as victim impact evidence neither comports with Payne v. Tennessee, 501 U.S. 808 (1991) nor the FDPA. See Doc. 1528 at 1-10.

As the plain language of the government's proffer demonstrates, it seeks not just to present testimony about Mr. Marti's life and how his death impacted his family, but "[I]n particular, the family members will describe how the family took

9

repeated steps to help Andrew Marti given the physical and mental problems he faced after surviving hundreds of epileptic seizures when he was a young child." Doc. 1489 at 3-4. As the Defendant has already argued, this evidence is not relevant under Payne or the FDPA. Doc. 1528 at 4-6.

Indeed, evidence about the steps the family took to help Andrew Marti deal with his physical and mental problems and his enduring hundreds of seizures while a child does not help "[t]he jury to understand the consequences of the crime committed." *BIO* at 7. There is a stark difference between what is constitutionally permissible per Payne, statutorily permitted by the FDPA and what the government proposes to introduce in this case.

And, while Defendant has never alleged that victim impact evidence violates the constitutional requirement of an "individualized sentencing," he does in fact allege that the concept of individualized sentencing is violated when, as in this case, the victim impact evidence exceeds that which was contemplated by Payne and the FDPA. See Doc. 1528 at 8.

Finally, in the Oklahoma City bombing case, where the extraordinary nature of the crime and number of victims occasioned an unprecedented victim-impact presentation, the District Court still disallowed "non-objective emotional testimony" about "the emotional aspect" of each family's loss, particularly the "grieving process,

the mourning process and prohibited the introduction of wedding photographs and home videos. United States v. McVeigh, 153 F.3d. 1166, 1221-1222 (10th Cir. 1998). Similarly, testimony about Andrew Marti's history of physical and mental disabilities, including the seizures he suffered as a child and the family's efforts to help him must also be excluded because the potential for unfair prejudice is too great.

As one jurist noted,

> I can say, without hesitation, that the victim impact testimony...was the most forceful, emotionally powerful, and emotionally draining evidence that I have heard in any kind of proceeding in any case, civil or criminal, in my entire career as a practicing trial attorney and federal judge spanning nearly 30 years...To pretend that such evidence is not potentially unfairly prejudicial...is simply not realistic...

United States v. Johnson, 362 F. Supp. 2d 1043, 1107 (N.D. Iowa 2005). This Court should grant Mr. Hammer's motion or, at a minimum, conduct a hearing so that this issue can be resolved prior to the start of the re-sentencing.

**E.    Defendant's Motion in Limine to Preclude the Admission of Irrelevant and Constitutionally Improper Evidence Under the Guise of Future Dangerousness.**

The government seeks to introduce a slew of conduct ranging in remoteness from thirty-two years ago, thirty-one years ago, thirty years ago, twenty-seven years ago, twenty-four years ago and twenty years ago. At its extreme, thirty-two years ago, Mr. Hammer was twenty-two years old. Today he is fifty-four.

The government not only seeks to present evidence that is stale and irrelevant, it seeks to do so through testimonial hearsay evidence in the form of reports, prison records and documents. It seeks to introduce evidence of "other inappropriate conduct" and intends to introduce prison misconducts, evidence it produced in 1996 by having a witness read from prison disciplinary records, including "minor disruptions" caused by Mr. Hammer. *BIO* at 5. The government also intends to proffer evidence of prior escapes from Oklahoma in the 1980's as somehow relevant to Mr. Hammer's potential for future dangerousness if ultimately incarcerated for life in the custody of the Bureau of Prisons. The records concerning alleged misconduct in prison, like most of the other evidence the government seeks to introduce in support of future dangerousness, is also remote, unreliable and not relevant to whether Mr. Hammer will be a future danger. Moreover, the evidence the government seeks to introduce is inadmissible because its probative value is outweighed by the prejudicial impact. See 18 U.S.C. § 3593 ( c ); Doc. 1528 at 9, 10, 13.

In its *BIO*, the government relies primarily upon two cases, United States v. Pleau, 2013 WL 1673109 (D.R.I. April 17, 2013) and United States v. Henderson, 485 F. Supp. 2d 831 (S.D. Ohio 2007), and chides Mr. Hammer for ignoring their alleged import while nonetheless arguing that the government's evidence of future dangerousness is "too remote in time" to be relevant for the jury's consideration. *BIO*

at 9.  In both these cases, the defendant's remoteness argument was rejected because for most of the time in between the prior conduct and the defendant's capital murder charge, he had been incarcerated.  See Pleau 2013 WL 1673109 at *5 (rejecting remoteness argument regarding prior misconduct noting that "defendant spent a relatively short period of time outside of imprisonment"); Henderson, 485 F.Supp. 2d. at 869 (same).

