UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | No. 4:96-CR-239 |
| | : | |
| v. | : | Honorable Joel H. Slomsky |
| | : | |
| DAVID HAMMER, | : | Capital Case |
| | : | |
| Defendant | : | |
| _____ | : | _____ |

**BRIEF IN SUPPORT OF DEFENDANT'S PROPOSED JUROR QUESTIONNAIRE, VOIR
DIRE, AND PRELIMINARY INSTRUCTIONS**

Defendant, David Hammer, through undersigned counsel, submits this

*Brief in Support of Defendant's Proposed Juror Questionnaire, Voir Dire, and*

*Preliminary Instructions* and, in support thereof states the following:

**I.    INTRODUCTION**

Mr. Hammer previously submitted his proposed Juror Questionnaire (Doc.

1574) and Preliminary Instructions (Doc. 1507) for consideration by the Court.  Prior

to the January 9, 2013 status hearing, the parties discussed the Juror Questionnaire

and reached some agreement regarding questions and the opening instructions on that

document.  The parties did not reach an agreement as to others.  On January 8, 2014,

the government filed a *Brief Concerning the Appropriate Scope of Voir Dire and*

*Preliminary Instructions* (Doc. 1590) and its proposed Preliminary Instructions (Doc.

1592) on January 9, 2014. This brief responds to the government's filings and addresses the other issues related to the jury questionnaire that were raised in the parties' discussions. Mr. Hammer also this date submits his revised juror questionnaire.

## II.   GENERAL PRINCIPLES REGARDING CAPITAL JURY SELECTION

It is well settled that the Fifth and Sixth Amendments "guarantee a defendant on trial for his life the right to an impartial jury." Ross v. Oklahoma, 487 U.S. 81, 85 (1988); Irvin v. Dowd, 366 U.S. 717, 722 (1961). Impartiality means "a fair trial by a panel of impartial, 'indifferent' jurors." Irvin v. Dowd, 366 U.S. at 722; that is, a jury comprised of "nothing more than 'jurors who will conscientiously apply the law and find the facts.'" Lockhart v. McCree, 476 U.S. 162, 178 (1986) (quoting Wainwright v. Witt, 469 U.S. 412, 423 (1985)). The right to an impartial jury entitles a criminal defendant to "a verdict of conviction or acquittal . . . given in accordance with the law by persons who are fair." Powers v. Ohio, 499 U.S. 400, 413 (1991). "Due process means a jury capable and willing to decide the case solely on the evidence before it." Smith v. Phillips, 455 U.S. 209, 217 (1982).

"[T]he decision whether a man deserves to live or die must be made on scales that are not deliberately tipped toward death." Witherspoon v. Illinois, 391 U.S. 510, 523 n.20 (1968). Accordingly, in capital cases, the Sixth Amendment right to an

impartial jury is violated whenever a jury is empaneled that is "uncommonly willing to condemn a man to die." Id. at 521.  Such a jury exists when jurors who can conscientiously find the facts and make the statutorily mandated choice between life or death are erroneously excluded because of initially expressed reluctance to impose the death penalty.  It also exists when jurors are permitted to serve despite pro-death biases that substantially impair their ability to consider mitigating evidence or impose a life sentence.

Critical to the guaranty of the right to an impartial jury "is an adequate voir dire to identify unqualified jurors." Morgan v. Illinois, 504 U.S. 719, 730 (1992); Dennis v. United States, 339 U.S. 162, 171-72 (1950); Morford v. United States, 339 U.S. 258, 259 (1950).  Voir dire "plays a critical function" in protecting this right because "[w]ithout an adequate voir dire the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled." Rosales-Lopez v. United States, 451 U.S. 182, 188 (1981) (White, J., plurality opinion), quoted in Morgan, 504 U.S. at 730-31.

Purporting to address the appropriate scope of voir dire, the government asserts that "[w]ith limited exceptions, no particular questions are constitutionally required, unless a failure to ask them would 'render the trial fundamentally unfair.'" *Government's Brief Concerning The Appropriate Scope of Voir Dire and Preliminary Instructions* at 1 (quoting Mu'Min v. Virginia, 500 U.S. 415, 425-26 (1991))

(hereinafter *Government's Voir Dire Brief*).  That statement, however, begs the question because while no *particular* questions are constitutionally required to be asked in every case, the defendant is always permitted to ask questions designed to ferret out particular types of bias that may be present in his case, and the denial of an opportunity to so inquire is reversible error.  In short, "[a] defendant on trial for his life *must be permitted* on voir dire" to ascertain whether the prospective jurors in his case harbor beliefs about imposing the death penalty that would substantially impair him or her from fulfilling the duties a juror must perform in a capital case.  Morgan v. Illinois, 504 U.S. 719, 735-36 (1992).

