# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | No. 4:96-CR-239 |
| | : | |
| v. | : | Honorable Joel H. Slomsky |
| | : | |
| DAVID HAMMER, | : | Capital Case |
| | : | |
| Defendant | : | |

_____

### DEFENDANT'S CONSOLIDATED FIFTH AMENDED/SUPPLEMENTAL MOTION PURSUANT TO 28 U.S. C. § 2255 AND BRIEF IN SUPPORT

Ronald C. Travis, Esquire
Rieders, Travis, Humphrey, Harris,
Waters & Waffenschmidt
161 West Third Street
Williamsport, PA  17703-0215
rtravis@riederstravis.com

Anne Saunders, Esquire
Federal Public Defender
Middle District Pennsylvania
100 Chestnut Street, Suite 300
Harrisburg, PA 17101
anne_saunders@fd.org

James J. McHugh, Jr., Esquire
James Moreno, Esquire
Federal Community Defender
Eastern District Pennsylvania
Suite 540 – The Curtis Center
Philadelphia, PA 19106
james_mchugh@fd.org
james_moreno@fd.org

TABLE OF CONTENTS

Introduction.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Relevant Procedural/Factual History.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    1.      Relevant Procedural History. . . . . . . . . . . . . . . . . . . . . . . . . . 4

    2.      Relevant Facts.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

          a.      Relevant Facts Surrounding the Upton Case. . . . . . . . . . . . . 7

          b.      Relevant Facts Surrounding Yager and Classen.. . . . . . . . . . 12

This Amendment is Proper and There are no Bars to This Court's Consideration of
    the Merits of Mr. Hammer's Claims.. . . . . . . . . . . . . . . . . . . . . . . . 17

CLAIMS FOR RELIEF.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

CLAIM I.     THE GOVERNMENT'S PRESENTATION OF CONVICTIONS AND
          SENTENCES THAT WERE THE PRODUCT OF PERJURY AND MATERIALLY
          FALSE AND MISLEADING EVIDENCE TO THE GRAND JURY AND ITS
          FAILURE TO INFORM THE GRAND JURY OF YAGER'S STATUS AS ITS
          AGENT DEPLOYED FOR THE PURPOSE OF CIRCUMVENTING MR.
          HAMMER'S INVOCATION OF HIS RIGHT TO COUNSEL VIOLATED THE
          FIFTH AND EIGHTH AMENDMENTS. . . . . . . . . . . . . . . . . . . . . 20

          A.      Introduction.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

          B.      The Grand Jury's Consideration of, and Reliance On, Evidence
               that was the Product of Perjury Violated the Fifth
               Amendment. .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

          C.      The Government's Presentation of Evidence Obtained Through
               the Government's Deployment of Yager as Its Agent to
               Circumvent Mr. Hammer's Invocation of His Right to Counsel
               and Materially Misleading Testimony Regarding Yager and
               Classen's Reasons and Expectations in Exchange for Their

Cooperation Violated the Fifth Amendment.. . . . . . . . . . . . . 35

D. The Grand Jury's Exposure to the Constitutionally Tainted Evidence, Evidence that is the Product of Perjury, and False and Materially Misleading Testimony Rendered the Grand Jury Proceedings in this Capital Prosecution Inherently Unreliable in Violation of the Fifth and Eighth Amendments... . . . . . . . . 38

E. The Combined Errors Impacted the Integrity and Reliability of the Grand Jury's Determination.. . . . . . . . . . . . . . . . . . . . . 40

CLAIM II.  THE GOVERNMENT'S USE OF INMATE YAGER AS ITS AGENT TO CIRCUMVENT MR. HAMMER'S CLEAR AND UNEQUIVOCAL INVOCATION OF HIS RIGHT TO COUNSEL VIOLATED THE FIFTH, SIXTH AND EIGHTH AMENDMENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

A. Factual Background.. . . . . . . . . . . . . . . . . . . . . . . . . . 41

B. The Government's Use of Yager as Its Agent to Circumvent Mr. Hammer's Invocation of His Right to Counsel Violated the Fifth, Sixth, and Eighth Amendments. . . . . . . . . . . . . . . . . 45

C. Because the Government Concealed Yager's Status as an Agent for the Government to Circumvent Mr. Hammer's Invocation of His Right to Counsel, This Claim is Not Waived Despite Mr. Hammer's Entry of a Guilty Plea, Nor are There Any Bars to this Court's Consideration of This Claim.. . . . . . . 47

CLAIM IV.  THE GOVERNMENT'S FAILURE TO DISCLOSE MATERIAL EXCULPATORY EVIDENCE AND ITS RELIANCE ON MATERIALLY MISLEADING AND FALSE TESTIMONY VIOLATED THE FIFTH, SIXTH AND EIGHTH                    AMENDMENTS. . . . . . . . . . . . . . . . . . . . . . 69

A. Factual Background.. . . . . . . . . . . . . . . . . . . . . . . . . . 70

1. Facts Related to the Government's Failure to Disclose Exculpatory Evidence Regarding Yager.. . . . . . . . . . . . 70

2.      Facts Related to the Government's Failure to Disclose Exculpatory Evidence Regarding Classen.. . . . . . . . . . . 72

3.      The Government's Failure to Disclose Exculpatory Evidence Related to Thomas Upton's Perjured Testimony.. . . . . . . . . . . . . . . . . . . . . . . . . . 75

B.     The Government's Failure to Disclose This Material Favorable Evidence Violated the Fifth, Sixth and Eighth Amendments... 80

1.      The Undisclosed Evidence About Yager... . . . . . . . . . . 83

2.      The Undisclosed Evidence Regarding the True Nature and Extent of Classen's Expectations for Benefits in Exchange for His Cooperation Was Exculpatory and Material.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

3.      The Undisclosed Evidence Regarding Upton's Perjury Was Exculpatory and Material.. . . . . . . . . . . . . . . . . . 87

4.      The Cumulative Impact of All the Evidence Now Known to Have Been Suppressed by the Government Demonstrates Materiality and Mr. Hammer's Entitlement to Relief. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

C.     The Prosecution's Presentation of Materially False and/or Misleading Testimony and Argument Violated the Fifth, Sixth, and Eighth Amendments. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

CLAIM V.     THE JURY'S CONSIDERATION OF CONVICTIONS AND EVIDENCE THAT WERE THE PRODUCT OF PERJURY IN REACHING ITS SENTENCING DETERMINATION VIOLATED THE FIFTH, SIXTH AND EIGHTH AMENDMENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

A.     The Jury's Consideration of Constitutionally Invalid Convictions that Were the Product of Perjured Testimony In

Reaching Its Sentencing Determination Violated The Fifth and Eighth Amendments. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

B.    The Jury's Consideration of Evidence Surrounding Convictions that Were the Product of Perjury In Reaching Its Sentencing Determination Violated the Fifth and Eighth Amendment Prohibition Against A Sentencing Verdict Based on False, Materially Misleading and/or Inaccurate Testimony. . . . . . . . . 98

C.    The Jury's Consideration of The False and Materially Misleading Testimony and Evidence Arising from the Upton Convictions In Reaching Its Sentencing Determination Violated Mr. Hammer's Fifth, Sixth, and Eighth Amendment Rights to a Verdict Based on Competent, Reliable Evidence. 100

D.    The Jury's Consideration of the Convictions and Evidence that Were the Product of Perjury In Reaching Its Sentencing Determination Violated the Fifth and Eighth Amendment Heightened Reliability Standards. . . . . . . . . . . . . . . . . . . . 102

E.    The Admission of Evidence of Convictions that Were the Product of Perjury Violates the Fifth and Eighth Amendment Prohibition Against an Arbitrary and Capricious Sentencing Determination. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

F.    Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

CLAIM VI.    THE GOVERNMENT'S RELIANCE ON CONVICTIONS AND SENTENCES THAT WERE THE PRODUCT OF PERJURY AND MATERIALLY FALSE AND MISLEADING TESTIMONY AND EVIDENCE IN REACHING ITS CAPITAL AUTHORIZATION DETERMINATION AND ITS SUBSEQUENT DEAUTHORIZATION DETERMINATIONS VIOLATED THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . 105

A.    The Government's Consideration of Convictions and Sentences that Were the Product of Perjury in Reaching the Capital Authorization Determination Violated the Government's Own

                Protocols and Due Process.......................... 107

B.      The Government's Consideration of Convictions and Sentences that Were the Product of Perjury in Reaching Its Capital Authorization Determination Violated the Eighth Amendment1.12

C.      Conclusion.................................... 113

CLAIM VII.  THE GOVERNMENT'S PRESENTATION OF PERJURED TESTIMONY IN THE PRIOR CAPITAL SENTENCING PROCEEDING COMBINED WITH ITS FAILURE TO DISCLOSE SIGNIFICANT AND MATERIAL EXCULPATORY EVIDENCE PRIOR TO TRIAL WARRANTS DISMISSAL. .............. 114

A.      Introduction.................................. 114

B.      The Government's Pervasive Misconduct and Its Reliance on Perjury Warrants Dismissal of this Capital Prosecution. . . . . 115

REQUEST FOR RELIEF.......................................... 123

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Ake v. Oklahoma*, 470 U.S. 68 (1985) ........................................................... 39, 91, 103

*Bank of Nova Scotia*, 487 U.S. 250 (1988) ............................................................. 35

*Beck v. Alabama*, 447 U.S. 625 (1980) ........................................................ 39, 91, 103

*Berger v. United States*, 295 U.S. 78 (1935) ........................................................ 90, 111

*Bracy v. Gramley*, 520 U.S. 899 (1997) .................................................. 24, 25, 26, 27

*Brady v. Maryland*, 373 U.S. 83 (1963) ......................................................... 6, *passim*

*Breakiron v. Horn*, 642 F.3d 126 (3d Cir. 2011) ....................................................... 81

*California v. Ramos*, 463 U.S. 992 (1983) .................................................... 39, 91, 103

*California v. Trombetta*, 467 U.S. 479 (1984) ............................................................ 82

*Carter v. Rafferty*, 826 F.2d 1299 (3d Cir. 1987) ...................................................... 90

*Chandler v. Florida*, 449 U.S. 560 (1981) ............................................................... 101

*Clemons v. Mississippi*, 494 U.S. 738 (1990) ............................................................ 99

*Cone v. Bell*, 556 U.S. 449 (2009) ........................................................................ 82

*Diaz v. United States*, 930 F.2d 832 (11th Cir. 1991) ................................................ 18

*Duest v. Singletary*, 967 F.2d 472 (11th Cir.) .......................................................... 96

*Eddings v. Oklahoma*, 455 U.S. 104 (1982) .......................................... 39, 91, 94, 103

*Edwards v. Arizona*, 451 U.S. 477 (1981) ............................................................... 45

*Evitts v. Lucey*, 469 U.S. 387 (1985) .................................................................... 108

*Ferrara v. United States*, 456 F.3d 278 (1st Cir. 2006) .............................................. 50, *passim*

*Ford v. Wainwright*, 477 U.S. 399 (1986) ........................................... 39, 91, 103, 108

*Gardner v. Florida*, 430 U.S. 349 (1977) ..................................... 39, 91, 103, 104, 106

*Giglio v. United States*, 405 U.S. 150 (1972) ........................................................................ 81, 90

*Godfrey v. Georgia*, 446 U.S. 420 (1980) ...................................................... 39, 91, 101, 103, 104

*Government of the Virgin Islands v. Fahie*, 419 F.3d, 249 (3d Cir. 2005) ............................... 122

*Gregg v. Georgia*, 428 U.S. 153 (1976) ................................................................................. 113

*Harris ex rel. Ramseyer v. Blodgett*, 853 F. Supp. 1239 (W.D. Wash. 1994) ........................... 96

*Hicks v. Oklahoma*, 447 U.S. 343 (1980) .............................................................................. 108

*Hinton v. Alabama*, 134 S. Ct. 1081 (2014) ........................................................................... 82

*Hitchcock v. Dugger*, 481 U.S. 393 (1987) ............................................................................. 94

*Imbler v. Pachtman*, 424 U.S. 409 (1976) .......................................................................... 81, 99

*Irvin v. Dowd*, 366 U.S. 717 (1961) ...................................................................................... 101

*Johnson v. Mississippi*, 486 U.S. 578 (1988) ................................................................. 40, *passim*

*Johnson v. Zerbst*, 304 U.S. 458 (1938) .................................................................................. 52

*King v. Hoke*, 825 F.2d 720 (2d Cir. 1987) ....................................................................... 90, 100

*Kyles v. Whitley*, 514 U.S. 419 (1995) ...................................................................... 81, 82, 83, 89

*Lockett v. Ohio*, 438 U.S. 586 (1978) ............................................................ 39, 91, 94, 103, 108

*Love v. .Jones*, 923 F.2d 816 (11th Cir. 1991) ....................................................................... 19

*Maine v. Moulton*, 474 U.S. 159 (1985) ................................................................. 35, 36, 46, 47

*McNeil v. Wisconsin*, 501 U.S. 171 (1991) .............................................................................. 45

*Mesarosh v. United States*, 352 U.S. 1 (1956) .......................................................................... 3

*Michigan v. Mosley*, 423 U.S. 96 (1975) ................................................................................ 46

*Miller v. Angliker*, 848 F.2d 1312 (2d Cir. 1988) ............................................................... 67, 68

*Mills v. Maryland*, 486 U.S. 367 (1988) ..................................................................... 40, 91, 103

*Miranda v. Arizona*, 384 U.S. 436 (1966) ............................................................................... 45

*Moore v. Balkcom*, 716 F.2d 1511 (11th Cir. 1983) ................................................................... 18

*Napue v. Illinois*, 360 U.S. 264 (1959) .................................................... 81, 90, 93, 111

*Penry v. Lynaugh*, 492 U.S. 302 (1989) ................................................................... 94

*Riley v. Taylor*, 62 F.3d 86 ................................................................... 18, 19

*Roberts v. United States*, 445 U.S. 552 (1980) ................................................ 90, 93, 99, 110

*Simmons v. Beard*, 590 F.3d 223 (3d Cir. 2009) .............................................. 81, 83, 89

*Skipper v. South South Carolina*, 476 U.S. 1 (1986) ................................................. 94

*Smith v. Cain*, 132 S. Ct. 627 (2012) ................................................................... 82

*Townsend v. Burke*, 334 U.S. 736 (1948) ...................................................... 90, 99, 110

*Tuggle v. Netherland*, 516 U.S. 10 (1995) ..................................................... 94, 99, 113

*Turner v. Murray*, 476 U.S. 28 (1986) ........................................................ 39, 91, 103

*United States v. Agurs*, 427 U.S. 97 (1976) ....................................................... 82, 111

*United States v. Bagley*, 473 U.S. 667 (1985) ................................................... 81, 83, 85

United States v. Basurto, 497 F.2d 781 (9th Cir. 1974) ............................................... 33

*United States v. Callandra*, 414 U.S. 338 (1974) ................................................... 32, 37

*United States v. Gaudin*, 515 U.S. 506 (1995) ...................................................... 101

*United States v. Kerley*, 838 F.2d 932 (7th Cir. 1988) ......................................... 90, 100

*United States v. Lee*, 274 F.3d 485 (8th Cir. 2001) .................................................. 111

*United States v. Levy*, 865 F.2d 551 (3d Cir. 1989) ................................................... 90

*United States v. Levy*, 865 F.2d 551 (3d Cir. 1989) ................................................... 99

*United States v. Mechanik*, 475 U.S. 66 (1986) ....................................................... 35

*United States v. Perdomo*, 929 F.2d 967 (3d Cir. 1991) ......................................... 83, 85

*United States v. Risha*, 445 F.3d 298 (3d Cir. 2006) ........................................... 48, 85

*United States v. Ross*, 372 F.3d 1097 (9th Cir. 2004) ........................................................ 122, 123

*United States v. Ruiz*, 536 U.S. 622 (2002) ................................................................. 67

*United States v. Ruster*, 712 F.2d 409 (9th Cir. 1983) ....................................................... 90, 100

*United States v. Soberon*, 929 F.2d 935 (3d Cir. 1991) .............................................. 35

*United States v. Tucker*, 404 U.S. 443 (1972) ................................................... 90, 99, 110

*United States v. Weintraub*, 871 F.2d 1257 (5th Cir. 1989) ....................................... 19

*United States v. Williams*, 504 U.S. 36 (1992) ..................................................... 32, 37

*Williams v. Lockhart*, 849 F.2d 1134 (8th Cir. 1988) .................................................. 18

*Wilson v. Beard*, 589 F.3d 651 (3d Cir. 2009) ................................................... 82, 83, 89

*Woodson v. North Carolina*, 428 U.S. 280 (1976) .......................................... 38, 39, 91, 103, 112

*Zant v. Stephens*, 462 U.S. 862 (1983) ....................................................... 39, 91, 103

## STATE CASES

*Ward v. State*, 827 S.W.2d 110 (Ark. 1992) ......................................................... 96, 98

## FEDERAL STATUTES

18 U.S.C. §1118 ........................................................................................... 4, 20

18 U.S.C. §3592 ......................................................................................... 5, *passim*

28 U.S.C. § 2255 ..................................................................................... 1, 2, 5, 17

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | : | No. 4:96-CR-239 |
|  | : |  |
| v. | : | Honorable Joel H. Slomsky |
|  | : |  |
| DAVID HAMMER, | : | Capital Case |
|  | : |  |
| Defendant | : |  |

**DEFENDANT'S CONSOLIDATED FIFTH AMENDED/SUPPLEMENTAL MOTION PURSUANT TO 28 U.S. C. § 2255 AND BRIEF IN SUPPORT**

Defendant, David Hammer, through undersigned counsel, submits his *Consolidated Fifth Amended/Supplemental Motion Pursuant to 28 U.S.C. § 2255 and Brief in Support*, and in support thereof, states the following:

**Introduction.**

1.     This matter arises from current government counsel's disclosure of multiple instances in which exculpatory evidence was not disclosed to Mr. Hammer prior to trial, including evidence of perjury and materially misleading and false testimony in these proceedings, as well as disclosures provided as a result of discovery requests during these pre-resentencing proceedings.

2.     Current government counsel's recent disclosures include troubling evidence that one material witness, Thomas Upton, committed perjury before the state

court in Oklahoma that resulted in the convictions which formed the basis for Mr. Hammer's 1200 year sentence and a critical aspect of this federal capital prosecution from indictment to capital authorization to trial to the penalty hearing. See Exhibits 1-3. The same witness also committed perjury in these federal proceedings during Mr. Hammer's prior sentencing hearing and the government relied on that perjured testimony in support of the intent factors; statutory and non-statutory aggravation; as a basis to dispute mitigation evidence; and, as a basis for arguing that the aggravation evidence outweighed the mitigation evidence.

3.      Current government counsel's recent disclosures also include evidence that another material witness to both guilt and sentencing, former inmate Yager, had been deployed as an agent of the government for the purposes of circumventing Mr. Hammer's clear and unequivocal invocation of his right to counsel and surreptitiously obtain inculpatory statements and evidence against Mr. Hammer in violation of the Fifth, Sixth, and Eighth Amendments. See Exhibit 3. Thus, the picture painted by the government that Yager had obtained information and evidence "by happenstance" was false, and his biases in favor of the government were much greater than that presented to the grand jury and at trial, and his motives to manufacture evidence in order to obtain benefits from the government were much stronger than either the grand jury or the sentencing jury were aware.

4.      Finally, in the course of discovery proceedings in these resentencing

2

proceedings, the government disclosed correspondence between former inmate Classen and AUSA Martin that demonstrates that his expectations for benefits from the government were much different from that in which the government disclosed during the grand jury, at trial and during the sentencing proceeding.

5.      The false and misleading evidence described below was directly related to, and constitutionally tainted, the reliability of all aspects of this capital prosecution from indictment to the government's authorization process, to the trial and former sentencing proceedings.  Nor can current government counsel's recent disclosures be considered in a vacuum.  The very reason Mr. Hammer was granted a new sentencing hearing was because the government had failed to disclose critical exculpatory evidence that the Court found material to sentencing.

6.      When that withheld evidence is considered in light of the other previously undisclosed evidence, there is no question that the constitutional errors and misconduct impact much more than just the sentencing determination.  It impacted and permeated all aspects of this capital prosecution from indictment to capital authorization, to trial and the capital sentencing proceeding.

7.      The government's deceptions, non-disclosures, and presentation of perjured and materially false testimony have "poisoned the water in this reservoir, and the reservoir cannot be cleansed without first draining it of all impurity." Mesarosh v. United States, 352 U.S. 1, 8 (1956).  The only way to "cleanse" the "pollution"

3

caused by the government's pattern and practice of deception, non-disclosure and presentation of perjured and materially false testimony in this case is a full grant of relief.

### Relevant Procedural/Factual History.

*1.    Relevant Procedural History*

8.    On April 13, 1996, Andrew Marti's body was found dead in the cell he had shared with Mr. Hammer.  The government pursued an indictment against Mr. Hammer for two counts of intentional murder, one involving a violation of 18 U.S.C. §1118.  See Doc. 1.  Section 1118 requires proof that the accused was "under a sentence for a term of life imprisonment" at the time of the murder.  18 U.S.C. § 1118(a).

9.    On September 18, 1996, the Grand Jury returned an Indictment on both counts of intentional murder. Id.  After obtaining an indictment, the government engaged in its capital authorization process and filed its Notice of Intent to seek a death sentence on April 9, 1997.  Doc. 93.

10.    The trial began on May 5, 1998. On June 22, 1998, after the defense had rested and while the government was presenting its rebuttal case, Mr. Hammer entered a plea of guilty to the murder charge.  The penalty phase began on June 30, 1998.

11. In support of death, the government sought to prove the statutory intent factors, two statutory aggravating factors: that the defendant committed the murder after substantial planning and premeditation, 18 U.S.C. §3592(c)(9), and that the defendant had previously been convicted of a state or federal offense punishable by a term of imprisonment of more than one year that involved the use, or attempted or threatened use, of a firearm against another person, 18 U.S.C. §3592(c)(2), and non-statutory aggravation.

12. One of the two convictions relied on by the government in support of the prior firearm conviction aggravator under Section 3592(c)(2) was State v. Hammer, CRF-84-l3l0 (hereinafter "Upton case"). That incident involved charges of kidnapping, robbery with a firearm, and shooting with intent to kill and resulted in an aggregate sentence of 1200 years. On July 24, 1998 the jury returned a verdict of death.

