# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | : | No. 4:96-CR-239 |
|  | : |  |
| v. | : | Honorable Joel H. Slomsky |
|  | : |  |
| DAVID HAMMER, | : | Capital Case |
|  | : |  |
| Defendant | : |  |

**EXHIBITS TO DEFENDANT'S CONSOLIDATED FIFTH AMENDED/SUPPLEMENTAL MOTION PURSUANT TO 28 U.S. C. § 2255 AND BRIEF IN SUPPORT**

Ronald C. Travis, Esquire
Rieders, Travis, Humphrey, Harris,
Waters & Waffenschmidt
161 West Third Street
Williamsport, PA  17703-0215
rtravis@riederstravis.com

Anne Saunders, Esquire
Federal Public Defender
Middle District Pennsylvania
100 Chestnut Street, Suite 300
Harrisburg, PA 17101
anne_saunders@fd.org

James J. McHugh, Jr., Esquire
James Moreno, Esquire
Federal Community Defender
Eastern District Pennsylvania
Suite 540 – The Curtis Center
Philadelphia, PA 19106
james_mchugh@fd.org
james_moreno@fd.org

## TABLE OF CONTENTS

| | |
|---|---|
| 1 | 20140311 Email from CCS Trial Attorney Haines |
| 2 | 20140313 Upton FBI-302 |
| 3 | 20140314 Email from CCS Trial Attorney Haines |
| 4 | State v. Hammer 84-1310 Preliminary Hearing Transcript |
| 5 | 19960413 David Hammer FBI-302 |
| 6 | 19960413 Leonard Yager FBI-302 |
| 7 | 19960417 Leonard Yager FBI-302 |
| 8 | 20120309 Government Disclosure |
| 9 | 19980527 Johnson FBI-302 |
| 10 | 19961206 Johnson FBI-302 |
| 11 | 19980603 Fowler FBI-302 |
| 12 | 19960626 Ball FBI-302 |
| 13 | 19960626 Agent Malocu Notes re:  Ball |
| 14 | 19960827 Guerrero FBI-302 |
| 15 | 20130807 Letter to United States Attorney Smith |
| | |
| | |
| | |
| | |

# EXHIBIT 1

 Haines, Amanda
to:
Anne Saunders, James Moreno, James McHugh, rtravis@riederstravis.com
03/11/2014 03:58 PM
Cc:
"Gurganus, John C. (USAPAM)"
Hide Details

Please be advised that pursuant to our obligations under <u>Brady v. Maryland</u>, the government is making the following disclosure. On Monday, March 10, 2014, CCS Trial Attorney Amanda Haines and FBI SA John Coyle met with Thomas Upton, the victim of the 1983 Oklahoma City kidnapping case. Mr. Upton disclosed that contrary to his testimony in 1984 and 1998, when he first saw Mr. Hammer walking in the vicinity of 36th and Classen Streets, Oklahoma City, OK, he "picked up" Mr. Hammer because he "thought he was cute" as "a trick." Contrary to his earlier testimony, Mr. Upton says that he voluntarily drove Mr. Hammer to his motel to have sex. At that time, according to Mr. Upton, he was not carjacked or kidnapped nor did Mr. Hammer display a weapon. Upon arriving at the motel, Mr. Upton voluntarily accompanied Mr. Hammer to his room. Once there, Mr. Upton claimed that he had sex with Mr. Hammer, but that he was forced to engage in anal sex against his will. At some point, Mr. Upton told Mr. Hammer that he knew he was an escapee. It was at that time, according to Mr. Upton, that Mr. Hammer retrieved a firearm from a nightstand in the hotel room. Mr. Upton now states that he was not "locked into" the bathroom, although he did go into the bathroom at Mr. Hammer's direction so that Mr. Hammer could make a phone call. The remainder of Mr. Upton's recollection is largely consistent with his prior testimony.

Mr. Upton explained that he lied about some of the circumstances leading up to the shooting, because he was concerned that in 1983, he would be discriminated against by law enforcement because he was a homosexual victim. An FBI 302 is being prepared to memorialize this interview and will be provided to defense counsel expeditiously.

Best regards


Amanda Haines
Trial Attorney
Capital Case Section
Criminal Division, Dept. of Justice
1331 F Street, NW, 3rd Floor
Washington, D.C. 20530

# EXHIBIT 2

FD-302 (Rev. 5-8-10)                              - 1 of 4 -

## FEDERAL BUREAU OF INVESTIGATION

Date of entry     03/13/2014

THOMAS ROY UPTON, JR. (protect identity), white male, date of birth
███████████ social security account number (ssan) ███████████, home address
███████████, ██████ ███████, telephone number ███████████,
work address ███████████, ███████████████████, ██████ ██████,
was interviewed by Special Agent (SA) John David Coyle at the Orlando,
Florida Resident Agency of the FBI. Present during the interview was
United States Department of Justice (USDOJ) Capital Unit Attorney Amanda
Haines. UPTON was served with a subpoena to appear as a witness in the
Eastern District of Pennsylvania at the capital murder trial of defendant
DAVID PAUL HAMMER on 05/21/2014. After being advised of the official
identities of SA Coyle and Attorney Haines, beginning at approximately 2:00
p.m., UPTON provided the following information:

UPTON grew up in Oklahoma. UPTON identifies as a homosexual, but he
was not always open about his sexuality. As a young man, UPTON hitch-hiked
across the country. In 1974, UPTON was arrested for prostitution in Los
Angeles, California when a male undercover police officer offered UPTON
money in exchange for sex.

In Oklahoma, UPTON fell under the influence of BILL SIMMONS (No Further
Information). SIMMONS developed a sexual relationship with UPTON, and
introduced UPTON to methamphetamine use and criminal behavior. UPTON
eventually served a one-year prison sentence in McAlester, Oklahoma for a
crime, and then served a 32-month sentence at the Connor prison unit in
Oklahoma for larceny and other charges. Both inside and outside of prison,
UPTON became "infamous" in the homosexual community as "Bill's kid," due to
his relationship with SIMMONS. People knew SIMMONS was protective of
UPTON, and treated UPTON accordingly. SIMMONS eventually died sometime in
the 1990's in his Oklahoma home when it exploded under suspicious
conditions (NFI).

In October 1983, UPTON was living at the home of his mother at 1617
Northeast 34th Street in Oklahoma City, Oklahoma. UPTON worked at the time
at a hair salon located in Edmond, Oklahoma. One day, UPTON finished his
shift at the hair salon, and drove his Buick LeSabre to an older man's
house, located around Meridian Street and Northwest Highway in Oklahoma
City. UPTON could not recall the man's name, but the man was a leader of

---

Investigation on  03/10/2014  at  Maitland, Florida, United States (In Person)

File # 90A-PH-79493                                    Date drafted  03/12/2014

by  John David Coyle

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 05-08-10)

90A-PH-79493

Continuation of FD-302 of  Interview of Thomas Roy Upton, Jr.          , On   03/10/2014  , Page   2 of 4

the Hairdressers' Association, and he wanted UPTON to give him a haircut. After cutting the man's hair, UPTON got back in his car and began to drive home.

By this time, the sun was going down. UPTON was driving east on 36th Street, and came to a stop at a red light at Classen Boulevard. Two vehicles were positioned ahead of him at the intersection, and UPTON's windows were down. Suddenly, a gunman later identified as DAVID PAUL HAMMER, appeared on the passenger side of UPTON's car. HAMMER pointed a silver-colored revolver at UPTON and demanded UPTON take HAMMER where HAMMER wanted to go. HAMMER entered the passenger side of the car, and UPTON began driving.

HAMMER directed UPTON to a motel in the vicinity of Interstate 40 and either Meridian Street or MacArthur Boulevard in Oklahoma City. HAMMER forced UPTON to walk to HAMMER's second floor motel room, and the two men entered. Inside the motel room, UPTON asked if HAMMER had escaped from prison, and HAMMER confirmed that he had. UPTON attempted to wrestle HAMMER's gun from him, but failed. For approximately one to two hours, HAMMER and UPTON talked, and HAMMER eventually locked UPTON in the bathroom while HAMMER spoke with an unknown person on the telephone.

Eventually, HAMMER forced UPTON at gunpoint back to UPTON's car, and forced UPTON to drive west on Interstate 40 to an exit near a truck stop. HAMMER then forced UPTON to drive south on a two-lane highway, and turn right on a desolate road. HAMMER then told UPTON to stop the car, get out, and strip off his clothing. UPTON thought HAMMER was going to leave him in the middle of nowhere to walk home, and UPTON asked HAMMER to at least allow UPTON to retrieve his barber tools from the trunk of the car; instead, HAMMER forced UPTON to lie face-down on the ground, and HAMMER shot UPTON three times in the back of the head with HAMMER's handgun.

After being shot, UPTON jumped to his feet. HAMMER screamed, jumped in UPTON's car, and drove away. UPTON staggered down the road until a car occupied by two men stopped, and the men transported UPTON to a hospital. UPTON spent two nights at the hospital, and learned he had been shot with bird-shot. UPTON told his story to police, and eventually, he was shown an array of photos, and identified HAMMER as the man who had kidnapped and shot him. UPTON eventually testified at HAMMER's trial, and HAMMER was sentenced to over 1,200 years in prison for kidnapping and attempting to kill UPTON.

At approximately 2:45 p.m., at the request of SA Coyle, Attorney Haines exited the interview room. SA Coyle challenged portions of UPTON's explanation of events, and admonished UPTON of the consequences of giving perjured testimony at the upcoming trial in federal district court. At

FD-302a (Rev. 05-08-10)

90A-PH-79493

Continuation of FD-302 of  Interview of Thomas Roy Upton, Jr.               , On   03/10/2014  , Page   3 of 4

approximately 3:05 p.m., at UPTON's request, UPTON was permitted a break to use the bathroom and smoke a cigarette outside.

At approximately 3:20 p.m., SA Coyle's interview of UPTON resumed. UPTON acknowledged he had previously left out some information concerning his kidnapping, and now wished to reveal the whole truth about what had happened.  UPTON was raped by HAMMER on the night of the incident, and he had never revealed that fact before.  Because of the emotional trauma of the rape, UPTON has not had sex with anyone since that night.  When he first spoke with police after being abducted and almost killed by HAMMER, UPTON believed if he mentioned his homosexuality, the crime would not have been taken seriously, and HAMMER would not have been prosecuted.

At approximately 3:45 p.m., Attorney Haines re-entered the room, and the interview continued.  UPTON clarified that he picked up HAMMER at the intersection of 36th Street and Classen Boulevard, but the encounter began in a consensual manner.  UPTON was driving through the area, which he acknowledged was an area of town popular with homosexuals, and he spotted HAMMER, who appeared to be "cute." HAMMER wanted a ride, and UPTON agreed to give him one.  HAMMER directed UPTON to HAMMER's motel, and the two entered HAMMER's room.

Once inside the room, after conversing about each other's experiences in prison, UPTON asked HAMMER if he was an escapee, and HAMMER confirmed that he was.  HAMMER pulled a handgun from a drawer beneath the television, and pointed the gun at UPTON. HAMMER then anally raped UPTON while holding the gun to UPTON's head. UPTON attempted to wrestle the gun from HAMMER, but was unsuccessful.  HAMMER then commanded UPTON to wait in the bathroom. While in the bathroom, UPTON heard HAMMER speaking on the telephone, but did not know with whom HAMMER was speaking, or the nature of the conversation.  HAMMER then forced UPTON to drive him to a remote area, and shot UPTON, just as UPTON had related earlier in the interview.

UPTON was asked if he had previously been challenged about his story by investigators or prosecutors.  UPTON recalled that after HAMMER's trial in Oklahoma, a person UPTON believed was a state prosecutor had contacted UPTON by telephone, and said HAMMER had procured witnesses who contradicted UPTON's version of the events. This troubled UPTON because UPTON did not want to testify at a trial again.  UPTON was later told by the prosecutor that HAMMER's witnesses were proven to be "paid-off" by HAMMER, and the issue of a re-trial disappeared.

Sometime around HAMMER's trial in federal court for the murder of ANDREW MARTI, UPTON was challenged by someone (NFI) possibly from the United States Attorney's Office, regarding UPTON's testimony in the Oklahoma trial.  UPTON recalled being asked if HAMMER and UPTON had met in

FD-302a (Rev. 05-08-10)

90A-PH-79493

Continuation of FD-302 of  Interview of Thomas Roy Upton, Jr.            , On  03/10/2014 , Page  4 of 4

a "gay bar" on the night HAMMER shot UPTON, and UPTON denied the allegation.  Until his interview with SA Coyle and Attorney Haines, UPTON had never revealed the true circumstances of how he picked up HAMMER because he had been fearful of discrimination and a lack of law enforcement response, based on UPTON's homosexuality.  The interview ended at approximately 4:05 p.m.

# EXHIBIT 3



Witness Disclosures (3/14/14)
Haines, Amanda
to:
Anne Saunders, James Moreno, James McHugh, rtravis@riederstravis.com
03/14/2014 11:27 AM
Cc:
"Gurganus, John C. (USAPAM)"
Hide Details

Following up on our conversation yesterday:

On, February 25, 2014, FBI SA Herbst and Trial Attorney Haines met with Lenny Yager at the FBI Regional Office in Memphis, TN. Mr. Yager is a 67 year old heroin addict, currently on probation until 2015, with a pending misdemeanor case. He received a Rule 35 in exchange for his testimony in 1998.

During the course of the interview, Mr. Yager disclosed the following: (1) he "got lucky" on Monday and used heroin in violation of his probation; (2) his last use of heroin was two weeks before that, in violation of his probation; (3) he was only willing to testify if the government did something for him with respect to his pending misdemeanor case and/or probation; and (4) at the time of the offense, the FBI "sent him in" to talk to Mr. Hammer. The admitted heroin use was reported by the FBI to Mr. Yager's Probation Officer on March 3, 2014.

Also, yesterday, March 13, 2014, the government provided to you an FBI302 for Thomas Upton. In the interest of total transparency, I wish to clarify that Mr. Upton agreed to give Mr. Hammer a ride fully intending that they were going to the motel room to have sex. Mr. Upton admitted that he agreed to have sex, but not anal sex, and that is why he views what transpired between them as "a rape."

Best regards,
Amanda Haines
Trial Attorney
Capital Case Section
Criminal Division, Dept. of Justice
1331 F Street, NW, 3rd Floor
Washington, D.C. 20530

# EXHIBIT 4

P. H. T # 2   2

(Whereupon, with the Court, counsel, and the Defendant present in person, the following proceedings were had, to-wit:)

MR. REINKE:   I think there's some motions, Judge.

THE COURT:   All right.

MR. HAMMER:   Your Honor, I have a motion and application pending before the Court.

THE COURT:   All right.  Motion to be recognized as own counsel.

MR. REINKE:   I believe that's already been ruled on, hasn't it, by Judge Parr?

MR. EVANS:   Not on this case.  It was ruled on the last case, but, when this was refiled, Judge Parr put it off until the preliminary hearing could be heard.

THE COURT:   All right.  I'm going to take that up first.  Let me read this, please.

There's a case filed in this county dealing with Hammer vs. T. Hurley---Public Defender's office.

MR. HAMMER:   Your Honor, there is a case in federal court, a civil suit, and it's in the United States District Court for the Western District of Oklahoma, and it is pending, but I will stipulate to Mr. Evans as my stand-by counsel.  He has been helping me over the last two or three months and he's done an excellent job.

THE COURT:   All right.  With that stipulation, you waive any prejudice or conflict you have?  Because he's in

the Public Defender's office, also.

MR. HAMMER: Yes, sir, I understand that.

THE COURT: All right.

MR. EVANS: When Judge Parr considered that the last time, Judge, he appointed us to represent him--or as stand-by counsel.

THE COURT: You understand, sir, that you have a right to have counsel and, if you are indigent, this Court will appoint counsel to represent you at no expense to you to be able to follow the Rules and Procedures to be able to cross-examine and bring in witnesses for your defense or whatever legal action that individual deems is necessary for the full, complete representation of your rights; do you understand that?

MR. HAMMER: Yes, I do.

THE COURT: And do you understand that you have a right, also, though, to represent yourself, but, when you do that, you face the perils of your own representation; do you understand that?

MR. HAMMER: Yes, sir, I do.

THE COURT: Do you understand further that you are bound by your own representation as to any other rules or procedures that all other lawyers are bound by, and you must follow that in this Court--nor any Court can go into a dissertation of principles of law at each time they may arise, and

you have to protect your own record and your own constitutional rights as if you were in fact a lawyer; do you understand that?

MR. HAMMER: Yes, sir, Your Honor, I understand.

THE COURT: Do you understand that, on a waiver of counsel, that you can be jeopardized and all errors committed by you are binding against you, as well as all points of law in your favor are binding upon you?

MR. HAMMER: Yes, I understand that.

THE COURT: With all that admonition, knowing the perils and the situation, is it your desire to represent yourself?

MR. HAMMER: Yes, sir, it is.

