UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | : | No. 4:96-CR-239 |
| v. | : | Honorable Joel H. Slomsky |
| DAVID PAUL HAMMER, | : | Capital Case |
| Defendant | : |  |

**DEFENDANT'S MOTION IN LIMINE TO PRECLUDE THE GOVERNMENT FROM SEEKING DEATH ON THE BASIS OF A PRIOR CONVICTION AND OTHER EVIDENCE THAT WAS THE PRODUCT OF PERJURED TESTIMONY**

Defendant, David Paul Hammer, through counsel, herein submits his *Motion in Limine to Preclude the Government from Seeking Death on the Basis of a Prior Conviction and Other Evidence that Was the Product of Perjured Testimony* and, in support thereof states the following.

### A.   Background.

1.   On September 18, 1996, a Grand Jury sitting in Williamsport, Pennsylvania, returned an Indictment charging David Hammer with first degree murder arising from the April 13, 1996, death of Mr. Hammer's cellmate, Andrew Marti.  Doc. 1.  On April 9, 1997, the government filed a notice of its intent to seek

the death penalty.  Doc. 93.  Included in the factors the government considered in reaching a capital authorization decision is the defendant's prior record, including Mr. Hammer's Oklahoma convictions for kidnapping, robbery and assault with a gun in State v. Hammer, CRF-84-l3l0.  The trial began on May 5, 1998.  On June 22, 1998, after the defense had rested and while the government was presenting its rebuttal case, Mr. Hammer entered a plea of guilty to the murder charge.

2.    The penalty phase began on June 30, 1998.  In support of death, the government sought to prove two statutory aggravating factors:  that the defendant committed the murder after substantial planning and premeditation, 18 U.S.C. §3592(c)(9), and that the defendant had previously been convicted of a state or federal offense punishable by a term of imprisonment of more than one year that involved the use, or attempted or threatened use, of a firearm against another person, 18 U.S.C. §3592(c)(2).

3.    One of the two convictions relied on by the government in support of the prior firearms conviction aggravator under Section 3592(c)(2) was State v. Hammer, CRF-84-l3l0 (Okla.) (hereinafter "Upton case"), which resulted in a sentence of 1200 years.  The Upton case involved charges that Mr. Hammer kidnapped Thomas Upton, robbed him with a firearm, and shot him with intent to kill.  Mr. Upton testified at two preliminary hearings and trial in that case.  Although the details of some of his

testimony varied, Upton consistently testified that, at the time of the incident, Mr. Hammer had approached Upton's car on the street brandishing a firearm and demanded that Upton drive to a motel.

4.      Mr. Upton also testified that, inside the motel room, he fought with Mr. Hammer and that Mr. Hammer struck him multiple times during that fight.  Mr. Upton also testified that at one point Mr. Hammer locked him in the bathroom, during which time Mr. Hammer made two phone calls.  Upton also testified that Mr. Hammer had forced him to drive to an area near some oil wells, ordered him to take off his clothes and lie on the ground, and then shot him multiple times with a large gun.  Mr. Upton testified that, after being shot, he got up and ran or walked away while Mr. Hammer screamed and then drove away in Upton's car.  See Exhibit 1.

5.      Mr. Upton's importance in the government's case for death against Mr. Hammer is underscored by the fact that he was the first witness the government called in the prior penalty hearing.  NT Vol. 15 (6/30/98) at 5.  Mr. Upton adopted and authenticated his preliminary hearing testimony from the Oklahoma case.  See NT Vol. 15 (6/30/98) at 6.  He also provided live testimony as to various aspects of the incident that was consistent with his prior testimony in Oklahoma.  See id. at 8 (indicating that Mr. Hammer assaulted him); id. at 9 (indicating that Mr. Hammer brandished a large gray weapon and ordered Upton to take him where he wanted to

go); id. at 10 (indicating that Mr. Hammer forced Upton to accompany him to a motel room).

6.      The government also presented testimony from the prosecutor in the Upton case, William Louis Keel.  During that testimony, the government elicited testimony that Mr. Hammer had been convicted of kidnapping, shooting with intent to kill, and robbery.  NT Vol. 16 (7/1/98) at 66.  The government also admitted into evidence the certified convictions.  See Tr. Govt. Exh. 4001.

