# EXHIBIT 1

P.H. T #2   2

(Whereupon, with the Court, counsel, and the Defendant present in person, the following proceedings were had, to-wit:)

MR. REINKE:  I think there's some motions, Judge.

THE COURT:  All right.

MR. HAMMER:  Your Honor, I have a motion and application pending before the Court.

THE COURT:  All right.  Motion to be recognized as own counsel.

MR. REINKE:  I believe that's already been ruled on, hasn't it, by Judge Parr?

MR. EVANS:  Not on this case.  It was ruled on the last case, but, when this was refiled, Judge Parr put it off until the preliminary hearing could be heard.

THE COURT:  All right.  I'm going to take that up first.  Let me read this, please.

There's a case filed in this county dealing with Hammer vs. T. Hurley--Public Defender's office.

MR. HAMMER:  Your Honor, there is a case in federal court, a civil suit, and it's in the United States District Court for the Western District of Oklahoma, and it is pending, but I will stipulate to Mr. Evans as my stand-by counsel.  He has been helping me over the last two or three months and he's done an excellent job.

THE COURT:  All right.  With that stipulation, you waive any prejudice or conflict you have?  Because he's in

the Public Defender's office, also.

MR. HAMMER:  Yes, sir, I understand that.

THE COURT:  All right.

MR. EVANS:  When Judge Parr considered that the last time, Judge, he appointed us to represent him--or as stand-by counsel.

THE COURT:  You understand, sir, that you have a right to have counsel and, if you are indigent, this Court will appoint counsel to represent you at no expense to you to be able to follow the Rules and Procedures to be able to cross-examine and bring in witnesses for your defense or whatever legal action that individual deems is necessary for the full, complete representation of your rights; do you understand that?

MR. HAMMER:  Yes, I do.

THE COURT:  And do you understand that you have a right, also, though, to represent yourself, but, when you do that, you face the perils of your own representation; do you understand that?

MR. HAMMER:  Yes, sir, I do.

THE COURT:  Do you understand further that you are bound by your own representation as to any other rules or procedures that all other lawyers are bound by, and you must follow that in this Court--nor any Court can go into a dissertation of principles of law at each time they may arise, and

you have to protect your own record and your own constitutional rights as if you were in fact a lawyer; do you understand that?

MR. HAMMER: Yes, sir, Your Honor, I understand.

THE COURT: Do you understand that, on a waiver of counsel, that you can be jeopardized and all errors committed by you are binding against you, as well as all points of law in your favor are binding upon you?

MR. HAMMER: Yes, I understand that.

THE COURT: With all that admonition, knowing the perils and the situation, is it your desire to represent yourself?

MR. HAMMER: Yes, sir, it is.

THE COURT: All right. Court will allow him to represent himself.

I, also, will put an exception to that, ask that the Public Defender's office, Mr. Ron Evans, be there to give you any legal assistance that you may require at the time of any evidence; do you understand that, or help you in formulating or making any objections for the record, do you understand that?

MR. HAMMER: Yes, sir, I do.

THE COURT: All right.

MR. HAMMER: On this application, Your Honor, I

would like to ask that you hold it in abeyance until at least after the preliminary, because I am--it's not known if I am going to be bound over this morning.

THE COURT: That's right.. I haven't made any decision, I haven't heard any evidence.

MR. HAMMER: So, I would like for you to hold this application in abeyance, if you would.

THE COURT: All right. I will do that.

Let me study it, please, sir.

All right, the request for supplies, as well as working hours, access to the library, notary public, interview room will be held in abeyance until further determination by this Court, if necessary.

MR. HAMMER: Thank you, Your Honor.

THE COURT: All right. Any other motions?

MR. HAMMER: No; I would just ask that the Rule be invoked at this time.

THE COURT: All right.

(Whereupon, the Rule having been invoked, all parties, counsel, and witnesses were admonished by the Court accordingly.)

THE COURT: All right. Any other requests by either side?

MR. PEINKE: No, none for the State.

THE COURT: All right. Call your first witness.

MR. REINKE:   Call Thomas Upton.

THOMAS UPTON,

called as a witness on behalf of the Plaintiff, having been first duly sworn, testified on his oath as follows, to-wit:

DIRECT EXAMINATION

BY MR. REINKE:

Q    Would you state your name, please?

A    Thomas Roy Upton.

Q    Let me direct your attention to October 28, 1983, did you have occasion to be at a location of Northwest 36th and Classen in Oklahoma City?

