**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | No. 4:96-CR-239 |
| v. | : | Honorable Joel H. Slomsky |
| DAVID HAMMER, | : | Capital Case |
| Defendant | : | |

**DEFENDANT'S MOTION IN LIMINE TO PRECLUDE/SUPPRESS THE TESTIMONY OF LEONARD YAGER**

Defendant, David Hammer, through undersigned counsel, submits his *Motion in Limine to Preclude/Suppress the Testimony of Leonard Yager*, and in support thereof, states the following:

1.      On September 18, 1996, a Grand Jury sitting in Williamsport, Pennsylvania, returned an Indictment charging David Hammer with first degree murder arising from the April 13, 1996, death of Mr. Hammer's cellmate, Andrew Marti.  Doc. 1.  On April 9, 1997, the government filed a notice of its intent to seek the death penalty.  Doc. 93.  The trial began on May 5, 1998.  On June 22, 1998, after the defense had rested and while the government was presenting its rebuttal case, Mr. Hammer entered a plea of guilty to the murder charge.

2.      The penalty phase began on June 30, 1998.  In support of death, the government sought to prove two statutory aggravating factors:  that the defendant committed the murder after substantial planning and premeditation, 18 U.S.C. §3592(c)(9), and that the defendant had previously been convicted of a state or federal offense punishable by a term of imprisonment of more than one year that involved the use, or attempted or threatened use, of a firearm against another person, 18 U.S.C. §3592(c)(2).  On July 24, 1998 the jury returned a verdict of death.

3.      In September 2002, Mr. Hammer filed a petition for writ of habeas corpus collaterally attacking his conviction and sentence pursuant to 28 U.S.C. §2255.  On the twenty-ninth day of the evidentiary hearing, September 22, 2005, the government provided the defense with thirty-three previously undisclosed FBI 302 statements that summarized interviews with various prison inmates.

4.      On December 27, 2005, the Court issued its decision vacating the 1998 sentence of death.  The Court held that the government's failure to disclose four 302 witness statements that were "relevant and material" to the jury's penalty determination violated Brady v. Maryland, 373 U.S. 83 (1963).  United States v. Hammer, 404 F. Supp. 2d 676, 801 (M.D. Pa. 2006) (Muir, J.)  The Court then concluded as a matter of law that the failure of the government to disclose the 302

2

statements rendered "the penalty phase of the trial defective." Id.[1]

5.      In its informational outline for these sentencing proceedings, the government indicated that it intended to call Leonard Yager and Stephen Classen as support for both the gateway intent factors and the substantial planning and premeditation statutory aggravator.  Doc. 1489 at 1-3.

6.      Leonard Yager was a critical government witness for purposes of supporting its case for intentional, premeditated murder in the guilt-phase of the prior trial and for purposes of supporting its gateway intent theory and the substantial planning and premeditation statutory aggravator during the original penalty trial. Yager testified at trial that he had celled with Mr. Hammer for a short period of time and described his observations of Mr. Hammer and Mr. Marti after they became cellmates.  NT Vol. 4 at 85-89.  At the time of Mr. Marti's death, Yager was an orderly and, thus free to move about the block and pass items, including notes, from one inmate to another.  Id. at 82. Yager claimed that on the day prior to Mr. Marti's death, he was at the door of Mr. Hammer's cell when he observed Mr. Hammer braiding sheets and making a gesture about Mr. Marti with his finger across his neck. Id. at 94-96.

---

[1]The Court also found that the jury's failure to find mitigating factors that had been conceded or undisputed by the government constituted constitutional error requiring reversal.  Hammer, 404 F. Supp. 2d at 801.

3

7.      Yager testified that, after Mr. Marti's death, he encountered Mr. Hammer again, purportedly in the context of his position as an orderly.  Id. at 97.  Yager supplied Mr. Hammer with paper and pencil and asked Mr. Hammer "why he did it" to which Mr. Hammer purportedly responded that he had told Yager he was going to do it.  Id. at 97-98.  Yager asked "for what reason" to which Mr. Hammer responded that Yager should "come back."  Id. at 102.  When Yager returned, Mr. Hammer allegedly slipped a note to him through the door.  Id.  Yager identified government Exhibit 32.1 as the note that Mr. Hammer allegedly passed to him, id. at 103, and then read various portions of Exhibit 32.1 that purported to be Mr. Hammer's reasons for killing Mr. Marti.  Id. at 105-109.

