# EXHIBIT 5

# FEDERAL PUBLIC DEFENDER

CAPITAL HABEAS UNIT
MIDDLE DISTRICT OF PENNSYLVANIA
100 CHESTNUT STREET, SUITE 300
HARRISBURG, PENNSYLVANIA 17101-2540
TELEPHONE: (717) 782-3843
FAX: (717) 782-3966

**FEDERAL PUBLIC DEFENDER**
JAMES V. WADE

**ASSISTANT FEDERAL DEFENDER**
ANNE L. SAUNDERS
BETH A. MUHLHAUSER
ROBERT BRETT DUNHAM
KELLY D. MILLER

August 7, 2013

The Honorable Peter J. Smith
United States Attorney
AUSA John Gurganus
Middle District of Pennsylvania
William J. Nealon Federal Building and Courthouse
235 N. Washington Ave., Suite 311
Scranton, PA 18503

Re:    Counsel's Renewed Request to Forego Capital Authorization in <u>USA v. Hammer</u>,
       96-239 (M.D. Pa.)

Dear Messrs. Smith and Gurganus:

We write to renew our request that the United States forego seeking the death penalty
against David Hammer. In our prior submission, we had discussed a number of factors
relevant to the consideration of whether or not a capital prosecution of Mr. Hammer was
appropriate and how the capital case against Mr. Hammer had changed. Since our April
2010 submission, a number of additional factors supporting deauthorization have developed
demonstrating that continuing a capital prosecution against Mr. Hammer does not serve the
ends of justice.

In these difficult economic times, with funding cutbacks and additional sequestration
cuts looming for fiscal year 2014, the cost of the resentencing proceedings is a valid
consideration in determining whether or not to continue the capital prosecution against Mr.
Hammer. The litigation surrounding Mr. Hammer's capital prosecution has already involved
significant costs, including a lengthy trial and sentencing proceeding that included the cost
of accommodating jurors and presenting multiple expert witnesses. The 1996 capital trial
was followed by extensive litigation that included a three-month evidentiary hearing in which
over ten expert witnesses were presented. The District Court's grant of relief was followed
by additional litigation that ultimately concluded in the Third Circuit's dismissal on
jurisdictional grounds. The resources expended — necessary in light of the capital nature of
the prosecution — have already taken a toll on the resources of the Court, the government and
the defense.

The Honorable Peter J. Smith
August 7, 2013
Page 2

If this case continues to a resentencing hearing, the Court will be required to expend significant staffing and other resources to accommodate the necessary jury selection process as well as the two to three month resentencing proceeding. The cost of bringing in multiple panels of prospective jurors will be substantial. When that is added to the cost and Court resources necessary to bring in a jury for what everyone agrees will be a lengthy resentencing proceeding that total increases significantly. In addition, both the government and the defense have provided notice of more than fifteen (15) expert witnesses. A number of lay and expert witnesses are from areas across the country, taking an additional economic toll on Court and other resources. In short, the cost of this resentencing will far exceed hundreds of thousands of dollars.

When these exceptional costs are considered in light of the factors presented in the prior submission for deauthorization as well as those described below, including: the resolutions of various capital cases since the prior submission; the additional mitigation developed further supporting a sentence less than death; and, Mr. Hammer's continuing failing health, thus further reducing his likelihood of being a future danger in the prison environment, we would submit that deauthorization is an appropriate result that will provide some relief from the already extraordinary toll this capital litigation has had on the resources of the Court, the government and the defense.

