# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | : | No. 4:96-CR-239 |
| | : | |
| v. | : | Honorable Joel H. Slomsky |
| | : | |
| DAVID HAMMER, | : | Capital Case |
| | : | |
| Defendant | : | |

_____:_____

### DEFENDANT'S BRIEF IN SUPPORT OF MOTION  TO PRECLUDE THE CAPITAL PROSECUTION WHERE THE GOVERNMENT'S CAPITAL AUTHORIZATION DETERMINATION AND SUBSEQUENT DEAUTHORIZATION DETERMINATIONS RELIED ON CONVICTIONS AND EVIDENCE THAT WERE THE PRODUCT OF PERJURED TESTIMONY IN VIOLATION OF THE FIFTH AND EIGHTH AMENDMENTS

Defendant, David Hammer, through undersigned counsel, submits his *Brief in Support of Motion to Preclude the Capital Prosecution Where the Government's Capital Authorization and Subsequent Deauthorization Determinations Relied on Convictions and Evidence that Were the Product of Perjured Testimony in Violation of the Fifth and Eighth Amendments*.

### A.    Background.

On September 18, 1996, a Grand Jury sitting in Williamsport, Pennsylvania, returned an Indictment charging David Hammer with first degree murder arising from the April 13, 1996, death of Mr. Hammer's cellmate, Andrew Marti.  Doc. 1.  On

April 9, 1997, the government filed a notice of its intent to seek the death penalty. Doc. 93. The government's notice of intent to seek death was the product of the government's authorization determination done in all capital cases. See United States Attorneys' Manual, Death Penalty Protocol. § 9-10.010 et seq. (hereafter Protocol). Included in the factors the government considered in reaching a capital authorization decision is the defendant's prior record, id. at § 9-10.080.

The trial began on May 5, 1998. On June 22, 1998, after the defense had rested and while the government was presenting its rebuttal case, Mr. Hammer entered a plea of guilty to the murder charge.

The penalty phase began on June 30, 1998. In support of death, the government sought to prove two statutory aggravating factors: that the defendant committed the murder after substantial planning and premeditation, 18 U.S.C. §3592(c)(9), and that the defendant had previously been convicted of a state or federal offense punishable by a term of imprisonment of more than one year that involved the use, or attempted or threatened use, of a firearm against another person, 18 U.S.C. §3592(c)(2).

One of the two convictions relied on by the government in support of the prior firearm conviction aggravator under Section 3592(c)(2) was State v. Hammer, CRF-84-13l0 (Okla.) (hereinafter "Upton case"). That incident involved charges of kidnapping, robbery with a firearm, and shooting with intent to kill. Once convicted,

Mr. Hammer was sentenced to 1200 years by the jury.

The victim of that incident was Thomas Upton. Mr. Upton testified at two preliminary hearings and trial in Oklahoma. He contended that on the date of the incident, Mr. Hammer approached his (Upton's) car on the street brandishing a firearm and demanded that Upton drive to a motel. Mr. Upton also testified that inside the motel room, he fought with Mr. Hammer and was struck multiple times by Mr. Hammer during that fight. Mr. Upton also testified that at one point Mr. Hammer locked Mr. Upton in the bathroom and then made two phone calls. Upton also testified that Mr. Hammer forced Mr. Upton to drive to an area near some oil wells, ordered Upton to take off his clothes and lay on the ground and then shot Mr. Upton multiple times with a large gun. Mr. Upton got up and ran or walked away while Mr. Hammer screamed and then drove away in Mr. Upton's car. Exhibit 1.

From the start of this capital prosecution, the government has repeatedly highlighted these convictions and the 1200-year sentence and argued that they are highly relevant evidence that Mr. Hammer should be sentenced to death. The government first presented evidence relating to these convictions and the 1200-year sentence to the Grand Jury. NT 9/18/96 at 5. The government unsuccessfully sought to inform the jury that Mr. Hammer had received a 1200-year sentence as a result of those convictions, see NT 7/1/98 at 71, and despite having being barred from presenting that evidence at the initial sentencing continued to pursue its admission

3

during these resentencing proceedings.   See Consolidated Opposition to Mr. Hammer's Motions in Limine (Doc. 1550) at 11 (arguing that this Court should reconsider the prior ruling precluding the admission of evidence of the 1200-year sentence).

