# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | : | No. 4:96-CR-239 |
|  | : |  |
| v. | : | Honorable Joel H. Slomsky |
|  | : |  |
| DAVID HAMMER, | : | Capital Case |
|  | : |  |
| Defendant | : |  |
| _____ | : | _____ |

**DEFENDANT'S MOTION IN LIMINE TO DISMISS THIS CAPITAL RESENTENCING BECAUSE OF THE GOVERNMENT'S PRESENTATION OF PERJURED TESTIMONY AND REPEATED MISCONDUCT IN SUPPRESSING A SUBSTANTIAL VOLUME OF MATERIAL EXCULPATORY AND IMPEACHMENT EVIDENCE AND ITS USE OF A CLANDESTINE AGENT TO ILLEGALLY GATHER INCRIMINATING EVIDENCE**

Defendant, David Hammer, through undersigned counsel, submits his *Motion To Dismiss This Capital Resentencing Because Of The Government's Presentation of Perjured Testimony And Repeated Misconduct In Suppressing A Substantial Volume Of Material Exculpatory And Impeachment Evidence And Its Use Of A Clandestine Agent To Illegally Gather Incriminating Evidence*, and in support thereof, states the following:

1.    On September 18, 1996, a Grand Jury sitting in Williamsport, Pennsylvania, returned an Indictment charging David Hammer with first degree murder arising from the April 13, 1996, death of Mr. Hammer's cellmate, Andrew

Marti.  Doc. 1.  On April 9, 1997, the government filed a notice of its intent to seek the death penalty.  Doc. 93.  The trial began on May 5, 1998.  On June 22, 1998, after the defense had rested and while the government was presenting its rebuttal case, Mr. Hammer entered a plea of guilty to the murder charge.

2.     The penalty phase began on June 30, 1998.  In support of death, the government sought to prove two statutory aggravating factors:  that the defendant committed the murder after substantial planning and premeditation, 18 U.S.C. §3592(c)(9), and that the defendant had previously been convicted of a state or federal offense punishable by a term of imprisonment of more than one year that involved the use, or attempted or threatened use, of a firearm against another person, 18 U.S.C. §3592(c)(2).  On July 24, 1998 the jury returned a verdict of death.

3.     In September 2002, Mr. Hammer filed a petition for writ of habeas corpus collaterally attacking his conviction and sentence pursuant to 28 U.S.C. §2255.  The Court conducted an evidentiary hearing on his petition from July 14, 2005 through September 29, 2005.  On the twenty-ninth day of the hearing, September 22, 2005, the government provided the defense with thirty-three previously undisclosed FBI 302 statements that summarized interviews with various prison inmates.

4.     On December 27, 2005, the Court issued its decision vacating the 1998 sentence of death.  The Court found, in part, that, as a result of the government's

misconduct for failing to disclose material exculpatory evidence, the prior sentencing proceeding was constitutionally defective.[1]  Specifically, the Court held that the government's failure to disclose four 302 witness statements that were "relevant and material" to the jury's penalty determination violated Brady v. Maryland, 373 U.S. 83 (1963).  United States v. Hammer, 404 F. Supp. 2d 676, 801 (M.D. Pa. 2006) (Muir, J.)  The Court then concluded as a matter of law that the failure of the government to disclose the 302 statements rendered "the penalty phase of the trial defective."  Id.

5.     As discussed below, this is only the tip of the iceberg.  Unbeknownst to Mr. Hammer as his execution date loomed was the breadth of evidence suppressed by the government or of the fact that his death sentence was predicated on perjured testimony.

6.     In 2004, Mr. Hammer came within three days of execution. If he had been executed, his death would have been the result of pernicious misconduct and, as the government now admits, perjured testimony. Indeed, without the perjured testimony of the government's key witness in aggravation, Mr. Thomas Upton, and had the government complied with its Brady obligations at the time of trial, it is

---

[1]The Court also found that the jury's failure to find mitigating factors that had been conceded or undisputed by the government constituted constitutional error requiring reversal.  Hammer, 404 F. Supp. 2d at 801.

reasonably probable that Mr. Hammer would not have been sentenced to death.

