UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

————————

NO. 4:96-CR-239

————————

UNITED STATES OF AMERICA,

v.

DAVID PAUL HAMMER,

Defendant

————————————

CONSOLIDATED BRIEF OF THE UNITED STATES IN
OPPOSITION TO DEFENDANT'S MOTIONS IN LIMINE, TO
DISMISS CAPITAL PROSECUTION, AND TO FILE A
SUPPLEMENTAL MOTION TO VACATE

————————————

STATEMENT OF THE CASE

In 1998, David Paul Hammer, a federal prisoner charged with killing his

cellmate, pleaded guilty in the United States District Court for the Middle District

of Pennsylvania to first-degree murder within the special territorial jurisdiction of

the United States, in violation of 18 U.S.C. § 1111.  The plea occurred during the

government's rebuttal case at Hammer's guilt/innocence trial.  (TT Vol. 11, Pgs. 99-

121);  United States v. Hammer, 25 F. Supp. 2d 518, 519-20 (M.D. Pa. 1998).  A

capital penalty hearing followed, in which a jury returned a death penalty verdict.

On direct appeal, the United States Court of Appeals for the Third Circuit granted

Hammer's motion for voluntary dismissal of the appeal, United States v. Hammer, 226 F.3d 229 (3rd Cir. 2000), cert. denied, 532 U.S. 959 (2001), and denied his rehearing petition seeking reinstatement of the appeal.  See United States v. Hammer, 239 F.3d 302 (3rd Cir.), cert. denied, 534 U.S. 831 (2001).

Hammer filed a motion for Section 2255 relief on March 29, 2002, (Doc. 767), which was within the one-year limitations period measured from the Supreme Court's October 1, 2001, certiorari denial.   See 28 U.S.C. § 2255. Thereafter, he filed additional motions to supplement his motion to vacate.

On the merits of Hammer's Section 2255 motion, the district court denied relief with regard to his plea-based conviction but granted relief with regard to the death sentence, based on rulings that the government violated Brady v. Maryland, 373 U.S. 83 (1963), and that the jury failed to find undisputed mitigating factors at the penalty hearing.  (Doc. 1216, Pgs. 256-77).  The district court accordingly vacated the death sentence and ordered that the case be set for a new capital penalty hearing once the government confirmed that it was still seeking the death penalty. (Doc. 1216, Pgs. 277-78); Hammer, 404 F. Supp. 2d at 801.  The government filed that confirmation.  (Doc. 1232).

Both parties appealed from the district court's Section 2255 order.  A certificate of appealability was only granted for three issues raised by Hammer.  It is notable that the Third Circuit did not grant a certificate of appealability with regard to any claim by Hammer that his guilty plea was subject to attack.

Hammer moved to dismiss the government's appeal, arguing that the district court's order was not a final, appealable judgment.  Eventually, the Third Circuit agreed that the district court's order granting a resentencing was interlocutory and could not be reviewed on appeal until the resentencing had been completed and a final judgment entered in the criminal prosecution.  *United States v. Hammer*, 564 F.3d 628, 634-35 (3rd Cir. 2009).

This Court has scheduled to matter to commence in Philadelphia with the presentation of evidence to begin on June 2, 2014.

At the present time, Hammer has filed various motions seeking to preclude the government from seeking the death penalty.  The defendant has filed the following motions:

a.  Motion to Supplement/Amend His Motion to Vacate, Set Aside or Correct the Judgment and Sentence Pursuant to 28 U.S.C. § 2255 In Light of Recent Disclosures By the Government by David Paul Hammer.  (Doc. 1640);

b. Motion to Vacate under 28 U.S.C. 2255 Defendant's Consolidated Motion and Brief in Support to Supplement/Amend His Motion to Vacate, Set Aside or

Correct the Judgment and Sentence Pursuant to 28 U.S.C. § 2255 In Light of Recent Disclosures By the Government by David Paul Hammer. (Doc. 1642);

c. Motion in Limine Motion to Preclude the Government from Seeking Death on the Basis of a Prior Conviction and Other Evidence that Was the Product of Perjured Testimony by David Paul Hammer. (Doc. 1643);

d. Motion in Limine to Preclude the Testimony of Leonard Yager by David Paul Hammer. (Doc. 1645).

e. Motion in Limine Motion to Preclude the Admission of Prior Testimony of Stephen Classen by David Paul Hammer.  (Doc. 1647).

f.  Motion to Preclude the Capital Prosecution Where the Governments Capital Authorization and Subsequent Deauthorization Determinations Relied on Convictions and Evidence that Were the Product of Perjured Testimony in Violation of the Fifth and Eighth Amendments by David Paul Hammer.  (Doc. 1649).

g.  Motion To Dismiss This Capital Resentencing Because Of The Governments Presentation of Perjured Testimony And Repeated Misconduct In Suppressing A Substantial Volume Of Material Exculpatory And Impeachment Evidence And Its Use Of A Clandestine Agent To Illegally Gather Incriminating Evidence by David Paul Hammer.  (Doc. 1651).

The government opposes the motions. In order to properly respond to the allegations which include claims of outrageous prosecutorial misconduct (which

4

include renewed claims concerning allegations relating the failure to disclose FBI reports of interviews relating to Hammer's own sexual practices), a detailed recitation of the previous trial and subsequent proceedings is in order.

STATEMENT OF FACTS

A.   <u>Guilt/innocence trial and guilty plea</u>

1.   <u>The guilty plea</u>

The Government's rebuttal presentation at the conclusion of the guilt/innocence trial was interrupted by Hammer's plea of guilty to first-degree murder.  (TT Vol 11 Pg 99).  The district court first held an evidentiary hearing on Hammer's competence to plead guilty.  (TT Vol. 11 Pgs.  ).  The court also conducted a colloquy with Hammer to confirm that the plea was knowingly, voluntarily, and intelligently made.  (TT Vol. 11 Pgs. 25-27; 98-121).  During the colloquy, Hammer acknowledged that he had discussed the elements of first-degree murder with counsel "extensively" and that he understood them.  (TT Vol 11 - Pgs. 102-103).  He acknowledged that by pleading guilty he was relieving the Government of the burden of proving premeditation and other elements of murder beyond a reasonable doubt.  (TT Vol. 11 - Pgs. 105-107).

> The Government proffered the following factual basis for the plea, (TT Vol. 11 - Pg. 111), summarizing some of the evidence already admitted:
>
> [Assistant U.S. Attorney Frederick E. Martin]:  . . . .  The facts in the indictment that are relevant indicate that the Allenwood Penitentiary is on exclusive federal property as of April 13, 1996.

And that Mr. Hammer at that location willfully with malice aforethought and with premeditation strangled Andrew Marti with a cord or a homemade garrotte.

*          *          *

With respect again to the evidence, Mr. Hammer solicited Mr. Marti as a cellmate.  Once Mr. Marti was his cellmate he persuaded him to engage in a hostage scenario, whereby Mr. Marti would allow himself to be tied to the bed in an effort to have Mr. Marti transferred more quickly to another federal institution.

Mr. Hammer persuaded, or succeeded in persuading Mr. Marti to do this.  Also prepared items, including cloth restraints, to facilitate the ruse, and when Mr. Marti was tied, all of his limbs were tied to various aspects of the cell, he indicated–he basically put a sock in Mr. Marti's mouth, then put him in a sleeper hold and rendered him unconscious.

After doing so he took a cloth, a strip of cloth, and used that to finally strangle Mr. Marti to death.  Mr. Hammer said to several inmates that that what–that is what he intended to do.  And they have testified to that effect in this proceeding.

He also wrote letters after the fact, after the killing of Mr. Marti, basically saying that I did what I told you I was going to do, and that was to strangle Mr. Marti, and all of these–the preplanning and the statements to the inmates, as well as Mr. Hammer's written statements following the murder support the prosecution– prosecution's conclusion that this murder occurred in cold blood with premeditation.

(TT Vol. 11 – Pgs. 112-113).  Hammer agreed with the proffer "in substance," (TT Vol 11 – Pgs. 113-114), and he acknowledged, "I did in fact with these hands kill Andrew Marti," (TT Vol 11. – Pg. 114). Hammer objected to one aspect of the proffer:

Well, the fact that I solicited [Marti] to move into my cell.  It was a–it was a mutual decision for him to move in there with me, and

6

the ruse for the hostage scenario, that was not accurate. That's something I told the FBI I did, along with Marti, braid the sheets, braid the restraints, but we used them for other purposes.

The bottom line is I tied him up, I tied him to the bed and I killed him. And I'm responsible for that.

(TT Vol. 11 Pg. 114). Hammer reiterated that he was guilty of first-degree murder as charged. (TT Vol 11 – Pgs. 115; 121). The court found Hammer competent to plead guilty and accepted the plea. (TT Vol. 11 – Pgs. 118-122).

2.      Evidence of premeditation introduced prior to Hammer's plea

The prosecutor noted that the foregoing factual proffer was intended as a "thumbnail rendition of the evidence" of the murder, and referred the court to the evidence already admitted as further support for a finding of premeditation. (TT Vol. 11 – Pgs. 111-113).

In summary, the admitted evidence showed that Hammer premeditatedly murdered fellow inmate Marti primarily in retaliation for Marti's antecedent act of disrespect. (Gov. Exhibit 32.2; TT Pg. 2-22; TT Vol. 4 – Pg. 104, 209-211; TT Vol. 5 – Pgs 5-18, 92-124). Statements that Hammer gave to the FBI and others shortly after the murder revealed that the killing was the fruit of an elaborate deception of both Marti and the correctional staff that Hammer carried out over an extended period of time. (TT Vol. 4 – Pgs 209-211; TT Vol. 5 – Pgs. 5-18, 92-124). Hammer's post-murder confession was corroborated in significant respects

7

correspondence that Hammer authored, testimony of fellow inmates and correctional staff, and physical evidence recovered from the murder scene.

### a.     Hammer's 1995 encounter with Marti in the general population

Hammer became an inmate at USP Allenwood in 1995.  (TT Pg. 27; TT Vol. 2 – Pgs. 186-187).  Hammer was serving terms of incarceration imposed by Oklahoma state courts, (TT Vol. 2 – Pgs 12-19).  His transfer to federal custody was pursuant to contractual provisions, JA ("JA" refers to the joint appendix on the appeal of the 2255 decision) 5648-52, and 18 U.S.C. § 5003.  For a significant portion of his time there, Hammer was confined in the Special Housing Unit ("SHU"), see JA 2186-97, a section where prisoners generally are held in their cells for 23 hours per day, among other restrictions, (TT Vol. 2 – Pgs. 13, 201). Hammer also spent some time in the prison's general population, where he had contact with other prisoners in the recreation yard and other common areas.  (TT Vol. 2 – Pg. 201, 211-214; Vol. 5 – Pgs. 5-47).

Hammer said in his post-murder confession and correspondence that, while in the general population, he came into contact with Marti, who showed disrespect.  (TT Vol. 5 – Pgs. 18, 119-120).  In prison culture, prisoners often treat insults and personal affronts as serious matters.  (TT Vol. 5 – Pg. 18).  In his confession and correspondence Hammer indicated that he intended to exact revenge when the time was right, well after Marti had forgotten the incident.

8

(Govt. Exhibit 32.2 ; TT Vol. 5 – Pgs. 17-18).

Not long after Marti offended Hammer, Hammer and his fellow inmate and close friend, Brad Hosselkus, (TT. Vol 2 – Pgs. 110-111), approached a special investigative agent (SIA Mark Traxler) of the Special Intelligence Office of USP Allenwood and obtained Traxler's approval for Hammer and Hosselkus to be cellmates in the SHU.  (TT Vol. 2 – Pgs. 109-110; TT Vol. 4 – Pg. 192). Hammer (who had provided tips to SIA Traxler in connection with an internal investigation, (TT Vol. 5 – Pgs. 53-59)  explained to Traxler that he had been targeted by other inmates (apparently not including Marti) as a cooperator and that Hosselkus was also at risk.  (TT Vol. 4 – Pgs. 191-192; Vol. 11 – Pg. 111).

> b.    Hammer's planning of the murder

Hammer's first cellmate in the SHU after Hosselkus's March 1996 release from prison was Leonard Yager.  (TT Vol. 4 – Pgs. 64-65; TT Vol. 11 – Pgs. 110-111; TT Vol. 12 – Pg. 83).  Yager testified that when Marti (then assigned to the SHU) was in the SHU outdoor recreation cages, Hammer would gaze out the cell window at Marti.  (TT Vol. 4 – Pgs. 72-74).  Hammer talked about Marti on a daily basis and mentioned wanting to have sex with Marti.  (TT Vol. 4 – Pgs. 74-76).  Hammer also said that he intended to kill Marti.  (TT Vol 4 – Pg. 98).  Yager shrugged this off as idle talk.  (TT Vol. 4- Pg. 98).

Yager testified that he served as an orderly while confined with Hammer in the SHU, which allowed Yager to work outside of his cell for approximately three hours per day, performing janitorial duties and passing out clothing and bedding to other SHU inmates. ( TT Vol. 4 – Pgs. 65-66; TT Vol. 4 – Pg. 70; TT Vol. 5 – Pgs. 53-59). At Hammer's request, Yager went to Marti's SHU cell and delivered "kites" from Hammer to Marti, and also delivered kites from Marti to Hammer. (TT Vol. 4 – Pgs. 82-83). The term "kite" is slang for a prisoner-to-prisoner note. J(TT Vol. 5 – Pg. 91).

After Hammer arranged to be moved out of Yager's cell and into another SHU cell, (TT Vol. 4 – Pg. 79), a new inmate, Stephen Classen, was quartered with Hammer. (TT Vol. 5 – Pg. 180). According to Classen's trial testimony, Hammer informed Classen that he could stay in Hammer's cell for a couple of weeks until "Crow" (Marti) was released from disciplinary segregation and became available to move in with Hammer. (TT Vol. 5 – Pgs. 180, 190). About nine days after Classen's arrival, Hammer sent a kite to Marti. (TT Vol. 5 – Pg. 91). Marti sent a reply kite: "I really want to be your cellee." (TT Vol. 5 – Pg 191).

Classen testified that on the date scheduled for Marti's transfer to Hammer's cell, a fight broke out in a recreation cage, in which one inmate stabbed another with a plastic knife. (TT Vol. 5 – Pgs. 192-193). Hammer became excited and screamed to other inmates that the fight was occurring. (TT Vol. 5 – Pg. 192).

10

Hammer turned to Classen and said, "I'm going to kill Marti." (TT Vol. 5 – Pg. 193). Noticing Classen's apparent horror, Hammer retracted by pointing at Classen and saying, "Got you." (TT Vol. 5 – Pg. 193).

