# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | : | No. 4:96-CR-239 |
|  | : |  |
| v. | : | Honorable Joel H. Slomsky |
|  | : |  |
| DAVID PAUL HAMMER, | : | Capital Case |
|  | : |  |
| Defendant | : |  |

## MR. HAMMER'S REPLY TO THE GOVERNMENT'S CONSOLIDATED BRIEF IN OPPOSITION

RONALD C. TRAVIS
Rieders, Travis, Humphrey, Harris,
Waters & Waffenschmidt
161 West Third Street
PO Box 215
Williamsport, PA  17703-0215
570-323-8711 (telephone)
570-323-4192 (facsimile)
rtravis@riederstravis.com

ANNE SAUNDERS
Assistant Federal Defender
Federal Public Defender
Middle District Pennsylvania
100 Chestnut Street, Suite 300
Harrisburg, PA 17101
717-782-3843 (telephone)
717-782-3966 (facsimile)
anne_saunders@fd.org

JAMES MORENO
JAMES J. MCHUGH, JR.
Federal Community Defender
Eastern District Pennsylvania
Suite 540 – The Curtis Center
Philadelphia, PA 19106
215-928-1100 (telephone)
215-928-0826 (facsimile)
james_mchugh@fd.org
james_moreno@fd.org

TABLE OF CONTENTS

I.    INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   THE CLAIMS RAISED IN MR. HAMMER'S FIFTH AMENDED/SUPPLEMENTAL
      2255 MOTION REQUIRE RELIEF OR, AT A MINIMUM, AN EVIDENTIARY
      HEARING.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      A.    The Government's Attempt to Characterize the *2255 Motion* as a
            Successor Fails. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      B.    The Government's Other Attempts to Inject Unsupportable
            Procedural Defenses Fail.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      C.    Mr. Hammer is Entitled to an Evidentiary Hearing.. . . . . . . . . . . . . 14

      D.    Mr. Hammer's Claims Require Relief. . . . . . . . . . . . . . . . . . . . . 16

            Claim I.     The Government's Presentation of Convictions and
                         Sentences that Were the Product of Perjury and
                         Materially False and Misleading Evidence to the Grand
                         Jury and Its Failure to Inform the Grand Jury of Yager's
                         Status as Its Agent Deployed for the Purpose of
                         Circumventing Mr. Hammer's Invocation of His Right to
                         Counsel Violated the Fifth and Eighth Amendments. . . 16

            Claim II.    The Government's Use of Inmate Yager as Its Agent to
                         Circumvent Mr. Hammer's Clear and Unequivocal
                         Invocation of His Right to Counsel Violated the Fifth,
                         Sixth and Eighth Amendments. . . . . . . . . . . . . . . . 23

            Claim III.   The Government's Failure To Provide Petitioner With
                         Material Exculpatory Evidence Prior To His Mid-Trial
                         Guilty Plea Vitiates The Alleged Voluntariness Of The
                         Plea And Warrants A New Trial. . . . . . . . . . . . . . . 26

Claim IV.    The Government's Failure to Disclose Material Exculpatory Evidence and Its Reliance on Materially Misleading and False Testimony Violated the Fifth, Sixth and Eighth Amendments. . . . . . . . . . . . . . . . . . . 27

Claim V.    The Jury's Consideration of Convictions and Evidence That Were the Product of Perjury In Reaching Its Sentencing Determination Violated the Fifth, Sixth and Eighth Amendments. . . . . . . . . . . . . . . . . . . . . . . . . . 34

Claim VI.    The Government's Reliance on Convictions and Sentences that Were the Product of Perjury and Materially False and Misleading Testimony and Evidence In Reaching Its Capital Authorization Determination And Its Subsequent DeAuthorization Determinations Violated the Fifth, Sixth, and Eighth Amendments. . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Claim VII.    The Government's Presentation Of Perjured Testimony In The Prior Capital Sentencing Proceeding Combined With Its Failure To Disclose Significant And Material Exculpatory Evidence Prior To Trial Warrants Dismissal. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

E.    Conclusion.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

III.    THE GOVERNMENT'S OBJECTIONS TO MR. HAMMER'S MOTION IN LIMINE TO PRECLUDE/SUPPRESS YAGER'S TESTIMONY FAIL. . . . . . . . . . . . . . . . . . . . 40

IV.    THE GOVERNMENT'S OBJECTIONS TO MR. HAMMER'S MOTION IN LIMINE TO PRECLUDE THE GOVERNMENT FROM SEEKING DEATH ON THE BASIS OF PRIOR CONVICTIONS AND OTHER EVIDENCE THAT WERE THE PRODUCT OF PERJURED TESTIMONY FAIL... . . . . . . . . . . . . . . . . . . . . . . . . . . 43

V.    THE GOVERNMENT'S OBJECTIONS TO MR. HAMMER'S MOTION IN LIMINE TO PRECLUDE THE ADMISSION OF PRIOR TESTIMONY OF STEPHEN CLASSEN FAIL.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

VI.    THE GOVERNMENT'S OBJECTIONS TO MR. HAMMER'S MOTION  TO
       PRECLUDE THE CAPITAL PROSECUTION WHERE THE GOVERNMENT'S
       CAPITAL AUTHORIZATION DETERMINATION AND SUBSEQUENT
       DEAUTHORIZATION DETERMINATIONS RELIED ON CONVICTIONS AND
       EVIDENCE THAT WERE THE PRODUCT OF PERJURED TESTIMONY IN
       VIOLATION OF THE FIFTH AND EIGHTH AMENDMENTS FAIL.. . . . . . . . . . . . 48

VII.   THE GOVERNMENT'S OBJECTIONS TO MR. HAMMER'S MOTION TO DISMISS
       THIS CAPITAL RESENTENCING ON THE BASIS OF THE GOVERNMENT'S
       PRESENTATION OF PERJURED TESTIMONY AND REPEATED MISCONDUCT IN
       SUPPRESSING A SUBSTANTIAL VOLUME OF MATERIAL EXCULPATORY AND
       IMPEACHMENT EVIDENCE AND ITS USE OF A CLANDESTINE AGENT TO
       ILLEGALLY GATHER INCRIMINATING EVIDENCE FAIL.. . . . . . . . . . . . . . . . . 49

VIII.  CONCLUSION. .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | : | No. 4:96-CR-239 |
| | : | |
| v. | : | Honorable Joel H. Slomsky |
| | : | |
| DAVID PAUL HAMMER, | : | Capital Case |
| | : | |
| Defendant | : | |

_____:_____

### MR. HAMMER'S REPLY TO THE GOVERNMENT'S CONSOLIDATED BRIEF IN OPPOSITION

Defendant, David Paul Hammer, through counsel, submits his Reply to the government's Consolidated Brief In Opposition, Doc. 1684, and in support thereof, states the following:

### I.    INTRODUCTION.

In response to the continuing and seemingly endless revelations of misconduct in this case, Mr. Hammer has filed a number of habeas and pretrial motions seeking a new trial, to bar capital resentencing, and/or to exclude evidence that is tainted by the misconduct.  The government's *Consolidated Brief in Opposition* (hereinafter *BIO*) responds by accusing the defense of having "seriously lost contact with reality." *BIO* at 87.  Given the government's history of misrepresentations in this case, perhaps

such an attack is not surprising.  It is also a blustery smokescreen divorced from the realities of the record.

The government's *BIO* now argues that Upton's admitted perjury is not <u>Brady</u> evidence.  This is peculiar, given current government counsel's prior admission that its recent disclosure of Upton's perjury was "pursuant to [the government's] obligations under <u>Brady v. Maryland</u>".  (Doc. 1642-1).  The government's *BIO* contends that Mr. Hammer's *Amended/Supplemental 2255 Motion* (hereinafter, *2255 Motion*) is a successor petition.  This is similarly odd, given its own acknowledgment elsewhere in the *BIO* that the Third Circuit has already said otherwise.  And as for "contact with reality," it is the government – not Mr. Hammer – that has characterized as "Facts" in its *BIO* assertions that are not actually facts at all, assertions that are not contained in *any* testimony or record evidence admitted in this case, or that arise from testimony or evidence that Mr. Hammer has already disputed (and refuted) during the hearing before Judge Muir.  Moreover, the government's legal arguments also have lost contact with the record and the law of this case.  In its *BIO*, the government relies on – and in large part merely repeats – arguments that have already (twice) been rejected by the District Court in its opinion and orders granting a new sentencing hearing and denying the government's motion to reconsider that order.

As demonstrated more fully below, nothing offered by the government supports

its contention that Mr. Hammer's *2255 Motion* is a successive motion or that the claims presented in that habeas motion are procedurally barred; nothing offered by the government supports its contention that relief is not required; and nothing offered by the government supports its contention that Mr. Hammer's motions in limine should not be granted. Mr. Hammer is entitled to the relief he seeks. But at a minimum, the government's injection of extra-record information and its dispute of material facts requires an evidentiary hearing on these matters. See Machibroda v. United States, 368 U.S. 487, 494 (1962); United States v. Costanzo, 625 F.2d 465, 470 (3d Cir. 1980) (finding a hearing was required because affidavits presented by the government were not part of the record and "not conclusive against the movant").

