IN THE UNITED STATES DISTRICT COURT FOR THE

WESTERN DISTRICT OF OKLAHOMA

DAVID PAUL HAMMER,

       Petitioner,

v.

EARL ALLEN, et al.,

       Respondent.

)
)
)
)
)
)
)
)
)
)

Case No. CIV-90-478-D

**DOCKETED**

**FILED**

FEB 14 1991

ROBERT O. DENNIS
CLERK, U. S. DISTRICT COURT
BY _____
DEPUTY

## VOLUME II

TRANSCRIPT OF TRIAL

OKLAHOMA COUNTY DISTRICT COURT

CASE NO. CRF-84-1310

OK NT-001



23.

THE COURT: All right. I remember that. Ten is also admitted.

Okay. Now, Mr. Hammer, before you start, you understand that these are all exhibits, would go back to the juryroom with the Instructions.

DEFENDANT: Yes, I do. That's why I left them up here.

THE COURT: We'll see to it, but I want you to understand they will go no matter . . .

(Instructions read to jury:)

THE COURT: Now, as I've stated before, you will listen to the argument of counsel.

State.

MR. KEEL: Thank you, Your Honor.

Ladies and gentlemen of the jury, first of all, I would like to thank you for the high degree of attention that you paid throughout these proceedings. During this closing argument while I am commenting on the testimony and the evidence that you yourselves were able to hear during this trial, in the event that my recollection of what was said from that witness stand differs from your own recollection of what was said, I ask that you please rely on your own recollection. You were able to hear the witnesses testify without the burden of having to make or respond to objections you were able to hear the witnesses testify from that witness

235

stand without having to worry about what they said to you before the trial or after they testified. You were able to hear the testimony from the witnesses as they testified without having to worry about the next question to ask them. The final and most important reason I ask that you rely on your own recollection and your collective recollections of what was said from that witness stand is that you are the judges of the facts. It's up to you to determine what was the evidence in this case. If I misstate something that you remember hearing different, please rely on the way you remember hearing it. I ask that you do the same when the Defendant is making his closing statement.

Now, I'd briefly like to turn to the Instructions just to cover them very superficially. First of all, these are the crimes that the State has the burden of proving beyond a reasonable doubt. I'd like to submit to you that it's uncontroverted that these crimes were committed. The victim, Thomas Upton, got up on that witness stand and told you he went through these experiences, that he was kidnapped, that a man pointed this gun at him, took him under his control. The elements in number five state that kidnapping is, these elements for kidnapping are unlawful. Forcible seizure and confinement of another. I submit when you come up, point a gun at somebody and say you're taking me where I tell you or I'll blow your head off, that what you're doing

here is exactly what is set forth in these elements. That he's forcibly seizing and confining another with the intent to confine secretly against the person's will. That these elements could not be any clearer. What Mr. Upton told you occurred that night, it's uncontroverted testimony that somebody got in his car, pointed a gun and took custody, took his control away from him and directed him to other destinations. I submit to you that all the elements in number five are obviously met.

Number six, Instruction Number Six, sets forth the elements for robbery with a firearm, states that it's a wrongful taking and carrying away. Now, this is to the motor vehicle that he was driving, that '70 Buick. That, as Mr. Upton told you, the man, when he finally left him, jumped in his car, hopped in it, took off and hit something. Seemed to have some trouble spinning out. As the detective told you, it seemed that a car went through a ditch. The signs indicated that a car had gotten stuck momentarily or slid through a ditch as a car was leaving that area. And, as Mr. Upton told you, the man took off in his car, was a wrongful taking, carrying away by driving that motor vehicle, personal property, the car belonging to Thomas Upton, of another, from a person or his immediate presence. The car was within a hundred yards of where he was. By force or fear, through the use of a firearm. I submit to you that

23

there's no question that the elements of whether or not the crime of robbery was committed. The only question is by who, just as it is for kidnapping.

