UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| -vs- | : | |
| | : | NO.  4:CR-96-239 |
| DAVID PAUL HAMMER, | : | |
| | : | |
| Defendant | : | |

**GOVERNMENT'S RESPONSE IN OPPOSITION
TO DEFENDANT'S MOTION IN LIMINE TO PRECLUDE
EVIDENCE ABOUT THE "LOMPOC INCIDENT"**

Defendant moves the Court to admit preclude the admission of evidence concerning the "Lompoc Incident."  The relevant facts concerning that incident are as follows:

On March 19, 1995, David Paul Hammer was an inmate at the United States Penitentiary at Lompoc, California.  Hammer was housed in a cell with inmate Glenn Bevins.  By approximately 12:40 AM, on that date, Hammer had his cellmate, Glenn Bevins, tied with strips of linen and positioned on the floor of their cell.  Bevins was bound with one strand tied around his neck, a second strand around his wrist, a third around his thighs, and a fourth around his ankles. Bevins was also

1

gagged and had a sheet stuffed in his mouth. The cell door was also tied securely with sheets and blankets. Additionally, foot wear was lodged in the bars to stop the cell door from opening. When officers arrived, Hammer demanded to see the operations lieutenant otherwise threatening to harm inmate Bevins.

When Operations Lieutenant Richard Truchsess arrived, Hammer said that if he could talk with him for a while, he would let Bevins go. At one point, Bevins struggled against his ties and Hammer became angry and yelled at him. At several points, Bevins began to sob. Hammer told the lieutenant that he didn't want to harm Bevins. Hammer took a pillow from his bed and placed it under Bevin's head to display concern for him. Hammer then told Bevins to tell the operations lieutenant that he was okay. Hammond removed the gag and sheet stuffed in Bevins mouth so that he could talk. Bevins then told the operations lieutenant that he was okay. Hammer reiterated that if he could talk with the operations lieutenant he would let Bevins go. The operations lieutenant responded that he would continue to talk with Hammer after Bevins was out of the cell. Hammer then asked that a video tape recording be used so that he would be assured that he would not be beaten by any of the

2

officers. A video recorder was employed at that point. Hammer then began to untie the cell door. Once it was untied, Hammer submitted to hand restraints placed on him by the officers.

The officers removed Bevins from the cell and they utilized scissors to cut the bonds from Bevins.   Bevins ultimately was determined to have sustained a superficial abrasion on the left side of his neck and on the left side of his back which did not require medical attention.

The cell was searched and no contraband was found. Thereafter, the operations lieutenant interviewed Hammer and asked him how he managed to tie up Bevins. Hammer explained that he waited until Bevins fell to sleep and then held something to his throat and told him it was a knife. He claimed not to have had any problems with Bevins until that day.  Hammer claimed to be having a bad day and was tired of Bevins running his mouth. Hammer said that he thought about killing Bevins but didn't do it because Bevins didn't do anything wrong.

FBI Special Agent Daniel M. Payne reviewed the matter the following day, and determined that the FBI would not be investigating or seeking to prosecute the case.  Two days later, on March 22, 1995, Agent Payne interviewed Hammer about a separate incident where Bevins

3

threw hot water on two guards.  Hammer stated he was bothered by Bivens's bragging about having thrown hot water on a guard. Hammer noted that he felt what Bivens did was a cowardly act and was sick of hearing him talk about it. Hammer decided to tie Bivens up in order to have him removed as his cellmate.  The interview was memorialized in a FD302 which was turned over to the defense.  There was no additional FD302s completed concerning the incident by the FBI Special Agent Payne.

Hammer was issued an incident report citing him with *threatening another person*, and *conduct disruptive to security or orderly running of a BOP facility most like: Taking Hostage*.

At the hearing, Hammer admitted, "I made the threat, and I tied him up."

The hearing officer found the following acts were committed, *threating another person*, and *assaulting any person (minor assault)* because he believed the incident would be better charged this way.  He did not believe that he was holding him as a hostage, but did assault him in the process of tying him up.  The sanction imposed was a disciplinary transfer and a period of 60 days of disciplinary segregation.

4

In connection with this prosecution, the government attempted to locate the video referenced in the Bureau of Prisons' report for use in this prosecution. After a search by personnel at the USP-Lompoc, it was revealed that the video is no longer available and that there is no record of what happened to it. In all likelihood it was purged in the normal course of business operations.

Hammer now claims that the loss of the videotape from 1995 amounted to a constitutional violation. He also claims that the fact that there is no second government FD302, it likewise amounted to some constitutional violation that should preclude the government from offering the evidence. Finally, Mr. Hammer claims that the government's misbranding of the incident, by virtue of the hearing officer's resolution of the matter, requires remedial measures.

## LAW AND ARGUMENT

The facts in this matter are fairly straightforward and are not seriously subject to dispute. In *Arizona v. Youngblood*, the Court held that in cases involving evidence that is only potentially exculpatory, "[u]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute

a denial of due process of law." 467 U.S. 479, 489 (1984).   First, the defendant cannot show that the videotape would have been exculpatory. Second, there is no bad faith on the part of the government.  It would be highly favorable for the government to still have the video, to buttress Hammer's admission during the disciplinary hearing that "I made the threat, and I tied him up."  Thus, there is no violation here.

Next, Hammer complains that there is a missing FD 302.  The defense has been advised that no such second report exists.

As for the claim that the hearing officer's decision has some effect in this case, that is far from the case.  Certainly, any such finding on his part is not create jeopardy against the government and precluding it from eliciting the facts in this matter.  *U.S. v. Brown*, 59 F.3d 102, 104 (9th Cir. 1995) (Double Jeopardy Clause inapplicable to prison disciplinary sanctions)

For the reasons set forth above, the United States requests that
this Court deny Defendant's motion in limine to preclude the
government from offering evidence about the "Lompoc incident."

PETER J. SMITH
UNITED STATES ATTORNEY

/s/ John C. Gurganus, Jr.

JOHN C. GURGANUS, JR.
Assistant United States Attorney

/s/ Amanda Haines

AMANDA HAINES
Trial Attorney For the
Capital Case Section
1331 F Street, N.W.
Washington, D.C. 20530

<u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on this 1st day of June, 2014 he served a true and correct copy of the foregoing

<u>**GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION IN LIMINE TO PRECLUDE EVIDENCE ABOUT THE "LOMPOC INCIDENT"**</u>

via electronic filing:

ADDRESSEES:

Ronald C. Travis, Esquire
rtravis@riederstravis.com

James J. McHugh, Jr., Esquire
James_McHugh@fd.org

James Moreno, Esquire
James_Moreno@fd.org

Anne Saunders, Esquire
Anne_Saunders@fd.org


<u>/s/ John C. Gurganus, Jr.</u>

JOHN C. GURGANUS, JR.
Assistant United States Attorney