UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF PENNSYLVANIA


UNITED STATES OF AMERICA          :   CRIMINAL NUMBER


                    V.


DAVID PAUL HAMMER                  :   4:96-CR-239


                              MONDAY, 6-2-14
                              COURTROOM 16B
                              PHILADELPHIA, PA 19106


_____
        BEFORE THE HONORABLE JOEL H. SLOMSKY, J.
_____

            SENTENCING HEARING
                  DAY 1


_____

APPEARANCES:

JOHN C. GURGANUS, JR., ESQUIRE       FOR THE GOVERNMENT
UNITED STATES ATTORNEYS OFFICE
MIDDLE DISTRICT OF PENNSYLVANIA
235 N. WASHINGTON STREET, SUITE 311
PO BOX 309
SCRANTON, PA 18501


            SUZANNE R. WHITE, RPR, FCRR, CM
               OFFICIAL COURT REPORTER
             FIRST FLOOR U. S. COURTHOUSE
                601 MARKET STREET
              PHILADELPHIA, PA 19106
                 (215)627-1882


PROCEEDINGS RECORDED BY STENOTYPE-COMPUTER,
TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

CONTINUED APPEARANCES:

AMANDA HAINES, ESQUIRE                    FOR THE GOVERNMENT
UNITED STATES DEPARTMENT OF JUSTICE
CRIMINAL DIVISION
CAPITAL CRIMES SECTION
1331 F. STREET, N.W.
WASHINGTON, D.C. 20530

ANNE SAUNDERS, ESQUIRE                    FOR THE DEFENDANT
FEDERAL PUBLIC DEFENDER
MIDDLE DISTRICT OF PENNSYLVANIA
100 CHESTNUT STREET, SUITE 300
HARRISBURG, PA 17101

RONALD C. TRAVIS, ESQUIRE                 FOR THE DEFENDANT
REIDERS, TRAVIS, HUMPHREY,
HARRIS, WATERS & WAFFENSCHMIDT
161 WEST THIRD STREET
PO BOX 215
WILLIAMSPORT, PA 17703-0215

JAMES MORENO, ESQUIRE                     FOR THE DEFENDANT
JAMES MCHUGH, ESQUIRE
FEDERAL COMMUNITY DEFENDER
EASTERN DISTRICT OF PENNSYLVANIA
SUITE 540 - THE CURTIS CENTER
PHILADELPHIA, PA 19106

(THE CLERK OPENS COURT.)

THE COURT:  PLEASE BE SEATED.

ALL COUNSEL:  GOOD MORNING, YOUR HONOR.

THE COURT:  THIS IS THE CASE OF UNITED STATES VERSUS DAVID PAUL HAMMER, CRIMINAL NUMBER 96-239-1 IN THE MIDDLE DISTRICT OF PENNSYLVANIA.  AND MR. HAMMER IS REPRESENTED BY RONALD TRAVIS, ESQUIRE.

WELCOME, MR. TRAVIS.

AND WE HAVE JAMES MCHUGH, ESQUIRE.

MR. MCHUGH:  GOOD MORNING, YOUR HONOR.

THE COURT:  JAMES MORENO AND ANNE SAUNDERS, ESQUIRE.

MS. SAUNDERS:  GOOD MORNING, YOUR HONOR.

THE COURT:  THE GOVERNMENT IS REPRESENTED BY JOHN GURGANUS, JR., THE ASSISTANT U.S. ATTORNEY.

MS. GURGANUS:  GOOD MORNING, YOUR HONOR.

THE COURT:  GOOD MORNING.

AND AMANDA HAINES.

MS. HAINES:  GOOD MORNING, YOUR HONOR.

THE COURT:  GOOD MORNING, ASSISTANT U.S. ATTORNEY.

I SEE A THIRD PERSON SITTING AT COUNSEL TABLE.  WHO IS THAT?

MS. HAINES:  YOUR HONOR, CAN I HAVE HER INTRODUCE HERSELF.  THIS IS OUR AGENT, FBI AGENT.

THE COURT:  I'M SURE SHE HAS A NAME.

MS. GREENAWALT:  I DO.  FAITH ELIZABETH GREENAWALT.

THE COURT:  JUST SPEAK INTO THE MIC.  SIT DOWN AND SPEAK INTO THE MIC.

MS. GREENAWALT:  FAITH ELIZABETH GREENAWALT.

THE COURT:  FAITH -- GREENAWALT?

MS. GREENAWALT:  G-R-E-E-N-A-W-A-L-T.

THE COURT:  ALL RIGHT.  NOW, AS I OFTEN TELL PEOPLE, LAWYERS AND OTHERS, THERE IS NO NEED TO STAND.  EVERYBODY CAN REMAIN SEATED WHEN THEY SPEAK. JUST PULL UP A MIC AND MAKE SURE YOU ARE SPEAKING INTO A MIC SO THAT EVERYTHING IS RECORDED.  AND IF YOU ARE GOING TO WALK AROUND THE COURTROOM, MAKE SURE YOU HAVE A MIKE THAT YOU ARE TALKING INTO.  TRIAL LAWYERS TEND TO TRAVEL A LOT AROUND THE COURTROOM, BUT MAKE SURE YOU ARE TALKING INTO A MIC.

NOW, I'M USED TO ELECTRONIC SOUND RECORDING.  BUT FOR THIS PROCEEDING WE HAVE A COURT REPORTER.  SO I GUESS THERE IS LESS OF A NEED FOR A MICROPHONE BECAUSE WE DO HAVE A COURT REPORTER.  BUT IN TERMS OF THE VOLUME OF WHAT WE HEAR, PERHAPS IT WOULD BE BETTER IF EVERYONE TRIED TO SPEAK INTO A MIC.

NOW ALSO WE HAVE PRESENT THROUGH A VIDEO

HOOKUP, MR. HAMMER.  WELCOME, MR. HAMMER.

THE DEFENDANT:  GOOD MORNING, YOUR HONOR.

THE COURT:  GOOD MORNING.  MR. HAMMER IS LOCATED IN TERRE HAUTE, INDIANA, IS THAT CORRECT?

THE DEFENDANT:  YES, SIR.

THE COURT:  MY UNDERSTANDING IS YOU WILL BE AVAILABLE THROUGH THIS ELECTRONIC HOOKUP FROM 9 TO 3:30.  AND MR. HAMMER, YOU DON'T HAVE A DIRECT COMMUNICATION WITH YOUR LAWYERS.  SO IF, AT ANY TIME, YOU WANT TO SPEAK TO YOUR LAWYERS, SOMEHOW JUST SAY, YOUR HONOR, I WOULD LIKE TO SPEAK TO -- JUDGE, I WOULD LIKE TO SPEAK TO COUNSEL AND WE WILL CLEAR THE COURTROOM AND WE WILL GIVE YOU THE OPPORTUNITY TO SPEAK TO COUNSEL WITHOUT EVERYBODY ELSE PRESENT.  I WOULD HOPE YOU HAVE -- WOULD HAVE DISCUSSED THIS, MR. TRAVIS, WITH MR. HAMMER SO THAT WE DON'T HAVE TOO MANY INTERRUPTIONS, OR PERHAPS YOU CAN ACCUMULATE WHAT YOU ARE GOING TO SAY 'TIL A CERTAIN TIME.

MR. TRAVIS:  YES.  ACTUALLY, YOUR HONOR, THERE ARE THREE MATTERS THAT I WANTED TO -- THREE MATTERS I WANTED TO BRING TO THE ATTENTION OF THE COURT CONCERNING THE COMMUNICATION ALSO WITH RESPECT TO MR. HAMMER.

ONE, BECAUSE OF HIS HEALTH ISSUES, HE HAS A NEED TO BE ALLOWED TO FREQUENT -- TO HAVE FREQUENT

ACCESS TO THE RESTROOM.  AND SO THERE MAY BE OCCASIONS WHEN HE NEEDS TO TAKE THAT TYPE OF BREAK.

THE SECOND MATTER IS, FOR SOME REASON, THEY HAVE A FIRE ALARM THERE AT THE UNIT WHERE HE IS BEING HOUSED THAT SEEMS TO BE UNCONTROLLABLE AND IT FREQUENTLY GOES OFF.  WHEN IT GOES OFF, IT'S RATHER LOUD WHERE HE IS, AND SO MR. HAMMER ASKED ME TO BRING THAT TO THE ATTENTION OF THE COURT AND ASK IF IN FACT THE FIRE ALARM GOES OFF THAT WE KIND OF WAIT IN PLACE UNTIL THEY GET TO IT AND TURN IT OFF.

THE THIRD ISSUE THAT HE ASKED ME TO DISCUSS WITH THE COURT CONCERNING THE -- CONCERNS THE ABILITY TO COMMUNICATE WITH HIM.  AND I TAKE RESPONSIBILITY FOR THIS BECAUSE I PROBABLY WAS NOT REAL CLEAR IN THE MOTION I FILED.  WHEN WE CALL TO HAVE PRIVATE CONVERSATIONS WITH MR. HAMMER, WE CALL A NUMBER AT TERRE HAUTE, THEY ANSWER THE PHONE, AND THEY THEN JUST HAVE THE HEADSET, THE HAND-HELD PART PRESENTED TO MR. HAMMER, AND THE REST OF THE PHONE STAYS OUT OF THE ROOM.  OUR THOUGHT WAS THAT IT IS POSSIBLE THAT WE COULD DO THAT INSTEAD OF EVERYBODY HAVING TO CLEAR THE COURTROOM FOR US TO HAVE A CONVERSATION WITH MR. HAMMER.

THE COURT:  THAT IS FINE WITH ME.  I HAVE NO OBJECTION TO THAT.  AS LONG AS IT CAN BE DONE WITH THE COOPERATION OF THE BUREAU OF PRISONS, THAT IS FINE.

SO HOPEFULLY THE AUTHORITIES AT THE PRISON ARE LISTENING TO THIS CONVERSATION AND THAT WOULD BE APPROPRIATE WITH THE COURT.

THE DEFENDANT:  YOUR HONOR, THERE IS NO ONE HERE WITH ME.  THEY SET -- MY COUNSEL IS SITTING RIGHT OUTSIDE.  I CAN HAVE HIM STEP IN FOR JUST A SECOND IF YOU WANT AND EXPLAIN THAT.

THE COURT:  MR. TRAVIS, EXPLAIN IT ONE MORE TIME ON THE RECORD WHAT YOU ARE PROPOSING.

MR. TRAVIS:  WHAT WE ARE PROPOSING IS IF MR. HAMMER HAS A NEED FOR A CONVERSATION WITH THE ATTORNEYS OR ONE OF THE ATTORNEYS, THAT HE SO INDICATE, AND WE CALL THE NUMBER AT TERRE HAUTE, WHICH WILL BE ANSWERED BY THE STAFF.  AND THE STAFF WOULD MAKE AVAILABLE TO MR. HAMMER THE HANDSET, HEADSET, WHATEVER YOU WANT TO CALL IT, SO THAT HE CAN TALK AND LISTEN WITHOUT THE WHOLE PHONE BEING IN THE ROOM.

THE COURT:  ALL RIGHT.  IS THERE A HANDSET WITH HIM IN THIS ROOM?  YOU WOULD HAVE TO LEAVE THIS ROOM.

THE DEFENDANT:  NO, SIR.  I WOULD NOT HAVE TO LEAVE THE ROOM.  THERE IS AN OUTLET WHERE THEY PLUG THE PHONE IN RIGHT HERE TO THE LEFT OF THE TABLE. AND THEN THE PHONE WOULD ACTUALLY SIT OUTSIDE THE DOOR THAT IS BEHIND ME WHERE MY COUNSEL IS, AND THE WHOLE

PHONE WOULD SIT OUT THERE.  AND IF THEY CALLED IN, HE WOULD JUST GIVE ME THE HANDSET WHEN THEY CALLED IN. THERE IS A WICKET IN THE DOOR THAT HE CAN HAND THE HANDSET THROUGH, JUST LIKE IF I WAS IN MY CELL.  THAT IS THE WAY --

THE COURT:  IS YOUR COUNSELOR AWARE OF THIS, MR. HAMMER?

THE DEFENDANT:  ONE SECOND, I WILL HAVE HIM STEP IN.  JUST ONE SECOND.

I WAS WRONG.  I THOUGHT THERE WAS A WICKET.

THE COURT:  ALL RIGHT.

PRISON OFFICIAL:  GOOD MORNING, SIR.

THE COURT:  GOOD MORNING.  THIS IS JUDGE SLOMSKY IN PHILADELPHIA.  WE CAN SEE YOU THROUGH THE VIDEO HOOKUP SYSTEM.  THE QUESTION ALWAYS ARISES HOW CAN SOMEONE COMMUNICATE IN PRIVATE WITH THEIR ATTORNEY.  AND MR. HAMMER IS EXPLAINING TO US, AND PERHAPS YOU CAN FILL US IN, THAT IF HE WANTS TO SPEAK TO COUNSEL PRIVATELY, YOU KNOW, THE ORIGINAL SUGGESTION WAS WE WERE GOING TO CLEAR THE COURTROOM AND HE CAN TALK TO COUNSEL OVER THE VIDEO SYSTEM.  BUT MR. TRAVIS, HIS LAWYER, IS SUGGESTING THERE IS AN ALTERNATIVE PROCESS WITH MR. HAMMER THAT APPARENTLY A HANDSET CAN BE PLUGGED INTO THE OUTLET ON THE WALL?

PRISON OFFICIAL:  ACTUALLY THIS DOOR HERE IS NOT ALLOWED -- THERE IS NOT A WICKET IN THIS DOOR.

THE COURT:  CAN YOU SPEAK INTO A MICROPHONE SO WE CAN HEAR YOU CLEARLY?

PRISON OFFICIAL:  UNFORTUNATELY, THE DOOR BEHIND US IS A SOLID DOOR.  IT DOES NOT HAVE A FOOD TRAY SLOT.  WHAT WE COULD DO IS PLUG THE PHONE IN HERE AND WHENEVER HE NEEDS TO SPEAK TO HIS COUNSEL, HE CAN HAVE HIM CALL ON A DIRECT NUMBER, IF THAT IS FINE WITH YOU.

THE COURT:  YES.  THEY ARE SAYING THAT IS FINE.  NOW, ARE YOU GOING TO BE PRESENT DURING THE TESTIMONY OR ARE YOU GOING TO BE JUST STANDING OUTSIDE THE DOOR?

PRISON OFFICIAL:  I WILL BE RIGHT OUTSIDE THE DOOR, SIR.

THE COURT:  BECAUSE WE ARE GOING TO BE GOING NOW, AS YOU KNOW, FROM 9 TO 3 OR THEREABOUTS.

PRISON OFFICIAL:  I WILL BE RIGHT THERE THE ENTIRE TIME.

THE COURT:  I APPRECIATE YOUR COOPERATION.  I ALWAYS EXPRESS THE THANKS OF THE COURT FOR THE FEDERAL BUREAU OF PRISONS TO MAKE AVAILABLE THIS KIND OF HOOKUP BECAUSE IT DOES EXPEDITE MATTERS IN THE CASE AND THE COURT.  SO THANK YOU.

MS. SAUNDERS:  I'M SORRY, YOUR HONOR.

THE COURT:  BEFORE YOU LEAVE --

MS. SAUNDERS:  BEFORE HE WALKS OUT, YOUR HONOR --

THE COURT:  BEFORE YOU WALK OUT, THERE IS ONE OTHER THING.

MS. SAUNDERS, SPEAK INTO THE MIC SO HE CAN HEAR YOU.

MS. SAUNDERS:  I'M SORRY, YOUR HONOR.

COUNSELOR, IS IT POSSIBLE THAT SOMEONE CAN E-MAIL TO ME THE PHONE NUMBER SO I'M SURE I'M DIALING IN THE RIGHT LINE?

PRISON OFFICIAL:  I SURE WILL.

MS. SAUNDERS:  THANK YOU, SIR.

THE COURT:  THANK YOU VERY MUCH.

ALL RIGHT.  ASSUMING THAT IS ALL THE HOUSEKEEPING MATTERS THAT HAVE TO BE DONE, WE CAN BEGIN THE HEARING.

MR. GURGANUS, DO YOU WANT TO MAKE AN OPENING STATEMENT?

MR. GURGANUS:  A BRIEF ONE, YOUR HONOR.

AS THE COURT KNOWS, THIS IS A SENTENCING HEARING.  THE GUILT PHASE HAS ALREADY BEEN COMPLETED.  THE DEFENDANT PLEADED GUILTY IN 1998.  HE PLEADED GUILTY TO FIRST DEGREE MURDER OF ANDREW MARTI.  HE ADMITTED, AFTER SITTING AT A TRIAL AND HEARING WITNESSES AND THE

ADMISSION OF DOCUMENTS, INCLUDING LETTERS THAT HE HAD WRITTEN HIMSELF, THAT HE HAD IN FACT KILLED ANDREW MARTI WITH HIS OWN HANDS.  THE EVIDENCE AT THIS SENTENCING HEARING, YOUR HONOR, WILL HIGHLIGHT THE KEY FACTS OF THAT FIRST DEGREE MURDER CONVICTION.

IT WILL SHOW AND HIGHLIGHT THE PLANNING THAT MR. HAMMER ENGAGED IN BEFORE KILLING ANDREW MARTI IN THAT CELL 103 ON APRIL 13TH, 1996.  IT WILL HIGHLIGHT THE FACT THAT MR. HAMMER COMMITTED THIS MURDER AFTER PLANNING AND THOUGHT AND REFLECTION.  IT WAS NOT A SPUR OF THE MOMENT INCIDENT, THAT IT WAS NOT THE RESULT OF SOME MENTAL ILLNESS, THAT IT WAS NOT SOME ACCIDENT. RATHER, THE EVIDENCE WILL SHOW AND WILL HIGHLIGHT THAT MR. HAMMER TOLD OTHER PEOPLE HE WAS GOING TO KILL ANDREW MARTI.  HAD ANDREW MARTI THROUGH A MUTUAL AGREEMENT START TO LIVE IN HIS CELL WITH HIM.

AFTER THAT, WE WILL SHOW -- THE EVIDENCE WILL SHOW AND THROUGH HIS OWN ADMISSIONS THAT THEY CAME UP WITH A HOSTAGE PLAN.  AND IT WAS A PART OF THE PLAN THAT MR. HAMMER HAD TO INCAPACITATE ANDREW MARTI, A SIZABLE MAN, SO THAT HE COULD STRANGLE HIM IN HIS CELL.

IT WILL SHOW THAT AS PART OF THAT PLAN, YOUR HONOR, THAT MR. HAMMER BRAIDED ROPES OR BRAIDED PIECES OF SHEET INTO ROPES, NOT FOR SOME EXTRACURRICULAR ACTIVITIES, BUT RATHER TO BIND SOMEONE TIGHTLY, A BIG

MAN, SO THAT THAT PERSON, ONCE TIED DOWN, COULD NOT GET FREE.

THE EVIDENCE WILL SHOW THAT MR. HAMMER, AFTER DOING THAT IN THE MIDDLE OF THE NIGHT, IN THE PRISON -- WITHIN THE PRISON, THE SPECIAL HOUSING UNIT, THAT AFTER BINDING ANDREW MARTI, HIS HANDS TO HIS SIDE, AND HIS FEET TIED TO A BUNK WITH HIM LAYING DOWN FLAT ON HIS STOMACH, THAT DAVID HAMMER GOT ON TOP OF ANDREW MARTI, PUT HIM IN A SLEEPER HOLD, HELD HIM THERE FOR A PERIOD OF TIME, YOUR HONOR.

AT ONE POINT, THE EVIDENCE IS GOING TO SHOW THAT DAVID HAMMER'S SHOULDER INJURY POPPED IN OR POPPED OUT AND THAT HE HAD TO RELINQUISH THAT SLEEPER HOLD.  YOU ARE GOING TO HEAR THROUGH HIS OWN ADMISSIONS THAT HE MADE THAT ANDREW MARTI AT THAT POINT PLEADED "NO, PLEASE, NO."  REGARDLESS, MR. HAMMER AGAIN APPLIED THAT SLEEPER HOLD, RENDERED HIM UNCONSCIOUS, GOT OFF OF HIM, RETRIEVED A PIECE OF CLOTH, A LONG PIECE OF CLOTH.  AT THAT POINT PUT IT UNDER HIS HEAD, AROUND HIS NECK AND THEN STRANGLED HIM FOR MINUTES, TO MAKE SURE THAT ANDREW MARTI WAS DEAD.

THE EVIDENCE IS GOING TO BE VERY CLEAR ON THAT, WE SUBMIT, YOUR HONOR, AND THE DEFENDANT PLEADED GUILTY TO THAT MURDER.  AND IN THIS CASE IN THIS SENTENCING HEARING, IT'S LIKELY NOT GOING TO BE MUCH

ISSUE ABOUT THE FACT THAT THIS WAS AN INTENTIONAL KILLING.

YOU ARE GOING TO HEAR FROM THE BUREAU OF PRISONS PERSONNEL THAT ENCOUNTERED HIM RIGHT AFTER THIS INCIDENT.  OUR FIRST WITNESS WILL BE NICOLE WEAVER, THE SENIOR CORRECTIONAL OFFICER WHO ENCOUNTERED MR. HAMMER IN THAT SPECIAL HOUSING UNIT ON THAT MORNING, SHORTLY AFTER HE HAD MURDERED ANDREW MARTI.  MS. WEAVER WILL TESTIFY AND TELL YOU ABOUT WHAT HE SAID AT THAT TIME, INCLUDING THE FACT THAT THE REASON HE WAS TIED UP WAS TO MAKE IT EASIER SO THAT HE COULD KILL ANDREW MARTI.

YOU ARE GOING TO HEAR ALSO ABOUT THE OTHER BUREAU OF PRISONS PERSONNEL WHO ARRIVED THERE. ONE OF THEM, TIM DEVANE, IS GOING TO TESTIFY ABOUT RECEIVING FROM THIS DEFENDANT A NAIL CLIPPER THAT HAD BEEN RENDERED TO LOOK LIKE SOME SORT OF A WEAPON, THAT IT WAS HANDED TO HIM.  YOU ARE GOING TO HEAR THE COMMENTS THAT HE MADE TO THAT LIEUTENANT.

YOU ARE GOING TO HEAR ABOUT MEASURES THAT WERE TAKEN BY THE BUREAU OF PRISONS PERSONNEL TO TRY TO SAVE ANDREW MARTI'S LIFE, EFFORTS THAT WERE IN VAIN. YOU ARE GOING TO HEAR HOW DIFFICULT IT WAS TO GET THOSE BINDS, THOSE BINDINGS, THOSE SHEETS BRAIDED INTO ROPES OFF OF HIS ANKLES AND HIS WRISTS.  HE HAD TO RUN AND GET SCISSORS TO CUT THEM OFF BECAUSE THEY WERE SO TIGHT.

YOU ARE ALSO GOING TO HEAR THAT SHORTLY THEREAFTER, A FEW HOURS LATER, AN FBI AGENT INTERVIEWED THIS DEFENDANT.  AND IN THAT INTERVIEW WHICH WAS -- WHICH TOOK A SUBSTANTIAL PERIOD OF TIME, THE AGENT WAS TAKING COPIOUS NOTES AS HE TALKED TO DAVID HAMMER.  AND DAVID HAMMER VOLUNTARILY CONFESSED TO THE MURDER, CONFESSED TO THE PLANNING, CONFESSED TO TELLING OTHER INMATES THAT HE WAS GOING TO DO THIS.

THAT WITNESS, CARLYLE THOMPSON, HE GOES BY RICK THOMPSON, WILL ALSO TESTIFY ABOUT THE CRIME SCENE AND A VIDEO THAT WAS MADE, JUDGE, SHORTLY LATER IN THAT MORNING.  THAT THE CELL HAD BEEN LOCKED UP.  YOU ARE GOING TO BE ABLE TO, JUDGE, TO WATCH THE VIDEO, IT'S ABOUT 36 MINUTES IN LENGTH, WHERE THAT AGENT GOES THROUGH THE CELL AND NARRATES THE PERTINENT THINGS THAT HE FOUND IN THE CELL AND ALSO REFLECTING ON THAT EARLIER CONFESSION THAT DAVID PAUL HAMMER HAD MADE THAT MORNING.

IN ADDITION, YOUR HONOR, WE ARE GOING TO SHOW YOU AGAIN AND HIGHLIGHT AGAIN SOME LETTERS THAT DAVID PAUL HAMMER WROTE SHORTLY THEREAFTER, IN SOME DOCUMENT THAT HE WROTE SHORTLY THEREAFTER IN THE FEW DAYS THAT OCCURRED AFTER THE MURDER.  YOU ARE GOING TO HEAR OR SEE WHAT HE WROTE, THE REASONS THAT HE OFFERED FOR KILLING ANDREW MARTI, INCLUDING THAT MARTI AND HIS CLIQUE HAD DISRESPECTED HIM AND HAD MADE THREATS AGAINST

HIM WHEN HE FIRST ARRIVED THERE.

YOU ARE GOING TO ALSO HEAR FROM A PSYCHOLOGIST, WHO IS GOING TO FLY IN.  HE IS GOING TO TESTIFY ABOUT A SIMILAR TYPE COMMENT MADE TO HIM THAT MORNING THAT HE HAD -- THERE HAD BEEN AN ACT OF DISRESPECT THAT MARTI FORGOT, BUT THAT HE DIDN'T, MR. HAMMER DIDN'T, SHOWING SOME MOTIVE, THE MOTIVE FOR THE KILLING.  NOT THAT A MOTIVE IS REQUIRED, BUT IT DOES SHOW THE SUBSTANTIAL PREPARATION AND PLANNING THAT WAS ENGAGED IN IN THIS CASE.

YOU ARE GOING TO SEE THOSE LETTERS AND THOSE DOCUMENTS ALSO, JUDGE.  AND YOU ARE GOING TO SEE THE HANDWRITING.  IF THERE IS ANY ISSUE ABOUT WHOSE THEY WERE, YOU WILL HEAR FROM A DOCUMENT EXAMINER.  AND I NOTE ALSO THAT THIS IS ONE OF THE THINGS THAT YOU ARE GOING TO HEAR WHEN WE READ IN THE TRANSCRIPT OF THE GUILTY PLEA THAT WAS MENTIONED BY AUSA MARTIN AND THAT THERE WAS NO DISAGREEMENT ABOUT THE FACT THAT HE HAD MADE THESE ADMISSIONS IN CORRESPONDENCE THAT FOLLOWED.

SO ALL THIS EVIDENCE THAT AGAIN IS BEING OFFERED WILL SHOW BEYOND ANY DOUBT THAT THE GUILTY PLEA WAS A VALID ONE AND THAT CLEARLY THIS WAS AN INTENTIONAL KILLING BY DAVID PAUL HAMMER OF ANDREW MARTI.

WE ARE ALSO GOING TO LOOK TO ESTABLISH OTHER FACTORS AS REQUIRED IN THIS TYPE OF HEARING.  AS

THE COURT IS AWARE, ONE OF THE FIRST THINGS WE ARE GOING TO HAVE TO SHOW, THAT IS WHY WE ARE DOING IT, IS THAT THERE WAS AN INTENTIONAL KILLING.  NOW, AGAIN, THE DEFENDANT PLEADED GUILTY TO IT, BUT THE EVIDENCE AS WELL AS THE GUILTY PLEA WILL ESTABLISH BEYOND A REASONABLE DOUBT THAT MR. HAMMER DID IN FACT INTENTIONALLY KILL ANDREW MARTI.

YOU WILL ALSO CONSIDER THEN WHETHER, JUDGE, THERE ARE STATUTORY AGGRAVATING FACTORS THAT MAKE THIS DEFENDANT ELIGIBLE FOR THE DEATH PENALTY.  AND THIS COURT HAS, THROUGH THIS LITIGATION, PROBABLY SEEN MORE THAN THE COURT WOULD EVER WANT TO SEE.  BUT WE ARE GOING TO AGAIN PRESENT EVIDENCE AND ESTABLISH HERE ON THE RECORD THOSE MATTERS THAT HAVE BEEN -- YOU HAVE BEEN READING ABOUT.

THE FIRST BEING -- THE FIRST ISSUE BEING ON STATUTORY AGGRAVATING FACTOR, WHETHER THIS DEFENDANT HAS PREVIOUSLY BEEN CONVICTED OF A STATE OR FEDERAL OFFENSE PUNISHABLE BY A TERM OF IMPRISONMENT OF MORE THAN ONE YEAR INVOLVING THE USE OR ATTEMPTED OR THREATENED USE OF A FIREARM.  AS THE COURT IS AWARE, THERE ARE TWO SUCH QUALIFYING CONVICTIONS THAT WILL BE OFFERED HERE.

ONE IS A 1978 CONVICTION OF MR. HAMMER THAT INVOLVED AN INCIDENT AT THE BAPTIST -- BAPTIST

HOSPITAL, I BELIEVE, IN OKLAHOMA CITY IN 1978.  AND THE COURT MAY HAVE SOME FAMILIARITY WITH THAT, BUT THE EVIDENCE IS GOING TO SHOW THAT MR. HAMMER TOOK A LOADED FIREARM INTO A HOSPITAL, TOOK THREE PEOPLE INTO A ROOM HOSTAGE, THAT THERE WAS A STANDOFF WITH THE POLICE THAT OCCURRED OVER A PERIOD OF HOURS, AND THAT ULTIMATELY ONE OF THE VICTIMS GRABBED MR. HAMMER'S ARM AND THAT OTHERS RUSHED IN, AND ONE OFFICER WAS ABLE TO TAKE THE GUN OUT OF MR. HAMMER'S HAND.  MR. HAMMER PLEADED GUILTY TO THAT AND HE WAS SENTENCED.  AND WE HAVE THE CERTIFIED COPY OF THE CONVICTION THAT WE WILL OFFER, WHICH WE SUBMIT WILL PROVE BEYOND A REASONABLE DOUBT THAT HE HAS BEEN CONVICTED OF CRIME, OF A CRIME PUNISHABLE BY A TERM OF IMPRISONMENT MORE THAN A YEAR.  HE RECEIVED A SUBSTANTIAL SENTENCE IN EXCESS OF THAT, YOUR HONOR.  AND IT INVOLVED THE USE -- THREATENED USE OF A FIREARM.  AND ONE OF THE CONVICTIONS WAS POINTING OF A WEAPON, THAT VERY TYPE CHARGE.  THE OTHER WAS A KIDNAPPING.  THE EVIDENCE AGAIN IS GOING TO BE VERY CLEAR THAT A WEAPON WAS INVOLVED IN THAT MATTER.

WE HAVE A SECOND FIREARM CONVICTION THAT THIS COURT IS WELL AWARE OF.  I WON'T SPEND MUCH TIME ON IT, BUT IT DEALS WITH THE THOMAS UPTON MATTER.  AS THE COURT IS AWARE, IT WAS THROUGH ALL OF THE LITIGATION THAT HAS BEEN GOING ON RECENTLY, THAT THERE WAS AN

ESCAPE.  AND MR. HAMMER, DURING THE COURSE OF HIS ESCAPE, ULTIMATELY SHOT A PERSON BY THE NAME OF THOMAS UPTON IN THE HEAD WITH A FIREARM.  FORTUNATELY FOR THOMAS UPTON, THE FIREARM HAD BIRDSHOT IN IT.  AND EVEN THOUGH HE HAD SHOT HIM A NUMBER OF TIMES IN THE HEAD, HE HAD -- HE SURVIVED.  MR. HAMMER WAS CONVICTED AND RECEIVED A SUBSTANTIAL SENTENCE IN THAT CASE.  SO THAT WOULD BE A SECOND QUALIFYING CONVICTION THAT WOULD SATISFY THIS FIRST -- THIS STATUTORY AGGRAVATING FACTOR.

THE NEXT STATUTORY AGGRAVATING FACTOR THAT WE WILL BE SEEKING TO PROVE IS, I HAVE ALREADY GONE THROUGH IT, YOUR HONOR, AND THAT IS THE SUBSTANTIAL PLANNING, PREMEDITATION THAT OCCURRED WHEN MR. HAMMER MURDERED ANDREW MARTI.  AND SO I WILL NOT GO INTO THAT AGAIN, BUT THAT WOULD BE THE SECOND STATUTORY AGGRAVATING FACTOR THAT THE COURT WILL CONSIDER AND THE EVIDENCE THAT I HAVE BEEN SPEAKING TO EARLIER WILL GO TO THAT.

THE COURT WILL ALSO THEN CONSIDER THE QUESTION OF FUTURE DANGEROUSNESS OF MR. HAMMER.  WE WILL BE OFFERING EVENTS IN HIS PAST THAT AGAIN SUGGEST THAT MR. HAMMER IS A VERY DANGEROUS MAN, THAT WITH OPPORTUNITY, THAT HE CAN BE VIOLENT AND THAT THAT PAST THAT HE HAS INDICATES THAT REGARDLESS, HE IS A CONTINUING DANGER TO THE LIVES AND SAFETY OF OTHERS, AND

IF AN OPPORTUNITY PRESENTED ITSELF, WOULD BE LIKELY TO COMMIT CRIMINAL ACTS OF VIOLENCE.  SO THERE IS A NONSTATUTORY AGGRAVATING FACTOR THAT WE ARE SEEKING TO PROVE, AND IT GOES TO THAT VERY QUESTION, THAT VERY ISSUE OF FUTURE DANGEROUSNESS.

THE FINAL AREA THAT WE WILL PRESENT TO YOU, YOUR HONOR, WILL BE THE IMPACT THAT ANDREW MARTI'S DEATH OBVIOUSLY HAD ON HIM.  IT ENDED ANDREW MARTI'S LIFE AT THE AGE OF 27.  BUT THE -- ANDREW MARTI'S FAMILY WAS IN FACT, AFFECTED AS A RESULT OF THIS.  AND WE WILL BE CALLING HIS BROTHER THAT WILL EXPLAIN TO THE COURT HOW THIS AFFECTED THAT FAMILY.

THAT IS, IN A BRIEF SUMMARY, JUDGE, OF WHAT WE EXPECT TO SHOW IN THIS HEARING.  AGAIN, IT'S A SENTENCING HEARING.  GUILT HAS BEEN ESTABLISHED.  WE WILL PRESENT THIS EVIDENCE LIKELY IN THE COURSE OF THIS WEEK.  MR. MARTI WILL BE TESTIFYING THE FOLLOWING MONDAY AND WE WOULD EXPECT, YOUR HONOR, THAT THE EVIDENCE WILL ALL BE IN OF THE GOVERNMENT BY THAT TIME, SO THE COURT CAN UNDERSTAND FOR ITS OWN SCHEDULE.

ONE MOMENT.

(PAUSE.)

MR. GURGANUS:  YOUR HONOR, I THINK THAT KIND OF SETS UP WHERE WE INTEND TO GO AT THIS POINT, AND WITH THAT, I WILL CONCLUDE MY INTRODUCTORY REMARKS WITH

THANKS FOR YOUR PATIENCE.

THE COURT:  ONE QUESTION I HAVE IS, DEATH PENALTY PROCEEDINGS ENTAILS TWO STAGES.  AND I'M ASSUMING I WILL HAVE TO MAKE FINDINGS ON THE FIRST STAGE BEFORE WE MOVE ON TO THE SECOND STAGE, IS THAT CORRECT? OR ARE WE SORT OF COMBINING IT BECAUSE IT'S A NON-JURY PENALTY HEARING?

MR. TRAVIS:  YOUR HONOR, BIFURCATION HAD NOT BEEN REQUESTED OR ORDERED.

THE COURT:  I DON'T THINK IT'S NECESSARY, BUT I'M JUST BRINGING IT TO YOUR ATTENTION.

MR. TRAVIS:  I DO AGREE THAT THERE IS -- THE FIRST STEP IS THE ELIGIBILITY STEP AND THEN THERE IS -- IF YOU GET PAST THAT, THEN YOU HAVE THE SELECTION STEP.

THE COURT:  ALL RIGHT.  IN EFFECT I'M GOING TO HAVE TO MAKE FINDINGS AT THE END ON EACH STEP. SO WE CAN DO IT THAT WAY.  THAT IS FINE.

MR. GURGANUS:  YOUR HONOR, SO WE ARE CLEAR, THEN I THINK IT IS IN AGREEMENT OF THE GOVERNMENT ALSO THAT WE CAN JUST DO THE WHOLE HEARING IN ONE STEP AND ULTIMATELY THE COURT WILL MAKE THE FINDING AS TO WHETHER WE HAVE MET THAT BURDEN ON THE FIRST STEP TO MOVE INTO THE SECOND STEP.

THE COURT:  ALL RIGHT.

MR. TRAVIS.

MR. TRAVIS:  THANK YOU, YOUR HONOR.

YOUR HONOR, DEATH IS NOT THE JUSTIFIED VERDICT WHICH SHOULD BE RETURNED IN THIS CASE.  AND THE GOVERNMENT IS SEEKING DEATH BASED ON THE FOUR AGGRAVATING FACTORS THAT THEY HAVE TALKED ABOUT HERE, AND I WILL TALK ABOUT ALL OF THEM LATER.  BUT THE DEFENSE POSITION BASICALLY IS THAT, EVEN ABSENT MITIGATION, THAT THE WEIGHT OF THOSE FOUR FACTORS, IF ALL PROVEN, WOULD NOT JUSTIFY A SENTENCE OF DEATH.  BUT THIS IS NOT GOING TO BE A CASE WITHOUT MITIGATION.

THERE ARE A LOT OF DIFFERENT MITIGATION AREAS THAT WE WILL PRESENT INFORMATION TO THE COURT ABOUT AND WE WILL START WITH THE AREA OF ACCEPTANCE OF RESPONSIBILITY.  AS COUNSEL HAS INDICATED, BACK ON JUNE 22, 1998, MR. HAMMER DID IN FACT STAND IN FRONT OF JUDGE MUIR, AND HE ENTERED A PLEA OF GUILTY TO FIRST DEGREE MURDER.  MR. HAMMER ENTERED THAT PLEA WITHOUT ANY PLEA BARGAIN, WITHOUT ANY CONCESSION, WITHOUT ANY INDUCEMENT BY THE GOVERNMENT.  I THINK THE COURT FROM ITS YEARS ON THE BENCH IS AWARE THAT THAT WOULD MAKE HIS PLEA RATHER UNIQUE, BECAUSE USUALLY WHEN A DEFENDANT ENTERS A PLEA, THEY DO SO BECAUSE OF SOME CONCESSION ON THE PART OF THE GOVERNMENT, WHETHER IT'S ONLY A PLEA TO ONE COUNT OF A MULTI-COUNT CHARGE, MAYBE PLEA TO A

LESSER OFFENSE, MAYBE TO GET A RECOMMENDATION FOR ACCEPTANCE OF RESPONSIBILITY.  MR. HAMMER HAD NONE OF THAT.  MR. HAMMER MADE THE DETERMINATION THAT HE WAS GOING TO ENTER A GUILTY PLEA.

IT'S ALSO A UNIQUE PLEA IN THE SENSE THAT MR. HAMMER ENTERED THAT PLEA, DECIDED TO MAKE THAT PLEA, OVER THE OBJECTION OF HIS ATTORNEYS IN THE SENSE THAT HE WAS COUNSELED NOT TO ENTER THE PLEA.  MR. HAMMER AT THAT POINT IN TIME DECIDED THAT HIS MORAL COMPASS TOLD HIM THAT THE APPROPRIATE THING TO DO WAS TO ACCEPT RESPONSIBILITY FOR WHAT HAD OCCURRED IN THAT CELL ON APRIL 13TH, 1996.  AND SO WITHOUT INDUCEMENT, WITHOUT CONCESSION AND IN OPPOSITION TO THE LEGAL ADVICE THAT HE RECEIVED, HE WENT FORWARD AND HE ENTERED A PLEA OF GUILTY.  HE ENTERED THAT PLEA OF GUILTY BECAUSE THAT IS THE DECISION THAT HE MADE THAT HE WANTED TO DO.

NOW PART OF THE ELIGIBILITY FACTORS THAT THE COURT WILL HAVE TO ULTIMATELY DETERMINE IS WHETHER MR. HAMMER ACTED WITH AN INTENT CONSISTENT WITH THE ALLEGED INTENT AS SET FORTH IN THE NOTICE TO SEEK DEATH. THERE IS A DIFFERENCE -- AND THE DEATH PENALTY ACT MAKES IT CLEAR, THERE IS A DIFFERENCE BETWEEN THE INTENT NECESSARY TO COMMIT AN ACT OF FIRST DEGREE MURDER AND THE INTENT WHICH HAS TO BE PROVEN AS PART OF THE ELIGIBILITY PHASE.  SO THE FACT THAT THERE WILL BE SOME

DISPUTE CONCERNING THE INTENT WITH RESPECT TO THE ELIGIBILITY PHASE DOES NOT DISTRACT FROM OR DETRACT FROM THE ACCEPTANCE OF RESPONSIBILITY BECAUSE WE ARE TALKING ABOUT TWO DIFFERENT TYPES OF INTENT.

AND THE SINCERITY OF MR. HAMMER'S DECISION THAT THE RIGHT THING TO DO WAS TO ACCEPT RESPONSIBILITY IS AMPLY DEMONSTRATED BY WHAT OCCURRED ON NOVEMBER 4, 1998.  ON NOVEMBER 4, 1998, MR. HAMMER HAD DISCHARGED HIS ATTORNEYS AND HAD MADE KNOWN -- ON THE RECORD MADE KNOWN THAT HE DID NOT WANT TO PURSUE AN APPEAL.  AND AS HE STOOD IN FRONT OF JUDGE MUIR TO HAVE THE SENTENCE IMPOSED, HE SAID:  I CAN NEVER BRING BACK ANDREW MARTI.  I REGRET WHAT HAPPENED.  I HAVE ACCEPTED RESPONSIBILITY FOR WHAT HAPPENED.  AND HE UTTERED THOSE WORDS AT A POINT IN TIME WHEN HE COULD GET NO LENIENCY OR ANYTHING ELSE FROM JUDGE MUIR BECAUSE JUDGE MUIR WAS OBLIGATED TO IMPOSE A SENTENCE OF DEATH ON NOVEMBER 4, 1998, WHICH HE DID.

IN ADDITION TO THE ACCEPTANCE OF RESPONSIBILITY, A SECOND MITIGATION AREA WHICH WE WILL ADDRESS IS REMORSE.  AND WE WILL CALL TO THE STAND MULTIPLE PEOPLE WHO HAVE ON MULTIPLE OCCASIONS TALKED WITH MR. HAMMER AND LISTENED TO MR. HAMMER AND SEEN THE EXTREME REMORSE THAT HE FEELS AND A SENSE OF REMORSE THAT HE WILL LIVE WITH FOR THE REST OF HIS LIFE.

THE THIRD MITIGATION AREA THAT WE ARE GOING TO GET INTO IS BASICALLY TO SHOW THE COURT THAT THE DAVID PAUL HAMMER FROM 1996, 1998, IS NOT THE DAVID PAUL HAMMER WHO IS PRESENTLY SEATED AT TABLE IN TERRE HAUTE.  AND BECAUSE OF CERTAIN CHANGES THAT I WILL GO INTO, THERE IS A LOT OF MITIGATION.

WHAT WE WILL PRESENT AS PART OF OUR CASE IS EVIDENCE CONCERNING UNGODLY PHYSICAL, EMOTIONAL AND SEXUAL ABUSE WHICH MR. HAMMER SUFFERED DURING HIS FORMATIVE YEARS THAT LEFT HIM WITH UNSEEN INTERNAL SCARRING THAT WAS CAUSED BY THE ABUSE HE SUFFERED AT THE HANDS OF INDIVIDUALS WHO WERE SUPPOSED TO BE LOVING, NURTURING AND PROTECTING HIM FROM THESE TYPE OF ACTIVITIES.

WE WILL PRESENT INFORMATION CONCERNING DEPARTMENT OF JUSTICE STUDIES WHICH HAVE BEEN DONE AND WHICH HAVE IDENTIFIED CERTAIN RISK FACTORS WHICH ARE POTENTIALLY IN THE LIVES OF CHILDREN DURING THEIR FORMATIVE YEARS.  THROUGH THIS TESTIMONY, YOU WILL FIND OUT WHAT THE RECOGNIZED RISK FACTORS ARE.  YOU WILL FIND OUT WHICH OF THOSE VARIOUS FACTORS HAS APPLICATION TO DAVID HAMMER AND THE LIFE HE LIVED AS HE WAS GROWING UP.

WE WILL ALSO PRESENT TO THE COURT IN VARIOUS WAYS INFORMATION CONCERNING MENTAL HEALTH ISSUES WITH RESPECT TO MR. HAMMER.  AND AS PART OF THE MENTAL

HEALTH ISSUES -- AS PART OF THE MENTAL HEALTH INFORMATION THE COURT WILL LEARN ABOUT, BACK IN WHEN MR. HAMMER WAS AGE 14, HE RECOGNIZED THAT HE HAD PROBLEMS AND HE RECOGNIZED HE NEEDED HELP.  AND HE REACHED OUT AND HE ATTEMPTED TO GET THE HELP AND HE MET WITH, I BELIEVE IT WAS, TWO PSYCHOLOGISTS.  AND THE PSYCHOLOGISTS RECOGNIZED THE NEED FOR HELP AND RECOMMENDED THAT PROGRAMMING, COUNSELING BE SET UP, AND THAT WAS NEVER FOLLOWED THROUGH BY MR. HAMMER'S PARENTS. WE WILL BRING TO THE COURTROOM AT LEAST ONE OF THOSE TWO PSYCHOLOGISTS, WHO WILL TELL YOU ABOUT THAT INTERACTION WITH MR. HAMMER DECADES AGO.

ONCE THE BAPTIST HOSPITAL INCIDENT OCCURRED AND MR. HAMMER ENTERED HIS PLEA OF GUILTY, HE WAS SENTENCED TO THE OKLAHOMA DEPARTMENT OF CORRECTIONS. AND THE INFORMATION WILL SHOW THAT THE OKLAHOMA DEPARTMENT OF CORRECTIONS RECORDS ARE FULL OF INFORMATION THAT MR. HAMMER NEEDED MEDICAL CARE -- EXCUSE ME, MENTAL HEALTH CARE AND HELP.  UNFORTUNATELY, THE RECORDS ALSO SHOW THAT THE MENTAL HEALTH CARE THAT MR. HAMMER RECEIVED WAS ESSENTIALLY -- THEY GAVE HIM MEDICATIONS.  IT WAS NOT UNUSUAL OR UNIQUE THAT MR. HAMMER WAS TREATED THAT WAY.  AND WE WILL SHOW TO THE COURT THROUGH ATTORNEY LOUIS BULLOCK WHO WAS AN ATTORNEY WHO HANDLED A CLASS ACTION LAWSUIT CONCERNING

THE MENTAL HEALTH CARE OR LACK THEREOF IN THE OKLAHOMA SYSTEM, AND THROUGH THE TESTIMONY CONCERNING THE OKLAHOMA DEPARTMENT OF CORRECTIONS MENTAL HEALTH SYSTEM THE COURT WILL COME TO LEARN THAT AT BEST, THE MENTAL HEALTH THAT MR. HAMMER NEEDED WAS SPARSELY RECEIVED AND AT WORSE IT WAS NONEXISTENT.

THROUGH THE 2255 LITIGATION ALSO DEVELOPED OTHER MENTAL HEALTH INFORMATION WHICH WILL BE BROUGHT TO THE ATTENTION OF THE COURT.  AND IN SUMMARY FASHION, ESSENTIALLY, NUMBER ONE, YOU WILL HEAR THE EVIDENCE OF THE HORRIFIC CHILDHOOD AND THE MENTAL DAMAGE THAT MR. HAMMER SUFFERED AS A RESULT OF THAT HORRIFIC CHILDHOOD.

SECONDLY, YOU WILL HEAR TESTIMONY THROUGH DR. JOHN MITCHELL, WHO IS THE CHIEF PSYCHOLOGIST AT THE UNITED STATES PENITENTIARY IN ALLENWOOD, THAT HE AGREED THAT MR. HAMMER SUFFERED COGNITIVE DEFECTS.

THIRDLY, YOU WILL HEAR THAT AS A RESULT OF THE COGNITIVE DEFECTS, AS RECOGNIZED BY DR. MITCHELL AND OTHERS, A MORE SOPHISTICATED TESTING OF MR. HAMMER WAS DONE BY DR. RUBEN GUR.  AND INCLUDED WERE AN MRI AND A PET SCAN OF MR. HAMMER'S BRAIN.  AS A RESULT OF THIS MORE SOPHISTICATED TESTING, IT ESTABLISHED THAT MR. HAMMER HAS BRAIN DAMAGE.  WE WILL BRING TO THE WITNESS STAND DR. GUR, WHO WILL TESTIFY CONCERNING WHAT

THE TESTING SHOWED AND THE IMPACT OF THE BRAIN DAMAGE ON THE IMPULSIVITY OF MR. HAMMER.

WE WILL ALSO BRING TO THE COURT DR. NEIL BLUMBERG, WHO WILL TESTIFY AND WHO WILL EXPLAIN TO THE COURT THE SIGNIFICANT MENTAL HEALTH ISSUES WHICH VARIOUS MENTAL HEALTH RECORDS CREATED HAVE SHOWN TO EXIST WITH RESPECT TO MR. HAMMER.  DR. BLUMBERG WILL SHARE WITH THE COURT HIS DIAGNOSIS OF MR. HAMMER AND EXPLAIN TO THE COURT THE FACTUAL BASIS WHICH SUPPORTS HIS DIAGNOSIS. MR. HAMMER SUFFERS FROM PTSD AND BORDERLINE PERSONALITY DISORDER.

THE BOTTOM LINE, WHEN YOU HEAR ALL OF THE MENTAL HEALTH INFORMATION WHICH WE WILL PRESENT, IS WHATEVER LABEL ONE CHOOSES TO PUT ON MR. HAMMER'S MENTAL HEALTH ISSUES, IN APRIL OF 1996 AND NOW, MR. HAMMER HAS SEVERE MENTAL HEALTH ISSUES.

WE WILL ALSO BRING TO THE ATTENTION OF THE COURT THE FACT THAT THESE EVENTS FROM 1996 HAPPENED A LONG TIME AGO.  AND WE WILL BRING TO THE ATTENTION OF THE COURT WHAT HAS HAPPENED WITH RESPECT TO MR. HAMMER IN THAT APPROXIMATELY 18-YEAR PERIOD OF TIME.  AT THE TIME OF THIS EVENT, MR. HAMMER WAS 37 YEARS OF AGE.  HE IS NOW 55 GOING ON 56.

IN ADDITION TO HIS ADVANCED AGE, MR. HAMMER'S HEALTH HAS BEEN STEADILY DETERIORATING FOR

MANY YEARS.  ONE OF THE PEOPLE WHO WILL PROVIDE TO THE COURT INFORMATION ON MR. HAMMER'S HEALTH SITUATION IS DR. THOMAS HYDE, WHO IS A DIPLOMAT OF THE AMERICAN ACADEMY OF PSYCHIATRY AND NEUROLOGY.  DR. HYDE NOT ONLY HAS REVIEWED THE AVAILABLE WRITTEN MEDICAL RECORDS, BUT DR. HYDE HAS ALSO PERSONALLY INTERVIEWED, EXAMINED AND TESTED MR. HAMMER.  DR. HYDE WILL EXPLAIN TO THE COURT THAT AS A RESULT OF MR. HAMMER'S DETERIORATING MEDICAL CONDITION, HE HAS BEEN HOSPITALIZED NUMEROUS TIMES, APPROXIMATELY A YEAR AGO HE HAD A SERIOUS INFECTION THAT ALMOST KILLED HIM, HE HAS BEEN HOSPITALIZED MULTIPLE TIMES WITH CARDIAC PROBLEMS, INCLUDING UNDERGOING A CATHETERIZATION IN 2012.  AND HE HAS BEEN SUFFERING FROM INCREASED COMPLICATIONS FROM HIS TYPE 2 DIABETES.  IN FACT, ALL OF THESE CONDITIONS ARE CHRONIC, SERIOUS AND WORSENING.  AS THE COURT'S AWARE, BECAUSE OF THE HEALTH ISSUES MR. HAMMER HAS, HE ELECTED TO WAIVE HIS RIGHT TO BE PHYSICALLY PRESENT AND TO PARTICIPATE IN THIS PROCESS VIA VIDEO CONFERENCING.

AS A RESULT OF THESE HEALTH ISSUES THAT MR. HAMMER HAS, HE HAS BEEN CATEGORIZED OR CLASSIFIED BY THE BUREAU OF PRISONS AS A CARE LEVEL 3 INMATE. ACCORDING TO THE CRITERIA OF THE BUREAU OF PRISONS, A CARE LEVEL 3 INMATE IS -- REQUIRES FREQUENT CLINICAL CONTACT.  HE IS A FRAGILE OUTPATIENT, AND HE MAY REQUIRE

PERIODIC HOSPITALIZATION.

IN THE TESTIMONY THAT DR. HYDE WILL SHARE WITH THIS COURT, HE WILL TALK -- ADVISE THE COURT THAT AS RECENTLY AS MAY 16, 2014, HE CONDUCTED A NEUROLOGICAL EXAMINATION OF MR. HAMMER AND HE FOUND MR. HAMMER TO BE SUFFERING FROM VARIOUS CONDITIONS, ALL OF WHICH ARE USUALLY IRREVERSIBLE, ALMOST ALWAYS PROGRESSIVE, THAT THE NEUROLOGICAL DEFECTS THAT HE FOUND IMPOSE MAJOR LIMITATIONS ON MR. HAMMER'S STRENGTH, BALANCE AND STAMINA, AND THAT MR. HAMMER IS SIGNIFICANTLY LIMITED BY THESE DISORDERS AND THESE LIMITATIONS WILL ONLY GET WORSE IN THE FUTURE.

WE WILL ALSO BRING TO THE ATTENTION OF THE COURT ANOTHER SIGNIFICANT CHANGE IN THE PERSON DAVID HAMMER, AND THAT IS WHAT I WILL CALL A SPIRITUAL CHANGE. BACK IN 1998 WHEN MR. HAMMER WAS SCHEDULED FOR EXECUTION, I BELIEVE IT WAS ON JANUARY 14 OF 1999, HE REACHED OUT FOR A SPIRITUAL ADVISOR, AND INTO HIS LIFE, SISTER CAMILLE D'ARIENZO, A SISTER OF MERCY, ENTERED. SHE WENT TO ALLENWOOD. SHE CONFERRED WITH MR. HAMMER AND SHE BASICALLY HAS BEEN IN HIS LIFE SINCE THAT INITIAL MEETING IN 1998, DECEMBER OF 1998. SHE IS AN ANCHOR FOR MR. HAMMER AND SHE HAS PLAYED A SIGNIFICANT ROLE IN HIS GROWTH. AS A RESULT OF THE RELATIONSHIP THAT MR. HAMMER HAD WITH SISTER CAMILLE, HE ALSO WAS

EXPOSED TO OTHER SISTERS.  AND EVENTUALLY DAVID HAMMER CAME TO REALIZE THAT THE GROUP OF PEOPLE THAT HE WAS ASSOCIATING WITH WERE IMPORTANT TO HIM AND WERE KIND TO HIM AND CARED ABOUT HIM.  AND IT LED HIM TO ACTUALLY BE BAPTIZED INTO THE CATHOLIC RELIGION BY THE ARCHBISHOP OF INDIANAPOLIS.  WE WILL BRING TO THE COURTROOM PEOPLE WHO WERE INVOLVED IN THAT BAPTISM.

BUT PROBABLY THE MOST SIGNIFICANT ASPECT OF MR. HAMMER'S RELATIONSHIP WITH SISTER CAMILLE IS THE FACT THAT AS AN OUTGROWTH OF THAT RELATIONSHIP WAS CREATED WHAT I WILL CALL A HOLIDAY GIFT PROJECT, A HOLIDAY CARD PROJECT.  AND THROUGH THIS PROJECT ESSENTIALLY CHRISTMAS CARDS, HOLIDAY CARDS ARE SOLD. AND AS A RESULT OF THIS PROCESS, WHICH HAS BEEN ONGOING SINCE 2001 UP THROUGH THE END OF 2003, IN EXCESS OF $92,000 HAS BEEN DONATED TO VARIOUS GROUPS.  OVER THE YEARS, SOME OF THEM GOT MONEY, SOME DIDN'T.  THERE HAVE BEEN 21 DIFFERENT GROUPS THAT HAVE RECEIVED MONEY FROM THIS HOLIDAY CARD PROJECT.  WE WILL PRESENT TO THE COURT THE TESTIMONY OF SISTER CAMILLE, WHO WILL BE ABLE TO EXPLAIN TO THE COURT THE PROJECT, HOW IT GOT STARTED, HOW IT WORKED.

IN ADDITION TO SISTER CAMILLE, WE WILL BRING TO THE COURT A NUMBER OF DIFFERENT REPRESENTATIVES FROM DIFFERENT GROUPS WHO HAVE BEEN THE BENEFICIARIES OF

THE FUNDS.  AND THE COURT WILL HEAR AND UNDERSTAND HOW THESE FUNDS ARE USED.  TWO OF THE ORGANIZATIONS OR GROUPS THAT RECEIVED THE FUNDING WILL BE ABLE TO PERSONALIZE BECAUSE A LOT OF THEM, FOR EXAMPLE, THE MONEY GOES TO -- ONE OF THE RECIPIENTS IS A FOOD BANK IN TERRE HAUTE.  AND IT'S HARD TO PERSONALIZE THAT.  BUT THERE IS A FAMILY IN HAITI THAT MR. HAMMER HAS MADE CONTRIBUTIONS TO AND HAS ESSENTIALLY CHANGED THE LIVES OF THE MOTHER AND THE THREE CHILDREN.  AND YOU WILL HEAR TESTIMONY ABOUT HAITI.

THERE IS ALSO A PLACE IN JAMAICA, ST. JOHN BOSCO'S HOME THAT SIGNIFICANT AMOUNTS OF MONEY HAVE BEEN SENT TO AND ST. JOHN BOSCO'S IS BASICALLY A HOME FOR AT-RISK CHILDREN.  AND THE MONEY THAT MR. HAMMER HAS HAD SENT IN THAT DIRECTION HAS BEEN USED IN VARIOUS WAYS.  ONE OF THE WAYS IS THEY PURCHASE WOODMAKING MACHINERY.  NOT ONLY DO THE CHILDREN GET AN OPPORTUNITY TO LEARN A TRADE, BUT WHEN THEY HAVE CREATED THESE PRODUCTS THEY ARE ABLE TO SELL THEM AND RAISE EVEN MORE MONEY.  AND OTHERS HAVE -- OTHER OF THE FUNDS GONE TO BOOKS AND TO TRY TO HELP WITH THE EDUCATION OF THESE CHILDREN.

THE COURT:  MR. TRAVIS, YOU SAID 2001 TO 2003.  DID YOU MEAN 2013?

MR. TRAVIS:  YES.  2013.  I'M SORRY, YOUR

HONOR IF I SAID 2003.

THE COURT:  I THOUGHT I HEARD 2003.
COULD HAVE BEEN MY MISTAKE.

MR. TRAVIS:  IT MAY WELL HAVE BEEN MINE,
YOUR HONOR.

THE COURT:  ALL RIGHT.  GO AHEAD.

MR. TRAVIS:  IN ADDITION TO THE MONETARY
CONTRIBUTION, MR. HAMMER HAS ALSO ON OCCASION WRITTEN
LETTERS, EXCHANGED CORRESPONDENCE WITH THESE AT RISK
CHILDREN TO TRY TO ENCOURAGE THEM TO DO TWO THINGS, TO
GET AN EDUCATION, AND TO STAY AWAY FROM A LIFE OF CRIME.
AND WHEN YOU HEAR THE EVIDENCE CONCERNING WHAT HAS GONE
ON WITH RESPECT TO THE FUNDRAISING THROUGH THE CARD
PROJECT, WE BELIEVE THIS WILL SHOW TO THE COURT THAT
MR. HAMMER HAS TOUCHED THE SOCIETY OF MAN IN MULTIPLE
POSITIVE WAYS AND HAS MADE A REAL TANGIBLE AND IMPORTANT
CONTRIBUTION TO THE LIVES OF OTHERS.

NOW, THE GOVERNMENT HAS SET FORTH THE
AGGRAVATING FACTORS THAT IT WILL BE PURSUING.  AND WITH
RESPECT TO THE TWO STATUTORY AGGRAVATING FACTORS INSOFAR
AS THE PRIOR FIREARM AGGRAVATOR, CLEARLY THAT IS NOT IN
DISPUTE.  THE CONVICTIONS ARE THE CONVICTIONS.

THE SECOND STATUTORY AGGRAVATING FACTOR
WHICH THE GOVERNMENT WILL RELY ON IS WHAT THEY CALL
SUBSTANTIAL PLANNING AND PREMEDITATION.  THIS FACTOR OF

SUBSTANTIAL PLANNING AND PREMEDITATION WAS LITIGATED BEFORE THIS COURT AND WE ORALLY ARGUED THE CONCEPT OF SUBSTANTIAL PLANNING AND PREMEDITATION, AND IT NEEDS TO BE BOTH SUBSTANTIAL PLANNING AND SUBSTANTIAL PREMEDITATION.  THE GOVERNMENT HAS INDICATED THAT IT BELIEVES IT WILL BE ABLE TO ESTABLISH THAT.  WE DON'T BELIEVE THAT THE GOVERNMENT WILL BE ABLE TO ESTABLISH THAT.  WE BELIEVE THAT THE EVIDENCE WILL SHOW THAT THE -- YES, THERE WERE BRAIDED ROPES BUT THE BRAIDING OF THE ROPES WAS FOR SOMETHING ENTIRELY DIFFERENT.  AND EVEN IF THERE WAS PLANNING AND PREMEDITATION, THAT IT DOES NOT SATISFY THE SUBSTANTIAL COMPONENT WHICH MUST BE ESTABLISHED TO CARRY THE DAY ON THAT SECOND STATUTORY AGGRAVATING FACTOR.

INSOFAR AS THE NONSTATUTORY AGGRAVATING FACTORS, THE VICTIM IMPACT, THERE IS NO REAL DISPUTE WITH RESPECT TO VICTIM IMPACT.  OBVIOUSLY, THE DEATH OF A SON, BROTHER, SISTER, CAUSES SOME LOSS AND THERE WAS VICTIM IMPACT.

THE OTHER NONSTATUTORY AGGRAVATING FACTOR WHICH THE GOVERNMENT RELIES ON IS THE CONTENTION OF FUTURE DANGEROUSNESS.  AND ESSENTIALLY THE GOVERNMENT SAYS TO THE COURT, YOU MUST ORDER THAT MR. HAMMER BE PUT TO DEATH BECAUSE OTHERWISE HE REPRESENTS A RISK THAT HE MAY COMMIT FUTURE ACTS OF VIOLENCE DIRECTED AT INMATES

OR STAFF.  AND GOVERNMENT COUNSEL HAS EXPLAINED WHAT WILL BE PRESENTED TO SEEK TO SUPPORT THAT CONCEPT.  WE WILL ALSO PRESENT INFORMATION TO SEEK TO SHOW THAT THE FUTURE DANGEROUSNESS ASSERTION WITH RESPECT TO MR. HAMMER IS NOT VALID.  IT'S NOT LEGITIMATE.  IT'S NOT A TRUE CONCERN.

WE WILL DO THAT IN VARIOUS WAYS, ONE OF WHICH WILL BE, WE WILL BRING TO THE ATTENTION OF THE COURT THAT MR. HAMMER HAS GONE -- UNDERGONE EVALUATIONS BY VARIOUS CLINIC -- VARIOUS PSYCHOLOGISTS EMPLOYED BY THE BUREAU OF PRISONS.  HE HAS BEEN ASSESSED CONCERNING WHETHER HE IS A THREAT OF HARM TO OTHERS.  AND AS I UNDERSTAND THE SCALE, THE SCALE IS HIGH, MEDIUM AND LOW. AND CONSISTENTLY, THESE BUREAU OF PRISONS PSYCHOLOGISTS AND THEY'RE PSYCHOLOGISTS FROM USP ALLENWOOD, ADX FLORENCE, USP TERRE HAUTE, USP LEWISBURG AND USP CANAAN, ALL PLACES WHERE MR. HAMMER HAS BEEN FOR SOME PERIODS OF TIME SINCE 1998, HAVE CONSISTENTLY FOUND THAT MR. HAMMER IS A LOW -- HAS A LOW POTENTIAL FOR HARM TO OTHERS.

IN ADDITION TO THIS WRITTEN DOCUMENTATION, WE WILL ALSO PRESENT TO THE COURT THE TESTIMONY OF A FORMER WARDEN, TIM GRAVETTE, WHO WILL EXPLAIN TO THE COURT THAT WHEN MR. HAMMER IS SENTENCED IF THE SENTENCE IS LIFE IMPRISONMENT WITHOUT THE POSSIBILITY OF RELEASE, MR. HAMMER DOES NOT GET TO

CHOOSE WHERE HE WANTS TO GO AND STAY, THAT THERE IS A CLASSIFICATION PROCESS THAT THE BUREAU OF PRISONS HAS AND THE CLASSIFICATION PROCESS WILL BE IMPLEMENTED WITH RESPECT TO MR. HAMMER.

THE BUREAU OF PRISONS IN IMPLEMENTING THE DETERMINATION OF WHERE MR. HAMMER SHOULD BE HOUSED WILL HAVE IN FRONT OF IT ALL OF THE KNOWLEDGE OF THE DEATH OF MR. MARTI, THE 1981 ESCAPE AND THE AFTERMATH, THE 1983 ESCAPE AND AFTERMATH, AND ALSO THE INCIDENT IN LOMPOC. AND THEY WILL BE ABLE TO TAKE THAT INTO CONSIDERATION IN DETERMINING WHERE MR. HAMMER SHOULD BE HOUSED.

I DON'T THINK THERE WILL BE ANY SERIOUS DISPUTE THAT AS A RESULT OF THE CLASSIFICATION PROCESS THE LEAST SECURE PLACE THAT MR. HAMMER WILL BE HOUSED IS IN THE UNITED STATES PENITENTIARY.  AND MR. GRAVETTE BELIEVES THAT IS PROBABLY WHERE HE WILL GO.  BUT HE IS NOT GOING TO BE DOING THE CLASSIFICATION.  BUT FORMER WARDEN GRAVETTE WILL EXPLAIN TO THE COURT THE GENERAL SECURITY IN THE UNITED STATES PENITENTIARIES AND ALSO WILL BRING TO THE ATTENTION OF THE COURT SPECIAL SECURITY MEANS WHICH CAN BE EMPLOYED NOT ONLY WITH RESPECT TO MR. HAMMER BUT ALSO WITH RESPECT TO ANY OTHER INMATE THOUGHT TO NEED EXTRA WATCHING, FOR LACK OF A BETTER TERM.  THAT THE FEDERAL BUREAU OF PRISONS IS THE GOLD STANDARD IN CORRECTIONS AND THAT THE FEDERAL BUREAU

OF PRISONS HAS THE ABILITY TO SAFELY CONTROL MR. HAMMER WHILE HE SERVES OUT A SENTENCE OF LIFE.

SINCE MR. GRAVETTE WILL NOT BE DOING THE CLASSIFICATION, ABOVE -- HE WILL EXPLAIN THAT ABOVE THE UNITED STATES PENITENTIARY LEVEL, THERE ARE MORE RESTRICTIVE INSTITUTIONS.  THERE ARE SPECIAL MANAGEMENT UNITS.  THERE ARE SPECIAL CONFINEMENT UNITS.  AND AT THE VERY TOP OF THE CHAIN IS ADX, ADMINISTRATIVE MAXIMUM, THE ALCATRAZ OF THE ROCKIES, WHATEVER NAME YOU WANT TO PUT ON IT.  NOW MR. GRAVETTE DOES NOT BELIEVE THAT THAT IS WHERE MR. HAMMER WILL BE INITIALLY DESIGNATED, BUT SINCE HE IS NOT GOING TO BE MAKING THE DESIGNATION, HE WILL ALSO TALK ABOUT THOSE TYPE OF INSTITUTIONS, AND AS THE COURT WILL LEARN AS SECURE AS THE UNITED STATES PENITENTIARIES ARE, THESE OTHER OPTIONS ARE EVEN MORE SECURE.

SO WE TAKE THE POSITION AND ADVOCATE AND WILL BE ADVOCATING TO THE COURT THAT BASED ON THE ABILITY OF THE BUREAU OF PRISONS TO SAFELY CONTROL MR. HAMMER BY CHOOSING WHERE TO HOUSE HIM, AND THIS COUPLED WITH MR. HAMMER'S AGING AND HIS MULTIPLE MEDICAL PROBLEMS LEAD TO THE CONCLUSION THAT MR. HAMMER IS NOT TRULY A FUTURE DANGER.

WE WILL START THE PRESENTATION, BASICALLY OUR PRESENTATION, WITH LOUISE LUCK.  WE WILL THEN BRING

IN FAMILY MEMBERS.  WE WILL THEN BRING IN VARIOUS EXPERTS.  WE WILL BRING IN SISTER CAMILLE AND PEOPLE FROM THE VARIOUS ORGANIZATIONS.  AND WE WILL BRING IN TIM GRAVETTE.

AND WE SUGGEST TO THE COURT THAT WHEN ALL OF THE INFORMATION IS IN FRONT OF THE COURT, THE INFORMATION WILL LEAD THE COURT TO THE CONCLUSION THAT A SENTENCE OF DEATH IS NOT A JUSTIFIED SENTENCE IN THIS CASE.

THANK YOU, YOUR HONOR.

THE COURT:  DO YOU WANT TO BEGIN, MR. GURGANUS?  USUALLY WE TAKE A RECESS ABOUT EVERY HOUR AND-A-HALF.  HOPEFULLY THAT WILL ACCOMMODATE EVERYONE.

MR. GURGANUS:  IT HAS BEEN ABOUT AN HOUR AND-A-HALF WE HAVE BEEN HERE.  THIS WITNESS WILL BE 20 MINUTES.  I THINK EVERYONE IS --

THE COURT:  WHY DON'T WE TAKE A FIVE-MINUTE RECESS AT THIS POINT THEN.  ALL RIGHT.

MS. HAINES:  THANK YOU, YOUR HONOR.

THE COURT:  WE WILL STAND IN RECESS.

(BREAK TAKEN.)

THE COURT:  ALL RIGHT.  WE ARE BACK ON THE RECORD.

MR. GURGANUS, FIRST WITNESS.

MR. GURGANUS:  THE UNITED STATES CALLS

NICOLE WEAVER.

THE COURT:  ALL RIGHT.

NICOLE WEAVER, GOVERNMENT WITNESS, SWORN.

THE CLERK:  STATE AND SPELL YOUR FULL NAME FOR THE RECORD, PLEASE.

THE WITNESS:  NICOLE WEAVER, N-I-C-O-L-E W-E-A-V-E-R.

DIRECT EXAMINATION

BY MR. GURGANUS:

Q.      MS. WEAVER, CAN YOU TELL JUDGE SLOMSKY WHO IT IS THAT YOU WORK FOR?

A.      I WORK FOR THE FEDERAL BUREAU OF PRISONS.

Q.      HOW LONG HAVE YOU WORKED WITH THE FEDERAL BUREAU OF PRISONS?

A.      OVER 20 YEARS NOW.

Q.      WHERE ARE YOU PRESENTLY STATIONED?

A.      FCI BUTNER IN BUTNER, NORTH CAROLINA.

Q.      WHAT'S FCI BUTNER?

A.      FEDERAL CORRECTIONAL INSTITUTION.

Q.      CAN YOU BRIEFLY TELL US ABOUT YOUR EDUCATIONAL BACKGROUND?

A.      I WENT TO COLLEGE AT MANSFIELD UNIVERSITY AND RECEIVED A BACHELOR OF ARTS DEGREE.

Q.      AND HOW ABOUT YOUR EMPLOYMENT FOLLOWING THAT?

THE COURT:  CAN YOU PULL THE MIC A LITTLE

CLOSER TO YOU.

THE WITNESS:  AFTER COLLEGE, I STARTED WORKING FOR FRANKLIN COUNTY DETENTION CENTER, WHICH WAS IN PENNSYLVANIA.  I WORKED THERE MAYBE ABOUT SIX MONTHS BEFORE I GOT HIRED ON WITH THE FEDERAL BUREAU OF PRISONS.

BY MR. GURGANUS:

Q.      APPROXIMATELY WHERE IS FRANKLIN COUNTY?

A.      IT'S DOWN OUTSIDE OF HARRISBURG.

Q.      AND WHAT YEAR WAS THAT APPROXIMATELY?

A.      THAT WAS IN '93.

Q.      IN 1993?

A.      YES.

Q.      IN 1993, DID YOU THEN APPLY TO GET A JOB WITH THE FEDERAL BUREAU OF PRISONS?

A.      YES, I DID, AND I WAS HIRED ON THERE IN OCTOBER -- OCTOBER 31ST OF 1993.

Q.      SO IN OCTOBER OF 1993, WHAT WERE THE STEPS THAT THEN YOU UNDERTOOK TO START YOUR EMPLOYMENT WITH BOP?  WAS THERE TRAINING?  WAS THERE AN INITIAL PERIOD WHERE YOU WENT TO A JAIL TO LEARN THE ROPES?  CAN YOU TELL US ABOUT THAT?

A.      WHEN I WAS HIRED ON, WE HAVE AN INITIAL WHAT THEY CALL AN INSTITUTIONAL FAMILIARIZATION TRAINING, WHICH IS A TWO-WEEK CLASS THAT YOU SIT AT THE

INSTITUTION AND YOU FIND OUT WHAT IT'S LIKE TO BE IN THE CORRECTIONAL ENVIRONMENT.  THEN THEY SEND YOU AWAY TO GLYNCO LAW ENFORCEMENT TRAINING ACADEMY DOWN THERE FOR THREE WEEKS.

Q.    AND DID YOU DO THAT, THIS INITIAL TWO-WEEK PERIOD?

A.    YES.

Q.    WHERE WAS IT THAT YOU WENT FOR THIS INITIAL TWO-WEEK PERIOD?

A.    THAT TWO WEEKS WAS AT THE TRAINING CENTER AT ALLENWOOD PENITENTIARY, ALLENWOOD COMPLEX.

Q.    AT THE ALLENWOOD COMPLEX?

A.    YES.

Q.    THAT IS LOCATED OUTSIDE OF ALLENWOOD, PENNSYLVANIA, IS THAT RIGHT?

A.    IT'S RIGHT IN ALLENWOOD.

Q.    NOW, WHAT WAS THE STATUS OF THAT INSTITUTION AT THAT POINT?

A.    AS IN --

Q.    IN OTHER WORDS, HAD IT OPENED ALREADY?  WAS IT PULL OF INMATES?

A.    NO.  WE WERE OPENING IT.  IT WAS -- WE STARTED IT FROM THE GROUND UP, BASICALLY.  WE WERE THE INITIAL STAFF COMING IN TO OPEN IT UP.

Q.    SO WHEN YOU WENT THERE THEN FOR THAT FIRST

COUPLE OF WEEKS, IT WAS NOT FULL.  IT WAS NOT -- THE PRISON WAS NOT FULL AT THAT POINT, IS THAT FAIR TO SAY?

A.      NO.  WE DID NOT HAVE ANY INMATES AT THE TIME.

Q.      WHAT MONTH WAS THAT APPROXIMATELY IN '93?

A.      OCTOBER IS WHEN I STARTED AND I BELIEVE WE FINALLY GOT OUR FIRST INMATES BEGINNING OF DECEMBER, APPROXIMATELY AROUND THERE.

Q.      BY THAT TIME HAD YOU GONE TO GLYNCO ALSO?

A.      NO.  I WENT TO GLYNCO IN THE MIDDLE OF DECEMBER, AND CAME BACK AT THE VERY END OF DECEMBER.

Q.      WHAT IS THE PROCESS AT GLYNCO?

A.      THEY GIVE YOU CLASSES IN SELF DEFENSE, FIREARMS, CLASSROOM WORK, TRY TO TRAIN YOU MORE FOR WHAT A CORRECTIONAL ENVIRONMENT IS.

Q.      NOW, YOU HAD SOME -- YOU SAID ABOUT SIX MONTHS EXPERIENCE PRECEDING THAT, IS THAT RIGHT, AT THE FRANKLIN COUNTY JAIL?

A.      THAT'S CORRECT.

Q.      HOW LONG WERE YOU AT GLYNCO THEN?

A.      THREE WEEKS.

Q.      AND WAS THERE A GRADUATION, SOMETHING AFTER THE THOSE THREE WEEKS?

A.      YES.  IF YOU PASSED -- YOU PASSED FIREARMS, THE SELF DEFENSE AND THE CLASSROOM WORK, YOU RECEIVED YOUR -- LIKE A CERTIFICATE THAT SAID YOU PASSED.

Q.      AT THAT POINT, WHAT WAS YOUR TITLE?

A.      I WAS A CORRECTIONAL OFFICER.

Q.      DID YOU THEN GO DIRECTLY BACK TO ALLENWOOD TO COMMENCE OR TO CONTINUE YOUR EMPLOYMENT WITH THE BUREAU OF PRISONS?

A.      YES, I DID.

Q.      AND WHEN YOU STARTED WORKING THERE, YOU WERE A CORRECTIONAL OFFICER INITIALLY?

A.      THAT'S CORRECT.

Q.      HOW DID YOU -- YOUR PROGRESSION, HOW HAS IT GONE SINCE THAT POINT WITH THE FEDERAL BUREAU OF PRISONS?

A.      STARTED AS A CORRECTIONAL OFFICER.  A YEAR LATER I WAS PROMOTED TO A SENIOR OFFICER.  A YEAR AFTER THAT I WAS PROMOTED TO A SENIOR OFFICER SPECIALIST.  AFTER THAT I WENT TO SPECIAL INVESTIGATIVE TECHNICIAN AND THEN FROM THERE, CASE MANAGER.

Q.      AND PRESENTLY IS THAT YOUR POSITION, IS A CASE MANAGER?

A.      THAT'S CORRECT.

Q.      AND I THINK YOU SAID BEFORE YOU WERE DOWN IN BUTNER, IS THAT RIGHT?

A.      YES.

Q.      IS THAT IN NORTH CAROLINA?

A.      YES.

Q.      I WANT TO -- JUST SO WE CAN GET AN IDEA, LET'S

PUT UP GOVERNMENT EXHIBIT 1.  I'M GOING TO PUT THAT ON AT THIS POINT ON THE SANCTION.

CAN YOU PUBLISH THAT, PLEASE.  ALL RIGHT.

WE HAVE GOVERNMENT EXHIBIT 1 ON THE SCREEN.  IS THAT AN AERIAL PHOTO?

A.      YES.

Q.      DO YOU RECOGNIZE WHAT IT IS AN AERIAL PHOTO OF?

A.      YES, IT'S USP ALLENWOOD.

Q.      IS THAT WHERE YOU WERE THEN EMPLOYED AND WORKING IN -- FROM 1993 -- WAS IT -- WHEN DID YOU LEAVE THERE?

A.      AUGUST 1997.

Q.      '97?  FROM '93 TO '97, IS THAT AN AERIAL PHOTO OF WHAT THE ALLENWOOD COMPLEX LOOKS LIKE?

A.      YES, IT IS.  THAT IS THE PENITENTIARY.

Q.      THAT IS THE PENITENTIARY?

A.      YES.

Q.      IN ADDITION TO THIS ARE THERE OTHER CORRECTIONAL FACILITIES IN THAT AREA?

A.      YEAH.  AT THE TIME THERE WAS A CAMP, ALLENWOOD CAMP, ALLENWOOD LOW AND ALLENWOOD MEDIUM.

Q.      AND WE HAVE -- I THINK THE RECORD SHOULD -- THE PICTURE IS NOW OFF THE SCREEN.

I WANT TO DIRECT YOUR ATTENTION TO APRIL 13TH OF 1996.  YOU WERE WORKING AT ALLENWOOD AT THAT TIME, IS THAT RIGHT?

A.      THAT'S CORRECT.

Q.      WHAT POSITION WERE YOU IN AT THAT TIME?

A.      I WAS A SENIOR OFFICER SPECIALIST.

Q.      DO YOU RECALL WHAT SHIFT YOU WERE WORKING ON APRIL 13TH, 1996, AND WHERE YOU WERE WORKING?

A.      I WAS WORKING MIDNIGHT TO 8 AND I WAS THE OFFICER IN CHARGE OF THE SPECIAL HOUSING UNIT.

Q.      CAN YOU EXPLAIN TO THE COURT WHAT THE SPECIAL HOUSING UNIT WAS AT USP ALLENWOOD AT THAT TIME?

A.      IT'S THE LOCKDOWN UNIT WHERE EVERYBODY IS LOCKED IN PRETTY MUCH ABOUT 23 HOURS A DAY.

Q.      YOU SAY 23 HOURS A DAY?

A.      BECAUSE YOU ARE AFFORDED ONE HOUR OF REC WHERE YOU COME OUT.

Q.      I WANT TO SHOW YOU GOVERNMENT EXHIBIT 2 AND ASK THAT THAT BE PUBLISHED.

        WHAT IS GOVERNMENT EXHIBIT 2 THAT IS NOW ON THE SCREEN?

A.      THAT IS THE LAYOUT OF THE SPECIAL HOUSING UNIT.

        MR. GURGANUS:  YOUR HONOR, JUST FOR OUR PURPOSES HERE, AT THE CONCLUSION OF THE WITNESSES WE WILL MOVE THE EXHIBITS IN.  IS THAT ACCEPTABLE TO THE COURT?

        THE COURT:  THAT IS FINE.

        MR. GURGANUS:  I DON'T BELIEVE THAT THERE

IS ANY -- I MOVE IN TO IT BECAUSE I DON'T BELIEVE THAT THERE IS ANY PROBLEM WITH ANY OF THE THINGS THAT WE ARE GOING --

THE COURT:  THAT IS FINE.  IF THERE IS NO OBJECTION, IT CAN BE PUBLISHED.

BY MR. GURGANUS:

Q.     SO THAT IS THE -- SO THAT IS THE SPECIAL HOUSING UNIT AND IS THAT WHERE YOU WERE WORKING ON APRIL 13TH, 1996?

A.     THAT'S CORRECT.

Q.     I'M GOING TO GO TO -- PUT ON THE SCREEN GOVERNMENT EXHIBIT 5.

WHAT IS GOVERNMENT EXHIBIT 5?

A.     THAT IS THE LAYOUT OF USP ALLENWOOD.

Q.     SO THAT IS THE -- WHEN WE SHOWED YOU GOVERNMENT EXHIBIT 1, THAT WAS A PHOTO OF THE COMPLEX OF -- AND THIS IS THE SCHEMATIC OF THAT COMPLEX?

A.     THAT'S CORRECT.  IT BREAKS DOWN TO WHERE ALL THE UNITS ARE AND WHAT IS WHERE.

Q.     OKAY.  CAN YOU SHOW US IN -- I THINK -- YOU CAN TOUCH THE SCREEN THERE OR CIRCLE THE AREA WHERE THAT SPECIAL HOUSING UNIT IS.  AND THEN YOU CAN ALSO CLEAR IT.  SO AT THIS TIME, CAN YOU SHOW THE COURT BY CIRCLING WHERE THE SPECIAL HOUSING UNIT IS?

A.     RIGHT THERE.

Q.    THERE YOU GO.

IS IT -- ARE THERE LETTERS THERE, S-H-U?

A.    YES.

Q.    CAN YOU HIT THE CLEAR BUTTON ON THAT TO TAKE THAT OFF NOW?

A.    I'M NOT SURE WHICH BUTTON IT IS.

THE COURT:  WHICH IS THE CLEAR BUTTON?

MR. GURGANUS:  THERE SHOULD BE AN AREA ON THE SCREEN.

BY MR. GURGANUS:

Q.    YOU WERE WORKING THEN FROM -- THE LATE SHIFT, IS THAT RIGHT, ON APRIL 13TH?

A.    MIDNIGHT TO 8.

Q.    MIDNIGHT TO 8?

A.    UH-HUH.

Q.    WHAT'S THE PROCESS AT THE SHU WHEN YOU WOULD -- WHEN YOU CAME ON THAT NIGHT?  WHAT WOULD YOU DO?

A.    SINCE IT WAS A SUNDAY NIGHT AND THE BEGINNING OF THE NEW WEEK, I WAS IN CHARGE OF GETTING ALL THE PAPERWORK STRAIGHT FOR THE NEXT WEEK, LAYING OUT ALL OF THE FORMS AND STUFF FOR THE INMATES AND FOR THE STAFF THAT THEY HAD TO FILL OUT FOR THE WEEK.

Q.    WHO ELSE WAS WORKING IN THAT UNIT WITH YOU AT THAT TIME OF NIGHT?

A.    I'M THE ONLY ONE IN THAT UNIT THAT NIGHT.

Q.      DID YOU -- AS PART OF THAT, WHEN YOU CAME ON, DID YOU HAVE TO MAKE CHECKS, CERTAIN CHECKS BEFORE YOU STARTED?

A.      YES.

Q.      AND WHAT KIND OF CHECKS DID YOU DO?

A.      YOU CHECK ALL YOUR KEYS AND EQUIPMENT AND YOU CHECK THE FIRE PANEL AND THE DURESS ALARM PANEL.

Q.      AND DID YOU DO THAT THAT DAY?

A.      YES, I DID.

Q.      WAS THERE -- WHEN YOU WOULD MAKE THOSE CHECKS, DO YOU RECORD THOSE IN SOME WAY?

A.      WE PUT THEM IN A LOG BOOK.

Q.      I SHOW YOU GOVERNMENT EXHIBIT 31.1.  CAN YOU PUBLISH, PLEASE.

MS. SAUNDERS:  IS THAT THE LOG?

BY MR. GURGANUS:

Q.      WHAT IS GOVERNMENT EXHIBIT 31.1?

A.      THAT'S THE 30-MINUTE CHECK LOG.

Q.      I WILL SHOW YOU GOVERNMENT EXHIBIT 31.2.  WHAT IS THAT?

A.      THAT IS THE LOG THAT YOU COME IN AND YOU WRITE DOWN EVERYTHING THAT HAPPENED THAT NIGHT.

Q.      AND DOES THAT INCLUDE THE ALARM CHECK ON THAT?

A.      YES.  THAT WAS AT 12 O'CLOCK.

Q.      SO AT 12 O'CLOCK IN THE -- IT SAYS END OF SHIFT,

IS THAT RIGHT, IN THE MIDDLE OF THE PAGE THERE?

A.      RIGHT.

Q.      AND THEN THERE IS A NOTATION UNDER THAT.  CAN YOU READ IT?

A.      APRIL 13TH, 1996, MORNING WATCH, THAT'S MW.  N. WEAVER TADROSS, AND MY BASE COUNT WAS 126 THAT NIGHT. THAT IS HOW MANY INMATES I HAD IN THE UNIT.

Q.      SO THERE WAS THAT MANY INMATES IN THE ENTIRE UNIT, IS THAT RIGHT?

A.      THAT'S CORRECT.

Q.      WOULD THAT HAVE BEEN IN THE ADMINISTRATIVE SEGREGATION AS WELL AS THE DISCIPLINARY SEGREGATION?

A.      BOTH.

Q.      BOTH.  IS THERE TWO SEPARATE SIDES TO THE SPECIAL HOUSING UNIT AT THAT POINT -- AT THAT TIME?

A.      DIFFERENT RANGES.  THERE'S FOUR RANGES.

Q.      CAN YOU -- YOU SAID YOU DID A CHECK, IS THAT RIGHT?  WHERE WOULD THAT BE?

A.      ARE YOU TALKING THE 30-MINUTE CHECKS OR ARE YOU TALKING --

Q.      NO.  RIGHT BELOW THERE, 12 O'CLOCK, ASSUMES -- CAN YOU READ WHAT YOU WROTE?  IS THIS YOUR HANDWRITING, BY THE WAY?

A.      YES, IT IS.

Q.      WHAT DID YOU WRITE THEN AT 12 A.M.?

A.     ASSUME DUTIES AND EQUIPMENT OF SHU, FIRE PANEL AND DURESS OPERATIONAL.

Q.     NOW IN THE COURSE OF AN EVENING, RIGHT, ARE YOU REQUIRED TO DO WHAT IS CALLED COUNTS?

A.     THAT'S CORRECT.

Q.     HOW MANY COUNTS WERE YOU REQUIRED TO DO ON YOUR SHIFT?

A.     THERE'S THREE ON MORNING WATCH.

Q.     AND WHAT TIMES ARE THOSE COUNTS?

A.     1 O'CLOCK, 3 O'CLOCK, AND 5 O'CLOCK.

Q.     NOW, DURING THE COURSE OF THE EVENING IN ADDITION TO THE COUNTS, ARE THERE ALSO CHECKS THAT ARE DONE?

A.     YES.

Q.     WHAT IS THE DIFFERENCE BETWEEN A COUNT AND A CHECK?

A.     FOR A COUNT I HAVE ANOTHER PERSON WITH ME WHO COMES IN AND WE ACTUALLY COUNT TOGETHER TO MAKE SURE WE HAVE THE SAME NUMBER.  AND A CHECK WOULD BE I JUST WALK THE RANGES, KIND OF PEER IN THE CELLS, SEE WHAT'S GOING ON IN THE RANGE.  EVERY 30 MINUTES I WALK DOWN A RANGE.

Q.     WHEN YOU SAY EVERY 30 MINUTES YOU WALK DOWN A RANGE, DO YOU COVER ALL THE RANGES WITHIN THE SPECIAL HOUSING UNIT?

A.     YES.

Q.      OR DID YOU THAT NIGHT?

A.      YES, I DID.

Q.      WITH RESPECT TO THE 1 O'CLOCK COUNT, CAN YOU EXPLAIN TO THE JUDGE WHAT YOU DID ON THE 1 O'CLOCK COUNT AND WHETHER THERE WAS ANYTHING OUT OF THE ORDINARY THAT EVENING?

A.      NOTHING OUT OF THE ORDINARY.  MY NUMBER TWO WHO CAME IN TO HELP COUNT WITH ME, WE STARTED AT -- I COULDN'T REMEMBER WHAT RANGE WE STARTED AT NOW.  WE WENT DOWN THERE, WE COUNTED EACH CELL.  FIND OUT HOW MANY INMATES WERE DOWN THERE.  WE'D GET DOWN TO THE END OF THE RANGE.  HE WOULD SAY HOW MANY HE HAD.  I WOULD SAY HOW MANY I HAD, MAKE SURE WE MATCHED.  AND THEN WE'D PROCEED TO THE NEXT RANGE AND DO THE SAME THING.  THEN AT THE END WE TOTAL UP HOW MANY WERE ON EACH RANGES, TO MAKE SURE WE HAD THE 126.

Q.      ALL RIGHT.  AND THEN YOU LOGGED THAT INTO A BOOK, IS THAT RIGHT?

A.      PUT IT IN THE BOOK AND WE ALSO CALL THE CONTROL CENTER BECAUSE THEY ARE THE ONES THAT ARE DOING THE MASTER LOG TO SEE -- THE ENTIRE INSTITUTION IS COUNTING. IT IS NOT JUST THE SPECIAL HOUSING UNIT.

Q.      WHEN YOU ARE DOING THIS COUNT, RIGHT, WHEN YOU ARE ON THAT RANGE, IS THERE -- DO YOU HAVE KEYS TO THE CELL?

A.      NO, I DO NOT.  I HAVE KEYS TO THE RANGE DOOR, AND THAT IS IT.

Q.      YOU CAN GET INTO THE RANGE AND THEN WALK BY ALL THE CELLS, IS THAT RIGHT?

A.      THAT'S CORRECT.

Q.      BUT YOU CAN'T GET INTO THE CELLS THEMSELVES?

A.      NO.

Q.      AT THAT POINT AT NIGHT WAS THE DOORS LOCKED IN ALL THE CELLS?

A.      YES.

Q.      AND IN THE SPECIAL HOUSING UNIT, IS THAT THE WAY IT IS UNLESS SOMEONE IS BEING MOVED?

A.      THAT'S CORRECT.  THEY ARE ALWAYS SECURE.

Q.      SO UNLIKE GENERAL POPULATION, CORRECT, WHERE THE INMATES CAN GO IN AND OUT OF THEIR CELL AT WILL DURING CERTAIN PERIODS, IT'S NOT THAT WAY IN THE SPECIAL HOUSING UNIT, CORRECT?

A.      THAT'S CORRECT.

Q.      INMATES ARE LOCKED IN, TRUE?

A.      THEY ARE LOCKED IN.

Q.      HOW WOULD YOU SEE INTO THESE CELLS, SAY, DURING THAT 1 O'CLOCK COUNT THAT YOU DID?

A.      UNLESS THE INMATE ALREADY HAD THE LIGHT ON AND THEN YOU COULD SEE IN BY THE LIGHT, I CARRIED A FLASHLIGHT.  WHEN I GO DOWN THE RANGE, I SHINE THE

FLASHLIGHT IN THE ROOM.

Q.    YOU CAN TELL THE NUMBER OF PEOPLE IN THERE AT THAT TIME?

A.    YES.

Q.    IS THERE A WINDOW ON THESE DOORS?

A.    YES.  IT'S A PRETTY GOOD SIZED WINDOW.

Q.    OKAY.

AND SO BY 1 O'CLOCK THEN THE COUNT MATCHED UP, TRUE?

A.    THAT'S CORRECT.

Q.    AND MR. JONES THEN LEFT THE SPECIAL HOUSING UNIT, IS THAT RIGHT?

A.    THAT'S RIGHT.

Q.    DO YOU REMEMBER WHERE HE WAS GOING THAT EVENING, WHERE HE WOULD HAVE GONE?

A.    HE HAS THE COUNT SLIP.  SO HE WAS GOING TO TURN IN THE COUNT SLIP.  WHERE HE WENT AFTER THAT, I DON'T KNOW.

Q.    NOW, 1:30, DID YOU DO -- WALK THE RANGE?

A.    YES, I DID, THEREABOUTS, APPROXIMATELY.  I DON'T KNOW WHAT TIME WAS ON THE LOG BOOK.

Q.    AND CAN YOU PUT THE LOG BOOK --

ANYTHING OCCURRING AT ALL THAT EVENING THAT -- BY THAT POINT, LET'S SAY, THE 2 O'CLOCK WHEN YOU WALKED THE RANGE, DID YOU NOTICE ANYTHING AT THAT TIME?

A.       NO.

Q.       CAN WE PUBLISH, AGAIN, NUMBER 31.2.

NOW THAT EVENING, ALSO, WHO WAS THE PERSON THAT YOU WERE -- WOULD HAVE TO REPORT TO?  WAS THERE SOMEONE IN CHARGE OF THE INSTITUTION THAT NIGHT?

A.       THE LIEUTENANT, THE OPERATIONS LIEUTENANT.

Q.       WHO'S THE OPERATION LIEUTENANT?

A.       IT WAS LIEUTENANT DEVANE.

Q.       TIM DEVANE, IS THAT HIS NAME?

A.       THAT'S CORRECT.

Q.       DID HE ALSO COME DOWN TO THE UNIT AT ONE POINT THAT EVENING?

A.       YES.  HE COMES IN, SIGNS THE BOOK AND MAKES ROUNDS.

Q.       DOES THE -- THE RECORD THAT YOU -- RESPONSIBLE ALSO FOR RECORDING THINGS, IS THAT -- DID HE SIGN THAT THAT DAY?

A.       YES.  HE SIGNED IT BETWEEN THE 1 -- RIGHT AFTER THE 1 A.M. COUNT.

Q.       NOW WHAT OTHER -- 31.1.  WE HAVE -- 31.1 HAS BEEN PUBLISHED.  IF YOU CAN HIGHLIGHT BETWEEN 12 AND 3 O'CLOCK.  COME ON DOWN FURTHER.  WE WILL DO IT TO 4. BRING THAT UP.  BLOW IT UP.

ON 31.1, WHAT IS THAT?  AND CAN YOU EXPLAIN TO THE COURT WHAT YOU DO WITH THIS DOCUMENT.

A.     THAT IS THE 30-MINUTE CHECK LOG AND WHEN YOU GO DOWN EACH RANGE, YOU WRITE DOWN APPROXIMATELY WHAT TIME YOU WALK DOWN EACH RANGE.  AND THERE'S FOUR RANGES.

Q.     AND DID YOU -- WHAT RANGE ON THAT NIGHT WAS CELL 103?  WHERE WOULD THAT APPEAR?  THE SECOND COLUMN?

A.     I BELIEVE SO, BUT WITHOUT THE TOP OF THE LOG BOOK, I CAN'T --

Q.     AD 100 AT THE TOP?

A.     THE FIRST ONE THEN.

Q.     ON THAT DAY WAS EVERYTHING -- WHEN DID YOU DO YOUR CHECKS?

A.     AT THE DIFFERENT -- THE TIMES ON THE LEFT.

Q.     SO IF YOU CAN START AT 12 --  TADROSS, IS THAT YOUR NAME ALSO?

A.     I HAD JUST GOTTEN MARRIED RECENTLY AND EVERYBODY STILL KNEW ME IN THE INSTITUTION AS TADROSS.  SO IF I HAD PUT WEAVER DOWN AT THE TIME, THEY WOULD NOT HAVE KNOWN WHO WROTE IN THE LOG BOOK.  SO I KEPT TADROSS.

Q.     THE FIRST TIME YOU DID YOUR CHECK WAS AT WHAT TIME?

A.     IF YOU HAVE A PAPER COPY, I CAN PROBABLY SEE IT BETTER.  I CAN'T REALLY SEE THAT VERY WELL.

              THE FIRST TIME I WENT DOWN AD RANGE WAS 11:58.

Q.     EVERYTHING WAS FINE?

A.        EVERYTHING WAS FINE.

Q.        NEXT TIME?

A.        FOR THAT RANGE?

Q.        YES.

A.        12:55.

Q.        12:55 YOU WENT DOWN THAT RANGE?

A.        UH-HUH.

Q.        NEXT TIME THAT EVENING?

A.        WELL, IT WOULD HAVE BEEN THE 1 O'CLOCK COUNT. 1:25 FROM THE CHECK LOG.

Q.        SO YOU DO THE 1 O'CLOCK COUNT AND THEN THE NEXT TIME YOU DO A CHECK WAS AT WHAT TIME?

A.        1:25.

Q.        1:25.  OKAY.

          AFTER 1:25, WHEN WAS THE NEXT TIME YOU WENT THROUGH?

A.        2:05.

Q.        2:05?

A.        YES.

Q.        BUT THAT -- AND AGAIN, YOU ARE DOING THE COUNTS AT 1, 3 AND 5.  IS THAT THE WAY THEY WERE SCHEDULED?

A.        RIGHT.

Q.        BUT THIS WAS JUST A CHECK WHERE YOU WALKED THE RANGE, TRUE?

A.        RIGHT.  YES.

Q.     AT 2:05 YOU WALKED THE RANGE OF AD 100, IS THAT RIGHT?

A.     THAT'S CORRECT.

Q.     AND THAT IS -- DOES THAT INCLUDE CELL 103?

A.     YES, IT DOES.

Q.     IN 103 THAT NIGHT, WAS -- WHO WERE THE TWO INMATES THAT WERE LOCATED IN 103?

A.     IT WAS DAVID PAUL HAMMER AND ANDREW MARTI.

Q.     ANDREW MARTI.  OKAY.

NOW, AFTER 2:05 DID YOU DO A CHECK AGAIN OR WALK THE RANGE AGAIN THAT NIGHT?

A.     YES, I DID.

Q.     WHAT TIME?

A.     2:25.

Q.     2:25?

A.     YES.

Q.     DID YOU NOTICE ANYTHING AMISS AT 2:25 THAT MORNING?

A.     NO, IT WAS QUIET.

Q.     AFTER THAT DID YOU DO ANOTHER WALK THE RANGE AGAIN?

A.     WE WALKED THE RANGE FOR THE 3 O'CLOCK COUNT.

Q.     SO THIS TIME WHEN YOU ARE GOING INTO THE RANGE FROM YOUR LOCATION, YOU WERE TO DO THE COUNT, IS THAT RIGHT?

A.      THAT'S CORRECT.

Q.      WAS THERE SOMEONE ELSE WITH YOU THEN IN THE SPECIAL HOUSING UNIT AT THAT TIME TO DO THAT 3 O'CLOCK COUNT?

A.      OFFICER JONES CAME BACK WITH ME.

Q.      NOW, CAN YOU EXPLAIN TO THE COURT WHAT HAPPENED THEN DURING THE 3 O'CLOCK COUNT.  AND AM I CORRECT THAT THIS COUNT STARTED SHORTLY BEFORE 3 O'CLOCK?

A.      THAT'S CORRECT.

Q.      CAN YOU TELL THE COURT WHAT HAPPENED AT THAT TIME DURING THAT 3 O'CLOCK COUNT IN THE SPECIAL HOUSING UNIT ON APRIL 13TH, 1996?

A.      I WALKED UP TO CELL 103 AND INMATE HAMMER WAS STANDING AT THE DOOR.  AND I HAD SHINED MY FLASHLIGHT UP AND HE WAS STANDING THERE, SO HE KIND OF SURPRISED ME. HE TOLD ME, HEY, CO, MY CELLIE IS DEAD.  CAN YOU TURN THE LIGHT ON.

                SO I TURNED THE LIGHT ON AND HE WALKED OVER AND PULLED THE SHEET OFF MARTI, WHO WAS LAYING TIED TO THE BED.  AND THEN -- I DIDN'T UNDERSTAND WHAT WAS GOING ON AT THE TIME.  AND I HAD ASKED HIM WHY IS HE TIED TO THE BED?  AND HE SAID, IT WAS EASIER THAT WAY. AND I ASKED HIM WHY IS IT EASIER THAT WAY?  HE SAID, MA'AM, IT'S BECAUSE I KILLED HIM.

Q.      NOW, DID YOU DO A -- SHORTLY AFTER THIS, DID YOU

DO A REPORT THAT SAME DAY, APRIL 13TH, 1996?

A.      YES.

Q.      AND IN THAT REPORT DID YOU WRITE IN THE SECOND -- IN THE FIRST PARAGRAPH, AND I WILL READ THE FOURTH LINE -- OR STARTING AT THE SECOND PAGE, THIS IS GOVERNMENT EXHIBIT 1014:  AS I APPROACHED CELL 103, INMATE HAMMER, NUMBER 24507-077, WAS STANDING AT THE DOOR WHEN I SHINED THE FLASHLIGHT IN.

A.      THAT'S CORRECT.

Q.      HAMMER STATED TO ME HIS CELLMATE WAS DEAD AND TO TURN ON THE LIGHT?

A.      THAT'S CORRECT.

Q.      WHEN THE BUNK LIGHT -- YOU WROTE:  WHEN THE BUNK LIGHT CAME ON, INMATE HAMMER --

MS. SAUNDERS:  YOUR HONOR, I WOULD OBJECT.  COUNSEL IS JUST READING THE REPORT.  CERTAINLY THE OFFICER HAS STATED HER RECOLLECTION AND IF SHE NEEDS TO -- HER RECOLLECTION TO BE REFRESHED HE CAN HAND THE REPORT OVER.  BUT SHE HAS NOT SEEMED TO INDICATE ANY LACK OF RECOLLECTION AT THIS POINT.  SO I WOULD OBJECT TO READING THE REPORT IN.

THE COURT:  MR. GURGANUS.

MR. GURGANUS:  YOUR HONOR, THIS IS A SENTENCING HEARING.  EVENTS THAT HAPPENED 18 YEARS AGO, SHE IS TESTIFYING HERE.  IT'S NOT A MEMORIZATION

PROCESS.  I THINK THE REPORT, JUDGE, FOR THIS COURT'S CONSIDERATION, THE WITNESS IS THERE, IF THEY WANT TO CROSS EXAMINE HER THEY CAN.  BUT IT'S ENTIRELY PROPER GIVEN THE AMOUNT OF TIME THAT HAS PASSED AND THE FACT THAT -- WE ARE IN A SENTENCING HEARING BEFORE A JUDGE.  WE WANT TO MAKE THIS TO BE CLEAR SO THE COURT HAS ALL THE FACTS ON WHAT THE WITNESSES WROTE AT THE TIME.

MS. SAUNDERS:  PERHAPS IF MR. GURGANUS COULD FOCUS ON WHATEVER FACT IS IN THE REPORT THAT HE BELIEVES CASE MANAGER WEAVER HAS NOT PRODUCED ON HER TESTIMONY.  SO FAR ALL HE HAS DONE IS REPEATED WHAT CASE MANAGER WEAVER SAID.

THE COURT:  WELL, I'M JUST LOOKING UP THE PROVISION IN TITLE 18 AT 3593, SECTION 3593.  I THOUGHT THERE WAS A PROVISION IN HERE THAT THE FEDERAL RULES OF EVIDENCE DID NOT APPLY AT SENTENCING HEARINGS.  ORDINARILY, THAT IS THE CASE, THAT RULES OF EVIDENCE DON'T APPLY.  AM I CORRECT IN THAT PROPOSITION, THAT IT'S IN THE DEATH PENALTY STATUTE THAT THE RULES OF EVIDENCE DON'T APPLY?

MS. SAUNDERS:  IT IS, YOUR HONOR.  HOWEVER -- I MEAN, THIS IS A CAPITAL SENTENCING HEARING AND THEY NEED TO PRESENT EVIDENCE THAT HAS A STRIKINGLY HIGH LEVEL OF RELEVANCE AND RELIABILITY.  RIGHT NOW HE IS JUST READING FROM A REPORT.

MR. GURGANUS:  YOUR HONOR, THE STRIKINGLY HIGH LEVEL OF RELIABILITY, GIVEN THE FACT THAT THERE HAS BEEN 18 YEARS SINCE THESE EVENTS HAPPENED AND THAT THIS WITNESS RECORDED THIS ON THAT VERY DAY, I THINK IT MAKES A LOT OF SENSE FOR THE COURT TO UNDERSTAND WHAT WAS WRITTEN THEN AND WHAT IS BEING SAID NOW.  LIKE I SAID, IT'S NOT A MEMORIZATION CONTEST HERE.  WE ARE TRYING TO PRESENT THE FACTS AS CLEARLY AS POSSIBLE SO THE COURT CAN HAVE ALL THE FACTS.  THAT IS THE REASON FOR --

THE COURT:  I UNDERSTAND.  WHY DON'T WE DO THIS NOW.  AGAIN, WHAT IS GOOD FOR THE PROSECUTION IS GOOD FOR THE DEFENSE.  WHY DON'T YOU JUST -- WHEN WE REACH A POINT WHERE YOU THINK YOU HAVE TO READ FROM A REPORT, WHY DON'T YOU GIVE THE WITNESS THE REPORT.  ASK HER IF THAT IS HER REPORT AND LET HER READ THE RELEVANT PORTION.  I THINK THAT WOULD BE A BETTER WAY TO MAKE THE RECORD.

MR. GURGANUS:  OKAY.

THE COURT:  I DON'T THINK IT WILL TAKE TOO MUCH TIME TO DO THAT.

MR. GURGANUS:  NO, IT WOULDN'T, YOUR HONOR.

THE COURT:  ALL RIGHT, COUNSEL?

MS. SAUNDERS:  VERY WELL, YOUR HONOR.

MR. GURGANUS:  THANK YOU, YOUR HONOR.

THE COURT:  ARE THE WITNESSES GOING TO HAVE AN EXHIBIT BOOK OF ANY KIND IN FRONT OF THEM?

MR. GURGANUS:  YOUR HONOR, WE HAVE -- NO, THEY DON'T.  THEY CAN -- THERE IS A WITNESS -- HERS WAS TWO PAGES AND WE CAN PROVIDE -- I CAN PROVIDE THIS TO HER FOR --

THE COURT:  WHY DON'T DO YOU THAT.  JUST READ IT.  AND PERHAPS IF WE ARE GOING TO REACH POINTS LIKE THIS DURING THE COURSE OF THE HEARING WE CAN GET THE EXHIBITS IN FRONT OF THE WITNESS BEFOREHAND.  OKAY?

MR. GURGANUS:  YES, YOUR HONOR.

THE COURT:  IF POSSIBLE.

IS THAT YOUR REPORT?

THE WITNESS:  YES, SIR.

THE COURT:  WOULD YOU READ THE PORTION THAT MR. GURGANUS WAS REFERRING TO?

THE WITNESS:  WHERE DO YOU WANT ME TO START?

MR. GURGANUS:  MAY I DIRECT THE WITNESS?

THE COURT:  YES.

BY MR. GURGANUS:

Q.    THIS IS GOVERNMENT EXHIBIT 1014.  LET'S PICK UP WHEN YOU WROTE:  AS I APPROACHED CELL 103.

A.    AS I APPROACHED CELL 103, INMATE HAMMER, NUMBER 20507-077, WAS STANDING AT THE DOOR WHEN I SHINED THE

FLASHLIGHT IN.  HAMMER STATED TO ME HIS CELLMATE WAS DEAD AND TO TURN ON THE LIGHT.  WHEN THE LIGHT CAME ON, INCOME HAMMER PULLED THE SHEET OFF THE LOWER BUNK --

THE COURT:  START AGAIN, BUT SLOW.

THE WITNESS:  AS I APPROACHED CELL 103, INMATE HAMMER, NUMBER 24507-077, WAS STANDING AT THE DOOR WHEN I SHINED THE FLASHLIGHT IN, HAMMER STATED TO ME HIS CELLMATE WAS DEAD AND TO TURN ON THE LIGHT.  WHEN THE LIGHT CAME ON, INMATE HAMMER PULLED THE SHEET OFF THE LOWER BUNK REVEALING INMATE MARTI, NUMBER 58008-065, LAYING FACE DOWN, TIED TO THE BED.  BOTH MARTI'S FEET AND HANDS WERE TIED TO THE BED IN A FOUR POINT RESTRAINT.  THE MATERIAL USED TO TIE HIM UP -- TO TIE -- USED TO TIE HIM TO THE BED APPEARED TO BE RIPPED-UP BED SHEETS BRAIDED INTO ROPE.  I ASKED INMATE HAMMER WHY HE WAS TIED TO THE BED.  AND HAMMER REPLIED, DON'T WORRY, HE IS DEAD, IT WAS EASIER THAT WAY.  I ASKED HAMMER AGAIN WHY IS MARTI TIED TO THE BED AND HAMMER STATED, MA'AM, IT WAS EASIER THAT WAY.  I ASKED HIM WHY IT WAS EASIER THAT WAY.  HAMMER REPLIED, MA'AM, BECAUSE I KILLED HIM.  I IMMEDIATELY CALLED FOR ASSISTANCE.

Q.     THAT IS THE FIRST TWO PARAGRAPHS OF YOUR REPORT, IS THAT RIGHT?

A.     THAT'S CORRECT.

Q.     CAN YOU EXPLAIN --

THE COURT:  WHEN WAS THAT REPORT MADE?
WHEN DID YOU MAKE THAT REPORT?

THE WITNESS:  APRIL 13TH, 1996.

THE COURT:  OKAY.

BY MR. GURGANUS:

Q.     WHEN YOU MADE THIS REPORT, APPROXIMATELY HOW MANY HOURS AFTER THE INCIDENT DID THAT OCCUR, DID YOU TYPE THIS UP?

A.     MAYBE AN HOUR OR TWO I STARTED WRITING IT.

Q.     ALL RIGHT.

IS THAT CONSISTENT WITH YOUR RECOLLECTION OF WHAT HAPPENED WHEN YOU FIRST WENT TO CELL 103?

A.     THAT'S CORRECT.

Q.     NOW, YOU SAID THAT MR. MARTI WAS TIED DOWN, IS THAT RIGHT?

A.     UH-HUH.

Q.     NOW CAN YOU TELL THE COURT WHERE YOU THEN WENT -- WHERE YOU WENT RIGHT AFTER YOU OBSERVED THAT.  YOU CALLED FOR ASSISTANCE?

A.     RIGHT.  I WALKED OFF THE RANGE, GRABBED THE TELEPHONE AND CALLED THE LIEUTENANT.

Q.     AND HOW LONG DID THAT TAKE, TO CALL THE LIEUTENANT?

A.     30 SECONDS.

Q.     WHAT DID YOU REPORT TO THE LIEUTENANT?

A.      THAT AN INMATE HAD JUST TOLD ME HE KILLED HIS CELLMATE AND THE OTHER INMATE WAS TIED TO THE BED.

Q.      AND THEN WHAT DID YOU DO?

A.      I NOTIFIED THE PA IN THE CONTROL CENTER AND THEN I WENT RIGHT BACK DOWN TO THE RANGE.

Q.      NOW, AT THAT POINT, COULD YOU GET INTO THE CELL?

A.      NO, SIR.

Q.      WHY IS THAT?

A.      WE DID NOT HAVE THE KEY -- AS OFFICER IN CHARGE ON MORNING WATCH, YOU DO NOT HAVE THE KEYS TO THE CELLS.

Q.      I'M GOING TO PUT ON THE SCREEN GOVERNMENT EXHIBIT 30.3-1A.

        DO YOU RECOGNIZE THAT PHOTO?

A.      YES.

Q.      WHAT DOES THAT DEPICT?

A.      INMATE MARTI LAYING ON THE BED.

Q.      IS THAT HOW YOU SAW HIM WHEN YOU FIRST LOOKED IN, CONSISTENT WITH THAT?

A.      YES.

Q.      IS THAT THE WAY HE WAS -- APPEARED TO BE LYING ON THE BED?

A.      HE APPEARED TO BE AT THE TIME.

Q.      TAKE THAT OFF, PLEASE.

        ONCE YOU MADE THOSE CALLS, RIGHT, WHAT DID YOU THEN DO?

A.      I WENT BACK DOWN TO THE CELL.

Q.      AND WHEN YOU GOT BACK DOWN TO THE CELL, WAS
THERE A FURTHER CONVERSATION THAT YOU HAD WITH
MR. HAMMER?

A.      YES.

Q.      BY THE WAY, DID HE HAVE ANYTHING IN HIS HANDS AT
THAT POINT?

A.      YES, HE DID.

Q.      WHAT DID HE HAVE?

A.      IT APPEARED TO BE TAPED-UP NAIL CLIPPERS.

Q.      DID YOU ASK HIM ABOUT THAT?

A.      YES.  I ASKED HIM IF I COULD HAVE THEM.

Q.      WHAT DID HE SAY?

A.      HE SAID I COULD AND I ASKED HIM TO SLIDE IT
UNDER THE DOOR, BUT THEY WOULD NOT FIT.

Q.      DID YOU ASK HIM WHAT IT WAS?

A.      YES, I DID.  HE TOLD ME IT WASN'T IMPORTANT.

Q.      WERE THOSE HIS WORDS?

A.      YES.

Q.      IT'S NOT IMPORTANT?

A.      THAT'S CORRECT.

Q.      WHEN YOU OFFERED HIM, OR WHEN HE OFFERED TO GIVE
THEM TO YOU, HOW DID YOU TRY TO GET THEM?

A.      UNDER THE DOOR, BECAUSE THAT WAS THE ONLY WAY I
COULD GET IT.  I COULD NOT OPEN THE DOOR.

Q.    DID YOU GET THEM?

A.    NO.

Q.    WHY NOT?

A.    THEY WOULD NOT FIT.  HE TRIED, BUT THEY WOULD NOT FIT.

Q.    WHAT DID YOU THEN ASK HIM ABOUT EARLIER ROUNDS?

A.    I ASKED HIM WHY HE HADN'T TOLD ME WHAT HAD HAPPENED EARLIER.

Q.    AND WHAT DID HE STATE?

A.    HE STATED BECAUSE HE WAS NOT DEAD YET.

Q.    DID YOU ASK HIM WHY HE KILLED MR. MARTI?

A.    YES, I DID.

Q.    WHAT DID HE REPLY THEN?

A.    HE SAID HE MEANT NO DISRESPECT TO ME BUT I WOULD HAVE TO ATTEND COURT AND TESTIFY AND HE DID NOT WANT TO SAY.

Q.    WHAT WAS HIS DEMEANOR WHEN YOU WERE HAVING THIS CONVERSATION WITH HIM?

A.    HE WAS VERY CALM, VERY POLITE.

Q.    NOW, HOW LONG DID YOU STAY THERE UNTIL OTHERS ARRIVED?

A.    IT WASN'T LONG AFTER THAT.  I SAID, BY THE TIME I WENT DOWN THERE AND HAD THAT SECOND CONVERSATION WITH HIM, YOU KNOW, EVERYBODY ELSE WAS RUNNING DOWN TO THE SPECIAL HOUSING UNIT.  SO MAYBE A MINUTE.  NOT VERY

LONG.

Q.      WHO THEN ARRIVED?

A.      LIEUTENANT DEVANE CAME, THE PA.

Q.      WHEN YOU SAY THE PA --

A.      THE PHYSICIAN ASSISTANT WHO WAS ON DUTY THAT NIGHT.

Q.      WHO ELSE?

A.      A COUPLE OF THE OFFICERS THAT WERE WORKING.  THE COMPOUND OFFICER AND THE CORRIDOR OFFICER.

Q.      WERE YOU THERE AND WATCHED WHAT THEN HAPPENED?

A.      YES, WHEN EVERYBODY CAME IN.

Q.      RIGHT.

A.      YES.

Q.      AND YOU STAYED THERE THEN, I TAKE IT, IS THAT RIGHT?

A.      YES.

Q.      WHAT THEN HAPPENED?

A.      THE LIEUTENANT CAME DOWN, HE ASKED HAMMER TO CUFF UP, YOU KNOW, SUBMIT TO A SET OF RESTRAINTS, BASICALLY.

Q.      WHAT IS THAT?  WHAT DO YOU MEAN CUFF UP?

A.      PUT ON A PAIR OF HANDCUFFS.

Q.      HOW WOULD THAT HAVE BEEN ACCOMPLISHED WITH THE DOOR LOCKED?  HOW WAS IT, I SHOULD SAY, ACCOMPLISHED?

A.      THERE'S A FOOD SLOT IN THE DOOR THAT HAS A

SPECIAL -- A DIFFERENT KEY THAN THE DOOR LOCK.  AND HE OPENED UP THE FOOD SLOT AND ASKED HIM TO CUFF UP.

Q.      WAS THERE ANY REQUEST MADE AT THAT POINT?

A.      HAMMER SAID HE WOULD IF HE COULD BE DOUBLE-CUFFED, TWO SETS OF CUFFS TOGETHER, BECAUSE HE SAID HE HAD A -- I BELIEVE IT WAS A SHOULDER PROBLEM OR SOMETHING LIKE THAT.

Q.      DID THAT DOUBLE-CUFFING THEN OCCUR?

A.      YES, IT DID.

Q.      AND THEN WHAT HAPPENED?

A.      THE LIEUTENANT CUFFED HIM UP.  THEY OPENED UP THE CELL DOOR, THEY ESCORTED HIM OVER TO AN INSIDE REC CELL IN THE UNIT.

Q.      SO THE DOOR IS OPENED, MR. HAMMER IS NOW CUFFED; IS THAT RIGHT?

A.      THAT'S CORRECT.

Q.      IS HE CUFFED BEHIND HIS BACK?

A.      BEHIND, RIGHT.

Q.      BUT THIS TIME THERE ARE TWO CUFFS BEHIND HIS BACK, IS THAT RIGHT?

A.      RIGHT, DOUBLE-CUFFED.

Q.      SO IT GIVES -- AM I CORRECT THAT THAT MEANS THAT HE CAN MOVE?

A.      HE HAS GOT MORE LEEWAY.

Q.      SO INSTEAD OF BEING REAL CLOSE TIGHT, I'M

STANDING, SHOWING MY ARMS CLOSED, IT WOULD BE WIDER, IS THAT RIGHT?

A.    THAT'S CORRECT.

Q.    AND WHERE WAS HE ESCORTED?

A.    THERE IS AN INSIDE REC CELL RIGHT OUTSIDE THE RANGE.

Q.    AND HOW FAR IN DISTANCE WAS THAT INSIDE REC CELL FROM CELL 103, WHERE YOU ENCOUNTERED HIM RIGHT BEFORE THEN AND HE WAS TAKEN OUT?

A.    APPROXIMATELY FROM ME TO YOU AWAY.  IT WAS NOT THAT FAR.

Q.    SO I'M ESTIMATING HERE, 26, 25 FEET?

A.    THEREABOUTS.

Q.    SO THE DOOR WAS THEN OPENED, MR. HAMMER WAS LED TO THAT CELL.  DID YOU ACCOMPANY HIM AT THAT POINT?

A.    NO.  THE LIEUTENANT TOOK HIM AND SOMEBODY ELSE AND I WENT IN THE CELL TO SEE IF WE COULD UNTIE MARTI.

Q.    SO YOU WERE IN THE CELL WITH OTHER CORRECTIONAL OFFICERS?

A.    THAT'S CORRECT.

Q.    WHAT LUCK DID YOU HAVE WITH UNTYING MR. MARTI?

A.    WE COULD NOT UNTIE HIM THE KNOTS WERE SO TIGHT.

Q.    WHAT WAS HE TIED WITH?

A.    IT APPEARED TO BE RIPPED UP BED SHEETS.

Q.    WERE THEY JUST NORMAL BED SHEETS?

A.    THEY WERE THE SPECIAL HOUSING UNIT BED SHEETS. THEY WERE KIND OF LIKE A LIGHT ORANGE.

Q.    HAD ANYTHING HAPPENED TO THEM OTHER THAN THEM BEING RIPPED UP, IN YOUR VIEW?

A.    I MEAN, THEY WERE RIPPED UP IN STRIPS, USED TO TIE HIM.

Q.    WERE THEY BRAIDED?

A.    I BELIEVE SOME WERE.  I DON'T KNOW IF ALL OF THEM WERE.  I DON'T REMEMBER THAT.

Q.    NOW, DID YOU HAVE -- DID YOU, AT THAT POINT, ATTEMPT TO UNTIE THOSE RESTRAINTS?

A.    YES.

Q.    WERE YOU ABLE TO?

A.    NO.

Q.    WHAT DID YOU THEN DO?

A.    I RAN BACK TO THE OFFICE WITH OFFICER ABRAHAM TO GO OPEN UP THE CAGE TO GET THE SCISSORS OUT SO THEY COULD CUT THEM OFF.

Q.    WHO TOOK THE SCISSORS?

A.    I HANDED THE SCISSORS TO OFFICER ABRAHAM.  HE RAN BACK TO THE CELL BECAUSE I HAD TO LOCK EVERYTHING BACK UP.

Q.    AND THEN WHERE DID YOU GO?

A.    I WENT BACK TO THE CELL.

Q.    AND ONCE YOU WERE IN THE CELL, WHAT DID YOU

OBSERVE HAPPEN AND WHAT DID YOU DO?

A.      THEY HAD ALREADY HAD UNTIED HIM AND PUT HIM ON THE FLOOR AND THEY STARTED I GUESS CPR.

Q.      ONCE THEY STARTED CPR, WHERE DID HE GO, DO YOU KNOW?  WHEN I SAY HE, MR. MARTI.

A.      HE WENT TO THE INSTITUTION HOSPITAL.

Q.      HOW DO YOU KNOW THAT?

A.      BECAUSE THE PA WAS THERE, AND THEY WERE GOING TO TAKE HIM BACK THERE AND, YOU KNOW, CALL EMS.

Q.      NOW, DID YOU ACCOMPANY HIM BACK TO THE INSTITUTION HOSPITAL?

A.      NO, I DID NOT.

Q.      WHERE DID YOU THEN GO?

A.      I STAYED BACK IN THE UNIT, BECAUSE I WAS THE OFFICER IN CHARGE OF THE SPECIAL HOUSING UNIT.  I COULD NOT LEAVE.

Q.      SO YOU WENT BACK TO YOUR POST?

A.      CORRECT, THE UNIT.  I STAYED IN THE UNIT.

Q.      NOW, HOW LONG WERE YOU THEN IN THE UNIT, SUPERVISING THAT AREA OF THE SPECIAL HOUSING UNIT THAT NIGHT?

A.      UNTIL 8:00 A.M., UNTIL I WAS RELIEVED.

Q.      DID YOU HAVE ANY OBSERVATIONS OF MR. HAMMER DURING THAT TIME?

A.      YES.

Q.      WAS HE IN VIEW OF YOU?

A.      YES.

Q.      AND WHAT DID YOU OBSERVE HIM TO BE DOING DURING THAT TIME?

A.      HE WAS SWEATING A LOT.  HE PACED BACK AND FORTH FOR A LITTLE BIT.  AT ONE POINT, HE JUMPED HIS CUFFS. AND WHEN I SAY JUMPED HIS CUFFS, HE HAD THEM IN THE BACK, HE PUT HIS FEET OVER, SO THAT THE CUFFS ARE NOW IN FRONT.  AND THEN HE SAT DOWN AND HAD HIS LEGS CROSSED AND SAT THERE FOR A WHILE.

Q.      DID YOU HAVE ANY OTHER CONVERSATIONS WITH HIM?

A.      JUST ONE MORE.  HE HAD ASKED ME, WHEN I WALKED BY, IF MARTI WAS DEAD.  AND I TOLD HIM I DIDN'T KNOW.

                MR. GURGANUS:  I HAVE NO FURTHER QUESTIONS AT THIS TIME, YOUR HONOR.

                THE COURT:  CROSS EXAMINE.

                MS. SAUNDERS:  THANK YOU, YOUR HONOR.

                    CROSS EXAMINATION

BY MS. SAUNDERS:

Q.      GOOD MORNING.

A.      GOOD MORNING.

Q.      THE TIME THAT YOU ENCOUNTERED MR. HAMMER IN CELL 103 AND HE ASKED YOU TO TURN THE LIGHT ON, THAT, ACCORDING TO YOUR REPORT, IS 2:53 AM, IS THAT CORRECT?

A.      YES, APPROXIMATELY 2:53.

Q.      WHEN YOU SAW THAT MR. HAMMER HAD SOMETHING IN HIS HAND, YOU ASKED HIM -- BY THAT I'M REFERRING TO THE TOENAIL CLIPPERS -- YOU ASKED HIM TO GIVE THEM TO YOU, IS THAT CORRECT?

A.      THAT'S CORRECT.

Q.      AND HE DID NOT DISPUTE IT OR TRY TO HIDE THEM. HE TRIED TO ACTUALLY GET THEM UNDER THE DOOR, IS THAT RIGHT?

A.      THAT'S CORRECT.

Q.      HE NEVER SAID ANYTHING TO YOU ABOUT WHAT THE PURPOSE OF THE TOENAIL CLIPPERS WAS EXCEPT TO SAY THAT THAT HAS NOTHING TO DO WITH IT, IS THAT CORRECT?

A.      THAT'S CORRECT.

Q.      SO HE NEVER MENTIONED TO YOU ANYTHING ABOUT A HOSTAGE RUSE OF ANY KIND, IS THAT CORRECT?

A.      THAT'S CORRECT.

THE COURT:  I'M SORRY.  I DID NOT HEAR THE QUESTION.

MS. SAUNDERS:  I ASKED IF HE HAD MENTIONED ANYTHING TO HER ABOUT A HOSTAGE RUSE, YOUR HONOR.

BY MS. SAUNDERS:

Q.      IF WE COULD --

MS. SAUNDERS:  COURT'S INDULGENCE SO I CAN FIND THE RIGHT EXHIBIT.

BY MS. SAUNDERS:

Q.      GOVERNMENT'S EXHIBIT NUMBER 2.  CAN YOU SHOW THAT UP, PLEASE?

IF YOU SEE DOWN BELOW ON THE RIGHT, IT SAYS SOMETHING CALLED DISC SEG.  DO YOU SEE THAT?  IT MIGHT BE EASIER IF I HAND UP A COPY OF IT.

A.      YES, PLEASE.

MS. SAUNDERS:  IF I MAY.

BY MS. SAUNDERS:

Q.      IT'S HARD TO READ ON THAT SCREEN.

A.      THANK YOU.

Q.      NOW DO YOU SEE WHAT I'M REFERRING TO?

A.      WHAT BOX?

Q.      DOWN BELOW ON THE RIGHT-HAND SIDE OF THE PAGE, YOU SEE THERE'S WORDING UNDERNEATH.  IT'S DISC SEG. IT'S HIGHLIGHTED.  DO YOU SEE IT?

A.      OH, SORRY.  I WAS LOOKING OVER TO THE RIGHT.

Q.      DO YOU KNOW WHAT THAT STANDS FOR?

A.      YES.

Q.      WHAT DOES THAT STAND FOR?

A.      DISCIPLINARY SEG.

Q.      AND THEN ON THE OTHER SIDE -- I'M SORRY, UP AT THE TOP, IS THAT WHERE IT WAS?  UP AT THE TOP, THERE IS ANOTHER HIGHLIGHT, AND WHAT DOES THAT SAY?

A.      THAT IS ADMINISTRATIVE DETENTION.

Q.      WHAT IS THE DIFFERENCE BETWEEN ADMINISTRATIVE DETENTION AND DISCIPLINARY SEGREGATION?  RIGHT, AM I USING THE RIGHT TERM?

A.      YES.  DISCIPLINARY SEGREGATION IS GUYS THAT HAVE BEEN IN TROUBLE AND HAVE MAYBE ALREADY GONE TO THE DISCIPLINARY HEARING OFFICER AND ARE SANCTIONED TO BE DOWN IN THE SPECIAL HOUSING UNIT FOR 30, 60, 90 DAYS, WHATEVER THEIR PUNISHMENT, QUOTE, UNQUOTE, WOULD BE THAT THEY RECEIVED FROM THE DHO.

ADMINISTRATION, THEY COULD BE WAITING FOR THE DHO, THEY COULD BE WAITING FOR A TRANSFER.  THERE'S A WHOLE HOST OF REASONS WHY THEY COULD BE ON ADMINISTRATIVE DETENTION.

Q.      BUT IF SOMEONE IS DESIGNATED ADMINISTRATIVE DETENTION VERSUS DISCIPLINARY SEGREGATION, THEY WOULD BE -- THEY WOULD NOT BE ABLE TO BE IN THE SAME AREA, IS THAT FAIR TO SAY?  THEY WOULD NOT BE -- SOMEONE FROM -- WHO IS DESIGNATED -- SORRY.  DISCIPLINARY SEGREGATION WOULD NOT BE ABLE TO, FOR EXAMPLE, CELL WITH SOMEONE WHO WAS IN ADMINISTRATIVE DETENTION?

A.      NOT NECESSARILY.

Q.      NOT NECESSARILY?

A.      UH-HUH.

Q.      NOW, WHEN YOU TRIED TO GET THE TOENAIL CLIPPERS FROM MR. HAMMER, YOU SAID HE COULD NOT SHOVE IT UNDER

THE DOOR, RIGHT?

A.       RIGHT.

Q.       AND WHEN LIEUTENANT DEVANE CAME AND OPENED UP THE SLOT, MR. HAMMER WILLINGLY PUT THE TOENAIL CLIPPERS INTO THE SLOT, IS THAT FAIR TO SAY?

A.       THAT'S CORRECT.

Q.       WHEN LIEUTENANT DEVANE ASKED MR. HAMMER TO PUT HIS HANDS INTO THE SLOT SO THAT HE COULD BE CUFFED, MR. HAMMER WILLINGLY DID THAT, IS THAT CORRECT?

A.       THAT'S CORRECT.

Q.       AND YOU WERE THE ONE WHO ESCORTED HIM DOWN TO THE OTHER CELL, IS THAT FAIR TO SAY?  OR DID YOU GO WITH HIM?

A.       NO.  THE LIEUTENANT DID, AND I BELIEVE ANOTHER OFFICER.  I WENT INTO THE CELL.

Q.       AND YOU DID NOT HEAR OR SEE ANY ATTEMPT ON MR. HAMMER'S PART TO FIGHT WITH THE OFFICERS OR CREATE ANY TYPE OF DISTURBANCE, IS THAT FAIR TO SAY?

A.       THAT'S CORRECT.

Q.       YOU TESTIFIED THAT WHEN HE WAS IN THE CELL, WHEN YOU WERE AT THE CONTROL CENTER WATCHING, YOU OBSERVED HIM PACING, IS THAT FAIR TO SAY?

A.       YES.

                    MS. SAUNDERS:  COURT'S INDULGENCE.

                    (PAUSE.)

MS. SAUNDERS:  I HAVE NOTHING ELSE.

MR. GURGANUS:  NO FURTHER QUESTIONS, YOUR HONOR.

THE COURT:  ALL RIGHT.  YOU MAY STEP DOWN.

(WITNESS EXCUSED.)

MR. GURGANUS:  YOUR HONOR, CAN WE MOVE IN THE EXHIBITS THEN THAT WE JUST HAD IDENTIFIED?

THE COURT:  YES.

MR. GURGANUS:  GOVERNMENT EXHIBIT 1, 2, 5, 30.3-1A, 31.1 AND 31.2, AS WELL AS GOVERNMENT EXHIBIT 1014.

THE COURT:  WHICH IS 1014?

MR. GURGANUS:  YOUR HONOR, JUST FOR THE RECORD, THAT IS MISS WEAVER'S REPORT THAT SHE WAS READING FROM.

THE COURT:  SO HEARING NO OBJECTION, THOSE EXHIBITS WILL BE RECEIVED IN EVIDENCE.

(GOVERNMENT EXHIBITS 1, 2, 5, 30.3-1A, 31.1, 31.2 AND 1014 RECEIVED INTO EVIDENCE.)

THE COURT:  NEXT WITNESS.

MR. GURGANUS:  YOUR HONOR, THE UNITED STATES CALLS TIM DEVANE.

TIMOTHY D. DEVANE, GOVERNMENT WITNESS, SWORN.

THE CLERK:  STATE AND SPELL YOUR FULL NAME FOR THE RECORD, PLEASE.

THE WITNESS:  TIMOTHY DEVANE, D-E-V-A-N-E.

DIRECT EXAMINATION

BY MR. GURGANUS:

Q.      GOOD MORNING.

A.      GOOD MORNING.

Q.      PLEASE INTRODUCE YOURSELF TO THE COURT.

A.      TIMOTHY DEVANE.

Q.      AND SIR, WHERE IS IT THAT YOU PRESENTLY WORK?

A.      LYCOMING COLLEGE, SECURITY.

Q.      DID YOU EVER WORK WITH THE BUREAU OF PRISONS, SIR?

A.      YES, I DID.

Q.      WHEN DID YOU WORK WITH THE BUREAU OF PRISONS?

A.      STARTED IN '81, UNTIL 2008.

Q.      FROM 1981 TO 2008, IS THAT RIGHT?

A.      THAT IS CORRECT.

Q.      DID YOU RETIRE THEN IN 2008?

A.      YES, SIR, I DID.

Q.      AT THAT POINT IN TIME, WHAT WAS YOUR POSITION?

A.      WHEN I RETIRED?

Q.      YES, SIR.

A.      GS 11, LIEUTENANT.

Q.    CAN YOU JUST GIVE US YOUR BACKGROUND BRIEFLY? WHAT DID YOU DO OUT OF -- YOU WENT TO SCHOOL, I TAKE IT?

A.    YES.

Q.    AND AFTER SCHOOL, DID YOU ENTER THE MILITARY?

A.    WENT IN THE U.S. ARMY.

Q.    HOW LONG WERE YOU IN THE ARMY?

A.    ABOUT EIGHT YEARS.  AND THEN FROM THERE, GOT OUT OF THE MILITARY AND WENT TO THE FEDERAL BUREAU OF PRISONS.

Q.    SO IT WAS RIGHT OUT OF -- SHORTLY AFTER LEAVING THE MILITARY, YOU WENT TO THE FEDERAL BUREAU OF PRISONS?

A.    ABOUT THREE MONTHS AFTER I LEFT THE MILITARY.

Q.    WHERE, DURING YOUR CAREER, HAVE YOU WORKED?

A.    AT USP LEWISBURG FIRST.  I WENT TO FPC NELLIS.

Q.    WHERE IS THAT?

A.    LAS VEGAS.

AND USP ALLENWOOD.

Q.    YOU CAME BACK TO ALLENWOOD?

A.    YES, TO ALLENWOOD.

Q.    WHAT YEAR DID YOU GO FROM NELLIS TO ALLENWOOD, SIR?

A.    '91 -- EXCUSE ME, YEAH, 1991 TO 1993 TO ALLENWOOD.

Q.    SO YOU GOT THERE IN 1993?

A.    CORRECT.

Q.      SO IT WAS NOT '91; IT WAS '93?

A.      NO.  I WAS THINKING OF THE CAMP.

Q.      I JUST WANT TO MAKE IT CLEAR.

SO IN 1993, WHAT WAS THE STATUS WHEN YOU ARRIVED THERE AT USP ALLENWOOD OF THE INSTITUTION?

A.      IT WAS JUST -- ACTUALLY WE DIDN'T HAVE INMATES WHEN I FIRST GOT THERE.  IT WAS JUST STARTING THE INSTITUTION.

Q.      WHEN YOU ARRIVED IN 1993, WHAT WAS YOUR RANK, SIR?

A.      GS 11.

Q.      AND WHAT WAS YOUR POSITION, DID YOU SAY?  I HEARD YOU, BUT I DON'T KNOW THAT THE COURT DID.

A.      OKAY.  I WAS A GS 11, LIEUTENANT.  THERE ARE DIFFERENT POSITIONS WITHIN THAT, BUT USUALLY THE OPERATIONS LIEUTENANT, MANY TIMES.  BUT THERE IS A SEG. I MEAN, YOU CAN -- FOR THE TIME, I MEAN -- AT THAT TIME, I STARTED JUST A LIEUTENANT.  IT WAS A PROMOTION FROM THE CAMP OVER TO THERE.

Q.      AND CAN YOU TELL WHAT THE STATUS OR THE SECURITY LEVEL OF THIS ALLENWOOD WAS, USP ALLENWOOD?

A.      IT'S A HIGH MAXIMUM INSTITUTION.

Q.      AND THE SETTING THAT IT IS IN, OUT IN THE COUNTRY?

A.      YOU COULD SAY THAT, YES.

Q.      NOW, DID YOU ALSO WORK AT FEDERAL CORRECTIONAL INSTITUTIONS AND CAMPS AND THINGS OF THAT NATURE?

A.      WELL, YES.  I STARTED AT LEWISBURG, WHICH IS A PENITENTIARY AND THEN I WENT TO A CAMP, WHICH IS LIKE THE LOWEST LEVEL THAT YOU CAN GET INTO, AND THEN I WENT TO USP ALLENWOOD.

Q.      CAN YOU DESCRIBE THE DIFFERENCE BETWEEN THE GENERAL POPULATION AND THE SHU SEGREGATION, AS IT RELATES TO INMATES?

A.      OKAY.  GENERAL POPULATION IS LIKE MORE OPEN. INMATES CAN MOVE AROUND.  THEY CAN GO ON THE YARD. THERE IS -- GO TO THE LAUNDRY.  THEY CAN GO TO HEALTH SERVICES.  THERE ARE MOVEMENTS TO LET THEM GO TO DIFFERENT PLACES.  IF THEY ARE ON THE YARD, THEY CAN LIKE PLAY BALL OR SOMETHING.  THEY CAN STAY ON THE YARD, YOU KNOW, UNTIL THE NEXT MOVEMENT OR SOMETHING.  THE DIFFERENCE IS IN SEGREGATION, THEY ARE LOCKED DOWN. THEY STAY IN THEIR CELLS OTHER THAN FIVE HOURS A WEEK THEY GO TO -- THEY CAN GO OUTSIDE FOR REC, RECREATION.

Q.      NOW, THOSE IN GENERAL POPULATION, PEOPLE FROM, SAY, UNIT ONE, COULD THEY ENCOUNTER PEOPLE FROM UNIT TWO?

A.      YES.

Q.      IN GENERAL POPULATION?

A.      YES, THEY COULD.

Q.      IN WHAT SETTINGS?

A.      DINING ROOM, OUT IN THE YARD.  ONE INMATE IS NOT SUPPOSED TO GO TO ANOTHER INMATE'S DORM.  OKAY?  BUT THEY CAN MEET AT THE GYM.  I MEAN, THERE IS ALL KINDS OF AREAS THEY CAN MEET.

Q.      APPROXIMATELY HOW MANY INMATES ARE WE TALKING ABOUT AT USP ALLENWOOD AT THE TIME OF -- IN THE '90S THERE?

A.      LIKE MAYBE 900, BUT THERE WAS ALSO -- I MEAN, ARE YOU TALKING GENERAL POPULATION OR ALL TOGETHER?

Q.      ALL TOGETHER.  GENERAL POPULATION AND THE SPECIAL HOUSING UNIT?

A.      MAYBE A THOUSAND.

Q.      NOW, YOU HAVE TALKED ABOUT THE SPECIAL HOUSING UNIT A LITTLE BIT.  CAN YOU GO INTO THAT IN A LITTLE BIT MORE DETAIL?  APPROXIMATELY HOW MANY -- I THINK WE SAW IT BEFORE, BUT APPROXIMATELY HOW MANY INMATES ARE IN THE SPECIAL HOUSING UNIT?

A.      IT CAN VARY.  NORMALLY THERE ARE TWO INMATES PER -- ASSIGNED TO A CELL, UNLESS THERE'S SEPARATION FOR SOME REASON.

NORMALLY IT WOULD PROBABLY BE 125 TO 130, 140, MAYBE SOMETHING LIKE THAT.

Q.      AND YOU SAY THERE ARE TWO PEOPLE IN EACH CELL?

A.      NORMALLY THEY ARE GOING TO HOUSE THEM WITH TWO

IN A CELL, NORMALLY, YES.

Q.      AND IN ADMINISTRATIVE DETENTION, WE HAVE HEARD TESTIMONY ABOUT CELL 103 ON THE A RANGE.  HOW LONG ARE INMATES -- DO THEY STAY IN THEIR CELLS IN THE SPECIAL HOUSING UNIT?

A.      ARE YOU TALKING ABOUT DAILY?

Q.      YES, IN A DAY.

A.      NORMALLY 23 HOURS.

Q.      CAN YOU DESCRIBE WHEN THEY COULD POSSIBLY GET OUT?  AND YOU ARE LEAVING AN HOUR OPEN THERE.

A.      TO GO TO RECREATION, WHICH IS THERE IS INSIDE RECREATION CELLS AND THERE'S AN OUTSIDE RECREATION AREA.

Q.      IS THAT STILL RIGHT IN THE SAME VICINITY AS SPECIAL HOUSING UNIT?

A.      YES.

Q.      IS IT PART OF IT?

A.      PART OF IT, YES.

Q.      IS THERE ALSO TIMES THAT AN INMATE WILL BE BROUGHT OUT FOR OTHER THINGS, SUCH AS MEDICAL ATTENTION?

A.      YES, OR LIKE GOING OVER THEIR PROPERTY, SOMETHING LIKE THAT.

Q.      EXPLAIN THAT TO ME.  I'M NOT SURE --

A.      WELL, LIKE AN INMATE, WHEN HE GETS SENT DOWN TO SEGREGATION, YOU GOT ADMINISTRATIVE AND DISCIPLINARY SECTIONS.  OKAY?  IF THE INMATE IS SANCTIONED FOR

DISCIPLINARY REASONS, HE CAN ONLY HAVE CERTAIN ITEMS WITH HIM, WHERE IN ADMINISTRATIVE THEY WILL ALLOW HIM MORE ITEMS THAN IN DISCIPLINARY SEG.

Q.      SO IN DISCIPLINARY SEG, IT'S MORE OF A PUNISHMENT, YOU ARE NOT ALLOWED TO HAVE ALL YOUR THINGS?

A.      CORRECT.

Q.      IS THAT FAIR TO SAY?

A.      PRETTY MUCH, YES.

Q.      AND IF YOU GO INTO ADMINISTRATIVE SEGREGATION, YOU CAN GET THOSE ITEMS BACK?

A.      CERTAIN ITEMS YOU CAN GET BACK, YES.

Q.      WHAT CONTACT IS THERE BETWEEN INMATES IN THE SPECIAL HOUSING UNIT?  CAN THEY COMMUNICATE WITH EACH OTHER?

A.      THEY CAN -- THERE IS LIKE A SPEAKER ON THE DOORS.  I MEAN, THEY CAN HOLLER OUT TO ANOTHER INMATE DOWN THE RANGE OR SOMETHING.

Q.      ALL RIGHT.

A.      FROM DISCIPLINARY SEG TO ADMINISTRATIVE SEG, THAT WOULD BE KIND OF HARD BECAUSE OF THE FACT THAT THERE IS A SEPARATION AREA OR EVEN THE SECOND FLOOR AS TO THE FIRST FLOOR.

Q.      OKAY.  AND HOW ARE THE INMATES FED IN THE SPECIAL HOUSING UNIT?

A.      FOOD IS SENT DOWN TO SEGREGATION.

Q.      OKAY.

A.      STAFF HANDS IT OUT.  YOU KNOW, THEY HAVE A FOOD SLOT, AND GIVE IT TO THE INMATE, AND BASICALLY THEY EAT THEIR FOOD, PUT IT BACK ON THE FOOD SLOT.  THE STAFF WOULD TAKE IT AND LOCK THE FOOD SLOT.

Q.      OKAY.  SO THEY EAT IN THEIR CELLS, IS THAT RIGHT?

A.      YES, SIR.

Q.      IS IT STAFF STRICTLY THAT HAS THIS CONTACT WITH THE INMATES WITHIN THE CELLS IN THE SPECIAL HOUSING UNIT?

A.      YES, NORMALLY, YES.

Q.      IS THERE EVER ORDERLIES OR ANYONE ELSE, INMATES, THAT CAN BE IN THE SPECIAL HOUSING UNIT WORKING?

A.      YES.  AT THAT TIME, THEY WERE -- THEY WOULD HAVE INMATES MAYBE GO DOWN THERE, LIKE THE TRAYS, WHEN THE STAFF PUT THEM DOWN, THEY WOULD GO AND COLLECT THEM, OR THEY COULD MAYBE BE LIKE SWEEPING THE HALLWAYS.

Q.      SO WERE THERE ORDERLIES AT THE TIME THAT WOULD DO THAT KIND OF WORK WITHIN THE SPECIAL HOUSING UNIT?

A.      DAYTIME, YES.

Q.      BUT AT NIGHT, NO?

A.      NOT -- NO.  NOT LATE, NO.

Q.      EVERYONE IS LOCKED IN AT THAT POINT, TRUE?

A.      YES, SIR.  EVERYTHING IS LOCKED IN.

Q.    HOW MANY SHIFTS WERE THERE BACK IN 1996 AT THE USP ALLENWOOD?  WHEN I SAY SHIFTS --

A.    ARE YOU TALKING ABOUT MAIN -- WELL, THERE IS OVERLAPPING SHIFTS.

Q.    LET'S JUST GO WITH THE SPECIAL HOUSING UNIT.

A.    YOU HAD OFFICERS THAT COME IN -- WELL, START AT MIDNIGHT.  MIDNIGHT TO EIGHT.  YOU HAD OFFICERS COME IN AT 6 TO 2.  AND THEN MOST OF THE STAFF WOULD START SHOWING UP AT 7:30 OR 8.  THEN YOU HAVE A RELIEF FOR THE PERSON THAT CAME IN AT 6 WOULD COME IN AT 2.  AND THEN AT 4 O'CLOCK THEY WOULD HAVE OTHER STAFF.  USUALLY TWO OTHER OFFICERS.

Q.    SO THERE WAS SOME OVERLAP, IS THAT RIGHT?

A.    YES.

Q.    BETWEEN THE SHIFTS?

A.    YES, SIR.

Q.    IS THAT CORRECT?

A.    YES.

Q.    THAT MIDNIGHT SHIFT, HOW MANY OFFICERS WORKED THAT SHIFT?

A.    IN SEGREGATION?

Q.    IN SPECIAL HOUSING UNIT.

A.    JUST NORMALLY ONE OFFICER.

Q.    ONE OFFICER.

        IN THE DAY TIME, IN 1996, HOW MANY

OFFICERS WOULD BE WORKING WITHIN THE SPECIAL HOUSING

UNIT, APPROXIMATELY?

A.      MAYBE 7 OR 8.

Q.      SO SUBSTANTIALLY MORE?

A.      YES, SIR.

Q.      I'M GOING TO DIRECT YOUR ATTENTION TO APRIL 13TH

OF 1996.

A.      OKAY.

Q.      WHAT SHIFT WERE YOU WORKING THAT NIGHT?

A.      THE MIDNIGHT SHIFT, WHICH MIDNIGHT TO 8 O'CLOCK

IN THE MORNING.

Q.      HOW MANY PEOPLE -- AND YOUR POSITION THAT NIGHT,

WHAT WAS IT?

A.      OPERATIONS LIEUTENANT.

Q.      EXPLAIN TO US WHAT THE OPERATIONS LIEUTENANT'S

RESPONSIBILITIES WERE.

A.      PRETTY MUCH YOUR -- YOU'RE IN CHARGE OF THE

INSTITUTION.

Q.      YOU ARE BEING HUMBLE.  BUT YOU ARE THE GUY

THAT'S IN CHARGE AT THAT POINT?

A.      RIGHT.

Q.      THE WARDEN IS HOME SLEEPING?

A.      YES, SIR.

Q.      SO YOU ARE THE GUY THAT HAS GOT THE

RESPONSIBILITY?

A.        YES, SIR.

Q.        HOW MANY PEOPLE WERE YOU SUPERVISING THAT DAY, SIR, APPROXIMATELY?

A.        I THINK 21.  I MIGHT BE WRONG.

Q.        NOW, IN THAT CAPACITY, YOU HAD TO SUPERVISE THE SPECIAL HOUSING UNIT, IS THAT RIGHT?

A.        YES, SIR.

Q.        YOU WERE ALSO RESPONSIBLE FOR THE COUNTS COMING IN, AND THINGS OF THAT NATURE?

A.        YES, SIR.

Q.        DID YOU, ON APRIL 13TH, 1996, MAKE IT OVER TO THE SPECIAL HOUSING UNIT BEFORE THERE WERE ANY INCIDENTS THAT OCCURRED?

A.        YES, SIR.

Q.        HOW DO YOU KNOW THAT?

A.        WELL, USUALLY I GO DOWN -- AT THE TIME I WOULD GO DOWN 1 O'CLOCK IN THE MORNING TO TAKE THE COUNT. USUALLY TRY TO DO ONE COUNT DURING THE NIGHT.  AND THEN ON THE WAY BACK TO THE OFFICE I WOULD STOP SPECIAL HOUSING UNIT AND JUST SEE HOW THE OFFICERS ARE DOING.  I WOULD SIGN THEIR 30-ROUND MINUTE CHECKS, THE LOG BOOK, AND SEVERAL OTHER BOOKS.

Q.        WELL, WE WILL SHOW YOU A COUPLE OF THOSE REAL QUICK AND YOU CAN JUST IDENTIFY.

          CAN WE PULL UP 31.2 AND PUBLISH, PLEASE.

DO YOU RECOGNIZE THAT, SIR?

A.      YES.

Q.      WHAT IS IT?

A.      THAT IS THE LOG BOOK.

Q.      AND DID YOU SIGN THAT LOG BOOK ANYWHERE?

A.      YES, I DID.  WHERE IT SAYS 1 AM, IT SAYS COUNT CONNECT -- CONDUCTED.  UNDERNEATH THAT IT SAYS -- RIGHT THERE, MORNING ROUNDS, T. DEVANE, LIEUTENANT.

Q.      IS THAT M SLASH?

A.      MORNING WATCH.

Q.      AND THEN THAT IS YOUR SIGNATURE THERE, IS THAT RIGHT?

A.      YES, SIR.

Q.      ANY ISSUE AT THAT POINT IN THE EVENING THERE?

A.      NO, SIR.

Q.      LET ME NOW SHOW YOU GOVERNMENT EXHIBIT 31.1.  DO YOU RECOGNIZE GOVERNMENT EXHIBIT 31.1?

A.      YES, SIR.

Q.      WHAT IS THAT, SIR?

A.      THAT IS A 30-MINUTE CHECK IN SEGREGATION, WHERE I SIGN THAT.  IT SHOWS 2 O'CLOCK, BUT THAT IS NOT RIGHT. MORNING WATCH, ROUNDS, T DEVANE, LIEUTENANT.

Q.      AND IS THERE SOMETHING IN THE MIDDLE THERE OF THAT DOCUMENT?

A.      YES.  THAT IS -- WHERE IT SAYS PHOTOCOPY OF

30-MINUTE CHECK LOGS, SHOWING CHECKS MADE ON 4/13.

Q.      HOLD ON.  LET ME BRING IT UP.

CAN YOU READ THAT, WHAT WAS ON 31.1?

A.      PHOTOCOPY OF 30-MINUTE CHECK LOG, SHOWING CHECKS MADE ON 4/13/96, BEGIN TIME 11:58 PM ON 4/12.  SEE ARROW, PHOTOCOPY BY MYSELF, T. DEVANE.  THAT IS MY SIGNATURE, 4/13/96.

Q.      WHY DID YOU PHOTOCOPY?  WHY WAS THAT ENTRY ON THERE, SIR?

A.      BECAUSE OF THE INCIDENT THAT HAPPENED DOWN IN SEGREGATION.

Q.      SO THAT IS NOT TYPICAL, THAT YOU WOULD PHOTOCOPY A 30-MINUTE CHECK THAT YOU WRITE SOMETHING IN LIKE THAT?

A.      NO, SIR.

Q.      WHEN YOU WENT DOWN THERE AND SIGNED THE BOOKS, RIGHT?

A.      OKAY.

Q.      HOW LONG WERE YOU IN THE SPECIAL HOUSING UNIT TYPICALLY?

A.      10 OR 15 MINUTES.

Q.      IS THAT WHAT YOU WOULD TYPICALLY DO ALSO?

A.      TYPICALLY, YES, SIR.  10 OR 15 MINUTES MAYBE. TALK TO THE OFFICERS AND SIGN THE LOGS, AND THAT IS ABOUT IT, NORMALLY.

Q.      WHERE DID YOU THEN GO THAT NIGHT?  I'M GOING TO

DIRECT YOUR ATTENTION TO APPROXIMATELY 2:30 IN THE MORNING TO 3 O'CLOCK IN THE MORNING.  CAN YOU ACCOUNT FOR WHERE YOU WERE IN THAT HALF-HOUR PERIOD, SIR?

A.      YES, SIR.  I WENT TO THE LIEUTENANT'S OFFICE AFTER I LEFT SEGREGATION.

Q.      AND THE LIEUTENANT'S OFFICE, HOW FAR AWAY IS THE LIEUTENANT'S OFFICE TO THE SPECIAL HOUSING UNIT?

A.      A COUPLE HUNDRED YARDS, MAYBE A LITTLE MORE.

Q.      LET ME SHOW YOU GOVERNMENT EXHIBIT 5, AND ASK THAT IT BE PUT ON THE SCREEN.

DO YOU RECOGNIZE WHAT GOVERNMENT EXHIBIT 5 IS, THE SCHEMATIC?

A.      YES, SIR.

Q.      WHAT IS IT?

A.      THE INSTITUTION.

Q.      ALL RIGHT.  AND WE SAW BEFORE THE LOCATION OF WHERE THIS SPECIAL HOUSING UNIT WAS LOCATED.

A.      YES.

Q.      SO AM I CORRECT THAT IT'S OVER TO THE RIGHT?

A.      YES.  RIGHT -- RIGHT BOTTOM.

Q.      KIND OF IN THE CORNER AREA THERE, WHERE THE CURSOR IS?

A.      YES.

Q.      IT HAS BEEN HIGHLIGHTED NOW?

A.      RIGHT.  THAT IS SPECIAL HOUSING UNIT.

Q.      LET ME ASK YOU, THE AREA TO THE RIGHT THAT KIND OF ENCOMPASSES THE WHOLE THING, WHAT IS THAT?  WHAT WOULD THAT DEPICT ALL THE WAY AROUND THE BORDER?

A.      THAT WOULD BE THE -- LIKE THE FENCE, THE FENCING AREA.

Q.      THERE IS FENCING?

A.      YES, SIR.

Q.      AND I ALSO SEE WHAT APPEARS TO BE OUTSIDE THE FENCING THERE IS A -- IT LOOKS LIKE A BUILDING?

A.      THE ROUND ONES?  OH, THAT.

Q.      WHAT IS THAT?

A.      THAT WOULD BE THE ENTRANCE TO THE INSTITUTION. SEGREGATION -- EXCUSE ME, THE CONTROL CENTER IS RIGHT ABOUT THERE.

Q.      AND SO THERE IS ALSO WHAT IS CALLED A CONTROL CENTER IN THERE?

A.      YES, THAT IS WHERE THE CONTROL CENTER IS, RIGHT THERE.

Q.      AND HOW ABOUT THE BLOCK BELOW THAT, SIR?

A.      THIS BLOCK?

Q.      RIGHT BELOW THE ARROW THAT YOU PUT ON THE SCREEN.  DO YOU KNOW WHAT THAT IS?  IF YOU KNOW?

A.      MAYBE THE PARKING LOT MAYBE.

Q.      OKAY.  ALL RIGHT.  BUT THE CONTROL CENTER IS THERE THAT YOU HAVE THE ARROW ON, IS THAT RIGHT?

A.      THAT IS CORRECT.  THE ENTRANCE, WHERE IT'S KIND OF ROUND RIGHT THERE, I THINK THAT IS INDICATING THE CONTROL CENTER.

Q.      SIR, IF SOMEONE WAS TO VISIT USP ALLENWOOD AT THE TIME, WOULD THEY COME TO THAT LOCATION FIRST?

A.      YES, SIR.

Q.      SO IF THE AMBULANCE, ON THE NIGHT OF APRIL 13TH, IF IT CAME THERE THAT NIGHT, WOULD THE AMBULANCE PEOPLE HAVE FIRST HAD TO GO INTO THAT?

A.      YES, SIR.

Q.      THAT BUILDING?

A.      YES, SIR.

Q.      IS THERE ANY OTHER WAY IN?

A.      THERE ARE -- THE OTHER WAY IS THROUGH THE REAR GATE.  HOWEVER, WE DON'T HAVE THE STAFF TO HAVE -- WE DON'T HAVE STAFF AT THAT TIME OF NIGHT.

Q.      NOW, WE ARE TALKING ABOUT THE PERIMETER HERE. IS THERE PEOPLE -- ARE THERE TOWERS AROUND THIS INSTITUTION?

A.      YES, I THINK THAT IS WHAT THESE LITTLE DOTS ARE INDICATING.  THAT IS ABOUT WHERE THE TOWERS WOULD BE.

Q.      AND THERE ARE PEOPLE THAT STAND IN THOSE AT THE TIME?

A.      YES, AN OFFICER IN EACH ONE.

Q.      AND YOU WERE SUPERVISING THEM THAT NIGHT, TOO,

IS THAT RIGHT?

A.      YES, SIR.

Q.      SHOW US WHERE THAT OFFICE WAS THAT YOU WERE IN BETWEEN 2:30 AND UP UNTIL THERE WAS AN INCIDENT THAT HAPPENED SHORTLY THEREAFTER.

A.      WHERE IT SAYS ADMIN RIGHT THERE.  IT WOULD BE RIGHT DOWN THERE, WHERE IT SAYS ADMIN.  YOU ARE CLOSE TO IT.  YES, SIR.

Q.      IS THAT IT?

A.      YES.

Q.      WE PUT A YELLOW -- HIGHLIGHTED THAT.  SO THAT LITTLE SMALL AREA WITH THE WRITING, IS THAT WHERE YOU WERE LOCATED?

A.      YES, SIR.

Q.      WHAT IS THE PURPOSE -- WHAT IS THAT YOU DO AT THAT OFFICE?  ARE COUNTS RECEIVED THERE ALSO?

A.      NO, THEY ARE SENT TO CONTROL CENTER.  THERE IS A LOT OF OTHER PAPERWORK THAT HAS TO BE TAKEN CARE OF AND THAT IS WHAT I WAS DOING AT THE TIME.

Q.      HOW WOULD YOU COMMUNICATE WITH THE PEOPLE -- YOU SAID YOU HAD 21 PEOPLE YOU WERE SUPERVISING THAT DAY?

A.      ABOUT 21, YES.

Q.      WHAT METHODS OF COMMUNICATION WERE THERE FOR YOU?

A.      TELEPHONE.  WE HAVE GOT RADIOS.  THAT'S THE MAIN

WAYS.  AND JUST WALKING AROUND, TALKING TO THE OFFICERS.

Q.      GOT YOU.  ALL RIGHT.

        LET'S DIRECT YOUR ATTENTION TO AROUND 2:50, 2:53 THAT MORNING.

A.      OKAY.

Q.      WHAT HAPPENED?

A.      I GOT A PHONE CALL FROM THE SEGREGATION OFFICER SAYING THAT THE INMATE HAD STATED THAT HE HAD KILLED HIS ROOMMATE, CELLMATE.  AND WHEN I GOT THAT, THEN I LEFT THE OFFICE IMMEDIATELY AND ALONG WITH SOME OTHER OFFICERS WE HEADED DOWN TO SEGREGATION.

Q.      HOW DID YOU GET NOTIFIED LIKE THAT?

A.      SHE CALLED ON THE PHONE.

Q.      CALLED ON THE PHONE?

A.      YES, SIR.

Q.      WHAT DID YOU IMMEDIATELY DO?

A.      HEADED ON DOWN, RUNNING DOWN THERE.

Q.      YOU SAY RUNNING DOWN THERE?

A.      YES, SIR.

Q.      YOU WERE MOVING?

A.      MOVING PRETTY QUICK.

Q.      WHO ELSE WAS WITH YOU?

A.      OFFICER BONCHUK, I BELIEVE THERE WAS, LUHRMAN AND ABRAHAM.

Q.      IS THAT THREE OTHER OFFICERS?

A.      YES, SIR.

Q.      HOW LONG APPROXIMATELY WOULD IT TAKE YOU TO GET THERE FROM YOUR LOCATION?

A.      A FEW MINUTES, BUT WE HAVE TO GO THROUGH SOME -- THREE GRILLES.

Q.      EXPLAIN TO THE COURT WHAT THAT -- WHAT YOU ARE TALKING ABOUT, GRILLES?

A.      THEY ARE METAL DOORS BASICALLY.  AND WHENEVER -- TO GET THROUGH THE GRILLES, CONTROL HAS TO LET YOU OUT, OR LET YOU IN, DEPENDING ON WHICH WAY YOU ARE GOING, OF COURSE.  SO I CALLED CONTROL ON THE RADIO AND THEY OPENED THE FIRST ONE AS WE GOT THERE, BEFORE WE GOT TO IT.  THAT WAS ALREADY OPEN.

Q.      WHAT DOOR WOULD THAT BE?

A.      THAT WOULD BE FROM THE -- LEADING DOWN TO -- DOWN TO SEGREGATION.  YOU ARE HEADING DOWN TO SEGREGATION.

Q.      IS THAT HELPFUL TO YOU, IF WE PUT -- CAN YOU PUBLISH PLEASE, 5?

A.      OKAY.

Q.      DOES THAT HELP YOU?

A.      YEAH.  I MEAN -- WELL, OKAY.  WE LEFT THE OFFICE.  I DON'T KNOW IF I CAN --

Q.      IF YOU PUT YOUR FINGER ON THE THING, YOU CAN PROBABLY TRACE YOUR --

A.      I'M NOT VERY GOOD.  WE CAME OUT THE OFFICE HERE,

CAME AROUND THERE, FOLLOWING THE ARROWS THERE.  RIGHT

THERE, WHERE THE LAST ARROW IS, THAT IS THE DOOR THAT WE

HAD TO GET THROUGH --

Q.      ALL RIGHT.

A.      -- THERE.  AND THEN THERE IS A HALLWAY THERE.

IT DOES NOT REALLY SHOW IT ON HERE VERY WELL.  BUT THERE

IS A HALLWAY THERE.  THEN THERE ARE TWO OTHER DOORS TO

GET INTO SEG.  YOU CAN'T -- THEY ARE LIKE -- THEY'RE

INTERLOCKED.  SO YOU HAVE TO GO THROUGH ONE, LET IT

CLOSE BEFORE YOU CAN GO THROUGH THE OTHER ONE.

Q.      DO YOU SOMETIMES REFER TO THOSE AS SALLY PORTS?

A.      YES, SIR.

Q.      SO THE FIRST ONE YOU GET THROUGH QUICKLY, IS

THAT RIGHT?

A.      YES, SIR.

Q.      AND THEN YOU GET TO THE NEXT DOOR?

A.      THAT WAS ALREADY -- SEGREGATION OR, EXCUSE ME,

CONTROL CENTER, WHERE WE WERE HEADED.  THEY KNEW WE WERE

GOING TO SEGREGATION, SO THEY GOT THAT DOOR OPEN.  BUT

WE HAD TO WAIT FOR THAT ONE TO CLOSE BEFORE WE COULD GO

THROUGH THE OTHER ONE.

Q.      SO YOU ARE IN THIS ONE AREA, MAYBE THIS --

A.      VERY SMALL.

Q.      SMALL ROOM.  WOULD BE THE FOUR OF YOU AT THAT

POINT, IS THAT RIGHT?

A.      YES.

Q.      YOU AND THE OTHER OFFICERS.  SO YOU HAVE TO STAND THERE AND WAIT WHILE THAT DOOR CLOSES.  AND ONCE THE DOOR IS CLOSED, THEN THE OTHER ONE OPENS, IS THAT RIGHT?

A.      YES.

Q.      AND AT THAT POINT ARE YOU INTO THE SPECIAL HOUSING UNIT?

A.      YES, SIR.

Q.      WHERE DID YOU THEN GO?

A.      WE WENT DOWN TO SEG, EXCUSE ME, AD CELL 103.

Q.      GIVE ME ONE MOMENT, SIR.

NOW, SO YOU ARE INTO THE SPECIAL HOUSING UNIT, YOU HEADED OVER TO 103, IS THAT RIGHT?

A.      YES, SIR.

Q.      WHO DID YOU SEE STANDING OUTSIDE 103 AT THAT POINT?

A.      OUTSIDE OF THE CELL?

Q.      OUTSIDE OF THE CELL.

A.      SEGREGATION OFFICER, I BELIEVE, CAME DOWN THERE. OFFICER -- I THINK OFFICER JONES WAS THERE AT THE TIME, IF I RECALL.

Q.      WAS NICKIE WEAVER THERE ALSO?

A.      WELL, YEAH, SHE WAS THE SEGREGATION OFFICER.

Q.    DID YOU THEN LOOK IN THE CELL AND HAVE ANY CONTACT OR COMMUNICATION WITH THE PERSON THAT WAS IN -- OR THE PEOPLE THAT WERE IN THE CELL?

A.    YES, SIR.

Q.    WHAT HAPPENED?

A.    JUST BASICALLY LOOKED DOWN IN THE WINDOW AND -- INMATE HAMMER WAS THERE.  HE SAID SOMETHING ABOUT, DON'T HURRY, I ALREADY KILLED HIM OR SOMETHING LIKE THAT, ABOUT THE INMATE.  HE HAD SOME KIND OF OBJECT IN HIS HAND.  AND I ASKED HIM TO HAND THAT TO ME, WHICH HE DID. AND THEN WE CUFFED HIM UP AND REMOVED HIM FROM THAT CELL DOWN -- A COUPLE OF DOORS DOWN WHERE THERE IS AN INSIDE RECREATION CENTER CELL AND JUST LEFT HIM THERE.  AND THEN WE WENT BACK -- I WENT BACK TO THE CELL TO TRY TO UNTIE MARTI.

Q.    LET'S TAKE THIS ONE STEP AT A TIME THEN.

THE FIRST THING YOU DO, YOU ENCOUNTER HIM.  WAS HE SEATED IN THE CELL OR STANDING IN THE CELL?

A.    STANDING.

Q.    STANDING IN THE CELL?

A.    YES, SIR.

Q.    AND YOU MENTIONED THAT AT THAT POINT HE MADE WORDS TO THE EFFECT THAT HURRYING WASN'T NECESSARY?

A.    SOMETHING TO THAT EFFECT, YES, SIR.

Q.    DID HE -- I WILL REFER TO YOU -- LET ME ASK YOU

THIS.  AFTER THIS WHOLE INCIDENT WAS OVER ON APRIL 13TH, DID YOU WRITE A REPORT UP?

A.      YES, SIR.

Q.      AND AT THAT TIME, DID YOU TRY TO MAKE IT AS ACCURATE AS POSSIBLE?

A.      YES, SIR.

Q.      AND DID YOU TYPE IT UP?

A.      YES, SIR.

Q.      AND I'M SHOWING YOU WHAT IS GOVERNMENT EXHIBIT 1010.  THAT IS IN FRONT OF YOU.

A.      YES, SIR.

Q.      IS THAT RIGHT?

A.      YES.

Q.      IS THAT THE REPORT THAT YOU DID?

A.      YES, SIR.

Q.      AND IS THERE A DATE AT THE TOP OF THAT?

A.      YES, SIR.

Q.      WHAT IS THE DATE?

A.      SATURDAY, APRIL 13TH, '96.

Q.      SO IT WAS A SATURDAY?

A.      YES, SIR.

Q.      AND WAS THIS A MEMORANDUM FOR SOMEONE?

A.      YES, SIR.

Q.      FOR WHOM?

A.      OF THE INCIDENT OF WHAT HAPPENED SO WE CAN -- IT

WAS GIVEN TO -- IT GOES TO THE -- A DOCUMENT OF WHAT HAPPENED.  EVERYBODY LIKE DOES A MEMORANDA AND THEN IT GOES TO SIS.

Q.    AND THE SUBJECTS WERE DAVID HAMMER AND ANDREW MARTI AT THE TOP, IS THAT RIGHT?

A.    YES, SIR.

Q.    IN THE SECOND PARAGRAPH -- AND I JUST -- SO WE ARE CLEAR AS TO THE EXACT LANGUAGE, CAN YOU READ THE -- START AT:  INMATE HAMMER WAS STANDING AT THE CELL DOOR.  CAN YOU START READING THERE, SIR?

A.    WHERE ARE WE AT NOW, THE SECOND PARAGRAPH?

Q.    THE SECOND PARAGRAPH.

A.    OKAY.  INMATE HAMMER WAS STANDING AT THE DOOR.

Q.    AT THE CELL DOOR, RIGHT?

A.    YES.  WELL, YES, SIR.

Q.    JUST READ --

A.    INMATE HAMMER WAS STANDING AT THE CELL DOOR AND TOLD ME YOU DON'T HAVE TO HURRY, HE IS ALREADY DEAD.

Q.    CONTINUE READING.

A.    I ORDERED INMATE HAMMER TO HAND ME AN OBJECT HE HAD IN HIS HAND, IDENTIFIED AS A LARGE TOENAIL CLIPPER, THEN PLACED HIS HANDS AT THE FOOD SLOT SO I COULD PLACE CUFFS ON HIM.  INMATE HAMMER COMPLIED WITH MY ORDERS AND STATED HE WAS NOT GOING TO CAUSE ME ANY PROBLEMS.

Q.    ALL RIGHT.

A.    AS SOON AS HE WAS RESTRAINED, THE CELL DOOR WAS OPENED AND INMATE HAMMER WAS ESCORTED TO THE INSIDE SEG REC CENTER CAGE IN THE FIRST FLOOR ADMINISTRATIVE DETENTION.

Q.    DOES THAT COMPORT WITH YOUR RECOLLECTION OF THAT INITIAL ENCOUNTER, SIR?

A.    YES, SIR.

Q.    TELL US, THOUGH, ABOUT THE SITUATION WHEN HE WAS CUFFED.  DO YOU REMEMBER CUFFING INMATE HAMMER, HOW YOU DID IT?

A.    YEAH, WE JUST -- WELL, WE USED TWO HANDCUFFS BECAUSE HE HAD PROBLEMS OR SOMETHING.  I CAN'T REMEMBER WHAT HE SAID EXACTLY.  BUT HE HAD PROBLEMS WITH -- I THINK HE SAID SOMETHING ABOUT HIS SHOULDER.

Q.    SO HE WANTED -- HE MADE A REQUEST?

A.    I BELIEVE SO, YES, SIR.

Q.    AND WHAT DID YOU THEN DO?

A.    WE DOUBLE-CUFFED HIM SO THAT WE JUST GET HIM OUT OF THE CELL.

Q.    AND YOU ARE TRYING TO DO THIS QUICKLY, I TAKE IT?

A.    YES, SIR.

Q.    AND YOU OPENED THE DOOR AT THAT POINT, ONCE HE WAS CUFFED?

A.    ONCE HE IS CUFFED, YES, SIR.

Q.    AND HOW FAR AWAY WAS THIS CELL THAT YOU PUT HIM
IN?

A.    THREE DOORS DOWN.

Q.    THREE DOORS DOWN?

A.    THREE DOORS DOWN, WE WILL SAY.

Q.    AND THEN WAS HE LOCKED IN THAT AREA?

A.    YES, SIR.

Q.    THEN WHAT DID YOU DO?

A.    WENT BACK TO CELL 103 TO HELP WITH UNTYING
MARTI.

Q.    DO YOU REMEMBER HOW HE WAS POSITIONED IN THAT
CELL, SIR?

A.    HE WAS FACE DOWN, HIS HEAD WAS TOWARDS THE
WINDOW AREA AWAY FROM THE DOOR, AND HE WAS TIED.

Q.    HE WAS TIED DOWN?

A.    HE WAS TIED DOWN.

Q.    HOW WAS HE TIED?  WAS HE TIED --

A.    ANKLES AND WRISTS.

Q.    ANKLES AND WRISTS?

A.    YES, SIR.

Q.    SO BOTH ARMS AND BOTH LEGS?

A.    YES, SIR.

Q.    WAS THERE ANYTHING -- OR STRIKE THAT.
      HOW WAS HE TIED, WITH WHAT?

A.    I BELIEVE IT WAS LIKE BED SHEETS AND STUFF.

JUST TIED UP WITH THEM.

Q.      WERE THEY BRAIDED OR WERE THEY JUST STRIPS OF SHEET?

A.      SOME THINGS WERE BRAIDED AND MOST OF THEM WERE JUST STRIPS OF LIKE BED SHEETS AND STUFF.

Q.      BUT THERE WERE BRAIDED ONES?

A.      I THINK THERE WAS A BRAIDED ONE, TOO, AT LEAST ONE.

Q.      AND WHAT ABOUT AROUND HIS NECK?

A.      THERE WAS AN OBJECT ON HIS NECK, LIKE -- SAME THING, LIKE -- BUT IT WAS NOT TIED OR ANYTHING.

Q.      WHAT DID YOU DO WITH THAT?

A.      REMOVED IT.  AND I KNOW I TURNED IT OVER TO THE SIS BUT EXACTLY --

THE COURT:  YOU ARE DROPPING YOUR VOICE. SPEAK UP.

THE WITNESS:  OKAY.

THE COURT:  YOU SAID THERE WAS AN OBJECT AROUND HIS NECK.  WHAT WAS THAT?

THE WITNESS:  LIKE PART OF WHAT HE WAS TIED WITH, LIKE BED SHEETS AND SUCH.

BY MR. GURGANUS:

Q.      NOW, SIR, CAN YOU READ IN THE THIRD PARAGRAPH, STARTED, I ENTERED THE CELL?

A.      I THEN ENTERED THE CELL AND OBSERVED INMATE

MARTI LAYING ON HIS STOMACH WITH HIS HEAD FACING DOWN INTO THE PILLOW -- A PILLOW.  HIS HANDS AND ANKLES WERE TIED TO THE BUNK WITH TORN AND BRAIDED BED SHEETS. THERE WAS A STRIP OF TORN BEDSHEET AROUND HIS NECK, BUT THIS WAS NOT TIED OR TIGHT.  THEREFORE, I REMOVED IT. HE ALSO HAD WHAT APPEARED TO BE SOME TYPE OF CHAIN AROUND HIS NECK, THE TYPE USUALLY USED TO HOLD A RELIGIOUS MEDAL IN PLACE.  I FELT INMATE MARTI'S NECK AREA IN AN ATTEMPT TO LOCATE A PULSE BUT COULD NOT FEEL ONE.  I INSTRUCTED THE OTHER STAFF TO BEGIN UNTYING INMATE MARTI FROM THE BED AND TOLD OFFICER HUFNAGLE, WHO HAD JUST ARRIVED IN THE UNIT, TO GET THE POLAROID CAMERA AND TAKE SOME PICTURES AS WE WERE REMOVING THE HOMEMADE ROPES FROM MARTI.

Q.      YOU ARE TALKING ABOUT HOMEMADE ROPES THERE, SIR, IS THAT RIGHT?

A.      YES, SIR.

Q.      WERE YOU ABLE TO UNTIE THOSE WITH YOUR HANDS?

A.      NO, SIR.

Q.      WAS THERE A PHYSICIAN'S ASSISTANT THAT ARRIVED?

A.      YES, SIR.

Q.      WHO WAS THAT, DO YOU REMEMBER?

A.      OFFICER -- OR PA CHAUDHRI.

Q.      AND THE SPELLING IS C-H-A-U-D-H-R-I?

A.      YES, SIR.

Q.      WHAT DID HE DO WHEN HE GOT THERE?

A.      HE TRIED TO GET A PULSE.  AND WE HAD TO GET HIM
UNTIED SO WE COULD ACTUALLY WORK ON HIM.

Q.      HOW WAS HE UNTIED?

A.      SCISSORS WAS OBTAINED FROM THE OFFICE, SPECIAL
HOUSING OFFICE, AND HAD TO CUT THEM.

Q.      AND THEN WHAT WAS DONE WITH MR. MARTI?

A.      HE WAS PLACED ON THE FLOOR.

Q.      WAS THERE CPR ATTEMPTED?

A.      YES, SIR.

Q.      WHERE WAS THAT?  WHERE DID THAT START?

A.      THAT STARTED IN THE SPECIAL HOUSING UNIT.

Q.      WHERE WAS MR. MARTI THEN TAKEN?

A.      HE WAS TAKEN TO THE HEALTH SERVICES OUTSIDE OF
SPECIAL HOUSING UNIT.

Q.      ALL RIGHT.

        WERE THEY HAVING SUCCESS WITH THE
RESUSCITATION EFFORTS?

A.      NO, SIR.  TO THE BEST OF MY KNOW, NO.

Q.      DID YOU MAKE ANY REQUESTS THAT ADDITIONAL
MEDICAL PERSONNEL BE SUMMONED?

A.      I HAD CALLED CONTROL CENTER AND HAD THEM CALL,
BASICALLY TO CALL FOR PARAMEDICS AND AN AMBULANCE AND
ALSO TOLD THEM TO TRY TO GET ME A LIEUTENANT AND SOME
OTHER OFFICERS TO GO OUT THERE.

Q.      WHY WOULD YOU NEED THOSE OTHER PEOPLE?

A.      YOU STILL HAVE PROCEDURES, MORE THAN ANYTHING.

TO MAKE SURE THAT THE -- I MEAN, YOU HAVE SO MANY STAFF

THAT YOU HAVE TO GO ON A TRIP, ANY KIND, TAKING AN

INMATE OUT OF THE INSTITUTION, NO MATTER WHAT REASON.

Q.      AND AT THAT POINT IT WAS FAIRLY SHORT-STAFFED,

IS THAT FAIR TO SAY?

A.      YES, SIR.

        THE COURT:  IT'S 12:30 NOW, MR. GURGANUS.

TODAY WE ARE GOING TO TAKE A BREAK UNTIL TWO.  WE MAY

NOT DO THAT, TAKE AN HOUR AND-A-HALF LUNCH EVERY DAY,

BUT WE ARE TODAY.  SO WE WILL COME BACK AND START AT 2

AND OBVIOUSLY WE HAVE TO BREAK AT 3:30.  THAT IS THE

RULE OF THE INSTITUTION.  HE CAN ONLY BE AVAILABLE ON

VIDEO UNTIL 3:30.  SO WHY DON'T WE TAKE A LUNCHEON

RECESS AT THIS POINT.  AND I WILL SEE EVERYBODY BACK AT

2 O'CLOCK AND WE WILL START PROMPTLY.

        WE STAND IN RECESS.

        MR. GURGANUS:  THANK YOU, YOUR HONOR.

        (LUNCHEON RECESS TAKEN.)

        THE COURT:  WE ARE BACK ON THE RECORD IN

THE CASE OF UNITED STATES VERSUS HAMMER.

        I NOTE THE PRESENCE OF MR. HAMMER ON THE

VIDEO AND ALL COUNSEL ARE PRESENT EXCEPT MS. SAUNDERS IS

NOT HERE.  IS MS. SAUNDERS GOING TO BE HERE?

MR. MORENO:  SHE IS, YOUR HONOR.  WE CAN PROCEED.  SORRY ABOUT THAT.

THE COURT:  OKAY.

GOOD.  MR. GURGANUS, GO AHEAD.

MR. GURGANUS:  THANK YOU, YOUR HONOR.

BY MR. GURGANUS:

Q.    MR. DEVANE, WHEN WE LEFT OFF, YOU WERE TALKING ABOUT THE SITUATION ON APRIL 13TH, 1996 AFTER MR. MARTI WAS REMOVED FROM THE CELL, IS THAT RIGHT?

A.    YES, SIR.

Q.    NOW, YOU MENTIONED DURING YOUR TESTIMONY THAT THERE WAS A STRIP OF SHEET THAT YOU REMOVED FROM ANDREW MARTI, AROUND HIS NECK?

THE COURT:  PULL UP THE MIC A LITTLE CLOSER.

BY MR. GURGANUS:

Q.    AROUND HIS NECK, SIR?

A.    YES, SIR.

Q.    I'M GOING TO SHOW YOU THAT.  I'M GOING TO BRING UP R166, ALSO.  THAT IS A PHOTO.  DO YOU RECOGNIZE THAT?

A.    YES, SIR.

Q.    WHAT IS THAT?

A.    I BELIEVE THAT'S THE PIECE THAT WAS AROUND HIS NECK.

Q.    I'M GOING TO SHOW YOU GOVERNMENT EXHIBIT 13.  DO

YOU RECOGNIZE GOVERNMENT EXHIBIT 13?

A.        THAT LOOKS LIKE IT, YES, SIR.

Q.        YOU SAY THAT LOOKS LIKE IT?

A.        YES, SIR.

Q.        YOU ALSO MENTIONED THAT A NAIL CLIPPER WAS HANDED TO YOU, IS THAT RIGHT?

A.        YES, SIR.

Q.        I SHOW YOU GOVERNMENT EXHIBIT 8 AND THE PHOTO R160.

A.        YES, SIR.

Q.        DO YOU RECOGNIZE THIS, SIR, GOVERNMENT EXHIBIT 8, AS DEPICTED IN THAT PHOTO?

A.        YES, SIR.

Q.        WHAT IS IT?

A.        IT LOOKS LIKE A TOENAIL CLIPPER.

Q.        WAS THIS THE ITEM THAT MR. HAMMER HANDED TO YOU THAT NIGHT?

A.        YES, SIR.

Q.        YOU ALSO MENTIONED THAT THERE WERE SHEETS, BRAIDED-TYPE SHEETS THAT WERE CUT OFF AND PIECES OF SHEET, IS THAT RIGHT?

A.        YES, SIR.

Q.        I'M GOING TO SHOW YOU GOVERNMENT EXHIBIT 10. GOVERNMENT EXHIBIT 10.  DO YOU RECOGNIZE THAT?

A.        YES, SIR.  IT LOOKS LIKE WHAT WAS USED TO TIE

MARTI DOWN.

Q.      THESE LOOK LIKE THE ITEMS THAT WERE TYING HIM DOWN?

A.      YES, SIR.

Q.      YOU MENTIONED THAT MR. MARTI WAS REMOVED FROM THE BED AT A CERTAIN POINT, IS THAT RIGHT?

A.      YES, SIR.

Q.      NOW BEFORE HE WAS REMOVED WHEN YOU CAME INTO THE CELL, DID YOU HAVE A GOOD VIEW OF HOW HE WAS POSITIONED ON THE BED?

A.      YES, SIR.

Q.      I'M GOING TO SHOW YOU GOVERNMENT EXHIBIT 30.3-1A.  DO YOU RECOGNIZE THAT PHOTO?

A.      YES, SIR.

Q.      WHAT IS IT?

A.      IT'S MARTI LAYING ON THE BED.  THAT IS HOW WE FOUND HIM.

Q.      I WILL SHOW YOU GOVERNMENT EXHIBIT 30.3-1B.

A.      YES.

Q.      WHAT IS THAT?

A.      THAT IS THE BED THAT HE WAS LAYING ON.

Q.      DID YOU NOTICE ANYTHING WHEN HE WAS REMOVED FROM THE BED, ANY STAINS ANYWHERE?

A.      THERE WAS LIQUID -- SOMETHING WHERE HIS GROIN WAS AND THERE WAS SOME BLOOD ON THE PILLOWS.

Q.   SHOW YOU GOVERNMENT EXHIBIT R164.  WHAT IS THAT, SIR?

A.   THAT WAS THE PILLOW THAT HE WAS LAYING ON.  THAT IS THE BLOOD.

Q.   NOW, DID YOU TAKE PICTURES ALSO WHEN MR. MARTI WAS BEING -- THEY WERE ATTEMPTING TO RESUSCITATE HIM?

A.   YES, SIR.

Q.   LET ME SHOW YOU GOVERNMENT EXHIBIT 30.3-2A. WHAT IS THAT?

A.   THEY WERE TREATING HIM AND I BELIEVE THEY WERE GIVING HIM OXYGEN AT THE TIME, TRYING TO GIVE HIM SOME OXYGEN.

Q.   DID YOU TAKE THAT PHOTO?

A.   YES, SIR.

Q.   APPROXIMATELY WHAT TIME?

A.   3:10.

Q.   DID YOU TYPE THESE THINGS ON THE PHOTO?

A.   YES, SIR.

Q.   WE ARE GOING TO MOVE TO THE 30.3-2B.  WHAT IS THAT PICTURE?

A.   THAT IS MARTI, SHOWING HIS RIGHT WRIST.  THERE WAS AN INJURY TO HIS -- FROM THE MARKS OF THE ROPE THAT HE WAS TIED DOWN WITH.

Q.   THIS IS YOUR TYPING AGAIN?

A.   YES, SIR.

Q.    WHAT TIME WAS THAT PHOTO?

A.    3:10.

Q.    ALL THESE PHOTOS ARE FROM APRIL 13TH, 1996, IS THAT CORRECT?

A.    YES, SIR.

Q.    WE'RE GOING TO GO TO 30.3-3A.  WHAT IS THAT?

A.    ANOTHER PHOTO SHOWING THE LEFT WRIST, MARKS FROM THE ROPE -- THE HOMEMADE ROPE THAT WAS USED TO TIE HIM DOWN.

Q.    YOU OBSERVED THESE THINGS, RIGHT?

A.    YES, SIR.

Q.    AND THEN YOU TOOK A PHOTO OF THEM, RIGHT?

A.    AS THE PA WAS LIKE -- THEY WERE TRYING TO RESUSCITATE HIM AND LIKE LOOKING AT THE INJURIES AND STUFF I WAS TRYING TO TAKE PICTURES OF THEM.

Q.    I'M GOING TO SHOW YOU GOVERNMENT EXHIBIT 30.3-3B. WHAT IS THAT PHOTO, SIR?

A.    THAT IS MARTI BEING TREATED AT THE EMERGENCY ROOM.

Q.    WERE THEY USING AN AIR BAG SYSTEM ON HIM?

A.    THEY DID, YES, SIR.

Q.    AS PART OF THE RESUSCITATION EFFORTS?

A.    YEAH, ONE THAT YOU SQUEEZE.

Q.    YOU TOOK THAT PHOTO ALSO?

A.    YES, SIR.

Q.      AT AROUND AGAIN, 3:10 A.M.?

A.      YES, SIR.

Q.      LET ME SHOW YOU GOVERNMENT EXHIBIT 30.3-2A.
SAME PHOTO WITH A BLOWUP OF AN EARLIER ONE, IS THAT
RIGHT?

A.      YES, SIR.

Q.      IN THE INSTITUTION EMERGENCY ROOM?

A.      YES, SIR.

Q.      LET ME SHOW YOU 30.3-2B.  THAT AGAIN IS A
BLOWN-UP PICTURE OF ONE OF THE PREVIOUS ONES?

A.      YES, SIR.

Q.      WHAT'S THE PURPOSE OF THAT PHOTO?

A.      JUST SHOWING HIS -- THE RIGHT WRIST AGAIN.

Q.      30.3-3A.  WHAT IS THAT, SIR?

A.      THE ONE SHOWING THE LEFT WRIST MARKS FROM THE
HOMEMADE ROPE.

Q.      OKAY.  AND YOU TOOK THAT PICTURE, RIGHT?

A.      YES, SIR.

Q.      30.3-3B.

A.      AGAIN, THAT IS MARTI WHEN HE IS BEING TREATED IN
THE INSTITUTION EMERGENCY ROOM.

Q.      WHEN YOU -- DID YOU MENTION YOU ATTEMPTED TO GET
A PULSE FROM MR. MARTI?

A.      YES.

Q.      WHILE HE WAS IN THE CELL?

A.      YES, SIR.

Q.      DID YOU NOTICE WHETHER HE WAS BLEEDING AT ALL?

A.      I THINK SOME BLOOD LIKE OUT OF HIS NOSTRILS.

Q.      NOW, AT A CERTAIN POINT IN TIME WAS MR. MARTI
TRANSPORTED OUT OF THE INSTITUTION?

A.      YES, SIR.

Q.      BY WHOM?

A.      WE HAD THE STAFF THAT WE BROUGHT IN TO TRANSPORT
HIM TO THE HOSPITAL.  THE PARAMEDICS AND THE AMBULANCE
CREW, THEY TRANSPORTED HIM.

Q.      NOW, DO YOU KNOW WHAT HOSPITAL THEY TOOK HIM TO?

A.      I BELIEVE IT WAS EVAN AT THE TIME, EVANGELICAL
HOSPITAL IN LEWISBURG.

Q.      IN LEWISBURG?

A.      YES, SIR.

Q.      HOW FAR WAS LEWISBURG APPROXIMATELY FROM THE --

A.      25, 30 MINUTES.

Q.      -- USP ALLENWOOD?

A.      ABOUT 25 MINUTES.

        THE COURT:  YOU ARE DROPPING YOUR VOICE.
CAN YOU KEEP YOUR VOICE UP.

        THE WITNESS:  YES, SIR.

BY MR. GURGANUS:

Q.      NOW, DID YOU THEN ATTEND TO MR. HAMMER IN ANY
WAY?

A.          WENT BACK DOWN TO SEGREGATION WITH THE PA AND HE HAD TO BE CHECKED AND TREATED AS NEEDED.

Q.          PRECEDING THAT, WAS THERE A STRIP SEARCH OF MR. HAMMER?

A.          YES, SIR.

Q.          DID YOU TAKE HIS CLOTHES FROM HIM?

A.          YES, SIR.

Q.          HOW DID THAT OCCUR?

A.          WHEN HE WAS IN THE CELL THAT WE HAD PUT HIM IN, THE REC CENTER OR THE REC CELL, WE DID A STRIP SEARCH ON HIM, TOOK HIS CLOTHES, GAVE HIM SOME NEW CLOTHES.

Q.          YOU KEPT THE CLOTHES, IS THAT RIGHT?

A.          YES, SIR.

Q.          AND APPROXIMATELY WHAT TIME WAS THAT, SIR?  DO YOU REMEMBER?

A.          4:40.

Q.          AND ARE YOU LOOKING AT YOUR ORIGINAL STATEMENT?

A.          YES, SIR.

Q.          DOES THAT REFRESH YOUR RECOLLECTION?

A.          YES, SIR.

Q.          AND YOU MENTIONED THAT THE PHYSICIAN'S ASSISTANT CAME DOWN?

A.          YES, SIR.

Q.          WHAT HAPPENED WHEN HE CAME DOWN?

A.          WELL, WE HAD ALREADY -- HE CAME DOWN TO DO A

PHYSICAL AND WE MOVED HIM TO THE -- THEY GOT LIKE A LITTLE ROOM THERE IN SPECIAL HOUSING UNIT, FOR PHYSICAL -- LITTLE PHYSICALS FOR THE INMATES OR LIKE A LITTLE HEALTH SERVICE ROOM, YOU MIGHT SAY, AND THAT IS WHERE HE CHECKED HIM.

Q.      WERE YOU STANDING THERE WHILE THAT WAS GOING ON?

A.      YES, SIR.

Q.      DID YOU ALSO TAKE SOME PHOTOS DURING THAT PROCESS?

A.      YES, SIR.

Q.      DID YOU NOTICE OR DID MR. HAMMER, I SHOULD ASK, SAY -- DID HE MAKE ANY COMPLAINTS OF INJURY?

A.      SOMETHING ABOUT HIS SHOULDER.  HE MADE A COMMENT ABOUT HIS SHOULDER, SOMEHOW POPPING IT BACK IN.

Q.      DID HE HAVE ANY OTHER --

A.      HE HAD SOME OTHER -- WELL, LET ME LOOK AT MY NOTE HERE.

Q.      WOULD IT HELP YOU JUST TO READ THIS PARAGRAPH, SIR?

A.      IF YOU WANT, THAT IS FINE.

Q.      WHY DON'T YOU GO AHEAD AND READ THE FOURTH PARAGRAPH ON YOUR STATEMENT OR REPORT OF APRIL 13TH, 1996, ON THE SECOND PAGE?

A.      AT APPROXIMATELY 4:40 A.M., I ALONG WITH OFFICER JONES CONDUCTED A STRIP SEARCH OF INMATE HAMMER IN

SPECIAL HOUSING UNIT.  I INSTRUCTED THE INMATE HAMMER TO HAND ME ALL THE CLOTHING HE WAS WEARING AND PROVIDED HIM WITH CLEAN CLOTHING.  AT APPROXIMATELY 5:15 PA CHAUDHRI ENTERED THE SPECIAL HOUSING UNIT IN ORDER TO CONDUCT AN EXAMINATION OF INMATE HAMMER.  I PLACED INMATE HAMMER IN HANDCUFFS AND MOVED HIM TO THE SHU EXAMINATION ROOM.  WHILE IN THE ROOM, INMATE HAMMER COMPLAINED OF HAVING THROWN OUT HIS SHOULDER, STATED THIS HAD HAPPENED TO HIM IN THE PAST.  HE STATED HE HAD RESET HIS SHOULDER HIMSELF, BUT THAT IT WAS A LITTLE PAINFUL TO MOVE.  HE ALSO HAD SEVERAL MINOR BRUISES ON HIS ARMS AND HANDS.  DURING THE EXAMINATION HE STATED ONE OF THE MARKS ON HIS LEFT HAND BETWEEN THE THUMB AND INDEX FINGER HAD BEEN CAUSED BY THE ROPE ON INMATE MARTI.  HE ALSO STATED THAT AN INJURY TO HIS LEFT LOWER ARM HAD BEEN CAUSED BY THE CHAIN AROUND INMATE MARTI'S NECK.

Q.    DID YOU NOTICE WHETHER INMATE MARTI HAD A CHAIN AROUND HIS NECK WHEN YOU WERE DEALING WITH HIM THAT NIGHT?

A.    YES, SIR.  HE HAD A CHAIN, KIND OF LIKE YOU FIND A RELIGIOUS MEDAL OR SOMETHING IN IT.

Q.    AGAIN, DO YOU WANT TO JUST SPEAK -- MAKE SURE YOU ARE SPEAKING INTO THE MIC.  OKAY?

A.    OKAY.

Q.    WHILE THIS EXAMINATION WAS GOING ON, YOU HEARD

HIM MAKE THOSE COMPLAINTS, IS THAT RIGHT?

A.      YES, SIR.

Q.      AND DID YOU ALSO THEN TAKE PHOTOGRAPHS OF SOME OF THESE INJURIES AS HE RELATED TO YOU?

A.      YES, SIR.

Q.      I'M GOING TO SHOW YOU, FIRST OF ALL, GOVERNMENT EXHIBIT 7.1-1B.  7.1-1B.  WHAT IS THAT, SIR?

A.      IT WAS POINTED -- USING THE PEN POINTING TO AN INJURY ON HIS WRIST.

Q.      WE'RE GOING TO NOW GO TO GOVERNMENT EXHIBIT 7.1-1A.  WHAT IS THAT?

A.      I THINK THAT WAS FOR THE FINGERS AND THE HANDS, KNUCKLE AREA.  YOU SEE SOME --

Q.      THAT IS HIS RIGHT HAND DEPICTED, THERE ARE HANDCUFFS ON HIM?

A.      YES, SIR.

Q.      LET ME SHOW YOU GOVERNMENT EXHIBIT 7.1-2.

A.      THAT IS A BURN FROM THE ROPE.

Q.      IS THAT CONSISTENT WITH WHAT YOU WERE OBSERVING THAT EVENING WHILE HE WAS BEING CHECKED BY THE PHYSICIAN'S ASSISTANT?

A.      YES, SIR.

Q.      THOSE WERE THE INJURIES YOU SAW?

A.      YES, SIR.

Q.      LET'S GO TO 7.1-3A.  WHAT IS THAT?

A.      THAT IS SHOWING HIS LEFT ARM AND THAT IS THE ONE THAT HE SAID HE GOT THE INJURY FROM THE NECK CHAIN.

Q.      THIS SERIES OF PHOTOS, DID YOU -- WERE THEY POLAROID TYPE PHOTOS?

A.      YES, SIR.

Q.      DID YOU THEN TAKE THOSE BACK AND THEN TYPE WHAT IS ON THE BOTTOM HERE?

A.      YES, SIR.

Q.      AND WOULD YOU -- WHAT YOU TYPED ON THE BOTTOM, IS THAT CONSISTENT WITH WHAT YOU SAW AND REMEMBERED SHORTLY THEREAFTER TAKING THE PHOTOS?

A.      YES, SIR.

Q.      THESE PHOTOS THAT I'M GOING TO BE SHOWING YOU, YOU TOOK ALL OF THEM?

A.      SO FAR, YES, SIR.  IT HAS MY SIGNATURE RIGHT THERE.

Q.      ALL RIGHT.  SO THAT WAS THE FIRST ONE.  WE ARE GOING TO NOW GO TO 7.1-3B.

A.      THAT IS SHOWING THE LEFT HAND AND THE ONE THAT HE SAID WAS CAUSED BY THE ROPE.

Q.      LET ME SHOW YOU GOVERNMENT EXHIBIT 7.1-3C.  WHO IS THAT?

A.      THAT IS INMATE HAMMER.

Q.      IS THAT -- WHAT TIME WAS THAT TAKEN?

A.      5:30.

Q.     DID YOU TAKE THAT PHOTO?

A.     YES, SIR.

Q.     AND THAT IS HOW HE LOOKED ON THAT NIGHT?

A.     YES, SIR.

Q.     7.1-3D WE WILL ASK TO BE PUT ON THE SCREEN.

A.     IT'S SHOWING HAMMER SHOWING THE INJURY TO HIS RIGHT HAND.

Q.     DID YOU TYPE SOMETHING IN AFTER THAT?

A.     MINOR.  IT WAS JUST A MINOR INJURY.

Q.     NOW GOING TO 7.1-3E.  WHAT IS THAT?

A.     THAT IS HAMMER SHOWING A MINOR BRUISE ON HIS LEFT LOWER ARM.

Q.     GOVERNMENT EXHIBIT 30.3-4A.

A.     SHOWING A MINOR BRUISE ON HIS RIGHT ARM.

Q.     GO TO 30.3-4B.

A.     AGAIN, SHOWING HAMMER, SHOWING A MINOR BRUISE ON HIS UPPER RIGHT ARM.

Q.     GO TO 30.3-5.

A.     THAT IS -- SHOWING A MINOR BRUISE ON HIS RIGHT ARM.

Q.     YOU ARE INDICATING -- SOMEONE WAS INDICATING WITH A PEN WHERE IT WAS?

A.     YES, SIR.

Q.     SHOW YOU GOVERNMENT EXHIBIT 30.3-4A.

A.     AGAIN, HAMMER SHOWING A MINOR BRUISE ON HIS

RIGHT ARM.

Q.      AND FINALLY 30.3-4B.  SOME OF THESE ARE BLOWUPS, IS THAT RIGHT?

A.      YES, SIR.  THE LAST ONE, HAMMER, SHOWING A MINOR BRUISE ON HIS RIGHT ARM, UPPER RIGHT ARM.

Q.      BEFORE YOU LEFT THAT -- RIGHT AFTER YOU WALKED OUT OF THAT CELL, DID YOU GIVE ANYONE ANY INSTRUCTIONS, SIR, ABOUT THE CELL AND HOW IT WAS TO BE MAINTAINED?

A.      I TOLD THEM TO LOCK THE CELL, AND DON'T LET ANYBODY IN IT BECAUSE IT WAS AN EVIDENCE AREA.

Q.      AND WAS THAT COMPLIED WITH?

A.      SIR?

Q.      WAS THAT ORDER COMPLIED WITH?

A.      YES, SIR.

Q.      THE QUESTIONS AND THESE STATEMENTS ABOUT INJURIES AND THE CHAIN MARKS AND THE ROPE MARKS, WAS HE ASKED THE QUESTIONS ABOUT THAT OR DID HE VOLUNTEER THEM?

A.      I BELIEVE HE VOLUNTEERED THOSE.  OKAY.  YES, HE --

Q.      DID YOU TYPE SOMETHING ABOUT THAT --

A.      YES, SIR, I DID.

Q.      -- THAT MORNING?  GO AHEAD.  CAN YOU READ THE FOURTH PARAGRAPH ON THE SECOND -- FIFTH PARAGRAPH ON THE SECOND PAGE, SIR.

A.      YES, SIR.

INMATE HAMMER WAS NOT QUESTIONED BY STAFF OTHER THAN THE INITIAL QUESTIONS ASKED BY OFFICER WEAVER WHEN SHE FIRST WALKED UP TO CELL.  I HAD ASKED ALL STAFF --

Q.     INSTRUCTED?

A.     I HAD INSTRUCTED ALL STAFF HAVING CONTACT WITH INMATE HAMMER TO NOT ASK HIM ANY QUESTIONS.  I INSTRUCTED THE PHYSICIAN ASSISTANT TO KEEP ANY QUESTION ASKED TO ONLY THINGS SUCH AS, ARE YOU INJURED AND WHERE.  INFORMATION OBTAINED ABOUT THE CHAIN MARKS AND THE ROPE MARKS WERE VOLUNTEERED BY INMATE HAMMER DURING HIS EXAMINATION.

Q.     AND THEN WHAT THEN HAPPENED WITH MR. HAMMER THAT MORNING?  WHERE WAS HE THEN TAKEN?

A.     WE PLACED HIM IN ANOTHER CELL.  IT'S ANOTHER REC SEND -- RIGHT THERE ON THE D SIDE, DISCIPLINARY 6 SIDE AND JUST PUT HIM IN THERE.

Q.     AND DO YOU KNOW WHETHER OR NOT HE WAS THEN QUESTIONED A LITTLE LATER BY ANYONE?

A.     I WAS NOT PRESENT FOR ANYTHING LIKE THAT SO I DON'T KNOW.

Q.     DO YOU KNOW --

A.     I'M SURE HE WAS.  HE WAS QUESTIONED, I'M SURE.

Q.     DO YOU KNOW IF THE FBI ARRIVED THAT MORNING?

A.     YES, SIR.

Q.      ALL RIGHT.

MR. GURGANUS:  YOUR HONOR, WE WILL MOVE FOR THE ADMISSION OF THE ITEMS THAT WE HAVE IDENTIFIED AND THE WITNESS HAS IDENTIFIED.

MR. TRAVIS:  NO OBJECTION, YOUR HONOR.

THE COURT:  ALL RIGHT.  ALL OF THOSE EXHIBITS WILL BE RECEIVED IN EVIDENCE.

(GOVERNMENT EXHIBITS 1010, 13, 8, 10, R164, 30.3-1A, 30.3-1B, 30.3-2A, 30.3-2B, 30.3-3A, 30.3-3B, 30.3-4A, 30.3-4B, 30.3-5, 7.1-1B, 7.1-1A, 7.1-2, 7.1-31, 7.1-3B, 7.1-3C, 7.1-3D, 7.1-3E, ADMITTED INTO EVIDENCE.)

THE COURT:  CROSS EXAMINE AT THIS POINT?

MR. GURGANUS:  YES, PLEASE.  I DON'T HAVE ANY OTHER QUESTIONS AT THIS TIME.

THE COURT:  CROSS EXAMINE.

MR. TRAVIS:  YES, YOUR HONOR.

CAN WE HAVE GOVERNMENT NUMBER 2 PUT UP?

CROSS EXAMINATION

BY MR. TRAVIS:

Q.      I WILL GIVE YOU A COPY IN CASE THAT IS CLEARER FOR YOU.

YOU, I BELIEVE, INDICATED THAT GOVERNMENT 2 IS A SCHEMATIC DRAWING OF THE SPECIAL HOUSING UNIT AT ALLENWOOD AS IT APPEARED BACK IN APRIL OF 1996, CORRECT?

A.      YES, SIR.

Q.      AND AS I UNDERSTAND THE PROCESS, THE SPECIAL HOUSING UNIT IS BROKEN UP INTO TWO DIFFERENT SECTIONS, IS THAT CORRECT?

A.      YES, SIR.

Q.      AT LEAST ACCORDING TO GOVERNMENT EXHIBIT 2 IT LOOKS LIKE THE CELLS FOR THOSE IN DISCIPLINARY SEGREGATION WOULD RUN ALONG THE BOTTOM, CORRECT?

A.      THAT WOULD BE DISCIPLINARY SIDE, YES, SIR.

Q.      THE ADMINISTRATIVE DETENTION ARE THE CELLS AND THEY RUN, I'M GOING TO SAY UP AND DOWN, AS OPPOSED TO SIDEWAYS?

A.      YES, SIR.

Q.      AND I BELIEVE YOU INDICATED THAT AS FAR AS THE TWO DIFFERENT AREAS, THAT IF YOU ARE IN DISCIPLINARY SEGREGATION, YOU ARE THERE AS A RESULT OF SOME DISCIPLINE, IS THAT CORRECT?

A.      YES, SIR.

Q.      AND SINCE YOU ARE BEING DISCIPLINED, YOU HAVE LESS FREEDOM, LESS THINGS AVAILABLE TO YOU IF YOU ARE IN DS THAN YOU WOULD IF YOU ARE IN AD, IS THAT CORRECT?

A.      YES, SIR.

Q.      AND I BELIEVE YOU INDICATED YOU COULD -- YOU HAD FEWER ITEMS IF YOU WERE IN DS THAN IF YOU WERE IN AD?

A.      YES, SIR.

Q.	DO YOU RECALL SAYING THAT?

A.	YEAH.  IF YOU ARE IN DISCIPLINARY SEG, YOU GET FEWER ITEMS THAT YOU ARE AVAILABLE TO HAVE.

Q.	ARE THERE OTHER DIFFERENCES BETWEEN BEING IN ADMINISTRATIVE DETENTION AND DISCIPLINARY SEGREGATION BESIDES HAVING MORE ACCESS TO ITEMS IF YOU ARE IN ADMINISTRATIVE DETENTION?

A.	I'M NOT QUITE SURE ON --

Q.	LET ME TRY THIS WAY.  WOULD YOU GET MORE REC IF YOU WERE IN ONE OR THE OTHER?

A.	NO, SIR.

Q.	HOW ABOUT TELEPHONE ACCESS?

A.	DEPENDS ON WHAT YOUR SANCTIONS ARE.

Q.	WHEN YOU WERE TALKING ABOUT THE TWO SIDES -- EXCUSE ME, THE TWO AREAS OF THE SPECIAL HOUSING UNIT, IS IT CORRECT THAT THE BUREAU OF PRISONS AT LEAST IN APRIL OF 1996 HAD A POLICY THAT DEFINED WHO COULD BE HOUSED IN ADMINISTRATIVE DETENTION?

A.	YES, SIR.

Q.	ALSO HAD A POLICY OF WHO COULD BE HOUSED IN DISCIPLINARY SEGREGATION, CORRECT?

A.	YES, SIR.

Q.	AND IS IT CORRECT THAT PURSUANT TO BUREAU OF PRISONS POLICY THAT YOU WERE NOT SUPPOSED TO HOUSE SOMEONE FROM DISCIPLINARY SEGREGATION WITH SOMEONE FROM

ADMINISTRATIVE DETENTION?

A.      NORMALLY, NO.

Q.      WELL, THERE IS A POLICY THAT PROHIBITS THAT, IS THERE NOT?

A.      YES, SIR.

Q.      AND WE HAVE BEEN TALKING ABOUT YOU GOING TO A CELL AND THE CELL THAT YOU WENT TO IS 103, AD, ADMINISTRATIVE DETENTION, IS THAT CORRECT?

A.      YES, SIR.

Q.      AND IS IT TRUE THAT THAT IS THE CELL IN WHICH MR. MARTI WAS FOUND TO BE?

A.      HE WAS IN THERE, YES, SIR.

Q.      ARE YOU FAMILIAR WITH RECORDKEEPING BY THE BUREAU OF PRISONS?

A.      SOMEWHAT, YES, SIR.

Q.      ARE YOU AWARE THAT THE BUREAU OF PRISONS KEEPS A ROSTER THAT TELLS -- A ROSTER WITH RESPECT TO THE SPECIAL HOUSING UNIT THAT TELLS WHERE VARIOUS INMATES ARE HOUSED?

A.      YES, SIR.

Q.      DO THEY KEEP THAT SEPARATELY, ONE FOR ADMINISTRATIVE DETENTION AND ONE FOR DISCIPLINARY SEGREGATION?

A.      THEY ARE BOTH IN THE SAME AREA.

Q.      I MEAN THE ROSTER?

A.    THE ROSTERS WERE AVAILABLE TO THE OFFICERS DOWN THERE.

Q.    NOW, LET ME TRY IT THIS WAY.  DO YOU RECOGNIZE THE DOCUMENT I HAVE JUST GIVEN YOU?

A.    YES, SIR.

Q.    MARKED AS DEFENDANT'S EXHIBIT 1?

A.    YES, SIR.

Q.    IS THAT A ROSTER THAT WAS CREATED AT ALLENWOOD?

A.    YES, SIR.

Q.    AND IS THAT ROSTER -- ON THE UPPER RIGHT-HAND SIDE, DOES THAT SHOW APRIL 13TH, 1996 AS THE DATE AND THE TIME, 24 MINUTES AND 33 SECONDS AFTER MIDNIGHT?

A.    YES, SIR.

Q.    DO YOU SEE THE NAME OF DAVID HAMMER ON THAT DOCUMENT?

A.    YES, SIR.

Q.    DOES THAT SHOW DAVID HAMMER TO HAVE BEEN ASSIGNED TO ADMINISTRATIVE DETENTION?

A.    YES, SIR, IT DID.

Q.    THAT SHOWS THAT MR. HAMMER WENT INTO ADMINISTRATIVE DETENTION ON FEBRUARY 4, 1996, IS THAT CORRECT?

A.    YES, SIR.

Q.    AND BASICALLY THAT LAST COLUMN, QTRD, THAT IS THE DATE ON WHICH SOMEBODY WAS PLACED IN ADMINISTRATIVE

DETENTION, CORRECT?

A.      YES, SIR.

THE COURT:  WAS CELL 103 ADMINISTRATIVE DETENTION?

MR. TRAVIS:  YES.  I'M SORRY.  I DID NOT KNOW IF YOU WERE ASKING ME.

THE COURT:  THAT'S ALL RIGHT.

BY MR. TRAVIS:

Q.      THE ITEM I JUST HANDED TO YOU MARKED FOR IDENTIFICATION AS DEFENDANT'S EXHIBIT 2, IS THAT A ROSTER?

A.      YES, SIR.

Q.      AND IS THAT FROM ALLENWOOD?

A.      YES, SIR.

Q.      IS IT FOR APRIL 13, 1996, AT 23 MINUTES AND 18 SECONDS AFTER MIDNIGHT?

A.      YES, SIR.

Q.      AND IS THAT A ROSTER THAT SHOWS DISCIPLINARY SEGREGATION?

A.      YES, SIR.

Q.      AND DO YOU FIND THE NAME OF ANDREW MARTI ON THAT?

A.      YES, SIR.

Q.      AND DOES -- IN THE QTRD, DOES IT INDICATE THAT AS OF APRIL 13TH, 1996, ANDREW MARTI HAD BEEN IN

DISCIPLINARY SEGREGATION, STARTING ON FEBRUARY 1, 1996?

A.      YES, SIR.

Q.      AT LEAST ACCORDING TO THE TWO DOCUMENTS, D 1 AND D 2, ACCORDING TO BUREAU POLICY MR. HAMMER AND MR. MARTI SHOULD NOT HAVE BEEN CELLED TOGETHER IN AD 103, CORRECT?

A.      ACCORDING TO THE DOCUMENTS, YES, SIR.

Q.      YOU HAD EARLIER TESTIFIED CONCERNING THE GOVERNMENT EXHIBIT 1.  CAN YOU PULL GOVERNMENT EXHIBIT 1, PLEASE?

THIS IS AN AERIAL VIEW OF UNITED STATES PENITENTIARY AT ALLENWOOD, CORRECT?

A.      YES, SIR.

Q.      THERE HAD BEEN SOME DISCUSSION EARLIER ABOUT WHERE CERTAIN BUILDINGS WERE AND I BELIEVE I HEARD YOU MENTION SOMETHING ABOUT A FENCE.  DO YOU RECALL SAYING SOMETHING ABOUT A FENCE?

A.      YES, SIR.

Q.      SO THAT THERE IS AN UNDERSTANDING, ARE YOU ABLE TO SHOW THE FENCE THAT YOU WERE TALKING ABOUT BY --

MR. TRAVIS:  I WILL WITHDRAW THAT QUESTION BECAUSE I WAS JUST TRYING TO GET SOME INFORMATION.

BY MR. TRAVIS:

Q.      YOU CAN TOUCH THE PICTURE AND YOU CAN TRACE THE FENCE AND THAT WILL ENABLE EVERYBODY TO SEE WHERE THE

FENCE IS?

A.      OKAY.  I'M NOT VERY GOOD.  ARROWS ARE COMING UP ON THIS.

Q.      SO ESSENTIALLY YOU HAVE A FENCE THAT IS ALL THE WAY AROUND THE OUTSIDE PERIMETER OF THE PENITENTIARY, CORRECT?

A.      TWO FENCES.

Q.      AND HOW HIGH IS THAT FENCE?

A.      I COULDN'T TELL YOU, SIR.

Q.      EXCUSE ME?

A.      I DON'T KNOW HOW --

Q.      OKAY.

        IS THERE ANYTHING ON TOP OF THE FENCE ITSELF?

A.      WIRE, RAZOR WIRE.

Q.      AND IN ADDITION TO THERE BEING RAZOR WIRE ON TOP OF THE FENCE, ARE THERE OTHER AREAS WITHIN THE PERIMETER THAT ARE -- THAT -- WHERE THERE IS WIRE?

A.      YES, SIR.  IT GOES AROUND THE WHOLE FENCE AREA.

Q.      OTHER THAN ON TOP OF THE FENCE, HOW ABOUT ON THE GROUND ITSELF?

A.      THAT IS WHAT I'M TALKING ABOUT.  THERE'S ALSO ON TOP OF THE FENCE AND IN BETWEEN THE TWO FENCES.

Q.      SO THE FENCE IS A DUAL FENCE?

A.      THERE ARE TWO FENCES, RIGHT.  YES, SIR.

Q.        SO THAT IF SOMEONE WAS TRYING TO COME OUT OF THAT, THEY WOULD HAVE TO GET OVER ONE FENCE AND THEN THEY WOULD RUN INTO THE RAZOR WIRE AND THEN THERE WOULD BE A SECOND FENCE, IS THAT CORRECT?

A.        YES, SIR.

Q.        DO YOU SEE IN THAT PHOTOGRAPH, DEFENDANT'S EXHIBIT 1, SOME TALL, LOOKS LIKE ROUND STRUCTURES?

A.        YES, SIR.  THAT'S THE TOWERS.

Q.        THE TOWERS.  ARE THOSE TOWERS MANNED?

A.        YES, SIR.

Q.        AND THE PEOPLE WHO MAN THOSE TOWERS, DO THEY HAVE FIREARMS WITH THEM?

A.        YES, SIR.

Q.        AND IS THEIR JOB BASICALLY TO MAKE SURE THAT NOBODY ATTEMPTS TO SCALE THAT FENCE?

A.        YES, SIR.

Q.        IN ADDITION TO THE OFFICERS IN THE TOWER, ARE THERE ANY WRITTEN -- EXCUSE ME, ANY VEHICLES THAT DRIVE AROUND THE PERIMETER?

A.        WE HAVE A PATROL OFFICER.  HE DOES NOT NECESSARILY GO AROUND THE WHOLE INSTITUTION.  NOT JUST AROUND THE FENCE, NO.

Q.        SO YOU HAVE THE TWO FENCES.  YOU HAVE GOT THE RAZOR WIRE.  YOU'VE GOT THE ARMED GUARDS IN THE TOWERS AND YOU HAVE THIS OTHER OFFICER WHO ALSO PATROLS TO KEEP

THEIR EYES OUT ON ANYBODY TRYING TO LEAVE WITHOUT

PERMISSION.  IS THAT A FAIR STATEMENT?

A.      YES, SIR.

Q.      AND I BELIEVE YOU INDICATED THAT IN ORDER TO

ENTER AND EXIT ANY OF THE BUILDINGS AT THE UNITED STATES

PENITENTIARY, THAT IT WOULD BE NECESSARY FOR CENTRAL

CONTROL TO KEY A SWITCH SO THAT THE GRATE OR GATE WOULD

OPEN?

A.      YES, SIR.

Q.      AND WITHOUT THAT SWITCH BEING KEYED, YOU CAN'T

JUST OPEN THE DOOR AND WALK THROUGH, RIGHT?

A.      NO, SIR.

Q.      AND MOST OF THE DOORS ARE SET UP SOME SORT OF

SEQUENCE.  I DON'T KNOW WANT YOU GIVING AWAY ANY

SECURITY INFORMATION, WHERE IF THERE ARE TWO GRILLES,

TWO GATES, WHEN THIS ONE OPENS SO YOU CAN WALK THROUGH,

THIS ONE CAN'T BE OPENED, CORRECT?

A.      PRETTY MUCH, YES, SIR.

Q.      IF YOU ARE ALONE OR WITH SOMEONE, ONCE YOU ARE

INSIDE THIS GRILLE CAN CLOSE BEHIND YOU BEFORE THE ONE

IN FRONT OF YOU OPENS, IS THAT CORRECT?

A.      YES, SIR.  THERE ARE SOME DOORS THOUGH YOU DON'T

NEED TO HAVE CONTROL CENTER TO OPEN OR CLOSE.

Q.      DO THEY OPEN TO THE OUTSIDE?

A.      NO.

Q.      THERE HAS BEEN SOME TALK ABOUT ORDERLIES WALKING AROUND OR BEING PERMITTED TO BE IN THE SPECIAL HOUSING UNIT AND I WANT TO ASK YOU SOMETHING IN PARTICULAR.  THE SPECIAL HOUSING UNIT DOORS UNLESS -- CONCENTRATE ON THE ADMINISTRATIVE DETENTION CELLS.  THEY HAVE A FOOD SLOT, RIGHT, A WICKET?

A.      YES, SIR.

Q.      WHO HAS THE KEY TO BE ABLE TO OPEN THAT WICKET?

A.      IN THE SPECIAL HOUSING UNIT, THE OFFICERS DOWN THERE.

Q.      IS THE ORDERLY GIVEN THAT KEY SO THAT THE ORDERLY CAN OPEN THAT WICKET IN ORDER TO PASS ANYTHING TO OTHER INMATES?

A.      NO, SIR.

THE COURT:  WHAT IS A WICKET?  YOU USED THE PHRASE "WICKET"?

MR. TRAVIS:  RIGHT.

THE COURT:  CAN WE ASK HIM WHAT IS A WICKET.

MR. TRAVIS:  WILL YOU BE KIND ENOUGH TO EXPLAIN THAT.

THE WITNESS:  WHAT THEY CALL THE FOOD SLOT OR WICKET.  SOME PEOPLE CALL IT THE WICKET.

THE COURT:  THE FOOD SLOT?

THE WITNESS:  YES, SIR.

THE COURT:  I UNDERSTAND.  OKAY.

THE WITNESS:  THE SAME THING.

MR. TRAVIS:  SORRY, YOUR HONOR.

THE COURT:  THAT'S ALL RIGHT.

BY MR. TRAVIS:

Q.      THERE WAS DISCUSSION AS PART OF YOUR TESTIMONY

ABOUT THE MOVEMENT OF MR. HAMMER AT THE POINT IN TIME

WHEN YOU ARRIVED AT THE SPECIAL HOUSING UNIT.  AND AS I

RECALL, WHAT YOU INDICATED WAS THAT WHEN YOU FIRST

ARRIVED AT THE ADMINISTRATIVE DETENTION CELL 103,

MR. HAMMER WAS STILL WITHIN THAT CELL, CORRECT?

A.      YES, SIR.

Q.      AND YOU THEN -- SOMEONE OPENED THE FOOD SLOT SO

HE COULD BE HANDCUFFED, CORRECT?

A.      YES, SIR.

Q.      AND AFTER HE WAS HANDCUFFED, THE CELL DOOR --

EXCUSE ME, THE DOOR TO CELL AD 103 WAS UNLOCKED,

CORRECT?  AND MR. HAMMER WAS REMOVED, CORRECT?

A.      YES.

Q.      AFTER HE WAS REMOVED, AS I UNDERSTAND IT, HE WAS

PLACED IN AN INSIDE RECREATION CELL, IS THAT CORRECT?

A.      YES, SIR.

Q.      IS THE INSIDE RECREATION CELL WHERE HE WAS

PLACED PART OF THE EXHIBIT THAT IS UP THERE?  I FORGET

WHAT THE NUMBER IS.

A.    YES, SIR.  YOU SEE AN OPEN AREA, OKAY, AND THEN SOME STAIRS.  OKAY.  IT'S JUST DOWN THOSE STAIRS AND THEN DOUBLE DOORS FROM -- I DON'T KNOW, NO, FROM DS 10 -- FROM THE CELL.

Q.    DO YOU SEE D 5?

A.    YES, SIR.

MR. GURGANUS:  EXHIBIT G 3.

THE COURT:  G 3 IS ON THE SCREEN.  DO YOU WANT G 5.

MR. TRAVIS:  NO, I'M WAITING FOR -- G 3 IS ON THE SCREEN.

BY MR. TRAVIS:

Q.    WILL YOU BE ABLE TO SHOW US WHERE HE WAS MOVED FROM AD 103 TO THE RECREATION AREA?

A.    PRETTY MUCH, EXCEPT I THINK THIS MIGHT BE THE SECOND FLOOR.  I'M NOT SURE.

Q.    WELL, WOULD THE LAYOUT --

A.    YEAH.  IT GIVES ME AN IDEA.  SO DO YOU WANT ME TO LIKE POINT ON IT OR SOMETHING?

Q.    WELL, IF YOU THINK THAT IS THE WRONG SCHEMATIC, I DON'T WANT YOU TO USE THE WRONG SCHEMATIC.

A.    OKAY.  THE FLOORS ARE PRETTY MUCH EXACT THE SAME SO --

Q.    OKAY.  WELL THEN, WHY DON'T YOU POINT WHERE -- FIRST OF ALL, IF YOU CAN LOCATE AD 103 AND MARK THAT

OR TOUCH THAT.

A.      I MISSED IT.  IT'S ONE UP.  I GOT IT BETWEEN THE TWO CELLS.  IT'S THE ONE ON TOP OF THAT WHEN YOU ARE LOOKING AT IT.

Q.      AND HE WAS THEN MOVED TO AN INDOOR RECREATION AREA.  WHERE WAS THAT?

A.      JUST DOWN THE HALLWAY, SHOULD BE RIGHT THERE, WHERE THE ARROW IS.

Q.      AND HE REMAINED IN THAT RECREATION CELL AREA FOR 20 MINUTES, HALF-HOUR OR SO?

A.      UNTIL ABOUT 4:40.

Q.      ROUGHLY AN HOUR AND-A-HALF?

A.      YES, SIR.

Q.      AND AFTER THAT HOUR AND-A-HALF, AS I UNDERSTAND IT, YOU WENT AND YOU REMOVED HIM FROM THAT CELL, THAT INDOOR RECREATION CELL, AND YOU TRANSPORTED HIM SOMEWHERE ELSE, CORRECT?

A.      JUST ON THE OTHER SIDE THERE, THERE IS A HEALTH SERVICES ROOM THERE THAT THEY CAN, LIKE, CHECK INMATES OR -- IF THEY NEED TO.

Q.      OKAY.  IS IT IN THE GENERAL AREA WHERE HE WAS?

A.      WELL, THIS IS WHERE THAT ARROW IS.

          MR. TRAVIS:  WHY DON'T WE TAKE DOWN 5 AND USE G 2, PLEASE.

BY MR. TRAVIS:

Q.      LET'S START ALL OVER AGAIN WITH G NUMBER 2.
OKAY?

A.      YES, SIR.

Q.      ARE THOSE MARKS STILL ACCURATE OR WOULD THEY
HAVE TO BE MOVED?

A.      JUST A LITTLE BIT.  THERE IS THE -- OKAY.  RIGHT
THERE IS THE -- THE ONE THAT I JUST DID IS THE DS -- OR
THE ADMIN SIDE REC CENTER.  OKAY.  THAT IS WHERE THEY
WERE AT, 103.  WE TOOK HIM THERE TO OVER HERE AND THE
LINE IS THERE.  THAT IS WHERE THE HEALTH SERVICES AREA
WAS.

Q.      IS THAT THE THIRD -- WHAT ABOUT THE SECOND
ARROW, THE SMALLER ARROW?

A.      THAT IS THE ONE THAT WAS ON THE OTHER SCREEN.

Q.      WAS THAT AN ERROR ON YOUR PART?

A.      THAT WAS AN ERROR.

Q.      AND THEN AFTER HE WENT THROUGH THE EXAMINATION
IN THE PHOTOGRAPHS I THOUGHT I HEARD YOU SAY HE WAS
TAKEN FROM THAT AREA WHERE HE WAS EXAMINED AND HE WAS
PLACED IN ANOTHER RECREATION CELL?

A.      RIGHT.  IT'S RIGHT NEXT TO WHERE THE EXAMINATION
WAS DONE.  THERE IS ANOTHER CELL RIGHT THERE.

Q.      DO YOU KNOW WHERE HE WAS MOVED FROM THAT
RECREATION -- THE SECOND RECREATION CELL HE WENT INTO?

A.      NO, SIR.

THE COURT:  I HAVE A QUESTION.  WHEN HE IS TRANSPORTED, IS HE TRANSPORTED DOWN THE CENTER AISLE?

THE WITNESS:  NO.  THERE IS A WALL BETWEEN THE CELLS IN THERE.  THAT IS A WALL.  THAT LINE, THAT IS A WALL.

THE COURT:  WHICH SIDE IS THE DOOR ON?

THE WITNESS:  THE DOOR IS RIGHT HERE (INDICATING).

THE COURT:  ON THE INSIDE?

THE WITNESS:  RIGHT.  WELL, THE DOORS COME OUT AND THEN THERE IS LIKE -- YOU CAN WALK DOWN THROUGH HERE, EITHER SIDE.  THAT WAY YOU DON'T HAVE TO WALK THE INMATES ALL THE WAY AROUND.

THE COURT:  AND THE LINE DOWN --

THE WITNESS:  IN THE MIDDLE, THAT IS A WALL.

THE COURT:  THAT'S A WALL.

THE WITNESS:  THAT'S A WALL, HEAD HIGH ALMOST.

THE COURT:  SO YOU CAN'T SEE INMATES HOUSED ON THE OTHER SIDE OF THE WALL IF YOU ARE ON YOUR SIDE.

THE WITNESS:  CORRECT.  IF YOU ARE AN INMATE IN A CELL OVER THERE, YOU COULDN'T REALLY SEE THE OTHER INMATES OVER THERE VERY WELL.

THE COURT:  RIGHT.  OKAY.

BY MR. TRAVIS:

Q.      YOU HAD INDICATED, AS I RECALL, AS PART OF YOUR DIRECT EXAMINATION THAT INMATES IN -- WHO ARE BEING HOUSED IN ADMINISTRATIVE DETENTION AND INMATES WHO ARE HOUSED IN DISCIPLINARY SEGREGATION WOULD HAVE DIFFICULTY YELLING DOWN THE HALLWAY AT ONE ANOTHER.  DO YOU RECALL SAYING THAT?

A.      YES, SIR.  WELL, IT WOULD BE HARD FOR THEM TO DO BECAUSE WHERE THEY ARE AT HERE AND THEN ADMIN IS OVER HERE AND THERE IS LIKE AN AREA IN BETWEEN.  COULD THEY YELL AT EACH OTHER?  THEY COULD TRY, BUT IT WOULDN'T WORK VERY GOOD.

Q.      AS FAR AS THE RUNNING OF THE SPECIAL HOUSING UNIT, THAT WOULD BE -- SOME DECISIONS WOULD BE MADE AS FAR AS THE INDIVIDUALS WORKING IN THE SPECIAL HOUSING UNIT, CORRECT?

A.      YOU MEAN LIKE MAKING THE ROSTER, THE STAFF WHERE THEY ARE GOING TO WORK?

Q.      YES, SIR.

A.      LIKE THE UNION IS INVOLVED WITH THAT, TOO.  OFFICERS DO PUT IN SOME REQUESTS ON WHERE THEY WOULD LIKE TO GO.

Q.      AS FAR AS THE CELL ASSIGNMENTS IN THE SPECIAL HOUSING UNIT, LET'S SAY THE ADMINISTRATIVE DETENTION

ASPECT OF IT, DOES THE INSTITUTION DECIDE WHERE SOMEONE GOES OR DOES THE INMATE DECIDE WHERE THEY WANT TO BE?

A.    BASICALLY THE INSTITUTION OR THE STAFF WILL. AND THEY WILL TRY TO PLACE THEM WITH SOMEBODY THAT THEY GET ALONG WITH SO....

MR. TRAVIS:  IF I MAY HAVE A MOMENT, YOUR HONOR.

(PAUSE.)

MR. TRAVIS:  I HAVE NO OTHER QUESTIONS, YOUR HONOR.

THE COURT:  ANY REDIRECT?

MR. GURGANUS:  JUST A FEW LITTLE QUESTIONS.

REDIRECT EXAMINATION

BY MR. GURGANUS:

Q.    YOU TALKED ABOUT INMATES AND THESE DOORS AND THE WICKET, ET CETERA, RIGHT?

A.    YES, SIR.

Q.    WE HEARD TESTIMONY THAT THERE WAS A REQUEST OF MR. HAMMER BY MS. WEAVER TO TRY TO SLIDE THOSE CLIPPERS UNDER THE DOOR.

A.    YES.

Q.    ARE YOU AWARE OF THAT?

A.    YES, SIR.

Q.    IS THERE AN AREA UNDER THE DOOR, THESE DOORS,

WHERE YOU CAN SLIDE SOMETHING UNDER?

A.      MAYBE A PIECE OF PAPER.

Q.      SO PAPER CAN MAKE IT UNDER?

A.      PAPER CAN GET UNDER IT, YES.

Q.      ANOTHER QUESTION THAT HAS ARISEN.  THERE HAVE BEEN SOME DOCUMENTS THAT SHOW SOME RECORDS SHOWING, D 1 AND D 2, THAT MR. MARTI WAS LISTED IN THE ROSTER AS DISCIPLINARY SEGREGATION AND MR. HAMMER WAS ADMINISTRATIVE DETENTION?

A.      YES, SIR.

Q.      DO YOU HAVE AN EXPLANATION FOR THAT, WHY MR. MARTI WOULD BE DISCIPLINARY SEGREGATION ON THE ROSTER?

A.      I REALLY DON'T.  JUST BECAUSE IT'S SENT THAT WAY -- WHAT IT IS, THERE IS A BOARD IN THE OFFICE AND THE OFFICERS KEEP TRACK OF WHERE THE INMATES ARE MOVING OR WHATEVER.  HOW IT WOULD HAPPEN IN THE ROSTER, I COULD NOT TELL YOU EXACTLY.  BUT I KNOW IT HAPPENED BEFORE.  I HAVE SEEN IT HAPPEN WHERE SOMEBODY JUST PUT SOMEBODY IN THE COMPUTER WRONG BY MISTAKE.

Q.      BUT THERE IS ALSO A ROSTER YOU ARE SAYING THAT HAS --

A.      THIS IS THE ROSTER.  THERE ARE SEVERAL ROSTERS. THIS IS A SENTRY PRINTOUT, FROM A SENTRY.

Q.      YOU'RE SAYING IT COULD BE THAT HE WAS IN

DISCIPLINARY SEGREGATION AND POSSIBLY THAT HE WASN'T. HE WAS LISTED --

A.      WHEN I GO DOWN THERE, I DON'T EVEN NECESSARILY -- IF HE IS ON THE AD SIDE, THEN HE IS ADMINISTRATIVE.  IF HE IS ON THE DS SIDE, HE IS DISCIPLINARY.

Q.      IS THERE A CERTAIN POINT IN TIME WHEN PEOPLE GET TAKEN OFF OF DISCIPLINARY SEGREGATION AND THEN THEY'D BE FREE TO GO TO ADMINISTRATIVE SEGREGATION?

A.      YES, SIR.

MR. GURGANUS:  I HAVE NO FURTHER QUESTIONS, YOUR HONOR.

THE COURT:  ANYTHING FURTHER?

MR. TRAVIS:  YES, I HAVE A FOLLOWUP BASED ON THE ADDITIONAL ROSTERS.

RECROSS EXAMINATION

BY MR. TRAVIS:

Q.      I JUST PUT IN FRONT OF YOU AN ITEM MARKED FOR IDENTIFICATION AS DEFENSE EXHIBIT 3 AND YOU CAN IGNORE THE PRIOR EXHIBIT ABOVE IT.

IS WHAT I PUT IN FRONT OF YOU A DOCUMENT THAT WAS GENERATED AT ALLENWOOD?

A.      YES, SIR.

Q.      AT THE TOP DOES IT INDICATE THAT THE DATE THIS WAS GENERATED WAS JUNE 21, 1996?

A.    YES, SIR.

Q.    A COUPLE OF MONTHS AFTER MR. MARTI DIED, CORRECT?

A.    YES, SIR.

Q.    AND IS THIS CALLED INMATE HISTORY QUARTERS?

A.    YES, SIR.

Q.    DOES THIS DOCUMENT SHOW THE HISTORY OF WHERE INMATES -- AN INMATE HAS LIVED?

A.    YES, SIR.

Q.    AND IS D 3 THE INMATE HISTORY QUARTERS FOR ANDREW HUNT MARTI?

A.    I'M SORRY.  REPEAT THAT AGAIN.

Q.    SURE.  IS THIS DOCUMENT, D 3, THE INMATE HISTORY QUARTERS FOR MARTI, ANDREW HUNT?

A.    YES, SIR.

Q.    AND DOES THIS DOCUMENT SHOW THAT MR. MARTI, ANDREW HUNT, WAS IN DISCIPLINARY SEGREGATION FROM FEBRUARY 21, 1996 THROUGH APRIL 13TH, 1996?  IF YOU LOOK AT THE THIRD LINE DOWN --

A.    YES, SIR.  YES, SHOWING AS DISCIPLINARY SEG.

Q.    AND THE START -- IF YOU GO TO THE COLUMN START, IT SAYS FEBRUARY 1, 1996, CORRECT?

A.    WHAT WAS THE DATE AGAIN?

Q.    THE THIRD COLUMN DOWN.

A.    YES, SIR.

Q.      EXCUSE ME.   THE THIRD LINE DOWN.

A.      OKAY.

Q.      ABOUT HALFWAY OVER, THERE IS A COLUMN THAT AT THE TOP SAYS START?

A.      RIGHT, SIR.

Q.      AND IF YOU GO DOWN TO THE THIRD LINE, IT SAYS, 02011996, 15:02, CORRECT?

A.      YES.

Q.      AND IT SAYS STOP, 04131996 AT 5:24 AM, CORRECT?

A.      YES.

Q.      SO ACCORDING TO D 3, THIS DOCUMENT ALSO INDICATES THAT MR. MARTI SHOULD HAVE BEEN HOUSED SOMEWHERE IN DISCIPLINARY SEGREGATION AS OPPOSED TO ADMINISTRATIVE DETENTION, CORRECT?

A.      YES.

                MR. TRAVIS:  I HAVE NO OTHER QUESTIONS, YOUR HONOR.

                MR. GURGANUS:  NO OTHER QUESTIONS.

                THE COURT:  DO YOU KNOW WHY THEY WERE HOUSED TOGETHER?

                THE WITNESS:  NO, SIR, COULDN'T TELL YOU.

                THE COURT:  YOU MAY STEP DOWN.

                (WITNESS EXCUSED.)

                MR. TRAVIS:  YOUR HONOR, CONSISTENT WITH THE PROCEDURE THAT THE GOVERNMENT IS FOLLOWING, WE WOULD

MOVE INTO EVIDENCE D 1, D 2 AND D 3.

MR. GURGANUS:  NO OBJECTION, YOUR HONOR.

THE COURT:  THOSE DOCUMENTS WILL BE RECEIVED IN EVIDENCE.

(DEFENSE EXHIBITS D 1, D 2 AND D 3 ADMITTED INTO EVIDENCE.)

THE COURT:  IF YOU HAVE AN EXTRA COPY OF THE DOCUMENTS FOR MY LAW CLERK WHEN YOU HAND THEM UP.

THOMAS ABRAHAM, GOVERNMENT WITNESS, SWORN.

THE CLERK:  STATE AND SPELL YOUR FULL NAME FOR THE RECORD, PLEASE.

THE WITNESS:  THOMAS, T-H-O-M-A-S, ABRAHAM, A-B-R-A-H-A-M.

DIRECT EXAMINATION

BY MR. GURGANUS:

Q.      SIR, WHAT COUNTY DO YOU LIVE IN?

A.      I LIVE IN NORTHUMBERLAND COUNTY.

Q.      WILL YOU GO THROUGH YOUR EMPLOYMENT BACKGROUND?

A.      YES, SIR.  I JOINED THE MILITARY IN JULY OF 1988.  LEFT ACTIVE DUTY IN NOVEMBER OF 1989.  AND I COMPLETED MY MILITARY SERVICE IN THE RESERVES UNTIL THE MIDDLE OF 1993.

Q.      AFTER THE MILITARY, WHERE DID YOU WORK?

A.      I WAS EMPLOYED WITH THE FEDERAL BUREAU OF

PRISONS IN DECEMBER OF 1993.

Q.      AND WHERE WERE YOU STATIONED?

A.      AT THE UNITED STATES PENITENTIARY, ALLENWOOD, PENNSYLVANIA.

Q.      DID YOU START WITH THE BUREAU OF PRISONS AT ALLENWOOD RIGHT AROUND THE TIME IT WAS OPENING?

A.      EXACTLY AROUND THE TIME IT WAS OPENING, SIR.

Q.      DID YOU GO TO GLYNCO?

A.      I DID.

Q.      AND RECEIVED INSTRUCTION THERE?

A.      YES, SIR.

Q.      WHEN YOU WENT BACK TO ALLENWOOD AFTER GLYNCO, WHAT WAS YOUR POSITION?

A.      CORRECTIONAL OFFICER.

Q.      HOW LONG OF A CAREER DID YOU HAVE WITH THE BUREAU OF PRISONS?

A.      14 YEARS.  I WAS RETIRED IN NOVEMBER OF 2007.

Q.      AND WHAT POSITIONS DID YOU HOLD WHILE WITH THE BUREAU OF PRISONS?

A.      I WENT FROM THE RANK OF CORRECTIONAL OFFICER TO SENIOR OFFICER DURING MY TENURE WITH THE BUREAU.

Q.      WHEN DID YOU BECOME A SENIOR OFFICER?

A.      IT WOULD HAVE BEEN THREE YEARS AFTER MY INITIAL SERVICE.  SO IT WOULD HAVE BEEN JANUARY OF 1996.

Q.      ALL RIGHT.  I WANT TO DIRECT YOUR ATTENTION TO

APRIL 13TH, 1996.  WHERE WERE YOU WORKING THAT DAY?

A.      I WAS ON THE MORNING WATCH SHIFT, WHICH WOULD HAVE BEEN MIDNIGHT TO 8 IN THE MORNING, AND I WAS ASSIGNED AS A COMPOUND NUMBER 2 OFFICER FOR THAT SHIFT.

Q.      WHAT DOES A COMPOUND NUMBER 2 OFFICER DO?

A.      THE COMPOUND NUMBER 2 OFFICER HAS VARIOUS DUTIES.

ONE OF OUR MOST IMPORTANT DUTIES IS ON MORNING WATCH, WE DO A SECURITY CHECK OF THE OUTER FENCE TO MAKE SURE NOTHING HAS BEEN TAMPERED WITH.  WE CHECK THE SENSOR ALARMS.  WE ALSO DO WHAT'S CALLED A TRASH RUN, WHICH WE SECURE THE TRASH IN AN AREA, WHERE WE TIE IT AND SECURE IT FOR THREE DAYS TO MAKE SURE ALL OF THE COUNTS ARE CLEARED.  WE ALSO HAVE THE RESPONSIBILITY OF PICKING UP UNIT COUNT SLIPS AT 1 O'CLOCK, 3 O'CLOCK AND 5 O'CLOCK.  ALSO WE ARE RESPONSIBLE FOR THE INITIATION OF THE MORNING MEAL, TO MAKE SURE THAT THE SECURITY OF THE INSTITUTION IS NOT COMPROMISED AND TO MAKE SURE THE INMATES GET BACK TO THE HOUSING UNITS AFTER THE MORNING MEAL SAFELY.

Q.      I'M GOING TO DIRECT YOUR ATTENTION TO AFTER 2 O'CLOCK THAT MORNING.  IT WAS THE MIDDLE OF THE NIGHT THEN, RIGHT?

A.      YES.

Q.      WAS THERE AN INCIDENT THAT HAPPENED?

A.        YES.  AT AROUND 2:55 AM IN THE MORNING LIEUTENANT TIM DEVANE, WHO WAS OUR SUPERVISOR ON THAT SHIFT ON APRIL 13TH, MYSELF, OFFICER LUHRMAN AND OFFICER BONCHUK WERE IN THE LIEUTENANT'S OFFICE GETTING READY TO PICK UP THE 3 AM COUNT SLIPS.  AT THAT TIME LIEUTENANT DEVANE CAME OUT OF HIS OFFICE TO WHERE WE WERE IN THE SECTION OF LIEUTENANT'S OFFICE WHICH WOULD HAVE BEEN THE CAPTAIN'S SECRETARY SECTION OF THE OFFICE AND SAID WE ARE NEEDED DOWN IN THE SPECIAL HOUSING UNIT.  WE FOLLOWED LIEUTENANT DEVANE TO THE SPECIAL HOUSING UNIT, ACTUALLY AT A RUN TO THE SPECIAL HOUSING UNIT.

Q.        DID YOU -- SO YOU WERE WITH LIEUTENANT DEVANE THE WHOLE TIME?

A.        ABSOLUTELY, YES.

Q.        AND ONCE YOU GOT INTO THE SPECIAL HOUSING UNIT, WHERE DID YOU GO?

A.        WE FOLLOWED LIEUTENANT DEVANE DOWN TO AD CELL 103, WHICH IS THE ADMINISTRATIVE DETENTION AREA OF THE SPECIAL HOUSING UNIT, CELL 103.

Q.        DID YOU HEAR ANY DISCUSSIONS THAT THEN HAPPENED BETWEEN ANYONE?

A.        YES.

          WHEN WE REACHED THE FRONT OF THE CELL, LIEUTENANT DEVANE WAS STANDING IN FRONT OF ME IN THE WINDOW SECTION OF THE CELL.  I MOVED TO THE LEFT AND I

HEARD INMATE HAMMER SAY, HE'S DEAD.  AND LIEUTENANT DEVANE THEN SAID, CUFF UP.  AT THAT MOMENT, INMATE HAMMER SAID, I HAVE AN INJURED SHOULDER.  AND LIEUTENANT DEVANE ASKED ME FOR MY SET OF CUFFS.  AND I GAVE LIEUTENANT DEVANE MY SET OF CUFFS AND LIEUTENANT DEVANE DOUBLE-CUFFED INMATE HAMMER, SO HE WOULD NOT EXPERIENCE HIS SHOULDER PAIN.  IT'S ACTUALLY TWO SETS OF HANDCUFFS PUT TOGETHER.

Q.    THEN WHAT HAPPENED?

A.    LIEUTENANT DEVANE OPENED UP -- WE CALL IT A WICKET OR FOOD SLOT AND ASKED INMATE HAMMER TO THEN CUFF UP, WHICH HE COMPLIED WITH.  THE CELL DOOR WAS OPENED AND MYSELF -- AND I CANNOT RECALL THE OTHER OFFICER BUT IT MIGHT HAVE JUST BEEN MYSELF, I ESCORTED INMATE HAMMER DOWN TO THE RECREATION HOLDING PEN, WHICH WAS PROBABLY FOUR CELLS DOWN FROM WHERE INMATE HAMMER'S CELL WAS AND PLACED HIM INSIDE THE RECREATION PEN AND I RETURNED TO CELL 103.

Q.    AND WHEN YOU RETURNED TO CELL 103, WHAT DID YOU DO?

A.    I IMMEDIATELY ENTERED CELL 103 AND NOTICED OFFICER LUHRMAN ATTEMPTING TO REMOVE WHAT APPEARED TO BE CLOTH RESTRAINTS SECURED TO INMATE MARTI'S WRISTS.  AND THEN LIEUTENANT DEVANE WAS IN THE CELL AND WE BOTH PROCEEDED TO REMOVE THE SAME TYPE OF MATERIAL FABRIC

THAT WAS TIED TO INMATE MARTI'S ANKLES.  OFFICER LUHRMAN TOLD ME, I CAN'T REMOVE THEM.  THEY ARE ON TOO TIGHT. AND I WAS ALSO WORKING TO REMOVE THE RESTRAINTS FROM INMATE MARTI'S ANKLES.  AND WE CAME QUICKLY TO THE CONCLUSION THAT WITHOUT ANOTHER INSTRUMENT TO ASSIST US IN REMOVING THE RESTRAINTS, WE WOULD NOT BE ABLE TO GET THEM OFF.

Q.     WHEN YOU SAY THESE RESTRAINTS, WHAT WERE THEY MADE OF?

A.     THEY WERE CLOTH, ALMOST LIKE A SALMON COLOR, WHICH WOULD HAVE BEEN ALMOST THE DUPLICATIVE COLOR OF EITHER THE SHEETS OR PILLOW CASE THAT THE INMATES USED FOR THEIR BEDS.

SO AT THAT MOMENT I PROCEEDED DOWN TO WHICH HAD BEEN OUR SPECIAL HOUSING UNIT OFFICER STATION WHERE WE KEPT NUMEROUS SUPPLIES AND I GRABBED A PAIR OF ALL-PURPOSE CUTTING SCISSORS.

Q.     BEFORE YOU GET THERE, DID THESE RESTRAINTS, WERE THEY JUST STRIPS OR HAD ANYTHING HAPPENED TO THEM?

A.     IT APPEARED THAT THEY WERE WOVEN INTO A CONFIGURATION THAT MADE THEM VERY STRONG.  THEY JUST WERE NOT STRAPS.  THEY WERE ALMOST LIKE A CROCHET TYPE OF PATTERN.  IT'S DIFFICULT TO DESCRIBE HOW THEY WERE MADE, BUT THEY WERE MADE VERY STRONG.

Q.     YOU SAID YOU RAN AND GOT SCISSORS?

A.    I MOVED VERY QUICKLY DOWN TO THE OFFICER STATION, YES, TO GET THE PAIR OF SCISSORS.  WE CALL THEM ALL-PURPOSE CUTTING SCISSORS.

Q.    THEN WHAT HAPPENED?

A.    I PROCEEDED BACK TO CELL 103.

Q.    WAS ANYONE ELSE OVER THERE WITH YOU?

A.    YES.  IT WOULD HAVE BEEN NICKIE TADROSS THAT WOULD HAVE GIVEN ME THE SCISSORS BECAUSE SHE WOULD HAVE HAD THE KEYS TO THAT COMPARTMENT WHERE THEY WERE KEPT.

Q.    DOES SHE ALSO HAVE THE LAST NAME WEAVER?

A.    YES.  NOW IT'S WEAVER.  I'M SORRY, YES.  I'M GOING BACK A LOT OF YEARS.

Q.    AND SO YOU WENT BACK WITH THE SCISSORS?

A.    YES.

Q.    AND THEN WHAT HAPPENED?

A.    I HANDED THEM TO OFFICER LUHRMAN SO HE COULD REMOVE THE RESTRAINTS FROM INMATE MARTI'S WRISTS AND THEN HE GAVE THEM BACK TO ME OR LIEUTENANT DEVANE.  ONE OF US HELD THE FABRIC AWAY FROM INMATE MARTI'S ANKLE AND ONE OF US CUT THE RESTRAINTS OFF INMATE MARTI'S ANKLES, SO WE COULD FREE HIM FROM HIS CONFINEMENT OF THOSE RESTRAINTS.

Q.    CAN YOU DESCRIBE HOW HE WAS POSITIONED WHEN YOU WERE TRYING TO GET THESE RESTRAINTS UNDONE?

A.    FACE DOWN, HANDS WERE TO HIS SIDE.

Q.    I WILL SHOW YOU GOVERNMENT EXHIBIT 30.3-1 A.

A.    YES.

Q.    WHEN YOU SAY YES, WHAT ARE YOU REFERRING TO?

A.    THAT IS HOW HE LOOKED AT THE TIME, FACE DOWN.

Q.    TAKE THAT OFF, PLEASE.

WAS HE TAKEN OFF THE BED THEN ONCE THE RESTRAINTS WERE REMOVED?

A.    YES.  MYSELF, OFFICER LUHRMAN, AND LIEUTENANT DEVANE REMOVED INMATE MARTI FROM THE BED.  AND TO THE BEST OF MY RECOLLECTION, BECAUSE MARTI WAS A PRETTY LARGE MAN, I BELIEVE WE ROLLED HIM AS BEST WE COULD ON TO A BACKBOARD THAT WAS PLACED IN THE CELL AT THE TIME.

Q.    WAS THERE ANYONE ELSE THERE FROM THE MEDICAL DEPARTMENT?

A.    I CAN RECALL SEEING THE PHYSICIAN'S ASSISTANT IN THE CELL, YES.

Q.    WHAT THEN HAPPENED?

A.    WE REMOVED INMATE MARTI FROM THE CELL ON THE BACKBOARD, PLACED HIM ON WHAT I BELIEVE WAS A GURNEY. AND AT THAT TIME I CAN RECALL OFFICER HUFNAGLE BEGINNING CPR AT THAT TIME.

Q.    WHEN YOU SAY CPR, WHAT WAS HE DOING?

A.    CHEST COMPRESSIONS.

Q.    WHERE WAS HE -- DID YOU ACCOMPANY MR. MARTI AT THAT POINT TO ANY OTHER AREA IN THE PRISON?

A.      YES.  I GOT INMATE MARTI DOWN TO THE INSTITUTIONAL HOSPITAL, WHICH WAS PROBABLY 15 TO 20 SECONDS TO GET HIM TO THE INSTITUTION DOOR, TO THE HOSPITAL.  AND WHEN WE GOT INSIDE THE HOSPITAL, I WAS INSTRUCTED BY THE PA TO GET NUMEROUS SUPPLIES FROM THE CABINETS WHERE THE MEDICAL SUPPLIES WERE LOCATED.  HE WOULD GIVE ME INSTRUCTIONS ON WHAT TO GET.  I WOULD GET THEM, I WOULD GIVE THEM TO HIM AND THEN HE WOULD SAY I NEED THIS, IT'S IN THIS CABINET, BRING IT TO ME, AND I WOULD DO THAT.

Q.      WHEN YOU SAY HE WAS GIVING HIM THINGS, WAS HE GIVING HIM TYPES OF MEDICINE IN YOUR VIEW OR DON'T YOU KNOW?

A.      I BELIEVE HE WAS DOING HIS BEST TO RESUSCITATE THE INMATE, BECAUSE I BELIEVE OFFICER HUFNAGLE WAS DOING --WAS CONTINUING TO DO CHEST COMPRESSIONS AND PROBABLY FROM -- I MEAN, OFFICER HUFNAGLE WAS PROBABLY DOING CHEST COMPRESSIONS FOR 20 TO 25 MINUTES AT THAT TIME AND WAS CONTINUING TO DO IT.  AND I BELIEVE, TO THE BEST OF MY RECOLLECTION, IT WAS SUPPLIES TO GET MEDICINE INTO HIS VEINS.  THAT IS THE BEST OF MY RECOLLECTION.  I BELIEVE THAT IS WHY HE WAS ASKING ME TO GET THOSE TYPE OF MEDICAL SUPPLIES, FOR MEDICINE TO BE PLACED IN HIS BODY.

Q.      DO YOU KNOW IF ANYONE WAS DOING -- BAGGING HIM?

DO YOU KNOW WHAT I MEAN BY THAT?

A.      YES.  AND I CANNOT RECALL THAT, SIR.

THE COURT:  WHAT DO YOU MEAN BY BAGGING?

BY MR. GURGANUS:

Q.      WAS HE USING AN AIR BAG, SIR?  DO YOU KNOW WHAT
AN AIR BAG IS?

A.      YES.

Q.      CAN YOU DESCRIBE IT?

A.      IT'S LIKE A PIECE THAT GOES OVER THE NOSE AND
MOUTH AND THE PERSON WOULD SQUEEZE THE BAG TO ATTEMPT TO
GET AIR INTO THE NOSE AND MOUTH OF THE INDIVIDUAL.

Q.      NOW, DO YOU KNOW IF THERE WAS AMBULANCE
PERSONNEL THAT ARRIVED AT SOME POINT?

A.      YES.  AND AT THE END OF MY TIME IN THE HOSPITAL,
AND I CANNOT RECALL IF IT WAS BY RADIO OR TELEPHONE, THE
BEST OF MY -- TO THE BEST OF MY RECOLLECTION, IT WOULD
HAVE BEEN BY RADIO, LIEUTENANT DEVANE ASKED ME TO GO
DOWN TO OUR INSTITUTIONAL CONTROL CENTER TO ESCORT THE
PARAMEDICS UP TO THE INSTITUTIONAL HOSPITAL.

THAT IS ANOTHER ONE OF COMPOUND 2'S JOBS
TO DO DURING THE MORNING WATCH SHIFT, IS TO ESCORT
NONJUSTICE PEOPLE INTO THE INSTITUTION.  AND I WENT DOWN
TO THE CONTROL CENTER AND AS A CONTROL CENTER OFFICER
PROCESSED IN THE PARAMEDICS, I BROUGHT THEM UP TO THE
INSTITUTIONAL HOSPITAL.

Q.      DO YOU RECALL DOING THAT?

A.      VERY CLEARLY.

Q.      WHAT DO YOU RECALL ABOUT IT?

A.      RUNNING DOWN TO THE CONTROL CENTER.  I REMEMBER THE CONTROL CENTER OFFICER DOING THE PROPER IDENTIFICATION AND PAPERWORK AND THEN US -- THEM THEN GETTING THEM THROUGH THE INSTITUTIONAL GRILLES AS QUICKLY AS POSSIBLE.  AND WE GOT TO THE POINT WHERE THEY WERE INSIDE THE INSTITUTION WE MOVED VERY QUICKLY TO GET UP TO THE HOSPITAL.

Q.      WHEN YOU SAY MOVING VERY QUICKLY --

A.      ALMOST AT A RUN, SIR.

Q.      YOU MENTIONED THAT YOU BROUGHT MR. HAMMER FROM THE CELL TO THE RECREATION AREA, A FEW DOORS DOWN?

A.      YES.  AFTER LIEUTENANT DEVANE DOUBLE-CUFFED HIM, YES.

Q.      WHAT WAS HIS DEMEANOR?

A.      I WOULD DESCRIBE HIS DEMEANOR AS COMPLIANT, NONCONFRONTATIONAL AND HE FOLLOWED INSTRUCTIONS TO THE LETTER.

            MR. GURGANUS:  I HAVE NO FURTHER QUESTIONS AT THIS TIME.

            THE COURT:  CROSS EXAMINE.

            MR. TRAVIS:  THANK YOU, YOUR HONOR.

            CROSS EXAMINATION

BY MR. TRAVIS

Q.    OFFICER, DID YOU HAVE ANYTHING TO DO WITH ESCORTING THE PARAMEDICS OUT OF ALLENWOOD?

A.    NO, SIR.  AT THAT TIME -- AND IT HAS BEEN 18 YEARS, BUT I KNOW I WAS CALLED BACK TO THE MAIN INSTITUTION FOR THE INITIATION OF THE MORNING MEAL.  SO I HAD NO FURTHER CONTACT AFTER I ESCORTED THE PARAMEDICS UP TO THE HOSPITAL.

Q.    WERE THE PARAMEDICS ESCORTED OUT BY SOMEONE?

A.    THEY CERTAINLY WOULD HAVE HAD TO HAVE BEEN.

Q.    DO YOU KNOW HOW MANY PEOPLE WOULD HAVE ESCORTED THEM OUT?

A.    IT COULD HAVE BEEN ONE, IT COULD HAVE BEEN TWO.

Q.    WOULD ANYBODY HAVE TRAVELED WITH THE PARAMEDICS AND MR. MARTI TO EVANGELICAL COMMUNITY HOSPITAL?

A.    IT'S BUREAU POLICY, SIR.  ABSOLUTELY.

Q.    AT THE POINT IN TIME WHEN MR. HAMMER WAS TAKEN OUT OF ADMINISTRATIVE DETENTION CELL 103, AS I UNDERSTOOD YOUR TESTIMONY, HE WAS DOUBLE-CUFFED TO THE REAR, IS THAT CORRECT?

A.    THAT'S CORRECT, SIR.

Q.    WAS HE ALLOWED TO TAKE ANY ITEMS OF PERSONAL PROPERTY WITH HIM WHEN HE LEFT AD 103?

A.    THE ONLY ARTICLE, SIR, THAT I CAN RECALL INMATE HAMMER HAVING ON HIM AT THE TIME WAS A TOWEL AROUND HIS

NECK.

Q.      AND AT SOME POINT IN TIME, WAS HE SEARCHED?

A.      HE WAS NOT SEARCHED BY MYSELF, AND I CANNOT RECALL ANYBODY SEARCHING HIM.  AT THAT TIME, OUR MAIN GOAL WAS TO REMOVE INMATE HAMMER AND TO GET TO INMATE MARTI AS QUICKLY AS POSSIBLE.

Q.      WHEN MR. HAMMER WAS PLACED INTO THE INDOOR RECREATION CELL, WAS THERE ANYTHING IN THAT CELL OTHER THAN MR. HAMMER?

A.      THERE WOULD HAVE BEEN A SET OF PULL-UP BARS ON THE WALL.  THAT IS WHERE INTERNAL RECREATION TAKES PLACE.  I CANNOT RECALL ANY OTHER OBJECT BEING IN THE CELL BESIDES INMATE HAMMER AND THAT RECREATIONAL OBJECT THAT WAS SECURED TO THE WALL.  AND IF THERE WAS, SIR, I CAN'T RECALL.

            MR. TRAVIS:  I HAVE NO OTHER QUESTIONS, YOUR HONOR.

            MR. GURGANUS:  NO FOLLOW-UP, YOUR HONOR.

            THE COURT:  ALL RIGHT.  YOU MAY STEP DOWN.

            (WITNESS EXCUSED.)

            THE COURT:  DO YOU WANT TO CALL THE NEXT WITNESS?

            MR. GURGANUS:  CARLYLE THOMPSON.

            CARLYLE THOMPSON, GOVERNMENT WITNESS,

SWORN.

THE CLERK:  STATE AND SPELL YOUR FULL NAME FOR THE RECORD, PLEASE.

THE WITNESS:  CARLYLE RICHARD THOMPSON, C-A-R-L-Y-L-E, LAST NAME T-H-O-M-P-S-O-N.

THE COURT:  I'M GOING TO ASK YOU TO SPEAK INTO THE MIC, MR. THOMPSON.

THE WITNESS:  OKAY.  THANK YOU, YOUR HONOR.

THE COURT:  AS CLOSE AS YOU CAN.

DIRECT EXAMINATION

BY MR. GURGANUS:

Q.      MR. THOMPSON, CAN YOU TELL THE COURT WHAT YOUR PRESENT OCCUPATION IS?

A.      PRESENTLY, I'M A CONTRACT INVESTIGATOR CONSULTANT FOR WASTE MANAGEMENT CORPORATION.

Q.      AND HOW LONG HAVE YOU BEEN DOING THAT, SIR?

A.      SINCE 2004.

Q.      PRECEDING THAT, WHAT WAS YOUR OCCUPATION?

A.      I WAS A SPECIAL AGENT OF THE FBI FROM JUNE 1996 -- CORRECTION, JUNE 1969 TILL I RETIRED ON APRIL 30TH OF 2002.

Q.      IN 2002, YOU RETIRED THEN?

A.      THAT IS CORRECT.

Q.      WHERE WERE YOU STATIONED IN 2002 WHEN YOU

RETIRED FROM THE FBI?

A.      I WAS STATIONED IN WILLIAMSPORT, PENNSYLVANIA.

Q.      WHAT POSITION DID YOU HOLD AT THAT POINT IN TIME IN WILLIAMSPORT, PENNSYLVANIA WITH THE FBI?

A.      I WAS A SUPERVISOR FOR THE RESIDENT AGENCY UP THERE.

Q.      AND WHEN YOU SAY A RESIDENT AGENCY IN WILLIAMSPORT, CAN YOU EXPLAIN TO US WHAT YOU MEAN BY THAT?

A.      WE ARE -- IT'S A SMALL SATELLITE OFFICE OF A DIVISION BEING -- IN PENNSYLVANIA, EASTERN PART OF PENNSYLVANIA WOULD BE PHILADELPHIA DIVISION.  WE REPORTED TO PHILADELPHIA.

Q.      SO IF I UNDERSTAND YOU CORRECTLY, THEN, THE FBI IS MADE UP OF DIVISIONS, IS THAT CORRECT?

A.      THAT IS CORRECT.

Q.      AND ONE OF THE DIVISIONS IS THE PHILADELPHIA DIVISION?

A.      THAT IS CORRECT.

Q.      AND THAT PHILADELPHIA DIVISION HAS, AS PART OF IT, OFFICES OUTSIDE OF PHILADELPHIA, IS THAT RIGHT?

A.      THAT'S CORRECT.

Q.      IN THE PHILADELPHIA DIVISION, SIR, HOW MANY SATELLITE OFFICES ARE THERE, IF YOU CAN RECALL?

A.      ALLENTOWN, SCRANTON, HARRISBURG, STATE COLLEGE.

Q.    AND WILLIAMSPORT?

A.    AND WILLIAMSPORT.

Q.    IS THERE ANY OUT OF STATE, DELAWARE, DO YOU KNOW?

A.    EASTERN PART OF -- NEW JERSEY, YES.

Q.    SO THAT WOULD BE THE PHILADELPHIA DIVISION?

A.    SOUTHERN NEW JERSEY.

Q.    SOUTHERN NEW JERSEY, OKAY.  AND YOU MENTIONED THAT YOU WERE THE RESIDENT AGENT IN CHARGE OF THE WILLIAMSPORT OFFICE WHEN YOU RETIRED?

A.    SUPERVISOR, YES.

Q.    SUPERVISOR.

A.    YES.

Q.    AND CAN YOU DETAIL FOR THE COURT, THEN, YOUR BACKGROUND WITH THE FBI BEFORE THAT, STARTING WHEN YOU JOINED THE FBI AFTER GETTING THROUGH QUANTICO?

A.    I WAS ASSIGNED TO BRIEFLY THE WASHINGTON FIELD OFFICE, WHERE I WORKED GENERAL CRIMINAL WORK, TRANSFERRED TO BALTIMORE, MARYLAND DIVISION.  I WORKED THERE FOR SIX MONTHS, WORKING FUGITIVES AND BANK ROBBERIES AND MILITARY DESERTERS.

Q.    OKAY.

A.    I THEN WAS TRANSFERRED TO SILVER SPRING, MARYLAND, WHERE I WORKED GOVERNMENT CRIMES.

Q.    APPROXIMATELY WHEN WAS THAT?

A.      WHOA, THAT WAS 19 -- I WOULD SAY FIRST PART OF 1974.

Q.      OKAY.

A.      I WORKED GOVERNMENT CRIMES WITH -- AT NATIONAL INSTITUTES OF HEALTH, BETHESDA NAVAL HOSPITAL, WALTER REED AND THE C&O CANAL, WHICH IS A STATE -- A FEDERAL PARK.

Q.      AND THEN WHERE DID YOU THEN GO AFTER THAT?

A.      I WAS TRANSFERRED THERE, WORKED FOREIGN COUNTERINTELLIGENCE FOR ONE YEAR, AND THEN WORKED BANK ROBBERIES.  THEN I GOT TRANSFERRED TO PHILADELPHIA DIVISION, WORKED BLACK ORGANIZED CRIME AND POLICE CORRUPTION ON OLD SQUAD 5.

Q.      THAT WAS IN PHILADELPHIA?

A.      THAT IS CORRECT.

Q.      AND THEN FROM THERE WHERE DID YOU GO?

A.      APRIL OF 1978, I WAS TRANSFERRED TO WILLIAMSPORT, PENNSYLVANIA RESIDENT AGENCY.

Q.      AND DID YOU STAY THERE, THEN, UNTIL THE POINT YOU RETIRED IN 2002?

A.      THAT'S CORRECT.

Q.      NOW, IN WILLIAMSPORT RA, ONCE YOU GOT THERE IN 1978, WHAT WAS YOUR JOB THERE, WHAT TYPE OF WORK DID YOU DO?

A.      I WAS ASSIGNED A PRIMARY INVESTIGATIVE AGENT FOR

THE U.S. PENITENTIARY LEWISBURG, PENNSYLVANIA, AND IN ADDITION, I HAD RESPONSIBILITY FOR ANY FEDERAL INVESTIGATIONS WITHIN THREE COUNTIES.

Q.      AT SOME POINT DID YOU START WORKING AT THE ALLENWOOD PENITENTIARY?

A.      VERY BRIEFLY, YES.

Q.      AND HOW ABOUT, DID THERE COME A POINT IN TIME WHEN YOU STARTED TO GET AWAY FROM THE PRISON-TYPE WORK?

A.      YES.

Q.      WHEN WAS THAT?

A.      THAT WAS ROUGHLY IN 19 -- NOVEMBER OF 1984.

Q.      NOW, '84 OR '94?

A.      1984.

Q.      OKAY.  ALL RIGHT.  NOW, I WANT TO DIRECT YOUR ATTENTION TO APRIL 13TH, 1996.

A.      YES.

Q.      WHAT WERE YOUR RESPONSIBILITIES ON THAT WEEKEND, THAT SATURDAY OF APRIL 13TH, 1996?

A.      I WAS THE WEEKEND DUTY AGENT FOR THE WILLIAMSPORT RESIDENT AGENCY.

Q.      WHAT DOES THAT MEAN?

A.      SO THAT THE SEVEN SPECIAL AGENTS IN THE FBI ARE NOT CALLED OUT EVERY WEEKEND, WE WOULD ROTATE HAVING A WEEKEND RESPONSIBILITY THAT WE WOULD RECEIVE ALL CALLS.

Q.      DID YOU RECEIVE A CALL ON APRIL 13TH, 1996?

A.      YES, I DID.

Q.      DO YOU RECALL FROM WHOM?

A.      IT WAS FROM LIEUTENANT RON JURY, SPECIAL INVESTIGATIVE AGENT AT THE U.S. PENITENTIARY IN ALLENWOOD.

Q.      AND WHAT WAS THE SUBJECT MATTER OF THAT PHONE CALL?

A.      HE INDICATED THAT THEY HAD A DEATH DOWN IN SPECIAL HOUSING UNIT, CELL 103, INVOLVING -- IT WAS A TWO-MAN CELL OCCUPIED BY DAVID PAUL HAMMER AND ANDREW HUNT MARTI.

Q.      WHAT DID YOU THEN DO?

A.      THAT WAS ABOUT 3:25 AM.  I GOT UP, GOT DRESSED AND RESPONDED TO THE INSTITUTION.

Q.      HOW LONG DID IT TAKE YOU TO GET TO THE INSTITUTION APPROXIMATELY?

A.      PROBABLY IN THE NEIGHBORHOOD OF 20, 25 MINUTES.

Q.      AND WHEN YOU ARRIVED, WHAT DID YOU DO?  DID YOU MEET WITH ANYONE?

A.      YES.  I MET WITH LIEUTENANT JURY, LIEUTENANT MARK TRASKER.

Q.      TRAXLER?

A.      I'M SORRY, TRAXLER AND FRANCISCO SANTOS, BOTH BEING LIEUTENANTS IN THE SPECIAL INVESTIGATIONS --

                THE COURT:  LET'S STOP.  MR. HAMMER WAS

CUT OFF.  SO AT 3:30 I GUESS THEY HAVE THEIR COMPUTER PROGRAMMED FOR IT TO END.  THEY DON'T WAIT FOR THE COURT TO -- DID IT JUST TURN OFF WHEN YOU --

THE CLERK:  YES.

THE COURT:  SO WE WILL HAVE MR. THOMPSON REPEAT HIS LAST ANSWER --

MR. GURGANUS:  SURE.

THE COURT:  -- AS TO WHO HE MET AT THE PRISON WITH.  IT WAS LIEUTENANT JURY, MARK WHAT?

THE WITNESS:  I'M SORRY, YOUR HONOR.  IT WAS LIEUTENANT RON JURY, LIEUTENANT MARK TRAXLER, AND LIEUTENANT FRANCISCO SANTOS.

THE COURT:  SANTOS?

THE WITNESS:  YES, SIR.

THE COURT:  ALL RIGHT.  HE WILL REPEAT THAT TOMORROW MORNING, ALL RIGHT, SO MR. HAMMER HAS ALL THE TESTIMONY.  OKAY.  SO WE WILL STAND IN RECESS AT THIS POINT.  OKAY.

MR. MORENO:  WHAT TIME WOULD YOU LIKE US BACK TOMORROW, YOUR HONOR?

THE COURT:  NINE O'CLOCK TOMORROW.

(COURT ADJOURNED AT 3:30 PM.)

I CERTIFY THAT THE FOREGOING IS A CORRECT

TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

ABOVE-ENTITLED MATTER.

DATE                          OFFICIAL COURT REPORTER

                              SUZANNE R. WHITE

INDEX

OPENING STATEMENTS                                    PAGE

MR. GURGANUS                                          10

MR. TRAVIS                                            21


| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| NICOLE WEAVER | | | | |
| BY MR. GURGANUS | 38 | -- | -- | -- |
| BY MS. SAUNDERS | -- | 72 | -- | -- |
| TIMOTHY DEVANE | | | | |
| BY MR. GURGANUS | 78 | -- | 140 | -- |
| BY MR. TRAVIS | -- | 123 | -- | 142 |
| THOMAS ABRAHAM | | | | |
| BY MR. GURGANUS | 145 | -- | -- | -- |
| BY MR. TRAVIS | -- | 155 | -- | -- |
| CARLYLE THOMPSON | | | | |
| BY MR. GURGANUS | 158 | -- | -- | -- |


GOVERNMENT EXHIBITS                                   PAGE

1, 2, 5, 30.3-1, 31.1, 31.2, 1014            77

1010, 13, 8, 10, R164, 30.3-1A, 30.3-1B,     123

30.3-2A, 30.3-2B, 30.3-3A, 30.3-3B,

30.3-4A, 30.3-4B, 30.3-5, 7.1-1B, 7.1-1A,

7.1-2, 7.1-31, 7.1-3B, 7.1-3C, 7.1-3D, 7.1-3E

| DEFENSE EXHIBITS | PAGE |
|---|---|
| 1, 2, 3 | 145 |

## $

**$92,000** [1] - 30:16

## '

**'81** [1] - 78:17
**'84** [1] - 162:12
**'90S** [1] - 82:7
**'91** [2] - 79:22, 80:1
**'93** [4] - 39:11, 41:4, 43:12, 80:1
**'94** [1] - 162:12
**'96** [1] - 100:19
**'97** [2] - 43:12
**'TIL** [1] - 5:18

## 0

**02011996** [1] - 144:7
**04131996** [1] - 144:9

## 1

**1** [31] - 1:12, 43:1, 43:4, 45:16, 49:10, 50:3, 50:4, 51:22, 52:8, 53:18, 53:19, 55:9, 55:11, 55:21, 77:10, 77:19, 88:17, 89:6, 127:6, 129:1, 129:3, 129:8, 129:9, 131:7, 141:6, 143:22, 145:1, 145:5, 147:15, 166:21, 167:2
**10** [8] - 90:20, 90:22, 109:23, 109:24, 123:8, 135:3, 166:3, 166:22
**100** [3] - 2:7, 54:8, 56:1
**1010** [3] - 100:10, 123:8, 166:22
**1014** [6] - 58:6, 61:22, 77:12, 77:13, 77:20, 166:21
**103** [35] - 11:8, 54:5, 56:4, 56:6, 56:7, 57:13, 58:6, 61:23, 61:24, 62:5, 63:12, 69:8, 72:23, 83:3, 98:12, 98:15, 98:17, 103:9, 126:7, 128:3, 129:5, 134:10, 134:17, 135:14, 135:25, 137:9, 148:18, 148:19, 149:18, 149:19, 149:21, 151:5,

156:18, 156:23, 163:9
**11** [3] - 78:25, 80:11, 80:14
**11:58** [2] - 54:24, 90:5
**12** [6] - 47:24, 47:25, 48:21, 48:25, 53:21, 54:13
**123** [2] - 166:13, 166:22
**125** [1] - 82:22
**126** [2] - 48:6, 50:16
**12:30** [1] - 107:9
**12:55** [2] - 55:5, 55:6
**13** [5] - 108:25, 109:1, 123:8, 128:15, 166:22
**130** [1] - 82:22
**1331** [1] - 2:4
**13TH** [26] - 11:8, 22:12, 43:24, 44:5, 45:8, 46:12, 48:5, 57:12, 58:1, 63:3, 87:6, 88:11, 93:7, 100:1, 100:19, 108:8, 112:3, 116:22, 127:11, 128:25, 143:18, 147:1, 148:3, 162:15, 162:18, 162:25
**14** [3] - 25:3, 29:17, 146:17
**140** [2] - 82:23, 166:12
**142** [1] - 166:13
**145** [2] - 166:15, 167:2
**15** [3] - 90:20, 90:22, 153:2
**155** [1] - 166:16
**158** [1] - 166:18
**15:02** [1] - 144:7
**16** [1] - 29:4
**161** [1] - 2:10
**16B** [1] - 1:8
**17101** [1] - 2:7
**17703-0215** [1] - 2:11
**18** [5] - 58:24, 59:14, 60:3, 128:16, 156:5
**18-YEAR** [1] - 27:21
**18501** [1] - 1:18
**19** [2] - 161:1, 162:11
**19106** [3] - 1:9, 1:21, 2:14
**1969** [1] - 158:21
**1974** [1] - 161:2
**1978** [4] - 16:24, 17:1, 161:17, 161:23
**1981** [2] - 35:8, 78:18
**1983** [1] - 35:8
**1984** [2] - 162:11,

162:13
**1988** [1] - 145:21
**1989** [1] - 145:21
**1991** [1] - 79:22
**1993** [11] - 39:12, 39:14, 39:17, 39:18, 43:10, 79:22, 79:24, 80:4, 80:9, 145:23, 146:1
**1996** [36] - 11:8, 22:12, 24:3, 27:15, 27:18, 43:24, 44:5, 45:9, 48:5, 57:12, 58:1, 63:3, 86:1, 86:25, 87:7, 88:11, 108:8, 112:3, 116:23, 123:25, 125:17, 127:11, 127:21, 128:15, 128:25, 129:1, 142:25, 143:18, 143:22, 146:24, 147:1, 158:21, 162:15, 162:18, 162:25
**1997** [1] - 43:11
**1998** [10] - 10:23, 21:16, 23:8, 23:18, 24:3, 29:16, 29:22, 34:18
**1999** [1] - 29:17
**1:25** [4] - 55:10, 55:13, 55:14, 55:15
**1:30** [1] - 52:19

## 2

**2** [28] - 28:14, 44:15, 44:17, 52:24, 74:2, 77:10, 77:19, 86:8, 86:10, 89:21, 107:12, 107:17, 123:18, 123:24, 124:6, 128:10, 129:4, 136:24, 137:1, 141:7, 145:1, 145:5, 147:4, 147:5, 147:6, 147:22, 166:21, 167:2
**2'S** [1] - 154:20
**20** [6] - 37:16, 38:15, 136:10, 153:3, 153:18, 163:17
**2001** [2] - 30:15, 31:23
**2002** [4] - 158:22, 158:23, 158:25, 161:20
**2003** [4] - 30:15, 31:24, 32:1, 32:2
**2004** [1] - 158:18

**2007** [1] - 146:17
**2008** [3] - 78:17, 78:18, 78:20
**2012** [1] - 28:13
**2013** [2] - 31:24, 31:25
**2014** [1] - 29:4
**20507-077** [1] - 61:25
**20530** [1] - 2:4
**21** [7] - 30:18, 88:4, 94:21, 94:22, 142:25, 143:18, 166:4
**215** [1] - 2:10
**215)627-1882** [1] - 1:22
**22** [1] - 21:16
**2255** [1] - 26:7
**23** [4] - 44:11, 44:12, 83:8, 128:15
**235** [1] - 1:17
**24507-077** [2] - 58:7, 62:6
**25** [5] - 69:12, 114:17, 114:19, 153:18, 163:17
**26** [1] - 69:12
**27** [1] - 19:9
**2:05** [4] - 55:17, 55:18, 56:1, 56:10
**2:25** [3] - 56:14, 56:15, 56:17
**2:30** [2] - 91:1, 94:4
**2:50** [1] - 95:4
**2:53** [3] - 72:24, 72:25, 95:4
**2:55** [1] - 148:1

## 3

**3** [24] - 9:17, 28:22, 28:24, 49:10, 53:22, 55:21, 56:22, 57:3, 57:7, 57:8, 57:11, 91:2, 135:7, 135:8, 135:10, 142:19, 143:10, 143:13, 144:11, 145:1, 145:5, 147:15, 148:5, 167:2
**30** [5] - 49:21, 49:22, 63:24, 75:7, 114:17
**30-MINUTE** [7] - 47:18, 48:19, 54:1, 89:20, 90:1, 90:4, 90:13
**30-ROUND** [1] - 88:21
**30.3-1** [2] - 152:1, 166:21
**30.3-1A** [6] - 64:12,

77:11, 77:19, 110:13, 123:9, 166:22
**30.3-1B** [3] - 110:18, 123:9, 166:22
**30.3-2A** [4] - 111:8, 113:3, 123:9, 166:23
**30.3-2B** [4] - 111:19, 113:9, 123:9, 166:23
**30.3-3A** [4] - 112:6, 113:14, 123:9, 166:23
**30.3-3B** [4] - 112:17, 113:19, 123:10, 166:23
**30.3-4A** [4] - 120:13, 120:24, 123:10, 166:24
**30.3-4B** [4] - 120:15, 121:2, 123:10, 166:24
**30.3-5** [3] - 120:18, 123:10, 166:24
**300** [1] - 2:7
**309** [1] - 1:17
**30TH** [1] - 158:22
**31.1** [11] - 47:13, 47:17, 53:20, 53:24, 77:11, 77:20, 89:16, 89:17, 90:3, 166:21
**31.2** [6] - 47:19, 53:2, 77:11, 77:20, 88:25, 166:21
**311** [1] - 1:17
**31ST** [1] - 39:17
**33** [1] - 127:12
**3593** [2] - 59:14
**36** [1] - 14:14
**37** [1] - 27:22
**38** [1] - 166:9
**3:10** [3] - 111:16, 112:2, 113:1
**3:25** [1] - 163:13
**3:30** [5] - 5:8, 107:13, 107:15, 164:1, 164:22

## 4

**4** [6] - 23:8, 23:17, 53:22, 86:11, 127:21
**4/12** [1] - 90:5
**4/13** [1] - 90:1
**4/13/96** [2] - 90:5, 90:7
**4:40** [3] - 115:16, 116:24, 136:11
**4:96-CR-239** [1] - 1:6

## 5

**5** [15] - 45:12, 45:13, 49:10, 55:21, 77:11, 77:19, 91:9, 91:12, 96:19, 135:5, 135:9, 136:23, 147:16, 161:13, 166:21
**540** [1] - 2:14
**55** [1] - 27:23
**56** [1] - 27:23
**58008-065** [1] - 62:10
**5:15** [1] - 117:3
**5:24** [1] - 144:9
**5:30** [1] - 119:25

## 6

**6** [3] - 86:8, 86:10, 122:16
**6-2-14** [1] - 1:8
**60** [1] - 75:7
**601** [1] - 1:21

## 7

**7** [1] - 87:3
**7.1-1A** [3] - 118:11, 123:10, 166:24
**7.1-1B** [4] - 118:7, 123:10, 166:24
**7.1-2** [3] - 118:17, 123:11, 166:25
**7.1-31** [2] - 123:11, 166:25
**7.1-3A** [1] - 118:25
**7.1-3B** [3] - 119:18, 123:11, 166:25
**7.1-3C** [3] - 119:21, 123:11, 166:25
**7.1-3D** [3] - 120:5, 123:11, 166:25
**7.1-3E** [3] - 120:10, 123:11, 166:25
**72** [1] - 166:10
**77** [1] - 166:21
**78** [1] - 166:12
**7:30** [1] - 86:9

## 8

**8** [11] - 44:6, 46:13, 46:14, 86:9, 87:3, 87:10, 109:8, 109:12, 123:8, 147:3, 166:22
**8:00** [1] - 71:22

## 9

**9** [2] - 5:7, 9:17
**90** [1] - 75:7
**900** [1] - 82:9
**96-239-1** [1] - 3:6

## A

**A-B-R-A-H-A-M** [1] - 145:14
**A.M** [5] - 48:25, 53:19, 71:22, 113:1, 116:24
**ABILITY** [3] - 6:13, 36:1, 36:19
**ABLE** [16] - 14:13, 17:8, 30:20, 31:3, 31:19, 33:6, 33:7, 35:10, 70:13, 75:16, 75:19, 105:18, 129:18, 133:8, 135:13, 150:6
**ABOVE-ENTITLED** [1] - 165:5
**ABRAHAM** [6] - 70:16, 70:20, 95:24, 145:9, 145:14, 166:14
**ABSENT** [1] - 21:8
**ABSOLUTELY** [2] - 148:14, 156:16
**ABUSE** [2] - 24:9, 24:11
**ACADEMY** [2] - 28:4, 40:3
**ACCEPT** [2] - 22:10, 23:6
**ACCEPTABLE** [1] - 44:22
**ACCEPTANCE** [4] - 21:14, 22:2, 23:3, 23:19
**ACCEPTED** [1] - 23:13
**ACCESS** [3] - 6:1, 125:6, 125:12
**ACCIDENT** [1] - 11:12
**ACCOMMODATE** [1] - 37:13
**ACCOMPANY** [3] - 69:15, 71:10, 152:24
**ACCOMPLISHED** [2] - 67:23, 67:24
**ACCORDING** [7] - 28:23, 72:24, 124:6, 129:3, 129:4, 129:6, 144:11
**ACCOUNT** [1] - 91:2
**ACCUMULATE** [1] - 5:17
**ACCURATE** [2] -

100:5, 137:4
**ACT** [3] - 15:5, 22:21, 22:23
**ACTED** [1] - 22:19
**ACTION** [1] - 25:25
**ACTIVE** [1] - 145:21
**ACTIVITIES** [2] - 11:25, 24:14
**ACTS** [2] - 19:2, 33:25
**AD** [14] - 54:8, 54:23, 56:1, 98:12, 124:21, 124:24, 126:7, 129:5, 134:17, 135:14, 135:25, 142:4, 148:17, 156:23
**ADDITION** [11] - 14:18, 23:19, 27:24, 30:23, 32:7, 34:20, 43:17, 49:12, 130:16, 131:17, 162:2
**ADDITIONAL** [2] - 106:20, 142:15
**ADDRESS** [1] - 23:21
**ADJOURNED** [1] - 164:22
**ADMIN** [4] - 94:6, 94:7, 137:8, 139:10
**ADMINISTRATION** [1] - 75:10
**ADMINISTRATIVE** [34] - 36:8, 48:11, 74:25, 75:1, 75:13, 75:14, 75:20, 83:2, 83:24, 84:2, 84:9, 84:19, 102:3, 124:10, 125:5, 125:7, 125:18, 126:1, 126:8, 126:22, 127:18, 127:21, 127:25, 128:3, 133:5, 134:10, 139:5, 139:25, 141:9, 142:5, 142:9, 144:14, 148:18, 156:18
**ADMISSION** [2] - 11:1, 123:3
**ADMISSIONS** [3] - 11:18, 12:14, 15:19
**ADMITTED** [3] - 10:24, 123:12, 145:6
**ADVANCED** [1] - 27:24
**ADVICE** [1] - 22:13
**ADVISE** [1] - 29:3
**ADVISOR** [1] - 29:18
**ADVOCATE** [1] -

36:17
**ADVOCATING** [1] - 36:18
**ADX** [2] - 34:15, 36:8
**AERIAL** [4] - 43:5, 43:7, 43:12, 129:10
**AFFECTED** [2] - 19:10, 19:12
**AFFORDED** [1] - 44:13
**AFTERMATH** [2] - 35:8, 35:9
**AGE** [4] - 19:9, 25:3, 27:22, 27:24
**AGENCY** [4] - 159:5, 159:7, 161:18, 162:20
**AGENT** [10] - 3:25, 14:2, 14:4, 14:14, 158:20, 160:9, 161:25, 162:19, 163:4
**AGENTS** [1] - 162:22
**AGGRAVATING** [13] - 16:9, 16:17, 18:9, 18:10, 18:16, 19:3, 21:6, 32:19, 32:20, 32:23, 33:14, 33:15, 33:20
**AGGRAVATOR** [1] - 32:21
**AGING** [1] - 36:21
**AGO** [4] - 25:12, 27:19, 28:10, 58:24
**AGREE** [1] - 20:12
**AGREED** [1] - 26:16
**AGREEMENT** [2] - 11:15, 20:20
**AHEAD** [4] - 32:6, 108:4, 116:21, 121:22
**AIDED** [1] - 1:24
**AIR** [4] - 112:20, 154:5, 154:6, 154:11
**AISLE** [1] - 138:2
**ALARM** [4] - 6:4, 6:9, 47:7, 47:23
**ALARMS** [1] - 147:11
**ALCATRAZ** [1] - 36:9
**ALL-PURPOSE** [2] - 150:17, 151:3
**ALLEGED** [1] - 22:20
**ALLENTOWN** [1] - 159:25
**ALLENWOOD** [41] - 26:16, 29:20, 34:15, 40:11, 40:12, 40:14, 40:16, 42:3, 43:8, 43:13, 43:19, 43:20, 43:24, 44:9, 45:14,

79:17, 79:18, 79:19, 79:20, 79:23, 80:5, 80:21, 81:6, 82:7, 86:2, 93:4, 114:18, 123:25, 127:8, 128:13, 129:11, 142:22, 146:3, 146:6, 146:12, 156:3, 162:5, 163:5
**ALLOW** [1] - 84:2
**ALLOWED** [4] - 5:25, 9:2, 84:5, 156:22
**ALMOST** [7] - 28:11, 29:7, 138:19, 150:10, 150:11, 150:22, 155:12
**ALONE** [1] - 132:19
**ALTERNATIVE** [1] - 8:23
**AMANDA** [2] - 2:2, 3:18
**AMBULANCE** [5] - 93:7, 93:8, 106:23, 114:9, 154:12
**AMERICA** [1] - 1:3
**AMERICAN** [1] - 28:3
**AMISS** [1] - 56:17
**AMOUNT** [1] - 59:4
**AMOUNTS** [1] - 31:12
**AMPLY** [1] - 23:7
**ANCHOR** [1] - 29:23
**AND-A-HALF** [5] - 37:13, 37:15, 107:11, 136:12, 136:14
**ANDREW** [31] - 10:24, 11:2, 11:7, 11:14, 11:15, 11:20, 12:6, 12:8, 12:15, 12:21, 13:8, 13:11, 13:21, 14:24, 15:23, 16:7, 18:14, 19:7, 19:8, 19:9, 23:13, 56:8, 56:9, 101:4, 108:12, 128:21, 128:25, 143:11, 143:14, 143:17, 163:10
**ANKLE** [1] - 151:19
**ANKLES** [7] - 13:24, 103:18, 103:19, 105:2, 150:1, 150:4, 151:20
**ANNE** [2] - 2:5, 3:11
**ANSWER** [2] - 6:17, 164:6
**ANSWERED** [1] - 7:14
**APPEAL** [1] - 23:11
**APPEAR** [1] - 54:5
**APPEARANCES** [2] - 1:14, 2:1

APPEARED [9] - 62:14, 64:20, 64:22, 65:10, 69:24, 105:6, 123:25, 149:22, 150:20
APPLICATION [1] - 24:21
APPLIED [1] - 12:17
APPLY [4] - 39:14, 59:16, 59:18, 59:20
APPRECIATE [1] - 9:20
APPROACHED [4] - 58:6, 61:23, 61:24, 62:5
APPROPRIATE [2] - 7:2, 22:10
APRIL [32] - 11:8, 22:12, 27:15, 43:24, 44:5, 45:8, 46:12, 48:5, 57:12, 58:1, 63:3, 87:6, 88:11, 93:7, 100:1, 100:19, 108:8, 112:3, 116:22, 123:25, 125:16, 127:11, 128:15, 128:25, 143:18, 147:1, 148:3, 158:22, 161:17, 162:15, 162:18, 162:25
ARCHBISHOP [1] - 30:5
AREA [36] - 19:6, 21:14, 23:20, 24:1, 43:18, 45:21, 46:8, 71:20, 75:16, 83:12, 84:21, 91:21, 92:1, 92:5, 94:12, 97:23, 103:6, 103:14, 105:9, 118:13, 121:10, 126:24, 130:19, 135:1, 135:14, 136:6, 136:9, 136:21, 137:10, 137:19, 139:11, 140:25, 147:12, 148:18, 152:25, 155:14
AREAS [5] - 21:13, 82:5, 124:15, 125:15, 130:17
ARGUED [1] - 33:2
ARISEN [1] - 141:5
ARISES [1] - 8:16
ARM [10] - 17:7, 117:15, 119:1, 120:12, 120:14, 120:17, 120:20, 121:1, 121:5

ARMED [1] - 131:24
ARMS [3] - 69:1, 103:21, 117:11
ARMY [2] - 79:5, 79:6
ARRIVED [13] - 13:13, 15:1, 66:21, 67:2, 80:5, 80:9, 105:12, 105:20, 122:24, 134:8, 134:10, 154:13, 163:18
ARROW [8] - 90:6, 92:21, 92:25, 97:3, 136:8, 136:22, 137:13
ARROWS [2] - 97:2, 130:2
ARTICLE [1] - 156:24
ARTS [1] - 38:23
ASPECT [2] - 30:8, 140:1
ASSERTION [1] - 34:4
ASSESSED [1] - 34:11
ASSIGNED [5] - 82:20, 127:18, 147:4, 160:17, 161:25
ASSIGNMENTS [1] - 139:24
ASSIST [1] - 150:5
ASSISTANCE [2] - 62:21, 63:19
ASSISTANT [8] - 3:15, 3:20, 67:5, 105:20, 115:21, 118:21, 122:8, 152:15
ASSOCIATING [1] - 30:3
ASSUME [1] - 49:1
ASSUMES [1] - 48:21
ASSUMING [2] - 10:15, 20:4
AT-RISK [1] - 31:14
ATTEMPT [4] - 70:11, 76:16, 105:9, 154:10
ATTEMPTED [4] - 16:20, 25:5, 106:9, 113:22
ATTEMPTING [2] - 111:6, 149:22
ATTEMPTS [1] - 131:15
ATTEND [2] - 66:15, 114:24
ATTENTION [17] - 5:21, 6:8, 20:11, 26:9, 27:17, 27:19, 29:13, 34:8, 35:20, 43:23, 83:19, 87:6, 91:1, 95:3, 146:25, 147:21, 162:15

ATTORNEY [5] - 3:15, 3:21, 8:17, 25:24, 25:25
ATTORNEYS [5] - 1:16, 7:12, 22:7, 23:9
AUGUST [1] - 43:11
AUSA [1] - 15:17
AUTHORITIES [1] - 7:1
AVAILABLE [8] - 5:7, 7:15, 9:22, 28:5, 107:14, 124:20, 125:3, 127:1
AWARE [9] - 8:6, 16:1, 16:21, 17:22, 17:24, 21:21, 28:16, 126:16, 140:23

## B

BACHELOR [1] - 38:23
BACKBOARD [2] - 152:12, 152:19
BACKGROUND [4] - 38:21, 79:1, 145:19, 160:15
BAG [4] - 112:20, 154:5, 154:6, 154:10
BAGGING [2] - 153:25, 154:3
BALANCE [1] - 29:9
BALL [1] - 81:15
BALTIMORE [1] - 160:19
BANK [3] - 31:5, 160:20, 161:10
BAPTISM [1] - 30:7
BAPTIST [3] - 16:25, 25:13
BAPTIZED [1] - 30:5
BARGAIN [1] - 21:19
BARS [1] - 157:10
BASE [1] - 48:6
BASED [3] - 21:5, 36:18, 142:14
BASIS [1] - 27:9
BECOME [1] - 146:22
BED [26] - 57:20, 57:22, 62:11, 62:12, 62:14, 62:16, 62:18, 64:2, 64:16, 64:21, 69:24, 69:25, 70:1, 103:25, 104:5, 104:21, 105:3, 105:11, 110:6, 110:10, 110:16, 110:21, 110:23, 152:6, 152:9

BEDS [1] - 150:13
BEDSHEET [1] - 105:4
BEFOREHAND [1] - 61:10
BEGIN [4] - 10:16, 37:11, 90:5, 105:10
BEGINNING [3] - 41:6, 46:18, 152:20
BEHIND [6] - 7:25, 9:6, 68:17, 68:18, 68:19, 132:20
BELIEVES [3] - 33:6, 35:16, 59:10
BELOW [5] - 48:21, 74:4, 74:14, 92:19, 92:21
BENCH [1] - 21:21
BENEFICIARIES [1] - 30:25
BEST [9] - 26:4, 106:19, 152:10, 152:11, 153:14, 153:19, 153:21, 154:16
BETHESDA [1] - 161:5
BETTER [4] - 4:24, 35:24, 54:22, 60:16
BETWEEN [16] - 22:22, 49:15, 53:18, 53:21, 75:1, 81:7, 84:12, 86:15, 94:4, 117:13, 125:4, 130:23, 136:2, 138:4, 139:11, 148:21
BEYOND [3] - 15:21, 16:5, 17:12
BIFURCATION [1] - 20:8
BIG [1] - 11:25
BIND [1] - 11:25
BINDING [1] - 12:6
BINDINGS [1] - 13:23
BINDS [1] - 13:23
BIRDSHOT [1] - 18:4
BIT [4] - 72:6, 82:15, 137:6
BLACK [1] - 161:12
BLEEDING [1] - 114:2
BLOCK [2] - 92:19, 92:20
BLOOD [3] - 110:25, 111:4, 114:3
BLOW [1] - 53:23
BLOWN [1] - 113:10
BLOWN-UP [1] - 113:10
BLOWUP [1] - 113:4

BLOWUPS [1] - 121:2
BLUMBERG [2] - 27:4, 27:7
BOARD [1] - 141:15
BODY [1] - 153:24
BONCHUK [2] - 95:23, 148:4
BOOK [12] - 47:12, 50:18, 50:19, 52:21, 52:22, 53:13, 54:7, 54:18, 61:2, 88:21, 89:4, 89:5
BOOKS [3] - 31:21, 88:22, 90:15
BOP [1] - 39:19
BORDER [1] - 92:3
BORDERLINE [1] - 27:10
BOSCO'S [2] - 31:12, 31:13
BOTTOM [5] - 27:12, 91:20, 119:7, 119:9, 124:8
BOX [3] - 1:17, 2:10, 74:13
BRAIDED [12] - 11:23, 13:23, 33:9, 62:15, 70:7, 104:2, 104:4, 104:6, 104:7, 105:3, 109:20
BRAIDED-TYPE [1] - 109:20
BRAIDING [1] - 33:9
BRAIN [3] - 26:22, 26:24, 27:1
BREAK [4] - 6:2, 37:21, 107:10, 107:13
BREAKS [1] - 45:18
BRIEF [2] - 10:20, 19:13
BRIEFLY [4] - 38:20, 79:1, 160:17, 162:6
BRING [21] - 5:21, 6:7, 23:12, 25:10, 26:24, 27:3, 27:17, 27:19, 29:13, 30:6, 30:24, 34:8, 35:20, 36:25, 37:1, 37:2, 37:3, 53:23, 90:2, 108:19, 153:9
BRINGING [1] - 20:11
BROKEN [1] - 124:3
BROTHER [2] - 19:11, 33:18
BROUGHT [5] - 26:9, 83:19, 114:8, 154:24, 155:13
BRUISE [6] - 120:11, 120:14, 120:16,

120:19, 120:25, 121:5
**BRUISES** [1] - 117:11
**BUILDING** [2] - 92:9, 93:11
**BUILDINGS** [2] - 129:14, 132:5
**BULLOCK** [1] - 25:24
**BUNK** [6] - 12:7, 58:13, 62:3, 62:10, 105:3
**BURDEN** [1] - 20:23
**BUREAU** [35] - 6:25, 9:22, 13:3, 13:13, 13:20, 28:22, 28:23, 34:11, 34:14, 35:2, 35:5, 35:24, 35:25, 36:19, 38:12, 38:13, 39:5, 39:15, 42:4, 42:11, 78:13, 78:16, 79:8, 79:11, 125:16, 125:23, 126:14, 126:16, 129:4, 145:25, 146:5, 146:16, 146:19, 146:21, 156:16
**BURN** [1] - 118:18
**BUTNER** [4] - 38:17, 38:18, 42:21
**BUTTON** [3] - 46:4, 46:6, 46:7

**C**

**C&O** [1] - 161:6
**CABINET** [1] - 153:9
**CABINETS** [1] - 153:6
**CAGE** [2] - 70:17, 102:3
**CALM** [1] - 66:19
**CAMERA** [1] - 105:12
**CAMILLE** [6] - 29:19, 29:25, 30:9, 30:20, 30:23, 37:2
**CAMP** [5] - 43:19, 43:20, 80:2, 80:19, 81:4
**CAMPS** [1] - 81:2
**CANAAN** [1] - 34:16
**CANAL** [1] - 161:6
**CANNOT** [5] - 149:13, 154:2, 154:15, 157:3, 157:12
**CAPACITY** [1] - 88:5
**CAPITAL** [2] - 2:3, 59:22
**CAPTAIN'S** [1] - 148:8
**CARD** [3] - 30:12, 30:19, 32:13
**CARDIAC** [1] - 28:12

**CARDS** [2] - 30:13
**CARE** [7] - 25:18, 25:19, 25:20, 26:1, 28:22, 28:24, 94:18
**CARED** [1] - 30:4
**CAREER** [2] - 79:13, 146:15
**CARLYLE** [6] - 14:9, 157:24, 157:25, 158:4, 158:5, 166:17
**CAROLINA** [2] - 38:17, 42:23
**CARRIED** [1] - 51:24
**CARRY** [1] - 33:13
**CASE** [17] - 3:4, 9:24, 12:24, 15:10, 18:7, 21:4, 21:11, 24:7, 37:9, 42:16, 42:17, 59:10, 59:11, 59:17, 107:22, 123:21, 150:12
**CATEGORIZED** [1] - 28:21
**CATHETERIZATION** [1] - 28:13
**CATHOLIC** [1] - 30:5
**CAUSED** [4] - 24:11, 117:14, 117:15, 119:20
**CAUSES** [1] - 33:18
**CELL** [113] - 8:4, 11:8, 11:16, 11:21, 14:12, 14:15, 14:16, 22:11, 50:10, 50:25, 51:15, 54:4, 56:4, 57:13, 58:6, 61:23, 61:24, 62:5, 63:12, 64:6, 65:1, 65:2, 68:12, 68:13, 69:5, 69:7, 69:8, 69:15, 69:17, 69:18, 70:21, 70:24, 70:25, 72:22, 75:19, 76:12, 76:15, 76:20, 82:20, 82:24, 83:1, 83:3, 98:12, 98:19, 98:20, 99:1, 99:3, 99:11, 99:13, 99:14, 99:18, 99:20, 101:9, 101:14, 101:17, 102:1, 102:19, 103:1, 103:9, 103:12, 104:24, 104:25, 108:9, 110:9, 113:25, 115:9, 115:10, 121:7, 121:8, 121:9, 122:3, 122:15, 126:7, 126:10, 128:3, 134:10, 134:11, 134:16,

134:17, 134:21, 134:23, 135:4, 136:9, 136:15, 136:16, 137:20, 137:22, 137:24, 138:24, 139:24, 148:17, 148:19, 148:23, 148:25, 149:12, 149:16, 149:18, 149:19, 149:21, 149:24, 151:5, 152:12, 152:16, 152:18, 155:14, 156:18, 157:8, 157:13, 163:9, 163:10
**CELLED** [1] - 129:5
**CELLIE** [1] - 57:16
**CELLMATE** [5] - 58:10, 62:1, 62:8, 64:2, 95:9
**CELLS** [17] - 49:20, 51:4, 51:6, 51:9, 51:21, 64:10, 81:18, 83:4, 83:12, 85:6, 85:10, 124:7, 124:10, 133:5, 136:3, 138:4, 149:16
**CENTER** [25] - 2:14, 39:3, 40:10, 50:20, 64:4, 76:21, 92:13, 92:16, 92:17, 92:24, 93:3, 94:17, 97:19, 99:13, 102:3, 106:22, 115:10, 132:23, 137:8, 138:2, 154:18, 154:23, 155:4, 155:5
**CENTRAL** [1] - 132:6
**CERTAIN** [11] - 5:18, 24:5, 24:17, 47:2, 51:16, 84:1, 84:11, 110:6, 114:4, 129:14, 142:7
**CERTAINLY** [2] - 58:16, 156:10
**CERTIFICATE** [1] - 41:25
**CERTIFIED** [1] - 17:10
**CERTIFY** [1] - 165:3
**CETERA** [1] - 140:17
**CHAIN** [8] - 36:8, 105:6, 117:16, 117:17, 117:20, 119:2, 121:16, 122:10
**CHANGE** [2] - 29:14, 29:15
**CHANGED** [1] - 31:8
**CHANGES** [1] - 24:5

**CHARGE** [10] - 17:18, 21:25, 44:7, 46:19, 53:5, 64:9, 71:15, 87:17, 87:20, 160:9
**CHAUDHRI** [3] - 105:23, 105:24, 117:3
**CHECK** [20] - 47:6, 47:7, 47:18, 47:23, 48:17, 49:16, 49:19, 54:1, 54:19, 55:10, 55:12, 55:23, 56:10, 89:20, 90:1, 90:4, 90:13, 136:19, 147:9, 147:10
**CHECKED** [3] - 115:2, 116:5, 118:20
**CHECKS** [10] - 47:2, 47:5, 47:10, 48:19, 49:12, 54:11, 88:21, 90:1, 90:4
**CHEST** [3] - 152:23, 153:16, 153:18
**CHESTNUT** [1] - 2:7
**CHIEF** [1] - 26:15
**CHILDHOOD** [2] - 26:11, 26:13
**CHILDREN** [6] - 24:18, 31:9, 31:14, 31:17, 31:22, 32:10
**CHOOSE** [1] - 35:1
**CHOOSES** [1] - 27:14
**CHOOSING** [1] - 36:20
**CHRISTMAS** [1] - 30:13
**CHRONIC** [1] - 28:15
**CIRCLE** [1] - 45:21
**CIRCLING** [1] - 45:23
**CITY** [1] - 17:1
**CLASS** [2] - 25:25, 39:25
**CLASSES** [1] - 41:12
**CLASSIFICATION** [5] - 35:2, 35:3, 35:13, 35:17, 36:4
**CLASSIFIED** [1] - 28:21
**CLASSROOM** [2] - 41:13, 41:24
**CLEAN** [1] - 117:3
**CLEAR** [14] - 5:12, 6:15, 6:21, 8:21, 12:22, 17:19, 20:20, 22:22, 45:22, 46:4, 46:7, 59:6, 80:3, 101:8
**CLEARED** [1] - 147:14
**CLEARER** [1] - 123:21
**CLEARLY** [5] - 9:4,

15:22, 32:21, 60:8, 155:2
**CLERK** [7] - 3:1, 38:4, 78:1, 145:8, 145:11, 158:2, 164:4
**CLINIC** [1] - 34:10
**CLINICAL** [1] - 28:24
**CLIPPER** [4] - 13:15, 101:21, 109:5, 109:15
**CLIPPERS** [6] - 65:10, 73:3, 73:11, 75:24, 76:4, 140:20
**CLIQUE** [1] - 14:25
**CLOSE** [7] - 68:25, 94:7, 97:11, 97:21, 132:20, 132:23, 158:10
**CLOSED** [2] - 69:1, 98:5
**CLOSER** [2] - 39:1, 108:15
**CLOSES** [1] - 98:4
**CLOTH** [4] - 12:18, 12:19, 149:23, 150:10
**CLOTHES** [4] - 115:6, 115:11, 115:12
**CLOTHING** [2] - 117:2, 117:3
**CM** [1] - 1:19
**CO** [1] - 57:16
**COGNITIVE** [2] - 26:17, 26:19
**COLLECT** [1] - 85:17
**COLLEGE** [4] - 38:22, 39:2, 78:12, 159:25
**COLOR** [2] - 150:10, 150:11
**COLUMN** [5] - 54:5, 127:24, 143:21, 143:24, 144:3
**COMBINING** [1] - 20:6
**COMING** [3] - 40:24, 88:8, 130:2
**COMMENCE** [1] - 42:4
**COMMENT** [2] - 15:4, 116:13
**COMMENTS** [1] - 13:18
**COMMIT** [3] - 19:2, 22:23, 33:25
**COMMITTED** [1] - 11:9
**COMMUNICATE** [4] - 6:13, 8:17, 84:13, 94:20
**COMMUNICATION** [4] - 5:9, 5:22, 94:23, 99:2

**COMMUNITY** [2] - 2:13, 156:15

**COMPARTMENT** [1] - 151:9

**COMPASS** [1] - 22:9

**COMPLAINED** [1] - 117:7

**COMPLAINTS** [2] - 116:12, 118:1

**COMPLETED** [2] - 10:22, 145:22

**COMPLEX** [5] - 40:11, 40:12, 43:13, 45:16, 45:17

**COMPLIANT** [1] - 155:18

**COMPLICATIONS** [1] - 28:14

**COMPLIED** [4] - 101:23, 121:11, 121:13, 149:12

**COMPONENT** [1] - 33:12

**COMPORT** [1] - 102:5

**COMPOUND** [5] - 67:9, 147:4, 147:5, 147:6, 154:20

**COMPRESSIONS** [3] - 152:23, 153:16, 153:18

**COMPROMISED** [1] - 147:18

**COMPUTER** [4] - 1:24, 1:24, 141:20, 164:1

**COMPUTER-AIDED** [1] - 1:24

**CONCENTRATE** [1] - 133:4

**CONCEPT** [2] - 33:2, 34:2

**CONCERN** [1] - 34:6

**CONCERNING** [12] - 5:22, 6:12, 23:1, 24:8, 24:15, 24:24, 25:25, 26:2, 26:25, 32:12, 34:11, 129:7

**CONCERNS** [1] - 6:12

**CONCESSION** [3] - 21:19, 21:23, 22:13

**CONCLUDE** [1] - 19:25

**CONCLUSION** [4] - 36:22, 37:7, 44:21, 150:5

**CONDITION** [1] - 28:9

**CONDITIONS** [2] - 28:15, 29:6

**CONDUCT** [1] - 117:4

**CONDUCTED** [3] -

29:4, 89:7, 116:25

**CONFERENCING** [1] - 28:19

**CONFERRED** [1] - 29:20

**CONFESSED** [3] - 14:6, 14:7

**CONFESSION** [1] - 14:17

**CONFIGURATION** [1] - 150:21

**CONFINEMENT** [2] - 36:7, 151:21

**CONNECT** [1] - 89:7

**CONSIDER** [3] - 16:8, 18:16, 18:19

**CONSIDERATION** [2] - 35:10, 59:2

**CONSISTENT** [6] - 22:19, 63:11, 64:18, 118:19, 119:10, 144:24

**CONSISTENTLY** [2] - 34:14, 34:18

**CONSULTANT** [1] - 158:16

**CONTACT** [6] - 28:25, 84:12, 85:9, 99:2, 122:6, 156:7

**CONTENTION** [1] - 33:21

**CONTEST** [1] - 60:7

**CONTINUE** [2] - 42:4, 101:19

**CONTINUED** [1] - 2:1

**CONTINUING** [3] - 18:25, 153:16, 153:19

**CONTRACT** [1] - 158:15

**CONTRIBUTION** [2] - 32:8, 32:17

**CONTRIBUTIONS** [1] - 31:8

**CONTROL** [22] - 36:1, 36:19, 50:19, 64:4, 76:21, 92:13, 92:15, 92:17, 92:24, 93:3, 94:17, 96:9, 96:11, 97:19, 106:22, 132:7, 132:23, 154:18, 154:23, 155:4, 155:5

**CONVERSATION** [6] - 6:22, 7:2, 7:11, 65:3, 66:18, 66:23

**CONVERSATIONS** [2] - 6:16, 72:11

**CONVICTED** [3] - 16:18, 17:13, 18:6

**CONVICTION** [5] - 11:5, 16:24, 17:11, 17:21, 18:8

**CONVICTIONS** [4] - 16:22, 17:17, 32:22

**COOPERATION** [2] - 6:25, 9:21

**COPIOUS** [1] - 14:5

**COPY** [5] - 17:10, 54:21, 74:6, 123:21, 145:7

**CORNER** [1] - 91:21

**CORPORATION** [1] - 158:16

**CORRECT** [91] - 5:4, 20:5, 41:18, 42:9, 42:19, 44:1, 45:10, 45:18, 48:10, 49:5, 51:5, 51:13, 51:14, 51:17, 51:18, 52:10, 53:10, 56:3, 57:1, 57:7, 57:9, 58:9, 58:12, 59:18, 62:24, 63:13, 65:21, 68:16, 68:22, 69:3, 69:20, 71:18, 72:24, 73:4, 73:5, 73:9, 73:12, 73:13, 73:15, 73:16, 76:6, 76:9, 76:10, 76:19, 78:19, 79:25, 84:6, 86:17, 91:19, 93:1, 112:4, 123:25, 124:4, 124:8, 124:17, 124:21, 125:16, 125:21, 125:23, 126:8, 127:22, 128:1, 129:5, 129:11, 130:6, 131:4, 132:17, 132:21, 134:11, 134:14, 134:18, 134:21, 136:17, 138:23, 139:17, 143:3, 143:22, 144:7, 144:9, 144:14, 156:20, 156:21, 158:24, 159:15, 159:16, 159:19, 159:22, 161:15, 161:21, 165:3

**CORRECTION** [1] - 158:21

**CORRECTIONAL** [12] - 13:6, 38:19, 40:2, 41:14, 42:2, 42:8, 42:12, 43:17, 69:18, 81:1, 146:14, 146:20

**CORRECTIONS** [4] - 25:15, 25:17, 26:3,

35:25

**CORRECTLY** [1] - 159:14

**CORRESPONDENC E** [2] - 15:19, 32:9

**CORRIDOR** [1] - 67:9

**CORRUPTION** [1] - 161:13

**COUNSEL** [14] - 3:3, 3:22, 5:12, 5:13, 7:5, 7:25, 8:19, 8:21, 9:8, 21:15, 34:1, 58:16, 60:23, 107:24

**COUNSELED** [1] - 22:8

**COUNSELING** [1] - 25:8

**COUNSELOR** [2] - 8:6, 10:9

**COUNT** [28] - 21:25, 48:6, 49:15, 49:17, 49:18, 50:3, 50:4, 50:8, 50:23, 51:22, 52:8, 52:16, 52:17, 53:19, 55:9, 55:11, 56:22, 56:24, 57:4, 57:7, 57:8, 57:11, 88:17, 88:18, 89:6, 147:15, 148:5

**COUNTED** [1] - 50:10

**COUNTERINTELLIG ENCE** [1] - 161:10

**COUNTIES** [1] - 162:3

**COUNTING** [1] - 50:21

**COUNTRY** [1] - 80:24

**COUNTS** [8] - 49:4, 49:6, 49:9, 49:12, 55:20, 88:8, 94:16, 147:14

**COUNTY** [5] - 39:3, 39:8, 41:17, 145:17, 145:18

**COUPLE** [6] - 41:1, 67:8, 88:23, 91:8, 99:12, 143:2

**COUPLED** [1] - 36:21

**COURSE** [6] - 18:1, 19:16, 49:3, 49:11, 61:9, 96:11

**COURT** [184] - 1:1, 1:20, 3:1, 3:2, 3:4, 3:11, 3:14, 3:17, 3:20, 4:1, 4:4, 4:8, 4:10, 4:20, 4:22, 5:3, 5:6, 5:21, 6:8, 6:12, 6:23, 7:3, 7:8, 7:18, 8:6, 8:12, 8:14, 9:3, 9:10, 9:16, 9:20, 9:21, 9:24, 10:1, 10:4, 10:14, 10:21,

16:1, 16:11, 16:12, 16:21, 17:2, 17:22, 17:24, 18:16, 18:19, 19:11, 19:19, 20:2, 20:10, 20:16, 20:22, 20:25, 21:13, 21:20, 22:18, 24:2, 24:23, 25:2, 25:24, 26:4, 26:9, 27:3, 27:5, 27:8, 27:9, 27:18, 27:20, 28:2, 28:7, 29:3, 29:14, 30:19, 30:21, 30:24, 31:1, 31:23, 32:2, 32:6, 32:14, 33:2, 33:23, 34:9, 34:21, 34:23, 35:18, 35:20, 36:14, 36:18, 37:5, 37:6, 37:7, 37:11, 37:17, 37:20, 37:22, 38:2, 38:25, 44:8, 44:23, 44:24, 45:4, 45:23, 46:7, 53:25, 57:6, 57:10, 58:22, 59:6, 59:13, 60:5, 60:8, 60:10, 60:19, 60:23, 61:1, 61:7, 61:12, 61:15, 61:20, 62:4, 63:1, 63:4, 63:17, 66:15, 72:16, 73:17, 77:4, 77:9, 77:13, 77:17, 77:21, 78:9, 80:13, 96:6, 104:15, 104:18, 107:9, 107:21, 108:3, 108:14, 114:20, 123:6, 123:13, 123:16, 128:3, 128:7, 133:15, 133:18, 133:24, 134:1, 134:4, 135:8, 138:1, 138:6, 138:9, 138:14, 138:17, 138:20, 139:1, 140:11, 142:13, 144:19, 144:22, 145:3, 145:7, 154:3, 155:23, 157:19, 157:22, 158:6, 158:10, 158:13, 160:14, 163:25, 164:2, 164:5, 164:8, 164:13, 164:15, 164:21, 164:22, 165:9

**COURT'S** [4] - 28:16, 59:1, 73:24, 76:24

**COURTHOUSE** [1] - 1:20

**COURTROOM** [8] - 1:8, 4:15, 4:17, 5:12,

6:22, 8:21, 25:10, 30:6
**COVER** [1] - 49:23
**CPR** [5] - 71:3, 71:4, 106:9, 152:21, 152:22
**CREATE** [1] - 76:17
**CREATED** [4] - 27:6, 30:11, 31:18, 127:8
**CREW** [1] - 114:10
**CRIME** [5] - 14:10, 17:13, 32:11, 161:12
**CRIMES** [3] - 2:3, 160:24, 161:4
**CRIMINAL** [5] - 1:3, 2:3, 3:5, 19:2, 160:18
**CRITERIA** [1] - 28:23
**CROCHET** [1] - 150:22
**CROSS** [9] - 59:3, 72:16, 72:18, 123:13, 123:16, 123:19, 155:23, 155:25, 166:6
**CROSSED** [1] - 72:9
**CUFF** [5] - 67:19, 67:21, 68:2, 149:2, 149:11
**CUFFED** [14] - 68:5, 68:11, 68:14, 68:17, 68:21, 76:8, 99:11, 102:9, 102:18, 102:24, 102:25, 149:6, 155:15, 156:19
**CUFFING** [2] - 68:8, 102:9
**CUFFS** [8] - 68:5, 68:19, 72:6, 72:7, 72:8, 101:23, 149:4, 149:5
**CURSOR** [1] - 91:22
**CURTIS** [1] - 2:14
**CUT** [6] - 13:25, 70:18, 106:6, 109:20, 151:20, 164:1
**CUTTING** [2] - 150:17, 151:3

# D

**D'ARIENZO** [1] - 29:19
**D-E-V-A-N-E** [1] - 78:4
**D.C** [1] - 2:4
**DAILY** [1] - 83:6
**DAMAGE** [3] - 26:11, 26:24, 27:1
**DANGER** [2] - 18:25,

36:23
**DANGEROUS** [1] - 18:22
**DANGEROUSNESS** [4] - 18:20, 19:5, 33:22, 34:4
**DATE** [7] - 100:16, 100:18, 127:11, 127:25, 142:24, 143:23, 165:9
**DAVID** [19] - 1:6, 3:5, 12:8, 12:12, 14:5, 14:6, 14:17, 14:20, 15:23, 24:3, 24:22, 29:14, 30:1, 56:8, 101:4, 127:14, 127:17, 163:10
**DAYS** [3] - 14:22, 75:7, 147:13
**DAYTIME** [1] - 85:21
**DEAD** [10] - 12:21, 57:16, 58:10, 62:2, 62:8, 62:17, 66:10, 72:13, 101:18, 149:1
**DEALING** [1] - 117:18
**DEALS** [1] - 17:23
**DEATH** [15] - 16:10, 19:8, 20:2, 21:3, 21:5, 21:10, 22:20, 22:21, 23:17, 33:17, 33:24, 35:7, 37:8, 59:19, 163:8
**DECADES** [1] - 25:12
**DECEMBER** [5] - 29:22, 41:6, 41:9, 41:10, 146:1
**DECIDE** [2] - 140:1, 140:2
**DECIDED** [2] - 22:6, 22:9
**DECISION** [2] - 22:16, 23:6
**DECISIONS** [1] - 139:15
**DEFECTS** [3] - 26:17, 26:19, 29:8
**DEFENDANT** [16] - 2:5, 2:8, 2:12, 5:2, 5:5, 7:4, 7:21, 8:8, 10:23, 12:23, 13:15, 14:3, 16:4, 16:10, 16:17, 21:22
**DEFENDANT'S** [3] - 127:6, 128:10, 131:6
**DEFENDER** [2] - 2:6, 2:13
**DEFENSE** [7] - 21:8, 41:12, 41:24, 60:12, 142:19, 145:5, 167:1
**DEFINED** [1] - 125:17

**DEGREE** [5] - 10:24, 11:5, 21:18, 22:23, 38:23
**DELAWARE** [1] - 160:3
**DEMEANOR** [3] - 66:17, 155:17, 155:18
**DEMONSTRATED** [1] - 23:7
**DEPARTMENT** [6] - 2:2, 24:16, 25:15, 25:17, 26:3, 152:14
**DEPICT** [2] - 64:15, 92:3
**DEPICTED** [2] - 109:12, 118:14
**DESCRIBE** [6] - 81:7, 83:9, 150:23, 151:23, 154:8, 155:18
**DESERTERS** [1] - 160:21
**DESIGNATED** [3] - 36:11, 75:14, 75:18
**DESIGNATION** [1] - 36:12
**DETAIL** [2] - 82:16, 160:14
**DETENTION** [27] - 39:3, 74:25, 75:2, 75:13, 75:15, 75:20, 83:2, 102:4, 124:10, 125:5, 125:7, 125:18, 126:1, 126:8, 126:22, 127:18, 127:21, 128:1, 128:4, 133:5, 134:10, 139:5, 139:25, 141:9, 144:14, 148:18, 156:18
**DETERIORATING** [2] - 27:25, 28:8
**DETERMINATION** [2] - 22:3, 35:6
**DETERMINE** [1] - 22:18
**DETERMINING** [1] - 35:11
**DETRACT** [1] - 23:2
**DEVANE** [31] - 13:14, 53:8, 53:9, 67:3, 76:3, 76:7, 77:23, 77:24, 78:3, 78:10, 89:8, 89:22, 90:6, 108:7, 148:2, 148:6, 148:10, 148:12, 148:17, 148:24, 149:2, 149:4, 149:5,

149:10, 149:24, 151:18, 152:9, 154:17, 155:15, 166:11
**DEVELOPED** [1] - 26:8
**DHO** [2] - 75:9, 75:11
**DIABETES** [1] - 28:14
**DIAGNOSIS** [2] - 27:8, 27:9
**DIALING** [1] - 10:11
**DIED** [1] - 143:2
**DIFFERENCE** [6] - 22:21, 22:22, 49:15, 75:1, 81:7, 81:17
**DIFFERENCES** [1] - 125:4
**DIFFERENT** [13] - 21:12, 23:4, 30:18, 30:24, 30:25, 33:10, 48:16, 54:12, 68:1, 80:15, 81:14, 124:3, 124:15
**DIFFICULT** [2] - 13:22, 150:23
**DIFFICULTY** [1] - 139:6
**DINING** [1] - 82:2
**DIPLOMAT** [1] - 28:3
**DIRECT** [16] - 5:8, 9:9, 38:8, 43:23, 61:19, 78:5, 87:6, 91:1, 95:3, 139:4, 145:15, 146:25, 147:21, 158:11, 162:14, 166:6
**DIRECTED** [1] - 33:25
**DIRECTION** [1] - 31:15
**DIRECTLY** [1] - 42:3
**DISAGREEMENT** [1] - 15:18
**DISC** [2] - 74:5, 74:15
**DISCHARGED** [1] - 23:9
**DISCIPLINARY** [32] - 48:12, 74:21, 75:2, 75:4, 75:6, 75:15, 75:18, 83:24, 84:1, 84:3, 84:4, 84:19, 122:16, 124:7, 124:9, 124:15, 125:2, 125:5, 125:21, 125:25, 126:22, 128:18, 129:1, 139:6, 141:8, 141:12, 142:1, 142:6, 142:8, 143:17, 143:20, 144:13

**DISCIPLINE** [1] - 124:17
**DISCIPLINED** [1] - 124:19
**DISCUSS** [1] - 6:12
**DISCUSSED** [1] - 5:15
**DISCUSSION** [2] - 129:13, 134:6
**DISCUSSIONS** [1] - 148:20
**DISORDER** [1] - 27:11
**DISORDERS** [1] - 29:11
**DISPUTE** [5] - 23:1, 32:22, 33:16, 35:13, 73:6
**DISRESPECT** [2] - 15:6, 66:14
**DISRESPECTED** [1] - 14:25
**DISTANCE** [1] - 69:7
**DISTRACT** [1] - 23:2
**DISTRICT** [6] - 1:1, 1:2, 1:16, 2:6, 2:13, 3:6
**DISTURBANCE** [1] - 76:18
**DIVISION** [9] - 2:3, 159:11, 159:12, 159:18, 159:20, 159:23, 160:6, 160:19, 161:12
**DIVISIONS** [2] - 159:15, 159:17
**DOCUMENT** [12] - 14:21, 15:14, 53:25, 89:24, 101:1, 127:4, 127:15, 142:21, 143:7, 143:13, 143:16, 144:11
**DOCUMENTATION** [1] - 34:21
**DOCUMENTS** [7] - 11:1, 15:12, 129:3, 129:6, 141:6, 145:3, 145:8
**DONATED** [1] - 30:16
**DONE** [8] - 6:24, 10:16, 24:16, 26:21, 49:13, 59:11, 106:7, 137:22
**DOOR** [46] - 7:24, 8:3, 9:1, 9:2, 9:5, 9:6, 9:13, 9:15, 51:1, 57:14, 58:8, 61:25, 62:7, 65:15, 65:24, 65:25, 67:24, 67:25, 68:1, 68:12, 68:14, 69:14, 73:7, 76:1, 96:14, 97:3, 97:17,

97:20, 98:4, 98:5, 101:10, 101:13, 101:14, 101:17, 102:1, 102:23, 103:14, 132:11, 134:16, 134:17, 138:6, 138:7, 140:21, 140:25, 149:12, 153:3

**DOORS** [17] - 51:8, 52:5, 84:16, 96:8, 97:8, 99:12, 103:3, 103:4, 103:5, 132:13, 132:22, 133:4, 135:3, 138:10, 140:16, 140:25, 155:14

**DORM** [1] - 82:3

**DOTS** [1] - 93:20

**DOUBLE** [8] - 68:5, 68:8, 68:21, 102:18, 135:3, 149:6, 155:15, 156:19

**DOUBLE-CUFFED** [6] - 68:5, 68:21, 102:18, 149:6, 155:15, 156:19

**DOUBLE-CUFFING** [1] - 68:8

**DOUBT** [3] - 15:21, 16:6, 17:12

**DOWN** [105] - 4:5, 12:1, 12:7, 39:9, 40:3, 42:20, 45:18, 47:22, 49:21, 49:22, 50:10, 50:11, 51:25, 53:11, 53:22, 54:2, 54:3, 54:17, 54:23, 55:6, 62:11, 63:14, 64:5, 65:1, 65:2, 66:23, 66:24, 67:18, 72:9, 74:4, 74:14, 75:7, 76:11, 77:5, 81:17, 83:23, 84:17, 84:25, 85:16, 85:17, 88:16, 88:17, 90:10, 90:15, 94:7, 95:11, 95:17, 95:18, 96:15, 96:16, 98:12, 98:21, 99:6, 99:12, 103:3, 103:4, 103:5, 103:13, 103:15, 103:16, 105:1, 110:1, 110:3, 111:23, 112:9, 115:1, 115:22, 115:24, 115:25, 124:11, 127:1, 133:9, 135:2, 136:7, 136:23, 138:2,

138:11, 138:14, 139:7, 142:3, 143:19, 143:24, 144:1, 144:6, 144:22, 148:9, 148:17, 149:15, 149:16, 150:14, 151:1, 151:25, 152:4, 153:1, 154:18, 154:22, 155:4, 155:14, 157:20, 163:8

**DR** [11] - 26:15, 26:19, 26:21, 26:25, 27:3, 27:7, 28:3, 28:4, 28:6, 28:7, 29:2

**DRAWING** [1] - 123:24

**DRESSED** [1] - 163:13

**DRIVE** [1] - 131:18

**DROPPING** [2] - 104:15, 114:20

**DS** [5] - 124:21, 124:24, 135:3, 137:7, 142:5

**DUAL** [1] - 130:24

**DUPLICATIVE** [1] - 150:11

**DURESS** [2] - 47:7, 49:2

**DURING** [20] - 9:11, 18:1, 24:9, 24:18, 49:11, 51:15, 51:21, 57:7, 57:11, 61:9, 71:24, 72:3, 79:13, 88:18, 108:11, 116:8, 117:12, 122:11, 146:21, 154:21

**DUTIES** [3] - 49:1, 147:7, 147:8

**DUTY** [3] - 67:5, 145:21, 162:19

### E

**E-MAIL** [1] - 10:10

**EASIER** [7] - 13:11, 57:22, 57:23, 62:17, 62:19, 62:20, 74:6

**EASTERN** [3] - 2:13, 159:11, 160:5

**EAT** [2] - 85:3, 85:6

**EDUCATION** [2] - 31:21, 32:11

**EDUCATIONAL** [1] - 38:20

**EFFECT** [3] - 20:16, 99:23, 99:24

**EFFORTS** [3] - 13:21, 106:18, 112:22

**EIGHT** [2] - 79:7, 86:7

**EITHER** [2] - 138:12, 150:12

**ELECTED** [1] - 28:17

**ELECTRONIC** [2] - 4:19, 5:7

**ELIGIBILITY** [4] - 20:13, 22:17, 22:25, 23:2

**ELIGIBLE** [1] - 16:10

**ELIZABETH** [2] - 4:2, 4:6

**EMERGENCY** [3] - 112:18, 113:7, 113:21

**EMOTIONAL** [1] - 24:8

**EMPLOYED** [4] - 34:10, 35:21, 43:9, 145:25

**EMPLOYMENT** [4] - 38:24, 39:19, 42:4, 145:19

**EMS** [1] - 71:9

**ENABLE** [1] - 129:25

**ENCOMPASSES** [1] - 92:2

**ENCOUNTER** [3] - 81:21, 99:17, 102:6

**ENCOUNTERED** [4] - 13:4, 13:6, 69:8, 72:22

**ENCOURAGE** [1] - 32:10

**END** [8] - 20:17, 30:15, 41:10, 47:25, 50:11, 50:15, 154:14, 164:2

**ENDED** [1] - 19:8

**ENFORCEMENT** [1] - 40:3

**ENGAGED** [2] - 11:7, 15:10

**ENTAILS** [1] - 20:3

**ENTER** [4] - 22:4, 22:8, 79:4, 132:5

**ENTERED** [11] - 21:17, 21:18, 22:6, 22:14, 22:15, 25:14, 29:19, 104:24, 104:25, 117:4, 149:21

**ENTERS** [1] - 21:23

**ENTIRE** [3] - 9:19, 48:8, 50:21

**ENTIRELY** [2] - 33:10, 59:3

**ENTITLED** [1] - 165:5

**ENTRANCE** [2] - 92:12, 93:1

**ENTRY** [1] - 90:8

**ENVIRONMENT** [2] - 40:2, 41:14

**EQUIPMENT** [2] - 47:6, 49:1

**ERROR** [2] - 137:15, 137:16

**ESCAPE** [4] - 18:1, 18:2, 35:8, 35:9

**ESCORT** [2] - 154:18, 154:21

**ESCORTED** [8] - 68:12, 69:4, 76:11, 102:2, 149:14, 156:7, 156:9, 156:11

**ESCORTING** [1] - 156:3

**ESQUIRE** [9] - 1:15, 2:2, 2:5, 2:8, 2:12, 2:12, 3:7, 3:9, 3:12

**ESSENTIALLY** [6] - 25:21, 26:10, 30:13, 31:8, 33:22, 130:4

**ESTABLISH** [5] - 15:24, 16:5, 16:13, 33:6, 33:7

**ESTABLISHED** [3] - 19:15, 26:23, 33:13

**ESTIMATING** [1] - 69:12

**ET** [1] - 140:17

**EVALUATIONS** [1] - 34:9

**EVAN** [1] - 114:12

**EVANGELICAL** [2] - 114:12, 156:15

**EVENING** [10] - 49:3, 49:11, 50:6, 52:14, 52:23, 53:3, 53:12, 55:8, 89:14, 118:20

**EVENT** [1] - 27:22

**EVENTS** [4] - 18:21, 27:18, 58:24, 60:3

**EVENTUALLY** [1] - 30:1

**EVIDENCE** [30] - 11:3, 11:13, 11:17, 12:3, 12:11, 12:22, 15:20, 16:4, 16:13, 17:3, 17:19, 18:17, 19:16, 19:18, 24:8, 26:11, 32:12, 33:8, 59:16, 59:17, 59:20, 59:23, 77:18, 77:20, 121:10, 123:7, 123:12, 145:1, 145:4, 145:6

**EXACT** [2] - 101:8, 135:22

**EXACTLY** [4] - 102:13, 104:14,

141:18, 146:7

**EXAMINATION** [18] - 29:5, 38:8, 72:18, 78:5, 117:5, 117:6, 117:12, 117:25, 122:12, 123:19, 137:17, 137:21, 139:4, 140:14, 142:16, 145:15, 155:25, 158:11

**EXAMINE** [5] - 59:3, 72:16, 123:13, 123:16, 155:23

**EXAMINED** [2] - 28:6, 137:19

**EXAMINER** [1] - 15:14

**EXAMPLE** [2] - 31:4, 75:19

**EXCEPT** [3] - 73:11, 107:24, 135:15

**EXCESS** [2] - 17:15, 30:15

**EXCHANGED** [1] - 32:9

**EXCUSE** [10] - 25:19, 79:22, 92:13, 97:18, 98:12, 125:15, 130:10, 131:18, 134:17, 144:1

**EXCUSED** [3] - 77:6, 144:23, 157:21

**EXECUTION** [1] - 29:17

**EXHIBIT** [52] - 43:1, 43:4, 44:15, 44:17, 45:12, 45:13, 45:16, 47:13, 47:17, 47:19, 58:6, 61:2, 61:22, 64:12, 73:25, 74:2, 77:10, 77:12, 89:16, 89:17, 91:9, 91:12, 100:10, 108:25, 109:1, 109:8, 109:12, 109:23, 109:24, 110:13, 110:18, 111:1, 111:8, 112:16, 113:3, 118:7, 118:11, 118:17, 119:21, 120:13, 120:24, 124:6, 127:6, 128:10, 129:8, 129:9, 131:7, 134:24, 135:7, 142:19, 142:20, 152:1

**EXHIBITS** [10] - 44:22, 61:10, 77:8, 77:18, 77:19, 123:7, 123:8, 145:5, 166:20, 167:1

**EXIST** [1] - 27:6
**EXIT** [1] - 132:5
**EXPECT** [2] - 19:14, 19:18
**EXPEDITE** [1] - 9:23
**EXPERIENCE** [2] - 41:16, 149:6
**EXPERTS** [1] - 37:2
**EXPLAIN** [20] - 7:7, 7:8, 19:11, 27:4, 27:8, 28:7, 30:21, 34:23, 35:18, 36:4, 44:8, 50:4, 53:25, 57:6, 62:25, 83:22, 87:15, 96:6, 133:21, 159:8
**EXPLAINED** [1] - 34:1
**EXPLAINING** [1] - 8:18
**EXPLANATION** [1] - 141:11
**EXPOSED** [1] - 30:1
**EXPRESS** [1] - 9:21
**EXTRA** [2] - 35:23, 145:7
**EXTRACURRICULA R** [1] - 11:24
**EXTREME** [1] - 23:24
**EYES** [1] - 132:1

## F

**FABRIC** [2] - 149:25, 151:19
**FACE** [4] - 62:11, 103:13, 151:25, 152:4
**FACILITIES** [1] - 43:18
**FACING** [1] - 105:1
**FACT** [17] - 6:8, 11:2, 11:9, 13:1, 13:10, 15:18, 16:6, 19:10, 21:16, 22:25, 27:18, 28:15, 30:10, 59:4, 59:9, 60:2, 84:20
**FACTOR** [9] - 16:17, 18:9, 18:10, 18:16, 19:3, 32:23, 32:25, 33:14, 33:20
**FACTORS** [11] - 15:25, 16:9, 21:6, 21:9, 22:17, 24:17, 24:20, 24:21, 32:19, 32:20, 33:16
**FACTS** [4] - 11:4, 59:7, 60:8, 60:9
**FACTUAL** [1] - 27:9
**FAIR** [9] - 41:2, 75:17, 76:5, 76:12, 76:18, 76:22, 84:7, 107:7,

132:2
**FAIRLY** [1] - 107:6
**FAITH** [3] - 4:2, 4:6, 4:8
**FAMILIAR** [1] - 126:13
**FAMILIARITY** [1] - 17:2
**FAMILIARIZATION** [1] - 39:24
**FAMILY** [4] - 19:9, 19:12, 31:7, 37:1
**FAR** [11] - 59:11, 69:7, 69:11, 91:6, 103:1, 114:16, 119:15, 124:14, 139:14, 139:16, 139:24
**FASHION** [1] - 26:10
**FBI** [10] - 3:25, 14:2, 122:24, 158:20, 159:1, 159:4, 159:14, 160:15, 160:16, 162:22
**FCI** [2] - 38:17, 38:18
**FCRR** [1] - 1:19
**FEBRUARY** [4] - 127:21, 129:1, 143:18, 143:22
**FED** [1] - 84:23
**FEDERAL** [19] - 2:6, 2:13, 9:22, 16:18, 35:24, 35:25, 38:12, 38:13, 38:19, 39:5, 39:15, 42:11, 59:15, 79:8, 79:11, 81:1, 145:25, 161:6, 162:2
**FEET** [4] - 12:7, 62:11, 69:12, 72:8
**FELT** [1] - 105:8
**FENCE** [20] - 92:4, 129:15, 129:16, 129:19, 129:25, 130:1, 130:4, 130:8, 130:13, 130:17, 130:19, 130:20, 130:23, 130:24, 131:2, 131:4, 131:15, 131:22, 147:9
**FENCES** [4] - 130:7, 130:23, 130:25, 131:23
**FENCING** [3] - 92:4, 92:6, 92:9
**FEW** [5] - 14:2, 14:21, 96:4, 140:12, 155:14
**FEWER** [2] - 124:24, 125:3
**FIELD** [1] - 160:17
**FIFTH** [1] - 121:23
**FIGHT** [1] - 76:17

**FILED** [1] - 6:15
**FILL** [2] - 8:18, 46:22
**FINAL** [1] - 19:6
**FINALLY** [2] - 41:6, 121:2
**FINDINGS** [2] - 20:4, 20:17
**FINE** [10] - 6:23, 6:25, 9:9, 9:11, 20:18, 44:24, 45:4, 54:25, 55:1, 116:20
**FINGER** [2] - 96:24, 117:13
**FINGERS** [1] - 118:12
**FIRE** [4] - 6:4, 6:8, 47:7, 49:1
**FIREARM** [7] - 16:21, 17:4, 17:16, 17:21, 18:3, 18:4, 32:21
**FIREARMS** [3] - 41:12, 41:23, 131:12
**FIRST** [39] - 1:20, 10:24, 11:5, 13:5, 15:1, 16:1, 16:16, 18:9, 20:4, 20:13, 20:23, 21:17, 22:23, 37:24, 40:25, 41:6, 54:9, 54:19, 54:23, 58:4, 62:22, 63:12, 64:17, 79:14, 80:7, 84:22, 93:5, 93:9, 96:12, 97:14, 99:17, 102:3, 118:6, 119:17, 122:3, 134:9, 135:25, 161:1
**FIT** [3] - 65:15, 66:4, 66:5
**FIVE** [2] - 37:18, 81:18
**FIVE-MINUTE** [1] - 37:18
**FLASHLIGHT** [6] - 51:25, 52:1, 57:14, 58:8, 62:1, 62:7
**FLAT** [1] - 12:7
**FLOOR** [7] - 1:20, 71:3, 84:21, 84:22, 102:3, 106:8, 135:16
**FLOORS** [1] - 135:22
**FLORENCE** [1] - 34:16
**FLY** [1] - 15:3
**FOCUS** [1] - 59:9
**FOLLOW** [1] - 157:18
**FOLLOW-UP** [1] - 157:18
**FOLLOWED** [5] - 15:19, 25:9, 148:10, 148:17, 155:19
**FOLLOWING** [4] - 19:17, 38:24, 97:2,

144:25
**FOLLOWUP** [1] - 142:14
**FOOD** [15] - 9:6, 31:5, 67:25, 68:2, 84:25, 85:2, 85:4, 85:5, 101:22, 133:5, 133:22, 133:24, 134:13, 149:11
**FOREGOING** [1] - 165:3
**FOREIGN** [1] - 161:9
**FORGET** [1] - 134:24
**FORGOT** [1] - 15:6
**FORMATIVE** [2] - 24:10, 24:19
**FORMER** [2] - 34:22, 35:17
**FORMS** [1] - 46:21
**FORTH** [3] - 22:20, 32:18, 72:5
**FORTUNATELY** [1] - 18:3
**FORWARD** [1] - 22:14
**FOUR** [7] - 21:5, 21:9, 48:16, 54:3, 62:12, 97:25, 149:16
**FOURTH** [3] - 58:4, 116:21, 121:23
**FPC** [1] - 79:14
**FRAGILE** [1] - 28:25
**FRANCISCO** [2] - 163:23, 164:12
**FRANKLIN** [3] - 39:3, 39:8, 41:17
**FREE** [3] - 12:2, 142:9, 151:21
**FREEDOM** [1] - 124:20
**FREQUENT** [3] - 5:25, 28:24
**FREQUENTLY** [1] - 6:6
**FRONT** [13] - 21:16, 23:11, 35:7, 37:6, 61:2, 61:10, 72:9, 100:10, 132:21, 142:18, 142:21, 148:23, 148:24
**FUGITIVES** [1] - 160:20
**FULL** [7] - 25:17, 38:4, 41:1, 41:2, 78:1, 145:11, 158:2
**FUNDING** [1] - 31:3
**FUNDRAISING** [1] - 32:13
**FUNDS** [3] - 31:1, 31:2, 31:20
**FUTURE** [7] - 18:20,

19:5, 29:12, 33:22, 33:25, 34:4, 36:23

## G

**G-R-E-E-N-A-W-A-L-T** [1] - 4:9
**GATE** [2] - 93:15, 132:7
**GATES** [1] - 132:16
**GENERAL** [10] - 35:18, 51:14, 81:8, 81:10, 81:20, 81:24, 82:10, 82:11, 136:21, 160:18
**GENERATED** [2] - 142:22, 142:25
**GIFT** [1] - 30:11
**GIVEN** [6] - 59:4, 60:2, 101:1, 127:4, 133:11, 151:8
**GLYNCO** [7] - 40:3, 41:8, 41:9, 41:11, 41:19, 146:8, 146:12
**GOAL** [1] - 157:5
**GOLD** [1] - 35:25
**GOVERNMENT** [69] - 1:15, 2:2, 3:14, 19:19, 20:20, 21:5, 21:20, 21:24, 32:18, 32:24, 33:5, 33:7, 33:21, 33:22, 34:1, 38:3, 43:1, 43:4, 44:15, 44:17, 45:12, 45:13, 45:15, 47:13, 47:17, 47:19, 58:6, 61:22, 64:11, 77:10, 77:11, 77:19, 77:24, 89:16, 89:17, 91:9, 91:11, 100:9, 108:25, 109:1, 109:8, 109:11, 109:23, 109:24, 110:12, 110:18, 111:1, 111:8, 112:16, 113:3, 118:6, 118:10, 118:17, 119:21, 120:13, 120:24, 123:8, 123:18, 123:23, 124:6, 129:8, 144:25, 145:9, 152:1, 157:25, 160:24, 161:4, 166:20
**GOVERNMENT'S** [1] - 74:2
**GRABBED** [3] - 17:7, 63:20, 150:16
**GRADUATION** [1] -

41:21
**GRATE** [1] - 132:7
**GRAVETTE** [6] -
34:22, 35:15, 35:18,
36:3, 36:10, 37:4
**GREENAWALT** [6] -
4:2, 4:3, 4:6, 4:7,
4:8, 4:9
**GRILLE** [1] - 132:20
**GRILLES** [5] - 96:5,
96:7, 96:9, 132:15,
155:7
**GROIN** [1] - 110:24
**GROUND** [2] - 40:23,
130:21
**GROUP** [1] - 30:2
**GROUPS** [4] - 30:16,
30:18, 30:25, 31:3
**GROWING** [1] - 24:22
**GROWTH** [1] - 29:24
**GS** [3] - 78:25, 80:11,
80:14
**GUARDS** [1] - 131:24
**GUESS** [3] - 4:21,
71:3, 164:1
**GUILT** [2] - 10:22,
19:15
**GUILTY** [13] - 10:23,
12:24, 15:17, 15:21,
16:4, 16:5, 17:9,
21:17, 22:4, 22:15,
25:14
**GUN** [1] - 17:8
**GUR** [2] - 26:21, 26:25
**GURGANUS** [67] -
1:15, 3:15, 3:16,
10:18, 10:20, 19:23,
20:19, 37:12, 37:14,
37:24, 37:25, 38:9,
39:7, 44:20, 44:25,
45:6, 46:8, 46:10,
47:16, 58:22, 58:23,
59:8, 60:1, 60:18,
60:21, 60:25, 61:3,
61:11, 61:16, 61:19,
61:21, 63:5, 72:14,
77:2, 77:7, 77:10,
77:14, 77:22, 78:6,
104:22, 107:9,
107:19, 108:4,
108:5, 108:6,
108:16, 114:23,
123:2, 123:14,
135:7, 140:12,
140:15, 142:11,
144:18, 145:2,
145:16, 154:4,
155:21, 157:18,
157:24, 158:12,
164:7, 166:3, 166:9,

166:12, 166:15,
166:18
**GURNEY** [1] - 152:19
**GUY** [2] - 87:19, 87:24
**GUYS** [1] - 75:4
**GYM** [1] - 82:4

## H

**HAINES** [5] - 2:2, 3:18,
3:19, 3:24, 37:19
**HAITI** [2] - 31:7, 31:10
**HALF** [7] - 37:13,
37:15, 91:3, 107:11,
136:10, 136:12,
136:14
**HALF-HOUR** [2] -
91:3, 136:10
**HALFWAY** [1] - 144:3
**HALLWAY** [4] - 97:6,
97:8, 136:7, 139:7
**HALLWAYS** [1] -
85:18
**HAMMER** [189] - 1:6,
3:5, 3:7, 5:1, 5:3,
5:8, 5:16, 5:23, 6:7,
6:16, 6:19, 6:22,
7:11, 7:15, 8:7, 8:18,
8:23, 11:7, 11:9,
11:14, 11:20, 11:23,
12:3, 12:8, 12:16,
13:6, 14:5, 14:6,
14:17, 14:20, 15:7,
15:23, 16:6, 16:24,
17:3, 17:9, 18:1,
18:6, 18:13, 18:20,
18:22, 21:16, 21:18,
22:2, 22:3, 22:6,
22:8, 22:19, 23:8,
23:23, 24:3, 24:4,
24:9, 24:22, 24:25,
25:3, 25:12, 25:14,
25:18, 25:21, 25:23,
26:5, 26:12, 26:17,
26:20, 26:24, 27:2,
27:7, 27:8, 27:10,
27:15, 27:20, 27:22,
28:7, 28:17, 28:21,
29:5, 29:10, 29:15,
29:16, 29:20, 29:23,
29:25, 30:1, 31:7,
31:14, 32:8, 32:15,
33:23, 34:5, 34:9,
34:17, 34:18, 34:23,
34:25, 35:4, 35:6,
35:11, 35:14, 35:22,
36:1, 36:11, 36:20,
36:22, 56:8, 57:13,
58:7, 58:10, 58:14,
61:24, 62:1, 62:3,

62:6, 62:7, 62:9,
62:15, 62:16, 62:17,
62:18, 62:20, 65:4,
67:18, 68:4, 68:14,
69:14, 71:23, 72:22,
73:1, 75:25, 76:4,
76:7, 76:9, 99:7,
101:4, 101:9,
101:13, 101:17,
101:20, 101:23,
102:2, 102:9,
107:22, 107:23,
109:16, 114:24,
115:4, 116:11,
116:25, 117:1,
117:5, 117:7,
119:23, 120:6,
120:11, 120:16,
120:25, 121:4,
122:1, 122:7,
122:11, 122:13,
127:14, 127:17,
127:20, 129:4,
134:7, 134:11,
134:18, 140:20,
141:8, 149:1, 149:3,
149:6, 149:11,
149:14, 155:13,
156:17, 156:25,
157:5, 157:7, 157:9,
157:13, 163:10,
163:25, 164:16
**HAMMER'S** [15] -
12:12, 17:7, 17:9,
23:5, 25:9, 26:22,
27:14, 27:25, 28:2,
28:8, 29:9, 30:9,
36:21, 76:17, 149:16
**HAND** [18] - 6:18, 8:3,
17:9, 58:18, 73:2,
74:6, 74:14, 99:10,
101:20, 101:21,
117:2, 117:13,
118:14, 119:19,
120:7, 127:10, 145:8
**HAND-HELD** [1] - 6:18
**HANDCUFFED** [2] -
134:14, 134:16
**HANDCUFFS** [5] -
67:22, 102:11,
117:6, 118:15, 149:7
**HANDED** [6] - 13:17,
70:20, 109:6,
109:16, 128:9,
151:16
**HANDLED** [1] - 25:25
**HANDS** [13] - 11:3,
12:6, 24:12, 62:12,
65:6, 76:8, 85:2,
101:22, 105:2,

105:18, 117:11,
118:12, 151:25
**HANDSET** [5] - 7:15,
7:19, 8:2, 8:4, 8:24
**HANDWRITING** [2] -
15:13, 48:22
**HARD** [4] - 31:6,
74:10, 84:20, 139:9
**HARM** [2] - 34:12,
34:19
**HARRIS** [1] - 2:9
**HARRISBURG** [3] -
2:7, 39:9, 159:25
**HAUTE** [6] - 5:4, 6:17,
7:13, 24:5, 31:6,
34:16
**HEAD** [6] - 12:19,
18:3, 18:5, 103:13,
105:1, 138:18
**HEADED** [4] - 95:11,
95:17, 97:19, 98:15
**HEADING** [1] - 96:16
**HEADSET** [2] - 6:18,
7:15
**HEALTH** [25] - 5:24,
24:24, 25:1, 25:19,
25:20, 26:1, 26:3,
26:5, 26:8, 27:5,
27:6, 27:13, 27:15,
27:16, 27:25, 28:2,
28:16, 28:20, 81:12,
106:14, 116:4,
136:18, 137:10,
161:5
**HEAR** [24] - 4:23, 9:4,
10:7, 12:14, 13:3,
13:12, 13:17, 13:19,
13:22, 14:1, 14:23,
15:2, 15:14, 15:16,
26:10, 26:14, 26:18,
27:12, 31:1, 31:9,
32:12, 73:17, 76:16,
148:20
**HEARD** [8] - 32:2,
80:13, 83:2, 117:25,
129:14, 137:18,
140:19, 149:1
**HEARING** [17] - 1:12,
10:17, 10:22, 10:25,
11:4, 12:25, 15:25,
19:14, 19:15, 20:7,
20:21, 58:24, 59:5,
59:22, 61:9, 75:6,
77:17
**HEARINGS** [1] - 59:16
**HELD** [3] - 6:18, 12:9,
151:19
**HELP** [9] - 25:4, 25:5,
25:7, 25:19, 31:21,
50:8, 96:21, 103:9,

116:18
**HELPFUL** [1] - 96:18
**HERSELF** [1] - 3:25
**HIDE** [1] - 73:6
**HIGH** [6] - 34:13,
59:24, 60:2, 80:22,
130:8, 138:18
**HIGHLIGHT** [7] - 11:4,
11:6, 11:8, 11:13,
14:19, 53:21, 74:24
**HIGHLIGHTED** [3] -
74:16, 91:24, 94:11
**HIMSELF** [2] - 11:2,
117:10
**HIRED** [3] - 39:5,
39:16, 39:23
**HISTORY** [4] - 143:5,
143:7, 143:10,
143:13
**HIT** [1] - 46:4
**HOLD** [7] - 12:9,
12:14, 12:17, 90:2,
105:7, 146:18, 159:3
**HOLDING** [1] - 149:15
**HOLIDAY** [4] - 30:11,
30:12, 30:13, 30:19
**HOLLER** [1] - 84:16
**HOME** [3] - 31:12,
31:13, 87:22
**HOMEMADE** [4] -
105:13, 105:15,
112:8, 113:16
**HONOR** [68] - 3:3,
3:10, 3:13, 3:16,
3:19, 3:24, 5:2, 5:11,
5:19, 7:4, 9:25, 10:3,
10:8, 10:20, 11:4,
11:23, 12:10, 12:23,
14:18, 17:15, 18:12,
19:7, 19:18, 19:23,
20:8, 20:19, 21:2,
21:3, 32:1, 32:5,
37:10, 37:19, 44:20,
58:15, 58:23, 59:21,
60:1, 60:22, 60:24,
60:25, 61:3, 61:11,
72:15, 72:17, 73:21,
77:3, 77:7, 77:14,
77:22, 107:19,
108:1, 108:5, 123:2,
123:5, 123:17,
134:3, 140:7,
140:10, 142:12,
144:17, 144:24,
145:2, 155:24,
157:17, 157:18,
158:9, 164:10,
164:20
**HONORABLE** [1] -
1:10

**HOOKUP** [4] - 5:1, 5:7, 8:16, 9:23
**HOPE** [1] - 5:14
**HOPEFULLY** [2] - 7:1, 37:13
**HORRIFIC** [2] - 26:11, 26:12
**HOSPITAL** [18] - 17:1, 17:4, 25:13, 71:6, 71:11, 114:9, 114:11, 114:13, 153:2, 153:4, 154:14, 154:19, 154:25, 155:10, 156:8, 156:15, 161:5
**HOSPITALIZATION** [1] - 29:1
**HOSPITALIZED** [2] - 28:9, 28:11
**HOST** [1] - 75:12
**HOSTAGE** [4] - 11:19, 17:5, 73:15, 73:20
**HOUR** [10] - 37:12, 37:14, 44:13, 63:9, 83:10, 91:3, 107:11, 136:10, 136:12, 136:14
**HOURS** [7] - 14:2, 17:6, 44:11, 44:12, 63:7, 81:18, 83:8
**HOUSE** [3] - 36:20, 82:25, 125:24
**HOUSED** [12] - 6:5, 35:6, 35:11, 35:14, 125:17, 125:20, 126:19, 138:21, 139:5, 139:6, 144:12, 144:20
**HOUSEKEEPING** [1] - 10:16
**HOUSING** [68] - 12:5, 13:7, 44:7, 44:9, 44:19, 45:7, 45:22, 45:24, 48:15, 49:24, 50:22, 51:11, 51:17, 52:11, 57:3, 57:11, 66:25, 70:1, 71:15, 71:20, 75:7, 82:12, 82:14, 82:18, 83:5, 83:14, 84:13, 84:24, 85:10, 85:14, 85:20, 86:5, 86:22, 87:1, 88:6, 88:12, 88:20, 90:18, 91:7, 91:17, 91:25, 98:9, 98:14, 106:6, 106:12, 106:15, 116:2, 117:1, 117:4, 123:24, 124:3, 125:15, 126:18,

133:2, 133:4, 133:9, 134:8, 139:14, 139:16, 139:25, 147:19, 148:9, 148:10, 148:11, 148:15, 148:19, 150:15, 163:9
**HUFNAGLE** [4] - 105:11, 152:20, 153:15, 153:17
**HUMBLE** [1] - 87:19
**HUMPHREY** [1] - 2:9
**HUNDRED** [1] - 91:8
**HUNT** [4] - 143:11, 143:14, 143:17, 163:11
**HURRY** [2] - 99:8, 101:18
**HURRYING** [1] - 99:23
**HYDE** [5] - 28:3, 28:4, 28:6, 28:7, 29:2

## I

**IDEA** [2] - 42:25, 135:18
**IDENTIFICATION** [3] - 128:10, 142:19, 155:6
**IDENTIFIED** [5] - 24:17, 77:8, 101:21, 123:3, 123:4
**IDENTIFY** [1] - 88:24
**IGNORE** [1] - 142:19
**ILLNESS** [1] - 11:12
**IMMEDIATELY** [4] - 62:21, 95:10, 95:16, 149:21
**IMPACT** [5] - 19:7, 27:1, 33:16, 33:17, 33:19
**IMPLEMENTED** [1] - 35:3
**IMPLEMENTING** [1] - 35:5
**IMPORTANT** [5] - 30:3, 32:16, 65:17, 65:20, 147:8
**IMPOSE** [2] - 23:17, 29:8
**IMPOSED** [1] - 23:12
**IMPRISONMENT** [3] - 16:19, 17:14, 34:24
**IMPULSIVITY** [1] - 27:2
**INCAPACITATE** [1] - 11:20
**INCIDENT** [11] - 11:11, 13:5, 16:25, 25:13, 35:9, 63:7,

90:10, 94:4, 100:1, 100:25, 147:25
**INCIDENTS** [1] - 88:12
**INCLUDE** [2] - 47:23, 56:4
**INCLUDED** [1] - 26:21
**INCLUDING** [4] - 11:1, 13:10, 14:24, 28:12
**INCOME** [1] - 62:3
**INCREASED** [1] - 28:14
**INDEX** [2] - 117:13, 166:1
**INDIANA** [1] - 5:4
**INDIANAPOLIS** [1] - 30:6
**INDICATE** [4] - 7:12, 58:19, 128:24, 142:24
**INDICATED** [9] - 21:15, 33:5, 123:23, 124:14, 124:23, 132:4, 134:9, 139:3, 163:8
**INDICATES** [2] - 18:24, 144:12
**INDICATING** [4] - 93:2, 93:21, 120:21
**INDICATING)** [1] - 138:8
**INDIVIDUAL** [1] - 154:11
**INDIVIDUALS** [2] - 24:12, 139:16
**INDOOR** [3] - 136:5, 136:16, 157:7
**INDUCEMENT** [2] - 21:20, 22:12
**INDULGENCE** [2] - 73:24, 76:24
**INFECTION** [1] - 28:10
**INFORMATION** [15] - 21:13, 24:15, 24:24, 25:2, 25:16, 25:18, 26:8, 27:13, 28:2, 34:3, 37:6, 37:7, 122:10, 129:22, 132:15
**INITIAL** [9] - 29:22, 39:20, 39:23, 40:5, 40:8, 40:23, 102:6, 122:2, 146:23
**INITIATION** [2] - 147:16, 156:6
**INJURED** [2] - 122:9, 149:3
**INJURIES** [4] - 112:14, 118:4, 118:23, 121:16
**INJURY** [8] - 12:12,

111:22, 116:12, 117:15, 118:9, 119:2, 120:6, 120:9
**INMATE** [73] - 28:22, 28:24, 35:23, 51:23, 57:13, 58:7, 58:14, 61:24, 62:6, 62:9, 62:10, 62:15, 64:1, 64:2, 64:16, 82:2, 83:18, 83:23, 83:25, 84:16, 85:3, 95:8, 99:7, 99:9, 101:9, 101:13, 101:17, 101:20, 101:23, 102:2, 102:9, 104:25, 105:8, 105:11, 107:5, 116:25, 117:1, 117:5, 117:7, 117:14, 117:16, 117:17, 119:23, 122:1, 122:7, 122:11, 138:24, 140:2, 143:5, 143:8, 143:10, 143:13, 149:1, 149:2, 149:6, 149:11, 149:14, 149:16, 149:23, 150:1, 150:4, 151:17, 151:19, 151:20, 152:9, 152:18, 153:1, 153:15, 156:24, 157:5, 157:13
**INMATE'S** [1] - 82:3
**INMATES** [38] - 14:8, 33:25, 40:21, 41:3, 41:6, 46:21, 48:7, 48:8, 50:11, 51:15, 51:19, 56:7, 80:6, 81:9, 81:11, 82:6, 82:17, 82:19, 83:4, 84:12, 84:23, 85:10, 85:13, 85:16, 116:3, 126:18, 133:13, 136:19, 138:13, 138:20, 138:25, 139:4, 139:5, 140:16, 141:16, 143:8, 147:19, 150:12
**INSIDE** [13] - 68:12, 69:5, 69:7, 83:11, 99:12, 102:2, 132:20, 134:21, 134:23, 138:9, 149:17, 153:4, 155:9
**INSOFAR** [2] - 32:20, 33:15
**INSTEAD** [2] - 6:21,

68:25
**INSTITUTES** [1] - 161:5
**INSTITUTION** [30] - 38:19, 40:1, 40:17, 50:21, 53:5, 54:16, 71:6, 71:11, 80:5, 80:8, 80:22, 87:18, 91:15, 92:12, 93:19, 107:5, 107:14, 113:7, 113:21, 114:5, 131:21, 140:1, 140:3, 147:18, 153:3, 154:22, 155:9, 156:6, 163:14, 163:16
**INSTITUTIONAL** [6] - 39:24, 153:2, 154:18, 154:19, 154:25, 155:7
**INSTITUTIONS** [3] - 36:6, 36:13, 81:2
**INSTRUCTED** [6] - 105:10, 117:1, 122:5, 122:6, 122:8, 153:5
**INSTRUCTION** [1] - 146:10
**INSTRUCTIONS** [3] - 121:7, 153:7, 155:19
**INSTRUMENT** [1] - 150:5
**INTEND** [1] - 19:24
**INTENT** [6] - 22:19, 22:20, 22:22, 22:24, 23:1, 23:4
**INTENTIONAL** [3] - 13:1, 15:22, 16:3
**INTENTIONALLY** [1] - 16:6
**INTERACTION** [1] - 25:11
**INTERLOCKED** [1] - 97:10
**INTERNAL** [2] - 24:10, 157:11
**INTERRUPTIONS** [1] - 5:16
**INTERVIEW** [1] - 14:3
**INTERVIEWED** [2] - 14:2, 28:6
**INTRODUCE** [2] - 3:25, 78:9
**INTRODUCTORY** [1] - 19:25
**INVESTIGATIONS** [2] - 162:3, 163:24
**INVESTIGATIVE** [3] - 42:15, 161:25, 163:4

**INVESTIGATOR** [1] - 158:15

**INVOLVED** [5] - 16:25, 17:16, 17:20, 30:7, 139:21

**INVOLVING** [2] - 16:20, 163:9

**IRREVERSIBLE** [1] - 29:7

**ISSUE** [6] - 6:11, 13:1, 15:13, 16:16, 19:5, 89:14

**ISSUES** [8] - 5:24, 24:24, 25:1, 27:5, 27:15, 27:16, 28:17, 28:20

**ITEM** [3] - 109:16, 128:9, 142:18

**ITEMS** [10] - 84:1, 84:3, 84:10, 84:11, 110:2, 123:3, 124:24, 125:3, 125:6, 156:22

**ITSELF** [3] - 19:1, 130:14, 130:21

### J

**JAIL** [2] - 39:21, 41:17

**JAMAICA** [1] - 31:11

**JAMES** [4] - 2:12, 2:12, 3:9, 3:11

**JANUARY** [2] - 29:17, 146:24

**JERSEY** [3] - 160:5, 160:7, 160:8

**JOB** [3] - 39:14, 131:14, 161:23

**JOBS** [1] - 154:20

**JOEL** [1] - 1:10

**JOHN** [5] - 1:15, 3:15, 26:15, 31:12, 31:13

**JOINED** [2] - 145:20, 160:16

**JONES** [4] - 52:11, 57:5, 98:22, 116:25

**JR** [2] - 1:15, 3:15

**JUDGE** [15] - 5:11, 8:14, 14:11, 14:13, 15:12, 16:9, 19:13, 21:17, 23:11, 23:16, 38:10, 50:4, 59:1, 59:5

**JULY** [1] - 145:20

**JUMPED** [2] - 72:6, 72:7

**JUNE** [4] - 21:16, 142:25, 158:21

**JURY** [5] - 20:6, 163:3, 163:20,

164:9, 164:11

**JUSTICE** [2] - 2:2, 24:16

**JUSTIFIED** [2] - 21:3, 37:8

**JUSTIFY** [1] - 21:10

### K

**KEEP** [5] - 114:21, 122:8, 126:21, 131:25, 141:16

**KEEPS** [1] - 126:16

**KEPT** [4] - 54:18, 115:12, 150:16, 151:9

**KEY** [6] - 11:4, 64:9, 68:1, 132:7, 133:8, 133:11

**KEYED** [1] - 132:10

**KEYS** [5] - 47:6, 50:24, 51:1, 64:10, 151:9

**KIDNAPPING** [1] - 17:18

**KILL** [3] - 11:14, 13:11, 16:6

**KILLED** [8] - 11:2, 28:11, 57:24, 62:21, 64:1, 66:11, 95:8, 99:8

**KILLING** [6] - 11:7, 13:2, 14:24, 15:8, 15:23, 16:3

**KIND** [19] - 6:9, 9:23, 19:24, 30:3, 47:5, 49:20, 57:15, 61:2, 70:2, 73:15, 84:20, 85:20, 91:21, 92:1, 93:1, 99:9, 107:4, 117:20, 133:20

**KINDS** [1] - 82:4

**KNOTS** [1] - 69:22

**KNOWLEDGE** [1] - 35:7

**KNOWN** [3] - 23:9, 23:10, 54:18

**KNOWS** [1] - 10:21

**KNUCKLE** [1] - 118:13

### L

**LABEL** [1] - 27:14

**LACK** [3] - 26:1, 35:23, 58:20

**LANGUAGE** [1] - 101:8

**LARGE** [2] - 101:21, 152:11

**LAS** [1] - 79:16

**LAST** [6] - 97:3, 121:4, 127:24, 151:10, 158:5, 164:6

**LATE** [2] - 46:11, 85:23

**LAUNDRY** [1] - 81:12

**LAW** [2] - 40:3, 145:8

**LAWSUIT** [1] - 25:25

**LAWYER** [1] - 8:22

**LAWYERS** [4] - 4:11, 4:16, 5:9, 5:10

**LAYING** [9] - 12:7, 46:20, 57:19, 62:11, 64:16, 105:1, 110:16, 110:21, 111:3

**LAYOUT** [3] - 44:19, 45:14, 135:17

**LEAD** [2] - 36:22, 37:7

**LEADING** [1] - 96:15

**LEARN** [5] - 25:2, 26:4, 31:18, 36:14, 39:21

**LEAST** [6] - 25:10, 35:14, 104:7, 124:6, 125:16, 129:3

**LEAVE** [6] - 7:19, 7:22, 10:1, 43:10, 71:16, 132:1

**LEAVING** [2] - 79:10, 83:10

**LED** [2] - 30:4, 69:14

**LEEWAY** [1] - 68:24

**LEFT** [21] - 7:23, 24:10, 52:11, 54:12, 79:12, 91:5, 95:9, 96:22, 99:13, 108:7, 112:7, 113:15, 117:13, 117:15, 119:1, 119:19, 120:12, 121:6, 145:21, 148:25, 156:23

**LEGAL** [1] - 22:13

**LEGITIMATE** [1] - 34:5

**LEGS** [2] - 72:9, 103:21

**LENGTH** [1] - 14:14

**LENIENCY** [1] - 23:15

**LESS** [3] - 4:21, 124:20

**LESSER** [1] - 22:1

**LETTER** [1] - 155:20

**LETTERS** [5] - 11:1, 14:19, 15:11, 32:9, 46:2

**LEVEL** [7] - 28:22, 28:24, 36:5, 59:24,

60:2, 80:21, 81:5

**LEWISBURG** [7] - 34:16, 79:14, 81:3, 114:13, 114:14, 114:16, 162:1

**LIEUTENANT** [46] - 13:18, 53:6, 53:7, 53:8, 63:21, 63:23, 63:25, 67:3, 67:18, 68:11, 69:16, 76:3, 76:7, 76:14, 78:25, 80:14, 80:16, 80:18, 87:14, 89:8, 89:22, 106:24, 148:2, 148:5, 148:10, 148:12, 148:17, 148:24, 149:1, 149:3, 149:5, 149:10, 149:24, 151:18, 152:8, 154:17, 155:15, 163:3, 163:20, 164:9, 164:11, 164:12

**LIEUTENANT'S** [6] - 87:15, 91:4, 91:6, 91:7, 148:4, 148:7

**LIEUTENANTS** [1] - 163:24

**LIFE** [9] - 13:21, 19:9, 23:25, 24:22, 29:18, 29:21, 32:11, 34:24, 36:2

**LIGHT** [13] - 51:23, 51:24, 57:17, 57:18, 58:11, 58:13, 58:14, 62:2, 62:8, 62:9, 70:2, 72:23

**LIKELY** [3] - 12:25, 19:1, 19:16

**LIMITATIONS** [2] - 29:9, 29:11

**LIMITED** [1] - 29:10

**LINE** [9] - 10:11, 27:12, 58:5, 137:10, 138:4, 138:14, 143:19, 144:1, 144:6

**LIQUID** [1] - 110:24

**LISTED** [2] - 141:7, 142:2

**LISTEN** [1] - 7:16

**LISTENED** [1] - 23:23

**LISTENING** [1] - 7:1

**LITIGATED** [1] - 33:1

**LITIGATION** [3] - 16:11, 17:24, 26:7

**LIVE** [4] - 11:16, 23:25, 145:17, 145:18

**LIVED** [2] - 24:22,

143:8

**LIVES** [4] - 18:25, 24:18, 31:8, 32:17

**LOADED** [1] - 17:3

**LOCATE** [2] - 105:9, 135:25

**LOCATED** [6] - 5:4, 40:14, 56:7, 91:17, 94:13, 153:6

**LOCATION** [4] - 56:24, 91:16, 93:5, 96:3

**LOCK** [4] - 68:1, 70:21, 85:5, 121:9

**LOCKDOWN** [1] - 44:10

**LOCKED** [10] - 14:12, 44:10, 51:8, 51:19, 51:20, 67:24, 81:17, 85:24, 85:25, 103:6

**LOG** [15] - 47:12, 47:15, 47:18, 47:21, 50:21, 52:21, 52:22, 54:1, 54:6, 54:18, 55:10, 88:21, 89:4, 89:5, 90:4

**LOGGED** [1] - 50:17

**LOGS** [2] - 90:1, 90:23

**LOMPOC** [1] - 35:9

**LOOK** [6] - 13:16, 15:24, 99:1, 110:2, 116:16, 143:18

**LOOKED** [4] - 64:17, 99:6, 120:3, 152:4

**LOOKING** [5] - 59:13, 74:17, 112:14, 115:17, 136:4

**LOOKS** [8] - 43:13, 92:9, 109:2, 109:3, 109:15, 109:25, 124:7, 131:7

**LOSS** [1] - 33:18

**LOUD** [1] - 6:6

**LOUIS** [1] - 25:24

**LOUISE** [1] - 36:25

**LOVING** [1] - 24:12

**LOW** [4] - 34:13, 34:19, 43:20

**LOWER** [4] - 62:3, 62:10, 117:15, 120:12

**LOWEST** [1] - 81:5

**LUCK** [2] - 36:25, 69:21

**LUHRMAN** [6] - 95:23, 148:3, 149:22, 150:1, 151:16, 152:8

**LUNCH** [1] - 107:11

**LUNCHEON** [2] - 107:15, 107:20

## M

**LYCOMING** [1] - 78:12
**LYING** [1] - 64:20

**MA'AM** [3] - 57:24, 62:19, 62:20
**MACHINERY** [1] - 31:17
**MAIL** [1] - 10:10
**MAIN** [4] - 86:3, 94:25, 156:5, 157:4
**MAINTAINED** [1] - 121:8
**MAJOR** [1] - 29:8
**MAN** [7] - 11:21, 12:1, 18:22, 32:15, 131:11, 152:11, 163:10
**MANAGEMENT** [2] - 36:6, 158:16
**MANAGER** [4] - 42:16, 42:18, 59:10, 59:12
**MANNED** [1] - 131:9
**MANSFIELD** [1] - 38:22
**MARK** [4] - 135:25, 163:21, 164:9, 164:11
**MARKED** [3] - 127:6, 128:9, 142:18
**MARKET** [1] - 1:21
**MARKS** [9] - 111:22, 112:7, 113:15, 117:12, 121:16, 122:10, 122:11, 137:4
**MARRIED** [1] - 54:15
**MARTI** [73] - 10:24, 11:2, 11:7, 11:15, 11:20, 12:6, 12:9, 12:15, 12:21, 13:8, 13:11, 14:24, 15:6, 15:23, 16:7, 18:14, 19:17, 23:13, 35:8, 56:8, 56:9, 57:19, 62:10, 62:18, 63:14, 64:16, 66:11, 69:17, 69:21, 71:5, 72:13, 99:15, 101:5, 103:10, 105:1, 105:11, 105:14, 106:7, 106:13, 108:8, 108:13, 110:1, 110:5, 110:16, 111:5, 111:21, 112:18, 113:20, 113:23, 114:4, 117:14, 117:17, 126:11,

128:21, 128:25, 129:4, 141:7, 141:12, 143:2, 143:11, 143:14, 143:16, 144:12, 152:9, 152:10, 152:18, 152:24, 153:1, 156:15, 157:6, 163:11
**MARTI'S** [13] - 13:21, 19:7, 19:8, 19:9, 62:11, 105:8, 117:16, 149:23, 150:1, 150:4, 151:17, 151:19, 151:20
**MARTIN** [1] - 15:17
**MARYLAND** [2] - 160:19, 160:24
**MASTER** [1] - 50:21
**MATCHED** [2] - 50:13, 52:9
**MATERIAL** [2] - 62:13, 149:25
**MATTER** [6] - 6:3, 17:20, 17:23, 107:5, 163:6, 165:5
**MATTERS** [5] - 5:20, 5:21, 9:23, 10:16, 16:14
**MAXIMUM** [2] - 36:8, 80:22
**MCHUGH** [3] - 2:12, 3:9, 3:10
**MEAL** [3] - 147:17, 147:20, 156:6
**MEAN** [18] - 31:24, 59:22, 67:21, 70:5, 80:17, 82:4, 82:9, 84:16, 96:22, 107:3, 126:25, 139:18, 153:17, 154:1, 154:3, 159:8, 162:21
**MEANS** [2] - 35:21, 68:22
**MEANT** [1] - 66:14
**MEASURES** [1] - 13:19
**MEDAL** [2] - 105:8, 117:21
**MEDICAL** [9] - 25:18, 28:5, 28:8, 36:21, 83:19, 106:21, 152:13, 153:6, 153:23
**MEDICATIONS** [1] - 25:22
**MEDICINE** [3] - 153:12, 153:20, 153:23

**MEDIUM** [2] - 34:13, 43:20
**MEET** [3] - 82:4, 82:5, 163:19
**MEETING** [1] - 29:22
**MEMBERS** [1] - 37:1
**MEMORANDA** [1] - 101:2
**MEMORANDUM** [1] - 100:22
**MEMORIZATION** [2] - 58:25, 60:7
**MENTAL** [16] - 11:12, 24:24, 24:25, 25:1, 25:19, 25:20, 26:1, 26:3, 26:4, 26:8, 26:11, 27:5, 27:6, 27:13, 27:14, 27:16
**MENTION** [2] - 113:22, 129:15
**MENTIONED** [11] - 15:17, 73:14, 73:20, 99:22, 108:11, 109:5, 109:19, 110:5, 115:21, 155:13, 160:8
**MERCY** [1] - 29:19
**MET** [4] - 20:23, 25:5, 163:20, 164:8
**METAL** [1] - 96:8
**METHODS** [1] - 94:23
**MIC** [11] - 4:4, 4:5, 4:13, 4:14, 4:18, 4:24, 10:6, 38:25, 108:14, 117:23, 158:7
**MICROPHONE** [2] - 4:22, 9:4
**MIDDLE** [11] - 1:2, 1:16, 2:6, 3:6, 12:4, 41:9, 48:1, 89:23, 138:15, 145:23, 147:22
**MIDNIGHT** [11] - 44:6, 46:13, 46:14, 86:7, 86:19, 87:10, 127:12, 128:16, 147:3
**MIGHT** [5] - 74:6, 88:4, 116:4, 135:15, 149:14
**MIKE** [1] - 4:16
**MILITARY** [8] - 79:4, 79:8, 79:11, 79:12, 145:20, 145:22, 145:24, 160:21
**MINE** [1] - 32:4
**MINOR** [9] - 117:11, 120:9, 120:11, 120:14, 120:16,

120:19, 120:25, 121:4
**MINUTE** [3] - 37:18, 66:25, 88:21
**MINUTES** [15] - 12:20, 14:14, 37:16, 49:21, 49:22, 90:20, 90:22, 96:4, 114:17, 114:19, 127:12, 128:15, 136:10, 153:18, 163:17
**MISS** [1] - 77:15
**MISSED** [1] - 136:2
**MISTAKE** [2] - 32:3, 141:20
**MITCHELL** [2] - 26:15, 26:19
**MITIGATION** [6] - 21:9, 21:11, 21:12, 23:20, 24:1, 24:6
**MOMENT** [6] - 11:11, 19:21, 98:13, 140:6, 149:2, 150:14
**MONDAY** [2] - 1:8, 19:17
**MONETARY** [1] - 32:7
**MONEY** [6] - 30:17, 30:18, 31:5, 31:12, 31:14, 31:20
**MONTH** [1] - 41:4
**MONTHS** [5] - 39:4, 41:15, 79:12, 143:2, 160:20
**MORAL** [1] - 22:9
**MORENO** [4] - 2:12, 3:11, 108:1, 164:19
**MORNING** [44] - 3:3, 3:10, 3:13, 3:16, 3:17, 3:19, 3:20, 5:2, 5:3, 8:13, 8:14, 13:7, 14:12, 14:17, 15:5, 48:5, 49:8, 56:18, 64:10, 72:20, 72:21, 78:7, 78:8, 87:11, 88:17, 89:8, 89:10, 89:22, 91:2, 95:4, 121:22, 122:14, 122:24, 147:2, 147:3, 147:9, 147:17, 147:19, 147:22, 148:1, 154:21, 156:6, 164:16
**MOST** [5] - 30:8, 86:8, 104:4, 132:13, 147:8
**MOTHER** [1] - 31:9
**MOTION** [1] - 6:15
**MOTIVE** [3] - 15:7, 15:8
**MOUTH** [2] - 154:10,

154:11
**MOVE** [11] - 20:5, 20:24, 44:22, 45:1, 68:23, 77:7, 81:11, 111:19, 117:10, 123:2, 145:1
**MOVED** [10] - 51:12, 116:1, 117:6, 135:13, 136:5, 137:5, 137:23, 148:25, 151:1, 155:9
**MOVEMENT** [2] - 81:16, 134:7
**MOVEMENTS** [1] - 81:13
**MOVING** [4] - 95:20, 95:21, 141:16, 155:11
**MRI** [1] - 26:21
**MUIR** [4] - 21:17, 23:11, 23:16
**MULTI** [1] - 21:25
**MULTI-COUNT** [1] - 21:25
**MULTIPLE** [5] - 23:22, 28:11, 32:15, 36:21
**MURDER** [8] - 10:24, 11:5, 11:9, 12:24, 14:6, 14:22, 21:18, 22:23
**MURDERED** [2] - 13:8, 18:14
**MUST** [2] - 33:12, 33:23
**MUTUAL** [1] - 11:15
**MW** [1] - 48:5

## N

**N.W** [1] - 2:4
**NAIL** [3] - 13:15, 65:10, 109:5
**NAME** [13] - 4:1, 18:2, 36:9, 38:5, 53:9, 54:14, 78:2, 127:14, 128:21, 145:12, 151:10, 158:3, 158:5
**NARRATES** [1] - 14:15
**NATIONAL** [1] - 161:4
**NATURE** [2] - 81:2, 88:9
**NAVAL** [1] - 161:5
**NECESSARILY** [4] - 75:21, 75:22, 131:21, 142:4
**NECESSARY** [4] - 20:10, 22:23, 99:23, 132:6
**NECK** [14] - 12:20,

104:9, 104:10, 104:19, 105:4, 105:7, 105:8, 108:13, 108:17, 108:24, 117:16, 117:18, 119:2, 157:1

**NEED** [11] - 4:11, 4:21, 5:25, 7:11, 25:7, 35:23, 59:23, 107:1, 132:23, 136:20, 153:9

**NEEDED** [5] - 25:4, 25:18, 26:5, 115:2, 148:9

**NEEDS** [4] - 6:2, 9:8, 33:3, 58:17

**NEIGHBORHOOD** [1] - 163:17

**NEIL** [1] - 27:3

**NELLIS** [2] - 79:14, 79:20

**NEUROLOGICAL** [2] - 29:4, 29:8

**NEUROLOGY** [1] - 28:4

**NEVER** [4] - 23:12, 25:9, 73:10, 73:14

**NEW** [5] - 46:19, 115:11, 160:5, 160:7, 160:8

**NEXT** [12] - 18:10, 46:20, 50:14, 55:2, 55:8, 55:11, 55:15, 77:21, 81:16, 97:17, 137:21, 157:22

**NICKIE** [2] - 98:24, 151:7

**NICOLE** [6] - 13:5, 38:1, 38:3, 38:6, 166:8

**NIGHT** [28] - 12:4, 46:17, 46:18, 46:24, 46:25, 47:22, 48:6, 50:1, 51:8, 53:5, 54:4, 56:6, 56:11, 67:6, 71:21, 85:22, 87:9, 87:12, 88:18, 90:25, 93:7, 93:8, 93:16, 93:25, 109:17, 117:19, 120:3, 147:22

**NINE** [1] - 164:21

**NOBODY** [1] - 131:15

**NON** [1] - 20:6

**NON-JURY** [1] - 20:6

**NONCONFRONTATI ONAL** [1] - 155:19

**NONE** [1] - 22:2

**NONEXISTENT** [1] - 26:6

**NONJUSTICE** [1] - 154:22

**NONSTATUTORY** [3] - 19:3, 33:15, 33:20

**NORMAL** [1] - 69:25

**NORMALLY** [9] - 82:19, 82:22, 82:25, 83:1, 83:8, 85:12, 86:23, 90:24, 126:2

**NORTH** [2] - 38:17, 42:23

**NORTHUMBERLAN D** [1] - 145:18

**NOSE** [2] - 154:9, 154:11

**NOSTRILS** [1] - 114:3

**NOTATION** [1] - 48:3

**NOTE** [3] - 15:15, 107:23, 116:17

**NOTES** [1] - 14:5

**NOTHING** [4] - 50:7, 73:12, 77:1, 147:10

**NOTICE** [7] - 22:20, 52:25, 56:17, 110:22, 114:2, 116:11, 117:17

**NOTICED** [1] - 149:21

**NOTIFIED** [2] - 64:4, 95:12

**NOVEMBER** [6] - 23:8, 23:17, 145:21, 146:17, 162:11

**NUMBER** [24] - 1:3, 3:5, 6:16, 7:13, 9:9, 10:10, 18:5, 26:10, 30:24, 49:19, 50:7, 52:2, 53:2, 58:7, 61:24, 62:6, 62:10, 74:2, 123:18, 134:25, 137:1, 147:4, 147:5, 147:6

**NUMEROUS** [3] - 28:9, 150:16, 153:5

**NURTURING** [1] - 24:13

## O

**O'CLOCK** [30] - 47:24, 47:25, 48:21, 49:10, 50:3, 50:4, 51:22, 52:8, 52:24, 53:22, 55:9, 55:11, 56:22, 57:3, 57:7, 57:8, 57:11, 86:11, 87:10, 88:17, 89:21, 91:2, 107:17, 147:15, 147:16, 147:22, 164:21

**OBJECT** [8] - 58:16, 58:20, 99:9, 101:20, 104:10, 104:18, 157:12, 157:13

**OBJECTION** [6] - 6:24, 22:7, 45:5, 77:17, 123:5, 145:2

**OBLIGATED** [1] - 23:17

**OBSERVATIONS** [1] - 71:23

**OBSERVE** [2] - 71:1, 72:3

**OBSERVED** [4] - 63:18, 76:21, 104:25, 112:10

**OBSERVING** [1] - 118:19

**OBTAINED** [2] - 106:5, 122:10

**OBVIOUSLY** [3] - 19:8, 33:17, 107:13

**OCCASION** [1] - 32:8

**OCCASIONS** [2] - 6:1, 23:22

**OCCUPATION** [2] - 158:14, 158:19

**OCCUPIED** [1] - 163:10

**OCCUR** [3] - 63:7, 68:8, 115:8

**OCCURRED** [7] - 14:22, 17:6, 18:13, 22:11, 23:7, 25:14, 88:13

**OCCURRING** [1] - 52:23

**OCTOBER** [4] - 39:17, 39:18, 41:5

**OFFENSE** [2] - 16:19, 22:1

**OFFER** [1] - 17:11

**OFFERED** [5] - 14:23, 15:21, 16:23, 65:22

**OFFERING** [1] - 18:21

**OFFICE** [21] - 1:16, 70:16, 88:19, 91:4, 91:6, 91:7, 94:3, 94:16, 95:10, 96:23, 97:1, 106:5, 106:6, 141:15, 148:4, 148:6, 148:7, 148:8, 159:10, 160:10, 160:18

**OFFICER** [56] - 13:6, 17:8, 42:2, 42:8, 42:12, 42:13, 42:14, 44:3, 44:7, 57:5, 58:17, 64:9, 67:9, 70:16, 70:20, 71:15, 75:6, 76:15, 86:23, 86:24, 93:24, 95:7, 95:23, 98:21, 98:22, 98:25, 105:11, 105:23, 116:24, 122:2, 131:20, 131:25, 146:14, 146:20, 146:21, 146:22, 147:4, 147:5, 147:6, 148:3, 149:13, 149:22, 150:1, 150:15, 151:1, 151:16, 152:8, 152:20, 153:15, 153:17, 154:23, 155:5, 156:2

**OFFICERS** [20] - 67:8, 69:19, 76:17, 86:6, 86:7, 86:12, 86:19, 87:1, 88:20, 90:23, 95:1, 95:11, 95:25, 98:3, 106:25, 127:1, 131:17, 133:9, 139:22, 141:16

**OFFICES** [2] - 159:21, 159:24

**OFFICIAL** [8] - 1:20, 8:13, 9:1, 9:5, 9:14, 9:18, 10:12, 165:9

**OFTEN** [1] - 4:10

**OKLAHOMA** [5] - 17:1, 25:15, 25:16, 26:1, 26:3

**OLD** [1] - 161:13

**ONCE** [12] - 12:1, 25:13, 64:24, 70:25, 71:4, 98:4, 102:23, 102:25, 132:19, 148:15, 152:6, 161:22

**ONE** [83] - 5:24, 7:5, 7:8, 7:12, 8:8, 8:9, 10:5, 10:20, 12:11, 13:14, 15:15, 15:22, 16:1, 16:20, 16:24, 17:6, 17:8, 17:17, 19:21, 20:2, 20:21, 21:25, 25:10, 26:10, 27:14, 28:1, 31:5, 31:16, 34:7, 44:13, 46:25, 53:11, 54:9, 72:6, 72:12, 76:11, 81:21, 82:2, 86:23, 86:24, 88:18, 93:24, 96:12, 97:10, 97:11, 97:14, 97:21, 97:22, 97:23, 98:5, 98:13, 99:16, 104:7, 104:8, 105:10, 112:23, 113:4, 113:10, 113:15, 117:12, 119:1, 119:17, 119:19, 121:4, 125:10, 126:21, 126:22, 131:2, 132:16, 132:17, 132:20, 136:2, 136:3, 137:7, 137:14, 139:7, 147:8, 151:18, 151:20, 154:20, 156:13, 159:17, 161:10

**ONES** [4] - 50:20, 92:10, 104:6, 113:10

**ONGOING** [1] - 30:14

**OPEN** [14] - 40:24, 65:25, 70:17, 81:10, 83:10, 96:13, 97:20, 132:8, 132:11, 132:23, 132:24, 133:8, 133:12, 135:1

**OPENED** [13] - 40:20, 68:2, 68:11, 68:14, 69:14, 76:3, 96:12, 102:2, 102:23, 132:17, 134:13, 149:10, 149:12

**OPENING** [5] - 10:19, 40:22, 146:6, 146:7, 166:2

**OPENS** [4] - 3:1, 98:5, 132:16, 132:21

**OPERATION** [1] - 53:7

**OPERATIONAL** [1] - 49:2

**OPERATIONS** [4] - 53:6, 80:16, 87:14, 87:15

**OPPORTUNITY** [4] - 5:13, 18:23, 19:1, 31:17

**OPPOSED** [2] - 124:11, 144:13

**OPPOSITION** [1] - 22:13

**OPTIONS** [1] - 36:15

**ORALLY** [1] - 33:2

**ORANGE** [1] - 70:2

**ORDER** [5] - 33:23, 117:4, 121:13, 132:4, 133:12

**ORDERED** [2] - 20:9, 101:20

**ORDERLIES** [3] - 85:13, 85:19, 133:1

**ORDERLY** [2] - 133:11, 133:12

**ORDERS** [1] - 101:23

**ORDINARILY** [1] - 59:17

**ORDINARY** [2] - 50:5, 50:7
**ORGANIZATIONS** [2] - 31:2, 37:3
**ORGANIZED** [1] - 161:12
**ORIGINAL** [2] - 8:20, 115:17
**OTHERWISE** [1] - 33:24
**OUTER** [1] - 147:9
**OUTGROWTH** [1] - 30:10
**OUTLET** [2] - 7:22, 8:24
**OUTPATIENT** [1] - 28:25
**OUTSIDE** [17] - 7:6, 7:24, 9:12, 9:14, 39:9, 40:14, 69:5, 81:19, 83:12, 92:8, 98:17, 98:19, 98:20, 106:14, 130:5, 132:24, 159:21
**OVERLAP** [1] - 86:13
**OVERLAPPING** [1] - 86:4
**OWN** [4] - 11:3, 11:18, 12:14, 19:20
**OXYGEN** [2] - 111:11, 111:12

**P**

**PACED** [1] - 72:5
**PACING** [1] - 76:22
**PAGE** [8] - 48:1, 58:5, 74:14, 116:23, 121:24, 166:2, 166:20, 167:1
**PAGES** [1] - 61:5
**PAIN** [1] - 149:7
**PAINFUL** [1] - 117:10
**PAIR** [3] - 67:22, 150:16, 151:2
**PANEL** [3] - 47:7, 49:1
**PAPER** [4] - 54:21, 141:2, 141:3, 141:4
**PAPERWORK** [3] - 46:20, 94:18, 155:6
**PARAGRAPH** [9] - 58:4, 101:7, 101:11, 101:12, 104:23, 116:18, 116:22, 121:23
**PARAGRAPHS** [1] - 62:22
**PARAMEDICS** [8] - 106:23, 114:9, 154:19, 154:24,

156:3, 156:7, 156:9, 156:14
**PARENTS** [1] - 25:9
**PARK** [1] - 161:7
**PARKING** [1] - 92:23
**PART** [23] - 6:18, 11:19, 11:22, 21:24, 22:17, 22:24, 24:7, 24:25, 25:1, 47:1, 76:17, 83:16, 83:17, 104:20, 112:22, 134:6, 134:24, 137:15, 139:3, 159:11, 159:20, 160:5, 161:1
**PARTICIPATE** [1] - 28:18
**PARTICULAR** [1] - 133:3
**PASS** [1] - 133:12
**PASSED** [4] - 41:23, 41:25, 59:4
**PAST** [4] - 18:21, 18:23, 20:14, 117:9
**PATIENCE** [1] - 20:1
**PATROL** [1] - 131:20
**PATROLS** [1] - 131:25
**PATTERN** [1] - 150:23
**PAUL** [9] - 1:6, 3:5, 14:17, 14:20, 15:23, 24:3, 24:4, 56:8, 163:10
**PAUSE** [3] - 19:22, 76:25, 140:8
**PEER** [1] - 49:20
**PEN** [4] - 118:8, 120:22, 149:15, 149:17
**PENALTY** [5] - 16:10, 20:3, 20:7, 22:21, 59:19
**PENITENTIARIES** [2] - 35:19, 36:15
**PENITENTIARY** [14] - 26:16, 35:15, 36:5, 40:11, 43:14, 43:15, 81:4, 129:11, 130:5, 132:6, 146:3, 162:1, 162:5, 163:4
**PENNSYLVANIA** [14] - 1:2, 1:16, 2:6, 2:13, 3:6, 39:4, 40:15, 146:4, 159:2, 159:4, 159:11, 159:12, 161:18, 162:1
**PEOPLE** [26] - 4:11, 11:14, 17:4, 23:22, 28:1, 30:2, 30:6, 37:2, 52:2, 81:20, 81:21, 82:24, 87:12,

88:2, 93:8, 93:18, 93:22, 94:20, 94:21, 99:3, 107:1, 131:11, 133:23, 142:7, 154:22, 156:11
**PER** [1] - 82:19
**PERHAPS** [5] - 4:23, 5:17, 8:18, 59:8, 61:8
**PERIMETER** [4] - 93:17, 130:5, 130:17, 131:19
**PERIOD** [8] - 12:10, 14:4, 17:6, 27:21, 39:20, 40:6, 40:9, 91:3
**PERIODIC** [1] - 29:1
**PERIODS** [2] - 34:17, 51:16
**PERMISSION** [1] - 132:2
**PERMITTED** [1] - 133:2
**PERSON** [9] - 3:22, 12:1, 18:2, 29:14, 49:17, 53:4, 86:10, 99:2, 154:10
**PERSONAL** [1] - 156:22
**PERSONALITY** [1] - 27:10
**PERSONALIZE** [2] - 31:4, 31:6
**PERSONALLY** [1] - 28:6
**PERSONNEL** [5] - 13:4, 13:13, 13:20, 106:21, 154:13
**PERTINENT** [1] - 14:15
**PET** [1] - 26:22
**PHASE** [3] - 10:22, 22:25, 23:2
**PHILADELPHIA** [13] - 1:9, 1:21, 2:14, 8:15, 159:12, 159:13, 159:17, 159:20, 159:21, 159:23, 160:6, 161:11, 161:14
**PHONE** [12] - 6:17, 6:19, 7:17, 7:23, 7:24, 8:1, 9:7, 10:10, 95:7, 95:13, 95:14, 163:6
**PHOTO** [19] - 43:5, 43:7, 43:12, 45:16, 64:13, 108:20, 109:8, 109:12, 110:13, 111:13,

111:17, 112:1, 112:7, 112:12, 112:17, 112:24, 113:4, 113:12, 120:1
**PHOTOCOPY** [5] - 89:25, 90:4, 90:6, 90:8, 90:12
**PHOTOGRAPH** [1] - 131:6
**PHOTOGRAPHS** [2] - 118:3, 137:18
**PHOTOS** [6] - 112:3, 116:8, 119:3, 119:4, 119:11, 119:13
**PHRASE** [1] - 133:16
**PHYSICAL** [3] - 24:8, 116:1, 116:2
**PHYSICALLY** [1] - 28:18
**PHYSICALS** [1] - 116:3
**PHYSICIAN** [2] - 67:5, 122:8
**PHYSICIAN'S** [4] - 105:20, 115:21, 118:21, 152:15
**PICK** [2] - 61:22, 148:5
**PICKING** [1] - 147:15
**PICTURE** [5] - 43:22, 111:20, 113:10, 113:17, 129:24
**PICTURES** [3] - 105:13, 111:5, 112:15
**PIECE** [5] - 12:18, 108:23, 141:2, 154:9
**PIECES** [2] - 11:24, 109:20
**PILLOW** [4] - 105:2, 111:3, 150:12
**PILLOWS** [1] - 110:25
**PLACE** [7] - 6:9, 31:11, 35:14, 101:22, 105:8, 140:4, 157:12
**PLACED** [13] - 101:22, 106:8, 117:5, 122:15, 127:25, 134:21, 134:24, 137:20, 149:17, 152:12, 152:19, 153:23, 157:7
**PLACES** [2] - 34:17, 81:14
**PLAN** [3] - 11:19, 11:22
**PLANNING** [10] - 11:6, 11:10, 14:7, 15:9, 18:13, 32:25, 33:1,

33:3, 33:4, 33:11
**PLAY** [1] - 81:15
**PLAYED** [1] - 29:23
**PLEA** [18] - 15:17, 15:21, 16:5, 21:17, 21:18, 21:19, 21:22, 21:23, 21:24, 21:25, 22:4, 22:5, 22:6, 22:8, 22:14, 22:15, 25:14
**PLEADED** [6] - 10:23, 12:16, 12:23, 16:4, 17:9
**PLUG** [2] - 7:23, 9:7
**PLUGGED** [1] - 8:24
**PM** [2] - 90:5, 164:22
**PO** [2] - 1:17, 2:10
**POINT** [53] - 12:11, 12:15, 12:19, 19:24, 22:9, 23:15, 37:18, 40:18, 41:2, 42:1, 42:11, 43:2, 48:15, 51:8, 52:24, 53:11, 58:20, 60:13, 62:12, 64:6, 65:7, 68:3, 69:15, 70:10, 72:6, 78:22, 85:24, 87:20, 89:14, 98:1, 98:8, 98:18, 99:22, 102:23, 107:6, 107:16, 110:6, 114:4, 123:13, 134:7, 135:19, 135:24, 142:7, 152:25, 154:13, 155:8, 156:17, 157:2, 159:3, 161:19, 162:4, 162:7, 164:18
**POINTED** [1] - 118:8
**POINTING** [2] - 17:17, 118:8
**POINTS** [1] - 61:8
**POLAROID** [2] - 105:12, 119:4
**POLICE** [2] - 17:5, 161:12
**POLICY** [6] - 125:17, 125:20, 125:24, 126:3, 129:4, 156:16
**POLITE** [1] - 66:19
**POPPED** [2] - 12:12, 12:13
**POPPING** [1] - 116:14
**POPULATION** [7] - 51:14, 81:8, 81:10, 81:20, 81:24, 82:10, 82:11
**PORTION** [2] - 60:16, 61:15

**PORTS** [1] - 97:12
**POSITION** [9] - 21:8, 36:17, 42:17, 44:2, 78:22, 80:12, 87:12, 146:13, 159:3
**POSITIONED** [3] - 103:11, 110:9, 151:23
**POSITIONS** [2] - 80:15, 146:18
**POSITIVE** [1] - 32:16
**POSSIBILITY** [1] - 34:25
**POSSIBLE** [7] - 6:20, 10:9, 60:8, 61:12, 100:5, 155:8, 157:6
**POSSIBLY** [2] - 83:9, 142:1
**POST** [1] - 71:17
**POTENTIAL** [1] - 34:19
**POTENTIALLY** [1] - 24:18
**PRECEDING** [3] - 41:16, 115:3, 158:19
**PREMEDITATION** [6] - 18:13, 32:25, 33:1, 33:3, 33:5, 33:11
**PREPARATION** [1] - 15:9
**PRESENCE** [1] - 107:23
**PRESENT** [20] - 4:25, 5:14, 9:11, 16:13, 19:6, 19:16, 21:13, 24:7, 24:15, 24:23, 27:13, 28:18, 30:19, 34:3, 34:21, 59:23, 60:8, 107:24, 122:20, 158:14
**PRESENTATION** [2] - 36:24, 36:25
**PRESENTED** [3] - 6:18, 19:1, 34:2
**PRESENTLY** [5] - 24:4, 38:16, 42:17, 78:11, 158:15
**PRETTY** [9] - 44:11, 52:6, 84:8, 87:17, 95:21, 132:18, 135:15, 135:22, 152:10
**PREVIOUS** [1] - 113:10
**PREVIOUSLY** [1] - 16:18
**PRIMARY** [1] - 161:25
**PRINTOUT** [1] - 141:24
**PRISON** [13] - 7:1,

8:13, 9:1, 9:5, 9:14, 9:18, 10:12, 12:5, 41:2, 152:25, 162:8, 164:9
**PRISON-TYPE** [1] - 162:8
**PRISONS** [32] - 6:25, 9:22, 13:4, 13:13, 13:20, 28:22, 28:23, 34:11, 34:14, 35:2, 35:5, 35:24, 36:1, 36:19, 38:12, 38:14, 39:6, 39:15, 42:5, 42:11, 78:13, 78:16, 79:9, 79:11, 125:16, 125:24, 126:14, 126:16, 146:1, 146:5, 146:16, 146:19
**PRIVATE** [2] - 6:16, 8:17
**PRIVATELY** [1] - 8:19
**PROBLEM** [2] - 45:2, 68:6
**PROBLEMS** [6] - 25:4, 28:12, 36:22, 101:24, 102:12, 102:13
**PROCEDURE** [1] - 144:25
**PROCEDURES** [1] - 107:2
**PROCEED** [2] - 50:14, 108:2
**PROCEEDED** [3] - 149:25, 150:14, 151:5
**PROCEEDING** [1] - 4:20
**PROCEEDINGS** [3] - 1:24, 20:3, 165:4
**PROCESS** [11] - 8:23, 28:18, 30:14, 35:2, 35:3, 35:13, 41:11, 46:16, 59:1, 116:9, 124:2
**PROCESSED** [1] - 154:24
**PRODUCED** [2] - 1:24, 59:10
**PRODUCTS** [1] - 31:19
**PROGRAMMED** [1] - 164:2
**PROGRAMMING** [1] - 25:8
**PROGRESSION** [1] - 42:10
**PROGRESSIVE** [1] - 29:7

**PROHIBITS** [1] - 126:3
**PROJECT** [6] - 30:11, 30:12, 30:19, 30:21, 32:14
**PROMOTED** [2] - 42:13, 42:14
**PROMOTION** [1] - 80:18
**PROMPTLY** [1] - 107:17
**PROPER** [2] - 59:3, 155:5
**PROPERTY** [2] - 83:20, 156:23
**PROPOSING** [2] - 7:9, 7:10
**PROPOSITION** [1] - 59:18
**PROSECUTION** [1] - 60:11
**PROTECTING** [1] - 24:13
**PROVE** [3] - 17:12, 18:11, 19:4
**PROVEN** [2] - 21:10, 22:24
**PROVIDE** [3] - 28:1, 61:5
**PROVIDED** [1] - 117:2
**PROVISION** [2] - 59:14, 59:15
**PSYCHIATRY** [1] - 28:4
**PSYCHOLOGIST** [2] - 15:3, 26:15
**PSYCHOLOGISTS** [6] - 25:6, 25:7, 25:11, 34:10, 34:14, 34:15
**PTSD** [1] - 27:10
**PUBLIC** [1] - 2:6
**PUBLISH** [5] - 43:3, 47:14, 53:2, 88:25, 96:19
**PUBLISHED** [3] - 44:16, 45:5, 53:21
**PULL** [7] - 4:13, 38:25, 40:21, 88:25, 108:14, 129:8, 157:10
**PULL-UP** [1] - 157:10
**PULLED** [3] - 57:19, 62:3, 62:9
**PULSE** [3] - 105:9, 106:2, 113:23
**PUNISHABLE** [2] - 16:19, 17:13
**PUNISHMENT** [2] - 75:8, 84:5
**PURCHASE** [1] -

31:16
**PURPOSE** [5] - 73:11, 94:15, 113:12, 150:17, 151:3
**PURPOSES** [1] - 44:21
**PURSUANT** [1] - 125:23
**PURSUE** [1] - 23:10
**PURSUING** [1] - 32:19
**PUT** [35] - 12:9, 12:19, 27:14, 33:23, 36:10, 43:1, 45:11, 47:12, 50:19, 52:22, 54:17, 64:11, 67:22, 71:2, 72:8, 76:4, 76:7, 85:4, 85:17, 91:10, 92:21, 94:11, 96:18, 96:24, 103:1, 115:9, 120:5, 122:17, 123:18, 139:22, 141:19, 142:18, 142:21, 149:8

## Q

**QTRD** [2] - 127:24, 128:24
**QUALIFYING** [2] - 16:22, 18:8
**QUANTICO** [1] - 160:16
**QUARTERS** [3] - 143:5, 143:10, 143:14
**QUESTIONED** [3] - 122:1, 122:19, 122:23
**QUESTIONS** [14] - 72:15, 77:2, 121:15, 121:17, 122:2, 122:7, 123:15, 140:9, 140:13, 142:12, 144:16, 144:18, 155:22, 157:16
**QUICK** [2] - 88:24, 95:21
**QUICKLY** [8] - 97:14, 102:20, 150:4, 151:1, 155:8, 155:9, 155:11, 157:6
**QUIET** [1] - 56:19
**QUITE** [1] - 125:8
**QUOTE** [1] - 75:8

## R

**R160** [1] - 109:9
**R164** [3] - 111:1,

123:9, 166:22
**R166** [1] - 108:20
**RA** [1] - 161:22
**RADIO** [3] - 96:11, 154:15, 154:17
**RADIOS** [1] - 94:25
**RAISE** [1] - 31:19
**RAN** [3] - 70:16, 70:21, 150:25
**RANGE** [29] - 49:21, 49:23, 50:9, 50:12, 50:14, 50:24, 51:1, 51:3, 51:25, 52:19, 52:25, 54:2, 54:3, 54:4, 54:23, 55:3, 55:6, 55:24, 56:1, 56:11, 56:20, 56:22, 56:23, 63:20, 64:5, 69:6, 83:3, 84:17
**RANGES** [6] - 48:16, 49:20, 49:23, 50:15, 54:3
**RANK** [2] - 80:9, 146:20
**RATHER** [4] - 6:6, 11:13, 11:25, 21:22
**RAZOR** [4] - 130:15, 130:16, 131:3, 131:24
**REACH** [2] - 60:13, 61:8
**REACHED** [3] - 25:5, 29:18, 148:23
**READ** [16] - 15:16, 48:4, 48:22, 58:4, 60:13, 60:15, 61:8, 61:15, 74:10, 90:3, 101:8, 101:16, 104:23, 116:18, 116:21, 121:22
**READING** [7] - 16:15, 58:16, 58:21, 59:25, 77:16, 101:10, 101:19
**READY** [1] - 148:4
**REAL** [5] - 6:14, 32:16, 33:16, 68:25, 88:23
**REALIZE** [1] - 30:2
**REALLY** [4] - 54:22, 97:7, 138:24, 141:14
**REAR** [2] - 93:14, 156:20
**REASON** [5] - 6:3, 13:10, 60:9, 82:21, 107:5
**REASONABLE** [2] - 16:5, 17:12
**REASONS** [3] - 14:23, 75:12, 84:1

**REC** [11] - 44:13, 68:12, 69:5, 69:7, 81:19, 102:3, 115:10, 122:15, 125:9, 137:8

**RECEIVE** [2] - 162:24, 162:25

**RECEIVED** [16] - 17:14, 18:7, 22:14, 25:21, 26:5, 30:18, 31:3, 38:23, 41:24, 75:9, 77:18, 77:20, 94:16, 123:7, 145:4, 146:10

**RECEIVING** [1] - 13:15

**RECENTLY** [3] - 17:25, 29:4, 54:15

**RECESS** [7] - 37:12, 37:18, 37:20, 107:16, 107:18, 107:20, 164:17

**RECIPIENTS** [1] - 31:5

**RECOGNIZE** [11] - 43:7, 64:13, 89:1, 89:17, 91:11, 108:20, 109:1, 109:11, 109:24, 110:13, 127:3

**RECOGNIZED** [5] - 24:20, 25:3, 25:4, 25:7, 26:19

**RECOLLECTION** [10] - 58:17, 58:18, 58:20, 63:11, 102:5, 115:19, 152:10, 153:20, 153:21, 154:16

**RECOMMENDATION** [1] - 22:1

**RECOMMENDED** [1] - 25:8

**RECORD** [15] - 7:9, 16:14, 23:10, 37:23, 38:5, 43:21, 47:11, 53:15, 60:17, 77:15, 78:2, 107:21, 145:12, 158:3, 165:4

**RECORDED** [3] - 1:24, 4:14, 60:4

**RECORDING** [2] - 4:20, 53:16

**RECORDKEEPING** [1] - 126:13

**RECORDS** [5] - 25:17, 25:20, 27:6, 28:5, 141:6

**RECREATION** [19] - 81:19, 83:11, 83:12,

99:13, 134:21, 134:23, 135:14, 136:5, 136:9, 136:16, 137:20, 137:24, 149:15, 149:17, 155:14, 157:8, 157:11

**RECREATIONAL** [1] - 157:13

**RECROSS** [2] - 142:16, 166:6

**REDIRECT** [3] - 140:11, 140:14, 166:6

**REED** [1] - 161:6

**REFER** [2] - 97:12, 99:25

**REFERRING** [4] - 61:16, 73:2, 74:12, 152:3

**REFLECTING** [1] - 14:16

**REFLECTION** [1] - 11:10

**REFRESH** [1] - 115:19

**REFRESHED** [1] - 58:18

**REGARDLESS** [2] - 12:16, 18:24

**REGRET** [1] - 23:13

**REIDERS** [1] - 2:9

**RELATED** [1] - 118:4

**RELATES** [1] - 81:9

**RELATIONSHIP** [3] - 29:24, 30:9, 30:10

**RELEASE** [1] - 34:25

**RELEVANCE** [1] - 59:24

**RELEVANT** [1] - 60:15

**RELIABILITY** [2] - 59:24, 60:2

**RELIEF** [1] - 86:9

**RELIES** [1] - 33:21

**RELIEVED** [1] - 71:22

**RELIGION** [1] - 30:5

**RELIGIOUS** [2] - 105:8, 117:21

**RELINQUISH** [1] - 12:13

**RELY** [1] - 32:24

**REMAIN** [1] - 4:12

**REMAINED** [1] - 136:9

**REMARKS** [1] - 19:25

**REMEMBER** [9] - 50:9, 52:14, 70:9, 102:9, 102:12, 103:11, 105:22, 115:15, 155:4

**REMEMBERED** [1] - 119:10

**REMORSE** [3] - 23:21, 23:24

**REMOVE** [6] - 149:22, 149:25, 150:2, 150:3, 151:17, 157:5

**REMOVED** [14] - 99:11, 104:13, 105:5, 108:9, 108:12, 110:5, 110:8, 110:22, 134:18, 134:20, 136:15, 152:7, 152:9, 152:18

**REMOVING** [2] - 105:13, 150:6

**RENDERED** [2] - 12:17, 13:16

**REPEAT** [3] - 143:12, 164:6, 164:15

**REPEATED** [1] - 59:11

**REPLIED** [2] - 62:16, 62:20

**REPLY** [1] - 66:13

**REPORT** [23] - 53:4, 58:1, 58:3, 58:16, 58:19, 58:21, 59:1, 59:9, 59:25, 60:14, 60:15, 61:13, 62:22, 63:1, 63:2, 63:6, 63:25, 72:24, 77:15, 100:2, 100:14, 116:22

**REPORTED** [1] - 159:13

**REPORTER** [4] - 1:20, 4:21, 4:22, 165:9

**REPRESENTATIVES** [1] - 30:24

**REPRESENTED** [2] - 3:7, 3:14

**REPRESENTS** [1] - 33:24

**REQUEST** [3] - 68:3, 102:15, 140:19

**REQUESTED** [1] - 20:9

**REQUESTS** [2] - 106:20, 139:22

**REQUIRE** [1] - 28:25

**REQUIRED** [4] - 15:8, 15:25, 49:4, 49:6

**REQUIRES** [1] - 28:24

**RESERVES** [1] - 145:22

**RESET** [1] - 117:9

**RESIDENT** [5] - 159:5, 159:7, 160:9, 161:18, 162:20

**RESPECT** [14] - 5:22, 23:1, 24:25, 27:7,

27:20, 32:13, 32:20, 33:17, 34:4, 35:4, 35:22, 50:3, 126:17

**RESPONDED** [1] - 163:14

**RESPONSIBILITIES** [2] - 87:16, 162:17

**RESPONSIBILITY** [12] - 6:14, 21:15, 22:2, 22:11, 23:3, 23:7, 23:14, 23:20, 87:25, 147:14, 162:2, 162:24

**RESPONSIBLE** [3] - 53:15, 88:8, 147:16

**REST** [2] - 6:19, 23:25

**RESTRAINED** [1] - 102:1

**RESTRAINT** [1] - 62:13

**RESTRAINTS** [12] - 67:19, 70:11, 149:23, 150:3, 150:6, 150:8, 150:18, 151:17, 151:20, 151:22, 151:24, 152:7

**RESTRICTIVE** [1] - 36:6

**RESTROOM** [1] - 6:1

**RESULT** [11] - 11:11, 19:10, 26:12, 26:18, 26:22, 28:8, 28:20, 29:24, 30:14, 35:13, 124:16

**RESUSCITATE** [3] - 111:6, 112:14, 153:14

**RESUSCITATION** [2] - 106:18, 112:22

**RETIRE** [1] - 78:20

**RETIRED** [7] - 78:23, 146:17, 158:21, 158:23, 159:1, 160:10, 161:20

**RETRIEVED** [1] - 12:18

**RETURNED** [3] - 21:4, 149:17, 149:19

**REVEALING** [1] - 62:10

**REVIEWED** [1] - 28:5

**RICHARD** [1] - 158:4

**RICK** [1] - 14:10

**RIGHT-HAND** [2] - 74:14, 127:10

**RIPPED** [4] - 62:14, 69:24, 70:4, 70:5

**RIPPED-UP** [1] - 62:14

**RISK** [5] - 24:17, 24:20, 31:14, 32:9, 33:24

**ROBBERIES** [2] - 160:21, 161:11

**ROCKIES** [1] - 36:9

**ROLE** [1] - 29:24

**ROLLED** [1] - 152:11

**RON** [2] - 163:3, 164:11

**RONALD** [2] - 2:8, 3:7

**ROOM** [17] - 6:20, 7:17, 7:19, 7:20, 7:22, 17:4, 52:1, 82:2, 97:25, 112:19, 113:7, 113:21, 116:2, 116:4, 117:6, 117:7, 136:19

**ROOMMATE** [1] - 95:9

**ROPE** [10] - 62:15, 111:22, 112:8, 113:16, 117:14, 118:18, 119:20, 121:16, 122:10

**ROPES** [8] - 11:23, 11:24, 13:23, 33:9, 33:10, 39:21, 105:14, 105:15

**ROSTER** [13] - 126:17, 126:25, 127:8, 127:10, 128:11, 128:18, 139:18, 141:7, 141:13, 141:17, 141:21, 141:23

**ROSTERS** [3] - 127:1, 141:23, 142:15

**ROTATE** [1] - 162:23

**ROUGHLY** [2] - 136:12, 162:11

**ROUND** [3] - 92:10, 93:2, 131:7

**ROUNDS** [4] - 53:14, 66:6, 89:8, 89:22

**RPR** [1] - 1:19

**RUBEN** [1] - 26:21

**RULE** [1] - 107:14

**RULES** [3] - 59:15, 59:17, 59:19

**RUN** [7] - 13:24, 124:8, 124:11, 131:3, 147:12, 148:11, 155:12

**RUNNING** [5] - 66:24, 95:17, 95:18, 139:14, 155:4

**RUSE** [2] - 73:15, 73:20

**RUSHED** [1] - 17:8

# S

**SAFELY** [3] - 36:1, 36:19, 147:20
**SAFETY** [1] - 18:25
**SALLY** [1] - 97:12
**SALMON** [1] - 150:10
**SANCTION** [1] - 43:2
**SANCTIONED** [2] - 75:6, 83:25
**SANCTIONS** [1] - 125:13
**SANTOS** [3] - 163:23, 164:12, 164:13
**SAT** [2] - 72:9, 72:10
**SATELLITE** [2] - 159:10, 159:24
**SATISFY** [2] - 18:9, 33:12
**SATURDAY** [3] - 100:19, 100:20, 162:18
**SAUNDERS** [26] - 2:5, 3:12, 3:13, 9:25, 10:2, 10:6, 10:8, 10:13, 47:15, 58:15, 59:8, 59:21, 60:24, 72:17, 72:19, 73:19, 73:22, 73:24, 74:1, 74:8, 74:9, 76:24, 77:1, 107:24, 107:25, 166:10
**SAVE** [1] - 13:21
**SAW** [6] - 64:17, 73:1, 82:16, 91:16, 118:23, 119:10
**SCALE** [3] - 34:13, 131:15
**SCAN** [1] - 26:22
**SCARRING** [1] - 24:11
**SCENE** [1] - 14:11
**SCHEDULE** [1] - 19:20
**SCHEDULED** [2] - 29:16, 55:21
**SCHEMATIC** [5] - 45:17, 91:12, 123:24, 135:20, 135:21
**SCHOOL** [2] - 79:2, 79:4
**SCISSORS** [11] - 13:25, 70:17, 70:19, 70:20, 106:5, 150:17, 150:25, 151:2, 151:3, 151:8, 151:13
**SCRANTON** [2] - 1:18, 159:25
**SCREEN** [14] - 43:5,

43:22, 44:18, 45:11, 45:21, 46:9, 64:11, 74:10, 91:10, 92:22, 120:5, 135:8, 135:11, 137:14
**SEARCH** [3] - 115:3, 115:10, 116:25
**SEARCHED** [2] - 157:2, 157:3
**SEARCHING** [1] - 157:4
**SEATED** [4] - 3:2, 4:12, 24:4, 99:18
**SECOND** [27] - 6:3, 7:6, 8:8, 8:9, 17:21, 18:8, 18:15, 20:5, 20:24, 23:20, 32:23, 33:13, 54:5, 58:3, 58:5, 66:23, 84:21, 101:7, 101:11, 101:12, 116:23, 121:23, 121:24, 131:4, 135:16, 137:12, 137:24
**SECONDLY** [1] - 26:14
**SECONDS** [4] - 63:24, 127:12, 128:16, 153:3
**SECRETARY** [1] - 148:8
**SECTION** [5] - 2:3, 59:14, 148:7, 148:8, 148:25
**SECTIONS** [2] - 83:25, 124:3
**SECURE** [6] - 35:14, 36:14, 36:16, 51:13, 147:12, 147:13
**SECURED** [2] - 149:23, 157:14
**SECURITY** [7] - 35:19, 35:21, 78:12, 80:20, 132:15, 147:9, 147:17
**SEE** [32] - 3:22, 8:15, 14:23, 15:11, 15:12, 16:12, 49:20, 50:21, 51:21, 51:24, 54:21, 54:22, 69:17, 74:4, 74:5, 74:12, 74:15, 74:16, 76:16, 88:20, 90:5, 92:8, 98:17, 107:16, 118:13, 127:14, 129:25, 131:6, 135:1, 135:5, 138:20, 138:24
**SEEING** [1] - 152:15
**SEEK** [3] - 22:20, 34:2, 34:3

**SEEKING** [3] - 18:11, 19:3, 21:5
**SEG** [13] - 74:5, 74:15, 74:21, 80:16, 84:3, 84:4, 84:19, 97:9, 98:12, 102:2, 125:2, 143:20
**SEGREGATION** [41] - 48:12, 75:2, 75:4, 75:15, 75:18, 81:8, 81:17, 83:24, 84:9, 84:25, 86:21, 89:20, 90:11, 91:5, 92:13, 95:7, 95:11, 96:16, 96:17, 97:18, 97:20, 98:21, 98:25, 115:1, 124:8, 124:16, 125:5, 125:21, 125:25, 126:23, 128:19, 129:1, 139:6, 141:8, 141:12, 142:1, 142:8, 142:9, 143:17, 144:13
**SELECTION** [1] - 20:14
**SELF** [2] - 41:12, 41:24
**SELL** [1] - 31:19
**SEND** [2] - 40:2, 122:16
**SENIOR** [6] - 13:6, 42:13, 42:14, 44:3, 146:21, 146:22
**SENSE** [4] - 22:5, 22:7, 23:24, 60:5
**SENSOR** [1] - 147:11
**SENT** [6] - 31:13, 31:15, 83:23, 84:25, 94:17, 141:14
**SENTENCE** [9] - 17:15, 18:7, 21:10, 23:12, 23:17, 34:24, 36:2, 37:8
**SENTENCED** [3] - 17:10, 25:15, 34:23
**SENTENCING** [9] - 1:12, 10:21, 11:3, 12:25, 19:15, 58:24, 59:5, 59:16, 59:22
**SENTRY** [2] - 141:24
**SEPARATE** [1] - 48:14
**SEPARATELY** [1] - 126:21
**SEPARATION** [2] - 82:20, 84:21
**SEQUENCE** [1] - 132:14
**SERIES** [1] - 119:3
**SERIOUS** [3] - 28:10,

28:15, 35:12
**SERVES** [1] - 36:2
**SERVICE** [3] - 116:4, 145:22, 146:24
**SERVICES** [4] - 81:13, 106:14, 136:19, 137:10
**SET** [9] - 7:5, 22:20, 25:8, 32:18, 67:19, 132:13, 149:4, 149:5, 157:10
**SETS** [3] - 19:24, 68:5, 149:7
**SETTING** [1] - 80:23
**SETTINGS** [1] - 82:1
**SEVEN** [1] - 162:22
**SEVERAL** [3] - 88:22, 117:11, 141:23
**SEVERE** [1] - 27:16
**SEXUAL** [1] - 24:9
**SHARE** [2] - 27:7, 29:2
**SHEET** [7] - 11:24, 57:19, 62:3, 62:9, 104:3, 108:12, 109:21
**SHEETS** [12] - 13:23, 62:15, 69:24, 69:25, 70:1, 103:25, 104:5, 104:21, 105:3, 109:19, 109:20, 150:12
**SHIFT** [12] - 44:4, 46:11, 47:25, 49:7, 86:19, 86:20, 87:9, 87:10, 147:2, 147:4, 148:3, 154:21
**SHIFTS** [4] - 86:1, 86:2, 86:4, 86:15
**SHINE** [1] - 51:25
**SHINED** [4] - 57:14, 58:8, 61:25, 62:7
**SHORT** [1] - 107:6
**SHORT-STAFFED** [1] - 107:6
**SHORTLY** [10] - 13:7, 14:1, 14:11, 14:20, 14:21, 57:8, 57:25, 79:10, 94:5, 119:11
**SHOT** [2] - 18:2, 18:5
**SHOULDER** [9] - 12:12, 68:6, 102:14, 116:13, 116:14, 117:8, 117:9, 149:3, 149:7
**SHOVE** [1] - 75:25
**SHOW** [54] - 11:6, 11:13, 11:17, 11:18, 11:22, 12:3, 12:12, 14:19, 15:9, 15:21, 16:2, 17:3, 19:14,

24:2, 25:16, 25:20, 25:23, 32:14, 33:8, 34:3, 44:15, 45:20, 45:23, 47:13, 47:19, 74:2, 88:23, 89:16, 91:9, 94:3, 97:7, 108:19, 108:25, 109:8, 109:23, 110:12, 110:18, 111:1, 111:8, 112:16, 113:3, 113:9, 118:6, 118:17, 119:21, 120:24, 127:11, 127:17, 129:19, 135:13, 141:6, 143:7, 143:16, 152:1
**SHOWED** [2] - 27:1, 45:15
**SHOWING** [24] - 15:7, 69:1, 86:9, 90:1, 90:4, 100:9, 111:21, 112:7, 113:13, 113:15, 119:1, 119:13, 119:19, 120:6, 120:11, 120:14, 120:16, 120:19, 120:25, 121:4, 141:6, 143:20
**SHOWN** [1] - 27:6
**SHOWS** [3] - 89:21, 127:20, 128:18
**SHU** [5] - 46:2, 46:16, 49:1, 81:8, 117:6
**SIDE** [16] - 12:6, 74:14, 74:22, 122:16, 124:9, 127:11, 136:18, 137:8, 138:6, 138:12, 138:21, 138:22, 142:4, 142:5, 151:25
**SIDES** [2] - 48:14, 125:14
**SIDEWAYS** [1] - 124:12
**SIGN** [5] - 53:16, 88:21, 89:5, 89:21, 90:23
**SIGNATURE** [3] - 89:11, 90:7, 119:15
**SIGNED** [2] - 53:18, 90:15
**SIGNIFICANT** [5] - 27:5, 29:14, 29:23, 30:8, 31:12
**SIGNIFICANTLY** [1] - 29:10
**SIGNS** [1] - 53:13
**SILVER** [1] - 160:23

**SIMILAR** [1] - 15:4
**SINCERITY** [1] - 23:5
**SIS** [2] - 101:3, 104:14
**SISTER** [8] - 29:19, 29:25, 30:9, 30:20, 30:23, 33:18, 37:2
**SISTERS** [1] - 30:1
**SIT** [4] - 4:4, 7:24, 8:1, 39:25
**SITTING** [3] - 3:22, 7:5, 10:25
**SITUATION** [3] - 28:2, 102:8, 108:8
**SIX** [3] - 39:4, 41:15, 160:20
**SIZABLE** [1] - 11:21
**SIZED** [1] - 52:6
**SLASH** [1] - 89:9
**SLEEPER** [3] - 12:9, 12:13, 12:17
**SLEEPING** [1] - 87:22
**SLIDE** [3] - 65:14, 140:20, 141:1
**SLIP** [2] - 52:16, 52:17
**SLIPS** [2] - 147:15, 148:5
**SLOMSKY** [3] - 1:10, 8:15, 38:10
**SLOT** [15] - 9:7, 67:25, 68:2, 76:4, 76:5, 76:8, 85:3, 85:4, 85:5, 101:22, 133:5, 133:23, 133:24, 134:13, 149:11
**SLOW** [1] - 62:4
**SMALL** [4] - 94:12, 97:24, 97:25, 159:10
**SMALLER** [1] - 137:13
**SO...** [1] - 140:5
**SOCIETY** [1] - 32:15
**SOLD** [1] - 30:13
**SOLID** [1] - 9:6
**SOMEONE** [19] - 8:17, 10:9, 11:25, 51:12, 53:5, 57:2, 75:14, 75:17, 75:19, 93:4, 100:22, 120:21, 125:25, 131:1, 132:19, 134:13, 140:1, 156:9
**SOMETIMES** [1] - 97:12
**SOMEWHAT** [1] - 126:15
**SOMEWHERE** [2] - 136:17, 144:13
**SON** [1] - 33:18
**SOON** [1] - 102:1
**SOPHISTICATED** [2] - 26:20, 26:23

**SORRY** [14] - 9:25, 10:8, 31:25, 73:17, 74:17, 74:22, 75:18, 108:2, 128:5, 134:3, 143:12, 151:11, 163:23, 164:10
**SORT** [3] - 13:16, 20:6, 132:13
**SOUND** [1] - 4:19
**SOUTHERN** [2] - 160:7, 160:8
**SPARSELY** [1] - 26:5
**SPEAKER** [1] - 84:15
**SPEAKING** [3] - 4:13, 18:17, 117:23
**SPECIAL** [76] - 12:5, 13:7, 35:20, 36:6, 36:7, 42:15, 44:7, 44:8, 44:19, 45:7, 45:22, 45:24, 48:15, 49:23, 50:22, 51:11, 51:16, 52:11, 57:3, 57:11, 66:25, 68:1, 70:1, 71:15, 71:20, 75:7, 82:12, 82:14, 82:18, 83:4, 83:14, 84:13, 84:24, 85:10, 85:14, 85:20, 86:5, 86:22, 87:1, 88:6, 88:12, 88:19, 90:18, 91:7, 91:17, 91:25, 98:8, 98:14, 106:5, 106:12, 106:15, 116:2, 117:1, 117:4, 123:24, 124:2, 125:15, 126:18, 133:2, 133:4, 133:9, 134:8, 139:14, 139:16, 139:24, 148:9, 148:10, 148:11, 148:15, 148:19, 150:15, 158:20, 162:22, 163:3, 163:9, 163:24
**SPECIALIST** [2] - 42:14, 44:3
**SPELL** [4] - 38:4, 78:1, 145:11, 158:2
**SPELLING** [1] - 105:24
**SPEND** [1] - 17:22
**SPIRITUAL** [2] - 29:15, 29:18
**SPRING** [1] - 160:23
**SPUR** [1] - 11:10
**SQUAD** [1] - 161:13
**SQUEEZE** [2] - 112:23, 154:10
**ST** [2] - 31:11, 31:13
**STAFF** [21] - 7:14,

34:1, 40:24, 46:21, 85:2, 85:4, 85:9, 85:17, 86:8, 86:11, 93:15, 93:16, 105:10, 107:3, 114:8, 122:1, 122:4, 122:6, 139:18, 140:3
**STAFFED** [1] - 107:6
**STAGE** [2] - 20:4, 20:5
**STAGES** [1] - 20:3
**STAINS** [1] - 110:23
**STAIRS** [2] - 135:2
**STAMINA** [1] - 29:10
**STAND** [10] - 4:12, 21:16, 23:21, 26:25, 37:20, 74:20, 93:22, 98:4, 107:18, 164:17
**STANDARD** [1] - 35:25
**STANDING** [16] - 9:12, 57:14, 57:15, 58:7, 61:25, 62:6, 69:1, 98:17, 99:18, 99:19, 99:20, 101:9, 101:13, 101:17, 116:6, 148:24
**STANDOFF** [1] - 17:5
**STANDS** [1] - 74:18
**START** [20] - 11:16, 21:14, 36:24, 39:19, 54:13, 61:18, 62:4, 86:6, 86:8, 101:9, 101:10, 106:11, 107:12, 107:17, 137:1, 143:21, 144:4, 146:5, 162:4
**STARTED** [19] - 30:21, 39:2, 40:22, 41:5, 42:7, 42:12, 47:3, 50:8, 50:9, 57:8, 63:9, 71:3, 71:4, 78:17, 80:18, 81:3, 104:24, 106:12, 162:8
**STARTING** [4] - 58:5, 80:7, 129:1, 160:15
**STATE** [9] - 16:18, 38:4, 66:9, 78:1, 145:11, 158:2, 159:25, 160:3, 161:6
**STATEMENT** [4] - 10:19, 115:17, 116:22, 132:2
**STATEMENTS** [2] - 121:15, 166:2
**STATES** [16] - 1:1, 1:3, 1:16, 2:2, 3:5, 26:16, 35:15, 35:19, 36:5, 36:14, 37:25, 77:23, 107:22, 129:10,

132:5, 146:3
**STATION** [2] - 150:15, 151:2
**STATIONED** [4] - 38:16, 146:2, 158:25, 159:2
**STATUS** [3] - 40:17, 80:4, 80:20
**STATUTE** [1] - 59:19
**STATUTORY** [8] - 16:9, 16:17, 18:9, 18:10, 18:15, 32:20, 32:23, 33:13
**STAY** [7] - 32:11, 35:1, 66:20, 81:15, 81:18, 83:4, 161:19
**STAYED** [3] - 67:14, 71:14, 71:18
**STAYS** [1] - 6:19
**STEADILY** [1] - 27:25
**STENOTYPE** [1] - 1:24
**STENOTYPE-COMPUTER** [1] - 1:24
**STEP** [13] - 7:6, 8:9, 20:13, 20:15, 20:17, 20:21, 20:23, 20:24, 77:4, 99:16, 144:22, 157:19
**STEPS** [1] - 39:18
**STILL** [5] - 54:16, 83:13, 107:2, 134:11, 137:4
**STOMACH** [2] - 12:8, 105:1
**STOOD** [1] - 23:11
**STOP** [3] - 88:19, 144:9, 163:25
**STRAIGHT** [1] - 46:20
**STRANGLE** [1] - 11:21
**STRANGLED** [1] - 12:20
**STRAPS** [1] - 150:22
**STREET** [5] - 1:17, 1:21, 2:4, 2:7, 2:10
**STRENGTH** [1] - 29:9
**STRICTLY** [1] - 85:9
**STRIKE** [1] - 103:23
**STRIKINGLY** [2] - 59:23, 60:1
**STRIP** [5] - 105:4, 108:12, 115:3, 115:10, 116:25
**STRIPS** [4] - 70:5, 104:2, 104:5, 150:19
**STRONG** [2] - 150:21, 150:24
**STRUCTURES** [1] -

131:7
**STUDIES** [1] - 24:16
**STUFF** [4] - 46:21, 103:25, 104:5, 112:15
**SUBJECT** [1] - 163:6
**SUBJECTS** [1] - 101:4
**SUBMIT** [3] - 12:23, 17:11, 67:19
**SUBSTANTIAL** [11] - 14:4, 15:9, 17:15, 18:7, 18:12, 32:25, 33:1, 33:3, 33:4, 33:12
**SUBSTANTIALLY** [1] - 87:4
**SUCCESS** [1] - 106:17
**SUFFERED** [4] - 24:9, 24:11, 26:12, 26:17
**SUFFERING** [2] - 28:13, 29:6
**SUFFERS** [1] - 27:10
**SUGGEST** [2] - 18:21, 37:5
**SUGGESTING** [1] - 8:22
**SUGGESTION** [1] - 8:20
**SUITE** [3] - 1:17, 2:7, 2:14
**SUMMARY** [2] - 19:13, 26:9
**SUMMONED** [1] - 106:21
**SUNDAY** [1] - 46:18
**SUPERVISE** [1] - 88:5
**SUPERVISING** [4] - 71:20, 88:2, 93:25, 94:21
**SUPERVISOR** [4] - 148:2, 159:5, 160:11, 160:12
**SUPPLIES** [5] - 150:16, 153:5, 153:6, 153:20, 153:23
**SUPPORT** [1] - 34:2
**SUPPORTS** [1] - 27:9
**SUPPOSED** [3] - 24:12, 82:3, 125:24
**SURPRISED** [1] - 57:15
**SURVIVED** [1] - 18:6
**SUZANNE** [2] - 1:19, 165:10
**SWEATING** [1] - 72:5
**SWEEPING** [1] - 85:18
**SWITCH** [2] - 132:7, 132:10
**SWORN** [4] - 38:3,

77:25, 145:10, 158:1

**SYSTEM** [5] - 8:16, 8:22, 26:2, 26:3, 112:20

## T

**T-H-O-M-P-S-O-N** [1] - 158:5

**TABLE** [3] - 3:23, 7:23, 24:4

**TADROSS** [5] - 48:6, 54:13, 54:16, 54:18, 151:7

**TAKING** [3] - 14:5, 107:4, 119:11

**TALL** [1] - 131:7

**TAMPERED** [1] - 147:10

**TANGIBLE** [1] - 32:16

**TAPED** [1] - 65:10

**TAPED-UP** [1] - 65:10

**TECHNICIAN** [1] - 42:15

**TELEPHONE** [4] - 63:21, 94:25, 125:12, 154:15

**TEND** [1] - 4:16

**TENURE** [1] - 146:21

**TERM** [4] - 16:19, 17:13, 35:24, 75:3

**TERMS** [1] - 4:23

**TERRE** [6] - 5:4, 6:17, 7:13, 24:4, 31:6, 34:16

**TESTED** [1] - 28:7

**TESTIFIED** [2] - 76:20, 129:7

**TESTIFY** [7] - 13:9, 13:14, 14:10, 15:4, 26:25, 27:4, 66:15

**TESTIFYING** [2] - 19:17, 58:25

**TESTIMONY** [15] - 9:12, 24:19, 26:2, 26:14, 29:2, 30:20, 31:10, 34:22, 59:11, 83:3, 108:11, 134:6, 140:19, 156:19, 164:17

**TESTING** [3] - 26:20, 26:23, 27:1

**THEMSELVES** [1] - 51:6

**THERE** [267] - 4:11, 4:21, 5:20, 6:1, 6:4, 7:4, 7:18, 7:22, 8:1, 8:3, 8:10, 8:23, 9:2, 9:18, 10:4, 12:9, 13:13, 15:1, 15:5,

15:13, 15:18, 16:3, 16:9, 16:22, 17:5, 17:25, 19:2, 20:12, 20:13, 21:12, 22:21, 22:22, 22:25, 24:6, 30:17, 31:7, 31:11, 33:9, 33:11, 33:16, 33:18, 35:1, 35:12, 36:5, 36:6, 36:7, 39:4, 39:16, 39:20, 40:3, 40:25, 41:7, 41:21, 42:7, 42:16, 43:10, 43:17, 43:19, 44:25, 45:2, 45:4, 45:21, 45:25, 46:1, 46:2, 46:8, 47:10, 48:1, 48:3, 48:8, 48:14, 48:21, 49:12, 50:5, 50:10, 50:11, 50:24, 52:2, 52:5, 53:5, 57:2, 57:15, 59:2, 59:15, 60:2, 61:4, 65:3, 66:20, 66:23, 67:10, 67:14, 68:3, 68:19, 69:5, 71:8, 71:9, 72:10, 74:23, 79:7, 79:24, 80:5, 80:7, 80:14, 80:16, 80:19, 81:12, 81:13, 82:4, 82:8, 82:9, 82:19, 82:24, 83:10, 83:11, 83:18, 84:12, 84:15, 84:21, 85:13, 85:16, 85:19, 86:1, 86:3, 86:13, 88:12, 89:8, 89:11, 89:14, 89:23, 90:9, 90:15, 91:21, 92:6, 92:9, 92:14, 92:15, 92:16, 92:18, 92:25, 93:2, 93:8, 93:13, 93:14, 93:18, 93:22, 94:4, 94:6, 94:7, 94:16, 94:17, 94:23, 95:17, 95:18, 95:23, 96:3, 96:12, 97:2, 97:3, 97:6, 97:7, 97:8, 98:4, 98:21, 98:22, 98:24, 99:7, 99:12, 99:13, 100:16, 101:10, 103:23, 104:6, 104:7, 104:10, 104:18, 105:4, 105:15, 105:20, 106:1, 106:9, 106:25, 108:12, 109:19, 110:24, 110:25, 111:21, 115:3, 116:2, 116:6, 118:14, 119:16,

122:16, 122:17, 124:16, 125:4, 126:3, 126:4, 126:12, 127:2, 129:13, 129:18, 130:13, 130:16, 130:17, 130:18, 130:25, 131:3, 131:18, 132:15, 132:22, 133:1, 133:10, 134:6, 134:24, 136:7, 136:18, 136:19, 137:6, 137:7, 137:9, 137:10, 137:22, 138:3, 138:4, 138:11, 138:24, 138:25, 139:11, 140:19, 140:25, 141:5, 141:15, 141:21, 141:23, 142:3, 142:7, 144:3, 146:10, 147:25, 150:18, 151:6, 152:13, 154:12, 157:8, 157:10, 157:14, 159:6, 159:24, 160:3, 160:20, 161:9, 161:16, 161:19, 161:22, 161:23, 162:7

**THERE'S** [9] - 48:16, 49:8, 54:3, 67:25, 74:15, 75:11, 82:20, 83:12, 130:22

**THEREABOUTS** [3] - 9:17, 52:20, 69:13

**THEREAFTER** [5] - 14:2, 14:20, 14:21, 94:5, 119:11

**THEREFORE** [1] - 105:5

**THEREOF** [1] - 26:1

**THEY'D** [1] - 142:8

**THEY'RE** [2] - 34:15, 97:9

**THINKING** [1] - 80:2

**THIRD** [10] - 2:10, 3:22, 6:11, 24:1, 104:23, 137:12, 143:19, 143:24, 144:1, 144:6

**THIRDLY** [1] - 26:18

**THOMAS** [8] - 17:23, 18:2, 18:4, 28:3, 145:9, 145:13, 166:14

**THOMPSON** [9] - 14:9, 14:10, 157:24,

157:25, 158:4, 158:7, 158:13, 164:5, 166:17

**THOUSAND** [1] - 82:13

**THREAT** [1] - 34:12

**THREATENED** [2] - 16:21, 17:16

**THREATS** [1] - 14:25

**THREE** [17] - 5:20, 17:4, 31:9, 40:4, 41:20, 41:22, 49:8, 79:12, 95:25, 96:5, 103:3, 103:4, 103:5, 146:23, 147:13, 162:3

**THROWN** [1] - 117:8

**THUMB** [1] - 117:13

**TIE** [7] - 62:13, 62:14, 70:6, 109:25, 112:8, 147:12

**TIED** [25] - 12:1, 12:7, 13:10, 57:19, 57:22, 62:11, 62:12, 62:16, 62:18, 63:14, 64:2, 69:23, 103:14, 103:15, 103:16, 103:17, 103:24, 104:1, 104:11, 104:21, 105:3, 105:5, 111:23, 150:1

**TIGHT** [5] - 13:25, 68:25, 69:22, 105:5, 150:2

**TIGHTLY** [1] - 11:25

**TIM** [6] - 13:14, 34:22, 37:4, 53:9, 77:23, 148:2

**TIMOTHY** [4] - 77:24, 78:3, 78:10, 166:11

**TITLE** [2] - 42:1, 59:14

**TODAY** [2] - 107:10, 107:12

**TOENAIL** [6] - 73:3, 73:11, 75:24, 76:4, 101:21, 109:15

**TOGETHER** [7] - 49:18, 68:5, 82:10, 82:11, 129:5, 144:20, 149:8

**TOMORROW** [3] - 164:16, 164:20, 164:21

**TOOK** [12] - 14:4, 17:3, 17:4, 69:16, 70:19, 112:12, 112:24, 113:17, 114:11, 115:11, 119:14, 137:9

**TOP** [15] - 12:8, 36:8,

54:6, 54:8, 74:23, 100:16, 101:5, 130:13, 130:16, 130:20, 130:23, 136:3, 142:24, 144:4

**TORN** [2] - 105:3, 105:4

**TOTAL** [1] - 50:15

**TOUCH** [3] - 45:21, 129:24, 136:1

**TOUCHED** [1] - 32:15

**TOWARDS** [1] - 103:13

**TOWEL** [1] - 156:25

**TOWER** [1] - 131:17

**TOWERS** [7] - 93:18, 93:21, 131:8, 131:9, 131:11, 131:24

**TRACE** [2] - 96:25, 129:24

**TRACK** [1] - 141:16

**TRADE** [1] - 31:18

**TRAIN** [1] - 41:13

**TRAINING** [4] - 39:20, 39:24, 40:3, 40:10

**TRANSCRIPT** [3] - 1:24, 15:16, 165:4

**TRANSCRIPTION** [1] - 1:24

**TRANSFER** [1] - 75:11

**TRANSFERRED** [5] - 160:19, 160:23, 161:9, 161:11, 161:17

**TRANSPORT** [1] - 114:8

**TRANSPORTED** [5] - 114:5, 114:10, 136:16, 138:2

**TRASH** [2] - 147:11, 147:12

**TRASKER** [1] - 163:21

**TRAVEL** [1] - 4:17

**TRAVELED** [1] - 156:14

**TRAVIS** [45] - 2:8, 2:9, 3:7, 3:8, 5:15, 5:19, 7:8, 7:10, 8:22, 20:8, 20:12, 21:1, 21:2, 31:23, 31:25, 32:4, 32:7, 123:5, 123:17, 123:20, 128:5, 128:8, 129:20, 129:23, 133:17, 133:20, 134:3, 134:5, 135:10, 135:12, 136:23, 136:25, 139:2, 140:6, 140:9, 142:14, 142:17,

144:16, 144:24, 155:24, 156:1, 157:16, 166:4, 166:13, 166:16
**TRAXLER** [3] - 163:22, 163:23, 164:11
**TRAY** [1] - 9:6
**TRAYS** [1] - 85:16
**TREATED** [4] - 25:23, 112:18, 113:20, 115:2
**TREATING** [1] - 111:10
**TRIAL** [2] - 4:16, 10:25
**TRIED** [5] - 4:24, 66:4, 73:7, 75:24, 106:2
**TRIP** [1] - 107:4
**TROUBLE** [1] - 75:5
**TRUE** [6] - 34:6, 51:19, 52:9, 55:24, 85:24, 126:10
**TRULY** [1] - 36:23
**TRY** [15] - 13:20, 31:21, 32:10, 41:13, 65:23, 73:6, 88:18, 99:14, 100:4, 106:24, 125:9, 127:3, 139:12, 140:4, 140:20
**TRYING** [9] - 60:7, 102:20, 111:11, 112:13, 112:15, 129:21, 131:1, 132:1, 151:24
**TURN** [8] - 6:10, 52:16, 57:16, 58:11, 62:2, 62:8, 72:23, 164:3
**TURNED** [2] - 57:18, 104:13
**TWO** [43] - 16:22, 20:3, 23:4, 25:6, 25:10, 31:2, 32:10, 32:20, 39:25, 40:5, 40:9, 40:10, 48:14, 50:7, 56:6, 61:5, 62:22, 63:9, 68:5, 68:19, 81:22, 82:19, 82:24, 82:25, 86:11, 97:8, 102:11, 107:10, 124:3, 124:15, 125:14, 125:15, 129:3, 130:7, 130:23, 130:25, 131:23, 132:15, 132:16, 136:3, 149:7, 156:13, 163:10
**TWO-MAN** [1] -

163:10
**TWO-WEEK** [3] - 39:25, 40:5, 40:9
**TYING** [1] - 110:2
**TYPE** [23] - 6:2, 15:4, 15:25, 17:18, 24:13, 28:14, 36:13, 63:8, 76:18, 100:7, 105:6, 105:7, 109:20, 111:17, 119:4, 119:6, 120:8, 121:20, 149:25, 150:22, 153:22, 161:23, 162:8
**TYPED** [1] - 119:9
**TYPES** [2] - 23:4, 153:12
**TYPICAL** [1] - 90:12
**TYPICALLY** [3] - 90:19, 90:21, 90:22
**TYPING** [1] - 111:24

# U

**U.S** [5] - 3:15, 3:20, 79:5, 162:1, 163:4
**UH** [4] - 46:15, 55:7, 63:16, 75:23
**ULTIMATELY** [4] - 17:6, 18:2, 20:22, 22:18
**UNCONSCIOUS** [1] - 12:17
**UNCONTROLLABLE** [1] - 6:5
**UNDER** [11] - 12:19, 48:3, 65:15, 65:24, 73:7, 75:25, 140:21, 140:25, 141:1, 141:3, 141:4
**UNDERGOING** [1] - 28:12
**UNDERGONE** [1] - 34:9
**UNDERNEATH** [2] - 74:15, 89:7
**UNDERSTOOD** [1] - 156:19
**UNDERTOOK** [1] - 39:19
**UNDONE** [1] - 151:24
**UNFORTUNATELY** [2] - 9:5, 25:19
**UNGODLY** [1] - 24:8
**UNION** [1] - 139:21
**UNIQUE** [3] - 21:22, 22:5, 25:22
**UNIT** [82] - 6:4, 12:5, 13:7, 44:7, 44:9, 44:10, 44:19, 45:8,

45:22, 45:24, 46:23, 46:25, 48:7, 48:9, 48:15, 49:24, 50:22, 51:11, 51:17, 52:12, 53:11, 57:3, 57:12, 66:25, 68:13, 70:1, 71:14, 71:15, 71:18, 71:19, 71:20, 75:7, 81:21, 82:12, 82:15, 82:18, 83:5, 83:14, 84:13, 84:24, 85:11, 85:14, 85:20, 86:5, 86:22, 87:2, 88:6, 88:12, 88:20, 90:18, 91:7, 91:17, 91:25, 98:9, 98:15, 105:12, 106:12, 106:15, 116:2, 117:1, 117:4, 123:24, 124:3, 125:15, 126:18, 133:3, 133:4, 133:9, 134:8, 139:15, 139:17, 139:25, 147:15, 148:9, 148:10, 148:11, 148:15, 148:19, 150:15, 163:9
**UNITED** [16] - 1:1, 1:3, 1:16, 2:2, 3:4, 26:16, 35:15, 35:19, 36:5, 36:14, 37:25, 77:22, 107:22, 129:10, 132:5, 146:3
**UNITS** [4] - 36:7, 45:19, 147:19
**UNIVERSITY** [1] - 38:22
**UNLESS** [4] - 51:12, 51:23, 82:20, 133:4
**UNLIKE** [1] - 51:14
**UNLOCKED** [1] - 134:17
**UNQUOTE** [1] - 75:8
**UNSEEN** [1] - 24:10
**UNTIE** [5] - 69:17, 69:22, 70:11, 99:15, 105:18
**UNTIED** [3] - 71:2, 106:3, 106:4
**UNTYING** [3] - 69:21, 103:9, 105:10
**UNUSUAL** [1] - 25:22
**UP** [75] - 4:13, 11:19, 13:10, 14:12, 19:24, 24:22, 25:8, 30:15, 40:23, 40:24, 43:1, 50:15, 52:9, 53:23, 57:13, 57:14, 59:13, 61:22, 62:13, 62:14, 63:8, 65:10, 67:19,

67:21, 68:2, 68:11, 69:24, 70:4, 70:5, 70:17, 70:22, 74:3, 74:6, 74:22, 74:23, 76:3, 86:9, 88:25, 90:2, 94:4, 99:11, 100:2, 100:7, 104:1, 104:16, 108:14, 108:20, 113:10, 114:21, 122:3, 123:18, 124:3, 124:11, 130:2, 132:13, 134:24, 136:2, 145:8, 147:15, 148:5, 149:2, 149:10, 149:12, 154:19, 154:24, 155:10, 156:8, 157:10, 157:18, 159:5, 159:15, 163:13
**UPPER** [3] - 120:17, 121:5, 127:10
**UPTON** [3] - 17:23, 18:3, 18:4
**USP** [16] - 34:15, 34:16, 43:8, 44:9, 45:14, 79:14, 79:17, 80:5, 80:21, 81:6, 82:7, 86:2, 93:4, 114:18
**UTTERED** [1] - 23:14

# V

**VAIN** [1] - 13:21
**VALID** [2] - 15:22, 34:5
**VARIOUS** [13] - 24:21, 24:24, 27:5, 29:6, 30:16, 31:15, 34:7, 34:10, 37:1, 37:3, 126:18, 147:6
**VARY** [1] - 82:19
**VEGAS** [1] - 79:16
**VEHICLES** [1] - 131:18
**VEINS** [1] - 153:21
**VERDICT** [1] - 21:4
**VERSUS** [3] - 3:5, 75:15, 107:22
**VIA** [1] - 28:19
**VICINITY** [1] - 83:13
**VICTIM** [3] - 33:16, 33:17, 33:19
**VICTIMS** [1] - 17:7
**VIDEO** [8] - 4:25, 8:16, 8:22, 14:11, 14:13, 28:19, 107:15, 107:24

**VIEW** [5] - 70:4, 72:1, 110:9, 129:10, 153:12
**VIOLENCE** [2] - 19:2, 33:25
**VIOLENT** [1] - 18:23
**VISIT** [1] - 93:4
**VOICE** [3] - 104:15, 114:20, 114:21
**VOLUME** [1] - 4:23
**VOLUNTARILY** [1] - 14:6
**VOLUNTEER** [1] - 121:17
**VOLUNTEERED** [2] - 121:18, 122:11

# W

**W-E-A-V-E-R** [1] - 38:7
**WAFFENSCHMIDT** [1] - 2:9
**WAIT** [4] - 6:9, 97:21, 98:4, 164:2
**WAITING** [3] - 75:10, 75:11, 135:10
**WAIVE** [1] - 28:17
**WALK** [14] - 4:15, 10:4, 49:19, 49:21, 49:22, 51:3, 52:19, 54:3, 56:11, 56:20, 132:11, 132:16, 138:11, 138:13
**WALKED** [10] - 52:25, 55:23, 56:1, 56:22, 57:13, 57:18, 63:20, 72:12, 121:6, 122:3
**WALKING** [2] - 95:1, 133:1
**WALKS** [1] - 10:2
**WALL** [10] - 8:25, 138:3, 138:4, 138:5, 138:16, 138:17, 138:18, 138:21, 157:11, 157:14
**WALTER** [1] - 161:5
**WANTS** [2] - 8:19, 35:1
**WARDEN** [3] - 34:22, 35:18, 87:22
**WASHINGTON** [3] - 1:17, 2:4, 160:17
**WASTE** [1] - 158:16
**WATCH** [9] - 14:13, 48:5, 49:8, 64:10, 89:10, 89:22, 147:2, 147:9, 154:21
**WATCHED** [1] - 67:10
**WATCHING** [2] -

35:23, 76:21

**WATERS** [1] - 2:9

**WAYS** [6] - 24:24, 31:16, 32:16, 34:7, 95:1

**WEAPON** [3] - 13:16, 17:17, 17:19

**WEARING** [1] - 117:2

**WEAVER** [16] - 13:5, 13:8, 38:1, 38:3, 38:6, 38:10, 48:6, 54:17, 59:10, 59:12, 98:24, 122:2, 140:20, 151:10, 151:11, 166:8

**WEAVER'S** [1] - 77:15

**WEEK** [8] - 19:17, 39:25, 40:5, 40:9, 46:19, 46:20, 46:22, 81:18

**WEEKEND** [4] - 162:17, 162:19, 162:23, 162:24

**WEEKS** [5] - 40:4, 40:10, 41:1, 41:20, 41:22

**WEIGHT** [1] - 21:9

**WELCOME** [2] - 3:8, 5:1

**WEST** [1] - 2:10

**WHITE** [2] - 1:19, 165:10

**WHOA** [1] - 161:1

**WHOLE** [9] - 7:17, 7:25, 20:21, 75:12, 92:2, 100:1, 130:19, 131:21, 148:13

**WICKET** [13] - 8:3, 8:11, 9:2, 133:6, 133:8, 133:12, 133:15, 133:16, 133:19, 133:23, 140:17, 149:11

**WIDER** [1] - 69:1

**WILLIAMSPORT** [10] - 2:11, 159:2, 159:4, 159:8, 160:1, 160:2, 160:10, 161:18, 161:22, 162:20

**WILLINGLY** [2] - 76:4, 76:9

**WINDOW** [5] - 52:5, 52:6, 99:6, 103:14, 148:25

**WIRE** [6] - 130:15, 130:16, 130:18, 131:3, 131:24

**WITHDRAW** [1] - 129:20

**WITNESS** [47] - 13:5,

14:9, 26:25, 37:15, 37:24, 38:3, 38:6, 39:2, 59:2, 60:4, 60:14, 61:4, 61:10, 61:14, 61:17, 61:19, 62:5, 63:3, 77:6, 77:21, 77:24, 78:3, 104:17, 104:20, 114:22, 123:4, 133:22, 133:25, 134:2, 138:3, 138:7, 138:10, 138:15, 138:18, 138:23, 144:21, 144:23, 145:9, 145:13, 157:21, 157:23, 157:25, 158:4, 158:8, 164:10, 164:14, 166:6

**WITNESSES** [4] - 10:25, 44:21, 59:7, 61:1

**WOODMAKING** [1] - 31:16

**WORDING** [1] - 74:15

**WORDS** [4] - 23:15, 40:20, 65:18, 99:23

**WORRY** [1] - 62:16

**WORSE** [2] - 26:6, 29:12

**WORSENING** [1] - 28:16

**WOVEN** [1] - 150:20

**WRIST** [5] - 111:21, 112:7, 113:13, 113:15, 118:9

**WRISTS** [5] - 13:24, 103:18, 103:19, 149:23, 151:17

**WRITE** [6] - 47:21, 48:25, 54:2, 58:3, 90:13, 100:2

**WRITING** [2] - 63:9, 94:12

**WRITTEN** [6] - 11:2, 28:5, 32:8, 34:20, 60:6, 131:18

**WROTE** [8] - 14:20, 14:21, 14:23, 48:22, 54:18, 58:13, 59:7, 61:23

## Y

**YARD** [4] - 81:11, 81:14, 81:15, 82:2

**YARDS** [1] - 91:8

**YEAR** [8] - 16:20, 17:14, 28:10, 39:10, 42:12, 42:13, 79:20,

161:10

**YEARS** [14] - 21:21, 24:10, 24:19, 27:22, 28:1, 30:17, 38:15, 58:24, 60:3, 79:7, 146:17, 146:23, 151:12, 156:5

**YELL** [1] - 139:12

**YELLING** [1] - 139:7

**YELLOW** [1] - 94:11

**YOURSELF** [1] - 78:9