UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF PENNSYLVANIA


UNITED STATES OF AMERICA          :   CRIMINAL NUMBER


                    V.


DAVID PAUL HAMMER                 :   4:96-CR-239


                              TUESDAY, 6-3-14
                              COURTROOM 16B
                              PHILADELPHIA, PA 19106


_____
          BEFORE THE HONORABLE JOEL H. SLOMSKY, J.
_____

                    SENTENCING HEARING
                         DAY 2


_____

APPEARANCES:

JOHN C. GURGANUS, JR., ESQUIRE        FOR THE GOVERNMENT
UNITED STATES ATTORNEYS OFFICE
MIDDLE DISTRICT OF PENNSYLVANIA
235 N. WASHINGTON STREET, SUITE 311
PO BOX 309
SCRANTON, PA 18501


          SUZANNE R. WHITE, RPR, FCRR, CM
             OFFICIAL COURT REPORTER
          FIRST FLOOR U. S. COURTHOUSE
             601 MARKET STREET
          PHILADELPHIA, PA 19106
             (215)627-1882


PROCEEDINGS RECORDED BY STENOTYPE-COMPUTER,
TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

CONTINUED APPEARANCES:

AMANDA HAINES, ESQUIRE                   FOR THE GOVERNMENT
UNITED STATES DEPARTMENT OF JUSTICE
CRIMINAL DIVISION
CAPITAL CRIMES SECTION
1331 F. STREET, N.W.
WASHINGTON, D.C. 20530

ANNE SAUNDERS, ESQUIRE                   FOR THE DEFENDANT
FEDERAL PUBLIC DEFENDER
MIDDLE DISTRICT OF PENNSYLVANIA
100 CHESTNUT STREET, SUITE 300
HARRISBURG, PA 17101

RONALD C. TRAVIS, ESQUIRE                FOR THE DEFENDANT
REIDERS, TRAVIS, HUMPHREY,
HARRIS, WATERS & WAFFENSCHMIDT
161 WEST THIRD STREET
PO BOX 215
WILLIAMSPORT, PA 17703-0215

JAMES MORENO, ESQUIRE                    FOR THE DEFENDANT
JAMES MCHUGH, ESQUIRE
FEDERAL COMMUNITY DEFENDER
EASTERN DISTRICT OF PENNSYLVANIA
SUITE 540 - THE CURTIS CENTER
PHILADELPHIA, PA 19106

(THE CLERK OPENS COURT.)

THE COURT:  PLEASE BE SEATED.

ALL COUNSEL:  GOOD MORNING, YOUR HONOR.

THE COURT:  AGAIN, WE ARE ON THE RECORD. THIS IS THE CASE OF UNITED STATES VERSUS DAVID HAMMER. AND MR. HAMMER IS WITH US BY VIDEO HOOKUP AND I NOTE THE PRESENCE OF ALL COUNSEL IN COURT TODAY.

AND WHEN WE TERMINATED YESTERDAY, THE ELECTRONIC SOUND RECORDER WHO WAS HANDLING THE VIDEO ASPECT OF THIS CASE BECAUSE MR. HAMMER IS IN TERRE HAUTE, INDIANA, IN A FEDERAL CORRECTIONAL INSTITUTION, LET ME KNOW THAT AT 3:30 EXACTLY THE AUTHORITIES TURNED OFF THE -- DISCONNECTED MR. HAMMER FROM THE COURTROOM. AND THE AGREEMENT WE HAD GOING IN WAS THAT ALL PROCEEDINGS WOULD END AT 3:30.

SO MR. HAMMER, WHAT WE ARE GOING TO DO IS, YOU MAY HAVE MISSED A FEW WORDS OF TESTIMONY AND WE WILL START JUST WHERE WE ENDED SO YOU HAVE THE BENEFIT OF SEEING ALL THE TESTIMONY IN COURT.  AND ALSO I WOULD ASK THE -- OUR ELECTRONIC SOUND AND VIDEO RECORDER TO LET ME KNOW WHEN IT IS 25 AFTER 3 SO WE CAN TERMINATE AT THAT POINT SO WE ALL HAVE THE BENEFIT OF ALL OF THE TESTIMONY.

AT THIS POINT, MY NOTES INDICATE THAT THE LAST TESTIMONY GIVEN BY MR. THOMPSON, FORMER AGENT WITH

THE FEDERAL BUREAU OF INVESTIGATION, WAS:  AT ABOUT 3:25 AM HE RESPONDED TO THE INSTITUTION.  TOOK HIM 20, 25 MINUTES TO GET THERE AND HE MET WITH LIEUTENANTS JURY, MARK TRAXLER AND LIEUTENANT FRANCISCO SANTOS.  AND THAT WAS THE LAST TESTIMONY.  MR. HAMMER, I DON'T KNOW IF YOU RECOLLECT THAT, BUT THAT IS THE LAST TESTIMONY THAT WAS GIVEN.

THE DEFENDANT:  YES, SIR, I HEARD PORTIONS OF THAT.

THE COURT:  ALL RIGHT.  WELL, THAT IS WHERE WE ENDED.

WE CAN BEGIN AT THAT POINT.

MR. TRAVIS, YES?

MR. TRAVIS:  YES.  YOUR HONOR, TWO THINGS I WANT TO BRING TO THE COURT'S ATTENTION.  ONE, I TALKED WITH MR. HAMMER THIS MORNING AND I BELIEVE THAT THE TERRE HAUTE END OF THE HOOKUP DOES NOT COME ON UNTIL 9:30.  I DON'T KNOW IF THE COURT WANTS TO ADJUST THAT, TRY TO GET IT EARLIER OR NOT.

NUMBER TWO, APPARENTLY THERE HAS BEEN A CHANGE FROM YESTERDAY TO TODAY CONCERNING THE RESTRAINTS THAT MR. HAMMER IS IN.  INSTEAD OF JUST HANDCUFFS, HE HAS GOT LEG IRONS AND BELLY CHAIN, THE FULL RESTRAINT. MY UNDERSTANDING IS IF THE COURT WOULD ENTER AN ORDER ORALLY IMPLEMENTING THE RESTRAINTS HE WAS UNDER

YESTERDAY, THAT THE INSTITUTION WILL HONOR THAT ORDER.

SO I WOULD ASK THE COURT TO ENTER AN ORDER THAT

MR. HAMMER'S BELLY CHAIN AND LEG IRONS BE REMOVED.

THE COURT:  DO YOU HAVE THE ABILITY TO

HAVE ONE TYPED UP AND I WILL SIGN IT.

MR. GURGANUS, ANY --

MR. GURGANUS:  WELL, YOUR HONOR, THE ONLY

THING WE DON'T KNOW IS WHY THEY CHANGED THAT.  THAT IS

THE ONLY QUESTION.  IT WAS BROUGHT TO OUR ATTENTION THIS

MORNING.  I DON'T KNOW IF THERE WAS SOME REASON THAT

THEY IMPLEMENTED THAT.  SO THAT IS THE ONLY PROBLEM WITH

IT IS THAT WE DON'T KNOW WHY.

THE COURT:  IS IT THE SAME --

MR. TRAVIS:  MR. EDWARDS APPARENTLY IS

RIGHT OUTSIDE THE DOOR.  HE CAN EXPLAIN IT.  MY

UNDERSTANDING IS THAT IT'S POLICY UNLESS THE COURT

ORDERS OTHERWISE.

THE COURT:  WAS MR. EDWARDS THE

CORRECTIONAL OFFICER THAT WE SAW YESTERDAY?

MR. TRAVIS:  YES.

THE COURT:  DO YOU WANT TO HAVE HIM COME

IN?

THE DEFENDANT:  YES, SIR, JUST ONE

MOMENT, PLEASE.  I TOLD HIM ABOUT THE POLICY.

MR. EDWARDS:  GOOD MORNING, YOUR HONOR.

THE COURT:  GOOD MORNING, MR. EDWARDS. IT'S BEEN BROUGHT TO MY ATTENTION AT LEAST THAT YESTERDAY MR. HAMMER DID NOT HAVE THE RESTRAINT AROUND HIS WAIST AND HIS LEGS.

MR. EDWARDS:  RIGHT.

THE COURT:  AND IF I WOULD ENTER SOME ORDER THAT THOSE CAN BE REMOVED AND HE CAN BE IN THE SAME SITUATION HE WAS IN YESTERDAY.

MR. EDWARDS:  YES, WE CAN DO IT RIGHT NOW, SIR.

THE COURT:  ALL RIGHT.  I'M GOING TO ENTER THAT ORDER.  IF YOU WANT TO RELEASE HIM NOW FROM THAT, THAT IS FINE BUT I WILL ENTER THAT ORDER AND SIGN IT.  IT WILL BE SUBMITTED TO ME BY COUNSEL.  ALL RIGHT?

THE DEFENDANT:  YOUR HONOR, I WANTED TO CORRECT ONE THING.  I DID NOT FULLY EXPLAIN IT TO MR. TRAVIS, BUT I'M NOT IN ANY LEG RESTRAINTS, JUST THE ONES AROUND MY WAIST.  I JUST WANTED TO CORRECT THAT.

THE COURT:  ALL RIGHT.  I APOLOGIZE FOR STATING SOMETHING THAT WAS NOT CORRECT.

MR. EDWARDS:  I WILL HAVE HIM STEP OVER TO THE SIDE DOOR.

THE COURT:  WE WILL WAIT.  WE WILL WAIT UNTIL IT IS ACHIEVED.

(PAUSE.)

MR. TRAVIS:  THANK YOU, YOUR HONOR.

THE COURT:  COUNSEL, STARTING AT 9:30 IS WHAT THE INSTITUTION IS ALLOWING?

MR. TRAVIS:  MY UNDERSTANDING IS IT AUTOMATICALLY OPENS, AUTOMATICALLY CLOSES AT 3:30 -- AUTOMATICALLY OPENS AT 9:30, FROM WHAT I HAVE BEEN TOLD.

THE COURT:  ALL RIGHT.  THEN WE WILL WORK FROM 9:30 TO 3:30 IN THAT CASE.

THE DEFENDANT:  THANK YOU.  YOUR HONOR, MR. EDWARDS JUST -- HE HEARD THE DISCUSSION BETWEEN YOU AND MR. TRAVIS.  HE JUST INFORMED ME THAT IT WOULD BE ALL RIGHT TO START AT 9 O'CLOCK IF THE COURT WANTED TO. WE WOULD JUST TO HAVE ADJUST IT THROUGH THE IT PEOPLE.

THE COURT:  ALL RIGHT.  WHY DON'T WE LEAVE IT AT 9:30 AND WE WILL SEE WHERE IT TAKES US.  ALL RIGHT?  OKAY.  BUT WE CAN ALWAYS MAKE A CHANGE.

IN ANY EVENT, DO YOU WANT TO CONTINUE WITH THE DIRECT EXAMINATION OF AGENT THOMPSON, FORMER AGENT THOMPSON?  OKAY.

MR. GURGANUS:  YES, YOUR HONOR.  THANK YOU.

CARLYLE RICK THOMPSON, HAVING BEEN PREVIOUSLY SWORN, TESTIFIED AS FOLLOWS:

CONTINUED DIRECT EXAMINATION

BY MR. GURGANUS:

Q.      AGENT, WHEN WE PICKED UP YESTERDAY, CORRECT ME IF I'M WRONG, BUT YOU MENTIONED THAT YOU HAD RECEIVED A PHONE CALL, IS THAT RIGHT?

A.      THAT IS CORRECT.

Q.      AND THAT SHORTLY AFTER RECEIVING THE PHONE CALL AFTER YOU GOT UP, YOU MADE YOUR WAY TO THE UNITED STATES PENITENTIARY AT CANAAN, CORRECT?

A.      CORRECTION.  ALLENWOOD.

Q.      I'M SORRY, ALLENWOOD.

        THE DATE OF THAT WAS APRIL 13TH, 1996, IS THAT CORRECT?

A.      THAT IS CORRECT.

Q.      I THINK WHEN WE LEFT OFF, I ASKED YOU WHO IT WAS THAT YOU MET WITH WHEN YOU ARRIVED AT THE INSTITUTION?

A.      YES.

Q.      CAN YOU REPEAT THEN FOR US WHO YOU MET WITH THAT DAY?

A.      I MET WITH LIEUTENANT RON JURY, SPECIAL INVESTIGATIVE AGENT AT THE INSTITUTION; LIEUTENANT FRANCISCO SANTOS, SPECIAL INVESTIGATIVE SUPERVISOR AT THE INSTITUTION; AND LIEUTENANT MARK TRAXLER, SPECIAL INVESTIGATIVE SUPERVISOR OF THE INSTITUTION.

Q.      AT THAT POINT DID THEY BRIEF YOU ON WHAT THE SITUATION WAS?

A.      THAT IS CORRECT.

Q.      FOLLOWING THAT BRIEFING, WHAT WAS THE NEXT STEP THAT YOU UNDERTOOK?

A.      I RECALL LOOKING AT THE CELL NUMBER 103 TWO-MAN CELL WHERE THE CRIME OCCURRED.  AFTER THAT WE REQUESTED THAT THEY BRING IN DAVID PAUL HAMMER SO THAT WE COULD CONDUCT AN INTERVIEW.

Q.      OKAY.

SO IT WAS YOUR INTENTION AT THAT POINT TO SPEAK TO MR. HAMMER?

A.      THAT'S CORRECT.

Q.      WHERE DID YOU GO TO DO THIS INTERVIEW?

A.      THE INTERVIEW WAS DONE IN AN INSTITUTION COUNSELOR INMATE INTERVIEW ROOM ON THAT FLOOR.

Q.      ON THAT SAME FLOOR?

A.      THAT'S CORRECT.

Q.      CAN YOU DESCRIBE THE LAYOUT OF THAT ROOM, SIR?

A.      IT'S A RELATIVELY SMALL ROOM.  WHEN WE HAD MR. HAMMER COME IN, THERE WAS FIVE INDIVIDUALS IN THAT ROOM.

Q.      INCLUDING MR. HAMMER?

A.      INCLUDING MR. HAMMER.  MR. HAMMER WAS SEATED.  I WAS SEATED.  LIEUTENANT TRAXLER WAS SEATED. LIEUTENANT -- CORRECTION.  YEAH, LIEUTENANT FRANCISCO SANTOS WAS STANDING AND DONN C. TROUTMAN, THE UNIT MANAGER, WAS SEATED.

Q.    SO YOU WERE ALL SEATED AROUND THE TABLE THEN?

A.    YES.

Q.    WHERE WAS MR. HAMMER IN RELATION TO YOU?

A.    DIRECTLY ACROSS THE TABLE FROM ME.

Q.    AND WHEN YOU SAT DOWN WITH MR. HAMMER, WHAT IS
THE FIRST THING YOU UNDERTOOK TO DO?

A.    THE FIRST THING, I IDENTIFIED THOSE PRESENT TO
HIM, MY NAME, MR. TROUTMAN, MR. SANTOS AND MR. TRAXLER.
AT THAT POINT I BEGAN TO ADVISE HIM OF HIS RIGHTS,
MIRANDA RIGHTS, WITH A FORM ENTITLED INTERROGATION AND
ADVICE OF RIGHTS, WAIVER OF RIGHTS, WHICH IS FD 395 OR
FEDERAL DOCUMENT 395.

Q.    NOW, WHILE YOU HAVE BEEN IN THE COURTROOM HERE,
HAVE YOU BEEN ABLE TO SEE THE SCREEN, THE VIDEO FEED
FROM TERRE HAUTE?

A.    YES.

Q.    DO YOU RECOGNIZE WHO THE PERSON IS ON THE OTHER
SIDE --

A.    YES.

Q.    -- OF THAT SCREEN OR IN THAT SCREEN?

A.    YES.

Q.    WHO IS THAT?

A.    THAT IS MR. HAMMER.

Q.    IS THAT THE PERSON THAT YOU MET WITH THEN ON
THAT MORNING OF APRIL 13TH, 1996?

A.      YES, IT IS.

Q.      NOW, YOU INDICATED THERE IS AN FD 30 -- IS IT FD --

A.      395.

Q.      395, ADVICE OF RIGHTS.

LET ME SHOW YOU A DOCUMENT AND ASK THAT IT BE BROUGHT UP ON THE SCREEN.

GOVERNMENT EXHIBIT 29.  I WOULD ASK THAT IT BE PUBLISHED.  CAN YOU SEE THAT ON YOUR SCREEN AT THIS POINT?

A.      I HAVE JUST A LITTLE THUMBNAIL.

Q.      OH, OKAY.

THE COURT:  IS THERE SOME WAY -- CAN WE HAVE IT ENLARGED?

MR. GURGANUS:  YOUR HONOR, IS YOUR SCREEN -- DOES THAT SHOW MR. HAMMER IN THE LOWER SCREEN?

THE COURT:  IT IS ENLARGED AND I SEE MR. HAMMER.

BY MR. GURGANUS:

Q.      AT THIS TIME I WOULD LIKE TO GO THROUGH THIS RIGHTS FORM WITH YOU.  BY THE WAY, WERE YOU -- IN ADDITION TO THIS DOCUMENT, DID YOU HAVE OTHER PAPER AVAILABLE TO YOU?

A.      YES.

Q.      AND WHAT WAS THE PURPOSE OF HAVING THE OTHER

PAPER THERE?

A.      TO WRITE DOWN A CHRONOLOGICAL SEQUENCE OF EVENTS AND TIME AND ULTIMATELY THE INTERVIEW OF MR. HAMMER.

Q.      WELL, AT THIS TIME, WE WILL STAY WITH THIS GOVERNMENT EXHIBIT 29.  CAN WE BLOW UP THE TOP THERE A LITTLE BIT, THE FIRST HALF OF IT.

DOES THIS DOCUMENT INDICATE WHAT TIME THAT YOU STARTED, SIR?

A.      YES.

Q.      AND YOU FILLED THAT OUT?

A.      THAT'S CORRECT.  THAT IS MY HANDWRITING.

Q.      AFTER YOU FILLED THE TOP OUT, WHAT DID YOU DO?

A.      I FILLED OUT THE TOP, USP, ALLENWOOD, PA.  THE DATE, 4/13/96.  TIME 6:18 A.M.  AND AT THAT POINT I READ TO MR. HAMMER THE TEXT OF THAT DOCUMENT.

Q.      WHY DON'T YOU GO AHEAD AND READ IT INTO THE RECORD.

A.      BEFORE WE ASK YOU ANY QUESTIONS, YOU MUST UNDERSTAND YOUR RIGHTS.  YOU HAVE THE RIGHT TO REMAIN SILENT.  ANYTHING YOU SAY CAN BE USED AGAINST YOU IN COURT.

YOU HAVE THE RIGHT TO TALK TO A LAWYER FOR ADVICE BEFORE WE ASK YOU ANY QUESTIONS AND TO HAVE A LAWYER WITH YOU DURING QUESTIONING.

IF YOU CANNOT AFFORD A LAWYER, ONE WILL

BE APPOINTED FOR YOU BEFORE ANY QUESTIONING, IF YOU WISH.

IF YOU --

Q.    DO YOU WANT TO STOP THERE FOR A MOMENT?

A.    YES.

Q.    CAN YOU NOW GIVE US THE BOTTOM PART OF THAT FORM, PLEASE?

(OFF THE RECORD DISCUSSION.)

BY MR. GURGANUS:

Q.    CONTINUE, SIR.

A.    IF YOU DECIDE TO ANSWER QUESTIONS --

Q.    START AT THE TOP.  IF YOU CAN NOT AFFORD A LAWYER.

A.    IF YOU CANNOT AFFORD A LAWYER, ONE WILL BE APPOINTED FOR YOU BEFORE ANY QUESTIONING, IF YOU WISH.

IF YOU DECIDE TO ANSWER QUESTIONS NOW WITHOUT A LAWYER PRESENT, YOU WILL STILL HAVE THE RIGHT TO STOP ANSWERING AT ANY TIME.  YOU ALSO HAVE THE RIGHT TO STOP ANSWERING AT ANY TIME UNTIL YOU TALK TO A LAWYER.

WAIVER OF RIGHTS.  I HAVE READ THIS STATEMENT OF MY RIGHTS AND I UNDERSTAND WHAT MY RIGHTS ARE.  I AM WILLING TO MAKE A STATEMENT AND ANSWER QUESTIONS.  I DO NOT WANT A LAWYER AT THIS TIME.  I UNDERSTAND AND KNOW WHAT I AM DOING.  NO PROMISES OR

THREATS HAVE BEEN MADE TO ME AND NO PRESSURE OR COERCION OF ANY KIND HAS BEEN USED AGAINST ME.

Q.      DID YOU READ THE ENTIRE FORM THEN?

A.      YES, I DID.

Q.      WAS IT YOUR PRACTICE ALSO THROUGH YOUR CAREER TO READ THE ENTIRE FORM?

A.      YES, IT IS.

Q.      AFTER YOU READ THAT FORM TO HIM, WHAT WAS THE NEXT STEP YOU UNDERTOOK?

A.      I ASKED MR. HAMMER IF HE UNDERSTOOD HIS RIGHTS. HE ACKNOWLEDGED TO ME THAT HE DID BY SAYING YES.  AND THEN I ATTEMPTED TO PROVIDE HIM WITH THE FORM FOR HIM TO READ AND ULTIMATELY SIGN, IF SO DESIRED.

Q.      WHAT HAPPENED WHEN YOU DID THAT?

A.      MR. HAMMER ADVISED ME THAT HE UNDERSTOOD HIS RIGHTS AND SAID -- REFUSED TO READ THE FORM, STATING I WILL TALK TO YOU, BUT I WILL NOT SIGN THE FORM.

Q.      CAN YOU DESCRIBE HIS DEMEANOR AT THAT POINT IN TIME?

A.      AT THAT TIME AND DURING THE INITIAL FEW MINUTES OF THE INTERVIEW, HE WAS AGITATED, RATHER EXCITED.

Q.      BUT DID YOU -- SO HE DID NOT WANT TO SIGN THE FORM?

A.      THAT'S CORRECT.

Q.      SO THEN WHAT DID YOU DO?

A.      I WITNESSED THE FORM, CARLYLE R. THOMPSON, SPECIAL AGENT FBI, WILLIAMSPORT, PENNSYLVANIA, THE DATE, 4/13/96.  HAD IT WITNESSED ALSO BY FRANCISCO SANTOS, SPECIAL INVESTIGATIVE SUPERVISOR, USP ALLENWOOD, PA, 4/13/96 AND DONN C. TROUTMAN, UNIT MANAGER, 1/2 USP ALLENWOOD, PA, 4-13-96 AND THEN THE TIME, 6:24 A.M.

Q.      THIS PERIOD OF TIME FROM THE START WAS 6:18 A.M. AND THE TIME THAT YOU THEN ENTERED WAS 6:24 A.M.?

A.      THAT'S CORRECT.

Q.      AND IF YOU CAN BRING UP THAT -- YOU ALSO WROTE SOMETHING ON THE BOTTOM, IS THAT RIGHT?

A.      THAT'S RIGHT.

Q.      WE'LL HIGHLIGHT THAT FOR YOU.  IS THIS IN YOUR WRITING, SIR?

A.      THAT IS -- YES, THAT IS MY WRITING.  IT SAYS DAVID PAUL HAMMER, REG, FOR REGISTRATION NUMBER, 24507-077, ACKNOWLEDGED BY SAYING, QUOTE, YES, END OF QUOTE, WHEN QUESTIONED AFTER READING THE ABOVE FORM TO HIM BY SA THOMPSON, IF HE, HAMMER, UNDERSTOOD HIS RIGHTS.  HAMMER REFUSED TO READ THE FORM STATING, QUOTE: I WILL TALK TO YOU, BUT I WON'T SIGN THE FORM, END OF QUOTE, PERIOD.

Q.      SO AFTER THAT YOU WERE IN A POSITION THEN AND THAT FORM WAS FULLY SIGNED AND YOU INDICATED THE TIME IT WAS ALL DONE, RIGHT?

A.    THAT'S CORRECT.

Q.    WHAT HAPPENED NEXT, SIR?

A.    NEXT IT WAS PRETTY MUCH -- WE STARTED THE INTERVIEW.  THAT WAS ONE MINUTE LATER AT 6.25 A.M.

Q.    WERE YOU -- WHAT WAS THE INITIAL PHASE OF THAT INTERVIEW?

A.    THE INITIAL PHASE WAS MR. HAMMER ASKED ME A QUESTION AND IT WAS TO THE EFFECT HE WANTED TO KNOW IF MR. MARTI WAS STILL ALIVE.  AND I TOLD HIM THAT HE IS NO LONGER WITH US.

Q.    AND AFTER THAT, WERE YOU -- DID YOU HAVE A FORM THAT YOU WERE KEEPING TRACK OF WHAT WAS GOING ON?

A.    I MAINTAIN MY ORIGINAL INTERVIEW NOTES, WHICH COINCIDED WITH THE TIME OF EVENTS THAT OCCURRED DURING THE INTERVIEW, AS WELL AS DOCUMENTING WHAT -- ANY QUESTIONS BROUGHT FORWARD TO MR. HAMMER OR RESPONSES PROVIDED BY MR. HAMMER DURING THE INTERVIEW.

Q.    DO YOU HAVE YOUR ORIGINAL INTERVIEW NOTES IN FRONT OF YOU?

A.    YES, I DO.

Q.    IS THAT MARKED AS A GOVERNMENT EXHIBIT?

A.    YES, IT IS.

Q.    WHAT IS THAT GOVERNMENT EXHIBIT, SIR?

A.    GOVERNMENT EXHIBIT 1002.

Q.    CAN WE BRING THAT UP PLEASE ON THE SCREEN?  CAN

WE HIGHLIGHT, PLEASE, THE TOP PORTION.

NOW, SIR, AS YOU DO AN INTERVIEW, RIGHT, AND SPECIFICALLY WITH RESPECT TO THIS INTERVIEW, WHAT WAS THE -- HOW DID YOU DO YOUR QUESTIONING AND HOW DID YOU RECORD THE ANSWERS?

A.    THE QUESTIONING WAS -- ANY RESPONSES OR QUESTIONS WERE DOCUMENTED AND PLACED IN THE INTERVIEW NOTES.

Q.    WERE YOU ABLE TO PUT DOWN ALL YOUR QUESTIONS OR WERE YOU JUST NOTATING AS YOU WERE GETTING THE ANSWERS?

A.    PRETTY MUCH NOTATING AS HE ANSWERED.  IF IT WAS A SPECIFIC QUESTION THAT I BROUGHT FORWARD, I WOULD NOTATE IT OR I THINK IN RESPONSE HERE, MR. TROUTMAN ASKED MR. HAMMER A SPECIFIC QUESTION DURING THE COURSE OF THE INTERVIEW AND I PUT THAT DOWN, THAT TROUTMAN QUESTIONED MR. HAMMER.

Q.    YOU ARE TRYING TO RECORD THEN ON THIS DOCUMENT A FAIRLY -- A COMPLETELY ACCURATE RECITATION OF WHAT WAS SAID.  IS THAT FAIR TO SAY?

A.    EXACTLY.

Q.    WELL -- AT THE TOP THERE YOU ARE JUST GOING THROUGH THE TIME FRAME, THE TIME FRAMES, IS THAT RIGHT?

A.    THAT IS CORRECT.

Q.    WE WILL TRY TO MOVE THIS ALONG A LITTLE BIT. AND AT 6:16 A.M. YOU ARE TALKING ABOUT -- YOU NOTE WHEN

HE WAS BROUGHT IN THE ROOM, IS THAT RIGHT?

A.      THAT IS CORRECT.

Q.      6:18 ABOUT THE RIGHTS BEING READ, TRUE?

A.      THAT'S CORRECT.

Q.      6:19 A.M., INDICATING THAT HE WAS AWARE OF HIS RIGHTS IN STATING, QUOTE:  I WILL TALK TO YOU BUT I WON'T SIGN THE FORM?

A.      THAT'S CORRECT.

Q.      YOU NOTED WHEN THE FORM WAS WITNESSED AND RETAINED, IS THAT RIGHT?

A.      THAT IS CORRECT.

Q.      AND YOU ALSO NOTED WHEN THE INTERVIEW BEGAN?

A.      THAT'S CORRECT.

Q.      SO FOR OUR PURPOSES I THINK IT MIGHT BE BEST IF YOU -- CAN YOU JUST THEN GO THROUGH THE INTERVIEW THAT YOU HAD WITH HIM AND WHAT YOU RECORDED AND WHAT WAS SAID.  ALL RIGHT?

A.      6.25 A.M., INTERVIEW BEGAN.  TOLD HIM THAT MARTI IS NO LONGER WITH US, THAT IT WAS A DIRECT QUESTION FROM MR. HAMMER.  AND I RESPONDED THAT MARTI IS NO LONGER WITH US.  AND THEN MR. HAMMER SAID, QUOTE:  WHAT DO YOU WANT TO START AT?  END OF QUOTE.

HE THEN INFORMED ME OR THOSE IN THE INTERVIEW, HAMMER AND MARTI CELL TOGETHER IN A TWO-MAN CELL, 103 SHU, FOR SPECIAL HOUSING UNIT, SINCE 4/9 OR

APRIL 9TH, 1996.

APPROXIMATELY 1 A.M. APRIL 13TH, OFFICERS CAME THROUGH ON COUNT, MARTI WENT UP ON THE BUNK, ACTED LIKE HE WAS ASLEEP.  AFTER COUNT, MARTI GOT A SHOWER.  MR. HAMMER WAS TALKING A VERY EXCITED, FAST -- RATHER FAST, AND I WAS UNABLE TO RECORD HIS STATEMENTS SINCE IT WAS -- I'M RECORDING AS BEST AS POSSIBLE.  SO I ASKED HIM TO STOP AND TALK SLOWER SO THAT I CAN RECORD EVERYTHING.

Q.    RIGHT.

A.    AND START AT THE BEGINNING, WHICH HE DID.  HE COMPLIED.

Q.    DID YOU THEN START KIND OF FROM THE BEGINNING?

A.    YES, HE DID.  MR. HAMMER --

Q.    GO AHEAD.

A.    MR. HAMMER STARTED.  HE SAID MARTI CAME INTO MY CELL, SHU 103, ON TUESDAY OF THIS WEEK.

MARTI CAME IN AT HIS WRITTEN AND VERBAL REQUEST TO BE MY CELLIE.  TOLD INMATE CLASSEN WHO CALLED -- WHO CELLED WITH ME AT THE TIME THAT I WAS GOING TO HAVE MARTI MOVE IN MY CELL SO THAT I COULD KILL HIM.

Q.    ALL RIGHT.  LET ME STOP YOU THERE.

A.    YES.

Q.    DID YOU THEN GIVE THE CELL THAT HE WAS IN?

A.    HE INDICATED THAT CLASSEN WAS IN ADMINISTRATIVE DETENTION CELL NUMBER 215.

Q.    EXPLAIN THAT TO ME.  HE IS TELLING YOU WHAT?

A.    AT THE TIME, BEFORE MARTI MOVED INTO THIS CELL -- SPECIAL HOUSING UNIT 103, STEVEN CLASSEN, INMATE, WAS CELLED WITH MR. HAMMER IN THAT CELL.

HE IS TELLING ME THAT HE TOLD INMATE CLASSEN THAT HE WAS GOING TO HAVE MARTI MOVE INTO THE CELL WITH HIM.  AND THEN --

Q.    FOR WHAT PURPOSE DID HE TELL YOU HE WAS GOING TO HAVE HIM MOVE INTO THE CELL WITH HIM?

A.    SO THAT HE COULD KILL HIM.

Q.    YOU RECORDED THAT?

A.    YES, I DID.

Q.    DID HE INDICATE WHETHER HE HAD SAID THAT TO SOMEONE ELSE?

A.    YES, HE DID.

Q.    DID YOU RECORD THAT?

A.    YES, I DID.

Q.    HOW DID YOU RECORD IT?

A.    IN THE INTERVIEW NOTES.

Q.    CAN YOU READ SPECIFICALLY WHAT YOU WROTE?

A.    I, REFERRING TO MR. HAMMER, ALSO TOLD LEONARD YAGER, INMATE ORDERLY FOR THE PAST MONTH, THAT I WAS GOING TO KILL MARTI.

Q.      THAT WAS, IN OTHER WORDS, ANOTHER PERSON THAT HAMMER WAS TELLING YOU THAT HE HAD INFORMED IN ADVANCE? IS THAT HOW YOU UNDERSTOOD THAT?

A.      YES.

Q.      IN ADVANCE THAT HE WAS GOING TO KILL ANDREW MARTI?  CORRECT?

A.      THAT IS CORRECT?

Q.      WHAT ELSE DID HE TELL YOU DURING THAT INTERVIEW?

A.      HE ALSO TOLD ME THAT TWO WEEKS AGO HE INFORMED OFFICER BOONE THAT I WANTED MARTI AS A CELLMATE.

Q.      SO WHEN YOU WROTE THAT -- WHEN YOU SAY THE "I," THAT IS HAMMER WANTED MARTI --

A.      I, HAMMER, YES.

Q.      -- AS A CELLMATE, RIGHT?

A.      CORRECT.

        IF HE COULD ARRANGE -- HE, BEING BOONE, COULD ARRANGE IT, I WOULD DO SOMETHING TO MARTI.  AND ACCORDING TO MR. HAMMER, CORRECTIONAL OFFICER BOONE SAID, QUOTE, I HEAR NOTHING, END OF QUOTE.

Q.      DID HE CONTINUE WITH THE INTERVIEW OR DID YOU CONTINUE WITH THE INTERVIEW?

A.      YES.

Q.      ALL RIGHT.  CONTINUE WITH WHAT THE NEXT PART OF THE INTERVIEW WAS.

A.      MR. HAMMER INDICATED THAT LAST WEEK I ASKED

BOONE, REFERRING TO OFFICER BOONE, HOW LONG MARTI HAD IN DISCIPLINARY SEG.  BOONE SAID NOT MUCH.

Q.    WHAT DO YOU MEAN BY THAT NOW?  EXPLAIN HOW YOU UNDERSTOOD THAT AT THE TIME.

A.    WELL, APPARENTLY, THAT MR. MARTI WAS IN DISCIPLINARY SEG FOR POSSIBLY A VIOLATION OF INSTITUTION POLICIES AND WAS TO BE RELEASED SHORTLY.

Q.    SHORTLY FROM THE DISCIPLINARY SEG?

A.    THAT'S CORRECT.

Q.    HE -- AS I UNDERSTAND IT, HE IS TELLING YOU HE ASKED BOONE ABOUT THAT, RIGHT?

A.    YES.

Q.    AND THAT HE ASKED HOW MUCH MORE TIME MARTI HAS IN DISCIPLINARY SEG?

A.    THAT'S CORRECT.

Q.    AND BOONE -- HE SAID TO YOU THAT BOONE RESPONDED TO HIM WHAT?

A.    BOONE RESPONDED -- INDICATED THAT -- SAID, NOT MUCH OR NOT -- REFERRING TO NOT MUCH MORE TIME.

Q.    THAT MARTI HAD IN DISCIPLINARY SEG?

A.    THAT'S CORRECT.

Q.    CONTINUE.

A.    I, MR. MARTI, TOLD HIM THAT I WANT --

Q.    MR. HAMMER, YOU MEAN, RIGHT?

A.    OH, I'M SORRY, MR. HAMMER, YEAH.  I'M SORRY.

MR. HAMMER TOLD HIM THAT I WANT HIM MOVED IN WITH ME SO I CAN FUCK HIM UP.

Q.    ALL RIGHT.

AT THAT POINT -- THAT WAS THE FIRST PAGE OF THE NOTES, IS THAT RIGHT?

A.    THAT'S CORRECT.

Q.    YOU MOVED TO THE NEXT PAGE OF YOUR NOTES TO RECORD THE INTERVIEW?  ARE THEY OUT OF ORDER?  DO YOU HAVE A PAGE THERE THAT SAYS BOONE?  LET ME GIVE YOU ANOTHER ONE.

A.    MR. HAMMER INDICATED BOONE SAID:  DO A GOOD JOB SO THAT HE CAN GET TO THE OUTSIDE HOSPITAL SO THAT BOONE CAN GET SOME OVERTIME.

Q.    ALL RIGHT.

A.    AND CONTINUE, MR. HAMMER SAID THAT BOONE PROBABLY THOUGHT THAT I WAS JOKING.

Q.    OKAY.  SO HAMMER IS TELLING YOU HE IS SAYING THESE THINGS TO OFFICER BOONE AND OFFICER BOONE'S INTERPRETING IT AS JUST A JOKE?

A.    YES.

Q.    ALL RIGHT.

CONTINUE.

A.    MR. HAMMER CONTINUED:  MARTI WANTED TO MOVE IN WITH ME.  HE HAS HAD PROBLEMS IN HERE, CALLED HIM NAMES. INFORMANT CONTRACT OUT ON HIM, WORKING WITH THE SIS.

THIS HERE IS THAT HE --

Q.      WHY DON'T YOU FINISH THAT PARAGRAPH.

A.      OKAY.  ALL RIGHT.

        THAT HAD NOTHING TO DO OR MOTIVATED ME FOR WHAT I DID.

Q.      NOW EXPLAIN TO ME WHAT THAT IS, WHAT HE WAS -- HOW YOU INTERPRETED THAT?

A.      HE HAS HAD PROBLEMS IN HERE, REFERRING THAT HE HAD PROBLEMS WITH THE INMATE POPULATION.  THEY SAW HIM AS BEING AN INFORMANT OR A SNITCH AND WORKING FOR THE SIS OR THE SPECIAL INVESTIGATIVE SUPERVISOR.

Q.      AND THAT IS MARTI THAT HE IS REFERRING TO?

A.      HE IS REFERRING TO MARTI AND THAT HE INDICATED THAT THERE WAS A CONTRACT OUT ON HIM.

Q.      AND THEN THIS -- YOUR NOTE SAYING THAT HAD NOTHING TO DO OR MOTIVATED ME FOR WHAT I DID?

A.      THAT'S CORRECT.

Q.      WHAT DID THAT -- HOW WERE YOU INTERPRETING THAT?

A.      I INTERPRETED THAT THAT MR. HAMMER IS INDICATING THAT THE FACT THAT THERE IS A CONTRACT OUT ON MR. MARTI, THAT HE WAS VIEWED AS AN INFORMANT OR A SNITCH, THAT THAT WAS NOT THE MOTIVATION OR THE REASON THAT HE DID OR HE ULTIMATELY KILLED MARTI.

Q.      SO THE -- FOR WHAT I DID, MEANS THE KILLING OF MARTI?

A.    THAT'S CORRECT.

Q.    DID MR. HAMMER INDICATE WHEN THE MOVE HAD BEEN ACCOMPLISHED BY MR. MARTI?

A.    YES, HE DID.

Q.    WHAT DID YOU WRITE IN YOUR NOTES ABOUT THAT?

A.    HAMMER CONTINUED THAT MARTI MOVED IN WITH ME ON TUESDAY, 4/9, THAT WOULD BE APRIL 9TH, 1996, CELL NUMBER 103.  AFTER MOVING IN, MARTI CONTINUED TALKING ABOUT HOW BAD HE WAS, HE, BEING MARTI.  THE FACT THAT HE SHOT FIVE TIMES A MEMBER OF THE NORTH A GANG OUT OF STOCKTON, CALIFORNIA.

Q.    OKAY.  SO HE WAS GIVING SOME OF WHAT MARTI WAS TELLING HIM.  IS THAT HOW YOU UNDERSTOOD THAT?

A.    THAT'S CORRECT.

Q.    DID HE CONTINUE?

A.    YES, HE DID.

Q.    WHAT DID HE TELL YOU?

A.    MR. HAMMER CONTINUED THAT APPROXIMATELY 1 A.M. OR 1:30 A.M. ON THURSDAY MORNING, APRIL 11TH, 1996 --

Q.    THAT BEING TWO DAYS BEFORE YOU ARE THERE IN THE MORNING?

A.    THAT'S CORRECT.

Q.    OKAY.  APRIL 11, 1996.  WHAT DID HE SAY?

A.    I, REFER TO MR. HAMMER, STARTED TALKING TO HIM BEING, HIM BEING MARTI, KNEW I HAD TAKEN HOSTAGES BEFORE

AND OKLAHOMA FOUND ONE OF MY CELLMATES HANGING.

Q.      NOW WHAT WERE YOU CAPTURING THERE AS PART OF YOUR DISCUSSION?

A.      THE FACT THAT MR. HAMMER WAS INFORMING MARTI OF HIS PRIOR CRIMINAL ACTIVITIES OF TAKING HOSTAGES AND THE FACT THAT HIS CELLMATE IN ONE OF THE OKLAHOMA PENAL INSTITUTIONS WAS FOUND HANGING IN THE CELL.

Q.      DID THE INTERVIEW THEN CONTINUE WITH REFERENCES TO INSTITUTION --

A.      HE CONTINUED -- HE INFORMED ME, MR. HAMMER SAID THAT MARTI WANTED TO KNOW HOW TO GET TO THE USP ATLANTA, BEING THE U.S. PENITENTIARY ATLANTA, GEORGIA. MR. HAMMER TOLD HIM THAT I, HAMMER, COULD TAKE HIM HOSTAGE, HURT HIM A LITTLE BIT, THAT HE MIGHT HAVE A CHANCE TO GO.  GO, BEING TO THE U.S. PENITENTIARY, ATLANTA.

Q.      OKAY.

A.      MR. HAMMER THEN INFORMED THAT I, HAMMER, SWEETENED THE OFFER BY TELLING HIM -- GIVE HIM, MARTI, $500, CONSISTING OF COMMISSARY OF $200 TO HIS COMMISSARY ACCOUNT, NUMBER 58008-065, AND $300 THROUGH ANOTHER SOURCE.

Q.      WHAT WAS THAT?  WHAT DID HE MEAN BY THIS SWEETENING THE DEAL IN THAT?  HOW WERE YOU INTERPRETING WHAT HE WAS TELLING YOU AS YOU WERE TAKING THESE NOTES?

A.      APPARENTLY WHAT IT IS, IS MR. HAMMER IS SWEETENING THE DEAL TO GET MR. MARTI TO ACCEPT THE HOSTAGE SCENARIO AND THAT, YOU KNOW, HE THREW THIS IN AS AN INCENTIVE OR A REASON FOR HIM TO AGREE TO THE WHOLE HOSTAGE DEAL.

Q.      AND HE MENTIONED THAT THERE WOULD BE $300 THAT WOULD BE ALSO COMING FROM ANOTHER SOURCE, RIGHT?

A.      THAT'S CORRECT.  I GOT THE IMPRESSION THAT THE OTHER SOURCE WOULD BE FROM SOMEBODY ON THE --

MR. MCHUGH:  YOUR HONOR, I'M GOING TO OBJECT TO THE IMPRESSIONS THAT HE HAS GOTTEN.  I MEAN, HE CAN REPEAT THE WORDS HE HAS, BUT HE HAD NEVER MET MR. HAMMER BEFORE HE WAS THERE TO DO THIS INTERVIEW. AND I THINK HE NEEDS TO JUST TELL US WHAT MR. HAMMER SAID.

THE COURT:  ALL RIGHT.  WHY DON'T YOU TELL US WHAT HE SAID.  I WILL SUSTAIN THE OBJECTION. WHY DON'T YOU JUST READ THE LETTER.  LET'S HAVE HIM JUST READ THE LETTER.

MR. GURGANUS:  IT'S NOT A LETTER, JUDGE.

THE COURT:  I MEAN THE NOTES.

MR. GURGANUS:  OKAY.

THE COURT:  JUST READ THE NOTES.

MOST OF IT IS PRETTY SELF-EXPLANATORY.

THE WITNESS:  HAMMER DECLINED TO IDENTIFY

AS TO WHO THE UNIDENTIFIED SOURCE IS.

AT THIS POINT MR. TROUTMAN SAID, ASKED IF YESTERDAY THAT IF HAMMER WAS TOLD THAT HE WAS DESIGNATED, WOULD THIS -- WOULD THIS HAVE HAPPENED? HAMMER RESPONDED, QUOTE, YES, END OF QUOTE.

BY MR. GURGANUS:

Q.      SO REGARDLESS OF WHETHER THE DESIGNATION HAD BEEN MADE, THIS HAD HAPPENED, WHAT DO YOU MEAN BY THIS HAD HAPPENED?

MR. MCHUGH:  OBJECTION.

THE COURT:  I THINK IT'S CLEAR WHAT HE MEANS.

MR. GURGANUS:  OKAY.

AS LONG AS THE COURT --

THE COURT:  I CAN FOLLOW IT.

MR. GURGANUS:  IF THE COURT -- THEN, YOUR HONOR, IF THE COURT WOULD HAVE ANY QUESTION ABOUT SOMETHING LIKE THIS, THEN WE WOULD HAVE NO OBJECTION.

THE COURT:  I WILL ASK QUESTIONS.  IT IS PRETTY SELF-EXPLANATORY WHAT IS GOING ON HERE.

MR. MCHUGH:  VERY WELL.

THE COURT:  I INTERPRETED THE LAST PART TO MEAN THAT IF, YOU KNOW, EVEN IF HE DIDN'T ACCEPT THIS SCENARIO, THE SAME THING WOULD HAVE HAPPENED.  SO....

MR. GURGANUS:  OKAY.

THE COURT:  UNLESS I'M WRONG IN MY
INTERPRETATION.

MR. GURGANUS:  WELL, IF THERE HAD BEEN A
DESIGNATION, IT STILL WOULD HAVE HAPPENED.

THE COURT:  RIGHT.

BY MR. GURGANUS:

Q.     CONTINUE THEN.

A.     MR. HAMMER CONTINUED, TOLD MARTI IT WOULD BE
SOON - RE HOSTAGE - QUOTE:  WANTED TO SHOW
PREMEDITATION, WANTED TO SHOW THAT I PLANNED -- I, BEING
HAMMER, PLANNED WHAT I HAD DONE SO THERE WOULD BE NO
DOUBT, END OF QUOTE.

I TOLD MARTI TO THINK ABOUT IT AND THEN
HE SAID, QUOTE:  WHAT DID I HAVE TO LOSE?  END OF QUOTE.

Q.     WHAT DID WHO HAVE TO LOSE?

A.     MR. HAMMER.

ON THURSDAY EVENING APRIL 11TH, MARTI
TOLD ME HE WOULD GO AHEAD WITH THE HOSTAGE SCENARIO.
ALSO THURSDAY EVENING I, MR. HAMMER, WROTE A LETTER ON
MARTI'S BEHALF TO MARTIN GUERRERO, VIA P.O. BOX 234 IN
THREE RIVERS, MICHIGAN.  HAD DOUBTS AT THE TIME IN MY
OWN MIND IF I WAS GOING THROUGH WITH WHAT PLANNED.  TOLD
GUERRERO I KNEW MARTI FOR SOME TIME, DIDN'T BELIEVE
RUMORS.  GIVE MARTI A CHANCE TO SPREAD WORD AND DO IT AS
A PERSONAL FAVOR FOR ME.  STARTED TALKING WITH MARTI

AFTER AGREEMENT, TIMES AND SCENARIOS.  I HAD A GENERAL IDEA BUT NO SPECIFICS.

SAID, QUOTE:  I WOULD LIKE TO SEE A PSYCHOLOGIST WHEN THIS IS ALL OVER, END OF QUOTE.

MR. TROUTMAN RESPOND -- TOLD HIM THAT THE CHAPLAIN WAS HERE, TOO.  HAMMER SAID, QUOTE:  I WOULD LIKE TO SEE HIM, TOO, END OF QUOTE.

Q.    IS THAT JUST SEPARATE FROM THE STORY?  HE IS INDICATING HE WANTS TO?

A.    YES, THAT'S CORRECT.

Q.    CONTINUE.

A.    AT TIME I DIDN'T THINK OR KNOW IF I WAS GOING TO KILL HIM.  JUST TAKE HIM HOSTAGE, MAKE AN ASS OUT OF MYSELF TO GET ATTENTION.  FRIDAY AFTERNOON AFTER TEAM MEETING MARTI AND I STARTED TO DISCUSS HOW TO DO IT.  I STARTED TO BRAID TORN-UP SHEETS.  MARTI WANTED ME TO CUT HIM ON HIS NECK TO MAKE IT LOOK GOOD.

Q.    OKAY.  ARE YOUR NOTES OUT OF ORDER?

A.    YES.  SHOULD BE WHEN IT GOT TIME.

Q.    GO TO THE NEXT PAGE, PLEASE.

A.    WHEN IT GOT TIME TO DO IT, I TOLD HIM, MARTI, QUOTE: IT'S TIME, END OF QUOTE.  MARTI WANTED ME TO USE A RAZOR BLADE STILL IN CELL TO CUT HIS NECK.

AT APPROXIMATELY 1, 1:30 A.M. CO'S, FOR CORRECTIONAL OFFICERS, DID COUNT.  WE LAID IN OUR BUNKS,

MARTI IN THE TOP.  AFTER COUNT MARTI TOOK A SHOWER.  AT 2 O'CLOCK A.M. EXACTLY, RADIO STATION AT LYCOMING COLLEGE, DISC JOCKEY JEREMY RUNS ON AIR FROM 12 MID TO 2 A.M., WENT OFF THE AIR.  HAMMER STARTED TO TIE HIM UP. HE WAS ON MY BUNK AFTER HE TOOK A SHOWER.  TIED HIS LEFT LEG AROUND ANKLE OR SECURED IT TO RESTRAINT RING NEAR HIS COMMODE.  ALL ALONG MARTI IS LYING FACE DOWN ON HIS FRONT, BODY ON THE BED -- ON BED.  THEN DID HIS RIGHT LEG AND THEN HE PAUSES.  AND HE SAYS HE WAS CONFUSED. COMPOSED HIS THOUGHTS, AND THEN HE STARTED AGAIN.

MR. HAMMER SAID, FIRST, I TIED HIS RIGHT LEG TO ONE OUTSIDE, REFERRING TO THE RESTRAINING RING ON THE BED, THEN HIS LEFT LEG NEAREST THE WALL, REFERRING TO THE LEFT RESTRAINING RING.  HAMMER THEN TIED HIS LEFT ARM, THE ONE AGAINST THE WALL, TO THE RESTRAINING RING. I TIED THE ROPE RESTRAINT THROUGH THE BED RESTRAINT, THEN ONE END AROUND THE LEFT WRIST, LOOPED AROUND THE WRIST AGAIN, PULLED TIGHT AND TIED RESTRAINT AGAIN.  I THEN DID HIS RIGHT WRIST IN THE SAME FASHION.  AFTER TYING MARTI HAMMER GOT UP TO MARTI -- GOT UP TO MARTI TO PULL AGAINST THE RESTRAINTS TO MAKE SURE THEY WERE SECURE.

AND THEN HE SAID:  IT GOT TO LOOK REAL. MARTI COMPLIED.  HAMMER THEN LIT A CIGARETTE, ONE OF MY CAMELS, GAVE MARTI A COUPLE OF DRAGS ON THE CIGARETTE,

THEN STUFFED A SOCK IN HIS MOUTH AND USED A STRIP OF

SHEET TO SECURE IT.  TOLD HIM TO BITE DOWN ON IT AND --

Q.      CAN YOU GO TO THE PRECEDING PAGE.  YOU ALSO DID A 302 THAT FOLLOWED YOUR NOTES, IS THAT RIGHT?

A.      THAT'S CORRECT.

Q.      AND THAT IS GOVERNMENT EXHIBIT 1001.1.

A.      YES, IT IS.

THE COURT:  FOR THE RECORD, WHAT IS A 302?

BY MR. GURGANUS:

Q.      CAN YOU TELL US WHAT AN FD 302 IS, SIR?

A.      FEDERAL DOCUMENT 302.

THE COURT:  WHAT IS IT?

THE WITNESS:  IT'S --

THE COURT:  IS IT A REPORT OF INTERVIEW?

THE WITNESS:  IT'S A REPORT OF INTERVIEW, THAT'S CORRECT.

BY MR. GURGANUS:

Q.      IF WE CAN GO TO THE PAGE, ALLOWED TO GO TO THE BATHROOM.  GO TO THE NOTES, 1002.  HAMMER TIED IT AROUND HIS HEAD.

DO YOU KNOW WHERE YOU ARE AT NOW?

A.      YES, I DO.

Q.      CAN YOU PICK UP WHERE YOU WERE THEN?  YOU WERE TALKING ABOUT TRYING TO BREAK FREE, AN INDICATION OF

SOMEONE TRYING TO BREAK FREE, IS THAT RIGHT?

A.      THAT'S BEGINNING OF -- YEAH, PAGE 5 OF THE 302.

Q.      OKAY.  CONTINUE WITH YOUR INTERVIEW NOTES.
START WITH HAMMER TIED AROUND HIS HEAD, THAT PAGE.

A.      OKAY.  HAMMER TIED IT AROUND HIS HEAD.  MARTI
COULD STILL TALK BECAUSE IT WASN'T TIGHT.  THIS WAS
EXACTLY 2:17 A.M.  LOOKED AT THE CLOCK RADIO IN THE
WINDOW.

7:30 A.M., MR. HAMMER ALLOWED TO GO TO
THE BATHROOM.

Q.      SO THE INTERVIEW TOOK A BREAK?

A.      TOOK A BREAK.

7:33 A.M. INTERVIEW CONTINUED.  CAMEL
CIGARETTE CAME FROM A PACK IN THE CELL.  MARTI WAS
TWITCHING AND JUMPING AND MR. HAMMER INDICATED HE ASKED
HIM WHAT WAS WRONG.  MARTI TOLD ME HE WAS HAVING
FLASHBACKS TO WHEN HE GOT SHOT.  MARTI HAD BEEN SHOT IN
BACK OF HIS HEAD AND HE WAS WHIMPERING.  I SAID OH,
YEAH, AND STRADDLED HIS BACK FACING BACK OF HIS HEAD,
STARTED STRANGLING -- RAISED HEAD UP IN LEFT ARM IN
CROOK OF ELBOW, USED RIGHT ARM UNDER LEFT, PULLING HIS
HEAD BACKWARD.  HE STARTED STRUGGLING -- STRUGGLED,
MOVING HEAD.  I RELEASED PRESSURE TO GET A BETTER GRIP.
HE SAID, QUOTE: NO, PLEASE, NO, END OF QUOTE.  I
REGAINED A BETTER CHOKE HOLD IN THE SAME POSITION.

MARTI JERKED IN THE RESTRAINTS, GRABBING AT ME EVEN THOUGH RESTRAINED.  THE HOLD I HAD HIM IN WAS A SLEEPER HOLD, SECOND TIME WAS FOR OVER THREE MINUTES.  MARTI REALLY VIOLENT, JERKING AND GRABBING.  MARTI HANDS WERE TIED IN THE RESTRAINT RINGS ON THE SIDES OF THE BED. MARTI'S BODY THEN RELAXED.  HE EXPELLED GAS.  CONTINUED IN THE CHOKE HOLD.  NOT MUCH MOVEMENT, JUST INTERMITTENT SHUDDERING.

Q.     CAN YOU HOLD ON FOR A MOMENT.  ARE YOU REFERRING TO YOUR NOTES AT THIS POINT OR YOUR 302?

A.     I'M REFERRING TO MY NOTES.

Q.     I JUST WANT TO GET THEM UP ON THE SCREEN.  ALL RIGHT.

SO THE NEXT PAGE, I THEN SAT ON MARTI, NOT STRADDLING.  YOU READ THAT, RIGHT?

MR. TRAVIS:  HE DIDN'T FINISH THAT.

MR. GURGANUS:  YEAH, I KNOW THAT.

BY MR. GURGANUS:

Q.     WHAT PAGE ARE YOU ON AT THE START?

A.     HAMMER TIED IT AROUND HIS HEAD.  THAT IS IT.

Q.     I'M SORRY.  GO AHEAD.

A.     AFTER --

Q.     PICK UP THE NOTE AT, NO, PLEASE, NO, SIR.

A.     OKAY.  HE SAID, QUOTE:  NO, PLEASE, NO, END OF QUOTE.  I REGAINED A BETTER CHOKE HOLD IN THE SAME

POSITION. MARTI JERKED IN THE RESTRAINTS GRABBING AT ME EVEN THOUGH RESTRAINED. THE HOLD I HAD HIM IN WAS A SLEEPER HOLD. SECOND TIME WAS FOR OVER THREE MINUTES. MARTI REALLY VIOLENT, JERKING, GRABBING. MARTI HANDS WERE TIED TO THE RESTRAINT RINGS ON THE SIDE OF THE BED. MARTI BODY THEN RELAXED. HE EXPELLED GAS. CONTINUED IN CHOKE HOLD. NOT MUCH MOVEMENT, JUST INTERMITTENT SHUDDERING. AFTER NO MOVEMENT, APPROXIMATELY SIX MINUTES, GOT UP OFF OF HIM AND WENT TO GET A STRING OFF OF HIS BED.

I THEN SAT ON MARTI, NOT STRADDLED. I PUT THE STRING AROUND HIS NECK AND STARTED CHOKING. PULLED IT REAL TIGHT, WHICH CUT BURNS INTO MY BACK OF HANDS. 3 OR 4 MINUTES. AFTER NO MOVEMENT, NO SHUDDERS, GOT UP. WASHED FACE AND HANDS, DRIED THEM. WENT BACK, CHECKED WRIST PULSE, NO PULSE. THEN CHECKED NECK PULSE, NO PULSE. HAMMER THEN GOT A CLEAN SHEET FROM UNDER MY BED AND COVERED HIM UP. COMBED MY HAIR. WALKED IN MY CELL.

I LOOKED TO SEE WHAT TIME IT WAS. IT WAS 2:40 A.M. HEARD OFFICERS COMING IN FOR COUNT. AT 2:46 A.M. OFFICERS, A FEMALE OFFICER AND OFFICER JONES, CAME TO MY DOOR. TOLD OFFICERS, QUOTE: MY CELLIE IS DEAD, END OF QUOTE, SOMETHING TO THAT EFFECT. FEMALE OFFICER SAID, QUOTE: HE'S WHAT, QUESTIONING, END OF QUOTE. SAID

HE'S DEAD.  TURN ON THE LIGHTS TO CHECK.  I PULLED THE SHEET OFF OF MARTI SO THAT THE OFFICERS COULD SEE HE WAS TIED.  FEMALE OFFICER ASKED WHY HE WAS TIED.  HAMMER SAID, QUOTE: TO MAKE IT EASIER, END OF QUOTE.  SHE SAID: EASIER FOR WHAT?  HAMMER SAID, QUOTE:  TO KILL HIM, END OF QUOTE.

HAMMER IS HOLDING A PAIR OF TOENAIL CLIPPERS WITH MASKING TAPE.  FEMALE OFFICER ASKED WHAT I HAD.  TOLD HER IT WAS NOTHING TO DO WITH HIM.  THE TOENAIL CLIPPERS WERE MADE UP TO LOOK LIKE A KNIFE AS A PART OF MY RUSE IN THE HOSTAGE SCENARIO.  MORE OFFICERS AND LIEUTENANT RESPONDED.  ASKED IF I WOULD CUFF UP. SAID YES, WAS RESTRAINED, REMOVED.

Q.     CAN YOU GO TO THE NEXT PAGE.

A.     STRIP SEARCHED AND EXAMINED BY A PA.  THAT IS REFERRING TO A PHYSICIAN ASSISTANT.  I FAILED TO TELL YOU DURING INTERVIEW THE REASON I HAD TO STOP THE FIRST SLEEPER HOLD WAS MY LEFT SHOULDER DISLOCATED FROM THE PRESSURE.  I HAVE HAD THIS PROBLEM SINCE 12/94, FOR DECEMBER OF 1994, AND KNOW WHEN IT POPS OUT I HAVE TO IMMEDIATELY STOP WHATEVER I'M DOING AND GET IT BACK IN THE SOCKET.  I DID THIS AT THIS TIME AND ADJUSTED MY HOLD ON MARTI AND CONTINUED TO STRANGLE HIM.

WHY I DID IT WAS BETWEEN MARTI AND ME. WAS NOT MOTIVATED OVER MARTI'S CONTRACT AND NOT BECAUSE

I WANT THE DEATH PENALTY. HAMMER IS DOING 1,232 YEARS INCARCERATED. QUOTE: I'M JUST TIRED, END OF QUOTE. WHEN SOMEBODY FUCKS OVER ME, I'M NOT GOING TO SIT BACK AND TAKE IT. AND I'LL NEVER FORGET. WE HAD A RUN IN WHEN I FIRST GOT HERE, MARTI WAS ONE OF THEM. HE WAS ONE OF THEM. QUOTE: I DON'T GO RUNNING MY HEAD TO PEOPLE, END OF QUOTE. QUOTE: ALL THAT KILLING SHIT, END OF QUOTE.

BEEN IN THE HOLE FOR SEVEN MONTHS. I FUCKED UP HERE. MY PROBLEM ISN'T WITH THE OTHER INMATES OR SHU, FOR SPECIAL HOUSING UNIT, STAFF. DAVID PAUL HAMMER 24507-077, AGE 37. DOB, FOR DATE OF BIRTH, OCTOBER 9TH, 1958. PLACE OF BIRTH, HOLDENVILLE, OKLAHOMA, 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. INCARCERATED DECEMBER 16TH, 1993 IN FEDERAL SYSTEM, OKLAHOMA DEPARTMENT OF CORRECTIONS, JUNE, 1978, SERVING 1,232 YEARS FOR 13 FELONY CONVICTIONS. QUOTE: I HAD BETTER GET ME A LAWYER, END OF QUOTE.

8:17 A.M., INTERVIEW COMPLETED.

Q. ALL RIGHT. ONCE YOU STARTED WITH THE -- IS THAT A FAIR DESCRIPTION OF THE INFORMATION THAT MR. HAMMER PROVIDED TO YOU THAT MORNING?

A. THAT'S CORRECT.

Q. NOW, SIR, CAN YOU JUST -- YOU MENTIONED IN THE BEGINNING OF THE INTERVIEW THAT MR. HAMMER WAS A LITTLE

EXCITED, RIGHT?

A.      YES.

Q.      WHAT TIME WAS IT THAT THE INTERVIEW WAS COMPLETED?  DID YOU NOTE THAT?

A.      YES, NOTED AT THE END, 8:17 A.M.

Q.      AND JUST FOR -- AGAIN, THE INTERVIEW BEGAN AT 6:25, RIGHT?

A.      THAT'S CORRECT.

Q.      HOW WAS HIS DEMEANOR AS THE MATTER PROGRESSED?

A.      HE GAVE THE APPEARANCE OF CALMING DOWN AND NOT AS AGITATED AS HE WAS INITIALLY.

Q.      RIGHT.  HOW ABOUT YOUR QUESTIONING OF HIM?  WAS IT -- WHAT TONE?

A.      JUST NORMAL, CALM.  THE QUESTIONING WAS RATHER LIMITED.  IT WAS PRETTY MUCH A SEQUENCE OF THE EVENTS, RESPONSE BY MR. HAMMER TO WHAT OCCURRED IN CHRONOLOGICAL ORDER.

Q.      ALL RIGHT.

NOW, AT THAT POINT, IT WAS -- THERE WAS SOME DISCUSSION ABOUT MR. HAMMER WANTING TO SEE A PSYCHOLOGIST THAT MORNING?

A.      YES, THAT'S CORRECT.

Q.      WHAT DID YOU THEN DO WITH MR. HAMMER?

A.      AFTER THE COMPLETION OF THE INTERVIEW, I'M ASSUMING HE WAS ESCORTED OUT OF THE COUNSELOR/INMATE

INTERVIEW ROOM.  AND I IMAGINE WAS PLACED BY THE INSTITUTION STAFF BACK IN THE HOLDING CELL.

Q.     ALL RIGHT.  NOW, DID YOU THEN ENDEAVOR TO GO LOOK AT THE CELL AT SOME POINT THAT MORNING?

A.     I DID, YES.

Q.     ALL RIGHT.

AND HOW WERE YOU GOING TO RECORD THAT -- THE CELL PROCESS AND WHAT -- YOUR LOOKING AT THE CELL?

A.     WE, BEING MEMBERS OF THE SPECIAL INVESTIGATIVE SUPERVISORS OFFICE AND MYSELF, MEMORIALIZED THE CRIME SCENE BY PLACING IT ON A VIDEO RECORDING.

Q.     HAVE YOU SEEN THE VIDEO, SIR?

A.     YES, I HAVE.

Q.     WOULD YOU SAY THAT'S A FAIR AND ACCURATE RECORDING OF THE EVENTS IN THAT -- OUTSIDE THE CELL AND INSIDE THE CELL AS YOU SEARCHED IT?

A.     EXACT -- CORRECT.  IT'S THE SAME SEQUENCE.

MR. GURGANUS:  WITH THE COURT'S INDULGENCE, WE WILL PLAY THAT VIDEO AT THIS TIME.

BY MR. GURGANUS:

Q.     YOU VIEWED THIS VIDEO PRECEDING YOUR TESTIMONY HERE TODAY, IS THAT RIGHT?

A.     THAT'S CORRECT.

THE COURT:  GO AHEAD.

MR. GURGANUS:  IT'S GOVERNMENT

EXHIBIT 40.1.  AT THIS TIME WE WILL START.

(VIDEOTAPE BEING PLAYED.)

BY MR. GURGANUS:

Q.      I SAW YOU WERE WEARING GLOVES DURING THAT PROCESS, IS THAT RIGHT?

A.      THAT'S CORRECT.

THE COURT:  WHY DON'T WE TAKE A FIVE MINUTE RECESS AT THIS POINT AND THEN WE WILL COME BACK.

(BREAK TAKEN.)

THE COURT:  WE ARE BACK ON THE RECORD NOW.  IT'S 11:28 ON THE WALL CLOCK.

MR. GURGANUS, YOU MAY RESUME.

MR. GURGANUS:  THANK YOU, YOUR HONOR.

BY MR. GURGANUS:

Q.      AT THIS POINT I'M GOING TO BE SHOWING YOU SOME ITEMS OF EVIDENCE I WOULD LIKE YOU TO IDENTIFY.  ALL RIGHT?

A.      ALL RIGHT.

MR. GURGANUS:  WITH THE COURT'S INDULGENCE, I WILL BRING THEM UP.

BY MR. GURGANUS:

Q.      AND STARTING WITH GOVERNMENT EXHIBIT 9.  WHAT IS GOVERNMENT'S EXHIBIT 9, SIR?

A.      GOVERNMENT EXHIBIT 9 APPEARS TO BE A TORN-UP SHEET OF THE STANDARD INSTITUTION MATERIAL AND THE COLOR

IS KIND OF A SALMON COLOR.

Q.    SHOW YOU GOVERNMENT EXHIBIT 11.

A.    MATCH PACK, CAMEL MATCH PACK AND CAMEL NONFILTERED CIGARETTES.

Q.    THAT WAS THE ITEM YOU IDENTIFIED ON THE SCREEN?

A.    THAT'S CORRECT.  THE ITEM ON THE DESK, YES.

Q.    GOVERNMENT EXHIBIT 13, SIR?

A.    IT IS -- GOVERNMENT EXHIBIT 13 IS THE LIGATURE CORD THAT MR. HAMMER UTILIZED ON MARTI AFTER THE SLEEPER HOLD AS ASSURANCE THAT HE HAD SUCCUMBED FROM THE STRANGULATION.

Q.    EXHIBIT 14, SIR.

A.    THAT APPEARS TO BE THE PILLOW THAT WAS -- THE TOP PILLOW THAT HAD BLOOD AND BODILY FLUIDS ON IT ON MR. HAMMER'S BED IN THE AREA WHERE MR. MARTI'S HEAD WOULD BE.

Q.    HERE IS GOVERNMENT EXHIBIT 15, SIR.

A.    IT'S AN ADDITIONAL PILLOW, YES.

Q.    GOVERNMENT EXHIBIT 16, SIR.  YOU REVIEWED THESE BEFORE COURT, DID YOU NOT?

A.    THAT'S CORRECT.

Q.    WHAT IS 16?

A.    16 IS AN INSTITUTION SHEET.  IT'S PROBABLY THE SHEET THAT WAS ON -- WHICH COVERED MR. MARTI.

Q.    I SHOW YOU GOVERNMENT EXHIBIT 17A.

A.        OKAY.   17A IS THE LOWER SHEET THAT WAS ON

MR. HAMMER'S BED THAT WOULD HAVE COVERED THE MATTRESS.

Q.        SHOW YOU GOVERNMENT EXHIBIT 17B.   LIKEWISE, DID

YOU REVIEW THESE ALL BEFORE COMING TO COURT?

A.        YES.   THAT THERE IS THE SHEET THAT -- THAT IS

THE LOWER -- CORRECTION, THAT IS THE LOWER SHEET THAT

WAS ON THE BED.

Q.        AND 17A WAS THE -- ANOTHER SHEET?

A.        ANOTHER SHEET FROM THE LOWER BED, YES.

Q.        SHOW YOU GOVERNMENT EXHIBIT 19.

A.        GOVERNMENT EXHIBIT 19 IS THE SOCK GAG THAT

MR. HAMMER UTILIZED ON MR. MARTI.

Q.        LET ME SHOW YOU GOVERNMENT EXHIBIT 20.   DO YOU

RECOGNIZE THIS?

A.        YES.   THAT IS THE ITEM THAT I COULD NOT

IDENTIFY.   IT WAS RATHER FLEXIBLE.   COULD NOT IDENTIFY

WHAT IT WAS.   BUT IT WAS TWO BATTERIES TAPED TOGETHER

WITH MASKING TAPE AND UTILIZED IN A POSITION TO BE AS A

WEAPON.

Q.        IS THIS TAKEN OUT OF THIS?   WAS THIS IN THE SOCK

AT THE TIME?

A.        YES, IT WAS.

              THE COURT:   WHAT WAS THAT EXHIBIT NUMBER?

              MR. GURGANUS:   GOVERNMENT EXHIBIT 20.

BY MR. GURGANUS:

Q.    WHAT IS GOVERNMENT EXHIBIT 21?

A.    THAT IS A ROLL OF MASKING TAPE THAT WAS IDENTIFIED IN THE VIDEO ALSO.

Q.    SHOW YOU GOVERNMENT EXHIBIT 22.

A.    THAT IS THE BOOK DEPRESSION, WORKBOOK, AUTHORED BY MARY ELLEN COPELAND.  AND THAT WAS ALSO IDENTIFIED IN THE VIDEO.

Q.    LET ME SHOW YOU GOVERNMENT EXHIBIT 23, SIR.

A.    THAT IS THE BRAIDED SHEET USED AS A ROPE.  IT WAS THE ITEM THAT IDENTIFIED IN THE VIDEO AT THE LEFT FOOT RESTRAINING RING THAT WAS STILL ON THE BED.  AND IT ULTIMATELY WAS REMOVED AND RETAINED AS EVIDENCE.

Q.    I SHOW YOU GOVERNMENT EXHIBIT 24, SIR.

A.    THESE WERE THE INSTITUTION SHEETS THAT WERE TORN.  AND I REMOVED THEM FROM THE -- MR. MARTI'S TOP BED -- TOP BUNK BED.  IT WAS SHEETS THAT WERE USED TO BRAID A ROPE.

Q.    I SHOW YOU GOVERNMENT EXHIBIT R 39.

A.    R 39 IS THE SONY RADIO, WHICH WAS IN THE WINDOW OF CELL 103.

Q.    GOVERNMENT EXHIBIT 42.2.  WHAT IS THAT, SIR?

A.    THAT IS THE SPEAKER BOX WITH THE CORD FOR ATTACHMENT TO THE RADIO.

MR. GURGANUS:  ONE MOMENT, YOUR HONOR.

(PAUSE.)

MR. GURGANUS:  YOUR HONOR, AT THIS TIME WE HAVE NO FURTHER QUESTIONS.

THANK YOU.

THE COURT:  CROSS EXAMINE.

CROSS EXAMINATION

BY MR. MCHUGH:

Q.     GOOD MORNING, MR. THOMPSON.

A.     GOOD MORNING, SIR.

Q.     MR. THOMPSON, WHEN MR. HAMMER CAME INTO THE ROOM, WERE YOU ALREADY IN THE ROOM OR WAS HE IN THERE WHEN YOU WALKED IN, THE INTERVIEW ROOM?

A.     IF NOT MISTAKEN, I WAS ALREADY IN THE ROOM, AS WELL AS THE OTHER INTERVIEWING BUREAU OF PRISON PERSONNEL.

Q.     AND YOU WENT THROUGH, AS YOU STATED ON DIRECT, ALL OF HIS MIRANDA RIGHTS.  IS THAT FAIR TO SAY?

A.     THAT'S CORRECT.

Q.     YOU TOLD HIM THAT HE HAD THE RIGHT TO REMAIN SILENT, IS THAT RIGHT?

A.     THAT IS CORRECT.

Q.     AND HE WAIVED THAT RIGHT, IS THAT CORRECT?

A.     THAT'S CORRECT.

Q.     YOU TOLD HIM THAT WHAT HE SAID COULD BE USED AGAINST HIM IF HE AGREED TO TALK TO YOU, IS THAT RIGHT?

A.     THAT'S CORRECT.

Q.      AND HE CONTINUED TO COOPERATE WITH YOU AND AGREED TO TALK, IS THAT RIGHT?

A.      CORRECT.

Q.      HE ALSO -- YOU ALSO TOLD HIM THAT HE HAD THE RIGHT TO A LAWYER, IS THAT RIGHT?

A.      THAT IS CORRECT.

Q.      AND YOU TOLD HIM THAT IF HE COULD NOT AFFORD A LAWYER, THAT A LAWYER WOULD BE APPOINTED FOR HIM, IS THAT RIGHT?

A.      THAT IS CORRECT.

Q.      HE AGREED TO WAIVE HIS RIGHT TO A LAWYER AND TO SPEAK TO YOU, IS THAT RIGHT?

A.      THAT'S CORRECT.

Q.      THE ONLY THING HE DID NOT DO WAS SIGN THE FORM. IS THAT FAIR TO SAY?

A.      YES.

Q.      OTHER THAN THAT, HE FULLY AND INTELLIGENTLY AND VOLUNTARILY WAIVED HIS MIRANDA RIGHTS, IS THAT RIGHT?

A.      THAT IS CORRECT.

Q.      AS FAR AS YOU KNEW?

A.      YES.

Q.      AND THEN HE PROCEEDED TO GIVE YOU A FULL SIX OR SEVEN PAGE STATEMENT, IS THAT RIGHT?

A.      CORRECT.

Q.      AND DURING THE COURSE OF THIS STATEMENT, IT

ACTUALLY STOPPED A COUPLE OF TIMES WHERE HE COULD TAKE A BREAK, IS THAT RIGHT, AND HE WENT TO THE BATHROOM?

A.     YES, THAT'S CORRECT.

Q.     AT LEAST ONCE?

A.     ONCE.

Q.     WHEN HE CAME BACK FROM THE BATHROOM, HE CONTINUED UP AGAIN WITHOUT HESITATION, FULLY COOPERATING WITH YOU, IS THAT RIGHT?

A.     CORRECT.

Q.     I BELIEVE YOU SAID THAT AT ONE POINT HE WAS TALKING TOO FAST FOR YOU TO WRITE EVERYTHING DOWN SO YOU HAD TO CAUTION HIM TO SLOW DOWN?

A.     THAT WAS INITIALLY AT THE VERY BEGINNING.

Q.     BUT THERE WAS ANOTHER PERSON PRESENT TAKING NOTES AT THE TIME, IS THAT RIGHT, LIEUTENANT TRAXLER?

A.     I DON'T KNOW -- I DON'T RECALL HIM TAKING NOTES IF HE DID.

Q.     WELL, HE WAS PRESENT, IS THAT RIGHT?

A.     HE WAS PRESENT, YES.

Q.     AND THE -- I THINK I COUNTED TWICE THROUGHOUT YOUR NOTES AND AS WELL AS WHAT WE WILL CALL YOUR 302, WHERE MR. HAMMER, I BELIEVE IT WAS ON PAGE 3, HE STATED -- IN DISCUSSING WHAT HE WAS GOING TO DO THAT NIGHT, HE STATED THAT HE HAD DOUBTS IN HIS OWN MIND AS TO WHETHER HE WAS GOING TO GO THROUGH WITH THE PLAN.  DO YOU

REMEMBER THAT?

A.     YES.

Q.     AND I BELIEVE IT APPEARS ONCE ON PAGE 3 -- WE CAN USE YOUR 302.  I THINK IT MIRRORS THE NOTES.

A.     OKAY.

Q.     DO YOU SEE THAT AT THE BOTTOM WHERE HE IS TALKING ABOUT -- IT'S ABOUT SIX OR SEVEN LINES FROM THE BOTTOM.  HAMMER HAD DOUBTS AT THE TIME IN HIS OWN MIND AS TO WHETHER HE WAS GOING THROUGH WITH THE PLAN -- WITH WHAT HE PLANNED?

A.     YES.

Q.     AND THEN ON THE NEXT PAGE, PAGE 4, AGAIN, HE TOLD YOU THAT HE HAD HAD DOUBTS.  HE DID NOT THINK OR KNOW IF HE WAS GOING TO KILL MARTI OR JUST TAKE HIM HOSTAGE AND MAKE AN ASS OUT OF MYSELF TO GET ATTENTION. IS THAT FAIR TO SAY?

A.     YES.

Q.     SO TWICE DURING THE COURSE OF HIS DISCUSSION OF THIS INCIDENT HE TOLD YOU THAT HE WAS NOT SURE WHAT HE WAS GOING TO DO AS FAR AS EITHER TAKE A HOSTAGE OR KILL MR. MARTI.  IS THAT FAIR TO SAY?

A.     CORRECT.

Q.     THE -- AS I RECALL FROM YOUR TESTIMONY YESTERDAY, YOU WERE -- YOU STARTED WITH THE FBI IN 1969, IS THAT RIGHT?

A.      CORRECT.

Q.      SO YOU HAD -- IF I CALCULATED THIS CORRECTLY, YOU HAD 27 YEARS OF EXPERIENCE WHEN YOU WERE INTERVIEWING MR. HAMMER.  IS THAT FAIR TO SAY?

A.      IT'S FAIR.

Q.      I THINK YOU WERE A COUPLE MONTHS SHY BECAUSE YOU STARTED IN JUNE, AND THIS WAS IN APRIL OF '96.

                THE COURT:  MAY I ASK YOU TO SPEAK CLOSER TO THE MIC.

                MR. MCHUGH:  I'M SORRY, YOUR HONOR.

BY MR. MCHUGH:

Q.      YOU HAD HANDLED A NUMBER OF PRISON ASSAULTS AT THIS POINT?

A.      YES.

Q.      HANDLED A NUMBER OF PRISON KILLINGS AT THIS POINT?

A.      YES.

Q.      YOU'D HANDLED A NUMBER OF VARIOUS FEDERAL CRIMES OF ALL TYPES?

A.      YES.

Q.      YOU HAD WORKED WITH INFORMANTS, COOPERATORS?

A.      YES.

Q.      YOU HAD WORKED WITH INTERVIEWING AND TAKING STATEMENTS FROM A NUMBER OF DEFENDANTS.  IS THAT FAIR TO SAY?  THIS WAS NOT YOUR FIRST TIME TAKING A STATEMENT,

WAS IT?

A.        THAT IS CORRECT, AND MANY PRIOR.

Q.        BY THE WAY, THE SCRAP OF SHEET THAT YOU FOUND THAT YOU SAVED, I THINK WE SAW IT ON THE VIDEO, THAT WAS USED TO BRAID SHEETS, THAT WAS ACTUALLY FOUND IN MR. MARTI'S BUNK.  IS THAT FAIR TO SAY?

A.        IT WAS ON THE TOP BUNK, YES.

Q.        UNDER A PILLOW, RIGHT?

A.        YES.

Q.        SO IF I HEARD YOU YESTERDAY, YOU SAID THAT YOU WERE ON DUTY THAT WEEKEND, IS THAT RIGHT?

A.        THAT'S CORRECT.

Q.        AND SO THE CASE DID NOT GET ASSIGNED TO YOU, DID IT?

A.        NO, IT DID NOT.

Q.        IT GOT ASSIGNED TO SPECIAL AGENT MALOCU, IS THAT RIGHT?

A.        YES.  ANTHONY MALOCU.

Q.        AGENT MALOCU WAS THE NEWEST AGENT IN THE FIELD OFFICE, IS THAT RIGHT, AT THAT TIME?

A.        YES.

Q.        HE HAD ONLY BEEN IN THE FIELD OFFICE LESS THAN SIX MONTHS?

A.        THAT'S CORRECT, YES.

Q.        AND SO FROM THAT POINT FORWARD IT WAS AGENT

MALOCU'S CASE ONCE HE TOOK OVER?

A.    THAT'S CORRECT.

Q.    AND HE WAS WHAT WE CALL THE CASE AGENT?

A.    YES.

Q.    I JUST HAVE A COUPLE MORE QUESTIONS, MR. THOMPSON.

AS PART OF YOUR INVESTIGATION, AND I KNOW IT WAS QUITE BRIEF, DID YOU AT ANY TIME REVIEW MR. HAMMER'S MEDICAL OR PSYCHIATRIC RECORDS?

A.    NO, I DID NOT.

Q.    DID YOU, AT ANY TIME, REVIEW ANY OF THE MEDICATIONS THAT HE WAS PRESCRIBED OR SUPPOSED TO BE ON?

A.    NO, I DID NOT.

Q.    DID YOU CHECK AT ANY TIME TO SEE IF HE HAD BEEN COMPLIANT WITH ANY OF THE MEDICATIONS THAT HAD BEEN PRESCRIBED FOR HIM?

A.    NO.

MR. MCHUGH:  IF I MAY INQUIRE, YOUR HONOR.  I MAY HAVE NO MORE QUESTIONS.

THE COURT:  YES.

(PAUSE.)

MR. MCHUGH:  NOTHING FURTHER, YOUR HONOR.

THE COURT:  REDIRECT?

MR. GURGANUS:  YOUR HONOR, IF WE CAN JUST MOVE IN THE EXHIBITS THAT HAVE BEEN IDENTIFIED.

THE COURT:  ANY OBJECTION TO ANY OF THOSE EXHIBITS?

MR. TRAVIS:  NO OBJECTION.

MR. GURGANUS:  WOULD YOU LIKE ME TO GO THROUGH THOSE, JUDGE?

THE COURT:  WELL, I HAVE G 29.

MR. GURGANUS:  YES, SIR.

THE COURT:  CORRECT ME IF I'M WRONG. G 1002.

MR. GURGANUS:  YES, SIR.

THE COURT:  1001.1

MR. GURGANUS:  YES, SIR.

THE COURT:  G 40.1.

MR. GURGANUS:  THAT'S CORRECT.

THE COURT:  G 9, 11, 13, 14, 15, 16, 17A, 17B, 19, 20, 21, 22, 23, G 24, G 39 -- GR 39, G 42.2. ANY OTHERS?

MR. GURGANUS:  NO, YOUR HONOR.

THE COURT:  OKAY.  THOSE WILL BE RECEIVED IN EVIDENCE, AND YOU MAY STEP DOWN.

(GOVERNMENT EXHIBIT NUMBERS 29, 1002, 1001.1, 40.1, 9, 11, 13, 14, 15, 16, 17A, 17B, 19, 20, 21, 22, 23, 24, R 39, 42.2  ADMITTED INTO EVIDENCE.)

THE WITNESS:  THANK YOU, YOUR HONOR.

(WITNESS EXCUSED.)

MR. GURGANUS:

THE COURT:  NEXT WITNESS.

MR. GURGANUS:  THE UNITED STATES CALLS DR. SARALEE FUNKE.

SARALEE FUNKE, GOVERNMENT WITNESS, SWORN.

THE CLERK:  STATE AND SPELL YOUR FULL NAME FOR THE RECORD, PLEASE.

THE WITNESS:  SARALEE FUNKE, F-U-N-K-E.

DIRECT EXAMINATION

BY MR. GURGANUS:

Q.    CAN YOU TELL US WHAT YOUR FORMER OCCUPATION WAS?

A.    YES.  I WAS A FORENSIC PATHOLOGIST.

Q.    AND WE ARE JUST GOING TO BE VERY BRIEF WITH YOU HERE TODAY.  ARE YOU RETIRED NOW?

A.    YES, I AM.

Q.    AND YOU ARE NO LONGER PRACTICING?

A.    THAT'S CORRECT.

Q.    BEFORE YOU CAME INTO COURT HERE THIS MORNING, DID YOU IDENTIFY A PATHOLOGY REPORT THAT WAS DONE, AN AUTOPSY REPORT THAT WAS DONE THAT IS MARKED GOVERNMENT EXHIBIT 1000.1.  DID YOU LOOK AT THAT?

A.    I LOOKED AT AN AUTOPSY REPORT.  I DON'T KNOW WHAT THE IDENTIFICATION NUMBER WAS, BUT I RECOGNIZED MY SIGNATURE ON THE REPORT.

Q.    WHAT PAGE WOULD THAT BE ON?

A.    THE SIGNATURE IS ON PAGE 2.

Q.    AND THAT REPORT, DID THAT ALSO INCLUDE DIAGRAMS?

A.    YES, IT DID.

Q.    AND THE REPORT WE ARE REFERRING TO IS AN AUTOPSY REPORT OF ANDREW MARTI, IS THAT CORRECT?

A.    THAT'S CORRECT.

Q.    YOU DID NOT REVIEW THIS FOR CONTENT HERE TODAY?

A.    THAT'S CORRECT.

Q.    BUT THIS WAS YOUR REPORT, IS THAT RIGHT?

A.    THAT'S RIGHT.

Q.    AND AT THE TIME YOU DID IT, WAS IT ACCURATE IN YOUR VIEW?

A.    YES.

Q.    YOU ALSO WERE SHOWN A TWO-PAGE SUPPLEMENTAL REPORT OR LETTER TO FREDERICK E. MARTIN, IS THAT RIGHT?

A.    YES.

Q.    I WILL SHOW YOU THAT, GOVERNMENT EXHIBIT R174.

A.    YES, THAT IS MY SIGNATURE ON PAGE 2.

Q.    THIS IS SOMETHING THAT YOU PREPARED?

A.    YES, IT IS.

Q.    WAS IT ACCURATE AT THE TIME YOU PREPARED IT, MA'AM?

A.    YES.

Q.    DO YOU STAND BY THIS, THOUGH YOU HAVEN'T REVIEWED IT TODAY?

A.    IT IS MY REPORT.  YES, I STAND BY IT.

Q.    ADDITIONALLY IN THIS CASE YOU ARE AWARE THAT YOU TESTIFIED ON A FEW OCCASIONS, IS THAT RIGHT?

A.    YES.

Q.    AND YOU TESTIFIED IN 1998, IS THAT CORRECT?

A.    I BELIEVE IT IS, YES.

Q.    ALSO THERE WAS A TRANSCRIPT THERE FROM SEPTEMBER OF 2005.  DID YOU ALSO TESTIFY IN THAT?

A.    YES.

Q.    WHEN YOU GAVE THE ANSWERS AT THAT TIME, WERE YOU TRUTHFUL?

A.    YES.

Q.    MA'AM, YOU ARE NOT -- IS IT FAIR TO SAY THAT YOU ARE NOT IN A POSITION HERE TO TESTIFY AT THIS TIME?

A.    THAT'S CORRECT.

Q.    TESTIFY AS TO THE CONTENT OF THESE REPORTS, IS THAT RIGHT?

A.    TO TESTIFY AS TO THE CONTENT OR TO EXPRESS OPINIONS, YES.  I DON'T AT THIS POINT FEEL THAT I'M STILL AN EXPERT IN FORENSIC PATHOLOGY.

Q.    AND HAVE YOU HAD SOME HEALTH ISSUES?  AND WE WON'T GO INTO THEM.

A.    YES, I HAVE.

        MR. GURGANUS:  ALL RIGHT.  THANK YOU FOR YOUR TIME.  AND I HAVE NO FURTHER QUESTIONS AT THIS

POINT.

CROSS EXAMINATION

BY MR. MCHUGH:

Q.      GOOD MORNING, DR. FUNKE.  I JUST HAVE A COUPLE OF QUESTIONS FOR YOU.

DR. FUNKE, WOULD IT BE FAIR TO SAY THAT WHEN YOU WERE PRACTICING AS A PATHOLOGIST THAT THE OPINIONS THAT YOU GIVE AT THE TIME OF THE AUTOPSY AND YOUR REPORT ARE BASED ON WHAT IS CURRENTLY KNOWN BY YOU AT THAT TIME?

A.      YES.

Q.      AND WOULD IT ALSO BE FAIR TO SAY THAT NEW INFORMATION, IF YOU RECEIVE IT, CAN SOMETIMES CHANGE YOUR OPINION?

A.      IT MAY OR MAY NOT FOR AN EXPERT WITNESS CHANGE THEIR OPINION.  IT WOULD DEPEND ON THE INFORMATION.

Q.      RIGHT.  BUT IT COULD.

A.      BUT IT'S POSSIBLE.  IT'S ALSO POSSIBLE IT MIGHT NOT CHANGE.

Q.      I UNDERSTAND THAT.  THERE HAVE BEEN OCCASIONS THROUGHOUT YOUR CAREER WHERE WHEN YOU RECEIVED SOME ADDITIONAL INFORMATION THAT YOU MADE AN ADDENDUM OR MADE SOME CORRECTIONS TO CONCLUSIONS.  IS THAT FAIR TO SAY ALSO?

A.      I CAN'T RECALL ONE WAY OR THE OTHER RIGHT NOW AS

I SIT HERE.

Q.    THE -- SO AT THE TIME -- IF YOU RECALL, AT THE TIME OF THIS AUTOPSY, DID YOU HAVE ANY INFORMATION CONCERNING MR. HAMMER OR MR. MARTI'S SEXUAL PRACTICES?

A.    I HAVE NO RECOLLECTION OF THAT.

Q.    AND JUST ANOTHER FOLLOW-UP QUESTION TO THAT POINT.

DID YOU EVER RECEIVE ANY ADDITIONAL INFORMATION THROUGHOUT THE COURSE OF THIS CONCERNING THEIR SEXUAL PRACTICE, IF YOU RECALL?

A.    I DO NOT RECALL.

Q.    DO YOU ORDER A RAPE -- WHEN YOU WERE PRACTICING, A RAPE KIT, OR IS THAT SOMETHING THAT THE AGENT THAT WOULD BE IN CHARGE OF THE CASE, THE CASE AGENT, WOULD DO?

A.    TO THE BEST OF MY RECOLLECTION IT WOULD DEPEND ON THE CASE.  IT COULD BE ORDERED BY ME OR IT COULD BE SUGGESTED BY SOMEBODY ELSE.

Q.    DO YOU RECALL IN THIS CASE WHETHER YOU ORDERED IT?  THERE WAS ONE DONE IN THIS CASE, I CAN CORRECTLY TELL YOU.  DO YOU RECALL IF YOU ORDERED IT OR IF IT WAS SOMETHING THAT THE CASE AGENT DID?

A.    I DON'T RECALL.

MR. MCHUGH:  I THINK THAT IS ALL I HAVE.

MAY I CONSULT, YOUR HONOR?

THE COURT:  YES.

(PAUSE.)

BY MR. MCHUGH:

Q.      DR. FUNKE, JUST ONE FOLLOW-UP QUESTION.  DO YOU RECALL TESTIFYING IN SEPTEMBER OF 2005 IN WILLIAMSPORT, PENNSYLVANIA IN THIS MATTER?

A.      I KNOW THAT I TESTIFIED IN WILLIAMSPORT.  I DON'T RECALL THE EXACT MONTH OR DATE, BUT I HAVE SEEN A TRANSCRIPT PRESENTED TO ME WITH THAT DATE ON IT.

Q.      AND I DON'T KNOW IF MR. GURGANUS SPECIFIED THAT, BUT AT THAT TIME YOUR TESTIMONY WAS TRUTHFUL AND ACCURATE AS BEST YOU COULD BE.  IS THAT FAIR TO SAY?

A.      YES, SIR.

MR. MCHUGH:  THAT'S ALL I HAVE, YOUR HONOR.

MR. GURGANUS:  YOUR HONOR, JUST TO MOVE IN GOVERNMENT EXHIBIT 1000.1 AND EXHIBIT R174.

THE COURT:  ALL RIGHT.  THOSE EXHIBITS WILL BE RECEIVED IN EVIDENCE, HEARING NO OBJECTION.

(GOVERNMENT EXHIBITS 1000.1 AND R174 ADMITTED INTO EVIDENCE.)

THE COURT:  YOU MAY STEP DOWN.

THE WITNESS:  THANK YOU.

MR. GURGANUS:  THANK YOU, MA'AM.

(WITNESS EXCUSED.)

THE COURT:  I DON'T HAVE ANY OF THOSE EXHIBITS.  AT SOME POINT I ASSUME THEY ARE GOING TO BE --

MR. GURGANUS:  THEY WILL BE PROVIDED, YOUR HONOR.

THE COURT:  OKAY.

MR. GURGANUS:  YOUR HONOR, WE HAVE STEPHEN KARTEN THAT CAN TESTIFY NOW.  MY DIRECT WILL NOT BE THAT LONG WITH HIM.

THE COURT:  ALL RIGHT.  LET'S CALL YOUR NEXT WITNESS.

MR. GURGANUS:  WHAT TIME DID YOU ANTICIPATE GOING UNTIL?

THE COURT:  I WOULD LIKE TO GO TO AT LEAST -- IF WE GO TO QUARTER AFTER 12, WE CAN RESUME AT 1:30.

MR. GURGANUS:  WHATEVER WORKS FOR THE COURT.

THE COURT:  AND WORK UNTIL 3:30.  ALL RIGHT.  IT ALL DEPENDS ON YOUR FLOW OF WITNESSES.  IF YOU FEEL WE SHOULD WAIT A BIT UNTIL -- THIS, BOTH SIDES -- IF YOU FEEL WE SHOULD WAIT, IF WE SHOULD BREAK AT A CERTAIN POINT, JUST LET ME KNOW.  THAT IS FINE.

MR. GURGANUS:  THANK YOU FOR THE COURTESY, YOUR HONOR.

STEPHEN KARTEN, GOVERNMENT WITNESS, SWORN.

THE CLERK:  STATE AND SPELL YOUR FULL NAME FOR THE RECORD, PLEASE.

THE WITNESS:  MY NAME IS STEPHEN J. KARTEN, K-A-R-T-E-N.

DIRECT EXAMINATION

BY MR. GURGANUS:

Q.    WHERE IS IT THAT YOU ARE PRESENTLY RESIDING, SIR?

A.    I LIVE IN FORT WORTH, TEXAS.

Q.    I MEAN, HOW LONG HAVE YOU LIVED THERE?

A.    SINCE 2001.

Q.    CAN YOU GO THROUGH YOUR EDUCATIONAL BACKGROUND FOR US, SIR?

A.    SURE.

I OBTAINED A BACHELOR'S DEGREE IN PSYCHOLOGY FROM RUTGERS UNIVERSITY.  I GOT A MASTER'S AND DOCTORATE DEGREE FROM TEXAS A AND M UNIVERSITY.  I DID MY INTERNSHIP AT UNIVERSITY OF TEXAS HEALTH SCIENCE CENTER IN HOUSTON.  AND I STARTED MY CAREER AT THE FCI TEXARKANA, AS A STAFF PSYCHOLOGIST.  FCI, FEDERAL CORRECTIONAL INSTITUTION, TEXARKANA.

Q.    SO YOU BECAME EMPLOYED WITH THE BUREAU OF PRISONS?

A.    THAT'S CORRECT.

Q.    AND HOW LONG WERE YOU IN -- AT USP TEXARKANA?

A.    IT WAS A FEDERAL CORRECTIONAL INSTITUTION.  I WAS THERE FOR TWO-AND-A-HALF YEARS.  AND THEN I TRANSFERRED TO UNITED STATES PENITENTIARY IN ALLENWOOD, PENNSYLVANIA.  AND I WAS THERE FOR ABOUT FOUR, FOUR AND-A-HALF YEARS, AND THEN I TRANSFERRED TO WASHINGTON, D.C. TO HEADQUARTERS, CENTRAL OFFICE, AND WAS THERE ABOUT FOUR MORE YEARS.

Q.    WHAT DID YOU DO WHEN YOU TRANSFERRED TO WASHINGTON, D.C.?

A.    WHEN I TRANSFERRED TO WASHINGTON, I WAS CHIEF OF THE PROGRAM ANALYSIS BRANCH.

Q.    WERE YOU DOING PSYCHOLOGY WORK AT THAT TIME OR -- IN WASHINGTON?

A.    THE FIRST TWO YEARS IN WASHINGTON I DID NOT DO PSYCHOLOGY WORK.  THE SECOND TWO YEARS I DID, NOT DIRECT SERVICE, BUT I WAS AN AUDITOR.  I WENT OUT AND CHECKED THE VARIOUS INSTITUTIONS AND MADE SURE THAT THEY WERE FOLLOWING POLICY.

Q.    SIR, CAN YOU TELL US ABOUT WHEN YOU ARRIVED AT USP ALLENWOOD.  YOU WORKED THERE FOR A PERIOD OF TIME?

A.    YES.  I BELIEVE IT WAS NOVEMBER 1993 IS WHEN I GOT THERE.

Q.    ALL RIGHT.

AND HOW MANY PSYCHOLOGISTS WERE THERE AT THE TIME?

A.    THERE WAS NONE WHEN I FIRST STARTED FOR THE FIRST YEAR AND THEN WE HIRED ONE.

Q.    WHO WAS THE PERSON YOU HIRED?

A.    HIS NAME IS DR. JOHN MITCHELL.

Q.    NOW, I WANT TO DIRECT YOUR ATTENTION TO APRIL 13TH, 1996.  WERE YOU CALLED IN?  DID YOU RECEIVE A CALL REQUESTING YOU TO COME TO USP ALLENWOOD THAT DAY?

A.    YES.

Q.    WHAT WAS THE CIRCUMSTANCES EXPLAINED TO YOU IN THE CALL AND THEN WHAT DID YOU DO?

A.    I WAS TOLD THAT INMATE HAMMER HAD KILLED HIS CELLMATE, MARTI, AND THEY HAD CONCERNS ABOUT HAMMER, WHETHER OR NOT HE MIGHT HURT HIMSELF OR TRY TO HURT HIMSELF.  SO I WENT UP THERE AND DID A SUICIDE RISK ASSESSMENT.

Q.    AND CAN YOU EXPLAIN TO THE COURT WHERE YOU MET WITH HIM AND WHAT THE CIRCUMSTANCES WERE, WHAT YOU INITIALLY TOLD HIM AND WHAT HE INITIALLY TOLD YOU?

A.    SURE.  I MET WITH HIM IN THE SPECIAL HOUSING UNIT AND I EXPLAINED JUST THAT I WAS THERE BECAUSE I HAD HEARD WHAT HAPPENED, TO SEE IF HE WAS GOING TO BE OKAY AND WHAT HIS THOUGHTS WERE ABOUT IT.  I DID TELL HIM THAT ANYTHING HE SAID WOULD NOT BE CONFIDENTIAL.  AND I

WENT AHEAD TO DO A RISK ASSESSMENT FOR POTENTIAL

SUICIDALITY FOR MR. HAMMER.

Q.      DID YOU AT SOME POINT ALSO PREPARE A REPORT,

SIR?

A.      YES, I DID.

Q.      AND IS THAT REPORT GOVERNMENT EXHIBIT R169?

A.      YES, THIS IS IT.

Q.      DO YOU HAVE A RECOLLECTION AT THIS TIME OF THAT

INTERVIEW?  YOU REMEMBER IT, IS THAT RIGHT?

A.      YES, I DO.

Q.      BUT IN CASE YOU NEED TO REFER -- I AM PROVIDING

THAT TO YOU IN CASE YOU NEED TO REFER TO IT.

A.      VERY GOOD.

Q.      BUT DID YOU AT SOME POINT -- YOU MENTIONED THAT

THERE WAS NO CONFIDENTIALITY AS PART OF THE MEETING, IS

THAT RIGHT?

A.      THAT'S RIGHT.

Q.      AND WHAT DID YOU -- WHAT WERE YOU TELLING

MR. HAMMER WHEN YOU TOLD HIM THAT?

A.      WELL, MY MAIN CONCERN WAS JUST WHERE HE WAS AT

IN TERMS OF HIS UNDERSTANDINGS OF WHAT HAPPENED AND WHAT

HIS REACTION WAS GOING TO BE FOR HIMSELF.

Q.      TO HIMSELF?

A.      TO HIMSELF, RIGHT.

Q.      WHAT WERE YOU ATTEMPTING TO DETERMINE DURING THE

COURSE OF THE INTERVIEW?

A.    I WAS ATTEMPTING TO DETERMINE WHETHER OR NOT HE WAS SUICIDAL AND NEEDED TO BE PUT ON SUICIDE WATCH.

Q.    AND DID HE EXPRESS TO YOU OR TELL YOU ABOUT WHAT HAD HAPPENED THAT MORNING?

A.    YES, HE DID.

Q.    DID HE TELL YOU THAT HE HAD ALREADY MET WITH THE FBI AND HAD BEEN INTERVIEWED EARLIER?

A.    YES.

Q.    DID HE SAY ANYTHING ELSE TO YOU ABOUT THE INCIDENT, SIR?

A.    WELL, HE KNEW I KNEW MARTI AS WELL, INMATE MARTI.  AND HE JUST SAID THAT HE KILLED HIM AND HE MADE SURE THAT HE WAS NOT GOING TO LEAVE HIM BRAIN DEAD, THAT HE WAS GOING TO MAKE SURE HE WAS REALLY DEAD.

Q.    WHAT ELSE DID HE SAY ABOUT THAT?

A.    HE SAID THAT HE KNEW THAT HIS PARENTS WOULD BE UPSET, BUT NO ONE ELSE WAS GOING TO REALLY MISS MARTI, AND I THINK THAT WAS IT.

Q.    DID HE MENTION TO YOU HOW LONG IT TOOK TO ACCOMPLISH THE KILLING?

A.    YES.

Q.    WHAT DID HE SAY?

A.    HE SAID HE DID IT FOR NINE MINUTES.  HE STRANGLED HIM FOR NINE MINUTES TO MAKE SURE THAT HE WAS

FULLY DEAD.

Q.    DID YOU ASK HIM WHETHER HE WAS -- OR DID HE PROVIDE -- LET ME ASK YOU THIS.  DID HE PROVIDE A REASON FOR WHY HE HAD KILLED HIS CELLMATE?

A.    I DON'T BELIEVE SO.

Q.    OKAY.  CAN I REFER YOU TO THE THIRD PARAGRAPH?

A.    OKAY, THANK YOU.  OKAY, ABOUT THE STRANGLING.

Q.    DID HE INDICATE, SIR, THE REASON?

A.    OH, THAT HE NEVER FORGOT, RIGHT, THAT MARTI HAD DISRESPECTED HIM.  RIGHT.

Q.    WOULD IT BE HELPFUL FOR YOU TO READ -- START READING AT THE THIRD PARAGRAPH, NEVERTHELESS.

A.    OKAY.

Q.    CAN YOU DO THAT?

A.    SURE.

Q.    WHY DON'T YOU, ACTUALLY FOR CONTEXT, START AT THE INMATE DENIED.

A.    OKAY.

Q.    GO AHEAD.

A.    THE INMATE DENIED HE HAD SPOKEN -- SORRY.  THE INMATE DENIED FEELING SUICIDAL, BUT ADMITTED FEELING REMORSE FOR HIS CELL PARTNER'S FAMILY.  NEVERTHELESS, HE ADDED THAT HE DID NOT -- HE DID WHAT HE HAD TO DO.  HE CLAIMED THAT HIS CELL PARTNER HAD DISRESPECTED HIM WHEN HE FIRST ARRIVED AT USP ALLENWOOD AND THAT HE, INMATE

HAMMER, HAD NEVER FORGOTTEN.  HE SAID THAT HE WOULD CONTINUE TO TAKE CARE OF HIMSELF NO MATTER WHAT, AND THAT COMMITTING SUICIDE WAS THE LAST THING ON HIS MIND AT THAT TIME.

Q.   CAN YOU READ THE NEXT PARAGRAPH, SIR?

A.   I FOUND NO EVIDENCE TO SUGGEST THAT INMATE HAMMER WAS EITHER DEPRESSED OR PSYCHOTIC.  HIS MEMORY FOR RECENT AND REMOTE EVENTS WAS INTACT, AND HIS AWARENESS OF THE SITUATION WAS CLEAR AND NOT DISTORTED.  THE INMATE SEEMED TO TAKE GREAT PRIDE IN STATING THAT HE MADE SURE THAT HIS CELL PARTNER DID NOT SUFFER AND THAT HE WAS CAREFUL TO MAKE SURE THAT HIS CELL PARTNER WAS FULLY DEAD AS A RESULT OF HIM STRANGLING HIM SO THAT HE WOULD NOT BE JUST BRAIN DEAD.

Q.   DID YOU PUT "JUST BRAIN DEAD" IN QUOTES?

A.   YES, I DID.

Q.   ALL RIGHT.  CONTINUE.

A.   AGAIN HE SAID THAT HE FELT BAD FOR THE INMATE'S FAMILY BUT, QUOTE, THE WORLD WOULD NOT MISS, END QUOTE, HIS FORMER CELL PARTNER.

DID YOU WANT ME TO CONTINUE?

Q.   IS THAT ALSO -- IS THAT A FAIR SUMMARY OF SOME OF THE THINGS HE TOLD YOU THAT MORNING?

A.   YES.

MR. MORENO:  I'M GOING TO OBJECT TO "SOME

OF THE THINGS HE TOLD YOU THAT MORNING."  IF HE WOULD LIKE TO BE SPECIFIC AS TO WHAT HE TOLD HIM.  I DON'T KNOW WHAT "SOME OF THESE THINGS" MEANS.

MR. GURGANUS:  I WILL WITHDRAW THE QUESTION.

BY MR. GURGANUS:

Q.    DID YOU -- WHAT YOU THEN WROTE THERE WAS INFORMATION -- SOME OF THE INFORMATION THAT HE PROVIDED YOU.  DID YOU CAPTURE YOUR ENTIRE INTERVIEW IN THIS DOCUMENT?

A.    NO.

Q.    AND THAT IS THE POINT I WAS TRYING TO MAKE.

MR. GURGANUS:  OKAY.  I HAVE NO FURTHER QUESTIONS AT THIS TIME, YOUR HONOR.

THE COURT:  CROSS EXAMINE?

MR. MORENO:  YES, SIR.

YOUR HONOR, MAY I CONFER WITH OPPOSING COUNSEL AT THIS TIME?

THE COURT:  YES.

MR. MORENO:  THANK YOU, YOUR HONOR.

CROSS EXAMINATION

BY MR. MORENO:

Q.    GOOD MORNING, DOCTOR.

A.    GOOD MORNING.

Q.    DOCTOR, ARE YOU STILL A PRACTICING PSYCHOLOGIST?

A.      YES, I AM.

Q.      WHERE ARE YOU PRACTICING THESE DAYS?  I KNOW YOU LIVE IN FORT WORTH.  ARE YOU WITH A HOSPITAL SYSTEM?

A.      NO, I HAVE MY OWN PRACTICE.

Q.      YOU HAVE YOUR OWN PRACTICE.  AND YOUR PRACTICE IS CLINICAL THEN?

A.      YES.  CLINICAL FORENSIC.

Q.      CLINICAL FORENSIC.  SO YOU NOW PROVIDE SOME EXPERT TESTIMONY AS WELL?

A.      YES.

Q.      AND IN WHAT CONTEXT IS THAT IN?  IS THAT BOTH IN CIVIL AND CRIMINAL OR MOSTLY --

A.      YES.

Q.      NOW, DOCTOR, YOU WERE ASKED A COUPLE OF QUESTIONS A MOMENT AGO BY MR. GURGANUS ABOUT THE LENGTH OF TIME MR. HAMMER TOLD YOU THAT HE STRANGLED MR. MARTI FOR, CORRECT?

A.      YES.

Q.      BUT THAT INFORMATION, WHICH, YOU KNOW, IS FAIRLY RELEVANT INFORMATION, IS NOT CONTAINED IN YOUR REPORT OR AM I INCORRECT ABOUT THAT?  THAT HE STRANGLED HIM FOR NINE MINUTES?

A.      YEAH.  I DON'T THINK I PUT THE TIME IN.

Q.      AND IT'S NOT -- DID YOU TAKE ANY INDEPENDENT NOTES?

A.      YOU KNOW, I DON'T KNOW.  I DON'T RECALL.

Q.      FAIR ENOUGH.  IT'S A LONG TIME AGO.

A.      YEAH, I DON'T RECALL.  I DON'T HAVE ANY --

Q.      HOW ABOUT YOUR PRACTICE AT THE TIME, WAS YOUR PRACTICE AT THE TIME TO TAKE NOTES?

A.      YES.

Q.      AND THEN MEMORIALIZE IT IN A REPORT?

A.      YES, YES.

Q.      BUT THOSE NOTES ARE NOT AVAILABLE?

A.      NO, I DON'T HAVE THEM.

Q.      WHAT HAPPENS TO THE NOTES AFTER YOU MAKE THEM IN THE INSTITUTIONAL SETTING?  WHAT WOULD YOU DO WITH THE NOTES AFTER YOU --

A.      SHRED THEM.  I WOULD SHRED THEM ONCE I USED THEM FOR MY REPORT.

Q.      SO NOWHERE IN THE REPORT THAT YOU DID DO, THOUGH, DOES IT CONTAIN THE INFORMATION ABOUT THE NINE MINUTES, WOULD THAT BE FAIR?

A.      THAT IS FAIR.

Q.      NOW, AT THE TIME THAT YOU CONDUCTED YOUR SUICIDE ASSESSMENT OF MR. HAMMER, YOU WERE THE CHIEF OF PSYCHOLOGY SERVICES AT ALLENWOOD, IS THAT CORRECT?

A.      THAT'S CORRECT.

Q.      AND HOW LONG HAD YOU BEEN THE CHIEF?  WERE YOU HIRED AS CHIEF?

A.    YES.

Q.    DID YOU COME IN AS CHIEF?

A.    YES.

Q.    NOW, YOU RECALL TESTIFYING AT THE TIME OF TRIAL?

A.    YES.

Q.    AND MR. HAMMER HAD BEEN TRANSFERRED TO ALLENWOOD FROM USP LOMPOC, DO YOU RECALL THAT?

A.    YES, I DO.

Q.    NOW, WHEN HE ARRIVED FROM LOMPOC, HE WAS ON MEDICATION, WAS HE NOT?

A.    YES.

Q.    AND HE WAS ON PROZAC, CORRECT?

A.    YES.

Q.    WHICH IS AN ANTIDEPRESSANT.

A.    UM-HUM.

Q.    AND HE WAS ON XANAX?

A.    RIGHT.

Q.    AND THAT IS AN ANTIANXIETY MEDICATION?

A.    CORRECT.

Q.    NOW, WHEN HE CAME TO ALLENWOOD, THOSE MEDICATIONS WERE DISCONTINUED?

A.    THAT IS MY UNDERSTANDING, YES.

Q.    AND WOULD YOU KNOW WHY THEY WERE DISCONTINUED?

A.    I DON'T RECALL.

Q.    DID YOU RECALL TESTIFYING IN 1998 -- AND I KNOW

IT'S A LONG TIME AGO, IT'S NOT A MEMORY TEST -- THAT OFTEN PRISONERS WHO WERE TRANSFERRED FROM LOMPOC CAME ON THE BENZODIAZEPINE-TYPE MEDICATION AND THAT IT WAS PRETTY MUCH PRACTICE AT THE INSTITUTION TO TAKE THEM OFF OF THAT?

A.    THAT'S RIGHT.

Q.    DOES THAT SOUND FAMILIAR?

A.    YES, IT DOES.

Q.    NOW, IN MR. HAMMER'S RECORDS, I DID NOT SEE ANY EVIDENCE THAT THE XANAX WAS TAPERED.  DID YOU JUST TAKE THE GUYS OFF THE XANAX COLD TURKEY?

A.    OKAY.  IN THE BUREAU OF PRISONS, THE MEDICINES ARE DONE BY THE MEDICAL DEPARTMENT.  THE PSYCHOLOGY DOES OTHER THINGS.  SO THAT WAS HANDLED BY THE MEDICAL DOCTORS.  I DON'T RECALL IF IT WAS TAPERED OR NOT.

Q.    WAS IT THE -- I MEAN, AS CHIEF PSYCHOLOGIST, I WOULD ASSUME, AND CORRECT ME IF I'M WRONG, THAT IF AN INMATE WAS ON SOME TYPE OF MEDICATION TO HELP WITH MENTAL PROBLEMS OR MENTAL ILLNESS YOU WOULD BE AWARE OF THAT?

A.    YES.

Q.    CORRECT?

A.    YES.

Q.    AND BEING AWARE OF IT, YOU WOULD BE AWARE OF WHAT DOSAGE THEY WERE ON?

A.      YES.

Q.      AND SO IS IT BEST PRACTICE TO JUST CUT SOMEONE OFF FROM EITHER PROZAC OR XANAX COLD TURKEY?

A.      NO, IT'S NOT.

Q.      NOW, WHAT IS THE HARM BY STOPPING PROZAC COLD TURKEY?

A.      WELL, I'M NOT -- YOU KNOW, I DON'T PRESCRIBE, SO MY KNOWLEDGE --

Q.      THAT IS FAIR.  THAT IS FAIR.  GO AHEAD.

A.      BUT MY KNOWLEDGE IS THAT IT CAN CAUSE SEIZURES AND OTHER NEGATIVE SIDE EFFECTS AS A RESULT.

Q.      AND ISN'T IT -- NOW, I'M OBVIOUSLY NOT A DOCTOR EITHER, WHICH IS WHY I'M A LAWYER, BUT ISN'T IT TRUE THAT PROZAC IS A SEROTONIN UPTAKE INHIBITOR?

A.      YES, IT IS.

Q.      AND IF SOMEONE HAS BEEN ON PROZAC AND THEN THEY'RE SUDDENLY OFF OF IT, DOES IT NOT EVENTUALLY AFFECT MOOD AS WELL?

A.      IT CAN, YES.  YOU FEEL TERRIBLE WHEN YOU GET OFF OF IT.  AND IT LASTS FOR A FEW DAYS AND THEN -- OR A FEW WEEKS.  DEPENDS ON HOW MUCH YOU ARE ON.

Q.      NOW, YOU MENTIONED EARLIER THAT SHORTLY AFTER YOUR ARRIVAL AT THE INSTITUTION YOU HIRED DR. JOHN MITCHELL?

A.      THAT'S RIGHT.

Q.      AND AT THE TIME YOU DID YOUR SUICIDE ASSESSMENT
OF MR. HAMMER, YOU WERE AWARE THAT DR. MITCHELL WAS
MR. HAMMER'S TREATING PSYCHOLOGIST?

A.      THAT'S CORRECT.

Q.      NOW, AS THE SUPERVISOR, DID YOU REVIEW THE NOTES
AND PROGRESS REPORTS THAT DR. MITCHELL WOULD DO ON
INMATES TO ASSESS BOTH HIS PROGRESS AND SORT OF KEEP A
FEEL FOR WHAT IS GOING ON WITH PATIENTS WHO ARE NOT
YOURS?

A.      YES.

Q.      SO YOU WERE FAMILIAR WITH MR. HAMMER'S SITUATION
AT THAT POINT IN TIME?

A.      WITH HIS WORK WITH DR. MITCHELL?

Q.      YES.

A.      YES.

Q.      SO YOU KNEW AT THAT POINT IN TIME THAT
DR. MITCHELL HAD BEEN TREATING HIM FOR DEPRESSION?

A.      YES.

Q.      AND MOOD SWINGS?

A.      YES.

Q.      SO AS A PSYCHOLOGIST, NEITHER YOU NOR DR.
MITCHELL COULD PRESCRIBE MEDICATION?

A.      CORRECT.

Q.      SO WHO AT THE INSTITUTION -- YOU DID NOT HAVE AN
ON-STAFF PSYCHIATRIST, DID YOU?

A.    NO.

Q.    SO HOW WAS MEDICATION HANDLED?

A.    WELL, WE EITHER HAD A CONTRACTOR COME IN TO DO THAT OR WE USED OUR MEDICAL DOCTOR, MEDICAL DOCTORS WHO WERE ON STAFF.

Q.    AND MEDICAL DOCTORS ARE NOT -- WHILE THEY HAVE SOME TRAINING IN PSYCHIATRY, IF YOU HAD YOUR CHOICE BETWEEN WHO WAS GOING TO PRESCRIBE MEDICATION FOR A MENTALLY ILL PATIENT, WOULD IT BE THE MEDICAL DOCTOR OR THE PSYCHIATRIST?

A.    I WOULD SAY THE PSYCHIATRIST IN MOST CASES, YEAH.

Q.    NOW, THE CONTRACT PSYCHIATRIST, IF YOU RECALL, AT THE TIME OF THIS INCIDENT IN APRIL OF 1996, DO YOU KNOW WHO THE CONTRACT PSYCHIATRIST WAS AT THAT POINT IN TIME?

A.    NO.

Q.    AT THE TIME THAT YOU WORKED AT THE INSTITUTION, DID THE CONTRACT -- DID THEY HAVE MORE THAN ONE CONTRACT PSYCHIATRIST?

A.    NOT THAT I RECALL.

Q.    SO --

A.    WE HAD ENOUGH TROUBLE TRYING TO GET ONE.

Q.    AND SO WOULD THE CASELOAD, THEN, IF YOU KNOW, FOR THAT CONTRACT PSYCHIATRIST, BE PRETTY HIGH?

A.    YES.

Q.    AND HOW OFTEN WERE THEY IN THE INSTITUTION, IF YOU RECALL?

A.    I WOULD SAY ONCE A MONTH, ONCE EVERY 30 DAYS.

Q.    SO IN TERMS OF CONTINUITY OF CARE, THAT WAS HARD TO ACCOMPLISH AT THE PRISON WITH JUST ONE PRESCRIBING PSYCHIATRIST?

A.    IT WAS NOT IDEAL.

Q.    IT WOULD NOT BE WHAT YOU WOULD CONSIDER BEST PRACTICE?

A.    NO.

Q.    NOW, DID YOU KNOW AT THE TIME -- WELL, LET ME BACKTRACK FOR A MINUTE.

SO WHEN MR. HAMMER ARRIVED AT USP ALLENWOOD, YOU DIAGNOSED HIM AS SUFFERING FROM INTERMITTENT EXPLOSIVE DISORDER, DO YOU RECALL THAT?

A.    YES.

Q.    AND I THINK YOU TOLD THE JURY THAT, QUOTE, IN OTHER WORDS, HE WOULD HAVE PERIODS OF RAGE?

A.    RIGHT.

Q.    AND SO THAT, IN A NUTSHELL, IS SORT OF HOW YOU WOULD DESCRIBE AN INTERMITTENT EXPLOSIVE DISORDER?

A.    YES.  IT'S SOMEBODY THAT GETS OUT OF CONTROL WAY MORE THAN THE SITUATION WOULD CALL FOR.

Q.    AND DO YOU FIND THAT THAT IS A DISORDER THAT IS

MORE COMMON WITH PEOPLE WHO HAVE HAD TRAUMA IN THEIR LIFE?

A.     I DON'T KNOW.

Q.     YOU DON'T KNOW?

A.     NO.

Q.     SO THAT IS NOT WITHIN YOUR REALM OF --

A.     I JUST DON'T KNOW THAT THERE IS A CONNECTION BETWEEN THE TWO.

Q.     AND YOU DON'T KNOW THAT THERE ISN'T, ONE WAY OR THE OTHER?

A.     RIGHT, RIGHT.

Q.     NOW, HE HAD ALSO BEEN DEEMED BY YOUR STAFF TO HAVE SIGNIFICANT MENTAL HEALTH PROBLEMS THAT WARRANTED PSYCHOLOGICAL OR PSYCHIATRIC INTERVENTION, IS THAT CORRECT?

A.     YES.

Q.     AND THERE WAS A PARTICULAR DESIGNATION AT THAT TIME, I DON'T RECALL WHAT IT WAS, BUT A PARTICULAR DESIGNATION THAT WENT IN THE FILE FOR YOUR INMATES WHO REQUIRED REGULAR MENTAL HEALTH SERVICES, PGM OR --

A.     I DON'T RECALL.

Q.     BUT MR. HAMMER WAS DESIGNATED IN THE CATEGORY THAT HE NEEDED PSYCHOLOGICAL --

A.     I BELIEVE HE WAS, YES.

Q.     -- INTERVENTION?

A.      YES.

MR. MORENO:  CAN I HAVE A MOMENT, YOUR HONOR?

THE COURT:  YES.

MR. MORENO:  JUDGE, MAY I APPROACH THE WITNESS?

THE COURT:  YES.

BY MR. MORENO:

Q.      DOCTOR, I'M SHOWING YOU --

THE COURT:  DO YOU HAVE ONE MORE COPY FOR MY LAW CLERK?

MR. MORENO:  I DO HAVE ANOTHER ONE.

THE COURT:  IF YOU CAN, TRY TO HAND UP TWO.

MR. MORENO:  SORRY ABOUT THAT.

BY MR. MORENO:

Q.      DOCTOR, I'M SHOWING YOU WHAT IS DEFENSE EXHIBIT 4.  I JUST ASK YOU TO TAKE A QUICK LOOK AT THAT. THAT IS A MEMO FROM DR. JOHN MITCHELL.  IT'S DATED MARCH 20TH, 1996 AT THE TOP.  DO YOU SEE THAT?

A.      YES.  YES, I DO.

Q.      NOW, DO YOU HAVE A RECOLLECTION OF HAVING SEEN THIS DOCUMENT BEFORE?

A.      NO.

Q.      OKAY.  CAN YOU READ WHAT DR. MITCHELL WROTE

THERE ABOUT MR. HAMMER?

MR. GURGANUS:  YOUR HONOR, JUST SO WE DON'T GET FAR AFIELD, WE OBJECT BECAUSE I THINK DR. -- I BELIEVE MITCHELL WILL BE TESTIFYING, SO I DON'T KNOW THE RELEVANCE AT THIS POINT.  IT'S NOT HIS DOCUMENT.  AND HE IS TESTIFYING HERE ABOUT, YOU KNOW, A STATEMENT THAT MR. HAMMER GAVE.

THE COURT:  HE DID SAY HE REVIEWED MITCHELL'S REPORTS, SO I WILL ALLOW IT.

MR. GURGANUS:  ALL RIGHT.

MR. MORENO:  THANK YOU, YOUR HONOR.

THE WITNESS:  OKAY.  THIS IS A MEMORANDUM FOR RON LAINO, HEALTH SERVICE ADMINISTRATOR.  IT'S DATED MARCH 20TH, 1996, FROM JOHN R. MITCHELL, PSY D, DAPC PSYCHOLOGIST, SUBJECT:  HAMMER, DAVID, REG NUMBER 25507-077.  I'M REFERRING THE ABOVE INMATE TO SEE THE PSYCHIATRIST FOR A MEDICATION EVALUATION.  IN MY WORK WITH THE INMATE, HE HAS DEMONSTRATED PRIMARILY DEPRESSIVE SYMPTOMS.  HE HAS EXPRESSED CONCERNS ABOUT HIS MOOD SWINGS AND WONDERED IF LITHIUM WOULD HELP HIM.

THE ASSISTANCE OF THE PSYCHIATRIST IN HELPING TO DETERMINE IF THIS WOULD BE -- BENEFIT THE INMATE WOULD BE HELPFUL.  THANK YOU.

Q.    SO THAT IS A LITTLE LESS THAN A MONTH BEFORE THE OFFENSE IN THIS CASE, IS THAT CORRECT?

A.      YES.

Q.      AND I'M GOING TO SHOW YOU NOW WHAT HAS BEEN MARKED AS DEFENSE EXHIBIT 5.  I WILL JUST ASK YOU TO TAKE A QUICK LOOK AT THAT, PLEASE.  THAT IS A MEDICAL RECORD CONSULTATION SHEET.

A.      YES.

Q.      DATED 3/20/96?

A.      YES.

Q.      IS THIS THE TYPE OF FORM THAT YOU WOULD SEE WHEN AN INMATE WAS PRESCRIBED MEDICATION BY ONE OF THE CONTRACT PSYCHIATRISTS?

A.      THIS WOULD GO INTO THE MEDICAL RECORD.

Q.      AND IS THAT SOMETHING YOU WOULD HAVE ACCESS TO?

A.      YES.

Q.      SO DO YOU SEE WHERE IT SAYS, TOWARDS THE BOTTOM OF THE MAIN PARAGRAPH, THAT HE WAS PRESCRIBED DEPAKOTE, 250 MILLIGRAMS?

A.      YES, THERE IT IS.  OKAY, WOW.  OKAY, YES.

Q.      AND THAT WAS ABOUT LESS THAN A MONTH BEFORE THE TIME OF THE OFFENSE IN THIS CASE, IS THAT CORRECT?

A.      THAT'S RIGHT.

Q.      NOW, DEPAKOTE HAS A NUMBER OF DIFFERENT USES THESE DAYS, IS THAT CORRECT?

THE COURT:  CAN YOU SPELL THAT?

MR. MORENO:  YES, I'M SORRY.  IT'S

D-E-P-A-K-O-T-E.

THE COURT:  WAIT.  D-E-P- --

MR. MORENO:  A --

THE COURT:  A.

MR. MORENO:  K-O-T-E.

THE COURT:  OKAY.

THE WITNESS:  YES, IT'S USED FOR SEIZURES AND IT'S ALSO USED FOR BIPOLAR DISORDER.

BY MR. MORENO:

Q.     RIGHT.  AND IT'S USED FOR MANIA, I GUESS, CORRECT?

A.     CORRECT.

Q.     AND MOOD SWINGS?

A.     BIPOLAR, RIGHT.  THAT IS WHAT THAT MEANS.

Q.     SO NOW THE DOCTOR WHO PRESCRIBED THAT, IT LOOKS LIKE IT WAS DR. LEON EIGLETE, E-I-G-L-E-T-E.  DO YOU SEE THE STAMP DOWN TOWARDS THE SIDE ON THE RIGHT-HAND SIDE?

A.     RIGHT.  I DON'T KNOW WHO THAT IS.

Q.     YOU DON'T KNOW WHO THAT IS?

A.     NO.

Q.     SO THAT IS NOT A NAME THAT IS FAMILIAR TO YOU?

A.     NO.

Q.     BUT OBVIOUSLY HE WORKED AT THE PRISON AT THE TIME, OR AT LEAST WAS A CONTRACT PSYCHIATRIST AND PRESCRIBED THIS MEDICATION?

A.      JUST GOING OFF THE PAPER, I WILL SAY YES.  I JUST DON'T KNOW.

Q.      DO YOU KNOW RONALD A. LAINO?

A.      LAINO, YES.  HE WAS THE HEALTH SERVICE ADMINISTRATOR.  SO HE WAS THE DEPARTMENT HEAD OVER THE HEALTH SERVICES.

Q.      FOR THE ENTIRE USP?

A.      YES, USP.

THE COURT:  AT ALLENWOOD OR THE WHOLE FEDERAL CORRECTIONAL SYSTEM?

THE WITNESS:  NO, JUST AT THE USP ALLENWOOD.

THE COURT:  OKAY.

BY MR. MORENO:

Q.      NOW, DO YOU RECALL WHETHER OR NOT YOU WERE AWARE AT THE TIME WHEN YOU EVALUATED MR. HAMMER, DID THE SUICIDE ASSESSMENT, AS TO WHETHER HE WAS TAKING DEPAKOTE?

A.      I DON'T RECALL.

Q.      ALL RIGHT.  SO YOU DON'T RECALL.  YOU TESTIFIED IN 1998 THAT YOU HAD HEARD HE WAS TAKING DEPAKOTE.

A.      OKAY.

Q.      I AM SHOWING YOU WHAT HAS BEEN MARKED AS DEFENSE EXHIBIT 6.

MR. MORENO:  IF I MAY, JUDGE, IS IT OKAY

IF I STAND NEXT TO THE WITNESS FOR A MOMENT --

THE COURT:  YES.

MR. MORENO:  -- TO GO OVER A DOCUMENT?

THANK YOU.

BY MR. MORENO:

Q.    ALL RIGHT.  SO AT THE TOP HERE IT'S DATED

3/20/96, CORRECT?

A.    CORRECT.

Q.    AND FIRST FULL LINE DOWN, IT SAYS DEPAKOTE 250

MILLIGRAMS?

A.    IN THE MORNING, IN THE AM, RIGHT.

Q.    AND THEN DO YOU SEE FARTHER DOWN, WE GET TO --

THE MEDICATION IS PRESCRIBED ON 3/20.  WE GET TO 4/10,

THREE DAYS BEFORE THE MURDER, HE IS REFUSING TO TAKE HIS

MEDICATION.  DO YOU SEE THAT?

A.    YES.

Q.    AND DO YOU RECALL IF AT THE TIME -- WELL, I KNOW

YOU SAID A MOMENT AGO THAT YOU DID NOT KNOW THAT -- YOU

DON'T HAVE A RECOLLECTION TODAY AS TO MR. HAMMER TAKING

DEPAKOTE AT THAT TIME.  BUT PRIOR TO YOUR CONDUCTING THE

SUICIDE ASSESSMENT OF MR. HAMMER WOULD YOU HAVE REVIEWED

HIS FILE?

A.    NO, NO.

Q.    HOW ABOUT SUBSEQUENT TO IT, WOULD YOU HAVE GONE

BACK AND REVIEWED HIS FILE?

A.        NO, NO, NOT AT THAT MOMENT.

Q.        IT IS SIGNIFICANT WHEN SOMEONE STOPS TAKING MEDICATION THAT THEY HAVE BEEN PRESCRIBED BY A PSYCHIATRIST, IS IT NOT?

A.        IT CAN BE, YES.

Q.        AND IF HE WAS BEING PRESCRIBED MEDICINE FOR MOOD SWINGS, AND HE BEGAN TAKING IT ON MARCH 20TH, IT COULD BE A PROBLEM IN TERMS OF HIS POTENTIAL BEHAVIOR DOWN THE ROAD IF HE STOPS TAKING HIS MEDICATION?

A.        WELL, ONE OF THE THINGS ABOUT THAT PARTICULAR MEDICINE IS THAT BEFORE IT IS EVEN EFFECTIVE, YOU HAVE TO HAVE A CERTAIN AMOUNT IN YOUR BLOOD.  AND SO THAT HAS TO BE CHECKED PERIODICALLY.  AND WHEN YOU FIRST START, OFTENTIMES YOU ARE NOT UP TO AN EFFECTIVE DOSAGE.  SO IT'S HARD TO SAY THAT BY 4/10, WHICH IS WHAT, TEN DAYS LATER, IF REALLY HIM STOPPING TAKING THE MEDICINE WOULD HAVE BEEN THAT BIG OF AN ISSUE.

Q.        BUT IT MIGHT HAVE BEEN?

A.        IT MIGHT HAVE BEEN.

Q.        DID YOU KNOW THE PHYSICIAN'S ASSISTANT, MR. CHAUDHRI?

A.        YES.

Q.        MR. CHAUDHRI TESTIFIED IN THE TRIAL THAT MR. HAMMER HAD NOT HAD HIS MEDICATION IN AT LEAST A WEEK BEFORE THE MURDER IN THIS CASE.  WERE YOU AWARE OF THAT

INFORMATION?  DOES THAT REFRESH YOUR RECOLLECTION AT ALL?

A.      I DON'T RECALL THAT, NO.

Q.      AS CHIEF OF PSYCHOLOGY AT THE PRISON, WHOSE RESPONSIBILITY WOULD IT HAVE BEEN TO FOLLOW UP PERHAPS WITH HIS TREATING PSYCHIATRIST AS TO HIS REFUSAL TO TAKE THE MEDICATION?

A.      WHEN WE FIND OUT THAT PEOPLE ARE NOT TAKING THEIR MEDICINES, AND WHOSOEVER DOCTOR IT IS, WHOEVER IS ON THEIR CASE -- THAT INMATE IS ON THE CASELOAD, WOULD TALK TO THEM ABOUT IT.

Q.      AND DO YOU KNOW IF ANYONE TALKED TO MR. HAMMER ABOUT THAT?

A.      I DON'T KNOW.  I DON'T KNOW.

Q.      WOULD THAT HAVE BEEN SOMETHING THAT DR. MITCHELL WOULD HAVE BEEN REQUIRED TO REPORT?

A.      I THINK IT WOULD HAVE BEEN SOMETHING -- IT'S JUST PART OF OUR PRACTICE.  THAT IS WHAT WE WOULD HAVE DONE SO --

Q.      AND YOU JUST DON'T KNOW IF IT WAS DONE IN THIS CASE?

A.      I DON'T KNOW.

                MR. MORENO:  YOUR HONOR, CAN I HAVE JUST ONE MOMENT?  I'M LOOKING FOR AN EXHIBIT THAT I THOUGHT I HAD UP HERE WITH ME.  MAY I HAVE A MOMENT?

THE COURT: YES.

(PAUSE.)

MR. MORENO: YOUR HONOR, I'M HAVING TROUBLE FINDING ALL OF THE DOCUMENTS OF COURSE I HAD A MOMENT AGO. AS MURPHY'S LAW WOULD HAVE IT, THEY HAVE SINCE DISAPPEARED SINCE I NEED THEM AT THIS MOMENT. WOULD IT BE OKAY IF WE TOOK A LUNCH BREAK, I'LL FIND THEM AND THEN --

THE COURT: ALL RIGHT. ALL RIGHT.

MR. MORENO: I APOLOGIZE FOR THE INCONVENIENCE.

THE COURT: I JUST HAD ONE QUESTION TO CLARIFY.

ACCORDING TO D 6, I'M ASSUMING FROM THE TOP PORTION IT WAS ON 3/20/96 HE WAS PRESCRIBED THE DEPAKOTE.

MR. MORENO: THAT'S CORRECT.

THE COURT: NO. THE WITNESS HAS TO ANSWER, MR. MORENO.

MR. MORENO: OH, I'M SORRY. I THOUGHT YOU WERE DIRECTING IT TO ME.

THE COURT: I WAS DIRECTING IT TO THE WITNESS.

THE WITNESS: WELL, YOU KNOW, ONE OF THE THINGS THAT -- WHAT I THINK -- WHAT ARE THESE NUMBERS ON

THE OUTSIDE?  WHAT IS THIS LIKE 033116?  I DON'T KNOW WHAT THAT IS, WHAT THAT MEANS.  BUT YEAH, I MEAN, IT LOOKS LIKE ON 3/20/96 IT SAYS, PSYCHIATRIST, A. DENTON -- SEE, THAT IS NOT A PSYCHIATRIST.  THAT IS A PHYSICIAN ASSISTANT.  OKAY.  AND THEN UNDERNEATH -- AND THEN THERE IS REALLY -- OH, OKAY, HE MIGHT HAVE BEEN SITTING IN WITH THE PSYCHIATRIST.  MAYBE THAT IS WHAT IT IS.  AND THEN HE WROTE THE DEPAKOTE 250.  AND THEN THERE IS THE PSYCHIATRIST'S STAMP.

BY THE COURT:

Q.     NOW, THE NEXT QUESTION IS, I SEE LOOKING DOWN -- I'M NOT SURE I CAN READ EVERYTHING IN THE MIDDLE OF THIS FORM, ALL THE NOTES --

A.     ABOUT DIARRHEA?

Q.     IT LOOKS LIKE 4/10/96, HE REFUSED TO TAKE IT.

A.     THAT IS WHAT IT SAYS.

Q.     SO IT'S ABOUT -- WHAT, IT'S ABOUT 20 DAYS HE USED IT, ASSUMING HE STOPPED ON 4/10?

A.     RIGHT.

Q.     WOULD THAT BE ENOUGH TO BE IN HIS SYSTEM TO HAVE --

A.     YOU KNOW, JUDGE, I REALLY -- I DON'T THINK IT IS, BUT I REALLY CAN'T BE POSITIVE ON THAT, BECAUSE THIS STUFF REALLY HAS TO BUILD UP INTO YOUR BLOOD FOR -- IT TAKES AT LEAST A MONTH, IS MY UNDERSTANDING.

Q.      ALL RIGHT.  I ONLY ASK BECAUSE I THOUGHT YOU SAID TEN DAYS BEFORE.  IT SEEMS LIKE MORE DAYS FROM THIS REPORT, BUT WE DON'T KNOW WHEN HE STOPPED.

A.      RIGHT.

Q.      ALL RIGHT.

BY MR. MORENO:

Q.      DOCTOR --

             MR. MORENO:  I'M SORRY.  I HAVE A FOLLOW-UP BASED ON THE COURT'S QUESTION.

             THE COURT:  YES, ABSOLUTELY.

BY MR. MORENO:

Q.      PHARMACOLOGY, YOU ARE NOT FORMALLY TRAINED IN PHARMACOLOGY?

A.      THAT'S CORRECT.

Q.      AND SO YOU REALLY, WITH ALL DUE RESPECT, IT'S OUTSIDE YOUR REALM OF EXPERTISE --

A.      THAT'S CORRECT.

Q.      -- TO KNOW WHETHER OR NOT THERE WAS ENOUGH -- THE DOSAGE WAS HIGH ENOUGH AND HE HAD IT IN HIS SYSTEM LONG ENOUGH FOR IT TO HAVE AN IMPACT?

A.      THAT IS CORRECT, THAT IS OUTSIDE MY EXPERTISE.

Q.      NOW, YOU KNOW, WHEN YOU FIRST LOOKED AT IT AND SAW IT WAS 250 MILLIGRAMS, YOU SEEMED TO HAVE A REACTION TO THAT LIKE THAT SEEMED LIKE A LOT.

A.      NO.  NO.

Q.      THEN I MISREAD YOU THERE.

A.      NO, IT'S NOT THAT MUCH.

MR. MORENO:  ALL RIGHT.  NOW WOULD BE A GOOD TIME TO BREAK, IF WE COULD, YOUR HONOR.

THE COURT:  ALL RIGHT.  WE WILL STAND IN RECESS UNTIL QUARTER TO TWO.

MR. MORENO:  THANK YOU.

(LUNCHEON RECESS TAKEN.)

THE COURT:  I WILL HAVE THIS ORDER DOCKETED.  WE ARE BACK ON THE RECORD IN UNITED STATES VERSUS HAMMER.  AND I WILL HAVE THE ORDER DOCKETED THAT WHILE MR. HAMMER IS PARTICIPATING IN THESE RESENTENCING PROCEEDINGS VIA VIDEO CONFERENCING, HE SHALL NOT BE RESTRAINED IN A BELLY CHAIN OR SHACKLES AND HIS HANDCUFFS MUST PERMIT HIM TO WRITE AND READ DOCUMENTS. I WILL HAVE THIS FILED OF RECORD.

AND MR. GURGANUS, IF THE PRISON NEEDS A COPY, WOULD YOU GET A CERTIFIED COPY AND FORWARD IT TO THEM?

MR. GURGANUS:  I WILL, YOUR HONOR.

MS. SAUNDERS:  THANK YOU, YOUR HONOR.

THE COURT:  OKAY.  LET'S RESUME THE CROSS EXAMINATION OF THE WITNESS.

MR. MORENO:  THANK YOU, YOUR HONOR.

YOUR HONOR, FOR THE COURT'S EDIFICATION,

I'M GOING TO BE REFERRING BACK TO EXHIBIT 5 FOR A FEW MINUTES.

BY MR. MORENO:

Q.      DOCTOR, I PUT EXHIBIT 5 IN FRONT OF YOU.  DO YOU SEE THAT?

A.      YES, I DO.

Q.      THIS IS THE SHEET THAT, AMONG OTHER THINGS, NOTES THE PRESCRIPTION FOR DEPAKOTE, CORRECT?

A.      YES.

Q.      GOING TO THE TOP OF THAT DOCUMENT, THE PARAGRAPH, IT SAYS:  SINGLE LIFE TERM WITH DIAGNOSIS OF WHAT?  CAN YOU READ THAT?

A.      MOOD SWINGS.

Q.      AND HOW ABOUT WHAT DOES IT SAY UNDERNEATH IT, DIFFICULTY --

A.      DIFFICULTY HOLDING ANGER, HANDLING ANGER. EITHER HANDLING OR HOLDING.  IT LOOKS LIKE HOLDING.  ACT IMPULSIVELY, SOMETHING HIM.

Q.      IT'S HARD TO READ THAT ONE.  SO DIAGNOSIS OF MOOD SWINGS, DIFFICULTY HOLDING ANGER, ACTS IMPULSIVELY, CORRECT, AND THEN PRESCRIPTION FOR DEPAKOTE?

A.      CORRECT.

Q.      I AM SHOWING YOU WHAT HAS BEEN MARKED AS DEFENDANT'S 7.  DOCTOR, THAT IS A RECORD FROM THE SPECIAL HOUSING UNIT AT ALLENWOOD, IS THAT CORRECT?

A.      YES.

Q.      AND WHOSE NAME IS THE INMATE NAME?

A.      IT'S HAMMER, D.

Q.      AND HIS NUMBER THERE IS 24507-077?

A.      CORRECT.

Q.      AND DO YOU SEE DOWN A LITTLE WAYS WHERE IT SAYS PERTINENT INFORMATION?

A.      YES, I DO.

Q.      WHAT DOES IT SAY ON THAT LINE, PERTINENT INFORMATION?

A.      PERTINENT INFORMATION, THERE'S A BLANK LINE, AND IT IS FILLED IN:  MANIPULATIVE, PLACED ON PSYCH SINGLE ON 3/4/96.

Q.      PSYCH SINGLE.  PSYCH SINGLE IS WHERE IT IS DETERMINED THAT THE INMATE IS A DANGER TO OTHERS, CORRECT, OR TO HIMSELF?

A.      WELL, MAINLY OTHERS, YES.

Q.      MAINLY OTHERS.  OKAY.  AND THAT THE DETERMINATION IS MADE FOR THE SAFETY OF OTHERS THAT THIS INMATE SHOULD BE SINGLE CELLED?

A.      SAFETY OF OTHERS OR THE SAFETY OF THE INMATE BECAUSE THE OTHER PERSON MIGHT TAKE ADVANTAGE OF THAT. THAT WAS THE MAJOR REASON WHY WE DID IT, FOR THE WEAK INDIVIDUALS COMING BACK FROM MENTAL HOSPITALS, ET CETERA.

Q.    BUT IT WAS ALSO DONE FOR INDIVIDUALS WHO PRESENTED A DANGER TO OTHER PEOPLE?

A.    GENERALLY -- THE TRUTH IS THAT THE INMATES THAT MADE THE BIGGEST COMPLAINTS AND HAD SOME KIND OF PSYCH HISTORY OFTENTIMES WE WOULD DO THAT AT FIRST UNTIL WE REALLY KNEW WHAT WE HAD.  SO IN THIS CASE, YOU KNOW, HE SAID HE NEEDED IT, DA, DA, DA, AND HE GOT IT.

Q.    WELL, HE DOES NOT SAY.  WHERE DOES IT SAY ANYWHERE HE NEEDED IT?

A.    NO.  NO.

Q.    IT DOES NOT SAY THAT ANYWHERE, DOES IT?

A.    RIGHT, BUT THAT IS USUALLY HOW IT'S --

Q.    THAT IS NOT WHAT THIS RECORD SHOWS, IS IT, SIR?

A.    NO.

Q.    WHAT THIS RECORD SHOWS IS THAT HE WAS PLACED ON PSYCH SINGLE, CORRECT?

A.    CORRECT.

Q.    A LITTLE OVER A MONTH BEFORE THE OFFENSE IN THIS CASE, ISN'T THAT CORRECT?

A.    YES.

Q.    DO YOU REMEMBER TESTIFYING BACK IN 1998?

A.    YES.

MR. MORENO:  YOUR HONOR, MAY I APPROACH THE WITNESS?

THE COURT:  YES.

BY MR. MORENO:

Q.      DOCTOR, I'M SHOWING YOU A COPY OF YOUR TRANSCRIPTS FROM JUNE 30TH, 1988.

THE COURT:  YOU HAVE TO SPEAK INTO THE MIC.  YOU KNOW I SAY THAT ALSO BECAUSE IF YOU ARE NOT, THERE IS A CHANCE THAT MR. HAMMER MAY NOT BE HEARING YOU.  WE ARE DEALING WITH A BROADCAST.

MR. MORENO:  THANK YOU.  THANK YOU, DOCTOR.

BY MR. MORENO:

Q.      DOCTOR, I'M TURNING TO YOUR TRANSCRIPTS, JUNE 30TH ON PAGE -- 1998.  WE ARE LOOKING AT PAGE 54. HOLD ON FOR A MINUTE.

MR. MORENO:  YOUR HONOR, HERE IS A COPY FOR YOU.

LAUREN.

THE CLERK:  THANK YOU.

MR. MORENO:  I MAY HAVE A COPY FOR THE U.S. ATTORNEYS.

MR. GURGANUS:  I HAVE A COPY.

MR. MORENO:  THANK YOU.

BY MR. MORENO:

Q.      THE POINT THAT I JUST MARKED ON THOSE TRANSCRIPTS BEGINNING WITH -- LET'S GO ABOUT TO LINE 6. DO YOU SEE LINE 6, THE QUESTION?

A.      YES.

Q.      COULD YOU READ THAT FOR US, PLEASE.

A.      COULD YOU TELL THE JURY WHAT WOULD GO INTO THE PROCESS OF ASSIGNING SOMEONE PSYCH SINGLE STATUS IN THE SPECIAL HOUSING UNIT?

THE COURT:  WHICH PAGE?

MR. MORENO:  PAGE 54, YOUR HONOR.

THE WITNESS:  I'M ON LINE 9.

MAINLY THE ONLY REASON WE WOULD SAY DON'T PUT ANYONE ELSE IN WITH AN INMATE IS IF WE THINK THAT THE INMATE'S IN DANGER OF HURTING SOMEBODY ELSE OR THAT THE INMATE IS SO VULNERABLE OR SO DISTURBED THAT SOMEBODY ELSE MIGHT GET HURT AS A RESULT OF LIVING WITH HIM.

BY MR. MORENO:

Q.      SO BACK AT THE TIME WHEN YOU WERE CHIEF PSYCHOLOGIST AT USP ALLENWOOD, THAT IS WHAT YOU DEFINED --

A.      YES.

Q.      -- AS THE CRITERIA FOR BEING PUT ON SINGLE CELL PSYCH STATUS?

A.      CORRECT.

Q.      YOU STAND BY THAT TODAY?

A.      YES.

Q.      SO DO YOU HAVE A -- AND THIS MAY BE OUT OF YOUR

REALM OF RESPONSIBILITY, BUT CAN YOU TELL US WHY AN INMATE WHO WAS DEEMED BY STAFF TO BE A POTENTIAL DANGER TO OTHERS, ON MARCH 4TH, 1996 IS PLACED ON SINGLE PSYCH CELL STATUS, IS STILL WITH A ROOMMATE ON APRIL 13TH, 1996?

A.      I CAN'T EXPLAIN THAT.

Q.      THAT IS A FAILURE, WOULD YOU AGREE?

A.      BASED ON THIS DEFINITION, YES.

Q.      AND THAT IS THE OPERATIVE DEFINITION FOR THE BUREAU OF PRISONS, IS THAT CORRECT?

A.      GEE, I DON'T KNOW ABOUT THAT ONE.  WHEN I WAS WORKING FOR THEM, THAT WAS MY UNDERSTANDING, YEAH.

Q.      YOUR UNDERSTANDING OF THE POLICY WAS WHAT WAS JUST STATED.  AND BASED ON THE UNDERSTANDING OF THE POLICY, WHAT IT ENTAILS TO PLACE SOMEBODY ON THAT, MEANING THAT THEY ARE A POTENTIAL DANGER TO OTHERS, IT WAS A FAILURE, AN INSTITUTIONAL FAILURE FOR MR. HAMMER TO BE WITH A CELLMATE ON APRIL 13TH, 1996, WASN'T IT?

A.      YES.

Q.      NOW, AT THE TIME YOU WERE THERE, IN APRIL OF 1996 OR IN 1996, HOW MANY INMATES WERE AT THE INSTITUTION, IF YOU RECALL, ROUGHLY?  I KNOW IT'S NOT PRECISE.

A.      I'M GOING TO SAY 1100.

Q.      AND THERE WERE TWO PSYCHOLOGISTS FOR 1100

INMATES?

A.    WELL, WE WENT ON AND ACTUALLY ADDED A THIRD OVER TIME, BUT I'M NOT SURE EXACTLY WHEN HE CAME ON.  I REMEMBER SEEING THAT IN THE TRANSCRIPTS SO....

Q.    BUT AT THE TIME THAT THIS INCIDENT OCCURRED DO YOU KNOW IF YOU HAD TWO OR THREE?  I THOUGHT IT WAS YOU AND MR. MITCHELL.  I COULD BE WRONG.

A.    THERE WERE JUST TWO.

Q.    IT WAS JUST TWO?

A.    YEAH.

Q.    TWO FOR 1100 INMATES.

A.    RIGHT.

Q.    YOU WOULD AGREE, I WOULD ASSUME, AND PERHAPS I'M WRONG, THAT IN A PRISON SETTING THE NUMBER OF PEOPLE IN THE POPULATION WHO ACTUALLY NEED MENTAL HEALTH SERVICES IS GREATER THAN ON THE STREET?

A.    YES.

Q.    AND SO YOU HAD A LOT OF WORK FOR TWO PEOPLE?

A.    YES.  YES.

Q.    WOULD IT BE FAIR TO SAY THAT YOU WERE OVERWHELMED?

A.    YES.

Q.    WOULD IT BE FAIR TO SAY THAT YOU WOULD NOT PRACTICE THE SAME WAY IN YOUR PRIVATE PRACTICE AS YOU WERE FORCED TO IN THE INSTITUTIONAL SETTING?

A.    CORRECT.

Q.    AND THE SAME WOULD BE TRUE FOR THE SINGLE PSYCHIATRISTS, THE CONTRACT PSYCHIATRISTS WHO CAME ONCE A MONTH?

A.    THAT'S RIGHT.

Q.    SO FOR ONCE A MONTH THAT DOCTOR WOULD BE TRYING TO MONITOR THE MEDICATIONS OF AN ENTIRE PRISON POPULATION?

A.    THOSE THAT HAVE THE MEDICINE, YES.

Q.    AND DO YOU RECALL TODAY EXACTLY HOW MANY INMATES MIGHT HAVE BEEN ON YOUR SERVICE AT THE TIME?  I KNOW IT'S A LONG TIME AGO.

A.    NO.  YOU KNOW, I DON'T KNOW.

Q.    A COUPLE HUNDRED?

A.    THAT IS A GOOD NUMBER.

Q.    EASY?

A.    YEAH, EASY.  PLUS THERE WERE SO MANY OTHER DUTIES THAT WE HAD TO DO, INCLUDING THE SPECIAL HOUSING UNIT.

Q.    YOU WERE SPREAD PRETTY THIN?

A.    YES.

            MR. MORENO:  I HAVE NO FURTHER QUESTIONS. THANK YOU, DOCTOR.

            THE COURT:  REDIRECT.

            MR. GURGANUS:  YES.

REDIRECT EXAMINATION

BY MR. GURGANUS:

Q.    I WOULD JUST LIKE TO FOLLOW UP WITH YOUR TESTIMONY FROM 1998.  SIR, DO YOU HAVE THAT IN FRONT OF YOU.

A.    YES, I DO.

Q.    AND YOU WERE ON PAGE 54, IS THAT RIGHT?

A.    YES.

Q.    CAN YOU CONTINUE READING YOUR -- ON LINE 6 THE QUESTION WAS:  COULD YOU TELL THE JURY WHAT WOULD GO INTO THE PROCESS OF ASSIGNING SOMEONE PSYCH SINGLE STATUS IN THE SPECIAL HOUSING UNIT?  THAT WAS THE QUESTION, RIGHT?

A.    RIGHT.

Q.    CAN YOU READ YOUR ANSWER AND CONTINUE TO THE NEXT PARAGRAPH AND THEN I WILL FOLLOW UP WITH THE NEXT QUESTION AND WE WILL JUST KIND OF FILL IN THE WHOLE -- WHAT YOU TESTIFIED TO BACK THEN.

A.    RIGHT.

Q.    ALL RIGHT?

A.    OKAY.

Q.    SO I WILL READ THE QUESTION.  COULD YOU TELL THE JURY WHAT WOULD GO INTO THE PROCESS OF ASSIGNING SOMEONE SINGLE -- PSYCH SINGLE STATUS IN THE SPECIAL HOUSING UNIT?  ANSWER.

A.      MAINLY THE ONLY REASON WE WOULD SAY DON'T PUT ANYONE ELSE IN WITH AN INMATE IS IF WE THINK THAT THE INMATE IS IN DANGER OF HURTING SOMEBODY ELSE OR THAT THE INMATE IS SO VULNERABLE OR SO DISTURBED THAT SOMEBODY ELSE MIGHT GET HURT AS A RESULT OF LIVING WITH HIM.  IN CASES WHERE INMATES WERE SO DISTURBED CERTAINLY WE WOULD BE WORKING ON GETTING THEM TRANSFERRED TO A PSYCHIATRIC HOSPITAL AND THEY WOULD NOT STAY VERY LONG.  BUT WE WERE RARELY -- BUT WE RARELY WOULD PUT PEOPLE ON PSYCH SINGLE CELL STATUS IN THE SPECIAL HOUSING UNIT MAINLY BECAUSE THERE'S ONLY SO MANY CELLS AND WE COULD NOT JUSTIFY THAT.

Q.      THEN THE QUESTION:  WITH RESPECT AGAIN TO MR. HAMMER'S SITUATION, DOES -- IF A PERSON IS PUT ON PSYCH SINGLE STATUS, CAN THAT PERSON BASICALLY SAY, I WILL TAKE A ROOMMATE?  IS HE PROHIBITED FROM RECEIVING AN INMATE IF HE IS ONCE PUT ON PSYCH SINGLE STATUS BY YOURSELF OR BY DR. MITCHELL?  ANSWER.

A.      AGAIN, IF WE WERE TALKING ABOUT A FORMALIZED PROCESS, THEN NO, THEY CAN'T.  BUT IF WE ARE TALKING ABOUT WHERE SOMEBODY IS UPSET OR SAYS, YOU KNOW, DOC, IF YOU COULD JUST LEAVE ME ALONE FOR OVER THE WEEKEND, I WOULD APPRECIATE IT.  I JUST NEED TO SORT OUT SOME THINGS AND I WILL LET YOU KNOW WHEN I CAN TAKE A CELLIE, THAT WOULD BE DIFFERENT, THEN, YES.  THE ANSWER WOULD BE

YES.

Q.    DO YOU KNOW IF THERE WAS SOME -- IF YOU CAN RECALL, WAS THERE SOME SUGGESTION AT ONE POINT THAT MR. HAMMER'S FATHER HAD PASSED AWAY DURING THIS TIME PERIOD?

A.    YES.  THERE WAS SOME CONFUSION ABOUT THAT, WHETHER HE HAD OR HADN'T.

Q.    IN FACT HE HAD NOT, CORRECT?

A.    RIGHT.

Q.    NOW JUST ONE OTHER AREA.  THERE WAS QUESTIONS ABOUT THE NINE MINUTES, RIGHT?

A.    YES.

Q.    THAT MR. HAMMER TOLD YOU, STRANGLED HIM FOR NINE MINUTES.  DID YOU TESTIFY TO THAT ALSO IN 1996?  I WILL REFER YOU TO PAGE 44.

A.    OKAY.  THIS IS THE '98 TRANSCRIPT.

Q.    I'M SORRY.  1998, YES, PAGE 44.  DID YOU TESTIFY TO IT BACK THEN ALSO?

A.    YES.

MR. GURGANUS:  I HAVE NO FURTHER QUESTIONS, YOUR HONOR.

MR. MORENO:  BRIEFLY, YOUR HONOR, IF I MAY.

THE COURT:  YES.

RECROSS EXAMINATION

BY MR. MORENO:

Q.      DOCTOR, IN A CASE SUCH AS THIS WHERE A SINGLE PSYCH CELL STATUS HAS INDEED BEEN ORDERED FOR SOMEONE IN SPECIAL HOUSING UNIT, YOU ARE NOT SUGGESTING THAT AN INMATE WHO HAS BEEN DEEMED MENTALLY DISTURBED CAN OVERRIDE THE SAFETY CONCERNS AN INSTITUTION HAS BY PLACING SOMEONE ON SINGLE CELL STATUS AND REQUESTING A CELLIE?

A.      WELL, WHAT I AM SAYING IS THAT SOMETIMES IT WAS DONE INFORMALLY.  SO THE WAY YOU READ THE QUESTION, YOU SAID IF SOMEONE WAS ORDERED OR YOU USED SOME KIND OF FORMAL DECISION MAKING PROCESS.  AND I DON'T THINK THAT WAS THE CASE.

Q.      WELL, IT SAYS PLACED IN SINGLE CELL STATUS.

A.      IT DOES SAY THAT, RIGHT.

Q.      DO YOU SEE ANYWHERE IN THE RECORD WHERE IT SAYS THIS IS AN INFORMAL PROCESS?

A.      NO.

Q.      ANYWHERE WHERE IT SAYS HE JUST NEEDS A BREAK?

A.      NO.

Q.      WE ARE GOING TO GIVE HIM A BREAK?  NO.

A.      NO.

Q.      IT SAYS SINGLE CELL PSYCH STATUS, CORRECT?

A.      CORRECT.

Q.      SO YOU ARE NOT TELLING THIS COURT, ARE YOU, THAT

AN INMATE WHO IS ON SINGLE CELL PSYCH STATUS WHO THE INSTITUTION HAS DEEMED TO BE A POTENTIAL DANGER TO OTHERS CAN REQUEST A CELLMATE AND OVERRIDE A SAFETY DECISION THAT SOMEONE AT THE INSTITUTION MADE?

A.      TO MY KNOWLEDGE, THEY CAN'T.

Q.      THEY CAN'T?

A.      RIGHT.

Q.      AND IT SHOULD NOT HAVE BEEN ALLOWED TO HAPPEN IN THIS CASE.  WOULD YOU AGREE WITH THAT?

A.      I WOULD AGREE.

MR. MORENO:  NO FURTHER QUESTIONS.

MR. GURGANUS:  JUST ONE FINAL QUESTION.

RE-REDIRECT EXAMINATION

BY MR. GURGANUS:

Q.      DO YOU KNOW WHO WROTE THAT NOTE?

A.      NO.

MR. GURGANUS:  OKAY.  I HAVE NO FURTHER QUESTIONS, YOUR HONOR.

THE COURT:  ALL RIGHT.  YOU MAY STEP DOWN.

NEXT WITNESS.

THE DEFENDANT:  EXCUSE ME, YOUR HONOR. BEFORE WE ARE FINISHED WITH THIS WITNESS, I NEED TO SPEAK WITH ONE OF MY ATTORNEYS.

THE COURT:  ALL RIGHT.  COME BACK --

THE DEFENDANT:  I APOLOGIZE FOR THE INTERRUPTION.

THE COURT:  NO.  THAT IS FINE.

LET'S TAKE A FIVE-MINUTE RECESS AND THEY WILL CALL YOU, MR. HAMMER.

(BREAK TAKEN.)

MR. MORENO:  WE HAVE NO FURTHER NEED FOR DR. KARTEN.

THE COURT:  ALL RIGHT.  YOU MAY BE EXCUSED.

(WITNESS EXCUSED.)

THE COURT:  NEXT WITNESS.

MR. MORENO:  CAN I ASK ONE THING, YOUR HONOR?

THE COURT:  YES.

MR. MORENO:  MAY WE INTRODUCE INTO EVIDENCE THE EXHIBITS THAT WE USED WITH DR. KARTEN, PLEASE.

THE COURT:  YES.

MR. MORENO:  CAN I GATHER THEM FROM THE WITNESS STAND?

THE COURT:  YES.  WELL, ACCORDING TO MY NOTES, IT'S D 4, D 5, D 6, D 7, AND D 8 IS THE TRANSCRIPT.  I DON'T KNOW IF WE OFFERED THAT IN EVIDENCE, THE TRANSCRIPT OF HIS PRIOR TESTIMONY.

MR. MORENO:  IT'S UP TO YOU, YOUR HONOR.

THE COURT:  WELL, YOU HAVE TO EITHER OFFER IT OR NOT OFFER IT.

MR. MORENO:  I'M OFFERING IT.

THE COURT:  ANY OBJECTION?

MR. GURGANUS:  NO OBJECTION, YOUR HONOR.

THE COURT:  ALL RIGHT.  THEN ALL OF THOSE WILL BE ADMITTED INTO EVIDENCE.

MR. MORENO:  THANK YOU, YOUR HONOR.

(DEFENSE EXHIBITS D 4 THROUGH D 8 ADMITTED INTO EVIDENCE.)

THE COURT:  NEXT WITNESS.

MS. HAINES:  YES, YOUR HONOR, WE WOULD LIKE TO BRIEFLY RECALL NICOLE WEAVER.

THE COURT:  ALL RIGHT.

(GOVERNMENT WITNESS NICOLE WEAVER RECALLED TO THE STAND.)

THE COURT:  ALL RIGHT.  MS. WEAVER IS UNDER OATH.

MS. HAINES:  THANK YOU, YOUR HONOR.  MAY I PROCEED?

THE COURT:  YES.

DIRECT EXAMINATION

BY MS. HAINES:

Q.    GOOD AFTERNOON, MS. WEAVER.

A.      GOOD AFTERNOON.

Q.      COULD YOU JUST STATE YOUR NAME AGAIN FOR THE RECORD?

A.      NICOLE WEAVER.

Q.      NOW, MS. WEAVER, YESTERDAY WE HEARD SOME QUESTIONS ABOUT ANDREW MARTI'S HOUSING IN ADMINISTRATIVE DETENTION VERSUS DISCIPLINARY SEGREGATION.  AND I WANT TO ASK YOU, HAVE YOU HAD AN OPPORTUNITY TO LOOK AT SOME DOCUMENTS REGARDING MR. MARTI'S HOUSING?

A.      YES, I HAVE.

                MS. HAINES:  YOUR HONOR, MAY I APPROACH?

                THE COURT:  YES, BUT SPEAK INTO THE MIC.

BY MS. HAINES:

Q.      MS. WEAVER, ARE YOU FAMILIAR WITH GOVERNMENT EXHIBIT R170?

A.      YES.

Q.      CAN YOU TELL US WHAT THAT IS?

A.      IT'S SENTRY DOCUMENTATION, WHICH IS WHAT WE USE AT THE PRISON FOR RECORDS.

                THE COURT:  WHAT WAS THE FIRST WORD?

                THE WITNESS:  SENTRY.

                THE COURT:  SENTRY?

                THE WITNESS:  YES, THAT IS THE NAME OF OUR PRISON SYSTEM THAT DOES ALL OUR STUFF FOR INMATES.

                THE COURT:  ALL RIGHT.

BY MS. HAINES:

Q.       AND HOW ARE YOU FAMILIAR WITH THESE TYPES OF RECORDS?

A.       I USE THEM ALL THE TIME AS A CASE MANAGER.

Q.       AND WHO DO THESE PARTICULAR RECORDS PERTAIN TO?

A.       THIS ONE IS ANDREW MARTI'S RECORD.

         MS. HAINES:  YOUR HONOR, WE WOULD SEEK TO INTRODUCE GOVERNMENT'S EXHIBIT R170.

         THE COURT:  HEARING NO OBJECTION, GR170 WILL BE ADMITTED.

         (GOVERNMENT EXHIBIT GR170 ADMITTED INTO EVIDENCE.)

BY MS. HAINES:

Q.       NOW, MS. WEAVER, I WOULD LIKE YOU TO TURN TO THE FIFTH PAGE OF THAT EXHIBIT.

A.       INMATE DISCIPLINE DATA, IS THAT THE RIGHT ONE?

Q.       CORRECT.

         MS. HAINES:  AND, YOUR HONOR, IF I COULD TROUBLE THE COURT TO USE YOUR ELMO?

         THE COURT:  ABSOLUTELY.  YOU DON'T HAVE TO ASK.  JUST USE IT.

         MS. HAINES:  IT HAS TO BE TURNED ON.

BY MS. HAINES:

Q.       MS. WEAVER, IT'S A LITTLE BIT CUT OFF, BUT CAN YOU TELL US WHO THIS PARTICULAR RECORD PERTAINS TO?

A.      IT PERTAINS TO ANDREW MARTI.  THAT IS HIS DISCIPLINARY RECORD.

Q.      AND WHAT IS THE FIRST SEGMENT THAT WE ARE LOOKING AT ON THE SCREEN?

A.      HE RECEIVED AN INCIDENT REPORT FOR ASSAULTING WITHOUT SERIOUS INJURY.  THE DATE OF THE INCIDENT WAS JANUARY 21ST, 1996.  AND THIS IS BASICALLY HOW WE REVIEW IT, AND WE KNOW WHAT IS ON HIS RECORD.  HE SAW THE DHO MARCH 21ST, 1996.

Q.      CAN YOU EXPLAIN TO THE COURT WHAT THE DHO IS?

A.      IT'S A DISCIPLINARY HEARING OFFICER.

Q.      NOW, HAVE YOU LOOKED AT THE REST OF THE RECORDS IN THIS GROUP?

A.      NOT ALL OF THEM, NO.

Q.      DID YOU ASCERTAIN FROM WHAT YOU DID REVIEW WHETHER MR. MARTI HAD ANY OTHER DISCIPLINARY HEARINGS OR ACTIONS THAT POSTDATED THIS ONE, THAT HAPPENED AFTER THIS ONE?

A.      NO.  THIS IS THE LAST ONE.

Q.      ALL RIGHT.  SO CAN YOU TELL FROM THIS HOW MUCH TIME MR. MARTI RECEIVED IN DISCIPLINARY SEGREGATION?

A.      HE RECEIVED 21 DAYS.  SEE WHERE IT SAYS DS, 21 DAYS.

Q.      ALL RIGHT.  AND I'M GOING TO HIGHLIGHT THAT FOR YOU.

DID I CORRECTLY MAKE A GREEN LINE UNDER THE 21 DAYS?

A.    THAT'S CORRECT.

Q.    THE LINE BEFORE THAT THAT HAS ANOTHER NUMBER, 14 DAYS, WHAT DOES THAT MEAN?

A.    THAT IS DISALLOWANCE OF HIS GOOD CONDUCT TIME, WHICH MEANS THE DHO TOOK 14 DAYS AND ADDED IT BASICALLY, TOOK HIS GOOD CONDUCT TIME AWAY AND GAVE HIM 14 EXTRA DAYS ON HIS SENTENCE.

Q.    SO FROM LOOKING AT THIS RECORD, HOW MANY DAYS DID MR. MARTI GET SENTENCED TO IN DISCIPLINARY SEGREGATION?

A.    21.

Q.    AND WHEN DOES THAT BEGIN TO RUN?

A.    THE DAY OF HIS HEARING, SO DHO LOWTHER SAW HIM ON MARCH 21ST.  IT WOULD START RUNNING THAT DAY.

Q.    NOW, MS. WEAVER, I'M GOING TO SHOW YOU WHAT HAS BEEN MARKED AS GOVERNMENT EXHIBIT R171.

MS. WEAVER, DO YOU RECOGNIZE GOVERNMENT EXHIBIT R171?

A.    A CALENDAR FROM 1996.

MS. HAINES:  YOUR HONOR, WE WOULD SEEK TO INTRODUCE GOVERNMENT EXHIBIT R171.

MS. SAUNDERS:  NO OBJECTION, YOUR HONOR.

THE COURT:  ALL RIGHT.  NOW SHE DROPPED

HER VOICE.  IT WAS HARD FOR ME TO PICK UP WHAT YOU SAID.

CAN YOU SAY WHAT IT IS AGAIN.

THE WITNESS:  OH, IT'S A CALENDAR FROM

1996.

THE COURT:  A CALENDAR FROM 1996.

THE WITNESS:  YES.

THE COURT:  TRY TO SPEAK INTO THE MIC,

AND KEEP YOUR VOICE UP.  OKAY.

THE WITNESS:  YES, SIR.

THE COURT:  GR171 WILL BE ADMITTED INTO

EVIDENCE.

(GOVERNMENT EXHIBIT GR171 ADMITTED INTO

EVIDENCE.)

BY MS. HAINES:

Q.     MS. WEAVER, USING THIS CALENDAR, STARTING ON

MARCH 21ST, WHEN WOULD ANDREW MARTI HAVE BEEN DONE WITH

HIS DISCIPLINARY SEGREGATION?

A.     HOLD ON.

Q.     JUST FOR THE RECORD, YOU ARE COUNTING WITH YOUR

FINGER.

A.     APRIL 10TH.

Q.     TO YOUR UNDERSTANDING OF PRISON MOVEMENT, AFTER

APRIL 10TH, WAS THERE ANY REASON WHY MR. MARTI COULD NOT

BE HOUSED IN ADMINISTRATIVE DETENTION?

A.     NO.

Q.    NOW I WOULD LIKE TO SHOW YOU GOVERNMENT EXHIBIT 31.3.

MS. WEAVER, DO YOU RECOGNIZE GOVERNMENT EXHIBIT 31.3?

A.    YES, IT IS A LOG BOOK WE USED AT ALLENWOOD FOR SHU MOVES, CELL MOVES.  IT'S A LOG BOOK TO MOVE CELLS. WHEN WE MOVE AN INMATE FROM ONE CELL TO ANOTHER, WE LOG IT IN THE BOOK.

Q.    AND WHAT DATES DOES THIS PARTICULAR PAGE OF THE LOG BOOK PERTAIN TO?

A.    APRIL 9TH, 1996 THROUGH THE 10TH.

MS. HAINES:  YOUR HONOR, WE WOULD SEEK TO INTRODUCE GOVERNMENT EXHIBIT 31.3.

MR. TRAVIS:  NO OBJECTION.

THE COURT:  G31.3 WILL BE ADMITTED INTO EVIDENCE.

(GOVERNMENT EXHIBIT G31.3 ADMITTED INTO EVIDENCE.)

MS. HAINES:  IF WE COULD BRING THAT -- I THINK THAT IS ON SANCTIONS.

I'M GOING TO PUBLISH THAT ON THE ELMO.

BY MS. HAINES:

Q.    MS. WEAVER, DO YOU SEE THE FIRST LINE OF GOVERNMENT EXHIBIT 31.3?

A.    YES.

Q.      CAN YOU TELL US WHAT THAT SAYS.

A.      THE DATE WAS APRIL 9TH, 1996.  MARTI WAS THE NAME, HIS NUMBER, AND THEN HE WAS MOVED FROM AD 215.  THAT IS WHERE IT STOPS ON THE SCREEN, SORRY.  AND THEY MOVED HIM TO AD 103 AT APPROXIMATELY 1:55 P.M.  THE OFFICER IN CHARGE WHO MOVED HIM WAS OFFICER MATTHEWS, AND THE BASE COUNT IN THE UNIT WAS 122 AT THE TIME.

Q.      NOW, YOU INDICATED PREVIOUSLY THAT MR. MARTI'S DISCIPLINARY SEGREGATION EXPIRED ON APRIL 10TH, IS THAT CORRECT?

A.      THAT'S CORRECT.

Q.      CAN YOU EXPLAIN WHY, ON APRIL 9TH, HE WOULD HAVE BEEN BACK IN ADMINISTRATIVE DETENTION?

A.      THERE ARE TIMES WHERE, EVEN THOUGH IT'S THE ADMINISTRATION DETENTION RANGE, WE CAN HAVE INMATES THERE SERVING DS TIME.  JUST BECAUSE IT'S ON A DIFFERENT RANGE, HE IS STILL DOING HIS DS TIME UP UNTIL THE 10TH.

Q.      SO THE AD DESIGNATION FOR HIS CELL, DOES THAT HAVE ANYTHING TO DO WITH HIS DISCIPLINARY SEGREGATION SENTENCE?

A.      NO, NOT NORMALLY.

Q.      NOW, IF THERE WERE RECORDS FROM THE BUREAU OF PRISONS THAT INDICATED THAT, ON APRIL 13TH, MR. MARTI WAS STILL IN DISCIPLINARY SEGREGATION, WOULD YOU BE ABLE TO EXPLAIN WHETHER THOSE RECORDS WERE CORRECT OR

INCORRECT?

A.    WHEN THE DHO DOES THE 21 DAYS, THOSE 21 DAYS ARE UP AFTER THE 21ST DAY.  THAT WOULD HAVE BEEN AN ADMINISTRATIVE ERROR THAT SOMEBODY DID NOT KEY HIM OUT OF DISCIPLINARY SEG AND PUT HIM BACK INTO ADMINISTRATION.

Q.    IS THERE ANY PROBLEM WITH DISCIPLINARY SEGREGATION PRISONERS SERVING THEIR TIME IN ADMINISTRATIVE DETENTION CELLS?

A.    NO.  SOMETIMES WE ARE OVERFLOWED.  WE HAVE TOO MANY ON THE DS RANGE, SO WE HAVE TO MOVE THEM OVER, BUT THEY ARE STILL KIND OF IN THAT STATUS.  BASICALLY IT'S MORE OF A PRIVILEGE THING.  THEY GET LESS PRIVILEGES BY WHAT THEY CAN BUY AT COMMISSARY VERSUS WHAT THE AD RANGE CAN BUY.  SO THEY TRY TO KEEP THEM SEPARATE, IF THEY CAN.

MS. HAINES:  I HAVE NOTHING FURTHER, YOUR HONOR.

THE COURT:  ALL RIGHT.  CROSS EXAMINE.

CROSS EXAMINATION

BY MR. TRAVIS:

Q.    I HEARD THE EXPLANATION THAT -- LET ME WITHDRAW THAT.

YESTERDAY WE ADMITTED DEFENSE EXHIBIT 1, AND THAT SHOWS MR. MARTI IS ON DS STATUS AS OF SHORTLY

AFTER MIDNIGHT ON APRIL 13TH, 1996, CORRECT?

A.        THAT IS WHAT IT SAYS ON THE ROSTER.

Q.        AND WE ALSO ADMITTED DEFENDANT'S EXHIBIT 3, WHICH SHOWS THAT WHEN THAT DOCUMENT WAS PRINTED IN JUNE, JUNE 21, 1996, WHICH IS TWO MONTHS AFTER MR. MARTI DIED, THAT THEY ARE STILL SAYING THAT MR. MARTI WAS ON DS STATUS AS OF APRIL 13TH, 1996, CORRECT?

A.        THAT IS WHAT IT SAYS ON THE PAPER.

Q.        SO YOU ARE TELLING THE COURT SOMEBODY MADE AN ERROR AND HE REALLY WASN'T ON DS STATUS?

A.        BEING -- I MEAN, WHEN YOU LOOK AT IT THAT WAY, IT LOOKS LIKE YES, IT APPEARS HE IS ON DS.  HOWEVER, WHEN HIS 21 DAYS ARE UP, HE HAS TO COME OFF ADMINISTRATIVE DETENTION AND HE -- OFF OF DS STATUS, I'M SORRY, AND THEN GO INTO ADMINISTRATIVE DETENTION.  HE IS NO LONGER ON DS, WHETHER THEY MOVED HIM OR NOT --

Q.        I UNDERSTAND THAT.  BUT YOU ARE TALKING ABOUT A 21-DAY DISCIPLINARY SEGREGATION SENTENCE THAT HE RECEIVED ON, ACCORDING TO THIS, MARCH 21, 1996, CORRECT?

A.        CORRECT.

Q.        AND ISN'T IT TRUE THAT THAT 21-DAY SENTENCE WAS CONSECUTIVE TO ONE THAT HE RECEIVED ON FEBRUARY 1, 1996?

LOOK TWO ENTRIES BELOW THE MARCH 21 DATE.

A.        FOR THE KILLING, ATTEMPTED.

Q.        YEAH, THE ATTEMPTED KILLING.  ON MARCH 1, 1996,

HE GOT A 60-DAY SENTENCE IN DISCIPLINARY SEGREGATION THAT BEGAN ON FEBRUARY 1, 1996, CORRECT?

A.      CORRECT.

Q.      AND THE OTHER SENTENCE, THE ONE YOU ARE TALKING ABOUT, THE 21-DAY SENTENCE THAT HE PICKED UP, HE PICKED THAT UP WHILE HE WAS IN ADMINISTRATIVE DETENTION BEFORE HE GOT HIS FEBRUARY 1 SENTENCE, CORRECT?

A.      CORRECT.

Q.      AND ALL OF THAT INFORMATION IS IN R170, CORRECT? THAT IS THE MULTI-PAGE DOCUMENT IS R170.

A.      OKAY.

Q.      I MEAN, THE PAGE WE ARE WORKING FROM --

A.      YES, I SEE.

Q.      AND SO HE GOT A 60-DAY SENTENCE EFFECTIVE FEBRUARY 1, 1996, CORRECT?

A.      CORRECT.

Q.      AND WHEN WOULD THAT HAVE EXPIRED?

A.      I WOULD HAVE TO COUNT 60 DAYS OUT EXACTLY.

Q.      WELL, LET'S JUST CALL -- LET'S GIVE FEBRUARY 30 DAYS.  LET'S SAY IT IS APRIL 1, 1996, OKAY?

A.      OKAY.

Q.      AND HE THEN HAS A CONSECUTIVE 21-DAY DISCIPLINARY SANCTION, RIGHT?  AND SO 1 AND 21 IS 22, CORRECT?

A.      RIGHT.

Q.    SO HE IS STILL ON DISCIPLINARY SEGREGATION STATUS AS OF APRIL 13TH, 1996, CORRECT?

A.    ARE YOU RUNNING THE TWO TOGETHER?

Q.    NO.  CONSECUTIVE TO ONE ANOTHER.

A.    UH-HUM.  BECAUSE NORMALLY THE DHO WOULD PUT ON THERE IF IT WAS RUNNING CONSECUTIVE.  I GUESS I'M CONFUSED.

Q.    HAVE YOU LOOKED AT THE PAPERWORK?

A.    THIS PAPERWORK HERE.

Q.    NO, NO, NO, NO, NO.  THE UNDERLYING DHO HEARING PAPERWORK THAT SAYS THAT HE RECEIVED A 21-DAY SANCTION CONSECUTIVE TO THE SANCTION HE GOT FOR THE ATTEMPTED KILLING?

A.    NO, SIR, I DID NOT SEE THAT.

Q.    WELL, ASSUMING THAT I'M RIGHT, AND 30 DAYS AND A CONSECUTIVE -- EXCUSE ME, 60 DAYS AND A CONSECUTIVE 21 DAYS, THAT GOES BEYOND APRIL 13TH, 1996, CORRECT?

A.    CORRECT.

Q.    AND ALTHOUGH YOU BROUGHT A LOG BOOK HERE SHOWING THAT SOMEONE MOVED HIM TO SOME CELL THAT HAD AN AD NUMBER, AS I UNDERSTAND WHAT YOU SAID, HE MIGHT HAVE STILL BEEN SERVING SEGREGATION TIME WHEN THEY PUT HIM IN THAT CELL, CORRECT?

A.    NOT NECESSARILY.

Q.    NO, I SAID HE MAY HAVE.

A.      HE MAY HAVE.

Q.      AND IF MY NUMBERS ARE CORRECT, AND HE IS STILL ON DISCIPLINARY SEGREGATION STATUS AS OF APRIL 13TH, WHEN HE WAS IN -- I THINK YOU SAID ADMINISTRATIVE DETENTION 215, HE WAS STILL SERVING THE SEGREGATION SENTENCE, RIGHT, A DISCIPLINARY SANCTION SENTENCE?

A.      THEY MAY HAVE TAKEN HIM OFF SOONER.

Q.      OKAY.

THE FACT THAT HE IS SHOWN ON THAT LOG BOOK TO HAVE BEEN IN AN AD CELL, I THOUGHT YOU SAID THAT HE MIGHT HAVE STILL BEEN SERVING A SEGREGATION SENTENCE AND THEY MIGHT HAVE PUT HIM IN THAT CELL FOR ROOM PURPOSES?

A.      THAT'S CORRECT.

Q.      BUT IF THEY PUT HIM IN THAT CELL, THEY WOULD EITHER HAVE SINGLE-CELLED HIM OR PUT HIM WITH SOMEONE ELSE WHO WAS A DS SENTENCE, CORRECT?

A.      MOST CASES.  I WOULD SAY SO.  I DON'T KNOW ALL HIS CIRCUMSTANCES SO --

Q.      BUT IT'S BUREAU POLICY THAT YOU DON'T HOUSE TOGETHER PEOPLE IN ADMINISTRATIVE DETENTION AND PEOPLE IN DISCIPLINARY SEGREGATION, RIGHT?

A.      NOT IN THE SAME CELL.

Q.      RIGHT.  THEY ARE IN THE SAME UNIT BUT THEY ARE IN DIFFERENT PARTS OF THE UNIT, RIGHT?

A.       THEY COULD BE IN THE SAME RANGE.

Q.       OKAY.  BUT NOT IN THE SAME CELL?

A.       NOT IN THE SAME CELL.

         MR. TRAVIS:  I HAVE NO OTHER QUESTIONS.

         THE COURT:  REDIRECT.

         MS. HAINES:  BRIEFLY, YOUR HONOR.

         REDIRECT EXAMINATION

BY MS. HAINES:

Q.       MS. WEAVER, MR. TRAVIS JUST ASKED YOU SOME QUESTIONS ABOUT RECORDS THAT WERE GENERATED AFTER MR. MARTI DIED.  ARE YOU FAMILIAR WITH WHAT HE SHOWED YOU?

A.       YES.

Q.       DOES IT SURPRISE YOU THAT THE RECORDS WERE NOT UPDATED AFTER MR. MARTI DIED?

A.       NO.

Q.       WHY IS THAT?

A.       AFTER HE DIED, THEY WOULD NOT GO BACK AND CHANGE IT.  THEY WOULD JUST LET IT RIDE.

Q.       AND ACCORDING TO GOVERNMENT EXHIBIT R170, I KNOW WHAT MR. TRAVIS ASKED YOU, DO YOU SEE ANYTHING ON THESE RECORDS THAT INDICATE THOSE SENTENCES WERE CONSECUTIVE?

A.       NO, NOT AT ALL.  THE DHO WOULD PUT THAT IN THERE SO WE WOULD KNOW WHEN WE PULLED UP THAT SCREEN.

Q.       AND FINALLY, IS THERE A SECURITY RISK WITH

PEOPLE WHO ARE SERVING A DISCIPLINARY SEGREGATION -- LET ME STRIKE THAT.

DO YOU UNDERSTAND THE TERM SEPARATEE?

A.    YES.

Q.    WHAT IS A SEPARATEE?

A.    A SEPARATEE IS WHEN YOU CANNOT HOUSE TWO INMATES THAT ARE ACTUALLY SEPARATED FROM EACH OTHER.

Q.    AND WHY DO YOU HAVE THAT DESIGNATION?

A.    SO THAT THEY DON'T HURT EACH OTHER.

Q.    ARE INMATES WHO ARE IN ADMINISTRATIVE DETENTION VERSUS DISCIPLINARY SEGREGATION VIEWED THE SAME WAY AS SEPARATEES?

A.    NO, DIFFERENT.

Q.    WHY IS THAT?

A.    BECAUSE WHEN YOU ARE ON A DISCIPLINARY STATUS, IT'S MORE LIKE YOU GOT IN TROUBLE, WE ARE TAKING AWAY YOUR COMMISSARY.  WHEN YOU ARE SEPARATEES, WE HAVE TO MAKE SURE THAT YOU ARE CELLED AWAY FROM THAT PERSON AND YOU ARE NOT IN CONTACT WITH THAT PERSON AT ANY TIME.

Q.    SO JUST TO ASK YOU, IS IT FAIR TO SAY THAT THE DIFFERENCE BETWEEN ADMINISTRATIVE HOUSING AND DISCIPLINARY HOUSING IS A MATTER OF PRIVILEGES THAT THE INMATE GETS?

A.    YES.

MS. HAINES:  I HAVE NOTHING FURTHER, YOUR

HONOR.

THE COURT:  ANYTHING FURTHER?

MR. TRAVIS:  I CAN DO IT FROM HERE.

RECROSS EXAMINATION

BY MR. TRAVIS:

Q.    THE PAGE OF GOVERNMENT'S EXHIBIT R7 -- EXCUSE ME, 170, AS FAR AS THE 21-DAY SANCTION, THAT WAS IMPOSED AFTER THE 60-DAY SANCTION, CORRECT?

A.    YEAH.  THE CHARGES CAME LATER.

Q.    AND THE RECORDS WE HAVE DON'T SHOW WHETHER IT WAS CONCURRENT, CONSECUTIVE, OR WHAT IT WAS, RIGHT?

A.    IT DOES NOT SAY ON THERE.

Q.    OKAY.  BUT THERE WOULD BE -- THERE WOULD BE A DISCIPLINARY HEARING REPORT IN MR. MARTI'S CENTRAL INMATE FILE THAT WOULD DOCUMENT WHETHER IT WAS CONSECUTIVE OR CONCURRENT, CORRECT?

A.    THAT'S CORRECT.

MR. TRAVIS:  THANK YOU.  I HAVE NO OTHER QUESTIONS.

MS. HAINES:  NOTHING FURTHER, YOUR HONOR.

THE COURT:  YOU MAY STEP DOWN.

(WITNESS EXCUSED.)

ANTHONY S. MALOCU, GOVERNMENT WITNESS, SWORN.

THE CLERK:  STATE AND SPELL YOUR FULL

NAME FOR THE RECORD, PLEASE.

THE WITNESS:  MY NAME IS ANTHONY S. MALOCU, M-A-L-O-C-U.

MS. HAINES:  MAY I INQUIRE, YOUR HONOR?

THE COURT:  YES.

DIRECT EXAMINATION

BY MS. HAINES:

Q.     GOOD AFTERNOON, AGENT MALOCU.

A.     GOOD AFTERNOON.

Q.     CAN YOU TELL US WHERE YOU ARE CURRENTLY EMPLOYED?

A.     I'M CURRENTLY A SUPERVISORY SPECIAL AGENT IN --

Q.     I THINK THERE IS A PROBLEM WITH YOUR MIC.

A.     HOW IS THAT?  I'M CURRENTLY A SUPERVISORY SPECIAL AGENT IN THE FBI'S OPERATIONAL TECHNOLOGY DIVISION IN QUANTICO, VIRGINIA.

Q.     AND CAN YOU BREAK THAT DOWN INTO ENGLISH AND TELL US WHAT YOU DO?

A.     I HAVE BEEN DOWN THERE FOR ABOUT SEVEN YEARS. AND WHAT WE DO IS PROVIDE TECHNICAL SUPPORT, OPERATIONAL TECHNICAL SUPPORT TO THE FIELD OFFICES AROUND THE COUNTRY.

Q.     HOW MANY YEARS HAVE YOU BEEN AN FBI AGENT?

A.     THIS JULY WILL BE 19 YEARS.

Q.     AND CAN YOU JUST BRIEFLY TELL US ABOUT WHAT

OTHER ROLES YOU PERFORM AS AN FBI AGENT?

A.      SURE.

        I SPENT APPROXIMATELY 9, 9 AND-A-HALF YEARS IN THE WILLIAMSPORT RA, WHERE I WORKED PREDOMINANTLY IN VIOLENT CRIMES.  NEAR THE END OF MY TENURE IN WILLIAMSPORT, I BECAME A POLYGRAPH EXAMINER. FROM THAT POINT, I MOVED ON TO THE FBI'S POLYGRAPH UNIT WHERE I SPENT ABOUT THREE YEARS.  AND FROM THERE I WENT ON TO THE OPERATIONAL TECHNOLOGY DIVISION IN QUANTICO.

Q.      NOW, I WANT TO TAKE YOU BACK TO APRIL 13TH OF 1996.  WHAT WAS YOUR ASSIGNMENT AT THAT TIME?

A.      I WAS CALLED AND ASKED TO ATTEND THE AUTOPSY OF MR. MARTI.

Q.      AND HOW MANY YEARS HAD YOU BEEN WITH THE FBI ON APRIL 13TH, 1996?

A.      I WAS ASSIGNED TO THE WILLIAMSPORT FIELD OFFICE FOR ABOUT SIX MONTHS AT THAT TIME.

Q.      DO YOU RECALL WHERE THE AUTOPSY TOOK PLACE?

A.      THE LEHIGH VALLEY HOSPITAL IN ALLENTOWN, PENNSYLVANIA.

Q.      AND AFTER THIS DATE -- WELL, LET ME ASK YOU, WHEN WAS THE AUTOPSY?

A.      THE AUTOPSY WAS APRIL 14TH OF '96.

Q.      NOW, FROM THAT DATE FORWARDS, WHAT WAS YOUR ROLE IN THE INVESTIGATION INTO THE DEATH OF ANDREW MARTI?

A.    I WAS THEN ASSIGNED AS THE PRIMARY INVESTIGATOR.

Q.    NOW, YOU MENTIONED THAT YOU ATTENDED THE AUTOPSY.  HOW MANY AUTOPSIES HAD YOU ATTENDED BEFORE THIS ONE?

A.    BEFORE THAT ONE?  I THINK THAT WAS MY FIRST AUTOPSY.

Q.    DO YOU RECALL WHO ELSE WAS PRESENT WITH YOU AT THE AUTOPSY?

A.    MYSELF, ACCOMPANIED BY SPECIAL INVESTIGATIVE AGENT RON JURY, SPECIAL INVESTIGATIVE SUPERVISOR MARK TRAXLER.  DR. FUNKE WAS THERE, ALONG WITH ONE OF HER ASSISTANTS.  I BELIEVE THAT IS ALL THAT WAS IN ATTENDANCE.

Q.    AND DID YOU WITNESS THE ENTIRE AUTOPSY PROCEDURE?

A.    YES.

Q.    DURING THE COURSE OF THE AUTOPSY, WERE CERTAIN PHOTOGRAPHS TAKEN?

A.    YES.  THERE WERE MULTIPLE PEOPLE TAKING PHOTOGRAPHS.

Q.    I'M GOING TO SHOW YOU WHAT HAS BEEN MARKED AS GOVERNMENT EXHIBITS R125 THROUGH R140.

DO YOU RECOGNIZE GOVERNMENT R125 THROUGH 140?

A.    YES, I DO.

Q.      AND WHAT ARE THEY?

A.      THOSE ARE PHOTOGRAPHS OF THE VICTIM TAKEN DURING THE AUTOPSY.

Q.      AND HOW DO THEY COMPARE TO WHAT YOU WITNESSED THAT DAY?

A.      THEY LOOK LIKE THE PHOTOGRAPHS THAT WERE TAKEN ON THAT DAY.

            MS. HAINES:  YOUR HONOR, WE WOULD SEEK TO INTRODUCE R125 THROUGH R140.

            MR. MCHUGH:  NO OBJECTION.

            THE COURT:  ALL RIGHT.  R125 THROUGH R140 WILL BE ADMITTED INTO EVIDENCE.

            (GOVERNMENT EXHIBIT R125 THROUGH R140 ADMITTED INTO EVIDENCE.)

            MS. HAINES:  THANK YOU.

BY MS. HAINES:

Q.      NOW, AGENT, I'M GOING TO ASK THAT WE LOOK AT SOME OF THE PICTURES AND HAVE YOU EXPLAIN FOR US WHAT THEY ARE.  AND I WOULD LIKE TO START WITH GOVERNMENT EXHIBIT R125.  JUST WAIT FOR IT TO BE PUBLISHED.

            R125.

A.      YES.

Q.      CAN YOU TELL US WHAT WE ARE LOOKING AT IN R125?

A.      OKAY.  R125 --

Q.      DID YOU LOOK AT THESE PHOTOGRAPHS BEFORE?

A.      YES.  YES, I HAVE.

Q.      AND WERE YOU ABLE TO ASCERTAIN AT THAT TIME WHAT PARTS OF THE BODY YOU WERE LOOKING AT?

A.      YES.

Q.      WOULD YOU FLIP THE PHOTO OVER AND SEE IF THAT --

A.      OKAY.  THE RIGHT WRIST.

Q.      CAN I JUST -- I'M GOING TO FINISH UP.  IS THERE A NOTATION ON THE BACK OF THE PHOTO AS TO WHAT THAT IS?

A.      YES.

Q.      AND CAN YOU NOW TELL WHAT THAT IS A PHOTOGRAPH OF?

A.      YES, THAT IS MARTI'S RIGHT WRIST.

Q.      AND DO YOU NOTICE ANY INJURIES ON THAT PHOTOGRAPH?

A.      YES, THERE APPEARS TO BE BRUISING.

Q.      AND I THINK YOU CAN ACTUALLY TOUCH YOUR SCREEN AND IF YOU ARE -- NO, NOT SO MUCH.

                LET'S GO TO R126.

                THE COURT:  WAIT A MINUTE.  COULD YOU GO BACK TO R125?

                MS. HAINES:  YES, YOUR HONOR.

                THE COURT:  YOU ARE SAYING THAT IS A WRIST WE ARE LOOKING AT?

                MS. HAINES:  YES.

BY MS. HAINES:

Q.      AGENT MALOCU, CAN YOU TRY POINTING TO YOUR
SCREEN AND SEEING IF YOU CAN -- THERE WE GO.

        CAN YOU EXPLAIN, AGAIN, WHAT INJURIES YOU
ARE LOOKING AT HERE, AND HOW THIS IS ANATOMICALLY
POSITIONED?

A.      OKAY.  IT APPEARS AS THOUGH MR. MARTI IS LAYING
ON HIS BACK.

Q.      AND CAN YOU TELL US WHERE MR. MARTI'S HEAD WOULD
BE IN THIS PICTURE?

A.      ON THE LOWER RIGHT -- I'M SORRY, MY LOWER LEFT,
OR YOUR LOWER LEFT LOOKING AT THE PHOTOGRAPH.

Q.      CAN YOU POINT TO IT ON THE PHOTOGRAPH?

A.      SURE.  THAT WOULD BE HIS NECK AREA.

Q.      YOU NEED TO MAKE A HARDER MARK.

A.      OKAY.  HOLD ON.  NOT YET?

Q.      THERE YOU GO.  THAT LITTLE RED MARK IS WHAT?

A.      THAT WOULD BE MARTI'S NECK, NECK AREA.

Q.      AND NOW, WHAT IS THE BODY PART THAT HAS THE X
AND THE ARROW?

A.      OKAY.  THAT WOULD BE HIS RIGHT WRIST.  AND THIS
AREA WOULD BE THE BACK SIDE OF HIS HAND.

Q.      AND CAN YOU JUST PUT THAT ACROSS YOUR BODY, HOW
YOU THINK MR. MARTI WAS LYING?

A.      OKAY.  MARTI WOULD BE LYING ON HIS BACK AND HIS
HAND WOULD BE --

Q.      SPEAK INTO THE MIC, PLEASE.

A.      SO MR. MARTI WOULD HAVE HIS ARM DRAPED OVER HIS CHEST AREA.

Q.      ALL RIGHT.  AND THE ARROW SHOWS WHAT SORT OF INJURIES, AGAIN, JUST TO FINISH THIS ONE?

A.      IT LOOKS LIKE BRUISING UNDERNEATH THE SKIN.

MS. HAINES:  YOUR HONOR, WE WOULD LIKE TO NOW PROCEED TO R126.

THE COURT:  ALL RIGHT.

BY MS. HAINES:

Q.      NOW IF YOU COULD GO THROUGH THE SAME EXERCISE, AGENT MALOCU, AND TELL US WHAT IS THAT A PICTURE OF.

A.      THAT APPEARS TO BE THE WRIST, MARTI'S WRIST.

Q.      AND IS IT THE SAME SIDE AS THE EARLIER PICTURE, R125?

A.      NO, IT IS FLIPPED OVER.

Q.      ALL RIGHT.  DO YOU SEE ANY INJURIES ON THIS PHOTOGRAPH?

A.      YEAH, AGAIN, THERE IS BRUISING IN THE WRIST AREA, AS WELL AS THE BASE OF THE HAND.

Q.      NOW, ON YOUR SCREEN DO YOU SEE A BUTTON THAT SAYS CLEAR?

A.      YES, I DO.

Q.      COULD YOU CLEAR?  THERE YOU GO.  OKAY.  AND CAN YOU NOW JUST SHOW US BY POINTING WHERE THE BRUISES ON

THE INSIDE OF MR. MARTI'S RIGHT WRIST ARE?

BEAUTIFUL.  YOU'VE MADE SOME RED XS FOR US.  ALL RIGHT.

CLEAR, PLEASE.

A.    SURE.

Q.    NOW IF WE CAN GO TO R130.  CAN YOU TELL US WHAT IS THAT A PICTURE OF?

A.    R130 DEPICTS THE HAND AND WRIST OF MR. MARTI AS HE LIES ON HIS BACK.  AND WE ARE LOOKING AT HIS LEFT HAND.

Q.    ALL RIGHT.  AND CAN YOU SHOW US WHERE THE INJURIES ARE THAT YOU OBSERVED AT THE AUTOPSY?  YOU MADE A RED X FOR US.  THANK YOU.

R132.

A.    SO R132 APPEARS TO BE MR. MARTI'S RIGHT ANKLE AS HE LIES ON HIS STOMACH.

Q.    AND WHAT IS WHERE THE RED X IS APPROXIMATELY?

A.    BRUISING UNDERNEATH THE SKIN.

Q.    NOW, I WANT TO DIRECT YOUR ATTENTION TO R134.  CAN WE TAKE THE X OFF OF HIS EYE, IF YOU DON'T MIND.

WHAT WAS GOING ON IN THIS PICTURE?

A.    OKAY.  IN THIS PICTURE DR. FUNKE WAS ILLUSTRATING THE PETECHIA WITHIN THE EYE, EYELID.

Q.    DO YOU KNOW WHAT PETECHIA ARE?

A.    SHE HAD EXPLAINED TO ME THAT THAT WAS COMMON.

IT WAS A RESULT OF ASPHYXIATION.

Q.      IF WE CAN PUBLISH R135.  CAN YOU EXPLAIN WHAT THAT IS A PHOTOGRAPH OF?

A.      SURE.  THAT IS PETECHIA RESULTING -- IN THE LOWER -- INSIDE THE LOWER EYELID.

Q.      NOW I'M GOING TO DIRECT YOU TO ANOTHER SERIES OF PHOTOGRAPHS, R137.  CAN YOU TELL US WHAT THAT IS A PHOTOGRAPH OF?

A.      THIS DEPICTS THE LIGATURE BRUISING ON MARTI'S NECK.

Q.      WOULD YOU BE ABLE TO DRAW THAT?

A.      IN AND AROUND THAT AREA.

Q.      YOU HAVE MADE A RED X AND A RED LINE FOR US.

R138.  IF YOU CAN HIT CLEAR FOR US.

WHAT IS R138 A PHOTOGRAPH OF?

A.      R138 DEPICTS, AGAIN, THE BRUISING UNDER HIS NECK, AS WELL AS THE CHAIN THAT WAS AROUND HIS NECK, ST. CHRISTOPHER'S MEDAL.

Q.      DO YOU SEE ANY OTHER BRUISING OR LIGATURE MARKS ON THIS PHOTO, TOWARDS THE BACK OF HIS HEAD?  DO YOU RECALL WHAT THAT WAS?

A.      THERE IS A LITTLE BIT OF BRUISING RIGHT HERE.

Q.      THANK YOU.  YOU HAVE MADE RED LINES WHERE THE RED MARKS ARE AND ONE WHERE THE SILVER CHAIN IS, CORRECT?

A.      YES.

Q.      IF WE CAN NOW PUBLISH R139.

A.      CLEAR?

Q.      PLEASE.

        WHAT IS R139 A PHOTOGRAPH OF?

A.      R139 DEPICTS AGAIN THE BRUISING UNDERNEATH THE NECK AND THE ST. CHRISTOPHER MEDAL.

Q.      YOU HAVE DRAWN A LINE WHERE THE LIGATURE MARK IS, I BELIEVE, CORRECT?

A.      CORRECT.

Q.      NOW, THE FINAL PHOTOGRAPH IS R140.  IF YOU CAN HIT CLEAR FOR US.

A.      SURE.

Q.      AND WHAT DO YOU RECALL R140 SHOWING?

A.      DR. FUNKE WAS ILLUSTRATING THE BRUISING INSIDE OF MR. MARTI'S MOUTH UNDER HIS LIP.

Q.      YOU HAVE CIRCLED WHAT APPEARS TO BE A DISCOLORED AREA?

A.      CORRECT.

Q.      THAT IS IT FOR THE PHOTOGRAPHS.

        NOW I WANT TO ASK YOU, WAS ANYTHING IN THE WAY OF PHYSICAL EVIDENCE COLLECTED BY YOU OR TAKEN INTO YOUR CUSTODY AT THE TIME OF THE AUTOPSY?

A.      AT THE CONCLUSION OF THE AUTOPSY DR. FUNKE PROVIDED ME WITH SOME SWABS SHE HAD TAKEN FROM THE BODY.

Q.    AND ANYTHING ELSE IN THE WAY OF CLOTHING?

A.    WELL, THE CLOTHING WAS REMOVED FROM MR. MARTI AT THE BEGINNING OF THE AUTOPSY.  THAT WAS TURNED OVER TO MR. TRAXLER AND MR. JURY.

Q.    DID IT EVENTUALLY COME INTO YOUR POSSESSION?

A.    YES.  I TOOK CUSTODY OF IT A FEW DAYS LATER.

Q.    HAVE YOU REVIEWED IT IN PREPARATION FOR YOUR TESTIMONY TODAY?

A.    YES.

Q.    I'M GOING SO SHOW YOU WHAT HAS BEEN MARKED AS GOVERNMENT EXHIBIT 28.2, 28.3, 28.1 AND 27.

I WANT YOU TO FIRST START WITH GOVERNMENT'S EXHIBITS 28.2 AND 28.3 AND ASK YOU IF YOU RECOGNIZE WHAT THOSE ARE?

A.    28.3, 28.2.  LET ME OPEN UP 28.3.

THE DEFENDANT:  EXCUSE ME, YOUR HONOR, I CAN'T SEE ANYTHING BUT A BLACK SCREEN.

THE COURT:  ALL RIGHT.  WE WILL CORRECT IT.

THE DEFENDANT:  OKAY.  I CAN SEE NOW. THANK YOU.

BY MS. HAINES:

Q.    AGENT, DID YOU HAVE AN OPPORTUNITY TO LOOK AT GOVERNMENT EXHIBIT 28.2 AND 28.3?

A.    YES.  THESE ARE THE SHORTS THAT WERE REMOVED

FROM MR. MARTI'S BODY.

THE COURT:  JUST ONE SECOND.

(PAUSE.)

THE COURT:  ASK THE QUESTION AGAIN.

MS. HAINES:  THANK YOU, YOUR HONOR.

BY MS. HAINES:

Q.      DO YOU RECOGNIZE 28.2 AND 28.3?

A.      YES.  THAT IS ONE OF THE PAIR OF SHORTS THAT WERE REMOVED FROM MR. MARTI'S BODY BEFORE THE AUTOPSY.

Q.      WHICH ONE?  WHICH ONE HAVE YOU JUST LOOKED AT?

A.      28.3.

Q.      HOW ABOUT 28.2?

A.      THIS IS THE SECOND PAIR OF SHORTS THAT WAS REMOVED FROM HIS BODY PRIOR TO THE AUTOPSY.

Q.      NOW I WOULD LIKE TO SHOW YOU GOVERNMENT EXHIBIT R158 AND R157.  DO YOU RECOGNIZE WHAT R157 AND R158 IS?

A.      YES.  THEY ARE THE SHORTS THAT I JUST OPENED UP AND LOOKED AT.

Q.      ARE THEY THE SHORTS OR SOMETHING ELSE?  ARE THEY THE ACTUAL SHORTS OR ARE THEY A PHOTOGRAPH?

A.      THIS IS A PHOTOGRAPH OF THE UNDERGARMENTS.

MS. HAINES:  YOUR HONOR, WE WOULD SEEK TO INTRODUCE R157, R158, 28.2 AND 28.3.

MR. MCHUGH:  NO OBJECTION.

THE COURT:  THEY WILL BE ADMITTED.

(GOVERNMENT EXHIBITS R157, R158, 28.2 AND 28.3 ADMITTED INTO EVIDENCE.)

MS. HAINES:  IF WE CAN PUBLISH R157?

THE COURT:  YOU MAY.

BY MS. HAINES:

Q.    AGENT MALOCU, CAN YOU TELL US WHAT R157 IS A PHOTOGRAPH OF?

A.    THOSE ARE THE SHORTS THAT WERE WORN BY MR. MARTI.

Q.    NOW R158, IF WE COULD PUBLISH THAT.  DO YOU RECOGNIZE THAT?

A.    YES.  THOSE WERE THE SHORTS WORN BY MR. MARTI.

Q.    NOW, HOW DO YOU EXPLAIN THAT WE HAVE TWO SHORTS AND TWO PHOTOS OF TWO SHORTS?

A.    HE WAS WEARING TWO PAIR OF UNDERWEAR.

Q.    AND DO YOU RECALL AS YOU SIT HERE WHICH WAS THE PAIR THAT WAS CLOSER TO HIS BODY?

A.    WELL, IT WAS -- IT'S DOCUMENTED IN MY NOTES, WHICH I CAN'T RECALL.  THE INSEAM --

MS. HAINES:  COURT'S INDULGENCE.

(PAUSE.)

BY MS. HAINES:

Q.    AGENT MALOCU, DID YOU TAKE NOTES WHEN YOU WERE ATTENDING THE AUTOPSY?

A.    YES.

Q.   WOULD IT ASSIST YOU IN ANSWERING MY QUESTIONS IF YOU WERE ABLE TO REVIEW YOUR NOTES?

A.   YES, PLEASE.

Q.   I'M GOING TO SHOW YOU WHAT HAS BEEN MARKED AS EXHIBIT R151.  I HAVE NOW SHOWN YOU GOVERNMENT EXHIBIT R151.  IS THAT YOUR NOTES FROM THE AUTOPSY?

A.   YES.

Q.   WOULD YOU BE ABLE TO TELL US AFTER REVIEWING YOUR NOTES WHICH PAIR OF SHORTS WAS CLOSER TO MR. MARTI'S BODY?

A.   NO.  NOT FROM THIS DOCUMENT, I CAN'T.  MY 302 REFERENCES --

Q.   DID YOU PREPARE AN FBI 302 AFTER YOU TOOK YOUR NOTES?

A.   YES.

Q.   I HAVE HANDED YOU GOVERNMENT EXHIBIT R143, IS THAT CORRECT, AGENT?

A.   143.

Q.   IS THAT THE FBI 302, THE REPORT YOU PREPARED AFTER THE AUTOPSY?

A.   YES.

Q.   DOES THAT DOCUMENT REFRESH YOUR RECOLLECTION AS TO WHICH PAIR OF SHORTS WAS CLOSER TO MR. MARTI'S BODY?

A.   UNFORTUNATELY NO, THIS IS NOT -- THIS DOCUMENT IDENTIFIES THE PHOTOGRAPHS THAT WERE TAKEN, NOT THE

ACTUAL SHORTS WHEN I COLLECTED THEM.  I APOLOGIZE FOR THAT.  CLEARLY ON THAT DOCUMENT IT'S IN PARENTHESES IDENTIFYING.

THE COURT:  DO YOU WANT TO POINT HIM TO THE EXACT SPOT IN THE REPORT THAT YOU ARE REFERRING TO?

MS. HAINES:  YES, YOUR HONOR.

THE COURT:  WE WILL SAVE SOME TIME.

BY MS. HAINES:

Q.    JUST FOR THE RECORD, I HAVE HANDED YOU R142.  DOES THAT REFRESH YOUR RECOLLECTION AS TO WHICH PAIR OF SHORTS WAS CLOSER TO HIS BODY?

A.    YES.  THIS ITEMIZES THE ITEMS THAT I COLLECTED FROM MR. TRAXLER FROM THE BUREAU OF PRISONS AND IDENTIFIED AS ITEM NUMBER 22A AND B.  A WERE THE SHORTS LABELED K 43, WERE ON THE OUTSIDE, AND SHORTS LABELED I 35 ON THE INSEAM WERE AGAINST HIS BODY.

Q.    IF WE COULD RETURN TO R158.  WE HAVE PUBLISHED AGAIN R158.

DO YOU RECOGNIZE WHETHER THIS IS THE PAIR OF SHORTS YOU WERE TALKING ABOUT WITH THE INSEAM I 35?

A.    CORRECT.

Q.    THAT WAS CLOSEST TO MR. MARTI'S BODY?

A.    THAT'S CORRECT.

Q.    YOU ALSO MENTIONED THAT SOME SWABS WERE COLLECTED FROM MR. MARTI.

A.    YES.

Q.    I'M SORRY.  YOU HAVE TWO OTHER PIECES OF EVIDENCE UP THERE THAT WERE COLLECTED AT THE AUTOPSY. CAN YOU JUST TELL US WHAT THEY ARE?

A.    THIS APPEARS TO BE THE ST. CHRISTOPHER MEDAL AND CHAIN THAT WAS REMOVED FROM HIS BODY.  IS THAT GOVERNMENT'S EXHIBIT 27?

Q.    AND WHAT IS THE OTHER ITEM OF EVIDENCE?

A.    GOVERNMENT'S EXHIBIT 28.1, WHICH IS THE TEE SHIRT WORN BY MR. MARTI THAT WAS REMOVED FROM HIS BODY.

MS. HAINES:  YOUR HONOR, WE WOULD SEEK TO INTRODUCE GOVERNMENT EXHIBITS 27 AND 28.1.

THE COURT:  HEARING NO OBJECTION, THEY WILL BE ADMITTED.

(GOVERNMENT EXHIBITS 27 AND 28.1 ADMITTED INTO EVIDENCE.)

BY MS. HAINES:

Q.    NOW, AGENT MALOCU, YOU INDICATED THAT SOME SWABS WERE COLLECTED BY THE MEDICAL EXAMINER AND PROVIDED TO YOU, IS THAT CORRECT?

A.    YES.

Q.    ARE YOU FAMILIAR WITH THE TERM SEX KIT?

A.    YES.

Q.    CAN YOU TELL US WHAT SPECIFICALLY DR. FUNKE COLLECTED AND PROVIDED TO YOU?

A.      YES.  SHE PROVIDED SWABS FROM THE ANAL AREA, FROM HIS GUMS, FROM MR. MARTI'S THROAT, SOME PULLED HEAD HAIR, SOME PULLED PUBIC HAIR, AND CLIPPINGS OF HIS FINGERNAILS.

Q.      I DON'T THINK YOU MENTIONED HIS PENIS.  WAS THAT SWABBED?

A.      YES.  THERE WERE SWABS TAKEN FROM HIS PENIS.

Q.      DID YOU OBSERVE HER CREATING ANY ADDITIONAL EVIDENCE FROM THE SWABS?

A.      YES.  SHE MADE A SLIDE, A SLIDE FOR EACH OF THOSE ITEMS.

Q.      AND TO YOUR KNOWLEDGE WAS MR. MARTI'S BLOOD ALSO COLLECTED?

A.      YES.  I BELIEVE TWO VIALS OF BLOOD WERE PROVIDED.

Q.      DID YOU TAKE THOSE INTO YOUR CUSTODY?

A.      YES, I TOOK THE SWABS INTO MY CUSTODY.

Q.      WE ARE GOING TO MOVE TO A DIFFERENT AREA AND WE'RE GOING TO TALK ABOUT SOME WITNESSES IN THIS CASE.

DID YOU HAVE AN OPPORTUNITY IN YOUR ROLE AS THE LEAD INVESTIGATOR TO INTERVIEW SOME WITNESSES IN CONNECTION WITH THIS CASE?

A.      YES, I DID.

Q.      I'M GOING TO COLLECT THOSE FROM YOU.

NOW AGENT MALOCU, I WANT TO START WITH A

PERSON BY THE NAME OF LEONARD YAGER.  DID YOU KNOW

MR. YAGER?

A.      YES.

Q.      WHO WAS THAT INDIVIDUAL?

A.      LEONARD YAGER WAS AN ORDERLY THAT WORKED IN THE

SPECIAL HOUSING UNIT AT THE U.S. PENITENTIARY ALLENWOOD.

Q.      DID YOU HAVE AN OPPORTUNITY TO MEET WITH

MR. YAGER?

A.      YES, I DID.

Q.      DO YOU RECALL WHAT DATE THAT WAS?

A.      I BELIEVE IT WAS AROUND APRIL 15TH OR 16TH,

MAYBE THE 17TH, THAT WEEK.

MR. MCHUGH:  YOUR HONOR, WE ARE GOING TO

BE OBJECTING IF HE IS GOING TO TESTIFY ABOUT ANYTHING

MR. YAGER TOLD HIM OR DID WITH HIM.  THE BASIS FOR OUR

OBJECTION IS, IT'S OUR UNDERSTANDING THAT MR. YAGER HAS

BEEN ON THE GOVERNMENT'S WITNESS LIST, AS THE COURT IS

WELL AWARE OF MR. YAGER AND THAT HE IS NOW NOT GOING TO

BE CALLED BY THE GOVERNMENT.  HE CHOOSES NOT TO COME TO

PHILADELPHIA.  AND SO OUR BASIS -- WE CERTAINLY

UNDERSTAND THAT THE RULES OF EVIDENCE DON'T APPLY TO A

CAPITAL SENTENCING HEARING.  HOWEVER, THE SIXTH

AMENDMENT CERTAINLY DOES.  AND UNDER THE CONFRONTATION

CLAUSE THE DEFENDANT CERTAINLY HAS A RIGHT TO CONFRONT

ANYTHING THAT MR. YAGER PURPORTEDLY TOLD AGENT MALOCU OR

PROVIDED TO AGENT MALOCU.  AND CERTAINLY WITH MR. YAGER

BEING AVAILABLE TO THE GOVERNMENT AND THEM TELLING US

NOW THAT THEY ARE NOT GOING TO BE CALLING HIM, WE THINK

THIS IS DEPRIVATION OF OUR -- DENIAL OF OUR

CONFRONTATION RIGHTS.  I CAN GO INTO A LONG EXPLANATION

AS TO WHY MR. YAGER IS NOT RELIABLE GIVEN THE COURT'S --

THE RULES THAT DO APPLY TO THESE PROCEEDINGS ABOUT

HEIGHTENED RELIABILITY.  THERE IS EXTENSIVE PROBLEMS

WITH MR. YAGER'S CREDIBILITY.  AND I JUST RAISE THE

OBJECTION NOW.  I DON'T KNOW IF THAT IS WHERE COUNSEL IS

GOING.  I SUSPECT THAT IS WHERE SHE IS GOING.

MS. HAINES:  YOUR HONOR, I WASN'T GOING

TO ELICIT ANY OF THE CONVERSATION BETWEEN MR. YAGER AND

THE AGENT, BUT I THINK I CAN ELICIT THE EVIDENCE HE

COLLECTED.

MR. MCHUGH:  AND AGAIN, YOUR HONOR, THAT

IS CONFRONTATION CLAUSE BECAUSE THE EVIDENCE THAT HE

PROVIDED TO THEM GOES TO -- THE GOVERNMENT IS THEN GOING

TO TRY TO PRESENT THAT AS SOMETHING THAT YOU PREPARED BY

MR. HAMMER.  MR. YAGER'S CREDIBILITY IN THIS CASE AND

THE EVIDENCE THAT THE GOVERNMENT HAS GIVEN US CALLS INTO

DOUBT THE EVIDENCE THAT HE PROVIDED TO THE GOVERNMENT

WITH HIS OWN STATEMENTS ABOUT THAT EVIDENCE.

THE COURT:  WELL, IS THE TESTIMONY GOING

TO BE AS A RESULT OF THIS INTERVIEW OF YAGER HE

RECOVERED X, Y AND Z? IS THAT ESSENTIALLY IT?

MS. HAINES: WITHOUT GOING INTO ANY OF THE DETAILS OF THE INTERVIEW, YES. HE RECOVERED SOMETHING THAT MR. YAGER HANDED TO HIM.

THE COURT: ALL RIGHT. I WILL OVERRULE THE OBJECTION THEN.

MR. MCHUGH: IF I COULD JUST RESPOND BRIEFLY, YOUR HONOR. THE CIRCUMSTANCES OF THE RECOVERY AND THE TRUTHFULNESS OF WHERE HE GOT THESE ITEMS IS CERTAINLY IN QUESTION -- IN QUESTION WITH THE DISCOVERY THAT THE GOVERNMENT HAS PROVIDED US AS TO THE TRUTHFULNESS OF WHERE MR. YAGER GOT THESE ITEMS AND THE VERACITY AND THE VALIDITY AND THE RELIABILITY OF THIS ITEM WHICH IS A WRITING THAT HE PROVIDED TO AGENT MALOCU.

RECENTLY MR. YAGER TOLD THE GOVERNMENT THAT THE ITEM APPEARED TO BE HIS OWN HANDWRITING. SO THERE IS GREAT QUESTIONS AS TO THE DOCUMENT HE PROVIDED AS WELL AS HIS STATEMENTS SURROUNDING THE DOCUMENT. WE WILL BE DENIED OUR CONFRONTATION RIGHTS IF THEY ARE ALLOWED TO GET THIS IN AND PRESENT IT TO YOUR HONOR WITHOUT EVER CALLING MR. YAGER AND HAVING HIM CROSS-EXAMINED ON THE VALIDITY, VERACITY AND CREDIBILITY OF THAT DOCUMENT.

THE COURT: WELL, BASED UPON THE PROFFER

FROM THE GOVERNMENT, THE WITNESS IS ONLY GOING TO

TESTIFY TO SOMETHING THE WITNESS RECOVERED.  THE WITNESS

CAN'T USE MR. YAGER'S STATEMENTS TO AUTHENTICATE THE

DOCUMENT, AS I AM HEARING THE PROFFER.  LET ME HEAR THE

EVIDENCE.  IF -- THEN I HAVE TO DECIDE ON THE -- WHAT

WEIGHT IF ANY TO GIVE TO THE DOCUMENT, DEPENDING UPON

THE CONNECTION OF IT TO THIS CASE.  SO UNTIL I HEAR THE

EVIDENCE, I'M GOING TO -- BASED UPON THE PROFFER OF

MS. HAINES, I'M GOING TO OVERRULE THE OBJECTION.  I CAN

ALWAYS STRIKE THE EVIDENCE BECAUSE IT'S A NON-JURY

TRIAL, BUT RIGHT NOW ANYTHING RECOVERED BY THE AGENT HE

CAN TESTIFY TO.  BUT EVERYTHING HAS TO BE AUTHENTICATED.

JUST BECAUSE AN AGENT FOUND OR WAS GIVEN A PIECE OF

PAPER DOES NOT NECESSARILY MAKE IT RELEVANT.  LET ME --

THAT'S SOMETHING I'LL HAVE TO DECIDE OR VIOLATE THE

CONFRONTATION CLAUSE.  I UNDERSTAND.  OBVIOUSLY, IT'S A

NON-JURY TRIAL FROM PRETRIAL MOTIONS THAT HAVE BEEN

FILED, THE HISTORY OF MR. YAGER AND SOME OTHER

WITNESSES, BUT LET ME HEAR THE TESTIMONY AT THIS POINT.

MS. HAINES:  AND YOUR HONOR, I WAS GOING

TO SEEK TO PUBLISH THIS EXHIBIT THROUGH THE AGENT.  IT'S

GOING TO BE CONNECTED THROUGH A HANDWRITING ANALYST TO

MR. HAMMER'S HANDWRITING.  BUT I CAN RECALL AGENT MALOCU

IF THAT IS NECESSARY.

THE COURT:  IF YOU ARE SAYING THAT THIS

IS A PIECE OF PAPER WITH WRITING ON IT AND YOU HAVE A

HANDWRITING ANALYST WHO IS GOING TO SAY IT'S ONE AND THE

SAME, MADE BY THE SAME PERSON FROM THE HANDWRITING

SPECIMEN YOU HAVE FROM MR. HAMMER, THEN ORDINARILY THAT

IS SUFFICIENT DOCUMENTATION TO CONNECT.  SO SUBJECT TO

THAT CONNECTION I WILL ALLOW YOU TO PUBLISH IT.

MS. HAINES:  JUST TO BE CLEAR, SO THE

DEFENSE DOES NOT THINK I'M TRYING TO MISLEAD THE COURT,

SHE IS GOING TO SAY THE SIGNATURE IS DEFINITIVELY DAVID

HAMMER'S.  SHE IS GOING TO SAY THE SUBSTANCE IS PROBABLY

HIS.

THE COURT:  THEN IT'S UP TO ME TO GIVE

WHATEVER WEIGHT TO THE EXHIBIT THAT I THINK IT DESERVES.

MS. HAINES:  THANK YOU, YOUR HONOR.

BY MS. HAINES:

Q.      NOW, AGENT, WHEN WE LEFT OFF, YOU WERE TALKING

ABOUT THE DATE.  DID YOU PREPARE A REPORT FOLLOWING?

A.      YES, I DID.

Q.      AND IF I SHOWED YOU THAT, WOULD THAT REFRESH YOU

ON THE DATE THAT YOU ACTUALLY MET WITH MR. YAGER?

A.      SURE.

Q.      I'M SHOWN YOU GOVERNMENT R27.  DOES THAT REFRESH

YOUR RECOLLECTION?

A.      YES.

Q.      WHAT DATE DID YOU MEET WITH MR. YAGER?

A.    APRIL 17TH OF 1996.

Q.    AND WHERE DID THIS MEETING OCCUR?

A.    IN THE SPECIAL HOUSING UNIT AT THE UNITED STATES PENITENTIARY IN ALLENWOOD, WHITE DEER, PA.

Q.    WHO WAS PRESENT WITH YOU?

A.    SPECIAL INVESTIGATIVE SUPERVISOR MARK TRAXLER.

Q.    AT THE CONCLUSION OF THE INTERVIEW, DID YOU COLLECT ANYTHING IN THE WAY OF PHYSICAL EVIDENCE FROM MR. YAGER?

A.    YES.  HE HANDED ME A SMALL KITE OR LETTER.

Q.    I'M GOING TO SHOW YOU WHAT HAS BEEN MARKED AS GOVERNMENT EXHIBIT 32.1 AND 32-2.

DO YOU RECOGNIZE THOSE TWO EXHIBITS?

A.    YES.

Q.    CAN YOU TELL US WHAT 32.1 IS?

A.    32.1 IS A KITE OR A NOTE THAT IS TITLED REASONS FOR KILLING ANDREW MARTI.

Q.    AND DO YOU RECOGNIZE WHERE YOU GOT THAT FROM OR WHO YOU GOT THAT FROM?

A.    YES.  I GOT THIS FROM INMATE YAGER.

Q.    WHAT IS THE CONDITION OF IT AS FAR AS THE COLOR OF IT RIGHT NOW?

A.    WHEN I RECEIVED IT, IT WAS ALL WHITE.  IT -- NOW IT HAS SOME I GUESS NINHYDRIN OR DISCOLORATIONS FROM THE FINGERPRINT ANALYSIS.

Q.    GOVERNMENT EXHIBIT 32-2 IS WHAT?

A.    A PHOTOCOPY.

Q.    OF --

A.    32-1.

Q.    32.1?

A.    32.1, I APOLOGIZE.

Q.    HOW DOES 32-2 COMPARE TO THE ORIGINAL EXHIBIT WHEN YOU FIRST -- AS FAR AS DISCOLORATION?

A.    YES.  IT'S A PROPER COLOR.

MS. HAINES:  YOUR HONOR, WE WOULD SEEK TO INTRODUCE BOTH GOVERNMENT EXHIBIT 32.1 AND 32-2.

THE COURT:  I WILL ADMIT IT, SUBJECT TO CONNECTION.

MR. MCHUGH:  THANK YOU, YOUR HONOR.

(GOVERNMENT EXHIBIT NUMBERS 32.1 AND 32-2 ADMITTED INTO EVIDENCE.)

BY MS. HAINES:

Q.    AGENT, I WANT TO TURN TO THE NEXT EXHIBIT.  DO YOU KNOW SOMEBODY OR DID YOU COME ACROSS SOMEBODY DURING YOUR INVESTIGATION BY THE NAME OF CHESTER DREW LARRIMORE?

A.    YES.

Q.    DO YOU RECALL WHAT MR. LARRIMORE'S NICKNAME WAS?

A.    ROCK, R-O-C-K.

Q.    WHO WAS MR. LARRIMORE?

A.      HE WAS THE CELLMATE OF ORDERLY LEONARD YAGER.

Q.      WAS ANYTHING IN THE WAY OF PHYSICAL EVIDENCE
EVER OBTAINED FROM MR. LARRIMORE?

A.      I DON'T BELIEVE SO.

Q.      I'M GOING TO SHOW YOU WHAT HAS BEEN MARKED AS
GOVERNMENT EXHIBIT 33.1 AND 33.2.

        WAS ANYTHING IN THE WAY OF PHYSICAL
EVIDENCE EVER OBTAINED FROM MR. LARRIMORE, ROCK?

        THE COURT:  DO THESE REFRESH YOUR MEMORY?

        THE WITNESS:  WELL, THESE ITEMS I BELIEVE
I RECEIVED FROM MR. TRAXLER, THE INVESTIGATOR AT THE
PRISON.  AND THEY ARE ADDRESSED TO ROCK, AD 108.

BY MS. HAINES:

Q.      JUST TO BE CLEAR, YOU DID NOT RECEIVE THESE
DIRECTLY?

A.      THAT'S CORRECT.

        MR. MCHUGH:  YOUR HONOR, WE WILL RAISE
THE SAME OBJECTION BECAUSE IT'S OUR UNDERSTANDING THAT
THESE MAY ALSO HAVE COME FROM THE POLLUTED SOURCE OF
MR. YAGER ALSO.

        THE COURT:  ALL RIGHT.

        THEY HAVE TO BE AUTHENTICATED SO I WILL
MAKE THE SAME RULING.

        MS. HAINES:  THANK YOU, YOUR HONOR.

BY MS. HAINES:

Q.      JUST TO BE CLEAR FOR THE RECORD, 33.1 IS WHAT KIND OF DOCUMENT?

A.      IT IS AN ENVELOPE.

Q.      33.2 IS WHAT KIND OF DOCUMENT?

A.      A LETTER.

        MS. HAINES:  YOUR HONOR, WE SEEK TO INTRODUCE THESE INTO EVIDENCE.

        THE COURT:  I WILL ADMIT THEM SUBJECT TO CONNECTION.

        (GOVERNMENT EXHIBIT NUMBERS 33.1 AND 33.2 ADMITTED INTO EVIDENCE.)

BY MS. HAINES:

Q.      A THIRD INDIVIDUAL, STEPHEN CLASSEN, ARE YOU FAMILIAR WITH HIM, AGENT?

A.      YES.

Q.      WHO WAS MR. CLASSEN?

A.      MR. CLASSEN WAS THE CELLMATE OF MR. HAMMER PRIOR TO MARTI MOVING IN WITH HIM.

Q.      WAS ANYTHING IN THE WAY OF PHYSICAL EVIDENCE EVER OBTAINED FROM MR. CLASSEN?

A.      NOT FROM MYSELF.

Q.      FROM ANYBODY WHO PARTICIPATED IN THE INVESTIGATION?

A.      AGENT -- YEAH, AGENT TRAXLER PROVIDED ME WITH A LETTER THAT WAS ADDRESSED TO MR. CLASSEN.

Q.      I'M GOING TO SHOW YOU WHAT HAS BEEN MARKED AS GOVERNMENT EXHIBIT 35.1 AND 35.2.

MR. MCHUGH:  YOUR HONOR, WE RAISE THE SAME OBJECTION.  THESE ITEMS ALSO -- IT'S INFORMATION WE BELIEVE THAT CAME FROM THE POLLUTED SOURCE OF LEONARD YAGER.

THE COURT:  ALL RIGHT.  FOR THE SAME REASONS, I WILL OVERRULE THE OBJECTION AND AGAIN, EVERYTHING IS SUBJECT TO CONNECTION.

BY MS. HAINES:

Q.      DO YOU RECOGNIZE, AGENT, 35.1?

A.      35.1 IS AGAIN AN ENVELOPE ADDRESSED TO STEVEN CLASSEN FROM -- AND THE NAME WRITTEN IS HAMMER.

Q.      AND WHAT IS 35.2?

A.      THE CONTENTS OF THE ENVELOPE, WHICH WOULD BE A LETTER, ADDRESSED TO STEVE.

Q.      AND HOW DO THESE COMPARE TO THE ITEMS YOU RECEIVED FROM, I THINK IT WAS LIEUTENANT TRAXLER?  ARE THESE THE ITEMS?

A.      YES, THIS IS THE ITEM.  AGAIN, AS A RESULT OF THE LABORATORY PROCESSING, IT'S A DARK COLOR.  IT WAS A WHITE LETTER WHEN I RECEIVED IT.

MS. HAINES:  YOUR HONOR, WE WOULD SEEK TO INTRODUCE 35.1 AND 35.2.

THE COURT:  ALL RIGHT.  SUBJECT -- I WILL

ADMIT IT SUBJECT TO CONNECTION AND IF THERE IS NO CONNECTION, OBVIOUSLY WE WILL STRIKE THESE EXHIBITS.

(GOVERNMENT EXHIBITS 35.1 AND 35.2 ADMITTED INTO EVIDENCE.)

BY MS. HAINES:

Q.    AGENT, WHEN WE FIRST STARTED THIS DIALOGUE, YOU USED THE TERM "KITE."  WHAT DOES THAT MEAN?

A.    KITE IS A TERM THAT INMATES USE WITHIN THE PRISON.  IT'S MERELY A NOTE FROM -- A NOTE INSIDE A PRISON.

Q.    AND WOULD YOU -- HOW WOULD YOU CATEGORIZE THESE LAST THREE DOCUMENTS AND ENVELOPES THAT WE SHOWED YOU? WHAT ARE THOSE?

A.    THESE WOULD BE CONSIDERED KITES.

Q.    JUST TO BE CLEAR, ARE THOSE GOING THROUGH THE UNITED STATES MAIL?

A.    NO, THEY ARE NOT.  THEY ARE INTERNAL.

Q.    NOW, I'M GOING TO ASK YOU ABOUT A DIFFERENT KIND OF DOCUMENT.  ARE YOU FAMILIAR WITH THE NAME MATTHEW DARBY?

A.    YES.

Q.    WHO IS MR. DARBY?

A.    MR. DARBY WAS AN INMATE.  HE IS -- WAS AN ASSOCIATE OF MR. HAMMER'S AT THE UNITED STATES PENITENTIARY ALLENWOOD, AS WELL AS AT THE FEDERAL

CORRECTIONAL INSTITUTION ALLENWOOD, WHICH IS ACROSS THE STREET FROM THE PENITENTIARY.

Q.      WAS ANYTHING IN THE WAY OF PHYSICAL EVIDENCE EVER OBTAINED FROM MR. DARBY?

A.      YES.

Q.      I'M GOING TO SHOW YOU WHAT HAS BEEN MARKED AS GOVERNMENT EXHIBITS 36.1, 36.2 AND 36.3.

THE COURT:  IT IS NOW 3:25.  PERHAPS THIS WOULD BE A GOOD TIME TO RECESS AND WE WILL START TOMORROW AT, AGAIN, 9:30.  AND ANYTHING ANYBODY WANTS TO QUICKLY PUT ON THE RECORD WHILE MR. HAMMER IS HERE?

MR. GURGANUS:  YOUR HONOR, JUST BRIEFLY. WE DO HAVE SOME STIPULATIONS THAT I THINK ARE IMPORTANT TO NOTE OF RECORD.  THEY HAVE BEEN AUTHORIZED AND THERE WAS A STIPULATION --

THE COURT:  SPEAK INTO THE MIC.  LET ME GET YOU TO --

YOU WANT TO INTRODUCE STIPULATIONS, MR. GURGANUS?

MR. GURGANUS:  YOUR HONOR, I JUST WANT TO NOTE THEM AT THIS TIME.  WE DON'T NEED TO READ THEM IN, BUT WE DO HAVE STIPULATIONS.  I WILL JUST HAVE THE DEFENSE ACKNOWLEDGE THEM, IF APPROPRIATE.  I WON'T READ THEM IN AT THIS TIME.

THE COURT:  WHY DON'T YOU GO OVER THEM

WITH COUNSEL AND WE CAN DO IT FIRST THING AT 9:30 TOMORROW MORNING.

MR. GURGANUS:  JUST FOR PURPOSES OF WITNESSES WE WANT TO MAKE SURE THAT THE COURT IS -- AND THAT THEY ARE ACCEPTABLE.

MR. MCHUGH:  YOUR HONOR, THESE ARE ACCEPTABLE.  WE HAVE GONE OVER THEM WITH COUNSEL.  THE ONLY THING IS ONE OF THE STIPULATIONS IS STILL PENDING A COURT RULING.  SO SUBJECT TO THE COURT'S RULING --

THE COURT:  ALL RIGHT.  YOU WILL TELL ME WHAT IT IS --

MR. MCHUGH:  THE LOMPOC INCIDENT.

THE COURT:  -- RIGHT AFTER THE HEARING.

MR. GURGANUS:  THANK YOU, YOUR HONOR.

THE COURT:  AT THIS POINT WE ARE GOING TO RECESS AND WE WILL RESUME AT 9:30 TOMORROW.

MR. TRAVIS.

MR. TRAVIS:  THAT IS FINE, YOUR HONOR.

THE COURT:  WE WILL RECESS AT THIS POINT AND WE CAN TERMINATE THE VIDEO CONFERENCE WITH MR. HAMMER.

(HEARING ADJOURNED AT 3:30 P.M.)

I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

DATE                              OFFICIAL COURT REPORTER

SUZANNE R. WHITE

INDEX

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| CARLYLE RICK THOMPSON | | | | |
| BY MR. GURGANUS | 7 | -- | -- | -- |
| BY MR. MCHUGH | -- | 44 | -- | -- |
| SARALEE FUNKE | | | | |
| BY MR. GURGANUS | 52 | -- | -- | -- |
| BY MR. MCHUGH | -- | 55 | -- | -- |
| STEPHEN KARTEN | | | | |
| BY MR. GURGANUS | 59 | -- | 96,100 | -- |
| BY MR. MORENO | -- | 66 | -- | 99 |
| NICOLE WEAVER | | | | |
| BY MS. HAINES | 102 | -- | 115 | -- |
| BY MR. TRAVIS | -- | 110 | -- | 117 |
| ANTHONY MALOCU | | | | |
| BY MS. HAINES | 118 | -- | -- | -- |

| GOVERNMENT EXHIBITS | PAGE |
|---|---|
| 29, 1002, 1001.1, 40.1, 9, 11, 13, 14, 15, 16, 17A, 17B, 19, 20, 21, 22, 23, 24, R39, 42.2 | 51 |
| 1000.1 AND R174 | 57 |
| GR170 | 104 |

GR171                                                        107

G31.3                                                        108

R125 THROUGH R140                                            121

R157, R158, 28.2 AND 28.3                                    129

27 AND 28.1                                                  133

32.1 AND 32-2                                                141

33.1 AND 33.2                                                143

35.1 AND 35.2                                                145


DEFENSE EXHIBITS                                             PAGE

D 4 THROUGH D 8                                              102

## $

**$200** [1] - 26:20
**$300** [2] - 26:21, 27:6
**$500** [1] - 26:20

## '

**'96** [2] - 48:7, 119:23
**'98** [1] - 98:16

## 0

**033116** [1] - 85:1

## 1

**1** [11] - 19:2, 25:18, 30:24, 110:24, 111:22, 111:25, 112:2, 112:7, 112:15, 112:20, 112:23
**1,232** [2] - 37:1, 37:16
**1/2** [1] - 15:5
**100** [1] - 2:7
**1000.1** [4] - 52:21, 57:17, 57:20, 149:24
**1001.1** [4] - 32:6, 51:11, 51:22, 149:21
**1002** [5] - 16:24, 32:20, 51:9, 51:21, 149:21
**102** [2] - 149:15, 150:12
**103** [7] - 9:3, 18:25, 19:17, 20:5, 25:8, 43:20, 109:5
**104** [1] - 149:25
**107** [1] - 150:1
**108** [2] - 142:12, 150:2
**10TH** [5] - 107:21, 107:23, 108:11, 109:9, 109:17
**11** [5] - 25:23, 41:2, 51:15, 51:22, 149:21
**110** [1] - 149:16
**1100** [3] - 93:24, 93:25, 94:11
**115** [1] - 149:15
**117** [1] - 149:16
**118** [1] - 149:18
**11:28** [1] - 40:11
**11TH** [2] - 25:19, 29:17
**12** [2] - 31:3, 58:15
**12/94** [1] - 36:19
**121** [1] - 150:3
**122** [1] - 109:7

**129** [1] - 150:4
**13** [6] - 37:16, 41:7, 41:8, 51:15, 51:22, 149:21
**133** [1] - 150:5
**1331** [1] - 2:4
**13TH** [14] - 8:10, 10:25, 19:2, 61:8, 93:4, 93:18, 109:23, 111:1, 111:7, 113:2, 113:17, 114:3, 119:10, 119:15
**14** [7] - 41:12, 51:15, 51:22, 106:5, 106:7, 106:8, 149:21
**140** [1] - 120:24
**141** [1] - 150:6
**143** [2] - 131:18, 150:7
**145** [1] - 150:8
**14TH** [1] - 119:23
**15** [4] - 41:17, 51:15, 51:22, 149:22
**15TH** [1] - 135:11
**16** [6] - 41:19, 41:22, 41:23, 51:15, 51:22, 149:22
**161** [1] - 2:10
**16B** [1] - 1:8
**16TH** [2] - 37:14, 135:11
**170** [1] - 117:7
**17101** [1] - 2:7
**17703-0215** [1] - 2:11
**17A** [6] - 41:25, 42:1, 42:8, 51:15, 51:22, 149:22
**17B** [4] - 42:3, 51:16, 51:22, 149:22
**17TH** [2] - 135:12, 140:1
**18501** [1] - 1:18
**19** [6] - 42:10, 42:11, 51:16, 51:22, 118:24, 149:22
**19106** [3] - 1:9, 1:21, 2:14
**1958** [1] - 37:13
**1969** [1] - 47:24
**1978** [1] - 37:16
**1988** [1] - 91:3
**1993** [2] - 37:14, 60:23
**1994** [1] - 36:20
**1996** [37] - 8:10, 10:25, 19:1, 25:7, 25:19, 25:23, 61:8, 73:14, 76:20, 77:14, 93:3, 93:5, 93:18,

93:21, 98:14, 105:7, 105:9, 106:21, 107:4, 107:5, 108:11, 109:2, 111:1, 111:5, 111:7, 111:19, 111:22, 111:25, 112:2, 112:15, 112:20, 113:2, 113:17, 119:11, 119:15, 140:1
**1998** [7] - 54:5, 69:25, 80:21, 90:21, 91:12, 96:4, 98:17
**1:30** [3] - 25:19, 30:24, 58:16
**1:55** [1] - 109:5

## 2

**2** [5] - 1:12, 31:2, 31:3, 53:1, 53:18
**20** [7] - 4:2, 42:13, 42:24, 51:16, 51:22, 85:17, 149:22
**2001** [1] - 59:13
**2005** [2] - 54:8, 57:5
**20530** [1] - 2:4
**20TH** [3] - 76:20, 77:14, 82:7
**21** [16] - 43:1, 51:16, 51:23, 105:22, 105:23, 106:2, 106:13, 110:2, 111:5, 111:13, 111:19, 111:23, 112:23, 113:17, 149:22
**21-DAY** [6] - 111:18, 111:21, 112:5, 112:22, 113:11, 117:7
**215** [4] - 2:10, 20:2, 109:3, 114:5
**215)627-1882** [1] - 1:22
**21ST** [5] - 105:7, 105:9, 106:16, 107:16, 110:3
**22** [5] - 43:4, 51:16, 51:23, 112:23, 149:22
**22A** [1] - 132:14
**23** [4] - 43:8, 51:16, 51:23, 149:22
**234** [1] - 29:20
**235** [1] - 1:17
**24** [4] - 43:13, 51:16, 51:23, 149:22
**24507-077** [3] - 15:17, 37:12, 89:4
**25** [2] - 3:21, 4:3
**250** [4] - 78:17, 81:9, 85:8, 86:23
**25507-077** [1] -

77:16
**27** [6] - 48:3, 128:11, 133:7, 133:12, 133:15, 150:5
**28.1** [5] - 128:11, 133:9, 133:12, 133:15, 150:5
**28.2** [9] - 128:11, 128:13, 128:15, 128:24, 129:7, 129:12, 129:23, 130:1, 150:4
**28.3** [10] - 128:11, 128:13, 128:15, 128:24, 129:7, 129:11, 129:23, 130:2, 150:4
**29** [5] - 11:8, 12:5, 51:6, 51:21, 149:21
**2:17** [1] - 33:7
**2:40** [1] - 35:21
**2:46** [1] - 35:21

## 3

**3** [5] - 3:21, 35:14, 46:22, 47:3, 111:3
**3/20** [1] - 81:13
**3/20/96** [4] - 78:7, 81:7, 84:15, 85:3
**3/4/96** [1] - 89:13
**30** [4] - 11:2, 74:4, 112:19, 113:15
**300** [1] - 2:7
**302** [11] - 32:4, 32:9, 32:11, 32:12, 33:2, 34:10, 46:21, 47:4, 131:11, 131:13, 131:19
**309** [1] - 1:17
**30TH** [2] - 91:3, 91:12
**31.3** [4] - 108:2, 108:4, 108:13, 108:24
**311** [1] - 1:17
**32-1** [1] - 141:4
**32-2** [6] - 140:12, 141:1, 141:7, 141:11, 141:15, 150:6
**32.1** [8] - 140:12, 140:15, 140:16, 141:5, 141:6, 141:11, 141:15, 150:6
**33.1** [4] - 142:6, 143:1, 143:10, 150:7
**33.2** [4] - 142:6, 143:4, 143:10, 150:7
**35** [2] - 132:16, 132:20
**35.1** [6] - 144:2,

144:11, 144:12, 144:24, 145:3, 150:8
**35.2** [5] - 144:2, 144:14, 144:24, 145:3, 150:8
**36.1** [1] - 146:7
**36.2** [1] - 146:7
**36.3** [1] - 146:7
**37** [1] - 37:12
**39** [5] - 43:18, 43:19, 51:16, 51:23
**395** [4] - 10:11, 10:12, 11:4, 11:5
**3:25** [2] - 4:1, 146:8
**3:30** [6] - 3:12, 3:15, 7:5, 7:8, 58:19, 147:22

## 4

**4** [6] - 35:14, 47:12, 76:18, 101:23, 102:10, 150:12
**4-13-96** [1] - 15:6
**4/10** [3] - 81:13, 82:15, 85:18
**4/10/96** [1] - 85:15
**4/13/96** [3] - 12:14, 15:3, 15:5
**4/9** [2] - 18:25, 25:7
**40.1** [4] - 40:1, 51:13, 51:22, 149:21
**42.2** [4] - 43:21, 51:16, 51:23, 149:23
**43** [1] - 132:15
**44** [3] - 98:15, 98:17, 149:7
**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** [1] - 37:14
**4:96-CR-239** [1] - 1:6
**4TH** [1] - 93:3

## 5

**5** [5] - 33:2, 78:3, 88:1, 88:4, 101:23
**51** [1] - 149:21
**52** [1] - 149:9
**54** [3] - 91:12, 92:7, 96:7
**540** [1] - 2:14
**55** [1] - 149:10
**57** [1] - 149:24
**58008-065** [1] - 26:21
**59** [1] - 149:12

## 6

**6** [6] - 80:24, 84:14,

91:24, 91:25, 96:9, 101:23

**6-3-14** [1] - 1:8
**6.25** [2] - 16:4, 18:18
**60** [2] - 112:18, 113:16
**60-DAY** [3] - 112:1, 112:14, 117:8
**601** [1] - 1:21
**66** [1] - 149:13
**6:16** [1] - 17:25
**6:18** [3] - 12:14, 15:7, 18:3
**6:19** [1] - 18:5
**6:24** [2] - 15:6, 15:8
**6:25** [1] - 38:7

---

**7**

**7** [3] - 88:24, 101:23, 149:6
**7:30** [1] - 33:9
**7:33** [1] - 33:13

---

**8**

**8** [3] - 101:23, 102:10, 150:12
**8:17** [2] - 37:19, 38:5

---

**9**

**9** [10] - 7:12, 40:22, 40:23, 40:24, 51:15, 51:22, 92:8, 119:3, 149:21
**96,100** [1] - 149:12
**99** [1] - 149:13
**9:30** [8] - 4:18, 7:2, 7:6, 7:8, 7:15, 146:10, 147:1, 147:16
**9TH** [6] - 19:1, 25:7, 37:13, 108:11, 109:2, 109:12

---

**A**

**A.M** [21] - 12:14, 15:6, 15:7, 15:8, 16:4, 17:25, 18:5, 18:18, 19:2, 25:18, 25:19, 30:24, 31:2, 31:4, 33:7, 33:9, 33:13, 35:21, 35:22, 37:19, 38:5
**ABILITY** [1] - 5:4
**ABLE** [7] - 10:14, 17:9, 109:24, 122:2, 126:11, 131:2, 131:8
**ABOVE-ENTITLED**

[1] - 148:5
**ABSOLUTELY** [2] - 86:10, 104:20
**ACCEPT** [2] - 27:2, 28:23
**ACCEPTABLE** [2] - 147:5, 147:7
**ACCESS** [1] - 78:13
**ACCOMPANIED** [1] - 120:9
**ACCOMPLISH** [2] - 63:21, 74:6
**ACCOMPLISHED** [1] - 25:3
**ACCORDING** [5] - 21:18, 84:14, 101:22, 111:19, 115:20
**ACCOUNT** [1] - 26:21
**ACCURATE** [5] - 17:18, 39:14, 53:11, 53:21, 57:12
**ACHIEVED** [1] - 6:24
**ACKNOWLEDGE** [1] - 146:23
**ACKNOWLEDGED** [2] - 14:11, 15:17
**ACT** [1] - 88:17
**ACTED** [1] - 19:3
**ACTIONS** [1] - 105:17
**ACTIVITIES** [1] - 26:5
**ACTS** [1] - 88:20
**ACTUAL** [2] - 129:20, 132:1
**AD** [7] - 109:3, 109:5, 109:18, 110:14, 113:20, 114:10, 142:12
**ADDED** [3] - 64:23, 94:2, 106:7
**ADDENDUM** [1] - 55:22
**ADDITION** [1] - 11:22
**ADDITIONAL** [4] - 41:18, 55:22, 56:8, 134:8
**ADDITIONALLY** [1] - 54:2
**ADDRESSED** [4] - 142:12, 143:25, 144:12, 144:16
**ADJOURNED** [1] - 147:22
**ADJUST** [2] - 4:18, 7:13
**ADJUSTED** [1] - 36:22
**ADMINISTRATION**

[2] - 109:15, 110:6
**ADMINISTRATIVE** [13] - 20:1, 103:6, 107:24, 109:13, 110:4, 110:9, 111:14, 111:15, 112:6, 114:4, 114:21, 116:10, 116:21
**ADMINISTRATOR** [2] - 77:13, 80:5
**ADMIT** [3] - 141:12, 143:8, 145:1
**ADMITTED** [22] - 51:23, 57:21, 64:21, 102:8, 102:11, 104:10, 104:11, 107:10, 107:12, 108:15, 108:17, 110:24, 111:3, 121:12, 121:14, 129:25, 130:2, 133:14, 133:15, 141:16, 143:11, 145:4
**ADVANCE** [2] - 21:2, 21:5
**ADVANTAGE** [1] - 89:22
**ADVICE** [3] - 10:11, 11:5, 12:23
**ADVISE** [1] - 10:9
**ADVISED** [1] - 14:15
**AFFECT** [1] - 71:18
**AFFORD** [4] - 12:25, 13:12, 13:14, 45:7
**AFIELD** [1] - 77:3
**AFTERNOON** [5] - 30:14, 102:25, 103:1, 118:8, 118:9
**AGE** [1] - 37:12
**AGENT** [44] - 3:25, 7:18, 7:19, 8:1, 8:19, 15:2, 49:16, 49:19, 49:25, 50:3, 56:13, 56:14, 56:22, 118:8, 118:12, 118:15, 118:23, 119:1, 120:10, 121:17, 123:1, 124:12, 128:23, 130:6, 130:23, 131:17, 133:18, 134:25, 135:25, 136:1, 136:14, 137:14, 138:11, 138:13, 138:21, 138:23, 139:16, 141:18, 143:14, 143:24, 144:11, 145:6
**AGITATED** [2] - 14:21, 38:11

**AGO** [7] - 21:9, 67:15, 68:2, 70:1, 81:18, 84:5, 95:12
**AGREE** [5] - 27:4, 93:7, 94:13, 100:9, 100:10
**AGREED** [3] - 44:24, 45:2, 45:11
**AGREEMENT** [2] - 3:14, 30:1
**AHEAD** [8] - 12:16, 19:15, 29:18, 34:21, 39:24, 62:1, 64:19, 71:9
**AIDED** [1] - 1:24
**AIR** [2] - 31:3, 31:4
**ALIVE** [1] - 16:9
**ALLENTOWN** [1] - 119:19
**ALLENWOOD** [22] - 8:8, 8:9, 12:13, 15:4, 15:6, 60:5, 60:22, 61:9, 64:25, 68:22, 69:6, 69:20, 74:15, 80:9, 80:12, 88:25, 92:17, 108:5, 135:6, 140:4, 145:25, 146:1
**ALLOW** [2] - 77:9, 139:6
**ALLOWED** [4] - 32:19, 33:9, 100:8, 137:21
**ALLOWING** [1] - 7:3
**ALONE** [1] - 97:22
**AMANDA** [1] - 2:2
**AMENDMENT** [1] - 135:23
**AMERICA** [1] - 1:3
**AMOUNT** [1] - 82:12
**ANAL** [1] - 134:1
**ANALYSIS** [2] - 60:13, 140:25
**ANALYST** [2] - 138:22, 139:2
**ANATOMICALLY** [1] - 123:4
**AND-A-HALF** [2] - 60:7, 119:3
**ANDREW** [8] - 21:5, 53:5, 103:6, 104:6, 105:1, 107:16, 119:25, 140:17
**ANGER** [3] - 88:16, 88:20
**ANKLE** [2] - 31:6, 125:15
**ANNE** [1] - 2:5
**ANSWER** [8] - 13:11, 13:16, 13:23, 84:19, 96:15, 96:25, 97:18,

97:25
**ANSWERED** [1] - 17:11
**ANSWERING** [3] - 13:18, 13:19, 131:1
**ANSWERS** [3] - 17:5, 17:10, 54:10
**ANTHONY** [4] - 49:18, 117:23, 118:2, 149:17
**ANTIANXIETY** [1] - 69:18
**ANTICIPATE** [1] - 58:13
**ANTIDEPRESSANT** [1] - 69:14
**APOLOGIZE** [5] - 6:19, 84:10, 101:1, 132:1, 141:6
**APPEARANCE** [1] - 38:10
**APPEARANCES** [2] - 1:14, 2:1
**APPEARED** [1] - 137:17
**APPLY** [2] - 135:21, 136:7
**APPOINTED** [3] - 13:1, 13:15, 45:8
**APPRECIATE** [1] - 97:23
**APPROACH** [3] - 76:5, 90:23, 103:11
**APPROPRIATE** [1] - 146:23
**APRIL** [32] - 8:10, 10:25, 19:1, 19:2, 25:7, 25:19, 25:23, 29:17, 48:7, 61:8, 73:14, 93:4, 93:18, 93:20, 107:21, 107:23, 108:11, 109:2, 109:9, 109:12, 109:23, 111:1, 111:7, 112:20, 113:2, 113:17, 114:3, 119:10, 119:15, 119:23, 135:11, 140:1
**AREA** [11] - 41:15, 98:10, 123:13, 123:17, 123:21, 124:3, 124:20, 126:12, 127:18, 134:1, 134:18
**ARM** [4] - 31:15, 33:20, 33:21, 124:2
**ARRANGE** [2] - 21:16, 21:17
**ARRIVAL** [1] - 71:23
**ARRIVED** [5] - 8:14,

60:21, 64:25, 69:9, 74:14

**ARROW** [2] - 123:19, 124:4

**ASCERTAIN** [2] - 105:15, 122:2

**ASLEEP** [1] - 19:4

**ASPECT** [1] - 3:10

**ASPHYXIATION** [1] - 126:1

**ASS** [2] - 30:13, 47:15

**ASSAULTING** [1] - 105:5

**ASSAULTS** [1] - 48:12

**ASSESS** [1] - 72:7

**ASSESSMENT** [6] - 61:17, 62:1, 68:21, 72:1, 80:17, 81:21

**ASSIGNED** [4] - 49:13, 49:16, 119:16, 120:1

**ASSIGNING** [3] - 92:4, 96:11, 96:23

**ASSIGNMENT** [1] - 119:11

**ASSIST** [1] - 131:1

**ASSISTANCE** [1] - 77:21

**ASSISTANT** [3] - 36:16, 82:20, 85:5

**ASSISTANTS** [1] - 120:12

**ASSOCIATE** [1] - 145:24

**ASSUME** [3] - 58:2, 70:17, 94:13

**ASSUMING** [4] - 38:25, 84:14, 85:18, 113:15

**ASSURANCE** [1] - 41:10

**ATLANTA** [3] - 26:11, 26:12, 26:16

**ATTACHMENT** [1] - 43:23

**ATTEMPTED** [4] - 14:12, 111:24, 111:25, 113:12

**ATTEMPTING** [2] - 62:25, 63:2

**ATTEND** [1] - 119:12

**ATTENDANCE** [1] - 120:13

**ATTENDED** [2] - 120:2, 120:3

**ATTENDING** [1] - 130:24

**ATTENTION** [7] -

4:15, 5:9, 6:2, 30:14, 47:15, 61:7, 125:19

**ATTORNEYS** [3] - 1:16, 91:19, 100:24

**AUDITOR** [1] - 60:18

**AUTHENTICATE** [1] - 138:3

**AUTHENTICATED** [2] - 138:12, 142:22

**AUTHORED** [1] - 43:5

**AUTHORITIES** [1] - 3:12

**AUTHORIZED** [1] - 146:14

**AUTOMATICALLY** [3] - 7:5, 7:6

**AUTOPSIES** [1] - 120:3

**AUTOPSY** [25] - 52:20, 52:22, 53:4, 55:8, 56:3, 119:12, 119:18, 119:22, 119:23, 120:3, 120:6, 120:8, 120:14, 120:17, 121:3, 125:12, 127:23, 127:24, 128:3, 129:9, 129:14, 130:24, 131:6, 131:20, 133:3

**AVAILABLE** [3] - 11:23, 68:9, 136:2

**AWARE** [9] - 18:5, 54:2, 70:19, 70:24, 72:2, 80:15, 82:25, 135:18

**AWARENESS** [1] - 65:9

## B

**BACHELOR'S** [1] - 59:17

**BACKGROUND** [1] - 59:14

**BACKTRACK** [1] - 74:13

**BACKWARD** [1] - 33:22

**BAD** [2] - 25:9, 65:18

**BASE** [2] - 109:7, 124:20

**BASED** [6] - 55:9, 86:9, 93:8, 93:14, 137:25, 138:8

**BASIS** [2] - 135:15, 135:20

**BATHROOM** [4] - 32:20, 33:10, 46:2, 46:6

**BATTERIES** [1] - 42:17

**BEAUTIFUL** [1] - 125:2

**BECAME** [2] - 59:24, 119:6

**BED** [15] - 31:8, 31:13, 31:16, 34:5, 35:5, 35:10, 35:18, 41:15, 42:2, 42:7, 42:9, 43:11, 43:16

**BEGAN** [6] - 10:9, 18:12, 18:18, 38:6, 82:7, 112:2

**BEGIN** [2] - 4:12, 106:14

**BEGINNING** [7] - 19:11, 19:13, 33:2, 37:25, 46:13, 91:24, 128:3

**BEHALF** [1] - 29:20

**BEHAVIOR** [1] - 82:8

**BELLY** [3] - 4:23, 5:3, 87:14

**BELOW** [1] - 111:23

**BENEFIT** [3] - 3:18, 3:22, 77:22

**BENZODIAZEPINE** [1] - 70:3

**BENZODIAZEPINE-TYPE** [1] - 70:3

**BEST** [6] - 18:14, 19:7, 56:16, 57:12, 71:2, 74:9

**BETTER** [4] - 33:23, 33:25, 34:25, 37:17

**BETWEEN** [6] - 7:10, 36:24, 73:8, 75:8, 116:21, 136:13

**BEYOND** [1] - 113:17

**BIG** [1] - 82:17

**BIGGEST** [1] - 90:4

**BIPOLAR** [2] - 79:8, 79:14

**BIRTH** [2] - 37:12, 37:13

**BIT** [6] - 12:6, 17:24, 26:14, 58:21, 104:24, 126:22

**BITE** [1] - 32:2

**BLACK** [1] - 128:17

**BLADE** [1] - 30:23

**BLANK** [1] - 89:11

**BLOOD** [5] - 41:14, 82:12, 85:24, 134:12, 134:14

**BLOW** [1] - 12:5

**BODILY** [1] - 41:14

**BODY** [18] - 31:8,

34:6, 35:6, 122:3, 123:18, 123:22, 127:25, 129:1, 129:9, 129:14, 130:17, 131:10, 131:23, 132:11, 132:16, 132:22, 133:6, 133:10

**BOOK** [7] - 43:5, 108:5, 108:6, 108:8, 108:10, 113:19, 114:10

**BOONE** [15] - 21:10, 21:16, 21:18, 22:1, 22:2, 22:11, 22:16, 22:18, 23:9, 23:11, 23:12, 23:15, 23:18

**BOONE'S** [1] - 23:18

**BOTTOM** [5] - 13:6, 15:11, 47:6, 47:8, 78:15

**BOX** [4] - 1:17, 2:10, 29:20, 43:22

**BRAID** [3] - 30:16, 43:17, 49:5

**BRAIDED** [1] - 43:9

**BRAIN** [3] - 63:14, 65:14, 65:15

**BRANCH** [1] - 60:13

**BREAK** [13] - 32:25, 33:1, 33:11, 33:12, 40:9, 46:2, 58:22, 84:7, 87:4, 99:19, 99:21, 101:6, 118:17

**BRIEF** [3] - 8:23, 50:8, 52:13

**BRIEFING** [1] - 9:1

**BRIEFLY** [6] - 98:22, 102:14, 115:6, 118:25, 137:8, 146:12

**BRING** [6] - 4:15, 9:5, 15:10, 16:25, 40:20, 108:19

**BROADCAST** [1] - 91:7

**BROUGHT** [7] - 5:9, 6:2, 11:7, 16:16, 17:12, 18:1, 113:19

**BRUISES** [1] - 124:25

**BRUISING** [10] - 122:15, 124:6, 124:19, 125:18, 126:9, 126:16, 126:19, 126:22, 127:6, 127:15

**BUILD** [1] - 85:24

**BUNK** [5] - 19:3, 31:5, 43:16, 49:6, 49:7

**BUNKS** [1] - 30:25

**BUREAU** [8] - 4:1, 44:13, 59:24, 70:12, 93:10, 109:22, 114:20, 132:13

**BURNS** [1] - 35:13

**BUTTON** [1] - 124:21

**BUY** [2] - 110:14, 110:15

## C

**CALCULATED** [1] - 48:2

**CALENDAR** [4] - 106:21, 107:3, 107:5, 107:15

**CALIFORNIA** [1] - 25:11

**CALM** [1] - 38:14

**CALMING** [1] - 38:10

**CAMEL** [3] - 33:13, 41:3

**CAMELS** [1] - 31:25

**CANAAN** [1] - 8:7

**CANNOT** [3] - 12:25, 13:14, 116:6

**CAPITAL** [2] - 2:3, 135:22

**CAPTURE** [1] - 66:9

**CAPTURING** [1] - 26:2

**CARE** [2] - 65:2, 74:5

**CAREER** [3] - 14:5, 55:21, 59:21

**CAREFUL** [1] - 65:12

**CARLYLE** [3] - 7:22, 15:1, 149:5

**CASE** [30] - 3:5, 3:10, 7:8, 49:13, 50:1, 50:3, 54:2, 56:14, 56:17, 56:19, 56:20, 56:22, 62:11, 62:12, 77:25, 78:20, 82:25, 83:10, 83:21, 90:6, 90:19, 99:2, 99:13, 100:9, 104:4, 134:19, 134:22, 136:20, 138:7

**CASELOAD** [2] - 73:24, 83:10

**CASES** [3] - 73:11, 97:6, 114:18

**CATEGORIZE** [1] - 145:11

**CATEGORY** [1] - 75:22

**CAUTION** [1] - 46:12

**CELL** [48] - 9:3, 9:4, 18:24, 18:25, 19:17, 19:21, 19:25, 20:2, 20:4, 20:6, 20:9,

20:11, 25:7, 26:7, 30:23, 33:14, 35:19, 39:2, 39:4, 39:8, 39:15, 39:16, 43:20, 64:22, 64:24, 65:11, 65:12, 65:20, 92:20, 93:4, 97:10, 99:3, 99:7, 99:14, 99:23, 100:1, 108:6, 108:7, 109:18, 113:20, 113:23, 114:10, 114:12, 114:15, 114:23, 115:2, 115:3

**CELLED** [5] - 19:20, 20:6, 89:20, 114:16, 116:18

**CELLIE** [4] - 19:19, 35:23, 97:24, 99:8

**CELLMATE** [9] - 21:10, 21:14, 26:6, 61:14, 64:4, 93:18, 100:3, 142:1, 143:17

**CELLMATES** [1] - 26:1

**CELLS** [3] - 97:11, 108:6, 110:9

**CENTER** [2] - 2:14, 59:21

**CENTRAL** [2] - 60:8, 117:14

**CERTAIN** [3] - 58:23, 82:12, 120:17

**CERTAINLY** [6] - 97:6, 135:20, 135:23, 135:24, 136:1, 137:10

**CERTIFIED** [1] - 87:18

**CERTIFY** [1] - 148:3

**CETERA** [1] - 89:25

**CHAIN** [6] - 4:23, 5:3, 87:14, 126:17, 126:24, 133:6

**CHANCE** [3] - 26:15, 29:24, 91:6

**CHANGE** [6] - 4:21, 7:16, 55:13, 55:15, 55:19, 115:18

**CHANGED** [1] - 5:8

**CHAPLAIN** [1] - 30:6

**CHARGE** [2] - 56:14, 109:6

**CHARGES** [1] - 117:9

**CHAUDHRI** [2] - 82:21, 82:23

**CHECK** [2] - 36:1, 50:14

**CHECKED** [4] - 35:16, 60:18, 82:13

**CHEST** [1] - 124:3

**CHESTER** [1] - 141:20

**CHESTNUT** [1] - 2:7

**CHIEF** [8] - 60:12, 68:21, 68:24, 68:25, 69:2, 70:16, 83:4, 92:16

**CHOICE** [1] - 73:7

**CHOKE** [4] - 33:25, 34:7, 34:25, 35:7

**CHOKING** [1] - 35:12

**CHOOSES** [1] - 135:19

**CHRISTOPHER** [2] - 127:7, 133:5

**CHRISTOPHER'S** [1] - 126:18

**CHRONOLOGICAL** [2] - 12:2, 38:16

**CIGARETTE** [3] - 31:24, 31:25, 33:14

**CIGARETTES** [1] - 41:4

**CIRCLED** [1] - 127:17

**CIRCUMSTANCES** [4] - 61:11, 61:19, 114:19, 137:8

**CIVIL** [1] - 67:12

**CLAIMED** [1] - 64:24

**CLARIFY** [1] - 84:13

**CLASSEN** [10] - 19:19, 20:1, 20:5, 20:8, 143:13, 143:16, 143:17, 143:20, 143:25, 144:13

**CLAUSE** [3] - 135:24, 136:17, 138:16

**CLEAN** [1] - 35:17

**CLEAR** [12] - 28:11, 65:9, 124:22, 124:24, 125:4, 126:14, 127:3, 127:12, 139:7, 142:14, 143:1, 145:15

**CLEARLY** [1] - 132:2

**CLERK** [6] - 3:1, 52:6, 59:3, 76:11, 91:17, 117:25

**CLINICAL** [3] - 67:6, 67:7, 67:8

**CLIPPERS** [2] - 36:8, 36:10

**CLIPPINGS** [1] - 134:3

**CLOCK** [2] - 33:7, 40:11

**CLOSER** [5] - 48:8, 130:17, 131:9, 131:23, 132:11

**CLOSES** [1] - 7:5

**CLOSEST** [1] - 132:22

**CLOTHING** [2] - 128:1, 128:2

**CM** [1] - 1:19

**CO'S** [1] - 30:24

**COERCION** [1] - 14:1

**COINCIDED** [1] - 16:14

**COLD** [3] - 70:11, 71:3, 71:5

**COLLECT** [2] - 134:24, 140:8

**COLLECTED** [9] - 127:22, 132:1, 132:12, 132:25, 133:3, 133:19, 133:25, 134:13, 136:15

**COLLEGE** [1] - 31:3

**COLOR** [5] - 40:25, 41:1, 140:21, 141:9, 144:21

**COMBED** [1] - 35:18

**COMING** [4] - 27:7, 35:21, 42:4, 89:24

**COMMISSARY** [4] - 26:20, 110:14, 116:17

**COMMITTING** [1] - 65:3

**COMMODE** [1] - 31:7

**COMMON** [2] - 75:1, 125:25

**COMMUNITY** [1] - 2:13

**COMPARE** [3] - 121:4, 141:7, 144:17

**COMPLAINTS** [1] - 90:4

**COMPLETED** [2] - 37:19, 38:4

**COMPLETELY** [1] - 17:18

**COMPLETION** [1] - 38:24

**COMPLIANT** [1] - 50:15

**COMPLIED** [2] - 19:12, 31:24

**COMPOSED** [1] - 31:10

**COMPUTER** [2] - 1:24, 1:24

**COMPUTER-AIDED** [1] - 1:24

**CONCERN** [1] - 62:20

**CONCERNING** [3] - 4:21, 56:4, 56:9

**CONCERNS** [3] - 61:14, 77:19, 99:6

**CONCLUSION** [2] - 127:24, 140:7

**CONCLUSIONS** [1] - 55:23

**CONCURRENT** [2] - 117:11, 117:16

**CONDITION** [1] - 140:21

**CONDUCT** [3] - 9:6, 106:6, 106:8

**CONDUCTED** [1] - 68:20

**CONDUCTING** [1] - 81:20

**CONFER** [1] - 66:17

**CONFERENCE** [1] - 147:20

**CONFERENCING** [1] - 87:13

**CONFIDENTIAL** [1] - 61:25

**CONFIDENTIALITY** [1] - 62:15

**CONFRONT** [1] - 135:24

**CONFRONTATION** [5] - 135:23, 136:5, 136:17, 137:20, 138:16

**CONFUSED** [2] - 31:9, 113:7

**CONFUSION** [1] - 98:6

**CONNECT** [1] - 139:5

**CONNECTED** [1] - 138:22

**CONNECTION** [9] - 75:7, 134:22, 138:7, 139:6, 141:13, 143:9, 144:9, 145:1, 145:2

**CONSECUTIVE** [10] - 111:22, 112:22, 113:4, 113:6, 113:12, 113:16, 115:22, 117:11, 117:16

**CONSIDER** [1] - 74:9

**CONSIDERED** [1] - 145:14

**CONSISTING** [1] - 26:20

**CONSULT** [1] - 56:25

**CONSULTATION** [1] - 78:5

**CONTACT** [1] - 116:19

**CONTAIN** [1] - 68:17

**CONTAINED** [1] - 67:20

**CONTENT** [3] - 53:7, 54:16, 54:18

**CONTENTS** [1] - 144:15

**CONTEXT** [2] - 64:16, 67:11

**CONTINUE** [18] - 7:17, 13:10, 21:20, 21:21, 21:23, 22:22, 23:15, 23:22, 25:15, 26:8, 29:7, 30:11, 33:3, 65:2, 65:17, 65:21, 96:9, 96:15

**CONTINUED** [14] - 2:1, 7:24, 23:23, 25:6, 25:8, 25:18, 26:10, 29:8, 33:13, 34:6, 35:6, 36:23, 45:1, 46:7

**CONTINUITY** [1] - 74:5

**CONTRACT** [12] - 23:25, 24:14, 24:20, 36:25, 73:13, 73:15, 73:19, 73:25, 78:11, 79:24, 95:3

**CONTRACTOR** [1] - 73:3

**CONTROL** [1] - 74:23

**CONVERSATION** [1] - 136:13

**CONVICTIONS** [1] - 37:17

**COOPERATE** [1] - 45:1

**COOPERATING** [1] - 46:7

**COOPERATORS** [1] - 48:21

**COPELAND** [1] - 43:6

**COPY** [7] - 76:10, 87:18, 91:2, 91:14, 91:18, 91:20

**CORD** [2] - 41:9, 43:22

**CORRECT** [146] - 6:16, 6:18, 6:20, 8:1, 8:4, 8:7, 8:11, 8:12, 8:25, 9:10, 9:15, 12:11, 14:24, 15:9, 16:1, 17:23, 18:2, 18:4, 18:8, 18:11, 18:13, 21:6, 21:7, 21:15, 22:9, 22:15, 22:21, 23:6, 24:17,

25:1, 25:14, 25:22, 27:8, 30:10, 32:5, 32:17, 37:23, 38:8, 38:22, 39:17, 39:23, 40:6, 41:6, 41:21, 44:17, 44:20, 44:21, 44:22, 44:25, 45:3, 45:6, 45:10, 45:13, 45:19, 45:24, 46:3, 46:9, 47:22, 48:1, 49:2, 49:12, 49:24, 50:2, 51:8, 51:14, 52:17, 53:5, 53:6, 53:8, 54:5, 54:15, 60:1, 67:17, 68:22, 68:23, 69:12, 69:19, 70:17, 70:22, 72:4, 72:23, 75:15, 77:25, 78:20, 78:23, 79:11, 79:12, 81:7, 81:8, 84:17, 86:14, 86:17, 86:21, 88:8, 88:21, 88:22, 88:25, 89:5, 89:16, 90:16, 90:17, 90:19, 92:22, 93:10, 95:1, 98:8, 99:23, 99:24, 104:17, 106:3, 109:10, 109:11, 109:25, 111:1, 111:7, 111:19, 111:20, 112:2, 112:3, 112:7, 112:8, 112:9, 112:15, 112:16, 112:24, 113:2, 113:17, 113:18, 113:23, 114:2, 114:14, 114:17, 117:8, 117:16, 117:17, 126:25, 127:9, 127:10, 127:19, 128:18, 131:17, 132:21, 132:23, 133:20, 142:16, 148:3

**CORRECTION** [3] - 8:8, 9:23, 42:6

**CORRECTIONAL** [8] - 3:11, 5:19, 21:18, 30:25, 59:23, 60:3, 80:10, 146:1

**CORRECTIONS** [2] - 37:15, 55:23

**CORRECTLY** [3] - 48:2, 56:20, 106:1

**COUNSEL** [8] - 3:3, 3:7, 6:14, 7:2, 66:18, 136:10, 147:1, 147:7

**COUNSELOR** [1] - 9:13

**COUNSELOR/ INMATE** [1] - 38:25

**COUNT** [7] - 19:3, 19:4, 30:25, 31:1, 35:21, 109:7, 112:18

**COUNTED** [1] - 46:20

**COUNTING** [1] - 107:19

**COUNTRY** [1] - 118:22

**COUPLE** [7] - 31:25, 46:1, 48:6, 50:5, 55:4, 67:14, 95:14

**COURSE** [7] - 17:14, 45:25, 47:18, 56:9, 63:1, 84:4, 120:17

**COURT** [171] - 1:1, 1:20, 3:1, 3:2, 3:4, 3:7, 3:19, 4:10, 4:18, 4:24, 5:2, 5:4, 5:13, 5:16, 5:18, 5:21, 6:1, 6:6, 6:11, 6:19, 6:23, 7:2, 7:7, 7:12, 7:14, 11:13, 11:17, 12:21, 27:16, 27:21, 27:23, 28:11, 28:14, 28:15, 28:16, 28:17, 28:19, 28:22, 29:1, 29:5, 32:8, 32:13, 32:15, 39:24, 40:7, 40:10, 41:20, 42:4, 42:23, 44:4, 48:8, 50:20, 50:23, 51:1, 51:6, 51:8, 51:11, 51:13, 51:15, 51:19, 52:2, 52:18, 57:1, 57:18, 57:22, 58:1, 58:6, 58:10, 58:14, 58:18, 58:19, 61:18, 66:15, 66:19, 76:4, 76:7, 76:10, 76:13, 77:8, 78:24, 79:2, 79:4, 79:6, 80:9, 80:13, 81:2, 84:1, 84:9, 84:12, 84:18, 84:22, 85:10, 86:10, 87:5, 87:9, 87:22, 90:25, 91:4, 92:6, 95:24, 98:24, 99:25, 100:19, 100:25, 101:3, 101:9, 101:12, 101:15, 101:19, 101:22, 102:2, 102:5, 102:7, 102:12, 102:15, 102:18, 102:22, 103:12, 103:20, 103:22, 103:25, 104:9, 104:19, 104:20, 105:10, 106:25, 107:5, 107:7, 107:10, 108:15,

110:19, 111:9, 115:5, 117:2, 117:21, 118:5, 121:11, 122:19, 122:22, 124:9, 128:18, 129:2, 129:4, 129:25, 130:4, 132:4, 132:7, 133:13, 135:17, 136:24, 137:5, 137:25, 138:25, 139:8, 139:12, 141:12, 142:9, 142:21, 143:8, 144:7, 144:25, 146:8, 146:16, 146:25, 147:4, 147:9, 147:10, 147:13, 147:15, 147:19, 148:9

**COURT'S** [8] - 4:15, 39:18, 40:19, 86:9, 87:25, 130:20, 136:6, 147:9

**COURTESY** [1] - 58:25

**COURTHOUSE** [1] - 1:20

**COURTROOM** [3] - 1:8, 3:13, 10:13

**COVERED** [3] - 35:18, 41:24, 42:2

**CREATING** [1] - 134:8

**CREDIBILITY** [3] - 136:9, 136:20, 137:23

**CRIME** [2] - 9:4, 39:10

**CRIMES** [3] - 2:3, 48:18, 119:5

**CRIMINAL** [4] - 1:3, 2:3, 26:5, 67:12

**CRITERIA** [1] - 92:20

**CROOK** [1] - 33:21

**CROSS** [10] - 44:4, 44:5, 55:2, 66:15, 66:21, 87:22, 110:19, 110:20, 137:23, 149:3

**CROSS-EXAMINED** [1] - 137:23

**CUFF** [1] - 36:12

**CURTIS** [1] - 2:14

**CUSTODY** [4] - 127:23, 128:6, 134:16, 134:17

**CUT** [5] - 30:16, 30:23, 35:13, 71:2, 104:24

---

# D

**D-E-P-A-K-O-T-E** [1] - 79:1

**D.C** [3] - 2:4, 60:8, 60:11

**DA** [3] - 90:7

**DANGER** [7] - 89:15, 90:2, 92:11, 93:2, 93:16, 97:3, 100:2

**DAPC** [1] - 77:14

**DARBY** [4] - 145:20, 145:22, 145:23, 146:4

**DARK** [1] - 144:21

**DATA** [1] - 104:16

**DATE** [16] - 8:10, 12:14, 15:2, 37:12, 57:8, 57:9, 105:6, 109:2, 111:23, 119:21, 119:24, 135:10, 139:17, 139:20, 139:25, 148:9

**DATED** [4] - 76:19, 77:13, 78:7, 81:6

**DATES** [1] - 108:9

**DAVID** [7] - 1:6, 3:5, 9:5, 15:16, 37:11, 77:15, 139:9

**DAYS** [26] - 25:20, 67:2, 71:20, 74:4, 78:23, 81:14, 82:15, 85:17, 86:2, 105:22, 105:23, 106:2, 106:5, 106:7, 106:9, 106:10, 110:2, 111:13, 112:18, 112:20, 113:15, 113:16, 113:17, 128:6

**DEAD** [8] - 35:23, 36:1, 63:14, 63:15, 64:1, 65:13, 65:14, 65:15

**DEAL** [3] - 26:24, 27:2, 27:5

**DEALING** [1] - 91:7

**DEATH** [2] - 37:1, 119:25

**DECEMBER** [2] - 36:20, 37:14

**DECIDE** [4] - 13:11, 13:16, 138:5, 138:15

**DECISION** [2] - 99:12, 100:4

**DECLINED** [1] - 27:25

**DEEMED** [4] - 75:12, 93:2, 99:5, 100:2

**DEER** [1] - 140:4

**DEFENDANT** [12] - 2:5, 2:8, 2:12, 4:8, 5:23, 6:15, 7:9, 100:22, 101:1, 128:16, 128:20, 135:24

**DEFENDANT'S** [2] - 88:24, 111:3

**DEFENDANTS** [1] - 48:24

**DEFENDER** [2] - 2:6, 2:13

**DEFENSE** [8] - 76:17, 78:3, 80:23, 102:10, 110:24, 139:8, 146:23, 150:11

**DEFINED** [1] - 92:18

**DEFINITION** [2] - 93:8, 93:9

**DEFINITIVELY** [1] - 139:9

**DEGREE** [2] - 59:17, 59:19

**DEMEANOR** [2] - 14:18, 38:9

**DEMONSTRATED** [1] - 77:18

**DENIAL** [1] - 136:4

**DENIED** [4] - 64:17, 64:20, 64:21, 137:20

**DENTON** [1] - 85:3

**DEP** [1] - 79:2

**DEPAKOTE** [10] - 78:16, 78:22, 80:18, 80:21, 81:9, 81:20, 84:16, 85:8, 88:8, 88:21

**DEPARTMENT** [4] - 2:2, 37:15, 70:13, 80:5

**DEPICTS** [4] - 125:8, 126:9, 126:16, 127:6

**DEPRESSED** [1] - 65:7

**DEPRESSION** [2] - 43:5, 72:17

**DEPRESSIVE** [1] - 77:19

**DEPRIVATION** [1] - 136:4

**DESCRIBE** [3] - 9:16, 14:18, 74:22

**DESCRIPTION** [1] - 37:21

**DESERVES** [1] - 139:13

**DESIGNATED** [2] - 28:4, 75:22

**DESIGNATION** [6] - 28:7, 29:4, 75:17, 75:19, 109:18, 116:8

**DESIRED** [1] - 14:13

**DESK** [1] - 41:6

**DETAILS** [1] - 137:3

**DETENTION** [12] - 20:2, 103:7, 107:24,

109:13, 109:15, 110:9, 111:14, 111:15, 112:6, 114:5, 114:21, 116:10

**DETERMINATION** [1] - 89:19

**DETERMINE** [3] - 62:25, 63:2, 77:22

**DETERMINED** [1] - 89:15

**DHO** [8] - 105:8, 105:10, 106:7, 106:15, 110:2, 113:5, 113:10, 115:23

**DIAGNOSED** [1] - 74:15

**DIAGNOSIS** [2] - 88:11, 88:19

**DIAGRAMS** [1] - 53:2

**DIALOGUE** [1] - 145:6

**DIARRHEA** [1] - 85:14

**DIED** [4] - 111:5, 115:11, 115:15, 115:18

**DIFFERENCE** [1] - 116:21

**DIFFERENT** [7] - 78:22, 97:25, 109:16, 114:25, 116:13, 134:18, 145:18

**DIFFICULTY** [3] - 88:15, 88:16, 88:20

**DIRECT** [14] - 7:18, 7:24, 18:19, 44:15, 52:9, 58:8, 59:7, 60:17, 61:7, 102:23, 118:6, 125:19, 126:6, 149:3

**DIRECTING** [2] - 84:21, 84:22

**DIRECTLY** [2] - 10:4, 142:15

**DISALLOWANCE** [1] - 106:6

**DISAPPEARED** [1] - 84:6

**DISC** [1] - 31:3

**DISCIPLINARY** [29] - 22:2, 22:6, 22:8, 22:14, 22:20, 103:7, 105:2, 105:11, 105:16, 105:21, 106:11, 107:17, 109:9, 109:19, 109:24, 110:5, 110:7, 111:18, 112:1, 112:23, 113:1, 114:3,

114:6, 114:22, 116:1, 116:11, 116:15, 116:22, 117:14

**DISCIPLINE** [1] - 104:16

**DISCOLORATION** [1] - 141:8

**DISCOLORATIONS** [1] - 140:24

**DISCOLORED** [1] - 127:17

**DISCONNECTED** [1] - 3:13

**DISCONTINUED** [2] - 69:21, 69:23

**DISCOVERY** [1] - 137:10

**DISCUSS** [1] - 30:15

**DISCUSSING** [1] - 46:23

**DISCUSSION** [5] - 7:10, 13:8, 26:3, 38:20, 47:18

**DISLOCATED** [1] - 36:18

**DISORDER** [4] - 74:16, 74:22, 74:25, 79:8

**DISRESPECTED** [2] - 64:10, 64:24

**DISTORTED** [1] - 65:9

**DISTRICT** [5] - 1:1, 1:2, 1:16, 2:6, 2:13

**DISTURBED** [4] - 92:12, 97:4, 97:6, 99:5

**DIVISION** [3] - 2:3, 118:16, 119:9

**DOB** [1] - 37:12

**DOC** [1] - 97:21

**DOCKETED** [2] - 87:10, 87:11

**DOCTOR** [19] - 66:23, 66:25, 67:14, 71:12, 73:4, 73:9, 76:9, 76:17, 79:15, 83:9, 86:7, 88:4, 88:24, 91:2, 91:9, 91:11, 95:6, 95:23, 99:2

**DOCTORATE** [1] - 59:19

**DOCTORS** [3] - 70:15, 73:4, 73:6

**DOCUMENT** [27] - 10:12, 11:6, 11:22, 12:7, 12:15, 17:17, 32:12, 66:10, 76:23, 77:5, 81:3, 88:10,

111:4, 112:10, 117:15, 131:11, 131:22, 131:24, 132:2, 137:18, 137:19, 137:24, 138:4, 138:6, 143:2, 143:4, 145:19

**DOCUMENTATION** [2] - 103:18, 139:5

**DOCUMENTED** [2] - 17:7, 130:18

**DOCUMENTING** [1] - 16:15

**DOCUMENTS** [4] - 84:4, 87:15, 103:9, 145:12

**DONE** [12] - 9:12, 15:25, 29:11, 52:19, 52:20, 56:20, 70:13, 83:19, 83:20, 90:1, 99:10, 107:16

**DONN** [2] - 9:24, 15:5

**DOOR** [3] - 5:15, 6:22, 35:23

**DOSAGE** [3] - 70:25, 82:14, 86:19

**DOUBT** [2] - 29:12, 136:22

**DOUBTS** [4] - 29:21, 46:24, 47:8, 47:13

**DOWN** [21] - 10:5, 12:2, 17:9, 17:15, 31:7, 32:2, 38:10, 46:11, 46:12, 51:20, 57:22, 79:17, 81:9, 81:12, 82:8, 85:11, 89:6, 100:20, 117:21, 118:17, 118:19

**DR** [24] - 52:4, 55:4, 55:6, 57:4, 61:6, 71:23, 72:2, 72:6, 72:13, 72:17, 72:21, 76:19, 76:25, 77:3, 79:16, 83:15, 97:18, 101:8, 101:17, 120:11, 125:22, 127:15, 127:24, 133:24

**DRAGS** [1] - 31:25

**DRAPED** [1] - 124:2

**DRAW** [1] - 126:11

**DRAWN** [1] - 127:8

**DREW** [1] - 141:20

**DRIED** [1] - 35:15

**DROPPED** [1] - 106:25

**DS** [11] - 105:22, 109:16, 109:17, 110:11, 110:25,

111:6, 111:10, 111:12, 111:14, 111:16, 114:17

**DUE** [1] - 86:15

**DURING** [15] - 12:24, 14:20, 16:14, 16:17, 17:14, 21:8, 36:17, 40:4, 45:25, 47:18, 62:25, 98:4, 120:17, 121:2, 141:19

**DUTIES** [1] - 95:18

**DUTY** [1] - 49:11

## E

**E-I-G-L-E-T-E** [1] - 79:16

**EASIER** [2] - 36:4, 36:5

**EASTERN** [1] - 2:13

**EASY** [2] - 95:16, 95:17

**EDIFICATION** [1] - 87:25

**EDUCATIONAL** [1] - 59:14

**EDWARDS** [8] - 5:14, 5:18, 5:25, 6:1, 6:5, 6:9, 6:21, 7:10

**EFFECT** [2] - 16:8, 35:24

**EFFECTIVE** [3] - 82:11, 82:14, 112:14

**EFFECTS** [1] - 71:11

**EIGLETE** [1] - 79:16

**EITHER** [8] - 47:20, 65:7, 71:3, 71:13, 73:3, 88:17, 102:2, 114:16

**ELBOW** [1] - 33:21

**ELECTRONIC** [2] - 3:9, 3:20

**ELICIT** [2] - 136:13, 136:14

**ELLEN** [1] - 43:6

**ELMO** [2] - 104:19, 108:21

**EMPLOYED** [2] - 59:24, 118:11

**END** [26] - 3:15, 4:17, 15:17, 15:21, 18:22, 21:19, 28:5, 29:12, 29:14, 30:4, 30:7, 30:22, 31:17, 33:24, 34:24, 35:24, 35:25, 36:4, 36:5, 37:2, 37:7, 37:8, 37:17, 38:5, 65:19, 119:5

**ENDEAVOR** [1] - 39:3

**ENDED** [2] - 3:18, 4:11

**ENGLISH** [1] - 118:17

**ENLARGED** [2] - 11:14, 11:17

**ENTAILS** [1] - 93:15

**ENTER** [5] - 4:24, 5:2, 6:6, 6:12, 6:13

**ENTERED** [1] - 15:8

**ENTIRE** [6] - 14:3, 14:6, 66:9, 80:7, 95:7, 120:14

**ENTITLED** [2] - 10:10, 148:5

**ENTRIES** [1] - 111:23

**ENVELOPE** [3] - 143:3, 144:12, 144:15

**ENVELOPES** [1] - 145:12

**ERROR** [2] - 110:4, 111:10

**ESCORTED** [1] - 38:25

**ESQUIRE** [6] - 1:15, 2:2, 2:5, 2:8, 2:12, 2:12

**ESSENTIALLY** [1] - 137:1

**ET** [1] - 89:24

**EVALUATED** [1] - 80:16

**EVALUATION** [1] - 77:17

**EVENING** [2] - 29:17, 29:19

**EVENT** [1] - 7:17

**EVENTS** [5] - 12:2, 16:14, 38:15, 39:15, 65:8

**EVENTUALLY** [2] - 71:17, 128:5

**EVIDENCE** [43] - 40:16, 43:12, 51:20, 51:23, 57:19, 57:21, 65:6, 70:10, 101:17, 101:25, 102:8, 102:11, 104:12, 107:11, 107:13, 108:16, 108:18, 121:12, 121:14, 127:22, 130:2, 133:3, 133:8, 133:16, 134:9, 135:21, 136:14, 136:17, 136:21, 136:22, 136:23, 138:5, 138:8, 138:10, 140:8, 141:16, 142:2, 142:8, 143:7, 143:11,

143:19, 145:4, 146:3

**EXACT** [3] - 39:17, 57:8, 132:5

**EXACTLY** [7] - 3:12, 17:20, 31:2, 33:7, 94:3, 95:10, 112:18

**EXAMINATION** [16] - 7:18, 7:24, 44:5, 52:9, 55:2, 59:7, 66:21, 87:23, 96:1, 98:25, 100:13, 102:23, 110:20, 115:7, 117:4, 118:6

**EXAMINE** [3] - 44:4, 66:15, 110:19

**EXAMINED** [2] - 36:15, 137:23

**EXAMINER** [2] - 119:6, 133:19

**EXCITED** [3] - 14:21, 19:5, 38:1

**EXCUSE** [4] - 100:22, 113:16, 117:6, 128:16

**EXCUSED** [5] - 51:25, 57:25, 101:10, 101:11, 117:22

**EXERCISE** [1] - 124:11

**EXHIBIT** [79] - 11:8, 12:5, 16:21, 16:23, 16:24, 32:6, 40:1, 40:22, 40:23, 40:24, 41:2, 41:7, 41:8, 41:12, 41:17, 41:19, 41:25, 42:3, 42:10, 42:11, 42:13, 42:23, 42:24, 43:1, 43:4, 43:8, 43:13, 43:18, 43:21, 51:21, 52:21, 53:17, 57:17, 62:6, 76:18, 78:3, 80:24, 83:24, 88:1, 88:4, 103:15, 104:8, 104:11, 104:15, 106:18, 106:20, 106:23, 107:12, 108:2, 108:4, 108:13, 108:17, 108:24, 110:24, 111:3, 115:20, 117:6, 121:13, 121:20, 128:11, 128:24, 129:15, 131:5, 131:16, 133:7, 133:9, 138:21, 139:13, 140:12, 141:1, 141:7, 141:11, 141:15, 141:18, 142:6, 143:10, 144:2

**EXHIBITS** [18] - 50:25, 51:2, 57:18, 57:20, 58:2, 101:17, 102:10, 120:22, 128:13, 130:1, 133:12, 133:15, 140:13, 145:2, 145:3, 146:7, 149:20, 150:11

**EXPELLED** [2] - 34:6, 35:6

**EXPERIENCE** [1] - 48:3

**EXPERT** [3] - 54:20, 55:15, 67:9

**EXPERTISE** [2] - 86:16, 86:21

**EXPIRED** [2] - 109:9, 112:17

**EXPLAIN** [14] - 5:15, 6:16, 20:3, 22:3, 24:6, 61:18, 93:6, 105:10, 109:12, 109:25, 121:18, 123:3, 126:2, 130:13

**EXPLAINED** [3] - 61:11, 61:22, 125:25

**EXPLANATION** [2] - 110:22, 136:5

**EXPLANATORY** [2] - 27:24, 28:20

**EXPLOSIVE** [2] - 74:16, 74:22

**EXPRESS** [2] - 54:18, 63:4

**EXPRESSED** [1] - 77:19

**EXTENSIVE** [1] - 136:8

**EXTRA** [1] - 106:8

**EYE** [2] - 125:20, 125:23

**EYELID** [2] - 125:23, 126:5

## F

**F-U-N-K-E** [1] - 52:8

**FACE** [2] - 31:7, 35:15

**FACING** [1] - 33:19

**FACT** [6] - 24:20, 25:9, 26:4, 26:6, 98:8, 114:9

**FAILED** [1] - 36:16

**FAILURE** [3] - 93:7, 93:17

**FAIR** [25] - 17:19, 37:21, 39:14, 44:16, 45:15, 47:16, 47:21, 48:4, 48:5, 48:24,

49:6, 54:13, 55:6, 55:12, 55:23, 57:12, 65:22, 68:2, 68:18, 68:19, 71:9, 94:20, 94:23, 116:20

**FAIRLY** [2] - 17:18, 67:19

**FAMILIAR** [9] - 70:7, 72:11, 79:21, 103:14, 104:2, 115:11, 133:22, 143:14, 145:19

**FAMILY** [2] - 64:22, 65:19

**FAR** [6] - 45:20, 47:20, 77:3, 117:7, 140:21, 141:8

**FASHION** [1] - 31:19

**FAST** [3] - 19:5, 19:6, 46:11

**FATHER** [1] - 98:4

**FAVOR** [1] - 29:25

**FBI** [8] - 15:2, 47:24, 63:8, 118:23, 119:1, 119:14, 131:13, 131:19

**FBI'S** [2] - 118:15, 119:7

**FCI** [2] - 59:21, 59:22

**FCRR** [1] - 1:19

**FD** [4] - 10:11, 11:2, 11:3, 32:11

**FEBRUARY** [5] - 111:22, 112:2, 112:7, 112:15, 112:19

**FEDERAL** [12] - 2:6, 2:13, 3:11, 4:1, 10:12, 32:12, 37:15, 48:18, 59:22, 60:3, 80:10, 145:25

**FEED** [1] - 10:14

**FELONY** [1] - 37:16

**FELT** [1] - 65:18

**FEMALE** [4] - 35:22, 35:24, 36:3, 36:8

**FEW** [7] - 3:17, 14:20, 54:3, 71:20, 88:1, 128:6

**FIELD** [4] - 49:19, 49:22, 118:21, 119:16

**FIFTH** [1] - 104:15

**FILE** [4] - 75:19, 81:22, 81:25, 117:15

**FILED** [2] - 87:16, 138:18

**FILL** [1] - 96:17

**FILLED** [4] - 12:10, 12:12, 12:13, 89:12

**FINAL** [2] - 100:12, 127:11

**FINALLY** [1] - 115:25

**FINE** [4] - 6:13, 58:23, 101:3, 147:18

**FINGER** [1] - 107:20

**FINGERNAILS** [1] - 134:4

**FINGERPRINT** [1] - 140:25

**FINISH** [4] - 24:2, 34:16, 122:7, 124:5

**FINISHED** [1] - 100:23

**FIRST** [25] - 1:20, 10:6, 10:7, 12:6, 23:4, 31:11, 36:17, 37:5, 48:25, 60:16, 61:3, 61:4, 64:25, 81:9, 82:13, 86:22, 90:5, 103:20, 105:3, 108:23, 120:5, 128:12, 141:8, 145:6, 147:1

**FIVE** [4] - 9:18, 25:9, 40:7, 101:4

**FIVE-MINUTE** [1] - 101:4

**FLASHBACKS** [1] - 33:17

**FLEXIBLE** [1] - 42:16

**FLIP** [1] - 122:5

**FLIPPED** [1] - 124:16

**FLOOR** [3] - 1:20, 9:13, 9:14

**FLOW** [1] - 58:20

**FLUIDS** [1] - 41:14

**FOLLOW** [7] - 28:15, 56:6, 57:4, 83:5, 86:9, 96:3, 96:16

**FOLLOW-UP** [3] - 56:6, 57:4, 86:9

**FOLLOWED** [1] - 32:4

**FOLLOWING** [3] - 9:1, 60:20, 139:17

**FOLLOWS** [1] - 7:23

**FOOT** [1] - 43:11

**FORCED** [1] - 94:25

**FOREGOING** [1] - 148:3

**FORENSIC** [4] - 52:12, 54:20, 67:7, 67:8

**FORGET** [1] - 37:4

**FORGOT** [1] - 64:9

**FORGOTTEN** [1] - 65:1

**FORM** [21] - 10:10, 11:21, 13:7, 14:3, 14:6, 14:8, 14:12,

14:16, 14:17, 14:23, 15:1, 15:18, 15:20, 15:21, 15:24, 16:11, 18:7, 18:9, 45:14, 78:9, 85:13

**FORMAL** [1] - 99:12

**FORMALIZED** [1] - 97:19

**FORMALLY** [1] - 86:12

**FORMER** [4] - 3:25, 7:18, 52:11, 65:20

**FORT** [2] - 59:11, 67:3

**FORWARD** [4] - 16:16, 17:12, 49:25, 87:18

**FORWARDS** [1] - 119:24

**FOUR** [3] - 60:6, 60:9

**FRAME** [1] - 17:22

**FRAMES** [1] - 17:22

**FRANCISCO** [4] - 4:4, 8:20, 9:23, 15:3

**FREDERICK** [1] - 53:15

**FREE** [2] - 32:25, 33:1

**FRIDAY** [1] - 30:14

**FRONT** [4] - 16:19, 31:8, 88:4, 96:4

**FUCK** [1] - 23:2

**FUCKED** [1] - 37:10

**FUCKS** [1] - 37:3

**FULL** [6] - 4:23, 45:22, 52:6, 59:3, 81:9, 117:25

**FULLY** [6] - 6:16, 15:24, 45:17, 46:7, 64:1, 65:13

**FUNKE** [12] - 52:4, 52:5, 52:8, 55:4, 55:6, 57:4, 120:11, 125:22, 127:15, 127:24, 133:24, 149:8

## G

**G31.3** [3] - 108:15, 108:17, 150:2

**GAG** [1] - 42:11

**GANG** [1] - 25:10

**GAS** [2] - 34:6, 35:6

**GATHER** [1] - 101:20

**GEE** [1] - 93:11

**GENERAL** [1] - 30:1

**GENERALLY** [1] - 90:3

**GENERATED** [1] - 115:10

**GEORGIA** [1] - 26:12
**GIVEN** [5] - 3:25, 4:7, 136:6, 136:21, 138:13
**GLOVES** [1] - 40:4
**GOVERNMENT** [81] - 1:15, 2:2, 11:8, 12:5, 16:21, 16:23, 16:24, 32:6, 39:25, 40:22, 40:24, 41:2, 41:7, 41:8, 41:17, 41:19, 41:25, 42:3, 42:10, 42:11, 42:13, 42:24, 43:1, 43:4, 43:8, 43:13, 43:18, 43:21, 51:21, 52:5, 52:20, 53:17, 57:17, 57:20, 59:1, 62:6, 102:16, 103:14, 104:11, 106:18, 106:19, 106:23, 107:12, 108:1, 108:3, 108:13, 108:17, 108:24, 115:20, 117:23, 120:22, 120:23, 121:13, 121:19, 128:11, 128:24, 129:15, 130:1, 131:5, 131:16, 133:12, 133:15, 135:19, 136:2, 136:18, 136:21, 136:22, 137:11, 137:16, 138:1, 139:22, 140:12, 141:1, 141:11, 141:15, 142:6, 143:10, 144:2, 145:3, 146:7, 149:20
**GOVERNMENT'S** [7] - 40:23, 104:8, 117:6, 128:13, 133:7, 133:9, 135:17
**GR** [1] - 51:16
**GR170** [3] - 104:9, 104:11, 149:25
**GR171** [3] - 107:10, 107:12, 150:1
**GRABBING** [4] - 34:1, 34:4, 35:1, 35:4
**GREAT** [2] - 65:10, 137:18
**GREATER** [1] - 94:16
**GREEN** [1] - 106:1
**GRIP** [1] - 33:23
**GROUP** [1] - 105:13
**GUERRERO** [2] - 29:20, 29:23
**GUESS** [3] - 79:10, 113:6, 140:24
**GUMS** [1] - 134:2

**GURGANUS** [77] - 1:15, 5:6, 5:7, 7:20, 7:25, 11:15, 11:19, 13:9, 27:20, 27:22, 28:6, 28:13, 28:16, 28:25, 29:3, 29:6, 32:10, 32:18, 34:17, 34:18, 39:18, 39:20, 39:25, 40:3, 40:12, 40:13, 40:14, 40:19, 40:21, 42:24, 42:25, 43:24, 44:1, 50:24, 51:4, 51:7, 51:10, 51:12, 51:14, 51:18, 52:1, 52:3, 52:10, 54:24, 57:10, 57:16, 57:24, 58:4, 58:7, 58:12, 58:17, 58:24, 59:8, 66:4, 66:6, 66:13, 67:15, 77:2, 77:10, 87:17, 87:20, 91:20, 95:25, 96:2, 98:20, 100:12, 100:14, 100:17, 102:6, 146:12, 146:19, 146:20, 147:3, 147:14, 149:6, 149:9, 149:12
**GUYS** [1] - 70:11

## H

**HAINES** [63] - 2:2, 102:13, 102:20, 102:24, 103:11, 103:13, 104:1, 104:7, 104:13, 104:18, 104:22, 104:23, 106:22, 107:14, 108:12, 108:19, 108:22, 110:17, 115:6, 115:8, 116:25, 117:20, 118:4, 118:7, 121:8, 121:15, 121:16, 122:21, 122:24, 122:25, 124:7, 124:10, 128:22, 129:5, 129:6, 129:22, 130:3, 130:5, 130:20, 130:22, 132:6, 132:8, 133:11, 133:17, 136:12, 137:2, 138:9, 138:20, 139:7, 139:14, 139:15, 141:10, 141:17, 142:13, 142:24, 142:25, 143:6, 143:12, 144:10, 144:23, 145:5, 149:15, 149:18
**HAIR** [3] - 35:18,

134:3
**HALF** [4] - 12:6, 60:4, 60:7, 119:3
**HAMMER** [137] - 1:6, 3:5, 3:6, 3:10, 3:13, 3:16, 4:5, 4:16, 4:22, 6:3, 9:5, 9:9, 9:18, 9:20, 9:21, 10:3, 10:5, 10:23, 11:16, 11:18, 12:3, 12:15, 14:10, 14:15, 15:16, 15:19, 15:20, 16:7, 16:16, 16:17, 17:14, 17:16, 18:20, 18:21, 18:24, 19:5, 19:14, 19:16, 20:6, 20:23, 21:2, 21:12, 21:13, 21:18, 21:25, 22:24, 22:25, 23:1, 23:11, 23:15, 23:17, 23:23, 24:19, 25:2, 25:6, 25:18, 25:24, 26:4, 26:10, 26:13, 26:18, 27:1, 27:13, 27:14, 27:25, 28:3, 28:5, 29:8, 29:11, 29:16, 29:19, 30:6, 31:4, 31:11, 31:14, 31:20, 31:24, 32:20, 33:4, 33:5, 33:9, 33:15, 34:20, 35:17, 36:3, 36:5, 36:7, 37:1, 37:12, 37:21, 37:25, 38:16, 38:20, 38:23, 41:9, 42:12, 44:9, 46:22, 47:8, 48:4, 56:4, 61:13, 61:14, 62:2, 62:19, 65:1, 65:7, 67:16, 68:21, 69:6, 72:2, 74:14, 75:22, 77:1, 77:7, 77:15, 80:16, 81:19, 81:21, 82:24, 83:12, 87:11, 87:12, 89:3, 91:6, 93:17, 98:13, 101:5, 136:20, 139:4, 143:17, 144:13, 146:11, 147:21
**HAMMER'S** [12] - 5:3, 41:15, 42:2, 50:9, 70:9, 72:3, 72:11, 97:14, 98:4, 138:23, 139:10, 145:24
**HAND** [7] - 76:13, 79:17, 123:21, 123:25, 124:20, 125:8, 125:10
**HANDCUFFS** [2] - 4:22, 87:15
**HANDED** [4] -

131:16, 132:9, 137:4, 140:10
**HANDLED** [5] - 48:12, 48:15, 48:18, 70:14, 73:2
**HANDLING** [3] - 3:9, 88:16, 88:17
**HANDS** [4] - 34:4, 35:4, 35:14, 35:15
**HANDWRITING** [6] - 12:11, 137:17, 138:22, 138:23, 139:2, 139:3
**HANGING** [2] - 26:1, 26:7
**HARD** [4] - 74:5, 82:15, 88:19, 107:1
**HARDER** [1] - 123:14
**HARM** [1] - 71:5
**HARRIS** [1] - 2:9
**HARRISBURG** [1] - 2:7
**HAUTE** [3] - 3:11, 4:17, 10:15
**HEAD** [15] - 32:21, 33:4, 33:5, 33:18, 33:19, 33:20, 33:22, 33:23, 34:20, 37:6, 41:15, 80:5, 123:8, 126:20, 134:2
**HEADQUARTERS** [1] - 60:8
**HEALTH** [8] - 54:21, 59:20, 75:13, 75:20, 77:13, 80:4, 80:6, 94:15
**HEAR** [4] - 21:19, 138:4, 138:7, 138:19
**HEARD** [8] - 4:8, 7:10, 35:21, 49:10, 61:23, 80:21, 103:5, 110:22
**HEARING** [13] - 1:12, 57:19, 91:6, 104:9, 105:11, 106:15, 113:10, 117:14, 133:13, 135:22, 138:4, 147:13, 147:22
**HEARINGS** [1] - 105:16
**HEIGHTENED** [1] - 136:8
**HELP** [2] - 70:18, 77:20
**HELPFUL** [2] - 64:11, 77:23
**HELPING** [1] - 77:22
**HESITATION** [1] - 46:7

**HIGH** [2] - 73:25, 86:19
**HIGHLIGHT** [3] - 15:13, 17:1, 105:24
**HIMSELF** [7] - 61:15, 61:16, 62:22, 62:23, 62:24, 65:2, 89:16
**HIRED** [4] - 61:4, 61:5, 68:25, 71:23
**HISTORY** [2] - 90:5, 138:18
**HIT** [2] - 126:14, 127:12
**HOLD** [15] - 33:25, 34:2, 34:3, 34:7, 34:9, 34:25, 35:2, 35:3, 35:7, 36:18, 36:23, 41:10, 91:13, 107:18, 123:15
**HOLDENVILLE** [1] - 37:13
**HOLDING** [6] - 36:7, 39:2, 88:16, 88:17, 88:20
**HOLE** [1] - 37:9
**HONOR** [91] - 3:3, 4:14, 5:1, 5:7, 5:25, 6:15, 7:1, 7:9, 7:20, 11:15, 27:10, 28:17, 40:13, 43:24, 44:1, 48:10, 50:19, 50:22, 50:24, 51:18, 51:24, 56:25, 57:15, 57:16, 58:5, 58:7, 58:25, 66:14, 66:17, 66:20, 76:3, 77:2, 77:11, 83:23, 84:3, 87:4, 87:20, 87:21, 87:24, 87:25, 90:23, 91:14, 92:7, 98:21, 98:22, 100:18, 100:22, 101:14, 102:1, 102:6, 102:9, 102:13, 102:20, 103:11, 104:7, 104:18, 106:22, 106:24, 108:12, 110:18, 115:6, 117:1, 117:20, 118:4, 121:8, 122:21, 124:7, 128:16, 129:5, 129:22, 132:6, 133:11, 135:13, 136:12, 136:16, 137:8, 137:21, 138:20, 139:14, 141:10, 141:14, 142:17, 142:24, 143:6, 144:3, 144:23, 146:12, 146:20, 147:6, 147:14, 147:18

**HONORABLE** [1] - 1:10

**HOOKUP** [2] - 3:6, 4:17

**HOSPITAL** [4] - 23:12, 67:3, 97:8, 119:19

**HOSPITALS** [1] - 89:24

**HOSTAGE** [9] - 26:14, 27:3, 27:5, 29:9, 29:18, 30:13, 36:11, 47:15, 47:20

**HOSTAGES** [2] - 25:25, 26:5

**HOUSE** [2] - 114:20, 116:6

**HOUSED** [1] - 107:24

**HOUSING** [17] - 18:25, 20:5, 37:11, 61:21, 88:25, 92:5, 95:18, 96:12, 96:24, 97:10, 99:4, 103:6, 103:9, 116:21, 116:22, 135:6, 140:3

**HOUSTON** [1] - 59:21

**HUM** [2] - 69:15, 113:5

**HUMPHREY** [1] - 2:9

**HUNDRED** [1] - 95:14

**HURT** [6] - 26:14, 61:15, 92:13, 97:5, 116:9

**HURTING** [2] - 92:11, 97:3

---

## I

**IDEA** [1] - 30:2

**IDEAL** [1] - 74:8

**IDENTIFICATION** [1] - 52:23

**IDENTIFIED** [7] - 10:7, 41:5, 43:3, 43:6, 43:10, 50:25, 132:14

**IDENTIFIES** [1] - 131:25

**IDENTIFY** [5] - 27:25, 40:16, 42:16, 52:19

**IDENTIFYING** [1] - 132:3

**ILL** [1] - 73:9

**ILLNESS** [1] - 70:19

**ILLUSTRATING** [2] - 125:23, 127:15

**IMAGINE** [1] - 39:1

**IMMEDIATELY** [1] - 36:21

**IMPACT** [1] - 86:20

**IMPLEMENTED** [1] - 5:11

**IMPLEMENTING** [1] - 4:25

**IMPORTANT** [1] - 146:13

**IMPOSED** [1] - 117:7

**IMPRESSION** [1] - 27:8

**IMPRESSIONS** [1] - 27:11

**IMPULSIVELY** [2] - 88:18, 88:20

**INCARCERATED** [2] - 37:2, 37:14

**INCENTIVE** [1] - 27:4

**INCIDENT** [7] - 47:19, 63:11, 73:14, 94:5, 105:5, 105:6, 147:12

**INCLUDE** [1] - 53:2

**INCLUDING** [3] - 9:20, 9:21, 95:18

**INCONVENIENCE** [1] - 84:11

**INCORRECT** [2] - 67:21, 110:1

**INDEED** [1] - 99:3

**INDEPENDENT** [1] - 67:24

**INDEX** [1] - 149:1

**INDIANA** [1] - 3:11

**INDICATE** [6] - 3:24, 12:7, 20:15, 25:2, 64:8, 115:22

**INDICATED** [11] - 11:2, 15:24, 20:1, 21:25, 22:18, 23:11, 24:13, 33:15, 109:8, 109:23, 133:18

**INDICATING** [3] - 18:5, 24:19, 30:9

**INDICATION** [1] - 32:25

**INDIVIDUAL** [2] - 135:4, 143:13

**INDIVIDUALS** [3] - 9:18, 89:24, 90:1

**INDULGENCE** [3] - 39:19, 40:20, 130:20

**INFORMAL** [1] - 99:17

**INFORMALLY** [1] - 99:10

**INFORMANT** [3] - 23:25, 24:10, 24:21

**INFORMANTS** [1] - 48:21

**INFORMATION** [17] - 37:21, 55:13, 55:16, 55:22, 56:3, 56:9, 66:8, 67:19, 67:20, 68:17, 83:1, 89:7, 89:10, 89:11, 112:9, 144:4

**INFORMED** [6] - 7:11, 18:23, 21:2, 21:9, 26:10, 26:18

**INFORMING** [1] - 26:4

**INHIBITOR** [1] - 71:14

**INITIAL** [3] - 14:20, 16:5, 16:7

**INJURIES** [5] - 122:13, 123:3, 124:5, 124:17, 125:12

**INJURY** [1] - 105:6

**INMATE** [39] - 9:13, 19:19, 20:5, 20:7, 20:24, 24:9, 61:13, 63:12, 64:17, 64:20, 64:21, 64:25, 65:6, 65:10, 70:18, 77:16, 77:18, 77:23, 78:10, 83:10, 89:2, 89:15, 89:20, 89:21, 92:10, 92:12, 93:2, 97:2, 97:3, 97:4, 97:17, 99:5, 100:1, 104:16, 108:7, 116:23, 117:15, 140:20, 145:23

**INMATE'S** [2] - 65:18, 92:11

**INMATES** [14] - 37:10, 72:7, 75:19, 90:3, 93:21, 94:1, 94:11, 95:10, 97:6, 103:24, 109:15, 116:6, 116:10, 145:8

**INQUIRE** [2] - 50:18, 118:4

**INSEAM** [3] - 130:19, 132:16, 132:20

**INSIDE** [5] - 39:16, 125:1, 126:5, 127:15, 145:9

**INSTEAD** [1] - 4:22

**INSTITUTION** [27] - 3:11, 4:2, 5:1, 7:3, 8:14, 8:19, 8:21, 8:22, 9:12, 22:6, 26:9, 39:2, 40:25, 41:23, 43:14, 59:23, 60:3, 70:4, 71:23, 72:24, 73:18, 74:2, 93:22, 99:6, 100:2, 100:4, 146:1

**INSTITUTIONAL** [3] - 68:12, 93:17, 94:25

**INSTITUTIONS** [2] - 26:7, 60:19

**INTACT** [1] - 65:8

**INTELLIGENTLY** [1] - 45:17

**INTENTION** [1] - 9:8

**INTERMITTENT** [4] - 34:7, 35:7, 74:16, 74:22

**INTERNAL** [1] - 145:17

**INTERNSHIP** [1] - 59:20

**INTERPRETATION** [1] - 29:2

**INTERPRETED** [3] - 24:7, 24:19, 28:22

**INTERPRETING** [3] - 23:19, 24:18, 26:24

**INTERROGATION** [1] - 10:10

**INTERRUPTION** [1] - 101:2

**INTERVENTION** [2] - 75:14, 75:25

**INTERVIEW** [48] - 9:6, 9:11, 9:12, 9:13, 12:3, 14:21, 16:4, 16:6, 16:13, 16:15, 16:17, 16:18, 17:2, 17:3, 17:7, 17:15, 18:12, 18:15, 18:18, 18:24, 20:21, 21:8, 21:20, 21:21, 21:24, 23:8, 26:8, 27:13, 32:15, 32:16, 33:3, 33:11, 33:13, 36:17, 37:19, 37:25, 38:3, 38:6, 38:24, 39:1, 44:11, 62:9, 63:1, 66:9, 134:21, 136:25, 137:3, 140:7

**INTERVIEWED** [1] - 63:8

**INTERVIEWING** [3] - 44:13, 48:4, 48:23

**INTRODUCE** [11] - 101:16, 104:8, 106:23, 108:13, 121:9, 129:23, 133:12, 141:11, 143:7, 144:24, 146:18

**INVESTIGATION** [5] - 4:1, 50:7, 119:25, 141:20, 143:23

**INVESTIGATIVE** [9] - 8:19, 8:20, 8:22, 15:4, 24:11, 39:9, 120:9, 120:10, 140:6

**INVESTIGATOR** [3] - 120:1, 134:21, 142:11

**IRONS** [2] - 4:23, 5:3

**ISSUE** [1] - 82:17

**ISSUES** [1] - 54:21

**ITEM** [9] - 41:5, 41:6, 42:15, 43:10, 132:14, 133:8, 137:14, 137:17, 144:20

**ITEMIZES** [1] - 132:12

**ITEMS** [9] - 40:16, 132:12, 134:11, 137:9, 137:12, 142:10, 144:4, 144:17, 144:19

---

## J

**JAMES** [2] - 2:12, 2:12

**JANUARY** [1] - 105:7

**JEREMY** [1] - 31:3

**JERKED** [2] - 34:1, 35:1

**JERKING** [2] - 34:4, 35:4

**JOB** [1] - 23:11

**JOCKEY** [1] - 31:3

**JOEL** [1] - 1:10

**JOHN** [5] - 1:15, 61:6, 71:23, 76:19, 77:14

**JOKE** [1] - 23:19

**JOKING** [1] - 23:16

**JONES** [1] - 35:22

**JR** [1] - 1:15

**JUDGE** [5] - 27:20, 51:5, 76:5, 80:25, 85:22

**JULY** [1] - 118:24

**JUMPING** [1] - 33:15

**JUNE** [6] - 37:16, 48:7, 91:3, 91:12, 111:4, 111:5

**JURY** [10] - 4:4, 8:18, 74:18, 92:3, 96:10, 96:23, 120:10, 128:4, 138:10, 138:17

**JUSTICE** [1] - 2:2

**JUSTIFY** [1] - 97:11

---

## K

**K-A-R-T-E-N** [1] - 59:6

**K-O-T-E** [1] - 79:5

**KARTEN** [6] - 58:8,

59:1, 59:6, 101:8, 101:17, 149:11

**KEEP** [3] - 72:7, 107:8, 110:15

**KEEPING** [1] - 16:12

**KEY** [1] - 110:4

**KILL** [8] - 19:21, 20:12, 20:25, 21:5, 30:13, 36:5, 47:14, 47:20

**KILLED** [4] - 24:23, 61:13, 63:13, 64:4

**KILLING** [7] - 24:24, 37:7, 63:21, 111:24, 111:25, 113:13, 140:17

**KILLINGS** [1] - 48:15

**KIND** [10] - 14:2, 19:13, 41:1, 90:4, 96:17, 99:11, 110:12, 143:2, 143:4, 145:18

**KIT** [2] - 56:13, 133:22

**KITE** [4] - 140:10, 140:16, 145:7, 145:8

**KITES** [1] - 145:14

**KNIFE** [1] - 36:10

**KNOWLEDGE** [4] - 71:8, 71:10, 100:5, 134:12

**KNOWN** [1] - 55:9

**L**

**LABELED** [2] - 132:15

**LABORATORY** [1] - 144:21

**LAID** [1] - 30:25

**LAINO** [3] - 77:13, 80:3, 80:4

**LARRIMORE** [4] - 141:21, 141:25, 142:3, 142:8

**LARRIMORE'S** [1] - 141:23

**LAST** [8] - 3:25, 4:5, 4:6, 21:25, 28:22, 65:3, 105:19, 145:12

**LASTS** [1] - 71:20

**LAUREN** [1] - 91:16

**LAW** [2] - 76:11, 84:5

**LAWYER** [14] - 12:22, 12:24, 12:25, 13:13, 13:14, 13:17, 13:20, 13:24, 37:17, 45:5, 45:8, 45:11, 71:13

**LAYING** [1] - 123:6

**LAYOUT** [1] - 9:16

**LEAD** [1] - 134:21

**LEAST** [6] - 6:2, 46:4, 58:15, 79:24, 82:24, 85:25

**LEAVE** [3] - 7:15, 63:14, 97:22

**LEFT** [14] - 8:13, 31:5, 31:13, 31:14, 31:17, 33:20, 33:21, 36:18, 43:10, 123:10, 123:11, 125:9, 139:16

**LEG** [7] - 4:23, 5:3, 6:17, 31:6, 31:9, 31:12, 31:13

**LEGS** [1] - 6:4

**LEHIGH** [1] - 119:19

**LENGTH** [1] - 67:15

**LEON** [1] - 79:16

**LEONARD** [5] - 20:23, 135:1, 135:5, 142:1, 144:5

**LESS** [4] - 49:22, 77:24, 78:19, 110:13

**LETTER** [10] - 27:18, 27:19, 27:20, 29:19, 53:15, 140:10, 143:5, 143:25, 144:16, 144:22

**LIES** [2] - 125:9, 125:16

**LIEUTENANT** [10] - 4:4, 8:18, 8:19, 8:21, 9:22, 9:23, 36:12, 46:15, 144:18

**LIEUTENANTS** [1] - 4:3

**LIFE** [2] - 75:2, 88:11

**LIGATURE** [4] - 41:8, 126:9, 126:19, 127:8

**LIGHTS** [1] - 36:1

**LIKEWISE** [1] - 42:3

**LIMITED** [1] - 38:15

**LINE** [12] - 81:9, 89:9, 89:11, 91:24, 91:25, 92:8, 96:9, 106:1, 106:4, 108:23, 126:13, 127:8

**LINES** [2] - 47:7, 126:23

**LIP** [1] - 127:16

**LIST** [1] - 135:17

**LIT** [1] - 31:24

**LITHIUM** [1] - 77:20

**LIVE** [2] - 59:11, 67:3

**LIVED** [1] - 59:12

**LIVING** [2] - 92:13, 97:5

**LOG** [6] - 108:5, 108:6, 108:7, 108:10, 113:19, 114:9

**LOMPOC** [4] - 69:7, 69:9, 70:2, 147:12

**LOOK** [14] - 30:17, 31:23, 36:10, 39:4, 52:21, 76:18, 78:4, 103:8, 111:11, 111:23, 121:6, 121:17, 121:25, 128:23

**LOOKED** [8] - 33:7, 35:20, 52:22, 86:22, 105:12, 113:8, 129:10, 129:18

**LOOKING** [13] - 9:3, 39:8, 83:24, 85:11, 91:12, 105:4, 106:10, 121:23, 122:3, 122:23, 123:4, 123:11, 125:9

**LOOKS** [6] - 79:15, 85:3, 85:15, 88:17, 111:12, 124:6

**LOOPED** [1] - 31:17

**LOSE** [2] - 29:14, 29:15

**LOWER** [10] - 11:16, 42:1, 42:6, 42:9, 123:10, 123:11, 126:5

**LOWTHER** [1] - 106:15

**LUNCH** [1] - 84:7

**LUNCHEON** [1] - 87:8

**LYCOMING** [1] - 31:2

**LYING** [3] - 31:7, 123:23, 123:24

**M**

**M-A-L-O-C-U** [1] - 118:3

**MA'AM** [3] - 53:22, 54:13, 57:24

**MAIL** [1] - 145:16

**MAIN** [2] - 62:20, 78:16

**MAINTAIN** [1] - 16:13

**MAJOR** [1] - 89:23

**MALOCU** [17] - 49:16, 49:18, 49:19, 117:23, 118:3, 118:8, 123:1, 124:12, 130:6, 130:23, 133:18, 134:25, 135:25, 136:1, 137:15, 138:23, 149:17

**MALOCU'S** [1] - 50:1

**MAN** [2] - 9:3, 18:24

**MANAGER** [3] - 9:25, 15:5, 104:4

**MANIA** [1] - 79:10

**MANIPULATIVE** [1] - 89:12

**MARCH** [10] - 76:19, 77:14, 82:7, 93:3, 105:9, 106:16, 107:16, 111:19, 111:23, 111:25

**MARK** [7] - 4:4, 8:21, 120:10, 123:14, 123:16, 127:8, 140:6

**MARKED** [14] - 16:21, 52:20, 78:3, 80:23, 88:23, 91:23, 106:18, 120:21, 128:10, 131:4, 140:11, 142:5, 144:1, 146:6

**MARKET** [1] - 1:21

**MARKS** [2] - 126:19, 126:24

**MARTI** [111] - 16:9, 18:18, 18:20, 18:24, 19:3, 19:4, 19:16, 19:18, 19:21, 20:4, 20:8, 20:25, 21:6, 21:10, 21:12, 21:17, 22:1, 22:5, 22:13, 22:20, 22:23, 23:23, 24:12, 24:13, 24:20, 24:23, 24:25, 25:3, 25:6, 25:8, 25:9, 25:12, 25:25, 26:4, 26:11, 26:19, 27:2, 29:8, 29:13, 29:17, 29:23, 29:24, 29:25, 30:15, 30:16, 30:21, 30:22, 31:1, 31:7, 31:20, 31:24, 31:25, 33:5, 33:14, 33:16, 33:17, 34:1, 34:3, 34:4, 34:14, 35:1, 35:4, 35:6, 35:11, 36:2, 36:23, 36:24, 37:5, 41:9, 41:24, 42:12, 47:14, 47:21, 53:5, 61:14, 63:12, 63:13, 63:18, 64:9, 67:16, 105:1, 105:16, 105:21, 106:11, 107:16, 107:23, 109:2, 109:23, 110:25, 111:5, 111:6, 115:11, 115:15, 119:13, 119:25, 123:6, 123:23, 123:24, 124:2, 125:8, 128:2, 130:9, 130:12,

132:25, 133:10, 140:17, 143:18

**MARTI'S** [27] - 29:20, 34:6, 36:25, 41:15, 43:15, 49:6, 56:4, 103:6, 103:9, 104:6, 109:8, 117:14, 122:12, 123:8, 123:17, 124:13, 125:1, 125:15, 126:9, 127:16, 129:1, 129:9, 131:10, 131:23, 132:22, 134:2, 134:12

**MARTIN** [2] - 29:20, 53:15

**MARY** [1] - 43:6

**MASKING** [3] - 36:8, 42:18, 43:2

**MASTER'S** [1] - 59:18

**MATCH** [2] - 41:3

**MATERIAL** [1] - 40:25

**MATTER** [5] - 38:9, 57:6, 65:2, 116:22, 148:5

**MATTHEW** [1] - 145:19

**MATTHEWS** [1] - 109:6

**MATTRESS** [1] - 42:2

**MCHUGH** [25] - 2:12, 27:10, 28:10, 28:21, 44:6, 48:10, 48:11, 50:18, 50:22, 55:3, 56:24, 57:3, 57:14, 121:10, 129:24, 135:13, 136:16, 137:7, 141:14, 142:17, 144:3, 147:6, 147:12, 149:7, 149:10

**MEAN** [14] - 22:3, 22:24, 26:23, 27:11, 27:21, 28:8, 28:23, 59:12, 70:16, 85:2, 106:5, 111:11, 112:12, 145:7

**MEANING** [1] - 93:16

**MEANS** [6] - 24:24, 28:12, 66:3, 79:14, 85:2, 106:7

**MEDAL** [3] - 126:18, 127:7, 133:5

**MEDICAL** [10] - 50:9, 70:13, 70:14, 73:4, 73:6, 73:9, 78:4, 78:12, 133:19

**MEDICATION** [16] - 69:10, 69:18, 70:3,

70:18, 72:22, 73:2, 73:8, 77:17, 78:10, 79:25, 81:13, 81:15, 82:3, 82:9, 82:24, 83:7

**MEDICATIONS** [4] - 50:12, 50:15, 69:21, 95:7

**MEDICINE** [4] - 82:6, 82:11, 82:16, 95:9

**MEDICINES** [2] - 70:12, 83:9

**MEET** [2] - 135:7, 139:25

**MEETING** [3] - 30:15, 62:15, 140:2

**MEMBER** [1] - 25:10

**MEMBERS** [1] - 39:9

**MEMO** [1] - 76:19

**MEMORANDUM** [1] - 77:12

**MEMORIALIZE** [1] - 68:7

**MEMORIALIZED** [1] - 39:10

**MEMORY** [3] - 65:7, 70:1, 142:9

**MENTAL** [6] - 70:19, 75:13, 75:20, 89:24, 94:15

**MENTALLY** [2] - 73:9, 99:5

**MENTION** [1] - 63:20

**MENTIONED** [8] - 8:2, 27:6, 37:24, 62:14, 71:22, 120:2, 132:24, 134:5

**MERELY** [1] - 145:9

**MET** [10] - 4:3, 8:14, 8:16, 8:18, 10:24, 27:12, 61:18, 61:21, 63:7, 139:20

**MIC** [7] - 48:9, 91:5, 103:12, 107:7, 118:13, 124:1, 146:16

**MICHIGAN** [1] - 29:21

**MID** [1] - 31:3

**MIDDLE** [4] - 1:2, 1:16, 2:6, 85:12

**MIDNIGHT** [1] - 111:1

**MIGHT** [14] - 18:14, 26:14, 55:18, 61:15, 82:18, 82:19, 85:6, 89:22, 92:13, 95:11, 97:5, 113:21, 114:11, 114:12

**MILLIGRAMS** [3] - 78:17, 81:10, 86:23

**MIND** [5] - 29:22, 46:24, 47:8, 65:3, 125:20

**MINUTE** [6] - 16:4, 40:8, 74:13, 91:13, 101:4, 122:19

**MINUTES** [13] - 4:3, 14:20, 34:3, 35:3, 35:9, 35:14, 63:24, 63:25, 67:22, 68:18, 88:2, 98:11, 98:14

**MIRANDA** [3] - 10:10, 44:16, 45:18

**MIRRORS** [1] - 47:4

**MISLEAD** [1] - 139:8

**MISREAD** [1] - 87:1

**MISS** [2] - 63:18, 65:19

**MISSED** [1] - 3:17

**MISTAKEN** [1] - 44:12

**MITCHELL** [14] - 61:6, 71:24, 72:2, 72:6, 72:13, 72:17, 72:22, 76:19, 76:25, 77:4, 77:14, 83:15, 94:7, 97:18

**MITCHELL'S** [1] - 77:9

**MOMENT** [13] - 5:24, 13:4, 34:9, 43:24, 67:15, 76:2, 81:1, 81:18, 82:1, 83:24, 83:25, 84:5, 84:6

**MONITOR** [1] - 95:7

**MONTH** [9] - 20:24, 57:8, 74:4, 77:24, 78:19, 85:25, 90:18, 95:4, 95:6

**MONTHS** [5] - 37:9, 48:6, 49:23, 111:5, 119:17

**MOOD** [7] - 71:18, 72:19, 77:20, 79:13, 82:6, 88:13, 88:20

**MORENO** [55] - 2:12, 65:25, 66:16, 66:20, 66:22, 76:2, 76:5, 76:8, 76:12, 76:15, 76:16, 77:11, 78:25, 79:3, 79:5, 79:9, 80:14, 80:25, 81:3, 81:5, 83:23, 84:3, 84:10, 84:17, 84:19, 84:20, 86:6, 86:8, 86:11, 87:3, 87:7, 87:24, 88:3, 90:23, 91:1, 91:8, 91:10, 91:14, 91:18, 91:21, 91:22, 92:7, 92:15,

95:22, 98:22, 99:1, 100:11, 101:7, 101:13, 101:16, 101:20, 102:1, 102:4, 102:9, 149:13

**MORNING** [22] - 3:3, 4:16, 5:10, 5:25, 6:1, 10:25, 25:19, 25:21, 37:22, 38:21, 39:4, 44:7, 44:8, 52:18, 55:4, 63:5, 65:23, 66:1, 66:23, 66:24, 81:11, 147:2

**MOST** [3] - 27:24, 73:11, 114:18

**MOSTLY** [1] - 67:12

**MOTIONS** [1] - 138:17

**MOTIVATED** [3] - 24:4, 24:16, 36:25

**MOTIVATION** [1] - 24:22

**MOUTH** [2] - 32:1, 127:16

**MOVE** [12] - 17:24, 19:21, 20:8, 20:11, 23:23, 25:2, 50:25, 57:16, 108:6, 108:7, 110:11, 134:18

**MOVED** [10] - 20:4, 23:1, 23:7, 25:6, 109:3, 109:5, 109:6, 111:16, 113:20, 119:7

**MOVEMENT** [5] - 34:7, 35:7, 35:8, 35:14, 107:22

**MOVES** [2] - 108:6

**MOVING** [3] - 25:8, 33:23, 143:18

**MULTI** [1] - 112:10

**MULTI-PAGE** [1] - 112:10

**MULTIPLE** [1] - 120:19

**MURDER** [2] - 81:14, 82:25

**MURPHY'S** [1] - 84:5

**MUST** [2] - 12:18, 87:15

**N**

**N.W** [1] - 2:4

**NAME** [17] - 10:8, 52:7, 59:4, 59:5, 61:6, 79:21, 89:2, 103:2, 103:23, 109:3, 118:1, 118:2, 135:1, 141:20, 144:13, 145:19

**NAMES** [1] - 23:24

**NEAR** [2] - 31:6, 119:5

**NEAREST** [1] - 31:13

**NECESSARILY** [2] - 113:24, 138:14

**NECESSARY** [1] - 138:24

**NECK** [11] - 30:17, 30:23, 35:12, 35:16, 123:13, 123:17, 126:10, 126:17, 127:7

**NEED** [9] - 62:11, 62:12, 84:6, 94:15, 97:23, 100:23, 101:7, 123:14, 146:21

**NEEDED** [4] - 63:3, 75:23, 90:7, 90:9

**NEEDS** [3] - 27:14, 87:17, 99:19

**NEGATIVE** [1] - 71:11

**NEVER** [4] - 27:12, 37:4, 64:9, 65:1

**NEVERTHELESS** [2] - 64:12, 64:22

**NEW** [1] - 55:12

**NEWEST** [1] - 49:19

**NEXT** [21] - 9:1, 14:9, 16:2, 16:3, 21:23, 23:7, 30:20, 34:14, 36:14, 47:12, 52:2, 58:11, 65:5, 81:1, 85:11, 96:16, 100:21, 101:12, 102:12, 141:18

**NICKNAME** [1] - 141:23

**NICOLE** [4] - 102:14, 102:16, 103:4, 149:14

**NIGHT** [1] - 46:23

**NINE** [6] - 63:24, 63:25, 67:22, 68:17, 98:11, 98:13

**NINHYDRIN** [1] - 140:24

**NON** [2] - 138:10, 138:17

**NON-JURY** [2] - 138:10, 138:17

**NONE** [1] - 61:3

**NONFILTERED** [1] - 41:4

**NORMAL** [1] - 38:14

**NORMALLY** [2] - 109:21, 113:5

**NORTH** [1] - 25:10

**NOTATE** [1] - 17:13

**NOTATING** [2] - 17:10, 17:11

**NOTATION** [1] -

122:8

**NOTE** [11] - 3:6, 17:25, 24:15, 34:23, 38:4, 100:15, 140:16, 145:9, 146:14, 146:21

**NOTED** [3] - 18:9, 18:12, 38:5

**NOTES** [36] - 3:24, 16:13, 16:18, 17:8, 20:21, 23:5, 23:7, 25:5, 26:25, 27:21, 27:23, 30:18, 32:4, 32:20, 33:3, 34:10, 34:11, 46:15, 46:16, 46:21, 47:4, 67:25, 68:5, 68:9, 68:11, 68:13, 72:5, 85:13, 88:8, 101:23, 130:18, 130:23, 131:2, 131:6, 131:9, 131:14

**NOTHING** [8] - 21:19, 24:4, 24:16, 36:9, 50:22, 110:17, 116:25, 117:20

**NOTICE** [1] - 122:13

**NOVEMBER** [1] - 60:23

**NOWHERE** [1] - 68:16

**NUMBER** [22] - 1:3, 4:20, 9:3, 15:16, 20:2, 25:7, 26:21, 42:23, 48:12, 48:15, 48:18, 48:24, 52:23, 77:15, 78:22, 89:4, 94:14, 95:15, 106:4, 109:3, 113:21, 132:14

**NUMBERS** [5] - 51:21, 84:25, 114:2, 141:15, 143:10

**NUTSHELL** [1] - 74:21

**O**

**O'CLOCK** [2] - 7:12, 31:2

**OATH** [1] - 102:19

**OBJECT** [3] - 27:11, 65:25, 77:3

**OBJECTING** [1] - 135:14

**OBJECTION** [21] - 27:17, 28:10, 28:18, 51:1, 51:3, 57:19, 102:5, 102:6, 104:9, 106:24, 108:14, 121:10, 129:24, 133:13, 135:16, 136:10, 137:6, 138:9,

142:18, 144:4, 144:8

**OBSERVE** [1] - 134:8

**OBSERVED** [1] - 125:12

**OBTAINED** [5] - 59:17, 142:3, 142:8, 143:20, 146:4

**OBVIOUSLY** [4] - 71:12, 79:23, 138:16, 145:2

**OCCASIONS** [2] - 54:3, 55:20

**OCCUPATION** [1] - 52:11

**OCCUR** [1] - 140:2

**OCCURRED** [4] - 9:4, 16:14, 38:16, 94:5

**OCTOBER** [1] - 37:13

**OFFENSE** [3] - 77:25, 78:20, 90:18

**OFFER** [3] - 26:19, 102:3

**OFFERED** [1] - 101:24

**OFFERING** [1] - 102:4

**OFFICE** [6] - 1:16, 39:10, 49:20, 49:22, 60:8, 119:16

**OFFICER** [14] - 5:19, 21:10, 21:18, 22:1, 23:18, 35:22, 35:24, 36:3, 36:8, 105:11, 109:6

**OFFICERS** [7] - 19:2, 30:25, 35:21, 35:22, 35:23, 36:2, 36:11

**OFFICES** [1] - 118:21

**OFFICIAL** [2] - 1:20, 148:9

**OFTEN** [2] - 70:2, 74:2

**OFTENTIMES** [2] - 82:14, 90:5

**OKLAHOMA** [4] - 26:1, 26:6, 37:14, 37:15

**ON-STAFF** [1] - 72:25

**ONCE** [11] - 37:20, 46:4, 46:5, 47:3, 50:1, 68:14, 74:4, 95:3, 95:6, 97:17

**ONE** [61] - 4:15, 5:5, 5:23, 6:16, 12:25, 13:14, 16:4, 23:10,

26:1, 26:6, 31:12, 31:15, 31:17, 31:24, 37:5, 37:6, 43:24, 46:10, 55:25, 56:20, 57:4, 61:4, 63:18, 73:19, 73:23, 74:6, 75:9, 76:10, 76:12, 78:10, 82:10, 83:24, 84:12, 84:24, 88:19, 93:11, 98:3, 98:10, 100:12, 100:24, 101:13, 104:6, 104:16, 105:17, 105:18, 105:19, 108:7, 111:22, 112:4, 113:4, 120:4, 120:5, 120:11, 124:5, 126:24, 129:2, 129:8, 129:10, 139:2, 147:8

**ONES** [1] - 6:18

**OPEN** [1] - 128:15

**OPENED** [1] - 129:17

**OPENS** [3] - 3:1, 7:5, 7:6

**OPERATIONAL** [3] - 118:15, 118:20, 119:9

**OPERATIVE** [1] - 93:9

**OPINION** [2] - 55:14, 55:16

**OPINIONS** [2] - 54:19, 55:8

**OPPORTUNITY** [4] - 103:8, 128:23, 134:20, 135:7

**OPPOSING** [1] - 66:17

**ORALLY** [1] - 4:25

**ORDER** [12] - 4:24, 5:1, 5:2, 6:7, 6:12, 6:13, 23:8, 30:18, 38:17, 56:12, 87:9, 87:11

**ORDERED** [5] - 56:17, 56:19, 56:21, 99:3, 99:11

**ORDERLY** [3] - 20:24, 135:5, 142:1

**ORDERS** [1] - 5:17

**ORDINARILY** [1] - 139:4

**ORIGINAL** [3] - 16:13, 16:18, 141:7

**OTHERWISE** [1] - 5:17

**OUTSIDE** [8] - 5:15, 23:12, 31:12, 39:15, 85:1, 86:16, 86:21, 132:15

**OVERFLOWED** [1] -

110:10

**OVERRIDE** [2] - 99:6, 100:3

**OVERRULE** [3] - 137:5, 138:9, 144:8

**OVERTIME** [1] - 23:13

**OVERWHELMED** [1] - 94:21

**OWN** [7] - 29:22, 46:24, 47:8, 67:4, 67:5, 136:23, 137:17

## P

**P.M** [2] - 109:5, 147:22

**P.O** [1] - 29:20

**PACK** [3] - 33:14, 41:3

**PAGE** [34] - 23:4, 23:7, 23:9, 30:20, 32:3, 32:19, 33:2, 33:4, 34:14, 34:19, 36:14, 45:23, 46:22, 47:3, 47:12, 52:25, 53:1, 53:14, 53:18, 91:12, 92:6, 92:7, 96:7, 98:15, 98:17, 104:15, 108:9, 112:10, 112:12, 117:6, 149:20, 150:11

**PAIR** [9] - 36:7, 129:8, 129:13, 130:15, 130:17, 131:9, 131:23, 132:10, 132:19

**PAPER** [6] - 11:22, 12:1, 80:1, 111:8, 138:14, 139:1

**PAPERWORK** [3] - 113:8, 113:9, 113:11

**PARAGRAPH** [7] - 24:2, 64:6, 64:12, 65:5, 78:16, 88:11, 96:16

**PARENTHESES** [1] - 132:2

**PARENTS** [1] - 63:17

**PART** [9] - 13:6, 21:23, 26:2, 28:22, 36:11, 50:7, 62:15, 83:18, 123:18

**PARTICIPATED** [1] - 143:22

**PARTICIPATING** [1] - 87:12

**PARTICULAR** [6] - 75:17, 75:18, 82:10, 104:5, 104:25, 108:9

**PARTNER** [4] - 64:24, 65:11, 65:12, 65:20

**PARTNER'S** [1] - 64:22

**PARTS** [2] - 114:25, 122:3

**PASSED** [1] - 98:4

**PAST** [1] - 20:24

**PATHOLOGIST** [2] - 52:12, 55:7

**PATHOLOGY** [2] - 52:19, 54:20

**PATIENT** [1] - 73:9

**PATIENTS** [1] - 72:8

**PAUL** [4] - 1:6, 9:5, 15:16, 37:11

**PAUSE** [7] - 6:25, 43:25, 50:21, 57:2, 84:2, 129:3, 130:21

**PAUSES** [1] - 31:9

**PENAL** [1] - 26:6

**PENALTY** [1] - 37:1

**PENDING** [1] - 147:8

**PENIS** [2] - 134:5, 134:7

**PENITENTIARY** [8] - 8:7, 26:12, 26:15, 60:5, 135:6, 140:4, 145:25, 146:2

**PENNSYLVANIA** [8] - 1:2, 1:16, 2:6, 2:13, 15:2, 57:6, 60:6, 119:20

**PEOPLE** [12] - 7:13, 37:7, 75:1, 83:8, 90:2, 94:14, 94:18, 97:9, 114:21, 116:1, 120:19

**PERFORM** [1] - 119:1

**PERHAPS** [3] - 83:5, 94:13, 146:8

**PERIOD** [4] - 15:7, 15:22, 60:22, 98:5

**PERIODICALLY** [1] - 82:13

**PERIODS** [1] - 74:19

**PERMIT** [1] - 87:15

**PERSON** [12] - 10:17, 10:24, 21:1, 46:14, 61:5, 89:22, 97:14, 97:15, 116:18, 116:19, 135:1, 139:3

**PERSONAL** [1] - 29:25

**PERSONNEL** [1] - 44:14

**PERTAIN** [2] - 104:5, 108:10

**PERTAINS** [2] -

104:25, 105:1

**PERTINENT** [3] - 89:7, 89:9, 89:11

**PETECHIA** [3] - 125:23, 125:24, 126:4

**PGM** [1] - 75:20

**PHARMACOLOGY** [2] - 86:12, 86:13

**PHASE** [2] - 16:5, 16:7

**PHILADELPHIA** [4] - 1:9, 1:21, 2:14, 135:20

**PHONE** [2] - 8:3, 8:5

**PHOTO** [3] - 122:5, 122:8, 126:20

**PHOTOCOPY** [1] - 141:2

**PHOTOGRAPH** [13] - 122:10, 122:14, 123:11, 123:12, 124:18, 126:3, 126:8, 126:15, 127:5, 127:11, 129:20, 129:21, 130:7

**PHOTOGRAPHS** [8] - 120:18, 120:20, 121:2, 121:6, 121:25, 126:7, 127:20, 131:25

**PHOTOS** [1] - 130:14

**PHYSICAL** [6] - 127:22, 140:8, 142:2, 142:7, 143:19, 146:3

**PHYSICIAN** [2] - 36:16, 85:4

**PHYSICIAN'S** [1] - 82:20

**PICK** [3] - 32:24, 34:23, 107:1

**PICKED** [3] - 8:1, 112:5

**PICTURE** [6] - 123:9, 124:12, 124:14, 125:7, 125:21, 125:22

**PICTURES** [1] - 121:18

**PIECE** [2] - 138:13, 139:1

**PIECES** [1] - 133:2

**PILLOW** [4] - 41:13, 41:14, 41:18, 49:8

**PLACE** [3] - 37:13, 93:15, 119:18

**PLACED** [6] - 17:7, 39:1, 89:12, 90:15, 93:3, 99:14

**PLACING** [2] - 39:11, 99:7

**PLAN** [2] - 46:25, 47:9

**PLANNED** [4] - 29:10, 29:11, 29:22, 47:10
**PLAY** [1] - 39:19
**PLAYED** [1] - 40:2
**PLUS** [1] - 95:17
**PO** [2] - 1:17, 2:10
**POINT** [40] - 3:22, 3:24, 4:12, 8:23, 9:8, 10:9, 11:10, 12:14, 14:18, 23:4, 28:2, 34:10, 38:19, 39:4, 40:8, 40:15, 46:10, 48:13, 48:16, 49:25, 54:19, 55:1, 56:7, 58:2, 58:23, 62:3, 62:14, 66:12, 72:12, 72:16, 73:15, 77:5, 91:23, 98:3, 119:7, 123:12, 132:4, 138:19, 147:15, 147:19
**POINTING** [2] - 123:1, 124:25
**POLICIES** [1] - 22:7
**POLICY** [6] - 5:16, 5:24, 60:20, 93:13, 93:15, 114:20
**POLLUTED** [2] - 142:19, 144:5
**POLYGRAPH** [2] - 119:6, 119:7
**POPS** [1] - 36:20
**POPULATION** [3] - 24:9, 94:15, 95:8
**PORTION** [2] - 17:1, 84:15
**PORTIONS** [1] - 4:9
**POSITION** [5] - 15:23, 33:25, 35:1, 42:18, 54:14
**POSITIONED** [1] - 123:5
**POSITIVE** [1] - 85:23
**POSSESSION** [1] - 128:5
**POSSIBLE** [3] - 19:7, 55:18
**POSSIBLY** [1] - 22:6
**POSTDATED** [1] - 105:17
**POTENTIAL** [5] - 62:1, 82:8, 93:2, 93:16, 100:2
**PRACTICE** [13] - 14:5, 56:10, 67:4, 67:5, 68:4, 68:5, 70:4, 71:2, 74:10, 83:18, 94:24
**PRACTICES** [1] -

56:4
**PRACTICING** [5] - 52:16, 55:7, 56:12, 66:25, 67:2
**PRECEDING** [2] - 32:3, 39:21
**PRECISE** [1] - 93:23
**PREDOMINANTLY** [1] - 119:5
**PREMEDITATION** [1] - 29:10
**PREPARATION** [1] - 128:7
**PREPARE** [3] - 62:3, 131:13, 139:17
**PREPARED** [4] - 53:19, 53:21, 131:19, 136:19
**PRESCRIBE** [3] - 71:7, 72:22, 73:8
**PRESCRIBED** [10] - 50:12, 50:16, 78:10, 78:16, 79:15, 79:25, 81:13, 82:3, 82:6, 84:15
**PRESCRIBING** [1] - 74:6
**PRESCRIPTION** [2] - 88:8, 88:21
**PRESENCE** [1] - 3:7
**PRESENT** [9] - 10:7, 13:17, 46:14, 46:18, 46:19, 120:7, 136:19, 137:21, 140:5
**PRESENTED** [2] - 57:9, 90:2
**PRESENTLY** [1] - 59:9
**PRESSURE** [3] - 14:1, 33:23, 36:19
**PRETRIAL** [1] - 138:17
**PRETTY** [8] - 16:3, 17:11, 27:24, 28:20, 38:15, 70:4, 73:25, 95:20
**PREVIOUSLY** [2] - 7:23, 109:8
**PRIDE** [1] - 65:10
**PRIMARILY** [1] - 77:18
**PRIMARY** [1] - 120:1
**PRINTED** [1] - 111:4
**PRISON** [15] - 44:13, 48:12, 48:15, 74:6, 79:23, 83:4, 87:17, 94:14, 95:7, 103:19, 103:24, 107:22, 142:12, 145:9, 145:10
**PRISONERS** [2] -

70:2, 110:8
**PRISONS** [5] - 59:25, 70:12, 93:10, 109:23, 132:13
**PRIVATE** [1] - 94:24
**PRIVILEGE** [1] - 110:13
**PRIVILEGES** [2] - 110:13, 116:22
**PROBLEM** [6] - 5:11, 36:19, 37:10, 82:8, 110:7, 118:13
**PROBLEMS** [6] - 23:24, 24:8, 24:9, 70:19, 75:13, 136:8
**PROCEDURE** [1] - 120:15
**PROCEED** [2] - 102:21, 124:8
**PROCEEDED** [1] - 45:22
**PROCEEDINGS** [5] - 1:24, 3:15, 87:13, 136:7, 148:4
**PROCESS** [8] - 39:8, 40:5, 92:4, 96:11, 96:23, 97:20, 99:12, 99:17
**PROCESSING** [1] - 144:21
**PRODUCED** [1] - 1:24
**PROFFER** [3] - 137:25, 138:4, 138:8
**PROGRAM** [1] - 60:13
**PROGRESS** [2] - 72:6, 72:7
**PROGRESSED** [1] - 38:9
**PROHIBITED** [1] - 97:16
**PROMISES** [1] - 13:25
**PROPER** [1] - 141:9
**PROVIDE** [5] - 14:12, 64:3, 67:8, 118:20
**PROVIDED** [16] - 16:17, 37:22, 58:4, 66:8, 127:25, 133:19, 133:25, 134:1, 134:15, 136:1, 136:18, 136:22, 137:11, 137:14, 137:18, 143:24
**PROVIDING** [1] - 62:11
**PROZAC** [5] - 69:12, 71:3, 71:5, 71:14, 71:16

**PSY** [1] - 77:14
**PSYCH** [16] - 89:12, 89:14, 90:4, 90:16, 92:4, 92:21, 93:3, 96:11, 96:24, 97:9, 97:15, 97:17, 99:3, 99:23, 100:1
**PSYCHIATRIC** [3] - 50:9, 75:14, 97:7
**PSYCHIATRIST** [16] - 72:25, 73:10, 73:11, 73:13, 73:15, 73:20, 73:25, 74:7, 77:17, 77:21, 79:24, 82:4, 83:6, 85:3, 85:4, 85:7
**PSYCHIATRIST'S** [1] - 85:9
**PSYCHIATRISTS** [3] - 78:11, 95:3
**PSYCHIATRY** [1] - 73:7
**PSYCHOLOGICAL** [2] - 75:14, 75:23
**PSYCHOLOGIST** [9] - 30:4, 38:21, 59:22, 66:25, 70:16, 72:3, 72:21, 77:15, 92:17
**PSYCHOLOGISTS** [2] - 61:1, 93:25
**PSYCHOLOGY** [6] - 59:18, 60:14, 60:17, 68:22, 70:13, 83:4
**PSYCHOTIC** [1] - 65:7
**PUBIC** [1] - 134:3
**PUBLIC** [1] - 2:6
**PUBLISH** [7] - 108:21, 126:2, 127:2, 130:3, 130:10, 138:21, 139:6
**PUBLISHED** [3] - 11:9, 121:20, 132:17
**PULL** [1] - 31:21
**PULLED** [6] - 31:18, 35:13, 36:1, 115:24, 134:2, 134:3
**PULLING** [1] - 33:21
**PULSE** [4] - 35:16, 35:17
**PURPORTEDLY** [1] - 135:25
**PURPOSE** [2] - 11:25, 20:10
**PURPOSES** [3] - 18:14, 114:13, 147:3
**PUT** [22] - 17:9, 17:15, 35:12, 63:3, 65:15, 67:23, 88:4, 92:10, 92:20, 97:1, 97:9, 97:14, 97:17,

110:5, 113:5, 113:22, 114:12, 114:15, 114:16, 115:23, 123:22, 146:11

---

## Q

**QUANTICO** [2] - 118:16, 119:9
**QUARTER** [2] - 58:15, 87:6
**QUESTIONED** [2] - 15:18, 17:16
**QUESTIONING** [8] - 12:24, 13:1, 13:15, 17:4, 17:6, 35:25, 38:12, 38:14
**QUESTIONS** [27] - 12:18, 12:23, 13:11, 13:16, 13:24, 16:16, 17:7, 17:9, 28:19, 44:2, 50:5, 50:19, 54:25, 55:5, 66:14, 67:15, 95:22, 98:10, 98:21, 100:11, 100:18, 103:6, 115:4, 115:10, 117:19, 131:1, 137:18
**QUICK** [2] - 76:18, 78:4
**QUICKLY** [1] - 146:11
**QUITE** [1] - 50:8
**QUOTE** [44] - 15:17, 15:18, 15:20, 15:22, 18:6, 18:21, 18:22, 21:19, 28:5, 29:9, 29:12, 29:14, 30:3, 30:4, 30:6, 30:7, 30:22, 33:24, 34:24, 34:25, 35:23, 35:24, 35:25, 36:4, 36:5, 36:6, 37:2, 37:6, 37:7, 37:8, 37:17, 37:18, 65:19, 74:18
**QUOTES** [1] - 65:15

---

## R

**R-O-C-K** [1] - 141:24
**R125** [12] - 120:22, 120:23, 121:9, 121:11, 121:13, 121:20, 121:21, 121:23, 121:24, 122:20, 124:15, 150:3
**R126** [2] - 122:18, 124:8
**R130** [2] - 125:6, 125:8

**R132** [2] - 125:14, 125:15

**R134** [1] - 125:19

**R135** [1] - 126:2

**R137** [1] - 126:7

**R138** [3] - 126:14, 126:15, 126:16

**R139** [3] - 127:2, 127:5, 127:6

**R140** [7] - 120:22, 121:9, 121:11, 121:13, 127:11, 127:14, 150:3

**R142** [1] - 132:9

**R143** [1] - 131:16

**R151** [2] - 131:5, 131:6

**R157** [7] - 129:16, 129:23, 130:1, 130:3, 130:6, 150:4

**R158** [8] - 129:16, 129:23, 130:1, 130:10, 132:17, 132:18, 150:4

**R169** [1] - 62:6

**R170** [5] - 103:15, 104:8, 112:9, 112:10, 115:20

**R171** [3] - 106:18, 106:20, 106:23

**R174** [4] - 53:17, 57:17, 57:20, 149:24

**R27** [1] - 139:22

**R39** [1] - 149:23

**R7** [1] - 117:6

**RA** [1] - 119:4

**RADIO** [4] - 31:2, 33:7, 43:19, 43:23

**RAGE** [1] - 74:19

**RAISE** [3] - 136:9, 142:17, 144:3

**RAISED** [1] - 33:20

**RANGE** [5] - 109:15, 109:17, 110:11, 110:14, 115:1

**RAPE** [2] - 56:12, 56:13

**RARELY** [2] - 97:9

**RATHER** [4] - 14:21, 19:5, 38:14, 42:16

**RAZOR** [1] - 30:23

**RE** [2] - 29:9, 100:13

**RE-REDIRECT** [1] - 100:13

**REACTION** [2] - 62:22, 86:23

**READ** [28] - 12:14, 12:16, 13:21, 14:3, 14:6, 14:8, 14:13, 14:16, 15:20, 18:3,

20:22, 27:18, 27:19, 27:23, 34:15, 64:11, 65:5, 76:25, 85:12, 87:15, 88:12, 88:19, 92:2, 96:15, 96:22, 99:10, 146:21, 146:23

**READING** [3] - 15:18, 64:12, 96:9

**REAL** [2] - 31:23, 35:13

**REALLY** [12] - 34:4, 35:4, 63:15, 63:18, 82:16, 85:6, 85:22, 85:23, 85:24, 86:15, 90:6, 111:10

**REALM** [3] - 75:6, 86:16, 93:1

**REASON** [10] - 5:10, 24:22, 27:4, 36:17, 64:3, 64:8, 89:23, 92:9, 97:1, 107:23

**REASONS** [2] - 140:16, 144:8

**RECALLED** [1] - 102:17

**RECEIVE** [4] - 55:13, 56:8, 61:8, 142:14

**RECEIVED** [14] - 8:2, 51:19, 55:21, 57:19, 105:5, 105:21, 105:22, 111:19, 111:22, 113:11, 140:23, 142:11, 144:18, 144:22

**RECEIVING** [2] - 8:5, 97:16

**RECENT** [1] - 65:8

**RECENTLY** [1] - 137:16

**RECESS** [7] - 40:8, 87:6, 87:8, 101:4, 146:9, 147:16, 147:19

**RECITATION** [1] - 17:18

**RECOGNIZE** [13] - 10:17, 42:14, 106:19, 108:3, 120:23, 128:14, 129:7, 129:16, 130:11, 132:19, 140:13, 140:18, 144:11

**RECOGNIZED** [1] - 52:23

**RECOLLECT** [1] - 4:6

**RECOLLECTION** [9] - 56:5, 56:16, 62:8, 76:22, 81:19, 83:1, 131:22, 132:10, 139:23

**RECORD** [36] - 3:4, 12:17, 13:8, 17:5, 17:17, 19:6, 19:8, 20:18, 20:20, 23:8, 32:8, 39:7, 40:10, 52:7, 59:4, 78:5, 78:12, 87:10, 87:16, 88:24, 90:13, 90:15, 99:16, 103:3, 104:6, 104:25, 105:2, 105:8, 106:10, 107:19, 118:1, 132:9, 143:1, 146:11, 146:14, 148:4

**RECORDED** [3] - 1:24, 18:16, 20:13

**RECORDER** [2] - 3:9, 3:20

**RECORDING** [3] - 19:7, 39:11, 39:15

**RECORDS** [12] - 50:9, 70:9, 103:19, 104:3, 104:5, 105:12, 109:22, 109:25, 115:10, 115:14, 115:22, 117:10

**RECOVERED** [4] - 137:1, 137:3, 138:2, 138:11

**RECOVERY** [1] - 137:8

**RECROSS** [3] - 98:25, 117:4, 149:3

**RED** [8] - 123:16, 125:2, 125:13, 125:17, 126:13, 126:23, 126:24

**REDIRECT** [7] - 50:23, 95:24, 96:1, 100:13, 115:5, 115:7, 149:3

**REFER** [5] - 25:24, 62:11, 62:12, 64:6, 98:15

**REFERENCES** [2] - 26:8, 131:12

**REFERRING** [15] - 20:23, 22:1, 22:19, 24:8, 24:12, 24:13, 31:12, 31:13, 34:9, 34:11, 36:16, 53:4, 77:16, 88:1, 132:5

**REFRESH** [6] - 83:1, 131:22, 132:10, 139:19, 139:22, 142:9

**REFUSAL** [1] - 83:6

**REFUSED** [3] - 14:16, 15:20, 85:15

**REFUSING** [1] - 81:14

**REG** [2] - 15:16,

77:15

**REGAINED** [2] - 33:25, 34:25

**REGARDING** [1] - 103:9

**REGARDLESS** [1] - 28:7

**REGISTRATION** [1] - 15:16

**REGULAR** [1] - 75:20

**REIDERS** [1] - 2:9

**RELATION** [1] - 10:3

**RELATIVELY** [1] - 9:17

**RELAXED** [2] - 34:6, 35:6

**RELEASE** [1] - 6:12

**RELEASED** [2] - 22:7, 33:23

**RELEVANCE** [1] - 77:5

**RELEVANT** [2] - 67:20, 138:14

**RELIABILITY** [2] - 136:8, 137:13

**RELIABLE** [1] - 136:6

**REMAIN** [2] - 12:19, 44:18

**REMEMBER** [4] - 47:1, 62:9, 90:21, 94:4

**REMORSE** [1] - 64:22

**REMOTE** [1] - 65:8

**REMOVED** [11] - 5:3, 6:7, 36:13, 43:12, 43:15, 128:2, 128:25, 129:9, 129:14, 133:6, 133:10

**REPEAT** [2] - 8:16, 27:12

**REPORT** [26] - 32:15, 32:16, 52:19, 52:20, 52:22, 52:24, 53:2, 53:4, 53:5, 53:9, 53:15, 54:1, 55:9, 62:3, 62:6, 67:20, 68:7, 68:15, 68:16, 83:16, 86:3, 105:5, 117:14, 131:19, 132:5, 139:17

**REPORTER** [2] - 1:20, 148:9

**REPORTS** [3] - 54:16, 72:6, 77:9

**REQUEST** [2] - 19:19, 100:3

**REQUESTED** [1] -

9:4

**REQUESTING** [2] - 61:9, 99:7

**REQUIRED** [2] - 75:20, 83:16

**RESENTENCING** [1] - 87:12

**RESIDING** [1] - 59:9

**RESPECT** [3] - 17:3, 86:15, 97:13

**RESPOND** [2] - 30:5, 137:7

**RESPONDED** [6] - 4:2, 18:20, 22:16, 22:18, 28:5, 36:12

**RESPONSE** [2] - 17:13, 38:16

**RESPONSES** [2] - 16:16, 17:6

**RESPONSIBILITY** [2] - 83:5, 93:1

**REST** [1] - 105:12

**RESTRAINED** [4] - 34:2, 35:2, 36:13, 87:14

**RESTRAINING** [4] - 31:12, 31:14, 31:15, 43:11

**RESTRAINT** [8] - 4:23, 6:3, 31:6, 31:16, 31:18, 34:5, 35:5

**RESTRAINTS** [6] - 4:21, 4:25, 6:17, 31:21, 34:1, 35:1

**RESULT** [7] - 65:13, 71:11, 92:13, 97:5, 126:1, 136:25, 144:20

**RESULTING** [1] - 126:4

**RESUME** [4] - 40:12, 58:15, 87:22, 147:16

**RETAINED** [2] - 18:10, 43:12

**RETIRED** [1] - 52:14

**RETURN** [1] - 132:17

**REVIEW** [8] - 42:4, 50:8, 50:11, 53:7, 72:5, 105:7, 105:15, 131:2

**REVIEWED** [6] - 41:19, 53:25, 77:8, 81:21, 81:25, 128:7

**REVIEWING** [1] - 131:8

**RICK** [2] - 7:22, 149:5

**RIDE** [1] - 115:19

**RIGHT-HAND** [1] - 79:17

**RIGHTS** [19] - 10:9,

10:10, 10:11, 11:5, 11:21, 12:19, 13:21, 13:22, 14:10, 14:16, 15:20, 18:3, 18:6, 44:16, 45:18, 136:5, 137:20

**RING** [5] - 31:6, 31:12, 31:14, 31:15, 43:11

**RINGS** [2] - 34:5, 35:5

**RISK** [3] - 61:16, 62:1, 115:25

**RIVERS** [1] - 29:21

**ROAD** [1] - 82:9

**ROCK** [3] - 141:24, 142:8, 142:12

**ROLE** [2] - 119:24, 134:20

**ROLES** [1] - 119:1

**ROLL** [1] - 43:2

**RON** [3] - 8:18, 77:13, 120:10

**RONALD** [2] - 2:8, 80:3

**ROOM** [11] - 9:13, 9:16, 9:17, 9:19, 18:1, 39:1, 44:10, 44:11, 44:12, 114:12

**ROOMMATE** [2] - 93:4, 97:16

**ROPE** [3] - 31:16, 43:9, 43:17

**ROSTER** [1] - 111:2

**ROUGHLY** [1] - 93:22

**RPR** [1] - 1:19

**RULES** [2] - 135:21, 136:7

**RULING** [3] - 142:23, 147:9

**RUMORS** [1] - 29:24

**RUN** [2] - 37:4, 106:14

**RUNNING** [4] - 37:6, 106:16, 113:3, 113:6

**RUNS** [1] - 31:3

**RUSE** [1] - 36:11

**RUTGERS** [1] - 59:18

---

# S

**SA** [1] - 15:19

**SAFETY** [5] - 89:19, 89:21, 99:6, 100:3

**SALMON** [1] - 41:1

**SANCTION** [6] - 112:23, 113:11, 113:12, 114:6, 117:7,

117:8

**SANCTIONS** [1] - 108:20

**SANTOS** [5] - 4:4, 8:20, 9:24, 10:8, 15:3

**SARALEE** [4] - 52:4, 52:5, 52:8, 149:8

**SAT** [3] - 10:5, 34:14, 35:11

**SAUNDERS** [3] - 2:5, 87:21, 106:24

**SAVE** [1] - 132:7

**SAVED** [1] - 49:4

**SAW** [7] - 5:19, 24:9, 40:4, 49:4, 86:23, 105:8, 106:15

**SCENARIO** [4] - 27:3, 28:24, 29:18, 36:11

**SCENARIOS** [1] - 30:1

**SCENE** [1] - 39:11

**SCIENCE** [1] - 59:20

**SCRANTON** [1] - 1:18

**SCRAP** [1] - 49:3

**SCREEN** [17] - 10:14, 10:20, 11:7, 11:9, 11:15, 11:16, 16:25, 34:12, 41:5, 105:4, 109:4, 115:24, 122:16, 123:2, 124:21, 128:17

**SEARCHED** [2] - 36:15, 39:16

**SEATED** [6] - 3:2, 9:21, 9:22, 9:25, 10:1

**SECOND** [5] - 34:3, 35:3, 60:17, 129:2, 129:13

**SECTION** [1] - 2:3

**SECURE** [2] - 31:22, 32:2

**SECURED** [1] - 31:6

**SECURITY** [1] - 115:25

**SEE** [37] - 7:15, 10:14, 11:9, 11:17, 30:3, 30:7, 35:20, 36:2, 38:20, 47:6, 50:14, 61:23, 70:9, 76:20, 77:16, 78:9, 78:15, 79:16, 81:12, 81:15, 85:4, 85:11, 88:5, 89:6, 91:25, 99:16, 105:22, 108:23, 112:13, 113:14, 115:21, 122:5, 124:17, 124:21, 126:19,

128:17, 128:20

**SEEING** [3] - 3:19, 94:4, 123:2

**SEEK** [10] - 104:7, 106:22, 108:12, 121:8, 129:22, 133:11, 138:21, 141:10, 143:6, 144:23

**SEG** [6] - 22:2, 22:6, 22:8, 22:14, 22:20, 110:5

**SEGMENT** [1] - 105:3

**SEGREGATION** [18] - 103:7, 105:21, 106:12, 107:17, 109:9, 109:19, 109:24, 110:8, 111:18, 112:1, 113:1, 113:22, 114:3, 114:5, 114:11, 114:22, 116:1, 116:11

**SEIZURES** [2] - 71:10, 79:7

**SELF** [2] - 27:24, 28:20

**SELF-EXPLANATORY** [2] - 27:24, 28:20

**SENTENCE** [13] - 106:9, 109:20, 111:18, 111:21, 112:1, 112:4, 112:5, 112:7, 112:14, 114:6, 114:11, 114:17

**SENTENCED** [1] - 106:11

**SENTENCES** [1] - 115:22

**SENTENCING** [2] - 1:12, 135:22

**SENTRY** [3] - 103:18, 103:21, 103:22

**SEPARATE** [2] - 30:8, 110:15

**SEPARATED** [1] - 116:7

**SEPARATEE** [3] - 116:3, 116:5, 116:6

**SEPARATEES** [2] - 116:12, 116:17

**SEPTEMBER** [2] - 54:7, 57:5

**SEQUENCE** [3] - 12:2, 38:15, 39:17

**SERIES** [1] - 126:6

**SERIOUS** [1] - 105:6

**SEROTONIN** [1] - 71:14

**SERVICE** [4] - 60:18, 77:13, 80:4, 95:11

**SERVICES** [4] - 68:22, 75:20, 80:6, 94:15

**SERVING** [7] - 37:16, 109:16, 110:8, 113:22, 114:5, 114:11, 116:1

**SETTING** [3] - 68:12, 94:14, 94:25

**SEVEN** [4] - 37:9, 45:23, 47:7, 118:19

**SEX** [1] - 133:22

**SEXUAL** [2] - 56:4, 56:10

**SHACKLES** [1] - 87:14

**SHALL** [1] - 87:13

**SHEET** [15] - 32:2, 35:17, 36:2, 40:25, 41:23, 41:24, 42:1, 42:5, 42:6, 42:8, 42:9, 43:9, 49:3, 78:5, 88:7

**SHEETS** [4] - 30:16, 43:14, 43:16, 49:5

**SHIRT** [1] - 133:10

**SHIT** [1] - 37:7

**SHORTLY** [5] - 8:5, 22:7, 22:8, 71:22, 110:25

**SHORTS** [17] - 128:25, 129:8, 129:13, 129:17, 129:19, 129:20, 130:8, 130:12, 130:13, 130:14, 131:9, 131:23, 132:1, 132:11, 132:14, 132:15, 132:20

**SHOT** [3] - 25:9, 33:17

**SHOULDER** [1] - 36:18

**SHOW** [28] - 11:6, 11:16, 29:9, 29:10, 41:2, 41:25, 42:3, 42:10, 42:13, 43:4, 43:8, 43:13, 43:18, 53:17, 78:2, 106:17, 108:1, 117:10, 120:21, 124:25, 125:11, 128:10, 129:15, 131:4, 140:11, 142:5, 144:1, 146:6

**SHOWED** [3] - 115:11, 139:19, 145:12

**SHOWER** [3] - 19:4,

31:1, 31:5

**SHOWING** [8] - 40:15, 76:9, 76:17, 80:23, 88:23, 91:2, 113:19, 127:14

**SHOWN** [4] - 53:14, 114:9, 131:5, 139:22

**SHOWS** [5] - 90:13, 90:15, 110:25, 111:4, 124:4

**SHRED** [2] - 68:14

**SHU** [4] - 18:25, 19:17, 37:11, 108:6

**SHUDDERING** [2] - 34:8, 35:8

**SHUDDERS** [1] - 35:14

**SHY** [1] - 48:6

**SIDE** [8] - 6:22, 10:18, 35:5, 71:11, 79:17, 123:21, 124:14

**SIDES** [2] - 34:5, 58:21

**SIGN** [8] - 5:5, 6:13, 14:13, 14:17, 14:22, 15:21, 18:7, 45:14

**SIGNATURE** [4] - 52:24, 53:1, 53:18, 139:9

**SIGNED** [1] - 15:24

**SIGNIFICANT** [2] - 75:13, 82:2

**SILENT** [2] - 12:20, 44:19

**SILVER** [1] - 126:24

**SINGLE** [22] - 88:11, 89:12, 89:14, 89:20, 90:16, 92:4, 92:20, 93:3, 95:2, 96:11, 96:24, 97:9, 97:15, 97:17, 99:2, 99:7, 99:14, 99:23, 100:1, 114:16

**SINGLE-CELLED** [1] - 114:16

**SIS** [2] - 23:25, 24:11

**SIT** [3] - 37:3, 56:1, 130:16

**SITTING** [1] - 85:6

**SITUATION** [6] - 6:8, 8:24, 65:9, 72:11, 74:24, 97:14

**SIX** [5] - 35:8, 45:22, 47:7, 49:23, 119:17

**SIXTH** [1] - 135:22

**SKIN** [2] - 124:6, 125:18

**SLEEPER** [4] - 34:2, 35:3, 36:18, 41:9

**SLIDE** [2] - 134:10

**SLOMSKY** [1] - 1:10
**SLOW** [1] - 46:12
**SLOWER** [1] - 19:8
**SMALL** [2] - 9:17, 140:10
**SNITCH** [2] - 24:10, 24:21
**SO...** [2] - 28:24, 94:4
**SOCK** [3] - 32:1, 42:11, 42:20
**SOCKET** [1] - 36:22
**SOMEONE** [14] - 20:16, 33:1, 71:2, 71:16, 82:2, 92:4, 96:11, 96:23, 99:3, 99:7, 99:11, 100:4, 113:20, 114:16
**SOMETIMES** [3] - 55:13, 99:9, 110:10
**SONY** [1] - 43:19
**SOON** [1] - 29:9
**SOONER** [1] - 114:7
**SORRY** [15] - 8:9, 22:25, 34:21, 48:10, 64:20, 76:15, 78:25, 84:20, 86:8, 98:17, 109:4, 111:15, 123:10, 133:2
**SORT** [4] - 72:7, 74:21, 97:23, 124:4
**SOUND** [3] - 3:9, 3:20, 70:7
**SOURCE** [6] - 26:22, 27:7, 27:9, 28:1, 142:19, 144:5
**SPEAKER** [1] - 43:22
**SPECIAL** [26] - 8:18, 8:20, 8:21, 15:2, 15:4, 18:25, 20:5, 24:11, 37:11, 39:9, 49:16, 61:21, 88:25, 92:5, 95:18, 96:12, 96:24, 97:10, 99:4, 118:12, 118:15, 120:9, 120:10, 135:6, 140:3, 140:6
**SPECIFIC** [3] - 17:12, 17:14, 66:2
**SPECIFICALLY** [3] - 17:3, 20:22, 133:24
**SPECIFICS** [1] - 30:2
**SPECIFIED** [1] - 57:10
**SPECIMEN** [1] - 139:4
**SPELL** [4] - 52:6, 59:3, 78:24, 117:25
**SPENT** [2] - 119:3, 119:8
**SPOKEN** [1] - 64:20

**SPOT** [1] - 132:5
**SPREAD** [2] - 29:24, 95:20
**ST** [3] - 126:17, 127:7, 133:5
**STAFF** [7] - 37:11, 39:2, 59:22, 72:25, 73:5, 75:12, 93:2
**STAMP** [2] - 79:17, 85:9
**STAND** [7] - 53:24, 54:1, 81:1, 87:5, 92:23, 101:21, 102:17
**STANDARD** [1] - 40:25
**STANDING** [1] - 9:24
**START** [18] - 3:18, 7:12, 13:12, 15:7, 18:22, 19:11, 19:13, 33:4, 34:19, 40:1, 64:11, 64:16, 82:13, 106:16, 121:19, 128:12, 134:25, 146:9
**STARTED** [18] - 12:8, 16:3, 19:16, 25:24, 29:25, 30:15, 30:16, 31:4, 31:10, 33:20, 33:22, 35:12, 37:20, 47:24, 48:7, 59:21, 61:3, 145:6
**STARTING** [3] - 7:2, 40:22, 107:15
**STATE** [4] - 52:6, 59:3, 103:2, 117:25
**STATEMENT** [6] - 13:22, 13:23, 45:23, 45:25, 48:25, 77:6
**STATEMENTS** [5] - 19:6, 48:24, 136:23, 137:19, 138:3
**STATES** [12] - 1:1, 1:3, 1:16, 2:2, 3:5, 8:6, 52:3, 60:5, 87:10, 140:3, 145:16, 145:24
**STATING** [5] - 6:20, 14:16, 15:20, 18:6, 65:10
**STATION** [1] - 31:2
**STATUS** [21] - 92:4, 92:21, 93:4, 96:12, 96:24, 97:10, 97:15, 97:17, 99:3, 99:7, 99:14, 99:23, 100:1, 110:12, 110:25, 111:7, 111:10, 111:14, 113:2, 114:3, 116:15
**STAY** [2] - 12:4, 97:8
**STENOTYPE** [1] - 1:24

**STENOTYPE-COMPUTER** [1] - 1:24
**STEP** [7] - 6:21, 9:1, 14:9, 51:20, 57:22, 100:19, 117:21
**STEPHEN** [5] - 58:8, 59:1, 59:5, 143:13, 149:11
**STEVE** [1] - 144:16
**STEVEN** [2] - 20:5, 144:12
**STILL** [19] - 13:17, 16:9, 29:4, 30:23, 33:6, 43:11, 54:20, 66:25, 93:4, 109:17, 109:24, 110:12, 111:6, 113:1, 113:22, 114:2, 114:5, 114:11, 147:8
**STIPULATION** [1] - 146:15
**STIPULATIONS** [4] - 146:13, 146:18, 146:22, 147:8
**STOCKTON** [1] - 25:10
**STOMACH** [1] - 125:16
**STOP** [7] - 13:4, 13:18, 13:19, 19:8, 19:23, 36:17, 36:21
**STOPPED** [3] - 46:1, 85:18, 86:3
**STOPPING** [2] - 71:5, 82:16
**STOPS** [3] - 82:2, 82:9, 109:4
**STORY** [1] - 30:8
**STRADDLED** [2] - 33:19, 35:11
**STRADDLING** [1] - 34:15
**STRANGLE** [1] - 36:23
**STRANGLED** [4] - 63:25, 67:16, 67:21, 98:13
**STRANGLING** [3] - 33:20, 64:7, 65:13
**STRANGULATION** [1] - 41:11
**STREET** [7] - 1:17, 1:21, 2:4, 2:7, 2:10, 94:16, 146:2
**STRIKE** [3] - 116:2, 138:10, 145:2
**STRING** [2] - 35:9, 35:12
**STRIP** [2] - 32:1, 36:15

**STRUGGLED** [1] - 33:22
**STRUGGLING** [1] - 33:22
**STUFF** [2] - 85:24, 103:24
**STUFFED** [1] - 32:1
**SUBJECT** [8] - 77:15, 139:5, 141:12, 143:8, 144:9, 144:25, 145:1, 147:9
**SUBMITTED** [1] - 6:14
**SUBSEQUENT** [1] - 81:24
**SUBSTANCE** [1] - 139:10
**SUCCUMBED** [1] - 41:10
**SUDDENLY** [1] - 71:17
**SUFFER** [1] - 65:11
**SUFFERING** [1] - 74:15
**SUFFICIENT** [1] - 139:5
**SUGGEST** [1] - 65:6
**SUGGESTED** [1] - 56:18
**SUGGESTING** [1] - 99:4
**SUGGESTION** [1] - 98:3
**SUICIDAL** [2] - 63:3, 64:21
**SUICIDALITY** [1] - 62:2
**SUICIDE** [7] - 61:16, 63:3, 65:3, 68:20, 72:1, 80:17, 81:21
**SUITE** [3] - 1:17, 2:7, 2:14
**SUMMARY** [1] - 65:22
**SUPERVISOR** [7] - 8:20, 8:22, 15:4, 24:11, 72:5, 120:10, 140:6
**SUPERVISORS** [1] - 39:10
**SUPERVISORY** [2] - 118:12, 118:14
**SUPPLEMENTAL** [1] - 53:14
**SUPPORT** [2] - 118:20, 118:21
**SUPPOSED** [1] - 50:12
**SURPRISE** [1] - 115:14

**SURROUNDING** [1] - 137:19
**SUSPECT** [1] - 136:11
**SUSTAIN** [1] - 27:17
**SUZANNE** [2] - 1:19, 148:10
**SWABBED** [1] - 134:6
**SWABS** [7] - 127:25, 132:24, 133:18, 134:1, 134:7, 134:9, 134:17
**SWEETENED** [1] - 26:19
**SWEETENING** [2] - 26:24, 27:2
**SWINGS** [6] - 72:19, 77:20, 79:13, 82:7, 88:13, 88:20
**SWORN** [4] - 7:23, 52:5, 59:2, 117:24
**SYMPTOMS** [1] - 77:19
**SYSTEM** [6] - 37:15, 67:3, 80:10, 85:20, 86:19, 103:24

---

**T**

**TABLE** [2] - 10:1, 10:4
**TAKING** [16] - 26:5, 26:25, 46:14, 46:16, 48:23, 48:25, 80:17, 80:21, 81:19, 82:2, 82:7, 82:9, 82:16, 83:8, 116:16, 120:19
**TAPE** [3] - 36:8, 42:18, 43:2
**TAPED** [1] - 42:17
**TAPERED** [2] - 70:10, 70:15
**TEAM** [1] - 30:14
**TECHNICAL** [2] - 118:20, 118:21
**TECHNOLOGY** [2] - 118:15, 119:9
**TEE** [1] - 133:9
**TEN** [2] - 82:15, 86:2
**TENURE** [1] - 119:6
**TERM** [5] - 88:11, 116:3, 133:22, 145:7, 145:8
**TERMINATE** [2] - 3:21, 147:20
**TERMINATED** [1] - 3:8
**TERMS** [3] - 62:21, 74:5, 82:8

TERRE [3] - 3:10,
4:17, 10:15
TERRIBLE [1] -
71:19
TEST [1] - 70:1
TESTIFIED [7] -
7:23, 54:3, 54:5, 57:7,
80:20, 82:23, 96:18
TESTIFY [10] - 54:8,
54:14, 54:16, 54:18,
58:8, 98:14, 98:17,
135:14, 138:2, 138:12
TESTIFYING [6] -
57:5, 69:4, 69:25,
77:4, 77:6, 90:21
TESTIMONY [15] -
3:17, 3:19, 3:23, 3:25,
4:5, 4:6, 39:21, 47:23,
57:11, 67:9, 96:4,
101:25, 128:8,
136:24, 138:19
TEXARKANA [3] -
59:22, 59:23, 60:2
TEXAS [3] - 59:11,
59:19, 59:20
TEXT [1] - 12:15
THERE [88] - 4:3,
4:20, 5:10, 9:18, 11:2,
11:13, 12:1, 12:5,
13:4, 17:21, 19:23,
23:9, 24:14, 24:20,
25:20, 26:2, 27:6,
27:13, 29:3, 29:11,
38:19, 42:5, 44:10,
46:14, 54:7, 55:20,
56:20, 59:12, 60:4,
60:6, 60:8, 60:22,
60:24, 61:1, 61:3,
61:16, 61:22, 62:15,
66:7, 75:7, 75:9,
75:17, 77:1, 78:18,
85:5, 85:8, 86:18,
87:1, 89:4, 91:6,
93:20, 93:25, 94:8,
95:17, 98:2, 98:3,
98:6, 98:10, 107:23,
109:14, 109:16,
109:22, 110:7, 113:6,
115:23, 115:25,
117:12, 117:13,
118:13, 118:19,
119:8, 120:11,
120:19, 122:7,
122:15, 123:2,
123:16, 124:19,
124:24, 126:22,
133:3, 134:7, 136:8,
137:18, 145:1, 146:14
THERE'S [2] - 89:11,
97:11

THEY'RE [1] - 71:17
THIRD [5] - 2:10,
64:6, 64:12, 94:2,
143:13
THOMPSON [10] -
3:25, 7:18, 7:19, 7:22,
15:1, 15:19, 44:7,
44:9, 50:6, 149:5
THOUGHTS [2] -
31:10, 61:24
THREATS [1] - 14:1
THREE [7] - 29:21,
34:3, 35:3, 81:14,
94:6, 119:8, 145:12
THREW [1] - 27:3
THROAT [1] - 134:2
THROUGHOUT [3] -
46:20, 55:21, 56:9
THUMBNAIL [1] -
11:11
THURSDAY [3] -
25:19, 29:17, 29:19
TIE [1] - 31:4
TIED [13] - 31:5,
31:11, 31:14, 31:16,
31:18, 32:20, 33:4,
33:5, 34:5, 34:20,
35:5, 36:3
TIGHT [3] - 31:18,
33:6, 35:13
TIRED [1] - 37:2
TITLED [1] - 140:16
TODAY [10] - 3:7,
4:21, 39:22, 52:14,
53:7, 53:25, 81:19,
92:23, 95:10, 128:8
TOENAIL [2] - 36:7,
36:10
TOGETHER [4] -
18:24, 42:17, 113:3,
114:21
TOMORROW [3] -
146:10, 147:2, 147:16
TONE [1] - 38:13
TOOK [14] - 4:2,
31:1, 31:5, 33:11,
33:12, 50:1, 63:20,
84:7, 106:7, 106:8,
119:18, 128:6,
131:13, 134:17
TOP [15] - 12:5,
12:12, 12:13, 13:12,
17:1, 17:21, 31:1,
41:14, 43:15, 43:16,
49:7, 76:20, 81:6,
84:15, 88:10
TORN [3] - 30:16,
40:24, 43:15
TORN-UP [2] -
30:16, 40:24

TOUCH [1] - 122:16
TOWARDS [3] -
78:15, 79:17, 126:20
TRACK [1] - 16:12
TRAINED [1] - 86:12
TRAINING [1] - 73:7
TRANSCRIPT [7] -
1:24, 54:7, 57:9,
98:16, 101:24,
101:25, 148:4
TRANSCRIPTION [1]
- 1:24
TRANSCRIPTS [4] -
91:3, 91:11, 91:24,
94:4
TRANSFERRED [7] -
60:5, 60:7, 60:10,
60:12, 69:6, 70:2,
97:7
TRAUMA [1] - 75:1
TRAVIS [23] - 2:8,
2:9, 4:13, 4:14, 5:14,
5:20, 6:17, 7:1, 7:4,
7:11, 34:16, 51:3,
108:14, 110:21,
115:4, 115:9, 115:21,
117:3, 117:5, 117:18,
147:17, 147:18,
149:16
TRAXLER [12] - 4:4,
8:21, 9:22, 10:8,
46:15, 120:11, 128:4,
132:13, 140:6,
142:11, 143:24,
144:18
TREATING [3] - 72:3,
72:17, 83:6
TRIAL [4] - 69:4,
82:23, 138:11, 138:17
TROUBLE [4] -
73:23, 84:4, 104:19,
116:16
TROUTMAN [7] -
9:24, 10:8, 15:5,
17:13, 17:15, 28:2,
30:5
TRUE [4] - 18:3,
71:13, 95:2, 111:21
TRUTH [1] - 90:3
TRUTHFUL [2] -
54:11, 57:11
TRUTHFULNESS [2]
- 137:9, 137:12
TRY [8] - 4:19, 17:24,
61:15, 76:13, 107:7,
110:15, 123:1, 136:19
TRYING [7] - 17:17,
32:25, 33:1, 66:12,
73:23, 95:6, 139:8
TUESDAY [3] - 1:8,

19:17, 25:7
TURKEY [3] - 70:11,
71:3, 71:6
TURN [3] - 36:1,
104:14, 141:18
TURNED [3] - 3:12,
104:22, 128:3
TURNING [1] - 91:11
TWICE [2] - 46:20,
47:18
TWITCHING [1] -
33:15
TWO [31] - 4:14,
4:20, 9:3, 18:24, 21:9,
25:20, 42:17, 53:14,
60:4, 60:16, 60:17,
75:8, 76:14, 87:6,
93:25, 94:6, 94:8,
94:9, 94:11, 94:18,
111:5, 111:23, 113:3,
116:6, 130:13,
130:14, 130:15,
133:2, 134:14, 140:13
TWO-AND-A-HALF
[1] - 60:4
TWO-MAN [2] - 9:3,
18:24
TWO-PAGE [1] -
53:14
TYING [1] - 31:20
TYPE [3] - 70:3,
70:18, 78:9
TYPED [1] - 5:5
TYPES [2] - 48:19,
104:2

## U

U.S [4] - 26:12,
26:15, 91:19, 135:6
UH [1] - 113:5
UH-HUM [1] - 113:5
ULTIMATELY [4] -
12:3, 14:13, 24:23,
43:12
UM [1] - 69:15
UM-HUM [1] - 69:15
UNABLE [1] - 19:6
UNDER [9] - 4:25,
33:21, 35:17, 49:8,
102:19, 106:1,
126:16, 127:16,
135:23
UNDERGARMENT
S [1] - 129:21
UNDERLYING [1] -
113:10
UNDERNEATH [5] -
85:5, 88:14, 124:6,
125:18, 127:6

UNDERSTANDING
S [1] - 62:21
UNDERSTOOD [6] -
14:10, 14:15, 15:19,
21:3, 22:4, 25:13
UNDERTOOK [3] -
9:2, 10:6, 14:9
UNDERWEAR [1] -
130:15
UNFORTUNATELY
[1] - 131:24
UNIDENTIFIED [1] -
28:1
UNIT [19] - 9:24,
15:5, 18:25, 20:5,
37:11, 61:22, 88:25,
92:5, 95:19, 96:12,
96:25, 97:10, 99:4,
109:7, 114:24,
114:25, 119:7, 135:6,
140:3
UNITED [12] - 1:1,
1:3, 1:16, 2:2, 3:5,
8:6, 52:3, 60:5, 87:10,
140:3, 145:16, 145:24
UNIVERSITY [3] -
59:18, 59:19, 59:20
UNLESS [2] - 5:16,
29:1
UP [51] - 5:5, 8:1,
8:6, 11:7, 12:5, 15:10,
16:25, 19:3, 23:2,
30:16, 31:4, 31:20,
32:24, 33:20, 34:12,
34:23, 35:9, 35:15,
35:18, 36:10, 36:12,
37:10, 40:20, 40:24,
46:7, 56:6, 57:4,
61:16, 76:13, 82:14,
83:5, 83:25, 85:24,
86:9, 96:3, 96:16,
102:1, 107:1, 107:8,
109:17, 110:3,
111:13, 112:5, 112:6,
115:24, 122:7,
128:15, 129:17,
133:3, 139:12
UPDATED [1] -
115:15
UPSET [2] - 63:18,
97:21
UPTAKE [1] - 71:14
USES [1] - 78:22
USP [14] - 12:13,
15:4, 15:5, 26:11,
60:2, 60:22, 61:9,
64:25, 69:7, 74:14,
80:7, 80:8, 80:11,
92:17
UTILIZED [3] - 41:9,

42:12, 42:18

## V

**VALIDITY** [2] - 137:13, 137:23
**VALLEY** [1] - 119:19
**VARIOUS** [2] - 48:18, 60:19
**VERACITY** [2] - 137:13, 137:23
**VERBAL** [1] - 19:18
**VERSUS** [5] - 3:5, 87:11, 103:7, 110:14, 116:11
**VIA** [2] - 29:20, 87:13
**VIALS** [1] - 134:14
**VICTIM** [1] - 121:2
**VIDEO** [14] - 3:6, 3:9, 3:20, 10:14, 39:11, 39:12, 39:19, 39:21, 43:3, 43:7, 43:10, 49:4, 87:13, 147:20
**VIDEOTAPE** [1] - 40:2
**VIEW** [1] - 53:12
**VIEWED** [3] - 24:21, 39:21, 116:11
**VIOLATE** [1] - 138:15
**VIOLATION** [1] - 22:6
**VIOLENT** [3] - 34:4, 35:4, 119:5
**VIRGINIA** [1] - 118:16
**VOICE** [2] - 107:1, 107:8
**VOLUNTARILY** [1] - 45:18
**VULNERABLE** [2] - 92:12, 97:4

## W

**WAFFENSCHMIDT** [1] - 2:9
**WAIST** [2] - 6:4, 6:18
**WAIT** [7] - 6:23, 58:21, 58:22, 79:2, 121:20, 122:19
**WAIVE** [1] - 45:11
**WAIVED** [2] - 44:21, 45:18
**WAIVER** [2] - 10:11, 13:21
**WALKED** [2] - 35:18, 44:11
**WALL** [3] - 31:13, 31:15, 40:11

**WANTS** [3] - 4:18, 30:9, 146:10
**WARRANTED** [1] - 75:13
**WASHED** [1] - 35:15
**WASHINGTON** [7] - 1:17, 2:4, 60:7, 60:11, 60:12, 60:15, 60:16
**WATCH** [1] - 63:3
**WATERS** [1] - 2:9
**WAYS** [1] - 89:6
**WEAK** [1] - 89:23
**WEAPON** [1] - 42:19
**WEARING** [2] - 40:4, 130:15
**WEAVER** [16] - 102:14, 102:16, 102:18, 102:25, 103:4, 103:5, 103:14, 104:14, 104:24, 106:17, 106:19, 107:15, 108:3, 108:23, 115:9, 149:14
**WEEK** [4] - 19:17, 21:25, 82:24, 135:12
**WEEKEND** [2] - 49:11, 97:22
**WEEKS** [2] - 21:9, 71:21
**WEIGHT** [2] - 138:6, 139:13
**WEST** [1] - 2:10
**WHIMPERING** [1] - 33:18
**WHITE** [5] - 1:19, 140:4, 140:23, 144:22, 148:10
**WHOLE** [3] - 27:4, 80:9, 96:17
**WHOSOEVER** [1] - 83:9
**WILLIAMSPORT** [7] - 2:11, 15:2, 57:5, 57:7, 119:4, 119:6, 119:16
**WILLING** [1] - 13:23
**WINDOW** [2] - 33:8, 43:19
**WISH** [2] - 13:2, 13:15
**WITHDRAW** [2] - 66:4, 110:22
**WITNESS** [47] - 27:25, 32:14, 32:16, 51:24, 51:25, 52:2, 52:5, 52:8, 55:15, 57:23, 57:25, 58:11, 59:1, 59:5, 76:6, 77:12, 79:7, 80:11, 81:1, 84:18, 84:23,

84:24, 87:23, 90:24, 92:8, 100:21, 100:23, 101:11, 101:12, 101:21, 102:12, 102:16, 103:21, 103:23, 107:3, 107:6, 107:9, 117:22, 117:23, 118:2, 120:14, 135:17, 138:1, 138:2, 142:10, 149:3
**WITNESSED** [4] - 15:1, 15:3, 18:9, 121:4
**WITNESSES** [5] - 58:20, 134:19, 134:21, 138:19, 147:4
**WONDERED** [1] - 77:20
**WORD** [2] - 29:24, 103:20
**WORDS** [4] - 3:17, 21:1, 27:12, 74:19
**WORKBOOK** [1] - 43:5
**WORKS** [1] - 58:17
**WORLD** [1] - 65:19
**WORN** [3] - 130:8, 130:12, 133:10
**WORTH** [2] - 59:11, 67:3
**WOW** [1] - 78:18
**WRIST** [13] - 31:17, 31:18, 31:19, 35:16, 122:6, 122:12, 122:23, 123:20, 124:13, 124:19, 125:1, 125:8
**WRITE** [4] - 12:2, 25:5, 46:11, 87:15
**WRITING** [4] - 15:14, 15:15, 137:14, 139:1
**WRITTEN** [2] - 19:18, 144:13
**WROTE** [8] - 15:10, 20:22, 21:11, 29:19, 66:7, 76:25, 85:8, 100:15

## X

**XANAX** [4] - 69:16, 70:10, 70:11, 71:3
**XS** [1] - 125:2

## Y

**YAGER** [25] - 20:24, 135:1, 135:2, 135:5, 135:8, 135:15,

135:16, 135:18, 135:25, 136:1, 136:6, 136:13, 136:25, 137:4, 137:12, 137:16, 137:22, 138:18, 139:20, 139:25, 140:9, 140:20, 142:1, 142:20, 144:6
**YAGER'S** [3] - 136:9, 136:20, 138:3
**YEAR** [1] - 61:4
**YEARS** [14] - 37:1, 37:16, 48:3, 60:4, 60:7, 60:9, 60:16, 60:17, 118:19, 118:23, 118:24, 119:4, 119:8, 119:14
**YESTERDAY** [12] - 3:8, 4:21, 5:1, 5:19, 6:3, 6:8, 8:1, 28:3, 47:24, 49:10, 103:5, 110:24
**YOURSELF** [1] - 97:18