UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF PENNSYLVANIA


UNITED STATES OF AMERICA          :   CRIMINAL NUMBER


V.


DAVID PAUL HAMMER                 :   4:96-CR-239


WEDNESDAY, 6-4-14
COURTROOM 16B
PHILADELPHIA, PA 19106


_____
BEFORE THE HONORABLE JOEL H. SLOMSKY, J.
_____

SENTENCING HEARING
DAY 3


_____

APPEARANCES:

JOHN C. GURGANUS, JR., ESQUIRE     FOR THE GOVERNMENT
UNITED STATES ATTORNEYS OFFICE
MIDDLE DISTRICT OF PENNSYLVANIA
235 N. WASHINGTON STREET, SUITE 311
PO BOX 309
SCRANTON, PA 18501


SUZANNE R. WHITE, RPR, FCRR, CM
OFFICIAL COURT REPORTER
FIRST FLOOR U. S. COURTHOUSE
601 MARKET STREET
PHILADELPHIA, PA 19106
(215)627-1882


PROCEEDINGS RECORDED BY STENOTYPE-COMPUTER,
TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

CONTINUED APPEARANCES:

AMANDA HAINES, ESQUIRE                    FOR THE GOVERNMENT
UNITED STATES DEPARTMENT OF JUSTICE
CRIMINAL DIVISION
CAPITAL CRIMES SECTION
1331 F. STREET, N.W.
WASHINGTON, D.C. 20530

ANNE SAUNDERS, ESQUIRE                    FOR THE DEFENDANT
FEDERAL PUBLIC DEFENDER
MIDDLE DISTRICT OF PENNSYLVANIA
100 CHESTNUT STREET, SUITE 300
HARRISBURG, PA 17101

RONALD C. TRAVIS, ESQUIRE                 FOR THE DEFENDANT
REIDERS, TRAVIS, HUMPHREY,
HARRIS, WATERS & WAFFENSCHMIDT
161 WEST THIRD STREET
PO BOX 215
WILLIAMSPORT, PA 17703-0215

JAMES MORENO, ESQUIRE                     FOR THE DEFENDANT
JAMES MCHUGH, ESQUIRE
FEDERAL COMMUNITY DEFENDER
EASTERN DISTRICT OF PENNSYLVANIA
SUITE 540 - THE CURTIS CENTER
PHILADELPHIA, PA 19106

(THE CLERK OPENS COURT.)

THE COURT:  PLEASE BE SEATED.

COUNSEL, I HAVE REVIEWED THE MOTIONS AND RESPONSES REGARDING THE INCIDENT AT LOMPOC AND I'M ENTERING AN ORDER.  I'M GOING TO ALLOW THAT TESTIMONY TO BE PRESENTED.  ALL RIGHT.

MR. GURGANUS:  THANK YOU, YOUR HONOR.

THE COURT:  SO WE WILL GIVE YOU A COPY OF OUR ORDER.

MR. TRAVIS:  YOUR HONOR --

THE COURT:  YES.

MR. TRAVIS:  -- BEFORE WE START WITH THE WITNESS, THE COURT LIKELY RECALLS THERE WAS A LOT OF QUESTIONING YESTERDAY ABOUT DISCIPLINARY SEGREGATION SENTENCES AND CONSECUTIVE AND CONCURRENT.

THE COURT:  BEFORE YOU CONTINUE, I JUST WANT THE RECORD TO NOTE THAT MR. HAMMER IS WITH US BY THE VIDEO CONFERENCE AND ALL COUNSEL ARE HERE.

MR. TRAVIS:  AND OVER THE EVENING WE LOCATED SOME DOCUMENTS THAT WE WILL PRESENT.  MARKED AS DEFENDANT'S EXHIBIT 9 IS A MEMO THAT WAS CREATED WITH RESPECT TO THE DISCIPLINARY HEARING OFFICER'S REPORT FROM THE FEBRUARY 1, 1996 HEARING, IMPOSING A 60-DAY SANCTION -- 60-DAY SENTENCE ON MR. MARTI FOR THE INCIDENT THAT WAS HEARD ON FEBRUARY 1, 1996.  AND THAT

IS MARKED DECEMBER -- EXCUSE ME, DEFENDANT'S 9.  MY UNDERSTANDING IS THAT THE GOVERNMENT HAS NO OBJECTION TO THE DOCUMENT.

MS. HAINES:  NO OBJECTION, YOUR HONOR.

MS. TRAVIS:  AND WE ALSO HAVE A DOCUMENT MARKED DEFENDANT'S EXHIBIT NUMBER 10.  IT'S FROM THE SAME DISCIPLINARY HEARING OFFICER.  THIS ONE IS DATED MARCH 21, 1996.  AND IT IS HIS MEMO CONCERNING THE HEARING THAT WAS CONDUCTED ON MARCH 21, 1996.  AND THAT IS THE SENTENCE THAT -- EXCUSE ME, THAT IS THE DISCIPLINARY HEARING WHERE MR. MARTI WAS PLACED ON DISCIPLINARY SEGREGATION STATUS FOR 21 DAYS.  AND IT INDICATES THAT THE 21-DAY SENTENCE IS TO BE CONSECUTIVE WITH ANY OTHER DISCIPLINARY SEGREGATION SANCTION CURRENTLY BEING SERVED AND GOES ON TO SAY HIS RELEASE DATE FROM THIS HOUSING STATUS IS APRIL 11, 1996.  AND AGAIN, MY UNDERSTANDING IS THAT THE --

THE COURT:  D 10 -- D 10?

MR. TRAVIS:  D 10.

THE COURT:  ALL RIGHT.  I HAVE D 9 --

MR. TRAVIS:  THE GOVERNMENT HAS NO OBJECTION, TO MY UNDERSTANDING.

THE COURT:  ALL RIGHT.  D 9 AND D 10 WILL BE ADMITTED.

MR. TRAVIS:  THANK YOU, YOUR HONOR.

(DEFENSE EXHIBIT NUMBERS D 9 AND D 10

ADMITTED INTO EVIDENCE.)

THE COURT:  SO AS I UNDERSTAND IT, THE DEFENSE POSITION IS THAT MR. MARTI SHOULD NOT HAVE BEEN HOUSED WITH MR. HAMMER FOR TWO REASONS.  ONE WAS THAT SOMEBODY FROM ADMINISTRATIVE SEGREGATION SHOULD NOT HAVE BEEN HOUSED WITH SOMEBODY FROM DISCIPLINARY SEGREGATION AND THE PSYCH SINGLE TESTIMONY.

MR. TRAVIS:  THAT'S CORRECT.

THE COURT:  ALL RIGHT.  OKAY.

MR. GURGANUS:  AND, YOUR HONOR, THE OTHER THING TO POINT OUT, THOUGH, IS THAT THAT DOCUMENT INDICATES THAT THE HOUSING STATUS -- THAT RELEASE FROM THAT HOUSING STATUS WAS 4/11/1996.  FOR WHATEVER REASON, THE RECORD SAID 4/11/1996, WHICH WAS TWO DAYS PRECEDING THE DEATH OF MR. MARTI.

THE COURT:  ALL RIGHT.  I SEE IT.

MS. HAINES:  THANK YOU, YOUR HONOR.

THE COURT:  ALL RIGHT.  DO YOU WANT TO CONTINUE?  WE ARE ON DIRECT, MISS HAINES.

MS. HAINES:  THANK YOU, YOUR HONOR.

SPECIAL AGENT ANTHONY S. MALOCU, PREVIOUSLY SWORN, RESUMES.

DIRECT EXAMINATION (CONTINUED)

BY MS. HAINES:

Q.        GOOD MORNING, AGENT.

A.        GOOD MORNING.

Q.        I BELIEVE THAT YESTERDAY WE LEFT OFF WITH GOVERNMENT EXHIBIT 36.1, 36.2, AND 36.3, WHICH I HAD JUST SHOWN TO DEFENSE COUNSEL.

                MS. HAINES:  MAY I APPROACH, YOUR HONOR?

                THE COURT:  YES.

BY MS. HAINES:

Q.        AGENT MALOCU, I'M GOING TO HAND YOU THAT EXHIBIT AGAIN, AND JUST REMIND US -- I'M SORRY.  I'M HANDING YOU THAT EXHIBIT AGAIN, AND IF YOU CAN JUST REMIND US WHAT THAT IS.

A.        THIS IS AN ENVELOPE AND LETTER THAT WAS SENT TO THE UNITED STATES ATTORNEY'S OFFICE IN WILLIAMSPORT FROM MATTHEW DARBY.

Q.        HOW DID YOU OBTAIN THAT LETTER?

A.        I RECEIVED IT FROM AUSA FRED MARTIN.

                MS. HAINES:  YOUR HONOR, WE WOULD SEEK TO INTRODUCE GOVERNMENT EXHIBIT 36.2 AND 36.3.

                THE COURT:  ALL RIGHT.  THOSE EXHIBITS, THERE IS NO OBJECTION, BUT THOSE EXHIBITS WILL BE ADMITTED UNDER THE SAME RULING, SUBJECT TO CONNECTION.

                MS. HAINES:  THANK YOU, YOUR HONOR.

                (GOVERNMENT EXHIBITS 36.2 AND 36.3 ADMITTED INTO EVIDENCE.)

BY MS. HAINES:

Q.      AND AGENT MALOCU, DO YOU RECALL WHEN IT WAS THAT YOU RECEIVED THE THREE KITES THAT ARE ALREADY IN EVIDENCE -- I'M SORRY, THE TWO KITES AND THE ONE SEVEN REASONS NOTE -- I'M SORRY, THE SEVEN REASONS NOTE YOU'VE ALREADY TESTIFIED TO.  DO YOU RECALL WHEN YOU RECEIVED THE KITES TO ROCK AND STEVE CLASSEN, THE DATE?

A.      YES, I RECEIVED ALL THREE ON THE SAME DAY.  IT WAS --

THE COURT:  I'M SORRY, FINISH YOUR ANSWER.  GO AHEAD.

THE WITNESS:  APRIL -- I BELIEVE APRIL 17TH.

BY MS. HAINES:

Q.      OF WHAT YEAR?

A.      OF 1996.

Q.      ALL RIGHT.

THE COURT:  NOW, YOU REFER TO A SEVEN REASONS NOTE.

MS. HAINES:  YES, YOUR HONOR.

BY MS. HAINES:

Q.      THE FIRST NOTE FROM MR. YAGER CALLED THE REASONS FOR KILLING MR. MARTI WAS RECEIVED ON WHAT DATE, AGENT?

A.      APRIL 17TH.

Q.      NOW, SIR, I WANT TO SHOW YOU WHAT HAS BEEN

MARKED AS GOVERNMENT EXHIBIT 30.

THE COURT:  BEFORE YOU GET TO THAT.  MY NOTES INDICATE THE YAGER EXHIBITS ARE G 32.1 AND G 32-2.

MS. HAINES:  CORRECT, YOUR HONOR.

THE COURT:  AND THEN G 32.1.  WHICH IS THE SEVEN REASONS NOTE?

MS. HAINES:  THE ORIGINAL IS 32.1.  THE MORE LEGIBLE COPY IS 32-2.

THE COURT:  ALL RIGHT.  I DON'T RECALL IT BEING REFERRED TO YESTERDAY AS THE SEVEN REASONS NOTE BUT --

THE WITNESS:  THAT IS HOW I TESTIFIED, SIR.  IT WAS TITLED ON THE TOP, SEVEN REASONS.

THE COURT:  ALL RIGHT.  OH, OKAY.

MS. HAINES:  MAY I PROCEED, YOUR HONOR?

THE COURT:  ALL RIGHT.  GIVEN THAT THAT -- THE WORD APPELLATION?

MS. HAINES:  THAT WORKS.

THE COURT:  OKAY.  ALL RIGHT.

BY MS. HAINES:

Q.    SIR, I'M GOING TO SHOW YOU WHAT HAS BEEN MARKED AS GOVERNMENT EXHIBIT 30, WHICH IS A BINDER.  AND I ASK YOU, DO YOU RECOGNIZE THE DOCUMENTS THAT ARE IN GOVERNMENT EXHIBIT 30?

A.    YES, I DO.

Q.      AND COULD YOU TELL US, AS PART OF YOUR PREPARATION FOR YOUR TESTIMONY, DID YOU PREPARE TRANSCRIPTIONS OF THE DOCUMENTS THAT WE HAVE NOW INTRODUCED INTO EVIDENCE?

A.      YES, I DID.

Q.      AND DID YOU ASCERTAIN WHETHER THOSE TRANSCRIPTIONS ARE TRUE AND CORRECT TO THE BEST OF YOUR ABILITY?

A.      YES.

Q.      ALL RIGHT.  AND IF YOU WOULD JUST FLIP THROUGH, OR MAYBE YOU HAVE, WHAT HAS BEEN MARKED R33 -- I'M SORRY, R32, R33.2, R35.2 AND R36.2.  ARE THOSE TRANSCRIPTIONS THAT CORRELATE TO THE GOVERNMENT EXHIBITS BY THOSE SAME -- MORE OR LESS SAME NUMBERS?

A.      YES, THEY ARE.

            MS. HAINES:  ALL RIGHT.  AT THIS TIME, YOUR HONOR, WE WOULD LIKE TO PUBLISH THE LETTERS AND HAVE AGENT MALOCU -- WELL, IT'S THE COURT'S PREFERENCE. HE CAN EITHER READ THE ENTIRE DOCUMENT OR HE CAN READ PARTS THAT ARE PERHAPS THE MOST RELEVANT PARTS.

            THE COURT:  I HAVE NO OBJECTION TO HIS READING THE RELEVANT PARTS.

            MS. HAINES:  AND LET ME HAVE -- WITH YOUR HONOR'S PERMISSION, I'M GOING TO DISTRIBUTE COPIES OF THE BINDER.

IF WE CAN PUBLISH 32-2.

BY MS. HAINES:

Q.        AND THIS IS THE FIRST TAB, IS THAT CORRECT, AGENT MALOCU?

A.        YES.

Q.        THAT IS BEING DISPLAYED ON THE SCREEN.  IS THAT BEING DISPLAYED ON THE SCREEN CURRENTLY?

A.        YES.  THAT'S THE COPY OF THE ORIGINAL LETTER.

Q.        AND IF YOU COULD TURN TO WHAT IS MARKED AS R32, WHICH IS THE TRANSCRIPTION.  AND I WOULD ASK YOU TO READ THIS INTO THE RECORD FOR US.

MR. MCHUGH:  AND, AGAIN, YOUR HONOR, THIS IS THE DOCUMENTS THAT WE HAVE MADE OUR ONGOING OBJECTION CONCERNING --

THE COURT:  RIGHT.  I NOTE THE OBJECTION AND, AGAIN, I HAVE ADMITTED IT SUBJECT TO AUTHENTICATION, CONNECTION.

THE WITNESS:  FROM THE VERY TOP.  REASONS FOR KILLING ANDREW H. MARTI, NUMBER 58008-065.

ONE, USP ALLENWOOD'S SIS FUCKED ME OVER BY FAILING TO GO THROUGH WITH THEIR INVESTIGATION INTO CORRUPT OFFICERS BRINGING DRUGS INTO THE PRISON.

NUMBER TWO, MARTI AND HIS CLIQUE DISRESPECTED ME AND MADE THREATS AGAINST ME WHEN I FIRST ARRIVED HERE.

THREE, MARTI HAD A BOUNTY ON HIS HEAD FOR HIS ALLEGED ASSISTANCE WITH JURY OF THE SIS INTO GANG ACTIVITY.

FOUR, I WANT TO MAKE A STATEMENT TO THESE PRISON OFFICIALS THAT THEY CANNOT TREAT ME LIKE AN ANIMAL AND EXPECT ME TO ACT LIKE A HUMAN.

FIVE, I DO NOT FEAR THE DEATH PENALTY OR ANYTHING ELSE THE GOVERNMENT CAN DO TO ME.

SIX, HUMAN LIFE HOLDS VERY LITTLE MEANING FOR ME AND ANYONE CAN KILL OR BE KILLED.

SEVEN, GIVEN THE OPPORTUNITY, I WILL KILL AGAIN.

DATED 4/17/96, DAVID HAMMER.

BY MS. HAINES:

Q.     THANK YOU.

NOW IF WE COULD MOVE TO THE NEXT TAB, WHICH I BELIEVE IS 33.2, AND THE TRANSCRIPTION IS MARKED AS R33.2.

AGENT MALOCU, I WOULD DIRECT YOUR ATTENTION -- ARE YOU ON THAT PAGE?

A.     YES.

Q.     AND IF WE COULD PUBLISH R33.2.

I WOULD DIRECT YOUR ATTENTION, SIR, TO THE MIDDLE PARAGRAPH, WHICH BEGINS, YOU'RE RIGHT, AND ASK THAT YOU JUST READ THAT PARAGRAPH INTO THE RECORD.

A.       YOU'RE RIGHT.  I HAD PLENTY OF PROBLEMS BEFORE I KILLED MARTI AND HIS DEATH WILL ONLY ADD TO THEM.  AND ONE THING IS FOR CERTAIN, I DID NOT HAVE ANY RIGHT TO TAKE HIS LIFE.  BUT THE OBVIOUS PART IS I DID SO.  I NEVER HAD ANY THOUGHTS OR INTENTIONS OF GETTING AWAY WITH MURDERING HIM, NOR OF ESCAPING JUSTICE.  I WILL PAY FOR WHAT I HAVE DONE, WHETHER IT BE BY SPENDING YEARS MORE IN PRISON OR WITH MY OWN LIFE.  I WILL PAY.  MY DECISION WAS MADE AFTER CAREFUL THOUGHT AND CONSIDERATION.  I CAN'T CHANGE ANYTHING, AND LIKELY WOULDN'T, EVEN IF I COULD.  I HATE THAT ANDREW MARTI WAS SACRIFICED FOR MY OWN CAUSE.  HIS PAST DIDN'T AFFECT ME, BUT HE IS FREE NOW, FAR AWAY FROM THESE PRISON WALLS.  I FEEL FOR HIS FAMILY AND WHAT THEY ARE SUFFERING NOW BECAUSE OF ME, SO I HAVE MUCH TO BE JUDGED FOR.

Q.       THANK YOU, AGENT.  WHO IS THIS LETTER SIGNED BY?

A.       TIL LATER, W.R. DAVID HAMMER.

Q.       NOW I WOULD LIKE YOU TO TURN TO THE NEXT TAB, WHICH IS 35, AND THE LETTER WHICH IS IN EVIDENCE AS 35.2 TO STEVE CLASSEN.  THE TRANSCRIPT IS MARKED AS R35.2. IF WE COULD PUBLISH 35.2 -- R35.2.

         AND AGENT, I WOULD DIRECT YOU TO THE PARAGRAPH THAT BEGINS STEVE, AND ASK YOU TO READ THAT PARAGRAPH INTO THE RECORD, PLEASE.

A.       STEVE, I DON'T CARE WHAT YOU SAY TO THE FBI OR

SIS.  THERE ISN'T ANYTHING THAT CAN HURT ME BECAUSE THEIR CASE IS PRETTY OPEN AND SHUT.  I'M SURE YOU WERE SURPRISED TO LEARN THAT I'D DONE WHAT I TOLD YOU I WAS GOING TO WITH MARTI.  HE'S IN A FAR BETTER PLACE THAN THIS NOW.  HE IS FAR, FAR AWAY FROM THESE PRISON WALLS.  THANKFULLY, HE DIDN'T SUFFER.  JUST WENT AWAY PEACEFULLY.  I GRIEVE FOR HIS FAMILY BECAUSE THEY LOVED HIM.  IN DEATH MARTI FACES NOT THE END, BUT RATHER A NEW BEGINNING.

Q.    AND IS THIS LETTER DATED?

A.    YES.  AT THE VERY TOP RIGHT, SUNDAY MORNING, 4/14/96.

Q.    AND IS THERE A SIGNATURE?

A.    YOUR FRIEND, DAVID HAMMER.  AD 120 IS WRITTEN ON THE LOWER RIGHT.

Q.    AND FINALLY, AGENT MALOCU, I WOULD ASK THAT YOU TURN TO 36.  THE ACTUAL EXHIBIT IS 36-3, THE LETTER TO DARBY.  AND IF WE COULD PUBLISH R36-3 AND READ THE TRANSCRIPT.  THIS ONE, THE ENTIRE TRANSCRIPT, PLEASE, WHICH IS MARKED AS R36.2.

A.    DARBY, I WOULDN'T MIND HELPING YOU OUT IF I CAN.  ALL I ASK IS THAT YOU TELL THE TRUTH ABOUT MARTI BEING HIV POSITIVE, AS TO WHY HE WAS KILLED.  THEY ARE ASSUMING AND ATTEMPTING TO PROVE THAT I DID IT FOR MONEY BECAUSE OF THE HIT THAT THE HISPANIC GANG MEMBERS HAD

OUT ON HIM.  I'VE NEVER TOLD ANY OFFICIALS WHY I DID IT OR IF I REALLY DID IT.  MY STATEMENT AFTER HIS BODY WAS FOUND WAS MADE UNDER DURESS, AND IS FULL OF LIES.  THE U.S. ATTORNEY IS TRYING TO KILL ME BUT I DON'T FEEL I DESERVE A DEATH SENTENCE.  MARTI WANTED TO DIE, OR AT LEAST HE SAID HE DID.  MAYBE I DO DESERVE THE DEATH PENALTY.  I GUESS A JURY WILL DECIDE THAT.  I'M NOT AFRAID TO DIE, AND AT TIMES, I FEEL BEING DEAD WOULD BE BETTER THAN SPENDING THE REST OF MY LIFE IN PRISON.  THE FACT IS MARTI IS DEAD.  NOTHING IS GOING TO BRING HIM BACK.

IF YOU FEEL YOU MUST TELL WHOEVER WHAT YOU KNOW AND WHY I KILLED MARTI, THEN SO BE IT.  YOU ARE NOT THE ONLY ONE.  IF ANYONE TELLS THE TRUTH THEN I HAVE NO COMPLAINT.  IT'S ALL OF THE LIES AND RUMORS I'VE HEARD THAT PISS ME OFF.  TAKE IT EASY.  THANKS FOR YOUR CONCERN.  DAVID HAMMER.

Q.    THANK YOU.

NOW, AGENT, I WANT TO TURN TO ANOTHER SET OF GOVERNMENT EXHIBITS WHICH HAVE BEEN MARKED 51, 52, 53, 54 AND 55.  IF I CAN HAND THOSE UP TO YOU.

DO YOU RECOGNIZE GOVERNMENT'S EXHIBITS 51 THROUGH 55?

A.    YES, I DO.

Q.    CAN YOU TELL US WHAT THEY ARE?

A.     THESE ARE LETTERS THAT WERE BEING SENT OUT OF THE PRISON AND WERE COPIED BY PRISON OFFICIALS.

Q.     DO YOU RECALL WHICH PRISON -- DID THOSE COME INTO YOUR POSSESSION AT SOME POINT IN TIME?

A.     YES.  I WENT DOWN TO THE UNITED STATES PENITENTIARY ALLENWOOD AND COLLECTED THEM.

Q.     DO YOU RECALL WHO YOU COLLECTED THEM FROM?

A.     I BELIEVE IT WAS LIEUTENANT SANTOS, ONE OF THE SIS INVESTIGATORS.

Q.     AND YOU SAID THESE LETTERS ARE BEING COLLECTED. DO YOU HAVE KNOWLEDGE OF HOW THEY WERE BEING COLLECTED BY THE PRISON OFFICIALS?

A.     YES.  INMATE HAMMER WAS ON MAIL MONITORING AT THE TIME, SO ALL OF HIS MAIL WAS BEING COPIED AND THEN SENT ON ITS WAY TO ITS -- WHOEVER THEY WERE ADDRESSED TO.

Q.     NOW, ARE THESE DOCUMENTS PHOTOCOPIES OF THE LETTER OR ORIGINAL LETTERS?

A.     PHOTOCOPIES.

Q.     AND WHY ARE THEY PHOTOCOPIES AS OPPOSED TO THE ORIGINALS?

A.     BECAUSE IN THE MAIL MONITORING PROCESS, THE INSTITUTION OFFICIALS COPIED THEM, PUT THE LETTERS BACK IN THE ENVELOPES AND SENT THEM ON THEIR WAY.

Q.     NOW, AS PART OF YOUR PREPARATION FOR YOUR

TESTIMONY, DID YOU ALSO TRANSCRIBE THESE LETTERS?

A.      YES.

Q.      AND ARE THEY ALSO PART OF THE GOVERNMENT EXHIBIT BINDER, WHICH IS 30?

A.      YES.

MS. HAINES:  SO YOUR HONOR, WE WOULD LIKE TO INTRODUCE 51 THROUGH 55, AND READ THE TRANSCRIPTS THAT PERTAIN TO THEM.

THE COURT:  HEARING NO OBJECTION, G 51 THROUGH 55 WILL BE RECEIVED IN EVIDENCE, AND YOU MAY READ THE RELEVANT PORTIONS.

MS. HAINES:  THANK YOU, YOUR HONOR.

(GOVERNMENT EXHIBITS G 51 THROUGH G 55 ADMITTED INTO EVIDENCE.)

BY MS. HAINES:

Q.      AGENT MALOCU, GOING BACK TO THE BINDER, GOVERNMENT EXHIBIT 51 -- IF WE COULD PUBLISH THAT, THE TRANSCRIPT AS R51.  I'M GOING TO ASK YOU TO READ THE ENTIRE LETTER TO BRAD INTO THE RECORD, PLEASE.

A.      PAGE ONE, SUNDAY, APRIL 14TH, 1996.  BRAD, HOW ARE YOU DOING, MY FRIEND AND BROTHER?  AS FOR ME I'M OKAY, ALL THINGS CONSIDERED.  HAVE HAD A RATHER EVENTFUL PAST FEW DAYS.  I HAVE NO WAY TO TELL YOU ABOUT MY CURRENT SITUATION OTHER THAN DIRECT AND TO THE POINT.  I AM CHARGED WITH KILLING MY CELLMATE ON EARLY SATURDAY

MORNING, 4/13/96.  THEY BROUGHT ME AN INCIDENT REPORT EARLIER TODAY STATING THAT HE WAS ESCORTED TO A LOCAL HOSPITAL WHERE HE WAS PRONOUNCED DEAD ON ARRIVAL.  THE CASE HAS BEEN TURNED OVER TO THE FBI FOR INVESTIGATION.  IT'S ONLY A MATTER OF TIME UNTIL I'LL BE INDICTED AND TRIED FOR MURDER.  I CAN'T GO INTO THE DETAILS RIGHT NOW BUT EVENTUALLY I WILL.  I'M AS OKAY AS I CAN BE UNDER THESE CIRCUMSTANCES.  I WON'T TELL YOU NOT TO WORRY BECAUSE I KNOW IT WOULDN'T DO ANY GOOD.  I WAS HAPPY TO RECEIVE YOUR LETTER OF EASTER SUNDAY THIS PAST FRIDAY.  IT'S ALWAYS GOOD TO HEAR FROM YOU.  I HOPE YOU CAN START WRITING REGULARLY AGAIN.  MY LETTERS TO YOU MAY BE LESS FREQUENT AND NOT AS LONG FOR A WHILE AS I HAVE MUCH TO DEAL WITH ON MANY DIFFERENT LEVELS.

I AM VERY SADDENED BY THE PATH I HAVE BEEN FORCED TO TAKE, AND IN THE END JUDGMENT WILL BE HARSH.  NEVERTHELESS, ALL I CAN DO IS MAKE THE BEST OF THE SITUATION.  BROTHER, I KNOW THIS WILL BE VERY DIFFICULT ON YOU AND SAM.  FOR THAT I AM SORRY.  JUST KNOW THAT I LOVE AND MISS YOU BOTH WITH ALL OF MY HEART.

TO BE HONEST, I'M NOT MUCH IN THE MOOD FOR WRITING AND I HAVE TOO MANY THINGS ON MY MIND WHICH PREVENTS ME FROM THINKING CLEARLY.  SO DON'T THINK IT'S BECAUSE I DON'T WANT TO WRITE YOU AS NOTHING COULD BE FURTHER FROM THE TRUTH.  I WILL WRITE AGAIN BEFORE TOO

LONG.  UNTIL THEN STAY STRONG.  TAKE CARE OF SAM AND J.D.  THEY NEED YOU.  WE ALL DO.  SO WITH THAT IN MIND, I'M GOING TO GO FOR NOW.  TAKE CARE AND WRITE TO ME WHEN YOU CAN.  LOVE, YOUR BROTHER DAVID.

Q.     AND AGENT, BASED ON YOUR INVESTIGATION, DO YOU KNOW WHO BRADLEY YOUNG HAMMER IS?

A.     YES, THAT'S BRADLEY HOSSELKUS, AT THE TIME WAS -- HE HAD BEEN HOUSED AS A CELLMATE WITH INMATE HAMMER AT THE UNITED STATES PENITENTIARY IN ALLENWOOD AND AT THIS TIME WAS BEING HOUSED IN, I BELIEVE, A STATE FACILITY.

Q.     NOW, I WOULD LIKE YOU TO TURN TO THE NEXT TAB, WHICH IS GOVERNMENT EXHIBIT 52, IF WE COULD PUBLISH THAT, AND THE TRANSCRIPT IS AT R52.  AND I'M GOING TO DIRECT YOU TO CERTAIN PARTS OF THIS.  NOW, THIS LETTER IS WRITTEN TO JESSICA BREWER.  DO YOU KNOW WHO JESSICA BREWER IS?

A.     JESSICA BREWER WAS A LONG-TIME FRIEND OF MR. HAMMER'S.

Q.     AND WHAT IS THE DATE OF THIS LETTER?

A.     SUNDAY EVENING, APRIL 14, 1996.

Q.     SO I WOULD LIKE YOU TO BEGIN AND FOR US JUST READ THE PARAGRAPH THAT SAYS, BY NOW, THE SECOND PARAGRAPH.

A.     BY NOW, YOU MAY HAVE ALREADY HEARD THAT I AM

GOING TO BE CHARGED WITH OR INDICTED FOR THE MURDER OF MY CELLMATE.  I CAN'T REALLY GO INTO ANY DETAILS RIGHT NOW, OTHER THAN TO SAY I'M SORRY THAT THINGS HAD TO HAPPEN THE WAY THEY DID.  THIS PATH CAN ONLY LEAD TO MORE DARKNESS OR DEATH.  BUT I'VE FACED OVERWHELMING ODDS MOST OF MY LIFE, SO I'M NOT GOING TO DWELL ON IT. I LOVE THE EASTER CARD YOU SENT AND YOUR LATEST PACKAGE OF BOOKS ALSO ARRIVED LAST WEEK.  THANK YOU FOR SENDING THEM.

Q.      NOW, SIR, IF YOU COULD GO TO THE BOTTOM AND START WITH THE FOURTH PARAGRAPH WHICH BEGINS, THE FBI?

A.      THE FBI IS INVESTIGATING.  MY CELLMATE'S NAME WAS ANDREW MARTI.  HE WAS 27 FROM STOCKTON, CALIFORNIA, AND THE INCIDENT REPORT SAYS THAT I STRANGLED HIM WITH MY ARMS, THAT HE WAS ESCORTED TO A LOCAL HOSPITAL WHERE HE WAS PRONOUNCED DEAD.  THIS IS ALLEGED TO HAVE HAPPENED AT APPROXIMATELY 2:30 A.M. ON 4/13/96, HERE AT THE UNITED STATES PENITENTIARY ALLENWOOD IN WHITE DEER, PA.  THE SPECIAL INVESTIGATION SECTION LIEUTENANT WHO CONCLUDED HIS INVESTIGATION ON 4/14/96 AT 9:00 A.M. IS FRANK SANTOS, SIS LIEUTENANT.  YOU MAY WANT TO PASS ALONG THIS INFORMATION TO JAMES BEATTY, AT THE PLACE WHERE DON LUCK USED TO BE IN MCALLISTER.  HE LIKELY ALREADY KNOWS BUT I'M NOT REAL SURE.

Q.      AND THEN FINALLY THE PARAGRAPH THAT BEGINS WITH,

MOM.

A.      MOM, PLEASE PRAY FOR ANDREW AND HIS FAMILY.  I CANNOT UNDO WHAT HAS BEEN DONE AND WILL HAVE TO PAY FOR MY DEEDS.  I CAN DO THAT BUT ANDREW'S FAMILY WILL SUFFER FAR WORSE THAN I EVER WILL.  EVEN IN DEATH.

Q.      AND HOW IS THIS LETTER SIGNED?

A.      LOVE YOUR SON, DAVID.

Q.      ALL RIGHT.  NOW IF YOU WOULD GO TO THE NEXT TAB, GOVERNMENT EXHIBIT 53, ANOTHER LETTER TO JESSICA BREWER, AND THE TRANSCRIPT, WHICH IS R53.  I WOULD LIKE YOU TO BEGIN READING WITH THE SECOND PARAGRAPH ON THE FIRST PAGE THAT SAYS, MOM.  BUT CAN YOU START OFF BY TELLING US WHAT THE DATE IS.

A.      FRIDAY, APRIL 19TH OF 1996.

Q.      ALL RIGHT.  AND IF YOU COULD READ THE PARAGRAPH MOM TO THE END.

A.      MOM, I KNOW ALL OF THIS IS HARD ON YOU BUT TRY NOT TO WORRY ABOUT ME BECAUSE I AM OKAY.  THINGS WILL WORK OUT FOR THE BEST.  I KNOW IT ISN'T EASY FOR YOU OR ANYONE ELSE TO UNDERSTAND MY BEHAVIOR.  HELL, AT TIMES I DON'T EVEN UNDERSTAND IT MYSELF.  I DON'T KNOW HOW LONG IT WILL BE UNTIL I AM INDICTED.  THAT'S UP TO THE U.S. ATTORNEY'S OFFICE.  AS FAR AS I KNOW, THE FBI IS STILL CONTINUING WITH THEIR INVESTIGATION.  THINGS MOVE SLOW WHILE THEY ARE GATHERING ALL THE EVIDENCE THEY CAN TO

CONVICT ON ME OF THESE TYPE OF CASES.

I WENT TO THE LAW LIBRARY YESTERDAY FOR A COUPLE OF HOURS, RESEARCHED TO SEE EXACTLY WHAT I CAN BE INDICTED FOR, ET CETERA.  IT'S NOT GOOD NEWS, BUT THEN I KNEW WELL IN ADVANCE WHAT THE POSSIBILITIES WERE.

BEFORE I FORGET, HERE'S MY NEW ADDRESS.  THE PHONE NUMBER HERE IS 717-547-7950.  DAVID HAMMER. 24507-077/SHU, FCI/ALLENWOOD, P.O. BOX 2000, WHITE DEER, PA 17887-2000.

Q.    THANK YOU, AGENT.

AND THEN TURNING TO THE NEXT TAB, GOVERNMENT EXHIBIT 54, IF WE CAN PUBLISH THAT.  THE TRANSCRIPT BEING R54.

SIR, THIS IS A LETTER, IT APPEARS TO BE ADDRESSED TO SAM YOUNG.  BASED ON YOUR INVESTIGATION, WHO WAS MR. YOUNG?

A.    SAM YOUNG IS A CLOSE FRIEND OF MR. HAMMER'S. SAM HAD REPLIED TO AN ADVERTISEMENT THAT MR. HAMMER HAD PUT IN THE ADVOCATE MAGAZINE.  MR. HAMMER HAD PLACED AN AD IN THE ADVOCATE MAGAZINE AND SAM HAD REPLIED TO IT.

Q.    WHAT KIND OF MAGAZINE IS THE ADVOCATE?

A.    IT'S A GAY AND LESBIAN MAGAZINE.

Q.    NOW, UNFORTUNATELY FOR YOU, I WOULD LIKE YOU TO READ THIS ENTIRE LETTER INTO THE RECORD.  IF YOU CAN BEGIN WITH THE DATE, AND THE SALUTATION DEAR SAM.

A.          PAGE ONE, SATURDAY NIGHT, APRIL 13TH, 1996.

DEAR SAM, THIS IS A RATHER HARD LETTER FOR ME TO WRITE BECAUSE I'M VERY UNCERTAIN OF WHAT TO SAY OR HOW I CAN ADEQUATELY DESCRIBE ALL OF WHAT'S INSIDE OF ME.  I HAVE FEELINGS OF RAGE, ANGER, FRUSTRATION, SORROW AND OTHERS THAT I CAN'T EVEN NAME.  THE EVENTS OF THE PAST 24 HOURS HAVE TAKEN A TOLL ON ME PHYSICALLY AND EMOTIONALLY.  I CAN NEVER SHARE WITH ANYONE ALL THAT IS INVOLVED IN MY THOUGHT PROCESS, OR HOW IT IS THAT MY BEHAVIOR IS DICTATED BY THE ANTISOCIAL CONCEPTS I SEEM TO HAVE.

THE TAKING OF A HUMAN LIFE IS WRONG, IT'S ILLEGAL AND CAN ALMOST NEVER BE JUSTIFIED.  I HAVE NO INTENTIONS OF EVER TRYING TO DO SO.  I HAVE A BLACK SIDE OF MY PERSONALITY WHICH I'VE MENTIONED TO YOU PREVIOUSLY IN OUR WRITTEN AND VERBAL CONVERSATIONS.  I AM ABLE TO PUT ASIDE THE COMPASSIONS ONE NORMALLY FEELS.  THIS CAUSES ME TO ACT AND/OR REACT IN WAYS THAT ARE FAR OUTSIDE THOSE WHICH ARE ACCEPTABLE IN A POLITE SOCIETY.  HAVING SAID ALL OF THAT, I KNOW YOU HAVE LOTS OF QUESTIONS AND I WILL ANSWER THEM FOR YOU, JUST ASK.  I'LL TELL YOU HOW, WHEN AND WHERE BUT THE WHY I CANNOT DISCLOSE.  IT'S PERSONAL BETWEEN ME AND MARTI.

HE'S GONE NOW AFTER ONLY 27 YEARS OF LIFE.  IF ONE SUBSCRIBES TO RELIGIOUS THEORY, THEN HE HAS PASSED TO A BETTER PLACE THAN THIS.  DID I HAVE A

RIGHT TO TAKE HIS LIFE?  ABSOLUTELY NOT.  NO ONE HAD SUCH A RIGHT.  DO I FEEL REMORSE?  YES AND NO.  I FEEL SORRY FOR THE PAIN I HAVE INFLICTED UPON HIS FAMILY. I'M ASHAMED OF THE GRIEF I'VE CAUSED THEM AND NO DOUBT THEY WILL HATE ME UNTIL THE END OF TIME AND THIS TOO IS AS IT SHOULD BE.  IT'S NOTHING NEW FOR ME TO BE HATED BECAUSE I'VE EXPERIENCED THIS THROUGHOUT MY LIFETIME.

AS FOR ANDREW, HE IS FREE NOW, ALL OF HIS PROBLEMS ARE GONE.  HIS FEARS, TOO, ARE GONE.  HE NOW SOARS FAR ABOVE AND BEYOND THESE PRISON WALLS.  DID I HATE ANDREW?  NO WAY.  I HATED SOME OF WHAT HE REPRESENTED, BUT ANDREW WAS A SIMPLE BUT YET COMPLEX PERSON.  HE TRUSTED ME TOO MUCH WAY TOO SOON BUT HE OPENED UP AND SHOWED ME THE HURTING YOUNG BOY THAT WAS INSIDE OF HIM.  HE AND I SHARED A SIMILAR BACKGROUND IN SOME RESPECTS.  HIS GANG BANGING DAYS GAVE HIM A SENSE OF POWER HE HAD NEVER KNOWN BEFORE AND HE LIVED AND BREATHED THOSE MEMORIES OVER AND OVER.

HIS ONLY THOUGHTS OF THE FUTURE WERE DIRECTED TOWARDS THESE THINGS.  MORE DRIVE-BY SHOOTINGS, MORE DOPE DEALS, MORE GUNS.  PRISON DID NOTHING BUT TO REINFORCE THESE IDEAS AND VALUES FOR HIM.  IT'S VERY SAD THAT HE IS NO LONGER ALIVE.  IT'S SAD BECAUSE YEARS AGO HE COULD HAVE BEEN SAVED.  NOW HIS LIFE HAS ENDED TRAGICALLY, NOT BY THE BULLETS THAT WERE FIRED INTO HIS

BODY BUT RATHER AT THE HANDS OF A MONSTER WHO CAN KILL FOR NO APPARENT REASON.

THEN WHY DID I BURST OUT CRYING A LITTLE WHILE AGO WHILE REMEMBERING HIS LAST WORDS TO ME, NO, PLEASE NO.  WHY DIDN'T THOSE WORDS AFFECT ME WHEN IT STILL COUNTED FOR HIM.  IT'S TOO LATE FOR ME, AND IT'S BEEN TOO LATE FOR A LONG TIME.  SOMEWHERE ALONG THE LINE I WENT REAL, REAL WRONG.  I STOPPED CARING ABOUT PEOPLE IN GENERAL AND WHILE THERE ARE MANY, MANY ASPECTS TO ME AND WHO I AM, BASICALLY I'M NO GOOD FOR ANYONE.  THE TRUTH HAS NEVER BEEN MORE APPARENT TO ME THAN IT IS NOW. THE ONLY QUESTION I HAVE LEFT TO ANSWER IS WHY. HOPEFULLY BEFORE I DIE, I WILL FIND THE ANSWER.

THIS LETTER WILL LIKELY CAUSE YOU TO HAVE MORE QUESTIONS THAN ANSWERS.  SAM, I AM THANKFUL FOR YOU AND YOUR LOVE.  I'VE NEVER FELT WORTHY OF THE KIND OF LOVE AND FRIENDSHIP YOU AND BRAD GIVE ME.  I AM TERRIBLY SORRY FOR THE HURT AND PAIN I CAUSE YOU ALL BECAUSE OF MY ACTIONS.  IF THE TWO OF YOU SHOULD DECIDE TO SHUT ME OUT OF YOUR LIVES, I CAN AND WILL UNDERSTAND.

SUNDAY MORNING, 4/14/96.

I'M BACK AND RESTED SOME, HAD A RESTLESS NIGHT BUT SLEEP FINALLY CAME.  THINK IT WAS DUE TO EXHAUSTION.  I JUST REREAD THE FIRST PARTS OF THIS LETTER AND I'M UNCERTAIN ABOUT SENDING IT, BUT NOTHING

HAS CHANGED AS FAR AS MY FEELINGS, SO EVEN THOUGH THE FBI WILL GET A COPY OF THIS LETTER, I AM SENDING IT. I'M NOT GOING TO HIDE THINGS OUT OF FEAR THEY WILL USE IT AGAINST ME.

I SAW CHAPLAIN COOK AND DR. KARTEN, THE CHIEF PSYCHOLOGIST, YESTERDAY.  THEY WERE NICE TO ME AND EXPRESSED SORROW IN HOW AND WHY THINGS HAD HAPPENED. MOST EVERYONE SAID THEY WERE SORRY FOR ANDREW AND FOR ME.  THE QUESTION THAT KEEPS GOING THROUGH MY MIND IS WHY DIDN'T THEY CARE BEFORE SOMEONE DIED?  WHY DIDN'T THEY SHOW IT IF THEY DID CARE.

YOU CANNOT TREAT PEOPLE LIKE ANIMALS AND EXPECT THEM TO ACT LIKE HUMANS.  ANYONE CAN KILL OR BE KILLED UNDER THE RIGHT CIRCUMSTANCES.  IT TAKES A GREAT DEAL OUT OF YOU TO MURDER ANOTHER HUMAN BEING WITH YOUR OWN HANDS USING NO WEAPON OTHER THAN HARNESSED HATE AND ANGER FOR ONE'S CAPTORS.  I'M ONCE AGAIN REMINDED OF WHAT WILLIAM SHAKESPEARE WROTE ABOUT ALL THE WORLD BEING A STAGE, ET CETERA.

OUTSIDE IT APPEARS THAT SPRING HAS FINALLY ARRIVED, THE SUN IS SHINING AND TIME GOES ON AS IF NOTHING HAS CHANGED, BUT FOR ME, LIFE HAS CHANGED AND THINGS ARE NEITHER WORSE OR BETTER.  THEY JUST ARE.

I'M GOING TO STOP AND MAIL THIS LETTER REALLY DON'T FEEL MUCH LIKE TALKING.  I HAVE MUCH TO

DEAL WITH.  JUST KNOW THAT I LOVE AND MISS YOU, PLEASE DO GIVE MY LOVE TO BRAD, TELL HIM TO STAY STRONG, GIVE J.D. A HUG FOR ME AND SAM, PLEASE -- AND SAM, PLEASE PRAY FOR ANDREW'S FAMILY ASK GOD TO SOMEHOW COMFORT THEM IN THESE TRYING TIMES, PRAY ALSO FOR ANDREW EVEN THOUGH HE IS GONE FROM THIS WORLD.  WRITE TO ME WHEN YOU CAN, I MISS YOU AND WHAT'S GOOD IN THE WORLD.  LOVE, DAVID.

Q.    AND FINALLY, AGENT MALOCU, IF WE COULD TURN TO THE LAST TAB WHICH IS GOVERNMENT EXHIBIT 55.

I'M JUST GOING TO ASK YOU TO READ A FEW PARAGRAPHS OF THIS.  AND THIS IS ANOTHER LETTER TO SAM. IF YOU WOULD READ THE FIRST PARAGRAPH FOR US ON PAGE ONE.

A.    FIRST PARAGRAPH?

Q.    YES, SIR, AND THE GREETING AND DATE.

A.    DATE, FRIDAY EVENING, APRIL 19TH, 1996.  DEAR SAM, I TRUST THIS LETTER WILL FIND YOU DOING WELL.  AS FOR ME I AM ALL RIGHT.  HAVE HAD SOME BETTER DAYS AND SOME WORSE ONES TOO.  BY NOW, HOPEFULLY, YOU HAVE HEARD THAT I AM NO LONGER AT THE USP ALLENWOOD.  ON WEDNESDAY SHORTLY AFTER OUR PHONE CONVERSATIONS I WAS CHAINED UP AND BROUGHT ACROSS THE ROAD TO THE FCI.  I AM BEING HELD IN AN ISOLATION CELL HERE ON THE SPECIAL HOUSING UNIT, THE CELL IS BASICALLY THE SAME EXCEPT MY BUNK IS A CONCRETE SLAB, LIKE IN OKLAHOMA, AND I HAVE A 3 BY 4

WINDOW SO I CAN SEE TO THE NORTH.  IT'S SO NICE TO SEE THE TREES, MOUNTAINS, BIRDS, DUCKS, DEER, GREEN GRASS. ONLY FENCES, NO WALLS TO OBSTRUCT THE VIEW.

Q.      AND THEN IF YOU COULD READ THE THIRD PARAGRAPH, BEGINNING WITH, I HAVEN'T BEEN ALLOWED TO?

A.      I HAVEN'T BEEN ALLOWED TO PLACE ANY TELEPHONE CALLS FROM HERE.  EVERYTHING IS STILL BEING HANDLED THROUGH MY UNIT TEAM AT USP/ALLENWOOD.  THE FCI STAFF ONLY HOUSES ME, FEEDS ME, ET CETERA, AT FIRST, THEY THOUGHT I WAS SOME HARD ASS OR SOMETHING, BUT THEY SEE NOW I'M RESPECTFUL TO STAFF AND TREAT THEM THE WAY I WANT TO BE TREATED.  SO HOPEFULLY EVERYTHING WILL BE OKAY.  I'M JUST TAKING IT EASY AND TRYING NOT TO MAKE ANY WAVES.

Q.      AND THEN, SIR, IF YOU COULD SKIP DOWN TO THE VERY LAST PARAGRAPH ON PAGE TWO, I SURE DO MISS.

A.      I SURE DO MISS HAVING LEONARD AROUND TO LOOK OUT FOR ME.  I'M SURE HE WILL GIVE YOU A CALL SOON.  IF SO GIVE HIM MY BEST REGARDS.  OKAY.

Q.      TURNING TO PAGE THREE, THE LAST FULL PARAGRAPH BEGINNING WITH THE RA?

A.      THE RA JUST BROUGHT ME THAT BULLSHIT MEDICATION. GUESS THEY ALL THINK IT WILL HELP.  IN MY OPINION IT'S TOO LITTLE WAY TOO LATE.  I'M GONNA STOP AND TAKE A SHOWER.  MAYBE THAT WILL WAKE ME UP.  I SHALL RETURN

SOON.

Q.    ON PAGE FOUR, THE THIRD PARAGRAPH, THIS PAST WEEK.

A.    THIS AFTER WEEK HAS BEEN SOMEWHAT HECTIC AND THE COMING WEEKS WILL LIKELY BE SIMILAR BUT IN THE END THINGS WILL SMOOTH OUT.  AT LEAST MY EMOTIONAL STATE IS BACK ON A MORE EVEN KEEL.  THE MIND IS A TERRIBLE THING TO WASTE OR SO THEY SAY.

Q.    PAGE FIVE, I'M GOING TO ASK YOU TO BEGIN WITH THE SECOND FULL PARAGRAPH AND READ THE SECOND, THIRD AND FOURTH PARAGRAPH, BEGINNING WITH, THEY FINALLY ALLOWED ME TO.

A.    THEY FINALLY ALLOWED ME TO SHAVE LAST NIGHT.  FIRST TIME IN OVER A WEEK.  HELL, THE ONE THING I'M NOT AT THIS POINT IN TIME IS SUICIDAL.  SOME MIGHT BEG TO DIFFER WITH ME CONSIDERING BUT THEY WOULD BE WRONG.  SINCE I DON'T HAVE ACCESS TO MY PROPERTY RIGHT NOW, I HAVE PLENTY OF TIME TO WRITE SOME OF MY BOOK WHICH WILL BE ENTITLED FINAL ESCAPE AND IT HAS NOTHING TO DO WITH ESCAPING FROM CUSTODY BUT RATHER ESCAPING FROM THIS WORLD.  1232 YEARS PLUS WHATEVER HAPPENS WITH THIS ORDEAL.  TIL THAT FINAL ESCAPE COMES, I'M GOING TO GET ALL THE THINGS COMPLETED WHICH I HAVE STARTED OR SET INTO MOTION.

I'M LOOKING FORWARD TO THE COPY OF THE

SHORT STORY YOU TYPED AND EDITED FOR ME.  I SURELY DO APPRECIATE YOUR HELP AND ALSO THANK SHERYL FOR ME TOO. I'M ANXIOUS TO SEE THIS MANUSCRIPT FORM YOU MENTIONED. I HAVE NO EXPERIENCE IN SUCH MATTERS.  PROPER FORM ONLY MAKES MY CHANCES BETTER.  PUBLISHERS LOOK AT SUCH THINGS.

Q.     AND HOW IS THIS LETTER SIGNED, IF YOU GO TO PAGE TEN.

A.     LOVE, YOUR BROTHER DAVID.

Q.     THANK YOU, AGENT.

MS. HAINES:  YOUR HONOR, AT THIS TIME WE WOULD LIKE TO MOVE IN GOVERNMENT EXHIBIT 30, WHICH IS THE BINDER, R 30.

MR. MCHUGH:  AGAIN, YOUR HONOR, PORTIONS OF EXHIBIT 30 ARE PART OF OUR OBJECTION, SO JUST FOR THE RECORD.

THE COURT:  ALL RIGHT.  I WILL ADMIT IT SUBJECT TO THE SAME, CONNECTION?

MR. MCHUGH:  YES.

(GOVERNMENT EXHIBITS G 30 AND R 30 ADMITTED INTO EVIDENCE.)

THE COURT:  ALTHOUGH THERE IS TESTIMONY NOW THAT THESE LETTERS WERE INTERCEPTED BY THE PRISON.

MR. MCHUGH:  THE 50 SERIES WERE INTERCEPTED BY THE PRISON.  OUR OBJECTION GOES TO THE

FRONT OF EXHIBIT 30, WHICH IS 32, 33, 35, AND I BELIEVE -- WELL, 36 IS THE LETTER TO THE U.S. ATTORNEY.  OUR OBJECTION GOES TO 32, 33 AND 35, WHICH IS THE FIRST THREE LETTERS OF EXHIBIT 30.

THE COURT:  OKAY.

AND FOR CLARIFICATION, CAN WE FIND OUT WHO LEONARD IS AND SHERYL IS.

BY MS. HAINES:

Q.    SIR, DID YOU RECALL READING THE REFERENCE MR. HAMMER MADE TO LEONARD?

A.    LEONARD, YES.

Q.    DO YOU KNOW WHO HE IS TALKING ABOUT?

A.    LEONARD YAGER.

MR. MCHUGH:  YOUR HONOR, I OBJECT.  THAT IS PURE SPECULATION.

THE COURT:  EXCUSE ME.

MR. MCHUGH:  I'M OBJECTING.  THAT IS PURE SPECULATION.  HOW WOULD HE KNOW WHO MR. HAMMER IS REFERRING TO IN A SIX-PAGE LETTER WITH THE FIRST NAME OF LEONARD.

THE COURT:  YOU CAN CROSS ON IT.

MS. HAINES:  AND I CAN REPHRASE.

BY MS. HAINES:

Q.    SIR, ARE YOU AWARE OF ANY --

THE DEFENDANT:  THAT'S THE FIRE ALARM.

THE COURT:  ALL RIGHT.  CONTINUE.

BY MS. HAINES:

Q.      ARE YOU AWARE OF ANY LEONARDS THAT WERE ASSOCIATED WITH MR. HAMMER?

A.      YES, LEONARD YAGER.

THE DEFENDANT:  EXCUSE ME, YOUR HONOR. WE HAVE A FIRE ALARM GOING.  CAN WE WAIT FOR A FEW MOMENTS, PLEASE?

THE COURT:  YES.

I THINK WE CAN CONTINUE NOW.

BY MS. HAINES:

Q.      AGENT MALOCU, MY QUESTION WAS, ARE YOU AWARE OF ANY LEONARDS --

MR. TRAVIS:  YOUR HONOR, THE BLINKING MEANS THE FIRE ALARM.

THE COURT:  ALL RIGHT.  WHEN THAT BLINKS CAN MR. HAMMER HEAR US?

MS. SAUNDERS:  WHAT HAPPENS IS THE BLINKING MEANS IT'S GOING TO GO OFF AGAIN.

THE DEFENDANT:  YOUR HONOR, IT USUALLY GOES OFF IN ABOUT 2 TO 3 MINUTES.

YOUR HONOR, MY COUNSELOR JUST TOLD ME THAT THEY ARE TESTING THE FIRE ALARMS THIS MORNING, SO THIS MIGHT BE HAPPENING OFF AND ON FOR THE NEXT HOUR, BUT IT'S OFF NOW.

THE COURT:  ALL RIGHT.  I THINK WE CAN CONTINUE EVEN THOUGH WE SEE THE LIGHT BLINKING.

THE DEFENDANT:  YEAH.  THAT IS FINE.  I CAN HEAR.  THE ALARM HAS GONE OFF NOW.

THE COURT:  ALL RIGHT.  DO YOU WANT TO CONTINUE?

THE DEFENDANT:  YES, PLEASE.

THE COURT:  CONTINUE, MS. HAINES.

MS. HAINES:  THANK YOU, YOUR HONOR.

BY MS. HAINES:

Q.      AGENT MALOCU, ARE YOU AWARE OF ANY LEONARDS THAT ASSOCIATED WITH MR. HAMMER DURING THIS TIME PERIOD?

A.      YES.  LEONARD YAGER WAS THE ORDERLY OVER AT THE USP ALLENWOOD WHO WOULD PROVIDE INMATES WITH EXCHANGE OF CLOTHING AND ASSIST WITH MOVING LETTERS TO AND FROM INMATES ON SPECIAL HOUSING UNIT.  SO HE WAS CLOSELY ASSOCIATED WITH MR. HAMMER.

Q.      ARE YOU AWARE OF ANY OTHER LEONARDS, OTHER THAN MR. YAGER, WHO HAD THAT RELATIONSHIP WITH MR. HAMMER AT THIS TIME?

SIR, YOU CAN ANSWER.

A.      LEONARD KAHLE POSSIBLY.

THE COURT:  LEONARD WHO?

THE WITNESS:  LEONARD KAHLE.

BY MS. HAINES:

Q.      TO YOUR KNOWLEDGE, DID MR. KAHLE HAVE THE SAME ORDERLY STATUS AS MR. YAGER?

A.      I BELIEVE SO.

Q.      SO AS WE SIT HERE, DO YOU KNOW WHICH LEONARD MR. HAMMER WAS REFERRING TO?

A.      I DO NOT.

Q.      AGENT MALOCU, DID THERE COME A TIME WHEN YOU OBTAINED HANDWRITING SAMPLES FROM MR. HAMMER?

THE COURT:  WELL, THERE IS ALSO A SHERYL REFERRED TO.

MS. HAINES:  OH, THANK YOU, YOUR HONOR.

BY MS. HAINES:

Q.      SIR, DO YOU KNOW WHO SHERYL IS?

A.      NO, I DO NOT.

MS. HAINES:  ANY OTHER CLARIFICATIONS, YOUR HONOR?

THE COURT:  NO.

MS. HAINES:  THANK YOU.

BY MS. HAINES:

Q.      AGENT, DID THERE COME A TIME WHERE YOU COLLECTED HANDWRITING SAMPLES --

THE DEFENDANT:  EXCUSE ME.  I'M SORRY, YOUR HONOR, BUT I JUST CAN'T HEAR WITH THE ALARM GOING OFF.  I CAN'T HEAR WHAT IS BEING SAID.

THE COURT:  ALL RIGHT.  WHEN THE ALARM IS

GOING OFF WE WILL NOT -- WE WON'T HAVE ANY TESTIMONY.

THE DEFENDANT:  OKAY.  THANK YOU.

THE COURT:  ALL RIGHT, CONTINUE.

BY MS. HAINES:

Q.     DID YOU COLLECT HANDWRITING SAMPLES FROM MR. HAMMER?

A.     YES, I DID.

Q.     I'M GOING TO SHOW YOU WHAT HAS BEEN MARKED AS GOVERNMENT EXHIBIT 37.  DO YOU RECOGNIZE THOSE, SIR?

A.     YES.

Q.     WHAT ARE THEY?

A.     THESE ARE THE EXEMPLARS THAT I OBTAINED FROM MR. HAMMER.

MS. HAINES:  YOUR HONOR, WE WOULD SEEK TO MOVE --

MR. TRAVIS:  YOUR HONOR, I THINK WHAT MR. HAMMER IS DOING IS TURNING IT OFF BUT IT'S STILL GOING, JUST FOR THE RECORD, YOUR HONOR.

THE DEFENDANT:  I CAN TURN IT OFF SO THAT YOU DON'T HEAR IT IN THE COURTROOM AND THEN AS SOON AS IT GOES OFF I WILL LET YOU KNOW, IF THAT IS OKAY.

THE COURT:  I'M JUST A LITTLE CONFUSED AS TO WHAT DEVICE MR. HAMMER HAS.  CAN HE CONTROL THESE SOUNDS --

MS. SAUNDERS:  HE HAS A MUTE BUTTON ON

HIS MICROPHONE SO THAT WE DON'T HEAR --

THE COURT:  SPEAK INTO THE MIC, MS. SAUNDERS.

MS. SAUNDERS:  I'M SORRY, YOUR HONOR. I'M NOT PROJECTING EITHER.

HE HAS A MUTE BUTTON ON HIS MICROPHONE TO MUTE OUT HIS MICROPHONE THERE.  AND WHAT HE IS DOING IS EVERY TIME THE ALARM -- WHEN THE ALARM IS OFF, HE HAS IT MUTED NOW.  HE HAS BEEN TURNING IT ON SO THAT YOU CAN HEAR WHEN IT GOES ON -- WHEN THE ALARM GOES OFF.

THE COURT:  SO WHEN DOES HE HIT THE MUTE BUTTON?

MR. MORENO:  HE DOES IT SO THAT THE ALARM SOUND DOES NOT COME INTO THE COURTROOM.  BUT HE CAN'T HEAR BECAUSE OF THE BEEPING SOUND.  HE CAN'T --

THE COURT:  WELL, TELL ME WHEN WE SHOULD HAVE TESTIMONY AND NOT HAVE TESTIMONY.

THE DEFENDANT:  YOUR HONOR, I'VE BEEN TURNING -- I'VE BEEN HITTING THE MUTE BUTTON SO THAT YOU WOULD NOT HAVE TO HEAR THE ALARM IN THE COURTROOM.  IF IT'S OKAY, I WILL LEAVE THE MUTE BUTTON ON AND THEN WHEN THE ALARM STOPS I WILL LET YOU KNOW SO WE CAN CONTINUE, IF THAT IS PERMISSIBLE.

THE COURT:  WELL, I DON'T MIND HEARING THE SOUND IN THE COURTROOM.  AT LEAST IT ALERTS US AS TO

WHEN WE SHOULD NOT HAVE TESTIMONY SO DON'T --

THE DEFENDANT:  I WILL JUST LEAVE IT OFF.

THE COURT:  YES.  AND WE WILL TRY TO GET TESTIMONY IN BETWEEN THE NOISE, THE ALARM.  ALL RIGHT? MR. HAMMER SHOOK HIS HEAD.  THE ONLY ALTERNATIVE IS TO TAKE A RECESS.

MR. TRAVIS:  IT'S CONTINUOUS.  IT HAS NOT BEEN CONTINUOUS IN THE COURTROOM BECAUSE HE HAS BEEN TURNING OFF THE SOUND BUT --

THE DEFENDANT:  COLD WE GO AHEAD AND TAKE A FIVE-MINUTE RECESS BECAUSE BY THAT TIME IT SHOULD BE OFF.

THE COURT:  ALL RIGHT.  LET'S TAKE A FIVE-MINUTE RECESS AND SOMEHOW LET'S KEEP MR. HAMMER ON THE LINE SO HE CAN LET US KNOW WHEN THE ALARM IS OFF. ALL RIGHT.  WE WILL STAND IN RECESS.

ALL COUNSEL:  THANK YOU, YOUR HONOR.

(RECESS TAKEN.)

THE COURT:  WE ARE BACK ON THE RECORD. IT'S 10:36.

I STILL SEE A BLINKING LIGHT IN THE SCREEN WITH MR. HAMMER.

AGENT GREENAWALT:  IT'S FINE.

THE DEFENDANT:  YES, SIR.

THE COURT:  ALL RIGHT.  CONTINUE.

MS. HAINES:  THANK YOU, YOUR HONOR.

BY MS. HAINES:

Q.    I HAVE SHOWN YOU WHAT HAS BEEN MARKED AS GOVERNMENT EXHIBIT 37.  CAN YOU REMIND US WHAT THAT IS?

A.    YES.  THESE ARE THE EXEMPLARS, THE HANDWRITING THAT I RECEIVED FROM MR. HAMMER.

Q.    ARE THEY ALSO PART OF THE GOVERNMENT EXHIBIT 30, THE BINDER BEHIND TAB 37?

A.    YES.

MS. HAINES:  WE SEEK TO INTRODUCE GOVERNMENT EXHIBIT 37.

MR. MCHUGH:  NO OBJECTION.

THE COURT:  G37 WILL BE ADMITTED.

(GOVERNMENT EXHIBIT 37 ADMITTED INTO EVIDENCE.)

BY MS. HAINES:

Q.    CAN YOU EXPLAIN THE CIRCUMSTANCES IN WHICH YOU GOT HANDWRITING EXEMPLARS FROM MR. HAMMER?

A.    I RECEIVED A GRAND JURY SUBPOENA AND I WENT DOWN TO THE UNITED STATES PENITENTIARY ALLENWOOD AND SERVED THE SUBPOENA ON MR. HAMMER.  MR. HAMMER ASKED IF HE COULD CONTACT HIS ATTORNEY.  HE, IN FACT, CALLED MR. TRAVIS, AT WHICH TIME MR. HAMMER INDICATED THAT HE WOULD PREFER TO GO BEFORE THE GRAND JURY.

Q.    I'M GOING TO SHOW YOU WHAT HAS BEEN MARKED AS

GOVERNMENT EXHIBIT R38.  DO YOU RECOGNIZE R38, AGENT?

A.    YES.

Q.    WHAT IS IT?

A.    IT IS THE GRAND JURY SUBPOENA FOR THE HANDWRITING AND HANDPRINTING EXEMPLARS.

MS. HAINES:  YOUR HONOR, WE WOULD SEEK TO INTRODUCE GOVERNMENT EXHIBIT R38.

THE COURT:  HEARING NO OBJECTION, R38 WILL BE ADMITTED.

(GOVERNMENT EXHIBIT R38 ADMITTED INTO EVIDENCE.)

BY MS. HAINES:

Q.    AND AGENT MALOCU, YOU INDICATED THAT MR. HAMMER THEN APPEARED BEFORE THE GRAND JURY.  DO YOU RECALL WHAT DATE THAT WAS?

A.    SEPTEMBER 18TH OF 1996.

Q.    AND AFTER MR. HAMMER APPEARED BEFORE THE GRAND JURY, WHAT HAPPENED NEXT?

A.    I MET WITH MR. HAMMER AND MR. TRAVIS AT THE -- IN THE MARSHAL'S HOLDING CELL IN WILLIAMSPORT, PENNSYLVANIA.

Q.    AND CAN YOU EXPLAIN TO US HOW YOU THEN ACTUALLY PHYSICALLY TOOK THE HANDWRITING SAMPLES FROM MR. HAMMER?

A.    YES.  YES.  SO I EXPLAINED TO MR. HAMMER THAT I WAS NOT -- I WAS NOT THERE FOR ANY ORAL STATEMENTS, I

WAS ONLY THERE TO GET THE EXEMPLARS.  I ASKED HIM TO --
THE FIRST STEP WAS TO OBTAIN HIS SIGNATURE, HANDWRITTEN
AND PRINTED.

Q.     AND I'M GOING TO STOP YOU THERE AND ASK THAT
GOVERNMENT EXHIBIT 37 BE PUBLISHED.  AND IF YOU COULD
JUST SORT OF TAILOR YOUR NARRATION TO THE EXHIBIT WHICH
I THINK IS SEVERAL PAGES.

A.     SURE.

Q.     OKAY.

A.     SO THE FIRST PAGE WERE HIS SIGNATURE,
HANDWRITTEN AND PRINTED.  THE SECOND PAGE, I HAD ASKED
OF HIM TO PROVIDE ME THE LETTERS OF THE ALPHABET
MULTIPLE TIMES.

Q.     AND THE NEXT PAGE, WHAT ELSE DID YOU ASK HIM?

A.     THE NEXT PAGE, I ASKED HIM TO WRITE THE WORDS
THAT I WOULD DICTATE TO HIM.  AND I FIRST ASKED HIM TO
WRITE THE WORDS DEATH, I, MARTI, AND KILLED.

Q.     AND THEN WHAT ELSE DID YOU ASK HIM TO WRITE?

A.     THE NEXT PAGE WAS A SERIES OF NUMBERS.  I
BELIEVE 100, 200, UP TO 220.  AND ON THE LAST PAGE IT
WAS A COMBINATION OF A DICTATED -- I ASKED HIM TO WRITE
SOMETHING THAT WOULD NOT BE DICTATED TO HIM.  ANYTHING
THAT HE WANTED TO WRITE.

Q.     AND WHAT DID HE WANT TO WRITE?

A.     HE WROTE, ALL OF THE WORLD IS A STAGE, AND MR.

TRAVIS INTERJECTED, AND HE THEN WROTE, AND NO MATTER WHAT THE EVIDENCE IS, I DID NOT DO IT.  I DIDN'T DO IT.

Q.      WHEN YOU SAY MR. TRAVIS INTERJECTED, WHAT DO YOU MEAN BY THAT?

A.      MR. TRAVIS STOPPED HIM, AND I CAN'T REMEMBER WHO STATED THAT, BUT THAT IS WHAT HE WROTE.

Q.      NOW, I ALSO SEE FROM THE EXHIBIT THAT THERE ARE SOME SIGNATURES THERE.  WAS MR. HAMMER ALSO ASKED TO PROVIDE HIS SIGNATURE?

A.      YES.

Q.      AND HOW DID YOU KNOW WHAT TYPES OF WRITINGS TO OBTAIN FROM MR. HAMMER?

A.      I REFERENCED A LABORATORY -- A LABORATORY GUIDE PER SE ON COLLECTING EVIDENCE FOR EXEMPLARS.

Q.      HAD YOU EVER DONE THIS BEFORE?

A.      NO.

Q.      DID YOU ALSO OBTAIN SOME, WHAT I WILL CALL KNOWN WRITINGS OF MR. HAMMER?

A.      YES.

Q.      AND I'M SHOWING YOU WHAT HAS BEEN MARKED AS GOVERNMENT EXHIBIT 36.  WHAT IS THAT EXHIBIT?

A.      THESE ARE KNOWN WRITING SAMPLES OF MR. HAMMER'S THAT I OBTAINED FROM HIS CENTRAL FILE, DOCUMENTS THAT HE WOULD HAVE AUTHORED AND THAT WOULD HAVE BEEN PLACED IN HIS UNITED STATES CORRECTIONAL FILE.

Q.      AND WHAT TYPE --

A.      -- MAINTAINED BY THE BUREAU OF PRISONS.

Q.      AND WHAT SPECIFICALLY WERE YOU TRYING TO COLLECT?  WHAT WERE YOU LOOKING FOR?

A.      KNOWN WRITING OF MR. HAMMER'S THAT WAS DEFINITIVELY HIS.

Q.      AND BY THAT YOU MEAN SIGNATURES, WORDS, NUMBERS, WHAT EXACTLY?

A.      ALL OF THAT.

Q.      NOW, ONCE YOU HAD --

        MS. HAINES:  YOUR HONOR, WE WOULD SEEK TO INTRODUCE GOVERNMENT EXHIBIT 36, IF I HAVE NOT ALREADY.

        THE COURT:  ALL RIGHT.  NO OBJECTION. G36 WILL BE ADMITTED.

        (GOVERNMENT EXHIBIT G36 ADMITTED INTO EVIDENCE.)

BY MS. HAINES:

Q.      ONCE YOU HAD THE QUESTIONED DOCUMENTS -- BY THAT I MEAN THE LETTERS THAT HAD BEEN INTERCEPTED AND THE NOTES, AND YOU HAD COLLECTED HIS EXEMPLARS, AND THEN HIS KNOWN WRITINGS, WHAT DID YOU DO WITH ALL THAT MATERIAL?

A.      I SENT IT ALL DOWN TO THE LABORATORY, FBI LABORATORY, FOR HANDWRITING ANALYSIS, AS WELL AS, I BELIEVE, FINGERPRINT ANALYSIS AS WELL.

Q.      NOW, FINALLY, I WANT TO TURN TO A DIFFERENT

TOPIC.  I WANT TO TALK TO YOU ABOUT A RECORD SEARCH.

AS PART OF YOUR INVESTIGATION HERE, WERE YOU ASKED TO OBTAIN CERTAIN RECORDS FROM THE SENTRY SYSTEM?

A.    YES.

MS. HAINES:  AND COURT'S INDULGENCE.

(PAUSE.)

BY MS. HAINES:

Q.    I'M GOING TO HAND YOU WHAT'S BEEN MARKED AS 141.1 AND 141.2, AND ASK IF YOU RECOGNIZE THESE.

DO YOU RECOGNIZE THEM, AGENT MALOCU?

A.    YES.

Q.    WHAT ARE THEY?

A.    THEY ARE BUREAU OF PRISONS RECORDS IDENTIFIED AS AN INMATE QUARTERS HISTORY.

Q.    AND WHICH INMATES DO THEY PERTAIN TO?

A.    INMATE HAMMER AND INMATE MARTI.

Q.    WERE YOU ASKED TO OBTAIN THESE RECORDS PREVIOUSLY?

A.    YES.

Q.    AND HAVE YOU HAD A CHANCE TO REVIEW THEM SINCE 1998?

A.    YES.

MS. HAINES:  YOUR HONOR, WE WOULD SEEK TO INTRODUCE GOVERNMENT EXHIBIT 141.1 AND 141.2.

THE COURT:  NO OBJECTION, THEY WILL BE ADMITTED.

(GOVERNMENT EXHIBITS 141.1 AND 141.2 ADMITTED INTO EVIDENCE.)

MS. HAINES:  AND IF WE COULD PUBLISH THESE, I BELIEVE WE HAVE THE CAPACITY TO PUT THEM ON A SPLIT SCREEN.

BY MS. HAINES:

Q.    WHILE WE ARE DOING THAT, AGENT, I WOULD ASK YOU IF YOU COULD DETERMINE FOR US WHETHER -- WELL, FIRST OF ALL, CAN YOU JUST EXPLAIN FOR US WHAT DO THESE RECORDS ACTUALLY SHOW WITH RESPECT TO MR. MARTI AND MR. HAMMER?

A.    THIS IS DOCUMENTATION OF WHERE THE INMATES WERE HOUSED WITHIN THE INSTITUTION FOR A PARTICULAR TIME PERIOD.

Q.    AND IT'S VERY FAINT, BUT WERE YOU ABLE TO DETERMINE WHETHER MR. MARTI AND MR. HAMMER WERE EVER IN GENERAL POPULATION AT THE SAME TIME?

A.    YES.  THEY WERE IN -- GENERAL POPULATION AT LEAST OVERLAPPED FOR ABOUT 11 DAYS.

Q.    AND COULD YOU TELL US THE DATES OF THAT?

A.    OKAY.  ON INMATE MARTI'S RECORD, ON JULY 10TH, -- OKAY, FROM APRIL 18TH OF 1995 THROUGH JULY 10TH OF 1995, HE WAS IN UNIT 2A, ROOM 210, LOWER BUNK.

Q.    AND IS THAT GENERAL POPULATION?

A.      YES.

Q.      ALL RIGHT.

A.      IF YOU WERE TO LOOK AT MR. HAMMER'S RECORD, FROM JUNE 30TH OF 1995 THROUGH AUGUST 15TH OF 1995, HE WAS IN UNIT 2B, ROOM 120, LOWER BUNK.  THAT IS GENERAL POPULATION.

Q.      AND HAS THAT NOW BEEN HIGHLIGHTED ON THE SCREEN, THE TIME PERIODS WHERE THEY WERE BOTH IN GENERAL POPULATION?

A.      YES.

MS. HAINES:  I HAVE NOTHING FURTHER, YOUR HONOR.

MR. MCHUGH:  YOUR HONOR, I DON'T KNOW IF MR. HAMMER CAN PUT THE MUTE BUTTON ON MAYBE LIKE HE HAD PREVIOUSLY BECAUSE OF THE BACKGROUND NOISES.

THE COURT:  MR. HAMMER, IF YOU HIT THE MUTE BUTTON, WILL THAT FILTER OUT THE BACKGROUND NOISE AND YOU CAN STILL HEAR US?

THE DEFENDANT:  YES, SIR.

THE COURT:  ALL RIGHT.  LET'S DO THAT.

MR. MCHUGH:  THANK YOU, MR. HAMMER.

                    CROSS EXAMINATION

BY MR. MCHUGH:

Q.      AGENT MALOCU, WHEN YOU -- YOU GRADUATED FROM THE FBI ACADEMY IN NOVEMBER OF '95, IS THAT RIGHT?

A.      I WAS AT THE FBI ACADEMY FROM JULY 9TH THROUGH, I BELIEVE, SEPTEMBER.

Q.      OKAY.  AND WHEN YOU CAME TO WILLIAMSPORT, THAT WAS YOUR FIRST FIELD ASSIGNMENT, IS THAT RIGHT?

A.      YES.

Q.      AND YOU HAD BEEN IN THE FBI, OUT OF SCHOOL FOR ABOUT SIX MONTHS, IS THAT FAIR TO SAY?

A.      AT THE TIME OF THE HOMICIDE?

Q.      YES.

A.      YES, THAT'S CORRECT.

Q.      AND PRIOR TO THE FBI ACADEMY, YOU DID NOT HAVE ANY TYPE OF LAW ENFORCEMENT EXPERIENCE?

A.      I DID NOT, NO.

Q.      AND IN FACT, THIS WAS THE FIRST MURDER CASE THAT YOU WERE ASSIGNED, IS THAT RIGHT?

A.      WELL, I BELIEVE I WAS WORKING TWO HOMICIDE CASES AT THAT TIME.  THE TONY JAKE HOMICIDE CASE WAS ALSO ASSIGNED TO ME.  THAT HAD HAPPENED IN 1991.

Q.      AS FAR AS A NEW CASE IS WHAT I'M TALKING ABOUT, LIKE FROM THE BEGINNING, BECAUSE THE JAKE CASE WAS AN OLD MATTER?

A.      YES, THAT'S CORRECT.

Q.      AND I THINK YOU TESTIFIED BEFORE IT WAS YOUR FIRST AUTOPSY, THINGS LIKE THAT?

A.      YES.

Q.      NOW, AND YOUR ASSIGNMENT, ONCE YOU RECEIVED IT FROM RICK THOMPSON, WAS -- YOU WERE THE CASE AGENT, IS THAT RIGHT?

A.      CORRECT.

Q.      SO YOU WERE IN CHARGE, AS FAR AS THE FBI WAS CONCERNED, OF THIS INVESTIGATION?

A.      YES.

Q.      AND I WANTED TO TALK TO YOU FIRST ABOUT THESE LETTERS AND KITES.

I'M GOING TO REFER TO THE GOVERNMENT'S, WHICH IS THEIR OVERALL EXHIBIT 30, BUT THEN AS WE GET INTO 30, THERE ARE SOME SUBPARTS OF 30.  YOU ARE FAMILIAR WITH THAT, RIGHT?

A.      YES.

Q.      AND THE FIRST THREE ITEMS IN EXHIBIT 30 ARE THE LETTERS OR WE'LL CALL THEM KITES THAT YOU RECEIVED FROM VARIOUS SOURCES WITHIN THE PRISON, IS THAT RIGHT?

A.      YES.

Q.      AND I WILL GET MORE SPECIFIC IN A SECOND.  THE BACK END OF EXHIBIT 30, THE 50 SERIES, ARE LETTERS THAT WERE TAKEN AS THEY CAME OUT OF THE PRISON THAT MR. HAMMER WAS WRITING, AND HE HAD A MAIL HOLD SO THEY WERE PHOTOCOPIED, IS THAT RIGHT?

A.      EXACTLY.

Q.      SO THERE IS A DISTINCTION BETWEEN THE 5 SERIES

AND THE 30 SERIES, IS THAT RIGHT?

A.      YES.

Q.      AND WE ARE GOING TO FOCUS MOSTLY ON THE 30 SERIES HERE.

THE HANDWRITING EXEMPLARS ARE OBVIOUSLY -- HAVE 30 UNDER IT, MARKED BY 30.  I THINK THEY ARE 37. AND THEN THERE IS A LETTER THAT WAS MAILED TO FRED MARTIN.  THAT IS NUMBER 36.

SO LOOKING AT THE FIRST THREE.  SO THE FIRST ONE YOU TESTIFIED YESTERDAY TO, THAT IS THE SEVEN REASONS.  AND IT'S YOUR TESTIMONY FROM YESTERDAY THAT YOU RECEIVED THAT FROM MR. YAGER, IS THAT RIGHT?

A.      YES.  HE HANDED IT TO ME AT THE END OF AN INTERVIEW, YES.

Q.      AND IN THAT INTERVIEW IS WHERE HE HAD ALSO BEEN SEEKING SOME FAVORABLE TREATMENT FROM YOU, IS THAT RIGHT, OR FROM THE GOVERNMENT, WHEN HE HANDED IT TO YOU?

A.      NO.

Q.      YOU DON'T RECALL HIM ASKING FOR A HOUSING SITUATION AT AN FCI?

A.      NOT THAT I RECALL.

Q.      THE OTHER TWO LETTERS, YOU TESTIFIED YESTERDAY TO, A STEVE LETTER AND A ROCK LETTER.  THEY CAME FROM AGENT TRAXLER, IS THAT RIGHT?

A.      YES, THEY DID, YES, THAT'S CORRECT.

Q.      AND YOU WERE AT THE TRIAL, IS THAT RIGHT?

A.      YES.

Q.      AND DO YOU RECALL AGENT TRAXLER, WHO OBVIOUSLY HE WAS WITH THE PRISON, IS THAT RIGHT?

A.      YES.  HE WAS THE --

Q.      SIS?

A.      -- LEAD SPECIAL INVESTIGATOR, YES, AT THE PRISON.

Q.      AND HE TESTIFIED AT THE TRIAL THAT HE COULD NOT REMEMBER WHERE HE HAD GOTTEN THOSE LETTERS?

A.      I HAVE NO IDEA WHAT HE TESTIFIED TO.  IN FACT, I DON'T THINK I WAS PRESENT WHEN HE TESTIFIED.

Q.      SO YOU DON'T KNOW WHERE HE GOT THEM FROM, IS THAT FAIR TO SAY?

A.      TODAY, AS I SIT HERE, I DO NOT RECALL WHERE HE GOT THEM FROM.

Q.      AND OBVIOUSLY HIS TRIAL TESTIMONY IS PART OF THIS RECORD.  BUT -- SO YOU DON'T THINK YOU WERE IN THE COURTROOM WHEN HE TESTIFIED ON JUNE 9TH.

A.      I DON'T THINK I WAS.  I MAY HAVE BEEN SEQUESTERED.

Q.      WELL, WEREN'T YOU SEATED AT COUNSEL TABLE AS THE CASE AGENT?

A.      YES.

Q.      ON OCCASION?

A.      YES, BUT I WAS ASKED TO LEAVE THE COURTROOM ON VARIOUS REASONS.  I HAD TO GO PICK UP WITNESSES.  I WAS IN AND OUT THROUGHOUT.

THE COURT:  CAN I JUST GET A CLARIFICATION?  WHEN YOU SAY JUNE 9TH, ARE YOU TALKING ABOUT --

MR. MCHUGH:  I'M SORRY, 1998.

THE COURT:  1998.

MR. MCHUGH:  YES, THE UNDERLYING TRIAL HERE IN THIS MATTER.  I'M SORRY, YOUR HONOR.

BY MR. MCHUGH:

Q.      SO YOU DON'T REMEMBER AGENT TRAXLER TESTIFYING THAT HE COULD NOT REMEMBER WHERE HE HAD GOTTEN THE STEVE LETTER AND THE ROCK LETTER?

A.      NO.  AGAIN, I DON'T BELIEVE I WAS PRESENT FOR MR. TRAXLER'S TESTIMONY.

Q.      YOU ARE AWARE THAT MR. TRAXLER LEFT THE BUREAU OF PRISONS IN 2004?

A.      YES.

Q.      AND THAT HE HAD BEEN FOUND TO HAVE LIED DURING AN OFFICIAL INVESTIGATION?

A.      I DON'T KNOW WHY HE LEFT THE BUREAU OF PRISONS.

Q.      YOU ARE NOT AWARE OF THAT?

A.      NO.

Q.      NOW, AFTER YOU RECEIVED THOSE THREE -- WE WILL

CALL THEM KITES OR LETTERS, THE ONE FROM MR. YAGER AND THE OTHER TWO FROM MR. TRAXLER, YOU WERE CONCERNED ABOUT THEIR VALIDITY, IS THAT FAIR TO SAY?

A.    I'M SORRY.  REPEAT THAT QUESTION.

Q.    THE THREE THAT WE ARE TALKING ABOUT, THE ONE FROM MR. YAGER AND THE TWO THAT YOU RECEIVED FROM MR. TRAXLER, YOU WANTED TO DO SOME FURTHER INVESTIGATION INTO THESE DOCUMENTS, ISN'T THAT RIGHT?

A.    THE ONLY INVESTIGATION THAT I DID WAS TO SEND THEM TO LABORATORY FOR HANDWRITING AND FINGERPRINT ANALYSIS.

Q.    RIGHT.  YOU WANTED TO DO AN INVESTIGATION CONCERNING THE VALIDITY OF THE ALLEGATIONS THAT THEY CAME FROM MR. HAMMER, IS THAT RIGHT?

A.    THE VALIDITY AND AUTHENTICITY OF THE WRITER.

Q.    AND, IN FACT, DURING THE COURSE OF THIS INVESTIGATION, DO YOU RECALL THAT YOU HAD RECEIVED SOME DOCUMENTS THAT WERE PURPORTED TO BE FROM MR. HAMMER THAT WERE FAKES?

A.    YES.

Q.    THAT PRISONERS HAD WRITTEN THAT DID NOT PASS MUSTER, IS THAT FAIR TO SAY?

A.    CORRECT.

Q.    MATT MCSHEA HAD TURNED IN A COUPLE DOCUMENTS THAT WERE --

A.      CORRECT.  I BELIEVE THAT WAS THE INMATE.

Q.      SO WHEN YOU SENT THEM TO QUANTICO -- IS THAT WHERE YOU SENT THEM?

A.      YEAH, THE FBI LABORATORY HAPPENED TO BE -- IT'S IN QUANTICO, THAT'S CORRECT.

Q.      YOU WANTED TO GET BASICALLY A FAIR, UNBIASED OPINION AS TO WHAT THEY THOUGHT AS TO WHO WROTE THOSE DOCUMENTS, IS THAT RIGHT?

A.      THAT'S CORRECT, STANDARD PROCEDURE.

Q.      NOW -- OKAY, SO LET'S LOOK AT YOUR CORRESPONDENCE.  ARE WE UP TO -- THE NEXT ONE IS 10?

        MR. MORENO:  NO, 11.

BY MR. MCHUGH:

Q.      I AM SHOWING YOU WHAT I HAVE MARKED AS D11.  CAN YOU IDENTIFY THIS, WHEN YOU HAVE HAD A CHANCE TO LOOK AT IT?

A.      THIS WAS THE COMMUNICATION THAT I HAD SENT TO TWO DIVISIONS WITH LEADS TO CONDUCT SOME WORK ON THIS CASE.

Q.      AND WOULD ONE OF THOSE DIVISIONS BE THE DOCUMENT EXAMINERS IN WASHINGTON?

A.      YES, THE CHEMICAL ANALYSIS SECTION AND THE DOCUMENT SECTION.

Q.      AND ON PAGE 1, YOU INDICATE, UNDER ROMAN NUMERAL NUMBER ONE, UNDER THE ENCLOSURES, YOU DESCRIBED THE

19 PAGES THAT WE JUST HEARD YOU TESTIFY TO ON DIRECT THAT WERE TAKEN OUT OF MR. HAMMER'S PRISON FILE, IS THAT RIGHT?

A.    YES, THAT'S CORRECT.

Q.    AND THEN IF YOU TURN THE PAGE, NUMBER TWO IS THE LETTERS THAT WE ARE TALKING ABOUT, THE 30 SERIES, THE YAGER, ROCK, AND I BELIEVE IT'S STEVE, THE STEVE LETTER, IS THAT RIGHT?  THERE WERE FIVE, BUT THOSE THREE WERE CONTAINED IN THOSE FIVE, IS THAT RIGHT?

A.    YES.

Q.    AND THEN UNDERNEATH THAT YOU DESCRIBE THE EXEMPLARS, IS THAT RIGHT?  OH, I'M SORRY, THE --

A.    NUMBER TWO ARE THE -- ITEM NUMBER 2 --

Q.    IS THE EXEMPLARS?

A.    ARE THE EXEMPLARS.

Q.    RIGHT, I'M SORRY, THE 5.  AND THEN NUMBER 3 IS THE PRISON LETTERS THAT WE ARE TALKING ABOUT?

A.    THAT'S CORRECT.

Q.    AND THEN, SO YOU GAVE VARIOUS INSTRUCTIONS TO THE PEOPLE IN KANSAS CITY THAT HAD NOTHING TO DO WITH LETTERS, IS THAT RIGHT?

A.    YES.

Q.    AND THEN BUT ON PAGE THREE IS WHERE YOU GIVE THE INSTRUCTIONS WHAT YOU WANT THE HANDWRITING PEOPLE TO DO, IS THAT RIGHT?

A.      YES.

Q.      NOW, WHEN WE LOOK AT NUMBER 3, THAT'S -- ON PAGE TWO -- THAT IS YOU DESCRIBING THE QUESTIONED DOCUMENTS, IS THAT RIGHT, THE DOCUMENTS THAT YOU WANT EXAMINED?

A.      YES.

Q.      AND WHAT YOU TOLD THE HANDWRITING ANALYSTS IN WASHINGTON, WHOEVER IS GOING TO REVIEW THIS, GET ASSIGNED THIS CASE, IS THAT THE ENVELOPE CONTAINED THE ORIGINAL ENVELOPES AND LETTERS WRITTEN BY INMATE DAVID PAUL HAMMER TO VARIOUS OTHER INMATES, IS THAT RIGHT?

A.      YES.

Q.      DO YOU THINK THAT THAT IS A GOOD PRACTICE, TO TELL THE EXAMINER WHO WROTE THEM -- IN YOUR OPINION WHO WROTE THESE LETTERS?

A.      THE REFERENCE WOULD BE TO WHAT IS ACTUALLY WRITTEN ON THE LETTER.  WRITTEN BY, BECAUSE HE HAD SIGNED THE DOCUMENT.

Q.      RIGHT.  BUT CERTAINLY IT APPEARS AS IF YOU ARE TELLING THE EXAMINER THAT THESE LETTERS WERE WRITTEN BY DAVID HAMMER TO VARIOUS OTHER INMATES, IS THAT RIGHT?

MS. HAINES:  YOUR HONOR, I'M GOING TO OBJECT TO WHAT IT APPEARS.  HE JUST TESTIFIED AS TO WHAT IT MEANT.

MR. MCHUGH:  WELL --

THE COURT:  OVERRULED.

BY MR. MCHUGH:

Q.    YOU CAN ANSWER.

A.    OKAY.  NO, I JUST MEANT TO INFORM -- MY PURPOSE WAS TO INFORM THEM AS A REFERENCE THAT THE LETTER IS SIGNED BY DAVID PAUL HAMMER.

Q.    BUT YOU DID NOT SAY ALLEGED TO HAVE BEEN WRITTEN BY HIM, PURPORTED TO HAVE BEEN WRITTEN BY HIM.  YOU SAID WRITTEN BY HIM, RIGHT?

A.    THAT'S CORRECT.

Q.    AND THEN IF WE GO TO PAGE THREE, AT THE BOTTOM OF THE PAGE, YOU SEE WHERE YOU WROTE, THE LABORATORY DIVISION, DOCUMENT SECTION, IS REQUESTED TO COMPARE THE ORIGINAL EXEMPLARS, RIGHT -- THAT IS THE STUFF THAT YOU GOT AT THE GRAND JURY -- TO THE ORIGINAL LETTERS, AGAIN, WRITTEN BY DAVID HAMMER, DAVID PAUL HAMMER, TO OTHER INMATES IMPLICATING HIMSELF IN THE MURDER?

A.    CORRECT, THAT'S WHAT I WROTE.

Q.    SO YOU WERE TELLING THE PERSON WHO WAS GOING TO BE ANALYZING THESE DOCUMENTS THAT, IN YOUR OPINION AT LEAST, DAVID HAMMER HAD WRITTEN THOSE LETTERS?

A.    MY INTENTION WAS TO IDENTIFY THOSE LETTERS AS THE LETTERS THAT WERE SIGNED BY DAVID PAUL HAMMER.

Q.    BUT YOU WOULD AGREE -- AND THIS PERSON WORKS FOR THE FBI, ISN'T THAT RIGHT?

A.    YES.

Q.    YOU WORK FOR THE FBI?

A.    CORRECT.

Q.    IT'S IMPORTANT TO AVOID ANY TYPE OF CONTEXTUAL INFORMATION THAT CAN LEAD TO A MISIDENTIFICATION, ISN'T THAT RIGHT?

A.    WELL, I ASSUMED THAT VERY PROFESSIONAL INDIVIDUALS WHO ARE GOING TO IDENTIFY -- THEY ARE GOING TO DO THEIR JOB AND IDENTIFY THE DOCUMENTS AS THEY ARE, WHETHER THEY WERE WRITTEN BY HIM OR NOT.

Q.    OKAY.  BUT WE CAN AGREE THAT, AS THIS DOCUMENT IS WRITTEN, YOU HAVE IDENTIFIED IN YOUR OPINION THAT THOSE QUESTIONED DOCUMENTS WERE WRITTEN BY DAVID HAMMER IMPLICATING HIMSELF, IS THAT RIGHT?

A.    THAT'S RIGHT -- INDICATING, YES.

Q.    NOW, YOU SAY THAT IN PARAGRAPH -- ON PAGE TWO WHEN YOU DESCRIBE THE LETTERS, YOU SAY, ENVELOPES CONTAINING THE ORIGINAL ENVELOPES AND LETTERS WRITTEN BY INMATE DAVID PAUL HAMMER TO VARIOUS OTHER INMATES, IS THAT RIGHT?

A.    YES.

Q.    OKAY.  NOW, THE STEVE LETTER, THE TESTIMONY AT TRIAL -- AND HOPEFULLY YOU WERE IN THE COURTROOM AND WILL REMEMBER THIS -- DO YOU REMEMBER THAT MR. CLASSEN TESTIFIED THAT HE RECEIVED THAT LETTER WITH AN ENVELOPE UNDER HIS CELL DOOR AND THAT HE TORE UP THE ORIGINAL?

A.       I DON'T RECALL HIS TESTIMONY.

                    MR. MCHUGH:  IT'S JUNE 10TH.  I'M NOT GOING TO MARK IT.  PAGE 17.

BY MR. MCHUGH:

Q.       SIR, I'M SHOWING YOU -- YOUR HONOR, I'M JUST GOING TO -- WHAT IS DATED JUNE 10TH, 1998, THE TRIAL TESTIMONY OF MR. CLASSEN.  QUESTIONING BY MR. MARTIN. IF YOU CAN LOOK AT PAGE --

A.       17.

Q.       PAGE 17.

                    AND JUST SO WE'RE CERTAIN, THE ENVELOPE FOR 33.1 -- I'M SORRY, 35.1, WAS ADDRESSED TO STEVE CLASSEN, IS THAT RIGHT?

A.       YES, IT WAS.

Q.       AND THIS IS STEVE CLASSEN TESTIFYING AT TRIAL. AND CAN YOU JUST READ TO US, AT THE BOTTOM OF PAGE 17, WHERE MR. MARTIN'S QUESTION IS WITH RESPECT TO AGAIN THE KITE THAT YOU RECEIVED, DID YOU READ IT?  DO YOU SEE THAT?

A.       YES, I DO.  HIGHLIGHTED.

                    WITH RESPECT TO, AGAIN, THE KITE THAT YOU RECEIVED, DID YOU READ IT?

                    NOT THE WHOLE THING.  I DIDN'T LIKE WHAT IT SAID.

                    I'M SORRY -- IS THE QUESTION.

NO, I DIDN'T READ THE WHOLE THING.  I READ PART OF IT, THEN I THREW IT AWAY.

QUESTION:  WITH RESPECT TO THROWING IT AWAY, HOW DID YOU THROW IT AWAY?

ANSWER:  IN THE TOILET AND THEN I FLUSHED IT.

QUESTION:  AND THIS YOU DID EVEN AFTER THE FBI SPOKE TO YOU?

ANSWER:  YEAH.

Q.     SO DO YOU RECALL THAT TESTIMONY NOW AT TRIAL?

A.     NO, I DON'T, BUT OBVIOUSLY --

Q.     AND I DON'T KNOW IF YOU WERE IN THE GRAND JURY, BUT MR. CLASSEN TESTIFIED THE SAME WAY IN THE GRAND JURY CONCERNING THE KITE THAT HE RECEIVED.  SO DO YOU KNOW WHAT YOU SENT TO WASHINGTON, WHETHER IT WAS A PHOTOCOPY OR THE ORIGINAL?

A.     IT WAS AN ORIGINAL LETTER.

Q.     WELL, THE DOCUMENT ITSELF WAS NOT A PHOTOCOPY?

A.     NO, I DON'T BELIEVE SO.

Q.     WELL, HOW WOULD YOU EXPLAIN THAT MR. CLASSEN SAID THAT THE KITE HE GOT HE TORE UP AND FLUSHED DOWN THE TOILET?

A.     I CAN'T EXPLAIN THAT.

Q.     YOU CAN'T EXPLAIN THAT?

A.     NOPE.

Q.      NOW, THE EXEMPLARS THAT YOU TOOK, ESSENTIALLY WE CAN AGREE THAT MR. HAMMER COOPERATED WITH YOU ONCE YOU GOT TO THE GRAND JURY?

A.      IF I CAN SAY, THE ONLY WAY I CAN EXPLAIN --

Q.      ARE WE GOING BACK TO CLASSEN?

A.      YES.

Q.      OKAY.  I'M SORRY.

A.      THE ONLY WAY I CAN EXPLAIN IT IS IF THERE WAS MORE THAN ONE LETTER.

Q.      OKAY.  HAVE YOU AT ALL, IN THIS ENTIRE INVESTIGATION, EVER HEARD OF MORE THAN ONE LETTER FROM MR. CLASSEN?

A.      YOU MEAN MR. HAMMER?  HE WROTE LOTS OF LETTERS.

Q.      THAT CLASSEN RECEIVED.  HE SENT ONE --

A.      WE HAVE ONE, BUT I'M SAYING MR. HAMMER COULD HAVE WRITTEN MORE THAN ONE LETTER TO MR. CLASSEN, ONE HE THREW AWAY AND THE OTHER ONE WAS A SUBSEQUENT LETTER. THAT IS THE ONLY EXPLANATION I CAN GIVE TO YOU.

Q.      BUT MR. MARTIN INTRODUCED A COPY OF THAT LETTER AT THE GRAND JURY AND STATED ON THE RECORD THAT HE HAD RECEIVED IT IN A MYSTERIOUS WAY, THAT THERE WAS NOT A SECOND LETTER, THAT HE HAD A COPY OF THE FIRST LETTER, OF THE ONLY LETTER?

A.      I DID NOT READ THE GRAND JURY TESTIMONY.

Q.      WELL, YOU WORKED CLOSELY WITH MR. MARTIN ON THIS

CASE, IS THAT RIGHT?

A.     YES.

Q.     SO OTHER THAN THE FACT THAT YOU GOT THIS LETTER FROM TRAXLER, YOU REALLY HAVE NO IDEA WHERE THIS DOCUMENT CAME FROM THAT MR. CLASSEN IS REPORTED TO HAVE GOTTEN?

A.     NO.  I RECEIVED IT FROM MR. TRAXLER.

Q.     WHAT DID I SAY?  I'M SORRY.  I MEANT TO SAY TRAXLER.

A.     I RECEIVED IT FROM MR. TRAXLER.  BUT, AGAIN, MR. CLASSEN SAID HE DID NOT READ THE LETTER HIMSELF SO HE COULD HAVE BEEN MISTAKEN --

Q.     WELL, NO, HE SAYS HE READ IT AND IT WAS SO DISTURBING TO HIM HE RIPPED IT UP.

A.     I DON'T THINK HE READ THE WHOLE THING.

Q.     HE DID NOT READ THE WHOLE THING.

           MS. HAINES:  YOUR HONOR --

BY MR. MCHUGH:

Q.     BUT THE PART THAT WAS DISTURBING TO HIM HE SAID HE RIPPED UP --

           MS. HAINES:  YOUR HONOR --

BY MR. MCHUGH:

Q.     -- OR HE SAID HE RIPPED UP THE WHOLE LETTER BECAUSE WHEN HE GOT HALFWAY THROUGH IT, HE RIPPED IT UP.

           THE COURT:  ALL RIGHT.  I THINK THE POINT

IS MADE.  LET'S MOVE ON.

MR. MCHUGH:  OKAY.

BY MR. MCHUGH:

Q.    NOW, YOU TOOK EXEMPLARS, IS THAT RIGHT?

A.    I DID, SIR.

Q.    AND YOU HAD NEVER DONE EXEMPLARS BEFORE?

A.    NO, I DID NOT, NOT IN THE FIELD.

Q.    AND MR. HAMMER GAVE, IT APPEARED TO BE, LIKE 5 OR 6 FULL PAGES OF DIFFERENT THINGS, NUMBERS, ALPHABET, WORDS, WHATEVER YOU ASKED HIM, IS THAT RIGHT?

A.    YES.

Q.    PRINTING AND WRITING?

A.    YES, HE DID.

Q.    NOW, YOU SENT THOSE DOWN TO WASHINGTON, IS THAT RIGHT?

A.    YES.

Q.    AND SO WHAT I'M GOING TO SHOW YOU IS NUMBER 12.

AGENT MALOCU, I'M SHOWING YOU WHAT I HAVE MARKED AS D12.  AND IF YOU CAN TAKE A MOMENT TO REVIEW AND IF YOU COULD IDENTIFY IT.

DO YOU RECOGNIZE THAT, SIR?

A.    YES.

Q.    AND THIS BASICALLY, WE CAN AGREE, CAME FROM THE HANDWRITING EXAMINER IN WASHINGTON BACK TO YOU, IS THAT RIGHT?

A.        CORRECT.

Q.        WITH RESULTS OF SOME OF THE THINGS YOU HAD SENT THEM?

A.        YES.

Q.        AND THE DATE IS MARCH OF '97, IS THAT RIGHT?

A.        YEP.

Q.        THAT WAS OVER A YEAR BEFORE THE TRIAL STARTED, IS THAT RIGHT?

A.        CORRECT.

Q.        AND WE CAN AGREE THAT THE HANDWRITING EXPERT STATED THAT THEY HAD TO GIVE A QUALIFIED OPINION BECAUSE OF THE LIMITED KNOWN WRITING, IS THAT RIGHT?  I'M LOOKING AT THE THIRD PARAGRAPH FROM THE BOTTOM.

A.        YES.  IN ORDER FOR THEM -- WHICH I DIDN'T KNOW AT THE TIME, IN ORDER FOR THEM TO MAKE A DEFINITIVE COMPARISON, THEY HAVE TO HAVE -- THEY HAVE TO HAVE AN IDENTICAL DICTATION OF WHAT WAS WRITTEN.

Q.        RIGHT.

A.        AND I DID NOT PROVIDE THAT TO THEM.

Q.        RIGHT.  AND SO BUT THEY GAVE YOU NOTICE THAT THAT IS WHAT THEY WANTED, IS THAT RIGHT?

A.        WELL --

Q.        LOOK AT THE LAST PARAGRAPH.

A.        YEAH.

Q.        IT SAYS, IT IS SUGGESTED THAT THE DICTATED NOTE

HANDWRITING AND HANDPRINTING BE OBTAINED FROM DAVID

HAMMER IS THE SAME WORDING AND FORMAT FOUND ON THE

QUESTIONED ITEMS.

                 DO YOU SEE THAT?

A.      CORRECT.  SAME TYPE OF ENVELOPE, SAME TYPE OF

LINED PAPER, SAME TYPE OF WORK.

Q.      RIGHT.  FOR EXAMPLE, THE SEVEN REASONS.  IF THEY

WANTED TO DO A FULL ANALYSIS OF THAT, THEY WANTED YOU TO

GO AND GET THE SEVEN REASONS WRITTEN OUT.  IS THAT A

FAIR ASSESSMENT?

A.      YES, THEY WOULD.

Q.      NOW, DID YOU DO ANYTHING WITH THAT, AS FAR AS

GETTING THEM ADDITIONAL INFORMATION?

A.      NO, I DID NOT.

Q.      YOU KNEW AT THAT TIME THAT THIS WAS A DEATH

PENALTY CASE, IS THAT RIGHT?

A.      YES, I DID.

Q.      LET ME SHOW YOU --

A.      BECAUSE SHE HAD INDICATED, EXAMINER BUNCH, THAT

IT WAS PROBABLY THE HANDWRITING OF MR. HAMMER.  AND THE

SIGNATURE WAS DEFINITIVELY HIS.  SO I MADE THE

DETERMINATION THAT I DID NOT NEED TO SEND HER ANY

ADDITIONAL INFORMATION.

Q.      YOU THOUGHT PROBABLY IT WAS OKAY TO GO WITH, IS

THAT RIGHT?  SO YOU DID NOT DO ANYTHING MORE?

A.      NO, I DID NOT, SIR.

Q.      I'M GOING TO SHOW YOU D13.  IF YOU CAN TAKE A MOMENT AND LOOK AT D13 AND IDENTIFY IT, IF YOU CAN.

NOW, D13, CAN WE AGREE, IS ANOTHER REPORT FROM QUANTICO, THE HANDWRITING PEOPLE, IS THAT RIGHT, OR MISS BUNCH?

A.      YES.

Q.      IS THAT RIGHT?

AND, AGAIN -- NOW, THIS ONE IS DATED MAY OF 1998, IS THAT RIGHT?

A.      YES.

Q.      SO AT LEAST ANOTHER 30 OR 60 DAYS BEFORE THE START OF THE TESTIMONY IN THE TRIAL, IS THAT RIGHT?

A.      THAT'S RIGHT.

Q.      AND HERE AGAIN, THEY ARE PROVIDING YOU WITH A QUALIFIED OPINION, IS THAT RIGHT?

A.      YES, THEY ARE.

Q.      AND THEY ARE AGAIN ASKING YOU FOR ADDITIONAL INFORMATION IN THE -- MORE SPECIFIC KNOWN WRITING, IS THAT RIGHT?

A.      THAT'S RIGHT.

Q.      AND HERE DID YOU DO ANYTHING TO FOLLOW UP ON THIS REQUEST FROM THE HANDWRITING PEOPLE IN WASHINGTON?

A.      NO, NO.  I DID NOT GO TO MR. HAMMER AND ASK HIM TO WRITE THE LETTERS OUT AS I READ THIS MORNING IN THAT

GREAT LENGTH.  NO, I DID NOT DO THAT.

Q.      NOW, YOU DID HAVE THE LETTERS FINGERPRINTED, IS THAT RIGHT?

A.      I DID.

Q.      AND AGAIN, AS A FURTHER WAY TO VALIDATE OR CONFIRM THAT THEY ACTUALLY CAME FROM WHO THESE PEOPLE ARE ALLEGING THEY GOT THEM FROM, IS THAT RIGHT?

A.      YES.

Q.      THAT WAS ANOTHER ADDITIONAL STEP YOU WANTED TO TAKE.

AND THESE FINGERPRINTS CAME BACK WITH NO MR. HAMMER FINGERPRINTS ON THESE DOCUMENTS, DID THEY?

A.      NO, THEY DID NOT.  I NEVER COLLECTED MAJOR CASE PRINTS FROM ANY OF THESE WITNESSES.  A MAJOR CASE PRINT IS FINGERPRINT SAMPLES OF THEIR ENTIRE HAND.  SO I BELIEVE WHAT I RELIED UPON WERE REGULAR PRINT CARDS FROM -- THAT WHEN AN INMATE IS PROCESSED THEY WOULD HAVE A SIMPLE FINGERPRINT CARD, WHICH RECORDS THE PADS OF THEIR FINGERS, NOT -- FOR THIS TYPE OF EXAMINATION, I WOULD HAVE HAD TO DO A MAJOR CASE PRINTING, WHICH COVERS THE -- ALL THE RIDGES ON ALL -- ON THE FINGERS AND THE PALM. AND I DON'T RECALL DOING MAJOR CASE PRINTING ON ANY INMATE.

Q.      DID THE FINGERPRINT PEOPLE TELL YOU, SIMILAR TO THE DOCUMENT PEOPLE, THAT THEY WANTED BETTER PRINTS?

A.    I HONESTLY DON'T RECALL WHAT THEY HAD ASKED OF ME.

Q.    SO I'M NOT FOLLOWING YOU.  DID THEY TELL YOU SOMETHING WAS WRONG WITH YOUR PRINTS THAT YOU SENT THEM, OR YOU FIGURED THAT OUT?  HOW DID THAT COME ABOUT?

A.    HOW DID WHAT COME ABOUT?

Q.    YOU SAID THAT YOUR PRINTS WERE NOT MAJOR CASE PRINTS.

A.    RIGHT.  THEY HAD LIMITED PRINTS.  WHAT I'M SAYING IS, THEY HAD LIMITED PRINTS TO COMPARE AGAINST.

Q.    BUT OBVIOUSLY MR. HAMMER WAS INDICTED IN THIS CASE, IS THAT RIGHT?

A.    YES.

Q.    HE COULD HAVE BEEN PROCESSED IN THIS CASE, IS THAT RIGHT?

A.    I COULD HAVE SERVED HIM WITH A SUBPOENA AND OBTAINED MAJOR CASE PRINTS FOR HIM.  I DON'T RECALL THAT I DID DO THAT.

Q.    BUT IN ANY EVENT, WHAT YOU GOT BACK FROM WASHINGTON, I THINK YOU ARE TELLING US, THAT THERE ARE NO MATCHES TO MR. HAMMER, IS THAT RIGHT?

A.    ON THE FINGERPRINTS?

Q.    YES, ON ANY OF THESE DOCUMENTS, THESE PRISON DOCUMENTS.

A.    I BELIEVE SO.

Q.      WELL, IT'S CLEAR FROM THE TRIAL TRANSCRIPT.  I BELIEVE YOU TESTIFIED ON JUNE 11TH OF '98 THAT THERE WERE NO PRINTS LINKING THESE DOCUMENTS TO MR. HAMMER.

A.      OKAY.

Q.      BUT NOW ARE YOU ALSO TELLING ME THAT YOU -- SOMEBODY INFORMED YOU THAT YOUR PRINTS WERE NOT PROPER, YOUR KNOWN PRINTS THAT YOU SENT TO WASHINGTON, OR THAT NEEDED MORE DETAIL?

A.      NO.

Q.      OKAY.  THAT IS SOMETHING YOU HAVE SINCE FIGURED OUT WITH MORE EXPERIENCE.  I'M NOT FOLLOWING HOW YOU SAID --

A.      YES.

Q.      OKAY.  NOW, YOU DID SEND SOME ITEMS DOWN THERE FOR DNA TESTING, IS THAT RIGHT?

A.      I DID.

Q.      HOW ABOUT AS FAR AS SENDING THESE LETTERS, THE PRISON -- THE LETTERS THAT ALLEGEDLY CAME FROM THESE PRISON COOPERATORS FOR DNA TESTING, DID YOU THINK TO DO THAT, TO SEE IF MR. HAMMER'S DNA OR THESE PRISONERS' DNAS WOULD BE ON THAT?

A.      I DID NOT DO THAT.

Q.      SO --

A.      FOR THE PILLOW AND THE SOCK?

Q.      NO, NO, I'M TALKING ABOUT THE LETTERS.

A.    I DON'T BELIEVE I ASKED FOR ANY DNA ANALYSIS ON THOSE LETTERS AT ALL.

Q.    RIGHT.  THAT IS WHAT MY QUESTION WAS.  I'M SORRY.

SO BUT FOR THE QUALIFIED OPINION FROM THE HANDWRITING PERSON IN WASHINGTON, THE -- WHAT WE ARE LEFT WITH IS MR. YAGER -- WHO WE ALL KNOW ABOUT MR. YAGER -- HANDING YOU A DOCUMENT AND MAKING ALLEGATIONS ABOUT IT, ABOUT THE SEVEN REASONS, AND THEN MR. TRAXLER, WHO IS NO LONGER WITH THE BOP, WHO CAN'T REMEMBER WHERE HE GOT THESE LETTERS, IS THAT A FAIR ASSESSMENT?

MS. HAINES:  YOUR HONOR, I'M OBJECTING TO THE FORM OF THAT QUESTION.

MR. MCHUGH:  I'M JUST TRYING TO ESTABLISH THE PARAMETERS BECAUSE I KNOW WE HAVE GOT A LOT OF EXHIBITS HERE.

THE COURT:  I WILL OVERRULE IT.

BY MR. MCHUGH:

Q.    SO WHAT WE ARE LEFT WITH HERE, AFTER THE FINGERPRINT ISSUE, THE DNA ISSUE, AND THE HANDWRITING ISSUE IS, WE HAVE A KITE, THE SEVEN REASONS, WE ARE CALLING IT, THAT CAME FROM MR. TRAXLER, IS THAT RIGHT, WHO WAS A COOPERATING INFORMANT, IS THAT RIGHT -- NOT MR. TRAXLER, MR. YAGER.

A.      YES, INVESTIGATOR TRAXLER TURNED THOSE OVER TO ME AS --

Q.      BUT NOT THE SEVEN REASONS, THAT CAME DIRECTLY FROM --

A.      THAT CAME DIRECTLY FROM MR. YAGER TO ME.

Q.      JUST FOR PURPOSES OF REFRESHING YOUR RECOLLECTION, YOU SAID YOU GOT IT ON THE 17TH, IS THAT RIGHT?  AND YOU SAID YOU DID NOT RECALL MR. YAGER ASKING FOR ANY FAVORABLE TREATMENT, IS THAT RIGHT?

A.      YES.  DURING THE INTERVIEW --

MR. MCHUGH:  I'M JUST GOING TO SHOW HIM FOR PURPOSES OF REFRESHING HIS RECOLLECTION.

MS. HAINES:  YOUR HONOR, I'M GOING TO OBJECT TO THIS.  WE PULLED AN OBJECTION YESTERDAY FROM THEM THAT THEY DID NOT THINK IT WAS PROPER TO ELICIT ANY DETAILS OF MR. YAGER'S INTERVIEW, AND WE STOOD BY THAT AND NOT ELICITED ANY DETAILS.  SO I WOULD SUGGEST IT IS IMPROPER THAT THEY NOW GET TO ELICIT THE DETAILS THAT ARE FAVORABLE TO THEM.

MR. MCHUGH:  THE ONLY DETAIL I WAS GOING TO ELICIT, YOUR HONOR, WAS A REQUEST THAT HE MADE WHEN HE TURNED OVER THE SEVEN REASONS.  IF YOUR HONOR'S OBJECTION IS GOOD FOR THEM, IT'S GOOD FOR US, THEN I STAND BY YOUR HONOR'S RULING.

THE COURT:  I WILL SUSTAIN IT.

THE WITNESS:  I WILL SAY THAT I --

THE COURT:  DON'T ANSWER IT.  I SUSTAINED IT.

BY MR. MCHUGH:

Q.      WHAT WE DO KNOW, I KNOW YOU TESTIFIED TO THIS AT TRIAL, IS THAT BEFORE MR. YAGER TURNED OVER THAT LETTER, YOU HAD ACTUALLY GIVEN HIM HIS MIRANDA WARNINGS, IS THAT RIGHT?  DO YOU REMEMBER THAT?

A.      YES, I DID.

Q.      AND YOU ALSO TESTIFIED THAT NO OTHER WITNESS IN ALL THE PRISON WITNESSES THAT YOU INTERVIEWED DID YOU MIRANDIZE?  OBVIOUSLY -- WELL, YOU DID NOT MIRANDIZE MR. HAMMER.  AGENT THOMPSON DID.  BUT NOBODY ELSE WAS MIRANDIZED, IS THAT RIGHT?

A.      ON THAT DAY?

Q.      IN GENERAL.

A.      THAT I DO NOT KNOW.  BUT I BELIEVE ON THAT DAY I HAD INTERVIEWED A FEW INMATES, AND HE WAS THE ONLY ONE I MIRANDIZED.

Q.      LET'S SEE IF I CAN BE MORE SPECIFIC.  I WILL CHECK YOUR TESTIMONY, JUST A SECOND.

I'M GOING TO HAVE HIM LOOK AT JUNE 11TH, 1998.

THE COURT:  LET'S GO UNTIL 11:20, AND WE WILL TAKE A SHORT RECESS.

BY MR. MCHUGH:

Q.      SEE IF THIS REFRESHES YOUR RECOLLECTION ABOUT THE MIRANDA ISSUE.  IF YOU LOOK AT PAGE 36.

A.      SURE.

MR. MCHUGH:  YOUR HONOR, I'M SORRY, WHAT TIME DID YOU SAY WE SHOULD STOP?

THE COURT:  11:20, AND WE WILL TAKE A SHORT RECESS.

MR. MCHUGH:  SURE.

THE COURT:  WE'LL FINISH THIS LINE OF QUESTIONING.

BY MR. MCHUGH:

Q.      DOES THAT REFRESH YOUR RECOLLECTION AS TO WHETHER OR NOT ANY OTHER INMATES WERE MIRANDIZED BESIDES MR. YAGER IN THIS CASE?

A.      FRANKLY, NO.  NO, IT DOESN'T.  BUT IT JUST SAYS THAT -- I INDICATED THAT I DID NOT MIRANDIZE ANY OTHER INMATES, BUT I'M NOT SURE WHAT THIS IS SPECIFICALLY REFERRING TO.

Q.      I BELIEVE IT'S REFERRING TO YOUR INTERVIEW WITH MR. YAGER.  SO IF YOU LOOK ON THE PRECEDING PAGE, YOU WILL SEE IT'S --

A.      YES, I KNOW IT'S -- I'M SAYING WITH RESPECT TO INTERVIEWING OF INMATE WITNESSES.  OKAY.  I INTERVIEWED A LOT OF INMATES.  SO I DON'T KNOW WHETHER I MIRANDIZED

ANY OF THEM OTHER THAN MR. YAGER.  BUT ON THE PARTICULAR DATE THAT I WENT DOWN TO THE PRISON, I RECALL ONLY MIRANDIZING MR. YAGER.  AND I BELIEVE THAT IS WHAT THE REFERENCE IS TO.

Q.    AND I KNOW WE ARE ABOUT TO FINISH THIS LINE OF QUESTIONING, SO JUST ONE FINAL.

A.    SURE.

Q.    YOU SAID THAT YOU INTERVIEWED A LOT OF WITNESSES.  AS YOU SIT HERE TODAY, CAN YOU REMEMBER ANY OTHER WITNESSES THAT YOU MIRANDIZED THAT WERE PRISONER WITNESSES?

A.    NO.

MR. MCHUGH:  OKAY.

THE COURT:  ALL RIGHT.  LET'S TAKE A FIVE-MINUTE RECESS.

(BREAK TAKEN.)

THE COURT:  LET'S CONTINUE CROSS EXAMINATION, MR. MCHUGH.

MR. MCHUGH:  YES, YOUR HONOR.

BY MR. MCHUGH:

Q.    AGENT MALOCU, DO YOU REMEMBER TESTIFYING IN THE GRAND JURY ON JULY 24TH, 1996?

A.    YES, I DID TESTIFY IN THE GRAND JURY.

Q.    AND DO YOU REMEMBER THERE YOU TESTIFIED ABOUT A -- SOME OF THE LETTERS, THE PRISONER LETTERS WE WILL

CALL THEM?

A.      YES.

Q.      I'M JUST GOING TO -- DO YOU RECALL TESTIFYING ABOUT THE CLASSEN LETTER, THE STEVE LETTER, THAT WE ARE CALLING, AND THAT IS 35.1?

A.      I BELIEVE SO, SIR.

Q.      DO YOU REMEMBER TESTIFYING -- MR. MARTIN ASKED YOU IF YOU WOULD READ ANY HIGHLIGHTED PORTIONS OF THAT DOCUMENT.  DO YOU RECALL THAT?

A.      NOT SPECIFICALLY BUT....

Q.      WELL, I CAN SHOW YOU.

I'M SHOWING YOU A TRANSCRIPT FROM JULY 24TH, '96 OF THE GRAND JURY IN THIS MATTER, IS THAT RIGHT?

A.      YES.

Q.      AND IF YOU COULD TURN TO PAGE 18.  I KNOW WE HAD QUESTIONS EARLIER ABOUT WHETHER THE CLASSEN LETTER THAT YOU HAD WAS AN ORIGINAL OR HAD MR. CLASSEN TORN UP THE ORIGINAL.  ON PAGE 18 MR. MARTIN ASKED YOU TO READ THE HIGHLIGHTED PORTIONS OF THE DOCUMENT, IS THAT RIGHT, A COUPLE OF LINES DOWN?

A.      YES.

Q.      WHAT WAS YOUR ANSWER TO HIM?

A.      PLEASE EXCUSE ME.  IT'S BEEN COPIED SO MANY TIMES IT'S DIFFICULT TO READ.

Q.      SO AT LEAST AS FAR AS THE GRAND JURY IS
CONCERNED, YOU WERE WORKING OFF OF A COPY, IS THAT
RIGHT?

A.      YES.

Q.      AND SO MOVING ON TO THIS ISSUE, THE BRAIDED
SHEETS ISSUE, MOVING AWAY FROM THE LETTER ISSUE.  OH,
ONE FINAL QUESTION.

THE -- WHEN MR. HAMMER, IF YOU KNOW, WAS
INTERVIEWED BY AGENT THOMPSON, HE WAS THEN KEPT AT THE
USP ALLENWOOD FOR A FEW DAYS, IS THAT RIGHT?

A.      YES.

Q.      I BELIEVE -- DO YOU KNOW WHEN HE WAS MOVED
ACROSS THE STREET TO THE FCI ALLENWOOD?

A.      I BELIEVE IT WAS ON THE 19TH.  I'M NOT CERTAIN.

Q.      ABOUT SIX DAYS HE REMAINED THERE?

A.      HE WAS THERE FOR A FEW DAYS.

Q.      DO YOU KNOW WHERE HE WAS DURING THOSE SIX DAYS,
WHERE HE WAS KEPT?

A.      SPECIFICALLY, NO.  I JUST KNOW THAT HE WAS
TEMPORARILY HOUSED IN THE HOLDING PEN BY THE REC CELL
FOR A WHILE.  FROM THERE, I DON'T KNOW IF HE WENT
ANYWHERE ELSE.

Q.      WELL, FOR A WHILE.  DO YOU MEAN LIKE A COUPLE OF
DAYS OR A COUPLE HOURS?

A.      THAT I DON'T KNOW.

Q.    BUT HE DID REMAIN IN THE SHU FOR THAT TIME PERIOD, IS THAT RIGHT?

A.    YES.

Q.    DO YOU RECALL -- I KNOW YOU GOT OR RECEIVED SOME LETTERS THAT WERE TAKEN OUT OF FCI ALLENWOOD.  THEY WERE PHOTOCOPIED FOR YOU.  HE WAS NOT PERMITTED TO HAVE ANY PERSONAL PROPERTY WITH HIM WHEN HE WAS BEING HELD IN THAT SIX DAYS BEFORE HE WAS SHIPPED OVER TO FCI ALLENWOOD.  IS THAT FAIR TO SAY?

A.    I DON'T KNOW.

Q.    YOU DON'T KNOW?

A.    I DON'T, NO.

Q.    IN ANY EVENT, MOVING TO THE BRAIDED SHEET ISSUE.

I REMEMBER YOU TESTIFIED AT THE GRAND JURY THAT IT WAS NOT UNCOMMON FOR A PRISONER TO HAVE A BRAIDED SHEET, IS THAT RIGHT?  DO YOU REMEMBER THAT?

A.    YES.

Q.    AND THAT WAS IN THE GRAND JURY.  I THINK IT WAS THAT SAME GRAND JURY THAT WE JUST LOOKED AT.

A.    YEAH, I THINK, YES.

Q.    PAGE 29?

A.    IT WAS CLARIFIED, THE BRAIDED SHEET WOULD HAVE BEEN CONSIDERED A FORM OF A WEAPON.

Q.    OR CONTRABAND.

A.    OR CONTRABAND, CORRECT.

Q.    I BELIEVE IN THIS GRAND JURY YOU TESTIFIED THAT IT'S COMMON FOR THEM TO HAVE IT, PRISONER TO HAVE IT, AND IN FACT THEY ARE ALLOWED TO KEEP THEM IN THEIR CELL, IS THAT RIGHT?  DO YOU REMEMBER TESTIFYING TO THAT?

A.    SOMETHING TO THAT EFFECT.

Q.    AND THEN A COUPLE OF MONTHS LATER, MAYBE A MONTH LATER, YOU CAME BACK TO A SECOND GRAND JURY AND YOU CLARIFIED THAT IT'S NOT PERMITTED TO BE IN THE CELL, A BRAIDED SHEET?

A.    THAT'S CORRECT.

Q.    BUT MY POINT HERE IS THAT YOU STILL ABIDE BY YOUR TESTIMONY IN FRONT OF THAT GRAND JURY THAT BRAIDED SHEETS ARE NOT THAT UNCOMMON FOR A PRISONER TO HAVE OR TO MAKE, IS THAT FAIR TO SAY, A FEDERAL PRISON AND THESE TYPES OF INSTITUTIONS?

A.    HONESTLY DON'T KNOW THE ANSWER TO THAT.

Q.    AT THE TIME YOU TESTIFIED TO --

A.    AT THE TIME I TESTIFIED TO -- I TESTIFIED TO WHAT I SAID.

Q.    AND THAT WAS THAT IT'S NOT UNCOMMON FOR A PRISONER TO HAVE A BRAIDED SHEET?

A.    THAT'S CORRECT.

Q.    ARE YOU CHANGING -- YOU ARE SAYING YOU DON'T RECALL THAT NOW?

A.    NO.

Q.    YOU ARE DISPUTING YOURSELF?

A.    NO, I'M NOT.  I'M AGREEING THAT I TESTIFIED TO THAT.

Q.    AND ALSO IN THIS CASE, WERE YOU PRESENT DURING THE GUILTY PLEA WHEN MR. HAMMER PLED GUILTY?

A.    I DON'T THINK I WAS.

Q.    WELL, WERE YOU INFORMED THAT -- MR. MARTIN GAVE A RECITATION OF THE FACTS.  YOU ARE FAMILIAR WITH THAT, WHERE A PROSECUTOR WILL GIVE A RECITATION OF THE FACTS IN SUPPORT OF THE PLEA?

A.    YES.

Q.    AND DO YOU REMEMBER OR --

A.    I DON'T THINK I WAS PRESENT FOR THAT, SIR.

Q.    WELL, THE TRANSCRIPT WOULD REFLECT THAT MR. MARTIN STATED THAT THE BRAIDED SHEETS WERE PART OF A HOSTAGE RUSE.  DO YOU REMEMBER THAT?

A.    YES.

Q.    THAT WAS THE GOVERNMENT'S THEORY IN THIS CASE AND PROBABLY STILL IS THE GOVERNMENT'S THEORY?

A.    THAT CAME UP, YES.

Q.    DO YOU REMEMBER OR HAVE YOU BECOME AWARE THAT MR. HAMMER ACCEPTED THE FACTS OF THE PLEA, PLED GUILTY, BUT DID MAKE ONE CORRECTION ON THE RECORD ABOUT THE BRAIDED SHEETS.  DO YOU REMEMBER THAT?

MS. HAINES:  OBJECTION, YOUR HONOR.  HE

WAS NOT THERE.

BY MR. MCHUGH:

Q.    HAVE YOU BEEN INFORMED OF THAT?

A.    NO.

THE COURT:  I'LL OVERRULE THE OBJECTION.

BY MR. MCHUGH:

Q.    WERE YOU INFORMED THAT MR. HAMMER SAID --

A.    NO.

Q.    I'M PARAPHRASING THE FIRST PART ABOUT THE BRAIDED SHEETS, BUT WE USE THOSE FOR OTHER -- WE USE THEM FOR OTHER PURPOSES.  DO YOU REMEMBER THAT?

A.    NO, I DON'T.  I DID NOT GET INTO THE SPECIFICS OTHER THAN --

Q.    THE PLEA WILL SPEAK FOR ITSELF.  I JUST THOUGHT YOU MIGHT REMEMBER.  IN ANY EVENT IN THIS CASE, DID YOU ORDER -- I THINK YESTERDAY COUNSEL REFERRED TO IT AS A SEX KIT.  I KNOW IT AS A RAPE KIT.  BUT IN ANY EVENT A KIT TO DO SOME ANALYSIS DURING THE AUTOPSY, IS THAT RIGHT?

A.    I'M NOT SURE OF YOUR QUESTION.  DID I REQUEST A RAPE KIT?

Q.    YES.  DID YOU DO IT?

A.    I CAN'T RECALL.  I BELIEVE THAT THAT WAS A COMMON PRACTICE WHEN AN INMATE WAS MURDERED AT THE AUTOPSY WE WOULD OBTAIN THOSE ITEMS.  I CAN'T RECALL IF

I SPECIFICALLY ASKED MS. FUNKE FOR THAT ANALYSIS OR THOSE SWABS OR IF SHE JUST PROVIDED IT TO ME.

Q.      BUT ONE WAS DONE IN THIS CASE, IS THAT RIGHT?

A.      YES, IT WAS.

Q.      YOU WERE AWARE OF THAT WITHIN DAYS OF BEING ASSIGNED TO THE CASE, IS THAT RIGHT?

A.      THAT'S CORRECT.  AND I HAD COLLECTED THAT TYPE OF INFORMATION FROM OTHER INMATES WHEN THEY WERE AT AUTOPSY AS WELL.

Q.      DURING THE COURSE OF YOUR INVESTIGATION, AS WE HAVE ALREADY TALKED ABOUT, YOU INTERVIEWED A NUMBER OF INMATES, IS THAT RIGHT?

A.      THAT IS FAIR TO SAY.

Q.      YOU PREPARED 302S WHICH WE HAVE IDENTIFIED PREVIOUSLY IN THIS HEARING AS TO WHAT A 302 IS, AS A RESULT OF THESE INTERVIEWS, IS THAT RIGHT?

A.      CORRECT.

Q.      AND DURING THE COURSE OF YOUR INVESTIGATION, DO YOU RECALL BEING INTERVIEWED OR INTERVIEWING AN INMATE THAT TOLD YOU IT WAS COMMON KNOWLEDGE THAT BOTH MR. MARTI AND MR. HAMMER WERE HOMOSEXUAL?  DO YOU REMEMBER HEARING INFORMATION?

A.      YES, I REMEMBER.  I DON'T RECALL WHO SAID THAT, BUT I REMEMBER --

Q.      I SAW THAT IN THE KENNETH BROWN INTERVIEW.  IT

WAS IN APRIL OF '96, WHO WAS AT USP ALLENWOOD.  HOW ABOUT A GAYLON DON BALL WHO INDICATED DURING YOUR INTERVIEW THAT THE DEFENDANT WAS HAVING SEX WITH MR. MARTI AT SOME POINT?  I'M NOT TALKING ABOUT AT THE TIME OF THE MURDER, BUT AT SOME POINT.

A.      YES, I REMEMBER THAT.  NOT AT THE TIME OF THE MURDER, BUT YES.

Q.      DO YOU REMEMBER INTERVIEWING A ROYCE LEE FOWLER AND YOU MEMORIALIZED IT IN A 302 THAT THE DEFENDANT LIKED BONDAGE AND WANTED TO BE TIED UP DURING SEX?  DO YOU REMEMBER GETTING THAT INFORMATION FROM HIM?

A.      YES.

Q.      SO GIVEN THE BRAIDED SHEETS, THE INTERVIEWS THAT YOU DID, YOU THEN HAD THIS RAPE KIT OR SOMEBODY IN THE -- IN THE PROSECUTION HAD A RAPE KIT DONE?

MS. HAINES:  OBJECTION TO THE FORM OF THAT QUESTION.

MR. MCHUGH:  I'M MOVING ON.  I WILL WITHDRAW IT.

THE COURT:  ALL RIGHT.

BY MR. MCHUGH:

Q.      THE KIT THAT YOU HAD INCLUDED SLIDES AND SWABS, RIGHT?

A.      YES.

Q.      WERE YOU IN CHARGE OF PACKAGING THAT UP AND

SENDING IT TO WASHINGTON FOR THE INVESTIGATION, FOR FURTHER TESTING?

A.    YES, I BELIEVE SO.

Q.    AND SO YOU SENT IT OFF, IS THAT RIGHT?

A.    CORRECT.

Q.    NOW WERE YOU MADE AWARE WHEN IT GOT TO WASHINGTON THAT THEY HAD FOUND THAT THE SLIDE FOR THE PENILE EXAM HAD BEEN -- ARRIVED TO THEM BROKEN?

A.    YEAH, I DO RECALL THAT, YES.

Q.    AND DO YOU KNOW -- DID YOU EVER GET TO THE BOTTOM OF WHAT HAD HAPPENED AS FAR AS THE PACKAGING THAT THAT -- SOMETHING THAT IMPORTANT WOULD BREAK?

A.    IT WAS SENT IN -- I BELIEVE WE FED-EXED IT TO THE LABORATORY.  SO IT BROKE IN BEING COURIERED TO THE LABORATORY THROUGH FED EX.

Q.    IS THAT THE FIRST TIME THAT YOU HAD PACKAGED SOMETHING OF THAT NATURE TO MAIL TO WASHINGTON FOR EXAMINATION?

A.    I CAN'T RECALL.

Q.    WELL --

A.    WHEN YOU SAY SOMETHING LIKE THAT, YOU ARE TALKING ABOUT SWABS?

Q.    SWABS OR SLIDES.

A.    YEAH.

Q.    IMPORTANT DNA EVIDENCE?

A.      SURE.

Q.      IN THIS CASE WE HAVE THE DEFENDANT'S STATEMENT, IS THAT RIGHT, THAT MR. THOMPSON TOOK?

A.      YES.

Q.      YOU DID SOME INVESTIGATION CONCERNING MR. HAMMER CONCERNING OTHER MATTERS THAT HE HAD CONFESSED TO, IS THAT RIGHT?

A.      THAT'S CORRECT.

Q.      AND AS PART OF YOUR INVESTIGATION, YOU ESTABLISHED THAT MR. HAMMER HAD FALSELY CONFESSED TO SOME OTHER MATTERS, IS THAT RIGHT?

A.      YES.

Q.      IN FACT, SOME SERIOUS MATTERS, MURDERS IN EFFECT, IS THAT RIGHT?

A.      YES.

Q.      IN FACT YOU INVESTIGATED ONE PERSONALLY, THE KENNETH KENNER MATTER, IS THAT RIGHT?

A.      THAT'S CORRECT.

Q.      YOU DETERMINED THAT IT WAS A FALSE CONFESSION BY MR. HAMMER, IS THAT RIGHT?

A.      SURE.

Q.      AND THE UNABOMBER, THERE WAS A FALSE CONFESSION THAT HE WAS -- THAT HE WAS INVOLVED IN THAT?

A.      THAT'S CORRECT.  HE WAS IN PRISON AT THE TIME OF THESE MURDERS.

Q.      RIGHT, BUT THERE WERE CONFESSIONS TO THAT, ISN'T THAT RIGHT?

A.      THERE WERE CONFESSIONS, YES.

Q.      AND HOW ABOUT KAREN SILKWOOD MATTER?

A.      YES.  HE WAS IN PRISON AT THE TIME.

Q.      AND IN FACT OTHER MATTERS THAT WE HAVE TALKED ABOUT.  I WON'T GO INTO EACH AND EVERY ONE, BUT YOU ARE AWARE OF NUMEROUS FALSE CONFESSIONS BY MR. HAMMER, IS THAT RIGHT?

A.      YES.

Q.      THIS PARTICULAR STATEMENT THAT YOU RECEIVED, THAT MR. THOMPSON TOOK FROM MR. HAMMER, HE SAID THAT HE HAD ACTUALLY TOLD CORRECTIONAL OFFICER BOONE PRIOR TO THIS INCIDENT OR OFFENSE WITH MR. MARTI, THAT HE WAS GOING TO MESS HIM UP AND THAT BOONE SAID I DON'T HEAR ANYTHING.  DO YOU REMEMBER THAT STUFF IN THE CONFESSION?

A.      I REMEMBER READING THAT, YES.

Q.      DO YOU REMEMBER YOURSELF AND OFFICER TRAXLER ACTUALLY OBVIOUSLY INTERVIEWING CO BOONE TO SEE IF IN FACT THAT WAS TRUE?

A.      I DON'T RECALL INTERVIEWING MR. BOONE.

Q.      DO YOU RECALL THAT OFFICER BOONE TESTIFIED AT TRIAL -- WELL, THAT HE WAS INTERVIEWED AND TESTIFIED, DENYING THAT?  DO YOU RECALL THAT?

A.      I DON'T.  I DON'T RECALL WHETHER HE TESTIFIED OR

NOT.

Q.        THERE WAS ALSO SOME -- IN THE STATEMENT, MR. HAMMER -- IN THE CONFESSION TO MR. THOMPSON -- AGENT THOMPSON, MR. HAMMER STATED THAT HE HAD SENT A LETTER OUT ON BEHALF OF MR. MARTI TO A SHOT CALLER NAMED MARTIN GUERRERO?  DO YOU REMEMBER THAT?

A.        CORRECT.

Q.        DO YOU RECALL YOU DID -- YOU FOLLOWED UP INVESTIGATION ON THAT.  I DON'T BELIEVE YOU PERSONALLY BUT ANOTHER AGENT?

A.        YEAH, I SAID A LEAD AND I BELIEVE THEY FOUND THAT LETTER AT THE RESIDENCE OF MR. SAM YOUNG.

Q.        THEY FOUND A LETTER AT A DIFFERENT PLACE?

A.        NO.  THE LETTER TO MARTIN GUERRERO.

Q.        BECAUSE THE 302 I'M REFERRING TO IS THEY INVESTIGATED AND DID NOT FIND ANY -- MR. GUERRERO NEVER RECEIVED ANY SUCH LETTER.  DO YOU REMEMBER THAT?

A.        MR. GUERRERO NEVER RECEIVED THE LETTER, BUT I'M SAYING IT WAS MAILED THROUGH A THIRD PARTY BECAUSE MR. GUERRERO WAS AN INMATE.  SO THEY COULD NOT SEND MAIL DIRECTLY TO MR. GUERRERO.  THAT WAS -- WHAT HE WAS -- MR. HAMMER WAS SENDING MAIL THROUGH MR. YOUNG, AND THEN MR. YOUNG WOULD FORWARD ON.

Q.        YOU ACTUALLY RECOVERED THAT LETTER?

A.        I PERSONALLY DID NOT, BUT ANOTHER AGENT WHO

DID -- SET A LEAD AND INTERVIEWED MR. YOUNG.  I BELIEVE

THAT WAS ITEMIZED AS AN ITEM THAT WAS RECEIVED AT --

COLLECTED IN MR. YOUNG'S RESIDENCE.

Q.      I'M NOT AWARE OF THAT SO -- NOW, AS PART OF YOUR

INVESTIGATION, DID YOU REVIEW MR. HAMMER'S MEDICAL FILE?

A.      I MAY HAVE COLLECTED EXEMPLARS FROM THEM.

Q.      I'M GOING TO BE MORE SPECIFIC THEN.  DID YOU

INVESTIGATE WHETHER OR NOT HE HAD -- HE WAS AT OR AROUND

THE TIME OF THIS INCIDENT ON PRESCRIPTION MEDICATION, OR

PRESCRIBED MEDICATION BY THE PRISON HOSPITAL OR DOCTORS?

A.      NO, I DID NOT.

Q.      DID YOU DO ANY INVESTIGATION TO SEE IF HE IN

FACT -- IF THE RECORDS REFLECTED, THAT HE WAS IN FACT

COMPLIANT WITH THAT PRESCRIPTION MEDICATION?

A.      NO, I DID NOT.

Q.      AND -- BUT YOU DID INTERVIEW OR YOU ARE FAMILIAR

WITH AN INTERVIEW THAT WAS DONE WITH MR. CLASSEN SHORTLY

AFTER THE MURDER, IS THAT RIGHT?

A.      BY MR. THOMPSON.

Q.      YES, YOU ARE FAMILIAR WITH THAT 302?

A.      I KNOW HE INTERVIEWED HIM, YES.

Q.      DO YOU REMEMBER -- I CAN SHOW IT TO YOU.  DO YOU

WANT TO SEE IT?  IT'S JUST A SMALL POINT.  MR. CLASSEN,

IN THE COURSE OF THAT INTERVIEW, INDICATED HE HAD BEEN

THE CELLMATE OF MR. HAMMER UP UNTIL EITHER THE 8TH OR

9TH OF APRIL, IS THAT RIGHT?

A.      THAT'S RIGHT, HE WAS THE CELLMATE BEFORE MR. MARTI.

Q.      AND THAT THE REASON HE -- ONE OF THE REASONS HE EXITED THE CELL WAS BECAUSE MR. HAMMER WAS BECOMING INCREASINGLY STRESSED OUT.  DO YOU REMEMBER THAT?

A.      YES, SOMETHING TO THAT EFFECT, YES.

MR. MCHUGH:  COUPLE MORE POINTS, YOUR HONOR.

BY MR. MCHUGH:

Q.      I DON'T KNOW IF YOU ARE FAMILIAR WITH AGENT THOMPSON'S VIDEO OF THE CELL.  DO YOU REMEMBER THAT?

A.      YES.

Q.      AT SOME POINT HE HAD FOUND WHAT APPEARED TO BE LIKE A SOCK WITH SOME HARD OBJECTS IN IT MAYBE LIKE BATTERIES, THINGS OF THAT NATURE?

A.      TYPICAL PRISON WEAPON, YES.

Q.      YOU RECALL FROM YOUR INVESTIGATION IN THIS MATTER THAT IN FACT MR. MARTI HAD PREVIOUSLY RECEIVED A WRITEUP FOR POSSESSING A SIMILAR TYPE HOMEMADE DEVICE LIKE THAT.  DO YOU RECALL THAT?

A.      I DON'T.  IT'S POSSIBLE.  BUT I DON'T.

MR. MCHUGH:  I MIGHT HAVE ONE MORE QUESTION, YOUR HONOR, IF I CAN JUST CHECK MY STUFF.

(PAUSE.)

MR. MCHUGH:  YOUR HONOR, THERE IS A DOCUMENT I WANTED TO SHOW THE WITNESS, BUT MR. HAMMER ADVISED ME THAT HE WANTS TO SPEAK TO ME BEFORE I AM DONE MY DIRECT.  SO MAYBE THIS WOULD BE A GOOD TIME I CAN SPEAK TO MR. HAMMER AND ALSO GET THAT LAST DOCUMENT, BECAUSE HE ADVISED ME AHEAD OF TIME TO MAKE SURE I CHECK WITH HIM BEFORE I FINISH.

THE COURT:  THAT IS FINE.  LET'S TAKE A FIVE-MINUTE RECESS.

MR. MCHUGH:  OKAY.  THANK YOU.

(BREAK TAKEN.)

THE COURT:  WE ARE BACK ON THE RECORD.

MR. MCHUGH:  THANK YOU, YOUR HONOR, AND THANK YOU FOR THE BREAK.

THE COURT:  YOU HAVE CONSULTED WITH YOUR CLIENT?

MR. MCHUGH:  I HAVE CONSULTED WITH MR. HAMMER AND I AM READY TO PROCEED.

BY MR. MCHUGH:

Q.    AGENT MALOCU, WE ONLY HAVE A FEW MORE QUESTIONS.

A.    SURE THING.

Q.    I AM GOING TO SHOW YOU WHAT I HAVE MARKED AS D 14.  TAKE A MOMENT.  IF YOU COULD IDENTIFY THAT FOR THE RECORD.

A.    YES.  THIS APPEARS TO BE A REPORT OF INTERVIEW

WITH MARTIN R. GUERRERO.

Q.      AND JUST A COUPLE OF QUESTIONS.  SO THIS IS A 302, IS THAT RIGHT?

A.      IT IS, FROM AGENT DENNIS L. CONWAY.

Q.      AND SO WHEN YOU SAID YOU DID A LEAD, IS THAT THE FBI TERMINOLOGY WHERE YOU KIND OF MAKE A REQUEST FOR SOMEBODY OUTSIDE THE OFFICE -- OUTSIDE YOUR OFFICE TO DO SOME WORK FOR YOU FOR THE FBI?

A.      YES, BECAUSE THE WITNESS WOULD NOT HAVE BEEN IN MY TERRITORY, SO IT WOULD NOT HAVE BEEN RIGHT FOR ME TO INTERVIEW HIM.

Q.      RIGHT.  OKAY.  SO THIS GENTLEMAN, MR. CONWAY, DID THE INTERVIEW, IS THAT RIGHT?

A.      YES.

Q.      AND THEN HE PROVIDED YOU WITH THIS, IS THAT RIGHT?

A.      THAT'S CORRECT.

Q.      THIS IS PART OF THE HAMMER INVESTIGATION, THOUGH, IS THAT CORRECT?

A.      YES.

Q.      OKAY.  AND WOULD YOU AGREE WITH ME IN THIS 302, THAT AS FAR AS THE INTERVIEW -- IT WAS AN INTERVIEW WITH MR. GUERRERO, IS THAT RIGHT?

A.      YES, IT WAS.

Q.      MR. GUERRERO STATED AMONG OTHER THINGS THAT HE

HAD NEVER HEARD OF INMATE ANDREW HUNT MARTI, IS THAT RIGHT?

A.      THAT'S CORRECT.  HE KNEW MR. HAMMER.  HE DID NOT KNOW MARTI.

Q.      NOW, I UNDERSTAND YOUR TESTIMONY CONCERNING THE LETTER, BUT CAN WE AGREE THAT THIS 302 DOES NOT INDICATE THAT ANY LETTER WAS EVER RECOVERED CONCERNING -- ADDRESSED TO A MR. GUERRERO?

A.      THAT'S CORRECT.

Q.      NOW, YOU HAVE TESTIFIED THAT YOU BELIEVE THAT A LETTER WAS RECOVERED FROM A MR. SAM YOUNG THAT WAS ADDRESSED TO MR. GUERRERO, IS THAT RIGHT?

A.      YES.

Q.      WHEN WAS THE LAST TIME YOU SAW THAT LETTER, IF YOU RECALL?

A.      MANY YEARS.

Q.      MANY YEARS.

        MR. MCHUGH:  I WOULD JUST AT THIS TIME, YOUR HONOR -- WE HAVE NOT BEEN PROVIDED WITH A COPY OF THAT LETTER.  SO IF ONE DOES EXIST, WE WOULD JUST MAKE A REQUEST THAT WE BE PROVIDED WITH A COPY OF THAT LETTER FROM THE GOVERNMENT.

        THE COURT:  ALL RIGHT.  YOUR REQUEST IS SO NOTED.

        MR. MCHUGH:  THANK YOU.

BY MR. MCHUGH:

Q.        NOW MOVING ON TO A FINAL ISSUE.  I'M GOING TO SHOW YOU A DOCUMENT.  I HAVE MARKED THIS AS D 15.  NOW THIS IS A MEMORANDUM THAT WAS WRITTEN ON BEHALF OF -- ADDRESSED TO LIEUTENANT TRAXLER, IS THAT RIGHT?  AT THE VERY TOP IT SAYS MEMORANDUM FROM LIEUTENANT TRAXLER.

A.        MEMORANDUM FOR LIEUTENANT TRAXLER.

Q.        THIS IS CONCERNING THE HAMMER INVESTIGATION, IS THAT RIGHT?

A.        YES.

Q.        MR. TRAXLER WAS AN EMPLOYEE OF USP ALLENWOOD, THE BOP, IS THAT RIGHT?

A.        YES.

Q.        HE WAS WORKING THIS CASE ALONG WITH YOURSELF, IS THAT RIGHT?

A.        MR. TRAXLER?

Q.        YES.

A.        I'M TRYING TO READ IT.  I APOLOGIZE.

Q.        TAKE A MINUTE TO REVIEW THE DOCUMENT.  MY APOLOGIES.

A.        OKAY.

Q.        AND WOULD IT BE FAIR TO SAY THAT THIS MEMORANDUM INDICATES THAT IT WAS MR. MARTI WHO PROVIDED THE INITIAL PAPERWORK REQUESTING -- A WRITTEN DOCUMENT, A COPOUT, AS WELL AS A VERBAL REQUEST TO BE MOVED INTO THE CELL WITH

MR. HAMMER, IS THAT RIGHT?

A.      WELL, THIS INDICATES THAT INMATE MARTI WAS REQUESTING TO CELL WITH MR. HAMMER.  AS FAR AS WHO PUT THE FIRST COPOUT IN, I DON'T KNOW.

Q.      THIS WOULD INDICATE THAT MR. MARTI DID THIS DOCUMENT, IS THAT RIGHT?

A.      YES, MADE A COPOUT.

Q.      LATER ON IN THE BODY OF THIS DOCUMENT IT INDICATES THAT IT WAS JOINTLY SIGNED BY MR. HAMMER AND MR. MARTI, IS THAT RIGHT?

A.      YES.

Q.      ALSO IT INDICATES THAT CELL MOVEMENT CAN'T BE DONE BY THE NIGHT SHIFT, IS THAT RIGHT?  THAT IS SOMETHING THAT IS BEST LEFT FOR THE DAY SHIFT, IS THAT RIGHT?

A.      IT'S NOT EXPLICIT IN HERE, BUT MAYBE THAT IS POLICY OF THE PRISON.  I DON'T RECALL.

Q.      WELL, I THOUGHT I SAW -- YOU WOULD HAVE TO GET WITH DAY WATCH BECAUSE EVENING WATCH CAN'T DO CELL CHANGES.  DO YOU SEE THAT LAST SENTENCE?

A.      YES.

Q.      AND YOU KNOW MS. WEAVER.  SHE WAS A NIGHT WATCH, RIGHT, SHE WAS NOT DAY WATCH, IS THAT RIGHT?  AROUND THE TIME OF THIS INCIDENT.

A.      YES, SHE -- WELL, SHE HAPPENED TO BE THERE THAT

EVENING, BUT SHE WAS ON VISITOR -- I'M SORRY.  SHE WAS ON ROAMING.  SO THE NEXT DAY SHE COULD HAVE BEEN ON DAY WATCH.

MR. MCHUGH:  LET ME JUST CHECK MY NOTES, YOUR HONOR, AND I THINK THAT IS ALL I HAVE.

(PAUSE.)

MR. MCHUGH:  THAT'S ALL I HAVE, YOUR HONOR.

THE COURT:  REDIRECT?

MS. HAINES:  THANK YOU, YOUR HONOR.

REDIRECT EXAMINATION

BY MS. HAINES:

Q.    HELLO AGAIN, AGENT MALOCU.

A.    HELLO.

Q.    I WANT TO DIRECT YOUR ATTENTION TO SOME QUESTIONS MR. MCHUGH ASKED YOU ABOUT A COUPLE OF LETTERS OR DOCUMENTS THAT WERE FALSE OR FAKE IN THIS CASE.  DO YOU RECALL A COUPLE OF DOCUMENTS OR LETTERS OR ONE LETTER?

A.    ONE LETTER.

Q.    ONE LETTER?  IS THAT THE LETTER THAT WAS PROVIDED BY A MR. MCSHEA?

A.    THAT'S CORRECT.

Q.    AND MR. MCSHEA, CORRECT ME IF I'M WRONG, PROVIDED A LETTER THAT HE CLAIMED WAS WRITTEN BY

MR. HAMMER, IS THAT TRUE?

A.      CORRECT.

Q.      DO YOU RECALL AS YOU SIT HERE THE SUBSTANCE OF THAT LETTER?

A.      NO, NOT PARTICULARLY ALL THE DETAILS.  I DO REMEMBER IT WAS OBVIOUS THAT IT WAS NOT THE HANDWRITING, EVEN FROM A LAYMAN.

Q.      WHAT, IF ANYTHING, DID YOU DO WITH THAT MCSHEA LETTER TO DETERMINE WHETHER IT WAS ACTUALLY MR. HAMMER'S HANDWRITING?

A.      I BELIEVE I SENT IT TO THE LABORATORY.

Q.      AND DO YOU RECALL WHAT THE LABORATORY CONCLUDED AS TO WHETHER OR NOT IT WAS MR. HAMMER'S HANDWRITING?

A.      THEY WOULD HAVE CONCLUDED IT WAS NOT HIS HANDWRITING.

Q.      WERE ANY OF THE OTHER EXHIBITS THAT YOU HAVE LOOKED AT TODAY THAT WERE INTRODUCED INTO EVIDENCE BY THE GOVERNMENT CONCLUDED TO BE NOT MR. HAMMER'S HANDWRITING, FORGERIES OR FAKE DOCUMENTS?

A.      NO.

Q.      DID YOU EVER TRY TO PASS OFF THE MCSHEA LETTER --

A.      NO.

Q.      -- AS AUTHENTIC MR. HAMMER'S WRITING?

A.      NO.

Q.      NOW, YOU WERE ALSO ASKED A SERIES OF QUESTIONS ABOUT HOW STEVE CLASSEN -- HOW YOU OBTAINED THE STEVE CLASSEN KITE WHEN MR. CLASSEN HAD DESTROYED THAT, DO YOU RECALL THOSE QUESTIONS?

A.      YES, YES.

Q.      I'M GOING TO SHOW YOU AGAIN YOUR TESTIMONY FROM -- I'M SORRY, MR. CLASSEN'S TESTIMONY FROM JUNE 10TH OF 1998 WHICH I HAVE NOW MARKED AS GOVERNMENT EXHIBIT R175 AND I WOULD ASK YOU -- DO YOU STILL HAVE THAT IN FRONT OF YOU?

A.      NO, I DO NOT.

Q.      I'M GOING TO DIRECT YOUR ATTENTION, SIR, TO PAGE 17, LINE ONE.

                MS. HAINES:  YOUR HONOR, I WOULD JUST LIKE TO READ A PORTION OF THIS INTO THE RECORD, IF I MAY?

                THE COURT:  YES.

BY MS. HAINES:

Q.      AGENT MALOCU, IF YOU CAN JUST FOLLOW ALONG AND MAKE SURE I READ IT CORRECTLY.  THE QUESTION WAS ASKED -- THIS IS THE TESTIMONY OF STEVE CLASSEN ON JUNE 10, 1998, PAGE 17, LINE ONE.  THE QUESTION WAS ASKED, AND DID YOU EVER RECEIVE ANY OTHER WRITTEN CORRESPONDENCE FROM MR. HAMMER DURING THE TIME THAT YOU WERE WITH HIM OR IN THE SPECIAL HOUSING UNIT AT ALL?

AND THE ANSWER WAS GIVEN, YEAH, BUT I DIDN'T -- I DIDN'T READ THE WHOLE THING.  THE NIGHT THAT I SENT HIM THE COMMISSARY THROUGH THE COP, I WENT TO BED EARLY THAT NIGHT AND THEN WHEN I WOKE UP THE SATURDAY MORNING, THERE WAS A KITE ON THE FLOOR AND I HAD JUST PUT IT UNDER MY BED.  I DIDN'T READ IT AND THEN I WENT BACK TO BED AND THEN THEY WOKE ME UP TO SEE THE FBI PEOPLE THAT CAME TO INVESTIGATE ME.

DROPPING DOWN TO LINE 21.  WITH RESPECT TO AGAIN THE KITE THAT YOU RECEIVED, DID YOU READ IT?

ANSWER:  NOT THE WHOLE THING.  I DIDN'T LIKE WHAT IT SAID.

QUESTION:  I'M SORRY?

ANSWER:  NO, I DIDN'T READ THE WHOLE THING.  I READ PART OF IT AND THEN I THREW IT AWAY.  PAGE 18, LINE TWO.

QUESTION:  WITH RESPECT TO THROWING IT AWAY, HOW DID YOU THROW IT AWAY?

ANSWER:  IN THE TOILET AND THEN I FLUSHED IT.

DO YOU SEE WHERE MR. CLASSEN GAVE THOSE ANSWERS TO THOSE QUESTIONS?

A.     YES.

Q.     NOW, LET'S READ THE PART THAT MR. MCHUGH DID NOT ASK YOU ABOUT.  TURNING TO PAGE 19, LINE FIVE.

QUESTION:  WHAT I'M GOING TO SHOW YOU NOW, MR. CLASSEN, ALTHOUGH IT'S A LITTLE GRAY, IT'S DISCOLORED, IS GOVERNMENT'S EXHIBIT 35.2 AND 35.1 IS THE ENVELOPE ON THE OTHER SIDE OF IT.

ANSWER:  OKAY.

QUESTION:  WITH RESPECT TO THIS PARTICULAR ITEM OF CORRESPONDENCE, DID YOU EVER RECEIVE THIS ITEM?

ANSWER:  NO, NOT THIS ONE.

QUESTION:  IT IS ADDRESSED TO A STEVE. IF YOU WANT TO LOOK ON THE OTHER SIDE, STEVE CLASSEN, AD 215 AND THE SENDER'S NAME IS HAMMER?

ANSWER:  YES.

QUESTION:  DO YOU SEE THAT?

ANSWER:  YEAH.

QUESTION:  ARE YOU FAMILIAR WITH THE HANDWRITING ON THE ENVELOPE?

ANSWER:  YEAH.

QUESTION:  WHOSE WRITING IS IT?

ANSWER:  IT LOOKS LIKE DAVE.

DOES THAT CLARIFY FOR YOU, AGENT, WHETHER THE NOTE THAT MR. CLASSEN DESTROYED IS THE SAME OR A DIFFERENT DOCUMENT THAN THE GOVERNMENT EXHIBITS 35.2 AND 35.1?

A.     CORRECT, IT APPEARS TO HAVE BEEN A DIFFERENT

ONE.

Q.     YOU WERE ALSO ASKED A SERIES OF QUESTIONS ABOUT WHY YOU DIDN'T OBTAIN MORE EXEMPLARS FROM THE FBI, DO YOU RECALL THOSE QUESTIONS?

A.     YES.

Q.     NOW, I HAVE PUT BACK IN FRONT OF YOU GOVERNMENT EXHIBIT 55, WHICH IS A TEN-PAGE SINGLE-SPACED LETTER TO SAM DATED APRIL 19TH, 1996.  TO YOUR UNDERSTANDING, HOW MUCH OF THIS LETTER WOULD MR. HAMMER HAVE HAD TO COPY OR REWRITE IN ORDER TO GET THE TYPE OF EXEMPLAR THAT THE HANDWRITING ANALYST WANTED?

A.     FOR THEM TO CONCLUDE THAT HE WAS -- TO AUTHENTICATE THAT LETTER, HE WOULD HAVE TO REWRITE THE WHOLE LETTER.

Q.     TEN PAGES WORTH OF SINGLE SPACED WRITING?

A.     CORRECT.

Q.     DO YOU KNOW WHETHER HE WOULD HAVE HAD TO HAVE WRITTEN THAT ONCE OR MORE THAN ONCE?

A.     PROBABLY MORE THAN ONCE.

Q.     NOW, YOU WERE ALSO ASKED SOME QUESTIONS ABOUT WHAT DATE MR. HAMMER MOVED FROM ALLENWOOD USP TO THE FCI AND I BELIEVE YOUR ANSWER WAS APRIL 19TH, CORRECT?

A.     YEAH, THAT WAS MY ANSWER.

Q.     I WOULD LIKE TO PUBLISH WHAT IS IN EVIDENCE AS GOVERNMENT EXHIBIT R171.

AND AGENT MALOCU, KEEPING GOVERNMENT EXHIBIT 55 IN FRONT OF YOU, LET'S LOOK AT WHAT MR. HAMMER HAD TO SAY ABOUT WHEN HE MOVED.  WOULD YOU PLEASE REFER BACK TO GOVERNMENT EXHIBIT 55, THE LETTER TO SAM YOUNG?

A.     YES.

Q.     DO YOU SEE THE FOURTH SENTENCE, ON WEDNESDAY?

A.     PAGE ONE?

Q.     PAGE ONE.

A.     OH, OKAY, YES.

Q.     WHAT DOES THAT SAY?  YOU ALREADY READ IT ONCE, BUT WHAT DOES IT SAY?

A.     ON WEDNESDAY SHORTLY AFTER OUR PHONE CONVERSATION I WAS CHAINED UP AND BROUGHT ACROSS THE ROAD TO THE FCI.

Q.     AND IF THIS LETTER WAS DATED APRIL 19TH OF 1996, WHEN WAS WEDNESDAY WHEN HE WAS CHAINED UP AND BROUGHT ACROSS THE ROAD TO THE FCI?

A.     THAT WOULD HAVE BEEN THE 17TH.

Q.     THANK YOU.

YOU WERE ALSO ASKED A SERIES OF QUESTIONS AS TO WHETHER MR. HAMMER AND MR. MARTI ENGAGED IN SEXUAL BONDAGE, DO YOU RECALL THOSE QUESTIONS?

A.     YES.

Q.     DO YOU HAVE ANY EVIDENCE THAT MR. MARTI AND

MR. HAMMER WERE ENGAGED IN SEXUAL BONDAGE AT THE TIME THAT MR. MARTI WAS MURDERED?

A.    NO EVIDENCE.

Q.    YOU WERE ALSO ASKED A SERIES OF QUESTIONS ABOUT A MARTIN GUERRERO LETTER, CORRECT?

A.    THAT'S CORRECT.

Q.    A LETTER TO MR. GUERRERO CAME UP IN MR. HAMMER'S CONFESSION, IS THAT NOT CORRECT?

A.    YES.

Q.    DO YOU RECALL WHAT MR. HAMMER ALLEGED AS FAR AS WRITING TO MR. GUERRERO?

A.    YES, HE WAS WRITING ON BEHALF OF MR. MARTI FOR MR. GUERRERO TO CUT HIM A BREAK.

Q.    YOU WERE SHOWN AN FBI 302 WHERE MR. GUERRERO WAS INTERVIEWED AND INDICATED HE NEVER RECEIVED THAT LETTER, DO YOU RECALL SEEING THAT?

A.    YES.

Q.    YOU ALSO, I BELIEVE, SAID THAT A LETTER WAS INTERCEPTED, DO YOU RECALL THOSE QUESTIONS?

A.    YES.

Q.    I'M GOING TO SHOW YOU WHAT HAS BEEN MARKED AS GOVERNMENT EXHIBIT R177.

AND IF YOU COULD TELL US WHAT IS R177, AND I WILL ASK YOU IF THAT REFRESHES YOUR RECOLLECTION AS TO WHEN THE LETTER FROM MARTIN GUERRERO -- WHEN THE

LETTER TO MARTIN GUERRERO WAS INTERCEPTED?

A.        SEPTEMBER 13 OF 1996, AGENT BRUCE JOHNSON, I WOULD IMAGINE HE WOULD BE FROM OUR CINCINNATI OFFICE, HE HAD WROTE THE SUMMARY OF INVESTIGATION.

Q.        AND AS PART OF AGENT JOHNSON'S INVESTIGATION, DID HE INTERCEPT A LETTER TO MARTIN GUERRERO?

A.        YES, HE HAD MET WITH MR. YOUNG, HE HAD INTERVIEWED MR. YOUNG AND HAD COLLECTED VARIOUS ITEMS FROM MR. YOUNG'S RESIDENCE.

Q.        I'M NOW GOING TO SHOW YOU WHAT HAS BEEN MARKED AS GOVERNMENT EXHIBIT 128.

AGENT, DO YOU RECOGNIZE GOVERNMENT EXHIBIT 128?

A.        YES, I DO.

Q.        WHAT IS IT?

A.        THIS IS THE LETTER THAT WAS -- THE LETTER TO MARTIN THAT WAS COLLECTED FROM MR. YOUNG, MAURICE'S YOUNG'S RESIDENCE.

Q.        IS IT DATED?

THE COURT:  HE DROPPED HIS VOICE.  IT'S A LETTER FROM WHO?

THE WITNESS:  THIS IS THE LETTER TO MARTIN FROM DAVID PAUL WITH RESPECT -- FROM DAVID PABLO ARTEO, 1232, WHICH WAS COLLECTED IN THE RESIDENCE OF MAURICE YOUNG.

BY MS. HAINES:

Q.      THE DATE OF THE LETTER?

THE COURT:  THAT NAME YOU JUST REFERRED TO IS NOT MR. HAMMER'S NAME.

THE WITNESS:  IT APPEARS TO BE SPANISH, 1232 I WOULD IMAGINE ALLUDES TO THE YEARS OF SENTENCE THAT MR. HAMMER RECEIVED.

THE COURT:  AND THIS LETTER WAS RETRIEVED FROM WHERE?

THE WITNESS:  THIS WAS RECEIVED FROM MR. HAMMER'S LONG TIME FRIEND AND ASSOCIATE IN OHIO, MAURICE SAMUEL YOUNG.

THE COURT:  WHO?

THE WITNESS:  MAURICE SAMUEL YOUNG.

THE COURT:  ALL RIGHT.

BY MS. HAINES:

Q.      AND AGENT MALOCU, DO YOU RECALL WHERE MR. YOUNG SAID HE RECEIVED THE LETTER?  IF YOU NEED TO REVIEW A REPORT, PLEASE LET ME KNOW.

A.      YES.  THE REPORT ITEM NUMBER TEN HANDWRITTEN LETTER DATED APRIL 11TH, 1996 TO MARTIN.

Q.      THAT WAS NOT MY QUESTION, SIR.  MY QUESTION WAS, WHEN MR. YOUNG WAS INTERVIEWED, DO YOU KNOW WHERE HE SAID HE RECEIVED THE LETTER, WHO HE RECEIVED THE LETTER FROM?

A.        NO, I DON'T.

Q.        LET ME SHOW YOU WHAT HAS BEEN MARKED AS GOVERNMENT EXHIBIT R178.

AGENT, IF YOU CAN REVIEW THE HIGHLIGHTED PORTION OF GOVERNMENT R178 AND FIRST OF ALL, WHAT IS THAT?

A.        THIS IS FD 302, WHICH IS A SUMMARY OF INTERVIEW WITH MAURICE SAMUEL YOUNG BY SPECIAL AGENT BRUCE JOHNSON.

Q.        AND IF YOU COULD REVIEW THE HIGHLIGHTED PORTION?

A.        ON OR ABOUT?

Q.        YES, PLEASE.

A.        ON OR ABOUT APRIL 1996, YOUNG LEARNED FROM HAMMER THAT HAMMER HAD MURDERED HIS CELLMATE, ANDREW MARTI.  YOUNG FIRST LEARNED OF THIS DURING A CONVERSATION HE HAD WITH HAMMER.  DURING THIS CONVERSATION HAMMER ADMITTED TO YOUNG THAT HE HAD MURDERED MARTI IN HIS CELL AT THE U.S. PENITENTIARY ALLENWOOD, WHITE DEER, PENNSYLVANIA.  ON OR ABOUT THE TIME OF THE MURDER, YOUNG ALSO RECALLED RECEIVING A LETTER FROM HAMMER.  THE LETTER WAS ADDRESSED TO MARTIN, NO LAST NAME.  IN ADDITION, NO FORWARDING ADDRESS WAS ALSO GIVEN WITH THE LETTER.  ACCORDINGLY, YOUNG NEVER FORWARDED THE LETTER AND IS CURRENTLY IN POSSESSION OF IT.  YOUNG STATED THAT HE HAS READ THE LETTER AND THAT

HE IS CURRENTLY OF THE OPINION THAT IT WAS NOT RELEVANT TO THE MURDER WHICH WAS COMMITTED BY HAMMER.  THE LETTER WAS ALSO SAID TO CONTAIN VARIOUS LAST NAMES OF INDIVIDUALS THAT WERE OF A HISPANIC NATURE.  YOUNG INDICATED THAT HE WOULD RETRIEVE THE LETTER FROM HIS RECORDS AND THAT HE WOULD FORWARD IT TO THE FBI FOR ITS USE IN THE INVESTIGATION.

Q.     IS THAT THE LETTER THAT IS UP THERE MARKED AS, IF YOU CAN ASSIST ME, GOVERNMENT EXHIBIT --

A.     YES.

Q.     GOVERNMENT EXHIBIT, WHAT IS IT?

A.     128.

Q.     128.

MS. HAINES:  YOUR HONOR, IF I HAVE NOT ALREADY, WE WOULD SEEK TO MOVE 128 INTO EVIDENCE.

THE COURT:  ALL RIGHT, 128 WILL BE RECEIVED HEARING NO OBJECTION.

(GOVERNMENT EXHIBIT NUMBER 128 ADMITTED INTO EVIDENCE.)

MS. HAINES:  I HAVE NO FURTHER QUESTIONS, YOUR HONOR.

THE COURT:  RECROSS.

RECROSS EXAMINATION

BY MR. MCHUGH:

Q.     AGENT MALOCU, YOU WERE JUST QUESTIONED ON

REDIRECT ABOUT GETTING AN EXEMPLAR FOR AN EIGHT PAGE LETTER FROM, I THINK IT'S IN THE 50 SERIES.  I'M MORE CONCERNED ABOUT THE 30 SERIES, THESE ALLEGED LETTERS FROM THE PRISONERS, THE INFORMANTS.  THE SEVEN REASONS TO KILL.  THAT IS A HALF -- NOT EVEN A HALF A PIECE OF PAPER, IS THAT RIGHT?

A.     YES.  SO --

Q.     YOU COULD HAVE GOTTEN AN EXEMPLAR FOR THAT, CORRECT?

A.     WHAT I DID FOR THAT LETTER, I HAD ASKED HIM TO WRITE --

Q.     THREE WORDS?

A.     -- WORDS THAT WERE IN THOSE LETTERS.

Q.     RIGHT.  BUT CERTAINLY GETTING AN EXEMPLAR FOR A HALF A PIECE OF PAPER IS SOMETHING THAT YOU COULD HAVE DONE IN THIS MATTER, IS THAT RIGHT?

A.     YES.  AND AT THE TIME I DID NOT KNOW I HAD TO DO THAT, YES.

Q.     YOU DID RECEIVE THOSE REPORTS FROM WASHINGTON?

A.     SUBSEQUENTLY YES AND I DID NOT GO BACK AND DO THAT.

Q.     RIGHT, BUT YOU COULD HAVE?

A.     SURE.

Q.     THE SAME THING FOR THE OTHER TWO, THE ROCK LETTER IS ONE PAGE, IS THAT CORRECT?

A.    YES.

Q.    AND THE STEVE LETTER THAT I'M GOING TO ALSO TALK TO YOU ABOUT IS BARELY ONE PAGE, IS THAT RIGHT?

A.    THAT'S CORRECT.

Q.    SO NOW, THE ISSUE WITH THIS CLASSEN, STEVE LETTER IS -- MY QUESTIONING TO YOU WAS SIMPLY, THE LETTER THAT WAS SENT TO WASHINGTON, WAS IT AN ORIGINAL OR WAS IT A COPY?  NOW, I THINK YOU'VE TESTIFIED ON REDIRECT THAT YOU THINK NOW THERE MIGHT BE TWO LETTERS, BUT I WANT TO FOCUS ON THE LETTER THAT YOU SENT TO WASHINGTON, OKAY, TO GET EXEMPLARS DONE.  THAT WAS A LETTER TO STEVE, IS THAT RIGHT, IT'S IN THIS BOOK?

A.    YES, THE LETTER TO STEVE.

Q.    AND DO YOU RECALL THAT MR. CLASSEN TESTIFIED IN THE GRAND JURY, IS THAT RIGHT?

A.    I WAS NOT PRESENT, BUT YES, HE DID TESTIFY IN FRONT OF THE GRAND JURY.

Q.    AS YOU JUST READ IN HIS TRIAL TESTIMONY OR AS COUNSEL READ TO YOU, HE DESCRIBES HOW IT CAME UNDER HIS DOOR AND THEN HE TORE IT UP, IS THAT RIGHT?

A.    NO, IT CAME UNDER HIS DOOR, HE LAID IT UNDER HIS BED AND HE DID NOT READ IT.

Q.    AND THEN HE TORE IT UP AND THREW IT IN THE TOILET, IS THAT RIGHT, DO YOU REMEMBER THAT?

A.    LATER, CORRECT.

Q.      YEAH, OKAY.  THERE IS SOME INDICATION THAT THIS LETTER THAT WENT TO WASHINGTON IS A SECOND LETTER, IS THAT WHAT YOU THOUGHT MIGHT BE POSSIBLE, AND NOT THE LETTER HE TORE UP?

A.      SURE.

Q.      SO I WANT YOU TO LOOK AT HIS GRAND JURY TESTIMONY AND I ALREADY TOLD COUNSEL IT'S PAGE 13.  I DON'T HAVE AN EXTRA COPY.

MR. GURGANUS:  CAN YOU USE THE ELMO?

MR. MCHUGH:  SURE.

MR. GURGANUS:  THAT MIGHT HELP EVERYONE.

BY MR. MCHUGH:

Q.      IF YOU CAN JUST READ THIS.

THE COURT:  SOMEHOW YOU HAVE TO SPEAK INTO A MIC.

MR. MCHUGH:  I DON'T KNOW IF IT'S GOING TO BE CLEAR ENOUGH.

MR. GURGANUS:  YOU CAN BRING IT DOWN, YOU CAN LOWER IT.  YOU CAN BLOW IT UP WITH THAT.  THERE IS A ZOOM FEATURE.

MR. MCHUGH:  YOU KNOW WHAT, IT'S JUST GOING TO BE TWO PAGES OF READING.  THANKS FOR THE SUGGESTION.

BY MR. MCHUGH:

Q.      I'M GOING TO ASK YOU TO READ FROM PAGE 13 DOWN

TO THE BOTTOM OF PAGE 15, OKAY.  SO FOR THE RECORD, THIS IS STEVE CLASSEN, WITNESS, AUGUST 28, 1996, IN RE: MATTER OF UNITED STATES ATTORNEY'S OFFICE.  OKAY.  IF YOU COULD READ THE QUESTION.

A.      QUESTION:  AND WE ARE GETTING TO THE AFTERWARDS NOW.  THIS GRAND JURY'S ON AN EARLIER OCCASION SAW THIS GRAND JURY EXHIBIT NUMBER 4 WHICH IS A LETTER TO YOU, RIGHT?

            ANSWER:  YEAH.

Q.      AND YOU IS THE WITNESS, MEANING MR. CLASSEN, RIGHT?

A.      CORRECT, MR. CLASSEN.

Q.      OKAY.

A.      YEAH, IT'S A LETTER TO ME.

            QUESTION:  CAN YOU EXPLAIN HOW THIS CAME ABOUT OR WHAT THE SEQUENCE OF EVENTS WAS, HOW YOU GOT IT?

            ANSWER:  YEAH.  YOU SAW THESE GUYS READ THIS, HUH?

            QUESTION:  THEY HAVE HEARD PARTS OF IT.

            ANSWER:  OKAY.

            QUESTION:  SO YOU DON'T HAVE TO READ IT TO THEM.

            ANSWER:  YEAH, I WASN'T GOING TO READ IT. I JUST DIDN'T KNOW IF THEY HEARD IT OR NOT.  I DON'T

REMEMBER THE DAY FOR SURE, BUT I THINK IT WAS THE DAY THAT THE FBI CAME.  THEY HAVE -- OH, THEY HAVE ORDERLIES OR WHATEVER THAT BRING THESE LITTLE KITES HERE, LETTERS, AND THEY SLIDE THEM UNDER YOUR DOOR, OR WHATEVER.  AND I HAD GOTTEN THIS ONE AND I DON'T REMEMBER RIGHT NOW, I LIKE -- I SAID THE DATE.  I MEAN, THE DATE IS RIGHT HERE, YOU KNOW.  IT SAYS MONDAY, BUT IN MY MIND I DON'T REALLY REMEMBER THE DATE FOR SURE.

CONTINUE?

Q.    YES.

A.    BUT ANYWAY, I WENT TO BED EARLY THAT NIGHT AND WHEN I WOKE UP THERE WAS A KITE UNDER MY DOOR.

AND I JUST PUT IT UNDER MY BED AND I WAS GOING TO READ IT LATER BECAUSE I WENT BACK TO BED AND THEN WHEN I PICKED IT UP, IT WAS THIS ONE HERE AND I DIDN'T EVEN READ THE WHOLE THING, YOU KNOW.  WHEN I GOT DOWN TO HERE, AND THEN WHEN I HAD TORE IT UP, BECAUSE I DIDN'T LIKE WHAT IT WAS SAYING.

Q.    SO SO FAR IT'S CONSISTENT WITH THE LETTER HE TESTIFIED ABOUT AT TRIAL, IS THAT RIGHT, ABOUT TEARING IT UP AND FINDING IT UNDER HIS DOOR?

A.    YES.

Q.    OKAY.

A.    AND THIS WAS AFTER I HAD TALKED TO THE FBI.

Q.    IF YOU RECALL, HE TALKED TO AGENT THOMPSON ON

THE 13TH.

A.          CORRECT.

Q.          OKAY.

A.          SO I DID THIS, BUT YOU KNOW, I DIDN'T READ THE WHOLE THING.

QUESTION:  AGAIN, YOU NEVER GAVE THIS TO THE FBI?

ANSWER:  NO.  I THREW IT AWAY RIGHT AWAY, I DIDN'T EVEN FINISH READING IT, YOU KNOW.  AND THEN LATER ON ABOUT 3 OR 4, I THINK IN MAY SOMETIME, I HAD TOLD ONE OF THE STAFF GUYS AT THE INSTITUTION THAT THERE WAS A LETTER, YOU KNOW, TRAXLER, AND I'M SURE HE COULD REMEMBER, AND I TOLD HIM AND I DIDN'T EVEN KNOW THESE GUYS HAD THIS.  I DIDN'T KNOW YOU GUYS HAD THIS.  I THOUGHT IT CAME RIGHT TO ME.

QUESTION:  WE WORK IN STRANGE AND MYSTERIOUS WAYS.

Q.          AND THAT IS MR. MARTIN?

A.          CORRECT.

RATHER THAN READ THE WHOLE THING, THERE IS SOMETHING IN IT THAT SAYS BASICALLY I DID WHAT I COULD -- I DID WHAT I TOLD YOU I WAS GOING TO DO.

ANSWER:  YEAH.  WELL, I GUESS LIKE THE THIRD PARAGRAPH SAYS, STEVE --

Q.          OKAY.  NOW, IF I CAN STOP YOU THERE, BECAUSE HE

IS ABOUT TO READ FROM THE LETTER, RIGHT?

A.      YES.

Q.      I'M GOING TO ASK YOU --  I'M SHOWING YOU THE
TRANSCRIPT THAT YOU READ FROM EARLIER TODAY WHICH IS
WHAT THE GOVERNMENT BELIEVES IS THIS LETTER.  DOES IT
NOT IDENTICALLY TRACK THIS TRANSCRIPT WITH WHAT HE IS
READING FROM IN THAT GRAND JURY?  IF YOU COULD READ IT.
YOU CAN READ THE GRAND JURY TRANSCRIPT.

A.      ALOUD OR TO MYSELF?

Q.      ALOUD.

A.      IN QUOTES, STEVE, I DON'T CARE WHAT YOU SAY TO
THE FBI OR SIS.  THIS ISN'T ANYTHING THAT CAN HURT ME
BECAUSE THEIR CASE IS PRETTY OPEN AND SHUT.  I'M SURE
YOU WERE SURPRISED TO LEARN THAT I DONE WHAT I TOLD YOU
I WAS GOING TO DO WITH MARTI.  I MEAN, I DID NOT READ
THAT VERY GOOD BUT --

Q.      SO IS THAT NOT THE EXACT LANGUAGE FROM THIS
TRANSCRIPT THAT YOU READ EARLIER OF THE LETTER THAT YOU
SENT DOWN TO WASHINGTON?  YOU CAN LOOK AT IT RIGHT HERE
IF YOU WANT.  GO LINE BY LINE, WORD-FOR-WORD, ISN'T THAT
RIGHT?

A.      YES.

Q.      THE PART THAT YOU WERE ASKED TO READ TODAY AND
THE PART THAT HE WAS ASKED TO READ IN THE GRAND JURY ARE
EXACTLY THE SAME, IS THAT RIGHT?

A.      THAT PHRASEOLOGY, YES.

Q.      FROM THIS GRAND JURY, THE EXHIBIT THAT MR. MARTIN IS SHOWING THE WITNESS IS WORD-FOR-WORD VERBATIM FROM THE LETTER THAT THE GOVERNMENT IS INTRODUCING TODAY AND THAT THE LETTER THAT YOU SENT TO WASHINGTON, IS THAT RIGHT?

A.      I BELIEVE SO.

Q.      AND MR. CLASSEN IN THAT SAME DISCUSSION SAID HE THREW THAT LETTER AWAY, RIGHT, THAT LETTER THAT HE READ?

MS. HAINES:  I'M GOING TO OBJECT, YOUR HONOR, THE TRANSCRIPT SPEAKS FOR ITSELF.  I THINK IT'S CONFUSING AND AMBIGUOUS, BUT THIS WITNESS CANNOT INTERPRET IT.

THE COURT:  I THINK I HAVE HEARD THE EVIDENCE AND I CAN DRAW MY OWN CONCLUSIONS AT THIS POINT.  THE LAST QUESTION IS REDUNDANT.  ALL RIGHT.

MR. MCHUGH:  THANK YOU, YOUR HONOR.  THE FACT THAT IT IS GRAND JURY TESTIMONY I DON'T THINK IT WOULD BE PART OF THE OFFICIAL RECORD, SO MAYBE I SHOULD INCLUDE IT AS A DEFENSE EXHIBIT OUT OF AN ABUNDANCE OF CAUTION, SO I'M GOING TO MARK THIS.  IT'S THE ONLY COPY I HAVE, YOUR HONOR, BECAUSE I DID NOT FORESEE THIS AS A PROBLEM.

THE COURT:  WHY DON'T YOU MAKE COPIES.

MR. MCHUGH:  IT WILL BE D 16.

THE COURT:  SEE IF YOU CAN MAKE IT A LITTLE DARKER, TOO.  IT LOOKS LIKE A LIGHT COPY.

MR. MCHUGH:  THAT IS ALL I HAVE ON REDIRECT.

THE COURT:  ANY FURTHER TESTIMONY FROM THIS AGENT?

MS. HAINES:  JUST ONE QUESTION, YOUR HONOR.

THE COURT:  ONE QUESTION?

MS. HAINES:  YES, PROMISE.

REDIRECT EXAMINATION

BY MS. HAINES:

Q.    SIR, I'M GOING TO SHOW YOU GOVERNMENT EXHIBIT 35.2 AND ASK YOU TO LOOK AT WHETHER THIS IS AN ORIGINAL DOCUMENT OR A PHOTOCOPY.  CAN YOU DO THAT, SIR?

A.    YEAH.

MR. MCHUGH:  I WOULD ASK THE COURT TO GIVE IT THE WEIGHT IT IS WORTH.  HE IS NOT AN EXPERT.

THE COURT:  I CAN'T --

MR. MCHUGH:  YOUR HONOR, HE IS OBVIOUSLY NOT AN EXPERT IN DOCUMENT ANALYSIS, SO HE WOULD BE GIVING AN OPINION OF WHETHER THIS IS A PHOTOCOPY OR AN ORIGINAL I THINK IS --

THE COURT:  I'LL OVERRULE IT.  HE HAS HAD ENOUGH EXPERIENCE WITH THESE DOCUMENTS.

WHAT IS THIS?

MS. HAINES:  THIS IS THE STEVE CLASSEN LETTER THAT WE HAVE BEEN ARGUING ABOUT.

THE COURT:  GIVE ME A NUMBER.

MS. HAINES:  G 35.2.

THE COURT:  G 35.2.

MS. HAINES:  AND AGENT MALOCU, IF YOU CAN ASSIST ME, I BELIEVE THE ENVELOPE IS 35.1?

THE COURT:  ARE THOSE ORIGINALS OR COPIES, IN YOUR OPINION?

THE WITNESS:  ORIGINALS.

MS. HAINES:  THANK YOU, I HAVE NOTHING FURTHER, YOUR HONOR.

THE COURT:  YOU MAY STEP DOWN, THANK YOU.

THE DEFENDANT:  EXCUSE ME, YOUR HONOR. EXCUSE ME, YOUR HONOR, BEFORE THE WITNESS IS EXCUSED, COULD WE TAKE OUR -- CAN WE TAKE OUR BREAK FOR LUNCH, IT'S ALMOST 12:30, SO IT WOULD GIVE ME A CHANCE TO SPEAK WITH MY ATTORNEYS BEFORE THE WITNESS IS EXCUSED?

THE COURT:  YES, I WILL AFFORD THAT RIGHT TO YOU.  ALL RIGHT.  WE ARE GOING TO TAKE OUR RECESS NOW.

THE DEFENDANT:  THANK YOU, SIR.

THE COURT:  IT'S 12:30, WE'LL COME BACK AT QUARTER OF TWO.  LET'S HAVE THE AGENT AVAILABLE AT

THAT POINT IF THERE IS ANY FURTHER FOLLOW-UP QUESTIONS.

MS. HAINES:  YES, YOUR HONOR.

THE COURT:  ALL RIGHT.  OKAY.  WE WILL STAND IN RECESS UNTIL QUARTER OF TWO.

(LUNCHEON BREAK TAKEN.)

THE COURT:  WE ARE BACK ON THE RECORD NOW.  MR. HAMMER IS WITH US AND ALL COUNSEL.

AND WHAT IS THE STATUS WITH RESPECT TO THE AGENT?

MR. MCHUGH:  WE HAD ONE FINAL QUESTION, YOUR HONOR, AFTER CONSULTATION WITH MR. HAMMER.

THE COURT:  ALL RIGHT.

BY MR. MCHUGH:

Q.      AGENT MALOCU, ON REDIRECT THERE WAS AN EXHIBIT MARKED, WHICH WAS A LETTER TO MARTIN.  I BELIEVE IT'S EXHIBIT 128.

A.      YES.

Q.      MY QUESTION IS, DID THAT EVER GET SENT, AS FAR AS YOU KNOW, TO BE EXAMINED FOR HANDWRITING COMPARISON?

A.      NOT THAT I'M AWARE OF.  NOT THAT I CAN RECALL.

MR. MCHUGH:  THAT'S ALL I HAVE, YOUR HONOR.

THE COURT:  YOU MAY STEP DOWN.

THE WITNESS:  THANK YOU, YOUR HONOR.

(WITNESS EXCUSED.)

MR. GURGANUS:  YOUR HONOR, IF WE MAY --
TO CLARIFY A COUPLE OF MATTERS, I THINK IT WOULD BE
HELPFUL TO THE COURT, IF I MAY.

THE COURT:  OKAY.

MR. GURGANUS:  WE HAVE THE FULL GRAND
JURY TRANSCRIPT.  UNFORTUNATELY WHEN THE DEFENSE WAS
READING IT TO MR. MALOCU, THEY DID NOT HAVE THE NEXT
PAGE.  THEY STOPPED AT PAGE 15.  AND I THINK THIS WILL
HELP THE COURT UNDERSTAND THE GOVERNMENT'S POSITION THAT
THERE WERE TWO MATTERS, TWO LETTERS, ESPECIALLY WHEN THE
COURT WILL HEAR MR. CLASSEN'S FULL TRIAL TESTIMONY.  THE
GRAND JURY TESTIMONY SEEMED TO HAVE A LITTLE BIT OF
CONFUSION ON WHAT LETTERS THEY WERE TALKING ABOUT, BUT
AS I READ HERE, YOU ARE GOING TO SEE THAT THERE WAS A
SECOND LETTER MENTIONED.  I CAN HAND -- WOULD YOU LIKE
ME TO READ IT INTO THE RECORD.

THE COURT:  WHY DON'T YOU JUST READ IT
INTO THE RECORD.

MR. GURGANUS:  I HAVE A COPY FOR YOU,
ALSO.

MR. MCHUGH:  YOUR HONOR, WE HAD MARKED AS
D 16 THE INCOMPLETE VERSION.  SO IF WE CAN JUST SWITCH
THAT COMPLETE VERSION TO D 16, I THINK WOULD MAKE THE
MOST SENSE.

THE COURT:  THIS IS GOVERNMENT -- IT SAYS

1012.4.

MR. GURGANUS:  YES, YOUR HONOR.

THE COURT:  WHICH WOULD ALSO BE D 16.

MR. GURGANUS:  THAT'S CORRECT, YOUR HONOR.

YOUR HONOR, THIS IS FROM THE GRAND JURY TRANSCRIPT, AUGUST 28, 1996, OF STEVE CLASSEN AND THE -- THERE WAS THIS QUESTIONING ABOUT THE LETTER THAT WAS BEING READ.  AND, JUDGE, IT SAYS, AFTER THAT:  WE WORK IN STRANGE AND MYSTERIOUS WAYS.  IT THEN CONTINUED. RATHER THAN READ THE WHOLE THING, THERE IS SOMETHING IN IT THAT SAYS BASICALLY, I DID WHAT I TOLD YOU I WAS GOING TO DO.

AND THE ANSWER WAS:  YEAH, WELL, I GUESS LIKE THE THIRD PARAGRAPH SAYS, STEVE, I DON'T CARE WHAT YOU SAY TO THE FBI OR SIS.  THIS ISN'T ANYTHING THAT CAN HURT ME BECAUSE THEIR CASE IS PRETTY OPEN AND SHUT.  I'M SURE YOU WERE SURPRISED TO LEARN THAT I DONE WHAT I TOLD YOU I WAS GOING TO DO WITH MARTI.  I MEAN I DIDN'T READ THAT VERY GOOD BUT I'M NOT A GOOD PUBLIC SPEAKER.  AND THEN THERE IS ANOTHER ONE, YOU KNOW, BUT YEAH, AND THAT IS ABOUT WHEN I THREW IT AWAY AND I HAD ALREADY KNOWN ALWAYS.  I WAS STILL IN SHOCK BECAUSE THE FBI HAD ALREADY TALKED TO ME.

IN THE GOVERNMENT'S VIEW THERE IS SOME

CONFUSION HERE, BUT THERE'S TWO LETTERS HERE.  THERE HAS BEEN ALSO SOME ARGUMENT HERE THAT -- A QUESTION OF WHETHER THIS DOCUMENT IS A PHOTOCOPY.  WELL, YOUR HONOR, IT IS A DOCUMENT THAT HAS AN ENVELOPE WITH IT AND IT HAS BEEN SUBMITTED FOR FINGERPRINTS.  THAT IS WHY IT'S ALL GRAY.  SO THEY WOULD NOT BE SUBMITTING A PHOTOCOPY.

THE COURT:  I UNDERSTAND ALL THIS.

MR. GURGANUS:  WE JUST WANTED TO CLARIFY THAT FOR THE COURT.

THE COURT:  I HAVE D 16, WHICH IS GOVERNMENT EXHIBIT 1012.4.  THE PAGE IS MARKED WITH A PAPER CLIP.

MR. GURGANUS:  YES, GOING TO THE NEXT PAGE THAT I WAS READING.

THE COURT:  RIGHT.  ALL RIGHT.

NEXT WITNESS.

MS. HAINES:  YES, YOUR HONOR.  WE CALL JEANETTE BUNCH.

JEANNETTE BUNCH BROWN, GOVERNMENT WITNESS, SWORN.

THE CLERK:  STATE AND SPELL YOUR FULL NAME FOR THE RECORD, PLEASE.

THE WITNESS:  JEANNETTE BUNCH BROWN, J-E-A-N-N-E-T-T-E, B-U-N-C-H, B-R-O-W-N.

MS. HAINES:  MAY I PROCEED, YOUR HONOR?

THE COURT:  YES.

DIRECT EXAMINATION (VOIR DIRE)

BY MS. HAINES:

Q.      MISS BROWN, HOW ARE YOU CURRENTLY EMPLOYED?

A.      I'M A DOCUMENT EXAMINER AT THE FBI LABORATORY.

Q.      HOW LONG HAVE YOU BEEN A DOCUMENT EXAMINER FOR THE FBI?

A.      20 YEARS.

Q.      WHEN DID YOU START IN THAT POSITION?

A.      STARTED IN 1990 WITH THE FAIRFAX -- STATE OF VIRGINIA LABORATORY IN FAIRFAX.

Q.      SO HOW MANY YEARS -- HOW MANY YEARS HAVE YOU BEEN JUST WITH THE FBI?

A.      30.

Q.      HOW MANY YEARS TOTAL DO YOU HAVE IN HANDWRITING ANALYSIS EXPERIENCE?

A.      34.

Q.      NOW, WHAT DOES YOUR JOB EXACTLY ENTAIL?

A.      I EXAMINE HANDWRITING, HAND PRINTING, TYPEWRITING AND OTHER DOCUMENT PROCESSES IN ORDER TO DETERMINE WHETHER A PERSON WROTE THE SPECIMENS OR NOT OR WHETHER THE SPECIMENS ARE GENUINE OR NOT.

Q.      HOW DO YOU DO THAT?

A.      I LOOK AT SEVERAL THINGS, SUCH AS SPACING BETWEEN LETTERS AND WORDS, THE RELATIONSHIP TO THE

WRITING TOWARD THE BASELINE.  UNUSUAL LETTER FORMATIONS, SLANT, RELATIVE HEIGHTS OF LETTERS, BEGINNING AND ENDING STROKES, CONNECTING STROKES AND OTHER THINGS.

Q.    ARE THERE CERTAIN PRINCIPLES THAT YOU OPERATE UNDER IN YOUR FIELD?

A.    YES.  NO TWO PEOPLE WRITE EXACTLY ALIKE.  EACH PERSON HAS A RANGE OF WRITING THEY CAN'T SURPASS.  AND NO PERSON WRITES THE SAME WAY WHEN REPEATING.  THOSE ARE THE MAIN ONES.

Q.    WHAT DOES IT MEAN THAT NO PERSON HAS A RANGE OF ABILITY -- THERE IS A RANGE OF ABILITIES THAT A PERSON CANNOT SURPASS?  WHAT DOES THAT MEAN?

A.    RIGHT.  EACH PERSON HAS WRITING ABILITY THAT ONLY THEY CAN PERFORM BASED ON THEIR NERVES, MUSCLES, BRAIN.

Q.    NOW, CAN YOU TELL US WHAT YOUR EDUCATIONAL BACKGROUND IS?

A.    YES.  I HAVE A BACHELOR OF ARTS DEGREE IN SPEECH PATHOLOGY AND AUDIOLOGY FROM NORFOLK UNIVERSITY, NORFOLK STATE COLLEGE.  ALSO I RECEIVED FURTHER GRADUATE INSTRUCTION IN SPEECH PATHOLOGY FROM MARSHALL UNIVERSITY, HUNTINGDON, WEST VIRGINIA.

Q.    CAN YOU ALSO TELL US A BIT ABOUT YOUR TRAINING?

A.    I RECEIVE QUARTERLY TRAINING WITH THE FBI AND WHEN I WAS WITH THE STATE.  INITIALLY AS A BRAND NEW

PERSON, NORMALLY THERE IS A TWO-YEAR TRAINING PROGRAM FOR DOCUMENT EXAMINERS.  BUT I WAS A DOCUMENT TECHNICIAN IN THE LABORATORY FOR EIGHT AND-A-HALF YEARS.  AND AS A TECHNICIAN, I PREPARED ANY PRELIMINARY EXAMINATIONS FOR THE EXAMINER AT THE TIME, CONDUCTING COMPARISONS BETWEEN HANDWRITING AND AT THAT TIME NATIONAL FRAUDULENT CHECK FILE, ANONYMOUS LETTER FILE, TYPEWRITING STANDARDS FILE, AND OTHER FILES THAT WE HAD AT THAT TIME.  I ALSO INVENTORIED EVIDENCE, CONDUCTED INDENTED WRITING EXAMINATIONS AND OTHER DUTIES FOR THE EXAMINER.

I ALSO COMPLETED CLASSROOM TRAINING IN THE FIELD OF QUESTIONED DOCUMENTS, AND DURING THAT TIME, I READ BOOKS, ARTICLES, ATTENDED PRINTING, PROCESSING BUSINESSES, PRETTY MUCH PERFORMED THE SAME TRAINING THAT THE AGENT EXAMINER AT THAT TIME WOULD HAVE, WITH THE EXCEPTION OBVIOUSLY OF EXAMINING CASES AND WRITING REPORTS.

Q.    AND HOW MANY HANDWRITING COMPARISONS DO YOU THINK YOU HAVE PERFORMED IN YOUR 30 SOME YEAR CAREER?

A.    THOUSANDS, BECAUSE AS A TRAINEE EXAMINER, I ALSO EXAMINED CASES UNDER THE SUPERVISION OF QUALIFIED EXAMINERS.

Q.    NOW IN YOUR THREE DECADES OF EXPERIENCE, HAVE YOU EVER HAD WHAT I WILL CALL ANY ISSUES POINTED OUT WITH RESPECT TO YOUR WORK?

A.      YES.  AS DOCUMENT EXAMINER WE ARE PROFICIENCY TESTED TWICE A YEAR.  ONE TEST IS ALWAYS IN HANDWRITING, HAND PRINTING.  ONE TEST WOULD BE IN ANYTHING ELSE, TYPEWRITING, PRINTING PROCESSES, CHARRED PAPER, ALTERATIONS.  AND I HAD AN ISSUE IN 2006 WITH HANDWRITING PROFICIENCY TESTS.  THERE ARE FOUR QUESTIONED ITEMS.  ONE OF THE QUESTIONED ITEMS I FELL OUTSIDE OF THE RANGE THAT IT SHOULD HAVE BEEN -- THE CONCLUSION SHOULD HAVE BEEN.  LET ME BACK UP.  OUR PROFICIENCY TESTS ARE HANDLED BY THE COLLABORATIVE TESTING SERVICE, WHICH IS AN OUTSIDE TESTING SERVICE. THEY SUBMIT THE TESTS TO THE LABORATORY.  TWO EXAMINERS IN THE LABORATORY IN OUR UNIT WOULD FIRST EXAMINE THE CASE THAT IS SENT IN.  ONE PERSON WOULD EXAMINE IT FIRST, WOULD REPORT HIS RESULTS, THE NEXT PERSON WOULD EXAMINE, REPORT HIS OR HER RESULTS, AND THEN THEY WOULD DISCUSS THE ANSWER.

ALL OTHER EXAMINERS IN OUR UNIT SHOULD HAVE THE SAME RESULTS THAT THEY HAD.  I DIDN'T.  SO THEREFORE I WAS TAKEN OFF OF HANDWRITING CASES FOR APPROXIMATELY FIVE MONTHS.  OUR QUALITY ASSURANCE PROGRAM SAYS THAT WE HAVE TO -- IN THAT CASE, YOU ARE GIVEN REMEDIAL TRAINING, REVIEWED, WHATEVER -- THIS WAS HANDWRITING, SO ANY HANDWRITING TOPICS.  YOU ARE THEN GIVEN ANOTHER PROFICIENCY TEST, NOT THE SAME AS THIS

ONE, AND I PASSED, OBVIOUSLY.  ALSO PART OF THAT PROCEDURE IS DURING THE TEST THAT I DID NOT PASS, QUOTE, PASS, ALL HANDWRITING CASES THAT I HAD BEFORE THAT TIME WERE REVIEWED BY THE LABORATORY TO SEE IF MY RESULTS WERE CORRECT WITH THE NOTES THAT I HAD.  SINCE THAT TIME, THE SAME THING HAS HAPPENED.  ANY TIME THERE IS ANY TYPE OF PROFICIENCY TEST ISSUE, ALL OF YOUR CASES THAT YOU HAVE EXAMINED IN THAT PARTICULAR FIELD ARE REVIEWED.  AND I HAVE NOT HAD ANY ISSUES SINCE THAT TIME.

Q.      I THINK THAT WAS ONE IN 2006.  WAS THERE A SECOND ONE?

A.      SORRY, YES.

Q.      SORRY TO INTERRUPT YOU.

A.      I FORGOT.  YES, THERE WAS ANOTHER CASE.  THIS TIME IT WAS CONSIDERED AN ALTERATION CASE.  THE QUESTION WAS DETERMINED WHETHER THERE WAS ANY PROBLEM WITH THE PARTICULAR ITEM THAT WAS SENT IN.  AND I DIDN'T CONDUCT INDENTED WRITING ON THAT PARTICULAR ITEM.  THEREFORE MY RESULTS DIDN'T REFLECT WHAT THEY SHOULD HAVE REFLECTED.  AGAIN, ALL OF THOSE CASES -- I WAS TAKEN OFF OF ALTERATION CASES FOR, IN THAT CASE, SIX WEEKS, REMEDIAL TRAINING, REVIEWED BY PEOPLE IN THE LAB, TESTED AGAIN, GIVEN ANOTHER TEST AND PASSED AND I HAVE NOT HAD ANY ISSUES -- THOSE ARE THE ONLY TWO ISSUES I HAVE HAD IN MY

20 PLUS YEARS AS AN EXAMINER.

Q.      AND JUST TO BE CLEAR, I WANT THE COURT TO KNOW, I BELIEVE THE DEFENSE IS CHALLENGING MISS BROWN, WHICH IS WHY WE ARE GOING THROUGH SOME OF THIS INFORMATION.

THE COURT:  CHALLENGING HER QUALIFICATIONS?

MS. HAINES:  YES.  SO I'M NOT TRYING TO BELABOR THIS POINT.  BUT I BELIEVE SHE IS BEING CHALLENGED.

BY MS. HAINES:

Q.      SO MA'AM, YOU ARE SAYING IN THE PAST SEVEN YEARS, HAVE THERE BEEN ANY PROBLEMS WITH YOUR WORK?

A.      NO.

Q.      HOW OFTEN EVERY YEAR DO YOU TAKE A PROFICIENCY TEST?

A.      TWICE.

Q.      WITH RESPECT TO THE 2007 ERROR YOU MADE, WOULD YOU AGREE THAT YOU ERR ON THE SIDE OF BEING TOO CONSERVATIVE?

A.      I USUALLY AM CONSERVATIVE.  OH, BACK UP TO THAT. ADDING TO THE PROFICIENCY TEST, THOSE ARE NOT ORIGINAL DOCUMENTS THAT ARE SUBMITTED.  WE DON'T IDENTIFY ORIGINAL WRITING, BUT BECAUSE IT'S A PROFICIENCY TEST, THE REASON WE HAVE TWO PEOPLE CONDUCTING IT IS, ONE PERSON MAY CONSIDER THEM ORIGINAL, SINCE THEY KNOW IT'S

A TEST, AND ANOTHER MAY NOT.  SO THEREFORE YOU COULD HAVE -- FOR EXAMPLE, IF THE PERSON WROTE IT, ONE PERSON COULD SAY HE WROTE IT, ONE PERSON COULD SAY HE PROBABLY WROTE IT, AND THAT IS OKAY TO HAVE THAT RANGE.  IN MY PARTICULAR INSTANCE, I WAS OUTSIDE OF THAT.  I SAID I'M GUESSING -- GUESSING NO CONCLUSION, SO THEREFORE I WAS OUT OF THEIR RANGE.

Q.    AS FAR AS -- YOU SAID THE SECOND ISSUE, THE EARLIER ONE IN 2006 HAD TO DO WITH INDENT WRITINGS.

A.    INDENTED WRITING.

Q.    CAN YOU JUST EXPLAIN WHAT THAT IS.

A.    YES.  IF SOMEONE HAS WRITTEN ON PAPER ON TOP OF ANOTHER PAGE THE INDENTATIONS FROM THAT TOP PAGE WILL APPEAR ON THE SECOND PAGE.  WE HAVE A MACHINE THAT WILL BRING UP THAT WRITING.  AND I DIDN'T CONDUCT THAT PARTICULAR EXAM BECAUSE, HAD I DONE THAT, THE CONCLUSION WOULD HAVE FIT THE OTHER TWO EXAMS' CONCLUSION.  AND I JUST DIDN'T.  I NEGLECTED TO DO IT.

Q.    KNOWING YOUR WORK IN THIS CASE, DOES THIS CASE HAVE ANYTHING TO DO WITH INDENTED WRITING?

A.    NO.

Q.    HAVE YOU BEEN PREVIOUSLY QUALIFIED IN OTHER COURTS AS AN EXPERT IN THE QUESTIONED DOCUMENT FIELD AND BEEN ALLOWED TO GIVE OPINIONS WITH RESPECT TO YOUR COMPARISONS BETWEEN KNOWN AND QUESTIONED DOCUMENTS?

A.    YES.

Q.    HOW MANY TIMES DO YOU THINK YOU HAVE BEEN PREVIOUSLY QUALIFIED?

A.    34 IN FEDERAL COURTS.  14 IN THE STATE OF VIRGINIA, ONCE IN IOWA AND ONCE IN MARYLAND.

Q.    HAVE YOU EVER FAILED TO BE QUALIFIED IN ANY COURT WHERE YOU HAVE BEEN SPONSORED AS AN EXPERT?

A.    NO.

MS. HAINES:  YOUR HONOR, AT THIS TIME THE GOVERNMENT WOULD ASK THAT MISS BROWN BE RECOGNIZED AS AN EXPERT IN THE QUESTIONED DOCUMENT FIELD AND BE ALLOWED TO GIVE OPINION TESTIMONY IN THIS CASE REGARDING THE COMPARISONS AND OPINIONS SHE FORMED BETWEEN CERTAIN QUESTIONED AND CERTAIN KNOWN DOCUMENTS?

THE COURT:  IS THERE ANY VOIR DIRE?

MR. MCHUGH:  YES, PLEASE, JUDGE.

CROSS EXAMINATION (VOIR DIRE)

BY MR. MCHUGH:

Q.    GOOD AFTERNOON, MISS BROWN.

A.    GOOD AFTERNOON.

Q.    I JUST WANTED TO GO BACK OVER A COUPLE OF THINGS THAT YOU TOUCHED ON WITH MS. HAINES.

I THOUGHT YOU SAID THAT THE 2006 ISSUE WAS -- I THOUGHT YOU SAID SIX MONTHS, YOU WERE TAKEN OFF THE --

A.      I'M JUST -- APPROXIMATELY SIX.  I'M NOT POSITIVE AT THAT TIME.

Q.      IS IT POSSIBLE IT WAS THE OTHER WAY AROUND, THAT THE 2007 ISSUE WAS WHERE YOU WERE TAKEN OFF FOR SIX MONTHS, AND THE 2006 ISSUE WAS FIVE OR SIX WEEKS?

A.      I THOUGHT IT WAS THE HANDWRITING.  I THOUGHT THAT WAS THE FIRST ONE WHERE I WAS TAKEN OFF FOR A LONGER TIME, BUT I COULD BE MISTAKEN.

Q.      I'M LOOKING AT THE INFORMATION I WAS PROVIDED FROM THE GOVERNMENT.  IT SEEMS TO INDICATE WHEN WE ARE TALKING ABOUT -- I WILL START WITH 2006.  THAT IN 2006, IN AUGUST OF 2006 A LEVEL OF NONCONFORMITY ERROR WAS DETECTED.  THEN THERE WAS THE FOLLOWUP REMEDIAL TRAINING, VARIOUS BOOKS THAT YOU WERE TOLD TO READ AND IT INDICATES HERE THAT ON SEPTEMBER 19TH, '06, YOU WENT BACK ON CASE WORK.  WHEN I LOOK AT THAT, I SEE THAT TO BE APPROXIMATELY A LITTLE OVER A MONTH IN '06.

A.      I WAS MISTAKEN THEN.

Q.      SO '06 IT WAS ABOUT 30 DAYS GIVE OR TAKE THAT YOU WERE TAKEN OFF THE WORK.  AND IT WAS IN '07 THAT IT WAS A LONGER TIME.  AND I BELIEVE THERE FROM WHAT I HAVE BEEN PROVIDED, THE INTERNAL EVALUATION REVEALED UNSATISFACTORY IN NOVEMBER OF '07, RIGHT?

A.      CORRECT.

Q.      YOU WERE NOT ALLOWED -- I DON'T KNOW HOW TO PUT

THIS, BUT YOU WERE NOT BACK TO EVALUATIONS UNTIL JULY OF

'08.  DOES THAT MAKE SENSE?  DOES THAT SOUND RIGHT?

A.      CORRECT.  AGAIN, THAT'S THOSE CASES, NOT -- I

WAS STILL ABLE TO DO ALL OTHER CASES.

Q.      SO I JUST WANTED TO TALK BRIEFLY ABOUT THOSE

CASES.  THE 2006 CASE WAS ALTERATIONS, INTERLINEATIONS

OR AGE DETERMINATION, IS THAT RIGHT?

A.      YES.

Q.      ALTERATIONS, WHAT DOES THAT MEAN?

A.      THE PERSON HAS DONE SOMETHING TO THE PAGE,

EITHER INSERTED WRITING OR PRINTING POSSIBLY OR DONE

SOMETHING TO CHANGE THE PRINTING OR WRITING ON THE PAGE

ITSELF.

Q.      OKAY.  HOW ABOUT INTERLINEATIONS?

A.      THEY HAVE AGAIN INSERTED TEXT POSSIBLY.

Q.      AND WHAT I SAW FROM THE INFORMATION I WAS

PROVIDED, IT SAID:  SPEED WAS DETERMINED TO BE THE

PROBLEM.  CAN YOU TELL US WHAT THAT MEANS?  WHAT WAS IT

ABOUT THE SPEED?

A.      OKAY.  BECAUSE I SAID I NEGLECTED TO CONDUCT THE

ESDA CASE, THAT IS WHAT THAT MEANT.  I DIDN'T COMPLETE

ALL OF THE EXAMS THAT I SHOULD HAVE COMPLETED ON THAT

PARTICULAR TEST.

Q.      BECAUSE YOU WERE GOING TOO SLOW OR TOO FAST?

I'M NOT SURE --

A.        THAT IS WHAT THAT MEANS.  IT WAS INTERPRETED THAT I WAS GOING TOO FAST IN COMPLETING THOSE PARTICULAR CASES -- CASE.

Q.        THERE WAS SOME PORTION OF THE EXAM YOU DID NOT COMPLETE?

A.        CORRECT.  THAT WAS THE ESDA PART.

Q.        WHAT'S ESDA?

A.        ELECTROSTATIC DETECTION APPARATUS.  AND IT IS JUST A MACHINE -- THAT'S A MACHINE THAT WOULD BRING UP INDENTED WRITING ON PAPER, IF THERE IS ANY ON IT.

Q.        OKAY.  NOW, JUMPING AHEAD TO '07 TO THE ISSUE THERE, WHAT I HAD BEEN INFORMED WAS THAT NOTETAKING SEEMED TO BE THE PROBLEM.  AND CAN YOU TELL US WHAT THAT MEANT, THE ISSUE WITH NOTETAKING?

A.        OKAY.

Q.        I CAN READ IT TO YOU:  MS. BROWN COMPLETED AN ALL DAY TRAINING SESSION THAT REVOLVED AROUND INTERPRETATIONS OF NOTES AND NOTETAKING (WHICH SEEMED TO BE THE ROOT CAUSE OF HER PROFICIENCY PROBLEM).

A.        I'M NOT SURE.  LIKE I SAID, I DON'T HAVE IT IN FRONT OF ME.  I'M NOT SURE.

Q.        WHAT WOULD YOU NEED --

A.        UNLESS -- THEY ARE SAYING THE NOTES THAT I HAD DID NOT AGREE WITH THE RESULT.  I DON'T KNOW.  I DON'T HAVE IT IN FRONT OF ME, SO I'M NOT SURE.

Q.        WHAT WOULD YOU NEED TO HAVE IN FRONT OF YOU?  I JUST HAVE A LETTER FROM THE UNITED STATES DEPARTMENT OF JUSTICE.  I'M NOT SURE IF THAT IS WHAT YOU'RE REFERRING TO THAT YOU WOULD WANT IN FRONT OF YOU.

A.        OUR QUALITY ASSURANCE UNIT IN THE LABORATORY KEEPS COPIES OF ALL OF THAT SO THEY COULD PROBABLY GIVE YOU THE SPECIFICS ON THAT.

Q.        YOU DON'T RECALL EVER BEING ADVISED ABOUT AN ISSUE WITH YOUR NOTETAKING AND HAVING TO DO WORK TO CORRECT IT OR IMPROVE IT?

A.        NO.  NO.

Q.        THE UNDERGRADUATE AND GRADUATE DEGREES THAT YOU HAVE, THEY DIDN'T HAVE ANYTHING TO DO WITH YOUR EXPERTISE TODAY, IS THAT RIGHT?

A.        CORRECT.

Q.        SO THE TRAINING -- I REVIEWED YOUR CV.  IT INDICATES THAT YOUR FIRST TRAINING WAS IN 1990 AT THE QUESTIONED DOCUMENT SCHOOL, IS THAT RIGHT?

A.        THAT IS JUST A TWO-WEEK SCHOOL AT THE FBI ACADEMY.

Q.        BESIDES THAT SCHOOLING ON YOUR RESUME, I DIDN'T SEE ANYTHING THAT DEALS WITH QUESTIONED DOCUMENTS.  WAS THERE OTHER TRAININGS THAT YOU ATTENDED THAT DEALT DIRECTLY WITH QUESTIONED DOCUMENTS, WHICH YOU ARE TALKING ABOUT HERE TODAY?

A.      ALL OF THAT DEALS WITH QUESTIONED DOCUMENTS.  AS A DOCUMENT TECHNICIAN, I HAD EXPERIENCE IN QUESTIONED DOCUMENTS, READING BOOKS, ARTICLES, COMPARING ACTUAL EVIDENCE IN THOSE FILES THAT I MENTIONED BEFORE.

Q.      I'M LOSING YOU A LITTLE BIT, BECAUSE I SEE IN YOUR RESUME YOU ARE A DOCUMENT ANALYST?

A.      WHICH IS THE SAME AS A TECHNICIAN.

Q.      SO WHEN YOU ARE TALKING ABOUT -- WHEN YOU SAY TECHNICIAN, YOU ARE TALKING ABOUT YOUR YEARS AS AN ANALYST?

A.      CORRECT.

Q.      THAT IS BEFORE YOU BECAME AN EXAMINER?

A.      CORRECT.

Q.      SO YOU ARE SAYING THAT AS A TECHNICIAN IT WAS ON-THE-JOB TRAINING?

A.      CORRECT.  IT'S BASICALLY ON-THE-JOB TRAINING AND APPROXIMATELY SIX TO EIGHT MONTHS CLASSROOM WORK IN ADDITION TO THAT.

Q.      OKAY.  WHERE DID THAT TAKE PLACE?

A.      THAT WAS AT THE FBI LAB.

Q.      SO IT'S AN INTERNAL TRAINING BY YOUR SUPERIORS?

A.      CORRECT.

Q.      I KNOW YOU TALKED ABOUT YOUR PRIOR TESTIMONY. IF I JUST MAY -- HAVE YOU EVER PUBLISHED IN THE AREA OF QUESTIONED DOCUMENTS?

A.    NO.

Q.    HAVE YOU EVER TAUGHT IN THE AREA OF QUESTIONED DOCUMENTS?

A.    YES.  WHEN I WAS WITH THE NORTHERN VIRGINIA LABORATORY, TO LOCAL POLICE IN THE AREA, ON THE SUBJECT OF QUESTIONED DOCUMENTS.

Q.    YOU WERE TRAINING THEM IN HOW TO LOOK AT DOCUMENTS?

A.    WHAT TO LOOK FOR, BECAUSE AT THAT TIME IT WAS MOSTLY BANK RELATED TYPE CASES.

Q.    AND SO SINCE YOUR TIME BACK AT THE FBI, WHICH IS FROM 1994 TO PRESENT, HAVE YOU DONE ANY TEACHING IN THE AREA?

A.    NO, I HAVEN'T.

Q.    THE INTERNAL CONTROLS THAT HAPPENED IN '06 AND '07, ARE THOSE TESTING THAT YOU DO, LIKE A COUPLE TIMES A YEAR OR SOMETHING LIKE THAT?

A.    THE PROFICIENCY TESTS ARE TWICE A YEAR, YES.

Q.    THOSE ARE PASS/FAIL, IS THAT RIGHT?

A.    CORRECT.

Q.    DO YOU KNOW WHAT THE PASSING GRADE WOULD BE TO PASS IN ANY OF THOSE GRADES -- ANY OF THOSE TRAINING?

A.    THERE ISN'T A NUMBER FOR THOSE.  IT'S JUST PASS/FAIL FOR THOSE PARTICULAR TYPES.

Q.    I GUESS WHAT I'M SAYING, I KNOW THERE'S NOT A

NUMBER, BUT DO YOU KNOW HOW MANY YOU HAVE TO GET WRONG IN ORDER TO FAIL?

A.    YOU DON'T GET --

Q.    IF YOU CAN'T ANSWER IT, THAT IS FINE.  I JUST --

A.    AGAIN, ITS PASS/FAIL.  I MEAN, YOU HAVE TO PASS THEM ALL.

Q.    AND WHO IS DOING THE GRADING AND THE REVIEW OF YOUR WORK?  IS IT YOUR SUPERVISORS AT THE FBI ACADEMY?

A.    YES.

Q.    FBI --

A.    LABORATORY.

Q.    HOW MANY OTHER EXAMINERS ARE THERE?

A.    13 TOTAL.

MR. MCHUGH:  I THINK THAT IS ALL I HAVE, YOUR HONOR, IF I MAY JUST HAVE A MOMENT?

THE COURT:  ALL RIGHT.

(PAUSE.)

BY MR. MCHUGH:

Q.    THE OPINIONS THAT YOU WILL BE GIVING HERE TODAY, ARE THEY TO A REASONABLE DEGREE OF SCIENTIFIC CERTAINTY OR SOMETHING ELSE?

A.    YES.  THEY ARE TO SCIENTIFIC CERTAINTY.

Q.    SCIENTIFIC CERTAINTY?

A.    YES.

MR. MCHUGH:  OKAY.

THE COURT:  I WILL FIND MISS BROWN QUALIFIED AS AN EXPERT IN THE QUESTIONED DOCUMENT FIELD. SHE CAN SO TESTIFY.

MS. HAINES:  THANK YOU, YOUR HONOR.

DIRECT EXAMINATION

BY MS. HAINES:

Q.      MISS BROWN, WERE YOU ASKED TO PERFORM AN ANALYSIS OF CERTAIN HANDWRITING IN THIS CASE?

A.      YES.

Q.      I'M GOING TO START OFF BY ASKING YOU, DO YOU RECALL WHEN IT WAS THAT YOU PERFORMED YOUR COMPARISONS?

A.      FOR THE -- THERE WERE THREE SEPARATE REPORTS. THE FIRST WAS THE FALL OF '96 AND THE NEXT WAS FEBRUARY OF '97, AND THE LAST WAS MAYBE NOVEMBER OF '97.  I'M NOT EXACT.

Q.      AND TO START OFF, DID YOU RECEIVE CERTAIN HANDWRITING EXEMPLARS AND CERTAIN KNOWN DOCUMENTS AS PART OF THE MATERIALS THAT WERE SUBMITTED TO YOU?

A.      YES, IN THE FIRST CASE.

Q.      I WANT TO SHOW YOU WHAT HAS BEEN INTRODUCED INTO EVIDENCE AS GOVERNMENT EXHIBIT 36 AND 37 AND ASK YOU IF YOU RECOGNIZE THESE?

A.      YES, I RECOGNIZE THESE.

Q.      CAN YOU TELL US WHAT IS GOVERNMENT EXHIBIT 36?

A.      YES.   THAT WAS THE KNOWN SAMPLES TAKEN FROM THE CASE FILES OF DAVID HAMMER.

Q.      DO YOU GIVE IT YOUR OWN SPECIAL DESIGNATION?

A.      YES.   K, WHICH MEANS KNOWN, AND 2, SECOND KNOWN.

Q.      I DID NOT MEAN TO CUT YOU OFF.   WHAT IS GOVERNMENT'S EXHIBIT 37?

A.      FIVE EXEMPLARS FROM THAT SAME CASE OF DAVID HAMMER AND IT WAS GIVEN K, WHICH IS KNOWN, 1 BECAUSE THAT WAS THE FIRST KNOWN PACK.

Q.      NOW, I'M GOING TO HAND YOU SOME QUESTIONED DOCUMENTS THAT ARE IN EVIDENCE AND THESE ARE IN EVIDENCE AS 32.1, 32-1, 33.1, 33.2, 35.1 AND 35.2.   I WOULD ASK YOU TO JUST LOOK AT THESE AND SEE IF YOU RECOGNIZE THEM.

A.      OKAY.

YES.

Q.      WHAT DO YOU RECOGNIZE THOSE TO BE?

A.      THESE WERE THE QUESTIONED ITEMS THAT WERE SUBMITTED IN THE FIRST SUBMISSION, YES, THE FIRST SUBMISSION.   OH, THEY ARE DESIGNATED MY Q 14, WHICH WAS QUESTIONED 14 ITEM, Q 16, Q 18.1, WHICH IS THE ENVELOPE, Q 18, LETTER, AND Q 14 AND Q 14 ENVELOPE.   MY INITIALS AND DESIGNATIONS ON EACH ONE.   THAT IS WHAT I WAS LOOKING FOR.

Q.      NOW BECAUSE YOU USED Q NUMBERS AND WE USE EXHIBIT NUMBERS, DID YOU HELP US TO PREPARE A CHART THAT

SHOWS HOW THESE ITEMS OF EVIDENCE ARE LABELED, REFERRED

TO AND YOUR CONCLUSIONS?

A.      YES.

Q.      DID YOU REVIEW THAT CHART AND FIND IT TO BE AN

ACCURATE SUMMARY OF YOUR CONCLUSIONS?

A.      YES, I DID.

Q.      I'M GOING TO SHOW YOU WHAT HAS BEEN MARKED AS

GOVERNMENT EXHIBIT R43.  DO YOU RECOGNIZE THAT, MISS

BROWN?

A.      YES.

Q.      AND IS THAT A CHART THAT -- A SUMMARY CHART THAT

WAS GENERATED FROM YOUR REPORT AND YOUR CONCLUSIONS?

A.      YES, IT IS.

            MS. HAINES:  WE WOULD SEEK TO INTRODUCE

GOVERNMENT EXHIBIT R43.

            THE COURT:  NO OBJECTION, R43 WILL BE

RECEIVED IN EVIDENCE.

            (GOVERNMENT EXHIBIT R43 ADMITTED INTO

EVIDENCE.)

BY MS. HAINES:

Q.      IF WE CAN PUBLISH THAT.

            NOW, I WANT TO START WITH YOUR Q 14,

WHICH IS GOVERNMENT EXHIBIT 35.1, AN ENVELOPE, AND 35.2,

A LETTER TO STEVE CLASSEN.  MISS BROWN, ARE YOU FAMILIAR

WITH THAT EXHIBIT?

A.      YES, I AM.

Q.      AND WERE YOU ABLE TO COMPARE THAT QUESTIONED DOCUMENT VERSUS THE KNOWN HANDWRITING EXEMPLARS AND SAMPLES YOU HAD?

A.      YES, I DID.

Q.      LET ME JUST ASK YOU, DID YOU COMPARE THE QUESTIONED DOCUMENT AGAINST BOTH THE EXEMPLARS AND THE KNOWNS, OR ONE OR THE OTHER OR HOW DOES THAT WORK?

A.      IT IS ALL CONSIDERED KNOWN WRITINGS.  THE EXEMPLARS ARE DICTATED SAMPLES THAT WERE TAKEN FROM THE SUSPECT IN FRONT OF A POLICE OFFICER, INVESTIGATOR. UNDICTATED OR THE NORMAL COURSE OF BUSINESS WRITING IN THIS CASE WOULD BE THE CASE FILES, BUT IT'S ALL CONSIDERED KNOWN WRITING OF THE SUSPECT.

Q.      WERE YOU ABLE TO REACH A CONCLUSION REGARDING THE ORIGINATION OR AUTHENTICITY OF THE QUESTIONED DOCUMENTS VERSUS THE KNOWN?

A.      YES.

Q.      WHAT WAS YOUR CONCLUSION WITH RESPECT TO THE STEVE CLASSEN LETTER AND ENVELOPE, WHICH IS YOUR Q 14, OUR 35.1 AND 2?

A.      I DETERMINED THAT DAVID HAMMER WROTE THE SIGNATURE ON EXHIBIT 35.1 AND ALSO WROTE THE HAMMER ENTRIES ON 35.1 AND ALSO PROBABLY PREPARED THE REMAINING WRITING, BUT I DIDN'T IDENTIFY -- PROBABLY PREPARED THE

REMAINING UNIDENTIFIED WRITING.

Q.    I WILL JUST ASK YOU THIS FOR THIS EXHIBIT AND WE WILL TRY TO KEEP IT STREAMLINED.  WHAT DO YOU MEAN BY HE PROBABLY WROTE THE SUBSTANCE OF THE LETTER?

A.    IN THIS PARTICULAR CASE I DID NOT HAVE ALL THE COMPARABLE WRITINGS, WHICH MEANS SAME WORDING AS I HAD ON THE QUESTIONED WRITING IN ORDER TO GIVE A MORE POSITIVE IDENTIFICATION.  BUT THERE ARE NUMEROUS SIMILARITIES BETWEEN THE TWO, WHICH INDICATED THAT HE PROBABLY WROTE IT.

Q.    AND WHEN YOU SAY YOU WOULD HAVE NEEDED MORE, HOW MUCH OF THAT LETTER, THE QUESTIONED LETTER, WOULD YOU HAVE NEEDED TO HAVE REPLICATED IN ORDER TO MAKE A CONCLUSIVE DETERMINATION THAT MR. HAMMER WROTE IT?

A.    THE SAME WRITING IN BOTH WILL GIVE YOU YOUR BEST RESULTS ALWAYS.

Q.    CAN YOU JUST EXPLAIN FOR US WHAT WERE THE LEVELS OF CONCLUSIONS THAT YOU WERE PERMITTED TO MAKE BACK AT THIS TIME IN 1996?

A.    POSITIVE IDENTIFICATION, THAT MEANS THAT THE WRITER OF THE KNOWN WRITING PREPARED OR WROTE THE QUESTIONED WRITING.

PROBABLY PREPARED, THAT MEANS THERE WERE SIMILARITIES BETWEEN THE QUESTIONED AND KNOWN, BUT THERE IS SOMETHING THAT I DIDN'T HAVE IN ORDER TO SAY POSITIVE

IDENTIFICATION.

NO CONCLUSION, USUALLY THAT IS GOING TO BE BASED ON WRITING IS NOT COMPARABLE, PHOTOCOPIED, DISTORTED LOOKING WRITING.  THERE IS GOING TO BE SOME REASON WHY YOU CAN'T GIVE ANY KIND OF LEANING AT ALL, POSITIVE OR NEGATIVE.

PROBABLY -- AT THAT TIME, PROBABLY DID NOT PREPARE, THAT MEANS THERE WERE MANY DIFFERENCE BETWEEN THE QUESTIONED AND KNOWN WRITING WHICH INDICATES THE PERSON PROBABLY DIDN'T WRITE IT.

NONIDENTIFICATION.  BASICALLY NONIDENTIFICATIONS ARE NO SIMILARITIES BETWEEN THE QUESTIONED AND KNOWN WRITING, WHICH MEANS ANOTHER PERSON PREPARED IT.

Q.     WHEN YOU RECEIVED THE STEVE CLASSEN ENVELOPE AND LETTER, YOUR Q 14, WERE YOU ABLE TO DETERMINE WHETHER THAT WAS AN ORIGINAL PIECE OF EVIDENCE?

A.     YES.

Q.     AND WHAT WAS YOUR CONCLUSION?

A.     IT WAS ORIGINAL BECAUSE INK.  ALL WRITING, A MICROSCOPE IS USED INITIALLY TO SEE HOW THE WRITING IS PLACED ON THE PAPER, AND THAT WAS INK THAT WAS SHOWN.

THE COURT:  CAN I GET SOME CLARIFICATION?

MS. HAINES:  YES, YOUR HONOR.

BY THE COURT:

Q.      MISS BROWN, I'M SHOWING YOU EXHIBIT 35.1.  IT HAS WRITING IN THE MIDDLE OF THE ENVELOPE?

A.      OKAY.

Q.      WHO WROTE THAT?

A.      I SAID HE PROBABLY WROTE IT.  I CAN'T SAY FOR CERTAIN.  THAT WASN'T AN IDENTIFICATION.  THAT WAS A PROBABLY WROTE.

Q.      ON THE ENVELOPE.

A.      ON THE ENVELOPE, CORRECT.

Q.      35.2?

A.      THE SIGNATURE I SAID HE WROTE.  HE PROBABLY WROTE THE REST.  AGAIN, I DIDN'T HAVE THE EXACT WORDING IN EVERYTHING.

Q.      JUST THE SIGNATURE ON THAT?

A.      CORRECT.

BY MS. HAINES:

Q.      JUST TO FOLLOW UP ON THE COURT'S QUESTION, YOU SAID THAT -- 35.1, YOU SAID THAT STEVE CLASSEN PART, HE PROBABLY WROTE?

A.      CORRECT.

Q.      HOW ABOUT THE NAME HAMMER?

A.      HAMMER.  I'M SORRY, I DID NOT SAY THAT BEFORE. THE HAMMER NAME WAS -- IN THE RETURN ADDRESS PORTION. I'M SORRY, I WAS LOOKING AT THE BOTTOM.  YES, RETURN ADDRESS HAMMER HE DID WRITE.  STEVE CLASSEN PROBABLY,

BECAUSE I DIDN'T HAVE ALL OF THE SAME WORDING.

Q.      IS THERE A PERCENTAGE THAT YOU PUT ON PROBABLY

OR WHAT DOES THAT MEAN IN LAYMEN'S TERMS?

A.      WELL, IT'S THE WRITER, BUT I CAN'T SAY THAT

DEFINITIVELY BECAUSE I DON'T HAVE EVERY SINGLE THING,

BUT THERE ARE MANY SIMILARITIES BETWEEN THE QUESTIONED

AND KNOWN.

Q.      NOW MOVING ON TO Q 16, WHICH IS OUR 32.2, WE'VE

CALLED THAT THE SEVEN REASONS.  DID YOU REACH ANY

CONCLUSION BETWEEN -- WITH RESPECT TO THAT EXHIBIT?

A.      I SAID HE WROTE THE SIGNATURE AGAIN, BUT

PROBABLY WROTE THE REST BECAUSE THEY COPIED IT.  THIS

WAS HAND PRINTING AND A LOT OF MY KNOWN WRITING WAS

CURSIVE, AND I CAN'T COMPARE HAND PRINTING TO CURSIVE

WRITING.

Q.      HOW ABOUT Q 18, WHICH IS OUR 33.1, THE ENVELOPE,

AND 33.2, THE LETTER TO ROCK?

A.      AGAIN, I SAID HE WROTE THE SIGNATURE, HANDWROTE

THE SIGNATURE, ALSO THE HAMMER ENTRY ON THE LETTER AND

THE ENVELOPE.  AND PROBABLY AGAIN PREPARED THE REMAINING

WRITING BECAUSE I DIDN'T HAVE AGAIN THE SAME WORDING IN

ALL OF THE KNOWN WRITING.

Q.      NOW, JUST WITH RESPECT TO THESE THREE EXHIBITS.

I WANT TO SHOW YOU A CHART THAT HAS BEEN PREPARED WHICH

IS GOVERNMENT EXHIBIT R44, A COMPARISON CHART.  HAVE YOU

HAD A CHANCE TO LOOK AT THIS EXHIBIT?  I'M GOING TO HAND IT TO YOU.

A.      YES, RIGHT BEFORE COURT THIS MORNING.

Q.      DOES THIS CHART SHOW THE COMPARISON THAT YOU JUST DISCUSSED WITH RESPECT TO THE SIGNATURES BEING COMPARED BETWEEN THE KNOWN SIGNATURE AND THE QUESTIONED DOCUMENTS?

A.      YES.

MS. HAINES:  YOUR HONOR, WE SEEK TO INTRODUCE GOVERNMENT EXHIBIT R44.

MR. MCHUGH:  YOUR HONOR, I HAVE NOT SEEN IT.

I HAVE NO OBJECTION.

THE COURT:  R44 WILL BE RECEIVED INTO EVIDENCE.

(GOVERNMENT EXHIBIT R44 ADMITTED INTO EVIDENCE.)

BY MS. HAINES:

Q.      MISS BROWN, JUST FOR CLARIFICATION, THIS CHART SHOWS A KNOWN SIGNATURE ON THE LEFT, OUR LEFT, THE COURT'S -- OUR LEFT, AND THE UNKNOWN SIGNATURES WE HAVE JUST DISCUSSED.  32-2, JUST FOR THE RECORD SHOULD BE 32.2 ACTUALLY, IS THE SEVEN REASONS.

A.      YES.

Q.      33.2 IS THE LETTER TO ROCK, WHICH IS YOUR Q 18?

A.      YES.

Q.      AND 35.2 IS THE STEVE CLASSEN LETTER WHICH IS YOUR Q 14.  IS THAT ALL CORRECT?

A.      YES, THAT'S CORRECT.

Q.      I THINK YOU CAN ACTUALLY WRITE ON THAT SCREEN IF YOU ARE ADEPT.  CAN YOU JUST POINT OUT SOME OF THE THINGS THAT YOU NOTICED AS YOU COMPARED MR. HAMMER'S KNOWN WRITING TO THE UNKNOWN SIGNATURES?  WHAT ARE THE THINGS THAT SHOW COMMONALITY?

A.      A FEW OF THE SIMILARITIES BETWEEN THE QUESTIONED AND THE KNOWN, THE WRITER TENDS TO BREAK A LOT OF HIS WORDS.  USUALLY WITH CURSIVE WRITING YOU CONNECT ALL OF THE LETTERS.  FOR EXAMPLE, A BREAK, THERE IS A SPACE BETWEEN THE V AND I IN DAVID.

Q.      YOU CAN ACTUALLY TOUCH THAT.

A.      THE V AND I IN DAVID FOUND IN EACH -- EACH QUESTIONED SIGNATURE.  SAME CHARACTERISTIC IS FOUND IN THE KNOWN.  AND AGAIN, THIS IS JUST ONE SAMPLE OF HIS KNOWN WRITING.  I HAD FIVE EXEMPLARS AND I HAD 19 PAGES OF KNOWNS.  SO THERE WERE MORE DAVID HAMMER SIGNATURES. ALSO ANOTHER CHARACTERISTIC IN COMMON, AGAIN, GETTING BACK TO THE BREAK, THERE IS A BREAK BETWEEN THE M AND E IN HAMMER.

Q.      MISS BROWN, IF YOU CAN CLEAR IT.  THERE IS A LITTLE CLEAR BUTTON ON THE BOTTOM LEFT.  ACTUALLY TOUCH

THE SCREEN.  THERE YOU GO.  AND THEN YOU CAN ACTUALLY SHOW US THE NEXT THING.

A.      THERE IS A BREAK BETWEEN THE M AND THE E IN HAMMER.  AGAIN, USUALLY THAT WOULD ALL BE CONNECTED BECAUSE YOU WRITE CURSIVE IN ONE CONTINUOUS MANNER, USUALLY CONNECTING.  SAME CHARACTERISTIC IS FOUND IN THE SECOND QUESTIONED ITEM.  ALSO THE THIRD QUESTIONED ITEM.  SAME CHARACTERISTIC IS FOUND IN THE HAMMER SIGNATURE IN THE KNOWN.

DIFFERENT LETTERS.  CAPITAL D IN DAVID, THE WRITER STARTS NEAR THE BASELINE, GOES AROUND, MAKES A CURVE TOWARD THE TOP LOOP.  SAME CHARACTERISTIC IS FOUND IN THE KNOWN SAMPLE OF DAVID.  WE ARE NOT MACHINES SO WE DON'T WRITE EXACTLY ALIKE.  THAT IS WHY YOU SEE THE CONNECTING STROKE IN THE FIRST QUESTIONED DAVID SIGNATURE, THE SECOND QUESTIONED DAVID SIGNATURE.  THE LAST QUESTIONED DAVID SIGNATURE IS NOT CONNECTED.  HOWEVER, IN THE KNOWN WRITING THERE IS A BREAK.  AGAIN, IN OTHER KNOWN SAMPLES THAT I HAD IT WAS CONNECTED.  THIS IS JUST THE ONE THAT WE USED FOR DEMONSTRATION PURPOSES ONLY.

H IN HAMMER.  I MENTION RELATIVE HEIGHTS OF LETTERS.  THE LEFT BAR OR DOWNWARD STROKE OF THE H IS SHORTER THAN THE RIGHT STROKE OF THE H.  SAME CHARACTERISTIC IS FOUND IN THE SECOND QUESTIONED ITEM,

THIRD QUESTIONED ITEM.  ALSO IN THIS PARTICULAR KNOWN SIGNATURE.

Q.      DO YOU WANT TO HIT CLEAR.  WE HAVE A LOT OF ARROWS NOW.  ANYTHING ELSE OF MAJOR -- THERE YOU GO.

A.      JUST -- WELL, THERE IS A SPACE BETWEEN THE A IN DAVID, ALSO IN HAMMER.  IT DOES NOT CLOSE AT THE TOP OF THE A IN THE FIRST QUESTIONED ITEM, SECOND QUESTIONED, THIRD QUESTIONED EVEN THOUGH -- SORRY.  THE SAME CHARACTERISTIC IS FOUND IN THE KNOWN.  THERE IS A SPACE BETWEEN THE A IN DAVID, PAUL AND HAMMER.

Q.      I THANK YOU FOR THAT.  NOW, WE ARE GOING TO MOVE TO A DIFFERENT TYPE OF DOCUMENT.  THESE ARE COPIES.  I WANT TO SHOW YOU WHAT IS IN EVIDENCE AS 36.2, 36.3 AND 51 THROUGH 55 AND SEE IF YOU RECOGNIZE THESE.

A.      OKAY.

I'M SORRY, DID YOU MENTION 36.1 THROUGH 36.3 BEFORE?

Q.      YES, YOUR Q 17.  WE ARE DOING THIS NOW.

A.      OKAY.  YES, I RECOGNIZE ALL OF THESE.  SORRY.

Q.      SO JUST GOING THROUGH YOUR CHART AGAIN, WHICH IS R43, Q 17, LET ME JUST SET THEM FORTH, WHICH IS 36.2 AND 36.3 AND THEN OUR 51 THROUGH 54 IN EVIDENCE --

MS. HAINES:  BLESS YOU, YOUR HONOR.

BY MS. HAINES:

Q.      -- WHICH IS 24 THROUGH Q 28, DID YOU REACH ANY

CONCLUSION COMPARING THOSE QUESTIONED DOCUMENTS VERSUS MR. HAMMER'S KNOWN WRITINGS?

A.      YES, I DID.

Q.      WHAT WAS YOUR CONCLUSION WITH RESPECT TO EACH OF THESE EXHIBITS?

A.      I DETERMINED THAT HE PROBABLY PREPARED THOSE PARTICULAR ITEMS.

Q.      AND WHY IS IT THAT YOU CANNOT MAKE A MORE DEFINITIVE COMPARISON OR CONCLUSION WITH RESPECT TO THESE TYPES OF DOCUMENTS?

A.      THESE ARE ALL COPIES AND I HAVE NO WAY OF KNOWING HOW THEY WERE FIRST PLACED ON THE PAPER.  YOU CAN CUT AND PASTE.  YOU CAN DO ANYTHING WITH A COPY. YOU HAVE NO WAY OF KNOWING HOW IT WAS FIRST PUT ON. BECAUSE IT'S A COPY YOU DON'T HAVE THE DETAIL, YOU DON'T HAVE CLARITY THAT YOU WOULD HAVE WITH AN ORIGINAL WRITING.  THEREFORE YOU CAN'T IDENTIFY IT.

Q.      NOW, WAS YOUR OPINIONS -- YOUR OPINIONS MEMORIALIZED IN A REPORT?

A.      YES.

Q.      WAS THAT REPORT REVIEWED?

A.      YES, IT WAS.

Q.      DID IT NEED TO BE CLARIFIED OR CORRECTED IN ANY WAY?

A.      NO.

MS. HAINES:  I HAVE NOTHING FURTHER, YOUR HONOR.

THE COURT:  CROSS EXAMINE.

MR. MCHUGH:  THANK YOU, YOUR HONOR.

CROSS EXAMINATION

BY MR. MCHUGH:

Q.     MISS BROWN, ARE YOU FAMILIAR WITH LORIE GOTTESMAN?

A.     YES.

Q.     WHO IS SHE?

A.     SHE IS MY SUPERVISOR.

Q.     IS THERE A DIFFERENCE BETWEEN THE DOCUMENT EXAMINATION AND QUESTIONED DOCUMENTS?

A.     NO, THAT IS THE SAME.

Q.     SAME THING?

A.     YES.

Q.     I WANT TO SHOW YOU WHAT I'M GOING TO MARK AS DEFENSE, I THINK WE ARE UP TO 17.

I'M SHOWING YOU A TRANSCRIPT FROM A SENTENCING HEARING, UNITED STATES VERSUS CHRIS MCDANIELS, JANUARY 30TH, 2014, FROM THIS COURTHOUSE IN FRONT OF JUDGE ROBRENO.  I'M GOING TO ASK YOU SOME QUESTIONS ABOUT THAT.  I'M GOING TO GIVE THE COURT THEIR COPIES.

NOW, THIS WAS A CASE THAT MISS GOTTESMAN

TESTIFIED AS AN EXPERT IN THIS COURTHOUSE JUST A FEW MONTHS AGO.  DO YOU REMEMBER HER COMING TO PHILADELPHIA IF SHE WAS YOUR SUPERVISOR?

A.      WE TRAVEL A LOT BUT MAYBE.

Q.      AND SO MISS GOTTESMAN WAS CALLED BY THE U.S. ATTORNEY IN THE CASE AND SHE WAS ASKED TO RENDER EXPERT OPINIONS AND SHE DID NOT QUALIFY HER EXPERTISE TO A SCIENTIFIC CERTAINTY.  I WOULD ASK YOU TO TURN TO PAGE 30.  AND RIGHT AT THE BEGINNING OF CROSS EXAMINATION SHE WAS ASKED:  SO YOU CAN'T ACTUALLY GIVE IT ANY SPECIFIC DEGREE OF CERTAINTY, CORRECT?

                ANSWER:  WELL, WE DON'T USE DEGREE OF SCIENTIFIC CERTAINTY.  THAT IS NOT --

                THAT WAS MY NEXT QUESTION.  IT IS NOT A DEGREE OF SCIENTIFIC CERTAINTY.

                RIGHT.

                SO SHE IS YOUR SUPERVISOR, RIGHT?

A.      YES, SHE IS.

Q.      THIS IS FEDERAL COURT, JUST A FEW MONTHS AGO, AND SHE CAME HERE AND SAID THAT SHE DOESN'T USE SCIENTIFIC CERTAINTY.  BUT YOU TODAY SAY YOU ARE USING SCIENTIFIC CERTAINTY.  HOW COULD THERE POSSIBLY BE A DISTINCTION BETWEEN THE TWO?

A.      WELL, WE FOLLOW SCIENTIFIC PRINCIPLES AND OUR PROCEDURES ARE SCIENTIFIC SO THAT'S ....

Q.        BUT YOUR SUPERVISOR ALSO TESTIFIED THAT WHAT YOU DO IS SUBJECTIVE.  DO YOU AGREE WITH THAT?

A.        WELL, IT'S BOTH.  IT'S SUBJECTIVE AND OBJECTIVE, I THINK.

Q.        SHE ALSO TESTIFIED THAT THERE IS NO -- AND I CAN POINT YOU TO THE PAGES, IF YOU LOOK AT PAGE 31 OF THAT SAME TRANSCRIPT.

A.        OKAY.  YES, I HAVE IT.

Q.        DO YOU SEE THERE WHERE SHE WAS QUESTIONED.  I'M SORRY, PAGE 31: I WOULD ASSUME SO.

QUESTION:  OKAY.  AND LET'S TALK ABOUT THAT.  I GUESS THE TOOLS THAT YOU USE, THIS IS A SUBJECTIVE DETERMINATION, RIGHT?

AND SHE ANSWERED:  YES.

WOULD YOU AGREE THAT WHAT YOU ARE DOING IS SUBJECTIVE?

A.        I STILL SAY IT'S BOTH AND MOST EXAMINERS WOULD SAY IT'S BOTH, OBJECTIVE AND SUBJECTIVE.

Q.        BUT YOUR SUPERVISOR DOES NOT AGREE WITH YOU?

A.        SHE AGREES -- I CAN'T EXPLAIN THIS PARTICULAR TESTIMONY, BUT EXAMINERS THINK IT'S BOTH.  MOST EXAMINERS THINK IT'S BOTH.

Q.        AND THEN IF YOU WOULD LOOK AT PAGE 32 AT THE TOP.  SHE IS QUESTIONED:  OKAY.  SO IN OTHER WORDS, YOU ARE NOT ABLE TO PROVIDE THE ERROR RATING FOR THE

TECHNIQUE?

DO YOU SEE THAT?

A.    YES, I DO.

Q.    SHE ANSWERED:  RIGHT.

NOW, DO YOU AGREE WITH HER THERE, THAT THERE IS NO ERROR RATING FOR THE TECHNIQUE THAT YOU USE?

A.    THERE -- STUDIES HAVE BEEN DONE SHOWING ERROR RATES, BUT THERE ISN'T A NUMBER THAT I CAN GIVE YOU.

Q.    WELL, IF YOU CAN'T GIVE ME A NUMBER, THEN THERE IS NOT AN ERROR RATE.  WOULD THAT BE FAIR TO SAY?

A.    I STILL SAY NO BECAUSE THIS ISN'T LIKE FINGERPRINTS WHERE YOU HAVE A CERTAIN NUMBER OF POINTS THAT YOU CAN USE.

Q.    WE WILL GET INTO THAT.  BUT WHAT I'M SAYING IS, SHE TELLS US THERE IS NO ERROR RATING.  THAT IS IMPORTANT TO BE ABLE TO TELL WHAT YOUR ERROR RATING IS, WOULD YOU AGREE, WHEN YOU ARE DOING EXAMINATIONS?

A.    YES.

Q.    AND YOUR SUPERVISOR TESTIFIED A FEW MONTHS AGO HERE THAT THERE IS NO ERROR RATING.  AND YOU ARE SAYING NOW THAT YOU DISAGREE WITH HER ON THAT TOO?

A.    I'M NOT GOING TO SAY DISAGREE, BUT LIKE I SAID, THERE HAVE BEEN STUDIES CONDUCTED INVOLVING ERROR RATES. I DON'T HAVE AN ERROR RATE MYSELF.

Q.    AND YOU ARE AWARE OF THE NATIONAL ACADEMY OF

SCIENCE'S REPORT ON FORENSIC SCIENCE?

A.      YES, I AM.

Q.      FROM 2009?

A.      YES.

Q.      AND DO -- DOES THIS SOUND FAMILIAR, THAT THERE HAS BEEN ONLY LIMITED RESEARCH TO QUANTIFY THE RELIABILITY AND REPLICABILITY OF THE PRACTICES USED BY TRAINED DOCUMENT EXAMINERS, BUT IT STILL HAS SOME USE IN THE FIELD.  DO YOU REMEMBER THAT?

A.      I REMEMBER IT, BUT WE -- THERE HAVE BEEN STUDIES SINCE 1960 INVOLVING TWIN STUDIES WHICH SHOW THAT NO TWO PEOPLE WRITE ALIKE.

Q.      WE ARE NOT INTO THAT YET.  WE WILL GET TO THERE. BUT AS FAR AS THE ERROR RATE, CAN YOU TELL US WHAT THE ERROR RATE IS OR ARE YOU JUST TELLING US THERE ARE SOME LIMITED STUDIES?

A.      I CAN'T GIVE YOU A NUMBER, NO.

Q.      SO YOU ARE NOT AWARE OF AN ERROR RATE IN THE FIELD THAT YOU ARE IN, THAT YOU CAN GIVE US A QUANTIFIABLE NUMBER?

A.      CORRECT, I CAN'T GIVE YOU A NUMBER.

Q.      SO DESPITE YOUR SUPERVISOR NOT WANTING TO GIVE US AN OPINION TO A SCIENTIFIC DEGREE OF CERTAINTY, YOU ARE TELLING US TODAY THAT THAT IS WHAT YOU ARE GOING TO DO OR THAT IS WHAT YOU HAVE DONE ALREADY.

A.      I'M SAYING THAT EVERYTHING I HAVE DONE IS BASED ON SCIENTIFIC PRINCIPLES.

Q.      I'M SAYING, ARE YOU GIVING OPINIONS TODAY TO A REASONABLE DEGREE OF SCIENTIFIC CERTAINTY OR NOT?

A.      YES, BASED ON -- YES, I AM.

Q.      SO YOU ARE DEPARTING FROM WHAT YOUR SUPERVISOR DID HERE A FEW MONTHS BACK.  YOU ARE TAKING IT A STEP FURTHER.  IS THAT FAIR TO SAY?

A.      SHE CONDUCTS THE EXAMS THE SAME WAY EVERYONE IN THE LAB CONDUCTS THE EXAMS.

Q.      YOU SAW HER TESTIMONY.  THERE IS NO DISPUTE WHAT SHE SAID, IS THERE?

A.      NO.

Q.      I WILL MOVE ON.

        YOU ALSO AGREE THAT AT LEAST PART OF WHAT YOU ARE DOING IS SUBJECTIVE?

A.      YES.

Q.      AND BY THAT, WHAT DO WE MEAN?

A.      YOU ARE USING YOUR EYES, BRAIN, HANDS.  SO WHAT YOU ARE SEEING WOULD BE SUBJECTIVE.  THAT IS WHAT YOUR EYES ARE SEEING.

Q.      I'M SORRY.  I UNDERSTAND THAT.  THERE WAS ONE QUESTION I MEANT TO ASK YOU ABOUT THAT, THE QUESTIONING IN 2007.  THAT WAS ON QUESTIONED DOCUMENTS, WASN'T IT, WHEN YOU DIDN'T DO WELL ON THE TEST, THE NOTETAKING THAT

I WENT OVER WITH YOU.  I MEANT TO ASK YOU THAT BUT THAT WAS ON WHAT WE ARE DOING HERE TODAY.  I THINK IT SAID HANDWRITING COMPARISON.

A.       AGAIN, I MISSED PART OF ONE OF FOUR ITEMS.

Q.       I UNDERSTAND, BUT ONE THING I WANTED TO JUST CLARIFY WAS WHAT YOU WERE DOING AND WHAT THEY FOUND FAULT WITH WAS HANDWRITING COMPARISONS?

A.       YES.

Q.       AND THAT IS WHAT YOU ARE DOING IN THIS CASE?

A.       THAT'S CORRECT.

Q.       I JUST WANTED TO CLARIFY THAT.

NOW, THE PRINCIPLE OF INDIVIDUALITY AND THE PRINCIPLE OF UNIQUENESS, YOU TOLD US THAT, IS THAT RIGHT?

A.       YES.

Q.       WHAT IS THAT, THAT NO TWO PEOPLE WRITE ALIKE, IS THAT RIGHT?

A.       EXACTLY ALIKE IS THE WORD.

Q.       NO TWO PEOPLE WRITE EXACTLY ALIKE.  THEN THE SECOND PART OF THAT IS THAT NO ONE PERSON WRITES THE SAME WAY EVERY TIME, IS THAT RIGHT?

A.       CORRECT.

Q.       SO WE HAVE TWO PEOPLE DON'T WRITE ALIKE.  WE HAVE THE SAME PERSON DOESN'T WRITE THE SAME WAY EVERY TIME.

WHAT IS THE RATIO OF CHARACTERISTICS THAT ARE SIMILAR VERSUS VARIATIONS THAT WILL TELL US WHETHER IT'S THE SAME PERSON NOT WRITING ALIKE OR WHETHER IT'S TWO PEOPLE NOT WRITING ALIKE?

A.    IF IT'S AN IDENTIFICATION, THE SAME SIMILARITIES THAT APPEAR IN THE QUESTIONED WILL APPEAR IN THE KNOWN.

Q.    WELL, YOU TOLD US -- SO YOU ARE NOT AWARE OF A RATIO TO DISTINGUISH WHETHER IT IS THE SAME PERSON NOT WRITING ALIKE, WHICH IS A PRINCIPLE, VERSUS TWO PEOPLE THAT DON'T RIGHT ALIKE, WHICH IS YOUR PRINCIPLE?

A.    THERE IS NO RATIO.

Q.    SO THERE IS NO RATIO ABOUT THAT TO BE ABLE TO DISTINGUISH BETWEEN THOSE TWO PRINCIPLES, IS THAT RIGHT?

A.    CORRECT.

Q.    NOW, YOU SAID WHEN YOU LOOKED AT -- LET'S BE SPECIFIC HERE -- Q 14, THE LETTER TO STEVE IF I TOOK MY NOTES RIGHT, THAT YOU SAID THAT THERE WERE NUMEROUS -- FIRST OF ALL, WHEN YOU TALK SIMILARITIES, YOU ARE TALKING CHARACTERISTICS, IS THAT RIGHT?

A.    THAT ARE FORMED IN THE SAME MANNER, CORRECT.

Q.    CHARACTERISTICS OF WRITING?

A.    CORRECT.

Q.    YOU SAID THERE WERE NUMEROUS CHARACTERISTICS. HOW MANY CHARACTERISTICS TO BE FOUND SIMILAR BEFORE YOU WILL SAY SOMETHING IS IDENTIFIED OR PROBABLY OR NOT

DECIDED OR NOT IDENTIFIED?  HOW MANY CHARACTERISTICS DO YOU NEED TO MEET THAT STANDARD?

A.      THE SAME CHARACTERISTICS THAT YOU HAVE IN THE QUESTIONED WRITING, YOU WILL HAVE IN THE KNOWN WRITING.

Q.      HOW MANY OF THEM?  YOU SAID NUMEROUS.

A.      AGAIN, IF IT'S 100, IT WILL BE 100.  IF THERE ARE 50, IT WILL BE 50.  IT'S THE SAME CHARACTERISTICS THAT YOU HAVE IN THE QUESTIONED YOU HAVE IN THE KNOWN.

Q.      WHAT IF IT IS 1?

A.      IF IT IS 1.  NO, NO, NO NO.

Q.      I'M ASKING YOU, HOW MANY SIMILAR CHARACTERISTICS DO WE NEED FOR YOU TO SAY PROBABLY OR FOR YOU TO SAY IDENTIFICATION?

A.      ONE --

Q.      THERE IS NO NUMBER, IS THERE?

A.      THERE IS NO NUMBER, BUT THE AMOUNT IS GOING TO BE THE SAME, THE SAME CHARACTERISTICS --

Q.      I UNDERSTAND THEY WILL MATCH.  WHAT I'M SAYING IS, HOW MUCH MATCHES DO YOU NEED TO BE AN IDENTIFICATION OR SLIP DOWN TO PROBABLY OR SLIP DOWN OR SLIP DOWN.  IS THERE ANY NUMBER QUANTIFICATIONS?

A.      THERE IS NOT A NUMBER QUANTIFICATION, NO.

Q.      AND THAT IS WHERE WE GET INTO THIS SUBJECTIVE ANALYSIS, ISN'T THAT RIGHT?

A.      I SUPPOSE, YES.  OKAY.  OKAY.

Q.      WELL, HOW ABOUT THIS?  NO ONE PERSON WRITES THE SAME WAY EVERY TIME, IS THAT RIGHT?

A.      THAT'S CORRECT.

Q.      YOU ARE SAYING ONE PERSON WROTE THIS, RIGHT, DAVID HAMMER?

A.      EXACTLY THE SAME WAY, THE PRINCIPLE, EXACTLY.

Q.      HOW MANY AND WHAT WE CALL -- WHAT YOU CALL IN THIS FIELD IS, DIFFERENCES ARE KNOWN AS VARIATIONS, IS THAT RIGHT?

A.      NO.

Q.      I'M SORRY THEN.  WHAT ARE THEY CALLED?

A.      A DIFFERENCE IS SOMETHING THAT WON'T APPEAR IN ONE OF THE OTHERS.  IT'S ONLY GOING TO APPEAR IN -- FOR EXAMPLE, THE QUESTIONED WON'T APPEAR IN THE KNOWN.  A VARIATION IS PART OF -- YOU COULD -- FOR EXAMPLE, YOU COULD FORM LOWER CASE E -- YOU COULD STOP THE ENDING STROKE OF THE E AS SOON AS YOU HAVE DONE THE LOOP.  YOU COULD EXTEND THE STROKE OF THE E.  THAT IS A VARIATION.

Q.      HOW MANY VARIATIONS DO WE NEED BEFORE YOU WILL SAY THAT THAT SIGNATURE IS NOT DAVID HAMMER'S?

A.      NO.  WHEN YOU ARE TALKING ABOUT ANOTHER WRITER, IT'S DIFFERENCE, HOW MANY DIFFERENCES ARE THERE.

Q.      I STAND CORRECTED.  HOW MANY DIFFERENCES DO YOU NEED TO FIND?

A.      YOU WON'T -- IN ORDER TO SAY THE PERSON DIDN'T

WRITE IT, YOU WON'T HAVE ANY SIMILARITIES AT ALL.

Q.     BUT WOULDN'T YOU AGREE WITH ME THAT IF -- YOU WON'T HAVE ANY SIMILARITIES?

A.     CORRECT.

Q.     THAT WAS NOT MY QUESTION.  MY QUESTION WAS, HOW MANY DIFFERENCES DO YOU NEED TO SAY IT'S NOT HIS SIGNATURE?

A.     THE SAME AMOUNT OF DIFFERENCES THAT YOU SEE IN THE QUESTIONED -- THE DIFFERENCES THAT YOU HAVE IN THE QUESTIONED, YOU WILL NOT HAVE IN THE KNOWN.  THAT MEANS THAT WRITER DID NOT DO IT.

Q.     HOW MANY OF THOSE DO WE NEED FOR IT TO BE --

A.     AGAIN, IT IS NOT THE NUMBER.  IT'S GOING TO THE SAME --

Q.     SO IT'S SUBJECTIVE?

A.     THAT PART, YES.

Q.     YOU WOULD AGREE WITH ME IF THERE ARE NO DIFFERENCES, THEN IT WOULD BE A FORGERY, IS THAT RIGHT?  IF IT'S EXACTLY THE SAME, THEN YOU WOULD QUESTION THAT, WOULDN'T YOU?

A.     IF IT'S EXACTLY THE SAME, IT'S GOING TO BE EITHER A TRACING OR SOMETHING ELSE.  YEAH, THAT IS NOT --

Q.     SOMETHING ELSE THAT IS NOT NORMAL?

A.     CORRECT.

Q.    HOW MANY DIFFERENCES DID YOU FIND IN THESE SIGNATURES THAT YOU JUST TESTIFIED TO?  CAN YOU TELL US?

A.    I CAN'T TELL YOU DIFFERENCES.

Q.    DIFFERENCES ARE IMPORTANT, AREN'T THEY, BECAUSE IF YOU DON'T HAVE DIFFERENCES, YOU COULD HAVE A FORGERY?

A.    NO.  IN THIS PARTICULAR CASE THERE WASN'T ANY INDICATION THAT THE WRITER DIDN'T WRITE THE WAY HE WOULD NORMALLY WRITE.  I DIDN'T HAVE ANY INDICATION OF TREMOR, PEN LIFTS, RETOUCHING, ERASURES, ANYTHING LIKE THAT.

Q.    BUT I THOUGHT YOU HAD TESTIFIED PREVIOUSLY IN ANOTHER MATTER THAT IF EVERYTHING IS IDENTICAL, THEN YOU WOULD QUESTION THAT SIGNATURE AS BEING A FORGERY OR SOMETHING WRONG WITH IT.  IS THAT FAIR TO SAY?

A.    IDENTICAL AS OVERLAP.  IF IT OVERLAPPED, THAT MEANS IT'S A TRACING OR SOMETHING ELSE.

Q.    WELL, ARE THERE ANY DIFFERENCES THAT YOU FOUND IN ANY OF THIS SIGNATURE STUFF, SIGNATURES, JUST TALKING ABOUT THE SIGNATURES, NOT THE BODY OF THE WORK?

A.    SIGNATURES, NO.  BUT VARIATION BECAUSE WE ARE NOT MACHINES, SO YOU ARE GOING TO HAVE VARIATION BETWEEN ALL OF THE WRITING.

Q.    HOW MANY VARIATIONS DID YOU FIND?

A.    THERE IS NOT A NUMBER.  I MEAN, I DON'T HAVE A NUMBER.

Q.    YOU DON'T KEEP TRACK OF THAT?

A.        THAT IS NOT IMPORTANT.  IF YOU ARE IDENTIFYING IT, YOU ARE GOING TO HAVE THE SAME SIMILARITIES BETWEEN THE QUESTIONED AND THE KNOWN.  THAT IS WHAT AN IDENTIFICATION IS.

Q.        MAYBE I'M MISSING SOMETHING.  BUT IF WE WANT TO KNOW IF YOU ARE DOING IT RIGHT, DON'T WE WANT TO KNOW HOW MANY VARIATIONS YOU FOUND?

A.        YOU ARE GOING TO HAVE NATURAL VARIATION IN ALL WRITING.

Q.        I UNDERSTAND THAT.  AND THAT IS THE PRINCIPLE THAT NO ONE PERSON WRITES THE SAME WAY TWICE?

A.        CORRECT.

Q.        THEN WE HAVE THE SECOND PRINCIPLE THAT NO TWO PEOPLE WRITE THE SAME WAY, IS THAT RIGHT?

A.        EXACTLY IS THE WORD.

Q.        IN ORDER TO DISTINGUISH BETWEEN WHETHER IT'S TWO PEOPLE, WE NEED TO KNOW HOW MANY DIFFERENCES OR VARIATIONS THERE ARE, RIGHT?

A.        NO.  BECAUSE --

Q.        IT DOES NOT MATTER?

A.        NO.

Q.        WELL, AS WE SIT HERE TODAY, YOU CAN'T TELL US HOW MANY SIMILAR CHARACTERISTICS YOU FOUND IN THESE SIGNATURES BEYOND NUMEROUS, IS THAT RIGHT?

A.        I CAN -- IF YOU WANT ME, I HAVE MY NOTES.  I CAN

POINT -- COUNT THEM FOR YOU.

Q.      YOU HAVE YOUR NOTES?

A.      WITH THE ARROWS POINTING TO SIMILARITIES.

Q.      YOU DID NOT PUT THAT IN YOUR REPORT OR ANYTHING, DID YOU?

A.      BECAUSE THAT WASN'T HOW THE REPORTS WERE DONE AND THAT IS NOT HOW THEY ARE DONE NOW EITHER.

Q.      I DID NOT SEE ANYWHERE WHERE YOU TALLIED IT UP. DID YOU TALLY IT BEFORE YOU MADE YOUR CONCLUSIONS?

A.      NO, I DON'T TALLY IT, BUT IF THE SIMILARITIES ARE IN THE SAME PLACE IN THE QUESTIONED AND KNOWN, I DON'T HAVE TO ADD THEM UP.

Q.      YOU JUST MAKE NOTE OF IT?

A.      CORRECT.  IN MY NOTES THERE ARE NOTES -- I MEAN, THERE ARE ARROWS POINTING TO THE SIMILARITIES BETWEEN BOTH, QUESTIONED AND KNOWN.

THE COURT:  IF YOU ARE GOING TO GO ON TO A DIFFERENT SUBJECT, LET'S JUST TAKE A FIVE-MINUTE RECESS AND WE WILL COME BACK.

(BREAK TAKEN.)

THE COURT:  YOU MAY CONTINUE.

MR. MCHUGH:  THANK YOU, YOUR HONOR.

BY MR. MCHUGH:

Q.      MISS BROWN, THE STANDARDS THAT YOU USED BACK IN 1996, '97 '98 WHEN YOU WERE DOING THIS EXAMINATION,

COULD YOU JUST BRIEFLY SUMMARIZE WHAT THOSE WERE, AND BY THAT I MEAN, IDENTIFICATION, PROBABLY, WHAT WAS IT?

A.    IDENTIFICATION, THAT MEANS THE PERSON WROTE WHATEVER THE WRITING WAS, QUESTIONED WRITING.  PROBABLY PREPARED, THE CHARACTERISTICS IN COMMON BETWEEN THE TWO BUT YOU COULD NOT POSITIVELY SAY THAT HE WROTE IT.  I DON'T KNOW IF I SAID MAY HAVE BEFORE.  MAY HAVE PREPARED, AGAIN, CHARACTERISTICS IN COMMON BETWEEN HIS WRITING AND THE QUESTIONED WRITING.  NO CONCLUSION, CAN'T TELL, THERE REALLY ISN'T ANYTHING REALLY IN COMMON BETWEEN THE TWO.  MAY NOT HAVE PREPARED.  YOU ARE SEEING SOME CHARACTERISTICS THAT ARE IN ONE THAT AREN'T IN THE OTHER, WHICH INDICATES POSSIBLY ANOTHER WRITER DID IT.  PROBABLY DID NOT PREPARE, THERE ARE NUMEROUS DIFFERENCES BETWEEN THE TWO WHICH INDICATES PROBABLY ANOTHER PERSON WROTE IT, BUT YOU CAN'T SAY POSITIVELY THAT HE DID NOT WRITE IT.  AND THEN NO IDENTIFICATION, THERE ARE DIFFERENCES BETWEEN BOTH.  THERE REALLY AREN'T ANY SIMILARITIES AT ALL, WHICH WOULD INDICATE ANOTHER WRITER PREPARED IT.

Q.    SO IF I COULD SUMMARIZE, IT WAS IDENTIFICATION WHICH IS A MATCH, PROBABLY PREPARED, MAY HAVE PREPARED, NO CONCLUSION, MAY NOT HAVE, PROBABLY NOT, AND NO IDENTIFICATION, AM I RIGHT ON THAT?

A.    YES.

Q.    NOW, HAVE THOSE STANDARDS CHANGED AT ALL TO DATE?

A.    NOW, WE ARE SAYING IDENTIFICATION, PERSON WROTE, MAY HAVE PREPARED, CHARACTERISTICS IN COMMON, NO CONCLUSION, AGAIN, CAN'T TELL, MAY NOT HAVE PREPARED, DIFFERENCES BETWEEN THE TWO, AND DID NOT.

Q.    SO WHAT YOU DID BACK IN 1998, YOU DID NOT FIND AN IDENTIFICATION, RIGHT?  I'M SORRY, YOU DID FOR THE SIGNATURES, BUT ON THE TEXT OF ALL OF THESE DOCUMENTS, YOU DID NOT FIND AN IDENTIFICATION IN THE BODY OF THESE DOCUMENTS?

A.    CORRECT.

Q.    NOW TODAY IF YOU WERE DOING THAT, THERE WOULD NOT BE A PROBABLY, WOULD THERE?

A.    IT WOULD BE MAY HAVE.

Q.    IT WOULD BE MAY HAVE.  SO IF YOU ARE TESTIFYING HERE TODAY, YOUR EXPERT TESTIMONY IS THAT THESE -- THE PRINTING ON THE SEVEN REASONS, THE STEVE LETTER, THE ROCK LETTER, THAT IS NOW MAY HAVE, THAT IS NOT PROBABLY, IS IT?

A.    CORRECT, THAT'S CORRECT.

Q.    SO THE PROBABLY CATEGORY THAT YOU HAD AT THE TIME YOU DID THIS HAS BEEN DONE AWAY WITH BY YOUR OFFICE, IS THAT RIGHT?

A.    CORRECT.

Q.    AND CERTAINLY MAY HAVE IS A LESSER STANDARD THAN THE PROBABLY STANDARD, IS THAT RIGHT?

A.    WELL, QUALIFYING WITH THAT.

Q.    SURE.

A.    I WOULD BE WRITING MY REPORT SIGNIFICANT CHARACTERISTICS IN COMMON SUGGESTS THAT WHOEVER MAY HAVE PREPARED.

Q.    BUT YOUR CONCLUSION WOULD BE MAY HAVE?

A.    CORRECT.

Q.    BACK IN 1998 IT WENT IDENTIFICATION, PROBABLY, MAY HAVE, IS THAT RIGHT?

A.    YES.

Q.    SO TODAY AS YOU TESTIFY HERE TODAY, THE STANDARD THAT YOU WOULD BE APPLYING IS NOW NOT PROBABLY, IT'S DOWN TO MAY HAVE, CORRECT?

A.    CORRECT.

Q.    I JUST WANTED TO MAKE THAT CLEAR.

SO IF I UNDERSTAND WHAT YOU DID FROM READING YOUR TRIAL TESTIMONY, WE WILL TALK ABOUT THE SEVEN REASONS DOCUMENT, THAT IS THE Q 16.  YOU TOOK THREE WORDS OUT OF THE EXEMPLARS, IS THAT RIGHT?  DO YOU REMEMBER TESTIFYING TO THAT?

A.    YES, YES.

Q.    DEATH, KILLED AND MARTI, IS THAT RIGHT?

A.    YES.

Q.    I BELIEVE YOU TESTIFIED THAT BECAUSE THE EXEMPLARS WERE NOT IDENTICAL TO THE NOTE, THAT THAT WAS -- YOU TESTIFIED THAT NORMALLY YOU WOULD HAVE EXACT, IS THAT RIGHT?  YOU WOULD HAVE THE EXEMPLAR MATCH THE --

A.    RIGHT, THAT IS WHAT YOU WANT FOR YOUR BEST IN --

Q.    AND TYPICAL CASE YOU GUYS PROBABLY GET ALL THE TIME IS A DEMAND NOTE BANK ROBBERY, VERY COMMON?

A.    WE HAVE ONE PERSON THAT DOES THAT.

Q.    THAT IS ALL THEY DO ALL DAY THEN IS DEMAND NOTE BANK ROBBERIES, IS THAT RIGHT?

A.    CORRECT.

Q.    SO IN YOUR NORMAL RUN-OF-THE-MILL CASE, YOU HAVE BETTER EXEMPLARS THAN YOU DID IN THIS CASE, IS THAT RIGHT?

A.    YES, IN SOME -- YES, SOME CASES.

Q.    IN THIS CAPITAL PROCEEDING, THE EXEMPLARS THAT YOU GOT WERE NOT UP TO SNUFF TO A CASE THAT YOU WOULD HAVE THAT WAS SAY A BANK ROBBERY CASE, IS THAT RIGHT?

A.    WELL, IT JUST DEPENDS UPON WHO IS OBTAINING THE EXEMPLARS.  OKAY, YEAH IN SOME CASES, YES, EXEMPLARS ARE BETTER THAN --

Q.    IN THIS CASE, YOU HAD PROBLEMS WITH THE EXEMPLARS, RIGHT?

A.    YES, YES.

Q.    AND THIS IS A CAPITAL CASE, IS THAT RIGHT?

A.   YES, IT IS.

Q.   YOU MADE DO WITH WHAT YOU HAD, IS THAT RIGHT?

A.   I EXAMINED WHAT I HAD.

Q.   RIGHT, YOU TRIED YOUR BEST?

A.   YES.

Q.   AT THAT TIME YOU GAVE US A PROBABLY.  IF I'M UNDERSTANDING WHAT YOU DID, AND YOU CORRECT ME IF I'M WRONG, YOU TOOK THE THREE WORDS AND YOU LOOKED INTO THE SEVEN REASONS AND FOUND WHERE THOSE THREE WORDS APPEARED, IS THAT RIGHT?

A.   CORRECT, BECAUSE I WAS TRYING TO DEMONSTRATE THOSE FOR THE CHARTS.  I WAS TRYING TO FIND WHAT MATCHED FOR THE CHART.

Q.   DID YOU DO ANY TYPE OF COMPARISON WITH ANY OTHER WORDS BESIDES DEATH, KILLED AND MARTI?

A.   THE ENTIRE PIECE OF EVIDENCE WAS EXAMINED.  I WAS JUST TRYING TO FIND WHAT WAS SIMILAR TO DEMONSTRATE FOR THE PARTICULAR CHART THAT I WAS MAKING, BUT --

Q.   I WAS NOT WORRIED ABOUT A CHART, I'M MORE WORRIED ABOUT WHAT YOU DID IN YOUR LAB AND WHAT I READ YOUR TESTIMONY WAS YOU FOUND THREE WORDS THAT YOU COMPARED TO THE DOCUMENT, IS THAT WHAT YOU DID?

A.   NO, NO, NO, NO.  THE ENTIRE SPECIMEN WAS EXAMINED TO THE KNOWN WRITING.

Q.   SO WHAT OTHER PARTS OF THE SEVEN REASONS NOTE

DID YOU COMPARE -- SO THE EXEMPLARS WERE BETTER THAN JUST THREE WORDS IS WHAT YOU ARE TELLING ME NOW.  DID YOU COMPARE INDIVIDUAL LETTERS THAT MR. HAMMER WROTE OUT, THE WHOLE ALPHABET.

A.    CORRECT.  EVERYTHING THAT I RECEIVED IN THE QUESTIONED WAS EXAMINED -- WAS COMPARED TO ALL OF THE KNOWN THAT WAS SUBMITTED.

Q.    BUT WHEN YOU TESTIFIED YOU JUST MENTIONED THE THREE WORDS AS AN EXAMPLE?

A.    CORRECT.  RIGHT.

Q.    WELL, THEN ARE YOU SAYING YOU WERE ABLE TO COMPARE -- I KNOW YOU CAN EXAMINE THE ENTIRE DOCUMENT, BUT I THOUGHT YOU WERE TELLING ME THE EXEMPLARS WERE NOT GOOD ENOUGH BECAUSE THEY DIDN'T HAVE ENOUGH STUFF TO EXAMINE.  SO YOU EXAMINED -- I DON'T WANT TO RUN OVER YOUR ANSWER, I'M SORRY.

A.    I'M LOSING YOU.  ALL OF THE EVIDENCE THAT WAS SENT IN WAS EXAMINED.

Q.    THE QUESTIONED?

A.    RIGHT.  BUT I NEED EXACT WORDING IN ORDER TO FORM A POSITIVE IDENTIFICATION, BUT IT ALL WAS EXAMINED.

Q.    OKAY.  BUT THE THREE THAT YOU DID FIND IN THE EXEMPLARS WERE THREE WORDS, IS THAT RIGHT?

A.    YES.

Q.    DID YOU RUN ANY MORE WORDS, THIS IS WHAT I WANT

TO KNOW, FROM THE EXEMPLARS THROUGH THE QUESTIONED DOCUMENT?

A.      YES.  I LOOKED AT LETTER FORMATIONS THROUGHOUT BOTH.  I JUST DID NOT HAVE COMPARABLE WORDING TO GIVE A POSITIVE ON THAT.

Q.      BUT YOU WOULD WANT COMPARABLE WORDING, THAT IS WHY YOU SENT IT BACK TO MR. MALOCU, RIGHT?  YOU SENT IT BACK AND SAID I HAVE TO GIVE A QUALIFIED OPINION, I NEED EXACT?

A.      YES, THAT'S CORRECT.

Q.      AND THE ONLY THREE YOU COULD FIND WERE THREE WORDS, IS THAT RIGHT?

A.      YES.

Q.      THAT YOU USED?

A.      YES, THAT'S CORRECT.

Q.      SO NO OTHER WORDS WERE ANALYZED FOR THE WORD FORMATIONS BESIDES THOSE THREE WORDS, IS THAT FAIR TO SAY?

A.      I DIDN'T HAVE ANY OTHER WORDS THAT WERE THE SAME, BUT ALL OF THE LETTERS AND LETTER FORMATIONS WERE EXAMINED.

Q.      AND WITH ALL OF THAT, IT WAS NOT GOOD ENOUGH, IS THAT FAIR TO SAY, TO MAKE A --

A.      YES, CORRECT.

Q.      AND IF I UNDERSTOOD YOUR TRIAL TESTIMONY WITH Q

16, WHICH IS THE STEVE LETTER, YOU ONLY FOUND TWO WORDS THAT YOU COULD COMPARE AND THAT WAS MARTI AND -- WELL, YOU KNOW WHAT, I'M NOT SURE ABOUT THAT.  DEATH AND MARTI, DO YOU REMEMBER THAT?

A.      RIGHT, THAT HAD THE SAME LETTERS AND LETTER COMBINATIONS IN THE WORDS, RIGHT.

Q.      THAT STILL GOT A PROBABLY, IS THAT RIGHT?

A.      YES.

Q.      I DIDN'T SEE ANY TRIAL TESTIMONY ABOUT THE ROCK LETTER.  WHAT WORDS DID YOU COMPARE IN THE ROCK LETTER?

A.      THE ENTIRE SPECIMEN WAS EXAMINED.

Q.      I GOT THAT, BUT FROM THE EXEMPLARS, YOU TOLD ME THE EXEMPLARS WERE LIMITED, SO YOU HAD TO PICK -- YOU HAD TO MAKE DO.  WHAT PART OF THE EXEMPLARS DID YOU USE TO EXAMINE THE ROCK LETTER?

A.      ALL OF EXEMPLARS ARE USED IN EVERY CASE TO EXAMINE WRITING.

Q.      WELL, WE ARE TALKING ABOUT WORDS NOW.  YOU TESTIFIED ABOUT COMPARING WORDS, IS THAT A VALID WAY TO GO ABOUT THINGS?

A.      BUT YOU ARE ALSO COMPARING LETTERS AND LETTER COMBINATIONS ALSO.

Q.      THEN I'M NOT QUITE SURE I UNDERSTAND WHAT YOU ARE SAYING ABOUT THE EXEMPLARS BEING DEFICIENT BECAUSE YOU HAD THE ENTIRE ALPHABET WRITTEN OUT BY MR. HAMMER IN

CURSIVE AND PRINTED, RIGHT?

A.       BUT YOU WANT THE SAME COMBINATION.

Q.       YOU WANT IT IN WORDS?

A.       CORRECT, YOU WANT WORDS, RIGHT.

Q.       SO WHEN YOU SAY THE WHOLE DOCUMENT IS EXAMINED, I UNDERSTAND THAT YOU ARE EXAMINING THE WHOLE DOCUMENT BUT WHAT YOU REALLY NEED ARE THE WORDS, IS THAT RIGHT?

A.       SAME WORDING, CORRECT.

Q.       AND FOR THE STEVE LETTER YOU ONLY HAD TWO WORDS, IS THAT RIGHT?

A.       THAT WERE THE SAME, THAT'S CORRECT.

Q.       AND HOW MANY FOR THE ROCK LETTER?  DID YOU KEEP NOTES OF THAT?  I DIDN'T SEE ANYWHERE WHERE THERE WAS A RECORD OF THAT, SO MAYBE YOU REMEMBER?

A.       IT'S -- WELL, IN MY NOTES I POINT TO SIMILARITIES, SO IN MY NOTES I WOULD HAVE THEM POINTED OUT.

Q.       DO YOU KNOW HOW MANY WORDS YOU USED FOR THE ROCK LETTER TO COMPARE FROM THE KNOWN TO THE QUESTIONED?

A.       ALL OF THE KNOWN WRITING THAT I HAD WOULD BE COMPARED TO THE QUESTIONED.

Q.       SO IN ANY EVENT, WE ARE CLEAR THAT YOU USED THREE LETTERS FOR THE SEVEN REASONS -- THREE WORDS FOR THE SEVEN REASON TO KILL, BUT OF THOSE THREE WORDS, TWO APPEARED ONCE AND MARTI APPEARED THREE TIMES, IS THAT

RIGHT, DO YOU REMEMBER THAT?

A.      I HAVE TO LOOK AT THE KNOWN.

Q.      KILL APPEARED ONCE, DEATH APPEARED ONCE AND MARTI APPEARED THREE TIMES, SO I'M LOOKING AT YOU ANALYZED FIVE WORDS FROM THE QUESTIONED DOCUMENT?

A.      NO, THAT IS NOT CORRECT.

        AGAIN, THOSE LETTERS APPEAR THROUGHOUT THE KNOWN WRITING, SO ALL OF THAT WAS EXAMINED.  YOU ARE POINTING OUT A WORD, BUT ALL OF THOSE LETTERS WERE THROUGHOUT THE KNOWN WRITING.

Q.      OKAY.

        NOW, WHY ARE COPIES BAD TO USE?

A.      BECAUSE AGAIN, WITH A COPY I DON'T KNOW HOW THE WRITING OR PRINTING WAS PLACED ON THE PAPER INITIALLY.

Q.      SO COPIES ARE A DISASTER, IS THAT RIGHT, FOR SOMEONE IN YOUR LINE OF WORK?

A.      YES.

Q.      BUT YET WHEN YOU ANALYZED 51, 52, 53, 54, 55, WHAT DID YOU PUT?  THOSE WERE ALL COPIES, RIGHT?

A.      CORRECT.  LET'S BACK UP.  COPIES ARE NOT GOOD IN ORDER TO GIVE A POSITIVE IDENTIFICATION, BUT YOU CAN GIVE A LEANING, WHICH IS WHAT I GAVE.

Q.      WELL, WHEN THEY ARE IN THE QUESTIONED DOCUMENTS, COPIES ARE VERY DANGEROUS, RIGHT?  YOU CAN HAVE COPIES OBVIOUSLY OF EXEMPLARS BECAUSE THEY WERE DONE IN FRONT

OF A LAW ENFORCEMENT OFFICER?

A.    CORRECT.

Q.    YOU ANALYZED 51, 52 TO 55 WERE QUESTIONED DOCUMENTS THAT WERE COPIES, IS THAT RIGHT?

A.    CORRECT.

Q.    AND YOU GAVE THOSE DOCUMENTS THAT WERE COPIES THE SAME GRADE, THE SAME PROBABLY AS YOU DID WITH THE ORIGINALS, THE SEVEN REASONS TO KILL, THE STEVE LETTER AND THE ROCK LETTER, IS THAT RIGHT?

A.    CORRECT.

Q.    SO YOU USED -- SO THIS STANDARD YOU USED OF PROBABLY IS PRETTY BROAD, ISN'T IT?

A.    REMEMBER, AT THAT TIME PROBABLY, MAY HAVE -- THE SAME CHARACTERISTICS WERE FOUND IN THE QUESTIONED AND THE KNOWN.  EVEN THOUGH THEY ARE COPIES, THIS IS EXTENDED WRITING, EXTENDED WRITING IS HARDER TO MANIPULATE.

Q.    BUT THAT -- WHAT WE ARE LOOKING AT HERE, STRONG LIKELIHOOD THAT WRITING IS PROBABLY HIS, THAT IS A SERIOUS FINDING BY YOU, ISN'T IT?

A.    RIGHT.

Q.    YOU COME INTO COURT AND YOU TESTIFY TO THAT AND PEOPLE LISTEN TO YOU AND THEY ARE GOING TO BELIEVE YOU, ISN'T THAT RIGHT?

A.    BECAUSE THAT IS THE TRUTH.

Q.      WELL, YOU DID IT WITH A PHOTOCOPY, YOU FOUND THAT, AND YOU TOLD US PHOTOCOPIES ARE NOT GOOD WITH QUESTIONED DOCUMENTS?

A.      FORMING IDENTIFICATIONS.  THIS WAS NOT AN IDENTIFICATION.

Q.      STRONG LIKELIHOOD THAT WRITING IS PROBABLY HIS IS A PRETTY STRONG STATEMENT.

A.      BUT IT'S NOT AN IDENTIFICATION.

Q.      NO, I AGREE WITH YOU, IT'S NOT.  BUT YOU CAN AGREE WITH ME THAT SAME FINDING YOU HAD FOR THE THREE OTHER DOCUMENTS THAT YOU HAD THE ORIGINALS, ISN'T THAT RIGHT?

A.      CORRECT.

Q.      WHOSE JOB IS IT TO GET YOU THE EXEMPLARS?

A.      THAT IS WHOEVER THE INVESTIGATOR IS ON THE CASE.

Q.      YOU TOLD THAT INVESTIGATOR THAT YOU NEEDED BETTER EXEMPLARS, ISN'T THAT RIGHT?

A.      CORRECT.

Q.      YOU NEVER GOT THEM, DID YOU?

A.      THAT HAPPENS.  THAT IS -- WITH A LOT OF CASES THAT HAPPENS.

Q.      HOW MANY CAPITAL CASES HAS THAT HAPPENED FOR YOU?

A.      I DON'T HAVE A RECORD, BUT I MEAN --

Q.      HAS IT HAPPENED IN A CAPITAL CASE THAT YOU ARE

AWARE OF THAT YOU HAVE BEEN IN ON?

A.      I CAN'T TELL YOU NOW.  I WOULD PROBABLY SAY YES BECAUSE THAT IS HOW MOST CASES ARE, I MEAN --

Q.      CAN YOU NAME ONE?

A.      I CAN'T.  NO, I CAN'T.  I CAN'T GIVE YOU A TITLE NOW.

Q.      I DID NOT SEE FROM YOUR TESTIMONY AND YOUR REPORT THE DARBY LETTER.  DO YOU HAVE ANY NOTES AS TO WHAT WORDS YOU USED IN THE DARBY LETTER?

A.      THAT WAS Q --

Q.      I'M SORRY, THAT IS Q 17 AND 36.2.  JUST FOR COMPLETENESS, I JUST WANTED TO COVER THAT BECAUSE I DIDN'T SEE ANYTHING IN YOUR REPORT OR TESTIMONY.  DO YOU REMEMBER WHAT WORDS FROM THE EXEMPLARS YOU WERE ABLE TO WORK WITH?

A.      THERE ARE SIMILARITIES THROUGHOUT THAT PARTICULAR WRITING.  AGAIN, THAT WAS A COPY AND I COULDN'T IDENTIFY IT BECAUSE IT'S A COPY, BUT EVERYTHING, I HAVE SIMILARITIES THROUGHOUT.

Q.      OKAY, BUT I THOUGHT WE WERE WORKING WITH WORDS.  DO YOU REMEMBER WHAT WORDS YOU WERE ABLE TO COMPARE?

A.      IT WAS ALL COMPARED.

Q.      WHAT WORDS FROM THE -- I'M SORRY, FROM THE EXEMPLARS?

A.      I DON'T HAVE ANY WORDS UNDERLINED, BUT IT WAS

ALL COMPARED, ALL OF THE LETTERS ARE COMPARED.

Q.      YOU DON'T HAVE ANY WORDS UNDERLINED, WHY NOT?
IS THAT WHAT YOU NORMALLY DO?

A.      WITH SOME CASES.  REMEMBER, THIS WAS 19 --
WHATEVER.  YOU KNOW WHAT I MEAN?

Q.      HAVE YOUR STANDARDS CHANGED SINCE THEN?

A.      STANDARDS HAVE NOT CHANGED, BUT I CAN'T COMMENT
ON WHAT I DIDN'T DO AT THE TIME.  I CAN ONLY SAY BASED
ON MY NOTES THERE ARE SIMILARITIES THROUGHOUT THIS
PARTICULAR DOCUMENT.  IT JUST HAPPENS TO BE A COPY.

Q.      NOW, WOULD YOU AGREE WITH THIS FROM THE NAS
REPORT, THAT CONTEXTUAL INFORMATION RENDERS EXPERTS
VULNERABLE TO MAKING ERRONEOUS IDS?

A.      NO, I EXAMINE WRITING BASED ON THE LETTER
FORMATIONS THAT ARE SENT IN THE CASE.  I REALLY COULD
CARE LESS ABOUT WHAT THEY ARE TALKING ABOUT.

Q.      SO I UNDERSTAND THAT.  BUT IF -- SO IT WOULD BE
IMPROPER -- LET'S SEE IF WE CAN AGREE ON THIS.  IT WOULD
BE IMPROPER FOR SOMEBODY TO SEND YOU A QUESTIONED
DOCUMENT AND TELL YOU THAT THE DEFENDANT WROTE IT, WOULD
THAT BE FAIR TO SAY?

A.      OH, THAT HAPPENS IN SOME OF OUR CASES.  BUT
AGAIN, I EXAMINE WHAT IS IN FRONT OF ME, SO IT REALLY
DOES NOT MATTER WHAT THEY SAY.

Q.      IT DOES HAPPEN, BUT THAT IS IMPROPER, ISN'T IT?

A.        CORRECT, THAT IS NOT STANDARD PROCEDURE, BUT THAT DOES NOT AFFECT MY EXAMINATION.

Q.        I KNOW WHAT YOU ARE SAYING HERE TODAY, BUT WE DO KNOW THAT THE NAS SAYS THAT IT CAN AFFECT YOU, RIGHT?

          MS. HAINES:  YOUR HONOR, I THINK THAT THIS HAS BEEN ASKED AND ANSWERED, GONE OVER.

          THE COURT:  I AGREE.

          MR. MCHUGH:  I HAVE NO FURTHER QUESTIONS, YOUR HONOR.

          THE COURT:  ANY REDIRECT?

                REDIRECT EXAMINATION

BY MS. HAINES:

Q.        MISS BROWN, DID ANY OF MR. MCHUGH'S QUESTIONS CHANGE YOUR OPINION IN THIS CASE?

A.        NO.

Q.        AND HE WAS ASKING YOU A SERIES OF QUESTIONS ABOUT COMPARISONS OF WORDS.  ARE YOU COMPARING WORDS IN THESE DOCUMENTS?

A.        NO, I'M COMPARING THE LETTERS AND LETTER FORMATIONS THAT ARE SUBMITTED IN THE CASE.

Q.        LET ME SHOW YOU TWO EXHIBITS THAT ARE MARKED AS GOVERNMENT'S EXHIBIT R179 AND R180.

          THE COURT:  CAN I GET THE NUMBERS AGAIN?

          MS. HAINES:  R179, YOUR HONOR AND R180.

BY MS. HAINES:

Q.      MISS BROWN, DO YOU RECOGNIZE THESE EXHIBITS AS THE STEVE CLASSEN LETTER AND THE SEVEN REASONS NOTE YOU HAVE ALREADY TESTIFIED ABOUT?

A.      YES.

Q.      EXCEPT WHAT DO THESE DOCUMENTS HAVE HIGHLIGHTED?

A.      SIMILARITIES IN COMMON BETWEEN THE QUESTIONED AND THE KNOWN WRITING THAT WAS SUBMITTED IN THE CASE.

Q.      WHO MADE NOTE OF THOSE SIMILARITIES BETWEEN THESE WRITINGS AND THE KNOWN WRITINGS OF MR. HAMMER?

A.      I DID.  AN ARROW ON EACH LETTER INDICATES THE SAME SIMILARITY OR CHARACTERISTIC WAS FOUND IN THE KNOWN WRITING, AND THIS IS JUST A COPY OF MY NOTE PAGE.

MS. HAINES:  YOUR HONOR, I WOULD SEEK TO INTRODUCE GOVERNMENT EXHIBIT R179 AND R180 AND PUBLISH THESE.

MR. MCHUGH:  JUST A CLARIFICATION, THAT IS, IN FACT, HER DOCUMENT OR IS THAT THE GOVERNMENT'S DOCUMENT?  IT WAS NOT CLEAR ON THE ANSWER.

BY MS. HAINES:

Q.      IS THAT A COPY OF YOUR NOTES?

A.      THIS IS A COPY OF MY NOTE.

MR. MCHUGH:  THERE ARE COLORS ON IT, IS THAT ACTUALLY WHAT SHE DID OR SOMEBODY ELSE DID?

THE WITNESS:  I DIDN'T DO THE COLORS, NO. THE ARROWS UNDERNEATH THE COLOR I WOULD HAVE DONE IN MY

NOTES.

MR. MCHUGH:  I'M GOING TO OBJECT.

THE COURT:  I HAVE TO SEE THE DOCUMENT.
IT'S HARD FOR ME TO -- DO YOU HAVE A -- I'M LOOKING AT
179 AND IT'S A COPY WITH A LOT OF --

THE WITNESS:  RIGHT, IN MY NOTES WHEN I
MARK SIMILARITIES --

THE COURT:  LET ME JUST -- WAIT.  IT'S
COPY OF A LETTER TO STEVE DATED 4 -- IS THAT 4/14?

THE WITNESS:  '96.

THE COURT:  '96.  AND IT HAS ON IT
NUMEROUS INDICATIONS WITH AN ORANGE WITH A MAGIC MARKER.

THE WITNESS:  I DID NOT DO THAT.  I DID
NOT PUT THE ORANGE ON IT.

THE COURT:  DO YOU KNOW WHO DID THAT?

THE WITNESS:  I GUESS -- I'M ASSUMING THE
ATTORNEY, BUT I DIDN'T.

THE COURT:  YOU DON'T KNOW?

THE WITNESS:  NO.

THE COURT:  IN LOOKING AT THE OTHER
DOCUMENT, R180, IT'S A COPY OF A DOCUMENT.  IT ALSO HAS
THE SAME NUMEROUS MARKINGS WITH A MAGIC MARKER IN
ORANGE.

THE WITNESS:  RIGHT, THE ORANGE I DID NOT
DO.

THE COURT:  ALL RIGHT.  SO WHAT IS THE PURPOSE OF THESE DOCUMENTS, COUNSEL?

MS. HAINES:  YOUR HONOR, IF I CAN CLARIFY WITH A QUESTION?

THE COURT:  YES.

BY MS. HAINES:

Q.      THE ARROWS AND UNDERLINING THAT NOW HAVE BEEN HIGHLIGHTED IN ORANGE, WHO MADE THOSE NOTATIONS?

A.      THE ORIGINAL NOTATIONS ARE MINE.  THE ARROWS, I HAVE COPIES IN MY NOTES I CAN SHOW YOU THE SAME THING. THE ORIGINAL ARROWS AND LIKE LINES IN MY NOTES I HAVE AND THAT IS A COPY OF ONE OF MY NOTE PAGE, WELL, MY THREE NOTE PAGES.

THE COURT:  SO WHEREVER THERE IS THE ORANGE MARK -- MAGIC MARKER, WITHIN THAT MARKING THERE IS AN ARROW?

THE WITNESS:  CORRECT.

THE COURT:  AND YOU PUT THE ARROWS ON THERE?

THE WITNESS:  ORIGINALLY, YES, ON MY NOTE PAGES, YES.

THE COURT:  WHY DID YOU PUT THE ARROWS ON THERE?

THE WITNESS:  THAT SHOWS SIMILARITIES BETWEEN THE QUESTIONED WRITING AND THE KNOWN WRITING.

THE SAME CHARACTERISTIC THAT IS THERE IS IN THE KNOWN WRITING.

THE COURT:  ALL RIGHT.  WHAT IS THE OBJECTION NOW?

MR. MCHUGH:  THE OBJECTION IS, YOUR HONOR, IT WAS A DOCUMENT THAT WAS ALTERED BY COUNSEL, APPARENTLY AND SO --

THE COURT:  WELL, WE DON'T KNOW WHO --

MR. MCHUGH:  I DON'T KNOW WHO DID IT.  I PRESUME IT IS COUNSEL.

THE COURT:  ALL RIGHT.  IT IS BEING ADMITTED FOR THE FACT THAT IT SHOWS HER INDICATIONS OF WHAT THE LETTERS ARE THAT SHOW THE SIMILARITIES, SO I WILL OVERRULE THE OBJECTION.  I WILL ADMIT R179 AND R180.

MS. HAINES:  THANK YOU, YOUR HONOR, IF I MAY PUBLISH.

(GOVERNMENT EXHIBITS R179 AND R180 ARE ADMITTED.)

THE COURT:  YES.

WE ARE GETTING CLOSE TO 25 AFTER NOW.

MS. HAINES:  VERY CLOSE, YOUR HONOR.

THE COURT:  HOW MUCH MORE DO YOU HAVE?

MS. HAINES:  PROBABLY ONE OR TWO QUESTIONS.

THE COURT:  I WILL LET YOU GO TWO QUESTIONS THEN.

BY MS. HAINES:

Q.      THE FLAGS OR THE ARROWS THAT HAVE BEEN HIGHLIGHTED, ARE THOSE ALL OF YOUR INDICATIONS OF SIMILARITIES BETWEEN THESE LETTERS AND MR. HAMMER'S LETTERS?

A.      CORRECT, YES.

Q.      AND YOU WERE ASKED WHETHER YOU TALLIED THEM. WOULD YOU ACCEPT MY REPRESENTATION THAT YOU NOTED OVER 150 SIMILARITIES BETWEEN THIS DOCUMENT AND MR. HAMMER'S KNOWN WRITINGS?

A.      I DIDN'T COUNT THEM, BUT I WILL GO ALONG WITH YOUR COUNT.  I NORMALLY DON'T COUNT THEM, BUT YES.

THE COURT:  NUMEROUS SIMILARITIES?

THE WITNESS:  YES.

THE COURT:  ANY QUESTIONS, MR. MCHUGH?

MR. MCHUGH:  YES.

RECROSS EXAMINATION

BY MR. MCHUGH:

Q.      I SEE THAT YOU HIGHLIGHTED THE SIMILARITIES. DID YOU ALSO MAKE NOTE OF THE VARIATIONS?

A.      NO.

Q.      SO YOU DON'T MAKE NOTE OF VARIATIONS?

A.      SIMILARITIES INDICATE THE SAME WRITER WROTE IT.

THAT IS WHAT --

Q.      VARIATIONS WOULD INDICATE NOT THE SAME WRITER, CORRECT?

A.      VARIATIONS BETWEEN EVERYONE'S WRITING, THAT DOESN'T -- A DIFFERENCE INDICATES ANOTHER WRITER, A VARIATION IS JUST A VARIATION.

Q.      DID YOU INDICATE ANY DIFFERENCES ON HERE?

A.      NO.

Q.      WHY NOT?

A.      BECAUSE THERE REALLY WEREN'T ANY.  I COULD ONLY COMPARE WHAT I HAD.  I DID NOT HAVE ALL OF THE SAME COMPARABLE CHARACTERISTICS IN BOTH, SO I CAN'T COMPARE WHAT I DON'T HAVE.

Q.      SO YOU DID NOT MARK DOWN ANY VARIATIONS OR DIFFERENCES?

A.      UNLESS THERE IS A DIFFERENCE, IT IS NOT GOING TO BE MARKED -- I DID NOT HAVE A DIFFERENCE TO MARK.

Q.      YOU HAD NO DIFFERENCES IN THAT ENTIRE LETTER?

A.      AGAIN, I DIDN'T HAVE ALL OF THE SAME COMPARABLE WRITINGS, SO I REALLY CAN'T SAY THAT IT'S A DIFFERENCE IF I DON'T HAVE THE SAME CHARACTER IN THE --

Q.      SEEMS LIKE YOU HAVE A SIMILARITY ON ALMOST EVERY LETTER?

A.      BECAUSE THERE WERE SIMILARITIES BETWEEN THE QUESTIONED AND THE KNOWN.  THE SAME THING THAT I HAVE

MARKED I FOUND IN THE KNOWN WRITING.

Q.       BUT YOU DID NOT HAVE ALL OF THE WORDS AND YOU HAD THE ENTIRE ALPHABET?

A.       CORRECT.

MR. MCHUGH:  I HAVE NO FURTHER QUESTIONS.

THE WITNESS:  ALL RIGHT, YOU MAY STEP DOWN.

(WITNESS EXCUSED.)

THE COURT:  ALL RIGHT, IT IS NOW 25 AFTER.  RATHER THAN CALL ANOTHER WITNESS, LET'S RECESS FOR THE DAY.

MR. MCHUGH:  YOUR HONOR, CAN I MOVE MY EXHIBITS IN?

THE COURT:  YES.  WHICH EXHIBITS ARE WE TALKING ABOUT?

MR. MCHUGH:  I BELIEVE I HAVE THE TRANSCRIPT FROM THE OTHER MATTER, I THINK THE OTHER -- I THINK THAT IS IT, SO I THINK D 17.

THE COURT:  D 17?

MR. MCHUGH:  YES.

(DEFENSE EXHIBIT NUMBER D 17 ADMITTED INTO EVIDENCE.)

THE COURT:  AND THERE ARE SOME OTHER EXHIBITS THAT HAVE BEEN OFFERED, TOO.  LET'S SEE, D 16 WAS WHAT?

MR. MCHUGH:  D 16 IS THE FULL GRAND JURY TRANSCRIPT FROM MR. CLASSEN.

THE COURT:  D 15 IS THE MEMO FOR LIEUTENANT TRAXLER.

MR. MCHUGH:  YES.

THE COURT:  ARE YOU MOVING THAT INTO EVIDENCE?

MR. MCHUGH:  YES, YOUR HONOR.

THE COURT:  D 14 IS THE REPORT OF INTERVIEW OF MARTIN GUERRERO.

MR. MCHUGH:  YES.

THE COURT:  WITHOUT OBJECTION, THOSE WILL BE --

MR. MCHUGH:  THERE WERE A COUPLE MORE.  I THINK 11.  THERE WERE THE REPORTS FROM MISS --

THE COURT:  D 13 IS ANOTHER REPORT?

MR. MCHUGH:  YES.  MISS BROWN, THERE WAS THE D 11 IS MR. -- AGENT MALOCU'S LEAD DOWN TO WASHINGTON AND THEN THE TWO REPORTS ARE D 12 AND D 11.

THE COURT:  D 11 WILL BE ADMITTED AND D 13.  WHAT IS D 12?

MR. MCHUGH:  D 12 IS A FINDING BY MISS BROWN, MS. BUNCH AT THE TIME, AS TO HER QUALIFIED OPINION.  THEY ARE BOTH SIMILAR DOCUMENTS, D 11 AND D 12.

THE COURT:  D 12 WILL BE ADMITTED.

(DEFENSE EXHIBITS 11, 12, 13, 14, 15, 16 ADMITTED INTO EVIDENCE.)

THE COURT:  ARE THERE ANY GOVERNMENT EXHIBITS?  ANY OTHER GOVERNMENT EXHIBITS BEING MOVED?

MS. HAINES:  OTHER THAN WHAT WE OFFERED AND WERE ADMITTED PREVIOUSLY, NO, YOUR HONOR.

MR. GURGANUS:  YOUR HONOR, FROM YESTERDAY, R169, I DON'T BELIEVE WE GOT IN, IT WAS THE KARTEN MEMORANDUM.  I THINK I OMITTED OFFERING THAT YESTERDAY.

THE COURT:  ALL RIGHT.  ANY OBJECTION TO THAT, R169?  HEARING NONE, THAT WILL BE ADMITTED.  THAT COVERS ALL THE EXHIBITS.  IT IS ALMOST 27 AFTER AND WE ARE GOING TO LOSE MR. HAMMER VERY SHORTLY, SO WHY DON'T WE STAND IN RECESS.  MR. HAMMER, YOU PROBABLY HAVE A MINUTE TO SPEAK TO YOUR COUNSEL IF YOU WANT TO.

THE DEFENDANT:  THANK YOU, YOUR HONOR.

(GOVERNMENT EXHIBIT R169 ADMITTED INTO EVIDENCE.)

MR. TRAVIS:  I WILL TALK TO YOU IN THE MORNING.

THE DEFENDANT:  THANK YOU ALL.  HAVE A NICE EVENING.

(HEARING ADJOURNED AT 3:30 P.M.)

INDEX

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| ANTHONY MALOCU | | | | |
|    BY MS. HAINES | | | | |
| (CONTINUED DIRECT) | 5 | -- | 91,111 | -- |
|    BY MR. MCHUGH | -- | 44 | -- | 104 |
| | | | | |
| JEANNETTE BUNCH BROWN | | | | |
|    BY MS. HAINES | | | | |
|     (VOIR DIRE) | 117 | -- | -- | -- |
| | 132 | -- | 173 | -- |
|    BY MR. MCHUGH | | | | |
|     (VOIR DIRE) | -- | 124 | -- | -- |
| | -- | 145 | -- | 178 |

EXHIBITS

| GOVERNMENT EXHIBITS | ADMITTED |
|---|---|
| 36.2 | 6 |
| 36.3 | 6 |
| 51 TO 55 | 16 |
| 30, R30 | 29 |

37                                                      37

R38                                                     38

36                                                      41

141.1 AND 141.2                                         43

128                                                     102

R43                                                     134

R44                                                     140

R179, R180                                              177

R169                                                    182


DEFENSE EXHIBITS                          ADMITTED

9 AND 10                                     5

17                                           180

11, 12, 13, 14, 15, AND 16                   182




                    I CERTIFY THAT THE FOREGOING IS A CORRECT

TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

ABOVE-ENTITLED MATTER.




DATE                          OFFICIAL COURT REPORTER

                              SUZANNE R. WHITE

**'**

**'06** [4] - 125:15, 125:17, 125:19, 130:15
**'07** [4] - 125:20, 125:23, 127:11, 130:16
**'08** [1] - 126:2
**'95** [1] - 44:25
**'96** [5] - 72:13, 79:1, 132:14, 175:10, 175:11
**'97** [4] - 61:5, 132:15, 158:25
**'98** [2] - 66:2, 158:25

---

**1**

---

**1** [6] - 3:23, 3:25, 51:24, 133:8, 153:9, 153:10
**10** [9] - 4:6, 4:18, 4:19, 4:23, 5:1, 51:11, 93:22, 184:12
**100** [4] - 2:7, 39:20, 153:6
**1012.4** [2] - 115:1, 116:11
**102** [1] - 184:5
**104** [1] - 183:9
**10:36** [1] - 36:20
**10TH** [5] - 43:22, 43:23, 56:2, 56:6, 93:8
**11** [10] - 4:16, 43:20, 51:12, 181:15, 181:18, 181:19, 181:20, 181:24, 182:2, 184:14
**117** [1] - 183:13
**11:20** [2] - 69:24, 70:7
**11TH** [3] - 66:2, 69:22, 100:21
**12** [8] - 60:17, 181:19, 181:21, 181:22, 181:25, 182:1, 182:2, 184:14
**120** [2] - 13:14, 44:5
**1232** [3] - 28:21, 99:24, 100:6
**124** [1] - 183:16
**128** [9] - 99:11, 99:13, 102:12, 102:13, 102:15, 102:16, 102:18, 113:16, 184:5
**12:30** [2] - 112:18, 112:24
**13** [8] - 99:2, 105:7, 105:25, 131:14, 181:16, 181:21, 182:2, 184:14
**132** [1] - 183:14
**1331** [1] - 2:4
**134** [1] - 184:6
**13TH** [2] - 22:1, 108:1
**14** [15] - 18:21, 86:23, 124:4, 133:19, 133:20, 133:21, 134:22, 135:20, 137:16, 141:3, 152:16, 181:9, 182:2, 184:14
**140** [1] - 184:7
**141.1** [4] - 42:10, 42:25, 43:3, 184:4
**141.2** [4] - 42:10, 42:25, 43:3, 184:4
**145** [1] - 183:17
**14TH** [1] - 16:20
**15** [6] - 89:3, 106:1, 114:8, 181:3, 182:2, 184:14
**150** [1] - 178:11
**15TH** [1] - 44:4
**16** [14] - 110:25, 114:22, 114:23, 115:3, 116:10, 133:20, 139:8, 161:20, 166:1, 180:24, 181:1, 182:2, 183:24, 184:14
**161** [1] - 2:10
**16B** [1] - 1:8
**17** [14] - 56:3, 56:9, 56:10, 56:16, 93:13, 93:22, 143:18, 143:21, 145:18, 171:11, 180:18, 180:19, 180:21, 184:13
**17101** [1] - 2:7
**173** [1] - 183:14
**177** [1] - 184:8
**17703-0215** [1] - 2:11
**178** [1] - 183:17
**17887-2000** [1] - 21:9
**179** [1] - 175:5
**17TH** [4] - 7:13, 7:24, 68:7, 97:19
**18** [6] - 72:16, 72:19, 94:16, 133:21, 139:16, 140:25
**18.1** [1] - 133:20
**180** [1] - 184:13
**182** [2] - 184:9, 184:14
**18501** [1] - 1:18
**18TH** [2] - 38:16, 43:23
**19** [4] - 52:1, 94:25, 141:19, 172:4
**19106** [3] - 1:9, 1:21, 2:14
**1960** [1] - 149:11
**1990** [2] - 117:10, 128:17
**1991** [1] - 45:18
**1994** [1] - 130:12
**1995** [4] - 43:23, 43:24, 44:4
**1996** [22] - 3:23, 3:25, 4:8, 4:9, 4:16, 7:16, 16:20, 18:21, 20:14, 22:1, 26:16, 38:16, 71:22, 96:8, 97:16, 99:2, 100:21, 101:13, 106:2, 115:7, 136:19, 158:25
**1998** [10] - 42:22, 49:7, 49:8, 56:6, 63:10, 69:23, 93:8, 93:22, 160:7, 161:10
**19TH** [7] - 20:14, 26:16, 73:14, 96:8, 96:22, 97:16, 125:15

---

**2**

---

**2** [4] - 31:21, 52:13, 133:4, 135:21
**20** [2] - 117:8, 122:1
**200** [1] - 39:20
**2000** [1] - 21:8
**2004** [1] - 49:18
**2006** [9] - 120:5, 121:11, 123:9, 124:23, 125:5, 125:11, 125:12, 126:6
**2007** [3] - 122:17, 125:4, 150:24
**2009** [1] - 149:3
**2014** [1] - 145:21
**20530** [1] - 2:4
**21** [4] - 4:8, 4:9, 4:12, 94:9
**21-DAY** [1] - 4:13
**210** [1] - 43:24
**215** [2] - 2:10, 95:12
**215)627-1882** [1] - 1:22
**220** [1] - 39:20
**235** [1] - 1:17
**24** [2] - 22:6, 143:25
**24507-077/SHU** [1] - 21:8
**24TH** [2] - 71:22, 72:13
**25** [2] - 177:21, 180:9
**27** [3] - 19:13, 22:23, 182:14
**28** [3] - 106:2, 115:7, 143:25
**29** [2] - 74:21, 183:25
**2:30** [1] - 19:17
**2A** [1] - 43:24
**2B** [1] - 44:5

---

**3**

---

**3** [6] - 1:12, 26:25, 31:21, 52:16, 53:2, 108:10
**30** [29] - 8:1, 8:22, 8:24, 16:4, 29:12, 29:13, 29:15, 29:20, 30:1, 30:4, 37:7, 46:11, 46:12, 46:15, 46:20, 47:1, 47:3, 47:6, 52:6, 63:12, 103:3, 117:14, 119:19, 125:19, 146:9, 183:25
**300** [1] - 2:7
**302** [9] - 78:15, 79:9, 83:15, 84:20, 87:3, 87:21, 88:6, 98:14, 101:7
**302S** [1] - 78:14
**309** [1] - 1:17
**30TH** [2] - 44:4, 145:21
**31** [2] - 147:6, 147:10
**311** [1] - 1:17
**32** [3] - 30:1, 30:3, 147:23
**32-1** [1] - 133:12
**32-2** [4] - 8:3, 8:8, 10:1, 140:22
**32.1** [4] - 8:3, 8:5, 8:7, 133:12
**32.2** [2] - 139:8, 140:23
**33** [2] - 30:1, 30:3
**33.1** [3] - 56:12, 133:12, 139:16
**33.2** [4] - 11:17, 133:12, 139:17, 140:25
**34** [2] - 117:17, 124:4
**35** [3] - 12:19, 30:1, 30:3
**35.1** [12] - 56:12, 72:5, 95:3, 95:24, 112:8, 133:12, 134:23, 135:21, 135:23, 135:24, 138:1, 72:13
**35.2** [11] - 12:19, 12:21, 95:3, 95:23, 111:14, 112:5, 112:6, 133:12, 134:23, 138:10, 141:2
**36** [9] - 13:17, 30:2, 40:21, 41:12, 47:8, 70:3, 132:22, 132:25, 184:3
**36-3** [1] - 13:17
**36.1** [2] - 6:4, 143:16
**36.2** [7] - 6:4, 6:19, 6:24, 143:13, 143:21, 171:11, 183:22
**36.3** [7] - 6:4, 6:19, 6:24, 143:13, 143:17, 143:22, 183:23
**37** [11] - 34:9, 37:4, 37:8, 37:11, 37:14, 39:5, 47:6, 132:22, 133:6, 184:1
**38** [1] - 184:2
**3:30** [1] - 182:25

---

**4**

---

**4** [4] - 26:25, 106:7, 108:10, 175:9
**4/11/1996** [2] - 5:14, 5:15
**4/13/96** [2] - 17:1, 19:17
**4/14** [1] - 175:9
**4/14/96** [3] - 13:12, 19:20, 24:21
**4/17/96** [1] - 11:13
**41** [1] - 184:3
**43** [1] - 184:4
**44** [1] - 183:9
**4:96-CR-239** [1] - 1:6

---

**5**

---

**5** [5] - 46:25, 52:16, 60:8, 183:8, 184:12
**50** [5] - 29:24, 46:20, 103:2, 153:7
**51** [11] - 14:20, 14:22, 16:7, 16:9, 16:13, 16:17, 143:14, 143:22, 168:18, 169:3, 183:24
**52** [4] - 14:20, 18:13, 168:18, 169:3
**53** [3] - 14:21, 20:9, 168:18
**138:18**

**54** [4] - 14:21, 21:12, 143:22, 168:18
**540** [1] - 2:14
**55** [13] - 14:21, 14:23, 16:7, 16:10, 16:13, 26:9, 96:7, 97:2, 97:4, 143:14, 168:18, 169:3, 183:24
**58008-065** [1] - 10:19

---

## 6

**6** [3] - 60:9, 183:22, 183:23
**6-4-14** [1] - 1:8
**60** [1] - 63:12
**60-DAY** [2] - 3:23, 3:24
**601** [1] - 1:21

---

## 7

**717-547-7950** [1] - 21:7

---

## 8

**8TH** [1] - 84:25

---

## 9

**9** [6] - 3:21, 4:1, 4:20, 4:23, 5:1, 184:12
**91,111** [1] - 183:8
**9:00** [1] - 19:20
**9TH** [4] - 45:1, 48:19, 49:5, 85:1

---

## A

**A.M** [2] - 19:17, 19:20
**ABIDE** [1] - 75:11
**ABILITIES** [1] - 118:11
**ABILITY** [3] - 9:8, 118:11, 118:13
**ABLE** [12] - 22:15, 43:16, 126:4, 135:2, 135:15, 137:16, 147:25, 148:16, 152:12, 164:11, 171:14, 171:21
**ABOVE-ENTITLED** [1] - 184:20
**ABSOLUTELY** [1] - 23:1
**ABUNDANCE** [1] - 110:20
**ACADEMY** [6] - 44:25, 45:1, 45:11, 128:20,

131:9, 148:25
**ACCEPT** [1] - 178:10
**ACCEPTABLE** [1] - 22:18
**ACCEPTED** [1] - 76:22
**ACCESS** [1] - 28:17
**ACCORDINGLY** [1] - 101:23
**ACCURATE** [1] - 134:5
**ACT** [3] - 11:6, 22:17, 25:13
**ACTIONS** [1] - 24:19
**ACTIVITY** [1] - 11:3
**ACTUAL** [2] - 13:17, 129:3
**AD** [3] - 13:14, 21:20, 95:11
**ADD** [2] - 12:2, 158:12
**ADDING** [1] - 122:21
**ADDITION** [2] - 101:22, 129:18
**ADDITIONAL** [4] - 62:13, 62:23, 63:18, 64:9
**ADDRESS** [4] - 21:6, 101:22, 138:23, 138:25
**ADDRESSED** [8] - 15:15, 21:15, 56:12, 88:8, 88:12, 89:5, 95:10, 101:21
**ADEPT** [1] - 141:6
**ADEQUATELY** [1] - 22:4
**ADJOURNED** [1] - 182:25
**ADMINISTRATIVE** [1] - 5:6
**ADMIT** [2] - 29:17, 177:14
**ADMITTED** [30] - 4:24, 5:2, 6:22, 6:25, 10:16, 16:14, 29:21, 37:13, 37:14, 38:9, 38:10, 41:14, 41:15, 43:2, 43:4, 101:17, 102:18, 134:18, 140:16, 177:12, 177:19, 180:21, 181:20, 182:1, 182:3, 182:7, 182:13, 182:19, 183:21, 184:11
**ADVANCE** [1] - 21:5
**ADVERTISEMENT** [1] - 21:18
**ADVISED** [3] - 86:3, 86:6, 128:8

**ADVOCATE** [3] - 21:19, 21:20, 21:21
**AFFECT** [4] - 12:12, 24:5, 173:2, 173:4
**AFFORD** [1] - 112:20
**AFRAID** [1] - 14:8
**AFTERNOON** [2] - 124:19, 124:20
**AFTERWARDS** [1] - 106:5
**AGE** [1] - 126:7
**AGENT** [61] - 5:22, 6:1, 6:9, 7:2, 7:23, 9:18, 10:4, 11:19, 12:16, 12:22, 13:16, 14:19, 16:16, 18:5, 21:10, 26:8, 29:10, 31:12, 32:11, 33:7, 33:20, 36:23, 38:1, 38:13, 42:11, 43:9, 44:24, 46:2, 47:24, 48:3, 48:23, 49:12, 60:18, 69:13, 71:21, 73:9, 83:3, 83:10, 83:25, 85:11, 86:20, 87:4, 91:13, 93:19, 95:21, 97:1, 99:2, 99:5, 99:12, 100:17, 101:4, 101:8, 102:25, 107:25, 111:6, 112:7, 112:25, 113:9, 113:14, 119:15, 181:18
**AGO** [5] - 23:23, 24:4, 146:2, 146:19, 148:19
**AGREE** [23] - 54:23, 55:10, 58:2, 60:23, 61:10, 63:4, 87:21, 88:6, 122:18, 127:24, 147:2, 147:15, 147:19, 148:5, 148:17, 150:15, 155:2, 155:17, 170:9, 170:10, 172:11, 172:18, 173:7
**AGREEING** [1] - 76:2
**AGREES** [1] - 147:20
**AHEAD** [4] - 7:11, 36:10, 86:6, 127:11
**AIDED** [1] - 1:24
**ALARM** [14] - 30:25, 31:7, 31:15, 32:4, 33:23, 33:25, 35:8, 35:10, 35:13, 35:20, 35:22, 36:4, 36:15
**ALARMS** [1] - 31:23
**ALERTS** [1] - 35:25

**ALIKE** [11] - 118:6, 142:14, 149:12, 151:16, 151:18, 151:19, 151:23, 152:3, 152:4, 152:9, 152:10
**ALIVE** [1] - 23:23
**ALLEGATIONS** [2] - 50:13, 67:9
**ALLEGED** [5] - 11:2, 19:16, 54:6, 98:10, 103:3
**ALLEGEDLY** [1] - 66:18
**ALLEGING** [1] - 64:7
**ALLENWOOD** [14] - 15:6, 18:9, 19:18, 26:20, 32:14, 37:20, 73:10, 73:13, 74:5, 74:9, 79:1, 89:11, 96:21, 101:19
**ALLENWOOD'S** [1] - 10:20
**ALLOW** [1] - 3:5
**ALLOWED** [8] - 27:5, 27:6, 28:11, 28:13, 75:3, 123:24, 124:11, 125:25
**ALLUDES** [1] - 100:6
**ALMOST** [4] - 22:12, 112:18, 179:22, 182:14
**ALOUD** [2] - 109:9, 109:10
**ALPHABET** [5] - 39:12, 60:9, 164:4, 166:25, 180:3
**ALTERATION** [2] - 121:16, 121:22
**ALTERATIONS** [3] - 120:5, 126:6, 126:9
**ALTERED** [1] - 177:6
**ALTERNATIVE** [1] - 36:5
**AMANDA** [1] - 2:2
**AMBIGUOUS** [1] - 110:12
**AMERICA** [1] - 1:3
**AMOUNT** [2] - 153:16, 155:8
**ANALYSIS** [12] - 41:23, 41:24, 50:11, 51:22, 62:8, 67:1, 77:18, 78:1, 111:21, 117:16, 132:9, 153:24
**ANALYST** [3] - 96:11, 129:6, 129:10
**ANALYSTS** [1] - 53:6
**ANALYZED** [4] -

165:16, 168:5, 168:18, 169:3
**ANALYZING** [1] - 54:19
**AND-A-HALF** [1] - 119:3
**ANDREW** [11] - 10:19, 12:11, 19:13, 20:2, 23:8, 23:11, 23:12, 25:8, 26:5, 88:1, 101:14
**ANDREW'S** [2] - 20:4, 26:4
**ANGER** [2] - 22:5, 25:17
**ANIMAL** [1] - 11:6
**ANIMALS** [1] - 25:12
**ANNE** [1] - 2:5
**ANONYMOUS** [1] - 119:7
**ANSWER** [35] - 7:11, 22:20, 24:12, 24:13, 32:21, 54:2, 57:5, 57:9, 69:2, 72:23, 75:16, 94:1, 94:11, 94:14, 94:19, 95:5, 95:9, 95:13, 95:15, 95:18, 95:20, 96:22, 96:23, 106:9, 106:18, 106:21, 106:24, 108:8, 108:23, 115:14, 120:17, 131:4, 146:12, 164:16, 174:18
**ANSWERED** [3] - 147:14, 148:4, 173:6
**ANSWERS** [2] - 24:15, 94:22
**ANTHONY** [2] - 5:22, 183:6
**ANTISOCIAL** [1] - 22:10
**ANXIOUS** [1] - 29:3
**ANYWAY** [1] - 107:11
**APOLOGIES** [1] - 89:20
**APOLOGIZE** [1] - 89:18
**APPARATUS** [1] - 127:8
**APPARENT** [2] - 24:2, 24:11
**APPEAR** [7] - 123:14, 152:6, 154:12, 154:13, 154:14, 168:7
**APPEARANCES** [2] - 1:14, 2:1
**APPEARED** [10] -

38:14, 38:17, 60:8, 85:14, 163:10, 167:25, 168:3, 168:4
**APPELLATION** [1] - 8:17
**APPLYING** [1] - 161:14
**APPRECIATE** [1] - 29:2
**APPROACH** [1] - 6:6
**APRIL** [17] - 4:16, 7:12, 7:13, 7:24, 16:20, 18:21, 20:14, 22:1, 26:16, 43:23, 79:1, 85:1, 96:8, 96:22, 97:16, 100:21, 101:13
**AREA** [4] - 129:24, 130:2, 130:5, 130:13
**ARGUING** [1] - 112:3
**ARGUMENT** [1] - 116:2
**ARMS** [1] - 19:15
**ARRIVAL** [1] - 17:3
**ARRIVED** [4] - 10:25, 19:8, 25:21, 80:8
**ARROW** [2] - 174:10, 176:16
**ARROWS** [10] - 143:4, 158:3, 158:15, 174:25, 176:7, 176:9, 176:11, 176:18, 176:22, 178:4
**ARTEO** [1] - 99:24
**ARTICLES** [2] - 119:13, 129:3
**ARTS** [1] - 118:18
**ASCERTAIN** [1] - 9:6
**ASHAMED** [1] - 23:4
**ASIDE** [1] - 22:16
**ASPECTS** [1] - 24:9
**ASS** [1] - 27:10
**ASSESSMENT** [2] - 62:10, 67:12
**ASSIGNED** [4] - 45:15, 45:18, 53:8, 78:6
**ASSIGNMENT** [2] - 45:4, 46:1
**ASSIST** [3] - 32:15, 102:9, 112:8
**ASSISTANCE** [1] - 11:2
**ASSOCIATE** [1] - 100:11
**ASSOCIATED** [3] - 31:4, 32:12, 32:17
**ASSUME** [1] - 147:10
**ASSUMED** [1] - 55:6

**ASSUMING** [2] - 13:24, 175:16
**ASSURANCE** [2] - 120:21, 128:5
**ATTEMPTING** [1] - 13:24
**ATTENDED** [2] - 119:13, 128:23
**ATTENTION** [4] - 11:20, 11:23, 91:15, 93:12
**ATTORNEY** [5] - 14:4, 30:2, 37:22, 146:6, 175:17
**ATTORNEY'S** [3] - 6:14, 20:23, 106:3
**ATTORNEYS** [2] - 1:16, 112:19
**AUDIOLOGY** [1] - 118:19
**AUGUST** [4] - 44:4, 106:2, 115:7, 125:12
**AUSA** [1] - 6:17
**AUTHENTIC** [1] - 92:24
**AUTHENTICATE** [1] - 96:13
**AUTHENTICATION** [1] - 10:17
**AUTHENTICITY** [2] - 50:15, 135:16
**AUTHORED** [1] - 40:24
**AUTOPSY** [4] - 45:24, 77:18, 77:25, 78:9
**AVAILABLE** [1] - 112:25
**AVOID** [1] - 55:3
**AWARE** [17] - 30:24, 31:3, 31:12, 32:11, 32:18, 49:17, 49:23, 76:21, 78:5, 80:6, 82:8, 84:4, 113:20, 148:25, 149:18, 152:7, 171:1

## B

**B-R-O-W-N** [1] - 116:24
**BACHELOR** [1] - 118:18
**BACKGROUND** [4] - 23:15, 44:15, 44:17, 118:17
**BAD** [1] - 168:12
**BALL** [1] - 79:2
**BANGING** [1] - 23:16
**BANK** [4] - 130:10, 162:7, 162:10,

162:18
**BAR** [1] - 142:23
**BARELY** [1] - 104:3
**BASED** [8] - 18:5, 21:15, 118:14, 137:3, 150:1, 150:5, 172:8, 172:14
**BASELINE** [2] - 118:1, 142:11
**BATTERIES** [1] - 85:16
**BEATTY** [1] - 19:22
**BECAME** [1] - 129:12
**BECOME** [1] - 76:21
**BECOMING** [1] - 85:5
**BED** [7] - 94:3, 94:6, 94:7, 104:22, 107:11, 107:13, 107:14
**BEEPING** [1] - 35:15
**BEG** [1] - 28:15
**BEGIN** [4] - 18:22, 20:11, 21:25, 28:9
**BEGINNING** [7] - 13:9, 27:5, 27:21, 28:11, 45:20, 118:2, 146:9
**BEGINS** [4] - 11:24, 12:23, 19:11, 19:25
**BEHALF** [3] - 83:5, 89:4, 98:12
**BEHAVIOR** [2] - 20:20, 22:9
**BEHIND** [1] - 37:8
**BELABOR** [1] - 122:8
**BELIEVES** [1] - 109:5
**BEST** [8] - 9:7, 17:17, 20:19, 27:19, 90:14, 136:15, 162:5, 163:4
**BETTER** [11] - 13:4, 14:9, 22:25, 25:23, 26:18, 29:5, 64:25, 162:13, 162:21, 164:1, 170:17
**BETWEEN** [40] - 22:22, 36:4, 46:25, 117:25, 119:5, 123:25, 124:13, 136:9, 136:24, 137:9, 137:12, 139:6, 139:10, 140:6, 141:10, 141:14, 141:22, 142:3, 143:5, 143:10, 145:12, 146:23, 152:13, 156:20, 157:2, 157:16, 158:15, 159:5, 159:8, 159:11, 159:15, 159:18, 160:6,

174:6, 174:8, 176:25, 178:6, 178:11, 179:4, 179:24
**BEYOND** [2] - 23:10, 157:24
**BINDER** [6] - 8:22, 9:25, 16:4, 16:16, 29:13, 37:8
**BIRDS** [1] - 27:2
**BIT** [3] - 114:12, 118:23, 129:5
**BLACK** [1] - 22:13
**BLESS** [1] - 143:23
**BLINKING** [4] - 31:14, 31:19, 32:2, 36:21
**BLINKS** [1] - 31:16
**BLOW** [1] - 105:19
**BODY** [5] - 14:2, 24:1, 90:8, 156:18, 160:10
**BONDAGE** [3] - 79:10, 97:23, 98:1
**BOOK** [2] - 28:18, 104:12
**BOOKS** [4] - 19:8, 119:13, 125:14, 129:3
**BOONE** [5] - 82:13, 82:15, 82:19, 82:21, 82:22
**BOP** [2] - 67:10, 89:12
**BOTTOM** [8] - 19:10, 54:10, 56:16, 61:13, 80:11, 106:1, 138:24, 141:25
**BOUNTY** [1] - 11:1
**BOX** [3] - 1:17, 2:10, 21:8
**BOY** [1] - 23:14
**BRAD** [4] - 16:19, 16:20, 24:17, 26:2
**BRADLEY** [2] - 18:6, 18:7
**BRAIDED** [11] - 73:5, 74:13, 74:16, 74:22, 75:9, 75:12, 75:21, 76:15, 76:24, 77:10, 79:13
**BRAIN** [2] - 118:15, 150:19
**BRAND** [1] - 118:25
**BREAK** [14] - 71:16, 80:12, 86:11, 86:14, 98:13, 112:17, 113:5, 141:11, 141:13, 141:22, 142:3, 142:18, 158:20
**BREATHED** [1] - 23:18

**BREWER** [4] - 18:16, 18:17, 18:18, 20:9
**BRIEFLY** [2] - 126:5, 159:1
**BRING** [5] - 14:10, 105:18, 107:3, 123:15, 127:9
**BRINGING** [1] - 10:22
**BROAD** [1] - 169:12
**BROKE** [1] - 80:14
**BROKEN** [1] - 80:8
**BROTHER** [4] - 16:21, 17:18, 18:4, 29:9
**BROUGHT** [5] - 17:1, 26:22, 27:22, 97:14, 97:17
**BROWN** [22] - 78:25, 116:19, 116:23, 117:4, 122:3, 124:10, 124:19, 127:16, 132:2, 132:8, 134:9, 134:24, 138:1, 140:19, 141:24, 145:7, 158:24, 173:13, 174:1, 181:17, 181:23, 183:11
**BRUCE** [2] - 99:2, 101:8
**BULLETS** [1] - 23:25
**BULLSHIT** [1] - 27:22
**BUNCH** [8] - 62:19, 63:6, 116:18, 116:19, 116:23, 116:24, 181:23, 183:11
**BUNK** [3] - 26:24, 43:24, 44:5
**BUREAU** [4] - 41:2, 42:14, 49:17, 49:22
**BURST** [1] - 24:3
**BUSINESS** [1] - 135:12
**BUSINESSES** [1] - 119:14
**BUT...** [1] - 72:10
**BUTTON** [8] - 34:25, 35:6, 35:12, 35:19, 35:21, 44:14, 44:17, 141:25

## C

**CALIFORNIA** [1] - 19:13
**CALLER** [1] - 83:5
**CANNOT** [7] - 11:5, 20:3, 22:21, 25:12, 110:12, 118:12,

144:8
**CAPACITY** [1] - 43:6
**CAPITAL** [6] - 2:3, 142:10, 162:16, 162:25, 170:22, 170:25
**CAPTORS** [1] - 25:17
**CARD** [2] - 19:7, 64:18
**CARDS** [1] - 64:16
**CARE** [8] - 12:25, 18:1, 18:3, 25:10, 25:11, 109:11, 115:15, 172:16
**CAREER** [1] - 119:19
**CAREFUL** [1] - 12:9
**CARING** [1] - 24:8
**CASE** [69] - 13:2, 17:4, 45:14, 45:17, 45:19, 45:20, 46:2, 48:23, 51:19, 53:8, 59:1, 62:16, 64:13, 64:14, 64:20, 64:22, 65:7, 65:12, 65:14, 65:17, 70:15, 76:4, 76:18, 77:15, 78:3, 78:6, 81:2, 89:14, 91:17, 109:13, 115:17, 120:14, 120:22, 121:15, 121:16, 121:22, 123:19, 124:12, 125:16, 126:6, 126:21, 127:3, 132:9, 132:20, 133:2, 133:7, 135:13, 136:5, 145:25, 146:6, 151:9, 154:16, 156:6, 162:6, 162:12, 162:13, 162:17, 162:18, 162:22, 162:25, 166:16, 170:15, 170:25, 172:15, 173:14, 173:20, 174:7
**CASES** [21] - 21:1, 45:16, 119:16, 119:21, 120:20, 121:3, 121:7, 121:21, 121:22, 126:3, 126:4, 126:6, 127:3, 130:10, 162:15, 162:20, 170:20, 170:22, 171:3, 172:4, 172:22
**CATEGORY** [1] - 160:22
**CAUSED** [1] - 23:4
**CAUSES** [1] - 22:17
**CAUTION** [1] - 110:21

**CELL** [14] - 26:23, 26:24, 38:20, 55:25, 73:20, 75:3, 75:8, 85:5, 85:12, 89:25, 90:3, 90:12, 90:19, 101:18
**CELLMATE** [6] - 16:25, 18:8, 19:2, 84:25, 85:2, 101:14
**CELLMATE'S** [1] - 19:12
**CENTER** [1] - 2:14
**CENTRAL** [1] - 40:23
**CERTAIN** [13] - 12:3, 18:15, 42:3, 56:11, 73:14, 118:4, 124:13, 124:14, 132:9, 132:17, 132:18, 138:6, 148:12
**CERTAINLY** [3] - 53:18, 103:14, 161:1
**CERTAINTY** [11] - 131:21, 131:23, 131:24, 146:8, 146:11, 146:13, 146:15, 146:21, 146:22, 149:23, 150:4
**CERTIFY** [1] - 184:18
**CETERA** [3] - 21:4, 25:19, 27:9
**CHAINED** [3] - 26:21, 97:14, 97:17
**CHALLENGED** [1] - 122:9
**CHALLENGING** [2] - 122:3, 122:5
**CHANCE** [4] - 42:21, 51:15, 112:18, 140:1
**CHANCES** [1] - 29:5
**CHANGE** [3] - 12:10, 126:12, 173:14
**CHANGED** [6] - 25:1, 25:22, 160:1, 172:6, 172:7
**CHANGES** [1] - 90:20
**CHANGING** [1] - 75:23
**CHAPLAIN** [1] - 25:5
**CHARACTER** [1] - 179:21
**CHARACTERISTIC** [9] - 141:17, 141:21, 142:6, 142:8, 142:12, 142:25, 143:9, 174:11, 177:1
**CHARACTERISTICS** [18] - 152:1, 152:19, 152:21, 152:23, 152:24, 153:1,

153:3, 153:7, 153:11, 153:17, 157:23, 159:5, 159:8, 159:12, 160:4, 161:6, 169:14, 179:12
**CHARGE** [2] - 46:5, 79:25
**CHARGED** [2] - 16:25, 19:1
**CHARRED** [1] - 120:4
**CHART** [12] - 133:25, 134:4, 134:11, 139:24, 139:25, 140:4, 140:19, 143:20, 163:13, 163:18, 163:19
**CHARTS** [1] - 163:12
**CHECK** [5] - 69:21, 85:24, 86:6, 91:4, 119:6
**CHEMICAL** [1] - 51:22
**CHESTNUT** [1] - 2:7
**CHIEF** [1] - 25:6
**CHRIS** [1] - 145:20
**CINCINNATI** [1] - 99:3
**CIRCUMSTANCES** [3] - 17:8, 25:14, 37:17
**CITY** [1] - 52:20
**CLAIMED** [1] - 91:25
**CLARIFICATION** [5] - 30:6, 49:5, 137:23, 140:19, 174:16
**CLARIFICATIONS** [1] - 33:15
**CLARIFIED** [3] - 74:22, 75:8, 144:23
**CLARIFY** [6] - 95:21, 114:2, 116:8, 151:6, 151:11, 176:3
**CLARITY** [1] - 144:16
**CLASSEN** [43] - 7:7, 12:20, 55:23, 56:7, 56:13, 56:15, 57:13, 57:20, 58:5, 58:12, 58:14, 58:16, 59:5, 59:11, 72:4, 72:17, 72:18, 84:17, 84:23, 93:2, 93:3, 93:21, 94:21, 95:2, 95:11, 95:22, 104:5, 104:14, 106:2, 106:10, 106:12, 110:8, 112:2, 115:7, 134:24, 135:20, 137:15, 138:18, 138:25, 141:2, 174:2, 181:2
**CLASSEN'S** [2] - 93:7, 114:11

**CLASSROOM** [2] - 119:11, 129:17
**CLEAR** [9] - 66:1, 105:17, 122:2, 141:24, 141:25, 143:3, 161:17, 167:22, 174:18
**CLEARLY** [1] - 17:23
**CLERK** [2] - 3:1, 116:21
**CLIENT** [1] - 86:16
**CLIP** [1] - 116:12
**CLIQUE** [1] - 10:23
**CLOSE** [4] - 21:17, 143:6, 177:21, 177:22
**CLOSELY** [2] - 32:16, 58:25
**CLOTHING** [1] - 32:15
**CM** [1] - 1:19
**CO** [1] - 82:19
**COLD** [1] - 36:10
**COLLABORATIVE** [1] - 120:10
**COLLECT** [2] - 34:5, 41:4
**COLLECTED** [13] - 15:6, 15:7, 15:10, 15:11, 33:20, 41:20, 64:13, 78:7, 84:3, 84:6, 99:8, 99:17, 99:24
**COLLECTING** [1] - 40:14
**COLLEGE** [1] - 118:20
**COLOR** [1] - 174:25
**COLORS** [2] - 174:22, 174:24
**COMBINATION** [2] - 39:21, 167:2
**COMBINATIONS** [2] - 166:6, 166:22
**COMFORT** [1] - 26:4
**COMING** [2] - 28:5, 146:2
**COMMENT** [1] - 172:7
**COMMISSARY** [1] - 94:3
**COMMITTED** [1] - 102:2
**COMMON** [11] - 75:2, 77:24, 78:20, 141:21, 159:5, 159:8, 159:10, 160:4, 161:6, 162:7, 174:6
**COMMONALITY** [1] - 141:9
**COMMUNICATION** [1] - 51:17

**COMMUNITY** [1] - 2:13
**COMPARABLE** [6] - 136:6, 137:3, 165:4, 165:6, 179:12, 179:19
**COMPARE** [14] - 54:12, 65:10, 135:2, 135:6, 139:14, 164:1, 164:3, 164:12, 166:2, 166:10, 167:19, 171:21, 179:11, 179:12
**COMPARED** [8] - 140:6, 141:7, 163:22, 164:6, 167:21, 171:22, 172:1
**COMPARING** [6] - 129:3, 144:1, 166:19, 166:21, 173:17, 173:19
**COMPARISON** [7] - 61:16, 113:19, 139:25, 140:4, 144:9, 151:3, 163:14
**COMPARISONS** [7] - 119:5, 119:18, 123:25, 124:13, 132:12, 151:7, 173:17
**COMPASSIONS** [1] - 22:16
**COMPLAINT** [1] - 14:15
**COMPLETE** [3] - 114:23, 126:21, 127:5
**COMPLETED** [4] - 28:23, 119:11, 126:22, 127:16
**COMPLETENESS** [1] - 171:12
**COMPLETING** [1] - 127:2
**COMPLEX** [1] - 23:12
**COMPLIANT** [1] - 84:14
**COMPUTER** [2] - 1:24, 1:24
**COMPUTER-AIDED** [1] - 1:24
**CONCEPTS** [1] - 22:10
**CONCERN** [1] - 14:17
**CONCERNED** [4] - 46:6, 50:2, 73:2, 103:3
**CONCERNING** [9] -

4:8, 10:14, 50:13, 57:14, 81:5, 81:6, 88:5, 88:7, 89:8

**CONCLUDE** [1] - 96:12

**CONCLUDED** [4] - 19:20, 92:12, 92:14, 92:18

**CONCLUSION** [16] - 120:9, 123:6, 123:16, 123:17, 135:15, 135:19, 137:2, 137:19, 139:10, 144:1, 144:4, 144:9, 159:9, 159:23, 160:5, 161:8

**CONCLUSIONS** [6] - 110:15, 134:2, 134:5, 134:12, 136:18, 158:9

**CONCLUSIVE** [1] - 136:14

**CONCRETE** [1] - 26:25

**CONCURRENT** [1] - 3:15

**CONDUCT** [4] - 51:18, 121:18, 123:15, 126:20

**CONDUCTED** [3] - 4:9, 119:9, 148:23

**CONDUCTING** [2] - 119:5, 122:24

**CONDUCTS** [2] - 150:9, 150:10

**CONFERENCE** [1] - 3:18

**CONFESSED** [2] - 81:6, 81:10

**CONFESSION** [5] - 81:19, 81:22, 82:16, 83:3, 98:8

**CONFESSIONS** [3] - 82:1, 82:3, 82:8

**CONFIRM** [1] - 64:6

**CONFUSED** [1] - 34:22

**CONFUSING** [1] - 110:12

**CONFUSION** [2] - 114:13, 116:1

**CONNECT** [1] - 141:12

**CONNECTED** [3] - 142:4, 142:17, 142:19

**CONNECTING** [3] - 118:3, 142:6, 142:15

**CONNECTION** [3] - 6:22, 10:17, 29:18

**CONSECUTIVE** [2] - 3:15, 4:13

**CONSERVATIVE** [2] - 122:19, 122:20

**CONSIDER** [1] - 122:25

**CONSIDERATION** [1] - 12:10

**CONSIDERED** [5] - 16:22, 74:23, 121:16, 135:9, 135:14

**CONSIDERING** [1] - 28:16

**CONSISTENT** [1] - 107:19

**CONSULTATION** [1] - 113:11

**CONSULTED** [2] - 86:15, 86:17

**CONTACT** [1] - 37:22

**CONTAIN** [1] - 102:3

**CONTAINED** [2] - 52:9, 53:8

**CONTAINING** [1] - 55:17

**CONTEXTUAL** [2] - 55:3, 172:12

**CONTINUE** [13] - 3:16, 5:20, 31:1, 31:10, 32:2, 32:6, 32:8, 34:3, 35:22, 36:25, 71:17, 107:9, 158:21

**CONTINUED** [4] - 2:1, 5:24, 115:10, 183:8

**CONTINUING** [1] - 20:24

**CONTINUOUS** [3] - 36:7, 36:8, 142:5

**CONTRABAND** [2] - 74:24, 74:25

**CONTROL** [1] - 34:23

**CONTROLS** [1] - 130:15

**CONVERSATION** [3] - 97:14, 101:16, 101:17

**CONVERSATIONS** [2] - 22:15, 26:21

**CONVICT** [1] - 21:1

**CONWAY** [2] - 87:4, 87:12

**COOK** [1] - 25:5

**COOPERATED** [1] - 58:2

**COOPERATING** [1] - 67:24

**COOPERATORS** [1] - 66:19

**COP** [1] - 94:3

**COPIED** [5] - 15:2, 15:14, 15:23, 72:24, 139:12

**COPIES** [17] - 9:24, 110:24, 112:10, 128:6, 143:12, 144:11, 145:24, 168:12, 168:15, 168:19, 168:20, 168:24, 169:4, 169:6, 169:15, 176:10

**COPOUT** [3] - 89:24, 90:4, 90:7

**COPY** [29] - 3:8, 8:8, 10:8, 25:2, 28:25, 58:19, 58:22, 73:2, 88:19, 88:21, 96:9, 104:8, 105:8, 110:21, 111:2, 114:19, 144:13, 144:15, 168:13, 171:17, 171:18, 172:10, 174:12, 174:20, 174:21, 175:5, 175:9, 175:21, 176:12

**CORRECT** [110] - 5:9, 8:4, 9:7, 10:3, 45:10, 45:22, 46:4, 47:25, 50:23, 51:1, 51:5, 51:9, 52:4, 52:18, 54:9, 54:17, 55:2, 61:1, 61:9, 62:5, 74:25, 75:10, 75:22, 78:7, 78:17, 80:5, 81:8, 81:18, 81:24, 83:7, 87:17, 87:19, 88:3, 88:9, 91:23, 91:24, 92:2, 95:25, 96:16, 96:22, 98:5, 98:6, 98:8, 103:9, 103:25, 104:4, 104:25, 106:12, 108:2, 108:19, 115:4, 121:5, 125:24, 126:3, 127:6, 128:10, 128:15, 129:11, 129:13, 129:16, 129:22, 130:20, 138:9, 138:15, 138:20, 141:3, 141:4, 146:11, 149:21, 151:10, 151:22, 152:14, 152:20, 152:22, 154:3, 155:4, 155:25, 157:12, 158:14, 160:12, 160:21, 160:25, 161:9, 161:15, 161:16, 162:11, 163:7, 163:11, 164:5, 164:10, 165:10, 165:15, 165:24, 167:4, 167:8, 167:11, 168:6, 168:20, 169:2, 169:5, 169:10, 170:13, 170:18, 173:1, 176:17, 178:8, 179:3, 180:4, 184:18

**CORRECTED** [2] - 144:23, 154:23

**CORRECTION** [1] - 76:23

**CORRECTIONAL** [2] - 40:25, 82:13

**CORRECTLY** [1] - 93:20

**CORRELATE** [1] - 9:13

**CORRESPONDENCE** [3] - 51:11, 93:24, 95:7

**CORRUPT** [1] - 10:22

**COUNSEL** [13] - 3:3, 3:18, 6:5, 36:17, 48:22, 77:16, 104:19, 105:7, 113:7, 176:2, 177:6, 177:10, 182:17

**COUNSELOR** [1] - 31:22

**COUNT** [4] - 158:1, 178:13, 178:14

**COUNTED** [1] - 24:6

**COUPLE** [14] - 21:3, 50:24, 72:21, 73:23, 73:24, 75:6, 85:8, 87:2, 91:16, 91:18, 114:2, 124:21, 130:16, 181:14

**COURIERED** [1] - 80:14

**COURSE** [5] - 50:16, 78:10, 78:18, 84:24, 135:12

**COURT** [170] - 1:1, 1:20, 3:1, 3:2, 3:8, 3:11, 3:13, 3:16, 4:18, 4:20, 4:23, 5:3, 5:10, 5:17, 5:19, 6:7, 6:20, 7:10, 7:18, 8:2, 8:5, 8:9, 8:14, 8:16, 8:19, 9:21, 10:15, 16:9, 29:17, 29:22, 30:5, 30:16, 30:21, 31:1, 31:9, 31:16, 32:1, 32:5, 32:8, 32:23, 33:9, 33:17, 33:25, 34:3, 34:22, 35:2, 35:11, 35:16, 35:24, 36:3, 36:13, 36:19, 36:25, 37:13, 38:8, 41:13, 43:1, 44:16, 44:20, 49:4, 49:8, 53:25, 59:25, 67:18, 68:25, 69:2, 69:24, 70:7, 70:10, 71:14, 71:17, 77:5, 79:20, 86:8, 86:12, 86:15, 88:23, 91:9, 93:17, 99:20, 100:3, 100:8, 100:13, 100:15, 102:16, 102:22, 105:14, 110:14, 110:24, 111:1, 111:5, 111:9, 111:17, 111:19, 111:24, 112:4, 112:6, 112:9, 112:14, 112:20, 112:24, 113:3, 113:6, 113:12, 113:23, 114:3, 114:4, 114:9, 114:11, 114:17, 114:25, 115:3, 116:7, 116:9, 116:10, 116:15, 117:1, 122:2, 122:5, 124:7, 124:15, 131:17, 132:2, 134:16, 137:23, 137:25, 140:3, 140:14, 145:3, 145:23, 146:19, 158:17, 158:21, 169:22, 173:7, 173:10, 173:23, 175:3, 175:8, 175:11, 175:15, 175:18, 175:20, 176:1, 176:5, 176:14, 176:18, 176:22, 177:3, 177:8, 177:11, 177:20, 177:23, 178:1, 178:15, 178:17, 180:9, 180:14, 180:19, 180:23, 181:3, 181:6, 181:9, 181:12, 181:16, 181:20, 182:1, 182:4, 182:12, 184:24

**COURT'S** [4] - 9:18,

42:6, 138:17, 140:21
**COURTHOUSE** [3] -
1:20, 145:21, 146:1
**COURTROOM** [9] -
1:8, 34:20, 35:14,
35:20, 35:25, 36:8,
48:19, 49:1, 55:22
**COURTS** [2] - 123:23,
124:4
**COVER** [1] - 171:12
**COVERS** [2] - 64:20,
182:14
**CREATED** [1] - 3:21
**CRIMES** [1] - 2:3
**CRIMINAL** [2] - 1:3,
2:3
**CROSS** [8] - 30:21,
44:22, 71:17,
124:17, 145:3,
145:5, 146:9, 183:4
**CRYING** [1] - 24:3
**CURRENT** [1] - 16:24
**CURSIVE** [5] - 139:14,
141:12, 142:5, 167:1
**CURTIS** [1] - 2:14
**CURVE** [1] - 142:12
**CUSTODY** [1] - 28:20
**CUT** [3] - 98:13, 133:5,
144:13
**CV** [1] - 128:16

**D**

**D.C** [1] - 2:4
**D11** [1] - 51:14
**D12** [1] - 60:19
**D13** [3] - 63:2, 63:3,
63:4
**DANGEROUS** [1] -
168:24
**DARBY** [5] - 6:15,
13:18, 13:21, 171:8,
171:9
**DARKER** [1] - 111:2
**DARKNESS** [1] - 19:5
**DATE** [18] - 4:16, 7:7,
7:23, 18:20, 20:13,
21:25, 26:15, 26:16,
38:15, 61:5, 71:2,
96:21, 100:2, 107:6,
107:8, 160:2, 184:24
**DATED** [10] - 4:7,
11:13, 13:10, 56:6,
63:9, 96:8, 97:16,
99:19, 100:21, 175:9
**DATES** [1] - 43:21
**DAVE** [1] - 95:20
**DAVID** [37] - 1:6,
11:13, 12:17, 13:14,
14:17, 18:4, 20:7,

21:7, 26:7, 29:9,
53:9, 53:20, 54:5,
54:15, 54:20, 54:22,
55:12, 55:18, 62:1,
99:23, 133:2, 133:7,
135:22, 141:14,
141:16, 141:20,
142:10, 142:13,
142:15, 142:16,
142:17, 143:6,
143:10, 154:5,
154:20
**DAYS** [15] - 4:12, 5:15,
16:23, 23:16, 26:18,
43:20, 63:12, 73:10,
73:15, 73:16, 73:17,
73:24, 74:8, 78:5,
125:19
**DEAD** [4] - 14:8,
14:10, 17:3, 19:16
**DEAL** [3] - 17:14,
25:15, 26:1
**DEALS** [3] - 23:21,
128:22, 129:1
**DEALT** [1] - 128:23
**DEAR** [3] - 21:25,
22:2, 26:16
**DEATH** [14] - 5:16,
11:7, 12:2, 13:8,
14:5, 14:6, 19:5,
20:5, 39:17, 62:15,
161:24, 163:15,
166:3, 168:3
**DECADES** [1] - 119:23
**DECEMBER** [1] - 4:1
**DECIDE** [2] - 14:7,
24:19
**DECIDED** [1] - 153:1
**DECISION** [1] - 12:9
**DEEDS** [1] - 20:4
**DEER** [4] - 19:18,
21:8, 27:2, 101:19
**DEFENDANT** [23] -
2:5, 2:8, 2:12, 30:25,
31:6, 31:20, 32:3,
32:7, 33:22, 34:2,
34:19, 35:18, 36:2,
36:10, 36:24, 44:19,
79:3, 79:9, 112:15,
112:23, 172:20,
182:18, 182:23
**DEFENDANT'S** [4] -
3:21, 4:1, 4:6, 81:2
**DEFENDER** [2] - 2:6,
2:13
**DEFENSE** [10] - 5:1,
5:4, 6:5, 110:20,
114:6, 122:3,
145:18, 180:21,
182:2, 184:11

**DEFICIENT** [1] -
166:24
**DEFINITIVE** [2] -
61:15, 144:9
**DEFINITIVELY** [3] -
41:6, 62:21, 139:5
**DEGREE** [7] - 118:18,
131:21, 146:11,
146:12, 146:15,
149:23, 150:4
**DEGREES** [1] -
128:12
**DEMAND** [2] - 162:7,
162:9
**DEMONSTRATE** [2] -
163:11, 163:17
**DEMONSTRATION** [1]
- 142:20
**DENNIS** [1] - 87:4
**DENYING** [1] - 82:24
**DEPARTING** [1] -
150:6
**DEPARTMENT** [2] -
2:2, 128:2
**DESCRIBE** [3] - 22:4,
52:11, 55:16
**DESCRIBED** [1] -
51:25
**DESCRIBES** [1] -
104:19
**DESCRIBING** [1] -
53:3
**DESERVE** [2] - 14:5,
14:6
**DESIGNATED** [1] -
133:19
**DESIGNATION** [1] -
133:3
**DESIGNATIONS** [1] -
133:22
**DESPITE** [1] - 149:22
**DESTROYED** [2] -
93:3, 95:22
**DETAIL** [3] - 66:8,
68:20, 144:15
**DETAILS** [6] - 17:6,
19:2, 68:16, 68:17,
68:18, 92:5
**DETECTED** [1] -
125:13
**DETECTION** [1] -
127:8
**DETERMINATION** [4]
- 62:22, 126:7,
136:14, 147:13
**DETERMINE** [5] -
43:10, 43:17, 92:9,
117:21, 137:16
**DETERMINED** [5] -
81:19, 121:17,

126:17, 135:22,
144:6
**DEVICE** [2] - 34:23,
85:20
**DICTATE** [1] - 39:16
**DICTATED** [5] - 22:10,
39:21, 39:22, 61:25,
135:10
**DICTATION** [1] - 61:17
**DIE** [3] - 14:5, 14:8,
24:13
**DIED** [1] - 25:10
**DIFFER** [1] - 28:16
**DIFFERENCE** [8] -
137:8, 145:12,
154:12, 154:22,
179:5, 179:16,
179:17, 179:20
**DIFFERENCES** [19] -
154:8, 154:22,
154:23, 155:6,
155:8, 155:9,
155:18, 156:1,
156:3, 156:4, 156:5,
156:16, 157:17,
159:14, 159:18,
160:6, 179:7,
179:15, 179:18
**DIFFERENT** [9] -
17:14, 41:25, 60:9,
83:13, 95:23, 95:25,
142:10, 143:12,
158:18
**DIFFICULT** [2] -
17:19, 72:25
**DIRE** [5] - 117:2,
124:15, 124:17,
183:13, 183:16
**DIRECT** [15] - 5:20,
5:24, 11:19, 11:23,
12:22, 16:24, 18:15,
52:1, 86:4, 91:15,
93:12, 117:2, 132:6,
183:4, 183:8
**DIRECTED** [1] - 23:20
**DIRECTLY** [4] - 68:3,
68:5, 83:21, 128:24
**DISAGREE** [2] -
148:21, 148:22
**DISASTER** [1] -
168:15
**DISCIPLINARY** [7] -
3:14, 3:22, 4:7, 4:11,
4:12, 4:14, 5:7
**DISCLOSE** [1] - 22:22
**DISCOLORED** [1] -
95:3
**DISCUSS** [1] - 120:17
**DISCUSSED** [2] -
140:5, 140:22

**DISCUSSION** [1] -
110:8
**DISPLAYED** [2] - 10:6,
10:7
**DISPUTE** [1] - 150:11
**DISPUTING** [1] - 76:1
**DISRESPECTED** [1] -
10:24
**DISTINCTION** [2] -
46:25, 146:23
**DISTINGUISH** [3] -
152:8, 152:13,
157:16
**DISTORTED** [1] -
137:4
**DISTRIBUTE** [1] - 9:24
**DISTRICT** [5] - 1:1,
1:2, 1:16, 2:6, 2:13
**DISTURBING** [2] -
59:14, 59:19
**DIVISION** [2] - 2:3,
54:12
**DIVISIONS** [2] - 51:18,
51:20
**DNA** [6] - 66:15,
66:19, 66:20, 67:1,
67:21, 80:25
**DNAS** [1] - 66:21
**DOCTORS** [1] - 84:10
**DOCUMENT** [60] - 4:3,
4:5, 5:12, 9:19,
51:20, 51:23, 53:17,
54:12, 55:10, 57:18,
59:5, 64:25, 67:8,
72:9, 72:20, 86:2,
86:5, 89:3, 89:19,
89:24, 90:6, 90:8,
95:23, 111:15,
111:21, 116:3,
116:4, 117:5, 117:6,
117:20, 119:2,
120:1, 123:23,
124:11, 128:18,
129:2, 129:6, 132:3,
135:3, 135:7,
143:12, 145:12,
149:8, 161:20,
163:22, 164:12,
165:2, 167:5, 167:6,
168:5, 172:10,
172:20, 174:17,
174:18, 175:3,
175:21, 177:6,
178:11
**DOCUMENTATION**
[1] - 43:13
**DOCUMENTS** [55] -
3:20, 8:23, 9:3,
10:13, 15:17, 40:23,
41:18, 50:8, 50:18,

50:24, 51:8, 53:3, 53:4, 54:19, 55:8, 55:12, 64:12, 65:23, 65:24, 66:3, 91:17, 91:18, 92:19, 111:25, 119:12, 122:22, 123:25, 124:14, 128:22, 128:24, 129:1, 129:3, 129:25, 130:3, 130:6, 130:8, 132:18, 133:11, 135:17, 140:7, 144:1, 144:10, 145:13, 150:24, 160:9, 160:11, 168:23, 169:4, 169:6, 170:3, 170:11, 173:18, 174:5, 176:2, 181:24

**DON** [2] - 19:23, 79:2

**DONE** [27] - 12:7, 13:3, 20:3, 40:15, 60:6, 78:3, 79:15, 84:17, 86:3, 90:13, 103:16, 104:11, 109:14, 115:18, 123:16, 126:10, 126:11, 130:12, 148:7, 149:25, 150:1, 154:17, 158:6, 158:7, 160:23, 168:25, 174:25

**DOOR** [6] - 55:25, 104:20, 104:21, 107:4, 107:12, 107:21

**DOPE** [1] - 23:21

**DOUBT** [1] - 23:4

**DOWN** [23] - 15:5, 27:15, 37:19, 41:22, 57:21, 60:14, 66:14, 71:2, 72:21, 94:9, 105:18, 105:25, 107:17, 109:19, 112:14, 113:23, 153:20, 161:15, 179:14, 180:7, 181:18

**DOWNWARD** [1] - 142:23

**DR** [1] - 25:5

**DRAW** [1] - 110:15

**DRIVE** [1] - 23:20

**DRIVE-BY** [1] - 23:20

**DROPPED** [1] - 99:20

**DROPPING** [1] - 94:9

**DRUGS** [1] - 10:22

**DUCKS** [1] - 27:2

**DUE** [1] - 24:23

**DURESS** [1] - 14:3

**DURING** [16] - 32:12, 49:20, 50:16, 68:10, 73:17, 76:4, 77:18, 78:10, 78:18, 79:2, 79:10, 93:24, 101:15, 101:16, 119:12, 121:2

**DUTIES** [1] - 119:10

**DWELL** [1] - 19:6

**E**

**EARLY** [3] - 16:25, 94:3, 107:11

**EASTER** [2] - 17:10, 19:7

**EASTERN** [1] - 2:13

**EASY** [3] - 14:16, 20:19, 27:13

**EDITED** [1] - 29:1

**EDUCATIONAL** [1] - 118:16

**EFFECT** [3] - 75:5, 81:14, 85:7

**EIGHT** [3] - 103:1, 119:3, 129:17

**EITHER** [6] - 9:19, 35:5, 84:25, 126:11, 155:22, 158:7

**ELECTROSTATIC** [1] - 127:8

**ELICIT** [3] - 68:15, 68:18, 68:21

**ELICITED** [1] - 68:17

**ELMO** [1] - 105:9

**EMOTIONAL** [1] - 28:6

**EMOTIONALLY** [1] - 22:7

**EMPLOYED** [1] - 117:4

**EMPLOYEE** [1] - 89:11

**ENCLOSURES** [1] - 51:25

**END** [7] - 13:8, 17:16, 20:16, 23:5, 28:5, 46:20, 47:13

**ENDED** [1] - 23:24

**ENDING** [2] - 118:2, 154:16

**ENFORCEMENT** [2] - 45:12, 169:1

**ENGAGED** [2] - 97:22, 98:1

**ENTAIL** [1] - 117:18

**ENTERING** [1] - 3:5

**ENTIRE** [13] - 9:19, 13:19, 16:19, 21:24, 58:10, 64:15, 163:16, 163:23, 164:12, 166:11, 166:25, 179:18, 180:3

**ENTITLED** [2] - 28:19, 184:20

**ENTRIES** [1] - 135:24

**ENTRY** [1] - 139:19

**ENVELOPE** [19] - 6:13, 53:8, 55:24, 56:11, 62:5, 95:4, 95:17, 112:8, 116:4, 133:20, 133:21, 134:23, 135:20, 137:15, 138:2, 138:8, 138:9, 139:16, 139:20

**ENVELOPES** [4] - 15:24, 53:9, 55:16, 55:17

**ERASURES** [1] - 156:9

**ERR** [1] - 122:18

**ERRONEOUS** [1] - 172:13

**ERROR** [14] - 122:17, 125:12, 147:25, 148:6, 148:7, 148:10, 148:15, 148:16, 148:20, 148:23, 148:24, 149:14, 149:15, 149:18

**ESCAPE** [2] - 28:19, 28:22

**ESCAPING** [3] - 12:6, 28:20

**ESCORTED** [2] - 17:2, 19:15

**ESDA** [3] - 126:21, 127:6, 127:7

**ESPECIALLY** [1] - 114:10

**ESQUIRE** [6] - 1:15, 2:2, 2:5, 2:8, 2:12, 2:12

**ESSENTIALLY** [1] - 58:1

**ESTABLISH** [1] - 67:15

**ESTABLISHED** [1] - 81:10

**ET** [3] - 21:4, 25:19, 27:9

**EVALUATION** [1] - 125:22

**EVALUATIONS** [1] - 126:1

**EVENING** [6] - 3:19, 18:21, 26:16, 90:19, 91:1, 182:24

**EVENT** [5] - 65:19, 74:13, 77:15, 77:17, 167:22

**EVENTFUL** [1] - 16:22

**EVENTS** [2] - 22:6, 106:16

**EVENTUALLY** [1] - 17:7

**EVIDENCE** [42] - 5:2, 6:25, 7:4, 9:4, 12:19, 16:10, 16:14, 20:25, 29:21, 37:15, 38:11, 40:2, 40:14, 41:16, 43:4, 80:25, 92:17, 96:24, 97:25, 98:3, 102:15, 102:19, 110:15, 119:9, 129:4, 132:22, 133:11, 134:1, 134:17, 134:19, 137:17, 140:15, 140:17, 143:13, 143:22, 163:16, 164:17, 180:22, 181:7, 182:3, 182:20

**EX** [1] - 80:15

**EXACT** [6] - 109:17, 132:16, 138:12, 162:3, 164:20, 165:9

**EXACTLY** [14] - 21:3, 41:8, 46:24, 109:25, 117:18, 118:6, 142:14, 151:18, 151:19, 154:6, 155:19, 155:21, 157:15

**EXAM** [3] - 80:8, 123:16, 127:4

**EXAMINATION** [18] - 5:24, 44:22, 64:19, 71:18, 80:18, 91:11, 102:23, 111:11, 117:2, 124:17, 132:6, 145:5, 145:13, 146:9, 158:25, 173:2, 173:11, 178:19

**EXAMINATIONS** [3] - 119:4, 119:10, 148:17

**EXAMINE** [11] - 117:19, 120:13, 120:14, 120:16, 145:3, 164:12, 164:15, 166:15, 166:17, 172:14, 172:23

**EXAMINED** [15] - 53:4, 113:19, 119:21, 121:8, 163:3, 163:16, 163:24, 164:6, 164:15, 164:18, 164:21, 165:21, 166:11, 167:5, 168:8

**EXAMINER** [13] - 53:13, 53:19, 60:24, 62:19, 117:5, 117:6, 119:5, 119:10, 119:15, 119:20, 120:1, 122:1, 129:12

**EXAMINERS** [10] - 51:21, 119:2, 119:22, 120:12, 120:18, 131:13, 147:17, 147:21, 147:22, 149:8

**EXAMINING** [2] - 119:16, 167:6

**EXAMPLE** [6] - 62:7, 123:2, 141:13, 154:14, 154:15, 164:9

**EXAMS** [3] - 126:22, 150:9, 150:10

**EXAMS'** [1] - 123:17

**EXCEPT** [2] - 26:24, 174:5

**EXCEPTION** [1] - 119:16

**EXCHANGE** [1] - 32:14

**EXCUSE** [8] - 4:1, 4:10, 30:16, 31:6, 33:22, 72:24, 112:15, 112:16

**EXCUSED** [4] - 112:16, 112:19, 113:25, 180:8

**EXED** [1] - 80:13

**EXEMPLAR** [5] - 96:10, 103:1, 103:8, 103:14, 162:4

**EXEMPLARS** [45] - 34:12, 37:5, 37:18, 38:5, 39:1, 40:14, 41:20, 47:5, 52:12, 52:14, 52:15, 54:13, 58:1, 60:4, 60:6, 84:6, 96:3, 104:11, 132:18, 133:7, 135:3, 135:7, 135:10, 141:19, 161:21, 162:2, 162:13, 162:16, 162:20, 162:23, 164:1, 164:13, 164:23, 165:1,

166:12, 166:13, 166:14, 166:16, 166:24, 168:25, 170:14, 170:17, 171:14, 171:24

**EXHAUSTION** [1] - 24:24

**EXHIBIT** [81] - 3:21, 4:6, 5:1, 6:4, 6:9, 6:11, 6:19, 8:1, 8:22, 8:24, 13:17, 16:3, 16:17, 18:13, 20:9, 21:12, 26:9, 29:12, 29:15, 30:1, 30:4, 34:9, 37:4, 37:7, 37:11, 37:14, 38:1, 38:7, 38:10, 39:5, 39:6, 40:7, 40:21, 41:12, 41:15, 42:25, 46:11, 46:15, 46:20, 93:9, 95:3, 96:7, 96:25, 97:2, 97:4, 98:22, 99:11, 99:13, 101:3, 102:9, 102:11, 102:18, 106:7, 110:2, 110:20, 111:14, 113:14, 113:16, 116:11, 132:22, 132:25, 133:6, 133:25, 134:8, 134:15, 134:18, 134:23, 134:25, 135:23, 136:2, 138:1, 139:10, 139:25, 140:1, 140:10, 140:16, 173:22, 174:14, 180:21, 182:19

**EXHIBITS** [28] - 6:20, 6:21, 6:24, 8:3, 9:13, 14:20, 14:22, 16:13, 29:20, 43:3, 67:17, 92:16, 95:23, 139:23, 144:5, 173:21, 174:1, 177:18, 180:13, 180:14, 180:24, 182:2, 182:5, 182:14, 183:20, 183:21, 184:11

**EXIST** [1] - 88:20

**EXITED** [1] - 85:5

**EXPECT** [2] - 11:6, 25:13

**EXPERIENCE** [7] - 29:4, 45:12, 66:11, 111:25, 117:16, 119:23, 129:2

**EXPERIENCED** [1] -

23:7

**EXPERT** [10] - 61:10, 111:18, 111:21, 123:23, 124:7, 124:11, 132:3, 146:1, 146:6, 160:17

**EXPERTISE** [2] - 128:14, 146:7

**EXPERTS** [1] - 172:12

**EXPLAIN** [12] - 37:17, 38:22, 43:11, 57:20, 57:23, 57:24, 58:4, 58:8, 106:15, 123:11, 136:17, 147:20

**EXPLAINED** [1] - 38:24

**EXPLANATION** [1] - 58:18

**EXPLICIT** [1] - 90:16

**EXPRESSED** [1] - 25:7

**EXTEND** [1] - 154:18

**EXTENDED** [2] - 169:16

**EXTRA** [1] - 105:8

**EYES** [2] - 150:19, 150:21


# F

**FACED** [1] - 19:5

**FACES** [1] - 13:8

**FACILITY** [1] - 18:11

**FACT** [17] - 14:10, 37:22, 45:14, 48:11, 50:16, 59:3, 75:3, 81:13, 81:16, 82:6, 82:20, 84:13, 85:19, 110:18, 174:17, 177:12

**FACTS** [3] - 76:8, 76:9, 76:22

**FAIL** [1] - 131:2

**FAILED** [1] - 124:6

**FAILING** [1] - 10:21

**FAINT** [1] - 43:16

**FAIR** [17] - 45:7, 48:14, 50:3, 50:22, 51:6, 62:10, 67:11, 74:9, 75:14, 78:13, 89:22, 148:10, 150:8, 156:13, 165:17, 165:23, 172:21

**FAIRFAX** [2] - 117:10, 117:11

**FAKE** [2] - 91:17, 92:19

**FAKES** [1] - 50:19

**FALL** [1] - 132:14

**FALSE** [4] - 81:19, 81:22, 82:8, 91:17

**FALSELY** [1] - 81:10

**FAMILIAR** [9] - 46:13, 76:8, 84:16, 84:20, 85:11, 95:16, 134:24, 145:7, 149:5

**FAMILY** [6] - 12:14, 13:7, 20:2, 20:4, 23:3, 26:4

**FAR** [22] - 12:13, 13:4, 13:5, 20:5, 20:23, 22:17, 23:10, 25:1, 45:19, 46:5, 62:12, 66:17, 73:1, 80:11, 87:22, 90:3, 98:10, 107:19, 113:18, 123:8, 149:14

**FAST** [2] - 126:24, 127:2

**FAULT** [1] - 151:7

**FAVORABLE** [3] - 47:16, 68:9, 68:19

**FBI** [37] - 12:25, 17:4, 19:11, 19:12, 20:23, 25:2, 41:22, 44:25, 45:1, 45:6, 45:11, 46:5, 51:4, 54:24, 55:1, 57:8, 87:6, 87:8, 94:7, 96:3, 98:14, 102:6, 107:2, 107:24, 108:7, 109:12, 115:16, 115:23, 117:5, 117:7, 117:13, 118:24, 128:19, 129:20, 130:11, 131:9, 131:11

**FCI** [9] - 26:22, 27:8, 47:20, 73:13, 74:5, 74:8, 96:21, 97:15, 97:18

**FCI/ALLENWOOD** [1] - 21:8

**FCRR** [1] - 1:19

**FD** [1] - 101:7

**FEAR** [2] - 11:7, 25:3

**FEARS** [1] - 23:9

**FEATURE** [1] - 105:20

**FEBRUARY** [3] - 3:23, 3:25, 132:14

**FED** [2] - 80:13, 80:15

**FED-EXED** [1] - 80:13

**FEDERAL** [5] - 2:6, 2:13, 75:14, 124:4, 146:19

**FEEDS** [1] - 27:9

**FEELINGS** [2] - 22:5, 25:1

**FELL** [1] - 120:7

**FELT** [1] - 24:16

**FENCES** [1] - 27:3

**FEW** [12] - 16:23, 26:10, 31:7, 69:18, 73:10, 73:16, 86:20, 141:10, 146:1, 146:19, 148:19, 150:7

**FIELD** [11] - 45:4, 60:7, 118:5, 119:12, 121:8, 123:23, 124:11, 132:3, 149:9, 149:19, 154:8

**FIGURED** [2] - 65:5, 66:10

**FILE** [7] - 40:23, 40:25, 52:2, 84:5, 119:7

**FILES** [4] - 119:8, 129:4, 133:2, 135:13

**FILTER** [1] - 44:17

**FINAL** [6] - 28:19, 28:22, 71:6, 73:7, 89:2, 113:10

**FINALLY** [8] - 13:16, 19:25, 24:23, 25:21, 26:8, 28:11, 28:13, 41:25

**FINE** [4] - 32:3, 36:23, 86:8, 131:4

**FINGERPRINT** [6] - 41:24, 50:10, 64:15, 64:18, 64:24, 67:21

**FINGERPRINTED** [1] - 64:2

**FINGERPRINTS** [5] - 64:11, 64:12, 65:22, 116:5, 148:12

**FINGERS** [2] - 64:19, 64:21

**FINISH** [5] - 7:10, 70:10, 71:5, 86:7, 108:9

**FIRE** [4] - 30:25, 31:7, 31:15, 31:23

**FIRED** [1] - 23:25

**FIRST** [43] - 1:20, 7:22, 10:3, 10:24, 20:11, 24:24, 26:12, 26:14, 27:9, 28:14, 30:3, 30:19, 39:2, 39:10, 39:16, 43:10, 45:4, 45:14, 45:24, 46:8, 46:15, 47:9, 47:10, 58:22, 77:9, 80:16, 90:4, 101:5, 101:15, 120:13, 120:15, 125:7, 128:17, 132:14,

132:20, 133:9, 133:18, 142:15, 143:7, 144:12, 144:14, 152:18

**FIT** [1] - 123:17

**FIVE** [15] - 11:7, 28:9, 36:11, 36:14, 52:8, 52:9, 71:15, 86:9, 94:25, 120:21, 125:5, 133:7, 141:19, 158:18, 168:5

**FIVE-MINUTE** [5] - 36:11, 36:14, 71:15, 86:9, 158:18

**FLAGS** [1] - 178:4

**FLIP** [1] - 9:10

**FLOOR** [2] - 1:20, 94:5

**FLUSHED** [3] - 57:5, 57:21, 94:19

**FOCUS** [2] - 47:3, 104:10

**FOLLOW** [5] - 63:22, 93:19, 113:1, 138:17, 146:24

**FOLLOW-UP** [1] - 113:1

**FOLLOWED** [1] - 83:8

**FOLLOWING** [2] - 65:3, 66:11

**FOLLOWUP** [1] - 125:13

**FORCED** [1] - 17:16

**FOREGOING** [1] - 184:18

**FORENSIC** [1] - 149:1

**FORESEE** [1] - 110:22

**FORGERIES** [1] - 92:19

**FORGERY** [3] - 155:18, 156:5, 156:12

**FORGET** [1] - 21:6

**FORGOT** [1] - 121:15

**FORM** [7] - 29:3, 29:4, 67:14, 74:23, 79:16, 154:16, 164:21

**FORMAT** [1] - 62:2

**FORMATIONS** [6] - 118:1, 165:3, 165:17, 165:20, 172:15, 173:20

**FORMED** [2] - 124:13, 152:20

**FORMING** [1] - 170:4

**FORTH** [1] - 143:21

**FORWARD** [3] - 28:25, 83:23, 102:6

**FORWARDED** [1] -

101:24
**FORWARDING** [1] - 101:22
**FOUR** [4] - 11:4, 28:2, 120:6, 151:4
**FOURTH** [3] - 19:11, 28:11, 97:7
**FOWLER** [1] - 79:8
**FRANK** [1] - 19:21
**FRANKLY** [1] - 70:16
**FRAUDULENT** [1] - 119:6
**FRED** [2] - 6:17, 47:7
**FREE** [2] - 12:13, 23:8
**FREQUENT** [1] - 17:13
**FRIDAY** [3] - 17:10, 20:14, 26:16
**FRIEND** [5] - 13:14, 16:21, 18:18, 21:17, 100:11
**FRIENDSHIP** [1] - 24:17
**FRONT** [14] - 30:1, 75:12, 93:10, 96:6, 97:2, 104:17, 127:21, 127:25, 128:1, 128:4, 135:11, 145:22, 168:25, 172:23
**FRUSTRATION** [1] - 22:5
**FUCKED** [1] - 10:20
**FULL** [9] - 14:3, 27:20, 28:10, 60:9, 62:8, 114:5, 114:11, 116:21, 181:1
**FUNKE** [1] - 78:1
**FUTURE** [1] - 23:19

## G

**G36** [2] - 41:14, 41:15
**G37** [1] - 37:13
**GANG** [3] - 11:2, 13:25, 23:16
**GATHERING** [1] - 20:25
**GAY** [1] - 21:22
**GAYLON** [1] - 79:2
**GENERAL** [7] - 24:9, 43:18, 43:19, 43:25, 44:5, 44:8, 69:16
**GENERATED** [1] - 134:12
**GENTLEMAN** [1] - 87:12
**GENUINE** [1] - 117:22
**GIVEN** [10] - 8:16, 11:11, 69:7, 79:13,

94:1, 101:23, 120:23, 120:25, 121:24, 133:8
**GOD** [1] - 26:4
**GONNA** [1] - 27:24
**GOTTESMAN** [3] - 145:8, 145:25, 146:5
**GOVERNMENT** [76] - 1:15, 2:2, 4:2, 4:21, 6:4, 6:19, 6:24, 8:1, 8:22, 8:24, 9:13, 11:8, 14:20, 16:3, 16:13, 16:17, 18:13, 20:9, 21:12, 26:9, 29:12, 29:20, 34:9, 37:4, 37:7, 37:11, 37:14, 38:1, 38:7, 38:10, 39:5, 40:21, 41:12, 41:15, 42:25, 43:3, 47:17, 88:22, 92:18, 93:8, 95:23, 96:6, 96:25, 97:1, 97:4, 98:22, 99:11, 99:12, 101:3, 101:5, 102:9, 102:11, 102:18, 109:5, 110:4, 111:13, 114:25, 116:11, 116:19, 124:10, 125:10, 132:22, 132:25, 134:8, 134:15, 134:18, 134:23, 139:25, 140:10, 140:16, 174:14, 177:18, 182:4, 182:5, 182:19, 183:21
**GOVERNMENT'S** [10] - 14:22, 46:10, 76:18, 76:19, 95:3, 114:9, 115:25, 133:6, 173:22, 174:17
**GRADE** [2] - 130:21, 169:7
**GRADES** [1] - 130:22
**GRADING** [1] - 131:8
**GRADUATE** [2] - 118:20, 128:12
**GRADUATED** [1] - 44:24
**GRAND** [35] - 37:19, 37:24, 38:4, 38:14, 38:17, 54:14, 57:12, 57:13, 58:3, 58:20, 58:24, 71:22, 71:23, 72:13, 73:1, 74:14, 74:18, 74:19, 75:1, 75:7, 75:12, 104:15, 104:17, 105:6,

106:6, 106:7, 109:7, 109:8, 109:24, 110:2, 110:18, 114:5, 114:12, 115:6, 181:1
**GRASS** [1] - 27:2
**GRAY** [2] - 95:2, 116:6
**GREAT** [2] - 25:14, 64:1
**GREEN** [1] - 27:2
**GREENAWALT** [1] - 36:23
**GREETING** [1] - 26:15
**GRIEF** [1] - 23:4
**GRIEVE** [1] - 13:7
**GUERRERO** [20] - 83:6, 83:14, 83:16, 83:18, 83:20, 83:21, 87:1, 87:23, 87:25, 88:8, 88:12, 98:5, 98:7, 98:11, 98:13, 98:14, 98:25, 99:1, 99:6, 181:10
**GUESS** [7] - 14:7, 27:23, 108:23, 115:14, 130:25, 147:12, 175:16
**GUESSING** [2] - 123:6
**GUIDE** [1] - 40:13
**GUILTY** [3] - 76:5, 76:22
**GUNS** [1] - 23:21
**GURGANUS** [14] - 1:15, 3:7, 5:11, 105:9, 105:11, 105:18, 114:1, 114:5, 114:19, 115:2, 115:4, 116:8, 116:13, 182:8
**GUYS** [5] - 106:18, 108:11, 108:14, 162:6

## H

**HAINES** [114] - 2:2, 4:4, 5:18, 5:20, 5:21, 5:25, 6:6, 6:8, 6:18, 6:23, 7:1, 7:14, 7:20, 7:21, 8:4, 8:7, 8:15, 8:18, 8:20, 9:16, 9:23, 10:2, 11:14, 16:6, 16:12, 16:15, 29:11, 30:8, 30:22, 30:23, 31:2, 31:11, 32:8, 32:9, 32:10, 32:25, 33:11, 33:12, 33:15, 33:18, 33:19, 34:4, 34:14, 37:1, 37:2, 37:10, 37:16,

38:6, 38:12, 41:11, 41:17, 42:6, 42:8, 42:24, 43:5, 43:8, 44:11, 53:21, 59:17, 59:21, 67:13, 68:13, 76:25, 79:16, 91:10, 91:12, 93:14, 93:18, 100:1, 100:16, 102:14, 102:20, 110:10, 111:7, 111:10, 111:12, 112:2, 112:5, 112:7, 112:12, 113:2, 116:17, 116:25, 117:3, 122:7, 122:10, 124:9, 124:22, 132:5, 132:7, 134:14, 134:20, 137:24, 138:16, 140:9, 140:18, 143:23, 143:24, 145:1, 173:5, 173:12, 173:24, 173:25, 174:13, 174:19, 176:3, 176:6, 177:16, 177:22, 177:24, 178:3, 182:6, 183:7, 183:12
**HALF** [4] - 103:5, 103:15, 119:3
**HALFWAY** [1] - 59:24
**HAMMER** [137] - 1:6, 3:17, 5:5, 11:13, 12:17, 13:14, 14:17, 15:13, 18:6, 18:8, 21:7, 21:18, 21:19, 30:10, 30:18, 31:4, 31:17, 32:12, 32:17, 32:19, 33:5, 33:8, 34:6, 34:13, 34:17, 34:23, 36:5, 36:14, 36:22, 37:6, 37:18, 37:21, 37:23, 38:13, 38:17, 38:19, 38:23, 38:24, 40:8, 40:12, 40:18, 42:17, 43:12, 43:17, 44:14, 44:16, 44:21, 46:22, 50:14, 50:18, 53:10, 53:20, 54:5, 54:15, 54:20, 54:22, 55:12, 55:18, 58:2, 58:13, 58:15, 60:8, 62:2, 62:20, 63:24, 64:12, 65:11, 65:21, 66:3, 69:13, 73:8, 76:5, 76:22, 77:7, 78:21, 81:5, 81:10, 81:20, 82:8, 82:12, 83:3, 83:4, 83:22, 84:25, 85:5,

86:2, 86:5, 86:18, 87:18, 88:3, 89:8, 90:1, 90:3, 90:9, 92:1, 93:24, 95:12, 96:9, 96:21, 97:3, 97:22, 98:1, 98:10, 100:7, 101:14, 101:16, 101:17, 101:21, 102:2, 113:7, 113:11, 133:2, 133:8, 135:22, 135:23, 136:14, 138:21, 138:22, 138:23, 138:25, 139:19, 141:20, 141:23, 142:4, 142:8, 142:22, 143:6, 143:10, 154:5, 164:3, 166:25, 174:9, 182:15, 182:16
**HAMMER'S** [20] - 18:19, 21:17, 40:22, 41:5, 44:3, 52:2, 66:20, 84:5, 92:9, 92:13, 92:18, 92:24, 98:7, 100:4, 100:11, 141:7, 144:2, 154:20, 178:6, 178:11
**HAND** [11] - 6:9, 14:21, 42:9, 64:15, 114:15, 117:19, 120:3, 133:10, 139:13, 139:14, 140:1
**HANDED** [2] - 47:13, 47:17
**HANDING** [2] - 6:10, 67:8
**HANDLED** [2] - 27:7, 120:10
**HANDPRINTING** [2] - 38:5, 62:1
**HANDS** [3] - 24:1, 25:16, 150:19
**HANDWRITING** [44] - 33:8, 33:21, 34:5, 37:5, 37:18, 38:5, 38:23, 41:23, 47:5, 50:10, 52:24, 53:6, 60:24, 61:10, 62:1, 62:20, 63:5, 63:23, 67:6, 67:21, 92:6, 92:10, 92:13, 92:15, 92:19, 95:17, 96:11, 113:19, 117:15, 117:19, 119:6, 119:18, 120:2,

120:6, 120:20, 120:24, 121:3, 125:6, 132:9, 132:18, 135:3, 151:3, 151:7

**HANDWRITTEN** [3] - 39:2, 39:11, 100:20

**HANDWROTE** [1] - 139:18

**HAPPY** [1] - 17:9

**HARD** [5] - 20:17, 22:2, 27:10, 85:15, 175:4

**HARDER** [1] - 169:16

**HARNESSED** [1] - 25:16

**HARRIS** [1] - 2:9

**HARRISBURG** [1] - 2:7

**HARSH** [1] - 17:17

**HATE** [4] - 12:11, 23:5, 23:11, 25:16

**HATED** [2] - 23:6, 23:11

**HEAD** [2] - 11:1, 36:5

**HEAR** [13] - 17:11, 31:17, 32:4, 33:23, 33:24, 34:20, 35:1, 35:10, 35:15, 35:20, 44:18, 82:15, 114:11

**HEARD** [10] - 3:25, 14:16, 18:25, 26:19, 52:1, 58:11, 88:1, 106:20, 106:25, 110:14

**HEARING** [15] - 1:12, 3:22, 3:23, 4:7, 4:9, 4:11, 16:9, 35:24, 38:8, 78:15, 78:22, 102:17, 145:20, 182:13, 182:25

**HEART** [1] - 17:20

**HECTIC** [1] - 28:4

**HEIGHTS** [2] - 118:2, 142:22

**HELD** [2] - 26:22, 74:7

**HELL** [2] - 20:20, 28:14

**HELLO** [2] - 91:13, 91:14

**HELP** [5] - 27:23, 29:2, 105:11, 114:9, 133:25

**HELPFUL** [1] - 114:3

**HELPING** [1] - 13:21

**HIDE** [1] - 25:3

**HIGHLIGHTED** [10] - 44:7, 56:20, 72:8, 72:20, 101:4, 101:10, 174:5,

176:8, 178:5, 178:21

**HIMSELF** [3] - 54:16, 55:13, 59:11

**HISPANIC** [2] - 13:25, 102:4

**HISTORY** [1] - 42:15

**HIT** [4] - 13:25, 35:11, 44:16, 143:3

**HITTING** [1] - 35:19

**HIV** [1] - 13:23

**HOLD** [1] - 46:22

**HOLDING** [2] - 38:20, 73:20

**HOLDS** [1] - 11:9

**HOMEMADE** [1] - 85:20

**HOMICIDE** [3] - 45:8, 45:16, 45:17

**HOMOSEXUAL** [1] - 78:21

**HONEST** [1] - 17:21

**HONESTLY** [2] - 65:1, 75:16

**HONOR** [105] - 3:7, 3:10, 4:4, 4:25, 5:11, 5:18, 5:21, 6:6, 6:18, 6:23, 7:20, 8:4, 8:15, 9:17, 10:12, 16:6, 16:12, 29:11, 29:14, 30:14, 31:6, 31:14, 31:20, 31:22, 32:9, 33:11, 33:16, 33:23, 34:14, 34:16, 34:18, 35:4, 35:18, 36:17, 37:1, 38:6, 41:11, 42:24, 44:12, 44:13, 49:10, 53:21, 56:5, 59:17, 59:21, 67:13, 68:13, 68:21, 70:5, 71:19, 76:25, 85:9, 85:24, 86:1, 86:13, 88:19, 91:5, 91:8, 91:10, 93:14, 102:14, 102:21, 110:11, 110:17, 110:22, 111:8, 111:20, 112:13, 112:15, 112:16, 113:2, 113:11, 113:22, 113:24, 114:1, 114:21, 115:2, 115:5, 115:6, 116:3, 116:17, 116:25, 124:9, 131:16, 132:5, 137:24, 140:9, 140:11, 143:23, 145:2, 145:4, 158:22, 173:5, 173:9, 173:24,

174:13, 176:3, 177:6, 177:16, 177:22, 180:12, 181:8, 182:7, 182:8, 182:18

**HONOR'S** [3] - 9:24, 68:22, 68:24

**HONORABLE** [1] - 1:10

**HOPE** [1] - 17:11

**HOPEFULLY** [4] - 24:13, 26:19, 27:12, 55:22

**HOSPITAL** [3] - 17:3, 19:15, 84:10

**OSSELKUS** [1] - 18:7

**HOSTAGE** [1] - 76:16

**HOUR** [1] - 31:24

**HOURS** [3] - 21:3, 22:6, 73:24

**HOUSED** [6] - 5:5, 5:7, 18:8, 18:10, 43:14, 73:20

**HOUSES** [1] - 27:9

**HOUSING** [7] - 4:16, 5:13, 5:14, 26:23, 32:16, 47:19, 93:25

**HUG** [1] - 26:3

**HUMAN** [4] - 11:6, 11:9, 22:11, 25:15

**HUMANS** [1] - 25:13

**HUMPHREY** [1] - 2:9

**HUNT** [1] - 88:1

**HUNTINGDON** [1] - 118:22

**HURT** [4] - 13:1, 24:18, 109:12, 115:17

**HURTING** [1] - 23:14

---

## I

**IDEA** [2] - 48:11, 59:4

**IDEAS** [1] - 23:22

**IDENTICAL** [4] - 61:17, 156:11, 156:14, 162:2

**IDENTICALLY** [1] - 109:6

**IDENTIFICATION** [21] - 136:8, 136:20, 137:1, 138:6, 152:5, 153:13, 153:19, 157:4, 159:2, 159:3, 159:17, 159:21, 159:24, 160:3, 160:8, 160:10, 161:10, 164:21, 168:21, 170:5, 170:8

**IDENTIFICATIONS** [1]

- 170:4

**IDENTIFIED** [5] - 42:14, 55:11, 78:14, 152:25, 153:1

**IDENTIFY** [11] - 51:15, 54:21, 55:7, 55:8, 60:20, 63:3, 86:23, 122:22, 135:25, 144:17, 171:18

**IDENTIFYING** [1] - 157:1

**IDS** [1] - 172:13

**ILLEGAL** [1] - 22:12

**IMAGINE** [2] - 99:3, 100:6

**IMPLICATING** [2] - 54:16, 55:13

**IMPORTANT** [6] - 55:3, 80:12, 80:25, 148:16, 156:4, 157:1

**IMPOSING** [1] - 3:23

**IMPROPER** [4] - 68:18, 172:18, 172:19, 172:25

**IMPROVE** [1] - 128:10

**INCIDENT** [7] - 3:4, 3:25, 17:1, 19:14, 82:14, 84:9, 90:24

**INCLUDE** [1] - 110:20

**INCLUDED** [1] - 79:22

**INCOMPLETE** [1] - 114:22

**INCREASINGLY** [1] - 85:6

**INDENT** [1] - 123:9

**INDENTATIONS** [1] - 123:13

**INDENTED** [5] - 119:9, 121:19, 123:10, 123:20, 127:10

**INDEX** [1] - 183:2

**INDICATE** [9] - 8:3, 51:24, 88:6, 90:5, 125:10, 159:19, 178:25, 179:2, 179:7

**INDICATED** [9] - 37:23, 38:13, 62:19, 70:17, 79:2, 84:24, 98:15, 102:5, 136:9

**INDICATES** [13] - 4:13, 5:13, 89:23, 90:2, 90:9, 90:12, 125:15, 128:17, 137:9, 159:13, 159:15, 174:10, 179:5

**INDICATING** [1] - 55:14

**INDICATION** [3] - 105:1, 156:7, 156:8

**INDICATIONS** [3] - 175:12, 177:12, 178:5

**INDICTED** [5] - 17:5, 19:1, 20:22, 21:4, 65:11

**INDIVIDUAL** [1] - 164:3

**INDIVIDUALITY** [1] - 151:12

**INDIVIDUALS** [2] - 55:7, 102:4

**INDULGENCE** [1] - 42:6

**INFLICTED** [1] - 23:3

**INFORM** [2] - 54:3, 54:4

**INFORMANT** [1] - 67:24

**INFORMANTS** [1] - 103:4

**INFORMATION** [12] - 19:22, 55:4, 62:13, 62:23, 63:19, 78:8, 78:22, 79:11, 122:4, 125:9, 126:16, 172:12

**INFORMED** [5] - 66:6, 76:7, 77:3, 77:7, 127:12

**INITIAL** [1] - 89:23

**INITIALS** [1] - 133:21

**INK** [2] - 137:20, 137:22

**INMATE** [17] - 15:13, 18:8, 42:15, 42:17, 43:22, 51:1, 53:9, 55:18, 64:17, 64:23, 70:24, 77:24, 78:19, 83:20, 88:1, 90:2

**INMATES** [14] - 32:14, 32:16, 42:16, 43:13, 53:10, 53:20, 54:16, 55:18, 69:18, 70:14, 70:18, 70:25, 78:8, 78:12

**INSERTED** [2] - 126:11, 126:15

**INSIDE** [2] - 22:4, 23:15

**INSTANCE** [1] - 123:5

**INSTITUTION** [3] - 15:23, 43:14, 108:11

**INSTITUTIONS** [1] - 75:15

**INSTRUCTION** [1] - 118:21

**INSTRUCTIONS** [2] - 52:19, 52:24

**INTENTION** [1] - 54:21

**INTENTIONS** [2] - 12:5, 22:13
**INTERCEPT** [1] - 99:6
**INTERCEPTED** [5] - 29:23, 29:25, 41:19, 98:19, 99:1
**INTERJECTED** [2] - 40:1, 40:3
**INTERLINEATIONS** [2] - 126:6, 126:14
**INTERNAL** [3] - 125:22, 129:21, 130:15
**INTERPRET** [1] - 110:13
**INTERPRETATIONS** [1] - 127:18
**INTERPRETED** [1] - 127:1
**INTERRUPT** [1] - 121:14
**INTERVIEW** [17] - 47:14, 47:15, 68:10, 68:16, 70:20, 78:25, 79:3, 84:16, 84:17, 84:24, 86:25, 87:11, 87:13, 87:22, 101:7, 181:10
**INTERVIEWED** [13] - 69:11, 69:18, 70:24, 71:8, 73:9, 78:11, 78:19, 82:23, 84:1, 84:21, 98:15, 99:8, 100:23
**INTERVIEWING** [5] - 70:24, 78:19, 79:8, 82:19, 82:21
**INTERVIEWS** [2] - 78:16, 79:13
**INTRODUCE** [9] - 6:19, 16:7, 37:10, 38:7, 41:12, 42:25, 134:14, 140:10, 174:14
**INTRODUCED** [4] - 9:4, 58:19, 92:17, 132:21
**INTRODUCING** [1] - 110:4
**INVENTORIED** [1] - 119:9
**INVESTIGATE** [2] - 84:8, 94:8
**INVESTIGATED** [2] - 81:16, 83:16
**INVESTIGATING** [1] - 19:12
**INVESTIGATION** [29] - 10:21, 17:4, 18:5, 19:19, 19:20, 20:24,

21:15, 42:2, 46:6, 49:21, 50:7, 50:9, 50:12, 50:17, 58:11, 78:10, 78:18, 80:1, 81:5, 81:9, 83:9, 84:5, 84:12, 85:18, 87:18, 89:8, 99:4, 99:5, 102:7
**INVESTIGATOR** [5] - 48:7, 68:1, 135:11, 170:15, 170:16
**INVESTIGATORS** [1] - 15:9
**INVOLVED** [2] - 22:8, 81:23
**INVOLVING** [2] - 148:23, 149:11
**IOWA** [1] - 124:5
**ISOLATION** [1] - 26:23
**ISSUE** [19] - 67:21, 67:22, 70:3, 73:5, 73:6, 74:13, 89:2, 104:5, 120:5, 121:7, 123:8, 124:23, 125:4, 125:5, 127:11, 127:14, 128:9
**ISSUES** [4] - 119:24, 121:9, 121:25
**ITEM** [13] - 52:13, 84:2, 95:7, 95:8, 100:20, 121:18, 121:19, 133:20, 142:7, 142:25, 143:1, 143:7
**ITEMIZED** [1] - 84:2
**ITEMS** [11] - 46:15, 62:3, 66:14, 77:25, 99:8, 120:7, 133:17, 134:1, 144:7, 151:4
**ITSELF** [4] - 57:18, 77:14, 110:11, 126:13

**J**

**J.D** [2] - 18:2, 26:3
**JAKE** [2] - 45:17, 45:20
**JAMES** [3] - 2:12, 2:12, 19:22
**JANUARY** [1] - 145:21
**JEANETTE** [1] - 116:18
**JEANNETTE** [4] - 116:19, 116:23, 116:24, 183:11
**JESSICA** [4] - 18:16, 18:18, 20:9
**JOB** [5] - 55:8, 117:18,

129:15, 129:16, 170:14
**JOEL** [1] - 1:10
**JOHN** [1] - 1:15
**JOHNSON** [2] - 99:2, 101:9
**JOHNSON'S** [1] - 99:5
**JOINTLY** [1] - 90:9
**JR** [1] - 1:15
**JUDGE** [3] - 115:9, 124:16, 145:22
**JUDGED** [1] - 12:15
**JUDGMENT** [1] - 17:16
**JULY** [6] - 43:22, 43:23, 45:1, 71:22, 72:13, 126:1
**JUMPING** [1] - 127:11
**JUNE** [9] - 44:4, 48:19, 49:5, 56:2, 56:6, 66:2, 69:22, 93:8, 93:22
**JURY** [36] - 11:2, 14:7, 37:19, 37:24, 38:4, 38:14, 38:18, 54:14, 57:12, 57:13, 58:3, 58:20, 58:24, 71:22, 71:23, 72:13, 73:1, 74:15, 74:18, 74:19, 75:1, 75:7, 75:12, 104:15, 104:17, 105:6, 106:7, 109:7, 109:8, 109:24, 110:2, 110:18, 114:6, 114:12, 115:6, 181:1
**JURY'S** [1] - 106:6
**JUSTICE** [3] - 2:2, 12:6, 128:3
**JUSTIFIED** [1] - 22:12

**K**

**KAHLE** [3] - 32:22, 32:24, 33:1
**KANSAS** [1] - 52:20
**KAREN** [1] - 82:4
**KARTEN** [2] - 25:5, 182:10
**KEEL** [1] - 28:7
**KEEP** [5] - 36:14, 75:3, 136:3, 156:25, 167:12
**KEEPING** [1] - 97:1
**KEEPS** [2] - 25:9, 128:6
**KENNER** [1] - 81:17
**KENNETH** [2] - 78:25, 81:17
**KEPT** [2] - 73:9, 73:18

**KILL** [9] - 11:10, 11:11, 14:4, 24:1, 25:13, 103:5, 167:24, 168:3, 169:8
**KILLED** [8] - 11:10, 12:2, 13:23, 14:13, 25:14, 39:17, 161:24, 163:15
**KILLING** [3] - 7:23, 10:19, 16:25
**KIND** [4] - 21:21, 24:16, 87:6, 137:5
**KIT** [7] - 77:17, 77:18, 77:21, 79:14, 79:15, 79:22
**KITE** [9] - 56:18, 56:21, 57:14, 57:21, 67:22, 93:3, 94:5, 94:10, 107:12
**KITES** [7] - 7:3, 7:4, 7:7, 46:9, 46:16, 50:1, 107:3
**KNOWING** [3] - 123:19, 144:12, 144:14
**KNOWLEDGE** [3] - 15:11, 33:1, 78:20
**KNOWN** [66] - 23:17, 40:17, 40:22, 41:5, 41:21, 61:12, 63:19, 66:7, 115:22, 123:25, 124:14, 132:18, 133:1, 133:4, 133:8, 133:9, 135:3, 135:9, 135:14, 135:17, 136:21, 136:24, 137:9, 137:13, 139:7, 139:13, 139:22, 140:6, 140:20, 141:8, 141:11, 141:18, 141:19, 142:9, 142:13, 142:18, 142:19, 143:1, 143:9, 144:2, 152:6, 153:4, 153:8, 154:8, 154:14, 155:10, 157:3, 158:11, 158:16, 163:24, 164:7, 167:19, 167:20, 168:2, 168:8, 168:10, 169:15, 174:7, 174:9, 174:11, 176:25, 177:1, 178:12, 179:25, 180:1
**KNOWNS** [2] - 135:8, 141:20

**KNOWS** [1] - 19:24

**L**

**LAB** [4] - 121:23, 129:20, 150:10, 163:20
**LABELED** [1] - 134:1
**LABORATORY** [20] - 40:13, 41:22, 41:23, 50:10, 51:4, 54:11, 80:14, 80:15, 92:11, 92:12, 117:5, 117:11, 119:3, 120:12, 120:13, 121:4, 128:5, 130:5, 131:12
**LAID** [1] - 104:21
**LANGUAGE** [1] - 109:17
**LAST** [16] - 19:8, 24:4, 26:9, 27:16, 27:20, 28:13, 39:20, 61:23, 86:5, 88:14, 90:20, 101:22, 102:3, 110:16, 132:15, 142:17
**LATE** [3] - 24:6, 24:7, 27:24
**LATEST** [1] - 19:7
**LAW** [3] - 21:2, 45:12, 169:1
**LAYMAN** [1] - 92:7
**LAYMEN'S** [1] - 139:3
**LEAD** [7] - 19:4, 48:7, 55:4, 83:11, 84:1, 87:5, 181:18
**LEADS** [1] - 51:18
**LEANING** [2] - 137:5, 168:22
**LEARN** [3] - 13:3, 109:14, 115:18
**LEARNED** [2] - 101:13, 101:15
**LEAST** [8] - 14:6, 28:6, 35:25, 43:20, 54:20, 63:12, 73:1, 150:15
**LEAVE** [3] - 35:21, 36:2, 49:1
**LEE** [1] - 79:8
**LEFT** [12] - 6:3, 24:12, 49:17, 49:22, 67:7, 67:20, 90:14, 140:20, 140:21, 141:25, 142:23
**LEGIBLE** [1] - 8:8
**LENGTH** [1] - 64:1
**LEONARD** [12] - 27:17, 30:7, 30:10,

30:11, 30:13, 30:20, 31:5, 32:13, 32:22, 32:23, 32:24, 33:4
**LEONARDS** [4] - 31:3, 31:13, 32:11, 32:18
**LESBIAN** [1] - 21:22
**LESS** [3] - 9:14, 17:12, 172:16
**LESSER** [1] - 161:1
**LETTER** [171] - 6:13, 6:16, 10:8, 12:16, 12:19, 13:10, 13:17, 15:18, 16:19, 17:10, 18:15, 18:20, 20:6, 20:9, 21:14, 21:24, 22:2, 24:14, 24:25, 25:2, 25:24, 26:11, 26:17, 29:7, 30:2, 30:19, 47:7, 47:23, 49:14, 52:7, 53:16, 54:4, 55:21, 55:24, 57:17, 58:9, 58:11, 58:16, 58:17, 58:19, 58:22, 58:23, 59:3, 59:11, 59:23, 69:6, 72:4, 72:17, 73:6, 83:4, 83:12, 83:13, 83:14, 83:17, 83:18, 83:24, 88:6, 88:7, 88:11, 88:14, 88:20, 88:21, 91:19, 91:20, 91:21, 91:25, 92:4, 92:9, 92:22, 96:7, 96:9, 96:13, 96:14, 97:4, 97:16, 98:5, 98:7, 98:15, 98:18, 98:25, 99:1, 99:6, 99:16, 99:21, 99:22, 100:2, 100:8, 100:18, 100:21, 100:24, 101:21, 101:23, 101:24, 101:25, 102:2, 102:5, 102:8, 103:2, 103:10, 103:25, 104:2, 104:6, 104:7, 104:10, 104:12, 104:13, 105:2, 105:4, 106:7, 106:14, 107:19, 108:12, 109:1, 109:5, 109:18, 110:4, 110:5, 110:9, 112:3, 113:15, 114:15, 115:8, 118:1, 119:7, 128:2, 133:21, 134:24, 135:20, 136:4, 136:12, 137:16, 139:17, 139:19,

140:25, 141:2, 152:16, 160:18, 160:19, 165:3, 165:20, 166:1, 166:5, 166:10, 166:15, 166:21, 167:9, 167:12, 167:19, 169:8, 169:9, 171:8, 171:9, 172:14, 173:19, 174:2, 174:10, 175:9, 179:18, 179:23
**LETTERS** [67] - 9:17, 15:1, 15:10, 15:18, 15:23, 16:1, 17:12, 29:23, 30:4, 32:15, 39:12, 41:19, 46:9, 46:16, 46:20, 47:22, 48:10, 50:1, 52:6, 52:17, 52:21, 53:9, 53:14, 53:19, 54:14, 54:20, 54:21, 54:22, 55:16, 55:17, 58:13, 63:25, 64:2, 66:17, 66:18, 66:25, 67:2, 67:11, 71:25, 74:5, 91:16, 91:18, 103:3, 103:13, 104:9, 107:3, 114:10, 114:13, 116:1, 117:25, 118:2, 141:13, 142:10, 142:23, 164:3, 165:20, 166:5, 166:21, 167:23, 168:7, 168:9, 172:1, 173:19, 177:13, 178:6, 178:7
**LEVEL** [1] - 125:12
**LEVELS** [2] - 17:14, 136:17
**LIBRARY** [1] - 21:2
**LIED** [1] - 49:20
**LIES** [2] - 14:3, 14:15
**LIEUTENANT** [7] - 15:8, 19:19, 19:21, 89:5, 89:6, 89:7, 181:4
**LIFE** [10] - 11:9, 12:4, 12:8, 14:9, 19:6, 22:11, 22:24, 23:1, 23:24, 25:22
**LIFETIME** [1] - 23:7
**LIFTS** [1] - 156:9
**LIGHT** [3] - 32:2, 36:21, 111:2
**LIKELIHOOD** [2] - 169:19, 170:6
**LIKELY** [5] - 3:13,

12:10, 19:23, 24:14, 28:5
**LIMITED** [6] - 61:12, 65:9, 65:10, 149:6, 149:16, 166:13
**LINE** [12] - 24:7, 36:15, 70:10, 71:5, 93:13, 93:22, 94:9, 94:16, 94:25, 109:20, 168:16
**LINED** [1] - 62:6
**LINES** [2] - 72:21, 176:11
**LINKING** [1] - 66:3
**LISTEN** [1] - 169:23
**LIVED** [1] - 23:17
**LIVES** [1] - 24:20
**LOCAL** [3] - 17:2, 19:15, 130:5
**LOCATED** [1] - 3:20
**LOMPOC** [1] - 3:4
**LONG-TIME** [1] - 18:18
**LOOK** [26] - 27:17, 29:5, 44:3, 51:10, 51:15, 53:2, 56:8, 61:23, 63:3, 69:22, 70:3, 70:21, 95:11, 97:2, 105:6, 109:19, 111:14, 117:24, 125:16, 130:7, 130:9, 133:13, 140:1, 147:6, 147:23, 168:2
**LOOKED** [5] - 74:19, 92:17, 152:15, 163:8, 165:3
**LOOKING** [12] - 28:25, 41:4, 47:9, 61:13, 125:9, 133:23, 137:4, 138:24, 168:4, 169:18, 175:4, 175:20
**LOOKS** [2] - 95:20, 111:2
**LOOP** [2] - 142:12, 154:17
**LORIE** [1] - 145:7
**LOSE** [1] - 182:15
**LOSING** [2] - 129:5, 164:17
**LOVE** [10] - 17:20, 18:4, 19:7, 20:7, 24:16, 24:17, 26:1, 26:2, 26:7, 29:9
**LOVED** [1] - 13:7
**LOWER** [5] - 13:15, 43:24, 44:5, 105:19, 154:16
**LUCK** [1] - 19:23

**LUNCH** [1] - 112:17
**LUNCHEON** [1] - 113:5

## M

**MA'AM** [1] - 122:11
**MACHINE** [3] - 123:14, 127:9
**MACHINES** [2] - 142:13, 156:20
**MAGAZINE** [4] - 21:19, 21:20, 21:21, 21:22
**MAGIC** [3] - 175:12, 175:22, 176:15
**MAIL** [8] - 15:13, 15:14, 15:22, 25:24, 46:22, 80:17, 83:20, 83:22
**MAILED** [2] - 47:7, 83:19
**MAIN** [1] - 118:9
**MAINTAINED** [1] - 41:2
**MAJOR** [7] - 64:13, 64:14, 64:20, 64:22, 65:7, 65:17, 143:4
**MALOCU** [28] - 5:22, 6:9, 7:2, 9:18, 10:4, 11:19, 13:16, 16:16, 26:8, 31:12, 32:11, 33:7, 38:13, 42:11, 44:24, 60:18, 71:21, 86:20, 91:13, 93:19, 97:1, 100:17, 102:25, 112:7, 113:14, 114:7, 165:7, 183:6
**MALOCU'S** [1] - 181:18
**MANIPULATE** [1] - 169:17
**MANNER** [2] - 142:5, 152:20
**MANUSCRIPT** [1] - 29:3
**MARCH** [3] - 4:8, 4:9, 61:5
**MARK** [7] - 56:3, 110:21, 145:17, 175:7, 176:15, 179:14, 179:17
**MARKED** [33] - 3:20, 4:1, 4:6, 8:1, 8:21, 9:11, 10:9, 11:17, 12:20, 13:20, 14:20, 34:8, 37:3, 37:25, 40:20, 42:9, 47:6, 51:14, 60:19, 86:22,

89:3, 93:8, 98:21, 99:10, 101:2, 102:8, 113:15, 114:21, 116:11, 134:7, 173:21, 179:17, 180:1
**MARKER** [3] - 175:12, 175:22, 176:15
**MARKET** [1] - 1:21
**MARKING** [1] - 176:15
**MARKINGS** [1] - 175:22
**MARSHAL'S** [1] - 38:20
**MARSHALL** [1] - 118:21
**MARTI** [48] - 3:24, 4:11, 5:4, 5:16, 7:23, 10:19, 10:23, 11:1, 12:2, 12:11, 13:4, 13:8, 13:22, 14:5, 14:10, 14:13, 19:13, 22:22, 39:17, 42:17, 43:12, 43:17, 78:21, 79:4, 82:14, 83:5, 85:3, 85:19, 88:1, 88:4, 89:23, 90:2, 90:5, 90:10, 97:22, 97:25, 98:2, 98:12, 101:15, 101:18, 109:15, 115:19, 161:24, 163:15, 166:2, 166:4, 167:25, 168:4
**MARTI'S** [1] - 43:22
**MARTIN** [24] - 6:17, 47:8, 56:7, 58:19, 58:25, 72:7, 72:19, 76:7, 76:15, 83:5, 83:14, 87:1, 98:5, 98:25, 99:1, 99:6, 99:17, 99:23, 100:21, 101:21, 108:18, 110:3, 113:15, 181:10
**MARTIN'S** [1] - 56:17
**MARYLAND** [1] - 124:5
**MATCH** [3] - 153:18, 159:22, 162:4
**MATCHED** [1] - 163:12
**MATCHES** [2] - 65:21, 153:19
**MATERIAL** [1] - 41:21
**MATERIALS** [1] - 132:19
**MATT** [1] - 50:24
**MATTER** [15] - 17:5, 40:1, 45:21, 49:10,

72:13, 81:17, 82:4, 85:19, 103:16, 106:3, 156:11, 157:20, 172:24, 180:17, 184:20
**MATTERS** [7] - 29:4, 81:6, 81:11, 81:13, 82:6, 114:2, 114:10
**MATTHEW** [1] - 6:15
**MAURICE** [4] - 99:25, 100:12, 100:14, 101:8
**MAURICE'S** [1] - 99:17
**MCALLISTER** [1] - 19:23
**MCDANIELS** [1] - 145:21
**MCHUGH** [102] - 2:12, 10:12, 29:14, 29:19, 29:24, 30:14, 30:17, 37:12, 44:13, 44:21, 44:23, 49:7, 49:9, 49:11, 51:13, 53:24, 54:1, 56:2, 56:4, 59:18, 59:22, 60:2, 60:3, 67:15, 67:19, 68:11, 68:20, 69:4, 70:1, 70:5, 70:9, 70:12, 71:13, 71:18, 71:19, 71:20, 77:2, 77:6, 79:18, 79:21, 85:8, 85:10, 85:23, 86:1, 86:10, 86:13, 86:17, 86:19, 88:18, 88:25, 89:1, 91:4, 91:7, 91:16, 94:24, 102:24, 105:10, 105:12, 105:16, 105:21, 105:24, 110:17, 110:25, 111:3, 111:17, 111:20, 113:10, 113:13, 113:21, 114:21, 124:16, 124:18, 131:15, 131:19, 132:1, 140:11, 145:4, 145:6, 158:22, 158:23, 173:8, 174:16, 174:22, 175:2, 177:5, 177:9, 178:17, 178:18, 178:20, 180:5, 180:12, 180:16, 180:20, 181:1, 181:5, 181:8, 181:11, 181:14, 181:17, 181:22, 183:9, 183:15

**MCHUGH'S** [1] - 173:13
**MCSHEA** [5] - 50:24, 91:22, 91:24, 92:8, 92:21
**MEAN** [22] - 40:4, 41:7, 41:19, 58:13, 73:23, 107:6, 109:15, 115:19, 118:10, 118:12, 126:9, 131:6, 133:5, 136:3, 139:3, 150:18, 156:23, 158:14, 159:2, 170:24, 171:3, 172:5
**MEANING** [2] - 11:9, 106:10
**MEANS** [13] - 31:15, 31:19, 126:18, 127:1, 133:4, 136:6, 136:20, 136:23, 137:8, 137:13, 155:10, 156:15, 159:3
**MEANT** [7] - 53:23, 54:3, 59:8, 126:21, 127:14, 150:23, 151:1
**MEDICAL** [1] - 84:5
**MEDICATION** [4] - 27:22, 84:9, 84:10, 84:14
**MEET** [1] - 153:2
**MEMBERS** [1] - 13:25
**MEMO** [3] - 3:21, 4:8, 181:3
**MEMORANDUM** [5] - 89:4, 89:6, 89:7, 89:22, 182:10
**MEMORIALIZED** [2] - 79:9, 144:19
**MEMORIES** [1] - 23:18
**MENTION** [2] - 142:22, 143:16
**MENTIONED** [5] - 22:14, 29:3, 114:15, 129:4, 164:8
**MESS** [1] - 82:15
**MET** [2] - 38:19, 99:7
**MIC** [2] - 35:2, 105:15
**MICROPHONE** [3] - 35:1, 35:6, 35:7
**MICROSCOPE** [1] - 137:21
**MIDDLE** [5] - 1:2, 1:16, 2:6, 11:24, 138:2
**MIGHT** [7] - 28:15, 31:24, 77:15, 85:23, 104:9, 105:3, 105:11

**MILL** [1] - 162:12
**MIND** [7] - 13:21, 17:22, 18:2, 25:9, 28:7, 35:24, 107:7
**MINE** [1] - 176:9
**MINUTE** [7] - 36:11, 36:14, 71:15, 86:9, 89:19, 158:18, 182:17
**MINUTES** [1] - 31:21
**MIRANDA** [2] - 69:7, 70:3
**MIRANDIZE** [3] - 69:12, 70:17
**MIRANDIZED** [5] - 69:14, 69:19, 70:14, 70:25, 71:10
**MIRANDIZING** [1] - 71:3
**MISIDENTIFICATION** [1] - 55:4
**MISS** [27] - 5:20, 17:20, 26:1, 26:7, 27:16, 27:17, 63:6, 117:4, 122:3, 124:10, 124:19, 132:2, 132:8, 134:8, 134:24, 138:1, 140:19, 141:24, 145:7, 145:25, 146:5, 158:24, 173:13, 174:1, 181:15, 181:17, 181:22
**MISSED** [1] - 151:4
**MISSING** [1] - 157:5
**MISTAKEN** [3] - 59:12, 125:8, 125:18
**MOM** [5] - 20:1, 20:2, 20:12, 20:16, 20:17
**MOMENT** [4] - 60:19, 63:3, 86:23, 131:16
**MOMENTS** [1] - 31:8
**MONDAY** [1] - 107:7
**MONEY** [1] - 13:24
**MONITORING** [2] - 15:13, 15:22
**MONSTER** [1] - 24:1
**MONTH** [2] - 75:6, 125:17
**MONTHS** [10] - 45:7, 75:6, 120:21, 124:24, 125:5, 129:17, 146:2, 146:19, 148:19, 150:7
**MOOD** [1] - 17:21
**MORENO** [3] - 2:12, 35:13, 51:12
**MORNING** [10] - 6:1,

6:2, 13:11, 17:1, 24:21, 31:23, 63:25, 94:4, 140:3, 182:22
**MOST** [7] - 9:20, 19:6, 25:8, 114:24, 147:17, 147:21, 171:3
**MOSTLY** [2] - 47:3, 130:10
**MOTION** [1] - 28:24
**MOTIONS** [1] - 3:3
**MOUNTAINS** [1] - 27:2
**MOVE** [9] - 11:16, 20:24, 29:12, 34:15, 60:1, 102:15, 143:11, 150:14, 180:12
**MOVED** [5] - 73:12, 89:25, 96:21, 97:3, 182:5
**MOVEMENT** [1] - 90:12
**MOVING** [8] - 32:15, 73:5, 73:6, 74:13, 79:18, 89:2, 139:8, 181:6
**MULTIPLE** [1] - 39:13
**MURDER** [10] - 17:6, 19:1, 25:15, 45:14, 54:16, 79:5, 79:7, 84:18, 101:20, 102:2
**MURDERED** [4] - 77:24, 98:2, 101:14, 101:18
**MURDERING** [1] - 12:6
**MURDERS** [2] - 81:13, 81:25
**MUSCLES** [1] - 118:14
**MUST** [1] - 14:12
**MUSTER** [1] - 50:22
**MUTE** [8] - 34:25, 35:6, 35:7, 35:11, 35:19, 35:21, 44:14, 44:17
**MUTED** [1] - 35:9
**MYSTERIOUS** [3] - 58:21, 108:17, 115:10

## N

**N.W** [1] - 2:4
**NAME** [11] - 19:12, 22:6, 30:19, 95:12, 100:3, 100:4, 101:22, 116:22, 138:21, 138:23, 171:4

**NAMED** [1] - 83:5
**NAMES** [1] - 102:3
**NARRATION** [1] - 39:6
**NAS** [2] - 172:11, 173:4
**NATIONAL** [2] - 119:6, 148:25
**NATURAL** [1] - 157:8
**NATURE** [3] - 80:17, 85:16, 102:4
**NEAR** [1] - 142:11
**NEED** [17] - 18:2, 62:22, 100:18, 127:22, 128:1, 144:23, 153:2, 153:12, 153:19, 154:19, 154:24, 155:6, 155:12, 157:17, 164:20, 165:8, 167:7
**NEEDED** [4] - 66:8, 136:11, 136:13, 170:16
**NEGATIVE** [1] - 137:6
**NEGLECTED** [2] - 123:18, 126:20
**NERVES** [1] - 118:14
**NEVER** [16] - 12:5, 14:1, 22:8, 22:12, 23:17, 24:11, 24:16, 60:6, 64:13, 83:16, 83:18, 88:1, 98:15, 101:23, 108:6, 170:19
**NEVERTHELESS** [1] - 17:17
**NEW** [5] - 13:8, 21:6, 23:6, 45:19, 118:25
**NEWS** [1] - 21:4
**NEXT** [19] - 11:16, 12:18, 18:12, 20:8, 21:11, 31:24, 38:18, 39:14, 39:15, 39:19, 51:11, 91:2, 114:7, 116:13, 116:16, 120:15, 132:14, 142:2, 146:14
**NICE** [3] - 25:6, 27:1, 182:24
**NIGHT** [8] - 22:1, 24:23, 28:13, 90:13, 90:22, 94:2, 94:4, 107:11
**NOBODY** [1] - 69:13
**NOISE** [2] - 36:4, 44:17
**NOISES** [1] - 44:15
**NONCONFORMITY** [1] - 125:12
**NONE** [1] - 182:13

**NONIDENTIFICATIO N** [1] - 137:11
**NONIDENTIFICATIO NS** [1] - 137:12
**NORFOLK** [2] - 118:19
**NORMAL** [3] - 135:12, 155:24, 162:12
**NORMALLY** [6] - 22:16, 119:1, 156:8, 162:3, 172:3, 178:14
**NORTH** [1] - 27:1
**NORTHERN** [1] - 130:4
**NOTATIONS** [2] - 176:8, 176:9
**NOTE** [24] - 3:17, 7:5, 7:19, 7:22, 8:6, 8:10, 10:15, 61:25, 95:22, 158:13, 162:2, 162:7, 162:9, 163:25, 174:2, 174:8, 174:12, 174:21, 176:12, 176:13, 176:20, 178:22, 178:24
**NOTED** [2] - 88:24, 178:10
**NOTES** [21] - 8:3, 41:20, 91:4, 121:5, 127:18, 127:23, 152:17, 157:25, 158:2, 158:14, 167:13, 167:15, 167:16, 171:8, 172:9, 174:20, 175:1, 175:6, 176:10, 176:11
**NOTETAKING** [5] - 127:12, 127:14, 127:18, 128:9, 150:25
**NOTHING** [11] - 14:10, 17:24, 23:6, 23:21, 24:25, 25:22, 28:19, 44:11, 52:20, 112:12, 145:1
**NOTICE** [1] - 61:20
**NOTICED** [1] - 141:7
**NOVEMBER** [3] - 44:25, 125:23, 132:15
**NUMBER** [34] - 1:3, 4:6, 10:19, 10:23, 21:7, 47:8, 51:25, 52:5, 52:13, 52:16, 53:2, 60:17, 78:11, 100:20, 102:18, 106:7, 112:4, 130:23, 131:1,

148:8, 148:9, 148:12, 149:17, 149:20, 149:21, 153:15, 153:16, 153:21, 153:22, 155:13, 156:23, 156:24, 180:21
**NUMBERS** [8] - 5:1, 9:14, 39:19, 41:7, 60:9, 133:24, 133:25, 173:23
**NUMERAL** [1] - 51:24
**NUMEROUS** [10] - 82:8, 136:8, 152:17, 152:23, 153:5, 157:24, 159:14, 175:12, 175:22, 178:15

## O

**OBJECT** [5] - 30:14, 53:22, 68:14, 110:10, 175:2
**OBJECTING** [2] - 30:17, 67:13
**OBJECTION** [28] - 4:2, 4:4, 4:22, 6:21, 9:21, 10:13, 10:15, 16:9, 29:15, 29:25, 30:3, 37:12, 38:8, 41:13, 43:1, 68:14, 68:23, 76:25, 77:5, 79:16, 102:17, 134:16, 140:13, 177:4, 177:5, 177:14, 181:12, 182:12
**OBJECTIVE** [2] - 147:3, 147:18
**OBJECTS** [1] - 85:15
**OBSTRUCT** [1] - 27:3
**OBTAIN** [8] - 6:16, 39:2, 40:12, 40:17, 42:3, 42:18, 77:25, 96:3
**OBTAINED** [6] - 33:8, 34:12, 40:23, 62:1, 65:17, 93:2
**OBTAINING** [1] - 162:19
**OBVIOUS** [2] - 12:4, 92:6
**OBVIOUSLY** [11] - 47:5, 48:3, 48:17, 57:11, 65:11, 69:12, 82:19, 111:20, 119:16, 121:1, 168:25
**OCCASION** [2] - 48:25, 106:6

**ODDS** [1] - 19:6
**OFFENSE** [1] - 82:14
**OFFERED** [2] - 180:24, 182:6
**OFFERING** [1] - 182:10
**OFFICE** [8] - 1:16, 6:14, 20:23, 87:7, 99:3, 106:3, 160:24
**OFFICER** [6] - 4:7, 82:13, 82:18, 82:22, 135:11, 169:1
**OFFICER'S** [1] - 3:22
**OFFICERS** [1] - 10:22
**OFFICIAL** [4] - 1:20, 49:21, 110:19, 184:24
**OFFICIALS** [5] - 11:5, 14:1, 15:2, 15:12, 15:23
**OFTEN** [1] - 122:14
**OHIO** [1] - 100:11
**OKLAHOMA** [1] - 26:25
**OLD** [1] - 45:21
**OMITTED** [1] - 182:10
**ON-THE-JOB** [2] - 129:15, 129:16
**ONCE** [14] - 25:17, 41:10, 41:18, 46:1, 58:2, 96:18, 96:19, 97:11, 124:5, 167:25, 168:3
**ONE** [88] - 4:7, 5:5, 7:4, 10:20, 12:3, 13:19, 14:14, 15:8, 16:20, 22:1, 22:16, 22:24, 23:1, 26:13, 28:14, 47:10, 50:1, 50:5, 51:11, 51:20, 51:25, 58:9, 58:11, 58:14, 58:15, 58:16, 58:17, 63:9, 69:18, 71:6, 73:7, 76:23, 78:3, 81:16, 82:7, 85:4, 85:23, 88:20, 91:18, 91:20, 91:21, 93:13, 93:22, 95:9, 96:1, 97:8, 97:9, 103:25, 104:3, 107:5, 107:15, 108:11, 111:7, 111:9, 113:10, 115:21, 120:2, 120:3, 120:7, 120:14, 121:1, 121:11, 121:12, 122:24, 123:2, 123:3, 123:9, 125:7, 133:22, 135:8,

141:18, 142:5, 142:20, 150:22, 151:4, 151:5, 151:20, 153:14, 154:1, 154:4, 154:13, 157:11, 159:12, 162:8, 171:4, 176:12, 177:24
**ONE'S** [1] - 25:17
**ONES** [2] - 26:19, 118:9
**ONGOING** [1] - 10:13
**OPEN** [3] - 13:2, 109:13, 115:17
**OPENED** [1] - 23:14
**OPENS** [1] - 3:1
**OPERATE** [1] - 118:4
**OPINION** [16] - 27:23, 51:7, 53:13, 54:19, 55:11, 61:11, 63:16, 67:5, 102:1, 111:22, 112:10, 124:12, 149:23, 165:8, 173:14, 181:24
**OPINIONS** [7] - 123:24, 124:13, 131:20, 144:18, 146:7, 150:3
**OPPORTUNITY** [1] - 11:11
**OPPOSED** [1] - 15:20
**ORAL** [1] - 38:25
**ORANGE** [6] - 175:12, 175:14, 175:23, 175:24, 176:8, 176:15
**ORDEAL** [1] - 28:22
**ORDER** [15] - 3:5, 3:9, 61:14, 61:15, 77:16, 96:10, 117:20, 131:2, 136:7, 136:13, 136:25, 154:25, 157:16, 164:20, 168:21
**ORDERLIES** [1] - 107:2
**ORDERLY** [2] - 32:13, 33:2
**ORIGINAL** [23] - 8:7, 10:8, 15:18, 53:9, 54:13, 54:14, 55:17, 55:25, 57:16, 57:17, 72:18, 72:19, 104:7, 111:15, 111:23, 122:21, 122:23, 122:25, 137:17, 137:20, 144:16, 176:9, 176:11
**ORIGINALLY** [1] -

176:20
**ORIGINALS** [5] - 15:21, 112:9, 112:11, 169:8, 170:11
**ORIGINATION** [1] - 135:16
**OUTSIDE** [7] - 22:18, 25:20, 87:7, 120:8, 120:11, 123:5
**OVERALL** [1] - 46:11
**OVERLAP** [1] - 156:14
**OVERLAPPED** [2] - 43:20, 156:14
**OVERRULE** [4] - 67:18, 77:5, 111:24, 177:14
**OVERRULED** [1] - 53:25
**OVERWHELMING** [1] - 19:5
**OWN** [5] - 12:8, 12:12, 25:16, 110:15, 133:3

## P

**P.M** [1] - 182:25
**P.O** [1] - 21:8
**PABLO** [1] - 99:23
**PACK** [1] - 133:9
**PACKAGE** [1] - 19:7
**PACKAGED** [1] - 80:16
**PACKAGING** [2] - 79:25, 80:11
**PADS** [1] - 64:18
**PAGE** [61] - 11:20, 16:20, 20:12, 22:1, 26:12, 27:16, 27:20, 28:2, 28:9, 29:7, 30:19, 39:10, 39:11, 39:14, 39:15, 39:19, 39:20, 51:24, 52:5, 52:23, 53:2, 54:10, 54:11, 55:15, 56:3, 56:8, 56:10, 56:16, 70:3, 70:21, 72:16, 72:19, 74:21, 93:12, 93:22, 94:16, 94:25, 96:7, 97:8, 97:9, 103:1, 103:25, 104:3, 105:7, 105:25, 106:1, 114:8, 116:11, 116:14, 123:13, 123:14, 126:10, 126:12, 146:8, 147:6, 147:10, 147:23, 174:12, 176:12

**PAGES** [9] - 39:7, 52:1, 60:9, 96:15, 105:22, 141:19, 147:6, 176:13, 176:21

**PAIN** [2] - 23:3, 24:18

**PALM** [1] - 64:21

**PAPER** [10] - 62:6, 103:6, 103:15, 116:12, 120:4, 123:12, 127:10, 137:22, 144:12, 168:14

**PAPERWORK** [1] - 89:24

**PARAGRAPH** [23] - 11:24, 11:25, 12:23, 12:24, 18:23, 18:24, 19:11, 19:25, 20:11, 20:15, 26:12, 26:14, 27:4, 27:16, 27:20, 28:2, 28:10, 28:11, 55:15, 61:13, 61:23, 108:24, 115:15

**PARAGRAPHS** [1] - 26:11

**PARAMETERS** [1] - 67:16

**PARAPHRASING** [1] - 77:9

**PART** [31] - 9:1, 12:4, 15:25, 16:3, 29:15, 37:7, 42:2, 48:17, 57:2, 59:19, 76:15, 77:9, 81:9, 84:4, 87:18, 94:15, 94:24, 99:5, 109:23, 109:24, 110:19, 121:1, 127:6, 132:19, 138:18, 150:15, 151:4, 151:20, 154:15, 155:16, 166:14

**PARTICULAR** [20] - 43:14, 71:1, 82:11, 95:7, 121:8, 121:18, 121:19, 123:5, 123:16, 126:23, 127:2, 130:24, 136:5, 143:1, 144:7, 147:20, 156:6, 163:18, 171:17, 172:10

**PARTICULARLY** [1] - 92:5

**PARTS** [7] - 9:20, 9:22, 18:15, 24:24, 106:20, 163:25

**PARTY** [1] - 83:19

**PASS** [7] - 19:21,

50:21, 92:21, 121:2, 121:3, 130:22, 131:6

**PASS/FAIL** [3] - 130:19, 130:24, 131:6

**PASSED** [3] - 22:25, 121:1, 121:24

**PASSING** [1] - 130:21

**PAST** [6] - 12:12, 16:23, 17:10, 22:6, 28:2, 122:11

**PASTE** [1] - 144:13

**PATH** [2] - 17:15, 19:4

**PATHOLOGY** [2] - 118:19, 118:21

**PAUL** [8] - 1:6, 53:10, 54:5, 54:15, 54:22, 55:18, 99:23, 143:10

**PAUSE** [4] - 42:7, 85:25, 91:6, 131:18

**PAY** [3] - 12:6, 12:8, 20:3

**PEACEFULLY** [1] - 13:7

**PEN** [2] - 73:20, 156:9

**PENALTY** [3] - 11:7, 14:7, 62:16

**PENILE** [1] - 80:8

**PENITENTIARY** [5] - 15:6, 18:9, 19:18, 37:20, 101:18

**PENNSYLVANIA** [6] - 1:2, 1:16, 2:6, 2:13, 38:21, 101:19

**PEOPLE** [22] - 24:8, 25:12, 52:20, 52:24, 63:5, 63:23, 64:6, 64:24, 64:25, 94:7, 118:6, 121:23, 122:24, 149:12, 151:16, 151:19, 151:23, 152:4, 152:9, 157:14, 157:17, 169:23

**PER** [1] - 40:14

**PERCENTAGE** [1] - 139:2

**PERFORM** [2] - 118:14, 132:8

**PERFORMED** [3] - 119:14, 119:19, 132:12

**PERHAPS** [1] - 9:20

**PERIOD** [3] - 32:12, 43:15, 74:2

**PERIODS** [1] - 44:8

**PERMISSIBLE** [1] - 35:23

**PERMISSION** [1] - 9:24

**PERMITTED** [3] - 74:6, 75:8, 136:18

**PERSON** [32] - 23:13, 54:18, 54:23, 67:6, 117:21, 118:7, 118:8, 118:10, 118:11, 118:13, 119:1, 120:14, 120:15, 122:25, 123:2, 123:3, 126:10, 137:10, 137:13, 151:20, 151:24, 152:3, 152:8, 154:1, 154:4, 154:25, 157:11, 159:3, 159:15, 160:3, 162:8

**PERSONAL** [2] - 22:22, 74:7

**PERSONALITY** [1] - 22:14

**PERSONALLY** [3] - 81:16, 83:9, 83:25

**PERTAIN** [2] - 16:8, 42:16

**PHILADELPHIA** [4] - 1:9, 1:21, 2:14, 146:2

**PHONE** [3] - 21:6, 26:21, 97:13

**PHOTOCOPIED** [3] - 46:23, 74:6, 137:3

**PHOTOCOPIES** [4] - 15:17, 15:19, 15:20, 170:2

**PHOTOCOPY** [7] - 57:15, 57:18, 111:15, 111:22, 116:3, 116:6, 170:1

**PHRASEOLOGY** [1] - 110:1

**PHYSICALLY** [2] - 22:7, 38:23

**PICK** [2] - 49:2, 166:13

**PICKED** [1] - 107:15

**PIECE** [4] - 103:5, 103:15, 137:17, 163:16

**PILLOW** [1] - 66:24

**PISS** [1] - 14:16

**PLACE** [7] - 13:4, 19:22, 22:25, 27:6, 83:13, 129:19, 158:11

**PLACED** [6] - 4:11, 21:19, 40:24, 137:22, 144:12, 168:14

**PLEA** [4] - 76:5, 76:10,

76:22, 77:14

**PLED** [2] - 76:5, 76:22

**PLENTY** [2] - 12:1, 28:18

**PLUS** [2] - 28:21, 122:1

**PO** [2] - 1:17, 2:10

**POINT** [17] - 5:12, 15:4, 16:24, 28:15, 59:25, 75:11, 79:4, 79:5, 84:23, 85:14, 110:16, 113:1, 122:8, 141:6, 147:6, 158:1, 167:15

**POINTED** [2] - 119:24, 167:16

**POINTING** [3] - 158:3, 158:15, 168:9

**POINTS** [2] - 85:8, 148:12

**POLICE** [2] - 130:5, 135:11

**POLICY** [1] - 90:17

**POLITE** [1] - 22:18

**POPULATION** [5] - 43:18, 43:19, 43:25, 44:6, 44:9

**PORTION** [5] - 93:15, 101:5, 101:10, 127:4, 138:23

**PORTIONS** [4] - 16:11, 29:14, 72:8, 72:20

**POSITION** [3] - 5:4, 114:9, 117:9

**POSITIVE** [9] - 13:23, 125:1, 136:8, 136:20, 136:25, 137:6, 164:21, 165:5, 168:21

**POSITIVELY** [2] - 159:6, 159:16

**POSSESSING** [1] - 85:20

**POSSESSION** [2] - 15:4, 101:24

**POSSIBILITIES** [1] - 21:5

**POSSIBLE** [3] - 85:22, 105:3, 125:3

**POSSIBLY** [5] - 32:22, 126:11, 126:15, 146:22, 159:13

**POWER** [1] - 23:17

**PRACTICE** [2] - 53:12, 77:24

**PRACTICES** [1] - 149:7

**PRAY** [3] - 20:2, 26:4, 26:5

**PRECEDING** [2] - 5:15, 70:21

**PREFER** [1] - 37:24

**PREFERENCE** [1] - 9:18

**PRELIMINARY** [1] - 119:4

**PREPARATION** [2] - 9:2, 15:25

**PREPARE** [4] - 9:2, 133:25, 137:8, 159:14

**PREPARED** [19] - 78:14, 119:4, 135:24, 135:25, 136:21, 136:23, 137:14, 139:20, 139:24, 144:6, 159:5, 159:8, 159:11, 159:20, 159:22, 160:4, 160:5, 161:7

**PRESCRIBED** [1] - 84:10

**PRESCRIPTION** [2] - 84:9, 84:14

**PRESENT** [7] - 3:20, 48:12, 49:15, 76:4, 76:13, 104:16, 130:12

**PRESENTED** [1] - 3:6

**PRESUME** [1] - 177:10

**PRETTY** [6] - 13:2, 109:13, 115:17, 119:14, 169:12, 170:7

**PREVENTS** [1] - 17:23

**PREVIOUSLY** [10] - 5:23, 22:14, 42:19, 44:15, 78:15, 85:19, 123:22, 124:3, 156:10, 182:7

**PRINCIPLE** [7] - 151:12, 151:13, 152:9, 152:10, 154:6, 157:10, 157:13

**PRINCIPLES** [4] - 118:4, 146:24, 150:2, 152:13

**PRINT** [2] - 64:14, 64:16

**PRINTED** [3] - 39:3, 39:11, 167:1

**PRINTING** [13] - 60:12, 64:20, 64:22, 117:19, 119:13, 120:3, 120:4, 126:11, 126:12,

139:13, 139:14, 160:18, 168:14
**PRINTS** [11] - 64:14, 64:25, 65:4, 65:7, 65:8, 65:9, 65:10, 65:17, 66:3, 66:6, 66:7
**PRISON** [31] - 10:22, 11:5, 12:8, 12:13, 13:5, 14:9, 15:2, 15:3, 15:12, 23:10, 23:21, 29:23, 29:25, 46:17, 46:21, 48:4, 48:8, 52:2, 52:17, 65:23, 66:18, 66:19, 69:11, 71:2, 75:14, 81:24, 82:5, 84:10, 85:17, 90:17
**PRISONER** [6] - 71:10, 71:25, 74:15, 75:2, 75:13, 75:21
**PRISONERS** [2] - 50:21, 103:4
**PRISONERS'** [1] - 66:20
**PRISONS** [4] - 41:2, 42:14, 49:18, 49:22
**PROBLEM** [4] - 110:23, 121:17, 126:18, 127:13
**PROBLEM)** [1] - 127:19
**PROBLEMS** [4] - 12:1, 23:9, 122:12, 162:22
**PROCEDURE** [3] - 51:9, 121:2, 173:1
**PROCEDURES** [1] - 146:25
**PROCEED** [3] - 8:15, 86:18, 116:25
**PROCEEDING** [1] - 162:16
**PROCEEDINGS** [2] - 1:24, 184:19
**PROCESS** [2] - 15:22, 22:9
**PROCESSED** [2] - 64:17, 65:14
**PROCESSES** [2] - 117:20, 120:4
**PROCESSING** [1] - 119:13
**PRODUCED** [1] - 1:24
**PROFESSIONAL** [1] - 55:6
**PROFICIENCY** [10] - 120:1, 120:6, 120:10, 120:25, 121:7, 122:14, 122:21, 122:23,

127:19, 130:18
**PROGRAM** [2] - 119:1, 120:22
**PROJECTING** [1] - 35:5
**PROMISE** [1] - 111:10
**PRONOUNCED** [2] - 17:3, 19:16
**PROPER** [3] - 29:4, 66:6, 68:15
**PROPERTY** [2] - 28:17, 74:7
**PROSECUTION** [1] - 79:15
**PROSECUTOR** [1] - 76:9
**PROVE** [1] - 13:24
**PROVIDE** [5] - 32:14, 39:12, 40:9, 61:19, 147:25
**PROVIDED** [10] - 78:2, 87:15, 88:19, 88:21, 89:23, 91:22, 91:25, 125:9, 125:22, 126:17
**PROVIDING** [1] - 63:15
**PSYCH** [1] - 5:8
**PSYCHOLOGIST** [1] - 25:6
**PUBLIC** [2] - 2:6, 115:20
**PUBLISH** [13] - 9:17, 10:1, 11:22, 12:21, 13:18, 16:17, 18:13, 21:12, 43:5, 96:24, 134:21, 174:14, 177:17
**PUBLISHED** [2] - 39:5, 129:24
**PUBLISHERS** [1] - 29:5
**PULLED** [1] - 68:14
**PURE** [2] - 30:15, 30:17
**PURPORTED** [2] - 50:18, 54:7
**PURPOSE** [2] - 54:3, 176:2
**PURPOSES** [4] - 68:6, 68:12, 77:11, 142:21
**PUT** [17] - 15:23, 21:19, 22:16, 43:6, 44:14, 90:3, 94:5, 96:6, 107:13, 125:25, 139:2, 144:14, 158:4, 168:19, 175:14, 176:18, 176:22

**Q**

**QUALIFICATIONS** [1] - 122:6
**QUALIFIED** [10] - 61:11, 63:16, 67:5, 119:21, 123:22, 124:3, 124:6, 132:3, 165:8, 181:23
**QUALIFY** [1] - 146:7
**QUALIFYING** [1] - 161:3
**QUALITY** [2] - 120:21, 128:5
**QUANTICO** [3] - 51:2, 51:5, 63:5
**QUANTIFIABLE** [1] - 149:20
**QUANTIFICATION** [1] - 153:22
**QUANTIFICATIONS** [1] - 153:21
**QUANTIFY** [1] - 149:6
**QUARTER** [2] - 112:25, 113:4
**QUARTERLY** [1] - 118:24
**QUARTERS** [1] - 42:15
**QUESTIONED** [77] - 41:18, 53:3, 55:12, 62:3, 102:25, 119:12, 120:7, 123:23, 123:25, 124:11, 124:14, 128:18, 128:22, 128:24, 129:1, 129:2, 129:25, 130:2, 130:6, 132:3, 133:10, 133:17, 133:20, 135:2, 135:7, 135:16, 136:7, 136:12, 136:22, 136:24, 137:9, 137:13, 139:6, 140:6, 141:10, 141:17, 142:7, 142:15, 142:16, 142:17, 142:25, 143:1, 143:7, 143:8, 144:1, 145:13, 147:9, 147:24, 150:24, 152:6, 153:4, 153:8, 154:14, 155:9, 155:10, 157:3, 158:11, 158:16, 159:4, 159:9, 164:6, 164:19, 165:1, 167:19, 167:21,

168:5, 168:23, 169:3, 169:14, 170:3, 172:19, 174:6, 176:25, 179:25
**QUESTIONING** [7] - 3:14, 56:7, 70:11, 71:6, 104:6, 115:8, 150:23
**QUESTIONS** [26] - 22:20, 24:15, 72:17, 86:20, 87:2, 91:16, 93:1, 93:4, 94:22, 96:2, 96:4, 96:20, 97:21, 97:23, 98:4, 98:19, 102:20, 113:1, 145:23, 173:8, 173:13, 173:16, 177:25, 178:2, 178:17, 180:5
**QUITE** [1] - 166:23
**QUOTE** [1] - 121:2
**QUOTES** [1] - 109:11

**R**

**R169** [4] - 182:9, 182:13, 182:19, 184:9
**R171** [1] - 96:25
**R175** [1] - 93:9
**R177** [2] - 98:22, 98:23
**R178** [2] - 101:3, 101:5
**R179** [6] - 173:22, 173:24, 174:14, 177:14, 177:18, 184:8
**R180** [7] - 173:22, 173:24, 174:14, 175:21, 177:15, 177:18, 184:8
**R30** [1] - 183:25
**R32** [2] - 9:12, 10:9
**R33** [1] - 9:11
**R33.2** [3] - 9:12, 11:18, 11:22
**R35.2** [3] - 9:12, 12:20, 12:21
**R36-3** [1] - 13:18
**R36.2** [2] - 9:12, 13:20
**R38** [6] - 38:1, 38:7, 38:8, 38:10, 184:2
**R43** [6] - 134:8, 134:15, 134:16, 134:18, 143:21, 184:6
**R44** [5] - 139:25, 140:10, 140:14, 140:16, 184:7
**R51** [1] - 16:18

**R52** [1] - 18:14
**R53** [1] - 20:10
**R54** [1] - 21:13
**RA** [2] - 27:21, 27:22
**RAGE** [1] - 22:5
**RANGE** [6] - 118:7, 118:10, 118:11, 120:8, 123:4, 123:7
**RAPE** [4] - 77:17, 77:21, 79:14, 79:15
**RATE** [5] - 148:10, 148:24, 149:14, 149:15, 149:18
**RATES** [2] - 148:8, 148:23
**RATHER** [8] - 13:8, 16:22, 22:2, 24:1, 28:20, 108:20, 115:11, 180:10
**RATING** [5] - 147:25, 148:6, 148:15, 148:16, 148:20
**RATIO** [4] - 152:1, 152:8, 152:11, 152:12
**RE** [1] - 106:2
**REACH** [3] - 135:15, 139:9, 143:25
**REACT** [1] - 22:17
**READ** [73] - 9:19, 10:10, 11:25, 12:23, 13:18, 16:7, 16:11, 16:18, 18:23, 20:15, 21:24, 26:10, 26:12, 27:4, 28:10, 56:16, 56:18, 56:22, 57:1, 57:2, 58:24, 59:11, 59:13, 59:15, 59:16, 63:25, 72:8, 72:19, 72:25, 89:18, 93:15, 93:20, 94:2, 94:6, 94:10, 94:14, 94:15, 94:24, 97:11, 101:25, 104:18, 104:19, 104:22, 105:13, 105:25, 106:4, 106:18, 106:22, 106:24, 107:14, 107:16, 108:4, 108:20, 109:1, 109:4, 109:7, 109:8, 109:15, 109:18, 109:23, 109:24, 110:9, 114:14, 114:16, 114:17, 115:9, 115:11, 115:19, 119:13, 125:14, 127:16, 163:20
**READING** [11] - 9:22,

20:11, 30:9, 82:17, 105:22, 108:9, 109:7, 114:7, 116:14, 129:3, 161:19
**READY** [1] - 86:18
**REAL** [3] - 19:24, 24:8
**REALLY** [13] - 14:2, 19:2, 25:25, 59:4, 107:8, 159:10, 159:18, 167:7, 172:15, 172:23, 179:10, 179:20
**REASON** [6] - 5:14, 24:2, 85:4, 122:24, 137:5, 167:24
**REASONABLE** [2] - 131:21, 150:4
**REASONS** [28] - 5:5, 7:5, 7:19, 7:22, 8:6, 8:10, 8:13, 10:18, 47:11, 49:2, 62:7, 62:9, 67:9, 67:22, 68:3, 68:22, 85:4, 103:4, 139:9, 140:23, 160:18, 161:20, 163:9, 163:25, 167:23, 169:8, 174:2
**REC** [1] - 73:20
**RECALLED** [1] - 101:20
**RECEIVE** [6] - 17:10, 93:23, 95:7, 103:19, 118:24, 132:17
**RECEIVED** [41] - 6:17, 7:3, 7:6, 7:8, 7:23, 16:10, 37:6, 37:19, 46:1, 46:16, 47:12, 49:25, 50:6, 50:17, 55:24, 56:18, 56:22, 57:14, 58:14, 58:21, 59:7, 59:10, 74:4, 82:11, 83:17, 83:18, 84:2, 85:19, 94:10, 98:15, 100:7, 100:10, 100:18, 100:24, 102:17, 118:20, 134:17, 137:15, 140:14, 164:5
**RECEIVING** [1] - 101:20
**RECESS** [14] - 36:6, 36:11, 36:14, 36:16, 36:18, 69:25, 70:8, 71:15, 86:9, 112:21, 113:4, 158:19, 180:10, 182:16
**RECITATION** [2] -

76:8, 76:9
**RECOGNIZE** [16] - 8:23, 14:22, 34:9, 38:1, 42:10, 42:11, 60:21, 99:12, 132:23, 132:24, 133:13, 133:16, 134:8, 143:14, 143:19, 174:1
**RECOGNIZED** [1] - 124:10
**RECOLLECTION** [5] - 68:7, 68:12, 70:2, 70:13, 98:24
**RECORD** [29] - 3:17, 5:15, 10:11, 11:25, 12:24, 16:19, 21:24, 29:16, 34:18, 36:19, 42:1, 43:22, 44:3, 48:18, 58:20, 76:23, 86:12, 86:24, 93:15, 106:1, 110:19, 113:6, 114:16, 114:18, 116:22, 140:22, 167:14, 170:24, 184:19
**RECORDED** [1] - 1:24
**RECORDS** [7] - 42:3, 42:14, 42:18, 43:11, 64:18, 84:13, 102:6
**RECOVERED** [3] - 83:24, 88:7, 88:11
**RECROSS** [4] - 102:22, 102:23, 178:19, 183:4
**REDIRECT** [10] - 91:9, 91:11, 103:1, 104:9, 111:4, 111:11, 113:14, 173:10, 173:11, 183:4
**REDUNDANT** [1] - 110:16
**REFER** [3] - 7:18, 46:10, 97:4
**REFERENCE** [4] - 30:9, 53:15, 54:4, 71:4
**REFERENCED** [1] - 40:13
**REFERRED** [5] - 8:10, 33:10, 77:16, 100:3, 134:1
**REFERRING** [6] - 30:19, 33:5, 70:19, 70:20, 83:15, 128:3
**REFLECT** [2] - 76:14, 121:20
**REFLECTED** [2] - 84:13, 121:20
**REFRESH** [1] - 70:13

**REFRESHES** [2] - 70:2, 98:24
**REFRESHING** [2] - 68:6, 68:12
**REGARDING** [3] - 3:4, 124:12, 135:15
**REGARDS** [1] - 27:19
**REGULAR** [1] - 64:16
**REGULARLY** [1] - 17:12
**REIDERS** [1] - 2:9
**REINFORCE** [1] - 23:22
**RELATED** [1] - 130:10
**RELATIONSHIP** [2] - 32:19, 117:25
**RELATIVE** [2] - 118:2, 142:22
**RELEASE** [2] - 4:15, 5:13
**RELEVANT** [4] - 9:20, 9:22, 16:11, 102:1
**RELIABILITY** [1] - 149:7
**RELIED** [1] - 64:16
**RELIGIOUS** [1] - 22:24
**REMAIN** [1] - 74:1
**REMAINED** [1] - 73:15
**REMAINING** [3] - 135:24, 136:1, 139:20
**REMEDIAL** [3] - 120:23, 121:22, 125:13
**REMEMBER** [52] - 40:5, 48:10, 49:12, 49:13, 55:23, 67:11, 69:8, 71:9, 71:21, 71:24, 72:7, 74:14, 74:16, 75:4, 76:12, 76:16, 76:21, 76:24, 77:11, 77:15, 78:22, 78:23, 78:24, 79:6, 79:8, 79:11, 82:16, 82:17, 82:18, 83:6, 83:17, 84:22, 85:6, 85:12, 92:6, 104:24, 107:1, 107:5, 107:8, 108:13, 146:2, 149:9, 149:10, 161:22, 166:4, 167:14, 168:1, 169:13, 171:14, 171:21, 172:4
**REMEMBERING** [1] - 24:4
**REMIND** [3] - 6:10, 6:11, 37:4
**REMINDED** [1] - 25:17

**REMORSE** [1] - 23:2
**RENDER** [1] - 146:6
**RENDERS** [1] - 172:12
**REPEAT** [1] - 50:4
**REPEATING** [1] - 118:8
**REPHRASE** [1] - 30:22
**REPLICABILITY** [1] - 149:7
**REPLICATED** [1] - 136:13
**REPLIED** [2] - 21:18, 21:20
**REPORT** [20] - 3:22, 17:1, 19:14, 63:4, 86:25, 100:19, 100:20, 120:15, 120:16, 134:12, 144:19, 144:21, 149:1, 158:4, 161:5, 171:8, 171:13, 172:12, 181:9, 181:16
**REPORTED** [1] - 59:5
**REPORTER** [2] - 1:20, 184:24
**REPORTS** [6] - 103:19, 119:17, 132:13, 158:6, 181:15, 181:19
**REPRESENTATION** [1] - 178:10
**REPRESENTED** [1] - 23:12
**REQUEST** [7] - 63:23, 68:21, 77:20, 87:6, 88:21, 88:23, 89:25
**REQUESTED** [1] - 54:12
**REQUESTING** [2] - 89:24, 90:3
**REREAD** [1] - 24:24
**RESEARCH** [1] - 149:6
**RESEARCHED** [1] - 21:3
**RESIDENCE** [5] - 83:12, 84:3, 99:9, 99:18, 99:24
**RESPECT** [20] - 3:22, 43:12, 56:17, 56:21, 57:3, 70:23, 94:9, 94:17, 95:6, 99:23, 113:8, 119:25, 122:17, 123:24, 135:19, 139:10, 139:23, 140:5, 144:4, 144:9
**RESPECTFUL** [1] -

27:11
**RESPECTS** [1] - 23:16
**RESPONSES** [1] - 3:4
**REST** [3] - 14:9, 138:12, 139:12
**RESTED** [1] - 24:22
**RESTLESS** [1] - 24:22
**RESULT** [2] - 78:16, 127:24
**RESULTS** [7] - 61:2, 120:15, 120:16, 120:19, 121:4, 121:20, 136:16
**RESUME** [2] - 128:21, 129:6
**RESUMES** [1] - 5:23
**RETOUCHING** [1] - 156:9
**RETRIEVE** [1] - 102:5
**RETRIEVED** [1] - 100:8
**RETURN** [3] - 27:25, 138:23, 138:24
**REVEALED** [1] - 125:22
**REVIEW** [10] - 42:21, 53:7, 60:19, 84:5, 89:19, 100:18, 101:4, 101:10, 131:8, 134:4
**REVIEWED** [7] - 3:3, 120:23, 121:4, 121:9, 121:23, 128:16, 144:21
**REVOLVED** [1] - 127:17
**REWRITE** [2] - 96:10, 96:13
**RICK** [1] - 46:2
**RIDGES** [1] - 64:21
**RIPPED** [4] - 59:14, 59:20, 59:23, 59:24
**ROAD** [3] - 26:22, 97:15, 97:18
**ROAMING** [1] - 91:2
**ROBBERIES** [1] - 162:10
**ROBBERY** [2] - 162:7, 162:18
**ROBRENO** [1] - 145:22
**ROCK** [14] - 7:7, 47:23, 49:14, 52:7, 103:24, 139:17, 140:25, 160:19, 166:9, 166:10, 166:15, 167:12, 167:18, 169:9
**ROMAN** [1] - 51:24
**RONALD** [1] - 2:8

**ROOM** [2] - 43:24, 44:5
**ROOT** [1] - 127:19
**ROYCE** [1] - 79:8
**RPR** [1] - 1:19
**RULING** [2] - 6:22, 68:24
**RUMORS** [1] - 14:15
**RUN** [3] - 162:12, 164:15, 164:25
**RUN-OF-THE-MILL** [1] - 162:12
**RUSE** [1] - 76:16

## S

**SACRIFICED** [1] - 12:12
**SAD** [2] - 23:22, 23:23
**SADDENED** [1] - 17:15
**SALUTATION** [1] - 21:25
**SAM** [17] - 17:19, 18:1, 21:15, 21:17, 21:18, 21:20, 21:25, 22:2, 24:15, 26:3, 26:11, 26:17, 83:12, 88:11, 96:8, 97:5
**SAMPLE** [2] - 141:18, 142:13
**SAMPLES** [10] - 33:8, 33:21, 34:5, 38:23, 40:22, 64:15, 133:1, 135:4, 135:10, 142:19
**SAMUEL** [3] - 100:12, 100:14, 101:8
**SANCTION** [2] - 3:24, 4:14
**SANTOS** [2] - 15:8, 19:21
**SATURDAY** [3] - 16:25, 22:1, 94:4
**SAUNDERS** [5] - 2:5, 31:18, 34:25, 35:3, 35:4
**SAVED** [1] - 23:24
**SAW** [8] - 25:5, 78:25, 88:14, 90:18, 106:6, 106:18, 126:16, 150:11
**SCHOOL** [3] - 45:6, 128:18, 128:19
**SCHOOLING** [1] - 128:21
**SCIENCE** [1] - 149:1
**SCIENCE'S** [1] - 149:1
**SCIENTIFIC** [13] - 131:21, 131:23,

131:24, 146:8, 146:13, 146:15, 146:21, 146:22, 146:24, 146:25, 149:23, 150:2, 150:4
**SCRANTON** [1] - 1:18
**SCREEN** [7] - 10:6, 10:7, 36:22, 43:7, 44:7, 141:5, 142:1
**SE** [1] - 40:14
**SEARCH** [1] - 42:1
**SEATED** [2] - 3:2, 48:22
**SECOND** [21] - 18:23, 20:11, 28:10, 39:11, 46:19, 58:22, 69:21, 75:7, 105:2, 114:15, 121:12, 123:8, 123:14, 133:4, 142:7, 142:16, 142:25, 143:7, 151:20, 157:13
**SECTION** [5] - 2:3, 19:19, 51:22, 51:23, 54:12
**SEE** [46] - 5:17, 21:3, 27:1, 27:10, 29:3, 32:2, 36:21, 40:7, 54:11, 56:18, 62:4, 66:20, 69:20, 70:2, 70:22, 82:19, 84:12, 84:23, 90:20, 94:7, 94:21, 95:14, 97:7, 111:1, 114:14, 121:4, 125:16, 128:22, 129:5, 133:13, 137:21, 142:14, 143:14, 147:9, 148:2, 155:8, 158:8, 166:9, 167:13, 171:7, 171:13, 172:18, 175:3, 178:21, 180:24
**SEEING** [4] - 98:16, 150:20, 150:21, 159:11
**SEEK** [10] - 6:18, 34:14, 37:10, 38:6, 41:11, 42:24, 102:15, 134:14, 140:9, 174:13
**SEEKING** [1] - 47:16
**SEEM** [1] - 22:10
**SEGREGATION** [5] - 3:14, 4:12, 4:14, 5:6, 5:7
**SEND** [5] - 50:9, 62:22, 66:14, 83:20, 172:19

**SENDER'S** [1] - 95:12
**SENDING** [6] - 19:8, 24:25, 25:2, 66:17, 80:1, 83:22
**SENSE** [3] - 23:16, 114:24, 126:2
**SENT** [31] - 6:13, 15:1, 15:15, 15:24, 19:7, 41:22, 51:2, 51:3, 51:17, 57:15, 58:14, 60:14, 61:2, 65:4, 66:7, 80:4, 80:13, 83:4, 92:11, 94:2, 104:7, 104:10, 109:19, 110:5, 113:18, 120:14, 121:18, 164:18, 165:7, 172:15
**SENTENCE** [7] - 3:24, 4:10, 4:13, 14:5, 90:20, 97:7, 100:6
**SENTENCES** [1] - 3:15
**SENTENCING** [2] - 1:12, 145:20
**SENTRY** [1] - 42:3
**SEPARATE** [1] - 132:13
**SEPTEMBER** [4] - 38:16, 45:2, 99:2, 125:15
**SEQUENCE** [1] - 106:16
**SEQUESTERED** [1] - 48:21
**SERIES** [14] - 29:24, 39:19, 46:20, 46:25, 47:1, 47:4, 52:6, 93:1, 96:2, 97:21, 98:4, 103:2, 103:3, 173:16
**SERIOUS** [2] - 81:13, 169:20
**SERVED** [3] - 4:15, 37:20, 65:16
**SERVICE** [2] - 120:11
**SESSION** [1] - 127:17
**SET** [4] - 14:19, 28:23, 84:1, 143:21
**SEVEN** [26] - 7:4, 7:5, 7:18, 8:6, 8:10, 8:13, 11:11, 47:10, 62:7, 62:9, 67:9, 67:22, 68:3, 68:22, 103:4, 122:11, 139:9, 140:23, 160:18, 161:20, 163:9, 163:25, 167:23, 167:24, 169:8, 174:2
**SEVERAL** [2] - 39:7,

117:24
**SEX** [3] - 77:17, 79:3, 79:10
**SEXUAL** [2] - 97:22, 98:1
**SHAKESPEARE** [1] - 25:18
**SHALL** [1] - 27:25
**SHARE** [1] - 22:8
**SHARED** [1] - 23:15
**SHAVE** [1] - 28:13
**SHEET** [5] - 74:13, 74:16, 74:22, 75:9, 75:21
**SHEETS** [6] - 73:6, 75:13, 76:15, 76:24, 77:10, 79:13
**SHERYL** [4] - 29:2, 30:7, 33:9, 33:13
**SHIFT** [2] - 90:13, 90:14
**SHINING** [1] - 25:21
**SHIPPED** [1] - 74:8
**SHOCK** [1] - 115:23
**SHOOK** [1] - 36:5
**SHOOTINGS** [1] - 23:20
**SHORT** [3] - 29:1, 69:25, 70:8
**SHORTER** [1] - 142:24
**SHORTLY** [4] - 26:21, 84:17, 97:13, 182:15
**SHOT** [1] - 83:5
**SHOW** [33] - 7:25, 8:21, 25:11, 34:8, 37:25, 43:12, 60:17, 62:18, 63:2, 68:11, 72:11, 84:22, 86:2, 86:22, 89:3, 93:6, 95:1, 98:21, 99:10, 101:2, 111:13, 132:21, 134:7, 139:24, 140:4, 141:9, 142:2, 143:13, 145:17, 149:11, 173:21, 176:10, 177:13
**SHOWED** [1] - 23:14
**SHOWER** [1] - 27:25
**SHOWING** [10] - 40:20, 51:14, 56:5, 60:18, 72:12, 109:3, 110:3, 138:1, 145:19, 148:7
**SHOWN** [4] - 6:5, 37:3, 98:14, 137:22
**SHOWS** [4] - 134:1, 140:20, 176:24, 177:12
**SHU** [1] - 74:1

**SHUT** [4] - 13:2, 24:19, 109:13, 115:17
**SIDE** [4] - 22:13, 95:4, 95:11, 122:18
**SIGNATURE** [23] - 13:13, 39:2, 39:10, 40:9, 62:21, 135:23, 138:11, 138:14, 139:11, 139:18, 139:19, 140:6, 140:20, 141:17, 142:8, 142:16, 142:17, 143:2, 154:20, 155:7, 156:12, 156:17
**SIGNATURES** [12] - 40:8, 41:7, 140:5, 140:21, 141:8, 141:20, 156:2, 156:17, 156:18, 156:19, 157:24, 160:9
**SIGNED** [7] - 12:16, 20:6, 29:7, 53:17, 54:5, 54:22, 90:9
**SIGNIFICANT** [1] - 161:5
**SILKWOOD** [1] - 82:4
**SIMILAR** [10] - 23:15, 28:5, 64:24, 85:20, 152:2, 152:24, 153:11, 157:23, 163:17, 181:24
**SIMILARITIES** [29] - 136:9, 136:24, 137:12, 139:6, 141:10, 152:5, 152:18, 155:1, 155:3, 157:2, 158:3, 158:10, 158:15, 159:19, 167:16, 171:16, 171:19, 172:9, 174:6, 174:8, 175:7, 176:24, 177:13, 178:6, 178:11, 178:15, 178:21, 178:25, 179:24
**SIMILARITY** [2] - 174:11, 179:22
**SIMPLE** [2] - 23:12, 64:18
**SIMPLY** [1] - 104:6
**SINGLE** [4] - 5:8, 96:7, 96:15, 139:5
**SINGLE-SPACED** [1] - 96:7
**SIS** [8] - 10:20, 11:2, 13:1, 15:9, 19:21,

48:6, 109:12, 115:16
**SIT** [5] - 33:4, 48:15, 71:9, 92:3, 157:22
**SITUATION** [3] - 16:24, 17:18, 47:20
**SIX** [12] - 11:9, 30:19, 45:7, 73:15, 73:17, 74:8, 121:22, 124:24, 125:1, 125:4, 125:5, 129:17
**SIX-PAGE** [1] - 30:19
**SKIP** [1] - 27:15
**SLAB** [1] - 26:25
**SLANT** [1] - 118:2
**SLEEP** [1] - 24:23
**SLIDE** [2] - 80:7, 107:4
**SLIDES** [2] - 79:22, 80:23
**SLIP** [3] - 153:20
**SLOMSKY** [1] - 1:10
**SLOW** [2] - 20:24, 126:24
**SMALL** [1] - 84:23
**SMOOTH** [1] - 28:6
**SNUFF** [1] - 162:17
**SOARS** [1] - 23:10
**SOCIETY** [1] - 22:18
**SOCK** [2] - 66:24, 85:15
**SOMEONE** [3] - 25:10, 123:12, 168:16
**SOMETIME** [1] - 108:10
**SOMEWHAT** [1] - 28:4
**SOMEWHERE** [1] - 24:7
**SON** [1] - 20:7
**SOON** [5] - 23:13, 27:18, 28:1, 34:20, 154:17
**SORROW** [2] - 22:5, 25:7
**SORRY** [40] - 6:10, 7:4, 7:5, 7:10, 9:12, 17:19, 19:3, 23:3, 24:18, 25:8, 33:22, 35:4, 49:7, 49:10, 50:4, 52:12, 52:16, 56:12, 56:25, 58:7, 59:8, 67:4, 70:5, 91:1, 93:7, 94:13, 121:13, 121:14, 138:22, 138:24, 143:8, 143:16, 143:19, 147:10, 150:22, 154:11, 160:8, 164:16, 171:11, 171:23
**SORT** [1] - 39:6

**SOUND** [6] - 35:14, 35:15, 35:25, 36:9, 126:2, 149:5
**SOUNDS** [1] - 34:24
**SOURCES** [1] - 46:17
**SPACE** [3] - 141:13, 143:5, 143:9
**SPACED** [2] - 96:7, 96:15
**SPACING** [1] - 117:24
**SPANISH** [1] - 100:5
**SPEAKER** [1] - 115:20
**SPEAKS** [1] - 110:11
**SPECIAL** [8] - 5:22, 19:19, 26:23, 32:16, 48:7, 93:25, 101:8, 133:3
**SPECIFIC** [6] - 46:19, 63:19, 69:20, 84:7, 146:10, 152:16
**SPECIFICALLY** [5] - 41:3, 70:18, 72:10, 73:19, 78:1
**SPECIFICS** [2] - 77:12, 128:7
**SPECIMEN** [2] - 163:23, 166:11
**SPECIMENS** [2] - 117:21, 117:22
**SPECULATION** [2] - 30:15, 30:18
**SPEECH** [2] - 118:18, 118:21
**SPEED** [2] - 126:17, 126:19
**SPELL** [1] - 116:21
**SPENDING** [2] - 12:7, 14:9
**SPLIT** [1] - 43:7
**SPONSORED** [1] - 124:7
**SPRING** [1] - 25:20
**STAFF** [3] - 27:8, 27:11, 108:11
**STAGE** [2] - 25:19, 39:25
**STAND** [5] - 36:16, 68:24, 113:4, 154:23, 182:16
**STANDARD** [7] - 51:9, 153:2, 161:1, 161:2, 161:13, 169:11, 173:1
**STANDARDS** [5] - 119:7, 158:24, 160:1, 172:6, 172:7
**START** [10] - 3:12, 17:11, 19:11, 20:12, 63:13, 117:9, 125:11, 132:11,

132:17, 134:22
**STARTED** [3] - 28:23, 61:7, 117:10
**STARTS** [1] - 142:11
**STATE** [7] - 18:10, 28:6, 116:21, 117:10, 118:20, 118:25, 124:4
**STATEMENT** [6] - 11:4, 14:2, 81:2, 82:11, 83:2, 170:7
**STATEMENTS** [1] - 38:25
**STATES** [13] - 1:1, 1:3, 1:16, 2:2, 6:14, 15:5, 18:9, 19:18, 37:20, 40:25, 106:3, 128:2, 145:20
**STATING** [1] - 17:2
**STATUS** [6] - 4:12, 4:16, 5:13, 5:14, 33:2, 113:8
**STAY** [2] - 18:1, 26:2
**STENOTYPE** [1] - 1:24
**STENOTYPE-COMPUTER** [1] - 1:24
**STEP** [6] - 39:2, 64:9, 112:14, 113:23, 150:7, 180:6
**STEVE** [40] - 7:7, 12:20, 12:23, 12:25, 47:23, 49:13, 52:7, 55:21, 56:12, 56:15, 72:4, 93:2, 93:21, 95:10, 95:11, 104:2, 104:5, 104:12, 104:13, 106:2, 108:24, 109:11, 112:2, 115:7, 115:15, 134:24, 135:20, 137:15, 138:18, 138:25, 141:2, 152:16, 160:18, 166:1, 167:9, 169:8, 174:2, 175:9
**STILL** [15] - 20:23, 24:6, 27:7, 34:17, 36:21, 44:18, 75:11, 76:19, 93:9, 115:23, 126:4, 147:17, 148:11, 149:8, 166:7
**STOCKTON** [1] - 19:13
**STOOD** [1] - 68:16
**STOP** [6] - 25:24, 27:24, 39:4, 70:6, 108:25, 154:16

**STOPPED** [3] - 24:8, 40:5, 114:8
**STOPS** [1] - 35:22
**STORY** [1] - 29:1
**STRANGE** [2] - 108:16, 115:10
**STRANGLED** [1] - 19:14
**STREAMLINED** [1] - 136:3
**STREET** [6] - 1:17, 1:21, 2:4, 2:7, 2:10, 73:13
**STRESSED** [1] - 85:6
**STROKE** [5] - 142:15, 142:23, 142:24, 154:17, 154:18
**STROKES** [2] - 118:3
**STRONG** [5] - 18:1, 26:2, 169:18, 170:6, 170:7
**STUDIES** [5] - 148:7, 148:23, 149:10, 149:11, 149:16
**STUFF** [5] - 54:13, 82:16, 85:24, 156:17, 164:14
**SUBJECT** [5] - 6:22, 10:16, 29:18, 130:5, 158:18
**SUBJECTIVE** [9] - 147:2, 147:3, 147:13, 147:16, 147:18, 150:16, 150:20, 153:23, 155:15
**SUBMISSION** [2] - 133:18, 133:19
**SUBMIT** [1] - 120:12
**SUBMITTED** [7] - 116:5, 122:22, 132:19, 133:18, 164:7, 173:20, 174:7
**SUBMITTING** [1] - 116:6
**SUBPARTS** [1] - 46:12
**SUBPOENA** [4] - 37:19, 37:21, 38:4, 65:16
**SUBSCRIBES** [1] - 22:24
**SUBSEQUENT** [1] - 58:17
**SUBSEQUENTLY** [1] - 103:20
**SUBSTANCE** [2] - 92:3, 136:4
**SUFFER** [2] - 13:6, 20:4

**SUFFERING** [1] - 12:14
**SUGGEST** [1] - 68:17
**SUGGESTED** [1] - 61:25
**SUGGESTION** [1] - 105:23
**SUGGESTS** [1] - 161:6
**SUICIDAL** [1] - 28:15
**SUITE** [3] - 1:17, 2:7, 2:14
**SUMMARIZE** [2] - 159:1, 159:21
**SUMMARY** [4] - 99:4, 101:7, 134:5, 134:11
**SUN** [1] - 25:21
**SUNDAY** [5] - 13:11, 16:20, 17:10, 18:21, 24:21
**SUPERIORS** [1] - 129:21
**SUPERVISION** [1] - 119:21
**SUPERVISOR** [8] - 145:11, 146:3, 146:17, 147:1, 147:19, 148:19, 149:22, 150:6
**SUPERVISORS** [1] - 131:9
**SUPPORT** [1] - 76:10
**SUPPOSE** [1] - 153:25
**SURELY** [1] - 29:1
**SURPASS** [2] - 118:7, 118:12
**SURPRISED** [3] - 13:3, 109:14, 115:18
**SUSPECT** [2] - 135:11, 135:14
**SUSTAIN** [1] - 68:25
**SUSTAINED** [1] - 69:2
**SUZANNE** [2] - 1:19, 184:25
**SWABS** [4] - 78:2, 79:22, 80:22, 80:23
**SWITCH** [1] - 114:22
**SWORN** [2] - 5:23, 116:20
**SYSTEM** [1] - 42:4

---

## T

**TAB** [8] - 10:3, 11:16, 12:18, 18:12, 20:8, 21:11, 26:9, 37:8
**TABLE** [1] - 48:22
**TAILOR** [1] - 39:6
**TAKING** [3] - 22:11, 27:13, 150:7

**TALLIED** [2] - 158:8, 178:9
**TALLY** [2] - 158:9, 158:10
**TAUGHT** [1] - 130:2
**TEACHING** [1] - 130:12
**TEAM** [1] - 27:8
**TEARING** [1] - 107:20
**TECHNICIAN** [6] - 119:2, 119:4, 129:2, 129:7, 129:9, 129:14
**TECHNIQUE** [2] - 148:1, 148:6
**TELEPHONE** [1] - 27:6
**TEMPORARILY** [1] - 73:20
**TEN** [4] - 29:8, 96:7, 96:15, 100:20
**TEN-PAGE** [1] - 96:7
**TENDS** [1] - 141:11
**TERMINOLOGY** [1] - 87:6
**TERMS** [1] - 139:3
**TERRIBLE** [1] - 28:7
**TERRIBLY** [1] - 24:17
**TERRITORY** [1] - 87:10
**TEST** [12] - 120:2, 120:3, 120:25, 121:2, 121:7, 121:24, 122:15, 122:21, 122:23, 123:1, 126:23, 150:25
**TESTED** [2] - 120:2, 121:23
**TESTIFIED** [40] - 7:6, 8:12, 45:23, 47:10, 47:22, 48:9, 48:11, 48:12, 48:19, 53:22, 55:24, 57:13, 66:2, 69:5, 69:10, 71:24, 74:14, 75:1, 75:17, 75:18, 76:2, 82:22, 82:23, 82:25, 88:10, 104:8, 104:14, 107:20, 146:1, 147:1, 147:5, 148:19, 156:2, 156:10, 162:1, 162:3, 164:8, 166:19, 174:3
**TESTIFY** [6] - 52:1, 71:23, 104:16, 132:4, 161:13, 169:22
**TESTIFYING** [8] - 49:12, 56:15, 71:21,

72:3, 72:7, 75:4, 160:16, 161:22
**TESTIMONY** [42] - 3:5, 5:8, 9:2, 16:1, 29:22, 34:1, 35:17, 36:1, 36:4, 47:11, 48:17, 49:16, 55:21, 56:1, 56:7, 57:10, 58:24, 63:13, 69:21, 75:12, 88:5, 93:6, 93:7, 93:21, 104:18, 105:7, 110:18, 111:5, 114:11, 114:12, 124:12, 129:23, 147:21, 150:11, 160:17, 161:19, 163:21, 165:25, 166:9, 171:7, 171:13
**TESTING** [7] - 31:23, 66:15, 66:19, 80:2, 120:11, 130:16
**TESTS** [4] - 120:6, 120:10, 120:12, 130:18
**TEXT** [2] - 126:15, 160:9
**THANKFUL** [1] - 24:15
**THANKFULLY** [1] - 13:6
**THEORY** [3] - 22:24, 76:18, 76:19
**THERE** [149] - 3:13, 6:21, 13:1, 13:13, 24:9, 29:22, 33:7, 33:9, 33:20, 35:7, 38:25, 39:1, 39:4, 40:7, 40:8, 46:12, 46:25, 47:7, 52:8, 58:8, 58:21, 65:20, 66:2, 66:14, 71:24, 73:15, 73:16, 73:21, 77:1, 81:22, 82:1, 82:3, 83:2, 86:1, 90:25, 94:5, 102:8, 104:9, 105:1, 105:19, 107:12, 108:11, 108:20, 108:25, 113:1, 113:14, 114:10, 114:14, 115:8, 115:11, 115:21, 115:25, 116:1, 118:4, 118:11, 119:1, 120:6, 121:6, 121:11, 121:15, 121:17, 122:12, 124:15, 125:13, 125:21, 127:4, 127:10, 127:12,

128:23, 130:23, 131:13, 132:13, 136:8, 136:23, 136:24, 137:4, 137:8, 139:2, 139:6, 141:13, 141:20, 141:22, 141:24, 142:1, 142:3, 142:18, 143:4, 143:5, 143:9, 145:12, 146:22, 147:5, 147:9, 148:5, 148:6, 148:7, 148:8, 148:9, 148:15, 148:20, 148:23, 149:5, 149:10, 149:13, 149:15, 150:11, 150:12, 150:22, 152:11, 152:12, 152:17, 152:23, 153:6, 153:15, 153:16, 153:21, 153:22, 154:22, 155:17, 156:6, 156:16, 156:23, 157:18, 158:14, 158:15, 159:10, 159:14, 159:17, 159:18, 160:13, 160:14, 167:13, 171:16, 172:9, 174:22, 176:14, 176:15, 176:19, 176:23, 177:1, 179:10, 179:16, 179:24, 180:23, 181:14, 181:15, 181:17, 182:4
**THERE'S** [2] - 116:1, 130:25
**THEREFORE** [5] - 120:20, 121:19, 123:1, 123:6, 144:17
**THINKING** [1] - 17:23
**THIRD** [11] - 2:10, 27:4, 28:2, 28:10, 61:13, 83:19, 108:24, 115:15, 142:7, 143:1, 143:8
**THOMPSON** [9] - 46:2, 69:13, 73:9, 81:3, 82:12, 83:3, 83:4, 84:19, 107:25
**THOMPSON'S** [1] - 85:12
**THOUGHTS** [2] - 12:5, 23:19
**THOUSANDS** [1] - 119:20

**THREATS** [1] - 10:24
**THREE** [34] - 7:3, 7:8, 11:1, 27:20, 30:4, 46:15, 47:9, 49:25, 50:5, 52:8, 52:23, 54:10, 103:12, 119:23, 132:13, 139:23, 161:21, 163:8, 163:9, 163:21, 164:2, 164:9, 164:22, 164:23, 165:11, 165:17, 167:23, 167:24, 167:25, 168:4, 170:10, 176:13
**THREW** [7] - 57:2, 58:17, 94:15, 104:23, 108:8, 110:9, 115:22
**THROUGHOUT** [8] - 23:7, 49:3, 165:3, 168:7, 168:10, 171:16, 171:19, 172:9
**THROW** [2] - 57:4, 94:18
**THROWING** [2] - 57:3, 94:17
**TIED** [1] - 79:10
**TIL** [2] - 12:17, 28:22
**TITLE** [1] - 171:5
**TITLED** [1] - 8:13
**TODAY** [20] - 17:2, 48:15, 71:9, 92:17, 109:4, 109:23, 110:4, 128:14, 128:25, 131:20, 146:21, 149:24, 150:3, 151:2, 157:22, 160:13, 160:17, 161:13, 173:3
**TOILET** [4] - 57:5, 57:22, 94:19, 104:24
**TOLL** [1] - 22:7
**TONY** [1] - 45:17
**TOOK** [8] - 38:23, 58:1, 60:4, 81:3, 82:12, 152:16, 161:20, 163:8
**TOOLS** [1] - 147:12
**TOP** [9] - 8:13, 10:18, 13:11, 89:6, 123:12, 123:13, 142:12, 143:6, 147:24
**TOPIC** [1] - 42:1
**TOPICS** [1] - 120:24
**TORE** [6] - 55:25, 57:21, 104:20,

104:23, 105:4, 107:17
**TORN** [1] - 72:18
**TOTAL** [2] - 117:15, 131:14
**TOUCH** [2] - 141:15, 141:25
**TOUCHED** [1] - 124:22
**TOWARD** [2] - 118:1, 142:12
**TOWARDS** [1] - 23:20
**TRACING** [2] - 155:22, 156:15
**TRACK** [2] - 109:6, 156:25
**TRAGICALLY** [1] - 23:25
**TRAINED** [1] - 149:8
**TRAINEE** [1] - 119:20
**TRAINING** [16] - 118:23, 118:24, 119:1, 119:11, 119:14, 120:23, 121:23, 125:14, 127:17, 128:16, 128:17, 129:15, 129:16, 129:21, 130:7, 130:22
**TRAININGS** [1] - 128:23
**TRANSCRIBE** [1] - 16:1
**TRANSCRIPT** [23] - 1:24, 12:20, 13:19, 16:18, 18:14, 20:10, 21:13, 66:1, 72:12, 76:14, 109:4, 109:6, 109:8, 109:18, 110:11, 114:6, 115:7, 145:19, 147:7, 180:17, 181:2, 184:19
**TRANSCRIPTION** [3] - 1:24, 10:10, 11:17
**TRANSCRIPTIONS** [3] - 9:3, 9:7, 9:13
**TRANSCRIPTS** [1] - 16:7
**TRAVEL** [1] - 146:4
**TRAVIS** [19] - 2:8, 2:9, 3:10, 3:12, 3:19, 4:5, 4:19, 4:21, 4:25, 5:9, 31:14, 34:16, 36:7, 37:23, 38:19, 40:1, 40:3, 40:5, 182:21
**TRAXLER** [22] - 47:24, 48:3, 49:12, 49:17, 50:2, 50:7, 59:4, 59:7, 59:9, 59:10,

67:10, 67:23, 67:25, 68:1, 82:18, 89:5, 89:6, 89:7, 89:11, 89:16, 108:12, 181:4

**TRAXLER'S** [1] - 49:16

**TREAT** [3] - 11:5, 25:12, 27:11

**TREATED** [1] - 27:12

**TREATMENT** [2] - 47:16, 68:9

**TREES** [1] - 27:2

**TREMOR** [1] - 156:8

**TRIAL** [19] - 48:1, 48:9, 48:17, 49:9, 55:22, 56:6, 56:15, 57:10, 61:7, 63:13, 66:1, 69:6, 82:23, 104:18, 107:20, 114:11, 161:19, 165:25, 166:9

**TRIED** [2] - 17:6, 163:4

**TRUE** [3] - 9:7, 82:20, 92:1

**TRUST** [1] - 26:17

**TRUSTED** [1] - 23:13

**TRUTH** [5] - 13:22, 14:14, 17:25, 24:11, 169:25

**TRY** [4] - 20:17, 36:3, 92:21, 136:3

**TRYING** [11] - 14:4, 22:13, 26:5, 27:13, 41:3, 67:15, 89:18, 122:7, 163:11, 163:12, 163:17

**TURN** [11] - 10:9, 12:18, 13:17, 14:19, 18:12, 26:8, 34:19, 41:25, 52:5, 72:16, 146:8

**TURNED** [5] - 17:4, 50:24, 68:1, 68:22, 69:6

**TURNING** [7] - 21:11, 27:20, 34:17, 35:9, 35:19, 36:9, 94:25

**TWICE** [4] - 120:2, 122:16, 130:18, 157:11

**TWIN** [1] - 149:11

**TWO** [53] - 5:5, 5:15, 7:4, 10:23, 24:19, 27:16, 45:16, 47:22, 50:2, 50:6, 51:18, 52:5, 52:13, 53:3, 55:15, 94:16, 103:24, 104:9, 105:22, 112:25,

113:4, 114:10, 116:1, 118:6, 119:1, 120:12, 121:25, 122:24, 123:17, 128:19, 136:9, 146:23, 149:11, 151:16, 151:19, 151:23, 152:4, 152:9, 152:13, 157:13, 157:16, 159:5, 159:11, 159:15, 160:6, 166:1, 167:9, 167:24, 173:21, 177:24, 178:1, 181:19

**TWO-WEEK** [1] - 128:19

**TWO-YEAR** [1] - 119:1

**TYPE** [15] - 21:1, 41:1, 45:12, 55:3, 62:5, 62:6, 64:19, 78:7, 85:20, 96:10, 121:7, 130:10, 143:12, 163:14

**TYPED** [1] - 29:1

**TYPES** [4] - 40:11, 75:15, 130:24, 144:10

**TYPEWRITING** [3] - 117:20, 119:7, 120:4

**TYPICAL** [2] - 85:17, 162:6

## U

**U.S** [5] - 14:4, 20:22, 30:2, 101:18, 146:5

**UNABOMBER** [1] - 81:22

**UNBIASED** [1] - 51:6

**UNCERTAIN** [2] - 22:3, 24:25

**UNCOMMON** [3] - 74:15, 75:13, 75:20

**UNDER** [18] - 6:22, 14:3, 17:7, 25:14, 47:6, 51:24, 51:25, 55:25, 94:6, 104:19, 104:21, 107:4, 107:12, 107:13, 107:21, 118:5, 119:21

**UNDERGRADUATE** [1] - 128:12

**UNDERLINED** [2] - 171:25, 172:2

**UNDERLINING** [1] - 176:7

**UNDERLYING** [1] -

49:9

**UNDERNEATH** [2] - 52:11, 174:25

**UNDERSTOOD** [1] - 165:25

**UNDICTATED** [1] - 135:12

**UNDO** [1] - 20:3

**UNFORTUNATELY** [2] - 21:23, 114:6

**UNIDENTIFIED** [1] - 136:1

**UNIQUENESS** [1] - 151:13

**UNIT** [9] - 26:23, 27:8, 32:16, 43:24, 44:5, 93:25, 120:13, 120:18, 128:5

**UNITED** [13] - 1:1, 1:3, 1:16, 2:2, 6:14, 15:5, 18:9, 19:18, 37:20, 40:25, 106:3, 128:2, 145:20

**UNIVERSITY** [2] - 118:19, 118:22

**UNKNOWN** [2] - 140:21, 141:8

**UNLESS** [2] - 127:23, 179:16

**UNSATISFACTORY** [1] - 125:23

**UNUSUAL** [1] - 118:1

**UP** [47] - 14:21, 20:22, 23:14, 26:21, 27:25, 39:20, 49:2, 51:11, 55:25, 57:21, 59:14, 59:20, 59:23, 59:24, 63:22, 72:18, 76:20, 79:10, 79:25, 82:15, 83:8, 84:25, 94:4, 94:7, 97:14, 97:17, 98:7, 102:8, 104:20, 104:23, 105:4, 105:19, 107:12, 107:15, 107:17, 107:21, 113:1, 120:9, 122:20, 123:15, 127:9, 138:17, 145:18, 158:8, 158:12, 162:17, 168:20

**USP** [7] - 10:20, 26:20, 32:14, 73:10, 79:1, 89:11, 96:21

**USP/ALLENWOOD** [1] - 27:8

## V

**VALID** [1] - 166:19

**VALIDATE** [1] - 64:5

**VALIDITY** [3] - 50:3, 50:13, 50:15

**VALUES** [1] - 23:22

**VARIATION** [7] - 154:15, 154:18, 156:19, 156:20, 157:8, 179:6

**VARIATIONS** [11] - 152:2, 154:8, 154:19, 156:22, 157:7, 157:18, 178:22, 178:24, 179:2, 179:4, 179:14

**VARIOUS** [9] - 46:17, 49:2, 52:19, 53:10, 53:20, 55:18, 99:8, 102:3, 125:14

**VERBAL** [2] - 22:15, 89:25

**VERBATIM** [1] - 110:3

**VERSION** [2] - 114:22, 114:23

**VERSUS** [6] - 135:3, 135:17, 144:1, 145:20, 152:2, 152:9

**VIDEO** [2] - 3:18, 85:12

**VIEW** [2] - 27:3, 115:25

**VIRGINIA** [4] - 117:11, 118:22, 124:5, 130:4

**VISITOR** [1] - 91:1

**VOICE** [1] - 99:20

**VOIR** [5] - 117:2, 124:15, 124:17, 183:13, 183:16

**VULNERABLE** [1] - 172:13

## W

**W.R** [1] - 12:17

**WAFFENSCHMIDT** [1] - 2:9

**WAIT** [2] - 31:7, 175:8

**WAKE** [1] - 27:25

**WALLS** [4] - 12:13, 13:5, 23:10, 27:3

**WANTS** [1] - 86:3

**WARNINGS** [1] - 69:7

**WASHINGTON** [21] - 1:17, 2:4, 51:21, 53:7, 57:15, 60:14, 60:24, 63:23, 65:20, 66:7, 67:6, 80:1, 80:7, 80:17, 103:19, 104:7, 104:11, 105:2, 109:19, 110:5, 181:19

**WASTE** [1] - 28:8

**WATCH** [5] - 90:19, 90:22, 90:23, 91:3

**WATERS** [1] - 2:9

**WAVES** [1] - 27:14

**WAYS** [3] - 22:17, 108:17, 115:10

**WEAPON** [3] - 25:16, 74:23, 85:17

**WEAVER** [1] - 90:22

**WEDNESDAY** [5] - 1:8, 26:20, 97:7, 97:13, 97:17

**WEEK** [5] - 19:8, 28:3, 28:4, 28:14, 128:19

**WEEKS** [3] - 28:5, 121:22, 125:5

**WEIGHT** [1] - 111:18

**WEST** [2] - 2:10, 118:22

**WHEREVER** [1] - 176:14

**WHITE** [5] - 1:19, 19:18, 21:8, 101:19, 184:25

**WHOLE** [16] - 56:23, 57:1, 59:15, 59:16, 59:23, 94:2, 94:11, 94:14, 96:14, 107:16, 108:5, 108:20, 115:11, 164:4, 167:5, 167:6

**WILLIAM** [1] - 25:18

**WILLIAMSPORT** [4] - 2:11, 6:14, 38:20, 45:3

**WINDOW** [1] - 27:1

**WITHDRAW** [1] - 79:19

**WITNESS** [40] - 3:13, 7:12, 8:12, 10:18, 32:24, 69:1, 69:10, 86:2, 87:9, 99:22, 100:5, 100:10, 100:14, 106:2, 106:10, 110:3, 110:12, 112:11, 112:16, 112:19, 113:24, 113:25, 116:16, 116:20, 116:23, 174:24, 175:6, 175:10, 175:13, 175:16, 175:19, 175:24, 176:17, 176:20, 176:24, 178:16, 180:6, 180:8, 180:10, 183:4

**WITNESSES** [7] - 49:2, 64:14, 69:11,

70:24, 71:9, 71:10, 71:11

**WOKE** [3] - 94:4, 94:7, 107:12

**WORD** [9] - 8:17, 109:20, 110:3, 151:18, 157:15, 165:16, 168:9

**WORD-FOR-WORD** [2] - 109:20, 110:3

**WORDING** [9] - 62:2, 136:6, 138:12, 139:1, 139:21, 164:20, 165:4, 165:6, 167:8

**WORDS** [47] - 24:4, 24:5, 39:15, 39:17, 41:7, 60:10, 103:12, 103:13, 117:25, 141:12, 147:24, 161:21, 163:8, 163:9, 163:15, 163:21, 164:2, 164:9, 164:23, 164:25, 165:12, 165:16, 165:17, 165:19, 166:1, 166:6, 166:10, 166:18, 166:19, 167:3, 167:4, 167:7, 167:9, 167:18, 167:23, 167:24, 168:5, 171:9, 171:14, 171:20, 171:21, 171:23, 171:25, 172:2, 173:17, 180:2

**WORKS** [2] - 8:18, 54:23

**WORLD** [5] - 25:18, 26:6, 26:7, 28:21, 39:25

**WORRIED** [2] - 163:19, 163:20

**WORRY** [2] - 17:8, 20:18

**WORSE** [3] - 20:5, 25:23, 26:19

**WORTH** [2] - 96:15, 111:18

**WORTHY** [1] - 24:16

**WRITE** [30] - 17:24, 17:25, 18:3, 22:2, 26:6, 28:18, 39:15, 39:17, 39:18, 39:21, 39:23, 39:24, 63:25, 103:11, 118:6, 137:10, 138:25, 141:5, 142:5, 142:14, 149:12,

151:16, 151:19, 151:23, 151:24, 155:1, 156:7, 156:8, 157:14, 159:17

**WRITER** [13] - 50:15, 136:21, 139:4, 141:11, 142:11, 154:21, 155:11, 156:7, 159:13, 159:19, 178:25, 179:2, 179:5

**WRITES** [4] - 118:8, 151:20, 154:1, 157:11

**WRITEUP** [1] - 85:20

**WRITING** [82] - 17:12, 17:22, 40:22, 41:5, 46:22, 60:12, 61:12, 63:19, 92:24, 95:19, 96:15, 98:11, 98:12, 118:1, 118:7, 118:13, 119:9, 119:16, 121:19, 122:23, 123:10, 123:15, 123:20, 126:11, 126:12, 127:10, 135:12, 135:14, 135:25, 136:1, 136:7, 136:15, 136:21, 136:22, 137:3, 137:4, 137:9, 137:13, 137:20, 137:21, 138:2, 139:13, 139:15, 139:21, 139:22, 141:8, 141:12, 141:19, 142:18, 144:17, 152:3, 152:4, 152:9, 152:21, 153:4, 156:21, 157:9, 159:4, 159:9, 161:5, 163:24, 166:17, 167:20, 168:8, 168:10, 168:14, 169:16, 169:19, 170:6, 171:17, 172:14, 174:7, 174:12, 176:25, 177:2, 179:4, 180:1

**WRITINGS** [11] - 40:11, 40:18, 41:21, 123:9, 135:9, 136:6, 144:2, 174:9, 178:12, 179:20

**WRITTEN** [27] - 13:14, 18:16, 22:15, 50:21, 53:9, 53:16, 53:19, 54:6, 54:7, 54:8,

54:15, 54:20, 55:9, 55:11, 55:12, 55:17, 58:16, 61:17, 62:9, 89:4, 89:24, 91:25, 93:23, 96:18, 123:12, 166:25

**WROTE** [38] - 25:18, 39:25, 40:1, 40:6, 51:7, 53:13, 53:14, 54:11, 54:17, 58:13, 99:4, 117:21, 123:2, 123:3, 123:4, 135:22, 135:23, 136:4, 136:10, 136:14, 136:21, 138:4, 138:5, 138:7, 138:11, 138:12, 138:19, 139:11, 139:12, 139:18, 154:4, 159:3, 159:6, 159:16, 160:3, 164:3, 172:20, 178:25

**Y**

**YAGER** [21] - 7:22, 8:3, 30:13, 31:5, 32:13, 32:19, 33:2, 47:12, 50:1, 50:6, 52:7, 67:7, 67:8, 67:25, 68:5, 68:8, 69:6, 70:15, 70:21, 71:1, 71:3

**YAGER'S** [1] - 68:16

**YEAR** [8] - 7:15, 61:7, 119:1, 119:19, 120:2, 122:14, 130:17, 130:18

**YEARS** [15] - 12:7, 22:23, 23:23, 28:21, 88:16, 88:17, 100:6, 117:8, 117:12, 117:15, 119:3, 122:1, 122:12, 129:9

**YESTERDAY** [12] - 3:14, 6:3, 8:10, 21:2, 25:6, 47:10, 47:11, 47:22, 68:14, 77:16, 182:9, 182:11

**YOUNG** [27] - 18:6, 21:15, 21:16, 21:17, 23:14, 83:12, 83:22, 83:23, 84:1, 88:11, 97:5, 99:7, 99:8, 99:17, 99:25, 100:12, 100:14, 100:17, 100:23, 101:8, 101:13, 101:15, 101:17, 101:20, 101:23,

101:25, 102:4

**YOUNG'S** [3] - 84:3, 99:9, 99:18

**YOURSELF** [3] - 76:1, 82:18, 89:14

**Z**

**ZOOM** [1] - 105:20