UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF PENNSYLVANIA


UNITED STATES OF AMERICA                :    CRIMINAL NUMBER


            V.


DAVID PAUL HAMMER                       :    4:96-CR-239


                          THURSDAY, 6-5-13
                          COURTROOM 16B
                          PHILADELPHIA, PA 19106


_____
        BEFORE THE HONORABLE JOEL H. SLOMSKY, J.
_____

                   SENTENCING HEARING
                        DAY 4


_____

APPEARANCES:

JOHN C. GURGANUS, JR., ESQUIRE        FOR THE GOVERNMENT
UNITED STATES ATTORNEYS OFFICE
MIDDLE DISTRICT OF PENNSYLVANIA
235 N. WASHINGTON STREET, SUITE 311
PO BOX 309
SCRANTON, PA 18501


            SUZANNE R. WHITE, RPR, FCRR, CM
               OFFICIAL COURT REPORTER
             FIRST FLOOR U. S. COURTHOUSE
                 601 MARKET STREET
               PHILADELPHIA, PA 19106
                  (215)627-1882



PROCEEDINGS RECORDED BY STENOTYPE-COMPUTER,
TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

CONTINUED APPEARANCES:

AMANDA HAINES, ESQUIRE                FOR THE GOVERNMENT
UNITED STATES DEPARTMENT OF JUSTICE
CRIMINAL DIVISION
CAPITAL CRIMES SECTION
1331 F. STREET, N.W.
WASHINGTON, D.C. 20530

ANNE SAUNDERS, ESQUIRE                FOR THE DEFENDANT
FEDERAL PUBLIC DEFENDER
MIDDLE DISTRICT OF PENNSYLVANIA
100 CHESTNUT STREET, SUITE 300
HARRISBURG, PA 17101

RONALD C. TRAVIS, ESQUIRE             FOR THE DEFENDANT
REIDERS, TRAVIS, HUMPHREY,
HARRIS, WATERS & WAFFENSCHMIDT
161 WEST THIRD STREET
PO BOX 215
WILLIAMSPORT, PA 17703-0215

JAMES MORENO, ESQUIRE                 FOR THE DEFENDANT
JAMES MCHUGH, ESQUIRE
FEDERAL COMMUNITY DEFENDER
EASTERN DISTRICT OF PENNSYLVANIA
SUITE 540 - THE CURTIS CENTER
PHILADELPHIA, PA 19106

(THE CLERK OPENS COURT.)

THE COURT:  PLEASE BE SEATED.

THIS IS THE CASE OF UNITED STATES VERSUS DAVID HAMMER.

AND OUR NEXT WITNESS.

MS. HAINES:  YOUR HONOR, THE GOVERNMENT CALLS THOMAS UPTON.

THOMAS UPTON, GOVERNMENT WITNESS, SWORN.

THE CLERK:  STATE AND SPELL YOUR FULL NAME FOR THE RECORD, PLEASE.

THE WITNESS:  THOMAS ROY UPTON.

DIRECT EXAMINATION

BY MS. HAINES:

Q.    GOOD MORNING, MR. UPTON.

A.    GOOD MORNING.

Q.    I NEED YOU TO PULL THAT MICROPHONE AROUND TOWARDS YOU SO THAT YOU ARE SPEAKING DIRECTLY INTO IT. IF YOU CAN JUST SIT FORWARD IN YOUR CHAIR.  IT'S VERY IMPORTANT THAT YOU SPEAK INTO THAT MIC.  OKAY?

A.    OKAY.

Q.    THANK YOU.  EXCELLENT.

CAN YOU SPELL YOUR LAST NAME FOR US?  I DON'T THINK YOU DID THAT.

A.    U-P-T-O-N.

Q.    AND HOW OLD ARE YOU, MR. UPTON?

A.      60.

Q.      AND WHAT PART OF THE COUNTRY ARE YOU CURRENTLY LIVING IN?

A.      ORLANDO, FLORIDA.

Q.      HOW LONG HAVE YOU LIVED IN ORLANDO?

A.      20 SOME YEARS.

Q.      AND WHAT DO YOU DO FOR A LIVING DOWN THERE?

A.      I'M A BARBER.

Q.      HOW LONG HAVE YOU BEEN DOING THAT KIND OF WORK?

A.      FOR 43 YEARS.

Q.      NOW, WHERE WERE YOU BORN AND RAISED?

A.      I WAS BORN IN MODESTO, CALIFORNIA.  I WAS RAISED IN OKLAHOMA CITY.

Q.      I WANT TO DIRECT YOUR ATTENTION TO THE FALL OF 19 --

        WELL, LET ME ASK YOU THIS.  DO YOU KNOW WHY YOU ARE IN COURT TODAY?

A.      YES.

Q.      DO YOU RECALL AN INCIDENT THAT HAPPENED IN THE FALL OF 1983?

A.      OH, YES.

Q.      CAN YOU TELL US -- CAN YOU DO THE MATH OR CAN YOU TELL US HOW OLD YOU WERE OR DO YOU WANT TO GIVE US YOUR DATE OF BIRTH AND WE CAN FIGURE IT OUT?  DO YOU KNOW HOW OLD YOU WERE?

A.       I THINK I WAS 29, 28, 29, SOMETHING LIKE THAT.

Q.       AND IN 1983, THE FALL, WHERE WERE YOU LIVING, NOT THE EXACT STREET ADDRESS, BUT WHAT AREA?

A.       IN OKLAHOMA CITY.

Q.       AND WHAT WERE YOU DOING FOR A LIVING AT THAT TIME?

A.       I WAS CUTTING HAIR.

Q.       WERE YOU LIVING WITH ANYBODY OR WERE YOU LIVING BY YOURSELF?

A.       I WAS LIVING WITH MY PARENTS.

Q.       NOW I WANT TO DIRECT YOUR ATTENTION, THINK BACK IN TIME, DID THERE COME A TIME -- AND DO YOU RECALL THE EXACT DATE, SIR --

A.       NO.

Q.       -- OF THE INCIDENT WE ARE TALKING ABOUT?

A.       NO.  I DON'T RECALL THE EXACT DAY.  I THINK IT WAS OCTOBER 22ND OR SOMETHING LIKE THAT.

Q.       ALL RIGHT.

         DO YOU RECALL -- WOULD OCTOBER 28TH BE MORE ACCURATE?

A.       YEAH.

Q.       OCTOBER 28TH, 1983?

A.       YES.

Q.       DOES THAT SOUND RIGHT?

A.       YES.

Q.    DO YOU RECALL A TIME WHERE YOU STOPPED AT THE INTERSECTION OF TWO STREETS, 36TH AND CLASSEN STREET. DO YOU RECALL THAT?

A.    YES.

Q.    CAN YOU EXPLAIN TO THE COURT WHAT KIND OF NEIGHBORHOOD THAT IS?

A.    THAT IS A RESIDENTIAL NEIGHBORHOOD.

Q.    AND DO YOU REMEMBER WHERE YOU WERE COMING FROM WHEN YOU GOT TO THAT INTERSECTION?

A.    YES, I WAS COMING FROM DOING A HAIRCUT.

Q.    AND HOW WERE YOU TRAVELING?

A.    IN MY CAR.

Q.    WHAT KIND OF CAR DID YOU HAVE?

A.    I HAD BUICK LESABRE.

Q.    DO YOU REMEMBER THE COLOR?

A.    GREEN.

Q.    WHAT CAUSED YOU TO STOP AT THE INTERSECTION?

A.    RED LIGHT.

Q.    AND DO YOU REMEMBER WHETHER IT WAS DARK OR LIGHT AT THIS TIME?

A.    I THINK IT WAS JUST GETTING DARK.

Q.    DO YOU REMEMBER THE TIME?

A.    NO.

Q.    OKAY.

NOW, WERE YOU ALONE OR WITH OTHERS?

A.    I WAS ALONE.

Q.    AND DO YOU REMEMBER WHERE YOU WERE HEADED? WHERE WERE YOU GOING?

A.    MY PARENTS.

Q.    NOW, WHEN YOU CAME TO A STOP AT THAT RED LIGHT, CAN YOU TELL US IN STAGES OR STEPS WHAT IS THE FIRST THING THAT HAPPENED?

A.    I STOPPED, AND THEN I SAW MR. HAMMER APPROACHING MY CAR.

Q.    NOW, DID YOU KNOW HIS NAME AT THAT TIME?

A.    NO.

Q.    HAD YOU EVER SEEN THAT MAN BEFORE?

A.    NO.

Q.    HOW DID YOU LEARN HIS NAME WAS MR. HAMMER?

A.    THE POLICE.

Q.    AND I'M ASSUMING THAT YOU ARE IN THE DRIVER'S SEAT BECAUSE YOU ARE DRIVING?

A.    CORRECT.

Q.    WHERE WAS MR. HAMMER COMING FROM?  WHAT SIDE OF YOUR CAR?

A.    HE WAS COMING FROM THE PASSENGER SIDE OF THE CAR.

Q.    AND WERE YOUR WINDOWS UP OR DOWN?

A.    DOWN.

Q.    NOW, AS MR. HAMMER APPROACHED, DO YOU REMEMBER

WHAT YOU WERE THINKING OR WHAT WAS GOING ON?

A.    YEAH.  I THOUGHT HE WAS KIND OF CUTE.

Q.    AND WHAT HAPPENED?  DID HE COME UP TO YOUR CAR?

A.    YES.

Q.    WHAT HAPPENED AT THAT POINT?

A.    ASKED ME FOR A RIDE.

Q.    AND WHAT DID YOU SAY?

A.    I SAID GET IN.  I WILL TAKE YOU WHEREVER YOU WANT TO GO.

Q.    WHY DID YOU AGREE TO GIVE MR. HAMMER A RIDE?

A.    BECAUSE HE LOOKED CUTE.

Q.    NOW, SIR, I'M NOT TRYING TO INVADE YOUR PRIVACY, BUT WE DO NEED TO ASK YOU, WHAT IS YOUR SEXUAL ORIENTATION?

A.    I'M GAY MAN.

Q.    DID MR. HAMMER IN ANY WAY FORCE YOU TO GIVE HIM A RIDE AT THAT TIME?

A.    AT THAT TIME -- PARTICULAR MOMENT, NO.

Q.    DO YOU RECALL WHERE YOU DROVE HIM?

A.    YES.

Q.    WHERE DID YOU GO?

A.    TO A MOTEL.

Q.    DO YOU REMEMBER THE NAME OF THE MOTEL?

A.    NO, I DO NOT.

Q.    CAN YOU DESCRIBE WHAT KIND OF MOTEL IT WAS?

A.       IT WAS KIND OF LIKE AN OLD HOLIDAY INN.  IT WAS OUT ON MERIDIAN OR MACARTHUR OR PORTLAND, BY INTERSTATE 40.

Q.       BECAUSE WE ARE NOT THAT FAMILIAR WITH OKLAHOMA CITY, CAN YOU TELL US WHAT KIND OF NEIGHBORHOOD THAT IS?

A.       IT'S A NEIGHBORHOOD RIGHT OFF THE INTERSTATE HIGHWAY.  THERE'S MOTELS AND RESTAURANT.

Q.       AND WHY DID YOU DECIDE TO GO TO THAT PARTICULAR MOTEL?

A.       MR. HAMMER ASKED ME TO TAKE HIM THERE.

Q.       WHAT WERE YOU THINKING WAS GOING TO HAPPEN WHEN THE TWO OF YOU GOT TO THE MOTEL?

A.       WHAT DID I WANTED TO HAPPEN OR WHAT DID I THINK? I DIDN'T KNOW WHAT WAS GOING TO HAPPEN.  I WAS JUST GOING TO PLAY IT BY EAR AND SEE IF I GET LUCKY.

Q.       AND I THINK WE ALL KNOW WHAT THAT MEANS, BUT WHAT DO YOU MEAN BY IT?

A.       HAVE SEX.

Q.       OKAY.  DID THERE COME A TIME WHEN YOU ARRIVED AT THE MOTEL?

A.       YES.

Q.       AND DO YOU RECALL PARKING THE CAR?

A.       YES.

Q.       DID YOU GO TO A ROOM?

A.       YES, UPSTAIRS.

Q.   AND WHO WENT WITH YOU?

A.   MR. HAMMER.

Q.   AND WHO TOLD YOU WHAT ROOM TO GO TO?

A.   MR. HAMMER.

Q.   DID HE FORCE YOU TO GO THERE AT ALL?

A.   NO.

Q.   NOW, WHEN YOU ARRIVED IN THE ROOM, WHO ELSE WAS THERE, OTHER THAN YOU AND MR. HAMMER?

A.   NO ONE.

Q.   AND I'M GOING TO SORT OF DIRECT YOU TO CERTAIN HIGHLIGHTS.  DO YOU RECALL A TIME WHEN YOU WERE IN THE ROOM WITH MR. HAMMER THAT YOU LEARNED THAT HE WAS ON ESCAPE STATUS FROM A PRISON?

A.   YES.  I REMEMBER TELLING HIM HE WAS AN ESCAPEE.

Q.   YOU SAID YOU TOLD HIM.  HOW DID YOU KNOW THAT?

A.   I THINK I SAW IT ON TV.  I'M NOT SURE, BUT I FIGURED IT OUT.

Q.   NOW WHEN YOU SAY YOU SAW IT ON TV, CAN YOU REMEMBER WHAT THE SPECIFICS WERE OF THE NEWS BROADCAST OR WHAT INFORMATION YOU HAD AT THAT TIME ABOUT THIS ESCAPE?

A.   NO.  IT HAS BEEN 31 YEARS AGO.  I DON'T RECALL.

Q.   DO YOU EVEN REMEMBER WHAT THE PRISON WAS THAT MR. HAMMER SUPPOSEDLY ESCAPED FROM?

A.   LATER I FOUND OUT IT WAS GRANITE.

Q.      WHEN YOU SAY LATER, WHO TOLD YOU IT WAS GRANITE?

A.      THE POLICE.

Q.      DID YOU KNOW IT AT THAT TIME WHERE HE HAD ESCAPED FROM?

A.      AT THE BEGINNING, NO.

Q.      WAS THERE A TIME YOU LEARNED IT FROM HIM WHERE HE HAD ESCAPED FROM?

A.      I THINK SO, YES.

Q.      ARE YOU FAMILIAR WITH GRANITE?

A.      NO.

Q.      NOW, WHEN YOU CONFRONTED MR. HAMMER WITH THE FACT THAT HE WAS AN ESCAPEE, WHAT HAPPENED?

A.      HE OPENED A DRAWER AND HE PULLED OUT A GUN.

Q.      AND DO YOU REMEMBER WHAT THE GUN LOOKED LIKE?

A.      A COWBOY GUN.  LOOKED -- A BIG GUN.

Q.      WHEN YOU SAY A "COWBOY GUN," ARE YOU TALKING ABOUT THE KIND YOU SEE IN WESTERNS WITH THE SPINNING REVOLVER?

A.      CORRECT.

Q.      DO YOU KNOW WHY MR. HAMMER WENT AND GOT A GUN? DID HE SAY ANYTHING?

A.      TO KILL ME.

Q.      BUT DO YOU KNOW WHAT PROVOKED HIM TO REACH FOR THE GUN, IF ANYTHING?

A.      NO, I DON'T RECALL.

Q.      OKAY.  WHAT HAPPENED WHEN MR. HAMMER GOT THE GUN?  WHAT DID YOU DO?

A.      I FREAKED OUT.  I WAS SCARED TO DEATH.  THEN HE GOT VIOLENT WITH ME AND --

Q.      LET ME ASK YOU A QUESTION.  DID YOU TRY TO GRAB THE GUN FROM HIM AT ANY TIME?

A.      YES, I DID.

Q.      CAN YOU EXPLAIN FOR US HOW YOU DID THAT?

A.      MR. HAMMER WAS RAPING ME WHEN I GRABBED THE GUN AND WRESTLED WITH HIM FOR IT, BUT MR. HAMMER WAS A LOT BIGGER AND STRONGER THAN I WAS.

Q.      WHAT HAPPENED AFTER YOU WERE WRESTLING WITH HIM FOR THE GUN?  WHAT DID HE DO?

A.      HE GOT THE GUN, AND HE HIT ME WITH IT.

Q.      WHERE DID HE HIT YOU, SIR?

A.      IN THE HEAD.

Q.      NOW, AFTER YOU WERE SEXUALLY ASSAULTED BY MR. HAMMER, DO YOU RECALL WHERE YOU WENT AFTER THAT?

A.      MR. HAMMER GOT A PHONE CALL.  HE PUT ME IN THE BATHROOM.

Q.      AND YOU SAID HE GOT A PHONE CALL.  WERE YOU ABLE TO HEAR THROUGH THE BATHROOM OR IN ANY OTHER WAY WHO HE WAS TALKING TO?

A.      I BELIEVE HE WAS TALKING TO HIS AUNT OR A FAMILY MEMBER ANYWAY.

Q.      DID THERE COME A TIME WHERE HE TOLD YOU IT WAS OKAY TO COME OUT OF THE BATHROOM?

A.      YES.

Q.      NOW, I'M GOING TO FAST FORWARD AGAIN A LITTLE BIT.  DID THERE COME A TIME WHERE YOU LEFT THE MOTEL?

A.      WHERE WE LEFT THE MOTEL, YES.

Q.      AND HOW DID THAT COME ABOUT THAT YOU TWO LEFT THE MOTEL?

A.      I JUST KEPT ASKING HIM TO NOT TO KILL ME.  AND HE SAID HE WASN'T GOING TO KILL ME.  HE JUST WANTED MY CAR.

Q.      AND WHAT DID YOU SAY WHEN HE SAID I JUST WANT YOUR CAR?

A.      I TOLD HIM HE COULD HAVE IT.

Q.      DID THERE COME A TIME WHERE YOU LEFT WITH HIM?

A.      YES.

Q.      HOW DID -- DID YOU LEAVE OF YOUR OWN WILL?

A.      NO.  NO.  MR. HAMMER HAD A GUN ON ME.  HE HAD THE GUN IN MY BACK AND HE TOLD ME HE WOULD SHOOT ME -- AND HE TOLD ME HE WOULD SHOOT ME.  AND OF COURSE I WAS SCARED TO DEATH.  AND WE WENT TO THE CAR AND WE DROVE AROUND.  I REMEMBER DRIVING AROUND AND HE HAD THE GUN IN MY SIDE.

Q.      LET ME JUST STOP YOU FOR A SECOND.  WHO WAS DOING THE DRIVING?

A.      I WAS.

Q.      HOW DID YOU KNOW WHERE TO GO?

A.      I DON'T RECALL.  I THINK MR. HAMMER WAS TELLING ME WHICH WAY TO GO.  THEN HE HAD ME DRIVE OUT INTERSTATE 40 WEST AND OUT TO THE COUNTRY.  AND HE SAID THAT'S SO I COULD NOT GET NEAR A PHONE AND CALL THE POLICE ON HIM.

Q.      I'M GOING TO STOP YOU AGAIN, SIR.  WHEN YOU SAY YOU DROVE OUT I 40 TO THE COUNTRY, WHAT IS THAT COUNTRYSIDE LIKE?

A.      IT'S WHEAT FIELDS, OIL RIGS, FARMING COMMUNITIES.

Q.      ARE THERE A LOT OF RESIDENCES, HOUSES?

A.      NO.

Q.      DO YOU RECALL HOW LONG ABOUT YOU WERE DRIVING AROUND WITH MR. HAMMER BEFORE HE TOOK YOU OUT TO THAT AREA?

A.      OH, PROBABLY -- MY RECOLLECTION IS AN HOUR OR SO.

Q.      AND WHAT WAS GOING THROUGH YOUR MIND AS HE WAS TAKING YOU OUT OR TELLING YOU WHERE TO GO?

A.      I JUST DIDN'T WANT HIM TO KILL ME.  I WAS THINKING OF HOW I'VE MESSED UP MY LIFE, AND I HAVE NEVER DONE ANYTHING.  AND SO, YOU KNOW, I WANTED ANOTHER CHANCE AT LIFE.  I WANTED TO BE SOMEBODY.

Q.      NOW DID THERE COME A TIME -- YOU HAVE TAKEN US

TO WHERE YOU ARE IN THESE OIL FIELDS AND FARMING COMMUNITIES OR LAND, WHEAT FIELDS AND SUCH.  DID THERE COME A TIME WHERE YOU STOPPED THE CAR?

A.      YES.

Q.      AND WHY DID YOU DECIDE TO STOP?

A.      BECAUSE MR. HAMMER TOLD ME TO.

Q.      AND DO YOU RECALL WHERE IT WAS THAT HE TOLD YOU TO STOP?  WHAT PART OF TOWN WERE YOU IN?

A.      IT WAS WAY OUT NORTHWEST OKLAHOMA CITY, OUT INTO THE COUNTRY.  IT WAS -- I REMEMBER DRIVING UP A DIRT ROAD AND INTO LIKE AN OIL THING, WHERE THEY STORED OIL OR SOMETHING.  AND WE GOT OUT OF THE CAR AND MR. HAMMER TOLD ME TO WALK.  WE WALKED UP THIS ROAD AND THEN MR. HAMMER TOLD ME TO TAKE OFF MY CLOTHES.  I SAID, WHY? HE SAID SO YOU CAN'T CHASE ME.

Q.      LET ME STOP YOU, SIR.  WHY DID YOU AGREE TO DO THOSE THINGS?

A.      BECAUSE I DIDN'T WANT TO DIE.

Q.      WHERE WAS THE GUN TO YOUR KNOWLEDGE AT THAT POINT?

A.      IN MR. HAMMER'S HAND.

Q.      NOW, WHEN YOU GET OUT OF THE CAR AND HE MAKES YOU WALK AND HE TELLS YOU TO STRIP OFF YOUR CLOTHES, WHAT DO YOU DO NEXT?

A.      I DO WHAT HE TELLS ME TO DO.

Q.     THEN WHAT HAPPENED?

A.     HE TOLD ME TO GET DOWN ON MY KNEES AND LAY DOWN AND THEN HE SHOT ME IN THE HEAD THREE TIMES.

Q.     AND CAN YOU TELL US BY POINTING TO YOUR HEAD WHERE EXACTLY YOU GOT SHOT?

A.     HE SHOT ME RIGHT HERE (INDICATING).

Q.     SIR, JUST FOR THE RECORD, YOU HAVE INDICATED THE LEFT BACK PART OF YOUR HEAD?

A.     SHOT ME RIGHT HERE, RIGHT HERE AND RIGHT HERE (INDICATING).

Q.     SO I'M GOING TO MAKE A RECORD, YOU POINTED TO A FEW PLACES ON THE BACK OF YOUR LEFT SKULL AND THE LEFT SIDE OF YOUR FACE, IS THAT CORRECT?

A.     CORRECT.

Q.     AND WAS THERE ANY WORDS THAT HE WAS SAYING AS HE SHOT YOU?

A.     NOT THAT I REMEMBER.

Q.     SO YOU HAVE BEEN SHOT.  WHAT HAPPENS NEXT?

A.     I THOUGHT I WAS DYING.  THE LIGHTS DID NOT GO OUT.  I EXPECTED THE LIGHTS TO GO OUT AND THEY DIDN'T. AND SO I JUMPED UP AND HE WAS NEAR MY CAR, AND I SAW HIM JUMPING UP AND DOWN AND SCREAMING.  HE JUMPED IN MY CAR AND TOOK OFF.  AND I GRABBED MY COAT AND WRAPPED IT AROUND MY HEAD AND TOOK OFF, TOO.  I SAID BECAUSE HE IS NOT GOING TO KILL ME LIKE THIS.  I'M NOT DYING LIKE

THIS, THIS IS JUST NO WAY TO DIE.

Q.      SO YOU HAVE YOUR COAT WRAPPED AROUND YOUR HEAD.
WHAT DO YOU DO?

A.      I TAKE OFF WALKING.

Q.      WHAT WAS GOING THROUGH YOUR MIND?  WHAT WERE YOU
TRYING TO ACCOMPLISH?

A.      TO GET SOME HELP.

Q.      NOW, DO YOU RECALL WHAT KIND OF AREA YOU WERE
WALKING THROUGH OR WHAT YOU WERE WALKING ON?

A.      YES.

Q.      WHAT WAS IT?

A.      FIRST IT WAS A DIRT ROAD AND THEN IT WAS AN
ASPHALT ROAD AND I WAS BLEEDING UNREAL, AND I WAS
COVERED IN BLOOD.  AND I KEPT -- I WAS ABOUT TO PASS OUT
AND I STOOD IN THE MIDDLE OF THE ROAD.  AND I SAID,
SOMEBODY IS GOING TO HAVE TO EITHER RUN OVER ME OR TAKE
ME TO THE HOSPITAL.  AND SO THESE GENTLEMEN STOPPED AND
THEY TOOK ME TO THE EMERGENCY ROOM.

Q.      DO YOU RECALL WHAT HOSPITAL YOU WENT TO?

A.      DEACONESS.

Q.      DID YOU STAY AT DEACONESS OR DID YOU TRANSFER TO
ANOTHER HOSPITAL?

A.      STAYED AT DEACONESS.

Q.      IN THE HOURS, DAYS THAT FOLLOWED, DID YOU HAVE
ANY MEDICAL PROCEDURES?

A.    OH, YES.

Q.    CAN YOU TELL US WHAT MEDICAL PROCEDURES WERE NECESSARY?

A.    I HAD TO HAVE PLASTIC SURGERY ON MY FACE, ON MY HAND, BECAUSE I GUESS I TRIED TO GUARD MY HAND AND HE BLEW THIS PART OF MY FINGERS OFF.

Q.    LET ME JUST STOP YOU.  BECAUSE YOU HAVE INDICATED YOUR RIGHT HAND AND WHICH FINGERS GOT INJURED?

A.    THIS ONE, THIS ONE (INDICATING).

Q.    THAT IS YOUR SECOND FINGER?

A.    THAT FINGER (INDICATING).

Q.    CAN YOU COUNT FOR ME BECAUSE I CAN'T SEE?

A.    ONE, TWO -- THE THIRD FINGER, THE MIDDLE FINGER.

Q.    YOU ARE COUNTING FROM YOUR PINKY.  SO THE MIDDLE FINGER.  ALL RIGHT.  SO THAT FINGER WAS SHOT AS WELL?

A.    YES.

Q.    YOU SAID YOU HAD PLASTIC SURGERY.  TELL US AGAIN.

A.    YES.  I HAD PLASTIC SURGERY AND I HAD SURGERY ON MY SCALP, MY HEAD.

Q.    HOW LONG WERE YOU IN THE HOSPITAL FOR?

A.    I DON'T RECALL HOW LONG I WAS IN THE HOSPITAL FOR.

Q.    DO YOU HAVE ANY LASTING EFFECTS FROM BEING SHOT IN THE HEAD?

A.    OH, YES.

Q.    CAN YOU SHARE THAT WITH US?

A.    WELL, MY FACE IS FULL OF SHRAPNEL.  MY HEAD IS FULL OF SHRAPNEL.  I CAN NEVER HAVE FALSE TEETH IN THE TOP BECAUSE MY GUMS ARE JUST THOUSANDS OF PIECES OF SHRAPNEL IN THEM.  I HAVE HEADACHES.  WHERE I GOT SHOT IN THE BACK OF THE HEAD BACK HERE, THERE'S TWO BIG BUMPS.  AND I HAVE TO KEEP THEM WHERE THEY DON'T GET INFLAMED FROM LAYING MY HEAD ON.  AND, OF COURSE, THE PSYCHOLOGICAL PART OF IT HAS BEEN UNREAL.

Q.    CAN YOU JUST SHARE WITH US YOUR -- THE EMOTIONAL REPERCUSSIONS FROM BEING SHOT, THE PSYCHOLOGICAL PART YOU JUST REFERENCED?

A.    OH, YEAH.

FOR A LONG TIME I WAS -- I'M A BARBER AND I WORKED FOR THE DEPARTMENT OF DEFENSE.  AND WHEN SOMEONE WOULD COME IN WITH A GUN ON, I WOULD HAVE TO LEAVE THE BARBER SHOP.  IT'S JUST IN THE LAST FEW YEARS WHERE I CAN STILL BE IN THE SAME ROOM WITH A GUN.  AND I USED TO BE -- EVERYBODY WAS MY FRIEND.  I USED TO MEET STRANGERS.  I DIDN'T KNOW A STRANGER.  THERE WASN'T ANY SUCH THING AND NOW THERE IS.  AND SO MY CIRCLE OF FRIENDS HAS SURE GOTTEN SMALLER.

Q.    HOW DID YOU FEEL ABOUT TESTIFYING TODAY?

A.    I DIDN'T WANT TO.  IT'S BEEN 31 YEARS AGO.  I

WANTED TO FORGET IT.  I THOUGHT I HAD PUT MOST OF IT OUT.  AND THEN ALL THIS COMING BACK UP, I BROKE OUT IN HIVES.

Q.      ARE YOU OKAY?

                MS. HAINES:  THE COURT'S INDULGENCE.

                (PAUSE.)

                THE WITNESS:  SORRY.

BY MS. HAINES:

Q.      NOW, MR. UPTON, ARE YOU OKAY?

A.      YEAH.  MY APOLOGIES.

Q.      TAKE YOUR TIME, SIR.

        DO YOU FEEL YOU CAN ANSWER ANOTHER QUESTION FOR ME?

A.      YEAH.

Q.      I'M GOING TO MOVE TO A DIFFERENT SUBJECT.  WE ARE DONE WITH THAT.

        HAVE YOU TESTIFIED ABOUT THIS CRIME PREVIOUSLY?

A.      YES.

Q.      DO YOU REMEMBER HOW MANY TIMES YOU'VE TESTIFIED ABOUT THIS PREVIOUSLY?

A.      NO.  TWO OR THREE TIMES.

Q.      AND WHEN YOU SAY TWO OR THREE TIMES, DID YOU TESTIFY AT A TRIAL REGARDING THE CASE WHERE YOU WERE THE VICTIM?

A.      YES.    THE FIRST TRIAL WHEN MR. HAMMER WAS --
PLAYED HIS OWN DEFENSE ATTORNEY.

Q.      WHEN YOU SAY THAT, WHAT DO YOU MEAN?  WHEN YOU
WERE ON THE STAND, WHO WAS ASKING YOU THE QUESTIONS AT
THAT TRIAL?

A.      DAVID PAUL HAMMER WAS.

Q.      IN CONNECTION WITH THE SHOOTING CASE, DID YOU
ALSO TESTIFY AT TWO PRELIMINARY HEARINGS?  DO YOU
REMEMBER THAT?

A.      I DON'T REMEMBER THAT, BUT, YEAH, I MUST HAVE.

Q.      DO YOU REMEMBER TESTIFYING AT THE DEATH PENALTY
PROCEEDING?

A.      WHEN HE KILLED THAT OTHER BOY?

Q.      BACK IN 1998.

        MS. SAUNDERS:  OBJECTION, YOUR HONOR, TO
HIS STATEMENT ABOUT HEARSAY.

        THE COURT:  I WILL SUSTAIN THE OBJECTION
AND STRIKE THE ANSWER.

        GO AHEAD.

BY MS. HAINES:

Q.      IN WILLIAMSPORT, PENNSYLVANIA IN 1998, DO YOU
RECALL TESTIFYING IN MR. HAMMER'S DEATH PENALTY
PROCEEDING?

A.      YES, MA'AM.

Q.      IN EACH OF THOSE CASES, DO YOU RECALL TAKING AN

OATH TO TELL THE TRUTH, JUST LIKE YOU DID HERE TODAY?

A.      YES, MA'AM.

Q.      AND DID YOU TELL THE TRUTH WHEN YOU TESTIFIED, AND I MEAN THE WHOLE TRUTH, WHEN YOU TESTIFIED THOSE FOUR OTHER TIMES?

A.      NO.

Q.      WHAT DID YOU LIE ABOUT MOSTLY?

A.      I LEFT OUT THE PART WHERE THERE WAS SEX INVOLVED AND I LEFT THE PART OUT THAT I WAS GAY.

Q.      AND DID YOU ALSO TELL THOSE JURIES AND THAT JUDGE THAT MR. HAMMER FORCED YOU TO GO TO THE MOTEL THAT NIGHT?

A.      YES.

Q.      AND WHY DID YOU NOT TELL THE TRUTH IN THOSE OTHER TRIALS AND PRELIMINARY HEARINGS, ABOUT BEING GAY, HAVING SEX AND THE FACT THAT YOU WENT WILLINGLY WITH MR. HAMMER TO HIS MOTEL ROOM?

A.      IT WAS 1980, IN THE '80S.  AND WHEN I WAS QUESTIONED I WAS QUESTIONED IN FRONT OF MY FATHER AND MY FATHER DID NOT KNOW I WAS GAY.  AND I THOUGHT THE REPERCUSSIONS OF ME BEING GAY WOULD BE A LOT WORSE THAN ANYTHING ELSE.  SO I DID NOT SAY ANYTHING ABOUT IT.

Q.      AND MR. UPTON, WE DON'T STAND IN YOUR SHOES. WHAT DO YOU MEAN BY SAYING THE REPERCUSSIONS WOULD BE WORSE THAN TELLING THE TRUTH?

A.    WELL, BACK THEN IN OKLAHOMA THEY BEAT UP AND THEY KILL QUEERS.  THEY DID NOT -- IT'S NOT LIKE TODAY.

Q.    DO YOU KNOW THE TERM "OUT OF THE CLOSET"?

A.    YES.

Q.    ARE YOU OUT OF THE CLOSET NOW?

A.    YES.

Q.    YOU HESITATED.  ARE YOU --

A.    WELL, NOT TO MY FAMILY.

Q.    NOW, WHEN WAS THE FIRST TIME THAT YOU ACTUALLY TOLD THIS WHOLE STORY ABOUT BEING RAPED AND BEING GAY AND GOING WITH MR. HAMMER WILLINGLY TO HIS MOTEL?

A.    TO YOU AND MR. COYLE.

Q.    AND DO YOU SEE MR. COYLE IN THE COURTROOM TODAY?

A.    YES.

Q.    IS HE SITTING IN FRONT OF YOU SOMEWHERE IN THE AUDIENCE?

A.    RIGHT THERE (INDICATING).

Q.    WHY DID YOU DECIDE TO COME OUT WITH THE WHOLE STORY THIS YEAR?

A.    YOU KNOW, WHEN YOU KNOW BETTER, YOU DO BETTER, BUT IT'S -- I'M JUST NOT AFRAID ANYMORE.

Q.    CAN YOU EXPLAIN THAT FOR US IN A DIFFERENT WAY?

A.    WELL, YEAH, I OWN MY OWN BUSINESS.  I HAVE GOT SIX PEOPLE THAT WORK FOR ME.  AND MY FAMILY LIVES IN OKLAHOMA, I LIVE IN FLORIDA.  EVERYBODY THAT WORKS WITH

ME KNOWS I'M GAY.  I'VE GOT A PARTNER I LIVED WITH FOR THE LAST TEN YEARS.  I JUST WASN'T AFRAID ANYMORE.

MS. HAINES:  THANK YOU, SIR.

I HAVE NOTHING FURTHER, YOUR HONOR.

THE COURT:  CROSS EXAMINE.

MS. SAUNDERS:  COURT'S INDULGENCE, YOUR HONOR.

(PAUSE.)

MS. SAUNDERS:  MR. UPTON, DO YOU NEED A BREAK BEFORE I START CROSS-EXAMINING YOU?

THE WITNESS:  SURE.

MS. SAUNDERS:  YOUR HONOR, CAN WE TAKE JUST A FEW MINUTES?

THE COURT:  ALL RIGHT.  LET'S TAKE A FIVE-MINUTE RECESS.

(BREAK TAKEN.)

THE COURT:  PLEASE BE SEATED.

MR. GURGANUS:  MR. UPTON IS COLLECTING HIMSELF.  HE MAY HAVE GONE FOR A QUICK SMOKE.

THE COURT:  LET HIM TAKE HIS TIME.  WE WILL WAIT FOR HIM.

(SIDEBAR OFF THE RECORD.)

THE COURT:  CROSS EXAMINE.

CROSS EXAMINATION

BY MS. SAUNDERS:

Q.      MR. UPTON, GOOD MORNING.

A.      GOOD MORNING.

Q.      LIKE MS. HAINES, I AM GOING TO HAVE TO GET INTO SOME SENSITIVE AREAS, BUT THIS IS A VERY IMPORTANT CASE. SO IF YOU AT ANY TIME NEED A BREAK OR NEED TO STOP FOR A MINUTE, PLEASE FEEL FREE TO SAY SO.  OKAY?

A.      OKAY.

Q.      YOU JUST TESTIFIED HERE TODAY THAT WHEN YOU WERE ON 36TH AND CLASSEN STREET --

        THE COURT:  COULD YOU SPEAK INTO THE MIC.

        MS. SAUNDERS:  I'M SORRY, YOUR HONOR. USUALLY I DON'T HAVE THIS PROBLEM.

        THE COURT:  ALL RIGHT.

BY MS. SAUNDERS:

Q.      YOU TESTIFIED HERE TODAY THAT WHEN YOU WERE AT 36TH AND CLASSEN, STOPPED AT A LIGHT, THAT YOU -- YOU SAW MR. HAMMER COMING TOWARDS YOUR CAR, RIGHT?

A.      CORRECT.

Q.      AND HE DIDN'T HAVE A GUN, RIGHT --

A.      CORRECT.

Q.      -- IN HIS HAND?

A.      CORRECT.

Q.      AND WHEN HE APPROACHED THE CAR TODAY YOU ARE TESTIFYING THAT HE ASKED YOU FOR A RIDE AND YOU WILLINGLY AND HAPPILY SAID YES, RIGHT?

A.    CORRECT.

Q.    AND THAT WAS BECAUSE HE WAS CUTE, RIGHT?

A.    CORRECT.

Q.    YOU WERE HOPING TO GET INVOLVED WITH HIM, RIGHT?

A.    CORRECT.

Q.    SO HE GETS INTO THE CAR AND YOU ASK HIM WHERE IT IS HE WANTS TO GO AND HE TOLD YOU WHERE HE NEEDED TO GO, RIGHT?

A.    CORRECT.

Q.    AND HE DIDN'T MAKE ANY THREATS TO YOU IN THAT RIDE, RIGHT?

A.    NO.

Q.    HE DID NOT TAKE OUT A GUN DURING -- IN THE CAR, RIGHT?

A.    NO.

Q.    AND HE DIDN'T FIRE THE GUN OUT OF THE WINDOW OF THE CAR, RIGHT?  AS YOU WERE GOING TO THE HOTEL, HE DID NOT FIRE THE GUN OUT OF THE WINDOW OF THE CAR, CORRECT?

A.    NO.

Q.    DOES THAT MEAN YOU AGREE WITH ME THAT HE DID NOT DO THAT?

A.    CORRECT.

Q.    AND HE DID NOT FIRE THE GUN INTO THE SEAT OF THE CAR ON THE WAY TO THE MOTEL, DID HE?

A.    NO.

Q.      OKAY.  SO WHEN YOU GOT TO THE MOTEL, YOU BOTH GOT OUT OF THE CAR WILLINGLY, IS THAT CORRECT?

A.      CORRECT.

Q.      AND MR. HAMMER DID NOT HAVE A GUN WITH HIM POINTED AT YOU AS YOU WERE WALKING INTO THE MOTEL ROOM, IS THAT CORRECT?

A.      YES.

Q.      AND YOU WENT INTO THE HOTEL ROOM WILLINGLY, IS THAT CORRECT?

A.      YES.

Q.      THAT IS BECAUSE, AS YOU SAID, YOU WERE HOPING TO GET LUCKY, RIGHT?

A.      CORRECT.

Q.      YOU ALSO TESTIFIED ON DIRECT EXAMINATION IN RESPONSE TO MS. HAINES' QUESTIONS THAT YOU DID TESTIFY PREVIOUSLY ABOUT THIS INCIDENT, CORRECT?

A.      REPEAT YOUR QUESTION.

Q.      YOU DID TESTIFY PREVIOUSLY ABOUT THIS INCIDENT, CORRECT?

A.      YES.

Q.      OKAY.

        AND THE FIRST TIME YOU TESTIFIED, IT WAS -- THERE WAS NO JURY.  IT WAS A JUDGE AND THERE WAS A LAWYER FOR MR. HAMMER AND A LAWYER FOR THE PROSECUTION, RIGHT?

A.      I DON'T REMEMBER THAT.

THE COURT:  CAN I ASK YOU TO MOVE CLOSER TO THE MICROPHONE, MR. UPTON.

THE WITNESS:  YES.

BY MS. SAUNDERS:

Q.      IF I WERE TO TELL YOU --

THE COURT:  TRY NOT TO LEAN BACK AWAY FROM THE MICROPHONE.  MOVE THE CHAIR.

THE WITNESS:  OKAY.  IS THAT BETTER?

THE COURT:  YES.

BY MS. SAUNDERS:

Q.      IF I WERE TO TELL YOU THAT THE TRANSCRIPT OF THAT FIRST PRELIMINARY HEARING INDICATED THAT THERE WAS TWO LAWYERS AND A JUDGE, WOULD THAT -- WOULD YOU AGREE WITH ME THAT THAT WAS PROBABLY THE CASE?

A.      IF THAT IS WHAT YOU SAY.  I DON'T REMEMBER.

Q.      AND WHEN YOU TESTIFIED, YOU WERE SWORN UNDER OATH, RIGHT?

A.      YEAH.

Q.      AND YOU SWORE TO TELL THE TRUTH, RIGHT?

A.      LIKE I SAID, I DON'T REMEMBER THAT FIRST -- THAT -- WHAT YOU'RE -- THE ONE THAT YOU ARE DISCUSSING NOW, I HAVE NO RECOLLECTION OF IT.  IT'S BEEN 31 YEARS AGO.

Q.      I'M ABOUT TO SHOW YOU THE TESTIMONY, BUT MY

POINT IS, IS THAT AT ANY POINT WHEN YOU TESTIFIED, YOU WERE SWORN AND PLACED UNDER OATH, IS THAT RIGHT?

A.      CORRECT.

Q.      MR. UPTON, IF YOU LOOK ON THE FRONT OF THAT PAGE, IT SAYS PRELIMINARY HEARING, IS THAT CORRECT?

A.      YES, MA'AM.

Q.      IT SAYS MARCH 12TH, 1984?

A.      YES, MA'AM.

Q.      OKAY.  AND APPEARANCES, IT INDICATES RON EVANS, ASSISTANT PUBLIC DEFENDER FOR THE DEFENDANT?

A.      YES, MA'AM.

Q.      AND MR. OWENS FOR THE PROSECUTION, RIGHT?

A.      CORRECT.  THAT'S WHAT IT SAYS.

Q.      OKAY.  ON THE NEXT PAGE IT HAS AN INDEX AND IT HAS YOUR NAME ON IT, IS THAT RIGHT?

A.      YES.

Q.      SO THIS OBVIOUSLY WAS A PROCEEDING WHERE YOU ACTUALLY TESTIFIED, RIGHT?

A.      APPARENTLY.

Q.      OKAY.  ALL RIGHT.

        I WOULD LIKE YOU TO TURN TO PAGE 4 AND 5 -- TO PAGE 4 OF THAT PARTICULAR DOCUMENT.  IF YOU LOOK -- USE THE NUMBERS ON THE --

        MS. SAUNDERS:  I'M SORRY, YOUR HONOR, THESE RECORDS ARE VERY OLD AND WHEN I GOT SOME OF THESE

TRANSCRIPTS, I REALIZED THAT SOME OF THEM, THE PAGINATION WAS OFF.  SO WE BATES STAMPED ON THE BOTTOM OF THE PAGE TO THE RIGHT JUST SO THAT THEY WERE ALWAYS SEQUENTIAL.

BY MS. SAUNDERS:

Q.      IF YOU COULD TURN TO PAGE 4, THERE IS A NUMBER ON THE BOTTOM OF THE PAGE.  DO YOU SEE THAT?

A.      YES.

Q.      ON PAGE 4, AT THE VERY BOTTOM OF THAT PAGE, THERE IS A QUESTION THAT SAYS:  GO AHEAD, MR. UPTON.

DO YOU SEE THAT?  IT STARTS ON LINE 22 RIGHT AT THE BOTTOM OF THE PAGE.

A.      OKAY.  I SEE THAT.

Q.      AND THEN IT SAYS A FOR ANSWER.  DO YOU SEE THAT ON THE NEXT LINE?

A.      YES.

Q.      OKAY.  AND SO THAT WOULD BE YOUR RESPONSE TO THE QUESTION, CORRECT?

A.      APPARENTLY.

Q.      OKAY.

CAN YOU READ THAT, PLEASE.

A.      IT SAID:  I HAD ALL MY WINDOWS DOWN.  IT WAS A NICE EVENING.  HE WALKED BETWEEN THE CARS.  HE GOT IN THE PASSENGER'S SIDE OF THE WINDOW AND HE LAID A PISTOL ON IT AND SAID I WAS --

Q.      TURN TO THE NEXT PAGE TO FINISH THAT SENTENCE FOR ME, PLEASE.

A.      -- GOING TO TAKE HIM WHERE HE WANTED TO GO.

Q.      SO WHEN YOU TESTIFIED UNDER OATH AT THIS PROCEEDING THAT HE LAID A PISTOL ON THE PASSENGER'S SIDE WINDOW, THAT WAS NOT TRUE, IS THAT CORRECT?

A.      APPARENTLY NOT.

Q.      ALL RIGHT.  NOW IF YOU SKIP DOWN ON THE SAME -- ON PAGE 5, YOU WILL SEE AT LINE 4 A QUESTION AND AN ANSWER.  WOULD YOU READ THAT QUESTION AND ANSWER, PLEASE?

A.      YEAH.

            DID HE HAVE THE PISTOL WITH HIM THE ENTIRE TIME HE WAS IN YOUR CAR?

            YES, HE DID.

Q.      OKAY.  THAT WAS NOT TRUE, CORRECT?

A.      APPARENTLY NOT.

Q.      NOW, IF YOU TURN TO PAGE 14 AND 15 -- 14 OF THE -- THERE ARE NUMBERS ON THE BOTTOM NOW BECAUSE THE TOP NUMBERS MAY BE DIFFERENT BECAUSE OF THE SEQUENTIAL -- THE PAGINATION PROBLEM.  IT'S A PAGE WHERE THE TOP OF THE PAGE STARTS WITH "TRY TO HELP ME HERE."  DO YOU SEE IT?

A.      YES.

Q.      ON LINE 20 OF THAT PAGE, IF YOU CAN READ THAT

QUESTION AND ANSWER AND THEN THE NEXT QUESTION AND
ANSWER, PLEASE.

A.      YES.

            IT SAYS:  TRY TO HELP ME HERE.  HOW BIG
WAS THAT MAN ON THE 28TH OF OCTOBER?

Q.      I'M SORRY.  I'M SORRY.

A.      THAT GUN BARREL WAS AWFUL BIG.

Q.      MR. UPTON, I SAID IF YOU COULD GO TO LINE 20 ON
THE PAGE.  I APOLOGIZE.  I WAS NOT CLEAR.

A.      OH, OKAY.

Q.      OKAY.  READ THAT QUESTION AND THE ANSWER.

A.      AFTER THE MAN GOT IN THE CAR WITH YOU, WHERE DID
YOU GO?

            TO THE MOTEL.

            THAT WOULD BE THE MOTEL ON MACARTHUR.

            MS. SAUNDERS:  OKAY.  COURT'S INDULGENCE.

            (PAUSE.)

BY MS. SAUNDERS:

Q.      GO TO THE NEXT PAGE, IF YOU WOULD.  MY
APOLOGIES.  I'M HAVING PAGINATION PROBLEMS.  PAGE 15 AND
START ON LINE 4, IF YOU WOULD, AND THAT QUESTION AND
THAT ANSWER AND THE NEXT QUESTION AND ANSWER.

A.      DID THE MAN HAVE A GUN ON YOU THE WHOLE WAY?

            YES.

Q.      AND THE NEXT QUESTION?

A.    HE WAS POINTING AT YOU THE WHOLE WAY?

YES.  HE EVEN FIRED INTO THE SEAT AND TOLD ME HE MEANT BUSINESS.

Q.    OKAY.  SO THAT WAS NOT TRUTHFUL TESTIMONY EITHER, WAS IT?

A.    WELL, SEE, IT HAS BEEN 31 YEARS AGO, MA'AM.  I KNOW HE DIDN'T HAVE A GUN ON ME FROM THE 36TH AND CLASSEN TO THE MOTEL, BUT AFTER THAT HE DID.  AND IT SAYS HERE THAT HE FIRED INTO MY CAR AND HE MUST HAVE OR I WOULD NOT HAVE SAID IT.

Q.    SO YOU ARE SAYING THAT ON THE WAY TO THE MOTEL HE -- NOW YOU ARE SAYING ON THE WAY TO THE MOTEL HE FIRED INTO YOUR CAR?

A.    NO, I'M NOT SAYING THAT.  I'M SAYING THAT THAT IS THE FIRST TIME I HAD SAW THAT AND REMEMBERED THAT.  I PUT THAT OUT OF MY MIND, THAT HE HAD FIRED INTO THE CAR.

Q.    BUT MY QUESTION, SIR, IS, DID HE FIRE INTO THE CAR ON THE WAY TO THE MOTEL?

A.    NO.

Q.    NOW, ON PAGE -- THE PAGE BEFORE THAT, THE TESTIMONY WAS ABOUT YOUR GOING TO THE MOTEL, RIGHT, BOTTOM OF THE PAGE, THE SECTION THAT YOU READ?

A.    YES.

Q.    SAYS:  AFTER HE GOT IN THE CAR WHERE DID YOU GO? TO THE MOTEL.  THAT WOULD BE THE MOTEL ON MACARTHUR.

AND THEN THE NEXT LINE OF QUESTIONS WAS: DID THE MAN HAVE A GUN ON YOU THE WHOLE WAY?  SO THEY ARE TALKING ABOUT ON THE WAY TO THE MOTEL, RIGHT?

A.      OKAY.

Q.      AND SO THE TESTIMONY YOU GAVE ABOUT FIRING INTO THE SEAT AND TOLD ME HE MEANT BUSINESS ON THE WAY TO THE MOTEL IS NOT TRUE, CORRECT?

A.      NOT ON THE WAY TO THE MOTEL.

Q.      OKAY.

A.      I FORGOT ALL ABOUT THAT.

Q.      NOW THERE IS ANOTHER QUESTION BELOW THAT THAT SAYS:  ON THE WAY OVER TO THE MOTEL HE DID THIS, RIGHT?

RIGHT?  LINE NINE ON PAGE 15.

A.      LET'S SEE.

ON THE WAY OVER TO THE MOTEL, HE DID THIS.  HE DID THIS TWICE.

HE FIRED INTO THE SEAT TWICE ON THE WAY OVER TO THE MOTEL?

YES, AND THEN AFTER WE LEFT THE MOTEL.

Q.      OKAY.  SO YOUR TESTIMONY DURING THIS HEARING WAS THAT HE FIRED THE GUN IN THE CAR ON THE WAY TO THE MOTEL AND THEN FROM THE MOTEL TO THIS DESOLATE AREA, RIGHT?

A.      YEAH.

Q.      BUT YOUR TESTIMONY TODAY IS THAT HE FIRED -- HE DID NOT FIRE THE GUN INTO THE MOTEL -- IN THE CAR ON THE

WAY TO THE MOTEL, IS THAT RIGHT?

A.      YEAH.

Q.      OKAY.  BECAUSE YOU WERE GOING WITH HIM WILLINGLY TO THE MOTEL, RIGHT?

A.      CORRECT.  THAT HAS BEEN ESTABLISHED.

Q.      HE HAD NO NEED TO THREATEN YOU BECAUSE THE TWO OF YOU WERE DOING IT CONSENSUALLY, RIGHT?

A.      CORRECT.

Q.      YOU WERE ALSO CALLED TO TESTIFY AT ANOTHER PRELIMINARY HEARING.  DO YOU RECALL THAT?

A.      NO.

            MS. SAUNDERS:  COURT'S INDULGENCE.

            (PAUSE.)

            MS. SAUNDERS:  I'M SORRY, YOUR HONOR.  I FORGOT TO NOTE THAT THIS WAS DEFENSE EXHIBIT 18.  MY APOLOGIES.  I WOULD NOTE FOR THE RECORD THAT THAT IS WHAT THIS IS, THAT HE JUST READ FROM.  OKAY.

BY MS. SAUNDERS:

Q.      AS I SAID, YOU ALSO TESTIFIED AT ANOTHER PRELIMINARY HEARING.  DO YOU REMEMBER THAT, MR. UPTON?

A.      NO.

Q.      OKAY.  WELL, THIS WAS A PRELIMINARY HEARING WHEN MR. HAMMER CROSS-EXAMINED YOU.  DO YOU REMEMBER THAT, WHERE IT WAS JUST A JUDGE AND THE PROSECUTOR AND IT WAS ALSO -- AND YOU.  DO YOU RECALL THAT?

A.      I REMEMBER MR. HAMMER ASKING ME QUESTIONS AT HIS TRIAL.

Q.      OKAY.  ALL RIGHT.

        MS. SAUNDERS:  THIS IS, FOR THE RECORD, DEFENSE EXHIBIT 19, YOUR HONOR.

        THE WITNESS:  ARE YOU TRYING TO GET TO THE POINT THAT HE DID NOT KIDNAP ME AND SHOOT ME?  I'M CURIOUS.

        MS. SAUNDERS:  MR. UPTON, I'M ASKING YOU QUESTIONS.

        THE COURT:  WAIT A MINUTE.

        MS. SAUNDERS:  THIS IS DEFENSE EXHIBIT 19, YOUR HONOR.

        THE COURT:  MR. UPTON, JUST ANSWER QUESTIONS.  ALL RIGHT?  THAT'S ALL.  OKAY.

        THE WITNESS:  OKAY.  THANK YOU.

BY MS. SAUNDERS:

Q.      NOW, DO YOU SEE ON THE COVER OF DEFENSE EXHIBIT 19 WHERE IT SAYS TRANSCRIPT OF PRELIMINARY HEARING IN THE MIDDLE OF THE PAGE?

A.      YES, MA'AM.

Q.      OKAY.  ALL RIGHT.

        WOULD YOU TURN TO PAGE 6?  EXCUSE ME, ON THE SECOND PAGE OF THE TRANSCRIPT, DO YOU SEE WHERE IT SAYS YOUR NAME --

A.      YES, MA'AM.

Q.      -- AS A WITNESS?

ON PAGE 6 OF THAT TRANSCRIPT --

THE COURT:  WHY DON'T WE GET THE DATE OF THE HEARING.

MS. SAUNDERS:  I'M SORRY.  IT'S JUNE 1ST, 1984.  MY APOLOGIES, YOUR HONOR.

BY MS. SAUNDERS:

Q.      ARE YOU WITH ME ON PAGE 6, SIR?

A.      6?

Q.      YES.

A.      YES, MA'AM, I'M ON PAGE 6.

Q.      WHEN YOU WERE CALLED HERE, YOU TOOK AN OATH AS WELL, RIGHT, AN OATH TO TELL THE TRUTH, RIGHT?

A.      CORRECT.

Q.      ON PAGE 6, IF YOU WOULD LOOK AT LINES 19 AND READ LINES 19 THROUGH 22.

A.      I WAS AT A RED LIGHT AND DAVID HAMMER, THIS MAN HERE, WALKED UP TO MY CAR, PUT A GUN IN THE WINDOW AND TOLD ME I WAS GOING TO TAKE HIM WHERE HE WANTED TO GO.

Q.      SO WHEN YOU TESTIFIED THAT HE PUT A GUN IN THE WINDOW AND TOLD YOU TO TAKE HIM WHERE HE WANTED TO GO, THAT WAS A LIE, RIGHT?

A.      YES.

Q.      OKAY.

NOW, IF YOU WOULD TURN TO THE NEXT PAGE, PLEASE.

A.      PAGE 7?

Q.      PAGE 7.

AND IF YOU WOULD READ LINES 17 THROUGH LINE 25, PLEASE.

A.      YES, HE WANTED -- TOLD ME THAT HE WANTED TO GO TO A MOTEL OUT ON MACARTHUR, I 40 AND MACARTHUR.

AND HE DIRECTED YOU TO DRIVE HIM THERE?

YES, HE DID.

WHY DID YOU DRIVE HIM THERE?

BECAUSE HE HAD A GUN.

WAS IT YOUR DESIRE OR WAS YOUR TRIP AGAINST YOUR WILL?

COMPLETELY.

Q.      WHEN YOU TESTIFIED THAT YOU DROVE HIM TO THE MOTEL BECAUSE HE HAD A GUN, THAT WAS A LIE, RIGHT, MR. UPTON?

A.      CORRECT.

Q.      AND WHEN YOU TESTIFIED THAT IT WAS COMPLETELY AGAINST YOUR WILL TO DRIVE TO THE MOTEL, THAT WAS A LIE, IS THAT CORRECT?

A.      CORRECT.

Q.      OKAY.

NOW, IF YOU TURN TO PAGE 16, MR. UPTON.

IF YOU SEE ON LINE 14, QUESTION IS:  OKAY, WHAT HAPPENED ONCE YOU REACHED THE MOTEL PARKING LOT?

A.      ONCE YOU REACHED THE MOTEL PARKING LOT, HE TOLD ME HE WOULD SHOOT ME IF I RUN.  THAT HE DIDN'T WANT TO SHOOT ME.  WE WENT UP THE STAIRS INTO THE ROOM WHERE HE MADE TWO PHONE CALLS.

Q.      OKAY.  SO WHEN HE TOLD -- WHEN YOU TESTIFIED THAT HE TOLD YOU -- IN THE PARKING LOT OF THE MOTEL, HE TOLD YOU THAT HE WOULD SHOOT YOU IF YOU RAN, BUT HE DIDN'T WANT TO SHOOT YOU, THAT WAS A LIE, RIGHT? BECAUSE YOU WALKED FROM THE MOTEL PARKING LOT --

A.      AT THAT PARTICULAR -- AT THAT PARTICULAR TIME I GUESS IT WAS.

Q.      OKAY.  ALL RIGHT.

NOW, AS A RESULT OF YOUR TESTIMONY, MR. UPTON, BEFORE THESE TWO PRELIMINARY HEARINGS, MR. HAMMER'S CHARGES WERE BOUND OVER FOR TRIAL, IS THAT RIGHT?

A.      YES.

Q.      OKAY.

AND YOU WERE CALLED TO TESTIFY AT TRIAL ON SEPTEMBER 4TH, 1984, IS THAT CORRECT?

A.      YES.  I WAS AT MR. HAMMER'S TRIAL.

Q.      YOU WERE UNDER OATH AT THE TIME.  WELL, DID YOU STAY FOR THE WHOLE TRIAL FROM THE BEGINNING TO END OR

DID YOU JUST APPEAR TO TESTIFY AND THEN --

A.       THEY WOULD NOT LET ME WATCH IT.

            MS. SAUNDERS:  I'M SORRY.  COURT'S

INDULGENCE.

            (PAUSE.)

BY MS. SAUNDERS:

Q.       I'M SHOWING YOU, MR. UPTON, DEFENDANT'S EXHIBIT

NUMBER 20.

A.       OKAY.

Q.       AND ON THE FRONT OF THE DOCUMENT IT'S DATED

SEPTEMBER 4TH, 5TH AND 6TH, CORRECT, OF 1984?

A.       IT SAYS OCTOBER 22ND, 1985.

Q.       NO, SIR.  DOES IT?

A.       OH, HERE IT IS.

Q.       I'M SORRY.  YOU MAY BE LOOKING AT THE WRONG

DATE.

A.       YES.

Q.       I SEE.  YOU ARE LOOKING AT THE STAMP.

A.       YES.

Q.       MY APOLOGIES.

            IT SAYS SEPTEMBER 4TH, 5TH AND 6TH,

CORRECT?

A.       CORRECT.

Q.       IT SAYS TRANSCRIPT OF TRIAL PROCEEDINGS, DOESN'T

IT?

A.      YES.

Q.      AND IF YOU GO TO -- IF YOU GO TO THE THIRD PAGE, IT INDICATES YOU AS A WITNESS AT LINES 10 AND 11, IS THAT CORRECT?

A.      YES, MA'AM.

Q.      OKAY.  AND ONCE AGAIN, WHEN YOU WENT UP TO TESTIFY, YOU WERE PLACED UNDER OATH, IS THAT CORRECT?

A.      YES.

Q.      IF YOU COULD TURN TO PAGE 33, AGAIN, USING THE NUMBERS ON THE BOTTOM OF THE PAGE ON THE RIGHT.

A.      OKAY.

Q.      AT THE TOP OF THE PAGE IF YOU CAN READ LINES 1 THROUGH 5 FOR ME, PLEASE.

A.      I WAS DRIVING DOWN 36 AND STOPPED AT THE RED LIGHT ON CLASSEN.  THIS MAN OVER HERE, INDICATING MR. HAMMER, WALKED UP TO MY CAR.  AND HE STUCK A GUN IN THE WINDOW, TOLD ME I WAS GOING TO TAKE HIM WHERE HE WANTED TO GO.

Q.      OKAY.  AND THEN IF YOU COULD ALSO READ THE -- WELL, LET'S GO AHEAD AND DO IT THIS WAY.  THAT ACTUALLY WAS A LIE, WAS IT NOT?

A.      THE GUN WAS A LIE, YES.

Q.      RIGHT.  THE MAN DID NOT APPROACH YOU WITH THE GUN, AND DID NOT SAY YOU ARE GOING TO TAKE HIM WHERE HE WANTED TO GO?

A.      THE GUN WAS A LIE, YES.

Q.      WELL, HE MADE NO THREATS TO YOU WHEN HE APPROACHED THE CAR, IS THAT CORRECT?

A.      CORRECT.

Q.      NOW IF YOU GO DOWN TO LINES 23 AND READ THAT THROUGH LINES -- LINE 1 OF THE NEXT PAGE.

A.      YEAH.  HE WALKED UP TO MY CAR, LAID THE GUN ON MY WINDOWSILL.  AND TOLD ME I WAS GOING TO TAKE HIM WHERE HE WANTED TO GO.  HE GOT IN AND SAID HE WANTED TO GO TO THIS MOTEL.

Q.      OKAY.

        IF YOU COULD READ THROUGH LINE 5 OF THAT, PLEASE.

A.      OKAY.

        SO I TOLD HIM THAT I WOULD TAKE HIM AND WE WENT DOWN CLASSEN TO SHERIDAN.  AND ON CLASSEN HE FIRED THE GUN OUT THE WINDOW AND HE TOLD ME HE MEANT BUSINESS.  AND I GOT ON I 40 WEST AND EXITED ON MACARTHUR AND TURNED LEFT AND WENT TO THE MOTEL.

Q.      OKAY.

        SO WHEN YOU TESTIFIED THAT HE LAID THE GUN ON THE WINDOWSILL, THAT WAS -- WHEN HE APPROACHED YOUR CAR, THAT WAS A LIE, CORRECT?

A.      YES.

Q.      AND WHEN YOU TESTIFIED THAT HE THREATENED YOU

WITH THE GUN AND SAID, YOU ARE GOING TO TAKE HIM WHERE HE WANTS TO GO, THAT WAS A LIE, CORRECT?

A.     AT THAT PARTICULAR TIME.

Q.     AND WHEN YOU TESTIFIED THAT AS YOU WERE GOING DOWN CLASSEN HE FIRED A GUN OUT THE WINDOW, THAT WAS A LIE, CORRECT?

A.     AT THAT PARTICULAR TIME.

Q.     NOW, IF YOU COULD -- THE NEXT QUESTION THAT THE PROSECUTOR ASKED YOU IS IF YOU COULD -- IF YOU COULD EXPLAIN FOR THE COURT IN THE CAR ON THE WAY TO THE MOTEL HOW THE MAN WAS HOLDING THE GUN.  AND WHAT DID YOU RESPOND?

A.     HE WAS HOLDING IT AT HIS SIDE.

Q.     NO.  THAT IS THE PROSECUTOR'S QUESTION, WAS HE JUST HOLDING IT AT HIS SIDE.  IN WHAT DIRECTION WAS HE POINTING THE GUN?

A.     NO.  HE HAD IT POINTED AT ME.

Q.     THAT WAS YOUR ANSWER, RIGHT?

A.     YES.

Q.     AND THAT WAS AS YOU WERE DRIVING DOWN CLASSEN, RIGHT?

A.     CORRECT.

Q.     ON THE WAY TO THE MOTEL, RIGHT?

A.     AT THAT PARTICULAR TIME, YES.

Q.     RIGHT.  AND SO THAT WAS A LIE, WASN'T IT?

A.      AT THAT TIME, YES.

Q.      OKAY.

                MS. SAUNDERS:  COURT'S INDULGENCE.

                (PAUSE.)

BY MS. SAUNDERS:

Q.      IF YOU LOOK DOWN AT THE BOTTOM OF 34 TO 35, YOU AGAIN TESTIFIED THAT WHEN YOU WERE ON CLASSEN, HE FIRED THE GUN OUT THE WINDOW AND SAID HE MEANT BUSINESS, RIGHT?  THAT IS LINES 25 ON 34 THROUGH 3 ON 35.

A.      YES.

Q.      OKAY.  AND THAT WAS A LIE, WASN'T IT?

A.      AT THAT PARTICULAR TIME, YES.

Q.      THE NEXT QUESTION THAT THE PROSECUTOR ASKED AT LINE 4 ON PAGE 35, WHAT WAS THAT QUESTION?

A.      DURING THIS TRIP AT ANY TIME DURING THE TRIP DID YOU CONSENT TO HAVE THAT MAN IN THE CAR?

                NO, NOT AT ALL.

Q.      WHAT IS THE NEXT QUESTION?

A.      DID YOU CONSENT TO TAKE THIS MAN DOWN CLASSEN IN ANY WAY?

                NO.

Q.      AND THOSE WERE BOTH -- THOSE ANSWERS WERE BOTH LIST, WEREN'T THEY?

A.      AT THAT PARTICULAR TIME.

Q.      TURN TO PAGE 37 OF THE TRANSCRIPT, LINES 24 AND

25 AND 1 INTO THE NEXT PAGE.  COULD YOU READ THAT ANSWER, PLEASE.

PARDON ME.  JUST BEFORE THAT THE PROSECUTOR IS ASKING YOU ABOUT ARRIVING AT WHAT YOU BELIEVE TO BE THE COACHMAN INN, IS THAT RIGHT?

A.    THAT'S WHAT IT SAYS.

Q.    AND THE PROSECUTOR THEN ASKED YOU:  WHAT DID YOU DO ONCE YOU ARRIVED THERE AT THE COACHMAN INN, RIGHT?

A.    YES.

Q.    AND WHAT WAS YOUR ANSWER?

A.    IT SAYS:  HE MADE ME SLIDE OVER TO THE PASSENGER'S SIDE AND GET OUT WHILE HE HAD THE GUN ON ME.

Q.    AND GET OUT WHILE HE HAD THE GUN ON YOU, RIGHT? THAT'S WHAT YOU SAID.

A.    YEAH.  WE WENT TO THE ROOM UPSTAIRS.

Q.    OKAY.  SO WHEN YOU TESTIFIED THAT HE HELD A GUN ON YOU AND FORCED YOU TO GET OUT ON THE PASSENGER'S SIDE AT THE MOTEL PARKING LOT, THAT WAS A LIE, WASN'T IT?

A.    AT THAT PARTICULAR TIME.

Q.    WELL, IT'S A LIE THEN.  AND IT'S A LIE NOW, RIGHT, MR. UPTON?

A.    FROM 36 AND CLASSEN TO THE MOTEL.  BUT THERE WAS TIMES AFTER THAT THAT HE -- THAT HE DID ALL THE OTHER. SO WHEN I SAY AT THAT PARTICULAR MOMENT, I MEAN, THAT YOU ARE TALKING LIKE HE DID NOT SHOOT ME AT ALL.  SO

THAT IS WHY I'M SAYING AT THAT PARTICULAR MOMENT FROM 36TH AND CLASSEN TO THE MOTEL, PERIOD.  BECAUSE SOME OF THIS STUFF DID HAPPEN AFTER THAT.

Q.      OKAY, MR. UPTON.

        IF YOU CAN LOOK ON PAGE 38 ON LINE 2.  AND THE PROSECUTOR ASKED YOU:  WHAT WAS YOUR EMOTIONAL STATE AT THE TIME THAT YOU ARRIVED AT THE MOTEL?

        AND WHAT WAS YOUR ANSWER?

A.      I WAS SCARED TO DEATH.

Q.      OKAY.  AND THE PROSECUTOR THEN ASKED YOU -- AT THE MOTEL NOW, IS THAT WHY YOU ACCOMPANIED HIM?

        AND YOUR RESPONSE WAS YES.

A.      YES.

Q.      AND BOTH OF THOSE -- WELL, THE ANSWERS WERE FALSE BECAUSE YOU WERE THERE CONSENSUALLY, RIGHT?

A.      AT THAT PARTICULAR TIME, RIGHT.

Q.      OKAY.

        NOW, AFTER THE TRIAL, MR. HAMMER WAS CONVICTED, IS THAT RIGHT?

A.      CORRECT.

Q.      THEN HE WAS SENTENCED, IS THAT RIGHT?

A.      CORRECT.

Q.      AND THE PROSECUTOR RELIED ON YOUR TESTIMONY TO ARGUE THAT THE JURY SHOULD CONVICT AND SENTENCE YOU, RIGHT?

MS. HAINES:  OBJECTION.

THE COURT:  I WILL OVERRULE THE OBJECTION.

THE WITNESS:  ANSWER IT?

BY MS. SAUNDERS

Q.     YES, YOU CAN ANSWER IT.

A.     YEAH, HE GOT THE CONVICTION BECAUSE DAVID PAUL HAMMER EXECUTED ME.

Q.     OKAY.

MS. SAUNDERS:  COURT'S INDULGENCE, YOUR HONOR.

(PAUSE.)

BY MS. SAUNDERS:

Q.     NOW, MR. UPTON, JUST LIKE YOU PREVIOUSLY TESTIFIED THAT MR. HAMMER SUPPOSEDLY FIRED A GUN OUT OF THE WINDOW OR INTO THE SEAT FROM CLASSEN TO THE MOTEL, TODAY YOU ARE SAYING THAT IT HAPPENED LATER, IS THAT RIGHT?

A.     WELL, I HAVE BEEN TRYING TO FORGET THIS FOR 31 YEARS.  AND WHEN I READ SOME OF THIS, THEN SOME OF IT I REMEMBERED, YOU KNOW, AND I HAD FORGOT ABOUT THAT.  I FORGOT ABOUT IT.

Q.     OKAY.  BUT YOU ARE NOW SAYING THAT THE SHOOTING OUT OF THE CAR --

A.     YES.

Q.   -- HAPPENED AFTER YOU WERE LEAVING THE MOTEL. IS THAT WHAT YOUR TESTIMONY IS?

A.   IT MUST HAVE.

Q.   AND THE TESTIMONY THAT YOU PREVIOUSLY PROVIDED ABOUT IT HAPPENING ON CLASSEN STREET WAS DEFINITELY NOT TRUE, IS THAT CORRECT?

A.   I DON'T KNOW.

Q.   WELL, MR. UPTON, YOU TESTIFIED YOU WENT THERE WILLINGLY?

A.   YES.

Q.   HE DID NOT BRANDISH A GUN SO HE DID NOT FIRE THE GUN OUT OF THE WINDOW, RIGHT?

A.   CORRECT.  GOING TO THE MOTEL, RIGHT.

Q.   YOU TESTIFIED THAT WHEN YOU GOT TO THE REMOTE LOCATION, AT ONE POINT MR. HAMMER DIRECTED YOU TO TAKE YOUR CLOTHES OFF, IS THAT RIGHT?

A.   YES, HE DID.

Q.   AND YOU RAN -- YOU RAN AND WENT TO GET HELP, MEDICAL HELP, RIGHT, AFTER THE SHOOTING, RIGHT?

A.   YEAH.

Q.   DID THE POLICE EVER RETURN YOUR CLOTHES TO YOU?

A.   I DON'T REMEMBER.

Q.   IF I WERE TO TELL YOU THAT THE POLICE NEVER FOUND YOUR CLOTHES, WOULD THAT SURPRISE YOU?

A.   YES.

Q.      IF I WERE TO TELL YOU THAT THE POLICE NEVER FOUND ANY EVIDENCE CONNECTING MR. HAMMER TO THE SHOOTING, WOULD THAT SURPRISE YOU?

A.      YES.

Q.      OTHER THAN YOUR TESTIMONY, OF COURSE?

A.      AND MR. HAMMER HAS ADMITTED IT.

Q.      WELL, MR. UPTON, IF I WERE TO TELL YOU AT THE TIME OF THIS TRIAL, THE POLICE HAD NO PRINTS OR ANYTHING LIKE THAT THAT CONNECTED MR. HAMMER TO YOUR SHOOTING, WOULD YOU -- WOULD THAT BE ACCURATE IN YOUR MEMORY?

MS. HAINES:  OBJECTION, YOUR HONOR.

THE WITNESS:  I HAVE NO IDEA.

THE COURT:  HE DOESN'T KNOW.  LET'S MOVE ON.

BY MS. SAUNDERS:

Q.      NOW 15 YEARS GO BY, MR. UPTON, AND THEN YOU ARE CALLED TO TESTIFY IN THIS FEDERAL CAPITAL TRIAL, RIGHT, 1998?  THAT IS ABOUT 15 YEARS AFTER YOUR TESTIMONY -- YOUR PREVIOUS TESTIMONY?

A.      YES, MA'AM.

Q.      AT THAT TIME YOU WENT TO A DIFFERENT TOWN THAN YOU ARE HERE TODAY, IS THAT RIGHT?

A.      CORRECT.

Q.      AND YOU WERE TALKING TO A DIFFERENT PROSECUTING ATTORNEY, IS THAT RIGHT?

A.      CORRECT.

Q.      I HAVE SHOWN YOU WHAT HAS BEEN MARKED AS
DEFENDANT'S EXHIBIT 21, MR. UPTON.  ON THE COVER OF THAT
DOES IT INDICATE WILLIAMSPORT, PENNSYLVANIA AND JURY
TRIAL?

A.      YEAH.

Q.      DOES IT INDICATE JUNE 30TH, 1998?

A.      TUESDAY, YES.

Q.      AND IF YOU TURN TO PAGE 2 OF THE -- THAT
DOCUMENT, DO YOU SEE YOUR NAME RIGHT UP THERE AT THE
TOP?

A.      YES.

Q.      IN THIS PROCEEDING, ONCE AGAIN, 15 YEARS AFTER
THE PREVIOUS TRIAL, YOU ARE ONCE AGAIN PLACED UNDER
OATH, IS THAT CORRECT?

A.      YEAH.

Q.      NOW, IF YOU COULD TURN TO PAGE 6 OF THAT
DOCUMENT AND THESE I DID NOT BATES STAMP, SO IT IS --
JUST THE TOP NUMBER WORKS.

        IF YOU LOOK ON LINES 18 THROUGH 23, MR.
MARTIN IS INDICATING THAT THEY HAVE YOUR PRELIMINARY
HEARING TESTIMONY AND THAT THAT COVERS YOUR TESTIMONY
AND YOU RESPONDED:  THAT'S CORRECT.

        IS THAT TRUE?

A.      YES.

Q.      OKAY.

AT THAT TIME YOU DID NOT SPEAK UP AND SAY THERE WERE SOME PROBLEMS WITH THE PRELIMINARY HEARING TESTIMONY, DID YOU?

A.      NO.

Q.      TURN TO PAGE 9.  DO YOU SEE ON LINE 12 -- WELL, ON LINE --

A.      YEAH, ABOUT THE GUN?

Q.      RIGHT.  AND THE QUESTION:  BY BIG GUN, YOU USED YOUR HANDS?

A.      YES.  IT WAS A BIG GUN.

Q.      YOU WERE DESCRIBING THE LONG BARREL?

A.      YES.

Q.      AND THE QUESTION WAS -- THAT MR. MARTIN ASKED WHEN YOU FIRST SAW THAT GUN.  AND YOUR ANSWER WAS:  I FIRST SAW IT AT 36TH AND CLASSEN.  RIGHT?

A.      YES.

Q.      THAT IS A LIE, RIGHT?

A.      YES.

Q.      AND WHEN YOU SAID THAT MR. HAMMER HAD A GUN AT 36TH AND CLASSEN, THAT WAS NOT TRUE EITHER, WAS IT?

A.      NOT AT THAT PARTICULAR MOMENT, NO.

Q.      AND WHEN YOU SAID THAT HE POINTED THE GUN AT YOU AND TOLD YOU HE WAS GOING TO -- THAT YOU WERE GOING TO TAKE HIM WHERE HE WANTED TO GO, THAT WASN'T TRUE EITHER,

WAS IT?

A.    NOT AT THAT PARTICULAR TIME.

Q.    OKAY.

SO AT THAT POINT YOU DIDN'T -- YOU NOT ONLY DID NOT CORRECT YOUR PRIOR TESTIMONY THAT WAS NOT TRUE, BUT YOU CONTINUED TO SAY THE STORY THAT YOU NOW SAY TODAY WAS NOT TRUE, IS THAT RIGHT?

A.    YEAH.

Q.    EVEN IN MARCH OF THIS YEAR WHEN YOU SPOKE WITH MS. HAINES AND SPECIAL AGENT COYLE, IT'S TRUE, IS IT NOT, THAT YOU DID NOT IMMEDIATELY INDICATE THAT THERE WERE PARTS OF YOUR STORY THAT WERE NOT TRUE, RIGHT?

A.    CORRECT.

Q.    YOU INITIALLY STARTED TO TELL THEM THE SAME STORY, DIDN'T YOU?

A.    YES.

Q.    AND IN FACT YOU WERE CONFRONTED BY THE PROSECUTOR OR SPECIAL AGENT COYLE ABOUT THAT STORY, WEREN'T YOU?

A.    CORRECT.

Q.    IT WAS -- YOU DESCRIBED THAT AS BEING -- FEELING LIKE YOU WERE BEING CROSS-EXAMINED, RIGHT?

A.    CORRECT.

Q.    OKAY.  IT WAS THAT -- AT THAT POINT THAT YOU SAID, WELL, SOME OF IT IS NOT TRUE, RIGHT?

A.      CORRECT.  IT HAS BEEN 31 YEARS AND I'VE GOT PICTURES IN MY MIND.  I HAVE BEEN TELLING MYSELF THAT STORY FOR SO LONG, I BELIEVED IT.  SO THERE YOU GO.

Q.      YOU TESTIFIED ON DIRECT EXAMINATION, MR. UPTON, THAT YOU TOLD THE TRUTH TO AGENT COYLE -- TO AGENT COYLE AND MS. HAINES BECAUSE IT WAS TIME TO COME CLEAN?

A.      YES.

Q.      BUT YOU DID NOT INITIALLY TELL THE TRUTH TO AGENT COYLE AND MS. HAINES, DID YOU?

A.      WE HAD A CONVERSATION.

Q.      BUT AT FIRST YOU WERE NOT TELLING THEM THE TRUTH, IS THAT RIGHT?

A.      NO, I DIDN'T JUST RUN IN THERE AND TELL THEM.

Q.      OKAY.  ALL RIGHT.

        NOW -- SORRY I FORGOT TO ASK YOU.  WHEN YOU WERE TESTIFYING IN THESE FEDERAL CAPITAL PROCEEDINGS WHERE MR. HAMMER WAS FACING A DEATH SENTENCE, YOU WERE UNDER OATH AT THAT TIME TOO, RIGHT?

A.      YEAH, I GUESS.  YEAH, I WAS.

Q.      ALL RIGHT.

        MS. SAUNDERS:  COURT'S INDULGENCE.

        (PAUSE.)

BY MS. SAUNDERS:

Q.      I KNOW IT HAS BEEN A LONG TIME.  IT'S NOW 30 YEARS SINCE THIS INCIDENT HAPPENED.  IN MARCH, YOUR

MARCH 10, 2014 STATEMENT TO -- WHEN YOU WERE TALKING TO MS. HAINES AND SPECIAL AGENT COYLE, YOU INDICATED THAT YOU HAD BEEN RAPED BY MR. HAMMER, RIGHT?

A.     CORRECT.

Q.     AND YOU SAID THAT BECAUSE OF THE EMOTIONAL TRAUMA YOU HAVE NOT HAD SEX WITH ANYONE SINCE THAT TIME, IS THAT RIGHT?

A.     CORRECT.

Q.     THAT IS WHAT YOU TOLD THEM?

A.     THAT'S CORRECT.

Q.     YOU SAID THAT AGAIN TO SPECIAL AGENT GREENAWALT, RIGHT?

A.     CORRECT.

Q.     AND MS. HAINES, AGAIN, RIGHT?

A.     CORRECT.

Q.     RIGHT?

A.     YES.

Q.     YOU NEVER MENTIONED TO ANYONE IN THE 30 YEARS SINCE OCTOBER 28, 1983 THAT YOU HAD BEEN SEXUALLY ASSAULTED BY MR. HAMMER, RIGHT?

A.     NO.

Q.     AND YOU TESTIFIED ON DIRECT THAT YOU ARE WITH YOUR PARTNER, TOM, NOW, RIGHT?

A.     WE DON'T HAVE SEX.

Q.     I SEE.

A.      NEVER HAVE.

Q.      OKAY.  DO YOU KNOW A DAN MCGRUDER, MR. UPTON?

A.      A DAN MCGRUDER.  I KNOW A DON --

Q.      A DON MCGRUDER, MR. UPTON?

A.      YEAH, I KNOW DON MCGRUDER.

Q.      YOU WERE ROMANTICALLY INVOLVED WITH MR. MCGRUDER FOR A TIME, WEREN'T YOU?

A.      NO, I WAS NOT ROMANTICALLY INVOLVED WITH MR. MCGRUDER.  MR. MCGRUDER TRIED TO BLACKMAIL ME AND -- AFTER HE BEAT HIS 89-YEAR OLD GRANDMOTHER HALF TO DEATH.

Q.      OH.  WAS THAT THE INCIDENT WHERE YOU RAN OVER SOMEONE WITH A CAR?

A.      NO.  THAT WAS THE INCIDENT WHERE HE -- HERE IN FLORIDA WHERE HE BEAT UP HIS GRANDMOTHER AND HE CALLED ME, WANTED ME TO GET HIM OUT OF JAIL.

Q.      SO YOU'RE SAYING IF MR. MCGRUDER SAID THAT HE HAD BEEN IN A RELATIONSHIP WITH YOU AFTER THIS SHOOTING INCIDENT --

A.      HE IS LYING.

Q.      -- THEN HE WOULD BE LYING?

A.      YES, HE WOULD BE.

Q.      YOU MENTIONED IN YOUR DISCUSSION WITH AGENT COYLE AND MS. HAINES THAT YOU WERE INVOLVED WITH A BILL SIMMONS, RIGHT?

A.      YES.  FOR YEARS.

Q.      MR. SIMMONS, YOU HAD A LONG-TERM RELATIONSHIP WITH HIM, RIGHT?

A.      FROM THE TIME I WAS ABOUT 12 YEARS OLD.

Q.      HE BECAME PROTECTIVE OF YOU, RIGHT?

A.      AT FIRST.

Q.      AND YOU WERE INVOLVED WITH MR. SIMMONS UNTIL THE DAY HE DIED, WEREN'T YOU?

A.      NO, I WAS NOT.

Q.      SO IF MR. SNOW OR MR. MCGRUDER INDICATED THAT THEY KNEW THAT YOU WERE INVOLVED IN A RELATIONSHIP WITH MR. SIMMONS, THAT WOULD BE A LIE, RIGHT?

            MS. HAINES:  YOUR HONOR, THIS SEEMS A LITTLE OUTSIDE THE REALM OF HIS TESTIMONY.  THIS IS ALL PREDATING THE HAMMER INCIDENT.

            THE WITNESS:  YEAH.  THIS IS ALL PREDATING GETTING SHOT.

            MS. SAUNDERS:  NO.  I'M ASKING ABOUT SUBSEQUENT TO THE HAMMER INCIDENT.  THAT IS MY POINT.

            THE COURT:  I'M GOING TO OVERRULE THE OBJECTION.

BY MS. SAUNDERS:

Q.      THEY WOULD BE LYING IF THEY SAID YOU HAD A RELATIONSHIP WITH MR. SIMMONS AFTER THE SHOOTING.  IS THAT YOUR TESTIMONY?

A.      MR. SIMMONS I THINK -- IF I'M NOT SURE, BUT I

THINK THEY HAD ALREADY BLOWED HIS HOUSE UP BEFORE THIS THING WITH MR. HAMMER, BECAUSE I HAD CUT -- EVERYBODY LOOSE BEFORE THAT BECAUSE I WAS STRAIGHTENING MY LIFE UP.

Q.    MR. UPTON, MR. SIMMONS' HOUSE DID NOT BLOW UP UNTIL 1991.

A.    OKAY, SEE, I DID NOT KNOW THAT.

Q.    THAT WAS AFTER THE SHOOTING?

A.    SEE, I DIDN'T KNOW THAT.

Q.    DO YOU REMEMBER EVEN TALKING TO MR. MCGRUDER ABOUT THE SHOOTING?

A.    I HAVE NOT SPOKE TO MR. MCGRUDER IN YEARS.

Q.    OKAY.

A.    IN YEARS I HAVE NOT -- I DIDN'T EVEN KNOW IF HE WAS STILL ALIVE.

Q.    ALL RIGHT.

WELL, MR. SIMMONS LIVED -- AT THE TIME YOU KNEW HIM, HE LIVED AT 45 AND CLASSEN, DIDN'T HE?

A.    HE LIVED ON -- HIS MOTHER LIVED ON 45TH OFF CLASSEN.

Q.    THAT IS THE HOUSE THAT GOT BLOWN UP, RIGHT?

A.    YES.  I KNEW THAT.

Q.    THAT IS IN THE SAME NEIGHBORHOOD AS 36TH AND CLASSEN WHERE YOU PICKED UP MR. HAMMER, RIGHT?

A.    CORRECT.

Q.        NOW, YOU SAID THAT THE REASON YOU DIDN'T TELL THE TRUTH WAS BECAUSE YOU WERE AFRAID THAT THE PROSECUTION WOULD NOT TAKE -- IN 1983, IS BECAUSE YOU WERE AFRAID THAT THE PROSECUTION WOULD NOT TAKE YOU SERIOUSLY IF YOU TOLD THEM THAT YOU WERE GAY, RIGHT?

A.        THAT'S CORRECT.

Q.        OKAY.

THAT IS WHAT YOU TOLD SPECIAL AGENT COYLE AND MS. HAINES ON MARCH 10TH, RIGHT, OF THIS YEAR? SORRY.  YOU TOLD THEM THAT WAS THE REASON WHY YOU DID NOT TELL THE TRUTH IS BECAUSE YOU WERE AFRAID THAT THEY WOULD NOT TAKE YOU SERIOUSLY BECAUSE YOU WERE GAY, RIGHT?

A.        YEAH.

Q.        DO YOU RECALL DURING THE FIRST PRELIMINARY HEARING COUNSEL FOR MR. HAMMER ASKING YOU QUESTIONS ABOUT WHETHER OR NOT YOU WERE HOMOSEXUAL?

A.        NO, I DO NOT RECALL IT.

MS. SAUNDERS:  COURT'S INDULGENCE.

(PAUSE.)

BY MS. SAUNDERS:

Q.        IF YOU COULD LOOK AT DEFENSE EXHIBIT 18, MR. UPTON.  THAT IS THE PRELIMINARY HEARING THAT OCCURRED ON MARCH 12TH, 1984.  DO YOU SEE THAT?  TURN TO PAGE 13, MR. UPTON.

A.      PAGE 13?

Q.      YES.

A.      OKAY.  WHAT DO YOU WANT ME TO READ?

Q.      DO YOU SEE ON LINE 4 WHERE THE QUESTION IS ASKED:  ARE YOU HOMOSEXUAL, MR. UPTON?

        DO YOU SEE THAT?

        MS. HAINES:  PAGE AND LINE.

BY MS. SAUNDERS:

Q.      I'M SORRY.  TURN TO PAGE 12.  I AM READING THE WRONG --

A.      I'VE GOT PAGE 13 HERE AND IT SAYS LINE 4, THAT'S RIGHT.

Q.      TURN TO THE PAGE BEFORE IT, MR. UPTON.  ON LINE 4:  ARE YOU HOMOSEXUAL, MR. UPTON?  THAT IS THE QUESTION, RIGHT?

A.      YES.

Q.      AND THERE WAS ALSO A QUESTION ABOUT WHETHER OR NOT YOU WERE PATRONIZING A BAR CALLED SADDLE TRAMPS DURING THIS PRELIMINARY HEARING, RIGHT?  DO YOU RECALL THAT?

A.      I DON'T RECALL THAT.

Q.      TURN TO PAGE 12, PLEASE.  I'M SORRY, PAGE 11. MY APOLOGIES.  I'M LOOKING AT THE WRONG NUMBER.

A.      IN WHICH ONE?

Q.      IN THE SAME TRANSCRIPT, THE MARCH 12TH, 1984.

A.      PAGE WHAT?

Q.      PAGE 11.  YOU SEE THE QUESTION ON LINE 4:  HAVE YOU EVER BEEN IN THAT CLUB, MR. UPTON, SADDLE TRAMPS?

A.      YES.  I HAVE BEEN.

Q.      AND YOUR ANSWER WAS YES, RIGHT?

A.      YES.

Q.      THAT WAS A BAR THAT WAS KNOWN FOR -- TO BE A GAY BAR AT THAT TIME, RIGHT?

A.      CORRECT.  STILL IS.

Q.      OKAY.  SO EVEN AFTER THE OBVIOUS INFERENCES FROM THOSE QUESTIONS DURING THAT PRELIMINARY HEARING, THE PROSECUTION STILL PURSUED THE CHARGES, DIDN'T HE?

        MS. HAINES:  OBJECTION TO THE OBVIOUS INFERENCES, YOUR HONOR.

        THE COURT:  SUSTAINED.

BY MS. SAUNDERS:

Q.      AFTER THAT FIRST PRELIMINARY HEARING, THE PROSECUTION STILL PURSUED THE CHARGES, DIDN'T HE?

A.      WELL, YEAH, BECAUSE HE SHOT ME IN THE HEAD THREE TIMES AND TRIED TO KILL ME.

Q.      SO THERE WAS NO ISSUE ABOUT THAT -- ABOUT HOMOSEXUALITY AT THAT POINT, RIGHT?

A.      YEAH.

Q.      OKAY.  AND HE STILL CALLED YOU AT TRIAL, THE PROSECUTOR DID, DIDN'T HE?

A.      YEAH.

Q.      ARE YOU AWARE THAT THE PROSECUTION FILED A MOTION JUST BEFORE TRIAL TO PRECLUDE THE DEFENSE FROM ADMITTING OR FROM MENTIONING PERSONALLY OR THROUGH WITNESSES THE FACT THAT YOU, MR. UPTON, OR ANY OF THE OTHER STATE WITNESSES HAVE AT ANY TIME ENGAGED IN HOMOSEXUAL ACTIVITY?

A.      NO, I WAS NOT AWARE OF IT.

Q.      I WOULD LIKE YOU TO TAKE A LOOK AT WHAT I JUST HANDED YOU, WHICH IS DEFENSE EXHIBIT NUMBER 22.  DO YOU SEE THAT, SIR?

A.      YES.

Q.      AND IT IS IN FACT A MOTION -- CALLED A MOTION IN LIMINE, ISN'T IT?

A.      YES.

Q.      AND IT'S SIGNED BY THE ASSISTANT DISTRICT ATTORNEY IN THE DISTRICT COURT OF OKLAHOMA COUNTY, ISN'T IT?

A.      YES, MA'AM.

Q.      OKAY.  AND IT SPECIFICALLY STATES THAT HE WANTS TO ADMONISH MR. HAMMER NOT TO MENTION THAT YOU OR ANY OF THE STATE WITNESSES AT ANY TIME ENGAGED IN HOMOSEXUAL ACTIVITIES BECAUSE IT'S NOT RELEVANT.  RIGHT?

A.      RIGHT.

        THE COURT:  IS THIS D 22?

MS. SAUNDERS:  THIS IS D 22.  YES, YOUR HONOR.

BY MS. SAUNDERS:

Q.      SO BY TRIAL, HE MUST HAVE HAD AN IDEA THAT YOU MAY BE HOMOSEXUAL, RIGHT?

MS. HAINES:  OBJECTION TO WHAT THE PROSECUTOR MUST HAVE HAD AN IDEA ABOUT.

THE WITNESS:  MA'AM, I HAVE NO IDEA. THAT HAS BEEN 31 YEARS AGO.  I NEVER SEEN THAT PIECE OF PAPER BEFORE IN MY LIFE.

THE COURT:  I'M GOING TO OVERRULE THE OBJECTION.  IT HAS BEEN ANSWERED.

MS. SAUNDERS:  I'M SORRY.

THE COURT:  I OVERRULED THE OBJECTION. HE ANSWERED THE QUESTION.

BY MS. SAUNDERS:

Q.      EVEN THOUGH HE FILED THIS MOTION TALKING ABOUT POTENTIAL EVIDENCE OF YOUR HOMOSEXUALITY, THE PROSECUTOR STILL CONTINUED TO PROSECUTE YOUR CASE, DIDN'T HE?

A.      WELL, YES.

Q.      OKAY.  ALL RIGHT.

15 YEARS AFTER THE CONVICTIONS AND SENTENCES HAD BEEN UPHELD IN 1998, YOU CERTAINLY DIDN'T HAVE ANY CONCERN THAT THE PROSECUTION WOULD NOT TAKE THE CHARGES SERIOUSLY, DID YOU?

A.        MA'AM, I NEVER THOUGHT ABOUT IT.

Q.        OKAY.  SO YOU DIDN'T THINK ABOUT IT AND WENT INTO FEDERAL COURT AND DIDN'T CORRECT YOUR PRIOR UNTRUTHFUL TESTIMONY OR PROVIDE TRUTHFUL TESTIMONY, IS THAT RIGHT?

A.        I DIDN'T EVEN THINK ABOUT IT, MA'AM.  YOU KNOW, HE WAS THERE BECAUSE HE KILLED SOMEBODY.

Q.        WELL, YOU KNEW IT WAS A DEATH PENALTY CASE.

A.        AND I JUST KNEW THAT I WAS LUCKY, THAT IT COULD HAVE BEEN ME.

Q.        YOU KNEW IT WAS A DEATH PENALTY CASE AND YOU KNEW YOU HAD LIED IN THE PAST AND YOU LIED IN 1998 AS WELL?

A.        I DIDN'T EVEN THINK ABOUT IT, MA'AM, BECAUSE I BELIEVED THAT VERSION.  I BELIEVED IT AT THE TIME.

Q.        YOU DIDN'T THINK ABOUT THE FACT THAT MR. HAMMER WAS FACING THE DEATH SENTENCE WHEN YOU GOT ON THE STAND AND TOLD LIES.  IS THAT ESSENTIALLY WHAT HAPPENED?

A.        I DID NOT GET ON AND INTENTIONALLY TELL A LIE.

Q.        WELL, MR. UPTON, YOU SAID THAT YOU SPECIFICALLY MADE A DECISION NOT TO TELL THE TRUTH BECAUSE YOU WERE AFRAID ABOUT THEM NOT PROSECUTING, RIGHT?

A.        I DIDN'T THINK ABOUT IT.  I NEVER EVEN THOUGHT ABOUT IT.

Q.        OKAY.

A.    ALL I KNEW IS THAT I DID NOT WANT SEX TO COME INTO THIS THING.

Q.    YOU DID NOT WHAT?

A.    I DID NOT WANT SEX TO COME INTO THIS THING.

Q.    RIGHT.  AND YOU -- WHEN YOU SAY YOU DID NOT WANT IT TO COME IN, THAT YOU AND MR. HAMMER HAD SEX, RIGHT?

A.    WELL, THAT IS HOW I ENDED UP FIGHTING WITH HIM OVER THE GUN.

Q.    NEVERTHELESS, IN 1998 WHEN YOU KNEW MR. HAMMER WAS FACING A DEATH SENTENCE, YOU CONTINUED TO LIE, IS THAT CORRECT, MR. UPTON?

A.    MR. HAMMER DESERVED IT.

            MS. SAUNDERS:  COURT'S INDULGENCE.

            (PAUSE.)

            MS. SAUNDERS:  I HAVE NO FURTHER QUESTIONS.

            THE COURT:  ANY REDIRECT?

            MS. HAINES:  YES, YOUR HONOR.

                REDIRECT EXAMINATION

BY MS. HAINES:

Q.    HELLO AGAIN, MR. UPTON.

A.    HELLO.

Q.    MS. SAUNDERS JUST ASKED YOU A SERIES OF QUESTIONS ABOUT WHETHER BACK IN THOSE OKLAHOMA PROCEEDINGS EVERYONE KNEW YOU WERE A HOMOSEXUAL.  DO YOU

RECALL THOSE QUESTIONS?

A.      YES.

Q.      I WANT YOU TO TURN BACK TO DEFENSE EXHIBIT 18,
IF YOU WOULD, PLEASE.

A.      OKAY.

Q.      DO YOU HAVE THAT, SIR?  TURN TO PAGE 12, THE
NUMBER ON THE BOTTOM.

A.      OKAY.

Q.      NOW, MS. SAUNDERS HAD YOU READ THE QUESTION INTO
THE RECORD, LINE 4.  THE QUESTION WAS ASKED OF YOU BY
THE DEFENSE ATTORNEY:  ARE YOU A HOMOSEXUAL, MR. UPTON?
AND SIR, PLEASE READ WHAT YOUR ANSWER WAS.

A.      NO, I'M NOT.

Q.      SO DID YOU TELL ANYONE ON THE RECORD IN OKLAHOMA
THAT YOU WERE A GAY MAN?

A.      NO.

Q.      ALL RIGHT.  NOW, SIR, YOU WERE ALSO ASKED A
SERIES OF QUESTIONS ABOUT WHETHER MR. HAMMER EVER FIRED
INTO YOUR CAR.  DO YOU RECALL THAT?

A.      YES.

Q.      AND YOU ANSWERED A LOT OF THOSE QUESTIONS WITH
NOT AT THAT TIME.  DO YOU RECALL YOUR ANSWERS?

A.      YES.

Q.      AND I BELIEVE MS. SAUNDERS ASKED YOU -- OR SAID
IN HER QUESTION THAT NOW YOU ARE SAYING THAT HE FIRED

INTO YOUR CAR ON THE WAY FROM THE MOTEL TO THE OIL ROOM. DO YOU RECALL HER ASKING YOU THAT?

A.      YES.

Q.      SIR?

A.      YES.

Q.      YOU ARE READING.  COULD YOU -- DO YOU RECALL THAT YOU HAVE ACTUALLY SAID THAT IN THE PAST, THAT IT WAS ON THE WAY TO THE OIL FIELD THAT HE FIRED INTO THE CAR?  IF YOU DON'T REMEMBER --

A.      I DON'T REMEMBER.

Q.      -- THAT IS FINE.

SO PLEASE TURN TO DEFENDANT EXHIBIT 19. THAT IS ANOTHER ONE OF THESE TRANSCRIPTS, DATED JUNE 1ST, 1984.  OKAY?

A.      OKAY.

Q.      IF YOU COULD TURN TO PAGE 21.  ARE YOU WITH ME, SIR?  IT'S PAGE 21.  I'M GOING TO START ON LINE 6.  THIS IS YOU TESTIFYING ON JUNE 1ST, 1984, CORRECT?

A.      YES.

Q.      AND MAKE SURE I READ IT RIGHT.  THE QUESTION WAS ASKED: APPROXIMATELY HOW LONG WERE YOU IN THE MOTEL ROOM, MR. UPTON?

YOUR ANSWER:  30 MINUTES, 45 MINUTES.

QUESTION:  OKAY.  MR. UPTON, WHEN YOU LEFT THE MOTEL ROOM --

YOUR ANSWER:  SOMETHING LIKE THAT.

QUESTION:  WHEN YOU LEFT THE MOTEL ROOM, MR. UPTON, WHAT HAPPENED THEN?

ANSWER:  YOU TOLD ME IF I RUN THAT YOU WERE GOING TO BLOW MY BRAINS OUT.  AND I DIDN'T -- YOU SAID YOU WERE NOT GOING TO SHOOT ME, JUST TAKE ME OUT TO WHERE I COULDN'T GET TO A TELEPHONE.

MS. SAUNDERS:  YOUR HONOR, OBJECTION, IS THERE A QUESTION HERE?

THE COURT:  OVERRULED.

BY MS. HAINES:

Q.      WHICH SOUNDED LOGICAL.  AND ALSO I FORGOT TO BRING UP THE POINT THAT HE FIRED INTO MY SEAT TO MAKE A BELIEVER OUT OF ME.  FIRED OUT THE WINDOW WITH THE GUN. AND THEN WE DROVE DOWN 29TH STREET -- 29TH STREET I BELIEVE IS WHERE YOU SHOT OUT THE WINDOW.  I THOUGHT YOU WERE FIXING TO SHOOT ME IN THE HEAD, BUT YOU SHOT OUT THE WINDOW.

MR. UPTON, DO YOU SEE WHERE YOU GAVE THOSE ANSWERS TO THOSE QUESTIONS?

A.      YES.

Q.      AND THAT WAS IN 1984, CORRECT?

A.      YES.

Q.      NOW, MR. UPTON, I WANT TO ASK YOU, DID YOU EVER EVER ONCE LIE IN 31 YEARS ABOUT WHO IT WAS THAT TOOK YOU

OUT TO THE OIL FIELD AT GUNPOINT AND MADE YOU STRIP

NAKED?

A.      NO.

Q.      HAVE YOU EVER LIED ONCE, SIR, IN 31 YEARS ABOUT

WHO MADE YOU LIE DOWN AND THEN SHOT YOU IN THE HEAD AND

LEFT YOU FOR DEAD THAT NIGHT?

A.      NO.

Q.      HAVE YOU EVER LIED ABOUT WHO TOOK YOUR CAR AND

STRANDED YOU THERE?

A.      NO.

Q.      HAVE YOU EVER LIED ABOUT THE FACT THAT HE FORCED

YOU TO DO ALL THAT?

A.      NO.

Q.      AND WHO WAS THE PERSON WHO YOU HAVE SAID TOOK

YOU OUT THERE, STRIPPED YOU NAKED, MADE YOU LIE DOWN,

SHOT YOU AND THEN TOOK YOUR CAR?

A.      DAVID PAUL HAMMER.

Q.      ANY DOUBT IN YOUR MIND THAT IT WAS DAVID PAUL

HAMMER?

A.      NO.

Q.      MR. UPTON, MY FINAL QUESTION, DID YOU DO

ANYTHING THAT NIGHT TO DESERVE THAT?

A.      NO.

            MS. SAUNDERS:  OBJECTION.

            THE COURT:  OVERRULED.

MS. HAINES:  I HAVE NOTHING FURTHER, YOUR HONOR.

MS. SAUNDERS:  NOTHING FURTHER.

THE COURT:  ALL RIGHT.  YOU MAY STEP DOWN AND WE WILL TAKE A FIVE-MINUTE RECESS.

THE DEFENDANT:  EXCUSE ME, YOUR HONOR.  I NEED TO SPEAK TO MY ATTORNEYS BEFORE THIS WITNESS LEAVES AND THEY KNOW THAT.

THE COURT:  ALL RIGHT.  WE WILL ASK MR. UPTON TO REMAIN IN THE COURTROOM.  HE MAY STEP DOWN DURING THE BREAK AND WE WILL AFFORD COUNSEL THE OPPORTUNITY TO CALL MR. HAMMER.

MR. MORENO:  THANK YOU, YOUR HONOR.

THE COURT:  WE WILL STAND IN RECESS.

(BREAK TAKEN.)

THE COURT:  PLEASE BE SEATED.

PLEASE BE SEATED.  IT'S OBVIOUS THAT THE PICTURE HAS FROZEN OF MR. HAMMER.  THERE IS SOME PROBLEM WITH THE CAMERA, PROBABLY AT THE INSTITUTION.  I WONDER, MR. HAMMER, IF WE CAN'T HAVE A SECURITY GUARD COME IN.  I WON'T SEE HIM ENTER BECAUSE THE PICTURE --

THE DEFENDANT:  JUST ONE SECOND, YOUR HONOR, LET ME GET THE OFFICER OR MY COUNSELOR.

THE COURT:  ALL RIGHT, IS HE THERE?

OFFICER:  IS THAT ANY BETTER, YOUR HONOR?

THE COURT:  IS THAT THE SECURITY OFFICER?

THE DEFENDANT:  YES, SIR.  HE IS MY COUNSELOR.

THE COURT:  SIR, WE HAVE A SITUATION WHERE MR. HAMMER'S IMAGE ON OUR SCREENS IS FROZEN.  WE SEE MOVEMENT.  THE ONLY SUGGESTION I HAVE TO CURE IT IS THAT I BELIEVE SOMETHING IS HAPPENING AT YOUR END AT THE INSTITUTION.

OFFICER:  I WILL GET AHOLD OF OUR I-T SPECIALIST AND SEE IF HE CAN FIX IT FOR US REAL QUICK.

THE COURT:  DO YOU HAVE ANY IDEA HOW LONG THAT WOULD TAKE?

OFFICER:  I DO NOT.  I WILL CALL HIM RIGHT NOW.

THE COURT:  IT IS NOW OUR TIME, EASTERN STANDARD TIME, ALMOST 25 AFTER 11 AND I AM JUST WONDERING WHETHER OR NOT -- I THINK MR. HAMMER WHO IS ON VIDEO OUGHT TO BE ABLE TO AT LEAST -- WE OUGHT TO BE ABLE TO SEE HIM TO MAKE SURE THAT HE CAN ASSURE US THAT HE SEES EVERYTHING.

YOU HAVE BEEN ABLE TO WITNESS EVERYTHING IN THE COURTROOM, CORRECT, MR. HAMMER?

THE DEFENDANT:  YES, SIR, I HAVE.

THE COURT:  ALL RIGHT.  BUT I THINK WE OUGHT TO HAVE THE ABILITY TO SEE HIM TOO SO I'M JUST

WONDERING IF WE SHOULD NOT TAKE AN EARLY LUNCH AND COME BACK AT OH, MAYBE A QUARTER TO ONE AND SEE WHERE IT TAKES US.

WOULD THAT BE FEASIBLE, OFFICER?

OFFICER:  YEAH, THAT IS FINE, SIR.

THE COURT:  WHY DON'T WE DO THAT AND SEE IF YOU CAN'T GET IT CORRECTED.  I'M GOING TO ASK OUR I-T STAFF HERE TO BE AVAILABLE WHEN YOUR I-T PERSON COMES IN AND SEE IF WE CAN GET IT CORRECTED MUTUALLY, OKAY?

OFFICER:  ALL RIGHT, SIR.

THE COURT:  WE WILL STAND IN RECESS.

MS. HAINES:  IS MR. UPTON NEEDED AFTER LUNCH?

MS. SAUNDERS:  YES.  THANK YOU, YOUR HONOR.

THE COURT:  BREAK TAKEN.

(BREAK TAKEN.)

THE COURT:  PLEASE BE SEATED.  FROM WHAT I CAN SEE, WE'VE RESOLVED OUR PROBLEM AND -- WITH THE VIDEO OF MR. HAMMER AND IT'S NOW 1:53.  AND LET'S RESUME.

ARE WE RECALLING THE WITNESS?

MS. SAUNDERS:  YES, YOUR HONOR, I HAVE NOT QUITE FINISHED.

THE COURT:  ALL RIGHT.

RECROSS EXAMINATION

BY MS. SAUNDERS:

Q.      MR. UPTON, ON DIRECT EXAMINATION YOU TESTIFIED THAT YOU GOT ON TO I 40 AND WENT TO NORTHWEST OKLAHOMA AND THAT THAT IS WHERE THE -- OKLAHOMA CITY AND THAT IS WHERE --

A.      PARDON ME.  IT WAS SOUTHEAST OKLAHOMA CITY, BECAUSE INTERSTATE 40 -- THAT'S RIGHT.  INTERSTATE 40 DIVIDES -- OR BROADWAY DIVIDES NORTH AND SOUTH SO --

Q.      DO YOU RECALL TESTIFYING AT TRIAL THAT YOU WENT ON I-40 TO 240 TO 29TH STREET AND THEN SOUTH ON 29TH STREET?

A.      YEAH.

Q.      AND THAT YOU WERE ON SARAH ROAD?

A.      WAS IT SARAH ROAD, OKAY.

Q.      WELL, IF YOU TAKE A LOOK AT --

A.      I DON'T KNOW.  IT HAS BEEN 31 YEARS AGO.

Q.      TAKE A LOOK AT THE TRANSCRIPT RIGHT IN FRONT OF YOU, MR. UPTON.  IF YOU TAKE A LOOK AT PAGE 43.

A.      OKAY.

Q.      IF YOU SEE ON LINE 7 TO 9, YOU TESTIFIED THAT YOU WENT SOUTH ON 240, TOOK THE 29TH STREET EXIT.  SEE THAT?

A.      YES.

Q.      AND THEN DOWN A LITTLE BIT ON 13 AND 14, LINES

13 AND 14, YOU WENT -- YOU SAY YOU TRAVELLED A LONG WAY TO SARAH ROAD, RIGHT?

A.    YEAH.

Q.    SO IT WAS SOUTHWEST OKLAHOMA CITY, AS OPPOSED TO NORTHWEST, RIGHT?

A.    YEAH.

Q.    ALL RIGHT.  AND DO YOU RECALL WHEN YOU WERE IN THE -- WHEN YOU GOT TO THE HOSPITAL, DEACONESS HOSPITAL, MR. UPTON --

A.    YES.

Q.    -- YOU DON'T NEED TO LOOK AT THE TRANSCRIPTS ANYMORE.  I'M MOVING ON TO SOMETHING ELSE.  WHEN YOU GOT TO THE HOSPITAL, DEACONESS HOSPITAL --

A.    UH-HUH.

Q.    -- AND A POLICE OFFICER RESPONDED TO INTERVIEW YOU, IS THAT RIGHT?

A.    YES.

Q.    THAT WAS OFFICER GRAHAM, RIGHT?

A.    I HAVE NO IDEA WHO IT WAS.

Q.    IT WAS A WOMAN POLICE OFFICER, RIGHT?

A.    I DON'T REMEMBER.

Q.    WELL, THE POLICE OFFICER INTERVIEWED YOU SHORTLY AFTER YOU ARRIVED AT THE HOSPITAL, RIGHT?

A.    OKAY.

Q.    AND YOU WERE THERE GETTING TREATED SO YOU DID

NOT HAVE FAMILY THERE YET, RIGHT?

A.      MY PARENTS -- MY RECOLLECTION, MY PARENTS WERE THERE REAL QUICK.  SO I DON'T REMEMBER IF THEY WERE THERE OR NOT THEN.

Q.      YOU DON'T RECALL ONE WAY OR THE OTHER?

A.      NO.

Q.      WELL, WHEN YOU WERE IN WILLIAMSPORT TALKING TO MR. MARTIN DURING THESE CAPITAL PROCEEDINGS, YOUR FATHER WAS NOT PRESENT THERE, WAS HE?

A.      NO.

MS. SAUNDERS:  YOUR HONOR, I'M ONE SHORT, SO I APOLOGIZE.

BY MS. SAUNDERS:

Q.      YOU CAN TAKE THAT, MR. UPTON.  I'M SHOWING YOU WHAT HAS BEEN MARKED AS DEFENSE EXHIBIT 23.  DO YOU SEE IT, MR. UPTON?

A.      I SEE IT.

Q.      OKAY.  AND WOULD YOU LOOK AT THE FIRST PAGE AT THE TOP AND DOES IT HAVE YOUR NAME UP THERE IN THE RIGHT-HAND SIDE?  I KNOW IT'S HARD TO READ, BUT THERE IS A LITTLE BLOCK WITH YOUR NAME ON IT?

A.      YES, IT DOES.

Q.      NOW, IF YOU TURN TO THE SECOND PAGE.

A.      OKAY.

Q.      AND ON THE FIRST REMARK IT SAYS THAT THIS

OFFICER INTERVIEWED YOU AT DEACONESS HOSPITAL, RIGHT, IN REFERENCE TO A SHOOTING, RIGHT?

A.      THAT'S WHAT IT SAYS, YES.

Q.      ALL RIGHT.  AND IT SAYS THAT YOU STATED THAT YOU HAD BEEN SHOT AT SOUTHWEST 29 AND SARAH ROAD, RIGHT?

A.      IF THAT'S WHAT IT SAYS.

Q.      SO THAT IS WHAT YOU TOLD THE POLICE OFFICER, RIGHT?

A.      OKAY.

Q.      OKAY.  YOU ALSO TOLD THE POLICE OFFICER, IF YOU GO DOWN 11 LINES, ABOUT HALFWAY DOWN --

A.      UH-HUH.

Q.      -- YOU WILL SEE A LINE THAT STARTS IN CLASSEN, DROVE SOUTH ON CLASSEN.  DO YOU SEE THAT?

A.      YEAH, TO THE COACHMAN INN, I-40 AND MACARTHUR.

Q.      AND YOU INDICATE THAT YOU TOLD THE POLICE OFFICER AT THAT TIME THAT THE SUBJECT FIRED OUT -- A SHOT OUT OF THE WINDOW SOMEWHERE ON CLASSEN STREET, RIGHT?

A.      NO, MA'AM, IT DOES NOT SAY THAT, THAT HE SHOT THE GUN OUT THE WINDOW.

Q.      DO YOU SEE IT SAYS:  SUBJECT FIRED OUT -- SHOT OUT THE WINDOW SOMEWHERE ON CLASSEN?

A.      THE SUBJECT HIT THE VICTIM SEVERAL TIMES IN THE SIDE OF THE HEAD WITH THE GUN.

Q.        YOU ARE A LITTLE BIT BELOW.

                MS. SAUNDERS:  IF I MAY APPROACH THE

WITNESS, YOUR HONOR?

                THE COURT:  YES.

BY MS. SAUNDERS:

Q.        IF I CAN JUST POINT TO IT FOR YOU, AND SHOW YOU

WHAT I'M TALKING ABOUT.  MY APOLOGIES.  IF YOU SEE

-- RIGHT THERE, THE WORD RIGHT THERE, STARTS WITH

SUBJECT?

A.        ONE WORD.  SUBJECT HAD A ROOM SOMEWHERE IN THE

SOUTHWEST PORTION OF THE COMPLEX.  VICTIM AND SUSPECT

WENT INTO THE ROOM.

Q.        SKIP UP, MR. UPTON.  I'M SORRY.  LET ME MAKE A

MARK ON IT FOR YOU, RIGHT HERE.

A.        WELL, MA'AM, I READ RIGHT WHERE YOU TOLD ME TO

READ.

Q.        SUBJECT FIRED.

A.        OKAY.  I SEE WHAT YOU WANT ME TO READ.

Q.        SEE WHAT I'M SAYING?  MY APOLOGIES.

A.        OKAY.

                SUBJECT FIRED ONE SHOT OUT WINDOW

SOMEWHERE ON CLASSEN.

Q.        OKAY.  NOW IF YOU GO TO THE NEXT PAGE ON THAT

REPORT.

A.        UH-HUH.

MS. SAUNDERS:  LET ME JUST, IF I COULD APPROACH, YOUR HONOR.

BY MS. SAUNDERS:

Q.      I WILL MARK IT FOR YOU.

OKAY.  THERE IT IS MARKED.  IF YOU CAN JUST READ THAT.  DO YOU SEE WHERE I MARKED IT, MR. UPTON?

A.      UH-HUH.

Q.      THERE IT SAYS THAT THE SUSPECT ORDERED YOU TO TAKE YOUR CLOTHES OFF, YOU STRIPPED AND THEN --

A.      AND THEN HE SHOT ME IN THE HEAD BECAUSE I WANTED MY BARBER TOOLS OUT OF THE TRUNK.

Q.      RIGHT.  BUT THE LINE BEFORE THAT, MR. UPTON, IT SAYS YOU ASKED THE SUSPECT IF YOU COULD HAVE YOUR JACKET AND THEN BENT OVER TO GET IT AND THE SUSPECT FIRED TWO SHOTS, RIGHT?  THAT'S WHAT THE POLICE REPORT INDICATES YOU TOLD THE OFFICER, RIGHT?

A.      THAT'S WHAT HE WROTE DOWN.

Q.      OKAY.  AND SO YOU WERE LEANING DOWN.  YOU TOLD THE POLICE OFFICER YOU WERE LEANING DOWN AS OPPOSED TO LAYING DOWN?

A.      MA'AM, I HAD JUST BEEN SHOT IN THE HEAD THREE TIMES.  I DON'T REMEMBER WHAT I TOLD THAT POLICE OFFICER.

Q.      OKAY.  OKAY.  ALL RIGHT.

WELL, MR. UPTON, LET ME GET BACK TO JUST ONE MORE THING.  OKAY.  YOU TESTIFIED ON DIRECT THAT YOU WERE ON YOUR WAY HOME WHEN YOU GOT TO 36TH AND CLASSEN, RIGHT?

A.    THAT'S CORRECT.

Q.    YOU WERE PRETTY CLOSE TO WHERE YOUR HOME IS, RIGHT?

A.    NO, I WAS NOT.

Q.    HOW ABOUT HOW FAR AWAY FROM YOUR HOUSE WERE YOU?

A.    LET'S SEE.  CLASSEN IS IN THE 14, 1500-BLOCK WEST AND MY PARENTS LIVE IN THE 1600 BLOCK EAST.

Q.    BUT YOUR PLAN WAS TO GO HOME, RIGHT?

A.    CORRECT.

Q.    BUT THEN YOU SAW SOMEONE ON THE STREET COME TOWARDS YOUR CAR, RIGHT?

A.    CORRECT.

Q.    AND THEN YOUR PLANS CHANGED BECAUSE YOU FELT THE GUY WAS CUTE, RIGHT?

A.    CORRECT.

Q.    AND YOU LET HIM IN YOUR CAR BECAUSE YOU THOUGHT HE WAS CUTE, RIGHT?

A.    CORRECT.

Q.    AND YOU DROVE QUITE A FEW MILES AWAY OUT OF YOUR WAY, AWAY FROM WHERE YOU WERE GOING TO APPROACH TO THIS HOTEL BECAUSE YOU THOUGHT HE WAS CUTE, RIGHT?

A.      YES.

Q.      OKAY.

AND YOU WENT WITH HIM WILLINGLY INTO THE HOTEL ROOM BECAUSE YOU THOUGHT HE WAS CUTE, RIGHT?

A.      I WENT WILLINGLY WITH HIM TO THE HOTEL ROOM.

Q.      BECAUSE YOU THOUGHT HE WAS CUTE AND YOU WERE HOPING TO HAVE SEX, RIGHT?

THE COURT:  WE HAVE BEEN OVER THIS ALREADY.

MS. SAUNDERS:  I JUST HAVE ONE MORE QUESTION, YOUR HONOR.

BY MS. SAUNDERS:

Q.      BUT AFTER 31 YEARS YOU TELL US THAT WHEN YOU GOT INSIDE THE HOTEL ROOM, WHAT HAPPENED WAS WHAT YOU CALL RAPE, RIGHT?

A.      YES.

Q.      OKAY.

MS. SAUNDERS:  NOTHING FURTHER.

THE WITNESS:  WHEN YOU'VE GOT A GUN TO YOUR HEAD AND SOMEBODY IS DOING THAT TO YOU, THAT IS RAPE, MA'AM.

MS. SAUNDERS:  I TOLD YOU, I HAVE NOTHING FURTHER.

THE COURT:  ANYTHING FURTHER?

MS. HAINES:  NO, YOUR HONOR.

THE COURT:  YOU MAY STEP DOWN.

THE WITNESS:  THANK YOU.

ARE ALL THESE MINE TO KEEP?

MS. SAUNDERS:  NO.  THEY ARE EXHIBITS FOR THE COURT.

THE WITNESS:  OKAY.

(WITNESS EXCUSED.)

MS. SAUNDERS:  WE WOULD MOVE OUR EXHIBITS INTO EVIDENCE.  I BELIEVE IT'S 18 TO 23, YOUR HONOR.

THE COURT:  ALL RIGHT.  HEARING NO OBJECTION, D 18 TO 23 WILL BE ADMITTED.

(DEFENSE EXHIBITS 18 THROUGH 23 ADMITTED INTO EVIDENCE.)

THE COURT:  AND MIGHT -- I'M JUST WONDERING WHETHER WE -- I NOTICE THE WITNESS WAS CHEWING GUM OR SOMETHING.  PERHAPS WE CAN --

MS. HAINES:  ARE YOU CHEWING GUM, MR. FULLERTON?

MR. FULLERTON:  YES, MA'AM.

MS. HAINES:  WOULD YOU MIND DISPOSING OF THAT, SIR.

(DAVID FULLERTON, GOVERNMENT WITNESS, SWORN.)

MS. SAUNDERS:  YOUR HONOR, I APOLOGIZE.

I WAS TALKING WITH COUNSEL.  I DO HAVE AN OBJECTION THAT I WOULD LIKE TO RAISE, YOUR HONOR.

THE COURT:  COME TO SIDEBAR.  WANT TO DO IT AT SIDEBAR?

MS. SAUNDERS:  SURE.

(SIDE-BAR.)

MS. SAUNDERS:  AS I UNDERSTAND IT, YOUR HONOR --

THE COURT:  THIS WITNESS' NAME IS WHAT?

MS. HAINES:  DAVID FULLERTON.

MS. SAUNDERS:  AS I UNDERSTAND IT, YOUR HONOR, MR. FULLERTON WILL BE TESTIFYING ABOUT CIRCUMSTANCES SURROUNDING THE POST CONVICTION PROCEEDINGS WITH RESPECT TO MR. HAMMER'S CASE IN THE UPTON CASE.  THAT OCCURRED IN 1986 AND 1987.  THE ALLEGATION IS THAT MR. HAMMER PURPORTEDLY GOT MR. FULLERTON TO FILE AN AFFIDAVIT SAYING THAT HE ACTUALLY COMMITTED THE SHOOTING.  THE PROBLEM I HAVE --

THE COURT:  MR. FULLERTON COMMITTED THE SHOOTING?

MS. SAUNDERS:  HE LATER RECANTED.  THE PROBLEM I HAVE WITH THE SHOOTING HOWEVER IS THAT IN MY VIEW AND I BELIEVE UNDER THE LAW -- EVIDENCE MUST BE PARTICULARLY RELEVANT TO THE AGGRAVATING FACTORS.

THE COURT:  SPEAK A LITTLE LOUDER AND A

LITTLE SLOWER SO THAT WE KNOW WE ARE PICKING UP EVERYTHING YOU ARE SAYING.  VERY WELL.

MS. SAUNDERS:  MR. FULLERTON'S TESTIMONY MUST BE -- THE EVIDENCE THEY PRESENT IN SUPPORT OF AGGRAVATING FACTORS PARTICULARLY -- IN THIS CASE WE ARE TALKING ABOUT STATUTORY AGGRAVATING FACTORS MUST BE PARTICULARLY RELEVANT TO THE AGGRAVATOR.  THIS HAPPENED YEARS AFTER MR. HAMMER WAS CONVICTED, YEARS AFTER MR. UPTON TESTIFIED.  IT HAS ALSO NO RELEVANCE.  THE ONLY BASIS I CAN SEE FOR ADMITTING IS TO TRY TO GET IN THROUGH THE BACK DOOR PRIOR BAD ACTS, WHICH IN FACT WOULD NOT BE NORMALLY ADMISSIBLE IN A CAPITAL SENTENCING HEARING.  FOR THAT REASON I WOULD SUBMIT TO THE COURT THAT IT SHOULD NOT BE ADMITTED.

THE COURT:  ALL RIGHT.  NOW THERE IS NO MOTION IN LIMINE IF YOU RECALL, RIGHT?

MS. SAUNDERS:  NO, YOUR HONOR.

THE COURT:  IT WAS A DIFFERENT WITNESS.

MS. HAINES, WHAT IS THE RELEVANCY OF MR. FULLERTON'S TESTIMONY?

MS. HAINES:  YOUR HONOR, MY UNDERSTANDING OF THAT LENGTHY CROSS EXAMINATION OF MR. UPTON WAS TO CHALLENGE HIS CREDIBILITY.  AND I THINK MR. FULLERTON IS GOING TO TESTIFY THAT MR. HAMMER CONFESSED TO HIM THAT HE DID THE SHOOTING OF MR. UPTON, THAT THE ONE MISTAKE

HE MADE WAS NOT KILLING HIM AND THEN ASK MR. FULLERTON TO FALSELY CONFESS, WHICH HE DID, WHICH ALL GOES TO CONSCIOUSNESS OF GUILT AND HELPS CORROBORATE WHAT MR. UPTON JUST TESTIFIED TO.

THE COURT:  IS THIS ALL ABOUT FUTURE DANGEROUSNESS TOO?

MS. HAINES:  YES.

MS. SAUNDERS:  IT IS CLEARLY NOT RELEVANT FUTURE DANGEROUSNESS EVIDENCE BECAUSE IT HAS NOTHING TO DO WITH WHETHER OR NOT MR. HAMMER WILL BE A FUTURE DANGER IN A PRISON SETTING.  SO IT'S NOT FUTURE DANGEROUSNESS EVIDENCE.  IT'S BAD ACTS.  IT'S BAD CHARACTER EVIDENCE.  IT'S AN ATTEMPT TO GET THAT IN IN THE BACK DOOR, I JUST THINK FROM A CAPITAL PERSPECTIVE IT'S IRRELEVANT.

THE COURT:  TO SOME EXTENT IT DOES CORROBORATE MR. HAMMER'S TESTIMONY AND HIS CREDIBILITY HAS BEEN CHALLENGED.  AGAIN I HAVE TO MAKE A DECISION WHAT WEIGHT TO GIVE TO TESTIMONY OF THIS NATURE.  IT DOES HAVE RELEVANCY TO THE ISSUES IN THE CASE AND I WILL OVERRULE THE OBJECTION.

(WHEREUPON THE SIDE-BAR CONFERENCE ENDED.)

THE COURT:  AGAIN, I WILL ASK THE WITNESS TO MOVE CLOSER TO THE MIC AND SPEAK INTO THE MIC.

MS. HAINES:  MR. FULLERTON, DID YOU INTRODUCE YOURSELF?

THE WITNESS:  MY NAME IS DAVID FULLERTON.

DIRECT EXAMINATION

BY MS. HAINES:

Q.     SIR, JUST AS YOU ARE DOING NOW, IF YOU COULD LEAN FORWARD AND SPEAK INTO THE MIC, THAT WORKS WONDERFULLY FOR US.  OKAY?

A.     OKAY.

Q.     CAN YOU TELL ME HOW OLD YOU ARE?

A.     I'M 55.

Q.     WHAT DO YOU DO FOR A LIVING, SIR?

A.     I'M A CONTRACTOR.

Q.     WHAT PART OF THE COUNTRY DO YOU CURRENTLY LIVE IN?

A.     I LIVE IN OKLAHOMA.

Q.     WHAT PART OF OKLAHOMA?

A.     I LIVE IN TULSA.

Q.     WERE YOU BORN AND RAISED THERE?

A.     YES.

Q.     NOW, DO YOU KNOW SOMEONE BY THE NAME OF DAVID HAMMER?

A.     YES, MA'AM.

Q.     AND HOW DO YOU KNOW MR. HAMMER?

A.     I WAS AT OSP WITH HIM.

Q.   AND OSP IS WHAT, SIR?

A.   IT'S A PRISON IN OKLAHOMA.

Q.   DO YOU KNOW THE NAME OF IT, NOT JUST THE INITIALS?

A.   YEAH, IT'S CALLED BIG MAC.  BIG MAC, LIKE THE BIG MAC YOU GET AT MCDONALDS, THE SAME THING.

Q.   IS IT FORMALLY KNOWN AS OKLAHOMA STATE PENITENTIARY AT MCALESTER?

A.   YES, THAT'S CORRECT.

Q.   WHERE WERE YOU HOUSED AT MCALESTER, AT BIG MAC?

A.   WE WERE HOUSED IN THE F CELL HOUSE.

Q.   WHAT TYPE OF UNIT WAS THAT?

A.   IT'S PROTECTIVE CUSTODY.

Q.   NOW, HOW DID YOU COME TO KNOW MR. HAMMER?

A.   HE WAS IN THE CELL DIRECTLY ACROSS FROM ME.

Q.   AND DID YOU KNOW HIM PRIOR TO BEING IN PRISON WITH HIM?

A.   NOT TO MY KNOWLEDGE.

Q.   AND WE ARE GOING TO --

A.   IN PRISON.  NO, I DID NOT KNOW HIM OUTSIDE OF PRISON.  I KNOW THAT FOR A FACT.

Q.   NOW, WE ARE GOING TO DIRECT YOU TO A PARTICULAR CONVERSATION YOU HAD WITH MR. HAMMER.  AND IF YOU CAN PUT THAT IN YOUR MIND.  AT THAT POINT IN TIME, WHEN WE GET TO THE CONVERSATION, HOW LONG DO YOU THINK YOU HAD

KNOWN MR. HAMMER?

A.      I'M NOT SURE ABOUT THAT.

Q.      HOW OFTEN WOULD YOU SEE HIM DURING THE WEEK?

A.      EVERY DAY.

Q.      NOW, DID THERE COME A TIME THAT YOU HEARD MR. HAMMER TALKING ABOUT A CRIME THAT HE HAD COMMITTED?

A.      YES, MA'AM.

Q.      AND HOW -- LET ME ASK YOU TO SET THE STAGE FOR US.

        WHERE WERE YOU WHEN YOU HEARD HIM TALKING?

A.      I WAS IN MY CELL.

Q.      AND WHERE WAS HE?

A.      IN HIS CELL.

Q.      AND HOW WERE YOU ABLE TO HEAR HIM?

A.      HE IS DIRECTLY ACROSS FROM ME.  WE JUST -- EVERYBODY JUST TALKS FREELY THERE.

Q.      DO YOU REMEMBER THE TYPE OF CRIME THAT HE WAS TALKING ABOUT THAT HE DID?

A.      YEAH, HE SHOT SOMEBODY IN THE HEAD.

Q.      DO YOU REMEMBER HOW THAT CAME UP IN CONVERSATION OR WAS IT JUST SOMETHING YOU WERE LISTENING TO?

A.      WELL, ACTUALLY, I CAN'T REALLY REMEMBER HOW THE CONVERSATION CAME UP, TO BE TOTALLY HONEST, BUT AT SOME POINT HE ASKED ME IF I WOULD WRITE A STATEMENT SAYING

THAT I COMMITTED HIS CRIME AND HE WOULD PAY ME $5,000.

Q.      SO LET ME JUST BREAK THAT DOWN A LITTLE BIT.

        IS THE FIRST THING YOU HEAR HIM TALKING ABOUT HAVING SHOT SOMEBODY?

A.      I'M SORRY.  I DID NOT HEAR YOU.

Q.      IS THE FIRST PART OF THE CONVERSATION THAT HE SHOT SOMEBODY?

A.      EVERYBODY KNEW WHAT HE DID BECAUSE -- I MEAN, EVERYBODY JUST KNEW --

        MS. SAUNDERS:  OBJECTION TO WHAT EVERYBODY KNEW, YOUR HONOR.

        THE WITNESS:  I KNEW WHAT HE DID BECAUSE HE TOLD ME HE SHOT SOMEBODY.

        THE COURT:  SUSTAINED.  ALL RIGHT.  THAT IS FINE.

BY MS. HAINES:

Q.      AND THEN YOU SAID AT SOME POINT HE ASKED YOU TO DO SOMETHING FOR HIM, AND WHAT WAS THAT?

A.      THAT WAS BEFORE I WROTE THE STATEMENT.  THERE WAS A GUY THAT DISRESPECTED HIM AND HIS NAME WAS JOHN DAVIS.  AND HE ASKED ME TO PUNCH HIM IN THE MOUTH AND HE WOULD GIVE ME A PACT OF CIGARETTES.

        MR. TRAVIS:  OBJECTION, YOUR HONOR, MOVE TO STRIKE.

        THE COURT:  SUSTAINED.

MS. HAINES:  IT'S NOT MR. HAMMER, YOUR HONOR, I DON'T BELIEVE, THAT HE IS TALKING ABOUT.

BY MS. HAINES:

Q.    WHO ASKED YOU TO DO THE PUNCHING?

A.    MR. HAMMER.

MS. HAINES:  OH, I'M SORRY.

MS. SAUNDERS:  I WOULD OBJECT.

THE COURT:  WAIT A MINUTE.  GIVE ME THIS -- I'M GOING TO OVERRULE THE OBJECTION.  LET'S HEAR THE SEQUENCE AGAIN.  IT'S UNCLEAR.

BY MS. HAINES:

Q.    I GOT CONFUSED, I THINK, MR. FULLERTON.

A.    OKAY.

Q.    YOU SAID THE FIRST SORT OF PART OF THIS CONVERSATION WAS MR. HAMMER ASKING YOU TO DO SOMETHING?

A.    YES.  WELL, WHEN WE ATE -- WHEN WE ATE, THEY LET US OUT AT CERTAIN TIMES.  AND I GOT OUT THE SAME TIME JOHN DID, BECAUSE MY CELL WAS ON HIS SIDE.  AND DAVID'S CELL WAS ON THE OTHER SIDE.  SO HE IS LIKE THIS GUY DISRESPECTED HIM AND THAT HE WANTED SOMEONE TO PUNCH HIM.  AND I TOLD HIM I WOULD DO IT.

Q.    I STILL NEED YOU TO LEAN A LITTLE BIT FORWARD AND SPEAK INTO THE MIC.

A.    NO PROBLEM.

THE COURT:  WHO WANTED WHO TO PUNCH WHOM?

THE WITNESS:  DAVID HAMMER WANTED ME TO PUNCH JOHN FOR DISRESPECTING HIM BECAUSE HE COULD NOT GET TO HIM.

BY MS. HAINES:

Q.      I WANT TO FOCUS YOU THEN -- DID HE, AT SOME POINT IN TIME, AFTER THAT, ASK YOU TO DO SOMETHING ELSE FOR HIM?

A.      YES.  AFTER THAT HE APPROACHED ME AND ASKED ME IF I HAD BEEN -- IF I WAS OUT DURING THESE TIMES, I DON'T REMEMBER THE DATES.  AND I WAS PRETTY SURE THAT I HAD BEEN OUT.  AND HE SAID THAT IF I WOULD WRITE A STATEMENT SAYING THAT I COMMITTED HIS CRIME, HE WOULD PAY ME $5,000, AND THE STATUTE OF LIMITATIONS HAD RAN OUT ON ME BEING PUNISHED, SO THAT HE WOULD GET OUT AND I WOULD NOT BE CHARGED WITH IT.

Q.      AND DURING THE COURSE OF THAT CONVERSATION, OR AT ANY TIME, DID MR. HAMMER TELL YOU WHAT CRIME IT WAS THAT HE WANTED YOU TO FALSELY CONFESS TO?

A.      YES.

Q.      WHAT WAS IT?

A.      IT WAS SHOOT, INTENT TO KILL, AND ROBBERY.

Q.      AND DID HE TELL YOU DURING THIS CONVERSATION WHETHER HE'D MADE A MISTAKE WHEN HE COMMITTED THAT SHOOTING?

A.      YES.

Q.    WHAT DID HE SAY THE MISTAKE WAS THAT HE MADE?

A.    THAT HE DIDN'T KILL THE GUY.

Q.    HOW DID YOU RESPOND WHEN MR. HAMMER ASKED YOU TO FALSELY CONFESS TO THE SHOOTING?

A.    I TOLD HIM I WOULD DO IT.

Q.    WHY DID YOU AGREE TO DO IT?

A.    I WAS DOING IT FOR THE MONEY.

Q.    NOW DID THERE COME A TIME WHERE HE ASKED YOU TO PREPARE OR WRITE A STATEMENT CONFESSING?

A.    YES, MA'AM.

Q.    AND CAN YOU TELL US HOW IT CAME ABOUT THAT YOU WERE ABLE TO -- LET ME STRIKE THAT.

DID YOU KNOW ANYTHING ABOUT HIS CRIME, THE SHOOTING IN PARTICULAR?

A.    NO.

Q.    SO DID THERE COME A TIME WHERE HE ASKED YOU TO WRITE A STATEMENT FOR HIM?

A.    YES, MA'AM.

Q.    AND HOW DID YOU GET THE DETAILS THAT NEEDED TO GO INTO THE STATEMENT?

A.    HE SENT ME THE TRANSCRIPT OF HIS -- OR HE SAID I COULD READ THE TRANSCRIPT OF HIS TRIAL AND HE WANTED ME TO WRITE LIKE AN OUTLINE ON A BOOK FOR IT.

Q.    DID THERE COME A TIME WHERE YOU GOT THE TRANSCRIPT OF HIS TRIAL?

A.      EVENTUALLY.

Q.      AND DID YOU READ THEM?

A.      YES.

Q.      NOW, CAN YOU TELL US HOW YOU WENT ABOUT PREPARING THE CONFESSION?

A.      I WROTE -- I DID AN OUTLINE OF WHAT I THOUGHT WOULD BE GOOD WORDING.  AND I SLIDE IT ACROSS THE HALL TO HIM AND HE WOULD READ IT AND ANYTHING IN THERE THAT WAS NOT SUPPOSED TO BE IN THERE, THERE WAS LIKE A LITTLE BLANK PART ON THE SIDE OF THE PAGE.  HE WOULD WRITE IN THERE WHAT I NEEDED TO SAY.

Q.      AND THEN WHAT WOULD HAPPEN ONCE MR. HAMMER MADE HIS EDITS TO WHAT YOU WROTE?

A.      I WOULD HAVE TO REWRITE IT ALL OVER AGAIN.

Q.      I'M GOING TO SHOW YOU WHAT HAS BEEN MARKED AS R 56.

THE COURT:  CAN WE GET A TIME WHEN THIS IS OCCURRING?

MS. HAINES:  THIS WILL HELP, YOUR HONOR.

BY MS. HAINES:

Q.      SIR, I'M SHOWING YOU GOVERNMENT EXHIBIT R56.  DO YOU RECOGNIZE THAT PIECE OF PAPER?

A.      YES, MA'AM.

Q.      CAN YOU GO THROUGH ALL OF THE PAGES OF IT?

A.      YOU WANT ME TO READ IT?

Q.    NO.  I JUST WANT YOU TO FLIP THROUGH UNTIL THE VERY END.  JUST FLIP THROUGH.

A.    OKAY.

Q.    WHAT DO YOU RECOGNIZE THAT DOCUMENT TO BE?

A.    MY STATEMENT.

Q.    AND SIR, DOES IT HAVE YOUR SIGNATURE ON THE END?

A.    YES, MA'AM.

MS. HAINES:  YOUR HONOR, WE SEEK TO INTRODUCE GOVERNMENT EXHIBIT R56.

THE COURT:  HEARING NO OBJECTION, IT WILL BE ADMITTED.

MS. HAINES:  AND PUBLISH THIS?

THE COURT:  YES.

(GOVERNMENT EXHIBIT R56 ADMITTED INTO EVIDENCE.)

BY MS. HAINES:

Q.    NOW, SIR, ON YOUR FALSE CONFESSION, DO YOU HAVE A DATE THAT YOU WROTE THIS, IF YOU CAN LOOK AT THE FIRST PAGE AT THE VERY TOP?

A.    FIRST PAGE AT THE TOP.  JANUARY 21, 1986.

Q.    IS THERE A DATE THAT YOU SIGNED IT?

A.    JANUARY 22, 1986.

Q.    AND WAS THE AFFIDAVIT OR THE FALSE CONFESSION, WAS IT NOTARIZED?

A.    YES, MA'AM.

Q.   NOW, HOW MANY DRAFTS OF THIS DID YOU GO THROUGH WITH MR. HAMMER BEFORE IT WAS ACCEPTABLE, IF YOU CAN RECALL?

A.   I KNOW IT WAS MORE THAN TWO OR THREE.  I CAN'T REMEMBER EXACTLY HOW MANY, THOUGH.

Q.   ONCE YOU HAD COMPLETED THE FALSE CONFESSION AND IT WAS NOTARIZED, DID YOU RECEIVE ANY PAYMENT FOR THAT?

A.   YES.

Q.   WHAT DID YOU GET?

A.   I GOT A TV AND A RADIO PUT IN MY CELL.

Q.   WHO GAVE YOU THAT?

A.   DAVID HAMMER.

Q.   NOW, DID THERE COME A TIME WHEN YOU WERE CALLED TO COURT ON THIS MATTER?

A.   YES, MA'AM.

Q.   AND DID YOU HAVE ANY CONVERSATION WITH MR. HAMMER BEFORE YOU WENT TO COURT?

A.   NO.

Q.   DO YOU RECALL WHAT HAPPENED WHEN YOU WENT TO COURT?

A.   YES.  SOME OF IT, NOT ALL OF IT.

Q.   DID THERE COME A TIME WHERE YOU CONFESSED THAT THIS WAS NOT TRUE?

A.   YES, ABSOLUTELY.

MS. HAINES:  I HAVE NO FURTHER QUESTIONS,

YOUR HONOR.

THE COURT:  CROSS EXAMINE?

CROSS EXAMINATION

BY MS. SAUNDERS:

Q.      MR. FULLERTON --

A.      YES, MA'AM.

Q.      -- HOW LONG WERE YOU IN PRISON AT THIS PARTICULAR POINT?

A.      I'M NOT SURE.

Q.      AND YOU WERE IN PRISON FOR A BURGLARY COUNT, RIGHT?

A.      UNAUTHORIZED USE AND BURGLARY COUNT.

Q.      YOU GOT A SENTENCE OF TEN YEARS, RIGHT?

A.      I HAD TWO 10-YEAR SENTENCES RUNNING TOGETHER, YES, MA'AM.

Q.      SO A TOTAL OF 10 YEARS, RIGHT?

A.      YES, MA'AM.

Q.      THIS DOCUMENT YOU SIGNED, YOU SIGNED IN JANUARY OF 1986, RIGHT?

A.      YES, MA'AM.

Q.      YOU WENT TO COURT IN JUNE OF 1986.  DO YOU RECALL THAT?

A.      I DON'T KNOW THE DATE, BUT I DID GO TO COURT, YES, MA'AM.

Q.      WELL, YOU WENT TO COURT ONE TIME AND YOU INVOKED

YOUR FIFTH AMENDMENT PRIVILEGE.  DO YOU REMEMBER THAT?

A.      NO, I DID NOT DO THAT.

Q.      YOU DID NOT DO THAT?

A.      NO, MA'AM.

        MS. SAUNDERS:  I APOLOGIZE, YOUR HONOR.
THIS SHOULD BE D 24.

BY MS. SAUNDERS:

Q.      I'M SHOWING YOU WHAT HAS BEEN MARKED AS
DEFENDANT'S EXHIBIT 24.  DO YOU SEE THAT?  DO YOU SEE
THAT?

A.      YES, MA'AM.

Q.      DO YOU SEE AT THE TOP IT SAYS STATE OF OKLAHOMA
VERSUS DAVID PAUL HAMMER?

A.      YES, MA'AM.

Q.      DO YOU SEE -- IF YOU GO DOWN TO HALFWAY DOWN THE
PAGE, THERE IS A LINE THAT SAYS FINDINGS OF FACT.  DO
YOU SEE THAT?  I CAN POINT TO IT FOR YOU IF THAT IS
EASIER.

A.      OH, YEAH, I SEE IT, YEAH.  SORRY.

Q.      AND ON THAT FINDINGS OF FACT, DOES IT NOT --
DOES THE COURT NOT NOTE THAT YOU INVOKED YOUR FIFTH
AMENDMENT PRIVILEGE, RIGHT?

A.      YES, IT DOES SAY THAT.

Q.      SO AT ONE POINT YOU DID INVOKE YOUR FIFTH
AMENDMENT PRIVILEGE?

A.    YES.  IT'S BEEN 25 YEARS.

Q.    I KNOW.  A LONG TIME AGO, RIGHT?

A.    YES.

Q.    AND THAT WAS ON JULY 29TH OF 1986, RIGHT?

A.    OKAY.  YEAH.

Q.    ACCORDING TO THE --

A.    I AGREE WITH YOU BECAUSE I DON'T REMEMBER IT.

Q.    WELL, YOU WERE STILL IN PRISON ON JULY 29TH, 1986, RIGHT?

A.    YES, MA'AM.

Q.    AND YOU WERE STILL SERVING THAT TEN-YEAR SENTENCE, RIGHT?

A.    THAT'S CORRECT.

Q.    AS A RESULT OF THIS, YOU HAD CONVERSATIONS WITH THE PROSECUTOR, RIGHT?

A.    I DON'T REMEMBER.

Q.    THE DISTRICT ATTORNEY?

A.    I DON'T REMEMBER IT.  I DON'T REMEMBER IT.

Q.    YOU TALKED TO THE DISTRICT ATTORNEY AFTER THIS WAS FILED.  DO YOU RECALL THAT?

A.    NOT REALLY.  I DIDN'T EVEN KNOW I WAS GOING TO COURT.  THEY JUST TOLD ME TO GET MY STUFF, I WAS LEAVING.  I DIDN'T KNOW WHERE I WAS GOING.

Q.    IF YOU -- YOU TOLD THE FBI AGENT THAT YOU ACTUALLY -- IF I WERE TO TELL YOU THAT HE REPORTS THAT

YOU SPOKE WITH THE PROSECUTOR, WOULD THAT SEEM LOGICAL?

A.      YEAH.  YEAH.

Q.      WHEN YOU TALKED TO THE PROSECUTOR THEN, YOU SAID THAT YOU WENT IN AND TOLD THE TRUTH, RIGHT?

A.      YEAH.  THE PROSECUTOR --

Q.      AFTER YOU TALKED TO THE PROSECUTOR?

A.      YES.

Q.      NOW, YOU WERE PAROLED IN 1987, RIGHT?

A.      YES, MA'AM.

Q.      AND THAT WAS -- YOU WERE ORIGINALLY SENTENCED IN 1984, RIGHT?

A.      OKAY.  YES, MA'AM.

Q.      SO THAT WAS -- YOU HAD NOT DONE YOUR TEN YEARS YET, RIGHT?

A.      THAT WAS THE SECOND TIME, THOUGH.  I WENT IN TWICE.

Q.      BUT YOU STILL HAD NOT DONE YOUR TEN YEARS, FINISHED YOUR TEN YEARS, RIGHT?

A.      THAT'S RIGHT.  THAT'S RIGHT.

Q.      WHEN YOU WERE TALKING WITH THE PROSECUTOR, DID YOU MENTION THAT YOU WANTED TO BE ON PAROLE?

A.      NO.  THAT NEVER CAME UP.

Q.      THAT NEVER CAME UP?

A.      NO.

Q.      DID THE PROSECUTOR ASK YOU IF YOU WANTED HIS

ASSISTANCE FOR YOUR SENTENCE?

A.        NO.  THAT NEVER EVEN -- IF IT DID COME UP, I DON'T REMEMBER IT.

Q.        WHEN YOU WERE TALKING WITH THE FBI AGENT, YOU MENTIONED A DIFFERENT AMOUNT OF MONEY?

A.        WHICH FBI AGENT?

Q.        THAT WOULD BE AGENT CAVIT.

A.        YES.

Q.        DO YOU REMEMBER YOU TALKED TO HIM ON MAY 19 -- EXCUSE ME, ON MAY 12TH OF THIS YEAR?  DO YOU REMEMBER TALKING TO HIM RECENTLY?

A.        A GUY?  NO, I TALKED TO A LADY.

Q.        JAMIE CAVIT.  I APOLOGIZE.

A.        YEAH.

Q.        AND WHEN YOU SPOKE WITH HER, YOU GAVE A DIFFERENT AMOUNT OF MONEY, RIGHT?

A.        YEAH.

Q.        THAT WAS A MISTAKE?

A.        YES, MA'AM.  IT SURE WAS.

Q.        SO YOU WERE MISTAKEN ABOUT THE NUMBER OF TIMES YOU WENT TO COURT.  ONCE YOU INVOKED THE FIFTH AND THEN YOU CAME BACK, RIGHT?  SO YOU WERE MISTAKEN ABOUT THAT, RIGHT?

A.        I DON'T REMEMBER GOING BACK TO COURT.

Q.        OKAY.  AND YOU WERE MISTAKEN ABOUT THE MONEY,

RIGHT?

A.     I DON'T REMEMBER ANYTHING -- HONESTLY, I DID NOT REMEMBER ABOUT THE MONEY.

Q.     AND THAT IS BECAUSE IT HAPPENED SO LONG AGO, RIGHT?

A.     THAT'S RIGHT.

Q.     DO YOU KNOW WHAT YEAR THE SHOOTING THAT YOU WROTE THIS CONFESSION FOR ACTUALLY OCCURRED?

A.     NO, MA'AM.

            MS. SAUNDERS:  COURT'S INDULGENCE.

            (PAUSE.)

            MS. SAUNDERS:  I HAVE NO FURTHER QUESTIONS.

            MS. HAINES:  NOTHING FURTHER, YOUR HONOR.

            THE COURT:  ALL RIGHT.  YOU MAY STEP DOWN.

            THE WITNESS:  THANK YOU.

            (WITNESS EXCUSED.)

            MS. HAINES:  WE CALL THOMAS CALLAGHAN.

            THOMAS CALLAGHAN, GOVERNMENT WITNESS, SWORN.

            THE CLERK:  STATE AND SPELL YOUR FULL NAME FOR THE RECORD, PLEASE.

            THE WITNESS:  THOMAS F. CALLAGHAN, C-A-L-L-A-G-H-A-N.

DIRECT EXAMINATION

BY MS. HAINES:

Q.      MR. CALLAGHAN, IT'S VERY IMPORTANT BECAUSE WE ARE ON VIDEO FEED TO SPEAK INTO THAT MIC.  OKAY?

A.      YES.

Q.      CAN YOU TELL US HOW YOU ARE EMPLOYED?

A.      I'M CURRENTLY EMPLOYED AS A SENIOR BIOMETRIC SCIENTIST FOR THE FBI LABORATORY DIVISION.

Q.      AND HOW LONG HAVE YOU BEEN EMPLOYED BY THE FBI?

A.      SINCE OCTOBER OF 1994.

Q.      AND CAN YOU DESCRIBE WHAT IT IS THAT YOU CURRENTLY DO?

A.      AS THE SENIOR BIOMETRIC SCIENTIST, I'M THE CHIEF ADVISOR FOR THE LATENT FINGERPRINT AND DNA DISCIPLINES WITHIN THE LABORATORY.

Q.      WHAT WAS YOUR POSITION IN THE FBI DURING THE PERIOD 1996 TO 1998?

A.      DURING THAT TIME I WAS A FORENSIC DNA EXAMINER. IN THAT ROLE THAT I CONDUCTED FORENSIC EXAMINATIONS ON EVIDENCE SUBMITTED TO THE LABORATORY.

I SUPERVISED A TEAM OF BIOLOGISTS OR TECHNICIANS.  I WAS RESPONSIBLE FOR THAT TEAM'S EXAMINATIONS OF SEROLOGY, GENERALLY BLOOD AND SEMEN ANALYSIS OR IDENTIFICATION AND ANALYSIS, AND DNA ANALYSIS.  SO I ISSUED REPORTS AND I WOULD TESTIFY WHEN

NEEDED.

Q.        CAN YOU TELL US BRIEFLY ABOUT YOUR EDUCATIONAL BACKGROUND?

A.        I RECEIVED A BACHELOR'S IN SCIENCE IN BIOLOGY FROM PENN STATE UNIVERSITY.

I BEGAN MY GRADUATE STUDIES IN MOLECULAR GENETICS AT MICHIGAN STATE UNIVERSITY.  I COMPLETED THOSE STUDIES IN THE DEPARTMENT OF MOLECULAR BIOLOGY AND MICROBIOLOGY AT CASE WESTERN RESERVE UNIVERSITY MEDICAL SCHOOL AND I RECEIVED A PH.D.

Q.        HAVE YOU YOURSELF PERSONALLY PERFORMED THE PROCEDURES INVOLVED IN VARIOUS ASPECTS OF DNA ANALYSIS AND SEROLOGY TESTING?

A.        YES, I HAVE, BUT THE ROLES DIFFERED.  IN PENNSYLVANIA I WAS RESPONSIBLE FOR DOING THE BENCH WORK ANALYSIS AND THEN WRITING THE REPORTS.  AT THE FBI I WOULD MAKE AN ASSESSMENT OF THE CASE WHEN IT CAME IN. THE TECHNICIANS WOULD ACTUALLY DO THE WORK.  I WAS INVOLVED WITH THEM AND THEN I WOULD LOOK AT THE WORK, MAKE THE CONCLUSIONS.  KIND OF LIKE IF YOU GO TO THE HOSPITAL, YOU BELIEVE YOU HAVE BROKEN YOUR LEG, THE DOCTOR LOOKS AT YOU, HE ORDERS A X-RAY, AN X-RAY TECHNICIAN TAKES THE X-RAY.  THE DOCTOR READS THE X-RAYS.  THAT IS WHAT I DO.

Q.        AND I DON'T THINK YOU TOLD US.  WHAT WORK DID

YOU DO IN PENNSYLVANIA?

A.      PRIOR TO JOINING THE FBI, I WAS A DNA EXAMINER WITH THE PENNSYLVANIA STATE POLICE.

Q.      NOW, HAVE YOU EVER TESTIFIED IN COURT AS AN EXPERT IN THE FIELDS OF SEROLOGY AND FORENSIC DNA ANALYSIS?

A.      YES.  I HAVE BEEN QUALIFIED AS AN EXPERT IN BOTH OF THOSE FIELDS IN STATE AND FEDERAL COURT THROUGHOUT THE UNITED STATES.

Q.      HAVE YOU EVER FAILED TO QUALIFY AS AN EXPERT?

A.      NO, I HAVE NOT.

            MS. HAINES:  YOUR HONOR, WE WOULD SEEK TO HAVE MR. CALLAGHAN RECOGNIZED AS AN EXPERT IN THE FIELDS OF SEROLOGY AND FORENSIC DNA ANALYSIS.

            MR. MCHUGH:  NO QUESTIONS, YOUR HONOR.

            THE COURT:  ALL RIGHT.  I WILL FIND HIM SO QUALIFIED AS AN EXPERT IN DNA ANALYSIS AND SEROLOGY.

            MS. HAINES:  THANK YOU, YOUR HONOR.

BY MS. HAINES:

Q.      NOW, MR. CALLAGHAN, IN THIS CASE DID YOU HAVE AN OCCASION TO EXAMINE AND ANALYZE ANY EVIDENCE?

A.      YES, I DID.

Q.      AND DID THAT INCLUDE BOTH KNOWN SAMPLES AND QUESTIONED SAMPLES?

A.      YES.

Q.      AND ARE THERE DOCUMENTS THAT MEMORIALIZE THE WORK THAT YOU DO OR DID?

A.      YES.

Q.      DO YOU HAVE THEM IN FRONT OF YOU?

A.      YES, I HAVE MY ORIGINAL NOTES FROM THE CASE.

MS. HAINES:  WITH THE COURT'S PERMISSION, COULD MR. CALLAGHAN REFER TO THOSE NOTES IF HE NEEDS TO?

THE COURT:  YES.

MS. HAINES:  THANK YOU.

BY MS. HAINES:

Q.      NOW, DO YOU RECALL EXACTLY WHAT ITEMS OF EVIDENCE YOU WERE ASKED TO EXAMINE IN THIS CASE?

A.      YES.

Q.      AND WHAT WERE THOSE?

A.      I RECEIVED IN THE -- I WILL USE THE NUMBERS FOR THE FBI.  WHEN ITEMS OF EVIDENCE ARE RECOVERED FROM A CRIME SCENE, THEY ARE GIVEN Q NUMBERS FOR QUESTION NUMBERS, AND SAMPLES THAT ARE EXEMPLARS OR REFERENCE SAMPLES, SOMEONE'S BLOOD, WOULD BE A K FOR KNOWN, K-N-O-W-N.

SO I RECEIVED Q 1 THROUGH Q 4, WHICH WERE RECTAL SWABS; Q 5, WHICH WAS A RECTAL SMEAR SLIDE.  Q 6 THROUGH Q 9 WERE PENILE SWABS.  Q 10 WAS A PENILE SLIDE. Q 11 WAS A PILLOW.  Q 12 WAS A SOCK.  AND KNOWN BLOOD SAMPLE FROM K 3, MR. MARTI.

Q.      I'M JUST GOING TO HAVE YOU LOOK AT THE ITEMS YOU MENTIONED AND MAKE SURE THAT WE ARE TALKING ABOUT THE SAME THINGS, OKAY, THE PHYSICAL EVIDENCE.

A.      YES.

Q.      AS YOU HOLD THEM UP, MR. CALLAGHAN, COULD YOU TELL US WHAT Q NUMBER CORRESPONDS TO WHAT ITEM OF EVIDENCE AS THEY ARE MARKED.

A.      I RECOGNIZE THIS BAG.  IT HAS THE FBI LABORATORY NUMBERS ON IT FROM THIS CASE AND THE EVIDENCE SEAL HAS MY INITIALS ON IT.

Q.      THOSE ENVELOPES CONSIST OF WHAT?

A.      THAT WAS THE ZIPLOCK BAG WAS WHAT I WAS TALKING ABOUT.

THESE, WE REFER TO THESE AS COIN ENVELOPES SO....

Q.      SIR, I DON'T NEED YOU TO GO THROUGH EACH ONE.  I JUST NEED YOU TO TELL US WHAT TYPE OF EVIDENCE WOULD HAVE BEEN IN THOSE COIN ENVELOPES?

A.      Q 1 THROUGH Q 4 WOULD HAVE BEEN SWABS AND THOSE WERE SWABS, RECTAL SWABS.

AND Q 6 THROUGH Q 9 WERE PENILE SWABS.

Q 11 WAS A CUTTING FROM A PILLOW AND Q 12 WAS A CUTTING FROM A SOCK.

Q.      ALL RIGHT.  THAT IS FINE.  THANK YOU.

NOW IF YOU COULD JUST LOOK AT THE SOCK,

THE PILLOW, AND I BELIEVE THAT IS IT, AND TELL US, DO YOU RECOGNIZE THOSE ITEMS OF EVIDENCE?

A.      THIS SOCK IS IDENTIFIED AS Q 12.  AND IT CONTAINS MY INITIALS NEAR THE TOE OF THE SOCK.

Q.      CAN YOU TELL US WHAT EXHIBIT NUMBER IS ON THAT?

A.      THE BAG HAS GOVERNMENT EXHIBIT 19.

Q.      ALL RIGHT.  HOW ABOUT THE PILLOW IN THAT BLACK BAG?

THE WITNESS:  MAY I STAND UP, YOUR HONOR.

THE COURT:  YES.

THE WITNESS:  THIS IS THE PILLOW AND THERE IS A CUTTING TAKEN FROM THE PILLOW.

BY MS. HAINES:

Q.      DO YOU SEE AN EXHIBIT NUMBER ON THAT, ON THE BLACK BAG?

A.      NO, I DO NOT.

Q.      JUST FOR THE RECORD, THAT IS GOVERNMENT EXHIBIT 14.  GOVERNMENT EXHIBIT 14.

A.      Q 11 AND MY INITIALS ARE PRESENT ON THE PILLOW.

Q.      THANK YOU, SIR.

MR. CALLAGHAN, I WOULD LIKE TO ASK YOU FIRST ABOUT THE SEROLOGY TESTING THAT YOU PERFORMED. WHAT SEROLOGY TESTS DID YOU DO ON THOSE ITEMS OF EVIDENCE?

A.      HUMAN BLOOD WAS IDENTIFIED ON Q 11, THE PILLOW,

AND Q 12, THE SOCK.  AND SEMEN TESTING WAS CONDUCTED ON SPECIMENS Q 1 THROUGH Q 9.

Q.    WAS THERE ANY SEMEN OR SPERM IDENTIFIED ON THE SWABS?

A.    NO, THERE WAS NOT.

Q.    YOU SAID WAS THERE BLOOD IDENTIFIED ON THE PILLOW AND THE SOCK?

A.    YES, THERE WAS.

Q.    COULD YOU TELL WHETHER THAT WAS HUMAN BLOOD?

A.    BASED ON THE SEROLOGY RESULTS, I COULD NOT TELL IT WAS HUMAN BLOOD.  I CONFIRMED THAT HUMAN BLOOD -- I CONFIRMED THAT BLOOD WAS PRESENT.  THERE IS -- THE FIRST TEST IS A PRESUMPTIVE TEST.  SO SOMETHING THAT YIELDS A POSITIVE RESULT COULD GIVE -- COULD BE BLOOD.  SO THAT IS A VERY SENSITIVE TEST.  THE NEXT TEST IS A CONFIRMATORY TEST.  ONLY BLOOD GIVES A POSITIVE RESULT, BUT THE CONFIRMATORY TEST IS NOT AS SENSITIVE.  SO YOU NEED MORE BLOOD TO GET A POSITIVE RESULT.

DNA ANALYSIS FOLLOWED, AND BASED ON THE DNA ANALYSIS RESULTS, I WAS ABLE TO CONFIRM THAT HUMAN BLOOD WAS PRESENT.

Q.    SO LET'S TALK ABOUT YOUR DNA ANALYSIS.  WHAT ITEMS WENT FORWARD FOR DNA TESTING?

A.    Q 11 AND Q 12, THE CUTTINGS FROM THE PILLOW AND THE SOCK.

Q.      WAS THE TEST YOU USED BACK IN 1997, IS THAT STILL CONSIDERED A VALID TEST?

A.      YES, IT'S STILL CONSIDERED A VALID TEST, BUT THERE HAVE BEEN ADVANCES SINCE THEN.

Q.      WHAT WERE THE RESULTS OF THE DNA ANALYSIS THAT WAS PERFORMED ON THE PILLOW AND THE SOCK?  I'M SORRY. THE BLOOD ON THE PILLOW AND THE SOCK.

A.      SO, MAY I READ FROM MY REPORT.  THERE ARE NUMBERS INVOLVED.

THE COURT:  YES.

THE WITNESS:  BASED ON THE POLYMARKER AND DQA1 TYPING RESULTS.  SO THOSE ARE THE TYPES OF DNA TESTS THAT WERE DONE.  THAT IS LOOKING AT SIX DIFFERENT GENETIC LOCATIONS.  I WILL CONTINUE READING.  THE SOURCE OF SPECIMEN K3, MARTI, IS INCLUDED AS A POTENTIAL CONTRIBUTOR OF THE DNA OBTAINED FROM SPECIMENS Q 11 AND Q 12.  THE PROBABILITY OF SELECTING AN UNRELATED INDIVIDUAL AT RANDOM HAVING THE SAME POLYMARKER AND DQA1 TYPES AS DETECTED IN THE DNA OBTAINED FROM THE QUESTIONED SPECIMENS Q 11 AND Q 12, IS APPROXIMATELY 1 IN 6,200 IN THE BLACK POPULATION; 1 IN 1100 IN THE CAUCASIAN POPULATION; 1 IN 1800 IN THE SOUTHEASTERN HISPANIC POPULATION; AND 1 IN 2,900 IN THE SOUTHWESTERN HISPANIC POPULATION.  BASED ON THE AMPLIGEN AND TYPING RESULTS, THE MALE DNA WAS DETECTED ON SPECIMENS Q 11 AND

Q 12.

Q.        NOW, WHAT DOES THAT MEAN IN SORT OF LAYMEN TERMS AS FAR AS WHOSE BLOOD WAS ON THE PILLOW AND THE SOCK, OR WHOSE DNA FROM THE BLOOD WAS ON THE PILLOW AND THE SOCK?

A.        THOSE ARE QUESTIONED ITEMS.  WE DON'T KNOW WHOSE DNA IS THERE.  MR. MARTI IS INCLUDED AS A POTENTIAL CONTRIBUTOR OF THE DNA.

Q.        DID YOU FIND ANY OTHER MALE PROFILES PRESENT IN THE DNA?

A.        NO.

Q.        NOW, WERE ANY FOLLOWUP REVIEWS CONDUCTED TO MAKE SURE THAT YOUR RESULTS WERE ACCURATE?

A.        PRIOR TO THE ISSUING OF MY REPORT, ONE OF MY PEERS, A QUALIFIED EXAMINER IN SEROLOGY AND DNA, INDEPENDENTLY REVIEWS MY NOTES AND COMES TO THEIR OWN CONCLUSIONS BASED ON THAT REVIEW.  THEN THEY READ MY REPORT.  AND THEY AGREED WITH MY CONCLUSIONS AND SIGNED A DOCUMENT THAT IS CONTAINED IN MY NOTES.  IT'S CALLED A TECHNICAL REVIEW.

Q.        WAS THERE ANY PROBLEMS WITH YOUR RESULTS?

A.        NO.

Q.        NOW, SIR, I WANT TO MOVE TO A DIFFERENT TOPIC, IF I CAN.  I WANT TO TAKE YOU TO THIS YEAR.  THIS YEAR WERE YOU ASKED TO REVIEW A MARCH 24TH, 2005 FORENSIC DNA CASE REPORT FROM BODE TECHNOLOGY GROUP?

A.    YES.  YOU ASKED ME TO REVIEW THE REPORT.

Q.    I'M GOING TO SHOW YOU WHAT HAS BEEN MARKED AS GOVERNMENT EXHIBIT R6.

DO YOU RECOGNIZE R6, SIR?

A.    YES.  R6 IS A SEVEN-PAGE REPORT.  IT'S A COPY OF THE REPORT THAT I RECEIVED EARLIER THIS YEAR.

Q.    AND ARE YOU AWARE OF WHAT IS BODE TECHNOLOGY GROUP?

A.    BODE TECHNOLOGY GROUP IS A PRIVATE OR COMMERCIAL FORENSIC DNA LABORATORY.  THEY CONDUCT DNA ANALYSIS FOR LAW ENFORCEMENT AGENCIES.  THEY CONDUCT DNA ANALYSIS FOR PROSECUTORS AND FOR DEFENSE.  AND THEY HAVE CONTRACTS WITH VARIOUS LAW ENFORCEMENT AGENCIES.

Q.    FROM THIS REPORT, JUST REVIEWING THE REPORT, DID IT APPEAR THAT BODE TESTED AT LEAST ONE OF THE SAME ITEMS THAT YOU TESTED, THE SOCK?

A.    YES.

Q.    DID YOU COMPARE THEIR RESULTS WITH YOUR RESULTS AS FAR AS THE SOCK?

A.    YES.  BODE DETERMINED THAT THERE WAS NO SEMEN PRESENT ON THE SOCK AND I CONCLUDED THE SAME THING.

Q.    AND DID IT APPEAR THAT BODE FROM THE REPORT WAS ALSO ASKED TO TEST OTHER ITEMS OF EVIDENCE THAT YOU WERE NOT REQUESTED TO TEST?

A.    YES.

Q.      NOW, IN REVIEWING THE REPORT FROM BODE, DID SOMETHING STRIKE YOU ABOUT THE WAY THE REPORT WAS WRITTEN?

A.      YES.  WHEN I READ THE REPORT, I FOUND MYSELF HAVING TO GET A PIECE OF PAPER AND PENCIL TO FOLLOW WHAT WAS BEING REPORTED.  BODE REPORTS WHEN THEY DID DNA ANALYSIS ON THE SWABS, THEY REPORTED A SPERM FRACTION AND A NONSPERM FRACTION.

Q.      SIR, IF I CAN STOP YOU, WHICH SWABS?  ARE WE TALKING ABOUT THE ONES YOU LOOKED AT OR SOMETHING DIFFERENT?

A.      NO.  THESE WERE SWABS THAT WERE NOT SUBMITTED TO THE FBI LABORATORY.  I DID NOT LOOK AT THEM.

Q.      WOULD IT ASSIST YOU IF I REPRESENTED THAT THOSE WERE GUM SWABS, SWABS FROM MR. MARTI'S MOUTH?

A.      YES, THERE WERE SWABS, I BELIEVE, FROM HIS GUMS AND HIS THROAT.

Q.      AND WHAT ABOUT THE WAY BODE REPORTED THE RESULTS, IF THEY HAD ANY, STRUCK YOU?

A.      WHAT STRUCK ME WAS THAT THEY SAID SPERM FRACTION AND NONSPERM FRACTION AND THAT'S -- DNA LABORATORIES REFER TO THOSE FRACTIONS.  YOU CAN SEPARATE OUT SPERM CELLS FROM OTHER CELLS.  CAN I EXPLAIN THAT?

Q.      I DON'T KNOW IF WE NEED A WHOLE BUNCH OF EXPLANATION, BUT I WOULD JUST DIRECT YOU -- DID IT

APPEAR IN LAYMEN'S TERMS THAT THEY MIGHT HAVE FOUND SPERM IN MR. MARTI'S MOUTH?

A.      TO ME WHEN I WENT THROUGH IT, I HAD TO GO BACK TO THE SEROLOGY SECTION AND CONFIRM THAT THERE WAS NO SEROLOGY DONE ON THOSE SWABS.

SO YOU CAN IDENTIFY SEMEN IN TWO WAYS. YOU CAN LOOK FOR A SPECIFIC PROTEIN, WHICH IS WHAT BODE ATTEMPTED TO DO AND WHAT THE FBI ATTEMPTED TO DO OR DID. AND THOSE RESULTS WERE NEGATIVE BY BOTH LABORATORIES ON THE SOCK.

YOU CAN ALSO LOOK FOR SPERM ON SLIDES. AND SO SPERM IS ONE OF THE COMPONENTS OF SEMEN.  SO IF YOU IDENTIFY A SPERM CELL, IT WOULD BE A POSITIVE RESULT FOR SEMEN.  IF YOU IDENTIFY PROSTATIC ANTIGEN P 30, THEN IT'S POSITIVE FOR SEMEN.  THOSE TESTS WERE NOT PERFORMED ON THE SWAB FROM MR. MARTI'S GUMS OR THROAT.

Q.      HAVING REVIEWED BODE'S REPORT, BASED ON THE REPORT, IS THERE ANY EVIDENCE THAT THERE WAS SEMEN OR SPERM FOUND ON HIS GUM SWABS?

A.      NO.

Q.      AND SIR, AFTER YOU WERE FINISHED REVIEWING BODE'S REPORT AND YOUR OWN WORK, WAS A SUMMARY CHART PREPARED WHICH MORE OR LESS SUMMARIZES THE TESTIMONY YOU HAVE JUST GIVEN?

A.      YES.

Q.    I'M GOING TO SHOW YOU WHAT HAS BEEN MARKED GOVERNMENT EXHIBIT R7.

DO YOU RECOGNIZE THAT, MR. CALLAGHAN?

A.    YES.  THIS IS A COPY OF THE CHART THAT YOU PROVIDED TO ME AND ASKED ME TO REVIEW.

Q.    DOES THIS PROVIDE THE SUMMARY OF YOUR UNDERSTANDING OF BOTH YOUR OWN TEST RESULTS AND BODE'S TEST RESULTS?

A.    YES.  I FOUND NO DIFFERENCES BETWEEN THE TWO REPORTS AND WHAT YOU REPRESENTED IN THE CHART.

MS. HAINES:  YOUR HONOR, WE WOULD SEEK TO INTRODUCE GOVERNMENT EXHIBIT R7?

THE COURT:  DO YOU HAVE AN EXTRA COPY?

MS. HAINES:  I DO.

THE COURT:  HEARING NO OBJECTION, R7 WILL BE ADMITTED.

(GOVERNMENT EXHIBIT R7 ADMITTED INTO EVIDENCE.)

MS. HAINES:  AND I HAVE NO FURTHER QUESTIONS, YOUR HONOR.

THE COURT:  CROSS EXAMINE.

CROSS EXAMINATION

BY MR. MCHUGH:

Q.    DR. CALLAGHAN, YOU HAVE A PH.D. IN MICROBIOLOGY, IS THAT RIGHT?

A.        MOLECULAR BIOLOGY AND MICROBIOLOGY.

Q.        YOU ARE ALSO A SENIOR SCIENTIST WITH THE FBI DNA LAB?

A.        YES, THAT'S CORRECT.

Q.        WHY IS DNA ANALYSIS A SCIENCE, A SCIENCE THAT WE CAN RELY ON IN FEDERAL COURT?

A.        IT'S BEEN USED FOR MORE THAN 25 YEARS IN THE UNITED STATES TO INCLUDE OR EXCLUDE AN INDIVIDUAL.  IT HAS THE POTENTIAL TO INCLUDE OR EXCLUDE AN INDIVIDUAL AS THE SOURCE OF BIOLOGICAL MATERIAL.  AND SO THERE ARE LOTS OF SCIENTIFIC ARTICLES WRITTEN ON IT, AND THERE HAVE BEEN MANY ADMISSIBILITY HEARINGS ON THE SCIENTIFIC VALIDITY.

Q.        NO.  I TOTALLY UNDERSTAND THAT.  YOU CAN TEST IT, IS THAT RIGHT?  IT'S SUBJECT TO EMPIRICAL TESTING?

A.        YES.

Q.        THERE IS A KNOWN ERROR RATE, IS THAT RIGHT, OR LACK OF -- SUCCESS RATE?

A.        I DON'T KNOW THAT THERE IS -- I DON'T WANT TO MINCE WORDS WITH YOU.  SO YOU GET TO THE AREA OF ERROR RATE, HUMANS MAKE ERRORS.

Q.        RIGHT.

A.        WITH REGARD TO THE SCIENTIFIC VALIDITY OR ACCURACY OF THE TEST, IF DONE PROPERLY, THE RESULTS THAT ARE OBTAINED ARE RELIABLE AND ACCURATE.

Q.    IT CAN BE VALIDATED, IS THAT RIGHT?

A.    THAT'S CORRECT.

MR. MCHUGH:  THAT'S ALL I HAVE, YOUR HONOR.

MS. HAINES:  NOTHING FURTHER, YOUR HONOR.

THE COURT:  ALL RIGHT.  YOU MAY STEP DOWN.

(WITNESS EXCUSED.)

THE COURT:  NEXT WITNESS.

MS. HAINES:  I THINK AT THIS POINT WE ARE ACTUALLY AT THE POINT OF READING SOME INFORMATION OR TRANSCRIPTS IN.

THE COURT:  ALL RIGHT.

MR. GURGANUS:  YOUR HONOR, WHAT WE PROPOSE TO DO AT THIS TIME IS READ THE TRANSCRIPT OF TESTIMONY OF MR. CLASSEN, STEPHEN CLASSEN.  AND THIS IS FROM TUESDAY, JUNE 9TH AND 10TH OF 1998, THE TRIAL TESTIMONY.  AND I HAVE COPIES FOR YOU AND THE LAW CLERK.

FBI AGENT JOHN COYLE IS PRESENT IN COURT AND WITH YOUR PERMISSION WE WILL HAVE HIM SIT IN THE WITNESS BOX.  AND WHAT I PROPOSE TO DO IS ASK THE QUESTIONS OF HIM AND JUST HAVE HIM ANSWER.  AND THEN LIKEWISE WHEN THERE IS CROSS EXAMINATION, DO THE SAME. I WILL PLAY THE ROLE OF WHOEVER.

THE DEFENDANT:  EXCUSE ME, BUT I CAN'T

HEAR YOU, SIR.  CAN YOU SPEAK INTO TO THE MICROPHONE, PLEASE.

THE COURT:  SPEAK A LITTLE LOUDER.

MR. GURGANUS:  WRONG MICROPHONE.  I WILL REPEAT WHAT I SAID.  I WILL BE ASKING THE QUESTIONS AND FBI AGENT JOHN COYLE WILL BE SITTING IN THE WITNESS STAND AND ANSWERING AS RECORDED IN THE TRANSCRIPT OF JUNE 9TH AND JUNE 10TH, 1998 AT THE TRIAL, UNITED STATES VERSUS DAVID PAUL HAMMER 96-CR, WILL BE UTILIZING THE TRANSCRIPT THAT HAS BEEN MARKED AS R175.  BECAUSE IT WAS TWO DAYS, JUDGE, IT STARTS -- THE TESTIMONY WOULD THEN -- WHAT WE DID HERE WAS, WE USED THE FIRST PAGE, THE INDEX TO THE WITNESSES, THE INDEX TO EXHIBITS, AND THEN WE JUMPED TO THE AREA WHERE MR. CLASSEN STARTED TESTIFYING THAT DAY AT 177.  AND THAT THEN CONTINUED AND THERE WAS A BREAK FOR THE EVENING.  AND IT CONTINUED ON WEDNESDAY JUNE 10, 1998.  AND COURT RECONVENED APPARENTLY AT 10:00 A.M.

WITH THAT INTRODUCTION, WE WILL START.

THE WITNESS:  ALL RIGHT.

MR. GURGANUS:  STARTING ON PAGE 177 OF R175, MR. CLASSEN BEING CALLED.

THE COURT STATED:  ALL RIGHT.  WOULD YOU RAISE YOUR RIGHT HAND, SIR.

STEPHEN J. CLASSEN CALLED AS A WITNESS ON

BEHALF OF THE UNITED STATES HAVING BEEN DULY SWORN AND

AFFIRMED ACCORDING TO LAW TESTIFIED AS FOLLOWS.

THE COURT ASKED --  AND AT THIS TIME,

AGENT COYLE, I WILL ASK YOU TO RESPOND TO THE QUESTIONS.

BY THE COURT:

Q.      WHAT IS YOUR LAST NAME, PLEASE.

A.      CLASSEN.

Q.      C-L-A-S-S-O-N?

A.      E-N.

Q.      YOUR FIRST NAME MR. CLASSEN?

A.      STEPHEN.

Q.      IS THAT SPELLED WITH A V?

A.      P-H.

Q.      DO YOU USE A MIDDLE INITIAL?

A.      J.

Q.      J AS IN JOHN?

A.      JAMES, YES.

THE COURT:  ALL RIGHT.  YOU MAY GO AHEAD.

AT THAT POINT DIRECT EXAMINATION WAS BY

FREDERICK MARTIN, ASSISTANT UNITED STATES ATTORNEY.  I

WILL BE ASKING THE QUESTIONS POSED AT THIS TIME BY

MR. MARTIN, AND I WOULD ASK, MR. COYLE, THAT YOU ANSWER

THE QUESTIONS BY MR. -- OR THE ANSWERS BY MR. CLASSEN.

Q.      MR. CLASSEN, ARE YOU PRESENTLY IN CUSTODY?

A.      YES, I AM.

Q.      WHAT SENTENCE OR SENTENCES ARE YOU PRESENTLY SERVING NOW, MR. CLASSEN?

A.      CONSPIRACY FOR --

Q.      CONSPIRACY TO DO WHAT, SIR?

A.      INTRODUCE DRUGS INTO THE INSTITUTION.

Q.      WHAT INSTITUTION WAS IT THAT YOU WERE FOUND GUILTY OF HAVING CONSPIRED TO INTRODUCE DRUGS INTO?

A.      SHERIDAN, OREGON.

Q.      AND WHAT COURT SENTENCED YOU?

A.      HUM, OREGON, PORTLAND, OREGON, WELL, NINTH CIRCUIT.

Q.      AND WHEN WAS THE SENTENCING?  WHEN DID THAT TAKE PLACE?

A.      UM --

Q.      IF YOU CAN RECALL?

A.      '97, MARCH, I THINK.  MARCH 1.

Q.      WITH RESPECT TO YOUR COMING FORWARD, AT LEAST IN PROVIDING STATEMENTS EITHER TO THE FBI OR THE GRAND JURY, WHICH CAME FIRST, THE PROSECUTION OR THE COOPERATION?

A.      UM.  COOPERATION.

Q.      BUT WHAT CAME -- DID THE CRIMINAL ACT OCCUR BEFORE?

A.      OH, YEAH, BEFORE -- BEFORE THAT.

Q.      WHEN DID THE CRIMINAL ACT TAKE PLACE?

A.    OH, 1995, MARCH OF '95.

Q.    AND FOLLOWING THAT CRIMINAL ACT IN SHERIDAN, DID YOU FIND YOURSELF AT THE ALLENWOOD PENITENTIARY?

A.    YES, I DID.

Q.    AND WHEN, IF YOU CAN RECALL, DID YOU ARRIVE AT THE ALLENWOOD PENITENTIARY?

A.    I BELIEVE IT WAS MARCH OF '96.

Q.    WHEN YOU ARRIVED AT THE ALLENWOOD PENITENTIARY, MR. CLASSEN, WHERE DID YOU STAY, IN WHAT CELL?

A.    IN WITH THE -- MR. HAMMER, DAVE, OVER THERE. 103 I BELIEVE IT WAS.

Q.    WITH RESPECT TO STAYING WITH MR. HAMMER, HOW LONG, IF YOU CAN RECALL, DID YOU STAY WITH MR. HAMMER IN THE BEGINNING OF MARCH OF '96 WHEN YOU ARRIVED AT THE ALLENWOOD FACILITY?

A.    TWO WEEKS OR A LITTLE OVER.

Q.    AND WITH RESPECT TO THE -- THE REASON THAT YOU LEFT THE CELL THAT MR. HAMMER WAS IN, WHAT DID -- WHAT WAS THE REASON FOR THAT?

A.    SO SOMEBODY ELSE COULD MOVE IN.

Q.    AND DID MR. HAMMER TELL YOU WHAT THE NAME OF THE PERSON WAS THAT WAS GOING TO REPLACE YOU AS HIS CELLMATE?

A.    MARTI, OR HE WAS CALLED CROW TOO, I THINK.

Q.    OKAY.  WITH RESPECT TO THE NICKNAME CROW, IS

THAT SOMETHING YOU GAVE MR. MARTI OR IS THAT SOMETHING THAT MR. HAMMER GAVE TO MR. MARTI?

A.    THAT'S SOMETHING I HEARD FROM MR. HAMMER.

Q.    WITH RESPECT, AGAIN, TO MR. HAMMER AS A CELLMATE, WHEN YOU LIVED WITH HIM IN CELL 103, HOW DID YOU GET ALONG -- HOW DID YOU GET ALONG WELL WITH HIM OR HOW WELL DID YOU GET ALONG WITH HIM, RATHER?

A.    PRETTY GOOD.

Q.    IN TERMS OF YOUR STAY IN THE SPECIAL HOUSING UNIT, WHEN YOU ARRIVED IN THE SPECIAL HOUSING UNIT, DID YOU SEE ANY CORRECTIONAL OFFICIALS SHORTLY AFTER YOUR ARRIVAL AT THE ALLENWOOD FACILITY?

A.    YEAH.  THE NEXT DAY.

Q.    AND WHO DID YOU SEE THEN?

A.    IT WAS A CAPTAIN.  I DON'T REMEMBER HIS NAME BUT --

Q.    WITH RESPECT TO, AGAIN, THAT HAPPENED THE DAY AFTER YOU ARRIVED, IS THAT CORRECT?

A.    YEAH.

Q.    HOW MUCH TIME DID YOU HAVE BEFORE YOU SPOKE TO THE CAPTAIN ON THE FOLLOWING DAY?

A.    IT WAS ABOUT 24 HOURS AFTER I GOT THERE OR A LITTLE LESS THAN 24 HOURS FROM THE TIME I GOT THERE.

Q.    I'M SORRY.  WHEN YOU ARRIVED AT THE ALLENWOOD PENITENTIARY, DID YOU TELL MR. HAMMER, WHO YOU WERE

LIVING WITH AT THE TIME, WHY YOU WERE THERE?

A.     YES, I DID.

Q.     WHAT DETAILS DID YOU GIVE MR. HAMMER AS TO WHAT CAUSED YOU TO BE TRANSFERRED FROM SHERIDAN, OREGON TO THE ALLENWOOD PENITENTIARY?

A.     JUST -- OH, I TOLD HIM I WAS HAVING TROUBLES OR THAT THEY SHIPPED ME THERE BECAUSE I WAS HAVING TROUBLES JUST BECAUSE OTHER PEOPLE WERE SAYING THINGS ABOUT ME BECAUSE IF I GOTTEN CAUGHT BRINGING IN DRUGS AND THEY --

Q.     AND WHAT -- AGAIN, IN TELLING MR. HAMMER THIS, WHAT IF ANYTHING DID HE TELL YOU?

A.     HE SAID THAT IT'S POSSIBLE THAT I COULD HAVE TROUBLES THERE OR HE ALREADY HEARD THAT I COULD HAVE TROUBLES THERE.

Q.     AND WHAT SPECIFICALLY DID MR. HAMMER SAY WAS THE TYPE OF TROUBLE OR THE CHARACTER OF THE TROUBLE THAT YOU COULD HAVE IF YOU WENT INTO THE ALLENWOOD PENITENTIARY'S GENERAL POPULATION?

A.     HE SAID HE HEARD THAT I WOULD HAVE TROUBLE WITH THE DIRTY WHITE BOYS.

Q.     AND AGAIN, WITH RESPECT TO WHAT TROUBLE -- HOW DID HE -- HOW WAS IT THAT HE KNEW, ACCORDING TO WHAT HE'S TOLD YOU, THAT YOU WOULD HAVE TROUBLE WITH THE DIRTY WHITE BOYS AT THE ALLENWOOD PENITENTIARY?

A.      WELL, I THINK HE JUST PUT IT TOGETHER BECAUSE WE WERE TALKING AND I KIND OF -- YOU KNOW, I'M AN UPFRONT PERSON AND I TOLD HIM A LOT ABOUT WHAT WAS HAPPENING AND WHY I WAS THERE ALL THE WAY FROM OREGON.  AND I REALLY DIDN'T WANT TO BE THERE.  AND I TOLD HIM A LOT OF THINGS.  AND THEN HE TOLD ME THAT HE THOUGHT THAT I COULD HAVE SOME TROUBLES THERE.

Q.      ON THE LAST DAY THAT YOU STAYED WITH HIM, ON THE DAY THAT YOU WERE TRANSFERRED, DID THE SUBJECT OF YOUR POTENTIAL TROUBLE WITH THE DIRTY WHITE BOYS COME UP AGAIN?

A.      YEAH.

Q.      AND WHAT WAS IT THAT MR. HAMMER SAID TO YOU THEN AS YOU WERE LEAVING HIS CELL ABOUT THE THREATS THAT THE DIRTY WHITE BOYS HAD POSED TO YOU?

A.      HE SAID HE MADE IT UP, THAT I WASN'T GOING TO HAVE ANY TROUBLE.

Q.      DID HE EVER TELL YOU WHY HE MADE UP A STORY THAT YOU WOULD HAVE TROUBLE WITH THE DIRTY WHITE BOYS AT THE ALLENWOOD PENITENTIARY?

A.      BECAUSE HE WANTED MY COMPANY.  HE ENJOYED -- I MEAN, JUST FROM WHAT WE TALKED AT FIRST, THAT HE ENJOYED MY PERSONALITY, I GUESS.

Q.      AND IN TERMS OF YOUR GETTING ALONG WELL WITH HIM, AGAIN, WHAT DID YOU DO, DURING THE TWO OR THREE

WEEKS THAT YOU WERE IN CELL 103 WITH HIM?

A.      NOTHING REALLY SPECIAL, I DIDN'T THINK.  NOTHING THAT WAS DIFFERENT FROM ANYPLACE ELSE.  WE PLAYED CARDS, AND, YOU KNOW, DIFFERENT THINGS.  I JUST READ AND WAITED AROUND TO SEE WHAT WAS GOING TO HAPPEN.

Q.      DO YOU RECALL WHAT THE CHARACTERISTICS WERE OR WHAT CELL 103 LOOKED LIKE WITH YOU WHEN YOU WERE THERE FOR THOSE SEVERAL WEEKS?

A.      PRETTY MUCH, YEAH.

Q.      LET ME SHOW YOU A SERIES OF PHOTOGRAPHS, 5.1, FOR EXAMPLE, I'LL SHOW YOU A STACK OF BOOKS IN THE CORNER NEAR THE SHOWER.  AND I'LL ASK YOU IS THAT THE WAY THE CELL LOOKED WHEN YOU WERE IN THE CELL 103 WITH MR. HAMMER?

A.      YEAH, PRETTY MUCH.

Q.      AGAIN, WERE THERE ANY DIFFERENCES, TO THE BEST OF YOUR RECOLLECTION, BETWEEN WHAT -- WHAT YOU OR HOW IT WAS WHEN YOU WERE THERE AND HOW IT IS DEPICTED IN THAT PHOTOGRAPH?

A.      I THINK THAT'S -- THAT'S RIGHT EXCEPT MAYBE THE TOBACCO WOULD BE UNDER THE BED SO THAT THE ORDERLY COULDN'T SEE IT.  THAT WOULD BE THE ONLY THING.  SO NOBODY WOULD ASK FOR TOBACCO.

Q.      DID YOU SEE -- OR DO YOU SEE IN THAT PHOTOGRAPH A SMALL YELLOW ITEM WHICH APPEARS TO BE IN THE WINDOW OF

THAT CELL?

A.     YES, I DO.

Q.     ARE YOU FAMILIAR WITH THAT YELLOW ITEM?

A.     IT'S A RADIO.

Q.     AND DO YOU REMEMBER, FOR EXAMPLE, WHAT KIND OF MUSIC MR. HAMMER LIKED?

A.     HE PREFERRED COUNTRY, I BELIEVE.

Q.     AND AGAIN WAS THAT THE RADIO HE HAD WHEN YOU LIVED WITH HIM?

A.     YEAH.

Q.     AND GOVERNMENT'S EXHIBIT 5.1-14, THERE'S A SERIES OF PHOTOGRAPHS AND IT'S ALSO DEPICTED IN A LITTLE BETTER FASHION IN DEFENDANT'S EXHIBIT 3, MR. CLASSEN. AND I'LL ASK YOU IF THAT IS SOMETHING -- THAT SCENE IS SOMETHING SIMILAR TO OR IF IT'S DIFFERENT IN ANY FASHION FROM THE WAY IT WAS WHEN YOU LIVED IN CELL D -- OR WHEN YOU CELLED WITH HIM IN 103?

A.     YEAH, IT'S DIFFERENT.  THEY HAD GIRLS ALL OVER, UP ABOVE HERE, ALL OVER AND THE PICTURE OF THIS MONKEY WAS LIKE IN THE CENTER OF THEM ALL.

Q.     SO THAT THERE WERE MORE GIRLS?

A.     MORE.

Q.     BUT THE MONKEY WAS THERE?

A.     YEAH, THE MONKEY WAS THERE.

Q.     AND IN TERMS OF MORE GIRLS, WAS IT SPREAD OUT

WIDTH WISE OR WAS IT -- DID IT GO HIGHER?

A.      IT COVERED -- IT COVERED EVERYTHING, EVERYTHING, THE WHOLE, ALL THE METAL, THE GIRLS DID.

Q.      AND WITH RESPECT TO, AGAIN, THE GIRLS, DID MR. HAMMER ALLUDE TO THE GIRLS, FOR EXAMPLE, THE GIRLS' PHOTOGRAPHS?  DID HE PAY ANY PARTICULAR ATTENTION TO THEM AT ANY TIME THAT YOU WERE LIVING WITH HIM?

A.      WELL, HE SAID -- I DON'T KNOW -- I THINK IT WAS THE NEXT DAY OR THAT NIGHT, HE SAID THESE ARE MY GIRLS, AND TO THE MONKEY HE SAID THAT'S JASPER, AND THAT'S ALL HE SAID ABOUT IT.

Q.      AND WITH RESPECT TO YOUR CONVERSATIONS WITH MR. HAMMER, AGAIN, YOU PROVIDED HIM WITH THE DETAILS ABOUT YOUR BACKGROUND, IS THAT CORRECT?

A.      YES.

Q.      AND YOU PLAYED CARDS WITH HIM, IS THAT CORRECT?

A.      YES.

Q.      DURING THE TIME THAT YOU WERE WITH MR. HAMMER, AGAIN, HE REFERRED TO THIS MONKEY AS JASPER, IS THAT CORRECT?

A.      YES.

Q.      WHEN, IF EVER, WAS HE TALKING TO THE MONKEY?

A.      THE ONLY TIME I REMEMBER IS WHEN WE PLAYED CARDS SOMETIMES, AND WHEN I WOULD WIN AND THEN HE'D SAY -- HE'D LIKE SAY SOMETHING TO JASPER, OH, JASPER OR

SOMETHING LIKE THAT, JUST REFER TO IT LIKE THAT, LIKE WHEN HE WAS LOSING, WHICH WASN'T TOO OFTEN.

Q.    WHICH WAS -- PARDON?

A.    WHICH WASN'T TOO OFTEN.

Q.    SO HE WOULD INVOKE THE MONKEY WHEN HE WAS LOSING AT CARDS?

A.    YEAH.

Q.    WITH RESPECT TO, AGAIN, HIS PHYSICAL SITUATION, DID HE, DURING THE TIME YOU LIVED WITH MR. HAMMER, HAVE ANY MEDICATIONS WHICH HE RECEIVED IN CELL 103?

A.    HE -- I DON'T THINK HE TOOK THEM WHEN I WAS THERE.  I THINK HE STOPPED TAKING THEM.  THE DOCTOR WOULD COME AROUND AND I HAVE SOME MEDICATION AND HE HAD SOME, AND HE DIDN'T TAKE HIS.  HE DIDN'T WANT IT.

Q.    WITH RESPECT TO THE MEDICATIONS THAT HE DID NOT TAKE, DID HE TAKE THEM OR THEN GIVE THEM TO YOU OR WHAT? --

A.    NO.  HE JUST -- HE JUST TOLD THE DOCTOR HE DIDN'T EVEN WANT THEM.

Q.    AND IN TERMS OF, AGAIN, YOU WERE THERE TO OVERHEAR HIS COMMENTS TO THE PHYSICIANS'S ASSISTANT OR WHOEVER IT WAS THAT PASSED OUT THE MEDICATION?

A.    YEAH.

Q.    WHY DID HE SAY -- OR DID HE GIVE ANY REASONS WHY HE DIDN'T WANT THE DRUGS?

A.        HE TOLD THEM THAT IT WASN'T DOING ANY GOOD.

Q.        IN TERMS OF DOING ANY GOOD, DOING ANY GOOD FOR WHAT?

A.        I'M NOT REALLY SURE.  HE SAID IT WAS NOT HELPING HIM IN ANY WAY, SO HE DID NOT WANT TO CONTINUE TAKING THEM.

Q.        WITH RESPECT TO THE DRUGS YOU TOOK, WHAT IF ANY DRUGS DID YOU TAKE DURING THE TWO OR THREE-WEEK PERIOD WHILE YOU WERE WITH MR. HAMMER?

A.        TRAZODONE I TOOK IN THE EVENINGS AND IN THE MORNING I TOOK SERTRALINE.

Q.        DO YOU KNOW WHAT THE EFFECTS OF EITHER?  AND AGAIN, I'LL LET YOU PRONOUNCE THEM.  THE EVENING DRUG THAT YOU TOOK, WHAT WAS THAT FOR?

A.        THAT WAS LIKE RELAXED -- MAYBE MAKE YOU TIRED FOR THE EVENING, HELP YOU SLEEP.

Q.        DID YOU ALWAYS TAKE THAT PARTICULAR MEDICATION?

A.        I HAD TAKEN IT FOR ABOUT A YEAR, A YEAR AND A HALF.

Q.        AND WHEN, IF EVER, DURING THE TWO OR THREE-WEEK PERIOD, DID YOU SHARE THAT WITH MR. HAMMER?

A.        THERE'S A COUPLE OF TIMES I DIDN'T TAKE IT.  AND ONE TIME I HAD GIVEN IT TO HIM, BUT HE DIDN'T LIKE IT, SO.

Q.        WITH RESPECT TO THE MORNING DRUG THAT YOU TOOK,

AGAIN, I'LL LET YOU REFER TO IT BY NAME.

A.        SERTRALINE.

Q.        WHAT WAS THE PURPOSE OF THAT DRUG, AS YOU UNDERSTOOD IT?

A.        KIND OF KEEP YOU LEVEL, KEEP YOUR MOOD LEVEL SO YOU WOULDN'T GET LIKE DEPRESSED OR TOO UP AND TOO DOWN, JUST LIKE AN ON AN EVEN KEEL.

Q.        AND AGAIN, WOULD YOU REGULARLY HAVE TAKEN THAT?

A.        YEAH, I TOOK THAT EVERY DAY.

Q.        HOW, IF AT ALL, DID IT AFFECT YOU IN TERMS OF YOUR ABILITY TO PERCEIVE THINGS?  I MEAN, DID YOU HEAR VOICES?  DID YOU SEE THINGS MOVING AROUND INSIDE THE CELL?

A.        NO.  THE REASON I STARTED TAKING IT WAS WHEN I GOT ARRESTED.  AND I WAS DEPRESSED A LOT AND COULDN'T CONCENTRATE AND THEY JUST GAVE IT TO ME SO I COULD FOCUS MORE.  BUT IT WAS NOTHING LIKE HEARING VOICES OR ANYTHING.  SERTRALINE, THEY RELATE IT TO LIKE PROZAC OR ZOLOFT.  AND THEY SAY IT'S JUST LIKE TO MAKE YOU -- LIKE I SAID -- EVEN, EVEN KEEL.  THERE'S NO VOICES OR ANYTHING LIKE THAT.

Q.        WITH RESPECT TO AGAIN THAT PARTICULAR DRUG, YOU INDICATED THAT YOU TOOK THAT FAIRLY FREQUENTLY?

A.        EVERY DAY, YEAH.

Q.        WAS THERE ANY SHARING WITH MR. HAMMER OF THAT

PARTICULAR ITEM?

A.      NO.

Q.      DURING THE TIME THAT YOU WERE LIVING WITH MR. HAMMER, AGAIN, YOU MENTIONED THE NAME MARTI OR CROW IN TERMS OF YOUR SUCCESSOR ROOMMATE WITH MR. HAMMER, IS THAT CORRECT?

A.      YES.

Q.      HOW OFTEN WOULD MR. HAMMER -- OR HOW OFTEN DID, WHEN HE LIVED WITH YOU, MR. HAMMER REFER TO MR. MARTI?

A.      I THINK IT WAS -- THE NEXT -- THE NEXT DAY, THE DAY AFTER I GOT THERE.  IT MIGHT HAVE BEEN THAT NIGHT BUT -- WHEN I SAID, WELL, I THINK I'LL TELL THE CAPTAIN. YOU KNOW, HE TOLD ME ABOUT THE DIRTY WHITE BOYS AND HE SAID I SHOULD TELL THE CAPTAIN.  HE SAID THAT HE HAS A FRIEND THAT WAS COMING OFF DISCIPLINARY SOMETIME SOON. HE DIDN'T KNOW IF -- OR I DON'T KNOW FOR SURE WHEN OR HE DIDN'T KNOW FOR SURE WHEN BUT HE WANTED TO HAVE HIM MOVE IN SO THAT I COULD LIKE JUST STAY THERE UNTIL THAT GUY MOVED IN.

Q.      AND AGAIN, THAT WAS THE DAY THAT YOU WENT TO THE CAPTAIN, THE SECOND DAY THAT YOU WERE AT THE ALLENWOOD PENITENTIARY THAT HE TOLD YOU ABOUT THAT DETAIL?

A.      YEAH.

Q.      FROM TIME-TO-TIME AFTER THE SECOND DAY THAT YOU WERE WITH MR. HAMMER, HOW OFTEN WOULD MR. MARTI'S NAME

COME UP IN CONVERSATION?

A.      WELL, I THINK --

Q.      IF IT CAME UP AT ALL?

A.      YEAH, I THINK IT WAS AFTER, I DON'T KNOW.  IT MUST HAVE BEEN A WEEK, A WEEK LATER OR SOMETHING.  I DON'T THINK IN THE FIRST WEEK ANYTHING CAME UP.  AND I THINK IT WAS -- ABOUT A WEEK, MAYBE EVEN EIGHT OR NINE DAYS.  AND HE GOT OFF DS AND HE HAD MOVED UPSTAIRS AND THEN HE HEARD FROM HIM, I THINK.  HE SENT HIM A KITE.

Q.      OKAY.  AND IN TERMS OF A KITE, THAT WAS A NOTE THAT MR. HAMMER SENT TO MR. MARTI?

A.      YES.

Q.      AND WAS THERE ANY OTHER EXCHANGE?  DID MR. MARTI SEND ANY KITES TO MR. HAMMER?

A.      WELL, ONE THAT I KNOW OF JUST BEFORE I MOVED OUT.  BUT, YOU KNOW, I DIDN'T TRY TO PAY ATTENTION TO EVERYTHING HE WAS DOING.  I LIKE MIND MY OWN BUSINESS A LOT, AND I KNOW OF ONE FOR SURE.

Q.      WAS THAT BUT --

A.      BUT I KNOW OF ONE FOR SURE.

Q.      THAT MR. MARTI HAD SENT TO MR. HAMMER?

A.      YEAH.

Q.      AND DO YOU REMEMBER READING IT?

A.      YEAH.  HE -- HE -- HE SENT HIM -- ONE OF THEM WAS A KITE THAT SAID THAT HE WANTED TO MOVE IN THERE.

AND HE SAID, I REALLY WANT TO P YOUR CELLIE.  AND THEN INSIDE OF THERE WAS ANOTHER ONE FOR HAMMER TO GIVE TO THE POLICE TO MOVE IN -- TO HAVE MARTI MOVE IN WITH HIM, LIKE A COPOUT.

THE COURT:  COUNSEL, IT'S 4:31.  WE OUGHT TO QUIT PRETTY SOON.

MR. MARTIN THEN CONTINUED:  JUST A FEW MORE QUESTIONS, YOUR HONOR, WHILE WE ARE ON THE SUBJECT.

Q.     WITH RESPECT TO AGAIN THE TIME THAT INCIDENT OCCURRED, WAS IT PLANNED THAT MR. MARTI WOULD MOVE IN WITH MR. HAMMER ON MONDAY, APRIL 8TH?

A.     YEAH, I MEAN, I'M NOT SURE OF THE DATE BUT I KNOW IT WAS A MONDAY.

Q.     AND DID THAT MOVE TAKE PLACE ON THE EXPECTED DAY?

A.     NO.

Q.     WHAT INSTEAD HAPPENED?

A.     THERE WAS A FIGHT IN THE REC CAGE BECAUSE FROM OUR ROOM YOU COULD SEE THE REC CAGE.  AND THAT MESSED UP THE WHOLE SCHEDULE FOR THE DAY.  I REMEMBER, IT WAS IN THE MORNING, AND HAMMER STARTED SCREAMING AT EVERYBODY THAT THERE WAS A FIGHT IN THE REC CAGE.

AND I HAD JUST GOT THERE AND I HAD NEVER BEEN TO A HIGH SECURITY PLACE BEFORE.  AND HE WAS PRETTY EXCITED ABOUT IT AND I'M JUST LOOKING AT IT.  THEY HAD

KNIVES, PLASTIC KNIVES AND -- OR ONE OF THEM DID ANY WAYS.

AND THEN I THINK IT WAS AFTER THEY -- THEY FINALLY BROKE IT UP.  THERE WAS A LOT OF POLICE IN THERE AND THEY RAN INTO THE CAGE AND -- ANYWAYS AND THEY PULLED THE GUYS AWAY.  ONE OF THEM HAD BLOOD ALL RUNNING DOWN HIS FACE AND STUFF.

AND HAMMER LOOKED -- LOOKED OVER AT ME AND I THINK I WAS KIND OF WHITE-FACED BECAUSE I DIDN'T LIKE SEEING THAT ANYWAYS, AND HE SAID THAT, I'M GOING TO KILL MARTI.  AND I JUST LOOKED AT HIM.  AND I DON'T KNOW WHAT KIND OF EXPRESSION I HAD, BUT THE NEXT THING HE SAYS, POINT TO ME, HE GOES, GOT YOU, LIKE THAT.  AND ANYWAYS, THAT -- THAT STOPPED US FROM MOVING.  IT WAS THE NEXT DAY THAT WE ENDED UP MOVING.

Q.     WITH RESPECT TO MR. HAMMER, DID HE EVER HAVE ANY PORTIONS OF HIS BODY AROUND YOUR NECK?

A.     I THINK -- IT WAS THAT DAY OR THE NEXT DAY BECAUSE WE WALK, YOU KNOW, IT'S A SMALL CELL.  WE WALK AROUND IN IT.  HE PUT HIS ARM AROUND ME ONE TIME AND HE ASKED IF I THOUGHT THAT HE COULD CHOKE ME AND I SAID, WELL, YEAH.  THEN HE LET ME GO.

AT THAT POINT:  YOUR HONOR, THIS IS A GOOD PLACE TO STOP AS ANY.

THE COURT STATED:  ALL RIGHT.  4:34.

WE'LL ASK YOU TO COME IN TOMORROW MORNING AT THE REGULAR TIME.

COURT IS ADJOURNED.

THE COURT:  NEXT WE GO TO JUNE 10?

MR. GURGANUS:  YES, YOUR HONOR.

THE COURT:  1998.  I'M SORRY.

MR. GURGANUS:  WEDNESDAY.  THIS IS VOLUME 6 OF THE JURY TRIAL, UNITED STATES VERSUS DAVID PAUL HAMMER.  IT'S 10 A.M.  THE TRANSCRIPT INDICATES THAT COURT CONVENED.

AND THE COURT STATED:  GOOD MORNING.

MR. MARTIN:  GOOD MORNING, YOUR HONOR.

THE COURT:  YOU'RE STILL UNDER OATH, MR. CLASSEN.

YOU MAY GO AHEAD.

MR. MARTIN:  THANK YOU, YOUR HONOR.

AT THAT POINT THE QUESTIONING CONTINUED.

Q.    MR. CLASSEN, YESTERDAY YOU INDICATED THAT YOU HAD BEEN SENTENCED FOR A CONSPIRACY CHARGE BY THE DISTRICT OF OREGON.  WHEN YOU WERE HERE IN PENNSYLVANIA AT THE ALLENWOOD PENITENTIARY, WERE YOU SERVING ANOTHER SENTENCE?

A.    YEAH, THAT WAS A BANK ROBBERY SENTENCE.

Q.    AND WHAT WAS THE LENGTH OF THAT SENTENCE, SIR?

A.    51 MONTHS.

Q.      WHEN WOULD THAT HAVE EXPIRED, SIR?

A.      JULY OF LAST YEAR, I THINK.

Q.      AND THE ADDITIONAL SENTENCE FROM OREGON IS THE REASON YOU'RE STILL IN CUSTODY TODAY, IS THAT CORRECT?

A.      YES, IT IS.

Q.      WITH RESPECT AGAIN TO PROMISES OR UNDERSTANDINGS THAT HAVE BEEN MADE BY THE PROSECUTION TO YOU, FIRST OF ALL, WITH RESPECT, AGAIN, TO THE OREGON SENTENCE, HAS THERE BEEN ANY PROMISES MADE TO YOU ABOUT A POSSIBLE RULE 35 OR A REDUCTION OF SENTENCE FROM THAT PARTICULAR SENTENCE?

A.      NO, NOT A RULE 35.

Q.      WITH RESPECT TO, AGAIN, HAVE THERE BEEN ANY PROMISES MADE THAT LETTERS WOULD BE WRITTEN TO THE U.S. ATTORNEY'S OFFICE IN OREGON?

A.      YEAH, I WAS TOLD THAT I WOULD GET A LETTER.

Q.      CAN YOU EXPLAIN AT LEAST YOUR UNDERSTANDING OF THE PROCESS WHERE YOU MIGHT GET A SENTENCE REDUCTION IN EXCHANGE FOR YOUR TESTIMONY?

A.      WELL, I WAS TOLD THAT I WOULD HAVE A LETTER WRITTEN TO MY PROSECUTOR AND THEN IT'S UP TO HIM.  HE HAS TO TAKE IT TO HIS BOSS AND THEN THEY HAVE TO OKAY IT, TO SEE IF I COULD GET A SENTENCE REDUCTION, BUT IT'S UP TO MY JUDGE THAT SENTENCED ME IN '97.

Q.      AND WHO WAS THAT JUDGE AGAIN?

A.        MARSH, JUDGE MARSH.

Q.        WITH RESPECT TO YOUR LOCATION, FOLLOWING YOUR

TESTIMONY BEFORE THE GRAND JURY, MR. CLASSEN, WHERE DID

YOU GO?

A.        I WENT TO LEWISBURG FOR LIKE THREE WEEKS, AND

THEN I WENT UP TO OREGON TO GO TO TRIAL ON A CONSPIRACY

CHARGE, INTRODUCTION CHARGE.

Q.        AND THAT'S WHEN YOU ENTERED A PLEA OF GUILTY TO

THAT CHARGE, IS THAT CORRECT?

A.        YES.

Q.        THE CONSPIRACY CHARGE ANYWAY.

A.        YES.

Q.        WITH RESPECT TO, AGAIN, YOUR PLACEMENT,

FOLLOWING THE CRIMINAL PROCEEDINGS IN OREGON, WHERE WERE

YOU PLACED?  WHERE DID YOU GO?

A.        LEWISBURG, BACK TO LEWISBURG.

Q.        AGAIN, WERE THERE ANY PROMISES MADE TO -- BY OUR

OFFICE TO RECOMMEND TO THE BUREAU OF PRISONS, TO PUT YOU

IN A FACILITY OTHER THAN A PENITENTIARY?

A.        YEAH, TO GET -- NOT ANY PROMISES TO ME, BUT WHEN

I GOT TO LEWISBURG, THEY TOLD ME, I GUESS THEY CALLED

YOU, I DON'T KNOW FOR SURE WHAT HAPPENED, BUT THEN THEY

TRANSFERRED ME TO SCHUYLKILL OR SHUKILL, WHATEVER IT IS.

Q.        AND WITH RESPECT TO SCHUYLKILL, IS THAT A

PENITENTIARY OR A LESSER SECURE FACILITY?

A.        LESS SECURE, FCI.

Q.        AND WITH RESPECT TO SCHUYLKILL, DO YOU EXPECT TO BE GOING BACK TO SCHUYLKILL?

A.        NO, I DON'T.

Q.        WHY?

A.        BECAUSE I GUESS THERE WAS SOME FRIENDS OF DAVE'S THERE AND --

MR. GURGANUS:  AT THAT POINT THERE WAS AN OBJECTION BY MR. TRAVIS:  YOUR HONOR, WE'RE GOING TO OBJECT TO HIS GUESS.

THE COURT:  YOU'RE GOING TO --

AND MR. TRAVIS STATED:  WE OBJECT TO HIS TESTIFYING WHAT HE GUESSES HAPPENED.

THE COURT:  WHAT IS YOUR VIEW, SIR?

MR. MARTIN:  I AGREE, YOUR HONOR.

THE COURT:  ALL RIGHT.

I WILL CONTINUE AT THIS POINT.

Q.        MR. CLASSEN, LET ME ASK YOU WHAT HAPPENED IN TERMS -- IN SCHUYLKILL, WERE YOU IN GENERAL POPULATION OR IN THE SPECIAL HOUSING UNIT?

A.        I WAS IN GENERAL POPULATION UNTIL JANUARY.

Q.        WHAT CAUSED YOU, WITHOUT GUESSING, IF YOU WOULD SAY WHAT CAUSED YOU TO LEAVE THE GENERAL POPULATION AT THE SCHUYLKILL FACILITY?

A.        I WAS TOLD BY THE SIS LIEUTENANT IT IS BECAUSE

THAT I WAS GOING TO TESTIFY --

MR. TRAVIS AT THAT POINT INTERJECTED:
YOUR HONOR, I OBJECT TO THE HEARSAY.

THE COURT:  WELL, I'M NOT SURE IT'S
HEARSAY.

MR. TRAVIS:  HE SAYS HE WAS TOLD.

THE COURT:  WHY DO YOU THINK IT'S
HEARSAY?

MR. TRAVIS:  HE SAID HE WAS TOLD BY THE
SIS LIEUTENANT.

THE COURT:  WHAT?

MR. TRAVIS:  WELL, THAT'S WHAT I'M TRYING
TO PREVENT HIM FROM SAYING.

THE COURT:  WELL, I'M NOT CONVINCED IT'S
HEARSAY AT ALL.  IS IT HEARSAY, COUNSEL?

MR. MARTIN:  YOUR HONOR, THE FACT THAT HE
SPOKE TO THE SIS OFFICE, I DON'T THINK IT'S HEARSAY.
THE DETAILS THAT THEY MAY HAVE SAID MAY BE HEARSAY.  SO
I'LL ASK A FOLLOW-UP QUESTION, IF I MAY.

I WILL CONTINUE.

Q.    WITH RESPECT, AGAIN, TO THE SPECIAL INTELLIGENCE
SUPERVISOR, WITHOUT SAYING WHAT THEY SAID, DID YOU
REQUEST PLACEMENT IN THE SPECIAL HOUSING UNIT?

A.    NO, I DIDN'T REQUEST IT.  BEFORE THAT TIME IN
DECEMBER, THERE WAS SOMEBODY THAT CAME FROM ANOTHER UNIT

AND SAID, OH, YOU KNOW DAVE.  I DON'T REMEMBER THE GUY'S NAME.  THEN A COUPLE OF DAYS LATER HE SAID ARE YOU GOING TO BE TESTIFYING AGAINST HIM?  AND I DIDN'T REALLY REPLY.  I SAID I THINK I'M GOING TO COURT.  AND THEN ABOUT A WEEK LATER, I THINK THAT WAS AROUND CHRISTMAS OR JUST AFTER CHRISTMAS -- THEN ON THE FIFTH OF JANUARY I WENT TO THE HOLE.

Q.      AND AGAIN, THAT WAS BECAUSE THE SIS TOLD YOU THAT YOU SHOULD BE PLACED IN THE SPECIAL HOUSING UNIT?

A.      YEAH, HE SAID --

Q.      DON'T SAY WHAT HE SAID.

A.      OKAY.

Q.      THEY PLACED YOU IN THE SPECIAL HOUSING UNIT AFTER YOU HAD DISCUSSIONS WITH INMATES ABOUT DAVE AND POSSIBLY TESTIFYING IN THIS CASE?

A.      YEAH.

Q.      BASED UPON THOSE SITUATIONS, DO YOU EXPECT TO BE GOING BACK TO SCHUYLKILL?

A.      NO, I DON'T.

Q.      WITH RESPECT TO YOUR INCARCERATION AT SCHUYLKILL, YOU INDICATED THAT YOU WERE PLACED IN THE SPECIAL HOUSING UNIT THERE FOR SOME PERIOD OF TIME, IS THAT CORRECT?

A.      YES.

Q.      FROM WHEN TO WHEN, SIR?

A.        JANUARY 5TH I WENT TO THE HOLE AND THEN MAY 4TH I WAS TRANSFERRED HERE TO WILLIAMSPORT, SO FOUR MONTHS, I GUESS.

Q.        AND AGAIN, THAT WAS NOT YOUR WISH TO BE IN THE SPECIAL HOUSING UNIT, IS THAT CORRECT?

A.        NO.  NO, IT WASN'T.

Q.        AND AGAIN, IN EXCHANGE FOR YOUR TESTIMONY OR ANTICIPATION OF YOUR TESTIMONY, DO YOU EXPECT OUR OFFICE TO RECOMMEND THAT YOU BE PLACED AT ANOTHER FEDERAL CORRECTIONAL INSTITUTION OTHER THAN SCHUYLKILL?

A.        YES.

Q.        ARE THERE ANY OTHER PROMISES OR UNDERSTANDINGS BETWEEN THE U.S. ATTORNEY'S OFFICE, THE FBI AND THE BUREAU OF PRISONS REGARDING YOUR TESTIMONY HERE TODAY?

A.        NO.

Q.        AGAIN, WITH RESPECT TO MR. -- YOUR TWO OR THREE WEEKS WEEKS THAT YOU STAYED WITH MR. HAMMER IN CELL 103, WHEN YOU FIRST ARRIVED AT THE FACILITY, DID YOU HAVE THE WHEREWITHAL OR FUNDS FOR COMMISSARY?

A.        NOT RIGHT WHEN I GOT THERE, NO.

Q.        AND AGAIN, COULD YOU EXPLAIN TO THE JURY WHAT THE PROCEDURE IS ABOUT COMMISSARY?

A.        WELL, WHEN YOU TRANSFER LIKE THAT, I HAD COME FROM CALIFORNIA AT THAT PARTICULAR TIME, NOT OREGON.  I TRANSFERRED AROUND.  ANYWAYS, WHEN YOU GET SOMEPLACE,

YOU DON'T HAVE ANY MONEY.  IT DOES NOT COME WITH YOU, OR YOUR PROPERTY.  AND NOT ONLY THAT, THE STORE WAS CLOSED THAT WEEK SO THAT THEY USUALLY LET YOU SHOP ONCE A WEEK EXCEPT FOR EVERY THREE MONTHS THAT THEY CLOSE IT DOWN FOR A WEEK.  AND I GOT THERE AT A BAD TIME.  SO I COULDN'T SHOP FOR LIKE ALMOST TWO WEEKS.

Q.        WITH RESPECT TO AGAIN YOUR PREDICAMENT, HOW DID YOU COPE WITH THAT PARTICULAR SITUATION?

A.        WELL, DAVE HAD SOME CIGARETTES AND --

Q.        AND DID -- DAVE HAD CIGARETTES?  WHAT DID HE DO WITH THEM?

A.        WELL, HE WASN'T SMOKING AT THAT TIME, HE LET ME HAVE THEM.  THERE WAS LIKE TWO PACKS OR THREE PACKS.

Q.        AGAIN FOR TWO TO THREE WEEKS THAT MR. HAMMER WAS YOUR ROOMMATE OR CELLMATE IN CELL 103, DID HE EVER REVERT TO SMOKING OR DID YOU -- DID HE STAY ABSTAINED FROM SMOKING, IF YOU CAN RECALL?

A.        THERE -- HE SMOKED A FEW CIGARETTES AFTER I WAS THERE LIKE 10, 11 DAYS.  HE DIDN'T SMOKE A LOT, BUT I REMEMBER HIM SMOKING A COUPLE CIGARETTES.

Q.        AND WITH RESPECT TO THE CIGARETTES THAT HE GAVE YOU WAS THERE EVER ANY RETURN BY YOU TO MR. HAMMER?

A.        YEAH.

Q.        OKAY.  COULD YOU EXPLAIN TO THE JURY WHEN THAT TOOK PLACE AND HOW IT TOOK PLACE?

A.        THAT WAS AFTER I MOVED OUT INTO ANOTHER CELL AND THEN WE WERE SHOPPING A FEW DAYS LATER AND WE PUT IN A LIST AND THEN I GOT DAVE'S CIGARETTES BACK.  AND THEN I HAD TO GIVE THEM TO SOMEBODY ELSE TO GIVE TO HIM BECAUSE I'M LOCKED IN THE CELL BUT I HAD THEM ON THE LIST.

Q.        WITH RESPECT TO THAT, HOW DID YOU GET YOUR -- FIRST OF ALL, DID YOU BUY A PARTICULAR BRAND?

A.        MARLBORO'S.

Q.        HOW DID YOU GET THEM TO MR. HAMMER'S CELL SINCE YOU WERE LOCKED IN YOURS?

A.        GAVE THEM TO AN OFFICER THAT WAS ON.  I CAN'T FOR SURE REMEMBER HIS NAME, BUT IT WAS FRIDAY NIGHT, I THINK, WE GOT OUR COMMISSARY.  AND I HAD SOME COFFEE FOR HIM TOO.  I SENT HIM SOME COFFEE AND SOME -- THE ORDERLY HAD COME UP AND SAID GIVE THAT TO THE OFFICER AND SO THAT IS WHAT I DID.

Q.        DO YOU REMEMBER WHO THE ORDERLY WAS?

A.        I BELIEVE IT WAS LENNIE, LENNIE YAGER.  WE JUST CALLED HIM LENNIE ALL THE TIME.

Q.        WITH RESPECT TO LENNIE, DID YOU OBSERVE MR. HAMMER IN ANY INTERACTION WITH LENNIE DURING THE SEVERAL WEEKS THAT YOU WERE WITH HIM?

A.        YEAH.  HE'D STOP BY THE CELL AND TALK TO HIM SOMETIMES.  AND THEN -- WELL, QUITE, EVERY DAY REALLY. I REMEMBER ONE TIME HAMMER ASKING FOR A TINY PAIR OF

UNDERWEAR TO -- I THOUGHT THAT WAS PRETTY -- I LAUGHED ABOUT IT, BUT IT WAS PRETTY SERIOUS.  HE JUST WANTED A TINY PAIR FOR THE GUY THAT WAS MOVING IN.

Q.    SO THOSE WERE NOT MEANT FOR YOU?

A.    NO.  THEY WEREN'T MEANT FOR ME.  HE SAID THEY WERE.  HE TOLD LENNIE THEY WERE AND I TOLD HIM NO.  HE KNEW I WASN'T GOING TO WEAR THEM ANYWAYS BUT....

Q.    DID MR. HAMMER, IN YOUR PRESENCE, HAVE ANY CONVERSATIONS WITH LENNIE ABOUT MARTI OR CROW, AS SOMETIMES HE WAS CALLED, TO THE BEST OF YOUR RECOLLECTION?

A.    NO, NOT TO LENNIE, NOT THAT I REMEMBER, NO.

Q.    OKAY.  WITH RESPECT TO THE SUBJECT OF THE -- SUBJECT OF UNDERWEAR CAME UP, IS THAT CORRECT?

A.    YES.

Q.    AND IN TERMS OF THE TYPES OF UNDERWEAR THAT WAS WANTED, I TAKE IT WAS SOMETHING OTHER THAN THE BOXER SHORTS?

A.    YEAH.  WE USUALLY WEAR BOXERS.  THEY WERE THE LITTLE BRIEFS, WHATEVER YOU CALL THEM, BLOOPERS OR WHATEVER THEY HAPPEN TO HAVE AROUND.  THEY DON'T HAVE A LOT OF THEM IN THE SEG UNIT, I DON'T THINK BUT --

Q.    AND WITH RESPECT TO THOSE, THEY WERE -- MR. HAMMER WAS LOOKING FOR THOSE FOR WHOM?

A.    YEAH, I GUESS THEY WERE, NOW THAT I THINK ABOUT

IT, FOR MARTI, BECAUSE HE TOLD HIM THAT HE WANTED HIM TO MOVE IN. I GUESS LENNIE KNEW. SO HE SAID YEAH, FOR WHEN HE MOVES IN, FOR WHEN MARTI MOVES IN.

Q. AND WITH RESPECT TO WHY MR. HAMMER -- OR DID HE EVER EXPLAIN TO YOU WHY HE WANTED DIFFERENT UNDERWEAR FOR MR. MARTI?

A. WELL, HE DIDN'T REALLY NEED TO, I DON'T THINK. HE DIDN'T EXPLAIN, BUT HE SAID HE WAS GOING TO HAVE HIM WEAR THEM. THAT WAS ENOUGH FOR ME. I DIDN'T REALLY WANT TO HEAR ANYMORE.

THE COURT: MAYBE WE CAN TAKE A FIVE-MINUTE BREAK. AND BEFORE WE DO THAT, CAN I JUST INQUIRE? WITH RESPECT TO THESE TRANSCRIPTS, IS EVERY PAGE GOING TO BE READ OR HAVE YOU SELECTED SOME PAGES AND ELIMINATED OTHERS?

MR. GURGANUS: WELL, YOUR HONOR, WE WERE UNDER THE IMPRESSION THAT YOU WANTED THE WHOLE TRANSCRIPT READ SO THAT WAS THE REASON WHY WE ARE DOING THAT BUT IF --

THE COURT: WELL, YOU KNOW, I'M HEARING THINGS READ INTO THE RECORD THAT TO SOME EXTENT MAY NOT BE RELEVANT AND I'M JUST WONDERING WHETHER OR NOT WE CAN'T SOMEHOW -- YOU CAN'T SOMEHOW EDIT THE -- WHAT IS IN THESE TRANSCRIPTS, JUST TO GO THROUGH THE TESTIMONY THAT YOU THINK YOU WANT TO BRING TO MY ATTENTION. I'M

NOT CONVINCED EVERY DETAIL THAT IS IN HERE IS IMPORTANT TO THIS RESENTENCING HEARING.

MR. GURGANUS:  YES, YOUR HONOR.  AND WE WOULD HAVE TO GET AN AGREEMENT WITH COUNSEL FOR THE DEFENSE, OBVIOUSLY, AND THEN ENDEAVOR TO DO THAT TO CUT IT DOWN.

THE COURT:  OKAY.  WHEN WE HAVE CIVIL CASES, LAWYERS DO THIS ALL THE TIME.  THEY PLAY PRIOR TESTIMONY, BUT THEY DON'T PLAY THE WHOLE THING.  AND I'M NOT CONVINCED I NEED TO HEAR READ EVERY WORD IN EVERY TRANSCRIPT.

NOW, WE CAN GO TO THE END OF TODAY.  AND THEN YOU CAN SORT IT OUT AFTER TODAY, OR PERHAPS YOU CAN USE SOME TIME TOMORROW OVER THE WEEKEND TO SEE IF YOU CAN'T GET AN AGREEMENT TO REDUCE THE SIZE OF ALL THESE TRANSCRIPTS THAT ARE GOING TO BE READ.

MR. GURGANUS:  I THINK THAT IS A GOOD SUGGESTION, YOUR HONOR.  WE WERE -- THE REASON WE WERE READING THEM ALL IN, WE THOUGHT THAT WOULD BE YOUR PREFERENCE.  SO WITH THAT WE WILL ENDEAVOR TO DO THAT.

THE COURT:  MY PREFERENCE IS TO READ THEM IN, BUT ONLY READ IN WHAT IS RELEVANT.

MR. GURGANUS:  THANK YOU, YOUR HONOR.

THE COURT:  OKAY?

MR. GURGANUS:  YES.

THE COURT:  ALL RIGHT.  WE WILL STAND IN RECESS.

(RECESS TAKEN.)

MR. GURGANUS:  YOUR HONOR, THE PART --

THE COURT:  WE ARE BACK ON THE RECORD. MR. GURGANUS, DID YOU WANT TO SAY SOMETHING.

MR. GURGANUS:  YOUR HONOR, THE PARTIES WILL ENDEAVOR TO TRY TO GET THE TRANSCRIPTS CUT DOWN. WE DISCUSSED THIS TRANSCRIPT.  AND GIVEN THE SHORT PERIOD OF TIME, THE DEFENSE WANTED JUST TO MOVE FORWARD THE WAY IT IS AT THIS TIME.  AND WITH THE NEXT ONES WE WILL TRY TO ACCOMMODATE AND CERTAINLY TAKE THE IRRELEVANT THINGS OUT.  THE COURT IS CORRECT.  THERE'S A LOT OF THINGS THAT ARE NO LONGER AN ISSUE WE BELIEVE.

THE COURT:  WHEN YOU MENTION AT SIDEBAR YOU HAD THE TRANSCRIPTS, YOU OFFERED FOR ME TO READ THEM OR READ THEM INTO THE RECORD.  I WANTED THEM READ INTO THE RECORD, BUT I THOUGHT YOU HAD REDACTED COPIES, BUT LET'S FINISH WITH THIS AND THEN YOU WILL REDACT THE NEXT SET.

MR. GURGANUS:  CERTAINLY.  THANK YOU, JUDGE.

MR. COYLE:  WHERE WERE WE PICKING UP?

MR. GURGANUS:  START AT LINE 18 ON PAGE 12.

Q.      DID THE SUBJECT OF SEX COME UP DURING THE TWO TO THREE WEEKS THAT YOU WERE WITH MR. HAMMER IN CELL 103?

A.      YEAH.

Q.      WHO BROUGHT UP THE SUBJECT?

A.      DAVE.

Q.      APART FROM TALKING ABOUT IT, WAS THERE ANY SEXUAL ACTIVITY THAT OCCURRED WITHIN CELL 103 DURING THE TWO TO THREE WEEKS THAT YOU STAYED THERE?

A.      NO.

Q.      WITH RESPECT TO ANY SEXUAL ACTIVITY BETWEEN YOU AND MR. HAMMER, WAS THERE ANY?

A.      NO.

Q.      DID MR. HAMMER ENGAGE IN ANY SEXUAL ACTIVITY BY HIMSELF?

A.      YEAH.  IN THE AFTERNOONS, USUALLY LIKE AROUND 2 O'CLOCK, HE WOULD -- WHICH I CALLED NAP TIME BECAUSE I ALWAYS TAKE A NAP AROUND THAT TIME, I THINK EVERYBODY DOES IN PRISON.  BUT WHEN I WOULD BE UP ON MY BUNK, HE WOULD USUALLY MASTURBATE AT THAT TIME.

Q.      AND DO YOU KNOW, WHAT WAS HE LOOKING AT OR HOW WOULD HE ENGAGE IN THAT PARTICULAR BUSINESS?

A.      I'M NOT SURE.  I TRIED NOT TO PAY TOO MUCH ATTENTION, BUT I WOULD JUST BE UP THERE.  SOMETIMES, YOU KNOW, HE WOULD SAY SOMETHING, BUT, YOU KNOW, HE WANTED, OF COURSE, FOR ME TO ENGAGE IN SEX.  AND HE WOULD SAY,

LOOK AT THIS, THIS ISN'T GOING TO HURT ANYONE OR SOMETHING LIKE THAT, BUT I NEVER DID LOOK.  I JUST LET HIM GO.

Q.      WHEN HE SAID LOOK AT THIS, HE WAS REFERRING TO HIS PENIS, IS THAT CORRECT?

A.      YES.

Q.      BY THE WAY, DID HE HAVE A NAME FOR HIS PENIS?

A.      I DON'T THINK SO.  I'VE NEVER HEARD HIM CALL IT BY NAME.

Q.      AGAIN, DID THE SUBJECT OF SEX AND MR. MARTI EVER COME UP WHILE YOU WERE LIVING WITH MR. HAMMER, TO THE BEST OF YOUR RECOLLECTION?

A.      WELL, OTHER THAN THE UNDERWEAR, I DON'T THINK SO, THAT WAS ENOUGH.  I MEAN THAT WAS PRETTY, PRETTY -- INDICATED TO ME, BUT I DON'T LIKE TALKING ABOUT THAT.  I DON'T REALLY WANT TO KNOW ANYWAY SO....

Q.      AFTER MR. HAMMER ENGAGED IN HIS BUSINESS IN THE AFTERNOON DURING NAP TIME, DID HIS DEMEANOR, DID HE CHANGE IN TERMS OF HIS BEHAVIOR BIASED ON WHAT YOU SAW FOR THOSE TWO OR THREE WEEKS YOU WERE IN THE CELL?

A.      WELL, MAYBE HE WAS MORE RELAXED, BUT NOTHING LIKE REALLY ASTOUNDING OR ANYTHING LIKE THAT.  JUST LIKE ANYBODY, JUST MORE RELAXED IS THE BEST I COULD SAIL.

Q.      WITH RESPECT TO, AGAIN, WHILE YOU WERE WITH MR. HAMMER IN THAT CELL, CELL 103, I'LL SHOW YOU THIS

ITEM.  HOPEFULLY YOU CAN SEE IT IN A PLASTIC BAG, GOVERNMENT EXHIBIT 13.

DO YOU REMEMBER SEEING THAT THING, THAT PIECE OF STRING OR THAT PIECE OF CLOTH, HOWEVER YOU WANT TO DESCRIBE IT, IN YOUR CELL OR SOMETHING LIKE IT, TO THE BEST OF YOUR RECOLLECTION?

A.      I'M NOT SURE I SAW THIS ONE.  THEY HAD, YOU KNOW, SOME STRING LIKE, IT WOULD HAVE A STRING GOING FROM THE TOILET TO THE SHOWER SO WE COULD LIKE HAVE A PRIVACY CURTAIN FOR USING THE BATHROOM OR WHATEVER.  BUT I DON'T KNOW, YOU KNOW, IF THAT PARTICULAR --

Q.      LET ME SHOW YOU WHAT'S BEEN MARKED AS GOVERNMENT'S EXHIBIT 18, A SIMILAR PIECE OF STRING, ONE THAT'S BEEN MODIFIED TO AN EXTENT.  DO YOU SEE GOVERNMENT EXHIBIT 18 THERE, SIR?

A.      THIS IS 18?

Q.      YES.

A.      YEAH, I SEE IT.

Q.      DOES THAT APPEAR TO BE BRAIDED OR PLAITED OR WHATEVER TERM YOU CARE TO USE IN TERMS OF DESCRIBING HOW THAT IS IN CONTRAST WITH 13?

A.      YEAH, IT LOOKS LIKE IT'S BRAIDED.

Q.      DURING THE TIME THAT YOU WERE WITH MR. HAMMER, WHAT, IF ANY, BRAIDING DID YOU SEE HIM ENGAGE IN?

A.      I DIDN'T SEE ANY.

Q.    WITH RESPECT TO MR. HAMMER'S ACTIVITIES DID YOU OBSERVE HIM AT ANY TIME ENGAGE IN WRITING?

A.    YES.

Q.    FOR WHAT PURPOSES DID HE TELL YOU HE WAS WRITING?

A.    WELL, HE GOT A LOT OF MAIL FOR ONE THING SO HE WROTE SOME LETTERS.  AND HE WAS ALSO WORKING ON A -- I DON'T KNOW IF IT WAS A BRIEF OR SOME SORT OF LEGAL MATERIAL, A RESPONSE OR SOMETHING.  HE WAS LOOKING FOR AN EXTENSION OR SOMETHING.

Q.    AGAIN FOR THE TWO OR THREE WEEKS THAT YOU WERE WITH MR. HAMMER, HOW OFTEN WOULD HE WRITE ON A DAILY OR WEEKLY BASIS?

A.    EVERY DAY.  HE MIGHT HAVE MISSED A COUPLE OF DAYS, BUT FOR THE MOST PART IT WAS LIKE EVERY DAY.

Q.    DID YOU EVER RECEIVE FROM MR. HAMMER ANY WRITINGS?

A.    YEAH.

Q.    WHAT TYPE OF ITEMS DID YOU RECEIVE FROM MR. HAMMER WITH MR. HAMMER'S WRITING ON IT?

A.    THE FIRST THING I GOT WAS A PICTURE.  WHEN I WAS GOING TO LEAVE, HE GAVE ME A PICTURE OF HIM.  I THINK IT WAS THE MONDAY THAT WE THOUGHT I WAS GOING TO LEAVE AND HE SIGNED A PICTURE THAT, YOU KNOW, FOR THE SHORT TIME THAT WE KNEW EACH OTHER WE GOT ALONG PRETTY GOOD.

Q.    AND WHAT DID HE WRITE ON THE BACK OF THE PICTURE, IF YOU CAN RECALL?

A.    JUST -- JUST WHAT I SAID, THAT FOR THE SHORT TIME, YOU KNOW, WE ONLY KNEW EACH OTHER TWO WEEKS, BUT HE SAID WE GOT ALONG PRETTY GOOD, ESPECIALLY -- NOW HE DIDN'T WRITE THIS ON THE PICTURE, BUT HE SAID ESPECIALLY FOR SOMEBODY THAT, YOU KNOW, DIDN'T HAVE SEX WITH HIM BUT WE GOT ALONG PRETTY GOOD ANYWAY.  I REMEMBER HIM SAYING THAT.  BUT HE JUST WROTE THAT FOR THE SHORT TIME HE CONSIDERED US PRETTY GOOD FRIENDS AND HE WAS SURPRISED.

Q.    DID HE SIGN IT OR --

A.    YEAH, YEAH.

Q.    AND DID YOU EVER RECEIVE ANY OTHER WRITTEN CORRESPONDENCE FROM MR. HAMMER DURING THE TIME THAT YOU WERE WITH HIM OR IN THE SPECIAL HOUSING UNIT AT ALL?

A.    YEAH, BUT I DIDN'T -- I DIDN'T READ THE WHOLE THING.  THE NIGHT THAT I SENT HIM THE COMMISSARY THROUGH THE COP, I WENT TO BED EARLY THAT NIGHT.  AND THEN WHEN I WOKE UP THE SATURDAY MORNING, THERE WAS A KITE ON THE FLOOR AND I HAD JUST PUT IT UNDER MY BED, I DIDN'T READ IT AND THEN I WENT BACK TO BED.  AND THEN THEY WOKE ME UP TO SEE THE FBI PEOPLE THAT CAME TO INVESTIGATE.

Q.    AND WHEN YOU SPOKE TO THE FBI, AT THAT POINT IN TIME HAD YOU LOOKED AT THE KITE THEN?

A.      NO.

Q.      WHEN IF EVER DID YOU LOOK AT THE KITE, MR. CLASSEN?

A.      I THINK IT WAS LIKE SUNDAY, THE NEXT DAY OR A DAY LATER.  I THINK IT WAS SHEET EXCHANGE AND WE MADE OUR BED AND THEN THEY -- I FOUND IT THEN.  I REMEMBERED IT THEN.  BECAUSE IT CAME -- WHEN I PULLED MY SHEETS OFF, IT WAS THERE UNDER THE MATTRESS.

Q.      WITH RESPECT TO, AGAIN, THE KITE THAT YOU RECEIVED, DID YOU READ IT?

A.      NOT THE WHOLE THING.  I DIDN'T LIKE WHAT IT SAID.

Q.      I'M SORRY.

A.      NO.  I DIDN'T READ THE WHOLE THING.  I READ PART OF IT AND THEN I THREW IT AWAY.

Q.      WITH RESPECT TO THROWING IT AWAY, HOW DID YOU THROW IT AWAY?

A.      IN THE TOILET AND THEN I FLUSHED IT.

Q.      AND THIS YOU DID EVEN AFTER THE FBI SPOKE TO YOU?

A.      YEAH.

Q.      IS THAT CORRECT?

A.      YEAH, I THREW HIS PICTURE AWAY TOO.  SORRY, DAVE.

Q.      WITH RESPECT TO THE -- THAT WHICH YOU DID READ

IN TERMS OF THE KITE, DID YOU RECOGNIZE THE HANDWRITING?

A.      YEAH.

Q.      WHOSE HANDWRITING WAS IT?

A.      IT WAS DAVE'S.

Q.      AND WHAT -- AGAIN, YOU SAID THAT YOU DIDN'T READ THE WHOLE THING.  WHAT WAS IT THAT YOU DID READ?

A.      WELL, HE SAID THAT HE WAS SERIOUS ABOUT WHAT HE WAS GOING TO DO, THAT HE WAS GOING TO KILL MARTI. THAT'S REALLY ALL THAT I COULD REMEMBER SPECIFIC, AND THEN I SAID, OH, I DON'T WANT THIS AND I THREW IT AWAY.

Q.      AND AGAIN BASED UPON THE TWO TO THREE WEEKS DO YOU HAVE -- WHAT FAMILIARITY DO YOU HAVE WITH MR. HAMMER'S HANDWRITING?

A.      OH, FROM THE PICTURE AND THEN, YOU KNOW, SOMETIMES I'D SEE HIM AND I THINK EVEN I READ SOME OF HIS -- BECAUSE HE WAS WRITING LIKE -- WELL, HE SAID IT WAS A BOOK, BUT LIKE A HISTORY OF HIS LIFE.  AND SOMETIMES I'D READ PART OF THAT.  HE WAS BETTER AT READING IT TO ME LIKE SOME OF THE DIFFERENT THINGS, BUT I REMEMBER SEEING SOME OF THAT AND THEN OF COURSE THE PICTURE AND I GUESS THAT'S ABOUT IT.

Q.      WHAT I'M GOING TO SHOW YOU NOW, MR. CLASSEN, ALTHOUGH IT'S -- IT'S A LITTLE GRAY, IT'S DISCOLORED, IS GOVERNMENT EXHIBIT 35.2 AND 35.1 IS THE ENVELOPE ON THE OTHER SIDE OF IT.

A.      OKAY.

Q.      WITH RESPECT TO THIS PARTICULAR ITEM OF CORRESPONDENCE, DID YOU EVER RECEIVE THIS ITEM?

A.      NO, NOT THIS ONE.

Q.      IT IS ADDRESSED TO A STEVE.  IF YOU WANT TO LOOK AT THE OTHER SIDE, STEVE CLASSEN, AD 215, AND THE SENDER'S NAME IS HAMMER?

A.      YES.

Q.      DO YOU SEE THAT?

A.      YEAH.

Q.      ARE YOU FAMILIAR WITH THE HANDWRITING ON THIS ENVELOPE?

A.      YEAH.

Q.      WHOSE HANDWRITING IS IT?

A.      LOOKS LIKE DAVE'S.

Q.      WAS THERE ANY OTHER STEVE CLASSENS IN AD 215 IN THE SPECIAL HOUSING UNIT OTHER THAN YOURSELF?

A.      NO.

Q.      WITH RESPECT TO THE STEVE, I THINK YOU INDICATED IT WAS S-T-E-P-H-E-N?

A.      YEAH.

Q.      IF YOU LOOK, AND I DON'T KNOW IF YOU CAN READ GOVERNMENT EXHIBIT 35.2, ALL OF IT, AGAIN, DOES THAT HANDWRITING SEEM FAMILIAR TO YOU?

A.      YES, IT DOES.

Q.      AND WHOSE HANDWRITING IS IT?

A.      DAVE'S.

Q.      AND IS IT ADDRESSED TO YOU, SIR?

A.      YES, IT IS.

Q.      WITH RESPECT TO THE DATE, IF YOU CAN LOOK IN THE UPPER RIGHT-HAND CORNER AND IF YOU CAN READ THAT, THE DATE?

A.      SUNDAY -- SUNDAY MORNING, 4/19/86 -- '96, EXCUSE ME.

Q.      COULD THAT BE 4/14/96?

A.      OH, YEAH.

Q.      IF YOU WOULD READ THE FIRST PARAGRAPH TO YOURSELF AND THEN I'LL ASK YOU A QUESTION ABOUT IT.

        THERE'S A REFERENCE IN THAT PARTICULAR PARAGRAPH TO CIGARETTES, IS THAT CORRECT?

A.      YEAH.

Q.      AGAIN, YOU'VE INDICATED ON ONE OCCASION YOU PROVIDED MR. HAMMER WITH CIGARETTES, IS THAT CORRECT?

A.      YEAH.

Q.      IN RETURN FOR THOSE WHICH HE ADVANCED YOU?

A.      YEAH.

Q.      IS HE ALLUDING TO THIS SITUATION OR A DIFFERENT SITUATION IN THE FIRST PARAGRAPH?

A.      THIS IS A DIFFERENT ONE.  I THINK IT WAS -- I THINK IT WAS SATURDAY NIGHT THAT LENNIE CAME UP AND SAID

THAT DAVE NEEDED SOME CIGARETTES BECAUSE THEY MOVED HIM

AND HE DIDN'T HAVE ANYTHING -- ANY OF HIS PROPERTY.

Q.       COULD YOU KEEP YOUR VOICE UP, MR. CLASSEN.  SO

LENNIE TOLD YOU THAT MR. HAMMER DIDN'T HAVE ANY

CIGARETTES THAT SATURDAY EVENING?

A.       RIGHT.

Q.       AND WHAT DID YOU DO AFTER MR. -- OR AFTER LENNIE

SAID THIS TO YOU?

A.       I GAVE HIM A COUPLE PACKS UNDER THE DOOR FROM MY

CELL.  I HAD TO SMASH THEM DOWN.  I THINK IT WAS TWO

PACKS.

Q.       AND SO THE FIRST PARAGRAPH IS SOMETHING THAT

ACTUALLY HAPPENED, IS THAT CORRECT?

A.       YEAH.

Q.       WOULD YOU READ IT FOR THE JURY, THAT FIRST

PARAGRAPH?

A.       I WANTED TO WRITE AND THANK YOU FOR THE

CIGARETTES.  I HAVE A HARD TIME READING THIS WORD,

RECEIVED THEM LAST NIGHT.  I HOPE YOU ARE DOING OKAY OR

AT LEAST AS WELL AS YOU CAN BE.

Q.       IF YOU COULD, READ THE SECOND PARAGRAPH, FIRST

QUIETLY TO YOURSELF AND THEN I'LL ASK YOU A QUESTION

ABOUT IT.

A.       OKAY.

Q.       NOW THERE'S THE NAME TRAVIS IN THAT SECOND

PARAGRAPH, IS THAT CORRECT?

A.      YES.

Q.      THERE IS AN ATTORNEY IN THIS ROOM BY THE NAME OF TRAVIS, BUT ARE YOU REFERRING TO HIM OR ANOTHER TRAVIS?

A.      ANOTHER TRAVIS.

Q.      OKAY.  WHO IS THE TRAVIS TO WHOM YOU ARE REFERRING?

A.      THAT IS MY SON.

Q.      AND IS THE SUBSTANCE OF THAT SECOND PARAGRAPH SOMETHING THAT YOU HAD DISCUSSED WITH MR. HAMMER PREVIOUSLY?

A.      YES, IT IS.

Q.      OKAY.  IF YOU'D READ IT TO THE JURY, PLEASE.

A.      SO HAVE YOU DECIDED IF YOU'RE GOING TO THE COMPOUND IN THE MORNING?  I'M SURE YOU'RE LOOKING FORWARD TO BEING ABLE TO TALK WITH TRAVIS ON THE PHONE.

Q.      WITH RESPECT TO DIFFICULTIES IN SPEAKING ON THE PHONE, IN THE GENERAL POPULATION WOULD YOU HAVE MORE OR LESS DIFFICULTIES IN SPEAKING WITH YOUR SON ON THE PHONE THAN YOU WOULD IF YOU REMAINED IN THE SPECIAL HOUSING UNIT?

A.      IT WOULD BE A LOT EASIER.  YOU COULD CALL EVERYDAY WHEN YOU'RE ON THE COMPOUND.

Q.      IF YOU COULD READ THE NEXT, THE THIRD PARAGRAPH QUIETLY TO YOURSELF, SIR.

AND AFTER YOU HAVE READ IT, LET ME KNOW.

A.    I HAVE TROUBLE WITH THE WORDS SOMETIMES.  OKAY.

Q.    IF YOU WOULD, IS THE SUBSTANCE OF THE THIRD PARAGRAPH SOMETHING THAT, AGAIN, YOU HAD DISCUSSED WITH MR. HAMMER, AT LEAST IN PART?

A.    YES.

Q.    AND WHAT WAS IT THAT YOU PREVIOUSLY DISCUSSED WITH MR. HAMMER THAT'S CONTAINED IN THAT SECOND OR THAT THIRD PARAGRAPH OF THE LETTER?

A.    WELL, WHEN HE TOLD ME HE WAS ONLY KIDDING, BUT HE SAID ABOUT MARTI, TAKING CARE OF MARTI, HE SAID HE DID WHAT HE TOLD ME HE WAS GOING TO DO.

Q.    COULD YOU READ THE FIRST FIVE LINES OF THAT LETTER, PLEASE, SIR.

A.    OKAY.  STEVE, I DON'T CARE WHAT YOU SAY TO THE FBI OR SIS.  THERE ISN'T ANYTHING THAT CAN HURT ME BECAUSE THEIR CASE IS PRETTY OPEN AND SHUT.  I'M SURE YOU WERE SURPRISED TO LEARN THAT I HAD DONE WHAT I TOLD YOU I WAS GOING TO WITH MARTI.

Q.    IF YOU CAN STOP AT THAT POINT.  AND AGAIN, THE BOTTOM OF THE -- OR THE LOWER RIGHT-HAND CORNER OF THE DOCUMENT HAS THE CLOSE AND WHO WAS THIS LETTER FROM?

A.    DAVID HAMMER.

Q.    AND WHERE DID HE RESIDE AT THE TIME?

A.    120.

Q.    HOW DID HE DESCRIBE HIS RELATIONSHIP WITH YOU IN THAT LETTER?  THE LINE JUST ABOVE HIS NAME, CAN YOU READ THAT?

A.    YEAH.  TAKE CARE OF YOURSELF.  BEST OF LUCK TO YOU AND ALSO STAY IN TOUCH IF YOU ARE SO INCLINED.

Q.    AND AGAIN, JUST ABOVE HIS SIGNATURE, WHAT DID -- HOW DID HE CLOSE IT?

A.    YOUR FRIEND, DAVID HAMMER.

Q.    WITH RESPECT TO THAT, MR. -- SORRY, WITH RESPECT TO MR. CLASSEN, THE TWO OR THREE WEEKS THAT YOU WERE WITH MR. HAMMER, DID THERE COME A TIME WHEN HE SHOWED YOU SOME NEWSPAPER ARTICLES?

A.    YES.

Q.    FIRST OF ALL, WHAT CAUSED YOU OR WHAT -- DID YOU ASK TO SEE THE ARTICLES OR DID HE VOLUNTEER TO SHOW YOU THE NEWSPAPER ARTICLES?

A.    HE VOLUNTEERED.

Q.    AND WITH RESPECT TO THE ARTICLES, THERE WAS MORE THAN ONE, IS THAT CORRECT?

A.    YEAH.

Q.    AND AGAIN, WITHOUT GETTING INTO THE DETAILS OF THE ARTICLES, DID THE ARTICLES RELATE TO CRIMINAL ACTIVITY BY MR. HAMMER?

A.    YEAH.

Q.    DURING THE TIME THAT MR. HAMMER WAS WITH YOU,

WHAT, IF ANY, PHYSICAL COMPLAINTS DID HE MAKE TO YOU ABOUT HOW HE WAS FEELING OR WHAT PARTS OF HIS BODY WERE AILING HIM, INCLUDING HIS MIND?

A.    ALL THAT I COULD REALLY REMEMBER IS HIS SHOULDER, I THINK.  AND I THINK THAT'S WHAT HIS LAWSUIT PARTLY WAS ABOUT.  BUT HE SAID HE NEVER DID HEAL RIGHT AND HE SEEMED TO HAVE A LOT OF TROUBLE.  BUT A LITTLE BIT OF TROUBLE IS WHAT HE'D COMPLAIN ABOUT.

Q.    WHEN HE COMPLAINED ABOUT HIS SHOULDER AND HE HAD SOME TROUBLES WITNESS, DO YOU RECALL WHAT KIND OF TROUBLE IT WAS THAT HE HAD WITH HIS SHOULDER?

A.    NO, NOT FOR SURE, JUST SOME PAIN BUT I CAN'T REMEMBER, NOT REALLY ANYTHING ELSE.

Q.    DURING THE TIME THAT MR. HAMMER WAS WITH YOU, DID HE EVER MAKE COMPLAINTS OF HEADACHES?

A.    MAYBE ONE TIME I THINK.

Q.    AND WHEN -- YOU KNOW, WHAT CAUSED, IF YOU KNOW -- WHAT DID HE SAY CAUSED THE HEADACHE, IF YOU KNOW?

A.    I HAVE NO IDEA.

Q.    AND HOW, IF AT ALL, DID HE DEAL WITH THE HEADACHE?

A.    I THINK HE TOOK SOME ASPIRIN.  MAYBE HE DID, MAYBE HE DIDN'T, BUT I'M PRETTY SURE HE DID THOUGH.

Q.    DURING THE TWO TO THREE WEEKS THAT YOU WERE WITH

MR. HAMMER, DID YOU HAVE ANY HEADACHES?

A.      SURE.

Q.      AND HOW DID YOU DEAL WITH THEM?

A.      ASPIRIN.

Q.      DURING THE TWO TO THREE WEEKS THAT YOU WERE WITH HIM, MR. CLASSEN, DID HE EVER COMPLAIN OF MEMORY LOSS, NOT KNOWING WHERE HE WAS OR LOSING TRACK OF TIME?

A.      NO.

Q.      AGAIN, DURING THE TWO TO THREE WEEKS THAT YOU WERE WITH MR. HAMMER, DID THE SUBJECT OF WEAPONS EVER COME UP?

THE COURT:  OF WHAT?

MR. MARTIN:  WEAPONS EVER COME UP.

A.      I THINK THE FIRST COUPLE DAYS HE HAD TOLD ME HE HAD A KNIFE AND I SEEM TO RECALL --

Q.      DID YOU EVER SEE THAT ITEM?

A.      NO, I NEVER SAW IT.  I SEEM TO RECALL HE SAID HE KEPT IT IN HIS LEGAL MATERIAL BUT -- .

Q.      DID YOU HAVE ANY WEAPONS THEN, SIR?

A.      NO.

Q.      WHAT I'M GOING TO SHOW YOU NOW, MR. CLASSEN, IS A PHOTOGRAPH.

IT'S 5.1-9, YOUR HONOR.

OF A SERIES OF PHOTOGRAPHS OF CELL 103 AND I'LL ASK YOU TO REFER TO THE TOP PHOTOGRAPH OF THE

TWO ON THE PAGE, ONE OF WHICH HAS A -- OR IN THAT PHOTO THERE LOOKS TO BE A SINK AND A STAINLESS STEEL TOILET, IS THAT CORRECT?

A.      YES.

Q.      TO THE IMMEDIATE RIGHT OF THAT -- THOSE TWO PLUMBING ITEMS.  THERE APPEAR TO BE A BLACKENED OR DARK AREA, IS THAT CORRECT?

A.      YEAH.

Q.      AND THERE SEEMS TO BE SOMETHING AS WELL AFFIXED TO OR ATTACHED TO THE SINK, IS THAT CORRECT?

A.      YES.

Q.      CAN YOU TELL THE JURY, WHAT, IF YOU KNOW, WHAT THE ITEM IS THAT IS HANGING THERE AND WHAT MAY HAVE CAUSED THE SCORCHED AREAS?

A.      THAT IS A CAN.  IT WAS HANGING BY A STRING, AND THAT'S WHAT WE WOULD USE TO HEAT COFFEE WATER.  PUT THE WATER IN THE CAN AND THEN WE WOULD LIKE USE THESE CUPS UNDER HERE, LIKE THREE CUPS AND LIGHT THEM ON FIRE AND HEAT THE WATER IN THE CAN.

Q.      AND THAT WAY YOU COULD MAKE COFFEE?

A.      COFFEE OR SOUP OR WHATEVER YOU WANTED TO MAKE.

Q.      WITHIN YOUR CELL?

A.      YEAH.

Q.      IT'S A WAY OF SUPPLEMENTING THE FOOD THAT THE BUREAU OF PRISONS PROVIDES TO YOU?

A.      YEAH.

AT THAT POINT THE COURT DID NOT HEAR THE ANSWER.  DID HE ANSWER IT?

MR. MARTIN:  COULD YOU --

A.      YEAH, YEAH.

THE COURT SAID:  OKAY.

MR. MARTIN:  IF I COULD HAVE A MOMENT, YOUR HONOR.

AND THEN MR. MARTIN CONTINUED.

Q.      YOU HAVE INDICATED AGAIN THAT YOU DIDN'T HAVE ANY SEXUAL RELATIONSHIP WITH MR. HAMMER DURING THE TWO TO THREE WEEKS YOU WERE WITH HIM?

A.      RIGHT.

Q.      BUT NONETHELESS, WAS SEX A TOPIC OF CONVERSATIONS BETWEEN THE TWO OF YOU?

A.      SURE.

Q.      AND WHO DID THE MAJORITY OF THE TALKING ABOUT THAT, IF THERE WAS MORE THAN ONE, IF ANYONE, BETWEEN THE TWO OF YOU SPOKE ABOUT THE SUBJECT TO SOME DEGREE?

A.      DAVE.

Q.      AND WHAT WAS IT THAT DAVE WAS TALKING ABOUT?

A.      WELL, DIFFERENT THINGS.  REALLY HE TRIED TO GET ME INTERESTED, WHICH DIDN'T WORK VERY GOOD.  FIRST, WHEN WE STARTED PLAYING CARDS, HE WANTED TO PLAY FOR LIKE MASSAGES, BUT THAT WAS OUT.  SO ANYTHING ELSE, HE TOLD

ME THAT IF I WAS WILLING, HE WOULD GO EITHER WAY.  HE SAID -- HE TOLD ME THAT HE'S USUALLY A TOP, BUT HE SAID HE WOULD DO ANY -- ANYTHING, YOU KNOW, THAT I WANTED IF I WANTED TO ENGAGE IN SEX.

Q.    AND AGAIN, HOW FREQUENTLY DURING THE TWO OR THREE WEEKS WOULD THAT SUBJECT, THE SUBJECT OF SEX, BE DISCUSSED BY MR. HAMMER?

A.    I THINK AFTER THE FIRST FEW DAYS -- HE TRIED FOR LIKE FOUR OR FIVE DAYS AND THEN HE ACCEPTED THAT I WASN'T GOING TO DO IT, ANYTHING, AND THEN HE STOPPED AFTER THAT.

Q.    WITH RESPECT, AGAIN, TO THE -- YOU'VE INDICATED YESTERDAY IN EXAMINATIONS THAT MR. HAMMER AT LEAST ON ONE OCCASION SPOKE TO YOU -- TO THIS PICTURE IN DEFENDANT'S EXHIBIT 3, THE MONKEY?

A.    YEAH.

Q.    DID HE EVER SPEAK TO THE GIRLS OR JUST TO THE MONKEY?

A.    I DON'T RECALL HIM EVER SPEAKING TO THE GIRLS.

Q.    AND AGAIN, THERE WERE MORE GIRLS WHEN YOU SAW IT THAN THERE ARE IN THIS PICTURE NOW, RIGHT?

A.    YEAH, THE WHOLE, THE WHOLE WALL WAS COVERED.  IN THIS PICTURE THERE WOULD BE ALL GIRLS IN IT.

Q.    WERE THERE ANY MEN THAT YOU SAW UP THERE, ANY MEN'S PICTURES AT LEAST ON THE WALL?

A.    NO.

Q.    WERE THERE ANY MEN'S PICTURES THAT YOU SAW ANYWHERE WITHIN CELL 103 WHEN YOU LIVED THOSE TWO TO THREE WEEKS WITH MR. HAMMER?

A.    HE HAD ONE MAGAZINE WITH SOME MEN IN IT.

Q.    AGAIN, HE REFERRED TO THE MONKEY AND USED A NAME, IS THAT CORRECT?

A.    YES, HE DID.

Q.    AND WHO WAS THAT?

A.    JASPER.

Q.    DURING THE TWO TO THREE WEEKS YOU WERE WITH MR. HAMMER, DID HE REFER TO A TAMMY?

A.    NO.

Q.    DURING THE TWO TO THREE WEEK YOU WERE WITH MR. HAMMER, DID HE REFER TO A WILBUR?

A.    NO.

Q.    DURING THE TWO TO THREE WEEKS THAT YOU WERE WITH MR. HAMMER, DID HE REFER TO A JOCKO?

A.    NO.

Q.    WHEN MR. HAMMER DID -- AND, AGAIN, HOW MANY TIMES WOULD HE HAVE SPOKEN TO THE MONKEY, THE MONKEY'S PICTURE, IN YOUR PRESENCE, SIR, TO THE BEST OF YOUR RECOLLECTION.

A.    MAYBE FOUR OR FIVE.

Q.    AND AGAIN, WHAT, TO THE BEST OF YOUR

RECOLLECTION, WAS THE EXTENT OF HIS ONE SIDED CONVERSATION WITH THAT PHOTOGRAPH?

A.    WHEN WE WERE PLAYING CARDS AND WHEN HE WOULD BE LOSING I THINK HE'D LOOK UP AND SAY SOMETHING TO JASPER, JASPER, WHAT'S GOING ON OR JASPER SOMETHING LIKE THAT. I DON'T REMEMBER THE EXACT WORDS, BUT HE'D JUST SAY SOMETHING TO JASPER, A ONE LINE.

Q.    OTHER THAN WHEN YOU WERE PLAYING CARDS DO YOU REMEMBER HIM SPEAKING TO THE PHOTOGRAPH OR THE PICTURE?

A.    NO.

Q.    AND DID HE EVER TELL YOU WHY HE SPOKE TO THE PICTURE OF THE MONKEY AS OPPOSED TO ANY ONE OF THE OTHER WOMEN OR OTHER ASPECTS OF THE PRISON CELL?

A.    NO, HE DIDN'T.

Q.    DURING THOSE TIMES THAT HE SPOKE TO THE MONKEY OR TO THE PHOTOGRAPH OF THE CHIMP, WHATEVER IT IS, WAS HIS DEMEANOR ANY DIFFERENT?

A.    NO.

Q.    AGAIN, DURING THE TIME THAT YOU WERE WITH HIM, WAS THERE ANY OTHER -- WAS THERE ANY OTHER TIME THAT YOU WERE CONCERNED ABOUT CELLING OR BEING THE ROOMMATE OF MR. HAMMER?

A.    NOT REALLY.  I MEAN, I WAS GLAD TO BE MOVING OUT BECAUSE I -- I WAS PRETTY SURE HE WANTED MARTI TO MOVE IN THERE.  AND OTHER THAN THAT, I MEAN NOT REALLY.

NO OTHER QUESTIONS FOR MR. CLASSEN, YOUR HONOR.

THE COURT THEN SAID:  ALL RIGHT.  CROSS EXAMINE, SIR.

AT THIS TIME I WILL PLAY THE ROLE OF MR. TRAVIS.

Q.    GOOD MORNING, MR. CLASSEN.

A.    GOOD MORNING.

Q.    DO YOU STILL HAVE 35.2 THERE IN FRONT OF YOU WHICH IS THE KITE?

A.    OKAY.

Q.    NOW WITH RESPECT TO THE DOCUMENT ITSELF --

A.    OKAY.

Q.    -- I'M TRYING TO GET SOME CLARIFICATION.  DID YOU INDICATE TO MR. MARTIN THAT YOU HAVE NO RECOLLECTION OF RECEIVING THAT DOCUMENT?

A.    THIS ONE, THAT'S WHAT I SAID, YES.

Q.    OKAY.  SO AS FAR AS YOU KNOW YOU NEVER RECEIVED THAT DOCUMENT?

A.    RIGHT.

Q.    WAS THERE SOME OTHER DOCUMENT YOU RECEIVED?

A.    YES.

Q.    AND THE DOCUMENT THAT YOU RECEIVED YOU FLUSHED DOWN THE TOILET, IS THAT CORRECT?

A.    YES, IT IS.

Q.      THE DOCUMENT THAT YOU RECALL RECEIVING, WHEN IN POINT OF TIME DO YOU RECALL RECEIVING IT?

A.      WHEN I WOKE UP THAT MORNING, THAT SATURDAY MORNING, IT WAS ON THE FLOOR.  THEY PUT THE TRAYS IN AND I NOTICED IT DOWN THERE ON THE FLOOR THEN.

Q.      AND WHICH SATURDAY MORNING ARE YOU TALKING ABOUT?

A.      THE ONE THAT THE FBI CAME AND TALKED TO ME.

Q.      AND WHEN THE FBI TALKED TO YOU, DID YOU TELL THEM ANYTHING ABOUT A NOTE?

A.      NO, BECAUSE I DIDN'T -- I DIDN'T EVEN REMEMBER IT FOR A COUPLE OF DAYS SO --

Q.      OKAY.  ALTHOUGH YOU HAD RECEIVED A NOTE IN THE MORNING AND THE FBI LATER TALKED TO YOU, YOU DIDN'T REMEMBER THAT YOU HAD RECEIVED THE NOTE WHEN YOU TALKED TO THE FBI?

A.      RIGHT.

Q.      THE DOCUMENT THAT MR. MARTIN HAD READ -- HAD YOU READ FROM THAT YOU DON'T RECALL RECEIVING, HE HAD YOU READ PART OF THE THIRD PARAGRAPH OF THAT DOCUMENT.

A.      YES.

Q.      HE HAD YOU STOP READING, QUOTE:  TOLD YOU I WAS GOING TO DO WITH MARTI, PERIOD, END QUOTE.  DO YOU SEE WHERE HE HAD YOU STOP READING?

A.      RIGHT.

Q.        WOULD YOU READ THE REMAINDER OF THAT PARAGRAPH?

A.        HE IS IN A FAR BETTER PLACE THAN THIS NOW.    HE IS FREE, FAR FAR AWAY FROM THESE PRISON WALLS, THANKFULLY HE DIDN'T SUFFER, JUST WENT AWAY PEACEFULLY. I CAN'T READ THAT SECOND WORD.

Q.        I GRIEVE?

A.        OH.    I GRIEVE FOR HIS FAMILY BECAUSE THEY LOVED HIM.    IN DEATH MARTI -- I CAN'T GET THAT WORD EITHER.    I CAN'T READ THAT OTHER WORD THERE.    IN DEATH MARTI --

Q.        OKAY.    SOMETHING?

          THE COURT SAYS:    WELL, DO YOU THINK IT COULD BE IN DEATH MARTI?

          MR. TRAVIS:    YES.

A.        YEAH, I GOT THAT.

Q.        IN DEATH MARTI, IT'S THE FOURTH WORD, YOUR HONOR.

          THE COURT:    FOURTH WORD?    WELL, I THINK THE WORD IS F-A-C-E-S.

A.        OH.    IN DEATH MARTI FACES NOT THE EARTH, BUT RATHER A NEW BEGINNING.

Q.        OKAY.    AND THE WORD EARTH, COULD THAT BE END INSTEAD OF EARTH?    SO THAT THE SENTENCE WOULD READ:    IN DEATH MARTI FACES NOT THE END BUT RATHER A NEW BEGINNING?

A.        YES.    I'M SORRY.

Q.      THE CIGARETTES AND COFFEE THAT YOU SENT TO MR. HAMMER, DO I UNDERSTAND THAT THAT WAS SOMETHING YOU SENT TO MR. HAMMER AFTER THE FBI HAD TALKED TO YOU?

A.      NO.   THAT -- THAT WAS BEFORE.   THE CIGARETTES AND THE COFFEE, THAT WAS FRIDAY NIGHT.

Q.      YOU SENT THE CIGARETTES AND COFFEE ON A FRIDAY EVENING?

A.      YES.

Q.      OKAY.  WITH REGARD TO EVENTS IN THE CELL THAT TOOK PLACE DURING THE TWO TO THREE WEEK PERIOD THAT YOU LIVED WITH MR. HAMMER, DO YOU HAVE ANY RECOLLECTION OF THERE BEING SOME SORT OF WINDOW COVERING THAT WAS PUT UP ON THE WINDOW WHEN THE TOILET WAS BEING USED?

A.      YES.

Q.      OKAY.  AND DO YOU HAVE ANY RECOLLECTION OF, ON THE SIDE OF THAT WINDOW COVERING THE INSIDE OF THE CELL, THERE BEING A LITTLE BOY ON THE TOILET?

A.      THERE WAS SOMETHING THERE.  I DON'T REMEMBER.

Q.      DO YOU HAVE ANY RECOLLECTION OF WHEN MR. HAMMER WAS USING THE TOILET, THAT HE WOULD TALK TO THAT, WHATEVER WAS ON THE INSIDE OF THE WINDOW COVERING WHEN HE WAS USING THE TOILET?

A.      NO.

COUNSEL SAID:  WILL YOU HAVE THAT EVIDENCE TO THAT EFFECT?

MR. TRAVIS:  YES, YOUR HONOR.

THE COURT:  OKAY.

A.     NO.

Q.     DO YOU HAVE ANY RECOLLECTION OF HEARING MR. HAMMER USE THE WORD WILBUR OR THE NAME WILBUR WHILE HE WAS GOING TO THE BATHROOM?

A.     NO.

Q.     INSOFAR AS THE LAST PART OF YOUR TESTIMONY, WHERE YOU INDICATED THAT YOU REALLY DIDN'T HAVE ANY CONCERN ABOUT LIVING WITH MR. HAMMER, DO YOU RECALL DISCUSSING THAT SUBJECT MATTER EITHER WITH THE FBI OR IN FRONT OF THE GRAND JURY WHEN YOU TESTIFIED?

A.     NOT FOR SURE.

Q.     OKAY.  WHEN -- WAS THE FIRST INTERVIEW THAT YOU HAD WITH THE FBI ON APRIL 13TH, 1996?

A.     YEAH, THAT'S PROBABLY RIGHT.

Q.     AND DURING THAT INTERVIEW, DID YOU TELL AGENT THOMPSON THAT HAMMER WAS NO LONGER FUN TO LIVE WITH AND WAS GIVING THE APPEARANCE OF BEING STRESSED OUT?

A.     WELL, IF IT'S THERE, I PROBABLY -- YEAH, I PROBABLY --

Q.     DO YOU --

A.     I DON'T REMEMBER RIGHT NOW.  IT WAS TWO YEARS AGO BUT I PROBABLY SAID SOMETHING LIKE THAT.

Q.     OKAY.  AND AT THAT POINT IN TIME WHEN YOU WERE

MOVING OUT AND MR. MARTI WAS MOVING IN, IS IT YOUR RECOLLECTION THAT HAMMER WAS NO LONGER FUN TO LIVE WITH?

A.    YEAH.

Q.    OKAY.  AND IS YOUR RECOLLECTION THAT AT THAT -- AT THE POINT IN TIME WHEN YOU WERE MOVING OUT, THAT MR. HAMMER WAS GIVING THE APPEARANCE OF BEING STRESSED OUT?

A.    YEAH.

Q.    IN ADDITION TO BEING INTERVIEWED BY THE FBI ON APRIL 13TH, 1996, YOU APPEARED AND TESTIFIED BEFORE THE GRAND JURY IN AUGUST OF 1996, CORRECT?

A.    YES.

Q.    AND WHEN YOU WERE INTERVIEWED BY THE FBI ON -- SOMETIME IN MAY OF 1998, IS THAT CORRECT?

A.    YES.

Q.    OTHER THAN THE INTERVIEW IN APRIL OF '96 AND INTERVIEW IN MAY OF 1998, HAVE THERE BEEN OTHER OCCASIONS WHEN YOU'VE HAD DISCUSSIONS WITH ANY FBI AGENTS CONCERNING THIS CASE?

A.    NO.  I TALKED TO THEM FOR MAYBE AN HOUR BUT NOT ABOUT THE CASE OR ANYTHING.  THEY JUST WANTED TO KNOW IF I WAS COMFORTABLE TESTIFYING AND EVERYTHING, I THINK.

Q.    WELL, YOU WERE THERE.  I MEAN --

A.    YES.

Q.    DID THEY TALK TO YOU ABOUT THE CASE?

A.    NO.  THEY JUST WANTED TO LET ME KNOW WHAT I COULD EXPECT WHEN I TESTIFIED.

Q.    AND YESTERDAY, YESTERDAY WHEN YOU TESTIFIED, THE LAST BIT OF TESTIMONY YOU GAVE WAS SOMETHING ABOUT MR. HAMMER PUTTING HIS ARM AROUND YOUR NECK.  DO YOU RECALL SAYING THAT?

A.    YES.

Q.    WHEN YOU WERE INTERVIEWED BY THE FBI ON APRIL 13TH, 1996, DID YOU TELL THE FBI ANYTHING ABOUT MR. HAMMER PUTTING HIS ARM AROUND YOUR NECK?

A.    NO, I DIDN'T REMEMBER THAT.

Q.    OKAY.  AND WHEN YOU APPEARED BEFORE THE GRAND JURY ON AUGUST 28, 1996, DID YOU TELL THE GRAND JURY ANYTHING ABOUT MR. HAMMER PUTTING HIS ARM AROUND YOUR NECK?

A.    NO.

Q.    WHEN YOU WERE INTERVIEWED BY THE FBI ON MAY 6, 1998, DID YOU TELL THE FBI ANYTHING ABOUT MR. HAMMER PUTTING HIS ARM AROUND YOUR NECK?

A.    NO.

Q.    YESTERDAY WHEN YOU TESTIFIED, YOU INDICATED THAT YOU HAD BEEN MOVED FROM A FEDERAL FACILITY IN OREGON TO USP ALLENWOOD, CORRECT?

A.    YEAH.

Q.    WASN'T THERE SOME STOP IN BETWEEN THE OREGON

FACILITY AND USP ALLENWOOD?

A.        YEAH.  I WAS ACTUALLY IN A COUPLE OF THEM.  I

WENT TO LOMPOC, CALIFORNIA AND THEN FROM CALIFORNIA I

WENT TO OKLAHOMA AND THEN TO PENNSYLVANIA.

Q.        LOMPOC IS A USP?

A.        USP.

Q.        CORRECT?

A.        YES.

Q.        HOW LONG WERE YOU AT LOMPOC?

A.        ABOUT MAYBE SIX MONTHS.

Q.        OKAY.  AND WERE YOU MOVED OUT OF LOMPOC BECAUSE

OF SOMETHING THAT HAPPENED TO YOU THERE?

A.        YEAH, THERE WAS A FIGHT.

Q.        AND DID THE FIGHT INVOLVE YOU AND OTHERS?

A.        YEAH.

Q.        AND WERE THE OTHERS AT LEAST REPUTED TO BE

MEMBERS OF THE DIRTY WHITE BOYS?

A.        I THINK SO, YES.

Q.        AND FROM LOMPOC YOU WERE TRANSFERRED -- WERE YOU

TRANSFERRED TO OKLAHOMA CITY TO THE TRANSFER CENTER?

A.        YES.

Q.        AND WERE YOU JUST THERE A SHORT PERIOD OF TIME?

A.        ABOUT TWO WEEKS.

Q.        AND THEN YOU CAME TO USP ALLENWOOD?

A.        YES.

Q.      SO AT THE TIME YOU GOT TO USP ALLENWOOD YOU HAD AT LEAST SIX MONTHS EXPERIENCE OF BEING IN A USP, IS THAT CORRECT?

A.      YES, IN THE HOLE.  I WAS IN THE HOLE THE ENTIRE TIME THAT I WAS AT LOMPOC.

Q.      WERE YOU ASSAULTED OR WERE YOU INVOLVED IN THAT FIGHT IN THE HOLE?

A.      THE SHOT -- THE INCIDENT REPORT WAS WRITTEN UP THAT I WAS ASSAULTED.

Q.      IN THE HOLE?

A.      NO, WHEN I WAS ON THE COMPOUND AT LOMPOC.  I WAS THERE ABOUT TWO HOURS AND I WAS SITTING IN THE CHOW HALL AND SOMEBODY CAME UP BEHIND ME AND HIT ME.

Q.      OKAY.  AND AFTER THAT, YOU WERE PUT INTO THE LOCKDOWN?

A.      YES.

Q.      AND YESTERDAY YOU WERE TALKING ABOUT, AS I UNDERSTOOD YOUR TESTIMONY, TWO DIFFERENT TYPES OF MEDICATIONS THAT YOU WERE TAKING DURING THE TIME FRAME WHEN YOU WERE CELLING WITH MR. HAMMER, CORRECT?

A.      YES.

Q.      AND AS I UNDERSTOOD, ONE OF THE MEDICATIONS YOU TOOK BASICALLY BEFORE YOU WENT TO SLEEP AND THAT WAS TO MAKE YOU RELAX AND SLEEP, IS THAT CORRECT?

A.      YES.

Q.      AND WAS THAT THE MEDICATION YOU SHARED WITH MR. HAMMER?

A.      ONE TIME, YES.

Q.      HOW DID MR. HAMMER COME TO GET THAT MEDICATION ONE TIME?  DID YOU OFFER IT TO HIM?  DID HE ASK YOU FOR IT?

A.      HE ASKED BECAUSE SOMETIMES I WOULD SPIT IT IN THE TOILET.  I WAS -- DIDN'T LIKE TAKING THAT MEDICATION AND I WAS GETTING READY TO STOP.  AND HE SAID WELL, MAYBE YOU CAN GIVE ME IT.

Q.      ALL RIGHT.

        HAD YOU EXPLAINED TO MR. HAMMER WHAT THE MEDICATION DID FOR YOU?

A.      YEAH, A LITTLE BIT.

Q.      WHAT HAD YOU TOLD MR. HAMMER ABOUT THAT MEDICATION?

A.      MAKES YOU SLEEP, MAKES YOU DROWSY.

Q.      AND MR. HAMMER EXPRESSED AN INTEREST IN HAVING THAT MEDICATION?

A.      YEAH, TRYING IT.

Q.      AND THE OTHER MEDICATIONS THAT YOU WERE TESTIFYING ABOUT YESTERDAY AND I DIDN'T QUITE HEAR WHAT YOU SAID, DID YOU SAY THAT WAS OR WAS NOT LIKE PROZAC?

A.      IT WAS.  IT'S SUPPOSED TO BE LIKE PROZAC.

Q.      AND THE MEDICATIONS THAT YOU WERE TAKING WHILE

YOU WERE WITH -- CELLING WITH MR. HAMMER, WERE THEY PRESCRIBED BY A PSYCHIATRIST?

A.    YES.

Q.    WHEN DID YOU START RECEIVING THE PRESCRIPTION?

A.    I THINK IT WAS IN '93, LATE 1993 WHEN I WAS ARRESTED FOR THE BANK ROBBERY.

Q.    AND DID YOU REMAIN ON THOSE TWO MEDICATIONS BASICALLY FROM '93 THROUGH APRIL OF '96?

A.    YES.

Q.    AND AFTER APRIL 13TH, 1996, DID YOU CONTINUE TO TAKE EITHER OF THOSE MEDICATIONS FOR ANY PERIOD OF TIME?

A.    YES.

Q.    AND ARE YOU STILL TAKING EITHER OF THOSE MEDICATIONS?

A.    NO.

Q.    LET'S TAKE THE ONE THAT HELPS YOU RELAX AND HELPS YOU SLEEP.  FOR WHAT PERIOD OF TIME AFTER APRIL OF '96 DID YOU TAKE THAT?

A.    NOT VERY LONG.  WHEN I GOT TO THE COMPOUND, YOU HAVE TO GO UP IN THE EVENING TO THE PILL LINE AND TAKE IT.  AND THAT WOULD BE LIKE AT 6 O'CLOCK AND I DIDN'T LIKE TAKING IT THEN.  SO MAYBE ONCE A WEEK I WOULD TAKE THAT ONE.

Q.    OKAY.  AND THE OTHER ONE THAT WAS LIKE PROZAC OR SUPPOSED TO BE LIKE PROZAC, FOR WHAT PERIOD OF TIME

AFTER APRIL '96 DID YOU CONTINUE TO TAKE THAT?

A.        UNTIL LAST YEAR, JUNE I THINK OF LAST YEAR.

Q.        JUNE OF '97?

A.        YES, LAST YEAR.

Q.        AT THE POINT IN TIME WHEN YOU STOPPED TAKING THE MEDICATION THAT WAS SUPPOSED TO BE LIKE PROZAC, DID YOU STOP TAKING THE MEDICATION BECAUSE YOU JUST REFUSED TO TAKE IT ANYMORE OR WERE YOU TAKEN -- WAS THAT PRESCRIPTION NOT FILLED?

A.        IT WAS KIND OF BOTH.  WHEN I GOT TO SCHUYLKILL, THEY DIDN'T HAVE THE RECORD OF IT AND THEN I JUST DIDN'T WANT TO GO THROUGH THE HASSLE OF THE MEDICAL SERVICE THERE OF MAKING SURE THAT, TO CONTINUE IT.  I DIDN'T THINK THAT I NEEDED IT ANY ANYMORE ANYWAY.

Q.        OKAY.  WE HEARD SOME TESTIMONY FROM YOU THIS MORNING ABOUT SECURING -- SOME CONVERSATION ABOUT SECURING SOME SMALL SIZED UNDERWEAR --

A.     YES.

Q.        -- DO YOU RECALL GIVING THAT?  IN THE INTERVIEW YOU GAVE THE FBI ON APRIL 13TH, '96, OR IN YOUR GRAND JURY TESTIMONY OR IN THE INTERVIEW IN MAY OF 1998 WITH THE FBI, DID YOU EVER MENTION THE SECURING OF THE UNDERWEAR?

A.     NO.

Q.        WITH REGARD TO THE SEXUAL CONVERSATIONS OR THE

CONVERSATION ABOUT SEX THAT YOU SAY YOU HAD WITH MR. HAMMER WHILE YOU WERE LIVING WITH HIM, DURING THOSE CONVERSATIONS DID MR. HAMMER EVER PUT PRESSURE ON YOU OR FORCE YOU TO INTO A SEXUAL RELATIONSHIP?

A.     NO.

Q.     WHEN YOU ARRIVED AT USP ALLENWOOD IN MARCH OF 1996 HAD YOU EVER MET DAVID HAMMER IN ANY OTHER INSTITUTION?

A.     NO.

Q.     YOU DIDN'T KNOW HIM AT ALL?

A.     NO.

Q.     AND HE DIDN'T KNOW YOU AT ALL?

A.     NO.

Q.     AND HOW SOON IS IT AFTER YOU ARRIVED AT USP ALLENWOOD THAT YOU CONTEND THAT MR. HAMMER MADE THE STATEMENT ABOUT KILLING OR THAT'S WHAT I'M GOING TO DO TO MR. MARTI AND THEN SAID GOTCHA?

A.     I THINK THE ONLY TIME WAS WHEN IT WAS THAT KNIFE FIGHT THE DAY BEFORE I MOVED OUT.

Q.     OKAY.  AND IT'S YOUR RECOLLECTION THAT MR. HAMMER TALKED ABOUT AN INDIVIDUAL CALLED CROW, IS THAT CORRECT?

A.     YEAH.

Q.     NOW DO YOU KNOW IF CROW AND MARTI WERE ONE AND THE SAME?

A.    I'M SURE THEY WERE, YES.

Q.    AND HOW IS IT THAT YOU'RE SURE OF THAT?

A.    WELL, BECAUSE HAMMER WOULD REFER TO IT -- TO HIM.  AND WHEN I MOVED INTO MY NEW CELL ESPECIALLY, HE SAID THAT CROW JUST MOVED DOWNSTAIRS, THE GUY THAT I MOVED IN WITH.  AND I, I DIDN'T -- I HAD HIM IN MY MIND THEY WERE THE SAME PEOPLE AND I SAID, OH, MARTI? BECAUSE I ALWAYS JUST CALLED HIM MARTI.  AND THE GUY SAID YEAH.

Q.    NOW WITH RESPECT TO DEFENDANT'S 3, THE PHOTOGRAPH AND PARTICULARLY THE PHOTOGRAPH OF THE ORANGUTAN, THAT PHOTOGRAPH WAS IN THE CELL AND ON DISPLAY WHEN YOU GOT THERE, CORRECT?

A.    YES.

Q.    AS BEST YOU UNDERSTAND IT, THAT PHOTOGRAPH OF THE ORANGUTAN WAS SOMETHING THAT HAD BEEN UP ON THE SHOWER WALL BEFORE YOU ARRIVED AT THE CELL, IS THAT CORRECT?

A.    YES.

Q.    AND AS FAR AS THE PHOTOGRAPH OF THAT ORANGUTAN, THAT WAS STILL THERE WHEN YOU MOVED OUT OF THE CELL, IS THAT CORRECT?

A.    YES.

Q.    YOU TALKED ABOUT WHAT I'VE CALLED A PRIVACY SHEET?

A.        RIGHT.

Q.        AND AS I UNDERSTAND THE SITUATION, THERE WAS SOME DEVICE AVAILABLE THAT WHEN SOMEONE WAS USING THE TOILET, A SHEET COULD BE HUNG OVER SOME SORT OF CORD OR ROPE, IS THAT CORRECT?

A.        YEAH.

Q.        SHOWING YOU WHAT HAS PREVIOUSLY BEEN ADMITTED AS GOVERNMENT EXHIBIT 3.1.  AND DO YOU RECOGNIZE THAT AS THE LAYOUT OF A CELL IN THE SPECIAL HOUSING UNIT?

A.        OH, OKAY.

Q.        THIS IS SUPPOSED TO BE --

A.        RIGHT, THE SHOWER.

Q.        THE SHOWER AREA?

A.        OKAY.

Q.        AND THIS IS THE FRONT DOOR AREA.  I THINK THAT'S THE TOILET AREA?

A.        RIGHT.

Q.        OKAY.  WITH THAT ORIENTATION, ARE YOU ABLE TO STAND UP AND I'LL HOLD THIS NEXT TO YOU, JUST STAND UP HERE.

          MR. TRAVIS SAYS:  ARE THERE ANY JURORS THAT ARE UNABLE TO SEE THIS?  I SEE NO ANSWER.

Q.        COULD YOU BASICALLY JUST SHOW ME WHERE THE ROPE WOULD BE CONNECTED THAT WOULD ALLOW THE SHEET TO BE PUT UP WHEN THE TOILET WAS BEING USED?

A.    OKAY.  WELL, OVER HERE IS OUR BEDS.

Q.    YES.

A.    BUT THOSE AREN'T IN THERE.

BUT THERE'S LIKE A VENT UP HERE, AND WE COULD STICK LIKE A PLASTIC SPOON IN THERE AND PUT A CORD OR A STRING OR WHATEVER ACROSS FROM HERE TO THE SHOWER WHERE THERE'S ANOTHER SPOON AND THEN DRAPE YOUR SHEET OVER THAT SO YOU COULD HAVE PRIVACY USING THE BATHROOM, IF YOU WANTED, OR EVEN A SHOWER.

Q.    SO BASICALLY THE ROPE WOULD GO FROM THE WALL BEHIND THE --

A.    RIGHT.

Q.    -- TOILET?

A.    YES, RIGHT IN THERE.

Q.    OVER TO THE --

A.    CORNER OF THE SHOWER.

Q.    OKAY.

A.    SO YOU WOULD HAVE PRIVACY.

Q.    OKAY, THANK YOU.  WHERE WAS THAT ROPE KEPT WHEN IT WAS NOT IN USE?

A.    I THINK HE HAD IT STUCK IN THE VENT, LIKE A ROPE OR A STRING, AND THEN IF WE WANTED TO USE IT, WE'D PUT IT OVER TOWARDS THE SHOWER.

Q.    AND DO YOU RECALL WHETHER IT WAS BRAIDED, THAT WAS BRAIDED?

A.      NO, IT WASN'T BRAIDED.

Q.      OKAY.  YESTERDAY YOU MAD GIVEN SOME TESTIMONY ABOUT MR. HAMMER SENDING A KITE, YOU BELIEVED, TO MR. MARTI.  DO YOU RECALL THAT TESTIMONY?

A.      A KITE TO MARTI?

Q.      YES.

A.      YES.

Q.      OKAY.  HOW DO YOU KNOW THAT HE SENT A KITE TO MR. MARTI?

A.      WELL, HE TOLD ME THAT HE WAS WRITING MARTI.  HE WANTED HIM TO MOVE DOWN.

Q.      OKAY.  AND HOW -- HOW WOULD THAT HAVE BEEN DELIVERED?

A.      TO THE ORDERLY, PROBABLY LENNIE.  I DON'T KNOW. THEY HAD OTHER ORDERLIES BUT...

Q.      AND DID YOU INDICATE THAT AT SOME POINT IN TIME YOU BECAME AWARE OF A KITE COMING FROM MR. MARTI THAT INCLUDED A LETTER AND ALSO, I BELIEVE YOU DESCRIBED IT AS A COPOUT?

A.      YES.

Q.      LET'S TALK ABOUT THE COPOUT ASPECT FIRST.

        IS A COPOUT A FORMAL PRINTED DOCUMENT, BOP DOCUMENT, THAT BASICALLY AT THE TOP SAYS, REQUEST OF INMATE TO STAFF?

A.      YES, IT IS.

Q.      AND DID YOU GET TO SEE THAT COPOUT?

A.      I THINK -- I'M NOT 100 PERCENT SURE THAT I READ IT.  AT THE TIME, IN THE HOLE, THEY DIDN'T HAVE ANY OFFICIAL COPOUT FORMS.  SO WE WERE PUTTING ALL OUR COPOUTS ON PAPER, ANY REQUEST WE MADE TO THE STAFF, BUT I DON'T RECALL 100 PERCENT IF I DID READ THAT PARTICULAR ONE.

Q.      AS YOU UNDERSTOOD IT, WAS THE COPOUT RECEIVED BY MR. HAMMER A COPOUT WHICH HAD BEEN PREPARED BY MR. MARTI?

A.      YES.

Q.      AS YOU UNDERSTOOD IT, WAS THE COPOUT ONE WHERE MR. MARTI WAS ASKING TO BECOME A CELLMATE OF MR. HAMMER?

A.      RIGHT.

Q.      AND DID YOU SAY THAT, AT LEAST AS YOU UNDERSTOOD THE SITUATION, MR. HAMMER WAS SUPPOSED TO TURN THAT DOCUMENT OVER TO THE CORRECTIONAL STAFF?

A.      YEAH.  HE WAS SUPPOSED TO SIGN IT AND LET HIM KNOW THAT THEY WANTED TO LIVE TOGETHER.

Q.      DID YOU EVER SEE HIM DO THAT?

A.      YEAH.  HE -- HE GAVE IT TO HIM.  I THINK IT WAS -- I THINK IT WAS THAT MORNING THAT THEY HAD THE FIGHT IN THE REC CAGE.

Q.      DO YOU RECALL THE STAFF MEMBER THAT WAS GIVEN TO?

A.      I DON'T KNOW THE NAME.

Q.      CAN YOU DESCRIBE THE STAFF MEMBER AT ALL?

A.      BALD.  THAT'S ALL I REMEMBER.  A LITTLE SHORT BALD GUY.

Q.      OKAY.

A.      THAT'S ALL I REMEMBER.

Q.      I ASSUME IT WAS A MALE?

A.      YEAH.

Q.      NOW, DID YOU ALSO INDICATE THAT THE NOTE THAT ACCOMPANIED THAT SAID THE WORDS TO THE EFFECT, I WANT TO BE YOUR CELLIE OR SOMETHING LIKE THAT?

A.      QUOTE:  HAMMER, I REALLY WANT TO BE YOUR CELLIE, CLOSE QUOTE.

Q.      AND AFTER RECEIVING THAT INFORMATION OR THAT NOTE, WHICH INCLUDED THE WORDS, HAMMER, I REALLY WANT TO BE YOUR CELLIE, DID MR. HAMMER BASICALLY, FOR THE REST OF THE DAY, WALK AROUND THE CELL AND CONTINUALLY REPEAT, I WANT TO BE YOUR CELLIE AND SHAKE HIS HEAD?

A.      WELL, NOT FOR THE REST OF THE DAY OR ANYTHING LIKE THAT.  HE DID IT MAYBE THREE OR FOUR TIMES.  IT WAS ON THE DESK.  AND I DON'T THINK HE TURNED IN THE COPOUT YET.  HE HAD THE COPOUT READY TO GIVE, AND THEN HE'D READ THE LETTER AND THEN HE DID WHAT YOU DESCRIBED.  HE WOULD SAY, I JUST WANT TO BE YOUR CELLIE.  AND THEN -- I THINK HE SAID THAT ONE TIME THAT HE JUST DOESN'T KNOW OR

SOMETHING LIKE THAT.

Q.       AND WHEN HE WOULD REPEAT, I JUST WANT TO BE YOUR CELLIE, WOULD HE THEN LIKE, YOU KNOW, SHAKE HIS HEAD ABOUT THAT OR HOW WAS HE ACTING?

A.       HOW WAS HE ACTING?  THAT'S HARD TO SAY REALLY. I MEAN HE -- JUST LIKE HE WAS TRYING TO DECIDE OR SOMETHING IF HE WANTED HIM TO MOVE IN, I THINK.  I'M NOT --

Q.       OKAY.  OKAY.  OVER WHAT PERIOD WAS IT THAT HE WAS REPEATING THE WORDS, I WANT TO BE YOUR CELLIE OR WHATEVER HE WAS SAYING?

A.       I CAN'T REALLY GIVE A TIME.  I THINK IT WAS JUST LIKE THREE TIMES, LIKE MAYBE FOUR, OR MAYBE EVEN TWO, BUT, YOU KNOW, I'M JUST SAYING THREE, BUT IT'S NOT LIKE IT WAS COMPLETELY ON HIS MIND.  IT WAS JUST SITTING ON THE DESK.  AND I THINK WE EVEN PLAYED SOME CARDS AND THEN HE WAS GETTING READY TO TURN IN THE COPOUT AND HE'D READ THE LETTER AGAIN AND THEN HE WOULD BE LIKE, THINK ABOUT IT.

YOUR HONOR, COULD I INTERRUPT FOR A MOMENT JUST TO TALK TO MR. TRAVIS?  THAT IS MR. RUHNKE.

THE COURT:  YES.

MR. TRAVIS:  YOUR HONOR, WOULD IT BE POSSIBLE TO TAKE THE MORNING BREAK NOW?

THE COURT:  ALL RIGHT.  15 MINUTES,

PLEASE.

THE COURT WAS PUT IN RECESS.  THAT WAS AT 11:06 A.M.  AT 11:21 COURT RECONVENED.

DEPUTY CLERK:  COURT IS IN SESSION.  PLEASE BE SEATED.

MR. TRAVIS CONTINUED QUESTIONING:

Q.    MR. CLASSEN, IN ADDITION TO THE CONSPIRACY CHARGE YOU ARE PRESENTLY SERVING A SENTENCE FOR AND THE BANK ROBBERY CHARGE YOU SERVED A SENTENCE FOR, WHICH EXPIRED, I THINK YOU SAID SOMETHING IN 1997, WITHIN THE PERIOD OF THE LAST TEN YEARS HAVE YOU BEEN CONVICTED OF ANY OTHER FELONIES?

A.    YES.

Q.    WHAT OTHER FELONIES?

A.    BANK ROBBERY.

Q.    AND WHEN WAS THAT?

A.    1988.

Q.    THAT IS THE ONLY FELONY YOU HAVE BEEN CONVICTED OF?

A.    YES.

Q.    WHEN YOU WERE BEFORE THE -- WITHDRAW.

WHEN YOU WERE INTERVIEWED BY THE FBI IN APRIL OF 1996, AT THAT POINT IN TIME DID YOU TELL THE FBI ANYTHING ABOUT THE NOTE CONCERNING I REALLY WANT TO BE YOUR CELLIE AND MR. HAMMER WALKING AROUND AND SAYING

THAT?

A.      NO, I DON'T THINK SO.

Q.      OKAY.  AND WHEN YOU APPEARED BEFORE THE GRAND JURY IN AUGUST OF 1996 AND TESTIFIED, DID YOU TELL THE GRAND JURY ANYTHING ABOUT THE SITUATION WITH MR. HAMMER WALKING AROUND REPEATING, I REALLY WANT TO BE YOUR CELLIE?

A.      NO.

Q.      YOU HAD JUST TALKED ABOUT THE SITUATION WHERE MR. HAMMER MASTURBATED.  WHEN YOU GAVE THE FBI INFORMATION OR WERE INTERVIEWED ON MAY 6, 1998, DID YOU INDICATE TO THE FBI THAT THE MASTURBATION WAS A TWICE A DAY OCCURRENCE?

A.      I MAY HAVE.  I KNOW THE AFTERNOON WAS THE ONE I WAS SURE OF.

Q.      WAS THAT LIKE A SET PREARRANGED TIME?

A.      NO, IT JUST LIKE HAPPENED.  I MEAN, I CAN'T SAY IT WAS SET, BUT IT WAS JUST LIKE, I'D ALWAYS, YOU KNOW, CRAWL UP ON MY BED AND RELAX --

Q.      OKAY.

A.      -- AND STUFF.  AND HE ALWAYS SEEMED TO TAKE ADVANTAGE OF THAT --

Q.      ALL RIGHT.

A.      -- PARTICULAR TIME.

Q.      AND THAT WAS DURING WHAT YOU CALLED NAP TIME?

A.      YEAH.

Q.      AND WHEN MR. HAMMER WAS ENGAGING IN THAT ACTIVITY, DID HE MAKE ANY EFFORT TO HIDE IT FROM YOU?

A.      NO.

Q.      DID HE, YOU KNOW, ATTEMPT TO DO IT UNDER THE COVER OF DARKNESS?

A.      NO.

Q.      DID HE PUT UP THE STRING AND THE SHEET?

A.      NO.

Q.      DID YOU FIND THAT SOMEWHAT UNUSUAL AND BIZARRE?

A.      NO.

Q.      IS THAT A COMMON OCCURRENCE IN THE FEDERAL FACILITY, FOR SOMEBODY TO OPENLY MASTURBATE IN FRONT OF A CELLMATE?

A.      WELL, IF YOU'RE IN THE HOLE, I WOULD -- IT IS. BUT NOT LIKE ON THE COMPOUND.  YOU CAN EASILY WAIT UNTIL YOU'RE IN BED OR IN THE SHOWER OR SOMETHING.  BUT IN THE HOLE YOU DON'T HAVE MUCH PRIVACY.  YOU'RE THERE ALL DAY WITH YOUR CELLIE SO --

Q.      YESTERDAY WHEN YOU WERE TALKING ABOUT THE REC CAGE FIGHT, I SEEM TO RECALL YOU SAYING SOMETHING TO THE EFFECT THAT MR. HAMMER WAS SCREAMING TO OTHERS THAT THERE WAS A FIGHT GOING ON.  IS THAT WHAT YOU SAID?

A.      SOMETHING LIKE THAT.

Q.      COULD YOU ELABORATE A LITTLE BIT ON WHAT MR.

HAMMER WAS DOING AND WHAT HIS REACTION WAS WHEN HE BECAME AWARE OF THAT?

A.      HE WAS PRETTY EXCITED.  HE JUST WENT TO THE DOOR AND HOLLERED OUT THE DOOR ONE TIME.  AND THEN HE WENT TO THE TOILET WHICH THEY'VE GOT A VENT IN THE TOILET AND YOU CAN HEAR IT IN OTHER CELLS.  AND HE SCREAMED IT IN THE TOILET SO THAT THEY COULD HEAR IT UPSTAIRS, THAT THERE WAS A FIGHT IN THE REC CAGE.  AND HE WAS PRETTY EXCITED ABOUT IT, IT SEEMED LIKE.

Q.      HIS REACTION TO THERE BEING A FIGHT IN THE REC CAGE WAS IMPORTANT DRAMATIC THAN YOURS, IS THAT A FAIR STATEMENT?

A.      YEAH, I GUESS SO.

Q.      AND AS FAR AS THE COMMENT YOU RECALL MR. HAMMER MAKING ABOUT HURTING MR. MARTI, FIRST OF ALL, DO YOU RECALL WHAT HE -- WHAT HE SAID?

A.      I THINK IT WAS AFTER THEY PULLED BOTH THE GUYS IN.  AND ONE GUY CAME BACK WITH HIS -- THEY HAD HIM CUFFED UP AND ONE GUY HAD BLOOD ALL OVER HIS FACE.  AND THEN HE TOLD ME HE WAS GOING TO KILL MARTI.  AND THEN I JUST LOOKED AT HIM, I THINK, AND HE GOES, GOTCHA.  AND HE POINTED AT ME GOTCHA AND HE SMILED.

Q.      OKAY.  AS IF IT WAS A JOKE?

A.      AS IF IT WAS A JOKE.

Q.      AND HAVING RECEIVED THE INFORMATION IN THAT

MANNER AND WITH THE GOTCHA, DID YOU TAKE IT TO BE A JOKE?

A.     WELL, I DIDN'T TAKE IT SERIOUS, I GUESS.

Q.     AS A RESULT OF WHAT YOU HEARD HIM SAY, DID YOU, FOR EXAMPLE, REPORT IT TO ANY STAFF MEMBERS OR GO TO ANY STAFF ABOUT IT?

A.     NO.

Q.     WHEN YOU WERE INTERVIEWED BY AGENT MALOCU ON MAY 6, 1998, DID YOU INDICATE TO AGENT MALOCU THAT DURING THE TIME FRAME THAT MR. HAMMER WAS YOUR CELLMATE THAT HE HAD TALKED ABOUT HIS CHILDHOOD BEING HARD?

A.     YEAH, A LITTLE BIT.

Q.     AND COULD YOU TELL US WHAT HE TOLD YOU ABOUT HIS CHILDHOOD?

A.     HE DIDN'T TELL ME A LOT.  EITHER THAT OR I WASN'T LISTENING WHEN HE DID.  BUT I REMEMBER TELLING HIM THAT I LEFT HOME EARLY AND THE EXTENT I REMEMBER IS THAT HE LEFT HOME WHEN HE WAS YOUNG TOO, AND THEIR FAMILY WASN'T THAT WELL OFF AND THAT'S ABOUT THE EXTENT OF IT REALLY.

Q.     YOU HAVE NO RECOLLECTION BEYOND THAT?

A.     NO.

Q.     AND AGAIN, DURING THAT MAY 6, 1998 INTERVIEW, DID YOU TELL AGENT MALOCU ABOUT AN INCIDENT WHICH OCCURRED WHEN MR. HAMMER TALKED WITH YOU ABOUT THE DEATH

OF HIS MOTHER AND THEN THAT EVENING WHEN THE LIGHTS WERE OFF AND YOU'RE SUPPOSED TO BE SLEEPING, THAT YOU HEARD MR. HAMMER CRYING IN HIS BUNK?

A.      YEAH.

Q.      DURING YOUR APPEARANCE IN FRONT OF THE GRAND JURY, DO YOU RECALL SAYING, I'VE BEEN THINKING, OH, NO, MAN, THIS GUY IS NUTS, YOU KNOW?  DO YOU RECALL SAYING THAT?

A.      NO.  I READ MY GRAND JURY STATEMENT THOUGH AND SAW THAT.  BUT I DON'T REMEMBER ACTUALLY SAYING IT.

Q.      YOU DON'T REMEMBER SAYING THAT, BUT YOU HAVE READ YOUR GRAND JURY TESTIMONY?

A.      YEAH.

Q.      AND YOU RECALL IN THE NOTES OF THAT TESTIMONY YOU'RE QUOTED AS SAYING:  I'VE BEEN THINKING, OH, NO, MAN, THIS GUY IS NUTS, YOU KNOW?

A.      RIGHT.

Q.      AND YOU -- DO YOU HAVE A RECOLLECTION FROM READING YOUR GRAND JURY TESTIMONY, DID YOU FIND OUT THAT -- THAT YOU ALSO TOLD THE GRAND JURY THAT YOU DIDN'T THINK ANYBODY KNOWS DAVID PAUL HAMMER?

A.      YEAH.

Q.      AT THE CONCLUSION OF YOUR GRAND JURY TESTIMONY THERE IS AN EXCHANGE WHERE MR. MARTIN IS INDICATING THAT HE'S GOING TO GO UPSTAIRS WITH YOU TO GET SOME ADDRESS

AND SOME PHONE NUMBER.  DO YOU HAVE RECOLLECTION OF WHOSE ADDRESS AND PHONE NUMBER WE'RE TALKING ABOUT?

A.      I THINK -- I THINK MY ATTORNEY'S.

Q.      EXCUSE ME.  WAS THE PURPOSE FOR OBTAINING THAT INFORMATION SO MR. MARTIN COULD SEND TO YOUR -- YOUR ATTORNEY IN OREGON A LETTER INDICATING YOUR COOPERATION AND YOUR APPEARANCE IN FRONT OF THE GRAND JURY?

A.      YES.

Q.      AND WAS THE INFORMATION MADE KNOWN TO THE OREGON AUTHORITIES SO THAT -- LET ME WITHDRAW THAT.  WAS THE INFORMATION KNOWN -- MADE KNOWN TO THE FEDERAL AUTHORITIES IN OREGON ABOUT YOUR COOPERATION SO THAT THAT INFORMATION COULD BE CONSIDERED AS PART OF THE DISPOSITION OF YOUR PENDING OREGON CHARGES?

A.      YEAH.  I KEPT TELLING MY ATTORNEY TO DO THAT.

Q.      THE LETTER, YOU UNDERSTAND, WHICH MR. MARTIN IS GOING TO WRITE AT THE CONCLUSION OF YOUR TESTIMONY, IS THAT SOMETHING YOU'VE ASKED MR. MARTIN TO WRITE?

A.      YEAH, FINALLY I DID.

Q.      AND IS IT YOUR UNDERSTANDING THAT, ALTHOUGH YOU MIGHT KNOW -- NOT KNOW IT'S CALLED RULE 35, THAT THAT LETTER WILL BE USED IN AN EFFORT TO GET YOU BACK IN FRONT OF YOUR SENTENCING JUDGE WITH THE REQUEST THAT YOUR SENTENCE BE REDUCED?

A.      CAN YOU SAY THAT AGAIN.

Q.    THERE IS A FEDERAL RULE CALLED RULE 35.

A.    RIGHT.

Q.    THAT ALLOWS JUDGES TO RECONSIDER AN IMPOSED SENTENCE, OKAY?  DO YOU UNDERSTAND THAT THE LETTER IS BEING DRAWN UP AND WILL BE FORWARDED SO THAT THE U.S. ATTORNEY IN OREGON WILL BE IN A POSITION TO CONSIDER WHETHER A RULE 35 MOTION WILL BE FILED AS FAR AS YOUR PRESENT SENTENCE?

A.    YEAH, I HOPE SO.  I'M NOT COUNTING ON IT, BUT I HOPE SO.

Q.    DO YOU KNOW AN INMATE BY THE NAME OF MARK JORDAN?

A.    I THINK SO.

Q.    DO YOU KNOW AN INDIVIDUAL NAMED DAWN -- OR DAWNA D-A-W-N-A, TARRENT, T-A-R-R-E-N-T?

A.    YES.

Q.    AFTER THE DEATH OF MR. MARTI, DID YOU COME TO BE HOUSED IN THE DISCIPLINARY -- THE SHU UNIT -- I'M SORRY. IN THE DISCIPLINARY, THE SHU UNIT WITH MARK JORDAN?

A.    YEAH.

Q.    DURING THE TIME FRAME THAT YOU WERE HOUSED WITH MARK JORDAN IN THE SHU UNIT DID YOU EVER HAVE OCCASION TO ASK MARK JORDAN TO CONFIRM THAT YOU HAD RECEIVED A LETTER FROM MR. HAMMER?

A.    CAN YOU SAY IT AGAIN.

Q.       SURE.   DURING THE TIME YOU WERE HOUSED WITH MARK JORDAN DID YOU EVER HAVE OCCASION TO ASK MR. JORDAN TO BE WILLING TO TESTIFY THAT YOU HAD IN FACT RECEIVED A LETTER FROM MR. HAMMER?

A.       NO.

Q.       DURING THE TIME FRAME THAT YOU WERE HOUSED WITH MR. JORDAN DID YOU EVER OFFER TO SELL TO MR. JORDAN A LETTER FROM MR. HAMMER FOR $500?

A.       NO.

THE COURT:  COUNSEL, WILL YOU HAVE EVIDENCE OF THAT?

MR. TRAVIS:  WE HAVE MR. JORDAN, YOUR HONOR.

THE COURT:  ALL RIGHT.  BECAUSE I JUST DON'T WANT QUESTIONS ASKED WHICH DO NOT HAVE A FOUNDATION IN THE EVIDENCE OR WHAT'S GOING TO BE IN THE EVIDENCE.

MR. TRAVIS:  I UNDERSTAND, YOUR HONOR.

THE COURT:  OKAY.

AND I WOULD NOT ASK IT IF WE DON'T HAVE A WITNESS.

ALL RIGHT.  AND THAT'S BY THE COURT.

MR. TRAVIS:

Q.       IS DAWNA TARRENT SOMEONE WHO HAD CUSTODY OF YOUR SON, TRAVIS?

A.      YES, DAWNA.

Q.      DAWNS.  AND SHE IS SOMEONE YOU KNOW, CORRECT?

A.      WELL, I MET HER.  I DIDN'T EVEN MEET HER, JUST OVER THE PHONE AFTER SHE GOT CUSTODY.

Q.      OKAY.  DO YOU HAVE ANY RECOLLECTION OF EVER SUPPLYING TO MR. JORDAN HER NAME AND ADDRESS?

A.      I DON'T REMEMBER.

Q.      OKAY.  CAN YOU THINK OF ANY REASON WHY YOU WOULD GIVE TO MARK JORDAN HER NAME AND ADDRESS?

A.      NO, NOT MARK.

                IF I MAY HAVE A MOMENT, YOUR HONOR.

                THE COURT ANSWERS:  YES, SIR.

                THE COURT:  I THINK THIS WOULD BE A GOOD TIME TO BREAK.  IT'S 3:25.  WE ARE UP TO PAGE 61 IN THIS TRANSCRIPT.  WE HAVE ABOUT 20 PAGES TO GO.  OBVIOUSLY WE ARE NOT SITTING TOMORROW.  SO WE WILL COME BACK MONDAY AT 9:30 AND WE WILL CONTINUE WITH THE TESTIMONY.  AND I ASSUME THAT NO ONE IS GOING TO USE THIS COURTROOM TOMORROW SO THAT YOU CAN LEAVE YOUR PAPERS HERE.  AND IF THERE IS SOME CHANGE, I'M SURE YOU WILL BE NOTIFIED.

                ALL RIGHT?

                MR. MCHUGH:  YOUR HONOR, I THINK WE ARE IN 16 A NEXT WEEK.

                THE COURT:  WE ARE IN A DIFFERENT COURTROOM NEXT WEEK?

MR. MCHUGH:  JUST SAME FLOOR, JUST A.

THE COURT:  WE ARE IN 16 A NEXT MONDAY, ON MONDAY.  WE WILL --

ALL RIGHT.  WE WILL STAND IN RECESS UNTIL NEXT MONDAY IN COURTROOM 16 A.

ALL COUNSEL:  THANK YOU, YOUR HONOR.

(HEARING ADJOURNED AT 3:30 P.M.)

I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

DATE                          OFFICIAL COURT REPORTER

SUZANNE R. WHITE

INDEX

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| **THOMAS UPTON** | | | | |
| BY MS. HAINES | 3 | -- | 64 | -- |
| BY MS. SAUNDERS | -- | 24 | -- | 72 |
| | | | | |
| **DAVID FULLERTON** | | | | |
| BY MS. HAINES | 84 | -- | -- | -- |
| BY MS. SAUNDERS | -- | 94 | -- | -- |
| | | | | |
| **THOMAS F. CALLAGHAN** | | | | |
| BY MS. HAINES | 100 | -- | -- | -- |
| BY MR. MCHUGH | -- | 112 | -- | -- |
| | | | | |
| **STEPHEN CLASSEN** | | | | |
| (READ IN TRANSCRIPT | 116 | | | |

EXHIBITS

| GOVERNMENT EXHIBITS | ADMITTED |
|---|---|
| R56 | 92 |
| R7 | 112 |
| DEFENSE EXHIBITS | ADMITTED |
| 18 THROUGH 23 | 80 |

**$**

**$5,000** [2] - 87:1, 89:13
**$500** [1] - 193:8

**'**

**'80S** [1] - 22:18
**'93** [2] - 175:5, 175:8
**'95** [1] - 118:1
**'96** [8] - 118:7, 118:14, 153:8, 170:16, 175:8, 175:18, 176:1, 176:20
**'97** [3] - 117:16, 133:24, 176:3

**1**

**1** [11] - 41:12, 42:6, 45:1, 103:21, 104:19, 106:2, 107:20, 107:21, 107:22, 107:23, 117:16
**10** [8] - 41:3, 54:1, 94:16, 103:23, 115:17, 132:4, 132:9, 139:19
**10-YEAR** [1] - 94:14
**100** [4] - 2:7, 182:2, 182:6, 196:14
**103** [14] - 118:11, 119:5, 122:1, 122:7, 122:13, 123:17, 125:10, 138:17, 139:15, 145:2, 145:7, 146:25, 159:24, 163:3
**10:00** [1] - 115:18
**10TH** [3] - 58:9, 114:17, 115:8
**11** [14] - 41:3, 59:22, 60:2, 70:16, 75:11, 103:24, 104:22, 105:19, 105:25, 106:24, 107:16, 107:20, 107:25, 139:19
**1100** [1] - 107:21
**112** [2] - 196:15, 196:23
**116** [1] - 196:18
**11:06** [1] - 185:3
**11:21** [1] - 185:3
**12** [14] - 51:6, 56:3, 59:9, 59:22, 65:6, 103:24, 104:22, 105:3, 106:1, 106:24, 107:17, 107:20, 108:1, 144:25
**120** [1] - 156:25
**12TH** [4] - 29:7, 58:24, 59:25, 98:10
**13** [7] - 58:25, 59:1, 59:11, 72:25, 73:1, 147:2, 147:21
**1331** [1] - 2:4
**13TH** [5] - 169:15, 170:10, 171:9, 175:10, 176:20
**14** [8] - 31:18, 39:1, 72:25, 73:1, 78:10, 105:18
**15** [8] - 31:18, 32:20, 34:13, 49:16, 49:18, 50:13, 62:22, 184:25
**1500-BLOCK** [1] - 78:10
**16** [4] - 38:25, 194:23, 195:2, 195:5
**1600** [1] - 78:11
**161** [1] - 2:10
**16B** [1] - 1:8
**17** [1] - 38:5
**17101** [1] - 2:7
**177** [2] - 115:15, 115:21
**17703-0215** [1] - 2:11
**18** [12] - 35:15, 50:20, 58:22, 65:3, 80:9, 80:11, 80:12, 144:24, 147:13, 147:15, 147:16, 196:25
**1800** [1] - 107:22
**18501** [1] - 1:18
**19** [9] - 4:15, 36:5, 36:13, 36:19, 37:16, 37:17, 66:12, 98:9, 105:6
**19106** [3] - 1:9, 1:21, 2:14
**1980** [1] - 22:18
**1983** [5] - 4:20, 5:2, 5:22, 54:19, 58:3
**1984** [10] - 29:7, 37:7, 39:22, 40:11, 58:24, 59:25, 66:14, 66:18, 67:22, 97:11
**1985** [1] - 40:12
**1986** [7] - 81:15, 92:20, 92:22, 94:19, 94:21, 96:4, 96:9
**1987** [2] - 81:15, 97:8
**1988** [1] - 185:17
**1991** [1] - 57:6
**1993** [1] - 175:5

**1994** [1] - 100:10
**1995** [1] - 118:1
**1996** [10] - 100:17, 169:15, 170:10, 170:11, 171:9, 171:13, 175:10, 177:7, 185:23, 186:4
**1997** [2] - 107:1, 185:10
**1998** [19] - 21:14, 21:21, 49:18, 50:7, 62:23, 63:12, 64:9, 100:17, 114:17, 115:8, 115:17, 132:6, 170:14, 170:17, 171:18, 176:21, 186:11, 189:9, 189:23
**1:53** [1] - 71:20
**1ST** [3] - 37:6, 66:14, 66:18

**2**

**2** [3] - 46:5, 50:9, 145:16
**2,900** [1] - 107:23
**20** [5] - 4:6, 31:25, 32:8, 40:8, 194:15
**2005** [1] - 108:24
**2014** [1] - 54:1
**20530** [1] - 2:4
**21** [4] - 50:3, 66:16, 66:17, 92:20
**215** [3] - 2:10, 152:6, 152:16
**215)627-1882** [1] - 1:22
**22** [6] - 30:11, 37:17, 61:10, 61:25, 62:1, 92:22
**22ND** [2] - 5:17, 40:12
**23** [7] - 42:5, 50:20, 74:15, 80:9, 80:11, 80:12, 196:25
**235** [1] - 1:17
**24** [6] - 44:25, 95:6, 95:9, 119:22, 119:23, 196:7
**240** [2] - 72:11, 72:22
**24TH** [1] - 108:24
**25** [6] - 38:6, 44:9, 45:1, 70:16, 96:1, 113:7
**28** [3] - 5:1, 54:19, 171:13
**28TH** [3] - 5:19, 5:22, 32:5
**29** [3] - 5:1, 75:5
**29TH** [7] - 67:15,

72:11, 72:22, 96:4, 96:8

**3**

**3** [6] - 44:9, 103:25, 123:13, 162:15, 178:10, 196:6
**3.1** [1] - 179:8
**30** [4] - 53:25, 54:18, 66:23, 111:14
**300** [1] - 2:7
**309** [1] - 1:17
**30TH** [1] - 50:7
**31** [11] - 10:22, 19:25, 28:23, 33:6, 47:20, 53:1, 62:9, 67:25, 68:4, 72:17, 79:13
**311** [1] - 1:17
**33** [1] - 41:9
**34** [2] - 44:6, 44:9
**35** [8] - 44:6, 44:9, 44:14, 133:10, 133:12, 191:21, 192:1, 192:7
**35.1** [1] - 151:24
**35.2** [3] - 151:24, 152:23, 165:9
**36** [2] - 41:14, 45:22
**36TH** [9] - 6:2, 25:9, 25:16, 33:7, 46:2, 51:16, 51:21, 57:23, 78:3
**37** [1] - 44:25
**38** [1] - 46:5
**3:25** [1] - 194:14
**3:30** [1] - 195:7

**4**

**4** [15] - 1:12, 29:21, 29:22, 30:6, 30:9, 31:9, 32:21, 44:14, 59:4, 59:11, 59:14, 60:2, 65:10, 103:21, 104:19
**4/14/96** [1] - 153:10
**4/19/86** [1] - 153:8
**40** [8] - 9:3, 14:5, 14:8, 38:8, 42:18, 72:4, 72:8
**43** [2] - 4:10, 72:19
**45** [2] - 57:18, 66:23
**45TH** [1] - 57:19
**4:31** [1] - 130:5
**4:34** [1] - 131:25
**4:96-CR-239** [1] - 1:6
**4TH** [4] - 39:22, 40:11, 40:21, 138:1

**5**

**5** [5] - 29:22, 31:9, 41:13, 42:12, 103:22
**5.1** [1] - 122:10
**5.1-14** [1] - 123:11
**5.1-9** [1] - 159:23
**51** [1] - 132:25
**540** [1] - 2:14
**55** [1] - 84:11
**56** [1] - 91:16
**5TH** [3] - 40:11, 40:21, 138:1

**6**

**6** [16] - 36:23, 37:3, 37:9, 37:10, 37:12, 37:16, 50:17, 66:17, 103:22, 104:21, 132:8, 171:17, 175:21, 186:11, 189:9, 189:23
**6,200** [1] - 107:21
**6-5-13** [1] - 1:8
**60** [1] - 4:1
**601** [1] - 1:21
**61** [1] - 194:14
**64** [1] - 196:6
**6TH** [2] - 40:11, 40:21

**7**

**7** [3] - 38:3, 38:4, 72:21
**72** [1] - 196:7

**8**

**80** [1] - 196:25
**84** [1] - 196:10
**89-YEAR** [1] - 55:10
**8TH** [1] - 130:11

**9**

**9** [5] - 51:6, 72:21, 103:23, 104:21, 106:2
**92** [1] - 196:22
**94** [1] - 196:11
**96-CR** [1] - 115:9
**9:30** [1] - 194:17
**9TH** [2] - 114:17, 115:8

**A**

**A.M** [3] - 115:18, 132:9, 185:3

**ABILITY** [2] - 70:25, 127:11
**ABLE** [9] - 12:21, 70:18, 70:19, 70:21, 86:15, 90:12, 106:20, 155:16, 179:18
**ABOVE-ENTITLED** [1] - 195:15
**ABSOLUTELY** [1] - 93:24
**ABSTAINED** [1] - 139:16
**ACCEPTABLE** [1] - 93:2
**ACCEPTED** [1] - 162:9
**ACCOMMODATE** [1] - 144:12
**ACCOMPANIED** [2] - 46:11, 183:10
**ACCOMPLISH** [1] - 17:6
**ACCORDING** [3] - 96:6, 116:2, 120:23
**ACCURACY** [1] - 113:24
**ACCURATE** [4] - 5:20, 49:10, 108:12, 113:25
**ACT** [3] - 117:22, 117:25, 118:2
**ACTING** [2] - 184:4, 184:5
**ACTIVITIES** [2] - 61:23, 148:1
**ACTIVITY** [6] - 61:7, 145:7, 145:10, 145:13, 157:23, 187:3
**ACTS** [2] - 82:11, 83:12
**AD** [2] - 152:6, 152:16
**ADDITION** [2] - 170:9, 185:7
**ADDITIONAL** [1] - 133:3
**ADDRESS** [5] - 5:3, 190:25, 191:2, 194:6, 194:9
**ADDRESSED** [2] - 152:5, 153:3
**ADJOURNED** [2] - 132:3, 195:7
**ADMISSIBILITY** [1] - 113:12
**ADMISSIBLE** [1] - 82:12
**ADMITTED** [11] - 49:6, 80:11, 80:12, 82:14,

92:11, 92:14, 112:16, 112:17, 179:7, 196:21, 196:24
**ADMITTING** [2] - 61:4, 82:10
**ADMONISH** [1] - 61:21
**ADVANCED** [1] - 153:20
**ADVANCES** [1] - 107:4
**ADVANTAGE** [1] - 186:22
**ADVISOR** [1] - 100:14
**AFFECT** [1] - 127:10
**AFFIDAVIT** [2] - 81:17, 92:23
**AFFIRMED** [1] - 116:2
**AFFIXED** [1] - 160:9
**AFFORD** [1] - 69:11
**AFRAID** [6] - 23:21, 24:2, 58:2, 58:4, 58:11, 63:22
**AFTERNOON** [2] - 146:18, 186:14
**AFTERNOONS** [1] - 145:15
**AGENCIES** [2] - 109:11, 109:13
**AGENT** [20] - 52:10, 52:18, 53:5, 53:9, 54:2, 54:11, 55:23, 58:8, 96:24, 98:4, 98:6, 98:7, 114:19, 115:6, 116:4, 169:17, 189:8, 189:9, 189:24
**AGENTS** [1] - 170:19
**AGGRAVATING** [3] - 81:24, 82:5, 82:6
**AGGRAVATOR** [1] - 82:7
**AGO** [9] - 10:22, 19:25, 28:24, 33:6, 62:9, 72:17, 96:2, 99:4, 169:24
**AGREE** [7] - 8:10, 15:16, 26:20, 28:14, 90:6, 96:7, 135:15
**AGREED** [1] - 108:17
**AGREEMENT** [2] - 143:4, 143:15
**AHEAD** [5] - 21:19, 30:10, 41:20, 116:18, 132:15
**AHOLD** [1] - 70:9
**AIDED** [1] - 1:24
**AILING** [1] - 158:3
**ALIVE** [1] - 57:15
**ALLEGATION** [1] -

81:16
**ALLENWOOD** [18] - 118:3, 118:6, 118:8, 118:15, 119:12, 119:24, 120:5, 120:18, 120:25, 121:20, 128:21, 132:21, 171:23, 172:1, 172:24, 173:1, 177:6, 177:15
**ALLOW** [1] - 179:24
**ALLOWS** [1] - 192:3
**ALLUDE** [1] - 124:5
**ALLUDING** [1] - 153:22
**ALMOST** [2] - 70:16, 139:6
**ALONE** [2] - 6:25, 7:1
**AMANDA** [1] - 2:2
**AMENDMENT** [3] - 95:1, 95:22, 95:25
**AMERICA** [1] - 1:3
**AMOUNT** [2] - 98:5, 98:16
**AMPLIGEN** [1] - 107:24
**ANALYSIS** [16] - 100:24, 100:25, 101:12, 101:16, 102:6, 102:14, 102:17, 106:19, 106:20, 106:22, 107:5, 109:10, 109:11, 110:7, 113:5
**ANALYZE** [1] - 102:21
**ANNE** [1] - 2:5
**ANSWER** [28] - 20:12, 21:18, 30:14, 31:10, 32:1, 32:2, 32:11, 32:22, 36:14, 43:18, 45:2, 45:10, 46:8, 47:4, 47:6, 51:15, 60:5, 65:12, 66:23, 67:1, 67:4, 114:22, 116:22, 161:3, 179:22
**ANSWERED** [3] - 62:12, 62:15, 65:21
**ANSWERING** [1] - 115:7
**ANSWERS** [6] - 44:22, 46:14, 65:22, 67:20, 116:23, 194:12
**ANTICIPATION** [1] - 138:8
**ANTIGEN** [1] - 111:14
**ANYPLACE** [1] - 122:3
**ANYWAY** [5] - 12:25, 134:11, 146:16,

149:8, 176:14
**ANYWAYS** [5] - 131:5, 131:10, 131:14, 138:25, 141:7
**APART** [1] - 145:6
**APOLOGIES** [8] - 20:10, 32:20, 35:16, 37:7, 40:20, 59:23, 76:7, 76:19
**APOLOGIZE** [5] - 32:9, 74:12, 80:25, 95:5, 98:13
**APPEAR** [6] - 40:1, 109:15, 109:22, 111:1, 147:19, 160:6
**APPEARANCE** [4] - 169:19, 170:6, 190:5, 191:7
**APPEARANCES** [3] - 1:14, 2:1, 29:9
**APPEARED** [3] - 170:10, 171:12, 186:3
**APPROACH** [4] - 41:23, 76:2, 77:2, 78:24
**APPROACHED** [5] - 7:25, 25:23, 42:3, 42:22, 89:8
**APPROACHING** [1] - 7:8
**APRIL** [11] - 130:11, 169:15, 170:10, 170:16, 171:9, 175:8, 175:10, 175:17, 176:1, 176:20, 185:23
**AREA** [10] - 5:3, 14:16, 17:8, 34:22, 113:20, 115:14, 160:7, 179:13, 179:15, 179:16
**AREAS** [2] - 25:4, 160:14
**ARGUE** [1] - 46:24
**ARM** [5] - 131:20, 171:5, 171:10, 171:14, 171:19
**ARRESTED** [2] - 127:15, 175:6
**ARRIVAL** [1] - 119:12
**ARRIVE** [1] - 118:5
**ARRIVED** [14] - 9:19, 10:7, 45:8, 46:7, 73:23, 118:8, 118:14, 119:10, 119:18, 119:24, 138:18, 177:6, 177:14, 178:17
**ARRIVING** [1] - 45:4

**ARTICLES** [7] - 113:11, 157:12, 157:15, 157:16, 157:18, 157:22
**ASPECT** [1] - 181:21
**ASPECTS** [2] - 101:12, 164:13
**ASPHALT** [1] - 17:13
**ASPIRIN** [2] - 158:23, 159:4
**ASSAULTED** [4] - 12:17, 54:20, 173:6, 173:9
**ASSESSMENT** [1] - 101:17
**ASSIST** [1] - 110:14
**ASSISTANCE** [1] - 98:1
**ASSISTANT** [4] - 29:10, 61:16, 116:20, 125:21
**ASSUME** [2] - 183:7, 194:18
**ASSUMING** [1] - 7:16
**ASSURE** [1] - 70:19
**ASTOUNDING** [1] - 146:22
**ATE** [2] - 88:16
**ATTACHED** [1] - 160:10
**ATTEMPT** [2] - 83:13, 187:5
**ATTEMPTED** [2] - 111:8
**ATTENTION** [6] - 4:14, 5:11, 124:6, 129:16, 142:25, 145:23
**ATTORNEY** [11] - 21:2, 49:25, 61:17, 65:11, 96:17, 96:19, 116:20, 155:3, 191:6, 191:15, 192:6
**ATTORNEY'S** [3] - 133:15, 138:13, 191:3
**ATTORNEYS** [2] - 1:16, 69:7
**AUDIENCE** [1] - 23:16
**AUGUST** [3] - 170:11, 171:13, 186:4
**AUNT** [1] - 12:24
**AUTHORITIES** [2] - 191:10, 191:12
**AVAILABLE** [2] - 71:8, 179:3
**AWARE** [5] - 61:2, 61:8, 109:7, 181:17, 188:2
**AWFUL** [1] - 32:7

## B

**BACHELOR'S** [1] - 101:4
**BACKGROUND** [2] - 101:3, 124:14
**BAD** [4] - 82:11, 83:12, 139:5
**BAG** [6] - 104:8, 104:12, 105:6, 105:8, 105:15, 147:1
**BALD** [2] - 183:3, 183:4
**BANK** [4] - 132:23, 175:6, 185:9, 185:15
**BAR** [5] - 59:18, 60:7, 60:8, 81:6, 83:22
**BARBER** [4] - 4:8, 19:15, 19:18, 77:12
**BARREL** [2] - 32:7, 51:12
**BASED** [8] - 106:10, 106:19, 107:11, 107:24, 108:16, 111:17, 137:17, 151:11
**BASIS** [2] - 82:10, 148:13
**BATES** [2] - 30:2, 50:18
**BATHROOM** [6] - 12:20, 12:22, 13:2, 147:10, 169:6, 180:8
**BEAT** [3] - 23:1, 55:10, 55:14
**BECAME** [3] - 56:4, 181:17, 188:2
**BECOME** [1] - 182:13
**BED** [7] - 122:21, 149:19, 149:21, 149:22, 150:6, 186:19, 187:17
**BEDS** [1] - 180:1
**BEGAN** [1] - 101:6
**BEGINNING** [5] - 11:5, 39:25, 118:14, 167:20, 167:24
**BEHALF** [1] - 116:1
**BEHAVIOR** [1] - 146:19
**BEHIND** [2] - 173:13, 180:11
**BELIEVER** [1] - 67:14
**BELOW** [2] - 34:11, 76:1
**BENCH** [1] - 101:15
**BENT** [1] - 77:15
**BEST** [9] - 122:16, 141:10, 146:12, 146:23, 147:6,

157:4, 163:22, 163:25, 178:15
**BETTER** [7] - 23:20, 28:9, 69:25, 123:13, 151:18, 167:2
**BETWEEN** [8] - 30:23, 112:9, 122:17, 138:13, 145:10, 161:15, 161:18, 171:25
**BEYOND** [1] - 189:21
**BIASED** [1] - 146:19
**BIG** [10] - 11:15, 19:7, 32:4, 32:7, 51:9, 51:11, 85:5, 85:6, 85:10
**BIGGER** [1] - 12:11
**BILL** [1] - 55:24
**BIOLOGICAL** [1] - 113:10
**BIOLOGISTS** [1] - 100:21
**BIOLOGY** [3] - 101:4, 101:8, 113:1
**BIOMETRIC** [2] - 100:7, 100:13
**BIRTH** [1] - 4:24
**BIT** [10] - 13:5, 72:25, 76:1, 87:2, 88:22, 158:8, 171:4, 174:14, 187:25, 189:12
**BIZARRE** [1] - 187:10
**BLACK** [3] - 105:7, 105:15, 107:21
**BLACKENED** [1] - 160:6
**BLACKMAIL** [1] - 55:9
**BLANK** [1] - 91:10
**BLEEDING** [1] - 17:13
**BLEW** [1] - 18:6
**BLOCK** [2] - 74:21, 78:11
**BLOOD** [19] - 17:14, 100:23, 103:19, 103:24, 105:25, 106:6, 106:9, 106:11, 106:12, 106:14, 106:16, 106:18, 106:21, 107:7, 108:3, 108:4, 131:6, 188:19
**BLOOPERS** [1] - 141:20
**BLOW** [2] - 57:5, 67:5
**BLOWED** [1] - 57:1
**BLOWN** [1] - 57:21
**BODE** [10] - 108:25, 109:7, 109:9, 109:15, 109:20,

109:22, 110:1, 110:6, 110:18, 111:7
**BODE'S** [3] - 111:17, 111:22, 112:7
**BODY** [2] - 131:17, 158:2
**BOOK** [2] - 90:23, 151:17
**BOOKS** [1] - 122:11
**BOP** [1] - 181:23
**BORN** [3] - 4:11, 4:12, 84:19
**BOSS** [1] - 133:22
**BOTTOM** [10] - 30:2, 30:7, 30:9, 30:12, 31:19, 33:22, 41:10, 44:6, 65:7, 156:21
**BOUND** [1] - 39:17
**BOX** [3] - 1:17, 2:10, 114:21
**BOXER** [1] - 141:17
**BOXERS** [1] - 141:19
**BOY** [2] - 21:13, 168:17
**BOYS** [7] - 120:21, 120:25, 121:10, 121:15, 121:19, 128:13, 172:17
**BRAIDED** [5] - 147:19, 147:22, 180:24, 180:25, 181:1
**BRAIDING** [1] - 147:24
**BRAINS** [1] - 67:5
**BRAND** [1] - 140:7
**BRANDISH** [1] - 48:11
**BREAK** [12] - 24:10, 24:16, 25:5, 69:11, 69:15, 71:16, 71:17, 87:2, 115:16, 142:12, 184:24, 194:14
**BRIEF** [1] - 148:8
**BRIEFLY** [1] - 101:2
**BRIEFS** [1] - 141:20
**BRING** [2] - 67:13, 142:25
**BRINGING** [1] - 120:9
**BROADCAST** [1] - 10:19
**BROADWAY** [1] - 72:9
**BROKE** [2] - 20:2, 131:4
**BROKEN** [1] - 101:21
**BROUGHT** [1] - 145:4
**BUICK** [1] - 6:14
**BUMPS** [1] - 19:8
**BUNCH** [1] - 110:24
**BUNK** [2] - 145:18, 190:3

**BUREAU** [3] - 134:18, 138:14, 160:25
**BURGLARY** [2] - 94:10, 94:12
**BUSINESS** [8] - 23:23, 33:3, 34:6, 42:18, 44:8, 129:17, 145:21, 146:17
**BUT..** [1] - 181:15
**BUT...** [1] - 141:7
**BUY** [1] - 140:7

## C

**C-A-L-L-A-G-H-A-N** [1] - 99:25
**CAGE** [8] - 130:18, 130:19, 130:22, 131:5, 182:23, 187:21, 188:8, 188:11
**CALIFORNIA** [4] - 4:12, 138:24, 172:3
**CALLAGHAN** [12] - 99:19, 99:20, 99:24, 100:3, 102:13, 102:20, 103:7, 104:5, 105:21, 112:3, 112:24, 196:13
**CAMERA** [1] - 69:19
**CAPITAL** [6] - 2:3, 49:17, 53:16, 74:8, 82:12, 83:14
**CAPTAIN** [5] - 119:15, 119:21, 128:12, 128:14, 128:21
**CAR** [48] - 6:12, 6:13, 7:9, 7:20, 7:22, 8:3, 9:22, 13:11, 13:13, 13:21, 15:3, 15:12, 15:22, 16:21, 16:22, 25:17, 25:23, 26:6, 26:13, 26:17, 26:18, 26:24, 27:2, 31:14, 32:12, 33:9, 33:13, 33:16, 33:18, 33:24, 34:21, 34:25, 37:19, 41:16, 42:3, 42:7, 42:23, 43:10, 44:16, 47:24, 55:12, 65:19, 66:1, 66:9, 68:8, 68:16, 78:15, 78:20
**CARDS** [8] - 122:3, 124:16, 124:23, 125:6, 161:24, 164:3, 164:8, 184:16
**CARE** [4] - 147:20, 156:11, 156:15, 157:4

**CARS** [1] - 30:23
**CASE** [24] - 3:3, 20:24, 21:7, 25:4, 28:15, 62:19, 63:8, 63:11, 81:14, 81:15, 82:5, 83:20, 101:9, 101:17, 102:20, 103:5, 103:12, 104:9, 108:25, 137:15, 156:17, 170:19, 170:21, 170:25
**CASES** [2] - 21:25, 143:8
**CAUCASIAN** [1] - 107:22
**CAUGHT** [1] - 120:9
**CAUSED** [8] - 6:17, 120:4, 135:22, 135:23, 157:14, 158:17, 158:18, 160:14
**CAVIT** [2] - 98:7, 98:13
**CELL** [46] - 85:11, 85:15, 86:12, 86:14, 88:18, 88:19, 93:10, 111:13, 118:9, 118:18, 119:5, 121:14, 122:1, 122:7, 122:13, 123:1, 123:16, 125:10, 127:13, 131:19, 138:17, 139:15, 140:1, 140:5, 140:9, 140:23, 145:2, 145:7, 146:20, 146:25, 147:5, 154:10, 159:24, 160:22, 163:3, 164:13, 168:9, 168:16, 178:4, 178:12, 178:17, 178:21, 179:9, 183:17
**CELLED** [1] - 123:17
**CELLIE** [11] - 130:1, 183:11, 183:12, 183:16, 183:18, 183:24, 184:3, 184:10, 185:25, 186:7, 187:19
**CELLING** [3] - 164:21, 173:20, 175:1
**CELLMATE** [6] - 118:23, 119:5, 139:15, 182:13, 187:14, 189:10
**CELLS** [3] - 110:23,

188:6

**CENTER** [3] - 2:14, 123:20, 172:20

**CERTAIN** [2] - 10:10, 88:17

**CERTAINLY** [3] - 62:23, 144:12, 144:21

**CERTIFY** [1] - 195:13

**CHAIR** [2] - 3:18, 28:8

**CHALLENGE** [1] - 82:23

**CHALLENGED** [1] - 83:18

**CHANCE** [1] - 14:24

**CHANGE** [2] - 146:19, 194:20

**CHANGED** [1] - 78:17

**CHARACTER** [2] - 83:13, 120:17

**CHARACTERISTICS** [1] - 122:6

**CHARGE** [7] - 132:19, 134:7, 134:9, 134:11, 185:8, 185:9

**CHARGED** [1] - 89:15

**CHARGES** [5] - 39:17, 60:12, 60:18, 62:25, 191:14

**CHART** [3] - 111:22, 112:4, 112:10

**CHASE** [1] - 15:15

**CHESTNUT** [1] - 2:7

**CHEWING** [2] - 80:16, 80:18

**CHIEF** [1] - 100:13

**CHILDHOOD** [2] - 189:11, 189:14

**CHIMP** [1] - 164:16

**CHOKE** [1] - 131:21

**CHOW** [1] - 173:12

**CHRISTMAS** [2] - 137:5, 137:6

**CIGARETTES** [15] - 87:22, 139:9, 139:10, 139:18, 139:20, 139:21, 140:3, 153:15, 153:18, 154:1, 154:5, 154:18, 168:1, 168:4, 168:6

**CIRCLE** [1] - 19:22

**CIRCUIT** [1] - 117:11

**CIRCUMSTANCES** [1] - 81:13

**CITY** [8] - 4:13, 5:4, 9:5, 15:9, 72:5, 72:7, 73:4, 172:20

**CIVIL** [1] - 143:7

**CLARIFICATION** [1] -

165:14

**CLASSEN** [54] - 6:2, 25:9, 25:16, 33:8, 41:15, 42:16, 43:5, 43:20, 44:7, 44:19, 45:22, 46:2, 47:16, 48:5, 51:16, 51:21, 57:18, 57:20, 57:24, 75:13, 75:14, 75:18, 75:23, 76:22, 78:3, 78:10, 114:16, 115:14, 115:22, 115:25, 116:7, 116:10, 116:23, 116:24, 117:2, 118:9, 123:13, 132:14, 132:18, 134:3, 135:18, 150:3, 151:22, 152:6, 154:3, 157:10, 159:6, 159:21, 165:1, 165:7, 185:7, 196:17

**CLASSENS** [1] - 152:16

**CLASSON** [1] - 116:8

**CLEAN** [1] - 53:6

**CLEAR** [1] - 32:9

**CLEARLY** [1] - 83:8

**CLERK** [5] - 3:1, 3:9, 99:22, 114:18, 185:4

**CLOSE** [5] - 78:6, 139:4, 156:22, 157:7, 183:13

**CLOSED** [1] - 139:2

**CLOSER** [2] - 28:2, 83:25

**CLOSET** [2] - 23:3, 23:5

**CLOTH** [1] - 147:4

**CLOTHES** [6] - 15:14, 15:23, 48:16, 48:21, 48:24, 77:10

**CLUB** [1] - 60:3

**CM** [1] - 1:19

**COACHMAN** [3] - 45:5, 45:8, 75:15

**COAT** [2] - 16:23, 17:2

**COFFEE** [8] - 140:13, 140:14, 160:16, 160:20, 160:21, 168:1, 168:5, 168:6

**COIN** [2] - 104:14, 104:18

**COLLECTING** [1] - 24:18

**COLOR** [1] - 6:15

**COMFORTABLE** [1] - 170:22

**COMING** [9] - 6:8,

6:10, 7:19, 7:21, 20:2, 25:17, 117:17, 128:15, 181:17

**COMMENT** [1] - 188:14

**COMMENTS** [1] - 125:21

**COMMERCIAL** [1] - 109:9

**COMMISSARY** [4] - 138:19, 138:22, 140:13, 149:18

**COMMITTED** [6] - 81:18, 81:19, 86:6, 87:1, 89:12, 89:23

**COMMON** [1] - 187:12

**COMMUNITIES** [2] - 14:11, 15:2

**COMMUNITY** [1] - 2:13

**COMPANY** [1] - 121:21

**COMPARE** [1] - 109:18

**COMPLAIN** [2] - 158:8, 159:6

**COMPLAINED** [1] - 158:9

**COMPLAINTS** [2] - 158:1, 158:15

**COMPLETED** [2] - 93:6, 101:7

**COMPLETELY** [3] - 38:15, 38:20, 184:15

**COMPLEX** [1] - 76:11

**COMPONENTS** [1] - 111:12

**COMPOUND** [5] - 155:15, 155:23, 173:11, 175:19, 187:16

**COMPUTER** [2] - 1:24, 1:24

**COMPUTER-AIDED** [1] - 1:24

**CONCENTRATE** [1] - 127:16

**CONCERN** [2] - 62:24, 169:10

**CONCERNED** [1] - 164:21

**CONCERNING** [2] - 170:19, 185:24

**CONCLUDED** [1] - 109:21

**CONCLUSION** [2] - 190:23, 191:17

**CONCLUSIONS** [3] - 101:20, 108:16, 108:17

**CONDUCT** [2] - 109:10, 109:11

**CONDUCTED** [3] - 100:19, 106:1, 108:11

**CONFERENCE** [1] - 83:22

**CONFESS** [3] - 83:2, 89:18, 90:4

**CONFESSED** [2] - 82:24, 93:22

**CONFESSING** [1] - 90:9

**CONFESSION** [5] - 91:5, 92:17, 92:23, 93:6, 99:8

**CONFIRM** [3] - 106:20, 111:4, 192:23

**CONFIRMATORY** [2] - 106:16, 106:17

**CONFIRMED** [2] - 106:11, 106:12

**CONFRONTED** [2] - 11:11, 52:17

**CONFUSED** [1] - 88:12

**CONNECTED** [2] - 49:9, 179:24

**CONNECTING** [1] - 49:2

**CONNECTION** [1] - 21:7

**CONSCIOUSNESS** [1] - 83:3

**CONSENSUALLY** [2] - 35:7, 46:15

**CONSENT** [2] - 44:16, 44:19

**CONSIDER** [1] - 192:6

**CONSIDERED** [4] - 107:2, 107:3, 149:10, 191:13

**CONSIST** [1] - 104:11

**CONSPIRACY** [6] - 117:3, 117:4, 132:19, 134:6, 134:11, 185:7

**CONSPIRED** [1] - 117:7

**CONTAINED** [2] - 108:18, 156:8

**CONTAINS** [1] - 105:4

**CONTEND** [1] - 177:15

**CONTINUALLY** [1] - 183:17

**CONTINUE** [8] - 107:14, 126:5, 135:17, 136:20,

175:10, 176:1, 176:13, 194:17

**CONTINUED** [10] - 2:1, 52:6, 62:19, 64:10, 115:15, 115:16, 130:7, 132:17, 161:9, 185:6

**CONTRACTOR** [1] - 84:13

**CONTRACTS** [1] - 109:12

**CONTRAST** [1] - 147:21

**CONTRIBUTOR** [2] - 107:16, 108:7

**CONVENED** [1] - 132:10

**CONVERSATION** [14] - 53:10, 85:23, 85:25, 86:21, 86:24, 87:6, 88:15, 89:16, 89:22, 93:16, 129:1, 164:2, 176:16, 177:1

**CONVERSATIONS** [6] - 96:14, 124:12, 141:9, 161:15, 176:25, 177:3

**CONVICT** [1] - 46:24

**CONVICTED** [4] - 46:19, 82:8, 185:11, 185:18

**CONVICTION** [2] - 47:7, 81:13

**CONVICTIONS** [1] - 62:22

**CONVINCED** [3] - 136:14, 143:1, 143:10

**COOPERATION** [4] - 117:20, 117:21, 191:6, 191:12

**COP** [1] - 149:19

**COPE** [1] - 139:8

**COPIES** [2] - 114:18, 144:18

**COPOUT** [12] - 130:4, 181:19, 181:21, 181:22, 182:1, 182:4, 182:8, 182:9, 182:12, 183:21, 183:22, 184:17

**COPOUTS** [1] - 182:5

**COPY** [3] - 109:5, 112:4, 112:13

**CORD** [2] - 179:4, 180:5

**CORNER** [4] - 122:12, 153:6, 156:21, 180:16

**CORRECT** [117] -

7:18, 11:19, 16:13, 16:14, 25:18, 25:20, 25:22, 26:1, 26:3, 26:5, 26:9, 26:18, 26:22, 27:2, 27:3, 27:6, 27:9, 27:13, 27:16, 27:19, 29:3, 29:5, 29:13, 30:18, 31:6, 31:16, 34:7, 35:5, 35:8, 37:15, 38:19, 38:22, 38:23, 39:22, 40:11, 40:22, 40:23, 41:4, 41:7, 42:3, 42:4, 42:23, 43:2, 43:6, 43:22, 46:20, 46:22, 48:6, 48:13, 49:23, 50:1, 50:15, 50:23, 52:5, 52:13, 52:20, 52:23, 53:1, 54:4, 54:8, 54:10, 54:13, 54:15, 57:25, 58:6, 60:9, 63:3, 64:11, 66:18, 67:22, 70:22, 78:5, 78:13, 78:16, 78:19, 78:22, 85:9, 96:13, 113:4, 114:2, 119:18, 124:14, 124:16, 124:20, 128:6, 133:4, 134:9, 137:23, 138:5, 141:14, 144:13, 146:5, 150:22, 153:15, 153:18, 154:13, 155:1, 157:19, 160:3, 160:7, 160:10, 163:7, 165:24, 170:11, 170:14, 171:23, 172:7, 173:3, 173:20, 173:24, 177:22, 178:13, 178:18, 178:22, 179:5, 194:2, 195:13

**CORRECTED** [2] - 71:7, 71:9

**CORRECTIONAL** [3] - 119:11, 138:10, 182:17

**CORRESPONDENC E** [2] - 149:15, 152:3

**CORRESPONDS** [1] - 104:6

**CORROBORATE** [2] - 83:3, 83:17

**COUNSEL** [9] - 58:16, 69:11, 81:1, 130:5, 136:15, 143:4, 168:24, 193:10,

195:6

**COUNSELOR** [2] - 69:23, 70:3

**COUNT** [3] - 18:12, 94:10, 94:12

**COUNTING** [2] - 18:14, 192:9

**COUNTRY** [6] - 4:2, 14:5, 14:8, 15:10, 84:14, 123:7

**COUNTRYSIDE** [1] - 14:9

**COUNTY** [1] - 61:17

**COUPLE** [8] - 126:22, 137:2, 139:20, 148:14, 154:9, 159:14, 166:12, 172:2

**COURSE** [6] - 13:20, 19:9, 49:5, 89:16, 145:25, 151:20

**COURT** [151] - 1:1, 1:20, 3:1, 3:2, 4:17, 6:5, 21:17, 24:5, 24:14, 24:17, 24:20, 24:23, 25:10, 25:13, 28:2, 28:7, 28:10, 36:11, 36:14, 37:4, 43:10, 47:2, 49:13, 56:19, 60:15, 61:17, 61:25, 62:11, 62:14, 63:3, 64:17, 67:10, 68:25, 69:4, 69:9, 69:14, 69:16, 69:24, 70:1, 70:4, 70:11, 70:15, 70:24, 71:6, 71:11, 71:16, 71:18, 71:25, 76:4, 79:8, 79:24, 80:1, 80:5, 80:10, 80:15, 81:3, 81:9, 81:19, 81:25, 82:13, 82:15, 82:18, 83:5, 83:16, 83:24, 87:14, 87:25, 88:8, 88:25, 91:17, 92:10, 92:13, 93:14, 93:17, 93:20, 94:2, 94:21, 94:23, 94:25, 95:21, 96:22, 98:21, 98:24, 99:15, 102:4, 102:8, 102:16, 103:8, 105:10, 107:10, 112:13, 112:15, 112:21, 113:6, 114:6, 114:9, 114:13, 114:19, 115:3, 115:17, 115:23, 116:3, 116:5, 116:18, 117:9, 130:5,

131:25, 132:3, 132:4, 132:6, 132:10, 132:11, 132:13, 135:11, 135:14, 135:16, 136:4, 136:7, 136:11, 136:14, 137:4, 142:11, 142:20, 143:7, 143:21, 143:24, 144:1, 144:5, 144:13, 144:15, 159:12, 161:2, 161:6, 165:3, 167:11, 167:17, 169:2, 184:22, 184:25, 185:2, 185:3, 185:4, 193:10, 193:14, 193:19, 193:22, 194:12, 194:13, 194:24, 195:2, 195:19

**COURT'S** [12] - 20:5, 24:6, 32:16, 35:12, 40:3, 44:3, 47:10, 53:21, 58:19, 64:13, 99:10, 103:6

**COURTHOUSE** [1] - 1:20

**COURTROOM** [7] - 1:8, 23:13, 69:10, 70:22, 194:18, 194:25, 195:5

**COVER** [3] - 36:18, 50:3, 187:6

**COVERED** [4] - 17:14, 124:2, 162:22

**COVERING** [3] - 168:12, 168:16, 168:21

**COVERS** [1] - 50:22

**COWBOY** [2] - 11:15, 11:16

**COYLE** [15] - 23:12, 23:13, 52:10, 52:18, 53:5, 53:9, 54:2, 55:23, 58:8, 114:19, 115:6, 116:4, 116:22, 144:23

**CRAWL** [1] - 186:19

**CREDIBILITY** [2] - 82:23, 83:17

**CRIME** [8] - 20:17, 86:6, 86:18, 87:1, 89:12, 89:17, 90:13, 103:17

**CRIMES** [1] - 2:3

**CRIMINAL** [7] - 1:3, 2:3, 117:22, 117:25,

118:2, 134:14, 157:22

**CROSS** [14] - 24:5, 24:10, 24:23, 24:24, 35:23, 52:22, 82:22, 94:2, 94:3, 112:21, 112:22, 114:23, 165:3, 196:3

**CROSS-EXAMINED** [2] - 35:23, 52:22

**CROSS-EXAMINING** [1] - 24:10

**CROW** [7] - 118:24, 118:25, 128:4, 141:9, 177:21, 177:24, 178:5

**CRYING** [1] - 190:3

**CUFFED** [1] - 188:19

**CUPS** [2] - 160:17, 160:18

**CURE** [1] - 70:6

**CURIOUS** [1] - 36:8

**CURTAIN** [1] - 147:10

**CURTIS** [1] - 2:14

**CUSTODY** [5] - 85:13, 116:24, 133:4, 193:24, 194:4

**CUT** [3] - 57:2, 143:5, 144:8

**CUTE** [8] - 8:2, 8:11, 26:2, 78:18, 78:21, 78:25, 79:4, 79:6

**CUTTING** [4] - 5:7, 104:22, 104:23, 105:12

**CUTTINGS** [1] - 106:24

## D

**D.C** [1] - 2:4

**DAILY** [1] - 148:12

**DAN** [2] - 55:2, 55:3

**DANGER** [1] - 83:11

**DANGEROUSNESS** [3] - 83:6, 83:9, 83:12

**DARK** [3] - 6:19, 6:21, 160:6

**DARKNESS** [1] - 187:6

**DATE** [11] - 4:24, 5:13, 37:4, 40:16, 92:18, 92:21, 94:23, 130:12, 153:5, 153:7, 195:19

**DATED** [2] - 40:10, 66:13

**DATES** [1] - 89:10

**DAVE** [10] - 118:10, 137:1, 137:14,

139:9, 139:10, 145:5, 150:24, 154:1, 161:20, 161:21

**DAVE'S** [5] - 135:6, 140:3, 151:4, 152:15, 153:2

**DAVID** [21] - 1:6, 3:4, 21:6, 37:18, 47:7, 68:17, 68:18, 80:23, 81:10, 84:3, 84:21, 89:1, 93:12, 95:13, 115:9, 132:8, 156:23, 157:8, 177:7, 190:21, 196:9

**DAVID'S** [1] - 88:18

**DAVIS** [1] - 87:21

**DAWN** [1] - 192:14

**DAWNA** [4] - 192:14, 192:15, 193:24, 194:1

**DAWNS** [1] - 194:2

**DAYS** [11] - 17:24, 115:11, 129:8, 137:2, 139:19, 140:2, 148:15, 159:14, 162:8, 162:9, 166:12

**DEACONESS** [6] - 17:20, 17:21, 17:23, 73:8, 73:13, 75:1

**DEAD** [1] - 68:6

**DEAL** [2] - 158:21, 159:3

**DEATH** [19] - 12:3, 13:21, 21:11, 21:22, 46:9, 53:17, 55:10, 63:8, 63:11, 63:17, 64:10, 167:8, 167:9, 167:12, 167:15, 167:19, 167:23, 189:25, 192:17

**DECEMBER** [1] - 136:25

**DECIDE** [4] - 9:8, 15:5, 23:18, 184:6

**DECIDED** [1] - 155:14

**DECISION** [2] - 63:21, 83:18

**DEFENDANT** [10] - 2:5, 2:8, 2:12, 29:10, 66:12, 69:6, 69:22, 70:2, 70:23, 114:25

**DEFENDANT'S** [6] - 40:7, 50:3, 95:9, 123:13, 162:15, 178:10

**DEFENDER** [3] - 2:6, 2:13, 29:10

**DEFENSE** [17] - 19:16,

21:2, 35:15, 36:5, 36:12, 36:18, 58:22, 61:3, 61:10, 65:3, 65:11, 74:15, 80:12, 109:12, 143:5, 144:10, 196:24
**DEFINITELY** [1] - 48:5
**DEGREE** [1] - 161:19
**DELIVERED** [1] - 181:13
**DEMEANOR** [2] - 146:18, 164:17
**DEPARTMENT** [3] - 2:2, 19:16, 101:8
**DEPICTED** [2] - 122:18, 123:12
**DEPRESSED** [2] - 127:6, 127:15
**DEPUTY** [1] - 185:4
**DESCRIBE** [5] - 8:25, 100:11, 147:5, 157:1, 183:2
**DESCRIBED** [3] - 52:21, 181:18, 183:23
**DESCRIBING** [2] - 51:12, 147:20
**DESERVE** [1] - 68:22
**DESERVED** [1] - 64:12
**DESIRE** [1] - 38:13
**DESK** [2] - 183:21, 184:16
**DESOLATE** [1] - 34:22
**DETAIL** [2] - 128:22, 143:1
**DETAILS** [5] - 90:19, 120:3, 124:13, 136:18, 157:21
**DETECTED** [2] - 107:19, 107:25
**DETERMINED** [1] - 109:20
**DEVICE** [1] - 179:3
**DIE** [2] - 15:18, 17:1
**DIED** [1] - 56:7
**DIFFERED** [1] - 101:14
**DIFFERENCES** [2] - 112:9, 122:16
**DIFFERENT** [23] - 20:15, 23:22, 31:20, 49:21, 49:24, 82:18, 98:5, 98:16, 107:13, 108:22, 110:11, 122:3, 122:4, 123:15, 123:18, 142:5, 151:19, 153:22, 153:24, 161:22, 164:17,

173:18, 194:24
**DIFFICULTIES** [2] - 155:17, 155:19
**DIRECT** [15] - 3:12, 4:14, 5:11, 10:10, 27:14, 53:4, 54:22, 72:3, 78:2, 84:4, 85:22, 100:1, 110:25, 116:19, 196:3
**DIRECTED** [2] - 38:9, 48:15
**DIRECTION** [1] - 43:15
**DIRECTLY** [3] - 3:17, 85:15, 86:16
**DIRT** [2] - 15:10, 17:12
**DIRTY** [7] - 120:21, 120:25, 121:10, 121:15, 121:19, 128:13, 172:17
**DISCIPLINARY** [3] - 128:15, 192:18, 192:19
**DISCIPLINES** [1] - 100:14
**DISCOLORED** [1] - 151:23
**DISCUSSED** [5] - 144:9, 155:10, 156:4, 156:7, 162:7
**DISCUSSING** [2] - 28:22, 169:11
**DISCUSSION** [1] - 55:22
**DISCUSSIONS** [2] - 137:14, 170:18
**DISPLAY** [1] - 178:13
**DISPOSING** [1] - 80:21
**DISPOSITION** [1] - 191:14
**DISRESPECTED** [2] - 87:20, 88:20
**DISRESPECTING** [1] - 89:2
**DISTRICT** [10] - 1:1, 1:2, 1:16, 2:6, 2:13, 61:16, 61:17, 96:17, 96:19, 132:20
**DIVIDES** [2] - 72:9
**DIVISION** [2] - 2:3, 100:8
**DNA** [30] - 100:14, 100:18, 100:24, 101:12, 102:2, 102:5, 102:14, 102:17, 106:19, 106:20, 106:22, 106:23, 107:5,

107:12, 107:16, 107:19, 107:25, 108:4, 108:6, 108:7, 108:9, 108:14, 108:24, 109:10, 109:11, 110:6, 110:21, 113:2, 113:5
**DOCTOR** [4] - 101:22, 101:23, 125:12, 125:18
**DOCUMENT** [19] - 29:22, 40:10, 50:10, 50:18, 92:4, 94:18, 108:18, 156:22, 165:12, 165:16, 165:19, 165:21, 165:23, 166:1, 166:18, 166:20, 181:22, 181:23, 182:17
**DOCUMENTS** [1] - 103:1
**DON** [3] - 55:3, 55:4, 55:5
**DONE** [8] - 14:23, 20:16, 97:13, 97:17, 107:13, 111:5, 113:24, 156:18
**DOOR** [6] - 82:11, 83:14, 154:9, 179:15, 188:3, 188:4
**DOUBT** [1] - 68:18
**DOWN** [42] - 4:7, 7:23, 7:24, 16:2, 16:22, 30:22, 31:8, 41:14, 42:5, 42:16, 43:5, 43:20, 44:6, 44:19, 67:15, 68:5, 68:15, 69:4, 69:10, 72:25, 75:11, 77:18, 77:19, 77:20, 77:21, 80:1, 87:2, 95:15, 99:16, 114:7, 127:6, 131:7, 139:4, 143:6, 144:8, 154:10, 165:24, 166:5, 181:11
**DOWNSTAIRS** [1] - 178:5
**DQA1** [2] - 107:12, 107:18
**DR** [1] - 112:24
**DRAFTS** [1] - 93:1
**DRAMATIC** [1] - 188:11
**DRAPE** [1] - 180:7
**DRAWER** [1] - 11:13
**DRAWN** [1] - 192:5
**DRIVE** [4] - 14:4, 38:9, 38:11, 38:21
**DRIVER'S** [1] - 7:16

**DRIVING** [7] - 7:17, 13:22, 13:25, 14:14, 15:10, 41:14, 43:20
**DROVE** [7] - 8:19, 13:21, 14:8, 38:16, 67:15, 75:14, 78:23
**DROWSY** [1] - 174:17
**DRUG** [4] - 126:13, 126:25, 127:3, 127:22
**DRUGS** [6] - 117:5, 117:7, 120:9, 125:25, 126:7, 126:8
**DS** [1] - 129:8
**DULY** [1] - 116:1
**DURING** [50] - 26:13, 34:20, 44:15, 58:15, 59:19, 60:11, 69:11, 74:8, 86:3, 89:9, 89:16, 89:22, 100:16, 100:18, 121:25, 124:18, 125:9, 126:8, 126:20, 128:3, 140:21, 145:1, 145:7, 146:18, 147:23, 149:15, 157:25, 158:14, 158:25, 159:5, 159:9, 161:11, 162:5, 163:11, 163:14, 163:17, 164:15, 164:19, 168:10, 169:17, 173:19, 177:2, 186:25, 189:9, 189:23, 190:5, 192:21, 193:1, 193:6
**DYING** [2] - 16:19, 16:25

## E

**E-N** [1] - 116:9
**EAR** [1] - 9:15
**EARLY** [3] - 71:1, 149:19, 189:17
**EARTH** [3] - 167:19, 167:21, 167:22
**EASIER** [2] - 95:18, 155:22
**EASILY** [1] - 187:16
**EAST** [1] - 78:11
**EASTERN** [2] - 2:13, 70:15
**EDIT** [1] - 142:23
**EDITS** [1] - 91:13
**EDUCATIONAL** [1] - 101:2
**EFFECT** [3] - 168:25,

183:10, 187:22
**EFFECTS** [2] - 18:24, 126:12
**EFFORT** [2] - 187:3, 191:22
**EIGHT** [1] - 129:7
**EITHER** [12] - 17:16, 33:5, 51:21, 51:25, 117:18, 126:12, 162:1, 167:8, 169:11, 175:11, 175:13, 189:15
**ELABORATE** [1] - 187:25
**ELIMINATED** [1] - 142:15
**EMERGENCY** [1] - 17:18
**EMOTIONAL** [3] - 19:11, 46:6, 54:5
**EMPIRICAL** [1] - 113:15
**EMPLOYED** [3] - 100:6, 100:7, 100:9
**END** [8] - 39:25, 70:7, 92:2, 92:6, 143:12, 166:23, 167:21, 167:23
**ENDEAVOR** [3] - 143:5, 143:20, 144:8
**ENDED** [3] - 64:7, 83:23, 131:15
**ENFORCEMENT** [2] - 109:11, 109:13
**ENGAGE** [6] - 145:13, 145:21, 145:25, 147:24, 148:2, 162:4
**ENGAGED** [3] - 61:6, 61:22, 146:17
**ENGAGING** [1] - 187:2
**ENJOYED** [2] - 121:21, 121:22
**ENTER** [1] - 69:21
**ENTERED** [1] - 134:8
**ENTIRE** [2] - 31:14, 173:4
**ENTITLED** [1] - 195:15
**ENVELOPE** [2] - 151:24, 152:12
**ENVELOPES** [3] - 104:11, 104:15, 104:18
**ERROR** [2] - 113:17, 113:20
**ERRORS** [1] - 113:21
**ESCAPE** [2] - 10:13, 10:21
**ESCAPED** [3] - 10:24, 11:4, 11:7

**ESCAPEE** [2] - 10:14, 11:12
**ESPECIALLY** [3] - 149:5, 149:6, 178:4
**ESQUIRE** [6] - 1:15, 2:2, 2:5, 2:8, 2:12, 2:12
**ESSENTIALLY** [1] - 63:18
**ESTABLISHED** [1] - 35:5
**EVANS** [1] - 29:9
**EVENING** [8] - 30:23, 115:16, 126:13, 126:16, 154:5, 168:7, 175:20, 190:1
**EVENINGS** [1] - 126:10
**EVENTS** [1] - 168:9
**EVENTUALLY** [1] - 91:1
**EVERYDAY** [1] - 155:23
**EVIDENCE** [27] - 49:2, 62:18, 80:9, 80:13, 81:23, 82:4, 83:9, 83:12, 83:13, 92:15, 100:20, 102:21, 103:12, 103:16, 104:3, 104:7, 104:9, 104:17, 105:2, 105:24, 109:23, 111:18, 112:18, 168:25, 193:11, 193:16, 193:17
**EXACT** [4] - 5:3, 5:13, 5:16, 164:6
**EXACTLY** [3] - 16:5, 93:5, 103:11
**EXAMINATION** [14] - 3:12, 24:24, 27:14, 53:4, 64:19, 72:1, 72:3, 82:22, 84:4, 94:3, 100:1, 112:22, 114:23, 116:19
**EXAMINATIONS** [3] - 100:19, 100:23, 162:13
**EXAMINE** [7] - 24:5, 24:23, 94:2, 102:21, 103:12, 112:21, 165:4
**EXAMINED** [2] - 35:23, 52:22
**EXAMINER** [3] - 100:18, 102:2, 108:14
**EXAMINING** [1] - 24:10
**EXAMPLE** [4] -

122:11, 123:5, 124:5, 189:5
**EXCELLENT** [1] - 3:21
**EXCEPT** [2] - 122:20, 139:4
**EXCHANGE** [5] - 129:13, 133:19, 138:7, 150:5, 190:24
**EXCITED** [3] - 130:25, 188:3, 188:9
**EXCLUDE** [2] - 113:8, 113:9
**EXCUSE** [6] - 36:23, 69:6, 98:10, 114:25, 153:8, 191:4
**EXCUSED** [3] - 80:7, 99:18, 114:8
**EXECUTED** [1] - 47:8
**EXEMPLARS** [1] - 103:18
**EXHIBIT** [33] - 35:15, 36:5, 36:13, 36:19, 40:7, 50:3, 58:22, 61:10, 65:3, 66:12, 74:15, 91:21, 92:9, 92:14, 95:9, 105:5, 105:6, 105:14, 105:18, 109:3, 112:2, 112:12, 112:17, 123:11, 123:13, 147:2, 147:13, 147:15, 151:24, 152:23, 162:15, 179:8
**EXHIBITS** [7] - 80:4, 80:8, 80:12, 115:13, 196:20, 196:21, 196:24
**EXIT** [1] - 72:22
**EXITED** [1] - 42:18
**EXPECT** [4] - 135:2, 137:17, 138:8, 171:2
**EXPECTED** [2] - 16:20, 130:14
**EXPERIENCE** [1] - 173:2
**EXPERT** [5] - 102:5, 102:7, 102:10, 102:13, 102:17
**EXPIRED** [2] - 133:1, 185:10
**EXPLAIN** [10] - 6:5, 12:8, 23:22, 43:10, 110:23, 133:17, 138:21, 139:24, 142:5, 142:8
**EXPLAINED** [1] - 174:12
**EXPLANATION** [1] - 110:25

**EXPRESSED** [1] - 174:18
**EXPRESSION** [1] - 131:12
**EXTENSION** [1] - 148:10
**EXTENT** [6] - 83:16, 142:21, 147:14, 164:1, 189:17, 189:19
**EXTRA** [1] - 112:13

## F

**F-A-C-E-S** [1] - 167:18
**FACE** [5] - 16:13, 18:4, 19:3, 131:7, 188:19
**FACED** [1] - 131:9
**FACES** [2] - 167:19, 167:23
**FACILITY** [9] - 118:15, 119:12, 134:19, 134:25, 135:24, 138:18, 171:22, 172:1, 187:13
**FACING** [3] - 53:17, 63:17, 64:10
**FACT** [13] - 11:12, 22:16, 52:17, 61:5, 61:13, 63:16, 68:11, 82:11, 85:21, 95:16, 95:20, 136:16, 193:3
**FACTORS** [3] - 81:24, 82:5, 82:6
**FAILED** [1] - 102:10
**FAIR** [1] - 188:11
**FAIRLY** [1] - 127:23
**FALL** [3] - 4:14, 4:20, 5:2
**FALSE** [5] - 19:4, 46:15, 92:17, 92:23, 93:6
**FALSELY** [3] - 83:2, 89:18, 90:4
**FAMILIAR** [5] - 9:4, 11:9, 123:3, 152:11, 152:24
**FAMILIARITY** [1] - 151:12
**FAMILY** [6] - 12:24, 23:8, 23:24, 74:1, 167:7, 189:19
**FAR** [10] - 78:9, 108:3, 109:19, 165:18, 167:2, 167:3, 178:20, 188:14, 192:7
**FARMING** [2] - 14:10, 15:1

**FASHION** [2] - 123:13, 123:15
**FAST** [1] - 13:4
**FATHER** [3] - 22:19, 22:20, 74:8
**FBI** [41] - 96:24, 98:4, 98:6, 100:8, 100:9, 100:16, 101:16, 102:2, 103:16, 104:8, 110:13, 111:8, 113:2, 114:19, 115:6, 117:18, 138:13, 149:23, 149:24, 150:19, 156:16, 166:8, 166:9, 166:14, 166:16, 168:3, 169:11, 169:15, 170:9, 170:13, 170:18, 171:8, 171:9, 171:17, 171:18, 176:20, 176:22, 185:22, 185:24, 186:10, 186:12
**FCI** [1] - 135:1
**FCRR** [1] - 1:19
**FEASIBLE** [1] - 71:4
**FEDERAL** [12] - 2:6, 2:13, 49:17, 53:16, 63:3, 102:8, 113:6, 138:9, 171:22, 187:12, 191:11, 192:1
**FEED** [1] - 100:4
**FELONIES** [2] - 185:12, 185:14
**FELONY** [1] - 185:18
**FELT** [1] - 78:17
**FEW** [8] - 16:12, 19:18, 24:13, 78:23, 130:7, 139:18, 140:2, 162:8
**FIELD** [2] - 66:8, 68:1
**FIELDS** [6] - 14:10, 15:1, 15:2, 102:5, 102:8, 102:13
**FIFTH** [5] - 95:1, 95:21, 95:24, 98:21, 137:6
**FIGHT** [11] - 130:18, 130:22, 172:13, 172:14, 173:7, 177:19, 182:22, 187:21, 187:23, 188:8, 188:10
**FIGHTING** [1] - 64:7
**FIGURE** [1] - 4:24
**FIGURED** [1] - 10:17
**FILE** [1] - 81:17

**FILED** [4] - 61:2, 62:17, 96:20, 192:7
**FILLED** [1] - 176:9
**FINAL** [1] - 68:21
**FINALLY** [2] - 131:4, 191:19
**FINDINGS** [2] - 95:16, 95:20
**FINE** [4] - 66:11, 71:5, 87:15, 104:24
**FINGER** [6] - 18:10, 18:11, 18:13, 18:15
**FINGERPRINT** [1] - 100:14
**FINGERS** [2] - 18:6, 18:8
**FINISH** [2] - 31:1, 144:19
**FINISHED** [3] - 71:24, 97:18, 111:21
**FIRE** [7] - 26:16, 26:18, 26:23, 33:17, 34:25, 48:11, 160:18
**FIRED** [21] - 33:2, 33:9, 33:13, 33:16, 34:17, 34:21, 34:24, 42:17, 43:5, 44:7, 47:15, 65:18, 65:25, 66:8, 67:13, 67:14, 75:17, 75:22, 76:17, 76:21, 77:15
**FIRING** [1] - 34:5
**FIRST** [46] - 1:20, 7:6, 17:12, 21:1, 23:9, 27:22, 28:13, 28:21, 33:15, 51:15, 51:16, 53:11, 56:5, 58:15, 60:17, 74:18, 74:25, 87:3, 87:6, 88:14, 92:18, 92:20, 105:22, 106:12, 115:12, 116:10, 117:19, 121:22, 129:6, 133:7, 138:18, 140:7, 148:21, 153:12, 153:23, 154:12, 154:15, 154:21, 156:13, 157:14, 159:14, 161:23, 162:8, 169:14, 181:21, 188:15
**FIVE** [6] - 24:15, 69:5, 142:12, 156:13, 162:9, 163:24
**FIVE-MINUTE** [3] - 24:15, 69:5, 142:12
**FIX** [1] - 70:10
**FIXING** [1] - 67:17
**FLIP** [2] - 92:1, 92:2

**FLOOR** [5] - 1:20, 149:21, 166:4, 166:5, 195:1
**FLORIDA** [3] - 4:4, 23:25, 55:14
**FLUSHED** [2] - 150:18, 165:23
**FOCUS** [2] - 89:5, 127:16
**FOLLOW** [2] - 110:5, 136:19
**FOLLOW-UP** [1] - 136:19
**FOLLOWED** [2] - 17:24, 106:19
**FOLLOWING** [4] - 118:2, 119:21, 134:2, 134:14
**FOLLOWS** [1] - 116:2
**FOLLOWUP** [1] - 108:11
**FOOD** [1] - 160:24
**FORCE** [3] - 8:16, 10:5, 177:4
**FORCED** [3] - 22:11, 45:17, 68:11
**FOREGOING** [1] - 195:13
**FORENSIC** [6] - 100:18, 100:19, 102:5, 102:14, 108:24, 109:10
**FORGET** [2] - 20:1, 47:19
**FORGOT** [6] - 34:10, 35:15, 47:21, 47:22, 53:15, 67:12
**FORMAL** [1] - 181:22
**FORMALLY** [1] - 85:7
**FORMS** [1] - 182:4
**FORWARD** [8] - 3:18, 13:4, 84:7, 88:22, 106:23, 117:17, 144:10, 155:16
**FORWARDED** [1] - 192:5
**FOUNDATION** [1] - 193:16
**FOUR** [6] - 22:5, 138:2, 162:9, 163:24, 183:20, 184:13
**FOURTH** [2] - 167:15, 167:17
**FRACTION** [4] - 110:7, 110:8, 110:20, 110:21
**FRACTIONS** [1] - 110:22
**FRAME** [4] - 173:19,

189:10, 192:21, 193:6
**FREAKED** [1] - 12:3
**FREDERICK** [1] - 116:20
**FREE** [2] - 25:6, 167:3
**FREELY** [1] - 86:17
**FREQUENTLY** [2] - 127:23, 162:5
**FRIDAY** [3] - 140:12, 168:5, 168:6
**FRIEND** [3] - 19:20, 128:15, 157:8
**FRIENDS** [3] - 19:23, 135:6, 149:10
**FRONT** [13] - 22:19, 23:15, 29:4, 40:10, 72:18, 103:4, 165:9, 169:12, 179:15, 187:13, 190:5, 191:7, 191:23
**FROZEN** [2] - 69:18, 70:5
**FULL** [4] - 3:9, 19:3, 19:4, 99:22
**FULLERTON** [14] - 80:19, 80:20, 80:23, 81:10, 81:12, 81:17, 81:19, 82:23, 83:1, 84:1, 84:3, 88:12, 94:5, 196:9
**FULLERTON'S** [2] - 82:3, 82:20
**FUN** [2] - 169:18, 170:2
**FUNDS** [1] - 138:19
**FUTURE** [4] - 83:5, 83:9, 83:10, 83:11

## G

**GAY** [11] - 8:15, 22:9, 22:15, 22:20, 22:21, 23:10, 24:1, 58:5, 58:12, 60:7, 65:15
**GENERAL** [5] - 120:19, 135:19, 135:21, 135:23, 155:18
**GENERALLY** [1] - 100:23
**GENETIC** [1] - 107:14
**GENETICS** [1] - 101:7
**GENTLEMEN** [1] - 17:17
**GIRLS** [11] - 123:18, 123:21, 123:25, 124:3, 124:4, 124:5, 124:9, 162:17, 162:19, 162:20,

162:23
**GIRLS'** [1] - 124:5
**GIVEN** [6] - 103:17, 111:24, 126:23, 144:9, 181:2, 182:24
**GLAD** [1] - 164:23
**GOTCHA** [4] - 177:17, 188:21, 188:22, 189:1
**GOVERNMENT** [22] - 1:15, 2:2, 3:6, 3:8, 80:23, 91:21, 92:9, 92:14, 99:20, 105:6, 105:17, 105:18, 109:3, 112:2, 112:12, 112:17, 147:2, 147:15, 151:24, 152:23, 179:8, 196:21
**GOVERNMENT'S** [2] - 123:11, 147:13
**GRAB** [1] - 12:5
**GRABBED** [2] - 12:9, 16:23
**GRADUATE** [1] - 101:6
**GRAHAM** [1] - 73:18
**GRAND** [16] - 117:18, 134:3, 169:12, 170:11, 171:12, 171:13, 176:20, 186:3, 186:5, 190:5, 190:9, 190:12, 190:19, 190:20, 190:23, 191:7
**GRANDMOTHER** [2] - 55:10, 55:14
**GRANITE** [3] - 10:25, 11:1, 11:9
**GRAY** [1] - 151:23
**GREEN** [1] - 6:16
**GREENAWALT** [1] - 54:11
**GRIEVE** [2] - 167:6, 167:7
**GROUP** [3] - 108:25, 109:8, 109:9
**GUARD** [2] - 18:5, 69:20
**GUESS** [13] - 18:5, 39:13, 53:19, 121:23, 134:21, 135:6, 135:10, 138:3, 141:25, 142:2, 151:21, 188:13, 189:3
**GUESSES** [1] - 135:13
**GUESSING** [1] - 135:22
**GUILT** [1] - 83:3

**GUILTY** [2] - 117:7, 134:8
**GUM** [4] - 80:17, 80:18, 110:15, 111:19
**GUMS** [3] - 19:5, 110:16, 111:16
**GUN** [63] - 11:13, 11:14, 11:15, 11:16, 11:20, 11:24, 12:2, 12:6, 12:9, 12:13, 12:14, 13:18, 13:19, 13:22, 15:19, 19:17, 19:19, 25:19, 26:13, 26:16, 26:18, 26:23, 27:4, 32:7, 32:23, 33:7, 34:2, 34:21, 34:25, 37:19, 37:21, 38:12, 38:17, 41:16, 41:22, 41:24, 42:1, 42:7, 42:17, 42:22, 43:1, 43:5, 43:11, 43:16, 44:8, 45:12, 45:13, 45:16, 47:15, 48:11, 48:12, 51:8, 51:9, 51:11, 51:15, 51:20, 51:23, 64:8, 67:14, 75:21, 75:25, 79:19
**GUNPOINT** [1] - 68:1
**GURGANUS** [18] - 1:15, 24:18, 114:14, 115:4, 115:21, 132:5, 132:7, 135:8, 142:16, 143:3, 143:17, 143:23, 143:25, 144:4, 144:6, 144:7, 144:21, 144:24
**GUY** [14] - 78:18, 87:20, 88:19, 90:2, 98:12, 128:18, 141:3, 178:5, 178:8, 183:4, 188:18, 188:19, 190:7, 190:16
**GUY'S** [1] - 137:1
**GUYS** [2] - 131:6, 188:17

## H

**HAINES** [65] - 2:2, 3:6, 3:13, 20:5, 20:8, 21:20, 24:3, 25:3, 47:1, 49:11, 52:10, 53:6, 53:9, 54:2, 54:14, 55:23, 56:12, 58:9, 59:7, 60:13, 62:6, 64:18, 64:20,

67:11, 69:1, 71:12, 79:25, 80:18, 80:21, 81:10, 82:19, 82:21, 83:7, 84:1, 84:5, 87:16, 88:1, 88:3, 88:6, 88:11, 89:4, 91:19, 91:20, 92:8, 92:12, 92:16, 93:25, 99:14, 99:19, 100:2, 102:12, 102:18, 102:19, 103:6, 103:9, 103:10, 105:13, 112:11, 112:14, 112:19, 114:5, 114:10, 196:6, 196:10, 196:14
**HAINES'** [1] - 27:15
**HAIR** [1] - 5:7
**HAIRCUT** [1] - 6:10
**HALF** [2] - 55:10, 126:19
**HALFWAY** [2] - 75:11, 95:15
**HALL** [2] - 91:7, 173:12
**HAMMER** [216] - 1:6, 3:4, 7:8, 7:14, 7:19, 7:25, 8:10, 8:16, 9:10, 10:2, 10:4, 10:8, 10:12, 10:24, 11:11, 11:20, 12:1, 12:9, 12:10, 12:18, 12:19, 13:18, 14:3, 14:15, 15:6, 15:12, 15:14, 21:1, 21:6, 22:11, 22:17, 23:11, 25:17, 27:4, 27:24, 35:23, 36:1, 37:18, 41:16, 46:18, 47:8, 47:15, 48:15, 49:2, 49:6, 49:9, 51:20, 53:17, 54:3, 54:20, 56:14, 56:18, 57:2, 57:24, 58:16, 61:21, 63:16, 64:6, 64:9, 64:12, 65:18, 68:17, 68:19, 69:12, 69:18, 69:20, 70:17, 70:22, 71:20, 81:16, 82:8, 82:24, 83:10, 84:22, 84:24, 85:14, 85:23, 86:1, 86:6, 88:1, 88:5, 88:15, 89:1, 89:17, 90:3, 91:12, 93:2, 93:12, 93:17, 95:13, 115:9, 118:10, 118:12, 118:13, 118:18, 118:21, 119:2,

119:3, 119:4, 119:25, 120:3, 120:11, 120:16, 121:13, 122:14, 123:6, 124:5, 124:13, 124:18, 125:9, 126:9, 126:21, 127:25, 128:4, 128:5, 128:8, 128:9, 128:25, 129:11, 129:14, 129:21, 130:2, 130:11, 130:21, 131:8, 131:16, 132:9, 138:17, 139:14, 139:22, 140:21, 140:25, 141:8, 141:24, 142:4, 145:2, 145:11, 145:13, 146:11, 146:17, 146:25, 147:23, 148:12, 148:16, 148:20, 149:15, 152:7, 153:18, 154:4, 155:10, 156:5, 156:8, 156:23, 157:8, 157:11, 157:23, 157:25, 158:14, 159:1, 159:10, 161:11, 162:7, 162:13, 163:4, 163:12, 163:15, 163:18, 163:20, 164:22, 168:2, 168:3, 168:11, 168:19, 169:5, 169:10, 169:18, 170:2, 170:6, 171:5, 171:10, 171:14, 171:18, 173:20, 174:2, 174:4, 174:12, 174:15, 174:18, 175:1, 177:2, 177:3, 177:7, 177:15, 177:21, 178:3, 181:3, 182:9, 182:13, 182:16, 183:12, 183:15, 183:16, 185:25, 186:5, 186:10, 187:2, 187:22, 188:1, 188:14, 189:10, 189:25, 190:3, 190:21, 192:24, 193:4, 193:8

**HAMMER'S** [11] - 15:21, 21:22, 39:17, 39:23, 70:5, 81:14, 83:17, 140:9, 148:1,

148:20, 151:13
**HAND** [9] - 15:21, 18:5, 18:8, 25:21, 74:20, 115:24, 153:6, 156:21
**HANDED** [1] - 61:10
**HANDS** [1] - 51:10
**HANDWRITING** [7] - 151:1, 151:3, 151:13, 152:11, 152:14, 152:24, 153:1
**HANGING** [2] - 160:13, 160:15
**HAPPILY** [1] - 25:25
**HARD** [4] - 74:20, 154:18, 184:5, 189:11
**HARRIS** [1] - 2:9
**HARRISBURG** [1] - 2:7
**HASSLE** [1] - 176:12
**HEAD** [21] - 12:16, 16:3, 16:4, 16:8, 16:24, 17:2, 18:20, 18:25, 19:3, 19:7, 19:9, 60:19, 67:17, 68:5, 75:25, 77:11, 77:22, 79:20, 86:20, 183:18, 184:3
**HEADACHE** [2] - 158:18, 158:22
**HEADACHES** [3] - 19:6, 158:15, 159:1
**HEADED** [1] - 7:2
**HEAL** [1] - 158:6
**HEAR** [13] - 12:22, 86:15, 87:3, 87:5, 88:9, 115:1, 127:11, 142:10, 143:10, 161:2, 174:22, 188:6, 188:7
**HEARD** [10] - 86:5, 86:10, 119:3, 120:14, 120:20, 129:9, 146:8, 176:15, 189:4, 190:2
**HEARING** [25] - 1:12, 28:13, 29:5, 34:20, 35:10, 35:20, 35:22, 36:20, 37:5, 50:22, 51:3, 58:16, 58:23, 59:19, 60:11, 60:17, 80:10, 82:13, 92:10, 112:15, 127:17, 142:20, 143:2, 169:4, 195:7
**HEARINGS** [4] - 21:8, 22:15, 39:16, 113:12
**HEARSAY** [8] - 21:16,

136:3, 136:5, 136:8, 136:15, 136:17, 136:18
**HEAT** [2] - 160:16, 160:19
**HELD** [1] - 45:16
**HELLO** [2] - 64:21, 64:22
**HELP** [7] - 17:7, 31:22, 32:4, 48:18, 48:19, 91:19, 126:16
**HELPING** [1] - 126:4
**HELPS** [3] - 83:3, 175:16, 175:17
**HESITATED** [1] - 23:7
**HIDE** [1] - 187:3
**HIGH** [1] - 130:24
**HIGHER** [1] - 124:1
**HIGHLIGHTS** [1] - 10:11
**HIGHWAY** [1] - 9:7
**HIMSELF** [2] - 24:19, 145:14
**HISPANIC** [2] - 107:23, 107:24
**HISTORY** [1] - 151:17
**HIT** [4] - 12:14, 12:15, 75:24, 173:13
**HIVES** [1] - 20:3
**HOLD** [2] - 104:5, 179:19
**HOLDING** [3] - 43:11, 43:13, 43:15
**HOLE** [9] - 137:7, 138:1, 173:4, 173:7, 173:10, 182:3, 187:15, 187:18
**HOLIDAY** [1] - 9:1
**HOLLERED** [1] - 188:4
**HOME** [5] - 78:3, 78:6, 78:12, 189:17, 189:18
**HOMOSEXUAL** [8] - 58:17, 59:5, 59:14, 61:7, 61:22, 62:5, 64:25, 65:11
**HOMOSEXUALITY** [2] - 60:22, 62:18
**HONEST** [1] - 86:24
**HONESTLY** [1] - 99:2
**HONOR** [81] - 3:6, 21:15, 24:4, 24:7, 24:12, 25:11, 29:24, 35:14, 36:5, 36:13, 37:7, 47:11, 49:11, 56:12, 60:14, 62:2, 64:18, 67:8, 69:2, 69:6, 69:13, 69:23, 69:25, 71:15, 71:23,

74:11, 76:3, 77:2, 79:11, 79:25, 80:9, 80:25, 81:2, 81:8, 81:12, 82:17, 82:21, 87:11, 87:23, 88:2, 91:19, 92:8, 94:1, 95:5, 99:14, 102:12, 102:15, 102:18, 105:9, 112:11, 112:20, 114:4, 114:5, 114:14, 130:8, 131:23, 132:5, 132:12, 132:16, 135:9, 135:15, 136:3, 136:16, 142:16, 143:3, 143:18, 143:23, 144:4, 144:7, 159:23, 161:8, 165:2, 167:16, 169:1, 184:20, 184:23, 193:13, 193:18, 194:11, 194:22, 195:6
**HONORABLE** [1] - 1:10
**HOPE** [3] - 154:19, 192:9, 192:10
**HOPEFULLY** [1] - 147:1
**HOPING** [3] - 26:4, 27:11, 79:7
**HOSPITAL** [12] - 17:17, 17:19, 17:22, 18:21, 18:22, 73:8, 73:13, 73:23, 75:1, 101:21
**HOTEL** [6] - 26:17, 27:8, 78:25, 79:4, 79:5, 79:14
**HOUR** [2] - 14:17, 170:20
**HOURS** [4] - 17:24, 119:22, 119:23, 173:12
**HOUSE** [5] - 57:1, 57:5, 57:21, 78:9, 85:11
**HOUSED** [6] - 85:10, 85:11, 192:18, 192:21, 193:1, 193:6
**HOUSES** [1] - 14:12
**HOUSING** [12] - 119:9, 119:10, 135:20, 136:23, 137:9, 137:13, 137:22, 138:5, 149:16, 152:17, 155:20, 179:9

**HUM** [1] - 117:10
**HUMAN** [5] - 105:25, 106:9, 106:11, 106:20
**HUMANS** [1] - 113:21
**HUMPHREY** [1] - 2:9
**HUNG** [1] - 179:4
**HURT** [2] - 146:1, 156:16
**HURTING** [1] - 188:15

**I**

**I-40** [2] - 72:11, 75:15
**IDEA** [7] - 49:12, 62:4, 62:7, 62:8, 70:11, 73:19, 158:20
**IDENTIFICATION** [1] - 100:24
**IDENTIFIED** [4] - 105:3, 105:25, 106:3, 106:6
**IDENTIFY** [3] - 111:6, 111:13, 111:14
**IMAGE** [1] - 70:5
**IMMEDIATE** [1] - 160:5
**IMMEDIATELY** [1] - 52:11
**IMPORTANT** [5] - 3:19, 25:4, 100:3, 143:1, 188:11
**IMPOSED** [1] - 192:3
**IMPRESSION** [1] - 142:17
**INCARCERATION** [1] - 137:20
**INCIDENT** [13] - 4:19, 5:15, 27:16, 27:18, 53:25, 55:11, 55:13, 55:18, 56:14, 56:18, 130:9, 173:8, 189:24
**INCLINED** [1] - 157:5
**INCLUDE** [3] - 102:23, 113:8, 113:9
**INCLUDED** [4] - 107:15, 108:6, 181:18, 183:15
**INCLUDING** [1] - 158:3
**INDEPENDENTLY** [1] - 108:15
**INDEX** [4] - 29:14, 115:13, 196:1
**INDICATE** [9] - 50:4, 50:7, 52:11, 75:16, 165:15, 181:16, 183:9, 186:12, 189:9
**INDICATED** [15] - 16:7, 18:8, 28:13,

54:2, 56:9, 127:23, 132:18, 137:21, 146:15, 152:19, 153:17, 161:10, 162:12, 169:9, 171:21
**INDICATES** [4] - 29:9, 41:3, 77:16, 132:9
**INDICATING** [4] - 41:15, 50:21, 190:24, 191:6
**INDICATING)** [5] - 16:6, 16:10, 18:9, 18:11, 23:17
**INDIVIDUAL** [5] - 107:18, 113:8, 113:9, 177:21, 192:14
**INDULGENCE** [11] - 20:5, 24:6, 32:16, 35:12, 40:4, 44:3, 47:10, 53:21, 58:19, 64:13, 99:10
**INFERENCES** [2] - 60:10, 60:14
**INFLAMED** [1] - 19:9
**INFORMATION** [9] - 10:20, 114:11, 183:14, 186:11, 188:25, 191:5, 191:9, 191:11, 191:13
**INITIAL** [1] - 116:14
**INITIALS** [4] - 85:4, 104:10, 105:4, 105:19
**INJURED** [1] - 18:8
**INMATE** [2] - 181:24, 192:11
**INMATES** [1] - 137:14
**INN** [4] - 9:1, 45:5, 45:8, 75:15
**INQUIRE** [1] - 142:13
**INSIDE** [5] - 79:14, 127:12, 130:2, 168:16, 168:21
**INSOFAR** [1] - 169:8
**INSTEAD** [2] - 130:17, 167:22
**INSTITUTION** [6] - 69:19, 70:8, 117:5, 117:6, 138:10, 177:8
**INTELLIGENCE** [1] - 136:21
**INTENT** [1] - 89:21
**INTENTIONALLY** [1] - 63:19
**INTERACTION** [1] - 140:21
**INTEREST** [1] -

174:18
**INTERESTED** [1] - 161:23
**INTERJECTED** [1] - 136:2
**INTERRUPT** [1] - 184:20
**INTERSECTION** [3] - 6:2, 6:9, 6:17
**INTERSTATE** [5] - 9:2, 9:6, 14:4, 72:8
**INTERVIEW** [8] - 73:15, 169:14, 169:17, 170:16, 170:17, 176:19, 176:21, 189:23
**INTERVIEWED** [9] - 73:22, 75:1, 170:9, 170:13, 171:8, 171:17, 185:22, 186:11, 189:8
**INTRODUCE** [5] - 84:2, 92:9, 112:12, 117:5, 117:7
**INTRODUCTION** [2] - 115:19, 134:7
**INVADE** [1] - 8:12
**INVESTIGATE** [1] - 149:23
**INVOKE** [2] - 95:24, 125:5
**INVOKED** [3] - 94:25, 95:21, 98:21
**INVOLVE** [1] - 172:14
**INVOLVED** [11] - 22:8, 26:4, 55:6, 55:8, 55:23, 56:6, 56:10, 101:12, 101:19, 107:9, 173:6
**IRRELEVANT** [2] - 83:15, 144:13
**ISSUE** [2] - 60:21, 144:14
**ISSUED** [1] - 100:25
**ISSUES** [1] - 83:20
**ISSUING** [1] - 108:13
**ITEM** [9] - 104:6, 122:25, 123:3, 128:1, 147:1, 152:2, 152:3, 159:16, 160:13
**ITEMS** [11] - 103:11, 103:16, 104:1, 105:2, 105:23, 106:23, 108:5, 109:16, 109:23, 148:19, 160:6
**ITSELF** [1] - 165:12

## J

**JACKET** [1] - 77:14
**JAIL** [1] - 55:15
**JAMES** [3] - 2:12, 2:12, 116:17
**JAMIE** [1] - 98:13
**JANUARY** [6] - 92:20, 92:22, 94:18, 135:21, 137:6, 138:1
**JASPER** [9] - 124:10, 124:19, 124:25, 163:10, 164:4, 164:5, 164:7
**JOCKO** [1] - 163:18
**JOEL** [1] - 1:10
**JOHN** [7] - 1:15, 87:20, 88:18, 89:2, 114:19, 115:6, 116:16
**JOINING** [1] - 102:2
**JOKE** [3] - 188:23, 188:24, 189:2
**JORDAN** [11] - 192:12, 192:19, 192:22, 192:23, 193:2, 193:7, 193:12, 194:6, 194:9
**JR** [1] - 1:15
**JUDGE** [10] - 22:11, 27:23, 28:14, 35:24, 115:11, 133:24, 133:25, 134:1, 144:22, 191:23
**JUDGES** [1] - 192:3
**JULY** [3] - 96:4, 96:8, 133:2
**JUMPED** [3] - 16:21, 16:22, 115:14
**JUMPING** [1] - 16:22
**JUNE** [12] - 37:6, 50:7, 66:14, 66:18, 94:21, 114:17, 115:8, 115:17, 132:4, 176:2, 176:3
**JURIES** [1] - 22:10
**JURORS** [1] - 179:21
**JURY** [25] - 27:23, 46:24, 50:4, 117:19, 132:8, 134:3, 138:21, 139:24, 154:15, 155:13, 160:12, 169:12, 170:11, 171:13, 176:21, 186:4, 186:5, 190:6, 190:9, 190:12, 190:19, 190:20, 190:23, 191:7
**JUSTICE** [1] - 2:2

## K

**K-N-O-W-N** [1] - 103:20
**K3** [1] - 107:15
**KEEL** [2] - 127:7, 127:20
**KEEP** [5] - 19:8, 80:3, 127:5, 154:3
**KEPT** [5] - 13:9, 17:14, 159:18, 180:19, 191:15
**KIDDING** [1] - 156:10
**KIDNAP** [1] - 36:7
**KILL** [12] - 11:22, 13:9, 13:10, 14:21, 16:25, 23:2, 60:20, 89:21, 90:2, 131:11, 151:8, 188:20
**KILLED** [2] - 21:13, 63:7
**KILLING** [2] - 83:1, 177:16
**KIND** [17] - 4:9, 6:5, 6:13, 8:2, 8:25, 9:1, 9:5, 11:17, 17:8, 101:20, 121:2, 123:5, 127:5, 131:9, 131:12, 158:10, 176:10
**KITE** [13] - 129:9, 129:10, 129:25, 149:20, 149:25, 150:2, 150:9, 151:1, 165:10, 181:3, 181:5, 181:8, 181:17
**KITES** [1] - 129:14
**KNEES** [1] - 16:2
**KNIFE** [2] - 159:15, 177:18
**KNIVES** [2] - 131:1
**KNOWING** [1] - 159:7
**KNOWLEDGE** [2] - 15:19, 85:18
**KNOWN** [10] - 60:7, 85:7, 86:1, 102:23, 103:19, 103:24, 113:17, 191:9, 191:11
**KNOWS** [2] - 24:1, 190:21

## L

**LAB** [1] - 113:3
**LABORATORIES** [2] - 110:21, 111:9
**LABORATORY** [6] - 100:8, 100:15, 100:20, 104:8,

109:10, 110:13
**LACK** [1] - 113:18
**LADY** [1] - 98:12
**LAID** [4] - 30:24, 31:5, 42:7, 42:21
**LAND** [1] - 15:2
**LAST** [13] - 3:22, 19:18, 24:2, 116:6, 121:8, 133:2, 154:19, 169:8, 171:4, 176:2, 176:4, 185:11
**LASTING** [1] - 18:24
**LATE** [1] - 175:5
**LATENT** [1] - 100:14
**LAUGHED** [1] - 141:1
**LAW** [5] - 81:23, 109:11, 109:13, 114:18, 116:2
**LAWSUIT** [1] - 158:5
**LAWYER** [2] - 27:24
**LAWYERS** [2] - 28:14, 143:8
**LAY** [1] - 16:2
**LAYING** [2] - 19:9, 77:21
**LAYMEN** [1] - 108:2
**LAYMEN'S** [1] - 111:1
**LAYOUT** [1] - 179:9
**LEAN** [3] - 28:7, 84:7, 88:22
**LEANING** [2] - 77:19, 77:20
**LEARN** [2] - 7:14, 156:18
**LEARNED** [2] - 10:12, 11:6
**LEAST** [11] - 70:18, 109:15, 117:17, 133:17, 154:20, 156:5, 162:13, 162:25, 172:16, 173:2, 182:15
**LEAVE** [6] - 13:17, 19:18, 135:23, 148:22, 148:23, 194:19
**LEAVES** [1] - 69:7
**LEAVING** [3] - 48:1, 96:23, 121:14
**LEFT** [17] - 13:5, 13:6, 13:7, 13:15, 16:8, 16:12, 22:8, 22:9, 34:19, 42:19, 66:25, 67:2, 68:6, 118:18, 189:17, 189:18
**LEG** [1] - 101:21
**LEGAL** [2] - 148:8, 159:18
**LENGTH** [1] - 132:24

LENGTHY [1] - 82:22
LENNIE [13] - 140:18, 140:19, 140:20, 140:21, 141:6, 141:9, 141:12, 142:2, 153:25, 154:4, 154:7, 181:14
LESABRE [1] - 6:14
LESS [4] - 111:23, 119:23, 135:1, 155:19
LESSER [1] - 134:25
LETTER [16] - 133:16, 133:20, 156:9, 156:14, 156:22, 157:2, 181:18, 183:23, 184:18, 191:6, 191:16, 191:22, 192:4, 192:24, 193:4, 193:8
LETTERS [2] - 133:14, 148:7
LEVEL [2] - 127:5
LEWISBURG [4] - 134:5, 134:16, 134:21
LIE [23] - 22:7, 37:23, 38:17, 38:21, 39:10, 41:21, 41:22, 42:1, 42:23, 43:2, 43:6, 43:25, 44:11, 45:18, 45:20, 51:18, 56:11, 63:19, 64:10, 67:25, 68:5, 68:15
LIED [5] - 63:12, 68:4, 68:8, 68:11
LIES [1] - 63:18
LIEUTENANT [2] - 135:25, 136:10
LIFE [5] - 14:22, 14:24, 57:3, 62:10, 151:17
LIGHT [7] - 6:18, 6:19, 7:5, 25:16, 37:18, 41:15, 160:18
LIGHTS [3] - 16:19, 16:20, 190:1
LIKEWISE [1] - 114:23
LIMINE [2] - 61:14, 82:16
LIMITATIONS [1] - 89:13
LINE [31] - 30:11, 30:15, 31:9, 31:25, 32:8, 32:21, 34:1, 34:13, 38:6, 39:1, 42:6, 42:12, 44:14, 46:5, 51:6, 51:7, 59:4, 59:7, 59:11, 59:13, 60:2, 65:10,

66:17, 72:21, 75:13, 77:13, 95:16, 144:24, 157:2, 164:7, 175:20
LINES [13] - 37:16, 37:17, 38:5, 41:3, 41:12, 42:5, 42:6, 44:9, 44:25, 50:20, 72:25, 75:11, 156:13
LIST [3] - 44:23, 140:3, 140:5
LISTENING [2] - 86:22, 189:16
LIVE [8] - 23:25, 78:11, 84:14, 84:16, 84:18, 169:18, 170:2, 182:19
LIVED [13] - 4:5, 24:1, 57:17, 57:18, 57:19, 119:5, 123:9, 123:16, 125:9, 128:9, 163:3, 168:11
LIVES [1] - 23:24
LIVING [14] - 4:3, 4:7, 5:2, 5:5, 5:8, 5:10, 84:12, 120:1, 124:7, 128:3, 146:11, 169:10, 177:2
LOCATION [2] - 48:15, 134:2
LOCATIONS [1] - 107:14
LOCKDOWN [1] - 173:15
LOCKED [2] - 140:5, 140:10
LOGICAL [2] - 67:12, 97:1
LOMPOC [7] - 172:3, 172:5, 172:9, 172:11, 172:19, 173:5, 173:11
LONG-TERM [1] - 56:1
LOOK [28] - 29:4, 29:22, 37:16, 44:6, 46:5, 50:20, 58:22, 61:9, 72:16, 72:18, 72:19, 73:11, 74:18, 92:18, 101:19, 104:1, 104:25, 110:13, 111:7, 111:11, 146:1, 146:2, 146:4, 150:2, 152:5, 152:22, 153:5, 164:4
LOOKED [11] - 8:11, 11:14, 11:15, 110:10, 122:7, 122:13, 131:8,

131:11, 149:25, 188:21
LOOKING [9] - 40:15, 40:18, 59:23, 107:13, 130:25, 141:24, 145:20, 148:9, 155:15
LOOKS [4] - 101:22, 147:22, 152:15, 160:2
LOOSE [1] - 57:3
LOSING [4] - 125:2, 125:5, 159:7, 164:4
LOSS [1] - 159:6
LOUDER [2] - 81:25, 115:3
LOVED [1] - 167:7
LOWER [1] - 156:21
LUCK [1] - 157:4
LUCKY [3] - 9:15, 27:12, 63:9
LUNCH [2] - 71:1, 71:13
LYING [3] - 55:19, 55:20, 56:22

# M

MA'AM [42] - 21:24, 22:2, 29:6, 29:8, 29:11, 33:6, 36:21, 37:1, 37:12, 41:5, 49:20, 61:19, 62:8, 63:1, 63:6, 63:14, 75:20, 76:15, 77:22, 79:21, 80:20, 84:23, 86:7, 90:10, 90:18, 91:23, 92:7, 92:25, 93:15, 94:6, 94:15, 94:17, 94:20, 94:24, 95:4, 95:11, 95:14, 96:10, 97:9, 97:12, 98:19, 99:9
MAC [4] - 85:5, 85:6, 85:10
MACARTHUR [7] - 9:2, 32:15, 33:25, 38:8, 42:19, 75:15
MAD [1] - 181:2
MAGAZINE [1] - 163:5
MAIL [1] - 148:6
MAJORITY [1] - 161:17
MALE [3] - 107:25, 108:8, 183:7
MALOCU [3] - 189:8, 189:9, 189:24
MAN [15] - 7:12, 8:15, 32:5, 32:12, 32:23, 34:2, 37:18, 41:15,

41:23, 43:11, 44:16, 44:19, 65:15, 190:7, 190:16
MANNER [1] - 189:1
MARCH [14] - 29:7, 52:9, 53:25, 54:1, 58:9, 58:24, 59:25, 108:24, 117:16, 118:1, 118:7, 118:14, 177:6
MARK [9] - 76:14, 77:4, 192:11, 192:19, 192:22, 192:23, 193:1, 194:9, 194:10
MARKED [11] - 50:2, 74:15, 77:5, 77:6, 91:15, 95:8, 104:7, 109:2, 112:1, 115:10, 147:12
MARKET [1] - 1:21
MARLBORO'S [1] - 140:8
MARSH [2] - 134:1
MARTI [46] - 103:25, 107:15, 108:6, 118:24, 119:1, 119:2, 128:4, 128:9, 129:11, 129:13, 129:21, 130:3, 130:10, 131:11, 141:9, 142:1, 142:3, 142:6, 146:10, 151:8, 156:11, 156:19, 164:24, 166:23, 167:8, 167:9, 167:12, 167:15, 167:19, 167:23, 170:1, 177:17, 177:24, 178:7, 178:8, 181:4, 181:5, 181:9, 181:10, 181:17, 182:10, 182:13, 188:15, 188:20, 192:17
MARTI'S [4] - 110:15, 111:2, 111:16, 128:25
MARTIN [20] - 50:21, 51:14, 74:8, 116:20, 116:22, 130:7, 132:12, 132:16, 135:15, 136:16, 159:13, 161:4, 161:7, 161:9, 165:15, 166:18, 190:24, 191:5, 191:16, 191:18
MASSAGES [1] -

161:25
MASTURBATE [2] - 145:19, 187:13
MASTURBATED [1] - 186:10
MASTURBATION [1] - 186:12
MATERIAL [3] - 113:10, 148:9, 159:18
MATH [1] - 4:22
MATTER [3] - 93:14, 169:11, 195:15
MATTRESS [1] - 150:8
MCALESTER [2] - 85:8, 85:10
MCDONALDS [1] - 85:6
MCGRUDER [11] - 55:2, 55:3, 55:4, 55:5, 55:6, 55:9, 55:16, 56:9, 57:10, 57:12
MCHUGH [7] - 2:12, 102:15, 112:23, 114:3, 194:22, 195:1, 196:15
MEAN [17] - 9:17, 21:3, 22:4, 22:24, 26:20, 45:24, 87:8, 108:2, 121:22, 127:11, 130:12, 146:14, 164:23, 164:25, 170:23, 184:6, 186:17
MEANS [1] - 9:16
MEANT [6] - 33:3, 34:6, 42:17, 44:8, 141:4, 141:5
MEDICAL [5] - 17:25, 18:2, 48:19, 101:9, 176:12
MEDICATION [11] - 125:13, 125:22, 126:17, 174:1, 174:4, 174:8, 174:13, 174:16, 174:19, 176:6, 176:7
MEDICATIONS [9] - 125:10, 125:15, 173:19, 173:22, 174:21, 174:25, 175:7, 175:11, 175:14
MEET [2] - 19:20, 194:3
MEMBER [3] - 12:25, 182:24, 183:2
MEMBERS [2] - 172:17, 189:5

**MEMORIALIZE** [1] - 103:1

**MEMORY** [2] - 49:10, 159:6

**MEN** [2] - 162:24, 163:5

**MEN'S** [2] - 162:25, 163:2

**MENTION** [4] - 61:21, 97:21, 144:15, 176:22

**MENTIONED** [5] - 54:18, 55:22, 98:5, 104:2, 128:4

**MENTIONING** [1] - 61:4

**MERIDIAN** [1] - 9:2

**MESSED** [2] - 14:22, 130:19

**MET** [2] - 177:7, 194:3

**METAL** [1] - 124:3

**MIC** [7] - 3:19, 25:10, 83:25, 84:7, 88:23, 100:4

**MICHIGAN** [1] - 101:7

**MICROBIOLOGY** [3] - 101:9, 112:24, 113:1

**MICROPHONE** [5] - 3:16, 28:3, 28:8, 115:1, 115:4

**MIDDLE** [8] - 1:2, 1:16, 2:6, 17:15, 18:13, 18:14, 36:20, 116:14

**MIGHT** [6] - 80:15, 111:1, 128:11, 133:18, 148:14, 191:21

**MILES** [1] - 78:23

**MINCE** [1] - 113:20

**MIND** [11] - 14:19, 17:5, 33:16, 53:2, 68:18, 80:21, 85:24, 129:17, 158:3, 178:6, 184:15

**MINE** [1] - 80:3

**MINUTE** [6] - 24:15, 25:6, 36:11, 69:5, 88:8, 142:12

**MINUTES** [4] - 24:13, 66:23, 184:25

**MISSED** [1] - 148:14

**MISTAKE** [4] - 82:25, 89:23, 90:1, 98:18

**MISTAKEN** [3] - 98:20, 98:22, 98:25

**MODESTO** [1] - 4:12

**MODIFIED** [1] - 147:14

**MOLECULAR** [3] -

101:6, 101:8, 113:1

**MOMENT** [7] - 8:18, 45:24, 46:1, 51:22, 161:7, 184:21, 194:11

**MONDAY** [7] - 130:11, 130:13, 148:23, 194:16, 195:2, 195:3, 195:5

**MONEY** [6] - 90:7, 98:5, 98:16, 98:25, 99:3, 139:1

**MONKEY** [13] - 123:19, 123:23, 123:24, 124:10, 124:19, 124:22, 125:5, 162:15, 162:18, 163:6, 163:21, 164:12, 164:15

**MONKEY'S** [1] - 163:21

**MONTHS** [5] - 132:25, 138:2, 139:4, 172:10, 173:2

**MOOD** [1] - 127:5

**MORENO** [2] - 2:12, 69:13

**MORNING** [22] - 3:14, 3:15, 25:1, 25:2, 126:11, 126:25, 130:21, 132:1, 132:11, 132:12, 149:20, 153:8, 155:15, 165:7, 165:8, 166:3, 166:4, 166:6, 166:14, 176:16, 182:22, 184:24

**MOST** [2] - 20:1, 148:15

**MOSTLY** [1] - 22:7

**MOTEL** [59] - 8:22, 8:23, 8:25, 9:9, 9:12, 9:20, 13:5, 13:6, 13:8, 22:11, 22:17, 23:11, 26:24, 27:1, 27:5, 32:14, 32:15, 33:8, 33:11, 33:12, 33:18, 33:21, 33:25, 34:3, 34:7, 34:8, 34:12, 34:15, 34:18, 34:19, 34:21, 34:22, 34:25, 35:1, 35:4, 38:8, 38:17, 38:21, 39:2, 39:3, 39:8, 39:11, 42:10, 42:19, 43:10, 43:23, 45:18, 45:22, 46:2, 46:7, 46:11, 47:16, 48:1,

48:13, 66:1, 66:21, 66:25, 67:2

**MOTELS** [1] - 9:7

**MOTHER** [2] - 57:19, 190:1

**MOTION** [6] - 61:3, 61:13, 62:17, 82:16, 192:7

**MOUTH** [3] - 87:21, 110:15, 111:2

**MOVE** [20] - 20:15, 28:2, 28:8, 49:13, 80:8, 83:25, 87:23, 108:22, 118:20, 128:17, 129:25, 130:3, 130:10, 130:14, 142:2, 144:10, 164:24, 181:11, 184:7

**MOVED** [12] - 128:19, 129:8, 129:15, 140:1, 154:1, 171:22, 172:11, 177:19, 178:4, 178:5, 178:6, 178:21

**MOVEMENT** [1] - 70:6

**MOVES** [2] - 142:3

**MOVING** [9] - 73:12, 127:12, 131:14, 131:15, 141:3, 164:23, 170:1, 170:5

**MUSIC** [1] - 123:6

**MUST** [9] - 21:10, 33:9, 48:3, 62:4, 62:7, 81:23, 82:4, 82:6, 129:5

**MUTUALLY** [1] - 71:9

## N

**N.W** [1] - 2:4

**NAKED** [2] - 68:2, 68:15

**NAME** [37] - 3:10, 3:22, 7:10, 7:14, 8:23, 29:15, 36:25, 50:10, 74:19, 74:21, 81:9, 84:3, 84:21, 85:3, 87:20, 99:23, 116:6, 116:10, 118:21, 119:15, 127:1, 128:4, 128:25, 137:2, 140:12, 146:7, 146:9, 152:7, 154:25, 155:3, 157:2, 163:7, 169:5, 183:1, 192:11, 194:6, 194:9

**NAMED** [1] - 192:14

**NAP** [4] - 145:16, 145:17, 146:18, 186:25

**NATURE** [1] - 83:19

**NEAR** [4] - 14:6, 16:21, 105:4, 122:12

**NECESSARY** [1] - 18:3

**NECK** [5] - 131:17, 171:5, 171:10, 171:15, 171:19

**NEED** [15] - 3:16, 8:13, 24:9, 25:5, 35:6, 69:7, 73:11, 88:22, 104:16, 104:17, 106:18, 110:24, 142:7, 143:10

**NEEDED** [7] - 26:7, 71:12, 90:19, 91:11, 101:1, 154:1, 176:14

**NEEDS** [1] - 103:7

**NEGATIVE** [1] - 111:9

**NEIGHBORHOOD** [5] - 6:6, 6:7, 9:5, 9:6, 57:23

**NEVER** [18] - 14:22, 19:4, 48:23, 49:1, 54:18, 55:1, 62:9, 63:1, 63:23, 97:22, 97:23, 98:2, 130:23, 146:2, 146:8, 158:6, 159:17, 165:18

**NEVERTHELESS** [1] - 64:9

**NEW** [3] - 167:20, 167:23, 178:4

**NEWS** [1] - 10:19

**NEWSPAPER** [2] - 157:12, 157:16

**NEXT** [37] - 3:5, 15:24, 16:18, 29:14, 30:15, 31:1, 32:1, 32:19, 32:22, 32:25, 34:1, 38:1, 42:6, 43:8, 44:13, 44:18, 45:1, 76:23, 106:15, 114:9, 119:13, 124:9, 128:10, 131:12, 131:15, 131:18, 132:4, 144:11, 144:19, 150:4, 155:24, 179:19, 194:23, 194:25, 195:2, 195:5

**NICE** [1] - 30:23

**NICKNAME** [1] - 118:25

**NIGHT** [11] - 22:12, 68:6, 68:22, 124:9, 128:11, 140:12,

149:18, 149:19, 153:25, 154:19, 168:5

**NINE** [2] - 34:13, 129:7

**NINTH** [1] - 117:10

**NOBODY** [1] - 122:23

**NONETHELESS** [1] - 161:14

**NONSPERM** [2] - 110:8, 110:21

**NORMALLY** [1] - 82:12

**NORTH** [1] - 72:9

**NORTHWEST** [3] - 15:9, 72:4, 73:5

**NOTARIZED** [2] - 92:24, 93:7

**NOTE** [10] - 35:15, 35:16, 95:21, 129:10, 166:10, 166:13, 166:15, 183:9, 183:15, 185:24

**NOTES** [5] - 103:5, 103:7, 108:15, 108:18, 190:14

**NOTHING** [12] - 24:4, 69:1, 69:3, 79:18, 79:22, 83:9, 99:14, 114:5, 122:2, 127:17, 146:21

**NOTICE** [1] - 80:16

**NOTICED** [1] - 166:5

**NOTIFIED** [1] - 194:20

**NUMBER** [13] - 1:3, 30:6, 40:8, 50:19, 59:23, 61:10, 65:7, 98:20, 104:6, 105:5, 105:14, 191:1, 191:2

**NUMBERS** [9] - 29:23, 31:19, 31:20, 41:10, 103:15, 103:17, 103:18, 104:9, 107:9

**NUTS** [2] - 190:7, 190:16

## O

**O'CLOCK** [2] - 145:16, 175:21

**OATH** [11] - 22:1, 28:18, 29:2, 31:4, 37:13, 37:14, 39:24, 41:7, 50:15, 53:18, 132:13

**OBJECT** [4] - 88:7, 135:10, 135:12, 136:3

**OBJECTION** [21] -

21:15, 21:17, 47:1, 47:3, 49:11, 56:20, 60:13, 62:6, 62:12, 62:14, 67:8, 68:24, 80:11, 81:1, 83:21, 87:10, 87:23, 88:9, 92:10, 112:15, 135:9

**OBSERVE** [2] - 140:20, 148:2

**OBTAINED** [3] - 107:16, 107:19, 113:25

**OBTAINING** [1] - 191:4

**OBVIOUS** [3] - 60:10, 60:13, 69:17

**OBVIOUSLY** [3] - 29:17, 143:5, 194:15

**OCCASION** [5] - 102:21, 153:17, 162:14, 192:22, 193:2

**OCCASIONS** [1] - 170:18

**OCCUR** [1] - 117:22

**OCCURRED** [6] - 58:24, 81:15, 99:8, 130:10, 145:7, 189:25

**OCCURRENCE** [2] - 186:13, 187:12

**OCCURRING** [1] - 91:18

**OCTOBER** [7] - 5:17, 5:19, 5:22, 32:5, 40:12, 54:19, 100:10

**OFFER** [2] - 174:5, 193:7

**OFFERED** [1] - 144:16

**OFFICE** [6] - 1:16, 133:15, 134:18, 136:17, 138:8, 138:13

**OFFICER** [21] - 69:23, 69:25, 70:1, 70:9, 70:13, 71:4, 71:5, 71:10, 73:15, 73:18, 73:20, 73:22, 75:1, 75:7, 75:10, 75:17, 77:17, 77:20, 77:24, 140:11, 140:15

**OFFICIAL** [3] - 1:20, 182:4, 195:19

**OFFICIALS** [1] - 119:11

**OFTEN** [7] - 86:3, 125:2, 125:4, 128:8, 128:25, 148:12

**OIL** [7] - 14:10, 15:1, 15:11, 66:1, 66:8,

68:1

**OKLAHOMA** [20] - 4:13, 5:4, 9:4, 15:9, 23:1, 23:25, 61:17, 64:24, 65:14, 72:4, 72:5, 72:7, 73:4, 84:16, 84:17, 85:2, 85:7, 95:12, 172:4, 172:20

**OLD** [8] - 3:25, 4:23, 4:25, 9:1, 29:25, 55:10, 56:3, 84:10

**ONCE** [13] - 39:2, 39:3, 41:6, 45:8, 50:13, 50:14, 67:25, 68:4, 91:12, 93:6, 98:21, 139:3, 175:22

**ONE** [65] - 10:9, 18:9, 18:13, 28:22, 48:15, 59:24, 66:13, 69:22, 71:2, 74:5, 74:11, 76:10, 76:21, 78:2, 79:10, 82:25, 94:25, 95:24, 104:16, 108:13, 109:15, 111:12, 126:23, 129:15, 129:18, 129:20, 129:24, 130:2, 131:1, 131:6, 131:20, 140:25, 147:7, 147:13, 148:6, 152:4, 153:17, 153:24, 157:19, 158:16, 160:1, 161:18, 162:14, 163:5, 164:1, 164:7, 164:12, 165:17, 166:8, 173:22, 174:3, 174:5, 175:16, 175:23, 175:24, 177:24, 182:7, 182:12, 183:25, 186:14, 188:4, 188:18, 188:19, 194:18

**ONES** [2] - 110:10, 144:11

**OPEN** [1] - 156:17

**OPENED** [1] - 11:13

**OPENLY** [1] - 187:13

**OPENS** [1] - 3:1

**OPPORTUNITY** [1] - 69:12

**OPPOSED** [3] - 73:4, 77:20, 164:12

**ORANGUTAN** [3] - 178:12, 178:16, 178:20

**ORDERED** [1] - 77:9

**ORDERLIES** [1] - 181:15

**ORDERLY** [4] - 122:21, 140:14, 140:17, 181:14

**ORDERS** [1] - 101:22

**OREGON** [19] - 117:8, 117:10, 120:4, 121:4, 132:20, 133:3, 133:8, 133:15, 134:6, 134:14, 138:24, 171:22, 171:25, 191:6, 191:9, 191:12, 191:14, 192:6

**ORIENTATION** [2] - 8:14, 179:18

**ORIGINAL** [1] - 103:5

**ORIGINALLY** [1] - 97:10

**ORLANDO** [2] - 4:4, 4:5

**OSP** [2] - 84:25, 85:1

**OUGHT** [4] - 70:18, 70:25, 130:5

**OUTLINE** [2] - 90:23, 91:6

**OUTSIDE** [2] - 56:13, 85:20

**OVERHEAR** [1] - 125:21

**OVERRULE** [5] - 47:2, 56:19, 62:11, 83:21, 88:9

**OVERRULED** [3] - 62:14, 67:10, 68:25

**OWENS** [1] - 29:12

**OWN** [8] - 13:17, 21:2, 23:23, 108:15, 111:22, 112:7, 129:17

## P

**P-H** [1] - 116:13

**P.M** [1] - 195:7

**PACKS** [4] - 139:13, 154:9, 154:11

**PACT** [1] - 87:22

**PAGE** [74] - 29:5, 29:14, 29:21, 29:22, 30:3, 30:6, 30:7, 30:9, 30:12, 31:1, 31:9, 31:18, 31:21, 31:22, 31:25, 32:9, 32:19, 32:20, 33:20, 33:22, 34:13, 36:20, 36:23, 36:24, 37:3, 37:9, 37:12, 37:16,

38:1, 38:3, 38:4, 38:25, 41:2, 41:9, 41:10, 41:12, 42:6, 44:14, 44:25, 45:1, 46:5, 50:9, 50:17, 51:6, 58:25, 59:1, 59:7, 59:9, 59:11, 59:13, 59:22, 60:1, 60:2, 65:6, 66:16, 66:17, 72:19, 74:18, 74:23, 76:23, 91:10, 92:19, 92:20, 95:16, 109:5, 115:12, 115:21, 142:14, 144:24, 160:1, 194:14

**PAGES** [3] - 91:24, 142:14, 194:15

**PAGINATION** [3] - 30:2, 31:21, 32:20

**PAIN** [1] - 158:12

**PAIR** [2] - 140:25, 141:3

**PAPER** [4] - 62:10, 91:22, 110:5, 182:5

**PAPERS** [1] - 194:19

**PARAGRAPH** [13] - 153:12, 153:15, 153:23, 154:12, 154:16, 154:21, 155:1, 155:9, 155:24, 156:4, 156:9, 166:20, 167:1

**PARDON** [3] - 45:3, 72:7, 125:3

**PARENTS** [5] - 5:10, 7:4, 74:2, 78:11

**PARKING** [6] - 9:22, 39:2, 39:3, 39:8, 39:11, 45:18

**PAROLE** [1] - 97:21

**PAROLED** [1] - 97:8

**PART** [21] - 4:2, 15:8, 16:8, 18:6, 19:10, 19:12, 22:8, 22:9, 84:14, 84:17, 87:6, 88:14, 91:10, 144:4, 148:15, 150:14, 151:18, 156:5, 166:20, 169:8, 191:13

**PARTICULAR** [33] - 8:18, 9:8, 29:22, 39:12, 43:3, 43:7, 43:24, 44:12, 44:24, 45:19, 45:24, 46:1, 46:16, 51:22, 52:2, 85:22, 90:14, 94:8, 124:6, 126:17, 127:22, 128:1,

133:10, 138:24, 139:8, 140:7, 145:21, 147:11, 152:2, 153:14, 182:6, 186:24

**PARTICULARLY** [4] - 81:24, 82:5, 82:7, 178:11

**PARTIES** [1] - 144:7

**PARTLY** [1] - 158:6

**PARTNER** [2] - 24:1, 54:23

**PARTS** [2] - 52:12, 158:2

**PASS** [1] - 17:14

**PASSED** [1] - 125:22

**PASSENGER** [1] - 7:21

**PASSENGER'S** [4] - 30:24, 31:5, 45:12, 45:17

**PAST** [2] - 63:12, 66:7

**PATRONIZING** [1] - 59:18

**PAUL** [9] - 1:6, 21:6, 47:7, 68:17, 68:18, 95:13, 115:9, 132:8, 190:21

**PAUSE** [11] - 20:6, 24:8, 32:17, 35:13, 40:5, 44:4, 47:12, 53:22, 58:20, 64:14, 99:11

**PAY** [5] - 87:1, 89:13, 124:6, 129:16, 145:22

**PAYMENT** [1] - 93:7

**PEACEFULLY** [1] - 167:4

**PEERS** [1] - 108:14

**PENALTY** [4] - 21:11, 21:22, 63:8, 63:11

**PENCIL** [1] - 110:5

**PENDING** [1] - 191:14

**PENILE** [3] - 103:23, 104:21

**PENIS** [2] - 146:5, 146:7

**PENITENTIARY** [12] - 85:8, 118:3, 118:6, 118:8, 119:25, 120:5, 120:25, 121:20, 128:22, 132:21, 134:19, 134:25

**PENITENTIARY'S** [1] - 120:18

**PENN** [1] - 101:5

**PENNSYLVANIA** [11] - 1:2, 1:16, 2:6, 2:13,

21:21, 50:4, 101:15, 102:1, 102:3, 132:20, 172:4
**PEOPLE** [4] - 23:24, 120:8, 149:23, 178:7
**PERCEIVE** [1] - 127:11
**PERCENT** [2] - 182:2, 182:6
**PERFORMED** [4] - 101:11, 105:22, 107:6, 111:15
**PERHAPS** [2] - 80:17, 143:13
**PERIOD** [14] - 46:2, 100:17, 126:8, 126:21, 137:22, 144:10, 166:23, 168:10, 172:22, 175:11, 175:17, 175:25, 184:9, 185:11
**PERMISSION** [2] - 103:6, 114:20
**PERSON** [4] - 68:14, 71:8, 118:22, 121:3
**PERSONALITY** [1] - 121:23
**PERSONALLY** [2] - 61:4, 101:11
**PERSPECTIVE** [1] - 83:14
**PH.D** [2] - 101:10, 112:24
**PHILADELPHIA** [3] - 1:9, 1:21, 2:14
**PHONE** [10] - 12:19, 12:21, 14:6, 39:6, 155:16, 155:18, 155:19, 191:1, 191:2, 194:4
**PHOTO** [1] - 160:1
**PHOTOGRAPH** [12] - 122:19, 122:24, 159:22, 159:25, 164:2, 164:9, 164:16, 178:11, 178:12, 178:15, 178:20
**PHOTOGRAPHS** [4] - 122:10, 123:12, 124:6, 159:24
**PHYSICAL** [3] - 104:3, 125:8, 158:1
**PHYSICIANS'S** [1] - 125:21
**PICKED** [1] - 57:24
**PICKING** [2] - 82:1, 144:23
**PICTURE** [17] - 69:18,

69:21, 123:19, 148:21, 148:22, 148:24, 149:2, 149:6, 150:23, 151:14, 151:21, 162:14, 162:21, 162:23, 163:22, 164:9, 164:12
**PICTURES** [3] - 53:2, 162:25, 163:2
**PIECE** [6] - 62:9, 91:22, 110:5, 147:4, 147:13
**PIECES** [1] - 19:5
**PILL** [1] - 175:20
**PILLOW** [14] - 103:24, 104:22, 105:1, 105:7, 105:11, 105:12, 105:19, 105:25, 106:7, 106:24, 107:6, 107:7, 108:3, 108:4
**PINKY** [1] - 18:14
**PISTOL** [3] - 30:24, 31:5, 31:13
**PLACE** [9] - 117:13, 117:25, 130:14, 130:24, 131:24, 139:25, 167:2, 168:10
**PLACED** [8] - 29:2, 41:7, 50:14, 134:15, 137:9, 137:13, 137:21, 138:9
**PLACEMENT** [2] - 134:13, 136:23
**PLACES** [1] - 16:12
**PLAITED** [1] - 147:19
**PLAN** [1] - 78:12
**PLANNED** [1] - 130:10
**PLANS** [1] - 78:17
**PLASTIC** [6] - 18:4, 18:17, 18:19, 131:1, 147:1, 180:5
**PLAY** [6] - 9:15, 114:24, 143:8, 143:9, 161:24, 165:5
**PLAYED** [5] - 21:2, 122:3, 124:16, 124:23, 184:16
**PLAYING** [3] - 161:24, 164:3, 164:8
**PLEA** [1] - 134:8
**PLUMBING** [1] - 160:6
**PO** [2] - 1:17, 2:10
**POINT** [37] - 8:5, 15:20, 29:1, 36:7, 48:15, 52:4, 52:24, 56:18, 60:22, 67:13, 76:6, 85:24, 86:25,

87:17, 89:6, 94:8, 95:17, 95:24, 114:10, 114:11, 116:19, 131:13, 131:23, 132:17, 135:8, 135:17, 136:2, 149:24, 156:20, 161:2, 166:2, 169:25, 170:5, 176:5, 181:16, 185:23
**POINTED** [5] - 16:11, 27:5, 43:17, 51:23, 188:22
**POINTING** [3] - 16:4, 33:1, 43:16
**POLICE** [19] - 7:15, 11:2, 14:6, 48:21, 48:23, 49:1, 49:8, 73:15, 73:20, 73:22, 75:7, 75:10, 75:16, 77:16, 77:20, 77:23, 102:3, 130:3, 131:4
**POLYMARKER** [2] - 107:11, 107:18
**POPULATION** [9] - 107:21, 107:22, 107:23, 107:24, 120:19, 135:19, 135:21, 135:23, 155:18
**PORTION** [1] - 76:11
**PORTIONS** [1] - 131:17
**PORTLAND** [2] - 9:2, 117:10
**POSED** [2] - 116:21, 121:15
**POSITION** [2] - 100:16, 192:6
**POSITIVE** [5] - 106:14, 106:16, 106:18, 111:13, 111:15
**POSSIBLE** [3] - 120:13, 133:9, 184:24
**POSSIBLY** [1] - 137:15
**POST** [1] - 81:13
**POTENTIAL** [5] - 62:18, 107:15, 108:6, 113:9, 121:10
**PREARRANGED** [1] - 186:16
**PRECLUDE** [1] - 61:3
**PREDATING** [2] - 56:14, 56:16
**PREDICAMENT** [1] - 139:7

**PREFERENCE** [2] - 143:20, 143:21
**PREFERRED** [1] - 123:7
**PRELIMINARY** [16] - 21:8, 22:15, 28:13, 29:5, 35:10, 35:20, 35:22, 36:19, 39:16, 50:21, 51:3, 58:15, 58:23, 59:19, 60:11, 60:17
**PREPARE** [1] - 90:9
**PREPARED** [2] - 111:23, 182:9
**PREPARING** [1] - 91:5
**PRESCRIBED** [1] - 175:2
**PRESCRIPTION** [2] - 175:4, 176:9
**PRESENCE** [2] - 141:8, 163:22
**PRESENT** [9] - 74:9, 82:4, 105:19, 106:12, 106:21, 108:8, 109:21, 114:19, 192:8
**PRESENTLY** [3] - 116:24, 117:1, 185:8
**PRESSURE** [1] - 177:3
**PRESUMPTIVE** [1] - 106:13
**PRETTY** [20] - 78:6, 89:10, 119:8, 122:9, 122:15, 130:6, 130:24, 141:1, 141:2, 146:14, 148:25, 149:5, 149:8, 149:10, 156:17, 158:24, 164:24, 188:3, 188:8
**PREVENT** [1] - 136:13
**PREVIOUS** [2] - 49:19, 50:14
**PREVIOUSLY** [9] - 20:18, 20:21, 27:16, 27:18, 47:14, 48:4, 155:11, 156:7, 179:7
**PRINTED** [1] - 181:22
**PRINTS** [1] - 49:8
**PRISON** [13] - 10:13, 10:23, 83:11, 85:2, 85:16, 85:20, 85:21, 94:7, 94:10, 96:8, 145:18, 164:13, 167:3
**PRISONS** [3] - 134:18, 138:14, 160:25
**PRIVACY** [6] - 8:12, 147:10, 178:24,

180:8, 180:18, 187:18
**PRIVATE** [1] - 109:9
**PRIVILEGE** [3] - 95:1, 95:22, 95:25
**PROBABILITY** [1] - 107:17
**PROBLEM** [7] - 25:12, 31:21, 69:18, 71:19, 81:18, 81:22, 88:24
**PROBLEMS** [3] - 32:20, 51:3, 108:20
**PROCEDURE** [1] - 138:22
**PROCEDURES** [3] - 17:25, 18:2, 101:12
**PROCEEDING** [5] - 21:12, 21:23, 29:17, 31:5, 50:13
**PROCEEDINGS** [8] - 1:24, 40:24, 53:16, 64:25, 74:8, 81:14, 134:14, 195:14
**PROCESS** [1] - 133:18
**PRODUCED** [1] - 1:24
**PROFILES** [1] - 108:8
**PROMISES** [6] - 133:6, 133:9, 133:14, 134:17, 134:20, 138:12
**PRONOUNCE** [1] - 126:13
**PROPERLY** [1] - 113:24
**PROPERTY** [2] - 139:2, 154:2
**PROPOSE** [2] - 114:15, 114:21
**PROSECUTE** [1] - 62:19
**PROSECUTING** [2] - 49:24, 63:22
**PROSECUTION** [10] - 27:25, 29:12, 58:3, 58:4, 60:12, 60:18, 61:2, 62:24, 117:19, 133:7
**PROSECUTOR** [20] - 35:24, 43:9, 44:13, 45:4, 45:7, 46:6, 46:10, 46:23, 52:18, 60:25, 62:7, 62:18, 96:15, 97:1, 97:3, 97:5, 97:6, 97:20, 97:25, 133:21
**PROSECUTOR'S** [1] - 43:14
**PROSECUTORS** [1] - 109:12

**PROSTATIC** [1] - 111:14
**PROTECTIVE** [2] - 56:4, 85:13
**PROTEIN** [1] - 111:7
**PROVIDE** [2] - 63:4, 112:6
**PROVIDED** [4] - 48:4, 112:5, 124:13, 153:18
**PROVIDES** [1] - 160:25
**PROVIDING** [1] - 117:18
**PROVOKED** [1] - 11:23
**PROZAC** [6] - 127:18, 174:23, 174:24, 175:24, 175:25, 176:6
**PSYCHIATRIST** [1] - 175:2
**PSYCHOLOGICAL** [2] - 19:10, 19:12
**PUBLIC** [2] - 2:6, 29:10
**PUBLISH** [1] - 92:12
**PULL** [1] - 3:16
**PULLED** [4] - 11:13, 131:6, 150:7, 188:17
**PUNCH** [4] - 87:21, 88:20, 88:25, 89:2
**PUNCHING** [1] - 88:4
**PUNISHED** [1] - 89:14
**PURPORTEDLY** [1] - 81:16
**PURPOSE** [2] - 127:3, 191:4
**PURPOSES** [1] - 148:4
**PURSUED** [2] - 60:12, 60:18
**PUT** [22] - 12:19, 20:1, 33:16, 37:19, 37:21, 85:24, 93:10, 121:1, 131:20, 134:18, 140:2, 149:21, 160:16, 166:4, 168:12, 173:14, 177:3, 179:24, 180:5, 180:22, 185:2, 187:8
**PUTTING** [5] - 171:5, 171:10, 171:14, 171:19, 182:4

## Q

**QUALIFIED** [3] - 102:7, 102:17,
108:14
**QUALIFY** [1] - 102:10
**QUARTER** [1] - 71:2
**QUEERS** [1] - 23:2
**QUESTIONED** [5] - 22:19, 102:24, 107:20, 108:5
**QUESTIONING** [2] - 132:17, 185:6
**QUESTIONS** [26] - 21:4, 27:15, 34:1, 36:1, 36:10, 36:15, 58:16, 60:11, 64:16, 64:24, 65:1, 65:18, 65:21, 67:20, 93:25, 99:13, 102:15, 112:20, 114:22, 115:5, 116:4, 116:21, 116:23, 130:8, 165:1, 193:15
**QUICK** [3] - 24:19, 70:10, 74:3
**QUIETLY** [2] - 154:22, 155:25
**QUIT** [1] - 130:6
**QUITE** [4] - 71:24, 78:23, 140:24, 174:22
**QUOTE** [4] - 166:22, 166:23, 183:12, 183:13
**QUOTED** [1] - 190:15

## R

**R175** [2] - 115:10, 115:22
**R56** [4] - 91:21, 92:9, 92:14, 196:22
**R6** [3] - 109:3, 109:4, 109:5
**R7** [5] - 112:2, 112:12, 112:15, 112:17, 196:23
**RADIO** [3] - 93:10, 123:4, 123:8
**RAISE** [2] - 81:2, 115:24
**RAISED** [3] - 4:11, 4:12, 84:19
**RAN** [6] - 39:9, 48:18, 55:11, 89:13, 131:5
**RANDOM** [1] - 107:18
**RAPE** [2] - 79:15, 79:21
**RAPED** [2] - 23:10, 54:3
**RAPING** [1] - 12:9
**RATE** [3] - 113:17, 113:18, 113:21

**RATHER** [3] - 119:7, 167:20, 167:23
**RAY** [3] - 101:22, 101:23
**RAYS** [1] - 101:24
**REACH** [1] - 11:23
**REACHED** [2] - 39:2, 39:3
**REACTION** [2] - 188:1, 188:10
**READ** [76] - 30:21, 31:10, 31:25, 32:11, 33:22, 35:17, 37:17, 38:5, 41:12, 41:19, 42:5, 42:12, 45:1, 47:20, 59:3, 65:9, 65:12, 66:20, 74:20, 76:15, 76:16, 76:18, 77:6, 90:22, 91:2, 91:8, 91:25, 107:8, 108:16, 110:4, 114:15, 122:4, 142:14, 142:18, 142:21, 143:10, 143:16, 143:21, 143:22, 144:16, 144:17, 149:17, 149:21, 150:10, 150:14, 150:25, 151:5, 151:6, 151:15, 151:18, 152:22, 153:6, 153:12, 154:15, 154:21, 155:13, 155:24, 156:1, 156:13, 157:2, 166:18, 166:19, 166:20, 167:1, 167:5, 167:9, 167:22, 182:2, 182:6, 183:23, 184:18, 190:9, 190:12, 196:18
**READING** [11] - 59:9, 66:6, 107:14, 114:11, 129:23, 143:19, 151:19, 154:18, 166:22, 166:24, 190:19
**READS** [1] - 101:23
**READY** [3] - 174:9, 183:22, 184:17
**REAL** [2] - 70:10, 74:3
**REALIZED** [1] - 30:1
**REALLY** [26] - 86:23, 96:21, 121:4, 122:2, 126:4, 130:1, 137:3, 140:24, 142:7, 142:9, 146:16, 146:22, 151:9,

158:4, 158:13, 161:22, 164:23, 164:25, 169:9, 183:12, 183:15, 184:5, 184:12, 185:24, 186:6, 189:20
**REALM** [1] - 56:13
**REASON** [10] - 58:1, 58:10, 82:13, 118:17, 118:19, 127:14, 133:4, 142:18, 143:18, 194:8
**REASONS** [1] - 125:24
**REC** [7] - 130:18, 130:19, 130:22, 182:23, 187:20, 188:8, 188:10
**RECALLING** [1] - 71:22
**RECANTED** [1] - 81:21
**RECEIVE** [5] - 93:7, 148:16, 148:19, 149:14, 152:3
**RECEIVED** [17] - 101:4, 101:10, 103:15, 103:21, 109:6, 125:10, 150:10, 154:19, 165:18, 165:21, 165:23, 166:13, 166:15, 182:8, 188:25, 192:23, 193:3
**RECEIVING** [6] - 165:16, 166:1, 166:2, 166:19, 175:4, 183:14
**RECENTLY** [1] - 98:11
**RECESS** [8] - 24:15, 69:5, 69:14, 71:11, 144:2, 144:3, 185:2, 195:4
**RECOGNIZE** [8] - 91:22, 92:4, 104:8, 105:2, 109:4, 112:3, 151:1, 179:8
**RECOGNIZED** [1] - 102:13
**RECOLLECTION** [21] - 14:17, 28:23, 74:2, 122:17, 141:11, 146:12, 147:6, 163:23, 164:1, 165:15, 168:11, 168:15, 168:19, 169:4, 170:2, 170:4,

177:20, 189:21, 190:18, 191:1, 194:5
**RECOMMEND** [2] - 134:18, 138:9
**RECONSIDER** [1] - 192:3
**RECONVENED** [2] - 115:17, 185:3
**RECORD** [16] - 3:10, 16:7, 16:11, 24:22, 35:16, 36:4, 65:10, 65:14, 99:23, 105:17, 142:21, 144:5, 144:17, 144:18, 176:11, 195:14
**RECORDED** [2] - 1:24, 115:7
**RECORDS** [1] - 29:25
**RECOVERED** [1] - 103:16
**RECROSS** [2] - 72:1, 196:3
**RECTAL** [3] - 103:22, 104:20
**RED** [4] - 6:18, 7:5, 37:18, 41:14
**REDACT** [1] - 144:19
**REDACTED** [1] - 144:18
**REDIRECT** [3] - 64:17, 64:19, 196:3
**REDUCE** [1] - 143:15
**REDUCED** [1] - 191:24
**REDUCTION** [3] - 133:10, 133:18, 133:23
**REFER** [11] - 103:7, 104:14, 110:22, 125:1, 127:1, 128:9, 159:25, 163:12, 163:15, 163:18, 178:3
**REFERENCE** [3] - 75:2, 103:18, 153:14
**REFERENCED** [1] - 19:13
**REFERRED** [2] - 124:19, 163:6
**REFERRING** [3] - 146:4, 155:4, 155:7
**REFUSED** [1] - 176:7
**REGARD** [3] - 113:23, 168:9, 176:25
**REGARDING** [2] - 20:24, 138:14
**REGULAR** [1] - 132:1
**REGULARLY** [1] - 127:8

REIDERS [1] - 2:9
RELATE [2] - 127:18, 157:22
RELATIONSHIP [7] - 55:17, 56:1, 56:10, 56:23, 157:1, 161:11, 177:4
RELAX [3] - 173:24, 175:16, 186:19
RELAXED [3] - 126:15, 146:21, 146:23
RELEVANCE [1] - 82:9
RELEVANCY [2] - 82:19, 83:20
RELEVANT [6] - 61:23, 81:24, 82:7, 83:8, 142:22, 143:22
RELIABLE [1] - 113:25
RELIED [1] - 46:23
RELY [1] - 113:6
REMAIN [2] - 69:10, 175:7
REMAINDER [1] - 167:1
REMAINED [1] - 155:20
REMARK [1] - 74:25
REMEMBER [78] - 6:8, 6:15, 6:19, 6:22, 7:2, 7:25, 8:23, 10:14, 10:19, 10:23, 11:14, 13:22, 15:10, 16:17, 20:20, 21:9, 21:10, 21:11, 28:1, 28:16, 28:21, 35:20, 35:23, 36:1, 48:22, 57:10, 66:9, 66:10, 73:21, 74:3, 77:23, 86:18, 86:21, 86:23, 89:10, 93:5, 95:1, 96:7, 96:16, 96:18, 98:3, 98:9, 98:10, 98:24, 99:2, 99:3, 119:15, 123:5, 124:23, 129:23, 130:20, 137:1, 139:20, 140:12, 140:17, 140:25, 141:12, 147:3, 149:8, 151:9, 151:20, 158:4, 158:13, 164:6, 164:9, 166:11, 166:15, 168:18, 169:23, 171:11, 183:3, 183:6, 189:16, 189:17, 190:10, 190:11,

194:7
REMEMBERED [3] - 33:15, 47:21, 150:6
REMOTE [1] - 48:14
REPEAT [4] - 27:17, 115:5, 183:17, 184:2
REPEATING [2] - 184:10, 186:6
REPERCUSSIONS [3] - 19:12, 22:21, 22:24
REPLACE [1] - 118:22
REPLY [1] - 137:4
REPORT [20] - 76:24, 77:16, 107:8, 108:13, 108:17, 108:25, 109:1, 109:5, 109:6, 109:14, 109:22, 110:1, 110:2, 110:4, 111:17, 111:18, 111:22, 173:8, 189:5
REPORTED [3] - 110:6, 110:7, 110:18
REPORTER [2] - 1:20, 195:19
REPORTS [5] - 96:25, 100:25, 101:16, 110:6, 112:10
REPRESENTED [2] - 110:14, 112:10
REPUTED [1] - 172:16
REQUEST [5] - 136:23, 136:24, 181:23, 182:5, 191:23
REQUESTED [1] - 109:24
RESENTENCING [1] - 143:2
RESERVE [1] - 101:9
RESIDE [1] - 156:24
RESIDENCES [1] - 14:12
RESIDENTIAL [1] - 6:7
RESOLVED [1] - 71:19
RESPECT [51] - 81:14, 117:17, 118:12, 118:17, 118:25, 119:4, 119:17, 120:22, 124:4, 124:12, 125:8, 125:15, 126:7, 126:25, 127:22, 130:9, 131:16, 133:6, 133:8, 133:13, 134:2, 134:13, 134:24, 135:2, 136:21,

137:20, 138:16, 139:7, 139:21, 140:6, 140:20, 141:13, 141:23, 142:4, 142:13, 145:10, 146:24, 148:1, 150:9, 150:16, 150:25, 152:2, 152:19, 153:5, 155:17, 157:9, 157:18, 162:12, 165:12, 178:10
RESPOND [3] - 43:12, 90:3, 116:4
RESPONDED [2] - 50:23, 73:15
RESPONSE [4] - 27:15, 30:17, 46:12, 148:9
RESPONSIBLE [2] - 100:22, 101:15
REST [2] - 183:16, 183:19
RESTAURANT [1] - 9:7
RESULT [7] - 39:15, 96:14, 106:14, 106:16, 106:18, 111:13, 189:4
RESULTS [14] - 106:10, 106:20, 107:5, 107:12, 107:25, 108:12, 108:20, 109:18, 110:19, 111:9, 112:7, 112:8, 113:24
RESUME [1] - 71:21
RETURN [3] - 48:21, 139:22, 153:20
REVERT [1] - 139:16
REVIEW [5] - 108:16, 108:19, 108:24, 109:1, 112:5
REVIEWED [1] - 111:17
REVIEWING [3] - 109:14, 110:1, 111:21
REVIEWS [2] - 108:11, 108:15
REVOLVER [1] - 11:18
REWRITE [1] - 91:14
RIDE [5] - 8:6, 8:10, 8:17, 25:24, 26:11
RIGHT-HAND [3] - 74:20, 153:6, 156:21
RIGS [1] - 14:10
ROAD [9] - 15:11,

15:13, 17:12, 17:13, 17:15, 72:14, 72:15, 73:2, 75:5
ROBBERY [5] - 89:21, 132:23, 175:6, 185:9, 185:15
ROLE [3] - 100:19, 114:24, 165:5
ROLES [1] - 101:14
ROMANTICALLY [2] - 55:6, 55:8
RON [1] - 29:9
RONALD [1] - 2:8
ROOM [22] - 9:24, 10:3, 10:7, 10:12, 17:18, 19:19, 22:17, 27:5, 27:8, 39:5, 45:15, 66:1, 66:22, 66:25, 67:2, 76:10, 76:12, 79:4, 79:5, 79:14, 130:19, 155:3
ROOMMATE [3] - 128:5, 139:15, 164:21
ROPE [5] - 179:5, 179:23, 180:10, 180:19, 180:21
ROY [1] - 3:11
RPR [1] - 1:19
RUHNKE [1] - 184:21
RULE [6] - 133:10, 133:12, 191:21, 192:1, 192:7
RUN [4] - 17:16, 39:4, 53:13, 67:4
RUNNING [2] - 94:14, 131:7

## S

SADDLE [2] - 59:18, 60:3
SAIL [1] - 146:23
SAMPLE [1] - 103:25
SAMPLES [4] - 102:23, 102:24, 103:18, 103:19
SARAH [4] - 72:14, 72:15, 73:2, 75:5
SATURDAY [5] - 149:20, 153:25, 154:5, 166:3, 166:6
SAUNDERS [83] - 2:5, 21:15, 24:6, 24:9, 24:12, 24:25, 25:11, 25:14, 28:5, 28:11, 29:24, 30:5, 32:16, 32:18, 35:12, 35:14, 35:18, 36:4, 36:9, 36:12, 36:17, 37:6,

37:8, 40:3, 40:6, 44:3, 44:5, 47:5, 47:10, 47:13, 49:15, 53:21, 53:23, 56:17, 56:21, 58:19, 58:21, 59:8, 60:16, 62:1, 62:3, 62:13, 62:16, 64:13, 64:15, 64:23, 65:9, 65:24, 67:8, 68:24, 69:3, 71:14, 71:23, 72:2, 74:11, 74:13, 76:2, 76:5, 77:1, 77:3, 79:10, 79:12, 79:18, 79:22, 80:4, 80:8, 80:25, 81:5, 81:7, 81:11, 81:21, 82:3, 82:17, 83:8, 87:10, 88:7, 94:4, 95:5, 95:7, 99:10, 99:12, 196:7, 196:11
SAW [16] - 7:8, 10:16, 10:18, 16:21, 25:17, 33:15, 51:15, 51:16, 78:14, 146:19, 147:7, 159:17, 162:20, 162:24, 163:2, 190:10
SCALP [1] - 18:20
SCARED [3] - 12:3, 13:21, 46:9
SCENE [2] - 103:17, 123:14
SCHEDULE [1] - 130:20
SCHOOL [1] - 101:10
SCHUYLKILL [10] - 134:23, 134:24, 135:2, 135:3, 135:19, 135:24, 137:18, 137:21, 138:10, 176:10
SCIENCE [3] - 101:4, 113:5
SCIENTIFIC [3] - 113:11, 113:13, 113:23
SCIENTIST [3] - 100:8, 100:13, 113:2
SCORCHED [1] - 160:14
SCRANTON [1] - 1:18
SCREAMED [1] - 188:6
SCREAMING [3] - 16:22, 130:21, 187:22
SCREENS [1] - 70:5
SEAL [1] - 104:9
SEAT [7] - 7:17, 26:23,

33:2, 34:6, 34:17, 47:16, 67:13
**SEATED** [6] - 3:2, 24:17, 69:16, 69:17, 71:18, 185:5
**SECOND** [13] - 13:24, 18:10, 36:24, 69:22, 74:23, 97:15, 128:21, 128:24, 154:21, 154:25, 155:9, 156:8, 167:5
**SECTION** [3] - 2:3, 33:22, 111:4
**SECURE** [2] - 134:25, 135:1
**SECURING** [3] - 176:16, 176:17, 176:22
**SECURITY** [3] - 69:20, 70:1, 130:24
**SEE** [82] - 9:15, 11:17, 18:12, 23:13, 30:7, 30:11, 30:13, 30:14, 31:9, 31:22, 33:6, 34:14, 36:18, 36:24, 39:1, 40:18, 50:10, 51:6, 54:25, 57:7, 57:9, 58:24, 59:4, 59:6, 60:2, 61:11, 67:19, 69:21, 70:6, 70:10, 70:19, 70:25, 71:2, 71:6, 71:9, 71:19, 72:21, 72:22, 74:15, 74:17, 75:13, 75:14, 75:22, 76:7, 76:18, 76:19, 77:6, 78:10, 82:10, 86:3, 95:9, 95:12, 95:15, 95:17, 95:19, 105:14, 119:11, 119:14, 122:5, 122:22, 122:24, 127:12, 130:19, 133:23, 143:14, 147:1, 147:14, 147:18, 147:24, 147:25, 149:23, 151:15, 152:9, 157:15, 159:16, 166:23, 179:22, 182:1, 182:20
**SEEING** [3] - 131:10, 147:3, 151:20
**SEEK** [3] - 92:8, 102:12, 112:11
**SEEM** [5] - 97:1, 152:24, 159:15, 159:17, 187:21
**SEES** [1] - 70:20
**SEG** [1] - 141:22

**SELECTED** [1] - 142:14
**SELECTING** [1] - 107:17
**SELL** [1] - 193:7
**SEMEN** [9] - 100:23, 106:1, 106:3, 109:20, 111:6, 111:12, 111:14, 111:15, 111:18
**SEND** [2] - 129:14, 191:5
**SENDER'S** [1] - 152:7
**SENDING** [1] - 181:3
**SENIOR** [3] - 100:7, 100:13, 113:2
**SENSITIVE** [3] - 25:4, 106:15, 106:17
**SENT** [11] - 90:21, 129:9, 129:11, 129:21, 129:24, 140:14, 149:18, 168:1, 168:3, 168:6, 181:8
**SENTENCE** [24] - 31:1, 46:24, 53:17, 63:17, 64:10, 94:13, 96:12, 98:1, 117:1, 132:22, 132:23, 132:24, 133:3, 133:8, 133:10, 133:11, 133:18, 133:23, 167:22, 185:8, 185:9, 191:24, 192:4, 192:8
**SENTENCED** [5] - 46:21, 97:10, 117:9, 132:19, 133:24
**SENTENCES** [3] - 62:23, 94:14, 117:1
**SENTENCING** [4] - 1:12, 82:12, 117:12, 191:23
**SEPARATE** [1] - 110:22
**SEPTEMBER** [3] - 39:22, 40:11, 40:21
**SEQUENCE** [1] - 88:10
**SEQUENTIAL** [2] - 30:4, 31:20
**SERIES** [5] - 64:23, 65:18, 122:10, 123:12, 159:24
**SERIOUS** [3] - 141:2, 151:7, 189:3
**SERIOUSLY** [3] - 58:5, 58:12, 62:25
**SEROLOGY** [11] - 100:23, 101:13,

102:5, 102:14, 102:17, 105:22, 105:23, 106:10, 108:14, 111:4, 111:5
**SERTRALINE** [3] - 126:11, 127:2, 127:18
**SERVED** [1] - 185:9
**SERVICE** [1] - 176:12
**SERVING** [4] - 96:11, 117:2, 132:21, 185:8
**SESSION** [1] - 185:4
**SET** [4] - 86:8, 144:20, 186:16, 186:18
**SETTING** [1] - 83:11
**SEVEN** [1] - 109:5
**SEVEN-PAGE** [1] - 109:5
**SEVERAL** [3] - 75:24, 122:8, 140:22
**SEX** [17] - 9:18, 22:8, 22:16, 54:6, 54:24, 64:1, 64:4, 64:6, 79:7, 145:1, 145:25, 146:10, 149:7, 161:14, 162:4, 162:6, 177:1
**SEXUAL** [7] - 8:13, 145:7, 145:10, 145:13, 161:11, 176:25, 177:4
**SEXUALLY** [2] - 12:17, 54:19
**SHAKE** [2] - 183:18, 184:3
**SHARE** [3] - 19:2, 19:11, 126:21
**SHARED** [1] - 174:1
**SHARING** [1] - 127:25
**SHEET** [6] - 150:5, 178:25, 179:4, 179:24, 180:7, 187:8
**SHEETS** [1] - 150:7
**SHERIDAN** [4] - 42:16, 117:8, 118:2, 120:4
**SHIPPED** [1] - 120:7
**SHOES** [1] - 22:23
**SHOOT** [11] - 13:19, 13:20, 36:7, 39:4, 39:5, 39:9, 39:10, 45:25, 67:6, 67:17, 89:21
**SHOOTING** [18] - 21:7, 47:23, 48:19, 49:3, 49:9, 55:17, 56:23, 57:8, 57:11, 75:2, 81:18, 81:20, 81:22, 82:25, 89:24, 90:4, 90:14, 99:7

**SHOP** [3] - 19:18, 139:3, 139:6
**SHOPPING** [1] - 140:2
**SHORT** [7] - 74:11, 144:9, 148:24, 149:3, 149:9, 172:22, 183:3
**SHORTLY** [2] - 73:22, 119:11
**SHORTS** [1] - 141:18
**SHOT** [28] - 16:3, 16:5, 16:6, 16:9, 16:16, 16:18, 18:15, 18:24, 19:6, 19:12, 56:16, 60:19, 67:16, 67:17, 68:5, 68:16, 75:5, 75:18, 75:20, 75:22, 76:21, 77:11, 77:22, 86:20, 87:4, 87:7, 87:13, 173:8
**SHOTS** [1] - 77:16
**SHOULDER** [3] - 158:5, 158:9, 158:11
**SHOW** [13] - 28:25, 76:6, 91:15, 109:2, 112:1, 122:10, 122:11, 146:25, 147:12, 151:22, 157:15, 159:21, 179:23
**SHOWED** [1] - 157:11
**SHOWER** [10] - 122:12, 147:9, 178:17, 179:12, 179:13, 180:6, 180:9, 180:16, 180:23, 187:17
**SHOWING** [5] - 40:7, 74:14, 91:21, 95:8, 179:7
**SHOWN** [1] - 50:2
**SHRAPNEL** [3] - 19:3, 19:4, 19:6
**SHU** [3] - 192:18, 192:19, 192:22
**SHUKILL** [1] - 134:23
**SHUT** [1] - 156:17
**SIDE** [20] - 7:19, 7:21, 13:23, 16:13, 30:24, 31:5, 43:13, 43:15, 45:12, 45:17, 74:20, 75:25, 81:6, 83:22, 88:18, 88:19, 91:10, 151:25, 152:6, 168:16
**SIDE-BAR** [2] - 81:6, 83:22
**SIDEBAR** [4] - 24:22, 81:3, 81:4, 144:15
**SIDED** [1] - 164:1

**SIGN** [2] - 149:12, 182:18
**SIGNATURE** [2] - 92:6, 157:6
**SIGNED** [6] - 61:16, 92:21, 94:18, 108:17, 148:24
**SIMILAR** [2] - 123:15, 147:13
**SIMMONS** [7] - 55:24, 56:1, 56:6, 56:11, 56:23, 56:25, 57:17
**SIMMONS'** [1] - 57:5
**SINK** [2] - 160:2, 160:10
**SIS** [5] - 135:25, 136:10, 136:17, 137:8, 156:16
**SIT** [2] - 3:18, 114:20
**SITTING** [5] - 23:15, 115:6, 173:12, 184:15, 194:16
**SITUATION** [9] - 70:4, 125:8, 139:8, 153:22, 153:23, 179:2, 182:16, 186:5, 186:9
**SITUATIONS** [1] - 137:17
**SIX** [4] - 23:24, 107:13, 172:10, 173:2
**SIZE** [1] - 143:15
**SIZED** [1] - 176:17
**SKIP** [2] - 31:8, 76:13
**SKULL** [1] - 16:12
**SLEEP** [5] - 126:16, 173:23, 173:24, 174:17, 175:17
**SLEEPING** [1] - 190:2
**SLIDE** [4] - 45:11, 91:7, 103:22, 103:23
**SLIDES** [1] - 111:11
**SLOMSKY** [1] - 1:10
**SLOWER** [1] - 82:1
**SMALL** [3] - 122:25, 131:19, 176:17
**SMALLER** [1] - 19:23
**SMASH** [1] - 154:10
**SMEAR** [1] - 103:22
**SMILED** [1] - 188:22
**SMOKE** [2] - 24:19, 139:19
**SMOKED** [1] - 139:18
**SMOKING** [4] - 139:12, 139:16, 139:17, 139:20
**SNOW** [1] - 56:9
**SO...** [2] - 104:15, 146:16

**SOCK** [16] - 103:24, 104:23, 104:25, 105:3, 105:4, 106:1, 106:7, 106:25, 107:6, 107:7, 108:3, 108:4, 109:16, 109:19, 109:21, 111:10

**SOMEONE** [8] - 19:17, 55:12, 78:14, 84:21, 88:20, 179:3, 193:24, 194:2

**SOMEPLACE** [1] - 138:25

**SOMETIME** [2] - 128:15, 170:14

**SOMETIMES** [8] - 124:24, 140:24, 141:10, 145:23, 151:15, 151:18, 156:2, 174:7

**SOMEWHAT** [1] - 187:10

**SOMEWHERE** [5] - 23:15, 75:18, 75:23, 76:10, 76:22

**SON** [3] - 155:8, 155:19, 193:25

**SOON** [3] - 128:15, 130:6, 177:14

**SORRY** [26] - 20:7, 25:11, 29:24, 32:6, 35:14, 37:6, 40:3, 40:15, 53:15, 58:10, 59:9, 59:22, 62:13, 76:13, 87:5, 88:6, 95:19, 107:6, 119:24, 132:6, 150:13, 150:23, 157:9, 167:25, 192:18

**SORT** [7] - 10:10, 88:14, 108:2, 143:13, 148:8, 168:12, 179:4

**SOUND** [1] - 5:24

**SOUNDED** [1] - 67:12

**SOUP** [1] - 160:21

**SOURCE** [2] - 107:14, 113:10

**SOUTH** [4] - 72:9, 72:11, 72:22, 75:14

**SOUTHEAST** [1] - 72:7

**SOUTHEASTERN** [1] - 107:22

**SOUTHWEST** [3] - 73:4, 75:5, 76:11

**SOUTHWESTERN** [1] - 107:23

**SPEAKING** [5] - 3:17, 155:17, 155:19, 162:19, 164:9

**SPECIAL** [19] - 52:10, 52:18, 54:2, 54:11, 58:8, 119:9, 119:10, 122:2, 135:20, 136:21, 136:23, 137:9, 137:13, 137:22, 138:5, 149:16, 152:17, 155:20, 179:9

**SPECIALIST** [1] - 70:10

**SPECIFIC** [2] - 111:7, 151:9

**SPECIFICALLY** [3] - 61:20, 63:20, 120:16

**SPECIFICS** [1] - 10:19

**SPECIMEN** [1] - 107:15

**SPECIMENS** [4] - 106:2, 107:16, 107:20, 107:25

**SPELL** [3] - 3:9, 3:22, 99:22

**SPELLED** [1] - 116:12

**SPERM** [9] - 106:3, 110:7, 110:20, 110:22, 111:2, 111:11, 111:12, 111:13, 111:19

**SPINNING** [1] - 11:17

**SPIT** [1] - 174:7

**SPOKEN** [1] - 163:21

**SPOON** [2] - 180:5, 180:7

**SPREAD** [1] - 123:25

**STACK** [1] - 122:11

**STAFF** [8] - 71:8, 181:24, 182:5, 182:17, 182:24, 183:2, 189:5, 189:6

**STAGE** [1] - 86:8

**STAGES** [1] - 7:6

**STAINLESS** [1] - 160:2

**STAIRS** [1] - 39:5

**STAMP** [2] - 40:18, 50:18

**STAMPED** [1] - 30:2

**STAND** [11] - 21:4, 22:23, 63:17, 69:14, 71:11, 105:9, 115:7, 144:1, 179:19, 195:4

**STANDARD** [1] - 70:16

**START** [6] - 24:10, 32:21, 66:17, 115:19, 144:24, 175:4

**STARTED** [5] - 52:14, 115:14, 127:14, 130:21, 161:24

**STARTING** [1] - 115:21

**STARTS** [5] - 30:11, 31:22, 75:13, 76:8, 115:11

**STATE** [11] - 3:9, 46:7, 61:6, 61:22, 85:7, 95:12, 99:22, 101:5, 101:7, 102:3, 102:8

**STATEMENT** [12] - 21:16, 54:1, 86:25, 87:19, 89:12, 90:9, 90:17, 90:20, 92:5, 177:16, 188:12, 190:9

**STATEMENTS** [1] - 117:18

**STATES** [12] - 1:1, 1:3, 1:16, 2:2, 3:3, 61:20, 102:9, 113:8, 115:8, 116:1, 116:20, 132:8

**STATUS** [1] - 10:13

**STATUTE** [1] - 89:13

**STATUTORY** [1] - 82:6

**STAY** [8] - 17:21, 39:25, 118:9, 118:13, 119:9, 128:18, 139:16, 157:5

**STAYED** [4] - 17:23, 121:8, 138:17, 145:8

**STAYING** [1] - 118:12

**STEEL** [1] - 160:2

**STENOTYPE** [1] - 1:24

**STENOTYPE-COMPUTER** [1] - 1:24

**STEP** [5] - 69:4, 69:10, 80:1, 99:15, 114:6

**STEPHEN** [5] - 114:16, 115:25, 116:11, 152:20, 196:17

**STEPS** [1] - 7:6

**STEVE** [5] - 152:5, 152:6, 152:16, 152:19, 156:15

**STICK** [1] - 180:5

**STILL** [18] - 19:19, 57:15, 60:9, 60:12, 60:18, 60:24, 62:19, 88:22, 96:8, 96:11, 97:17, 107:2, 107:3, 132:13, 133:4, 165:9, 175:13, 178:21

**STOOD** [1] - 17:15

**STOP** [18] - 6:17, 7:5, 13:24, 14:7, 15:5, 15:8, 15:16, 18:7, 25:5, 110:9, 131:24, 140:23, 156:20, 166:22, 166:24, 171:25, 174:9, 176:7

**STOPPED** [10] - 6:1, 7:8, 15:3, 17:17, 25:16, 41:14, 125:12, 131:14, 162:10, 176:5

**STORE** [1] - 139:2

**STORED** [1] - 15:11

**STORY** [8] - 23:10, 23:19, 52:6, 52:12, 52:15, 52:18, 53:3, 121:18

**STRAIGHTENING** [1] - 57:3

**STRANDED** [1] - 68:9

**STRANGER** [1] - 19:21

**STRANGERS** [1] - 19:21

**STREET** [16] - 1:17, 1:21, 2:4, 2:7, 2:10, 5:3, 6:2, 25:9, 48:5, 67:15, 72:11, 72:12, 72:22, 75:18, 78:14

**STREETS** [1] - 6:2

**STRESSED** [2] - 169:19, 170:6

**STRIKE** [4] - 21:18, 87:24, 90:12, 110:2

**STRING** [8] - 147:4, 147:8, 147:13, 160:15, 180:6, 180:22, 187:8

**STRIP** [2] - 15:23, 68:1

**STRIPPED** [2] - 68:15, 77:10

**STRONGER** [1] - 12:11

**STRUCK** [2] - 110:19, 110:20

**STUCK** [2] - 41:16, 180:21

**STUDIES** [2] - 101:6, 101:8

**STUFF** [4] - 46:3, 96:22, 131:7, 186:21

**SUBJECT** [21] - 20:15, 75:17, 75:22, 75:24, 76:9, 76:10, 76:17, 76:21, 113:15, 121:9, 130:8, 141:13, 141:14, 145:1, 145:4, 146:10, 159:10, 161:19, 162:6, 169:11

**SUBMIT** [1] - 82:13

**SUBMITTED** [2] - 100:20, 110:12

**SUBSEQUENT** [1] - 56:18

**SUBSTANCE** [2] - 155:9, 156:3

**SUCCESS** [1] - 113:18

**SUCCESSOR** [1] - 128:5

**SUFFER** [1] - 167:4

**SUGGESTION** [2] - 70:6, 143:18

**SUITE** [3] - 1:17, 2:7, 2:14

**SUMMARIZES** [1] - 111:23

**SUMMARY** [2] - 111:22, 112:6

**SUNDAY** [3] - 150:4, 153:8

**SUPERVISED** [1] - 100:21

**SUPERVISOR** [1] - 136:22

**SUPPLEMENTING** [1] - 160:24

**SUPPLYING** [1] - 194:6

**SUPPORT** [1] - 82:4

**SUPPOSED** [8] - 91:9, 174:24, 175:25, 176:6, 179:11, 182:16, 182:18, 190:2

**SUPPOSEDLY** [2] - 10:24, 47:15

**SURGERY** [4] - 18:4, 18:17, 18:19

**SURPRISE** [2] - 48:24, 49:3

**SURPRISED** [2] - 149:11, 156:18

**SURROUNDING** [1] - 81:13

**SUSPECT** [4] - 76:11, 77:9, 77:14, 77:15

**SUSTAIN** [1] - 21:17

**SUSTAINED** [3] - 60:15, 87:14, 87:25

**SUZANNE** [2] - 1:19, 195:20

**SWAB** [1] - 111:16

**SWABS** [15] - 103:22, 103:23, 104:19,

104:20, 104:21, 106:4, 110:7, 110:9, 110:12, 110:15, 110:16, 111:5, 111:19
**SWORE** [1] - 28:20
**SWORN** [6] - 3:8, 28:17, 29:2, 80:24, 99:21, 116:1

## T

**TAKING** [13] - 14:20, 21:25, 125:12, 126:5, 127:14, 156:11, 173:19, 174:8, 174:25, 175:13, 175:22, 176:5, 176:7
**TALKS** [1] - 86:17
**TAMMY** [1] - 163:12
**TARRENT** [3] - 192:15, 193:24
**TEAM** [1] - 100:21
**TEAM'S** [1] - 100:22
**TECHNICAL** [1] - 108:19
**TECHNICIAN** [1] - 101:23
**TECHNICIANS** [2] - 100:22, 101:18
**TECHNOLOGY** [3] - 108:25, 109:7, 109:9
**TEETH** [1] - 19:4
**TELEPHONE** [1] - 67:7
**TEN** [7] - 24:2, 94:13, 96:11, 97:13, 97:17, 97:18, 185:11
**TEN-YEAR** [1] - 96:11
**TERM** [3] - 23:3, 56:1, 147:20
**TERMS** [15] - 108:2, 111:1, 119:9, 121:24, 123:25, 125:20, 126:2, 127:10, 128:5, 129:10, 135:19, 141:16, 146:19, 147:20, 151:1
**TEST** [15] - 106:13, 106:15, 106:16, 106:17, 107:1, 107:2, 107:3, 109:23, 109:24, 112:7, 112:8, 113:14, 113:24
**TESTED** [2] - 109:15, 109:16
**TESTIFIED** [40] -

20:17, 20:20, 22:3, 22:4, 25:8, 25:15, 27:14, 27:22, 28:17, 29:1, 29:18, 31:4, 35:19, 37:21, 38:16, 38:20, 39:7, 42:21, 42:25, 43:4, 44:7, 45:16, 47:15, 48:8, 48:14, 53:4, 54:22, 72:3, 72:21, 78:2, 82:9, 83:4, 102:4, 116:2, 169:12, 170:10, 171:2, 171:3, 171:21, 186:4
**TESTIFY** [13] - 20:24, 21:8, 27:15, 27:18, 35:9, 39:21, 40:1, 41:7, 49:17, 82:24, 100:25, 136:1, 193:3
**TESTIFYING** [14] - 19:24, 21:11, 21:22, 25:24, 53:16, 66:18, 72:10, 81:12, 115:15, 135:13, 137:3, 137:15, 170:22, 174:22
**TESTIMONY** [49] - 28:25, 33:4, 33:21, 34:5, 34:20, 34:24, 39:15, 46:23, 48:2, 48:4, 49:5, 49:18, 49:19, 50:22, 51:4, 52:5, 56:13, 56:24, 63:4, 82:3, 82:20, 83:17, 83:19, 111:23, 114:16, 114:18, 115:11, 133:19, 134:3, 138:7, 138:8, 138:14, 142:24, 143:9, 169:8, 171:4, 173:18, 176:15, 176:21, 181:2, 181:4, 190:12, 190:14, 190:19, 190:23, 191:17, 194:17
**TESTING** [5] - 101:13, 105:22, 106:1, 106:23, 113:15
**TESTS** [3] - 105:23, 107:13, 111:15
**THANKFULLY** [1] - 167:4
**THERE** [194] - 4:7, 5:12, 9:10, 9:19, 10:5, 10:8, 11:6, 13:1, 13:5, 13:15, 14:12, 14:25, 15:2, 16:15, 19:21, 19:22,

22:8, 23:17, 27:23, 28:13, 30:6, 30:10, 31:19, 34:11, 38:9, 38:11, 45:8, 45:22, 46:15, 48:8, 50:10, 51:3, 52:11, 53:3, 53:13, 59:17, 60:21, 63:7, 67:9, 68:9, 68:15, 69:18, 69:24, 73:25, 74:1, 74:3, 74:4, 74:9, 74:19, 74:20, 76:8, 77:5, 77:9, 82:15, 84:19, 86:5, 86:17, 87:19, 90:8, 90:16, 90:24, 91:8, 91:9, 91:11, 92:21, 93:13, 93:22, 95:16, 103:1, 105:12, 106:3, 106:5, 106:6, 106:8, 106:12, 107:4, 107:8, 108:6, 108:20, 109:20, 110:16, 111:4, 111:18, 113:10, 113:11, 113:17, 113:19, 114:23, 115:16, 118:10, 119:22, 119:23, 120:1, 120:7, 120:14, 120:15, 121:4, 121:5, 121:7, 122:7, 122:16, 122:18, 123:21, 123:23, 123:24, 125:12, 125:20, 127:25, 128:11, 128:18, 129:13, 129:25, 130:2, 130:18, 130:22, 130:23, 131:4, 131:5, 133:9, 133:13, 134:17, 135:6, 135:7, 135:8, 136:25, 137:22, 138:12, 138:20, 139:5, 139:13, 139:18, 139:19, 139:22, 145:6, 145:8, 145:11, 145:23, 147:15, 149:20, 150:8, 152:16, 155:3, 156:16, 157:11, 157:18, 160:2, 160:6, 160:9, 160:13, 161:18, 162:20, 162:21, 162:23, 162:24, 163:2, 164:20, 164:25, 165:9,

165:21, 166:5, 167:9, 168:12, 168:17, 168:18, 169:20, 170:17, 170:23, 171:25, 172:12, 172:13, 172:22, 173:12, 176:13, 178:13, 178:21, 179:2, 179:21, 180:3, 180:5, 180:14, 187:18, 187:23, 188:8, 188:10, 190:24, 192:1, 194:20
**THERE'S** [10] - 9:7, 19:7, 123:11, 126:22, 127:20, 144:13, 153:14, 154:25, 180:4, 180:7
**THEY'VE** [1] - 188:5
**THINKING** [5] - 8:1, 9:11, 14:22, 190:6, 190:15
**THIRD** [7] - 2:10, 18:13, 41:2, 155:24, 156:3, 156:9, 166:20
**THOMAS** [8] - 3:7, 3:8, 3:11, 99:19, 99:20, 99:24, 196:5, 196:13
**THOMPSON** [1] - 169:18
**THOUSANDS** [1] - 19:5
**THREATEN** [1] - 35:6
**THREATENED** [1] - 42:25
**THREATS** [3] - 26:10, 42:2, 121:14
**THREE** [34] - 16:3, 20:22, 20:23, 60:19, 77:22, 93:4, 121:25, 126:8, 126:20, 134:5, 138:16, 139:4, 139:13, 139:14, 145:2, 145:8, 146:20, 148:11, 151:11, 157:10, 158:25, 159:5, 159:9, 160:18, 161:12, 162:6, 163:4, 163:11, 163:14, 163:17, 168:10, 183:20, 184:13, 184:14
**THREE-WEEK** [2] - 126:8, 126:20
**THREW** [3] - 150:15, 150:23, 151:10

**THROAT** [2] - 110:17, 111:16
**THROUGHOUT** [1] - 102:8
**THROW** [1] - 150:17
**THROWING** [1] - 150:16
**THURSDAY** [1] - 1:8
**TIME-TO-TIME** [1] - 128:24
**TINY** [2] - 140:25, 141:3
**TIRED** [1] - 126:15
**TOBACCO** [2] - 122:21, 122:23
**TODAY** [16] - 4:17, 19:24, 22:1, 23:2, 23:13, 25:8, 25:15, 25:23, 34:24, 47:17, 49:22, 52:7, 133:4, 138:14, 143:12, 143:13
**TOE** [1] - 105:4
**TOGETHER** [3] - 94:14, 121:1, 182:19
**TOILET** [16] - 147:9, 150:18, 160:2, 165:24, 168:13, 168:17, 168:20, 168:22, 174:8, 179:4, 179:16, 179:25, 180:13, 188:5, 188:7
**TOM** [1] - 54:23
**TOMORROW** [4] - 132:1, 143:14, 194:16, 194:19
**TOOK** [23] - 14:15, 16:23, 16:24, 17:18, 37:13, 67:25, 68:8, 68:14, 68:16, 72:22, 125:11, 126:7, 126:10, 126:11, 126:14, 126:25, 127:9, 127:23, 139:25, 158:23, 168:10, 173:23
**TOOLS** [1] - 77:12
**TOP** [13] - 19:5, 31:19, 31:21, 41:12, 50:11, 50:19, 74:19, 92:19, 92:20, 95:12, 159:25, 162:2, 181:23
**TOPIC** [2] - 108:22, 161:14
**TOTAL** [1] - 94:16
**TOTALLY** [2] - 86:24, 113:14
**TOUCH** [1] - 157:5

**TOWARDS** [4] - 3:17, 25:17, 78:15, 180:23
**TOWN** [2] - 15:8, 49:21
**TRACK** [1] - 159:7
**TRAMPS** [2] - 59:18, 60:3
**TRANSCRIPT** [22] - 1:24, 28:12, 36:19, 36:24, 37:3, 40:24, 44:25, 59:25, 72:18, 90:21, 90:22, 90:25, 114:15, 115:7, 115:10, 132:9, 142:18, 143:11, 144:9, 194:15, 195:14, 196:18
**TRANSCRIPTION** [1] - 1:24
**TRANSCRIPTS** [9] - 30:1, 66:13, 73:11, 114:12, 142:13, 142:24, 143:16, 144:8, 144:16
**TRANSFER** [3] - 17:21, 138:23, 172:20
**TRANSFERRED** [7] - 120:4, 121:9, 134:23, 138:2, 138:25, 172:19, 172:20
**TRAUMA** [1] - 54:6
**TRAVELING** [1] - 6:11
**TRAVELLED** [1] - 73:1
**TRAVIS** [26] - 2:8, 2:9, 87:23, 135:9, 135:12, 136:2, 136:6, 136:9, 136:12, 154:25, 155:4, 155:5, 155:6, 155:16, 165:6, 167:13, 169:1, 179:21, 184:21, 184:23, 185:6, 193:12, 193:18, 193:23, 193:25
**TRAYS** [1] - 166:4
**TRAZODONE** [1] - 126:10
**TREATED** [1] - 73:25
**TRIAL** [24] - 20:24, 21:1, 21:5, 36:2, 39:17, 39:21, 39:23, 39:25, 40:24, 46:18, 49:8, 49:17, 50:5, 50:14, 60:24, 61:3, 62:4, 72:10, 90:22, 90:25, 114:17, 115:8, 132:8, 134:6

**TRIALS** [1] - 22:15
**TRIED** [6] - 18:5, 55:9, 60:20, 145:22, 161:22, 162:8
**TRIP** [3] - 38:13, 44:15
**TROUBLE** [12] - 120:17, 120:20, 120:22, 120:24, 121:10, 121:17, 121:19, 156:2, 158:7, 158:8, 158:11
**TROUBLES** [6] - 120:6, 120:7, 120:14, 120:15, 121:7, 158:10
**TRUE** [13] - 31:6, 31:16, 34:7, 48:6, 50:24, 51:21, 51:25, 52:6, 52:7, 52:10, 52:12, 52:25, 93:23
**TRUNK** [1] - 77:12
**TRUTH** [14] - 22:1, 22:3, 22:4, 22:14, 22:25, 28:20, 37:14, 53:5, 53:8, 53:12, 58:2, 58:11, 63:21, 97:4
**TRUTHFUL** [2] - 33:4, 63:4
**TRY** [8] - 12:5, 28:7, 31:22, 32:4, 82:10, 129:16, 144:8, 144:12
**TRYING** [8] - 8:12, 17:6, 36:6, 47:19, 136:12, 165:14, 174:20, 184:6
**TUESDAY** [2] - 50:8, 114:17
**TULSA** [1] - 84:18
**TURN** [23] - 29:21, 30:6, 31:1, 31:18, 36:23, 38:1, 38:25, 41:9, 44:25, 50:9, 50:17, 51:6, 58:24, 59:9, 59:13, 59:22, 65:3, 65:6, 66:12, 66:16, 74:23, 182:16, 184:17
**TURNED** [2] - 42:19, 183:21
**TV** [3] - 10:16, 10:18, 93:10
**TWICE** [4] - 34:16, 34:17, 97:16, 186:12
**TWO** [54] - 6:2, 9:12, 13:7, 18:13, 19:7, 20:22, 20:23, 21:8, 28:14, 35:6, 39:6, 39:16, 77:15, 93:4,

94:14, 111:6, 112:9, 115:11, 118:16, 121:25, 126:8, 126:20, 138:16, 139:6, 139:13, 139:14, 145:1, 145:8, 146:20, 148:11, 149:4, 151:11, 154:10, 157:10, 158:25, 159:5, 159:9, 160:1, 160:5, 161:11, 161:15, 161:19, 162:5, 163:3, 163:11, 163:14, 163:17, 168:10, 169:23, 172:23, 173:12, 173:18, 175:7, 184:13
**TYPE** [5] - 85:12, 86:18, 104:17, 120:17, 148:19
**TYPES** [4] - 107:12, 107:19, 141:16, 173:18
**TYPING** [2] - 107:12, 107:24

## U

**U-P-T-O-N** [1] - 3:24
**U.S** [3] - 133:14, 138:13, 192:5
**UH** [4] - 73:14, 75:12, 76:25, 77:8
**UM** [2] - 117:14, 117:21
**UNABLE** [1] - 179:22
**UNAUTHORIZED** [1] - 94:12
**UNCLEAR** [1] - 88:10
**UNDER** [16] - 28:17, 29:2, 31:4, 39:24, 41:7, 50:14, 53:18, 81:23, 122:21, 132:13, 142:17, 149:21, 150:8, 154:9, 160:18, 187:5
**UNDERSTANDINGS** [2] - 133:6, 138:12
**UNDERSTOOD** [6] - 127:4, 173:18, 173:22, 182:8, 182:12, 182:15
**UNDERWEAR** [7] - 141:1, 141:14, 141:16, 142:5, 146:13, 176:17, 176:23
**UNIT** [18] - 85:12,

119:10, 135:20, 136:23, 136:25, 137:9, 137:13, 137:22, 138:5, 141:22, 149:16, 152:17, 155:21, 179:9, 192:18, 192:19, 192:22
**UNITED** [11] - 1:1, 1:3, 1:16, 2:2, 3:3, 102:9, 113:8, 115:8, 116:1, 116:20, 132:8
**UNIVERSITY** [3] - 101:5, 101:7, 101:9
**UNREAL** [2] - 17:13, 19:10
**UNRELATED** [1] - 107:17
**UNTRUTHFUL** [1] - 63:4
**UNUSUAL** [1] - 187:10
**UP** [80] - 7:23, 8:3, 14:22, 15:10, 15:13, 16:21, 16:22, 20:2, 23:1, 37:19, 39:5, 41:6, 41:16, 42:7, 50:10, 51:2, 55:14, 57:1, 57:4, 57:5, 57:21, 57:24, 64:7, 67:13, 74:19, 76:13, 82:1, 86:21, 86:24, 97:22, 97:23, 98:2, 104:5, 105:9, 121:10, 121:16, 121:18, 123:19, 127:6, 129:1, 129:3, 129:6, 130:19, 131:4, 131:15, 133:21, 133:24, 134:6, 136:19, 140:15, 141:14, 144:23, 145:1, 145:4, 145:18, 145:23, 146:11, 149:20, 149:23, 153:25, 154:3, 159:11, 159:13, 162:24, 164:4, 166:3, 168:12, 173:8, 173:13, 175:20, 178:16, 179:19, 179:25, 180:4, 186:19, 187:8, 188:19, 192:5, 194:14
**UPFRONT** [1] - 121:2
**UPHELD** [1] - 62:23
**UPPER** [1] - 153:6
**UPSTAIRS** [5] - 9:25, 45:15, 129:8, 188:7,

190:25
**UPTON** [66] - 3:7, 3:8, 3:11, 3:14, 3:25, 20:9, 22:23, 24:9, 24:18, 25:1, 28:3, 29:4, 30:10, 32:8, 35:20, 36:9, 36:14, 38:18, 38:25, 39:16, 40:7, 45:21, 46:4, 47:14, 48:8, 49:7, 49:16, 50:3, 53:4, 55:2, 55:4, 57:5, 58:23, 58:25, 59:5, 59:13, 59:14, 60:3, 61:5, 63:20, 64:11, 64:21, 65:11, 66:22, 66:24, 67:3, 67:19, 67:24, 68:21, 69:10, 71:12, 72:3, 72:19, 73:9, 74:14, 74:16, 76:13, 77:7, 77:13, 78:1, 81:15, 82:9, 82:22, 82:25, 83:4, 196:5
**USP** [9] - 171:23, 172:1, 172:5, 172:6, 172:24, 173:1, 173:2, 177:6, 177:14
**UTILIZING** [1] - 115:9

## V

**VALID** [2] - 107:2, 107:3
**VALIDATED** [1] - 114:1
**VALIDITY** [2] - 113:13, 113:23
**VARIOUS** [2] - 101:12, 109:13
**VENT** [3] - 180:4, 180:21, 188:5
**VERSION** [1] - 63:15
**VERSUS** [4] - 3:3, 95:13, 115:9, 132:8
**VICTIM** [3] - 20:25, 75:24, 76:11
**VIDEO** [3] - 70:18, 71:20, 100:4
**VIEW** [2] - 81:23, 135:14
**VIOLENT** [1] - 12:4
**VOICE** [1] - 154:3
**VOICES** [3] - 127:12, 127:17, 127:20
**VOLUME** [1] - 132:7
**VOLUNTEER** [1] - 157:15
**VOLUNTEERED** [1] - 157:17

# W

**WAFFENSCHMIDT** [1] - 2:9

**WAIT** [4] - 24:21, 36:11, 88:8, 187:16

**WAITED** [1] - 122:4

**WALK** [5] - 15:13, 15:23, 131:19, 183:17

**WALKED** [6] - 15:13, 30:23, 37:19, 39:11, 41:16, 42:7

**WALKING** [6] - 17:4, 17:9, 27:5, 185:25, 186:6

**WALL** [4] - 162:22, 162:25, 178:17, 180:10

**WALLS** [1] - 167:3

**WANTS** [3] - 26:7, 43:2, 61:20

**WASHINGTON** [2] - 1:17, 2:4

**WATCH** [1] - 40:2

**WATER** [3] - 160:16, 160:17, 160:19

**WATERS** [1] - 2:9

**WAYS** [2] - 111:6, 131:2

**WEAPONS** [3] - 159:10, 159:13, 159:19

**WEAR** [3] - 141:7, 141:19, 142:9

**WEDNESDAY** [2] - 115:17, 132:7

**WEEK** [16] - 86:3, 126:8, 126:20, 129:5, 129:6, 129:7, 137:5, 139:3, 139:5, 163:14, 168:10, 175:22, 194:23, 194:25

**WEEKEND** [1] - 143:14

**WEEKLY** [1] - 148:13

**WEEKS** [25] - 118:16, 122:1, 122:8, 134:5, 138:17, 139:6, 139:14, 140:22, 145:2, 145:8, 146:20, 148:11, 149:4, 151:11, 157:10, 158:25, 159:5, 159:9, 161:12, 162:6, 163:4, 163:11, 163:17, 172:23

**WEIGHT** [1] - 83:19

**WEST** [4] - 2:10, 14:5, 42:18, 78:11

**WESTERN** [1] - 101:9

**WESTERNS** [1] - 11:17

**WHEAT** [2] - 14:10, 15:2

**WHEREVER** [1] - 8:8

**WHEREWITHAL** [1] - 138:19

**WHITE** [10] - 1:19, 120:21, 120:25, 121:10, 121:15, 121:19, 128:13, 131:9, 172:17, 195:20

**WHITE-FACED** [1] - 131:9

**WHOLE** [18] - 22:4, 23:10, 23:18, 32:23, 33:1, 34:2, 39:25, 110:24, 124:3, 130:20, 142:17, 143:9, 149:17, 150:11, 150:14, 151:6, 162:22

**WIDTH** [1] - 124:1

**WILBUR** [3] - 163:15, 169:5

**WILLIAMSPORT** [5] - 2:11, 21:21, 50:4, 74:7, 138:2

**WILLING** [2] - 162:1, 193:3

**WILLINGLY** [9] - 22:16, 23:11, 25:25, 27:2, 27:8, 35:3, 48:9, 79:3, 79:5

**WIN** [1] - 124:24

**WINDOW** [24] - 26:16, 26:18, 30:24, 31:6, 37:19, 37:22, 41:17, 42:17, 43:5, 44:8, 47:16, 48:12, 67:14, 67:16, 67:18, 75:18, 75:21, 75:23, 76:21, 122:25, 168:12, 168:13, 168:16, 168:21

**WINDOWS** [2] - 7:23, 30:22

**WINDOWSILL** [2] - 42:8, 42:22

**WISE** [1] - 124:1

**WISH** [1] - 138:4

**WITHDRAW** [2] - 185:21, 191:10

**WITNESS** [46] - 3:5, 3:8, 3:11, 20:7, 24:11, 28:4, 28:9,

36:6, 36:16, 37:2, 41:3, 47:4, 49:12, 56:15, 62:8, 69:7, 70:21, 71:22, 76:3, 79:19, 80:2, 80:6, 80:7, 80:16, 80:23, 82:18, 83:24, 84:3, 87:12, 89:1, 99:17, 99:18, 99:20, 99:24, 105:9, 105:11, 107:11, 114:8, 114:9, 114:21, 115:6, 115:20, 115:25, 158:10, 193:21, 196:3

**WITNESS'** [1] - 81:9

**WITNESSES** [4] - 61:5, 61:6, 61:22, 115:13

**WOKE** [3] - 149:20, 149:22, 166:3

**WOMAN** [1] - 73:20

**WOMEN** [1] - 164:13

**WONDER** [1] - 69:19

**WONDERFULLY** [1] - 84:8

**WONDERING** [4] - 70:17, 71:1, 80:16, 142:22

**WORD** [12] - 76:8, 76:10, 143:10, 154:18, 167:5, 167:8, 167:9, 167:15, 167:17, 167:18, 167:21, 169:5

**WORDING** [1] - 91:7

**WORDS** [7] - 16:15, 113:20, 156:2, 164:6, 183:10, 183:15, 184:10

**WORKS** [3] - 23:25, 50:19, 84:7

**WORSE** [2] - 22:21, 22:25

**WRAPPED** [2] - 16:23, 17:2

**WRESTLED** [1] - 12:10

**WRESTLING** [1] - 12:12

**WRITE** [12] - 86:25, 89:11, 90:9, 90:17, 90:23, 91:10, 148:12, 149:1, 149:6, 154:17, 191:17, 191:18

**WRITING** [6] - 101:16, 148:2, 148:5, 148:20, 151:16,

181:10

**WRITINGS** [1] - 148:17

**WRITTEN** [6] - 110:3, 113:11, 133:14, 133:21, 149:14, 173:8

**WROTE** [8] - 77:18, 87:19, 91:6, 91:13, 92:18, 99:8, 148:7, 149:9

# X

**X-RAY** [3] - 101:22, 101:23

**X-RAYS** [1] - 101:24

# Y

**YAGER** [1] - 140:18

**YEAR** [15] - 23:19, 52:9, 58:9, 96:11, 98:10, 99:7, 108:23, 109:6, 126:18, 133:2, 176:2, 176:4

**YEARS** [36] - 4:6, 4:10, 10:22, 19:18, 19:25, 24:2, 28:23, 33:6, 47:20, 49:16, 49:18, 50:13, 53:1, 53:25, 54:18, 55:25, 56:3, 57:12, 57:14, 62:9, 62:22, 67:25, 68:4, 72:17, 79:13, 82:8, 94:13, 94:16, 96:1, 97:13, 97:17, 97:18, 113:7, 169:23, 185:11

**YELLOW** [2] - 122:25, 123:3

**YESTERDAY** [9] - 132:18, 162:13, 171:3, 171:21, 173:17, 174:22, 181:2, 187:20

**YIELDS** [1] - 106:13

**YOUNG** [1] - 189:18

**YOURSELF** [9] - 5:9, 84:2, 101:11, 118:3, 152:17, 153:13, 154:22, 155:25, 157:4

# Z

**ZIPLOCK** [1] - 104:12

**ZOLOFT** [1] - 127:19