UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF PENNSYLVANIA


UNITED STATES OF AMERICA          :   CRIMINAL NUMBER


        V.


DAVID PAUL HAMMER                  :   4:96-CR-239


                         MONDAY, 6-9-13
                         COURTROOM 16B
                         PHILADELPHIA, PA 19106


_____
        BEFORE THE HONORABLE JOEL H. SLOMSKY, J.
_____
                  SENTENCING HEARING
                       DAY 5

_____

APPEARANCES:

JOHN C. GURGANUS, JR., ESQUIRE       FOR THE GOVERNMENT
UNITED STATES ATTORNEYS OFFICE
MIDDLE DISTRICT OF PENNSYLVANIA
235 N. WASHINGTON STREET, SUITE 311
PO BOX 309
SCRANTON, PA 18501


          SUZANNE R. WHITE, RPR, FCRR, CM
             OFFICIAL COURT REPORTER
          FIRST FLOOR U. S. COURTHOUSE
              601 MARKET STREET
           PHILADELPHIA, PA 19106
              (215)627-1882


PROCEEDINGS RECORDED BY STENOTYPE-COMPUTER,
TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

CONTINUED APPEARANCES:

AMANDA HAINES, ESQUIRE                    FOR THE GOVERNMENT
UNITED STATES DEPARTMENT OF JUSTICE
CRIMINAL DIVISION
CAPITAL CRIMES SECTION
1331 F. STREET, N.W.
WASHINGTON, D.C. 20530

ANNE SAUNDERS, ESQUIRE                    FOR THE DEFENDANT
FEDERAL PUBLIC DEFENDER
MIDDLE DISTRICT OF PENNSYLVANIA
100 CHESTNUT STREET, SUITE 300
HARRISBURG, PA 17101

RONALD C. TRAVIS, ESQUIRE                 FOR THE DEFENDANT
REIDERS, TRAVIS, HUMPHREY,
HARRIS, WATERS & WAFFENSCHMIDT
161 WEST THIRD STREET
PO BOX 215
WILLIAMSPORT, PA 17703-0215

JAMES MORENO, ESQUIRE                     FOR THE DEFENDANT
JAMES MCHUGH, ESQUIRE
FEDERAL COMMUNITY DEFENDER
EASTERN DISTRICT OF PENNSYLVANIA
SUITE 540 - THE CURTIS CENTER
PHILADELPHIA, PA 19106

(THE CLERK OPENS COURT.)

ALL COUNSEL:  GOOD MORNING, YOUR HONOR.

THE COURT:  PLEASE BE SEATED.

I BELIEVE WHEN WE BROKE ON THURSDAY, WE WERE UP TO PAGE 61, THE TESTIMONY OF MR. CLASSEN.

MR. GURGANUS:  THAT'S CORRECT, YOUR HONOR.

THE COURT:  ALL RIGHT.  WE CAN CONTINUE AND COMPLETE THIS ONE.

NOW, HAVE YOU GONE OVER THE TRANSCRIPTS?

MR. GURGANUS:  YOUR HONOR, FORTUNATELY THE OTHER TRANSCRIPTS THAT WE WILL BE READING ARE NOT THAT LENGTHY AND I DON'T THINK IT'S GOING TO BE A PROBLEM.  MOST OF THE INFORMATION IS RELEVANT.

THE COURT:  ALL RIGHT.  THEN LET'S CONTINUE.

MR. GURGANUS:  YOUR HONOR, BEFORE WE DO CONTINUE, WITH THE AGREEMENT OF COUNSEL, I JUST WANT TO POINT A COUPLE OF THINGS OUT TO THE COURT.  I WILL BE OFFERING --

THE COURT:  SPEAK INTO THE MIC.

MR. GURGANUS:  -- GOVERNMENT R200.  AND R200 IS THE CERTIFICATE OF DEATH FOR STEPHEN JOSEPH CLASSEN.  IT INDICATES THE DEATH DATE WAS JUNE 10, 2006, AND THAT IS THE INDIVIDUAL WHOSE TRANSCRIPT WE ARE

READING IN HERE, JUDGE.  I'D ALSO NOTE THAT THE MANNER OF DEATH WAS ACCIDENT AND THE INJURY OCCURRED FROM INJECTION OF INTRAVENOUS HEROIN.  AND THE CAUSE OF DEATH WAS ACUTE INTRAVENOUS NARCOTISM HEROIN OVERDOSE.  WE WILL OFFER GOVERNMENT EXHIBIT R200.

THE COURT:  NO OBJECTION?

MR. TRAVIS:  NO OBJECTION.

THE COURT:  R200 WILL BE ADMITTED.

(GOVERNMENT EXHIBIT R200 ADMITTED INTO EVIDENCE.)

MR. GURGANUS:  JUDGE, JUST FOR -- THERE HAS BEEN SOME REFERENCES TO SOME EXHIBITS DURING THE COURSE OF THE READING OF THIS TRANSCRIPT.  AND WITH THE COURT'S PERMISSION, I WILL JUST SHOW YOU THE TWO EXHIBITS.

THE COURT:  ALL RIGHT.

MR. GURGANUS:  THE FIRST EXHIBIT IS 35.1 AND 35.2.  IT'S THE STEVE LETTER DATED SUNDAY, 4/14/96. AND THE SECOND EXHIBIT IS GOVERNMENT EXHIBIT 13, WHICH IS AN ITEM THAT WAS FOUND, AND THERE HAS BEEN TESTIMONY, FOUND IN THE CELL OF MR. HAMMER AND ANDREW MARTI.

WOULD THE COURT LIKE TO SEE THOSE BRIEFLY?

THE COURT:  YES.  WHAT IS EXHIBIT 35.1 AND 35.2?

MR. GURGANUS:  THIS IS THE LETTER, JUDGE.

THE COURT:  WHICH LETTER?

MR. GURGANUS:  THIS WOULD BE THE SECOND LETTER THAT YOU HAVE HEARD TESTIMONY THAT MR. CLASSEN SAID HE DID NOT RECEIVE.

THE COURT:  OKAY.

MR. GURGANUS:  AND THE OTHER ITEM IS EXHIBIT 13.  IF I MAY, I WILL JUST SHOW THOSE TO THE COURT BRIEFLY.

THE COURT:  ALL RIGHT.  I WILL TAKE A LOOK AT THEM.

MR. MCHUGH:  YOUR HONOR, THAT ONE IS THE ONE THAT IS STILL UNDER THE PORTION OF THE OBJECTION THAT WE HAD MADE AT THAT TIME.

THE COURT:  OKAY.

NOW THE OBJECTION YOU ARE REFERRING TO, IF I CAN LOOK AT MY NOTES, I BELIEVE WERE REFERRING TO -- WAS IT R27?  IS R27 A LETTER?  IN OTHER WORDS, THERE WAS OBJECTIONS MADE THAT WERE SUBJECT TO CONNECTION?

MR. MCHUGH:  YES.

THE COURT:  R27 WAS -- IS WHAT?  LET'S LOOK AT OUR EXHIBIT LIST.  I'M JUST GOING BACK TO MY NOTES.

MS. HAINES:  YOUR HONOR, I HAVE R27 AS A

FBI 302.

THE COURT:  SO IT'S NOT R27.

IT'S G 32.1 AND G 32-2.  I BELIEVE ARE THE LEONARD YAGER LETTERS.

G 32.1 OBVIOUSLY IS THE SEVEN REASONS.

G 32-2 IS A PHOTOCOPY OF G 32.1.  THEN WE HAVE THE CHESTER LARIMORE LETTERS AND ENVELOPE, G 33.1 AND G 33.2.  THEY WERE RECEIVED FROM LIEUTENANT TRAXLER, I BELIEVE, AND ADDRESSED TO ROCK AND THEN --

MS. HAINES:  THAT'S CORRECT.

THE COURT:  AND WE HAVE THE CLASSEN LETTERS THAT WERE JUST REFERRED TO, G 35.1 AND G 35.2. AND THEN WE HAD G 36.1, G 36.2 AND G 36.3, WHICH WERE THE MATTHEW DARBY LETTERS.  I THINK THOSE WERE THE ONES THAT WERE OBJECTED TO SUBJECT TO CONNECTION.

THEN WE HAD THE TESTIMONY OF THE HANDWRITING EXPERT, WHO TESTIFIED THAT THE SIGNATURES ON THOSE LETTERS WERE DAVID HAMMER'S, AM I CORRECT?

MS. HAINES:  THAT'S CORRECT, YOUR HONOR. AND SHE ALSO SAID THE SUBSTANCE WAS PROBABLY HIS WRITING AS WELL, BUT BECAUSE SHE DIDN'T HAVE AN EXACT REPLICA, SHE COULD ONLY POINT OUT SIMILARITIES.

THE COURT:  BUT AT THE VERY LEAST WE HAVE THESE LETTERS CONNECTED TO MR. HAMMER BY HIS SIGNATURE BEING IDENTIFIED BY THE HANDWRITING EXPERT, AND THAT

WOULD SATISFY ME THAT THE CONNECTION IS MADE, THAT THE LETTERS HAVE BEEN AUTHENTICATED AND ALSO THE ADDITIONAL TESTIMONY THAT -- AS MS. HAINES SAID, THAT THE EXPERT SAID -- I FORGET THE EXACT WORDS THE EXPERT USED.  IT WAS SUBSTANTIALLY -- WHAT WERE THE WORDS?  I KNOW SHE TESTIFIED TO IT.  I WOULD HAVE TO LOOK AT MY NOTES BUT SHE SAID SUBSTANTIALLY --

MS. HAINES:  I BELIEVE IT WAS PROBABLE.

THE COURT:  IT WAS PROBABLE THAT IT WAS WRITTEN BY MR. HAMMER, WHICH WOULD CORROBORATE THE FACT THAT HIS SIGNATURE WAS ON THE PAGE AND OBVIOUSLY HE OBSERVED THE LETTERS.  THE INFERENCE IS THAT WHEN YOU SIGN IT, YOU SAW IT AND YOU READ IT AND ADOPTED IT.  SO AS FAR AS I'M CONCERNED, MR. MCHUGH, THE CONNECTION HAS BEEN MADE AND THOSE THINGS WOULD BE ADMISSIBLE.

MR. MCHUGH:  JUST ONE POINT, YOUR HONOR, I BELIEVE -- I KNOW COUNSEL INDICATED THAT SHE SAID ON DIRECT THAT IT WAS PROBABLE, BUT I BELIEVE AS FAR AS THE CONTENTS OF THE LETTERS ON CROSS, SHE SAID THOSE STANDARDS HAD CHANGED AND TODAY IT WOULD BE MAYBE.  SO JUST FOR PURPOSES OF CLARIFICATION.

THE COURT:  I UNDERSTAND.  I'M RELYING MORE ON THE FACT THAT THE SIGNATURE HAS BEEN AUTHENTICATED AND THAT WOULD LEAD TO THE INFERENCE THAT HE READ THE LETTERS AND WAS ADOPTING THEM.  SO AS FAR AS

I'M CONCERNED, THE CONNECTION HAS BEEN MADE AND THOSE ITEMS ARE ADMISSIBLE.

NOW WE HAVE JUST REFERRED TO EXHIBIT 35.1 AND 35.2 AND EXHIBIT 13.  EXHIBIT 13, IS THAT THE STRING THAT WAS FOUND IN MR. MARTI'S CELL -- IN MR. HAMMER'S CELL?

MR. GURGANUS:  YES, IN TWO OF THEIR CELLS, THAT'S CORRECT, YOUR HONOR.  IT WAS ON THE VIDEO, ET CETERA.  THERE WILL BE OTHER TESTIMONY ABOUT THIS WHEN WE READ IN THE PATHOLOGIST'S REPORT.

THE COURT:  ALL RIGHT.

YOU CAN CONTINUE.  LET'S READ ON.  WE ARE ON PAGE 61 OF MR. CLASSEN'S TESTIMONY, BEGINNING WITH THE WORD "BRIEFLY."

(STEPHEN CLASSEN'S TESTIMONY WAS READ AS FOLLOWS:

Q.    BRIEFLY, MR. CLASSEN, DURING THE INTERVIEW WITH AGENT MALOCU ON APRIL 6TH OF 1998, WHEN YOU WERE DISCUSSING MR. HAMMER'S CHILDHOOD AND HARD LIFE, DID YOU TELL AGENT MALOCU THAT MR. HAMMER TOLD YOU THAT HIS FAMILY HAD NO MONEY, AND THAT THEY HAD LIVED IN SHACKS?

A.    MAYBE NOT IN THOSE WORDS, BUT HE TOLD ME THEY WERE POOR.

Q.    OKAY.

A.    AND POOR HOUSING.  I THINK I SAID SHACKS.

Q.      YOU THINK YOU DID USE THE WORD "SHACKS"?

A.      YEAH, I THINK SO, YEAH.

Q.      OKAY.  AND YOU THINK YOU SAID POOR, AS OPPOSED TO SAYING THEY HAD NO MONEY?

A.      YEAH.

MR. TRAVIS:  OKAY.  ONE MOMENT, YOUR HONOR.

Q.      OKAY.  I MAY HAVE MISREAD THE DATE.  MR. RUHNKE WAS KIND ENOUGH TO INFORM ME.  I'M TALKING ABOUT THE MAY 6, 1998 INTERVIEW, WHICH WAS THE SECOND INTERVIEW.  IT WAS AFTER YOU WERE WITH THE GRAND JURY, WHEN YOU TALKED ABOUT MR. HAMMER'S HARD LIFE.

DO YOU RECALL THAT BEING THE OCCASION THAT YOU HAD TALKED ABOUT THAT WITH MR. MALOCU?

A.      ABOUT -- WHAT IS IT ABOUT?  HIM BEING POOR?

Q.      YES.

A.      A POOR FAMILY, YES.

Q.      OKAY.  AND DO YOU RECALL IF YOU USED THE WORD, QUOTE, HARD, CLOSE QUOTE TO DESCRIBE HIS CHILDHOOD?

A.      I THINK SO, YES.  OKAY.

MR. TRAVIS:  WE HAVE NO OTHER QUESTIONS, YOUR HONOR.

AND THE COURT STATED:  ALL RIGHT.  ANY REDIRECT?

AT THAT POINT MR. MARTIN HAD REDIRECT

EXAMINATION, WHICH I WILL BEGIN READING AT THIS POINT FROM PAGE 63.

Q.     WITH RESPECT TO, AGAIN, YOUR IDEA OF A HARD CHILDHOOD MAY NOT BE THE SAME AS MR. MALOCU'S OR MINE, WHAT DID YOU MEAN BY THAT IN TERMS OF WHAT DID MR. HAMMER SAY WAS SO HARD ABOUT HIS CHILDHOOD?

A.     WELL, EITHER I WASN'T PAYING ATTENTION OR I WASN'T LISTENING OR -- BUT JUST POOR.  AND YOU KNOW, THEY DIDN'T HAVE A LOT OF MONEY.  AND THEY LIVED IN LIKE A -- WELL, HE -- I THINK THIS IS HAMMER'S WORDS, SHACK. YOU KNOW, THEY LIVED IN LIKE A SHACK OR SOMETHING OR POOR IN OKLAHOMA SO....

Q.     AGAIN THAT'S WHAT MR. HAMMER TOLD YOU?

A.     YES.

Q.     THIS FELLOW, MARK JORDAN, HOW DID YOU GET ALONG WITH HIM?

A.     NOT VERY GOOD.  I DIDN'T LIKE HIM.  AT THAT TIME THERE WAS THREE OF US HOUSED IN A CELL AND HE WAS SLEEPING ON THE FLOOR.  AND I DIDN'T LIKE THE GUY VERY MUCH.  AND I WANT TO SAY THAT WE DID TALK ABOUT THE CASE.  THAT'S ALL.  I TOLD HIM A LITTLE BIT, SOMETHING ABOUT MR. HAMMER.

Q.     WHAT WAS IT THAT YOU SAID TO MR. JORDAN ABOUT THE CASE, TO THE BEST OF YOUR RECOLLECTION?

A.     I'M NOT EVEN SURE I RECALL.  BUT I RECALL HIM

OFFERING ME SOME MONEY, BUT I ALWAYS HAD MONEY ON MY

BOOKS.  HE SAID, WELL, MAYBE I COULD, LIKE, TELL ON HIM

OR SOMETHING, YOU KNOW, AND TESTIFY OR SOMETHING.  I

REMEMBER THAT.  AND I DIDN'T WANT TO DO IT.  AND AS FOR

THE ADDRESS, HE MAY HAVE GOTTEN IT -- I MAY HAVE GOTTEN

LETTERS.  MY LETTERS ARE RIGHT THERE.  AND HE COULD PICK

UP AN ADDRESS ANYWHERES.  ANYBODY CAN DO THAT.

Q.     AGAIN, YOU INDICATED WHEN YOU TESTIFIED,

MR. CLASSEN, A FEW MINUTES BACK, YOU SAID NOT MARK

JORDAN IN TERMS OF GIVING DAWNA TARRENT'S ADDRESS?

A.     RIGHT.

Q.     SUGGESTING THAT MAYBE YOU GAVE IT TO SOMEBODY

ELSE, BUT NOT MARK JORDAN?

A.     SURE.  THE GUY I WAS LIVING WITH AT THE CELL AT

THE SAME TIME, THE OTHER GUY, HIS NAME WAS DARBY.

MATTHEW DARBY WAS IN THE CELL AT THE SAME TIME.

Q.     DID YOU GIVE MATTHEW DARBY, FOR EXAMPLE -- DID

HE RECEIVE --

A.     YES.  YES, I DID AND I MAY HAVE EVEN GIVEN IT TO

MARK, JUST -- NOT TO BE RUDE TO HIM, YOU KNOW, NOT

THINKING HE'D EVER WRITE OR ANYTHING, BUT I REMEMBER

GIVING IT TO DARBY.

Q.     AND WITH RESPECT -- AGAIN, MR. TRAVIS ASKED SOME

QUESTIONS ABOUT A LETTER FROM MR. HAMMER.

DO YOU REMEMBER ANY -- SPEAKING TO

MR. JORDAN ABOUT SOME LETTER FROM MR. HAMMER THAT DAWNA TARRENT HAD?

A.      NO.

Q.      ALL RIGHT.  DID DAWNA TARRENT EVER HAVE A LETTER FROM MR. HAMMER?

A.      NO.

Q.      DID YOU EVER GIVE MR. HAMMER DAWNA TARRENT'S NAME AND ADDRESS, TO THE BEST OF YOUR RECOLLECTION?

A.      I DON'T THINK SO.  I THINK HE HAD MY PARENTS' ADDRESS, BUT NOT DAWNA'S.

Q.      AND AGAIN YOU RECALL THAT MR. JORDAN WANTED TO BECOME PART OF THIS PROSECUTION TEAM OR AT LEAST TO HAVE SOME INFORMATION ABOUT --

A.      YES.

Q.      -- THE CASE?

A.      YES, I DID.

Q.      DID HE INDICATE WHY HE WOULD WANT SUCH INFORMATION?

A.      BECAUSE HE HAD A LOT OF TIME, AND HE WANTED TO GET OUT.  HE'S A PRETTY YOUNG KID AND HE WASN'T HAPPY WITH HIS SENTENCE.

Q.      WELL, LET'S STAY WITH THAT TOPIC OF HAPPINESS WITH SENTENCES.  YOU INDICATED THAT IN OREGON YOU RECEIVED A SENTENCE OF WHAT?

A.      FOR THE CONSPIRACY, 46 MONTHS.

Q.      OKAY.  NOW WERE SENTENCING GUIDELINES USED IN YOUR CASE?

A.      YES, THEY WERE.

Q.      AND THE JURY PROBABLY DOESN'T KNOW AS MUCH ABOUT IT AS YOU DO.  WITH RESPECT TO SENTENCING GUIDELINES, COULD YOU EXPLAIN HOW THAT WORKED IN YOUR CASE?

A.      WELL, HOW DO YOU MEAN?  WHAT THEY DO, I GUESS, IS TAKE YOUR PRIOR CRIMES AND THEY FIGURE OUT A NUMBER, AND THEY USE JUST A GRID BOX.  AND THEY -- MY SENTENCE JUST CAME UP -- OR MY GUIDELINES CAME UP.  WHAT DID I GET?  37 TO 46 MONTHS I THINK, AND THEY SENTENCED ME TO THE TOP OF MY GUIDELINES BECAUSE OF MY CRIMINAL HISTORY.

Q.      AND AGAIN, WITH RESPECT TO YOUR COOPERATION, YOU ASKED YOUR ATTORNEY, YOUR DEFENSE ATTORNEY, TO PRESENT THAT TO PROSECUTORS IN OREGON, IS THAT CORRECT?

A.      THE GRAND JURY THING AND HE SAID IT WASN'T GOING TO DO ANY GOOD ANYWAY.  SO THEY WEREN'T TOO OPEN TO IT ANYWAY IS WHAT HE TOLD ME.  SO --

Q.      AS A MATTER OF FACT, AGAIN, YOU'VE INDICATED THAT YOU RECEIVED THE MAXIMUM SENTENCE WITHIN THE GUIDELINES?

A.      IN THE GUIDELINES, YES.

Q.      FOR YOUR PARTICULAR OFFENSE?

A.      YES.

Q.      SO AS OF TODAY WHAT BENEFIT HAS YOUR BEING

INTERVIEWED AT LEAST TWICE BY THE FBI AND THE GRAND JURY BEEN TO YOU?

A.    NOTHING.

Q.    WHEN WILL YOUR SENTENCE END, MR. CLASSEN, IF NOTHING ELSE HAPPENS IN YOUR SENTENCE?

A.    NOVEMBER OF 2000.

Q.    SO THAT YOU HAVE ROUGHLY A YEAR AND A HALF TO DO, IS THAT CORRECT?

A.    TWO YEARS, NOVEMBER 2000.

Q.    I'M SORRY.  WITH RESPECT TO AGAIN, THE BUSINESS OF YOUR SENTENCING, DO YOU KNOW WHAT A 5K MOTION IS?

A.    NO.

Q.    OR A DEPARTURE MOTION FROM THE GUIDELINES?

A.    I'VE HEARD ABOUT THEM AT THE LAST PLACE.  I DON'T KNOW FOR MYSELF, BUT --

Q.    I TAKE IT THAT NONE OF THAT WAS DONE IN YOUR CASE?

A.    NO.

Q.    IN TERMS OF ANY DEPARTURES GIVEN BY THE GOVERNMENT OR ASKED BY YOUR DEFENSE ATTORNEY?

A.    NO.

Q.    BY THE WAY, WITH RESPECT TO THE INTERVIEWS THAT YOU HAD WITH THE FBI, YOU, AT LEAST, HAVE SEEN SYNOPSIS OR REFERENCES TO TWO TIMES THE FBI WROTE THINGS DOWN OR AT LEAST THOUGHT THEY WROTE THE THINGS DOWN THAT YOU HAD

SAID TO THEM, IS THAT CORRECT?

A.      YEAH.

Q.      THE FIRST TIME THAT YOU SPOKE TO THE FBI, WHERE
DID THAT TAKE PLACE?

A.      AT ALLENWOOD.

Q.      AND WAS THAT IN THE SPECIAL HOUSING UNIT IN THE
CELL THERE?

A.      THEY PULLED ME OUT OF MY CELL.

Q.      BUT WHERE DID THEY TALK TO YOU?

A.      LIEUTENANT'S OFFICE.  IT WAS IN THE SPECIAL
HOUSING UNIT AREA RIGHT THERE.

Q.      HOW LONG DID THAT ENCOUNTER WITH THE FBI TAKE
PLACE?

A.      NO MORE THAN 15 MINUTES, I DON'T THINK.

Q.      COMPARING TIME WISE, AGAIN, DID YOU SPEND MORE
TIME WITH MR. MALOCU IN MAY OF 19 -- OF THIS YEAR WHEN
HE SPOKE TO YOU?

A.      YES.

Q.      AND IN TERMS OF YOUR GRAND JURY APPEARANCE, DID
WE HAVE A GREAT DEAL OF DISCUSSION BEFORE YOU APPEARED
BEFORE THE GRAND JURY?

A.      NOT A LOT, NO.

Q.      HOW MUCH TIME WAS IT, TO THE BEST OF YOUR
RECOLLECTION?

A.      MAYBE ABOUT THE SAME, ABOUT 10 OR 15 MINUTES.

Q.    NOW, YOU HAVE -- MR. TRAVIS HAS ASKED YOU CERTAIN QUESTIONS, WHICH YOU'VE GIVEN TESTIMONY, WHICH IS NOT COVERED IN THE GRAND JURY STATEMENT OR IN THE STATEMENTS THAT YOU MAY HAVE GIVEN EITHER TO AGENT THOMPSON OR TO AGENT MALOCU.  FOR EXAMPLE, THE ONE -- THE QUESTION ABOUT THE BRIEFS, THE UNDERWEAR?

A.    OKAY.

Q.    AGAIN, THAT IS NOT REFERENCED IN ANY OF THOSE THREE DOCUMENTS, IS THAT CORRECT?

A.    RIGHT.

Q.    AND AGAIN, AS YOU SIT HERE TODAY, DO YOU HAVE -- IN SOME OF YOUR TESTIMONY, MR. CLASSEN, YOU SAID YOU WERE NOT A HUNDRED PERCENT SURE?

A.    RIGHT.

Q.    OKAY.  WITH RESPECT TO THE BRIEFS, AS YOU SIT HERE TODAY, ARE YOU A HUNDRED PERCENT SURE OR SOMETHING LESS THAN THAT?

A.    NO.

Q.    ABOUT THE BRIEFS?

A.    I REMEMBER IT SPECIFICALLY.

Q.    AND WITH RESPECT TO THE ARM AROUND THE NECK, WHAT YOU TESTIFIED TO YESTERDAY --

A.    RIGHT.

Q.    -- THAT WAS NOT REFERENCED IN EITHER OF THE FBI INTERVIEWS AND WAS NOT REFERENCED IN YOUR GRAND JURY

STATEMENT, IS THAT CORRECT?

A.    THAT'S TRUE.

Q.    UM -- WHAT -- AS YOU SIT HERE TODAY, WITH THE ARM AROUND THE NECK BUSINESS, ARE YOU A HUNDRED PERCENT SURE ABOUT THIS?

A.    YES.

Q.    OKAY.  WHAT WAS IT THAT CAUSED YOU TO REMEMBER MR. HAMMER PLACING HIS ARM AROUND YOUR NECK?

A.    I'M NOT EVEN SURE WHAT IT WAS THAT MADE ME MIND IT.  I REMEMBER JUST -- WHEN THEY CAME -- THE DEFENSE CAME OVER AND TALKED TO ME LAST WEEK FOR JUST A FEW MINUTES.  THEY CAME.  AND I REMEMBER THAT -- LIKE THAT DAY.  I PROBABLY REMEMBERED IT EVEN BEFORE, ONLY I NEVER WRITE ANYTHING DOWN, OF COURSE, ABOUT THIS.  AND THEN I FORGET AND REMEMBER AGAIN.  BUT THOSE THINGS ARE LIKE SPECIFIC, BUT I DON'T RECALL WHAT IT WAS THAT MADE ME REMEMBER.  IT'S JUST I REMEMBER IT AT THAT TIME.

Q.    AGAIN, SO THE JURY WOULD UNDERSTAND, IT WAS YOUR DISCUSSION WITH THE DEFENSE IN THIS CASE THAT CAUSED YOU TO REMEMBER THE ARM AROUND THE NECK.

AT THAT POINT THERE WAS AN OBJECTION BY MR. TRAVIS.

YOUR HONOR, I OBJECT TO THE QUESTION.

THE COURT THEN STATED:  WELL, THERE'S NO QUESTION.  I'M GOING TO OVERRULE THE OBJECTION AND I'LL

STRIKE WHAT WAS LAST SAID.  THERE WAS ABSOLUTELY NO QUESTION AT ALL.

AT THAT POINT MR. MARTIN CONTINUED.

Q.     MR. CLASSEN, WHEN DO YOU FIRST RECALL TELLING ANYONE, ANYONE IN THIS COURTROOM OR ANYONE OUTSIDE THIS COURTROOM, ABOUT MR. HAMMER PUTTING HIS ARM AROUND YOUR NECK?

A.     LAST WEEK.

Q.     AND WHO WAS PRESENT WHEN YOU HAVE A RECOLLECTION OR WHEN THAT RECOLLECTION WAS COMMUNICATED TO SOMEONE ELSE, TO ANOTHER LIVING BEING?

A.     MR. TRAVIS AND MR. RUHNKE.

Q.     MR. HAMMER DID APPARENTLY TALK TO YOU ABOUT HIS CHILDHOOD TO SOME DEGREE, IS THAT CORRECT?

A.     A LITTLE BIT.

Q.     DID YOU TALK TO HIM ABOUT YOUR CHILDHOOD TO SOME DEGREE?

A.     A LITTLE BIT.

Q.     WHAT DID YOU TELL HIM?

A.     I TOLD HIM THAT I WAS MOLESTED WHEN I WAS A KID AND HE JUST --

Q.     AND WHAT DID HE SAY TO YOU, IF ANYTHING, WHEN YOU TOLD HIM YOU WERE MOLESTED AS A CHILD?

A.     I DON'T EVEN REMEMBER, TO TELL YOU THE TRUTH, BECAUSE I PROBABLY, AGAIN, WASN'T PAYING MUCH ATTENTION.

I WAS JUST TELLING HIM.  I DON'T KNOW WHAT -- WHY IT EVEN CAME UP OR SOMETHING LIKE THAT.

Q.      BUT YOU RECALL SHARING THAT INFORMATION WITH MR. HAMMER?

A.      YES, I DO.

Q.      WITH RESPECT TO HIS RELATIONSHIP WITH HIS FAMILY, DID YOU TALK TO HIM ABOUT HIS RELATIONSHIP WITH HIS FAMILY OTHER THAN LIVING IN PERHAPS SHACKS?

A.      NOT -- NOT A LOT.  A LITTLE BIT.

Q.      OKAY.  WHAT DO YOU REMEMBER MR. HAMMER SAYING ABOUT HIS RELATIONSHIP WITH HIS FAMILY TO YOU FOR THE TWO OR THREE WEEKS THAT YOU WERE WITH HIM?

A.      WELL, ONLY SENSE -- THIS WOULD BE A SENSE OF IT, IS ABOUT HIS MOTHER.  AND HE TOLD ME HE DIDN'T GET ALONG WITH HIS SISTER.  AND I THINK HE HAS A BROTHER TOO OR SOMETHING.  AND HE DIDN'T TALK TO THEM TOO MUCH.  BUT I ALWAYS GOT THE IMPRESSION THAT HE WAS CLOSE TO HIS MOM BECAUSE OF THE INCIDENT THAT MR. TRAVIS BROUGHT UP, THE STORY HE TOLD ME THE ONE NIGHT.  AND THEN IT UPSET HIM, BUT I THINK HIS MOM WAS THE CLOSEST ONE THAT HE HAD.

Q.      OKAY.  WITH RESPECT TO THE INCIDENT, THE RELATIONSHIP, THE INCIDENT THAT YOU REFERRED TO WHEN MR. TRAVIS ASKED YOU THE QUESTION, WHAT WAS THAT INCIDENT IN TERMS OF MR. HAMMER'S RELATIONSHIP WITH HIS MOM?

A.      THAT MADE HIM CRY?

Q.    YES.

A.    THE LAST TIME THAT HE SAW HER I BELIEVE HE WAS TELLING ME THAT HE SAW HER ON HER DEATH BED AND SHE DIED A COUPLE OF DAYS LATER AND THEY TRIED TO TAKE HIM TO HIS FUNERAL OR TO HER FUNERAL AND --

Q.    AND HE WAS NOT ALLOWED TO GO?

A.    HE WAS NOT ALLOWED TO GO BECAUSE HE JUST VISITED HER.

Q.    AGAIN, SO IT WAS HIS RECALLING HIS MOTHER'S DEATH.  AND AGAIN, HE TOLD YOU THAT.

WAS THERE A LAPSE OF TIME BETWEEN HE STARTED CRYING OR WAS HE CRYING IMMEDIATELY AFTER THAT?

A.    IT WASN'T LONG.  LIKE MAYBE 20 MINUTES OR A HALF-HOUR OR SOMETHING.  BECAUSE, LIKE, IT WAS ALREADY DARK IN THERE AND WE WERE ALREADY IN BED, YOU KNOW.  WE ALWAYS TALKED A LITTLE BIT AND HE'D TELL ME DIFFERENT STORIES LIKE -- WE'D TALK AT NIGHT AND THEN THAT PARTICULAR NIGHT HE TOLD ME ABOUT HIS MOTHER.

Q.    AND AGAIN, YOU LINK THE STORY THAT HE GAVE YOU ABOUT HIS MOTHER'S DEATH TO HIS CRYING LATER THAT DAY OR LATER THAT EVENING?

A.    SURE.  IT SEEMED PRETTY EMOTIONAL TO ME.

Q.    WHENEVER -- ON WHAT OTHER OCCASIONS, MR. CLASSEN, DURING THE TWO TO THREE WEEKS THAT YOU WERE WITH DAVID PAUL HAMMER DID HE CRY IN YOUR PRESENCE?

A.      THAT WOULD BE THE ONLY TIME.

Q.      YOU INDICATED THAT HE WAS TERRIBLY --  WELL, HOW WAS IT THAT YOU WOULD DESCRIBE HIM WHEN THAT CELL FIGHT -- THE CELL REC FIGHT TOOK PLACE?

A.      HOW --

Q.      HOW DID HE REACT?  HOW DID HE RESPOND TO THAT PARTICULAR SITUATION?

A.      PRETTY EXCITED.

                AT THAT POINT THERE WAS AN OBJECTION BY MR. TRAVIS.

                MR. TRAVIS:  YOUR HONOR, I'M GOING TO OBJECT.  I DON'T THINK THIS IS PROPER REDIRECT.

                THE COURT:  THE QUESTION IS BEING REPHRASED.  GO ON TO PAGE 75.

Q.      ON WHAT OTHER OCCASIONS DURING THE TWO OR THREE WEEKS THAT YOU WERE WITH DAVID PAUL HAMMER DID MR. HAMMER ACT IN THE SAME FASHION OR A SIMILAR FASHION AS WHAT OCCURRED IN THAT CELL REC FIGHT?

A.      NONE.

Q.      YOU WERE ASKED TO READ THE OTHER PORTIONS OF THE LETTER THAT WAS SENT TO YOU WHICH YOU NEVER RECEIVED FROM MR. HAMMER, IS THAT CORRECT?

A.      RIGHT.

Q.      DO YOU HAVE THAT LETTER THERE STILL WITH YOU, MR. CLASSEN?

A.      YES.

Q.      YOU WERE ASKED TO READ THE --

THE COURT INTERJECTED:  I DON'T --

Q.      AND THE BUSINESS ABOUT --

CONTINUING DOWN TO LINE 24, YOUR HONOR.

Q.      YOU WERE ASKED TO READ ABOUT MR. HAMMER'S PHILOSOPHY OF DEATH, THAT PORTION OF THE LETTER?

A.      YES.

Q.      DID -- WHILE YOU WERE WITH MR. HAMMER FOR THOSE TWO OR THREE WEEKS, DID HE SHARE ANYTHING ABOUT HIS PHILOSOPHY OF DEATH WITH YOU?

A.      PARENTHETICALLY, THE WITNESS NODDED.

Q.      DID THE SUBJECT -- OTHER THAN OF PERHAPS THE PASSING OF HIS MOTHER, DID THE SUBJECT OF DEATH EVER COME UP IN YOUR CONVERSATIONS?

A.      NO.

Q.      THERE'S ALSO -- AGAIN, WHAT YOU READ IN THAT LETTER, WHICH I DIDN'T ASK YOU TO READ, WHAT MR. TRAVIS ASKED YOU TO READ, WAS MATTERS OR REFERENCES TO MR. MARTI'S FAMILY, IS THAT CORRECT?

A.      YES.

Q.      DURING THE TWO TO THREE WEEKS THAT YOU WERE WITH MR. HAMMER, DID MR. MARTI'S FAMILY EVER BECOME A SUBJECT OF CONVERSATION BETWEEN THE TWO OF YOU?

A.      NO.

Q.      YOU INDICATED IN QUESTIONS ASKED BY MR. TRAVIS THAT MR. HAMMER AT TIMES WAS -- SOMETIME DURING THE TWO TO THREE WEEKS THAT YOU WERE LIVING WITH HIM, ACTED STRESSED.  DO YOU REMEMBER ANSWERING THOSE QUESTIONS TO MR. TRAVIS?

A.      WHAT IS THE QUESTION AGAIN?

Q.      AGAIN, DO YOU REMEMBER WHEN MR. HAMMER -- WHEN MR. TRAVIS ASKED YOU ABOUT WHETHER MR. HAMMER SEEMED STRESSED, AND YOU SAID THERE WERE TIMES WHEN HE SEEMED STRESSED?

