UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA          :   CRIMINAL NUMBER

v.

DAVID PAUL HAMMER                 :   4:96-CR-239

WEDNESDAY, 6-25-14
COURTROOM 15B
PHILADELPHIA, PA 19106

_____
BEFORE THE HONORABLE JOEL H. SLOMSKY, J.
_____

DAY 11

_____

APPEARANCES:

JOHN C. GURGANUS, JR., ESQUIRE      FOR THE GOVERNMENT
UNITED STATES ATTORNEYS OFFICE
MIDDLE DISTRICT OF PENNSYLVANIA
235 N. WASHINGTON STREET, SUITE 311
PO BOX 309
SCRANTON, PA 18501

SUZANNE R. WHITE, RPR, FCRR, CM
OFFICIAL COURT REPORTER
FIRST FLOOR U. S. COURTHOUSE
601 MARKET STREET
PHILADELPHIA, PA 19106
(215)627-1882

PROCEEDINGS RECORDED BY STENOTYPE-COMPUTER,
TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

CONTINUED APPEARANCES:

AMANDA HAINES, ESQUIRE                    FOR THE GOVERNMENT
UNITED STATES DEPARTMENT OF JUSTICE
CRIMINAL DIVISION
CAPITAL CRIMES SECTION
1331 F. STREET, N.W.
WASHINGTON, D.C. 20530

ANNE SAUNDERS, ESQUIRE                    FOR THE DEFENDANT
FEDERAL PUBLIC DEFENDER
MIDDLE DISTRICT OF PENNSYLVANIA
100 CHESTNUT STREET, SUITE 300
HARRISBURG, PA 17101

RONALD C. TRAVIS, ESQUIRE                 FOR THE DEFENDANT
REIDERS, TRAVIS, HUMPHREY,
HARRIS, WATERS & WAFFENSCHMIDT
161 WEST THIRD STREET
PO BOX 215
WILLIAMSPORT, PA 17703-0215

JAMES MORENO, ESQUIRE                     FOR THE DEFENDANT
JAMES MCHUGH, ESQUIRE
FEDERAL COMMUNITY DEFENDER
EASTERN DISTRICT OF PENNSYLVANIA
SUITE 540 - THE CURTIS CENTER
PHILADELPHIA, PA 19106

THE COURT:  WE ARE BACK ON THE RECORD IN UNITED STATES VERSUS DAVID HAMMER.  WE ARE AT A POINT NOW WHERE MR. HAMMER IS GOING TO CALL HIS NEXT WITNESS.

MR. MCHUGH:  YOUR HONOR, DEFENSE CALLS LOU BULLOCK.

LOUIS BULLOCK, DEFENSE WITNESS, SWORN.

THE CLERK:  STATE AND SPELL YOUR FULL NAME FOR THE RECORD, PLEASE.

THE WITNESS:  LOUIS W. BULLOCK.  LOUIS IS L-O-U-I-S AND BULLOCK IS B-U-L-L-O-C-K.

DIRECT EXAMINATION

BY MR. MCHUGH:

Q.    MR. BULLOCK, WHERE DO YOU PRESENTLY RESIDE?

A.    TULSA, OKLAHOMA.

Q.    WHAT IS YOUR OCCUPATION?

A.    I'M AN ATTORNEY.

Q.    ARE YOU A MEMBER OF THE BAR OF THE HIGHEST COURT OF OKLAHOMA?

A.    YES, I AM.

Q.    AND HOW LONG HAVE YOU BEEN BARRED AS AN ATTORNEY?

A.    I WAS SWORN IN IN SEPTEMBER OF 1975.

Q.    CAN YOU BRIEFLY DESCRIBE YOUR EDUCATIONAL BACKGROUND FOR US?

A.    I GRADUATED FROM OKLAHOMA STATE UNIVERSITY IN

1971 AND LAW SCHOOL I GRADUATED FROM OKLAHOMA UNIVERSITY IN 1975.

Q.    AND HOW ARE YOU PRESENTLY EMPLOYED?

A.    I AM IN PRIVATE PRACTICE WITH MY WIFE, PATRICIA BULLOCK.

Q.    AND HOW LONG HAVE YOU BEEN IN PRIVATE PRACTICE?

A.    SINCE 1975.  I HAD A BRIEF PERIOD OF ABOUT TWO YEARS WHERE I PRACTICED WITH A FIRM.  OTHERWISE I HAVE BEEN IN SMALL FIRMS WHICH I HAVE BEEN ONE OF THE MAJOR PARTNERS OF.

Q.    AND WHAT IS THE NATURE OF YOUR PRACTICE?

A.    IT'S ALMOST COMPLETELY FEDERAL LITIGATION.  A GREAT DEAL OF IT HAS BEEN SPENT IN CIVIL RIGHTS AND PARTICULARLY IN INSTITUTIONAL REFORM LITIGATION.  WE INITIALLY -- OR I INITIALLY WAS LEAD LAWYER IN THE BATTLE VERSUS ANDERSON LAWSUIT FOR OVER 20 YEARS.  AND WE -- MY WIFE AND I WERE ALSO COUNSEL IN A CASE WITH THE PUBLIC INTEREST LAW CENTER OF PHILADELPHIA TO CLOSE A SCHOOL FOR THE MENTALLY RETARDED IN OKLAHOMA AND ESTABLISH A COMMUNITY TREATMENT CENTER.  WITH THE SAME GROUP OF LAWYERS WE ALSO DID A MAJOR CASE AGAINST THE STATE'S CHILD MEDICAL SERVICES, THE MEDICAID PROGRAM, AND WE HAVE DONE OTHER LAWSUITS AGAINST JAILS AND SIMILAR INSTITUTIONS.

Q.    AND HAVE YOU EVER REPRESENTED ANY GOVERNMENT

ENTITIES?

A.      YES.   I WAS APPOINTED SPECIAL COUNSEL BY GOVERNOR BELLMON TO INVESTIGATE A CANDIDATE FOR GOVERNOR'S CAMPAIGN FINANCE SHENANIGANS.  AND THEN I LATER WAS ONE OF THE LAWYERS REPRESENTING THE STATE OF OKLAHOMA IN A MAJOR POLLUTION LAWSUIT INVOLVING A WATERSHED NEAR TULSA.  AND PRESENTLY I'M REPRESENTING THE CHICKASAW AND CHOCTAW NATIONS IN A TRIBAL TRUST ACCOUNTING CASE INVOLVING THEIR HAVING LOST 1.3 MILLION ACRES OF PRIME COMMERCIAL TIMBERLANDS.

SO THOSE WOULD BE MY MAJOR EXPERIENCE IN REPRESENTING THE STATE.

Q.      AND YOU HAD ALREADY MENTIONED THIS CASE OF BATTLE VERSUS ANDERSON.  ARE YOU FAMILIAR WITH THAT CASE?

A.      I AM.

Q.      AND WHAT DISTRICT WAS THAT CASE FROM?

A.      THAT WAS FILED IN THE EASTERN DISTRICT OF OKLAHOMA, WHICH SITS IN MUSKOGEE, OKLAHOMA.

Q.      IF YOU COULD JUST GIVE US A GENERAL NATURE, A GENERAL SKETCH OF THAT LITIGATION.  OBVIOUSLY, WE'RE GOING TO GET INTO IT IN A LITTLE MORE DETAIL BUT....

A.      THE CASE WAS ACTUALLY FILED WHILE I WAS -- ACTUALLY BEFORE I WAS IN LAW SCHOOL.  IT WAS FILED IN 1972, WHEN THE DISTRICT JUDGE IN THE EASTERN DISTRICT,

JUDGE LANGLEY, WAS CONTACTED OR HAD RECEIVED SO MANY COMPLAINTS CONCERNING THE OKLAHOMA STATE PENITENTIARY THAT HE CALLED THE LOCAL ACLU.  THEY GOT INTO -- THEY RECRUITED STEPHEN JONES, WHO THE COURT MIGHT REMEMBER REPRESENTED MCVEIGH IN THE MURRAH BUILDING BOMBING CASE. AND THEN THEY FILED A COMPLAINT INVOLVING VIRTUALLY ALL OF THE CONDITIONS IN THE PENITENTIARY, AND IT WAS DECLARED A CLASS ACTION.  SUBSEQUENTLY THE UNITED STATES, THEY WANTED THE EARLY -- CASES IN WHICH THEY INTERVENED IN A MAJOR INSTITUTIONAL CASE, UNITED STATES --

Q.      IF I MAY STOP YOU THERE.  SO MR. JONES WAS THE LEAD COUNSEL ORIGINALLY?

A.      YES.

Q.      SO THE ACLU WAS PARTNERED WITH MR. JONES TO FILE THIS ACTION ORIGINALLY?

A.      CORRECT.

Q.      AND THEN YOU SAID THAT THE DEPARTMENT OF JUSTICE INTERVENED?

A.      THAT'S CORRECT.  IN FACT, ATTORNEY GENERAL JOHN MITCHELL PERSONALLY AUTHORIZED IT BECAUSE YOU DIDN'T HAVE CRIPA AND THE AUTHORIZATION AND STRUCTURE WE HAVE TODAY FOR SUCH MATTERS.

Q.      SO WHEN YOU SAY THAT THE ATTORNEY GENERAL, THE DEPARTMENT OF JUSTICE INTERVENED, WAS THAT ON BEHALF OF

THE PLAINTIFF CLASS?

A.    CORRECT.

Q.    AND AT SOME POINT DID YOU BECOME LEAD COUNSEL?

A.    YES.  I INITIALLY CLERKED ON THE CASE FOR MR. JONES.  AND THEN AFTER I GRADUATED FROM LAW SCHOOL, THE CASE HAD BEEN THROUGH ITS INITIAL TRIAL AND THE INITIAL ORDER, AND THE LAWYER WHO WAS AT THAT TIME LEADING THE PROSECUTION TEAM ASKED ME IF I WOULD TAKE OVER, SAYING THAT THERE WERE ONLY A FEW THINGS TO BE WRAPPED UP.  AND SO FOR THE NEXT 20 SOMETHING YEARS I WAS WRAPPING IT UP.

Q.    SO YOU MENTIONED THE TRIAL.  THERE WAS A TRIAL IN THE BATTLE CASE?

A.    YES.  THERE WERE A NUMBER OF TRIALS OR HEARINGS. THE FIRST ONE WAS IN MARCH OF 1974.

Q.    AND DID THE COURT ISSUE AN OPINION AFTER THAT TRIAL?

A.    YES, HE DID.

Q.    SIR, I'M GOING TO ASK YOU TO LOOK AT WHAT'S BEEN MARKED DEFENDANT'S EXHIBIT 138.

THE COURT:  THIS IS EXHIBIT D 138?

MR. MCHUGH:  YES, YOUR HONOR.

BY MR. MCHUGH:

Q.    DO YOU HAVE THAT IN FRONT OF YOU?

A.    I DO.

Q.      COULD YOU PLEASE IDENTIFY WHAT HAS BEEN MARKED AS DEFENSE 138?

A.      THIS IS THE INITIAL BATTLE VERSUS ANDERSON DECISION, OFTEN REFERRED TO AS BATTLE 1.

Q.      WHO WAS YOUR DISTRICT COURT JUDGE WHO HAD THE TRIAL AND WROTE THIS OPINION?

A.      THE HONORABLE LUTHER BOHANON.

Q.      YOU MENTIONED ABOUT THE INTERVENOR.  I WOULD ASK YOU TO TURN TO PAGE 7 IN THE LEFT-HAND COLUMN.  DO YOU SEE THERE AT THE BEGINNING OF THE SECOND PARAGRAPH WHERE IT INDICATES THAT THERE WAS AN AMENDED COMPLAINT?

A.      CORRECT.

Q.      WHY DID THE INTERVENOR, THE UNITED STATES GOVERNMENT, FILE AN AMENDED COMPLAINT?

A.      WELL, THE UNITED STATES INITIALLY INTERVENED ON THE SOLE ISSUE OF RACIAL DISCRIMINATION BECAUSE THAT WAS THE ONLY JURISDICTIONAL GROUNDS THAT THEY COULD FIND TO GET INTO THE CASE AT ALL.  AND THEN THEY SUBSEQUENTLY, HAVING THEIR FOOT IN THE DOOR, AMENDED TO INCLUDE ALL OF THE CONDITIONS WITHIN THE PENITENTIARY.

Q.      SO IT WENT FROM A RACIAL DISCRIMINATION CASE WITH THE UNITED STATES DEPARTMENT OF JUSTICE TO THAT PLUS CONDITIONS OF CONFINEMENT, THINGS OF THAT NATURE?

A.      CORRECT.

Q.      AND SPECIFICALLY, WE ARE GOING TO BE TALKING

ABOUT -- MOSTLY ABOUT THE MENTAL HEALTH TREATMENT ISSUE OF THE CASE.

THE COURT DESCRIBES THE UNITED STATES' ALLEGATIONS CONCERNING MENTAL HEALTH. DO YOU SEE THAT THERE IN THE LEFT-HAND COLUMN OF THE FIRST -- SECOND FULL PARAGRAPH?

A.      YES. AS I RECALL, WHAT THE COURT REFERS TO THERE IS THE FAILURE TO PROVIDE ADEQUATE MEDICAL CARE, BUT BY THAT THAT INCLUDED PSYCHIATRIC CARE.

Q.      AND DID THE UNITED STATES GOVERNMENT ASSERT A CONSTITUTIONAL CLAIM THERE?

A.      YES. THE FUNDAMENTAL BASIS OF THE CASE WAS -- AND THE CASE WHICH THE UNITED STATES WAS PROSECUTING, IS THAT THE CONDITIONS WITHIN THE PRISON, INCLUDING THE MEDICAL AND PSYCHIATRIC CARE, VIOLATED THE 8TH AMENDMENT PROHIBITION AGAINST CRUEL AND UNUSUAL PUNISHMENT.

Q.      SO THE UNITED STATES WAS ALLEGING THAT THE LACK OF MENTAL HEALTH CARE WAS VIOLATING OF THE CONSTITUTION, CRUEL AND UNUSUAL PUNISHMENT?

A.      CORRECT.

Q.      NOW, I SEE THAT THE COURT BEGINS ITS FINDINGS OF FACT ON PAGE 7, IS THAT CORRECT?

A.      THAT'S RIGHT.

Q.      I'M GOING TO AGAIN TRY AND FOCUS YOU INTO THE MENTAL HEALTH ASPECT OF THE MATTER. SO IF YOU COULD

TURN TO PAGE 12 OF THE OPINION.

AND ARE YOU THERE, SIR?

A.      YES.

Q.      AND, AGAIN, DO YOU SEE THAT ON THE RIGHT-HAND COLUMN, THERE'S A SECTION CALLED MEDICAL CARE, IS THAT RIGHT?

A.      CORRECT.

Q.      AND IF WE CONTINUE ON TO THE NEXT PAGE UNDER THE HEADING OF MEDICAL CARE TO THE SECOND FULL PARAGRAPH OF 13?

A.      YES.

Q.      COULD YOU READ THAT PARAGRAPH, PLEASE, SIR.

A.      THOUGH APPROXIMATELY ONE HALF OF THE AVERAGE INMATE POPULATION AT THE PENITENTIARY IS HOSPITALIZED FOR PSYCHIATRIC REASONS, THERE IS NO PROFESSIONAL PSYCHIATRIC STAFF AVAILABLE FOR TREATMENT ON A REGULAR BASIS.  A VISITING PSYCHIATRIST MAKES WEEKLY VISITS PURSUANT TO AN INFORMAL AGREEMENT, BUT HE HAS NOT ASSUMED RESPONSIBILITY FOR THE CARE OF THESE PATIENTS. THE ONLY TREATMENT AVAILABLE AT THE PENITENTIARY CONSISTS OF TEMPORARY RELIEF FROM DISTRESS THROUGH SEDATION.

Q.      SO IS THAT WHAT YOU WERE TALKING ABOUT -- WHEN WE'RE TALKING ABOUT THIS LAWSUIT ABOUT MEDICAL CARE, THAT IT ALSO INCLUDES THE MENTAL HEALTH OR PSYCHOLOGICAL

ISSUES CONCERNING THE PRISON?

A.    THAT'S CORRECT.

Q.    IF YOU COULD TURN TO PAGE 16, I BELIEVE WE START THE CONCLUSIONS OF LAW, IS THAT RIGHT?

A.    YES.

Q.    AND THEN UNDERNEATH THE CONCLUSIONS OF LAW, CONTINUING ON, THE COURT GETS TO THE CRUEL AND UNUSUAL. PUNISHMENT ASPECT OF THE CASE, IS THAT RIGHT, ON PAGE 18?

A.    THAT'S CORRECT.

Q.    UNDERNEATH CRUEL AND UNUSUAL THERE IS A PARAGRAPH D, IS THAT RIGHT, ON PAGE 19?

A.    THAT'S RIGHT.

Q.    AND THAT IS ENTITLED WHAT?

A.    DENIAL OF MEDICAL CARE.

Q.    COULD YOU PLEASE READ FOR US THE VERY BOTTOM, THE PARAGRAPH THAT IS IN BRACKETS, 31-27, CONCERNING MEDICAL CARE ON TO THE NEXT PAGE WHERE IT FINISHES THE PARAGRAPH.

A.    THE ACTIONABLE CIRCUMSTANCES RESULT WHERE AS HERE, THE LEVEL OF MEDICAL CARE AVAILABLE TO A CONFINED AND DEPENDENT POPULATION IS INADEQUATE TO MEET PREDICTABLE HEALTHCARE NEEDS BECAUSE OF OBVIOUS AND SUSTAINED DEFICIENCIES IN PROFESSIONAL STAFF, FACILITIES AND EQUIPMENT.  WHEN CONTINUED AND SYSTEMIC DEFICIENCIES

OF THIS NATURE EXIST AND HAVE RESULTED IN THE ACTUAL IMPAIRMENT OF INMATE HEALTH, AND WHEN SUCH DEFICIENCIES CONTINUE TO POSE A CURRENT AND POTENTIAL THREAT TO THE PHYSICAL HEALTH AND WELLBEING OF AN ENTIRE PRISON POPULATION, THEN INMATES ARE DEPRIVED OF THE BASIC ELEMENTS OF ADEQUATE MEDICAL TREATMENT IN VIOLATION OF THE 8TH AMENDMENT, CAMPBELL VERSUS BETO, AND ARE ALSO SUBJECTED TO DISABILITIES BEYOND THOSE CONTEMPLATED BY INCARCERATION, IN VIOLATION OF THE DUE PROCESS CLAUSE OF THE 14TH AMENDMENT.

Q.      SO WHAT WAS YOUR TAKE FROM THAT CONCLUSION OF LAW?

A.      THAT THE COURT WAS FINDING THAT AS A LEGAL MATTER THE MEDICAL PROGRAM, INCLUDING THE PSYCHIATRIC PROGRAM WITHIN THIS PRISON, WAS UNCONSTITUTIONAL.

Q.      NOW, AS A RESULT OF THIS OPINION, DID THE COURT ALSO ISSUE AN ORDER?

A.      HE DID.

Q.      AND I WOULD ASK YOU TO TURN TO PAGE 27 AND THE LEFT-HAND COLUMN.  DO YOU SEE THAT, SIR?

A.      YES.

Q.      THERE IS A CAPTION:  ORDER ON MEDICAL CARE?

A.      YES.

Q.      I WOULD JUST ASK YOU AGAIN IF YOU COULD JUST READ PARAGRAPH 23, THE VERY FIRST PARAGRAPH THERE?

A.          WITHIN 60 DAYS FROM THE DATE OF THIS ORDER, THE DEFENDANT SHALL FORMULATE A COMPREHENSIVE PLAN FOR PROVIDING CONSTITUTIONALLY ADEQUATE ROUTINE AND EMERGENCY MEDICAL CARE, INCLUDING PSYCHIATRIC CARE, TO ALL INMATES AT THE OKLAHOMA STATE PENITENTIARY.  THIS PLAN SHALL BE SUBMITTED TO COUNSEL FOR THE PLAINTIFFS AND FOR THE PLAINTIFF INTERVENOR FOR COMMENT AND TO THE COURT FOR CONSIDERATION AND APPROVAL.

Q.      DO YOU KNOW THE DATE OF THIS ORDER?

A.      YES.  THIS WAS MAY 30TH, 1974.

Q.      SO I BELIEVE YOU SAID EARLIER THAT THE ACTION WAS INITIATED IN '72 AND THE COURT ISSUES THIS ORDER IN '74, IS THAT CORRECT?

A.      CORRECT.

Q.      NOW, THE ORDER INDICATED THAT IT WAS OKLAHOMA STATE PENITENTIARY.  DID IT STAY AS LIMITED TO OKLAHOMA STATE PENITENTIARY OR DID IT EXPAND THE ORDER?

A.      NO.  THE COURT ON ITS OWN MOTION EXPANDED THE CLASS TO INCLUDE ALL OF THE INMATES INCARCERATED BY THE STATE OF OKLAHOMA AND HELD THAT THEY WERE ALL ENTITLED TO THE BENEFITS OF THE ORDER.

Q.      SO NOT JUST THE OS -- WHAT WE WILL CALL MCALESTER, THE STATE PENITENTIARY?

A.      RIGHT.

Q.      DID THE STATE OF OKLAHOMA APPEAL THE DECISION OF

JUDGE BOHANON, DATED MAY 30TH, 1974?

A.     THEY DID NOT.

Q.     IN YOUR EXPERIENCE AND PRACTICE, ONCE YOU GET AN ORDER LIKE THAT, THERE IS -- THE NEXT PHASE OF THE CASE IS COMPLIANCE?

A.     CORRECT.

Q.     AND WERE YOU INVOLVED IN MONITORING THE STATE'S COMPLIANCE WITH THE COURT'S ORDER OR INJUNCTION?

A.     YES, I WAS.

Q.     AND WHAT WERE YOUR DUTIES AS FAR AS MONITORING COMPLIANCE?

A.     WELL, AFTER OCTOBER OF 1975, I WAS THE LEAD COUNSEL FOR THE PLAINTIFF CLASS.  AND AS SUCH I PARTICIPATED IN ALL OF THE DISCOVERY AND ALL OF THE INSPECTIONS OF THE INSTITUTIONS.

Q.     SO AS PART OF YOUR DUTIES AS LEAD COUNSEL DID THAT INVOLVE ACTUALLY GOING TO THE INSTITUTIONS?

A.     YES.

Q.     AND CAN YOU ESTIMATE HOW MANY TIMES YOU MIGHT HAVE GONE TO THESE INSTITUTIONS?

A.     WELL, THERE WERE TIMES WHEN I WOULD BE IN SOME OF THE INSTITUTIONS EVERY MONTH.  CERTAINLY DURING THOSE EARLY YEARS AT LEAST EVERY YEAR I SAW VIRTUALLY ALL OF THE INSTITUTIONS.

Q.     AND DID YOU BECOME FAMILIAR WITH THE PERSONNEL,

WARDENS?

A.        I DID.

Q.        WERE YOU FAMILIAR WITH THE CONDITIONS THAT EXISTED IN THE VARIOUS PRISON FACILITIES THAT WERE UNDER THE AUSPICES OF THE INJUNCTION OR THE COURT'S ORDER?

A.        YES, I DID.  YES, I WAS.

Q.        I'M GOING TO ASK YOU TO LOOK AT DEFENSE EXHIBIT 139.

          DO YOU HAVE THAT IN FRONT OF YOU, SIR?

A.        YES, I DO.

Q.        CAN YOU IDENTIFY THIS DOCUMENT FOR US?

A.        YES.  IN THE FALL OF 1976 THE COURT WANTED TO HAVE OR SET FOR HEARING A COMPLIANCE HEARING TO DETERMINE WHAT THE STATUS OF COMPLIANCE WAS AND REQUIRED THE FILING OF REPORTS OR THE POSITION OF THE PARTIES REGARDING THAT.  AND THIS WAS THE UNITED STATES COMPLIANCE HEARING PLEADING SETTING FORTH THEIR POSITION CONCERNING THE STATUS OF COMPLIANCE.

Q.        OKAY.  SO THIS IS FILED BY ATTORNEYS FROM THE DEPARTMENT OF JUSTICE, IS THAT RIGHT?

A.        THAT'S CORRECT.

Q.        AND WHAT IS THE DATE OF THIS FILING?

A.        THIS WAS SEPTEMBER 2ND, 1976.

Q.        AND IN THE VERY FIRST SENTENCE IT MENTIONS A COURT'S DIRECTIVE OF MAY 5TH OF '76.  DO YOU SEE THAT?

A.      YES.

Q.      IS THE DIRECTIVE WHAT YOU JUST TOLD US ABOUT AS FAR AS THE COURT WANTING TO SET A HEARING FOR COMPLIANCE?

A.      CORRECT.

Q.      DOES IT INDICATE IN THE NEXT SENTENCE WHAT TYPE OF INVESTIGATION THE INTERVENOR, THE DEPARTMENT OF JUSTICE, CONDUCTED?

A.      YES.  THE GOVERNMENT, AND I PARTICIPATED IN IT, BUT THEY HIRED A NUMBER OF EXPERTS TO REVIEW VIRTUALLY ALL OF THE ASPECTS OF THE ORDER AS WELL AS REVIEWED A NUMBER OF INMATE FILES AND RECORDS.

Q.      DID THEY ACTUALLY DESCRIBE IT IN THE VERY SECOND LINE ABOUT THE TYPE OF INVESTIGATION AS FAR AS HOW THOROUGH IT WAS?

A.      YES.  THEY DESCRIBED THERE, AND AT THAT POINT THE FBI WAS STILL -- WAS WORKING WITH US AND THEY DID EXTENSIVE INVESTIGATION THEMSELVES.

Q.      IN FACT, DID THEY NOT CHARACTERIZE IT AS AN IN-DEPTH INVESTIGATION?

A.      YES.

Q.      AND YOU MENTIONED THE FBI.  IS THAT IN THE VERY FIRST SENTENCE OF THE SECOND PARAGRAPH?

A.      YES.

Q.      SO YOU ACTUALLY HAD FEDERAL BUREAU OF

INVESTIGATION AGENTS WORKING ON BEHALF OF THE PLAINTIFFS TO DETERMINE WHETHER THE INSTITUTIONS WERE COMPLYING WITH THE COURT'S ORDER?

A.      CORRECT.

Q.      AND I'M GOING TO ASK YOU TO LOOK AT PAGE 4 OF THIS DOCUMENT THAT WAS FILED BY THE DEPARTMENT OF JUSTICE AND SPECIFICALLY PARAGRAPH 10.  WHAT DOES PARAGRAPH 10 INDICATE TO YOU THAT THE GOVERNMENT WAS PUTTING FORTH IN THIS PLEADING?

A.      THAT THE STATE HAD FAILED TO IMPLEMENT A SYSTEM OF ADEQUATE HEALTHCARE AND MENTAL HEALTHCARE.

Q.      IN FACT, DOES IT INDICATE THAT NO PRISON HAD MET THAT -- THE COURT'S ORDER?

A.      THAT IS CORRECT.

Q.      AGAIN, THIS WAS IN 1976, IS THAT RIGHT?

A.      CORRECT.

Q.      THAT WOULD HAVE BEEN FOUR YEARS AFTER THE CASE WAS FILED?

A.      YES.  I THINK THE MOST IMPORTANT PART OF THAT IN TERMS OF THE QUALITY IS WHAT THEY SAY ABOUT THE EXTENT TO WHICH UNLICENSED PROVIDERS WERE PROVIDING MEDICAL CARE AND MENTAL HEALTHCARE WITHIN THE SYSTEM DURING THIS PERIOD.

Q.      THAT IS ALSO IN PARAGRAPH 10?

A.      YES.

Q.    NOW, AS A RESULT OF THAT FILING BY THE DEPARTMENT OF JUSTICE, DID THE COURT TAKE FURTHER ACTION?

A.    YES.

Q.    I'M GOING TO ASK YOU TO LOOK AT WHAT HAS BEEN MARKED AS DEFENSE EXHIBIT 140.

A.    OKAY.

Q.    IF YOU COULD DESCRIBE OR IDENTIFY THIS DOCUMENT FOR US.

A.    WELL, FOLLOWING THE COMPLIANCE REPORT THAT WE SAW THAT WERE IN FACT A SERIES OF HEARINGS CONCERNING COMPLIANCE, AND THIS IS THE OPINION ENTERED BY THE COURT IN SEPTEMBER OF 1978 FOLLOWING SUCH A HEARING.

Q.    SO THE -- I NOTICE ON THE FRONT THAT THERE'S TWO DATES STAMPED.  CAN YOU TELL US WHY THAT HAPPENED?

A.    YES.  THIS CASE WAS FILED IN THE EASTERN DISTRICT OF OKLAHOMA, BUT JUDGE BOHANON HAD AN ASSIGNMENT.  HE WAS ASSIGNED BOTH TO THE EASTERN AND THE WESTERN DISTRICT.  THE WESTERN DISTRICT IS IN OKLAHOMA CITY.  AND FOR THE CONVENIENCE OF BOTH THE COURT AND FOR THE LAWYERS WITH THE DEPARTMENT OF CORRECTIONS IN THE OKLAHOMA ATTORNEY GENERAL'S OFFICE, WE HAD OVERWHELMINGLY MOST OF THE HEARINGS IN OKLAHOMA CITY, RATHER THAN MCALESTER OR MUSKOGEE.

Q.    SO IT WAS SIMPLY A MATTER OF THE FACT THAT THERE

WERE TWO DISTRICTS INVOLVED IN THE CASE IN THE SENSE THAT THE JUDGE WAS IN A DIFFERENT DISTRICT?

A.      RIGHT.  AND THE JUDGE, WHEN HE WOULD ENTER AN ORDER LIKE THIS, WOULD HAND IT TO THE CLERK IN THE WESTERN DISTRICT, WHO WOULD STAMP IT, AND THEN THE CLERK WOULD FORWARD IT TO THE EASTERN DISTRICT, WHERE IT WOULD AGAIN BE FILE STAMPED.

Q.      MUSKOGEE IS THE MAIN COURTHOUSE FOR THE EASTERN DISTRICT?

A.      CORRECT.

Q.      IN FACT, IS MUSKOGEE WHERE THIS COURT FILE IS?

A.      THAT'S RIGHT.

Q.      I'M GOING TO ASK YOU TO AGAIN FOCUS IN ON -- I KNOW THIS IS A LONG LENGTHY OPINION AND MEMORANDUM BUT WE ARE GOING TO FOCUS IN ON PAGE 12, WHICH DEALS WITH THE HEALTHCARE SERVICES.

A.      OKAY.

Q.      THE PARAGRAPHS 16, 17 AND 18, IF YOU COULD READ THOSE FOR US, SIR.

A.      OKAY.  ON MAY 30TH, 1974, DEFENDANTS WERE ORDERED TO SUBMIT A COMPREHENSIVE PLAN COVERING THE MEDICAL, DENTAL AND PSYCHOLOGICAL NEEDS OF THE INMATES.

TO DATE, BY THEIR DOCUMENTS AND BY THE EVALUATION OF PLAINTIFF INTERVENORS' EXPERT, THEY HAVE NOT YET SUBMITTED THIS PLAN.  THE DEPARTMENT OF

CORRECTIONS MEDICAL DIRECTOR ON AUGUST 15TH, 1978, TESTIFIED THAT THE DEFENDANTS HAD BOTH A FAT AND AN ABRIDGED MEDICAL PLAN.  TO DATE ONLY ONE MEDICAL PLAN HAS BEEN SUBMITTED, I.E., THE ABRIDGED, WHICH WAS COMPILED AND SUBMITTED BEFORE THE MEDICAL DIRECTOR ASSUMED OFFICE.

FURTHER, DEFENDANTS ADMIT THAT THEIR HEALTHCARE SERVICES PLAN HAS ALREADY UNDERGONE SEVERE MODIFICATION BUT STILL DOES NOT PROVIDE FOR THE NEEDS OF ALL INMATES.  THE PLAN AS MODIFIED HAS NOT BEEN COMPLETELY IMPLEMENTED.  STEPS 1, 2 AND 3 OF THE PLAN REQUIRE FURTHER IMPLEMENTATION THROUGH FILLING OF STAFF VACANCIES, PURCHASING OF EQUIPMENT AND CONSTRUCTION OF FACILITIES.  THE HEALTHCARE STAFF, BOTH AUTHORIZED AND THOSE ACTUALLY ON DUTY AS OF THE DATE OF THE HEARING IS NOT SUFFICIENT.  THERE ARE PRESENTLY --

Q.    YOU CAN STOP THERE.

A.    OKAY.

Q.    I THINK WE GET THE FLAVOR.  IS THE POINT HERE -- WHAT IS THE POINT HERE, SIR?

A.    THE POINT IS THAT THE SYSTEM WAS STILL VERY CLOSE TO THE SYSTEM WHICH THE COURT HAD FOUND IN 1974 AND CONTINUED TO BE UNCONSTITUTIONAL.

Q.    AND SO NOW WE ARE INTO 1978, IS THAT RIGHT?

A.    CORRECT.

Q.      NOW, THERE WAS MENTION THERE ABOUT SOME EXPERTS. DURING THE MONITORING OF COMPLIANCE WITH THIS INJUNCTION, DID THE PLAINTIFF CLASS RETAIN EXPERTS TO ASSIST IN THE MONITORING?

A.      WE RODE ON THE BACK OF THE UNITED STATES AND AT THIS PART OF THE CASE ALL OF THE EXPERTS WERE HIRED BY THE PLAINTIFF INTERVENOR.

Q.      AND AGAIN THAT WOULD BE THE DEPARTMENT OF JUSTICE?

A.      CORRECT.

Q.      DO YOU RECOGNIZE THE NAME DR. FRANK RUNDLE?

A.      CORRECT.  HE WAS THE EXPERT FOR THE UNITED STATES THROUGHOUT MUCH OF THIS PERIOD.

Q.      AND HOW ABOUT DR. GEORGE SOLOMON?

A.      YES, HE WAS ALSO CONTRACTED BY THE UNITED STATES TO LOOK AT THE MENTAL HEALTH.

Q.      HOW ABOUT DR. MELVIN HELLER?

A.      SIMILARLY, HE ALSO WAS LOOKING AT THE MENTAL HEALTH PLAN.

Q.      SIR, I'M GOING TO ASK YOU TO LOOK AT WHAT HAS BEEN MARKED AS DEFENDANT'S EXHIBIT 141.

CAN YOU IDENTIFY THIS DOCUMENT WHEN YOU HAVE HAD AN OPPORTUNITY?

A.      YES.  THIS IS A LETTER AND IN FACT IT WAS FILED AS AN EXPERT REPORT BY DR. SOLOMON.

Q.    OKAY.  AND WHAT WAS THE DATE THAT HE FILED IT?

A.    FEBRUARY 27TH, 1981.

Q.    AND THIS IS THE -- HE IS ACTUALLY WRITING THE LETTER TO THE CIVIL RIGHTS DIVISION OF THE DEPARTMENT OF JUSTICE, IS THAT RIGHT?

A.    CORRECT.

Q.    SO HE IS ONE OF THE EXPERTS THAT THEY HAD RETAINED?

A.    THAT'S CORRECT.

Q.    THE VERY -- THE BEGINNING OF THE -- THE FIRST PARAGRAPH I'M GOING TO ASK YOU TO SKIP, BUT THE VERY FIRST SENTENCE OF THE SECOND PARAGRAPH I THINK, IF YOU COULD JUST READ THAT.

A.    FIRST OF ALL, IMPLEMENTATION OF THE PLAN CERTAINLY WOULD REPRESENT A SIGNIFICANT IMPROVEMENT OVER THE DISMAL STATE OF AFFAIRS IN REGARD TO MENTAL HEALTH SERVICES, RATHER LACK THEREOF, EXISTING IN THE OKLAHOMA PRISON SYSTEM WHEN I VISITED THE STATE IN MARCH OF 1979.

Q.    AND WHAT IS THE PARENTHETICAL?

A.    OKAY.  ALMOST ANY PROGRAM WOULD BE AN IMPROVEMENT.

Q.    SO AGAIN, ARE WE NOW UP TO 1979 WHERE THERE'S ISSUES WITH THE PLAN BEING IMPLEMENTED OR EVEN BEING --

A.    RIGHT.  IN FACT, THE LETTER WAS IN '81.  NOW HIS VISIT WAS IN '79.  SO I THINK THERE IS A LITTLE

AMBIGUITY AS TO THE EXACT PERIOD, BUT AT LEAST '79 HE FOUND VIRTUALLY NOTHING.

Q.   I'M GOING TO ASK YOU TO LOOK AT WHAT HAS BEEN MARKED AS DEFENSE EXHIBIT 142.

A.   YES.

Q.   CAN YOU IDENTIFY THIS DOCUMENT WHEN YOU HAVE HAD AN OPPORTUNITY?

A.   THIS IS THE REPORT OF DR. FRANK RUNDLE, ADDRESSING BOTH MEDICAL CARE AND PSYCHIATRIC CARE IN THE OKLAHOMA DEPARTMENT OF CORRECTIONS.

Q.   THIS WAS -- WAS THIS ALSO FILED ON THE SAME DATE AS DR. --

A.   SOLOMON.

Q.   SOLOMON.

A.   YES, IT IS.

Q.   IT WAS FILED WITH THE COURT?

A.   CORRECT.

Q.   AND IN THE VERY FIRST SENTENCE DOES DR. RUNDLE INDICATE WHO HE HAD BEEN RETAINED BY?

A.   HE INDICATES THAT HE WAS RETAINED BY THE CIVIL RIGHTS DIVISION OF THE UNITED STATES DEPARTMENT OF JUSTICE.

Q.   AND DOES HE ALSO IN THAT SAME PARAGRAPH GIVE A FAIRLY LENGTHY DESCRIPTION OF ALL OF THE INSTITUTIONS THAT HE HAD VISITED AS WELL AS THE NUMBER OF TIMES HE

VISITED?

A.      THAT'S CORRECT.

Q.      AND IS THAT PRETTY MUCH AN EXHAUSTIVE LIST OF THE INSTITUTIONS THAT WERE UNDER THE COURT'S ORDER?

A.      YES.  I CAN OFF THE TOP OF MY HEAD THINK OF ONE SMALL ONE THAT IS NOT MENTIONED HERE, BUT THIS IS ALL OF THE PRIMARY ONES.

Q.      OBVIOUSLY, IT INCLUDE THE OKLAHOMA STATE PENITENTIARY AT MCALESTER?

A.      CORRECT.

Q.      AND THE LEXINGTON ASSESSMENT AND RECEPTION CENTER?

A.      CORRECT.

Q.      AND THE OKLAHOMA STATE REFORMATORY AT GRANITE?

A.      THAT'S CORRECT.

Q.      AND BY THE WAY, THESE VISITS -- YOU HAD ALSO VISITED THESE INSTITUTIONS?

A.      YES.  I ACCOMPANIED DR. RUNDLE ON ALL OF THESE VISITS.

Q.      AND HOW ABOUT THE JOE HARP CORRECTIONAL CENTER IN LEXINGTON?

A.      YES.

Q.      AND THE EASTERN STATE HOSPITAL IN VINITA, IS THAT RIGHT?

A.      CORRECT.

Q.    NOW, HAVE YOU REVIEWED THIS -- I KNOW IT WAS A WHILE AGO WHEN YOU WERE ACTUALLY PART OF THIS LITIGATION AND THIS REPORT WAS FILED, BUT HAVE YOU REVIEWED THIS REPORT RECENTLY IN PREPARATION FOR YOUR TESTIMONY TODAY?

A.    I DID.  I READ OVER IT IN ADVANCE OF TESTIFYING HERE.

Q.    AND IF YOU COULD JUST SUMMARIZE FOR US THE RELEVANT PORTIONS, KNOWING THAT WE ARE TALKING ABOUT THE MENTAL HEALTHCARE.  ARE YOU ABLE TO GIVE US A SUMMARY OF WHAT DR. RUNDLE'S EXPERT REPORT WAS CONCERNING?

A.    I BELIEVE SO.  WHAT DR. RUNDLE FOUND WAS THAT WHILE THERE WAS SOME IMPROVEMENT AND HE, LIKE OTHERS, WAS VERY COMPLIMENTARY OF THE MEDICAL DIRECTOR, HE STILL FOUND A CRITICAL LACK OF IMPORTANT SERVICES AND PARTICULARLY A CRITICAL LACK OF TRAINED STAFF TO PROVIDE, RELEVANT TO THIS HEARING, PSYCHIATRIC AND MENTAL HEALTHCARE.

Q.    SO THERE HAD BEEN IMPROVEMENTS IN THE MEDICAL CARE IN THE SENSE OF SOMEONE GETTING SICK, BUT AS FAR AS -- PHYSICALLY SICK, BUT AS FAR AS THE MENTAL HEALTHCARE, DR. RUNDLE WAS STILL FINDING DEFICIENCIES?

A.    THAT'S CORRECT.  PROBABLY WITHIN THE MENTAL HEALTHCARE THE MAJOR IMPROVEMENT WAS THE FACT THAT THEY HAD A MULTI PURPOSE UNIT AT JOE HARP THAT WAS TRYING TO PROVIDE SOME MENTAL HEALTH SERVICES.  IT WAS VERY

LIGHTLY STAFFED IN THAT REGARD.  IT PERHAPS WAS AN 80-PERSON UNIT.  AND THEN THEY WERE ALSO IN THE PROCESS OF ESTABLISHING A UNIT AT THE EASTERN STATE HOSPITAL AT VINITA, THAT IS OLD RURAL MENTAL HOSPITAL, IN FACT, JUST CLASSIC IN TERMS OF LOOKING LIKE THAT.  IT HAD ITS OWN PROBLEMS WITH MAINTAINING STAFF AND WAS CLEARLY INADEQUATELY STAFFED AND THEN --

Q.    I WILL STOP YOU THERE, BECAUSE I BELIEVE WE ARE GOING TO TALK ABOUT THAT EASTERN STATE HOSPITAL IN MORE DETAIL -- GO AHEAD.  I DID NOT MEAN TO INTERRUPT YOU.

PAGE 4, IF YOU COULD LOOK AT THAT.

A.    OKAY.

Q.    OF THAT EXHIBIT.

ON PAGE 4, IS THE CONVERSATION NOW SPECIFICALLY CONCERNING THAT EASTERN STATE HOSPITAL?

A.    YES.

Q.    AT VERY BOTTOM OF THAT LARGE PARAGRAPH, THE LAST SENTENCE THAT BEGINS AT THE TIME OF MY VISIT.  IF YOU COULD JUST READ THAT FOR US.

A.    AT THE TIME OF MY VISIT, A PHYSICIAN COMPLETELY UNTRAINED IN PSYCHIATRY WAS IN CHARGE OF THE WARD TO WHICH WERE ASSIGNED THE INMATES FROM THE OKLAHOMA DEPARTMENT OF CORRECTIONS.  IN ADDITION, DR. O'TOOLE POINTED OUT THAT HE HAS BEEN UNABLE TO RECRUIT OTHER PROFESSIONALS, PRIMARILY REGISTERED NURSES AND

REGISTERED OCCUPATIONAL THERAPISTS.

Q.      SO COULD YOU TELL US WHAT ESSENTIALLY THE PROBLEMS WERE WITH THIS EASTERN STATE HOSPITAL AS FAR AS BEING AN ADEQUATE MENTAL HEALTH FACILITY?

A.      WELL, IT IS PERHAPS AN HOUR AND 45 MINUTES FROM TULSA.  AND IT'S AN EXTREMELY POOR PART OF THE STATE AND IT'S JUST VERY DIFFICULT TO GET PHYSICIANS TO MOVE TO THAT PART OF THE STATE AT ALL.  AND SO RECRUITING TRAINED AND QUALIFIED SPECIALISTS SUCH AS PSYCHIATRISTS IS EXTREMELY CHALLENGING AND AS THE REPORT INDICATES THEY HAD FAILED TO DO SO DURING THIS PERIOD.

Q.      AND IF YOU COULD TURN TO PAGE 11 WHERE THERE IS SOME CONCLUSIONS AND RECOMMENDATIONS.  I'M GOING TO FOCUS YOU IN ON PARAGRAPH A.  IF YOU WANT TO READ IT, THAT'S FINE, BUT IF YOU CAN JUST SUMMARIZE FOR US WHAT THE CONCLUSIONS AND RECOMMENDATIONS CONCERNING PARAGRAPH A WERE FROM DR. RUNDLE.

A.      WELL, DR. RUNDLE IS STILL RECOMMENDING THAT THEY PREPARE A TRULY COMPREHENSIVE MENTAL HEALTH PLAN.  THAT IS SOMETHING THEY WERE SUPPOSED TO DO UNDER THE '74 ORDER, AND SET FORTH IN DETAIL BOTH THE STAFFING AND THE FACILITIES THAT THEY ARE GOING TO USE TO IMPLEMENT IT.

Q.      AND HE ACTUALLY UNDERLINES THE WORD "TRULY," IS THAT RIGHT?

A.      THAT'S CORRECT.

Q.    SO NOW WE ARE INTO 1981 AND IT APPEARS THAT THE GOVERNMENT'S EXPERT IS STILL INDICATING THAT THE PLAN IS INSUFFICIENT, IS THAT RIGHT?

A.    THAT'S CORRECT.

Q.    I'M GOING TO ASK YOU TO TURN TO PAGE 12 AND AT THE VERY BOTTOM OF PAGE 12 DR. RUNDLE DESCRIBES AN INCIDENT THAT OCCURRED IN DECEMBER OF 1980.  DO YOU SEE THAT?

A.    YES, I DO.

Q.    IN REVIEWING THIS REPORT, DID THAT REFRESH YOUR RECOLLECTION CONCERNING THAT INCIDENT?

A.    IT DID.  IT'S ONE OF THOSE EVENTS THAT WAS SO STARK THAT WHILE SO MUCH OF THIS CASE I HAVE FORGOTTEN, I REMEMBER THAT DAY VERY CLEARLY.

Q.    AND WHAT INSTITUTION IS HE REFERRING TO THERE?

A.    THIS WAS AT THE OKLAHOMA STATE PENITENTIARY, PARTICULARLY THE MEDICAL UNIT WHICH HAD A FEW CELLS THAT WERE SEGREGATED AND ISOLATED THAT THEY CALLED THE NP UNIT, WHICH WAS -- STOOD FOR NEUROPSYCH.

Q.    WHAT DO YOU RECALL HAPPENING THAT DAY?

A.    WELL, I RECALL OUR GOING BACK INTO THIS LITTLE UNIT, AND AS I SAY, IT WAS VERY ISOLATED.  THERE WERE FOUR, MAYBE SIX CELLS BACK THERE.  AND THAT DAY I GUESS HALF OF THEM WERE OCCUPIED.  AND I REMEMBER DR. RUNDLE COMING UP TO THIS ONE CELL AND BEGINNING TO ENGAGE THE

INMATE.  AND HE ASKED THE GUARD TO OPEN THE CELL DOOR AND THE GUARD QUAKED AND DID NOT WANT TO DO IT BECAUSE OF ALLEGATIONS AS TO HOW DANGEROUS THE PERSON WAS.  BUT DR. RUNDLE WAS BOTH EXPERIENCED AND SKILLFUL WITH BOTH GUARDS AND INMATES.  AND THE GUARD RELENTED AND DR. RUNDLE WENT IN AND I WAS ACCOMPANYING HIM AND SPENT MAYBE TEN MINUTES VISITING WITH THIS INMATE.  AND IT WAS JUST A VERY SAD OCCASION.

Q.    DID HE INDICATE THAT HE HAD LEARNED ABOUT THERE WAS A RECENT SUICIDE?

A.    THAT'S RIGHT.  THERE ALSO HAD BEEN A SUICIDE ON THAT UNIT.  ONE OF ITS PROBLEMS WAS THAT IT WAS REMOVED FROM THE REST OF THIS LITTLE MEDICAL UNIT AND YOU COULD NOT EVEN HEAR THE INMATES CALLING OUT WHEN THEY WERE LOCKED BACK THERE.  THEY HAD TRIED INSTALLING VARIOUS DEVICES BACK THERE FOR THE INMATES TO SIGNAL THAT SOMETHING WAS NEEDED IN THE WAY OF CALL PULLS OR THAT KIND OF THING, BUT ALL OF THOSE QUICKLY BECAME DYSFUNCTIONAL.

Q.    SIR, I'M GOING TO ASK YOU TO LOOK AT WHAT HAS BEEN MARKED AS DEFENDANT'S EXHIBIT 143.

A.    OKAY.

Q.    IF YOU COULD IDENTIFY THIS FOR THE RECORD.

A.    YES.  THIS IS A REPORT DONE BY DR. HELLER, WHO ALSO WAS AN EXPERT WHO REVIEWED PARTICULARLY THE MENTAL

HEALTH PLAN, AND THIS IS HIS REPORT.

Q.      HE ACTUALLY WAS IN THE PHILADELPHIA AREA, IS THAT RIGHT?

A.      THAT'S CORRECT.

Q.      AGAIN, THE DATE OF THIS REPORT?

A.      THIS WAS MARCH 3RD, 1981.

Q.      AND THIS WAS ALSO TO THE HONORABLE LUTHER BOHANON?

A.      CORRECT.

Q.      IN PARAGRAPH 4 ON THE VERY FIRST PAGE, DOES HE INDICATE HOW HE FELT AS FAR AS THE PLAN WAS CONCERNED?

A.      HE FOUND THAT IT WAS SERIOUSLY FLAWED, BOTH BECAUSE OF THE CHOICE OF THE SITE FOR THE MAJOR MENTAL HEALTH HOSPITAL AND THE FACT THAT HE FOUND THAT THEY HAD NOT VERY WELL DELINEATED HOW THIS SYSTEM WAS TO WORK.

Q.      NOW, THIS REPORT TOUCHES ON THE -- DOES THIS REPORT TOUCH ON THE INSTITUTION THAT YOU HAVE ALREADY TALKED ABOUT, JOE HARP?

A.      THAT'S CORRECT.

Q.      ARE YOU FAMILIAR WITH THE SPECIAL PROGRAMS UNIT THAT WAS DEVELOPED AT JOE HARP?

A.      I AM.

Q.      COULD YOU GIVE US A BACKGROUND ON THAT?

A.      JOE HARP IS PERHAPS 30, MAYBE 45 MINUTES SOUTH OF OKLAHOMA CITY AND IN THE GREAT SCHEME OF THINGS IT

WAS MORE ACCESSIBLE TO MEDICAL CARE THAN MOST --
OVERWHELMINGLY MOST OF THE INSTITUTIONS IN THE SYSTEM.

SO THEY SET UP WHAT WAS CLEARLY TO BE A
TRANSITIONAL MENTAL HEALTH PROGRAM WHERE -- BETWEEN
BEING GENERAL POPULATION AND BEING SENT TO EASTERN
STATE.  THE DIFFICULTY WAS THAT THAT PROGRAM BECAME THE
ANSWER TO EVERY QUESTION.  WHAT ARE YOU GOING TO DO WITH
SEX OFFENDERS?  WHAT ARE YOU GOING TO DO WITH PEOPLE
THAT ARE IN A PSYCHOTIC STATE?  WHAT ARE YOU GOING TO DO
WITH THE SUICIDAL?  IT WAS ALWAYS THAT SAME UNIT.  AND
SO THE LACK OF DEFINITION IN IT MADE IT MARGINALLY -- A
MARGINAL IMPROVEMENT.  AND THEY ALSO HAD THE PROBLEM
THAT WHILE IT HAD MORE STAFF THAN WHAT THEY HAD HAD IN
THE PAST, IT WAS STILL TOO THINLY STAFFED.

Q.     AND I WILL ASK YOU TO TURN TO PAGE 8 OF THIS
REPORT.  THERE IS A PARAGRAPH BEGINNING FINALLY.  DO YOU
SEE THAT?

A.     YES.

Q.     AND IS THAT DISCUSSING THE SPECIAL PROGRAMS UNIT
AT JOE HARP?

A.     THAT'S CORRECT.

Q.     IF YOU COULD JUST READ THAT FOR US TO THE BOTTOM
OF THE PAGE.

A.     FINALLY, THE SPECIAL PROGRAM UNIT WOULD
SEEMINGLY ALLOW FOR THE TREATMENT OF SERIOUSLY MENTAL

ILL PRISONERS INCLUDING PSYCHOTIC ONES IN A SPECIAL PROGRAM IN WHICH MENTALLY ILL PERSONS ARE MIXED IN WITH BEHAVIORAL ADJUSTMENT PROBLEMS, INCLUDING VIOLENT PRISONERS.  THIS INTERMIXING OF THE SO-CALLED MAD AND BAD WITHOUT A DETAILED SPELLING OUT OF THE SPECIAL PROGRAM IS DISCONCERTING.  FURTHERMORE, ALL OF THESE PROGRAMS WOULD BE UNDER THE DIRECTION -- WOULD BE UNDER THE DIRECTION OF PSYCHOLOGISTS WHOSE QUALIFICATIONS AND LEVEL OF PROFESSIONAL EXPERIENCE AND EXPERTISE ARE INADEQUATELY DETAILED IN THE PLAN.

Q.      SO THAT IS SORT OF REITERATING WHAT YOU HAD DESCRIBED AS FAR AS SORT OF A THROW EVERYBODY INTO THE JOE HARP PROGRAM TYPE OF DEAL?

A.      RIGHT.  IT WAS THE ANSWER TO EVERY QUESTION.

Q.      IF YOU COULD LOOK AT DEFENSE EXHIBIT 144.

A.      YES.

Q.      ARE YOU ABLE TO IDENTIFY THIS DOCUMENT?

A.      YES.  THIS IS A LETTER BY DR. HUBER, THAT WAS A CONSULTANT IN THE JOE HARP PROGRAM, COMMENTING ON MR. HAMMER.

Q.      SO THIS WAS IN THE TIME FRAME THAT THESE REPORTS WERE COVERING, IS THAT RIGHT?

A.      RIGHT.  THIS IS A JANUARY 3RD, 1980 LETTER.

Q.      YOU MENTIONED THAT DR. HUBER WAS A CONSULTANT.  CAN YOU TELL US WHAT THAT SIGNIFICATION?

A.      WELL, BECAUSE THE MEDICAL STAFFING IN THE PRISON SYSTEM WAS SO THIN, THE SYSTEM USED A NUMBER OF DOCTORS AS CONSULTANTS.  THEY WERE NOT STAFF PHYSICIANS.  THEY DIDN'T TAKE RESPONSIBILITY FOR THE TREATMENT OF THE INMATES.  IN FACT, DR. RUNDLE COMMENTS ON THAT IN HIS REPORT, THAT THE INMATES ARE NOT REALLY THE PATIENTS OF THE DOCTORS THAT ARE CONSULTED.  BUT THAT IS WHAT THEY WERE USING TO FILL IN FOR THE LACK OF ADEQUATE STAFF.

Q.      HOW ABOUT AS FAR AS THEIR ACCESS TO THIS LOCATION?  HOW OFTEN WOULD THE CONSULTANTS BE ON SITE, IF YOU HAVE AN IDEA?

A.      IN READING THE REPORTS, IT'S MY RECOLLECTION THAT THEY WERE THERE PERHAPS PART OF A DAY, MAYBE TWO TO THREE DAYS A WEEK.

Q.      IT'S SUGGESTED IN THIS LETTER THAT AFTER MR. HAMMER LEAVES THE SPECIAL PROGRAMS UNIT THAT HE CONTINUE IN SOME TREATMENT ARRANGEMENT AFTER HE LEAVES THE CORRECTIONAL CENTER.  DO YOU SEE THAT?

A.      RIGHT.  RIGHT.

Q.      IS THERE A PROBLEM WITH THAT RECOMMENDATION?

A.      THERE WASN'T ANYTHING OUTSIDE OF JOE HARP.  I MEAN, THERE WAS NO PROGRAM FOR HIM TO CONTINUE TO ACCESS.

Q.      SO ONCE -- SO RECOMMENDING THAT HE LEAVE, THAT HE CONTINUE TREATMENT AFTER JOE HARP COULD NOT BE

FOLLOWED BY MR. HAMMER, IS THAT RIGHT?

A.      NO.

Q.      I WANTED TO JUST GO BACK TO EXHIBIT 143 BRIEFLY. AND I WOULD ASK YOU TO TURN TO PAGE 40.  BY 40 IN THE FAR RIGHT-HAND CORNER I GUESS I WOULD CALL THAT THE BATES STAMPED PAGE 40.  DO YOU SEE THAT, SIR?

A.      YES.

Q.      IN THE VERY FIRST PARAGRAPH THERE'S FINDINGS, IS THAT RIGHT?

A.      YES.

Q.      YOU DON'T HAVE TO READ IT, BUT COULD YOU TELL US GENERALLY SPEAKING WHAT THE FINDINGS WERE WITH THIS REPORT?

A.      WELL, THE FINDINGS WERE THAT BASICALLY THEY HAD TWO PART TIME PSYCHIATRISTS THAT CONTRIBUTED TWO TO THREE MORNINGS PER WEEK AT LEXINGTON AND JOE HARP, AND THAT OUTSIDE OF THAT, THEY HAD VERY LITTLE.

Q.      AND DID THEY DESCRIBE THE OKLAHOMA STATE PENITENTIARY PSYCHIATRIC COVERAGE AS GROSSLY LACKING?

A.      YES.  AS I RECALL AT THAT POINT, THERE WAS A PSYCHIATRIST THAT ACTUALLY DROVE DOWN FROM VINITA ONE MORNING A MONTH, I BELIEVE, WHO ALSO WAS A CONSULTANT.

Q.      AND IF YOU COULD TURN TO PAGE 41 AT THE TOP. THERE IS A PARAGRAPH THERE THAT INDICATES ADDITIONAL DETAILS.  WHAT DOES THAT PARAGRAPH TELL YOU?

A.      THAT THEY SIMPLY DON'T HAVE MENTAL HEALTH SERVICES, PARTICULARLY IN TERMS OF STAFF.

Q.      NOW, THIS IS 1981, IS THAT RIGHT?

A.      RIGHT.

Q.      NOW, WE ARE ALMOST TEN YEARS FROM THE DATE OF THE FILING OF THE SUIT?

A.      CORRECT.

Q.      AND SEVEN YEARS FROM JUDGE BOHANON'S INJUNCTION, IS THAT RIGHT?

A.      THAT'S RIGHT.

Q.      NOW, AS A RESULT OF THESE EXPERT REPORTS FILED ON BEHALF OF THE INTERVENOR, DID THE COURT CONDUCT A HEARING?

A.      THAT'S CORRECT, HE DID.

Q.      AS A RESULT OF THE HEARING DID THE COURT ISSUE AN ORDER?

A.      YES.

Q.      SIR, I'M GOING TO ASK YOU TO LOOK AT WHAT HAS BEEN MARKED AS DEFENSE EXHIBIT 145.

A.      OKAY.  I SEE IT.

Q.      AND CAN YOU IDENTIFY THIS?

A.      YES.  THIS IS THE ORDER WHICH JUDGE BOHANON ENTERED MARCH 13TH, 1981.

Q.      AND AGAIN, THE VERY FIRST SENTENCE OF THE ORDER INDICATES THAT IT'S COVERING WHAT?

A.      THIS PARTICULARLY REGARDING THE COMPREHENSIVE MENTAL HEALTH PLAN.

Q.      SO YOU TELL ME, BUT THE INITIAL LAWSUIT COVERED A LOT OF ISSUES, IS THAT RIGHT?

A.      CORRECT.

Q.      WAS MENTAL HEALTH A PARTICULAR PROBLEM, GIVEN THAT IT'S STILL BEING ADDRESSED IN 1981?

A.      IT WAS ONE OF THE MORE DIFFICULT PROBLEMS FOR THE DEPARTMENT TO SOLVE AND THE REPORTS THAT WE REFERENCED CENTER ON THE FACT THAT BECAUSE OF THE GEOGRAPHIC LOCATION OF ALL OF THE MAJOR INSTITUTIONS, RECRUITING THE NECESSARY STAFF TO TAKE CARE OF THE INMATES WAS VERY DIFFICULT.  AND THAT WAS COMPOUNDED BY THE FACT THAT THE BUDGET WOES OF THE STATE.  THE LEGISLATURE DID NOT WANT TO DEVOTE THE MONEY TO IT THAT IT NEEDED TO PROVIDE THE CARE FOR THE INMATES THAT THEY WERE INCARCERATING.

Q.      SO IT WAS A COMBINATION OF FACTORS THAT CAME TOGETHER TO MAKE THIS A PARTICULARLY THORNY ISSUE?

A.      CORRECT.

Q.      IN THE THIRD FULL PARAGRAPH, DOES JUDGE BOHANON DESCRIBE THE -- THAT IT'S A CRITICAL NEED STILL?

A.      YES.

Q.      FOR MENTAL HEALTHCARE?

A.      HE ADDRESSES IT IN TERMS OF ONE IMPORTANT ISSUE

WHICH STILL NEEDS TO BE ADDRESSED IS THE PROVISION OF MENTAL HEALTH SERVICES.  AND IT WAS ONE OF MANY ISSUES, BUT IT ROSE TO BECOME ONE OF THE MORE DIFFICULT ISSUES.

Q.     NOW, THIS ORDER WAS ENTERED AFTER A HEARING. DID THE STATE OF OKLAHOMA APPEAL THIS ORDER?

A.     I DON'T BELIEVE THAT THEY APPEALED THIS ONE.

Q.     OKAY.

NOW, AFTER THIS ORDER WAS ENTERED, DID THERE COME A POINT WHERE JUDGE BOHANON RECUSED HIMSELF FROM THE CASE?

A.     YES.  I THINK JUDGE BOHANON WORE OUT, BUT HE EVENTUALLY RECUSED HIMSELF AND CONTINUED ON THE BENCH AND THE CASE WAS REASSIGNED TO FRANK SEAY, JUDGE FRANK SEAY OF THE EASTERN DISTRICT.

Q.     WHEN DID THE CASE FINALLY END?

A.     MY BEST RECOLLECTION, IT WAS 1996 WHEN JUDGE MIKE BURRAGE WAS PRESIDING OVER IT.

Q.     THIS IS YOUR EXPERTISE.  WHY WOULD A CASE LIKE THIS END?  IS IT BECAUSE THERE WAS A FINDING THAT IT HAD FINALLY COME INTO COMPLIANCE?

A.     THAT IS THE TECHNICAL REASON.  MY PERSONAL EXPERIENCE IS THAT THERE COMES A POINT WHERE THE COURTS SAY, WE HAVE DONE EVERYTHING THAT WE CAN DO AND THEY GIVE THE STATE A CHANCE TO GET ON WITH THEIR BUSINESS.

Q.     SO IF YOU COULD JUST TELL US THEN, THIS CASE WAS

ONGOING.  WE ARE NOT GOING TO GO THROUGH EACH AND EVERY ORDER FROM FRANK -- JUDGE SEAY IN 1983 ALL OF THE WAY TO 1996, AS BEST YOU RECOLLECT?

A.      CORRECT.

Q.      COMPLIANCE ISSUES ARISING AS WE SAW HERE?

A.      THAT'S RIGHT.  THERE WAS A GREAT CONFUSION OF LITIGATION FOLLOWING THIS.  WE ALSO HAD DURING THAT PERIOD A CHANGE IN CLASS REPRESENTATIVE, THAT -- THAT WAS A MAJOR ISSUE THAT DIDN'T DEAL AT ALL WITH THE SUBSTANCE.

Q.      BUT YOU REMAINED LEAD COUNSEL UNTIL 1996?

A.      THAT'S RIGHT.

Q.      UNTIL THE CONCLUSION --

A.      UNTIL THE CASE WAS DISMISSED AND THE ORDERS DISSOLVED.

Q.      I JUST HAVE A FEW MORE QUESTIONS, MR. BULLOCK. MR. HAMMER WAS INCARCERATED FROM JUNE 1978 UNTIL SEPTEMBER 1978 IN THE OKLAHOMA STATE PENITENTIARY, OSP MCALESTER?

A.      CORRECT.

Q.      WHAT WAS THE STATE AS BEST YOU KNOW OF THE MENTAL CARE AT THAT OSP AT THAT TIME?

A.      IT TRULY WAS VIRTUALLY NONEXISTENT.  MEDICAL CARE WAS ONLY A LITTLE BETTER AND PSYCHIATRIC CARE, IF THEY HAD A CONSULTING PSYCHIATRIST ONE DAY A MONTH, I

WOULD HAVE BEEN SURPRISED.  AND THEY HAD NO QUALIFIED STAFF ASSISTING, SUCH AS PSYCHIATRIC SOCIAL WORKERS OR PSYCHIATRIC NURSES.

Q.    AND WHEN YOU MENTIONED THE MEDICAL CARE, DO YOU RECALL WHAT TYPE OF PERSONNEL WERE HANDLING THESE -- MEDICAL CARE FOR THESE INMATES?

A.    IT WAS LARGELY BEING RUN BY STAFF THAT WAS TRAINED AS ARMY MEDICS.

Q.    SO THEY HAD BEEN IN THE MILITARY AND HAD GONE ON TO --

A.    HAD GONE ON AND BECAME THE MEDICAL STAFF AT THE PENITENTIARY.

Q.    AND MR. HAMMER WAS AT EASTERN STATE HOSPITAL IN VINITA FROM SEPTEMBER OF '78 UNTIL OCTOBER OF '78. AGAIN, WHAT WAS, AS BEST YOU KNOW, THE STATE OF MENTAL CARE AT EASTERN STATE AT THAT TIME?

A.    WELL, THAT IS ESSENTIALLY WHAT DR. RUNDLE WAS TALKING ABOUT AND MR. HELLER IN TERMS OF -- OR DR. HELLER IN TERMS OF THAT UNIT, IT WAS VERY THINLY STAFFED ALSO.

Q.    OKAY.  AND WE HAVE NOT TALKED ABOUT THIS INSTITUTION, BUT MR. HAMMER WAS AT -- FROM DECEMBER OF '81 AT THE OKLAHOMA STATE REFORMATORY AT GRANITE.  ARE YOU FAMILIAR WITH THAT?

A.    I'M VERY FAMILIAR WITH IT.

Q.      WHAT WAS THE STATE OF THE MEDICAL CARE IN THAT TIME FRAME FOR GRANITE?

A.      WELL, GRANITE MAY BE ONE OF THE MOST ISOLATED LARGE INSTITUTIONS IN THE SYSTEM.  IF YOU THINK ABOUT THE STATE OF OKLAHOMA, THE MAIN BODY OF IT WITHOUT THE PANHANDLE, AND YOU DIVIDE IT INTO QUADRANTS, GRANITE IS JUST ABOUT IN THE MIDDLE OF THE SOUTHWESTERN QUADRANT OF IT.  YOU GO WEST FROM OKLAHOMA CITY HALFWAY TO COLORADO, THEN YOU TURN SOUTH AND YOU GO HALFWAY TO TEXAS AND YOU WILL BE IN SOME OF THE MOST STARK AND I THINK BEAUTIFUL, BUT IT'S AN ACQUIRED TASTE, COUNTRY.  THERE ARE NOT MANY PEOPLE OUT THERE, MUCH LESS VERY MANY PHYSICIANS.  AND GRANITE HAD VERY LITTLE IN THE WAY OF MEDICAL SERVICES OR -- AND NO PSYCHIATRIC SERVICES THAT I REMEMBER.

Q.      AND MR. HAMMER WAS AT THE CONNOR CORRECTIONAL CENTER FROM JUNE OF '82 TO AUGUST OF '83.  IF YOU KNOW, WHAT WAS THE MENTAL HEALTHCARE SITUATION AT THE CONNOR CORRECTIONAL CENTER?

A.      WELL, CONNOR WAS IN A LITTLE BETTER SHAPE THAN MANY OF THE FACILITIES BECAUSE, NUMBER ONE, IT WAS NEW, AND SECONDLY, IT'S LESS THAN AN HOUR NORTH OF TULSA. AND SO THEY HAD THE ABILITY TO RECRUIT SOME.  BUT GRANITE -- CONNORS WAS ALSO VERY NEW AT THAT POINT.  IT HAD JUST COME ON LINE.  SO IT HAD ALL OF THE STARTUP PROBLEMS AND IN FACT IT EXPLODED IN RIOT DURING THAT

TIME.

Q.      IN FACT, MR. HAMMER WAS TRANSFERRED OUT OF THERE ON AUGUST 30TH OF 1983.  IS THAT THE RIOT YOU ARE TALKING ABOUT?

A.      CORRECT.

Q.      AND THAT WAS AT CONNOR?

A.      THAT'S RIGHT.

Q.      SO OBVIOUSLY NOT JUST MR. HAMMER, BUT WAS THE INSTITUTION --

A.      THE INSTITUTION WAS CLOSED FOR -- I THINK MORE THAN A YEAR.  IT WAS VIRTUALLY DESTROYED.

Q.      WHERE WERE THE INMATES THAT WERE TAKEN FROM CONNOR AT THE TIME OF THIS RIOT?  WHERE WERE THEY HOUSED?

A.      MOST OF THEM WERE TAKEN TO THE EAST CELL HOUSE AT THE OKLAHOMA STATE PENITENTIARY.

Q.      WHAT WAS THE PHYSICAL CONDITION OF THE EAST CELL HOUSE?

A.      THE EAST CELL HOUSE, THE COURT HAD ORDERED CLOSED I BELIEVE IN 1978 BECAUSE THE CONDITIONS IN IT WERE SO DETERIORATED.

Q.      WHEN YOU SAY THE COURT, WAS THIS THE LITIGATION JUDGE BOHANON --

A.      THAT'S RIGHT.

Q.      SO THIS EAST CELL HOUSE HAD BEEN CLOSED ALREADY?

A.        IT HAD BEEN ORDERED CLOSED AND IT TOOK THEM SEVERAL YEARS TO DO THAT.  I BELIEVE THAT IT WOULD HAVE BEEN 1980, PROBABLY '81 BEFORE THEY GOT THE INMATES OUT OF THERE.  AND THEN IT HAD BEEN CLOSED APPROXIMATELY A YEAR WHEN THE CONNOR RIOT TOOK PLACE.  IN THE EXIGENCY OF THAT MOMENT, THEY MOVED THE INMATES BACK IN.

Q.        ARE YOU AWARE OF THE PHYSICAL CONDITION WHEN THEY MOVED THE INMATES BACK IN?

A.        YES.

Q.        AND CAN YOU DESCRIBE THAT FOR US?

A.        WELL, I TOURED THE FACILITY A NUMBER OF TIMES DURING THAT PERIOD.  AT THAT POINT IT TRULY WAS ONE OF THE MORE HELLISH ENVIRONMENTS THAT ANYONE COULD IMAGINE.

THE DESIGN OF THE EAST CELL HOUSE WAS WITH STEEL BULKHEADS AND THE CELLS SAT BACK TO BACK OVER A PIPE CHASE.  WELL, OVER THE YEARS THE -- WHEN THE INMATES WOULD STOP UP THE PLUMBING OR WHATEVER, THE INMATES WHO WERE ON THE MAINTENANCE CREW WOULD GO INTO THE PIPE CHASE AND THEY WOULD JUST BREAK INTO THE CAST IRON DRAINS AND CLEAN OUT THE DRAIN THAT WAY.  THE RESULT WAS THAT THE ENTIRE PLUMBING SYSTEM WAS LEAKING AND FLOWING WITH RAW SEWAGE.  A NUMBER OF THE CELLS IN THE EAST CELL HOUSE HAD RAW SEWAGE RUNNING DOWN THE WALLS WITH INMATES IN THEM.  AND THE INMATES HAD TAKEN PLASTIC BAGS AND TAPED THEM AROUND TO TRY TO GET -- TO

PROTECT THEM FROM IT.

THE ELECTRICAL SYSTEM WAS JUST A NIGHTMARE OF BARE WIRES AGAINST THESE STEEL BULKHEADS. IT WAS COMMON DURING THE PERIOD FOR INMATES TO BE SHOCKED TOUCHING THE WALL OF THEIR CELL.  AND NOT TO MENTION THE PROBLEMS WITH ALL OF THE WATER AND SEWAGE. AND THEN THERE WAS NO VENTILATION IN THE CELLS.  OVER THE YEARS, THEY HAD WELDED SHEETS OVER THE VENTILATION DUCTS, METAL SHEETS OVER IT, SO THE INMATES COULD NOT PASS KITES BETWEEN ONE CELL TO ANOTHER.  SO IT WAS TRULY MEDIEVAL IN CONDITION.

Q.      LASTLY, ARE YOU ABLE TO DESCRIBE THE STATE OF THE MENTAL HEALTHCARE AT OKLAHOMA STATE PENITENTIARY FROM APPROXIMATELY JANUARY OF 1984 UNTIL MR. HAMMER LEFT TO GO TO THE BUREAU OF PRISONS IN DECEMBER OF '93?

A.      IT WAS STILL TROUBLED.  THERE WERE STILL REAL PROBLEMS WITH GETTING INMATES ADEQUATE MENTAL HEALTHCARE AT THE PENITENTIARY.  THERE WAS SOME IMPROVEMENT OVER THAT PERIOD OF TIME.  BUT IT CONTINUED TO BE AND CONTINUES TO THIS DAY TO BE A SIGNIFICANT PROBLEM.

MR. MCHUGH:  IF I MAY HAVE A MOMENT, YOUR HONOR.

(PAUSE.)

MR. MCHUGH:  THAT IS ALL I HAVE, YOUR HONOR.  I WOULD MOVE FOR THE ADMISSION OF THE EXHIBITS

THAT I HAVE MARKED.

THE COURT:  ALL RIGHT.  HEARING NO --

MR. GURGANUS:  NO OBJECTION, YOUR HONOR.

THE COURT:  HEARING NO OBJECTION THEN, D 138, D 139, D 140, D 141, D 142, D 143, D 144, D 145 WILL BE ADMITTED INTO EVIDENCE.

(DEFENSE EXHIBITS 138, 139, 140, 141, 142, 143, 144, 145 ADMITTED INTO EVIDENCE.)

THE COURT:  CROSS EXAMINE.

MR. GURGANUS:  THANK YOU, YOUR HONOR.

CROSS EXAMINATION

BY MR. GURGANUS:

Q.     GOOD MORNING.

A.     GOOD MORNING.

Q.     NOW YOU ARE NOT OBVIOUSLY A PSYCHOLOGIST OR PSYCHIATRIST.  AM I CORRECT ON THAT?

A.     THAT'S CORRECT.

Q.     YOU'RE A PRACTICING ATTORNEY THAT HAD INVOLVEMENT WITH THIS LAWSUIT, IS THAT CORRECT?

A.     THAT'S CORRECT.

Q.     THE BATTLE CASE, RIGHT?

WOULD YOU AGREE WITH ME THAT YOU ARE NOT -- YOU DIDN'T REVIEW THE BACKGROUND AND HISTORY OF DAVID PAUL HAMMER BEFORE COMING HERE AND TESTIFYING TODAY?

A.      I HAVE NOT REVIEWED HIS HISTORY AND BACKGROUND.

Q.      YOU ARE GIVING THE COURT A GENERAL VIEW OF WHAT THE STATE OF THE PRISON SYSTEM WAS STARTING IN -- I BELIEVE YOU STARTED IN 1972, IS THAT RIGHT?

A.      THAT'S CORRECT.

Q.      DO YOU KNOW WHEN DAVID PAUL HAMMER WAS BORN?

A.      NO.

Q.      HE WAS BORN IN, I BELIEVE THE RECORD WOULD REFLECT, OCTOBER 9TH OF 1958?

A.      OKAY.

Q.      DO YOU KNOW WHEN HE WAS FIRST INCARCERATED, SIR?

A.      NO, I DON'T.

Q.      YOU DESCRIBED DIFFERENT SITUATIONS, ONE OF WHICH YOU WENT TO AN AREA OF A HOSPITAL AND THE DOCTOR CONVINCED THE GUARD TO OPEN A PART OF THE CELL AND YOU WENT IN AND YOU TALKED TO AN INMATE, IS THAT RIGHT?

A.      I DESCRIBED THAT INCIDENT, YES.

Q.      DAVID PAUL HAMMER WAS NOT ONE OF THOSE PEOPLE?

A.      NO.

Q.      DO YOU KNOW WHAT INSTITUTIONS THAT HE WAS INCARCERATED AT?

A.      ONLY FROM COUNSEL'S RECITATION OF IT.

Q.      THERE HAS BEEN SOME DISCUSSION OF THE JOSEPH HARP CENTER, IS THAT RIGHT?

A.      CORRECT.

Q.    DID YOU KNOW THAT DAVID PAUL HAMMER PARTICIPATED IN THAT PROGRAM?

A.    I DON'T HAVE ANY SPECIFIC RECOLLECTION OF BEING AWARE OF THAT AT THE TIME.

Q.    WELL, JUST TO, AGAIN, START REALLY FROM THE BEGINNING THEN, THE SITUATION THAT YOU DESCRIBED IN 19 -- IN THIS ORDER, DEFENDANT'S EXHIBIT 138, THAT DEALS WITH SITUATIONS IN THESE FACILITIES IN 1972 THROUGH '74. WOULD YOU AGREE WITH ME THERE?

A.    YES.

Q.    AND THAT, IF DAVID PAUL HAMMER WAS NOT INCARCERATED UNTIL LATER IN 1978 AND '79, THAT WOULD NOT REALLY APPLY TO HIM, NOW WOULD IT?

A.    CERTAINLY I THINK THAT IT'S GOT SOME RELEVANCE TO WHAT HE FOUND AT THAT TIME.

Q.    DAVID PAUL HAMMER WAS NOT THERE AT THAT TIME. YOU WILL AGREE WITH ME THERE, RIGHT?

A.    OH, ABSOLUTELY.

Q.    AND THEN WE TALK ABOUT THE NEXT EXHIBIT, THAT WAS 138, 139.  THAT WAS AN ORDER THAT WAS ENTERED IN 1976 DETAILING ISSUES WITH DUE PROCESS AND WHETHER THERE WAS CRUEL AND UNUSUAL PUNISHMENT PRECEDING THE DATE OF THAT, AM I CORRECT?

A.    RIGHT.

Q.    INTERVENOR, SEPTEMBER 2ND, 1976?

A.      YES.

Q.      AGAIN, YOU WOULD AGREE THAT DAVID PAUL HAMMER WAS NOT THERE AT THAT TIME, CORRECT?

A.      I THINK THAT'S CORRECT.

Q.      NOW AS THINGS WENT ALONG, IT STARTED IMPROVING. WOULD YOU AGREE WITH ME?

A.      IT DID.

Q.      IN DEFENDANT'S EXHIBIT 140 YOU POINTED TO THE HEALTHCARE SERVICES IN THIS MEMORANDUM OPINION.  YOU HIGHLIGHTED ONE SECTION ABOUT DEFENDANT'S ADMIT THEIR HEALTHCARE SERVICES PLAN HAS ALREADY UNDERGONE SEVERE MODIFICATION BUT STILL DOES NOT PROVIDE THE NEEDS FOR ALL OF ITS INMATES.  WAS THERE ANYTHING IN THIS PARTICULAR SECTION THAT WAS DEALING WITH PSYCHIATRIC AND PSYCHOLOGICAL SERVICES?

A.      I DON'T KNOW THAT THE SPECIFIC REFERENCE THAT YOU HAVE DOES.

Q.      BUT THAT IS AGAIN IN SEPTEMBER OF 1978 AND THAT WOULD REALLY DEAL WITH THINGS THAT PRECEDED THE DATE OF THIS ORDER WHEN IT WAS FILED, SEPTEMBER 8, 1978, CORRECT?

A.      I THINK THAT IS CORRECT.

Q.      BY FEBRUARY OF 1981 THINGS WERE GETTING BETTER, IS THAT RIGHT?

A.      IN TERMS OF PSYCHIATRIC CARE, I THINK YOU WOULD

HAVE TO SAY MARGINALLY BETTER, BUT BETTER.

Q.      BUT THE ARTICLE -- THE REPORT OF DEFENDANT'S EXHIBIT 141 ON FEBRUARY 27, 1981, THAT SECOND PARAGRAPH FIRST OF ALL --

A.      JUST A SECOND.  CAN I FIND IT?

Q.      OH, I'M SORRY.

A.      OKAY.

Q.      THAT SECOND PARAGRAPH YOU ARE REFERRING TO WHERE IT SAYS:  FIRST OF ALL, IMPLEMENTATION OF THE PLAN CERTAINLY WOULD REPRESENT A SIGNIFICANT IMPROVEMENT OVER THE DISMAL STATE OF AFFAIRS IN REGARD TO THE MENTAL HEALTH SERVICES EXISTING.  AND THIS WOULD HAVE BEEN WHEN THIS PERSON VISITED IN 1979, IS THAT RIGHT?

A.      WELL, I THINK YOU LEFT OUT THE PARENS.

Q.      YEAH.

A.      RATHER LACK THEREOF.

Q.      THIS IS THE WHOLE SYSTEM, ISN'T THAT RIGHT?

A.      WELL, THAT IS RIGHT.

Q.      WE ARE NOT TALKING ABOUT THE JOSEPH HARP CENTER, ARE WE?

A.      WELL --

Q.      BECAUSE THAT HAD BETTER PROGRAMS, CORRECT?

A.      IT HAD SOME PROGRAMS, YES.

Q.      THIS PROGRAM AT JOSEPH HARP, DID YOU VISIT THAT PLACE?

A.      YES.

Q.      AND DID YOU VISIT THAT PARTICULAR -- THIS PROGRAM IN THIS NEW UNIT THAT WAS MANDATED BY THE FEDERAL COURT ACTION?

A.      YES.  I DID VISIT.

Q.      DID YOU REVIEW WHAT DAVID HAMMER HAD TO SAY ABOUT HIS ENTRY INTO IT?

A.      NO.

Q.      LET ME SHOW YOU -- THIS IS -- I HANDED YOU JUST TWO PAGES FROM GOVERNMENT EXHIBIT GC 17, WHICH, SIR, WAS A BOOK THAT WAS WRITTEN BY DAVID PAUL HAMMER.  ARE YOU FAMILIAR WITH THE FINAL ESCAPE, SIR?

A.      NO, I'M NOT.

Q.      I WILL REFER YOU TO PAGE 86 IF YOU CAN JUST -- NOVEMBER 1978 TO DECEMBER 1979.  CAN YOU READ FOR US WHAT DAVID HAMMER WROTE ABOUT THIS PARTICULAR PROGRAM, STARTING AT, IT WAS TIME FOR GROUP THERAPY.

A.      IT WAS TIME FOR GROUP THERAPY, SOMETHING THAT I HAD DISCOVERED WOULD ALLOW ME TO MANIPULATE MY WAY THROUGH CERTAIN PERIODS OF PRISON LIFE.  I'D FIRST BEEN TRANSFERRED TO THE JOSEPH HARP CORRECTION CENTER IN LEXINGTON, OKLAHOMA ON NOVEMBER 21, 1978.  ON MY ARRIVAL THERE I WAS PLACED IN A NEW UNIT THAT HAD BEEN MANDATED BY THE FEDERAL COURTS.  IT WAS A SPECIAL PROGRAM UNIT FOR PRISONERS WITH MENTAL OR EMOTIONAL PROBLEMS AND IT

CONSISTED OF 80 SINGLE-MAN CELLS.  I WAS ONE OF THE FIRST TEN INMATES IN THE PROGRAM.  AT FIRST I SAW SPU AS A WAY TO RECEIVE FAVORABLE TREATMENT.  JUST BY BEING SENT THERE, I HAD GONE IN LESS THAN SIX MONTHS FROM AN 80-YEAR OLD MAXIMUM SECURITY PENITENTIARY TO A STATE-OF-THE-ART FACILITY AT MINIMUM SECURITY LEVEL.

Q.      MEDIUM SECURITY LEVEL?

A.      MEDIUM.  I'M SORRY.

Q.      THAT'S OKAY.

A.      SO I MADE MY WAY THROUGH THE VARIOUS PROGRAMS AND THERAPY SESSIONS, GAINING WHAT I COULD FROM THE STAFF AND LEARNING VARIOUS PRISON GAMES.  TO ME, THIS WAS JUST A STEPPING STONE FOR EVENTUALLY OBTAINING A RELEASE ON PAROLE.  AT THE START OF EACH WEEKDAY, MONDAY THROUGH FRIDAY, WE HAD WHAT WAS CALLED THE BIG GROUP MEETINGS.  THESE WERE MANDATORY MEETINGS AND REQUIRED THE ATTENDANCE OF ALL SPU STAFF AND INMATES.

ON MONDAY MORNING FOLLOWING THE 1978 CHRISTMAS HOLIDAY, THE BIG GROUP MEETING WAS UNDERWAY.  EACH OF THE STAFF SHARED WITH THE GROUP WHAT THEY HAD DONE FOR CHRISTMAS.  THIS SPECIAL PROGRAM UNIT WAS EQUIPPED WITH TELEVISION SETS IN THE DAY ROOM.  SOME INMATES WATCHED THEM RELIGIOUSLY, PAYING SPECIAL ATTENTION TO THE COMMERCIALS.

Q.      YOU CAN STOP THERE.  THAT IS THE RELEVANT PART,

SIR.

SO DAVID HAMMER WAS IN THAT PARTICULAR, AS HE CALLED IT, STATE-OF-THE-ART FACILITY, IS THAT RIGHT?

A.    YES.

Q.    NOW THE BATTLE LAWSUIT WAS PRIMARILY DEALING WITH OVERCROWDING, ISN'T THAT RIGHT?

A.    NO.

Q.    IT WASN'T?

A.    OVERCROWDING WAS A MAJOR ISSUE, BUT THE LAWSUIT, AS YOU SEE IN FACT OVERCROWDING WAS NOT EVEN INCLUDED IN THE '74 DECISION.  WHEN I WAS LEAD COUNSEL IN '76 I FILED THE FIRST PLEADING ON OVERCROWDING, BUT THE CONDITIONS OF CONFINEMENT AND THE PROGRAMS WERE STILL MAJOR ISSUES IN ADDITION TO THE ISSUES CONCERNING PSYCHIATRIC CARE.  DURING THESE YEARS THAT WE ARE TALKING ABOUT WE WERE ALSO DEALING WITH ACCESS TO COURTS, WE WERE DEALING WITH RACIAL DESEGREGATION. THERE WERE JUST A HOST OF OTHER ISSUES THAT WERE PROMINENT.

Q.    BUT I THINK THAT IS MY POINT.  THERE WAS A HOST OF OTHER ISSUES THAT WERE INVOLVED IN THIS LAWSUIT, ISN'T THAT CORRECT?

A.    YES.

Q.    WITH HEALTHCARE AND PSYCHIATRIC TREATMENT BEING

ONE OF THE MANY?

A.      THAT'S CORRECT.

Q.      SO THERE WAS A LOT OF AREAS THAT THE PRISON SYSTEM IN OKLAHOMA HAD TO TRY TO ADJUST, ISN'T THAT RIGHT?

A.      OH, YEAH.

Q.      WITH THE HELP OF YOU, CORRECT?

A.      WELL, I DON'T KNOW THAT THEY WOULD SAY I WAS HELPING THEM MUCH BUT....

Q.      WELL, YOU WERE HELPING -- THEM AND THE COURTS COME INTO COMPLIANCE?

A.      I WAS TRYING TO BE OF ASSISTANCE TO THE COURT.

Q.      NOW, YOU MENTIONED THAT OTHER THAN THIS PROGRAM, THERE WAS NO -- YOU SEEM TO INDICATE THAT THERE WAS NO OTHER PSYCHIATRIC SERVICES ONCE MR. HAMMER LEFT THIS PROGRAM.

A.      WELL, THEY WERE VERY THIN OUTSIDE OF THIS PROGRAM.

YOU HAD -- THE MAJOR PSYCHIATRIC STAFFING WERE THESE TWO PART-TIME PSYCHIATRISTS THAT CAME DOWN TO BOTH LEXINGTON AND JOE HARP.  THEY ARE SIDE-BY-SIDE.

Q.      DO YOU KNOW THEIR NAMES?

A.      THE PSYCHIATRISTS?  NO, I DON'T RECALL THEIR NAMES.  I'M NOT EVEN SURE IT WAS ALWAYS THE SAME TWO.

Q.      NOW, YOU PROVIDED US WITH A LETTER THAT YOU

REFERRED TO WHERE MR. HAMMER WAS FINISHING UP THERE?

A.        144.

Q.        I'M GOING TO SHOW YOU GOVERNMENT EXHIBIT GC 15.

GC 15.

A.        OKAY.

Q.        I'M GOING TO HAVE TO MAKE THAT GC 15A.

UNFORTUNATELY WE DUPLICATED.

MR. MCHUGH:  15A.

MR. GURGANUS:  I'M SORRY ABOUT THAT.

BY MR. GURGANUS:

Q.        DOES THIS -- ON THE LAST PAGE THERE IS A EDITH

P. KING, A PH.D. CLINICAL PSYCHOLOGIST, IS THAT RIGHT?

A.        THAT'S CORRECT.

Q.        SHE IS THE UNIT MANAGER OF THE SPECIAL PROGRAMS

UNIT?

A.        THAT'S CORRECT.

Q.        THAT INDICATES ON THE FIRST PAGE THAT IT'S A

PSYCHOLOGICAL SUMMARY.  WOULD YOU AGREE WITH ME THERE?

A.        THAT IS WHAT THAT PURPORTS TO BE.

Q.        IT FURTHER INDICATES THAT DAVID HAMMER WAS

RECEIVED AT THE SPECIAL PROGRAMS UNIT IN NOVEMBER OF

1978, RIGHT?

A.        YES.

Q.        IT FURTHER INDICATES THAT HE HAS BEEN IN A

NEUROPSYCHIATRIC UNIT AT OSP AND HAD NEVER LIVED OUT IN

THE GENERAL POPULATION IN ANY PRISON FACILITY, CORRECT?

A.        THAT'S WHAT IT SAYS.

Q.        IT GOES INTO SOME OF THE PROBLEMS HE WAS HAVING, IS THAT RIGHT?

A.        UH-HUH.

Q.        IT FURTHER INDICATES IN THE SECOND PARAGRAPH THAT HE WORKED CLOSELY WITH THE UNIT CLINICAL PSYCHOLOGIST, DR. EDITH KING, AND WITH THE UNIT CONSULTING PSYCHIATRIST, DR. WOLFGANG HUBER.  IS THAT PERSON ONE OF THE PEOPLE YOU KNOW?

A.        AS I SAID, I DIDN'T RECALL THE NAMES OF THEM.  I DON'T KNOW WHETHER I KNEW DOCTOR -- THE DOCTOR OR NOT.

Q.        BUT THIS REPORT IS INDICATING THAT DAVID PAUL HAMMER, AS OF THIS DATE, FEBRUARY 7, 1980, HAD BEEN RECEIVING PSYCHIATRIC CARE, CORRECT?

A.        WELL, I THINK THE IMPORTANT THING TO NOTE THERE IS THAT SHE REFERS TO HIM AS A CONSULTANT, WHICH INDICATES THAT HE IS A VERY -- FOLKS WHO --

Q.        WHAT'S THAT?

A.        THAT THE PSYCHIATRIC STAFF ON THE UNIT DURING THIS TIME WAS MERELY PART-TIME CONSULTING PSYCHIATRISTS AND THAT THEY DIDN'T HAVE ANY FULL-TIME COVERAGE OF THIS MAJOR PSYCHIATRIC UNIT.  THAT IS MY POINT.

Q.        HE IS GETTING PSYCHIATRIC CARE.  YOU WILL AGREE WITH ME THERE?

A.      HE IS GETTING SOME.

Q.      SO YOUR PROBLEM IS THAT DR. WOLFGANG HUBER WAS NOT EMPLOYED BY OSP IN A FULL-TIME POSITION, IS THAT CORRECT?

A.      NO.  MY PROBLEM IS THAT THIS UNIT THAT HAMMER WAS ON DID NOT HAVE ADEQUATE PSYCHIATRIC COVERAGE.

Q.      BUT --

A.      BUT THEY HAD SOME.

Q.      IN PARTICULAR TO HIM YOU CAN'T REALLY SAY THAT, CAN YOU?  YOU ARE NOT AN EXPERT PSYCHIATRIST OR PSYCHOLOGIST?

A.      NO.  ALL -- WELL, I CAN SAY THAT AS TO THE UNIT. I CAN'T SAY THAT AS TO MR. HAMMER.

Q.      YOU CAN'T SAY THAT AS TO THE TREATMENT THAT HE WAS GETTING, CORRECT?

A.      NO.

Q.      HIS TREATMENT MIGHT HAVE BEEN QUITE GOOD FOR HIS PARTICULAR PROBLEM.  WOULD YOU AGREE WITH ME THERE?

A.      I GUESS IT'S POSSIBLE.

Q.      BECAUSE YOU DON'T -- YOU DID NOT REVIEW HIS RECORDS, CORRECT?

A.      NO, I DIDN'T.  AND IT WOULD NOT BE MY SPECIALTY TO OPINE ON THAT IF I HAD.

Q.      I'M SHOWING YOU GC 16.

A.      OKAY.

Q.      WOULD YOU ALSO AGREE WITH ME THAT YOU CAN HAVE ALL THE PROGRAMS IN THE WORLD, SIR, BUT IF YOU ARE NOT INTERESTED IN IMPROVING OR USING THE PROGRAM TO ITS APPROPRIATE PURPOSE, YOU ARE NOT GOING TO GET VERY FAR?

A.      I THINK THAT IS TRUE.

Q.      SO WHEN MR. HAMMER WAS DESCRIBING IN HIS BOOK, LEARNING HIS WAY TO MANIPULATE THROUGH THE SYSTEM, THAT WOULD BE ONE INDICATION THAT NO MATTER HOW MUCH PSYCHIATRIC CARE YOU GIVE, OR COUNSELING, IF YOU DON'T HAVE THE MIND SET TO IMPROVE, YOU ARE NOT GOING TO IMPROVE, TRUE?

A.      I THINK THAT CERTAINLY IS ONE OF THE THINGS THAT HAPPENS.

Q.      AND THEN THIS FACILITY TRANSFER AUTHORIZATION ESSENTIALLY SPEAKS TO THAT, DOES IT NOT?

A.      WELL, IT APPEARS TO, BUT THIS SEEMS TO BE A LITTLE DIFFERENT TONE THAN WHAT WE SEE IN BOTH OF THE OTHER EXHIBITS REGARDING JOE HARP, BUT I HAVE NOT STUDIED YOUR EXHIBITS CLOSELY.

Q.      I UNDERSTAND.

AGAIN, BECAUSE YOUR FOCUS HERE TODAY AND WHAT YOU ARE TRYING TO EXPLAIN TO US ALL IS THE STATE OF THE OKLAHOMA PRISONS WHEN YOU CAME INVOLVED WITH IT AND THROUGH THOSE YEARS, RIGHT?

A.      CORRECT.

Q.      AGAIN, YOU ARE NOT FOCUSING ON -- YOU DID NOT FOCUS ON DAVID PAUL HAMMER, TRUE?

A.      CORRECT.

Q.      YOU ARE NOT FAMILIAR THEN WITH THE PROBLEMS THAT HE HAD IN THE OKLAHOMA SYSTEM, CORRECT?

A.      WELL --

Q.      DO YOU KNOW WHETHER HE ESCAPED OR NOT?

A.      NO.  I'M AWARE OF THE PROBLEMS THAT THE SYSTEM MAY HAVE PRESENTED FOR HIM, BUT I'M NOT AWARE OF HOW HE INTERACTED WITH THOSE PROBLEMS.

Q.      ONE OTHER THING I'M GOING TO ASK YOU TO DO HERE, THERE IS -- IF YOU CAN JUST PAGE THROUGH.

THE COURT:  MR. GURGANUS, MAYBE THIS WILL BE A GOOD TIME TO TAKE A FIVE-MINUTE RECESS.

MR. GURGANUS:  THAT WOULD BE FINE, YOUR HONOR.  THANK YOU.

THE COURT:  RECESS.

(BREAK TAKEN.)

THE COURT:  CONTINUE THE CROSS.

MR. GURGANUS:  THANK YOU, YOUR HONOR.

BY MR. GURGANUS:

Q.      SIR --

A.      YES.

Q.      -- I HAVE TWO BINDERS HERE THAT I JUST WANT YOU TO LOOK THROUGH AND SOME OF THEM FROM EASTERN STATE

HOSPITAL, VINITA, OKLAHOMA.  DO YOU KNOW WHAT THAT IS?

A.      YES, I DO.

Q.      WHAT IS THAT?

A.      THAT IS THE PSYCHIATRIC UNIT THAT'S IN VINITA.
IT WAS PART OF THE OLD STATE HOSPITAL.

Q.      AND ARE YOU FAMILIAR WITH THE DEPARTMENT OF
INSTITUTION SOCIAL AND REHABILITATIVE SERVICES, STATE OF
OKLAHOMA, SIR?

A.      I AM FAMILIAR WITH THAT AGENCY.

Q.      AND THE LETTER TO A LEXINGTON ASSESSMENT AND
RECEPTION CENTER?

A.      I'M FAMILIAR WITH LEXINGTON, A AND R IS WHAT IS
COMMONLY REFERRED TO.

Q.      AND WHAT IS A AND R?

A.      ASSESSMENT AND RECEPTION.

Q.      AND DOES THAT HELP DESIGNATE INMATES?

A.      YES.  IT'S THE CENTRAL RECEIVING POINT FOR THE
PRISON SYSTEM.

Q.      I WOULD JUST LIKE YOU TO LOOK THROUGH, STARTING
AT TAB 4 IN THIS BOOK THROUGH TAB 10, AND THEN ON THE
OTHER ONE, TAB 11 TO TAB 34.  AND THESE ARE FROM YOUR
DEFENSE EXHIBITS.  THESE ARE THE TRIAL DEFENSE EXHIBITS
FROM THE UNITED STATES VERSUS DAVID HAMMER.  THESE ARE
THE EXHIBITS THAT WERE OFFERED.  AND THESE, SIR, I
BELIEVE ARE PSYCHIATRIC RECORDS FOR DAVID PAUL HAMMER

DURING THE YEARS WITHIN WHICH HE WAS AT THE -- WITHIN THE OKLAHOMA PRISON SYSTEM.  OKAY?

A.      OKAY.

MR. MCHUGH:  YOUR HONOR, IF IT'S ALL RIGHT, WHEN HE GETS DONE WITH THE FIRST BOOK, I DON'T HAVE A COPY, IF I CAN JUST LOOK THROUGH IT.

THE COURT:  YES.

MR. MCHUGH:  MR. BULLOCK, WHEN YOU GET DONE THE FIRST, COULD YOU LET ME KNOW SO I COULD LOOK THROUGH IT?

THE WITNESS:  OKAY.

MR. MCHUGH:  THANK YOU.

THE WITNESS:  JUST IN TERMS OF DOING THIS, AM I JUST -- DO YOU WANT ME TO JUST FAMILIARIZE MYSELF OR DO YOU WANT ME --

BY MR. GURGANUS:

Q.      WOULD YOU AGREE WITH ME THAT THOSE ARE PSYCHIATRIC OR -- RECORDS, MEDICAL RECORDS AND PSYCHIATRIC RECORDS FOR DAVID PAUL HAMMER THROUGH THE YEARS WHILE HE WAS AT THE -- WITHIN THE OKLAHOMA PRISON SYSTEM?  IS THAT WHAT THEY APPEAR TO BE TO YOU?

A.      WELL, I NOTICE THAT THIS, BEHIND TAB 4, APPEARS TO BE FROM CENTRAL STATE GRIFFIN MEMORIAL HOSPITAL.

Q.      GOING FROM WHERE I STARTED YOU.  DON'T GO BEFORE THOSE.

A.      OKAY.

Q.      GOING TO BE TAB 4 THROUGH TAB 10.

A.      OKAY.

WELL, I'M NOT SURE THAT ALL OF THESE ARE WHAT YOU WOULD BE CALLING MEDICAL OR TREATMENT RECORDS. MOST OF THEM ARE.  BUT, FOR INSTANCE, THIS LETTER FROM THE DEPARTMENT OF INSTITUTION SOCIAL AND REHABILITATIVE SERVICES, WHICH IS OKLAHOMA'S DEPARTMENT OF PUBLIC WELFARE, WHAT -- THIS APPEARS TO BE SOMETHING, SORT OF A SOCIAL HISTORY OF HAMMER OR RELATING TO SOMETHING.  I DON'T KNOW WHETHER IT WAS PAROLE OR WHATEVER.

Q.      THAT WAS THE FIRST, BEGINNING OF THE DOCUMENTS?

A.      RIGHT.  THAT IS 5, UNDER TAB 5.  TAB 4, AS I SAID, WAS GRIFFIN MEMORIAL.  I THINK THAT -- IT'S MY SUSPICION THAT THIS RELATED TO SOME TYPE OF PRETRIAL EVALUATION OF MR. HAMMER.

Q.      COMPETENCY, PERHAPS?

A.      COMPETENCY.  THEY DID THAT DOWN AT CENTRAL STATES.  BUT DURING THIS PERIOD -- DURING MUCH OF THIS PERIOD, THAT INSTITUTION DID NOT PLAY A ROLE. EVENTUALLY IT HAD A MEDICAL UNIT ON IT, BUT NOT A PSYCHIATRIC UNIT, IRONICALLY.

SO THAT WAS 4 AND 5.

SIX IS ACTUALLY A LETTER BY THE THEN WARDEN OF THE OKLAHOMA STATE PENITENTIARY, SO I WOULD

NOT CONSIDER THAT TO BE A MEDICAL OR PSYCHIATRIC RECORD.

Q.      WHAT IS IT DIRECTING TO?

A.      IT'S CONCERNING THE TRANSFER OF MR. HAMMER AND DOES TALK SOME ABOUT HIS BEHAVIOR AND DRUG ABUSE AND THOSE TYPES OF THINGS.  I JUST WOULD NOT CONSIDER IT TO BE A MEDICAL OR PSYCHIATRIC RECORD.

Q.      IS IT DIRECTING HIM TO GO TO A PARTICULAR INSTITUTION?

A.      WELL, IT'S SENDING IT TO EASTERN STATE, OR IT'S DIRECTED TO EASTERN STATE, TO DR. GARCIA.

Q.      DR. GARCIA BEING?

A.      HE WAS A PSYCHIATRIST AT EASTERN STATE.  HE ACTUALLY CAME DOWN AND PERIODICALLY CONSULTED THERE AT OSP.

Q.      WOULD YOU AGREE WITH ME, THEN, THAT THAT WAS DEALING THEN WITH MR. HAMMER'S PSYCHIATRIC SITUATION AND TO ENSURE THAT HE WOULD RECEIVE POTENTIAL TREATMENT?

A.      WELL, I THINK SO BUT --

Q.      OKAY.

A.      BUT IT'S JUST A DIFFERENT CATEGORY.

Q.      OKAY.  I'M ASKING YOU WHETHER, AGAIN, WOULD YOU AGREE THAT THESE RECORDS PERTAIN TO MR. HAMMER'S MEDICAL AND PSYCHIATRIC NEEDS?

A.      WELL, I GUESS IN SOME RELATED FASHION.

                SEVEN IS -- AT THE UNIT THERE AT EASTERN

STATE, AT VINITA, SOME MEDICAL RECORDS.

AND SIMILARLY 8 IS A LETTER DIRECTED TO DR. START, WHO WAS THE DIRECTOR OF THE MEDICAL PROGRAM FOR THE DEPARTMENT OF CORRECTIONS FROM EASTERN STATE.

NINE IS CLEARLY MEDICAL RECORDS FROM SOME INSTITUTION.  BUT JUST LOOKING AT IT, I CAN'T TELL WHICH INSTITUTION IT IS.

AND SIMILARLY 10, JUST IN GLANCING AT IT, MAYBE IF I READ IT IN DETAIL I MIGHT BE ABLE TO TEASE IT OUT, BUT IT DOES NOT INDICATE WHICH INSTITUTION, BUT IT CLEARLY IS AT LEAST MEDICAL RECORDS FROM SOME INSTITUTION.

Q.      I WILL TAKE THAT AND HAND THAT TO COUNSEL.

A.      OKAY.  AND WHERE DID YOU WANT ME TO START?

Q.      IN THE BEGINNING UNTIL THE YELLOW TAB.

A.      TO THE TAB.

Q.      YES, SIR.

A.      OKAY.

Q.      WHAT YOU HAVE BEEN PAGING THROUGH ARE ALL MEDICAL AND PSYCHIATRIC RECORDS FOR DAVID PAUL HAMMER, SIR?

A.      THAT IS WHAT THEY -- ALL OF THIS VOLUME APPEAR TO BE.

Q.      UP TO THAT YELLOW -- HAVE YOU GOTTEN TO THE YELLOW TAB YET?

A.    I'M ALMOST THERE.

Q.    OKAY.  AND THAT IS WHEN THE BUREAU OF PRISONS RECORD STARTS, SO YOU CAN STOP BEFORE THERE.

A.    OKAY.

I THINK ALL OF THESE APPEAR TO BE MEDICAL OR PSYCHIATRIC RECORDS.  AND I HAVE NO IDEA AS TO WHAT THE BALANCE OF EITHER IS RELATING TO MR. HAMMER.

Q.    WHEN YOU SAY THE BALANCE, HOW MUCH PSYCHIATRIC AS OPPOSED TO HOW MUCH MEDICAL?

A.    THAT'S RIGHT.  THAT'S RIGHT.

Q.    BUT YOU WILL AGREE THAT THEY DO DEAL WITH MEDICAL AND PSYCHIATRIC CARE FOR DAVID PAUL HAMMER WHILE WITHIN THE OKLAHOMA PRISON SYSTEM?

A.    CORRECT.

Q.    ALL RIGHT.  WOULD YOU ALSO AGREE THAT THEY WENT THROUGH APPARENTLY 19 -- INTO 1990, AT LEAST 1992?

A.    I DID NOT LOOK AT THE DATES BUT I WILL ACCEPT THAT THAT IS --

Q.    WELL, HERE WE GO.

A.    -- TRUE.

Q.    AND I WILL SHOW COUNSEL.  THERE'S THE LAST -- APPARENTLY LOOKS LIKE 4/7/1993.  AND WOULD YOU ACCEPT OUR REPRESENTATION THAT THAT IS FROM TAB 33.  ONE OF THE LAST FEW PAGES, APRIL 1993, THERE WAS STILL SOME NOTATIONS.

A.        I HAVE NO REASON TO QUESTION THAT.

MR. GURGANUS:  YOUR HONOR, WE WILL MOVE IN GOVERNMENT EXHIBITS GC 15 A, GC 16, AND GC 17.

THE COURT:  HEARING NO OBJECTION --

MR. MCHUGH:  YOUR HONOR, I DID NOT UNDERSTAND WHAT 17 WAS.  IF I COULD JUST --

MR. GURGANUS:  THAT WAS THAT PORTION OF THE BOOK THAT THE WITNESS READ FROM, THE FINAL ESCAPE.

MR. MCHUGH:  I GOT YOU.  GOT IT.

THE COURT:  ALL RIGHT.  THOSE WILL BE ADMITTED INTO EVIDENCE.

(GOVERNMENT EXHIBITS GC 15 A, 16, 17 ADMITTED INTO EVIDENCE.)

THE COURT:  DOES THAT CONCLUDE THE CROSS?

MR. GURGANUS:  THAT CONCLUDES OUR CROSS, YOUR HONOR.

THE WITNESS:  ANY REDIRECT?

MR. MCHUGH:  BRIEFLY, YOUR HONOR.

REDIRECT EXAMINATION

BY MR. MCHUGH:

Q.        MR. BULLOCK, IF YOU CAN LOOK AT GOVERNMENT GC 16.  THAT'S A ONE-PAGE DOCUMENT.

A.        YES, I GOT IT.

Q.        AND IF YOU COULD LOOK SIDE-BY-SIDE WITH GC 15 A.

A.        OKAY.

Q.    DO YOU HAVE THOSE TWO?

A.    I SAW IT A SECOND AGO.  YES.

Q.    NOW, GC 16 APPEARS TO BE SOME TYPE OF PRISON FORM, IS THAT RIGHT?

A.    YES.

Q.    CONCERNING A TRANSFER FROM ONE INSTITUTION TO ANOTHER?

A.    CORRECT.

Q.    YOU WOULD AGREE WITH ME THAT IT'S NOT A PSYCHOLOGICAL EVALUATION OF ANY TYPE, IS IT?

A.    NO.  IT'S SIGNED BY A CASE MANAGER, WHICH ACTUALLY IS ON THE SECURITY SIDE RATHER THAN ON THE MEDICAL SIDE.

Q.    SO BASICALLY SOMEONE WHO'S POSSIBLY A CORRECTIONAL OFFICER?

A.    CORRECT, OR SIMILAR TO.

Q.    AND THE DATE OF THAT WAS JANUARY OF 1980, IS THAT RIGHT?

A.    CORRECT.

Q.    NOW, IF WE GO TO GC 15 A.  THAT IS A MONTH LATER, IS THAT RIGHT, OR A COUPLE OF WEEKS LATER?

A.    YES.

Q.    AND THAT IS -- THAT IS A PSYCHOLOGICAL SUMMARY, IS THAT RIGHT?

A.    CORRECT.  AND IT'S SIGNED BY A DOCTOR OF

PSYCHOLOGY.

Q.      FROM THE SPECIAL PROGRAMS UNIT AT JOSEPH HARP, IS THAT RIGHT?

A.      CORRECT.

Q.      SO WHEN WE LOOK AT GC 15 A, IN THE SECOND FULL PARAGRAPH, IT KIND OF SUMMARIZES HOW DAVID PARTICIPATED IN THE JOSEPH HARP SPECIAL PROGRAMS UNIT, IS THAT RIGHT?

A.      CORRECT.

Q.      AND IT INDICATES THAT HE WORKED CLOSELY WITH THE UNIT CLINICAL PSYCHOLOGIST?

A.      YES.

Q.      AND IF YOU GO DOWN TO THE SECOND LINE, HE WAS AN ACTIVE -- THIRD LINE, HE HAS BEEN AN ACTIVE PARTICIPANT IN SMALL GROUP THERAPY SESSIONS?

A.      YES.

Q.      AND IN LARGER COMMUNITY GROUP MEETINGS?

A.      CORRECT.

Q.      HE HAS VOLUNTEERED FOR MOST THERAPEUTIC ACTIVITIES?

A.      YES.

Q.      AND THUS HAS AVAILED HIMSELF OF WHAT WAS PERTINENT FOR HIS PERSONAL PSYCHOLOGICAL GROWTH?

A.      CORRECT.

Q.      WOULD IT APPEAR TO YOU -- AND I KNOW YOU ARE NOT A PSYCHOLOGIST, BUT WOULD IT APPEAR TO YOU THAT

MR. HAMMER IS AVAILING HIMSELF OF THE PROGRAMS THAT ARE OFFERED BY JOSEPH HARP, BASED ON THIS PSYCHOLOGIST'S OPINION?

A.      THAT APPEARS TO BE THE PSYCHOLOGIST'S OPINION.

Q.      AND IF YOU LOOK AT THE SECOND PAGE, AT THE VERY BOTTOM, THE PSYCHOLOGIST IS KIND OF GIVING A LONG-TERM PLAN FOR DAVID, IS THAT RIGHT?

A.      CORRECT.

Q.      AND THEY INDICATE THAT HE ACTUALLY REQUIRES LONG-TERM PSYCHOLOGICAL TREATMENT, IS THAT RIGHT?

A.      CORRECT.

Q.      AND WHAT DOES THE VERY LAST SENTENCE ON THAT PAGE SAY?

A.      THE PRESENT PROGRAM AT THE SPECIAL PROGRAMS UNIT IS NOT DESIGNED FOR SUCH LONG-TERM TREATMENT, AND SO OTHER NEEDS WILL HAVE TO BE ADDRESSED.

Q.      AND IS THAT -- SO WE ARE BACK TO WHAT WAS THE LETTER I SHOWED YOU ON DIRECT, WHERE HE IS BEING SENT FROM JOSEPH HARP BUT WITH STILL SIGNIFICANT PSYCHOLOGICAL ISSUES TO BE DEALT WITH, IS THAT RIGHT?

A.      CORRECT.

Q.      AND IS IT YOUR OPINION THAT JOSEPH HARP WAS THE MAIN PLACE FOR PSYCHOLOGICAL COUNSELING IN THE OKLAHOMA STATE PENITENTIARY SYSTEM -- STATE PRISON SYSTEM?

A.      OTHER THAN THE FORENSIC UNIT THAT THEY WERE

DISCUSSING UP AT VINITA, THAT WOULD BE IT.

Q.      AND BUT HE WAS NOT GOING TO THAT UNIT, IS THAT RIGHT?

A.      NO.

Q.      HE HAD BEEN IN THAT UNIT?

A.      HE HAD BEEN THERE.

Q.      NOW, I ALSO WANT TO JUST GO BACK TO THE FIRST PAGE OF GC 15 A.

A.      OKAY.

Q.      IN THE VERY FIRST SENTENCE IT INDICATES -- I'M SORRY, THE SECOND SENTENCE, HE HAD BEEN IN THE NEUROPSYCHIATRIC UNIT AT OSP.  DO YOU SEE THAT?

A.      YES.

Q.      NOW, WE TOUCHED ON THAT ON DIRECT BUT I WOULD LIKE TO HAVE YOU DESCRIBE THAT UNIT.  DID YOU EVER HEAR OF THE TERM A BEAN HOLE?

A.      YES.

Q.      WHAT IS THAT?

A.      THAT IS -- IN A SOLID CELL DOOR, THAT IS A LITTLE SLOT WITH -- GENERALLY WITH A FLAP OVER IT, THROUGH WHICH THEY PASS THE FOOD TRAYS.  THAT IS WHERE I BELIEVE IT GOT ITS NAME, BEAN HOLE.  THAT IS WHERE THE BEANS COME IN.

Q.      AND WAS THAT HOW THESE DOORS WERE CONSTRUCTED IN THAT NEUROPSYCHIATRIC UNIT?

A.        YEAH, THEY WERE.  THEY WERE A SOLID DOOR, SO THAT IT WAS DIFFICULT TO -- THEY ALSO HAD A SMALL WINDOW IN THEM.  BUT OTHER THAN THAT, YOU COULD NOT SEE IN, AND THE INMATE COULD NOT SEE OUT.

Q.        AND HOW ABOUT AS FAR AS BEDDING, DO YOU RECALL WAS IT A BED OR WAS IT JUST A MATTRESS ON THE FLOOR?

A.        I BELIEVE THAT THOSE HAD JUST A MATTRESS ON THE FLOOR.

Q.        AND THIS NEUROPSYCHIATRIC UNIT, HOW MANY CELLS WERE THERE?

A.        LIKE I SAY, THERE WERE FOUR, PERHAPS SIX.

Q.        AND THAT WAS FOR THE ENTIRE OKLAHOMA STATE PENITENTIARY?

A.        CORRECT.

Q.        AND WHAT WAS YOUR DESCRIPTION OF THESE SIX CELLS THAT HE HAD BEEN IN?

A.        WELL, THEY WERE STARK, COLD ENVIRONMENT WHERE THE INMATES WERE ISOLATED, REALLY, OFTEN 24 HOURS A DAY, SEVEN DAYS A WEEK.  THEY EVENTUALLY DEVELOPED, BUT I DON'T THINK THEY USED VERY OFTEN, A LITTLE SPACE FOR EXERCISING THE INMATES OUTSIDE OF IT.

Q.        DID ANY OF THE EXPERTS THAT WERE RETAINED BY THE DEPARTMENT OF JUSTICE FIND THAT THOSE CELLS IN THE NEUROPSYCHIATRIC UNIT WERE SUITABLE FOR -- OR WERE CONSTITUTIONALLY SUITABLE, CONSTITUTIONALLY VALID FOR

INMATES SUFFERING FROM MENTAL HEALTH DISORDERS?

A.     NO.  IN FACT, THEY WERE FREQUENTLY THE SUBJECT OF CONDEMNATION.

MR. MCHUGH:  THANK YOU.  I HAVE NOTHING FURTHER.

RECROSS EXAMINATION

BY MR. GURGANUS:

Q.     JUST GOING TO THE SECOND PAGE THERE AT THE TOP OF THAT EXHIBIT, GC 15 A?

A.     OKAY.

Q.     CAN YOU JUST READ THAT FIRST PARAGRAPH?

A.     DAVID IS SELF-CENTERED -- IS THAT WHAT YOU ARE TALKING ABOUT?

Q.     YES, SIR.

A.     IS SELF-CENTERED AND DEMANDING WITH OTHER PEOPLE.  HE IS POSSESSIVE AND JEALOUS AND MANY INTERPERSONAL SCRAPES ARISE OUT OF HIS INSATIABLE NEED FOR ATTENTION.  HE HAS BEEN INVOLVED WITH LOTS OF PRISON "GAMES" AND THIS BEHAVIOR IS DIRECTLY THE RESULT OF NEEDING TO BE NOTICED AND TO HAVE STATUS WITH OTHER INMATES.

MR. GURGANUS:  THAT'S ALL.  I HAVE NO FURTHER QUESTIONS, YOUR HONOR.

THE COURT:  YOU MAY STEP DOWN.

THE WITNESS:  JUDGE, DO THESE STAY WITH

THE CLERK OR IS THAT YOUR -- I WILL TAKE MY YELLOW PAD.

(WITNESS EXCUSED.)

MICHAEL COHAN, DEFENSE WITNESS, SWORN.

THE CLERK:  STATE AND SPELL YOUR FULL NAME FOR THE RECORD, PLEASE.

THE WITNESS:  MICHAEL COHAN, C-O-H-A-N.

DIRECT EXAMINATION

BY MR. TRAVIS:

Q.      GOOD MORNING, MR. COHAN.

A.      GOOD MORNING, MR. TRAVIS.

Q.      WHERE DO YOU RESIDE?

A.      KNOXVILLE, TENNESSEE.

Q.      AND WHAT IS YOUR OCCUPATION?

A.      I'M A LICENSED PRIVATE INVESTIGATOR.

Q.      AND HOW LONG HAVE YOU BEEN A LICENSED PRIVATE INVESTIGATOR?

A.      ALMOST 30 YEARS.

Q.      PRIOR TO BECOMING A LICENSED PRIVATE INVESTIGATOR, HOW WERE YOU EMPLOYED?

A.      I WAS A POLICE OFFICER VARIOUS PLACES.

Q.      EXCUSE ME?

A.      I SAID I WAS A POLICE OFFICER VARIOUS PLACES.

Q.      OKAY.

BACK IN FEBRUARY OF 1998, WERE YOU ASKED TO TRAVEL TO OKLAHOMA STATE PENITENTIARY AT MCALESTER TO

TAKE CERTAIN PHOTOGRAPHS?

A.      YES, SIR, I WAS.

Q.      AND DID YOU AGREE TO UNDERTAKE THAT ASSIGNMENT?

A.      YES, SIR.

Q.      AND WAS THAT ASSIGNMENT GIVEN TO YOU BY EITHER MR. RUNKLE OR MYSELF AS PART OF THE TRIAL BACK IN 1998?

A.      YES, SIR.

Q.      DID YOU IN FACT TRAVEL TO MCALESTER?

A.      I DID.

Q.      AND DO YOU RECALL WHEN IT WAS THAT YOU WERE AT MCALESTER?

A.      22 FEBRUARY.

Q.      OF 1998?

A.      YES, SIR.

Q.      WHILE YOU WERE THERE, DID YOU GO TO TWO DIFFERENT CELL AREAS?

A.      YES, SIR, I DID.

Q.      AND WAS ONE OF THE AREAS YOU WENT TO D BLOCK?

A.      YES, SIR.

Q.      AND WHILE YOU WERE AT D BLOCK, IN ADDITION TO MAKING WHATEVER OBSERVATIONS YOU MADE, DID YOU TAKE PHOTOGRAPHS?

A.      YES, SIR, I DID.

Q.      WAS THE OTHER AREA THAT YOU VISITED H UNIT?

A.      YES, SIR.

Q.      AND WHILE YOU WERE AT H UNIT, IN ADDITION TO YOUR OBSERVATIONS, DID YOU ALSO TAKE PHOTOGRAPHS?

A.      YES, SIR, I DID.

Q.      I'M GOING TO PROVIDE TO YOU A SERIES OF PHOTOGRAPHS MARKED FOR IDENTIFICATION AS D 400 THROUGH D 414.  AND WOULD YOU LOOK AT THESE PHOTOGRAPHS AND TELL US WHETHER YOU ARE FAMILIAR WITH THEM.

A.      YES, SIR, I AM.

Q.      ARE THOSE PHOTOGRAPHS, 400 THROUGH 414, PHOTOGRAPHS TAKEN AT D UNIT AT USP MCALESTER BACK IN FEBRUARY OF 1998?

A.      YES, SIR, THEY ARE.

MR. TRAVIS:  YOUR HONOR, IF I MAY, I ONLY HAD THREE COPIES MADE.  I HAVE GIVEN ONE TO THE GOVERNMENT AND YOU AND YOUR CLERK HAVE ONE.  IF OVER THE LUNCH HOUR I CAN BORROW YOUR CLERK'S COPY I WILL HAVE ANOTHER SET MADE.

THE COURT:  THAT IS FINE.  DO YOU NEED A SET TO WORK WITH NOW?

MR. TRAVIS:  NO.

THE WITNESS:  I HAVE THE SPARE SET I PRINTED ON MY PRINTER.

BY MR. TRAVIS:

Q.      EXCUSE ME?

A.      I HAVE THE SPARE SET THAT I PRINTED ON MY

PRINTER IN THE OFFICE.  IF YOU NEED SOMETHING TO GO BY OR -- IT BEARS THE SAME NUMBERS AS THE 4 BY 6'S DO.

Q.     I THINK THE PROBLEM IS GOING TO BE, AS YOU LOOK AT THOSE, THAT I TRIED TO PUT THEM IN THE ORDER I THOUGHT THAT THEY WERE.  OKAY.

A.     OKAY.

Q.     SO WHY DON'T YOU TAKE THE PHOTOGRAPHS, THE STACK OF PHOTOGRAPHS, AND STARTING WITH 400 -- AND YOU WILL FIND THE NUMBERS ON THE BACK.

A.     YES, I SEE THEM.

Q.     IF YOU COULD JUST START US WITH 400, AND TELL US WHAT IS DEPICTED IN 400.

A.     OKAY.  400 IS THE AREA OUTSIDE DAVID'S CELL IN D BLOCK OR -- YEAH, D BLOCK.

Q.     NOW, INSOFAR AS THE CELL THAT YOU TOOK THE PHOTOGRAPHS OF IN D BLOCK, WAS IT YOUR UNDERSTANDING, BASED ON INFORMATION GIVEN TO YOU BY PERSONNEL AT OSP, THAT THE CELL YOU ENDED UP TAKING THE PHOTOGRAPHS OF IS THE CELL THAT MR. HAMMER WAS HOUSED IN?

A.     THAT'S CORRECT.

Q.     AND WHAT WAS YOUR UNDERSTANDING OF WHAT PERIOD OF TIME MR. HAMMER WAS HOUSED IN THE CELL IN D BLOCK?

A.     ABOUT FOUR OR FIVE YEARS ENDING, I THINK, IN EARLY 1993.

Q.     GO TO 401.

A.    AGAIN, THIS IS THE EXTERIOR HALLWAY.

Q.    OKAY.  402?

A.    402 IS THE DOOR TO THE CELL THAT SHOWS THE LOCKING MECHANISM.

Q.    OKAY.  403?

A.    403 IS THE SAME THING.  IT JUST SHOWS THE OTHER LOCKS.

Q.    OKAY.

A.    404 IS THE DOOR OPEN.

Q.    THAT WOULD BE OPEN SO THAT SOMEBODY COULD EITHER ENTER OR EXIT, IS THAT CORRECT?

A.    THAT'S CORRECT, OPENED FROM -- THE SHOT IS FROM THE HALLWAY.

Q.    OKAY.

A.    405 IS INSIDE THE CELL WITH THE DOOR CLOSED.

406 IS, AGAIN, INSIDE THE CELL WITH THE DOOR CLOSED.

WHAT I WAS DOING WITH THESE WAS JUST PANNING AROUND AND TAKING A SHOT BACK-TO-BACK-TO-BACK.

Q.    OKAY.

A.    407 IS INSIDE THE CELL.

408 IS INSIDE THE CELL.

409 IS INSIDE THE CELL.

410 IS INSIDE THE CELL.

411 IS THE SHOWER AREA THAT DAVID USED IN

THAT BLOCK.

AND 412 IS THE EXERCISE AREA OUTSIDE.

413 IS THE EXERCISE AREA OUTSIDE.

AND 414 IS THE EXERCISE AREA OUTSIDE.

Q.    INSOFAR AS THE CELL, WAS IT A SINGLE CELL?

A.    YES, SIR.

Q.    AND WHERE DID MR. HAMMER TAKE HIS MEALS?

A.    TO MY KNOWLEDGE, INSIDE THAT CELL.

Q.    OKAY.

A.    THERE IS AN OPENING TO SLIDE IT IN.

Q.    AND AS FAR AS THE EXERCISE, DID YOU SAY THAT
THERE WAS AN OUTDOOR RECREATION AREA?

A.    YES, SIR.

Q.    AND THAT IS DEPICTED IN?

A.    IN 12, 13 AND -- SORRY, 412, 413, AND 414.

Q.    WHILE YOU WERE THERE IN THE CELL, DID YOU FLUSH
THE TOILET?

A.    I DID.

Q.    AND WHAT WAS THE PURPOSE FOR FLUSHING THE
TOILET?

A.    TO SEE THE DIFFERENCE IN THE SOUND IN THAT CELL
AND THE CELL IN H.

Q.    WAS THE CELL AT D, WAS THAT ABOVE GROUND?

A.    YES.

Q.    AND I BELIEVE SOME OF THE PHOTOGRAPHS DEPICT A

WINDOW?

A.    YES, SIR.  AN OUTSIDE WINDOW YOU MEAN?

Q.    YES.

A.    YES, SIR.

Q.    SO THE RESIDENT OF THAT CELL NOT ONLY COULD SEE OUTSIDE BUT COULD GET SOME NATURAL LIGHT?

A.    THAT'S CORRECT.

Q.    IS THERE ANYTHING ELSE ABOUT THAT PARTICULAR CELL THAT YOU WANT TO BRING TO THE ATTENTION OF THE JUDGE?

A.    NO, SIR.

Q.    OKAY.  NOW, THE OTHER AREA THAT YOU WENT TO WAS H UNIT, IS THAT CORRECT?

A.    YES, SIR.

Q.    AND AS FAR AS H UNIT IS CONCERNED -- I'M GOING TO HAND UP TO YOU A SERIES OF PHOTOGRAPHS, 415 THROUGH 441.  AGAIN, I JUST WANT YOU TO LOOK AT THESE, MAKE SURE THAT THEY ARE ALL H UNIT PHOTOGRAPHS.

A.    YES, SIR, THEY ARE.

Q.    NOW, WITH RESPECT TO THE CELL IN H UNIT, IS THAT CELL ABOVE GROUND OR BELOW GROUND?

A.    BELOW GROUND.

Q.    DID THAT CELL HAVE ANY WINDOWS THAT ALLOWED THE OCCUPANT OF THAT CELL TO LOOK OUTSIDE?

A.    NO, SIR.

Q.     DID IT HAVE ANY WINDOWS THAT ALLOWED FOR THE ENTRY OF NATURAL LIGHT?

A.     NO, SIR.

Q.     AND INSOFAR AS THAT CELL IS CONCERNED, AGAIN, IF YOU TAKE THE SERIES OF PHOTOGRAPHS, IF YOU COULD EXPLAIN TO THE COURT AND GOVERNMENT COUNSEL WHAT IS DEPICTED STARTING WITH 415 I THINK.

A.     YES, SIR, 415.

Q.     OKAY.  START WITH 415.

A.     WHAT THESE ARE ATTEMPTING TO SHOW IS THE WAY THIS THING WAS SET UP.  THESE BARS ARE IN THE HALLWAY. THEY HAVE TO MOVE THESE BARS -- THIS IS 415 -- IN ORDER TO EVEN GET INTO WHERE THE CELL IS.

Q.     BEFORE YOU GO TO THE NEXT PHOTOGRAPH, WHAT WAS YOUR UNDERSTANDING OF HOW LONG MR. HAMMER WAS IN THAT CELL?

A.     SOMETHING ON THE MAGNITUDE OF ABOUT NINE MONTHS.

Q.     AND BEFORE YOU TOURED THE D CELL AND THE H CELL, DID YOU INQUIRE AS TO WHETHER THERE HAD BEEN ANY SUBSTANTIAL CHANGES IN THE CONDITIONS OF EITHER CELL?

A.     MY UNDERSTANDING THERE HAD BEEN SOME SUBSTANTIAL CHANGES IN D.

Q.     OKAY.  IN WHAT WAY?

A.     THEY JUST TOLD ME THEY HAD BEEN RENOVATED.

Q.     OKAY.

A.        I HAD SOME VERY NICE PEOPLE FROM THE

PENITENTIARY BUT THEY WERE NOT FOUNTS OF INFORMATION.

Q.        HOW ABOUT YOUR UNDERSTANDING WITH RESPECT TO H?

A.        I DON'T RECALL THAT.

Q.        OKAY.  GO TO THE NEXT PHOTOGRAPH, PLEASE.

A.        THE NEXT PHOTOGRAPH SIMPLY SHOWS THROUGH THE

BARS THE DOOR INTO DAVID'S CELL, WITH THE BARS STILL

CLOSED.  I'M SORRY, MA'AM.  THAT WAS 416.

417 IS INSIDE.  THEY HAVE, AT THIS POINT,

PULLED BACK THE OUTER BARS AND I HAVE STEPPED INTO THE

CORRIDOR -- WELL, INTO THE AREA.  IT'S NOT REALLY A

CORRIDOR.  AND I AM FACING THE CELL NOW.  THE BARS THAT

WERE IN THE FIRST TWO PICTURES ARE ON MY LEFT AND I'M

FACING AT THE DOOR TO DAVID'S CELL.  THAT'S 417.

Q.        THE BARS THAT WERE MOVED, DID THEY SLIDE LIKE A

BOX-CAR TYPE OF MOVEMENT?

A.        YES, SIR.  THEY ARE SHOWN IN 418 HAVING BEEN

SLID BACK AND STILL SHOWING THE DOOR THAT I WAS JUST

ADDRESSING.

Q.        OKAY.

A.        419 IS THE DOOR TO DAVID'S CELL, AS IS 420.

THERE ARE INTERIOR BARS -- I'M SORRY -- THAT SHOW IN

419.  AND IN 420 THEY HAVE BEEN PULLED BACK.  THESE ARE

MANUAL.  THESE ARE NOT ON SOME SORT OF A PULLEY SYSTEM.

THEY JUST GRAB THEM AND PULL THEM BACK.

Q.   OKAY.

A.   421 IS THE DOOR WITH THE BARS PULLED BACK.

422 IS THE BOTTOM OF THE DOOR.

Q.   AND WHY DID YOU TAKE THE PHOTOGRAPH OF THE BOTTOM OF THE DOOR?

A.   BECAUSE THERE IS A PADLOCK ON IT DOWN THERE.

Q.   OKAY.

A.   423 BEGINS A SERIES OF PICTURES INSIDE THE CELL.

Q.   AND ESSENTIALLY DID YOU DO THE SAME THING, TAKE --

A.   YES, SIR.

Q.   -- PHOTOS OF ALL FOUR WALLS?

A.   JUST STOOD BASICALLY IN ONE SPOT AND KEPT TURNING AND PHOTOGRAPHING.

Q.   OKAY.

A.   AND THOSE ARE 423, 424, 425, 426, 426.1, 427, 428 AND 429.

NOW, I SHOT ALL OF THOSE INSIDE THE CELL WITH A FLASH.

Q.   WHAT WAS THE LIGHTING LIKE WITHOUT THE FLASH?

A.   WELL, THAT IS WHERE WE GO IN 430.

Q.   OKAY.  I WAS JUST ASKING YOU TO DESCRIBE IT GENERALLY.

A.   WELL, THERE WAS A SINGLE, AS I RECALL, 100-WATT BULB IN THE BACK OF THE WALL THAT CAN BE SEEN IN 429.

Q.      OKAY.

A.      AND THEN I TURNED THE FLASH OFF AND PUT A ROLL OF THOUSAND SPEED FILM IN THE CAMERA AND TOOK 430, 431, 432, 433.

        I ALSO TOOK 434.  BUT IT'S A LITTLE DIFFERENT.

Q.      OKAY.  WE WILL GET TO 434.

A.      I THOUGHT SO.

Q.      THE ONES THAT YOU TOOK WITHOUT THE FLASH --

A.      RIGHT.

Q.      -- DOES THAT ACCURATELY DEPICT THE LIGHTING CONDITION?

A.      IT MORE ACCURATELY SHOWS IT.  THEY MAY BE A SMIDGEN DARK.  BUT YES, SIR.  BETTER THAN CERTAINLY THAN WITH THE FLASH.  THE FLASH JUST LIT THE PLACE UP.

Q.      AND AS FAR AS THE SHOWER FACILITIES?

A.      YES, SIR.

Q.      YOU INDICATED WHEN MR. HAMMER WAS IN D, THAT HE USED A SHOWER SOMEWHERE OUTSIDE OF THE CELL, CORRECT?

A.      RIGHT.

Q.      HOW ABOUT THE SHOWER CONDITIONS OR SHOWER AVAILABILITY WHEN HE WAS IN H?

A.      IT WAS ATTACHED.  BY THAT I MEAN, THERE IS AN INTERIOR DOOR IN THE CELL THAT IS CLOSED.  THE NEXT SMALL AREA IS THE SHOWER AREA, WHICH IS JUST HIS.  AND

THEN THERE IS THE OUTSIDE DOOR OF THE CELL.  IT'S MY UNDERSTANDING THAT THE LIGHT IN THE SHOWER AREA WAS ALWAYS ON.  BUT THE WAY IT'S MADE, AS YOU WILL SEE IN THE NEXT PHOTOGRAPH, IS THERE'S A WINDOW IN EACH BUT THE WINDOWS DON'T LINE UP, IF THAT MAKES ANY SENSE.  SO YOU DON'T HAVE A WHOLE LOT OF DIRECT SIGHT OUT OF THE INTERIOR DOOR OF THE CELL TO ANYTHING EXCEPT THE SHOWER.

Q.    AND WHAT IS 434?

A.    434 IS A PHOTOGRAPH OF THE WINDOW IN THE INTERIOR CELL DOOR WITH THE LIGHTS OFF, WITH THOUSAND SPEED FILM.

Q.    LOOKING THROUGH THAT WINDOW, YOU WOULD LOOK INTO THE SHOWER?

A.    YOU WOULD LOOK INTO THE SHOWER AND YOU COULD SEE A LITTLE BIT THROUGH THE SECOND DOOR INTO THAT AREA OUTSIDE THE SECOND DOOR.  BUT THERE IS NOTHING OUT THERE BUT A WALL.  I MEAN, THE BARS ARE HERE, THE WALL IS HERE (INDICATING) SO ALL YOU ARE REALLY DOING IS LOOKING AT A WALL.

Q.    AND WHEN YOU WERE IN THE CELL IN H UNIT, DID YOU FLUSH THE TOILET?

A.    YES, SIR.

Q.    AND HOW DID THE SOUND THAT WAS CREATED IN H UNIT COMPARE TO THE SOUND IN D UNIT?

A.    WELL, IT WAS MARKEDLY LOUDER.

Q.      DID YOU LEARN HOW PEOPLE WERE ABLE TO VERBALLY INTERACT WITH MR. HAMMER WHILE HE WAS IN THE H UNIT CELL?

A.      YES, SIR, THERE IS AN INTERCOM.

Q.      AND AS PART OF YOUR VISIT, DID YOU ASK SOMEONE TO SPEAK WITH YOU OVER THE INTERCOM?

A.      I DID.

Q.      AND WHAT WAS THAT EXPERIENCE LIKE?  I MEAN, HOW DOES IT SOUND?

A.      WELL, IT'S VERY INTRUSIVE, IF YOU ARE IN THERE BY YOURSELF.  I MEAN, IT SOUNDED LIKE AN INTERCOM WHERE YOU HAVE NO PRIVACY.

Q.      NOW, DID YOU ALSO TAKE SOME PHOTOGRAPHS OF THE SHOWER?

A.      YES, SIR.  THE SHOWER PHOTOGRAPHS ARE MARKED 435, 436 AND 437.

Q.      NOW, AS FAR AS MR. HAMMER'S MEALS WHILE HE WAS IN THE CELL IN H UNIT, WERE THOSE MEALS THAT HE ATE IN HIS CELL?

A.      YES, SIR.

Q.      DID HE HAVE RECREATIONAL OPPORTUNITY WHILE IN H UNIT?

A.      YES, SIR.

Q.      AND DID YOU TAKE SOME PHOTOGRAPHS OF THE RECREATION AREA?

A.       I DID.

Q.       AND WHAT ARE THOSE?

A.       THEY ARE 438, 439, 440, AND 441.

Q.       AND CAN YOU DESCRIBE FOR THE COURT WHAT THAT RECREATIONAL AREA LOOKS LIKE?

A.       IT IS BASICALLY A TWO-STORY CONCRETE HOLE IN THE GROUND.  IT DOES HAVE NATURAL LIGHT, BECAUSE THERE IS A FENCE AT THE TOP.  BUT YOU CAN'T SEE OUT OF IT.  YOU CAN'T SEE ANYTHING OUT OF IT BUT THE SKY BECAUSE IT'S TWO STORIES UP.  AND THE WALLS ARE ALL CONCRETE EXCEPT THE WALLS YOU CAN SEE IN 438, AND THOSE ARE FLOOR-TO-CEILING GLASS AND THAT IS FROM THE INNER CORRIDOR.

Q.       AS FAR AS MR. HAMMER'S RECREATIONAL OPPORTUNITIES WHEN HE WAS HOUSED IN H UNIT, WAS IT SINGLE REC?

A.       OTHER INMATES WENT OUT SIX AT A TIME. MR. HAMMER WENT OUT BY HIMSELF.

Q.       H UNIT CELL, SINGLE CELL?

A.       YES, SIR.

Q.       AND AS FAR AS THE RECREATIONAL OPPORTUNITIES HE HAD WHEN HE WAS IN D, SINGLE REC?

A.       YES, SIR.

                 MR. TRAVIS:  IF I MAY HAVE A MOMENT, YOUR HONOR?

THE COURT:  YES.

MR. TRAVIS:  I HAVE NO OTHER QUESTIONS, YOUR HONOR.

THE COURT:  CROSS EXAMINE.

MR. GURGANUS:  YES.  THANK YOU, YOUR HONOR.

CROSS EXAMINATION

BY MR. GURGANUS:

Q.      I WANT TO TALK TO YOU FIRST ABOUT THIS D UNIT, SPECIAL ISOLATION CELL.  NOW, YOU TOOK SOME PICTURES OF THAT, IS THAT RIGHT?

A.      OKAY.  NOW, THE SPECIALIZED ISOLATION CELL IS H, AS IN HENRY.

Q.      OKAY.  BUT LET'S TALK ABOUT THE D FIRST.

A.      THAT'S FINE.  THAT'S FINE.  I JUST WANT TO MAKE SURE I WAS TALKING ABOUT THE RIGHT ONE.

Q.      THE D BEING THE FIRST ONE, CORRECT?

A.      YES, SIR.

Q.      NOW, WHEN YOU TOOK THESE PICTURES, IT WAS YEARS AFTER DAVID HAMMER HAD BEEN IN THIS CELL, WOULD YOU AGREE WITH ME THERE?

A.      FIVE YEARS, YES, SIR.

Q.      FIVE YEARS?

A.      YES, SIR.

Q.      AND YOU TOOK THE PICTURES WITH BLACK AND WHITE

FILM.   THESE APPEAR TO BE BLACK AND WHITE?

A.      I DON'T THINK SO.

Q.      IS THERE A REASON WHY --

A.      I THINK THEY WERE COLOR WHEN WE TOOK THEM.

Q.      BUT THESE HERE THAT ARE EXHIBITS ARE BEING
DEPICTED IN BLACK AND WHITE, RIGHT?

A.      YES, SIR.

Q.      AND WOULD YOU AGREE WITH ME THAT BLACK AND WHITE
DOES NOT GIVE THE SAME -- NECESSARILY THE SAME VISUAL
THAT YOU DO IF YOU ARE NOT COLOR BLIND AND ARE LOOKING
AT THE LOCATION?

A.      TO SOME EXTENT, YES, SIR.

Q.      LET ME SHOW YOU -- I'M GOING TO HAND YOU UP A
BOOK THAT IS ENTITLED, THE FINAL ESCAPE, OKAY?  IT'S BY
DAVID PAUL HAMMER.

A.      I HAVE READ IT.

Q.      GOOD.

         MR. GURGANUS:  CAN WE PUT THE ELMO ON.

BY MR. GURGANUS:

Q.      IS THIS THE SAME CELL THAT YOU WERE IN?

A.      I HAVE NO CLUE.

Q.      THIS PICTURE INDICATES THAT IT'S THE OKLAHOMA
STATE PENITENTIARY D UNIT, SPECIAL ISOLATION CELL.

A.      I UNDERSTAND WHAT IT SAYS.  I DO NOT KNOW IF
THAT IS THE SAME CELL THEY TOOK ME TO OR NOT.  WELL,

IT'S A SIMILAR CELL.  AND IT MAY WELL BE THE CELL THEY TOOK ME TO, BUT I DON'T KNOW THAT I HAVE ANY INDEPENDENT KNOWLEDGE OF THAT.

Q.      YOU ARE FAMILIAR WITH THE BOOK, THOUGH, CORRECT?

A.      I OWN THE BOOK, YES.

Q.      YOU OWN THE BOOK?

A.      ABSOLUTELY.

Q.      AND IN THE BOOK -- IT'S DAVID PAUL HAMMER'S AUTOBIOGRAPHY?

A.      YES.

Q.      WOULD YOU AGREE WITH ME THERE?  HE WROTE IT, IS THAT CORRECT?

A.      THAT IS MY UNDERSTANDING.

Q.      AND HE INDICATED IN THE FOREWORD THAT THE ACCOUNT IN THE BOOK WAS TRUE WITH THE EXCEPTION OF PERHAPS SOME NAMES WERE ADJUSTED TO PROTECT PEOPLE.

A.      I THINK THAT'S CORRECT.

Q.      NOW, LOOKING AT THAT PHOTO OF THAT CELL, YOU WOULD AGREE WITH ME THAT IT'S NOT AS STARK AS THE PICTURES THAT ARE BEING OFFERED.  WOULD YOU AGREE?

A.      YOU ARE TALKING ABOUT D NOW?

Q.      D UNIT, SIR.

A.      I DON'T FIND THE PICTURES STARK, BUT I WOULD NOT CHARACTERIZE IT THAT WAY.

Q.      YOU DON'T FIND THE CELL TO BE -- THE PICTURE OF

CELL TO BE LIKE STARK?

A.    NO.

Q.    OKAY.

A.    I THINK IT JUST LOOKS LIKE A REGULAR PRISON CELL.

Q.    A REGULAR PRISON CELL.  OKAY.  AND IN THIS PICTURE WHEN DAVID PAUL HAMMER WAS IN THAT CELL, THERE IS A TELEVISION, IS THAT RIGHT?

A.    YES, THERE IS A TELEVISION IN MY PICTURE.

Q.    AND PICTURES OUTSIDE, ON THE WALL?

A.    YES, SIR.

Q.    LOOKS TO BE A BOOKCASE THERE WITH ITEMS IN IT?

A.    YES, SIR.

Q.    AND THIS WAS -- IT'S IDENTIFIED AS AN ISOLATION CELL, IS THAT RIGHT?

A.    THAT IS WHAT IT SAYS IN THE BOOK, YES, SIR.

Q.    DO YOU KNOW WHEN DAVID PAUL HAMMER WENT INTO THE D BLOCK ISOLATION CELL?

A.    NO.

Q.    WELL, DO YOU KNOW -- YOU KNOW FROM THE BOOK, THOUGH, THAT HE ENDED UP IN THESE TYPE CELLS BECAUSE OF THE PROBLEMS THAT HE HAD IN THE OKLAHOMA PRISON SYSTEM, ISN'T THAT RIGHT?

A.    I READ THE BOOK A LONG TIME AGO.  I DO NOT REMEMBER SPECIFICALLY WHAT THE BOOK SAYS ABOUT ANYTHING.

Q.      WELL, LET ME ASK YOU THIS.  DID YOU KNOW THAT THE BOOK INDICATED THAT HE ESCAPED FROM THE JOSEPH HARP CORRECTIONAL CENTER?

MR. TRAVIS:  YOUR HONOR, I'M GOING TO OBJECT ON THE BASIS OF RELEVANCY AND PROBATIVE VALUE. THE WITNESS IS HERE DEALING WITH THE CELL MR. HAMMER WAS IN, AND WHY HE WAS IN THE CELL HAS NOTHING TO DO WITH THE CONDITIONS OF CONFINEMENT TO WHICH HE WAS EXPOSED.

THE COURT:  MR. GURGANUS.

MR. GURGANUS:  YOUR HONOR, THE REPRESENTATION IS THAT HE WAS CELLED -- I BELIEVE THAT HE WAS IN VERY SEVERE CONDITIONS.  AND I THINK THAT THE GOVERNMENT SHOULD HAVE THE OPPORTUNITY IN THE SENTENCING HEARING TO EXPLAIN WHY HE WAS IN THAT CELL.

THE COURT:  I WILL OVERRULE THE OBJECTION.

BY MR. GURGANUS:

Q.      NOW, SIR, HE HAD ESCAPED IN 1981, ISN'T THAT RIGHT?

A.      I DON'T KNOW THAT.

Q.      DID YOU REMEMBER READING ANYTHING ABOUT HIS CREATING A DUMMY, WILBUR WAS THE NICKNAME, IN ORDER TO FACILITATE HIS ESCAPE FROM AN OKLAHOMA CORRECTIONAL FACILITY?

A.      I REMEMBER WILBUR.

Q.    AND WILBUR BEING THE DUMMY, RIGHT?

A.    OH, YES, SIR.  YES, SIR.

Q.    AND YOU RECALL THAT?

A.    ABSOLUTELY.

Q.    AND YOU RECALL THAT THAT WAS IN CONNECTION WITH AN ESCAPE THAT MR. HAMMER PULLED, RIGHT?

A.    THAT MAY WELL BE THE CASE.  I DO NOT SPECIFICALLY RECALL THAT.  IT'S BEEN 16 YEARS SINCE I HAVE BEEN TO OKLAHOMA.

Q.    ALL RIGHT.  SO YOU DON'T HAVE A GREAT RECOLLECTION OF THAT.

DID YOU KNOW THAT HE HAD TRIED TO ESCAPE A SECOND TIME IN 1982?

A.    NO, SIR.  AGAIN, I MAY HAVE KNOWN IT AT SOME POINT.

Q.    AND IN 1983, WERE YOU AWARE THAT HE ESCAPED FROM THE OKLAHOMA STATE REFORMATORY IN WHERE HE WAS ABLE TO GET UNDER -- DO YOU REMEMBER ANYTHING ABOUT HIM GETTING UNDER A TRUCK AND BEING ABLE TO ESCAPE?

A.    NO, SIR.

Q.    DO YOU RECALL THAT WHILE ON ESCAPE THAT HE SHOT A MAN -- IN THE BOOK I'M REFERRING TO -- THAT HE SHOT A MAN THREE TIMES IN THE HEAD?

A.    NO, SIR, I DON'T.

Q.    YOU DON'T REMEMBER ANYTHING ABOUT THAT?

A.          I'M NOT SAYING IT'S NOT IN THE BOOK.  AND I DID READ IT AT ONE POINT, WHENEVER THE BOOK FIRST CAME OUT.

Q.          OKAY.  DID YOU ALSO KNOW THAT SHORTLY BEFORE GOING INTO THE CELL, THAT THERE WAS AN INCIDENT THAT HE EVENTUALLY WENT TO TRIAL ON, WHERE THERE WAS A CORRECTIONAL OFFICER THAT WAS --

MR. TRAVIS:  YOUR HONOR, I'M GOING TO OBJECT TO THIS.  AGAIN, THE RELEVANCE AND THE PROBATIVE VALUE.  THE ASSISTANT UNITED STATES ATTORNEY IS NOW GOING INTO AREAS THAT WERE PRECLUDED AS BEING ADMISSIBLE FOR PURPOSES OF THIS HEARING.  AND HE IS PUTTING INTO THE RECORD INFORMATION THAT THE COURT HAS PREVIOUSLY RULED IS NOT ADMISSIBLE AND IS NOT TO BE TAKEN INTO CONSIDERATION AND NOT TO BE WEIGHED AS PART OF THE DECISION-MAKING PROCESS IN THIS CASE.

THE COURT:  MR. GURGANUS.

MR. GURGANUS:  YOUR HONOR, THE ISSUE IS WHY THE DEFENDANT IS IN THIS CELL AND WHY THESE MEASURES ARE NEEDED TO BE TAKEN AND WHETHER OR NOT THERE WAS -- AND WE WERE REFERRING TO ACQUITTED CONDUCT HERE, YOUR HONOR.  BUT THERE WAS STILL AN INCIDENT WHERE THIS DEFENDANT WENT TO TRIAL.  AND IT IS DEPICTED -- IT IS LAID RIGHT OUT IN THE BOOK.  AND IT EXPLAINS WHY THIS DEFENDANT ENDED UP IN THE D BLOCK CELL.

THE COURT:  I UNDERSTAND THE GOVERNMENT'S

POSITION.  I GAVE YOU SOME LATITUDE, BUT THE LAST QUESTION IS WHETHER THE WITNESS IS AWARE OF A CASE MR. HAMMER WAS INVOLVED IN, AND THAT IS WELL BEYOND DIRECT EXAMINATION.  IT CERTAINLY DOES NOT TOUCH ANY SUBJECT MATTER THAT THIS WITNESS TESTIFIED ON DIRECT EXAMINATION.  IF YOU WANT TO PROVE THESE MATTERS, IF THEY ARE ADMISSIBLE, I'M NOT SURE.  MR. TRAVIS SAID I HAVE ALREADY RULED ON IT IN SOME OTHER WAY, THAT MAY BE PERMISSIBLE.  BUT THIS IS WELL BEYOND THE SCOPE OF ANYTHING THAT THIS WITNESS IS INVOLVED IN.  AND AGAIN, THE EVIDENCE IS HIS ANSWERS, NOT THE QUESTIONS.

MR. GURGANUS:  YES, SIR.

THE COURT:  SO HE HAS NO KNOWLEDGE OF THESE THINGS, SO I WILL SUSTAIN THE OBJECTION.

BY MR. GURGANUS:

Q.     NOW, SIR, YOU HAVE BEEN TESTIFYING ABOUT HIS ABILITY TO COMMUNICATE WITHIN THE H UNIT AND THE D CELL, IS THAT RIGHT?

A.     NO, SIR.  I DON'T BELIEVE I HAVE -- OR I'M NOT UNDERSTANDING YOUR QUESTION.

Q.     OKAY.  WAS MR. HAMMER ABLE TO COMMUNICATE WITH OTHERS WHILE WITHIN THIS -- THESE PARTICULAR CELLS?

A.     TO MY KNOWLEDGE IN H, CERTAINLY HE WAS NOT.  BUT I CAN'T TELL YOU THAT ANYONE HAS ADDRESSED THAT DIRECTLY TO ME.  I CAN TELL YOU, FROM WHAT THEY TOLD ME, THAT HE

WENT OUT TO HIS OWN AREA TO RECREATION IN D, AND THAT HE WENT OUT BY HIMSELF IN H.  BUT AS TO WHETHER OR NOT HE WAS IN -- I JUST DON'T THINK I KNOW.

Q.     I'M GOING TO REFER YOU TO PAGE 143.

MR. TRAVIS:  143 OF?

MR. GURGANUS:  MR. HAMMER'S BOOK.

BY MR. GURGANUS:

Q.     NOW, WITHIN THE D BLOCK UNIT, WAS HE ABLE TO USE THE PRISON PHONE SYSTEM AND CALLING CARDS?

MR. TRAVIS:  YOUR HONOR, AGAIN, I'M GOING TO OBJECT.  IT'S WELL BEYOND THE SCOPE OF ANYTHING HE WAS ASKED.  ALSO, IT IS NOT PROBATIVE WITH RESPECT TO THE CONDITIONS OF CONFINEMENT.  AGAIN, WHAT HE DID TO GET HIMSELF PLACED WHERE HE WAS PLACED IS NOT RELEVANT.

THE COURT:  WELL, THIS QUESTION JUST GOES TO WHAT WAS AVAILABLE TO HIM IN THESE CELLS.  THIS WITNESS WAS THERE AND TOOK PICTURES IN THOSE CELLS.  SO I WILL OVERRULE THE OBJECTION.

THE WITNESS:  WELL, CERTAINLY THERE WAS NO TELEPHONE IN THE CELL, YOUR HONOR.

BY MR. GURGANUS:

Q.     WAS THERE AN AVAILABILITY OF A PRISON PHONE SYSTEM AND CALLING CARDS WITHIN THAT AREA IF YOU KNOW?

A.     I DO NOT HAVE THE SLIGHTEST IDEA.  I WOULD NOTE THAT FROM LOOKING DOWN AT THE BOOK THIS SAYS NOVEMBER

1986 TO APRIL 1987.  I DIDN'T -- I DON'T BELIEVE I EVEN KNEW DAVID WAS IN D THEN.

Q.      WELL, THIS PORTION OF THE BOOK SAYS FROM MY SOLITARY CONFINEMENT CELL IN D BLOCK.

A.      OH, I'M NOT ARGUING WITH THAT.  I'M JUST SAYING JUST LOOKING AT THE DATE, THAT WAS NOT THE DATE THAT I UNDERSTOOD HE WAS THERE.

Q.      BUT WHAT IS THE BASIS OF YOUR KNOWLEDGE OF WHEN HE WAS THERE?

A.      WHAT I HAVE BEEN TOLD.

Q.      BY WHOM?

A.      MR. TRAVIS.

Q.      SO YOU ARE BASING HIS -- WHERE HE CELLED STRICTLY ON WHAT MR. TRAVIS TOLD YOU?

A.      YES, SIR.  I HAVE NO OTHER WAY TO KNOW.

Q.      WELL, THE BOOK SAYS -- YOU WOULD KNOW IT THROUGH YOUR READING OF THE BOOK THAT YOU OWN, RIGHT?

A.      AGAIN, I GOT THE BOOK, I READ THE BOOK, IT'S ON MY BOOKSHELF.  ITS SPECIFIC CONTENTS AT THIS POINT I DON'T HAVE ANY IDEA ABOUT.

Q.      WELL, ON PAGE 143 HE INDICATES THAT HE WAS ABLE TO COMMUNICATE WITH THE OUTSIDE WORLD.  TRUE?

A.      YES, SIR, IT DOES SAY THAT.  THE COPYRIGHT IN THE BOOK IS 2004.  I BOUGHT IT SHORTLY AFTER IT WAS PUT OUT.  SO I HAVE HAD IT FOR A DECADE.

Q.   I'M JUST ASKING YOU WHAT YOU MAY HAVE SEEN BEFORE AND WHAT YOUR KNOWLEDGE ABOUT, AND YOU TESTIFIED ABOUT THE CELLS AND WHAT WAS AVAILABLE WITHIN THE CELL. CORRECT?

A.   YES, SIR.

Q.   AND THE BOOK ALSO REVEALS THAT HE WAS ABLE, WITH THE COMMUNICATION TO THE OUTSIDE WORLD, TO RUN SCAMS FROM WITHIN THAT UNIT, TRUE?

A.   IT DOES.

Q.   I'M GOING TO REFER YOU TO PAGE 149.

A.   YES, SIR.

Q.   THE SCAMS AMOUNTED TO, HE CLAIMED, A MILLION DOLLARS WORTH OF MERCHANDISE?

MR. TRAVIS:  YOUR HONOR, AGAIN, I'M GOING TO OBJECT ON THIS SUBJECT MATTER THAT IS SO FAR BEYOND DIRECT EXAMINATION.  AND I BELIEVE THAT THIS MAN HAS TESTIFIED REPEATEDLY THAT HE DOES NOT HAVE ANY RECOLLECTION OF THE CONTENT OF THE BOOK AND ALL THAT THE U.S. ATTORNEY IS ATTEMPTING TO DO, AND I UNDERSTAND IT'S NOT THE QUESTION, BUT HE KEEPS THROWING OUT FACTS THAT THIS MAN SAYS HE DOES NOT HAVE ANY RECOLLECTION AND HAS NO FIRSTHAND KNOWLEDGE OF.

THE COURT:  WHAT IS THE RELEVANCY OF THIS LAST QUESTION?

MR. GURGANUS:  YOUR HONOR, THE RELEVANCE

IS WHAT HE IS ABLE TO DO FROM WITHIN THAT CELL.  I MEAN, THEY ARE TALKING ABOUT, THEY ARE SHOWING THESE CELLS, THEY ARE INDICATING THAT HE WAS -- ESSENTIALLY I THINK WHAT THEY ARE TRYING TO SHOW HE IS SHUT OFF FROM THE OUTSIDE WORLD IN STARK CONFINEMENT, ISOLATION, THAT HE IS UNABLE TO, I GUESS, GROW AS A PERSON.  AND HERE THERE IS EVIDENCE, CLEAR EVIDENCE, THAT BEYOND HE IS THRIVING AS A CRIMINAL FROM WITHIN THESE AREAS.  SO I DO THINK IT'S RELEVANT GIVEN WHAT THEY ARE TRYING TO OFFER ON THEIR SIDE OF THE CASE.

THE COURT:  AGAIN, MR. GURGANUS, I'M GOING TO SUSTAIN THE OBJECTION.  MR. GURGANUS, YOU ARE GOING ABOUT ATTEMPTING TO PROVE YOUR POINT IN A WAY THAT IS BEYOND THE SCOPE OF THE KNOWLEDGE OF THIS WITNESS. IF YOU WANT TO ASK HIM IF HE SAW SOMETHING IN THAT CELL WHICH ALLOWED MR. HAMMER TO COMMUNICATE WITH THE OUTSIDE WORLD OR ANYTHING OBSERVED IN THAT CELL, THAT IS FAIR GAME.  BUT TO GO THROUGH A LITANY OF WHAT YOU PERCEIVE AS CONDUCT OF HAMMER THAT WAS IMPROPER THAT HE ENGAGED IN IN THAT CELL, IS SOMETHING BEYOND THE SCOPE OF WHAT THIS WITNESS KNOWS.

BY MR. GURGANUS:

Q.    WELL, WE WILL PICK UP WITH THE JUDGE'S QUESTION THERE.  DID YOU SEE ANY METHODS FOR THIS DEFENDANT TO COMMUNICATE WITH THE OUTSIDE WORLD WITHIN EITHER THE D

UNIT OR THE H UNIT?

A.       THE SHORT ANSWER IS NO.  BUT I WAS THERE 16 YEARS AGO.  WITHIN THE CELLS CERTAINLY NOT.  DID I WALK BY A PAY PHONE SOMETIME IN THE HALLWAY, I CAN'T TELL YOU THAT.

Q.       AND FINALLY, YOU'RE SAYING THE PICTURES THAT YOU TOOK WERE OF COLOR, THEY WERE COLOR PICTURES?

A.       I'M REALLY PRETTY SURE THAT THEY WERE.

          MR. GURGANUS:  OKAY.  I HAVE NO FURTHER QUESTIONS, YOUR HONOR.

          THE COURT:  ANY REDIRECT?

          MR. TRAVIS:  YES, A COUPLE.

                    REDIRECT EXAMINATION

BY MR. TRAVIS:

Q.       THE PHOTOGRAPHS THAT YOU BROUGHT WITH YOU YESTERDAY --

A.       YES, SIR.

Q.       -- DID THEY COME OFF A DISC THAT HAS THE NEGATIVES ON IT?

A.       YES, SIR.  I WAS SENT A DISC WITH 200 NEGATIVES ON IT.

Q.       AND WHEN YOU PRINTED THE PICTURES, DID YOU LOOK AT THE NEGATIVES?

A.       YES, SIR.

Q.       DO YOU HAVE THAT DISC WITH YOU OR DID YOU GIVE

IT BACK TO ME?

A.      I HAVE IT WITH ME IN PHILADELPHIA.  I DO NOT HAVE IT WITH ME IN THE BUILDING.

MR. TRAVIS:  IS THE LAST NUMBER 441?

THE COURT:  YES.

THE WITNESS:  YES, SIR.

BY MR. TRAVIS:

Q.      MAYBE YOU CAN'T DO THIS.  CAN YOU TELL IF THAT IS THE DISC THAT YOU GOT THAT HAS THE 200 NEGATIVES ON IT?

A.      IT IS NOT.

Q.      SINCE WE ARE ALMOST AT LUNCHTIME, WILL YOU BE ABLE TO GO AND GET THE --

A.      SURE.

Q.      -- THE DISC?

THANK YOU.

A.      DO YOU WANT THE DISC WITH ALL 200 OR THE ONES WITH JUST THESE PICTURES?

Q.      BRING THE DISCS THAT YOU HAVE.

A.      ALL RIGHT.

THE COURT:  DO YOU WANT TO PUT THIS DISC IN A SLEEVE SO IT DOES NOT GET DAMAGED?

MR. TRAVIS:  I WILL GET IT, YOUR HONOR.

BY MR. TRAVIS:

Q.      YOU WERE ASKED A NUMBER OF QUESTIONS ABOUT THE

BOOK, THE FINAL ESCAPE.

A.      YES, SIR.

Q.      DO YOU HAVE ANY RECOLLECTION OF MR. HAMMER, THE BOOK, THE FINAL ESCAPE CLAIMING THAT WHEN MR. HAMMER WAS PUT IN H UNIT THAT HE CRIED?

MR. GURGANUS:  OBJECTION, YOUR HONOR.

THE WITNESS:  I JUST DON'T REMEMBER WHAT IS IN THAT BOOK, MR. TRAVIS.

THE COURT:  WAIT A MINUTE.  THERE IS AN OBJECTION.  DON'T ANSWER.

THE WITNESS:  I'M SORRY.

MR. GURGANUS:  THEY ARE OBJECTING TO MY COMMENTS ON THE BOOK AS OUTSIDE THE SCOPE OF HIS KNOWLEDGE, SO --

THE COURT:  I WILL SUSTAIN THE OBJECTION.

MR. TRAVIS:  IF I MAY HAVE A MOMENT, YOUR HONOR?

YOUR HONOR, THAT IS ALL MY REDIRECT.  I WOULD LIKE TO HAVE THE OPPORTUNITY TO BRING MR. COHAN BACK AFTER LUNCH WITH THE DISC.

THE COURT:  THAT IS FINE.

I JUST HAVE A FEW QUESTIONS FOR MR. COHAN.

BY THE COURT:

Q.      WHEN I LOOK AT, FOR EXAMPLE, D 424, I BELIEVE

THIS IS THE H UNIT, D 424, D 425, D 426, 427, 428.

A.    YES, SIR.

Q.    426.1, 427, 428, D 429, I BELIEVE D 430, I SEE PHOTOGRAPHIC EQUIPMENT IN THOSE PHOTOGRAPHS.

A.    YES, SIR.

Q.    IS THAT YOUR EQUIPMENT?

A.    YES, SIR, IT IS.

Q.    ALL RIGHT.

THE COURT:  I HAVE NO FURTHER QUESTIONS.

MR. GURGANUS:  NO FURTHER QUESTIONS, YOUR HONOR.  THANK YOU.

THE COURT:  HEARING NOTHING FURTHER, WHY DOESN'T MR. COHAN STEP DOWN AT THIS POINT.  AND IT IS NOW 2:20 -- I'M SORRY, 12:20.  WHY DON'T WE RECESS FOR THE DAY -- NOT FOR THE DAY, I MEAN FOR THE MORNING AND --

(WITNESS EXCUSED.)

MR. MORENO:  I WAS SCARED THERE, YOUR HONOR.

THE COURT:  I'M GETTING USED TO WHAT WE DID YESTERDAY.  BUT IN ANY EVENT, HOW MANY WITNESSES DO YOU HAVE THIS AFTERNOON?

MS. SAUNDERS:  ONE MORE.

THE COURT:  ONE MORE.  AND HOW LONG DO YOU THINK THAT WITNESS WILL LAST?  THE REST OF THE

AFTERNOON?

MS. SAUNDERS:  MORE THAN LIKELY, YOUR HONOR, AND POSSIBLY INTO THE MORNING, DEPENDING ON HOW THE CROSS GOES.

THE COURT:  AND SO IT'S NOW 20 AFTER 12. WHY DON'T WE RESUME AT -- IF WE COME BACK AT 2 O'CLOCK, DO YOU THINK THE WITNESS WILL BE MORE THAN AN HOUR AND-A-HALF?

MR. MORENO:  1:30 WOULD PROBABLY BE BETTER, YOUR HONOR.

THE COURT:  WHAT?

MR. MORENO:  1:30 WOULD PROBABLY BE BETTER.

THE COURT:  1:30?

MR. GURGANUS:  YEAH, I THINK WE COULD FINISH IT UP IF WE HAD A LITTLE BIT MORE TIME.  MAYBE MR. GRAVETTE COULD GO HOME.

THE COURT:  OKAY, LET'S MAKE IT A QUARTER TO 2 THEN.  ALL RIGHT?  WE WILL COME BACK AT 1:45.  ALL RIGHT.  WE WILL STAND IN RECESS.

MR. GURGANUS:  THANK YOU, YOUR HONOR.

(LUNCHEON RECESS TAKEN.)

THE COURT:  PLEASE BE SEATED.

MR. TRAVIS, ARE WE GOING TO RECALL THE LAST WITNESS FOR SOME REASON?

MR. TRAVIS:  OVER THE LUNCH HOUR I TALKED WITH MR. GURGANUS AND WE AGREED THAT IT'S UNNECESSARY TO CALL MR. COHAN BACK AND TO PUT THE DISK IN THE RECORD.

THE COURT:  OKAY.

CORRECT?

MR. GURGANUS:  THAT'S CORRECT, YOUR HONOR.

THE COURT:  ALL RIGHT.  LET'S CALL THE NEXT WITNESS.

MR. TRAVIS:  BEFORE I DO THAT, YOUR HONOR, I WOULD MOVE INTO EVIDENCE PHOTOGRAPHS 400 THROUGH 414, WHICH ARE THE PHOTOS OF D UNIT, AND 415 THROUGH 441, WHICH ARE THE PHOTOGRAPHS OF H UNIT.

THE COURT:  ALL RIGHT.  HEARING NO OBJECTION, THOSE WILL BE ADMITTED.

(DEFENSE EXHIBITS 400 THROUGH 414 AND 415 THROUGH 441 ADMITTED INTO EVIDENCE.)

THE COURT:  NEXT WITNESS.

ROY TIMOTHY GRAVETTE, DEFENSE WITNESS, SWORN.

THE CLERK:  STATE AND SPELL YOUR FULL NAME FOR THE RECORD, PLEASE.

THE WITNESS:  MY NAME IS ROY TIMOTHY --

THE COURT:  I'M GOING TO ASK YOU TO PULL THE MIC UP SO WE CAN ALL HEAR.

THE WITNESS:  HOW IS THAT, SIR?

THE COURT:  ALL RIGHT.

THE WITNESS:  ROY TIMOTHY GRAVETTE.  LAST NAME IS SPELLED G-R-A-V-E-T-T-E.

DIRECT EXAMINATION (QUALIFICATIONS)

BY MR. TRAVIS:

Q.      MR. GRAVETTE, HOW ARE YOU CURRENTLY EMPLOYED?

A.      I'M CURRENTLY RETIRED FROM THE FEDERAL BUREAU OF PRISONS, AND I ALSO HAVE A CONSULTING BUSINESS WHERE I DO LITIGATION CONSULTING FOR ATTORNEYS.

Q.      WHAT IS THE NAME OF YOUR BUSINESS?

A.      GRAVETTE CONSULTING LLC.

Q.      WHAT SORT OF SERVICES DOES THAT BUSINESS PROVIDE?

A.      I PROVIDE INFORMATION AND EXPERT WITNESS TESTIMONY IF NECESSARY --

THE COURT:  YOU'RE NOT SPEAKING INTO THE MIC.  FOR SOME REASON -- PUT IT IN FRONT OF YOU, OKAY, RATHER THAN TO THE SIDE.

THE WITNESS:  JUST START OVER?

THE COURT:  YES.  START OVER.

THE WITNESS:  I PROVIDE CONSULTING INFORMATION LITIGATION CONSULTING FOR ATTORNEYS, SOMETIMES THE MEDIA, AND SOMETIMES I HAVE WORKED FOR INMATES OR POTENTIAL INMATES WHO ARE GOING TO PRISON AND

TALK WITH THEM BEFORE THEY GO IN.

BY MR. TRAVIS:

Q.      DO YOU DO ANY CONTRACT WORK FOR THE GOVERNMENT?

A.      YES.  I ALSO HAVE A CONTRACT WITH THE FEDERAL GOVERNMENT.  IT'S THROUGH KEYPOINT GOVERNMENT SOLUTIONS. WE DO CONTRACT WORK FOR THE OFFICE OF PERSONNEL MANAGEMENT, DOING SECURITY BACKGROUND INVESTIGATIONS.

Q.      AND IN YOUR CONSULTING BUSINESS, HAVE YOU DONE WORK FOR THE UNITED STATES DEPARTMENT OF THE ARMY?

A.      YES, I HAVE.

Q.      HOW ABOUT THE ATTORNEY GENERAL'S OFFICE FOR THE STATE OF ARIZONA?

A.      YES, SIR.

Q.      PRIOR TO STARTING YOUR CONSULTING BUSINESS, YOU WERE EMPLOYED BY THE FEDERAL BUREAU OF PRISONS, CORRECT?

A.      THAT'S CORRECT.

Q.      WHEN DID YOU START YOUR EMPLOYMENT WITH THE FEDERAL BUREAU OF PRISONS?

A.      JUNE OF 1990.

Q.      AND WHEN YOU WERE INITIALLY HIRED BY THE FEDERAL BUREAU OF PRISONS, BEFORE YOU STARTED ACTUALLY WORKING, DID YOU RECEIVE ANY SORT OF TRAINING PROGRAM OR ANY SORT OF TRAINING?

A.      YES.  THE FIRST WEEK WAS WHAT THEY CALL INSTITUTION FAMILIARIZATION TRAINING, WAS A ONE WEEK

TRAINING.  WE STARTED ON MONDAY MORNING AND WE TRAINED THROUGH FRIDAY.  IT WAS BECOMING FAMILIAR WITH THE INSTITUTION, THE POLICIES AND PROCEDURES AND JUST GETTING US READY --

THE DEFENDANT:  EXCUSE ME.  COULD WE WAIT FOR JUST A MOMENT, PLEASE.  THE FIRE ALARM IS GOING OFF.

THE COURT:  OKAY.

COUNSELOR, REFRESH MY MEMORY.  HOW LONG DOES THE FIRE ALARM AT THE INSTITUTION TAKE?

MR. TRAVIS:  I THINK THE LAST TIME WE EXPERIENCED THIS, IT WAS LIKE 15 MINUTES.

MS. SAUNDERS:  IT WAS AT LEAST 10.

THE COURT:  10 MINUTES?

MS. SAUNDERS:  AT LEAST 10.

THE COURT:  WHY DON'T WE DO THIS.  LET'S TAKE A RECESS UNTIL WE ARE NOTIFIED THAT THE FIRE ALARM HAS BEEN TURNED OFF AT THE PRISON.  THIS WAY WE JUST DON'T SIT AROUND AND --

MR. TRAVIS:  THAT IS FINE, YOUR HONOR.

THE COURT:  -- AND WAIT.  ALL RIGHT, MR. HAMMER.

THE DEFENDANT:  YOUR HONOR, THE FIRE ALARM JUST WENT OFF.  IT STOPPED NOW.

THE COURT:  ALL RIGHT.  THEN WE DON'T HAVE TO TAKE A RECESS.  WE CAN CONTINUE.

THE DEFENDANT:  THANK YOU.

THE COURT:  LET'S CONTINUE.

BY MR. TRAVIS:

Q.    AFTER THAT INITIAL ONE-WEEK TRAINING PROGRAM, DID YOU RECEIVE ANY OTHER TRAINING DURING THE PERIOD OF TIME YOU WERE EMPLOYED BY THE BUREAU OF PRISONS?

A.    YES.  AFTER I HAD BEEN WORKING FOR THE BUREAU OF PRISONS ABOUT TWO-AND-A-HALF OR THREE MONTHS, THEY SENT ME TO GLYNCO, GEORGIA TO THE FEDERAL TRAINING CENTER DOWN THERE FOR THREE WEEKS OF INTENSIVE TRAINING.

Q.    WERE YOU INITIALLY HIRED AS A CORRECTIONAL OFFICER?

A.    YES, SIR.

Q.    WHERE WAS YOUR FIRST DUTY ASSIGNMENT?

A.    MY FIRST DUTY ASSIGNMENT AT THE FEDERAL CORRECTIONAL INSTITUTION IN TALLADEGA, ALABAMA WAS IN BETA B UNIT AS A DAY WATCH HOUSING UNIT OFFICER.

Q.    I JUST PUT BEFORE YOU A DOCUMENT MARKED FOR IDENTIFICATION AS D 302.  IS THAT AN AERIAL VIEW OF THE TALLADEGA COMPLEX?

A.    YES, SIR.

Q.    WHAT SECURITY LEVEL IS THAT COMPLEX?

A.    AT THAT TIME IT WAS A MEDIUM SECURITY LEVEL INSTITUTION.

Q.    AND HOW LONG DID YOU REMAIN AT THE TALLADEGA

POSITION?

A.       IT WAS ABOUT THREE YEARS AND THREE MONTHS.

Q.       AND WHILE YOU WERE AT TALLADEGA, DID YOU REMAIN A CORRECTIONAL OFFICER?

A.       I STARTED AS A CORRECTIONAL OFFICER, AND THEN I WAS PROMOTED ONE YEAR LATER TO WHAT IS CALLED A GS 7 SENIOR OFFICER.  AND THEN FOLLOWING THAT, I CAN'T REMEMBER HOW MUCH LONGER IT WAS, I WAS PROMOTED TO SENIOR OFFICER SPECIALIST, A GS 8.

Q.       LET'S START WITH YOUR INITIAL POSITION, YOUR CORRECTIONAL OFFICER POSITION.  GENERALLY, WHAT WERE YOUR JOB RESPONSIBILITIES?

A.       MY JOB AS A CORRECTIONAL WORKER WAS THE OVERALL SAFETY AND SECURITY OF THE ENTIRE INSTITUTION.  I WOULD BE ASSIGNED A POST OR A DUTY.  IT MAY BE SUPERVISING A HOUSING UNIT.  I COULD HAVE BEEN ASSIGNED TO WORKING AS A COMPOUND OFFICER, MONITORING INMATE MOVEMENTS, AND INMATE WORK DETAILS THAT WORKED OUT ON THE COMPOUND AREA.  I WORKED IN THE VISITING ROOM AT ONE TIME.  I WORKED IN THE SPECIAL INVESTIGATIVE SUPERVISOR'S OFFICE FOR A WHILE AS A TELEPHONE MONITOR.  AND THEN I ALSO WORKED IN THE ADMINISTRATIVE OFFICE, HELPING WITH THE TIME AND ATTENDANCE REPORTS AT ONE TIME ALSO.

Q.       AND WHEN YOU RECEIVED THE PROMOTION TO SENIOR OFFICER, DID YOUR JOB RESPONSIBILITIES CHANGE?

A.      NOT REALLY.  IT WAS JUST -- AFTER YOUR FIRST YEAR YOU ARE PROMOTED TO GS 7.  THE RESPONSIBILITIES STAY PRETTY MUCH THE SAME.

Q.      AND HOW ABOUT WHEN YOU WERE PROMOTED TO SENIOR OFFICER SPECIALIST?

A.      AS A SENIOR OFFICER SPECIALIST YOUR DUTIES DO CHANGE SOMEWHAT.  YOU ARE MORE OF A SENIOR PERSON THERE. I WORKED AS A HOUSING UNIT OFFICER IN CHARGE OF THE SPECIAL HOUSING UNIT ON NUMEROUS OCCASIONS, ALSO IN THE CUBAN MARIELITO UNIT.

Q.      DO ALL FEDERAL INSTITUTIONS HAVE SPECIAL HOUSING UNITS?

A.      ALL BUT THE MINIMUM SECURITY CAMPS DO.

Q.      AND DO ALL OF THE SPECIAL HOUSING UNITS OPERATE UNDER THE SAME POLICIES AND PROCEDURES?

A.      YES, SIR.  IT'S A NATIONAL POLICY.

Q.      AND HOW LONG DID YOU WORK OR HAVE ANY RESPONSIBILITIES WITH RESPECT TO THE SPECIAL HOUSING UNIT IN TALLADEGA?

A.      I WOULD SAY THE ENTIRE TIME I WAS THERE, PROBABLY A YEAR.

Q.      OKAY.

        EITHER DURING THAT PERIOD AT TALLADEGA OR AT ANY OTHER TIME WHILE YOU WERE AT THE BUREAU OF PRISONS, DID YOU BECOME FAMILIAR WITH INMATES BEING ABLE

TO BUY ITEMS THROUGH THE COMMISSARY?

A.      YES.

Q.      AND DID YOU ALSO BECOME FAMILIAR WITH INMATES BEING ABLE TO BUY SPECIAL PURCHASE ORDERS?

A.      YES.

Q.      WHEN YOU LEFT TALLADEGA, WHERE DID YOU MOVE TO?

A.      I MOVED TO THE FEDERAL DETENTION CENTER IN MIAMI, FLORIDA AS A GS 9 LIEUTENANT.

Q.      WAS THAT A PROMOTION?

A.      YES, SIR, IT WAS.

Q.      HOW LONG DID YOU REMAIN AT MIAMI?

A.      I WAS AT MIAMI FOR -- I ARRIVED THERE IN OCTOBER OF '93, AND LEFT THERE IN JUNE OF '95.

Q.      AND WHAT WERE YOUR JOB RESPONSIBILITIES AT MIAMI?

A.      THE INSTITUTION THAT I WENT DOWN INITIALLY ASSIGNED TO THE FEDERAL DETENTION CENTER WAS STILL UNDER CONSTRUCTION, SO WE DID A LOT OF HIRING OF NEW OFFICERS, A LOT OF WRITING OF LOCAL POLICY.  I INSTRUCTED A LOT OF CLASSES WITH THE NEW OFFICERS, TOOK THEM THROUGH INSTITUTIONAL FAMILIARIZATION TRAINING.  THEN I WAS ALSO ASSIGNED BACK AND FORTH TO THE METROPOLITAN CORRECTIONAL CENTER, WHICH WAS THE OLDER INSTITUTION IN MIAMI AS A GS 9 ACTIVITIES LIEUTENANT.

Q.      AND WHAT WOULD BE INVOLVED IN BEING AN

ACTIVITIES LIEUTENANT?

A.        THE ACTIVITIES LIEUTENANT ASSISTS THE OPERATIONS LIEUTENANT IN THE DAILY OPERATION OF THE INSTITUTION. YOUR SHIFT STARTS AT 6 A.M. THE FIRST SHIFT, WHICH MEANS YOU GET THERE IN TIME TO MAKE SURE THE MORNING MEAL IS SERVED TO THE INMATES, THAT THE INMATES GET TO THE MORNING MEAL IF THEY SO DESIRE.  AND THEN WE OPEN UP THE RECREATION YARD AND THE OTHER DAILY ACTIVITIES THAT GO ON.  YOU JUST PRETTY MUCH MONITOR THE COMPOUND AREA DURING THE DAY AND ALSO ASSIST WITH SUPERVISION OF THE CORRECTIONAL STAFF.

Q.        WOULD THERE BE ANY INVOLVEMENT WITH SECURITY IN THAT POSITION?

A.        OH, YES.

Q.        AND WHAT?

A.        THE MONITORING OF THE INMATES, THE MONITORING OF THE STAFF.  YOU WOULD MAKE SURE THAT ALL SECURITY PROCEDURES ARE BEING FOLLOWED.  THAT THE STAFF ARE WHERE THEY ARE SUPPOSED TO BE, THAT THEY HAVE THE PROPER EQUIPMENT.  YOU MAKE DAILY ROUNDS TO ALL THE AREAS OF THE INSTITUTION TO MAKE SURE EVERYTHING IS OPERATING PROPERLY.

Q.        AND FROM MIAMI, WHERE DID YOU GO?

A.        FROM MIAMI I TOOK A LATERAL TRANSFER TO THE FEDERAL CORRECTIONAL INSTITUTION IN ESTILL, SOUTH

CAROLINA.

Q.      AND WAS THERE ANY CHANGE IN JOB RESPONSIBILITIES WHEN YOU ARRIVED AT THE FACILITY IN SOUTH CAROLINA?

A.      DURING MY TIME IN MIAMI AFTER I HAD BEEN THERE FOR A YEAR, I WAS PROMOTED TO A GS 11 LIEUTENANT, WHICH WAS OPERATIONS LIEUTENANT.  AND I ALSO DURING THE TIME -- BACKTRACK TO MIAMI, I ALSO OPENED UP THE SPECIAL HOUSING UNIT FOR THAT FACILITY WHEN THEY FINALLY STARTED RECEIVING INMATES.  SO THEN I TRANSFERRED IN JUNE OF '95 TO ESTILL, SOUTH CAROLINA WHERE I ASSUMED THE DUTIES AS AN OPERATIONS LIEUTENANT, AND DURING MY TIME THERE I WAS A SPECIAL HOUSING UNIT LIEUTENANT, ADMINISTRATIVE LIEUTENANT.  I WAS IN CHARGE OF THE SPECIAL OPERATIONS RESPONSE TEAM AND ALSO I RAN THE DISTURBANCE CONTROL SQUAD FOR A WHILE.

Q.      AS A SPECIAL HOUSING UNIT LIEUTENANT WOULD YOU BASICALLY BE IN CHARGE OF THE ORDERLY OPERATION OF THE SPECIAL HOUSING UNIT?

A.      YES, SIR.

Q.      AND FROM THE PLACE IN SOUTH CAROLINA, WHERE DID YOU GO?

A.      I LEFT THERE AND WENT -- I WAS PROMOTED TO CAPTAIN TO THE FEDERAL DETENTION CENTER IN OAKDALE, LOUISIANA.

THE TOP PHOTOGRAPH IS EDGEFIELD.  THE

BOTTOM IS THREE RIVERS, TEXAS.

Q.     SORRY, I THOUGHT ONE WAS WHERE YOU ARE CURRENTLY ARE IN YOUR TOUR.

WHEN YOU WERE AT OAKDALE, HOW LONG WERE YOU AT OAKDALE?

A.     I ARRIVED IN OAKDALE IN DECEMBER OF 1997 AND LEFT THERE IN AUGUST OF 1999.

Q.     WHAT WAS YOUR POSITION THERE?

A.     I WAS A CAPTAIN.

Q.     AND WHAT WERE YOUR OVERALL JOB RESPONSIBILITIES?

A.     AS A CAPTAIN YOUR RESPONSIBILITIES ARE FOR THE ENTIRE INSTITUTION, THE SAFETY AND SECURITY OF THE INSTITUTION AS LIKE BEFORE, BUT I HAD THE OVERSIGHT OF THE ENTIRE CORRECTIONAL SERVICES DEPARTMENT.  THE LIEUTENANTS WORKED FOR ME.  THE SPECIAL INVESTIGATIVE OPERATIONS -- SPECIAL INVESTIGATIVE SUPERVISOR'S OFFICE WORKED FOR ME.

Q.     AND FROM OAKDALE, DID YOU GO TO EDGEFIELD?

A.     YES.  EDGEFIELD, SOUTH CAROLINA.

Q.     I PUT BEFORE YOU A PHOTOGRAPH MARKED FOR IDENTIFICATION AS D 302.  IS THAT AN AERIAL VIEW OF EDGEFIELD?

A.     YES, SIR, IT IS.

THE COURT:  I HAVE 301 IN FRONT OF ME.

MR. TRAVIS:  OH, I'M SORRY.  IS 301

EDGEFIELD?

THE WITNESS:  YES, SIR.

MR. TRAVIS:  301 IS EDGEFIELD, I'M SORRY.

I LOOKED AT THE WRONG NUMBER, YOUR HONOR.

THE COURT:  OKAY.

BY MR. TRAVIS:

Q.      AT EDGEFIELD WHAT POSITION OR RANK DID YOU HOLD?

A.      I WAS PROMOTED TO GS 13 CAPTAIN, BECAUSE
EDGEFIELD WAS A HIGH SECURITY INSTITUTION.

Q.      AND DID YOUR JOB RESPONSIBILITIES CHANGE?

A.      NO.  THE JOB RESPONSIBILITIES DID NOT CHANGE.
IT WAS MUCH MORE IN-DEPTH.  THERE WAS A LOT MORE TO IT
BECAUSE OF THE DIFFERENT LEVELS OF THE INSTITUTION,
SECURITY LEVELS, AND DIFFERENT TYPES OF INMATES.

Q.      AND AS THE CAPTAIN, WOULD YOU BE INVOLVED WITH
SECURITY?

A.      THAT WAS MY RESPONSIBILITY WAS THE SECURITY FOR
THE ENTIRE INSTITUTION.

Q.      BOTH STAFF AND INMATES?

A.      YES.

Q.      WHEN YOU LEFT EDGEFIELD, WHERE DID YOU GO?

A.      I LEFT EDGEFIELD AND WENT BACK TO TALLADEGA,
ALABAMA.

Q.      AND WAS THERE A PROMOTION IN CONJUNCTION WITH
RETURN TO TALLADEGA?

A.        YES, SIR.  I WAS PROMOTED TO ASSOCIATE WARDEN.

Q.        IN THE POSITION OF ASSOCIATE WARDEN, WHAT CHANGE IN JOB RESPONSIBILITIES WOULD THERE BE?

A.        THE CHANGE IN JOB RESPONSIBILITIES, AS AN ASSOCIATE WARDEN NORMALLY THE WAY THE INSTITUTIONS ARE STAFFED NOWADAYS IS YOU HAVE TWO ASSOCIATE WARDENS.  ONE ASSOCIATE WARDEN IS THE ASSOCIATE WARDEN OF PROGRAMS. THE OTHER ASSOCIATE WARDEN IS THE ASSOCIATE WARDEN OF OPERATIONS.  WHEN I FIRST ARRIVED, I WAS ASSIGNED AS THE ASSOCIATE WARDEN OF OPERATIONS.

Q.        THE ASSOCIATE WARDEN OF OPERATIONS, WHAT DOES THAT ENTAIL?

A.        THE OPERATIONS SIDE OF THE INSTITUTION, WHICH INCLUDES HUMAN RESOURCES, FINANCIAL MANAGEMENT, THE FACILITIES DEPARTMENT, HEALTH SERVICES DEPARTMENT, AND A COUPLE OTHERS I CAN'T RECALL.

Q.        DOES IT HAVE ANYTHING TO DO WITH SAFETY AND SECURITY?

A.        ALWAYS.  IN THE FEDERAL BUREAU OF PRISONS YOU ARE A CORRECTIONAL WORKER FIRST.  EVERYBODY IS RESPONSIBLE FOR SAFETY AND SECURITY.

Q.        WHILE YOU WERE AT TALLADEGA THIS SECOND TIME, DID YOU EVER FUNCTION AS AN ASSOCIATE WARDEN WITH RESPECT TO PROGRAM?

A.        YES, I DID.

Q.      AND WHAT WOULD THAT ENTAIL?

A.      ASSOCIATE WARDEN OF PROGRAMS IS IN CHARGE OF ALL INMATE PROGRAMS, RECEIVING AND DISCHARGE, THE EDUCATIONAL DEPARTMENT, RECEIVING AND DISCHARGE, CHAPLAINCY PROGRAMS, PSYCHOLOGY, RECREATION.  AND THEN OF COURSE YOU'RE OVER CORRECTIONAL SERVICES, WHICH IS THE SECURITY COMPONENT OF THE INSTITUTION.

Q.      IN YOUR POSITION AS ASSOCIATE WARDEN OR IN ANY OF THE POSITIONS YOU HELD BEFORE YOU BECAME AN ASSOCIATE WARDEN, DID YOU HAVE EXPOSURE TO CLASSIFICATION OF INMATES?

A.      YES.

Q.      WHAT WAS YOUR EXPOSURE?

A.      AS A CAPTAIN, I REVIEWED INMATES ON INTAKE AND THEN AS AN ASSOCIATE WARDEN I ALSO -- I REVIEWED TRANSFER ORDERS, REQUESTS FOR TRANSFERS AND THAT SORT OF THING.

Q.      AS PART OF THAT POSITION, DID YOU BECOME FAMILIAR WITH THE CLASSIFICATION PROCESS USED BY THE BUREAU OF PRISONS?

A.      YES, I DID.

Q.      AND FROM THAT ASSOCIATE WARDEN POSITION, WHERE DID YOU NEXT GO?

A.      I TOOK A TRANSFER TO BEAUMONT, TEXAS TO THE FEDERAL CORRECTIONAL COMPLEX.

Q.      AND AT BEAUMONT, WHAT POSITION DID YOU HOLD?

A.      I WAS THE ASSOCIATE WARDEN AT THE MEDIUM SECURITY INSTITUTION FOR THE FIRST TWO YEARS I WAS THERE.

Q.      HOW LONG DID YOU STAY AT BEAUMONT?

A.      I WAS IN BEAUMONT FROM NOVEMBER OF 2003 UNTIL JANUARY THE 7TH, I BELIEVE, OF 2007.

Q.      SO WHAT POSITION DID YOU HOLD AFTER THE FIRST TWO YEARS?

A.      AFTER THE FIRST TWO YEARS, WE HAD A HURRICANE IN 2005.  AND AFTER THAT I WAS MOVED OVER TO THE CENTRAL ADMINISTRATION BUILDING AS THE ASSOCIATE WARDEN OVER THE CENTRAL ADMINISTRATION BUILDING, WHICH -- THE MAIN REASON THEY MOVED ME OVER THERE WAS BECAUSE OF THE FACILITIES COMPONENT BECAUSE THERE WERE SO MANY THINGS THAT HAD TO BE REBUILT AND REDONE.  AND AT THAT TIME I WAS ALSO OVER THE MEDICAL SERVICES DEPARTMENT, WHICH WAS A CONTRACT SERVICE WITH THE UNITED -- WITH THE UNIVERSITY OF TEXAS MEDICAL BRANCH.

Q.      DURING THAT TENURE, THAT PERIOD OF TIME WERE YOU INVOLVED AT ALL IN CLASSIFICATION AND DESIGNATION?

A.      NOT DURING THOSE FEW MONTHS, NO.

Q.      AND FROM BEAUMONT WHERE DID YOU GO?

A.      WELL, BEFORE I LEFT BEAUMONT, AFTER THE CENTRAL ADMINISTRATION BUILDING, I TRANSFERRED OVER TO THE

PENITENTIARY AND THAT WAS WHERE I WAS AT BEFORE I TRANSFERRED OUT.  I WAS THERE FOR THE LAST SEVEN MONTHS. AND YES, THERE WAS CLASSIFICATION INVOLVED IN THAT JOB.

Q.      AND FROM BEAUMONT WHERE DID YOU NEXT GO?

A.      THREE RIVERS, TEXAS.

Q.      THE PHOTO MARKED FOR IDENTIFICATION AS D 303, IS THAT AN AERIAL VIEW OF THE THREE RIVERS COMPLEX?

A.      YES, SIR, IT IS.

Q.      WHEN YOU WERE AT THREE RIVERS, WHAT WAS YOUR RANK?

A.      I WAS AN ASSOCIATE WARDEN.

Q.      AND WHAT WERE YOUR JOB RESPONSIBILITIES?

A.      WHEN I FIRST ARRIVED THERE, I WAS ASSIGNED AS ASSOCIATE WARDEN OF PROGRAMS.

Q.      AND WOULD THE POSITION ASSOCIATE WARDEN OF PROGRAMS BE THE SAME AT THREE RIVERS AS IT WAS THAT YOU DESCRIBED EARLIER?

A.      YES, SIR.

Q.      AND IS THREE RIVERS -- HOW LONG WERE YOU AT THREE RIVERS?

A.      OH, THREE AND-A-HALF YEARS.

Q.      AND IS THREE RIVERS WHERE YOU WERE LOCATED AT THE TIME YOU RETIRED?

A.      YES, SIR.

Q.      IN ANY OF THE EMPLOYMENT POSITIONS YOU HELD WITH

THE BOP, DID YOU EVER BECOME INVOLVED IN DOING ANY SORT OF INVESTIGATIONS OF INCIDENTS?

A.    YES.

Q.    IS THAT COMMONLY CALLED AFTER-ACTION REPORTS?

A.    YOU HAVE AN AFTER ACTION WHEN YOU'VE HAD A SIGNIFICANT INCIDENT, YES, OR USE OF FORCE.

Q.    AND HOW DID YOU BECOME INVOLVED IN THOSE?

A.    MY FIRST INVOLVEMENT WITH THAT WAS AS A LIEUTENANT BECAUSE AS A LIEUTENANT YOU SUPERVISE USE OF FORCE IN CELL EXTRACTION TEAMS.

Q.    AND WHAT IS THE PURPOSE FOR THOSE INTERNAL INVESTIGATIONS?

A.    THOSE INTERNAL INVESTIGATIONS ARE DONE TO MAKE SURE THAT WE DID EVERYTHING CORRECTLY AND WE ALSO USE THAT AS A TEACHING TOOL TO MAKE SURE THAT IF WE DID ANYTHING THAT WAS INCORRECT OR IMPROPER, WE WANT TO MAKE SURE THAT WE CORRECT IT AND IT DOES NOT HAPPEN AGAIN.

Q.    AND AS FAR AS THE BOP HIERARCHY, THE NATIONAL OFFICE IN THE DISTRICT OF COLUMBIA, CORRECT?

A.    YES.

Q.    BELOW THAT THEY HAVE REGIONAL OFFICES?

A.    SIX REGIONAL OFFICES, YES.

Q.    THEN BELOW THE REGIONAL OFFICES, THEY HAVE THE INSTITUTIONS WITHIN THE REGION, CORRECT?

A.    THAT'S CORRECT.

Q.        IF YOU ARE INVOLVED IN AN AFTER-ACTION REPORT, WHERE DOES IT GO ONCE YOU HAVE REACHED WHATEVER CONCLUSION YOU REACH?

A.        THE AFTER-ACTION REPORT, COMMONLY KNOWN AS A 586, FORM 586, IS GENERATED BY THE LIEUTENANT'S OFFICE. AND THEN IT GOES FROM THERE TO THE CAPTAIN.  FROM THE CAPTAIN TO THE ASSOCIATE WARDEN.  THEN IT GOES OVER TO THE HEALTH SERVICES DEPARTMENT TO ENSURE THAT THERE IS NOT ANY MEDICAL ISSUES OR ANYTHING THAT WAS LEFT OUT MEDICALLY THAT SHOULD HAVE BEEN TAKEN CARE OF.  THEN IT GOES TO THE WARDEN'S OFFICE.  THEN THERE'S A MEETING HELD WHERE ANY VIDEOTAPES OR ANY MEMORANDUMS OR ANYTHING INVOLVED WITH IT ARE REVIEWED.  AFTER THAT REVIEW, IT IS SENT TO THE REGIONAL OFFICE.  AND FROM THE REGIONAL OFFICE AFTER THEIR REVIEW IT'S SENT TO THE CENTRAL OFFICE IN WASHINGTON, D.C.

Q.        AND DURING THE PERIOD OF TIME WHEN YOU WERE EMPLOYED BY THE BUREAU OF PRISONS, WAS SAFETY AND SECURITY OF INMATES AND THE STAFF A PRIORITY?

A.        THAT IS THE NUMBER ONE PRIORITY.

Q.        PRIOR TO TODAY HAVE YOU BEEN QUALIFIED AND OFFERED AS AN EXPERT WITNESS IN ANY UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF PENNSYLVANIA?

A.        YES, SIR, I HAVE.

Q.        AND WAS THAT IN UNITED STATES DISTRICT COURT FOR

THE MIDDLE DISTRICT OF PENNSYLVANIA IN SCRANTON?

A.      YES, SIR, IT WAS.

Q.      AND WHEN WAS THAT?

A.      THAT WAS RIGHT ABOUT TWO YEARS AGO TO THE DAY, I BELIEVE.

Q.      HAVE YOU EVER BEEN OFFERED AS AN EXPERT BEFORE ANY COURT AND NOT DEEMED QUALIFIED?

A.      NO, I HAVEN'T.

        MR. TRAVIS:  YOUR HONOR, AT THIS POINT IN TIME WE WOULD MAKE MR. GRAVETTE AVAILABLE FOR CROSS EXAMINATION WITH RESPECT TO QUALIFICATIONS.

        MR. GURGANUS:  NO QUESTIONS, YOUR HONOR.

        THE COURT:  HE IS BEING OFFERED AS AN EXPERT IN WHAT AREA?

        MR. TRAVIS:  BASICALLY BUREAU OF PRISONS POLICIES AND PROCEDURES.  IT WILL COVER A NUMBER OF DIFFERENT AREAS, BUT IT'S BASICALLY THE OPERATIONS OF THE BUREAU OF PRISONS.

        THE COURT:  ALL RIGHT.  I FIND HIM SO QUALIFIED.

                DIRECT EXAMINATION

BY MR. TRAVIS:

Q.      MR. GRAVETTE, JUST TO CLOSE THE CIRCLE, I HAVE PLACED IN FRONT OF YOU A DOCUMENT MARKED FOR IDENTIFICATION AS D 300.  IS THAT YOUR CV?

A.        YES, SIR, IT IS.

MR. TRAVIS:  IF I MAY HAVE A MOMENT, YOUR HONOR?

THE COURT:  YES.

(PAUSE.)

BY MR. TRAVIS:

Q.        ALTHOUGH MR. HAMMER IS CURRENTLY SERVING A SENTENCE OR AT LEAST IN CUSTODY OF THE FEDERAL BUREAU OF PRISONS, IF THE COURT WERE TO SELECT A SENTENCE OF LIFE WITHOUT THE POSSIBILITY OF RELEASE, WOULD HE GO THROUGH A CLASSIFICATION DESIGNATION PROCESS?

A.        YES, HE WOULD.

Q.        AND HOW IS THAT HANDLED?

A.        THE INITIAL INFORMATION IS GOING TO COME FROM HIS CASE MANAGER.  HIS CASE MANAGER IS GOING TO MAKE A RECOMMENDATION.  IT'S GOING TO GO TO THE UNIT MANAGER. FROM THE UNIT MANAGER IT'S GOING TO GO OVER TO WHAT IS CALLED A CENTRAL INMATE MONITORING OFFICE, WHAT WE CALL THE CMC, CASE MANAGEMENT COORDINATOR.  THE CASE MANAGEMENT COORDINATOR IS GOING TO REVIEW IT FOR ACCURACY AND ALL THAT GOOD STUFF.  THEN IT'S GOING TO GO FROM THERE TO THE ASSOCIATE WARDEN'S OFFICE AND THEN UP TO THE WARDEN'S OFFICE.  THEN AFTER IT LEAVES THE WARDEN'S OFFICE, IT'S GOING TO BE TRANSMITTED TO A CENTRALIZED LOCATION IN GRAND PRAIRIE, TEXAS WHERE ALL

THE DESIGNATORS ARE FOR THE FEDERAL BUREAU OF PRISONS. IT USED TO BE DONE ON A REGIONAL BASIS, BUT NOW IT'S ALL DONE OUT OF GRAND PRAIRIE, TEXAS.

Q.      APPROXIMATELY HOW LONG HAS IT BEEN THAT ALL THE DESIGNATIONS AND CLASSIFICATIONS COME OUT OF GRAND PRAIRIE, TEXAS?

A.      I WOULD SAY SEVEN YEARS.

Q.      AND WHEN THIS PROCESS IS ONGOING, THE CLASSIFICATION AND DESIGNATION, WOULD THOSE INDIVIDUALS INVOLVED IN THE PROCESS HAVE AVAILABLE ALL OF THE INFORMATION THAT IS IN MR. HAMMER'S CENTRAL INMATE FILE?

A.      YES, SIR.  THAT IS WHAT THEY USE FOR THE DESIGNATION, ALL THAT INFORMATION.

Q.      AND JUST TO PUT IT ON THE RECORD, IS IT CORRECT THAT WHEN THERE IS A FEDERAL INMATE, THEY HAVE A CENTRAL INMATE FILE THAT BASICALLY TRAVELS WITH THEM FROM INSTITUTION TO INSTITUTION?

A.      YES.

Q.      AND WHATEVER RECORDS ARE CREATED ON THAT INMATE, THEY WENT TO THE CENTRAL INMATE FILE, CORRECT?

A.      THAT'S CORRECT.

Q.      SO THE PEOPLE WHO WOULD BE INVOLVED IN THE DESIGNATION OF MR. HAMMER, IF HE RECEIVES A SENTENCE OF LIFE IMPRISONMENT WITHOUT THE POSSIBILITY OF RELEASE, THEY WOULD BE AWARE OF THIS CASE, IS THAT CORRECT?

A.      YES, THEY WOULD.

Q.      BE AWARE OF THE DEATH OF ANDREW MARTI?

A.      YES.

Q.      BE AWARE OF ALL OF HIS CENTRAL INMATE FILE?

A.      YES.  HIS ENTIRE FILE.

Q.      AND WOULD THEY ALSO BE AWARE OF HIS OKLAHOMA RECORDS?

A.      YES.

Q.      HAVING HAD THE OPPORTUNITY TO REVIEW MR. HAMMER'S RECORDS, DO YOU HAVE AN OPINION BASED UPON REASONABLE CERTAINTY AS TO WHERE YOU BELIEVE MR. HAMMER WOULD BE DESIGNATED IF HE RECEIVES A SENTENCE OF LIFE IMPRISONMENT WITHOUT THE POSSIBILITY OF RELEASE?  I'M NOT ASKING FOR A SPECIFIC LOCATION, JUST A CLASSIFICATION.

A.      I WOULD IMAGINE, ASSUME, AND BE MOST CERTAIN THAT HE WOULD GO TO UNITED STATES PENITENTIARY AND NOTHING LESS THAN THAT.

Q.      IF MR. HAMMER -- IF YOUR OPINION IS INCORRECT, DO YOU SEE ANY WAY IN THE WORLD THAT HE WOULD GET A LOWER SECURITY LEVEL THAN A USP?

A.      NO.  HE HAS OVER 30 YEARS TO SERVE AND HE IS A MALE, AND LESS THAN 70 YEARS OLD.

Q.      ARE THERE FACILITIES IN THE UNITED STATES IN THE FEDERAL BUREAU OF PRISONS WHICH ARE MORE SECURE THAN A

UNITED STATES PENITENTIARY?

A.      YES.  HE IS AT ONE NOW THE SPECIAL CONFINEMENT UNIT IN TERRE HAUTE.  THERE'S ALSO SOME SPECIAL MANAGEMENT UNITS IN OUR FACILITIES THAT HE COULD BE ASSIGNED TO.  OF COURSE IF THEY DEEMED NECESSARY HE WOULD GO TO THE ADMINISTRATIVE MAXIMUM IN FLORENCE, COLORADO.

Q.      THE PEOPLE WHO WOULD BE REVIEWING MR. HAMMER'S SITUATION AND MAKING THE DETERMINATION OF WHERE HE SHOULD BE DESIGNATED WOULD HAVE ALL OF THE BACKGROUND INFORMATION ON MR. HAMMER, CORRECT?

A.      YES, SIR.

Q.      AND INCLUDED IN THAT BACKGROUND INFORMATION WOULD BE THE SO-CALLED SEVEN REASONS LETTER?

A.      YES.

Q.      IF MR. HAMMER IS DESIGNATED TO A UNITED STATES PENITENTIARY AS A RESULT OF RECEIVING A LIFE IMPRISONMENT SENTENCE, ARE THERE SPECIAL SECURITY MEASURES WHICH CAN BE IMPLEMENTED IN ORDER TO KEEP CLOSE TABS ON MR. HAMMER, FOR LACK OF A BETTER STATEMENT?

A.      THERE ARE SEVERAL WAYS TO DO IT.  WE HAVE WHAT IS CALLED A TWO-HOUR WATCH PROGRAM, WHERE AN INMATE WHO -- THAT WE WANT TO KEEP AN EYE ON, HE HAS GOT TO REPORT TO A STAFF MEMBER EVERY TWO HOURS, AND IT IS CALLED INTO A CENTRALIZED LOCATION AND RECORDED.  IF HE

HAS NOT, THEN WE ARE GOING TO START LOOKING FOR HIM. THERE'S NOT MANY PLACES HE CAN GO, BUT WE ARE GOING TO START LOOKING FOR HIM. THERE CAN ALSO A SPECIAL JOB ASSIGNMENT. OF COURSE WITH HIS PAST THAT I'M AWARE OF, HE IS GOING TO BE PUT INTO THE POSTED PICTURE FILE, WHICH IS REVIEWED MONTHLY BY ALL THE CORRECTIONAL SERVICES STAFF AND ON A QUARTERLY BASIS BY EVERYONE ELSE IN THE INSTITUTION. SO EVERYBODY IS GOING TO BE AWARE OF HIS PRESENCE AT THAT INSTITUTION.

Q.    FROM YOUR REVIEW OF HIS FILE, IS MR. HAMMER DESIGNATED A MAXIMUM CUSTODY INMATE?

A.    YES.

Q.    AND DOES THAT CARRY SOME SORT OF SPECIAL MEANING AS FAR AS SECURITY WITHIN THE BUREAU OF PRISONS?

A.    FOR ESCORTED TRIPS, YES. AND OF COURSE WHERE HE IS HOUSED, AT A PENITENTIARY AT THE MINIMUM.

Q.    IF THE DESIGNATION WOULD BE TO A UNITED STATES PENITENTIARY, WOULD SINGLE CELL STATUS BE AVAILABLE?

A.    YES.

Q.    AND IN THE EVENT THAT MR. HAMMER IS DESIGNATED TO A UNITED STATES PENITENTIARY AND THEY KEEP CLOSER WATCH ON HIM, DID YOU INDICATE THAT THERE MIGHT BE HIGHER LEVEL OF SECURITY FACILITIES FOR HIM?

A.    YES, THERE IS.

Q.    I THINK YOU SAID ONE WAS AN SCU, IS THAT

CORRECT?

A.         THE SCU WHERE HE IS CURRENTLY HOUSED, HE COULD STAY THERE.

Q.         THE SCU, WHERE HE IS HOUSED AT TERRE HAUTE, CONTAINS INDIVIDUALS WHO ARE UNDER A SENTENCE OF DEATH, CORRECT?

A.         YES.

THE COURT:  CAN WE GET CLARIFICATION. SCU, WHAT IS THAT?

BY MR. TRAVIS:

Q.         DOES SCU MEAN SPECIAL CONFINEMENT UNIT?

A.         YES, SIR.

Q.         THE SPECIAL CONFINEMENT UNIT IS THE NAME GIVEN TO THE BUILDING IN WHICH THE PEOPLE ARE HOUSED?

A.         YES, THE ENTIRE BUILDING.

Q.         AND TO YOUR KNOWLEDGE, DOES TERRE HAUTE WHERE DEATH ROW IS ALSO HAVE A COMPONENT IN THE SCU FOR INDIVIDUALS WHO DO NOT HAVE A SENTENCE OF DEATH?

A.         YES.

Q.         ANOTHER FACILITY THAT YOU TALKED ABOUT WAS SMU, WHICH IS SPECIAL MANAGEMENT UNIT, CORRECT?

A.         YES, SIR.

Q.         AND I BELIEVE THERE IS ONE AT USP LEWISBURG. ARE THERE OTHER SPECIAL MANAGEMENT UNITS THROUGHOUT THE UNITED STATES?

A.      THE ONES THAT I REMEMBER, YOU HAVE ONE AT TALLADEGA WHERE I USED TO WORK.  THEY CONVERTED THE CUBAN UNIT INTO AN SMU.  THEN YOU HAVE ONE IN OAKDALE, LOUISIANA, IN LEWISBURG, AND THERE MAY BE ANOTHER, BUT I DON'T RECALL.

Q.      AND AS BETWEEN AN SCU AND AN SMU, IS THERE A DIFFERENCE IN SECURITY?

A.      NO.  NO, THEY ARE BOTH RUN -- THEY ARE ALL RUN AS HIGH SECURITY UNITS.

Q.      AND I BELIEVE THAT AT THE TOP OF THE CHAIN IS WHAT WE CALL ADX, WHICH IS THE ADMINISTRATIVE MAXIMUM IN FLORENCE, COLORADO, CORRECT?

A.      THAT'S CORRECT.

Q.      WHOEVER IS DOING THE DESIGNATION COULD MAKE THE DETERMINATION THAT MR. HAMMER SHOULD GO TO ONE OF THOSE HIGHER LEVEL SECURITY FACILITIES, CORRECT?

A.      THEY CAN REQUEST IT.

Q.      CAN'T THEY ACTUALLY DESIGNATE HIM THERE?

A.      TO GO TO THE ADX AND THE SMU AND TO THE SCU, IT TAKES HIGHER AUTHORITY THAN JUST A DESIGNATOR.  IT'S GOING TO HAVE TO GO UP -- ON UP THROUGH THE REGIONAL OFFICES FOR APPROVAL AND OF COURSE THE CENTRAL OFFICE.

Q.      BUT IF I'M DOING THE DESIGNATION AND I SAY I BELIEVE THIS MAN SHOULD BE IN THIS TYPE OF ENVIRONMENT, I CAN MAKE THAT RECOMMENDATION AND SOMEONE HIGHER WOULD

REVIEW MY RECOMMENDATION, EITHER AGREE WITH IT OR DISAGREE WITH IT?

A.      THAT'S CORRECT.

Q.      NOW, WITH RESPECT TO THE UNITED STATES PENITENTIARY, COULD YOU GIVE BRIEFLY TO THE JUDGE AN EXPLANATION OF WHAT LIFE FOR AN INMATE IN THE UNITED STATES PENITENTIARY CONSISTS OF?

A.      I COULD RUN THROUGH A DAILY TIMELINE.

Q.      SURE.

A.      THAT WOULD HELP US.  NORMALLY INMATES ARE GOING TO WAKE UP AROUND 5:30, FOLLOWING THE 5 A.M. COUNT.  THE DOORS OPEN AT 6.  AT 6 O'CLOCK THE INMATES ARE FREE TO MOVE AROUND THEIR HOUSING UNIT.  THEY WILL START SHOWERS OR HAVE THEIR COFFEE OR WATCH THE MORNING NEWS OR WHATEVER.  AND THEN AT 6 A.M. THE DINING HALL IS GOING TO OPEN.  AND FOR THE INMATES WHO WISH TO GO HAVE THE MORNING MEAL, THEY WILL BE CALLED OVER ONE UNIT AT A TIME TO START THE MORNING MEAL PROCESS.

THEN ONCE THAT IS FINISHED WE'LL CLOSE THE DINING HALL DOWN.  OF COURSE THE INMATES AFTER THEY HAVE EATEN THEIR MORNING MEAL, THEY'LL GO BACK TO THEIR HOUSING UNIT.  THEN AT 7:30 WE WILL HAVE WORK CALL.  ALL INMATES WITH A JOB ASSIGNMENT FOR THAT DAY WILL REPORT TO THEIR JOB ASSIGNMENT.

IF THE INMATE IS OFF THAT DAY, THEY MAY

STAY IN THE HOUSING UNIT OR THEY MAY GO TO THE RECREATION YARD, WHICH WOULD NORMALLY OPEN UP AROUND 8 O'CLOCK.  STARTING AT 8 O'CLOCK IN THE MORNING YOU WILL HAVE WHAT'S CALLED TEN-MINUTE CONTROL MOVEMENTS. THEY WILL CALL FOR THE MOVEMENT.  THE OFFICERS WILL OPEN THE FRONT DOORS TO THE UNITS.  THE INMATES WILL GO TO THE RECREATION YARD.  THEY MAY GO TO THE CHAPEL.  THEY MAY GO TO THE EDUCATION BUILDING OR SOMETHING LIKE THAT. AT TEN MINUTES AFTER 8, THEY ARE GOING TO CLOSE THE MOVE, THE YARD WILL BE CLEARED.  THEN AGAIN WE DO IT AT 9.  AND THEN AT 10.

THEN AT 10:30 YOU WILL WRAP EVERYTHING UP AND START COLLECTING ALL -- ANY TOOLS THAT WERE PUT OUT FOR THE MORNING FOR JOB LOCATIONS AND THAT SORT OF THING, GETTING READY TO START THE NOON MEAL.  AND THEN YOU WILL START OFF CALLING THE INMATES BY UNIT AND ALSO BY JOB ASSIGNMENT OVER TO THE DINING HALL.  THEY WILL HAVE THEIR LUNCH MEAL.  AND THEN AFTER THEY FINISH THEIR LUNCH, THEY MAY GO BACK TO THEIR HOUSING UNIT TO FRESHEN UP OR WHATEVER.  THEN WE'LL HAVE WORK CALL FOLLOWING THAT AND THEY REPORT BACK TO THEIR JOB ASSIGNMENT.  OPEN THE RECREATION YARD UP.  AND IT STARTS THE SAME THING AS YOU HAD IN THE MORNING.

THEN AT 3:30 IN THE AFTERNOON EVERYTHING SHUTS DOWN.  YOU HAVE THE YARD -- WHAT WE CALL THE YARD

RECALL AND ALL THE INMATES ARE RECALLED BACK TO THEIR HOUSING UNITS AND LOCKED IN FOR THE 4 P.M. COUNT. THE ONLY INMATES WHO NOT LOCKED IN FOR THE 4 P.M. COUNT ARE OF COURSE THE INMATES WHO ARE OVER PREPARING THE EVENING MEAL IN THE FOOD SERVICE AREA. AT 4 P.M. ALL INMATES STAND UP IN THEIR CELLS AND ARE COUNTED. AND ONCE THAT COUNT IS CLEAR, IT'S NORMALLY CLEAR AROUND 4:40, 4:45, THEN WE WILL OPEN UP THE DINING HALL AND START THE EVENING MEAL FEEDING PROCESS ONE UNIT AT A TIME. THE INMATES WILL COME OVER, HAVE THEIR EVENING MEAL IF THEY SO DESIRE. THEN THEY WILL OPEN UP THE RECREATION YARD. THE RECREATION YARD WILL REMAIN OPEN UNTIL RIGHT BEFORE DARK, AND THEN WE WILL CLOSE IT DOWN.

ALSO DURING THAT EVENING TIME YOU STILL HAVE THE CONTROL MOVEMENTS. IN A PENITENTIARY YOU DON'T HAVE INMATES JUST RUNNING AROUND. THEY ARE GOING TO GO FROM POINT A TO POINT B AT A DESIGNATED TIME SO EVERYBODY CAN KEEP UP WITH THEM. DURING THE DAY NOT ONLY DO YOU HAVE THE COUNTS, WHICH YOU HAVE A COUNT AT 4 P.M., AT 10 P.M., 12 MIDNIGHT, 3 A.M. AND 5 A.M., YOU ALSO HAVE WHAT IS CALLED CENSUS CHECKS. IN OTHER WORDS, WHEN ALL THOSE INMATES GO TO THEIR WORK ASSIGNMENT IN THE MORNING, THEY ARE GOING TO CHECK THEM. THAT SUPERVISOR OF, SAY, THE PLUMBING DETAIL, HE IS SUPPOSED TO HAVE 12 INMATES. HE KNOWS WHO THEY ARE. HE'S GOING

TO GO THROUGH HIS ROSTER.  HE'S GOING TO MAKE SURE, HE IS HERE, HE IS HERE, HE IS HERE, HE IS HERE.  NO, HE IS NOT HERE.  HE IS AT THE DOCTOR'S OFFICE, WHICH IS ACROSS THE COMPOUND, AND HE IS GOING TO BE BACK BECAUSE IT'S ALL SET UP.  WE KNOW WHO IS GOING WHERE.  IF HAMMER HAD A DOCTOR'S APPOINTMENT AT 10 O'CLOCK IN THE MORNING, WE KNOW THAT BECAUSE THE PRIOR AFTERNOON THAT HAS BEEN INPUTTED INTO WHAT IS CALLED CENTRALIZED COMPUTER SYSTEM AND IT'S POSTED ON THE BULLETIN BOARD AS WELL AS ALL THE SUPERVISORS HAVE A COPY OF THAT.  SO WE KNOW WHERE EVERY INMATE IS SUPPOSED TO BE ALL DAY LONG.

Q.     SO THAT THE ESSENCE OF WHAT YOU SAID, AS I UNDERSTAND IT, IF I'M AN INMATE, AFTER I EAT BREAKFAST, I'M NOT FREE TO WANDER AROUND WHEREVER I MIGHT WANT TO GO?

A.     NO.

Q.     AND I BELIEVE WE HEARD SOME TESTIMONY EARLIER FROM ONE OF THE BOP EMPLOYEES THAT IF I'M IN HOUSING UNIT, LET'S SAY A, AND YOU ARE IN HOUSING UNIT B, I'M PROHIBITED FROM GOING INTO YOUR HOUSING UNIT, IS THAT CORRECT?

A.     NO.  WE DON'T ALLOW VISITING.

Q.     AND WHEN WE HAVE THE MOVEMENTS GOING TO CHOW, IS THAT SUPERVISED BY STAFF?

A.     IT'S SUPERVISED BY THE COMPOUND OFFICERS AS WELL

AS THE LIEUTENANTS AND OTHER STAFF WHO ARE THERE.

IN A PENITENTIARY, IN A FEDERAL CORRECTIONAL INSTITUTION SETTING, YOU HAVE STAFF MEMBERS IN THE UNIT MANAGEMENT TEAM AND EDUCATION AND RECREATION WHO WORK IN THE EVENINGS.  SO IT'S NOT JUST -- NOT LIKE IT'S JUST THE OFFICERS THERE.  YOU HAVE OTHER PEOPLE.  YOU HAVE AT LEAST ONE STAFF MEMBER FROM EACH UNIT THERE TO HELP BACK AND FORTH.  THEY COME OVER AND HELP MONITOR THE EVENING MEALS AND THAT SORT OF THING.

Q.    IS THAT TO KEEP AN EYE ON THE INMATE?

A.    YES.

Q.    WE HAD HEARD TESTIMONY HERE THAT THE MIDNIGHT TO 8 A.M. SHIFT I BELIEVE IS ONE OFFICER WAS ASSIGNED TO SPECIAL HOUSING UNIT.  IS STAFFING DIFFERENT DURING THE OTHER TWO SHIFTS?

A.    YES.  YOU HAVE A HIGHER STAFFING LEVEL ON THE DAY WATCH SHIFT, WHICH IS 8 TO 4.  AND A LITTLE BIT -- YOU HAVE SOME DECREASE ON THE EVENING SHIFT, WHICH IS 4 TO 12.  AT MIDNIGHT YOU HAVE NORMALLY ONE OFFICER PER HOUSING UNIT.

Q.    HOW ABOUT RECREATION?  IF INMATES ARE INVOLVED IN RECREATION, IS THAT SUPERVISED?

A.    YES, YOU HAVE PEOPLE WHO ARE SPECIFICALLY -- THAT IS THEIR JOB TITLE, RECREATION SUPERVISOR.

Q.    NOW, AS FAR AS ACCESS OF INMATES TO THE GENERAL

PUBLIC, CAN ANYBODY JUST SHOW UP AT USP ALLENWOOD AND SAY I WOULD LIKE TO VISIT AN INMATE?

A.    NO.

Q.    WHAT IS THE VISITATION PROCESS?

A.    THE VISITATION PROCESS, IF I WERE AN INMATE AND I HAD SOMEONE I WANTED TO PUT ON MY VISITORS' LIST, I WOULD SUBMIT THAT INFORMATION TO MY COUNSELOR.  AND MY COUNSELOR WOULD MAKE SURE THAT I HAD SOME TYPE OF RELATIONSHIP WITH THAT INDIVIDUAL, AND NOT JUST A DEVELOPED RELATIONSHIP.  IT WOULD HAVE TO BE A FAMILY OR FRIEND OR SOMEONE THAT CAN BE DOCUMENTED.  THAT WE WOULD GET INFORMATION FROM THAT INDIVIDUAL AND THEN RUN A NATIONAL CRIMINAL AGENCY CHECK ON THEM TO MAKE SURE THAT THEY HAD A CLEAN RECORD.  AND THEN WE WOULD EVENTUALLY WOULD BE APPROVED OR DISAPPROVED.

Q.    LET'S ASSUME THAT I GET APPROVED TO VISIT.  WHAT IS THE NEXT STEP IN THE PROCESS?

A.    WELL, THERE ARE CERTAIN TIMES THAT YOU CAN VISIT.  AND YOU ARE GOING TO SHOW UP FOR YOUR VISIT. YOU ARE GOING TO PRESENT SOME IDENTIFICATION SO WE CAN ID YOU.  WE ARE GOING TO RUN YOU THROUGH A METAL DETECTOR.  YOU MAY BE THE LUCKY ONE SELECTED TO HAVE YOUR HANDS CHECKED FOR THE PRESENCE OF NARCOTICS AND THEN YOU WOULD BE ALLOWED IN, ALL UNDER STAFF ESCORT AND STAFF SUPERVISION.  ALL OF THE VISITING PROCESS IS STAFF

SUPERVISED AND ESCORTED.

Q.      AND BY ESCORTED YOU MEAN THAT I WOULD BE TAKEN TO WHEREVER THE VISITING AREA IS?

A.      CORRECT.

Q.      WHEN THE VISIT'S OVER, I WOULD BE RETURNED?

A.      YOU WOULD BE IDENTIFIED.  WE WILL IDENTIFY YOU AND MAKE SURE YOU ARE WHO YOU ARE BECAUSE WE USE METHODS OF IDENTIFICATION FOR VISITORS SO THEY CAN DEPART THE INSTITUTION.  NORMALLY IT'S A BLACK LIGHT PROCESS.

Q.      THAT IS THE HAND STAMP PROCESS?

A.      YES.

Q.      AND AS FAR AS THE INTERACTION BETWEEN THE INMATE AND THE VISITOR, ARE THERE CONTACT VISITS AND NONCONTACT VISITS?

A.      AS FAR AS CONTACT, THE MOST CONTACT YOU ARE GOING TO HAVE IS A HUG AND A LITTLE PECK ON THE CHEEK ON THE WAY IN, AND A HUG AND A PECK ON THE CHEEK ON THE WAY OUT.  BUT AT SOME INSTITUTIONS IT'S NONCONTACT, BUT A NORMAL VISITING ROOM, THAT IS HOW IT OPERATES.

Q.      CAN YOU EXPLAIN BRIEFLY TO THE COURT WHAT A NONCONTACT VISIT CONSISTS OF?

A.      A NONCONTACT VISIT IS A ROOM THAT IS SEPARATED BY PLEXIGLASS AND THE INMATE SITS ON ONE SIDE AND THE VISITOR SITS ON THE OTHER SIDE OF THE GLASS, AND THERE IS NO CONTACT WHATSOEVER.

Q.        AND HOW DO THEY COMMUNICATE?

A.        THERE -- SOMETIMES IT'S A LITTLE TELEPHONE, AND SOMETIMES IT'S JUST THE LITTLE HOLES IN THE -- I CAN'T RECALL WHAT THEY CALL IT, LIKE A LITTLE AMPLIFIER THING THERE.

Q.        ARE THOSE CONVERSATIONS SUBJECT TO MONITORING, RECORDING?

A.        THEY CAN BE, IF NECESSARY -- IF THERE IS A NEED TO BE.

Q.        HOW ABOUT MAIL COMING OUT OF AN INSTITUTION?

A.        MONITORED.

Q.        AND COULD YOU EXPLAIN TO THE JUDGE WHAT THAT MEANS?

A.        INMATES DROP THEIR MAIL IN THE MAILBOX IN THEIR HOUSING UNIT.  AND THE MORNING WATCH OFFICER WHO IS THE OFFICER WHO WORKS FROM 12 MIDNIGHT TO 8 A.M., HE TAKES THE MAIL OUT AND HE SORTS IT AND GOES THROUGH IT AND LOOKS FOR IT FOR CONTRABAND AND ANY OTHER THING THAT MAY BE SUSPICIOUS.  IF THERE IS NOTHING TO IT, HE SEALS IT AND PUTS IT IN THE MAIL BAG.  IF THERE IS SOMETHING THAT HE THINKS THAT MAY NEED TO BE -- FURTHER INVESTIGATION HE WILL TURN IT OVER TO THE LIEUTENANT'S OFFICE AND THEY WILL TURN IT OVER TO THE SPECIAL INVESTIGATIVE SUPERVISOR'S OFFICE FOR INVESTIGATION.

Q.        IS THERE A PROCESS WITH RESPECT TO MAIL WHERE

SOMEONE IS ON MAIL MONITORING AND EVERYTHING THAT THEY SEND OUT IS REVIEWED AND COPIED?

A.      YES.   THERE ARE SOME INMATES WHO HAVE THAT DISTINCTION.

Q.      HOW ABOUT MAIL COMING IN, OTHER THAN LEGAL MAIL?

A.      SAME THING.  IT COULD BE MONITORED.  IT'S OPENED AND CHECKED FOR CONTRABAND.

Q.      OKAY.

HOW ABOUT TELEPHONE CALLS?

A.      MONITORED.

Q.      AND WHEN YOU SAY MONITORED, DOES THAT MEAN IT'S REALTIME LISTENING, RECORDING OR A COMBINATION OF BOTH?

A.      BOTH.

Q.      YOU HAD MENTIONED -- I BELIEVE YOU MENTIONED ONE OF THESE SPECIAL SECURITY DEVICES THAT COULD BE ATTACHED TO AN INMATE.  WAS -- DID YOU SAY POSTED PICTURE FILE?

A.      IT'S CALLED A POSTED PICTURE FILE.  WHAT IT IS, IS INMATES OF NOTORIETY, INMATES WHO HAVE VIOLENCE IN THEIR BACKGROUND, INMATES WITH HOSTAGE SITUATIONS IN THEIR BACKGROUND, NARCOTICS INTRODUCTION IN THEIR BACKGROUND, AN INMATE THAT YOU NEED TO WATCH AND THAT IS GOING TO BE INITIATED BY THE CAPTAIN'S OFFICE.  IT'S GOING TO BE PUT IN THERE BY THE SPECIAL INVESTIGATIVE SUPERVISOR'S OFFICE AND ALSO APPROVED BY THE ASSOCIATE WARDEN.  IT'S GOING TO REMAIN IN THERE UNTIL DEEMED

NECESSARY BY THE WARDEN TO TAKE IT OUT.

Q.      AND WHAT IS THE SIGNIFICANCE TO THE STAFF OF THAT FILE OR THAT BOOK?

A.      IF I WAS AN INMATE THAT WAS IN THAT FILE, YOU ARE GOING TO OPEN THE BOOK, THAT IS THE OLD WAY OF DOING IT.  NOW IT'S ALL DONE ELECTRONICALLY.  IT'S ALL DONE OVER THE COMPUTER.  ALL THE STAFF HAVE ACCESS TO IT.  BUT IT'S GOING TO HAVE MY PHOTOGRAPH, MY NUMBER, MY JOB ASSIGNMENT, MY HOUSING UNIT ASSIGNMENT, WHAT THE REASON WHY I'M IN THERE, WHAT I DID, WHERE I DID IT, WHO WAS INVOLVED, THE WHOLE DEAL.

Q.      AND THAT IS TRUE OF ALL INMATES WHO MAKE THAT FILE, NOT JUST MR. HAMMER, CORRECT?

A.      OH, YES.

Q.      NOW, AS PART OF THE REVIEW OF MR. HAMMER'S FILE, DID YOU LEARN THAT HE HAS BEEN TRANSFERRED FROM INSTITUTION TO INSTITUTION AND ALSO THAT HE HAS HAD OCCASIONS WHEN HE WAS TAKEN OUT OF AN INSTITUTION FOR MEDICAL TREATMENT AND CARE?

A.      YES.

Q.      AND COULD YOU EXPLAIN TO THE JUDGE WHAT IS INVOLVED IN THE TRANSFERS?

A.      ONCE THE TRANSFER IS APPROVED, THE INFORMATION IS GOING TO BE PROVIDED TO THE INSTITUTION, THE INSTITUTION THAT IS ACTUALLY SENDING THE INMATE TO

ANOTHER INSTITUTION.  AND THEY ARE GOING TO DO UP THE TRANSFER REQUEST AND THEY ARE GOING TO NOTE EVERYTHING ABOUT THAT INMATE ON THERE.  THAT WAY YOU KNOW IF THERE IS ANY SPECIAL SECURITY CONCERNS, MEDICAL CONCERNS, PSYCHOLOGICAL CONCERNS OR WHATEVER.  IT'S GOING TO BE ON THERE FOR THAT BUS LIEUTENANT TO LOOK AT, TO MAKE SURE HE KNOWS ABOUT EACH INDIVIDUAL INMATE, THAT HE IS NOT JUST THROWN IN, HERE HE IS.  NO, YOU ARE GOING TO KNOW ABOUT HIM.  YOU HAVE THE OPPORTUNITY.

Q.    WOULD THAT INFORMATION TRAVEL WITH THE INMATE SO IT WOULD BE --

A.    YES.

Q.    -- AVAILABLE TO THE RECEIVER?

A.    YES.

Q.    HOW ABOUT MEDICAL TRIPS?

A.    MEDICAL TRIPS IT'S THE SAME WAY.  THE WAY A MEDICAL TRIP IS STARTED IN THE MEDICAL DEPARTMENT, AN INMATE NEEDS TO GO OUT FOR OUTSIDE MEDICAL CARE, SO THEY ARE GOING TO PUT IN A REQUEST THAT WE NEED THIS INMATE SUCH AND SUCH DATE AND TIME.  THEN THE UNIT TEAM OFFICE WHICH IS THE CASE MANAGER -- IT GOES BACK.  IT'S PRETTY MUCH THE SAME ROUTINE AS A TRANSFER ORDER.  AND THEY ARE GOING TO GO THROUGH AND THEY'RE GOING TO PUT ALL THE INFORMATION ABOUT THE INMATE ON THERE, ANY SECURITY CONCERNS.  IT'S GOING TO GO ALL OF THE WAY THROUGH, WITH

THE EXCEPTION OF ON THIS PIECE OF PAPERWORK IT GOES THROUGH THE CAPTAIN'S OFFICE.  THE CAPTAIN, AT HIS LEVEL, HE IS GOING TO ASSIGN A SECURITY TEAM TO WHAT IS NECESSARY TO TAKE THAT INMATE OUT TO MAKE EVERYTHING SAFE, WHAT WEAPONS TO TAKE, WHAT VEHICLES TO TAKE AND WHATEVER OTHER SPECIAL CIRCUMSTANCES THERE ARE.

Q.    NOW, IN YOUR REVIEW OF MR. HAMMER'S FILE, DID YOU HAVE AN OPPORTUNITY TO LOOK AT THE TRANSFERS THAT HE HAS HAD FROM INSTITUTION TO INSTITUTION?

A.    YES.

Q.    AND IN ANY OF THE PAPERWORK IN HIS CENTRAL INMATE FILE IS THERE ANY INDICATION THAT THERE WAS ANY ATTEMPT TO ESCAPE OR ANYTHING SUGGESTING TRYING TO ESCAPE?

A.    NO, SIR.

Q.    AND WITH RESPECT TO THE PEOPLE WHO WOULD ACCOMPANY MR. HAMMER WHEN HE IS TAKEN OUTSIDE FOR MEDICAL CARE, WOULD THEY BE ARMED?

A.    YES.

Q.    WHEN HE IS TRANSFERRED AND TAKEN TO THE BUS TO BE TRANSPORTED SOMEWHERE, WOULD THE STAFF BE ARMED?

A.    YES, THEY WOULD.

Q.    AND THEN IN LOOKING AT THE VARIOUS MEDICAL TRIPS THAT MR. HAMMER HAS MADE, IS THERE ANY INDICATION THAT IN ANY OF THOSE THERE WAS ANY SUGGESTION, EFFORT OF

ESCAPE?

A.      NO, SIR.

Q.      WHEN AN INMATE RECEIVES EITHER ADMINISTRATIVE DETENTION OR DISCIPLINARY SEGREGATION SO HE IS IN THE SPECIAL HOUSING UNIT, IS THERE A PROCESS WHEREBY AN INDIVIDUAL WHO IS IN THAT STATUS FOR MORE THAN 30 DAYS UNDERGOES A PSYCHOLOGICAL REVIEW?

A.      YES, THAT IS POLICY.

Q.      AND ARE THOSE COMMONLY REFERRED TO AS SHU REVIEWS?

A.      RIGHT, 30 DAY SHU REVIEWS.

Q.      IN REVIEWING THE PAPERWORK ON MR. HAMMER DID YOU COME TO LEARN THAT THERE WAS A PERIOD I BELIEVE NOVEMBER 2010 TO FEBRUARY OF 2011 WHEN MR. HAMMER WAS HOUSED AT USP CANAAN?

A.      YES.

Q.      AND IN LOOKING AT HIS FILES DID YOU LOOK AT THE SHU REVIEWS THAT WERE -- LET ME WITHDRAW THAT.

IN LOOKING AT HIS FILES DID THEY CREATE SHU REVIEWS FOR THE PERIOD OF TIME HE WAS AT USP CANAAN?

A.      YES.

Q.      WHEN THEY DO A SHU REVIEW, IS ONE OF THE THINGS THEY ASSESS THREAT OF HARM TO OTHERS?

A.      YES.

Q.      AND IN THE SHU REVIEWS FOR THE CANAAN, WHAT WAS

MR. HAMMER RATED WITH RESPECT TO THREAT OF HARM TO OTHERS?

A.     LOW.

Q.     IS THE SCALE -- THE RATING SCALE HIGH, MEDIUM, LOW?

A.     YES.

Q.     DID YOU ALSO SEE THOSE TYPE OF REVIEWS IN CONJUNCTION WITH MR. HAMMER SPENDING A NUMBER OF MONTHS I THINK IT WAS IN 2005 -- 2004, 2005 AT USP LEWISBURG IN CONJUNCTION WITH THE 2255 HEARING?

A.     YES, I SAW THEM.

Q.     FOR THE PERIOD OF TIME HE WAS AT USP LEWISBURG, WAS HE HELD IN THE SPECIAL HOUSING UNIT?

A.     YES.

Q.     AND DID HE UNDERGO SHU REVIEWS?

A.     YES.

Q.     AND WERE THEY ALL LOW?

A.     YES.

          MR. TRAVIS:  IF I MAY HAVE A MOMENT, YOUR HONOR.

          THE COURT:  YES.

          (PAUSE.)

BY MR. TRAVIS:

Q.     MR. GRAVETTE, I WANT TO TAKE YOU BACK TO ONE OF THE QUESTIONS WE ASKED YOU ABOUT EARLIER AND THAT IS

INMATE COMMISSARY PURCHASES.

I'M SHOWING YOU A GROUP OF DOCUMENTS WHICH HAVE BEEN MARKED FOR IDENTIFICATION PURPOSES AS 365, D 365.  AND THE FIRST PAGE IS AUGUST 23 OF 2000 AND -- I'M NOT SURE.  LOOKS LIKE THE LAST PAGE IS APRIL 25, 2009.  ARE YOU FAMILIAR WITH THOSE DOCUMENTS?

A.      YES, THEY ARE SPECIAL PURCHASE ORDER REQUESTS.

Q.      LET'S TALK ABOUT, FIRST OF ALL, COMMISSARY PURCHASES.

I'M LOCKED IN THE SPECIAL HOUSING UNIT AND I HAVE MONEY AVAILABLE AND I WANT TO BUY SOME JALAPENO POPPERS OR DIET PEPSI OR WHATEVER.  IS THERE A COMMISSARY MENU, FOR LACK OF A BETTER TERM, THAT I CAN ORDER ITEMS FROM?

A.      THERE ARE THREE COMMISSARY LISTS IN AN INSTITUTION.  ONE IS FOR THE GENERAL POPULATION, WHICH HAS ALL OF THE ITEMS THAT A GENERAL POPULATION INMATE CAN HAVE.  THEN THERE IS ANOTHER COMMISSARY LIST FOR THE INMATES ON ADMINISTRATIVE DETENTION STATUS, WHICH IS LESS RESTRICTIVE.  THEN THE LAST COMMISSARY LIST WHICH IS FOR THE INMATES ON DISCIPLINARY SEGREGATION STATUS.

Q.      SO IF I HAVE FUNDING AVAILABLE, WHATEVER MY STATUS IS, IF I'M PERMITTED TO BUY FROM THE COMMISSARY, I CAN ORDER FROM THE COMMISSARY A LIST OR MENU, CORRECT?

A.      YES.

Q.      AND THE COMMISSARY LIST OR MENU, IS THAT, YOU KNOW, BASICALLY FOODSTUFFS AND BATTERIES AND THINGS LIKE THAT?

A.      BASICALLY FOOD ITEMS, SOME HYGIENE ITEMS AND SOME CLOTHING ITEMS.

Q.      WHAT IF I HAVE A SPECIAL PURCHASE THAT I WANT TO MAKE?  LET'S SAY THAT I WANT TO PURCHASE SOME ART SUPPLIES, ARTS AND CRAFTS?

A.      THAT IS WHERE THE SPECIAL PURCHASE ORDER COMES FROM BECAUSE THAT IS NOT SOMETHING THAT IS NORMALLY KEPT IN THE COMMISSARY.  AND YOU WOULD ASK YOUR COUNSELOR TO PROVIDE YOU WITH ONE.  YOU WOULD SUBMIT IT AND IT WOULD BE APPROVED OR DISAPPROVED, AND YOUR ITEM WOULD BE BROUGHT INTO THE INSTITUTION.  THEN YOU WOULD SIGN FOR IT AND GET IT.

Q.      AND AS YOU LOOK AT THE ITEMS MARKED AS 365, DO THOSE ALL APPEAR TO BE PAPERWORK DOCUMENTING SPECIAL PURCHASE ORDERS MADE FROM -- MADE BY MR. HAMMER?

A.      YES.

Q.      I RECOGNIZE YOU JUST GOT THIS.  ARE ALL THESE PURCHASES, DO THEY APPEAR HAVE BEEN MADE WHILE HE WAS AT TERRE HAUTE?

A.      YES.  UNITED STATES PENITENTIARY, TERRE HAUTE.

Q.      IN LOOKING AT THE ITEMS THAT ARE ITEMIZED, DOES IT APPEAR TO YOU THAT THAT IS ALL REQUESTS AT VARIOUS

TIMES TO PURCHASE ART SUPPLIES?

A.      YES.   WHAT WE CALL HOBBY CRAFT ITEMS, ART SUPPLIES.

Q.      BASED UPON YOUR EXPERIENCE, YOUR OPPORTUNITY TO REVIEW MR. HAMMER'S BACKGROUND AND RECORDS AND YOUR KNOWLEDGE OF DECLASSIFICATION PROCESS, AS I UNDERSTOOD YOUR OPINION, YOUR OPINION IS THAT MR. HAMMER WOULD BE THROUGH THE CLASSIFICATION PROCESS AND DESIGNATED TO A UNITED STATES PENITENTIARY, CORRECT?

A.      YES.

Q.      AND IT'S ALSO -- NO.   LET ME NOT LEAD YOU.

AGAIN, DO YOU HAVE AN OPINION AS TO WHETHER THE BUREAU OF PRISONS HAS THE ABILITY TO HOUSE MR. HAMMER AND KEEP OTHER INMATES AND STAFF SAFE AT A UNITED STATES PENITENTIARY?

A.      YES, I DO.

Q.      WHAT IS THAT OPINION?

A.      MY OPINION IS THAT MR. HAMMER COULD BE HOUSED IN A PENITENTIARY SETTING WITH ADDITIONAL SECURITY MEASURES BECAUSE OF HIS BACKGROUND AND THAT HE WOULD BE SAFE THERE AS WELL AS THE OTHER STAFF AND THE INMATES.   IF ANYTHING WERE TO APPEAR OUT OF THE ORDINARY, I'M VERY CONFIDENT IN THE LEADERSHIP OF THE FEDERAL BUREAU OF PRISONS AND THOSE FOLKS WHO RUN THOSE INSTITUTIONS, THAT HE WOULD BE QUICKLY PLACED INTO AN ADMINISTRATIVE

STATUS.

Q.      AND AGAIN, IF MR. HAMMER IS DESIGNATED TO A UNITED STATES PENITENTIARY, AS I UNDERSTAND IT, SINGLE CELL STATUS WOULD BE AVAILABLE, IS THAT CORRECT?

A.      YES.

MR. TRAVIS:  IF I MAY HAVE A MOMENT, YOUR HONOR.

THE COURT:  YES.

(PAUSE.)

MR. TRAVIS:  IF I MAY HAVE A MOMENT, YOUR HONOR.  I WOULD LIKE TO GET THREE OR FOUR DOCUMENTS.

(PAUSE.)

BY MR. TRAVIS:

Q.      MR. GRAVETTE, EARLIER YOU HAD TALKED ABOUT REVIEWING FROM MR. HAMMER'S FILE THE SHU REVIEWS FOR THE PERIOD OF TIME THAT MR. HAMMER WAS AT CANAAN.  I JUST HANDED TO YOU FOUR SEPARATE DOCUMENTS, MARKED FOR IDENTIFICATION AS D 360, 361, 362 AND 363.

ARE THOSE THE WRITTEN DOCUMENTS SHOWING THE SPECIAL HOUSING UNIT REVIEWS FOR MR. HAMMER WHEN HE WAS HOUSED IN CANAAN BETWEEN NOVEMBER 25, 2011 AND FEBRUARY 16, 2012?

A.      YES, SIR.

Q.      I JUST SHOWED YOU A DOCUMENT MARKED FOR IDENTIFICATION AS D 334.  AND DOES THAT APPEAR TO YOU TO

BE A LETTER OF AUGUST 14TH, 2013, FROM MELISSA BAYLESS,

UNIT MANAGER, TO JAMES MORENO?

A.      YES, SIR.

Q.      DOES THAT DOCUMENT REFERENCE MR. HAMMER BEING A

ONE MAN HOLD COVER STATUS?

A.      YES, WITHIN THE UNIT.

Q.      I UNDERSTAND THAT.

        COULD YOU EXPLAIN TO THE JUDGE WHAT IT

MEANS THAT MR. HAMMER IS A ONE MAN HOLD COVER STATUS

WITHIN THE UNIT?

A.      IT MEANS THAT THEY ARE CONFIDENT IN THE WAY THAT

HAMMER HAS APPARENTLY BEEN HANDLING HIS SELF AND THAT

THEY FEEL SECURE ENOUGH THAT THEY CAN ALLOW ONLY ONE

STAFF MEMBER TO ESCORT HIM WITHIN THE UNIT, INSTEAD OF

THE NORMAL THREE.

Q.      DO YOU KNOW WHETHER HIS MOVEMENT TO ONE-MAN

STATUS WAS A MOVEMENT DOWN FROM TWO-MAN STATUS?

A.      YES.

Q.      WAS IT?

A.      YES.

Q.      AGAIN, SO WE ARE ALL ON THE SAME PAGE, WOULD IT

BE CORRECT THAT, FOR EXAMPLE, SOMEONE HAS TO BRING

MR. HAMMER TO THE VIDEO CONFERENCING AS PART OF THIS

PROCEEDING, ONLY ONE STAFF MEMBER WOULD ESCORT HIM?

A.      IF IT'S IN THAT UNIT, YES.

Q.        ONE OTHER MATTER BEFORE I MOVE ON TO THAT.

          THE ONE MAN HOLD COVER STATUS IS WHILE HE IS WITHIN THE UNIT ITSELF, CORRECT?

A.        YES, SIR.

Q.        THAT WOULD CHANGE IF HE WAS TRANSPORTED OUT OF THE UNIT?

A.        YES.

Q.        FOR EXAMPLE, IF HE WAS BEING TAKEN TO THE BUS TO BE TRANSPORTED SOMEWHERE?

A.        YES.

Q.        OR HE WAS BEING TAKEN TO THE HOSPITAL?

A.        RIGHT.

Q.        ONE LAST AREA, I BELIEVE.

          AS PART OF THE PROCESS BACK WHENEVER THE 2255 HEARING WAS HELD AND MR. HAMMER WAS BEING HELD AT LEWISBURG, AND HE WAS MOVING BACK AND FROM LEWISBURG TO WILLIAMSPORT AT LEAST TWICE A DAY, WAS THERE ANY INDICATION IN ANY BOP PAPERWORK OF ANY ESCAPE ATTEMPT OR ANYTHING SUGGESTING ESCAPE ATTEMPT ON THOSE MULTIPLE TRIPS THAT WERE MADE DURING THAT LITIGATION?

A.        NO, THERE WASN'T.

          MR. TRAVIS:  IF I MAY HAVE A MOMENT, YOUR HONOR?

          THE COURT:  YES.

          (PAUSE.)

MR. TRAVIS:  I HAVE NO OTHER QUESTIONS, YOUR HONOR.

THE DEFENDANT:  EXCUSE ME, YOUR HONOR. CAN WE TAKE A FIVE-MINUTE BREAK, PLEASE.

THE COURT:  ALL RIGHT.  YES, MR. HAMMER, WE WILL DO THAT.  WHY DON'T WE TAKE JUST A VERY SHORT RECESS AND COME BACK.  AND LET'S REMEMBER THAT WE ONLY HAVE MR. HAMMER UNTIL 3:30 AND THEN WE LOSE HIM AT THE INSTITUTION.  SO LET'S SEE IF WE CAN DO THIS EXPEDITIOUSLY.

THE DEFENDANT:  YOUR HONOR, COULD I SPEAK TO THAT?  I DON'T KNOW IF IT WOULD BE PERMISSIBLE, BUT I DON'T MIND IF MR. GRAVETTE'S TESTIMONY CONTINUES ONCE I'M GONE.  I WOULD BE WILLING TO ALLOW THAT TO HAPPEN WITHOUT ANY OBJECTION BECAUSE I UNDERSTAND IT CUTS OFF AT 3:30.  I WOULD NOT HAVE A PROBLEM WITH THAT SO THAT YOU COULD CONCLUDE HIS TESTIMONY EVEN IF I'M NOT PRESENT.

THE COURT:  ALL RIGHT.  DISCUSS THAT WITH YOUR COUNSEL ALSO AND LET'S GET A REPRESENTATION FROM YOUR COUNSEL TOO FOR THE RECORD.  OKAY?

THE DEFENDANT:  THANK YOU, SIR.

THE COURT:  JUST TAKE A QUICK RECESS.

(RECESS TAKEN.)

THE COURT:  BE SEATED AND CROSS EXAMINE.

MR. GURGANUS:  THANK YOU, YOUR HONOR.

CROSS EXAMINATION

BY MR. GURGANUS:

Q.      MR. GRAVETTE, GOOD AFTERNOON.  I JUST WANT TO PICK UP WHERE YOU WERE LEAVING OFF ON THIS D 334 DOCUMENT.  DO YOU SEE THAT THERE?

A.      YES, SIR.

Q.      AND AT THIS POINT, THIS ONE MAN HOLD SITUATION, RIGHT, MR. HAMMER STILL HAS TO HAVE -- WHEN HE IS WITH OR BEING ESCORTED ANYWHERE, HE HAS TO BE HANDCUFFED, IS THAT RIGHT?

A.      HANDCUFFED, YES.

Q.      WHAT IS A MARTIN CHAIN?

A.      A MARTIN CHAIN IS COMMONLY CALLED A BELLY CHAIN.

Q.      OKAY.

A.      IT GOES AROUND YOUR BELLY AND THEN IN THE FRONT YOU SLIP THE HANDCUFFS THROUGH THERE SO YOUR ARMS ARE RESTRAINED TO YOUR BODY BY THE CHAIN.

Q.      SO IN YOUR EXPERIENCE, YOU HAVE BEEN AT A LOT OF INSTITUTIONS, THAT IS STILL A VERY HIGHLY SECURED WAY OF BEING IN THE PRESENCE OF CORRECTIONAL STAFF, WOULD YOU AGREE WITH ME?

A.      IN THE SETTING THAT HE IS IN, THAT IS REQUIRED.

Q.      BUT THAT IS THE SETTING HE IS IN?

A.      CORRECT.

Q.      BUT AS FOR THE OTHER INSTITUTIONS YOU HAVE BEEN IN, ESPECIALLY, LET'S SAY, USP'S, WHERE YOU THINK HE WOULD GO TO A USP, CORRECT?

A.      CORRECT.

Q.      THAT WOULD BE A HIGHLY SECURED WAY OF BEING RESTRAINED IN THE PRESENCE OF STAFF, CORRECT?

A.      CORRECT.

Q.      AND YOU ARE SAYING THAT LIKELY MR. HAMMER WILL BE GOING TO A USP AT SOME POINT?

A.      YES.

Q.      AND HE WOULD NOT HAVE THAT KIND OF SECURITY, WOULD HE?

A.      NO, HE WOULDN'T.

Q.      NOW, I HAVE ALSO -- AND WE WERE TALKING ABOUT D 334 THERE.  I WANT TO DIRECT YOUR ATTENTION TO THESE PSYCHOLOGICAL DATA SYSTEM REPORTS, 360 THROUGH 363.  AM I CORRECT THAT THIS IS THE PSYCHIATRIC PEOPLE'S ASSESSMENT OF HOW THE PERSON IS ADJUSTING AT THE PRESENT TIME?

A.      YES.

Q.      THAT IS NOT REALLY AN INDICATION FROM THE BOP'S STANDPOINT ABOUT THE DANGER OF THE PERSON.  WOULD YOU AGREE WITH ME THERE?

A.      YES.

Q.      THAT IS MORE OF HOW THE PSYCHIATRIC PEOPLE ARE

ASSESSING HOW HE IS ADJUSTING TO HIS ENVIRONMENT.  TRUE?

A.      CORRECT.

Q.      BECAUSE I ALSO PUT UP THERE WITH YOU GC 19. THIS IS A NEW DOCUMENT.  AND I BELIEVE I SET THE DOCUMENTS -- YOU HAVE THEM.  THIS INDICATES THAT AS OF AUGUST 24TH, THERE WAS A REVIEW, A PANEL REVIEW TO DETERMINE WHETHER MR. HAMMER COULD GO TO PHASE TWO IN THE SPECIAL CONFINEMENT UNIT.  ARE YOU FAMILIAR WITH THIS KIND OF PAPERWORK?

A.      YES.

            THE COURT:  LET'S GET THE DATE, AUGUST 24TH, 2012?

            MR. GURGANUS:  YES, AUGUST 24TH, 2012.

BY MR. GURGANUS:

Q.      SIR, CAN YOU EXPLAIN TO THE COURT WHAT THIS IS, WHAT THIS DOCUMENT IS?  AND I DO BELIEVE YOU HAD A CHANCE TO REVIEW IT.

A.      UM-HUM.  WHAT THIS IS, IS A MEMORANDUM THAT IS SENT UP THE CHAIN OF COMMAND, ULTIMATELY TO THE COMPLEX WARDEN.  AND IT IS EITHER A RECOMMENDATION OR A RECOMMENDATION NOT TO APPROVE MR. HAMMER'S CHANGE OF STATUS FROM -- INTO PHASE TWO.  AND IT'S INITIATED BY HIS UNIT MANAGER.

Q.      AND WHAT WOULD THE PHASE TWO -- WOULD THAT BE A LESSER SECURITY SITUATION?

A.      YES.

Q.      AND THAT WAS DENIED, IS THAT RIGHT?

A.      YES.

Q.      IT WAS DISAPPROVED?

A.      YES, DISAPPROVED.

Q.      AND THAT IS ON THE FINAL PAGE.  IT IS INDICATED THAT THE CHIEF PSYCHOLOGIST DISAPPROVED IT, CORRECT?

A.      CORRECT.

Q.      THE COMPLEX CAPTAIN DISAPPROVED IT, TRUE?

A.      CORRECT.

Q.      THE ASSOCIATE WARDEN DISAPPROVED IT.  IS THAT CORRECT?

A.      THAT'S CORRECT.

Q.      AS WELL AS THE COMPLEX WARDEN, J.F. CARAWAY.  IS THAT RIGHT?

A.      THAT'S CORRECT.

Q.      WHAT IS THE SIGNIFICANCE OF SOMEONE THAT IS THE COMPLEX WARDEN?

A.       IN FEDERAL CORRECTIONAL COMPLEXES, LIKE TERRE HAUTE IS NOW, YOU HAVE A WARDEN WHO -- HE IS THE RANKING WARDEN THERE.

Q.      RIGHT.

A.       IN OTHER WORDS, HE IS GOING TO BE IN CHARGE OF THE HIGHEST SECURITY INSTITUTION.  LIKE WHEN I WORKED AT THE FEDERAL CORRECTIONAL COMPLEX IN BEAUMONT, TEXAS, THE

WARDEN AT THE PENITENTIARY WAS THE COMPLEX WARDEN.

Q.       SO WOULD THIS BE THE TOP PERSON AT USP TERRE HAUTE?

A.       YES.

Q.       WITHIN THE COMPLEX?

A.       YES, SIR.

Q.       AND IN MAKING THE -- DISAPPROVING IT, THERE WERE A VARIETY OF REASONS THAT WERE GIVEN, ISN'T THAT RIGHT?

A.       YES.

Q.       AND YOU ARE AWARE THAT THIS IS A DEFENDANT THAT IS A SECURITY RISK.  YOU WOULD AGREE WITH THAT, CORRECT?

A.       YES.

Q.       AND THIS IS A DEFENDANT THAT HAS A HISTORY OF ESCAPE, CORRECT?

A.       YES.

Q.       WOULD YOU ALSO AGREE WITH ME THAT IN -- AGAIN, IN MAKING YOUR ASSESSMENT OF HIM, THAT HE HAS A HISTORY OF COMMITTING VIOLENT CRIMES WHILE ON ESCAPE STATUS?

A.       YES.

Q.       WOULD YOU ALSO AGREE WITH ME THAT IN 1986 THAT IN A HOSPITAL, IF YOU KNOW, IN A HOSPITAL SETTING FOR AN EEG THAT HE HAD ATTEMPTED TO TAKE SOMEONE HOSTAGE, DID YOU KNOW ABOUT THAT?

A.       I DON'T RECALL THAT ONE, NO.

Q.       WELL, THIS WOULD HAVE BEEN WHEN HE WAS IN THE

OKLAHOMA PRISON SYSTEM.

A.      OKAY.

Q.      ARE YOU FAMILIAR WITH ANY INCIDENTS IN HIS PAST WHERE HE HAS TAKEN INDIVIDUALS HOSTAGE?

A.      YES.

Q.      AND IS IT A SIGNIFICANT HOSTAGE-TAKING HISTORY, IN YOUR VIEW?

A.      YES.

Q.      AND OF COURSE THAT MAKES HIM A SIGNIFICANT DANGER, WOULDN'T YOU AGREE?

A.      YES.

Q.      NOW, PRESENTLY, WHILE ON DEATH ROW, THE CONDITIONS ARE HIGHLY SECURE -- SECURITY ORIENTED, ISN'T THAT CORRECT?

A.      THAT'S CORRECT.

Q.      WOULD YOU SAY THAT THEY -- THEY ARE NOT AS FULL AS ADX, BUT PRETTY CLOSE TO GETTING TO THE SECURITY OF EVEN THE ADX.  ISN'T THAT RIGHT?

A.      YES, SIR.

Q.      WHICH IS THE MAXIMUM HIGHEST SECURITY SETTING THAT AN INMATE CAN BE IN, ISN'T THAT RIGHT?

A.      YES, SIR.

Q.      AND YOU WOULD AGREE THAT, DESPITE THE FACT THAT HE IS IN THIS EXCEPTIONALLY RESTRICTIVE CONDITIONS, THAT HE HAS NONETHELESS VIOLATED THE PRISON RULES?

A.   THAT'S CORRECT.

Q.   ON MULTIPLE OCCASIONS, WOULD YOU AGREE?

A.   YES.

Q.   AND ON THOSE MULTIPLE OCCASIONS -- I MEAN, SOME OF THEM ARE LISTED ON THAT SECOND PAGE OF GC 19, RIGHT?

A.   YES, SIR.

Q.   INCLUDING INSOLENCE.  WHAT IS INSOLENCE, BY THE WAY?

A.   INSOLENCE COULD BE CURSING AT ONE OF THE CORRECTIONAL OFFICERS, JUST BEING INSOLENT.

Q.   AND HE HAD A NUMBER OF THOSE, ISN'T THAT RIGHT?

A.   YES.

Q.   DID YOU REVIEW ANY OF THOSE INCIDENT REPORTS?

A.   I LOOKED AT THEM.

Q.   SOME OF THEM, WOULD YOU AGREE, HE WAS SAYING SOME PRETTY VILE THINGS TO SOME OF THE GUARDS, RIGHT?

A.   YES.  BUT THAT IS COMMON.

Q.   AND A FEMALE GUARD, DO YOU REMEMBER THE ONE WITH THE FEMALE GUARD IN PARTICULAR?

A.   YES.

Q.   RATHER, THAT'S A BIT OVER THE TOP, WOULD YOU AGREE WITH ME?

A.   YES.

Q.   SOME OF THE THINGS HE WAS SAYING TO HER?

A.   UM-HUM.  YES, SIR.

Q.        THERE WAS ALSO ASSAULTIVE-TYPE BEHAVIOR, KIND OF
BUCKING?

A.        CORRECT?

Q.        I DON'T WANT TO OVERSTATE IT, BUT ONE OCCASION
HE TRIED TO PULL AWAY FROM STAFF, IS THAT RIGHT?

A.        YES.

Q.        AND YOU GET AN INCIDENT REPORT FROM THAT -- FOR
THAT, IS THAT CORRECT?

A.        YES.

Q.        AND IN ONE INCIDENT, THERE WAS -- IN 2008
ASSAULTING WITHOUT SERIOUS INJURY AND REFUSING TO OBEY
AN ORDER, IS THAT RIGHT?

A.        YES.

Q.        NOW, WOULD YOU AGREE WITH ME THAT UNDER THE
SETTING THAT MR. HAMMER IS IN, IT'S RATHER RESTRICTIVE
AND IT IS TOUGH TO ASSAULT GUARDS WHEN YOU ARE EITHER ON
A TWO-MAN HOLD, WEARING A BELLY CHAIN AND HANDCUFFS,
WHEN YOU ARE BEING OUT OF YOUR CELL, WOULD YOU AGREE
WITH THAT?

A.        YES.

Q.        BUT NONETHELESS, THERE HAS BEEN -- COUNT THEM UP
SINCE 2001, 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13,
14, 15, 16, 17, 18, 19, 20, 21, 22 INCIDENTS WHERE HE
HAS BEEN WRITTEN UP FOR IMPROPER CONDUCT OF SOME SORT.
CORRECT?

A.    YES, SIR, HE HAS.

Q.    SOME OF IT INCLUDED THREATENING BODILY HARM, RIGHT?

A.    YES.

Q.    SUCH THREATS ON NOVEMBER 3RD, 2006, CORRECT?

A.    YES.

Q.    NOVEMBER 4TH, 2006, CORRECT?

A.    YES.

Q.    OCTOBER 23RD, 2008?

A.    YES, SIR.

Q.    AND THEN THERE WAS EVEN A MATTER OF PHONE ABUSE. ARE YOU FAMILIAR WITH THAT INCIDENT?  HE GOT -- HE WAS ABLE TO GET ON A TALK SHOW?

A.    A RADIO SHOW, I BELIEVE.

Q.    ALL MATTERS THAT ARE AGAINST THE RULES OF THAT UNIT AND THE BUREAU OF PRISONS, CORRECT?

A.    YES, SIR.

Q.    AND FOR THOSE REASONS, INCLUDING THE INSTITUTIONAL ADJUSTMENT, IT ALSO NOTED THAT, YOU KNOW, HE HAD BEEN IN MARCH OF '95 FOUND GUILTY, AND THAT INVOLVED AN INCIDENT WHERE ONE OF HIS CELLMATES WAS TIED UP, IS THAT RIGHT?

A.    YES.

Q.    WOULD YOU AGREE THAT MR. HAMMER IS NOT A MODEL INMATE?

A.       NO, SIR.

Q.       AND HE HAS NOT BEEN A MODEL INMATE WHILE ON DEATH ROW?

A.       NO, HE HASN'T.

Q.       AND HE HAS NOT BEEN A MODEL INMATE SINCE, SAY, HIS CONVERSION TO CATHOLICISM?

A.       CORRECT.

Q.       NOW, DESPITE ALL THAT, IT'S CORRECT, IS IT NOT, THAT UNDER THE WAY THE BUREAU OF PRISONS WORKS, THAT UNDER YOUR VIEW AS AN EXPERT HERE THAT MR. HAMMER, IF HE WAS GIVEN A LIFE SENTENCE, WOULD BE TRANSFERRED TO A UNITED STATES PENITENTIARY, TRUE?

A.       YES, SIR, THAT'S TRUE.

Q.       AND GOING INTO A UNITED STATES PENITENTIARY, HE WOULD LIKELY, IF HE BEHAVED, GO INTO THE GENERAL POPULATION, IS THAT RIGHT?

A.       YES, SIR.

Q.       NOW, YOU MENTIONED THAT THERE WAS A SINGLE CELL STATUS THAT IS POTENTIAL FOR HIM.  TRUE?

A.       YES.

Q.       NOW, WOULD THAT BE IN A -- IN YOUR VIEW, IN A UNIT?

A.       IT'S POSSIBLE.

Q.       IF HE GOT SINGLE-CELL STATUS IN A UNIT THAT WOULD NOT MEAN THAT HE WOULD NOT HAVE CONTACT WITH OTHER

INMATES, WOULD IT?

A.      NO.  HE WOULD STILL HAVE CONTACT.

Q.      IT WOULD JUST BE AT NIGHT WHEN HE IS LOCKED IN LIKE HE WAS AT THE SPECIAL HOUSING UNIT IN '96, HE WOULD BE ALONE, THOUGH, CORRECT?

A.      YES.

Q.      BUT HE COULD ALSO HAVE A CELLMATE, TRUE?

A.      YES.

Q.      AND AT A USP, IN THESE UNITS, I THINK YOU HAD A PICTURE -- AND JUST TO CLARIFY SOMETHING, YOU MENTIONED THAT YOU CAN'T GO FROM HAVE CONTACT OR GO INTO ANOTHER UNIT, RIGHT?

A.      CORRECT.

Q.      BUT THAT IS NOT -- INDIVIDUALS FROM DIFFERENT UNITS FREQUENTLY RUN INTO EACH OTHER AT USP'S, TRUE?

A.      YES.

Q.      I MEAN, DURING THE MOVES THEY ARE ALL TOGETHER, CORRECT?

A.      CORRECT.

Q.      OUT ON THE YARD, THEY ALL COULD BE TOGETHER?

A.      CORRECT.

Q.      AND DID YOU KNOW WHETHER IN 1996 AT USP ALLENWOOD WHETHER, SAY, SOMEONE FROM AN A UNIT COULD GO INTO B UNIT?

A.      THEY SHOULDN'T HAVE BEEN ABLE TO.

Q.      BACK THEN?

A.      RIGHT.

Q.      BUT THAT WOULD NOT HAVE PRECLUDED CONTACT BETWEEN PEOPLE FROM DIFFERENT UNITS?

A.      NO, IT WOULDN'T.

Q.      IT HAPPENS ALL THE TIME, DOESN'T IT?

A.      CORRECT.

Q.      IT'S JUST NOT -- YOU WOULD NOT BE GOING INTO THE OTHER PERSON'S CELL AND HANGING OUT, IS THAT WHAT YOU ARE SAYING?

A.      YES, SIR.

Q.      NOW, THESE UNITS ARE -- THE MODERN-DAY PRISON UNITS, YOU HAVE, AM I CORRECT, A COMMON AREA, A RATHER SIGNIFICANTLY SIZE COMMON AREA, PERHAPS THE SIZE OF THIS COURTROOM, TRUE?

A.      TRUE.

Q.      AND WITHIN THAT COMMON AREA, THERE ARE TABLES, TRUE?

A.      CORRECT.

Q.      MIGHT BE A COMPUTER TERMINAL, RIGHT?

A.      CORRECT.

Q.      AND A LOT OF TIMES THERE ARE TIERS AROUND THE TOP OF IT?

A.      CORRECT.

Q.      AND ALL AROUND THIS AREA WOULD BE THE CELLS,

CORRECT?

A.      YES, SIR.

Q.      NOW, THERE IS CAMERAS IN THESE UNITS, TRUE?

A.      CORRECT.

Q.      BUT WITHIN THE CELLS THERE ARE NO CAMERAS, ISN'T THAT CORRECT?

A.      THAT IS CORRECT.

Q.      AND MANY OF THE ASSAULTIVE CONDUCT HAPPEN DURING THESE GROUP PERIODS OF TIME WHEN INMATES ARE IN OTHER INMATES' CELLS, ISN'T THAT RIGHT?

A.      IT HAPPENS.

Q.      FOR INSTANCE, IN THE HURLEY CASE THAT YOU TESTIFIED IN, THAT WAS ONE INMATE FROM ANOTHER CELL WITHIN THAT UNIT IN MR. HURLEY'S CELL, ISN'T THAT CORRECT?

A.      YES, SIR, THAT'S CORRECT.

Q.      AND AT AROUND 6 O'CLOCK OR 7 O'CLOCK IN THE EVENING, AN INMATE NAMED O'KANE WAS IN THAT CELL, RIGHT?

A.      THAT'S CORRECT.

Q.      IN HURLEY'S CELL, TRUE?

A.      YES.

Q.      AND HE WAS STABBED 90 SOME TIMES WITH A SHANK, ISN'T THAT RIGHT?

A.      YES, SIR.

Q.      SO EVEN THOUGH THE BUREAU OF PRISONS TRIED AS

BEST THEY CAN TO PROVIDE A SAFE ENVIRONMENT, IT'S STILL QUITE A CHALLENGE, ISN'T IT?

A.      YES, IT IS.

Q.      AND WHEN WE TALK ABOUT WEAPONS, EVEN THOUGH THERE ARE METAL DETECTORS, TRUE?

A.      CORRECT.

Q.      ALL KINDS OF ATTEMPTS TO KEEP WEAPONS OUT OF THE HANDS OF INMATES, THEY ARE PREVALENT IN THESE INSTITUTIONS, ISN'T THAT RIGHT?

A.      YES, THEY ARE.

Q.      WOULD YOU SAY THAT SHANKS ARE VERY COMMONLY POSSESSED AND HIDDEN WITHIN UNITED STATES PENITENTIARIES?

A.      YES.

Q.      AND THEY ARE, IF A PERSON WANTS ONE, FAIRLY EASY TO COME BY?

A.      YES.

Q.      AND FAIRLY EASY TO HIDE?

A.      YES.

Q.      AND THEY ARE MADE OF ALL MANNER OF THINGS, CORRECT?

A.      YES, SIR.

Q.      AND THEY ARE SHARPENED TO A POINT, CORRECT?

A.      CORRECT.

Q.      AND THEY CAN BE USED AS A STABBING INSTRUMENT,

TRUE?

A.      YES, SIR.

Q.      AND NO MATTER HOW MUCH A PERSON IS UNDER THE WATCH OF THE BUREAU OF PRISONS THEY CAN, IF THEY WANT, GET A SHANK AND STAB ANOTHER INDIVIDUAL, TRUE?

A.      YES.

Q.      AND SOMEONE IN THE UNITED STATES PENITENTIARY, THERE IS REALLY NOT MUCH STAFF IS GOING TO BE ABLE TO DO TO STOP THAT IF SOMEONE HAS MADE UP THEIR MIND TO DO THAT, TRUE?

A.      TRUE.

Q.      THERE IS ALSO MANY OTHER TYPE WEAPONS IN AN INSTITUTION, ISN'T THAT RIGHT?

A.      YES.

Q.      AND IN YOUR EXPERIENCE, WOULD YOU SAY THAT PRACTICALLY ANYTHING CAN BE USED AS A WEAPON BY AN INMATE ON ANOTHER INMATE?

A.      YES.

Q.      AN AB ROLLER COULD BE TAKEN AND USED AS A CLUB, IF ONE WAS THERE?  AN AB ROLLER, HAVE YOU EVER HEARD OF THAT?

A.      A FOAM?  OH, I KNOW WHAT YOU ARE TALKING ABOUT, THE LITTLE WHEEL.

Q.      YES.

A.      YES.

Q.      THAT HAS BEEN USED AS A CLUB IN INSTITUTIONS, HASN'T IT?

A.      YES.

Q.      FIRE EXTINGUISHER?

A.      YES.

Q.      LIKEWISE.  TAKE A FIRE EXTINGUISHER OFF THE WALL, SLAM IT INTO A PERSON'S HEAD, TRUE?

A.      TRUE.

Q.      AND THERE IS ALSO -- IN THE FEDERAL PRISON SYSTEM THERE IS, WHAT, ABOUT TEN MURDERS PER YEAR, WOULD YOU SAY?

A.      YES, SIR.

Q.      WOULD THAT BE A FAIR ESTIMATE?

A.      PRETTY CLOSE.

Q.      AND AS FAR AS WEAPONS, DO YOU HAVE AN ESTIMATE AS TO HOW MANY WEAPONS ARE RECOVERED YEARLY BY THE BUREAU OF PRISONS?

A.      NO, I DON'T.

Q.      WOULD OVER 3,000 SURPRISE YOU?

A.      NO.

Q.      THAT WOULD BE SOMETHING WITHIN THE REALM OF POSSIBILITY?

A.      IT'S A POSSIBILITY.

Q.      AND AS FAR AS AREAS WHERE ASSAULTS CAN HAPPEN, PERHAPS ONE OF THE MOST SECURE WOULD BE IN THE CELLS,

ISN'T THAT RIGHT, BECAUSE NO ONE CAN SEE IT TYPICALLY, RIGHT?

A.    CORRECT.

Q.    BUT THEY HAPPEN ALL OVER THE PLACE IN A UNITED STATES PENITENTIARY, RIGHT?

A.    YES, SIR.

Q.    THEY HAPPEN IN THAT COMMON AREA A LOT OF TIMES, RIGHT?

A.    YES.

Q.    AND YOU YOURSELF HAVE PROBABLY WATCHED NUMEROUS VIDEOS WHERE ASSAULTS HAVE HAPPENED, ISN'T THAT RIGHT?

A.    YES.

Q.    AND IT'S NOT ONLY INMATE-ON-INMATE, CORRECT?

A.    CORRECT.

Q.    INMATES ON GUARDS, TOO?

A.    CORRECT.

Q.    ISN'T THAT RIGHT?

A.    YES.

Q.    AND WOULD YOU AGREE WITH ME THAT GUARDS ARE AT AN EXCEPTIONALLY VULNERABLE STATE WHILE THEY ARE IN A UNIT LIKE THAT, WHEN -- WITH OVER 100 INMATES?  I MEAN THEY ARE VULNERABLE, WOULDN'T YOU AGREE?

A.    YES.

Q.    UP UNTIL RECENTLY THEY DID NOT EVEN HAVE TEAR GAS, ISN'T THAT RIGHT?

A.    CORRECT.

Q.    THEY HAD NO WEAPON ON THEM, RIGHT?

A.    CORRECT.

Q.    AND AT NIGHTS IT WOULD BE ONE GUARD AMONG HOW MANY INMATES?

A.    DEPENDING ON THE HOUSING UNIT, PROBABLY AROUND 112 TO 120.

Q.    SO AS I MENTIONED, EXTREMELY VULNERABLE, TRUE?

A.    CORRECT.

Q.    SO ASSAULTS ALSO HAPPEN ON THE UNIT, RIGHT?

A.    YES.

Q.    ASSAULTS ALSO HAPPEN OUT IN THE YARD FREQUENTLY, ISN'T THAT RIGHT?

A.    CORRECT.

Q.    AS WELL AS IN THE CAFETERIA, CORRECT?

A.    YES, SIR.

Q.    AND WITHIN THE CAFETERIA, IN THOSE AREAS, THERE ARE OFFICES THAT HOUSE CORRECTIONAL -- OR WHERE CORRECTIONAL OFFICERS WORK OUT OF, ISN'T THAT RIGHT?

A.    YES.

Q.    AND MANY TIMES THEY ARE IN THERE BY THEMSELVES, RIGHT?

A.    YES, SIR.

Q.    AN INMATE CAN WALK INTO THAT OFFICE, AND THERE IS A -- OR INMATES, PLURAL, COULD WALK INTO THAT OFFICE

AND THERE IS ONE CORRECTIONAL OFFICER AGAINST THOSE PEOPLE, TRUE?

A.        YES, SIR.

Q.        AGAIN, VERY VULNERABLE, VERY VULNERABLE POSITION, TRUE?

A.        YES, SIR.

                 MR. GURGANUS:   JUST A MOMENT.

                 (PAUSE.)

BY MR. GURGANUS:

Q.        YOU DO HAVE -- YOU HAVE AN OPINION THAT MR. HAMMER, IF IN ONE OF THESE SETTINGS, IF WATCHED REALLY CLOSELY, RIGHT, THAT OTHERS WOULD BE ABLE -- WOULD BE SAFE.   THAT IS YOUR OPINION AS YOU SIT HERE?

A.        CORRECT.

Q.        BUT YOU CAN'T SAY -- CERTAINLY YOU CAN'T SAY WITH ANY DEGREE OF CONFIDENCE THAT THAT IS THE SITUATION?

A.        YOU CAN'T PREDICT THE FUTURE, NO.

Q.        BUT THE PAST IS A GOOD PREDICTOR OF THE FUTURE, WOULDN'T YOU AGREE WITH ME THERE?

A.        IT HAS BEEN SOMETIMES, YES.

Q.        AND WITH RESPECT TO MR. HAMMER, HIS PAST INCLUDES ESCAPES, CORRECT?

A.        CORRECT.

Q.        ASSAULTIVE CONDUCT WHILE ON ESCAPES, TRUE?

A.    YES.

Q.    SHOOTING A PERSON IN THE HEAD THREE TIMES WHILE IN ESCAPE STATUS, TRUE?

A.    TRUE.

Q.    TYING UP HIS CELLMATE, TRUE?

A.    TRUE.

Q.    BEING IN THE PRISON WITHIN THE PRISON, THE SHU, AND MURDERING HIS CELLMATE, TRUE?

A.    YES.

Q.    AND TYING ANOTHER CELLMATE UP, CORRECT?

A.    YES.

Q.    THAT PAST WOULD INDICATE A LEVEL OF DANGER THAT THE BUREAU OF PRISONS SEEMS TO STILL FEEL EXISTS IN THIS CASE, WOULD YOU AGREE?

A.    YES, IT IS A PREDICTOR.

MR. GURGANUS:  I HAVE NO FURTHER QUESTIONS, YOUR HONOR.

THE COURT:  ANY REDIRECT?

MR. TRAVIS:  YES, YOUR HONOR.

THE COURT:  WE ARE GOING TO LOSE MR. HAMMER VERY SHORTLY.

MR. TRAVIS:  MR. HAMMER HAS NO PROBLEM AND I HAVE NO PROBLEM AND NONE OF THE OTHER MEMBERS OF THE DEFENSE TEAM HAS ANY PROBLEM.

THE COURT:  MR. HAMMER, YOU HAVE A RIGHT

TO WITNESS THE REST OF THE TESTIMONY OF THIS WITNESS.

DO YOU UNDERSTAND?

THE DEFENDANT:  YES, SIR, BUT I'M CONFIDENT THAT MY ATTORNEYS CAN REPRESENT ME WITHOUT ME BEING PRESENT AND I WILL WAIVE ON THE RECORD ANY FURTHER TESTIMONY THAT I MISS WITH THIS WITNESS.

THE COURT:  ALL RIGHT.  THEN ANYBODY PROMISE OR OFFER YOU ANYTHING TO GET YOU TO WAIVE?

THE DEFENDANT:  NO, SIR.  THAT WAS MY SUGGESTION.

THE COURT:  ALL RIGHT.  YOU SURE YOU UNDERSTAND, YOU KNOW WHAT YOU ARE DOING?

THE DEFENDANT:  YES, SIR.

THE COURT:  ALL RIGHT.  WE WILL CONTINUE ON.

MR. TRAVIS:  JUST A FEW QUESTIONS.

REDIRECT EXAMINATION

BY MR. TRAVIS:

Q.     MR. GRAVETTE, ALL OF THE INFORMATION THAT MR. GURGANUS BROUGHT TO YOUR ATTENTION ABOUT MR. HAMMER'S PRIOR RECORDS AND HE DID THIS AND HE DID THAT, THAT WOULD ALL BE KNOWN TO THE PROFESSIONALS AT GRAND PRAIRIE THAT WOULD MAKE THE DETERMINATION OF WHERE MR. HAMMER GOES, CORRECT?

A.     YES, SIR.

Q.      AND IF THEY HAD ANY CONCERN ABOUT SAFETY OF STAFF OR SAFETY OF OTHER INMATES, WOULD THEY LIKELY REJECT YOUR BELIEF THAT HE IS GOING TO USP?

A.      YES.

Q.      AND IF THEY REJECT YOUR BELIEF THAT HE IS GOING TO USP, IS HE GOING TO AN EVEN MORE SECURE FACILITY THAN A USP?

A.      YES.

Q.      AND THE MORE SECURE FACILITIES, THE SCU, THE SMU, AND ADX, IS THAT -- ARE THOSE FACILITIES FACILITIES WHERE THE INMATES ARE SINGLE CELL AND MOVED IN RESTRAINTS?

A.      YES.

Q.      AND ALTHOUGH I BELIEVE AT LEAST THE SMU AND THE ADX HAS A STEP-DOWN COMPONENT, WHICH MEANS THAT THEY MIGHT BE MOVED TO A LOWER SECURITY LEVEL, IS IT CORRECT THAT THE BUREAU OF PRISONS MAKES THE DETERMINATION WHETHER THEY STEP DOWN OR NOT?

A.      YES.

Q.      IT'S NOT A MATTER, YOU ARE ASSIGNED TO ADX FOR THREE YEARS OR FIVE YEARS AND YOU PUT IN YOUR THREE YEARS OR FIVE YEARS AND YOU GRADUATE TO OPEN POPULATION, CORRECT?

A.      THAT'S CORRECT.

Q.      ONLY THE MOVEMENT APPROVED BY PROFESSIONALS WHO

MAKE THESE TYPE OF DECISIONS ON A DAILY BASIS WOULD HE MOVE, CORRECT?

A.      THAT IS ABSOLUTELY CORRECT.

Q.      AND I BELIEVE YOU INDICATED THAT THE PRIMARY GOAL AND THE PRIMARY OBJECTIVE IN THE BUREAU OF PRISONS IS SAFETY FOR STAFF, SAFETY FOR OTHER INMATES, CORRECT?

A.      THAT'S THEIR GOAL.

Q.      AND IF THERE IS ANY HESITANCY, ANY DOUBT --

THE COURT:  WE LOST MR. HAMMER AT THIS POINT.  I JUST WANT THAT ON THE RECORD.

BY MR. TRAVIS:

Q.      IF THERE IS ANY HESITANCY OR ANY DOUBT ABOUT WHETHER IT'S SAFE TO PUT MR. HAMMER IN AN OPEN POPULATION PENITENTIARY, WILL HE GO TO AN OPEN POPULATION PENITENTIARY?

A.      ALWAYS ERR ON THE SIDE OF CAUTION.

Q.      AND WHEN YOU HEARD MR. GURGANUS WALK YOU THROUGH PRIOR CONDUCT ON THE PART OF MR. HAMMER, IS THERE ANYTHING THAT HE BROUGHT TO YOUR ATTENTION THAT CHANGES YOUR OPINION THAT HE, MR. HAMMER, CAN BE SAFELY HOUSED -- AND BY SAFELY HOUSED I MEAN HOUSED IN A FASHION THAT HE CANNOT CAUSE HARM TO OTHER INMATES OR OTHER STAFF -- OR STAFF?

A.      CORRECT.  HE CAN BE SAFELY HOUSED BY THE FEDERAL BUREAU OF PRISONS.

Q.      AND IN THE CORRECTIONS FIELD, IS THE FEDERAL BUREAU OF PRISONS THE GOLD STANDARD?

A.      YES.

Q.      AND WHEN YOU GET TO REGIONAL OFFICE SPACE AND YOU ARE HOLDING EITHER A REGIONAL OR NATIONAL LEVEL, ARE THOSE PEOPLE WHO ARE THERE FOR THE LONG HAUL, THAT IS, IT IS THEIR PROFESSION, THEIR CAREER, CORRECTIONS?

A.      YES, THEY ARE VERY EXPERIENCED AND VERY KNOWLEDGEABLE PEOPLE IN THOSE POSITIONS.

Q.      AND THEY WOULD KNOW EVERYTHING THAT MR. GURGANUS ASKED YOU ABOUT AND PROBABLY MORE, CORRECT?

A.      CORRECT.

Q.      AND TAKE THAT INTO ACCOUNT?

A.      YES, SIR.

           MR. TRAVIS:  YOUR HONOR, IF I MAY HAVE A MOMENT?

           THE COURT:  YES.

           MR. TRAVIS:  I HAVE NO OTHER QUESTIONS.

           THE COURT:  ANY RECROSS?

           MR. GURGANUS:  NO, YOUR HONOR, NO RECROSS.

           THE COURT:  ALL RIGHT.  YOU MAY STEP DOWN.

           THE WITNESS:  THANK YOU, YOUR HONOR.

           (WITNESS EXCUSED.)

THE COURT:  ALL RIGHT, THAT WILL CONCLUDE OUR TESTIMONY TODAY.  WE START AGAIN TOMORROW AT 9:30?

MR. MORENO:  YOUR HONOR, I DON'T THINK THERE IS ANY TESTIMONY FOR TOMORROW.

THE COURT:  TODAY IS --

MS. SAUNDERS:  WEDNESDAY, YOUR HONOR.

THE COURT:  WEDNESDAY.

MR. MORENO:  WE HAD THOUGHT THERE MIGHT BE.

THE COURT:  SO WE ARE NOT GOING TO BE SITTING TOMORROW OR FRIDAY, AND WE'LL COME BACK MONDAY FOR ONE WITNESS?

MR. MORENO:  YES.  WHO I TRIED TO GET AVAILABLE FOR TOMORROW BUT HE JUST COULDN'T WORK IT OUT.

THE COURT:  ALL RIGHT.

MR. MORENO:  I WANTED TO RAISE ANOTHER ISSUE WITH THE COURT, IF I MAY?

THE COURT:  YES, BUT I WANT YOU TO SPEAK INTO A MIC, SO WE CAN ALL HEAR YOU.

MR. TRAVIS:  YOUR HONOR, BEFORE I FORGET, I AM OVER 70 NOW, I WOULD LIKE TO MOVE INTO EVIDENCE THE EXHIBITS THAT MR. GRAVETTE IDENTIFIED.

THE COURT:  ALL RIGHT.  WELL, I HAVE D 301, D 302, D 300, D 303, D 365 TO D 364, AND D 34. ANY OBJECTION TO THOSE BEING ADMITTED?

MR. GURGANUS:  NO, YOUR HONOR.

THE COURT:  ALL RIGHT.  AND ALSO GC 19.

MR. GURGANUS:  AND GC 18, PLEASE.

THE COURT:  AND GC 18.

HEARING NO OBJECTION, THOSE WILL BE ADMITTED ALSO INTO EVIDENCE.

(DEFENSE EXHIBITS D 301, D 302, D 300, D 303, D 365, D 364, D 34 AND GOVERNMENT EXHIBITS GC 19, GC 18 ADMITTED INTO EVIDENCE.)

THE COURT:  AND COUNSEL, AT SOME POINT DURING THE THREE-WEEK HEARING OR TWO-AND-A-HALF WEEK HEARING WE HAVE HAD ALREADY, MR. HAMMER HAD EXPRESSED AN INTEREST IN TESTIFYING.

MR. MORENO:  HE NO LONGER WISHES TO TESTIFY, YOUR HONOR.

THE COURT:  ALL RIGHT.  I WOULD LIKE TO COLLOQUY HIM ON THE RECORD ABOUT -- IF HE DOES NOT WANT TO TESTIFY AT THIS HEARING.

MR. MORENO:  THAT'S FINE.

THE COURT:  SO WE WILL DO THAT ON MONDAY MORNING.  AND DO WE KNOW WHO THE OTHER WITNESS IS?

MR. MORENO:  YES.  HIS NAME IS DR. DAVID LISAK.

THE COURT:  AND WHAT KIND OF WITNESS IS HE?

MR. MORENO:  HE IS A SPECIALIST IN SEXUAL ABUSE AND TRAUMA.

THE COURT:  AND YOU WANT TO PUT SOMETHING ON THE RECORD, MR. MORENO?

MR. MORENO:  WELL, I WANTED TO ASK, INQUIRE, DOES THE COURT WANT ARGUMENT AT THE CONCLUSION OF THE PROCEEDINGS?

THE COURT:  YOU ARE READING MY MIND.  I WAS JUST GOING TO BRING THAT UP.  I WOULD SAY AFTER WE HEAR FROM THE NEXT WITNESS ON MONDAY, IF I CAN HEAR CLOSING ARGUMENTS, I WOULD APPRECIATE IT.  AND I WAS THINKING -- ORDINARILY I DON'T LIMIT THE TIME, BUT I'M JUST WONDERING WHETHER OR NOT BOTH SIDES COULD DO A CLOSING IN 45 MINUTES.  WOULD THAT BE POSSIBLE?

MR. MORENO:  THE OTHER QUESTION WE HAVE, AND I KNOW, YOU KNOW, YOUR HONOR MADE CLEAR THAT YOUR SCHEDULE HAS EXPLODED, AND THAT YOUR AVAILABILITY IS LIMITED.  WE WERE WONDERING IF WE MIGHT BE ABLE TO DO ARGUMENT ON TUESDAY.  IT WOULD NOT TAKE THE WHOLE DAY. WE COULD DO A SHORTER TIME.

THE COURT:  I'M NOT AVAILABLE TUESDAY MORNING AND I KNOW TUESDAY AFTERNOON I'M BOOKED.  SO IT'S GOING TO BE DIFFICULT.  I WOULD LIKE TO DO IT ON MONDAY.

MR. MORENO:  WELL, YOU ARE THE JUDGE, SO

IF YOU ARE TELLING US --

THE COURT:  THANK YOU.

MR. MORENO:  -- IF WE NEED TO DO IT ON MONDAY, WE WILL BE HAPPY TO DO IT ON MONDAY, YOUR HONOR.

THE COURT:  YEAH, RIGHT AFTER THE WITNESS.  I THINK ONCE WE CLOSE THE TESTIMONY --

MR. GURGANUS:  AND JUDGE, WE MAY HAVE ONE OR TWO SHORT WITNESSES FOR REBUTTAL, BUT NOT EXTENSIVE.

THE COURT:  ALL RIGHT.  LET'S REMEMBER WE ONLY HAVE MR. HAMMER UNTIL 3:30, AND I WANT HIM TO HEAR THE CLOSING ARGUMENTS.

MR. MORENO:  WE WERE UNDER THE IMPRESSION THERE WASN'T ANY REBUTTAL, YOUR HONOR, SO PERHAPS WE CAN BE INFORMED OF WHAT THAT REBUTTAL MIGHT BE.

MR. GURGANUS:  WE HAVE TO MAKE THAT DECISION.  AS WE MENTIONED TO YOU, WE WERE GOING TO TALK TO THE PSYCHIATRIST ABOUT THE GUR TESTIMONY AND THAT WAS GOING TO BE DONE TODAY, AND THEN WE HAVE TO TALK TO ONE OTHER WITNESS AND MAKE A DECISION WHETHER WE WOULD BE CALLING ANYONE THERE.  AND WE CAN DISCUSS THAT AFTER THIS.

MR. MORENO:  FINE.

THE COURT:  ALL RIGHT.  UNDER ANY CIRCUMSTANCES, I WOULD LIKE TO DO THE CLOSINGS ON MONDAY.  NOW, I WOULD LIMIT IT TO 45 MINUTES.  WE ALL

KNOW WHAT THE ISSUES ARE.  WE ALL KNOW WHAT THE LAW IS IN THE FEDERAL DEATH PENALTY STATUTE.  AND OBVIOUSLY THIS IS A NON-JURY MATTER, SO I THINK WE CAN PROBABLY GET SOME GOOD ARGUMENTS IN ON MONDAY, IF WE LIMIT IT TO 45 MINUTES EACH SIDE.

MR. MORENO:  OKAY.

THE COURT:  I ORDINARILY DON'T LIMIT IT BUT IT'S BECAUSE MOST CASES ARE JURY TRIALS.  BUT IN A NON-JURY TRIAL, I THINK IT'S DIFFERENT.  ALL RIGHT. ANYTHING FURTHER?

MR. MORENO:  NO.

THE COURT:  I WILL SEE ALL COUNSEL MONDAY MORNING AT 9:30.  AND COULD YOU HAVE THE VERDICT SLIP ALSO FIRST THING MONDAY MORNING, TOO?

MR. MORENO:  YES.  SURE WILL.

THE COURT:  THANK YOU.

MR. GURGANUS:  THANK YOU, YOUR HONOR.

THE COURT:  HAVE A GREAT WEEKEND.

(COURT ADJOURNED AT 3:35 P.M.)

I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.


DATE                                SUZANNE R. WHITE

                                    OFFICIAL COURT REPORTER

INDEX

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| LOUIS BULLOCK | | | | |
| BY MR. MCHUGH | 3 | -- | 64 | -- |
| BY MR. GURGANUS | -- | 44 | -- | 70 |
| MICHAEL COHAN | | | | |
| BY MR. TRAVIS | 71 | -- | 97 | -- |
| BY MR. GURGANUS | -- | 85 | -- | -- |
| ROY T. GRAVETTE | | | | |
| BY MR. TRAVIS | 103,120 | -- | 169 | -- |
| BY MR. GURGANUS | -- | 149 | -- | -- |

| GOVERNMENT EXHIBITS | PAGE |
|---|---|
| GC 15A, 16 AND 17 | 64 |
| GC 18 AND 19 | 174 |

| DEFENSE EXHIBITS | PAGE |
|---|---|
| 138 THROUGH 145 | 44 |
| 400 THROUGH 414; 415 THROUGH 441 | 102 |
| 300 THROUGH 303; 364 THROUGH 534 | 174 |

**'**

**'72** [1] - 13:12
**'74** [4] - 13:13, 27:20, 46:8, 51:12
**'76** [2] - 15:25, 51:12
**'78** [2] - 39:14
**'79** [3] - 22:25, 23:1, 46:12
**'81** [3] - 22:24, 39:23, 42:3
**'82** [1] - 40:16
**'83** [1] - 40:16
**'93** [2] - 43:15, 109:13
**'95** [3] - 109:13, 111:9, 157:20
**'96** [1] - 159:4

**1**

**1** [3] - 8:4, 20:11, 156:22
**1.3** [1] - 5:9
**10** [13] - 17:7, 17:8, 17:24, 58:20, 60:2, 62:8, 105:12, 105:13, 105:14, 129:11, 130:20, 131:6, 156:22
**100** [2] - 2:7, 165:21
**100-WATT** [1] - 80:24
**102** [1] - 179:19
**103,120** [1] - 179:10
**10:30** [1] - 129:12
**11** [5] - 1:12, 27:12, 58:21, 111:5, 156:22
**112** [1] - 166:7
**12** [11] - 10:1, 19:15, 28:5, 28:6, 76:15, 101:5, 130:20, 130:25, 132:19, 135:16, 156:22
**120** [1] - 166:7
**12:20** [1] - 100:14
**13** [4] - 10:10, 76:15, 113:8, 156:22
**1331** [1] - 2:4
**138** [8] - 7:20, 7:21, 8:2, 44:5, 44:7, 46:7, 46:20, 179:18
**139** [4] - 15:8, 44:5, 44:7, 46:20
**13TH** [1] - 35:23
**14** [1] - 156:23
**140** [4] - 18:6, 44:5, 44:7, 47:8
**141** [4] - 21:21, 44:5, 44:7, 48:3
**142** [3] - 23:4, 44:5, 44:8

**143** [7] - 29:21, 34:3, 44:5, 44:8, 93:4, 93:5, 94:21
**144** [4] - 32:15, 44:5, 44:8, 53:2
**145** [4] - 35:19, 44:5, 44:8, 179:18
**149** [2] - 95:10, 179:11
**14TH** [2] - 12:10, 146:1
**15** [11] - 53:3, 53:4, 64:3, 64:12, 64:24, 65:20, 66:5, 68:8, 70:9, 105:11, 156:23
**15A** [3] - 53:6, 53:8, 179:14
**15B** [1] - 1:8
**15TH** [1] - 20:1
**16** [12] - 11:3, 19:18, 55:24, 64:3, 64:12, 64:22, 65:3, 90:8, 97:3, 145:22, 156:23, 179:14
**161** [1] - 2:10
**169** [1] - 179:10
**17** [7] - 19:18, 49:10, 64:3, 64:6, 64:12, 156:23, 179:14
**17101** [1] - 2:7
**174** [2] - 179:15, 179:20
**17703-0215** [1] - 2:11
**18** [7] - 11:9, 19:18, 156:23, 174:3, 174:4, 174:9, 179:15
**18501** [1] - 1:17
**19** [9] - 11:12, 46:6, 63:16, 151:3, 155:5, 156:23, 174:2, 174:8, 179:15
**19106** [3] - 1:9, 1:21, 2:14
**1958** [1] - 45:9
**1971** [1] - 4:1
**1972** [3] - 5:25, 45:4, 46:8
**1974** [5] - 7:15, 13:10, 14:1, 19:20, 20:22
**1975** [4] - 3:22, 4:2, 4:7, 14:12
**1976** [5] - 15:12, 15:23, 17:15, 46:21, 46:25
**1978** [13] - 18:13, 20:1, 20:24, 38:17, 38:18, 41:20, 46:12, 47:18, 47:20, 49:15, 49:22, 50:18, 53:22
**1979** [4] - 22:18, 22:22, 48:13, 49:15

**1980** [5] - 28:7, 32:23, 42:3, 54:14, 65:17
**1981** [9] - 22:2, 28:1, 30:6, 35:3, 35:23, 36:7, 47:23, 48:3, 89:18
**1982** [1] - 90:13
**1983** [3] - 38:2, 41:3, 90:16
**1984** [1] - 43:14
**1986** [2] - 94:1, 153:20
**1987** [1] - 94:1
**1990** [2] - 63:16, 104:19
**1992** [1] - 63:16
**1993** [2] - 63:24, 74:24
**1996** [4] - 37:16, 38:3, 38:11, 159:22
**1997** [1] - 112:6
**1998** [4] - 71:24, 72:6, 72:13, 73:11
**1999** [1] - 112:7
**1:30** [3] - 101:9, 101:12, 101:14
**1:45** [1] - 101:19

**2**

**2** [4] - 20:11, 101:6, 101:19, 156:22
**20** [4] - 4:16, 7:10, 101:5, 156:23
**200** [3] - 97:20, 98:9, 98:17
**2000** [1] - 142:4
**2001** [1] - 156:22
**2003** [1] - 116:6
**2004** [2] - 94:24, 141:9
**2005** [3] - 116:11, 141:9
**2006** [2] - 157:5, 157:7
**2007** [1] - 116:7
**2008** [2] - 156:10, 157:9
**2009** [1] - 142:6
**2010** [1] - 140:14
**2011** [2] - 140:14, 145:21
**2012** [3] - 145:22, 151:12, 151:13
**2013** [1] - 146:1
**20530** [1] - 2:4
**21** [2] - 49:22, 156:23
**215** [1] - 2:10
**215)627-1882** [1] - 1:21
**22** [2] - 72:12, 156:23
**2255** [2] - 141:10, 147:15
**23** [2] - 12:25, 142:4

**235** [1] - 1:16
**23RD** [1] - 157:9
**24** [1] - 69:18
**24TH** [3] - 151:6, 151:12, 151:13
**25** [2] - 142:5, 145:21
**27** [2] - 12:19, 48:3
**27TH** [1] - 22:2
**2:20** [1] - 100:14
**2ND** [2] - 15:23, 46:25

**3**

**3** [4] - 20:11, 130:20, 156:22, 179:4
**3,000** [1] - 164:19
**30** [5] - 30:24, 71:17, 123:22, 140:6, 140:11
**300** [5] - 2:7, 120:25, 173:24, 174:7, 179:20
**301** [5] - 112:24, 112:25, 113:3, 173:24, 174:7
**302** [4] - 106:19, 112:21, 173:24, 174:7
**303** [4] - 117:6, 173:24, 174:8, 179:20
**309** [1] - 1:17
**30TH** [4] - 13:10, 14:1, 19:20, 41:3
**31-27** [1] - 11:17
**311** [1] - 1:16
**33** [1] - 63:23
**334** [3] - 145:25, 149:5, 150:15
**34** [3] - 58:21, 173:24, 174:8
**360** [2] - 145:18, 150:16
**361** [1] - 145:18
**362** [1] - 145:18
**363** [2] - 145:18, 150:16
**364** [3] - 173:24, 174:8, 179:20
**365** [5] - 142:4, 143:16, 173:24, 174:8
**3:30** [4] - 129:24, 148:8, 148:16, 176:10
**3:35** [1] - 177:19
**3RD** [3] - 30:6, 32:23, 157:5

**4**

**4** [17] - 17:5, 26:11, 26:14, 30:10, 58:20, 59:22, 60:2, 60:13, 60:23, 74:2, 130:2, 130:3, 130:5, 130:20, 132:17, 132:18, 156:22
**4/7/1993** [1] - 63:22
**40** [3] - 34:4, 34:6
**400** [9] - 73:5, 73:9, 74:8, 74:11, 74:12, 74:13, 102:11, 102:16, 179:19
**401** [1] - 74:25
**402** [2] - 75:2, 75:3
**403** [2] - 75:5, 75:6
**404** [1] - 75:9
**405** [1] - 75:15
**406** [1] - 75:16
**407** [1] - 75:21
**408** [1] - 75:22
**409** [1] - 75:23
**41** [1] - 34:23
**410** [1] - 75:24
**411** [1] - 75:25
**412** [2] - 76:2, 76:15
**413** [2] - 76:3, 76:15
**414** [7] - 73:6, 73:9, 76:4, 76:15, 102:12, 102:16, 179:19
**415** [8] - 77:16, 78:7, 78:8, 78:9, 78:12, 102:12, 102:16, 179:19
**416** [1] - 79:8
**417** [2] - 79:9, 79:14
**418** [1] - 79:17
**419** [2] - 79:21, 79:23
**420** [2] - 79:21, 79:23
**421** [1] - 80:2
**422** [1] - 80:3
**423** [2] - 80:8, 80:16
**424** [3] - 80:16, 99:25, 100:1
**425** [2] - 80:16, 100:1
**426** [2] - 80:16, 100:1
**426.1** [2] - 80:16, 100:3
**427** [3] - 80:16, 100:1, 100:3
**428** [3] - 80:17, 100:1, 100:3
**429** [3] - 80:17, 80:25, 100:3
**430** [3] - 80:21, 81:3, 100:3
**431** [1] - 81:3

**432** [1] - 81:4
**433** [1] - 81:4
**434** [4] - 81:5, 81:7, 82:8, 82:9
**435** [1] - 83:16
**436** [1] - 83:16
**437** [1] - 83:16
**438** [2] - 84:3, 84:11
**439** [1] - 84:3
**44** [2] - 179:5, 179:18
**440** [1] - 84:3
**441** [6] - 77:17, 84:3, 98:4, 102:13, 102:17, 179:19
**45** [5] - 27:5, 30:24, 175:14, 176:25, 177:5
**4:40** [1] - 130:7
**4:45** [1] - 130:7
**4:96-CR-239** [1] - 1:6
**4TH** [1] - 157:7

## 5

**5** [6] - 60:13, 60:23, 128:11, 130:20, 156:22
**534** [1] - 179:20
**540** [1] - 2:14
**586** [2] - 119:5
**5:30** [1] - 128:11
**5TH** [1] - 15:25

## 6

**6** [6] - 110:4, 128:12, 128:15, 156:22, 161:17
**6'S** [1] - 74:2
**6-25-14** [1] - 1:8
**60** [1] - 13:1
**601** [1] - 1:20
**64** [2] - 179:4, 179:14

## 7

**7** [7] - 8:9, 9:22, 54:14, 107:6, 108:2, 156:22, 161:17
**70** [3] - 123:23, 173:21, 179:5
**71** [1] - 179:7
**7:30** [1] - 128:22
**7TH** [1] - 116:7

## 8

**8** [11] - 31:15, 47:20, 62:2, 107:9, 129:3, 129:9, 132:13,

132:17, 135:16, 156:22
**80** [1] - 50:1
**80-PERSON** [1] - 26:2
**80-YEAR** [1] - 50:5
**85** [1] - 179:8
**86** [1] - 49:14
**8TH** [2] - 9:15, 12:7

## 9

**9** [4] - 109:8, 109:24, 129:11, 156:22
**90** [1] - 161:22
**97** [1] - 179:7
**9:30** [2] - 173:2, 177:13
**9TH** [1] - 45:9

## A

**A.M** [7] - 110:4, 128:11, 128:15, 130:20, 132:13, 135:16
**AB** [2] - 163:19, 163:20
**ABILITY** [3] - 40:22, 92:17, 144:13
**ABLE** [20] - 25:9, 32:17, 43:12, 62:9, 83:1, 90:17, 90:19, 92:21, 93:8, 94:21, 95:6, 96:1, 98:13, 108:25, 109:4, 157:13, 159:25, 163:8, 167:12, 175:18
**ABOVE-ENTITLED** [1] - 178:3
**ABRIDGED** [2] - 20:3, 20:4
**ABSOLUTELY** [4] - 46:18, 87:7, 90:4, 171:3
**ABUSE** [3] - 61:4, 157:11, 175:2
**ACCEPT** [2] - 63:17, 63:22
**ACCESS** [5] - 33:9, 33:23, 51:17, 132:25, 137:7
**ACCESSIBLE** [1] - 31:1
**ACCOMPANIED** [1] - 24:18
**ACCOMPANY** [1] - 139:17
**ACCOMPANYING** [1] - 29:6

**ACCOUNT** [2] - 87:15, 172:13
**ACCOUNTING** [1] - 5:9
**ACCURACY** [1] - 121:21
**ACCURATELY** [2] - 81:11, 81:13
**ACLU** [2] - 6:3, 6:15
**ACQUIRED** [1] - 40:11
**ACQUITTED** [1] - 91:20
**ACRES** [1] - 5:10
**ACTION** [9] - 6:8, 6:16, 13:11, 18:3, 49:4, 118:4, 118:5, 119:1, 119:4
**ACTIONABLE** [1] - 11:20
**ACTIVE** [2] - 66:13
**ACTIVITIES** [5] - 66:19, 109:24, 110:1, 110:2, 110:8
**ACTUAL** [1] - 12:1
**ADDITION** [4] - 26:23, 51:15, 72:20, 73:1
**ADDITIONAL** [2] - 34:24, 144:19
**ADDRESSED** [4] - 36:7, 37:1, 67:16, 92:24
**ADDRESSES** [1] - 36:25
**ADDRESSING** [2] - 23:9, 79:19
**ADEQUATE** [8] - 9:8, 12:6, 13:3, 17:11, 27:4, 33:8, 43:17, 55:6
**ADJOURNED** [1] - 177:19
**ADJUST** [1] - 52:4
**ADJUSTED** [1] - 87:16
**ADJUSTING** [2] - 150:18, 151:1
**ADJUSTMENT** [2] - 32:3, 157:19
**ADMINISTRATION** [3] - 116:12, 116:13, 116:25
**ADMINISTRATIVE** [7] - 107:22, 111:12, 124:6, 127:11, 140:3, 142:19, 144:25
**ADMISSIBLE** [3] - 91:10, 91:13, 92:7
**ADMISSION** [1] - 43:25
**ADMIT** [2] - 20:7,

47:10
**ADMITTED** [9] - 44:6, 44:8, 64:11, 64:13, 102:15, 102:17, 173:25, 174:6, 174:9
**ADVANCE** [1] - 25:5
**ADX** [7] - 127:11, 127:19, 154:17, 154:18, 170:10, 170:15, 170:20
**AERIAL** [3] - 106:19, 112:21, 117:7
**AFFAIRS** [2] - 22:16, 48:11
**AFTER-ACTION** [3] - 118:4, 119:1, 119:4
**AFTERNOON** [6] - 100:22, 101:1, 129:24, 131:7, 149:4, 175:22
**AGENCY** [2] - 58:9, 133:13
**AGENTS** [1] - 17:1
**AGO** [5] - 25:2, 65:2, 88:24, 97:3, 120:4
**AGREE** [39] - 44:22, 46:9, 46:17, 47:2, 47:6, 53:18, 54:24, 55:18, 56:1, 59:17, 61:15, 61:22, 63:11, 63:15, 65:9, 72:3, 85:21, 86:8, 87:11, 87:19, 87:20, 128:1, 149:22, 150:23, 153:11, 153:16, 153:20, 154:10, 154:23, 155:2, 155:15, 155:22, 156:14, 156:18, 157:24, 165:19, 165:22, 167:20, 168:14
**AGREED** [1] - 102:2
**AGREEMENT** [1] - 10:18
**AHEAD** [1] - 26:10
**AIDED** [1] - 1:24
**ALABAMA** [2] - 106:16, 113:23
**ALARM** [4] - 105:6, 105:9, 105:16, 105:23
**ALLEGATIONS** [2] - 9:4, 29:3
**ALLEGING** [1] - 9:17
**ALLENWOOD** [2] - 133:1, 159:23
**ALLOW** [5] - 31:25, 49:19, 131:22, 146:13, 148:14

**ALLOWED** [4] - 77:23, 78:1, 96:16, 133:24
**ALMOST** [6] - 4:12, 22:20, 35:5, 63:1, 71:17, 98:12
**ALONE** [1] - 159:5
**AMANDA** [1] - 2:2
**AMBIGUITY** [1] - 23:1
**AMENDED** [3] - 8:11, 8:14, 8:19
**AMENDMENT** [3] - 9:15, 12:7, 12:10
**AMERICA** [1] - 1:3
**AMOUNTED** [1] - 95:12
**AMPLIFIER** [1] - 135:4
**AND-A-HALF** [2] - 101:8, 117:21
**ANDERSON** [3] - 4:16, 5:14, 8:3
**ANDREW** [1] - 123:2
**ANNE** [1] - 2:5
**ANSWER** [4] - 31:7, 32:14, 97:2, 99:10
**ANSWERS** [1] - 92:11
**APPEAL** [2] - 13:25, 37:5
**APPEALED** [1] - 37:6
**APPEAR** [11] - 59:21, 62:22, 63:5, 66:24, 66:25, 86:1, 143:17, 143:21, 143:25, 144:22, 145:25
**APPEARANCES** [2] - 1:14, 2:1
**APPLY** [1] - 46:13
**APPOINTED** [1] - 5:2
**APPOINTMENT** [1] - 131:6
**APPRECIATE** [1] - 175:11
**APPROPRIATE** [1] - 56:4
**APPROVAL** [2] - 13:8, 127:22
**APPROVE** [1] - 151:21
**APPROVED** [6] - 133:15, 133:16, 136:24, 137:23, 143:13, 170:25
**APRIL** [3] - 63:24, 94:1, 142:5
**AREA** [30] - 30:2, 45:14, 72:24, 74:13, 75:25, 76:2, 76:3, 76:4, 76:12, 77:12, 79:11, 81:25, 82:2, 82:15, 83:25, 84:5, 93:1, 93:23, 107:19, 110:9, 120:14,

130:5, 134:3, 147:13, 160:13, 160:14, 160:17, 160:25, 165:7

**AREAS** [9] - 52:3, 72:16, 72:18, 91:10, 96:8, 110:20, 120:17, 164:24, 166:17

**ARGUING** [1] - 94:5

**ARGUMENT** [2] - 175:6, 175:19

**ARGUMENTS** [3] - 175:11, 176:11, 177:4

**ARISE** [1] - 70:17

**ARISING** [1] - 38:5

**ARIZONA** [1] - 104:12

**ARMED** [2] - 139:18, 139:21

**ARMS** [1] - 149:17

**ARMY** [2] - 39:8, 104:9

**ARRANGEMENT** [1] - 33:17

**ARRIVAL** [1] - 49:22

**ARRIVED** [5] - 109:12, 111:3, 112:6, 114:9, 117:13

**ART** [5] - 50:6, 51:3, 143:7, 144:1, 144:2

**ARTICLE** [1] - 48:2

**ARTS** [1] - 143:8

**ASPECT** [2] - 9:25, 11:8

**ASPECTS** [1] - 16:11

**ASSAULT** [1] - 156:16

**ASSAULTING** [1] - 156:11

**ASSAULTIVE** [3] - 156:1, 161:8, 167:25

**ASSAULTIVE-TYPE** [1] - 156:1

**ASSAULTS** [4] - 164:24, 165:11, 166:10, 166:12

**ASSERT** [1] - 9:10

**ASSESS** [1] - 140:23

**ASSESSING** [1] - 151:1

**ASSESSMENT** [5] - 24:11, 58:10, 58:15, 150:18, 153:17

**ASSIGN** [1] - 139:3

**ASSIGNED** [11] - 18:18, 26:22, 107:15, 107:16, 109:17, 109:22, 114:9, 117:13, 124:5, 132:13, 170:20

**ASSIGNMENT** [13] - 18:18, 72:3, 72:5, 106:14, 106:15, 125:4, 128:23, 128:24, 129:17, 129:21, 130:22, 137:9

**ASSIST** [2] - 21:4, 110:10

**ASSISTANCE** [1] - 52:12

**ASSISTANT** [1] - 91:9

**ASSISTING** [1] - 39:2

**ASSISTS** [1] - 110:2

**ASSOCIATE** [25] - 114:1, 114:2, 114:5, 114:6, 114:7, 114:8, 114:10, 114:11, 114:23, 115:2, 115:8, 115:9, 115:15, 115:22, 116:2, 116:12, 117:11, 117:14, 117:15, 119:7, 121:22, 136:24, 152:11

**ASSUME** [2] - 123:16, 133:16

**ASSUMED** [3] - 10:19, 20:6, 111:10

**ATE** [1] - 83:18

**ATTACHED** [2] - 81:23, 136:15

**ATTEMPT** [3] - 139:13, 147:18, 147:19

**ATTEMPTED** [1] - 153:22

**ATTEMPTING** [3] - 78:10, 95:19, 96:13

**ATTEMPTS** [1] - 162:7

**ATTENDANCE** [2] - 50:17, 107:23

**ATTENTION** [6] - 50:24, 70:18, 77:9, 150:15, 169:20, 171:19

**ATTORNEY** [9] - 3:16, 3:21, 6:20, 6:24, 18:22, 44:18, 91:9, 95:19, 104:11

**ATTORNEYS** [5] - 1:15, 15:19, 103:10, 103:23, 169:4

**AUGUST** [9] - 20:1, 40:16, 41:3, 112:7, 142:4, 146:1, 151:6, 151:12, 151:13

**AUSPICES** [1] - 15:5

**AUTHORITY** [1] -

127:20

**AUTHORIZATION** [2] - 6:22, 56:14

**AUTHORIZED** [2] - 6:21, 20:14

**AUTOBIOGRAPHY** [1] - 87:9

**AVAILABILITY** [3] - 81:22, 93:22, 175:17

**AVAILABLE** [14] - 10:16, 10:20, 11:21, 93:16, 95:3, 120:10, 122:10, 125:18, 138:13, 142:11, 142:22, 145:4, 173:14, 175:21

**AVAILED** [1] - 66:21

**AVAILING** [1] - 67:1

**AVERAGE** [1] - 10:13

**AWARE** [13] - 42:7, 46:4, 57:8, 57:9, 90:16, 92:2, 122:25, 123:2, 123:4, 123:6, 125:4, 125:8, 153:10

## B

**B-U-L-L-O-C-K** [1] - 3:10

**BACK-TO-BACK-TO-BACK** [1] - 75:19

**BACKGROUND** [12] - 3:24, 30:23, 44:23, 45:1, 104:7, 124:10, 124:13, 136:19, 136:20, 136:21, 144:5, 144:20

**BACKTRACK** [1] - 111:7

**BAD** [1] - 32:5

**BAG** [1] - 135:20

**BAGS** [1] - 42:25

**BALANCE** [2] - 63:7, 63:8

**BAR** [1] - 3:17

**BARE** [1] - 43:3

**BARRED** [1] - 3:20

**BARS** [10] - 78:11, 78:12, 79:7, 79:10, 79:12, 79:15, 79:22, 80:2, 82:17

**BASED** [4] - 67:2, 74:17, 123:10, 144:4

**BASIC** [1] - 12:5

**BASING** [1] - 94:13

**BASIS** [7] - 9:12, 10:17, 89:5, 94:8, 122:2, 125:7, 171:1

**BATES** [1] - 34:6

**BATTERIES** [1] -

143:2

**BATTLE** [7] - 4:16, 5:14, 7:13, 8:3, 8:4, 44:21, 51:6

**BAYLESS** [1] - 146:1

**BEAN** [2] - 68:16, 68:22

**BEANS** [1] - 68:23

**BEARS** [1] - 74:2

**BEAUMONT** [8] - 115:24, 116:1, 116:5, 116:6, 116:23, 116:24, 117:4, 152:25

**BEAUTIFUL** [1] - 40:10

**BECAME** [4] - 29:18, 31:6, 39:11, 115:9

**BECOME** [8] - 7:3, 14:25, 37:3, 108:25, 109:3, 115:18, 118:1, 118:7

**BECOMING** [2] - 71:18, 105:2

**BED** [1] - 69:6

**BEDDING** [1] - 69:5

**BEGINNING** [7] - 8:10, 22:10, 28:25, 31:16, 46:6, 60:12, 62:15

**BEGINS** [3] - 9:21, 26:18, 80:8

**BEHALF** [3] - 6:25, 17:1, 35:12

**BEHAVED** [1] - 158:15

**BEHAVIOR** [3] - 61:4, 70:19, 156:1

**BEHAVIORAL** [1] - 32:3

**BEHIND** [1] - 59:22

**BELIEF** [2] - 170:3, 170:5

**BELLMON** [1] - 5:3

**BELLY** [3] - 149:14, 149:16, 156:17

**BELOW** [4] - 77:21, 77:22, 118:21, 118:23

**BENCH** [1] - 37:12

**BENEFITS** [1] - 13:21

**BEST** [5] - 37:16, 38:3, 38:21, 39:15, 162:1

**BETA** [1] - 106:17

**BETO** [1] - 12:7

**BETTER** [11] - 38:24, 40:19, 47:23, 48:1, 48:22, 81:14, 101:10, 101:13, 124:20, 142:13

**BETWEEN** [6] - 31:4, 43:10, 127:6,

134:12, 145:21, 160:4

**BEYOND** [8] - 12:8, 92:3, 92:9, 93:11, 95:15, 96:7, 96:14, 96:20

**BIG** [2] - 50:15, 50:19

**BINDERS** [1] - 57:24

**BIT** [4] - 82:15, 101:16, 132:17, 155:21

**BLACK** [5] - 85:25, 86:1, 86:6, 86:8, 134:9

**BLIND** [1] - 86:10

**BLOCK** [11] - 72:18, 72:20, 74:14, 74:16, 74:22, 76:1, 88:18, 91:24, 93:8, 94:4

**BOARD** [1] - 131:9

**BODILY** [1] - 157:2

**BODY** [2] - 40:5, 149:18

**BOHANON** [9] - 8:7, 14:1, 18:17, 30:8, 35:22, 36:21, 37:9, 37:11, 41:23

**BOHANON'S** [1] - 35:8

**BOMBING** [1] - 6:5

**BOOK** [36] - 49:11, 56:6, 58:20, 59:5, 64:8, 86:14, 87:4, 87:5, 87:6, 87:8, 87:15, 88:16, 88:20, 88:24, 88:25, 89:2, 90:22, 91:1, 91:2, 91:23, 93:6, 93:25, 94:3, 94:16, 94:17, 94:18, 94:24, 95:6, 95:18, 99:1, 99:4, 99:8, 99:13, 137:3, 137:5

**BOOKCASE** [1] - 88:12

**BOOKED** [1] - 175:22

**BOOKSHELF** [1] - 94:19

**BOP** [4] - 118:1, 118:18, 131:18, 147:18

**BOP'S** [1] - 150:21

**BORN** [2] - 45:6, 45:8

**BORROW** [1] - 73:16

**BOTTOM** [8] - 11:16, 26:17, 28:6, 31:22, 67:6, 80:3, 80:5, 112:1

**BOUGHT** [1] - 94:24

**BOX** [3] - 1:17, 2:10,

79:16
**BOX-CAR** [1] - 79:16
**BRACKETS** [1] - 11:17
**BRANCH** [1] - 116:19
**BREAK** [3] - 42:19, 57:18, 148:4
**BREAKFAST** [1] - 131:13
**BRIEF** [1] - 4:7
**BRIEFLY** [5] - 3:23, 34:3, 64:18, 128:5, 134:20
**BRING** [5] - 77:9, 98:19, 99:19, 146:22, 175:9
**BROUGHT** [4] - 97:15, 143:14, 169:20, 171:19
**BUCKING** [1] - 156:2
**BUDGET** [1] - 36:14
**BUILDING** [8] - 6:5, 98:3, 116:12, 116:13, 116:25, 126:14, 126:15, 129:8
**BULB** [1] - 80:25
**BULKHEADS** [2] - 42:15, 43:3
**BULLETIN** [1] - 131:9
**BULLOCK** [10] - 3:5, 3:6, 3:9, 3:10, 3:13, 4:5, 38:16, 59:8, 64:21, 179:3
**BUREAU** [31] - 16:25, 43:15, 63:2, 103:8, 104:15, 104:18, 104:21, 106:6, 106:7, 108:24, 114:19, 115:20, 119:18, 120:15, 120:18, 121:8, 122:1, 123:25, 125:14, 144:13, 144:23, 157:16, 158:9, 161:25, 163:4, 164:17, 168:13, 170:17, 171:5, 171:25, 172:2
**BURRAGE** [1] - 37:17
**BUS** [3] - 138:6, 139:20, 147:8
**BUSINESS** [6] - 37:24, 103:9, 103:11, 103:13, 104:8, 104:14
**BUT...** [2] - 5:22, 52:9
**BUY** [4] - 109:1, 109:4, 142:11, 142:23

**C**

**C-O-H-A-N** [1] - 71:6
**CAFETERIA** [2] - 166:15, 166:17
**CAMERA** [1] - 81:3
**CAMERAS** [2] - 161:3, 161:5
**CAMPAIGN** [1] - 5:4
**CAMPBELL** [1] - 12:7
**CAMPS** [1] - 108:13
**CANAAN** [5] - 140:15, 140:20, 140:25, 145:16, 145:21
**CANDIDATE** [1] - 5:3
**CANNOT** [1] - 171:22
**CAPITAL** [1] - 2:3
**CAPTAIN** [10] - 111:23, 112:9, 112:11, 113:8, 113:15, 115:14, 119:6, 119:7, 139:2, 152:9
**CAPTAIN'S** [2] - 136:22, 139:2
**CAPTION** [1] - 12:22
**CAR** [1] - 79:16
**CARAWAY** [1] - 152:14
**CARDS** [2] - 93:9, 93:23
**CARE** [38] - 9:8, 9:9, 9:15, 9:18, 10:5, 10:9, 10:19, 10:24, 11:15, 11:18, 11:21, 12:22, 13:4, 17:22, 23:9, 25:19, 31:1, 36:12, 36:16, 38:22, 38:24, 39:4, 39:6, 39:16, 40:1, 47:25, 51:16, 54:15, 54:24, 56:9, 63:12, 119:10, 137:19, 138:18, 139:18
**CAREER** [1] - 172:7
**CAROLINA** [5] - 111:1, 111:3, 111:10, 111:20, 112:19
**CARRY** [1] - 125:13
**CASE** [44] - 4:17, 4:21, 5:9, 5:13, 5:15, 5:17, 5:23, 6:5, 6:10, 7:4, 7:6, 7:13, 8:18, 8:21, 9:2, 9:12, 9:13, 11:8, 14:4, 17:17, 18:16, 19:1, 21:6, 28:13, 37:10, 37:13, 37:15, 37:18, 37:25, 38:14, 44:21, 65:11, 90:7,
91:15, 92:2, 96:10, 121:15, 121:19, 122:25, 138:21, 161:12, 168:14
**CASES** [2] - 6:9, 177:8
**CAST** [1] - 42:19
**CATEGORY** [1] - 61:20
**CATHOLICISM** [1] - 158:6
**CAUTION** [1] - 171:16
**CEILING** [1] - 84:12
**CELL** [103] - 28:25, 29:1, 41:15, 41:17, 41:19, 41:25, 42:14, 42:23, 43:5, 43:10, 45:15, 68:19, 72:16, 74:13, 74:15, 74:18, 74:19, 74:22, 75:3, 75:15, 75:16, 75:21, 75:22, 75:23, 75:24, 76:5, 76:8, 76:16, 76:21, 76:22, 76:23, 77:5, 77:9, 77:20, 77:21, 77:23, 77:24, 78:4, 78:13, 78:16, 78:18, 78:20, 79:7, 79:12, 79:14, 79:21, 80:8, 80:18, 81:19, 81:24, 82:1, 82:7, 82:10, 82:20, 83:3, 83:18, 83:19, 84:19, 85:10, 85:12, 85:20, 86:20, 86:23, 86:25, 87:1, 87:18, 87:25, 88:1, 88:5, 88:6, 88:7, 88:15, 88:18, 89:6, 89:7, 89:14, 91:4, 91:18, 91:24, 92:18, 93:20, 94:4, 95:3, 96:1, 96:15, 96:17, 96:20, 118:10, 125:18, 145:4, 156:18, 158:18, 158:24, 160:9, 161:13, 161:14, 161:18, 161:20, 170:11
**CELLED** [2] - 89:11, 94:13
**CELLMATE** [4] - 159:7, 168:5, 168:8, 168:10
**CELLMATES** [1] - 157:21
**CELLS** [21] - 28:17, 28:23, 42:15, 42:22, 43:7, 50:1, 69:9, 69:15, 69:23, 88:21, 92:22, 93:16, 93:17,
95:3, 96:2, 97:3, 130:6, 160:25, 161:5, 161:10, 164:25
**CENSUS** [1] - 130:21
**CENTER** [19] - 2:14, 4:18, 4:20, 24:12, 24:20, 33:18, 36:10, 40:16, 40:18, 45:24, 48:19, 49:21, 58:11, 89:3, 106:9, 109:7, 109:17, 109:23, 111:23
**CENTERED** [2] - 70:12, 70:15
**CENTRAL** [14] - 58:17, 59:23, 60:18, 116:11, 116:13, 116:24, 119:15, 121:18, 122:11, 122:15, 122:20, 123:4, 127:22, 139:11
**CENTRALIZED** [3] - 121:25, 124:25, 131:8
**CERTAIN** [4] - 49:20, 72:1, 123:16, 133:18
**CERTAINLY** [11] - 14:22, 22:15, 46:14, 48:10, 56:12, 81:14, 92:4, 92:23, 93:19, 97:3, 167:15
**CERTAINTY** [1] - 123:11
**CERTIFY** [1] - 178:1
**CHAIN** [7] - 127:10, 149:13, 149:14, 149:18, 151:19, 156:17
**CHALLENGE** [1] - 162:2
**CHALLENGING** [1] - 27:10
**CHANCE** [2] - 37:24, 151:17
**CHANGE** [10] - 38:8, 107:25, 108:7, 111:2, 113:10, 113:11, 114:2, 114:4, 147:5, 151:21
**CHANGES** [3] - 78:20, 78:22, 171:19
**CHAPEL** [1] - 129:7
**CHAPLAINCY** [1] - 115:5
**CHARACTERIZE** [2] - 16:19, 87:24
**CHARGE** [6] - 26:21, 108:8, 111:13,
111:17, 115:2, 152:23
**CHASE** [2] - 42:16, 42:19
**CHECK** [2] - 130:23, 133:13
**CHECKED** [2] - 133:23, 136:7
**CHECKS** [1] - 130:21
**CHEEK** [2] - 134:16, 134:17
**CHESTNUT** [1] - 2:7
**CHICKASAW** [1] - 5:8
**CHIEF** [1] - 152:7
**CHILD** [1] - 4:22
**CHOCTAW** [1] - 5:8
**CHOICE** [1] - 30:13
**CHOW** [1] - 131:23
**CHRISTMAS** [2] - 50:19, 50:21
**CIRCLE** [1] - 120:23
**CIRCUMSTANCES** [3] - 11:20, 139:6, 176:24
**CITY** [4] - 18:20, 18:23, 30:25, 40:8
**CIVIL** [3] - 4:13, 22:4, 23:20
**CLAIM** [1] - 9:11
**CLAIMED** [1] - 95:12
**CLAIMING** [1] - 99:4
**CLARIFICATION** [1] - 126:8
**CLARIFY** [1] - 159:10
**CLASS** [6] - 6:8, 7:1, 13:19, 14:13, 21:3, 38:8
**CLASSES** [1] - 109:20
**CLASSIC** [1] - 26:5
**CLASSIFICATION** [8] - 115:10, 115:19, 116:21, 117:3, 121:11, 122:9, 123:15, 144:8
**CLASSIFICATIONS** [1] - 122:5
**CLAUSE** [1] - 12:9
**CLEAN** [2] - 42:20, 133:14
**CLEAR** [4] - 96:7, 130:7, 175:16
**CLEARED** [1] - 129:10
**CLEARLY** [5] - 26:6, 28:14, 31:3, 62:5, 62:11
**CLERK** [7] - 3:7, 19:4, 19:5, 71:1, 71:4, 73:15, 102:21
**CLERK'S** [1] - 73:16
**CLERKED** [1] - 7:4

**CLINICAL** [3] - 53:12, 54:7, 66:10
**CLOSE** [10] - 4:18, 20:22, 120:23, 124:19, 128:19, 129:9, 130:13, 154:17, 164:14, 176:6
**CLOSED** [9] - 41:10, 41:20, 41:25, 42:1, 42:4, 75:15, 75:17, 79:8, 81:24
**CLOSELY** [4] - 54:7, 56:19, 66:9, 167:12
**CLOSER** [1] - 125:21
**CLOSING** [3] - 175:11, 175:14, 176:11
**CLOSINGS** [1] - 176:24
**CLOTHING** [1] - 143:5
**CLUB** [2] - 163:19, 164:1
**CLUE** [1] - 86:21
**CM** [1] - 1:19
**CMC** [1] - 121:19
**COFFEE** [1] - 128:14
**COHAN** [8] - 71:3, 71:6, 71:9, 99:19, 99:23, 100:13, 102:3, 179:6
**COLD** [1] - 69:17
**COLLECTING** [1] - 129:13
**COLLOQUY** [1] - 174:17
**COLOR** [4] - 86:4, 86:10, 97:7
**COLORADO** [3] - 40:8, 124:7, 127:12
**COLUMBIA** [1] - 118:19
**COLUMN** [4] - 8:9, 9:5, 10:5, 12:20
**COMBINATION** [2] - 36:18, 136:12
**COMING** [4] - 28:25, 44:24, 135:10, 136:5
**COMMAND** [1] - 151:19
**COMMENT** [1] - 13:7
**COMMENTING** [1] - 32:19
**COMMENTS** [2] - 33:5, 99:13
**COMMERCIAL** [1] - 5:10
**COMMERCIALS** [1] - 50:24
**COMMISSARY** [11] - 109:1, 142:1, 142:8,

142:13, 142:15, 142:18, 142:20, 142:23, 142:24, 143:1, 143:11
**COMMITTING** [1] - 153:18
**COMMON** [6] - 43:4, 155:17, 160:13, 160:14, 160:17, 165:7
**COMMONLY** [6] - 58:13, 118:4, 119:4, 140:9, 149:14, 162:11
**COMMUNICATE** [6] - 92:17, 92:21, 94:22, 96:16, 96:25, 135:1
**COMMUNICATION** [1] - 95:7
**COMMUNITY** [3] - 2:13, 4:20, 66:16
**COMPARE** [1] - 82:24
**COMPETENCY** [2] - 60:17, 60:18
**COMPILED** [1] - 20:5
**COMPLAINT** [3] - 6:6, 8:11, 8:14
**COMPLAINTS** [1] - 6:2
**COMPLETELY** [3] - 4:12, 20:11, 26:20
**COMPLEX** [11] - 106:20, 106:22, 115:25, 117:7, 151:19, 152:9, 152:14, 152:18, 152:25, 153:1, 153:5
**COMPLEXES** [1] - 152:19
**COMPLIANCE** [14] - 14:5, 14:8, 14:11, 15:13, 15:14, 15:17, 15:18, 16:4, 18:10, 18:12, 21:2, 37:20, 38:5, 52:11
**COMPLIMENTARY** [1] - 25:13
**COMPLYING** [1] - 17:2
**COMPONENT** [4] - 115:7, 116:15, 126:17, 170:15
**COMPOUND** [5] - 107:17, 107:18, 110:9, 131:4, 131:25
**COMPOUNDED** [1] - 36:13
**COMPREHENSIVE** [4] - 13:2, 19:21, 27:19, 36:1

**COMPUTER** [5] - 1:23, 1:24, 131:8, 137:7, 160:20
**COMPUTER-AIDED** [1] - 1:24
**CONCERN** [1] - 170:1
**CONCERNED** [3] - 30:11, 77:15, 78:4
**CONCERNING** [13] - 6:2, 9:4, 11:1, 11:17, 15:18, 18:11, 25:10, 26:15, 27:16, 28:11, 51:15, 61:3, 65:6
**CONCERNS** [4] - 138:4, 138:5, 138:25
**CONCLUDE** [3] - 64:14, 148:17, 173:1
**CONCLUDES** [1] - 64:15
**CONCLUSION** [4] - 12:11, 38:13, 119:3, 175:6
**CONCLUSIONS** [4] - 11:4, 11:6, 27:13, 27:16
**CONCRETE** [2] - 84:6, 84:10
**CONDEMNATION** [1] - 70:3
**CONDITION** [4] - 41:17, 42:7, 43:11, 81:12
**CONDITIONS** [14] - 6:7, 8:20, 8:23, 9:14, 15:3, 41:20, 51:14, 78:20, 81:21, 89:8, 89:12, 93:13, 154:13, 154:24
**CONDUCT** [7] - 35:12, 91:20, 96:19, 156:24, 161:8, 167:25, 171:18
**CONDUCTED** [1] - 16:8
**CONFERENCING** [1] - 146:23
**CONFIDENCE** [1] - 167:16
**CONFIDENT** [3] - 144:23, 146:11, 169:4
**CONFINED** [1] - 11:21
**CONFINEMENT** [10] - 8:23, 51:14, 89:8, 93:13, 94:4, 96:5, 124:2, 126:11, 126:13, 151:8
**CONFUSION** [1] - 38:6
**CONJUNCTION** [3] -

113:24, 141:8, 141:10
**CONNECTION** [1] - 90:5
**CONNOR** [6] - 40:15, 40:17, 40:19, 41:6, 41:13, 42:5
**CONNORS** [1] - 40:23
**CONSIDER** [2] - 61:1, 61:5
**CONSIDERATION** [2] - 13:8, 91:14
**CONSISTED** [1] - 50:1
**CONSISTS** [3] - 10:21, 128:7, 134:21
**CONSTITUTION** [1] - 9:18
**CONSTITUTIONAL** [1] - 9:11
**CONSTITUTIONALLY** [3] - 13:3, 69:25
**CONSTRUCTED** [1] - 68:24
**CONSTRUCTION** [2] - 20:13, 109:18
**CONSULTANT** [4] - 32:19, 32:24, 34:22, 54:17
**CONSULTANTS** [2] - 33:3, 33:10
**CONSULTED** [2] - 33:7, 61:13
**CONSULTING** [10] - 38:25, 54:9, 54:21, 103:9, 103:10, 103:12, 103:22, 103:23, 104:8, 104:14
**CONTACT** [8] - 134:13, 134:15, 134:25, 158:25, 159:2, 159:11, 160:3
**CONTACTED** [1] - 6:1
**CONTAINS** [1] - 126:5
**CONTEMPLATED** [1] - 12:8
**CONTENT** [1] - 95:18
**CONTENTS** [1] - 94:19
**CONTINUE** [9] - 10:8, 12:3, 33:17, 33:22, 33:25, 57:19, 105:25, 106:2, 169:14
**CONTINUED** [5] - 2:1, 11:25, 20:23, 37:12, 43:19
**CONTINUES** [2] - 43:20, 148:13
**CONTINUING** [1] -

11:7
**CONTRABAND** [2] - 135:18, 136:7
**CONTRACT** [4] - 104:3, 104:4, 104:6, 116:18
**CONTRACTED** [1] - 21:15
**CONTRIBUTED** [1] - 34:15
**CONTROL** [3] - 111:14, 129:4, 130:15
**CONVENIENCE** [1] - 18:20
**CONVERSATION** [1] - 26:14
**CONVERSATIONS** [1] - 135:6
**CONVERSION** [1] - 158:6
**CONVERTED** [1] - 127:2
**CONVINCED** [1] - 45:15
**COORDINATOR** [2] - 121:19, 121:20
**COPIED** [1] - 136:2
**COPIES** [1] - 73:14
**COPY** [3] - 59:6, 73:16, 131:10
**COPYRIGHT** [1] - 94:23
**CORNER** [1] - 34:5
**CORRECT** [192] - 6:17, 6:20, 7:2, 8:12, 8:24, 9:20, 9:22, 10:7, 11:2, 11:10, 13:13, 13:14, 14:6, 15:21, 16:5, 17:4, 17:14, 17:16, 19:10, 20:25, 21:10, 21:12, 22:6, 22:9, 23:17, 24:2, 24:10, 24:13, 24:15, 24:25, 25:22, 27:25, 28:4, 30:4, 30:9, 30:19, 31:21, 35:7, 35:14, 36:5, 36:20, 38:4, 38:20, 41:5, 44:16, 44:17, 44:19, 44:20, 45:5, 45:25, 46:23, 47:3, 47:4, 47:21, 47:22, 48:22, 51:23, 52:2, 52:7, 53:13, 53:16, 54:1, 54:15, 55:4, 55:15, 55:21, 56:25, 57:3, 57:5, 63:14, 65:8, 65:16, 65:19, 65:25, 66:4, 66:8,

66:17, 66:23, 67:8, 67:11, 67:21, 69:14, 74:20, 75:11, 75:12, 77:7, 77:13, 81:19, 85:17, 87:4, 87:12, 87:17, 95:4, 102:5, 102:6, 104:15, 104:16, 118:17, 118:19, 118:24, 118:25, 122:14, 122:20, 122:21, 122:25, 124:11, 126:1, 126:6, 126:21, 127:12, 127:13, 127:16, 128:3, 131:21, 134:4, 137:13, 142:24, 144:9, 145:4, 146:22, 147:3, 149:25, 150:3, 150:4, 150:6, 150:7, 150:17, 151:2, 152:7, 152:8, 152:10, 152:12, 152:13, 152:16, 153:11, 153:14, 154:14, 154:15, 155:1, 156:3, 156:8, 156:25, 157:5, 157:7, 157:16, 158:7, 158:8, 159:5, 159:13, 159:18, 159:19, 159:21, 160:7, 160:13, 160:19, 160:21, 160:24, 161:1, 161:4, 161:6, 161:7, 161:15, 161:16, 161:19, 162:6, 162:21, 162:23, 162:24, 165:3, 165:13, 165:14, 165:16, 166:1, 166:3, 166:9, 166:14, 166:15, 167:14, 167:23, 167:24, 168:10, 169:24, 170:16, 170:23, 170:24, 171:2, 171:3, 171:6, 171:24, 172:11, 172:12, 178:1

**CORRECTION** [1] - 49:21

**CORRECTIONAL** [30] - 24:20, 33:18, 40:15, 40:18, 65:15, 89:3, 89:23, 91:6, 106:11, 106:16, 107:4, 107:5, 107:11, 107:13,

109:22, 110:11, 110:25, 112:14, 114:20, 115:6, 115:25, 125:6, 132:3, 149:21, 152:19, 152:25, 155:10, 166:18, 166:19, 167:1

**CORRECTIONS** [7] - 18:21, 20:1, 23:10, 26:23, 62:4, 172:1, 172:7

**CORRECTLY** [1] - 118:14

**CORRIDOR** [3] - 79:11, 79:12, 84:13

**COUNSEL** [16] - 4:17, 5:2, 6:13, 7:3, 13:6, 14:13, 14:16, 38:11, 51:12, 62:13, 63:21, 78:6, 148:20, 148:21, 174:10, 177:12

**COUNSEL'S** [1] - 45:22

**COUNSELING** [2] - 56:9, 67:23

**COUNSELOR** [4] - 105:8, 133:7, 133:8, 143:11

**COUNT** [6] - 128:11, 130:2, 130:3, 130:7, 130:19, 156:21

**COUNTED** [1] - 130:6

**COUNTRY** [1] - 40:11

**COUNTS** [1] - 130:19

**COUPLE** [3] - 65:21, 97:12, 114:16

**COURSE** [8] - 115:6, 124:5, 125:4, 125:15, 127:22, 128:20, 130:4, 154:9

**COURT** [145] - 1:1, 1:19, 3:1, 3:17, 6:4, 7:16, 7:21, 8:5, 9:3, 9:7, 9:21, 11:7, 12:13, 12:16, 13:8, 13:12, 13:18, 15:12, 16:3, 18:2, 18:12, 18:20, 19:11, 20:22, 23:16, 35:12, 35:15, 41:19, 41:22, 44:2, 44:4, 44:9, 45:2, 49:4, 52:12, 57:13, 57:17, 57:19, 59:7, 64:4, 64:10, 64:14, 70:24, 73:18, 78:6, 84:4, 85:1, 85:4, 89:9, 89:15, 91:12, 91:16, 91:25, 92:13,

93:15, 95:23, 96:11, 97:11, 98:5, 98:21, 99:9, 99:15, 99:21, 99:24, 100:9, 100:12, 100:20, 100:24, 101:5, 101:11, 101:14, 101:18, 101:23, 102:4, 102:8, 102:14, 102:18, 102:24, 103:2, 103:17, 103:21, 105:7, 105:13, 105:15, 105:20, 105:24, 106:2, 112:24, 113:5, 119:23, 119:25, 120:7, 120:13, 120:19, 121:4, 121:9, 126:8, 134:20, 141:21, 145:8, 147:24, 148:5, 148:19, 148:23, 148:25, 151:11, 151:15, 168:18, 168:20, 168:25, 169:7, 169:11, 169:14, 171:9, 172:17, 172:19, 172:22, 173:1, 173:5, 173:7, 173:10, 173:15, 173:17, 173:18, 173:23, 174:2, 174:4, 174:10, 174:16, 174:20, 174:24, 175:3, 175:6, 175:8, 175:21, 176:2, 176:5, 176:9, 176:23, 177:7, 177:12, 177:16, 177:18, 177:19, 178:7

**COURT'S** [6] - 14:8, 15:5, 15:25, 17:3, 17:13, 24:4

**COURTHOUSE** [2] - 1:20, 19:8

**COURTROOM** [2] - 1:8, 160:15

**COURTS** [4] - 37:22, 49:24, 51:18, 52:10

**COVER** [4] - 120:16, 146:5, 146:9, 147:2

**COVERAGE** [3] - 34:19, 54:22, 55:6

**COVERED** [1] - 36:3

**COVERING** [3] - 19:21, 32:22, 35:25

**CRAFT** [1] - 144:2

**CRAFTS** [1] - 143:8

**CREATE** [1] - 140:19

**CREATED** [2] - 82:23, 122:19

**CREATING** [1] - 89:22

**CREW** [1] - 42:18

**CRIED** [1] - 99:5

**CRIMES** [2] - 2:3, 153:18

**CRIMINAL** [4] - 1:3, 2:3, 96:8, 133:13

**CRIPA** [1] - 6:22

**CRITICAL** [3] - 25:14, 25:15, 36:22

**CROSS** [12] - 44:9, 44:11, 57:19, 64:14, 64:15, 85:4, 85:7, 101:4, 120:10, 148:25, 149:2, 179:2

**CRUEL** [5] - 9:16, 9:19, 11:7, 11:11, 46:22

**CUBAN** [2] - 108:10, 127:3

**CURRENT** [1] - 12:3

**CURSING** [1] - 155:9

**CURTIS** [1] - 2:14

**CUSTODY** [2] - 121:8, 125:11

**CUTS** [1] - 148:15

**CV** [1] - 120:25

# D

**D.C** [2] - 2:4, 119:16

**DAILY** [5] - 110:3, 110:8, 110:20, 128:8, 171:1

**DAMAGED** [1] - 98:22

**DANGER** [3] - 150:22, 154:10, 168:12

**DANGEROUS** [1] - 29:3

**DARK** [2] - 81:14, 130:13

**DATA** [1] - 150:16

**DATE** [19] - 13:1, 13:9, 15:22, 19:23, 20:3, 20:15, 22:1, 23:11, 30:5, 35:5, 46:22, 47:19, 54:14, 65:17, 94:6, 138:20, 151:11, 178:6

**DATED** [1] - 14:1

**DATES** [2] - 18:15, 63:17

**DAVID** [32] - 1:6, 3:2, 44:24, 45:6, 45:18, 46:1, 46:11, 46:16,

47:2, 49:6, 49:11, 49:16, 51:2, 53:20, 54:13, 57:2, 58:23, 58:25, 59:19, 62:20, 63:12, 66:6, 67:7, 70:12, 75:25, 85:20, 86:15, 87:8, 88:7, 88:17, 94:2, 174:22

**DAVID'S** [4] - 74:13, 79:7, 79:14, 79:21

**DAYS** [4] - 13:1, 33:14, 69:19, 140:6

**DEAL** [6] - 4:13, 32:13, 38:9, 47:19, 63:11, 137:11

**DEALING** [6] - 47:14, 51:6, 51:17, 51:18, 61:16, 89:6

**DEALS** [2] - 19:15, 46:7

**DEALT** [1] - 67:20

**DEATH** [7] - 123:2, 126:5, 126:17, 126:18, 154:12, 158:3, 177:2

**DECADE** [1] - 94:25

**DECEMBER** [5] - 28:7, 39:22, 43:15, 49:15, 112:6

**DECISION** [6] - 8:4, 13:25, 51:12, 91:15, 176:16, 176:19

**DECISION-MAKING** [1] - 91:15

**DECISIONS** [1] - 171:1

**DECLARED** [1] - 6:8

**DECLASSIFICATION** [1] - 144:6

**DECREASE** [1] - 132:18

**DEEMED** [3] - 120:7, 124:5, 136:25

**DEFENDANT** [19] - 2:5, 2:8, 2:12, 13:2, 91:18, 91:22, 91:24, 96:24, 105:5, 105:22, 106:1, 148:3, 148:11, 148:22, 153:10, 153:13, 169:3, 169:9, 169:13

**DEFENDANT'S** [7] - 7:20, 21:21, 29:21, 46:7, 47:8, 47:10, 48:2

**DEFENDANTS** [3] - 19:20, 20:2, 20:7

**DEFENDER** [2] - 2:6, 2:13

**DEFENSE** [17] - 3:4, 3:6, 8:2, 15:7, 18:6, 23:4, 32:15, 35:19, 44:7, 58:22, 71:3, 102:16, 102:19, 168:24, 174:7, 179:17
**DEFICIENCIES** [4] - 11:24, 11:25, 12:2, 25:21
**DEFINITION** [1] - 31:11
**DEGREE** [1] - 167:16
**DELINEATED** [1] - 30:15
**DEMANDING** [1] - 70:15
**DENIAL** [1] - 11:15
**DENIED** [1] - 152:2
**DENTAL** [1] - 19:22
**DEPART** [1] - 134:8
**DEPARTMENT** [29] - 2:2, 6:18, 6:25, 8:22, 15:20, 16:7, 17:6, 18:2, 18:21, 19:25, 21:8, 22:4, 23:10, 23:21, 26:23, 36:9, 58:6, 60:7, 60:8, 62:4, 69:23, 104:9, 112:14, 114:15, 115:4, 116:17, 119:8, 138:17
**DEPENDENT** [1] - 11:22
**DEPICT** [2] - 76:25, 81:11
**DEPICTED** [5] - 74:12, 76:14, 78:6, 86:6, 91:22
**DEPRIVED** [1] - 12:5
**DEPTH** [2] - 16:20, 113:12
**DESCRIBE** [10] - 3:23, 16:13, 18:8, 34:18, 36:22, 42:10, 43:12, 68:15, 80:22, 84:4
**DESCRIBED** [6] - 16:16, 32:12, 45:13, 45:17, 46:6, 117:17
**DESCRIBES** [2] - 9:3, 28:6
**DESCRIBING** [1] - 56:6
**DESCRIPTION** [2] - 23:24, 69:15
**DESEGREGATION** [1] - 51:18
**DESIGN** [1] - 42:14
**DESIGNATE** [2] - 58:16, 127:18

**DESIGNATED** [8] - 123:12, 124:10, 124:16, 125:11, 125:20, 130:17, 144:8, 145:2
**DESIGNATION** [8] - 116:21, 121:11, 122:9, 122:13, 122:23, 125:17, 127:14, 127:23
**DESIGNATIONS** [1] - 122:5
**DESIGNATOR** [1] - 127:20
**DESIGNATORS** [1] - 122:1
**DESIGNED** [1] - 67:15
**DESIRE** [2] - 110:7, 130:11
**DESPITE** [2] - 154:23, 158:8
**DESTROYED** [1] - 41:11
**DETAIL** [5] - 5:22, 26:10, 27:21, 62:9, 130:24
**DETAILED** [2] - 32:5, 32:10
**DETAILING** [1] - 46:21
**DETAILS** [2] - 34:25, 107:18
**DETECTOR** [1] - 133:22
**DETECTORS** [1] - 162:5
**DETENTION** [5] - 109:7, 109:17, 111:23, 140:4, 142:19
**DETERIORATED** [1] - 41:21
**DETERMINATION** [4] - 124:9, 127:15, 169:23, 170:17
**DETERMINE** [3] - 15:14, 17:2, 151:7
**DEVELOPED** [3] - 30:21, 69:19, 133:10
**DEVICES** [2] - 29:16, 136:15
**DEVOTE** [1] - 36:15
**DIET** [1] - 142:12
**DIFFERENCE** [2] - 76:21, 127:7
**DIFFERENT** [13] - 19:2, 45:13, 56:17, 61:20, 72:16, 81:6, 113:13, 113:14, 120:17, 132:14, 159:14, 160:4, 177:9

**DIFFICULT** [6] - 27:7, 36:8, 36:13, 37:3, 69:2, 175:23
**DIFFICULTY** [1] - 31:6
**DINING** [4] - 128:15, 128:20, 129:17, 130:8
**DIRECT** [12] - 3:11, 67:18, 68:14, 71:7, 82:6, 92:4, 92:5, 95:16, 103:5, 120:21, 150:15, 179:2
**DIRECTED** [2] - 61:10, 62:2
**DIRECTING** [2] - 61:2, 61:7
**DIRECTION** [2] - 32:7, 32:8
**DIRECTIVE** [2] - 15:25, 16:2
**DIRECTLY** [2] - 70:19, 92:24
**DIRECTOR** [4] - 20:1, 20:5, 25:13, 62:3
**DISABILITIES** [1] - 12:8
**DISAGREE** [1] - 128:2
**DISAPPROVED** [7] - 133:15, 143:13, 152:4, 152:5, 152:7, 152:9, 152:11
**DISAPPROVING** [1] - 153:7
**DISC** [8] - 97:18, 97:20, 97:25, 98:9, 98:15, 98:17, 98:21, 99:20
**DISCHARGE** [2] - 115:3, 115:4
**DISCIPLINARY** [2] - 140:4, 142:21
**DISCONCERTING** [1] - 32:6
**DISCOVERED** [1] - 49:19
**DISCOVERY** [1] - 14:14
**DISCRIMINATION** [2] - 8:16, 8:21
**DISCS** [1] - 98:19
**DISCUSS** [2] - 148:19, 176:20
**DISCUSSING** [2] - 31:19, 68:1
**DISCUSSION** [1] - 45:23
**DISK** [1] - 102:3
**DISMAL** [2] - 22:16, 48:11

**DISMISSED** [1] - 38:14
**DISORDERS** [1] - 70:1
**DISSOLVED** [1] - 38:15
**DISTINCTION** [1] - 136:4
**DISTRESS** [1] - 10:21
**DISTRICT** [23] - 1:1, 1:2, 1:16, 2:6, 2:13, 5:17, 5:18, 5:25, 8:5, 18:17, 18:19, 19:2, 19:5, 19:6, 19:9, 37:14, 118:19, 119:23, 119:25, 120:1
**DISTRICTS** [1] - 19:1
**DISTURBANCE** [1] - 111:14
**DIVIDE** [1] - 40:6
**DIVISION** [3] - 2:3, 22:4, 23:21
**DOCTOR** [4] - 45:14, 54:12, 65:25
**DOCTOR'S** [2] - 131:3, 131:6
**DOCTORS** [2] - 33:2, 33:7
**DOCUMENT** [14] - 15:11, 17:6, 18:8, 21:22, 23:6, 32:17, 64:22, 106:18, 120:24, 145:24, 146:4, 149:6, 151:4, 151:16
**DOCUMENTED** [1] - 133:11
**DOCUMENTING** [1] - 143:17
**DOCUMENTS** [8] - 19:23, 60:12, 142:2, 142:6, 145:11, 145:17, 145:19, 151:5
**DOLLARS** [1] - 95:13
**DONE** [13] - 4:23, 29:24, 37:23, 50:21, 59:5, 59:9, 104:8, 118:13, 122:2, 122:3, 137:6, 176:18
**DOOR** [21] - 8:19, 29:1, 68:19, 69:1, 75:3, 75:9, 75:15, 75:17, 79:7, 79:14, 79:18, 79:21, 80:2, 80:3, 80:5, 81:24, 82:1, 82:7, 82:10, 82:15, 82:16
**DOORS** [3] - 68:24, 128:12, 129:6

**DOUBT** [2] - 171:8, 171:12
**DOWN** [19] - 34:21, 42:23, 52:20, 60:18, 61:13, 66:12, 70:24, 80:6, 93:25, 100:13, 106:10, 109:16, 128:20, 129:25, 130:13, 146:17, 170:15, 170:18, 172:23
**DR** [31] - 21:11, 21:14, 21:17, 21:25, 23:8, 23:12, 23:18, 24:18, 25:10, 25:11, 25:21, 26:23, 27:17, 27:18, 28:6, 28:24, 29:4, 29:5, 29:24, 32:18, 32:24, 33:5, 39:17, 39:18, 54:8, 54:9, 55:2, 61:10, 61:11, 62:3, 174:22
**DRAIN** [1] - 42:20
**DRAINS** [1] - 42:20
**DROP** [1] - 135:14
**DROVE** [1] - 34:21
**DRUG** [1] - 61:4
**DUCTS** [1] - 43:9
**DUE** [2] - 12:9, 46:21
**DUMMY** [2] - 89:22, 90:1
**DUPLICATED** [1] - 53:7
**DURING** [29] - 14:22, 17:22, 21:2, 27:11, 38:7, 40:25, 42:12, 43:4, 51:16, 54:20, 59:1, 60:19, 106:5, 108:23, 110:10, 111:4, 111:6, 111:11, 116:20, 116:22, 119:17, 130:14, 130:18, 132:14, 147:20, 159:17, 161:8, 174:11
**DUTIES** [4] - 14:10, 14:16, 108:6, 111:10
**DUTY** [4] - 20:15, 106:14, 106:15, 107:15
**DYSFUNCTIONAL** [1] - 29:19

## E

**EARLY** [3] - 6:9, 14:23, 74:24
**EAST** [6] - 41:15, 41:17, 41:19, 41:25,

42:14, 42:23
**EASTERN** [22] - 2:13, 5:18, 5:25, 18:16, 18:18, 19:6, 19:8, 24:23, 26:3, 26:9, 26:15, 27:3, 31:5, 37:14, 39:13, 39:16, 57:25, 61:9, 61:10, 61:12, 61:25, 62:4
**EASY** [2] - 162:15, 162:18
**EAT** [1] - 131:13
**EATEN** [1] - 128:21
**EDGEFIELD** [10] - 111:25, 112:18, 112:19, 112:22, 113:1, 113:3, 113:7, 113:9, 113:21, 113:22
**EDITH** [2] - 53:11, 54:8
**EDUCATION** [2] - 129:8, 132:4
**EDUCATIONAL** [2] - 3:23, 115:4
**EEG** [1] - 153:22
**EFFORT** [1] - 139:25
**EITHER** [11] - 63:7, 72:5, 75:10, 78:20, 96:25, 108:23, 128:1, 140:3, 151:20, 156:16, 172:5
**ELECTRICAL** [1] - 43:2
**ELECTRONICALLY** [1] - 137:6
**ELEMENTS** [1] - 12:6
**ELMO** [1] - 86:18
**EMERGENCY** [1] - 13:4
**EMOTIONAL** [1] - 49:25
**EMPLOYED** [7] - 4:3, 55:3, 71:19, 103:7, 104:15, 106:6, 119:18
**EMPLOYEES** [1] - 131:18
**EMPLOYMENT** [2] - 104:17, 117:25
**END** [2] - 37:15, 37:19
**ENDED** [3] - 74:18, 88:21, 91:24
**ENDING** [1] - 74:23
**ENGAGE** [1] - 28:25
**ENGAGED** [1] - 96:19
**ENSURE** [2] - 61:17, 119:8
**ENTAIL** [2] - 114:12,

115:1
**ENTER** [2] - 19:3, 75:11
**ENTERED** [5] - 18:12, 35:23, 37:4, 37:8, 46:20
**ENTIRE** [10] - 12:4, 42:21, 69:12, 107:14, 108:20, 112:12, 112:14, 113:18, 123:5, 126:15
**ENTITIES** [1] - 5:1
**ENTITLED** [4] - 11:14, 13:20, 86:14, 178:3
**ENTRY** [2] - 49:7, 78:2
**ENVIRONMENT** [4] - 69:17, 127:24, 151:1, 162:1
**ENVIRONMENTS** [1] - 42:13
**EQUIPMENT** [5] - 11:25, 20:13, 100:4, 100:6, 110:20
**EQUIPPED** [1] - 50:22
**ERR** [1] - 171:16
**ESCAPE** [18] - 49:12, 64:8, 86:14, 89:23, 90:6, 90:12, 90:19, 90:21, 99:1, 99:4, 139:13, 139:14, 140:1, 147:18, 147:19, 153:14, 153:18, 168:3
**ESCAPED** [4] - 57:7, 89:2, 89:18, 90:16
**ESCAPES** [2] - 167:23, 167:25
**ESCORT** [3] - 133:24, 146:14, 146:24
**ESCORTED** [4] - 125:15, 134:1, 134:2, 149:10
**ESPECIALLY** [1] - 150:2
**ESQUIRE** [6] - 1:15, 2:2, 2:5, 2:8, 2:12, 2:12
**ESSENCE** [1] - 131:12
**ESSENTIALLY** [5] - 27:2, 39:17, 56:15, 80:9, 96:3
**ESTABLISH** [1] - 4:20
**ESTABLISHING** [1] - 26:3
**ESTILL** [2] - 110:25, 111:10
**ESTIMATE** [3] - 14:19, 164:13, 164:15
**EVALUATION** [3] -

19:24, 60:16, 65:10
**EVENING** [7] - 130:4, 130:9, 130:10, 130:14, 132:9, 132:18, 161:18
**EVENINGS** [1] - 132:5
**EVENT** [2] - 100:21, 125:20
**EVENTS** [1] - 28:12
**EVENTUALLY** [6] - 37:12, 50:13, 60:21, 69:19, 91:5, 133:14
**EVIDENCE** [12] - 44:6, 44:8, 64:11, 64:13, 92:11, 96:7, 102:11, 102:17, 173:21, 174:6, 174:9
**EXACT** [1] - 23:1
**EXAMINATION** [15] - 3:11, 44:11, 64:19, 70:6, 71:7, 85:7, 92:4, 92:6, 95:16, 97:13, 103:5, 120:11, 120:21, 149:2, 169:17
**EXAMINE** [3] - 44:9, 85:4, 148:25
**EXAMPLE** [3] - 99:25, 146:22, 147:8
**EXCEPT** [2] - 82:7, 84:10
**EXCEPTION** [2] - 87:15, 139:1
**EXCEPTIONALLY** [2] - 154:24, 165:20
**EXCUSE** [4] - 71:21, 73:24, 105:5, 148:3
**EXCUSED** [3] - 71:2, 100:17, 172:25
**EXERCISE** [4] - 76:2, 76:3, 76:4, 76:11
**EXERCISING** [1] - 69:21
**EXHAUSTIVE** [1] - 24:3
**EXHIBIT** [18] - 7:20, 7:21, 15:8, 18:6, 21:21, 23:4, 26:13, 29:21, 32:15, 34:3, 35:19, 46:7, 46:19, 47:8, 48:3, 49:10, 53:3, 70:9
**EXHIBITS** [16] - 43:25, 44:7, 56:18, 56:19, 58:22, 58:24, 64:3, 64:12, 86:5, 102:16, 173:22, 174:7, 174:8, 179:13, 179:17
**EXIGENCY** [1] - 42:5

**EXIST** [1] - 12:1
**EXISTED** [1] - 15:4
**EXISTING** [2] - 22:17, 48:12
**EXISTS** [1] - 168:13
**EXIT** [1] - 75:11
**EXPAND** [1] - 13:17
**EXPANDED** [1] - 13:18
**EXPEDITIOUSLY** [1] - 148:10
**EXPERIENCE** [8] - 5:11, 14:3, 32:9, 37:22, 83:8, 144:4, 149:19, 163:15
**EXPERIENCED** [3] - 29:4, 105:11, 172:8
**EXPERT** [13] - 19:24, 21:12, 21:25, 25:10, 28:2, 29:25, 35:11, 55:10, 103:15, 119:22, 120:6, 120:14, 158:10
**EXPERTISE** [2] - 32:9, 37:18
**EXPERTS** [6] - 16:10, 21:1, 21:3, 21:6, 22:7, 69:22
**EXPLAIN** [8] - 56:22, 78:5, 89:14, 134:20, 135:12, 137:21, 146:8, 151:15
**EXPLAINS** [1] - 91:23
**EXPLANATION** [1] - 128:6
**EXPLODED** [2] - 40:25, 175:17
**EXPOSED** [1] - 89:8
**EXPOSURE** [2] - 115:10, 115:13
**EXPRESSED** [1] - 174:12
**EXTENSIVE** [2] - 16:18, 176:8
**EXTENT** [2] - 17:20, 86:12
**EXTERIOR** [1] - 75:1
**EXTINGUISHER** [2] - 164:4, 164:6
**EXTRACTION** [1] - 118:10
**EXTREMELY** [3] - 27:6, 27:10, 166:8
**EYE** [2] - 124:23, 132:10

**F**

**FACILITATE** [1] - 89:23

**FACILITIES** [16] - 11:24, 15:4, 20:14, 27:22, 40:20, 46:8, 81:16, 114:15, 116:15, 123:24, 124:4, 125:23, 127:16, 170:9, 170:10
**FACILITY** [11] - 27:4, 42:11, 50:6, 51:3, 54:1, 56:14, 89:24, 111:3, 111:8, 126:20, 170:6
**FACING** [2] - 79:12, 79:14
**FACT** [21] - 6:20, 9:22, 16:19, 17:12, 18:11, 18:25, 19:11, 21:24, 22:24, 25:23, 26:4, 30:14, 33:5, 36:10, 36:14, 40:25, 41:2, 51:11, 70:2, 72:8, 154:23
**FACTORS** [1] - 36:18
**FACTS** [1] - 95:20
**FAILED** [2] - 17:10, 27:11
**FAILURE** [1] - 9:8
**FAIR** [2] - 96:17, 164:13
**FAIRLY** [3] - 23:24, 162:15, 162:18
**FALL** [1] - 15:12
**FAMILIAR** [21] - 5:14, 14:25, 15:3, 30:20, 39:24, 39:25, 49:12, 57:4, 58:6, 58:9, 58:12, 73:7, 87:4, 105:2, 108:25, 109:3, 115:19, 142:6, 151:8, 154:3, 157:12
**FAMILIARIZATION** [2] - 104:25, 109:21
**FAMILIARIZE** [1] - 59:14
**FAMILY** [1] - 133:10
**FAR** [26] - 14:10, 16:3, 16:14, 25:19, 25:20, 27:3, 30:11, 32:12, 33:9, 34:5, 56:4, 69:5, 76:11, 77:15, 81:16, 83:17, 84:14, 84:21, 95:15, 118:18, 125:14, 132:25, 134:12, 134:15, 164:15, 164:24
**FASHION** [2] - 61:24, 171:21

FAT [1] - 20:2
FAVORABLE [1] - 50:3
FBI [2] - 16:17, 16:22
FCRR [1] - 1:19
FEBRUARY [9] - 22:2, 47:23, 48:3, 54:14, 71:24, 72:12, 73:11, 140:14, 145:22
FEDERAL [32] - 2:6, 2:13, 4:12, 16:25, 49:4, 49:24, 103:8, 104:4, 104:15, 104:18, 104:20, 106:9, 106:15, 108:11, 109:7, 109:17, 110:25, 111:23, 114:19, 115:25, 121:8, 122:1, 122:15, 123:25, 132:2, 144:23, 152:19, 152:25, 164:9, 171:24, 172:1, 177:2
FEEDING [1] - 130:9
FELT [1] - 30:11
FEMALE [2] - 155:18, 155:19
FENCE [1] - 84:8
FEW [7] - 7:9, 28:17, 38:16, 63:24, 99:22, 116:22, 169:16
FIELD [1] - 172:1
FILE [20] - 6:15, 8:14, 19:7, 19:11, 122:11, 122:16, 122:20, 123:4, 123:5, 125:5, 125:10, 136:16, 136:17, 137:3, 137:4, 137:13, 137:15, 139:7, 139:12, 145:15
FILED [16] - 5:18, 5:23, 5:24, 6:6, 15:19, 17:6, 17:18, 18:16, 21:24, 22:1, 23:11, 23:16, 25:3, 35:11, 47:20, 51:13
FILES [3] - 16:12, 140:17, 140:19
FILING [4] - 15:15, 15:22, 18:1, 35:6
FILL [1] - 33:8
FILLING [1] - 20:12
FILM [3] - 81:3, 82:11, 86:1
FINAL [6] - 49:12, 64:8, 86:14, 99:1, 99:4, 152:6
FINALLY [6] - 31:16,

31:24, 37:15, 37:20, 97:6, 111:8
FINANCE [1] - 5:4
FINANCIAL [1] - 114:14
FINDINGS [4] - 9:21, 34:8, 34:12, 34:14
FINE [9] - 27:15, 57:15, 73:18, 85:15, 99:21, 105:19, 174:19, 176:22
FINISH [2] - 101:16, 129:18
FINISHED [1] - 128:19
FINISHES [1] - 11:18
FINISHING [1] - 53:1
FIRE [6] - 105:6, 105:9, 105:16, 105:22, 164:4, 164:6
FIRM [1] - 4:8
FIRMS [1] - 4:9
FIRST [47] - 1:20, 7:15, 9:5, 12:25, 15:24, 16:23, 22:10, 22:12, 22:14, 23:18, 30:10, 34:8, 35:24, 45:11, 48:4, 48:9, 49:20, 50:2, 51:13, 53:17, 59:5, 59:9, 60:12, 68:7, 68:10, 70:11, 79:13, 85:9, 85:14, 85:17, 91:2, 104:24, 106:14, 106:15, 108:1, 110:4, 114:9, 114:20, 116:3, 116:8, 116:10, 117:13, 118:8, 142:4, 142:8, 177:14
FIRSTHAND [1] - 95:22
FIVE [7] - 57:14, 74:23, 85:22, 85:23, 148:4, 170:21, 170:22
FIVE-MINUTE [2] - 57:14, 148:4
FLAP [1] - 68:20
FLASH [6] - 80:19, 80:20, 81:2, 81:9, 81:15
FLAVOR [1] - 20:19
FLAWED [1] - 30:12
FLOOR [4] - 1:20, 69:6, 69:8, 84:12
FLOOR-TO-CEILING [1] - 84:12
FLORENCE [2] - 124:6, 127:12
FLORIDA [1] - 109:8

FLOWING [1] - 42:22
FLUSH [2] - 76:16, 82:21
FLUSHING [1] - 76:19
FOAM [1] - 163:22
FOCUS [6] - 9:24, 19:13, 19:15, 27:14, 56:21, 57:2
FOCUSING [1] - 57:1
FOLKS [2] - 54:18, 144:24
FOLLOWED [2] - 34:1, 110:18
FOLLOWING [7] - 18:10, 18:13, 38:7, 50:18, 107:7, 128:11, 129:20
FOOD [3] - 68:21, 130:5, 143:4
FOODSTUFFS [1] - 143:2
FOOT [1] - 8:19
FORCE [2] - 118:6, 118:10
FOREGOING [1] - 178:1
FORENSIC [1] - 67:25
FOREWORD [1] - 87:14
FORGET [1] - 173:20
FORGOTTEN [1] - 28:13
FORM [2] - 65:4, 119:5
FORMULATE [1] - 13:2
FORTH [5] - 15:17, 17:9, 27:21, 109:22, 132:8
FORWARD [1] - 19:6
FOUNTS [1] - 79:2
FOUR [7] - 17:17, 28:23, 69:11, 74:23, 80:12, 145:11, 145:17
FRAME [2] - 32:21, 40:2
FRANK [5] - 21:11, 23:8, 37:13, 38:2
FREE [2] - 128:12, 131:14
FREQUENTLY [3] - 70:2, 159:15, 166:12
FRESHEN [1] - 129:19
FRIDAY [3] - 50:15, 105:2, 173:11
FRIEND [1] - 133:11
FRONT [8] - 7:24, 15:9, 18:14, 103:18, 112:24, 120:24,

129:6, 149:16
FULL [10] - 3:7, 9:6, 10:9, 36:21, 54:22, 55:3, 66:5, 71:4, 102:21, 154:16
FULL-TIME [2] - 54:22, 55:3
FUNCTION [1] - 114:23
FUNDAMENTAL [1] - 9:12
FUNDING [1] - 142:22
FURTHERMORE [1] - 32:6
FUTURE [2] - 167:18, 167:19

## G

G-R-A-V-E-T-T-E [1] - 103:4
GAINING [1] - 50:11
GAME [1] - 96:18
GAMES [2] - 50:12, 70:19
GARCIA [2] - 61:10, 61:11
GAS [1] - 165:25
GC [25] - 49:10, 53:3, 53:4, 53:6, 55:24, 64:3, 64:12, 64:21, 64:24, 65:3, 65:20, 66:5, 68:8, 70:9, 151:3, 155:5, 174:2, 174:3, 174:4, 174:8, 174:9, 179:14, 179:15
GENERAL [11] - 5:20, 5:21, 6:20, 6:24, 31:5, 45:2, 54:1, 132:25, 142:16, 142:17, 158:15
GENERAL'S [2] - 18:22, 104:11
GENERALLY [4] - 34:12, 68:20, 80:23, 107:11
GENERATED [1] - 119:5
GEOGRAPHIC [1] - 36:11
GEORGE [1] - 21:14
GEORGIA [1] - 106:9
GIVEN [8] - 36:6, 72:5, 73:14, 74:17, 96:9, 126:13, 153:8, 158:11
GLANCING [1] - 62:8
GLASS [2] - 84:12, 134:24

GLYNCO [1] - 106:9
GOAL [2] - 171:5, 171:7
GOLD [1] - 172:2
GOVERNMENT [20] - 1:15, 2:2, 4:25, 8:14, 9:10, 16:9, 17:8, 49:10, 53:3, 64:3, 64:12, 64:21, 73:15, 78:6, 89:13, 104:3, 104:5, 174:8, 179:13
GOVERNMENT'S [2] - 28:2, 91:25
GOVERNOR [1] - 5:3
GOVERNOR'S [1] - 5:4
GRAB [1] - 79:25
GRADUATE [1] - 170:22
GRADUATED [3] - 3:25, 4:1, 7:5
GRAND [4] - 121:25, 122:3, 122:5, 169:23
GRANITE [7] - 24:14, 39:23, 40:2, 40:3, 40:6, 40:13, 40:23
GRAVETTE [13] - 101:17, 102:19, 103:3, 103:7, 103:12, 120:10, 120:23, 141:24, 145:14, 149:4, 169:19, 173:22, 179:9
GRAVETTE'S [1] - 148:13
GREAT [5] - 4:13, 30:25, 38:6, 90:10, 177:18
GRIFFIN [2] - 59:23, 60:14
GROSSLY [1] - 34:19
GROUND [5] - 76:23, 77:21, 77:22, 84:7
GROUNDS [1] - 8:17
GROUP [10] - 4:21, 49:17, 49:18, 50:15, 50:19, 50:20, 66:14, 66:16, 142:2, 161:9
GROW [1] - 96:6
GROWTH [1] - 66:22
GS [7] - 107:6, 107:9, 108:2, 109:8, 109:23, 111:5, 113:8
GUARD [7] - 29:1, 29:2, 29:5, 45:15, 155:18, 155:19, 166:4
GUARDS [5] - 29:5, 155:16, 156:16,

165:15, 165:19
**GUESS** [5] - 28:23, 34:5, 55:19, 61:24, 96:6
**GUILTY** [1] - 157:20
**GUR** [1] - 176:17
**GURGANUS** [62] - 1:15, 44:3, 44:10, 44:12, 53:9, 53:10, 57:13, 57:15, 57:20, 57:21, 59:16, 64:2, 64:7, 64:15, 70:7, 70:22, 85:5, 85:8, 86:18, 86:19, 89:9, 89:10, 89:17, 91:16, 91:17, 92:12, 92:15, 93:6, 93:7, 93:21, 95:25, 96:11, 96:12, 96:22, 97:9, 99:6, 99:12, 100:10, 101:15, 101:21, 102:2, 102:6, 120:12, 149:1, 149:3, 151:13, 151:14, 167:7, 167:9, 168:16, 169:20, 171:17, 172:10, 172:20, 174:1, 174:3, 176:7, 176:15, 177:17, 179:5, 179:8, 179:11

# H

**HAINES** [1] - 2:2
**HALF** [6] - 10:13, 28:24, 101:8, 106:8, 117:21, 174:11
**HALFWAY** [2] - 40:8, 40:9
**HALL** [4] - 128:15, 128:20, 129:17, 130:8
**HALLWAY** [4] - 75:1, 75:13, 78:11, 97:4
**HAMMER** [112] - 1:6, 3:2, 3:3, 32:20, 33:16, 34:1, 38:17, 39:13, 39:22, 40:15, 41:2, 41:8, 43:14, 44:24, 45:6, 45:18, 46:1, 46:11, 46:16, 47:2, 49:6, 49:11, 49:16, 51:2, 52:15, 53:1, 53:20, 54:14, 55:5, 55:13, 56:6, 57:2, 58:23, 58:25, 59:19, 60:10, 60:16, 61:3, 62:20, 63:7, 63:12, 67:1, 74:19,

74:22, 76:7, 78:15, 81:18, 83:2, 84:18, 85:20, 86:15, 88:7, 88:17, 89:6, 90:6, 92:3, 92:21, 96:16, 96:19, 99:3, 99:4, 105:21, 121:7, 122:23, 123:11, 123:19, 124:11, 124:16, 124:20, 125:10, 125:20, 127:15, 131:5, 137:13, 139:17, 139:24, 140:12, 140:14, 141:1, 141:8, 143:18, 144:7, 144:14, 144:18, 145:2, 145:16, 145:20, 146:4, 146:9, 146:12, 146:23, 147:15, 148:5, 148:8, 149:9, 150:8, 151:7, 156:15, 157:24, 158:10, 167:11, 167:22, 168:21, 168:22, 168:25, 169:24, 171:9, 171:13, 171:18, 171:20, 174:12, 176:10
**HAMMER'S** [15] - 61:16, 61:22, 83:17, 84:14, 87:8, 93:6, 122:11, 123:10, 124:8, 137:15, 139:7, 144:5, 145:15, 151:21, 169:21
**HAND** [10] - 8:9, 9:5, 10:4, 12:20, 19:4, 34:5, 62:13, 77:16, 86:13, 134:10
**HANDCUFFED** [2] - 149:10, 149:12
**HANDCUFFS** [2] - 149:17, 156:17
**HANDED** [2] - 49:9, 145:17
**HANDLED** [1] - 121:13
**HANDLING** [2] - 39:5, 146:12
**HANDS** [2] - 133:23, 162:8
**HANGING** [1] - 160:9
**HAPPY** [1] - 176:4
**HARM** [4] - 140:23, 141:1, 157:2, 171:22
**HARP** [23] - 24:20, 25:24, 30:18, 30:21,

30:24, 31:20, 32:13, 32:19, 33:21, 33:25, 34:16, 45:24, 48:19, 48:24, 49:21, 52:21, 56:18, 66:2, 66:7, 67:2, 67:19, 67:22, 89:2
**HARRIS** [1] - 2:9
**HARRISBURG** [1] - 2:7
**HAUL** [1] - 172:6
**HAUTE** [7] - 124:3, 126:4, 126:16, 143:22, 143:23, 152:20, 153:3
**HEAD** [4] - 24:5, 90:23, 164:7, 168:2
**HEADING** [1] - 10:9
**HEALTH** [24] - 9:1, 9:4, 9:18, 9:25, 10:25, 12:2, 12:4, 21:16, 21:19, 22:16, 25:25, 27:4, 27:19, 30:1, 30:14, 31:4, 35:1, 36:2, 36:6, 37:2, 48:12, 70:1, 114:15, 119:8
**HEALTHCARE** [18] - 11:23, 17:11, 17:22, 19:16, 20:8, 20:14, 25:9, 25:17, 25:21, 25:23, 36:24, 40:17, 43:13, 43:17, 47:9, 47:11, 51:25
**HEAR** [7] - 29:14, 68:15, 102:25, 173:19, 175:10, 176:10
**HEARD** [4] - 131:17, 132:12, 163:20, 171:17
**HEARING** [23] - 15:13, 15:17, 16:3, 18:13, 20:15, 25:16, 35:13, 35:15, 37:4, 44:2, 44:4, 64:4, 89:14, 91:11, 100:12, 102:14, 141:10, 147:15, 174:5, 174:11, 174:12, 174:18
**HEARINGS** [3] - 7:14, 18:11, 18:23
**HELD** [7] - 13:20, 115:9, 117:25, 119:12, 141:13, 147:15
**HELLER** [4] - 21:17, 29:24, 39:18, 39:19
**HELLISH** [1] - 42:13

**HELP** [5] - 52:7, 58:16, 128:10, 132:8
**HELPING** [3] - 52:9, 52:10, 107:22
**HENRY** [1] - 85:13
**HESITANCY** [2] - 171:8, 171:12
**HIDDEN** [1] - 162:12
**HIDE** [1] - 162:18
**HIERARCHY** [1] - 118:18
**HIGH** [3] - 113:9, 127:9, 141:4
**HIGHER** [5] - 125:23, 127:16, 127:20, 127:25, 132:16
**HIGHEST** [3] - 3:17, 152:24, 154:20
**HIGHLIGHTED** [1] - 47:10
**HIGHLY** [3] - 149:20, 150:5, 154:13
**HIMSELF** [7] - 37:9, 37:12, 66:21, 67:1, 84:18, 93:2, 93:14
**HIRED** [4] - 16:10, 21:6, 104:20, 106:11
**HIRING** [1] - 109:18
**HISTORY** [6] - 44:23, 45:1, 60:10, 153:13, 153:17, 154:6
**HOBBY** [1] - 144:2
**HOLD** [8] - 113:7, 116:1, 116:8, 146:5, 146:9, 147:2, 149:8, 156:17
**HOLDING** [1] - 172:5
**HOLE** [3] - 68:16, 68:22, 84:6
**HOLES** [1] - 135:3
**HOLIDAY** [1] - 50:19
**HOME** [1] - 101:17
**HONOR** [67] - 3:4, 7:22, 43:22, 43:25, 44:3, 44:10, 57:16, 57:20, 59:4, 64:2, 64:5, 64:16, 64:18, 70:23, 73:13, 84:25, 85:3, 85:6, 89:4, 89:10, 91:7, 91:17, 91:21, 93:10, 93:20, 95:14, 95:25, 97:10, 98:23, 99:6, 99:17, 99:18, 100:11, 100:19, 101:3, 101:10, 101:21, 102:7, 102:11, 105:19, 105:22, 113:4, 120:9, 120:12, 121:3,

141:20, 145:7, 145:11, 147:23, 148:2, 148:3, 148:11, 149:1, 168:17, 168:19, 172:15, 172:20, 172:24, 173:3, 173:6, 173:20, 174:1, 174:15, 175:16, 176:4, 176:13, 177:17
**HONORABLE** [3] - 1:10, 8:7, 30:7
**HOSPITAL** [15] - 24:23, 26:3, 26:4, 26:9, 26:15, 27:3, 30:14, 39:13, 45:14, 58:1, 58:5, 59:23, 147:11, 153:21
**HOSPITALIZED** [1] - 10:14
**HOST** [2] - 51:19, 51:21
**HOSTAGE** [4] - 136:19, 153:22, 154:4, 154:6
**HOSTAGE-TAKING** [1] - 154:6
**HOUR** [6] - 27:5, 40:21, 73:16, 101:7, 102:1, 124:22
**HOURS** [2] - 69:18, 124:24
**HOUSE** [8] - 41:15, 41:18, 41:19, 41:25, 42:14, 42:23, 144:13, 166:18
**HOUSED** [15] - 41:14, 74:19, 74:22, 84:15, 125:16, 126:2, 126:4, 126:14, 140:15, 144:18, 145:21, 171:20, 171:21, 171:24
**HOUSING** [29] - 106:17, 107:16, 108:8, 108:9, 108:11, 108:14, 108:18, 111:8, 111:12, 111:16, 111:18, 128:13, 128:22, 129:1, 129:19, 130:2, 131:18, 131:19, 131:20, 132:14, 132:20, 135:15, 137:9, 140:5, 141:13, 142:10, 145:20, 159:4, 166:6
**HUBER** [4] - 32:18,

32:24, 54:9, 55:2

**HUG** [2] - 134:16, 134:17

**HUM** [2] - 151:18, 155:25

**HUMAN** [1] - 114:14

**HUMPHREY** [1] - 2:9

**HURLEY** [1] - 161:12

**HURLEY'S** [2] - 161:14, 161:20

**HURRICANE** [1] - 116:10

**HYGIENE** [1] - 143:4

**I**

**I.E** [1] - 20:4

**ID** [1] - 133:21

**IDEA** [4] - 33:11, 63:6, 93:24, 94:20

**IDENTIFICATION** [10] - 73:5, 106:19, 112:21, 117:6, 120:25, 133:20, 134:8, 142:3, 145:18, 145:25

**IDENTIFIED** [3] - 88:14, 134:6, 173:22

**IDENTIFY** [9] - 8:1, 15:11, 18:8, 21:22, 23:6, 29:23, 32:17, 35:21, 134:6

**ILL** [2] - 32:1, 32:2

**IMAGINE** [2] - 42:13, 123:16

**IMPAIRMENT** [1] - 12:2

**IMPLEMENT** [2] - 17:10, 27:22

**IMPLEMENTATION** [3] - 20:12, 22:14, 48:9

**IMPLEMENTED** [3] - 20:11, 22:23, 124:19

**IMPORTANT** [4] - 17:19, 25:14, 36:25, 54:16

**IMPRESSION** [1] - 176:12

**IMPRISONMENT** [3] - 122:24, 123:13, 124:18

**IMPROPER** [3] - 96:19, 118:16, 156:24

**IMPROVE** [2] - 56:10, 56:11

**IMPROVEMENT** [7] - 22:15, 22:21, 25:12, 25:23, 31:12, 43:18,

48:10

**IMPROVEMENTS** [1] - 25:18

**IMPROVING** [2] - 47:5, 56:3

**IN-DEPTH** [2] - 16:20, 113:12

**INADEQUATE** [1] - 11:22

**INADEQUATELY** [2] - 26:7, 32:10

**INCARCERATED** [5] - 13:19, 38:17, 45:11, 45:21, 46:12

**INCARCERATING** [1] - 36:17

**INCARCERATION** [1] - 12:9

**INCIDENT** [11] - 28:7, 28:11, 45:17, 91:4, 91:21, 118:6, 155:13, 156:7, 156:10, 157:12, 157:21

**INCIDENTS** [3] - 118:2, 154:3, 156:23

**INCLUDE** [3] - 8:19, 13:19, 24:8

**INCLUDED** [4] - 9:9, 51:11, 124:13, 157:2

**INCLUDES** [3] - 10:25, 114:14, 167:23

**INCLUDING** [7] - 9:14, 12:14, 13:4, 32:1, 32:3, 155:7, 157:18

**INCORRECT** [2] - 118:16, 123:19

**INDEPENDENT** [1] - 87:2

**INDEX** [1] - 179:1

**INDICATE** [11] - 16:6, 17:8, 17:12, 23:19, 29:9, 30:11, 52:14, 62:10, 67:9, 125:22, 168:12

**INDICATED** [6] - 13:15, 81:18, 87:14, 89:2, 152:6, 171:4

**INDICATES** [15] - 8:11, 23:20, 27:10, 34:24, 35:25, 53:17, 53:20, 53:24, 54:6, 54:18, 66:9, 68:10, 86:22, 94:21, 151:5

**INDICATING** [4] - 28:2, 54:13, 82:18, 96:3

**INDICATION** [5] - 56:8, 139:12, 139:24, 147:18,

150:21

**INDIVIDUAL** [5] - 133:9, 133:12, 138:7, 140:6, 163:5

**INDIVIDUALS** [5] - 122:9, 126:5, 126:18, 154:4, 159:14

**INFORMAL** [1] - 10:18

**INFORMATION** [16] - 74:17, 79:2, 91:12, 103:15, 103:23, 121:14, 122:11, 122:13, 124:11, 124:13, 133:7, 133:12, 137:23, 138:10, 138:24, 169:19

**INFORMED** [1] - 176:14

**INITIAL** [7] - 7:6, 7:7, 8:3, 36:3, 106:4, 107:10, 121:14

**INITIATED** [3] - 13:12, 136:22, 151:22

**INJUNCTION** [4] - 14:8, 15:5, 21:3, 35:8

**INJURY** [1] - 156:11

**INMATE** [54] - 10:14, 12:2, 16:12, 29:1, 29:7, 45:16, 69:4, 107:17, 107:18, 115:3, 121:18, 122:11, 122:15, 122:16, 122:19, 122:20, 123:4, 124:22, 125:11, 128:6, 128:25, 131:11, 131:13, 132:10, 133:2, 133:5, 134:12, 134:23, 136:16, 136:21, 137:4, 137:25, 138:3, 138:7, 138:10, 138:18, 138:19, 138:24, 139:4, 139:12, 140:3, 142:1, 142:17, 154:21, 157:25, 158:2, 158:5, 161:13, 161:18, 163:17, 165:13, 166:24

**INMATE-ON-INMATE** [1] - 165:13

**INMATES** [86] - 12:5, 13:5, 13:19, 19:22, 20:10, 26:22, 29:5,

29:14, 29:16, 33:5, 33:6, 36:13, 36:16, 39:6, 41:12, 42:3, 42:6, 42:8, 42:17, 42:18, 42:24, 43:4, 43:9, 43:17, 47:13, 50:2, 50:17, 50:23, 58:16, 69:18, 69:21, 70:1, 70:21, 84:17, 103:25, 108:25, 109:3, 110:6, 110:16, 111:9, 113:14, 113:19, 115:11, 115:14, 119:19, 128:10, 128:12, 128:16, 128:20, 128:23, 129:6, 129:16, 130:1, 130:3, 130:4, 130:5, 130:10, 130:16, 130:22, 130:25, 132:21, 132:25, 135:14, 136:3, 136:18, 136:19, 137:12, 142:19, 142:21, 144:14, 144:21, 159:1, 161:9, 162:8, 165:15, 165:21, 166:5, 166:25, 170:2, 170:11, 171:6, 171:22

**INMATES'** [1] - 161:10

**INNER** [1] - 84:12

**INPUTTED** [1] - 131:8

**INQUIRE** [2] - 78:19, 175:6

**INSATIABLE** [1] - 70:17

**INSIDE** [10] - 75:15, 75:16, 75:21, 75:22, 75:23, 75:24, 76:8, 79:9, 80:8, 80:18

**INSOFAR** [3] - 74:15, 76:5, 78:4

**INSOLENCE** [3] - 155:7, 155:9

**INSOLENT** [1] - 155:10

**INSPECTIONS** [1] - 14:15

**INSTALLING** [1] - 29:15

**INSTANCE** [2] - 60:6, 161:12

**INSTEAD** [1] - 146:14

**INSTITUTION** [53] - 28:15, 30:17, 39:22, 41:9, 41:10, 58:7, 60:7, 60:20, 61:8,

62:6, 62:7, 62:10, 62:12, 65:6, 104:25, 105:3, 105:9, 106:16, 106:24, 107:14, 109:16, 109:23, 110:3, 110:21, 110:25, 112:12, 112:13, 113:9, 113:13, 113:18, 114:13, 115:7, 116:3, 122:17, 125:8, 125:9, 132:3, 134:9, 135:10, 137:17, 137:18, 137:24, 137:25, 138:1, 139:9, 142:16, 143:14, 148:9, 152:24, 163:13

**INSTITUTIONAL** [4] - 4:14, 6:10, 109:21, 157:19

**INSTITUTIONS** [23] - 4:24, 14:15, 14:17, 14:20, 14:22, 14:24, 17:2, 23:24, 24:4, 24:17, 31:2, 36:11, 40:4, 45:20, 108:11, 114:5, 118:24, 134:18, 144:24, 149:20, 150:1, 162:9, 164:1

**INSTRUCTED** [1] - 109:19

**INSTRUMENT** [1] - 162:25

**INSUFFICIENT** [1] - 28:3

**INTAKE** [1] - 115:14

**INTENSIVE** [1] - 106:10

**INTERACT** [1] - 83:2

**INTERACTED** [1] - 57:10

**INTERACTION** [1] - 134:12

**INTERCOM** [3] - 83:4, 83:6, 83:11

**INTEREST** [2] - 4:18, 174:13

**INTERESTED** [1] - 56:3

**INTERIOR** [4] - 79:22, 81:24, 82:7, 82:10

**INTERMIXING** [1] - 32:4

**INTERNAL** [2] - 118:11, 118:13

**INTERPERSONAL** [1] - 70:17

**INTERRUPT** [1] - 26:10
**INTERVENED** [4] - 6:10, 6:19, 6:25, 8:15
**INTERVENOR** [7] - 8:8, 8:13, 13:7, 16:7, 21:7, 35:12, 46:25
**INTERVENORS'** [1] - 19:24
**INTRODUCTION** [1] - 136:20
**INTRUSIVE** [1] - 83:10
**INVESTIGATE** [1] - 5:3
**INVESTIGATION** [7] - 16:7, 16:14, 16:18, 16:20, 17:1, 135:21, 135:24
**INVESTIGATIONS** [4] - 104:7, 118:2, 118:12, 118:13
**INVESTIGATIVE** [5] - 107:20, 112:15, 112:16, 135:23, 136:23
**INVESTIGATOR** [3] - 71:14, 71:16, 71:19
**INVOLVE** [1] - 14:17
**INVOLVED** [21] - 14:7, 19:1, 51:22, 56:23, 70:18, 92:3, 92:10, 109:25, 113:15, 116:21, 117:3, 118:1, 118:7, 119:1, 119:13, 122:10, 122:22, 132:21, 137:11, 137:22, 157:21
**INVOLVEMENT** [3] - 44:19, 110:12, 118:8
**INVOLVING** [3] - 5:6, 5:9, 6:6
**IRON** [1] - 42:20
**IRONICALLY** [1] - 60:22
**ISOLATED** [4] - 28:18, 28:22, 40:3, 69:18
**ISOLATION** [6] - 85:10, 85:12, 86:23, 88:14, 88:18, 96:5
**ISSUE** [11] - 7:16, 8:16, 9:1, 12:17, 35:15, 36:19, 36:25, 38:9, 51:10, 91:17, 173:17
**ISSUES** [15] - 11:1, 13:12, 22:23, 36:4, 37:2, 37:3, 38:5, 46:21, 51:15, 51:19,

51:22, 67:20, 119:9, 177:1
**ITEM** [1] - 143:13
**ITEMIZED** [1] - 143:24
**ITEMS** [10] - 88:12, 109:1, 142:14, 142:17, 143:4, 143:5, 143:16, 143:24, 144:2
**ITSELF** [1] - 147:3

## J

**J.F** [1] - 152:14
**JAILS** [1] - 4:23
**JALAPENO** [1] - 142:12
**JAMES** [3] - 2:12, 2:12, 146:2
**JANUARY** [4] - 32:23, 43:14, 65:17, 116:7
**JEALOUS** [1] - 70:16
**JOB** [20] - 107:12, 107:13, 107:25, 109:14, 111:2, 112:10, 113:10, 113:11, 114:3, 114:4, 117:3, 117:12, 125:3, 128:23, 128:24, 129:14, 129:17, 129:21, 132:24, 137:8
**JOE** [13] - 24:20, 25:24, 30:18, 30:21, 30:24, 31:20, 32:13, 32:19, 33:21, 33:25, 34:16, 52:21, 56:18
**JOEL** [1] - 1:10
**JOHN** [2] - 1:15, 6:20
**JONES** [4] - 6:4, 6:12, 6:15, 7:5
**JOSEPH** [10] - 45:23, 48:19, 48:24, 49:21, 66:2, 66:7, 67:2, 67:19, 67:22, 89:2
**JR** [1] - 1:15
**JUDGE** [24] - 5:25, 6:1, 8:5, 14:1, 18:17, 19:2, 19:3, 35:8, 35:22, 36:21, 37:9, 37:11, 37:13, 37:16, 38:2, 41:23, 70:25, 77:10, 128:5, 135:12, 137:21, 146:8, 175:25, 176:7
**JUDGE'S** [1] - 96:23
**JUNE** [5] - 38:17, 40:16, 104:19, 109:13, 111:9

**JURISDICTIONAL** [1] - 8:17
**JURY** [3] - 177:3, 177:8, 177:9
**JUSTICE** [12] - 2:2, 6:18, 6:25, 8:22, 15:20, 16:8, 17:7, 18:2, 21:9, 22:5, 23:22, 69:23

## K

**KEEP** [7] - 124:19, 124:23, 125:21, 130:18, 132:10, 144:14, 162:7
**KEEPS** [1] - 95:20
**KEPT** [2] - 80:13, 143:10
**KEYPOINT** [1] - 104:5
**KIND** [7] - 29:18, 66:6, 67:6, 150:11, 151:9, 156:1, 174:24
**KINDS** [1] - 162:7
**KING** [2] - 53:12, 54:8
**KITES** [1] - 43:10
**KNOWING** [1] - 25:8
**KNOWLEDGE** [11] - 76:8, 87:3, 92:13, 92:23, 94:8, 95:2, 95:22, 96:14, 99:14, 126:16, 144:6
**KNOWLEDGEABLE** [1] - 172:9
**KNOWN** [3] - 90:14, 119:4, 169:22
**KNOWS** [3] - 96:21, 130:25, 138:7
**KNOXVILLE** [1] - 71:12

## L

**LACK** [9] - 9:17, 22:17, 25:14, 25:15, 31:11, 33:8, 48:16, 124:20, 142:13
**LACKING** [1] - 34:19
**LAID** [1] - 91:23
**LANGLEY** [1] - 6:1
**LARGE** [2] - 26:17, 40:4
**LARGELY** [1] - 39:7
**LARGER** [1] - 66:16
**LAST** [16] - 26:17, 53:11, 63:21, 63:24, 67:12, 92:1, 95:24, 98:4, 100:25, 101:25, 103:3, 105:10, 117:2,

142:5, 142:20, 147:13
**LASTLY** [1] - 43:12
**LATERAL** [1] - 110:24
**LATITUDE** [1] - 92:1
**LAW** [8] - 4:1, 4:18, 5:24, 7:5, 11:4, 11:6, 12:12, 177:1
**LAWSUIT** [8] - 4:16, 5:6, 10:24, 36:3, 44:19, 51:6, 51:10, 51:22
**LAWSUITS** [1] - 4:23
**LAWYER** [2] - 4:15, 7:7
**LAWYERS** [3] - 4:21, 5:5, 18:21
**LEAD** [8] - 4:15, 6:13, 7:3, 14:12, 14:16, 38:11, 51:12, 144:11
**LEADERSHIP** [1] - 144:23
**LEADING** [1] - 7:8
**LEAKING** [1] - 42:21
**LEARN** [3] - 83:1, 137:16, 140:13
**LEARNED** [1] - 29:9
**LEARNING** [2] - 50:12, 56:7
**LEAST** [10] - 14:23, 23:1, 62:11, 63:16, 105:12, 105:14, 121:8, 132:7, 147:17, 170:14
**LEAVE** [1] - 33:24
**LEAVES** [3] - 33:16, 33:17, 121:23
**LEAVING** [1] - 149:5
**LEFT** [15] - 8:9, 9:5, 12:20, 43:14, 48:14, 52:15, 79:13, 109:6, 109:13, 111:22, 112:7, 113:21, 113:22, 116:24, 119:9
**LEFT-HAND** [3] - 8:9, 9:5, 12:20
**LEGAL** [2] - 12:13, 136:5
**LEGISLATURE** [1] - 36:15
**LENGTHY** [2] - 19:14, 23:24
**LESS** [6] - 40:12, 40:21, 50:4, 123:18, 123:23, 142:20
**LESSER** [1] - 151:25
**LETTER** [14] - 21:24, 22:4, 22:24, 32:18, 32:23, 33:15, 52:25,

58:10, 60:6, 60:24, 62:2, 67:18, 124:14, 146:1
**LEVEL** [14] - 11:21, 32:9, 50:6, 50:7, 106:22, 106:23, 123:21, 125:23, 127:16, 132:16, 139:3, 168:12, 170:16, 172:5
**LEVELS** [2] - 113:13, 113:14
**LEWISBURG** [6] - 126:23, 127:4, 141:9, 141:12, 147:16
**LEXINGTON** [7] - 24:11, 24:21, 34:16, 49:22, 52:21, 58:10, 58:12
**LICENSED** [3] - 71:14, 71:15, 71:18
**LIEUTENANT** [14] - 109:8, 109:24, 110:1, 110:2, 110:3, 111:5, 111:6, 111:11, 111:12, 111:13, 111:16, 118:9, 138:6
**LIEUTENANT'S** [2] - 119:5, 135:22
**LIEUTENANTS** [2] - 112:15, 132:1
**LIFE** [7] - 49:20, 121:9, 122:24, 123:12, 124:17, 128:6, 158:11
**LIGHT** [5] - 77:6, 78:2, 82:2, 84:7, 134:9
**LIGHTING** [2] - 80:20, 81:11
**LIGHTLY** [1] - 26:1
**LIGHTS** [1] - 82:10
**LIKELY** [4] - 101:2, 150:8, 158:15, 170:2
**LIKEWISE** [1] - 164:6
**LIMIT** [4] - 175:12, 176:25, 177:4, 177:7
**LIMITED** [2] - 13:16, 175:18
**LINE** [5] - 16:14, 40:24, 66:12, 66:13, 82:5
**LISAK** [1] - 174:23
**LIST** [6] - 24:3, 133:6, 142:18, 142:20, 142:24, 143:1
**LISTED** [1] - 155:5
**LISTENING** [1] - 136:12

**LISTS** [1] - 142:15
**LIT** [1] - 81:15
**LITANY** [1] - 96:18
**LITIGATION** [9] - 4:12, 4:14, 5:21, 25:2, 38:7, 41:22, 103:10, 103:23, 147:20
**LIVED** [1] - 53:25
**LLC** [1] - 103:12
**LOCAL** [2] - 6:3, 109:19
**LOCATED** [1] - 117:22
**LOCATION** [6] - 33:10, 36:11, 86:11, 121:25, 123:14, 124:25
**LOCATIONS** [1] - 129:14
**LOCKED** [5] - 29:15, 130:2, 130:3, 142:10, 159:3
**LOCKING** [1] - 75:4
**LOCKS** [1] - 75:7
**LONG-TERM** [3] - 67:6, 67:10, 67:15
**LOOK** [32] - 7:19, 15:7, 17:5, 18:5, 21:16, 21:20, 23:3, 26:11, 29:20, 32:15, 35:18, 57:25, 58:19, 59:6, 59:9, 63:17, 64:21, 64:24, 66:5, 67:5, 73:6, 74:3, 77:17, 77:24, 82:12, 82:14, 97:22, 99:25, 138:6, 139:8, 140:17, 143:16
**LOOKED** [2] - 113:4, 155:14
**LOOKING** [15] - 21:18, 26:5, 62:6, 82:12, 82:18, 86:10, 87:18, 93:25, 94:6, 125:1, 125:3, 139:23, 140:17, 140:19, 143:24
**LOOKS** [6] - 63:22, 84:5, 88:4, 88:12, 135:18, 142:5
**LOSE** [2] - 148:8, 168:20
**LOST** [2] - 5:9, 171:9
**LOU** [1] - 3:5
**LOUDER** [1] - 82:25
**LOUIS** [5] - 3:6, 3:9, 3:10, 179:3
**LOUISIANA** [2] - 111:24, 127:4
**LOW** [3] - 141:3, 141:5, 141:17

**LOWER** [2] - 123:21, 170:16
**LUCKY** [1] - 133:22
**LUNCH** [5] - 73:16, 99:20, 102:1, 129:18, 129:19
**LUNCHEON** [1] - 101:22
**LUNCHTIME** [1] - 98:12
**LUTHER** [2] - 8:7, 30:7

# M

**MA'AM** [1] - 79:8
**MAD** [1] - 32:4
**MAGNITUDE** [1] - 78:17
**MAIL** [8] - 135:10, 135:14, 135:17, 135:20, 135:25, 136:1, 136:5
**MAILBOX** [1] - 135:14
**MAIN** [4] - 19:8, 40:5, 67:23, 116:13
**MAINTAINING** [1] - 26:6
**MAINTENANCE** [1] - 42:18
**MAJOR** [13] - 4:9, 4:21, 5:6, 5:11, 6:10, 25:23, 30:13, 36:11, 38:9, 51:10, 51:15, 52:19, 54:23
**MALE** [1] - 123:23
**MAN** [13] - 50:1, 90:22, 90:23, 95:16, 95:21, 127:24, 146:5, 146:9, 146:16, 146:17, 147:2, 149:8, 156:17
**MANAGEMENT** [8] - 104:7, 114:14, 121:19, 121:20, 124:4, 126:21, 126:24, 132:4
**MANAGER** [9] - 53:14, 65:11, 121:15, 121:16, 121:17, 138:21, 146:2, 151:23
**MANDATED** [2] - 49:3, 49:23
**MANDATORY** [1] - 50:16
**MANIPULATE** [2] - 49:19, 56:7
**MANNER** [1] - 162:20
**MANUAL** [1] - 79:24

**MARCH** [5] - 7:15, 22:18, 30:6, 35:23, 157:20
**MARGINAL** [1] - 31:12
**MARGINALLY** [2] - 31:11, 48:1
**MARIELITO** [1] - 108:10
**MARKED** [18] - 7:20, 8:1, 18:6, 21:21, 23:4, 29:21, 35:19, 44:1, 73:5, 83:15, 106:18, 112:20, 117:6, 120:24, 142:3, 143:16, 145:17, 145:24
**MARKEDLY** [1] - 82:25
**MARKET** [1] - 1:20
**MARTI** [1] - 123:2
**MARTIN** [2] - 149:13, 149:14
**MATTER** [12] - 9:25, 12:14, 18:25, 56:8, 92:5, 95:15, 147:1, 157:11, 163:3, 170:20, 177:3, 178:3
**MATTERS** [3] - 6:23, 92:6, 157:15
**MATTRESS** [2] - 69:6, 69:7
**MAXIMUM** [5] - 50:5, 124:6, 125:11, 127:11, 154:20
**MCALESTER** [8] - 13:23, 18:24, 24:9, 38:19, 71:25, 72:8, 72:11, 73:10
**MCHUGH** [17] - 2:12, 3:4, 3:12, 7:22, 7:23, 43:21, 43:24, 53:8, 59:4, 59:8, 59:12, 64:5, 64:9, 64:18, 64:20, 70:4, 179:4
**MCVEIGH** [1] - 6:5
**MEAL** [10] - 110:5, 110:7, 128:17, 128:18, 128:21, 129:15, 129:18, 130:5, 130:9, 130:10
**MEALS** [4] - 76:7, 83:17, 83:18, 132:9
**MEAN** [17] - 26:10, 33:22, 77:2, 81:23, 82:17, 83:8, 83:11, 96:1, 100:15, 126:11, 134:2, 136:11, 155:4, 158:25, 159:17, 165:21, 171:21

**MEANING** [1] - 125:13
**MEANS** [5] - 110:4, 135:13, 146:9, 146:11, 170:15
**MEASURES** [3] - 91:18, 124:19, 144:19
**MECHANISM** [1] - 75:4
**MEDIA** [1] - 103:24
**MEDICAID** [1] - 4:22
**MEDICAL** [59] - 4:22, 9:8, 9:15, 10:5, 10:9, 10:24, 11:15, 11:18, 11:21, 12:6, 12:14, 12:22, 13:4, 17:21, 19:22, 20:1, 20:3, 20:5, 23:9, 25:13, 25:18, 28:17, 29:13, 31:1, 33:1, 38:23, 39:4, 39:6, 39:11, 40:1, 40:13, 59:18, 60:5, 60:21, 61:1, 61:6, 61:22, 62:1, 62:3, 62:5, 62:11, 62:20, 63:5, 63:9, 63:12, 65:13, 116:17, 116:19, 119:9, 137:19, 138:4, 138:15, 138:16, 138:17, 138:18, 139:18, 139:23
**MEDICALLY** [1] - 119:10
**MEDICS** [1] - 39:8
**MEDIEVAL** [1] - 43:11
**MEDIUM** [5] - 50:7, 50:8, 106:23, 116:2, 141:4
**MEET** [1] - 11:22
**MEETING** [2] - 50:19, 119:11
**MEETINGS** [3] - 50:16, 66:16
**MELISSA** [1] - 146:1
**MELVIN** [1] - 21:17
**MEMBER** [5] - 3:17, 124:24, 132:7, 146:14, 146:24
**MEMBERS** [2] - 132:3, 168:23
**MEMORANDUM** [3] - 19:14, 47:9, 151:18
**MEMORANDUMS** [1] - 119:12
**MEMORIAL** [2] - 59:23, 60:14
**MEMORY** [1] - 105:8
**MENTAL** [35] - 9:1,

9:4, 9:18, 9:25, 10:25, 17:11, 17:22, 21:16, 21:18, 22:16, 25:9, 25:17, 25:20, 25:22, 25:25, 26:4, 27:4, 27:19, 29:25, 30:13, 31:4, 31:25, 35:1, 36:2, 36:6, 36:24, 37:2, 38:22, 39:15, 40:17, 43:13, 43:17, 48:11, 49:25, 70:1
**MENTALLY** [2] - 4:19, 32:2
**MENTION** [2] - 21:1, 43:6
**MENTIONED** [14] - 5:13, 7:12, 8:8, 16:22, 24:6, 32:24, 39:4, 52:13, 136:14, 158:18, 159:10, 166:8, 176:16
**MENTIONS** [1] - 15:24
**MENU** [3] - 142:13, 142:24, 143:1
**MERCHANDISE** [1] - 95:13
**MERELY** [1] - 54:21
**MET** [1] - 17:12
**METAL** [3] - 43:9, 133:21, 162:5
**METHODS** [2] - 96:24, 134:7
**METROPOLITAN** [1] - 109:22
**MIAMI** [9] - 109:8, 109:11, 109:12, 109:15, 109:23, 110:23, 110:24, 111:4, 111:7
**MIC** [3] - 102:25, 103:18, 173:19
**MICHAEL** [3] - 71:3, 71:6, 179:6
**MIDDLE** [6] - 1:2, 1:16, 2:6, 40:7, 119:23, 120:1
**MIDNIGHT** [4] - 130:20, 132:12, 132:19, 135:16
**MIGHT** [11] - 6:4, 14:19, 55:17, 62:9, 125:22, 131:14, 160:20, 170:16, 173:8, 175:18, 176:14
**MIKE** [1] - 37:17
**MILITARY** [1] - 39:9
**MILLION** [2] - 5:9, 95:12

**MIND** [4] - 56:10, 148:13, 163:9, 175:8
**MINIMUM** [3] - 50:6, 108:13, 125:16
**MINUTE** [4] - 57:14, 99:9, 129:4, 148:4
**MINUTES** [9] - 27:5, 29:7, 30:24, 105:11, 105:13, 129:9, 175:14, 176:25, 177:5
**MISS** [1] - 169:6
**MITCHELL** [1] - 6:21
**MIXED** [1] - 32:2
**MODEL** [3] - 157:24, 158:2, 158:5
**MODERN** [1] - 160:12
**MODERN-DAY** [1] - 160:12
**MODIFICATION** [2] - 20:9, 47:12
**MODIFIED** [1] - 20:10
**MOMENT** [12] - 42:6, 43:21, 84:24, 99:16, 105:6, 121:2, 141:19, 145:6, 145:10, 147:22, 167:7, 172:16
**MONDAY** [13] - 50:14, 50:18, 105:1, 173:11, 174:20, 175:10, 175:24, 176:4, 176:25, 177:4, 177:12, 177:14
**MONEY** [2] - 36:15, 142:11
**MONITOR** [3] - 107:21, 110:9, 132:8
**MONITORED** [4] - 135:11, 136:6, 136:10, 136:11
**MONITORING** [10] - 14:7, 14:10, 21:2, 21:4, 107:17, 110:16, 121:18, 135:6, 136:1
**MONTH** [4] - 14:22, 34:22, 38:25, 65:20
**MONTHLY** [1] - 125:6
**MONTHS** [7] - 50:4, 78:17, 106:8, 107:2, 116:22, 117:2, 141:8
**MORENO** [23] - 2:12, 100:18, 101:9, 101:12, 146:2, 173:3, 173:8, 173:13, 173:16, 174:14, 174:19, 174:22, 175:1,

175:4, 175:5, 175:15, 175:25, 176:3, 176:12, 176:22, 177:6, 177:11, 177:15
**MORNING** [25] - 34:22, 44:13, 44:14, 50:18, 71:9, 71:10, 100:15, 101:3, 105:1, 110:5, 110:7, 128:14, 128:17, 128:18, 128:21, 129:3, 129:14, 129:23, 130:23, 131:6, 135:15, 174:21, 175:22, 177:13, 177:14
**MORNINGS** [1] - 34:16
**MOST** [13] - 17:19, 18:23, 31:1, 31:2, 40:3, 40:10, 41:15, 60:6, 66:18, 123:16, 134:15, 164:25, 177:8
**MOSTLY** [1] - 9:1
**MOTION** [1] - 13:18
**MOVE** [11] - 27:7, 43:25, 64:2, 78:12, 102:11, 109:6, 128:13, 129:10, 147:1, 171:2, 173:21
**MOVED** [8] - 42:6, 42:8, 79:15, 109:7, 116:11, 116:14, 170:11, 170:16
**MOVEMENT** [5] - 79:16, 129:5, 146:16, 146:17, 170:25
**MOVEMENTS** [4] - 107:17, 129:4, 130:15, 131:23
**MOVES** [1] - 159:17
**MOVING** [1] - 147:16
**MULTI** [1] - 25:24
**MULTIPLE** [3] - 147:19, 155:2, 155:4
**MURDERING** [1] - 168:8
**MURDERS** [1] - 164:10
**MURRAH** [1] - 6:5
**MUSKOGEE** [4] - 5:19, 18:24, 19:8, 19:11

**N**

**N.W** [1] - 2:4

**NAME** [10] - 3:8, 21:11, 68:22, 71:5, 102:22, 102:23, 103:4, 103:11, 126:13, 174:22
**NAMED** [1] - 161:18
**NAMES** [4] - 52:22, 52:24, 54:11, 87:16
**NARCOTICS** [2] - 133:23, 136:20
**NATIONAL** [4] - 108:16, 118:18, 133:13, 172:5
**NATIONS** [1] - 5:8
**NATURAL** [3] - 77:6, 78:2, 84:7
**NATURE** [4] - 4:11, 5:20, 8:23, 12:1
**NEAR** [1] - 5:7
**NECESSARILY** [1] - 86:9
**NECESSARY** [6] - 36:12, 103:16, 124:5, 135:8, 137:1, 139:4
**NEED** [9] - 36:22, 70:17, 73:18, 74:1, 135:8, 135:21, 136:21, 138:19, 176:3
**NEEDED** [3] - 29:17, 36:16, 91:19
**NEEDING** [1] - 70:20
**NEEDS** [8] - 11:23, 19:22, 20:9, 37:1, 47:12, 61:23, 67:16, 138:18
**NEGATIVES** [4] - 97:19, 97:20, 97:23, 98:9
**NEUROPSYCH** [1] - 28:19
**NEUROPSYCHIATRIC** [5] - 53:25, 68:12, 68:25, 69:9, 69:24
**NEVER** [1] - 53:25
**NEW** [7] - 40:20, 40:23, 49:3, 49:23, 109:18, 109:20, 151:4
**NEWS** [1] - 128:14
**NEXT** [18] - 3:3, 7:10, 10:8, 11:18, 14:4, 16:6, 46:19, 78:14, 79:5, 79:6, 81:24, 82:4, 102:9, 102:18, 115:23, 117:4, 133:17, 175:10
**NICE** [1] - 79:1
**NICKNAME** [1] - 89:22

**NIGHT** [1] - 159:3
**NIGHTMARE** [1] - 43:3
**NIGHTS** [1] - 166:4
**NINE** [2] - 62:5, 78:17
**NON** [2] - 177:3, 177:9
**NON-JURY** [2] - 177:3, 177:9
**NONCONTACT** [4] - 134:13, 134:18, 134:21, 134:22
**NONE** [1] - 168:23
**NONETHELESS** [2] - 154:25, 156:21
**NONEXISTENT** [1] - 38:23
**NOON** [1] - 129:15
**NORMAL** [2] - 134:19, 146:15
**NORMALLY** [7] - 114:5, 128:10, 129:2, 130:7, 132:19, 134:9, 143:10
**NORTH** [1] - 40:21
**NOTATIONS** [1] - 63:25
**NOTE** [3] - 54:16, 93:24, 138:2
**NOTED** [1] - 157:19
**NOTHING** [7] - 23:2, 70:4, 82:16, 89:7, 100:12, 123:18, 135:19
**NOTICE** [2] - 18:14, 59:22
**NOTICED** [1] - 70:20
**NOTIFIED** [1] - 105:16
**NOTORIETY** [1] - 136:18
**NOVEMBER** [9] - 49:15, 49:22, 53:21, 93:25, 116:6, 140:14, 145:21, 157:5, 157:7
**NOWADAYS** [1] - 114:6
**NP** [1] - 28:18
**NUMBER** [17] - 1:3, 7:14, 16:10, 16:12, 23:25, 33:2, 40:20, 42:11, 42:22, 98:4, 98:25, 113:4, 119:20, 120:16, 137:8, 141:8, 155:11
**NUMBERS** [2] - 74:2, 74:9
**NUMEROUS** [2] - 108:9, 165:10
**NURSES** [2] - 26:25,

39:3

**O**

**O'CLOCK** [7] - 101:6, 128:12, 129:3, 131:6, 161:17
**O'KANE** [1] - 161:18
**O'TOOLE** [1] - 26:23
**OAKDALE** [6] - 111:23, 112:4, 112:5, 112:6, 112:18, 127:3
**OBEY** [1] - 156:11
**OBJECT** [4] - 89:5, 91:8, 93:11, 95:15
**OBJECTING** [1] - 99:12
**OBJECTION** [14] - 44:3, 44:4, 64:4, 89:16, 92:14, 93:18, 96:12, 99:6, 99:10, 99:15, 102:15, 148:15, 173:25, 174:5
**OBJECTIVE** [1] - 171:5
**OBSERVATIONS** [2] - 72:21, 73:2
**OBSERVED** [1] - 96:17
**OBTAINING** [1] - 50:13
**OBVIOUS** [1] - 11:23
**OBVIOUSLY** [5] - 5:21, 24:8, 41:8, 44:15, 177:2
**OCCASION** [2] - 29:8, 156:4
**OCCASIONS** [4] - 108:9, 137:18, 155:2, 155:4
**OCCUPANT** [1] - 77:24
**OCCUPATION** [2] - 3:15, 71:13
**OCCUPATIONAL** [1] - 27:1
**OCCUPIED** [1] - 28:24
**OCCURRED** [1] - 28:7
**OCTOBER** [5] - 14:12, 39:14, 45:9, 109:12, 157:9
**OFFENDERS** [1] - 31:8
**OFFER** [2] - 96:9, 169:8
**OFFERED** [6] - 58:24, 67:2, 87:20, 119:22, 120:6, 120:13

**OFFICE** [30] - 1:15, 18:22, 20:6, 74:1, 104:6, 104:11, 107:20, 107:22, 112:16, 118:19, 119:5, 119:11, 119:14, 119:15, 119:16, 121:18, 121:22, 121:23, 121:24, 127:22, 131:3, 135:22, 135:24, 136:22, 136:24, 138:20, 139:2, 166:24, 166:25, 172:4

**OFFICER** [21] - 65:15, 71:20, 71:22, 91:6, 106:12, 106:17, 107:4, 107:5, 107:7, 107:9, 107:11, 107:17, 107:25, 108:5, 108:6, 108:8, 132:13, 132:19, 135:15, 135:16, 167:1

**OFFICERS** [7] - 109:18, 109:20, 129:5, 131:25, 132:6, 155:10, 166:19

**OFFICES** [5] - 118:21, 118:22, 118:23, 127:22, 166:18

**OFFICIAL** [2] - 1:19, 178:7

**OFTEN** [4] - 8:4, 33:10, 69:18, 69:20

**OKLAHOMA** [53] - 3:14, 3:18, 3:25, 4:1, 4:19, 5:6, 5:19, 6:2, 13:5, 13:15, 13:16, 13:20, 13:25, 18:17, 18:19, 18:22, 18:23, 22:17, 23:10, 24:8, 24:14, 26:22, 28:16, 30:25, 34:18, 37:5, 38:18, 39:23, 40:5, 40:8, 41:16, 43:13, 49:22, 52:4, 56:23, 57:5, 58:1, 58:8, 59:2, 59:20, 60:25, 63:13, 67:23, 69:12, 71:25, 86:22, 88:22, 89:23, 90:9, 90:17, 123:6, 154:1

**OKLAHOMA'S** [1] - 60:8

**OLD** [5] - 26:4, 50:5, 58:5, 123:23, 137:5

**OLDER** [1] - 109:23

**ONCE** [9] - 14:3, 33:24, 52:15, 119:2, 128:19, 130:6, 137:23, 148:13, 176:6

**ONE** [97] - 4:9, 5:5, 7:15, 10:13, 20:3, 22:7, 24:5, 24:6, 28:12, 28:25, 29:12, 34:21, 36:8, 36:25, 37:2, 37:3, 37:6, 38:25, 40:3, 40:20, 42:12, 43:10, 45:13, 45:18, 47:10, 50:1, 52:1, 54:10, 56:8, 56:12, 57:11, 58:21, 63:23, 64:22, 65:6, 72:18, 73:14, 73:15, 80:13, 85:16, 85:17, 91:2, 100:23, 100:24, 104:25, 106:4, 107:6, 107:19, 107:23, 112:2, 114:6, 119:20, 124:2, 125:25, 126:23, 127:1, 127:3, 127:15, 128:17, 130:9, 131:18, 132:7, 132:13, 132:19, 133:22, 134:23, 136:14, 140:22, 141:24, 142:16, 143:12, 146:5, 146:9, 146:13, 146:16, 146:24, 147:1, 147:2, 147:13, 149:8, 153:24, 155:9, 155:18, 156:4, 156:10, 157:21, 161:13, 162:15, 163:20, 164:25, 165:1, 166:4, 167:1, 167:11, 173:12, 176:7, 176:18

**ONE-MAN** [1] - 146:16

**ONE-PAGE** [1] - 64:22

**ONE-WEEK** [1] - 106:4

**ONES** [5] - 24:7, 32:1, 81:9, 98:17, 127:1

**ONGOING** [2] - 38:1, 122:8

**OPEN** [17] - 29:1, 45:15, 75:9, 75:10, 110:7, 128:12, 128:16, 129:2, 129:5, 129:21,

130:8, 130:11, 130:12, 137:5, 170:22, 171:13, 171:14

**OPENED** [3] - 75:12, 111:7, 136:6

**OPENING** [1] - 76:10

**OPERATE** [1] - 108:14

**OPERATES** [1] - 134:19

**OPERATING** [1] - 110:21

**OPERATION** [2] - 110:3, 111:17

**OPERATIONS** [10] - 110:2, 111:6, 111:11, 111:13, 112:16, 114:9, 114:10, 114:11, 114:13, 120:17

**OPINE** [1] - 55:23

**OPINION** [20] - 7:16, 8:6, 10:1, 12:16, 18:12, 19:14, 47:9, 67:3, 67:4, 67:22, 123:10, 123:19, 144:7, 144:12, 144:17, 144:18, 167:10, 167:13, 171:20

**OPPORTUNITIES** [2] - 84:15, 84:21

**OPPORTUNITY** [9] - 21:23, 23:7, 83:21, 89:13, 99:19, 123:9, 138:9, 139:8, 144:4

**OPPOSED** [1] - 63:9

**ORDER** [38] - 7:7, 12:17, 12:22, 13:1, 13:9, 13:12, 13:15, 13:17, 13:21, 14:4, 14:8, 15:5, 16:11, 17:3, 17:13, 19:4, 24:4, 27:21, 35:16, 35:22, 35:24, 37:4, 37:5, 37:8, 38:2, 46:7, 46:20, 47:20, 74:4, 78:12, 89:22, 124:19, 138:22, 142:7, 142:14, 142:24, 143:9, 156:12

**ORDERED** [3] - 19:21, 41:19, 42:1

**ORDERLY** [1] - 111:17

**ORDERS** [4] - 38:14, 109:4, 115:16, 143:18

**ORDINARILY** [2] -

175:12, 177:7

**ORDINARY** [1] - 144:22

**ORIENTED** [1] - 154:13

**ORIGINALLY** [2] - 6:13, 6:16

**OS** [1] - 13:22

**OSP** [7] - 38:18, 38:22, 53:25, 55:3, 61:14, 68:12, 74:17

**OTHERWISE** [1] - 4:8

**OUTDOOR** [1] - 76:12

**OUTER** [1] - 79:10

**OUTSIDE** [23] - 33:21, 34:17, 52:17, 69:21, 74:13, 76:2, 76:3, 76:4, 77:2, 77:6, 77:24, 81:19, 82:1, 82:16, 88:10, 94:22, 95:7, 96:5, 96:16, 96:25, 99:13, 138:18, 139:17

**OVERALL** [2] - 107:13, 112:10

**OVERCROWDING** [4] - 51:7, 51:10, 51:11, 51:13

**OVERRULE** [2] - 89:15, 93:18

**OVERSIGHT** [1] - 112:13

**OVERSTATE** [1] - 156:4

**OVERWHELMINGLY** [2] - 18:23, 31:2

**OWN** [6] - 13:18, 26:5, 87:5, 87:6, 93:1, 94:17

---

**P**

**P.M** [6] - 130:2, 130:3, 130:5, 130:20, 177:19

**PAD** [1] - 71:1

**PADLOCK** [1] - 80:6

**PAGE** [41] - 8:9, 9:22, 10:1, 10:8, 11:3, 11:8, 11:12, 11:18, 12:19, 17:5, 19:15, 26:11, 26:14, 27:12, 28:5, 28:6, 30:10, 31:15, 31:23, 34:4, 34:6, 34:23, 49:14, 53:11, 53:17, 57:12, 64:22, 67:5, 67:13, 68:8, 70:8, 93:4, 94:21, 95:10, 142:4, 142:5, 146:21,

152:6, 155:5, 179:13, 179:17

**PAGES** [2] - 49:10, 63:24

**PAGING** [1] - 62:19

**PANEL** [1] - 151:6

**PANHANDLE** [1] - 40:6

**PANNING** [1] - 75:19

**PAPERWORK** [6] - 139:1, 139:11, 140:12, 143:17, 147:18, 151:9

**PARAGRAPH** [30] - 8:10, 9:6, 10:9, 10:12, 11:12, 11:17, 11:19, 12:25, 16:23, 17:7, 17:8, 17:24, 22:11, 22:12, 23:23, 26:17, 27:14, 27:16, 30:10, 31:16, 34:8, 34:24, 34:25, 36:21, 48:3, 48:8, 54:6, 66:6, 70:11

**PARAGRAPHS** [1] - 19:18

**PARENS** [1] - 48:14

**PARENTHETICAL** [1] - 22:19

**PAROLE** [2] - 50:14, 60:11

**PART** [21] - 14:16, 17:19, 21:6, 25:2, 27:6, 27:8, 33:13, 34:15, 45:15, 50:25, 52:20, 54:21, 58:5, 72:6, 83:5, 91:14, 115:18, 137:15, 146:23, 147:14, 171:18

**PART-TIME** [2] - 52:20, 54:21

**PARTICIPANT** [1] - 66:13

**PARTICIPATED** [4] - 14:14, 16:9, 46:1, 66:6

**PARTICULAR** [11] - 36:6, 47:14, 49:2, 49:16, 51:2, 55:9, 55:18, 61:7, 77:8, 92:22, 155:19

**PARTICULARLY** [7] - 4:14, 25:15, 28:17, 29:25, 35:2, 36:1, 36:19

**PARTIES** [1] - 15:15

**PARTNERED** [1] - 6:15

**PARTNERS** [1] - 4:10

**PASS** [2] - 43:10, 68:21
**PAST** [6] - 31:14, 125:4, 154:3, 167:19, 167:22, 168:12
**PATIENTS** [2] - 10:19, 33:6
**PATRICIA** [1] - 4:4
**PAUL** [19] - 1:6, 44:24, 45:6, 45:18, 46:1, 46:11, 46:16, 47:2, 49:11, 54:13, 57:2, 58:25, 59:19, 62:20, 63:12, 86:15, 87:8, 88:7, 88:17
**PAUSE** [7] - 43:23, 121:5, 141:22, 145:9, 145:12, 147:25, 167:8
**PAY** [1] - 97:4
**PAYING** [1] - 50:23
**PECK** [2] - 134:16, 134:17
**PENALTY** [1] - 177:2
**PENITENTIARIES** [1] - 162:13
**PENITENTIARY** [47] - 6:2, 6:7, 8:20, 10:14, 10:20, 13:5, 13:16, 13:17, 13:23, 24:9, 28:16, 34:19, 38:18, 39:12, 41:16, 43:13, 43:18, 50:5, 60:25, 67:24, 69:13, 71:25, 79:2, 86:23, 117:1, 123:17, 124:1, 124:17, 125:16, 125:18, 125:21, 128:5, 128:7, 130:15, 132:2, 143:23, 144:9, 144:15, 144:19, 145:3, 153:1, 158:12, 158:14, 163:7, 165:5, 171:14, 171:15
**PENNSYLVANIA** [6] - 1:2, 1:16, 2:6, 2:13, 119:23, 120:1
**PEOPLE** [19] - 31:8, 40:12, 45:18, 54:10, 70:16, 79:1, 83:1, 87:16, 122:22, 124:8, 126:14, 132:6, 132:23, 139:16, 150:25, 160:4, 167:2, 172:6, 172:9
**PEOPLE'S** [1] -

150:17
**PEPSI** [1] - 142:12
**PER** [3] - 34:16, 132:19, 164:10
**PERCEIVE** [1] - 96:18
**PERHAPS** [10] - 26:1, 27:5, 30:24, 33:13, 60:17, 69:11, 87:16, 160:14, 164:25, 176:13
**PERIOD** [20] - 4:7, 17:23, 21:13, 23:1, 27:11, 38:8, 42:12, 43:4, 43:19, 60:19, 60:20, 74:21, 106:5, 108:23, 116:20, 119:17, 140:13, 140:20, 141:12, 145:16
**PERIODICALLY** [1] - 61:13
**PERIODS** [2] - 49:20, 161:9
**PERMISSIBLE** [2] - 92:9, 148:12
**PERMITTED** [1] - 142:23
**PERSON** [11] - 29:3, 48:13, 54:10, 96:6, 108:7, 150:18, 150:22, 153:2, 162:15, 163:3, 168:2
**PERSON'S** [2] - 160:9, 164:7
**PERSONAL** [2] - 37:21, 66:22
**PERSONALLY** [1] - 6:21
**PERSONNEL** [4] - 14:25, 39:5, 74:17, 104:6
**PERSONS** [1] - 32:2
**PERTAIN** [1] - 61:22
**PERTINENT** [1] - 66:22
**PH.D** [1] - 53:12
**PHASE** [4] - 14:4, 151:7, 151:22, 151:24
**PHILADELPHIA** [6] - 1:9, 1:21, 2:14, 4:18, 30:2, 98:2
**PHONE** [4] - 93:9, 93:22, 97:4, 157:11
**PHOTO** [2] - 87:18, 117:6
**PHOTOGRAPH** [9] - 78:14, 79:5, 79:6, 80:4, 82:4, 82:9, 111:25, 112:20,

137:8
**PHOTOGRAPHIC** [1] - 100:4
**PHOTOGRAPHING** [1] - 80:14
**PHOTOGRAPHS** [22] - 72:1, 72:22, 73:2, 73:5, 73:6, 73:9, 73:10, 74:7, 74:8, 74:16, 74:18, 76:25, 77:16, 77:18, 78:5, 83:13, 83:15, 83:24, 97:15, 100:4, 102:11, 102:13
**PHOTOS** [2] - 80:12, 102:12
**PHYSICAL** [3] - 12:4, 41:17, 42:7
**PHYSICALLY** [1] - 25:20
**PHYSICIAN** [1] - 26:20
**PHYSICIANS** [3] - 27:7, 33:3, 40:12
**PICK** [2] - 96:23, 149:5
**PICTURE** [8] - 86:22, 87:25, 88:7, 88:9, 125:5, 136:16, 136:17, 159:10
**PICTURES** [13] - 79:13, 80:8, 85:10, 85:19, 85:25, 87:20, 87:23, 88:10, 93:17, 97:6, 97:7, 97:22, 98:18
**PIECE** [1] - 139:1
**PIPE** [2] - 42:16, 42:19
**PLACE** [6] - 42:5, 48:25, 67:23, 81:15, 111:20, 165:4
**PLACED** [5] - 49:23, 93:14, 120:24, 144:25
**PLACES** [3] - 71:20, 71:22, 125:2
**PLAINTIFF** [6] - 7:1, 13:7, 14:13, 19:24, 21:3, 21:7
**PLAINTIFFS** [2] - 13:6, 17:1
**PLAN** [21] - 13:2, 13:6, 19:21, 19:25, 20:3, 20:8, 20:10, 20:11, 21:19, 22:14, 22:23, 27:19, 28:2, 30:1, 30:11, 32:10, 36:2, 47:11, 48:9, 67:7
**PLASTIC** [1] - 42:25
**PLAY** [1] - 60:20
**PLEADING** [3] - 15:17,

17:9, 51:13
**PLEXIGLASS** [1] - 134:23
**PLUMBING** [3] - 42:17, 42:21, 130:24
**PLURAL** [1] - 166:25
**PLUS** [1] - 8:23
**PO** [2] - 1:17, 2:10
**POINT** [28] - 3:2, 7:3, 16:16, 20:19, 20:20, 20:21, 34:20, 37:9, 37:22, 40:23, 42:12, 51:21, 54:23, 58:17, 79:9, 90:15, 91:2, 94:19, 96:13, 100:13, 120:9, 130:17, 149:8, 150:9, 162:23, 171:10, 174:10
**POINTED** [2] - 26:24, 47:8
**POLICE** [2] - 71:20, 71:22
**POLICIES** [3] - 105:3, 108:15, 120:16
**POLICY** [3] - 108:16, 109:19, 140:8
**POLLUTION** [1] - 5:6
**POOR** [1] - 27:6
**POPPERS** [1] - 142:12
**POPULATION** [11] - 10:14, 11:22, 12:5, 31:5, 54:1, 142:16, 142:17, 158:16, 170:22, 171:14, 171:15
**PORTION** [2] - 64:7, 94:3
**PORTIONS** [1] - 25:8
**POSE** [1] - 12:3
**POSITION** [18] - 15:15, 15:17, 55:3, 92:1, 107:1, 107:10, 107:11, 110:13, 112:8, 113:7, 114:2, 115:8, 115:18, 115:22, 116:1, 116:8, 117:15, 167:5
**POSITIONS** [3] - 115:9, 117:25, 172:9
**POSSESSED** [1] - 162:12
**POSSESSIVE** [1] - 70:16
**POSSIBILITY** [5] - 121:10, 122:24, 123:13, 164:22, 164:23
**POSSIBLE** [3] - 55:19, 158:23, 175:14

**POSSIBLY** [2] - 65:14, 101:3
**POST** [1] - 107:15
**POSTED** [4] - 125:5, 131:9, 136:16, 136:17
**POTENTIAL** [4] - 12:3, 61:17, 103:25, 158:19
**PRACTICALLY** [1] - 163:16
**PRACTICE** [4] - 4:4, 4:6, 4:11, 14:3
**PRACTICED** [1] - 4:8
**PRACTICING** [1] - 44:18
**PRAIRIE** [4] - 121:25, 122:3, 122:6, 169:23
**PRECEDED** [1] - 47:19
**PRECEDING** [1] - 46:22
**PRECLUDED** [2] - 91:10, 160:3
**PREDICT** [1] - 167:18
**PREDICTABLE** [1] - 11:23
**PREDICTOR** [2] - 167:19, 168:15
**PREPARATION** [1] - 25:4
**PREPARE** [1] - 27:19
**PREPARING** [1] - 130:4
**PRESENCE** [4] - 125:9, 133:23, 149:21, 150:6
**PRESENT** [5] - 67:14, 133:20, 148:18, 150:18, 169:5
**PRESENTED** [1] - 57:9
**PRESENTLY** [5] - 3:13, 4:3, 5:7, 20:16, 154:12
**PRESIDING** [1] - 37:17
**PRETRIAL** [1] - 60:15
**PRETTY** [8] - 24:3, 97:8, 108:3, 110:9, 138:21, 154:17, 155:16, 164:14
**PREVALENT** [1] - 162:8
**PREVIOUSLY** [1] - 91:12
**PRIMARILY** [2] - 26:25, 51:6
**PRIMARY** [3] - 24:7, 171:4, 171:5

PRIME [1] - 5:10
PRINTED [3] - 73:22, 73:25, 97:22
PRINTER [2] - 73:22, 74:1
PRIORITY [2] - 119:19, 119:20
PRISON [33] - 9:14, 11:1, 12:4, 12:15, 15:4, 17:12, 22:18, 33:1, 45:3, 49:20, 50:12, 52:3, 54:1, 58:18, 59:2, 59:20, 63:13, 65:3, 67:24, 70:18, 88:4, 88:6, 88:22, 93:9, 93:22, 103:25, 105:17, 154:1, 154:25, 160:12, 164:9, 168:7
PRISONERS [3] - 32:1, 32:4, 49:25
PRISONS [31] - 43:15, 56:23, 63:2, 103:9, 104:15, 104:18, 104:21, 106:6, 106:8, 108:25, 114:19, 115:20, 119:18, 120:15, 120:18, 121:9, 122:1, 123:25, 125:14, 144:13, 144:24, 157:16, 158:9, 161:25, 163:4, 164:17, 168:13, 170:17, 171:5, 171:25, 172:2
PRIVACY [1] - 83:12
PRIVATE [5] - 4:4, 4:6, 71:14, 71:15, 71:18
PROBATIVE [3] - 89:5, 91:8, 93:12
PROBLEM [12] - 31:12, 33:20, 36:6, 43:20, 55:2, 55:5, 55:18, 74:3, 148:16, 168:22, 168:23, 168:24
PROBLEMS [14] - 26:6, 27:3, 29:12, 32:3, 36:8, 40:25, 43:6, 43:17, 49:25, 54:3, 57:4, 57:8, 57:10, 88:22
PROCEDURES [4] - 105:3, 108:15, 110:18, 120:16
PROCEEDING [1] - 146:24
PROCEEDINGS [3] - 1:23, 175:7, 178:2

PROCESS [21] - 12:9, 26:2, 46:21, 91:15, 115:19, 121:11, 122:8, 122:10, 128:18, 130:9, 133:4, 133:5, 133:17, 133:25, 134:9, 134:10, 135:25, 140:5, 144:6, 144:8, 147:14
PRODUCED [1] - 1:24
PROFESSION [1] - 172:7
PROFESSIONAL [3] - 10:15, 11:24, 32:9
PROFESSIONALS [3] - 26:25, 169:22, 170:25
PROGRAM [29] - 4:22, 12:14, 12:15, 22:20, 31:4, 31:6, 31:24, 32:2, 32:6, 32:13, 32:19, 33:22, 46:2, 48:24, 49:3, 49:16, 49:24, 50:2, 50:21, 52:13, 52:16, 52:18, 56:3, 62:3, 67:14, 104:22, 106:4, 114:24, 124:22
PROGRAMS [21] - 30:20, 31:19, 32:7, 33:16, 48:22, 48:23, 50:10, 51:14, 53:14, 53:21, 56:2, 66:2, 66:7, 67:1, 67:14, 114:7, 115:2, 115:3, 115:5, 117:14, 117:16
PROHIBITED [1] - 131:20
PROHIBITION [1] - 9:16
PROMINENT [1] - 51:20
PROMISE [1] - 169:8
PROMOTED [8] - 107:6, 107:8, 108:2, 108:4, 111:5, 111:22, 113:8, 114:1
PROMOTION [3] - 107:24, 109:9, 113:24
PROPER [1] - 110:19
PROPERLY [1] - 110:22
PROSECUTING [1] - 9:13
PROSECUTION [1] - 7:8
PROTECT [2] - 43:1,

87:16
PROVE [2] - 92:6, 96:13
PROVIDE [12] - 9:8, 20:9, 25:16, 25:25, 36:16, 47:12, 73:4, 103:14, 103:15, 103:22, 143:12, 162:1
PROVIDED [2] - 52:25, 137:24
PROVIDERS [1] - 17:21
PROVIDING [2] - 13:3, 17:21
PROVISION [1] - 37:1
PSYCHIATRIC [40] - 9:9, 9:15, 10:15, 10:16, 12:14, 13:4, 23:9, 25:16, 34:19, 38:24, 39:2, 39:3, 40:14, 47:14, 47:25, 51:16, 51:25, 52:15, 52:19, 54:15, 54:20, 54:23, 54:24, 55:6, 56:9, 58:4, 58:25, 59:18, 59:19, 60:22, 61:1, 61:6, 61:16, 61:23, 62:20, 63:6, 63:8, 63:12, 150:17, 150:25
PSYCHIATRIST [8] - 10:17, 34:21, 38:25, 44:16, 54:9, 55:10, 61:12, 176:17
PSYCHIATRISTS [5] - 27:9, 34:15, 52:20, 52:23, 54:21
PSYCHIATRY [1] - 26:21
PSYCHOLOGICAL [13] - 10:25, 19:22, 47:15, 53:18, 65:10, 65:23, 66:22, 67:10, 67:20, 67:23, 138:5, 140:7, 150:16
PSYCHOLOGIST [8] - 44:15, 53:12, 54:8, 55:11, 66:10, 66:25, 67:6, 152:7
PSYCHOLOGIST'S [2] - 67:2, 67:4
PSYCHOLOGISTS [1] - 32:8
PSYCHOLOGY [2] - 66:1, 115:5
PSYCHOTIC [2] - 31:9, 32:1
PUBLIC [4] - 2:6, 4:18, 60:8, 133:1

PULL [3] - 79:25, 102:24, 156:5
PULLED [4] - 79:10, 79:23, 80:2, 90:6
PULLEY [1] - 79:24
PULLS [1] - 29:17
PUNISHMENT [4] - 9:16, 9:19, 11:8, 46:22
PURCHASE [7] - 109:4, 142:7, 143:6, 143:7, 143:9, 143:18, 144:1
PURCHASES [3] - 142:1, 142:9, 143:21
PURCHASING [1] - 20:13
PURPORTS [1] - 53:19
PURPOSE [4] - 25:24, 56:4, 76:19, 118:11
PURPOSES [2] - 91:11, 142:3
PURSUANT [1] - 10:18
PUT [21] - 74:4, 81:2, 86:18, 94:24, 98:21, 99:5, 102:3, 103:18, 106:18, 112:20, 122:14, 125:5, 129:13, 133:6, 136:23, 138:19, 138:23, 151:3, 170:21, 171:13, 175:3
PUTS [1] - 135:20
PUTTING [2] - 17:9, 91:11

## Q

QUADRANT [1] - 40:7
QUADRANTS [1] - 40:6
QUAKED [1] - 29:2
QUALIFICATIONS [3] - 32:8, 103:5, 120:11
QUALIFIED [5] - 27:9, 39:1, 119:21, 120:7, 120:20
QUALITY [1] - 17:20
QUARTER [1] - 101:18
QUARTERLY [1] - 125:7
QUESTIONS [15] - 38:16, 70:23, 85:2, 92:11, 97:10, 98:25, 99:22, 100:9, 100:10, 120:12,

141:25, 148:1, 168:17, 169:16, 172:18
QUICK [1] - 148:23
QUICKLY [2] - 29:18, 144:25
QUITE [2] - 55:17, 162:2

## R

RACIAL [3] - 8:16, 8:21, 51:18
RADIO [1] - 157:14
RAISE [1] - 173:16
RAN [1] - 111:14
RANK [2] - 113:7, 117:10
RANKING [1] - 152:20
RATED [1] - 141:1
RATHER [8] - 18:24, 22:17, 48:16, 65:12, 103:19, 155:21, 156:15, 160:13
RATING [1] - 141:4
RAW [2] - 42:22, 42:23
REACH [1] - 119:3
REACHED [1] - 119:2
READ [18] - 10:12, 11:16, 12:25, 19:18, 22:13, 25:5, 26:19, 27:14, 31:22, 34:11, 49:15, 62:9, 64:8, 70:11, 86:16, 88:24, 91:2, 94:18
READING [4] - 33:12, 89:21, 94:17, 175:8
READY [2] - 105:4, 129:15
REAL [1] - 43:16
REALLY [13] - 33:6, 46:5, 46:13, 47:19, 55:9, 69:18, 79:11, 82:18, 97:8, 108:1, 150:21, 163:8, 167:12
REALM [1] - 164:21
REALTIME [1] - 136:12
REASON [7] - 37:21, 64:1, 86:3, 101:25, 103:18, 116:14, 137:9
REASONABLE [1] - 123:11
REASONS [4] - 10:15, 124:14, 153:8, 157:18
REASSIGNED [1] - 37:13

**REBUILT** [1] - 116:16
**REBUTTAL** [3] - 176:8, 176:13, 176:14
**REC** [2] - 84:16, 84:22
**RECALLED** [1] - 130:1
**RECEIVE** [4] - 50:3, 61:17, 104:22, 106:5
**RECEIVED** [3] - 6:1, 53:21, 107:24
**RECEIVER** [1] - 138:13
**RECEIVES** [3] - 122:23, 123:12, 140:3
**RECEIVING** [6] - 54:15, 58:17, 111:9, 115:3, 115:4, 124:17
**RECENT** [1] - 29:10
**RECENTLY** [2] - 25:4, 165:24
**RECEPTION** [3] - 24:11, 58:11, 58:15
**RECESS** [10] - 57:14, 57:17, 100:14, 101:20, 101:22, 105:16, 105:25, 148:7, 148:23, 148:24
**RECITATION** [1] - 45:22
**RECOGNIZE** [2] - 21:11, 143:20
**RECOLLECT** [1] - 38:3
**RECOLLECTION** [8] - 28:11, 33:12, 37:16, 46:3, 90:11, 95:18, 95:21, 99:3
**RECOMMENDATION** [6] - 33:20, 121:16, 127:25, 128:1, 151:20, 151:21
**RECOMMENDATION S** [2] - 27:13, 27:16
**RECOMMENDING** [2] - 27:18, 33:24
**RECORD** [19] - 3:1, 3:8, 29:23, 45:8, 61:1, 61:6, 63:3, 71:5, 91:12, 102:3, 102:22, 122:14, 133:14, 148:21, 169:5, 171:10, 174:17, 175:4, 178:2
**RECORDED** [2] - 1:23, 124:25
**RECORDING** [2] - 135:7, 136:12
**RECORDS** [18] -

16:12, 55:21, 58:25, 59:18, 59:19, 60:5, 61:22, 62:1, 62:5, 62:11, 62:20, 63:6, 122:19, 123:7, 123:10, 144:5, 169:21
**RECOVERED** [1] - 164:16
**RECREATION** [14] - 76:12, 83:25, 93:1, 110:8, 115:5, 129:2, 129:7, 129:22, 130:11, 130:12, 132:4, 132:21, 132:22, 132:24
**RECREATIONAL** [4] - 83:21, 84:5, 84:14, 84:21
**RECROSS** [4] - 70:6, 172:19, 172:21, 179:2
**RECRUIT** [2] - 26:24, 40:22
**RECRUITED** [1] - 6:4
**RECRUITING** [2] - 27:8, 36:12
**RECUSED** [2] - 37:9, 37:12
**REDIRECT** [8] - 64:17, 64:19, 97:11, 97:13, 99:18, 168:18, 169:17, 179:2
**REDONE** [1] - 116:16
**REFER** [3] - 49:14, 93:4, 95:10
**REFERENCE** [2] - 47:16, 146:4
**REFERENCED** [1] - 36:10
**REFERRED** [4] - 8:4, 53:1, 58:13, 140:9
**REFERRING** [4] - 28:15, 48:8, 90:22, 91:20
**REFERS** [2] - 9:7, 54:17
**REFLECT** [1] - 45:9
**REFORM** [1] - 4:14
**REFORMATORY** [3] - 24:14, 39:23, 90:17
**REFRESH** [2] - 28:10, 105:8
**REFUSING** [1] - 156:11
**REGARD** [3] - 22:16, 26:1, 48:11
**REGARDING** [3] - 15:16, 36:1, 56:18
**REGION** [1] - 118:24

**REGIONAL** [9] - 118:21, 118:22, 118:23, 119:14, 122:2, 127:21, 172:4, 172:5
**REGISTERED** [2] - 26:25, 27:1
**REGULAR** [3] - 10:16, 88:4, 88:6
**REHABILITATIVE** [2] - 58:7, 60:7
**REIDERS** [1] - 2:9
**REITERATING** [1] - 32:11
**REJECT** [2] - 170:3, 170:5
**RELATED** [2] - 60:15, 61:24
**RELATING** [2] - 60:10, 63:7
**RELATIONSHIP** [2] - 133:9, 133:10
**RELEASE** [4] - 50:14, 121:10, 122:24, 123:13
**RELENTED** [1] - 29:5
**RELEVANCE** [3] - 46:14, 91:8, 95:25
**RELEVANCY** [2] - 89:5, 95:23
**RELEVANT** [5] - 25:8, 25:16, 50:25, 93:14, 96:9
**RELIEF** [1] - 10:21
**RELIGIOUSLY** [1] - 50:23
**REMAIN** [5] - 106:25, 107:3, 109:11, 130:12, 136:25
**REMAINED** [1] - 38:11
**REMEMBER** [15] - 6:4, 28:14, 28:24, 40:14, 88:25, 89:21, 89:25, 90:18, 90:25, 99:7, 107:8, 127:1, 148:7, 155:18, 176:9
**REMOVED** [1] - 29:12
**RENOVATED** [1] - 78:24
**REPEATEDLY** [1] - 95:17
**REPORT** [24] - 18:10, 21:25, 23:8, 25:3, 25:4, 25:10, 27:10, 28:10, 29:24, 30:1, 30:5, 30:16, 30:17, 31:16, 33:6, 34:13, 48:2, 54:13, 119:1, 119:4, 124:24, 128:23, 129:21,

156:7
**REPORTER** [2] - 1:19, 178:7
**REPORTS** [9] - 15:15, 32:21, 33:12, 35:11, 36:9, 107:23, 118:4, 150:16, 155:13
**REPRESENT** [3] - 22:15, 48:10, 169:4
**REPRESENTATION** [3] - 63:23, 89:11, 148:20
**REPRESENTATIVE** [1] - 38:8
**REPRESENTED** [2] - 4:25, 6:5
**REPRESENTING** [3] - 5:5, 5:7, 5:12
**REQUEST** [3] - 127:17, 138:2, 138:19
**REQUESTS** [3] - 115:16, 142:7, 143:25
**REQUIRE** [1] - 20:12
**REQUIRED** [3] - 15:14, 50:16, 149:23
**REQUIRES** [1] - 67:9
**RESIDE** [2] - 3:13, 71:11
**RESIDENT** [1] - 77:5
**RESOURCES** [1] - 114:14
**RESPECT** [11] - 77:20, 79:3, 93:12, 108:18, 114:24, 120:11, 128:4, 135:25, 139:16, 141:1, 167:22
**RESPONSE** [1] - 111:14
**RESPONSIBILITIES** [13] - 107:12, 107:25, 108:2, 108:18, 109:14, 111:2, 112:10, 112:11, 113:10, 113:11, 114:3, 114:4, 117:12
**RESPONSIBILITY** [3] - 10:19, 33:4, 113:17
**RESPONSIBLE** [1] - 114:21
**REST** [3] - 29:13, 100:25, 169:1
**RESTRAINED** [2] - 149:18, 150:6
**RESTRAINTS** [1] - 170:12
**RESTRICTIVE** [3] - 142:20, 154:24,

156:15
**RESULT** [8] - 11:20, 12:16, 18:1, 35:11, 35:15, 42:21, 70:19, 124:17
**RESULTED** [1] - 12:1
**RESUME** [1] - 101:6
**RETAIN** [1] - 21:3
**RETAINED** [4] - 22:8, 23:19, 23:20, 69:22
**RETARDED** [1] - 4:19
**RETIRED** [2] - 103:8, 117:23
**RETURN** [1] - 113:25
**RETURNED** [1] - 134:5
**REVEALS** [1] - 95:6
**REVIEW** [19] - 16:10, 44:23, 49:6, 55:20, 119:13, 119:15, 121:20, 123:9, 125:10, 128:1, 137:15, 139:7, 140:7, 140:22, 144:5, 151:6, 151:17, 155:13
**REVIEWED** [10] - 16:11, 25:1, 25:3, 29:25, 45:1, 115:14, 115:15, 119:13, 125:6, 136:2
**REVIEWING** [4] - 28:10, 124:8, 140:12, 145:15
**REVIEWS** [9] - 140:10, 140:11, 140:18, 140:20, 140:25, 141:7, 141:15, 145:15, 145:20
**RIGHT-HAND** [2] - 10:4, 34:5
**RIGHTS** [3] - 4:13, 22:4, 23:21
**RIOT** [4] - 40:25, 41:3, 41:13, 42:5
**RISK** [1] - 153:11
**RIVERS** [8] - 112:1, 117:5, 117:7, 117:9, 117:16, 117:19, 117:20, 117:22
**RODE** [1] - 21:5
**ROLE** [1] - 60:20
**ROLL** [1] - 81:2
**ROLLER** [2] - 163:19, 163:20
**RONALD** [1] - 2:8
**ROOM** [4] - 50:22, 107:19, 134:19, 134:22

**ROSE** [1] - 37:3
**ROSTER** [1] - 131:1
**ROUNDS** [1] - 110:20
**ROUTINE** [2] - 13:3, 138:22
**ROW** [3] - 126:17, 154:12, 158:3
**ROY** [4] - 102:19, 102:23, 103:3, 179:9
**RPR** [1] - 1:19
**RULED** [2] - 91:13, 92:8
**RULES** [2] - 154:25, 157:15
**RUN** [9] - 39:7, 95:7, 127:8, 128:8, 133:12, 133:21, 144:24, 159:15
**RUNDLE** [14] - 21:11, 23:8, 23:18, 24:18, 25:11, 25:21, 27:17, 27:18, 28:6, 28:24, 29:4, 29:6, 33:5, 39:17
**RUNDLE'S** [1] - 25:10
**RUNKLE** [1] - 72:6
**RUNNING** [2] - 42:23, 130:16
**RURAL** [1] - 26:4

## S

**SAD** [1] - 29:8
**SAFE** [6] - 139:5, 144:14, 144:20, 162:1, 167:13, 171:13
**SAFELY** [3] - 171:20, 171:21, 171:24
**SAFETY** [9] - 107:14, 112:12, 114:17, 114:21, 119:18, 170:1, 170:2, 171:6
**SAT** [1] - 42:15
**SAUNDERS** [6] - 2:5, 100:23, 101:2, 105:12, 105:14, 173:6
**SAW** [7] - 14:23, 18:11, 38:5, 50:2, 65:2, 96:15, 141:11
**SCALE** [2] - 141:4
**SCAMS** [2] - 95:7, 95:12
**SCARED** [1] - 100:18
**SCHEDULE** [1] - 175:17
**SCHEME** [1] - 30:25
**SCHOOL** [4] - 4:1, 4:19, 5:24, 7:5

**SCOPE** [5] - 92:9, 93:11, 96:14, 96:20, 99:13
**SCRANTON** [2] - 1:17, 120:1
**SCRAPES** [1] - 70:17
**SCU** [9] - 125:25, 126:2, 126:4, 126:9, 126:11, 126:17, 127:6, 127:19, 170:9
**SEALS** [1] - 135:19
**SEATED** [2] - 101:23, 148:25
**SEAY** [3] - 37:13, 37:14, 38:2
**SECOND** [21] - 8:10, 9:5, 10:9, 16:13, 16:23, 22:12, 48:3, 48:5, 48:8, 54:6, 65:2, 66:5, 66:12, 67:5, 68:11, 70:8, 82:15, 82:16, 90:13, 114:22, 155:5
**SECONDLY** [1] - 40:21
**SECTION** [4] - 2:3, 10:5, 47:10, 47:14
**SECURE** [6] - 123:25, 146:13, 154:13, 164:25, 170:6, 170:9
**SECURED** [2] - 149:20, 150:5
**SECURITY** [41] - 50:5, 50:6, 50:7, 65:12, 104:7, 106:22, 106:23, 107:14, 108:13, 110:12, 110:17, 112:12, 113:9, 113:14, 113:16, 113:17, 114:18, 114:21, 115:7, 116:3, 119:19, 123:21, 124:18, 125:14, 125:23, 127:7, 127:9, 127:16, 136:15, 138:4, 138:24, 139:3, 144:19, 150:11, 151:25, 152:24, 153:11, 154:13, 154:17, 154:20, 170:16
**SEDATION** [1] - 10:22
**SEE** [32] - 8:10, 9:4, 9:21, 10:4, 12:20, 15:25, 28:7, 31:17, 33:18, 34:6, 35:20, 51:11, 56:17, 68:12, 69:3, 69:4, 74:10,

76:21, 77:5, 82:3, 82:14, 84:8, 84:9, 84:11, 96:24, 100:3, 123:20, 141:7, 148:9, 149:6, 165:1, 177:12
**SEEM** [1] - 52:14
**SEEMINGLY** [1] - 31:25
**SEGREGATED** [1] - 28:18
**SEGREGATION** [2] - 140:4, 142:21
**SELECT** [1] - 121:9
**SELECTED** [1] - 133:22
**SELF** [3] - 70:12, 70:15, 146:12
**SELF-CENTERED** [2] - 70:12, 70:15
**SEND** [1] - 136:2
**SENDING** [2] - 61:9, 137:25
**SENIOR** [6] - 107:7, 107:9, 107:24, 108:4, 108:6, 108:7
**SENSE** [3] - 19:1, 25:19, 82:5
**SENT** [8] - 31:5, 50:4, 67:18, 97:20, 106:8, 119:14, 119:15, 151:19
**SENTENCE** [18] - 15:24, 16:6, 16:23, 22:12, 23:18, 26:18, 35:24, 67:12, 68:10, 68:11, 121:8, 121:9, 122:23, 123:12, 124:18, 126:5, 126:18, 158:11
**SENTENCING** [1] - 89:13
**SEPARATE** [1] - 145:17
**SEPARATED** [1] - 134:22
**SEPTEMBER** [8] - 3:22, 15:23, 18:13, 38:18, 39:14, 46:25, 47:18, 47:20
**SERIES** [5] - 18:11, 73:4, 77:16, 78:5, 80:8
**SERIOUS** [1] - 156:11
**SERIOUSLY** [2] - 30:12, 31:25
**SERVE** [1] - 123:22
**SERVED** [1] - 110:6
**SERVICE** [2] - 116:18, 130:5

**SERVICES** [24] - 4:22, 19:16, 20:8, 22:17, 25:14, 25:25, 35:2, 37:2, 40:13, 40:14, 47:9, 47:11, 47:15, 48:12, 52:15, 58:7, 60:8, 103:13, 112:14, 114:15, 115:6, 116:17, 119:8, 125:7
**SERVING** [1] - 121:7
**SESSIONS** [2] - 50:11, 66:14
**SET** [12] - 15:13, 16:3, 27:21, 31:3, 56:10, 73:17, 73:19, 73:21, 73:25, 78:11, 131:5, 151:4
**SETS** [1] - 50:22
**SETTING** [8] - 15:17, 132:3, 144:19, 149:23, 149:24, 153:21, 154:20, 156:15
**SETTINGS** [1] - 167:11
**SEVEN** [6] - 35:8, 61:25, 69:19, 117:2, 122:7, 124:14
**SEVERAL** [2] - 42:2, 124:21
**SEVERE** [3] - 20:8, 47:11, 89:12
**SEWAGE** [3] - 42:22, 42:23, 43:6
**SEX** [1] - 31:8
**SEXUAL** [1] - 175:1
**SHALL** [2] - 13:2, 13:6
**SHANK** [2] - 161:22, 163:5
**SHANKS** [1] - 162:11
**SHAPE** [1] - 40:19
**SHARED** [1] - 50:20
**SHARPENED** [1] - 162:23
**SHEETS** [2] - 43:8, 43:9
**SHENANIGANS** [1] - 5:4
**SHIFT** [5] - 110:4, 132:13, 132:17, 132:18
**SHIFTS** [1] - 132:15
**SHOCKED** [1] - 43:5
**SHOOTING** [1] - 168:2
**SHORT** [3] - 97:2, 148:6, 176:8
**SHORTER** [1] - 175:20
**SHORTLY** [3] - 91:3, 94:24, 168:21

**SHOT** [5] - 75:12, 75:19, 80:18, 90:21, 90:22
**SHOW** [11] - 49:9, 53:3, 63:21, 78:10, 79:22, 86:13, 96:4, 133:1, 133:19, 157:13, 157:14
**SHOWED** [2] - 67:18, 145:24
**SHOWER** [12] - 75:25, 81:16, 81:19, 81:21, 81:25, 82:2, 82:7, 82:13, 82:14, 83:14, 83:15
**SHOWERS** [1] - 128:13
**SHOWING** [5] - 55:24, 79:18, 96:2, 142:2, 145:19
**SHOWN** [1] - 79:17
**SHOWS** [4] - 75:3, 75:6, 79:6, 81:13
**SHU** [9] - 140:9, 140:11, 140:18, 140:20, 140:22, 140:25, 141:15, 145:15, 168:7
**SHUT** [1] - 96:4
**SHUTS** [1] - 129:25
**SICK** [2] - 25:19, 25:20
**SIDE** [13] - 52:21, 64:24, 65:12, 65:13, 96:10, 103:19, 114:13, 134:23, 134:24, 171:16, 177:5
**SIDE-BY-SIDE** [2] - 52:21, 64:24
**SIDES** [1] - 175:13
**SIGHT** [1] - 82:6
**SIGN** [1] - 143:14
**SIGNAL** [1] - 29:16
**SIGNED** [2] - 65:11, 65:25
**SIGNIFICANCE** [2] - 137:2, 152:17
**SIGNIFICANT** [7] - 22:15, 43:20, 48:10, 67:19, 118:6, 154:6, 154:9
**SIGNIFICANTLY** [1] - 160:14
**SIGNIFICATION** [1] - 32:25
**SIMILAR** [3] - 4:24, 65:16, 87:1
**SIMILARLY** [3] - 21:18, 62:2, 62:8

**SIMPLY** [3] - 18:25, 35:1, 79:6
**SINGLE** [11] - 50:1, 76:5, 80:24, 84:16, 84:19, 84:22, 125:18, 145:3, 158:18, 158:24, 170:11
**SINGLE-CELL** [1] - 158:24
**SINGLE-MAN** [1] - 50:1
**SIT** [2] - 105:18, 167:13
**SITE** [2] - 30:13, 33:10
**SITS** [3] - 5:19, 134:23, 134:24
**SITTING** [1] - 173:11
**SITUATION** [7] - 40:17, 46:6, 61:16, 124:9, 149:8, 151:25, 167:17
**SITUATIONS** [3] - 45:13, 46:8, 136:19
**SIX** [7] - 28:23, 50:4, 60:24, 69:11, 69:15, 84:17, 118:22
**SIZE** [2] - 160:14
**SKETCH** [1] - 5:21
**SKILLFUL** [1] - 29:4
**SKIP** [1] - 22:11
**SKY** [1] - 84:9
**SLAM** [1] - 164:7
**SLEEVE** [1] - 98:22
**SLID** [1] - 79:18
**SLIDE** [2] - 76:10, 79:15
**SLIGHTEST** [1] - 93:24
**SLIP** [2] - 149:17, 177:13
**SLOMSKY** [1] - 1:10
**SLOT** [1] - 68:20
**SMALL** [5] - 4:9, 24:6, 66:14, 69:2, 81:25
**SMIDGEN** [1] - 81:14
**SMU** [6] - 126:20, 127:3, 127:6, 127:19, 170:10, 170:14
**SO-CALLED** [2] - 32:4, 124:14
**SOCIAL** [4] - 39:2, 58:7, 60:7, 60:10
**SOLE** [1] - 8:16
**SOLID** [2] - 68:19, 69:1
**SOLITARY** [1] - 94:4
**SOLOMON** [4] - 21:14, 21:25, 23:13,

23:14
**SOLUTIONS** [1] - 104:5
**SOLVE** [1] - 36:9
**SOMEONE** [13] - 25:19, 65:14, 83:5, 127:25, 133:6, 133:11, 136:1, 146:22, 152:17, 153:22, 159:23, 163:7, 163:9
**SOMETIME** [1] - 97:4
**SOMETIMES** [5] - 103:24, 135:2, 135:3, 167:21
**SOMEWHAT** [1] - 108:7
**SOMEWHERE** [3] - 81:19, 139:21, 147:9
**SORRY** [12] - 48:6, 50:8, 53:9, 68:11, 76:15, 79:8, 79:22, 99:11, 100:14, 112:2, 112:25, 113:3
**SORT** [13] - 32:11, 32:12, 60:9, 79:24, 103:13, 104:22, 115:16, 118:1, 125:13, 129:14, 132:9, 156:24
**SORTS** [1] - 135:17
**SOUND** [4] - 76:21, 82:23, 82:24, 83:9
**SOUNDED** [1] - 83:11
**SOUTH** [7] - 30:24, 40:9, 110:25, 111:3, 111:10, 111:20, 112:19
**SOUTHWESTERN** [1] - 40:7
**SPACE** [2] - 69:20, 172:4
**SPARE** [2] - 73:21, 73:25
**SPEAKING** [2] - 34:12, 103:17
**SPEAKS** [1] - 56:15
**SPECIAL** [55] - 5:2, 30:20, 31:19, 31:24, 32:1, 32:5, 33:16, 49:24, 50:21, 50:23, 53:14, 53:21, 66:2, 66:7, 67:14, 85:10, 86:23, 107:20, 108:9, 108:11, 108:14, 108:18, 109:4, 111:7, 111:12, 111:13, 111:16, 111:18, 112:15, 112:16,

124:2, 124:3, 124:18, 125:3, 125:13, 126:11, 126:13, 126:21, 126:24, 132:14, 135:23, 136:15, 136:23, 138:4, 139:6, 140:5, 141:13, 142:7, 142:10, 143:6, 143:9, 143:17, 145:20, 151:8, 159:4
**SPECIALIST** [4] - 107:9, 108:5, 108:6, 175:1
**SPECIALISTS** [1] - 27:9
**SPECIALIZED** [1] - 85:12
**SPECIALTY** [1] - 55:22
**SPECIFIC** [4] - 46:3, 47:16, 94:19, 123:14
**SPECIFICALLY** [6] - 8:25, 17:7, 26:15, 88:25, 90:8, 132:23
**SPEED** [2] - 81:3, 82:11
**SPELL** [3] - 3:7, 71:4, 102:21
**SPELLED** [1] - 103:4
**SPELLING** [1] - 32:5
**SPENDING** [1] - 141:8
**SPENT** [2] - 4:13, 29:6
**SPOT** [1] - 80:13
**SPU** [2] - 50:2, 50:17
**SQUAD** [1] - 111:15
**STAB** [1] - 163:5
**STABBED** [1] - 161:22
**STABBING** [1] - 162:25
**STACK** [1] - 74:7
**STAFF** [47] - 10:16, 11:24, 20:12, 20:14, 25:15, 26:6, 31:13, 33:3, 33:8, 35:2, 36:12, 39:2, 39:7, 39:11, 50:12, 50:17, 50:20, 54:20, 110:11, 110:17, 110:18, 113:19, 119:19, 124:24, 125:7, 131:24, 132:1, 132:3, 132:7, 133:24, 133:25, 137:2, 137:7, 139:21, 144:14, 144:21, 146:14, 146:24, 149:21, 150:6, 156:5, 163:8,

170:2, 171:6, 171:22, 171:23
**STAFFED** [5] - 26:1, 26:7, 31:14, 39:19, 114:6
**STAFFING** [5] - 27:21, 33:1, 52:19, 132:14, 132:16
**STAMP** [2] - 19:5, 134:10
**STAMPED** [3] - 18:15, 19:7, 34:6
**STAND** [2] - 101:20, 130:6
**STANDARD** [1] - 172:2
**STANDPOINT** [1] - 150:22
**STARK** [7] - 28:13, 40:10, 69:17, 87:19, 87:23, 88:1, 96:5
**START** [20] - 11:3, 46:5, 50:14, 62:3, 62:14, 74:11, 78:9, 103:20, 103:21, 104:17, 107:10, 125:1, 125:3, 128:13, 128:18, 129:13, 129:15, 129:16, 130:8, 173:2
**STARTED** [8] - 45:4, 47:5, 59:24, 104:21, 105:1, 107:5, 111:8, 138:17
**STARTING** [7] - 45:3, 49:17, 58:19, 74:8, 78:7, 104:14, 129:3
**STARTS** [3] - 63:3, 110:4, 129:22
**STARTUP** [1] - 40:24
**STATE** [66] - 3:7, 3:25, 5:5, 5:12, 6:2, 13:5, 13:16, 13:17, 13:20, 13:23, 13:25, 17:10, 22:16, 22:18, 24:8, 24:14, 24:23, 26:3, 26:9, 26:15, 27:3, 27:6, 27:8, 28:16, 31:6, 31:9, 34:18, 36:14, 37:5, 37:24, 38:18, 38:21, 39:13, 39:15, 39:16, 39:23, 40:1, 40:5, 41:16, 43:12, 43:13, 45:3, 48:11, 50:6, 51:3, 56:22, 57:25, 58:5, 58:7, 59:23, 60:25, 61:9, 61:10, 61:12, 62:1, 62:4, 67:24, 69:12, 71:4, 71:25,

86:23, 90:17, 102:21, 104:12, 165:20
**STATE'S** [2] - 4:22, 14:7
**STATE-OF-THE-ART** [2] - 50:6, 51:3
**STATEMENT** [1] - 124:20
**STATES** [42] - 1:1, 1:3, 1:15, 2:2, 3:2, 6:9, 6:11, 8:13, 8:15, 8:22, 9:10, 9:13, 9:17, 15:16, 21:5, 21:13, 21:15, 23:21, 58:23, 60:19, 91:9, 104:9, 119:22, 119:25, 123:17, 123:24, 124:1, 124:16, 125:17, 125:21, 126:25, 128:4, 128:7, 143:23, 144:9, 144:15, 145:3, 158:12, 158:14, 162:12, 163:7, 165:5
**STATES'** [1] - 9:3
**STATUS** [20] - 15:14, 15:18, 70:20, 125:18, 140:6, 142:19, 142:21, 142:23, 145:1, 145:4, 146:5, 146:9, 146:17, 147:2, 151:22, 153:18, 158:19, 158:24, 168:3
**STATUTE** [1] - 177:2
**STAY** [6] - 13:16, 70:25, 108:3, 116:5, 126:3, 129:1
**STEEL** [2] - 42:15, 43:3
**STENOTYPE** [1] - 1:23
**STENOTYPE-COMPUTER** [1] - 1:23
**STEP** [6] - 70:24, 100:13, 133:17, 170:15, 170:18, 172:22
**STEP-DOWN** [1] - 170:15
**STEPHEN** [1] - 6:4
**STEPPED** [1] - 79:10
**STEPPING** [1] - 50:13
**STEPS** [1] - 20:11
**STILL** [27] - 16:17, 20:9, 20:21, 25:13,

25:21, 27:18, 28:2, 31:14, 36:7, 36:22, 37:1, 43:16, 47:12, 51:14, 63:24, 67:19, 79:7, 79:18, 91:21, 109:17, 130:14, 149:9, 149:20, 159:2, 162:1, 168:13

**STONE** [1] - 50:13

**STOOD** [2] - 28:19, 80:13

**STOP** [7] - 6:12, 20:17, 26:8, 42:17, 50:25, 63:3, 163:9

**STOPPED** [1] - 105:23

**STORIES** [1] - 84:10

**STORY** [1] - 84:6

**STREET** [5] - 1:16, 1:20, 2:4, 2:7, 2:10

**STRICTLY** [1] - 94:14

**STRUCTURE** [1] - 6:22

**STUDIED** [1] - 56:19

**STUFF** [1] - 121:21

**SUBJECT** [4] - 70:2, 92:5, 95:15, 135:6

**SUBJECTED** [1] - 12:8

**SUBMIT** [3] - 19:21, 133:7, 143:12

**SUBMITTED** [4] - 13:6, 19:25, 20:4, 20:5

**SUBSEQUENTLY** [2] - 6:8, 8:18

**SUBSTANCE** [1] - 38:10

**SUBSTANTIAL** [2] - 78:20, 78:21

**SUFFERING** [1] - 70:1

**SUFFICIENT** [1] - 20:16

**SUGGESTED** [1] - 33:15

**SUGGESTING** [2] - 139:13, 147:19

**SUGGESTION** [2] - 139:25, 169:10

**SUICIDAL** [1] - 31:10

**SUICIDE** [2] - 29:10, 29:11

**SUIT** [1] - 35:6

**SUITABLE** [2] - 69:24, 69:25

**SUITE** [3] - 1:16, 2:7, 2:14

**SUMMARIZE** [2] - 25:7, 27:15

**SUMMARIZES** [1] - 66:6

**SUMMARY** [3] - 25:9, 53:18, 65:23

**SUPERVISE** [1] - 118:9

**SUPERVISED** [4] - 131:24, 131:25, 132:22, 134:1

**SUPERVISING** [1] - 107:15

**SUPERVISION** [2] - 110:10, 133:25

**SUPERVISOR** [2] - 130:24, 132:24

**SUPERVISOR'S** [4] - 107:20, 112:16, 135:24, 136:24

**SUPERVISORS** [1] - 131:10

**SUPPLIES** [3] - 143:8, 144:1, 144:3

**SUPPOSED** [4] - 27:20, 110:19, 130:24, 131:11

**SURPRISE** [1] - 164:19

**SURPRISED** [1] - 39:1

**SUSPICION** [1] - 60:15

**SUSPICIOUS** [1] - 135:19

**SUSTAIN** [3] - 92:14, 96:12, 99:15

**SUSTAINED** [1] - 11:24

**SUZANNE** [2] - 1:19, 178:6

**SWORN** [4] - 3:6, 3:22, 71:3, 102:20

**SYSTEM** [32] - 17:10, 17:22, 20:21, 20:22, 22:18, 30:15, 31:2, 33:2, 40:4, 42:21, 43:2, 45:3, 48:17, 52:4, 56:7, 57:5, 57:8, 58:18, 59:2, 59:21, 63:13, 67:24, 79:24, 88:22, 93:9, 93:23, 131:8, 150:16, 154:1, 164:10

**SYSTEMIC** [1] - 11:25

## T

**TAB** [13] - 58:20, 58:21, 59:22, 60:2, 60:13, 62:15, 62:16, 62:25, 63:23

**TABLES** [1] - 160:17

**TABS** [1] - 124:20

**TAKING** [3] - 74:18, 75:19, 154:6

**TALLADEGA** [11] - 106:16, 106:20, 106:25, 107:3, 108:19, 108:23, 109:6, 113:22, 113:25, 114:22, 127:2

**TAPED** [1] - 42:25

**TASTE** [1] - 40:11

**TEACHING** [1] - 118:15

**TEAM** [6] - 7:8, 111:14, 132:4, 138:20, 139:3, 168:24

**TEAMS** [1] - 118:10

**TEAR** [1] - 165:24

**TEASE** [1] - 62:9

**TECHNICAL** [1] - 37:21

**TELEPHONE** [4] - 93:20, 107:21, 135:2, 136:9

**TELEVISION** [3] - 50:22, 88:8, 88:9

**TEMPORARY** [1] - 10:21

**TEN** [6] - 29:7, 35:5, 50:2, 129:4, 129:9, 164:10

**TEN-MINUTE** [1] - 129:4

**TENNESSEE** [1] - 71:12

**TENURE** [1] - 116:20

**TERM** [5] - 67:6, 67:10, 67:15, 68:16, 142:13

**TERMINAL** [1] - 160:20

**TERMS** [8] - 17:20, 26:5, 35:2, 36:25, 39:18, 39:19, 47:25, 59:13

**TERRE** [7] - 124:3, 126:4, 126:16, 143:22, 143:23, 152:19, 153:2

**TESTIFIED** [5] - 20:2, 92:5, 95:2, 95:17, 161:13

**TESTIFY** [2] - 174:15, 174:18

**TESTIFYING** [4] - 25:5, 44:24, 92:16, 174:13

**TESTIMONY** [12] - 25:4, 103:16,

131:17, 132:12, 148:13, 148:17, 169:1, 169:6, 173:2, 173:4, 176:6, 176:17

**TEXAS** [9] - 40:9, 112:1, 115:24, 116:19, 117:5, 121:25, 122:3, 122:6, 152:25

**THEMSELVES** [2] - 16:18, 166:21

**THERAPEUTIC** [1] - 66:18

**THERAPISTS** [1] - 27:1

**THERAPY** [4] - 49:17, 49:18, 50:11, 66:14

**THERE** [229] - 6:12, 7:9, 7:12, 7:14, 8:10, 8:11, 9:5, 9:8, 9:11, 10:2, 10:15, 11:11, 12:22, 12:25, 14:4, 14:21, 16:16, 18:25, 20:16, 20:17, 21:1, 22:25, 25:12, 25:18, 26:8, 27:12, 28:15, 28:22, 28:23, 29:9, 29:11, 29:15, 29:16, 31:16, 33:13, 33:20, 33:21, 33:22, 34:20, 34:24, 37:9, 37:19, 37:22, 38:6, 40:11, 40:12, 41:2, 42:4, 43:7, 43:16, 43:18, 45:23, 46:9, 46:16, 46:17, 46:21, 47:3, 47:13, 49:23, 50:4, 50:25, 51:19, 51:21, 52:3, 52:14, 53:1, 53:11, 53:18, 54:16, 54:25, 55:18, 57:12, 61:13, 61:25, 63:1, 63:3, 63:24, 68:6, 69:10, 69:11, 70:8, 72:15, 76:10, 76:12, 76:16, 77:8, 78:19, 78:21, 79:22, 80:6, 80:24, 81:23, 82:1, 82:16, 83:4, 83:10, 84:7, 85:21, 86:3, 87:11, 88:7, 88:9, 88:12, 91:4, 91:5, 91:19, 91:21, 93:17, 93:19, 93:22, 94:7, 94:9, 96:6, 96:24, 97:2, 99:9, 100:18, 106:10, 108:7, 108:20, 109:12, 109:13, 110:5, 110:12, 111:2,

111:4, 111:11, 111:22, 112:7, 112:8, 113:12, 113:24, 114:3, 116:4, 116:14, 116:15, 117:2, 117:3, 117:13, 119:6, 119:8, 121:22, 122:15, 123:24, 124:18, 124:21, 125:3, 125:22, 125:24, 126:3, 126:23, 126:24, 127:4, 127:6, 127:18, 132:1, 132:6, 132:7, 133:18, 134:13, 134:24, 135:2, 135:5, 135:8, 135:19, 135:20, 135:25, 136:3, 136:23, 136:25, 137:10, 138:3, 138:6, 138:24, 139:6, 139:12, 139:24, 139:25, 140:5, 140:13, 142:12, 142:15, 142:18, 144:21, 147:17, 147:21, 149:6, 149:17, 150:15, 150:23, 151:3, 151:6, 152:21, 153:7, 156:1, 156:10, 156:21, 157:11, 158:18, 160:17, 160:22, 161:3, 161:5, 162:5, 163:8, 163:12, 163:20, 164:9, 164:10, 166:17, 166:21, 166:24, 167:1, 167:20, 171:8, 171:12, 171:18, 172:6, 173:4, 173:8, 176:13, 176:20

**THERE'S** [9] - 10:5, 18:14, 22:22, 34:8, 63:21, 82:4, 119:11, 124:3, 125:2

**THEREOF** [2] - 22:17, 48:16

**THEY'LL** [1] - 128:21

**THEY'RE** [1] - 138:23

**THINKING** [1] - 175:12

**THINKS** [1] - 135:21

**THINLY** [2] - 31:14, 39:19

**THIRD** [3] - 2:10,

36:21, 66:13

**THORNY** [1] - 36:19
**THOROUGH** [1] -
16:15
**THOUSAND** [2] - 81:3,
82:10
**THREAT** [3] - 12:3,
140:23, 141:1
**THREATENING** [1] -
157:2
**THREATS** [1] - 157:5
**THREE** [24] - 33:14,
34:16, 73:14, 90:23,
106:8, 106:10,
107:2, 112:1, 117:5,
117:7, 117:9,
117:16, 117:19,
117:20, 117:21,
117:22, 142:15,
145:11, 146:15,
168:2, 170:21,
174:11
**THREE-WEEK** [1] -
174:11
**THRIVING** [1] - 96:7
**THROUGHOUT** [2] -
21:13, 126:24
**THROW** [1] - 32:12
**THROWING** [1] -
95:20
**THROWN** [1] - 138:8
**TIED** [1] - 157:21
**TIERS** [1] - 160:22
**TIMBERLANDS** [1] -
5:10
**TIMELINE** [1] - 128:8
**TIMOTHY** [3] - 102:19,
102:23, 103:3
**TITLE** [1] - 132:24
**TODAY** [8] - 6:23,
25:4, 44:25, 56:21,
119:21, 173:2,
173:5, 176:18
**TOGETHER** [3] -
36:19, 159:17,
159:20
**TOILET** [3] - 76:17,
76:20, 82:21
**TOMORROW** [4] -
173:2, 173:4,
173:11, 173:14
**TONE** [1] - 56:17
**TOOK** [17] - 42:1,
42:5, 74:15, 81:3,
81:5, 81:9, 85:10,
85:19, 85:25, 86:4,
86:25, 87:2, 93:17,
97:7, 109:20,
110:24, 115:24
**TOOL** [1] - 118:15

**TOOLS** [1] - 129:13
**TOP** [9] - 24:5, 34:23,
70:8, 84:8, 111:25,
127:10, 153:2,
155:21, 160:23
**TOUCH** [2] - 30:17,
92:4
**TOUCHED** [1] - 68:14
**TOUCHES** [1] - 30:16
**TOUCHING** [1] - 43:5
**TOUGH** [1] - 156:16
**TOUR** [1] - 112:3
**TOURED** [2] - 42:11,
78:18
**TRAINED** [4] - 25:15,
27:9, 39:8, 105:1
**TRAINING** [9] -
104:22, 104:23,
104:25, 105:1,
106:4, 106:5, 106:9,
106:10, 109:21
**TRANSCRIPT** [2] -
1:24, 178:2
**TRANSCRIPTION** [1] -
1:24
**TRANSFER** [9] -
56:14, 61:3, 65:6,
110:24, 115:16,
115:24, 137:23,
138:2, 138:22
**TRANSFERRED** [8] -
41:2, 49:21, 111:9,
116:25, 117:2,
137:16, 139:20,
158:11
**TRANSFERS** [3] -
115:16, 137:22,
139:8
**TRANSITIONAL** [1] -
31:4
**TRANSMITTED** [1] -
121:24
**TRANSPORTED** [3] -
139:21, 147:5, 147:9
**TRAUMA** [1] - 175:2
**TRAVEL** [3] - 71:25,
72:8, 138:10
**TRAVELS** [1] - 122:16
**TRAVIS** [59] - 2:8, 2:9,
71:8, 71:10, 73:13,
73:20, 73:23, 84:24,
85:2, 89:4, 91:7,
92:7, 93:5, 93:10,
94:12, 94:14, 95:14,
97:12, 97:14, 98:4,
98:7, 98:23, 98:24,
99:8, 99:16, 101:24,
102:1, 102:10,
103:6, 104:2,
105:10, 105:19,

106:3, 112:25,
113:3, 113:6, 120:9,
120:15, 120:22,
121:2, 121:6,
126:10, 141:19,
141:23, 145:6,
145:10, 145:13,
147:22, 148:1,
168:19, 168:22,
169:16, 169:18,
171:11, 172:15,
172:18, 173:20,
179:7, 179:10
**TRAYS** [1] - 68:21
**TREATMENT** [18] -
4:20, 9:1, 10:16,
10:20, 12:6, 31:25,
33:4, 33:17, 33:25,
50:3, 51:25, 55:14,
55:17, 60:5, 61:17,
67:10, 67:15, 137:19
**TRIAL** [10] - 7:6, 7:12,
7:17, 8:6, 58:22,
72:6, 91:5, 91:22,
177:9
**TRIALS** [2] - 7:14,
177:8
**TRIBAL** [1] - 5:8
**TRIED** [6] - 29:15,
74:4, 90:12, 156:5,
161:25, 173:13
**TRIP** [1] - 138:17
**TRIPS** [5] - 125:15,
138:15, 138:16,
139:23, 147:20
**TROUBLED** [1] -
43:16
**TRUCK** [1] - 90:19
**TRUE** [36] - 56:5,
56:11, 57:2, 63:20,
87:15, 94:22, 95:8,
137:12, 151:1,
152:9, 158:12,
158:13, 158:19,
159:7, 159:15,
160:15, 160:16,
160:18, 161:3,
161:20, 162:5,
163:1, 163:5,
163:10, 163:11,
164:7, 164:8, 166:8,
167:2, 167:5,
167:25, 168:3,
168:4, 168:5, 168:6,
168:8
**TRULY** [5] - 27:19,
27:23, 38:23, 42:12,
43:10
**TRUST** [1] - 5:8
**TRY** [3] - 9:24, 42:25,

52:4

**TRYING** [6] - 25:24,
52:12, 56:22, 96:4,
96:9, 139:13
**TUESDAY** [3] -
175:19, 175:21,
175:22
**TULSA** [4] - 3:14, 5:7,
27:6, 40:21
**TURN** [12] - 8:9, 10:1,
11:3, 12:19, 27:12,
28:5, 31:15, 34:4,
34:23, 40:9, 135:22,
135:23
**TURNED** [2] - 81:2,
105:17
**TURNING** [1] - 80:14
**TWICE** [1] - 147:17
**TWO** [31] - 4:7, 18:14,
19:1, 33:13, 34:15,
49:10, 52:20, 52:24,
57:24, 65:1, 72:15,
79:13, 84:6, 84:10,
106:8, 114:6, 116:3,
116:9, 116:10,
120:4, 124:22,
124:24, 132:15,
146:17, 151:7,
151:22, 151:24,
156:17, 174:11,
176:8
**TWO-AND-A-HALF** [2]
- 106:8, 174:11
**TWO-HOUR** [1] -
124:22
**TWO-MAN** [2] -
146:17, 156:17
**TWO-STORY** [1] -
84:6
**TYING** [2] - 168:5,
168:10
**TYPE** [15] - 16:6,
16:14, 32:13, 39:5,
60:15, 65:3, 65:10,
79:16, 88:21,
127:24, 133:8,
141:7, 156:1,
163:12, 171:1
**TYPES** [2] - 61:5,
113:14
**TYPICALLY** [1] -
165:1

## U

**U.S** [1] - 95:19
**UH** [1] - 54:5
**ULTIMATELY** [1] -
151:19
**UM** [2] - 151:18,

155:25
**UM-HUM** [2] - 151:18,
155:25
**UNABLE** [2] - 26:24,
96:6
**UNCONSTITUTIONA
L** [2] - 12:15, 20:23
**UNDER** [19] - 10:8,
15:4, 24:4, 27:20,
32:7, 60:13, 90:18,
90:19, 108:15,
109:17, 126:5,
133:24, 156:14,
158:9, 158:10,
163:3, 176:12,
176:23
**UNDERGO** [1] -
141:15
**UNDERGOES** [1] -
140:7
**UNDERGONE** [2] -
20:8, 47:11
**UNDERLINES** [1] -
27:23
**UNDERNEATH** [2] -
11:6, 11:11
**UNDERSTOOD** [2] -
94:7, 144:6
**UNDERTAKE** [1] -
72:3
**UNDERWAY** [1] -
50:19
**UNFORTUNATELY**
[1] - 53:7
**UNIT** [130] - 25:24,
26:2, 26:3, 28:17,
28:19, 28:22, 29:12,
29:13, 30:20, 31:10,
31:19, 31:24, 33:16,
39:19, 49:3, 49:23,
49:24, 50:21, 53:14,
53:15, 53:21, 53:25,
54:7, 54:8, 54:20,
54:23, 55:5, 55:12,
58:4, 60:21, 60:22,
61:25, 66:2, 66:7,
66:10, 67:14, 67:25,
68:2, 68:5, 68:12,
68:15, 68:25, 69:9,
69:24, 72:24, 73:1,
73:10, 77:13, 77:15,
77:18, 77:20, 82:20,
82:23, 82:24, 83:2,
83:18, 83:22, 84:15,
84:19, 85:9, 86:23,
87:22, 92:17, 93:8,
95:8, 97:1, 99:5,
100:1, 102:12,
102:13, 106:17,
107:16, 108:8,

108:9, 108:10, 108:19, 111:8, 111:12, 111:16, 111:18, 121:16, 121:17, 124:3, 126:11, 126:13, 126:21, 127:3, 128:13, 128:17, 128:22, 129:1, 129:16, 129:19, 130:9, 131:19, 131:20, 132:4, 132:7, 132:14, 132:20, 135:15, 137:9, 138:20, 140:5, 141:13, 142:10, 145:20, 146:2, 146:6, 146:10, 146:14, 146:25, 147:3, 147:6, 151:8, 151:23, 157:16, 158:22, 158:24, 159:4, 159:12, 159:23, 159:24, 161:14, 165:21, 166:6, 166:10

**UNITED** [43] - 1:1, 1:3, 1:15, 2:2, 3:2, 6:8, 6:10, 8:13, 8:15, 8:22, 9:3, 9:10, 9:13, 9:17, 15:16, 21:5, 21:12, 21:15, 23:21, 58:23, 91:9, 104:9, 116:18, 119:22, 119:25, 123:17, 123:24, 124:1, 124:16, 125:17, 125:21, 126:25, 128:4, 128:6, 143:23, 144:9, 144:15, 145:3, 158:12, 158:14, 162:12, 163:7, 165:4

**UNITS** [13] - 108:12, 108:14, 124:4, 126:24, 127:9, 129:6, 130:2, 159:9, 159:15, 160:4, 160:12, 160:13, 161:3

**UNIVERSITY** [3] - 3:25, 4:1, 116:19

**UNLICENSED** [1] - 17:21

**UNNECESSARY** [1] - 102:2

**UNTRAINED** [1] - 26:21

**UNUSUAL** [5] - 9:16,

9:19, 11:7, 11:11, 46:22

**UP** [50] - 7:10, 7:11, 22:22, 28:25, 31:3, 42:17, 53:1, 62:24, 68:1, 74:18, 77:16, 78:11, 81:15, 82:5, 84:10, 86:13, 88:21, 91:24, 96:23, 101:16, 102:25, 110:7, 111:7, 121:22, 127:21, 128:11, 129:2, 129:12, 129:20, 129:22, 130:6, 130:8, 130:11, 130:18, 131:5, 133:1, 133:19, 138:1, 149:5, 151:3, 151:19, 156:21, 156:24, 157:22, 163:9, 165:24, 168:5, 168:10, 175:9

**USP** [16] - 73:10, 123:21, 126:23, 133:1, 140:15, 140:20, 141:9, 141:12, 150:3, 150:9, 153:2, 159:9, 159:22, 170:3, 170:6, 170:7

**USP'S** [2] - 150:2, 159:15

---

# V

**VACANCIES** [1] - 20:13

**VALID** [1] - 69:25

**VALUE** [2] - 89:5, 91:9

**VARIETY** [1] - 153:8

**VARIOUS** [8] - 15:4, 29:15, 50:10, 50:12, 71:20, 71:22, 139:23, 143:25

**VEHICLES** [1] - 139:5

**VENTILATION** [2] - 43:7, 43:8

**VERBALLY** [1] - 83:1

**VERDICT** [1] - 177:13

**VERSUS** [6] - 3:2, 4:16, 5:14, 8:3, 12:7, 58:23

**VIDEO** [1] - 146:23

**VIDEOS** [1] - 165:11

**VIDEOTAPES** [1] - 119:12

**VIEW** [7] - 45:2, 106:19, 112:21, 117:7, 154:7,

158:10, 158:21

**VILE** [1] - 155:16

**VINITA** [8] - 24:23, 26:4, 34:21, 39:14, 58:1, 58:4, 62:1, 68:1

**VIOLATED** [2] - 9:15, 154:25

**VIOLATING** [1] - 9:18

**VIOLATION** [2] - 12:6, 12:9

**VIOLENCE** [1] - 136:18

**VIOLENT** [2] - 32:3, 153:18

**VIRTUALLY** [6] - 6:6, 14:23, 16:10, 23:2, 38:23, 41:11

**VISIT** [13] - 22:25, 26:18, 26:20, 48:24, 49:2, 49:5, 83:5, 133:2, 133:16, 133:19, 134:21, 134:22

**VISIT'S** [1] - 134:5

**VISITATION** [2] - 133:4, 133:5

**VISITED** [6] - 22:18, 23:25, 24:1, 24:17, 48:13, 72:24

**VISITING** [7] - 10:17, 29:7, 107:19, 131:22, 133:25, 134:3, 134:19

**VISITOR** [2] - 134:13, 134:24

**VISITORS** [1] - 134:8

**VISITORS'** [1] - 133:6

**VISITS** [5] - 10:17, 24:16, 24:19, 134:13, 134:14

**VISUAL** [1] - 86:9

**VOLUME** [1] - 62:22

**VOLUNTEERED** [1] - 66:18

**VULNERABLE** [5] - 165:20, 165:22, 166:8, 167:4

---

# W

**WAFFENSCHMIDT** [1] - 2:9

**WAIT** [3] - 99:9, 105:5, 105:20

**WAIVE** [2] - 169:5, 169:8

**WAKE** [1] - 128:11

**WALK** [4] - 97:4, 166:24, 166:25,

171:17

**WALL** [7] - 43:5, 80:25, 82:17, 82:19, 88:10, 164:7

**WALLS** [4] - 42:24, 80:12, 84:10, 84:11

**WANDER** [1] - 131:14

**WANTS** [1] - 162:15

**WARD** [1] - 26:21

**WARDEN** [32] - 60:25, 114:1, 114:2, 114:5, 114:7, 114:8, 114:10, 114:11, 114:23, 115:2, 115:8, 115:10, 115:15, 115:22, 116:2, 116:12, 117:11, 117:14, 117:15, 119:7, 136:25, 137:1, 151:20, 152:11, 152:14, 152:18, 152:20, 152:21, 153:1

**WARDEN'S** [4] - 119:11, 121:22, 121:23, 121:24

**WARDENS** [2] - 15:1, 114:6

**WASHINGTON** [3] - 1:16, 2:4, 119:16

**WATCH** [8] - 106:17, 124:22, 125:22, 128:14, 132:17, 135:15, 136:21, 163:4

**WATCHED** [3] - 50:23, 165:10, 167:11

**WATER** [1] - 43:6

**WATERS** [1] - 2:9

**WATERSHED** [1] - 5:7

**WAYS** [1] - 124:21

**WEAPON** [2] - 163:16, 166:2

**WEAPONS** [6] - 139:5, 162:4, 162:7, 163:12, 164:15, 164:16

**WEARING** [1] - 156:17

**WEDNESDAY** [3] - 1:8, 173:6, 173:7

**WEEK** [8] - 33:14, 34:16, 69:19, 104:24, 104:25, 106:4, 174:11

**WEEKDAY** [1] - 50:14

**WEEKEND** [1] - 177:18

**WEEKLY** [1] - 10:17

**WEEKS** [2] - 65:21,

106:10

**WEIGHED** [1] - 91:14

**WELDED** [1] - 43:8

**WELFARE** [1] - 60:9

**WELLBEING** [1] - 12:4

**WEST** [2] - 2:10, 40:8

**WESTERN** [3] - 18:19, 19:5

**WHATSOEVER** [1] - 134:25

**WHEEL** [1] - 163:23

**WHEREBY** [1] - 140:5

**WHEREVER** [2] - 131:14, 134:3

**WHITE** [6] - 1:19, 85:25, 86:1, 86:6, 86:8, 178:6

**WHOLE** [4] - 48:17, 82:6, 137:11, 175:19

**WIFE** [2] - 4:4, 4:17

**WILBUR** [3] - 89:22, 89:25, 90:1

**WILLIAMSPORT** [2] - 2:11, 147:17

**WILLING** [1] - 148:14

**WINDOW** [6] - 69:2, 77:1, 77:2, 82:4, 82:9, 82:12

**WINDOWS** [3] - 77:23, 78:1, 82:5

**WIRES** [1] - 43:3

**WISH** [1] - 128:16

**WISHES** [1] - 174:14

**WITHDRAW** [1] - 140:18

**WITNESS** [50] - 3:3, 3:6, 3:9, 59:11, 59:13, 64:8, 64:17, 70:25, 71:2, 71:3, 71:6, 73:21, 89:6, 92:2, 92:5, 92:10, 93:17, 93:19, 96:14, 96:21, 98:6, 99:7, 99:11, 100:17, 100:25, 101:7, 101:25, 102:9, 102:18, 102:19, 102:23, 103:1, 103:3, 103:15, 103:20, 103:22, 113:2, 119:22, 169:1, 169:6, 172:24, 172:25, 173:12, 174:21, 174:24, 175:10, 176:6, 176:19, 179:2

**WITNESSES** [2] - 100:21, 176:8

**WOES** [1] - 36:14

**WOLFGANG** [2] - 54:9, 55:2

**WONDERING** [2] - 175:13, 175:18

**WORD** [1] - 27:23

**WORDS** [2] - 130:21, 152:23

**WORE** [1] - 37:11

**WORKER** [2] - 107:13, 114:20

**WORKERS** [1] - 39:2

**WORKS** [2] - 135:16, 158:9

**WORLD** [7] - 56:2, 94:22, 95:7, 96:5, 96:17, 96:25, 123:20

**WORTH** [1] - 95:13

**WRAP** [1] - 129:12

**WRAPPED** [1] - 7:10

**WRAPPING** [1] - 7:11

**WRITING** [2] - 22:3, 109:19

**WRITTEN** [3] - 49:11, 145:19, 156:24

**WROTE** [3] - 8:6, 49:16, 87:11

## Y

**YARD** [11] - 110:8, 129:2, 129:7, 129:10, 129:22, 129:25, 130:11, 130:12, 159:20, 166:12

**YEAR** [8] - 14:23, 41:11, 42:5, 107:6, 108:2, 108:21, 111:5, 164:10

**YEARLY** [1] - 164:16

**YEARS** [34] - 4:8, 4:16, 7:10, 14:23, 17:17, 35:5, 35:8, 42:2, 42:16, 43:8, 51:16, 56:24, 59:1, 59:20, 71:17, 74:23, 85:19, 85:22, 85:23, 90:8, 97:3, 107:2, 116:3, 116:9, 116:10, 117:21, 120:4, 122:7, 123:22, 123:23, 170:21, 170:22

**YELLOW** [4] - 62:15, 62:24, 62:25, 71:1

**YESTERDAY** [2] - 97:16, 100:21

**YOURSELF** [2] - 83:11, 165:10