These two cases are not, however, the final word.  Indeed, numerous courts have excluded evidence far less remote than thirty-two years or even twenty years while others have excluded evidence that is just as old, stale and remote as that which the government seeks to admit in this case.[5]

For example, in United States v. Jacques, 684 F. Supp. 2d 324, 327-328 (2d Cir. 2012), the Second Circuit Court of Appeals affirmed the district court's exclusion of uncharged allegations of sexual misconduct as events twenty-two to thirty-two

---

[5]The government's reliance on Williams v. New York, 337 U.S. 241 (1949), *BIO* at 8, is similarly flawed.  As the Supreme Court noted in Gardner v. Florida, 430 U.S. 349, 357-58 (1977), much has changed in capital jurisprudence since the Williams decision in 1949, not the least of which is the recognition that because "death is a different kind of punishment from any other" (id. at 357) and that, as a result, "the sentencing process, as well as the trial, must satisfy the requirements of the Due Process Clause."  Id. at 358.  See also Muhammad v. Tucker, 905 F. Supp. 2d 1281, 1296 (S.D. Fla. 2012) (noting that Williams came "from a time before the Confrontation Clause applied to the states and before the Eighth Amendment placed limits on capital sentencing").

years before the litigation. The evidence excluded by the district court of Vermont included alleged "manipulation and deception of the Vermont criminal justice system" and "witness elimination." See United States v. Jacques, 2011 WL 1675417 (May 4, 2011).

In United States v. Gilbert, 120 F. Supp. 2d 147 (D. Mass. 2000), not only did the court exclude an unadjudicated prior bad act that was thirteen years old, see Doc. 1526 at 7, the evidence it excluded included an attempted breaking and entering by defendant of the home of his extra-martial partner and an incident wherein the defendant attempted to stab another individual in a heated dispute. According to the court, both of these incidents had no bearing on defendant's future dangerousness while incarcerated.

Likewise, in United States v. Sablan, 2008 WL 700172 (D. Colo. Mar. 13, 2008), the court excluded evidence of defendant's prior aggravated assault "manifesting extreme indifference to human life" where defendant beat victim about the head causing "deep lacerations and semi-consciousness." Id. at *4.  The court found that the danger of unfair prejudice outweighed the probative value of this evidence. The court also excluded this evidence on the grounds that it was too remote - the assault occurred thirteen years before the murder at issue and twenty-one years from the date of the court's order.

14

More recently, in the eastern district of Pennsylvania, the court in <u>United States v. Merritt</u>, 2013 WL 395458 (E.D. Pa. 2013), a highly aggravated case where the defendant was charged with six murders and host of other crimes, the court initially excluded from the government's future dangerousness presentation evidence that the defendant threatened and tried to kidnap potential witnesses in an uncharged murder. Specifically, the court held that:

> At this point, it is unclear how threats to and the alleged attempted abduction of potential witnesses in an uncharged murder impact the future dangerousness of defendant in the prison context. Courts have recognized that, if proven, a defendant's history of threatening and intimidating potential witnesses would have little bearing on defendant's dangerousness in prison, where [he] would be under lock and key.

<u>Id</u>. at *6.[6] In Mr. Hammer's case, he too, if sentenced to life without possibility of parole, would be under lock and key. The conduct the government seeks to introduce as evidence of future dangerousness has little bearing on whether Mr. Hammer will be a future danger in the prison context and is too remote to be admissible.

The government also defends its attempt to introduce evidence that Mr.

---

[6] The court also stated that if the government really wanted to introduce this unadjudicated serious misconduct, it "[m]ay provide additional briefing on how witness threats, intimidation, and the attempted abduction of a witness related to Simon's murder would be probative in establishing defendant's future dangerousness in the prison setting or would satisfy one of the other aggravating factors." <u>Id</u>.