A.    **Adequate Voir Dire to Determine Whether Prospective Jurors Are Predisposed to Find Death.**

The government objects to several questions that are material to determining whether prospective jurors have substantial impairments in their ability to follow the law limiting the grounds upon which they can impose death and to conscientiously consider, find, and give full effect to types of mitigating evidence relating to Mr. Hammer's character, background, and record and the circumstances of the offense that he may present as a basis for a life sentence.

It has long been established that jurors should be excused for cause if they harbor a bias towards death that impairs their ability to follow the law in capital sentencing proceedings.  As early as 1919, the Supreme Court had determined that

4

jurors who would automatically impose a death sentence because they "were in favor of nothing less than capital punishment in cases of conviction for murder in the first degree" were unqualified to serve in a capital case. Stroud v. United States, 251 U.S. 15, 20-21 (1919), reh'g denied, 251 U.S. 380, 381 (1920) ("The testimony of [challenged juror] Williamson made it reasonably certain that in the event of conviction for murder in the first degree he would render no other verdict than one which required capital punishment. . . . [T]his challenge for cause should have been sustained . . . .").

A half-century later, the Court noted this point again in Witherspoon v. Illinois, 391 U.S. 510, 522 n.20 (1968). Although Witherspoon's principal holding was that the exclusion of potential jurors based solely on generalized opposition to capital punishment violated the Sixth Amendment, the Court recognized that a juror's views both for and against the death penalty were relevant to his or her qualification to serve. The Court quoted with approval the Fourth Circuit's reversal of a North Carolina death sentence in Crawford v. Bounds, 395 F.2d 297, 303-04 (4th Cir. 1968), after concluding that permitting "a juror who felt it his 'duty' to sentence every convicted murderer to death . . . to serve . . . 'while those who admitted to scruples against capital punishment were dismissed without further interrogation'" was a "'double standard' [that] 'inevitably resulted in [the] denial of due process.'"

5

Witherspoon, 391 U.S. at 522 n.20 (quoting Bounds and citing Stroud).

In the 1980s, the Court decided three more cases making clear that questions of life-qualification presented nothing new, unequivocally holding that jurors who would automatically impose a death sentence must be excused for cause; that death-qualification and life-qualification are part of the same inquiry; and that the inquiry into both of these forms of exclusions for juror bias in capital sentencing are a subset of the general rule of law that governs exclusions for juror bias in every other setting. Adams v. Texas, 448 U.S. 38 (1980); Wainwright v. Witt, 409 U.S. 412 (1984); Ross v. Oklahoma, 487 U.S. 81 (1988).

The Court granted certiorari in Adams v. Texas, 448 U.S. 39 (1980), to answer the question of "whether Texas contravened the Sixth and Fourteenth Amendments as construed and applied in Witherspoon (citation omitted) when it excluded members of the venire from jury service because they were unable to take an oath that the mandatory penalty of death *or imprisonment for life* would not 'affect [their] deliberations on any issue of fact.'" Adams, 448 U.S. at 40. The Court held that the Texas statute was inconsistent with its holding in Witherspoon and struck it down.

Adams recognized that a potential juror's inability to return a verdict of *life* as well as his or her inability to return a verdict of death were equally relevant considerations. In addition, the Adams Court recognized that while there would likely be fewer jurors who would automatically impose death and could not return a

6

verdict of life imprisonment than those who could never return a verdict of death, these jurors who were biased towards death would nevertheless be subject to a defense challenge for cause.  448 U.S. at 49.

In <u>Wainwright v. Witt</u>, 409 U.S. 412, 420 (1984), the Court expressly reaffirmed the legal standard announced in <u>Adams</u>, holding that "the proper standard for determining when a prospective juror may be excused for cause because of his or her views on capital punishment . . . is whether the juror's views would 'prevent or substantially impair *the performance of his duties as a juror in accordance with his instructions and his oath*.'"  Because there was "nothing talismanic" about juror exclusion simply because a case involved capital sentencing, and the <u>Adams</u> standard employed the "traditional reasons" for determining juror bias, <u>id</u>. at 423, a juror who could not vote for life, just as a juror who could not vote for death, would be excused for cause because "the juror's views would 'substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'"  <u>Id.</u>

In 1988, Chief Justice Rehnquist, citing <u>Witherspoon</u>, held that a juror who would not consider a life sentence was unqualified to serve in a capital case.  <u>Ross v. Oklahoma</u>, 487 U.S. 81 (1988).  In <u>Ross</u>, a potential juror named Huling indicated during voir dire that if the jury found the defendant guilty, "he would vote to impose death automatically."  <u>Id</u>. at 84.  The trial court, however, denied defense counsel's challenge for cause.  Defense counsel had peremptory strikes remaining and used one

to challenge Huling. The <u>Ross</u> Court specifically held that automatically voting for death, just as automatically voting for life, would "prevent or substantially impair the performance of his duties as a juror," and thus the trial court erred in denying the challenge for cause. The availability and use of a peremptory challenge by the defense, however, rendered the error harmless. The Court unequivocally stated:

> Had Huling sat[,] . . . sentenced petitioner to death, and had petitioner properly preserved his right to challenge the trial court's failure to remove Huling for cause, the sentence would have to be overturned.