13. In September 2002, Mr. Hammer filed a petition for writ of habeas corpus collaterally attacking his conviction and sentence pursuant to 28 U.S.C. §2255. The Court conducted an evidentiary hearing on his petition from July 14, 2005 through September 29, 2005. On the twenty-ninth day of the hearing, September 22, 2005, the government provided the defense with thirty-three previously undisclosed FBI 302 statements that summarized interviews with various prison inmates.

14.    On December 27, 2005, the Court issued its decision vacating the 1998 sentence of death.  The Court found, in part, that, as a result of the government's misconduct for failing to disclose material exculpatory evidence, the prior sentencing proceeding was constitutionally defective.[1]   Specifically, the Court held that the government's failure to disclose four 302 witness statements that were "relevant and material" to the jury's penalty determination violated Brady v. Maryland, 373 U.S. 83 (1963).  United States v. Hammer, 404 F. Supp. 2d 676, 801 (M.D. Pa. 2006) (Muir, J.)  The Court then concluded as a matter of law that the failure of the government to disclose the 302 statements rendered "the penalty phase of the trial defective."  Id.

*2.    Relevant Facts*

15.    Critical aspects of the government's case supporting the indictment, the capital authorization decision, and its case at trial supporting intentional murder and the gateway intent and statutory and non-statutory aggravating factors for a death sentence involved the testimony of inmates Leonard Yager and Stephen Classen as well as the evidence surrounding the Upton case.

---

[1]The Court also found that the jury's failure to find mitigating factors that had been conceded or undisputed by the government constituted constitutional error requiring reversal.  Hammer, 404 F. Supp. 2d at 801.

### a.    Relevant Facts Surrounding the Upton Case

16.    The Upton case involved charges that Mr. Hammer kidnapped Thomas Upton, robbed him with a firearm, and shot him with intent to kill.  Mr. Upton testified at two preliminary hearings and the trial in that case.  Upton testified that, at the time of the incident, Mr. Hammer had approached Upton's car on the street brandishing a firearm and demanded that Upton drive to a motel.  See Exhibit 4.  Mr. Upton also testified that, inside the motel room, he fought with Mr. Hammer and that Mr. Hammer struck him multiple times during that fight.  Mr. Upton also testified that at one point Mr. Hammer locked him in the bathroom, during which time Mr. Hammer made two phone calls.  Upton also testified that Mr. Hammer had forced him to drive to an area near some oil wells, ordered him to take off his clothes and lie on the ground, and then shot him multiple times with a large gun.  Mr. Upton testified that, after being shot, he got up and ran or walked away while Mr. Hammer screamed and then drove away in Upton's car.  See Exhibit 4.  As a result of Upton's testimony, Mr. Hammer was found guilty of kidnapping, robbery with a fiream, and shooting with intent to kill and sentenced to an aggregate term of 1200 years.

17.    The record available to counsel demonstrates that the government relied on at least the 1200 year sentencing arising from these convictions, and possibly the circumstances as well, in obtaining the indictment before the grand jury.

18.    During FBI Special Agent Malocu's initial Grand Jury appearance,

7

AUSA Martin elicited testimony that Mr. Hammer was serving a "significant amount of time for offenses in jail." NT 7/24/96 at 29. After that testimony, one or more jurors expressed an interest in knowing what Mr. Hammer had been convicted of and whether there was any violence in Mr. Hammer's background. Id. at 31-32.

19.     When AUSA Martin indicated that it would be a "stretch" to attribute the nature of the offenses for which he was sentenced to premeditation or intent in this case, one juror responded:

> Actually, it isn't because if he was in there for a murder and he had that kind of instinct, I mean, this could be a person that has a desire to kill somebody but not all the time. But I mean . . .

See NT 7/24/96 at 32. Although Mr. Martin informed the jurors that the convictions had occurred in 1984 and were, therefore, "probably not all that probative," he did not specifically instruct the jurors that they could only consider the evidence of Mr. Hammer's 1200-year sentence in connection with whether Mr. Hammer had been serving a life sentence at the time of Mr. Marti's death.

20.     During Agent Malocu's subsequent appearance before the Grand Jury, AUSA Martin elicited testimony that Mr. Hammer was serving a 1232-year sentence at the time of Mr. Marti's death and that the sentence arose from Oklahoma convictions. NT 9/18/96 at 5. While AUSA Martin also indicated that he was not going to inform the jurors of the nature of the convictions for which Mr. Hammer was under sentence, id., he had said the same thing about the length of Mr. Hammer's

8

sentence during Agent Malocu's prior appearance and subsequently provided that information to the Grand Jury. Thus, it is not clear whether AUSA Martin's statement that he not would provide the jurors information on the facts underlying the convictions was the final word on this matter.

21.    On April 24, 1997, the government filed its Motion to Dismiss Count Two of the Indictment Pursuant to Rule 48(a). In that motion, the government indicated as its basis for dismissal that Mr. Hammer was facing a death sentence under either count, that dismissal would "simplify the issues," and "that David Paul Hammer, although facing 1200 years of imprisonment, may not technically be serving 'a term of life imprisonment' under Oklahoma law or as defined by [Section 1118]." Doc. 97.

22.    The government also relied heavily on the Upton case as support for its request that the jury find death. Upton was the first witness the government called in the prior penalty hearing. NT Vol. 15 (6/30/98) at 5. Mr. Upton adopted and authenticated his preliminary hearing testimony from the Oklahoma case. See NT Vol. 15 (6/30/98) at 6. He also provided live testimony as to various aspects of the incident that was consistent with his prior testimony in Oklahoma. See id. at 8 (indicating that Mr. Hammer assaulted him); id. at 9 (indicating that Mr. Hammer brandished a large gray weapon and ordered Upton to take him where he wanted to go); id. at 10 (indicating that Mr. Hammer forced Upton to accompany him to a motel

9

room).

23.    The government also presented testimony from the prosecutor in the Upton case, William Louis Keel.  During that testimony, the government elicited testimony that Mr. Hammer had been convicted of kidnapping, shooting with intent to kill, and robbery.  NT Vol. 16 (7/1/98) at 66.  The government also admitted into evidence the certified convictions.  See Tr. Govt. Exh. 4001.

24.    The government argued in its closing and in rebuttal that the jury should consider both the fact of the Upton convictions and the specific circumstances of the underlying incident in determining whether the government had proven its submitted aggravating factors, as a basis for rejecting Mr. Hammer's mitigation, and in finding that the government's reasons for death outweighed Mr. Hammer's reasons for life. See NT Vol. 27 at 62-63 (arguing the jury should find the prior conviction aggravator on the basis of these convictions); id. at 67 ("Mr. Upton was minding his own business in a truck on Classen Avenue . . . he was on Classen Avenue in Oklahoma City when Mr. Hammer with a firearm came up to him and basically commandeered his truck. He took him to a motel . . ."); NT Vol. 29 (7/23/98) at 19 (arguing that the jury should consider the convictions in aggravation); id. at 41 (arguing the Oklahoma incident and trial as a basis for rejecting mitigation evidence); id. at 56 (arguing the Oklahoma incident as support for escalation of violence).

25.    The prosecution employed various aspects of Upton's version of events

10

to bolster its theory of how Mr. Marti was killed. For example, it invoked Mr. Hammer's purported kidnapping and confinement of Mr. Upton as a "hostage theme" that was prevalent in Mr. Marti's death. Id. at 67 ("[I]t's always nice to have a hostage around. Again, you'll hear this hostage theme repeated, repeated and repeated"). The government argued that Mr. Hammer had used "deceit" and "lulled" Mr. Upton into believing he would not be hurt so as to get Mr. Upton to remove his clothes. Id. at 67-68. The prosecutor then employed the very same terms to describe what the government contended Mr. Hammer had done to Mr. Marti. Id. at 85.

26.    On March 11, 2014, counsel received a notice from current government counsel pursuant to Brady v. Maryland, 373 U.S. 83 (1963) that on March 10, 2014, Mr. Upton had admitted facts to Capital Crimes Section Trial Attorney Haines and Special Agent Coyle demonstrating that he had testified falsely against Mr. Hammer in 1984 and 1998. Specifically, the notice indicated that Upton had admitted that he had voluntarily accompanied Mr. Hammer to the motel; that Mr. Hammer had not brandished a weapon and forced Mr. Upton to accompany him; that Mr. Upton was neither kidnapped nor carjacked; and that Mr. Upton had not been locked into the bathroom in the motel, although he did go into the bathroom so that Mr. Hammer could make a phone call. See Exhibit 1.

27.    On March 13, 2014, the government provided counsel with an FBI 302 recounting further details of the interview, including multiple instances in which Ms.

11

Haines and/or Agent Coyle confronted Mr. Upton with the contradictions in his version of events.  See Exhibit 2.  On March 14, 2014, current government counsel sent Mr. Hammer's counsel an email that provided a further clarification of Mr. Upton's disclosures during the March 10, 2014 meeting.  Exhibit 3.

28.     The recently provided 302 also revealed that at or around the time of Mr. Hammer's first federal trial, a person Upton believed to have been from the United States Attorney's Office had challenged Upton concerning his testimony in the Oklahoma trial.  Id.

### b.     Relevant Facts Surrounding Yager and Classen

29.     At or around 6:24 am on April 13, 1996, after the discovery of Mr. Marti's death, Mr. Hammer was interrogated by FBI Special Agent Carlyle Thompson and BOP investigative personnel.  Exhibit 5.  Mr. Hammer initially waived his rights and gave a statement.  Id.  at 8. After Mr. Hammer indicated that he "had better get me a lawyer," the interrogation was terminated.  Id.  Following his interrogation and invocation of his right to counsel, the authorities moved Mr. Hammer to a separate, empty cell.  Mr. Hammer had no supplies available to him in that cell.  See NT Vol. 4 at 97-98.

30.     Following Mr. Hammer's invocation of his right to counsel, Special Agent Thompson, accompanied by BOP SIS investigators Mark Traxler and Ron Jury, interviewed inmate Leonard Yager.  Exhibit 6.  After this interview with the

authorities, Yager went to Mr. Hammer's cell door and spoke with him on a number of occasions.    At trial, Yager described the circumstances surrounding those discussions.  Yager was a prison orderly, and as an orderly, he was free to move about the block, speak with inmates through the cell doors, and receive and/or deliver various items from or to inmates.  NT Vol. 4 at 82.  Yager engaged Mr. Hammer in conversation about the murder and asked him various questions, including "why he did it." Id. at 97-98.  At some point, Mr. Hammer requested paper and pencil.  Yager left and returned with the supplies.  NT Vol. 4 at 97-98.  When Yager asked Mr. Hammer again why Mr. Marti was killed, id. 102, Mr. Hammer told Yager to come back later.  Yager claimed that when he returned, Mr. Hammer slipped a note to him through the door.  Id.

31.    On April 17, 1996, FBI Special Agent Anthony Malocu and BOP SIS investigator Traxler again interviewed Yager.  During this interview, Yager turned over a letter purportedly from Mr. Hammer that listed reasons for killing Mr. Marti. Exhibit 7.  Yager testified both at the grand jury and trial that his conversations with Mr. Hammer and his receipt of this letter occurred after the joint interrogation of Mr. Hammer by the FBI/BOP had concluded. See NT 7/24/96 at 25-27; NT Vol. 4 at 102-03.  At trial, Yager identified government Exhibit 32.1 as the note that Mr. Hammer passed to him, id. at 103, and then read various portions of Exhibit 32.1 that purported to be reasons for killing Mr. Marti.  Id. at 105-09; see also NT 7/24/96 at

25-27.

32.    Yager testified both before the grand jury and at trial that the only arrangements made between him and the government for his testimony were that the government would assist him in being transferred to a lower security prison and would recommend that he receive a sentence reduction in his case in the Western District of Tennessee.  NT 7/24/96 at 5; NT Vol. 4 at 58-60.

33.    Inmate Stephen Classen testified during both the grand jury proceedings and at trial about a letter he purportedly received under his cell door at some point after Mr. Hammer's interrogation had been concluded.  NT 8/28/96 at 14; NT Vol. 6 at 17.  Classen indicated that the letter would have been delivered by an orderly. NT 8/28/96 at 14.  Classen testified that he did not immediately read the note and that when he did finally open it, he only read part of it.  NT 8/28/96 at 14-15; NT Vol. 6 at 17-18.  He then flushed the letter down the toilet without finishing reading it.  NT Vol. 6 at 18.  At trial, Classen never positively identified the letter offered by the government (government trial exhibit 35.2), as the one he had received that morning under his cell door.  NT Vol. 6 at 19 (indicating that exhibit 35.2 was not the letter he received); id. at 32 (indicating that as far as he was concerned, he had never received exhibit 35.2).

34.    Classen also did not mention receiving any communication from Mr. Hammer during his interviews with the FBI and BOP investigators.  NT 8/28/96 at

14

15. Indeed, during the grand jury proceedings, when AUSA Martin showed Classen a document purporting to be a copy of the letter Classen had flushed down the toilet, Classen expressed his surprise that the government had a copy of the letter. Mr. Martin responded that the government "work[s] in strange and mysterious ways." Id.

35. Classen also testified during the grand jury and at trial that, other than his expectations for a letter of cooperation from Mr. Martin in support of a Rule 35 motion for his prosecution in Oregon and a recommendation to the Bureau of Prisons ("BOP") that Classen be housed in an institution other than a penitentiary, no agreements were made in exchange for his testimony. NT NT 8/28/96 at 5; NT 6/10/98 at 4-5.

36. The prosecutor relied heavily on the testimony of Yager and Classen to establish the necessary intent for indictment, guilt and the death sentence. In closing, the prosecutor repeatedly and consistently argued that the testimony by Yager and Classen provided strong evidence supporting the government's theory regarding gateway intent and the substantial planning and premeditation statutory aggravator. See NT Vol. 27 at 71-75; 81, 89.

37. On March 14, 2014, current government counsel disclosed, among other things, that, "at the time of the offense, the FBI 'sent [Yager] in' to talk to Mr. Hammer." Exhibit 3. Thus, at the time he was engaging Mr. Hammer and asking Mr. Hammer about the death of Mr. Marti, and also at the time he received the purported

15

letter from Mr. Hammer, Yager was acting as an agent of the government. Similarly, the government's recent disclosure concerning Yager's activities on its behalf indicates the government's "ways" regarding the Classen document are no longer "strange" or "mysterious." Obviously, Yager was secretly providing various documents to the investigators so that they could copy them and retain them as evidence.

38. In addition, in response to Mr. Hammer's first discovery motion in these resentencing proceedings, the government disclosed for the first time various letters between Classen and AUSA Martin, some of which had been sent prior to and others after Mr. Hammer's initial trial. Exhibit 8. This previously suppressed correspondence provides a clearer picture of Classen's expectations as to the assistance he would receive from the government (and specifically from Mr. Martin) in obtaining a reduction of sentence should he provide helpful testimony against Mr. Hammer. Moreover, the correspondence establishes that Classen affirmatively sought, and apparently received, Mr. Martin's assistance both before and after Mr. Hammer's trial as to where Classen would be housed. It demonstrates that Mr. Martin not only provided Classen assistance in obtaining a shorter sentence, but also intervened to expedite Classen's release from the custody of the Bureau of Prisons to a halfway house when Classen complained that he was not scheduled to be moved to the halfway house as quickly as he desired. In short, the correspondence

demonstrates that Mr. Martin provided much more to Classen than merely recommending a sentence reduction and housing in a facility that was not a penitentiary, and, more importantly, that Classen believed these additional benefits were part of the original cooperation agreement.  Id.

### This Amendment is Proper and There are no Bars to This Court's Consideration of the Merits of Mr. Hammer's Claims.

39.     28 U.S. C. § 2255 provides that the one year statute of limitations begins to run on the latest of one of four trigger dates:

(1) the date on which the judgment of conviction becomes final;

(2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;

(3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

40.     Mr. Hammer could not have developed the facts supporting the claims raised in this *Motion*, prior to current government counsel's recent disclosures. Accordingly, amendment is appropriate under Rule 15 of the Federal Rules of Civil Procedure which provides that "leave [to amend] shall be freely given when justice

17

so requires." See also Riley v. Taylor, 62 F.3d 86. 92 (3d Cir. 1995) (Recognizing "Rule 15(a)'s command that amendments should be freely allowed when justice so requires").

41. Except in situations involving bad faith on the part of the movant, which are clearly not present here, justice generally requires that leave to amend be granted. Riley, 62 F.3d at 90; Williams v. Lockhart, 849 F.2d 1134, 1140 (8th Cir. 1988). This is particularly appropriate in a capital case. Moore v. Balkcom, 716 F.2d 1511, 1526 (11th Cir. 1983) ("Certainly in a capital case, the district court should be particularly favorably disposed toward a petition's motion to amend"). See also Riley, 62 F.3d at 90 ("On the record now before us, we believe Riley's not insignificant risk of losing the opportunity to litigate the issues he raises in his proposed amended petition conflicts with the strong presumption of the Federal Rules of Civil Procedure favoring decisions on the merits").

42. Moreover, leave to amend should be granted to permit a petitioner to assert claims that were not previously available. Riley, 62 F.3d at 91 (reversing denial of leave to amend where petitioner sought to add two new claims and strengthen arguments in support of existing claims); Diaz v. United States, 930 F.2d 832, 835 (11th Cir. 1991) (reversing denial of petitioner's motion to amend § 2255 petition to include "potentially meritorious claim which he said he did not know about and which arguably was unavailable when the original petition was filed"); Love v.Jones,

18

923 F.2d 816, 818 (11th Cir. 1991) (amended petition filed after magistrate appointed counsel to represent pro se petitioner); United States v. Weintraub, 871 F.2d 1257, 1259 (5th Cir. 1989) (amendment permitted after new information revealed in discovery).

43.    Because it cannot be said that the requested amendments are "so unlikely to affect the outcome that they would be futile" permitting leave to amend is consistent with the intent of Rule 15. Riley, 62 F.3d at 92. Indeed, as the allegations in the amended claims demonstrate, current government counsel's disclosures demonstrate multiple constitutional violations that directly impact the reliability of all aspects of this capital prosecution from indictment to capital authorization determination, to the trial and Mr. Hammer's guilty plea, and the sentencing determination and require relief under Section 2255.

44.    Accordingly, this amendment is proper and, as it was the government's non-disclosure that prevented Mr. Hammer from raising these claims sooner, there is no waiver.

**CLAIMS FOR RELIEF.**

**CLAIM I.** **THE GOVERNMENT'S PRESENTATION OF CONVICTIONS AND SENTENCES THAT WERE THE PRODUCT OF PERJURY AND MATERIALLY FALSE AND MISLEADING EVIDENCE TO THE GRAND JURY AND ITS FAILURE TO INFORM THE GRAND JURY OF YAGER'S STATUS AS ITS AGENT DEPLOYED FOR THE PURPOSE OF CIRCUMVENTING MR. HAMMER'S INVOCATION OF HIS RIGHT TO COUNSEL VIOLATED THE FIFTH AND EIGHTH AMENDMENTS.**

45.     All prior allegations contained in the initial Section 2255 Motion and its prior Amendments are incorporated as if fully set forth herein.

**A.    Introduction.**

46.     The government pursued, presented evidence supporting, and obtained an indictment on a count involving a violation of 18 U.S.C. §1118. See Doc. 1, Count 2. Section 1118 requires proof that the accused was "under a sentence for a term of life imprisonment" at the time of the murder. 18 U.S.C. § 1118(a).

47.     The government relied on the 1200-year sentence Mr. Hammer received in State v. Hammer, CRF-84-l3l0 (hereinafter "Upton case"), as its basis for the "under a sentence for a term of life imprisonment" requirement of Section 1118.

48.     The Upton case involved charges that Mr. Hammer kidnapped Thomas Upton, robbed him with a firearm, and shot him with intent to kill. Mr. Upton testified at two preliminary hearings and the trial in that case. Upton testified that, at the time of the incident, Mr. Hammer had approached Upton's car on the street

20

brandishing a firearm and demanded that Upton drive to a motel. See Exhibit 4. Mr. Upton also testified that, inside the motel room, he fought with Mr. Hammer and that Mr. Hammer struck him multiple times during that fight. Mr. Upton also testified that at one point Mr. Hammer locked him in the bathroom, during which time Mr. Hammer made two phone calls. Upton also testified that Mr. Hammer had forced him to drive to an area near some oil wells, ordered him to take off his clothes and lie on the ground, and then shot him multiple times with a large gun. Mr. Upton testified that, after being shot, he got up and ran or walked away while Mr. Hammer screamed and then drove away in Upton's car. See Exhibit 4.

49.     On March 11, 2014, counsel received a notice from current government counsel pursuant to Brady v. Maryland, 373 U.S. 83 (1963) that on March 10, 2014, Mr. Upton had admitted facts to Capital Case Section Trial Attorney Haines and Special Agent Coyle demonstrating that he had testified falsely against Mr. Hammer in 1984 and 1998. Specifically, the notice indicated that Upton had admitted that he had voluntarily accompanied Mr. Hammer to the motel; that Mr. Hammer had not brandished a weapon and forced Mr. Upton to accompany him; that Mr. Upton was neither kidnapped nor carjacked; and that Mr. Upton had not been locked into the bathroom in the motel, although he did go into the bathroom so that Mr. Hammer could make a phone call. See Exhibit 1.

50.     On March 13, 2014, the government provided counsel with an FBI 302

21

recounting further details of the interview, including multiple instances in which Ms. Haines and/or Agent Coyle confronted Mr. Upton with the contradictions in his version of events. See Exhibit 2. The recently provided 302 also revealed that at or around the time of Mr. Hammer's trial, a person Upton believed to have been from the United States Attorney's Office had challenged Upton concerning his testimony in the Oklahoma trial. Id. On March 14, 2014, current government counsel sent Mr. Hammer's counsel an email that provided a further clarification of Mr. Upton's disclosures during the March 10, 2014 meeting. Exhibit 3.

51.     Current government counsel's recent disclosure demonstrates that the convictions and resulting sentences were the product of perjury and, as a result, were – and are – constitutionally invalid.

52.     There is no question that the Grand Jury was exposed to these sentences that were the product of perjury and considered the constitutionally invalid sentences in reaching its determination regarding the indictment. During FBI Special Agent Malocu's initial Grand Jury appearance, AUSA Martin elicited testimony that Mr. Hammer was serving a "significant amount of time for offenses in jail." NT 7/24/96 at 29. After that testimony, one or more jurors expressed an interest in knowing what Mr. Hammer had been convicted of and whether there was any violence in Mr. Hammer's background. Id. at 31-32.