THE COURT: All right. Court will allow him to represent himself.

I, also, will put an exception to that, ask that the Public Defender's office, Mr. Ron Evans, be there to give you any legal assistance that you may require at the time of any evidence; do you understand that, or help you in formulating or making any objections for the record, do you understand that?

MR. HAMMER: Yes, sir, I do.

THE COURT: All right.

MR. HAMMER: On this application, Your Honor, I

would like to ask that you hold it in abeyance until at least after the preliminary, because I am--it's not known if I am going to be bound over this morning.

THE COURT: That's right.. I haven't made any decision, I haven't heard any evidence.

MR. HAMMER: So, I would like for you to hold this application in abeyance, if you would.

THE COURT: All right. I will do that.

Let me study it, please, sir.

All right, the request for supplies, as well as working hours, access to the library, notary public, interview room will be held in abeyance until further determination by this Court, if necessary.

MR. HAMMER: Thank you, Your Honor.

THE COURT: All right. Any other motions?

MR. HAMMER: No; I would just ask that the Rule be invoked at this time.

THE COURT: All right.

(Whereupon, the Rule having been invoked, all parties, counsel, and witnesses were admonished by the Court accordingly.)

THE COURT: All right. Any other requests by either side?

MR. REINKE: No, none for the State.

THE COURT: All right. Call your first witness.

MR. REINKE:   Call Thomas Upton.

THOMAS UPTON,

called as a witness on behalf of the Plaintiff, having been first duly sworn, testified on his oath as follows, to-wit:

DIRECT EXAMINATION

BY MR. REINKE:

Q    Would you state your name, please?

A    Thomas Roy Upton.

Q    Let me direct your attention to October 28, 1983, did you have occasion to be at a location of Northwest 36th and Classen in Oklahoma City?

A    Yes, I did.

Q    And do you know if that is in Oklahoma County?

A    Yes, it is.

Q    All right.  And did anything unusual happen to you at that time?

A    Yes, it did.

Q    Would you explain to the Court what happened?

A    Yes, I was at a red light and David Hammer, this man here (indicating) walked up to my car and put a gun in the window and told me I was going to take him where he wanted to go.

I said, "Well, yes," you know.

Q    Did you see the gun?

A    Yes, I did.

7

Q    Okay. Now, before we go any further, you said David Hammer, do you see David Hammer in the courtroom?

A    Yes, I do.

Q    And where is he seated and what is he wearing?

A    He's wearing orange coveralls, and he's seated right there (indicating).

Q    Okay.

MR. REINKE:  May the record reflect he's pointed out the Defendant.

THE COURT:  Yes, the record so reflects.

Q    (Mr. Reinke) All right. What happened once he pointed the gun at you?

A    He told me that I was going to take him where he wanted to go, and he got in my car.

Q    Okay. And did he give you any further directions at that time?

A    Yes; he wanted--told me that he wanted to go to a motel out on MacArthur, I-40 and MacArthur.

Q    And did he direct you to drive him there?

A    Yes, he did.

Q    And why did you drive him there?

A    Because he had that gun.

Q    Okay. Was it your desire or was your trip against your will?

A    Completely.

Q    And what happened then?

A    Okay.  We drove over to the motel, and we got into a fight in the motel.

I tried to get the gun away from him; I couldn't do it.

And he made two phone calls; and he locked me in the bathroom while he made a phone call and, then, he kept telling me that he wasn't going to shoot me, he just wanted my car.

And I told him he could have my car or anything, you know, "Just don't shoot me."

Okay.  So, then, we left there, and he had me drive around and around.  Ended up on 29th--South 29th Street; he said, "Keep driving."

He said he was just going to take me out where I wouldn't be near a phone, where he could get away, which sounded logical to me, since he had the gun.

And, so, we get out there on 29th and Sara Road, and he made me walk up this trail to near some oil wells or something, you know, under this gate and, then, he told me to take my pants off and lay off--take my clothes off and lay down, and I did.

And, then, he shot me three times in the head.

Q    All right.

A    And, then, I jumped up and took off running across the field, and he starts screaming and jumped in my car--run back to my car and jumped in my car and took off.

And, then, I walked up three and a half miles and flagged somebody down and got a ride to the emergency room.

Q    All right.  And why did you allow him to take your car?

A    He had a gun.

Q    Okay.  And were you afraid of that?

A    Yes, I didn't want to get shot.

Q    And all of these events were performed by Mr. Hammer?

A    Yes, they were.

Q    Okay.

MR. REINKE:  Pass the witness.

CROSS-EXAMINATION

BY MR. HAMMER:

Q    Mr. Upton, what day of the week did this incident occur?

A    I don't rightly remember the exact—the day of the week, it was the 29th, because that's when I was in the emergency room.

Q    It was the 29th, not the 28th.

You testified a few moments ago, when he directed your attention to the 28th, that it was the 28th.

A    Well, it started on the 28th; by the time I got to the hospital, it was the 29th.

Q    Okay.  Mr. Upton, can you tell me where you are employed?

A    I'm employed by Gino Marino Enterprises.

Q    Were you so employed on the day in question?

A    Yes, I was.

Q    Where is that located, Mr. Upton?

A    At the day in question, I was employed at Super Hair, Incorporated, 310 South Bryant, Edmond, Oklahoma.

Q    Okay. Can you tell us what time you got off work that day, Mr. Upton?

A    About 5:00, 5:30.

Q    Okay. And what did you do then?

A    What did I do then?

Let me see, I went home; then, I went over to Jack Crooks's house to cut his hair. And, then, I was going home when you got me.

Q    Okay. About what time did you leave for the evening, Mr. Upton?

A    For the evening?

Q    Yes.

A    I told you what I had done. I went over and cut Jack's hair.

THE COURT: No; don't argue with him, sir. You just answer his questions. I'll rule if they are proper or not; you just answer the question.

THE WITNESS: Yes, sir.

THE COURT: Let's not have any colloquy between each other. All right.

Q    (Mr. Hammer) What time did you leave for the evening, Mr. Upton?

OKLAHOMA COUNTY

11

A    What time did I leave for the evening?

Q    Yes.

A    Well, let's see.    I got off work, went home and I had dinner.    And I guess I got over to Jack's house about, oh, 7:30.

Q    About 7:30?

A    Uh-huh.

See, it takes me about 20 minutes to cut his hair, and we visited and watched some TV.    And, I don't know, it was around 8:30 or 9:00 o'clock when I headed home.

Q    Okay.    Where's Mr. Crook live, Mr. Upton?

A    Mr. Jack Crooks lives at a retirement village across on, I think it is 56 and North Portland.

Q    Mr. Upton, had you had any type of alcoholic beverages to drink this evening, on this evening in question?

A    No, I don't believe I did that evening.

Q    Okay.    So, you say that you left home and went to Mr. Crooks's apartment, cut his hair, visited for a while.    Then, I suppose you left; is that correct?

A    That's correct.

Q    Okay.    What did you do when you left Mr. Crooks's house or apartment?

A    I was going home; I went down Portland to 36th Street and turned left, and was going down 36th Street.

Q    Okay.    So, you say that this incident happened at

OKLAHOMA COUNTY

12

Northwest 36th and Classen; is that correct?

A    This is where it started at, yes.

Q    Mr. Upton, I'm not real sure of what you are saying happened here, can you kind of describe to me exactly in detail what happened.

How did the man approach you?

You said that the man approached you--to the window, did you have your windows down in your car?

A    I had all four of my windows down in my car.

Q    All four of your windows down?

A    Uh-huh.

Q    Okay.  This was 8:30, 9:00 o'clock in the evening, I guess, from your testimony.

A    Yes.

Q    Okay.  And you say the man approached your car--

A    No; I said you approached my car.

Q    Can you explain that, Mr. Upton, was there any cars in front of you, were there any cars behind you, which lane of traffic were you in?

A    I was in the left-hand lane, and there was, I believe, two cars in front of me.

Q    Were there any cars behind you?

A    I don't know.

Q    You don't remember?

A    No.

Q      Did you see anyone else at this intersection?

A      Just the cars.

Q      Okay.  So, to your knowledge, no one seen this man approach your car?

A      I have no idea.

Q      All right.

(Whereupon, off-the-record discussion was had.)

THE COURT:  Any problem?

MR. HAMMER:  No, sir, none at all.

THE COURT:  All right.

(Whereupon, Mr. Reinke left the courtroom.)

Q      (Mr. Hammer) Okay.  Mr. Upton, I can't at all get a clear picture of this, was it light outside; was it dark?

A      It was just getting dark, I believe.

Q      You believe it was just getting dark.  Okay.

I can't really understand this, but maybe you can help me get a clear picture.

THE COURT:  All right, Counsel, let's not have any dissertation.  Just ask the question; no explanation, just ask the question, please.

MR. HAMMER:  All right, Your Honor.

Q      (Mr. Hammer) How big was the gun, Mr. Upton?

A      It was a big gun.

Q      Can you describe it for me?

A      I don't know that much about guns, but, all I know, it

14

was a big gun. It had a long barrel on it.

Q    What color was it?

A    The color of a gun.

Q    Mr. Upton, what did the man have on who approached you, can you describe his clothing?

A    You had on--

THE COURT:  Sir,--

A    --jeans.

THE COURT:  --he's playing the role of being an individual lawyer, treat him like a lawyer, not as the Defendant; will you do that, sir?

THE WITNESS:  Yes, Judge, but sometimes it's awfully hard.

THE COURT:  I understand.

THE WITNESS:  After what he's already done to me.

THE COURT:  I understand that. But that is my admonition to you.

THE WITNESS:  Okay.

THE COURT:  All right.

Q    (Mr. Hammer) Can you describe the clothing the man wore, sir?

A    Jeans, a blue flight jacket or policeman's looking jacket with fur collar, and a plaid shirt.

Q    Okay. Mr. Upton, you testified that the man approached your car, did the man stick the gun through the window; did

OKLAHOMA COUNTY

15

you open the door for the man, how did the man get in the car?

A    The man walked up to my car and he had the gun under his coat, and he laid the gun--the barrel of the gun on my window sill, on the passenger side, and said I was going to take him where he wanted to go.

Q    So, he approached on the passenger side.

A    Yes, he did.

Q    And you testified that you were in the left lane of traffic, so, that means there was a right lane of traffic.

A    No, not on 36th and Classen; 35th and Classen is, going east on 36th Street, is two-lane.

Q    It's two-lane. Okay. And you testified that he had on blue jeans, and jacket, plaid shirt under it; is that correct?

          MR. KITE:  Objection, it's repetitious.

          THE COURT:  That will be sustained.

Q    (Mr. Hammer) Mr. Upton, you testified that the man asked you to drive him to a motel, can you tell me what motel you took the man to?

A    I can tell you--I'll take you right to the room, it was on I-40 and MacArthur.

Q    Pardon?

A    I-40 and MacArthur.

Q    Do you know the name of the motel, Mr. Upton?

A    Days' Inn or something like that.

Q    Do you happen to know the room number?

A    No, not offhand.  It was up the stairs, third door on the left.

Q    Okay.  So, now, apparently you drove the man to the motel.

MR. KITE:  Object to the dissertation this individual is going through every time he asks a question, he just continues to repeat when he asks a question.

Ask the Court to instruct him to ask a question.

THE COURT:  All right.  Rephrase it, please, sir.

Q    (Mr. Hammer)  Okay.  You drove the man to the motel?

A    Yes.

Q    Okay.  Did the man have the gun on you at this time?

A    Yes, he did.

Q    Okay.  What happened once you reached the motel parking lot?

A    He told me he would shoot me if I run, that he didn't want to shoot me.  And we went up the stairs and into the room where he made two phone calls.

Q    Okay.  Did the man have the gun on you all this time?

A    Except for when he got lax, and he had it off me and, then, I grabbed for it and we fought.

Q    Okay.  When you reached the door to the motel room, was the door locked?

A    Uh-huh.

Q    Pardon?

17

A    Yes.

Q    The door was locked?

A    You have to have a key to get in a motel room.

Q    So, what happened, did the man have a key to the room?

A    Yes.

Q    So, you are telling me that he held a gun on you with one hand while he opened the door with the other; is that correct?

Is that correct, Mr. Upton?

A    Let me--we got in the motel room, I don't remember if he unlocked it or what, but I remember we did go to the motel room and I was scared to death.

Q    Mr. Upton, was there anyone else inside the motel room?

A    No, there was not.

Q    Did anyone else come in the room?

A    No, there was not.

Q    Okay.  What happened once you got inside the room, Mr. Upton?

A    You made two phone calls--pardon me---made two phone calls.

Q    Mr. Upton, are you familiar with the laws of perjury in this state?

MR. KITE:  If the Court please, objection to that question, totally irrelevant and uncalled for.

THE COURT:  That will be sustained.

Q    (Mr. Hammer) Mr. Upton, have you given testimony in this

18

case previously prior to today?

A    Uh-huh.

Q    You have?

A    Uh-huh.

Q    Mr. Upton, do you expect your testimony to be the same or similar to that in that preliminary hearing?

MR. KITE:    Objection to the form of the question, it's irrelevant and immaterial.

THE COURT:    Yes.    Not as to the form of the question, that will be sustained.

You can rephrase your question.

Q    (Mr. Hammer) Okay.    Mr. Upton, you said that, once you reached the motel room, that you were locked in the bathroom; is that correct?

A    Yeah.

Q    Okay.    Are you telling us that the bathroom had a lock on the outside of the door?

A    No.

Q    Okay.    I don't understand how you were locked in the bathroom.

THE WITNESS:    Let me calm down a minute, I'm getting mad.

THE COURT:    Let's take a five-minute recess.

(Whereupon, a brief recess was had.)

THE COURT:    All right, sir.    You may continue.

OKLAHOMA COUNTY
OFFICIAL COURT TRANSCRIPT

Q    (Mr. Hammer) Mr. Upton, would you tell me, please, what happened once you were in the motel room?

A    You made two phone calls--pardon me--made me go in the bathroom and I thought that--maybe that you was going to kill me in the bathroom, and, then, we left there.

And we fought in the motel room, also. And, then, you had me drive around, and we ended up on 29th, South.

Q    Mr. Upton, did you fight with this man before you went into the restroom or before you were locked in the bathroom, was it afterwards?

A    It was afterwards.

Q    Afterwards.

Were you in the room when the man made the telephone calls, Mr. Upton?

A    Yes.

Q    You were in the room?

A    Yes; and, then, I said, "You're an excaped convict," because the phone conversation was to your mother and it was how sorry you were and that you appreciated them bringing you to the City, or something like that.

And, then, the other one was your aunt, you tried to get them to come get you; they wouldn't do it. And, then, you schized out, waving the gun in my face, told me, "I ought to kill you," one minute. Then, the next minute you'd be just as calm and rational, "Well, I'm not going to kill you. I just

need your car."

The next minute, "I'm going to kill you." Crazy, man, completely. Completely insane.

Q   Mr. Upton, are you testifying that, after I had--the man had pointed a gun at you and you drove him to the motel, then, that the man got on the telephone, call--phone and called someone, asking them to come pick him up when he had you there hostage; is that correct?

MR. KITE:  Object to the form of the question; the question has been asked. Counsel--or this person is arguing with the witness.

THE COURT:  That'll be overruled.

You may answer the question yes or no.

A   Yes, that's what happened.

Q   (Mr. Hammer) Okay. Mr. Upton, did you testify on the 12th day of March, before Judge Wilson, that you were locked in the bathroom with the water running, and that you could not hear anything that was going on in the motel room?

A   That was after the two phone calls, when you had to make another phone call and you didn't want me to hear it, and that's when you put me in the bathroom, and told me to turn the water on.

Q   Is that the same testimony you gave on the 12th, Mr. Upton?

A   Yes.

21

Q    Okay.  Mr. Upton, when you were struggling in the motel room, did you scream for help or cry out for help?

A    Like a big dog, I sure did, top of my lungs.

Q    Okay.  Did anyone come to help you, Mr. Upton?

A    No, they did not.

Q    Okay.  Approximately how long were you in the motel room, Mr. Upton?

A    Thirty minutes, forty-five minutes.

Q    Okay.  Mr. Upton, when you left the motel room,--

A    Something like that.

Q    When you left the motel room, Mr. Upton, what happened then?

A    You told me if I run that you were going to blow my brains out, and I didn't.

You said you weren't going to shoot me, just take me out to where I couldn't get to a telephone, which sounded logical.

And, also, I forgot to bring up the point that he fired into my seat to make a believer out of me, fired out the window with the gun; and, then, we drove down 29th Street. Twenty-ninth Street, I believe, is where you shot out the window; I thought you were fixing to shoot me in the head, but you shot out the window.

Q    Mr. Upton, you're kind of getting ahead of me here.  If you would, would you go back to my question; okay, when you left the motel room?

22

A    I'm telling you what happened.

Q    Would you answer my question, please?

When you left the motel room, did you see anyone at that time?