7.      The government argued in its closing and in rebuttal that the jury should consider both the fact of the Upton convictions and the specific circumstances of the underlying incident in determining whether the government had proven its submitted aggravating factors, as a basis for rejecting Mr. Hammer's mitigation, and in finding that the government's reasons for death outweighed Mr. Hammer's reasons for life. See NT Vol. 27 at 62-63 (arguing the jury should find the prior conviction aggravator on the basis of these convictions); id. at 67 ("Mr. Upton was minding his own business in a truck on Classen Avenue . . . he was on Classen Avenue in Oklahoma City when Mr. Hammer with a firearm came up to him and basically commandeered his truck. He took him to a motel . . ."); NT Vol. 29 (7/23/98) at 19 (arguing that the jury should consider the convictions in aggravation); id. at 41 (arguing the Oklahoma incident and trial as a basis for rejecting mitigation evidence); id. at 56 (arguing the

Oklahoma incident as support for escalation of violence).

8.      The prosecution employed various aspects of Upton's version of events to bolster its theory of how Mr. Marti was killed.  For example, it invoked Mr. Hammer's purported kidnapping and confinement of Mr. Upton as a "hostage theme" that was prevalent in Mr. Marti's death.  Id. at 67 ("[I]t's always nice to have a hostage around.  Again, you'll hear this hostage theme repeated, repeated and repeated").  The government argued that Mr. Hammer had used "deceit" and "lulled" Mr. Upton into believing he would not be hurt so as to get Mr. Upton to remove his clothes.  Id. at 67-68.  The prosecutor then employed the very same terms to describe what the government contended Mr. Hammer had done to Mr. Marti.  Id. at 85.

9.      In September 2002, Mr. Hammer filed a petition for writ of habeas corpus collaterally attacking his conviction and sentence pursuant to 28 U.S.C. §2255.  The Court conducted an evidentiary hearing on his petition from July 14, 2005 through September 29, 2005.  On the twenty-ninth day of the hearing, September 22, 2005, the government provided the defense with thirty-three previously undisclosed FBI 302 statements that summarized interviews with various prison inmates.

10.     On December 27, 2005, the Court issued its decision vacating the 1998 sentence of death.  The Court found, in part, that, as a result of the government's

misconduct for failing to disclose material exculpatory evidence, the prior sentencing proceeding was constitutionally defective.[1]  Specifically, the Court held that the government's failure to disclose four FBI 302 witness statements that were "relevant and material" to the jury's penalty determination violated Brady v. Maryland, 373 U.S. 83 (1963).  United States v. Hammer, 404 F. Supp. 2d 676, 801 (M.D. Pa. 2006) (Muir, J.)  The Court then concluded as a matter of law that the failure of the government to disclose the FBI 302 statements rendered "the penalty phase of the trial defective."  Id.

11.     In its Informational Outline the government noticed its intent to again proceed with the prior firearms conviction aggravator under Section 3592(c)(2) and rely on the Upton case as support for that aggravator.  See Doc. 1489 at 2, n.1.

12.     On March 11, 2014, counsel received a notice from current government counsel pursuant to Brady v. Maryland, 373 U.S. 83 (1963) that on March 10, 2014, Mr. Upton had admitted facts to Capital Crimes Section Trial Attorney Haines and Special Agent Coyle demonstrating that he had testified falsely against Mr. Hammer in Oklahoma in 1984 and this federal court in 1998.  Specifically, the notice indicated that Upton had admitted that he had voluntarily accompanied Mr. Hammer to the

---

[1]The Court also found that the jury's failure to find mitigating factors that had been conceded or undisputed by the government constituted constitutional error requiring reversal.  Hammer, 404 F. Supp. 2d at 801.

motel; that Mr. Hammer had not brandished a weapon and forced Mr. Upton to accompany him; that Mr. Upton was neither kidnapped nor carjacked; and that Mr. Upton had not been locked into the bathroom in the motel, although he did go into the bathroom so that Mr. Hammer could make a phone call.  See Exhibit 2.

13.     On March 13, 2014, the government provided counsel with an FBI 302 recounting further details of the interview, including multiple instances in which Ms. Haines and/or Agent Coyle confronted Mr. Upton with the contradictions in his version of events.  See Exhibit 3.  On March 14, 2014, current government counsel sent Mr. Hammer's counsel an email that provided a further clarification of Mr. Upton's disclosures during the March 10, 2014 meeting.  See Exhibit 4.

14.     The recently provided 302 also revealed that at or around the time of Mr. Hammer's first federal trial, a person Upton believed to have been from the United States Attorney's Office had challenged Upton concerning his testimony in the Oklahoma trial.  Id.  Mr. Upton's revelation that he had been confronted by someone possibly from the United States Attorney's office demonstrates that the government knew or should have known that Mr. Upton had committed perjury in his Oklahoma testimony against Mr. Hammer.