A    Yes, I did.

Q    And do you know if that is in Oklahoma County?

A    Yes, it is.

Q    All right.  And did anything unusual happen to you at that time?

A    Yes, it did.

Q    Would you explain to the Court what happened?

A    Yes, I was at a red light and David Hammer, this man here (indicating) walked up to my car and put a gun in the window and told me I was going to take him where he wanted to go.

I said, "Well, yes," you know.

Q    Did you see the gun?

A    Yes, I did.

OKLAHOMA COUNTY
OFFICIAL COURT TRANSCRIPT

Q    Okay. Now, before we go any further, you said David Hammer, do you see David Hammer in the courtroom?

A    Yes, I do.

Q    And where is he seated and what is he wearing?

A    He's wearing orange coveralls, and he's seated right there (indicating).

Q    Okay.

MR. REINKE:  May the record reflect he's pointed out the Defendant.

THE COURT:  Yes, the record so reflects.

Q    (Mr. Reinke) All right. What happened once he pointed the gun at you?

A    He told me that I was going to take him where he wanted to go, and he got in my car.

Q    Okay. And did he give you any further directions at that time?

A    Yes; he wanted--told me that he wanted to go to a motel out on MacArthur, I-40 and MacArthur.

Q    And did he direct you to drive him there?

A    Yes, he did.

Q    And why did you drive him there?

A    Because he had that gun.

Q    Okay. Was it your desire or was your trip against your will?

A    Completely.

Q    And what happened then?

A    Okay.  We drove over to the motel, and we got into a fight in the motel.

I tried to get the gun away from him; I couldn't do it.

And he made two phone calls; and he locked me in the bathroom while he made a phone call and, then, he kept telling me that he wasn't going to shoot me, he just wanted my car.

And I told him he could have my car or anything, you know, "Just don't shoot me."

Okay.  So, then, we left there, and he had me drive around and around.  Ended up on 29th--South 29th Street; he said, "Keep driving."

He said he was just going to take me out where I wouldn't be near a phone, where he could get away, which sounded logi-cal to me, since he had the gun.

And, so, we get out there on 29th and Sara Road, and he made me walk up this trail to near some oil wells or something, you know, under this gate and, then, he told me to take my pants off and lay off--take my clothes off and lay down, and I did.

And, then, he shot me three times in the head.

Q    All right.

A    And, then, I jumped up and took off running across the field, and he starts screaming and jumped in my car--run back to my car and jumped in my car and took off.

And, then, I walked up three and a half miles and flagged somebody down and got a ride to the emergency room.

Q All right. And why did you allow him to take your car?

A He had a gun.

Q Okay. And were you afraid of that?

A Yes, I didn't want to get shot.

Q And all of these events were performed by Mr. Hammer?

A Yes, they were.

Q Okay.

MR. REINKE: Pass the witness.

CROSS-EXAMINATION

BY MR. HAMMER:

Q Mr. Upton, what day of the week did this incident occur?

A I don't rightly remember the exact—the day of the week, it was the 29th, because that's when I was in the emergency room.

Q It was the 29th, not the 28th.

You testified a few moments ago, when he directed your attention to the 28th, that it was the 28th.

A Well, it started on the 28th; by the time I got to the hospital, it was the 29th.

Q Okay. Mr. Upton, can you tell me where you are employed?

A I'm employed by Gino Marino Enterprises.

Q Were you so employed on the day in question?

A Yes, I was.

OKLAHOMA COUNTY

Q     Where is that located, Mr. Upton?

A     At the day in question, I was employed at Super Hair, Incorporated, 310 South Bryant, Edmond, Oklahoma.

Q     Okay.  Can you tell us what time you got off work that day, Mr. Upton?

A     About 5:00, 5:30.

Q     Okay.  And what did you do then?

A     What did I do then?

Let me see, I went home; then, I went over to Jack Crooks's house to cut his hair.  And, then, I was going home when you got me.

Q     Okay.  About what time did you leave for the evening, Mr. Upton?

A     For the evening?

Q     Yes.

A     I told you what I had done.  I went over and cut Jack's hair.

THE COURT:  No; don't argue with him, sir.  You just answer his questions.  I'll rule if they are proper or not; you just answer the question.

THE WITNESS:  Yes, sir.

THE COURT:  Let's not have any colloquy between each other.  All right.

Q     (Mr. Hammer) What time did you leave for the evening, Mr. Upton?