8.      Stephen Classen had also been called by the government to support both Mr. Hammer's guilt and to support the intent factor and substantial planning and premeditation.  During his testimony, the government elicited testimony that Classen had received a "kite" from Mr. Hammer the morning after Mr. Marti's death that also purported to provide statements acknowledging guilt and intent.  NT Vol. 6 at 17-23.

9.      In closing, the prosecutor repeatedly and consistently argued that the testimony by Yager and Classen provided strong evidence supporting the government's theory regarding the gateway intent factors and the substantial planning and premeditation statutory aggravator.  See NT Vol. 27 ay 71-75; 81, 89.

10.     On March 14, 2014, current government counsel provided counsel with a notice that on February 25, 2014, Special Agent Herbst and Trial Attorney Haines met with Leonard Yager.  Among other things, Yager told Agent Herbst and Ms. Haines that "at the time of the offense, the FBI 'sent him in' to talk to Mr. Hammer." See Exhibit 1.

11.     There is no question that, at the time the FBI sent Yager in to "talk to him, Mr. Hammer had invoked his right to counsel.  Mr. Hammer was interrogated by FBI Special Agent Carlyle Thompson and BOP investigative personnel after the discovery of Mr. Marti's death, at or around 6:24 am on April 13, 1996.  See Exhibit 2. Mr. Hammer initially waived his rights and gave a statement.  Id.  After Mr. Hammer indicated that he "had better get me a lawyer," the interrogation was terminated.  Id.  Following his interrogation and invocation of his right to counsel, the authorities moved Mr. Hammer to a separate, empty cell.  Mr. Hammer had no supplies available to him in that cell.  See NT Vol. 4 at 97-98.

12.     Later that day, Special Agent Thompson, accompanied by BOP SIS investigators Mark Traxler and Ron Jury, interviewed inmate Leonard Yager for the first time.  See Exhibit 3.  On April 17, 1996, FBI Special Agent Anthony Malocu and BOP SIS investigator Traxler again interviewed Yager.  During this interview, Yager turned over a letter purportedly from Mr. Hammer that listed reasons for killing Mr. Marti.  See Exhibit 4.

5

13.   Yager testified both at the grand jury and trial that his conversations with Mr. Hammer and his receipt of this letter occurred after the interrogation of Mr. Hammer by the FBI/BOP had concluded. See NT 7/24/96 at 25-27; NT Vol. 4 at 102-03.   Thus, at the time he was engaging Mr. Hammer and asking Mr. Hammer about the death of Mr. Marti, and also at the time he received the purported letter from Mr. Hammer, Yager was acting as an agent of the government.  The government's secret deployment of Yager as its agent to obtain information in circumvention of Mr. Hammer's invocation of his right to counsel violated the Fifth, Sixth, and Eighth Amendments and requires relief.

14.   The record demonstrates that Yager's work as an agent of the government went beyond merely interrogating Mr. Hammer, although the interrogation by itself was sufficient to violate Mr. Hammer's rights under the Fifth, Sixth, and Eighth Amendments.  In his undisclosed capacity as its agent, Yager also apparently used his access to Mr. Hammer to obtain for the government additional materials purporting to inculpate Mr. Hammer and to provide those inculpatory materials to the government.

15.   For example, Stephen Classen testified during the grand jury proceedings and at trial about a letter he purportedly received under his cell door.  NT 8/28/96 at 14; NT Vol. 6 at 17.  Classen indicated that the letter would have been delivered by an orderly.  NT 8/28/96 at 14.  Classen testified that he did not immediately read the

note and that when he did finally open it, he only read part of it.  NT 8/28/96 at 14-15; NT Vol. 6 at 17-18.  He then flushed the document down the toilet without finishing reading it.  NT Vol. 6 at 18.  At trial, Classen never positively identified the letter offered by the government (government trial exhibit 35.2), as the one he had received that morning under his cell door.  NT Vol. 6 at 19 (indicating that exhibit 35.2 was not the letter he received); id. at 32 (indicating that as far as he was concerned, he had never received exhibit 35.2).