Since Mr. Hammer's prior deauthorization submission, a number of federal capital cases have either reached resolutions or resulted in a sentence less than death. These include at least four cases involving inmate murders: United States v. Williams/Cooya, 4:08-cr-00070 (M.D. Pa.) (resolved via plea agreements on January 8, 2013 (Cooya) and April 15, 2013 (Williams)); United States v. Jackson, 1:06-cr-00051 (E.D. Tex.) (resolved after grant of Section 2255 relief); United States v. Richardson, 08-139 (N.D. Ga.) (jury resolution on April 29, 2012); and United States v. (Antonio) Johnson, 2:12-cr-00007 (W.D. Va.) (plea agreement March 12, 2010). From what counsel can determine regarding the circumstances of those murders, none appear particularly less aggravating than Mr. Hammer's case and some appear to be moreso. For example, the Williams/Cooya case involved circumstances in which the inmate was stabbed multiple times and his body kicked/beaten thereafter for over four minutes with Williams/Cooya taking various breaks throughout while waiting for the guards to arrive. The Richardson case involved the murder of a convicted sex-offender. Richardson stabbed the inmate nine times, then strangled him and during that process took various breaks to allow the inmate to regain consciousness before resuming. The Jackson and Johnson cases involved inmate stabbings.

The cases resolved since the prior submission also include at least three cases that were resolved for less than a death sentence after post-conviction relief was granted. In addition to the Jackson case described above, in United States v. Lecco, 2:05-cr-00107 (S.D.

The Honorable Peter J. Smith
August 7, 2013
Page 3

W.V.), the District Court granted a motion for a new trial. That case involved a 2005 murder-for-hire of a cooperating witness/informant. The victim was shot, beaten to death and buried in a shallow grave. The jury was unable to reach a unanimous verdict at the resentencing and Mr. Lecco was sentenced to life imprisonment. After the grant of Section 2255 relief, the government withdrew its Notice of Intent in United States v. Stitt, 2:98-cr-00047 (E.D. Va.) and United States v. Johnson, 96-cr-379-1 (N.D. Ill.). Stitt's conviction arose from his gang leadership in which he had ordered the murder of three individuals. Johnson, a leader of the Gangster Disciples Gang, had ordered the murders of cooperating witnesses. As described in the prior submission, Mr. Hammer's prison conduct during the time since the prior trial and sentencing hearing has no indications of violence or even the hint of any prospective future violence through the use of intermediaries.

The cases resolved since the prior submission also include at least three cases in which the government withdrew Notice of Intent prior to trial and the cases then proceeded as non-capital trials: United States v. (Antoine) Johnson, 2:05-cr-00920 (C.D. Cal.); United States v. (Herman) Johnson, 05-80337 (E.D. MI.); and United States v. Watson, 05-80025 (E.D. MI.). The Antoine Johnson case involved a sophisticated armored car robbery/murder involving a shoot-out in which over fifty rounds were fired killing a 61 year old father of ten. The Watson case also involved a bank robbery in which the guard was killed by Watson. The Herman Johnson case involved the shooting death of a cooperating witness.

In addition to the Antonio Johnson and Williams/Cooya cases described above, there were at least three other cases that were resolved for less than death by plea agreement: United States v. Lopez, 2:04-cr-00939 (E.D. NY); United States v. Aquart, 3:06-cr-00160; and United States v. Loughner, 4:11-cr-00187 (D. Ariz). Lopez was a MS-13 gang member who shot a cooperating witness. Aquart involved another gang-related murder in which Aquart and his co-conspirators entered a home, bound a woman and two men with duct tape and then beat them to death with a baseball bat. The Loughner case involved the shootings in Arizona that resulted in the death of five individuals, including a United States District Judge and Congressional employees and also seriously injured over ten others, including Congresswoman Gabriele Giffords. More recently, on June 5, 2013, the government's prosecution of former Sargent Bales – involving the murder of sixteen Afghan civilians, including women and children – was resolved by plea agreement that included the withdrawal of the death notice.

In addition to the Richardson case noted above, counsel is aware of at least three additional cases that proceeded to a capital sentencing hearing and resulted in a life verdict. These include: United States v. Northington, 2:07-cr-00550 (E.D. Pa.); United States v. Lujan, 2:05 -cr-00924 (D. N.M.); and, the life verdict just issued on August 2, 2013, in the Eastern District of Virginia, for the three Somali nationals convicted of piracy, murder,

The Honorable Peter J. Smith
August 7, 2013
Page 4

kidnapping and firearms offenses arising from the February, 2011 fatal shooting of four Americans on a yacht off the coast of Africa. The Lujan case involved a drug-related kidnapping murder of a sixteen (16) year old potential prosecution witness. The victim was beaten, forced to perform oral sex and nearly decapitated with a meat cleaver. DNA evidence connected Lujan to another double murder. Following a penalty hearing, Lujan was sentenced to life imprisonment.