Mr. Upton's importance in the government's case for death against Mr. Hammer is underscored by the fact that he was the first witness the government called in the prior penalty hearing.  NT Vol. 15 (6/30/98) at 5.  Mr. Upton adopted and authenticated his preliminary hearing testimony from the Oklahoma case.  See NT Vol. 15 (6/30/98) at 6.  He also provided live testimony as to various aspects of the incident that was consistent with his prior testimony in Oklahoma.  See id. at 8 (indicating that Mr. Hammer assaulted him); id. at 9 (indicating that Mr. Hammer brandished a large gray weapon and ordered Upton to take him where he wanted to go); id. at 10 (indicating that Mr. Hammer forced Upton to accompany him to a motel room).  The government also presented testimony from the prosecutor in the Upton case, William Louis Keel.  During that testimony, the government elicited testimony that Mr. Hammer had been convicted of kidnapping, shooting with intent to kill, and robbery.  NT Vol. 16 (7/1/98) at 66.  The government also admitted into evidence the certified convictions for this case.  See Tr. Govt. Exh. 4001.

The government argued in both closing and rebuttal that the jury should consider both the circumstances of the Upton incident as well as the fact of the

convictions arising from this incident in reaching its determination of the submitted aggravating factors and in weighing aggravation and mitigation. See NT Vol. 27 at 62-63 (arguing the jury should find the prior conviction aggravator on the basis of these convictions); id. at 67 ("Mr. Upton was minding his own business in a truck on Classen Avenue . . . he was on Classen Avenue in Oklahoma City when Mr. Hammer with a firearm came up to him and basically commandeered his truck. He took him to a motel . . ."); NT Vol. 29 (7/23/98) at 19 (arguing that the jury should consider the convictions in aggravation); id. at 41 (arguing the Oklahoma incident and trial as a basis for rejecting mitigation evidence); id. at 56 (arguing the Oklahoma incident as support for escalation of violence). On July 24, 1998 the jury returned a verdict of death.

In September 2002, Mr. Hammer filed a petition for writ of habeas corpus collaterally attacking his conviction and sentence pursuant to 28 U.S.C. §2255. The Court conducted an evidentiary hearing on his petition from July 14, 2005 through September 29, 2005. On the twenty-ninth day of the hearing, September 22, 2005, the government provided the defense with thirty-three previously undisclosed FBI 302 statements that summarized interviews with various prison inmates.

On December 27, 2005, the Court issued its decision vacating the 1998 sentence of death. The Court found, in part, that, as a result of the government's misconduct for failing to disclose material exculpatory evidence, the prior sentencing

proceeding was constitutionally defective.[1]  Specifically, the Court held that the government's failure to disclose four 302 witness statements that were "relevant and material" to the jury's penalty determination violated Brady v. Maryland, 373 U.S. 83 (1963).  United States v. Hammer, 404 F. Supp. 2d 676, 801 (M.D. Pa. 2006) (Muir, J.)  The Court then concluded as a matter of law that the failure of the government to disclose the 302 statements rendered "the penalty phase of the trial defective."  Id.

In its Informational Outline the government noticed its intent to again proceed with the prior firearms conviction aggravator under Section 3592(c)(2) and rely on the Upton case as support for that aggravator.  See Doc. 1489 at 2, n.1.

On March 11, 2014, counsel received a notice from current government counsel pursuant to Brady v. Maryland, 373 U.S. 83 (1963).  That notice indicated that, during an interview with  Capital Crimes Section Trial Attorney Haines and Special Agent John Coyle on March 10, 2014, Mr. Upton disclosed that he lied during his preliminary hearing and trial testimony in Oklahoma in 1984 and during his testimony at the federal capital sentencing proceeding in 1998.  Specifically, he now admits that he voluntarily accompanied Mr. Hammer to the motel; that Mr.

---

[1]The Court also found that the jury's failure to find mitigating factors that had been conceded or undisputed by the government constituted constitutional error requiring reversal.  Hammer, 404 F. Supp. 2d at 801.