7.     Sixteen years after Mr. Hammer's initial trial and sentencing, the landscape has changed. Not only did the government suppress critical evidence, as found by the late Judge Muir, it admittedly presented perjured testimony and gathered some of the most incriminating evidence against Mr. Hammer through the use of a clandestine government agent, inmate Yager. And, it withheld a document from the Bureau of Prisons indicating, contrary to the government's arguments during both the guilt phase and penalty phase, that Mr. Marti specifically requested to cell with Mr. Hammer, debunking the so-called "hostage ruse." And now it wants to try again to kill Mr. Hammer.

8.     During those sixteen years, Mr. Hammer has unconstitutionally languished on federal death-row, subjected to solitary confinement twenty-three out of twenty-four hours a day. During the past sixteen years, Mr. Hammer has endured near draconian deprivations and restrictions. And all of this punishment – in addition to his unconstitutional sentence of death – has been unconstitutional from the moment he stepped foot inside the death-row housing unit.  For sixteen years, Mr. Hammer has lived with utter uncertainty, anxiety and stress and continues to do so as he wonders whether he will again be sentenced to death.

**B.     The Government's Pervasive Misconduct and Its Reliance on Perjury Warrants Dismissal of this Capital Prosecution**.

9.     In <u>United States v. Harper</u>, 729 F.2d 1216 (9th Cir. 1984), the Court aptly described life as a capital defendant:

> Enduring a trial that entails the possibility of the death penalty imposes a hardship of different-in-kind from enduring the discomfiture of any other trial. The emotional stress and strain of a trial in a capital case are extreme in character and suri generis. We consider the ordeal of undergoing such a trial a truly substantial hardship.

<u>Id</u>. at 1223. As a result of the profound misconduct and the recently disclosed fact that his prior death sentence was premised in large part on perjured testimony, Mr. Hammer should not be required to endure the psychological torture of yet another attempt by the government to extinguish his life.

10.     The government has forfeited its right to continue to pursue Mr. Hammer's execution because of a pattern of misconduct that ranges from actively suppressing evidence, illegally gathering evidence and presenting perjured testimony.

11.     The government's misconduct has resulted in the violation of Mr. Hammer's right to a fair trial, right to present a defense, right to effective assistance of counsel and right to be free from cruel and unusual punishment as guaranteed by the Fifth, Sixth, and Eighth Amendments.

12.     It is now clear that the depth of the constitutional violations committed by the government during Mr. Hammer's prior capital trial and sentencing hearing are

more profound than anyone previously believed. Not only did the government suppress evidence it solicited supporting a defense it expected Mr. Hammer to raise – accidental death during a consensual sexual encounter – but it illegally elicited from Mr. Hammer purportedly incriminating evidence through its illegal agent, Mr. Yager.

13. But the worst of all, it presented the perjured testimony of Mr. Thomas Upton. The government relied upon Mr. Hammer's prior conviction in the Upton case as one of two convictions supporting the Section 3592(c) (2) aggravating factor.

14. The Upton case involved charges that Mr. Hammer kidnapped Thomas Upton, robbed him with a firearm, and shot him with intent to kill. Mr. Upton testified at two preliminary hearings and trial in that case. Although the details of some of his testimony varied, Upton consistently testified that, at the time of the incident, Mr. Hammer had approached Upton's car on the street brandishing a firearm and demanded that Upton drive to a motel.

15. Mr. Upton also testified that, inside the motel room, he fought with Mr. Hammer and that Mr. Hammer struck him multiple times during that fight. Mr. Upton also testified that at one point Mr. Hammer locked him in the bathroom, during which time Mr. Hammer made two phone calls. Upton also testified that Mr. Hammer had forced him to drive to an area near some oil wells, ordered him to take off his clothes and lie on the ground, and then shot him multiple times with a large gun. Mr. Upton testified that, after being shot, he got up and ran or walked away while Mr. Hammer

screamed and then drove away in Upton's car.

16.    As a result of these convictions, Mr. Hammer received a 1200 year prison sentence. We now know that Mr. Upton not only perjured himself in his 1998 testimony in this case, but he perjured himself when he testified against Mr. Hammer in Oklahoma state court back in 1984. Incidentally, he also lied to state and federal investigators who interviewed him concerning this incident.

17.    Mr. Upton's importance in the government's case for death against Mr. Hammer is underscored by the fact that he was the first witness the government called in the prior penalty hearing. NT Vol. 15 at 5. Mr. Upton adopted and authenticated his preliminary hearing testimony from the Oklahoma case. See id. at 6.