Marti was moved to Hammer's cell the next day, April 9, 1996. (TT Vol. 5 Pgs. 192-193). Classen testified that on that day, prior to Classen's being moved from Hammer's cell, Hammer put his arm around Classen's neck and asked if Classen thought Hammer could choke him. (TT Vol. 5 – Pg. 193). Classen responded, "well, yeah," and Hammer released him. (TT Vol. 5 – Pg. 193).

Yager testified that, on one visit to Hammer's and Marti's cell, Yager noticed that Hammer was weaving a rope from torn bedsheets. (TT Vol. 4-Pgs. 93-95). Marti was also in the cell. (TT Vol. 4 – Pg. 92, 95). Yager asked Hammer what he was doing, and Hammer gestured by drawing his thumb across the front of his throat. (TT Vol. 4 – Pgs 94-95). Yager responded, "Man, you're crazy," and resumed his rounds. (TT Vol. 4 – Pg. 94).

Hammer committed the murder shortly before the routine 3:00 a.m. census count of prisoners on April 13, 1996. (TT Vol. 2 – Pgs. 25-28). According to guards it was a "quiet night" prior to the murder, (TT Vol. 2- Pg. 26), and at the 1:00 a.m. count, there had been no indication of any problems in Hammer's and Marti's cell, (TT Vol. 2-Pgs. 25-26). A guard patrolling the SHU corridor adjacent to Hammer's and Marti's cell around 2:45 a.m. did not notice anything unusual.

11

(TT Vol. 2 – Pgs. 116-119; TT Vol. 13-Pg. 94).  At the time of the murder, the restraints binding Marti to the bed prevented him from activating an emergency "duress" button in the cell.  (TT Vol. 2 – Pgs. 26-41.

The guard who arrived at Hammer's cell for the 3:00 a.m. count was Nicole Tadross-Weaver.  Hammer said, "CO, turn on my light, my cellee's dead."  After Hammer uncovered Marti's body, Ms. Tadross-Weaver asked why Marti was tied down, and Hammer replied, "Don't worry, he's dead; it was easier that way." Confused, Ms. Tadross-Weaver asked again why Marti was tied, and Hammer repeated, "Ma'am, it was easier that way."  (TT Vol. 13- Pg. 96-98).

c.      Hammer's post-murder statements to prison officials and the FBI

Beginning at 6:25 a.m. and ending at 8:17 a.m. on the morning of the murder, SIA Traxler, FBI Special Agent Carlyle Thompson, and others interviewed Hammer.  (TT Vol. 4 – Pgs. 207-208; TT Vol. 6 – Pg. 88). Hammer orally waived Miranda, (TT Vol. 4 – Pg. 208; TT Vol. 6  Pgs. 84-87), and confessed as follows.

Marti moved into Hammer's cell on April 9, 1996.  (TT Vol. 6 – Pgs. 91-92). Hammer had told Classen (whose cell number Hammer gave to the FBI) that he intended to kill Marti after Marti moved into his cell.  (TT Vol. 6-Pg. 92).  Hammer

also had advised Yager of the murder plan. (TT Vol. 6-Pg. 93). Hammer maintained that a guard, Officer Boone, knew of the plan. (TT Vol. 6 – Pg. 94).

Some inmates elsewhere at USP Allenwood had targeted Marti as an informant, but Hammer did not kill Marti as a "hit." (TT Vol. 6 – Pgs. 95, 120). Hammer murdered Marti in retaliation for an earlier act of disrespect that Marti had forgotten. (TT Vol. 6-Pgs. 121-122).

On April 11, 1996, Hammer proposed that Marti allow Hammer to stage a hostage-taking of Marti, in which Hammer would tie Marti down and slightly hurt him. (TT Vol. 6-Pgs. 96-97, 104). Hammer suggested that this would enable Marti to realize his desire to be returned to USP Atlanta, (TT Vol. 6-Pg. 97), where Marti had previously been incarcerated, (TT Vol. 11-Pgs. 105-109). Marti was aware that Hammer had been involved in several prior hostage-takings in various prisons. (TT Vol. 5-Pg. 8, Pg. 97; TT Vol 7-Pg. 103). Hammer offered to give Marti, among other inducements, $200 from Hammer's commissary account plus $300 from a third party. (TT Vol. 6-Pg 98). Hammer then began fabricating ropes to restrain Marti. (TT Vol. 6-Pg. 105). Marti suggested that Hammer could cut Marti on the neck using a blade from a disposable razor. (TT Vol. 6-Pg. 105).

After the 1:00 a.m. count, Hammer and Marti prepared to stage the hostage-taking. (TT Vol. 6-Pg. 106). After a local college radio station signed off the air at

2:00 a.m., Marti laid down on Hammer's bed and Hammer tied Marti's limbs to metal restraint rings attached to the bed frame.  (TT Vol. 6-Pgs. 107-109).  At Hammer's request, Marti pulled at the restraints to confirm they were secure.  (TT Vol. 6-Pg 110).  Hammer lit a cigarette and gave Marti a couple of drags and then Hammer stuffed a sock into Marti's mouth.  (TT Vol. 6-Pg. 110).  Hammer tied the sock in place with a strip of sheet tied around Marti's head.  (TT Vol. 6-Pg. 110).  Hammer got up and checked the time, 2:17 a.m. (TT Vol. 6-Pg. 111).

While still up, Hammer noticed that Marti was twitching and whimpering; Marti said through the sock that he was having flashbacks to an incident where he was shot in the head.  (TT Vol. 6-Pg. 111).  Hammer then straddled Marti and put his arm around Marti's neck in a "sleeper hold."  (TT Vol. 6-Pg. 112).  Marti said, "No, please, no."(TT Vol. 6-Pg. 113).  After Hammer held Marti for about three minutes, Marti violently pulled against his restraints.  (TT Vol. 6-Pg. 113).  After Hammer continued the hold for approximately three more minutes, Marti was still except for intermittent shuttering.  (TT Vol. 6-Pg. 114).  Hammer then retrieved a cloth strip (a waist-band lining from prison clothing) from Marti's bed and used it as a garrote for approximately three to four minutes "to the point that [Hammer] had received burns on his hands from the actual pressure that he applied during this period."  (TT Vol. 6-Pgs. 114-115).

Hammer stopped to wash the sweat from his hands and face.  (TT Vol.

14

6-Pg. 115). Hammer then checked Marti's pulse and found none. (TT Vol. 6-Pg. 115). The time was 2:40 a.m. (TT Vol. 6-Pg. 116). Hammer covered Marti's body and alerted the guards when they approached for the 3:00 a.m. count. (TT Vol. 6-Pg. 116).

> d.   Interviews of Classen and Yager.

As mentioned above, Hammer stated in his confession that he had told inmates Classen and Yager that he intended to kill Marti. On the same day as the murder and confession, FBI Special Agent Carlyle Thompson interviewed both Classen and Yager. At that time, Classen said that Hammer had told him he wanted to kill Marti. Likewise, on April 13, 1996, Yager told Special Agent Thompson he recalled a conversation in which Hammer told him that he (Hammer) was going to kill Marti. The report of interview states, in part,

> Yager recalled a conversation in which Hammer told him that he (Hammer) was going to kill Marti. Yager thought that Hammer was only going to hurt Marti, and was not taken in the context of his actually killing Marti. Yager recalls Hammer, on a number of occasions, telling him that he was going to kill Marti.

> Yager recalls that a day or so ago, he observed Hammer braiding some cut up sheets. Yager asked Hammer what he was doing and what it was for, at which time Hammer put his hand to his throat, indicating hanging.

> e.   Hammer's post-murder correspondence with other inmates

After the murder, Yager asked Hammer why he committed the murder;

15

Hammer passed Yager a responding note.  That note appears at (Gov. Exhibit 32.2), and identified, among other grounds, Marti's prior act of disrespect. Hammer also declared in the note, "Given the opportunity, I will kill again!" (Gov. Exhibit 32.2).

Hammer sent Classen a kite the day after the murder, and attempted to send a second one.  (TT Vol. 6-Pgs. 17-23).  In both, Hammer acknowledged his murder plan.  (TT Vol. 6-Pgs. 17-23).  In the second note (Government's Exhibit 35.2, seized before delivery to Classen), Hammer remarked as follows:

> Steve, I don't care what you say to the FBI or SIS.  There isn't anything that can hurt me because their case is pretty much open and shut.  I'm sure you were surprised to learn that I had done what I told you I was going to do to Marti.

(TT Vol. 6-Pg. 23).

### 3.   The defense claim of insanity

Hammer's theory of defense up to the guilty plea was that he was insane when he killed Marti due to "Dissociative Identity Disorder" ("DID") (formerly known as "Multiple Personality Disorder").  (TT Pgs. 22-42) (guilt phase opening statement of defense counsel Ronald C. Travis).  According to a defense expert, Dr. Sadoff, Hammer was controlled at various times by alter personalities including Jocko (a violent personality); Tammy (a female personality); Wilbur (a child personality); and Jasper (a chimpanzee). (TT Vol. 10- Pgs. 104-106).  During his post-offense statements to law enforcement officers, however, Hammer did

16

not refer to himself in the plural number, mention the names Jasper, Wilbur, Tammy, or Jocko, or identify any periods of amnesia or blackouts he had suffered. (TT Vol. 6-Pgs. 123-124).

Defense counsel Travis also argued that the murder was not premeditated, (TT Pgs. 37-41), and that Marti had been tied down to the bed for the original purpose of "kinky homosexual activity between Mr. Hammer and Mr. Marti." (TT Pg. 25).

Mr. Travis's opening statement closely tracked the facts that Hammer laid out in a defense-created videotape, in which Hammer purported to present the "Jocko" alter personality after being hypnotized by a defense expert, Dr. Louis Dubin, with Dr. Sadoff observing. (TT Vol. 10-Pg. 153). This videotaped session enabled the defense to present to the jury, through "Jocko," a self-serving account of the murder without subjecting the defendant to cross-examination. Hammer recalled the murder as follows:

[Dr. Dubin]: Can you describe that?

[Hammer]: Yeah. He's tied to the bed in the fashion that I told you. He's dressed in a t-shirt, boxers and a pair of socks. He's lying face down, got two pillows under his head. I'm standing at the window smoking a cigarette, Andrew's lying there, he's got a gag in his mouth, but it's not tight, he can still talk, and I reach down and take the gag out of his – I say, me, because it's me, it's my body, and I give him a drag off the cigarette, put the gag back in his mouth, and I'm staring out the window, radio is on, there's music playing, and he kind of does this and shudders, and I ask him what's the matter. And he said I just had a flashback, I just had a flashback, and was

17

wondering why I got shot in the head, and I see my head in . . . , and then I'm on his back, I've got my left arm around his neck, choking him now, and he's moving his head and he says, no, please no.

[Dr. Dubin]:  What just happened David?  Am I talking to David?

[Hammer]:  You are now.

[Dr. Dubin]:  Apparently, Jocko came out then didn't he?

[Hammer]:  He didn't want to.

[Dr. Dubin]:  But he did.  Go ahead, David.  He can hear us.

[Hammer]:  He takes the rope, a piece of string, wraps it around Marti's neck, pulls it tight and he's sitting on Marti, and as he's sitting on him, Marti's body is flinching underneath him and he can feel him. He's actually, he's got a f*cking grin.  It's like he's mean – he doesn't even care, he doesn't give a f*ck, he didn't care when Marti asked him no, please no, he just f*cking deserves to die.

[Dr. Dubin]:  Who are we talking about, David?

[Hammer]:  You know who the f*ck we are talking about.

(Joint Appendix on Appeal of 2255 14648-49).

A Government psychiatrist, James Wolfson, M.D., testified in rebuttal to the insanity defense that Hammer suffered from an antisocial personality disorder, but did not at any relevant time suffer from DID or any other major mental illness or severe mental disease or defect.  (TT Vol. 12-Pgs. 167-170).  Dr. Wolfson noted several inconsistencies in the videotaped hypnosis session.  (TT Vol. 12-Pgs. 136-149).  For example, Dr. Wolfson noted, Hammer accidentally used a past tense

reference to the episode Hammer supposedly was re-experiencing, which was inconsistent with the way hypnosis actually works. (TT Vol. 12-Pg. 144).

The court considered Hammer's insanity claim again at the hearing on Hammer's competence to plead guilty. Dr. Mitchell testified that Hammer indicated in an interview that he understood defense counsel's tactical reasons for asserting DID, but Hammer expressed personal discomfort with that diagnosis. (TT Vol. 14-Pgs. 84-85). Hammer clarified that the decision to forego the insanity defense was his personal choice and not that of any alter ego. (TT Vol. 14- Pgs. 53-54). The experts opined that Hammer was competent to waive the insanity defense and plead guilty, (TT Vol. 14-Pgs. 65,74,89), and the court so found, (TT Vol. 14-Pg. 120).

4.    Evidence showing Hammer's participation in homosexual sex, and partially contradicting his post-murder confession

Mr. Travis's assertion that the bindings were for "kinky homosexual activity" tracked what Hammer said in the hypnosis session, and was consistent with multiple witnesses' accounts of Hammer's homosexual activity. Virtually every one of Hammer's cellmates either had a homosexual relationship with him or discussed the possibility of homosexual sex. These included, in the order of Hammer's successive cellmates, the following:

Gary McLaughlin – (TT Vol. 8-Pgs. 86-100) (McLaughlin's defense testimony)

Mark Oberg – (TT Vol. 9-Pg. 27) (Oberg's defense testimony)

Brad Hosselkus – (TT Vol. 4-Pg. 111)(Yager's prosecution testimony)

Leonard Yager – (TT Vol. 4-Pg. 75,87-91, 131) (Yager's prosecution testimony)

Stephen Classen – (TT Vol. 6-Pgs. 13,18, 24,29) (Classen's prosecution testimony)

Andrew Marti – (TT Vol. 4-Pgs. 74-75, 87-91,98,133 (Yager's prosecution testimony)

Although both sides thus presented evidence of Hammer's homosexual sex with cellmates, the defense conspicuously avoided any affirmative presentation of evidence that Hammer had a history of sexual bondage of cellmates.  Among the defense witnesses was Michael D. Smith, who shared a cell with Hammer in the Oklahoma State Penitentiary, and who recounted on direct examination the various alter personalities that Hammer supposedly exhibited there.  (TT Vol. 8-Pgs. 5-16). On cross-examination, the government elicited evidence of Hammer's participation in sexual bondage, as follows:

[Assistant U.S. Attorney]:  [Y]ou've indicated that Hammer was into homosexual activity.  That was something you were not into; is that correct?