II.   **THE CLAIMS RAISED IN MR. HAMMER'S FIFTH AMENDED/SUPPLEMENTAL 2255 MOTION REQUIRE RELIEF OR, AT A MINIMUM, AN EVIDENTIARY HEARING.**

    A.   **The Government's Attempt to Characterize the *2255 Motion* as a Successor Fails.**

The government contends that the *2255 Motion* is a successor petition that requires Circuit approval. *BIO* at 55-56. However, Mr. Hammer's Section 2255 proceedings have not been completed and the government is well-aware of this fatal flaw in its "successor" contention because the Third Circuit has already told it so.

In its opinion dismissing the government's appeal of the District Court's order

3

granting a new sentencing hearing, the Third Circuit found it lacked jurisdiction because a "§2255 proceeding is not final until the prisoner has been resentenced." United States v. Hammer, 564 F.3d 628, 634 (3rd Cir. 2009). In reaching its conclusion, the Court relied on United States v. Andrews, 373 U.S. 334, 339 (1963), which held that "Where, as here, what was appropriately asked and appropriately granted was the resentencing of the petitioners, it is obvious that there could be *no final disposition of the §2255 proceedings until the petitioners were resentenced*." See also Hammer, 564 F. 3d at 632.

While the Court has issued an order directing that Mr. Hammer be resentenced, "the §2255 petition is not complete until the district court actually resentences the prisoner." United States v. Hadden, 475 F.3d 652, 663 (4th Cir. 2007) (*citing* Andrews, 373 U.S. at 340). Mr. Hammer has not been resentenced and the Section 2255 proceedings remain pending. As a petition cannot be successive of itself, the government's contention fails and this Court is free to consider the merits of Mr. Hammer's claims.

**B.    The Government's Other Attempts to Inject Unsupportable Procedural Defenses Fail.**

The government next argues that this Court should not consider the individual claims presented in Mr. Hammer's *2255 Motion* because Mr. Hammer purportedly

4

cannot show cause and prejudice to overcome a procedural default engendered by his waiver of direct appeal and guilty plea. In making this argument, it confuses and conflates the different standards that apply to determining cause and prejudice for Mr. Hammer's various claims arising from Brady v. Maryland, Napue v. Illinois, and prosecutorial misconduct/overreaching and asks this Court to apply a standard for prejudice that even the United States Supreme Court has refused to apply.

Relying on a distorted view of the Supreme Court's decision in United States v. Frady, 456 U.S. 152 (1982), the government contends that to establish cause and prejudice sufficient to overcome a procedural bar, the petitioner must prove "super prejudice," as opposed to the quantum of prejudice that would establish his entitlement to relief for the constitutional violation that formed the basis for his underlying substantive claim. *BIO* at 59-62. The government is wrong.

In Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974), the Supreme Court explained that there are two distinct types of constitutional violations: generic due process violations and those that implicate "a specific provision of the Bill of Rights." To prove prejudice from a generic violation, a defendant must show that the combination of errors "so infected the trial with unfairness as to make the resulting conviction [or sentence] a denial of due process." Id. Prejudice is established for specific constitutional violations based upon the substantive standard of prejudice set

forth by the Court for each constitutional provision.

To the extent there was any constitutional violation at issue in Frady, it was the former type of error. A District of Columbia petitioner had filed a collateral attack on the basis of an improper jury instruction that had not been preserved on appeal. The Court of Appeals applied a "plain error" standard, while the Supreme Court held that the proper standard was cause and prejudice. Frady had not raised his counsel's ineffectiveness, nor did he contend that the waiver of the issue on direct appeal had been the result of governmental interference or suppression. Under those circumstances, the Court held that Frady had not proven prejudice from this ordinary trial error because he had failed to demonstrate a "substantial likelihood the erroneous malice instructions prejudiced Frady's chances with the jury." Frady, 446 U.S. at 174.

Nothing in Frady changes the prejudice standard for cause and prejudice arising from the government's suppression of exculpatory evidence, presentation of materially false and misleading evidence, and the other misconduct described in Mr. Hammer's *2255 Motion* that implicates other specific provisions of the Bill of Rights.

Indeed, the Supreme Court has applied the underlying substantive standard of prejudice to satisfy the cause and prejudice inquiry overcoming procedural default when specific constitutional violations were in issue. In Banks v. Dretke, 540 U.S.

668, 691 (2004), the Supreme Court held that, for claims arising under Brady, "prejudice within the compass of the 'cause and prejudice' requirement exists when the suppressed evidence is 'material' for Brady purposes." See also Slutzker v. Johnson, 393 F.3d 373, 385 (3d Cir. 2004) ("The analysis of prejudice for the procedural default of a *Brady* claim is identical to the analysis of materiality under *Brady* itself") (*citing* Strickler v. Greene, 527 U.S. 263, 282 (1999); Banks v. Dretke, 540 U.S. 668 (2004)); Johnson v. Folino, 705 F. 3d 117, 128 (3d Cir. 2013) ("To demonstrate prejudice excusing the procedural default of a Brady claim, a habeas petitioner must show that the undisclosed evidence is material"); id. (noting that "cause and prejudice," which excuse procedural default, mirror the last two elements of a Brady violation"). Similarly, where the basis for cause and prejudice arises from counsel's ineffectiveness, the standard for prejudice is the same as the Strickland prejudice standard. See Hodge v. United States, 554 F.3d 372, 381 (3d Cir. 2009) (applying the Strickland prejudice standard to determine the prejudice prong of cause and prejudice for overcoming the default); Becht v. United States, 403 F.3d 541, 546 (8th Cir. 2005) (applying the Strickland prejudice standard to determine whether or not counsel's ineffectiveness constituted cause and prejudice to excuse default).

Likewise, where the cause is not a constitutional violation, but is analogous to one (as in the ineffective assistance of post-conviction counsel in failing to raise trial

counsel's ineffectiveness), the Court has imported the prejudice standard of the underlying substantive claim.  E.g., Martinez v. Ryan, 132 S. Ct. 1309, 1318-19 (2012).   To the extent that any other requirement is added to proof of the constitutional violation, the Court has said that the petitioner must establish that the underlying constitutional claim "is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit."  Id. at 1319.  This is certainly not an onerous requirement, for the Court cited its relatively generous case law on certificates of appealability to explain what it meant by "some merit."  Id. (citing Miller–El v. Cockrell, 537 U.S. 322 (2003) (the issue is adequate to deserve encouragement for further review)).

As described more fully in the *2255 Motion* and below, each of the claims raised by Mr. Hammer easily satisfy the "cause" requirement of an impediment external to the defense – they arise from facts and evidence not previously disclosed by the government.  This previously undisclosed evidence includes:  (1) evidence demonstrating that Upton committed perjury in Oklahoma and before this Court; (2) evidence demonstrating that Yager was acting as an agent for the government at the time he elicited purported statements from Mr. Hammer after Mr. Hammer had clearly and unequivocally invoked his right to counsel; and (3) evidence of the true nature of Classen's cooperation and expectations in exchange for his testimony on behalf of

the government tainted all aspects of the government's capital prosecution and resulted in multiple constitutional violations. Mr. Hammer has and will demonstrate that the failure to raise these constitutional violations previously rests at the feet of the government.

Mr. Hammer has demonstrated, and will demonstrate after an evidentiary hearing that the factual allegations arising from the government's recent disclosures are true and that those allegations establish both the existence of the multiple constitutional violations and prejudice from those violations. Accordingly, Mr. Hammer has and will demonstrate both cause and prejudice to overcome any default.

Contrary to the government's assertions, the fact that Mr. Hammer waived his direct appeal also does not create any bar to his Court's consideration of the merits of the claims presented in his *2255 Motion*. Mr. Hammer's decision to waive his appeal was based upon his assessment of the evidence as it had come in at trial and was predicated on the (false) belief "that he had a fair though not a perfect trial" and slim chances of winning an appeal on the record as it stood. United States v. Hammer, 226 F.3d 229, 233 (3d Cir. 2000). The Third Circuit found the waiver appropriate because Mr. Hammer "not only pleaded guilty but also obtained what he believes was a fair trial on the penalty phase of the case." Id. at 237. As the allegations in the *2255 Motion* demonstrate, the previously undisclosed evidence

9

indicates that Mr. Hammer's belief was not just wrong, but materially uninformed, as very little about the government's entire capital prosecution, from authorization, to pretrial, to trial, to the capital sentencing was "fair."

The entire proceedings were tainted and polluted with perjury, false testimony, presentation of evidence purportedly elicited from Mr. Hammer by deploying a secret agent of the government, and testimony that misled Mr. Hammer, the Court, and the jury regarding the nature and extent of expectations an inmate witness had in exchange for his testimony. The misconduct, false and misleading testimony and argument, and the undisclosed evidence regarding Upton, Yager and Classen rendered Mr. Hammer's waiver of his appeal involuntary, just as it rendered Mr. Hammer's guilty plea involuntary.