With respect to Instruction Number Seven, it sets forth the definitions of each of these elements should you need to look at those definitions to clarify in your minds to make sure that what I'm telling you with regard to how those words should be defined is accurate.

Instruction Number Nine refers to the count three which is shooting with intent to kill. The first elements is intentional and wrongful. I submit to you when shooting with a firearm, when you have a man down and you point a gun at the back of his head and fire two rounds right here, (indicating), that there's no question as to whether or not that is intentional or wrongful. Shooting with a firearm another person, four, with the intent to take a human life. You take a gun, point it at somebody, shoot him once here, once here, (indicating), and then you're squeezing off that third shot trying to hit him again, there's only one possible intent. During voir dire, I asked if you understood with respect to proving what somebody's intent is, if you understand that the only way that we can prove intent is to show what a person's actions are and what, if anything, he might have to say. I submit to you that the actions in this case clearly indicate no intent other than to

take a human life when you shoot somebody in that area of their head.

I submit to you and it is uncontroverted and it's been substantiated time after time that Thomas Upton has been held accountable, relayed the incidents of that evening, that he was kidnapped at 36th and Classen. No matter how many times he has this man cross examining him at preliminary hearing or reports it to detectives or reports it to police officers, he was kidnapped at 36th and Classen. He drove south from that location, he went to a motel, the second motel you get to when you're heading south on MacArthur after you get off on the I-40 exit. I submit to you that that's become clear in this case that is the Coachman Motel and that is the first name that he reported to the police officer at the hospital in spite of his state. I'll get into that a little more later. But, that's the first name he gave to Officer Liz Graham.

Submit that it's uncontroverted that he was kidnapped, it's uncontroverted that he did have his car stolen that night and it's uncontroverted that he was shot three times in the head. The only question in this case, the issue really for you to decide as judges of the facts, is this man, David Paul Hammer, the man who committed those acts.

In Instruction Number Eleven, it states that

testimony to prove identity is to be scrutinized with extreme care, the possibility of human error or mistake.  It goes on to give you instructions and it gives you guidelines, that being four guidelines, to use in determining if the identity should be considered a good one.

Now, look at these four Instructions.  The first one, whether the witness had an opportunity to observe the subject clearly.  Mr. Upton told you that he was with this man for approximately three hours or more.  He doesn't know; he doesn't have a watch.  It was about 8:30 or 9:00 when this man kidnaps him on the corner of 36th and Classen and he gets the officer receives a call to the hospital at 1:35 a.m.  Now, as to how long it was that it took him to get from that field after he'd been shot to walking those three and a half miles and for those people to drive him to the hospital, we can only estimate.  But, I submit to you that the timetable we have to work with will easily provide for a solid three hours where Mr. Upton was in the company of the man who kidnapped him that night.  Now, he had not only the inside of his car but a couple hours inside of a well-lit motel room, outside back in the car again.  I submit to you that there's no question whatsoever that this first criteria has been -- is overwhelming.  When a guy has three hours to observe the subject, whether the witness had an opportunity to observe the subject clearly, how can you think of a more

OK NT-007

ideal situation than we are able to provide for you in this case. The length of time that Mr. Upton was with the man who kidnapped, robbed and shot him.

Number two, whether the witness is positive in his identification. Again, we have from the photograph he ID'd he said he was positive, the preliminary hearings on both instances he said, you know, that's the man. He told you from that witness stand he was positive in making those identifications, and from that witness stand during this trial, he told you not only was he positive but that that man's face has been etched into his brain and will be for the rest of his life, I submit to you.

Number three, whether the witness identification was weakened by a prior failure to identify the subject. I submit to you every opportunity, whether by photograph, preliminary hearing or a trial, every chance he has had he has identified David Paul Hammer as the man who kidnapped him, robbed his car and shot him in the head, every chance. And, the degree, the extent of certainty, could not be any higher with respect to Mr. Upton's identification of this man.