A.      YEAH.

Q.      WITH RESPECT -- AGAIN, STRESSED IS -- WHAT IS STRESS FOR YOU, MR. CLASSEN, MAY NOT BE THE SAME AS ME OR FOR THE JURY.

A.      YEAH.

Q.      WHEN YOU SAY THAT MR. HAMMER SEEMED STRESSED FOR SOME PORTION OF THE TWO TO THREE WEEKS THAT YOU WERE WITH HIM, HOW DID -- HOW DID HE PHYSICALLY REACT SO THAT YOU PUT THE TERM STRESSED TO HIS BEHAVIOR?

A.      WELL, THAT'S --

Q.      DO YOU UNDERSTAND MY QUESTION?

A.      I UNDERSTAND IT.  IT'S KIND OF HARD TO ANSWER. I MEAN, I'M NOT A VERY DESCRIPTIVE PERSON, BUT STRESSED IS JUST MY WAY OF DESCRIBING SOMETHING.  LIKE A -- FOR INSTANCE, IF YOU COULDN'T GET THE PHONE, WE'RE -- HE WAS

SUPPOSED TO GET THE PHONE I THINK ONE NIGHT AND HE DIDN'T GET THAT.  THEN HE'D BE LIKE STRESSED OUT BECAUSE HE COULD NOT GET THE PHONE OR SOMETHING LIKE THAT, BUT --

Q.     AGAIN, WAS THAT WHAT CAUSED HIM -- THE QUESTION IS, WHAT CAUSED HIM TO BE STRESSED, IF YOU CAN RECALL?

A.     IT --

Q.     DURING TWO TO THREE WEEKS YOU'VE INDICATED THAT HE ACTED STRESSED.  FIRST OF ALL, WHAT CAUSED HIM TO BE STRESSED, IF YOU KNOW, FROM WHAT MR. HAMMER TOLD YOU?

A.     WELL, THERE'S DIFFERENT -- DIFFERENT THINGS, LIKE THE ONE I JUST DESCRIBED, THE TELEPHONE.

Q.     OKAY.  SO HE DIDN'T GET A TELEPHONE CALL AND HE WAS STRESSED ABOUT THAT?

A.     SURE.

Q.     WAS THERE -- WHAT ELSE CAUSED MR. HAMMER TO, AGAIN, IN YOUR TERM, ACT STRESSED?

A.     GOING TO THE LAW LIBRARY, HE DIDN'T GET TO GO THERE ONE TIME.  AND ANOTHER TIME, I THINK THERE WAS TWO TIMES WITH THE PHONE CALL, BECAUSE HE HAD TO CALL AN ATTORNEY, AND THINGS LIKE THAT.

Q.     OKAY.  AGAIN, OTHER THAN NOT GETTING TO THE LAW LIBRARY WHEN HE WANTED TO GO OR NOT GETTING A PHONE CALL WHEN HE WANTED A PHONE CALL, WHAT OVER TIMES DID MR. HAMMER ACT STRESSED?

A.       THE DAY THAT I WAS SUPPOSED TO MOVE.

Q.       AND THAT WAS THE DAY THAT THE REC FIGHT TOOK PLACE?

A.       YEAH.  AND THEY EXPLAINED TO HIM SO HE LET IT GO.  AND THEN THE NEXT DAY AFTER THE FIGHT THEY TOLD HIM -- THEY SAID, WELL, I WANT TO MOVE MARTI IN TODAY AND THEY TOLD HIM IF WE HAVE TIME.  AND THERE WAS -- IT DIDN'T SEEM LIKE ANYTHING WAS GOING ON IN THE -- IN THE UNIT AT THAT TIME, SO HE SAID, YOU'LL MAKE TIME.

Q.       DAVID PAUL HAMMER TOLD THE CORRECTIONAL OFFICERS THAT YOU WILL MAKE TIME FOR THE MOVE, IS THAT WHAT YOU'RE SAYING?

A.       YEAH, YES.

Q.       AND AGAIN, WHEN HE ACTED STRESSED, DID HE TALK MORE?  DID HE WALK MORE?  DID HE RAISE HIS VOICE LIKE I JUST DID?  DID HE BECOME WITHDRAWN?  AGAIN, EVERYONE ACTS -- REACTS TO STRESS OR CERTAIN SITUATIONS OF DISAPPOINTMENT IN DIFFERENT FASHIONS.  HOW DID, AGAIN, DAVID PAUL HAMMER RESPOND TO THOSE STRESSING SITUATIONS?

A.       I THINK HE WOULD PACE.  HE WOULD PACE AND KIND OF THINK ABOUT WHAT HE WANTED TO DO NEXT OR SAY NEXT.  I -- THE IMPRESSION I GOT HE WOULD PACE WHEN HE WAS --

Q.       MR. TRAVIS ASKED YOU ABOUT THE STRING THAT WAS USED TO HOLD THE PRIVACY CURTAIN, FOR WANT OF A BETTER WORD.  AND AGAIN, I THINK YOU HAVE THE SINGLE STRING

THERE, WHICH MAY OR MAY NOT BE -- NOT THE BRAIDED ITEM, BUT THIS ITEM, GOVERNMENT EXHIBIT 13, WHICH MAY OR MAY NOT HAVE FIT THAT PARTICULAR DESCRIPTION.  AGAIN, DO YOU REMEMBER WHAT THE STRING WAS MADE OF THAT WAS USED FOR THE PRIVACY CURTAIN?

A.      I'M NOT EVEN SURE ON THAT STRING.  IT WASN'T THIS THICK.  IT WAS PRETTY THIN, WHATEVER IT WAS.

Q.      OKAY.

IT WASN'T AS THICK AS GOVERNMENT EXHIBIT 13, BUT WHAT WEIGHT DID IT SUPPORT?

A.      A SHEET.

IT CONTINUED:  I HAVE NO OTHER QUESTIONS FOR MR. CLASSEN, YOUR HONOR.

THEN THE COURT ASKED IF THERE WAS RECROSS.

THERE WAS NO RECROSS.

WITH THAT, YOUR HONOR, I THINK THAT CONCLUDES THE TESTIMONY OF STEPHEN CLASSEN.

THE COURT:  GO ON TO THE NEXT ONE.

MR. GURGANUS:  AT THIS TIME, YOUR HONOR, WE ARE GOING TO BE CALLING A WITNESS.

THE COURT:  ALL RIGHT.

YOU MAY STEP DOWN.

THE WITNESS:  THANK YOU, YOUR HONOR.

(READING OF STEPHEN CLAUSSEN COMPLETED.)

BILLY PRATT, GOVERNMENT WITNESS, SWORN.

THE CLERK:  STATE AND SPELL YOUR FULL NAME FOR THE RECORD.

THE WITNESS:  BILLY PRATT, P-R-A-T-T.

DIRECT EXAMINATION

BY MR. GURGANUS:

Q.      YOUR FIRST NAME IS BILLY?

A.      YES, SIR.

Q.      EVER GO BY BILL PRATT ALSO?

A.      YES.

Q.      CAN YOU TELL THE COURT WHERE IT IS THAT YOU ARE PRESENTLY RESIDING?

A.      I LIVE IN OKLAHOMA CITY.

Q.      AND HOW LONG HAVE YOU LIVED IN OKLAHOMA CITY, SIR?

A.      ABOUT 45 YEARS.

Q.      45 YEARS.  AND WHERE DID YOU -- CAN YOU GIVE THE COURT A SENSE AS TO WHERE YOU GREW UP BEFORE MOVING TO OKLAHOMA CITY?

A.      I WAS AN AIR FORCE BRAT SO WE GREW UP ALL OVER THE COUNTRY AND ALL OVER THE WORLD.  WE TRAVELED A LOT. BUT BEFORE I WENT TO OKLAHOMA, I LIVED IN VIETNAM FOR ALMOST FOUR YEARS.  AND THEN MOVED TO OKLAHOMA AND WENT TO SCHOOL.

Q.      WHEN DID YOU MOVE TO OKLAHOMA AND GO TO SCHOOL,

SIR?

A.      1969.

Q.      AND DO YOU RECALL HOW OLD YOU WERE OR WHAT TYPE SCHOOLING THAT WAS AT THE TIME?

A.      '69 I WOULD HAVE BEEN 20.

Q.      20 YEARS OLD.  WERE YOU GOING TO COLLEGE?

A.      YES.  I WAS GOING TO OKLAHOMA CHRISTIAN COLLEGE.

Q.      AND FOLLOWING YOUR STARTING COLLEGE, DID YOU THEN GET INVOLVED WITH LAW ENFORCEMENT?

A.      YES, I DID.  AFTER ABOUT TWO YEARS AFTER I LEFT COLLEGE I GOT MARRIED AND WENT TO WORK FOR THE OKLAHOMA CITY POLICE DEPARTMENT.

Q.      AND YOU ARE GOING BE TESTIFYING HERE TODAY ABOUT AN INCIDENT AT THE BAPTIST HOSPITAL, IS THAT CORRECT?

A.      YES, SIR.

Q.      AND IT OCCURRED IN JANUARY OF 1978, IS THAT RIGHT?

A.      THAT'S RIGHT.

Q.      I WANT TO GO BACK TO YOUR STARTING WITH THE POLICE DEPARTMENT.  DID YOU -- ONCE YOU STARTED WITH THE POLICE DEPARTMENT, WHAT POSITION DID YOU HOLD, SIR?

A.      WHEN I STARTED, I WAS A RECRUIT AND THEN AFTER THAT I WENT TO WHAT IS CALLED PATROL OFFICER, PATROL DIVISION, WHICH IS THE MAIN BODY OF THE POLICE DEPARTMENT.  IT'S OFFICERS WHO ANSWER CALLS, CALLS FOR

SERVICE AND RESPOND.  THEY ARE THE ONES MOST PEOPLE SEE.

Q.      OKAY.

            AND AT THE TIME, HOW BIG OF A POLICE DEPARTMENT WAS THE OKLAHOMA CITY POLICE DEPARTMENT, IF YOU CAN RECALL?

A.      IF I REMEMBER THERE WERE ABOUT 400 IS ALL THERE WERE, YEAH.

Q.      AND DID YOU GO FROM THAT PATROL-TYPE POSITION, AT SOME POINT GET INVOLVED IN A SPECIALTY TYPE TEAM?

A.      YES, I DID.  I BECAME PART OF OUR TACTICAL UNIT, WHICH IN CALIFORNIA THEY CALL IT SWAT, SPECIAL WEAPONS AND TACTICS.  WE CALL IT OUR TACTICAL UNIT.  I REMAINED IN PATROL AND WAS ON THE STREETS AND WE HAD TRAINING WHERE IF AN INCIDENT CAME UP, THEN WE WOULD BE CALLED OUT AND WE WOULD STAGE AND THEN GO TO THE INCIDENT.

Q.      ALL RIGHT.  WHEN DID YOU START WITH THAT TACTICAL TEAM?

A.      AROUND '76, I BELIEVE.

Q.      AND THIS INCIDENT AGAIN HAPPENED IN 1978, IS THAT RIGHT?

A.      YES, SIR.

Q.      HOW LONG DID YOU -- WE WILL FOCUS ON THAT INCIDENT IN A FEW MINUTES, BUT I JUST WANT TO CONTINUE WITH YOUR BACKGROUND.

            HOW LONG DID YOU STAY WITH THE POLICE

DEPARTMENT?

A.      35 YEARS.

Q.      AND WHEN WAS IT THAT YOU RETIRED FROM THE POLICE DEPARTMENT?

A.      I RETIRED IN 2007 AS A CAPTAIN.

Q.      AS A CAPTAIN?

A.      YES, SIR.

Q.      WHEN YOU RETIRED AS A CAPTAIN IN 2007, DID YOU PURSUE OR HAVE OTHER PURSUITS?

A.      YES.  I DIDN'T DO ANYTHING FOR ABOUT A YEAR AND THEN I WENT TO WORK PART TIME FOR THE U.S. MARSHALS SERVICE.

Q.      UNITED STATES MARSHALL SERVICE?

A.      YES, SIR.

Q.      WHERE AT?

A.      IN OKLAHOMA CITY, THE WESTERN DISTRICT OF OKLAHOMA.

Q.      AND WHAT IS IT THAT YOU DO WITH THE UNITED STATES MARSHALL SERVICE NOW?

A.      IN THE WESTERN DISTRICT OF OKLAHOMA WHEN THERE IS A WITNESS OR A DEFENDANT THAT IS IN CUSTODY, WE HAVE TO HAVE TWO DEPUTY MARSHALS WITH HIM OR HER WHILE THEY ARE IN COURT THE ENTIRE TIME.  AND THAT IS WHAT I DO.

Q.      AND YOU STILL HAVE THAT POSITION, SIR?

A.      YES, SIR.

Q.    AT THIS TIME I WANT TO TALK TO YOU ABOUT AN INCIDENT THAT HAPPENED IN MID JANUARY OF 1978, SPECIFICALLY JANUARY 18TH OF 1978.

DO YOU RECALL AN INCIDENT AT THE BAPTIST HOSPITAL ON THAT DAY?

A.    YES, I DO.

Q.    CAN YOU TELL THE COURT WHAT HAPPENED OR HOW YOU GOT INVOLVED?

A.    I WAS ON PATROL THAT NIGHT AND SOMETIME A LITTLE BIT AFTER MIDNIGHT WE GOT A CALL FOR THE TACTICAL TEAM MEMBERS THAT WERE ON DUTY TO STAGE AT BAPTIST HOSPITAL ON A HOSTAGE SITUATION.  AND SO WE -- THERE WERE THREE OF US THAT WERE ON THE TACTICAL UNIT THAT WERE ON DUTY THAT NIGHT.  SO WE RESPONDED AND MET AT THE BAPTIST HOSPITAL FOR THE HOSTAGE SITUATION.

Q.    DO YOU RECALL THE OTHER PEOPLE THAT WERE WITH YOU THAT DAY?

A.    YES.  IT WAS OFFICER CLYDE BOWLING AND GARY ENGLEBRETSON, E-N-G-L-E-B-R-E-T-S-O-N.

Q.    AND THE FIRST GENTLEMAN?

A.    CLYDE BOWLING, B-O-W-L-I-N-G.

Q.    SO YOU GOT A CALL THAT THERE WAS A HOSTAGE SITUATION?

A.    YES, SIR.

Q.    AND YOU SAY YOU STAGED.  WHAT DO YOU MEAN BY

STAGED?

A.      WELL, WE CARRY ALL OF OUR EQUIPMENT, OUR BDU'S AND THINGS LIKE THAT, WEAPONS THAT WE USE.  WE CARRY THEM IN OUR TRUNK IN A BAG SO THAT WHEN SOMETHING HAPPENED WE COULD GO RESPOND DIRECTLY TO THE INCIDENT INSTEAD OF HAVING TO GO SOMEWHERE AND PICK UP ALL OUR EQUIPMENT.  SO WHEN WE STAGED, WE GOT TOGETHER AND CHANGED OUR UNIFORM INTO OUR BDU UNIFORM.

Q.      WHAT DO YOU MEAN WHEN YOU SAY "BDU"?  ARE YOU TALKING BULLETPROOF VEST, THINGS OF THAT NATURE?

A.      NOT BACK THEN.  THEY ARE NOW, BUT BACK THEN IT WAS JUST DUNGAREE OR KHAKIS, LIKE THEY HAVE IN THE MILITARY, WITH THE SIDE POCKETS AND ALL THAT, NOT A DRESS UNIFORM.

Q.      SO YOU GET TO THE HOSPITAL THAT DAY.  DO YOU REMEMBER APPROXIMATELY WHAT TIME YOU GOT THERE?

A.      I'M THINKING IT WAS ABOUT 1 O'CLOCK WHEN WE GOT THERE.

Q.      AND HOW LONG WAS IT THERE UNTIL THE INCIDENT CONCLUDED?  HOW MUCH TIME WERE YOU THERE?

A.      PROBABLY ABOUT TWO HOURS.

Q.      ALL RIGHT.

        NOW, DO YOU KNOW WHO WAS THE PERSON THAT WAS THE SUSPECT AT THE TIME?

A.      WHEN WE GOT THERE, I WAS BRIEFED BY LIEUTENANT

LEMASTER AND HE TOLD US WHAT THE SITUATION WAS BUT I DON'T REMEMBER THAT HE TOLD US THE NAME OF THE PERSON.

Q.     DID YOU LATER FIND OUT THE NAME?

A.     YES, I DID.

Q.     WHAT WAS THAT PERSON'S NAME?

A.     DAVID HAMMER.

Q.     DAVID HAMMER?

A.     YES, SIR.

Q.     WHEN YOU WERE BRIEFED AS TO THE SITUATION, WHAT DID LIEUTENANT LEMASTER TELL YOU?

A.     HE TOLD ME THAT THERE WAS A PERSON IN BR ROOM 2, I BELIEVE IT WAS, WHO HAD A GUN AND HAD SEVERAL HOSTAGES INCLUDING A NURSE AND AN AMBULANCE ATTENDANT, THAT WE WERE TO PREPARE AND GET READY AND THEN BE RIGHT BESIDE THE DOOR TO GO IN.  WE WERE TO HOLD OFF UNTIL WE FELT THAT THE SITUATION WAS GETTING OUT OF HAND AND THE PROPENSITY FOR HARM TO ONE OF THE HOSTAGES EXISTED BECAUSE THEY WERE DOING NEGOTIATIONS WITH HIM.

Q.     WHO WAS NEGOTIATING WITH HIM?

A.     LIEUTENANT LEMASTER WAS ACTING AS THE NEGOTIATOR.

Q.     NOW, WHO WAS THE HEAD OF YOUR TEAM AT THAT POINT?

A.     ADAM KNIGHT, SERGEANT ADAM KNIGHT.

Q.     WAS THERE A THIRD HOSTAGE AT THAT POINT IN TIME

THAT YOU ARRIVED THERE?

A.    YES.  I BELIEVE THERE WAS A NURSE WHO WAS PREGNANT THAT WAS IN THERE AS WELL.

Q.    DO YOU KNOW IF SHE EVER -- IF SHE CAME OUT AND SOMEONE ELSE TOOK HER PLACE AT SOME POINT?

A.    YES.  SERGEANT R.V. DOUGLAS MADE A DEAL WITH THE HOSTAGE TAKER THAT HE WOULD COME AND BE HIS HOSTAGE IF HE WOULD RELEASE THE FEMALE WHO WAS PREGNANT, THE NURSE WHO WAS PREGNANT, AND THAT HAPPENED.

Q.    AT THAT POINT DID YOU KNOW WHETHER OR NOT THE INDIVIDUAL INSIDE THAT ROOM WITH THE THREE HOSTAGES WAS ARMED?

A.    YES, WE DID.

Q.    WHAT DID YOU KNOW HE WAS ARMED WITH?

A.    HE WAS ARMED WITH A SMALL PISTOL, FOUND LATER THAT IT WAS A SMALL .22-CALIBER SEMIAUTOMATIC PISTOL.

Q.    WAS IT A TYPE OF STERLING?

A.    YES, IT WAS A STERLING, YES, SIR.

Q.    YOU LEARNED THAT LATER THAT NIGHT?

A.    THAT'S CORRECT, AFTER I TOOK IT AWAY FROM HIM.

Q.    SO AT THIS POINT, YOU SAID YOU WERE THERE AROUND A ROUGHLY TWO-HOUR PERIOD OF TIME, IS THAT CORRECT?

A.    YES, SIR.

Q.    AND YOU ALSO MENTIONED THAT YOU WERE STANDING OUTSIDE THE DOOR OF THIS ROOM?

A.      YES, SIR.

Q.      HOW BIG WAS THE ROOM THAT THIS HOSTAGE SCENARIO WAS OCCURRING IN?

A.      IT WAS NOT VERY BIG.  ABOUT 11 OR 12 FEET BY 11 OR 12 FEET.  IT WAS A SMALL ROOM.

Q.      NOW, AFTER STANDING THERE FOR A PERIOD OF TIME, DID THERE COME A POINT IN TIME THAT YOU MADE A DECISION THAT YOU HAD TO GO IN?

A.      YES, WE DID.  WE HEARD A SCUFFLE AND SOME RAISED VOICES AND ME AND BOWLING AND ENGLEBRETSON DECIDED AT THAT POINT THAT THERE COULD POSSIBLY BE A DANGER TO THE HOSTAGES, SO WE WENT IN.

Q.      WHEN YOU WERE STANDING OUTSIDE THAT DOOR, HOW WERE YOU ARMED, SIR?

A.      I WAS ARMED WITH A PISTOL.

Q.      YOU SAID THAT THE TWO OTHER PEOPLE WERE WITH YOU.  WHAT WERE THEY ARMED?

A.      BOTH OF THEM CARRIED SHOTGUNS.

Q.      DO YOU KNOW WHAT THE SHOTGUNS HAD IN THEM?

A.      YES.  THEY HAD SLUGS.

Q.      SLUGS, RATHER THAN A SCATTERING?

A.      RATHER THAN BB'S THAT WOULD SCATTER OUT.  A SLUG, YOU CAN HIT ONE THING AND NOT WORRY ABOUT HITTING PEOPLE AROUND IT.

Q.      ALL RIGHT.

DID YOU HAVE A PLAN BEFORE, AS YOU WERE STANDING OUTSIDE, WHAT YOUR JOB WOULD BE IF YOU HAD TO RUSH IN?

A.     YES.  CLYDE BOWLING WAS GOING TO GO HIGH, ENGLEBRETSON WAS GOING TO GO LOW.  AND MY FUNCTION WAS TO GET THE GUN.

Q.     WHEN YOU SAY GOING HIGH AND GOING LOW, WHAT DO YOU MEAN BY THAT?

A.     TO GO IN AND IF WE HAD TO PHYSICALLY TACKLE THE GUY AND BRING HIM DOWN, BOWLING WOULD HIT HIM IN THE UPPER TORSO AND ENGLEBRETSON WOULD TAKE HIS LEGS OUT FROM UNDER HIM, AND I WOULD GO FOR THE GUN.

Q.     HOW BIG WAS PATROLMAN BOWLING?

A.     PROBABLY ABOUT 6-4, 6-5, SOMEWHERE AROUND THERE, 275 POUNDS.  GOOD MAN TO HAVE IN FRONT OF YOU.

Q.     ESPECIALLY IF YOU ARE NOT WEARING BULLETPROOF VESTS?

A.     EXACTLY.

Q.     WITH THAT, SIR, YOU MENTIONED THAT THERE WAS NOISE FROM INSIDE THE ROOM AND A DECISION THEN WAS MADE TO GO IN?

A.     THAT'S CORRECT.

Q.     CAN YOU TAKE US THROUGH WHAT HAPPENED, WHAT YOU SAW WHEN YOU WENT INTO THAT ROOM?

A.     AS WE -- AS I WENT INTO THE ROOM, THE DOOR WAS

OFFSET FROM THE CENTER OF THE ROOM.  IT WAS ALONG THE WALL.  AND AS I WENT IN, THE HOSTAGE TAKER AND THE HOSTAGES WERE TO MY RIGHT.  THERE WAS A GURNEY, A BED IN FRONT AND THEY WERE OVER TO THE RIGHT.  THERE WERE SOME CHAIRS IN THERE AS WELL.  AND AS WE WENT IN, WE SAW THAT THE HOSTAGE TAKER WAS SEPARATED FROM THE HOSTAGES.  THE GUN WAS NOT POINTED DIRECTLY AT THE HOSTAGES.  IT WAS POINTED DOWN A LITTLE BIT.  AS -- WE SAW THAT IN THE SPLIT SECOND AS WE WENT IN AND MADE THE DECISION TO NOT SHOOT BECAUSE WE FELT WE WOULD NOT HAVE TO.  WE COULD TAKE HIM WITHOUT SHOOTING, SO WE DID.  IT WAS LIKE ONE OR TWO STEPS ACROSS THE ROOM, AND ALL THREE OF US HIT HIM AT THE SAME TIME.

Q.      DO YOU KNOW IF ANYTHING BEFORE THERE THAT WAS AN IDEA TO TRY TO GET HIM DROWSY?  DID YOU OR ANYONE ELSE OR LEMASTER MAKE ANY EFFORT TO TRY TO DRUG HIM?

A.      YES, THEY DID.  HE ASKED FOR SOMETHING TO DRINK AND THEY GAVE HIM COLA IN A CUP.  AND THEY HAD MIXED -- I BELIEVE IT WAS DEMEROL IN IT, BUT MIXED IT INTO THE DRINK TO MAKE HIM DROWSY.  WHAT I BELIEVE STARTED THE ALTERCATION AT THE END WHEN WE WENT IN WAS THE FACT THAT HE WAS STARTING TO FEEL DROWSY AND THEN REALIZED THAT THEY HAD DRUGGED HIS DRINK AND HE WAS GETTING UPSET ABOUT THAT.

Q.      AND DO YOU KNOW WHETHER SOMEONE HAD GRABBED THE

GUN OR MADE AN ATTEMPT TO GRAB THE GUN?

A.      I UNDERSTAND THAT R.V. DOUGLAS TRIED TO AT THE BEGINNING OF THAT ALTERCATION.  AND HE JERKED IT AWAY FROM HIM.  R.V. -- THE HOSTAGE TAKER JERKED HIS HAND AND THE GUN AWAY FROM R.V. DOUGLAS SO THAT DOUGLAS WAS NOT SUCCESSFUL IN GETTING THE GUN.  SO THE GUN WAS FREE IN THE HOSTAGE TAKER'S HAND WHEN WE WENT IN.

Q.      NOW, I TAKE IT YOU ARE RUSHING IN AT THAT POINT TO TRY TO TAKE CONTROL OF HIM?

A.      YES, SIR.

Q.      WHAT DID PATROLMAN BOWLING DO WHEN HE GOT TO DAVID HAMMER?

A.      HE BUTT STROKED HIM IN THE MOUTH WITH THE BUTT OF THE SHOTGUN.

Q.      WHAT DO YOU MEAN BY THAT?

A.      YOU REVERSE THE WEAPON IN YOUR HAND AND HIT HIM WITH THE BUTT END OF IT.  YOU DON'T HIT HIM WITH THE BARREL, YOU BEND THE BARREL OR THINGS LIKE THAT.  IT'S A GOOD WAY TO USE A WEAPON IF YOU DON'T NEED TO FIRE IT.

Q.      AND HE WAS ABLE TO CATCH DAVID HAMMER IN THE FACE WITH THAT?

A.      YES.

Q.      AND THEN WHAT DID YOU DO?

A.      I JUMPED AND GRABBED THE GUN.  I GRABBED THE HAND AND THE GUN AT THE SAME TIME.

Q.      ALL RIGHT.

        AND WERE YOU ABLE TO GET IT AWAY FROM HIM?

A.      YES, I DID.

Q.      WHAT THEN HAPPENED AS FAR AS A STRUGGLE?  WAS IT A SHORT --

A.      IT WAS VERY SHORT BECAUSE AT THAT TIME HE HAD ALL THREE OF US ON HIM.  I HAD THE GUN AND BOWLING WAS ON HIS UPPER TORSO, AND ENGLEBRETSON WAS ON HIS LEGS. SO THERE WAS NOT MUCH OF A SCUFFLE AFTER THAT.  WE HANDCUFFED HIM.

Q.      WHAT DID YOU THEN DO -- YOU REMOVED IT FROM HIS HAND, I TAKE IT?

A.      YES.  I THEN CHECKED TO IT MAKE SURE IT WAS LOADED AND TO UNLOAD IT AND TAKE ONE OUT.  THERE WAS ONE IN THE CHAMBER.  AND I BELIEVE THERE WERE ROUNDS IN THE CLIP.  SO I UNLOADED IT AND TOOK THE CLIP OUT OF THE GUN.

Q.      CAN YOU TELL US WHETHER OR NOT THAT GUN HAD ITS SAFETY ON OR OFF?

A.      IT WAS OFF.

Q.      SO IN TERMS OF SOMEONE THAT IS NOT FAMILIAR WITH FIREARMS, WHAT POSITION WAS THE GUN IN?  WHEN I SAY POSITION --

A.      ALL HE HAD TO DO WAS TO POINT IT AND PULL THE

TRIGGER.

Q.    WHAT WOULD HAPPEN?

A.    IT WOULD FIRE AND THEN RELOAD ANOTHER ROUND SO HE COULD FIRE AGAIN.

Q.    AT THE POINT YOU TOOK IT FROM HIS HAND, THAT WAS THE CONDITION THAT THAT FIREARM WAS IN?

A.    YES, SIR.

Q.    LOADED WITH THE SAFETY OFF?

A.    RIGHT.

Q.    DID YOU -- ONCE YOU TOOK POSSESSION OF THAT FIREARM, YOU TOOK THE BULLETS OUT THEN?

A.    YES, SIR.

Q.    AND IT WAS LOGGED INTO EVIDENCE, IS THAT RIGHT?

A.    YES, SIR.

Q.    AND THE EVIDENCE RECORD REVEALS THAT THERE WERE .22 LONG RIFLE SHELLS, IS THAT CORRECT?

A.    I DON'T REMEMBER THERE BEING 22.  I KNOW THERE WERE SOME.  I BELIEVE --

Q.    I MEAN THE TYPE?

A.    YES.  THEY WERE .22.

Q.    .22 CALIBER?

A.    RIGHT.  MY UNDERSTANDING IS THAT HE HAD -- IF I REMEMBER CORRECTLY, HE HAD ROUNDS IN HIS POCKET AS WELL BECAUSE THE GUN WOULD NOT HOLD 22.

Q.    BUT THE PHYSICAL EVIDENCE RECORD SAYS STERLING?

.22 AUTOMATIC BLUE STEEL SERIAL NUMBER AND THE SERIAL NUMBER IS DIFFICULT TO READ.  THEN IT SAYS ONE MAGAZINE AND 18, .22`LONG RIFLE SHELLS AND IT WAS GIVEN AN EVIDENCE TAG.  IS THAT CONSISTENT WITH YOUR RECOLLECTION --

A.     YES, IT IS.

Q.     -- OF THE FIREARM THAT YOU TOOK FROM DAVID PAUL HAMMER'S HAND ON THAT NIGHT?

A.     YES, IT IS.

          MR. GURGANUS:  NOTHING FURTHER, YOUR HONOR, THANK YOU.

          THE COURT:  CROSS EXAMINE.

          CROSS EXAMINATION

BY MS. SAUNDERS:

Q.     GOOD MORNING, OFFICER PRATT.

A.     GOOD MORNING.

Q.     HOW ARE YOU?

          I'M GOING TO WALK UP TO THE PODIUM. PARDON ME.

          DID YOU REVIEW THE POLICE REPORTS FROM THIS INCIDENT BEFORE YOU CAME HERE TO TESTIFY?

A.     I DID NOT READ IT.  I DISCUSSED IT WITH THE PROSECUTOR.

Q.     OKAY.  YOU ARE AWARE THAT AFTER THE INCIDENT HAD BEEN CONTAINED AND MR. HAMMER WAS TAKEN INTO CUSTODY

THERE WERE A NUMBER OF WITNESS INTERVIEWS.  IS THAT FAIR TO SAY?

A.      YES.

Q.      THE WITNESS INTERVIEWS INCLUDED THE INDIVIDUALS WHO WERE INSIDE THE ROOM, RIGHT, AT THE TIME?

A.      YES, I ASSUME SO.

MS. SAUNDERS:  YOUR HONOR, IF I COULD APPROACH THE WITNESS.  I HAVE THIS.  THIS IS THE POLICE REPORT?

THE COURT:  YES.

MS. SAUNDERS:  I'M ALSO GOING TO TRY TO USE THE OVERHEAD BECAUSE THIS IS VERY DIFFICULT TO READ.

THE COURT:  YOU HAVE TO GET A MICROPHONE CLOSE TO YOU.  YOU SAID YOU WERE GOING TO USE THE OVERHEAD.

IT'S THE ELMO.

MS. SAUNDERS:  ELMO?  MY APOLOGIES.

BY MS. SAUNDERS:

Q.      I WOULD ASK YOU TO TURN TO PAGE 5, OFFICER, IF YOU COULD.

A.      YES, MA'AM.

Q.      DO YOU SEE ON THE FIRST PARAGRAPH, OFFICER, I HAVE BLOCKED OUT, MARKED SOMETHING FOR YOU IN THE FIRST PARAGRAPH?

A.      YES, MA'AM.

Q.   CAN YOU READ THAT FOR ME, PLEASE.

WELL, BEFORE WE DO THAT, OFFICER, LET ME START BACK THE PAGE BEFORE THAT.  IT STATES THE INDIVIDUAL BEING INTERVIEWED, DOES IT NOT, ON PAGE 4?

A.   THE PEOPLE THAT WERE -- THE PERSON THAT WAS BEING INTERVIEWED, LARRY RODGERS OR LARRY --

Q.   POWERS?

A.   -- POWERS.

Q.   AND JUST BELOW HIS NAME IT INDICATES THAT HE WAS A CAB DRIVER FOR YELLOW CAB?

A.   YES, MA'AM.  YES, IT DOES.

Q.   AND IT INDICATES THAT HE HAD PICKED UP MR. HAMMER?

A.   YES.

Q.   AND NOW IF YOU COULD GO TO PAGE 5 AND THAT PARTICULAR SENTENCE.

A.   THE FIRST PART OF THAT SENTENCE IS UNREADABLE, BUT THE SUSPECT GOT INTO THE CAB.  HE WAS NOT COMPLETELY COHERENT AND KEPT CHANGING HIS MIND ON EACH STATEMENT THAT HE MADE TO THE CAB DRIVER.

Q.   ALL RIGHT.

NOW IF YOU LOOK DOWN TO THE FOURTH PARAGRAPH DOWN?

A.   YES, MA'AM.

Q.   AND YOU SEE MY MARKINGS THERE AS WELL?

A.      YES.

Q.      IF YOU COULD READ THAT LAST SENTENCE, TOO?

A.      DURING THE RIDE TO THE HOSPITAL, THE -- AND THAT WORD IS UNREADABLE ON MY COPY -- HAD TWO HATS WHICH HE ALTERNATED PUTTING ON HIS HEAD.  ONE OF THEM WAS A BILLED CAP SIMILAR TO A BASEBALL CAP.  THE OTHER WAS A STOCKING CAP.  POWERS STATED THAT THE SUSPECT WOULD PUT ON ONE HAT AND ADJUST IT FOR A WHILE, TAKE IT OFF AND PUT THE OTHER ONE ON.

Q.      OKAY.  IF YOU SKIP THE NEXT ONE SENTENCE AND THEN THE NEXT PARAGRAPH, SEE THAT, STARTS WITH "POWERS WATCHED"?

A.      YES.

Q.      CAN YOU READ THAT?

A.      ALL RIGHT.

Q.      I'M SORRY.

A.      POWERS WATCHED THE SUSPECT BECAUSE HE FELT THAT HIS ACTIONS WERE EXTREMELY ODD AND HE SAW THE SUSPECT GO INTO THE HOSPITAL EMERGENCY ROOM.  CAN'T READ THE NEXT WORDS -- THE COUNTER AND WALK UP TO A WHITE MALE AND WHITE FEMALE STANDING AT THE COUNTER OF THE EMERGENCY ROOM.

Q.      AND THEN IF YOU CAN SKIP DOWN TO THAT LAST PARAGRAPH THAT STARTS WITH "DURING THE TIME THAT POWERS"?

A.      OKAY.

Q.      IF YOU COULD READ THAT SENTENCE, PLEASE.

A.      DURING THE TIME THAT POWERS WAS ON -- CORRECTION, IN CONTACT WITH THE SUSPECT, THE SUSPECT DID NOT DISPLAY ANY WEAPON AND DID NOT SHOW ANY TYPE OF AGGRESSIVENESS AGAINST POWERS.

Q.      OKAY.  NOW, IF YOU COULD TURN THE PAGE, TO PAGE 6, PLEASE.

MR. GURGANUS:  YOUR HONOR, JUST A POINT OF ORDER.  WE OBJECT TO JUST READING IN THE WHOLE DOCUMENT THROUGH THIS WITNESS.  I DON'T BELIEVE HE HAS KNOWLEDGE OF ANY OF THIS.  AND WE ARE NOT GOING TO HAVE AN OBJECTION IF THEY WANT TO OFFER THE POLICE REPORTS, BUT HE DOES NOT HAVE, I BELIEVE, ANY KNOWLEDGE OF THIS. THERE IS NO QUESTION OTHER THAN THEY'RE JUST READING IT IN THROUGH HIM.  WE ARE ALSO GOING TO BE OFFERING THE PRELIMINARY HEARING TRANSCRIPT, WHICH WILL BE READ IN.

THE COURT:  OFFICER, ARE YOU FAMILIAR WITH THESE?