Hammer, in a taped interview, stated his desire to kill the surviving victim of a shooting he committed 1983. Mr. Hammer's misplaced bravado is, as previously argued, inadmissible. See United States v. O'Reilly, 545 F.Supp. 2d 630, 638-639 (E.D. Mich. 2008) (because it was limiting future dangerousness evidence as it applied to life in prison, court excludes evidence of defendant's statements about crimes he would commit if released from prison and about how he should have killed his co-defendant after the crime). What the government misses is that this type of evidence has no bearing on Mr. Hammer's potential future dangerousness while serving a life without parole sentence in a maximum security federal prison. See United States v. Basciano, 763 F. Supp 2d. 303, 352 (E.D.N.Y. 2011) (when the sentence available is either death or life without possibility of parole, the government's evidence of future dangerousness must pertain to the context of prison).

Finally, the vast majority, if not all of the evidence of previous misconduct proffered by the government would, rather than helping the jury's decision, be a "pernicious distraction [] in considering whether [Mr. Hammer] shall live or die. Gilbert, 120 F. Supp. 2d at 143.

This Court should grant Mr. Hammer's motion in limine regarding this evidence. At a minimum, this Court should hold a hearing to determine the admissibility of the government's proposed future dangerousness evidence. See

16

United States v. Pleau, 2013 WL 1673109, *7 (D.R.I. April 17, 2013) (District court requires proffer concerning future dangerousness and prior acts of violence aggravating factors, specifically ordering government to proffer: "lists of witnesses it expects to testify in support of each aggravator, brief descriptions of each witnesses anticipated testimony, and copies of any out of court documents or exhibits that the government plans to introduce"); United States v. O'Reilly, 2009 WL 5217365 *2 (E.D. Mich. Dec. 30, 2009) (court agrees to hold an evidentiary hearing on whether evidence of defendant's participation in an unadjudicated murder-for-hire plot would be admissible to support future dangerousness).

## F.    Duplicative Aggravating Factors.

Mr. Hammer has alleged that two of the government's noticed aggravating factors are duplicative. See Doc. 1524 at 7 (arguing that government's proof of defendant's prior criminal convictions involving use or threat of violence aggravating factor and its proof of future dangerousness are subsumed, requiring exclusion).

In response, the government contends that these factors are not duplicative because they are separate and distinct aggravating factors that merely rely upon the same evidence to prove the different factors. *BIO* at 12.  However, the application of identical facts for two aggravators "serves no significant role other than to cloud the issues and place an unwarranted thumb on death's scale."  United States v. Bin

17

Laden, 126 F.Supp. 2d 290, 299 (S.D.N.Y. 2001).

The evidence the government seeks to present concerning prior criminal convictions involving use or threat of violence aggravating factor is the same evidence it seeks to present in support of the future dangerousness aggravating factor. In short, these two factors are subsumed by one and the other and thus, one must be stricken.

### G.   Defendant's Request For Evidentiary Proffer.

Defendant has asked this Court to require the government to provide more specificity, and in some instances, any evidence as none was specifically referenced, concerning the aggravating factors noticed in its Informational Outline. See Doc. 1489.  The government couches Defendant's requests as an attempt to get "[a]n exact copy of the government's litigation playbook and strategy." *BIO* at 12. This too, is not true.

According to the government, further discovery should be denied because it "[h]as already provided an enormous amount of discovery for this re-sentencing hearing" including "[a]n informational outline addressing the defendant's concerns" while noting that he also has transcripts that contain the testimony of "most, if not all, prospective witnesses." *BIO* at 1.

This argument misses the point. The hallmark of due process in a capital sentencing proceeding is the defendant's ability to defend against the government's case in aggravation. Simmons v. South Carolina, 512 U.S. 154, 175 (1994). The fact that the government characterizes the amount of discovery already provided as "enormous" lends further support for requiring it to identify not only particular acts, but specific documents it will present in support of the aggravating factors. Without such notice and specificity, Defendant will be forced to defend against such allegations and documents for the first time at trial. Such unfair surprise would prejudice Mr. Hammer's ability to mount an adequate defense and may cost him his life.

It is common practice for federal district courts to require the government to provide greater factual detail and specifics than contained in the indictment or informational outline. See United States v. Williams, 2013 WL 1335599, *42 (M.D. Pa. 2013) (court orders government to disclose pretrial "[a] more detailed proffer of evidence regarding the specific disciplinary infractions it intends to present during the penalty phase[.]"; court excludes one disciplinary infraction and defers ruling on other proposed prison infractions until it reviews the government's more detailed proffer); United States v. Rodriguez, 380 F.Supp. 2d 1041, 1058 (D. ND 2005) (Despite the fact that the government had already disclosed 16,000 pages of