<u>Ross</u>, 487 U.S. at 85 (citing <u>Adams</u>).

Thus, not only did the <u>Ross</u> Court affirm the validity of life-qualifying questions, it also recognized that the <u>Adams</u> standard, which the Court had stated in 1984 governed "*any* situation where a party seeks to exclude a biased juror," <u>Witt</u>, 469 U.S. at 423, compelled its holding. Thus, any juror whose views created a substantial impairment to his or her consideration of factors that could result in a life sentence or, having appropriately found the facts, created a substantial impairment in his or her ability to consider a life verdict should be excused for cause.

In <u>Morgan v. Illinois</u>, 504 U.S. 719 (1992), the Supreme Court repeated its views regarding "life-qualifying" a juror and reversed the defendant's death penalty because the trial court denied the defendant's request to ask potential jurors the following question: "If you found Derrick Morgan guilty, would you automatically

vote to impose the death penalty?"  Morgan, 504 U.S. at 723.  The Morgan Court explained that the reason "[a]ny juror who states that he or she will automatically vote for the death penalty without regard to the mitigating evidence" is biased is because that juror has expressed "an intention not to follow the instructions to consider the mitigating evidence and to decide if it is sufficient to preclude imposition of the death penalty."  Id. at 738.  "[S]uch a juror will not give mitigating evidence the consideration that the statute contemplates," id., is not impartial, and should be excused for cause.  See also id. at 738-39 (a factfinder who would "impose the death penalty without regard to the nature or extent of mitigating evidence . . . is refusing in advance to follow the statutory direction to consider that evidence").  The Court further explained it was proper – indeed constitutionally necessary – to remove for cause "[a]ny juror to whom mitigating factors are . . . irrelevant," and that a capital defendant must be allowed the opportunity to ferret out those prospective jurors who had "predetermined the terminating issue of his trial, that being whether to impose the death penalty."  Morgan, 504 U.S. at 736.

Although life-qualification is often discussed in terms of excluding jurors who would automatically impose a death penalty, Morgan's statement that such a juror "will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do" makes clear that automatic opposition to a life sentence is sufficient *but not necessary* to exclude a juror for

cause.[1]  Any substantial impairment in the juror's ability to properly consider the evidence of aggravating and mitigating circumstances as the instructions and the law requires mandates that the juror be excused for cause.

The question of excludable pro-death bias under Morgan and Ross thus applies at each step in the decision-making process that implicates the juror's willingness and ability to consider and give mitigating effect to constitutionally relevant mitigating evidence.  E.g., Eddings v. Oklahoma, 455 U.S. 104, 114-15 (1982) (the sentencer may not "refuse to consider . . . any relevant mitigating evidence" or "disregard the mitigating evidence [the defendant] proffer[s] on his behalf"; "The sentencer . . . may determine the weight to be given relevant mitigating evidence[, b]ut they may not

---

[1]The government's brief makes precisely this mistake, suggesting that voir dire questioning to discern anti-defendant bias should be limited to whether "prospective jurors would automatically vote for or against the death penalty." Doc. 1590 at 2; id. ("A juror's views would 'prevent' impartial performance if he or she would 'automatically' or 'always' vote for or against the death penalty, regardless of the facts and the law."). It also erroneously suggests that "a venire member is not partial merely because he or she states support, or even a preference, for capital punishment, so long as the prospective juror can distinguish between his personal views and what the law requires." Id. at 3. But while a juror's inability to distinguish between what the law requires and his or her contrary personal views is grounds to strike the juror for cause, the ability to distinguish between the juror's personal views and what the law requires does not in itself make the juror qualified to serve. What makes the juror qualified to serve is the ability to *set aside* his or her contrary views and follow the law. Otherwise, the court would be powerless to exclude for cause the most perniciously biased jurors – those who could distinguish between their view and what the law requires, but (even knowing that their views were contrary to the law) defiantly refuse to follow the law.

10

give it no weight by excluding such evidence from their consideration").

As noted above, an adequate voir dire is required to preserve a defendant's right to a fair and impartial jury. See Morgan, 504 U.S. at 729; see also Rosales-Lopez v. United States, 451 U.S. 182, 188 (1981); Dennis v. United States, 339 U.S. 162, 171-72 (1950); Morford v. United States, 339 U.S. 258, 259 (1950). Thus, a probing voir dire is required for the government and the defendant to gather the information needed to exercise juror challenges – peremptory and cause – in an intelligent and informed manner. A probing voir dire is also necessary to ensure that the Court has sufficient information to determine whether the prospective juror is qualified to serve. See Morgan, 504 U.S. at 729-730; Mu'Min v. Virginia, 500 U.S. 415, 431 (1991).