53.     During Agent Malocu's subsequent appearance before the Grand Jury,

22

AUSA Martin elicited testimony that Mr. Hammer was serving a 1232-year sentence at the time of Mr. Marti's death and that the sentence arose from Oklahoma convictions. NT 9/18/96 at 5. While AUSA Martin also indicated that he was not going to inform the jurors of the nature of the convictions for which Mr. Hammer was under sentence, id., he had said the same thing about the length of Mr. Hammer's sentence during Agent Malocu's prior appearance and subsequently provided that information to the Grand Jury. Thus, it is not clear whether AUSA Martin's statement that he would not provide the jurors information on the facts underlying the convictions was the final word on this matter.[2]

54.    On April 24, 1997, the government filed its Motion to Dismiss Count Two of the Indictment Pursuant to Rule 48(a). In that motion, the government indicated as its basis for dismissal that Mr. Hammer was facing a death sentence under either count, that dismissal would "simplify the issues," and "that David Paul Hammer, although facing 1200 years of imprisonment, may not technically be serving 'a term of life imprisonment' under Oklahoma law or as defined by [Section 1118]."

---

[2]Although the Court denied a prior pretrial motion to dismiss the indictment, that motion involved different issues, and the Court was not faced with and did not decide any question related to the presentation of perjured evidence to the Grand Jury. See United States v. Hammer, 25 F. Supp. 2d 518, 549 (D. Pa. 1997). Accordingly, the conclusions reached by the Court in deciding that motion are irrelevant to, and do not limit the Court's freedom to determine the merits of, this claim.

Doc. 97.

55.     Other than Agent Malocu's testimony, Mr. Hammer has not been provided any of the Grand Jury transcripts or exhibits relating to the evidence the government presented as to the underlying facts in the Upton case that resulted in Mr. Hammer's 1200-year sentence.[3]  However, it is clear from Agent Malocu's testimony and the government's Motion to Dismiss that the Grand Jury was presented with, and relied upon, perjured testimony or sentencing outcomes that were the product of perjured testimony.

56.     The government also presented Leonard Yager at the Grand Jury in support of the intentional murder counts.  Yager testified that the only arrangements made between him and the government for his testimony were that the government would assist him in being transferred to a lower security prison and would recommend that he receive a sentence reduction in his case in the Western District of Tennessee.  NT 7/24/96 at 5.

57.     Yager testified about observations of Mr. Hammer and Mr. Marti he had

---

[3]In light of the government's recent disclosures regarding Mr. Upton's perjury and the impact of his perjury on the validity of the convictions and resulting 1200-year sentence, Mr. Hammer requests that the government be directed to provide these materials to him so he can assess whether any additional claims may arise from the government's presentation to the Grand Jury of evidence tainted by Upton's perjury.  See RULES ON MOTION ATTACKING SENTENCE UNDER SECTION 2255, Rule 6; see also Bracy v. Gramley, 520 U.S. 899, 908-09 (1997).

24

purportedly made in the months preceding Mr. Marti's death. Id. at 8-10. Yager also testified that he had been a prison orderly at the time of Mr. Marti's death and that, in that capacity, had been able to move around the prison block from 6:00 am until 9:00 pm. and also pass various items from one inmate to another. Id. at 10, 14. Yager contended that, shortly before Mr. Marti's death, Mr. Hammer had purportedly made statements indicating that he wanted to kill Mr. Marti, although Yager did not believe Mr. Hammer had been serious. Id. at 12-13. Yager also contended that he had been outside Mr. Hammer's and Mr. Marti's cell talking with Mr. Hammer shortly before Mr. Marti's death, at which time he purportedly saw Mr. Hammer braiding ropes and then pointing to Mr. Marti and making a gesture with his finger across his neck. Id. at 17-19. On the evening of Mr. Marti's death, Yager heard someone say to "cuff up Hammer." Id. at 24. Yager testified that the "next day or so" he spoke with Mr. Hammer at Mr. Hammer's cell door and asked Mr. Hammer why he did it. Id. at 25. Mr. Hammer purportedly told Yager to return later and when Yager did, Mr. Hammer purportedly gave Yager a piece of paper with writing on it. Id.

58.    Yager also testified that he had been interviewed by the FBI and BOP investigators twice. He got the paper from Mr. Hammer after the first interview and gave it to the investigators during his second interview. Id. at 27. After he received this paper, Yager returned to Mr. Hammer's cell a "couple of times a day" until Mr. Hammer was moved, and purportedly obtained further information from Mr. Hammer

25

concerning the circumstances of Mr. Marti's death. Id. at 30. Yager also testified that Mr. Hammer purportedly stated that he (Mr. Hammer) would kill again if given the chance. Id. at 33-34. Yager read to the Grand Jury a document he claimed to have received from Mr. Hammer that purportedly set forth the reasons why Mr. Hammer had killed Mr. Marti, id. at 38-39, and then offered testimony speculating about what Mr. Hammer had meant when he purportedly referenced "corrupt officials." Id. at 39-41. Yager's testimony was unquestionably a critical part of the government's case for intentional murder.

59. The government also called Stephen Classen at the Grand Jury in support of the intentional murder counts. At the time of his Grand Jury testimony, Classen was facing federal criminal charges in Oregon. NT 8/28/96 at 5. Classen testified that the only benefit he expected in exchange for his cooperatiaon and testimony was consideration regarding the sentence he would receive for those charges. Id. Classen testified as to the circumstances in which he was moved out of the cell with Mr. Hammer and Mr. Marti was moved in. Id. at 6-9. Classen claimed that, shortly before Mr. Marti's death, Mr. Hammer had indicated his desire to kill Mr. Marti, but then said "Gotcha," leading Classen to believe he was joking. Id. at 10-11. The government also asked Classen to describe to the grand jury the circumstances leading up to his receipt of a letter, identified as Grand Jury Exhibit 4. Id. at 14.

60. Classen indicated that he had received a document under his cell door

at some point following Mr. Marti's death that apparently had been delivered by an orderly. Id. He testified that he read part of the document and then tore it up and threw it away. Id. at 14-15. When Classen expressed his surprise that the government had a copy of the letter because he "thought it came "right to [him]," AUSA Martin responded that "[w]e work in strange and mysterious ways." Id. at 15. The Grand Jury had heard undisclosed "parts" of the letter prior to Classen's testimony. Id. at 14.

61.     Contrary to the picture painted by AUSA Martin during Yager's Grand Jury appearance, the statements and other materials purportedly elicited by Yager from Mr. Hammer were the product of the government's deployment of Yager as its agent to circumvent Mr. Hammer's clear and unequivocal invocation of his right to counsel.[4] See Claim II, *infra*. But Yager's status as an agent of the government was not disclosed to the Grand Jury. Indeed, the government failed to disclose this patently exculpatory evidence to Mr. Hammer until current government counsel's notice on March 14, 2014, years after Mr. Hammer's trial and even more years after the Grand Jury proceedings. See Exhibit 3.

62.     Thus, at the time he was engaging Mr. Hammer and soliciting information from Mr. Hammer about the death of Mr. Marti – and also at the time he

---

[4]Yager was interviewed by the FBI and SIS investigators after Mr. Hammer had already invoked his right to counsel. See Claim II.

27

received the purported document from Mr. Hammer – Yager was acting as an agent of the government. The government's secret deployment of Yager as its agent to obtain information in circumvention of Mr. Hammer's invocation of his right to counsel violated the Fifth, Sixth, and Eighth Amendments. The government's failure to disclose Yager's obvious bias as a result of his status as an agent of the government also violated the Fifth and Eighth Amendments.

63.  As Classen's Grand Jury testimony demonstrates, Yager's work as an agent of the government went beyond merely interrogating Mr. Hammer. In his undisclosed capacity as its agent, Yager also apparently used his access to Mr. Hammer to obtain for the government additional materials purporting to inculpate Mr. Hammer and to provide those inculpatory materials to the government.

64.  Moreover, the grand jury materials disclosed to counsel indicate that letters purportedly from Mr. Hammer to inmates Leonard Kahle and Chester Drew Larrimore were admitted during the grand jury as evidence against Mr. Hammer. See NT 7/24/96, Index to Exhibits. As Yager was the block orderly, the reliability of these purported letters were equally compromised by virtue of the government's violation of Mr. Hammer's right to counsel.[5]

_____

[5]If either Larrimore or Kahle testified at the Grand Jury, the government has not disclosed that prior testimony. In light of the allegations in these claims, Mr. Hammer requests discovery, including the disclosure of all testimony that had been presented to the Grand Jury relevant to these claims including the testimony

65.    As noted above, Classen had been perplexed that the government had obtained a copy of a document he had destroyed and thrown away. After the government's recent disclosure concerning Yager's activities on its behalf, it is now obvious that Yager was secretly providing documents to the investigators to be copied and retained as evidence. In Classen's case, it is not clear whether Yager delivered to the government a copy of the actual document that had been placed under Classen's door or some other document that Yager hoped would ensure that he (Yager) received the benefits he was seeking from the government. Indeed, at trial, Classen never identified the questioned document as the note he had received. See NT Vol. 6 at 19 (indicating that exhibit 35.2 was not the letter he had received); id. at 32 (indicating that as far as he was concerned, he had never received exhibit 35.2). Regardless, the government's clandestine deployment of Yager as its agent in the development of the evidence presented during Classen's testimony deliberately circumvented Mr. Hammer's invocation of his right to counsel and constitutionally taints that testimony.

66.    Moreover, although AUSA Martin elicited Grand Jury testimony from Classen concerning *some* of the benefits Classen expected in exchange for his cooperation with the government, correspondence that was withheld by the

_____

of Kahle and Larrimore.

29

government until these pre-resentencing proceedings demonstrates that Classen's actual expectations went far beyond what the Grand Jury was told.

67.    In response to Mr. Hammer's first discovery motion, the government disclosed to Mr. Hammer various letters between Classen and AUSA Martin – some sent prior to Mr. Hammer's trial and others after – that it had never before disclosed. Exhibit 8.  This previously suppressed correspondence provides a clearer picture of Classen's expectations as to the assistance he would receive from the government (and specifically from Mr. Martin) in obtaining a reduction of sentence should he provide helpful testimony against Mr. Hammer.

68.    Moreover, the correspondence establishes that Classen affirmatively sought, and apparently received, Mr. Martin's assistance both before and after Mr. Hammer's trial as to where Classen would be housed.  It demonstrates that Mr. Martin not only provided Classen assistance in obtaining a shorter sentence, but also intervened to expedite Classen's release from the custody of the Bureau of Prisons to a halfway house when Classen complained that he was not scheduled to be moved to the halfway house as quickly as he desired.  In short, the correspondence demonstrates that Mr. Martin provided much more to Classen than merely recommending a sentence reduction and housing in a facility that was not a penitentiary, and, more importantly, that Classen believed these additional benefits were part of the original cooperation agreement.  Thus, the nature and extent of the

benefits Classen expected, and ultimately received, in exchange for his cooperation was materially different than what the government disclosed to the Grand Jury.

69. Individually and cumulatively, the constitutional errors arising from: the Grand Jury's consideration of convictions and/or sentences that were the product of perjured testimony; the government's failure to provide to the Grand Jury the true circumstances surrounding Yager's status as an agent of the government secretly deployed for the sole purpose of circumventing Mr. Hammer's invocation of his right to counsel; and the government's failure to provide the Grand Jury a full and accurate picture of the benefits Classen expected in exchange for his testimony tainted and polluted all aspects of the Grand Jury's deliberations and rendered the resulting indictment constitutionally unreliable, in violation of the Fifth and Eighth Amendments. Even if the errors before the Grand Jury did not rise to prejudicial constitutional dimension (but, they do), the errors did compromise the integrity and reliability of the Grand Jury proceedings and this Court should exercise its supervisory powers to correct the manifest injustice arising from the perjured testimony and the government's misconduct.

**B. The Grand Jury's Consideration of, and Reliance On, Evidence that was the Product of Perjury Violated the Fifth Amendment.**

70. The Grand Jury has "served for centuries both as a body of accusers sworn to discover and present for trial persons suspected of criminal wrongdoing and

as a protector of citizens against arbitrary and oppressive governmental action."

United States v. Callandra, 414 U.S. 338, 343 (1974).  Recognizing the "wide

latitude" afforded the Grand Jury, the Supreme Court has held that "its operation

generally is unrestrained by the technical procedural and evidentiary rules governing

the conduct of criminal trials."  Id.  While "certain constitutional protections afforded

defendants in criminal proceedings have no application before [the Grand Jury]"

United States v. Williams, 504 U.S. 36, 39 (1992), that does not mean that Grand Jury

proceedings are entirely insulated from judicial review or that a Grand Jury may base

its determination on false evidence or perjury.

71.    False and/or perjured evidence goes to the very heart of the reliability of

the Grand Jury's determination.  If material evidence, like that considered by the

Grand Jury here, is demonstrably false, there can be no confidence that the accused

was provided the longstanding protection against arbitrary and oppressive

governmental action that forms the foundation for the Grand Jury under the Fifth

Amendment.  Indeed,

> The consequences to the defendant of perjured testimony given before
> the grand jury are no less severe than those of perjured testimony given
> at trial, and in fact may be more severe. The defendant has no effective
> means of cross-examining or rebutting perjured testimony given before
> the grand jury, as he might in court.

United States v. Basurto, 497 F.2d 781, 786 (9th Cir. 1974).

72.    As the government's recent disclosures now make clear (see Exhibits

1-3), the convictions that resulted in the 1200-year sentence were procured by perjury and are constitutionally invalid. The Grand Jury definitely heard evidence about the constitutionally invalid 1200-year sentence and may also have heard other information about the constitutionally invalid convictions.

73.    While the count for which the 1200-year sentence was purportedly presented to the Grand Jury was ultimately dismissed, that does not cure the errors arising from the jury's consideration of false evidence regarding that sentence. Indeed, the limited record available to Mr. Hammer demonstrates that one or more jurors found the circumstances of the case involving 1200-year sentence to have been relevant to intent and premeditation. When AUSA Martin indicated that it would be a "stretch" to attribute the nature of the offenses for which he was sentenced to premeditation or intent in this case, one juror responded:

> Actually, it isn't because if he was in there for a murder and he had that kind of instinct, I mean, this could be a person that has a desire to kill somebody but not all the time. But I mean . . .

See NT 7/24/96 at 32. Although Mr. Martin informed the jurors that the convictions had occurred in 1984 and were, therefore, "probably not all that probative," he did not specifically instruct the jurors that they could only consider the evidence of Mr. Hammer's 1200-year sentence in connection with whether Mr. Hammer had been serving a life sentence at the time of Mr. Marti's death.

74.    Without such instruction, the jurors would reasonably believe that they

33

could consider both the 1200-year sentence and all the information presented by the government concerning the Upton case for any matter to which they believed it was relevant.  Even without the clearly expressed view of one juror that this evidence was relevant to the issue of premeditation and intent, there would have been a reasonable probability that the jury would have considered the 1200-year sentence and/or the other information presented regarding the Upton incident in their determination of intent and premeditation for Counts One and Two of the indictment.  Based upon the public comments of one juror, it is a near certainty that at least one juror – and most probably numerous jurors – considered perjured evidence and/or a sentence tainted by that perjury as a basis to indict Mr. Hammer on Counts One and Two.  The Grand Jury's consideration of that false evidence in reaching its determination violated the Fifth Amendment.

75.    Moreover, the Grand Jury's consideration of this false evidence was constitutionally prejudicial.  Prejudice is proven when "'the violation substantially influenced the grand jury's decision to indict' or . . . there is 'grave doubt' that the decision to indict was free from the substantial influence of such violations." Bank of Nova Scotia, 487 U.S. 250, 256 (1988) (quoting United States v. Mechanik, 475 U.S. 66, 78 (1986)); see also United States v. Soberon, 929 F.2d 935, 939-40 (3d Cir. 1991).  As noted above, one or more grand jurors found the circumstances underlying the convictions and the 1200-year sentence to have been relevant to the issues of

34

intent and premeditation. Without proof of intent or premeditation, the government could not sustain its burden for an indictment on either murder count. Thus, the jurors' consideration of this false evidence "substantially influenced" the indictment decision. At a minimum, in light of the record evidence available, there is "grave doubt" that the indictment was "free from the substantial influence" of the false evidence. Under either scenario, prejudice is proven and relief is required.

**C. The Government's Presentation of Evidence Obtained Through the Government's Deployment of Yager as Its Agent to Circumvent Mr. Hammer's Invocation of His Right to Counsel and Materially Misleading Testimony Regarding Yager and Classen's Reasons and Expectations in Exchange for Their Cooperation Violated the Fifth Amendment.**

76. As noted above and as discussed in greater detail in Claim II, the government presented Yager as a prisoner who fortuitously obtained statements and evidence from Mr. Hammer "by luck or happenstance." Maine v. Moulton, 474 U.S. 159, 176 (1985). As the recent disclosures by government counsel demonstrate, that was not the case at all. Instead, the government deliberately deployed Yager as an agent who would have a pretext for having contact with Mr. Hammer, and orchestrated the events to obtain statements and evidence it could use against him. In short, it obtained inculpatory evidence by "knowingly circumventing" Mr. Hammer's previously invoked right to counsel. Id.

77. Yager's work as an agent of the government went beyond merely

35

interrogating Mr. Hammer, although the interrogation alone violated Mr. Hammer's rights under the Fifth, Sixth, and Eighth Amendments. As Classen's testimony regarding the document he received under his cell door demonstrates, Yager – in his undisclosed capacity as the government's agent – also apparently used his access to Mr. Hammer to obtain additional materials purporting to inculpate Mr. Hammer, and provided those inculpatory materials to the government.

78. In Classen's case, it is not clear whether the document Yager delivered to the government was a copy of the actual document that had been placed under Classen's door or was some other document that Yager hoped would ensure that he (Yager) received the benefits he was seeking from the government. Regardless, the government's clandestine deployment of Yager as its agent in the development of the evidence presented during Classen's testimony deliberately circumvented Mr. Hammer's invocation of his right to counsel in violation of the Fifth and Sixth Amendments and resulted in the Grand Jury's consideration of constitutionally tainted testimony and evidence.

79. The government also failed to disclose its use of Yager as an agent pretrial, at trial, and post-trial. Because the government engaged in a pattern of deception and concealment over the course of seventeen years, the circumstances in this case are distinguishable from those in which the courts have found that the admission of evidence procured in violation of a constitutional right did not

36

invalidate an indictment.  See e.g.  Callandra, 414 U.S. at 343.

80.    Moreover, the government did more than admit evidence that had been obtained in violation of a defendant's Fifth and Sixth Amendment rights and then conceal those constitutional violations from the defendant.  The government also presented testimony from Yager to the Grand Jury regarding his arrangement with the government and misrepresented that this was the complete arrangement between Yager and the government.  NT 7/24/96 at 5.  The recent disclosure by current government counsel demonstrates that this was simply not true.  By presenting this false testimony, the government manipulated the Grand Jury's findings to avoid any Grand Jury determination that Yager's testimony was not to be believed because his motive as an agent seeking favorable treatment for his assistance fatally tainted the evidence and the statements he purportedly obtained.

81.    For each of these reasons, the government's failure to inform the Grand Jury of the true nature of its relationship with Yager involves more than a simple failure to present exculpatory evidence to the Grand Jury.  See United States v. Williams, 504 U.S. 36, 52 (1992) (holding that the prosecutor had no Fifth Amendment obligation to present exculpatory evidence in his/her possession to the grand jury).  Here, the government also affirmatively presented materially misleading testimony whose falsity is established by current government counsel's disclosure.

82.    Finally, the government also affirmatively misled the Grand Jury with

37

regard to its arrangements with Classen.  Having elected to present testimony about the benefits the government afforded Classen in exchange for his cooperation, the government was charged with a duty and obligation to present truthful testimony.  It did not.

83.    The Grand Jury's assessment of Yager's and Classen's testimony was critical to the government's case for indictment.  Thus, the jurors' consideration of materially misleading and false evidence relating to their reliability and credibility "substantially influenced" the indictment decision.  At a minimum, in light of the record evidence available, there is "grave doubt" that the indictment was "free from the substantial influence" of this materially misleading and false evidence. Accordingly, prejudice is demonstrated and relief is required.

**D.    The Grand Jury's Exposure to the Constitutionally Tainted Evidence, Evidence that is the Product of Perjury, and False and Materially Misleading Testimony Rendered the Grand Jury Proceedings in this Capital Prosecution Inherently Unreliable in Violation of the Fifth and Eighth Amendments.**

84.    The Supreme Court has long recognized that, because of its unparalleled severity and irrevocability, death differs fundamentally from any other punishment. See Ford v. Wainwright, 477 U.S. 399, 411 (1986); Woodson v. North Carolina, 428 U.S. 280, 305 (1976).  It also "has repeatedly said that under the Eighth Amendment 'the qualitative difference of death from all other punishments requires a

38

correspondingly greater degree of scrutiny of the capital sentencing determination.'" Caldwell v. Mississippi, 472 U.S. 320, 328-29 (1985) (citation omitted); Woodson, 428 U.S. at 305; Eddings v. Oklahoma, 455 U.S. 104, 118 (1982) (O'Connor, J., concurring) (because of the exceptional and irrevocable nature of the death penalty, due process and the Eighth Amendment require "extraordinary measures" to ensure the reliability of capital proceedings).  This proposition, which applies equally to the guilt and penalty phases of a capital trial, see, e.g., Beck v. Alabama, 447 U.S. 625, 637-38 (1980) (guilt); Lockett v. Ohio, 438 U.S. 586, 604 (1978) (penalty), is one of the most clearly established principles of Eighth Amendment law.  See also Gardner v. Florida, 430 U.S. 349, 357-58 (1977) (plurality opinion); id. at 363-64 (White, J., concurring); Lockett, 438 U.S. at 604; Godfrey v. Georgia, 446 U.S. 420, 427-28 (1980); Beck, 447 U.S. at 637-38; Zant v. Stephens, 462 U.S. 862, 884-85 (1983); California v. Ramos, 463 U.S. 992, 998-99 & n.9 (1983); Ake v. Oklahoma, 470 U.S. 68, 78 (1985); id. at 87 (1985) (Burger, C.J., concurring); Caldwell v. Mississippi, 472 U.S. 320, 328-29 (1985); Turner v. Murray, 476 U.S. 28, 36-37 (1986); Ford v. Wainwright, 477 U.S. 399, 411 (1986); Mills v. Maryland, 486 U.S. 367, 383-84 (1988); Johnson v. Mississippi, 486 U.S. 578, 584-85 (1988).