A    Yes, sure did; there was a--somebody coming up the stairs, I believe.

Q    Okay.  Did the man have the weapon pointed at you at this time?

A    The man had a--something over his arm, and he had the gun pointed at me, yes, he did.

Q    Once again, Mr. Upton, is this the same testimony that you gave on the 12th day of March in Judge Wilson's courtroom?

A    Yes.

Q    Did you scream out for help when you seen this person?

A    No.

Q    Would you tell us why, Mr. Upton?

A    I didn't want to get shot in the back, simple.

Q    Okay.  Is that also the same testimony you gave at that time, Mr. Upton?

A    I believe it is.  Yes, it is.

Q    Okay.  You said that the man shot into your car seat; is that correct?

A    That's correct.

Q    He shot into your window?

A    No; the window was down, he couldn't have shot the

23

window.  The window was down; he shot this way (indicating).

Q    Okay.  Do you happen to know where you were at that time?

A    Somewhere South Oklahoma City.

Q    Okay.  Mr. Upton, if you would, have you ever been back to where you say you were shot?

A    No, I have not.

Q    You have not.  Okay.

Just a few moments ago, I believe you testified that the man made you take off your clothing; is that correct?

A    That's correct.

Q    Would you go into that for me, tell me when or how.

A    Yeah, when we walked up the road, and you kept telling me, well, that you wasn't going to shoot me.  You know, you was just going to take my car.

And we walked up the road.  You said, "Okay.  Now, take off your clothes."

I figured you was just going to leave me out there naked or something, but that still beats getting shot.

Then, you told me to lay down, and I did, and you shot me twice in the back of the head and once in the face, right here (indicating), my hand.  And, then, I jumped up and you started screaming at the top of your lungs and run to my car and jumped in and took off, and hit a pole with it when you was taking off.

Q    Is this also, Mr. Upton, the same testimony that you have

24

given previously?

A    (Witness nods head.)

Q    Okay.  So, you were outside your car when you took off your clothing; is that correct?

A    That's correct.

MR. KITE:  Objection, it's repetitious.

THE COURT:  That will be overruled.

A    And the police found them later, after I went to the hospital--got to the hospital.  The police said they found them out there.

Q    (Mr. Hammer) So, you are telling me that the police found your clothing; is that correct?

A    That's correct.

Q    So, undoubtedly, that is evidence in this case.

(Witness indicating)

Q    (Mr. Hammer) Okay.  Mr. Upton, you testified that you laid down on the ground; is that correct?

A    That's correct.

Q    That you were shot twice.

MR. KITE:  Object, repetitious.

A    Right in the back of the head.

THE COURT:  Be overruled.

A    You shot me twice in the back of the head.

Q    (Mr. Hammer) Okay.

A    And, then, I guess I turned my head, then, you got me---

25

it grazed my cheek like this (indicating), just exploded my cheek right here.  I've had plastic surgery.

And, then, I jumped up, and you started screaming and took off for my car.

And I just took off down the road, and walked, and walked, and walked about three and a half miles.  I believe the police told me is how far I had walked before I flagged somebody down.

Nobody wanted to stop, because I was a bloody mess and didn't have on any clothes, and they took me to the emergency room at Deaconess Hospital.  And I just run in there and told them I didn't want to die, and I didn't.

Q    Do you know who took you to the hospital, Mr. Upton?

A    Couple of real nice fellows picked me up, I don't know who they were.

Q    Do you know their names?

A    No, I don't.

Q    Okay.  Mr. Upton, did you have any conversation with the man who shot you before it happened, before he shot you, did you have any conversation whatsoever, other than what you have told us in this Court today?

A    Lots of it.

Q    What I'm getting at, Mr. Upton,—

A    I kept trying to talk you out of killing me.

Q    Mr. Upton, you have given testimony previously in this

26

case, and I'm trying to bring out in this hearing the things that you said then.

You testified previously, did you not, Mr. Upton, that you asked the man for certain things from your car?

MR. KITE: Object to the form of the question, leading.

THE COURT: That will be sustained. Not a proper way to impeach, sir.

A      Yes.

THE WITNESS: He's refreshing my memory.

THE COURT: I understand that. When I sustain an objection, you don't answer the question.

THE WITNESS: Okay.

Q      (Mr. Hammer) Mr. Upton, did you ask for anything specific from this man before he shot you?

A      Yes, I told him, "Just give me my barber tools, take the car and go," but I wanted my barber tools because I had to go to work the next morning.

Q      Okay. So, you're telling me now that you were in fear of your life, afraid you were fixing to be shot, but, yet, you asked for your barber tools so you could go to work the next day?

A      This was at a point where you was more rational, and you kept telling me that you wasn't going to shoot me.

And I said, "Okay. If you're not going to shoot me, then,

just give me my barber tools so I can go to work in the morning."

I knew my car was gone, you know.

Q    Mr. Upton, will you tell me now exactly what property was taken from you?

A    I sure can.  A 1972, I believe it is, Buick LeSabre, a-- what, four pair of Wahl clippers, all my curling irons, a thousand rollers, scissors.

I had about a thousand dollars' worth of barber equipment in the trunk of my car.

Q    Okay.  Mr. Upton, has any of this property been returned to you?

A    Nothing has been returned; my car has not been recovered.

Q    Mr. Upton, one more question along this line, can you tell me how you know the exact location of where you were shot?

A    Sure can.

Q    Would you please?

A    I looked at a street sign.

Q    Okay.  So, undoubtedly, you are bleeding, and you walk for three and a half miles, but you are still conscious enough to know all those things; is that correct?

A    I looked at the street sign when we was driving there.

Q    Okay.  Mr. Upton, you said some people picked you up and took you to the emergency room of Deaconess Hospital.

28

A    Yes, and Deaconess didn't have a plastic surgeon on the staff, so, they transferred me to Mercy Hospital, where I stayed approximately 10 days. And I had $14,000 worth of medical bills.

Q    Mr. Upton, you testified just a few moments ago that you went to Deaconess Hospital; is that correct; is that the hospital you asked these people to take you to, Mr. Upton?

A    I asked them to take me to the nearest hospital.

Q    Okay. And this is South Oklahoma City, and you drove to north side of Oklahoma City to a hospital; is that correct?

A    That's the one I ended up at, that's correct.

Q    Okay. Mr. Upton, when was the first time you ever identified the suspect in this case?

A    At my mother's house, the police brought over pictures. They showed me pictures at the hospital, but your picture wasn't in it.

And, then, the next time they showed me pictures was at my mother's house, and your picture was in it.

Q    Okay. Mr. Upton, in that picture that you picked out,--

A    Yes.

Q    --you have testified that it was me that you picked out; is that correct?

A    That is correct.

Q    Did that picture look the same as I look now?

A    I don't remember, but it was you.

Q    You don't remember, Mr. Upton.

MR. HAMMER:    Your Honor, may I have permission to approach the witness?

THE COURT:    Yes.

Q    (Mr. Hammer) Mr. Upton, the picture look anything like this (indicating)?

MR. KITE:    If the Court please, that question is improper.

THE COURT:    Yes.    You want to mark it, mark it, please.

MR. HAMMER:    I'd like to mark this as Defense Exhibit A.

THE COURT:    Mark it Defendant's Exhibit 1.

(Instrument tendered the reporter was here marked Defendant's Exhibit 1, for the purpose of identification.)

THE COURT:    Hand it to the individual, ask him to identify it.

Q    (Mr. Hammer) Would you identify this photograph, please?

A    What, is that the picture they showed me at my mother's house?

No, it's not.

The one they showed me at my mother's house, I think, only had one--

Q    Only had one.

Did it resemble this picture, Mr. Upton?

30

A      It resembled you.

Q      I'm asking you, did it resemble that picture?

MR. KITE:  If the Court please, he's answered that question; object to that question.

THE COURT:  That will be sustained.

Q      (Mr. Hammer) Thank you, Mr. Upton.

I have a few more questions for you.

Did you ever view a line-up with the Defendant in it?

A      No.

Q      You never ever viewed a line-up?

A      No.

Q      Were you ever asked to view a line-up?

A      No.

Q      Mr. Upton, isn't it true that, the very first time you seen me was at the preliminary hearing on March 12th, in Judge Wilson's courtroom?

A      No, it's not.

Q      That is not correct?

A      You know it's not.

Q      Do you know a Bobby Gene Hinkle, Mr. Upton?

MR. KITE:  Objection, it's irrelevant.

THE COURT:  Don't know at this time.  Be overruled.

A      No, I do not.

Q      (Mr. Hammer) You don't know a Bobby Gene Hinkle?

MR. KITE:  Objection, it's repetitious.

31

THE COURT:  Yes, he's answered the question.

MR. HAMMER:  Okay.  Could I have a couple of seconds?

THE COURT:  Sure.

Q    (Mr. Hammer) Okay.  Mr. Upton, I only have a few more questions.

Would you give me your correct address, Mr. Upton?

A    Where I'm living right now is at 4503 North Penn, Town-House 4.

Q    Okay.  You testified a little earlier that you went to a Mr. Crooks's home to give him a haircut right before this happened.

A    That is correct.

Q    Do you happen to know Mr. Crooks's telephone number or address?

MR. KITE:  Objection, it's irrelevant.

THE COURT:  Been asked and answered in this transcript already.  Telephone number is not necessary; be sustained as to that.

He said 59th and Portland, retirement village.

MR. EVANS:  Your Honor, we have a right to examine Mr. Upton's actions on the night before this allegedly occurred, we'd like to talk to Mr. Crooks.

THE COURT:  I told you what his address was.

MR. EVANS:  We'd like to know his phone number,

OKLAHOMA COUNTY

32

that's a big apartment complex.

MR. KITE: If the Court please, they can subpoena the witness. The witness can appear or not.

MR. EVANS: We don't know his address; all we know is about where he lives. How can we subpoena him?

MR. KITE: The witness has answered the question to the best of his knowledge. If he's been asked a question, he's answered to the best of his knowledge.

If they want any other information, they can go in the yellow pages.

MR. EVANS: The question as to the phone number, that's not been asked. That's a question we would like to ask.

THE COURT: All right. That question--as to the State's objection, will be sustained.

If you are unable to find a witness, then, you can bring that up, conditional information, but, at this time, preliminary hearing--

MR. EVANS: Note our exceptions, Your Honor.

THE COURT: Yes, sir.

Q    (Mr. Hammer) Mr. Upton, have you ever been convicted of a felony?

A    Yes, I have.

Q    How many felonies have you been convicted of, Mr. Upton?

A    I don't know.

OKLAHOMA COUNTY

33

Q    Would five be a close number, Mr. Upton?

A    Something like that.

Q    Okay. Mr. Upton, have you ever been to the penitentiary?

A    Yes, I have.

Q    Mr. Upton, did you ever see the Defendant in the penitentiary?

A    No, I did not.

Q    Mr. Upton, have you ever in your life been treated for emotional or mental difficulties?

A    I never have.

        MR. KITE:  Objection, it's irrelevant.

        THE COURT:  What purpose--

        MR. HAMMER:  I'll withdraw the question, Your Honor.

        THE COURT:  All right.

        MR. HAMMER:  I have no more questions at this time.

        THE COURT:  All right. Any redirect?

        MR. KITE:  No, Your Honor.

        For the purpose of preliminary hearing--

        THE COURT:  All right. Thank you very much, sir. You may step down.

    (Witness excused.)

        MR. KITE:  Previous stipulation and pre-agreement entered into with Mr. Reinke, Page 2 stipulated for the purpose of preliminary hearing only.

        THE COURT:  Let me hear the stipulations.

34

MR. KITE:   That the former convictions listed on Page 2 of the Information, have been stipulated to for the purpose of preliminary hearing only, with that stipulation.

THE COURT:   Let me find out.

Do you understand what a stipulation is?

MR. HAMMER:   Yes, sir, I do.

THE COURT:   For the record, stipulation means that both counsel or Defendant Pro Se agrees that the convictions listed in here for the purpose of preliminary hearing, to satisfy probable cause, means other--that there was these convictions on the days in question, and that you were the one who was convicted with that, and that the convictions were final.

Do you stipulate as to that testimony for the purpose of preliminary hearing only?

MR. HAMMER:   Yes, sir, I do.

But, since you brought up something there, that the convictions are final, there are some of these convictions that aren't final, but, for the purpose of preliminary hearing, I will stipulate.

THE COURT:   Well, what do you mean not final?

MR. HAMMER:   Well, there's some of those cases that have never been upheld by the Oklahoma Court of Criminal Appeals and post-conviction proceedings have been filed.

THE COURT:   Post-conviction proceedings are not part of final conviction.   There has to be a final conviction

35

before a post-conviction appeal for relief can be filed, so, therefore--whether they have a ruling on those post-convictions are not proper as to determine whether or not these are valid.

MR. HAMMER: Okay.

THE COURT: Any other objections?

MR. HAMMER: No, sir, none at all.

THE COURT: With that stipulation accepted by this Court, with the understanding of all parties concerned, what says the State?

MR. KITE: State rests.

THE COURT: State rests. All right.

MR. HAMMER: I would like to demur to the evidence, Your Honor, presented here today, and some of the testimony given by the Defendant.

Defendant--I mean the victim testified that he was shot at Southwest 29th and Sara Road. I would inform the Court that is not even in Oklahoma County, that that's in Canadian County.

And, as far as jurisdiction, I'm not sure--I've had no access to any legal research materials, so, therefore, I couldn't research that.

And I would just demur to the evidence in general, Your Honor.

THE COURT: The venue question that you are raising has been presented by proper evidence; further, that the

36

evidence and probable cause of the three alleged crimes of kidnapping, armed robbery, and shooting with intent to kill has, for this purpose, met probable cause criteria.

Therefore, your demurrer is overruled, with the explanation that the preliminary hearing examining magistrate doesn't determine guilt or innocence.

MR. HAMMER:  Yes, sir.

THE COURT:  The magistrate only determines whether or not a crime happened under the law of Oklahoma, and this county, and the possibility of one participating in that crime.

And, since the victim has identified you as the one holding the gun and doing these acts, then, your demurrer is overruled.

You have exceptions to the Court's ruling.

Do you have any evidence?

MR. HAMMER:  No, sir.

THE COURT:  All right.  Show the Defendant rests.

With that statement, the Defendant will be bound over to stand trial.  Your formal arraignment will be before Judge Cannon on the 8th day of June, at 2:00 p.m.

Any previous bond-setting will remain the same.

As to the matter of application to the Court--on access to legal library, research material, telephone, inter-view room, notary public, access to the County Court Clerk's

37

office and supplies will be overruled at this time, but, however, you do have the right to submit this after your arraignment to the District Court for further determination. And, if they will rule on whether or not you'll have access, but, as far as the preliminary hearing, it is denied.

MR. HAMMER:  Thank you, Your Honor.

THE COURT:  All right.

# EXHIBIT 5

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription ___4/17/96___

DAVID PAUL HAMMER, inmate, UNITED STATES PENITENTIARY-ALLENWOOD (USP-A), White Deer, Pennsylvania, Registry Number 24507-077, incarcerated in the Special Housing Unit (SHU), Cell #103 at the USP-A, was contacted for interview within the interview room of the SHU.

Prior to interview, HAMMER was advised of the identity of the interviewing agent, Special Agent (SA) CARLYLE R. THOMPSON, FEDERAL BUREAU OF INVESTIGATION (FBI), Philadelphia Division, WILLIAMSPORT, Pennsylvania, RESIDENT AGENCY, accompanied by Lieutenant MARK TRAXLER, Special Investigative Supervisor, U.S. BUREAU OF PRISONS (BOP); Lieutenant FRANCISCO SANTOS, Special Investigative Supervisor, U.S. BOP; and, DON C. TROUTMAN, Unit Manager, U.S. BOP, all assigned to the USP-A, White Deer, Pennsylvania, and the nature of the intended interview relative to the death of HAMMER's cell mate, ANDREW HUNT MARTI, who was found dead by institution authorities at approximately 2:53 a.m. on Saturday, April 13, 1996.

Prior to interview, HAMMER was orally advised of his rights as read to him by SA THOMPSON from form entitled, Interrogation; Advice of Rights (FD-395). Upon completion of reading HAMMER his rights, SA THOMPSON inquired as to if HAMMER understood his rights to which HAMMER responded, "Yes."

SA THOMPSON thereafter attempted to provide HAMMER with the Interrogation; Advice of Rights form, to which HAMMER responded that he was aware of his rights on this form; however, refused to read it or sign the form, stating, "I will talk to you, but I won't sign the form."

The Interrogation; Advice of Rights form was thereafter witnessed and retained.

DAVID PAUL HAMMER provided the following information:

HAMMER questioned SA THOMPSON as to if MARTI was dead and was informed by SA THOMPSON that he is no longer with us. HAMMER then stated, "What do you want to start at?"