15.     A review of the trial prosecutor's direct examination of Mr. Upton provides further evidence that the government at a minimum viewed Mr. Upton's

testimony about critical facts of the Oklahoma incident as questionable.  During his direct examination, the prosecutor had Mr. Upton identify his preliminary testimony from the Oklahoma case.  Other than a single question as to whose decision it was to go to the motel room (NT Vol. 15 at 10), the prosecutor asked no questions about how Mr. Hammer came to be with Mr. Upton prior to the actual shooting.  The prosecutor asked nothing about Mr. Hammer accosting Mr. Upton's car at an intersection brandishing a firearm.  He asked nothing about what Mr. Hammer purportedly told Mr. Upton in the car ride to the motel.  He asked nothing about Mr. Upton being locked into the bathroom.  Instead, the prosecutor skipped all of these circumstances altogether and limited his examination to questions about the shooting itself and what Mr. Upton had meant when he had indicated that Mr. Hammer had "schized out." NT Vol. 15 at 6-12.  Thus, the prosecutor managed to avoid directly eliciting any of the false testimony, but was able to rely on that false testimony through the Oklahoma preliminary hearing transcript in arguing that Mr. Hammer should be put to death.

16.    Permitting the government to pursue this capital prosecution on the basis of any evidence surrounding that incident in light of these recent disclosures violates Mr. Hammer's Fifth, Sixth, and Eighth Amendment Rights and the Federal Death Penalty Act ("FDPA") for a number of reasons.  It violates the Fifth Amendment

prohibition against verdicts based on an invalid conviction. It violates the Fifth Amendment prohibition against verdicts based on false or misleading evidence. It violates Mr. Hammer's Fifth, Sixth, and Eighth Amendment rights to a verdict based on competent, reliable evidence. It violates Mr. Hammer's Fifth, Sixth and Eighth Amendment rights to a jury determination based solely on the relevant evidence and law. It violates Mr. Hammer's Eighth Amendment right to heightened procedural safeguards in this capital case. It violates the Fifth and Eighth Amendment prohibition against an arbitrary and capricious sentencing determination. As any probative value of prior convictions arising from perjured testimony is far "outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the [factfinder]," it violates the FDPA. 18 U.S.C. § 3593(c).

WHEREFORE, for each of these reasons, and those set forth in Mr. Hammer's *Brief in Support of his Motion in Limine to Preclude the Government from Seeking Death on the Basis of a Prior Conviction and Other Evidence that Was the Product of Perjured Testimony,* Mr. Hammer respectfully requests that, following discovery, an evidentiary hearing and/or argument, that this Court Grant Mr. Hammer's motion.

9

Respectfully submitted,


/s/  RONALD C. TRAVIS
Ronald C. Travis
Rieders, Travis, Humphrey, Harris,
Waters & Waffenschmidt
161 West Third Street
PO Box 215
Williamsport, PA  17703-0215
570-323-8711 (telephone)
570-323-4192 (facsimile)
rtravis@riederstravis.com


/s/ ANNE SAUNDERS
Anne Saunders
Assistant Federal Defender
Federal Public Defender
Middle District Pennsylvania
100 Chestnut Street, Suite 300
Harrisburg, PA 17101
717-782-3843 (telephone)
717-782-3966 (facsimile)
anne_saunders@fd.org

/s/ JAMES MCHUGH
James J. McHugh, Jr.
/s/ JAMES MORENO
James Moreno
Federal Community Defender
Eastern District Pennsylvania
Suite 540 – The Curtis Center
Philadelphia, PA 19106
215-928-1100 (telephone)
215-928-0826 (facsimile)
james_mchugh@fd.org
james_moreno@fd.org


Dated: April 2, 2014

# CERTIFICATE OF SERVICE

I, Anne Saunders, Esquire, do hereby certify that on this date I served a

copy of the foregoing by Electronic Case Filing, or by placing a copy in the United

States mail, first class addressed to the following:


John C. Gurganus, Jr. Esquire
United States Attorneys Office
Middle District of Pennsylvania
235 N. Washington Street, Suite 311
PO Box 309
Scranton, PA. 18501

Amanda Haines, Esquire
United States Department of Justice
Criminal Division
Capital Case Section
1331 F. Street, N.W.
Washington, D.C. 20530


/S/ANNE SAUNDERS, ESQUIRE
James Moreno, Esquire

Dated: April 2, 2014