OKLAHOMA COUNTY

A    What time did I leave for the evening?

Q    Yes.

A    Well, let's see.  I gotoff work, went home and I had dinner.  And I guess I got over to Jack's house about, oh, 7:30.

Q    About 7:30?

A    Uh-huh.

See, it takes me about 20 minutes to cut his hair, and we visited and watched some TV.  And, I don't know, it was around 8:30 or 9:00 o'clock when I headed home.

Q    Okay.  Where's Mr. Crook live, Mr. Upton?

A    Mr. Jack Crooks lives at a retirement village across on, I think it is 56 and North Portland.

Q    Mr. Upton, had you had any type of alcoholic beverages to drink this evening, on this evening in question?

A    No, I don't believe I did that evening.

Q    Okay.  So, you say that you left home and went to Mr. Crooks's apartment, cut his hair, visited for a while.  Then, I suppose you left; is that correct?

A    That's correct.

Q    Okay.  What did you do when you left Mr. Crooks's house or apartment?

A    I was going home; I went down Portland to 36th Street and turned left, and was going down 36th Street.

Q    Okay.  So, you say that this incident happened at

OKLAHOMA COUNTY

12

Northwest 36th and Classen; is that correct?

A    This is where it started at, yes.

Q    Mr. Upton, I'm not real sure of what you are saying happened here, can you kind of describe to me exactly in detail what happened.

How did the man approach you?

You said that the man approached you--to the window, did you have your windows down in your car?

A    I had all four of my windows down in my car.

Q    All four of your windows down?

A    Uh-huh.

Q    Okay.  This was 8:30, 9:00 o'clock in the evening, I guess, from your testimony.

A    Yes.

Q    Okay.  And you say the man approached your car--

A    No; I said you approached my car.

Q    Can you explain that, Mr. Upton, was there any cars in front of you, were there any cars behind you, which lane of traffic were you in?

A    I was in the left-hand lane, and there was, I believe, two cars in front of me.

Q    Were there any cars behind you?

A    I don't know.

Q    You don't remember?

A    No.

Q    Did you see anyone else at this intersection?

A    Just the cars.

Q    Okay. So, to your knowledge, no one seen this man approach your car?

A    I have no idea.

Q    All right.

(Whereupon, off-the-record discussion was had.)

THE COURT: Any problem?

MR. HAMMER: No, sir, none at all.

THE COURT: All right.

(Whereupon, Mr. Reinke left the courtroom.)

Q    (Mr. Hammer) Okay. Mr. Upton, I can't at all get a clear picture of this, was it light outside; was it dark?

A    It was just getting dark, I believe.

Q    You believe it was just getting dark. Okay.

I can't really understand this, but maybe you can help me get a clear picture.

THE COURT: All right, Counsel, let's not have any dissertation. Just ask the question; no explanation, just ask the question, please.

MR. HAMMER: All right, Your Honor.

Q    (Mr. Hammer) How big was the gun, Mr. Upton?

A    It was a big gun.

Q    Can you describe it for me?

A    I don't know that much about guns, but, all I know, it

was a big gun. It had a long barrel on it.

Q    What color was it?

A    The color of a gun.

Q    Mr. Upton, what did the man have on who approached you, can you describe his clothing?

A    You had on--

THE COURT:   Sir,--

A    --jeans.

THE COURT:   --he's playing the role of being an individual lawyer, treat him like a lawyer, not as the Defendant; will you do that, sir?

THE WITNESS:   Yes, Judge, but sometimes it's awfully hard.

THE COURT:   I understand.

THE WITNESS:   After what he's already done to me.

THE COURT:   I understand that. But that is my admonition to you.

THE WITNESS:   Okay.

THE COURT:   All right.

Q    (Mr. Hammer) Can you describe the clothing the man wore, sir?

A    Jeans, a blue flight jacket or policeman's looking jacket with fur collar, and a plaid shirt.

Q    Okay. Mr. Upton, you testified that the man approached your car, did the man stick the gun through the window; did

OKLAHOMA COUNTY

you open the door for the man, how did the man get in the car?

A   The man walked up to my car and he had the gun under his coat, and he laid the gun--the barrel of the gun on my window sill, on the passenger side, and said I was going to take him where he wanted to go.

Q   So, he approached on the passenger side.

A   Yes, he did.

Q   And you testified that you were in the left lane of traffic, so, that means there was a right lane of traffic.