16.     Classen also did not mention receiving any communication from Mr. Hammer during his interviews with the FBI and BOP investigators.  NT 8/28/96 at 15.  Indeed, during the grand jury proceedings, when AUSA Martin showed Classen a document purporting to be a copy of the letter Classen had flushed down the toilet, Classen expressed his surprise that the government had a copy. Mr. Martin responded that the government "work[s] in strange and mysterious ways."  Id.

17.     After the government's recent disclosure concerning Yager's activities on its behalf, the government's "ways" are no longer "strange" or "mysterious." Obviously, Yager was secretly providing various documents to the investigators so that they could copy them and retain them as evidence.  In Classen's case, it is not clear whether the document Yager delivered to the government was a copy of the actual document that had been placed under Classen's door or was some other document that Yager hoped would ensure that he (Yager) received the benefits he was

seeking from the government.  Regardless, the government's clandestine deployment of Yager as its agent in the development of the evidence presented during Classen's testimony deliberately circumvented Mr. Hammer's invocation of his right to counsel, constitutionally taints that testimony, and requires relief.

18.    The government's employ of Yager as its agent to elicit inculpatory evidence against Mr. Hammer violated Mr. Hammer's Fifth, Sixth and Eight Amendment rights.  The government's failure to disclose Yager's status as an agent of the government for over seventeen years violated Brady v. Maryland, 373 U.S. 83 (1963), and its progeny.  Permitting the government to present Yager now, despite its clear misconduct violates Mr. Hammer's Fifth, Sixth, and Eighth Amendment rights.

19.    Mr. Hammer can no longer confront Classen with this previously undisclosed evidence that bears directly on the reliability of critical testimony because Classen is now deceased, thus further depriving Mr. Hammer of his Fifth, Sixth and Eighth Amendment rights.  While Mr. Yager can be cross-examined, permitting the government to present Yager after having employed him as an agent of the government to circumvent Mr. Hammer's invocation of his right to counsel and then concealing its misconduct for over seventeen years is fundamentally unfair and a violation of the Fifth, Sixth and Eighth Amendments.

8

WHEREFORE, for each of these reasons, and those set forth in Mr. Hammer's *Brief in Support of his Motion in Limine to Preclude/Suppress the Testimony of Leanord Yager*, Mr. Hammer respectfully requests that, following discovery, an evidentiary hearing and/or argument, that this Court Grant Mr. Hammer's motion.

Respectfully submitted,

/S/  RONALD C. TRAVIS
Ronald C. Travis
Rieders, Travis, Humphrey, Harris,
Waters & Waffenschmidt
161 West Third Street
PO Box 215
Williamsport, PA  17703-0215
570-323-8711 (telephone)
570-323-4192 (facsimile)
rtravis@riederstravis.com


/S/ ANNE SAUNDERS
Anne Saunders
Assistant Federal Defender
Federal Public Defender
Middle District Pennsylvania
100 Chestnut Street, Suite 300
Harrisburg, PA 17101
717-782-3843 (telephone)
717-782-3966 (facsimile)
anne_saunders@fd.org

/S/ JAMES MCHUGH
James J. McHugh, Jr.
/S/ JAMES MORENO
James Moreno
Federal Community Defender
Eastern District Pennsylvania
Suite 540 – The Curtis Center
Philadelphia, PA 19106
215-928-1100 (telephone)
215-928-0826 (facsimile)
james_mchugh@fd.org
james_moreno@fd.org

Dated:  April 2, 2014

9

# CERTIFICATE OF SERVICE

I, Anne Saunders, Esquire, do hereby certify that on this date I served a copy of the foregoing by Electronic Case Filing, or by placing a copy in the United States mail, first class addressed to the following:

John C. Gurganus, Jr. Esquire
United States Attorneys Office
Middle District of Pennsylvania
235 N. Washington Street, Suite 311
PO Box 309
Scranton, PA. 18501

Amanda Haines, Esquire
United States Department of Justice
Criminal Division
1331 F. Street, N.W.
Washington, D.C. 20530

/S/ANNE SAUNDERS, ESQUIRE
James Moreno, Esquire

Dated: April 2, 2014