The Northington case involved gang-related murders in which Mr. Northington was convicted of multiple murders, including the murder of a prosecution witness. There was evidence presented during the sentencing hearing regarding recent threats or incidents of violence committed by Mr. Northington while in prison in support of future dangerousness. As noted in the prior submission, no such incidents exist for Mr. Hammer and, instead, his prison adjustment has improved over the years. See Prior Submission Section VI. Indeed, his current security classification is a "one-man" hold, the lowest classification for moving a prisoner on the Special Confinement Unit.

A comparison of the circumstances surrounding the cases in which the government has agreed to withdraw notice and/or those in which the sentencing jury rejected death with the circumstances of Mr. Hammer's case – as we now know those circumstances – supports deauthorization. Certainly each of these cases also had mitigation evidence supporting a resolution other than death. Mr. Hammer's case does as well, as described in the prior submission and as supplemented below.

Another consideration is the quality and nature of the mitigating evidence that will be presented on Mr. Hammer's behalf. This was discussed at length in the initial request for deauthorization. See Prior Submission, Section III. However, it is worth noting that Mr. Hammer's history of physical, sexual and psychological abuse and resulting psychological problems will not only be confirmed by records and through the testimony of mental health experts, but also by the lay testimony of a number of witnesses. This testimony will provide insight and corroboration to incidents of abuse, its recurring nature, the depravity of what transpired, and the early age at which the psychological impact of this trauma first surfaced in the context of a hospital admission.

Moreover, the government's own mental health experts who testified during the §2255 proceedings, and who have been noticed by the government for the upcoming resentencing hearing, found Mr. Hammer's rendition of his history of abuse to be credible and genuine. These experts, Drs. Martell, Matthews, and Mitchell, found that Mr. Hammer's background and history was plagued by horrific physical, emotional and sexual abuse. Id. Drs. Martell and Matthews diagnosed Mr. Hammer as suffering from Cognitive Disorder, Not Otherwise Specified and Borderline Personality Disorder. Both found that Mr. Hammer was not

The Honorable Peter J. Smith
August 7, 2013
Page 5

malingering and that as a result of his history of abuse, he suffered from many psychological symptoms. Id.

Both Drs. Martell and Matthews described the trauma Mr. Hammer experienced at the hands of caregivers, including his mother, his father and other extended family members that involved physical abuse; sexual abuse (at the hands of his mother, father and others); emotional abuse (including shaming, verbal abuse, and forcing Mr. Hammer to kill pets and engage in illegal activities); failure to protect (father's failure to prevent his mother's abuse and coercion of sexual abuse); and neglect. Id. Mr. Hammer's first sentencing jury did not have all of this information.

Another factor militating in favor of deauthorization is Mr. Hammer's continued declining health. Since our prior submission, Mr. Hammer has been hospitalized numerous times for issues ranging from a serious infection that almost killed him this past spring, cardiac issues, including a heart catheterization in 2012, and increased complications from his Type 2 Diabetes.

Mr. Hammer's health problems are chronic, serious, and worsening. Current medical records reveal that Mr. Hammer has a significant history of Type 2 Diabetes[1]; severe diabetic peripheral neuropathy[2]; diabetic retinopathy[3]; severe coronary artery disease; unstable Angina; Nephrotic Syndrome[4]; Metabolic Syndrome[5]; Hypertension; Hepatitis C; Hepatitis

---

[1] Type 2 Diabetes is a chronic condition where the body is unable to process what insulin it manufactures. It causes damage to nerves and blood vessels in the eyes, kidneys, heart and arteries. It leads to strokes and heart attacks. As discussed above, Mr. Hammer suffers from damage to his nerves, blood vessels, heart, kidney, eyes and arteries.