Hammer had not brandished a weapon and forced Mr. Upton to accompany him; that Mr. Upton was neither kidnapped nor carjacked; nor was Mr. Upton locked into the bathroom in the motel, although he did go into the bathroom so that Mr. Hammer could make a phone call.  Exhibit 2.

On March 13, 2014, the government provided counsel with an FBI 302 providing further details of the interview, including multiple instances of exchanges in which Ms. Haines and/or Agent Coyle confronted Mr. Upton with the flaws in his version of events.  Exhibit 3.  On March 14, 2014, current government counsel sent Mr. Hammer's counsel an email that provided a further clarification of Mr. Upton's disclosures during the March 10, 2014 meeting.  Exhibit 4.

The recently provided 302 also revealed that at or around the time of Mr. Hammer's first federal trial, a person Upton believed to have been from the United States Attorney's Office had challenged Upton concerning his testimony in the Oklahoma trial.  Id.  Mr. Upton's revelation that he had been confronted by someone possibly from the United States Attorney's office demonstrates that the government knew or should have known that Mr. Upton had committed perjury in his Oklahoma testimony against Mr. Hammer.

Given the emphasis the government has placed on these convictions and the 1200-year sentence at every stage in which any other fact-finder was to make a decision about this case, there is no question that the government considered – and

7

most likely applied great weight to – these convictions and Mr. Hammer's 1200-year sentence when it reached its initial decision to authorize the penalty and its two subsequent determinations not to deauthorize this capital prosecution.  Indeed, its own protocols for capital authorization stress that it must considered as a reason favoring pursuing the death penalty "[w]hether the defendant is already serving a substantial sentence such that an additional sentence of incarceration would have little punitive impact."  United States Attorneys' Manual, Death Penalty Protocol § 9-10.130 D(7) (hereafter Protocol).[2]

The government's consideration of convictions and a 1200-year sentence that were procured by and the product of perjured testimony in its decisions first to authorize and then not deauthorize the death penalty in this case violated the Fifth, Sixth, and Eighth Amendments.

**B.    The Government's Consideration of Convictions and Sentences that Were the Product of Perjury in Reaching the Capital Authorization Determination Violated the Government's Own Protocols and Due Process.**

When the government sets up specific processes and procedures for reaching determinations, like a determination to capitally prosecute an accused, the process and procedure followed by the government must conform with due process.  <u>See</u>

---

[2]These protocols are published on the Department of Justice's website at http://www.justice.gov/usao/eousa/foia_reading_room/usam/title9/10mcrm.htm#9 -10.010.

Evitts v. Lucey, 469 U.S. 387, 393 (1985) (due process interest in state created right to direct appeal); see also Hicks v. Oklahoma, 447 U.S. 343, 346 (1980) (liberty interest in state-created capital sentencing procedures); Ford v. Wainwright, 447 U.S. 399, 427-31 (1986) (O'Connor, J., concurring) (liberty interest in state-created right to proceedings to determine competency to be executed); Ohio Adult Parole Authority v. Woodard, 523 U.S. 272, 289 (1998) (O'Connor, J, with Souter, Ginsburg & Breyer, JJ., concurring) (life interest in state-created right to capital clemency proceedings); id. at 290-91 (Stevens, J., concurring).

The government established specific protocols for determining whether to capitally prosecute a federal defendant.  In setting forth the purpose of the capital case review process, the protocols require that "[e]ach . . . decision must be based upon the facts and law applicable to the case and be set within a framework of consistent and even-handed national application of Federal capital sentencing laws."  Protocol § 9-10.030.  The protocols further provide that "[a]rbitrary or impermissible factors . . . will not inform any stage of the decision-making process."  Id.  As noted previously, the protocols include within the standards for determining if a particular case should be capitally prosecuted whether the accused is currently serving a "substantial sentence such that an additional sentence of incarceration would have little punitive impact."  Id. § 10.130 D(7).

There is no debating whether a sentence of 1200 years falls within this factor:

if a sentence of more than a century plus two lifetimes does not, it is hard to conceive of a sentence that does.  Indeed, as Mr. Hammer demonstrated in his most recent deauthorization submission, a number of cases involving greater aggravation and/or more heinous acts than present in his case were not authorized. Exhibit 5.  Some – if not all – of the reviewers undoubtedly considered Mr. Hammer's 1200-year sentence as the distinguishing factor between Mr. Hammer's case and those cases in which death was not authorized.