18.     He also provided live testimony as to various aspects of the incident that was consistent with his prior testimony in Oklahoma. See id. at 8 (indicating that Mr. Hammer assaulted him); id. at 9 (indicating that Mr. Hammer brandished a large gray weapon and ordered Upton to take him where he wanted to go); id. at 10 (indicating that Mr. Hammer forced Upton to accompany him to a motel room).

19.    The government also presented testimony from the prosecutor in the Upton case, William Louis Keel, that Mr. Hammer had been convicted of kidnapping, shooting with intent to kill, and robbery. NT Vol. 16 (7/1/98) at 66. The government also admitted into evidence the certified convictions. See Tr. Govt. Exh. 4001.

20.     The government argued in its closing and in rebuttal that the jury should

consider both the fact of the Upton convictions and the specific circumstances of the underlying incident in determining whether the government had proven its submitted aggravating factors, as a basis for rejecting Mr. Hammer's mitigation, and in finding that the government's reasons for death outweighed Mr. Hammer's reasons for life. See NT Vol. 27 at 62-63 (arguing the jury should find the prior conviction aggravator on the basis of these convictions); id. at 67 ("Mr. Upton was minding his own business in a truck on Classen Avenue . . . he was on Classen Avenue in Oklahoma City when Mr. Hammer with a firearm came up to him and basically commandeered his truck. He took him to a motel . . ."); NT Vol. 29 (7/23/98) at 19 (arguing that the jury should consider the convictions in aggravation); id. at 41 (arguing the Oklahoma incident and trial as a basis for rejecting mitigation evidence); id. at 56 (arguing the Oklahoma incident as support for escalation of violence).

21.    The prosecution employed various aspects of Upton's version of events to bolster its theory of how Mr. Marti was killed.  For example, it invoked Mr. Hammer's purported kidnapping and confinement of Mr. Upton as a "hostage theme" that was prevalent in Mr. Marti's death.  Id. at 67 ("[I]t's always nice to have a hostage around.  Again, you'll hear this hostage theme repeated, repeated and repeated").  The government argued that Mr. Hammer had used "deceit" and "lulled" Mr. Upton into believing he would not be hurt so as to get Mr. Upton to remove his clothes.  Id. at 67-68.  The prosecutor then employed the very same terms to describe

what the government contended Mr. Hammer had done to Mr. Marti. Id. at 85.

22.    It turns out that Mr. Upton blatantly lied about what had transpired between him and Mr. Hammer back in Oklahoma.

23.    On March 11, 2014, counsel received a notice from current government counsel pursuant to Brady v. Maryland, 373 U.S. 83 (1963) that on March 10, 2014, Mr. Upton had admitted facts to Capital Crimes Section Trial Attorney Haines and Special Agent Coyle demonstrating that he had testified falsely against Mr. Hammer in 1984 and 1998. Specifically, the notice indicated that Upton had admitted that he had voluntarily accompanied Mr. Hammer to the motel; that Mr. Hammer had not brandished a weapon and forced Mr. Upton to accompany him; that Mr. Upton was neither kidnapped nor carjacked; and that Mr. Upton had not been locked into the bathroom in the motel, although he did go into the bathroom so that Mr. Hammer could make a phone call. See Exhibit 1.

24.    On March 13, 2014, the government provided counsel with an FBI 302 recounting further details of the interview, including multiple instances in which Ms. Haines and/or Agent Coyle confronted Mr. Upton with the contradictions in his version of events. See Exhibit 2. The recently provided 302 also revealed that at or around the time of Mr. Hammer's 1998 trial, a person Upton believed to have been from the United States Attorney's Office had challenged Upton concerning his testimony in the Oklahoma trial. Id. Mr. Upton's revelation that he had been

confronted by someone possibly from the United States Attorney's office demonstrates that the government knew or should have known that Mr. Upton had testified falsely in his Oklahoma testimony against Mr. Hammer.

25.    The government has also recently disclosed that Mr. Leonard Yager, a key witness against Mr. Hammer during the guilt phase, reports that his actions against Mr. Hammer shortly after the murder of Mr. Marti were at the behest of the government and that he had been "sent in" to talk with Hammer in direct violation of Mr. Hammer's invocation of his right to counsel.  See Exhibit 3.  A 302 has not yet been provided for Mr. Yager.

26.    And, as found by the late Judge Muir, the government failed to disclose evidence it actively sought through its investigation: evidence about Mr. Hammer's sexual practices. See 302 statements of Albert Johnson, Royce Lee Fowler, Gaylon Don Ball and Martin Guerrero.  The only surviving witness is Mr. Johnson.