[Smith]:  Yes.

Q:  Did he have a cellmate at some time by the name of Harmon?

***  *****

A:  Yes.

Q:  And did they engage in homosexual activities that you observed?

A:  Yes.

Q:  And was there any tying up that had to do with that?

A:  Yes.

Q:  Could you tell the jury what that tying up had to do with the homosexual relationship between Mr. Harmon and Mr. Hammer?

A:  Well, I seen Dave tie up a couple of his cellees before.  As far as watching them engage in sexual activity, I didn't watch, you know what I mean.  I'd go by, like I said, he lived across the hall from me and you could see right from my cell into their cell, and they'd have to put up their blanket up over the door, and every now and then it would come down.  But occasionally, yeah, he'd have them tied up in there and leave him for a while.

(TT Vol. 8-Pgs. 28-29).  The witness added that Hammer never allowed himself to be tied down.  (TT Vol. 8-Pg. 29).

On re-direct examination of Smith, the defense made no attempt to develop this evidence of bondage.  Instead, defense counsel quickly shifted Smith's testimony back to Hammer's alter egos, and then dismissed Smith from the witness stand.  (TT Vol. 8-Pgs. 33-35).

Both parties presented evidence contradicting parts of Hammer's post-murder confession.  Both parties presented testimony that Officer Boone had no advance warning of Hammer's murder plot, contrary to Hammer's assertion.  (TT Vol. 4-Pg. 213; TT Vol. 5-Pg. 108; TT Vol. 7-Pg. 150).  Hammer's counsel also

21

attempted to refute Hammer's claim that Marti agreed to be tied up as part of a sham hostage-taking by showing that Marti knew that he was already scheduled to be transferred, (TT Pg. 24, 150; TT Vol. 5-Pgs 89,96), and that inmate-on-inmate assaults ordinarily resulted in the transfer of the attacker, not the victim, (TT Vol. 17-Pg. 80). However, as BOP employees testified at trial and the subsequent penalty hearing, no final decision had been made on Marti's potential transfer, (TT Vol. 4-Pg. 204; TT Vol. 16-Pgs. 25-26), and also the decision on whether a victim or attacker should be transferred to another prison was made on a case-by-case basis, (TT Vol. 17-Pgs. 51-53, 80). The relevant question was what Marti believed his chances for transfer were, and on this point Marti was aware that his last transfer, from USP Atlanta to USP Allenwood, occurred as a result of an attack in which Marti was the victim. (TT Vol. 11-Pgs. 108-109).

B.      The capital sentencing hearing

The government's penalty phase case theory, as reflected in opening statement and closing argument, (Tt Vol. 15-Pgs. 21-41; TT Vol. 27-Pgs 60-151, 15-57), emphasized "two recurrent themes in David Paul Hammer's life." (TT Vol. 27-Pg. 60). The first was "deceit, fraud, manipulation." (TT Vol. 27-Pg. 60). Hammer's aggravating, manipulative acts, the government argued, included his 1989 "false confessions" to having set bombs at the Oklahoma City capitol and courthouse. JA 3993. What elevated Hammer's deceptions to a level warranting

the death penalty, the government continued, was the second recurrent theme –

"increasing resort to violence beginning in 1978 and continuing through 1996."

(TT Vol. 27-Pg. 60). These themes demonstrated Hammer's future dangerousness,

a non-statutory aggravating factor alleged in the government's death penalty

notice. (TT Vol. 27-Pgs. 92-99).

The defense approach to the penalty phase was largely pre-determined by not

only Hammer's guilty plea but also the defense-introduced trial evidence, including

the videotaped hypnosis session and Dr. Sadoff's diagnosis. Given Hammer's

statements in the hypnosis session that Jocko deliberately killed Marti, the defense

did not attempt to suggest that Marti was killed accidentally in a continuation of the

sex episode that ostensibly began with bondage. Instead, counsel emphasized that

Hammer suffered from a mental illness, DID, brought about by years of serious

childhood physical and sexual abuse, ultimately resulting in Hammer's killing

Marti while under the control of the "Jocko" alter ego. (TT Vol. 15-Pgs. 5-24; TT

Vol. 28-Pgs. 3-15). This, defense counsel maintained, negated the statutory

aggravating and intent factors that the government was required to prove for

Hammer's death penalty eligibility, and also carried independent weight as

statutory and non-statutory mitigating factors. (TT Vol. 15-Pgs. 5-24). Finally, in

defense counsel's view, the fact that Hammer would face life imprisonment under

severe security restrictions also weighed against the death penalty. (TT Vol. 15-Pg.

16).

The Government's penalty phase case-in-chief included evidence of the statutory aggravating factors that the defendant had previously been convicted of two or more State or Federal offenses punishable by a term of imprisonment for more than one year, involving the use or threatened use of a firearm, 18 U.S.C. § 3592(c)(2), and that Hammer killed Marti after substantial planning and premeditation, § 3592(c)(9), (Docket No. 1216-Pgs. 12,13), and the non-statutory aggravating factors of future dangerousness and victim impact, (Docket No. 1216-Pg. 13).

FBI Special Agent Anthony Malocu testified that in 1978, Hammer pleaded guilty in an Oklahoma state court to pointing a weapon at another after having previously been convicted of a felony. (TT Vol. 18-Pgs. 8-9). From 1978 through the present, Hammer lived almost all of his adult life behind bars, his incarceration being interrupted mainly by multiple escapes and attempted escapes. (TT Vol. 18-Pgs. 8-15). Hammer committed additional offenses during his escapes. See (TT Vol. 15-Pgs. 5-12; TT Vol. 18-Pgs. 8-15).

During a 1983 period of escape, Hammer kidnaped, shot, and attempted to murder Thomas Upton. (TT Vol. 18-Pg. 13; TT Vol 15-Pgs. 5-12, Pg. 16). The Government introduced the Oklahoma state conviction of robbery with a firearm and shooting with intent to kill that Hammer received in 1984 for this incident. (TT

Vol. 16-Pgs. 66-67, 75, 103-106). The Government also introduced underlying facts of the incident through Mr. Upton himself, (TT Vol. 15-Pgs. 5-12, 16), David Walter (a reporter), (TT Vol. 15-Pgs. 17-24) and William Louis Earl Keel (an Oklahoma state prosecutor), (TT Vol. 16-Pgs. 66-67, 75, 103-106).

The government called a reporter named David Walter who interviewed Hammer in connection with a story in 1989.   Walter recounted that Hammer told the reporter in a recorded interview (replayed for the jury) that, had he known that Upton would survive the head wounds Hammer inflicted, Hammer would "have reloaded the gun and shot him six more times."  (TT Vol. 15-Pg. 22).

The government offered additional evidence of Hammer's prior conduct including Hammer's 1989 false claim to having planted bombs at the Oklahoma City capitol and courthouse, and his threat to kill U.S. District Judge David Russell in Oklahoma City, (TT Vol. 17-Pgs. 12-14). Hammer admitted that his intention was to secure a transfer from the Oklahoma State Penitentiary to the federal prison system, and Judge Russell was not, in fact, killed.  (TT Vol. 17-Pg. 25).   Hammer ultimately succeeded in obtaining a transfer to federal incarceration; the Oklahoma authorities became frustrated over the amount of staff required to handle him and his repeated, successful efforts to compromise prison staff.  (TT Vol. 21-Pg. 15; TT Vol. 18-Pg. 174; TT Vol. 21-pgs. 80-81)

A BOP staff psychologist, Stephen Karten, Ph. D., testified that he interviewed Hammer shortly after the murder of Marti and did not note "anything unusual with his mental status at all." (TT Vol. 15-Pg. 43). Hammer did not indicate having any episodes of headaches or blackouts and did not refer to himself in the plural or evidence having any alter ego personalities. (TT Vol. 15-Pg. 46). FBI special agents who investigated the Oklahoma City incidents, in which Hammer threatened Judge Russell and made false bomb threats, testified that Hammer did not refer to alter personalities or to himself in the plural when interviewed in connection with those incidents. (TT Vol. 17-Pgs. 5-24).

Hammer's witnesses included Michael Gelbort, Ph. D., who administered neuropsychology tests to Hammer, (TT Vol. 19-Pgs. 4-90), and John Mitchell, Psy. D., a BOP psychologist who treated Hammer, (TT Vol. 19-Pgs. 132-187; TT Vol. 20-Pgs. 5-141). Several witnesses recalled Hammer's troubled youth and experiences while in state and federal custody. (TT Vol. 20-142-191, TT Vol. 21-Pgs. 6-136). Hammer also called BOP employees to recount the severe confinement conditions Hammer would face if he were sentenced to a life term. (TT Vol. 21-Pgs. 157-200; TT Vol. 22-Pgs. 5-117).

The Government's rebuttal evidence included testimony indicating that, even under the highest security arrangements, inmates like Hammer can present a

threat to guards and other inmates.  As a result of Hammer's manipulations and to ensure he was dealt with consistently, the Oklahoma prison system took the unusual precaution of limiting Hammer's access to staff to a handful of employees, primarily the warden, deputy warden, assistant to the warden, chief of security, and unit manager.  (TT Vol. 24-Pgs. 7-78).

At the conclusion of the capital sentencing hearing, the jury recommended a sentence of death.  (Document No. 1216-Pg. 17).  As the 18 U.S.C. § 3591(a)(2) threshold intent factor, the jury found that Hammer intentionally killed Marti. (Document No. 1216-Pg. 12).  The jury unanimously found both of the statutory aggravating factors submitted (previous convictions of two or more offenses involving the use or attempted use of a firearm and substantial planning and premeditation), (Document No. 1216-Pgs. 12-13), and both of the non-statutory aggravating factors submitted (future dangerousness and harm to the victim's surviving family), (Document No. 1216-Pg. 13).

The jury also made findings of proffered mitigating factors, as follows.  All of the factors refer to the defendant's status, and except as noted by citation, all of the factors are of the non-statutory variety (see 18 U.S.C. § 3592(a)(8)):

| Mitigating factor | Jurors finding the factor |
| --- | --- |
| Impaired capacity (§ 3592(a)(1)) | 0 |
| Duress (§ 3592(a)(2)) | 0 |
| Disturbance (§ 3592(a)(6)) | 1 |

| | |
|---|---|
| Presently-existing major mental disease or defect | 0 |
| Cognitive deficits | 1 |
| Violent and abusive childhood | 12 |
| Victim of child sexual abuse | 6 |
| Attempted to seek treatment while young | 12 |
| Would be sentenced to life without release if not death | 12 |
| Prison staff can prevent Hammer's future violence | 3 |
| Has done some good things | 5 |
| Family and friends will suffer from Hammer's death | 12 |
| Remorse | 1 |
| Acceptance of responsibility | 1 |
| Any other factor (§ 3592(a)(8)) | 0 |

(Document No. 1216-Pgs. 13-17).

C.    The hearing on Hammer's Section 2255 motion

The district court held a 32-day hearing on Hammer's Section 2255 motion. Hammer was represented by new counsel, of course, consisting of four capital litigators from two federal public defender offices. (2255 Transcript Vol. 1-Pgs. 1-2). Numerous experts testified, most of them called by the defense.

1.    Trial counsel's testimony on Hammer's history of false confessions

The defense called Hammer's trial counsel, David Ruhnke and Ronald Travis. Mr. Ruhnke met or communicated with Hammer perhaps "hundreds" of times. JA 8911. Mr. Travis spoke with Hammer "too many [times] to count." (2255 Transcript Vol. 1-Pg. 44).

Mr. Travis testified that he was aware from his pretrial investigation that Hammer had falsely implicated himself in the following offenses, among others:

28

- the Kenner murder
- the so-called "two-bit murder" that Hammer said occurred in Ohio
- the "Jane Doe" murder in Chatauqua, New York
- the murder of an individual in Maryland
- a false threat to kill a trial judge
- a false threat to kill Jesse Jackson
- the murder of Karen Silkwood
- the false claim of placing a bomb at the Oklahoma City Courthouse

Joint Appendix ("JA") on Appeal of 2255 6774-77; see JA 13763-918

(discovery materials provided to the defense). Both Mr. Travis and Mr. Ruhnke

viewed Hammer's false confessions as a two- edged sword, that might help the

prosecution more than the defense.  JA 6870,

9010-11.  As Mr. Ruhnke observed,

> We were following at that point what I called a K-I-S-S principle.
> Keep it simple stupid.  We had a confession.  We had a psychiatrist
> who said that Hammer was mentally ill and not responsible.  It did not
> seem to us, to start to prove a series of false confessions, some of
> which the jury might not think were actually false.

JA 8994.  Mr. Travis echoed this sentiment, recalling his concern that if the jury

heard Hammer's videotaped confession to the Kenner murder, for example, "they

might not necessarily believe that it was a false confession."  JA 6868; see JA

14037.

2.    <u>Hammer's consideration of a defense of "accident"</u>

Regarding the notion that Marti was killed accidentally, Mr. Ruhnke and Mr.

Travis testified on cross-examination that they decided not pursue that theory after

discussing the issue with Hammer.  JA 6875-76, 9007-08.  Hammer was "dead set" against arguing the accident theory.  JA 9008, 14039.

A defense forensic pathologist, Werner Spitz, M.D., opined at the hearing that Hammer must have killed Marti accidentally, based primarily on the fact that the ligature injured the front and sides but not the back of Marti's neck.  JA 7536-627.

In response to Dr. Spitz's testimony, the government called Saralee Funke, M.D., who performed the autopsy on Marti and previously appeared at Hammer's trial.  JA 10120-294.  Dr. Funke rejected Dr. Spitz's conclusion that Marti died accidentally during sexual activity.  JA 10170-76.  She reiterated her trial testimony that Marti's injuries were consistent with being strangled with a ligature, causing death through oxygen deprivation to the brain over a prolonged period.  JA 10132-76.  Use of a sleeper or choke hold could not be excluded. 10160-70.  Marti's body did not show visible signs of consensual, homosexual intercourse, JA 10147, 10170, and injuries on his wrists and ankles indicated that he had pulled violently against his restraints.  JA 10160, 10169-70.

3.    Evidence relating to Hammer's Brady v. Maryland claim

During Special Agent Malocu's testimony at the hearing below, the court directed the government to produce, for purposes of cross-examination of the agent, several previously-undisclosed FBI 302 reports pertaining to interviews of state or

federal inmates who had been incarcerated with Hammer at various times.