As the government appears to acknowledge (*BIO* at 64), where a plea and/or waiver is not knowing, intelligent, and voluntary, it is invalid and cannot stand. See Johnson v. Zerbst, 304 U.S. 458, 464 (1938); North Carolina v. Alford, 400 U.S. 25, 31 (1970) (a waiver must be a "voluntary and intelligent choice"). Here, the government's suppression of critical evidence surrounding Mr. Hammer's decision to enter his guilty plea and waive his right to appeal prevented him from making a knowing and intelligent choice, and rendered those waivers involuntary and constitutionally invalid.

10

The government relies heavily on statements Mr. Hammer made during the guilty plea hearing in its "Statement of the Facts" (*BIO* at 6-7) presumably as support for its contention that the guilty plea precludes any relief (see *BIO* at 63-65). Strikingly absent from the government's forty-nine page "Statement of Facts" is any acknowledgment that at the time of the initial sentencing hearing, the government had repeatedly characterized these same statements as "wishy-washy," see NT Vol. 27 at 110-11; id. at 117, or an attempt to create "wiggle room," id. at 108.

As the Brady evidence finally disclosed at the hearing before Judge Muir demonstrates, Mr. Hammer's statements during the guilty plea hearing were not, as the government had argued, some nefarious design, but were, instead, the truth.  Mr. Hammer said during the plea that it was a mutual decision for Mr. Marti to move into Mr. Hammer's cell.  NT Vol. 11 at 114.  The post-trial document provided to Mr. Runke in response to his FOIA request demonstrates that was true.  Mr. Hammer said that the ropes were used for other purposes.  Id.  The Brady FBI-302s demonstrate that was true.

As the evidence finally disclosed during Judge Muir's hearing and the more recently disclosed evidence demonstrates, Mr. Hammer entered his plea under a number of false impressions, all the result of the government's failure to disclose critical exculpatory evidence.  He was under the false impression there was no

extrinsic evidence supporting his at-plea statement that the ropes were used for other purposes and not indicative of any intent to kill.  But the government had in its possession FBI-302s that definitively established that to be the case, failed to disclose that evidence and then faulted the defense for failing to present that evidence, knowing that the defense could not because the government had withheld it.

Mr. Hammer was under the false impression that there was little evidence to support his at-plea statement that Mr. Marti's move into his cell was at his request, not Mr. Hammer's.  But the government had in its possession prison documentation demonstrating that this, too, was the case and still argued to the jury that it was Mr. Hammer's desire for Mr. Marti to move into his cell in order to effectuate his plan to kill Mr. Marti.

Mr. Hammer was under the false impression that there were no legal bases to challenge Yager's testimony.  But the government knew of – and suppressed evidence of – a number of bases for such challenges, not the least of which involved the government's complete disregard for Mr. Hammer's clear and unequivocal invocation of his right to counsel and deployment of Yager as its agent to obtain purported inculpatory evidence.  Mr. Hammer was under the false impression that there was little he could do to challenge Classen's credibility, but the government knew that Classen's expectations for leniency and assistance from the government in exchange

12

for his testimony was much greater than what it had presented at trial.

Mr. Hammer was under the false impression that there was no basis to challenge false testimony by Upton that was essential to proving the elements of each of the Oklahoma kidnapping, robbery, and shooting convictions. But, as the recent disclosure demonstrates, Upton admitted that his testimony that formed the basis for those Oklahoma convictions and the resulting 1200-year sentence was perjured.

Under these circumstances, there is much more than a "[r]easonable probability that, but for the [government's] misconduct [Mr. Hammer] would not have pleaded guilty and would have insisted on going to trial." Ferrara v. United States, 456 F.3d 278, 294 (1st Cir. 2006). The guilty plea was an involuntary product of the government's deception and suppression, and was constitutionally invalid.

For the same reasons, Mr. Hammer can demonstrate a reasonable probability that, but for the government's misconduct, he would not have believed his trial to have been fair and waived his right to appeal. Thus, neither the guilty plea nor the waiver of direct appeal constitute a bar to this Court's consideration of the merits of the constitutional claims raised in the *2255 Motion*. Moreover, the constitutional violations described in the Motion tainted and polluted all aspects of the government's capital prosecution against Mr. Hammer, resulting in a fundamental miscarriage of justice.

Finally, the government's attempt to mischaracterize the claims presented in Mr. Hammer's *2255 Motion* as "non-constitutional" is specious.  Mr. Hammer has demonstrated how each claim involved the violation of multiple constitutional provisions and that the constitutional violations resulted in prejudice.

### C.    Mr. Hammer is Entitled to an Evidentiary Hearing.

Section 2255 requires an evidentiary hearing "[u]nless the motion and the files and record of the case conclusively show that the prisoner is entitled to no relief."  28 U.S.C. § 2255(b).  Mr. Hammer has proffered facts which, if proven at an evidentiary hearing, would require relief.   Simply put, and counter to the government's suggestion, his motions cannot be dismissed and he cannot be denied relief on any of his claims without an evidentiary hearing.  Even if this Court gave due consideration to the government's properly pleaded facts (and even its unsupported non-record assertions), at a minimum, an evidentiary hearing is required.  See Fontaine v. United States, 411 U.S. 213, 214-216 (1977) (because the Court could not "conclude with the assurance required by the statutory standard 'conclusively show' that under no circumstances could the petitioner establish facts warranting relief under § 2255" remand was required for an evidentiary hearing on the petitioner's claim that his guilty plea was involuntary); United States v. McCoy, 410 F.3d 124, 134 (3d Cir. 2005) ("If [the] petition alleges any facts warranting relief under § 2255 that are not

clearly resolved by the record, the District Court was obliged to follow the statutory mandate to hold an evidentiary hearing"); United States v. Booth, 432 F.3d 542, 545-546 (3d Cir. 2005); United States v. Burrows, 872 F.2d 915, (3d Cir. 1989) ("An evidentiary hearing is usually required if the motion states a claim based on matters outside the record or events outside the courtroom").

Throughout its *BIO* the government proffers information it characterizes as "facts" that are not part of the record of this case – and in some cases are not "facts" at all – and asks that this Court deny relief on the basis of these purported "facts." This Court cannot accept the government's purported "facts" as true without an evidentiary hearing, even if those purported "facts" were presented in an affidavit – and they most assuredly are not in this case.  As the Supreme Court found:

> It is true that [the petitioner's allegations] are denied in the affidavits filed with the return to the rule, but the denials only serve to make the issues which must be resolved by evidence taken in the usual way. They can have no other office. *The witnesses who made them must be subjected to examination ore tenus or by deposition as are all other witnesses.* Not by the pleadings and the affidavits, but by the whole of the testimony, must it be determined whether the petitioner has carried his burden of proof and shown his right to a discharge. The Government's contention that his allegations are improbable and unbelievable cannot serve to deny him an opportunity to support them by evidence.

Walker v. Johnston, 321 U.S. 275, 286-87 (1941); see also Machibroda, 368 U.S. at 494-95; Costanzo, 625 F.2d at 470 ("Government affidavits filed in opposition to a

§ 2255 motion for postconviction relief are not part of the "files and records" of the case and are not conclusive against the movant"). Thus, by virtue of proffering these purported "facts," the government's Answer demonstrates that a hearing is required.

### D.    Mr. Hammer's Claims Require Relief.

**Claim I.    The Government's Presentation of Convictions and Sentences that Were the Product of Perjury and Materially False and Misleading Evidence to the Grand Jury and Its Failure to Inform the Grand Jury of Yager's Status as Its Agent Deployed for the Purpose of Circumventing Mr. Hammer's Invocation of His Right to Counsel Violated the Fifth and Eighth Amendments.**

As described more fully in the *2255 Motion*, the grand jury proceedings were constitutionally tainted because the government presented: (1) evidence of Mr. Hammer's convictions and 1200 year sentence in Oklahoma that were the product of perjured testimony; (2) testimony by Yager without informing the grand jury that this testimony was tainted by virtue of the government's deployment of Yager as its agent to circumvent Mr. Hammer's clear and unequivocal invocation of his right to counsel; and, (3) materially misleading and/or false testimony about the nature and extent of Yager's and Classen's expectations of benefits from the government in exchange for their testimony. Each of these instances of misconduct individually and/or cumulatively violated the Fifth, Sixth and Eighth Amendments.

The government provides nothing to dispute the legal bases offered by Mr.

16

Hammer demonstrating his entitlement to relief. Nor does the government dispute Mr. Hammer's proffer regarding the likelihood that the grand jury was exposed to additional (constitutionally tainted) testimony or evidence surrounding the Oklahoma convictions and 1200 year sentence that were the product of perjury. Indeed, the government is silent on this claim in its entirety.