Number four, whether the witness's testimony remains positive and unqualified after cross examination. Again, I submit to you that he did not waiver in his identification of Mr. David Paul Hammer as the man who committed these acts.

Finally, two more Instructions, voluntary admission. It states that if you feel that this admission was not made freely, then you can disregard this admission, the confession that he made to Richard Runyon in this case in particular.

Now, I'm going to only address the area of the voluntariness of that statement at this time. How freely was this statement given? After his rights are read to him, he's in the company of Richard Runyon and they begin to talk about this. He makes his statements to Mr. Runyon and then he says I tell you, I did shoot that man in Oklahoma City, Mr. Runyon, but I really don't want to say anything more about it. What does Richard Runyon do? He completely stops at that point asking him any questions whatsoever having to do with these crimes committed here in Oklahoma County. He ceases and at no point did he make any further effort to inquire of this man what happened with regard to those charges that he was facing here. I submit to you that he could not have been treated any fairer by Mr. Runyon. Upon his first indication of the reluctance to talk any further, it is completely dropped. I submit that that's how he was treated by everyone, including this Court, the help of the Public Defender's office in this case, the reports, the police reports that are turned over to Mr. David Paul Hammer so that he could prepare himself for this case. You saw

those officers when they got up there on the stand. This man has the report they filed in this case that's been given to him that he can use in the cross examination not only of them but to use it to impeach any statement that was given to them by the victim, Mr. Thomas Upton. I submit to you it's hard to imagine, envision how fair that everybody involved has been to David Paul Hammer in his defense of this case and of protecting his rights in this case, and Mr. Richard Runyon's behavior, as soon as this man said he didn't want to say anything more about it, it started from the very beginning where he was treated fairly by the people and the agents of the state of Oklahoma.

Finally, Instruction Number Twenty I think highlights the weight that you should aportion to each of the witnesses in this case. It says it is your responsibility to determine the credibility of each witness and the weight to be given the testimony of each witness as the judges of the facts. In determining such weight or credibility, you may properly consider the interest, if any, which the witness may have in the result of the trial, the interest and then the relation of the witness to the parties.

Now, everybody who testified in this case, we have Mr. Thomas Upton who says that he's never seen this man before in his life. Now, what interest, what motivation would he possibly have for identifying him as the man who has

kidnapped, stole his car and shot him in the head three times with the intent to kill him? Why would he possibly get up there with perjury spilling from his lips to tell you that this man committed that crime? What could he possibly have to gain? I submit to you there is nothing. He has no reason to get up there and tell you anything other than what he believes the truth to be.

The same would apply for Officer Liz Graham, for Detective Jack Wells, and the Defendant even asked Richard Runyon do you have any reason to be biased against me personally. He says, no, I don't have any reason. And, I submit to you that there isn't any reason, that none of the witnesses for the State of Oklahoma have any reason to get up there on that witness stand, risk telling perjury and risk or bother telling you anything other than what they knew the truth to be.

Look at Instruction Number Twenty, weigh the motivation of the witnesses in this case and look of the witnesses that were material witness, that could tell you something of the issue with regard to this case and look at what possible motivation they might have to be anything less than fully truthful with you. I submit that there is none.

Now, let's carefully review the testimony from Mr. Tom Upton. On the 28th of October, 1983, as he told you, he was kidnapped at the intersection of 36th and Classen;

OK NT-011

24

that is during the events following that he was shot in the head three times and his car was stolen. Now, during voir dire, you all said that you felt a little nervous about being called as jurors in this case, especially the ones of you who are here for the first time. You felt a little bit nervous. Now, try and envision how Mr. Tom Upton felt. Not only has he gone through this horrifying experience, but he has, after being kidnapped, spending three hours with this man who's threatening to kill him, strikes him twice with the gun, goes out, has the man shoot him three times in the head, and then to top this off, he has the same man who does this, who commits these acts, show up at preliminary hearing, get in his face, argue with him time after time after time --

DEFENDANT: I object, Your Honor. We approach the bench?