THE WITNESS:  I DID NOT DO THESE INTERVIEWS, NO, SIR.  MY BEING AT THE SCENE ENDED ONCE WE TOOK THE SUSPECT IN CUSTODY AND WE TOOK HIM TO JAIL.

THE COURT:  DID YOU INTERVIEW THE POLICE -- THIS CAB DRIVER?

THE WITNESS:  NO, SIR.  I INTERVIEWED NO

ONE.

MS. SAUNDERS:  I WOULD LIKE TO GET THE INFORMATION IN -- FROM THE POLICE REPORT IN, YOUR HONOR. I THINK IT'S VERY IMPORTANT BECAUSE IT'S WITNESS STATEMENTS DESCRIBING MY CLIENT'S STATE OF MIND AT THE TIME OF THE INCIDENT.  I BELIEVE HEARSAY IS ADMISSIBLE AT THIS POINT AND THAT IS THE REASON WHY I'M TRYING TO GET THIS IN.

THE COURT:  WELL, THIS IS BEFORE THE INCIDENT.  THIS IS WHEN HE WAS IN THE CAB.

MS. SAUNDERS:  I'M NOW MOVING INTO THE INCIDENT, YOUR HONOR, ON PAGE 6.  SYLVIA PARDUE IS AN INDIVIDUAL WHO WAS INSIDE THE HOSPITAL AT THE TIME.  AND THE CAB WAS ON THE WAY TO THE HOSPITAL, WHICH IS WHY?

THE COURT:  GIVEN THE MORE LIBERAL STANDARD OF ADMISSIBILITY AT THIS KIND OF HEARING, I WILL ALLOW IT.  PERHAPS WE CAN --

MS. SAUNDERS:  I WILL TRY TO MOVE IT AS QUICKLY TO THE POINT.

THE COURT:  -- GET TO THE POINT WITH THIS WITNESS A LITTLE QUICKER.  HE DOES NOT KNOW ANYTHING ABOUT THIS.

MS. SAUNDERS:  VERY WELL, YOUR HONOR.

BY MS. SAUNDERS:

Q.    ON PAGE 6 -- I'M SORRY, OFFICER.  IS THAT WHAT I

CALL YOU, MR. PRATT, OR MARSHAL PRATT?

A.      THAT OR CAPTAIN, WHATEVER YOU WANT.

Q.      CAPTAIN?

A.      YES, MA'AM.

Q.      CAPTAIN.  MY APOLOGIES.

                ON PAGE 6 ON SYLVIA PARDUE, YOU'LL SEE IN THE FIRST PARAGRAPH WHERE MS. PARDUE INDICATED THAT SHE KNEW MR. HAMMER BECAUSE HE HAD BEEN IN THE PSYCHIATRIC WARD THREE TIMES TO HER KNOWLEDGE.  DO YOU SEE THAT?

A.      YES, MA'AM.

Q.      SHE ALSO INDICATED THAT SHE HAD ACTUALLY GOTTEN A PHONE CALL FROM MR. HAMMER.  THAT WOULD BE THE THIRD PARAGRAPH DOWN.  DO YOU SEE THAT?  IF YOU WANT TO TAKE A MINUTE AND READ IT, THEN I WILL ASK YOU ABOUT IT.

A.      NO, I DON'T SEE WHERE SHE TALKED TO HIM ON THE PHONE.

Q.      THE THIRD PARAGRAPH DOWN STARTS:  SHE STATED HER FIRST INVOLVEMENT OCCURRED AT ABOUT 1:30 A.M. WHEN THE SUSPECT CALLED HER?

A.      I SEE IT THERE.  THANK YOU.

Q.      AND THAT HE INDICATED THAT THE POLICE -- HE INDICATED THAT HE BELIEVED THE POLICE WERE GOING TO KILL HIM?

A.      YES.

Q.      AND THEN DOWN A LITTLE BIT BELOW IN THAT

PARAGRAPH, DO YOU SEE THERE IS A SENTENCE THAT I HAVE MARKED OFF FOR YOU?

A.      YES.

Q.      BEGINNING:  SHE STATED SHE DIDN'T KNOW.  I UNDERSTAND THAT SOME OF THAT IS NOT READABLE, BUT THE THIRD LINE DOWN SHE DOES INDICATE THAT HE IS EXTREMELY MIXED UP AND UNBALANCED.  DO YOU SEE THAT?

A.      YES.

Q.      AND STATED THAT HE'S THE TYPE OF PERSON WHO TRIES VERY HARD TO DO RIGHT AND ALWAYS FAILS?

A.      YES.

Q.      DO YOU SEE THAT?

        NOW IF YOU CAN MOVE ON TO PAGE 7 OF THE REPORT.  AND THAT IS AN INTERVIEW WITH MR. MCELROY, STEVE MCELROY.  RIGHT?

A.      YES.

Q.      MR. MCELROY WAS THE AMBULANCE ATTENDANT, AN AMBULANCE ATTENDANT WHO WAS ONE OF THE HOSTAGES THAT WAS FIRST TAKEN INTO THE ROOM, IS THAT CORRECT?

A.      YES, MA'AM.

Q.      MR. MCELROY ALSO WAS INVOLVED IN A STRUGGLE WITH MR. HAMMER FOR THE GUN, WAS HE NOT?

A.      I BELIEVE HE WAS, YES.

Q.      OKAY.  ALL RIGHT.

        IF YOU COULD LOOK IN THE FIRST PARAGRAPH,

MR. MCELROY'S INITIAL MEETING WITH MR. HAMMER WHEN HE FIRST WALKED IN, HE INDICATED THAT HE HAD FIRST THOUGHT IT WAS A JOKE, BUT THEN MR. HAMMER SAID I NEED SOME HELP, COME WITH ME.  IS THAT CORRECT?

A.     YES.

Q.     IN THE THIRD PARAGRAPH DOWN, WHERE IT'S MARKED, YOU SEE:  THE SUSPECT STATED --

A.     YES, MA'AM.

Q.     -- HE WAS NOT GOING TO HURT ANYONE.  HE WANTED THE NEWS MEDIA TO ENSURE HE HIMSELF WOULD NOT BE HURT.

A.     YES.

Q.     AND HE SAID THE ONLY PERSON THAT'S GOING TO GET HURT IS GOING TO BE HIM.  IS THAT A FAIR ASSESSMENT?

A.     THAT IS WHAT THIS PARAGRAPH SAYS, YES.

Q.     THE SECOND TO THE LAST PARAGRAPH, THE MARKED SECTION WHERE IT SAYS:  MR. MCELROY EMPHASIZED THAT THE SUSPECT DEMANDED EMPHATICALLY THAT THE POLICE BE CALLED TO THE HOSPITAL, IS THAT CORRECT?

A.     THAT'S WHAT IT SAYS, YES.

Q.     NOW IN THE LAST PARAGRAPH, HE INDICATES ALSO THAT HE NEVER -- THAT THE SUSPECT NEVER THREATENED ORALLY TO SHOOT OR STRIKE ANYONE, BUT HE WAS REPEATING, I DON'T WANT TO HURT -- AGAIN HE WAS REPEATING, I DON'T WANT TO HURT ANYONE, IS THAT CORRECT?

A.     THAT'S WHAT THIS PARAGRAPH SAYS, YES.

Q.    HE ALSO AGAIN REQUESTED TO SPEAK WITH THE NEWS
MEDIA, CORRECT?

A.    YES.

Q.    NOW, ON PAGE 8 OF THE REPORT, IF YOU CAN SKIP
DOWN TO THE FIFTH PARAGRAPH DOWN THAT STARTS "MR.
MCELROY STATED HE LOOKED AT THE GUN IN THE SUSPECT'S
HAND."  DO YOU SEE THAT?

A.    WHICH PARAGRAPH?

Q.    THE SECOND TO THE LAST PARAGRAPH.  THERE SHOULD
BE A PEN MARK THERE.

A.    YES.

Q.    STATED THAT HE LOOKED AT THE GUN IN THE
SUSPECT'S HAND, WHICH IS STILL BEHIND MS. MCNEIL'S BACK,
RIGHT?

A.    YES.

Q.    THEN HE SAID:  THE BARREL WAS POINTED -- I KNOW
THAT IS NOT VERY EASY TO READ -- BUT THEN HE SAID:  AND
THE SUSPECT WAS LOOKING AWAY AND CRYING.  IS THAT
CORRECT?

A.    THAT'S WHAT IT SAYS, YES, MA'AM.

Q.    THEN HE SAYS:  IT'S AT THAT POINT THAT HE
GRABBED FOR THE GUN AND HUNG ON FOR DEAR LIFE, RIGHT?

A.    YES.

Q.    IF YOU READ THE NEXT PARAGRAPH DOWN HE TALKS
ABOUT HOW THE SUSPECT DID BREAK FREE, SERGEANT MCELROY

ROLLED OVER THE FLOOR -- I BELIEVE THAT IS IN THAT SECTION.  BUT NEVERTHELESS HE THEN HUNG ON TO MR. HAMMER AS THE TACTICAL UNIT WAS ARRIVING.  DO YOU RECALL THAT HAPPENING?

A.      DO I RECALL THAT WE WENT IN AND TOOK THE GUN?

Q.      WHEN YOU WENT IN, WAS IT MR. MCELROY WHO HAD HIS HANDS ON MR. HAMMER AT THAT POINT?

A.      I DO NOT REMEMBER HIM HAVING HIS HANDS ON MR. HAMMER AT THAT POINT, NO.

Q.      WELL, THIS WAS OVER -- OH, LORD, 30 YEARS AGO, RIGHT?

A.      MR. HAMMER HAD BROKEN AWAY FROM MCELROY WHEN MCELROY TRIED TO GRAB THE GUN.

Q.      WELL, MR. MCELROY'S VERSION IS A LITTLE BIT DIFFERENT, RIGHT?

A.      YES.

Q.      IF YOU CAN SKIP TO PAGE 10, PAGE 11, MY APOLOGIES.  ARE YOU WITH ME?

A.      YES, MA'AM.

Q.      AT THE BOTTOM OF PAGE 11 THERE'S A PARAGRAPH AND I HAVE MARKED SOMETHING FOR YOU.

A.      YES, MA'AM.

Q.      THE VICTIM ADVISED THAT THE SUSPECT STATED HE WAS IN A LOT OF TROUBLE, RIGHT?

A.      YES.

Q.      AND HE ALLEGED ON SEVERAL OCCASIONS THAT THE POLICE WERE GOING TO KILL HIM, RIGHT?

A.      YES.

Q.      AND THAT HE BELIEVED A PARTICULAR POLICE OFFICER NAMED RICHARDSON WAS OUT TO GET HIM, RIGHT?

A.      THAT'S WHAT IT SAYS.

Q.      TURN TO THE NEXT PAGE ON PAGE 12.

A.      YES, MA'AM.

Q.      IT'S THE FOURTH PARAGRAPH DOWN.  DO YOU SEE THAT?

A.      YES, MA'AM.

Q.      AND THAT MARK?

A.      YES.

Q.      HE TOLD THE VICTIM THAT HE NEEDED HELP VERY BADLY, RIGHT?

A.      YES.

Q.      AND THAT HE BELIEVED THIS WAS THE ONLY WAY THAT HE COULD GET IT.  RIGHT?

A.      THAT'S WHAT IT SAYS, YES, MA'AM.

Q.      AND THIS PARTICULAR WITNESS DESCRIBED THE SUSPECT AS BEING PSYCHOTIC, RIGHT?

A.      YES, MA'AM.  THAT'S WHAT IT SAYS.

Q.      AND HAVING WHAT THEY SAY "ALLUSIONS" I PRESUME THEY INTENDED TO MEAN DELUSIONS, RIGHT?

A.      YES, MA'AM.

Q.      OR AT LEAST -- AND IT SAYS EMANATIONS, BUT I PRESUME THAT MEANS SOME KIND OF HALLUCINATIONS, RIGHT?

A.      RIGHT.

Q.      AND OBSERVING THINGS THAT WERE NOT HAPPENING.

A.      WHAT THAT IS, IS -- IN BRACKETS OR THE "COR," THAT MEANS CORRECTION.

Q.      RIGHT.

A.      THEY DON'T -- ON REPORTS WE DON'T ERASE ANYTHING.  WE JUST CORRECT IT AFTERWARDS.

Q.      BEFORE THE AGE OF WORD PROCESSORS WHERE YOU COULD CORRECT THINGS RIGHT THERE.

A.      SO IMAGINATIONS IS THE CORRECT WORD, INSTEAD OF THE WORD BEFORE.

Q.      SO HE WAS IMAGINING THINGS THAT WERE NOT HAPPENING?

A.      THAT'S CORRECT.

Q.      IN THE NEXT PARAGRAPH DOWN, SHE DESCRIBES AN INCIDENT, DOES SHE NOT, IN THAT MARKED SECTION, WHERE THE POLICE ARE TALKING TO HIM AND HE CONTINUALLY SAID THAT THE LAST TIME THAT HE WAS ARRESTED, THE POLICE TOOK HIM IN AN ELEVATOR AND BEAT HIM WITH A BILLY CLUB AND WITH A TELEPHONE BOOK OVER HIS HEAD?  DO YOU SEE THAT?

A.      YES, I SEE WHERE IT IS WRITTEN.

Q.      AND THEN IN THE NEXT PARAGRAPH, THE FIRST THING SHE DESCRIBED IS HE SEEMED TO BE OVERCOME BY FEAR OF

THIS OFFICER RICHARDSON?

A.      YES.  I SEE THAT.

Q.      IF YOU COULD TURN TO THE NEXT PAGE.  DO YOU SEE THAT PARAGRAPH, THE SECOND FULL PARAGRAPH DOWN WHERE IT STARTS:  THIS OFFICER FURTHER ADVISED MS. MCNEIL, WHO WAS ONE OF THE INDIVIDUALS IN THE HOSTAGE ROOM, HAD THIS BEEPER APPARENTLY.  AND EACH TIME IT WENT OFF, SHE INDICATED THAT MR. HAMMER BECAME TERRIFIED, RIGHT?

A.      YES, MA'AM.

Q.      ON PAGE 14, THE SECOND FULL PARAGRAPH, MS. MCNEIL ONCE AGAIN DESCRIBED THE INDIVIDUAL AS BEING -- CHANGING HIS MOOD FREQUENTLY, RIGHT?

A.      YES.

Q.      AND INDICATING THAT HE WAS GOING TO KILL HIMSELF, RIGHT?

A.      YES.

Q.      AND THAT HE WANTED THE NEWSPAPERS THERE SO THAT THEY COULD WITNESS THAT, RIGHT?

A.      SAID HE WANTED THE MEDIA THERE.

Q.      I'M SORRY, THE MEDIA.

        AND SHE DESCRIBES THAT AGAIN, HIS SEEING THINGS THAT ARE NOT THERE, FOR EXAMPLE, HALLUCINATING, I BELIEVE IS WHAT THE WORD MEANS TO BE, WINDOWS OR DOORS, THINGS LIKE THAT.  DO YOU SEE THAT AT THE BOTTOM OF THE PARAGRAPH?

A.      YES, I DO.

Q.      AND THAT HE THOUGHT THERE WERE PEOPLE CRAWLING AROUND THE ATTIC AND TRYING TO COME IN THROUGH THE WALL BEHIND HIM.  DO YOU SEE THAT?

A.      YES.

Q.      AND I PRESUME THERE WAS NO TAC TEAM UP IN THE CEILING, RIGHT?

A.      NO, THERE WERE NOT.

Q.      THE LAST PARAGRAPH, SHE DESCRIBES THE SITUATION WHERE THE -- SHE IS SITTING AND SHE SEES MR. HAMMER START TO CRY.  DO YOU SEE THAT?

A.      YES.

Q.      AND HE PLACES HIS HAND ON HER SHOULDER AND THAT IS WHEN SHE SAW THE GUN SLIP AWAY FROM HIS NECK?

A.      YES.

Q.      AND SHE DESCRIBES LATER IN THAT PARAGRAPH HOW MR. MCELROY AND SERGEANT DOUGLAS THEN WENT TO MR. HAMMER AND TRIED -- AND, UM --TO TAKE THE GUN AWAY FROM HIM, RIGHT?

A.      YES.

Q.      ON PAGE 15 SHE DESCRIBES HOW THERE WERE -- IN THAT FIRST PARAGRAPH THAT IS MARKED, HOW THERE WERE NUMEROUS TIMES WHEN MR. HAMMER ASKED HER TO PRAY FOR HIM AND THAT THEY PRAYED TOGETHER?

A.      YES, I SEE THAT.

Q.      PAGE 17, THIS IS A WITNESS DESCRIBING HOW MR. HAMMER BECAME VERY EMOTIONAL AND BEGAN TO CRY WHILE HE WAS TALKING TO, I PRESUME IT WOULD BE, OFFICER BRADWAY, STATED HE DIDN'T WANT TO HURT ANYONE, DIDN'T WANT TO SEE ANYONE -- BUT HE COULD NOT SEE ANY OTHER WAY TO GET HELP, RIGHT?

A.      YES, I DON'T SEE OFFICER BRADWAY'S NAME.

Q.      I'M LOOKING DOWN AT THE BOTTOM OF THE PAGE.  I'M SORRY.

A.      OKAY.

Q.      AND THEN HE ALSO INDICATED THAT THE SUSPECT CHANGED MOODS FROM CRYING APOLOGIES TO LOUD DEMANDS, RIGHT?

A.      YES.

                MS. SAUNDERS:  THAT IS ALL I HAVE FOR THAT EXHIBIT.

BY MS. SAUNDERS:

Q.      ARE YOU THE INDIVIDUAL THAT ACTUALLY TOOK HIM INTO CUSTODY?

A.      I WAS ONE OF THE THREE.

Q.      WHEN YOU TOOK HIM INTO CUSTODY, HE HAD ON HIS POSSESSION PCP, DID HE NOT?

A.      HE HAD SOME POWDER.  I UNDERSTAND THAT LATER IT WAS DIAGNOSED AND FOUND OUT TO BE PCP.

Q.      OKAY.  ALL RIGHT.

MS. SAUNDERS:  COURT'S INDULGENCE.

(PAUSE.)

BY MS. SAUNDERS:

Q.     IF THE POLICE REPORT INDICATED THAT IT DID INDEED TEST POSITIVE FOR PCP, WOULD THAT BE ACCURATE IN YOUR MIND?

A.     YES.

Q.     ALL RIGHT.  AND IN BAPTIST HOSPITAL THERE IS A PSYCHIATRIC UNIT -- WAS A PSYCHIATRIC UNIT IN THAT HOSPITAL, RIGHT?

A.     YES, I BELIEVE THERE IS.

Q.     IN FACT, ONE OF THE THINGS THAT MR. HAMMER HAD REQUESTED WAS TO SEE DR. CHANDLER WHO I BELIEVE WAS WORKING IN THAT UNIT, IS THAT RIGHT?

A.     I THINK SO, YES, MA'AM.

MS. SAUNDERS:  AND SO -- COURT'S INDULGENCE.

(PAUSE.)

MS. SAUNDERS:  THAT IS ALL I HAVE, I THINK.  THAT IS ALL I HAVE, YOUR HONOR.

THE COURT:  ANY REDIRECT?

MR. GURGANUS:  JUST A FEW QUESTIONS, YOUR HONOR.

REDIRECT EXAMINATION

BY MR. GURGANUS:

Q.      THIS DR. CHANDLER OFFERED HIM AN OPPORTUNITY TO GO UP TO THAT PSYCHIATRIC WARD, IS THAT RIGHT?

A.      I BELIEVE THAT'S RIGHT, BUT I DON'T HAVE PERSONAL KNOWLEDGE OF THAT.

Q.      HE OBVIOUSLY DID NOT GO UP TO THE PSYCHIATRIC WARD TO GET HELP, DID HE?

A.      NO, HE DID NOT.  HE STAYED THERE WITH HIS HOSTAGES.

Q.      YOU MENTIONED THERE WAS A GUN TAKEN.  IN THAT POLICE REPORT THAT HAS BEEN OFFERED, THE PHYSICAL EVIDENCE INCLUDED A FOLDED PIECE OF A GIRLIE MAGAZINE THAT CONTAINED A POWDERED SUBSTANCE BELIEVED TO BE SOMETHING AND THAT WAS TESTED?

A.      YES, IT WAS.

MR. GURGANUS:  PUT THE ELMO ON.

BY MR. GURGANUS:

Q.      READ -- WAS IT ONE FOLDED PAPER CONTAINING A WHITE POWDERED SUBSTANCE, IS THAT RIGHT?

A.      YES, SIR.

Q.      ARE YOU FAMILIAR WITH THESE TYPE REPORTS, SIR?

A.      I'M SORRY.

Q.      FROM YOUR CAREER ARE YOU FAMILIAR WITH THESE TYPE REPORTS?

A.      YES.

Q.      AND THIS INDICATES THAT THERE WAS AN ANALYSIS OF THAT SUBSTANCE?

A.      YES, FURTHER DOWN IN THE REPORT.

Q.      AND WHAT DOES IT SHOW IT TO BE?

A.      IT SAYS:  THE DESCRIBED EVIDENCE WAS FOUND TO CONTAIN PHENCYCLIDINE, PCP, A SCHEDULE 3 SUBSTANCE.

Q.      ARE YOU FAMILIAR WITH PCP --

A.      SOMEWHAT, YES, SIR.

Q.      -- FROM YOUR CAREER.  ARE YOU FAMILIAR WITH WHAT HAPPENS TO PEOPLE WHEN THEY USE PCP?

A.      MOST OF THE TIME THEY WILL GET EXTREMELY PARANOID.  THEY WILL ACT IRRATIONALLY.  THEY WILL HAVE HALLUCINATIONS AND SEE THINGS.  AND THEN ALSO THEY DON'T FEEL PAIN.

Q.      NOW YOU WERE ASKED TO READ CERTAIN PORTIONS OF THE DOCUMENTS HERE, THE POLICE REPORTS, RIGHT?

A.      YES, SIR.

Q.      AND YOU DIDN'T DO THE INTERVIEWS WITH RESPECT TO THESE?

A.      NO, I DID NOT.

Q.      AND IN FACT THIS IS THE FIRST TIME YOU READ THEM, IS THAT RIGHT?

A.      YES, IT IS.

Q.      AS ONE PART OF THAT POLICE REPORT, DOES IT INDICATE THAT THE VICTIM, MS. KIHEGA, SHE WAS THE

PREGNANT WOMAN?

A.     YES, I BELIEVE SHE WAS.

Q.     DOES IT INDICATE THAT THE VICTIM ADVISED THE SUSPECT HELD A GUN TO THE SIDE OF HER HEAD NEAR HER RIGHT TEMPLE AND THAT HE LOCKED HIS LEFT ARM AROUND THE FRONT OF HER BODY, ABOVE THE ABDOMEN BUT BELOW THE BREAST AREA.  DOES IT SAY THAT?

A.     YES, SIR.

Q.     DOES IT FURTHER SAY THAT AS HE PUSHED HER ALONG THROUGH THE HALL AND CONTINUED TO HOLD WEAPON TO HER RIGHT TEMPLE?

A.     YES.

Q.     GOING TO THE NEXT PAGE, I THINK IT IS PAGE 3, DOES IT INDICATE THAT THE VICTIM ADVISED THAT THE SUSPECT CONTINUALLY REMARKED THE SAFETY WAS OFF ON THE GUN?

A.     YES.

Q.     ON TO THE NEXT PAGE.  STAY ON THAT PAGE:  HE CONTINUALLY HELD THE GUN AGAINST THE BACK OF THE HEAD OR THE RIGHT TEMPLE OF THIS VICTIM, IS THAT RIGHT?

A.     YES.

Q.     MS. MCNEIL ALSO SAID THAT DURING THIS INCIDENT HE WOULD HOLD THE GUN UP AND WAVE IT IN HER FACE AND THEN PLACE THE GUN AGAINST THE BACK OF HER NECK OR THE CENTER OF HER BACK, IS THAT RIGHT?

A.       YES.

Q.       THAT IS THE SECOND PERSON, MS. MCNEIL?

A.       YES.

MR. GURGANUS:  YOUR HONOR, WE HAVE NO FURTHER QUESTIONS.  I WOULD NOTE THAT MS. MCNEIL AND MS. KIHEGA'S PRELIMINARY HEARING TESTIMONY WILL BE READ FOR THE COURT.

THE COURT:  ALL RIGHT.  ANYTHING FURTHER?

MS. SAUNDERS:  NO, YOUR HONOR.

THE COURT:  YOU MAY STEP DOWN.

THE WITNESS:  MAY I BE EXCUSED?

THE COURT:  YES.

(WITNESS EXCUSED.)

THE DEFENDANT:  EXCUSE ME, YOUR HONOR, CAN WE TAKE FIVE MINUTES SO I COULD SPEAK WITH ONE OF MY COUNSEL, PLEASE.  IT DOES NOT HAVE ANYTHING TO DO WITH THE WITNESS WHO IS LEAVING.  IT HAS TO DO WITH THIS INCIDENT.

THE COURT:  YES.

THE DEFENDANT:  THANK YOU, SIR.

THE COURT:  TAKE A FIVE-MINUTE RECESS.

(BREAK TAKEN.)

THE COURT:  BACK ON THE RECORD.  IT'S NOW 11:18.  LET'S CONTINUE.

MS. HAINES:  MAY I JUST CLEAR SOMETHING

WITH THE COURT BEFORE WE CALL STEPHEN MARTI?

THE COURT:  YES.

MS. HAINES:  THE COURT HAS MADE A RULING ABOUT THE LIMITS ON THE VICTIM IMPACT STATEMENT OR THE VICTIM IMPACT TESTIMONY IN THIS CASE.  AND MR. MARTI HAS BEEN ADVISED OF THOSE LIMITS BUT HE WOULD LIKE --

THE COURT:  CAN YOU SPEAK A LITTLE LOUDER.

MS. HAINES:  MR. MARTI HAS BEEN ADVISED OF THE COURT'S RULING WITH RESPECT TO THE PARAMETERS OF HIS VICTIM IMPACT TESTIMONY.

THE COURT:  WHO HAS BEEN ADVISED?

MS. HAINES:  MR. MARTI, WHO IS ANDREW MARTI'S BROTHER.  HE IS GOING TO BE TESTIFYING ABOUT THE VICTIM IMPACT, YOUR HONOR.  AND HE WOULD REQUEST A BIT OF LEEWAY, YOUR HONOR, WITH JUST TALKING ABOUT ANDREW'S SEIZURES AS A CHILD BECAUSE THAT VERY MUCH AFFECTED HIS RELATIONSHIP WITH HIS BROTHER AND HIS PERCEPTION OF HIS BROTHER.  SO HE IS FINDING IT A LITTLE DIFFICULT NOT TO MENTION IT AT ALL.  I'M NOT SURE THAT IS WHAT THE COURT INTENDED ANYWAY, THAT IT WOULD NOT BE MENTIONED, BUT HE IS NOT GOING TO GO INTO GREAT DETAIL ABOUT THE EFFORTS HIS PARENTS MADE TO CORRECT THE PROBLEM OR THE TESTIMONY THAT I BELIEVE THE COURT FOUND OBJECTIONABLE.

THE COURT:  HE JUST WANTS TO MENTION HIS

MEDICAL CONDITION?

MS. HAINES:  WELL, THAT IS REALLY WHAT HIS INTERACTION WAS.  I THINK YOU WILL SEE, YOUR HONOR, BY HIS TESTIMONY, HE WAS MUCH OLDER THAN HIS BROTHER AND MANY OF HIS MEMORIES HARKEN BACK TO THE TIME WHEN HIS BROTHER WAS SUFFERING FROM SEIZURES.  SO HE MOSTLY RECALLS HIS BROTHER IN THAT WAY.

THE COURT:  ALL RIGHT.  LET ME HEAR FROM THE DEFENSE.

MR. MORENO:  YOUR HONOR, I THINK THAT IT'S HARD TO DRAW THE LINE BETWEEN WHAT THIS COURT HAS -- THE PARAMETERS THIS COURT HAS SET AND THE PROFFER THAT WAS JUST MADE BY MS. HAINES.  I UNDERSTAND WHAT SHE IS SAYING.  I THINK HIS TESTIMONY THEN SHOULD BE LIMITED IN THE MANNER IN WHICH HE DESCRIBES MR. ANDREW MARTI'S MEDICAL CONDITION AND THE EFFORTS THAT WERE PUT IN BY THE FAMILY TO HELP HIM WITH THAT.

IF MOST OF HIS INTERACTIONS CONCERNED ANDREW IN THAT POINT IN HIS LIFE WHEN HE WAS SUFFERING THE SEIZURES, I THINK HE CAN CERTAINLY TESTIFY TO THAT. BUT I WOULD ASK THAT THE PARAMETERS THAT THIS COURT IMPOSED BE STRICTLY GUARDED AND THAT MR. MARTI BE SO INSTRUCTED.

THE COURT:  ALL RIGHT.  DO YOU HAVE A COPY OF MY OPINION?  I DON'T HAVE IT IN FRONT OF ME.

DOES ANYBODY HAVE MY OPINION?  I KNOW I LIMITED IT.

MR. MORENO:  YOUR HONOR, I THINK YOU FOUND THAT THAT TYPE OF TESTIMONY WAS NOT VICTIM IMPACT, IS MY RECOLLECTION BUT....

MR. GURGANUS:  YOUR HONOR, AGAIN, THOUGH, I THINK THE OPINION WAS ALSO WITH A JURY AT THE TIME AND YOU KNOW, THE PREJUDICIAL EFFECT AND THINGS.  GIVEN THE FACT THAT THE COURT IS HEARING THIS, WE WOULD SUBMIT THAT THE COURT HAS SEEN MOST OF THIS ANYWAY AND THAT THE COURT CAN GIVE PROPER WEIGHT WHERE THE -- THERE WAS A CONCERN BEFORE WITH A JURY.  IT IS JUST NOT THERE AT THIS TIME.

THE COURT:  IN MY OPINION I SPECIFICALLY LIMITED THIS, RIGHT?

MS. SAUNDERS:  YES.

THE COURT:  JUST REFRESH MY MEMORY.  WHAT DID I SAY IN THE OPINION?  I DON'T HAVE IT FRONT OF ME.

MS. SAUNDERS:  AS I RECALL, IT TRACKED THE LANGUAGE OF THE CASES, WHICH SAY IT CAN ONLY GO TO -- THE TESTIMONY CANNOT GO TO ANYTHING OUTSIDE THE REALM OF ONLY THE IMPACT OF THE DEATH OF THE VICTIM ON THE PARTICULAR WITNESS WHO IS TESTIFYING.

THE PROBLEM WITH THE MEDICAL TREATMENT WAS THAT WHAT WAS TESTIFIED TO BY OTHER WITNESSES WAS A LONG INVOLVED STORY THAT ESSENTIALLY DISCUSSED HOW

MR. MARTI'S -- WHAT MR. MARTI SUFFERED FROM AND WHAT EFFORTS THE FAMILY MADE TO TRY TO HELP HIS HEALTH, WHICH IS NOT RELEVANT TO THE GLIMPSE OF THE LIFE OR THE SPECIFIC IMPACT OF THE VICTIM'S DEATH ON THE PARTICULAR WITNESS.

I BELIEVE THAT IS WHY THE COURT RULED THAT IT SHOULD NOT IN FACT INCLUDE SUCH THINGS LIKE MEDICAL -- MEDICAL -- EFFORTS TO OBTAIN MEDICAL TREATMENT OR PROVIDE MEDICAL TREATMENT TO THE INDIVIDUAL.  CERTAINLY I WOULD IMAGINE THAT THIS BROTHER HAS OTHER AREAS IN WHICH HE CAN TESTIFY TO WITH REGARDS TO THE LOSS THAT HE HAS SUFFERED AS A RESULT OF MR. MARTI'S DEATH WITHOUT GOING INTO THAT.

MR. MORENO:  THE OTHER POINT, YOUR HONOR, I THINK, WAS THAT WE VIEWED IT AS A WAY IN WHICH THE GOVERNMENT AT THE TIME ANYWAY WAS TRYING TO GET VULNERABLE VICTIM IMPACT EVIDENCE IN BEFORE THE COURT THAT JUDGE MUIR HAD EXCLUDED IN THE PREVIOUS SENTENCING HEARING.  AND IT DOES SOUND AS IF THE PROPOSED TESTIMONY OFFERED TODAY COMES VERY CLOSE IF NOT OVERLAPS WITH THAT CONCERN.

THE COURT:  WELL, I WILL JUST THEN LET HIM TESTIFY TO THE FACT THAT HIS BROTHER HAD THESE SEIZURES AND -- WE'RE NOT GOING INTO ALL OF THE MEDICAL PROCEDURES THAT HE WENT THROUGH.  JUST KEEP IT TO THAT

NARROW AREA THAT MS. HAINES SAID.  I WILL ALLOW THAT.

MS. HAINES:  THANK YOU, YOUR HONOR.

THE COURT:  ALL RIGHT.

IS HE THE NEXT WITNESS?

MR. GURGANUS:  YES, YOUR HONOR.

STEVE MARTI, GOVERNMENT WITNESS, SWORN.

THE CLERK:  STATE AND SPELL YOUR FULL NAME FOR THE RECORD, PLEASE.

THE WITNESS:  STEVE MARTI, M-A-R-T-I.

MS. HAINES:  MAY I INQUIRE, YOUR HONOR?

THE COURT:  YES.

DIRECT EXAMINATION

BY MS. HAINES:

Q.    GOOD MORNING, MR. MARTI.

A.    GOOD MORNING.

Q.    CAN YOU START OFF BY TELLING US HOW OLD YOU ARE?

A.    58.

Q.    AND ARE YOU MARRIED OR SINGLE?

A.    MARRIED.

Q.    DO YOU HAVE ANY CHILDREN?

A.    TWO.

Q.    AND ARE THEY GIRLS, BOYS?

A.    TWO GIRLS.

Q.    SIR, ARE YOU CURRENTLY EMPLOYED?

A.    YES, I AM.

Q.      WHAT DO YOU DO FOR A LIVING?

A.      I WORK FOR THE PUBLIC UTILITIES IN MONTANA AND I'M A NATURAL GAS WORKER.

Q.      NOW YOU MENTIONED MONTANA.  IS THAT WHERE YOU LIVE?

A.      CORRECT.

Q.      WITHOUT GIVING US YOUR EXACT STREET ADDRESS, CAN YOU TELL US WHAT TOWN YOU LIVE IN?

A.      LIVINGSTON, MONTANA.

Q.      HOW LONG HAVE YOU LIVED IN MONTANA?

A.      30 YEARS.

Q.      NOW, I WANT TO TALK ABOUT YOUR FAMILY.  AND BY THAT I MEAN YOUR FAMILY, YOUR BIOLOGICAL FAMILY OF YOUR MOTHER, FATHER, BROTHERS AND SISTERS.  ALL RIGHT?

A.      SURE.

Q.      NOW, ARE BOTH OF YOUR PARENTS STILL LIVING?

A.      NO, MY MOTHER IS DECEASED.

Q.      IS YOUR FATHER STILL LIVING?

A.      YES, HE IS.

Q.      HOW OLD IS HE?

A.      I BELIEVE HE'S 84.

Q.      DO YOU HAVE ANY BROTHERS AND SISTERS?

A.      I HAVE ONE BROTHER AND ONE SISTER.

Q.      AND CAN YOU TELL US WHAT THEIR NAMES ARE?

A.      MICHAEL MARTI AND PAMELA MARTI.

Q.   NOW, YOU LEFT OUT ANDREW.  WAS ANDREW YOUR BROTHER?

A.   HE WAS.

Q.   ALL RIGHT.  SO CAN YOU GO THROUGH YOUR BROTHERS AND SISTER FOR US BY THE FIRST BORN TO THE YOUNGEST.

A.   I'M THE OLDEST.  MY SISTER IS THREE YEARS YOUNGER, PAMELA.  AND THEN MY YOUNGER BROTHER IS MICHAEL AND THEN ANDY WAS THE YOUNGEST.

Q.   AND WHERE DID YOU AND YOUR FAMILY LIVE?  WHERE DID YOU GROW UP?

A.   CAMPBELL, CALIFORNIA.

Q.   WHAT PART OF CALIFORNIA IS THAT?

A.   THAT IS THE BAY AREA, SAN FRANCISCO BAY AREA.

Q.   NOW, WHAT WAS THE AGE DIFFERENCE BETWEEN YOU AND ANDY, THE YOUNGEST?

A.   IT WAS ABOUT 13 YEARS, I BELIEVE.

Q.   AND I WANT YOU, IF YOU CAN, TO JUST -- WHAT WAS YOUR RELATIONSHIP LIKE WITH YOUR BROTHER AS YOU WERE GROWING UP?

A.   WELL, HE WAS BASICALLY AN INFANT.  AND I WAS -- LIVED WITH HIM DAY-TO-DAY FOR THE FIRST FOUR YEARS OR SO OF HIS LIFE.  AND THEN I LEFT FOR COLLEGE.  IS THERE MORE THAT --

Q.   WELL, I'M ASKING YOU, CAN YOU DESCRIBE WHEN ANDY WAS A CHILD, WHAT WAS YOUR RELATIONSHIP LIKE WITH HIM?

I GATHER YOU WERE A TEENAGER BY THAT TIME, BUT WHAT SORT OF INTERACTION DID YOU HAVE WITH HIM?