19

transcripts, 1870 photos, 10 CD's and 2 DVD's, court finds that "[D]efendant is entitled to know more detailed information to properly defend against the allegations in this case. The Court has reviewed each of the Defendant's requests and finds the factual particularity requested is justified to fulfill Defendant's objective of meaningful notice to adequately prepare a defense and meet the allegations against him"); United States v. Solomon, 513 F. Supp. 2d 520, 535 (W.D. Pa. 2007) (exercising its "inherent authority," the court holds that the government must "[a]ddress further the nature of its victim impact evidence"); United States v. Corley, 519 F.3d 716, 724 (7th Cir. 2008) ("In this case, the district court recognized the significance of those factors [reliability of the evidence, and the burden of proof both for determining reliability and for a jury to determine whether the conduct may be considered in this case] assuring that Corley's rights were protected" by conducting a two-day evidentiary hearing to determine the reliability of the unadjudicated conduct evidence); United States v. Bin Laden, 126 F. Supp. 2d 290, 304 (S.D.N.Y. 2001) ("An oblique reference to victim's 'injury, harm and loss' without more, does nothing to guide defendant's vital task of preparing for the penalty phase"; court orders disclosure of specific categories of injury, harm and loss that will be proffered).

In essence, the government wants as little judicial supervision over the nature

20

and type of evidence it introduces to Defendant's sentencing jury as possible. The very nature of its *BIO* exemplifies why such judicial oversight is critically important to guarantee Defendant's constitutional right to fair trial and to ensure that the proceeding comports with the heightened standards of reliability required in such cases.

In this case, during the earlier sentencing proceeding, the government presented the testimony of F.B.I. Agent Malocu. In addition to his testimony regarding his investigation, Agent Malocu read from various prison records and other documents. The government has not provided Defendant with a copy or list of any of the documents it intends to use during the re-sentencing hearing. While indeed, Defendant has reams of records and transcripts at his disposal, he does not know what specific prison records, police reports or other documentation the government will seek to introduce into evidence during the re-sentencing hearing.

The government also balks at providing Defendant with a list of "precisely what witnesses will testify concerning the proof of the past criminal acts committed by the defendant." *BIO* at 12. Without this information, Mr. Hammer will be hamstrung in his ability to adequately defend against this evidence. This is not an attempt to get the government's playbook. On the contrary, Mr. Hammer merely seeks what the constitution requires: an even playing field.

Mr. Hammer's discovery request should be granted. As it stands right now, he does not have enough information upon which to adequately prepare his defense. The requested discovery is eminently reasonable and well-supported by the above referenced case law.

### D.    Conclusion.

For all of the reasons stated above and in his previous submissions, see Doc. 1524, 1526, 1528, this Court should grant Mr. Hammer's motions and order further detailed disclosure by the government as previously requested and noted above.

Respectfully submitted,


/S/  RONALD C. TRAVIS

Ronald C. Travis
Rieders, Travis, Humphrey, Harris,
Waters & Waffenschmidt
161 West Third Street
PO Box 215
Williamsport, PA  17703-0215
570-323-8711 (telephone)
570-323-4192 (facsimile)
rtravis@riederstravis.com


/S/ ANNE SAUNDERS

Anne Saunders
Assistant Federal Defender
Federal Public Defender
Middle District Pennsylvania
100 Chestnut Street, Suite 300
Harrisburg, PA 17101
717-782-3843 (telephone)
717-782-3966 (facsimile)
anne_saunders@fd.org

/S/ JAMES MORENO

James Moreno
James J. McHugh, Jr.
Federal Community Defender
Eastern District Pennsylvania
Suite 540 – The Curtis Center
Philadelphia, PA 19106
215-928-1100 (telephone)
215-928-0826 (facsimile)
james_mchugh@fd.org
james_moreno@fd.org

# <u>CERTIFICATE OF SERVICE</u>

I, James Moreno, Esquire, do hereby certify that on this date I served a copy of the foregoing by Electronic Case Filing, or by placing a copy in the United States mail, first class addressed to the following:

Steven Mellin, Esquire
United States Department of Justice
Criminal Division, Capital Case Unit
1331 F. Street, N.W.
Washington, D.C. 20530

John C. Gurganus, Jr. Esquire
United States Attorneys Office
Middle District of Pennsylvania
235 N. Washington Street, Suite 311
PO Box 309
Scranton, PA. 18501

<u>/S/ James Moreno</u>
James Moreno, Esq.
Assistant Federal Defender

September 3, 2013