While the scope of voir dire is left to the sound discretion of the Court, Ristiano v. Ross, 424 U.S. 589, 594-95 (1976), "a suitable inquiry is permissible in order to ascertain whether the juror has *any* bias, opinion, or prejudice that would affect or control the fair determination by him of the issues to be tried." Mu'Min, 500 U.S. at 431.[2] Morgan clarifies that, in a capital case, questioning potential jurors

---

[2]The government self-servingly suggests that "where there is ambiguity in a prospective juror's answers, the trial court is entitled to resolve the ambiguity in favor of the government." Doc. 1590 at 3. Of course, though the government does not see fit to acknowledge it, the court is equally "entitled" to resolve ambiguity in favor of the defendant. Further, the court in some instances need not resolve an "ambiguity" at all. If as a result of the parties' questioning of a juror,

11

regarding whether or not they would automatically or nearly always vote for the death penalty on the facts of the particular case, or whether a potential juror could consider and give effect to the relevant mitigating factors in the case, is not only suitable, but constitutionally required if a capital defendant is to receive a sufficient voir dire to protect the right to an impartial tribunal. United States v. Johnson, 366 F. Supp. 2d 822, 830, 847-49 (N.D. Iowa 2005) (describing Morgan as holding "that a defendant is entitled to make an inquiry into potential jurors' ability to impose a life sentence, as well as their ability to impose a death sentence, on the basis of the facts of the case and the trial court's instructions on the law, not merely on the basis of the defendant's conviction of a capital offense").

Without information about the juror's attitudes concerning the key issues presented by a particular capital prosecution, it is impossible to determine whether a prospective juror is substantially impaired in considering the evidence of aggravating and mitigating circumstances as the instructions require. General questions about a juror's willingness to impose death that are too abstract (such as: "if the defendant were convicted of intentional murder, would you automatically vote

---

the judge is uncertain whether the juror's views constitute a substantial impairment on his or her ability to impartially find the relevant facts and follow the law, then the moving party has failed to meet its burden of proof of juror bias and the ultimate fact of juror partiality must be found against the party seeking to exclude the juror.

to sentence him to death") will not uncover a bias a prospective juror may harbor on the basis of a particular fact present in the case that would disqualify that juror. Johnson, 366 F. Supp.2d at 847-49.

For these reasons, questions that explain the category or type of case are not only permissible, but required in order to ensure a fair and impartial jury.  For example, in United States v. Flores, 63 F.3d 1342, 1356 (5th Cir. 1995), a prospective juror initially indicated he was not opposed to the death penalty in the abstract.  Once he learned that the case involved a victim who was a coconspirator in drug dealing, however, the juror indicated that he could never impose the death penalty in a drug-related killing.  Had that juror not been aware of the type of case, neither counsel nor the Court would have been aware of this bias.

The same potential for error exists if the prospective juror is told that this case involves a premeditated and intentional murder but not that this case involves a prisoner who intentionally kills another prisoner with premeditation in a federal correctional facility.  To seat a juror in this case who believed that death is the only appropriate sentence for such a crime would countenance, in effect, a mandatory death-penalty statute, something the constitution forbids.  See, e.g., Sumner v. Shuman, 483 U.S. 66, 78 (1987).  Accordingly, counsel must be permitted to inquire whether or not this type of case would impair the prospective juror's ability to fairly consider the facts, including mitigation evidence presented, and apply the law.

Indeed, such questions were permitted in United States v. Ritz Williams, No. 08-00070 (M.D. Pa.) and United States v. Savage/Northington, No. 07-00550 (E.D. Pa.).

Similarly, because "jurors may have biases regarding particular forms of mitigating evidence," case-specific questioning regarding these factors is required because "[s]uch jurors must be excused for cause as the Supreme Court has emphasized that the sentencer may not refuse to consider evidence relating to the defendant's background or upbringing." United States v. Fell, 372 F. Supp. 2d 766, 771 (D. Vt. 2005) (citing Lockett v. Ohio, 438 U.S. 586, 604-05 (1978)). Accordingly, questions designed to elicit juror bias against various categories of mitigating evidence, such as those proposed in Mr. Hammer's questionnaire, are constitutionally required to ensure that the jurors empaneled in this case have no substantial impairments in their ability to consider and giving full effect to mitigating evidence in reaching their sentencing determination. Questions similar to those posed in Mr. Hammer's questionnaire regarding mitigating evidence were approved in the Williams, and Savage/Northington cases.

In addition, the FDPA specifically requires the jury to make a determination of whether "the aggravating factor or factors alone are sufficient to justify a sentence of death." 18 U.S.C. § 3593(e). Thus, a death sentence is never automatic:  a jury is never required to impose the death penalty, even if no mitigating evidence is offered by the defendant. See United States v. Haynes, 265 F. Supp. 2d 914, 917 (W.D. Tn.