85.   The recent disclosures demonstrate that the government relied on: evidence that was the product of perjury; materially misleading testimony and argument that painted a picture of Yager as having obtained information by

happenstance when, in fact, he had actually been secretly deployed as an agent of the government for the specific purpose of eliciting incriminating evidence from Mr. Hammer; and materially misleading and false testimony regarding the nature and extent of both Yager's and Classen's biases and motives to testify favorably for the government.

86.     The recent disclosures demonstrate that the integrity and reliability of the Grand Jury proceedings were compromised.  An indictment based, in whole or in part, on perjured and materially false and misleading testimony and evidence such as that presented by the government to the Grand Jury not only fails to satisfy the requirement of heightened reliability mandated by the Eighth Amendment, it fails to satisfy any standard of reliability.

**E.     The Combined Errors Impacted the Integrity and Reliability of the Grand Jury's Determination**

87.     The Grand Jury relied on perjured evidence, false evidence, materially misleading evidence, and evidence obtained through the government's secret deployment of an agent to circumvent Mr. Hammer's invocation of his right to counsel.  Even if the errors described above do not individually require relief (and they do), the combined impact on the integrity and reliability of the Grand Jury proceedings does.  The multiple instances of misconduct, deception, and concealment require relief.

CLAIM II.   THE GOVERNMENT'S USE OF INMATE YAGER AS ITS AGENT TO CIRCUMVENT MR. HAMMER'S CLEAR AND UNEQUIVOCAL INVOCATION OF HIS RIGHT TO COUNSEL VIOLATED THE FIFTH, SIXTH AND EIGHTH AMENDMENTS.

88.     All prior allegations contained in the initial Section 2255 Motion and its prior Amendments are incorporated as if fully set forth herein.

### A.     Factual Background.

89.     At or around 6:24 am on April 13, 1996, after the discovery of Mr. Marti's death, Mr. Hammer was interrogated by FBI Special Agent Carlyle Thompson and BOP investigative personnel. Exhibit 5. Mr. Hammer initially waived his rights and gave a statement. Id. After Mr. Hammer indicated that he "had better get me a lawyer," the interrogation was terminated. Id. Following his interrogation and invocation of his right to counsel, the authorities moved Mr. Hammer to a separate, empty cell. Mr. Hammer had no supplies available to him in that cell. See NT Vol. 4 at 97-98.

90.     That same day, Special Agent Thompson, accompanied by BOP SIS investigators Mark Traxler and Ron Jury, interviewed inmate Leonard Yager. Exhibit 6. On April 17, 1996, FBI Special Agent Anthony Malocu and BOP SIS investigator Traxler again interviewed Yager. During this interview, Yager turned over a letter purportedly from Mr. Hammer that listed reasons for killing Mr. Marti. Exhibit 7. Yager testified both at the grand jury and trial that his conversations with Mr.

41

Hammer and his receipt of this letter occurred after these joint interrogations of Mr. Hammer by the FBI/BOP had concluded. See NT 7/24/96 at 25-27; NT Vol. 4 at 102-03.

91.    After his April 13, 1996, interview with the authorities, Yager went to Mr. Hammer's cell door and spoke with him on a number of occasions. At trial, Yager described the circumstances surrounding those discussions. Yager was a prison orderly, and as an orderly, he was free to move about the block, speak with inmates through the cell doors, and receive and/or deliver various items from or to inmates. NT Vol. 4 at 82. Yager engaged Mr. Hammer in conversation about the murder and asked him various questions, including "why he did it." Id. at 97-98. At some point, Mr. Hammer requested paper and pencil. Yager left and returned with the supplies. NT Vol. 4 at 97-98. When Yager asked Mr. Hammer again why Mr. Marti was killed, id. 102, Mr. Hammer told Yager to come back later. Yager claimed that when he returned, Mr. Hammer slipped a note to him through the door. Id. At trial, Yager identified government Exhibit 32.1 as the note that Mr. Hammer passed to him, id. at 103, and then read various portions of Exhibt 32.1 that purported to be reasons for killing Mr. Marti. Id. at 105-09; see also NT 7/24/96 at 25-27.

92.    On March 14, 2014, current government counsel disclosed, among other things, that, "at the time of the offense, the FBI 'sent [Yager] in' to talk to Mr. Hammer." Exhibit 3. Thus, at the time he was engaging Mr. Hammer and asking

Mr. Hammer about the death of Mr. Marti, and also at the time he received the purported letter from Mr. Hammer, Yager was acting as an agent of the government. The government's secret deployment of Yager as its agent to obtain information in circumvention of Mr. Hammer's invocation of his right to counsel violated the Fifth, Sixth, and Eighth Amendments and requires relief.

93.    The record demonstrates that Yager's work as an agent of the government went beyond merely interrogating Mr. Hammer, although the interrogation by itself was sufficient to violate Mr. Hammer's rights under the Fifth, Sixth, and Eighth Amendments. In his undisclosed capacity as its agent, Yager also apparently used his access to Mr. Hammer to obtain for the government additional materials purporting to inculpate Mr. Hammer and to provide those inculpatory materials to the government.

94.    For example, Stephen Classen testified during the grand jury proceedings and at trial about a letter he purportedly received under his cell door. NT 8/28/96 at 14; NT Vol. 6 at 17. Classen indicated that the letter would have been delivered by an orderly. NT 8/28/96 at 14. Classen testified that he did not immediately read the note and that when he did finally open it, he only read part of it. NT 8/28/96 at 14-15; NT Vol. 6 at 17-18. He then flushed the letter down the toilet without finishing reading it. NT Vol. 6 at 18. At trial, Classen never positively identified the letter offered by the government (government trial exhibit 35.2), as the one he had received

43

that morning under his cell door.  NT Vol. 6 at 19 (indicating that exhibit 35.2 was not the letter he received); id. at 32 (indicating that as far as he was concerned, he had never received exhibit 35.2).

95.    Classen also did not mention receiving any communication from Mr. Hammer during his interviews with the FBI and BOP investigators.  NT 8/28/96 at 15.  Indeed, during the grand jury proceedings, when AUSA Martin showed Classen a document purporting to be a copy of the letter Classen had flushed down the toilet, Classen expressed his surprise that the government had a copy of the letter. Mr. Martin responded that the government "work[s] in strange and mysterious ways." Id.

96.    After the government's recent disclosure concerning Yager's activities on its behalf, the government's "ways" are no longer "strange" or "mysterious." Obviously, Yager was secretly providing various documents to the investigators so that they could copy them and retain them as evidence.  In Classen's case, it is not clear whether the document Yager delivered to the government was a copy of the actual document that had been placed under Classen's door or was some other document that Yager hoped would ensure that he (Yager) received the benefits he was seeking from the government.  Regardless, the government's clandestine deployment of Yager as its agent in the development of the evidence presented during Classen's testimony deliberately circumvented Mr. Hammer's invocation of his right to counsel, constitutionally taints that testimony, and requires relief.

44

**B.      The Government's Use of Yager as Its Agent to Circumvent Mr. Hammer's Invocation of His Right to Counsel Violated the Fifth, Sixth, and Eighth Amendments.**

97.      As noted above, Mr. Hammer indicated that he "had better get me a lawyer." This clearly and unambiguously invoked Mr. Hammer's right to counsel. See McNeil v. Wisconsin, 501 U.S. 171, 178 (1991) (invocation of counsel under Miranda, requires "some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney"). At that point, the government was required to cease all interrogation. See Miranda v. Arizona, 384 U.S. 436, 474 (1966) (once counsel is requested, "the interrogation must cease until an attorney is present"). Indeed, "having expressed his desire to deal with the [investigators] only through counsel," Mr. Hammer was not "subject to further interrogation by the authorities until counsel [had] been made available to him, unless [Mr. Hammer] himself initiate[d] further communication, exchanges, or conversations with the [investigators]." Edwards v. Arizona, 451 U.S. 477, 484 (1981).

98.      Recognizing Mr. Hammer's clear statement as an invocation of his right to counsel, the investigators terminated the interrogation. But rather than "scrupulously honoring"[6] Mr. Hammer's invocation of his right to counsel, the FBI recruited Leonard Yager as its agent to conduct further interrogation in violation of

---

[6]Michigan v. Mosley, 423 U.S. 96, 104 (1975).

45

Mr. Hammer's rights. The fact that the attempts to elicit inculpatory evidence were done by Yager as opposed to a law enforcement officer is of no moment under the constitution. The FBI "sent" Yager in to interrogate him and obtain inculpatory evidence. Yager asked Mr. Hammer specific questions about the death of Mr. Marti. Yager provided Mr. Hammer – whom the Bureau of Prisons had strategically isolated in an empty cell – with various supplies, including pencil and paper, that the prison had otherwise denied him. Yager delivered notes to the government that purportedly had been generated by Mr. Hammer. In short, in every way, Yager was acting as an agent of the government.

99.    This was not a situation in which the government fortuitously obtained inculpatory statements from Mr. Hammer "by luck or happenstance." Maine v. Moulton, 474 U.S. 159, 176 (1985). Here, the government deliberately deployed an agent who would have a pretext for having contact with Mr. Hammer, and orchestrated the events to obtain statements and evidence it could use against him. In short, it obtained inculpatory evidence by "knowingly circumventing" Mr. Hammer's previously invoked right to counsel. Id.

100.    The government's clandestine employment of Yager as its agent to obtain inculpatory information from Mr. Hammer was in patent disregard of Mr. Hammer's invocation of his right to counsel. All evidence obtained as a result of the government's use of Yager as an agent, including Classen's testimony regarding the

46

purported letter he received on April 14, 1996 and all of Yager's testimony, was inadmissible under the Fifth and Sixth Amendments.

C.   **Because the Government Concealed Yager's Status as an Agent for the Government to Circumvent Mr. Hammer's Invocation of His Right to Counsel, This Claim is Not Waived Despite Mr. Hammer's Entry of a Guilty Plea, Nor are There Any Bars to this Court's Consideration of This Claim.**

101.   The disclosure by current government counsel on March 14, 2014 was the first time that Mr. Hammer or his counsel were aware that the government had used Yager as an agent to circumvent Mr. Hammer's invocation of his right to counsel. There is no question that the prosecution knew about this arrangement, in light of Yager's statement that the "FBI" had "sent" him in to conduct his interrogation. Moreover, AUSA Martin's comment during Classen's grand jury testimony about the government's "strange and mysterious" ways – combined with the circumstances in which the government obtained the note purportedly sent to Classen on April 14, 1996, shows that Mr. Martin was aware of at least some of the arrangement with Yager and strongly suggests that he knew the full situation.

102.   Even if the government prosecutors did not have actual knowledge of Yager's activities on their behalf, the FBI and/or BOP investigators who were part of the same prosecution team were fully aware that Yager had been sent in as an agent of the government to circumvent Mr. Hammer's invocation of his right to counsel.

47

Accordingly, the government was obliged under Brady to disclose that information to Mr. Hammer pretrial. See United States v. Risha, 445 F. 3d 298, 305 (3d Cir. 2006).

103.   The government concealed this information pretrial, during trial, at the time Mr. Hammer entered his guilty plea, and this suppression continued throughout Mr. Hammer's post-trial proceedings and the Section 2255 evidentiary hearing. Had the government disclosed this information, Mr. Hammer would have challenged the admissibility of Yager's testimony and all other fruits of the government's misconduct, including the Classen testimony described above, obtained as a result of its clandestine deployment of Yager as an agent to circumvent Mr. Hammer's invocation of his right to counsel. As set forth above, the Fifth and Sixth Amendments would have required the Court to suppress this evidence, amply satisfying the requirement that Mr. Hammer demonstrate a reasonable probability that he would have succeeded with such a challenge.

104.   Likewise, the government's deployment of Yager as an agent for the purposes of circumventing Mr. Hammer's invocation of his right to counsel renders Mr. Hammer's guilty plea invalid. See Claim III. Because the government fraudulently induced that plea by failing to disclose its use of Yager to intentionally violate Mr. Hammer's rights, this claim is not waived. Had Mr. Hammer known of these meritorious challenges to this evidence, he would not have entered a guilty plea.

Nor can the government assert any other bar to this Court's consideration of the merits of these claims because the facts supporting the basis of these claims were unknown to Mr. Hammer – and could not have been known to him – before current government counsel's disclosure of these facts on March 14, 2014. The government lacks clean hands to assert any procedural bar, and having successfully concealed its deliberate misconduct for seventeen years, cannot now invoke procedural rules to benefit from that misconduct. For each of these reasons, there is no waiver, nor are there any other procedural bars to this Court's consideration of the merits of this claim. Mr. Hammer is entitled to merits review and, for the reasons described above, relief is required.

**CLAIM III. THE GOVERNMENT'S FAILURE TO PROVIDE PETITIONER WITH MATERIAL EXCULPATORY EVIDENCE PRIOR TO HIS MID-TRIAL GUILTY PLEA VITIATES THE ALLEGED VOLUNTARINESS OF THE PLEA AND WARRANTS A NEW TRIAL.**

105. All prior allegations contained in the initial Section 2255 Motion and its prior Amendments are incorporated as if fully set forth herein.

**A. Introduction.**

106. On June 22, 1998, in the middle of the government's rebuttal case, Mr. Hammer entered a plea of guilty. See NT Vol. 14 at 114 (Mr. Hammer) ("The bottom

49

line is I did in fact with these hands kill Andrew Marti...")[7].

107.   Mr. Hammer's mid-trial guilty plea was not knowing, intelligent or voluntary. It was a decision made without consideration of critical evidence suppressed by the government that would have changed the contours of his available defenses, his ability to effectively challenge the government's most critical witnesses and his ability to demonstrate that the death of Mr. Marti was accidental. In short, with knowledge of the suppressed materials discussed below, Mr. Hammer would not have entered a plea of guilty during the middle of his trial.[8]

108.   Mr. Hammer's decision to plead guilty was made without considering the impact of what his defense may have looked like at the time he entered his guilty plea had the handwritten notes allegedly authored by Mr. Hammer and provided to the government by Mr. Yager been deemed inadmissible because of facts suppressed

---

[7]Trial commenced in this case on June 3, 1998, and the government presented its case-in-chief through June 11, 1998. See NT Vol. 7 at 144. The defense presented its case through June 17, 1998. See NT Vol. 11 at 112. On the same day, the government began presenting its case in rebuttal.

[8] The late Judge Muir denied Petitioner's earlier claim that the government's failure to disclose numerous 302 FBI reports pursuant to its Brady obligations vitiated the voluntariness of his guilty plea because the suppressed evidence would not have "[d]eterred Hammer from entering a plea of guilty to first degree murder." United States v. Hammer, 404 F. Supp 2d 676, 798 (M.D. Pa. 2005). The facts related to that particular claim will be discussed below, as the government's overall misconduct must be assessed cumulatively. See Ferrara v. United States, 456 F.3d 278, 294 (1st Cir. 2006).

by the government that Mr. Yager procured those notes while acting as a clandestine government agent in order to circumvent Mr. Hammer's invocation of his right to counsel.

109.   It was a decision made without knowledge that the government had concrete evidence from inmate witnesses both housed within the Bureau of Prisons and from the Oklahoma Department of Corrections that would have supported his defense, as articulated by trial counsel during guilt phase opening argument that "[t]he tying was part of some plan; kinky homosexual activity between Mr. Hammer and Mr. Marti." NT Vol. 2 at 5.[9]

110.   It was a decision made without knowledge that FBI Special Agent Anthony Malocu specifically questioned potential witnesses about Mr. Hammer's sexual practices prior to trial and acquired information supporting a defense that Mr. Marti's death occurred during consensual sexual bondage. See United States v. Hammer, 404 F. Supp. 2d 676, 782, 783, 785 (M.D. Pa. 2006) (government interviews of Albert Johnson, Royce Lee Fowler and Gaylon Don Ball).

111.   Nor did Mr. Hammer know that the government had in its possession a document from the Bureau of Prisons stating unequivocally that Mr. Marti, who had

---

[9] This theme was repeated by counsel during his penalty phase closing argument. See NT Vol. 29 at 3, 4 (Mr. Travis) (Mr. Travis reminds the jury on two separate occasions that Mr. Marti was bound to the bed not as part of a ruse but rather, as a result of consensual "sexual bondage").

been housed in the Special Housing Unit (SHU), requested to share a cell with Mr. Hammer. This evidence, produced years after trial, would have allowed Mr. Hammer to confront the government's contention that Mr. Hammer arranged for Mr. Marti's transfer into his cell and that the transfer was part of the now defunct "hostage ruse" presented to the jury during the guilt phase.

112. The law is abundantly clear and long-standing: a waiver of a constitutional right may not stand absent a showing that the right was surrendered in a knowing, intelligent and voluntary manner. See e.g. Johnson v. Zerbst, 304 U.S. 458 (1938). As detailed below, Mr. Hammer can demonstrate to a "[r]easonable probability that, but for the [government's] misconduct he would not have pleaded guilty and would have insisted on going to trial." Ferrara v. United States, 456 F.3d 278, 294 (1st Cir. 2006).

### B. The Recently Disclosed Exculpatory Evidence.

#### 1. Leonard Yager Was A Clandestine Government Agent.

113. Leonard Yager testified during the guilt phase and was a critical government witness in establishing intent and premeditation. See NT Vol. 4 at 57-181 (Testimony of Leonard Yager). Indeed, he not only testified about what Mr. Hammer allegedly said to him concerning Mr. Marti's death, but he provided a handwritten note allegedly given to him by Mr. Hammer detailing purported reasons why he killed

Mr. Marti. Id. at 102.

114.    At the time of Mr. Marti's death, both Mr. Yager and Mr. Hammer were housed on the SHU. Mr. Yager worked as an orderly and had near unfettered access to Mr. Hammer on the basis of his position as the block orderly. Id. at 82. After the discovery of Mr. Marti's death, Mr. Hammer was interrogated by FBI Special Agent Carlyle Thompson and BOP investigative personnel. Exhibit 5. Mr. Hammer initially waived his rights and gave a statement. Id. After Mr. Hammer indicated that he "had better get me a lawyer," the interrogation was terminated. Id. at 8. Following his interrogation and invocation of his right to counsel, the authorities moved Mr. Hammer to a separate, empty cell. Mr. Hammer had no supplies available to him in that cell. See NT Vol. 4 at 97-98.

115.    Following Mr. Hammer's invocation of his right to counsel, Special Agent Thompson, accompanied by BOP SIS investigators Mark Traxler and Ron Jury, interviewed inmate Leonard Yager. Exhibit 6. After this interview with the authorities, Yager went to Mr. Hammer's cell door and spoke with him on a number of occasions.

116.    Yager supplied Mr. Hammer with a pencil and paper and asked Mr. Hammer why he killed Mr. Marti. Id. at 97-98. Mr. Hammer purportedly stated that he had told Yager he was going to kill Marti. When Yager persisted, asking for "what reason," Mr. Hammer purportedly told him to "come back" to his cell later. Id.

53

at 102.  When Mr. Yager returned, Mr. Hammer allegedly provided him with a note.
See Government Exhibit 32.1.  During the course of his testimony, Mr. Yager read
to the jury portions of the note purporting to demonstrate premeditation and intent.
Id. at 106, 108, 109.

117.  On March 14, 2014, current government counsel provided Mr. Hammer
with a notice that on February 25, 2014, Special Agent Herbst and Trial Attorney
Haines met with Leonard Yager. Among other things, Yager told Agent Herbst and
Ms. Haines that "at the time of the offense, the FBI 'sent him in' to talk to Mr.
Hammer." See Exhibit 3.

118.  Since Mr. Hammer had previously invoked his right to counsel, the
government's use of Mr. Yager violated Mr. Hammer's right to counsel, barring
admission of both his testimony and the inculpatory note allegedly written by Mr.
Hammer. See Claim II.

   *2.    Suppressed Impeachment Evidence For Leonard Yager.*

119.  Assuming, arguendo, that Mr. Yager's testimony would have been
allowed, and it would not, the fact that he was an illegal, clandestine agent of the
government actively seeking favor from the government has direct bearing on his
credibility and reliability as well as providing a challenge to the integrity of the
government's conduct. Finally this information would have provided powerful
impeachment evidence.

120.    The government's suppression of this information prevented counsel from cross-examining Yager about his informant status, including the circumstances relating to this arrangement, any directions given by the government or conditions it placed on Yager's activities as its agent, as well as Yager's expectations in return for his clandestine service as an agent.

### 3.    Suppressed Impeachment Evidence For Stephen Classen And The Inadmissibility of Exhibit 35.2.

121.    Yager's role as a clandestine agent for the government also impacts the admissibility and reliability of the guilt phase testimony of inmate Stephen Classen. Like Yager, Mr. Classen provided critical testimony regarding Mr. Hammer's alleged intent and premeditation.

122.    Classen was also questioned at trial about a hand written note allegedly penned by Mr. Hammer that also details the intentional and premeditated nature of Mr. Marti's murder.  Classen testified that he had found a note by his cell door some time after the death of Mr. Marti, but that he had flushed the note down the toilet without reading the entirety of it. NT 8/23/96 at 15.  At trial, Mr. Classen denied that the note shown to him before the jury was the note he had found by his cell door. NT Vol. 6 at 19, 32.  Nonetheless, at the behest of the government, he read the note to the jury. Id. at 20-23.  This note, like the note Yager allegedly received, was damning evidence.

123.   Unlike Yager, Classen was not an orderly. He did not roam the cell block during the day and evening delivering supplies and other items to other inmates. Nor, like Mr. Yager, did he have unfettered access to Mr. Hammer immediately after the death of Mr. Marti. In light of the recent disclosure, it is now clear that Yager was not only providing the government with information he purportedly received from Mr. Hammer, he was also collecting materials and providing them to the government before passing them along to other inmates.  It is not clear whether the document Yager delivered to the government was a copy of the actual document that had been placed under Classen's door or was some other document that Yager hoped would ensure that he (Yager) received the benefits he was seeking from the government. Regardless, the government's clandestine deployment of Yager as its agent in the development of the evidence presented during Classen's testimony deliberately circumvented Mr. Hammer's invocation of his right to counsel and constitutionally taints Classen's testimony.

124.    If this evidence had been made available to Mr. Hammer prior to trial – as it should have been –  it is reasonably probable that he would not have suddenly thrown in the towel.

125.   Classen also testified at trial that, other than his expectations for a letter of cooperation from Mr. Martin in support of a Rule 35 motion for his prosecution in Oregon and a recommendation to the Bureau of Prisons ("BOP") that  Classen be

housed in an institution other than a penitentiary, no agreements were made in exchange for his testimony.  NT Vol. 6 at 4-5.