Investigation on ___4/13/96___ at ___White Deer, Pennsylvania___

File # ___90A-PH-79493 (WRA)/-5___

by ___SA CARLYLE R. THOMPSON:sac___        Date dictated ___4/15/96___

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

90A-PH-79493 (WRA)

Continuation of FD-302 of DAVID PAUL HAMMER _____ . On ___4/13/96___ . Page ___2___

      HAMMER and MARTI celled together in a two-man cell, Number 103 within the SHU since April 9, 1996.

      HAMMER advised that at approximately 1 a.m. on Saturday morning, April 13, 1996, correctional officers came through the SHU, conducting a count. MARTI went up on his bunk, the top bed, and acted like he was asleep. After the count, MARTI took a shower in the cell. HAMMER then, in a very fast excited narrative, described how he tied MARTI to HAMMER's lower bunk bed and began to strangle him. At this point, SA THOMPSON stopped HAMMER, requesting that he start from the beginning in a slower narrative so as to allow SA THOMPSON time to write the interview down.

      HAMMER stated that MARTI came (moved) into his cell (SHU #103 on Tuesday of this week). MARTI came at the written and verbal request of HAMMER who wanted him to be his cell mate. HAMMER told inmate First Name Unknown (FNU), CLASSEN, who, at the time, celled with HAMMER, that HAMMER was going to have MARTI move into his cell so that he (HAMMER) could kill him. FNU CLASSEN is presently located in the institution's administrative detention Cell #215. HAMMER also recalled telling inmate LEONARD YAGER, SHU inmate orderly for the past month, that he (HAMMER) was going to kill MARTI.

      Approximately two weeks ago, HAMMER informed Officer FNU BOON (phonetic), that he (HAMMER) wanted MARTI as a cell mate, and if Officer BOON could arrange it, HAMMER would do something to MARTI. Correctional Officer BOON said to HAMMER, "I hear nothing."

      Last week, HAMMER again asked BOON how long MARTI had in disciplinary segregation, to which the officer responded, "Not much longer." HAMMER told the officer that he wanted him (MARTI) moved in with HAMMER so that he could fuck him up. Officer BOON said to HAMMER to do a good job so that he (MARTI) can get to the outside hospital and so that BOON can get some overtime. HAMMER stated BOON probably thought that HAMMER was joking.

      MARTI wanted to move in with HAMMER, according to HAMMER. He (MARTI) has had problems in here (referring to the USP-A in that other inmates called him names and thought of him as an informant). Being labeled as an informant and working for the Special Investigative Supervisor, a contract hit was put out on MARTI. HAMMER stated that the contract hit had nothing to do or motivated him for what he did to MARTI.

      HAMMER again stated that MARTI moved in with him on Tuesday, April 9, 1996, into Cell #103. After moving in, MARTI

90A-PH-79493 (WRA)

Continuation of FD-302 of DAVID PAUL HAMMER _____ .On ___4/13/96___ .Page ___3___

continued talking about how bad he was, convictions, and being
shot five times, as a member of the NORTHE (phonetic) gang out of
Stockton, California.

At approximately 1 a.m., or 1:30 a.m. on Thursday,
April 11, 1996, HAMMER started talking to MARTI, knowing that
HAMMER had taken hostages before and while incarcerated in
Oklahoma, authorities found one of his cell mates hanging.  MARTI
wanted to know how to get to the USP, Atlanta, Georgia.  HAMMER
told him that if HAMMER took him hostage, hurt him a little bit,
that he might have a chance to go.  HAMMER sweetened the offer by
telling him that HAMMER would give him $500, plus commissary.
The money breakdown consisted of $200 to MARTI's account under
Number 58008-065 and $300 through another source.  HAMMER
declined to identify as to who the unidentified source is.

TROUTMAN asked HAMMER if yesterday, if he (HAMMER) was
told that he was designated to another institution, would this
have happened?  HAMMER responded, "Yes."

HAMMER stated that MARTI wanted to know when the
hostage scenario would take place?  He was told by HAMMER that it
would be soon.  HAMMER stated that he is providing this
information during the course of this interview because he,
"wanted to show premeditation, wanted to show that I planned what
I had done so there will be no doubt."

HAMMER told MARTI to think about it, referring to the
hostage scenario.

HAMMER then stated, "What did I have to lose?"

On Thursday evening, April 11, 1996, MARTI told HAMMER
that he would go ahead with the hostage scenario.  Also, on
Thursday evening, HAMMER wrote a letter on MARTI's behalf to
MARTINE GERRERO (phonetic) via mailing it to a third party
located at Post Office Box 234, Three Rivers, Michigan.  HAMMER
had doubts at the time in his own mind as to whether he was going
through with what he planned.  HAMMER told GERRERO in the letter
that he (HAMMER) knew MARTI for some time, did not believe the
rumors, and to give MARTI a chance, to spread the word and do it
as a personal favor for me.

After MARTI agreed, HAMMER started talking with him as
to the time and scenario.  HAMMER had a general idea of how to
proceed with the hostage scenario, but had no specifics.

90A-PH-79493 (WRA)

Continuation of FD-302 of DAVID PAUL HAMMER                    , On    4/13/96    , Page    4

        At this point during the interview, HAMMER told TROUTMAN, "I would like to see a psychologist when this is all over." TROUTMAN told HAMMER that the Chaplain was here, also. HAMMER said, "I would like to see him, too."

        HAMMER continued that at the time, he did not think or know if he was going to kill MARTI, or just take him hostage and make an ass out of myself to get attention.

        Friday afternoon, after the institution's team meeting, MARTI and HAMMER started to discuss how to do it. HAMMER started to braid torn up sheets into ropes. MARTI also had an idea that he wanted HAMMER to cut him on his neck to make it look good.

        HAMMER stated that when it got time to do it, HAMMER told MARTI, "It's time." He recalled that MARTI wanted him to use a razor blade that was still in the cell, to cut his neck.

        At approximately 1:00 a.m. to 1:30 a.m., April 13, 1996, correctional officers in the SHU conducted the inmate count. We (referring to MARTI and HAMMER) laid in our bunks. MARTI was in the top bunk. After the count, MARTI took a shower. At approximately 2:00 a.m. exactly, HAMMER stated a radio station at LYCOMING COLLEGE, Williamsport, Pennsylvania, went off the air. He recalled that a disc jockey named JEREMY runs a program from 12 midnight to 2:00 a.m., after which time the station goes off the air.

        HAMMER then started to tie MARTI up. MARTI was lying on HAMMER's bunk after he took his shower. HAMMER had MARTI lay on his stomach, face down, and tied his left leg with the braided rope around his ankle and secured it to a restraint ring nearest the commode. All along, MARTI is lying face down on his chest on the bed. HAMMER then tied his right leg, around the ankle, in the same manner.

        HAMMER stated that he is confused as to the actual sequence, but then recalled that he first tied MARTI's right leg to the restraint ring, and then his left leg nearest the wall to the other restraint ring. HAMMER then tied MARTI's left arm at the wrist to the restraint ring in the middle of the bed, which is located against the wall. HAMMER described that after placing the braided rope around MARTI's left wrist, running the rope through the middle restraint ring, then again around his left wrist, looping it around the wrist again and pulling the rope tight, tying it off again. HAMMER then secured MARTI's right wrist in the same manner. After tying MARTI, HAMMER told him to attempt to get up, to pull against the restraints to make sure

90A-PH-79493 (WRA)

Continuation of FD-302 of DAVID PAUL HAMMER _____ , On ___4/13/96___ , Page ___5___

that they were secure. HAMMER told him, "It's got to look real."
MARTI complied and attempted to break free of the restraints.

HAMMER then lit a cigarette, one he obtained from a
pack of his Camel's, the pack still located on the desk in the
cell. After lighting the cigarette, HAMMER placed the lit
cigarette to MARTI's lips, allowing him to take a couple drags
off of it. HAMMER then threw the lit cigarette in the toilet.
He then stuffed a sock in MARTI's mouth and used a strip of sheet
to secure the sock gag. While securing the strip of sheet,
HAMMER told MARTI to bite down on the sock as he tied it around
his head. MARTI could still talk because the gag was not tight.

HAMMER stated that this was exactly 2:17 a.m. when he
completed the process of tying up MARTI. He knows the exact time
by looking at the clock radio in the cell window.

At this time, during the course of the interview,
HAMMER was allowed to go to the bathroom.

After returning to the interview, the interview of
HAMMER continued.

He related that he recalled that the Camel cigarette
came from a pack of cigarettes still located in his cell.

At this time, just prior to HAMMER beginning to
strangle MARTI, he recalled that MARTI started to twitch and jump
around. HAMMER asked him what was wrong, to which MARTI told him
that he (MARTI) was having flashbacks to when he got shot.
HAMMER related that MARTI had been shot in the back of the head.
MARTI then began to whimper.

HAMMER then said, "Oh yeah?" And then straddled
MARTI's back, facing the back of MARTI's head. HAMMER started
strangling MARTI by raising his head up off of the pillow with
his right hand and inserting his left arm under his Adam's apple
and the pillow, so that his neck was resting in the crook of
HAMMER's elbow. HAMMER then placed his right forearm under his
left forearm, simultaneously pulling MARTI's head backwards and
applying choke pressure. MARTI struggled by moving his head.
After a period of choking MARTI, HAMMER released pressure to get
a better grip. MARTI said, "No, please, no." HAMMER regained a
better choke hold in the same position and applied pressure
again. MARTI jerked in the restraints, grabbing at HAMMER's
legs, even though restrained. The hold HAMMER had on him was a
sleeper hold and he recalled that the second time in this hold
was for over three minutes. MARTI became really violent, jerking

90A-PH-79493 (WRA)

Continuation of FD-302 of DAVID PAUL HAMMER                    , On    4/13/96    , Page    6

and grabbing at HAMMER, even though MARTI's hands were tied in the restraint rings on the sides of the bed.

HAMMER advised that MARTI's body then relaxed; he expelled gas, all the while HAMMER continued the choke hold. He advised that MARTI did not make much movement, just intermittent shuttering.

After no further movement, which was approximately six minutes, HAMMER got up off of MARTI and went and got a string off of MARTI's bed. The string-like rope was removed previously from a stitched seam of institutional clothing.

HAMMER then sat on MARTI, not straddling him, and put the string around his neck and started choking him, pulling it really tight, with HAMMER's hands pulling in opposite directions. This resulted in HAMMER receiving cut burns along the sides of both palms of his hands. HAMMER continued this choking of MARTI for approximately three or four minutes.

After observing no movement or shutters by MARTI, HAMMER got up. He was sweating profusely and went to the wash basin, washing his face and hands. HAMMER, after drying himself, went back and checked MARTI's wrist pulse. There was no pulse. He then checked MARTI's neck pulse. There was no pulse. HAMMER then got a clean sheet from under his bed and covered MARTI up. HAMMER then combed his hair and walked back and forth in the cell.

HAMMER stated that he looked to see what time it was. It was 2:40 a.m.. He heard officers coming in for the count. At 2:46 a.m., the officers (a female officer and another officer, First Name Unknown JONES) came to his cell door.

HAMMER told the officers, "My cellie is dead," or something to that effect. The female officer said, "He's what?" HAMMER responded, "He's dead. Turn on the lights to check." HAMMER simultaneously to saying this to the officers, pulled the sheet off of MARTI so that the officers could see that he was tied up. The female officer asked why he was tied. HAMMER told her, "To make it easier." She said, "Easier for what?" HAMMER responded, "To kill him."

While HAMMER was talking to the officers, he was holding a pair of toenail clippers with masking tape securing it in the opened position, to give it the appearance of being a weapon. The female officer asked HAMMER what he had, to which he responded that it had nothing to do with him (referring to

90A-PH-79493 (WRA)

Continuation of FD-302 of DAVID PAUL HAMMER _____ , On __4/13/96__ , Page __7__

MARTI). He advised that the toenail clippers were made up to look like a knife, as part of his rouse in the hostage scenario.

Shortly thereafter, more officers and a Lieutenant responded and asked HAMMER if he would cuff up. HAMMER responded, "Yes." He was then restrained and removed from the cell. Thereafter, he was strip-searched, examined by a Physician's Assistant and photographed.

HAMMER stated that he failed to tell us during the interview the reason why he had to stop strangling MARTI the first time in the sleeper hold was because HAMMER's left shoulder dislocated from the pressure he was applying. HAMMER advised that he had problems with his left shoulder since December, 1994, and knew that when it pops out, he would have to immediately stop whatever he was doing and get the shoulder back into its socket. HAMMER did this after his shoulder dislocated and after adjusting his hold on MARTI, continued to strangle him.

SA THOMPSON questioned HAMMER as to why or what motivated him to kill MARTI. HAMMER responded that he did it for reasons between MARTI and himself. HAMMER was not motivated over MARTI's contract, and not because HAMMER wanted the death penalty. HAMMER related that he is serving 1232 years incarceration.

HAMMER then stated, "I'm just tired. When somebody fucks over me, I'm not going to sit back and take it. I'll never forget." HAMMER then indicated that he and MARTI had a run-in when HAMMER first got to the USP-A, White Deer, Pennsylvania, in that MARTI was one of a group that made HAMMER lose face. He (MARTI) was one of them. "I don't go running my head to people. All that killing shit."

HAMMER has been in the hole (SHU) for seven months. HAMMER stated, "I fucked up here, my problem isn't with the other inmates or SHU staff."

The following physical description was obtained during observation and interview:



90A-PH-79493 (WRA)

Continuation of FD-302 of <u>DAVID PAUL HAMMER</u>                          , On    4/13/96    , Page    8

HAMMER advised that he has been incarcerated within the U.S. BOPs' federal system since December 16, 1993, as an Oklahoma STATE DEPARTMENT OF CORRECTION's prisoner and has been incarcerated in the Oklahoma prison system since June, 1978. HAMMER is serving 1232 years incarceration for 13 separate felony convictions.

Upon completion of interview, HAMMER stated, "I had better get me a lawyer."

The interview of DAVID PAUL HAMMER was terminated at this time.

# EXHIBIT 6

# FEDERAL BUREAU OF INVESTIGATION

Date of transcription    4/18/96

LEONARD MORRIS YAGER, inmate, Registry Number 11927-076, Special Housing Unit (SHU), Cell #108, incarcerated at the UNITED STATES PENITENTIARY-ALLENWOOD (USP-A), White Deer, Pennsylvania, was contacted for interview within the SHU interview room.

Prior to interview, YAGER was advised of the identity of the interviewing agent, Special Agent (SA) CARLYLE R. THOMPSON, FEDERAL BUREAU OF INVESTIGATION (FBI), Philadelphia Division, WILLIAMSPORT, Pennsylvania, RESIDENT AGENCY, accompanied by Lieutenant MARK TRAXLER, U.S. BUREAU OF PRISONS (BOP), Special Investigative Supervisor, and Lieutenant RON JURY, Special Investigative Agent, U.S. BOP, both of this institution, and the nature of the intended interview regarding his association with inmate DAVID PAUL HAMMER.

LEONARD MORRIS YAGER provided the following information:

He advised that HAMMER cells with a guy named First Name Unknown (FNU), MARTI, in SHU Cell #103. YAGER formerly celled with HAMMER on a couple of occasions, the last of which was in January, or February, 1996.

YAGER recalled a conversation in which HAMMER told him that he (HAMMER) was going to kill MARTI. YAGER thought that HAMMER was only going to hurt MARTI, and was not taken in the context of his actually killing MARTI. YAGER recalls HAMMER, on a number of occasions, telling him that he was going to kill MARTI.

YAGER recalls that a day or so ago, he observed HAMMER braiding some cut up sheets. YAGER asked HAMMER what he was doing and what it was for, at which time HAMMER put his hand to his throat, indicating hanging.

YAGER recalled that HAMMER hollered down the range last night from his cell saying, "My roommate is dead." YAGER, after reflecting on HAMMER's statement, thought that it was made by

Investigation on    4/13/96    at    White Deer, Pennsylvania

File #    90A-PH-79493 (WRA)    -3

by    SA CARLYLE R. THOMPSON:sac    Date dictated    4/15/96

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

90A-PH-79493 (WRA)

Continuation of FD-302 of LEONARD YAGER _____ . On __4/13/96__ . Page __2__

HAMMER after he had been placed, cuffed up, in the recreation cage, under investigation. He thought that HAMMER's prior comments about killing MARTI consisted also of making gestures as though MARTI was his target. YAGER did not believe HAMMER in that he planned on killing his cell mate.

LEONARD MORRIS YAGER is described as follows:



# EXHIBIT 7

FEDERAL BUREAU OF INVESTIGATION

Date of transcription    4/23/96

LEONARD MORRIS YAGER, Inmate Registry Number 11927-076, Special Housing Unit (SHU), Administrative Detention, Cell #108, incarcerated at the U.S. PENITENTIARY (USP)-ALLENWOOD, White Deer, Pennsylvania, was contacted for interview within the SHU interview room.