A   No, not on 36th and Classen; 35th and Classen is, going east on 36th Street, is two-lane.

Q   It's two-lane. Okay. And you testified that he had on blue jeans, and jacket, plaid shirt under it; is that correct?

        MR. KITE:   Objection, it's repetitious.

        THE COURT:   That will be sustained.

Q   (Mr. Hammer) Mr. Upton, you testified that the man asked you to drive him to a motel, can you tell me what motel you took the man to?

A   I can tell you--I'll take you right to the room, it was on I-40 and MacArthur.

Q   Pardon?

A   I-40 and MacArthur.

Q   Do you know the name of the motel, Mr. Upton?

A   Days' Inn or something like that.

Q   Do you happen to know the room number?

16

A     No, not offhand.   It was up the stairs, third door on the left.

Q     Okay.  So, now, apparently you drove the man to the motel.

MR. KITE:  Object to the dissertation this individual is going through every time he asks a question, he just continues to repeat when he asks a question.

Ask the Court to instruct him to ask a question.

THE COURT:  All right.  Rephrase it, please, sir.

Q     (Mr. Hammer) Okay.  You drove the man to the motel?

A     Yes.

Q     Okay.  Did the man have the gun on you at this time?

A     Yes, he did.

Q     Okay.  What happened once you reached the motel parking lot?

A     He told me he would shoot me if I run, that he didn't want to shoot me.  And we went up the stairs and into the room where he made two phone calls.

Q     Okay.  Did the man have the gun on you all this time?

A     Except for when he got lax, and he had it off me and, then, I grabbed for it and we fought.

Q     Okay.  When you reached the door to the motel room, was the door locked?

A     Uh-huh.

Q     Pardon?

A    Yes.

Q    The door was locked?

A    You have to have a key to get in a motel room.

Q    So, what happened, did the man have a key to the room?

A    Yes.

Q    So, you are telling me that he held a gun on you with one hand while he opened the door with the other; is that correct?

Is that correct, Mr. Upton?

A    Let me--we got in the motel room, I don't remember if he unlocked it or what, but I remember we did go to the motel room and I was scared to death.

Q    Mr. Upton, was there anyone else inside the motel room?

A    No, there was not.

Q    Did anyone else come in the room?

A    No, there was not.

Q    Okay.  What happened once you got inside the room, Mr. Upton?

A    You made two phone calls--pardon me---made two phone calls.

Q    Mr. Upton, are you familiar with the laws of perjury in this state?

MR. KITE:  If the Court please, objection to that question, totally irrelevant and uncalled for.

THE COURT:  That will be sustained.

Q    (Mr. Hammer) Mr. Upton, have you given testimony in this

case previously prior to today?

A    Uh-huh.

Q    You have?

A    Uh-huh.

Q    Mr. Upton, do you expect your testimony to be the same or similar to that in that preliminary hearing?

MR. KITE:    Objection to the form of the question, it's irrelevant and immaterial.

THE COURT:    Yes.  Not as to the form of the question, that will be sustained.

You can rephrase your question.

Q    (Mr. Eammer) Okay.  Mr. Upton, you said that, once you reached the motel room, that you were locked in the bathroom; is that correct?

A    Yeah.

Q    Okay.  Are you telling us that the bathroom had a lock on the outside of the door?

A    No.

Q    Okay.  I don't understand how you were locked in the bathroom.

THE WITNESS:    Let me calm down a minute, I'm getting mad.

THE COURT:    Let's take a five-minute recess.

(Whereupon, a brief recess was had.)

THE COURT:    All right, sir.  You may continue.

OKLAHOMA COUNTY
OFFICIAL    ART TRANSCRIPT

Q    (Mr. Hammer) Mr. Upton, would you tell me, please, what happened once you were in the motel room?

A    You made two phone calls--pardon me--made me go in the bathroom and I thought that--maybe that you was going to kill me in the bathroom, and, then, we left there.

And we fought in the motel room, also. And, then, you had me drive around, and we ended up on 29th, South.

Q    Mr. Upton, did you fight with this man before you went into the restroom or before you were locked in the bathroom, was it afterwards?

A    It was afterwards.

Q    Afterwards.

Were you in the room when the man made the telephone calls, Mr. Upton?

A    Yes.

Q    You were in the room?

A    Yes; and, then, I said, "You're an excaped convict," because the phone conversation was to your mother and it was how sorry you were and that you appreciated them bringing you to the City, or something like that.