[2] Diabetic Peripheral Neuropathy is a chronic condition where the diabetes has damaged sensory nerves which allow the brain to respond to pain, touch and temperature. It can also damage the motor nerves, which work with the muscles to control movement. It can lead to severe foot ulcers, which Mr. Hammer suffers, and in severe cases, results in amputation.

[3] Diabetic Retinopathy is a disease of the retina. The retina is the nerve layer that lines the back of the eye. This disease can lead to poor vision and blindness. It is caused by damage to the blood vessels of the retina.

[4] Nephrotic Syndrome is caused by damage to the tiny blood vessels in the kidneys that filters waste and extra water from the blood. The failure of these blood vessels leads to high levels of protein in the urine, low levels of protein in the blood and high cholesterol.

[5] Metabolic Syndrome is a constellation of health problems that includes high blood pressure, elevated blood sugar, high triglycerides and low HDL cholesterol. This syndrome increases

The Honorable Peter J. Smith
August 7, 2013
Page 6

B; Hypothyroidism; a history of myocardial infarction (heart attack); and, degenerative disc disease. Mr. Hammer's medical history includes emergency bowel resection, the placement of a stent in his LAD[6] coronary artery in 2008; and a heart catheterization in 2012.

New to the diagnostic picture is his continued decline in cardiac health as well as chronic conditions brought about by his severe Type 2 Diabetes: Diabetic Peripheral Neuropathy; Diabetic Retinopathy; Nephrotic Syndrome and Metabolic Syndrome. These diseases damage the eyes, kidneys, sensory nerves, motor nerves and further damage Mr. Hammer's heart and arteries.

Since 2009, Mr. Hammer's coronary artery disease has significantly worsened. He was admitted to the hospital in January of 2010, suffering from chest pain and was diagnosed with unstable angina and severe coronary artery disease.

In May of 2010, Mr. Hammer was again admitted to the hospital, this time suffering from loss of vision from "advanced diabetic retinopathy." In the emergency room, "he was unable to count fingers when seen by Dr. Milstead." After evaluation, the assessment noted that his loss of vision "appears to be progressive."

In October of 2011, Mr. Hammer was admitted to the hospital suffering from severe chest pain. The pain had started earlier in the day and despite taking nitroglycerene pills (for angina), the pain worsened. Upon admission, he had both high blood pressure, a high heart rate, low breathing rate and very high sugar.

Indeed, at one point in 2011-12, Mr. Hammer, while housed at USP-Canaan, required the use of a wheelchair in order to travel any distance within the institution. This arose as a result of the further deterioration of Mr. Hammer's chronic back condition. In February, 2008, Mr. Hammer had been diagnosed with degenerative disc disease with posterior disc protrusion. He also suffers from diabetic ulcers on his foot and, at one point, medical staff expressed concern that the ulcer might enter the bone, which potentially could lead to amputation.

In January of 2012, Mr. Hammer was rushed to the hospital by ambulance where a heart catheterization was performed after full evaluation:

The Patient was brought to the cardiac catheterization laboratory on January

---

the risk of heart attack and stroke.

[6]Often called the "widowmaker."

The Honorable Peter J. Smith
August 7, 2013
Page 7

18, 2012, in guarded condition. He underwent left heart catheterization, coronary arteriography, left venticulography right femoral artery Mynx deployment.

\* \* \*

He was released in guarded condition on January 18, 2012, to...USP-Canaan...

Community Medical Center of Scranton Discharge Summary, at 2.

Post-operative notes indicate that Mr. Hammer's heart has "significant residual lesions." This ominous observation means that there were narrow areas in Mr. Hammer's coronary arteries which could not be opened during the catheterization. These blockages are significant in that the unopened blood vessels are narrow enough to block blood flow and remained because they were not amenable to treatment or were too risky to attempt to clear.

Thus, while the immediacy of Mr. Hammer's 2012 cardiac emergency was handled as best it could be, much damage remains and his cardiac health is in steady decline. As of this writing, Mr. Hammer suffers from Type 2 diabetes that has led to severe coronary artery disease and has suffered complications implicating his vision, kidney function, sensory and motor function and has significantly heightened his risk of stroke and of suffering from another heart attack.