The reviewers' consideration of perjured testimony violated the government's own protocols for a number of reasons.  It violated the standard requiring that decisions be based on the applicable facts and law, as there is no legitimate basis for considering perjured testimony.[3]  It violated the standard prohibiting the consideration of arbitrary and capricious factors, for what could be more arbitrary than basing a decision on fabricated "facts." The reviewers' consideration of the "substantial sentence" was tainted by the fact that the 1200 year sentence arising from

---

[3]If a sentence that is the product of a material misapprehension of law or fact about a defendant's record violates due process, Townsend v. Burke, 334 U.S. 736, 741 (1948); Roberts v. United States, 445 U.S. 552, 556 (1980); United States v. Tucker, 404 U.S. 443, 447 (1972), it is inconceivable that the pursuit of a death sentence based upon perjury does not.  Upton's perjury materially alters Mr. Hammer's criminal record and demonstrates the falsity of the underlying facts upon which his convictions and century-plus sentence rests.  Reliance upon Upton's perjury left the authorizing committee to act "on the basis of assumptions concerning [Mr. Hammer's] criminal record which were materially untrue," Townsend, 334 U.S. at 741; Tucker, 404 U.S. at 447, in violation of due process.

the perjured testimony was constitutionally invalid.   Its consideration of the constitutionally invalid convictions and 1200-year sentence that were the product of perjury tainted the weighing process and compromised the reviewers' mandate to reach a determination based on "consistent and even-handed national application of Federal capital sentencing laws."  In short, Mr. Upton's perjury polluted all aspects of the government's deauthorization determination.

Even if the government's consideration of perjury in reaching its authorization determination did not violate its own protocols, it nevertheless does violate due process for a number of reasons.  First, while Mr. Hammer may have received some process by the government, he most assuredly did not receive the same process and consideration provided to other capital eligible defendants in which the factors considered by the reviewers were based on the facts and the law rather than perjury and materially false evidence.  Accordingly, the process provided to Mr. Hammer violated his Fifth Amendment right to equal protection.

Moreover, even if other courts have found that, because prosecutorial discretion differs from other types of agency discretion, there is no enforceable right under the protocols,[4] those decisions do not involve a prosecutorial determination that relied on perjury.  That distinction is not insignificant.

---

[4]See United States v. Lee, 274 F. 3d 485, 492-493 (8th Cir. 2001).

"The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all." Berger v. United States, 295 U.S. 78, 88 (1935). It has a heightened obligation to follow the law.

Further, "[t]he principle that [the government] may not knowingly use false evidence, including false testimony, to obtain a tainted conviction [is] implicit in any concept of ordered liberty." Napue v. Illinois, 360 U.S. 264, 269 (1959); Agurs v. United States, 427 U.S. 97, 103 (1976) ("a conviction obtained by the knowing use of perjured testimony is fundamentally unfair"), quoted in Kyles v. Whitley, 514 U.S. 419, 433 n.7 (1995). For the same reasons that use of perjured testimony violates due process at trial, its use to secure authorization to undertake a prosecution to take a defendant's life offends our concept of ordered liberty and is fundamentally unfair. Any process that relies upon perjury as the basis of its decision is not *due* process.

Where, as here, the government's exercise of its discretionary power was grounded in Mr. Upton's perjury, it is unconstitutionally tainted, and whatever deference is traditionally owed the prosecution's discretion must stand aside to preserve the integrity and dignity of the system and our concept of ordered liberty. For this reason as well, the government's consideration of perjured testimony in reaching its authorization determination violated the Fifth Amendment.

12

**C.    The Government's Consideration of Convictions and Sentences that Were the Product of Perjury in Reaching Its Capital Authorization Determination Violated the Eighth Amendment.**

The Eighth Amendment imposes a heightened standard "for reliability in the determination that death is the appropriate punishment in a specific case." Woodson v. North Carolina, 428 U.S. 280, 305 (1976). "Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." Woodson v. North Carolina, 428 U.S. 280, 305 (1976); Gregg v. Georgia, 428 U.S. 153, 189 (1976).