27.    This suppressed evidence would have allowed Mr. Hammer to effectively present a defense to a charge of less than first degree murder; would have supported the defense proffered by trial counsel during opening argument, i.e., that the death of Mr. Marti occurred during consensual sex; it would have shown the jury that Mr. Hammer had a long history of braiding sheets for sexual activity; and, through the suppressed BOP document, demonstrate that Mr. Marti was not in Mr. Hammer's cell as part of a hostage ruse.

28.     The suppressed evidence went to the heart of Mr. Hammer's defense that Mr. Marti's death was the result of consensual sexual activity. The government actively investigated Mr. Hammer's sexual practices in an attempt to uncover evidence undermining this line of defense.  And what it found was witnesses who could support Mr. Hammer's argument that he did not intentionally kill Mr. Marti. And then it suppressed all related evidence.  All of it.  This was not by happenstance. At best, it is evidence of a "[r]eckless disregard for a defendant's constitutional rights." Government of the Virgin Islands v. Fahie, 419 F.3d, 249, 256 (3d Cir. 2005). Under the totality of the circumstances, dismissal is required.

29.     In the interest of justice, Mr. Hammer requests this Court, at a minimum, to exercise its supervisory powers and preclude the government from continuing with its attempt to take his life. See Fahie, 419 F.3d at 258 (recognizing that the District Court's "supervisory powers are broad and include implementing remedies for violations of recognized rights and remedies designed to deter illegal conduct").

30.     This Court has the supervisory authority to dismiss the indictment, death notice, or Informational Outline in this case because of the government's outrageous conduct. See United States v. Ross, 372 F.3d 1097, 1107 (9th Cir. 2004).  Indeed, "supervisory powers are a means by which the federal courts fulfill their role in the criminal justice system. . . . The supervisory powers provide a wider range of remedial options than would otherwise exist . . ." Id.

31.     The government's misconduct has permeated every aspect of this case from the grand jury through the penalty phase. Enough is enough.

WHEREFORE, for each of these reasons, and those set forth in Mr. Hammer's *Brief In Support Of Defendant's Motion In Limine To Dismiss This Capital Resentencing Because Of The Government's Presentation of Perjured Testimony And Repeated Misconduct In Suppressing A Substantial Volume Of Material Exculpatory And Impeachment Evidence And Its Use Of A Clandestine Agent To Illegally Gather Incriminating Evidence,* Mr. Hammer respectfully requests that following discovery, an evidentiary hearing and/or argument, that this Court Grant Mr. Hammer's motion.

Respectfully submitted,


/s/  RONALD C. TRAVIS
Ronald C. Travis
Rieders, Travis, Humphrey, Harris,
Waters & Waffenschmidt
161 West Third Street
PO Box 215
Williamsport, PA  17703-0215
570-323-8711 (telephone)
570-323-4192 (facsimile)
rtravis@riederstravis.com


/s/ ANNE SAUNDERS
Anne Saunders
Assistant Federal Defender
Federal Public Defender
Middle District Pennsylvania
100 Chestnut Street, Suite 300
Harrisburg, PA 17101
717-782-3843 (telephone)
717-782-3966 (facsimile)
anne_saunders@fd.org

/s/ JAMES MCHUGH
James J. McHugh, Jr.
/s/ JAMES MORENO
James Moreno
Federal Community Defender
Eastern District Pennsylvania
Suite 540 – The Curtis Center
Philadelphia, PA 19106
215-928-1100 (telephone)
215-928-0826 (facsimile)
james_mchugh@fd.org
james_moreno@fd.org


Dated: April 2, 2014

# CERTIFICATE OF SERVICE

I, Anne Saunders, Esquire, do hereby certify that on this date I served a copy of the foregoing by Electronic Case Filing, or by placing a copy in the United States mail, first class addressed to the following:

John C. Gurganus, Jr. Esquire
United States Attorneys Office
Middle District of Pennsylvania
235 N. Washington Street, Suite 311
PO Box 309
Scranton, PA. 18501

Amanda Haines, Esquire
United States Department of Justice
Criminal Division
Capital Case Section
1331 F. Street, N.W.
Washington, D.C. 20530

/S/Anne Saunders, Esquire
James Moreno, Esquire

Dated:  April 2, 2014