In the main, three inmates reported that Hammer was a sado-masochistic homosexual with a fondness for bondage.

a. <u>Albert Ray Johnson</u>. Johnson occupied cells adjacent to Hammer's cells both while incarcerated in the Oklahoma State Penitentiary and later at USP Allenwood. During pretrial interviews, Johnson told agents that Hammer and his various homosexual partners would tie each other up and whip each other with ropes or electrical cords, and identified three inmates with whom Hammer had engaged in such activities. Johnson further stated that he had told Hammer how to braid sheets into ropes (Johnson used the braided ropes as clotheslines) and had provided braided ropes to Hammer on occasion; however, Johnson had been transferred from USP Allenwood to USP Atlanta a year before Marti's murder and had no knowledge of it. JA 13630-37.

b. <u>Royce Lee Fowler.</u> Before trial, the FBI interviewed Fowler, whom the defense had subpoenaed but did not ultimately call as a witness. JA 1376. Fowler told federal agents that he had been Hammer's cellmate at USP-Leavenworth for nine months, during which time Hammer told him that he liked sexual bondage and that both he and his siblings had been sexually abused by their father. JA 13638-42.

c.   <u>Gaylon Don Ball</u>.  Ball was housed in a cell adjacent to Hammer's cell at the time of Marti's murder.  In a pretrial interview, Ball told federal agentsthat he believed – without specific knowledge – that Hammer and Marti had a homosexual relationship.  Ball further reported that he had heard a female's voice outside Hammer's cell around the time that Marti was killed.  JA 13643-45.

A fourth inmate – Martin Guerrero – had been incarcerated with Hammer at USP Leavenworth prior to Hammer's transfer to USP Allenwood.  JA 13646.  Hammer had mentioned Guerrero in his incriminating statement to Agent Thompson a few hours after Marti's death.  According to Hammer, two days before Marti was murdered, Hammer sent Guerrero a letter, routed through a third-party, vouching for Marti (i.e., Hammer "did not believe the rumors [about Marti]") and requesting, as a personal favor, that Guerrero "spread the word" in order "to give Marti a chance."  JA 12239.  In a pretrial interview with federal agents, Guerrero stated that, while he knew Hammer from their days at USP Leavenworth, he had "never received a letter from Hammer or [Marti]," had "never heard of [Marti]," and had "never received a letter from [the] third party" described in Hammer's post-murder statement.  JA 13646.  The third party was Hammer's friend and pen-pal, Sam Young.  See JA 13870.

Mr. Ruhnke and Mr. Travis testified that, had they reviewed FBI 302 reports, they would have investigated and presented Hammer's history of sexual

bondage.  JA 11243-325.  Counsel maintained that the information would have been used to corroborate Hammer's account in the hypnosis session with Dr. Dubin that he initially restrained Marti for sexual purposes only, and to counter the government's penalty phase argument that the preparation of the restraints supported the "substantial planning and premeditation" aggravating factor.  JA 11253-54, 11302.

D.     The district court's order

1.     Hammer's ineffectiveness claims

Prior to the hearing below, the district court denied Hammer's claim that trial counsel were ineffective in failing to object to the district court's pretrial order committing Hammer for an in-patient competency evaluation.  The court concluded that this claim was presented for the first time after Section 2255's one-year limitations period had expired, and was not allowed under the doctrines of "relation back" and "equitable tolling."

After the hearing, the court denied Hammer's remaining ineffectiveness assertions, including the claims that trial counsel ineffectively failed to investigate and present evidence that Marti was killed accidentally, that portions of Hammer's post-murder confession were false, and that Hammer had made false confessions to other, unrelated crimes.  The court found as a factual matter that counsel were aware of Hammer's history of false confessions because the government provided

the defense with the relevant documentation.  Further, while portions of Hammer's

post-murder confession "may be untrue," trial counsel "did adequately investigate

the basis for the charge and appropriately relied on Mr. Hammer's admissions

during the change of plea proceeding."  In light of these statements and Dr. Funke's

autopsy findings,

> there was no reason for counsel to doubt the veracity of Mr.
> Hammer's admissions during the change of plea proceeding that he
> had put [Marti] in a sleeper hold, rendered him unconscious and then
> had taken a piece of cloth and strangled him.  These admissions by
> Mr. Hammer were sufficient to establish malice and premeditation.

The court found that Dr. Spitz's testimony was not "credible to the extent that he

testified that [Marti's] death occurred during a sexual experience."

### 2.    The Brady claim

The court found the previously undisclosed FBI 302 interview reports

regarding Johnson, Fowler, and Ball "constitute[d] Brady evidence that should

have been disclosed by the Government prior to trial," as "these statements were

material, relevant and critical to counter the Government's argument concerning

substantial planning and premeditation during the penalty phase of this case."  JA

251-52.  Crediting the hearing testimony of Hammer's trial counsel, the court

explained that if defense counsel had been aware that Hammer had a long-standing

history of sexual practices that involved bondage – particularly the use of braided sheets in such sexual practices – counsel would have investigated Hammer's sexual background, including "the possible defense of erotic asphyxiation," and "very likely would have presented such evidence" at trial.  JA 246-247, 252-253. The court further found that this evidence would have been "relevant and material" to Dr. Sadoff's testimony and in cross-examining Dr. Wolfson and other prosecution witnesses.  JA 253.  Because the jurors had found two statutory aggravating factors, but numerous mitigating factors, and because non-disclosed Brady material need only affect a single juror to cause prejudice at a capital penalty hearing (JA 265, 273), the district court concluded that "[t]he Brady violations in this case taint the jury's determination that Mr. Hammer committed the offense after substantial planning and premeditation" and that "[t]he failure of the Government to disclose the 302 statements undermine[d] [the court's] confidence in [the penalty phase] verdict."  JA 273.

Although ruling that the Brady violations required vacating Hammer's death sentence, the district court rejected Hammer's claim that the undisclosed FBI 302 interview reports would, if known, had affected his decision to plead guilty to first-degree murder.  JA 267-70.

3.    The jury's findings regarding mitigating factors

As an additional ground for vacating Hammer's death sentence, the district court concluded that the sentence verdict was defective due to of the jury's failure to find supposedly-undisputed mitigating factors.  JA 254-56, 274-75.  In so ruling, the court rejected the government's arguments that this claim was barred by the procedural default and non-retroactivity doctrines, reasoning that a grant of relief was required to avoid a "miscarriage of justice," and did not involve application of a "new rule."  JA 274-75, 285, 1578-80.

The district court accordingly vacated the death sentence and ordered that the case be set for a new capital penalty hearing once the government confirmed that it was still seeking the death penalty.  Hammer, 404 F. Supp. 2d at 801.  The government filed that confirmation.

E.  The appeal of the district court's 2255 decision

As mentioned previously, both parties appealed from the district court's Section 2255 order.  A certificate of appealability was only granted for three issues raised by Hammer.  The Third Circuit did not grant a certificate of appealability with regard to any claim by Hammer that his guilty plea was subject to attack.

The government was authorized to appeal the district court's findings that there was a Brady violation, as well as the conclusion that the jury's finding with

respect to mitigating factors did not state a ground for relief.

Hammer moved to dismiss the government's appeal, arguing that the district court's order was not a final, appealable judgment. Eventually, the Third Circuit agreed that the district court's order granting a resentencing was interlocutory and could not be reviewed on appeal until the resentencing had been completed and a final judgment entered in the criminal prosecution. *United States v. Hammer*, 564 F.3d 628, 634-35 (3rd Cir. 2009).

F. The facts underlying the present motions

This Court has scheduled to matter to commence in Philadelphia with the presentation of evidence to begin on June 2, 2014.

Two years ago, upon request, the defense was provided with correspondence from inmate Classen, both before the trial and after the trial, to the prosecutor seeking information as to the commencement of the trial, and assistance with the location of his incarceration. The government also provided documentation showing that following the trial, the government filed a motion for a sentence reduction for inmate Classen and also endeavored to assist him with halfway house placement or home confinement. (Classen testified at trial that he was seeking a sentence reduction and to be sent to a lower security prison.)

The government also revealed that in March 2014, Thomas Upton, the victim of the 1983 shooting incident who testified in the penalty phase, had changed his story as to the details of how the initial encounter with Hammer began. Upton now claims that he had voluntarily accompanied Hammer to a motel, and that Hammer's assaultive conduct began when Upton realized that Hammer was an escapee. Upton further stated that he never told anyone of the way the episode started until the meeting in March 2014.

Finally, the government provided notice that during a February 25, 2014 meeting between Trial Attorney Amanda Haines and former inmate Leonard Yager, Yager made the comment that the FBI had "sent him back" following his statement to the FBI Special Agent--well before Hammer was charged with the offense. Yager now claims that the FBI did not do so.

These disclosures have spawned a recent flurry of motions seeking to derail the continued capital prosecution, vacate Hammer's conviction, and exclude evidence and testimony from Yager, Classen and Upton. For the reasons that follow, the government submits that the defendant's arguments fail.

G.  The facts pertaining to the Thomas Upton issue

    1.  The Thomas Upton shooting, prior testimony, and recent statement

On October 27, 1983, Hammer escaped from the Oklahoma State Reformatory at Granite, Oklahoma. To make good on his escape, Defendant collected street clothing and dressed himself as a construction worker, obtained a pair of wire cutters, and wedged himself under a construction van that was parked on the prison yard. Once the unwitting construction crew moved the van to a civilian lot, Defendant crept from the van to a parked 1966 Chevy pickup truck which he "hotwired." Hammer then drove the pickup out of the prison grounds and onwards to Hobart, Oklahoma, where he abandoned the vehicle. In Hobart, Defendant stole another pickup truck and its contents, including a checkbook, a .22 pistol, and a box of shells.

This escape resulted in the shooting of Thomas Upton on October 28, 1983, on the day after the escape. Thomas Upton reported to police, he was driving home from giving a person a haircut. At a stoplight, David Hammer, brandishing a firearm carjacked Upton and later shot him in the head three times execution-style alongside a desolate road. Upton survived because the gun, unbeknownst to Hammer, was loaded with bird shot.

In 1984, Hammer proceeded to two preliminary hearings and later a trial in connection with that criminal episode. Thomas Upton testified at each. It is noted that Hammer was acting as his own attorney in that case. Hammer was convicted

of (1) kidnapping; (2) robbery with firearm; and (3) shooting with intent to kill.
Under the Oklahoma system, the jury rendered the prison sentence and imposed a
sentence of 1200 years' imprisonment.

a. Upton's testimony during penalty phase of Hammer's murder trial.

The government called Upton as its first witness in the penalty phase.
During Thomas Upton's testimony, he testified to the following: That in 1983,
Upton resided in Oklahoma and was a barber. Upton first encountered Hammer at
an intersection on Northwest 36th and Classen, in Oklahoma City and thereafter
was with Hammer approximately four hours. During the four hours Upton was
with Hammer in 1983, he never complained about blackouts or amnesia, nor did
he mention any names such as Jocko, Jasper, Wilbur, or Tammy. Additionally, he
never referred to himself in plural sense such as "we" or "us" and never
complained of headaches during the four hours in 1983. (TT Vol. 15-Pgs. 7).

Upton said Hammer "schized out" when he got violent with Upton, i.e.,
"When he would hit me in the head with the gun or tell me he was going to blow
my brains out." There were times when he did not so verbally threaten or
physically assault Upton. Upton testified Hammer left him "in an oil-filled dirt
road" on the outskirts of Oklahoma City after Hammer made him drive there.
At that time, Hammer told him to stop. (TT Vol. 15-Pgs. 8). Once vehicle

stopped, "Hammer had me get out of the car and walk up this road and take my clothes off and lay face down on the dirt." He further testified that during the four hours he had been threatened with a gun. It was a big gun and had a cylinder in it and was gray and a long barrel. Upton first saw it at 36th and Classen when Hammer pointed it at him and said Upton was to take him where he wanted to go. (TT Vol. 15-Pgs. 9). When Hammer schized out, it was in the motel room. Upton testified it was Hammer's decision to go to the motel room, not a mutual decision. At the oil field, Hammer told him to take his clothes off and Hammer "shot me in the head three times." Upton testified Hammer used the gun and Upton was shot twice in the back of the head and once in the jaw when he had turned his head a little bit. (TT Vol. 15-Pgs. 10). Upton testified that after the third shot, "the lights didn't go out, so I jumped up and took off running. Hammer started jumping up and down and screaming and run to my car and got in it and took off." Hammer then took Upton's automobile. Upton had no recollection of what Hammer was screaming, he was 'just screaming." Before that, Hammer "kept telling me he wasn't going to shoot me, he just wanted to get me up there where I couldn't get to a telephone to call the police." His tone of voice was calm at that time and only was not calm after Upton got up after being shot three times. (TT Vol. 15-Pgs. 11).

41

During the four hours, they traveled about thirty miles.  And the motel room was about 15 miles from the oil field where he was required to take off his clothes.  (TT Vol. 15-Pgs. 12).

On cross examination, Upton testified that at the preliminary hearing in 1984, described Hammer as telling him "I ought to kill you one minute, and then the next minute he'd just be as calm and rational." (TT Vol. 15-Pgs. 14).

Upton testified that at a previous preliminary hearing in connection with the state prosecution he had described Hammer's behavior in 1984 as "Crazy, man, completely; completely insane." (TT Vol. 15-Pgs. 15).  "He would just get mad and calm down."

Q. "Would he change from one minute to the next?"

A. "Yeah, one minute he'd hit me and then I'd talk to him and calm him down."

A. "It wouldn't be just one minute to the next.  It'd be time in between."

Q.  "Did you say at preliminary hearing, "And then you schized out, waving the gun in the face, told me, I ought to kill you, one minute, and then the next minute you'd be just as calm and rational, well, I'm not going to kill you, I just need your car. The next minute, I'm going to kill you.  Crazy man, completely. Completely insane."

Q.  Do those accurately describe how Mr. Hammer behaved on that day in 1983?
A.  "In my opinion."  (TT Vol. 15-Pgs. 15).

On redirect, Upton stated that at the oil field, prior to being shot, Hammer was calm.

On recross, the following exchange occurred.

Q. "Hammer was calm and then did you do anything that would have reasonably provoked him or provoked a reasonable person into shooting you, or were you complying with what he said? "

A. "I was complying with what he said."

Q. "And the next minute, without any explanation or your doing anything to provoke it, he shot you; is that correct?"

A. "That's correct."  (TT Vol. 15-Pgs. 16).

At that point, Hammer's counsel concluded his examination of Upton.

b.  <u>Hammer's rendition of the facts in his 2004 book</u>.