To the extent the government relies on its procedural contentions, for the reasons described above, those contentions fail. To the extent the government relies on any factual disputes of the allegations presented in the *2255 Motion*, as described above, an evidentiary hearing is required.

Indeed, much of what the government presents in its "Statement of Facts" does less to resolve the factual issues supporting Mr. Hammer's claims as create even more questions, particularly regarding the veracity of Upton's testimony and Yager's role as a government agent, both of which formed a critical part of the grand jury's deliberations. For example, the government indicates that Upton claimed he did not disclose the truth about his encounter with Mr. Hammer "because he was concerned that in 1983, he would be discriminated against by law enforcement because he was a homosexual victim." *BIO* at 47. However, Upton's homosexuality was a part of the record of the Oklahoma case from the beginning and nothing by the prosecutor or the police would have given Upton any indication that the state did not intend to

17

aggressively prosecute Mr. Hammer.  Indeed, Lou Keel, the state prosecutor, filed an at-trial motion in limine to preclude Mr. Hammer from presenting evidence of Upton's homosexuality and, during the argument on that motion, made it clear that he was well-aware of that fact.  See Exhibit R-1 (State v. Hammer, CR-84-1310 (Mtn in Limine)); Exhibit R-2 (State v. Hammer, CR-84-1310 (NT Vol. I, pp. 5-7)).

Upton told current government counsel that at the time of Mr. Hammer's resentencing, someone, possibly from the United States Attorney's Office, challenged his version of events and asked if he had met Mr. Hammer at a bar.  *BIO* at 47. Subsequently, he indicated that "it was actually Lou Keel, the Oklahoma State prosecutor, who asked him that question."  Id.  However, the government has recently disclosed an FBI-302 interview of Mr. Keel in which Mr. Keel indicates that he has no recollection of even encountering Upton during the capital sentencing proceedings, let alone confronting Upton about his lies.  Exhibit R-3 (Keel FBI-302). Accordingly, it was apparently the federal prosecutor, not a state prosecutor, who had confronted Upton and the government's attempt to avoid relief on this basis fails.[1] At a minimum, a hearing is required to resolve the contradictory representations.

---

[1]Even if it was Keel who had asked the question, as demonstrated in the *Section 2255 Motion* and as Mr. Hammer expects to demonstrate at an evidentiary hearing, because he did so working in-concert with the Assistant United States Attorney, the government remains liable for its failure to discharge its obligations under Brady and Napue.

The government's reliance on its recitation of an excerpt from a book as "evidence" disputing this and other claims arising from Upton's perjured testimony is similarly unavailing. Upton presented his story – that he now admits was false – under oath in at least four court proceedings, including proceedings before this Court and possibly before the grand jury as well. There is certainly no comparison between an excerpt in a book and sworn testimony, nor does the excerpt from that book diminish the constitutional impact of Mr. Upton's perjured testimony on the grand jury proceedings.

The Oklahoma jury that found Mr. Hammer guilty of the kidnapping, robbery and shooting counts and sentenced Mr. Hammer to 1200 years did not hear about any excerpt from a book (published twenty years after the trial), but it did hear Upton's perjury. Moreover, nothing in the excerpt from the book disputes that Upton committed perjury, that this perjured testimony formed the basis for the jury's verdicts as well as the jury's determination to sentence Mr. Hammer to 1200 years.

The government contends that Upton's perjured testimony makes no difference because the (extremely questionable) version Upton gives now nevertheless establishes kidnapping and robbery, albeit at a later point in the incident. *BIO* at 46. However, the state prosecutor's case regarding the kidnapping and robbery counts was based on Upton's (perjured) version of events regarding his initial encounter with

19

Mr. Hammer and the circumstances leading up to their arrival at the hotel, not any subsequent events that may or may not have happened in Upton's new version. See Exhibit R-4 (State v. Hammer, CRF 84-1310, NT Vol. II at OK NT-004: "What Mr. Upton told you what occurred that night, it's uncontroverted testimony that somebody got in his car, pointed a gun and took custody, took his control away from him and directed him to other destinations"); id. (NT Vol. II at OK NT-006: Mr. Upton "was kidnapped at 36th and Classen")); id. (NT Vol. II at OK NT-006: "No matter how many times he has this man cross examining him at preliminary hearing or reports it to detectives or reports it to police officers, he was kidnapped at 36th and Classen"). Thus, the kidnapping and robbery counts arose from Upton's (perjured) testimony about what happened during his first encounter with Mr. Hammer, not any subsequent events.

The government's skewed view that what may have been in an excerpt in a book or what Upton may now be saying might establish some type of kidnapping, robbery, or some other felony (and it does not), does not diminish the constitutional violations arising from the Oklahoma jury's reliance on Upton's perjured testimony regarding the counts for which Mr. Hammer was actually prosecuted; the same jury's reliance on that perjury in reaching its 1200 year sentencing determination; and, the government's reliance on the constitutionally invalid convictions and sentences in

20

support of Mr. Hammer's indictment, capital prosecution and death sentence.

The government's "facts" with regard to Yager are similarly disputed and, at a minimum, require an evidentiary hearing. For example, the government contends that "Yager maintained that Hammer initiated the contacts with him" *BIO* at 49, while at the same time acknowledging that "[a]fter the murder, Yager asked Hammer why he committed the murder," *BIO* at 15. The government also acknowledges it was Yager, not Mr. Hammer, who was free to move from cell to cell during this time period. Thus, it would have been impossible for Mr. Hammer to have "initiated the contacts" and based on the government's own admissions, and the record, it was Yager that approached Mr. Hammer, it was Yager that asked the first question that set the wheels in motion, and it was Yager that provided the pencil or pen and paper so that he could collect inculpatory evidence. See Doc. 1642 at ¶ 30.

The government contends that, because FBI Special Agents Malocu and Thompson deny sending Yager in to collect information, there is no constitutional violation. *BIO* at 76-77. At the same time, the government acknowledges that Yager was considered "a reliable source for the Special Investigative staff at USP Allenwood," *BIO* at 48, and that Yager had recently verified his longstanding informant relationship with SIS investigators, particularly Lt. Bell, *BIO* at 50. In addition, the government just recently provided an FBI-302 of an interview with

21

former SIS Investigator Traxler in which Mr. Traxler indicates that the BOP was using Yager to collect information and that the various investigators used inmates as informants as a matter of course, and did so with little or no documentation. See Exhibit R-5 (Traxler FBI-302). Thus, even based on the government's own factual proffers, Yager was already an informant known to the government investigators and in the perfect position to be utilized as an agent to obtain inculpatory evidence.

Whether it was the FBI or the BOP investigators who sent Yager in to collect information from Mr. Hammer makes no difference in constitutional terms. The BOP investigators were working in-concert with the FBI and the United States Attorney from the beginning to end in this capital prosecution and, as a result, the government is charged with knowledge of what the BOP investigators had, knew and did. See United States v. Risha, 445 F. 3d 298, 305 (3d Cir. 2006).

The government also contends that Yager has now back-tracked from his claim that someone sent him in to collect evidence and attempts to explain his statement away on the basis of purported drug use. *BIO* at 51. Whether Yager's initial claim that he was an agent or his subsequent claim that he was not is true cannot be determined without an evidentiary hearing.

For each of these reasons, as well as those presented in the *2255 Motion*, nothing offered by the government supports its contention that relief is not warranted

and Mr. Hammer is entitled to relief or, at a minimum, an evidentiary hearing.

> **Claim II.    The Government's Use of Inmate Yager as Its Agent to Circumvent Mr. Hammer's Clear and Unequivocal Invocation of His Right to Counsel Violated the Fifth, Sixth and Eighth Amendments.**

The government fails to provide a specific answer to this claim. To the extent the government relies on its meritless procedural defenses, for the reasons described above, those defenses fail and there is no bar to this Court's consideration of the merits of this claim. To the extent the government relies on its answer to Mr. Hammer's Motion in Limine to preclude the government's admission of Yager's testimony in the resentencing hearing, those contentions also fail for a number of reasons. First, as noted previously, despite the government's attempt to characterize the encounter between Yager and Mr. Hammer as one initiated by Mr. Hammer, the record evidence demonstrates the opposite: it was Yager who initiated the contact, it was Yager who provided Mr. Hammer with pencil and paper and it was Yager who asked Mr. Hammer to explain why he killed Mr. Marti. See Claim I; see also Doc. 1642 at ¶ 30. Thus, this was not a situation of "happenstance" but, instead, a direct result of the government's deployment of Yager as its agent to obtain inculpatory information.

The government's attempt to characterize this as "happenstance" is further

disputed by a comparison of Yager's interviews with investigators with what the prison did with Mr. Hammer after he invoked his right to counsel during the first interrogation. Mr. Hammer invoked counsel on April 13, 1996. Yager was first interviewed on April 13, 1996, after Mr. Hammer had invoked his right to counsel. Doc. 1642-1, Exhibit 6. The prison kept Mr. Hammer in a separate cell on the same tier from April 13, 1996 until April 16, 1996. During that time, Yager was roaming the tier, approaching Mr. Hammer's cell and initiating conversations with Mr. Hammer regarding the death of Mr. Marti. NT Vol. 4 at 82.