THE COURT: All right. Mr. Keel, come on up.

(At bench, out of hearing of jury:)

DEFENDANT: That's totally irrelevant. It's totally uncalled for.

MR. KEEL: They were able to see. They can make their own determination of what he did with respect to cross examination. I'm able to comment on it.

THE COURT: Comment on it. Do not embroidery on it.

(Within hearing of jury:)

OK NT-012

MR. KEEL: He has the same man who kidnapped him, who took his car, who shot him three times in the face cross examining him in this case and every time he slips up, boy, if he leaves out one word, look at these things. He's got page after page here of testimony from this man that he can use each time and pick through all these pages just trying to show any inconsistency.

We've got page seventeen. Here's his statement on that day that this man, Mr. Hammer, read to you to show you the inconsistency of our witness, Thomas Upton. On page seventeen from the preliminary hearing transcript on March 12th before Judge Wilson. It says, starting on line eleven, and this is what he read to you. "He made two phone calls. He made me go in the bathroom and run some water so I couldn't hear who he was talking to." I submit to you that's the same thing that Mr. Upton testified to from this witness stand. That's the same thing as he told Officer Liz Graham. I submit that he has time after time given a consistent rendition of this account of this attack on him, and any little variance in a word.

Page four, line twenty-three of the same preliminary hearing transcript, as Mr. Hammer read to you, "I had all my windows down. It was a very nice evening. He walked between the cars, he got to the passenger side of the window, he just laid the pistol on it and said I'm going to

24

take him where he wanted to go."  I submit to you time after time he's got page after page, an opportunity after opportunity.

The police report, in addition to these two, where Mr. Upton gives an account of the incidents that occurred that night, and all he can do with all this work in the way of trying to impeach Mr. Upton is play trivial pursuit. Envision yourself in that situation.  You're sitting in your car on 36th and Classen.  A man walks up to you, points a gun through the window and says you're going to take me where you want to or I'm going to blow your head off.  Now, sitting there in the car, the man gets in next to him and this man, Mr. Hammer, wants to know how many lanes were there.  You're sitting there, guy's got a gun pointed at your chest and he says he's going to blow your head off you don't take him where you want to and he's supposed to be concentrating on the number of lanes there are at this point in time.  Let's see, was there four lanes, is there three lanes, does it billow out or does it go all the way out to 36th behind me? I submit to you that it's ridiculous that the trivial questions he wants to ask this man.  When I was marching you upstairs with this gun behind you and I had the pistol in one hand, did I take a key out to open the lock on that door?

DEFENDANT: I object, Your Honor.

THE COURT:  Just a minute.

OK NT-014

You object to what, sir?

DEFENDANT: He's stating evidence, Your Honor. That wasn't the testimony. No one ever said that I did this. I never told Mr. Upton I did this. He's stating evidence.

THE COURT: I think that that would be up to the jury to discern. I'm going to overrule your objection.

MR. KEEL: He says when the man is walking you up those stairs at gunpoint and the man has this door that he's attempting to open, does he have a key in his hand or not? I submit to you that the trivial questions that he's trying to pose to Mr. Upton on an incident during an experience where he is very much and justifiably very much afraid for his own life, his questions, the quality of the questions that he's posing to this man are ridiculous. They're an insult to anyone's intelligence. The little, inconsequential things he's demanding that this man know, that he throws in this man's face, if he doesn't know if there's a key in the guy's hand or how many lanes there are on Classen. He's being kidnapped. I submit to you it is ridiculous. It isn't unreasonable burden upon anyone, any witness, any victim going through the situation that Mr. Thomas Upton was going through that night, and in spite of the opportunity after opportunity and police report after police report, he was able to make no headway with respect to impeaching that man.

Let's look at what Mr. Upton had told Liz Graham.