A.    WELL, LIKE I SAID, HE WAS AN INFANT OR HE WAS A TODDLER.  HE WAS JUST LEARNING TO WALK.  HE HAD EPILEPSY AND SO WE -- US KIDS, BECAUSE MY MOM HAD A BAD BACK, SPENT A LOT OF TIME HELPING WITH HIM AND HIS DISABILITY.

Q.    LATER IN LIFE WHEN YOU WERE IN HIGH SCHOOL, DID THERE COME A TIME WHEN YOU GRADUATED HIGH SCHOOL AND LEFT THE FAMILY HOUSEHOLD?

A.    YES.  I LEFT AT 18 AND WENT TO COLLEGE.

Q.    NOW, FROM THE POINT OF 18 ONWARDS, HOW MUCH INTERACTION DID YOU HAVE WITH ANDY?

A.    IT WAS INFREQUENT, MAYBE A FEW HOLIDAYS.  I WAS NOT HOME DURING THE SUMMER.  I LEFT TO WORK OUT-OF-STATE.

Q.    AND CAN YOU DESCRIBE FOR US WHAT WAS YOUR BROTHER'S PERSONALITY LIKE?

A.    WELL, HE -- FROM OUTWARD APPEARANCES HE APPEARED TO BE NORMAL.  HE WAS A HAPPY KID.  HAD A GOOD SENSE OF HUMOR.  BUT HE ALWAYS SEEMED MAYBE A LITTLE YOUNGER THAN HE WAS, MAYBE A LITTLE NAIVE, MAYBE NOT A LOT OF SELF ESTEEM, MAYBE BECAUSE HE STRUGGLED IN SCHOOL OR, YOU KNOW, HAD A HARD TIME.

Q.    NOW, DID THERE COME A TIME WHEN YOU LEARNED THAT YOUR BROTHER HAD BEEN SENTENCED TO A PRISON TERM, IN

PRISON?

A.      YES.

Q.      AND HOW MUCH CONTACT DID YOU YOURSELF MAINTAIN WITH HIM ONCE YOUR BROTHER WAS IN PRISON?

A.      THERE WASN'T ANY CONTACT TO SPEAK OF.

Q.      AND IS THERE A REASON WHY YOU LOST CONTACT WITH ANDY AT THAT POINT?

A.      WELL, I GUESS JUST I WAS BUSY RAISING MY OWN DAUGHTERS AND GETTING SITUATED IN MONTANA AND JUST THE DAY-TO-DAY ISSUES WITH MY LIFE.

Q.      DO YOU KNOW, MR. MARTI, IF YOUR SIBLINGS AND YOUR PARENTS MAINTAINED CONTACT WITH YOUR BROTHER?

A.      MAYBE A LITTLE BIT MORE.  MY PARENTS DEFINITELY. THEY VISITED HIM AT VARIOUS TIMES AND, YEAH, KEPT IN CONTACT WITH HIM ALL THE TIME, AS FAR AS I KNOW, YEAH.

Q.      NOW, DID THERE COME A TIME WHEN YOU LEARNED THAT ANDREW HAD BEEN MURDERED?

A.      YES.

Q.      AND I WANT YOU TO DESCRIBE FOR US, IF YOU CAN, WHAT IMPACT HIS MURDER HAD ON YOU IN PARTICULAR?

A.      WELL, IT -- OF COURSE IT SADDENED ME GREATLY AND IT WAS JUST A LIFE CUT SHORT.

Q.      CAN YOU DESCRIBE FOR US WHAT IMPACT HIS DEATH HAD UPON YOUR PARENTS?

A.      WELL, YEAH, I THINK IT REALLY HURT THEM.  HE,

YOU KNOW, HAD ALWAYS STRUGGLED DURING HIS LIFE.  HE HAD TRIED VARIOUS THINGS.  HE TRIED TO GO INTO THE ARMY AND THEY HOPED THAT THAT DISCIPLINE THAT WOULD BE IMPOSED ON HIM WOULD HELP HIM.  THEY EVEN, I GUESS, WENT TO THE EXTREME OF HELPING HIM PASS THE ENTRANCE EXAM SO THAT THE ARMY WOULD BE OF BENEFIT TO HIM IN HIS LIFE.  BUT HE, YOU KNOW, WASN'T ABLE TO MAKE IT THROUGH.  AND SO, YOU KNOW, AGAIN ANOTHER DISAPPOINTMENT TO THEM FOR HIM.

THEY, YOU KNOW, HAD HOPED THAT WHEN HE WAS SENT TO PRISON THAT HE COULD POTENTIALLY GET SOME COUNSELING, MAYBE LEARN A TRADE TO GIVE HIM SOME DIRECTION AND DISCIPLINE IN LIFE.

Q.     HOW DO YOU THINK YOUR FATHER HAS COPED WITH ANDREW'S DEATH?

A.     HE DOESN'T UNDERSTAND WHY THIS PROCESS HAS TAKEN SO LONG.  HE IS CONFUSED WHY IT SHOULD TAKE THIS LONG. I THINK THAT, YOU KNOW, THAT THERE HAS BEEN NO CLOSURE. IT'S JUST KIND OF ALWAYS HANGING OVER HIS HEAD.  IT'S ONE OF THOSE THINGS THAT IS JUST ALWAYS OUT THERE FOR HIM.

Q.     NOW, SIR, IN YOUR DAY-TO-DAY LIFE, HOW DO YOU FEEL ABOUT HAVING TO DISCUSS THE FACT THAT YOUR BROTHER WAS MURDERED IN PRISON?

A.     OH, I DON'T DISCUSS IT, NO.

Q.     WHY IS THAT?

A.      IT'S AN EMBARRASSMENT TO THE FAMILY.  IT'S NOT THE WAY THAT WE WERE BROUGHT UP.  IT'S JUST COMPLETELY OUT OF OUR REALITY.

Q.      NOW, THE LAST THING I WANT TO DO, MR. MARTI, IS SHOW YOU THREE PICTURES.  THEY HAVE BEEN MARKED GOVERNMENT EXHIBIT R2, R3 AND R4.

        MS. HAINES:  IF I MAY APPROACH, YOUR HONOR?

        THE COURT:  YES.

BY MS. HAINES:

Q.      MR. MARTI, DO YOU RECOGNIZE WHO THOSE THREE PHOTOGRAPHS ARE PHOTOGRAPHS OF?

A.      YES.  THAT IS MY BROTHER ANDY AND HIS FAMILY.

        MS. HAINES:  YOUR HONOR, WE WOULD SEEK TO INTRODUCE GOVERNMENT EXHIBIT R2, R3 AND R4.

        THE COURT:  NO OBJECTION, THEY WILL BE ADMITTED.

        MR. MORENO:  NO OBJECTION.

        (GOVERNMENT EXHIBIT NUMBERS R2, R3 AND R4 ADMITTED INTO EVIDENCE.)

        MS. HAINES:  IF WE CAN PUBLISH R3.  R3 IS ON THE SCREEN.

BY MS. HAINES:

Q.      MR. MARTI, CAN YOU TELL US WHO IS IN THAT PICTURE?

A.        THAT IS ANDY IN THE CENTER AND MY MOTHER ON THE LEFT AND MY FATHER ON THE RIGHT.

Q.        AND DO YOU KNOW WHERE THAT PICTURE WAS TAKEN?

A.        I DON'T.

Q.        CAN WE ALSO SHOW YOU R4.

AND, MR. MARTI, CAN YOU TELL US WHO IS IN THIS PICTURE AND WHAT IS THE OCCASION?

A.        WELL, IT'S CHRISTMAS.  ANDY IS ON THE RIGHT AND MY MOTHER IS BEHIND HIM.  THAT IS MY GRANDMOTHER IN THE CENTER AND THEN MY DAD ON THE LEFT.

Q.        AND DO YOU KNOW WHERE THIS PICTURE WAS TAKEN, WHOSE HOUSE?

A.        I BELIEVE IT'S OUR LIVING ROOM.

Q.        IT APPEARS TO BE CHRISTMAS, IS THAT TRUE?

A.        YES.

MS. HAINES:  YOUR HONOR, I HAVE NO FURTHER QUESTIONS.

THE COURT:  ANY CROSS?

MR. MORENO:  NO, YOUR HONOR.  I WOULD JUST LIKE TO SAY ON BEHALF OF MR. HAMMER AND HIS DEFENSE TEAM, WE ARE SORRY FOR YOUR LOSS, SIR.

THE WITNESS:  THANK YOU.

(WITNESS EXCUSED.)

THE COURT:  NEXT WITNESS.

MR. GURGANUS:  YOUR HONOR, IF THE COURT

-- SO THE COURT UNDERSTANDS, THAT WILL BE -- I WILL JUST SIT.  THAT WILL BE ALL THE WITNESSES WE WILL BE OFFERING.

NOW, WE ARE GOING TO BE MOVING THROUGH READING SOME TRANSCRIPTS, JUDGE, AND OFFERING SOME PORTIONS OF MR. HAMMER'S WRITINGS AND COPIES OF CONVICTIONS AND OTHER MATTERS AND FOR EVERYONE'S USE, WE HAVE PUT TOGETHER BINDERS FOR THE COURT, WE WILL HAVE ANOTHER BINDER TO CARRY BACK WITH YOU.  THE DEFENSE WILL BE PROVIDED WITH ONE, THE LAW CLERK, AND YOU.

THE COURT:  SIR, WHAT IS IN THIS BINDER?

MR. GURGANUS:  IT WILL BE THE TRANSCRIPTS, JUDGE, WE WILL BE READING, AND SOME OF THE CERTIFIED COPIES OF CONVICTIONS.  THERE WILL BE THE SHORT STORY, PRELIMINARY HEARING TRANSCRIPT REGARDING ONE OF THE ESCAPES, SOME EXCERPTS FROM A BOOK, THE FINAL ESCAPE.  THERE WILL A TRANSCRIPT OF THE GUILTY PLEA. THERE WILL BE RECORDS FROM THE BAPTIST HOSPITAL HOSTAGE INCIDENT.  RECORDS FOR THE ESCAPE AND CAPTURE FROM THE JOSEPH HARP CORRECTIONAL CENTER AND RECORDS AND ESCAPE FROM CAPTURE OF GRANITE PRISON AND SHOOTING OF THOMAS UPTON, AS WELL AS STIPULATIONS.

THE COURT:  I MADE THE OFFER THE OTHER DAY THAT I CAN READ THESE OUTSIDE OF COURT AND THEY WOULD BE ADMITTED AS EXHIBITS.  AND BASED UPON THE TIME

IT TOOK TO READ THE TESTIMONY OF STEVEN CLASSEN, WHICH IS IN TAB 1 OF THE BOOK, I REALIZE THE OTHER TABS ARE SHORTER, BUT I'M JUST WONDERING WHETHER OR NOT THE PARTIES WOULD AGREE THAT I CAN READ THIS AFTER THE HEARING AND IT WOULD CERTAINLY SHORTEN THINGS.

MR. GURGANUS:  YOUR HONOR, THAT WOULD BE ACCEPTABLE TO THE GOVERNMENT.

THE COURT:  ALL RIGHT.

MR. MCHUGH:  WE HAVE ONE OBJECTION, YOUR HONOR, BUT I THINK THAT OTHER THAN THAT -- ONE OBJECTION TO ONE OF THE DOCUMENTS, ONE OF THE ENTRIES.  BUT OTHER THAN THAT, I THINK THAT IS ACCEPTABLE TO THE DEFENSE.

THE COURT:  WHAT'S BEING OBJECTED TO?

MS. SAUNDERS:  THE OBJECTION, YOUR HONOR, IS TO --

THE COURT:  WHICH TAB?

MS. SAUNDERS:  TAB 3, WHICH IS THE PRELIMINARY HEARING TESTIMONY FROM THE BAPTIST HOSPITAL INCIDENT WHICH THE COURT JUST HEARD LIVE TESTIMONY ABOUT.  THE OBJECTION IS THAT IT IS CUMULATIVE.  CAPTAIN PRATT WAS HERE AND TESTIFIED TO IT.  THEY WILL BE ALSO ADMITTING INTO EVIDENCE THE CERTIFIED COPY OF THE CONVICTIONS, I PRESUME.  MR. HAMMER ENTERED A GUILTY PLEA TO THIS.  I THINK THEY ARE ALSO ENTERING INTO EVIDENCE THE GUILTY PLEA AND FOR THAT REASON WE SUBMIT

THAT SECTION 3, THE PRELIMINARY HEARING TESTIMONY, IS CUMULATIVE AND NOT NECESSARY, AND WE WOULD ASK THE COURT TO STRIKE THAT OUT OF IT.

THE COURT:  WHO'S TESTIFYING AT THE PRELIMINARY HEARING?  I SEE RITA KIHEGA, K-I-H-E-G-A.

MR. GURGANUS:  YES, YOUR HONOR, THAT WAS THE PREGNANT WOMAN.

MS. SAUNDERS:  THAT THE OFFICER CAME IN AND TOOK HER PLACE WHEN MR. HAMMER LEARNED SHE WAS PREGNANT.  AND THE OTHER IS MS. MCNEIL.  THERE WAS SOME TESTIMONY WITH REGARDS TO HER AS WELL.

THE COURT:  NEITHER OF THOSE WITNESSES TESTIFIED AT THE HEARING AND YOU DID CROSS EXAMINE THE OFFICER WITH MS. MCNEIL'S OUT-OF-COURT POLICE STATEMENT. NOW THIS IS NOW A STATEMENT UNDER OATH THAT SHE IS GIVING.

MS. SAUNDERS:  YES, YOUR HONOR.

MR. GURGANUS:  YOU'RE CORRECT, YOUR HONOR, THOSE WERE POLICE REPORTS, NOT DRAFTED BY HER. THESE ARE HER OWN WORDS.  THERE ARE TWO OF THE VICTIMS OWN WORDS WITHIN -- AT A PRELIMINARY HEARING WHERE THEY WERE SUBJECT TO CROSS.  THEY ARE NOT AVAILABLE.  WE COULD NOT -- I BELIEVE ONE OR BOTH HAVE, MAY HAVE PASSED, COULD NOT LOCATE THEM AND FOR THAT REASON, WE ARE OFFERING THEM.  IT'S THEIR TESTIMONY, JUDGE, SWORN

TESTIMONY, SUBJECT TO CROSS.  SO IT'S NOT THAT LONG AND WE THINK THAT IT PUTS EVERYTHING IN PROPER CONTEXT, ESPECIALLY GIVEN THE EXTENSIVE CROSS FROM POLICE REPORTS THAT THE DEFENSE WENT OVER WITH MR. PRATT.  ALSO UNDERSTANDING THAT WE WERE GOING TO BE OFFERING THIS AND SINCE THERE WAS NO CHALLENGE TO IT AT THE TIME, WE THINK IT'S ENTIRELY PROPER.

MS. SAUNDERS:  THAT WAS BEFORE I KNEW WHAT OFFICER PRATT WAS TESTIFYING TO AND THE EXTENT OF HIS TESTIMONY.  I'M SIMPLY SAYING TO THE COURT THAT THERE WAS A GREAT DEAL OF TESTIMONY ABOUT THIS INCIDENT ALREADY.  FRANKLY, FOR THE STATUTORY AGGRAVATOR THEY SIMPLY NEED TO PRESENT THE EVIDENCE OF THE CONVICTION.  THEY HAVE THAT.  THEY HAVE THE FACT THAT MR. HAMMER PLED GUILTY TO THESE OFFENSES.  MY ARGUMENT IS THAT IT IS CUMULATIVE.  HE MENTIONS THAT HE BELIEVES ONE OF THE INDIVIDUALS HAS DECEASED, BUT WE HAVE NOT SEEN A DEATH CERTIFICATE WITH REGARD TO THAT.  BUT NEVERTHELESS, MY MAIN CONCERN FRANKLY IS THAT IT IS CUMULATIVE BASED ON ALL OF THE EVIDENCE THAT THEY HAVE ALREADY PRESENTED WITH REGARDS TO THIS INCIDENT.

THE COURT:  WELL, I'M GOING TO OVERRULE THE OBJECTION.  IT MAY BE CUMULATIVE, BUT THIS TESTIMONY IS UNDER OATH.  SO IT MAY BE THE MOST RELIABLE TESTIMONY ON THE INCIDENT THAT THE COURT REVIEWS.  SO I WILL

OVERRULE THE OBJECTION.

AND THERE WAS A MENTION THAT MR. HAMMER ENTERED A GUILTY PLEA IN REGARD TO THE BAPTIST HOSPITAL INCIDENT, AND I DON'T SEE THAT IN THE INDEX.  AND THAT THAT MIGHT BE ADMITTED, BUT I DON'T SEE THAT IN THE INDEX, UNLESS IT IS IN THE STIPULATION.  I DON'T KNOW.

MS. SAUNDERS:  I WAS UNDER THE IMPRESSION THEY WERE PRESENTING THE CERTIFIED COPY OF THE CONVICTION, AND THAT INCLUDES THAT HE ENTERED A GUILTY PLEA.  I BELIEVE AT ONE POINT MR. GURGANUS, I THOUGHT, HAD TOLD ME HE WAS PUTTING IN THE GUILTY PLEA NOTES OF TESTIMONY.

MR. GURGANUS:  YOUR HONOR, WE DON'T THINK IT IS NECESSARY.  THERE IS VERY LITTLE IN THAT GUILTY PLEA.

THE COURT:  SO YOU ARE NOT GOING TO OFFER IT.

MR. GURGANUS:  WE'RE NOT GOING TO OFFER IT.

THE COURT:  I'M GOING TO READ THE TRANSCRIPT OF THE PRELIMINARY HEARING.  SO THAT FOR PURPOSES OF THE RECORD THE COURT HAS A LOOSE LEAF BINDER PROVIDED BY THE GOVERNMENT.  IT SAYS ON THE FRONT PAGE IN CAPITAL LETTERS, MIDDLE DISTRICT OF PENNSYLVANIA IN SMALLER TYPE.  IN LARGER TYPE, US V DAVID HAMMER

TRANSCRIPTS AND I GUESS THE NUMBER OF THIS CASE.  THIS IS 96 CRIMINAL 239.

AND IN THE INDEX, THE FIRST THING LISTED -- THE FIRST THING THAT IS IN THIS BINDER IS THE TRIAL TESTIMONY OF STEVEN CLASSEN, DATED JUNE 9TH AND JUNE 10, 1998.  THAT IS IN TAB 1 THAT HAS ALREADY BEEN READ INTO THE RECORD LAST THURSDAY AND TODAY.

AT THAT, WE ALSO HAVE THE TRIAL TESTIMONY OF DR. SARALEE FUNKE, F-U-N-K-E, JUNE 4TH AND JUNE 30TH, 1998.  THAT IS TAB 2.

TAB 3 IS THE PRELIMINARY HEARING TRANSCRIPT, DATED MARCH 17, 1998, IN STATE V HAMMER, CRF-78-309 AND CRF-78-310, PARENTHESES, BAPTIST HOSPITAL.  THAT IS THE PRELIMINARY HEARING TRANSCRIPT WE WERE JUST TALKING ABOUT.

TAB 4 IS ENTITLED SHORT STORY, ESCAPE, THE NAME OF A BOOK, ESCAPE AND CAPTURE 1996, ESCAPED FROM THE HARP CORRECTIONAL CENTER IS IN PARENTHESES. THAT IS IN TAB 4.

TAB 5 IS PRELIMINARY HEARING TRANSCRIPT, DATED DECEMBER 14TH, 1981, STATE V HAMMER, CRF 81-592, CRF 81-596, AND CRF 81-643 IN PARENTHESES, THE HUDDLESTONS.  THAT'S TAB 5.

TAB 6 IS EXCERPT, THE FINAL ESCAPE.  IT'S ITALICIZED, I ASSUME IT'S THE NAME OF A BOOK.  IN

PARENTHESES, ESCAPE FROM JOSEPH HARP CORRECTIONAL CENTER AND THE HUDDLESTONS.

TAB 7 IS AN EXCERPT, THE FINAL ESCAPE, PARENTHESES, ESCAPE FROM GRANITE PRISON AND THOMAS UPTON, CLOSE PARENTHESES.

TAB 8, TRANSCRIPT OF GUILTY PLEA DATED JUNE 22ND, 1998, UNITED STATES VERSUS HAMMER, 96 CRIMINAL 239.

TAB 9, RECORDS.  AT BAPTIST HOSPITAL HOSTAGE INCIDENT.  STATE V HAMMER, CRF 78-309 AND CRF 78-310.

TAB 10 IS RECORDS, ESCAPE AND CAPTURE FROM JOSEPH HARP CORRECTIONAL CENTER.

TAB 11 IS RECORDS, ESCAPE AND CAPTURE FROM GRANITE PRISON AND SHOOTING OF THOMAS UPTON.

AND TAB 12 ARE STIPULATIONS.  AND LET ME JUST LOOK AT THE STIPULATIONS.

AND THE STIPULATION -- WELL, THE FIRST STIPULATION IS -- I'M JUST GOING TO READ THIS INTO THE RECORD:

NUMBER 1:  DAVID PAUL HAMMER WAS OVER 18 YEARS OF AGE ON THE DATE OF THE OFFENSE CHARGED IN THE INDICTMENT.  THAT IS APRIL 13TH, 1996.

NUMBER 2.  AT ALL TIMES MATERIAL TO THE INDICTMENT AND SPECIFICALLY ON APRIL 13TH, 1996, UNITED

STATES PENITENTIARY AT ALLENWOOD IN WHITE DEER,

PENNSYLVANIA, WHICH IS WHERE THE DEATH OF ANDREW MARTI

OCCURRED, WAS AND STILL IS LOCATED ON LAND ACQUIRED FOR

THE USE OF THE UNITED STATES AND UNDER ITS EXCLUSIVE

JURISDICTION AND THEREFORE IS AT A PLACE WITHIN THE

TERRITORIAL JURISDICTION OF THE UNITED STATES.

NUMBER 3:  ON APRIL 13, 1996, THE

DEFENDANT, DAVID PAUL HAMMER, AND ANDREW MARTI WERE BOTH

INMATES AT THE UNITED STATES PENITENTIARY AT ALLENWOOD

IN WHITE DEER, PENNSYLVANIA.

NUMBER 4:  GOVERNMENT EXHIBIT 4019 IS A

TRUE AND ACCURATE TRANSCRIPTION OF DAVID PAUL HAMMER'S

GUILTY PLEA PROCEEDINGS, WHICH OCCURRED ON JUNE 22,

1998, IN THE CASE OF UNITED STATES VERSUS DAVID HAMMER,

CASE NUMBER 96 CRIMINAL 239 BEFORE THE HONORABLE MALCOLM

MUIR.

GOVERNMENT EXHIBIT R1 IS A TRUE AND

CORRECT COPY OF, UNDERLINED, THE FINAL ESCAPE, A

PAPERBACK BOOK THAT WAS WRITTEN BY DEFENDANT DAVID PAUL

HAMMER, AND PUBLISHED ON MARCH 1, 2004 BY AUTHOR HOUSE.

AND THIS IS SIGNED BY ALL COUNSEL.

AND THEN THERE IS A SECOND STIPULATION.

THIS INVOLVES A LOMPOC INCIDENT STIPULATION AND THIS ONE

I WILL NOT READ INTO THE RECORD, BUT IT DEALS WITH AN

INCIDENT THAT OCCURRED AT UNITED STATES PENITENTIARY AT

LOMPOC, CALIFORNIA ON MARCH 1995 WHEN MR. HAMMER WAS HOUSED IN A CELL WITH INMATE GLENN BEVINS.

SO THOSE ARE THE STIPULATIONS THE PARTIES HAVE REACHED.  IS THAT CORRECT, COUNSEL?

MR. MCHUGH:  YES, YOUR HONOR.

MR. GURGANUS:  THAT'S CORRECT, YOUR HONOR.

THE COURT:  AND I WILL READ ALL OF THE ITEMS THAT ARE IN THE INDEX.  CERTAINLY IT WILL SAVE A GREAT DEAL OF COURT TIME AND -- FOR ME TO READ THIS AND THESE ITEMS OUTSIDE OF COURT BECAUSE I THINK TO PUT AN AGENT ON THE WITNESS STAND TO GO THROUGH ALL OF THIS WOULD LIKELY BE LIKE THE TRIAL TESTIMONY OF STEVEN CLASSEN, WOULD TAKE A GREAT DEAL MORE TIME.

SO, WITH THAT, I WILL REVIEW THESE ITEMS AFTER THE HEARING.  OR I MAY START READING THEM DURING BREAKS.

MR. GURGANUS:  JUDGE, IF WE COULD JUST OFFER GOVERNMENT EXHIBIT 30.4, WHICH IS THE CERTIFICATE, THE DEATH CERTIFICATE FOR ANDREW MARTI.  IT'S GOVERNMENT EXHIBIT 30.4.

THE COURT:  ALL RIGHT.

ANY OBJECTION?

MR. MCHUGH:  NO OBJECTION.

MR. TRAVIS:  NO OBJECTION.

THE COURT:  ALL RIGHT.  THAT WILL BE ADMITTED INTO EVIDENCE.

(GOVERNMENT EXHIBIT 30.4 ADMITTED INTO EVIDENCE.)

THE COURT:  AND WITH THAT, I TAKE IT THAT THE GOVERNMENT RESTS.

MR. GURGANUS:  WE WILL, YOUR HONOR.  JUST FOR CLARIFICATION, WHEN YOU READ THE FUNKE TRANSCRIPT -- THE FUNKE TRANSCRIPT, WHEN SHE IS TALKING ABOUT GOVERNMENT EXHIBIT 13, AGAIN, IT'S THIS ONE.  AND THERE WERE SOME DRAWINGS THAT SHE WAS REFERRING TO THERE.  I CAN -- I PROVIDED THE COPIES OF THE DRAWINGS THAT WERE PART OF HER AUTOPSY REPORT.  AND PERHAPS I CAN PROVIDE THOSE TO THE COURT FOR THE -- FOR WHEN IT IS READING HER TESTIMONY.  THERE WERE ALSO SOME PICTURES FROM THE AUTOPSY THAT WERE NOT --

THE COURT:  ARE THEY IN THE BOOK?

MR. GURGANUS:  THEY WILL BE IN THE GOVERNMENT EXHIBIT BOOK.  SO THE ONLY THING -- IT MIGHT BE USEFUL FOR THE COURT FROM THE GOVERNMENT EXHIBIT BOOK JUST TO TAKE THE ONE MINUTE TO LOOK AT THOSE PICTURES THAT WERE OUR EXHIBITS AND ALSO HAVE THIS.  AND I THINK THAT WOULD COVER THE TESTIMONY THAT THE COURT WOULD BE READING.

THE COURT:  WHEN ARE YOU SAY "GOVERNMENT

EXHIBIT BOOK," I HAVE -- THE BOOK YOU JUST -- I JUST REFERRED TO WITH THE TRANSCRIPTS AND THE OTHER ITEMS AND I HAVE THE LETTER EXHIBITS.  THIS WAS PART OF THE TESTIMONY OF THE EXPERT.  IS THERE ANOTHER BOOK YOU WANT TO HAND UP?

MR. GURGANUS:  YES.  YOUR HONOR, THERE WILL BE -- WE WILL MAKE A COPY OF THIS BOOK ONCE WE DECIDE EVERYTHING THAT IS IN.  BUT THE PHOTOS, IT MIGHT BE USEFUL FOR THE COURT JUST BRIEFLY TO LOOK THEM OVER.  WE WILL PUT THEM BACK IN THE BOOK AT THAT POINT IN TIME AND THEN WE WILL GET YOU A COPY OF THIS.

THE COURT:  WHY DON'T YOU JUST MAKE COPIES OF THOSE ITEMS.

MR. GURGANUS:  ALL RIGHT.

THE COURT:  JUST STAPLE THEM TOGETHER WITH A COVER DOCUMENT REFERRING TO WHAT THEY ARE.

MR. GURGANUS:  YES, SIR.

THE COURT:  AND WHAT YOU JUST SAID.

MR. GURGANUS:  OKAY.

THE COURT:  I WILL TAKE A LOOK AT THEM.  ALL RIGHT?

MR. GURGANUS:  YES, YOUR HONOR.

THE COURT:  TO SAVE TIME BECAUSE NOW IT IS ALMOST 5 TO 12.

AND IS THE DEFENSE PREPARED TO BEGIN YOUR

CASE NOW?

MR. MORENO:  YOUR HONOR, WE HAD ANTICIPATED -- I'M SORRY.  WE HAD ANTICIPATED GIVEN THAT WE WERE GOING TO BE READING TRANSCRIPTS IN WITH THE TWO WITNESSES THAT WE WOULD NOT ACTUALLY BE ABLE TO START OUR CASE UNTIL TOMORROW.  SO WE ARE FULLY PREPARED TO GO FORWARD TOMORROW, BUT WE DID NOT ANTICIPATE AT ALL THAT WE WOULD BE FINISHED BY NOON TODAY.  I APOLOGIZE FOR THAT, BUT IT WAS JUST BASED ON HOW THINGS WENT THE OTHER DAY IN COURT WITH THE READING OF THE TRANSCRIPTS AND ALL THAT WE EXPECTED WAS GOING TO BE READ IN ACCORDING TO WHAT WE THOUGHT THE COURT'S WISHES WERE.  WE WERE UNDER THE IMPRESSION THAT -- WE WERE HOPEFUL THAT WE WOULD FINISH THE GOVERNMENT'S CASE TODAY, LET ALONE REST AT NOON.  SO I APOLOGIZE FOR THAT.  WE DON'T HAVE ANY WITNESSES.

THE COURT:  THAT'S OKAY.  I WILL THEN -- WE CAN RECESS FOR THE DAY AND I WILL SPEND MY TIME READING THE DOCUMENTS THAT HAVE JUST BEEN HANDED UP. OBVIOUSLY, IT'S GOING TO TAKE A FEW HOURS, BUT IT REALLY IN MY JUDGMENT WOULD SAVE US A LOT OF TIME.

MR. MORENO:  ABSOLUTELY.

MS. SAUNDERS:  IF I NEGLECTED TO MOVE INTO EVIDENCE DEFENSE EXHIBIT NUMBER 25, WHICH WAS THE POLICE REPORT FROM OFFICER PRATT'S TESTIMONY, I WILL DO

SO NOW, YOUR HONOR.

THE COURT:  D 25, HEARING NO OBJECTION.

MR. GURGANUS:  WE HAVE NO OBJECTION, YOUR HONOR.

THE COURT:  WILL BE ADMITTED.

(DEFENSE EXHIBIT 25 ADMITTED INTO EVIDENCE.)

THE COURT:  SO WE WILL BEGIN AT 9:30 TOMORROW MORNING WITH THE DEFENSE CASE.  AND WE WILL STAND IN RECESS.

MR. MORENO:  THANK YOU, YOUR HONOR.

THE COURT:  IS THERE ANYTHING ELSE YOU WANT TO BRING TO MY ATTENTION AT ALL?

MS. HAINES:  YOUR HONOR, IF I MAY, THE GOVERNMENT HAS FILED SOME MOTIONS IN LIMINE ABOUT SOME OF THE UPCOMING DEFENSE WITNESSES.  AND I BELIEVE ONE OF THE WITNESSES TOMORROW, SCOTT BUTLER, IS THE SUBJECT OF ONE OF THE GOVERNMENT'S MOTIONS, BECAUSE FROM OUR UNDERSTANDING OF THE DEFENSE SUMMARY THAT THEY HAVE PROVIDED TO US OF THIS MAN'S TESTIMONY, IT GOES ALMOST EXCLUSIVELY TO THE IMPACT THAT MR. HAMMER'S DEATH WOULD HAVE ON HIM.  AND WE HAVE PROVIDED THE COURT WITH SOME CASE LAW WHERE WE BELIEVE THAT IS NOT PROPER MITIGATING TESTIMONY.

MS. SAUNDERS:  YOUR HONOR, THAT WAS A

MOTION THAT WAS FILED, I BELIEVE, LAST WEEK.  I AM PREPARED TO ADDRESS THAT ASPECT OF THE MOTION.

THE GOVERNMENT -- FIRST, I WOULD NOTE THAT THERE WAS SIMILAR TYPE EVIDENCE ACCEPTED IN A VERDICT SLIP IN THIS PARTICULAR CASE AT THE PRIOR RESENTENCING.  AND IF I CAN MARK THIS AS DEFENDANT'S EXHIBIT, I GUESS IT WOULD BE EXHIBIT 26.  THIS IS THE VERDICT SLIP FROM MR. HAMMER'S CASE, WHERE THERE WERE, IN FACT, FINDINGS OR PROPOSED FINDINGS WITH REGARD TO THE LOSS OF THE DEFENDANT, THE IMPACT OF THE LOSS OF THE DEFENDANT ON SPECIFIC INDIVIDUAL FAMILY MEMBERS.

IN ADDITION, THE GOVERNMENT HAS CITED IN THEIR BRIEF A CASE CALLED UNITED STATES VERSUS LUJAN.

THE COURT:  CAN I JUST STOP YOU ONE SECOND.

MS. SAUNDERS:  SURE.

THE COURT:  THE MOTIONS I HAVE ARE -- WE DEALT WITH THE LOMPOC MOTION, WHICH WAS DOCUMENT NUMBER 1689.  THAT WAS A DEFENDANT'S MOTION.

THEN I HAVE A MOTION TO COMPEL THE GOVERNMENT TO PROVIDE MR. HAMMER WITH FREEDOM OF INFORMATION ACT EXEMPT DOCUMENTS FROM THE BUREAU OF PRISONS.  I THINK WE DEALT WITH THAT ALREADY.  AND THEN -- THAT WAS DOCUMENT NUMBER 1692.

I HAVE ANOTHER MOTION, DEFENDANT'S MOTION

IN LIMINE FOR DISCLOSURE OF THE IDENTITIES OF ANY GOVERNMENT REBUTTAL WITNESSES AND INFORMATION.  AND I DON'T THINK I RULED ON THAT ONE YET.  BUT MR. GURGANUS, I'M NOT SURE I HAVE AN ANSWER TO THAT.  DO YOU -- WHAT'S YOUR POSITION ON THE REBUTTAL WITNESSES?

MR. GURGANUS:  YOUR HONOR, WE JUST RECENTLY WERE PROVIDED WITH A LIST OF THE WITNESSES THAT ARE BEING CALLED.  AND WE HAVE INDICATED TO THE DEFENSE THAT WE WERE ANTICIPATING POSSIBLY DR. WOLFSON COULD BE A REBUTTAL WITNESS DEPENDING ON WHAT THEY OFFERED. ALSO WE HAD ANTICIPATED THEY HAD LISTED DR. MITCHELL FROM ALLENWOOD AS A POTENTIAL WITNESS, AS ONE OF THEIR WITNESSES, BUT NOW I'M NOT SO SURE THAT THEY WILL CALL HIM.  SO HE COULD BE A POTENTIAL REBUTTAL WITNESS.  AND THEN IT'S JUST -- AGAIN, IT WILL BE DEPENDENT UPON WHAT OTHER EVIDENCE THAT THEY PROVIDE.  THEY HAVE GIVEN US SOME OUTLINE, BUT THAT IS WHERE I WOULD THINK THAT WE COULD POTENTIALLY HAVE REBUTTAL WITNESSES.

THE COURT:  WITH RESPECT TO THIS MOTION, I WILL JUST HOLD IT UNDER ABEYANCE FOR NOW.  REMIND ME THAT I HAVE.  ORDINARILY, WE GIVE THE GOVERNMENT THE OPPORTUNITY TO DECIDE AT THE HEARING OF THE ENTIRE DEFENSE CASE WHAT WITNESSES THEY WOULD CALL IN REBUTTAL. GIVEN THE NATURE OF THIS HEARING AND GIVEN THE LATITUDE THAT THE FEDERAL STATUTE PROVIDES ON THE DEATH PENALTY,

PERHAPS, MR. GURGANUS, AFTER YOU SEE THE LIST, YOU COULD AT LEAST GIVE THEM A PRELIMINARY OUTLINE LIKE YOU JUST DID OF WHO WOULD BE CALLED.  AND AS WE GO ALONG, IF YOU SEE THE NEED FOR ANOTHER REBUTTAL WITNESS, LET THEM KNOW AT THE FIRST AVAILABLE OPPORTUNITY.