14

2003).  Accordingly, questions such as those posed in Mr. Hammer's questionnaire designed to determine if a prospective juror is predisposed to find death where no mitigating circumstances are found are constitutionally required to ensure that Mr. Hammer's jurors have no substantial impairment in their ability to follow this aspect of the federal death penalty law.

The FDPA also provides for three distinct areas in which "jurors may exercise individual discretion."  Haynes, 265 F. Supp. 2d at 917.  These are:  "1) finding the existence of any aggravating and/or mitigating factors; 2) balancing the aggravating versus mitigating factors; and 3) deciding whether any imbalance is sufficient to justify a death sentence."  Id.  Similarly, the Eighth Amendment constitutionally mandates *individualized* capital sentencing determinations.  Woodson v. North Carolina, 428 U.S. 280, 304 (1976); Sumner, 483 U.S. at 75-76.  This requires a "reasoned moral response" to the personal culpability and the unique personal circumstances of the defendant.  Penry v. Lynaugh, 492 U.S. 302, 307, 319 (1989).

The Eighth Amendment's individualized sentencing doctrine applies not only to the defendant, but to the jury as well.  It is axiomatic that the sentencer must be free to consider *and give full effect to* all statutorily or constitutionally relevant reasons for life that are offered by the defense.  Woodson v. North Carolina, 428 U.S. 280, 304-05 (1976); Lockett v. Ohio, 438 U.S. 586, 604 (1978); Penry v. Johnson, 532 U.S. 782, 797 (2001).  It is equally clear that "each juror be permitted to consider and

give effect to mitigating evidence when deciding the ultimate question whether to vote for a sentence of death." McKoy v. North Carolina, 494 U.S. 433, 442-43 (1990); Mills v. Maryland, 486 U.S. 367, 375-76 (1988); Frey v. Fulcomer, 132 F.3d 916 (3d Cir. 1997).

In a statute that requires a unanimous vote as a precondition for a death sentence, this means that each juror must be allowed to give full effect to mitigation (i.e., be permitted to individually return a life verdict) in determining "whether aggravating circumstances outweigh mitigating circumstances, and whether the aggravating circumstances, when considered with any mitigating circumstances, are sufficiently substantial to justify a sentence of death." McKoy, 494 U.S. at 443.[3] That is also why, under such a statute, the Supreme Court has already approved the concept of "[a]n instruction that a juror should not join a [death verdict][4] if he is

---

[3]This requirement is precisely why the constitutional test for penalty-phase prejudice in ineffective assistance cases is whether there is "a 'reasonable probability' that at least one juror would have been moved to spare [the defendant's] life." Williams v. Taylor, 529 U.S. 362, 394 (2000); Wiggins v. Smith, 539 U.S. 510, 537 (2003) (finding "a reasonable probability that at least one juror would have struck a different balance"); see also Marshall v. Cathel, 428 F.3d 452, 472 (3d Cir. 2005); Jermyn v. Horn, 266 F.3d 257, 309 (3d Cir. 2001); Frey v. Fulcomer, 974 F.2d 348, 368 (3d Cir. 1992).

[4]Andres involved a non-bifurcated trial at which the jury simultaneously rendered guilt and penalty verdicts by voting "guilty, without qualification" (death), "guilty without capital punishment" (life), or not guilty. The Court struck down an instruction that suggested that a life verdict had to be unanimous and offered as a statutorily and constitutionally permissible alternative the instruction

convinced that capital punishment should not be inflicted" as "satisf[ying] the statute and protect[ing] the defendant." Andres v. United States, 333 U.S. 740, 752 (1948).

Mr. Hammer is entitled to question jurors about these fundamental principles to ensure that the jurors are capable of following them and respecting the determinations made by their fellow jurors. Contrary to the government's contention, nothing in Mr. Hammer's questionnaire indicates that the jury should not seek to reach a unanimous verdict, nor does Mr. Hammer's questionnaire or proposed instructions suggest anything close to "juror nullification." Reduced to its essence, the government complains that if jurors are accurately instructed that, if they have conscientiously reached a verdict that they genuinely believe to be the right sentencing choice (whether life or death), they are entitled to hold true to that choice, regardless of what other jurors have individually decided. But a verdict that is arrived at by jurors who have conscientiously and impartially determined what the appropriate sentence should be is not jury nullification, whether that verdict is unanimous or non-unanimous.

Indeed, not giving this instruction carries a substantially greater constitutional risk. If a juror has impartially found and weighed aggravating and mitigating circumstances and has conscientiously determined either that the aggravating factors

that "a juror should not join a verdict of guilty, without qualification, if he is convinced that capital punishment should not be inflicted."