126.   His testimony concerning the benefits he would receive from the government was, however, woefully incomplete. During the course of these proceedings, the government provided Mr. Hammer with a series of letters between Classen and AUSA Martin that had not been previously disclosed.

127.   This previously suppressed correspondence provides a clearer picture of Classen's expectations as to the assistance he would receive from the government (and specifically from Mr. Martin) in obtaining a reduction of sentence should he provide helpful testimony against Mr. Hammer.  Moreover, the correspondence establishes that Classen affirmatively sought, and apparently received, Mr. Martin's assistance both before and after Mr. Hammer's trial as to where Classen would be housed.

128.    It demonstrates that Mr. Martin not only provided Classen assistance in obtaining a shorter sentence, but also intervened to expedite Classen's release from the custody of the Bureau of Prisons to a halfway house when Classen complained that he was not scheduled to be moved to the halfway house as quickly as he desired.

129.   In short, the correspondence demonstrates that Mr. Martin provided much more to Classen than merely recommending a sentence reduction and housing in a facility that was not a penitentiary, and, more importantly, that Classen believed

these additional benefits were part of the original cooperation agreement.

130.    Although some of this correspondence predated his trial, the government failed to disclose it to Mr. Hammer.  The suppression of this information denied Mr. Hammer the opportunity to fully confront Classen about his expectations of benefits in exchange for his testimony.

### C.    The Previously Undisclosed Evidence.

131.    The Court has already concluded that the government's failure to provide Mr. Hammer with the 302 FBI witness statements of Mr. Albert Johnson, Mr. Royce Lee Fowler, Mr. Martin Guerrero and Mr. Gaylon Don Ball constitutes a violation of Brady v. Maryland, 373 U.S. 83, 88 (1963). See Hammer, 404 F. Supp 2d at 801. Thus, the materiality of these statements is not in question.

132.    As the late Judge Muir found:

The bulk of the information which the Government failed to turn over relates to Mr. Hammer's reason for braiding sheets into ropes and the truthfulness of Mr. Hammer's story that he convinced Mr. Marti to engage in a hostage ruse so that Mr. Marti could be transferred to the United States Penitentiary, Atlanta, Georgia.

The information from Albert Ray Johnson, Royce Lee Fowler and Gaylon Ball would have supported Mr. Hammer's contention that the sheets were braided into ropes for the purpose of being used as part of a consensual sexual activity involving bondage. See Findings of Fact Nos. 1595 through 1696. The testimony of Martin Guerrero would have bolstered Mr. Hammer's position that the hostage scenario was untrue. Mr. Hammer when interviewed by FBI Special Agent Thompson stated that Mr. Marti was viewed by other inmates as an informant and that he

58

had sent a letter to Martin Guerrero in which he informed Mr. Guerrero that he knew Mr. Marti, that he did not believe the rumors about Mr. Marti and that Mr. Guerrero should give Mr. Marti "a chance" and "to spread the word and do it as a personal favor for [Mr. Hammer]." An FBI Agent interviewed Mr. Guerrero at the United States Penitentiary, Leavenworth, Kansas, on August 27, 1996. The 302 statement of that interview was not disclosed to trial counsel. During that interview Mr. Guerrero told the FBI Agent that "he never received any letter from Hammer or Andrew Hunt Marti" and "*he had never heard of inmate Andrew Hunt Marti.*"

Hammer, 404 F. Supp. 2d at 796. This suppressed evidence directly impacted Mr. Hammer's ability to present his defense. If it had been disclosed prior to trial, as the Fifth and Fourteenth Amendments to the Constitution required, it is reasonably probable that Mr. Hammer would not have pled guilty in the middle of trial.

   *1.    The Albert Johnson 302 Statements.*

133.    On June 3, 1998, FBI Special Agent Malocu and BOP investigator Traxler conducted an interview of Albert Ray Johnson, Jr., who was incarcerated at the Great Plains Correctional Facility in Hinton, Oklahoma.  Mr. Johnson had served time with Mr. Hammer in Oklahoma and at USP-Allenwood.

134.    Mr. Johnson told the Government agents that while he was incarcerated with Mr. Hammer in Oklahoma, Hammer engaged in consensual sexual activities that included bondage and sadomasochism:

   JOHNSON indicated that HAMMER was a homosexual and was into bondage.  He and his homosexual cell mates would tie each other up and whip each other with rope or electrical cord. Hammer and his

59

sexual partners would come to the cell door playing with each other.

Exhibit 9 at 1.

135.   Mr. Johnson also told the Government that he again met Mr. Hammer

in 1995 at USP-Allenwood and that his sexual activities and consensual bondage

continued:

> While incarcerated in the Special Housing Unit, HAMMER engaged in
> sexual activity with his cell mate who was identified as a white male
> with a first name of TONY, having long stringy hair.  JOHNSON never
> really talked to HAMMER's cell mate, but did talk with HAMMER on
> many occasions.  HAMMER and his cell mate would tie each other up
> and bite each other.  They would yell over to JOHNSON's cell and make
> a lot of noise.  HAMMER and his cell mate would typically stay up all
> night engaging in sexual activity.  They would tie each other up using
> braided sheets. When one would fall asleep, the other would tie him up.

Id. at 3.

136.   Mr. Johnson also told the Government that he (Johnson)  had braided

sheets and provided them to Hammer.  He also told the Government that he had

shown  Hammer how to braid these sheets while incarcerated in the SHU at USP-

Allenwood:

> JOHNSON used to make braided sheets and used them as
> clotheslines in his cell.  JOHNSON recalls making them and providing
> them to Hammer.  He would tie a battery to one end and fish the braided
> rope to HAMMER, thus providing it to him.  JOHNSON had told
> HAMMER how to make the rope, by telling him that all you needed to
> do was braid some sheets.

Id. at 3.

60

137.  Mr. Johnson also told the Government that:

HAMMER had a cell partner "TONY LNU", a white male approximately 26 years of age...TONY and HAMMER would beat up each other periodically for the pain, as both were sadomasochist.

Exhibit 10 at 2.  None of these statements were disclosed to trial counsel.

138.  Thus, the Government was told by Mr. Johnson that Mr. Hammer had regularly engaged in consensual bondage and related sexual activities; that he – Johnson – had provided Hammer with braided sheets and also taught Mr. Hammer how to braid them; and that the use of braided sheets was part of Mr. Hammer's consensual sexual activities.

139.  The information contained within the Johnson statements are consistent with the defense theory that Mr. Marti's death occurred as an accident during consensual sexual activity.  Trial defense counsel presented glimpses of this defense during both his guilt phase opening statement and in his penalty phase closing argument.  See NT 6/3/98 at 5 (Guilt phase opening statement); NT Vol. 29 at 3- 4 (Defense penalty phase closing argument).  If Mr. Hammer had been aware of this affirmative evidence supporting his defense theory he would never have pled guilty.

2.    *The Royce Lee Fowler 302 Statement.*

140.  The FBI 302 statement of  Royce Lee Fowler was also disclosed to undersigned counsel for the first time on September 22, 2005.  Mr. Fowler, like Mr. Johnson, was interviewed by FBI Special Agent Malocu and BOP investigator

61

Traxler on June 3, 1998.  This interview took place at USP-Lewisburg.   Mr. Fowler

had served time with Mr. Hammer at USP-Leavenworth.

141.    Mr. Fowler told the Government that he lived with Mr. Hammer in the

Special Housing Unit at USP- Leavenworth for approximately nine months in 1995.

Mr. Fowler stated that Mr. Hammer was a homosexual with a preference for bondage

during sex:

> FOWLER has had the same girlfriend for the past 20 years.  Her name
> is NANCY. On one occasion when he was telling HAMMER bout how
> he wanted to tie NANCY up with her pantyhose, HAMMER informed
> FOWLER about his liking bondage and wanting to be tied up during
> sex.

Exhibit 11 at 1,3.

142.    Mr. Fowler's statement is consistent with Mr. Johnson's statement and

would have provided trial counsel with two sources of independent evidence that

could have been presented to the jury establishing that Mr. Hammer's sexual practices

were consistent with the consensual bondage of Mr. Marti on the night of April 13,

1996 for sexual purposes.

### 3.    The Gaylon Don Ball 302 and Handwritten Notes.

143.    At the time of trial the government had in its possession a 302 statement

from Gaylon Don Ball.  Mr. Ball had served time with Hammer at USP-Allenwood.

The Government also had Agent Maluco's handwritten notes of this interview.

Again, these documents were not provided to the defense until September 22, 2005.

62

144.   These documents revealed that Mr. Ball told the Government that he had known Hammer for several years and that:

> HAMMER was having sexual relations with MARTI, although he had no facts to back up his opinion.  The first knowledge BALL had regarding the death of inmate MARTI occurred when he heard a female's voice outside HAMMER'S cell on the morning that MARTI was murdered.

Exhibit 12 at 1.

145.   Indeed, when Agent Maluco's formal 302 statement of Mr. Ball is compared with Agent Maluco's handwritten notes of the interview another glaring contradiction between these two documents became evident.  According to Agent Maluco's handwritten notes, Mr. Ball stated "Hammer was having sexual relations with Marti although this is only his opinion  approx 1 hr before he heard females voice."   The handwritten notes suggest that Hammer and Marti were engaged in sexual relations an hour before Ball heard a female voice.  Exhibit 13.

146.   If the female voice was that of Correctional Officer Nicole Weaver – it is reasonable to conclude that Hammer was having sexual relations with Marti at the exact time –  according to the government's theory –  that Hammer was supposed to be murdering Marti.

       4.     *The Martin Guerrero 302 Statement.*

147.   At the time of trial the Government had in its possession a 302 statement from Martin Guerrero, who had served time with Hammer at USP-Allenwood.  This

63

document was not provided to the defense until September 22, 2005.  Mr. Guerrero's

302 statement directly and materially contradicts the statement Mr. Hammer gave to

FBI Special Agent Carlyle Thompson on the night of Mr. Marti's death.  On April 13,

1996, Mr. Hammer told the FBI that:

> On Thursday evening, April 11, 1996, . . . HAMMER wrote a letter on MARTI's behalf to MARTINE GUERRERO (phonetic) via mailing it to a third party located at Post Office Box 234, Three Rivers, Michigan. HAMMER had doubts at the time in his own mind as to whether he was going through with what he planned.  HAMMER told GERRERO in the letter that he (HAMMER) knew MARTI for some time, did not believe the rumors, and to give MARTI a chance, to spread the word and do it as a personal favor for me.

Exhibit 5 at 3.

148.   However, Mr. Guerrero in his interview with Agent Maluco when

specifically asked about receiving a letter from Mr. Hammer told Agent Maluco  that

"he never received any letter from Hammer" nor had he "received any mail from a

third party located in Michigan."  Exhibit  14.

149.   This evidence would have contradicted not  only  the  accuracy  and

reliability of Mr. Hammer's confession, but would have substantially weakened the

government's evidence of intent and premeditation.

> 5.    *The Suppressed Bureau of Prisons Document.*

150.   The Government also failed to provide the defense with a BOP document

that contained information that directly and materially contradicts the statement Mr.

Hammer gave to FBI Special Agent Carlyle Thompson on the night in question.[10]  On

April 13, 1996, Mr. Hammer told Agent Thompson that:

> HAMMER stated that MARTI came (moved) into his cell and (SHU 103
> on Tuesday of this week).   MARTI came at the written and verbal
> request of HAMMER who wanted him to be his cell mate.
>
> Marti wanted to move in with HAMMER according to HAMMER.

Section 2255 Defense Exhibit 197 at 2.

151.    The suppressed BOP document that was provided to defense counsel

long after trial revealed that it was Marti who had requested to cell with Hammer:

> Also in the interview it was discovered that on Tuesday, April 9, 1996,
> Marti requested to move in with Hammer.   There was no reported
> separation concerns between the two inmates and staff moved Marti in
> with Hammer.

Section 2255 Defense Exhibit 197 at 15.

152.    The BOP document directly and materially contradicts Mr. Hammer's

statement and a critical part of the government's theory of intent and premeditation.

**D.    Mr. Hammer's Guilty Plea Was Not Voluntary.**

153.    In most cases where a defendant pleads guilty it occurs prior to trial. In

the normal course of events, the defendant more often than not receives a lesser

---

[10]This undated BOP document was received by counsel in a post-trial
Freedom of Information Act request.  It was marked and admitted into evidence at
the 2255 hearing as Defendant's Exhibit 197.  The relevant portions of Exhibit
197 are found on page 15.

sentence in return for his or her acknowledgment of guilt.

154. In this case, Mr. Hammer received nothing in return for his guilty plea. Indeed, he had already presented his defense and his attorneys were busy dealing with the government's rebuttal case when he threw up his hands and gave up.

155. While a counseled plea of guilty is difficult to undo, it is not immune to a constitutional challenge under certain circumstances:

> Under limited circumstances, however – everything depends on the context – the prosecution's failure to disclose evidence may be sufficiently outrageous to constitute the sort of impermissible conduct that is needed to challenge the validity of a guilty plea.

Ferrara v. United States, 456 F.3d 278, 291 (1st Cir. 2006). In this case, when he entered his guilty plea, the government had already violated his right to due process, right to a fair trial and right to effective assistance by eschewing its Brady obligations and suppressing the evidence outlined above.[11]

---

[11]In United States v. Ruiz, 536 U.S. 622 (2002), the Court stated that:

> The Constitution does not require the Government to disclose material impeachment evidence prior to entering a plea agreement with a criminal defendant. Although the Fifth and Sixth Amendments provide, as part of the Constitution's "fair trial" guarantee, the defendant's right to receive exculpatory impeachment evidence from the prosecutors, a defendant who pleads guilty forgoes a fair trial as well as other accompanying constitutional guarantees.

Ruiz at 623. The Court in Ruiz, however, was dealing with a situation where a defendant entered a guilty plea well in advance of trial. In this case, on the other hand, Mr. Hammer entered his guilty plea not on the "fast-track" plea entered into

156.    As the court in <u>Miller v. Angliker</u>, 848 F.2d 1312 (2d Cir. 1988),

explained:

> Since a defendant's decision whether or not to plead guilty is often heavily influenced by his appraisal of the prosecution's case, and of information that may be available to cast doubt on the fact or degree of his culpability, we conclude that even a guilty plea that was "knowing" and "intelligent" may be vulnerable to challenge if it was entered without knowledge of material evidence withheld by the prosecution.

<u>Id</u>. at 1320.    In Mr. Hammer's case, the government's suppression of material

evidence unconstitutionally compromised his ability to effectively present his

challenge to the "degree of his culpability."

157.    Assessing the evidence in an objective manner,

---

by Ruiz, but rather, well after the time the government should have disclosed all exculpatory and impeachment evidence. <u>Ruiz</u> does not apply to Mr. Hammer's case.

As noted by the Tenth Circuit:

> By holding in <u>Ruiz</u> that the government committed no due process violation by requiring a defendant to waive her right to impeachment evidence before indictment in order to accept a fast-track plea, the Supreme Court did not imply that the government may avoid the consequence of a <u>Brady</u> violation if the defendant accepts an eleventh-hour plea agreement while ignorant of withheld exculpatory evidence in the government's possession.

<u>United States v. Ohiri</u>, 133 F. App'x 555, 562 (10th Cir. 2005). Mr. Hammer's plea was well after the eleventh hour. The consequences of the government's <u>Brady</u> violations in this case vitiate the voluntariness of Mr. Hammer's guilty plea. He is entitled to a new trial.

> The elementary question is whether a reasonable defendant standing in the petitioner's shoes would likely have altered his decision to plead guilty had the prosecution made a clean breast of the evidence in its possession.

Ferrara v. United States, 456 F.3d at 294. The answer in this case is no.

158.    The suppressed evidence changes the entire context of the defense case and its ability to raise reasonable doubt on the accuracy, veracity and reliability of the government's guilt phase case. Put another way, armed with the suppressed evidence, Mr. Hammer would have been able to raise a strong reasonable doubt defense as to his guilt of first degree murder. And, armed with this information, Mr. Hammer would not have pled guilty.

159.    As detailed above, Mr. Hammer would have been able to present witnesses who would have attested to the fact that Mr. Hammer had braided sheets into rope for consensual sexual activity for a long period of time. The jury would have heard from witnesses who would have provided first hand knowledge of historically how Mr. Hammer and his cell mates would routinely engage in sexual bondage. Another witness would have told the jury that he believed Mr. Hammer and Mr. Marti had engaged in sexual activity the night Mr. Marti died.

160.    Mr. Hammer would have been able to directly refute the government's allegation that Mr. Hammer orchestrated Mr. Marti's moving into his cell with the BOP document demonstrating that Mr. Marti had requested to cell with Mr. Hammer.

68

And he would have also had pointed impeachment evidence for use in cross examining the government's lay and expert witnesses.

161.   The evidence of premeditation and intent allegedly from Mr. Hammer's own writing would have been inadmissible because Mr. Yager procured those writings while acting as clandestine government agent.  Likewise, the letter attributed to Mr. Hammer introduced through Mr. Classen would have also been inadmissible, as it was a product of Yager's role as illegal agent.

162.   This, in turn, would have presented Mr. Hammer with a reasonable probability of a conviction of a lesser offense and not, as he faced on June 22, 1998, a seemingly bleak prospect that the jury would believe Mr. Marti's death was accidental.

163.   In Mr. Hammer's case, "[t]he totality of the circumstances discloses a reasonable probability that the defendant would not have pleaded guilty absent the misconduct." Ferrara 456 F.3d at 294.

164.   Mr. Hammer is entitled to withdraw his plea of guilty and is entitled to a new trial.

CLAIM IV.   THE GOVERNMENT'S FAILURE TO DISCLOSE MATERIAL EXCULPATORY EVIDENCE AND ITS RELIANCE ON MATERIALLY MISLEADING AND FALSE TESTIMONY VIOLATED THE FIFTH, SIXTH AND EIGHTH AMENDMENTS.

165.   All prior allegations contained in the initial Section 2255 Motion and its

prior Amendments are incorporated as if fully set forth herein.

166.   In the course of these resentencing proceedings, the government has made a number of disclosures of material exculpatory evidence that, despite its continuing obligations under *Brady v. Mayland*, it failed to disclose to Mr. Hammer prior to trial, during trial, on appeal, or during his habeas proceedings.  As described below, these disclosures involve exculpatory information about critical prosecution witnesses at both the guilt and penalty phases of Mr. Hammer's 1998 trial.  The government's failure to disclose this information violates the Fifth, Sixth, and Eighth Amendments.  Mr. Hammer is entitled to relief.

A.     **Factual Background.**

1.     *Facts Related to the Government's Failure to Disclose Exculpatory Evidence Regarding Yager.*

167.   Leonard Yager provided critical testimony for the government in support of its guilt-phase case for intentional, premeditated murder, its gateway penalty-phase theory of intent, and the substantial planning and premeditation aggravating factor. NT Vol. 27 at 70-72; 75-77; 80; 89; 110; NT Vol. 29 at 50.  Mr. Yager testified at trial that he had celled with Mr. Hammer for a short period of time and his tesimony described his observations of Mr. Hammer and Mr. Marti after they became cellmates.  NT Vol. 4 at 85-89.  At the time of Mr. Marti's death, Yager served as a prison orderly and, thus, was free to move about on the block and pass items –

70

including notes – from one inmate to another. Id. at 82. Yager claimed that on the day of Mr. Marti's death, he had been at the door of Mr. Hammer's cell where he purportedly observed Mr. Hammer braiding sheets and making a gesture about Mr. Marti with his finger across his neck. Id. at 94-96.

168.   Yager also testified that, after Mr. Marti's death, he encountered Mr. Hammer again, ostensibly in the context (and, we now know, under the pretext) of his position as an orderly. Id. at 97. Yager supplied Mr. Hammer with paper and pencil and asked Mr. Hammer "why he did it" to which Mr. Hammer purportedly responded that he had told Yager he was going to do it. Id. at 97-98. Yager asked "for what reason" to which Mr. Hammer responded that Yager should "come back." Id. at 102. When Yager returned, Mr. Hammer allegedly slipped a note to him through the door. Id. Yager identified government Exhibit 32.1 as the note that he claimed Mr. Hammer passed to him, id. at 103, and then read various portions of Exhibit 32.1 that purported to be Mr. Hammer's reasons for killing Mr. Marti. Id. at 105-109. Yager contended that the only benefits he expected to receive for his testimony were assistance in obtaining placement at a less-restrictive institution and a sentence reduction. Id. at 59-62.

169.   As noted previously, see Claim II, the government used inmate Yager as its agent to circumvent Mr. Hammer's invocation of his right to counsel by deploying Yager to surreptitiously interrogate Mr. Hammer and collect incriminating

71

evidence on its behalf. Until current government counsel finally disclosed this information during preparation for resentencing, the government had suppressed all information relating to Yager's status as an agent for the government. This information has direct bearing on Yager's credibility and reliability, and the government's suppression of this information prevented counsel from cross-examining Yager about his informant status, including the circumstances relating to this arrangement, any directions given by the government or conditions it placed on Yager's activities as its agent, and Yager's expectations in return for his clandestine service as an agent.

2.    *Facts Related to the Government's Failure to Disclose Exculpatory Evidence Regarding Classen.*

170.    The government also called inmate Classen during the initial trial as support for its contention that Mr. Hammer was guilty of premeditated intentional murder and to support the gateway intent factors and the substantial planning and premeditation aggravating factor it presented during the penalty hearing. NT Vol. 27 at 72-74; 77-78; 79-80. Classen testified to his observations of Mr. Hammer while he was a cellmate; statements Mr. Hammer purportedly made regarding Mr. Marti; and a letter the government contended that Classen had received from Mr. Hammer. NT Vol. 5 at 178-94; NT Vol. 6 at 3-80.

171.    Classen also testified that he had found the letter from Mr. Hammer on

the floor by the door of his cell at some point after Mr. Marti's death, but had flushed the note down the toilet without reading it in its entirety.  Id. at 17-18.  Yet despite his destruction of the note, the government claimed to have had a copy.  During his grand jury appearance, when AUSA Martin presented the note to him for identification, Classen testified that he "did not know that [the government] had  [the note]" and that he "thought it came right to [him]."  NT 8/28/96 at 15.  Mr. Martin responded that "[w]e work in strange and mysterious ways."  Id.