Prior to interview, YAGER was advised of the identity of the interviewing agent, Special Agent (SA) ANTHONY S. MALOCU, FEDERAL BUREAU OF INVESTIGATION (FBI), Philadelphia Division, WILLIAMSPORT, Pennsylvania, RESIDENT AGENCY, accompanied by Special Investigative Supervisor (SIS) Lieutenant MARK TRAXLER, U.S. BUREAU OF PRISONS (BOP), and the nature of the intended interview regarding his association with inmate DAVID PAUL HAMMER. Thereafter, he furnished the following information:

YAGER advised that inmate HAMMER and MARTI were engaged in a sexual relationship in the short time that they were cellmates. HAMMER had read letters to YAGER explaining that he (HAMMER) wanted MARTI as a cellmate. "HAMMER had his mind singled in on MARTI," although if he could not get MARTI as a cellmate, he would have killed inmate CLASSEN, who had been HAMMER's cellmate prior to MARTI's moving in. On one occasion, HAMMER was overheard saying, "You're either taking this mother fucker's stuff out of here, or carrying him out of here." This statement was made in reference to HAMMER's desire to have CLASSEN removed from the cell and replaced with MARTI.

YAGER had no reason to believe that HAMMER was going to kill anyone. Everyone threatens each other in prison, and as long as he (YAGER) has been an inmate, he has never seen any inmate go through with the threat of killing someone, although YAGER did inform an unidentified correctional officer that he (HAMMER) was going to hurt his cellmate.

YAGER advised that he received a letter from HAMMER identifying the seven reasons why he (HAMMER) killed inmate MARTI. YAGER was reluctant to present the letter to BOP officials because he wanted to use this information as a means to get himself (YAGER) transferred to a FEDERAL CORRECTIONAL

Investigation on  4/17/96        at  White Deer, Pennsylvania

File #  90A-PH-79493 (WRA)  ~\3

by  SA ANTHONY S. MALOCU:lag                    Date dictated  4/22/96

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

79493 (WRA)

Continuation of FD-302 of LEONARD MORRIS YAGER_____ , On___4/17/96___ . Page ___2__

INSTITUTION (FCI). At the end of the interview, YAGER provided the letter titled reasons for killing ANDREW H. MARTI, Registry Number 58008-065, to SA MALOCU.

# EXHIBIT 8



# U.S. Department of Justice

## Peter J. Smith
United States Attorney
Middle District of Pennsylvania

---

| | | |
|---|---|---|
| *William J. Nealon Federal Building* | *Ronald Reagan Federal Building* | *Herman T. Schneebeli Federal* |
| *Suite 311* | *Suite 220* | *Building* |
| *235 N. Washington Avenue* | *228 Walnut Street* | *Suite 316* |
| *P.O. Box 309* | *P.O. Box 11754* | *240 West Third Street* |
| *Scranton, PA 18501-0309* | *Harrisburg, PA 17108-1754* | *Williamsport, PA 17701-6465* |
| *(570) 348-2800* | *(717) 221-4482* | *(570) 326-1935* |
| *FAX (570) 348-2816/348-2830* | *FAX (717) 221-4493/221-2246* | *FAX (570) 326-7916* |

*Please respond to:* _____ Williamsport _____

March 9, 2012

Ronald C. Travis, Esquire
RIEDERS, TRAVIS, HUMPHREY, HARRIS,
    WATERS, & WAFFENSCHMIDT
161 West Third Street
P.O. Box 215
Williamsport, PA 17703-0215

     Re:    *United States v. Hammer*
           M.D. Pa. Crim. No. 4:96-CR-00239

Dear Mr. Travis:

    This is to acknowledge belatedly receipt of your letter dated June 13, 2011. It sought several categories of information. A response to one aspect of it was provided in correspondence dated March 8, 2012.

    The remaining aspect related to correspondence between our office and former inmates Stephen Classen and Leonard Yager and Michael Cole, some of whom testified at trial in 1998. This subject matter is referenced also in your formal discovery request Nos. 10 and 17, filed on November 4, 2011.

    You will find enclosed the material for Messrs. Yager, Classen, and Cole. With respect to Mr. Yager, our office was unable to secure from the Western District of Tennessee the motion that was filed. However, the docket entries are enclosed which demonstrate that Court's ruling, as well as our letter to those prosecutors.

    The same is true for Mr. Cole's case. However, in lieu of the docket entries, enclosed *inter alia* is a letter from the United Staets Attorney in Maine describing the sentence reduction in that person's case.

    Finally, Mr. Classen's materials are more complete. They include considerable correspondence from him as well.

Ronald C. Travis, Esquire
Re:   *United States v. Hammer*
March 9, 2012
Page 2


        Please feel free to contact me or anyone else assigned to this
if you have any questions about this response.

                                    Very truly yours,

                                    PETER J. SMITH
                                    United States Attorney


                                    FREDERICK E. MARTIN
                                    Assistant United States Attorney

PJS:FEM:jmm
Enclosures
cc w/o enclosures:
        J. Gurganus, Esquire
        S. Mellin, Esquire
        C. Patrick Austin, Special Agent

1-15-98

Fred:

Can you Please let me know something,
any-thing at all by The 23rd of Jan.??
I can't get any one here To tell me
any-thing. it is narve wrecking.
Please Get me out of The Hole.

Classon
Schuylkill

12-28-97

Fred:

CAN You help me TRANSFER FROM here
when I leave To go To COURT? I do NOT
WANT To RETURN TO This institution. I would
like To Return To my own Region - Pheonix
Would be great - Even ARKANSAS, TEXAS or
Colorado AS back up. I have less Than 3
YRS To go & I'm TiRed of Being This FAR
FROM home.
    You didn't Reply To my last letter - I would
JUST AS SOON Be TAKen out of here AS SOON
AS Possible & WAit Some where else - BECAUSE
I met Some-one Today who TAIKS/~~corresp~~
corresponds with HAMMER & it WAS veRy
unCOMFORTABle - I'm HesitANt To say Any-Thing
To The StAff Here BeCAuse I do-NOT
WANT To WAit in This Seg Unit to TRANSFER.
    Doesn't The Trial StARt Soon? Shouldn't I
Be cAlled To couRt Soon?
            KIT.

S.J. Classen
S 4804-065
Schuylkill

A. Maloau
96R3063

7-30-97

Mr. Martin:

Since I haven't heard from you - I have been thinking I should accept the interview Mr. Hammers atty's are requesting Only it seems like it would be a good idea for me to have an attorny since I never had one. I would even feel better to discuss whether or not I would even like to accept. If you would Just let me Know if you intend to call me to the Trial - It would sure put me at ease. I don't see why I should be there - I've already stated my view + Nothing really has changed. It's Just That The Not Knowing is Pretty Nerve Wracking - Concidering The Contact from Mr. Rihnke & Mr. Travis. Also I do Not want to Just get Pulled out of here - as I was in Allenwood I Lost All of My Property last Aug. Much of which can-not be replaced. The region is Putting me off Til Dec. on This issue. It sure feels like I'm getting an extra hard time because of This - when all I did was tell The Truth.

I would like TO hear from you Soon Mr Martin.

Thank-You

SJ CLASSEN
SJ Classen
FCI Schuylkill

P.S.

IS LENNY YEAGER still AROUND
Yes ___   NO ___

I`M JUST OVERLY CURIOUS.

I ALSO NEED A BREAK,
WITH THE SIS GUY HERE

2-22-98

Mr. Martin:

It has been over 2 wks. Since Tony was here
I was hoping I could get some News This WK.
If Even Thru Lt. Parker. I know That The
trial Date is Nearing again. And I want to
tell you That I would Much rather Wait at
The Schnieder County Jail which was dis-
cussed with Tony. It seems That, That would
be More Convienient for You. Even Should I
be RE-Designated [Please] I would Just as soon
wait there Til May. The Point being [of Course]
I would like To know my NEW designation & then
be held on Writ til The trial is Over.
Can You Please Try to let me know as
Soon as Possible. Even Tho I am an Orderly in
The hole here I am Very Tired of being
at F.C.I. Schuylkill. Its getting near 2 Months
Now. And I have Not been Told any Thing Concrete
Tell me.

SJ Classen
54804-005

9-1-97

Mr Martin:

Well I got 60 days + other sanctions. I think/hope that I'm let out of Seg. before Oct 19th tho. [DANG]

Maybe you could be more helpful with the followin I would like to find out when my Prosecutor in Oregon - MR Michael BROWN - intends to Submit my Rule 35 to the Courts. When I asked my atty in Oregon he was vague. I didn't like that. So I am hoping that I can't Just find out for sure what Mr. Browns intentions are + if he would file the Motion. That would really be all that I would need.

What do you think ??? Can you help me with this one? Ensure my Rule 35 ?? Let me know.

Also for your knowledge I've decided NOT to talk With poranimus atty; this decision was made by me alone. I am Just not at all happy to be pulled out of here in JAW. But I'll deal with it Now that I know its happening.

Steve
STClassen
Schulykill

KRISTINE OLSON, OSB #73254
United States Attorney
District of Oregon
MICHAEL J. BROWN, OSB #74045
Assistant United States Attorney
1000 SW Third Avenue, Suite 600
Portland, Oregon 97204
(503) 727-1020

RECEIVED

1998 SEP 28 P 3: 52

CLERK U.S. DISTRICT COURT
DISTRICT OF OREGON
PORTLAND, OREGON

BY_____

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | No. CR 96-273 (MA) |
| | ) | |
| v. | ) | |
| | ) | MOTION FOR REDUCTION |
| STEPHEN JOSEPH CLASSEN, | ) | OF SENTENCE (RULE 35(b)) |
| | ) | |
| Defendant. | ) | |

The United States of America, by and through Kristine Olson, United States Attorney

for the District of Oregon, and Michael J. Brown, Assistant United States Attorney, hereby

moves the court pursuant to Fed. R. Crim. P. 35 (b) for an order reducing Stephen Joseph

Classen's sentence in this case from 46 months to 26 months. This motion is based on

Classen's substantial assistance to the government in the prosecution of United States v.

Hammer, CR 96-239, in the Middle District of Pennsylvania. See attached letter of AUSA

Frederick Martin.

DATED this 28 day of September, 1998.

Respectfully submitted,

KRISTINE OLSON
United States Attorney

MICHAEL J. BROWN
Assistant United States Attorney



U.S. Depar      nt of Justice

David M. Barasch
United States Attorney
Middle District of Pennsylvania

RECEIVED
AUG 21 1998
U.S. ATTORNEY
PORTLAND, OR

Herman T. Schneebeli Federal Building, Suite 308
240 West Third Street, P. O. Box 548               717-326-1935
Williamsport, PA 17703-0548          FAX 717-326-7916/326-7954

August 13, 1998

Kristine Olson, Esquire
United States Attorney
District of Oregon
Attn: Michael Brown, Esquire
888 S.W. 5th Avenue, Suite 1000
Portland, OR 97204-2024

        Re:    Proposed Rule 35(b) Motion
               Stephen Classen, Reg. No. 54804-065

Dear Mr. Brown:

        You may recall that we previously spoke about the above-
referenced inmate, who was prosecuted by your office and sentenced by
Judge Marsh on April 4, 1997, to a term of forty-six (46) months
imprisonment in the United States District Court for the District of
Oregon. As indicated in that previous conversation, Mr. Classen
testified for the prosecution in the capital case of United States v.
Hammer, M.D. Pa. Crim. No. 4:CR-96-0239.. Given the successful outcome
in that prosecution as well as Mr. Classen's role in it, our office
recommends that you give serious consideration to presenting a motion
for reduction of sentence in accordance with Rule 35(b), Federal Rules
of Criminal Procedure to Judge Marsh.

        The trial against David Paul Hammer began with jury selection on
May 5, 1998. It lasted until June 21, 1998, when Hammer, in the
absence of any inducements from this office, entered a plea of guilty
to the premeditated killing of a fellow inmate at the Allenwood
Penitentiary, in violation of 18 U.S.C. § 1111. However, prior to
that plea of guilty, Mr. Classen testified regarding events leading up
to and subsequent to the killing of Andrew Marti on April 13, 1996, at
the Allenwood Penitentiary. Moreover, a critical aspect of the
testimony which Mr. Classen gave in the case was incorporated by
reference for the subsequent, penalty phase of the proceeding.

Kristine Olson, Esq    ᵋ
Re:   Proposed Rule ᵕᵕ(b) Motion (Stephen Classen,
August 13, 1998
Page 2

This related specifically to the aggravating feature set out at 18
U.S.C. § 3592(c)(9), substantial planning and premeditation of
homicide.  Based upon information provided by Mr. Classen, as well as
other sources, the jury on July 24, 1998, entered its recommendation,
in accordance with 18 U.S.C. § 3593(e), that Mr. Hammer be punished
with a sentence of death.

One aspect of Mr. Classen's testimony and cooperation was of
specific value to this prosecution in the penalty phase.  That is, as
stated above, Mr. Classen indicated that in late March 1996, or
approximately two weeks prior to the killing, David Paul Hammer stated
to his then cellmate, Mr. Classen, he intended to take Andrew Marti's
life.  Hammer repeated to agents of the FBI on the morning of April
13, 1996, the statement that he had told Mr. Classen well in advance
of April 13, 1996, that he intended to kill Andrew Marti.  Thus, Mr.
Classen's testimony on the critical issue of substantial premeditation
was corroborated by the contemporaneous admission of David Paul Hammer
to agents of the Federal Bureau of Investigation.

Mr. Classen's testimony received further confirmation from Hammer
himself.  That is, the inmate sent a "kite" or note to Mr. Classen, a
copy of which is attached, that had been intercepted by correctional
officers.  This confirmed Hammer's pre-killing admissions to Mr.
Classen.  An FBI Questioned Documents Expert concluded that Hammer had
signed the letter and addressed the envelope as well as probably wrote
the text.

Mr. Classen arrived in this District for debriefing in May 1998.
He has always been cooperative in the multiple interview sessions and
attempted to provide as complete and accurate information regarding
the details of Mr. Hammer's background, as well as a defense theory,
that David Paul Hammer suffered from multiple personalities, as he was
able to do so.  During the approximately three months that Mr. Classen
has been incarcerated in this District, he has created no problems in
any fashion whatsoever in the two County jails in which he has been
housed for his own safety.

Kristine Olson, Esq
Re:   Proposed Rule 35(b) Motion (Stephen Classen)
August 13, 1998
Page 3

By way of background, Mr. Classen's forty-six (46) month sentence is expected to end in November 2000, when he will have served approximately thirty-eight (38) months of that term, unless your office agrees to a sentence reduction. It is significant, in our view, that Mr. Classen began cooperating before he was even aware that formal charges had been brought against him by your District. Moreover, his incarceration after his appearance before the Grand Jury in the Summer of 1996, became exacerbated by his cooperation.

Among other difficulties, he encountered was a loss of all his property due to the frequent transfers from various jails. Unlike other inmates, Mr. Classen did not seek renumeration from the Bureau of Prisons. Additionally, after you prosecuted him, Mr. Classen was placed at a nearby Federal Correctional Institution located in Schuylkill, Pennsylvania. There inmates, who had antipathy towards "snitches" and had learned of Mr. Classen's cooperation, threatened him. This caused Mr. Classen to be placed in that facility's Special Housing Unit for his own protection for approximately five months.

Mr. Classen provided initial information to agents of the Federal Bureau of Investigation on the morning of the killing, April 13, 1996. Subsequently, correctional officials intercepted a letter intended for Mr. Classen from Hammer. It, as previously stated, confirmed that the inmate had shared his thoughts of killing Andrew Marti well in advance of the act.

During this time frame, Mr. Classen's family, in the form of his brother and sister-in-law, has contacted our office. They have indicated continued support for their brother during this difficult time. Moreover, it is our understanding that Mr. Classen will have employment opportunities with his family which would add further stability to his life when release takes place.

Kristine Olson, Esc     e
Re:   Proposed Rule 35(b) Motion (Stephen Classen,
August 13, 1998
Page 4


        For the above-stated reasons, our office believes that a
reduction in Mr. Classen's sentence is warranted due to his long-
standing and critical cooperation in a significant criminal
prosecution in this District.   The case agent, Special Agent Anthony
Malocu of the Williamsport Resident Agency of the Federal Bureau of
Investigation, would be available if you feel that testimony should be
presented to the Court in support of any Rule 35(b), Federal Rules of
Criminal Procedure, Motion.   Moreover, if additional information
regarding the prosecution, Mr. Classen's cooperation, or other details
are thought to be needed for a full and complete presentation of this
request to Judge Marsh, please feel free to contact me.   Thank you for
your continuing cooperation in this matter.