And, then, the other one was your aunt, you tried to get them to come get you; they wouldn't do it. And, then, you schized out, waving the gun in my face, told me, "I ought to kill you," one minute. Then, the next minute you'd be just as calm and rational, "Well, I'm not going to kill you. I just

20

need your car."

The next minute, "I'm going to kill you." Crazy, man, completely. Completely insane.

Q    Mr. Upton, are you testifying that, after I had--the man had pointed a gun at you and you drove him to the motel, then, that the man got on the telephone, call--phone and called someone, asking them to come pick him up when he had you there hostage; is that correct?

MR. KITE:  Object to the form of the question; the question has been asked. Counsel--or this person is arguing with the witness.

THE COURT:  That'll be overruled.

You may answer the question yes or no.

A    Yes, that's what happened.

Q    (Mr. Hammer) Okay.  Mr. Upton, did you testify on the 12th day of March, before Judge Wilson, that you were locked in the bathroom with the water running, and that you could not hear anything that was going on in the motel room?

A    That was after the two phone calls, when you had to make another phone call and you didn't want me to hear it, and that's when you put me in the bathroom, and told me to turn the water on.

Q    Is that the same testimony you gave on the 12th, Mr. Upton?

A    Yes.

21

Q    Okay. Mr. Upton, when you were struggling in the motel room, did you scream for help or cry out for help?

A    Like a big dog, I sure did, top of my lungs.

Q    Okay. Did anyone come to help you, Mr. Upton?

A    No, they did not.

Q    Okay. Approximately how long were you in the motel room, Mr. Upton?

A    Thirty minutes, forty-five minutes.

Q    Okay. Mr. Upton, when you left the motel room,--

A    Something like that.

Q    When you left the motel room, Mr. Upton, what happened then?

A    You told me if I run that you were going to blow my brains out, and I didn't.

You said you weren't going to shoot me, just take me out to where I couldn't get to a telephone, which sounded logical.

And, also, I forgot to bring up the point that he fired into my seat to make a believer out of me, fired out the window with the gun; and, then, we drove down 29th Street. Twenty-ninth Street, I believe, is where you shot out the window; I thought you were fixing to shoot me in the head, but you shot out the window.

Q    Mr. Upton, you're kind of getting ahead of me here. If you would, would you go back to my question; okay, when you left the motel room?

A    I'm telling you what happened.

Q    Would you answer my question, please?

When you left the motel room, did you see anyone at that time?

A    Yes, sure did; there was a--somebody coming up the stairs, I believe.

Q    Okay.  Did the man have the weapon pointed at you at this time?

A    The man had a--something over his arm, and he had the gun pointed at me, yes, he did.

Q    Once again, Mr. Upton, is this the same testimony that you gave on the 12th day of March in Judge Wilson's courtroom?

A    Yes.

Q    Did you scream out for help when you seen this person?

A    No.

Q    Would you tell us why, Mr. Upton?

A    I didn't want to get shot in the back, simple.

Q    Okay.  Is that also the same testimony you gave at that time, Mr. Upton?

A    I believe it is.  Yes, it is.

Q    Okay.  You said that the man shot into your car seat; is that correct?

A    That's correct.

Q    He shot into your window?

A    No; the window was down, he couldn't have shot the

23

window.  The window was down; he shot this way (indicating).

Q    Okay.  Do you happen to know where you were at that time?

A    Somewhere South Oklahoma City.

Q    Okay.  Mr. Upton, if you would, have you ever been back to where you say you were shot?

A    No, I have not.

Q    You have not.  Okay.

Just a few moments ago, I believe you testified that the man made you take off your clothing; is that correct?

A    That's correct.

Q    Would you go into that for me, tell me when or how.

A    Yeah, when we walked up the road, and you kept telling me, well, that you wasn't going to shoot me.  You know, you was just going to take my car.

And we walked up the road.  You said, "Okay.  Now, take off your clothes."

I figured you was just going to leave me out there naked or something, but that still beats getting shot.

Then, you told me to lay down, and I did, and you shot me twice in the back of the head and once in the face, right here (indicating), my hand.  And, then, I jumped up and you started screaming at the top of your lungs and run to my car and jumped in and took off, and hit a pole with it when you was taking off.

Q    Is this also, Mr. Upton, the same testimony that you have

given previously?

A    (Witness nods head.)

Q    Okay. So, you were outside your car when you took off your clothing; is that correct?