In February, 2013, Mr. Hammer was admitted to Union Hospital in Terre Haute suffering from nausea, vomiting and abdominal pain as well as chest pains. He was ultimately diagnosed with viral gastroenteritis, but the physician noted the neuropathy suffered by Mr. Hammer at that time and recommended diabetic shoes.

More recently, during a legal visit with Mr. Travis in May, 2013, Mr. Hammer became severely ill and was again hospitalized, this time as a result of multiple infections. He presented upon admission with symptoms of fatigue and low energy, a fever of 102 as well as chills and dysuria. His sugar levels were reportedly high, between 180 to 300 range, generally around 195 during the days preceding his hospitalization. During this hospitalization, the wound specialist noted the ongoing ulcers on Mr. Hammer's feet and resulting infections. He was diagnosed with pyelonephritis, likely left-sided,[7] severe sepsis,[8] severe neuropathy, as well as his chronic heart, diabetes and hypertension conditions.

---

[7] A bacterial or viral infection of the kidney.

[8] The body's inflammatory response to infection.

The Honorable Peter J. Smith
August 7, 2013
Page 8

Intravenous antibiotics were initially necessary followed by prescription medications and the physician's reiteration that Mr. Hammer needed diabetic shoes and continuing wound care. These were approved by the Chief Physician and URC.[9]

In short, Mr. Hammer's multiple medical conditions continue to deteriorate. These conditions, along with Mr. Hammer's age, he will turn fifty-five in October, as well as his history of a lack of violence within the institution for a significant period of time, demonstrate that, as he ages, any threat he may have posed in the institution setting has diminished.

Mr. Hammer has been classified as a medical "CARE level 3" of four possible levels. CARE Level 3 inmates are "fragile outpatients who require frequent clinical contacts" and "stabilization of medical . . . conditions that may require periodic hospitalization." See BOP Legal Resource Guide at 24. It is the second most serious medical classification. In light of his chronic medical conditions which have been deteriorating over the recent years, counsel would request that the government consider recommending that Mr. Hammer be designated to a United States Penitentiary that has CARE level 3 treatment available (USP-Terre Haute is one such facility).

---

[9]Utilization Review Committee.

The Honorable Peter J. Smith
August 7, 2013
Page 9

For each of these reasons, counsel respectfully request that the government deauthorize this capital prosecution. In return for the government's favorable consideration of all of the above, Mr. Hammer is willing to forego pursuing appeals of his guilt-phase issues. Counsel would be happy to discuss any questions you may have in person at your earliest convenience.

Respectfully,


/s/ RONALD C. TRAVIS
Rieders, Travis, Humphrey, Harris,
Waters & Waffenschmidt
161 West Third Street
PO Box 215
Williamsport, PA 17703-0215
570-323-8711 (telephone)
rtravis@riederstravis.com


/s/ ANNE SAUNDERS
Assistant Federal Defender
Federal Public Defender
Middle District Pennsylvania
100 Chestnut Street, Suite 300
Harrisburg, PA 17101
717-782-3843 (telephone)
anne_saunders@fd.org

/s/ JAMES MORENO
/s/ JAMES J. MCHUGH, JR.
Federal Community Defender
Eastern District Pennsylvania
Suite 545 West – The Curtis Center
Philadelphia, PA 19106
215-928-1100 (telephone)
215-928-0826 (facsimile)
james_mchugh@fd.org
james_moreno@fd.org

cc:    The Honorable Yvette Kane, Chief Judge
U.S. District Court
Middle District of Pennsylvania
PO Box 11817
228 Walnut Street
P.O. Box 983
Harrisburg, PA 17108-1817

The Honorable Joel H. Slomsky
5614 U.S. Courthouse
Eastern District of Pennsylvania
601 Market Street
Philadelphia, PA 19106

AUSA Steven Mellin
Department of Justice
Capital Case Unit
1331 F Street, N.W.
Washington, D.C. 20530