Under the Eighth Amendment, "accurate sentencing information is an indispensable prerequisite to a reasoned determination of whether a defendant shall live or die." Gregg, 428 U.S. at 190. The Eighth Amendment "mandates that where discretion is afforded . . . on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action. [¶] It is certainly not a novel proposition that discretion in the area of sentencing be exercised in an informed manner." Id. at 189.

Death-sentencing decisions that are the product of "consider[ation of]

materially inaccurate evidence" violate the Eighth Amendment. Tuggle v. Netherland, 516 U.S. 10, 14 (1995) (per curiam); Johnson v. Mississippi, 486 U.S. at 590. That would be a charitable description of Upton's perjury.

Here, in reaching its authorization determination, the government's discretion was not exercised in an informed manner nor limited to avoid the risk of wholly arbitrary and capricious action. Instead, the authorization process relied heavily on perjured testimony regarding a material factor. The entire process surrounding the authorization and deauthorization decisions was tainted by Mr. Upton's perjury. Under these circumstances, the authorization procedure was fatally flawed and failed to provide the heightened procedural safeguards constitutionally required in capital prosecutions.

### D. Conclusion.

The government's death-authorization process in this case violated due process and the Eighth Amendment. The illegitimacy of the death-authorization process was only part of the pervasive impact of prosecutorial misconduct that infected every stage of this case and which requires relief. When considered in light of the constitutional errors arising from the Court's opinion granting a new penalty hearing on the basis of the government's failure to disclose exculpatory evidence as well as the constitutional errors provided in Mr. Hammer's Amended/Supplemental Motion

Pursuant to 28 U.S.C. § 2255, also filed this date; Mr. Hammer's Motions in Limine arising from current government counsel's disclosure of additional constitutional errors arising from the government's reliance on testimony and evidence obtained through the use of a clandestine agent deployed for the clear purpose of circumventing Mr. Hammer's invocation of his right to counsel – the reliability of these capital proceedings is fatally compromised. Given the pervasive effects of the government's misconduct – from investigation to authorization to trial and sentencing – the only appropriate relief that can deter such misconduct in the future is to preclude the government from proceeding capitally.

For each of these reasons, and those set forth in the Mr. Hammer's *Motion to Preclude the Capital Prosecution Where the Government's Capital Authorization and Subsequent Deauthorization Determinations Relied on Convictions and Evidence that Were the Product of Perjured Testimony in Violation of the Fifth and Eighth Amendments*, Mr. Hammer respectfully request that following discovery, an evidentiary hearing and/or argument, that this Court Grant Mr. Hammer's motion.

Respectfully submitted,

/S/  RONALD C. TRAVIS
Ronald C. Travis
Rieders, Travis, Humphrey, Harris,
Waters & Waffenschmidt
161 West Third Street
PO Box 215
Williamsport, PA  17703-0215
570-323-8711 (telephone)
570-323-4192 (facsimile)
rtravis@riederstravis.com


/S/ ANNE SAUNDERS
Anne Saunders
Assistant Federal Defender
Federal Public Defender
Middle District Pennsylvania
100 Chestnut Street, Suite 300
Harrisburg, PA 17101
717-782-3843 (telephone)
717-782-3966 (facsimile)
anne_saunders@fd.org

/S/ JAMES MCHUGH
James J. McHugh, Jr.
/S/ JAMES MORENO
James Moreno
Federal Community Defender
Eastern District Pennsylvania
Suite 540 – The Curtis Center
Philadelphia, PA 19106
215-928-1100 (telephone)
215-928-0826 (facsimile)
james_mchugh@fd.org
james_moreno@fd.org


Dated:  April 2, 2014

16

# CERTIFICATE OF SERVICE

I, Anne Saunders, Esquire, do hereby certify that on this date I served a copy of the foregoing by Electronic Case Filing, or by placing a copy in the United States mail, first class addressed to the following:

John C. Gurganus, Jr. Esquire
United States Attorneys Office
Middle District of Pennsylvania
235 N. Washington Street, Suite 311
PO Box 309
Scranton, PA. 18501

Amanda Haines, Esquire
United States Department of Justice
Criminal Division
1331 F. Street, N.W.
Washington, D.C. 20530

/S/ANNE SAUNDERS, ESQUIRE
James Moreno, Esquire

Dated: April 2, 2014