Hammer's autobiographical account, contained in his 2004 book entitled *The Final Escape,* cast some doubt on the carjacking aspects of the Thomas Upton's testimony.  In his book, Hammer described the events following his escape as follows:

> I had decided earlier that I was going to go to one of the gay bars.  My reasoning was that it would be easier to get picked up there.  Most of the guys have their own apartments or house, have a car, clothes, credit card, and money—all making it an easy place to rob someone, take their vehicle and leave the state.  So I took a cab to one of the gay bars in the northwest part of the city.  After I had been there a little while a guy picked me up.  He offered to take me to dinner.  This gave me the clue that he had his own transportation.  We had dinner and directly from there he wanted to have sex.  Unfortunately he said that

he still lived with his mother. I am thinking, "I've picked up a loser but at least he's got a car and probably a little money." I'd had a couple of screwdrivers and, not being used to alcohol, I had a little buzz going. So I took him back to my motel room. We were sitting there having a drink when the 10:00 PM news came on TV. It showed my face and this guy recognized me.

"My God, that's you," he said excitedly. So he turns up the sound and listens to the broadcast. Then he makes a very big mistake.

"You know, I could turn you in," he says.

So I walked over to the nightstand, took out a pistol, pointed it at him and said, "Mother Fucker, I could kill you." He tried to tell me that he was just kidding, and I sarcastically said, "Yeah, sure, you're just kidding." I walked over to him and slapped him alongside his head with the pistol. Blood started to run and he was whining and pleading that he was just kidding, and begging me not to kill him. Then I told him to take off his clothes since he wanted some sex. In the process I hit him a few more times and he bled all over the bed.

This entire time my mood had been swinging from anger, to frustration, to disgust for this son-of-a-bitch who said he was going to turn me in, and at that moment I decided I was going to kill him.

I apologized for hurting him, told him that I was just into rough sex. After reassuring him that I wasn't going to hurt him, I told him to go into the bathroom and get cleaned up. I said I was going to make a phone call and didn't want him to hear it. I called my Mom and told her that I was leaving the area and that I'd call her when I could.

I saw the blood on the pillowcases and sheets so I gathered everything up just as he walked out of the bathroom. I told him all I wanted him to do was to take me somewhere and drop me off. I already knew that he was going to tell on me.

We left the motel and I told him which way to drive. To get his attention and keep him in line I shot through his open window a couple times. It nearly scared him to death. By then it was around 12:30AM. We drove to the outskirts of the city where I had spent a great deal of my teenage years. We stopped and I told him that I had

44

changed my mind.  I was going to take his car and leave him there. He readily agreed to it.  Once out of the car I told him to take off his shoes and he did.  In the distance a porch light came on and dogs started barking.  I told him to get back into the car, and directed him to another part of the city to an oil lease.  It was in the far southwest part of town.  We parked by a cattle guard, the gate that leads into the oil well.  I had told him to take the rest of his clothes off, and that is how I would leave him.  Once he had stripped he began to beg for his barber tools.  I agreed to give them to him, but had no intention of doing so.  We opened the trunk and took them out.  Then I threw them in the back seat.  We walked down the trail, and then I told him to lie down on his stomach.  Again he begged me not to kill him.  I told him to shut up, shoved the barrel of the gun into his mouth,, and told him to suck on it.

I really don't know how I was feeling at that moment, but I know that he should never have said he was going to turn me in.  So I hit him a few more times before I told him to lie down in the gravel.  I took the pistol and put it just inches from his head and BOOM.  I shot him once and he turned his head over, weakly raising his hand.  I knew I could not miss him so I shot three more times in rapid succession. When I shot again the gun just clicked.  I had forgotten that I had shot it twice before so I stood up to reload.  This guy jumped up stark naked, and took off running.  I had already shot him four times in the head.  It was very dark so I could not find him.  Since I had shot so many times I figured that he would be dead before anyone discovered him.  I took the car to a gas station, filled it up, and dumped the bloody sheets, etc., into a dumpster out back, and I was on my way.

David Paul Hammer, *The Final Escape*, pp.  116-19 (2004).

c.  Upton's statement in 2014.

As part of the preparation for the upcoming sentencing hearing in the instant case, on March 10, 2014, Capital Crimes Section Trial Attorney Amanda Haines and FBI Special Agent John Coyle met with Thomas Upton in Florida.   They were

45

aware of Hammer's account of the shooting described in his book. During the course of the interview, after being pressed by the FBI Special Agent as to the details of the initial encounter, Mr. Upton disclosed that contrary to his testimony in 1984 and 1998, when he first saw Mr. Hammer walking in the vicinity of 36th and Classen Streets, Oklahoma City, OK, Upton "picked up" Mr. Hammer because he "thought he was cute" as "a trick." Contrary to his earlier testimony, Mr. Upton says that he voluntarily drove Mr. Hammer to his motel to have sex. At that point in time, according to Mr. Upton, he was not carjacked or kidnapped nor did Mr. Hammer display a weapon. Upon arriving at the motel, Mr. Upton voluntarily accompanied Mr. Hammer to his room. Once there, Mr. Upton claimed that he had sex with Mr. Hammer, but that he was forced to engage in anal sex against his will. At some point, Mr. Upton told Mr. Hammer that he knew he was an escapee. It was at that time, according to Mr. Upton, that Mr. Hammer retrieved a firearm from a nightstand in the hotel room. Mr. Upton now states that he was not "locked into" the bathroom, although he did go into the bathroom at Mr. Hammer's direction so that Mr. Hammer could make a phone call. The remainder of Mr. Upton's recollection is largely consistent with his prior testimony (including the facts that Hammer forced Upton at gunpoint to drive to a location, strip off his clothes, told to lie down, and was shot in the head). Mr. Upton explained that he

46

lied about some of the circumstances leading up to the shooting, because he was concerned that in 1983, he would be discriminated against by law enforcement because he was a homosexual victim.

The above information from Thomas Upton was disclosed to Hammer's counsel the following day. In addition, the FBI report of interview was also disclosed to the defense on March 13, 2014. That report noted that around the time of the federal trial, someone had challenged him, possibly from the United States Attorney's Office, whether he and Hammer had met at a "gay bar" on the night Hammer shot Upton. Upton denied the allegation. (Upton now reports it was actually Lou Keel, the Oklahoma State prosecutor, who asked him that question). Upton stated that he had never revealed before the interview the true circumstances of how he picked up Hammer.

In response, Hammer's trial team is seeking to preclude the government from using that conviction and from calling Upton as a witness in the upcoming trial.

H.  The facts pertaining to the Leonard Yager issue

Defendant Hammer has filed a motion to exclude the testimony of Leonard Yager and suppress any evidence obtained by him on the ground that the evidence was procured in violation of *Massiah v. United States*, 377 U.S. 201 (1964).

47

Specifically, defendant argues that a note entitled "The Seven Reasons I Killed Andrew Marti", which he authored and was provided to law enforcement by Leonard Yager, was the "tainted fruit" of contact that Yager had with Hammer in 1996. This argument is without merit.

In the early morning hours of Saturday, April 13, 1996, defendant David Hammer was interviewed by law enforcement, including Carlyle Rick Thompson, a Special Agent with the FBI, and confessed to the murder of Andrew Marti. During the course of the interview, which occurred after defendant was advised of and waived his rights pursuant to *Miranda v. Arizona,* 384 U.S. 436 (1966), defendant revealed that Leonard Yager, a fellow inmate and orderly, was knowledgeable about the murder. Specifically, Mr. Hammer "recalled telling inmate LEONARD YAGER, SHU inmate orderly for the past month, that he (HAMMER) was going to kill MARTI." *See* 302 Report of SA Carlyle R. Thompson, dated April 13, 1996. Upon completion of the interview, Mr, Hammer said "I had better get me a lawyer." The interview then ended.

After obtaining defendant's statement, Special Agent Thompson immediately proceeded to interview Leonard Yager, who was a reliable source for the Special Investigative staff at USP Allenwood. During this April 13, 1996 interview, Yager confirmed that defendant confided to him that he was going to

48

kill Andrew Marti. Almost immediately thereafter, the investigation into the murder of Andrew Marti was reassigned to FBI Special Agent Anthony Malocu.

On April 15, 1996, Hammer wrote, signed and dated a "kite" or note identifying the "seven reasons" why he killed inmate Marti (hereinafter, "The Seven Reasons"), which he provided to Leonard Yager. Two days later, on Wednesday, April 17, 1996, Mr. Yager was reinterviewed by law enforcement. At that time, as memorialized in a second FBI report, Yager advised Special Agent Malocu that he had received a letter from Hammer explaining his motives for committing the murder, and that he, Yager, wanted to use this information as a means to secure a transfer to another facility. *See* 302 Report of SA Anthony Malocu, dated April 17, 1996. At no time during this April 17th interview did inmate Yager claim that law enforcement directed him to the defendant to obtain incriminating evidence. To the contrary, Yager maintained that Hammer initiated the contacts with him which resulted in "The Seven Reasons" being provided to the FBI. In the years that followed, Yager was consistent on this point. *See* Vol. Partial Trial Transcript, Testimony of Leonard Yager, dated June 8, 1998, at 96 (describing how Hammer instructed him to tell the truth to the FBI); *id.* at 97(stating that it was Hammer who requested a pencil and paper); *id.* at 102 (explaining that Hammer slid "The Seven Reasons" through his cell door to

49

satisfy Yager's curiosity); and; *id.* at 146 and 168 (expressing his hesitancy to provide the letter to law enforcement).

On April 17, 1996, the same day that Yager provided "The Seven Reasons" to the FBI, defendant was transferred from the United States Penitentiary at Allenwood to the Federal Correctional Institution at Allenwood.   From that point onwards, Leonard Yager had no further access to Mr. Hammer and obtained no additional incriminating documents.

Eighteen years later, on February 25, 2014, Mr. Yager, who has suffered from years of heroin addiction and serious medical problems, was interviewed by Trial Attorney Amanda Haines and FBI Special Agent Thomas Herbst in Memphis, Tennessee.  During this interview, apropos of nothing, Mr. Yager blurted out that he was a "long time informant" for Lt. [John] Bell of the Bureau of Prisons (who is now deceased)  and  that the FBI "sent him in" to talk to Hammer.  Upon being shown "The Seven Reasons," a document which he previously authenticated in the grand jury and at trial, Yager claimed that he could not recognize the document and did not know what it was.  This information was disclosed to defense counsel.  A separate notification was made to Mr. Yager's probation officer that during the interview, Mr. Yager confessed that he had recently ingested heroin in violation of his probation.

Approximately five weeks later, on April 1, 2014, Mr. Yager was re-interviewed by Trial Attorney Amanda Haines and lead FBI Special Agent John Coyle in Memphis, Tennessee. During this second interview, only five weeks after his revelation that the FBI "sent him in" to talk to the defendant, Yager denied that he was directed by the FBI, the Bureau of Prisons, or anyone else to seek information from Hammer regarding Marti's death or that he had ever made such representations to prosecutor Haines and Special Agent Herbst. *See* 302 Report of SA John Coyle, dated April 1, 2014. To the contrary, and more in keeping with his earlier statements and testimony, Mr. Yager claimed that he was not enlisted by law enforcement to obtain information in this case, but rather, that defendant Hammer voluntarily provided him with "The Seven Reasons" to satisfy Yager's curiosity. For the first time, Yager also revealed that Hammer told him "The Seven Reasons" would assist Yager in his interviews with law enforcement by corroborating his information. *Id.* Once again, Mr. Yager was unable to authenticate "The Seven Reasons." The substance of this second 2014 interview was memorialized and provided to defense counsel.

I.    The facts pertaining to the Stephen Classen issue

On April 13, 1996, FBI Special Agent Carlyle Rick Thompson and others interviewed David Hammer about the murder of Andrew Marti. During the

51

course of the interview, following Hammer's waiver of his *Miranda* rights, defendant not only revealed that Leonard Yager had been told in advance that he planned to kill Marti, but that he also told Steven Classen. Specifically, "HAMMER told inmate First Name Unknown (FNU), CLASSEN, who, at the time, celled with HAMMER, that HAMMER was going to have MARTI move into his cell so that he (HAMMER) could kill him. FNU CLASSEN is presently located in the institution's administrative detention Cell #215. *See* 302 Report of SA Carlyle R. Thompson, dated April 13, 1996.

After obtaining defendant's statement, Special Agent Thompson interviewed Stephen Classen that same day—April 13, 1996. Classen told Special Agent Thompson that he had been Hammer's cellmate until April 9, 1996. Classen related that he moved out of the cell because Hammer told Classen he wanted some guy in disciplinary segregation to move in with him. Classen further stated that shortly after moving in with Hammer, Hammer told him that he wanted to kill Marti. He thought that the initial conversation was on March 26, 1996. Hammer possibly told Classen a second time that he was going to kill Marti. *See* 302 Report of SA Carlyle R. Thompson, dated April 13, 1996.

Classen was interviewed a second time by an FBI Special Agent, appeared in the grand jury and later testified at trial.

At trial, Classen testified that Marti was to move in with Mr. Hammer on April 8, 1996. However, there was a delay because on April 8, 1996, a fight occurred in the recreation cage.  Classen testified that Mr. Hammer ''started screaming at everybody that there was a fight in the rec. cage.''  Mr. Classen observed one inmate with ''blood all running down his face and stuff.''   Mr. Classen testified that ''Hammer  looked—looked over at me, and I think I was kind of white-faced, because I didn't like seeing that anyways, and he said that, "I'm going to kill Marti." And I just looked at him. And I don't know what kind of expression I had, but the next thing he says, point to me, he goes, Got you, like that. And anyways, that—that stopped us from moving.  It was the next day that we ended up moving.''   Classen further testified that he received a ''kite'' from Mr. Hammer after the murder of Marti.  Classen found the ''kite'' on the floor of his cell, Saturday morning, April 13, 1996, and destroyed the ''kite'' by flushing it down the toilet.  With respect to that ''kite,'' Mr. Classen testified that he did not read the whole letter.  What he read said he was serious about what he was going to do, that he was going to kill Marti. He said he threw it away.  (Vol. 6, at 3-18.)

During Mr. Classen's testimony the Government presented a letter (Government Exhibit 35.2) purportedly written by Hammer to Classen.  The letter was dated April 14, 1996. The letter stated in part ''Steve, I don't care what you

53

say to the FBI or SIS. There isn't anything that can hurt me because their case is pretty open and shut.  I'm sure you were surprised to learn that I had done what I told you I was going to with Marti.''

At trial, Classen testified that he expected a possible sentence reduction and also that he be housed at another correctional facility other than Schuylkill. (Vol. 6, at 3-8.)