On April 16, 1996, the prison transferred Mr. Hammer from the Allenwood SHU to the Medical Unit. On April 17, 1996, Mr. Hammer was moved from the Medical Unit to Allenwood FCI. Yager was interviewed again by investigators on April 17, 1996, and it is during this interview that Yager turned over the letter he claimed he had obtained from Mr. Hammer during the days between his first interview and Mr. Hammer's transfer out of that location.

There is nothing to explain why the prison left Mr. Hammer in that tier for four days unless it was to facilitate Yager's access to Mr. Hammer in order to collect inculpatory evidence. For this reason as well, the government's "happenstance" argument fails.

Second, contrary to the government's contention, see *BIO* at 80, Mr. Hammer's

24

invocation of his right to counsel was clear and unequivocal.  Mr. Hammer did not say "maybe" he should get a lawyer, as occurred in the authority cited by the government.  See Davis v. United States, 512 U.S. 412 (1994).  Instead, he said "I had better get me a lawyer."  There was no equivocation, there was no hesitation, there was no question.  It was clear enough for the investigators to terminate the interview.

The government attempts to change the constitutional standard from an *invocation* of his right to counsel to *obtaining counsel* by arguing that Mr. Hammer did not request counsel.[2]  It is the invocation of the right that implicates the Fifth Amendment.  Once Mr. Hammer invoked his right to counsel, the investigators were precluded from interrogating him until he was provided counsel, whether that was by his own design or through the assistance of a Court.  See Edwards v. Arizona, 451 U.S. 477, 484 (1981) ("having expressed his desire to deal with the [investigators] only through counsel," Mr. Hammer was not "subject to further interrogation by the authorities until counsel [had] been made available to him, unless [Mr. Hammer] himself initiate[d] further communication, exchanges, or conversations with the

---

[2]Nor, as the government contends, was Mr. Hammer's statement merely some "flippant" remark.  *BIO* at 81.  Mr. Hammer will demonstrate at an evidentiary hearing that, following the termination of that particular interrogation, Mr. Hammer requested access to the phone and assistance in obtaining contact information in order to attempt to speak with counsel.  However, even if he had not made these efforts, his invocation alone nevertheless constitutionally required investigators to cease all interrogation, including interrogation through an agent.

[investigators]"). Accordingly, the government's attempts to avoid relief on this basis also fails.

Finally, the government's contention that there is no harm because the jury was aware that Yager was an informant for the BOP also fails as a matter of fact and law. *BIO* at 77. As a matter of fact, it made matters worse. The jury was told that Yager was considered a reliable informant but not also told that Yager's conduct in initiating questioning with Mr. Hammer and obtaining inculpatory evidence was done in direct violation of Mr. Hammer's right to counsel. As a matter of law, it is irrelevant since the government's use of Yager as an agent to circumvent Mr. Hammer's invocation of his right to counsel required suppression of the evidence.

For these reasons, those set forth above and those described in the *2255 Motion*, relief, or at a minimum, an evidentiary hearing is required.

> **Claim III.   The Government's Failure To Provide Petitioner With Material Exculpatory Evidence Prior To His Mid-Trial Guilty Plea Vitiates The Alleged Voluntariness Of The Plea And Warrants A New Trial.**

The government fails to submit a specific answer to this claim. To the extent the government relies on its meritless procedural defenses, for the reasons described above, those fail and there is no bar to this Court's consideration of the merits of this claim. To the extent the government relies on its allegations surrounding Mr.

Hammer's guilty plea in its "Statement of Facts" and its discussion of procedural bar, for the reasons described above, those contentions fail.

As indicated above and in the *2255 Motion*, as is now clear, a great deal of that which Mr. Hammer relied on in reaching his determination to enter a guilty plea is false and it was the government that suppressed this information that would have directly impacted Mr. Hammer's decision to plead guilty. Under these circumstances, there is much more than a "[r]easonable probability that, but for the [government's] misconduct he would not have pleaded guilty and would have insisted on going to trial," Ferrara v. United States, 456 F.3d 278, 294 (1st Cir. 2006). The previously undisclosed evidence rendered Mr. Hammer's plea unknowing, involuntary and constitutionally invalid. Relief or, at a minimum, an evidentiary hearing is required.

> **Claim IV.    The Government's Failure to Disclose Material Exculpatory Evidence and Its Reliance on Materially Misleading and False Testimony Violated the Fifth, Sixth and Eighth Amendments.**

As described more fully in the *2255 Motion*, the government has made a number of disclosures of material exculpatory evidence that, despite its continuing obligations under Brady v. Mayland, it failed to disclose to Mr. Hammer prior to trial, during trial, on appeal, or during his habeas proceedings. These disclosures involve exculpatory information about critical prosecution witnesses at both the guilt and

penalty phases of Mr. Hammer's 1998 trial.  Doc. 1642 at 69-89.  Also as set forth in the *2255 Motion*, these disclosures also reveal that the government presented false and/or materially misleading testimony and argument.  Id. at 89-94.

The government does not specifically respond to this claim.  To the extent the government relies on its meritless procedural defenses, for the reasons described above, those fail and there is no bar to this Court's consideration of the merits of this claim.  To the extent the government relies on its response to Mr. Hammer's motions in limine, see *BIO* at 82-88, those contentions also fail on the facts and on the law.

Throughout the pretrial, trial and even during the Section 2255 proceedings prior to the hearing conducted by Judge Muir, the government assured the defense that it had provided all materials required under Brady and its progeny.  Judge Muir relied on the government's (mis)representations in denying Mr. Hammer's pre-hearing motion for discovery.  See Hammer, 404 F. Supp. 2d at 781 ("There is no indication that the Government has not complied with the requirements of *Brady* or its progeny"). As became evident during the closing days of the hearing, and as has become even more evident recently, those assurances were far from true.

As it did during the proceedings before Judge Muir, the government contends that it "had no obligation to disclose to defense counsel documents setting forth facts that the defendant himself knew or had reason to know." *BIO* at 83.  As a factual

28

matter, the government is wrong that Mr. Hammer "knew or should have known" of any of the exculpatory evidence the government suppressed and Judge Muir's findings with regard to the previously undisclosed FBI-302s demonstrates that the government is wrong. Judge Muir found:

> In the present case the information the Government failed to disclose primarily relates to statements of third parties regarding what they knew or observed about Mr. Hammer. The Government presented no evidence during the section 2255 hearing indicating that prior to trial in 1998 Mr. Hammer knew that Messrs. Johnson, Fowler, Ball and Guerrero were interviewed by the FBI. Also, the Government presented no evidence that Mr. Hammer knew what those inmates' observations were regarding Mr. Hammer's behavior or what they had told the FBI regarding his statements or conduct.

Hammer, 404 F. Supp. 2d at 798.[3]   The same analysis applies to the most recent disclosures. The government does not, and it cannot, argue that Mr. Hammer had any way of knowing, or even suspecting, that Yager was deployed by the government as its agent to circumvent his clear invocation of his right to counsel, nor can the government seriously argue that Mr. Hammer should have known, or suspected, that Classen's expectations regarding benefits in exchange for his testimony were far more extensive than that disclosed by the prosecution. Instead, the government contends that, because Mr. Hammer had to know that Upton was lying, the government's

---

[3]Notably absent from the government's argument that there was no Brady error regarding the FBI-302s withheld until the hearing before Judge Muir is any reference or argument regarding the Guerrero FBI-302.

29

failure to disclose what the government knew about Upton's perjury was not error.

*BIO* at 87. Of course, that is not the constitutional standard. Indeed, taking the government's contention to its logical conclusion, the prosecution would not be required to disclose any exculpatory evidence, particularly where the accused is innocent, because the accused knows he is innocent and, therefore, must also know that anything the government presents disputing his innocence is false.

Moreover, the government is wrong as a matter of law. Controlling Supreme Court precedent forecloses any such "constructive knowledge" Brady exception. In both Strickler v. Greene, 527 U.S. 263, 285 (1999), and Banks v. Dretke, 540 U.S. 668 (2004), the Supreme Court rejected the very argument the Government makes here. In Strickler, the warden argued that its failure to disclose did not violate Brady "because the factual basis for the assertion of a Brady claim was available to state habeas counsel." 527 U.S. at 284 (noting respondent's argument that there was no Brady violation for failure to turn over reports of additional interviews with a witness because defense counsel should have been aware of those additional interviews). The Court rejected this argument:

> [I]f a prosecutor asserts that he complies with Brady through an open file policy, defense counsel may reasonably rely on that file to contain all materials the State is constitutionally obligated to disclose under Brady.

If it was reasonable for trial counsel to rely on, not just the presumption that the prosecutor would fully perform his duty to disclose all exculpatory materials, but also the implicit representation that such materials would be included in the open files tendered to defense counsel for their investigation, we think such reliance by counsel appointed to represent petitioner in state habeas proceedings was equally reasonable.