This is before he ever has an opportunity to know. He doesn't know David Paul Hammer's name, anything else about the man, other than he kidnaps people and shoots them. He told Liz Graham that the man who kidnapped him was five feet eight. He changed that from five feet nine inches tall. Now, this is on the police report to Liz Graham. I'll just put a "G" for Liz Graham's report. Now, on Mr. Runyon's statistics as he told you that were taken from this man that they showed on their records showing exactly how tall he is, what he weighs, going to put an "R" for Mr. Runyon. States that he's five eleven. Now, this is the only area, I submit to you, in that physical description he gave where he was not -- he didn't give a precise number.

For example, the weight he gives to Liz Graham is a hundred and sixty pounds to a hundred and seventy pounds. Now, what does Richard Runyon tell you that this man weighs? He was a hundred and seventy-six pounds. He was six pounds off on the weight description that he provided with Officer Liz Graham. Short hair. Look at the man as he is here today before you. I submit you can see that for yourself. The age that he gives her. Before he's ever provided an opportunity to see a photograph or know who David Paul Hammer is, he says that this man is twenty-five years of age. What is his actual age according to Richard Runyon? Twenty-six. He misses it by a year or some months,

24

who knows.

I submit to you that the physical description that he provided to Liz Graham hours or minutes after he's been shot three times in the head, after he went through this horrifying experience hour after hour in custody of this man who's telling you that he's going to blow his GD head off, the physical description he gave him is amazing and how closely it matches David Paul Hammer.

Then we've got the photographic ID where Mr. Upton is able to look at that photograph and say that's the man, I'm positive that's the man who shot me. When he identified that photograph, -- you just look at a photograph. There is nothing suggestive said to you. Both Mr. Upton said that and Detective Wells told you there was nothing suggestive said to him before he identified that photograph. He doesn't know when he's positively identifying this photograph as a photograph of the man who kidnapped, took my car and shot me, he doesn't know he's positively identifying the photograph that the guy is within two inches of the height that he told Liz Graham. He doesn't know he's positively identifying this photograph as a photograph of the man who shot me that the guy weighs within six pounds of what he told Liz Graham the man weighed who shot him in the head and he doesn't know when he's looking at this photograph and identifying him as the man who shot him positively identifying

OK NT-017

250

that the man is within a year or several months of the age of the man that he gave, the age that he gave Liz Graham. Told you he identified that photograph because his memory of that man's face through those three long hours he spent with him was etched and carved into his mind. I submit to you that he could not have had a better opportunity to identify this man and he has made perfect use of that opportunity. He has identified him positively on every chance that has been submitted to him.

Liz Graham, her account told you the only times when he was relaying the facts of this incident to her, the only times he ever varied was at the height and I asked you to look, you saw for yourselves Mr. Thomas Upton, when he was testifying here, he's not the tallest person in the world. To him five nine or five eleven is a ways up there, several inches higher than he is. Now, I submit that that was the only time that he did not nail the Defendant, as far as I'm concerned, right on the head, so to speak, with respect to all those other criteria if you look that he provided Liz Graham and that and the Coachman Inn. He told them he was unsure, gave them two names even from this witness stand here today. He wasn't sent out there to make sure you know which ones. We wanted to rely on his recollection as it was that evening. He told you that it was the Days Inn or the Coachman Inn and he wasn't sure when he testified from that

witness stand as to which one it was but he did know that it was the second motel as you drive south on MacArthur. As the evidence in this case has shown you, that would turn out to be the Coachman Inn.

With respect to Detective Jack Wells, in addition his part in this case, in addition to submitting the photo lineup, he says that he went out there to this scene, that he saw blood at that location which corroborates to a tee exactly what Tom Upton had to tell him, that he saw this trough dug out where a car had been momentarily stuck in a ditch and spun its way out through there which matches the way the incident was related to you by Tom Upton from that witness stand.