ALL RIGHT?  BUT I'M NOT GOING TO SPECIFICALLY RULE ON THIS UNTIL WE GET SOME SENSE OF WHAT THE -- THE GOVERNMENT GETS SOME SENSE OF WHAT WITNESSES WILL DEFINITELY BE CALLED BY THE DEFENSE, EVEN THOUGH YOU HAVE A WITNESS LIST.  ALL RIGHT.

AND THERE IS ANOTHER MOTION TO PRECLUDE PROPOSED MITIGATION TESTIMONY.  NOW, I'M NOT SURE IF THIS IS THE MOTION THAT GOES TO THE WITNESS WHO WE WERE JUST DISCUSSING, MR. BUTLER.  I DON'T HAVE A MOTION IN FRONT OF ME THAT I THINK TALKS ABOUT MR. BUTLER.  I'M JUST WONDERING WHAT MOTION WE ARE REFERRING TO.

MR. GURGANUS:  THAT IS THE MOTION THAT -- THE MOTION TO EXCLUDE EXECUTION IMPACT EVIDENCE AND I BELIEVE --

THE COURT:  THIS IS A MOTION TO PRECLUDE PROPOSED MITIGATION TESTIMONY.  THIS IS DOCUMENT NUMBER 1723 IN THE RECORD.

MS. HAINES:  I BELIEVE THAT IS THE SAME MOTION, YOUR HONOR.

MS. SAUNDERS:  THERE ARE TWO PARTS TO THE

MOTION, YOUR HONOR.

THE COURT:  LET ME JUST LOOK AT THE MOTION FOR ONE SECOND.  I KNOW I READ IT.

I SEE WHAT YOU ARE REFERRING TO.  THIS IS A MOTION TO EXCLUDE TESTIMONY FROM A, QUOTE, TEACHING EXPERTS, CLOSE QUOTE.

WHY IS THE WITNESS BEING REFERRED TO AS A TEACHING EXPERT?

MS. HAINES:  YOUR HONOR, THAT IS A DIFFERENT WITNESS.  THAT IS --

THE COURT:  THIS IS MR. BULLOCK.

MS. HAINES:  MR. BULLOCK, CORRECT, YOUR HONOR.

THE COURT:  THE COURT SHOULD EXCLUDE GENERAL TESTIMONY FROM SO-CALLED SOCIAL HISTORIANS OR TEACHING EXPERTS SUCH AS LOUIS BULLOCK.  MY UNDERSTANDING FROM THE PROFFER HERE IS THAT HE IS GOING TO TESTIFY ABOUT A CLASS ACTION LAWSUIT HE FILED ON BEHALF OF MENTALLY ILL INMATES IN THE CUSTODY OF THE OKLAHOMA DEPARTMENT OF CORRECTIONS IN THE 1980S, ALLEGING THAT THE DOC FAILED TO PROVIDE ADEQUATE PSYCHIATRIC CARE AND -- BUT WHY IS HE BEING REFERRED TO AS A TEACHING EXPERT?  THAT IS WHAT I'M NOT SURE ABOUT.

MS. HAINES:  HE APPEARS TO BE A SORT OF SOCIAL HISTORIAN, YOUR HONOR, WHO IS GOING TO BE

TEACHING THE COURT ABOUT PSYCHIATRIC CONDITIONS.

THE COURT:  TEACH THE COURT?

MS. HAINES:  IT APPEARS THAT IS WHAT HE IS BEING OFFERED TO BECAUSE HE DOESN'T SEEM TO HAVE ANY CONNECTION TO MR. HAMMER OR ANYTHING --

THE COURT:  WELL, TO THIS EXTENT, OBVIOUSLY, UNDER THE STATUTE IN TERMS OF MITIGATING EVIDENCE, THE STANDARD IS THAT THE DEFENSE MAY OFFER OTHER FACTORS IN THE DEFENDANT'S BACKGROUND, RECORD OR CHARACTER OR ANY OTHER CIRCUMSTANCES OF THE OFFENSE THAT MITIGATE AGAINST THE IMPOSITION OF THE DEATH SENTENCE. TO THE EXTENT THAT A WITNESS IS GOING TO TESTIFY TO THE LACK OF PSYCHIATRIC CARE MADE AVAILABLE TO SOMEONE IN CUSTODY IN OKLAHOMA WHEN MR. HAMMER WAS IN CUSTODY, IT WOULD GO TO THE FACTORS THAT I HAVE JUST MENTIONED. EVEN THOUGH IT IS NOT SPECIFICALLY MENTIONING MR. HAMMER, IT'S CERTAINLY SOMETHING THAT TOUCHES UPON SOMETHING THAT AFFECTED HIM, AND THAT IS THE LACK OF CARE THAT HE RECEIVED.  SO IT IS IN A WAY TIED TO MR. HAMMER.

NOW, THE WEIGHT TO BE GIVEN TO THAT TESTIMONY OBVIOUSLY IS UP TO THE COURT, BUT I CAN'T MAKE A FINDING THAT IT'S TOTALLY IRRELEVANT TO THE PROCEEDINGS HERE.  SO I WILL ALLOW MR. BULLOCK TO TESTIFY.

I DO HAVE ONE OTHER MOTION THAT IS PENDING BEFORE ME, AT LEAST ONE THAT CAUSES ME MORE CONCERN. AND THAT IS THE MOTION WITH RESPECT TO -- I BELIEVE HIS NAME IS MR. DONATELLI. THE TRIAL TESTIMONY OF MARK DONATELLI. MR. DONATELLI IS AN EMPLOYEE OF THE FEDERAL DEATH PENALTY RESOURCE CENTER. AND HIS TESTIMONY REALLY DEALS WITH STATISTICAL SUMMARIES REGARDING THE NUMBER OF FEDERAL DEATH-ELIGIBLE CASES AS COMPARED TO THE SMALL NUMBER OF CASES IN WHICH IT HAS ACTUALLY BEEN IMPOSED. AND AGAIN, THIS IS -- THESE ARE -- READING FROM THE DEFENSE MOTION AS TO THE OFFER OF WHAT HE WOULD TESTIFY TO, AN ANALYSIS OF SENTENCES IMPOSED IN THE 114 PRISON MURDERS WHICH OCCURRED FROM DECEMBER 14TH, 2001 THROUGH OCTOBER 1, 2013, AND A SUMMARY OF WHAT OCCURRED IN CASES IN THIS JURISDICTION, THIS MEANING THE MIDDLE DISTRICT OR THE EASTERN DISTRICT OF PENNSYLVANIA. THE MIDDLE DISTRICT?

MR. TRAVIS: MIDDLE DISTRICT, YOUR HONOR.

THE WITNESS: INVOLVING PRISON MURDERS. AND THE GOVERNMENT HAS OPPOSED THE ADMISSION OF MR. DONATELLI'S TESTIMONY. THEY HAVE GIVEN ME AN OPINION AUTHORED BY ANOTHER DISTRICT COURT JUDGE IN THE MCCLOSKEY CASE, I BELIEVE, UNITED STATES VERSUS JOHN CHARLES MCCLOSKEY, CRIMINAL NUMBER 10-2734. THIS IS A 2010 OPINION BY A JUDGE IN THE DISTRICT OF NEW MEXICO,

IN EFFECT EXCLUDING THIS KIND OF TESTIMONY BECAUSE IT DOES NOT GO TO THE FACTOR THAT I REFERENCED BEFORE IN THE FEDERAL DEATH PENALTY STATUTE.  THAT IS, IT'S NOT RELEVANT TO THE DEFENDANT'S BACKGROUND, RECORD OR CHARACTER OR ANY OTHER CIRCUMSTANCES OF THE OFFENSE THAT MITIGATE AGAINST IMPOSITION OF THE DEATH SENTENCE.  IN OTHER WORDS, OTHER MITIGATING FACTORS HAVE TO HAVE SOME CONNECTION TO THE DEFENDANT OTHER THAN JUST THE TESTIMONY BY A LAWYER WHO HANDLED A LOT OF THESE CASES GIVING US GENERAL STATISTICS.

LET ME HEAR FROM MR. TRAVIS ON THIS.

MR. TRAVIS:  YOUR HONOR --

THE COURT:  YOU CAN BE SEATED AND SPEAK INTO THE MIC.

MR. TRAVIS:  I'M SORRY.

THE COURT:  THAT'S OKAY.

MR. TRAVIS:  THE MOTION FILED IN THIS CASE IS SIMILAR TO MOTIONS FILED IN A COUPLE OF OTHER CASES.  THE DISTINGUISHING FACTOR IN THIS CASE IS IN THE OTHER CASES AND I BELIEVE IT WAS SO IN MCCLOSKEY.  THE REQUEST WAS TO ALLOW KEVIN MCNALLY, WHO IS THE HEAD OF THE FEDERAL RESOURCE COUNCIL PROJECT, TO TESTIFY CONCERNING INFORMATION WHICH HE HAD GATHERED CONCERNING PRIOR FEDERAL DEATH PENALTY OR DEATH ELIGIBLE CASES.

IN OUR CASE, THE STATISTICS -- THE

INFORMATION THAT MR. DONATELLI WOULD LOOK AT AND TESTIFY COME FROM AN EXHIBIT WHICH THE GOVERNMENT CREATED.  SO THERE CAN'T BE A CONFLICT AS TO WHETHER WE ARE ACCURATELY DESCRIBING THE CIRCUMSTANCES SURROUNDING WHAT OCCURRED.  THAT WAS ALWAYS PART OF THE REASON FOR REJECTING KEVIN MCNALLY'S TESTIMONY IN THE CASES WHERE THIS MOTION WAS ATTEMPTED.

THE COURT:  THAT IS KEVIN MCNALLY.  HE HAS A COHORT AT THE FEDERAL DEATH PENALTY RESOURCE CENTER, MR. DONATELLI?

MR. TRAVIS:  KEVIN MCNALLY IS THE HEAD OF THE FEDERAL RESOURCE CENTER.  THERE ARE THEN A NUMBER OF DIFFERENT ATTORNEYS, WHO WORK UNDER KEVIN MCNALLY.  MR. DONATELLI, WHO HAPPENS TO BE FROM ALBUQUERQUE, HE IS ESSENTIALLY IN CHARGE OF PROVIDING SUPPORT SERVICES AND SUGGESTIONS TO THE LAWYERS WHO ARE DEALING WITH FEDERAL INMATE KILLING CASES.  THAT IS WHY, INSTEAD OF LOOKING TO MR. MCNALLY AS A POTENTIAL WITNESS, I TALKED TO MR. DONATELLI AS A POTENTIAL WITNESS.  AND HE SEEMS TO FIT BETTER.

AND SECONDLY, THE INFORMATION THAT HE WOULD BE REVIEWING AND RELYING ON IS INFORMATION WHICH THE GOVERNMENT USED AS AN EXHIBIT AND IRONICALLY I THINK IT WAS IN THE MCCLOSKEY CASE.

THE COURT:  WHAT ABOUT IN THIS CASE?  IS

THAT DOCUMENT GOING TO BE USED AS AN EXHIBIT IN THIS CASE?

MR. TRAVIS:  NO, NOT YET.

THE COURT:  DO YOU KNOW WHAT DOCUMENT HE IS REFERRING TO, MS. HAINES?

MS. HAINES:  NO, YOUR HONOR, BECAUSE IN MCCLOSKEY THE GOVERNMENT DID CHALLENGE THIS TYPE OF TESTIMONY AND WAS SUCCESSFUL.  SO I THINK MR. TRAVIS MUST BE MISTAKEN IN SAYING WE USED IT SOMEHOW AFFIRMATIVELY LIKE THIS.

THE COURT:  WELL, THE TROUBLE I'M HAVING IS THAT I CAN TELL YOU IN THE 43-AND-A-HALF YEARS THAT I HAVE BEEN INVOLVED IN THE FEDERAL CRIMINAL JUSTICE SYSTEM THAT EVERY CASE IS DIFFERENT.  EVERY CASE STANDS ON ITS OWN FACTS.  EVERY CASE HAS ITS OWN NUANCES.  NO TWO CASES ARE REALLY ON ALL FOURS.  AND EVEN THOUGH WE STRUGGLE MIGHTILY IN THE FEDERAL CRIMINAL JUSTICE SYSTEM TO TREAT PEOPLE EQUALLY IT'S A DIFFICULT THING FOR A LAWYER TO GET UP AND SAY, WELL, I HAVE STUDIED 18 CASES AND THESE ARE MY CONCLUSIONS FROM THE 18 CASES THAT THE GOVERNMENT IS NOT DOING THEIR JOB PROPERLY OR THAT THE GOVERNMENT IS MAKING A DECISION TO SEEK THE DEATH PENALTY ABOUT SOMEONE WHEN IN FACT IN 16 OTHER CASES THEY DIDN'T, WHEN IN FACT THE GOVERNMENT, THE EXECUTIVE BRANCH OF GOVERNMENT, NOT THE JUDICIAL BRANCH OF WHICH

I'M PART, HAS THE EXCLUSIVE AUTHORITY AND RIGHT TO MAKE A DECISION WHETHER OR NOT THEY WISH TO SEEK THE DEATH PENALTY AGAINST SOMEBODY OR IS SATISFIED WITH LIFE IMPRISONMENT WITHOUT PAROLE.

SO I CAN'T -- I DON'T MAKE ANY DECISION ABOUT THAT.  THAT IS CERTAINLY UP TO THE GOVERNMENT. THAT IS NOT MY FUNCTION.  MY FUNCTION IN THIS COURT IS TO TRY THE CASE, BUT I NEED RELEVANT EVIDENCE PRESENTED BY BOTH SIDES.  EVEN THOUGH THE STANDARD IS LOWER FOR THE DEFENSE IN THE DEATH PENALTY HEARING THAN IT IS FOR THE GOVERNMENT, BUT I READ THE MOTION AND I READ THE MCCLOSKEY CASE.  AND I'M STRUGGLING TO SEE HOW THAT TESTIMONY WOULD BE RELEVANT UNDER THE -- TO CIRCUMSTANCES INVOLVING MR. HAMMER IN THIS SPECIFIC CASE.

IF THERE IS ANYTHING ELSE YOU WANT TO PRESENT ON THAT ISSUE OTHER THAN WHAT IS IN THE MOTION, I WILL HEAR IT, BUT I'M NOT GOING TO RULE ON THE MOTION RIGHT NOW.  BUT I AM -- I JUST WANTED TO LET EVERYONE KNOW THAT I BELIEVE THIS KIND OF TESTIMONY WOULD NOT BE RELEVANT AT THIS HEARING UNLESS THERE IS ANYTHING ELSE YOU WANT TO ADD TO IT.

MR. TRAVIS:  CAN I TELL TOMORROW MORNING?

THE COURT:  YES, ABSOLUTELY.  AGAIN, I'M NOT GOING TO RULE ON IT.  BUT SINCE WE ARE DEALING WITH

MOTIONS, I THOUGHT I WOULD BRING TO EVERYONE'S ATTENTION MY ANALYSIS OF THIS MOTION AND MY AGREEMENT, PRACTICAL AGREEMENT WITH THE JUDGE WHO WROTE THE MCCLOSKEY OPINION.

MR. TRAVIS:  I UNDERSTAND THAT THERE IS A STRONG ARGUMENT TO REJECT IT.  AND I WILL SEE BETWEEN NOW AND TOMORROW MORNING IF I CAN COME UP WITH ANYTHING THAT MIGHT PERSUADE YOU THAT OUR POSITION IS THE CORRECT POSITION, YOUR HONOR.

THE COURT:  ALL RIGHT.

ARE THERE ANY OTHER OUTSTANDING MOTIONS THAT I HAVE NOT DISCUSSED OR DEALT WITH?

MS. HAINES:  YOUR HONOR, I'M NOT TRYING TO KICK THIS DOG TOO MUCH, BUT PART OF THAT EARLIER MOTION REGARDING THE TEACHING EXPERT WAS ALSO THE EXECUTION IMPACT TESTIMONY THAT THE DEFENDANT'S FAMILY MEMBERS ARE APPARENTLY GOING TO PROFFER.  THE COURT SAW HOW VERY LIMITED THE GOVERNMENT WAS ON ITS VICTIM IMPACT TESTIMONY FROM MR. MARTI.  AND THE FLIP SIDE OF THIS, WHICH IS EXECUTION IMPACT TESTIMONY, HAS BEEN REJECTED A NUMBER OF TIMES IN THE CASES THAT THE GOVERNMENT BROUGHT TO THE COURT'S ATTENTION AND WE WOULD CONTINUE TO OBJECT TO IT.

THE COURT:  WELL, LET'S PUT IT THIS WAY. I THINK I HAVE TO AFFORD THE DEFENSE THE OPPORTUNITY TO

AT LEAST CALLING ONE IF NOT TWO WITNESSES.  BUT SIX WITNESSES, I DON'T KNOW IF WE NEED SIX WITNESSES TO DESCRIBE TO THE COURT WHAT THE IMPACT WOULD BE.  WE HAVE ONLY HEARD FROM ONE WITNESS IN MR. MARTI'S FAMILY.

SO WHY DON'T YOU GIVE IT SOME THOUGHT.  ALL RIGHT?  I'M NOT GOING TO MAKE A DEFINITIVE RULING RIGHT NOW.  ALL RIGHT?  WE WILL KEEP THAT OPEN TOO.  OKAY?

MS. SAUNDERS:  VERY WELL, YOUR HONOR.

THE COURT:  ALL RIGHT.

MR. TRAVIS:  YOUR HONOR, ON THE LAST ISSUE, THE NATURE OF THE TESTIMONY THAT THE GOVERNMENT IS OBJECTING TO, WOULD THE COURT BE INTERESTED -- WE PRINTED OUT THE VERDICT SHEET FROM THE FIRST TRIAL IN THIS CASE THAT SHOWS THAT THOSE ISSUES WERE SUBMITTED TO THE JURY, THE IMPACT OF MR. HAMMER'S EXECUTION.  WE PRINTED OUT THE VERDICT SHEET FROM A CASE CALLED UNITED STATES VERSUS O'DRISCOLL WHICH WAS ALSO TRIED IN THE MIDDLE DISTRICT.  THOSE ISSUES WERE SUBMITTED TO THE JURY.  WE PRINTED OUT THE VERDICT SHEET IN UNITED STATES VERSUS PHILLIPS, WHICH WAS TRIED HERE IN THE EASTERN DISTRICT.  THOSE ISSUES WENT TO THE JURY.  WE PRINTED OUT THE VERDICT SHEET IN UNITED STATES VERSUS NORTHINGTON, TRIED HERE IN THE EASTERN DISTRICT.  THOSE ISSUES WENT TO THE JURY.

AND WE PRINTED OUT THE VERDICT SHEET FROM THE LUJAN CASE IN NEW MEXICO THAT SHOWS MULTIPLE FAMILY IMPACT NAMES IN THE -- I THINK THERE WERE ROUGHLY 20 PEOPLE LISTED.  IF LARRY LUJAN IS EXECUTED, HIS SON PETE WILL SUFFER A LOSS.  IF LARRY LUJAN IS EXECUTED, HIS DAUGHTER MARIA WILL SUFFER A LOSS.  HOW THEY CAN CITE THAT CASE FOR THE PROPOSITION THAT YOU CAN'T PUT THAT EVIDENCE IN ESCAPES ME, BECAUSE THE VERDICT SHEET CLEARLY SHOWS IT WAS IN THERE.

THE COURT:  LET ME REREAD THE MOTION TO PRECLUDE FILED BY THE GOVERNMENT AND, LET'S SEE, THAT MOTION IS DOCUMENT NUMBER 1723.  IT WAS FILED ON JUNE 2ND.

MS. SAUNDERS:  YES.

THE COURT:  I DON'T HAVE A WRITTEN RESPONSE TO IT.

MS. SAUNDERS:  I HAVE NOT HAD A CHANCE, YOUR HONOR, BECAUSE WE HAVE BEEN IN COURT AND WAS WORKING ON A WRITTEN RESPONSE.  HOWEVER, I DO HAVE HERE THE VERDICT FORMS IF THE COURT WANTS THOSE NOW.

THE COURT:  I'M NOT MAKING A DECISION. WHY DON'T YOU FILE A WRITTEN RESPONSE.

MS. SAUNDERS:  VERY WELL.

THE COURT:  I HAVE TIME TO RULE ON THIS UNLESS THESE ARE YOUR FIRST WITNESSES.

MS. SAUNDERS: THE FAMILY IS ABOUT TO START TESTIFYING, YOUR HONOR.

THE COURT: I THINK THE BEST THING FOR YOU TO DO IS TO FILE A WRITTEN RESPONSE TO THE MOTION.

MS. SAUNDERS: VERY WELL, YOUR HONOR.

THE COURT: PERHAPS YOU CAN USE THE TIME THIS AFTERNOON TO GET IT IN AND --

MS. SAUNDERS: VERY WELL, YOUR HONOR.

THE COURT: -- LET ME TAKE A LOOK AT IT.

MS. SAUNDERS: SO YOU DO NOT WANT THESE VERDICT SLIPS?

THE COURT: NOT RIGHT NOW. I HAVE ENOUGH TO READ FROM THIS MORNING.

MS. SAUNDERS: I APOLOGIZE FOR NOT GETTING A RESPONSE BACK.

THE COURT: THAT'S OKAY. I UNDERSTAND. I'M JUST ALERTING EVERYONE TO SOME ISSUES THAT ARE OUTSTANDING AND THAT I HAVE TO MAKE A RULING ON.

MS. SAUNDERS: VERY WELL.

THE COURT: ALL RIGHT? IF THERE IS NOTHING FURTHER TO BE DONE TODAY, THEN WE WILL STAND IN RECESS.

MS. SAUNDERS: THANK YOU.

MR. TRAVIS: THANK YOU, YOUR HONOR.

THE DEFENDANT: RON.

MR. TRAVIS:  YES.

THE DEFENDANT:  CAN YOU GIVE ME A CALL HERE?

MR. TRAVIS:  YEAH.

THE DEFENDANT:  THANK YOU.

(HEARING ADJOURNED AT 12:25 P.M.)

INDEX.

I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

DATE                          OFFICIAL COURT REPORTER

SUZANNE R. WHITE

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| STEPHEN CLASSEN | | | | |
| (TRANSCRIPT READ INTO RECORD FROM PG 8 TO 27) | | | | |
| BILLY PRATT | | | | |
| BY MR. GURGANUS | 27 | -- | 58 | -- |
| BY MS. SAUNDERS | -- | 41 | -- | 104 |
| | | | | |
| STEVE MARTI | | | | |
| BY MS. HAINES | 66 | -- | -- | -- |

EXHIBITS

| GOVERNMENT EXHIBITS | ADMITTED |
|---|---|
| R200 | 4 |
| R2, R3 AND R4 | 72 |
| G30.4 | 83 |

| DEFENSE EXHIBITS | ADMITTED |
|---|---|
| 25 | 86 |

'

80:7, 81:14
**1:30** [1] - 47:18

**'69** [1] - 28:5
**'76** [1] - 29:18

## 1

**1** [6] - 32:17, 75:2, 79:6, 80:21, 81:20, 92:14
**10** [5] - 3:24, 15:25, 51:17, 79:6, 80:12
**10-2734** [1] - 92:24
**100** [1] - 2:7
**104** [1] - 102:6
**11** [5] - 35:4, 51:17, 51:20, 80:14
**114** [1] - 92:13
**11:18** [1] - 61:24
**12** [5] - 35:4, 35:5, 52:7, 80:16, 84:24
**12:25** [1] - 101:6
**13** [9] - 4:19, 5:8, 8:4, 26:2, 26:10, 68:16, 81:7, 83:10
**1331** [1] - 2:4
**13TH** [2] - 80:23, 80:25
**14** [1] - 54:10
**14TH** [2] - 79:21, 92:14
**15** [3] - 15:14, 15:25, 55:21
**16** [1] - 95:23
**161** [1] - 2:10
**1689** [1] - 87:19
**1692** [1] - 87:24
**16B** [1] - 1:8
**17** [2] - 56:1, 79:12
**17101** [1] - 2:7
**1723** [2] - 89:22, 99:12
**17703-0215** [1] - 2:11
**18** [6] - 41:3, 69:10, 69:11, 80:22, 95:19, 95:20
**18501** [1] - 1:17
**18TH** [1] - 31:3
**19** [1] - 15:16
**19106** [3] - 1:9, 1:21, 2:14
**1969** [1] - 28:2
**1978** [4] - 28:16, 29:19, 31:2, 31:3
**1980S** [1] - 90:20
**1981** [1] - 79:21
**1995** [1] - 82:1
**1996** [4] - 79:17, 80:23, 80:25, 81:7
**1998** [7] - 8:18, 9:10, 79:6, 79:10, 79:12,

## 2

**2** [3] - 33:11, 79:10, 80:24
**20** [4] - 20:13, 28:5, 28:6, 99:3
**2000** [2] - 14:6, 14:9
**2001** [1] - 92:14
**2004** [1] - 81:20
**2006** [1] - 3:24
**2007** [2] - 30:5, 30:8
**2010** [1] - 92:25
**2013** [1] - 92:14
**20530** [1] - 2:4
**215** [1] - 2:10
**215)627-1882** [1] - 1:21
**22** [7] - 40:16, 40:17, 40:20, 40:21, 40:24, 41:1, 81:13
**22-CALIBER** [1] - 34:16
**22`LONG** [1] - 41:3
**22ND** [1] - 80:7
**235** [1] - 1:16
**239** [3] - 79:2, 80:8, 81:15
**24** [1] - 22:5
**25** [4] - 85:24, 86:2, 86:6, 102:20
**26** [1] - 87:7
**27** [2] - 102:3, 102:5
**275** [1] - 36:15
**2ND** [1] - 99:13

## 3

**3** [6] - 59:6, 60:13, 75:17, 76:1, 79:11, 81:7
**30** [2] - 51:10, 67:11
**30.4** [3] - 82:19, 82:21, 83:3
**300** [1] - 2:7
**302** [1] - 6:1
**309** [1] - 1:17
**30TH** [1] - 79:9
**311** [1] - 1:16
**32-2** [2] - 6:3, 6:6
**32.1** [3] - 6:3, 6:5, 6:6
**33.1** [1] - 6:7
**33.2** [1] - 6:8
**35** [1] - 30:2
**35.1** [4] - 4:17, 4:24, 6:12, 8:3
**35.2** [4] - 4:18, 4:25, 6:12, 8:4

**36.1** [1] - 6:13
**36.2** [1] - 6:13
**36.3** [1] - 6:13
**37** [1] - 13:11

## 4

**4** [5] - 43:4, 79:16, 79:19, 81:11, 102:14
**4/14/96** [1] - 4:18
**400** [1] - 29:6
**4019** [1] - 81:11
**41** [1] - 102:6
**43-AND-A-HALF** [1] - 95:12
**45** [2] - 27:16, 27:17
**46** [2] - 12:25, 13:11
**4:96-CR-239** [1] - 1:6
**4TH** [1] - 79:9

## 5

**5** [6] - 1:12, 42:19, 43:15, 79:20, 79:23, 84:24
**540** [1] - 2:14
**58** [2] - 66:17, 102:5
**5K** [1] - 14:11

## 6

**6** [6] - 9:10, 45:8, 46:12, 46:25, 47:6, 79:24
**6-4** [1] - 36:14
**6-5** [1] - 36:14
**6-9-13** [1] - 1:8
**601** [1] - 1:20
**61** [2] - 3:5, 8:13
**63** [1] - 10:2
**66** [1] - 102:9
**6TH** [1] - 8:18

## 7

**7** [2] - 48:13, 80:3
**72** [1] - 102:15
**75** [1] - 21:14
**78-309** [1] - 80:10
**78-310** [1] - 80:11

## 8

**8** [3] - 50:4, 80:6, 102:3
**81-592** [1] - 79:21
**81-596** [1] - 79:22
**81-643** [1] - 79:22
**83** [1] - 102:16
**84** [1] - 67:21

**86** [1] - 102:20

## 9

**9** [1] - 80:9
**96** [3] - 79:2, 80:7, 81:15
**9:30** [1] - 86:8
**9TH** [1] - 79:5

## A

**A.M** [1] - 47:18
**ABDOMEN** [1] - 60:6
**ABEYANCE** [1] - 88:20
**ABLE** [4] - 38:20, 39:2, 71:7, 85:5
**ABOVE-ENTITLED** [1] - 101:12
**ABSOLUTELY** [3] - 18:1, 85:22, 96:24
**ACCEPTABLE** [2] - 75:7, 75:12
**ACCEPTED** [1] - 87:4
**ACCIDENT** [1] - 4:2
**ACCORDING** [1] - 85:11
**ACCURATE** [2] - 57:6, 81:12
**ACCURATELY** [1] - 94:4
**ACQUIRED** [1] - 81:3
**ACT** [5] - 21:17, 24:17, 24:25, 59:12, 87:22
**ACTED** [3] - 23:3, 24:9, 25:14
**ACTING** [1] - 33:20
**ACTION** [1] - 90:18
**ACTIONS** [1] - 44:18
**ACTS** [1] - 25:17
**ACUTE** [1] - 4:4
**ADAM** [2] - 33:24
**ADD** [1] - 96:22
**ADDITION** [1] - 87:12
**ADDITIONAL** [1] - 7:2
**ADDRESS** [7] - 11:5, 11:7, 11:10, 12:8, 12:10, 67:7, 87:2
**ADDRESSED** [1] - 6:9
**ADEQUATE** [1] - 90:21
**ADJOURNED** [1] - 101:6
**ADJUST** [1] - 44:8
**ADMISSIBILITY** [1] - 46:16
**ADMISSIBLE** [3] - 7:15, 8:2, 46:6
**ADMISSION** [1] -

92:20
**ADMITTED** [12] - 4:8, 4:9, 72:17, 72:20, 74:25, 78:5, 83:2, 83:3, 86:5, 86:6, 102:13, 102:19
**ADMITTING** [1] - 75:22
**ADOPTED** [1] - 7:13
**ADOPTING** [1] - 7:25
**ADVISED** [7] - 51:23, 54:5, 60:3, 60:14, 62:6, 62:9, 62:12
**AFFECTED** [2] - 62:17, 91:18
**AFFIRMATIVELY** [1] - 95:10
**AFFORD** [1] - 97:25
**AFTERNOON** [1] - 100:7
**AFTERWARDS** [1] - 53:9
**AGE** [3] - 53:10, 68:14, 80:22
**AGENT** [5] - 8:18, 8:20, 16:4, 16:5, 82:12
**AGGRAVATOR** [1] - 77:12
**AGGRESSIVENESS** [1] - 45:6
**AGO** [1] - 51:10
**AGREE** [1] - 75:4
**AGREEMENT** [3] - 3:18, 97:2, 97:3
**AIDED** [1] - 1:24
**AIR** [1] - 27:20
**ALBUQUERQUE** [1] - 94:14
**ALERTING** [1] - 100:17
**ALLEGED** [1] - 52:1
**ALLEGING** [1] - 90:21
**ALLENWOOD** [4] - 15:5, 81:1, 81:9, 88:12
**ALLOW** [4] - 46:17, 66:1, 91:24, 93:21
**ALLOWED** [2] - 20:6, 20:7
**ALLUSIONS** [1] - 52:23
**ALMOST** [3] - 27:23, 84:24, 86:20
**ALONE** [1] - 85:14
**ALTERCATION** [2] - 37:21, 38:3
**ALTERNATED** [1] - 44:5
**AMANDA** [1] - 2:2

**AMBULANCE** [3] - 33:13, 48:17, 48:18
**AMERICA** [1] - 1:3
**ANALYSIS** [3] - 59:1, 92:12, 97:2
**ANDREW** [10] - 4:21, 62:13, 63:15, 63:19, 68:1, 70:17, 81:2, 81:8, 82:20
**ANDREW'S** [2] - 62:16, 71:14
**ANDY** [8] - 68:8, 68:15, 68:24, 69:12, 70:7, 72:13, 73:1, 73:8
**ANNE** [1] - 2:5
**ANSWER** [3] - 23:22, 28:25, 88:4
**ANSWERING** [1] - 23:4
**ANTICIPATE** [1] - 85:7
**ANTICIPATED** [3] - 85:3, 88:11
**ANTICIPATING** [1] - 88:9
**ANYWAY** [5] - 13:17, 13:18, 62:21, 64:9, 65:16
**ANYWHERES** [1] - 11:7
**APOLOGIES** [4] - 42:17, 47:5, 51:18, 56:12
**APOLOGIZE** [3] - 85:8, 85:15, 100:14
**APPEARANCE** [1] - 15:19
**APPEARANCES** [3] - 1:14, 2:1, 69:18
**APPEARED** [2] - 15:20, 69:18
**APPROACH** [2] - 42:8, 72:7
**APRIL** [4] - 8:18, 80:23, 80:25, 81:7
**AREA** [5] - 15:11, 60:7, 66:1, 68:13
**AREAS** [1] - 65:11
**ARGUMENT** [2] - 77:15, 97:6
**ARM** [6] - 16:21, 17:4, 17:8, 17:20, 18:6, 60:5
**ARMED** [6] - 34:12, 34:14, 34:15, 35:14, 35:15, 35:17
**ARMY** [2] - 71:2, 71:6
**ARRESTED** [1] - 53:20
**ARRIVED** [1] - 34:1

**ARRIVING** [1] - 51:3
**ASPECT** [1] - 87:2
**ASSESSMENT** [1] - 49:13
**ASSUME** [2] - 42:6, 79:25
**ATTEMPT** [1] - 38:1
**ATTEMPTED** [1] - 94:7
**ATTENDANT** [3] - 33:13, 48:17, 48:18
**ATTENTION** [5] - 10:7, 18:25, 86:13, 97:1, 97:22
**ATTIC** [1] - 55:3
**ATTORNEY** [4] - 13:14, 14:20, 24:21
**ATTORNEYS** [2] - 1:15, 94:13
**AUTHENTICATED** [2] - 7:2, 7:24
**AUTHOR** [1] - 81:20
**AUTHORED** [1] - 92:22
**AUTHORITY** [1] - 96:1
**AUTOMATIC** [1] - 41:1
**AUTOPSY** [2] - 83:13, 83:16
**AVAILABLE** [3] - 76:22, 89:5, 91:13
**AWARE** [1] - 41:24

## B

**B-O-W-L-I-N-G** [1] - 31:21
**BACKGROUND** [3] - 29:24, 91:9, 93:4
**BAD** [1] - 69:5
**BADLY** [1] - 52:15
**BAG** [1] - 32:4
**BAPTIST** [10] - 28:14, 31:4, 31:11, 31:14, 57:9, 74:18, 75:18, 78:3, 79:13, 80:9
**BARREL** [3] - 38:18, 50:16
**BASEBALL** [1] - 44:6
**BASED** [3] - 74:25, 77:19, 85:9
**BAY** [2] - 68:13
**BB'S** [1] - 35:22
**BDU** [2] - 32:8, 32:9
**BDU'S** [1] - 32:2
**BEAT** [1] - 53:21
**BECAME** [3] - 29:10, 54:8, 56:2
**BECOME** [3] - 12:12, 22:23, 25:16
**BED** [3] - 20:3, 20:15,

37:3
**BEEPER** [1] - 54:7
**BEGAN** [1] - 56:2
**BEGIN** [3] - 10:1, 84:25, 86:8
**BEGINNING** [3] - 8:13, 38:3, 48:4
**BEHALF** [2] - 73:20, 90:19
**BEHAVIOR** [1] - 23:19
**BEHIND** [3] - 50:13, 55:4, 73:9
**BELIEVES** [1] - 77:16
**BELOW** [3] - 43:9, 47:25, 60:6
**BEND** [1] - 38:18
**BENEFIT** [2] - 13:25, 71:6
**BESIDE** [1] - 33:14
**BEST** [4] - 10:24, 12:8, 15:23, 100:3
**BETTER** [2] - 25:24, 94:20
**BETWEEN** [5] - 20:11, 22:24, 63:11, 68:14, 97:6
**BEVINS** [1] - 82:2
**BIG** [4] - 29:3, 35:2, 35:4, 36:13
**BILL** [1] - 27:9
**BILLED** [1] - 44:6
**BILLY** [5] - 27:1, 27:4, 27:7, 53:21, 102:4
**BINDER** [4] - 74:9, 74:11, 78:22, 79:4
**BINDERS** [1] - 74:8
**BIOLOGICAL** [1] - 67:13
**BIT** [11] - 10:21, 18:15, 18:18, 19:9, 20:16, 31:10, 37:8, 47:25, 51:14, 62:15, 70:13
**BLOCKED** [1] - 42:23
**BLUE** [1] - 41:1
**BODY** [2] - 28:24, 60:6
**BOOK** [14] - 53:22, 74:16, 75:2, 79:17, 79:25, 81:19, 83:17, 83:19, 83:20, 84:1, 84:4, 84:7, 84:10
**BOOKS** [1] - 11:2
**BORN** [1] - 68:5
**BOTTOM** [3] - 51:20, 54:24, 56:8
**BOWLING** [8] - 31:18, 31:21, 35:10, 36:4, 36:10, 36:13, 38:11, 39:8
**BOX** [3] - 1:17, 2:10, 13:9