17

are not sufficient to justify a death sentence or that, while sufficient, they do not outweigh mitigating factors, but that juror, while still believing in the correctness of the sentence he or she reached, changes his or her vote so as to achieve a unanimous verdict, that juror has a substantial impairment in his or her ability to give full effect to reasons for life and to consider a life sentence. That juror's vote against the sentencing choice he or she had conscientiously reached and still believed to be correct would violate Mr. Hammer's right to an impartial capital sentencing jury.

Mr. Hammer's questionnaire properly states the legal principles involved in this capital case and asks the jurors if they would be able to follow those principles. Such inquiry is both permissible and necessary to ensure that the jurors selected are not substantially impaired in their ability to follow this aspect of the federal death penalty law. Questions similar to those proposed by Mr. Hammer regarding these issues were accepted and used in both the <u>Williams</u> and <u>Savage/Northington</u> cases.

**B.     Prospective Jurors Who Indicate an Opposition to the Death Penalty**

Mr. Hammer seeks to ask the jury several questions that are material to determining whether prospective jurors who have expressed generalized opposition to the death penalty are capable nevertheless of setting aside those beliefs, making the factual findings required of all jurors in capital cases, and conscientiously following the law, fairly consider imposing the sentences of both life and death.

18

In Witherspoon v. Illinois, 391 U.S. 510, 522 (1968), the Supreme Court declared that "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." A jury so composed violates a defendant's state and federal constitutional rights to an impartial jury because that jury is "uncommonly willing to condemn a man to die." Witherspoon v. Illinois, 391 U.S. 510, 521 (1968). If even one juror was improperly death-qualified and the jury later imposes a death sentence, the death sentence cannot stand. Gray v. Mississippi, 481 U.S. 648, 659 (1987), and Davis v. Georgia, 429 U.S. 122, 122 (1976) (per curiam).

Rather, "a juror may not be challenged for cause based on his views about capital punishment *unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath*." Adams v. Texas, 448 U.S. 38, 45 (1980) (emphasis added); Gray v. Mississippi, 481 U.S. 648, 657 (1987); Wainwright v. Witt, 469 U.S. 412, 420 (1985). "As with any other trial situation where an adversary wishes to exclude a juror because of bias, . . . it is the adversary seeking exclusion who must demonstrate, through questioning, that the potential juror lacks impartiality." Wainwright v. Witt, 469 U.S. 412, 423 (1984).

In capital cases, "as elsewhere, the quest is for jurors who will conscientiously

19

apply the law and find the facts.  That is what an 'impartial' jury consists of . . . ." Witt, 469 U.S. at 423. Accordingly, "those who firmly believe that the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law" Lockhart v. McCree, 476 U.S. 162, 176 (1986).  See also Witherspoon, 391 U.S. at 519 ("A man who opposes the death penalty, no less than one who favors it, can make the discretionary judgment entrusted to him by the State and can thus obey the oath he takes as a juror"); Boulden v. Holman, 394 U.S. 478, 483-84 (1969) ("it is entirely possible that a person who has a 'fixed opinion against' or who does not 'believe in' capital punishment might nevertheless be perfectly able as a juror to abide by existing law -- to follow conscientiously the instructions of a trial judge and to consider fairly the imposition of the death sentence in a particular case"); Adams, 448 U.S. at 44-45.  Thus, mere opposition to the death penalty or a statement that the juror does not "believe in" the death penalty does not substantially impair a juror from performing his or her duties in accordance with the court's instructions and the juror's oath.

It is impossible to tell from general questioning about views on the death penalty whether a prospective juror actually is or is not death-disqualified unless that juror has a full understanding of what the law actually requires. The Federal Death Penalty Act ("FDPA") requires a juror to be able to conscientiously perform the

following tasks:

(1)    First, the juror must be willing and able to make factual determinations about the gateway intent factor to determine whether each element of the intent factor has been proven beyond a reasonable doubt.  In this case, a prospective juror would have to be willing and able to set aside his or her views against the death penalty and determine whether Mr. Hammer held the requisite specific intent to kill Andrew Marti pursuant to 18 U.S.C. § 3591(a) (2) (A).

If the prospective juror is able to conscientiously determine these facts, he or she is able to perform this part of the FDPA and is not substantially impaired with respect to this task.  Such a juror is not excludable for cause.

(2)    Second, the juror must be willing and able to make factual determinations about the statutory aggravating factors to determine whether each element of the aggravator has been proven beyond a reasonable doubt.  In this case, prospective jurors would have to be willing and able to set aside his or her views against the death penalty and determine whether –

(a)    "the defendant has previously been convicted of a Federal or State offense punishable by a term of imprisonment of more than 1 year, involving the use or attempted or threatened use of a firearm (as defined in section 921) against another person," 18 U.S.C. § 3592(C) (2);

21

(b)  "The defendant committed the offense after substantial planning and premeditation to cause the death of a person or commit an act of terrorism," 18 U.S.C. § 3592(C) (9).

If the prospective juror is able to conscientiously determine these facts, he or she is able to perform this part of the FDPA and is not substantially impaired with respect to this task. Such a juror is not excludable for cause.