172.   At trial, Classen never positively identified the letter offered by the government (government exhibit 35.2) as the one he had received under his cell door and subsequently destroyed.  NT Vol. 6 at 19 (indicating that exhibit 35.2 was not the letter he received); id. at 32 (indicating that as far as he was concerned, he had never received exhibit 35.2).  Nevertheless, the government had Classen read the contents of that letter to the jury.  NT Vol. 6 at 20-23.

173.   The government's failure to disclose Yager's status as an agent had a direct impact on Mr. Hammer's ability to challenge the reliability of the Classen letter, (government's exhibit 35.2).  As noted previously, Classen had testified that he had flushed the document he had received down the toilet.  At trial, the government had contended that exhibit 35.2 was a copy of that document.  Classen never substantiated that contention.

174.   Had Mr. Hammer learned of the true circumstances about Yager's role

73

as an agent for the government, he would have been able to argue to the jury that, in light of Yager's status – and the attending motives and biases it created – the reliability of the government's contentions about exhibit 35.2 are, at best, questionable. Had the jury learned of those circumstances, there is a reasonable probability that it would have rejected the government's contention that exhibit 35.2 was the document found under Classen's cell door.

175. Classen also testified at trial that, other than his expectations for a letter of cooperation from Mr. Martin in support of a Rule 35 motion for his prosecution in Oregon and a recommendation to the Bureau of Prisons ("BOP") that Classen be housed in an institution other than a penitentiary, no agreements were made in exchange for his testimony. NT 6/10/98 at 4-5.

176. In response to Mr. Hammer's first discovery motion in these resentencing proceedings, the government disclosed for the first time various letters between Classen and AUSA Martin, some of which had been sent prior to and others after Mr. Hammer's initial trial. Exhibit 8. This previously suppressed correspondence provides a clearer picture of Classen's expectations as to the assistance he would receive from the government (and specifically from Mr. Martin) in obtaining a reduction of sentence should he provide helpful testimony against Mr. Hammer. Moreover, the correspondence establishes that Classen affirmatively sought, and apparently received, Mr. Martin's assistance both before and after Mr.

74

Hammer's trial as to where Classen would be housed. It demonstrates that Mr. Martin not only provided Classen assistance in obtaining a shorter sentence, but also intervened to expedite Classen's release from the custody of the Bureau of Prisons to a halfway house when Classen complained that he was not scheduled to be moved to the halfway house as quickly as he desired. In short, the correspondence demonstrates that Mr. Martin provided much more to Classen than merely recommending a sentence reduction and housing in a facility that was not a penitentiary, and, more importantly, that Classen believed these additional benefits were part of the original cooperation agreement.

177.    Although some of this correspondence predated his trial, the government failed to disclose it to Mr. Hammer. The suppression of this information denied Mr. Hammer the opportunity to fully confront Classen about his expectations of benefits in exchange for his testimony.

> 3.    *The Government's Failure to Disclose Exculpatory Evidence Related to Thomas Upton's Perjured Testimony.*

178.    The government relied upon Mr. Hammer's prior conviction in State v. Hammer, CRF-84-l3l0 (hereinafter "Upton case") as one of two convictions supporting the Section 3592(c)(2) aggravating factor. The Upton case involved charges that Mr. Hammer kidnapped Thomas Upton, robbed him with a firearm, and shot him with intent to kill. Mr. Upton testified at two preliminary hearings and trial

in that case.  Upton testified that, at the time of the incident, Mr. Hammer had approached Upton's car on the street brandishing a firearm and demanding that Upton drive to a motel.

179.    Mr. Upton also testified that, inside the motel room, he fought with Mr. Hammer and that Mr. Hammer struck him multiple times during that fight.  Mr. Upton also testified that at one point Mr. Hammer locked him in the bathroom, during which time Mr. Hammer made two phone calls.  Upton also testified that Mr. Hammer had forced him to drive to an area near some oil wells, ordered him to take off his clothes and lie on the ground, and then shot him multiple times with a large gun.  Mr. Upton testified that, after being shot, he got up and ran or walked away while Mr. Hammer screamed and then drove away in Upton's car.  See Exhibit 4.

180.    Mr. Upton's importance in the government's case for death against Mr. Hammer is underscored by the fact that he was the first witness the government called in the prior penalty hearing.  NT Vol. 15 (6/30/98) at 5.  Mr. Upton adopted and authenticated his preliminary hearing testimony from the Oklahoma case.  See NT Vol. 15 (6/30/98) at 6.  He also provided live testimony as to various aspects of the incident that was consistent with his prior testimony in Oklahoma.  See id. at 8 (indicating that Mr. Hammer assaulted him); id. at 9 (indicating that Mr. Hammer brandished a large gray weapon and ordered Upton to take him where he wanted to go); id. at 10 (indicating that Mr. Hammer forced Upton to accompany him to a motel

76

room).

181.   The government also presented testimony from the prosecutor in the Upton case, William Louis Keel.  During that testimony, the government elicited testimony that Mr. Hammer had been convicted of kidnapping, shooting with intent to kill, and robbery.  NT Vol. 16 (7/1/98) at 66.  The government also admitted into evidence the certified convictions.  See Tr. Govt. Exh. 4001.

182.   The government argued in its closing and in rebuttal that the jury should consider both the fact of the Upton convictions and the specific circumstances of the underlying incident in determining whether the government had proven its submitted aggravating factors, as a basis for rejecting Mr. Hammer's mitigation, and in finding that the government's reasons for death outweighed Mr. Hammer's reasons for life. See NT Vol. 27 at 62-63 (arguing the jury should find the prior conviction aggravator on the basis of these convictions); id. at 67 ("Mr. Upton was minding his own business in a truck on Classen Avenue . . . he was on Classen Avenue in Oklahoma City when Mr. Hammer with a firearm came up to him and basically commandeered his truck. He took him to a motel . . ."); NT Vol. 29 (7/23/98) at 19 (arguing that the jury should consider the convictions in aggravation); id. at 41 (arguing the Oklahoma incident and trial as a basis for rejecting mitigation evidence); id. at 56 (arguing the Oklahoma incident as support for escalation of violence).

183.   The prosecution employed various aspects of Upton's version of events

to bolster its theory of how Mr. Marti was killed. For example, it invoked Mr. Hammer's purported kidnapping and confinement of Mr. Upton as a "hostage theme" that was prevalent in Mr. Marti's death. Id. at 67 ("[I]t's always nice to have a hostage around. Again, you'll hear this hostage theme repeated, repeated and repeated"). The government argued that Mr. Hammer had used "deceit" and "lulled" Mr. Upton into believing he would not be hurt so as to get Mr. Upton to remove his clothes. Id. at 67-68. The prosecutor then employed the very same terms to describe what the government contended Mr. Hammer had done to Mr. Marti. Id. at 85.

184. On March 11, 2014, counsel received a notice from current government counsel pursuant to Brady v. Maryland, 373 U.S. 83 (1963) that on March 10, 2014, Mr. Upton had admitted facts to Capital Crimes Section Trial Attorney Haines and Special Agent Coyle demonstrating that he had testified falsely against Mr. Hammer in 1984 and 1998. Specifically, the notice indicated that Upton had admitted that he had voluntarily accompanied Mr. Hammer to the motel; that Mr. Hammer had not brandished a weapon and forced Mr. Upton to accompany him; that Mr. Upton was neither kidnapped nor carjacked; and that Mr. Upton had not been locked into the bathroom in the motel, although he did go into the bathroom so that Mr. Hammer could make a phone call. See Exhibit 1.

185. On March 13, 2014, the government provided counsel with an FBI 302 recounting further details of the interview, including multiple instances in which Ms.

Haines and/or Agent Coyle confronted Mr. Upton with the contradictions in his version of events.  See Exhibit 2.  On March 14, 2014, current government counsel sent Mr. Hammer's counsel an email that provided a further clarification of Mr. Upton's disclosures during the March 10, 2014 meeting.  Exhibit 3.

186.    The recently provided 302 also revealed that at or around the time of Mr. Hammer's initial trial, a person Upton believed to have been from the United States Attorney's Office had challenged Upton concerning his testimony in the Oklahoma trial.  Id.  Mr. Upton's revelation that he had been confronted by someone possibly from the United States Attorney's office demonstrates that the government knew or should have known that Mr. Upton had committed perjury in his Oklahoma testimony against Mr. Hammer.

187.    A review of the trial prosecutor's direct examination of Mr. Upton provides further evidence that the government at a minimum viewed Mr. Upton's testimony about critical facts of the Oklahoma incident as questionable.  During his direct examination, the prosecutor had Mr. Upton identify his preliminary testimony from the Oklahoma case.  Other than a single question as to whose decision it was to go to the motel room (NT Vol. 15 at 10), the prosecutor asked no questions about how Mr. Hammer came to be with Mr. Upton prior to the actual shooting.  The prosecutor asked nothing about Mr. Hammer accosting Mr. Upton's car at an intersection brandishing a firearm.  He asked nothing about what Mr. Hammer

79

purportedly told Mr. Upton in the car ride to the motel. He asked nothing about Mr. Upton being locked into the bathroom. Instead, the prosecutor skipped all of these circumstances altogether and limited his examination to questions about the shooting itself and what Mr. Upton had meant when he had indicated that Mr. Hammer had "schized out." NT Vol. 15 at 6-12. Thus, the prosecutor managed to avoid directly eliciting any of the false testimony, but was able to rely on that false testimony through the Oklahoma preliminary hearing transcript in arguing that Mr. Hammer should be put to death.

188. Despite this evidence demonstrating that the prosecution knew or should have known that Mr. Upton's testimony about critical aspects of the incident in Oklahoma prior to Mr. Hammer's trial was false, the prosecution said nothing. Instead, it was not until current government counsel provided the above disclosures that Mr. Hammer had any indication that the government was aware of Mr. Upton's false testimony.

**B.    The Government's Failure to Disclose This Material Favorable Evidence Violated the Fifth, Sixth and Eighth Amendments.**

189. Due Process requires a prosecutor to disclose to the accused favorable evidence that is material to either guilt or punishment. Brady v. Maryland, 373 U.S. 83, 87 (1963); Giglio v. United States, 405 U.S. 150, 153-56 (1972); United States v. Bagley, 473 U.S. 667, 676 (1985); Kyles v. Whitley, 514 U.S. 419, 437 (1995).

A prosecutor's duty to disclose is especially important in a capital case.  Kyles, 514 U.S. at 422.  The duty to disclose is on-going, and continues past a defendant's arrest, conviction, and sentencing.  Imbler v. Pachtman, 424 U.S. 409, 427 n.25 (1976).

190.   "Favorable evidence" under Brady includes evidence that impeaches the prosecution's theory or witnesses.  Bagley, 473 U.S. at 676; Napue v. Illinois, 360 U.S. 264, 269 (1959) ("The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence");see also Breakiron v. Horn, 642 F.3d 126, 133-34 (3d Cir. 2011) (noting that impeachment evidence, including evidence that the key prosecution witness "was a suspect in another criminal investigation pending" at the time of trial was clearly exculpatory under Brady); Simmons v. Beard, 590 F.3d 223, 235 (3d Cir. 2009) (prosecution's failure to disclose multiple items of impeachment evidence violated Brady); Wilson v. Beard, 589 F.3d 651, 662 (3d Cir. 2009) (same).

191.   Favorable evidence is material, and its non-disclosure prejudicial, "when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different."  Cone v. Bell, 556 U.S. 449, 469-70 (2009).  This "does not mean that the defendant 'would more likely than not have received a different verdict with the evidence,' only that the likelihood of a different result is great enough to 'undermine[ ] confidence in the outcome of the trial.'"  Smith v. Cain, 132 S. Ct. 627, 630 (2012) (quoting Kyles, 514 U.S. at 434).  When there is

a reasonable probability that the withheld evidence, if presented, could have provided a "reasonable doubt" about Petitioner's guilt, he is entitled to relief.  Kyles, 514 U.S. at 434; United States v. Agurs, 427 U.S. 97, 112 (1976) ("It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed");California v. Trombetta, 467 U. S. 479, 485 (1984); see also Hinton v. Alabama, 134 S. Ct. 1081, 1089 (2014) (per curiam) (describing the identical standard applicable in cases of ineffective assistance of counsel, as "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt").

192.  Further, in assessing materiality, the Court must consider "any adverse effect" the prosecution's suppression of evidence had on the defendant's ability to prepare for trial or present a defense.  Bagley, 473 U.S. at 683; United States v. Perdomo, 929 F.2d 967, 972 (3d Cir. 1991).

193.  Moreover, the determination of materiality as to undisclosed evidence cannot be considered in a vacuum.  Instead, the courts are required to consider the "cumulative effect of all such evidence suppressed by the government."  Kyles 514 U.S. at 421; see also Simmons, 590 F.3d at 234 ("In judging materiality in a case involving multiple Brady violations, the Supreme Court has mandated that the effect of the violations should be 'considered collectively, not item by item'") (quoting Kyles, 514 U.S. at 436); Wilson, 589 F. 3d at 659 ("the impact of the suppressed

82

evidence must be considered cumulatively, not individually").

### 1.    The Undisclosed Evidence About Yager.

194.    As noted previously, evidence that impeaches a critical prosecution witness falls squarely within that which the Fifth and Sixth Amendments require the government to disclose.  At trial, Yager portrayed himself as a confident of Mr. Hammer, who – by mere coincidence – happened to come across the information that the government presented in support of its theory of premeditation for murder, as well the penalty-phase intent gateway factors and substantial planning aggravating circumstance.  As the recent disclosures demonstrate, nothing could be further from the truth.  Instead, Yager was acting as an agent of the government and made affirmative efforts to elicit information that would advance the prosecution's case on guilt and penalty.

195.    Armed with this suppressed evidence, Mr. Hammer's counsel would have been able to confront Yager with evidence of his actual role and the obvious biases inherent in that role, and would have been able to paint a materially different picture of his credibility to the jury.  Counsel also would have been able to use the recently disclosed evidence about Yager's status and the government's misconduct to challenge the genesis and reliability of government Exhibit 35.2, the purported "letter" Classen received under his cell door.  As noted previously, Classen never identified the government's exhibit as the letter he received.  Yager's involvement as

an agent of the government, and the orderly who was delivering documents between various inmates, would have provided counsel with further avenues for challenging the government's theory that its exhibit is what Classen received.

196. The truth of Yager's secret status as a government agent undermines confidence in his testimony. Had the jury heard the actual circumstances of Yager's involvement as an agent of the government, there is a reasonable probability that it would have rejected his testimony. There is also a reasonable probability that the jury would have rejected the prosecution's theory that the letter the government presented as Exhibit 35.2 was the same document Classen had received under his cell door.

197. In addition, the government's misconduct relating to the Yager evidence infected Mr. Hammer's decision to plead guilty and materially impaired the preparation of his defense. Bagley, 473 U.S. at 683; United States v. Perdomo, 929 F.2d 967, 972 (3d Cir. 1991). Had Mr. Hammer been aware of the significant challenges to the key witnesses supporting the prosecution's guilt-theory, he would not have entered a guilty plea and the defense would likely have pursued a different defense theory. In short, the failure to disclose tainted all aspects of the defense and requires relief.

198. Nor would the result change if Yager had been sent in by the FBI agent without the knowledge of the prosecutor. First, given AUSA Martin's comments during Classen's grand jury testimony regarding the sudden appearance of a letter that

84

Classen thought he had flushed down the toilet, there is little doubt that the prosecution was well-aware of the arrangement between the FBI and Yager. Second, even if the government prosecutor was not directly aware (although the record evidence demonstrates that he was), the FBI and/or BOP investigators who were part of the same prosecution team knew that Yager had been deployed as an agent of the government to circumvent Mr. Hammer's invocation of his right to counsel. Thus, the government is charged with knowledge of the arrangement. United States v. Risha, 445 F. 3d 298, 305 (3d Cir. 2006). Accordingly, the government's failure to disclose this information to Mr. Hammer pretrial violated the Fifth and Sixth Amendments.

> 2. *The Undisclosed Evidence Regarding the True Nature and Extent of Classen's Expectations for Benefits in Exchange for His Cooperation Was Exculpatory and Material.*

199. As described above, the government's failure to disclose pretrial correspondence between Mr. Martin and Classen prevented counsel from challenging Classen's and the government's false contention at trial that the only benefits that Classen expected to receive in exchange for his testimony were the government's recommendation that Classen receive a reduced sentence and placement at a less-restrictive federal prison. As the previously undisclosed letters demonstrate, Classen believed that the government would not only recommend these benefits, but affirmatively assist him with his conditions of confinement, with his encounters with

85

"SIS" investigators, with his early placement in a halfway house, and in obtaining other benefits.

200. The correspondence also demonstrates that, by the time of trial, Classen felt free to refer to Mr. Martin and Agent Malucu by their first names and expected that Mr. Martin would respond to his requests for special arrangements.

201. As noted previously, Classen's testimony was critical to the government's theory of intent to commit murder as well as the prosecution's theory regarding the gateway intent factor and aggravation. Had the jury learned the true nature and extent of the benefits Classen expected in exchange for his testimony, there is a reasonable probability that it would have rejected his testimony and reached a different result.

202. In addition, government's suppression of exculpatory evidence that undermined the reliability of Classen's testimony and the inferences the government sought to draw from that evidence wrongfully induced Mr. Hammer's decision to plead guilty and materially and adversely affected the preparation of his defense. Had Mr. Hammer been aware of these significant challenges to the key witnesses supporting the prosecution's guilt theory, he would not have entered a guilty plea. Thus, the prosecution's failure to disclose tainted all aspects of the defense and requires relief.

86

> 3.    *The Undisclosed Evidence Regarding Upton's Perjury Was Exculpatory and Material.*

203.    As noted above, Thomas Upton testified falsely about critical circumstances of the incident that resulted in Mr. Hammer's convictions in Oklahoma.  Also as noted above, the government relied heavily on Mr. Upton's perjured description of that incident as support for the intent factor and statutory aggravator and to rebut Mr. Hammer's mitigating evidence.

204.    Evidence contradicting Mr. Upton's version of events and undermining the reliability of the Oklahoma convictions was clearly exculpatory.  His Oklahoma preliminary hearing testimony and his trial testimony in this case were critical to the government's case for both the intent factors and the aggravating factors.  As noted above, the prosecutor drew direct connections between the circumstances of the Upton incident as described in Upton's perjured testimony and the circumstances of Mr. Marti's death.

205.    Had Mr. Hammer known pretrial that Upton had admitted that the version of events he provided regarding the Oklahoma incident was false, he would have moved pretrial to preclude the government from relying on those convictions as support for a death sentence.  In light of the facts disclosed by current government counsel, there is a reasonable probability that such a motion would have been granted.

206.    Even if the government had been able to overcome a motion to preclude

87

the admission of any evidence surrounding those convictions, materiality is nevertheless demonstrated because had the jury learned that Upton's version of events was false, there is a reasonable probability it would have rejected the statutory intent and aggravation; rejected the prosecution's attempts to draw connections between the Upton case and Mr. Marti's death; rejected the prosecution's theory that the circumstances of the Upton case rebuts mitigation; and reached a different verdict. For each of these reasons, materiality is demonstrated and relief is required.

    *4. The Cumulative Impact of All the Evidence Now Known to Have Been Suppressed by the Government Demonstrates Materiality and Mr. Hammer's Entitlement to Relief.*

207. As noted previously, in determining materiality/prejudice, the courts are required to consider the "cumulative effect of all such evidence suppressed by the government." <u>Kyles</u> 514 U.S. at 421; <u>Simmons</u>, 590 F.3d at 234; <u>Wilson</u>, 589 F. 3d at 659. The history of this case reveals a troubling pattern of non-disclosure by the prosecution.

208. The Court vacated Mr. Hammer's death sentence and ordered a resentencing hearing on the basis of the government's failure to disclose FBI 302 witness statements that "were material, relevant and critical to counter the Government's argument concerning substantial planning and premeditation during the penalty phase of this case." <u>Hammer</u>, 404 F. Supp. 2d at 789. Current government counsel have now disclosed even more evidence that had previously been

suppressed that is "material, relevant and critical to counter the Government's argument concerning substantial planning and premeditation," as well as the gateway intent factors for a capital sentencing determination. But, these additional disclosures are also "material, relevant and critical to counter" the prosecution's case for intentional murder.

209. The cumulative impact of the government's patent disregard for its obligations to disclose favorable evidence demonstrates that Mr. Hammer is not only clearly entitled to a new penalty hearing, he is also entitled to a new trial.

**C.    The Prosecution's Presentation of Materially False and/or Misleading Testimony and Argument Violated the Fifth, Sixth, and Eighth Amendments.**

210. The Government's "interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done. . . . It is as much [the prosecutor's] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." Berger v. United States, 295 U.S. 78, 88 (1935). The use of false, inaccurate, or misleading prosecutorial testimony violates due process and denies a defendant a fair trial whenever "the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury." Napue v. Illinois, 360 U.S. 264, 271 (1959); Giglio v. United States, 405 U.S. 150 (1972); Carter v. Rafferty, 826 F.2d 1299 (3d Cir. 1987).

89

Likewise, a verdict that is the product of a material misapprehension of law or fact violates due process.  Townsend v. Burke, 334 U.S. 736, 741 (1948); Roberts v. United States, 445 U.S. 552, 556 (1980); United States v. Tucker, 404 U.S. 443, 447 (1972).[12]

211.   Moreover, the Supreme Court has long recognized that, because of its unparalleled severity and irrevocability, death differs fundamentally from any other punishment.  See Ford v. Wainwright, 477 U.S. 399, 411 (1986); Woodson v. North Carolina, 428 U.S. 280, 305 (1976).  It also "has repeatedly said that under the Eighth Amendment 'the qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination.'" Caldwell v. Mississippi, 472 U.S. 320, 328-29 (1985) (citation omitted); Woodson, 428 U.S. at 305; Eddings v. Oklahoma, 455 U.S. 104, 118 (1982) (O'Connor, J., concurring) (because of the exceptional and irrevocable nature of the death penalty, due process and the Eighth Amendment require "extraordinary measures" to ensure

---

[12]See also United States v. Levy, 865 F.2d 551, 559-60 (3d Cir. 1989) (en banc) ("sentencing on the basis of materially untrue assumptions violates due process"); United States v. Kerley, 838 F.2d 932, 940 (7th Cir. 1988) (Posner, J.) ("a sentence predicated on misinformation cannot stand"); King v. Hoke, 825 F.2d 729, 724 (2d Cir. 1987) ("material false assumptions as to any facts relevant to sentencing . . . renders the entire sentencing procedure invalid as a violation of due process"); United States v. Ruster, 712 F.2d 409, 412 (9th Cir. 1983) (due process violated when sentencer "relies on materially false or unreliable information in sentencing a defendant").

the reliability of capital proceedings).  This proposition, which applies equally to the guilt and penalty phases of a capital trial, see, e.g., Beck v. Alabama, 447 U.S. 625, 637-38 (1980) (guilt); Lockett v. Ohio, 438 U.S. 586, 604 (1978) (penalty), is one of the most clearly established principles of Eighth Amendment law.  See also Gardner v. Florida, 430 U.S. 349, 357-58 (1977) (plurality opinion); id. at 363-64 (White, J., concurring); Lockett, 438 U.S. at 604; Godfrey v. Georgia, 446 U.S. 420, 427-28 (1980); Beck, 447 U.S. at 637-38; Zant v. Stephens, 462 U.S. 862, 884-85 (1983); California v. Ramos, 463 U.S. 992, 998-99 & n.9 (1983); Ake v. Oklahoma, 470 U.S. 68, 78 (1985); id. at 87 (1985) (Burger, C.J., concurring); Caldwell v. Mississippi, 472 U.S. 320, 328-29 (1985); Turner v. Murray, 476 U.S. 28, 36-37 (1986); Ford v. Wainwright, 477 U.S. 399, 411 (1986); Mills v. Maryland, 486 U.S. 367, 383-84 (1988); Johnson v. Mississippi, 486 U.S. 578, 584-85 (1988).