                                    Very truly yours,

                                    DAVID M. BARASCH
                                    United States Attorney


                                    FREDERICK E. MARTIN
                                    Assistant United States Attorney

DMB:FEM:jmm
Enclosure
cc w/o enclosure:
        David Classen, 71888 East Winden Road, Rhododendron, OR 97049
        Special Agent Anthony Malocu
        Martin C. Carlson, AUSA
        Chief, Criminal Division

Entered on the Docket on

DONALD M. CINNAMOND

By_____ Deputy

FILED

RECEIVED

OCT 28 1998    1998 OCT 27  P 4: 04

U.S. ATTORNEY    CLERK, U.S. DISTRICT COURT
PORTLAND, OR        DISTRICT OF OREGON
                              PORTLAND, OREGON

BY_____

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

UNITED STATES OF AMERICA,           )
                                    )
            Plaintiff,              )       CR. No. 96-273-MA
                                    )
      v.                            )
                                    )
STEPHEN JOSEPH CLASSEN,             )
                                    )       ORDER
            Defendant.              )

MARSH, Judge.

On March 31, 1997, I sentenced defendant to 46 months based upon his conviction for conspiracy to smuggle contraband drugs in to a federal correctional institution. This sentence was the high end of the applicable range due, in part, to the parties agreement since the applicable range turned out to be much lower than anticipated. Defendant used his wife to assist in this offense and she was sentenced to 4 months imprisonment.

The government now moves for a reduction in sentence pursuant to Fed. R. Crim. P. 35 based upon defendant's substantial assistance to authorities in the prosecution of United States v. Hammer, CR 96-239 (M.D. Penn.). The government

1 - ORDER

does not specify the level of departure sought, but instead urges the court to reduce the term to 26 months. Defendant's initial guideline level was a 14, VI for a range of 37-46 months. To achieve a 26 month sentence would require at least a 4-level departure to a 10, VI and a sentencing range of 24-30 months.

Based upon the government's proffer, I have no hesitancy in finding that the defendant did in fact provide substantial assistance relative to the prosecution and sentencing of Mr. Hammer. However, in considering any request for a sentencing reduction I may also consider all of the sentencing factors set forth in 18 U.S.C. § 3553(a) in the exercise of my discretion. United States v. Manella, 86 F.3d 201 (11th Cir. 1996). Given the seriousness of the offense conduct and the fact that defendant recruited others to assist in the crime and the leniency of the initial sentence imposed due to the nature of the plea bargain, I find that the reduction sought by the government leads to a sentence that is too lenient. In the exercise of my discretion, I find that a two level reduction is more appropriate which results in an adjusted offense level 12, VI for an adjusted sentencing range of 30-37 months. Based upon the foregoing, the government's motion for reduction of sentence (#43) is GRANTED and defendant's sentence is hereby reduced to 36 months.

IT IS SO ORDERED.

DATED this _27_ day of October, 1998.

_Malcolm F. Marsh_

Malcolm F. Marsh
United States District Judge

2 - ORDER

9-28-99

Fred:

THANK-You. I was Told by MR. Sutton This MORNING. THAT it is A doNE deal.
I don't HAVE The ActuAl date YET BeT he SAid it will be beFoRe X-MAS.
I don't KNOW if This would have happened with-out YouR. CAll BuT I do KNOW it helped.
So AGAiN. THANK-You. I'M gONNA MAKe The MoST of iT.

Steve Classen

HI TONY.




**U.S. Department of Justice**

*David M. Barasch*
*United States Attorney*
*Middle District of Pennsylvania*

*Herman T. Schneebeli Federal Building, Suite 308*
*240 West Third Street, P. O. Box 548*          *570-326-1935*
*Williamsport, PA 17703-0548*      *FAX 570-326-7916/326-7954*

October 6, 1999

Steve J. Classen
Reg. No. 54804-065
Federal Correctional Institution
8901 South Wilmot Road
Tucson, AZ 85706

        Re:  Halfway House Placement

Dear Mr. Classen:

        This is to acknowledge receipt of your recent letters about
halfway house placement.  By the time you receive this correspondence,
you already will have circled Thursday, December 23, 1999, on your
calendar.  If that is advanced, so much the better.

        The staff at FCI-Tucson, in our view, did the best they could.
Bed space at a halfway house is something quite valuable and even
beyond the control of Kathleen Hawk-Sawyer, the Bureau's Director.

        The eve of a new millennium is a wonderful time for new
beginnings.  Special Agent Malocu (Tony) and I wish you the best of
luck in all of your legal endeavors.  As you said, please "make the
most of it."

                            Very truly yours,

                            DAVID M. BARASCH
                            United States Attorney


                            FREDERICK E. MARTIN
                            Assistant United States Attorney

DMB:FEM:jmm
cc: A. Malocu, Special Agent

96cr239
St Malocy

9-26-99

Fred

I'll make this my LAST letter to you.
But I found it was the WARDEN
who only LET my ½ way house
Leave here with 2 months (60 DAYS)
So if you could JUST him
To increase it to 90 or 120 days it
Would be NO Problem.
I don't know why They didn't
Tell me That Before.
You Could even JUST E-MAIL HIM
OR Send a Letter with The Request
That way it will be in The File

Thank-You
Steve Classen

THUR  8-26-99

Fred:

I Go Home March 7th 2000. I was only given less than 2 months in a 1/2 way house. I was put in for 5 months which would have been Oct of this year. In stead I go to the 1/2 way house 1-10-2000.

I am asking if you can help me get out before X-mas or Thanks giving of this yr. By E-mailing the CCM in Oregon. My unit Manager here is Mr. Sutton. He claims that he is try-ing. But I'm not sure I Be Lieve him. [If you need to E-mail him too]

Please try to do something Because I could sure use more 1/2 way house Time + I really want to be Home This yr.

Thanx in advance Because I TRUST you will do Some Thing.

Hi Tony.

S.J. Classen

96R8063
① St Newco

SUN
9-19-99

Dear Fred;

Sorry To be bothering You again But I am
Asking For Either You, Tony or Even your
Secretary To call My Boss Here in Tucson
Because He Feels I Should Even be Home Before
Thanksgiving. My Boss is The Head psychologist
Here. His Name is DR. DENNIS WEIR. He wants
To Help. ON THURS & Fri He doesn't come to
Work til NOON But The rest of The
Wk. he is here at 7:30 a. And Especially on
Mondays he is usually in his office For
a while because I clean it Then. Well I'm saying
That I'd kinda like To Talk TO You. OR TONY To know if
You Even called Oregon or Any-Thing. If He's Not
there You could leave Your phone # or Tonys phone #
& he Would call you back. I'm Not Sure if you
went to Help, But I'm Sure You could make
a Huge difference & I am really ready to go Home &
I Do especially feel I need more Than 55
days in the ½ way house. ALSO if you
call & he is Not there, & You get ahold of
Some else I may be There Working, I'm The only
psychology orderly any way so I work by my self.

②

My Other Bosses under Doctor WEIR are
DR. DENISE DEROUEN [PRONOUNCED DERWIN] ALSO
MR. GONZALES. AND FINALLY The SECRETARY.
MRS WICKLIFFE.
     Sorry This is So long. Please call
Here, Fred.

                              Most Sincerely
                              Steve Classen.

# EXHIBIT 9

6/3/98

ALBERT RAY JOHNSON, JR., was advised of the identity of the interviewing agent.  JOHNSON telephonically contacted the interviewing agent from the GREAT PLAINS CORRECTIONAL FACILITY (GPCF), Hinton, Oklahoma, telephone 405-542-3711.  Also participating in the interview which was conducted over the speaker phone was Special Investigative Agent MARK TRAXLER of the FEDERAL BUREAU OF PRISONS.  JOHNSON, thereafter, provided the following information:

JOHNSON advised that another inmate who is currently incarcerated at the GPCF by the name of RICKY YANDEL was writted out recently and is believed to have been subpoenaed by the defense to testify for HAMMER.  JOHNSON knows of YANDEL but they did not associate with each other at the GPCF.

JOHNSON's first experience with HAMMER occurred at the OKLAHOMA STATE PENITENTIARY (OSP) which JOHNSON identified as a lock down facility.  After the riot which occurred in 1985, the OSP became a 23 hour lock down facility with one hour of recreation time available to inmates.  While incarcerated at OSP, JOHNSON knew HAMMER, who was celled across the hall.  The cells at that time were the old style cells with bars which allowed JOHNSON to view and speak with HAMMER all day long if he wished.

JOHNSON indicated that HAMMER was a homosexual and was into bondage.  He and his homosexual cell mates would tie each other up and whip each other with rope or electrical cord. HAMMER and his sexual partners would come to the cell door playing with each other.  JOHNSON identified two of HAMMER's cell mates and sex partners as JOHNNY PIDGEON (Phonetic) and VAN SUTTON (Phonetic), two inmates who were observed by JOHNSON to have engaged in homosexual activity with HAMMER.

HAMMER was also a drug user.  He shot crank and did weed and alcohol.  JOHNSON had done drugs with HAMMER on occasion.

When asked if HAMMER had any medical problems or ever experienced any psychological problems or unusual behavior, JOHNSON indicated, "He's got plenty of sense, he's one of the brightest individuals I've ever met."  HAMMER never complained of

5/27/98          Williamsport, PA              (telephonically)

90A-PH-79493  (WRA)                              5/28/98

SA ANTHONY S. MALOCU:djd

90A-PH-79493 (WRA)


ALBERT RAY JOHNSON, JR.                    5/27/98                    2

having any significant headaches.  HAMMER never mentioned or
complained about having any stomach problems.  HAMMER was never
observed to experience any memory lapse or forgetfulness that was
not normal.  JOHNSON does not recall HAMMER to have experienced
or to have ever mentioned having any problems with diarrhea.
JOHNSON could see inside of HAMMER's cell, and he never saw any
pictures of animals or monkeys in HAMMER's possession.  The only
pictures that HAMMER had displayed were those of homosexuals.
JOHNSON indicated that HAMMER typically had sex every day going
both ways.  JOHNSON advised that "He (HAMMER) used to lust after
guys."  He used to see them and say, "I wonder what it would take
to have sex with him."  HAMMER would even pay individuals to have
sex with him.  HAMMER's sexual preference was white males.

        HAMMER never talked about his family.

        The only mood changes in HAMMER that JOHNSON could
recall occurred after HAMMER would sleep, he would wake up
grumpy.

        YANDEL was an associate and knows HAMMER from the OSP.
They were not cell mates.  JOHNSON recalls that all three of
them, YANDEL, JOHNSON, and HAMMER, had gone to recreation
together while incarcerated at OSP.  YANDEL and HAMMER were
involved in scams together.  HAMMER had given JOHNSON some
telephone numbers of homosexuals that he had scammed.

        JOHNSON indicated that BILLY WEBB was known as "Bad
Billy Webb" in the OSP; he was a homosexual, "That's all he
messes with is them boys."  WEBB was never observed by JOHNSON to
have engaged in homosexual activity.  WEBB and JOHNSON talked on
a few occasions but were not personal friends.  WEBB ran a poker
table at the OSP.

        MICHAEL SMITH was known as "Bulldog" at the OSP.  He
was on death row while incarcerated with the OKLAHOMA DEPARTMENT
OF CORRECTIONS.  He and HAMMER had specially made cells so no one
could get to their cells.  SMITH and JOHNSON did not really know
each other and they rarely talked because SMITH was a racist.

        JOHNSON and HAMMER met up again at the UNITED STATES
PENITENTIARY (USP)-ALLENWOOD in 1995.  They had known each other
there for a couple of months.  In May or June 1995, JOHNSON left

90A-PH-79493 (WRA)


ALBERT RAY JOHNSON, JR.                    5/27/98                    3

USP-ALLENWOOD for USP-ATLANTA.  While at USP-ALLENWOOD, both
HAMMER and JOHNSON celled next door to each other in the Special
Housing Unit.  JOHNSON does not recall HAMMER to have complained
of any medical problems.  HAMMER never complained of having any
headaches.  JOHNSON described HAMMER as an on and off smoker.  He
was known to smoke at the OSP, but he does not recall HAMMER to
have smoked at USP-ALLENWOOD.  HAMMER did not talk to himself in
any unusual or unnatural way.  He did not conduct conversations
with himself, nor did he speak in plural.  JOHNSON indicated if
he did, "I would have remembered and talked to him about it."
HAMMER never experienced any memory loss which was unusual.  He
may have forgotten a date or phone number, but nothing
significant such as forgetting what day it was or any other
obvious forgetfulness or memory loss.

       While incarcerated in the Special Housing Unit, HAMMER
engaged in sexual activity with his cell mate who was identified
as a white male with a first name of TONY, having long, stringy
hair.  JOHNSON never really talked to HAMMER's cell mate, but did
talk with HAMMER on many occasions.  HAMMER and his cell mate
would tie each other up and bite each other.  They would yell
over to JOHNSON's cell and make a lot of noise.  HAMMER and his
cell mate would typically stay up all night engaging in sexual
activity.  They would tie each other up using braided sheets.
When one would fall asleep, the other would tie him up.

       JOHNSON used to make braided sheets and used them as
clotheslines in his cell.  JOHNSON recalls making them and
providing them to HAMMER.  He would tie a battery to one end and
fish the braided rope to HAMMER, thus providing it to him.
JOHNSON had told HAMMER how to make the rope, by telling him that
all you needed to do was braid some sheets.  JOHNSON does not
recall seeing the inside of HAMMER's cell.  In addition, he never
heard the names JASPER, JOCKO, WILBUR, or TAMMY ever used by
HAMMER.

       ALBERT RAY JOHNSON, JR., is described as follows from
interview and BUREAU OF PRISONS records:

# EXHIBIT 10

12/23/96

ALBERT RAY JOHNSON, JR., was interviewed at the Blaine County Jail, Watonga, Oklahoma. JOHNSON was advised of the identity of the interviewing Agent and of the reason for the interview. JOHNSON provided the following information:

JOHNSON was advised that he was being interviewed due to a letter he had sent to the United States Attorney's Office for the Middle District of Pennsylvania. JOHNSON advised that he wrote the letter to let it be known that DAVID PAUL HAMMER had planned the murder of his cellmate and that HAMMER told JOHNSON he was going to kill one of his cellmates in the future. JOHNSON stated that HAMMER does things for recognition and to get attention and to "con the system". In the past HAMMER has written letters for recognition to Current Affairs and other television programs, as well as newspapers like The Daily Oklahoman. HAMMER has even tried to confess to murders that he has never committed.

JOHNSON first met HAMMER at the McAlester State Penitentiary, McAlester, Oklahoma in 1987 or 1988. HAMMER was already serving time at McAlester in "D" Block, which is the "close custody" area of the prison. JOHNSON noticed that much of HAMMER's activity was to get attention. HAMMER's livelihood is based on "conning" homosexuals both inside prison and outside prison for the purpose of obtaining money from them. HAMMER is bi-sexual and will engage in homosexual activities to perpetuate the "con". He will obtain the names of homosexuals on the outside and thereafter write these homosexuals for money. While in McAlester he actually took some of the prison officers hostage; all for attention. Also while at McAlester he used various officers Social Security Account Numbers to obtain credit cards or purchase items on credit and to file W2 Forms for income tax refunds. HAMMER's expertise is in the "slow con" in which he obtains money or something else of value from homosexuals. HAMMER was still at McAlester in 1989, when JOHNSON left.

JOHNSON did not see HAMMER again until 1995. JOHNSON was already serving time at Allenwood Penitentiary for kidnapping which had occurred in Oklahoma in 1990, after he had escaped from prison. JOHNSON had "bounced" around from various Federal Penitentiaries and finally wound up in Allenwood in 1995, where

12/6/96          Watonga, Oklahoma

90A-PH-79493                                   12/9/96

SA GARRY R. HARMON:bjl

90A-PH-79493

ALBERT RAY JOHNSON, JR.                    12/6/96              2

he was placed in Cell 210. HAMMER was placed in Cell 211. The cells had a vent between them near the stool and both HAMMER and JOHNSON talked for hours utilizing this vent. HAMMER had just come into Allenwood from Lompoc, California.

HAMMER told JOHNSON that while at Lompac, he got into trouble after being attacked. At Lompac, HAMMER had tied up a cell partner and beat him up. HAMMER told JOHNSON that he was never going back to Oklahoma and that "I'll show you how to beat the system". "I want to stay a Federal prisoner". HAMMER stated that, "I'm going to kill one of them", meaning a cellmate. HAMMER indicated that this would make Worldwide News and would allow him to play crazy and ultimately beat the case. All to keep from going back to Oklahoma. The reason that HAMMER did not want to go back to Oklahoma seemed to be that while in McAlester he was placed in an underground cell and did not like it there. While in Oklahoma he was constantly in trouble for utilizing credit scams and using guards names and Social Security Numbers. HAMMER constantly talked about how he would beat the system, that how he was mentally incompetent and laughed about it.

HAMMER said that he had tied up a cell partner in Lompac and had beat him, but did not kill him. HAMMER did not say why he did not kill him. HAMMER stated, "OJ beat his and so will I" and "I'll beat mine".

JOHNSON believes that he lived next to HAMMER at Allenwood for about two weeks, but less than a month. Both were in the "hold" as both had had problems in the past. Apparently HAMMER's problem was at Lompac while JOHNSON's problem was with the Aryan Brotherhood at Allenwood. At Allenwood, HAMMER was extremely paranoid. HAMMER was actually placed in population at one time, however was back within hours. HAMMER did not like being in the general population.