A    That's correct.

    MR. KITE:  Objection, it's repetitious.

    THE COURT:  That will be overruled.

A    And the police found them later, after I went to the hospital---got to the hospital. The police said they found them out there.

Q    (Mr. Hammer) So, you are telling me that the police found your clothing; is that correct?

A    That's correct.

Q    So, undoubtedly, that is evidence in this case.

    (Witness indicating)

Q    (Mr. Hammer) Okay. Mr. Upton, you testified that you laid down on the ground; is that correct?

A    That's correct.

Q    That you were shot twice.

    MR. KITE:  Object, repetitious.

A    Right in the back of the head.

    THE COURT:  Be overruled.

A    You shot me twice in the back of the head.

Q    (Mr. Hammer) Okay.

A    And, then, I guess I turned my head, then, you got me---

it grazed my cheek like this (indicating), just exploded my cheek right here. I've had plastic surgery.

And, then, I jumped up, and you started screaming and took off for my car.

And I just took off down the road, and walked, and walked, and walked about three and a half miles. I believe the police told me is how far I had walked before I flagged somebody down.

Nobody wanted to stop, because I was a bloody mess and didn't have on any clothes, and they took me to the emergency room at Deaconess Hospital. And I just run in there and told them I didn't want to die, and I didn't.

Q   Do you know who took you to the hospital, Mr. Upton?

A   Couple of real nice fellows picked me up, I don't know who they were.

Q   Do you know their names?

A   No, I don't.

Q   Okay. Mr. Upton, did you have any conversation with the man who shot you before it happened, before he shot you, did you have any conversation whatsoever, other than what you have told us in this Court today?

A   Lots of it.

Q   What I'm getting at, Mr. Upton, —

A   I kept trying to talk you out of killing me.

Q   Mr. Upton, you have given testimony previously in this

case, and I'm trying to bring out in this hearing the things that you said then.

You testified previously, did you not, Mr. Upton, that you asked the man for certain things from your car?

MR. KITE: Object to the form of the question, leading.

THE COURT: That will be sustained. Not a proper way to impeach, sir.

A    Yes.

THE WITNESS: He's refreshing my memory.

THE COURT: I understand that. When I sustain an objection, you don't answer the question.

THE WITNESS: Okay.

Q    (Mr. Hammer) Mr. Upton, did you ask for anything specific from this man before he shot you?

A    Yes, I told him, "Just give me my barber tools, take the car and go," but I wanted my barber tools because I had to go to work the next morning.

Q    Okay. So, you're telling me now that you were in fear of your life, afraid you were fixing to be shot, but, yet, you asked for your barber tools so you could go to work the next day?

A    This was at a point where you was more rational, and you kept telling me that you wasn't going to shoot me.

And I said, "Okay. If you're not going to shoot me, then,

just give me my barber tools so I can go to work in the morning."

I knew my car was gone, you know.

Q    Mr. Upton, will you tell me now exactly what property was taken from you?

A    I sure can.  A 1972, I believe it is, Buick LeSabre, a— what, four pair of Wahl clippers, all my curling irons, a thousand rollers, scissors.

I had about a thousand dollars' worth of barber equipment in the trunk of my car.

Q    Okay.  Mr. Upton, has any of this property been returned to you?

A    Nothing has been returned; my car has not been recovered.

Q    Mr. Upton, one more question along this line, can you tell me how you know the exact location of where you were shot?

A    Sure can.

Q    Would you please?

A    I looked at a street sign.

Q    Okay.  So, undoubtedly, you are bleeding, and you walk for three and a half miles, but you are still conscious enough to know all those things; is that correct?

A    I looked at the street sign when we was driving there.

Q    Okay.  Mr. Upton, you said some people picked you up and took you to the emergency room of Deaconess Hospital.

A    Yes, and Deaconess didn't have a plastic surgeon on the staff, so, they transferred me to Mercy Hospital, where I stayed approximately 10 days. And I had $14,000 worth of medical bills.

Q    Mr. Upton, you testified just a few moments ago that you went to Deaconess Hospital; is that correct; is that the hospital you asked these people to take you to, Mr. Upton?

A    I asked them to take me to the nearest hospital.

Q    Okay. And this is South Oklahoma City, and you drove to north side of Oklahoma City to a hospital; is that correct?

A    That's the one I ended up at, that's correct.

Q    Okay. Mr. Upton, when was the first time you ever identified the suspect in this case?