Two years ago in response to discovery requests, the government disclosed correspondence between Classen and former Assistant United States Attorney Martin that had occurred both before and after Mr. Hammer's 1998 trial. In the letters, Classen questioned when the trial would start, and complained about his placement in a county prison while waiting to testify.  Following his testimony, the correspondence showed that the government sent a letter requesting a sentence reduction and that it sought to assist Classen in obtaining an earlier release to a halfway house.

DISCUSSION

1. **Government's Response to Motion to Vacate under 28 U.S.C. 2255 and to Supplement/Amend His Motion to Vacate, Set Aside or Correct the Judgment and Sentence In Light of Recent Disclosures By the Government. (Doc. 1640 and 1642)**.

**THIS COURT'S AUTHORITY TO REVIEW HAMMER'S PETITION INITIALLY IS LIMITED BY THE SUCCESSIVE PETITION RULE, PROCEDURAL DEFAULT DOCTRINE, BY HAMMER'S GUILTY PLEA WHICH ELIMINATES FROM CONSIDERATION ERRORS PRECEDING THAT ACT, BY THE TERMS OF § 2255 THAT PRECLUDE ALL BUT CONSTITUTIONAL ERRORS FOR REVIEW.**

There are numerous legal hurdles which Hammer must overcome, in the view of the United States, before this Court properly can consider the merits of his various arguments seeking to file an amendment to his original 2255 motion. Consequently, these will be presented before addressing the details of Hammer's § 2255 petition.

**A. Section 2255's rules regarding successive motions and the limitations period precludes this court from allowing Hammer to amend his 2255 motion.**

As detailed above, this resentencing follows a lengthy Section 2255 proceeding in which Hammer's motion to vacate his conviction was denied, but his sentence was vacated. The Court of Appeals refused to issue a certificate of

55

appealability with respect to the voluntariness of Hammer's guilty plea.  In 1996, in adopting the Anti-terrorism and Effective Death Penalty Act (AEDPA), Congress imposed strict limits on the power of district courts to entertain a second or successive motion under § 2255.  28 U.S.C.A. § 2255(h) provides that a second or successive motion must be certified as provided in 28 U.S.C.A. § 2244. Thus, sections 2244 and 2255 forbid a district court from entertaining a "second or successive" motion under section 2255 without permission from the court of appeals.   In order to grant permission, the court of appeals must find that the motion satisfies one of two gatekeeper requirements: (1) newly discovered evidence that would establish innocence of the offense or (2) a new and previously unavailable rule of constitutional law made retroactive to cases on collateral review by the Supreme Court. 28 U.S.C. §§ 2244(b)(2).  Neither exist in this case.

Moreover, Section 2255's one-year statute of limitations bars amendments to Section 2255 motions that present new, untimely claims for relief, as opposed to a clarification or factual supplementation of an existing, timely-filed claim.  *United States v. Thomas*, 221 F.3d 430, 438 (3d Cir. 2000); *United States v. Duffus*, 174 F.3d 333, 337 (3d Cir. 1999).  In this case, Hammer clearly knew of his Court accordingly should dismiss Hammer's claims.

    B**.**       **The Doctrine of Procedural Default Bars All of Hammer's Claims.**

If a convicted person does not present a claim on direct review, he is in dire straits because he has committed what is called a "procedural default."  A defaulted claim generally cannot be heard on collateral review unless the applicant shows "cause" for each failure to raise the claim and "actual prejudice" resulting from the error he alleges.  See *United States v. Frady*, 456 U.S. 152, 170 (1982).

This "cause and prejudice" standard requires Hammer to show, not only that "some objective factor external to the defense" impeded his efforts to raise the issue as required by each relevant procedural rule, *Coleman v. Thompson*, 501 U.S. 722, 753 (1991), but also that the error he alleges "worked to his actual and substantial disadvantage, infecting his entire trial with error," (emphasis in original). *Frady*, 456 U.S. at 170.  If he cannot show cause and prejudice, petitioner cannot have his claim considered unless he shows "actual innocence." *Bousley v. United States*, 523 U.S. 614, 623, 118 S. Ct. 1604, 1611 (1998).

A settled rule of federal appellate practice is that issues not raised on appeal are forfeited. *E.g.*, Fed. R. App. P. 28(a)(9); *United States v. Carruth*, 699 F.2d 1017, 1021 n.5 (9th Cir. 1983), *cert. denied*, 464 U.S. 1038 (1984).  The Supreme Court in *Bousley v. United States*, 523 U.S. 614, 622, 118 S. Ct. 1604, 1610 (1998), found a procedural default where a federal prisoner failed to challenge the voluntariness of his guilty plea on direct appeal.  It cannot be seriously doubted,

57

after *Bousley*, that Hammer's failure to raise an issue, either at trial or on appeal, is a procedural default.  His request to withdraw or discontinue his appeal, which the Third Circuit granted, just as if he had never filed a timely appeal, precludes this Court generally from considering the issues raised in his motion to supplement his petition.

To be sure there may be claims that cannot be procedurally defaulted.  Some courts of appeals have held that "jurisdictional" claims, which are not subject to forfeiture on direct appeal, are also immune from procedural default on collateral review.  In *Kelly v. United States*, 29 F.3d 1107 (7th Cir. 1994), the defendant's drug sentence was enhanced based on a prior conviction, but the government did not serve notice of the prior conviction as required by 21 U.S.C. § 851(a).  *Kelly* raised the Section 851 claim for the first time on collateral review, but the court of appeals considered it anyway, without a finding of cause and prejudice.  *Id*. at 1112.  The court reasoned that the Section 851 error was jurisdictional, and that "a jurisdictional defect cannot be procedurally defaulted."  *Id*. at 1113.  The Eleventh Circuit followed *Kelly* in *Harris v. United States*, 149 F.3d 1304, 1307-1308 (11th Cir. 1998).  The Tenth Circuit has also stated that "jurisdictional" claims cannot be defaulted.  *United States v. Burch*, 169 F.3d 666, 668 (10th Cir. 1999) ("Challenges to a district court's subject matter jurisdiction may be raised at any time, including

58

in a § 2255 motion").  It is submitted that none of Hammer's arguments could be fairly construed as attacks on this Court's jurisdiction.

Ordinarily, a procedural default is fatal, because it bars the court from even considering the merits of the prisoner's defaulted claims.  To overcome the default and have the claims heard, the defendant must show "cause" and "actual prejudice."  *See United States v. Frady*, 456 U.S. 152, 167 (1982).  It is well to bear in mind that whatever else "cause and prejudice" means, it raises "a significantly higher hurdle" than the plain-error standard of Fed. R. Crim. P. 52 and *United States v. Olano*, 507 U.S. 725 (1993).  *Frady*, 456 U.S. at 166.

In *Murray v. Carrier*, 477 U.S. 478, 488 (1986), the Court explained that "the existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the * * * procedural rule" that was violated.  The Court held that ineffective assistance of counsel provides "cause" for the failure to raise a claim.  *Id*. at 488-489.  Establishing "cause" on the grounds of ineffective assistance of counsel entitles the defendant not merely to have his defaulted claim heard, but to relief from the conviction.

59

Courts will also find "cause" where "a constitutional claim is so novel that its legal basis is not reasonably available to counsel." *Reed v. Ross*, 468 U.S. 1, 16 (1984). That kind of novelty requires more than mere contrary circuit precedent. As the Court held in *Engle v. Isaac*, 456 U.S. 107, 130 n.35 (1982), "futility cannot constitute cause if it means simply that a claim was unacceptable to that particular court at that particular time." Indeed, in *Bousley v. United States*, 523 U.S. 614, 623, 118 S. Ct. 1604, 1611 (1998), the Court found no cause for a defendant's failure, in 1990, to anticipate the Supreme Court's December 1995 holding in *Bailey v. United States*, 516 U.S. 137 (1995), which effectively overruled the interpretation of 18 U.S.C. § 924(c) that governed in all of the regional courts of appeals. The Court in *Bousley* explained that in 1990 other defendants had argued (unsuccessfully) for the result later reached in *Bailey*, and that *Bousley* therefore could not show cause for his own lawyer's failure to do so. *Bousley v. United States*, 118 S. Ct. at 1611 & n.2.

In *Strickler v. Greene*, 119 S. Ct. 1936 (1999), the Supreme Court came as close as it has ever come to defining "prejudice." There, the State *habeas* petitioner raised a claim under *Brady v. Maryland*, 373 U.S. 83 (1963), conceding that the claim was procedurally defaulted. *Strickler v. Greene*, 119 S. Ct. at 1949. Thus, the question before the Court was "whether that default is excused by an adequate showing of cause and prejudice." *Id*. The Court found that the defendant could

show "cause," because, *inter alia*, the State withheld the *Brady* evidence, *Id.* at 1952, but it held that the defendant could not show "prejudice," and it used the *Brady* standard for "materiality" in conducting the prejudice inquiry.  Relying on *Kyles v. Whitley*, 514 U.S. 419 (1995), a *Brady* case, the Court held that the defendant "must convince us that there is a reasonable probability that the result of the trial would have been different if the suppressed documents had been disclosed to the defense."  *Strickler v. Greene*, 119 S. Ct. at 1952 (internal quotation omitted). The Court went on to explain, again quoting from *Kyles*, that the "question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."  *Id*. (internal quotation omitted). That is also the "prejudice" requirement for establishing ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 694 (1984).  Only where an error undermines confidence in the outcome of the proceeding has there been a showing of prejudice.

Because *Strickler* was itself a *Brady* case, there may be room to argue that the *Brady* "materiality" standard does not define "prejudice" in all cases.  As the Fifth Circuit explained in *Felder v. Johnson*, 180 F.3d 206, 215 n.12 (5th Cir. 1999), "[i]t is not clear whether *Strickland* prejudice would be sufficient to meet the prejudice

required to overcome a procedural default in *habeas*," and not clear whether *Brady* "materiality" would be  sufficient in all cases.

In any event, as the recited above, there was no *Brady* violation with respect to any of the matters presently argued by Hammer.  None of the information would have established "prejudice," Hammer would asserts that he would have not pleaded guilty had he known of the alleged defects.   Hammer has failed to overcome the procedural default bar which flows from his request to discontinue his appeal to the Third Circuit.

If a person cannot establish cause and prejudice for his procedural default, he can have his claim heard on collateral review if he establishes "actual innocence." *See Bousley v. United States*, 523 U.S. 614, 623, 118 S. Ct. 1604, 1611 (1998); *McCleese v. United States*, 75 F.3d 1174, 1177-1178 (7th Cir. 1996).   But Hammer does not deny having strangled Marti, and any claim that the killing was "accidental" which, when read in conjunction with common sense and the pathologist's testimony, simply strains credulity.  *See Bousley*, 118 S. Ct. at 1611; *Knox v. Iowa*, 131 F.3d 1278, 1282 (8th Cir. 1997); *cf. Ortiz v. Stewart*, 149 F.3d 923, 931 (9th Cir. 1998).  Further, his allegation does not remotely show "innocence of" (i.e., ineligibility for) the death penalty.

Finally, the concept of actual innocence has a special meaning in the context of a guilty plea.  In *Bousley*, the Court held that the defendant could not show cause and prejudice for failing to challenge his conviction under Section 924(c), but that a remand was appropriate to determine if he could show actual innocence.  The Court stated:

> It is important to note in this regard that 'actual innocence' means factual innocence, not mere legal insufficiency.  In other words, the Government is not limited to the existing record to rebut any showing that petitioner might make.  Rather, on remand, the Government should be permitted to present any admissible evidence of petitioner's guilt even if that evidence was not presented during petitioner's plea colloquy and would not normally have been offered before our decision in *Bailey*.

*Bousley v. United States,* 118 S. Ct. at 1611-1612 (citations and footnote omitted).  That aspect of the opinion in *Bousley* was quite conventional.  It is well established that actual innocence means factual innocence, and that the government is not limited to the record at the time of the district court proceedings.  The point of the actual innocence test is to determine whether the defendant committed the crime or not.  And in light of the entire proceedings, Hammer cannot come close to showing actual innocence.

**C.    Hammer's Guilty Plea Precludes This Court From Considering Purported Errors Which Preceded That Act.**

During the colloquy on June 22, 1998, the following exchange occurred between Hammer and this Court:

> THE COURT:  By pleading guilty you waive your right to appeal all defenses in other matters relating to the crime with which you are charged and which you propose to plead guilty up to this time and date.  Do you understand that?
>
> DEFENDANT HAMMER:  Yes, sir, I do.

(TT Vol. 14, p. 110.)

Most convictions in the federal system are based on guilty pleas, and some defendants who decide to plead guilty later change their mind about the wisdom of that decision.  Collateral attacks brought by such defendants are subject to special limits, however, because the government's interest in the finality of a conviction is even more pronounced when the conviction rests on a guilty plea.  *See United States v. Timmreck*, 441 U.S. 780, 784 (1979).

The basic rule is that "a voluntary and intelligent plea of guilty made by an accused person who has been advised by competent counsel, may not be collaterally attacked."  *Mabry v. Johnson,* 467 U.S. 504, 508 (1984).  That is, the only claims that such a prisoner can make are (1) that his plea was not voluntary and intelligent, and (2) that he received ineffective assistance of counsel prior to entering the plea.

The Supreme Court's clearest statement of the basic rule against collateral attacks on guilty pleas came in *Tollett v. Henderson*, 411 U.S. 258 (1973). There, the defendant pleaded guilty to murder and later filed a *habeas corpus* petition based on the fact that black persons had been excluded from the grand jury that indicted him, in violation of *Strauder v. West Virginia*, 100 U.S. 303 (1880). Neither the defendant nor his attorney had known of the *Strauder* violation at the time of the guilty plea. *United States v. Timmreck*, 411 U.S. at 266. Relying on its prior decisions in *Brady v. United States*, 397 U.S. 742 (1970), *McMann v. Richardson*, 397 U.S. 759 (1970), and *Parker v. North Carolina*, 397 U.S. 790 (1970), the Court in *Tollett* held a guilty plea "forecloses independent inquiry into the claim of discrimination in the selection of the grand jury." *United States v. Timmreck*, 411 U.S. at 266.

In this case, the matters presently in issue preceded the entry of Hammer's guilty plea on June 22, 1998. This Court should not consider their merits under the circumstances. *United States v. Timmreck, supra*.

### D.      Alleged Non-Constitutional Errors Cannot Be Considered In Collateral Proceedings.

As the Supreme Court held in *United States v. Addonizio*, 442 U.S. 178, 184 (1979), "[i]t has, of course, long been settled law that an error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final

judgment."  Based on *Addonizio* and its progeny, it is submitted that this Court first must determine "whether [the] error [alleged] * * * is sufficiently fundamental to come within those narrow limits."  *Id.* at 184-185.