Id. at 283-84.

In Banks the state argued that Banks's lack of diligence in investigating the undisclosed matters foreclosed Brady relief. 540 U.S. at 695. Unlike Strickler, the prosecutor in Banks did not maintain an open file policy, but did assert in state post-conviction proceedings that "'nothing was kept secret from the defense.'" Id. at 683. Banks emphatically rejected the state's argument:

We rejected a similar argument in Strickler. There, the State contended that examination of a witness' trial testimony, alongside a letter the witness published in a local newspaper, should have alerted the petitioner to the existence of undisclosed interviews of the witness by the police. 527 U.S., at 284, and n. 26. We found this contention insubstantial. In light of the State's open file policy, we noted, "it is especially unlikely that counsel would have suspected that additional impeaching evidence was being withheld." Id., at 285. *Our decisions lend no support to the notion that defendants must scavenge for hints of undisclosed Brady material when the prosecution represents that all such material has been disclosed.* As we observed in Strickler, defense counsel has no "procedural obligation to assert constitutional error on the basis of mere suspicion that some prosecutorial misstep may have occurred." 527 U.S., at 286-287.

The State here nevertheless urges, in effect, that the prosecution can lie and conceal and the prisoner still has the burden to . . . discover

the evidence, so long as the potential existence of a prosecutorial misconduct claim might have been detected. *A rule thus declaring "prosecutor may hide, defendant must seek," is not tenable in a system constitutionally bound to accord defendants due process.*

\*          \*          \*

In summary, Banks's prosecutors represented at trial and in state postconviction proceedings that the State had held nothing back. . . . It was not incumbent on Banks to prove these representations false; rather, Banks was entitled to treat the prosecutor's submissions as truthful.

540 U.S. at 695-96, 698 (internal quotation marks omitted).

In this case, the prosecution also represented that it had held nothing back, to the extent that it convinced the Court to deny Mr. Hammer's request for disclosure. Contrary to the Government's suggestion, "[i]t was not incumbent on [Mr. Hammer] to prove these representations false; rather, [Mr. Hammer] was entitled to treat the prosecutor's submissions as truthful." Banks, 540 U.S. at 698.

Indeed, if anything, the prosecution's conduct here was one step more egregious than that confronted by the Supreme Court in Banks and Strickler, because here the prosecutor compounded the impact of his suppression by capitalizing on it in his closing argument. Cf. Napue v. Illinois, 360 U.S. 264 (1959); Paxton v. Ward, 199 F.3d 1197, 1216-18 (10th Cir. 1999).

In light of the foregoing authority it is clear that the rule sought by the government is contrary to controlling Supreme Court precedent. However, even the

32

cases the government *does* cite in support of its "constructive knowledge exception" do not support its application to Mr. Hammer's case. None applied such an exception to comparable facts. Three involved non-disclosure where the relevant facts were known both by *defense counsel and the defendant*, United States v. Diaz, 922 F.2d 998, 1007 (2d Cir. 1990); Fullwood v. Lee, 290 F.3d 663, 686 & n.13 (4th Cir. 2002); United States v. Pelullo, 399 F.3d 197, 214 (3d Cir. 2005). A fourth refused to apply any "constructive knowledge exception" because the relevant facts were not known by defense counsel. United States v. Perdomo, 929 F.2d 967, 973 (3d Cir. 1991). Cf. Strickler, 527 U.S. at 283-85 (defense excused from advancing Brady claim because "trial counsel were not aware of the factual basis," the state impeded "trial counsel's access to the factual basis," "petitioner's lawyers . . . [may not] have known" of the suppressed records, and "it is especially unlikely that counsel would have suspected that additional impeaching evidence was being withheld"). Here, of course, neither Mr. Hammer nor counsel knew of the recently disclosed exculpatory evidence in the government's possession and knowledge. A fifth case relied on by the government is simply inapposite. No undisclosed material ever was identified, and the court found it "plain that what West wants is discovery as to *whether* the prosecution had such evidence." West v. Johnson, 92 F.3d 1385, 1399 n.20 (5th Cir. 1996).

For each of these reasons, and those set forth in the *2255 Motion*, the

government's attempts to avoid grant of relief on the basis of its "blame the defendant" for the government's failure to discharge its constitutional obligations fails.  Mr. Hammer is entitled to relief or, at a minimum, an evidentiary hearing.

The government fails to mention, let alone address, Mr. Hammer's claims arising from the prosecution's presentation of materially false and/or misleading testimony and argument.  See Doc. 1642 at 89-94.  For the reasons set forth in the *2255 Motion*, and those described above, relief or, at a minimum, an evidentiary hearing is required.

**Claim V.   The Jury's Consideration of Convictions and Evidence That Were the Product of Perjury In Reaching Its Sentencing Determination Violated the Fifth, Sixth and Eighth Amendments.**

The government does not specifically respond to this claim.  To the extent the government relies on its meritless procedural defenses, for the reasons described above, those fail and there is no bar to this Court's consideration of the merits of this claim.  To the extent the government relies on its response to Mr. Hammer's motions in limine, see *BIO* at 73-76, those contentions also fail on the facts and on the law.

The government does not address, or even acknowledge, the constitutional violations presented in the *2255 Motion* arising from the jury's consideration of false and misleading testimony, evidence and argument in reaching its sentencing

34

determination. Instead, relying on <u>Daniels v. United States</u>, 532 U.S. 374 (2001), the government contends that Mr. Hammer cannot challenge the validity of a prior conviction used to enhance his federal sentence. The government is wrong for a number of reasons.

First, Mr. Hammer's claim involves much more than an attempt to collaterally attack the validity of a prior conviction. It involves the government's presentation of perjury. It involves the government's presentation of, and reliance on, convictions that were the product of perjury in support of a death sentence. In involves the capital jury considering false and materially misleading testimony, evidence and argument in reaching its sentencing determination. Nothing in <u>Daniels</u> addressed these constitutional violations and, not surprising, the government fails to explain how <u>Daniels</u> somehow overrules or alters the clearly established capital precedents provided in Mr. Hammer's *2255 Motion* requiring relief.

Moreover, contrary to the circumstances in <u>Daniels</u>, the prosecution here relied on much more than just the fact of the convictions. The government elicited, and the jury considered, convictions that were a direct product of Mr. Upton's false testimony. The government presented Upton's prior (perjured) testimony that falsely described the circumstances leading up to the shooting. The government argued that the jury should consider purported similarities between those circumstances and the

government's theory with regard to the circumstances of the death of Mr. Marti. The government invoked Upton's perjured testimony regarding Mr. Hammer's purported kidnapping and confinement of Mr. Upton to falsely argue that the two cases shared a "hostage theme" that was prevalent in Mr. Marti's death. In short, the government relied upon Mr. Upton's false and materially misleading testimony as support for its statutory and non-statutory aggravating evidence, to rebut Mr. Hammer's mitigating evidence, and to tip the weighing process between aggravation and mitigation in favor of death. Thus, even if the Daniels holding was somehow applicable, and it is not, that decision does not address the multiple constitutional violations arising from the jury's consideration of the false and misleading testimony and argument above and beyond the convictions themselves.

Moreover, unlike Daniels, this is not a case in which the petitioner is challenging the convictions on the basis that the guilty pleas were invalid or counsel in those cases was ineffective. Instead, this is a case in which the testimony that formed the basis for the convictions was false. In reaching its conclusion, the Daniels Court recognized that there was an exception to the rule precluding collateral attacks on prior convictions in cases in which the defendant had not been provided counsel. Daniels, 532 U.S. at 377-78. In Custis v. United States, 511 U.S. 485,  (1994), the Court explained that the reason for this exception was because the denial of counsel

in violation of the Sixth Amendment presented "a unique constitutional defect" that required a remedy.  See also Daniels, 532 U.S. at 377-78.  A conviction that is the product of perjury also constitutes a "unique constitutional defect" that requires a remedy.  Thus, even if Daniels applied to this claim, it does not preclude this Court from considering the merits and granting relief.

Finally, as noted previously, the government's attempts to disregard the admitted perjury that formed the basis for the Oklahoma jury's guilt and sentencing determination and request that this Court accept its unfounded theory that Mr. Hammer is guilty on the basis of different evidence and different theories fails.  See Section II.D. Claim I.  For these reasons, those presented above and in the *2255 Motion*, relief or at a minimum, an evidentiary hearing is required.

**Claim VI.  The Government's Reliance on Convictions and Sentences that Were the Product of Perjury and Materially False and Misleading Testimony and Evidence In Reaching Its Capital Authorization Determination And Its Subsequent DeAuthorization Determinations Violated the Fifth, Sixth, and Eighth Amendments.**

As described in the *2255 Motion*, the government's consideration of convictions and sentences that were the product of perjury in reaching its authorization decision and its decision not to deauthorize this capital prosecution violated the Fifth, Sixth and Eighth Amendments.  See Doc. 1642 at 104-114.  The

government does not deny that the government considered the convictions and sentences that were the product of perjury.