And, then, finally, we get to Richard Runyon. He was the last witness for the State of Oklahoma. Now, he told you about going out to California to pick up Mr. David Paul Hammer, that he did so, that they read him his rights, that he said he understood his rights, that sometime during the trip back from there he asked him how did you get hold of that guy in Oklahoma City, that Mr. David Paul Hammer stated to him, Mr. Hammer said, "I got in his car at a stop light." I submit to you that is exactly the factual situation related by Tom Upton in this case to a tee. "I got in his car at a stop light." Tom Upton was in his car at 36th and Classen when the man got into his car, pointing a gun at him. I think

25:

it's uncanny. That's exactly out of his own mouth. And, then he says to him, did you shoot him or not. The Defendant's response was, well, I'll tell you, Mr. Runyon. I did shoot that man in Oklahoma City. It's exactly what Thomas Upton told you that this man had done. You don't just have to believe Thomas Upton who's been a very consistent, very reliable witness in this case. You can believe Mr. Hammer himself out of his own mouth. What motivation does he have to tell you anything less than the truth when he's telling you, yeah, I was the guy got in his car at a stop light and I shot that man in Oklahoma City.

I submit to you as far as credibility goes, you can believe everyone who had anything to do with working up the material issues in this fact. The Defendant himself got in the car, I shot that man in Oklahoma City. What could possibly be more overwhelming and pointing towards his guilt in this case.

Soon as he then followed up but I don't really want to talk to you any more about that case, Mr. Runyon, Mr. Runyon stopped. He left it alone. I submit to you that shows that he was doing nothing but respecting this man's rights. At the first indication of reluctance to talk to him, he stopped. He allowed him to protect his rights.

Then, within three or four days after bringing this man back on that charge, he approached an Assistant

District Attorney, told him what he learned. The case had been filed with Oklahoma County, told him what he knew about the case and this man's statement and that was made of record.

Why is Jack Wells -- he wanted to make a big deal about Mr. Wells not going out to talk to him. Now, why is Jack Wells going to go out to talk to this Defendant about this case? He's already told a peace officer with the State of Oklahoma I got in that man's car at an intersection, I shot him in the head. What possibly could Jack Wells get after -- keep in mind this man's already indicated a reluctance to speak about the incident. Why would Jack Wells violate this man's indication of reluctance and why is it even necessary after he's already told the man that he committed the crime? I submit to you that the police officers did a good job in the investigation of this case, that they respected this man's rights maybe to a fault and that they had overwhelming evidence as was brought before you during this trial during the last two days that you've seen yourself, that this is a case where there is overwhelming evidence unquestionably that these three crimes were committed and I submit to you that it's overwhelming that this man, David Paul Hammer, committed this crime against Thomas Upton that evening.

When you look at -- In addition to this description that's provided to Officer Liz Graham, when you

look at his photograph, when you look at the photo ID, when you look at the identification at the preliminary hearing -- and I won't break these down. There's two preliminary hearings and here at trial. Let's just say the certainty of the victim, Tom Upton's, ID each and every time he's in a courtroom with this man, time after time, the degree of certainty that he expressed before you even at this trial as to whether or not this was the man who committed those offenses, and, finally, when you look to the confession out of this man's mouth, he himself said that he committed this crime. I submit to you that the evidence is overwhelming that David Paul Hammer was the man who kidnapped, robbed and shot Thomas Upton and he did this with the intent to take Mr. Upton's life. I submit and I ask as representatives of your community that you see the very real need to return a verdict of guilty in this case against David Paul Hammer to all three counts. Thank you very much.

THE COURT: Mr. Hammer.

DEFENDANT: Ladies and gentlemen of the jury, I'd like to thank each and every one of you for your time that you spent here. It's been trying on all of us.

Now, Mr. Keel talks about the evidence and how overwhelming it is. What Mr. Keel doesn't talk about is the evidence that's not here before us today. He doesn't talk about the victim's car. Where is it? He doesn't talk about