**BOYS** [1] - 66:22
**BR** [1] - 33:11
**BRACKETS** [1] - 53:5
**BRADWAY** [1] - 56:4
**BRADWAY'S** [1] - 56:7
**BRAIDED** [1] - 26:1
**BRANCH** [2] - 95:25
**BRAT** [1] - 27:20
**BREAK** [2] - 50:25, 61:22
**BREAKS** [1] - 82:17
**BREAST** [1] - 60:7
**BRIEF** [1] - 87:13
**BRIEFED** [2] - 32:25, 33:9
**BRIEFLY** [5] - 4:23, 5:9, 8:14, 8:17, 84:9
**BRIEFS** [3] - 16:6, 16:15, 16:19
**BRING** [3] - 36:10, 86:13, 97:1
**BROKE** [1] - 3:4
**BROKEN** [1] - 51:12
**BROTHER** [18] - 19:15, 62:14, 62:18, 62:19, 63:4, 63:6, 63:7, 65:10, 65:23, 67:23, 68:2, 68:7, 68:18, 69:25, 70:4, 70:12, 71:22, 72:13
**BROTHER'S** [1] - 69:17
**BROTHERS** [3] - 67:14, 67:22, 68:4
**BROUGHT** [3] - 19:18, 72:2, 97:21
**BULLETPROOF** [2] - 32:10, 36:16
**BULLETS** [1] - 40:11
**BULLOCK** [4] - 90:11, 90:12, 90:16, 91:24
**BUREAU** [1] - 87:22
**BUSINESS** [3] - 14:10, 17:4, 22:4
**BUSY** [1] - 70:8
**BUT...** [1] - 64:4
**BUTLER** [3] - 86:17, 89:14, 89:15
**BUTT** [3] - 38:13, 38:17

## C

**CAB** [7] - 43:10, 43:18, 43:20, 45:24, 46:10, 46:14
**CALIBER** [1] - 40:21
**CALIFORNIA** [4] - 29:11, 68:11, 68:12,

82:1
**CAMPBELL** [1] - 68:11
**CANNOT** [1] - 64:20
**CAP** [3] - 44:6, 44:7
**CAPITAL** [2] - 2:3, 78:24
**CAPTAIN** [7] - 30:5, 30:6, 30:8, 47:2, 47:3, 47:5, 75:20
**CAPTURE** [5] - 74:19, 74:21, 79:17, 80:12, 80:14
**CARE** [3] - 90:22, 91:13, 91:19
**CAREER** [2] - 58:23, 59:9
**CARRIED** [1] - 35:18
**CARRY** [3] - 32:2, 32:3, 74:9
**CASE** [37] - 10:21, 10:24, 12:15, 13:2, 13:6, 14:17, 17:19, 62:5, 79:1, 81:14, 81:15, 85:1, 85:6, 85:14, 86:9, 86:23, 87:5, 87:8, 87:13, 88:23, 92:23, 93:18, 93:19, 93:25, 94:24, 94:25, 95:2, 95:14, 95:15, 96:8, 96:12, 96:15, 98:15, 98:17, 99:2, 99:7
**CASES** [15] - 64:19, 92:8, 92:9, 92:15, 93:9, 93:19, 93:20, 93:24, 94:6, 94:17, 95:16, 95:19, 95:20, 95:23, 97:21
**CATCH** [1] - 38:20
**CAUSED** [6] - 17:7, 17:19, 24:5, 24:6, 24:9, 24:16
**CAUSES** [1] - 92:2
**CEILING** [1] - 55:7
**CELL** [12] - 4:21, 8:5, 8:6, 10:18, 11:14, 11:16, 15:7, 15:8, 21:3, 21:4, 21:18, 82:2
**CELLS** [1] - 8:8
**CENTER** [12] - 2:14, 37:1, 60:25, 73:1, 73:10, 74:20, 79:18, 80:2, 80:13, 92:6, 94:10, 94:12
**CERTAIN** [3] - 16:2, 25:17, 59:15
**CERTAINLY** [6] - 63:20, 65:10, 75:5,

82:9, 91:17, 96:6

**CERTIFICATE** [4] - 3:23, 77:18, 82:19, 82:20

**CERTIFIED** [3] - 74:14, 75:22, 78:8

**CERTIFY** [1] - 101:10

**CETERA** [1] - 8:9

**CHAIRS** [1] - 37:5

**CHALLENGE** [2] - 77:6, 95:7

**CHAMBER** [1] - 39:16

**CHANCE** [1] - 99:17

**CHANDLER** [2] - 57:14, 58:2

**CHANGED** [3] - 7:20, 32:8, 56:12

**CHANGING** [2] - 43:19, 54:12

**CHARACTER** [2] - 91:10, 93:5

**CHARGE** [1] - 94:15

**CHARGED** [1] - 80:22

**CHARLES** [1] - 92:24

**CHECKED** [1] - 39:14

**CHESTER** [1] - 6:7

**CHESTNUT** [1] - 2:7

**CHILD** [3] - 18:23, 62:17, 68:25

**CHILDHOOD** [6] - 8:19, 9:19, 10:4, 10:6, 18:14, 18:16

**CHILDREN** [1] - 66:20

**CHRISTIAN** [1] - 28:7

**CHRISTMAS** [2] - 73:8, 73:14

**CIRCUMSTANCES** [4] - 91:10, 93:5, 94:4, 96:14

**CITE** [1] - 99:6

**CITED** [1] - 87:12

**CITY** [6] - 27:13, 27:14, 27:19, 28:12, 29:4, 30:16

**CLARIFICATION** [2] - 7:21, 83:8

**CLASS** [1] - 90:18

**CLASSEN** [18] - 3:5, 3:24, 5:4, 6:11, 8:17, 11:9, 14:4, 16:12, 18:4, 20:24, 21:25, 23:13, 26:13, 26:18, 75:1, 79:5, 82:14, 102:2

**CLASSEN'S** [2] - 8:13, 8:15

**CLAUSSEN** [1] - 26:25

**CLEAR** [1] - 61:25

**CLEARLY** [1] - 99:9

**CLERK** [4] - 3:1, 27:2, 66:7, 74:10

**CLIENT'S** [1] - 46:5

**CLIP** [2] - 39:17

**CLOSE** [6] - 9:19, 19:17, 42:14, 65:20, 80:5, 90:6

**CLOSEST** [1] - 19:20

**CLOSURE** [1] - 71:17

**CLUB** [1] - 53:21

**CLYDE** [3] - 31:18, 31:21, 36:4

**CM** [1] - 1:19

**COHERENT** [1] - 43:19

**COHORT** [1] - 94:9

**COLA** [1] - 37:18

**COLLEGE** [6] - 28:6, 28:7, 28:8, 28:11, 68:22, 69:10

**COMMUNICATED** [1] - 18:10

**COMMUNITY** [1] - 2:13

**COMPARED** [1] - 92:9

**COMPARING** [1] - 15:15

**COMPEL** [1] - 87:20

**COMPLETE** [1] - 3:9

**COMPLETED** [1] - 26:25

**COMPLETELY** [2] - 43:18, 72:2

**COMPUTER** [2] - 1:23, 1:24

**COMPUTER-AIDED** [1] - 1:24

**CONCERN** [4] - 64:11, 65:21, 77:19, 92:3

**CONCERNED** [3] - 7:14, 8:1, 63:18

**CONCERNING** [2] - 93:23

**CONCLUDED** [1] - 32:20

**CONCLUDES** [1] - 26:18

**CONCLUSIONS** [1] - 95:20

**CONDITION** [3] - 40:6, 63:1, 63:16

**CONDITIONS** [1] - 91:1

**CONFLICT** [1] - 94:3

**CONFUSED** [1] - 71:16

**CONNECTED** [1] - 6:24

**CONNECTION** [7] - 5:20, 6:15, 7:1, 7:14,

8:1, 91:5, 93:8

**CONSISTENT** [1] - 41:4

**CONSPIRACY** [1] - 12:25

**CONTACT** [6] - 45:4, 70:3, 70:5, 70:6, 70:12, 70:15

**CONTAIN** [1] - 59:6

**CONTAINED** [2] - 41:25, 58:13

**CONTAINING** [1] - 58:18

**CONTENTS** [1] - 7:19

**CONTEXT** [1] - 77:2

**CONTINUALLY** [3] - 53:19, 60:15, 60:19

**CONTINUE** [7] - 3:8, 3:16, 3:18, 8:12, 29:23, 61:24, 97:22

**CONTINUED** [4] - 2:1, 18:3, 26:12, 60:10

**CONTINUING** [1] - 22:5

**CONTROL** [1] - 38:9

**CONVERSATION** [1] - 22:24

**CONVERSATIONS** [1] - 22:15

**CONVICTION** [2] - 77:13, 78:9

**CONVICTIONS** [3] - 74:7, 74:14, 75:23

**COOPERATION** [1] - 13:13

**COPED** [1] - 71:13

**COPIES** [4] - 74:6, 74:14, 83:12, 84:13

**COPY** [7] - 44:4, 63:25, 75:22, 78:8, 81:18, 84:7, 84:11

**COR** [1] - 53:5

**CORRECT** [37] - 3:6, 6:10, 6:18, 6:19, 8:8, 13:15, 14:8, 15:1, 16:9, 17:1, 18:14, 21:22, 22:20, 28:14, 34:20, 34:22, 36:22, 40:16, 48:19, 49:4, 49:18, 49:24, 50:2, 50:19, 53:9, 53:11, 53:12, 53:16, 62:23, 67:6, 76:18, 81:18, 82:4, 82:6, 90:12, 97:8, 101:10

**CORRECTION** [2] - 45:4, 53:6

**CORRECTIONAL** [5] - 25:10, 74:20, 79:18, 80:1, 80:13

**CORRECTIONS** [1] - 90:20

**CORRECTLY** [1] - 40:23

**CORROBORATE** [1] - 7:10

**COUNCIL** [1] - 93:22

**COUNSEL** [6] - 3:2, 3:18, 7:17, 61:16, 81:21, 82:4

**COUNSELING** [1] - 71:11

**COUNTER** [2] - 44:20, 44:21

**COUNTRY** [1] - 27:21

**COUPLE** [3] - 3:19, 20:4, 93:18

**COURSE** [3] - 4:13, 17:14, 70:21

**COURT** [164] - 1:1, 1:19, 3:1, 3:3, 3:8, 3:15, 3:19, 3:21, 4:6, 4:8, 4:16, 4:22, 4:24, 5:2, 5:6, 5:9, 5:10, 5:15, 5:22, 6:2, 6:11, 6:23, 7:9, 7:22, 8:11, 9:23, 17:24, 21:13, 22:3, 26:14, 26:19, 26:22, 27:11, 27:18, 30:23, 31:7, 41:12, 42:10, 42:13, 45:18, 45:23, 46:9, 46:15, 46:20, 57:22, 61:7, 61:8, 61:10, 61:12, 61:19, 61:21, 61:23, 62:1, 62:2, 62:3, 62:7, 62:12, 62:20, 62:24, 62:25, 63:8, 63:11, 63:12, 63:21, 63:24, 64:8, 64:9, 64:10, 64:13, 64:16, 65:6, 65:17, 65:22, 66:3, 66:11, 72:9, 72:16, 73:18, 73:24, 73:25, 74:1, 74:8, 74:11, 74:23, 74:24, 75:8, 75:13, 75:16, 75:19, 76:2, 76:4, 76:12, 76:14, 77:10, 77:22, 77:25, 78:16, 78:20, 78:22, 82:8, 82:10, 82:11, 82:22, 83:1, 83:5, 83:14, 83:17, 83:20, 83:23, 83:25, 84:9, 84:12, 84:15, 84:18, 84:20, 84:23, 85:10, 85:17, 86:2, 86:5, 86:8, 86:12, 86:22, 87:14, 87:17, 88:19, 89:20,

90:2, 90:11, 90:14, 91:1, 91:2, 91:6, 91:22, 92:22, 93:13, 93:16, 94:8, 94:25, 95:4, 95:11, 96:7, 96:24, 97:10, 97:17, 97:24, 98:3, 98:10, 98:13, 99:10, 99:15, 99:18, 99:20, 99:21, 99:24, 100:3, 100:6, 100:9, 100:12, 100:16, 100:20, 101:16

**COURT'S** [6] - 4:14, 57:2, 57:17, 62:10, 85:12, 97:22

**COURTHOUSE** [1] - 1:20

**COURTROOM** [3] - 1:8, 18:5, 18:6

**COVER** [2] - 83:23, 84:16

**COVERED** [1] - 16:3

**CRAWLING** [1] - 55:2

**CREATED** [1] - 94:2

**CRF** [5] - 79:21, 79:22, 80:10

**CRF-78-309** [1] - 79:13

**CRF-78-310** [1] - 79:13

**CRIMES** [2] - 2:3, 13:8

**CRIMINAL** [9] - 1:3, 2:3, 13:12, 79:2, 80:8, 81:15, 92:24, 95:13, 95:17

**CROSS** [9] - 7:19, 41:12, 41:13, 73:18, 76:13, 76:22, 77:1, 77:3, 102:1

**CRY** [4] - 19:25, 20:25, 55:11, 56:2

**CRYING** [5] - 20:12, 20:20, 50:18, 56:12

**CUMULATIVE** [5] - 75:20, 76:2, 77:16, 77:19, 77:23

**CUP** [1] - 37:18

**CURTAIN** [2] - 25:24, 26:5

**CURTIS** [1] - 2:14

**CUSTODY** [8] - 30:21, 41:25, 45:22, 56:19, 56:21, 90:19, 91:14

**CUT** [1] - 70:22

---

# D

**D.C** [1] - 2:4

**DAD** [1] - 73:10

**DANGER** [1] - 35:11
**DARBY** [5] - 6:14, 11:15, 11:16, 11:17, 11:22
**DARK** [1] - 20:15
**DATE** [4] - 3:24, 9:8, 80:22, 101:16
**DATED** [5] - 4:18, 79:5, 79:12, 79:21, 80:6
**DAUGHTER** [1] - 99:6
**DAUGHTERS** [1] - 70:9
**DAVID** [17] - 1:6, 6:18, 20:25, 21:16, 25:10, 25:19, 33:6, 33:7, 38:12, 38:20, 41:7, 78:25, 80:21, 81:8, 81:12, 81:14, 81:19
**DAWNA** [4] - 11:10, 12:1, 12:4, 12:7
**DAWNA'S** [1] - 12:10
**DAY-TO-DAY** [3] - 68:21, 70:10, 71:21
**DAYS** [1] - 20:4
**DEAL** [5] - 15:20, 34:6, 77:11, 82:10, 82:14
**DEALING** [2] - 94:16, 96:25
**DEALS** [2] - 81:24, 92:7
**DEALT** [3] - 87:18, 87:23, 97:12
**DEAR** [1] - 50:22
**DEATH** [31] - 3:23, 3:24, 4:2, 4:3, 20:3, 20:10, 20:20, 22:7, 22:11, 22:14, 64:21, 65:4, 65:13, 70:23, 71:14, 77:17, 81:2, 82:20, 86:21, 88:25, 91:11, 92:6, 92:8, 93:3, 93:6, 93:24, 94:9, 95:22, 96:2, 96:10
**DEATH-ELIGIBLE** [1] - 92:8
**DECEASED** [2] - 67:17, 77:17
**DECEMBER** [2] - 79:21, 92:14
**DECIDE** [2] - 84:8, 88:22
**DECIDED** [1] - 35:10
**DECISION** [7] - 35:7, 36:20, 37:9, 95:22, 96:2, 96:5, 99:21
**DEER** [2] - 81:1, 81:10
**DEFENDANT** [14] -

2:5, 2:8, 2:12, 30:21, 61:14, 61:20, 81:8, 81:19, 87:10, 87:11, 93:8, 100:25, 101:2, 101:5
**DEFENDANT'S** [6] - 87:6, 87:19, 87:25, 91:9, 93:4, 97:16
**DEFENDER** [2] - 2:6, 2:13
**DEFENSE** [23] - 13:14, 14:20, 17:10, 17:19, 63:9, 73:20, 74:9, 75:12, 77:4, 84:25, 85:24, 86:6, 86:9, 86:16, 86:19, 88:8, 88:23, 89:9, 91:8, 92:11, 96:10, 97:25, 102:19
**DEFINITELY** [2] - 70:13, 89:9
**DEFINITIVE** [1] - 98:6
**DEGREE** [2] - 18:14, 18:17
**DELUSIONS** [1] - 52:24
**DEMANDED** [1] - 49:17
**DEMANDS** [1] - 56:12
**DEMEROL** [1] - 37:19
**DEPARTMENT** [10] - 2:2, 28:12, 28:20, 28:21, 28:25, 29:4, 30:1, 30:4, 90:20
**DEPARTURE** [1] - 14:13
**DEPARTURES** [1] - 14:19
**DEPENDENT** [1] - 88:15
**DEPUTY** [1] - 30:22
**DESCRIBE** [7] - 9:19, 21:3, 68:24, 69:16, 70:19, 70:23, 98:3
**DESCRIBED** [5] - 24:12, 52:20, 53:25, 54:11, 59:5
**DESCRIBES** [6] - 53:17, 54:21, 55:9, 55:16, 55:21, 63:15
**DESCRIBING** [4] - 23:24, 46:5, 56:1, 94:4
**DESCRIPTION** [1] - 26:3
**DESCRIPTIVE** [1] - 23:23
**DETAIL** [1] - 62:22
**DIAGNOSED** [1] - 56:24

**DIED** [1] - 20:3
**DIFFERENCE** [1] - 68:14
**DIFFERENT** [8] - 20:16, 24:11, 25:18, 51:15, 90:10, 94:13, 95:14
**DIFFICULT** [4] - 41:2, 42:12, 62:19, 95:18
**DIRECT** [4] - 7:18, 27:5, 66:12, 102:1
**DIRECTION** [1] - 71:12
**DIRECTLY** [2] - 32:5, 37:7
**DISABILITY** [1] - 69:6
**DISAPPOINTMENT** [2] - 25:18, 71:8
**DISCIPLINE** [2] - 71:3, 71:12
**DISCLOSURE** [1] - 88:1
**DISCUSS** [2] - 71:22, 71:24
**DISCUSSED** [3] - 41:22, 64:25, 97:12
**DISCUSSING** [2] - 8:19, 89:14
**DISCUSSION** [2] - 15:20, 17:19
**DISPLAY** [1] - 45:5
**DISTINGUISHING** [1] - 93:19
**DISTRICT** [17] - 1:1, 1:2, 1:16, 2:6, 2:13, 30:16, 30:20, 78:24, 92:16, 92:17, 92:18, 92:22, 92:25, 98:19, 98:22, 98:24
**DIVISION** [2] - 2:3, 28:24
**DOC** [1] - 90:21
**DOCUMENT** [8] - 45:11, 84:16, 87:18, 87:24, 89:21, 95:1, 95:4, 99:12
**DOCUMENTS** [5] - 16:9, 59:16, 75:11, 85:19, 87:22
**DOG** [1] - 97:14
**DONATELLI** [7] - 92:4, 92:5, 94:1, 94:10, 94:14, 94:19
**DONATELLI'S** [1] - 92:21
**DONE** [2] - 14:16, 100:21
**DOOR** [4] - 33:15, 34:25, 35:13, 36:25
**DOORS** [1] - 54:23

**DOUGLAS** [5] - 34:6, 38:2, 38:5, 55:17
**DOWN** [24] - 14:24, 14:25, 17:14, 22:5, 26:23, 36:10, 37:8, 43:22, 43:23, 44:23, 47:13, 47:17, 47:25, 48:6, 49:6, 50:5, 50:24, 52:9, 53:17, 54:4, 56:8, 59:3, 61:10
**DR** [5] - 57:14, 58:2, 79:9, 88:9, 88:11
**DRAFTED** [1] - 76:19
**DRAW** [1] - 63:11
**DRAWINGS** [2] - 83:11, 83:12
**DRESS** [1] - 32:14
**DRINK** [3] - 37:17, 37:20, 37:23
**DRIVER** [3] - 43:10, 43:20, 45:24
**DROWSY** [3] - 37:15, 37:20, 37:22
**DRUG** [1] - 37:16
**DRUGGED** [1] - 37:23
**DUNGAREE** [1] - 32:12
**DURING** [14] - 4:12, 8:17, 20:24, 21:15, 22:22, 23:2, 24:8, 44:3, 44:24, 45:3, 60:22, 69:14, 71:1, 82:16
**DUTY** [2] - 31:11, 31:13

## E

**E-N-G-L-E-B-R-E-T-S-O-N** [1] - 31:19
**EASTERN** [4] - 2:13, 92:16, 98:21, 98:24
**EASY** [1] - 50:17
**EFFECT** [2] - 64:7, 93:1
**EFFORT** [1] - 37:16
**EFFORTS** [4] - 62:22, 63:16, 65:2, 65:8
**EITHER** [3] - 10:7, 16:4, 16:24
**ELEVATOR** [1] - 53:21
**ELIGIBLE** [2] - 92:8, 93:24
**ELMO** [3] - 42:16, 42:17, 58:16
**EMANATIONS** [1] - 53:1
**EMBARRASSMENT** [1] - 72:1

**EMERGENCY** [2] - 44:19, 44:21
**EMOTIONAL** [2] - 20:22, 56:2
**EMPHASIZED** [1] - 49:16
**EMPHATICALLY** [1] - 49:17
**EMPLOYED** [1] - 66:24
**EMPLOYEE** [1] - 92:5
**ENCOUNTER** [1] - 15:12
**END** [3] - 14:4, 37:21, 38:17
**ENDED** [1] - 45:21
**ENFORCEMENT** [1] - 28:9
**ENGLEBRETSON** [5] - 31:19, 35:10, 36:5, 36:11, 39:9
**ENSURE** [1] - 49:10
**ENTERED** [3] - 75:23, 78:3, 78:9
**ENTERING** [1] - 75:24
**ENTIRE** [2] - 30:23, 88:22
**ENTIRELY** [1] - 77:7
**ENTITLED** [2] - 79:16, 101:12
**ENTRANCE** [1] - 71:5
**ENTRIES** [1] - 75:11
**ENVELOPE** [1] - 6:7
**EPILEPSY** [1] - 69:4
**EQUALLY** [1] - 95:18
**EQUIPMENT** [2] - 32:2, 32:7
**ERASE** [1] - 53:8
**ESCAPE** [12] - 74:17, 74:19, 74:20, 79:16, 79:17, 79:24, 80:1, 80:3, 80:4, 80:12, 80:14, 81:18
**ESCAPED** [1] - 79:17
**ESCAPES** [2] - 74:16, 99:8
**ESPECIALLY** [2] - 36:16, 77:3
**ESQUIRE** [6] - 1:15, 2:2, 2:5, 2:8, 2:12, 2:12
**ESSENTIALLY** [2] - 64:25, 94:15
**ESTEEM** [1] - 69:22
**ET** [1] - 8:9
**EVENING** [1] - 20:21
**EVIDENCE** [23] - 4:10, 40:13, 40:15, 40:25, 41:4, 58:12, 59:5, 65:17, 72:20, 75:22,

75:25, 77:13, 77:20, 83:2, 83:4, 85:24, 86:7, 87:4, 88:16, 89:18, 91:8, 96:8, 99:8
**EXACT** [3] - 6:21, 7:4, 67:7
**EXACTLY** [1] - 36:18
**EXAM** [1] - 71:5
**EXAMINATION** [5] - 10:1, 27:5, 41:13, 57:25, 66:12
**EXAMINE** [2] - 41:12, 76:13
**EXAMPLE** [3] - 11:17, 16:5, 54:22
**EXCERPT** [2] - 79:24, 80:3
**EXCERPTS** [1] - 74:16
**EXCITED** [1] - 21:8
**EXCLUDE** [3] - 89:18, 90:5, 90:14
**EXCLUDED** [1] - 65:18
**EXCLUDING** [1] - 93:1
**EXCLUSIVE** [2] - 81:4, 96:1
**EXCLUSIVELY** [1] - 86:21
**EXCUSE** [1] - 61:14
**EXCUSED** [3] - 61:11, 61:13, 73:23
**EXECUTED** [2] - 99:4, 99:5
**EXECUTION** [4] - 89:18, 97:16, 97:20, 98:16
**EXECUTIVE** [1] - 95:24
**EXEMPT** [1] - 87:22
**EXHIBIT** [33] - 4:5, 4:9, 4:17, 4:19, 4:24, 5:8, 5:23, 8:3, 8:4, 26:2, 26:10, 56:16, 72:6, 72:15, 72:19, 81:11, 81:17, 82:19, 82:21, 83:3, 83:10, 83:19, 83:20, 84:1, 85:24, 86:6, 87:7, 94:2, 94:23, 95:1
**EXHIBITS** [8] - 4:12, 4:15, 74:25, 83:22, 84:3, 102:11, 102:13, 102:19
**EXISTED** [1] - 33:17
**EXPECTED** [1] - 85:11
**EXPERT** [8] - 6:17, 6:25, 7:3, 7:4, 84:4, 90:8, 90:23, 97:15
**EXPERTS** [2] - 90:6,

90:16
**EXPLAIN** [1] - 13:6
**EXPLAINED** [1] - 25:4
**EXTENSIVE** [1] - 77:3
**EXTENT** [3] - 77:9, 91:6, 91:12
**EXTREME** [1] - 71:5
**EXTREMELY** [3] - 44:18, 48:6, 59:11

## F

**FACE** [2] - 38:21, 60:23
**FACT** [14] - 7:10, 7:23, 13:19, 37:21, 57:13, 59:21, 64:8, 65:7, 65:23, 71:22, 77:14, 87:9, 95:23, 95:24
**FACTOR** [2] - 93:2, 93:19
**FACTORS** [3] - 91:9, 91:15, 93:7
**FACTS** [1] - 95:15
**FAILED** [1] - 90:21
**FAILS** [1] - 48:10
**FAIR** [2] - 42:1, 49:13
**FAMILIAR** [6] - 39:22, 45:18, 58:21, 58:23, 59:7, 59:9
**FAMILY** [21] - 8:21, 9:17, 19:7, 19:8, 19:11, 22:20, 22:23, 63:17, 65:2, 67:12, 67:13, 68:9, 69:9, 72:1, 72:13, 87:11, 97:16, 98:4, 99:2, 100:1
**FAR** [5] - 7:14, 7:18, 7:25, 39:5, 70:15
**FASHION** [2] - 21:17
**FASHIONS** [1] - 25:18
**FATHER** [4] - 67:14, 67:18, 71:13, 73:2
**FBI** [7] - 6:1, 14:1, 14:23, 14:24, 15:3, 15:12, 16:24
**FCRR** [1] - 1:19
**FEAR** [1] - 53:25
**FEDERAL** [13] - 2:6, 2:13, 88:25, 92:6, 92:8, 93:3, 93:22, 93:24, 94:9, 94:12, 94:16, 95:13, 95:17
**FEET** [2] - 35:4, 35:5
**FELLOW** [1] - 10:15
**FELT** [3] - 33:15, 37:10, 44:17
**FEMALE** [2] - 34:8, 44:21

**FEW** [6] - 11:9, 17:11, 29:23, 57:23, 69:13, 85:20
**FIFTH** [1] - 50:5
**FIGHT** [5] - 21:4, 21:18, 25:2, 25:5
**FIGURE** [1] - 13:8
**FILE** [2] - 99:22, 100:4
**FILED** [7] - 86:15, 87:1, 90:18, 93:17, 93:18, 99:11, 99:12
**FINAL** [4] - 74:16, 79:24, 80:3, 81:18
**FINDINGS** [2] - 87:9
**FINISH** [1] - 85:14
**FINISHED** [1] - 85:8
**FIRE** [3] - 38:19, 40:3, 40:4
**FIREARM** [3] - 40:6, 40:11, 41:7
**FIREARMS** [1] - 39:23
**FIRST** [28] - 1:20, 4:17, 15:3, 18:4, 24:9, 27:7, 31:20, 42:22, 42:23, 43:17, 47:7, 47:18, 48:19, 48:25, 49:2, 53:24, 55:22, 59:21, 68:5, 68:21, 79:3, 79:4, 80:18, 87:3, 89:5, 98:14, 99:25
**FIT** [2] - 26:3, 94:19
**FIVE** [2] - 61:15, 61:21
**FIVE-MINUTE** [1] - 61:21
**FLIP** [1] - 97:19
**FLOOR** [3] - 1:20, 10:19, 51:1
**FOCUS** [1] - 29:22
**FOLDED** [2] - 58:12, 58:18
**FOLLOWING** [1] - 28:8
**FOLLOWS** [1] - 8:16
**FORCE** [1] - 27:20
**FOREGOING** [1] - 101:10
**FORGET** [2] - 7:4, 17:15
**FORMS** [1] - 99:20
**FORTUNATELY** [1] - 3:11
**FORWARD** [1] - 85:7
**FOUR** [2] - 27:23, 68:21
**FOURS** [1] - 95:16
**FOURTH** [2] - 43:22, 52:9
**FRANCISCO** [1] - 68:13

**FRANKLY** [2] - 77:12, 77:19
**FREE** [2] - 38:6, 50:25
**FREEDOM** [1] - 87:21
**FREQUENTLY** [1] - 54:12
**FRONT** [7] - 36:15, 37:4, 60:6, 63:25, 64:17, 78:23, 89:15
**FULL** [4] - 27:2, 54:4, 54:10, 66:7
**FULLY** [1] - 85:6
**FUNCTION** [3] - 36:5, 96:7
**FUNERAL** [2] - 20:5
**FUNKE** [4] - 79:9, 83:8, 83:9

## G

**G30.4** [1] - 102:16
**GARY** [1] - 31:18
**GAS** [1] - 67:3
**GATHER** [1] - 69:1
**GATHERED** [1] - 93:23
**GENERAL** [2] - 90:15, 93:10
**GENTLEMAN** [1] - 31:20
**GIRLIE** [1] - 58:12
**GIRLS** [2] - 66:22, 66:23
**GIVEN** [14] - 11:19, 14:19, 16:2, 16:4, 41:3, 46:15, 64:7, 77:3, 85:3, 88:16, 88:24, 91:21, 92:21
**GLENN** [1] - 82:2
**GLIMPSE** [1] - 65:3
**GOVERNMENT** [49] - 1:15, 2:2, 3:22, 4:5, 4:9, 4:19, 14:20, 26:2, 26:9, 27:1, 65:16, 66:6, 72:6, 72:15, 72:19, 75:7, 78:23, 81:11, 81:17, 82:19, 82:20, 83:3, 83:6, 83:10, 83:19, 83:20, 83:25, 86:15, 87:3, 87:12, 87:21, 88:2, 88:21, 89:8, 92:20, 94:2, 94:23, 95:7, 95:21, 95:22, 95:24, 95:25, 96:6, 96:11, 97:18, 97:21, 98:12, 99:11, 102:13
**GOVERNMENT'S** [2] - 85:14, 86:18
**GRAB** [2] - 38:1, 51:13

**GRABBED** [4] - 37:25, 38:24, 50:22
**GRADUATED** [1] - 69:8
**GRAND** [7] - 9:11, 13:16, 14:1, 15:19, 15:21, 16:3, 16:25
**GRANDMOTHER** [1] - 73:9
**GRANITE** [3] - 74:21, 80:4, 80:15
**GREAT** [5] - 15:20, 62:22, 77:11, 82:10, 82:14
**GREATLY** [1] - 70:21
**GREW** [2] - 27:18, 27:20
**GRID** [1] - 13:9
**GROW** [1] - 68:10
**GROWING** [1] - 68:19
**GUARDED** [1] - 63:22
**GUESS** [5] - 13:7, 70:8, 71:4, 79:1, 87:7
**GUIDELINES** [7] - 13:1, 13:5, 13:10, 13:12, 13:21, 13:22, 14:13
**GUILTY** [10] - 74:17, 75:23, 75:25, 77:15, 78:3, 78:9, 78:11, 78:14, 80:6, 81:13
**GUN** [30] - 33:12, 36:6, 36:12, 37:7, 38:1, 38:5, 38:6, 38:24, 38:25, 39:8, 39:18, 39:19, 39:23, 40:24, 48:22, 50:6, 50:12, 50:22, 51:5, 51:13, 55:14, 55:18, 58:10, 60:4, 60:16, 60:19, 60:23, 60:24
**GURGANUS** [45] - 1:15, 3:6, 3:11, 3:17, 3:22, 4:11, 4:17, 5:1, 5:3, 5:7, 8:7, 26:20, 27:6, 41:10, 45:9, 57:23, 58:1, 58:16, 58:17, 61:4, 64:5, 66:5, 73:25, 74:12, 75:6, 76:6, 76:18, 78:10, 78:13, 78:18, 82:6, 82:18, 83:7, 83:18, 84:6, 84:14, 84:17, 84:19, 84:22, 86:3, 88:3, 88:6, 89:1, 89:17, 102:5
**GURNEY** [1] - 37:3
**GUY** [4] - 10:19, 11:14, 11:15, 36:10

# H

**HAINES** [32] - 2:2, 5:25, 6:10, 6:19, 7:3, 7:8, 61:25, 62:3, 62:9, 62:13, 63:2, 63:13, 66:1, 66:2, 66:10, 66:13, 72:7, 72:10, 72:14, 72:21, 72:23, 73:16, 86:14, 89:23, 90:9, 90:12, 90:24, 91:3, 95:5, 95:6, 97:13, 102:9
**HALF** [2] - 14:7, 20:14
**HALF-HOUR** [1] - 20:14
**HALL** [1] - 60:10
**HALLUCINATING** [1] - 54:22
**HALLUCINATIONS** [2] - 53:2, 59:13
**HAMMER** [74] - 1:6, 4:21, 6:24, 7:10, 8:20, 10:6, 10:13, 10:22, 11:24, 12:1, 12:5, 12:7, 17:8, 18:6, 18:13, 19:4, 19:10, 20:25, 21:16, 21:17, 21:22, 22:9, 22:23, 23:2, 23:7, 23:8, 23:16, 24:10, 24:16, 24:25, 25:10, 25:19, 33:6, 33:7, 38:12, 38:20, 41:25, 43:13, 47:8, 47:12, 48:22, 49:1, 49:3, 51:2, 51:7, 51:9, 51:12, 54:8, 55:10, 55:17, 55:23, 56:2, 57:13, 73:20, 75:23, 76:9, 77:14, 78:2, 78:25, 79:12, 79:21, 80:7, 80:10, 80:21, 81:8, 81:14, 81:20, 82:1, 87:21, 91:5, 91:14, 91:17, 91:20, 96:14
**HAMMER'S** [13] - 6:18, 8:5, 8:19, 9:12, 10:10, 19:24, 22:6, 41:8, 74:6, 81:12, 86:21, 87:8, 98:16
**HAND** [12] - 33:16, 38:4, 38:7, 38:16, 38:25, 39:13, 40:5, 41:8, 50:7, 50:13, 55:13, 84:5
**HANDCUFFED** [1] - 39:11
**HANDED** [1] - 85:19

**HANDLED** [1] - 93:9
**HANDS** [2] - 51:7, 51:8
**HANDWRITING** [2] - 6:17, 6:25
**HANGING** [1] - 71:18
**HAPPINESS** [1] - 12:22
**HAPPY** [2] - 12:20, 69:19
**HARD** [9] - 8:19, 9:12, 9:19, 10:3, 10:6, 23:22, 48:10, 63:11, 69:23
**HARKEN** [1] - 63:5
**HARM** [1] - 33:17
**HARP** [4] - 74:20, 79:18, 80:1, 80:13
**HARRIS** [1] - 2:9
**HARRISBURG** [1] - 2:7
**HAT** [1] - 44:8
**HATS** [1] - 44:4
**HEAD** [8] - 33:22, 44:5, 53:22, 60:4, 60:19, 71:18, 93:21, 94:11
**HEALTH** [1] - 65:2
**HEAR** [3] - 63:8, 93:11, 96:18
**HEARD** [5] - 5:4, 14:14, 35:9, 75:19, 98:4
**HEARING** [24] - 1:11, 45:17, 46:16, 61:6, 64:8, 65:19, 74:15, 75:5, 75:18, 76:1, 76:5, 76:13, 76:21, 78:21, 79:11, 79:14, 79:20, 82:16, 86:2, 88:22, 88:24, 96:10, 96:21, 101:6
**HEARSAY** [1] - 46:6
**HELD** [2] - 60:4, 60:19
**HELP** [7] - 49:4, 52:14, 56:6, 58:7, 63:17, 65:2, 71:4
**HELPING** [2] - 69:6, 71:5
**HEROIN** [2] - 4:3, 4:4
**HIGH** [4] - 36:4, 36:7, 69:7, 69:8
**HIMSELF** [2] - 49:10, 54:15
**HISTORIAN** [1] - 90:25
**HISTORIANS** [1] - 90:15
**HISTORY** [1] - 13:12
**HIT** [5] - 35:23, 36:10,