(3)  Third, the prospective juror must be willing and able to determine "whether all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death or, in the absence of a mitigating factor, whether the aggravating factor or factors alone are sufficient to justify a sentence of death."  18 U.S.C. § 3593(e).

A juror who is able to conscientiously determine whether a sentence of death is justified if no mitigation is found or if aggravating factors sufficiently outweigh mitigating circumstances is not excludable for cause because he or she is able to perform this part of the FDPA's capital-sentencing juror's obligations and is not substantially impaired.

Full and adequate voir dire regarding whether or not a prospective juror can conscientiously determine each of these legal requirements is necessary in order for the Court to determine whether or not the prospective juror "can make the discretionary judgment entrusted to him by the State and can thus obey the oath he

takes as a juror." Witherspoon, 391 U.S. at 519. Accordingly, the government's attempts to limit the voir dire with regard to these factors is constitutionally prohibited. The questions proposed by Mr. Hammer on these issues are both permissible and necessary in order to ensure that qualified jurors are not unconstitutionally excluded.

### C. The Government's Objections to Mr. Hammer's Proposed Preliminary Instructions are Meritless.

The government objects to several aspects of Mr. Hammer's proposed preliminary instructions on the grounds that these instructions misstate the law or mislead the jury with respect to the manner in which individual jurors may reach their verdict. The government is wrong on all counts.

Specifically, the government objects to Mr. Hammer's proposed language truthfully informing the jury that, should it be unable to reach a unanimous verdict, the Court will impose a sentence of life without the possibility of parole. Similar instructions were given by the Court in United States v. Northington, No. 07-00550 (E.D. Pa.) (NT 6/13/13 at 122) and accepted by the Court in United States v. Williams, No. 08-00070 (M.D. Pa.).                       .

Relying on Jones v. United States, 527 U.S. 373 (1999), the government contends that such an instruction is improper. Doc. 1590 at 6-9. However, the government's argument misreads Jones. Before reaching any instructional issue, the

23

Jones Court was faced with the a threshold question of statutory construction: whether, under the federal death penalty statute, a non-unanimous jury verdict resulted in a life sentence.  The Court held that a non-unanimous verdict did result in life, and so determined that the proposed instruction on the consequences of lack of unanimity was accurate.  The Court then dealt with the separate question of whether it would "exercise [its] supervisory powers to require that an instruction on the consequences of deadlock be given in every capital case," and declined to do so. Jones, 527 U.S. at 383.

Although Jones holds that the Eighth Amendment does not *require* a trial court to instruct the sentencing jury that the Court will impose a life sentence if they cannot reach a unanimous verdict, id. 527 U.S. at 381, nothing in the case *precludes* an instruction that informs the jury that if it cannot reach a unanimous verdict, the Court will impose a life sentence, nor remotely limits the trial court's discretion to accurately instruct the jury on this issue.  Likewise, nothing in any of the other authorities cited by the government supports the view that the trial court lacks the discretion to provide such an instruction.  Indeed, to the extent that trial courts retain broad discretion to provide accurate instructions to the jury and the Jones decision establishes that the instruction sought by Mr. Hammer is accurate, Jones actually supports this Court's authority to grant the requested instruction.

Furthermore, the government's contention that truthfully instructing the jury

24

on this issue amounts to jury nullification is as astonishing as it is erroneous.  The proposed instruction does not mislead the jury as to any aspect of its fact-finding or weighing functions, nor does it express any view on what the ultimate outcome of their deliberations should be.  Thus, it doesn't nullify anything.  Indeed, the only way a juror's awareness of the life-consequences of non-unanimity could equal nullification is if the law unconstitutionally assumed that death were the only appropriate punishment.  But jurors have no duty to impose death; their duty is to fairly and conscientiously consider the facts and sentencing options (both life and death) and render an independent verdict.  Informing the jury of what will happen if they are unable to reach unanimous agreement on these issues does nothing to prevent the jury from fulfilling its duties and obligations.

This Court has broad discretion in crafting proper instructions for the jury.  Accurately instructing the jury as to what will happen if it is unable to reach a unanimous verdict is neither contrary to the law, nor is it otherwise precluded.  As noted previously, other courts have deemed such an instruction appropriate.  Mr. Hammer requests that this Court do the same.