212.   The recent disclosures demonstrate that the government relied on materially misleading testimony and argument that painted a picture of Yager as having obtained information by happenstance when, in fact, he had actually been secretly deployed as an agent of the government for the specific purpose of eliciting incriminating evidence from Mr. Hammer.  The government relied on that materially misleading picture in arguing that the jury should credit Yager's testimony as support for its theory of intentional murder and its theory of aggravation in support of a death sentence.  The government did so, knowing that it was suppressing evidence that

91

could rebut those assertions and knowing that the defense had no way of presenting that evidence because the government had concealed it.

213.  The government also argued that the jury should credit Classen's testimony and the government's Exhibit 35.2 (purporting to be a letter Classen received from Mr. Hammer) in support of its theory of intentional murder and aggravation, knowing full well that the jury was unaware of the nature and extent of Classen's expectations for benefits in exchange for his testimony and of the questionable circumstances surrounding the purported letter.    Likewise, the government made these arguments knowing that the defense was powerless to present evidence attacking them because the government had withheld that evidence.

214.  Finally, the government argued that the jury should credit Upton's preliminary hearing testimony and his testimony at Mr. Hammer's trial as support for the intent factors and aggravation knowing that Upton's testimony was materially false, that the Upton conviction was unreliable, and that as a result it was presenting a materially false depiction of Mr. Hammer's criminal record, and also knowing that the defense was powerless to prove any of this false because the government had failed to disclose that evidence.

215.  There is a reasonable likelihood for *each* of these instances, that "the false testimony could . . . have affected the judgment of the jury," Napue, 360 U.S. at 271, as to guilt, as to the gateway determination of death-eligibility, as to the jury's

92

finding of aggravation and rebuttal of mitigation, and as to the jury's ultimate determination that aggravating circumstances outweighed mitigating circumstances. Collectively, there can be no doubt that the jury's judgment would have been affected.

216.   There is an unacceptable risk for *each* of these instances that the jury's guilt and penalty verdicts were "imposed on the basis of 'misinformation of constitutional magnitude.'" Roberts, 445 U.S. at 556.  This is particularly so with respect to the government's exploitation of Upton's perjury, which caused the jury to sentence Mr. Hammer "on the basis of assumptions concerning his criminal record which were materially untrue." See also Tucker, 404 U.S. at 447.  Collectively, there can be little doubt that Mr. Hammer's verdict was the direct by-product of a jury that was operating under broad misapprehensions of material fact.

217.   The jury's exposure to this evidence not only violated due process, but the Eighth Amendment, because it resulted in "a death sentence imposed by a jury that was allowed to consider materially inaccurate evidence." Tuggle v. Netherland, 516 U.S. 10, 14 (1995) (per curiam) (citing Johnson v. Mississippi, 486 U.S. at 590). The Eighth Amendment violations are even clearer because the misrepresentations facilitated by the prosecution's suppression of the true evidence meant that the jury's verdict was not based upon evidence that was "properly adduced at the sentencing hearing" and its evidence presented in aggravation was not "fully subject to

93

explanation by the defendant." Tuggle, 516 U.S. at 13.  In addition, the use of the perjured evidence from the Upton case to rebut Mr. Hammer's mitigating evidence unconstitutionally impaired the jury's consideration of that mitigating evidence by preventing the jury from giving it full effect as a basis to spare Mr. Hammer's life. Penry v. Lynaugh, 492 U.S. 302, 307 (1989); Hitchcock v. Dugger, 481 U.S. 393, 394 (1987); Skipper v. South South Carolina, 476 U.S. 1, 4 (1986); Eddings v. Oklahoma, 455 U.S. 104, 110-12 (1982); Lockett v. Ohio, 438 U.S. 586, 605 (1978).

218.   Finally, the government's misconduct denied Mr. Hammer the effective assistance of counsel and the ability to confront the witnesses and evidence against him that the Sixth Amendment requires he be provided, as well as the Fifth and Sixth Amendment right to present a defense.

219.   Individually and cumulatively, the instances of the government's reliance on materially misleading and/or false testimony and argument violated the Fifth, Sixth, and Eighth Amendments.  Relief is required.

**CLAIM V.   THE JURY'S CONSIDERATION OF CONVICTIONS AND EVIDENCE THAT WERE THE PRODUCT OF PERJURY IN REACHING ITS SENTENCING DETERMINATION VIOLATED THE FIFTH, SIXTH AND EIGHTH AMENDMENTS.**

220.   All prior allegations contained in the initial Section 2255 Motion and its prior Amendments are incorporated as if fully set forth herein.

221.   As noted previously, see Claims I and IV, the government relied upon

94

Mr. Hammer's prior conviction in State v. Hammer, CRF-84-l3l0 (hereinafter "Upton case") as one of two convictions supporting the Section 3592(c)(2) aggravating factor. As the government's recent disclosures now make clear (see Exhibits 1-3), these convictions were procured by perjury and are constitutionally invalid. Also as noted previously, the government relied upon Mr. Upton's false and materially misleading testimony as support for its statutory and non-statutory aggravating evidence, to rebut Mr. Hammer's mitigating evidence, and to tip the weighing process between aggravation and mitigation in favor of death. The jury's consideration of the constitutionally invalid convictions and Mr. Upton's false and misleading testimony in reaching its sentencing determination violated the Fifth, Sixth, and Eighth Amendments.

**A.     The Jury's Consideration of Constitutionally Invalid Convictions that Were the Product of Perjured Testimony In Reaching Its Sentencing Determination Violated The Fifth and Eighth Amendments.**

222.     An aggravating factor cannot be based in whole or in part on a conviction that is itself either invalid or nonexistent. Johnson v. Mississippi, 486 U.S. 578, 586 (1988) (where petitioner's death sentence was based in part on reversed conviction, death sentence vacated because the prior conviction "provided no legitimate support for the death sentence"); see also Duest v. Singletary, 967 F.2d 472, 480 (11th Cir.) (sentencer's consideration of a vacated conviction in support of

95

Florida prior conviction of violent felony aggravating factor was Eighth Amendment error), *vacated on other grounds*, 507 U.S. 1048 (1992), *after remand*, 997 F.2d 1336 (11th Cir. 1993); Harris ex rel. Ramseyer v. Blodgett, 853 F. Supp. 1239, 1277 (W.D. Wash. 1994) (sentence vacated where aggravating circumstance was supported by conviction that had been dismissed prior to sentencing proceedings), *aff'd on other grounds*, 64 F.3d 1432 (9th Cir. 1995); Ward v. State, 827 S.W.2d 110, 114-15 (Ark. 1992) (introduction of unsubstantiated allegations of prior offenses invalidated previous conviction aggravating factor).

223. Current government counsel's recent disclosure demonstrates that the convictions were the product of perjury and, as a result, were – and are – constitutionally invalid. Mr. Upton admits committing perjury, but continues to maintain that the portion of his testimony regarding the shooting itself was truthful. That, however, does not diminish the constitutional violations arising from the jury's reliance upon the convictions and Mr. Upton's tainted testimony as grounds to take Mr. Hammer's life. First, Mr. Upton's admitted perjury with respect to substantial, critical aspects of this incident renders the remainder of his testimony, including the version of the shooting to which he testified, constitutionally unreliable. Second, the government's evidentiary presentation and argument was not limited solely to the fact that Mr. Hammer was convicted of the shooting. Instead, the government elicited, and the jury considered, the convictions for kidnapping and robbery that were a direct

product of Mr. Upton's false testimony.  NT Vol. 16 at 66 (eliciting from former prosecutor Keel that Mr. Hammer had been convicted of kidnapping and robbery as a result of the Upton incident).

224.  Nor (even assuming the validity of these convictions) did the government confine its presentation of evidence and argument to the fact that Mr. Hammer had been convicted of all these charges.  Instead, the government presented Upton's prior (perjured) testimony that falsely described the circumstances leading up to the shooting.  Then it argued that the jury should consider purported similarities between those circumstances and the government's theory with regard to the circumstances of the death of Mr. Marti.  For example, the government invoked Upton's perjured testimony regarding Mr. Hammer's purported kidnapping and confinement of Mr. Upton to falsely argue that the two cases shared a "hostage theme" that was prevalent in Mr. Marti's death.  Id. at 67 ("[I]t's always nice to have a hostage around.  Again, you'll hear this hostage theme repeated, repeated and repeated").  The government then invoked more of Upton's perjured testimony to tell the jury that Mr. Hammer had used "deceit" and "lulled" Mr. Upton into believing he would not be hurt, so as to get Mr. Upton to remove his clothes.  Id. at 67-68.  The prosecutor then employed the very same terms to describe what the government contended Mr. Hammer had done to Mr. Marti.  Id. at 85.

225.  Thus, even if the Court were to believe Mr. Upton's current contention

97

that he lied about virtually everything else but still told the truth about the manner in which the shooting occurred, that would not obviate the need for relief. The prosecution's reliance on any aspect of Mr. Upton's perjured testimony as evidence of what Mr. Hammer purportedly did in this case, its reliance on any aspect of his perjured testimony as evidence of Mr. Hammer's death-eligibility or death-worthiness, its reliance on any aspect of his perjured testimony to rebut Mr. Hammer's mitigating evidence, and its reliance on any aspect of his perjured testimony to find that reasons for death outweighed reasons for life each violated the Fifth and Eighth Amendments. And given his pervasive perjury, the jury's reliance on not just Mr. Upton's admitted perjuries, but anything out of his mouth regarding this incident violated the Fifth and Eighth Amendments.

**B.      The Jury's Consideration of Evidence Surrounding Convictions that Were the Product of Perjury In Reaching Its Sentencing Determination Violated the Fifth and Eighth Amendment Prohibition Against A Sentencing Verdict Based on False, Materially Misleading and/or Inaccurate Testimony.**

226.  A sentence based upon false, inaccurate, and unreliable evidence, violates due process and the Eighth Amendment. Johnson v. Mississippi, *supra*; Tuggle v. Netherland, 516 U.S. 10, 14 (1995) (per curiam) ("a death sentence imposed by a jury that was allowed to consider materially inaccurate evidence" violates the Eighth Amendment, citing Johnson); Clemons v. Mississippi, 494 U.S.

98

738, 754 n.5 (1990) (explaining <u>Johnson</u> as finding Eighth Amendment error where the jury was permitted "to consider evidence that [was] revealed to be materially inaccurate" (quoting <u>Johnson</u>, 486 U.S. at 590));  <u>Townsend v. Burke</u>, 334 U.S. 736, 741 (1948) (due process violated when "prisoner was sentenced on the basis of assumptions concerning his criminal record which were materially untrue"); <u>United States v. Tucker</u>, 404 U.S. 443, 447 (1972)); <u>Roberts v. United States</u>, 445 U.S. 552, 556 (1980) (reaffirming that due process precludes "sentences imposed on the basis of 'misinformation of constitutional magnitude'");[13] <u>see also</u> <u>United States v. Levy</u>, 865 F.2d 551, 559-60 (3d Cir. 1989) (en banc) (vacating sentence imposed because "sentencing on the basis of materially untrue assumptions violates due process"), *aff'd after remand sub nom.* <u>Gozlon-Peretz v. United States</u>, 498 U.S. 395 (1991); <u>United States v. Kerley</u>, 838 F.2d 932, 940 (7th Cir. 1988) (Posner, J.) ("a sentence predicated on misinformation cannot stand"); <u>King v. Hoke</u>, 825 F.2d 720, 724 (2d Cir. 1987) ("It is well established that . . . material false assumptions as to any facts relevant to sentencing, renders the entire sentencing procedure invalid as a violation of due process."); <u>United States v. Ruster</u>, 712 F.2d 409, 412 (9th Cir. 1983) (due process violated when sentencer "relies on materially false or unreliable information

---

[13]There is no question that perjury qualifies as "misinformation of constitutional magnitude." <u>See</u>, <u>e.g.</u>, <u>Imbler v. Pachtman</u>, 424 U.S. 409, 431 n.34 (1976) (citing cases discussing, *inter alia*, the constitutional prohibition against using perjured testimony).

in sentencing a defendant").

227.    The 1984 convictions, Mr. Upton's prior testimony and his testimony during the 1998 sentencing hearing were the product of perjury. The jury's consideration of this false and materially misleading testimony and evidence in determining the government's aggravation, the strength of the mitigation evidence, and in weighing aggravation and mitigation in reaching its sentencing determination violates the Fifth and Eight Amendment prohibition against a verdict based on false, materially misleading, and/or inaccurate evidence.

**C.      The Jury's Consideration of The False and Materially Misleading Testimony and Evidence Arising from the Upton Convictions In Reaching Its Sentencing Determination Violated Mr. Hammer's Fifth, Sixth, and Eighth Amendment Rights to a Verdict Based on Competent, Reliable Evidence.**

228.    Due process affords a criminal defendant the right to a verdict based on competent, reliable evidence and the law. Chandler v. Florida, 449 U.S. 560, 574 (1981); see also Irvin v. Dowd, 366 U.S. 717, 722 (1961). That right is protected not just by due process, but by the Sixth Amendment. United States v. Gaudin, 515 U.S. 506, 514 (1995). And when a defendant is on trial for his life, the Eighth Amendment requires the State to "channel the sentencer's discretion by 'clear and objective standards' that provide 'specific and detailed guidance,' and that 'make rationally reviewable the process for imposing a sentence of death.'" Godfrey v. Georgia, 446

100

U.S. 420, 428 (1980). Because the government "has a constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty," id., a death sentence that is based on the consideration of perjured and/or materially misleading or false testimony or arguments that are outside the scope of the applicable law is unconstitutionally arbitrary and capricious.

229.    Here, the jury considered perjured testimony and materially misleading, inherently unreliable evidence regarding the circumstances of the Upton shooting in sentencing Mr. Hammer to death. Rather than seeking to avoid arbitrariness, the government embraced Upton's perjury and urged the jury to consider the purported similarities between various (false) circumstances of the Upton case and what it wanted the jury to conclude in a wide range of its fact-finding functions. It employed perjured evidence and perjury-poisoned argument about the purported circumstances of the Upton case as grounds for the jury to make judgments about the circumstances of this case, to find statutory and non-statutory aggravation, to reject Mr. Hammer's mitigating evidence, and to find that aggravation outweighed mitigation and warranted imposing a death sentence. With the perjured testimony central to the government's argument at every stage of the jury's fact-finding responsibilities, the risk that it affected the jury's verdict is unacceptably high, and one can have no confidence that the perjury did not taint the penalty verdict. With confidence in the penalty verdict so completely undermined, Mr. Hammer has easily proven that there

101

is a reasonable probability that the jury accepted the prosecution's perjured evidence and false argument and reached its sentencing determination on the basis of patently unconstitutional considerations.   Relief is required under the Fifth and Eighth Amendments.

      **D.**      **The Jury's Consideration of the Convictions and Evidence that Were the Product of Perjury In Reaching Its Sentencing Determination Violated the Fifth and Eighth Amendment Heightened Reliability Standards.**

230.   The United States Supreme Court has long recognized that, because of its unparalleled severity and irrevocability, death differs fundamentally from any other punishment.   See Ford v. Wainwright, 477 U.S. 399, 411 (1986); Woodson v. North Carolina, 428 U.S. 280, 305 (1976).   It also " has repeatedly said that under the Eighth Amendment 'the qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination.'"   Caldwell v. Mississippi, 472 U.S. 320, 328-29 (1985) (citation omitted); Woodson, 428 U.S. at 305; Eddings v. Oklahoma, 455 U.S. 104, 118 (1982) (O'Connor, J., concurring) (because of the exceptional and irrevocable nature of the death penalty, due process and the Eighth Amendment require "extraordinary measures" to ensure the reliability of capital proceedings).   This proposition, which applies equally to the guilt and penalty phases of a capital trial, see, e.g., Beck v. Alabama, 447 U.S. 625, 637-38 (1980) (guilt); Lockett v. Ohio, 438 U.S. 586, 604

102

(1978) (penalty), is one of the most clearly established principles of Eighth Amendment law.  See also Gardner v. Florida, 430 U.S. 349, 357-58 (1977) (plurality opinion); id. at 363-64 (White, J., concurring); Lockett, 438 U.S. at 604; Godfrey v. Georgia, 446 U.S. 420, 427-28 (1980); Beck, 447 U.S. at 637-38; Zant v. Stephens, 462 U.S. 862, 884-85 (1983); California v. Ramos, 463 U.S. 992, 998-99 & n.9 (1983); Ake v. Oklahoma, 470 U.S. 68, 78 (1985); id. at 87 (1985) (Burger, C.J., concurring); Caldwell v. Mississippi, 472 U.S. 320, 328-29 (1985); Turner v. Murray, 476 U.S. 28, 36-37 (1986); Ford v. Wainwright, 477 U.S. 399, 411 (1986); Mills v. Maryland, 486 U.S. 367, 383-84 (1988); Johnson v. Mississippi, 486 U.S. 578, 584-85 (1988).

231.   A death sentence based, in whole or in part, on perjured testimony not only fails to meet the heightened reliability standards, it fails to meet any reliability standard.   The jury's consideration of Mr. Upton's perjured testimony, the constitutionally invalid convictions, and the materially misleading evidence regarding the circumstances of the Upton case in sentencing Mr. Hammer to death violated the Fifth and Eight Amendments.

**E.     The Admission of Evidence of Convictions that Were the Product of Perjury Violates the Fifth and Eighth Amendment Prohibition Against an Arbitrary and Capricious Sentencing Determination.**

232.   When a defendant is on trial for his life, the Eighth Amendment requires

the government to "channel the sentencer's discretion by 'clear and objective standards' that provide 'specific and detailed guidance,' and that 'make rationally reviewable the process for imposing a sentence of death.'" Godfrey, 446 U.S. at 428. "It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion." Gardner v. Florida, 430 U.S. 349, 358 (1977).  Because the government "has a constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty," id., a death sentence that is based on the consideration of factors that are outside the scope of the applicable law is unconstitutionally arbitrary and capricious.

233.  Perjured testimony and convictions that were the product of perjured testimony are clearly not proper considerations for determining whether or not death is the appropriate sentence.  Exposing the jury to the constitutionally invalid convictions, Mr. Upton's perjured testimony and materially misleading evidence resulted in an arbitrary and capricious sentencing determination in violation of the Eighth Amendment.

**F.    Conclusion.**

234.  The jury's exposure to, and consideration of, perjured testimony, invalid convictions, and materially misleading evidence violated the Fifth, Sixth, and Eighth

Amendments under numerous different constitutional theories. Individually and collectively, the constitutional violations arising from the improper use of this evidence requires relief.

**CLAIM VI. THE GOVERNMENT'S RELIANCE ON CONVICTIONS AND SENTENCES THAT WERE THE PRODUCT OF PERJURY AND MATERIALLY FALSE AND MISLEADING TESTIMONY AND EVIDENCE IN REACHING ITS CAPITAL AUTHORIZATION DETERMINATION AND ITS SUBSEQUENT DEAUTHORIZATION DETERMINATIONS VIOLATED THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS.**

235.    All prior allegations contained in the initial Section 2255 Motion and its prior Amendments are incorporated as if fully set forth herein.

236.    As described throughout this *Motion*, Mr. Upton's perjured testimony in Oklahoma formed the basis for Mr. Hammer's constitutionally invalid convictions and sentence of 1200 years imprisonment.

237.    From the start of this capital prosecution, the government has repeatedly highlighted these convictions and the 1200-year sentence and argued that they are highly relevant evidence that Mr. Hammer should be sentenced to death. The government first presented evidence relating to these convictions and the 1200-year sentence to the Grand Jury. See Claim I. Then, during the penalty hearing, it presented both the fact of the convictions and the purported circumstances that resulted in the convictions. Upton's perjured testimony was at the core of the government's argument for death during the penalty hearing. See NT Vol. 27 at 62-

63 (arguing the jury should find the prior conviction aggravator on the basis of the Upton convictions); id. at 67 ("Mr. Upton was minding his own business in a truck on Classen Avenue[,] . . . he was on Classen Avenue in Oklahoma City when Mr. Hammer with a firearm came up to him and basically commandeered his truck. He took him to a motel . . . ."); NT Vol. 29 (7/23/98) at 19 (arguing that the jury should consider the Upton convictions in aggravation); id. at 41 (arguing the Oklahoma incident and trial as a basis for rejecting mitigation evidence); id. at 56 (arguing the Oklahoma incident as support for escalation of violence).

238.    The government unsuccessfully sought to inform the jury that Mr. Hammer had received a 1200-year sentence as a result of those convictions, see NT 7/1/98 at 71, and despite having being barred from presenting that evidence at the initial sentencing continued to pursue its admission during these resentencing proceedings.    See Consolidated Opposition to Mr. Hammer's Motions in Limine (Doc. 1550) at 11 (arguing that this Court should reconsider the prior ruling precluding the admission of evidence of the 1200-year sentence).