HAMMER had a cell partner "TONY LNU", a white male approximately 26 years of age. TONY had black hair, skinny build and was homosexual. TONY and HAMMER would beat up each other periodically for the pain, as both were sadomasochist. JOHNSON's cellmate was JESSE LATSON (phonetic) a black male, approximately 34 years of age. LATSON may have heard much of what HAMMER told JOHNSON through the vent, however, LATSON was in his own world most of the time.

90A-PH-79493

ALBERT RAY JOHNSON, JR.                    12/6/96              3

     During the two weeks or more that JOHNSON lived next door to HAMMER, HAMMER talked of scams and the use of addresses and Social Security Numbers and other variations of how the scams worked.  HAMMER talked of not going back to Oklahoma and the old times.  HAMMER stated that he, "did one at Lampoc and was going to kill one before I leave", meaning at Allenwood.  HAMMER stated, "I'm already incompetent" and that he was "noncompetent, and they can't hold court".  HAMMER constantly talked of making a mockery out of the system and how "they can't do anything to me, I'm incompetent".  JOHNSON estimated that he and HAMMER talked seven to eight hours a day through the vent for the two weeks or more they lived next to one another.

     When JOHNSON left Allenwood to come back to Oklahoma to serve his State time, HAMMER was still at Allenwood.  When JOHNSON returned to Oklahoma in August he heard that HAMMER had killed a cellmate back in Allenwood.  JOHNSON believes he heard this on August 23 or August 24, while being processed through Crabtree Correctional Facility, Helene, Oklahoma.  JOHNSON advised he was voluntarily making this information available to the Federal Bureau of Investigation (FBI).  If his testimony is of some assistance to the Federal Government, possibly some consideration may be made with the regard to the remainder of his time to be served for the State of Oklahoma.

     The following was determined from interview and observation:



# EXHIBIT 11

6/3/98

Inmate ROYCE LEE FOWLER was advised of the identity of the interviewing agent who was accompanied by Special Investigative Agent MARK TRAXLER of the METROPOLITAN DETENTION CENTER (MDC), Brooklyn, New York (NY), and ROBBIE WILSON, Special Investigative Agent of the UNITED STATES PENITENTIARY (USP)- LEWISBURG, Lewisburg, Pennsylvania (PA). FOWLER, who is being held as a holdover inmate at the USP-LEWISBURG, was advised of the purpose of the interview regarding his relationship with inmate DAVID PAUL HAMMER. FOWLER then provided the following information:

FOWLER had lived with HAMMER in the Special Housing Unit (The Hole) of the USP-LEAVENWORTH, Leavenworth, Kansas, as HAMMER's cell mate for approximately nine months. This occurred sometime in 1995. FOWLER indicated that HAMMER was a homosexual and that he was weird. HAMMER used to ask FOWLER if he (HAMMER) could pick FOWLER's blackheads, at which time, HAMMER would act like a sissy, like a little girl. During the nine months in which FOWLER and HAMMER were cell mates, they had a lot of little arguments over little things. Only one time during their nine month period together HAMMER became frustrated and hit FOWLER. Immediately after striking FOWLER, HAMMER became extremely apologetic.

In addition to their nine months together in the Special Housing Unit, FOWLER and HAMMER also knew each other on the compound. FOWLER recalled a situation where he had received information regarding another inmate by the name of BOB CUSTER who was planning a prison break. FOWLER, not knowing what to do with this information, confided in HAMMER. HAMMER took the information and provided it to someone on the outside, who, in turn, notified the Special Investigative Supervisor's (SIS) Office of the incident. FOWLER, himself, did not know how to get this information to the SIS Office and was worried about doing it. Subsequent to the information being provided to the SIS Office, FOWLER was locked up in the Special Housing Unit until the SIS Office could determine what his involvement was in the escape.

FOWLER does not recall HAMMER to have experienced any medical problems, to include headaches. HAMMER experienced

5/27/98          Lewisburg, PA

90A-PH-79493 (WRA)                              5/28/98

SA ANTHONY S. MALOCU:djd

90A-PH-79493 (WRA)

ROYCE LEE FOWLER                              5/27/98              2

headaches "like you and I" but did not experience any significant headaches or medical problems. FOWLER indicated that HAMMER had told him that his father had started to abuse HAMMER and his brother and sister when they were children. HAMMER was approximately five or six years old. HAMMER never talked about his mother and never discussed being abused by her.

FOWLER indicated that HAMMER never experienced any memory lapses or forgetfulness or had any memory problems, "He doesn't forget anything." During their time together, HAMMER did not experience any episodes of diarrhea.

HAMMER was a homosexual and never asked or tried to persuade FOWLER to engage in sexual activity with him, although both FOWLER and HAMMER did talk about homosexuality. HAMMER engaged in masturbation "all the time." HAMMER would first warn FOWLER by telling him, "I'm fixing to have sex." He would then go up to the top bunk and engage in masturbation. HAMMER would typically do this two or three times a day. Afterwards, he would have a cigarette. He had told FOWLER that he had to have a cigarette afterwards.

HAMMER did not talk about his family very often and led FOWLER to believe that he (HAMMER) does not like his brother. Out of the blue, on one occasion, HAMMER told FOWLER about being sexually abused by his father. HAMMER had informed FOWLER that his daddy would have HAMMER "suck his peter." He would do the same thing to his brother and sister. HAMMER never talked about his mother, maybe on one or two occasions. FOWLER cannot remember if he liked or disliked his mother. FOWLER does not even know if she is alive today. HAMMER never discussed being abused by his mother.

HAMMER did not put any pictures on his walls because HAMMER did not do that. He was a very neat individual. HAMMER was like a woman, he did not like any pictures on the walls. FOWLER never saw any pictures of any monkeys. HAMMER never talked to himself other than the normal mumbling to oneself. HAMMER never answered himself or carried on conversations with himself, nor did he ever talk in plural, using the terms "us" or "we." FOWLER never heard HAMMER use the names JASPER, JOCKO, TAMMY or WILBUR. The only nickname he is familiar with is "Birdshot." HAMMER had told FOWLER that he tried to kill a guy

90A-PH-79493 (WRA)

ROYCE LEE FOWLER                                5/27/98            3

one time; he laid him down and shot him in the back of the head with a gun which turned out to be loaded with birdshot.

FOWLER has had the same girlfriend for the past 20 years.  Her name is NANCY.  On one occasion when he was telling HAMMER about how he wanted to tie NANCY up with her pantyhose, HAMMER informed FOWLER about his liking bondage and wanting to be tied up during sex.

FOWLER's impression that HAMMER is weird comes from the fact that HAMMER wanted to pop FOWLER's blackheads and would act feminine.  FOWLER would not let HAMMER pop his blackheads, although FOWLER would allow HAMMER to give him back rubs.  FOWLER indicated that HAMMER had rubbed his back a few times  It was not uncommon to pay guys to rub your back in prison, although FOWLER never paid HAMMER to rub his back.

FOWLER described HAMMER as normal and smart.  His only downfall was that he was homosexual.  He was a good manipulator and scammer based on what HAMMER had told FOWLER.  HAMMER would scam homosexuals by writing to them and having them send money to HAMMER.  HAMMER had done this on several occasions while they were celled together.  On one occasion, HAMMER had scammed a homosexual individual, and after receiving $1,500 in the mail from the individual, HAMMER laughed and said they were stupid. HAMMER had no remorse.  HAMMER went on to say that the individual whom he had scammed would probably kill himself.

FOWLER had never observed HAMMER to use any drugs, although HAMMER had told FOWLER that he had smoked marijuana while they were incarcerated together, but this was never observed by FOWLER.  FOWLER was unaware of any other drug usage HAMMER may have been involved in and recalls HAMMER stating, "You ain't gonna see me do no heroin or anything else."

FOWLER indicated that HAMMER was such a good manipulator that he could manipulate staff, although being incarcerated in the Special Housing Unit, he was not around them long enough.  If he had the time with staff and the freedom, HAMMER would be able to manipulate staff.  FOWLER was asked if HAMMER sat here and lied to us, would he be convincing enough to believe.  FOWLER indicated that you could believe him by the way he talks.

90A-PH-79493 (WRA)

ROYCE LEE FOWLER                          5/27/98                4

HAMMER talked about the OKLAHOMA STATE PENITENTIARY
(OSP). He liked the freedom of the OKLAHOMA DEPARTMENT OF
CORRECTIONS (ODC) to do his scams, although HAMMER had talked
about the one man cell he had been placed in and indicated he did
not want to go back to that cell.

To FOWLER, HAMMER was a normal, stand-up guy, but he
was homosexual. FOWLER indicated that he had been around
homosexuality almost all his life but was not interested. A few
cells down the range in the Special Housing Unit where HAMMER and
FOWLER were celled, there were "a couple of fags." Near the end
of the nine months, HAMMER was making arrangements to have one of
those individuals cell with him. Eventually, one of the
homosexual individuals moved out, and HAMMER moved in with the
other individual.

FOWLER indicated in the nine months that he celled with
HAMMER, HAMMER was only aggressive on one occasion.

FOWLER recalls HAMMER banging his head against the wall
in the cell on a few occasions. HAMMER did not strike the wall
hard, and not enough to hurt himself. On one occasion, HAMMER,
after receiving his food tray, took the food and rubbed the food
on his face. HAMMER then stated to FOWLER, "They treat me like
an animal, I'm gonna act like an animal."

FOWLER advised that he has approximately one year to
serve before being released. When asked what his motivation was
for coming to testify, FOWLER indicated he is trying to get
himself some money to his commissary account before he hits the
street. FOWLER stated, "Believe me, I'm gonna try to get some
money, 25, 75, or even 100 dollars to my commissary account from
HAMMER's lawyers." FOWLER advised that he was upset with his
current living conditions and asked if the interviewing agent
could get him better living conditions. FOWLER stated, "I know
how it works. What do you want from me?"

FOWLER had indicated that he had assisted law
enforcement in the past in investigations regarding corrupt
B.O.P. correctional officers. FOWLER indicated that he had time
removed from his sentence because he assisted in getting corrupt
correctional officers, put in jail. FOWLER indicated that he has
information to provide for authorities at FCI-MANCHESTER,

90A-PH-79493 (WRA)

ROYCE LEE FOWLER                    5/27/98                    5

although, he does not like to provide them information because they do not give him anything in return. FOWLER has provided information to authorities at USP-ATLANTA and has received re-sentencing consideration for his assistance. FOWLER indicated he does not like to provide information if he is not going to get anything in return for it.

FOWLER indicated that HAMMER had written a letter to his girlfriend, NANCY, a few months back. NANCY is believed to still be in possession of this letter, however, FOWLER has never seen the letter.

ROYCE LEE FOWLER is described from interview and BUREAU OF PRISONS records as follows:



# EXHIBIT 12

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription      6/27/96

GAYLON DON BALL, inmate, UNITED STATES PENITENTIARY-ALLENWOOD (USP-A), White Deer, Pennsylvania, Registry Number 17290-009, was advised of the identity of the interviewing agent who was accompanied by Special Investigative Supervisor MARK TRAXLER.  BALL was informed of the purpose of the interview regarding the death of inmate ANDREW HUNT MARTI.  BALL then provided the following information:

BALL advised he had known HAMMER for several years. Both did time together in the UNITED STATES PENITENTIARY, Leavenworth, Kansas, back in 1992, and part of 1993.

During his stay at the USP-A, HAMMER would occasionally ask BALL if he needed any cigarettes or magazines.  BALL did not like to associate with HAMMER due to the fact that he was homosexual.  It is BALL's opinion that HAMMER was having sexual relations with MARTI, although he had no facts to back up his opinion.  The first knowledge BALL had regarding the death of inmate MARTI occurred when he heard a female's voice outside HAMMER's cell on the morning that MARTI was murdered.

On a few occasions, BALL would exchange books and magazines with HAMMER.  According to BALL, HAMMER enjoyed books about murders.  BALL did not know MARTI personally, other than to say hello while passing his cell.

The following information was obtained through BUREAU OF PRISONS' records:



Investigation on    6/26/96    at    White Deer, Pennsylvania

File #    90A-PH-79493 (WRA) -34

by   SA ANTHONY S. MALOCU:sac          Date dictated    6/26/96

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

# EXHIBIT 13

ДСМ
6/24/96

Gaylon Ball          UKM

Dacto Lev Kansas was sleeping at the time
Knew Kemmer a good while Knew of him when
both shared time in Lewisburg in 1992 and part
of 1993.
Assisted FBI in Lev to get a C.O. dealing drugs in
Lev.
Kemmer would ask him if he needed any cigarettes or
magazines.
It is Ball's opinion that Kemmer was having
sexual relations with Marti although this
is only his opinion.
Approx. 1 hr before to heard female voice
Didn't know Marti or talk to him other
then to say hello.
Would exchange books w/ Kemmer who enjoyed books
about Murders.


DEFENDANT'S EXHIBIT

# EXHIBIT 14

FD-302 (Rev. 3-10-82)

- 1 -

FEDERAL BUREAU OF INVESTIGATION

Date of transcription _____9/4/96_____

     Martin R. Guerrero, Jr., register number 43281-080, was located at the United States Penitentiary, Leavenworth, Kansas (USPLK). Guerrero thereafter provided the following information:

     Guerrero advised that he knew inmate David Paul Hammer because Hammer was an inmate at the United States Penitentiary, Leavenworth, Kansas, sometime prior to Hammer's transfer to the United States Penitentiary-Allenwood (USP-A). Guerrero advised he never received any letter from Hammer or Andrew Hunt Marti. Guerrero stated he had never heard of the inmate Andrew Hunt Marti. Guerrero stated that he never received any mail from a third party located in Michigan. Guerrero advised he never heard of Maurice Young or knew anyone from Three Rivers, Michigan. Guerrero advised he was from Texas and most of his friends and family reside around the San Antonio area.

     Guerrero advised he had no idea why Hammer was trying to involve him in a murder. Guerrero advised that he does not belong to any gangs or involve himself in any gang activities.

     The following is a description of Guerrero:



Investigation on __8/27/96__ at __Leavenworth, Kansas__

File # __90A-PH-79493__ & ~~90A-PH-77357~~

by __SA Dennis L. Conway/eisg__     Date dictated __9/4/96__

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;

# EXHIBIT 15

# FEDERAL PUBLIC DEFENDER
## CAPITAL HABEAS UNIT
MIDDLE DISTRICT OF PENNSYLVANIA
100 CHESTNUT STREET, SUITE 300
HARRISBURG, PENNSYLVANIA 17101-2540
TELEPHONE: (717) 782-3843
FAX: (717) 782-3966

**FEDERAL PUBLIC DEFENDER**
JAMES V. WADE

**ASSISTANT FEDERAL DEFENDER**
ANNE L. SAUNDERS
BETH A. MUHLHAUSER
ROBERT BRETT DUNHAM
KELLY D. MILLER

August 7, 2013

The Honorable Peter J. Smith
United States Attorney
AUSA John Gurganus
Middle District of Pennsylvania
William J. Nealon Federal Building and Courthouse
235 N. Washington Ave., Suite 311
Scranton, PA 18503

Re:   Counsel's Renewed Request to Forego Capital Authorization in <u>USA v. Hammer,</u>
96-239 (M.D. Pa.)

Dear Messrs. Smith and Gurganus:

We write to renew our request that the United States forego seeking the death penalty against David Hammer. In our prior submission, we had discussed a number of factors relevant to the consideration of whether or not a capital prosecution of Mr. Hammer was appropriate and how the capital case against Mr. Hammer had changed. Since our April 2010 submission, a number of additional factors supporting deauthorization have developed demonstrating that continuing a capital prosecution against Mr. Hammer does not serve the ends of justice.

In these difficult economic times, with funding cutbacks and additional sequestration cuts looming for fiscal year 2014, the cost of the resentencing proceedings is a valid consideration in determining whether or not to continue the capital prosecution against Mr. Hammer. The litigation surrounding Mr. Hammer's capital prosecution has already involved significant costs, including a lengthy trial and sentencing proceeding that included the cost of accommodating jurors and presenting multiple expert witnesses. The 1996 capital trial was followed by extensive litigation that included a three-month evidentiary hearing in which over ten expert witnesses were presented. The District Court's grant of relief was followed by additional litigation that ultimately concluded in the Third Circuit's dismissal on jurisdictional grounds. The resources expended — necessary in light of the capital nature of the prosecution — have already taken a toll on the resources of the Court, the government and the defense.

The Honorable Peter J. Smith
August 7, 2013
Page 2

If this case continues to a resentencing hearing, the Court will be required to expend significant staffing and other resources to accommodate the necessary jury selection process as well as the two to three month resentencing proceeding. The cost of bringing in multiple panels of prospective jurors will be substantial. When that is added to the cost and Court resources necessary to bring in a jury for what everyone agrees will be a lengthy resentencing proceeding that total increases significantly. In addition, both the government and the defense have provided notice of more than fifteen (15) expert witnesses. A number of lay and expert witnesses are from areas across the country, taking an additional economic toll on Court and other resources. In short, the cost of this resentencing will far exceed hundreds of thousands of dollars.