A    At my mother's house, the police brought over pictures. They showed me pictures at the hospital, but your picture wasn't in it.

And, then, the next time they showed me pictures was at my mother's house, and your picture was in it.

Q    Okay. Mr. Upton, in that picture that you picked out,—

A    Yes.

Q    —you have testified that it was me that you picked out; is that correct?

A    That is correct.

Q    Did that picture look the same as I look now?

A    I don't remember, but it was you.

Q    You don't remember, Mr. Upton.

MR. HAMMER:  Your Honor, may I have permission to approach the witness?

THE COURT:  Yes.

Q    (Mr. Hammer) Mr. Upton, the picture look anything like this (indicating)?

MR. KITE:  If the Court please, that question is improper.

THE COURT:  Yes.  You want to mark it, mark it, please.

MR. HAMMER:  I'd like to mark this as Defense Exhibit A.

THE COURT:  Mark it Defendant's Exhibit 1.

(Instrument tendered the reporter was here marked Defendant's Exhibit 1, for the purpose of identification.)

THE COURT:  Hand it to the individual, ask him to identify it.

Q    (Mr. Hammer) Would you identify this photograph, please?

A    What, is that the picture they showed me at my mother's house?

No, it's not.

The one they showed me at my mother's house, I think, only had one--

Q    Only had one.

Did it resemble this picture, Mr. Upton?

A    It resembled you.

Q    I'm asking you, did it resemble that picture?

MR. KITE:    If the Court please, he's answered that question; object to that question.

THE COURT:    That will be sustained.

Q    (Mr. Hammer) Thank you, Mr. Upton.

I have a few more questions for you.

Did you ever view a line-up with the Defendant in it?

A    No.

Q    You never ever viewed a line-up?

A    No.

Q    Were you ever asked to view a line-up?

A    No.

Q    Mr. Upton, isn't it true that, the very first time you seen me was at the preliminary hearing on March 12th, in Judge Wilson's courtroom?

A    No, it's not.

Q    That is not correct?

A    You know it's not.

Q    Do you know a Bobby Gene Hinkle, Mr. Upton?

MR. KITE:    Objection, it's irrelevant.

THE COURT:    Don't know at this time.  Be overruled.

A    No, I do not.

Q    (Mr. Hammer) You don't know a Bobby Gene Hinkle?

MR. KITE:    Objection, it's repetitious.

THE COURT:    Yes, he's answered the question.

MR. HAMMER:    Okay.  Could I have a couple of seconds?

THE COURT:    Sure.

Q    (Mr. Hammer) Okay.  Mr. Upton, I only have a few more questions.

Would you give me your correct address, Mr. Upton?

A    Where I'm living right now is at 4503 North Penn, Town-House 4.

Q    Okay.  You testified a little earlier that you went to a Mr. Crooks's home to give him a haircut right before this happened.

A    That is correct.

Q    Do you happen to know Mr. Crooks's telephone number or address?

MR. KITE:    Objection, it's irrelevant.

THE COURT:    Been asked and answered in this transcript already.  Telephone number is not necessary; be sustained as to that.

He said 59th and Portland, retirement village.

MR. EVANS:    Your Honor, we have a right to examine Mr. Upton's actions on the night before this allegedly occurred, we'd like to talk to Mr. Crooks.

THE COURT:    I told you what his address was.

MR. EVANS:    We'd like to know his phone number,

that's a big apartment complex.

MR. KITE:  If the Court please, they can subpoena the witness.  The witness can appear or not.

MR. EVANS:  We don't know his address; all we know is about where he lives.  How can we subpoena him?

MR. KITE:  The witness has answered the question to the best of his knowledge.  If he's been asked a question, he's answered to the best of his knowledge.

If they want any other information, they can go in the yellow pages.

MR. EVANS:  The question as to the phone number, that's not been asked.  That's a question we would like to ask.

THE COURT:  All right.  That question--as to the State's objection, will be sustained.

If you are unable to find a witness, then, you can bring that up, conditional information, but, at this time, preliminary hearing--

MR. EVANS:  Note our exceptions, Your Honor.

THE COURT:  Yes, sir.

Q    (Mr. Hammer) Mr. Upton, have you ever been convicted of a felony?

A    Yes, I have.

Q    How many felonies have you been convicted of, Mr. Upton?

A    I don't know.

OKLAHOMA COUNTY

33

Q    Would five be a close number, Mr. Upton?

A    Something like that.