Section 2255 provides redress for jurisdictional or harmful constitutional errors.  It also applies in rare circumstances to some non-jurisdictional and non-constitutional errors of federal law; but it does so only if those errors involve a "fundamental defect which inherently results in a complete miscarriage of justice." *Addonizio*, 442 U.S. at 185; *see Reed v. Farley*, 512 U.S. 339, 353-354 (1994); *United States v. Timmreck*, 441 U.S. 780, 784 (1979); *Davis v. United States*, 417 U.S. 333, 346 (1974); *Hill v. United States*, 368 U.S. 424, 428 (1962).   Thus, even if Hammer demonstrates a rule or statutory violation, he will not be entitled to collateral relief unless the violation is a fundamental defect  --  not merely a technical one  --  that amounts to a complete miscarriage of justice --  not merely to legal error.

Under this rigorous standard, of course, most non-constitutional violations of federal law are not cognizable on collateral review.  *See, e.g., Addonizio*, 442 U.S. at 186 (institution of parole guidelines); *Timmreck*, 441 U.S. at 783-784 (violation of Fed. R. Crim. P. 11); *Hill*, 368 U.S. at 429 (violation of Fed. R. Crim. P. 32); *United States v. Anderson*, 987 F.2d 251, 259-260 (5th Cir.) (erroneous jury instructions), *cert. denied*, 510 U.S. 853 (1993); *United States v. Pollard*, 959 F.2d

66

1011, 1028 (D.C. Cir.) (violation of plea agreement by government), *cert. denied*, 506 U.S. 915 (1992); *United States v. Stevens*, 851 F.2d 140, 143-144 (6th Cir. 1988) (violation of Fed. R. Crim. P. 32); *Fiumara v. United States*, 727 F.2d 209, 213 (2nd Cir.) (wiretapping violation), *cert. denied*, 466 U.S. 951 (1984).

Regardless of the procedural roadblocks, Hammer's claims do not justify relief under 2255. The facts as set forth pertaining to the Upton, Yager and Classen issues simply do not warrant relief. As will be detailed in the responses to Hammer's other motions, hereby incorporated by reference, it is apparent (1) that there was no *Brady* violation as Thomas Upton; (2) despite false testimony by Thomas Upton as to the way the ordeal began, Hammer always knew of that fact; (3) Hammer clearly committed the crimes to which he was convicted in Oklahoma; (4) the FBI did not send Leonard Yager in to see Hammer after Hammer confessed; (5) there could be no constitutional violation as it related to contacts between Yager and Hammer given the fact that Hammer's Sixth Amendment rights had not attached and any contacts between the two were non-custodial; and (6) the correspondence between Stephen Classen and AUSA Martin were inconsequential, and certainly do not demonstrate that the agreement between Classen and the government was misrepresented preceding Hammer's guilty plea.

2. **Government's Response Motion to Preclude the Capital Prosecution Where the Governments Capital Authorization and Subsequent Deauthorization Determinations Relied on Convictions and Evidence that Were the Product of Perjured Testimony in Violation of the Fifth and Eighth Amendments by David Paul Hammer.  (Doc. 1649)**.

For the second time, defendant Hammer seeks to preclude this capital prosecution on the grounds that the government's capital review and authorization process was fundamentally flawed and constitutionally invalid pursuant to the Fifth and Eighth Amendments.  *Compare with*  Defendant's Motion to Preclude the Government From Proceeding with a Capital Prosecution Because It's [sic] Decision not to De-authorize this Case, Violated It's [sic] Standards for Capital Prosecutions in Violation of the Fifth, Sixth, and Eighth Amendments, filed May 19, 2011 [Document 1326].   Assuming without knowing whether the authorization process "relied heavily" upon the testimony of Thomas Upton, a penalty phase witness, defendant again asks this Court to manage the internal processes of the Department of Justice in violation of the separation of powers.   For the reasons the Court cited previously, defendant's motion must be denied as the Death Penalty Protocols create no enforceable substantive or procedural rights, but rather, merely provide internal Department of Justice guidance.  *See* Order, dated December 1, 2011 [Document 1414] (hereafter, "December Order").

**A.   Defendant Hammer has no enforceable rights under the Death Penalty Protocols**

In enacting the Federal Death Penalty Act ("FDPA"), Congress broadly provided that the death penalty may be sought for a capital offense whenever "the attorney for the government believes that the circumstances of the offense are such that a sentence of death is justified" and thereafter files, within a reasonable time before trial or a guilty plea, a notice indicating that the government will seek the death penalty.  18 U.S.C. § 3593(a) (2007).

In 1995, the Attorney General added to its United States Attorney's Manual ("USAM") internal policies and procedures "to be followed in Federal cases in which a defendant is charged with an offense subject to the death penalty." USAM § 9-10.010.  Under these "death penalty protocols," the United States Attorney provides defense counsel a "reasonable opportunity" to present mitigating evidence before he or she makes a recommendation whether to seek the death penalty.  USAM § 9-10.050.   After the United States Attorney's recommendation, the Committee reviews the case, again providing defense counsel an opportunity to present mitigation, and makes its own recommendation. USAM § 9-10.120.  The Committee's recommendation goes to the Attorney General, who makes the final decision whether to seek the death penalty.  The USAM admonishes that "[n]o final decision to seek the death penalty shall be made if defense counsel has not been afforded an opportunity to present evidence

and argument in mitigation." USAM § 9-10.120.

In this case, defendant takes no issue with the fact that the procedures outlined above were scrupulously followed and that after the initial certification process, defense counsel had two opportunities, on April 23, 2010 and August 7, 2013, to provide additional submissions to the Department of Justice seeking de-authorization.  S*ee* December Order at 3 (setting forth the defendant's lengthy protocol review process).   Given these unsuccessful efforts to have this case de-authorized and in light of recent disclosures regarding Thomas Upton, defendant now asks this Court to intervene and make its own determination as to whether the process by which the government decided to seek the death sentence was appropriate.   Respectfully, for the same reasons cited in this Court's December Order, this argument fails.

Contrary to defendant's analysis, the government's capital case review and authorization procedures guide internal charging deliberations and are not justiciable.  By the USAM's plain terms, it is nonbinding: "The Manual provides only internal Department of Justice guidance.  It is not intended to, does not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter civil or criminal." *See* USAM § 1-1.100.  The Protocol therefore provides no procedural rights, but rather is a mere aid to the exercise of the Justice Department's independent

discretion.  *See United States v. Caceres*, 440 U.S. 741, 749-57 (1979).   Like

executive orders, the Protocol is not judicially enforceable because it is expressly

designed only to enhance the Department of Justice's internal management.  *See*

*In Re United States*, 197 F.3d 310, 316-17 (8th Cir. 1999).   Suspects and

defendants therefore are "on notice that they lack enforceable rights in DOJ

policies and procedures." *United States v. Lee*, 274 F.3d 485, 493 (8th Cir.

2001).

Given this express language, courts, including this one, have universally

rejected attempts by defendants to enforce provisions of the USAM's death

penalty protocol through judicial intervention.  *See* December Order at 6 (stating

that the Court concurs with those courts that have concluded that the

Department of Justice Protocol does not create an enforceable individual right

or entitlement).   Indeed, every circuit to have considered the question, including

the Third Circuit, agrees that the government may deviate from its own internal

protocols without creating a right capable of being reviewed or enforced by

defendants.  *See United States v. Wilson*, 413 F.3d 382, 389 (3d Cir. 2005)

(recognizing in the Petite policy context that Department of Justice guidelines and

policies do not create enforceable rights for criminal defendants); *see also United*

*States v. Gomez*, 237 F.3d 238, 241 n.1 (3d Cir. 2000) (noting that as to internal

grand jury guidelines, the defendant's argument that the USAM created rights

entitling him to relief "would be against the weight of judicial authority"); *See also United States v. Lopez-Matias*, 522 F.3d 150, 155–56 (1st Cir. 2008) (death penalty protocol is unenforceable by individuals); *United States v. Lee*, 274 F.3d 485, 493 (8th Cir. 2002) (same); *Nichols v. Reno*, 124 F.3d 1376, 1377 (10th Cir. 1997) (same).  In this light, even if the Department of Justice had violated the protocol—which is not the case here—this Court could not order the government to comply or decertify this case because of an alleged violation.  Accordingly, defendant's request for relief on this basis should be rejected.

**B.    Hammer has no enforceable rights under the Due Process and Equal Protection Clauses**

Hammer's second argument that the Due Process and Equal Protection Clauses give him an independent right to enforce the Protocol also fails.  His process-related claim presents an issue of "procedural," rather than "substantive," due process.  *See Herrera v. Collins*, 506 U.S. 390, 407  n.6 (1993).  Under the procedural due process analysis, the Committee's claimed reliance upon Upton's perjured testimony cannot be said to offend "some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Medina v. California*, 505 U.S. 437, 445 (1992).  This analysis is especially true given that Upton continues to maintain that Hammer shot him in cold blood, and the government has unearthed no evidence to the contrary.  As Hammer's request to dismiss the government's decision to seek the death penalty pits this Court against

72

the Executive's constitutionally delegated prosecutorial discretion, the separation of powers constrains the Court's authority to supervise. *See Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 807 (1987) (noting that in our adversarial system, investigatory and prosecutorial decisions are "made outside the supervision of the court"); *see also United States v. Cox*, 342 F.2d 167, 171 (5th Cir. 1965) ("It follows, as an incident of the constitutional separation of powers, that the courts are not to interfere with the free exercise of the discretionary powers of the attorneys of the United States in their control over criminal prosecutions."). So, even relying on its administrative and supervisory authority, this Court may not direct the process by which the government decides whether seeking a death sentence is appropriate. Accordingly, since the Protocol does not create individual rights that Defendant Hammer can enforce, any alleged violation is not a basis to preclude convening a new penalty hearing. *See* December Order at 7.

3. **Government's Response to Motion in Limine Motion to Preclude the Government from Seeking Death on the Basis of a Prior Conviction and Other Evidence that Was the Product of Perjured Testimony by David Paul Hammer (Doc. 1643).**

Hammer next seeks to preclude the government from introducing any evidence pertaining to Hammer's kidnaping, robbery and shooting with the intent to kill Thomas Upton. Hammer claims should Upton be allowed to testify it would violate his constitutional rights. Hammer further claims that any offer of the

convictions that were based, in part, on Upton's false testimony about how the ordeal began would similarly violate his constitutional rights.

In making his argument, Hammer makes an unsupported claim that the prosecutor, at the penalty phase of his murder trial, viewed Upton's testimony as questionable. While such an allegation bears little on the issue, it is simply untrue and unsupportable. Rather, a fair reading of the testimony shows that the focus of the examination was perhaps sidetracked by the defense that Hammer's alter ego "Jocko" was responsible for killing Marti and the prosecutor was not trying to avoid asking questions that would elicit perjury. Indeed, the examination of Upton by both prosecution and defense appeared more interested in Hammer's mental state during the crimes than the actual events themselves.

In reality, only Upton and defense side (Hammer in particular) were aware that Upton was not being forthcoming as to the manner in which the incident began. Nonetheless, there is no evidence which would indicate that Hammer is innocent of the charges. To the contrary, Hammer's own autobiography reveals that Hammer was in fact not only guilty of the offenses of conviction but also was guilty of rape.

Hammer now seeks to have those crimes fully ignored in the decision as to whether he is eligible for the death penalty and whether this conduct, committed

74

while on escape status, should be considered in determining whether he is a danger of committing future violent acts.

As for his attempt to preclude the conviction from being utilized in support of the statutory aggravating factor of having a conviction of a crime using a firearm, the short answer is that Hammer is barred from collaterally attacking the fact of the conviction in his criminal case. *Daniels v. United States*, 532 U.S. 374 (2001). *Daniels* holds that "a prior conviction used to enhance a federal sentence is no longer open to direct or collateral attack in its own right" if a "defendant failed to pursue those remedies while they were available" or if the defendant previously attacked his prior conviction without success. *Id.* In other words, once the defendant forgoes the opportunity to challenge his earlier conviction, judicial review "has been closed" and "defendant is not entitled to another bite at the apple simply because that conviction is later used to enhance another sentence." *Id.* at 383. With respect to Hammer's convictions arising out the Upton shooting, Hammer fully litigated that matter. Apparently in those proceedings, his defense was not that the encounter began a different way than Upton related, but rather that someone else had committed the crime. As his book reveals, this defense in the state court was an attempt to hide the truth.

In any event, Hammer did in fact commit the crimes to which he was convicted and he cannot collaterally attack those convictions in this Court.

75

Moreover, given the fact that the penalty verdict is no longer intact, Upton's testimony, if offered, can be fully developed by both sides and this Court can give it whatever weight is found to be appropriate.

### 4. <u>Government's Response to Motion in Limine to Preclude the Testimony of Leonard Yager (Doc. 1645).</u>

#### a. Yager's Contacts with Hammer Did Not Violate Defendant's Constitutional Rights

In light of the government's disclosures, the defense filed a motion to exclude Yager's testimony and "The Seven Reasons," on the ground that Mr. Hammer invoked his Sixth Amendment right to counsel at the conclusion of his confession and that the FBI recruited Leonard Yager as an agent to knowingly circumvent defendant's constitutional rights. Defendant argues further that the jury was unaware that Yager was "vested" in obtaining information for the government and to the contrary, was wrongly persuaded that Yager was a mere confidant who obtained "The Seven Reasons" coincidentally. Such is not the case.

First, as a factual matter, Mr. Yager's recollection, just from this bare recitation, is now less than perfect. The government suspects that on February 24, 2014, he was confused and likely mistaken as to his recollection on this point. But more importantly, if called to testify, both retired Special Agent Carlyle Thompson and Special Agent Anthony Malocu would strenuously affirm that they did **not**

instruct anyone to obtain a confession from defendant Hammer. Indeed, in the case of Special Agent Anthony Malocu, such a scenario is impossible given that his first meeting with Yager was April 17, 1996, two days after David Hammer wrote and signed "The Seven Reasons." Accordingly, it is not the case that the FBI violated defendant Hammer's constitutional rights by directing "their" agent to interrogate the defendant.