Instead, it essentially argues that its capital authorization determination is untouchable under *any* circumstances. The government makes the remarkable contention that an agency determination on the basis of perjury does not "offend 'some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *BIO* at 72 (citing Medina v. California, 505 U.S. 437, 445 (1992)).  If perjury does not offend the firmly rooted basic principles of justice, then nothing does.

The government's exercise of its discretionary power was grounded in Mr. Upton's perjury.  Whatever deference is traditionally owed the prosecution's discretion for capital authorization determinations must stand aside when that determination is based on perjury in order to preserve the integrity and dignity of the justice system and our concept of ordered liberty.

Nor, as the government contends, is the Court powerless to enforce a defendant's constitutional rights or remedy the government's violation of a defendant's constitutional rights. While the Court does not have the power to force a government prosecutor to sign an indictment, see United States v. Cox, 342 F. 2d 167, 172 (1965), it does have the power to dismiss a constitutionally invalid or

38

insufficient indictment.   Thus, the government's attempt to place its executive function over the constitution and the Court's power to enforce the constitution fails. For these reasons, as well as those presented in the *2255 Motion*, Mr. Hammer is entitled to relief.

> **Claim VII.   The Government's Presentation Of Perjured Testimony In The Prior Capital Sentencing Proceeding Combined With Its Failure To Disclose Significant And Material Exculpatory Evidence Prior To Trial Warrants Dismissal.**

As set forth in the *2255 Motion*, the combined impact of the government's pervasive misconduct, non-disclosure and presentation of false and materially misleading testimony, evidence and argument requires dismissal.  See Doc. 1642 at 114-122.  The government offers no response to this claim.  To the extent the government relies on its meritless procedural defenses, for the reasons described above, those fail and there is no bar to this Court's consideration of the merits of this claim.  To the extent the government relies on its response to Mr. Hammer's motion to dismiss, see *BIO* at 82-84, those contentions also fail.  Indeed, the government does not address, or even acknowledge the legal bases presented in the *2255 Motion*. Instead, the government merely restates its objections to the Court's previous grant of relief on the basis of the government's failure to disclose the FBI-302s.  As noted previously, the Court has twice rejected these contentions and the government's

contentions fail on the facts and the law. See Section II.D. Claim IV.

The government completely ignores the full nature of Mr. Hammer's claim arising from the cumulative impact of the misconduct already found by the Court; the recently disclosed misconduct arising from the government's deployment of Yager as its agent to circumvent Mr. Hammer's invocation of his right to counsel; the government's failure to disclose material exculpatory evidence regarding Classen; and, the government's presentation of, and reliance on, perjured/materially false testimony and argument in seeking Mr. Hammer's death. For the reasons set forth in the *2255 Motion*, the cumulative impact of these constitutional errors requires relief or, at a minimum, an evidentiary hearing.

## E.    Conclusion.

For all of the reasons stated above, and those set forth in the *2255 Motion*, the government's procedural and substantive objections fail and relief is required.

## III.    THE GOVERNMENT'S OBJECTIONS TO MR. HAMMER'S MOTION IN LIMINE TO PRECLUDE/SUPPRESS YAGER'S TESTIMONY FAIL.

As described in his *Motion in Limine to Preclude/Suppress the Testimony of Leonard Yager* (Doc. 1645) and his *Brief in Support*, (Doc. 1646), the government sent Leonard Yager in to collect inculpatory evidence after Mr. Hammer had invoked his right to counsel and then failed to inform the defense that Yager had been an agent

for the government in violation of the Fifth, Sixth and Eighth Amendments.

Although the government concedes that Yager recently told the government that he had been sent in at the behest of the government, relying on a subsequent contradictory statement, the government speculates that Yager's "recollection . . . is now less than perfect" and that his admission that he was a government agent was "confused and likely mistaken." *BIO* at 76. The government's view of which statement by Yager is true or correct is not determinative. That is a question for the Court that can only be made after hearing Yager's testimony subject to cross-examination. Thus, the government's proffer of contradictions with regard to Yager's statements requires a hearing, not denial of relief.

Similarly, the government's attempt to avoid preclusion on the basis of its proffer that neither FBI Agent Malocu nor Agent Thompson sent Yager in to collect evidence against Mr. Hammer fails for two reasons. First, whether or not those denials are credible is a question for the Court, after viewing their demeanor in a hearing, subject to cross-examination. Second, as noted above, the statements by Yager and Mr. Traxler (see *BIO* at 48, 50; see also Exhibit R-5), demonstrate that it was likely a BOP investigator or officer who had used Yager to collect information in direct violation of Mr. Hammer's right to counsel. Whether it was the BOP or an FBI Agent, the constitutional error remains because the BOP was working in-concert

with the FBI and the United States Attorney.  See United States v. Risha, 445 F. 3d 298, 305 (3d Cir. 2006); see also Section II.D. Claim I.  Moreover, as noted previously, Mr. Hammer will present evidence demonstrating that the movement (or more accurately, the failure to move Mr. Hammer) demonstrates that the investigators left Mr. Hammer on the tier in order to facilitate Yager's access to Mr. Hammer.  For these reasons as well, a hearing is required.

The government's contention that Mr. Hammer did not invoke his right to counsel similarly fails as a matter of fact and law.  As noted previously, Mr. Hammer indicated that he had better get a lawyer.  Once he said that, the investigators terminated the interrogation.  Mr. Hammer will present evidence that Mr. Hammer asked for access to a phone and contact information for an attorney and that he contacted two attorneys, although such evidence is not required to show an invocation of the right to counsel.

As a matter of law, even if Mr. Hammer had not made any efforts to obtain counsel, his statement to the investigators was nevertheless a clear invocation of his right to counsel and the investigators were constitutionally obliged to (and did) terminate the interrogation and refrain from initiating any further interrogation until Mr. Hammer had obtained counsel – whether by court appointment or otherwise.  See Edwards, 451 U.S. at 484; see also Section II.D. Claim II.  The government's attempt

to avoid suppression on this basis also fails.

For these reasons, and those set forth above and in the prior submissions, Mr. Hammer is entitled to preclusion/suppression of this evidence or, at a minimum, an evidentiary hearing.

## IV.   THE GOVERNMENT'S OBJECTIONS TO MR. HAMMER'S MOTION IN LIMINE TO PRECLUDE THE GOVERNMENT FROM SEEKING DEATH ON THE BASIS OF PRIOR CONVICTIONS AND OTHER EVIDENCE THAT WERE THE PRODUCT OF PERJURED TESTIMONY FAIL.

As described in Doc. 1643 and 1644, permitting the government to pursue this capital prosecution on the basis of any evidence surrounding the Upton incident in light of the recent disclosures demonstrating that Upton perjured himself in Oklahoma and before this Court violates Mr. Hammer's Fifth, Sixth, and Eighth Amendment Rights and the Federal Death Penalty Act ("FDPA") for a number of reasons.  It violates the Fifth Amendment prohibition against verdicts based on an invalid conviction.  It violates the Fifth Amendment prohibition against verdicts based on false or misleading evidence.  It violates Mr. Hammer's Fifth, Sixth, and Eighth Amendment rights to a verdict based on competent, reliable evidence.  It violates Mr. Hammer's Fifth, Sixth and Eighth Amendment rights to a jury determination based solely on the relevant evidence and law.  It violates Mr. Hammer's Eighth Amendment right to heightened procedural safeguards in this

43

capital case. It violates the Fifth and Eighth Amendment prohibition against an arbitrary and capricious sentencing determination. As any probative value of prior convictions arising from perjured testimony is far "outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the [factfinder]," it violates the FDPA. 18 U.S.C. § 3593(c).

Despite its acknowledgment that Upton lied as to material aspects of the incident leading up to the Oklahoma convictions and sentencing and that Upton lied before this Court during the prior sentencing hearing, the government nevertheless contends that the Oklahoma convictions and Upton's most recent (equally questionable) version of events should be considered by the sentencer as support for statutory aggravation and the government's theory of future dangerousness.

Any attempt to use these convictions or Upton's testimony (or any other witness testimony about this incident) in support of future dangerousness fails for a number of reasons. First, this incident was not noticed by the government. More importantly, as this Court has previously found, "any evidence that the Government intends to present in support of [the future dangerousness] aggravating factor is limited to potential dangerousness in prison." Doc. 1626 at 9. See also United States v. Rodriguez, 2006 WL 487117 at *5 (D.N.D. 2006) (future dangerousness evidence limited to evidence "relating to Defendant's future dangerousness in the context of

life imprisonment"); <u>United States v. Gilbert</u>, 120 F. Supp. 2d 147, 154 (D. Mass. 2000) (noting that the "prosecution concedes that the jury must evaluate defendant's 'future dangerousness' in the context of life in a prison setting" and rejecting certain evidence because it "lack[ed] any substantial relevance to defendant's dangerousness in a prison setting"); <u>United States v. Llera Plaza</u>, 179 F. Supp. 2d 464 (E.D. Pa. 2001) ("Lower courts have taken the Supreme Court's discussion in [<u>Simmons v. South Carolina</u>, 512 U.S. 154 (1992)] to mean that, in the FDPA context government arguments regarding 'future dangerousness' should be limited to the dangers posed by the defendants while serving a life sentence in prison"); <u>United States v. Hargrove</u>, 2005 WL 2122310 *6 (D.Kan. 2005) ("evidence in support of defendant's future dangerousness should be limited to evidence indicative of how he might act in prison"); <u>United States v. Duncan</u>, 2008 WL 711603 *11 (D. Idaho 2008) (limiting the prosecution's evidence to "the context of life imprisonment"). Accordingly, the government is precluded from admitting any evidence about the Upton incident in support of future dangerousness.