37:12, 38:16, 38:17
**HITTING** [1] - 35:23
**HOLD** [7] - 25:24, 28:21, 33:15, 40:24, 60:10, 60:23, 88:20
**HOLIDAYS** [1] - 69:13
**HOME** [1] - 69:14
**HONOR** [80] - 3:2, 3:7, 3:11, 3:17, 5:12, 5:25, 6:19, 7:16, 8:8, 9:7, 9:22, 17:23, 21:11, 22:5, 26:13, 26:17, 26:20, 26:24, 41:11, 42:7, 45:9, 46:3, 46:12, 46:23, 57:21, 57:24, 61:4, 61:9, 61:14, 62:15, 62:16, 63:3, 63:10, 64:2, 64:5, 65:14, 66:2, 66:5, 66:10, 72:8, 72:14, 73:16, 73:19, 73:25, 75:6, 75:10, 75:14, 76:6, 76:17, 76:19, 78:13, 82:5, 82:7, 83:7, 84:6, 84:22, 85:2, 86:1, 86:4, 86:11, 86:14, 86:25, 88:6, 89:24, 90:1, 90:9, 90:13, 90:25, 92:18, 93:12, 95:6, 97:9, 97:13, 98:9, 98:11, 99:18, 100:2, 100:5, 100:8, 100:24
**HONORABLE** [2] - 1:10, 81:15
**HOPED** [2] - 71:3, 71:9
**HOPEFUL** [1] - 85:13
**HOSPITAL** [17] - 28:14, 31:5, 31:11, 31:15, 32:15, 44:3, 44:19, 46:13, 46:14, 49:18, 57:9, 57:11, 74:18, 75:18, 78:3, 79:14, 80:9
**HOSTAGE** [14] - 31:12, 31:15, 31:22, 33:25, 34:7, 35:2, 37:2, 37:6, 38:4, 38:7, 54:6, 74:18, 80:10
**HOSTAGES** [9] - 33:12, 33:17, 34:11, 35:12, 37:3, 37:6, 37:7, 48:18, 58:9
**HOUR** [2] - 20:14, 34:22
**HOURS** [2] - 32:21, 85:20

**HOUSE** [2] - 73:12, 81:20
**HOUSED** [2] - 10:18, 82:2
**HOUSEHOLD** [1] - 69:9
**HOUSING** [3] - 8:25, 15:6, 15:11
**HUDDLESTONS** [2] - 79:23, 80:2
**HUMOR** [1] - 69:20
**HUMPHREY** [1] - 2:9
**HUNDRED** [3] - 16:13, 16:16, 17:4
**HUNG** [2] - 50:22, 51:2
**HURT** [7] - 49:9, 49:10, 49:13, 49:23, 49:24, 56:4, 70:25

# I

**IDEA** [2] - 10:3, 37:15
**IDENTIFIED** [1] - 6:25
**IDENTITIES** [1] - 88:1
**ILL** [1] - 90:19
**IMAGINATIONS** [1] - 53:12
**IMAGINE** [1] - 65:10
**IMAGINING** [1] - 53:14
**IMMEDIATELY** [1] - 20:12
**IMPACT** [19] - 62:4, 62:5, 62:11, 62:15, 64:3, 64:21, 65:4, 65:17, 70:20, 70:23, 86:21, 87:10, 89:18, 97:16, 97:18, 97:20, 98:3, 98:16, 99:3
**IMPORTANT** [1] - 46:4
**IMPOSED** [4] - 63:22, 71:3, 92:10, 92:13
**IMPOSITION** [2] - 91:11, 93:6
**IMPRESSION** [4] - 19:17, 25:22, 78:7, 85:13
**IMPRISONMENT** [1] - 96:4
**INCIDENT** [30] - 19:18, 19:21, 19:22, 19:23, 28:14, 29:14, 29:15, 29:19, 29:23, 31:2, 31:4, 32:5, 32:19, 41:21, 41:24, 46:6, 46:10, 46:12, 53:18, 60:22, 61:18, 74:19, 75:19, 77:11, 77:21, 77:25, 78:4, 80:10, 81:23, 81:25

**INCLUDE** [1] - 65:7
**INCLUDED** [2] - 42:4, 58:12
**INCLUDES** [1] - 78:9
**INCLUDING** [1] - 33:13
**INDEED** [1] - 57:6
**INDEX** [5] - 78:4, 78:6, 79:3, 82:9, 101:7
**INDICATE** [5] - 12:17, 48:6, 59:25, 60:3, 60:14
**INDICATED** [16] - 7:17, 11:8, 12:23, 13:19, 21:2, 23:1, 24:8, 47:7, 47:11, 47:21, 47:22, 49:2, 54:8, 56:11, 57:5, 88:8
**INDICATES** [5] - 3:24, 43:9, 43:12, 49:20, 59:1
**INDICATING** [1] - 54:14
**INDICTMENT** [2] - 80:23, 80:25
**INDIVIDUAL** [8] - 3:25, 34:11, 43:4, 46:13, 54:11, 56:18, 65:10, 87:11
**INDIVIDUALS** [3] - 42:4, 54:6, 77:17
**INDULGENCE** [2] - 57:2, 57:18
**INFANT** [2] - 68:20, 69:3
**INFERENCE** [2] - 7:12, 7:24
**INFORM** [1] - 9:9
**INFORMATION** [11] - 3:14, 12:13, 12:18, 19:3, 46:3, 87:22, 88:2, 93:23, 94:1, 94:21, 94:22
**INFREQUENT** [1] - 69:13
**INITIAL** [1] - 49:1
**INJECTION** [1] - 4:3
**INJURY** [1] - 4:2
**INMATE** [2] - 82:2, 94:17
**INMATES** [2] - 81:9, 90:19
**INQUIRE** [1] - 66:10
**INSIDE** [4] - 34:11, 36:20, 42:5, 46:13
**INSTANCE** [1] - 23:25
**INSTEAD** [3] - 32:6, 53:12, 94:17
**INSTRUCTED** [1] -

63:23
**INTENDED** [2] - 52:24, 62:21
**INTERACTION** [3] - 63:3, 69:2, 69:12
**INTERACTIONS** [1] - 63:18
**INTERESTED** [1] - 98:13
**INTERJECTED** [1] - 22:3
**INTERVIEW** [5] - 8:17, 9:10, 45:23, 48:14
**INTERVIEWED** [4] - 14:1, 43:4, 43:6, 45:25
**INTERVIEWS** [6] - 14:22, 16:25, 42:1, 42:4, 45:21, 59:18
**INTRAVENOUS** [2] - 4:3, 4:4
**INTRODUCE** [1] - 72:15
**INVOLVED** [6] - 28:9, 29:9, 31:8, 48:21, 64:25, 95:13
**INVOLVEMENT** [1] - 47:18
**INVOLVES** [1] - 81:23
**INVOLVING** [2] - 92:19, 96:14
**IRONICALLY** [1] - 94:23
**IRRATIONALLY** [1] - 59:12
**IRRELEVANT** [1] - 91:23
**ISSUE** [2] - 96:17, 98:12
**ISSUES** [6] - 70:10, 98:15, 98:19, 98:22, 98:25, 100:17
**ITALICIZED** [1] - 79:25
**ITEM** [4] - 4:20, 5:7, 26:1, 26:2
**ITEMS** [6] - 8:2, 82:9, 82:11, 82:15, 84:2, 84:13

**J**

**JAIL** [1] - 45:22
**JAMES** [2] - 2:12, 2:12
**JANUARY** [3] - 28:16, 31:2, 31:3
**JERKED** [2] - 38:3, 38:4
**JOB** [2] - 36:2, 95:21
**JOEL** [1] - 1:10

**JOHN** [2] - 1:15, 92:23
**JOKE** [1] - 49:3
**JORDAN** [6] - 10:15, 10:23, 11:10, 11:13, 12:1, 12:11
**JOSEPH** [4] - 3:23, 74:20, 80:1, 80:13
**JR** [1] - 1:15
**JUDGE** [11] - 4:1, 4:11, 5:1, 65:18, 74:5, 74:13, 76:25, 82:18, 92:22, 92:25, 97:3
**JUDGMENT** [1] - 85:21
**JUDICIAL** [1] - 95:25
**JUMPED** [1] - 38:24
**JUNE** [8] - 3:24, 79:5, 79:6, 79:9, 80:7, 81:13, 99:13
**JURISDICTION** [3] - 81:5, 81:6, 92:15
**JURY** [16] - 9:11, 13:4, 13:16, 14:1, 15:19, 15:21, 16:3, 16:25, 17:18, 23:14, 64:6, 64:11, 98:16, 98:20, 98:22, 98:25
**JUSTICE** [3] - 2:2, 95:13, 95:17

**K**

**K-I-H-E-G-A** [1] - 76:5
**KEEP** [2] - 65:25, 98:7
**KEPT** [2] - 43:19, 70:14
**KEVIN** [5] - 93:21, 94:6, 94:8, 94:11, 94:13
**KHAKIS** [1] - 32:12
**KICK** [1] - 97:14
**KID** [3] - 12:20, 18:20, 69:19
**KIDS** [1] - 69:5
**KIHEGA** [2] - 59:25, 76:5
**KIHEGA'S** [1] - 61:6
**KILL** [3] - 47:22, 52:2, 54:14
**KILLING** [1] - 94:17
**KIND** [8] - 9:9, 23:22, 25:20, 46:16, 53:2, 71:18, 93:1, 96:20
**KNIGHT** [2] - 33:24
**KNOWLEDGE** [4] - 45:12, 45:14, 47:9, 58:5

**L**

**LACK** [2] - 91:13, 91:18
**LAND** [1] - 81:3
**LANGUAGE** [1] - 64:19
**LAPSE** [1] - 20:11
**LARGER** [1] - 78:25
**LARIMORE** [1] - 6:7
**LARRY** [4] - 43:6, 99:4, 99:5
**LAST** [16] - 14:14, 17:11, 18:1, 18:8, 20:2, 44:2, 44:23, 49:15, 49:20, 50:9, 53:20, 55:9, 72:4, 79:7, 87:1, 98:11
**LATITUDE** [1] - 88:24
**LAW** [5] - 24:18, 24:22, 28:9, 74:10, 86:23
**LAWSUIT** [1] - 90:18
**LAWYER** [2] - 93:9, 95:19
**LAWYERS** [1] - 94:16
**LEAD** [1] - 7:24
**LEAF** [1] - 78:22
**LEARN** [1] - 71:11
**LEARNED** [4] - 34:19, 69:24, 70:16, 76:9
**LEARNING** [1] - 69:4
**LEAST** [9] - 6:23, 12:12, 14:1, 14:23, 14:25, 53:1, 89:2, 92:2, 98:1
**LEAVING** [1] - 61:17
**LEEWAY** [1] - 62:16
**LEFT** [9] - 28:10, 60:5, 68:1, 68:22, 69:9, 69:10, 69:14, 73:2, 73:10
**LEGS** [2] - 36:11, 39:9
**LEMASTER** [4] - 33:1, 33:10, 33:20, 37:16
**LENGTHY** [1] - 3:13
**LEONARD** [1] - 6:4
**LESS** [1] - 16:17
**LETTER** [13] - 4:18, 5:1, 5:2, 5:4, 5:18, 11:24, 12:1, 12:4, 21:21, 21:24, 22:7, 22:18, 84:3
**LETTERS** [13] - 6:4, 6:7, 6:12, 6:14, 6:18, 6:24, 7:2, 7:12, 7:19, 7:25, 11:6, 78:24
**LIBERAL** [1] - 46:15
**LIBRARY** [2] - 24:18, 24:23

**LIEUTENANT** [4] - 6:8, 32:25, 33:10, 33:20
**LIEUTENANT'S** [1] - 15:10
**LIFE** [14] - 8:19, 9:12, 50:22, 63:19, 65:3, 68:22, 69:7, 70:10, 70:22, 71:1, 71:6, 71:12, 71:21, 96:3
**LIKELY** [1] - 82:13
**LIMINE** [2] - 86:15, 88:1
**LIMITED** [4] - 63:14, 64:1, 64:14, 97:18
**LIMITS** [2] - 62:4, 62:6
**LINE** [3] - 22:5, 48:6, 63:11
**LINK** [1] - 20:19
**LIST** [4] - 5:23, 88:7, 89:1, 89:10
**LISTED** [3] - 79:4, 88:11, 99:4
**LISTENING** [1] - 10:8
**LIVE** [5] - 27:13, 67:5, 67:8, 68:9, 75:19
**LIVED** [7] - 8:21, 10:9, 10:11, 27:14, 27:22, 67:10, 68:21
**LIVING** [8] - 11:14, 18:11, 19:8, 23:3, 67:1, 67:16, 67:18, 73:13
**LIVINGSTON** [1] - 67:9
**LOADED** [2] - 39:15, 40:8
**LOCATE** [1] - 76:24
**LOCATED** [1] - 81:3
**LOCKED** [1] - 60:5
**LOGGED** [1] - 40:13
**LOMPOC** [3] - 81:23, 82:1, 87:18
**LOOK** [13] - 5:11, 5:17, 5:23, 7:6, 43:22, 48:25, 80:17, 83:21, 84:9, 84:20, 90:2, 94:1, 100:9
**LOOKED** [2] - 50:6, 50:12
**LOOKING** [3] - 50:18, 56:8, 94:17
**LOOSE** [1] - 78:22
**LORD** [1] - 51:10
**LOSS** [6] - 65:12, 73:21, 87:10, 99:5, 99:6
**LOST** [1] - 70:6
**LOUD** [1] - 56:12
**LOUDER** [1] - 62:8

**LOUIS** [1] - 90:16
**LOW** [2] - 36:5, 36:7
**LOWER** [1] - 96:9
**LUJAN** [4] - 87:13, 99:2, 99:4, 99:5

**M**

**M-A-R-T-I** [1] - 66:9
**MA'AM** [18] - 42:21, 42:25, 43:11, 43:24, 47:4, 47:10, 48:20, 49:8, 50:20, 51:19, 51:22, 52:8, 52:11, 52:19, 52:22, 52:25, 54:9, 57:16
**MAGAZINE** [2] - 41:2, 58:12
**MAIN** [2] - 28:24, 77:19
**MAINTAIN** [1] - 70:3
**MAINTAINED** [1] - 70:12
**MALCOLM** [1] - 81:15
**MALE** [1] - 44:20
**MALOCU** [5] - 8:18, 8:20, 9:14, 15:16, 16:5
**MALOCU'S** [1] - 10:4
**MAN** [1] - 36:15
**MAN'S** [1] - 86:20
**MANNER** [2] - 4:1, 63:15
**MARCH** [3] - 79:12, 81:20, 82:1
**MARIA** [1] - 99:6
**MARK** [8] - 10:15, 11:9, 11:13, 11:20, 50:10, 52:12, 87:6, 92:5
**MARKED** [8] - 42:23, 48:2, 49:6, 49:15, 51:21, 53:18, 55:22, 72:5
**MARKET** [1] - 1:20
**MARKINGS** [1] - 43:25
**MARRIED** [3] - 28:11, 66:18, 66:19
**MARSHAL** [1] - 47:1
**MARSHALL** [2] - 30:13, 30:19
**MARSHALS** [2] - 30:11, 30:22
**MARTI** [23] - 4:21, 25:6, 62:1, 62:5, 62:9, 62:13, 63:22, 65:1, 66:6, 66:9, 66:14, 67:25, 70:11, 72:4, 72:11, 72:24, 73:6, 81:2, 81:8,

82:20, 97:19, 102:8
**MARTI'S** [8] - 8:5, 22:20, 22:23, 62:14, 63:15, 65:1, 65:13, 98:4
**MARTIN** [2] - 9:25, 18:3
**MATERIAL** [1] - 80:24
**MATTER** [2] - 13:19, 101:12
**MATTERS** [2] - 22:19, 74:7
**MATTHEW** [3] - 6:14, 11:16, 11:17
**MAXIMUM** [1] - 13:20
**MCCLOSKEY** [7] - 92:23, 92:24, 93:20, 94:24, 95:7, 96:12, 97:3
**MCELROY** [11] - 48:14, 48:15, 48:17, 48:21, 49:16, 50:6, 50:25, 51:6, 51:12, 51:13, 55:17
**MCELROY'S** [2] - 49:1, 51:14
**MCHUGH** [8] - 2:12, 5:12, 5:21, 7:14, 7:16, 75:9, 82:5, 82:24
**MCNALLY** [5] - 93:21, 94:8, 94:11, 94:13, 94:18
**MCNALLY'S** [1] - 94:6
**MCNEIL** [6] - 54:5, 54:11, 60:22, 61:2, 61:5, 76:10
**MCNEIL'S** [2] - 50:13, 76:14
**MEAN** [10] - 10:5, 13:7, 23:23, 31:25, 32:9, 36:8, 38:15, 40:19, 52:24, 67:13
**MEANING** [1] - 92:16
**MEANS** [3] - 53:2, 53:6, 54:23
**MEDIA** [4] - 49:10, 50:2, 54:19, 54:20
**MEDICAL** [8] - 63:1, 63:16, 64:23, 65:8, 65:9, 65:24
**MEETING** [1] - 49:1
**MEMBERS** [3] - 31:11, 87:11, 97:17
**MEMORIES** [1] - 63:5
**MEMORY** [1] - 64:16
**MENTALLY** [1] - 90:19
**MENTION** [3] - 62:20, 62:25, 78:2
**MENTIONED** [6] -

34:24, 36:19, 58:10, 62:21, 67:4, 91:15
**MENTIONING** [1] - 91:16
**MENTIONS** [1] - 77:16
**MET** [1] - 31:14
**MEXICO** [2] - 92:25, 99:2
**MIC** [2] - 3:21, 93:14
**MICHAEL** [2] - 67:25, 68:7
**MICROPHONE** [1] - 42:13
**MID** [1] - 31:2
**MIDDLE** [8] - 1:2, 1:16, 2:6, 78:24, 92:16, 92:17, 92:18, 98:19
**MIDNIGHT** [1] - 31:10
**MIGHT** [4] - 78:5, 83:19, 84:8, 97:8
**MIGHTILY** [1] - 95:17
**MILITARY** [1] - 32:13
**MIND** [4] - 17:9, 43:19, 46:5, 57:7
**MINE** [1] - 10:4
**MINUTE** [3] - 47:14, 61:21, 83:21
**MINUTES** [7] - 11:9, 15:14, 15:25, 17:12, 20:13, 29:23, 61:15
**MISREAD** [1] - 9:8
**MISTAKEN** [1] - 95:9
**MITCHELL** [1] - 88:11
**MITIGATE** [2] - 91:11, 93:6
**MITIGATING** [3] - 86:23, 91:7, 93:7
**MITIGATION** [2] - 89:12, 89:21
**MIXED** [3] - 37:18, 37:19, 48:7
**MOLESTED** [2] - 18:20, 18:23
**MOM** [4] - 19:17, 19:20, 19:24, 69:5
**MOMENT** [1] - 9:6
**MONDAY** [1] - 1:8
**MONEY** [5] - 8:21, 9:4, 10:9, 11:1
**MONTANA** [5] - 67:2, 67:4, 67:9, 67:10, 70:9
**MONTHS** [2] - 12:25, 13:11
**MOOD** [1] - 54:12
**MOODS** [1] - 56:12
**MORENO** [9] - 2:12, 63:10, 64:2, 65:14, 72:18, 73:19, 85:2,

85:22, 86:11
**MORNING** [9] - 3:2, 41:15, 41:16, 66:14, 66:15, 86:9, 96:23, 97:7, 100:13
**MOST** [6] - 3:14, 29:1, 59:11, 63:18, 64:9, 77:24
**MOSTLY** [1] - 63:6
**MOTHER** [7] - 19:14, 20:18, 22:14, 67:14, 67:17, 73:1, 73:9
**MOTHER'S** [2] - 20:9, 20:20
**MOTION** [34] - 14:11, 14:13, 87:1, 87:2, 87:18, 87:19, 87:20, 87:25, 88:19, 89:11, 89:13, 89:14, 89:16, 89:17, 89:18, 89:20, 89:24, 90:1, 90:3, 90:5, 92:1, 92:3, 92:11, 93:17, 94:7, 96:11, 96:17, 96:18, 97:2, 97:15, 99:10, 99:12, 100:4
**MOTIONS** [6] - 86:15, 86:18, 87:17, 93:18, 97:1, 97:11
**MOUTH** [1] - 38:13
**MOVE** [7] - 25:1, 25:6, 25:11, 27:25, 46:18, 48:13, 85:23
**MOVED** [1] - 27:23
**MOVING** [3] - 27:18, 46:11, 74:4
**MUIR** [2] - 65:18, 81:16
**MULTIPLE** [1] - 99:2
**MURDER** [1] - 70:20
**MURDERED** [2] - 70:17, 71:23
**MURDERS** [2] - 92:13, 92:19
**MUST** [1] - 95:9

## N

**N.W** [1] - 2:4
**NAIVE** [1] - 69:21
**NAME** [13] - 11:15, 12:8, 27:3, 27:7, 33:2, 33:3, 33:5, 43:9, 56:7, 66:8, 79:17, 79:25, 92:4
**NAMED** [1] - 52:5
**NAMES** [2] - 67:24, 99:3
**NARCOTISM** [1] - 4:4
**NARROW** [1] - 66:1

**NATURAL** [1] - 67:3
**NATURE** [3] - 32:10, 88:24, 98:12
**NEAR** [1] - 60:4
**NECESSARY** [2] - 76:2, 78:14
**NECK** [7] - 16:21, 17:4, 17:8, 17:20, 18:7, 55:14, 60:24
**NEED** [6] - 38:19, 49:3, 77:13, 89:4, 96:8, 98:2
**NEEDED** [1] - 52:14
**NEGLECTED** [1] - 85:23
**NEGOTIATING** [1] - 33:19
**NEGOTIATIONS** [1] - 33:18
**NEGOTIATOR** [1] - 33:21
**NEVER** [4] - 17:13, 21:21, 49:21
**NEVERTHELESS** [2] - 51:2, 77:18
**NEW** [2] - 92:25, 99:2
**NEWS** [2] - 49:10, 50:1
**NEWSPAPERS** [1] - 54:17
**NEXT** [16] - 25:5, 25:21, 26:19, 44:10, 44:11, 44:19, 50:24, 52:7, 53:17, 53:24, 54:3, 60:13, 60:18, 66:4, 73:24
**NIGHT** [8] - 19:19, 20:17, 20:18, 24:1, 31:9, 31:14, 34:19, 41:8
**NOISE** [1] - 36:20
**NONE** [2] - 14:16, 21:19
**NOON** [2] - 85:8, 85:15
**NORMAL** [1] - 69:19
**NORTHINGTON** [1] - 98:24
**NOTE** [3] - 4:1, 61:5, 87:3
**NOTES** [4] - 5:17, 5:24, 7:6, 78:11
**NOTHING** [4] - 14:3, 14:5, 41:10, 100:21
**NOVEMBER** [2] - 14:6, 14:9
**NUANCES** [1] - 95:15
**NUMBER** [21] - 1:3, 13:8, 41:1, 41:2, 42:1, 79:1, 80:21,

80:24, 81:7, 81:11, 81:15, 85:24, 87:18, 87:24, 89:21, 92:8, 92:9, 92:24, 94:12, 97:21, 99:12
**NUMBERS** [1] - 72:19
**NUMEROUS** [1] - 55:23
**NURSE** [3] - 33:13, 34:2, 34:8

## O

**O'CLOCK** [1] - 32:17
**O'DRISCOLL** [1] - 98:18
**OATH** [2] - 76:15, 77:24
**OBJECT** [4] - 17:23, 21:12, 45:10, 97:22
**OBJECTED** [2] - 6:15, 75:13
**OBJECTING** [1] - 98:13
**OBJECTION** [21] - 4:6, 4:7, 5:13, 5:16, 17:21, 17:25, 21:9, 45:13, 72:16, 72:18, 75:9, 75:10, 75:14, 75:20, 77:23, 78:1, 82:23, 82:24, 82:25, 86:2, 86:3
**OBJECTIONABLE** [1] - 62:24
**OBJECTIONS** [1] - 5:19
**OBSERVED** [1] - 7:12
**OBSERVING** [1] - 53:4
**OBTAIN** [1] - 65:8
**OBVIOUSLY** [6] - 6:5, 7:11, 58:6, 85:20, 91:7, 91:22
**OCCASION** [2] - 9:13, 73:7
**OCCASIONS** [3] - 20:23, 21:15, 52:1
**OCCURRED** [10] - 4:2, 21:18, 28:16, 47:18, 81:3, 81:13, 81:25, 92:13, 92:15, 94:5
**OCCURRING** [1] - 35:3
**OCTOBER** [1] - 92:14
**ODD** [1] - 44:18
**OFFENSE** [4] - 13:23, 80:22, 91:10, 93:5
**OFFENSES** [1] - 77:15
**OFFER** [8] - 4:5, 45:13, 74:23, 78:16,

78:18, 82:19, 91:8, 92:11

**OFFERED** [5] - 58:2, 58:11, 65:20, 88:10, 91:4

**OFFERING** [7] - 3:20, 11:1, 45:16, 74:3, 74:5, 76:25, 77:5

**OFFICE** [2] - 1:15, 15:10

**OFFICER** [17] - 28:23, 31:18, 41:15, 42:19, 42:22, 43:2, 45:18, 46:25, 52:4, 54:1, 54:5, 56:3, 56:7, 76:8, 76:14, 77:9, 85:25

**OFFICERS** [2] - 25:10, 28:25

**OFFICIAL** [2] - 1:19, 101:16

**OFFSET** [1] - 37:1

**OKLAHOMA** [15] - 10:12, 27:13, 27:14, 27:19, 27:22, 27:23, 27:25, 28:7, 28:11, 29:4, 30:16, 30:17, 30:20, 90:20, 91:14

**OLD** [4] - 28:3, 28:6, 66:16, 67:20

**OLDER** [1] - 63:4

**OLDEST** [1] - 68:6

**ONCE** [6] - 28:20, 40:10, 45:21, 54:11, 70:4, 84:7

**ONE** [55] - 3:9, 5:12, 5:13, 7:16, 9:6, 16:5, 19:19, 19:20, 24:1, 24:12, 24:19, 26:19, 33:17, 35:23, 37:11, 39:15, 41:2, 44:5, 44:8, 44:9, 44:10, 46:1, 48:18, 54:6, 56:20, 57:13, 58:18, 59:24, 61:15, 67:23, 71:19, 74:10, 74:16, 75:9, 75:10, 75:11, 76:23, 77:16, 78:10, 81:23, 83:10, 83:21, 86:16, 86:18, 87:14, 88:3, 88:12, 90:3, 92:1, 92:2, 98:1, 98:4

**ONES** [2] - 6:14, 29:1

**ONWARDS** [1] - 69:11

**OPEN** [2] - 13:17, 98:7

**OPENS** [1] - 3:1

**OPINION** [8] - 63:25, 64:1, 64:6, 64:13, 64:17, 92:21, 92:25,

97:4

**OPPORTUNITY** [4] - 58:2, 88:22, 89:5, 97:25

**OPPOSED** [2] - 9:3, 92:20

**ORALLY** [1] - 49:22

**ORDER** [1] - 45:10

**ORDINARILY** [1] - 88:21

**OREGON** [2] - 12:23, 13:15

**OUT-OF-COURT** [1] - 76:14

**OUT-OF-STATE** [1] - 69:15

**OUTLINE** [2] - 88:17, 89:2

**OUTSIDE** [7] - 18:5, 34:25, 35:13, 36:2, 64:20, 74:24, 82:11

**OUTSTANDING** [2] - 97:11, 100:18

**OUTWARD** [1] - 69:18

**OVERCOME** [1] - 53:25

**OVERDOSE** [1] - 4:4

**OVERHEAD** [2] - 42:12, 42:15

**OVERLAPS** [1] - 65:20

**OVERRULE** [3] - 17:25, 77:22, 78:1

**OWN** [5] - 70:8, 76:20, 76:21, 95:15

---

## P

**P-R-A-T-T** [1] - 27:4

**P.M** [1] - 101:6

**PACE** [3] - 25:20, 25:22

**PAGE** [31] - 3:5, 7:11, 8:13, 10:2, 21:14, 42:19, 43:3, 43:4, 43:15, 45:7, 46:12, 46:25, 47:6, 48:13, 50:4, 51:17, 51:20, 52:7, 54:3, 54:10, 55:21, 56:1, 56:8, 60:13, 60:18, 78:23

**PAIN** [1] - 59:14

**PAMELA** [2] - 67:25, 68:7

**PAPER** [1] - 58:18

**PAPERBACK** [1] - 81:19

**PARAGRAPH** [30] - 42:22, 42:24, 43:23, 44:11, 44:24, 47:7,

47:13, 47:17, 48:1, 48:25, 49:6, 49:14, 49:15, 49:20, 49:25, 50:5, 50:8, 50:9, 50:24, 51:20, 52:9, 53:17, 53:24, 54:4, 54:10, 54:25, 55:9, 55:16, 55:22

**PARAMETERS** [3] - 62:10, 63:12, 63:21

**PARANOID** [1] - 59:12

**PARDON** [1] - 41:19

**PARDUE** [3] - 46:12, 47:6, 47:7

**PARENTHESES** [6] - 79:13, 79:18, 79:22, 80:1, 80:4, 80:5

**PARENTHETICALLY** [1] - 22:12

**PARENTS** [5] - 62:23, 67:16, 70:12, 70:13, 70:24

**PARENTS'** [1] - 12:9

**PAROLE** [1] - 96:4

**PART** [11] - 12:12, 29:10, 30:11, 43:17, 59:24, 68:12, 83:13, 84:3, 94:5, 96:1, 97:14

**PARTICULAR** [11] - 13:23, 20:18, 21:7, 26:3, 43:16, 52:4, 52:20, 64:22, 65:4, 70:20, 87:5

**PARTIES** [2] - 75:4, 82:3

**PARTS** [1] - 89:25

**PASS** [1] - 71:5

**PASSED** [1] - 76:24

**PASSING** [1] - 22:14

**PATHOLOGIST'S** [1] - 8:10

**PATROL** [5] - 28:23, 29:8, 29:13, 31:9

**PATROL-TYPE** [1] - 29:8

**PATROLMAN** [2] - 36:13, 38:11

**PAUL** [10] - 1:6, 20:25, 21:16, 25:10, 25:19, 41:7, 80:21, 81:8, 81:12, 81:19

**PAUSE** [2] - 57:3, 57:19

**PAYING** [2] - 10:7, 18:25

**PCP** [6] - 56:22, 56:24, 57:6, 59:6, 59:7, 59:10

**PEN** [1] - 50:10

**PENALTY** [8] - 88:25, 92:6, 93:3, 93:24, 94:9, 95:23, 96:3, 96:10

**PENDING** [1] - 92:2

**PENITENTIARY** [3] - 81:1, 81:9, 81:25

**PENNSYLVANIA** [8] - 1:2, 1:16, 2:6, 2:13, 78:24, 81:2, 81:10, 92:17

**PEOPLE** [9] - 29:1, 31:16, 35:16, 35:24, 43:5, 55:2, 59:10, 95:18, 99:4

**PERCENT** [3] - 16:13, 16:16, 17:4

**PERCEPTION** [1] - 62:18

**PERHAPS** [6] - 19:8, 22:13, 46:17, 83:13, 89:1, 100:6

**PERIOD** [2] - 34:22, 35:6

**PERMISSION** [1] - 4:14

**PERSON** [8] - 23:23, 32:23, 33:2, 33:11, 43:5, 48:9, 49:12, 61:2

**PERSON'S** [1] - 33:5

**PERSONAL** [1] - 58:5

**PERSONALITY** [1] - 69:17

**PERSUADE** [1] - 97:8

**PETE** [1] - 99:4

**PG** [1] - 102:3

**PHENCYCLIDINE** [1] - 59:6

**PHILADELPHIA** [3] - 1:9, 1:21, 2:14

**PHILLIPS** [1] - 98:21

**PHILOSOPHY** [2] - 22:7, 22:11

**PHONE** [8] - 23:25, 24:1, 24:3, 24:20, 24:23, 24:24, 47:12, 47:16

**PHOTOCOPY** [1] - 6:6

**PHOTOGRAPHS** [2] - 72:12

**PHOTOS** [1] - 84:8

**PHYSICAL** [2] - 40:25, 58:11

**PHYSICALLY** [2] - 23:18, 36:9

**PICK** [2] - 11:6, 32:6

**PICKED** [1] - 43:12

**PICTURE** [4] - 72:25, 73:3, 73:7, 73:11

**PICTURES** [3] - 72:5, 83:15, 83:21

**PIECE** [1] - 58:12

**PISTOL** [3] - 34:15, 34:16, 35:15

**PLACE** [9] - 14:14, 15:4, 15:13, 21:4, 25:3, 34:5, 60:24, 76:9, 81:5

**PLACES** [1] - 55:13

**PLACING** [1] - 17:8

**PLAN** [1] - 36:1

**PLEA** [9] - 74:17, 75:24, 75:25, 78:3, 78:10, 78:11, 78:15, 80:6, 81:13

**PLED** [1] - 77:14

**PO** [2] - 1:17, 2:10

**POCKET** [1] - 40:23

**POCKETS** [1] - 32:13

**PODIUM** [1] - 41:18

**POINT** [32] - 3:19, 6:22, 7:16, 9:25, 10:1, 17:21, 18:3, 21:9, 29:9, 33:23, 33:25, 34:5, 34:10, 34:21, 35:7, 35:11, 38:8, 39:25, 40:5, 45:9, 46:7, 46:19, 46:20, 50:21, 51:7, 51:9, 63:19, 65:14, 69:11, 70:7, 78:10, 84:10

**POINTED** [3] - 37:7, 37:8, 50:16

**POLICE** [28] - 28:12, 28:20, 28:21, 28:24, 29:3, 29:4, 29:25, 30:3, 41:20, 42:8, 45:13, 45:24, 46:3, 47:21, 47:22, 49:17, 52:2, 52:4, 53:19, 53:20, 57:5, 58:11, 59:16, 59:24, 76:14, 76:19, 77:3, 85:25

**POOR** [7] - 8:23, 8:25, 9:3, 9:15, 9:17, 10:8, 10:12

**PORTION** [3] - 5:13, 22:7, 23:17

**PORTIONS** [3] - 21:20, 59:15, 74:6

**POSITION** [8] - 28:21, 29:8, 30:24, 39:23, 39:24, 88:5, 97:8, 97:9

**POSITIVE** [1] - 57:6

**POSSESSION** [2] - 40:10, 56:22

**POSSIBLY** [2] - 35:11,

88:9

**POTENTIAL** [4] - 88:12, 88:14, 94:18, 94:19
**POTENTIALLY** [2] - 71:10, 88:18
**POUNDS** [1] - 36:15
**POWDER** [1] - 56:23
**POWDERED** [2] - 58:13, 58:19
**POWERS** [8] - 43:7, 43:8, 44:7, 44:11, 44:17, 44:25, 45:3, 45:6
**PRACTICAL** [1] - 97:2
**PRATT** [10] - 27:1, 27:4, 27:9, 41:15, 47:1, 75:21, 77:4, 77:9, 102:4
**PRATT'S** [1] - 85:25
**PRAY** [1] - 55:23
**PRAYED** [1] - 55:24
**PRECLUDE** [3] - 89:11, 89:20, 99:11
**PREGNANT** [6] - 34:3, 34:8, 34:9, 60:1, 76:7, 76:10
**PREJUDICIAL** [1] - 64:7
**PRELIMINARY** [12] - 45:17, 61:6, 74:15, 75:18, 76:1, 76:5, 76:21, 78:21, 79:11, 79:14, 79:20, 89:2
**PREPARE** [1] - 33:14
**PREPARED** [3] - 84:25, 85:6, 87:2
**PRESENCE** [1] - 20:25
**PRESENT** [4] - 13:14, 18:9, 77:13, 96:17
**PRESENTED** [2] - 77:20, 96:8
**PRESENTING** [1] - 78:8
**PRESENTLY** [1] - 27:12
**PRESUME** [5] - 52:23, 53:2, 55:6, 56:3, 75:23
**PRETTY** [4] - 12:20, 20:22, 21:8, 26:7
**PREVIOUS** [1] - 65:18
**PRINTED** [5] - 98:14, 98:17, 98:20, 98:22, 99:1
**PRISON** [10] - 69:25, 70:1, 70:4, 71:10, 71:23, 74:21, 80:4, 80:15, 92:13, 92:19