The government also objects to language indicating that no juror is required to sentence the defendant to death.  The proposed language in both the questionnaire and preliminary instructions is constitutionally accurate and completely consistent with the FDPA and controlling statutory authority.  As a constitutional matter, it has

long been the case that mandatory death sentences violate the Eighth Amendment. Woodson v. North Carolina, 428 U.S. 280 (1976); Roberts v. Louisiana, 428 U.S. 325 (1976); Sumner v. Shuman, 483 U.S. 66 (1987).  As s statutory matter, the FDPA specifically provides (as noted previously) that jurors are "never required to impose the death penalty at any point during the selection phase because they are free to exercise their discretion not to impose the death penalty until the final votes are cast and recorded."  Haynes, 265 F. Supp. 2d at 917.  While the government focuses on the statutory language indicating that the defendant "*shall* be sentenced to death" from Section 3591(a), it ignores the rest of that sentence that makes clear that such a verdict is appropriate only after the jury has considered the various requisite findings and has concluded that "a sentence of death *is justified*."  Both a plain reading of the statutory language of the FDPA (see Haynes, 265 F. Supp. 2d at 916-17) and a consideration of its legislative history (see id. at 918-20) demonstrate that the proposed language in Mr. Hammer's questionnaire and proposed instructions correctly state the law.  Indeed, Mr. Hammer's proposed language is very similar to critical portions of instruction approved by the Court in Jones.  See United States v. Jones, 132 F. 3d 232, 243-44 (5th Cir. 1998) (jury instructed, *inter alia*, to "[k]eep in mind, however, that regardless of your findings with respect to aggravating and mitigating factors, you are never required to recommend a death sentence"), aff'd Jones v. United States, 527 U.S. 373 (2005); see also Haynes, 265 F. Supp. 2d at 922

26

(adopting this instructional language from Jones); United States v. Northington, No. 05-00550 (E.D. Pa.) (NT 6/13/13 at 88, instructing: "You should understand that the law never requires the imposition of the death penalty . . . ."). For each of these reasons, the proposed language in the questionnaire and instructions are appropriate.

The government's objection to references to "mercy" are similarly without merit. Both the Fifth and Eighth Amendments prohibit preventing the jury from giving full mitigating effect to feelings of mercy to the defendant that arise out of the evidence presented in the case. See, e.g., Penry v. Lynaugh, 492 U.S. 302, 326-27 (1989);[5] see also Deutscher v. Whitley, 884 F. 2d 1152, 1161 (9th Cir. 1989) ("The Constitution prohibits the imposition of the death penalty without adequate consideration of factors which might evoke mercy"), adopted in pertinent part by Deutscher v. Angelone, 16 F.3d 981 (9th Cir. 1994). "Mercy is an implicit sentencing consideration in many United States Supreme Court decisions in capital cases." Nelson v. Nagle, 995 F.2d 1549 (11th Cir. 1993). Thus, where the defendant's evidence evokes in a juror feelings of mercy or sympathy, that juror must be permitted to give effect to those feelings as part of his consideration of whether to

---

[5]The Court has made clear that the jury may ignore "only the sort of sympathy that would be totally divorced from the evidence" – that is, those "extraneous emotional factors" that arise from consideration that were "not presented at the trial, and irrelevant to the issues at the trial." California v. Brown, 479 U.S. 538, 542, 543 (1987).

sentence Mr. Hammer to life imprisonment without the possibility of parole. Thus, the references to mercy in Mr. Hammer's questionnaire and preliminary instructions are perfectly appropriate.

Finally, in its proposed instructions, Doc. 1592 at 4, the government proposes instructions to the prospective jurors indicating that they will be "part of an anonymous group of jurors." The government has failed to file a motion requesting that the jurors remain anonymous, failed to provide any legal basis for doing so in its *Brief Concerning the Appropriate Scope of Voir Dire and Preliminary Instructions*. Doc. 1590. Nor is there any legal or factual basis for proceeding with an anonymous juror and proceeding in that manner would violate Mr. Hammer's Fifth, Sixth, and Eighth Amendment rights. Accordingly, Mr. Hammer respectfully requests that this Court reject the government's suggested instruction.

### D.     Conclusion

For the reasons set forth above and in the prior submission, Mr. Hammer respectfully requests that this Court overrule the government's objections to his proposed preliminary instructions and his questionnaire (as amended and filed this date).

28

Respectfully submitted,


/s/  RONALD C. TRAVIS
Ronald C. Travis
Rieders, Travis, Humphrey, Harris,
Waters & Waffenschmidt
161 West Third Street
PO Box 215
Williamsport, PA  17703-0215
570-323-8711 (telephone)
570-323-4192 (facsimile)
rtravis@riederstravis.com


/s/ ANNE SAUNDERS
Anne Saunders
Assistant Federal Defender
Federal Public Defender
Middle District Pennsylvania
100 Chestnut Street, Suite 300
Harrisburg, PA 17101
717-782-3843 (telephone)
717-782-3966 (facsimile)
anne_saunders@fd.org

/s/ JAMES MCHUGH
James J. McHugh, Jr.
/s/ JAMES MORENO
James Moreno
Assistant Federal Defenders
Federal Community Defender
Eastern District Pennsylvania
Suite 540 – The Curtis Center
Philadelphia, PA 19106
215-928-1100 (telephone)
215-928-0826 (facsimile)
james_mchugh@fd.org
james_moreno@fd.org


Dated:  February 14, 2014