239.    Given the emphasis the government has placed on these convictions and the 1200-year sentence at every stage in which any other fact-finder was to make a decision about this case, there is no question that the government considered – and most likely applied great weight to – these convictions and Mr. Hammer's 1200-year sentence when it reached its initial decision to authorize the penalty and its two

106

subsequent determinations not to deauthorize this capital prosecution. Indeed, its own protocols for capital authorization stress that it must consider as a reason favoring pursuing the death penalty "[w]hether the defendant is already serving a substantial sentence such that an additional sentence of incarceration would have little punitive impact." United States Attorneys' Manual, Death Penalty Protocol § 9-10.130 D(7) (hereafter Protocol).[14]

240. The government's consideration of convictions and a 1200-year sentence that were procured by and the product of perjured testimony in its decisions first to authorize and then not deauthorizate the death penalty in this case violated the Fifth, Sixth, and Eighth Amendments.

**A.** **The Government's Consideration of Convictions and Sentences that Were the Product of Perjury in Reaching the Capital Authorization Determination Violated the Government's Own Protocols and Due Process.**

241. When the government sets up specific processes and procedures for reaching determinations, like a determination to capitally prosecute an accused, the process and procedure followed by the government must conform with due process. See Evitts v. Lucey, 469 U.S. 387, 393 (1985) (due process interest in state created right to direct appeal); see also Hicks v. Oklahoma, 447 U.S. 343, 346 (1980) (liberty

---

[14]These protocols are published on the Department of Justice's website at http://www.justice.gov/usao/eousa/foia_reading_room/usam/title9/10mcrm.htm#9 -10.010.

interest in state-created capital sentencing procedures); <u>Ford v. Wainwright</u>, 447 U.S. 399, 427-31 (1986) (O'Connor, J., concurring) (liberty interest in state-created right to proceedings to determine competency to be executed); <u>Ohio Adult Parole Authority v. Woodard</u>, 523 U.S. 272, 289 (1998) (O'Connor, J, with Souter, Ginsburg & Breyer, JJ., concurring) (life interest in state-created right to capital clemency proceedings); <u>id</u>. at 290-91 (Stevens, J., concurring).

242.  The government established specific protocols for determining whether to capitally prosecute a federal defendant.  In setting forth the purpose of the capital case review process, the protocols require that "[e]ach . . .  decision must be based upon the facts and law applicable to the case and be set within a framework of consistent and even-handed national application of Federal capital sentencing laws." Protocol § 9-10.030.  The protocols further provide that "[a]rbitrary or impermissible factors . . . will not inform any stage of the decision-making process."  <u>Id.</u>  As noted previously, the protocols include within the standards for determining if a particular case should be capitally prosecuted whether the accused is currently serving a "substantial sentence such that an additional sentence of incarceration would have little punitive impact."  <u>Id.</u> § 10.130 D(7).

243.  There is no debating whether a sentence of 1200 years falls within this factor:  if a sentence of more than a century plus two lifetimes does not, it is hard to conceive of a sentence that does.  Indeed, as Mr. Hammer demonstrated in his most

recent deauthorization submission, a number of cases involving greater aggravation and/or more heinous acts than present in his case were not authorized. See Exhibit 15. Some – if not all – of the reviewers undoubtedly considered Mr. Hammer's 1200-year sentence as the distinguishing factor between Mr. Hammer's case and those cases in which death was not authorized.

244. The reviewers' consideration of a sentenced based upon perjured testimony violated the government's own protocols for a number of reasons. It violated the standard requiring that decisions be based on the applicable facts and law, as there is no legitimate basis for considering perjured testimony.[15] It violated the standard prohibiting the consideration of arbitrary and capricious factors, for what could be more arbitrary than basing a decision on fabricated "facts." The reviewers' consideration of the "substantial sentence" was tainted by the fact that the 1200 year sentence arising from the perjured testimony was constitutionally invalid. Its consideration of the constitutionally invalid convictions and 1200-year sentence that

_____

[15]If a sentence that is the product of a material misapprehension of law or fact about a defendant's record violates due process, Townsend v. Burke, 334 U.S. 736, 741 (1948); Roberts v. United States, 445 U.S. 552, 556 (1980); United States v. Tucker, 404 U.S. 443, 447 (1972), it is inconceivable that the pursuit of a death sentence based upon perjury does not. Upton's perjury materially alters Mr. Hammer's criminal record and demonstrates the falsity of the underlying facts upon which his convictions and century-plus sentence rests. Reliance upon Upton's perjury left the authorizing committee to act "on the basis of assumptions concerning [Mr. Hammer's] criminal record which were materially untrue," Townsend, 334 U.S. at 741; Tucker, 404 U.S. at 447, in violation of due process.

109

were the product of perjury tainted the weighing process and compromised the reviewers' mandate to reach a determination based on "consistent and even-handed national application of Federal capital sentencing laws." In short, Mr. Upton's perjury polluted all aspects of the government's deauthorization determination.

245. Even if the government's consideration of perjury in reaching its authorization determination did not violate its own protocols, it nevertheless does violate due process for a number of reasons. First, while Mr. Hammer may have received some process by the government, he most assuredly did not receive the same process and consideration provided to other capital eligible defendants in which the factors considered by the reviewers were based on the facts and the law rather than perjury and materially false evidence. Accordingly, the process provided to Mr. Hammer violated his Fifth Amendment right to equal protection.

246. Moreover, even if other courts have found that, because prosecutorial discretion differs from other types of agency discretion, there is no enforceable right under the protocols,[16] those decisions do not involve a prosecutorial determination that relied on perjury. That distinction is not insignificant.

247. "The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as

---

[16]See United States v. Lee, 274 F. 3d 485, 492-493 (8th Cir. 2001).

110

compelling as its obligation to govern at all." Berger v. United States, 295 U.S. 78, 88 (1935). It has a heightened obligation to follow the law.

248. Further, "[t]he principle that [the government] may not knowingly use false evidence, including false testimony, to obtain a tainted conviction [is] implicit in any concept of ordered liberty." Napue v. Illinois, 360 U.S. 264, 269 (1959); Agurs v. United States, 427 U.S. 97, 103 (1976) ("a conviction obtained by the knowing use of perjured testimony is fundamentally unfair"), quoted in Kyles v. Whitley, 514 U.S. 419, 433 n.7 (1995). For the same reasons that use of perjured testimony violates due process at trial, its use to secure authorization to undertake a prosecution to take a defendant's life offends our concept of ordered liberty and is fundamentally unfair. Any process that relies upon perjury as the basis of its decision is not *due* process.

249. Where, as here, the government's exercise of its discretionary power was grounded in Mr. Upton's perjury, it is unconstitutionally tainted, and whatever deference is traditionally owed the prosecution's discretion must stand aside to preserve the integrity and dignity of the system and our concept of ordered liberty. For this reason as well, the government's consideration of perjured testimony in reaching its authorization determination violated the Fifth Amendment.

111

**B.**    **The Government's Consideration of Convictions and Sentences that Were the Product of Perjury in Reaching Its Capital Authorization Determination Violated the Eighth Amendment.**

250.    The Eighth Amendment imposes a heightened standard "for reliability in the determination that death is the appropriate punishment in a specific case." Woodson v. North Carolina, 428 U.S. 280, 305 (1976). "Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two.    Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." Woodson v. North Carolina, 428 U.S. 280, 305 (1976); Gregg v. Georgia, 428 U.S. 153, 189 (1976).

251.    Under the Eighth Amendment, "accurate sentencing information is an indispensable prerequisite to a reasoned determination of whether a defendant shall live or die." Gregg, 428 U.S. at 190.  The Eighth Amendment "mandates that where discretion is afforded . . . on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action. [¶]  It is certainly not a novel proposition that discretion in the area of sentencing be exercised in an informed manner." Id. at 189.

252.    Death-sentencing decisions that are the product of "consider[ation of]

112

materially inaccurate evidence" violate the Eighth Amendment. Tuggle v. Netherland, 516 U.S. 10, 14 (1995) (per curiam); Johnson v. Mississippi, 486 U.S. at 590. That would be a charitable description of Upton's perjury.

253. Here, in reaching its authorization determination, the government's discretion was not exercised in an informed manner nor limited to avoid the risk of wholly arbitrary and capricious action. Instead, the authorization process relied heavily on perjured testimony regarding a material factor. The entire process surrounding the authorization and deauthorization decisions was tainted by Mr. Upton's perjury. Under these circumstances, the authorization procedure was fatally flawed and failed to provide the heightened procedural safeguards constitutionally required in capital prosecutions.

## C. Conclusion.

254. The government's death-authorization process in this case violated due process and the Eighth Amendment. The illegitimacy of the death-authorization process was only part of the pervasive impact of prosecutorial misconduct that infected every stage of this case and which requires relief. When considered in light of all of the constitutional errors presented throughout this *Motion* – including the government's recent admission of failures to disclose a range of new material exculpatory evidence, its reliance on testimony and evidence obtained through the use

of a clandestine agent deployed for the clear purpose of circumventing Mr. Hammer's invocation of his right to counsel, and the significant constitutional errors previously found by the Court that resulted in the grant of a new penalty hearing – the reliability of these capital proceedings is fatally compromised.  Given the pervasive effects of the government's misconduct – from investigation to authorization to trial and sentencing – the only appropriate relief that can deter such misconduct in the future is to preclude the government from proceeding capitally.

**CLAIM VII. THE GOVERNMENT'S PRESENTATION OF PERJURED TESTIMONY IN THE PRIOR CAPITAL SENTENCING PROCEEDING COMBINED WITH ITS FAILURE TO DISCLOSE SIGNIFICANT AND MATERIAL EXCULPATORY EVIDENCE PRIOR TO TRIAL WARRANTS DISMISSAL.**

255.    All prior allegations contained in the initial Section 2255 Motion and its prior Amendments are incorporated as if fully set forth herein.

**A.    Introduction.**

256.    In 2004, Mr. Hammer came within three days of execution. If he had been executed, his death would have been the result of pernicious misconduct and, as the government now admits, perjured testimony. Indeed, without the perjured testimony of the government's key witness in aggravation, Mr. Thomas Upton, and had the government complied with its Brady obligations at the time of trial, it is reasonably probable that Mr. Hammer would not have been sentenced to death.

257.    Sixteen years after Mr. Hammer's initial trial and sentencing, the

114

landscape has changed. Not only did the government suppress critical evidence, as found by the late Judge Muir, it admittedly presented perjured testimony and gathered some of the most incriminating evidence against Mr. Hammer through the use of a clandestine government agent, Mr. Yager. And now it wants to try again to kill Mr. Hammer.

258. During those sixteen years, Mr. Hammer has unconstitutionally languished on federal death-row, subjected to solitary confinement twenty-three out of twenty-four hours a day. During the past sixteen years, Mr. Hammer has endured near draconian deprivations and restrictions. And all of this punishment – in addition to his unconstitutional sentence of death – has been unconstitutional from the moment he stepped foot inside the death-row housing unit. For sixteen years, Mr. Hammer has lived with utter uncertainty, anxiety and stress and continues to do so as he wonders whether he will again be sentenced to death.

**B. The Government's Pervasive Misconduct and Its Reliance on Perjury Warrants Dismissal of this Capital Prosecution**

259. In United States v. Harper, 729 F.2d 1216 (9th Cir. 1984), the Court aptly described life as a capital defendant:

> Enduring a trial that entails the possibility of the death penalty imposes a hardship of different-in-kind from enduring the discomfiture of any other trial. The emotional stress and strain of a trial in a capital case are extreme in character and suri generis. We consider the ordeal of undergoing such a trial a truly substantial hardship.

115

Id. at 1223. As a result of the profound misconduct and the recently disclosed fact that his prior death sentence was premised in large part on perjured testimony, Mr. Hammer should not be required to endure the psychological torture of yet another attempt by the government to extinguish his life.

260.   The government has forfeited its right to continue to pursue Mr. Hammer's execution because of a pattern of misconduct that ranges from actively suppressing evidence, illegally gathering evidence and presenting perjured testimony.

261.   The government's misconduct has resulted in the violation of Mr. Hammer's right to a fair trial, right to present a defense, right to effective assistance of counsel and right to be free from cruel and unusual punishment as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments.

262.   It is now clear that the depth of the constitutional violations committed by the government during Mr. Hammer's prior capital trial and sentencing hearing are more profound than anyone previously believed. Not only did the government suppress evidence it solicited supporting a defense it expected Mr. Hammer to raise – accidental death during a consensual sexual encounter – but it illegally elicited from Mr. Hammer purportedly incriminating evidence through its illegal agent, Mr. Yager.

263.   But worst of all, it presented the perjured testimony of Mr. Thomas Upton. The government relied upon Mr. Hammer's prior conviction in the Upton case as one of two convictions supporting the Section 3592(c) (2) aggravating factor.

116

264.    The Upton case involved charges that Mr. Hammer kidnapped Thomas Upton, robbed him with a firearm, and shot him with intent to kill.  Mr. Upton testified at two preliminary hearings and trial in that case.  Upton testified that, at the time of the incident, Mr. Hammer had approached Upton's car on the street brandishing a firearm and demanded that Upton drive to a motel.

265.    Mr. Upton also testified that, inside the motel room, he fought with Mr. Hammer and that Mr. Hammer struck him multiple times during that fight.  Mr. Upton also testified that at one point Mr. Hammer locked him in the bathroom, during which time Mr. Hammer made two phone calls.  Upton also testified that Mr. Hammer had forced him to drive to an area near some oil wells, ordered him to take off his clothes and lie on the ground, and then shot him multiple times with a large gun.  Mr. Upton testified that, after being shot, he got up and ran or walked away while Mr. Hammer screamed and then drove away in Upton's car.

266.    As a result of these convictions, Mr. Hammer received a 1200 year prison sentence.  We now know that Mr. Upton not only perjured himself in his 1998 testimony in this case, but he perjured himself when he testified against Mr. Hammer in Oklahoma state court back in 1984. Incidentally, he also lied to state and federal investigators who interviewed him concerning this incident.

267.    Mr. Upton's importance in the government's case for death against Mr. Hammer is underscored by the fact that he was the first witness the government called

117

in the prior penalty hearing.  NT Vol. 15 (6/30/98) at 5.  Mr. Upton adopted and authenticated his preliminary hearing testimony from the Oklahoma case.  See NT Vol. 15 (6/30/98) at 6.

268.    He also provided live testimony as to various aspects of the incident that was consistent with his prior testimony in Oklahoma.  See Id. at 8 (indicating that Mr. Hammer assaulted him); id. at 9 (indicating that Mr. Hammer brandished a large gray weapon and ordered Upton to take him where he wanted to go); id. at 10 (indicating that Mr. Hammer forced Upton to accompany him to a motel room).

269.    The government also presented testimony from the prosecutor in the Upton case, William Louis Keel.  During that testimony, the government elicited testimony that Mr. Hammer had been convicted of kidnapping, shooting with intent to kill, and robbery.  NT Vol. 16 (7/1/98) at 66.  The government also admitted into evidence the certified convictions.  See Tr. Govt. Exh. 4001.

270.    The government argued in its closing and in rebuttal that the jury should consider both the fact of the Upton convictions and the specific circumstances of the underlying incident in determining whether the government had proven its submitted aggravating factors, as a basis for rejecting Mr. Hammer's mitigation, and in finding that the government's reasons for death outweighed Mr. Hammer's reasons for life. See NT Vol. 27 at 62-63 (arguing the jury should find the prior conviction aggravator on the basis of these convictions); id. at 67 ("Mr. Upton was minding his own

118

business in a truck on Classen Avenue . . . he was on Classen Avenue in Oklahoma City when Mr. Hammer with a firearm came up to him and basically commandeered his truck. He took him to a motel . . ."); NT Vol. 29 (7/23/98) at 19 (arguing that the jury should consider the convictions in aggravation); id. at 41 (arguing the Oklahoma incident and trial as a basis for rejecting mitigation evidence); id. at 56 (arguing the Oklahoma incident as support for escalation of violence).

271.   The prosecution employed various aspects of Upton's version of events to bolster its theory of how Mr. Marti was killed.  For example, it invoked Mr. Hammer's purported kidnapping and confinement of Mr. Upton as a "hostage theme" that was prevalent in Mr. Marti's death.  Id. at 67 ("[I]t's always nice to have a hostage around.  Again, you'll hear this hostage theme repeated, repeated and repeated").  The government argued that Mr. Hammer had used "deceit" and "lulled" Mr. Upton into believing he would not be hurt so as to get Mr. Upton to remove his clothes.  Id. at 67-68.  The prosecutor then employed the very same terms to describe what the government contended Mr. Hammer had done to Mr. Marti.  Id. at 85.

272.   It turns out that Mr. Upton blatantly lied about what transpired between him and Mr. Hammer back in Oklahoma.

273.   On March 11, 2014, counsel received a notice from current government counsel pursuant to Brady v. Maryland, 373 U.S. 83 (1963) that on March 10, 2014, Mr. Upton had admitted facts to Capital Crimes Section Trial Attorney Haines and

119

Special Agent Coyle demonstrating that he had testified falsely against Mr. Hammer in 1984 and 1998. Specifically, the notice indicated that Upton had admitted that he had voluntarily accompanied Mr. Hammer to the motel; that Mr. Hammer had not brandished a weapon and forced Mr. Upton to accompany him; that Mr. Upton was neither kidnapped nor carjacked; and that Mr. Upton had not been locked into the bathroom in the motel, although he did go into the bathroom so that Mr. Hammer could make a phone call. See Exhibit 1.

274. On March 13, 2014, the government provided counsel with an FBI 302 recounting further details of the interview, including multiple instances in which Ms. Haines and/or Agent Coyle confronted Mr. Upton with the contradictions in his version of events. See Exhibit 2. The recently provided 302 also revealed that at or around the time of Mr. Hammer's 1998 trial, a person Upton believed to have been from the United States Attorney's Office had challenged Upton concerning his testimony in the Oklahoma trial. Id. Mr. Upton's revelation that he had been confronted by someone possibly from the United States Attorney's office demonstrates that the government knew or should have known that Mr. Upton had testified falsely in his Oklahoma testimony against Mr. Hammer.

275. The government has also recently disclosed that Mr. Leonard Yager, a key witness against Mr. Hammer during the guilt phase, reports that his actions against Mr. Hammer shortly after the murder of Mr. Marti were at the behest of the

government and that he had been "sent in" to talk with Hammer.  See Exhibit 3.  A 302 has not yet been provided for Mr. Yager.

276.   And, as found by the late Judge Muir, the government failed to disclose evidence it actively sought through its investigation: evidence about Mr. Hammer's sexual practices.  See 302 statements of Albert Johnson, Royce Lee Fowler, Gaylon Don Ball and Martin Guerrero.  The only surviving witness is Mr. Johnson.

277.   This suppressed evidence would have allowed Mr. Hammer to effectively present a defense to a charge of less than first degree murder; would have supported the defense proffered by trial counsel during opening argument, i.e., that the death of Mr. Marti occurred during consensual sex; it would have shown the jury that Mr. Hammer had a long history of braiding sheets for sexual activity; and, through the suppressed BOP document, demonstrate that Mr. Marti was not in Mr. Hammer's cell as part of a hostage ruse.

278.   The suppressed evidence went to the heart of Mr. Hammer's defense that Mr. Marti's death was the result of consensual sexual activity. The government actively investigated Mr. Hammer's sexual practices in an attempt to uncover evidence undermining this line of defense.  And what it found was witnesses who could support Mr. Hammer's argument that he did not intentionally kill Mr. Marti. And then it suppressed all related evidence.  All of it.  This was not by happenstance. At best, it is evidence of a "[r]eckless disregard for a defendant's constitutional

121

rights." Government of the Virgin Islands v. Fahie, 419 F.3d, 249, 256 (3d Cir. 2005). Under the totality of the circumstances, dismissal is required.

279.    Finally, Mr. Hammer requests this Court, at a minimum, to exercise its supervisory powers and preclude the government from continuing with its attempt to take his life. See Fahie, 419 F.3d at 258 (recognizing that the District Court's "supervisory powers are broad and include implementing remedies for violations of recognized rights and remedies designed to deter illegal conduct").

280.    This Court has the supervisory authority to vacate Mr. Hammer's conviction and dismiss the Notice of Intent to seek death in this case because of the government's outrageous conduct. See United States v. Ross, 372 F.3d 1097, 1107 (9th Cir. 2004).  Indeed, "supervisory powers are a means by which the federal courts fulfill their role in the criminal justice system...The supervisory powers provide a wider range of remedial options than would otherwise exist..." Id.

281.    The government's misconduct has permeated every aspect of this case from the grand jury through the penalty phase. Enough is enough. Dismissal is warranted.

## REQUEST FOR RELIEF

WHEREFORE, based upon the foregoing, all other proceedings and submissions, Mr. Hammer respectfully requests that the Court grant him the following relief:

A)    That Mr. Hammer be granted such discovery as is necessary for full and fair resolution of the claims contained in this Motion;

B)    That an evidentiary hearing be conducted on all claims involving disputed issues of fact;

C)    That the government be Ordered to respond to this Motion; and

D)    That Mr. Hammer's conviction and sentence be vacated.

Respectfully submitted,


/S/ RONALD C. TRAVIS
Ronald C. Travis
Rieders, Travis, Humphrey, Harris,
Waters & Waffenschmidt
161 West Third Street
PO Box 215
Williamsport, PA  17703-0215
570-323-8711 (telephone)
570-323-4192 (facsimile)
rtravis@riederstravis.com


/S/ ANNE SAUNDERS
Anne Saunders
Assistant Federal Defender
Federal Public Defender
Middle District Pennsylvania
100 Chestnut Street, Suite 300
Harrisburg, PA 17101
717-782-3843 (telephone)
717-782-3966 (facsimile)
anne_saunders@fd.org

/S/ JAMES MCHUGH
James J. McHugh, Jr.
/S/ JAMES MORENO
James Moreno
Federal Community Defender
Eastern District Pennsylvania
Suite 540 – The Curtis Center
Philadelphia, PA 19106
215-928-1100 (telephone)
215-928-0826 (facsimile)
james_mchugh@fd.org
james_moreno@fd.org


Dated:  April 2, 2014

## CERTIFICATE OF SERVICE

I, Anne Saunders, Esquire, do hereby certify that on this date I served a copy of the foregoing by Electronic Case Filing, or by placing a copy in the United States mail, first class addressed to the following:

John C. Gurganus, Jr. Esquire
United States Attorneys Office
Middle District of Pennsylvania
235 N. Washington Street, Suite 311
PO Box 309
Scranton, PA. 18501

Amanda Haines, Esquire
United States Department of Justice
Criminal Division
Capital Crimes Section
1331 F. Street, N.W.
Washington, D.C. 20530

/S/ANNE SAUNDERS, ESQUIRE
James Moreno, Esquire

Dated: April 2, 2014