When these exceptional costs are considered in light of the factors presented in the prior submission for deauthorization as well as those described below, including: the resolutions of various capital cases since the prior submission; the additional mitigation developed further supporting a sentence less than death; and, Mr. Hammer's continuing failing health, thus further reducing his likelihood of being a future danger in the prison environment, we would submit that deauthorization is an appropriate result that will provide some relief from the already extraordinary toll this capital litigation has had on the resources of the Court, the government and the defense.

Since Mr. Hammer's prior deauthorization submission, a number of federal capital cases have either reached resolutions or resulted in a sentence less than death. These include at least four cases involving inmate murders: United States v. Williams/Cooya, 4:08-cr-00070 (M.D. Pa.) (resolved via plea agreements on January 8, 2013 (Cooya) and April 15, 2013 (Williams)); United States v. Jackson, 1:06-cr-00051 (E.D. Tex.) (resolved after grant of Section 2255 relief); United States v. Richardson, 08-139 (N.D. Ga.) (jury resolution on April 29, 2012); and United States v. (Antonio) Johnson, 2:12-cr-00007 (W.D. Va.) (plea agreement March 12, 2010). From what counsel can determine regarding the circumstances of those murders, none appear particularly less aggravating than Mr. Hammer's case and some appear to be moreso. For example, the Williams/Cooya case involved circumstances in which the inmate was stabbed multiple times and his body kicked/beaten thereafter for over four minutes with Williams/Cooya taking various breaks throughout while waiting for the guards to arrive. The Richardson case involved the murder of a convicted sex-offender. Richardson stabbed the inmate nine times, then strangled him and during that process took various breaks to allow the inmate to regain consciousness before resuming. The Jackson and Johnson cases involved inmate stabbings.

The cases resolved since the prior submission also include at least three cases that were resolved for less than a death sentence after post-conviction relief was granted. In addition to the Jackson case described above, in United States v. Lecco, 2:05-cr-00107 (S.D.

The Honorable Peter J. Smith
August 7, 2013
Page 3

W.V.), the District Court granted a motion for a new trial. That case involved a 2005 murder-for-hire of a cooperating witness/informant. The victim was shot, beaten to death and buried in a shallow grave. The jury was unable to reach a unanimous verdict at the resentencing and Mr. Lecco was sentenced to life imprisonment. After the grant of Section 2255 relief, the government withdrew its Notice of Intent in United States v. Stitt, 2:98-cr-00047 (E.D. Va.) and United States v. Johnson, 96-cr-379-1 (N.D. Ill.). Stitt's conviction arose from his gang leadership in which he had ordered the murder of three individuals. Johnson, a leader of the Gangster Disciples Gang, had ordered the murders of cooperating witnesses. As described in the prior submission, Mr. Hammer's prison conduct during the time since the prior trial and sentencing hearing has no indications of violence or even the hint of any prospective future violence through the use of intermediaries.

The cases resolved since the prior submission also include at least three cases in which the government withdrew Notice of Intent prior to trial and the cases then proceeded as non-capital trials: United States v. (Antoine) Johnson, 2:05-cr-00920 (C.D. Cal.); United States v. (Herman) Johnson, 05-80337 (E.D. MI.); and United States v. Watson, 05-80025 (E.D. MI.). The Antoine Johnson case involved a sophisticated armored car robbery/murder involving a shoot-out in which over fifty rounds were fired killing a 61 year old father of ten. The Watson case also involved a bank robbery in which the guard was killed by Watson. The Herman Johnson case involved the shooting death of a cooperating witness.

In addition to the Antonio Johnson and Williams/Cooya cases described above, there were at least three other cases that were resolved for less than death by plea agreement: United States v. Lopez, 2:04-cr-00939 (E.D. NY); United States v. Aquart, 3:06-cr-00160; and United States v. Loughner, 4:11-cr-00187 (D. Ariz). Lopez was a MS-13 gang member who shot a cooperating witness. Aquart involved another gang-related murder in which Aquart and his co-conspirators entered a home, bound a woman and two men with duct tape and then beat them to death with a baseball bat. The Loughner case involved the shootings in Arizona that resulted in the death of five individuals, including a United States District Judge and Congressional employees and also seriously injured over ten others, including Congresswoman Gabriele Giffords. More recently, on June 5, 2013, the government's prosecution of former Sargent Bales – involving the murder of sixteen Afghan civilians, including women and children – was resolved by plea agreement that included the withdrawal of the death notice.

In addition to the Richardson case noted above, counsel is aware of at least three additional cases that proceeded to a capital sentencing hearing and resulted in a life verdict. These include: United States v. Northington, 2:07-cr-00550 (E.D. Pa.); United States v. Lujan, 2:05 -cr-00924 (D. N.M.); and, the life verdict just issued on August 2, 2013, in the Eastern District of Virginia, for the three Somali nationals convicted of piracy, murder,

The Honorable Peter J. Smith
August 7, 2013
Page 4

kidnapping and firearms offenses arising from the February, 2011 fatal shooting of four Americans on a yacht off the coast of Africa. The Lujan case involved a drug-related kidnapping murder of a sixteen (16) year old potential prosecution witness. The victim was beaten, forced to perform oral sex and nearly decapitated with a meat cleaver. DNA evidence connected Lujan to another double murder. Following a penalty hearing, Lujan was sentenced to life imprisonment.

The Northington case involved gang-related murders in which Mr. Northington was convicted of multiple murders, including the murder of a prosecution witness. There was evidence presented during the sentencing hearing regarding recent threats or incidents of violence committed by Mr. Northington while in prison in support of future dangerousness. As noted in the prior submission, no such incidents exist for Mr. Hammer and, instead, his prison adjustment has improved over the years. See Prior Submission Section VI. Indeed, his current security classification is a "one-man" hold, the lowest classification for moving a prisoner on the Special Confinement Unit.

A comparison of the circumstances surrounding the cases in which the government has agreed to withdraw notice and/or those in which the sentencing jury rejected death with the circumstances of Mr. Hammer's case – as we now know those circumstances – supports deauthorization. Certainly each of these cases also had mitigation evidence supporting a resolution other than death. Mr. Hammer's case does as well, as described in the prior submission and as supplemented below.

Another consideration is the quality and nature of the mitigating evidence that will be presented on Mr. Hammer's behalf. This was discussed at length in the initial request for deauthorization. See Prior Submission, Section III. However, it is worth noting that Mr. Hammer's history of physical, sexual and psychological abuse and resulting psychological problems will not only be confirmed by records and through the testimony of mental health experts, but also by the lay testimony of a number of witnesses. This testimony will provide insight and corroboration to incidents of abuse, its recurring nature, the depravity of what transpired, and the early age at which the psychological impact of this trauma first surfaced in the context of a hospital admission.

Moreover, the government's own mental health experts who testified during the §2255 proceedings, and who have been noticed by the government for the upcoming resentencing hearing, found Mr. Hammer's rendition of his history of abuse to be credible and genuine. These experts, Drs. Martell, Matthews, and Mitchell, found that Mr. Hammer's background and history was plagued by horrific physical, emotional and sexual abuse. Id. Drs. Martell and Matthews diagnosed Mr. Hammer as suffering from Cognitive Disorder, Not Otherwise Specified and Borderline Personality Disorder. Both found that Mr. Hammer was not

The Honorable Peter J. Smith
August 7, 2013
Page 5

malingering and that as a result of his history of abuse, he suffered from many psychological symptoms.  Id.

Both Drs. Martell and Matthews described the trauma Mr. Hammer experienced at the hands of caregivers, including his mother, his father and other extended family members that involved physical abuse; sexual abuse (at the hands of his mother, father and others); emotional abuse (including shaming, verbal abuse, and forcing Mr. Hammer to kill pets and engage in illegal activities); failure to protect (father's failure to prevent his mother's abuse and coercion of sexual abuse); and neglect.  Id.  Mr. Hammer's first sentencing jury did not have all of this information.

Another factor militating in favor of deauthorization is Mr. Hammer's continued declining health. Since our prior submission, Mr. Hammer has been hospitalized numerous times for issues ranging from a serious infection that almost killed him this past spring, cardiac issues, including a heart catheterization in 2012, and increased complications from his Type 2 Diabetes.

Mr. Hammer's health problems are chronic, serious, and worsening. Current medical records reveal that Mr. Hammer has a significant history of Type 2 Diabetes[1]; severe diabetic peripheral neuropathy[2]; diabetic retinopathy[3]; severe coronary artery disease; unstable Angina; Nephrotic Syndrome[4]; Metabolic Syndrome[5]; Hypertension; Hepatitis C; Hepatitis

---

[1] Type 2 Diabetes is a chronic condition where the body is unable to process what insulin it manufactures. It causes damage to nerves and blood vessels in the eyes, kidneys, heart and arteries. It leads to strokes and heart attacks. As discussed above, Mr. Hammer suffers from damage to his nerves, blood vessels, heart, kidney, eyes and arteries.

[2] Diabetic Peripheral Neuropathy is a chronic condition where the diabetes has damaged sensory nerves which allow the brain to respond to pain, touch and temperature. It can also damage the motor nerves, which work with the muscles to control movement. It can lead to severe foot ulcers, which Mr. Hammer suffers, and in severe cases, results in amputation.

[3] Diabetic Retinopathy is a disease of the retina. The retina is the nerve layer that lines the back of the eye. This disease can lead to poor vision and blindness. It is caused by damage to the blood vessels of the retina.

[4] Nephrotic Syndrome is caused by damage to the tiny blood vessels in the kidneys that filters waste and extra water from the blood. The failure of these blood vessels leads to high levels of protein in the urine, low levels of protein in the blood and high cholesterol.

[5] Metabolic Syndrome is a constellation of health problems that includes high blood pressure, elevated blood sugar, high triglycerides and low HDL cholesterol. This syndrome increases

The Honorable Peter J. Smith
August 7, 2013
Page 6

B; Hypothyroidism; a history of myocardial infarction (heart attack); and, degenerative disc disease. Mr. Hammer's medical history includes emergency bowel resection, the placement of a stent in his LAD[6] coronary artery in 2008; and a heart catheterization in 2012.

New to the diagnostic picture is his continued decline in cardiac health as well as chronic conditions brought about by his severe Type 2 Diabetes: Diabetic Peripheral Neuropathy; Diabetic Retinopathy; Nephrotic Syndrome and Metabolic Syndrome. These diseases damage the eyes, kidneys, sensory nerves, motor nerves and further damage Mr. Hammer's heart and arteries.

Since 2009, Mr. Hammer's coronary artery disease has significantly worsened. He was admitted to the hospital in January of 2010, suffering from chest pain and was diagnosed with unstable angina and severe coronary artery disease.

In May of 2010, Mr. Hammer was again admitted to the hospital, this time suffering from loss of vision from "advanced diabetic retinopathy." In the emergency room, "he was unable to count fingers when seen by Dr. Milstead." After evaluation, the assessment noted that his loss of vision "appears to be progressive."

In October of 2011, Mr. Hammer was admitted to the hospital suffering from severe chest pain. The pain had started earlier in the day and despite taking nitroglycerene pills (for angina), the pain worsened. Upon admission, he had both high blood pressure, a high heart rate, low breathing rate and very high sugar.

Indeed, at one point in 2011-12, Mr. Hammer, while housed at USP-Canaan, required the use of a wheelchair in order to travel any distance within the institution. This arose as a result of the further deterioration of Mr. Hammer's chronic back condition. In February, 2008, Mr. Hammer had been diagnosed with degenerative disc disease with posterior disc protrusion. He also suffers from diabetic ulcers on his foot and, at one point, medical staff expressed concern that the ulcer might enter the bone, which potentially could lead to amputation.

In January of 2012, Mr. Hammer was rushed to the hospital by ambulance where a heart catheterization was performed after full evaluation:

The Patient was brought to the cardiac catheterization laboratory on January

the risk of heart attack and stroke.

[6]Often called the "widowmaker."

The Honorable Peter J. Smith
August 7, 2013
Page 7

18, 2012, in guarded condition. He underwent left heart catheterization, coronary arteriography, left venticulography right femoral artery Mynx deployment.

* * *

He was released in guarded condition on January 18, 2012, to...USP-Canaan...

Community Medical Center of Scranton Discharge Summary, at 2.

Post-operative notes indicate that Mr. Hammer's heart has "significant residual lesions." This ominous observation means that there were narrow areas in Mr. Hammer's coronary arteries which could not be opened during the catheterization. These blockages are significant in that the unopened blood vessels are narrow enough to block blood flow and remained because they were not amenable to treatment or were too risky to attempt to clear.

Thus, while the immediacy of Mr. Hammer's 2012 cardiac emergency was handled as best it could be, much damage remains and his cardiac health is in steady decline. As of this writing, Mr. Hammer suffers from Type 2 diabetes that has led to severe coronary artery disease and has suffered complications implicating his vision, kidney function, sensory and motor function and has significantly heightened his risk of stroke and of suffering from another heart attack.

In February, 2013, Mr. Hammer was admitted to Union Hospital in Terre Haute suffering from nausea, vomiting and abdominal pain as well as chest pains. He was ultimately diagnosed with viral gastroenteritis, but the physician noted the neuropathy suffered by Mr. Hammer at that time and recommended diabetic shoes.

More recently, during a legal visit with Mr. Travis in May, 2013, Mr. Hammer became severely ill and was again hospitalized, this time as a result of multiple infections. He presented upon admission with symptoms of fatigue and low energy, a fever of 102 as well as chills and dysuria. His sugar levels were reportedly high, between 180 to 300 range, generally around 195 during the days preceding his hospitalization. During this hospitalization, the wound specialist noted the ongoing ulcers on Mr. Hammer's feet and resulting infections. He was diagnosed with pyelonephritis, likely left-sided,[7] severe sepsis,[8] severe neuropathy, as well as his chronic heart, diabetes and hypertension conditions.

---

[7]A bacterial or viral infection of the kidney.

[8]The body's inflammatory response to infection.

The Honorable Peter J. Smith
August 7, 2013
Page 8

Intravenous antibiotics were initially necessary followed by prescription medications and the physician's reiteration that Mr. Hammer needed diabetic shoes and continuing wound care. These were approved by the Chief Physician and URC.[9]

In short, Mr. Hammer's multiple medical conditions continue to deteriorate. These conditions, along with Mr. Hammer's age, he will turn fifty-five in October, as well as his history of a lack of violence within the institution for a significant period of time, demonstrate that, as he ages, any threat he may have posed in the institution setting has diminished.

Mr. Hammer has been classified as a medical "CARE level 3" of four possible levels. CARE Level 3 inmates are "fragile outpatients who require frequent clinical contacts" and "stabilization of medical . . . conditions that may require periodic hospitalization." See BOP Legal Resource Guide at 24. It is the second most serious medical classification. In light of his chronic medical conditions which have been deteriorating over the recent years, counsel would request that the government consider recommending that Mr. Hammer be designated to a United States Penitentiary that has CARE level 3 treatment available (USP-Terre Haute is one such facility).

---

[9]Utilization Review Committee.

The Honorable Peter J. Smith
August 7, 2013
Page 9

For each of these reasons, counsel respectfully request that the government deauthorize this capital prosecution. In return for the government's favorable consideration of all of the above, Mr. Hammer is willing to forego pursuing appeals of his guilt-phase issues. Counsel would be happy to discuss any questions you may have in person at your earliest convenience.

Respectfully,


/s/ RONALD C. TRAVIS
Rieders, Travis, Humphrey, Harris,
Waters & Waffenschmidt
161 West Third Street
PO Box 215
Williamsport, PA 17703-0215
570-323-8711 (telephone)
rtravis@riederstravis.com


/s/ ANNE SAUNDERS
Assistant Federal Defender
Federal Public Defender
Middle District Pennsylvania
100 Chestnut Street, Suite 300
Harrisburg, PA 17101
717-782-3843 (telephone)
anne_saunders@fd.org

/s/ JAMES MORENO
/s/ JAMES J. MCHUGH, JR.
Federal Community Defender
Eastern District Pennsylvania
Suite 545 West – The Curtis Center
Philadelphia, PA 19106
215-928-1100 (telephone)
215-928-0826 (facsimile)
james_mchugh@fd.org
james_moreno@fd.org

cc:    The Honorable Yvette Kane, Chief Judge
U.S. District Court
Middle District of Pennsylvania
PO Box 11817
228 Walnut Street
P.O. Box 983
Harrisburg, PA 17108-1817

The Honorable Joel H. Slomsky
5614 U.S. Courthouse
Eastern District of Pennsylvania
601 Market Street
Philadelphia, PA 19106

AUSA Steven Mellin
Department of Justice
Capital Case Unit
1331 F Street, N.W.
Washington, D.C. 20530