Q    Okay.  Mr. Upton, have you ever been to the penitentiary?

A    Yes, I have.

Q    Mr. Upton, did you ever see the Defendant in the penitentiary?

A    No, I did not.

Q    Mr. Upton, have you ever in your life been treated for emotional or mental difficulties?

A    I never have.

MR. KITE:  Objection, it's irrelevant.

THE COURT:  What purpose--

MR. HAMMER:  I'll withdraw the question, Your Honor.

THE COURT:  All right.

MR. HAMMER:  I have no more questions at this time.

THE COURT:  All right.  Any redirect?

MR. KITE:  No, Your Honor.

For the purpose of preliminary hearing--

THE COURT:  All right.  Thank you very much, sir. You may step down.

(Witness excused.)

MR. KITE:  Previous stipulation and pre-agreement entered into with Mr. Reinke, Page 2 stipulated for the purpose of preliminary hearing only.

THE COURT:  Let me hear the stipulations.

MR. KITE:  That the former convictions listed on Page 2 of the Information, have been stipulated to for the purpose of preliminary hearing only, with that stipulation.

THE COURT:  Let me find out.

Do you understand what a stipulation is?

MR. HAMMER:  Yes, sir, I do.

THE COURT:  For the record, stipulation means that both counsel or Defendant Pro Se agrees that the convictions listed in here for the purpose of preliminary hearing, to satisfy probable cause, means other--that there was these convictions on the days in question, and that you were the one who was convicted with that, and that the convictions were final.

Do you stipulate as to that testimony for the purpose of preliminary hearing only?

MR. HAMMER:  Yes, sir, I do.

But, since you brought up something there, that the convictions are final, there are some of these convictions that aren't final, but, for the purpose of preliminary hearing, I will stipulate.

THE COURT:  Well, what do you mean not final?

MR. HAMMER:  Well, there's some of those cases that have never been upheld by the Oklahoma Court of Criminal Appeals and post-conviction proceedings have been filed.

THE COURT:  Post-conviction proceedings are not part of final conviction.  There has to be a final conviction

before a post-conviction appeal for relief can be filed, so, therefore--whether they have a ruling on those post-convictions are not proper as to determine whether or not these are valid.

MR. HAMMER:  Okay.

THE COURT:  Any other objections?

MR. HAMMER:  No, sir, none at all.

THE COURT:  With that stipulation accepted by this Court, with the understanding of all parties concerned, what says the State?

MR. KITE:  State rests.

THE COURT:  State rests.  All right.

MR. HAMMER:  I would like to demur to the evidence, Your Honor, presented here today, and some of the testimony given by the Defendant.

Defendant--I mean the victim testified that he was shot at Southwest 29th and Sara Road.  I would inform the Court that is not even in Oklahoma County, that that's in Canadian County.

And, as far as jurisdiction, I'm not sure--I've had no access to any legal research materials, so, therefore, I couldn't research that.

And I would just demur to the evidence in general, Your Honor.

THE COURT:  The venue question that you are raising has been presented by proper evidence; further, that the

evidence and probable cause of the three alleged crimes of kidnapping, armed robbery, and shooting with intent to kill has, for this purpose, met probable cause criteria.

Therefore, your demurrer is overruled, with the explanation that the preliminary hearing examining magistrate doesn't determine guilt or innocence.

MR. HAMMER:  Yes, sir.

THE COURT:  The magistrate only determines whether or not a crime happened under the law of Oklahoma, and this county, and the possibility of one participating in that crime.

And, since the victim has identified you as the one holding the gun and doing these acts, then, your demurrer is overruled.

You have exceptions to the Court's ruling.

Do you have any evidence?

MR. HAMMER:  No, sir.

THE COURT:  All right.  Show the Defendant rests.

With that statement, the Defendant will be bound over to stand trial.  Your formal arraignment will be before Judge Cannon on the 8th day of June, at 2:00 p.m.

Any previous bond-setting will remain the same.

As to the matter of application to the Court--on access to legal library, research material, telephone, interview room, notary public, access to the County Court Clerk's

OKLAHOMA COUNTY
OFFICIAL COURT TRANSCRIPT

office and supplies will be overruled at this time, but, however, you do have the right to submit this after your arraignment to the District Court for further determination. And, if they will rule on whether or not you'll have access, but, as far as the preliminary hearing, it is denied.

MR. HAMMER: Thank you, Your Honor.

THE COURT: All right.