Second, the jury was well aware that Leonard Yager was an informant, and not just a confidant, *see* Trial Transcript of Mark Traxler, dated June 9, 1998, at 57 (affirming that Yager was a confidential informant for others), who was trying to obtain a benefit in exchange for information, *see* Trial Transcript of Leonard Yager, dated June 8, 1998, at 151-3 (admitting that he wanted to use "The Seven Reasons" to obtain a transfer to lower level security institution where he could have more freedom). Accordingly, the defense had every opportunity at trial to challenge Yager's self-interest and the reliability of his testimony. But even were the facts as defendant alleges, and an employee of the Bureau of Prisons, as opposed to the FBI, instructed Yager to obtain information, defendant's argument fails.

Pursuant to the Sixth Amendment, the right to counsel arises at the initiation of adversarial judicial proceedings against the defendant. *See Kirby v. Illinois,* 406 U.S. 682 (1972). Judicial proceedings against an accused include the "formal

charge, preliminary hearing, indictment, information, or arraignment."  *Id.* at 688-89.  Thus, when formal criminal charges are brought against an accused, the Sixth Amendment establishes the defendant's right to have an attorney to assist in his defense.

In *Massiah v. United States*, the Supreme Court held that the Sixth Amendment right to counsel is violated if a confidential government agent deliberately elicits information from a defendant who has been formally charged, in the absence of the defendant's counsel.  377 U.S. at 206.  Specifically, in that case, after the defendant was indicted and retained a lawyer, his codefendant cooperated with law-enforcement and deliberately elicited incriminating statements that were then transmitted to agents waiting nearby.  *Id.* at 203.  The Supreme Court held that the defendant's statements could not constitutionally be used against him.  *Id.* at 207.

In order for a *Massiah* violation to exist, however, three things must be present: 1) the right to counsel must have attached, 2) the informant must have been acting as a government agent, and 3) the informant must have deliberately elicited the information in question.  *See West v. United States*, 866 A.2d 74, 84 (D.C. 2005) (relying on, *inter alia*, *Moore v. United States,* 178 F.3d 994, 998 (8th Cir. 1999)). At the time of the contacts of which Hammer complains, he was not under indictment.  Thus, *Massiah* would not even apply, as it is well established that the

78

right to counsel does not attach until charges are filed or until "adversary judicial proceedings" have begun preceding such a filing. *Kirby v. Illinois*, 406 U.S. at 688-90; *Accord Nelson v. Fulcomer*, 911 F.2d 928, 941 (3d Cir. 1990) (right to counsel did not attach when defendant gave inculpatory response to police-orchestrated confrontation with crime partner because defendant had not been arrested, indicted, or arraigned). In *United States v. Gouveia*, 467 U.S. 180 (1984), the Court held that the defendants, suspected of murder in prison, did not have a right to counsel while in administrative segregation prior to indictment since "[t]he right to counsel does not attach until after the initiation of adversary judicial proceedings." *Id.* at 187. Accordingly, Yager's brief and limited contact with Hammer did not violate his rights.

Moreover, given that prison officials are charged with the responsibility of keeping order and preventing their inmates from committing crimes while incarcerated, the Special Investigations staff had every right to intercept "The Seven Reasons" and to authorize Yager to accept anything that Hammer offered him. Hammer was prohibited from passing messages to others. Given that he had just murdered his cellmate, and continued to violate rules by communicating with other prisoners, Bureau of Prison officials would have been sorely remiss in their duties had they failed to intercept his communications. Thus, Yager served as nothing more than the equivalent of a listening post; that is, someone who received a

communication from an incarcerated inmate, and then passed that communication along to prison officials. *Kuhlmann v. Wilson*, 477 U.S. 436, 459 (1986) (where a prisoner makes incriminating statements to a passive listener - a "listening post" - the informant's presence does not constitute an interrogation and the right to counsel is not violated); *see also United States v. Brink*, 39 F.3d 419, 422 (3d Cir. 1994), *citing United States v. Van Scoy*, 654 F.2d 257, 260 (3d Cir. 1981).   As there is no evidence that the Special Investigations staff was acting on behalf of the FBI or the prosecution team in the criminal case, neither Yager's actions, nor those of the prison, violated *Massiah*.

Defendant's argument also fails, however, because his invocation of his right to counsel under the Sixth Amendment was neither clear nor unequivocal. *See Davis v. United States* 512 U.S. 452 (1994).  In *Davis*, as here, the suspect stated during a police interview, "Maybe I should talk to a lawyer."   The Court held that this statement was too ambiguous to invoke the suspect's right to counsel.  *Id.*  The Court also held that if a suspect makes an ambiguous statement about an attorney, the police are not required to clarify whether the suspect is invoking his right to counsel. *See id.* at 461–62 (stating "we decline to adopt a rule requiring officers to ask clarifying questions").

In this case, there is no basis to differentiate these facts from *Davis*.  Upon completion of the interview of April 13, 1996, Mr. Hammer said "I had better get

me a lawyer." While it is true that defendant used the word "lawyer," he did not request to speak to one before answering questions, but rather, waived his rights and gave a full confession. Accordingly, defendant's statement – "I had better get me a lawyer" -- when read in context, was not a request for counsel. To the contrary, Hammer's remark may reasonably be understood to mean that he was commenting upon the damaging impact of his confession. Accordingly, Hammer's somewhat flippant commentary was not an unambiguous request to speak to counsel, and the government was free to continue to question him, or send in their agent to do so, without violating his Sixth Amendment right to counsel. Clearly then, even if Yager was acting as an informant for the Bureau of Prisons, defendant's rights were not violated given that he failed to unambiguously request counsel at a time when the right to counsel had not attached. The motion, accordingly, should be denied.

5. **Government's Response to Motion in Limine to Preclude the Testimony of Stephen Classen (Doc. 1647).**

Hammer next seeks to preclude the use of the prior testimony of deceased witness Stephen Classen. In essence, Hammer seeks to do so on the grounds that correspondence provided to the defense in response to a request, in the defenses view, indicated that the government made promises beyond that revealed to the jury. The correspondence that preceded the trial simply related to scheduling and questions as to issues related to where Classen was being housed and inconvenience

and perceived danger he was encountering.  The letters preceding the guilty plea contained nothing of significance.  Likewise, the disclosure by the government as to the sentence reduction of approximately 10 months and the efforts to have Classen given halfway house placement and/or home confinement late in service of his sentence, likewise create nothing that would undermine Classen's prior testimony or suggest that it was unreliable.  Certainly, this Court, in examining Classen's prior testimony, and this new correspondence, can give proper weight to the testimony and these other matters and there is no possible undue prejudice to Hammer in doing so.

For those reasons, the motion seeking to preclude the Classen testimony should be denied.

6. **Government's Response to Hammer's Motion To Dismiss This Capital Resentencing Because Of Alleged Government Misconduct (Doc. 1651).**

Hammer argues that the government is guilty of repeated misconduct and seeks the Court to exercise its supervisory powers to preclude the government from continuing to seek the death penalty in this case. Hammer raises each of the matters discusses above relating to Thomas Upton and Leonard Yager.  Moreover, Hammer reasserts his argument that the government failed to disclose material exculpatory evidence which were the foundation for Judge Muir to find a *Brady* violation.

It is the government's position, however, the district court erred in granting

relief on Hammer's *Brady* claim.  In the court's view, the FBI 302 reports indicating that Hammer had a history of sexual bondage supported an accident/erotic asphyxiation defense and undercut the government's assertion that the "substantial planning and premeditation" aggravating factor was shown by Hammer's pre-murder braiding of Marti's restraints.  *Brady*, however, does not require disclosure of information already known to the defense.  Hammer was personally aware of all of the bondage incidents recounted in the FBI 302 reports, as he participated in each of the described bondage episodes.  Trial counsel were likewise aware of Hammer's history of sexual bondage, but quickly changed the subject when defense witness Michael Smith discussed Hammer's sexual bondage on cross-examination. Counsel had also interviewed and presented a number of inmate witnesses for the DID defense, who were familiar with Hammer's sexual activity.

Almost as well-established as *Brady* itself is the related corollary that "[e]vidence is not considered to be suppressed if the defendant either knew or should have known of the essential facts permitting him to take advantage of any exculpatory evidence."  *United States v. Perdomo*, 929 F.2d 967, 973 (3d Cir. 1991).  And, more specifically, the Government has had no obligation to disclose to defense counsel documents setting forth facts that the defendant himself knew or had reason to know.  *United States v. Diaz*, 922 F.2d 998, 1007 (2d Cir. 1990) (holding that the Government did not improperly fail to disclose a witness's

account that Diaz was not present at a meeting to set up a drug transaction; "[i]f in fact . . . Diaz was not in [the witness's] apartment during the transaction, Diaz knew that fact"); *United States v. Zuazo*, 243 F.3d 428, 431 (8th Cir. 2001) ("Having spent two days together with [the witness whose statements were not disclosed], Salaiza Zuazo was well aware of [the witness] and his potential testimony"); *United States v. Roane*, 378 F.3d 382, 402 (4th Cir. 2004) (because "information actually known by the defendant falls outside the ambit of the Brady rule," government did not violate *Brady* in failing to disclose statements of witnesses who assertedly could have provided defendant with an alibi, as the defendant "[o]bviously . . . knew who he was with on the evening of the murder" and, therefore, "had no need for the Government to provide him with such information"), cert. denied, 546 U.S. 810 (2005); *Fullwood v. Lee*, 290 F.3d 663, 686 (4th Cir. 2002) ("the state did not suppress the information that came out during Fullwood's conversation with Detective Robertson because Fullwood, better than anyone, knew about his cocaine use on the night prior to the stabbing and knew that he recounted that fact to Detective Robertson"); *West v. Johnson*,

92 F.3d 1385, 1399 (5th Cir. 1996) ("Certainly West knew whether or not had taken the necklace [as he had confessed], and necessarily knew that better than the prosecution could have"); *see United States v. Pellulo*, 399 F.3d 197, 216 (3d Cir. 2005).

As is obvious, Hammer was well aware of his own long-standing, blatant homosexual practices that involved bondage and the infliction of pain and of Albert Johnson's efforts to instruct him on the art of braiding sheets into ropes, all of which was reported in the FBI 302 reports.  Hammer knew what Johnson in particular heard because Hammer and "Tony" called out to Johnson while they engaged in sex, and Johnson also personally gave Hammer a rope to use.  *See id.* These basic facts were fully available to Hammer and undoubtedly known by him; the mere fact that the inmates subsequently reported the facts to investigators did not, in and of itself, provide additional, admissible exculpatory information.

Gaylon Ball's mere unsubstantiated suspicion that Hammer and Marti may have engaged in sex at some time when they lived together likewise did not provide additional, admissible exculpatory information that would "undermine confidence" in the jury's finding of substantial planning and premeditation and its imposition of a death sentence, in accordance with the standard of *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

Whether the defendant was aware that several inmates imprisoned with him were interviewed or that they observed his bondage-oriented homosexual activities and mentioned them to investigators is irrelevant for purposes of *Brady*. The critical factor is that Hammer was well aware of his demonstrated proclivities for bondage-oriented homosexual activities and the identities of the various inmates who had been housed in close proximity to him over his years of incarceration.  Moreover, Hammer had knowledge of his own sexual activities – together with those of his various sex partners – that was far superior to that of the various inmates interviewed by the federal agents.

Defense counsel were, in fact, well aware of Hammer's history of bondage, but deemed it entirely unfavorable, as the cross- and redirect-examination of Michael Smith make clear.  See Statement of Facts, supra.

Two further points bear making.  First, even setting aside the inconsistency with the insanity defense, it is far from apparent that the FBI 302 reports contain exculpatory information.  The district court believed that the information in the reports could have undercut the basis for the substantial planning and premeditation aggravator by suggesting that Hammer might have gone through the elaborate planning – arranging for Marti to be assigned as his cellmate, braiding the ropes, and carefully tying Marti to the bunk – as a prelude to homosexual activity that included erotic asphyxiation rather than as a prelude to murder.  But,

while the various FBI reports contain information about bondage and whipping, they do not refer to erotic asphyxiation as part of Hammer's sexual practices. As noted in the Statement of Facts, supra, Dr. Funke found no evidence that Hammer and Marti were engaged in sexual activity while Marti was restrained. More importantly, Albert Johnson's 302 reports contained information that strongly supported the existence of the substantial planning and premeditation aggravating factor: according to Johnson, Hammer stated that he planned to kill a cellmate while incarcerated at Allenwood to ensure that he would not be returned to the Oklahoma prison system, adding that he would be able to avoid legal liability for such a killing by reason of mental incompetency. JA 13636.

Hammer next claims that Hammer, while facing the death penalty, was somehow unaware of Upton's false testimony. Nothing can be further from the truth and one wonders whether the defense may have seriously lost contact with reality. It is the government that did not know that the kidnapping actually came later in the evening at issue, not Hammer. As Hammer was one of the two individuals with actual knowledge of the events, it is flatly wrong to try to claim that Hammer was unaware of this false aspect of Upton's testimony. Rather, Hammer had always pursued the false defense that someone else had abducted and shot with the intent to kill Upton. The attempt to hide the truth in such circumstance was Hammer's, not the prosecution team.

As for Hammer's claim that the government violated Hammer's constitutional rights in connection with Yager's contacts with Hammer after the murder, that likewise has no merit. As set forth above, the FBI agents did not, in fact, send Yager in to talk to Hammer after the murder. Regardless, the contacts between the two occurred before Hammer was charged with the murder and his Sixth Amendment rights had not attached. Moreover, Hammer obviously volunteered the letters that he wrote in his cell to Yager and others. Accordingly, Hammer cannot seriously complain that his rights were violated.

For the above reasons, the motion has no merit and should be denied.

Respectfully submitted,

PETER J. SMITH
United States Attorney

/s/ John C. Gurganus, Jr.
JOHN C. GURGANUS, JR.
Assistant U.S. Attorney

AMANDA HAINES
Trial Attorney
Department of Justice

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that he is an employee in the Office of the United States Attorney for the Middle District of Pennsylvania and is a person of such age and discretion as to be competent to serve papers.

That on May 13, 2014, he served a copy of the attached:

CONSOLIDATED BRIEF OF THE UNITED STATES IN OPPOSITION TO DEFENDANT'S MOTIONS IN LIMINE, TO DISMISS CAPITAL PROSECUTION, AND TO FILE A SUPPLEMENTAL MOTION TO VACATE

by electronic filing on counsel for the defendant.

Ronald C. Travis, Esquire
rtravis@riederstravis.com

James J. McHugh, Jr., Esquire
James_McHugh@fd.org

James Moreno, Esquire
James_Moreno@fd.org

Anne Saunders, Esquire
Anne_Saunders@fd.org

/s/ John C. Gurganus, Jr.

May 12, 2014          _____
Date                  JOHN C. GURGANUS, JR.
                      Assistant U.S. Attorney