Nor is the government's contention that the convictions are admissible in support of the statutory aggravator supportable. As noted previously, relying on <u>Daniels v. United States</u>, 532 U.S. 374 (2001), the government contends that Mr. Hammer cannot challenge the validity of a prior conviction used to enhance his

federal sentence.  For the reasons describe previously, see Section II.D. Claim V, the Daniels opinion is factually and legally distinguishable and nothing in Daniels disputes or contradicts the Supreme Court precedents provided by Mr. Hammer demonstrating that the capital sentencer is precluded from considering and giving effect to false and/or materially misleading evidence or argument. Id.

Nor can the government avoid preclusion on the basis that, notwithstanding Upton's admitted perjury, there is no constitutional error because – in the government's view – his new (equally questionable) version, that has not been subject to cross-examination, supports one or more felonies.  The factfinder's reliance on materially false, inherently unreliable or materially misleading testimony or evidence violates the Fifth, Sixth and Eighth Amendments.  Everything about the Oklahoma convictions is constitutionally tainted by Upton's admitted perjury and nothing in his current version of events overcomes those constitutional taints.

For these reasons, and those set forth above and in the prior submissions, preclusion or, at a minimum, an evidentiary hearing is warranted.

## V. THE GOVERNMENT'S OBJECTIONS TO MR. HAMMER'S MOTION IN LIMINE TO PRECLUDE THE ADMISSION OF PRIOR TESTIMONY OF STEPHEN CLASSEN FAIL.

As described in Docs. 1647 and 1648, the recently disclosed correspondence from Classen demonstrates that the nature and extent of his expectations for benefits

in exchange for his testimony was substantially different than that presented by the government during trial and initial sentencing hearing.  As Mr. Classen is now deceased, Mr. Hammer is unable to confront and cross-examine Mr. Classen about those expectations or his failure to disclose his understanding of his arrangements with the government during the prior proceedings.  For these reasons, permitting the government to admit the prior testimony of Classen violates Mr. Hammer's Fifth, Sixth and Eighth Amendment rights to confrontation, cross-examination, a fair trial and the heightened procedural safeguards required in capital cases and the requirements under the Federal Death Penalty Act.

The government attempts to diminish the significance of the previously undisclosed and subsequently received documents from Classen. *BIO* at 81-82.  For the reasons set forth in the prior submissions, the government's attempts fail.  Each of these documents provide a significantly different picture of what Classen expected and how far Classen would go to obtain benefits for himself from either the government or Mr. Hammer.  Moreover, as described more fully in the prior submissions, it is not just the opportunity to present to the factfinder these contradictions that satisfies the constitutional requirements. Instead, the heart of the Sixth Amendment requires a fair opportunity to "compel[] him to stand face to face with the [factfinder] in order that [the Court] may look at him, and judge by his

demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief." Mattox v. United States, 156 U.S. 237, 242-43 (1895). For the reasons described in the prior submissions, presentation of Mr. Classen's former testimony under these circumstances violates this Sixth Amendment requirement as well as the Fifth and Eighth Amendments and the FDPA.

VI.    **THE GOVERNMENT'S OBJECTIONS TO MR. HAMMER'S MOTION TO PRECLUDE THE CAPITAL PROSECUTION WHERE THE GOVERNMENT'S CAPITAL AUTHORIZATION DETERMINATION AND SUBSEQUENT DEAUTHORIZATION DETERMINATIONS RELIED ON CONVICTIONS AND EVIDENCE THAT WERE THE PRODUCT OF PERJURED TESTIMONY IN VIOLATION OF THE FIFTH AND EIGHTH AMENDMENTS FAIL.**

As described in Docs. 1649 and 1650, the government's consideration of convictions and a 1200-year sentence that were procured by and the product of perjured testimony in its decisions first to authorize, and then not deauthorize the death penalty in this case violated the Fifth, Sixth, and Eighth Amendments.

As noted previously, the government does not dispute that these convictions and the 1200 year sentence were a consideration in the government's authorization and subsequent deauthorization decision. Instead, it contends that this Court has no power to correct the constitutional errors arising from the government's reliance on perjured testimony in determining whether to seek Mr. Hammer's death. For the reasons described previously, see Section II.D. Claim VI, the government is wrong

48

on the facts and the law and this Court is well within its authority to correct this manifest injustice. For these reasons, and those set forth in the prior submissions, this Court should grant Mr. Hammer's motion.

**VII.  BECAUSE THE GOVERNMENT'S OBJECTIONS TO MR. HAMMER'S MOTION TO DISMISS THIS CAPITAL RESENTENCING ON THE BASIS OF THE GOVERNMENT'S PRESENTATION OF PERJURED TESTIMONY AND REPEATED MISCONDUCT IN SUPPRESSING A SUBSTANTIAL VOLUME OF MATERIAL EXCULPATORY AND IMPEACHMENT EVIDENCE AND ITS USE OF A CLANDESTINE AGENT TO ILLEGALLY GATHER INCRIMINATING EVIDENCE FAIL, RELIEF IS REQUIRED.**

As described in Docs. 1651 and 1652, the cumulative impact of the government's multiple instances of non-disclosure; the government's reliance on perjured and materially false testimony and argument; and the government's deployment of Yager as its clandestine agent to circumvent Mr. Hammer's right to counsel violated Mr. Hammer's Fifth, Sixth and Eighth Amendments, renders these capital proceedings inherently unreliable and requires that this Court exercise its inherent supervisory authority to correct the manifest injustices and dismiss the capital prosecution.

As noted previously, the government completely ignores the full nature of Mr. Hammer's claim and fails to address, or even acknowledge the legal precedents and authorities supporting dismissal provided in Mr. Hammer's Motion and Brief in Support. See Section II.D. Claim VII. Instead, the government merely restates its

49

objections to the Court's previous grant of relief on the basis of the government's failure to disclose the FBI-302s. As noted previously, the Court has twice rejected these contentions and the government's contentions fail on the facts and the law. See Section II.D. Claim IV.

For the reasons described above and those set forth in the prior submissions, the government's pervasive misconduct, non-disclosure and presentation of perjured and materially misleading evidence and argument constitutionally taints all aspects of this capital prosecution. This Court has the authority to remedy these fundamental miscarriages of justice and should do so by precluding the government from seeking Mr. Hammer's death.

## VIII. CONCLUSION.

For the reasons set forth above, the government's objections to each of Mr. Hammer's motions fail. Relief or, at a minimum, an evidentiary hearing is required.

Respectfully submitted,

/s/  RONALD C. TRAVIS
Ronald C. Travis
Rieders, Travis, Humphrey, Harris,
Waters & Waffenschmidt
161 West Third Street
PO Box 215
Williamsport, PA  17703-0215
570-323-8711 (telephone)
570-323-4192 (facsimile)
rtravis@riederstravis.com

/s/ ANNE SAUNDERS
Anne Saunders
Assistant Federal Defender
Federal Public Defender
Middle District Pennsylvania
100 Chestnut Street, Suite 300
Harrisburg, PA 17101
717-782-3843 (telephone)
717-782-3966 (facsimile)
anne_saunders@fd.org

/s/ JAMES MORENO
James Moreno
James J. McHugh, Jr.
Federal Community Defender
Eastern District Pennsylvania
Suite 540 – The Curtis Center
Philadelphia, PA 19106
215-928-1100 (telephone)
215-928-0826 (facsimile)
james_mchugh@fd.org
james_moreno@fd.org

# CERTIFICATE OF SERVICE

I, Anne Saunders, Esquire, do hereby certify that on this date I served a copy of the foregoing by Electronic Case Filing, or by placing a copy in the United States mail, first class addressed to the following:

John C. Gurganus, Jr. Esquire
United States Attorneys Office
Middle District of Pennsylvania
235 N. Washington Street, Suite 311
PO Box 309
Scranton, PA. 18501

Amanda Haines, Esquire
United States Department of Justice
Criminal Division
Capital Case Section
1331 F. Street, N.W.
Washington, D.C. 20530

/S/ANNE SAUNDERS, ESQUIRE
Anne Saunders, Esquire

Dated:  May 26, 2014