**PRISONS** [1] - 87:23
**PRIVACY** [2] - 25:24, 26:5
**PROBABLE** [3] - 7:8, 7:9, 7:18
**PROBLEM** [3] - 3:14, 62:23, 64:23
**PROCEDURES** [1] - 65:25
**PROCEEDINGS** [4] - 1:23, 81:13, 91:24, 101:11
**PROCESS** [1] - 71:15
**PROCESSORS** [1] - 53:10
**PRODUCED** [1] - 1:24
**PROFFER** [3] - 63:12, 90:17, 97:17
**PROJECT** [1] - 93:22
**PROPENSITY** [1] - 33:17
**PROPER** [5] - 21:12, 64:10, 77:2, 77:7, 86:23
**PROPERLY** [1] - 95:21
**PROPOSED** [4] - 65:19, 87:9, 89:12, 89:21
**PROPOSITION** [1] - 99:7
**PROSECUTION** [1] - 12:12
**PROSECUTOR** [1] - 41:23
**PROSECUTORS** [1] - 13:15
**PROVIDE** [5] - 65:9, 83:13, 87:21, 88:16, 90:21
**PROVIDED** [6] - 74:10, 78:23, 83:12, 86:20, 86:22, 88:7
**PROVIDES** [1] - 88:25
**PROVIDING** [1] - 94:15
**PSYCHIATRIC** [8] - 47:8, 57:10, 58:3, 58:6, 90:22, 91:1, 91:13
**PSYCHOTIC** [1] - 52:21
**PUBLIC** [2] - 2:6, 67:2
**PUBLISH** [1] - 72:21
**PUBLISHED** [1] - 81:20
**PULL** [1] - 39:25
**PULLED** [1] - 15:8
**PURPOSES** [2] - 7:21, 78:22

**PURSUE** [1] - 30:9
**PURSUITS** [1] - 30:9
**PUSHED** [1] - 60:9
**PUT** [10] - 23:19, 44:7, 44:9, 58:16, 63:16, 74:8, 82:11, 84:10, 97:24, 99:7
**PUTS** [1] - 77:2
**PUTTING** [3] - 18:6, 44:5, 78:11

# Q

**QUESTIONS** [9] - 9:21, 11:24, 16:2, 23:1, 23:4, 26:12, 57:23, 61:5, 73:17
**QUICKER** [1] - 46:21
**QUICKLY** [1] - 46:19
**QUOTE** [4] - 9:19, 90:5, 90:6

# R

**R.V** [4] - 34:6, 38:2, 38:4, 38:5
**R1** [1] - 81:17
**R2** [4] - 72:6, 72:15, 72:19, 102:15
**R200** [6] - 3:22, 3:23, 4:5, 4:8, 4:9, 102:14
**R27** [5] - 5:18, 5:22, 5:25, 6:2
**R3** [6] - 72:6, 72:15, 72:19, 72:21, 102:15
**R4** [5] - 72:6, 72:15, 72:19, 73:5, 102:15
**RAISE** [1] - 25:15
**RAISED** [1] - 35:9
**RAISING** [1] - 70:8
**RATHER** [2] - 35:21, 35:22
**REACHED** [1] - 82:4
**REACT** [2] - 21:6, 23:18
**REACTS** [1] - 25:17
**READ** [43] - 7:13, 7:25, 8:10, 8:12, 8:15, 21:20, 22:2, 22:6, 22:17, 22:18, 22:19, 41:2, 41:22, 42:12, 43:1, 44:2, 44:14, 44:19, 45:2, 45:17, 47:14, 50:17, 50:24, 58:18, 59:15, 59:21, 61:6, 74:24, 75:1, 75:4, 78:20, 79:7, 80:19, 81:24, 82:8, 82:10, 83:8, 85:11, 90:3, 96:11,

100:13, 102:3
**READABLE** [1] - 48:5
**READING** [16] - 3:12, 4:1, 4:13, 10:1, 26:25, 45:10, 45:15, 74:5, 74:13, 82:16, 83:14, 83:24, 85:4, 85:10, 85:19, 92:11
**READY** [1] - 33:14
**REALITY** [1] - 72:3
**REALIZE** [1] - 75:2
**REALIZED** [1] - 37:22
**REALLY** [5] - 63:2, 70:25, 85:20, 92:7, 95:16
**REALM** [1] - 64:20
**REASON** [5] - 46:7, 70:6, 75:25, 76:24, 94:5
**REASONS** [1] - 6:5
**REBUTTAL** [7] - 88:2, 88:5, 88:10, 88:14, 88:18, 88:23, 89:4
**REC** [3] - 21:4, 21:18, 25:2
**RECALLING** [1] - 20:9
**RECEIVE** [2] - 5:5, 11:18
**RECEIVED** [5] - 6:8, 12:24, 13:20, 21:21, 91:19
**RECENTLY** [1] - 88:7
**RECESS** [4] - 61:21, 85:18, 86:10, 100:22
**RECOGNIZE** [1] - 72:11
**RECOLLECTION** [7] - 10:24, 12:8, 15:24, 18:9, 18:10, 41:5, 64:4
**RECORD** [14] - 27:3, 40:15, 40:25, 61:23, 66:8, 78:22, 79:7, 80:20, 81:24, 89:22, 91:9, 93:4, 101:11, 102:3
**RECORDED** [1] - 1:23
**RECORDS** [6] - 74:18, 74:19, 74:20, 80:9, 80:12, 80:14
**RECROSS** [3] - 26:15, 26:16, 102:1
**RECRUIT** [1] - 28:22
**REDIRECT** [6] - 9:24, 9:25, 21:12, 57:22, 57:25, 102:1
**REFERENCED** [4] - 16:8, 16:24, 16:25, 93:2
**REFERENCES** [3] -

4:12, 14:24, 22:19
**REFERRED** [6] - 6:12, 8:3, 19:22, 84:2, 90:7, 90:22
**REFERRING** [7] - 5:16, 5:17, 83:11, 84:16, 89:16, 90:4, 95:5
**REFRESH** [1] - 64:16
**REGARD** [3] - 77:18, 78:3, 87:9
**REGARDING** [3] - 74:15, 92:8, 97:15
**REGARDS** [3] - 65:11, 76:11, 77:21
**REIDERS** [1] - 2:9
**REJECT** [1] - 97:6
**REJECTED** [1] - 97:20
**REJECTING** [1] - 94:6
**RELATIONSHIP** [8] - 19:6, 19:7, 19:11, 19:22, 19:24, 62:18, 68:18, 68:25
**RELEASE** [1] - 34:8
**RELEVANT** [6] - 3:14, 65:3, 93:4, 96:8, 96:13, 96:21
**RELIABLE** [1] - 77:24
**RELOAD** [1] - 40:3
**RELYING** [2] - 7:22, 94:22
**REMAINED** [1] - 29:12
**REMARKED** [1] - 60:15
**REMEMBER** [22] - 11:4, 11:21, 11:25, 16:20, 17:7, 17:10, 17:12, 17:15, 17:17, 17:20, 18:24, 19:10, 23:4, 23:7, 26:4, 29:6, 32:16, 33:2, 40:17, 40:23, 51:8
**REMEMBERED** [1] - 17:13
**REMIND** [1] - 88:20
**REMOVED** [1] - 39:12
**REPEATING** [2] - 49:22, 49:23
**REPHRASED** [1] - 21:14
**REPLICA** [1] - 6:21
**REPORT** [11] - 8:10, 42:9, 46:3, 48:14, 50:4, 57:5, 58:11, 59:3, 59:24, 83:13, 85:25
**REPORTER** [2] - 1:19, 101:16
**REPORTS** [8] - 41:20, 45:13, 53:8, 58:21,

58:24, 59:16, 76:19, 77:3
**REQUEST** [2] - 62:15, 93:21
**REQUESTED** [2] - 50:1, 57:14
**REREAD** [1] - 99:10
**RESENTENCING** [1] - 87:6
**RESIDING** [1] - 27:12
**RESOURCE** [4] - 92:6, 93:22, 94:9, 94:12
**RESPECT** [15] - 10:3, 11:23, 13:5, 13:13, 14:10, 14:22, 16:15, 16:21, 19:6, 19:21, 23:12, 59:18, 62:10, 88:19, 92:3
**RESPOND** [4] - 21:6, 25:19, 29:1, 32:5
**RESPONDED** [1] - 31:14
**RESPONSE** [5] - 99:16, 99:19, 99:22, 100:4, 100:15
**REST** [1] - 85:14
**RESTS** [1] - 83:6
**RESULT** [1] - 65:12
**RETIRED** [3] - 30:3, 30:5, 30:8
**REVEALS** [1] - 40:15
**REVERSE** [1] - 38:16
**REVIEW** [2] - 41:20, 82:15
**REVIEWING** [1] - 94:22
**REVIEWS** [1] - 77:25
**RICHARDSON** [2] - 52:5, 54:1
**RIDE** [1] - 44:3
**RIFLE** [2] - 40:16, 41:3
**RITA** [1] - 76:5
**ROCK** [1] - 6:9
**RODGERS** [1] - 43:6
**ROLLED** [1] - 51:1
**RON** [1] - 100:25
**RONALD** [1] - 2:8
**ROOM** [16] - 33:11, 34:11, 34:25, 35:2, 35:5, 36:20, 36:24, 36:25, 37:1, 37:12, 42:5, 44:19, 44:22, 48:19, 54:6, 73:13
**ROUGHLY** [3] - 14:7, 34:22, 99:3
**ROUND** [1] - 40:3
**ROUNDS** [2] - 39:16, 40:23
**RPR** [1] - 1:19
**RUDE** [1] - 11:20

**RUHNKE** [2] - 9:8, 18:12
**RULE** [4] - 89:7, 96:18, 96:25, 99:24
**RULED** [2] - 65:6, 88:3
**RULING** [4] - 62:3, 62:10, 98:6, 100:18
**RUSH** [1] - 36:3
**RUSHING** [1] - 38:8

## S

**SADDENED** [1] - 70:21
**SAFETY** [3] - 39:20, 40:8, 60:15
**SAN** [1] - 68:13
**SARALEE** [1] - 79:9
**SATISFIED** [1] - 96:3
**SATISFY** [1] - 7:1
**SAUNDERS** [42] - 2:5, 41:14, 42:7, 42:11, 42:17, 42:18, 46:2, 46:11, 46:18, 46:23, 46:24, 56:15, 56:17, 57:2, 57:4, 57:17, 57:20, 61:9, 64:15, 64:18, 75:14, 75:17, 76:8, 76:17, 77:8, 78:7, 85:23, 86:25, 87:16, 89:25, 98:9, 99:14, 99:17, 99:23, 100:1, 100:5, 100:8, 100:10, 100:14, 100:19, 100:23, 102:6
**SAVE** [3] - 82:9, 84:23, 85:21
**SAW** [9] - 7:13, 20:2, 20:3, 36:24, 37:5, 37:8, 44:18, 55:14, 97:17
**SCATTER** [1] - 35:22
**SCATTERING** [1] - 35:21
**SCENARIO** [1] - 35:2
**SCENE** [1] - 45:21
**SCHEDULE** [1] - 59:6
**SCHOOL** [5] - 27:24, 27:25, 69:7, 69:8, 69:22
**SCHOOLING** [1] - 28:4
**SCOTT** [1] - 86:17
**SCRANTON** [1] - 1:17
**SCREEN** [1] - 72:22
**SCUFFLE** [2] - 35:9, 39:10
**SEATED** [2] - 3:3, 93:13

**SECOND** [12] - 4:19, 5:3, 9:10, 37:9, 49:15, 50:9, 54:4, 54:10, 61:2, 81:22, 87:15, 90:3
**SECONDLY** [1] - 94:21
**SECTION** [5] - 2:3, 49:16, 51:2, 53:18, 76:1
**SEE** [39] - 4:22, 29:1, 42:22, 43:25, 44:11, 47:6, 47:9, 47:13, 47:15, 47:20, 48:1, 48:7, 48:12, 49:7, 50:7, 52:9, 53:22, 53:23, 54:2, 54:3, 54:24, 55:4, 55:11, 55:25, 56:5, 56:7, 57:14, 59:13, 63:3, 76:5, 78:4, 78:5, 89:1, 89:4, 90:4, 96:12, 97:6, 99:11
**SEEING** [1] - 54:21
**SEEK** [3] - 72:14, 95:22, 96:2
**SEEM** [2] - 25:8, 91:4
**SEES** [1] - 55:10
**SEIZURES** [4] - 62:17, 63:6, 63:20, 65:24
**SELF** [1] - 69:21
**SEMIAUTOMATIC** [1] - 34:16
**SENSE** [6] - 19:13, 27:18, 69:19, 89:7, 89:8
**SENT** [2] - 21:21, 71:10
**SENTENCE** [14] - 12:21, 12:24, 13:9, 13:20, 14:4, 14:5, 43:16, 43:17, 44:2, 44:10, 45:2, 48:1, 91:11, 93:6
**SENTENCED** [2] - 13:11, 69:25
**SENTENCES** [2] - 12:23, 92:12
**SENTENCING** [5] - 1:11, 13:1, 13:5, 14:11, 65:18
**SEPARATED** [1] - 37:6
**SERGEANT** [4] - 33:24, 34:6, 50:25, 55:17
**SERIAL** [2] - 41:1
**SERVICE** [4] - 29:1, 30:12, 30:13, 30:19
**SERVICES** [1] - 94:15

**SET** [1] - 63:12
**SEVEN** [1] - 6:5
**SEVERAL** [2] - 33:12, 52:1
**SHACK** [2] - 10:10, 10:11
**SHACKS** [4] - 8:21, 8:25, 9:1, 19:8
**SHARE** [1] - 22:10
**SHARING** [1] - 19:3
**SHEET** [7] - 26:11, 98:14, 98:17, 98:20, 98:23, 99:1, 99:8
**SHELLS** [2] - 40:16, 41:3
**SHOOT** [2] - 37:10, 49:22
**SHOOTING** [3] - 37:11, 74:21, 80:15
**SHORT** [5] - 39:6, 39:7, 70:22, 74:15, 79:16
**SHORTEN** [1] - 75:5
**SHORTER** [1] - 75:3
**SHOTGUN** [1] - 38:14
**SHOTGUNS** [2] - 35:18, 35:19
**SHOULDER** [1] - 55:13
**SHOW** [6] - 4:14, 5:8, 45:5, 59:4, 72:5, 73:5
**SHOWS** [3] - 98:15, 99:2, 99:9
**SIBLINGS** [1] - 70:11
**SIDE** [3] - 32:13, 60:4, 97:19
**SIDES** [1] - 96:9
**SIGN** [1] - 7:13
**SIGNATURE** [3] - 6:24, 7:11, 7:23
**SIGNATURES** [1] - 6:17
**SIGNED** [1] - 81:21
**SIMILAR** [4] - 21:17, 44:6, 87:4, 93:18
**SIMILARITIES** [1] - 6:22
**SIMPLY** [2] - 77:10, 77:13
**SINGLE** [2] - 25:25, 66:18
**SISTER** [4] - 19:15, 67:23, 68:5, 68:6
**SISTERS** [2] - 67:14, 67:22
**SIT** [4] - 16:11, 16:15, 17:3, 74:2
**SITTING** [1] - 55:10
**SITUATED** [1] - 70:9

**SITUATION** [8] - 21:7, 31:12, 31:15, 31:23, 33:1, 33:9, 33:16, 55:9
**SITUATIONS** [2] - 25:17, 25:19
**SIX** [2] - 98:1, 98:2
**SKIP** [4] - 44:10, 44:23, 50:4, 51:17
**SLEEPING** [1] - 10:19
**SLIP** [3] - 55:14, 87:5, 87:8
**SLIPS** [1] - 100:11
**SLOMSKY** [1] - 1:10
**SLUG** [1] - 35:23
**SLUGS** [2] - 35:20, 35:21
**SMALL** [4] - 34:15, 34:16, 35:5, 92:9
**SMALLER** [1] - 78:25
**SO-CALLED** [1] - 90:15
**SO...** [1] - 10:12
**SOCIAL** [2] - 90:15, 90:25
**SOMEONE** [6] - 18:10, 34:5, 37:25, 39:22, 91:13, 95:23
**SOMETIME** [2] - 23:2, 31:9
**SOMEWHAT** [1] - 59:8
**SOMEWHERE** [2] - 32:6, 36:14
**SON** [1] - 99:4
**SORRY** [9] - 14:10, 44:16, 46:25, 54:20, 56:9, 58:22, 73:21, 85:3, 93:15
**SORT** [2] - 69:1, 90:24
**SOUND** [1] - 65:19
**SPEAKING** [1] - 11:25
**SPECIAL** [3] - 15:6, 15:10, 29:11
**SPECIALTY** [1] - 29:9
**SPECIFIC** [4] - 17:16, 65:4, 87:11, 96:14
**SPECIFICALLY** [6] - 16:20, 31:3, 64:13, 80:25, 89:7, 91:16
**SPELL** [2] - 27:2, 66:7
**SPEND** [2] - 15:15, 85:18
**SPENT** [1] - 69:6
**SPLIT** [1] - 37:9
**STAGE** [2] - 29:15, 31:11
**STAGED** [3] - 31:25, 32:1, 32:7
**STAND** [3] - 82:12, 86:10, 100:21

**STANDARD** [3] - 46:16, 91:8, 96:9
**STANDARDS** [1] - 7:20
**STANDING** [5] - 34:24, 35:6, 35:13, 36:2, 44:21
**STANDS** [1] - 95:14
**STAPLE** [1] - 84:15
**START** [7] - 29:16, 43:3, 55:11, 66:16, 82:16, 85:5, 100:2
**STARTED** [4] - 20:12, 28:20, 28:22, 37:20
**STARTING** [3] - 28:8, 28:19, 37:22
**STARTS** [5] - 44:11, 44:24, 47:17, 50:5, 54:5
**STATE** [7] - 27:2, 46:5, 66:7, 69:15, 79:12, 79:21, 80:10
**STATEMENT** [6] - 16:3, 17:1, 43:19, 62:4, 76:14, 76:15
**STATEMENTS** [2] - 16:4, 46:5
**STATES** [19] - 1:1, 1:3, 1:15, 2:2, 30:13, 30:19, 43:3, 80:7, 81:1, 81:4, 81:6, 81:9, 81:14, 81:25, 87:13, 92:23, 98:18, 98:20, 98:23
**STATISTICAL** [1] - 92:7
**STATISTICS** [2] - 93:10, 93:25
**STATUTE** [3] - 88:25, 91:7, 93:3
**STATUTORY** [1] - 77:12
**STAY** [3] - 12:22, 29:25, 60:18
**STAYED** [1] - 58:8
**STEEL** [1] - 41:1
**STENOTYPE** [1] - 1:23
**STENOTYPE-COMPUTER** [1] - 1:23
**STEP** [2] - 26:23, 61:10
**STEPHEN** [6] - 3:23, 8:15, 26:18, 26:25, 62:1, 102:2
**STEPS** [1] - 37:12
**STERLING** [3] - 34:17, 34:18, 40:25
**STEVE** [5] - 4:18,

48:15, 66:6, 66:9, 102:8
**STEVEN** [3] - 75:1, 79:5, 82:13
**STILL** [7] - 5:13, 21:24, 30:24, 50:13, 67:16, 67:18, 81:3
**STIPULATION** [5] - 78:6, 80:18, 80:19, 81:22, 81:23
**STIPULATIONS** [4] - 74:22, 80:16, 80:17, 82:3
**STOCKING** [1] - 44:7
**STOP** [1] - 87:14
**STORIES** [1] - 20:17
**STORY** [5] - 19:19, 20:19, 64:25, 74:15, 79:16
**STREET** [6] - 1:16, 1:20, 2:4, 2:7, 2:10, 67:7
**STREETS** [1] - 29:13
**STRESS** [2] - 23:13, 25:17
**STRESSED** [15] - 23:4, 23:9, 23:10, 23:12, 23:16, 23:19, 23:23, 24:2, 24:6, 24:9, 24:10, 24:14, 24:17, 24:25, 25:14
**STRESSING** [1] - 25:19
**STRICTLY** [1] - 63:22
**STRIKE** [3] - 18:1, 49:22, 76:3
**STRING** [5] - 8:4, 25:23, 25:25, 26:4, 26:6
**STROKED** [1] - 38:13
**STRONG** [1] - 97:6
**STRUGGLE** [3] - 39:5, 48:21, 95:17
**STRUGGLED** [2] - 69:22, 71:1
**STRUGGLING** [1] - 96:12
**STUDIED** [1] - 95:19
**SUBJECT** [8] - 5:19, 6:15, 22:13, 22:14, 22:23, 76:22, 77:1, 86:17
**SUBMIT** [2] - 64:8, 75:25
**SUBMITTED** [2] - 98:15, 98:19
**SUBSTANCE** [5] - 6:20, 58:13, 58:19, 59:2, 59:6
**SUBSTANTIALLY** [2]

- 7:5, 7:7
**SUCCESSFUL** [2] - 38:6, 95:8
**SUFFER** [2] - 99:5, 99:6
**SUFFERED** [2] - 65:1, 65:12
**SUFFERING** [2] - 63:6, 63:19
**SUGGESTING** [1] - 11:12
**SUGGESTIONS** [1] - 94:16
**SUITE** [3] - 1:16, 2:7, 2:14
**SUMMARIES** [1] - 92:7
**SUMMARY** [2] - 86:19, 92:15
**SUMMER** [1] - 69:14
**SUNDAY** [1] - 4:18
**SUPPORT** [2] - 26:10, 94:15
**SUPPOSED** [2] - 24:1, 25:1
**SURROUNDING** [1] - 94:4
**SUSPECT** [19] - 32:24, 43:18, 44:7, 44:17, 44:18, 45:4, 45:22, 47:19, 49:7, 49:17, 49:21, 50:18, 50:25, 51:23, 52:21, 56:11, 60:4, 60:15
**SUSPECT'S** [2] - 50:6, 50:13
**SUZANNE** [2] - 1:19, 101:17
**SWAT** [1] - 29:11
**SWORN** [3] - 27:1, 66:6, 76:25
**SYLVIA** [2] - 46:12, 47:6
**SYNOPSIS** [1] - 14:23
**SYSTEM** [2] - 95:14, 95:17

---

## T

**TAB** [17] - 75:2, 75:16, 75:17, 79:6, 79:10, 79:11, 79:16, 79:19, 79:20, 79:23, 79:24, 80:3, 80:6, 80:9, 80:12, 80:14, 80:16
**TABS** [1] - 75:2
**TAC** [1] - 55:6
**TACKLE** [1] - 36:9
**TACTICAL** [6] - 29:10, 29:12, 29:17, 31:10,

31:13, 51:3
**TACTICS** [1] - 29:12
**TAG** [1] - 41:4
**TAKER** [4] - 34:7, 37:2, 37:6, 38:4
**TAKER'S** [1] - 38:7
**TALKS** [2] - 50:24, 89:15
**TARRENT** [2] - 12:2, 12:4
**TARRENT'S** [2] - 11:10, 12:7
**TEACH** [1] - 91:2
**TEACHING** [6] - 90:5, 90:8, 90:16, 90:23, 91:1, 97:15
**TEAM** [7] - 12:12, 29:9, 29:17, 31:10, 33:22, 55:6, 73:21
**TEENAGER** [1] - 69:1
**TELEPHONE** [3] - 24:12, 24:13, 53:22
**TEMPLE** [3] - 60:5, 60:11, 60:20
**TERM** [3] - 23:19, 24:17, 69:25
**TERMS** [7] - 10:5, 11:10, 14:19, 15:19, 19:24, 39:22, 91:7
**TERRIBLY** [1] - 21:2
**TERRIFIED** [1] - 54:8
**TERRITORIAL** [1] - 81:6
**TEST** [1] - 57:6
**TESTED** [1] - 58:14
**TESTIFIED** [7] - 6:17, 7:6, 11:8, 16:22, 64:24, 75:21, 76:13
**TESTIFY** [11] - 11:3, 41:21, 63:20, 65:11, 65:23, 90:18, 91:12, 91:25, 92:12, 93:22, 94:1
**TESTIFYING** [6] - 28:13, 62:14, 64:22, 76:4, 77:9, 100:2
**TESTIMONY** [59] - 3:5, 4:20, 5:4, 6:16, 7:3, 8:9, 8:13, 8:15, 16:2, 16:12, 26:18, 61:6, 62:5, 62:11, 62:23, 63:4, 63:14, 64:3, 64:20, 65:19, 75:1, 75:18, 75:19, 76:1, 76:11, 76:25, 77:1, 77:10, 77:11, 77:23, 77:24, 78:12, 79:5, 79:8, 82:13, 83:15, 83:23, 84:4, 85:25, 86:20, 86:24, 89:12,

89:21, 90:5, 90:15, 91:22, 92:4, 92:7, 92:21, 93:1, 93:9, 94:6, 95:8, 96:13, 96:20, 97:16, 97:19, 97:20, 98:12
**THERE** [113] - 4:11, 4:20, 5:19, 8:9, 10:18, 11:6, 15:7, 15:11, 17:21, 18:1, 20:11, 20:15, 21:9, 21:24, 23:9, 24:16, 24:19, 25:7, 26:1, 26:14, 26:16, 29:6, 30:20, 31:12, 31:22, 32:16, 32:18, 32:19, 32:20, 32:25, 33:11, 33:25, 34:1, 34:2, 34:3, 34:21, 35:6, 35:7, 35:11, 36:14, 36:19, 37:3, 37:4, 37:5, 37:14, 39:10, 39:15, 39:16, 40:15, 40:17, 42:1, 43:25, 45:15, 47:20, 48:1, 50:9, 50:10, 53:11, 54:17, 54:19, 54:22, 55:2, 55:6, 55:8, 55:21, 55:22, 57:9, 57:12, 58:8, 58:10, 59:1, 64:10, 64:11, 68:22, 69:8, 69:24, 70:5, 70:6, 70:16, 71:17, 71:19, 74:14, 74:17, 74:18, 76:10, 76:20, 77:6, 77:11, 78:2, 78:14, 81:22, 83:10, 83:11, 83:15, 84:4, 84:6, 86:12, 87:4, 87:8, 89:11, 89:25, 94:3, 94:12, 96:16, 96:21, 97:5, 97:11, 99:3, 99:9, 100:20
**THERE'S** [4] - 17:24, 22:17, 24:11, 51:20
**THEREFORE** [1] - 81:5
**THEY'RE** [1] - 45:15
**THICK** [2] - 26:7, 26:9
**THINKING** [2] - 11:21, 32:17
**THIRD** [6] - 2:10, 33:25, 47:12, 47:17, 48:6, 49:6
**THOMAS** [3] - 74:21, 80:4, 80:15
**THOMPSON** [1] - 16:5
**THREATENED** [1] - 49:21

**THREE** [19] - 10:18, 16:9, 19:12, 20:24, 21:15, 22:10, 22:22, 23:3, 23:17, 24:8, 31:12, 34:11, 37:12, 39:8, 47:9, 56:20, 68:6, 72:5, 72:11

**THURSDAY** [2] - 3:4, 79:7

**TIED** [1] - 91:19

**TODAY** [12] - 7:20, 13:25, 16:11, 16:16, 17:3, 25:6, 28:13, 65:20, 79:7, 85:8, 85:14, 100:21

**TODDLER** [1] - 69:4

**TOGETHER** [4] - 32:7, 55:24, 74:8, 84:15

**TOMORROW** [6] - 85:6, 85:7, 86:9, 86:17, 96:23, 97:7

**TOOK** [17] - 21:4, 25:2, 34:5, 34:20, 39:17, 40:5, 40:10, 40:11, 41:7, 45:22, 51:5, 53:20, 56:18, 56:21, 75:1, 76:9

**TOP** [1] - 13:12

**TOPIC** [1] - 12:22

**TORSO** [2] - 36:11, 39:9

**TOTALLY** [1] - 91:23

**TOUCHES** [1] - 91:17

**TOWN** [1] - 67:8

**TRACKED** [1] - 64:18

**TRADE** [1] - 71:11

**TRAINING** [1] - 29:13

**TRANSCRIPT** [15] - 1:24, 3:25, 4:13, 45:17, 74:15, 74:17, 78:21, 79:12, 79:14, 79:20, 80:6, 83:8, 83:9, 101:11, 102:3

**TRANSCRIPTION** [2] - 1:24, 81:12

**TRANSCRIPTS** [8] - 3:10, 3:12, 74:5, 74:13, 79:1, 84:2, 85:4, 85:10

**TRAVELED** [1] - 27:21

**TRAVIS** [33] - 2:8, 2:9, 4:7, 9:6, 9:21, 11:23, 16:1, 17:22, 18:12, 19:18, 19:23, 21:10, 21:11, 22:18, 23:1, 23:5, 23:8, 25:23, 82:25, 92:18, 93:11, 93:12, 93:15, 93:17, 94:11, 95:3, 95:8, 96:23, 97:5, 98:11,

100:24, 101:1, 101:4

**TRAXLER** [1] - 6:8

**TREAT** [1] - 95:18

**TREATMENT** [3] - 64:23, 65:9

**TRIAL** [5] - 79:5, 79:8, 82:13, 92:4, 98:14

**TRIED** [9] - 20:4, 38:2, 51:13, 55:18, 71:2, 98:18, 98:21, 98:24

**TRIES** [1] - 48:10

**TRIGGER** [1] - 40:1

**TROUBLE** [2] - 51:24, 95:11

**TRUE** [4] - 17:2, 73:14, 81:12, 81:17

**TRUNK** [1] - 32:4

**TRUTH** [1] - 18:24

**TRY** [7] - 37:15, 37:16, 38:9, 42:11, 46:18, 65:2, 96:8

**TRYING** [4] - 46:7, 55:3, 65:16, 97:13

**TURN** [4] - 42:19, 45:7, 52:7, 54:3

**TWICE** [1] - 14:1

**TWO** [28] - 4:14, 8:7, 14:9, 14:24, 19:12, 20:24, 21:15, 22:10, 22:22, 22:24, 23:2, 23:17, 24:8, 24:19, 28:10, 30:22, 32:21, 34:22, 35:16, 37:12, 44:4, 66:21, 66:23, 76:20, 85:4, 89:25, 95:16, 98:1

**TWO-HOUR** [1] - 34:22

**TYPE** [14] - 28:3, 29:8, 29:9, 34:17, 40:19, 45:5, 48:9, 58:21, 58:24, 64:3, 78:25, 87:4, 95:7

## U

**U.S** [1] - 30:11

**UM** [2] - 17:3, 55:18

**UNBALANCED** [1] - 48:7

**UNDER** [11] - 5:13, 36:12, 76:15, 77:24, 78:7, 81:4, 85:12, 88:20, 91:7, 94:13, 96:13

**UNDERLINED** [1] - 81:18

**UNDERWEAR** [1] - 16:6

**UNIFORM** [3] - 32:8,

32:14

**UNIT** [10] - 15:6, 15:11, 25:9, 29:10, 29:12, 31:13, 51:3, 57:10, 57:15

**UNITED** [18] - 1:1, 1:3, 1:15, 2:2, 30:13, 30:18, 80:7, 80:25, 81:4, 81:6, 81:9, 81:14, 81:25, 87:13, 92:23, 98:17, 98:20, 98:23

**UNLESS** [3] - 78:6, 96:21, 99:25

**UNLOAD** [1] - 39:15

**UNLOADED** [1] - 39:17

**UNREADABLE** [2] - 43:17, 44:4

**UP** [28] - 3:5, 11:7, 13:10, 19:2, 19:18, 22:15, 27:18, 27:20, 29:14, 32:6, 41:18, 43:12, 44:20, 48:7, 55:6, 58:3, 58:6, 60:23, 68:10, 68:19, 72:2, 84:5, 85:19, 91:22, 95:19, 96:6, 97:7

**UPCOMING** [1] - 86:16

**UPPER** [2] - 36:11, 39:9

**UPSET** [2] - 19:19, 37:23

**UPTON** [3] - 74:22, 80:5, 80:15

**USEFUL** [2] - 83:20, 84:9

**UTILITIES** [1] - 67:2

## V

**VARIOUS** [2] - 70:14, 71:2

**VERDICT** [10] - 87:5, 87:8, 98:14, 98:17, 98:20, 98:23, 99:1, 99:8, 99:20, 100:11

**VERSION** [1] - 51:14

**VERSUS** [7] - 80:7, 81:14, 87:13, 92:23, 98:18, 98:21, 98:23

**VEST** [1] - 32:10

**VESTS** [1] - 36:17

**VICTIM** [14] - 51:23, 52:14, 59:25, 60:3, 60:14, 60:20, 62:4, 62:5, 62:11, 62:15, 64:3, 64:21, 65:17,

97:18

**VICTIM'S** [1] - 65:4

**VICTIMS** [1] - 76:20

**VIDEO** [1] - 8:8

**VIETNAM** [1] - 27:22

**VIEWED** [1] - 65:15

**VISITED** [2] - 20:7, 70:14

**VOICE** [1] - 25:15

**VOICES** [1] - 35:10

**VULNERABLE** [1] - 65:17

## W

**WAFFENSCHMIDT** [1] - 2:9

**WALK** [4] - 25:15, 41:18, 44:20, 69:4

**WALKED** [1] - 49:2

**WALL** [2] - 37:2, 55:3

**WANTS** [2] - 62:25, 99:20

**WARD** [3] - 47:9, 58:3, 58:7

**WASHINGTON** [2] - 1:16, 2:4

**WATCHED** [2] - 44:12, 44:17

**WATERS** [1] - 2:9

**WAVE** [1] - 60:23

**WEAPON** [4] - 38:16, 38:19, 45:5, 60:10

**WEAPONS** [2] - 29:11, 32:3

**WEARING** [1] - 36:16

**WEEK** [3] - 17:11, 18:8, 87:1

**WEEKS** [8] - 19:12, 20:24, 21:16, 22:10, 22:22, 23:3, 23:17, 24:8

**WEIGHT** [3] - 26:10, 64:10, 91:21

**WEST** [1] - 2:10

**WESTERN** [2] - 30:16, 30:20

**WHITE** [7] - 1:19, 44:20, 44:21, 58:19, 81:1, 81:10, 101:17

**WHOLE** [1] - 45:10

**WILLIAMSPORT** [1] - 2:11

**WINDOWS** [1] - 54:23

**WISE** [1] - 15:15

**WISH** [1] - 96:2

**WISHES** [1] - 85:12

**WITHDRAWN** [1] - 25:16

**WITNESS** [43] - 22:12,

26:21, 26:24, 27:1, 27:4, 30:21, 42:1, 42:4, 42:8, 45:11, 45:20, 45:25, 46:4, 46:21, 52:20, 54:18, 56:1, 61:11, 61:13, 61:17, 64:22, 65:5, 66:4, 66:6, 66:9, 73:22, 73:23, 73:24, 82:12, 88:10, 88:12, 88:14, 89:4, 89:10, 89:13, 90:7, 90:10, 91:12, 92:19, 94:18, 94:19, 98:4, 102:1

**WITNESSES** [18] - 64:24, 74:2, 76:12, 85:5, 85:16, 86:16, 86:17, 88:2, 88:5, 88:7, 88:13, 88:18, 88:23, 89:9, 98:1, 98:2, 99:25

**WOLFSON** [1] - 88:9

**WOMAN** [2] - 60:1, 76:7

**WONDERING** [2] - 75:3, 89:16

**WORD** [9] - 8:14, 9:1, 9:18, 25:25, 44:4, 53:10, 53:12, 53:13, 54:23

**WORDS** [9] - 5:18, 7:4, 7:5, 8:22, 10:10, 44:20, 76:20, 76:21, 93:7

**WORKER** [1] - 67:3

**WORLD** [1] - 27:21

**WORRY** [1] - 35:23

**WRITE** [2] - 11:21, 17:14

**WRITING** [1] - 6:20

**WRITINGS** [1] - 74:6

**WRITTEN** [7] - 7:10, 53:23, 81:19, 99:15, 99:19, 99:22, 100:4

**WROTE** [3] - 14:24, 14:25, 97:3

## Y

**YAGER** [1] - 6:4

**YEAR** [3] - 14:7, 15:16, 30:10

**YEARS** [14] - 14:9, 27:16, 27:17, 27:23, 28:6, 28:10, 30:2, 51:10, 67:11, 68:6, 68:16, 68:21, 80:22, 95:12

**YELLOW** [1] - 43:10

**YESTERDAY** [1] -

16:22

**YOUNG** [1] - 12:20
**YOUNGER** [3] - 68:7, 69:20
**YOUNGEST** [3] - 68:5, 68:8, 68:15
**YOURSELF** [1] - 70:3