UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF PENNSYLVANIA


UNITED STATES OF AMERICA            :   CRIMINAL NUMBER


            V.


DAVID PAUL HAMMER                   :   4:96-CR-239


                    MONDAY, 6-30-14
                    COURTROOM 15B
                    PHILADELPHIA, PA 19106


_____
        BEFORE THE HONORABLE JOEL H. SLOMSKY, J.
_____

            SENTENCING HEARING
                DAY 12

APPEARANCES:

JOHN C. GURGANUS, JR., ESQUIRE        FOR THE GOVERNMENT
UNITED STATES ATTORNEYS OFFICE
MIDDLE DISTRICT OF PENNSYLVANIA
235 N. WASHINGTON STREET, SUITE 311
PO BOX 309
SCRANTON, PA 18501


            SUZANNE R. WHITE, RPR, FCRR, CM
              OFFICIAL COURT REPORTER
            FIRST FLOOR U. S. COURTHOUSE
                601 MARKET STREET
              PHILADELPHIA, PA 19106
                (215)627-1882


PROCEEDINGS RECORDED BY STENOTYPE-COMPUTER,
TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

CONTINUED APPEARANCES:

AMANDA HAINES, ESQUIRE                    FOR THE GOVERNMENT
UNITED STATES DEPARTMENT OF JUSTICE
CRIMINAL DIVISION
CAPITAL CRIMES SECTION
1331 F. STREET, N.W.
WASHINGTON, D.C. 20530

ANNE SAUNDERS, ESQUIRE                    FOR THE DEFENDANT
FEDERAL PUBLIC DEFENDER
MIDDLE DISTRICT OF PENNSYLVANIA
100 CHESTNUT STREET, SUITE 300
HARRISBURG, PA 17101

RONALD C. TRAVIS, ESQUIRE                 FOR THE DEFENDANT
REIDERS, TRAVIS, HUMPHREY,
HARRIS, WATERS & WAFFENSCHMIDT
161 WEST THIRD STREET
PO BOX 215
WILLIAMSPORT, PA 17703-0215

JAMES MORENO, ESQUIRE                     FOR THE DEFENDANT
JAMES MCHUGH, ESQUIRE
FEDERAL COMMUNITY DEFENDER
EASTERN DISTRICT OF PENNSYLVANIA
SUITE 540 - THE CURTIS CENTER
PHILADELPHIA, PA 19106

(THE CLERK OPENS COURT.)

THE COURT:  PLEASE BE SEATED.

ALL COUNSEL:  GOOD MORNING, YOUR HONOR.

THE COURT:  NEXT WITNESS.

MR. MORENO:  YES, YOUR HONOR.  THE DEFENSE WILL CALL DR. DAVID LISAK.

DAVID LISAK, DEFENSE WITNESS, SWORN.

THE CLERK:  STATE AND SPELL YOUR FULL NAME FOR THE RECORD, PLEASE.

THE WITNESS:  MY NAME IS DAVID LISAK, D-A-V-I-D L-I-S-A-K.

DIRECT EXAMINATION (QUALIFICATIONS)

BY MR. MORENO:

Q.      GOOD MORNING, DR. LISAK.

A.      GOOD MORNING.

MR. MORENO:  YOUR HONOR, MAY I APPROACH THE WITNESS BRIEFLY?

THE COURT:  YES.

BY MR. MORENO:

Q.      DOCTOR, I AM SHOWING YOU WHAT'S BEEN MARKED AS DEFENSE EXHIBIT 500.  DO YOU RECOGNIZE THAT DOCUMENT?

A.      YES, I DO.

Q.      THAT IS YOUR CV?

A.      YES, IT IS.

Q.      IT IS YOUR CURRENT CV?

A.    YES, PROBABLY A COUPLE MONTHS OUT OF DATE, BUT OTHERWISE, YES.

Q.    HOW ARE YOU CURRENTLY EMPLOYED?

A.    I'M SELF-EMPLOYED.

Q.    AS A CLINICAL PSYCHOLOGIST?

A.    A CLINICAL PSYCHOLOGIST AND A FORENSIC CONSULTANT.

Q.    WHERE ARE YOU BASED OUT OF?

A.    I LIVE OUTSIDE ALBUQUERQUE, NEW MEXICO.

Q.    TELL US A LITTLE ABOUT YOUR EDUCATIONAL BACKGROUND.

A.    I RECEIVED A BACHELOR'S DEGREE FROM THE UNIVERSITY OF VIRGINIA AND THEN A MASTER'S AND PH.D. IN CLINICAL PSYCHOLOGY FROM DUKE UNIVERSITY.

Q.    AND AFTER YOUR -- YOU FINISHED YOUR EDUCATION, WHAT DID YOU DO?

A.    I COMPLETED AN INTERNSHIP, CLINICAL INTERNSHIP AT BELLEVUE HOSPITAL AND AT THE KIRBY FORENSIC PSYCHIATRIC INSTITUTE IN MANHATTAN.

Q.    AFTER YOU FINISHED YOUR INTERNSHIP AT KIRBY, WHAT DID YOU DO NEXT?

A.    I TAUGHT FOR A YEAR AS A VISITING ASSISTANT PROFESSOR AT DUKE, AND THEN I MOVED TO BOSTON, TAUGHT AT UMASS BOSTON, UNIVERSITY OF MASSACHUSETTS, BOSTON, FROM 1990 UNTIL -- I THINK IT WAS MAY 2013.

Q.      AND ARE YOU A MEMBER OF ANY RELEVANT PROFESSIONAL ORGANIZATIONS TO EITHER CLINICAL PSYCHOLOGY OR FORENSIC PSYCHOLOGY?

A.      I'M A MEMBER AND FELLOW OF THE AMERICAN PSYCHOLOGICAL ASSOCIATION AND I'M ON THE BOARDS OF SEVERAL ORGANIZATIONS RELATED TO MOSTLY CHILD ABUSE.

Q.      CAN YOU TELL US WHAT IT MEANS TO BE A FELLOW, THAT WAS WITH THE AMERICAN PSYCHOLOGICAL ASSOCIATION?

A.      A FELLOW JUST MEANS THAT I HAVE BEEN AROUND A LONG TIME.

Q.      IT'S ESTEEMED.

A.      OKAY.

Q.      HAVE YOU RECEIVED ANY GRANTS OR HONORS FOR YOUR WORK?

A.      YES.  OVER THE YEARS I RECEIVED SOME HONORS FOR RESEARCH, I GUESS, RESEARCH AND CONTRIBUTIONS TO THE FIELD OF SEXUAL ASSAULT.

Q.      THEY WOULD BE LISTED ON PAGE 1 AND 2 OF YOUR CV?

A.      YES.

Q.      YOU HAVE A NUMBER OF PUBLICATIONS THAT ARE ALSO LISTED IN YOUR CV?

A.      YES.

Q.      BEGINNING ON PAGE 5?

A.      YES.

Q.      WHAT HAS BEEN THE PRIMARY FOCUS OF YOUR

WRITINGS?

A.        THE PRIMARY FOCUS HAS BEEN, WELL, TWO-FOLD.  ONE IS THE MOTIVES, CHARACTERISTICS OF SEX OFFENDERS, PRIMARILY NONSTRANGER RAPISTS, AND ALSO THE IMPACT OF CHILDHOOD SEXUAL ABUSE AND PRIMARILY ON MEN.

Q.        HAVE YOU GIVEN PROFESSIONAL PRESENTATIONS ON THESE SUBJECTS?

A.        YES.

Q.        WHO DO YOU GENERALLY GIVE THOSE TO?  WHAT IS YOUR AUDIENCE?

A.        I DO TRAININGS AND PRESENTATIONS TO A VERY, VERY WIDE VARIETY, SO PRETTY MUCH ALL THE PROFESSIONS WITHIN THE CRIMINAL JUSTICE SYSTEM, PROSECUTORS, LAW ENFORCEMENT, JUDGES, PROBATION OFFICERS, CORRECTIONS STAFF.  I ALSO -- I DO A LOT OF WORK TRAINING, CONSULTING WITH U.S. MILITARY ON SEXUAL ASSAULT ISSUES AND ALSO IN HIGHER EDUCATION.  SO THERE THE AUDIENCE WOULD BE ADMINISTRATORS.  AND IN THE MILITARY SENIOR LEADERSHIP AND ALSO THE JAG CORPS AND THE INVESTIGATIVE AGENCIES OF THE -- SO THE THREE, NCIS, OSI AND CID, THE INVESTIGATIVE AGENCIES THAT SERVE THE MILITARY SERVICES.

Q.        WHAT ARE YOU TRYING TO CONVEY TO THEM?  ARE YOU TRYING TO HELP THEM UNDERSTAND THE TRAUMA ASSOCIATED WITH SEXUAL ASSAULTS, TO RECOGNIZE THE SIGNS, TO UNDO MYTHS THAT MAY BE OUT THERE ABOUT RAPE VICTIMS?

A.          IT DEPENDS -- AGAIN, IT DEPENDS ON THE AUDIENCE. WITH SENIOR LEADERSHIP A LOT OF THE TRAINING HAS BEEN SORT OF BASIC UNDERSTANDING OF SEXUAL ASSUALT, IMPACT ON VICTIMS, ALSO OFFENDERS, WHO OFFENDERS ARE, WHAT WE KNOW ABOUT OFFENDERS.

          WITH THE INVESTIGATIVE AND THE JAG CORPS, IT'S MUCH MORE PRACTICAL.  SO IT'S THE IMPLICATIONS AND APPLICATIONS OF THAT RESEARCH AND THAT KNOWLEDGE BASE FOR INVESTIGATING THESE CASES AND ALSO FOR PROSECUTING THE CASES.

Q.     ALL RIGHT.  NOW, DURING THE COURSE OF YOUR CAREER HAVE YOU HAD AN OPPORTUNITY TO WORK IN THE CAPACITY AS AN EXPERT WITNESS WITH THE PROSECUTION IN SEXUAL ASSAULT CASES?

A.     YES.  MANY TIMES.

Q.     WHAT JURISDICTIONS WOULD THAT HAVE BEEN?

A.     WELL, LOCAL JURISDICTIONS BASICALLY ACROSS THE COUNTRY.  SO THAT WOULD BE JUST LOCAL PROSECUTORS WHO HAVE A CASE IN WHICH THERE ARE ISSUES THAT THEY EITHER WANT SOME CONSULTATION ON.  AND THEN WITHIN THE SERVICES, WITHIN THE MILITARY, I HAVE WORKED PRIMARILY WITH THE ARMY AND AIR FORCE, BOTH CONSULTING ON CASES AND ALSO TESTIFYING IN COURT MARTIALS.

Q.     SO YOU HAVE TESTIFIED.  YOU HAVE ACTUALLY TESTIFIED FOR THE PROSECUTION IN CRIMINAL CASES?

A.    YES.

Q.    NOW, HAVE YOU BEEN INVOLVED IN CAPITAL CASES OVER THE YEARS?

A.    YES.

Q.    AND ROUGHLY HOW MANY CAPITAL CASES HAVE YOU BEEN CONSULTED ON?

A.    OVER A HUNDRED.

Q.    OVER A HUNDRED.  ALL RIGHT.

        HAVE YOU WORKED FOR THE DEFENSE IN CAPITAL CASES?

A.    YES.

Q.    HOW ABOUT THE PROSECUTION?

A.    YES.

Q.    WHEN WAS THE LAST TIME YOU WORKED FOR THE PROSECUTION IN A CAPITAL CASE?

A.    THIS WINTER, I THINK IT WAS FEBRUARY.

Q.    FEBRUARY.  AND WHERE WAS THAT?

A.    IN HOUSTON, TEXAS.

Q.    HOUSTON, TEXAS.  ALL RIGHT.

        YOU ARE ALSO INVOLVED WITH THE BRISTLECONE PROJECT, IS THAT CORRECT?

A.    YES.

Q.    COULD YOU TELL US ABOUT THAT?

A.    THE BRISTLECONE PROJECT IS -- IT'S A PUBLIC AWARENESS PROJECT.  MAINLY WE INTERVIEW MEN WHO HAVE

BEEN SEXUALLY ABUSED AS CHILDREN AND DO THEIR PORTRAITS AND ALSO VIDEOTAPE THESE INTERVIEWS.  WE HAVE A GALLERY, A GROWING GALLERY OF THESE INTERVIEWS AND PORTRAITS ON A WEBSITE.  WE ALSO DO PUBLIC EXHIBITIONS.  AND THE PURPOSE IS TO TRY TO DESTIGMATIZE SEXUAL ABUSE, ESPECIALLY AS IT APPLIES TO MEN, SO THAT MORE MEN WOULD BE WILLING TO COME FORWARD, SEEK HELP.  THAT IS THE MAIN PURPOSE OF IT.

Q.    NOW YOU RECENTLY WERE DOING SOME FILMING.  WAS THAT FOR THE BRISTLECONE PROJECT?

A.    YES.

Q.    WHAT WAS THAT ABOUT?  YOU WERE JUST DOWN IN MARYLAND DOING SOME FILMING, CORRECT?

A.    YES.  I VISIT MEN ALL OVER THE COUNTRY.  I -- ACTUALLY AROUND THE WORLD NOW DOING THESE INTERVIEWS AND FILMING THEM.

Q.    NOW, HAVE YOU EVER BEEN -- HOW MANY TIMES HAVE YOU TESTIFIED IN THE STATE OR FEDERAL COURT AS AN EXPERT IN CLINICAL PSYCHOLOGY, TRAUMA AND THE IMPACT OF CHILDHOOD SEXUAL ABUSE AND VIOLENCE?

A.    WELL, IF YOU INCLUDE BOTH WRITTEN AND LIVE ORAL TESTIMONY, I WOULD SAY IT'S AT LEAST 60 TIMES, MAYBE EVEN MORE THAN THAT.

Q.    HAS A COURT EVER REFUSED TO QUALIFY YOU?

A.    NO.

MR. MORENO:  YOUR HONOR, I WOULD MOVE FOR THE ADMISSION OF DR. LISAK AS AN EXPERT IN CLINICAL PSYCHOLOGY, TRAUMA AND THE IMPACT OF SEXUAL ABUSE.

MS. HAINES:  NO OBJECTION.

THE COURT:  ONE MORE TIME.

CLINICAL --

MR. MORENO:  PSYCHOLOGY, TRAUMA.

THE COURT:  PSYCHOLOGY, TRAUMA.

MR. MORENO:  AND THE IMPACT OF SEXUAL ABUSE.

THE COURT:  IF THERE IS NO OBJECTION, DR. LISAK WILL BE FOUND SO QUALIFIED.

I JUST HAVE ONE QUESTION.  I THOUGHT YOU SAID YOU ARE BASED OUT OF -- NEAR ALBUQUERQUE, NEW MEXICO?

THE WITNESS:  YES, THAT'S CORRECT.

THE COURT:  ON YOUR CV YOU HAVE A FRAMINGHAM, MASSACHUSETTS ADDRESS.

THE WITNESS:  I THINK IT'S A SOMEWHAT OLD CV.  I MOVED ABOUT NINE MONTHS AGO.

DIRECT EXAMINATION

BY MR. MORENO:

Q.    DID YOU PREPARE A REPORT IN THIS CASE, DR. LISAK?

A.    YES, I DID.

MR. MORENO:  YOUR HONOR, MAY I APPROACH THE WITNESS?

THE COURT:  YES.

BY MR. MORENO:

Q.   DOCTOR, I'M SHOWING YOU WHAT HAS BEEN MARKED AS DEFENDANT'S EXHIBIT 501.  DO YOU RECOGNIZE THAT DOCUMENT?

A.   YES, I DO.

Q.   CAN YOU TELL US BRIEFLY WHAT IT IS?

A.   THIS IS A REPORT THAT I WROTE IN THIS CASE.

Q.   NOW THE RECORDS YOU REVIEWED, THEY ARE NOTED IN THIS REPORT, CORRECT, I BELIEVE STARTING ON PAGE 3?

A.   THAT'S CORRECT.

Q.   DID YOU ALSO HAVE AN OPPORTUNITY TO REVIEW ADDITIONAL MATERIALS PROVIDED TO YOU RECENTLY, MAINLY THE TESTIMONY OF RON MILLER?

A.   YES, I DID.

Q.   LOUISE LUCK?

A.   YES.

Q.   DR. NEIL BLUMBERG?

A.   YES.

Q.   BETTY PAYNE?

A.   YES.

Q.   KATHY NICHOLS?

A.   YES.

Q.      SCOTT BUTLER?

A.      YES.

Q.      AND MARTIN HAMMER?

A.      YES.

Q.      NOW PRIOR TO PREPARING YOUR REPORT, DID YOU HAVE AN OPPORTUNITY TO INTERVIEW ANYONE OTHER THAN DAVID CONCERNING THIS CASE?

A.      YES, I DID.  I INTERVIEWED HIS BROTHER MARTIN AND HIS SISTER DIANE.

Q.      WHERE DID YOU INTERVIEW THEM?

A.      IN THEIR HOMES IN OKLAHOMA.

Q.      AND DO YOU RECALL WHEN THAT WAS?

A.      IT WAS IN OCTOBER -- I THINK IT WAS OCTOBER 9TH, OCTOBER 9TH, 2013.

Q.      ARE THESE THE TYPE OF MATERIALS THAT YOU TYPICALLY RELY UPON WHEN EVALUATING A CASE SUCH AS THIS?

A.      YES, THEY ARE.

Q.      NOW BEFORE WE MOVE ON TO THE DETAILS OF YOUR EVALUATION OF DAVID, I'D LIKE TO JUST TELL THE JUDGE WHETHER OR NOT YOU'VE REACHED AN OPINION TO A REASONABLE DEGREE OF PSYCHOLOGICAL CERTAINTY CONCERNING WHETHER OR NOT DAVID HAMMER IS THE VICTIM OF PROFOUND CHILDHOOD SEXUAL ABUSE AND RAPE?

A.      YES, I HAVE.

Q.      AND WHAT IS THAT OPINION?

A.      THAT HE DID SUFFER SEVERE CHILDHOOD SEXUAL ABUSE.

Q.      HAVE YOU REACHED AN OPINION TO A REASONABLE DEGREE OF PSYCHOLOGICAL CERTAINTY AS TO WHETHER OR NOT THE SEXUAL ABUSE AND RAPE THAT DAVID SUFFERED AT THE HANDS OF HIS PARENTS AND OTHERS LED TO OVERWHELMING TRAUMA AND LIFE-LONG CONSEQUENCES?

A.      YES, I DID.

Q.      WHAT IS THAT OPINION?

A.      THAT HE DID.

Q.      DOES THE TYPE OF PROFOUND ABUSE -- AND CORRECT ME IF THAT IS AN INCORRECT VERB FOR HIM -- ADJECTIVE, PROFOUND ABUSE IN THIS CASE, DOES THAT TYPE OF VIOLENCE LEAD TO IMPULSIVITY?

A.      WELL, IT CAN.  IN DAVID'S CASE HE SUFFERED NOT ONLY VERY SEVERE SEXUAL ABUSE, RAPES BY HIS OWN -- INFLICTED BY HIS OWN MOTHER, SEXUAL ABUSE BY HIS FATHER, PHYSICAL ABUSE FROM BOTH PARENTS, NEGLECT, SEXUAL ABUSE BY OTHER PERPETRATORS THROUGHOUT THE COURSE OF HIS CHILDHOOD AND EARLY ADOLESCENCE.  HE GREW UP IN A FAMILY THAT WAS SO PROFOUNDLY -- DYSFUNCTIONAL HARDLY CAPTURES IT, THAT -- IT IS ALL OF THAT COMBINED THAT TENDS TO LEAD TO THE KIND OF PROBLEMS WITH IMPULSIVITY THAT WE SEE IN DAVID, BUT ALSO IN OTHER INDIVIDUALS WHO HAVE SUFFERED THE SAME KINDS OF CHILDHOODS.

Q.    DOES THAT KIND OF BACKGROUND ALSO LEAD TO POTENTIALLY IMPAIRED JUDGMENT?

A.    CERTAINLY.

Q.    CAN THESE IMPAIRMENTS BE LIFE-LONG?

A.    YES, THEY CAN BE LIFE-LONG.  YOU KNOW, THE BRAIN IS FORTUNATELY A FAIRLY PLASTIC ORGAN AND CAN CHANGE WITH DIFFERENT EXPERIENCES AND NEW EXPERIENCES OVER TIME.  SO THAT IT JUST DEPENDS ON A CASE-BY-CASE BASIS AS TO WHETHER OR NOT THEY ARE ABSOLUTELY PERMANENT AND IMMUTABLE OR UNCHANGED OR WHETHER THEY CAN BE MITIGATED TO SOME DEGREE OVER TIME.

Q.    NOW IN YOUR EVALUATION OF DAVID, DO YOU HAVE AN OPINION AS TO WHETHER OR NOT THE CONSEQUENCES FROM THE ABUSE HE SUFFERED ARE STILL ONGOING?

A.    OH, YES.  THERE ARE MANY CONSEQUENCES THAT HE IS STILL SUFFERING.

Q.    CAN YOU TELL US A LITTLE ABOUT THAT?

A.    WELL, HE STILL -- EVEN DURING THE COURSE OF THE INTERVIEW THAT I DID, HE EXHIBITED ON A NUMBER OF OCCASIONS WHAT WERE CLEARLY POST-TRAUMATIC SYMPTOMS.  ON A NUMBER OF INSTANCES HE REALLY BEGAN TO RELIVE THE EXPERIENCES THAT HE WAS -- HE HAD BEGUN TO DESCRIBE.

SO AS MANY OTHER PEOPLE, EXPERTS WHO HAVE EVALUATED HIM HAVE NOTED, THERE ARE STILL PRETTY SEVERE SYMPTOMS PRESENT THAT DERIVE FROM THE TRAUMAS HE

EXPERIENCED.

Q.    NOW, WHEN LOOKING AT DAVID'S HISTORY, CAN YOU TELL US, BASED ON YOUR 25 YEARS OR SO OF EXPERIENCE IN THIS FIELD, WHERE HE FALLS ON THE CONTINUUM OF SCALE FOR TRAUMA?

A.    I THINK BY ANY MEASURE HE WOULD HAVE TO FALL IN THE VERY SEVERE END, SIMPLY BY VIRTUE OF THE FACT THAT BOTH OF HIS PARENTS BOTH SEXUALLY AND PHYSICALLY ABUSED HIM.

Q.    WHAT IN YOUR OPINION IS THE MOST DEVASTATING FORM OF TRAUMA THAT A CHILD CAN ENDURE?

A.    WELL, IN MY OPINION AND MY EXPERIENCE AND I THINK IN A LOT OF -- THE EXPERIENCE OF A LOT OF TRAUMA EXPERTS, MATERNAL INCEST IS THE MOST DEVASTATING FORM OF TRAUMA, SIMPLY BECAUSE FOR THE VAST MAJORITY OF CHILDREN THEIR PRIMARY ATTACHMENT IS TO THEIR MOTHERS.  AND WHEN THE PERSON WHO IS YOUR PRIMARY ATTACHMENT FIGURE IS ALSO THE PERSON WHO IS INFLICTING THIS KIND OF HARM ON YOU, IT CREATES AN ABSOLUTELY IRRESOLVABLE CONFLICT AND JUST TERRIBLE SUFFERING IN A CHILD.

Q.    NOW, THAT IS THE MOM.  HIS FATHER ALSO ENGAGED IN SOME ABUSE WITH DAVID AS WELL, CORRECT?

A.    CORRECT, YES.

Q.    SO DOES HIS FATHER FORCING DAVID AND HIS SISTER DIANE WHEN THEY WERE STILL CHILDREN TO HAVE SEX WITH ONE

Q. ANOTHER WHILE HE WATCHED AND MASTURBATED, DOES THAT FALL UNDER THE SAME CATEGORY OF A DEVASTATING TRAUMA?

A. YES, AND IT'S KIND OF A DIFFERENT ORDER AND A DIFFERENT TWIST, ALMOST LITERALLY A TWIST, IN THAT TO FORCE A CHILD TO PARTICIPATE IN THAT KIND OF AN ACT, TO COMMIT AN ACT OF ESSENTIALLY SEXUAL ABUSE AGAINST HIS OWN SISTER, UNDER THE DIRECTION AND COMPULSION OF HIS FATHER, MAKES DAVID, MR. HAMMER, AN ACTOR IN THE ABUSE. AND FOR A CHILD -- YOU KNOW, CHILDREN WHO ARE SEXUALLY ABUSED INEVITABLY WRESTLE WITH AN INCREDIBLE AMOUNT OF SELF-BLAME. THEY BELIEVE THAT THEY ARE AT FAULT FOR WHATEVER HAPPENS TO THEM. THIS IS A PROCESS OF INTERNALIZATION THAT IS VERY, VERY COMMON. IT'S ALMOST UNIVERSAL FOR CHILDREN. BUT ON TOP OF THAT, WHEN A CHILD IS ACTUALLY MADE TO PERPETRATE THIS KIND OF AN ACT, IT JUST CREATES A REALLY UNTENABLE LEVEL OF GUILT AND COMPLICITY. AND DAVID CLEARLY SUFFERED THAT.

Q. WHAT ARE THE PSYCHOLOGICAL CONSEQUENCES OF THAT? WHAT DOES THAT TRANSFORM INTO? WHAT DOES IT LOOK LIKE IN SOMEBODY OR IN DAVID?

A. IT CAN VARY BUT, YOU KNOW, BASICALLY A CHILD LIKE DAVID WHO EXPERIENCES THESE KINDS OF ABUSES HE NOW -- HE IS -- HE ESSENTIALLY VIEWS HIMSELF AS THIS WORTHLESS ESSENTIALLY EVIL CHILD. FOR ONE THING, HE HAS BEEN TOLD REPEATEDLY BY HIS MOTHER WHEN HIS MOTHER WAS

RAPING HIM THAT HE IS EVIL AND THERE IS THE DEMON IN HIM THAT SHE HAS TO CLEANSE OUT, USING THIS PUMPED SCALDING WATER THAT SHE WAS DOING.  HE IS GETTING IT FROM ALL SIDES.  AND HAVING NOW ALSO BEEN FORCED TO BE COMPLICIT IN THIS BY HIS FATHER, IT JUST COMPLETELY CEMENTS THIS SELF IDENTITY THAT HE IS A WORTHLESS, EVIL PERSON.

Q.      AND THIS ALL HAPPENS BEFORE HE WAS 15, IS THAT CORRECT?

A.      OH, YES.

Q.      AND DO YOU RECALL HOW YOUNG HE WAS WHEN IT STARTED?

A.      WELL, THE SEXUAL ABUSE BY HIS MOTHER -- I BELIEVE HIS BEST RECOLLECTION WAS SORT OF THE GROOMING PROCESS WHEN THE INITIAL ABUSE STARTED -- I CAN'T REMEMBER WHETHER IT WAS 7, 8 OR 9 YEARS OLD.  I THINK IT WAS ACTUALLY 7.  THE SEXUAL ABUSE THAT HIS FATHER INFLICTED WAS LATER WHEN HE WAS, I THINK, 12, STARTED.

Q.      NOW, ONE OF THE QUESTIONS YOU MAY HEAR ON CROSS EXAMINATION CONCERNS THE RELIABILITY OF THE INFORMATION YOU HAVE REVIEWED AND THAT HAS INFORMED YOUR OPINION.  IS THAT A COMMON QUESTION YOU FACE IN THESE TYPE OF CASES?

A.      YES.

Q.      IS IT UNUSUAL -- YOU MIGHT VERY WELL BE QUESTIONED AS WELL THAT -- WHY DAVID DID NOT TELL ANYONE

AT THE TIME THAT THE SEXUAL ABUSE BY HIS PARENTS WAS ONGOING.  IS THAT AN UNUSUAL INQUIRY IN YOUR WORK?

A.        NO.  IT'S NOT UNUSUAL.  NO.

Q.        IS IT UNUSUAL THAT A PERSON DOES NOT REPORT SEXUAL ABUSE THAT IS ONGOING?

A.        NO.  QUITE THE OPPOSITE.  IT'S ACTUALLY COMMON, ALMOST TYPICAL FOR CHILDREN NOT TO REPORT SEXUAL ABUSE, ESPECIALLY BOYS.  IN FACT, THAT IS SO COMMON THAT IN THE WORK THAT I DO WITH SEXUAL PREDATORS I HAVE ENCOUNTERED -- NUMEROUS OCCASIONS PREDATORS WHO HAVE TOLD ME THAT THEY KNOW THAT MALE CHILDREN ARE SO MUCH LESS LIKELY TO DISCLOSE THAT THEY DELIBERATELY TARGET MALE CHILDREN, RATHER THAN FEMALE CHILDREN, SIMPLY TO REDUCE THEIR ODDS OF BEING CAUGHT OR BEING REPORTED.

Q.        AND HOW ABOUT WHEN THE SEXUAL ABUSE IS ON THE PART OF A PARENT?  IS IT UNUSUAL OR MORE UNUSUAL THAT A CHILD DOES NOT REPORT THAT WHILE IT'S ONGOING?

A.        WELL, DISCLOSURE IS EVEN LESS LIKELY FOR -- WELL, FOR OBVIOUS REASONS.  FOR ONE THING, WHO'S THE CHILD GOING TO DISCLOSE TO?  WHEN CHILDREN DO DISCLOSE, VERY OFTEN IF THAT HAPPENS IT'S TO THEIR PARENTS.  NOW, CLEARLY A CHILD WHO IS BEING SEXUALLY ABUSED BY BOTH HIS PARENTS IS NOT GOING TO BE DISCLOSING TO HIS PARENTS. AND IN FACT, IN THIS CASE, WHEN MARTIN, HIS BROTHER, WITNESSED THEIR FATHER RAPING DIANE, THE SISTER, AND

WENT TO HIS MOTHER, I CAN'T REMEMBER THE EXACT WORDS, THAT SHE OR HE REPORTS HER SAYING.  BUT BASICALLY SHE TOLD HIM THAT IT WAS NOT POSSIBLE OR HE WOULD NEVER DO THAT, SOMETHING TO THAT EXTENT.  SO CLEARLY DISCLOSING TO THEIR PARENTS WAS NOT AN OPTION.

THIS WAS SUCH A REALLY CATASTROPHICALLY DYSFUNCTIONAL FAMILY, NOT JUST THE IMMEDIATE FAMILY, BUT EXTENDED FAMILY IS SORT OF RIFE WITH MENTAL ILLNESS AND SUBSTANCE ABUSE AND SEXUAL ABUSE, AND THAT IS PART OF THE PROBLEM HERE.  THERE WAS VIRTUALLY NOBODY TO DISCLOSE TO, REALLY.  SO WHEN SEXUAL ABUSE IS AN INTERFAMILIAL ISSUE, AS IT WAS HERE, DISCLOSURE IS MUCH LESS LIKELY.

Q.    SO IT'S NOT UNUSUAL FOR SEXUAL ABUSE TO GO UNREPORTED FOR A LONG TIME?

A.    OH, YES, DECADES, LIFETIME.

Q.    NOW, I SUSPECT YOU MIGHT ALSO BE QUESTIONED ABOUT WHY DAVID AND MAYBE EVEN HIS SIBLINGS OR OTHERS MIGHT HAVE TOLD NOT -- MIGHT NOT HAVE TOLD THE SAME STORY OF ABUSE IN EXACTLY THE SAME MANNER EACH TIME THEY TELL IT.  IS THAT A TYPE OF QUESTION YOU FREQUENTLY ADDRESS?

A.    OH, YES.

Q.    WHY IS THAT?  IS IT UNUSUAL OR SURPRISING THAT THEY MAY NOT TELL THE SAME STORY EACH TIME ABOUT THE

SAME EVENT?

A.      NO, IT'S NOT UNUSUAL.  IN FACT THE VERY NATURE OF THESE KINDS OF TRAUMATIC EXPERIENCES MEANS THAT THEY ARE EXTREMELY UNLIKELY TO BE RECOUNTED THE SAME WAY ANY TWO TIMES, LET ALONE THREE OR FOUR TIMES.  AND ONE OF THE REASONS FOR THAT IS, THE -- WHEN SOMEBODY IS TRAUMATIZED, THE TRAUMATIC EXPERIENCE ACTUALLY ALTERS THE BRAIN'S NEUROCHEMISTRY FAIRLY SIGNIFICANTLY.  AND VERY HIGH CONCENTRATIONS OF NOREPINEPHRINE AND DOPAMINE CIRCULATE IN THE BRAIN, AND NOW THOSE NEUROCHEMICALS REALLY IMPEDE THE FUNCTIONING OF THE HIPPOCAMPUS, WHICH IS THE PART OF THE BRAIN THAT IS RESPONSIBLE FOR CREATING WHAT WE THINK OF AS NORMAL MEMORY, SEQUENTIAL MEMORY, CONTEXTUAL MEMORY.  AND THAT IS THE KIND OF MEMORY THAT WE RELY ON TO ESSENTIALLY TELL A COHERENT STORY.  SO IF SOMEBODY SAYS TELL ME ABOUT YOUR WEDDING DAY, I CAN REMEMBER MY WEDDING DAY, AND I HAVE ALL THESE CONTEXTUAL MEMORIES AND SEQUENTIAL MEMORIES AND I CAN TELL IT IN DETAIL.  AND FROM TIME TO TIME I MIGHT LEAVE OUT A DETAIL HERE OR THERE, BUT YOU WILL HEAR PRETTY MUCH THE SAME ACCOUNT.

UNDER TRAUMATIC CIRCUMSTANCES WHEN THAT HIPPOCAMPUS IS NOT FUNCTIONING WELL, WHAT THE VICTIM OF A TRAUMA HAS REALLY ARE THESE VERY VIVID FRAGMENTED MEMORIES THAT ARE ACTUALLY MEDIATED BY THE AMYGDALA, A

DIFFERENT PART OF THE BRAIN. YOU HAVE A GREAT DEAL OF TROUBLE SORT OF KNITTING TOGETHER THOSE FRAGMENTS INTO ANY KIND OF COHERENT SORT OF MEMORY. SO FROM ONE ACCOUNT TO THE NEXT REALLY WHAT THEY ARE DOING IS, THEY ARE RECALLING THESE VIVID FRAGMENTS. AND IT'S ALMOST INVARIABLE THAT THEY ARE GOING TO RECALL THEM IN DIFFERENT SEQUENCE OR RECALL SOME OF THEM THE FIRST TIME AND NOT THE SECOND TIME OR VICE VERSA.

THAT IS A VERY, VERY COMMON -- IN FACT, IT'S THE ALMOST NORMAL WAY IN WHICH PEOPLE WHO ARE TRAUMATIZED RECOUNT THOSE EXPERIENCES.

Q.    NOW, YOU MAY BE ASKED TO RECONCILE CONFLICTS IN WHAT A WITNESS REPORTS VERSUS WHAT DAVID HAS REPORTED ABOUT THE SAME INCIDENT. IS THIS TOO A FREQUENT SUBJECT OF INQUIRY WHEN YOU TESTIFY?

A.    IT IS, ON OCCASION. OBVIOUSLY, TWO PEOPLE WHO ARE EXPERIENCING EVEN THE SAME EVENT FROM DIFFERENT PERSPECTIVES AND DIFFERENT LIFE EXPERIENCES ARE VERY LIKELY GOING TO RECOUNT THOSE EXPERIENCES DIFFERENTLY. THEY MAY EVEN BE FOCUSED IN PAYING ATTENTION TO DIFFERENT THINGS AND THEREFORE RECALL DIFFERENT ASPECTS OF THE SAME EVENT.

Q.    SO THAT IS NOT -- THAT IS NOT SURPRISING?

A.    NO.

Q.    NOW, HOW ABOUT THE FACT THAT SOMETIMES SEXUAL

ABUSE IS REVEALED PIECEMEAL OVER A LONG PERIOD OF TIME? IS THAT UNUSUAL?

A.    NO, THAT IS NOT UNUSUAL AT ALL.

Q.    NOW, WHEN YOU HAVE BEEN QUESTIONED ALONG THESE LINES IN PRIOR CASES, IS THE THEME BASICALLY THAT THE STORY OF ABUSE TOLD BY THE VICTIM IS NOT TRUE?

A.    TYPICALLY, WHEN I'M ENCOUNTERING THESE TYPES OF QUESTIONS, IT'S WHEN I'M TESTING FOR THE PROSECUTION, AND IT IS THE DEFENSE THAT IS CHALLENGING THE ACCURACY OR THE CREDIBILITY OF THE ACCOUNT OF THE VICTIM.

Q.    SO IN YOUR EXPERIENCE IT'S USUALLY THE GOVERNMENT -- IS IT USUALLY THE GOVERNMENT THAT CHALLENGES THE VERACITY AND CREDIBILITY OF A VICTIM OF CHILDHOOD SEXUAL ABUSE?

A.    NO, IT'S USUALLY THE DEFENSE THAT IS CHALLENGING IT.

Q.    NOW, IN YOUR ROLE AS A GOVERNMENT EXPERT, HAVE YOU EVER EVALUATED FACT PATTERNS REGARDING SEXUAL ABUSE THAT WERE NOT AS SEVERE AS DAVID'S AND NONETHELESS TESTIFIED FOR THE GOVERNMENT?

A.    YES.

Q.    IN THAT SAME ROLE HAVE YOU TESTIFIED ABOUT ABUSE AND TRAUMA SUFFERED BY A VICTIM WITH LESS CORROBORATION THAN YOU FOUND IN THIS CASE?

A.    YES.

Q.      IN YOUR OPINION, IS THE SEXUAL VIOLENCE INFLICTED UPON DAVID THROUGHOUT HIS CHILDHOOD ANY LESS CREDIBLE OR TRAUMATIC THAN THOSE CASES WHERE YOU'VE TESTIFIED AS A GOVERNMENT EXPERT IN SEXUAL ABUSE CASES?

A.      LESS TRAUMATIC?

Q.      YES.

A.      NO.

Q.      NOW, LET'S TALK FOR A FEW MINUTES ABOUT CORROBORATION.  IN A FORENSIC SETTING, WHAT IS THE IMPORT OF CORROBORATION?

A.      WELL, IN THE REALM OF SEXUAL VIOLENCE, WHICH IS WHAT WE ARE FOCUSED ON HERE, IT IS VERY TYPICAL FOR THE ACTS OF SEXUAL ABUSE OR SEXUAL ASSAULT TO OCCUR IN COMPLETE PRIVACY.  TYPICALLY THERE ARE ONLY TWO PEOPLE PRESENT, THE PERPETRATOR AND THE VICTIM.  AND SO THE ISSUE OF HOW DO YOU CORROBORATE THAT -- FOR EXAMPLE, IF THE VICTIM REPORTS THIS AND DESCRIBES IT IN A CERTAIN WAY, HOW DO YOU CORROBORATE THAT?  AND THAT IS ALWAYS A -- IN FACT, YOU KNOW, IF I HAD TO IDENTIFY THE CORE ISSUE IN THESE KINDS OF CASES, AT LEAST IN MY INVOLVEMENT IN THESE CASES, IT'S REALLY AROUND THAT.  SO YOU LOOK AS MUCH AS POSSIBLE FOR ANY KIND OF FACTOR THAT ESSENTIALLY WEIGHS ON ONE SIDE OR THE OTHER SIDE OF THE SCALES.  DOES IT TEND TO SUPPORT?  AND OFTEN YOU ARE LOOKING AT INDIRECT SUPPORT.  BECAUSE, AGAIN, THERE IS

NO VIDEOTAPE THAT YOU CAN LOOK TO TO ANSWER THE ULTIMATE QUESTION.  SO YOU ARE LOOKING FOR INDIRECT FACTS, DATA THAT EITHER SUPPORT ONE OR ANOTHER CONCLUSION.

Q.      AND HOW MANY OF THESE EVALUATIONS HAVE YOU DONE OVER THE YEARS?

A.      OH, MY.  WELL, THIS WOULD BE WHAT I'M DOING PRIMARILY IN THE DEATH PENALTY CASES THAT I'VE WORKED AND THE CAPITAL CASES.  IT'S ALSO ESSENTIALLY WHAT I'M DOING WHEN I'M WORKING WITH THE PROSECUTION ON SEXUAL ASSUALT CASES.  SO IT'S HUNDREDS.

Q.      IS THE TYPE OF CORROBORATION YOU FIND IN THESE CASES DIFFERENT BECAUSE OF THE NATURE AND HOW SUCH OFFENSES GO UNREPORTED?  THERE ARE OFTEN NOT RECORDS.

A.      WELL, YES, THAT IS THE CASE.  IT VARIES OBVIOUSLY CASE BY CASE.  SOMETIMES IN CASES LIKE THIS WHERE YOU ARE LOOKING AT SOMETHING HISTORICAL, SOMETIMES THERE ARE RECORDS THAT CAN BE LOOKED TO FOR SOME KIND OF INDIRECT CORROBORATION.  FOR EXAMPLE, HAS THE INDIVIDUAL REPORTED THE SEXUAL ABUSE AT SOME PREVIOUS TIME?  IN MORE CURRENT SEXUAL ASSAULT CASES THAT I WORK ON, GENERALLY SPEAKING THOSE KINDS OF RECORDS ARE NOT PRESENT OR RELEVANT.  SO YOU HAVE TO LOOK FOR OTHER KINDS OF CORROBORATION.

Q.      IN THIS CASE, HOW DID YOU GO ABOUT ASSESSING THE RELIABILITY AND CREDIBILITY OF WHAT DAVID TOLD YOU ABOUT

HIS HISTORY OF SEXUAL ABUSE AND WHAT OTHERS HAVE SAID AS WELL?

A.    WELL, YOU START WITH, OF COURSE, THE DISCLOSURE ITSELF, THE MANNER IN WHICH THE DISCLOSURE IS MADE.  YOU TRY TO ASSESS CAREFULLY THE GENUINENESS.  IF THE DISCLOSURE INCLUDES SORT OF EMOTIONAL RESPONSE, YOU TRY TO ASSESS, DOES THIS FIT WITH -- AT THIS POINT I HAVE BEEN DOING THIS FOR ALMOST 30 YEARS, I HAVE EVALUATED IN VARIOUS CONTEXTS HUNDREDS AND HUNDREDS OF MEN IN THESE CIRCUMSTANCES AND, YOU KNOW, IS WHAT I'M SEEING AND HEARING CONSISTENT WITH WHAT I HAVE SEEN AND HEARD IN OTHER CIRCUMSTANCES LIKE THIS?

AND, YOU KNOW, BEYOND THAT AND IN THIS CASE OF COURSE, MR. HAMMER HAD TWO SIBLINGS, A SISTER AND A BROTHER, DIANE AND MARTIN, AND I WAS ABLE TO INTERVIEW THEM.

Q.    THAT WAS MY NEXT QUESTION ACTUALLY.  SO GO AHEAD, WHAT DID YOU LEARN?

A.    WELL, WITH REGARD FOR EXAMPLE TO THE -- WELL, I WILL CALL IT RAPES BY ENEMA.  BOTH DIANE AND MARTIN ALSO DISCLOSED THAT THEIR MOTHER HAD DONE THIS TO THEM.  IN DIANE'S CASE SHE SAID THAT THEIR MOTHER HAD DONE THIS TO HER, BUT NOT WITH THE HOT SAUCE ASPECT OF IT, JUST WITH THE WATER, THE HOT WATER.

AND DIANE OF COURSE WAS ALSO -- WITH

REGARD TO THE SEXUAL ABUSE BY THE FATHER, DIANE DISCLOSED VERY OPENLY HOW THE FATHER HAD BEGUN RAPING HER WHEN SHE WAS 12, I THINK, UP UNTIL THE AGE OF 15, WHEN SHE LEFT THE HOUSE.  SHE ALSO DESCRIBED IN DETAIL HOW THE FATHER STARTED FORCING DAVID TO PARTICIPATE IN THIS.

SO BOTH SIBLINGS WERE ABLE TO PROVIDE SUBSTANTIAL CORROBORATION.  IN FACT, ALSO MARTIN WITNESSED -- WALKED INTO THE ROOM ON MORE THAN ONE OCCASION APPARENTLY WHEN THEIR FATHER WAS RAPING DIANE.

Q.      NOW, WHEN DIANE HAMMER TOLD YOU ABOUT THE ABUSE IN THIS CASE, THAT WOULD HAVE BEEN IN 2013, CORRECT?

A.      CORRECT.

MR. MORENO:  MAY I APPROACH THE WITNESS, YOUR HONOR?

THE COURT:  YES.

BY MR. MORENO:

Q.      DOCTOR, I'M SHOWING YOU WHAT HAS BEEN MARKED AS DEFENDANT'S EXHIBIT 502.  THESE ARE HANDWRITTEN NOTES FROM JILL MILLER.  HAVE YOU SEEN THESE BEFORE?

A.      YES, I HAVE.

Q.      AND DO YOU KNOW WHO JILL MILLER IS OR WAS IN THIS CASE?

A.      YES.

Q.      WHO WAS SHE?

A.      SHE WAS -- SHE WORKED AS A MITIGATION EXPERT AT THE TIME OF THE ORIGINAL TRIAL, MY RECOLLECTION.

Q.      AND TURNING TO PAGE 6 THERE, DO YOU SEE THE HIGHLIGHTED PORTION?  THE ONE WITH THE TAB.

A.      YES.

Q.      HAVING REVIEWED THESE NOTES, DO YOU RECALL THAT SHE REPORTED TO JILL MILLER ABOUT THE SEXUAL ABUSE BY HER FATHER AS WELL?

A.      YES.

Q.      COULD YOU READ THE HIGHLIGHTED PORTION OF THOSE NOTES FOR US, PLEASE.

A.      I CAME HOME FROM SCHOOL ONE DAY.  MY DAD, I THINK IT'S, WAS LAYING ON HIS BED WITH A PLAYBOY OR HUSTLER.  HE CALLED ME TO COME TO HIM.  I WENT IN AND HE TOLD ME IT WAS ALL RIGHT FOR A DAD -- LOOKS SOMETHING LIKE TEACH THIS OR DO THIS -- TO DO THIS.  HAD ME STROKE HIM, PLAYED WITH MY BREASTS, DAVID CAME IN BEHIND ME. DAD TOLD ME TO SHUT THE DOOR.  DAVID OPENED THE DOOR AND SAW ME.  AFTER THIS, DAVID DID HIS THING WITH ME.  DAD TOLD DAVID HOW TO GET -- I THINK IS GET ON TOP OF ME AND HOW TO PUT HIS PENIS IN ME.  HE TOLD DAVID IT WAS ALL RIGHT TO DO THIS.

Q.      IN TERMS OF CORROBORATION, THE FACT THAT DIANE WAS REPORTING THIS BACK AT LEAST AS EARLY AS 1996, '97, IS THAT A SIGNIFICANT PIECE OF INFORMATION AS FAR AS YOU

ARE CONCERNED?

A.      WELL, CERTAINLY THE NUMBER OF TIMES THAT YOU SEE CONSISTENT REPORTS AND THE SPAN OF YEARS OF THE CONSISTENT REPORTS ADDS TO THE CREDIBILITY OF THE CORROBORATION.

Q.      SO THIS WAS A SIGNIFICANT PIECE OF CORROBORATION IN PART?

A.      YES.

Q.      IN YOUR REVIEW OF THE MATERIALS IN THIS CASE, DID YOU REVIEW A FEW OF THE BRIEF COUNSELING SUMMARIES PREPARED BY DR. MITCHELL, WHO AT THE TIME OF THE MURDER WAS DAVID'S TREATING PSYCHOLOGIST AT THE UNITED STATES PENITENTIARY AT ALLENWOOD?

A.      YES, I DID.

           MR. MORENO:  YOUR HONOR, MAY I APPROACH THE WITNESS?

           THE COURT:  YES.

BY MR. MORENO:

Q.      DR. LISAK, I'M SHOWING YOU WHAT HAS BEEN MARKED AS DEFENDANT'S EXHIBIT 503.  THERE ARE TWO PAGES TO THAT.  THE FIRST IS A SUMMARY NOTE DATED AUGUST 31ST OF 1995.  COULD YOU READ THAT FOR US, PLEASE.

A.      SURE.

           SO THE AUTHOR IS JOHN R. MITCHELL, PSY.D., STAFF PSYCHOLOGIST.  IT'S A REPORT ON HAMMER,

DAVID.  THE DATE, AS YOU SAID, WAS AUGUST 31, 1995.  AND

IT'S BASICALLY A CONTACT NOTE.  SO HE HAS HAD A SESSION.

HE WRITES A NOTE AT THE CONCLUSION OF IT.

THE NOTE SAYS:  THE INMATE WAS SEEN IN

PSYCHOLOGY SERVICE ON THIS DATE.  STATED HE WAS ABLE TO

ABSTAIN FROM HEROIN USE THOUGH HE WAS TEMPTED.

UTILIZING INTERPERSONAL SUPPORT AND THINKING THROUGH THE

CONSEQUENCES WERE IDENTIFIED AS EFFECTIVE RELAPSE

PREVENTION STRATEGIES HE USED.  WE DISCUSSED HIS FAMILY

BACKGROUND, WHICH SEEMED TO BE CHARACTERIZED BY

INSTABILITY AND LACK OF WARMTH AND INTIMACY.  THE INMATE

ALLUDED TO ABUSE HE SUFFERED AS A CHILD.  AND WE

IDENTIFIED THIS AS AN IMPORTANT AREA TO DISCUSS NEXT

SESSION.  HE WILL BE SEEN NEXT WEEK.

Q.    IS IT IMPORTANT IN TERMS OF CORROBORATION THAT

THERE IS A DOCUMENT IN 1995 INDICATING THAT DAVID HAD

BEGUN TO ADDRESS ISSUES OF SEXUAL ABUSE WITH THE

THERAPIST?

A.    YES, IT IS.

Q.    LET'S TURN TO THE NEXT DOCUMENT ON THE SAME

EXHIBIT.  IT'S ANOTHER CONTACT FROM DR. MITCHELL.  IT'S

DATED SEPTEMBER 7TH OF 1995.  CAN YOU READ THAT FOR US,

PLEASE.

A.    YES.  AGAIN, IT'S THE SAME HEADERS AND THIS IS

BASICALLY A WEEK LATER.

THE INMATE WAS SEEN IN PSYCHOLOGY SERVICE ON THIS DATE.  WE DISCUSSED HIS EXPERIENCES AS A CHILD AND ADOLESCENT AND HOW HE WAS PHYSICALLY ABUSED THROUGH BEATINGS BY BOTH MOTHER AND FATHER.  HE THEN WENT ON TO REVEAL A MULTITUDE OF SEXUAL ENCOUNTERS HE HAD GROWING UP, SOME WITH FAMILY MEMBERS.  THOUGH THE INMATE STATED HE DOES NOT SEE HIMSELF AS A, QUOTE, VICTIM OF SEXUAL ABUSE, HE DOES EXPRESS SOME CONFLICTUAL FEELINGS ABOUT THOSE EXPERIENCES AND THE NEED TO, QUOTE, RESOLVE WHAT HAPPENED TO HIM.

SESSIONS SO FAR WITH HAMMER REVEAL THAT HE TENDS TO REPRESS A GOOD DEAL, TAKES PRIDE IN HIS RESILIENCY AND MAKES GREAT EFFORTS TO STAY IN CONTROL. HE MADE THE STATEMENT THAT, QUOTE, I WILL NEVER BE THE UNDERDOG.  WE WILL CONTINUE TO EXPLORE HOW HIS CHILDHOOD EXPERIENCES HAVE AFFECTED HIM AND COLOR WHO HE IS TODAY IN TERMS OF HEALTHY AND UNHEALTHY BEHAVIORS.

Q.      IS THAT ANOTHER PIECE OF CORROBORATION THAT IS USEFUL IN THE CONTEXT IN WHICH YOU DID YOUR EVALUATION?

A.      YES, YES.

Q.      IN THIS DAVID NOTES HE DOES NOT SEE HIMSELF AS A VICTIM AND HE EXPRESSES SOME CONFLICTUAL FEELINGS.  THAT SORT OF ALLUDES TO WHAT YOU WERE DISCUSSING EARLIER, IS IT NOT, ABOUT WHEN DAVID'S ABUSED BY HIS MOTHER, FOR INSTANCE, IT CREATES THIS AMBIVALENCE AND CONFLICTUAL

FEELINGS?

A.      YES, BOTH -- EVEN THE ALLUSION TO THE FACT THAT HE DOES NOT SEE HIMSELF A VICTIM IS A VERY, VERY COMMON THING, ESPECIALLY AMONG MEN AND ESPECIALLY EARLY ON IN THE DISCLOSURE PROCESS.  HE IS TRYING TO -- MY INTERPRETATION WOULD BE THAT HE IS TRYING TO STILL MAINTAIN CONTROL OF THINGS.  AND IT'S SORT OF A STEP TOWARDS DISCLOSURE.  SO I DON'T KNOW -- I MEAN, THIS IS NOT ENOUGH DETAIL HERE, BUT I SUSPECT THAT HE WAS ONLY TELLING DR. MITCHELL A PART OF WHAT ACTUALLY OCCURRED. IT'S EXACTLY HOW THIS TENDS TO HAPPEN WHEN PEOPLE DO START TO DISCLOSE.

Q.      AND THIS SUMMARY NOTE IS DATED IN 1995, CORRECT?

A.      CORRECT.

Q.      IS IT SIGNIFICANT TO YOU IN THIS FORENSIC SETTING THAT DAVID WAS REPORTING THE SEXUAL ABUSE THAT HE ULTIMATELY DISCLOSED TO YOU WELL BEFORE THE DEATH OF MR. MARTI?

A.      WELL, YES.  IT SERVES TO ANSWER THE CHALLENGE THAT, YOU KNOW, ISN'T IT POSSIBLE THAT HE IS MAKING THIS ALL UP IN SORT OF -- IN THE SERVICE OF HIS CASE, IN OTHER WORDS.  AND CLEARLY THERE WERE DISCLOSURES MADE, YOU KNOW, BEFORE THE HOMICIDE.  IN FACT, I BELIEVE IF I REMEMBER CORRECTLY HE HAD MADE HIS FIRST AT LEAST OBLIQUE ALLUSION TO SEXUAL ABUSE BACK WHEN HE WAS A

TEENAGER AT THE AGE OF 14, I THINK.

Q.       WHEN HE WENT TO THE HOSPITAL THAT ONE TIME?

A.       WHEN HE WAS -- YES.

Q.       WE WILL TALK ABOUT THAT.

NOW, DID YOU HAVE AN OPPORTUNITY ALSO TO REVIEW SOME TRANSCRIPT EXCERPTS FROM DR. MITCHELL FROM WHEN HE TESTIFIED AT TRIAL?

A.       YES.

Q.       AND FROM WHEN HE ALSO TESTIFIED AT THE 2255 HEARING A NUMBER OF YEARS AGO UP IN WILLIAMSPORT?

A.       YES.

Q.       DO YOU RECALL IF DR. MITCHELL REPORTED WHAT DAVID HAD TOLD HIM ABOUT -- SOME OF THE FACTS DAVID HAD TOLD HIM ABOUT THE PHYSICAL AND SEXUAL ABUSE?

A.       I REMEMBER SOME DETAILS.

Q.       WHAT DO YOU RECALL FROM THAT?  WHAT DID DAVID REPORT TO DR. MITCHELL IN 1995?

A.       I THINK HE ACTUALLY REPORTED SEPARATELY BOTH THE SEXUAL ABUSE BY HIS MOTHER AND HIS FATHER.  I WOULD HAVE TO SEE IT AGAIN --

Q.       I THINK IT WAS MOSTLY THE FATHER.

A.       THE FATHER?

Q.       YES.

DO YOU RECALL WHETHER OR NOT HE DISCUSSED, FOR INSTANCE, THE RAPE BY THE ENEMAS WITH

DR. MITCHELL?

A.      I DON'T RECALL.  I MAY BE LOOKING -- REMEMBERING THE WRONG PAGE.  SO I DON'T WANT TO -- I WOULD HAVE TO SEE IT IN FRONT OF ME AGAIN TO REMEMBER EXACTLY WHAT --

Q.      DO YOU RECALL THAT DR. MITCHELL TESTIFIED IN DETAIL ABOUT SOME OF THE FACTS THAT DAVID CONVEYED TO HIM ABOUT THE SEXUAL ABUSE HE SUFFERED?

A.      YES.

Q.      DO YOU HAVE A RECOLLECTION OF WHETHER OR NOT THOSE FACTS WERE SIMILAR TO THE FACTS THAT DAVID TOLD YOU?

A.      YES, THEY WERE SIMILAR.

Q.      IS THIS CONSISTENCY IN REPORTING A CORROBORATIVE FACTOR THAT YOU LOOK AT IN ASSESSING THE OVERALL CREDIBILITY OF THE ALLEGATIONS IN THIS CASE?

A.      CERTAINLY, YES.

Q.      DO YOU RECALL READING SOME TRANSCRIPT EXCERPTS FROM DR. MITCHELL AS WELL AS FROM DR. MATTHEWS?

A.      YES.

Q.      AND THEY WERE FROM THE 2255 HEARING?

A.      YES.

Q.      AND DO YOU KNOW WHO DR. MATTHEWS IS?

A.      YES, I DO.

Q.      HE IS A FORENSIC PSYCHOLOGIST -- PSYCHIATRIST?

A.      I DON'T REMEMBER WHETHER HE WAS A PSYCHIATRIST

OR A PSYCHOLOGIST BUT I'VE ENCOUNTERED HIM IN CASES OVER THE YEARS.

Q.      DO YOU KNOW WHO HE WORKS FOR?

A.      I BELIEVE HE WAS WORKING WITH PARK DIETZ AND ASSOCIATES.  I'M NOT SURE IF HE STILL IS.

Q.      THAT IS PRIMARILY AN ORGANIZATION THAT TESTIFIES FOR THE PROSECUTION?

A.      THAT IS THE CONTEXT THAT I HAVE ENCOUNTERED HIM IN.  I DON'T KNOW WHAT THEIR OVERALL PRACTICE IS.

Q.      NOW, DO YOU RECALL FROM THE TRANSCRIPT EXCERPTS YOU REVIEWED FROM DR. MITCHELL, AND I BELIEVE IT WAS WHEN HE TESTIFIED ON JULY 7TH OF 2005, WHETHER OR NOT HE DISCUSSED THE WAY DAVID DISPLAYED THE EMOTION HE DISPLAYED DURING HIS INTERVIEWS WITH DAVID?

A.      YES, I DO.

Q.      WHAT DO YOU RECALL FROM THAT?

A.      WELL, I REMEMBER HIM DESCRIBING IT AS -- HIS EXPERIENCE AND CLINICAL JUDGMENT WAS THAT THIS WAS A GENUINE DISCLOSURE AND THAT THE EMOTIONS THAT HE WAS WITNESSING IN DAVID WERE GENUINE.

Q.      IS THAT SIMILAR TO YOUR OBSERVATIONS WHEN DAVID WAS DISCUSSING THIS WITH YOU?

A.      YES.

Q.      DO YOU RECALL WHAT DR. MATTHEWS STATED ABOUT THAT SAME SUBJECT IN THE 2255 HEARING?

A.      PRETTY MUCH EXACTLY THE SAME THING, THAT HE ALSO VIEWED DAVID'S EMOTIONAL RESPONSE DURING THE EVALUATION AS BEING VERY GENUINE.

Q.      DO YOU RECALL IF DR. MITCHELL FOUND THAT DAVID WAS MALINGERING DURING THIS ASPECT OF HIS EVALUATION?

A.      HE CONCLUDED THAT HE WAS NOT MALINGERING.

Q.      HOW ABOUT DR. MATTHEWS?  DID HE THINK THAT DAVID WAS MALINGERING ABOUT THIS HISTORY THAT HE WAS TELLING HIM?

A.      NO.

Q.      IN THE CONTEXT OF EVALUATING THE CREDIBILITY AND RELIABILITY, WHAT IS THE IMPORT OF HAVING PRIOR EXPERTS, INCLUDING GOVERNMENT EXPERTS, WHO HAVE EVALUATED DAVID WHO MAKE THE SAME CONCLUSIONS YOU DO IN TERMS OF THE GENUINE EXPRESSION OF EMOTION IN THIS CASE?

A.      WELL, OBVIOUSLY, I THINK IT'S VERY IMPORTANT. IT'S ESSENTIALLY INTER-RATER RELIABILITY.  YOU HAVE MULTIPLE INDIVIDUALS WHO ARE TRAINED TO DO THESE KINDS OF ASSESSMENTS.  EVEN IN THIS CASE FROM, IF YOU WANT TO CALL IT THAT, OPPOSITE SIDES OF THE LEGAL BATTLE WHO ARE COMING TO THE SAME CONCLUSION.  AND THAT -- I FIND THAT QUITE IMPORTANT.

Q.      NOW, YOU MENTIONED THIS EARLIER, BUT YOU TALKED ABOUT AN OVERALL GENERAL CATASTROPHIC COLLAPSE OF THE BASIC FAMILY UNIT AND HOW THAT LEADS TO THE ABUSE WE SEE

IN THIS CASE.  CAN YOU ELABORATE ON THAT A LITTLE, PLEASE?

A.      WHEN SOMEBODY IS ABUSED IN THE MULTIPLE WAYS THAT MR. HAMMER WAS, SO HE WAS SEXUALLY ABUSED BY BOTH OF HIS PARENTS, HE WAS SEXUALLY ABUSED BY MANY OTHER PERPETRATORS OVER THE COURSE OF HIS CHILDHOOD, HE WAS PHYSICALLY ABUSED.  THAT ALMOST NEVER HAPPENS IN A FAMILY THAT IS IN ANY WAY INTACT AND FUNCTIONING.  IN HIS CASE, THERE WAS A TREMENDOUS AMOUNT OF NEGLECT THAT WENT ALONG WITH THE VERY ACT OF ABUSE.

SO WHEN HE WAS A LITTLE BIT OLDER AND HE WAS SEXUALLY ABUSED BY OTHER FAMILY MEMBERS OR NEIGHBORHOOD ESSENTIALLY PEDOPHILES, IT'S VERY CLEAR THAT HIS MOTHER ON AT LEAST ONE OR TWO OF THESE OCCASIONS WAS WELL AWARE OF THE ABUSE.  IN FACT, HE WAS BRINGING MONEY BACK FROM ONE OF THESE MEN WHO WAS PAYING HIM AND HE RECALLED HIS MOTHER SAYING TO HIM I KNOW WHAT YOU ARE DOING WITH THAT QUEER OR SOMETHING TO THAT EFFECT, INDICATING THAT SHE KNEW WHAT IS GOING ON.  THIS IS HER CHILD WHO IS BEING SEXUALLY ABUSED BY THIS MIDDLE-AGED MAN, AND THAT IS HER REACTION TO IT.  THAT IS A VERY TELLING INDICATION OF JUST HOW ABSENT THERE WAS ANY KIND OF PROTECTIVE PARENTING, ANY KIND OF NORMAL PARENTING IN THIS HOUSEHOLD.

THEN THE FACT THAT THERE WAS SO MUCH BOTH

MENTAL ILLNESS AND SUBSTANCE ABUSE AND SEXUAL ABUSE, NOT JUST WITHIN THE IMMEDIATE FAMILY BUT IN THE EXTENDED FAMILY, IT MEANT THERE WAS REALLY NOBODY FOR MR. HAMMER TO GO TO.  THERE WERE NO PROTECTIVE FACTORS.  THERE WERE NO ALTERNATIVES.  SO THAT IS WHAT I WAS REFERRING TO.  I MEANT -- I USED THAT TERM, THE SORT OF CATASTROPHIC COLLAPSE OF THE FAMILY.

Q.      NOW, ON PAGE 5 OF YOUR REPORT, YOU DISCUSS THE DIFFICULTIES THAT PROFESSIONALS AND OFTEN LAY PEOPLE HAVE ALIKE IN DISCUSSING THIS SUBJECT AREA.  AND I ASSUME YOU ARE TALKING ABOUT THE TERMINOLOGY THAT IS OFTEN USED --

A.      YES.

Q.      -- IN THESE CASES.  CAN YOU TELL US ABOUT THAT BRIEFLY?

A.      YES.  WELL, THIS IS ONE OF THE THINGS THAT I HAVE -- THAT I HAVE TO STRUGGLE WITH BECAUSE OF THE WORK I DO.  IN DEALING WITH CHILDHOOD ABUSE, ESPECIALLY CHILDHOOD SEXUAL ABUSE, THERE IS A TENDENCY AMONGST PROFESSIONALS TO USE EUPHEMISMS, TO USE TERMS LIKE SEXUAL ABUSE AND SO FORTH THAT REFER TO SOMETHING -- REFER TO THE BEHAVIOR, THE ACTS, THE EXPERIENCES, BUT WHICH AT THE SAME TIME PROTECT EVERYBODY FROM REALLY UNDERSTANDING THE IMPACT AND REALLY WHAT WE ARE TALKING ABOUT.

AND THIS IS SO PERVASIVE.  I THINK IT IS ACTUALLY IMPORTANT TO POINT OUT THAT WHEN IN THIS CASE, FOR EXAMPLE -- WELL, THERE WAS A VERY -- I THINK A VERY CLEAR EXAMPLE OF THIS IN THIS CASE.  WHEN I STARTED READING THE PRIOR TESTIMONY AND REPORTS FROM EXPERTS AND ACTUALLY EVEN EXPERTS WHO WERE HIRED BY MR. HAMMER'S ATTORNEYS, REFERRED TO WHAT HIS MOTHER DID TO HIM AS GIVING HIM ENEMAS.  WELL, IF ONE OF OUR SOLDIERS CAME BACK FROM HAVING BEEN A POW AND REPORTED THAT THE TALIBAN INSERTED A PIPE IN HIS RECTUM AND PUMPED GALLONS OF HOT WATER SPIKED WITH TABASCO SAUCE INTO HIM, WE WOULD NOT REFER TO IT AS AN ENEMA.  WE WOULD REFER TO IT AS TORTURE.  AND IN FACT THE GENEVA CONVENTION WOULD BACK THAT UP.  THE FACT THAT IT'S HIS MOTHER DOING IT TO HIM DOES NOT MAKE IT AN ENEMA, AND YET THAT IS HOW IT IS DESCRIBED.

I THINK WHAT THAT DOES IS, IT PROTECTS PEOPLE FROM ACTUALLY STOPPING TO THINK WHAT IT'S LIKE FOR SOME 9, 8, 10-YEAR OLD KID TO BE STANDING IN A BATH TUB, HAVING HIS OWN MOTHER SCREAMING AT HIM YOU FILTHY THIS, ALL THIS KIND OF SCREAMING AT HIM, WHILE SHOVING THIS IN HIS RECTUM AND PUMPING THIS SCALDING WATER LACED WITH WHATEVER IT WAS, SOME KIND OF HOT SAUCE, AND HIS INSIDES ARE FEELING LIKE THEY ARE GOING TO EXPLODE.  I'M SORRY TO INFLICT THIS ON THE COURT, BUT THAT IS WHAT

IT'S LIKE.  AND IF YOU ARE TRYING TO UNDERSTAND WHAT DOES THIS DO TO SOMEBODY?  WHAT DOES IT DO TO HIM AS A CHILD AND WHAT IT DOES TO THEM AS AN ADOLESCENT AND ADULT, YOU HAVE TO STOP FOR A MOMENT AND REALLY THINK ABOUT WHAT THAT EXPERIENCE IS LIKE.  AND WHAT I JUST DESCRIBED IS ONE INSTANCE AND THIS HAPPENED MULTIPLE TIMES AND IT WAS NOT THE ONLY KIND OF ABUSE, OBVIOUSLY.

Q.     IS THIS A FORM OF SEXUAL SADISM ON THE PART OF HIS MOTHER?

A.     WELL, TO FORMALLY DIAGNOSE THE MOTHER WITH SEXUAL SADISM, YOU'D HAVE TO DO AN ASSESSMENT AND FIND OUT WHETHER SHE WAS GETTING SEXUALLY AROUSED BY IT.  BUT IT'S -- IT'S KIND OF EVIDENCE OF IT.  IT CERTAINLY -- THAT WOULD BE THE NEXT STEP, TO FIND OUT WHETHER SHE WAS -- THIS WAS A FORM OF ACTUALLY GETTING SEXUALLY AROUSED BY DOING THIS.

Q.     AND IS THERE A HISTORY OF SEXUAL ABUSE IN HER FAMILIAL BACKGROUND?

A.     YES, THERE IS.  IN HER FAMILY -- FOR ONE THING HER BROTHER, RON, MR. HAMMER'S UNCLE, DISCLOSED TO ME THAT WHEN HE WAS A CHILD, I THINK NINE YEARS OLD OR SO, AND DEAN, WILMA WAS 16, JUST BEFORE SHE LEFT HOME, SHE SEXUALLY ABUSED RON.  HE ALSO BELIEVED THAT SHE HAD BEEN SEXUALLY ABUSED BY SOMEBODY IN THE FAMILY.  THERE WERE OTHERS -- THERE WAS AN UNCLE BUD WHO WAS SEXUALLY

ABUSING FAMILY MEMBERS.  SO THERE WAS CLEARLY -- THERE WAS SEXUAL ABUSE FAIRLY RIFE IN THIS FAMILY.

Q.    WHAT'S THE IMPORT OF THAT IN TERMS OF LOOKING AT THE OVERALL PICTURE OF DAVID AND WHAT HAPPENED TO HIM?

A.    WELL, AGAIN IT'S SORT OF TWO THINGS.  ONE IS, WHEN YOU HAVE SEXUAL ABUSE LIKE THIS SORT OF RAMPANT THROUGHOUT A FAMILY, ONE IS IT INCREASES THE LIKELIHOOD THERE ARE GOING TO BE MULTIPLE OFFENDERS, AND OF COURSE THAT WAS THE CASE FOR DAVID.  HE WAS SEXUALLY ABUSED NOT ONLY BY HIS MOTHER AND HIS FATHER, BUT BY TWO UNCLES.

THE OTHER THING IS THAT WHEN YOU HAVE THAT LEVEL OF SEXUAL ABUSE AND VIOLENCE GOING ON, AGAIN, THE OPPORTUNITY, WHO WOULD YOU EVER DISCLOSE TO IN THIS FAMILY?  IT ALMOST BECOMES SORT OF PREPOSTEROUS TO THINK THAT DAVID COULD HAVE DISCLOSED TO ANYBODY.

Q.    NOW, HOW LONG -- YOU MET WITH DAVID.  WHERE DID YOU MEET WITH HIM?  YOU MET HIM AT TERRE HAUTE, OBVIOUSLY?

A.    YES.

Q.    HOW LONG DID YOU MEET WITH HIM?

A.    IT WAS ABOUT FIVE HOURS, I THINK.

Q.    AND WHAT WERE THE CONDITIONS?

A.    WE WERE IN A PRIVATE ROOM, SEEMED SOUNDPROOF, AND HE SEEMED QUITE SORT OF RELAXED WITH THE SETTING.

Q.    AND WAS HE COOPERATIVE WITH YOU?

A.      YES.

Q.      WAS HE ABLE TO MAKE APPROPRIATE EYE CONTACT?

A.      YES.   THERE WERE TIMES WHEN HE BROKE OFF EYE CONTACT, ESPECIALLY WHEN HE WAS IN A LOT OF PAIN OR FEELING ASHAMED ABOUT SOMETHING, BUT MOSTLY HE HAD GOOD EYE CONTACT, YES.

Q.      AND DID HE APPEAR ENGAGED?

A.      YES.

Q.      NOW YOU HAD NEVER MET DAVID BEFORE?

A.      NO.

Q.      SO IN A SITUATION WHERE YOU ARE COMING IN TO DISCUSS THESE TERRIBLE THINGS THAT HAPPENED IN DAVID'S PAST, HOW DO YOU AS A COMPLETE STRANGER BEGIN TO BROACH THESE AREAS SUCCESSFULLY WITH DAVID?

A.      WELL, I DO THIS A LOT.  AND WHAT I HAVE LEARNED IS THAT THE ONLY WAY THAT YOU CAN SUCCESSFULLY GAIN THE TRUST OF SOMEBODY TO THE EXTENT THAT THEY WILL BE WILLING TO DISCLOSE THINGS THAT ARE BOTH EXTREMELY PAINFUL AND VERY OFTEN EXPERIENCED AS EXTREMELY SHAME -- SHAMEFUL AND HUMILIATING, IS YOU HAVE TO ENCOUNTER THEM AS A HUMAN BEING.  SO I'M HONEST.  AND I DO NOT TREAT HIM AS A PATIENT AND I'M THE DOCTOR, YOU ARE THE PATIENT.  I'M A HUMAN BEING AND I'M HERE TO LISTEN TO YOU.

Q.      NOW, YOU ALREADY TALKED ABOUT THE SEXUAL ABUSE,

THE HISTORY OF SEXUAL ABUSE IN DAVID'S -- WELL, LET ME BACKTRACK FOR A MINUTE.

YOU NOTED IN YOUR REPORT THAT OFTEN THE EXPERIENCE OF SEXUAL ABUSE OR THE RAPE THAT PEOPLE LIKE DAVID HAVE ENCOUNTERED CREATES IMPLICIT MEMORIES OR A PHYSICAL MEMORY.  CAN YOU TELL US WHAT THAT MEANS?

A.      YES.  WELL, WHEN I WAS TALKING EARLIER ABOUT THE TWO PARTS OF THE BRAIN, THE HIPPOCAMPUS VERSUS THE AMYGDALA, DIFFERENT KINDS OF MEMORIES THAT THEY ENCODE, THAT IS WHAT IT IS.  SO THE HIPPOCAMPUS IS RESPONSIBLE FOR WHAT IS USUALLY REFERRED TO AS EXPLICIT MEMORY. AGAIN, THAT IS THE SORT OF NORMAL KIND OF MEMORY THAT WE THINK OF.

IMPLICIT MEMORY IS MEDIATED BY THE AMYGDALA AND IT IS -- THESE ARE MAINLY FRAGMENTED AND SENSORY MEMORIES.  SO THEY CAN BE SMELLS, SIGHTS, SOUNDS.  SO, WE'VE GOT, OF COURSE, MANY RETURNING SOLDIERS NOW COMING BACK FROM IRAQ AND AFGHANISTAN WHO ARE VERY, VERY REACTIVE TO VERY SPECIFIC SMELLS OR VERY SPECIFIC SOUNDS AND THINGS LIKE THAT.

BUT THESE MEMORIES CAN ALSO BE LITERALLY PHYSICAL, BODY MEMORIES.  SO WHEN I DO AN EVALUATION OF A RAPE VICTIM, AN ADULT RAPE VICTIM, VERY OFTEN THERE WILL BE VERY, VERY SPECIFIC PARTS OF THEIR BODY WHERE IF SOMEBODY TOUCHES THEM IN A PART OF THEIR BODY WHERE THE

A RAPIST HAD HIS HAND, THEY WILL BE EXTREMELY REACTIVE. AND IT'S LITERALLY AS THOUGH THAT PART OF THE BODY HAS ENCODED A MEMORY. AND THAT'S EXACTLY WHAT IT IS, ACTUALLY. AT A BIOLOGICAL LEVEL, THAT IS EXACTLY WHAT IT IS. IT'S A MEMORY THAT'S ESSENTIA LY ENCODED IN THE BODY.

AND THERE WAS ONE INSTANCE IN THIS -- IN THE EVALUATION I DID OF MR. HAMMER WHERE WHEN WE WERE -- WHEN I WAS ASKING HIM QUESTIONS ABOUT THE RAPES INFLICTED BY HIS MOTHER WITH THAT TUBE, HE DESCRIBED -- I THINK HIS WORDS WERE, IT FELT LIKE HIS INSIDES WERE GOING TO BUST OR BURST, AND HE LITERALLY PHYSICALLY GRABBED HIMSELF LIKE THIS. AND THAT WAS ANOTHER EXAMPLE OF THAT. THERE IS NO QUESTION THAT HE WAS EXPERIENCING TO SOME EXTENT SOME OF THE SENSATIONS IN HIS INTESTINES OR IN HIS -- THAT WERE ESSENTIALLY ENCODED AT THE TIME HE WAS A CHILD AND BEING SUBJECTED TO THESE RAPES.

Q.   THAT IS A COMMON PHENOMENA IN THESE CASES?

A.   YES.

Q.   DID YOU NOTE IF THERE WAS A FAMILY HISTORY OF MENTAL ILLNESS IN DAVID'S FAMILY?

A.   YES, THERE WAS.

Q.   IS THAT IMPORTANT TO YOU IN LOOKING AT THE OVERALL PICTURE IN THIS CASE?

A.   YES. AGAIN, IN THE SENSE THAT IT FURTHER

DECREASES THE LIKELIHOOD THAT THERE ARE GOING TO BE ANY PROTECTIVE FACTORS, THAT THERE IS GOING TO BE SOMEBODY, SOME FAMILY MEMBER WHO CAN BUFFER OR MITIGATE THE ABUSE, BOTH THE PHYSICAL AND SEXUAL ABUSE, THAT THIS CHILD IS EXPERIENCING.

Q.      NOW, WE'VE HEARD A LOT OF TESTIMONY OVER THE PAST FEW WEEKS ABOUT BOTH THE SEXUAL AND PHYSICAL AND EMOTIONAL VIOLENCE DAVID ENDURED AS A CHILD.  BUT WHAT DID HE DESCRIBE TO YOU IN TERMS OF THE PHYSICAL ABUSE HE SUFFERED?

A.      HE DESCRIBED THE MAIN AND THE MOST VICIOUS PHYSICAL ABUSE BEING PERPETRATED BY HIS MOTHER.  HE DESCRIBED IT AS COMPLETELY UNPREDICTABLE.  SHE WOULD BEAT HIM WITH EXTENSION CORDS, THE BRISTLE SIDE OF BRUSHES.  THERE WAS A PADDLE -- I THINK THEY CALLED IT THE WIFE BEATER THAT WAS HANGING ON THE WALL, A WOODEN PADDLE THAT SHE WOULD USE.  HER HANDS, HER FISTS.  THE BEATINGS WOULD RESULT IN WELTS, SOMETIMES CUTS, BRUISES. AND BOTH MARTIN AND DIANE WITNESSED AND DESCRIBED TO ME WITNESSING THESE TYPES OF BEATINGS.

HE ALSO DESCRIBED HIS MOTHER'S FACE WHEN SHE WAS INFLICTING THIS, THESE BEATINGS AS BEING SORT OF THIS LOOK OF RAGE AND THEN THIS KIND OF -- LIKE SHE WAS EMPTY, LIKE SHE WAS GONE, WHICH IS SOMETHING THAT I HAVE ENCOUNTERED VERY FREQUENTLY IN DOING THESE KINDS OF

EVALUATIONS WHEN THERE'S VERY, VERY SEVERE PHYSICAL ABUSE AND ESPECIALLY WHEN IT'S -- THIS IS NOT A PARENT WHO IS GOING A LITTLE BIT OVERBOARD WITH DISCIPLINE. THIS IS SOMEBODY WHO'S COMPLETELY OUT OF CONTROL AND IS REALLY INFLICTING ON THE CHILD PHYSICAL DAMAGE TO GRATIFY THEIR OWN -- WHETHER IT'S ANGER OR FRUSTRATION.

Q.      AND YOU TOUCHED ON THE UNPREDICTABILITY OF THE VIOLENCE.  THAT CAN'T BE GOOD FOR A CHILD.  CAN YOU TELL US WHAT IS THE DAMAGE CAUSED BY THE UNPREDICTABILITY, NOT KNOWING WHAT IS GOING TO TRIGGER HIS MOM'S RAGE?

A.      WHEN A CHILD CAN'T PREDICT WHEN IT'S GOING TO HAPPEN, THEN THE CHILD IS IN A PERENNIAL STATE OF HYPERVIGILANCE.  SO THAT IS THE ONE THING THAT WE ALL TRY TO DO.  I WORKED WITH A LOT OF SOLDIERS, ESPECIALLY OVER THE LAST TEN YEARS.  ONE OF THE WAYS THEY SURVIVE THE INCREDIBLE STRESS OF COMBAT IS THEY TRY TO ISOLATE -- OKAY, THESE ARE THE MOMENTS, THESE ARE THE TIMES WHEN I HAVE TO BE HYPERALERT AND THIS IS WHAT I HAVE TO BE HYPERALERT FOR.

THE WORST THING IS UNPREDICTABILITY.  ONE OF THE WORST THINGS AND ONE OF THE REASONS THAT ENEMY UNITS WILL LAUNCH -- LOB MORTAR SHELLS IS BECAUSE YOU CAN'T PREDICT.  SO ALL OF A SUDDEN YOU GET ALMOST NO WARNING AND IT COULD BE ANYWHERE.  AND THAT IS WHAT HAPPENS TO A CHILD WHEN THE CHILD IS FACED WITH A PARENT

WHO IS PHYSICALLY ABUSIVE AND THERE IS NO WAY OF PREDICTING IT.  SO THE CHILD IS BASICALLY LEFT IN A STATE OF HYPERVIGILANCE ALL THE TIME.

Q.      NOW, DID YOU SEEK CORROBORATION -- OBVIOUSLY, YOU MENTIONED DIANE AND MARTIN CORROBORATED THIS VIOLENCE IN THE HOME.  IN YOUR REVIEW OF SOME OF THE TESTIMONY IN THIS CASE DID YOU SEE CORROBORATION FROM OTHER RELATIVES?

A.      YES.  THERE WAS -- IF I REMEMBER CORRECTLY, THERE WAS CORROBORATION FROM RON, FROM THE UNCLE, FROM THE MOTHER'S SISTER, BETTY PAYNE.  AND THEN I BELIEVE THERE WERE TWO OTHER INDIVIDUALS WHOSE NAMES ARE ESCAPING ME.

Q.      KATHY NICHOLS?

A.      KATHY NICHOLS, YES.

Q.      NOW, I WANT TO TALK FOR A MOMENT ABOUT THE MATERNAL SEXUAL ABUSE.  I KNOW WE TOUCHED ON IT.  BUT CAN YOU TELL US WHAT DAVID'S MOTHER DID TO HIM, WHAT SHE MADE HIM DO?

A.      WELL, I WILL LEAVE ASIDE FOR THIS DISCUSSION THE RAPES BY THE SO-CALLED ENEMAS.

Q.      YES.

A.      SO WHAT HE DESCRIBED IS A FAIRLY CLASSIC SEQUENCE OF GROOMING THAT BEGAN I BELIEVE -- AGAIN, I THINK IT WAS WHEN HE WAS 7 YEARS OLD, HIS BEST

RECOLLECTION, HIS MOTHER BEGAN CALLING HIM INTO THE BATHROOM WHEN SHE WAS IN THE BATHTUB, SO BE OBVIOUSLY NAKED, AND SHE WOULD HAVE HIM WASH HER, HER BODY.  SHE THEN JUST MOVED FROM THERE TO CALLING HIM INTO THE BEDROOM WHEN SHE WAS NAKED AND GETTING DRESSED.  AND SHE WOULD HAVE HIM FASTEN HER BRA, WHICH IS A WAY OF OBVIOUSLY DRAWING HIS ATTENTION AND DRAWING HIM INTO BASICALLY HER BREASTS.  THIS THEN MOVED TO HAVING HIM FONDLE HER BREASTS AND KISS HER BREASTS AND THEN KISS HER NIPPLES.  SHE THEN ON A NUMBER OF CASES WOULD GRAB HIS HEAD AND SHOVE HIS HEAD INTO HER BREASTS.  AND SHE THEN ESCALATED THIS TO BEGINNING TO FONDLE HIS PENIS WHILE HE WAS KISSING HER BREASTS.

IT THEN MOVED TO ANOTHER PHASE, AT LEAST IN HIS MEMORY, A SEPARATE PHASE.  I'M SORRY.

Q.     THAT'S OKAY.

A.     WHERE HE -- SHE WOULD HAVE HIM APPLY LOTION TO HER LEGS.  AND SHE WOULD BASICALLY TELL HIM, OKAY, NOW HIGHER, HIGHER.  AND THEN TOOK HIS HAND AND HAD HIM MASTURBATE HER VAGINA WITH THE LOTION.  SHE THEN HAD HIM INSERT HIS FINGERS INTO HER.  IT THEN WENT BEYOND THAT TO FORCING HIM TO LICK HER GENITALS, LICK HER VAGINA. AND SHE ALSO THEN ORALLY STIMULATED HIS PENIS.

MR. MORENO:  YOUR HONOR, CAN I ASK MR. HAMMER A QUESTION?

THE COURT:  YES.

MR. MORENO:  DAVID -- DAVID, DO YOU NEED A BREAK?  DO YOU WANT TO TAKE A BREAK?  WANT TO TAKE FIVE MINUTES?

THE DEFENDANT:  NO.  I'M ALL RIGHT.  GO AHEAD, PLEASE.

MR. MORENO:  THANK YOU, YOUR HONOR.

BY MR. MORENO:

Q.    AND HOW LONG DID THIS GO ON FOR, DO YOU KNOW?

A.    I BELIEVE ALSO THAT INITIAL GROOMING PROCESS STARTED AT AGE 7 AND I THINK SOMEWHERE AROUND AGE 11 MR. HAMMER REFUSED TO CONTINUE.  IN FACT, HE RECALLED THREATENING TO CALL THE POLICE.

Q.    NOW, DID HE TALK TO YOU ABOUT HOW HE EXPERIENCED THIS RAPE BY HIS MOTHER?

A.    YES.  HE DESCRIBED REALLY A LOT OF JUST CONFLICTED FEELINGS.  HE WAS, YOU KNOW, IN PART REPULSED BY IT.  HE IN FACT HAS TO THIS DAY A REVULSION OF PUBIC HAIR, WOMEN'S PUBIC HAIR BECAUSE OF THIS.  BUT SIMULTANEOUSLY, YOU KNOW, HE WAS DESPERATE FOR HIS MOTHER'S LOVE AND ATTENTION.  AND THIS WAS A WAY TO PLEASE HER, THIS WAS A WAY TO HAVE TIME WITH HER, THIS WAS A WAY TO HAVE HER ATTENTION, WHICH IS A CLASSIC RESPONSE OF A CHILD TO INCEST.

AND THIS IS WHY -- WE STARTED WITH THIS

AND YOU ASKED ME WHAT IS THE WORST KIND OF SEXUAL ABUSE. MATERNAL INCEST IS CONSIDERED BY JUST ABOUT EVERYBODY TO BE THE MOST ESSENTIALLY DIABOLICAL FORM OF ABUSE AND SEXUAL ABUSE BECAUSE OF EXACTLY THIS. THIS IS A CHILD'S MOTHER WHO HE HAS THE CLOSEST BOND. AND SHE IS -- THAT BOND IS A RESULT OF ESSENTIALLY A -- SHE IS HIS LINK TO LIFE AND SURVIVAL. THAT STARTS FROM -- OBVIOUSLY FROM INFANCY AND THE RESIDUE OF THAT IS STILL WITH THE CHILD WHEN THE CHILD IS 7, 8, 9 10, 12 AND OLDER. SO IN THE FACE OF THAT, THIS IS ALSO THE PERSON WHO IS DOING THESE HORRIFIC THINGS TO HIM. AND THAT RESULTS IN A CONFLICT THAT IS COMPLETELY IRRESOLVABLE.

Q.      DOES THAT CONFLICT LEAD TO THE DEVELOPMENT OF MENTAL ILLNESS?

A.      OH, YES. EVERYTHING FROM DEPRESSION, OF COURSE, AND POST-TRAUMATIC STRESS SYMPTOMS AND SO FORTH. BUT EVEN MORE SORT OF -- IF YOU WANT TO CALL IT FUNDAMENTAL. THIS REALLY COMPLETELY DESTABILIZES A CHILD AND DERAILS THEIR DEVELOPMENT. AND THIS IS WHAT LIES AT THE CORE OF SOME OF THE MOST SEVERE, WHAT ARE CALLED, PERSONALITY DISORDERS.

Q.      IN THIS CASE ARE YOU AWARE THAT DAVID HAS BEEN DIAGNOSED AS HAVING BORDERLINE PERSONALITY DISORDER?

A.      YES.

Q.      IS THIS THE KIND OF EXPERIENCE OR THE

EXPERIENCES THAT YOU HAVE BEEN DISCUSSING OVERALL, BUT THIS ONE ON TOP, THE TYPE OF FACTORS THAT LEAD TO THE DEVELOPMENT OF BORDERLINE PERSONALITY DISORDER?

A.      YES.  IN FACT THERE IS RESEARCH ASSOCIATING INCEST WITH BORDERLINE PERSONALITY DISORDER.

Q.      IN THIS CASE DAVID HAD IT TWICE?

A.      YES.

Q.      MOM AND DAD?

A.      YES.

Q.      NOW IN YOUR REPORT YOU NOTE THAT THIS CONFLICT WE HAVE BEEN DISCUSSING IS IN ALL LIKELIHOOD AT THE VERY CORE OF THE SEVERE PSYCHIATRIC DISTURBANCE THAT MR. HAMMER HAS MANIFESTED VIRTUALLY HIS ENTIRE LIFE. WHEN YOU SAY HE HAS MANIFESTED IT VIRTUALLY HIS ENTIRE LIFE, WHAT ARE YOU REFERRING TO?  WHAT DO YOU MEAN BY THAT?

A.      WELL, IN THE READINGS I DID AND IN HIS ACCOUNTS TO ME, THERE REALLY WAS -- THERE IS NO PERIOD OF HIS LIFE WHEN HE WAS NOT AFFLICTED WITH SYMPTOMS WITH -- HIS RESPONSE TO SYMPTOMS, SO SELF MEDICATION.  HE USED VARIOUS KINDS OF DRUGS, PRESCRIPTION PILLS THAT HE MOSTLY GOT FROM HIS MOTHER, BUT ALSO LATER ON IN HIS ADOLESCENCE PCP AND OTHER DRUGS.

AND IT ALSO SHAPED HIS BEHAVIOR, SOME OF HIS BEHAVIORS INTO ADOLESCENCE.  AFTER BEING SEXUALLY

ABUSED BY HIS PARENTS, OF COURSE HE WAS SEXUALLY ABUSED BY OTHER INDIVIDUALS, BY OTHER MEN.  WHEN HE LEFT HOME AT THE AGE OF -- WHEN HE FIRST RAN AWAY AT 13 AND THEN SEEMED TO HAVE RUN AWAY ALMOST PERMANENTLY AT THE AGE OF 14, HE WAS A 14-YEAR OLD KID ON HIS OWN WITH -- HE HAD NO RESOURCES, NO WAY OF SURVIVING.  THERE WERE TIMES WHEN HE WAS FORCED TO ESSENTIALLY ACCEPT BEING SEXUALLY ABUSED BY OLDER MEN IN EXCHANGE EITHER FOR MONEY OR FOOD OR A PLACE TO STAY, WHICH IS ANOTHER COMMON OUTCOME FOR KIDS WHO COME OUT OF THESE KINDS OF HOMES.

SO THIS REALLY -- IT SHAPED HIS DEVELOPMENT AS A CHILD AND RIGHT INTO ADOLESCENCE AND YOUNG ADULTHOOD.

Q.    NOW, THE CONTINUOUS NATURE OF THE RAPES THAT WENT ON BOTH BY HIS MOTHER AND THEN HIS FATHER FORCING HIM AND HIS SISTER INTO AN INCESTUOUS -- I DON'T WANT TO CALL IT RELATIONSHIP, INCESTUOUS ENCOUNTERS, DOES THAT EXACERBATE THE SEVERITY OF THE DEVELOPMENT OF, SAY, BORDERLINE PERSONALITY DISORDER OR SOME OF THE OTHER PERSONALITY DISORDERS THAT YOU ARE REFERRING TO?

A.    YES.  THERE IS -- THE DURATION OF TRAUMA DOES NOT NECESSARILY EQUATE TO SORT OF A ONE-IN-ONE RELATIONSHIP WITH SEVERITY OF OUTCOME.  BUT WHEN YOU HAVE TRAUMA THAT IS THIS SEVERE FOR THIS LONG, WELL, THAT IS ONE OF THE REASONS WHY WHEN YOU ASKED ME

ORIGINALLY WHERE DOES THIS FALL ON THE SPECTRUM, THIS

FALLS AT THE VERY, VERY SEVERE END OF THE SPECTRUM

BECAUSE OF THAT.

Q.      NOW YOU HAD MENTIONED EARLIER THE FACT THAT

DAVID HAD REPORTED A SEXUAL ABUSE WHEN HE WAS 14 AND

WENT TO THE EMERGENCY ROOM.  DO YOU RECALL THAT?

A.      YES.

Q.      DO YOU RECALL WHETHER OR NOT DAVID WAS

ACCOMPANIED BY A PARENT WHEN HE WENT TO THE EMERGENCY

ROOM THAT DAY?

A.      NO.  I BELIEVE HE WAS ALONE.

Q.      HAVE YOU SEEN ANY DOCUMENTATION CONCERNING WHAT

THE CLINICAL PSYCHOLOGIST WHO SAW DAVID THAT DAY

RECOMMENDED TO DAVID'S PARENTS?

A.      YES.  MY RECOLLECTION -- I'M PARAPHRASING, BUT

SHE CLEARLY WAS QUITE CONCERNED ABOUT HIM AND SAW HIM AS

SOMEBODY WHO WAS IN DIRE NEED OF HELP.  AND SHE --

WHETHER SHE WAS WRITING A LETTER OR A PHONE CALL, I

DON'T REMEMBER THE MEANS OF COMMUNICATION --

Q.      LETTER?

A.      -- LETTER.  SHE EXHORTED, PLEADED WITH THE

MOTHER TO BRING HIM IN.  IN FACT, I THINK I REMEMBER

THERE WAS A MENTION OF THE FACT THAT HE IS A MINOR AND

SO IT HAS TO BE A PARENT WHO BRINGS HIM.  WOULD YOU

PLEASE DO THAT.  SOMETHING TO THAT EFFECT.  AND OF

COURSE UNFORTUNATELY THERE WAS NO FOLLOWUP.  THERE WAS NO RESPONSE.

Q.    IS THAT EMBLEMATIC OF THE SORT OF CATASTROPHIC FAILURE OF THE FAMILY THAT YOU WERE ALLUDING TO EARLIER?

A.    YES, EXACTLY.

Q.    NOW, WERE THERE OTHER PEOPLE WHO RAPED OR COMMITTED ACTS OF SEXUAL VIOLENCE AGAINST DAVID?  I KNOW YOU HAVE ALLUDED TO SOME.  BUT CAN YOU TELL US WHAT ELSE DAVID TOLD YOU ABOUT THAT, PLEASE.

A.    HE DESCRIBED BEING SEXUALLY ABUSED BY HIS UNCLE RON.  I BELIEVE THAT IS WHEN HE WAS 5 YEARS OLD, OR AT LEAST STARTED WHEN HE WAS 5 YEARS OLD.  THERE WAS SOME FONDLING OCCURRED DURING THE CAR RIDE AND WHEN HE VISITED -- I CAN'T REMEMBER WHERE THEY WERE VISITING, BUT HE HAD TO SLEEP IN THE SAME BED WITH HIS UNCLE.  AND HE DESCRIBED HIS UNCLE ESSENTIALLY RUBBING HIS PENIS BETWEEN HIS BUTTOCKS AND THEN EJACULATING.  AND MR. HAMMER WAS, AS HE SAID, ABOUT 5 YEARS OLD AND OF COURSE HAD NO IDEA WHAT HAD JUST HAPPENED.  SO HE REMEMBERS ASKS HIS UNCLE, YOU KNOW, SOMETHING LIKE WHY DID YOU JUST PEE ON ME OR SOMETHING LIKE THAT.  THAT WAS ONE INSTANCE OR ONE PERPETRATOR ADDITIONALLY.

Q.    I WANT TO TALK A LITTLE BIT ABOUT THAT ONE FOR A MOMENT AND THEN WE WILL ADDRESS SOME OF THE OTHER INSTANCES DAVID TOLD YOU ABOUT.  ARE YOU AWARE THAT

DURING THESE PROCEEDINGS DAVID'S UNCLE RON DENIED THAT HE HAD SEXUALLY ABUSED DAVID?

A.    YES.

Q.    IS IT UNCOMMON FOR SOMEONE EVEN WITH THAT KIND OF FAMILY HISTORY OF SEXUAL ABUSE -- HE WAS SEXUALLY ABUSED HIMSELF, I THINK YOU SAID EARLIER --

A.    YES.

Q.    -- TO DENY THAT THEY SEXUALLY ABUSED SOMEONE?

A.    NO, IT'S NOT UNCOMMON.

Q.    YOU HAD AN OPPORTUNITY TO LOOK AT RON'S TESTIMONY DURING THESE PROCEEDINGS?

A.    YES.

Q.    NOW, DURING THESE PROCEEDINGS RON TESTIFIED ABOUT AN INSTANCE OF SEXUAL ABUSE THAT HE ENDURED AT THE HANDS OF HIS BROTHER GLENN, GLENNIS I THINK THEY CALLED HIM.  AND ON THAT DATE, THAT WAS JUNE 10TH OF 2014, ON PAGES 192 TO 193 RON RECOUNTED THIS AND I'M GOING TO READ THE QUOTE:  WHAT HE WOULD DO -- HE IS TALKING ABOUT GLENN -- HE WOULD JUST HAVE ME -- HE WOULD GET AN ERECTION AND HAVE ME TOUCH HIM AND THEN I WOULD TURN OVER AND HE WOULD PLACE HIS PENIS BETWEEN MY LEGS AND THEN HE WOULD EJACULATE.  IT WAS KIND OF DISGUSTING TO ME BECAUSE IT WAS ALL WET.

DOES THAT SOUND A LOT LIKE WHAT DAVID DESCRIBED HIS UNCLE DID TO HIM?

A.      YES, IT DOES.

Q.      BASED ON YOUR EXTENSIVE EXPERIENCE IN EVALUATING THESE TYPE OF INSTANCES AND EVALUATING BOTH VICTIMS AND PERPETRATORS, DO THE SIMILARITIES BETWEEN WHAT RON SAID HIS BROTHER DID TO HIM AND WHAT DAVID SAYS RON DID TO HIM, LEND CREDENCE ONE WAY OR ANOTHER TO WHAT -- DAVID'S STORY?

A.      WELL, YOU KNOW, OBVIOUSLY, THERE IS NO WAY TO EVER BE POSITIVE ABOUT THIS.  BUT YES, IT'S SUGGESTIVE BECAUSE ONE OF THE THINGS WE KNOW IS THAT THERE IS A TENDENCY FOR INDIVIDUALS WHO HAVE BEEN SEXUALLY ABUSED IF THEY PERPETRATE SEXUAL ABUSE THEMSELVES AGAINST OTHERS, THERE IS A TENDENCY VERY OFTEN FOR THEM TO REENACT WHAT WAS DONE TO THEM ON THEIR VICTIMS.  SO THE FAIRLY DRAMATIC SIMILARITY BETWEEN THESE TWO INCIDENTS IS SUGGESTIVE OF THAT.  AND THAT WOULD SORT OF -- AGAIN, IF YOU WERE PUTTING EVIDENCE ON A SCALE, THAT WOULD GO ON THE SIDE OF THAT WOULD LEND CREDENCE TO MR. HAMMER'S RECOLLECTION.

Q.      NOW, YOU HAD TALKED EARLIER ABOUT HOW SOMETIMES WHEN SOMEONE IS VICTIMIZED, THEIR MEMORY OF THE EVENT CAN BE FRAGMENTED.  DOES THE SAME THING HAPPEN WHEN SOMEONE IS THE VICTIMIZER?

A.      IT CAN BE.  IT CAN BE.  SOMETIMES INDIVIDUALS WHO ARE PERPETRATING SEXUAL ABUSE, ESPECIALLY, AGAIN, IF

IT IS AN REENACTMENT OF THEIR OWN VICTIMIZATION, THEY CAN VERY OFTEN BE IN A VERY FRACTURED STATE THEMSELVES. IN FACT, WHEN I INTERVIEWED RON, HE DENIED SEXUALLY ABUSING MR. HAMMER, BUT HIS DENIAL WAS -- I'M NOT SURE WHAT THE RIGHT WORD IS -- IT'S A LITTLE BIT EQUIVOCAL. HE DID NOT SAY I NEVER DID THAT, I WOULD NEVER DO THAT. HE SAID I DON'T RECALL THAT HAPPENING, WHICH IS A FAIRLY MILD DENIAL OF OBVIOUSLY A VERY SERIOUS ALLEGATION.

Q.      IN YOUR EXPERIENCE PEOPLE DENY -- THEY DENY IT MUCH MORE VEHEMENTLY AND UNEQUIVOCALLY?

A.      YES.  AGAIN, BY ITSELF, IT'S NOT SORT OF DETERMINATIVE, BUT IT'S ANOTHER FACTOR.

Q.      NOW, YOU TALKED ABOUT YOUR INTERVIEWS WITH DAVID -- EXCUSE ME, WITH MARTIN AND DIANE.  AND IN YOUR OPINION, AS A RESULT OF THEIR CHILDHOOD DID THEY SUFFER LONG-TERM CONSEQUENCES?

A.      OH, YES.

Q.      CAN YOU TELL US A LITTLE ABOUT WHAT YOU LEARNED ABOUT THAT?

A.      WELL, DIANE DESCRIBED SUFFERING FROM DEPRESSIONS FOR MOST OF HER LIFE.  ALSO REAL DIFFICULTY IN INTIMATE RELATIONSHIPS, REAL DIFFICULTY IN HAVING A SEXUAL RELATIONSHIP WITH SOMEBODY BECAUSE OF WHAT HER FATHER DID TO HER.  SHE HAS LIVED -- I GUESS MAYBE A FAIR WAY OF CHARACTERIZING IT IS A FAIRLY MARGINAL LIFE.  SHE IS

CLEARLY A VERY FRAGILE INDIVIDUAL.

AND MARTIN, THE SAME.  MARTIN -- WELL HAS BEEN AND IS ON DISABILITY FOR -- ON A PSYCHIATRIC DISABILITY.  HE STRUGGLED WITH SUBSTANCE ABUSE PROBLEMS. HE IS BEING TREATED.  HE IS ON PSYCHIATRIC MEDICATIONS FOR MOOD DISORDER.  SO BOTH OF THEM ARE REALLY STRIKINGLY FRAGILE PEOPLE.

Q.      NOW, THE ABUSE YOU HAVE TALKED ABOUT THAT DAVID ENDURED, YOU KNOW, THIS SEEMS LIKE A SILLY QUESTION PERHAPS, BUT HOW DOES -- IT IMPACTS SELF-ESTEEM, CORRECT?

A.      OH, YES.

Q.      WHAT IS THE IMPORT OF THAT, HAVING YOUR SELF-ESTEEM DESTROYED AT SUCH A YOUNG AGE?

A.      WELL, CHILDREN INTERNALIZE WHAT -- HOW THEY ARE TREATED ESSENTIALLY BY THEIR PARENTS OR THEIR CARETAKERS.  WHAT THAT MEANS IS WHEN A CHILD IS ABUSED, THEY DON'T SEE -- THERE IS THAT PERSON AND THEY ARE DOING THIS TO ME.  I'M OKAY, BUT THAT PERSON IS WRONG TO DO THIS, ESPECIALLY WHEN IT IS A PARENT.  THE CHILD REALLY INTERNALIZES -- BASICALLY IT MEANS, IF I'M BEING TREATED BADLY, IT'S BECAUSE I'M BAD.  AND THIS FEELING OF BEING BAD REALLY IS LIKE LITERALLY MARROW DEEP.

SO WHEN YOU TREAT INDIVIDUALS WHO HAVE A HISTORY OF THIS, OF THIS KIND OF CHILD ABUSE, YOU CAN

TREAT ALL KINDS OF SYMPTOMS, YOU CAN TREAT ALL KINDS OF SORT OF IMPACT ON THEIR WELL-BEING AND HOW THEY FUNCTION.  THIS IS THE THING THAT WILL BE THE HARDEST TYPICALLY TO GET TO AND TO -- I DON'T EVEN WANT TO USE THE WORD ERADICATE BECAUSE YOU NEVER DO.  IT IS SO DEEP IN THE BONE MARROW THAT PEOPLE, YOU KNOW, IN MIDDLE AGE AND BEYOND WHO HAVE HAD A LOT OF TREATMENT AND HAVE REALLY OVERCOME BASICALLY IN EVERY WAY YOU CAN IMAGINE, ARE STILL STRUGGLING AT TIMES WITH THIS SENSE THAT THEY ARE LESS THAN, THAT THEY ARE INFERIOR, THAT THEY ARE NO GOOD, THAT THEY ARE BAD.  BECAUSE THAT'S WHAT INTERNALIZATION MEANS.  IT GOES SO DEEP INTO THE CHILD.

AND THAT IS -- OBVIOUSLY, WHEN YOU HAVE SOMEBODY WHO HAS EXPERIENCED THAT AND HAS NO TREATMENT, NO KIND OF BUFFER, NO KIND OF REMEDIATION OF THAT, THAT IS GOING TO HAVE AN ENORMOUS IMPACT ON HOW THEY FUNCTION, WHAT THEY ARE CAPABLE OF MANAGING AND ACCOMPLISHING IN LIFE.

Q.      AND DOES IT ALSO IMPACT THEIR ABILITY TO NOT ONLY FUNCTION IN LIFE BUT TO DEAL EFFECTIVELY WITH THE STRESSES AND PRESSURES OF LIFE?

A.      ABSOLUTELY.  IN FACT, THERE THERE ARE MANY OTHER FACTORS THAT IMPINGE ON THEIR ABILITY TO RESPOND TO STRESS.  SO, I DON'T WANT TO GET TOO DEEP IN THE WOODS HERE, BUT ONE OF THE THINGS THAT HAPPENS TO A KID WHO IS

EXPERIENCING CHRONIC TRAUMA LIKE DAVID DID IS ESSENTIALLY THEIR NERVOUS SYSTEM BECOMES DYSREGULATED. AND WHAT HAPPENS IS THEY ARE SO CONSTANTLY ON EDGE, WAITING FOR THE NEXT BLOW, WAITING FOR THE NEXT EPISODE OF BEING RAPED OR ABUSED THAT THEY ARE -- THEIR BODY LOSES ITS CAPACITY, THE BRAIN ACTUALLY LOSES THE CAPACITY TO SHUT DOWN THAT ADRENALINE RESPONSE.  AND SO WHAT THAT EFFECTIVELY MEANS IS, LATER IN LIFE, LET'S SAY THEY ARE IN A CLASSROOM, THEY ARE NOW -- IT'S SCHOOL, AND THERE IS A DISRUPTION IN THE CLASSROOM.  AND EVERYBODY GETS EXCITED.  ALL THE KIDS GET A LITTLE EXCITED FOR A MOMENT.  THE CHILD WHO IS DYSREGULATED GETS EXCITED, BUT THEN THEY CAN'T COME DOWN TO BASELINE. SO WHEN THE REST OF THE CLASS IS NOW BACK PAYING ATTENTION TO THE TEACHER, THIS CHILD IS STILL IN A COMPLETE HYPERSTATE, ESSENTIALLY HYPERVIGILANT.

THIS ENDURES THROUGH LIFE.  SO THE SAME THING HAPPENS WHEN THEY GET INTO ANY KIND OF A CONFLICT, ANY KIND OF A CONFRONTATION, WHEN A BOSS OR SUPERIOR CRITICIZES THEM, THEY GET ALL ACTIVATED AND THEY CAN'T RETURN TO BASELINE.  THAT IS ONE OF THE LONG-TERM CONSEQUENCES OF THIS KIND OF CHRONIC ABUSE.

Q.     DID YOU SEE EVIDENCE OF THAT IN THE RECORDS YOU REVIEWED CONCERNING DAVID?

A.     THERE IS A LOT OF REFERENCE TO EMOTIONAL

VOLATILITY AND REACTIVITY THAT WOULD CERTAINLY BE

CONSISTENT WITH THAT.

Q.        THAT IS AS AN ADULT?

A.        YES.

Q.        NOW, YOU TALKED EARLIER ABOUT SOME -- WHEN DAVID

RAN AWAY FROM HOME, HE WAS USING DRUGS.  YOU MENTIONED

PCP.  IS IT UNCOMMON IN YOUR EXPERIENCE FOR VICTIMS OF

THIS KIND OF ABUSE AND SEXUAL VICTIMIZATION TO TURN TO

PCP, OF ALL THINGS?

A.        WELL, PCP -- IN MY EXPERIENCE WHEN -- MANY OF

THESE ARE, IN FACT MOST OF THESE ABUSE SURVIVORS,

ESPECIALLY WHEN THEY HAVE -- THEY COME WITH A BACKGROUND

LIKE THIS, SO NOBODY IS OFFERING THEM TREATMENT.  NOBODY

IS SORT OF -- IN FACT, WHEN HE WAS OFFERED TREATMENT AT

14, YOU KNOW, HIS MOTHER DID NOT FOLLOW THROUGH SO HE

NEVER GOT ANY KIND OF TREATMENT.  THEY ULTIMATELY TURN

TO DRUGS BECAUSE THAT IS ALL THEY HAVE TO -- BECAUSE

THEY HAVE ALL THESE KINDS OF SYMPTOMS.  THEY HAVE

DEPRESSION.  THEY HAVE THIS PROFOUND SENSE OF

WORTHLESSNESS.  AND THE ONLY WAY THEY CAN HANDLE THIS IS

BY MEDICATING IT WITH STREET DRUGS BECAUSE THAT IS THE

ONLY DRUGS THEY HAVE AVAILABLE.

          NOW IN HIS CASE, HE ACTUALLY HAD ACCESS

TO -- SOME OF THESE WERE PSYCHIATRIC MEDICATIONS.  HIS

MOTHER WAS APPARENTLY BRINGING HOME PAIN KILLERS AND

VARIOUS KINDS OF THINGS THAT ARE SORT OF PSEUDOPSYCHIATRIC MEDS.  SO HE STARTED TO USE THEM.  AND THEN WHEN HE DISCOVERED PCP, WHAT HE DESCRIBED TO ME IS THE EFFECT OF PCP WAS -- IT MADE HIM FEEL NOT WORTHLESS.  WHEN THAT -- UNDER THE INFLUENCE OF THAT DRUG HE GOT ARRESTED FROM THAT CHRONIC FEELING LIKE HE IS WORTHLESS AND ALL THE THINGS THAT HIS MOTHER CALLED HIM AND HIS FATHER CALLED HIM.  THAT IS VERY COMMON.

WHETHER IT IS PCP OR IN MY EXPERIENCE ALSO METHAMPHETAMINES, VERY SIMILAR.  ESPECIALLY MEN WHO WERE ABUSED LIKE THIS, THEY EXPERIENCE WITH -- UNDER METH, A RELIEF FROM THE FEAR AND THE INFERIORITY THAT THEY ARE TYPICALLY DEALING WITH ALL THE TIME.

Q.    NOW, DID YOU NOTICE IN YOUR REVIEW OF RECORDS OR IN YOUR CONVERSATION WITH DAVID A HISTORY OF SUICIDE ATTEMPTS --

A.    YES.

Q.    -- OR FLASHBACKS, THINGS ALONG THOSE -- NATURE? YES?

A.    I REMEMBER THERE ARE REFERENCES TO SUICIDE ATTEMPTS AND SUICIDALITY.

Q.    IS THAT A MANIFESTATION OF PSYCHOLOGICAL CONSEQUENCES, THE TRAUMA THAT HE SUFFERED?

A.    WELL, ACTUALLY, THERE IS VERY GOOD RESEARCH ON THE ASSOCIATION BETWEEN CHILDHOOD ABUSE AND ESPECIALLY

SEXUAL ABUSE IN MEN.  AND A MUCH HIGHER RISK OF SUICIDE, SUICIDAL IDEATION, BUT ALSO ATTEMPTED AND COMPLETED SUICIDE.  OF COURSE, IT'S A RESPONSE TO THE SYMPTOMS AND TO THAT SENSE OF WORTHLESSNESS.

Q.    NOW, IN THESE PROCEEDINGS AND IN EARLIER PROCEEDINGS BEFORE JUDGE MUIR, DR. BLUMBERG, WHO IS A FORENSIC PSYCHIATRIST, HE DIAGNOSED DAVID AS HAVING POST-TRAUMATIC STRESS DISORDER.  DOES THAT DIAGNOSIS SURPRISE YOU IN LIGHT OF THE EVIDENCE IN THIS CASE?

A.    NO, NOT AT ALL.

Q.    IS THAT A COMMON DIAGNOSIS THAT YOU RUN INTO WITH SUCH VICTIMS?

A.    YES.

Q.    IS IT SURPRISING TO YOU THAT DAVID HAS BEEN DIAGNOSED AS HAVING BORDERLINE PERSONALITY DISORDER?

A.    NO, NOT AT ALL.

Q.    NOW, YOU WERE TALKING ABOUT THE PHYSICAL MEMORY THAT PEOPLE HAVE EARLIER.  DID YOU HAVE AN OPPORTUNITY TO REVIEW ANY OF DAVID'S MEDICAL RECORDS?

A.    YES.

Q.    AND DID YOU NOTE IN THE MEDICAL RECORDS THAT WHEN HE WAS YOUNGER HE WAS HOSPITALIZED A LOT FOR STOMACH PAINS?

A.    YES.

Q.    HE DID HAVE AN APPENDECTOMY?

A.      YES.

Q.      I BELIEVE HE HAD A PROCEDURE TO RELEASE ADHESIONS?

A.      YES, I REMEMBER THAT.

Q.      DID YOU NOTE IN THE RECORDS WHETHER OR NOT THERE WERE ANY OTHER HOSPITALIZATIONS FOR THESE RECURRING STOMACH AILMENTS THAT WENT UNRESOLVED?

A.      YES.  I SEEM TO REMEMBER.  I DON'T REMEMBER HOW MANY, BUT MY RECOLLECTION IS THAT THERE WERE A NUMBER OF -- I DON'T KNOW WHETHER HE WAS HOSPITALIZED OR SIMPLY EVALUATED AT A HOSPITAL FOR THESE KINDS OF STOMACH COMPLAINTS, AILMENTS, FOR WHICH THERE WAS NO DIAGNOSIS. I REMEMBER ONE NOTE SORT OF -- BASICALLY THERE WERE -- THEY COULD NOT IDENTIFY A CAUSE.  AND IT LEFT ME WONDERING WHETHER OR NOT HE WAS SEEKING MEDICAL TREATMENT FOR WHAT WERE ESSENTIALLY THOSE KINDS OF FLASHBACKS, THOSE BODY MEMORIES OF THOSE ENEMA RAPES.

Q.      HAVE YOU SEEN THAT TYPE OF CONNECTION BEFORE IN YOUR WORK?

A.      OH, ABSOLUTELY, YES.

Q.      THIS IS NOT UNCOMMON?

A.      NOPE.

              THE COURT:  IT'S 11 O'CLOCK NOW.  HOW MUCH LONGER DO YOU THINK THE DIRECT WILL BE?

              MR. MORENO:  I HAVE ABOUT ANOTHER TWO

MINUTES, THREE MINUTES.

THE COURT:  WHY DON'T YOU COMPLETE THAT AND WE WILL TAKE A MID-MORNING RECESS.

BY MR. MORENO:

Q.      DR. LISAK, GIVEN DAVID'S HISTORY, ARE YOU SURPRISED THAT HE SUFFERS FROM IMPULSIVITY?

A.      NO.

Q.      HOW ABOUT IMPAIRED JUDGMENT?

A.      NO.

Q.      PROBLEMS REGULATING MOOD?

A.      NO.

Q.      MOOD SWINGS?

A.      NO.

Q.      DEPRESSION?

A.      NO.

Q.      FLASHBACKS?

A.      NO.

Q.      NIGHTMARES?

A.      NO.

Q.      INABILITY TO TRUST?

A.      NO.

Q.      BEHAVES IN A SELF-DESTRUCTIVE MANNER?

A.      NOT SURPRISED AT ALL.

Q.      IS THAT PRETTY CONSISTENT WITH VICTIMS OF SEXUAL ABUSE?

A.      ESPECIALLY THIS LEVEL, THIS EXTREME LEVEL.

Q.      IN YOUR OPINION, ON APRIL 13TH, 1996 WHEN DAVID WAS IN CELL 103 WITH ANDREW MARTI, WAS HE A SEVERELY PSYCHOLOGICALLY DAMAGED HUMAN BEING?

A.      ABSOLUTELY.

MR. MORENO:  YOUR HONOR, I HAVE NOTHING FURTHER.

THE COURT:  WE WILL STAND IN RECESS.

(BREAK TAKEN.)

MR. MORENO:  YOUR HONOR, I WOULD LIKE TO MOVE IN EXHIBITS THAT I USED WITH DR. LISAK.  I BELIEVE THEY ARE 500 TO 504.

THE COURT:  ALL RIGHT.  HEARING NO OBJECTION.

MS. HAINES:  NO OBJECTION.

THE COURT:  THEY WILL BE ADMITTED INTO EVIDENCE.

(DEFENSE EXHIBITS 500 THROUGH 504 ADMITTED INTO EVIDENCE.)

THE COURT:  WE WILL STAND IN RECESS.

(BREAK TAKEN.)

THE COURT:  PLEASE BE SEATED.

MS. HAINES.

CROSS EXAMINATION

BY MS. HAINES:

Q.    GOOD MORNING, DR. LISAK.

A.    GOOD MORNING.

Q.    I'M MS. HAINES.  HOPEFULLY WE WILL GET YOU OUT OF HERE IN TIME.

I WANT TO JUST GO THROUGH WITH YOU WHAT YOU REVIEWED IN PREPARING YOUR REPORT.  DO YOU STILL HAVE YOUR REPORT UP THERE?

A.    YES.

Q.    ON PAGE 3, YOU LIST THE THINGS THAT YOU REVIEWED, IS THAT CORRECT?

A.    YES.

Q.    IN THIS LIST YOU INCLUDE JILL MILLER'S REPORTS AND TESTIMONY?

A.    YEP.

Q.    DR. JAMES WOLFSON'S REPORT?

A.    YUP.

Q.    DR. JOHN MITCHELL'S TESTIMONY FROM THE 2255?

A.    YUP.

Q.    DR. BLUMBERG'S TESTIMONY FROM THE 2255?

A.    YES.

Q.    AND MR. HAMMER'S AUTOBIOGRAPHY?

A.    YES.

Q.    THE FINAL ESCAPE?

A.    YES.

Q.    YOU REVIEWED ALL OF THOSE THINGS?

A.      YES.

Q.      BUT YOU NEGLECTED TO POINT OUT THAT YOU ALSO REVIEWED DR. MATTHEWS'S TESTIMONY?

A.      THERE WERE A NUMBER OF THINGS THAT I REVIEWED SUBSEQUENT TO MY REPORT.

Q.      WHEN YOU UPDATED YOUR REPORT IN OCTOBER 2013, DID YOU MENTION YOU HAD REVIEWED OTHER ITEMS?

MR. MORENO:  I'M GOING TO OBJECT.  I THINK I WENT THROUGH IT WITH THE DOCTOR ON DIRECT, HAD HE REVIEWED ADDITIONAL ITEMS, AND HE WENT THROUGH THE ITEMS THAT HE REVIEWED.

THE COURT:  OVERRULED, THIS IS CROSS EXAMINATION.

BY MS. HAINES:

Q.      DID YOU EVER INDICATE IN YOUR SUPPLEMENTAL REPORT THAT YOU HAD REVIEWED ADDITIONAL ITEMS TO INCLUDE DR. MATTHEWS'S TESTIMONY?

A.      I DIDN'T SUBMIT A SUPPLEMENTAL REPORT.  THIS IS THE ONLY REPORT I HAVE SUBMITTED.

Q.      I'M GOING TO JUST HAND UP A REPORT THAT I HAVE THAT IS DATED OCTOBER 30TH, 2013.  MAYBE YOU CAN SEE IT. CAN YOU SEE THIS?

MR. MORENO:  I AM GOING TO OBJECT BECAUSE THIS REPORT IS NOT FAIR GAME IN THESE PROCEEDINGS, NOT THAT IT HAS ANYTHING DIFFERENT IN IT, THIS WAS FOR

PURPOSES FOR DEAUTHORIZATION.  THIS WAS SUBMITTED TO THE GOVERNMENT IN THE DEAUTHORIZATION PROCESS.

THE COURT:  OVERRULED.

BY MS. HAINES:

Q.      CAN YOU SEE THIS FROM WHERE YOU ARE SITTING?

A.      I CAN SEE THAT IT IS A LETTER, BUT I CAN'T SEE ANY MORE THAN THAT.

MS. HAINES:  MAY I APPROACH, YOUR HONOR?

BY MS. HAINES:

Q.      DR. LISAK, IS THAT THE SAME REPORT, DOES THAT HAVE THE SAME INFORMATION IN IT AS THE REPORT THAT YOU WERE HANDED BY THE DEFENSE?

A.      THE SAME REPORT THAT I WAS --

Q.      LET ME MAKE THE QUESTION BETTER, THAT WAS A BAD QUESTION.

HAVE YOU ONLY WRITTEN ONE REPORT?

A.      YES.

Q.      AND IN YOUR REPORT, DID YOU INDICATE THAT YOU REVIEWED JILL MILLER'S NOTES AND HOSPITAL RECORDS?

A.      I HAVE A SUMMARY OF HOSPITALIZATIONS AND MEDICAL REPORTS COMPILED BY JILL MILLER.  IS THAT WHAT YOU ARE REFERRING TO?

Q.      NO, I'M ASKING YOU DID YOU EVER INDICATE THAT YOU HAD ACTUALLY REVIEWED HOSPITAL RECORDS?

A.      I REMEMBER MEDICAL RECORDS.

Q.   HAVE YOU INDICATED IN YOUR REPORT THAT YOU REVIEWED MEDICAL RECORDS?

A.   NO, NO.

Q.   ALL RIGHT.  HAVE YOU REVIEWED MEDICAL RECORDS?

A.   WELL, NOW I DON'T REMEMBER WHETHER I -- I REMEMBER JILL MILLER'S SUMMARY OF THEM, I GUESS THAT IS WHAT I -- THAT IS THE ONLY MEDICAL RECORDS THAT I REMEMBER.

Q.   WHEN YOU INDICATED IN YOUR REPORT THAT YOU REVIEWED DR. MITCHELL'S NOTES FROM AUGUST 3RD, 1998 AND SEPTEMBER 29TH OF 1998, THOSE ACTUALLY ARE NOT THE NOTES YOU REVIEWED, ARE THEY?

A.   I'M SORRY, REPEAT THE DATES AGAIN.

Q.   IT'S IN YOUR REPORT, PAGE 3.  YOU INDICATED THAT THE NOTES WERE DATED AUGUST 3RD, 1998 AND SEPTEMBER 29TH, 1998?

A.   YES.

Q.   THE NOTES THAT YOU WERE HANDED TODAY ARE DATED AUGUST 31, 1995 AND SEPTEMBER 7TH, 1995?

A.   RIGHT.  THOSE ARE DIFFERENT NOTES.

Q.   DID YOU EVER INDICATE THAT YOU HAD REVIEWED THOSE OTHER NOTES, THE '95 NOTES?

A.   THOSE ARE NOTES THAT I REVIEWED SUBSEQUENT TO THIS REPORT, MUCH MORE RECENTLY.

Q.   AND THAT WAS NEVER REFLECTED IN ANY REVISED OR

SUPPLEMENTAL REPORT THAT YOU ISSUED?

A.    NO.

Q.    ALL RIGHT.  GIVEN THAT YOU HAVE NOW REVIEWED A WEALTH OF OTHER MATERIALS SINCE YOU WROTE YOUR REPORT, AND THE TESTIMONY FROM THIS PROCEEDING, CORRECT?

A.    SOME OF IT, YES.

Q.    HAS ANY OF YOUR OPINION CHANGED BASED ON THE THINGS THAT YOU INTERVIEWED -- OR THAT YOU HAVE REVIEWED MORE RECENTLY?

A.    NO.

Q.    NOW, IN ALL OF THOSE REPORTS THAT YOU REVIEWED AND ALL OF THE REPORTED ABUSE THAT YOU HAVE SEEN, YOU WOULD AGREE THAT THERE IS A FAIR AMOUNT OF INCONSISTENCY BETWEEN WHAT DIANE MARTIN AND DAVID HAVE REPORTED, IS THAT FAIR TO SAY?

A.    I DON'T THINK I WOULD CHARACTERIZE IT AS A FAIR AMOUNT OF INCONSISTENCY, NO.

Q.    WOULD YOU AGREE THAT THERE ARE CONSISTENCIES BETWEEN THREE SIBLINGS IN THE REPORTED ABUSE?

A.    YES.

Q.    AND THEY ARE SELF-CONTRADICTORY AT TIMES, CORRECT?

A.    I CAN'T THINK OF ANY AT THE MOMENT.

Q.    LET'S TALK ABOUT SOME OF THAT THEN.

LET'S START WITH MARTIN HAMMER.  NOW, YOU

INTERVIEWED MR. MARTIN HAMMER ON OCTOBER 9TH OF 2013, CORRECT?

A.      YES.

Q.      AND I ASSUME HE KNEW WHO YOU WERE, WHAT YOU WERE DOING THERE AND THE PURPOSE OF THE INTERVIEW?

A.      YES.

Q.      AND WHEN YOU INTERVIEWED MARTIN, ACCORDING TO YOUR NOTES, HE TOLD YOU THAT AS FAR AS DAVID, HIS BROTHER BEING PUNISHED, "HE DIDN'T SEE WHAT MOTHER DID TO HIM BUT SHE WAS MUCH HARDER ON HIM." THAT IS WHAT MR. MARTIN HAMMER TOLD YOU, CORRECT?

A.      YES.

Q.      SO JUST TO SUMMARIZE THAT, I GATHER WHAT HE IS SAYING IS THAT OUT OF THE THREE CHILDREN, DAVID GOT THE BRUNT OF THE MOTHER'S PUNISHMENT?

A.      THAT WAS HIS PERCEPTION.

Q.      OKAY.

BECAUSE YOU HAVE REVIEWED DR. WOLFSON'S REPORT, YOU KNOW THAT DIANE HAMMER DISAGREES WITH THAT STATEMENT, CORRECT?

A.      I DON'T RECALL SPECIFICALLY WHAT SHE -- OR WHAT IS IN THAT REPORT.

Q.      LET ME SHOW YOU WHAT HAS BEEN MARKED AS GOVERNMENT'S EXHIBIT GC 130 A.

DR. LISAK, THIS IS AN EXCEPT OF

DR. WOLFSON'S REPORT THAT YOU REVIEWED, CORRECT?

A.       WELL, THE REPORT -- I HAVE THE DATE AS SEPTEMBER 23RD, 1998 AND THIS ONE IS DECEMBER 19, 1997.

MS. HAINES:  YOUR HONOR, I WOULD REQUEST THAT WHATEVER THAT REPORT IS IT BE PROVIDED TO THE GOVERNMENT BECAUSE THIS IS THE ONLY REPORT OF DR. WOLFSON THAT I HAVE.

MR. MORENO:  I BELIEVE THE ONLY REPORT, YOUR HONOR, WE HAVE SEEN IS THE BIG 150-PAGE REPORT THAT THEY HAVE BEEN WAVING AROUND THROUGHOUT THESE HEARINGS, SO I'M NOT SURE WHAT SHE IS TALKING ABOUT.

THE COURT:  IS THAT A REPORT OF DR. WOLFSON?

MR. MORENO:  I'M SORRY?

THE COURT:  IS THAT A REPORT OF DR. WOLFSON?

MR. MORENO:  YES, IT'S NOT IN EVIDENCE. IT HAS NEVER BEEN INTRODUCED, IT'S NOT IN EVIDENCE.

THE COURT:  DO YOU KNOW THE DATE OF IT?

MR. MORENO:  NO, I DON'T KNOW THE DATE. IT'S THEIR REPORT.  I COULD NOT TELL YOU WHAT THE DATE IS, I'M SORRY, YOUR HONOR.

MS. HAINES:  IF I MAY HAND UP, YOUR HONOR, GOVERNMENT EXHIBIT 130.  JUST FOR THE RECORD, I HAVE HANDED YOUR HONOR THE REPORT OF DR. WOLFSON DATED

DECEMBER 19TH OF 1997.

MR. MORENO:  DO YOU HAVE A COPY FOR US, PLEASE?

MS. HAINES:  YOU DON'T HAVE IT?

MR. MORENO:  I DID NOT BRING IT WITH ME. IF YOU NEED IT FOR THE EXAM, THAT IS FINE.

THE COURT:  HAS THIS PREVIOUSLY BEEN MARKED?

MS. HAINES:  IT'S BEEN PREVIOUSLY REFERRED TO AS GOVERNMENT EXHIBIT 130, SO IT'S BEEN PREVIOUSLY --

THE COURT:  THIS IS DATED DECEMBER 19, 1997.

MS. HAINES:  THAT'S CORRECT.  AND I'M ASKING DR. LISAK WHAT REPORT OF DR. WOLFSON HE REVIEWED IF IT IS NOT THIS.

BY MS. HAINES:

Q.    CAN I SHOW YOU THIS REPORT, DR. LISAK?

A.    SURE.

Q.    IT HAS MY SCRIBBLES ON IT, BUT DO YOU RECOGNIZE G 130 AS THE REPORT OF DR. WOLFSON?

A.    YOU KNOW, I DON'T.  IT HAS BEEN A WHILE SINCE I REVIEWED THE MATERIALS AND I CAN'T HONESTLY SAY IF THIS IS IT OR NOT.

MS. HAINES:  YOUR HONOR, I REQUEST THAT

THE DEFENSE PROVIDE ME WHATEVER REPORT IS THE SEPTEMBER 23RD, 1998 REPORT OF DR. WOLFSON BECAUSE I SIMPLY DON'T KNOW WHAT THAT IS NOW.

MR. MORENO:  YOUR HONOR, IT IS CLEAR THAT DR. LISAK MADE A MISTAKE ON THE DATES.  AS THE GOVERNMENT WELL KNOWS, DR. WOLFSON DID ONE REPORT.  IT IS THE REPORT THEY HAVE BEEN REFERENCING THROUGHOUT THE HEARING.  THERE IS NO SEPTEMBER 28TH REPORT.  THE GOVERNMENT KNOWS THAT, YOUR HONOR.

THE COURT:  WELL --

THE DEFENDANT:  EXCUSE ME, THAT IS NOT CORRECT.  I WAS SENT TO SPRINGFIELD FOR AN EVALUATION AND DR. WOLFSON DID A SECOND REPORT WHICH WAS FILED WITH THE COURT IN SEPTEMBER OF 1998 THAT WAS POST-TRIAL AND POST-VERDICT, BUT PRIOR TO SENTENCING.  SO THERE IS A SECOND REPORT THAT IS DATED SEPTEMBER OF 1998.

MS. HAINES:  YOUR HONOR, CONTRARY TO WHAT MR. HAMMER SAYS, THIS IS THE ONLY DR. WOLFSON REPORT THAT I'M CURRENTLY AWARE OF.

MR. MORENO:  THEN WHY WAS SHE ASKING QUESTIONS ABOUT ASKING FOR A REPORT THAT SHE KNOWS THERE IS ONLY ONE OF.  I DON'T GET THAT.  BUT I BELIEVE THE -- I'M NOT SURE EXACTLY WHAT REPORT MR. HAMMER IS REFERRING TO.  THAT WAS A REPORT TO THE COURT ON COMPETENCY TO PLEAD GUILTY.

THE COURT:  A REPORT TO THE COURT ON COMPETENCY TO PLEAD GUILTY.

THE DEFENDANT:  NO, SIR, IT WAS A REPORT TO THE COURT ON MY COMPETENCY TO WAIVE APPEALS AND PROCEED PRO SE.

THE COURT:  LET ME HEAR FROM MR. TRAVIS.

MR. TRAVIS:  YOUR HONOR, THE REPORT -- THE SEPTEMBER 1998 REPORT WAS AN EVALUATION THAT WAS CONDUCTED IN SPRINGFIELD FOR THE DETERMINATION OF WHETHER MR. HAMMER WOULD BE ALLOWED TO NOT PURSUE AN APPEAL AND FIRE HIS ATTORNEYS.  AND THAT REPORT WENT TO THE COURT.  THAT WAS NOT A DEFENSE ORDERED OR A GOVERNMENT ORDERED, THAT WENT TO THE COURT.

THE COURT:  WAS IT MADE AVAILABLE TO THE DEFENSE?

MR. TRAVIS:  IT'S FILED OF RECORD.

MS. SAUNDERS:  YOUR HONOR, I BELIEVE IT WAS FILED AND IT WAS CERTAINLY REFERENCED IN A NUMBER OF PROCEEDINGS.

THE COURT:  IT WAS FILED OF RECORD? AND --

THE WITNESS:  THAT IS WHAT I RECALL NOW, THAT IS THE REPORT I RECALL.

THE COURT:  ALL RIGHT.  SO IT WAS CERTAINLY MADE AVAILABLE TO THE GOVERNMENT.

MS. HAINES:  NOW I UNDERSTAND, YOUR HONOR.  I THOUGHT -- LET ME JUST -- I CAN NOW ASK A QUESTION BASED ON THIS.

THE COURT:  OKAY.

BY MS. HAINES:

Q.      SO HAVE YOU EVER SEEN THIS 143 PAGE REPORT FROM DR. WOLFSON?

A.      I DON'T BELIEVE SO.

Q.      ALL RIGHT.  WELL, IF YOU WILL ACCEPT MY REPRESENTATION THAT I HAVE NOW HANDED YOU AN EXCERPT OF IT, WHICH HAS BEEN MARKED AS GOVERNMENT EXHIBIT G 130 A, I WOULD LIKE YOU TO TURN TO PAGE 109 AND THE FIRST PARAGRAPH OF THAT PAGE, DO YOU SEE THAT PART?

MR. MORENO:  YOUR HONOR, NOT TO BE A FLY IN THE OINTMENT, BUT I BELIEVE WE HAD FILED A MOTION IN LIMINE TO EXCLUDE THE REPORT OF DR. WOLFSON IN THESE PROCEEDINGS.  IT WAS PART AND PARCEL OF THE MOTION IN LIMINE THAT'S MOOT BECAUSE DR. WOLFSON WAS NOT BEING CALLED AS A WITNESS, BUT OUR OBJECTION IN OUR MOTION IN LIMINE CONCERNED THE FACT THAT THE GOVERNMENT HAD AN UNFAIR ADVANTAGE AT THE TIME THAT THIS REPORT WAS ISSUED.  MR. HAMMER WAS INVOLUNTARILY COMMITTED TO SPRINGFIELD FOR AN EVALUATION.  THE GOVERNMENT HAD OVER 90 DAYS WITH MR. HAMMER IN THEIR CUSTODY.  THE DEFENSE HAD NO SUCH OPPORTUNITY, EVEN WITH THE DEFENSE EXPERTS.

IT IS AN ISSUE THAT I BELIEVE COA WAS GRANTED ON BY THE 3RD CIRCUIT IN THIS CASE, AND, YOU KNOW, IT'S OUR VIEW THAT THIS REPORT SHOULD NOT BE ADMITTED INTO EVIDENCE.

THE COURT:  WELL, LET ME ASK THIS QUESTION.

HAS THIS WITNESS ACKNOWLEDGED THAT HE REVIEWED THE DECEMBER 19, 1997 REPORT THAT IS GOVERNMENT EXHIBIT 130?

MR. MORENO:  NO, YOUR HONOR, HE SAID HE HAS NEVER SEEN IT BEFORE.

THE COURT:  HAVE WE ASKED HIM THAT QUESTION?

MS. HAINES:  YES, YOUR HONOR.  HE SAYS HE NEVER SAW THIS 145-PAGE REPORT.

THE COURT:  THAT IS WHAT I THOUGHT, BECAUSE I'M GETTING A LITTLE CONFUSED ON THE DATES. NOW, HE HAS SEEN THE SEPTEMBER 1997 --

MR. MORENO:  CORRECT.

THE COURT:  -- REPORT.

THE WITNESS:  '98.

THE COURT:  '98 REPORT.  AND HE HAS ALSO NEVER SEEN G -- WELL, G 130 A, I'M SORRY, IS EXCERPTED FROM G 130.

MR. MORENO:  CORRECT.

THE COURT:  HE CAN BE CROSS-EXAMINED

ABOUT ANYTHING THAT HE HAS EXAMINED ON A PRIOR OCCASION.

HE HAS NEVER SEEN THESE DOCUMENTS, MS. HAINES.

MS. HAINES:  WELL, YOUR HONOR, I WAS JUST GOING TO ASK HIM WHETHER THIS INFORMATION WAS EVER BROUGHT TO HIS ATTENTION BY ANYONE.

THE COURT:  IF HE HAS NEVER SEEN IT, IT WAS NEVER BROUGHT TO HIS ATTENTION.

MS. HAINES:  BY ANYONE, YOUR HONOR, INCLUDING THE DEFENSE, DIANE HAMMER.

THE COURT:  ASK THE QUESTION.

BY MS. HAINES:

Q.    SIR, AND I'M DIRECTING YOUR ATTENTION TO THE FIRST PAGE OF THE REPORT WHERE IT HAS --

THE COURT:  WHICH REPORT NOW?

MS. HAINES:  I'M SORRY.

THE COURT:  WHICH G, G 130 A?

MS. HAINES:  G 130 A.

MR. MORENO:  I OBJECT TO HER READING THIS INTO THE RECORD, YOUR HONOR, SINCE THE WITNESS NEVER SAW IT.  IF HE WANTS TO LOOK AT IT AND SAY I HAVE NEVER SEEN OR HEARD THIS INFORMATION BEFORE, THAT IS ONE THING, BUT I OBJECT TO HER READING THIS INTO THE RECORD.

THE COURT:  I JUST DON'T KNOW WHAT THE QUESTION IS.  I HAVE TO HEAR THE QUESTION FIRST.

GO AHEAD.  OVERRULED.  GO AHEAD.

MS. HAINES:  THANK YOU, YOUR HONOR.

BY MS. HAINES:

Q.     DO YOU SEE WHERE MISS HAMMER, DIANE HAMMER WAS QUOTED AS SAYING, PUNISHMENT, IN QUOTES, WAS ADMINISTERED TO ALL THREE CHILDREN.  DO YOU SEE THAT?

A.     YES.

Q.     AND THEN SHE GOES ON TO SAY THAT MY BROTHER --

MR. MORENO:  THIS IS MY OBJECTION.

THE COURT:  NOW I WILL SUSTAIN THE OBJECTION.  WHAT IS THE POINT OF READING FROM SOMETHING HE HAS NEVER SEEN BEFORE.

MR. MORENO:  EXACTLY.  THANK YOU, YOUR HONOR.

MS. HAINES:  BECAUSE I'M GOING TO ASK HIM, YOUR HONOR, IF THIS INFORMATION WAS EVER BROUGHT TO HIS ATTENTION IN ANY WAY, WHETHER --

THE COURT:  ASK HIM THE QUESTION WITHOUT REFERRING TO THE REPORT, BECAUSE HE HAS NEVER SEEN THE REPORT.

BY MS. HAINES:

Q.     DR. LISAK, WAS IT EVER BROUGHT TO YOUR ATTENTION THAT DIANE HAMMER HAS PREVIOUSLY SAID THAT DAVID WAS NOT SINGLED OUT FOR PUNISHMENT, THAT THEY WERE ALL PUNISHED EXACTLY THE SAME?

A.     NO.

Q.      AND WAS IT EVER BROUGHT TO YOUR ATTENTION THAT DIANE HAMMER HAS SAID --

MR. MORENO:  YOUR HONOR, I'M OBJECTING. THIS IS EXACTLY WHAT YOU WERE SAYING SHE COULD NOT READ INTO THE RECORD.  SHE IS ASKING THESE QUESTIONS.

THE COURT:  SHE IS ASKING THE QUESTION NOW INDEPENDENT OF THE REPORT, AND IT'S -- AGAIN THE EVIDENCE IS NOT THE QUESTION, IT'S THE WITNESS' ANSWER.

BY MS. HAINES:

Q.      WAS IT EVER BROUGHT TO YOUR ATTENTION THAT DIANE HAMMER SAID PREVIOUSLY THAT LOTS OF TIMES SHE AND HER BROTHER MARTIN WOULD BE PUNISHED FOR THINGS THAT DAVID DID?

A.      WELL, I THINK SHE ACTUALLY SAID SOMETHING ALONG THOSE LINES WHEN I INTERVIEWED HER.

Q.      DID YOU EVER CONFRONT MARTIN ABOUT WHY HE WOULD SAY DAVID WAS PUNISHED MORE WHEN DIANE SAID SOMETIMES WE GOT PUNISHED FOR WHAT DAVID DID?  WAS THAT SORT OF -- THAT INCONSISTENCY BETWEEN THE RECOLLECTION OF THE TWO SIBLINGS EVER ASKED DIRECTLY OF THEM?

MR. MORENO:  YOUR HONOR, THE WITNESS HAS ALREADY TESTIFIED THAT HE HAS NEVER SEEN THIS DOCUMENT.

THE COURT:  OVERRULED.

THE WITNESS:  WELL, SO WHAT I JUST SAID A MOMENT AGO IS THAT IT HAD NEVER BEEN BROUGHT TO MY

ATTENTION THAT DIANE HAD MADE THAT STATEMENT, SO THERE IS NO WAY THAT I COULD CONFRONT MARTIN WITH IT BECAUSE I DIDN'T KNOW THAT IT HAD BEEN MADE.  HOWEVER, ALL THAT BEING SAID, DO I FIND THESE KINDS OF LITTLE INCONSISTENCIES AMONG SIBLINGS RELEVANT OR SALIENT, NO, I DON'T.

BY MS. HAINES:

Q.     DR. LISAK, THAT WAS NOT MY QUESTION.  MY QUESTION WAS, YOU SAID DIANE DID TELL YOU SOMETHING ALONG THE LINES OF SHE AND MARTIN GOT PUNISHED WHEN IT WAS NOT THEIR FAULT FOR THINGS THAT DAVID DID.  ISN'T THAT WHAT YOU JUST SAID?

A.     SHE MADE -- I DON'T REMEMBER EXACTLY WHAT SHE SAID.  SHE MADE SOME ALLUSION TO SOMETIMES THEY GOT PUNISHED FOR SOMETHING THAT DAVID DID OR DAVID GOT PUNISHED FOR SOMETHING THAT MARTIN DID OR -- THESE WERE SORT OF GENERAL STATEMENTS ABOUT THE PHYSICAL ABUSE THAT MAINLY THEIR MOTHER WAS METING OUT ON A REGULAR BASIS.

Q.     DID DIANE HAMMER EVER TELL YOU THAT DAVID GOT PUNISHED MORE?

A.     I DON'T THINK SO.  I THINK THAT WAS MARTIN WHO SAID THAT.

Q.     WERE YOU ALSO AWARE THAT MARTIN HAS BEEN INTERVIEWED ABOUT THE SEXUAL ABUSE IN HIS FAMILY SEVERAL TIMES BEFORE?

A.      YES.

Q.      WERE YOU AWARE THAT HE WAS INTERVIEWED BY A PSYCHIATRIST IN AUGUST OF 1992 ABOUT THE SEXUAL ABUSE IN HIS FAMILY?

A.      I DON'T REMEMBER IF I WAS AWARE OF THAT OR NOT.

Q.      WERE YOU AWARE THAT HE WAS INTERVIEWED BY THE DEFENSE MITIGATION SPECIALIST, JILL MILLER?

A.      YES.

Q.      WERE YOU AWARE THAT MARTIN WAS INTERVIEWED BY A PSYCHOLOGIST IN OCTOBER OF 2000 WHEN HE WAS TRYING TO OBTAIN SOCIAL SECURITY BENEFITS?

A.      I DON'T THINK SO.

Q.      WERE YOU AWARE THAT HE WAS INTERVIEWED BY LOUISE LUCK ON JANUARY 11TH, 2012?

A.      NO.

Q.      DID YOU REVIEW MS. LUCK'S NOTES?

A.      I DON'T THINK SO, NO.

Q.      IS THERE A REASON WHY YOU DID NOT REVIEW HER NOTES?

A.      I REVIEWED WHAT I WAS PROVIDED WITH.

Q.      AND YOU SAID YOU DON'T KNOW ABOUT THIS AUGUST 1992 INTERVIEW.  LET ME SHOW YOU WHAT HAS BEEN MARKED AS GOVERNMENT EXHIBIT -- I WILL HAND YOU UP TWO, GC 21 AND GC 22.

        DOCTOR, HAVE YOU EVER SEEN GC 21 OR GC 22

BEFORE?

A.        I DON'T BELIEVE SO, NO.

Q.        ALL RIGHT.

          DID ANYONE EVER BRING TO YOUR ATTENTION THAT WHEN MARTIN WAS INTERVIEWED BY A PSYCHIATRIST IN 1992 AND A PSYCHOLOGIST IN 2000, THAT THE ONLY PERSON HE SAID THAT SEXUALLY ABUSED HIM WAS HIS BROTHER DAVID?

A.        WELL, I WAS NOT AWARE OF THESE DOCUMENTS, SO OBVIOUSLY I WAS NOT AWARE THAT HE HAD MADE THOSE STATEMENTS TO THESE EVALUATORS.

Q.        WERE YOU EVER MADE AWARE THAT MARTIN HAMMER HAS INDICATED THAT THE PERSON WHO SEXUALLY ABUSED HIM WAS DAVID HAMMER?

A.        WELL, YES, I KNEW ABOUT THAT.  I CAN'T REMEMBER WHERE I KNEW IT FROM, THOUGH.

Q.        DID THAT MAKE IT INTO YOUR REPORT, THAT DAVID HAMMER SEXUALLY ABUSED HIS BROTHER?

A.        NO.

Q.        DID YOU NOT THINK THAT WAS SOMEWHAT SIGNIFICANT, THAT MR. HAMMER IN ADDITION TO BEING THE VICTIM OF ABUSE ALSO ABUSED A SIBLING?

A.        WELL, MY GOAL AND MY PURPOSE IN THAT REPORT WAS NOT TO EVALUATE THE -- EITHER THE PERPETRATION OR THE SUBSEQUENT CRIMINAL ACTIVITY OR ANYTHING ELSE THAT MR. HAMMER ENGAGED IN BUT TO EVALUATE HIS TRAUMA

HISTORY.

Q.      ALL RIGHT.  WHEN MARTIN HAMMER TOLD YOU THAT HE HAD NO MEMORY OF BEING SEXUALLY ABUSED BUT THINKS IT DID HAPPEN, I GUESS IS WHAT HE MEANT, BUT THINKS IT DID, DID HE EXPLAIN WHAT HE MEANT BY THAT?

A.      NO, HE DIDN'T.

Q.      DID YOU FOLLOW UP WITH, WELL, WHAT DO YOU MEAN YOU THINK YOU WERE SEXUALLY ABUSED?

A.      I DID FOLLOW UP WITH SOME QUESTIONS, I JUST DIDN'T GET ANY FURTHER -- ANY MORE DETAILS FROM HIM.

Q.      WELL, HOW DID HE RESPOND?

A.      I DON'T REMEMBER HIS SPECIFIC WORDS, JUST THAT -- HE WAS JUST NOT DISCLOSING ANY FURTHER.

Q.      WELL, DOCTOR, WHEN YOU ARE TRYING TO CORROBORATE WITH WHAT MR. HAMMER IS SAYING, WOULDN'T IT BE FAIRLY SIGNIFICANT THAT HIS BROTHER THINKS HE WAS SEXUALLY ABUSED BUT CAN'T ACTUALLY PUT ANY DETAILS, NAMES, PLACES OR DATES TO IT?

A.      NOT NECESSARILY.  IT COULD BE EITHER THAT HE IS NOT PREPARED TO DISCLOSE OR THAT HE -- AS HE WAS DESCRIBING HAS MEMORIES OF -- VAGUE MEMORIES OF SOMETHING HAPPENING BUT CAN'T PUT ANYTHING -- ANY MORE DETAILS TO IT.  IN A FAMILY WHERE THERE WAS THIS MUCH INCEST GOING ON, IT WAS NOT AT ALL SURPRISING THAT -- WOULD NOT HAVE BEEN SURPRISING THAT HE HAD BEEN SEXUALLY

ABUSED, SO.

Q.      WHEN YOU TALK ABOUT THE INCEST, MARTIN NEVER WAS SUBJECTED TO ANY INCEST, CORRECT, HE NEVER HAD OR WAS FORCED TO HAVE SEX WITH HIS SISTER DIANE, RIGHT?

A.      HE WAS NOT FORCED TO HAVE SEX WITH HIS SISTER, BUT HE WAS SUBJECTED TO THE ENEMA RAPES.

Q.      AND HE WAS NEVER FORCED TO HAVE SEX WITH HIS MOTHER, CORRECT, NOBODY HAS EVER --

A.      HE DID NOT DISCLOSE ANYTHING LIKE THAT.

Q.      YOU HAVE SEEN NO RECORD THAT INDICATES THAT HE EITHER WAS HAVING SEX WITH HIS SISTER OR HIS MOTHER, CORRECT?

A.      CORRECT.

Q.      HE DID NOT SAY THAT TO YOU, DID HE, THAT I WAS FORCED TO HAVE SEX WITH MY MOTHER AND MY SISTER AND I WERE FORCED TO HAVE SEX BY MY FATHER, HE DID NOT SAY THAT, DID HE?

A.      NOPE.

Q.      SO WHEN HE SAID HE THINKS HE WAS SEXUALLY ABUSED, DO YOU THINK HE COULD BE TALKING ABOUT BEING ABUSED BY HIS BROTHER DAVID?

A.      COULD HAVE BEEN.

Q.      NOW, LET'S TALK ABOUT ANOTHER PERSON, RON MILLER.

YOU INTERVIEWED RON MILLER ON THE SAME

DAY YOU INTERVIEWED MARTIN HAMMER, IS THAT CORRECT?

A.      YES.

Q.      WHY OUT OF THE EXTENDED FAMILY, THE HAMMER FAMILY, WHY DID YOU CHOOSE RON MILLER TO INTERVIEW?

A.      MY UNDERSTANDING WAS HE WAS AVAILABLE, HE WAS NEARBY.  IN FACT, IT WAS NOT CLEAR THAT WE WERE GOING TO BE ABLE TO REACH HIM OR MEET WITH HIM, BUT HE WAS AVAILABLE SO WE WENT OVER AND TALKED TO HIM.

Q.      WHO SUGGESTED THAT MR. MILLER WAS AVAILABLE?

A.      AN INVESTIGATOR THAT I WAS WORKING.

Q.      NOW, MR. RON MILLER TOLD YOU THAT HE HAD BEEN ABUSED BY HIS SISTER WILMA, THAT IS DAVID'S MOTHER, CORRECT?

A.      THAT'S CORRECT.

Q.      YOU FOUND HIM CREDIBLE ON THAT POINT, I GATHER?

A.      YES.  THERE WAS NO -- IN FACT, HIS DISCLOSURE ABOUT THAT APPEARED TO BE -- HE WAS VERY RETICENT.  IN FACT, I WAS -- I HAD CLOSED MY NOTEBOOK AND WAS PREPARING TO LEAVE WHEN HE SAID THERE IS ONE MORE THING I THINK I NEED TO TELL YOU, AND THAT IS WHEN HE DISCLOSED THE SEXUAL ABUSE BY HIS SISTER.

Q.      ARE YOU HESITATING THAT HE WAS CREDIBLE WHEN HE SAID THAT, WHEN HE DISCLOSED THAT ABUSE TO YOU?

A.      NO.  TO ME IT SOUNDED LIKE HE WAS VERY UNCERTAIN ABOUT WHETHER HE WANTED TO DISCLOSE AND SIMPLY DECIDED

AT THE END THAT HE WAS GOING TO.

Q.        IN FACT IN YOUR REPORT, AND I'M QUOTING, YOU WROTE THAT HIS STATEMENTS ABOUT THIS ABUSE WAS A, QUOTE, VERY SIGNIFICANT SOURCE OF CORROBORATION FOR MR. HAMMER'S CLAIMS OF SEXUAL ABUSE?

A.        THAT'S CORRECT.

Q.        THAT IS WHAT YOU SAID, RIGHT?

A.        YES.

Q.        YOU WOULD NOT HAVE WRITTEN THAT, I DON'T THINK, IF YOU HAD THOUGHT MR. RON MILLER WAS NOT BEING TRUTHFUL WITH YOU ABOUT THE ABUSE?

A.        CORRECT.

Q.        SO YOU BELIEVED WHAT HE HAD TO SAY ABOUT THAT, CORRECT?

A.        YES.

Q.        WITH RESPECT TO HIS OWN ABUSE?

A.        YES.

Q.        BUT WHEN HE TOLD YOU, I DID NOT SEXUALLY ABUSE MY NEPHEW, I BELIEVE YOU SAID TODAY, WELL, YOU DON'T REALLY THINK HE IS TELLING THE TRUTH ABOUT THAT?

A.        NO, WHAT I SAID IS IN EVALUATING WHETHER OR NOT MR. HAMMER STATED VERY UNEQUIVOCALLY THAT HE HAD BEEN SEXUALLY ABUSED BY RON AND DESCRIBED IT IN SOME DETAIL, AND I HAVE TO WEIGH THAT AGAINST RON'S -- WELL, AS I SAID HIS STATEMENTS -- HIS DENIAL WAS SOMEWHAT

EQUIVOCAL.  AND I JUST HAVE TO WEIGH THAT.  THEN AS WE DISCUSSED ON DIRECT, WHEN I READ HIS TESTIMONY ABOUT WHAT HE SAID HIS BROTHER DID TO HIM, THAT AGAIN SORT OF -- IT'S ANOTHER SMALL PIECE OF EVIDENCE THAT SORT OF WEIGHS INTO THE PUZZLE.  SO IT'S NOT AN ABSOLUTE, BUT IT'S A JUDGMENT THAT ON BALANCE I THINK IT'S MORE LIKELY THAN NOT.

Q.     WELL, SIR, YOU READ HIS TESTIMONY, YOU READ MR. MILLER'S TESTIMONY FROM THESE PROCEEDINGS, CORRECT?

A.     YES.

Q.     AND HE WAS NOT EQUIVOCAL THEN, WAS HE?

A.     NO.

Q.     HE SAID ABSOLUTELY NOT, THOSE THINGS THAT DAVID SAID, THEY NEVER HAPPENED.  HE SAID THAT OVER AND OVER, ISN'T THAT FAIR TO SAY?

A.     YES.

Q.     AND YOU THOUGH IN WEIGHING THE CREDIBILITY BETWEEN MR. HAMMER AND MR. MILLER, WHAT I'M HEARING IF I'M CORRECT IS THAT YOU ARE LEANING ON THE SIDE THAT MR. HAMMER IS MORE CREDIBLE?

A.     ON THIS ONE ASPECT BY A SMALL MARGIN.

Q.     BY A SMALL MARGIN.  SO IS THERE DOUBT IN YOUR MIND THAT THESE THINGS HAPPENED?

A.     WELL, OF COURSE IT'S -- THIS IS NOT ANYTHING THAT ONE CAN BE CERTAIN ABOUT.  I'M WEIGHING THE DATA TO

THE EXTENT THAT I CAN.

Q.       AND DO YOU STILL HAVE JILL MILLER'S NOTES OF DIANE HAMMER'S INTERVIEW IN FRONT OF YOU?

A.       JILL MILLER'S NOTES.  YES.

Q.       YOU'VE REVIEWED THESE NOTES, CORRECT, FOR YOUR TESTIMONY HERE TODAY?

A.       FOR THE REPORT, YES.

Q.       AND PAGE 3, ACCORDING TO WHAT JILL MILLER WROTE, DIANE HAMMER SAID -- ARE YOU ON PAGE 3 WITH ME?

A.       THERE ARE NO NUMBERS HERE.  YOU MEAN THE THIRD PAGE OF THE NOTES?

Q.       MY EXHIBIT HAS A NUMBER AT THE TOP, IT SAYS THREE.

A.       NO NUMBERS ON THIS.

Q.       DO YOU SEE, THERE'S A PAGE THAT SAYS THREE.  I CAN SHOW YOU.

         I HAVE DIRECTED YOUR ATTENTION TO THE PARAGRAPH WHERE IT SAYS, RONNIE, CORRECT?  NOW THESE ARE JILL MILLER'S NOTES OF HER INTERVIEW WITH DIANE HAMMER, IS THAT CORRECT?  AND JILL MILLER WROTE THAT DIANE HAS NO KNOWLEDGE OF RONNIE EVER DOING ANYTHING TO DAVID, DO YOU SEE THAT?

A.       YES.

Q.       SPEAKING OF DIANE HAMMER, YOU ALSO INTERVIEWED HER, CORRECT?

A.      YES.

Q.      SHE HAS BEEN DIAGNOSED WITH SCHIZOPHRENIA, CORRECT?

A.      I BELIEVE SO, YES.

Q.      AND I'M SURE SHE DOES NOT WANT TO SEE HER BROTHER EXECUTED, CORRECT?

A.      WELL, I DON'T KNOW.  I DID NOT ASK HER THAT.

Q.      ONE CAN ASSUME SHE WOULD NOT WANT TO SEE HER BROTHER EXECUTED, FAIR TO SAY?

A.      I WISH IT WAS FAIR TO SAY.  IN MY EXPERIENCE, IT'S NOT QUITE AS SIMPLE AS THAT SOMETIMES.

Q.      DID SHE EVER EXPRESS TO YOU THAT SHE HOPED THAT MR. HAMMER GOT THE DEATH PENALTY IN THIS CASE?

A.      NO.

Q.      SHE HAS ALSO BEEN INTERVIEWED SEVERAL TIMES PREVIOUSLY, CORRECT?

A.      YES.

Q.      TO YOUR KNOWLEDGE, SHE HAS NEVER TESTIFIED TO ANY OF THE ALLEGATIONS THAT SHE SHARED WITH YOU AS TO SEXUAL ABUSE, RIGHT?

A.      SHE HAS NEVER SHARED ANY ALLEGATIONS, YOU MEAN ABOUT BEING SEXUALLY ABUSED BY HER FATHER?

Q.      ANY SEXUAL ALLEGATIONS.  HAS SHE EVER TESTIFIED, WERE YOU SHOWN ANY TESTIMONY AND ASKED TO REVIEW IT FOR DIANE HAMMER?

A.       TESTIMONY.  I DON'T REMEMBER ANY TESTIMONY.

Q.       ALL RIGHT.

         SO YOU SAID YOU DID NOT REVIEW WHAT SHE SAID TO DR. WOLFSON, IS THAT FAIR TO SAY?

A.       WELL, IF THAT WAS INCLUDED IN THAT 145 PAGE REPORT, THEN NO.

Q.       DID ANYBODY EVER BRING TO YOUR ATTENTION THAT DIANE HAMMER DID NOT TELL DR. WOLFSON THAT THERE WAS ANY INCEST IN THE FAMILY?  WAS THAT EVER BROUGHT TO YOUR ATTENTION?

A.       NO.

Q.       AND WHEN YOU WERE REVIEWING JILL MILLER'S NOTES, I BELIEVE THIS HAS A PAGE 6 ON IT, DO YOU HAVE THAT?

A.       THE PART ABOUT SEEING JILL MILLER?

Q.       YES, SIR.

A.       I DON'T SEE IT.  SIX AT THE TOP AGAIN?

Q.       NO, MINE HAS A SIX AT THE BOTTOM.  CAN YOU SEE THAT?  CAN YOU GO TO THE PART YOU READ INTO THE RECORD?

A.       FROM THE TAB PAGE HERE?  IF IT'S ON THAT SAME PAGE.

Q.       THIS IS THE PORTION YOU READ INTO THE RECORD ABOUT WHAT DIANE HAMMER TOLD JILL MILLER AS FAR AS THE INCEST, CORRECT?

A.       CORRECT.

Q.       AND HER FATHER RAPING HER, CORRECT?

A.      CORRECT.

Q.      AND THIS RECOLLECTION OF DIANE IS DIFFERENT THAN WHAT DAVID SAYS, RIGHT?

A.      IN WHAT RESPECT?

Q.      WELL, SHE TALKS ABOUT A ONE-TIME OCCURRENCE, CORRECT?

A.      WELL, I CAN'T -- NOT KNOWING SORT OF WHAT THE CONTEXT FOR THE NOTETAKING IS, I CAN'T INFER THAT.  SHE IS DESCRIBING ONE INCIDENT.  IT COULD BE THAT JILL MILLER DECIDED TO GO INTO DETAIL ABOUT ONE INCIDENT AMONGST MANY, SO I CAN'T SORT OF MAKE THAT ASSUMPTION ON THE BASIS OF THIS.

Q.      BUT FROM THE FOUR SQUARES OF THIS DOCUMENT, JILL MILLER'S NOTES OF HER INTERVIEW WITH DIANE HAMMER, WHICH ARE FAIRLY LENGTHY, CORRECT?

A.      THEY ARE LENGTHY, YES.

Q.      THERE IS NO OTHER REFERENCE TO ANY OTHER INCEST WITH DAVID, FAIR TO SAY, IT'S THIS ONE INCIDENT?

A.      I DON'T REMEMBER -- IT HAS BEEN A LONG TIME SINCE I HAVE GONE THROUGH ALL HER NOTES, SO I DON'T REMEMBER IF THERE WERE OTHER REFERENCES.

Q.      HOW ABOUT IN HER REPORT, HAVE YOU LOOKED AT MISS MILLER'S REPORT RECENTLY?

A.      NOT RECENTLY.

Q.      LET ME SHOW YOU HER REPORT OF MAY 22, 1998,

WHICH WAS PREVIOUSLY MARKED AS DEFENSE EXHIBIT JM 5. UNFORTUNATELY, THESE REPORTS DON'T HAVE PAGE NUMBERS EITHER, BUT IF YOU CAN GO TO THE FIFTH PAGE OF THIS REPORT.  AND YOU HAVE REVIEWED THIS REPORT BEFORE, CORRECT?

A.      YES.  ACTUALLY, I HAVE PAGE NUMBERS ON THIS.

Q.      WELL --

A.      TOP LEFT CORNER.

Q.      YOU ARE CORRECT.  THANK YOU FOR THAT.

        ALL RIGHT.  SO IF YOU GO TO PAGE 5, THIS IS WHAT DIANE WAS REPORTED AS SAYING IN HER INTERVIEW WITH JILL MILLER, CORRECT?

A.      WELL, THERE IS A SECTION HERE ON DIANE.

Q.      CORRECT.  AND IF YOU JUST SKIM IT FOR ME, THERE IS NOTHING IN THERE ABOUT INCEST OR EVEN ABOUT BEING SEXUALLY ABUSED BY HER FATHER, CORRECT?

A.      NOT IN THIS SECTION, NO.

Q.      DO YOU RECALL A SECTION WHERE DIANE HAMMER WAS REPORTED AS -- WHERE DIANE HAMMER, NOT DAVID, WAS REPORTED AS TELLING MISS MILLER IN A REPORT THAT SHE WAS THE VICTIM OF INCEST?

A.      I DON'T RECALL WHETHER OR NOT IT WAS IN JILL MILLER'S REPORT.

Q.      WOULD IT SURPRISE YOU THAT THERE IS, IN FACT, NO MENTION OF DIANE HAMMER IN ANY OF JILL MILLER'S REPORTS

SAYING ANYTHING ABOUT INCEST OR BEING RAPED BY HER FATHER?

A.    WOULD IT SURPRISE ME, NO.

Q.    DIANE TOLD YOU THAT HER MOTHER NEVER ABUSED HER, MOTHER NEVER ABUSED HER, THAT IS WHAT SHE TOLD YOU, RIGHT?

A.    YOU MEAN SEXUALLY ABUSED HER?

Q.    YES.

A.    NO, DIANE SAID THAT SHE HAD ALSO BEEN SUBJECTED TO THE RAPE BY ENEMA.

Q.    BUT JUST FOCUSING ON THE SEXUAL ABUSE, THERE IS NO CLAIM THAT DIANE HAS MADE TO YOU THAT HER MOTHER SEXUALLY ABUSED HER, CORRECT?

A.    WELL --

Q.    I KNOW, LEAVING ASIDE THE ENEMAS, WHICH YOU --

A.    APART FROM THAT?

Q.    APART FROM THE ENEMAS, DID SHE SAY HER MOTHER FORCED HER TO HAVE SEX WITH MARTIN OR MADE HER LICK HER BREASTS OR DO ANY OF THOSE TYPES OF BEHAVIORS?

A.    NO.

Q.    DIANE ALSO TOLD YOU THAT SHE HAD NO FIRSTHAND KNOWLEDGE THAT HER MOTHER ABUSED DAVID, CORRECT?

A.    CORRECT.

Q.    SHE SAID --

A.    SORRY, TAKE THAT BACK, SHE DID KNOW ABOUT THE

AGAIN FORCED ENEMAS.

Q.       ENEMAS, OKAY.  IF WE CAN LEAVE THE ENEMAS ASIDE FOR PURPOSES OF OUR DIALOGUE.  SHE TOLD YOU THAT THE ONLY WAY SHE KNEW ANYTHING ABOUT DAVID BEING SEXUALLY ABUSED WAS FROM MARTIN'S SECOND WIFE, THAT IS WHAT SHE TOLD YOU, RIGHT?

A.       THAT'S CORRECT.

Q.       SO FROM YOUR INTERVIEW WITH DIANE AND THE THINGS THAT YOU'VE REVIEWED, DIANE NEVER WALKED IN ON DAVID AND HIS MOTHER IN ANY KIND OF COMPROMISED POSITION, CORRECT?

A.       CORRECT.

Q.       AND EVEN THOUGH DAVID WALKED IN ON DIANE, RIGHT?

A.       YES.

Q.       AND EVEN THOUGH MARTIN WALKED IN ON DIANE, RIGHT?

A.       YES.

Q.       NOBODY EVER WALKED IN ON DAVID AND HIS MOTHER?

A.       CORRECT.

Q.       YOU KNOW WHAT KIND OF CONDITIONS THEY LIVED IN, TRUE?

A.       IN A VARIETY OF CONDITIONS, BUT YES.

Q.       SMALL, LITTLE, ONE ROOM SHACKS, RIGHT?

A.       I DON'T KNOW HOW MANY ROOMS THEIR VARIOUS HOUSES HAD.

Q.       SOMETIMES THEY DIDN'T HAVE ANY PLUMBING,

CORRECT?

A.        YES.  SOMETIMES THEY LIVED IN CARS.

Q.        SOMETIMES THEY LIVED IN CARS, SO THIS BEHAVIOR
DID NOT TAKE PLACE IN THE CAR, DID IT?

A.        I WOULD GUESS NOT.

Q.        AND DID ANYONE EVER SHARE WITH YOU THAT DIANE
HAMMER HAS TOLD OTHER PEOPLE, INCLUDING LOUISE LUCK,
THAT SHE WITNESSED DAVID AND MARTIN MESSING AROUND?  DID
ANYONE BRING THAT TO YOUR ATTENTION?

A.        I HAVE A VAGUE RECOLLECTION OF IT, BUT I CAN'T
REMEMBER FROM WHERE.

Q.        THAT WOULD BE CORROBORATIVE OF WHAT MARTIN SAID,
CORRECT, THAT HE --

A.        THAT'S RIGHT.

Q.        -- AND DAVID HAD SEX?

A.        YES.

Q.        ARE YOU AWARE, HOWEVER, THAT DIANE HAS ALSO SAID
ON OCCASIONS THAT MARTIN WAS BEING ABUSED BY THEIR
MOTHER, SEXUALLY ABUSED, NOT THE ENEMAS, SEXUAL ABUSE,
THAT HE WAS HAVING INTERCOURSE WITH HIS MOTHER, DID
ANYONE EVER TELL YOU --

MR. MORENO:  I WOULD ASK FOR A PROFFER ON
THAT.  I AM NOT SURE WHERE THE INTERCOURSE WITH THE
MOTHER EVER CAME FROM.  IF THERE IS A DOCUMENT THAT SAYS
IT, THAT'S FAIR GAME, BUT I AM NOT SURE THERE IS.

MS. HAINES:  GC 23.

THE COURT:  DOES THIS DOCUMENT CONTAIN THAT INFORMATION?

MS. HAINES:  YES, YOUR HONOR.  I WILL DIRECT THE COURT AND COUNSEL TO THE FINAL PAGE OF THIS DOCUMENT.

MR. MORENO:  I WOULD ASK FIRST THAT THE DOCTOR BE QUESTIONED AS TO WHETHER OR NOT HE HAS EVER SEEN THIS DOCUMENT.

THE COURT:  FIRST WE ARE ESTABLISHING THE BASIS OF THE QUESTION.

MR. MORENO:  OKAY, I'M SORRY.

MS. HAINES:  LAST PAGE, LAST TWO BULLET POINTS.

THE COURT:  OKAY.  NOW ASK THE NEXT QUESTION.

BY MS. HAINES:

Q.    DR. LISAK, DID ANYONE EVER BRING TO YOUR ATTENTION THAT DIANE CLAIMED THAT MARTIN WAS SEXUALLY ABUSED BY THEIR MOTHER, MEANING NOT THE ENEMAS BUT ACTUAL --

MR. MORENO:  IT DOES NOT SAY THAT ANYWHERE ABOUT ENEMAS, YOUR HONOR.

MS. HAINES:  I SAID OTHER --

MR. MORENO:  IT DOES NOT SAY NOT ENEMAS.

THE COURT:  SHE SAID OTHER THAN AN ENEMA.

MR. MORENO:  RIGHT, IT DOESN'T SAY THAT.

MS. HAINES:  I DON'T WANT TO USE THE PEJORATIVE.

THE COURT:  OVERRULED.  ASK THE QUESTION.

BY MS. HAINES:

Q.      DID ANYONE EVER TELL YOU, DR. LISAK, THAT DIANE HAS SAID THAT MARTIN WAS F-U-C-K-ED BY THEIR MOTHER?

A.      I DON'T BELIEVE SO, NO.

Q.      AND OF COURSE MARTIN DENIES THAT, RIGHT?

A.      WELL, HE DIDN'T -- HE -- AGAIN, HE THOUGHT HE HAD BEEN SEXUALLY ABUSED OR HE HAD THESE FEELINGS THAT HE HAD BEEN SEXUALLY ABUSED, BUT HE DID NOT SPECIFY BEYOND WHAT THAT MIGHT HAVE ENTAILED IF HE KNOWS, SO.  I DON'T KNOW IF HE WAS ALLUDING TO THAT OR NOT.

Q.      BUT WHEN YOU READ MR. MARTIN HAMMER'S TESTIMONY FROM THESE PROCEEDINGS, YOU SAW WHERE HE TESTIFIED UNDER OATH THAT MY MOTHER WAS NEVER INAPPROPRIATE WITH ME, DO YOU RECALL SEEING THAT?

A.      YES.

Q.      SO THAT WOULD BELIE THAT HIS MOTHER HAD SEXUAL RELATIONS WITH HIM, CORRECT?

A.      OR THAT HE CAN'T RECALL.

Q.      BUT APPARENTLY HE COULD RECALL AT SOME POINT, IF YOU ACCEPT MY REPRESENTATIONS THAT HE SAID IT TO OTHER

PEOPLE, RIGHT?

A.      WELL, I THINK -- I DON'T KNOW WHAT YOU ARE REFERRING TO, BUT CHILD ABUSE SURVIVORS, ESPECIALLY WHEN YOU ARE TALKING ABOUT INCEST PERPETRATED BY A PARENT, IT WOULD NOT BE AT ALL UNUSUAL IF HE WAS EITHER EXTREMELY AMBIVALENT ABOUT DISCLOSING THIS OR RECALLS IT AT A CERTAIN POINT IN HIS LIFE AND NOT AT OTHER POINTS IN HIS LIFE, SO WITHOUT KNOWING MUCH MORE ABOUT THE CONTEXT OF WHEN THESE EITHER PARTIAL DISCLOSURES OR NONDISCLOSURES OCCURRED, ALL I CAN SAY ARE SORT OF VERY GENERAL STATEMENTS.

Q.      SO IS IT FAIR TO SAY YOU JUST DON'T HAVE ENOUGH INFORMATION TO BE ABLE TO ANSWER THAT QUESTION?

A.      CORRECT.

Q.      NOW, DAVID TOLD YOU THAT HE SAW MARTIN AND DIANE HAVING SEX WITH EACH OTHER, CORRECT?

A.      DAVID -- YOU ARE ASKING ME WHETHER DAVID TOLD ME?

Q.      I BELIEVE IN YOUR NOTES IT SAYS THAT DAVID SAID HE SAW DIANE AND MARTIN HAVING SEX.

A.      I BELIEVE THAT'S RIGHT, YES.

Q.      WOULD YOU LIKE TO SEE YOUR NOTES?

A.      YES.  YES.

Q.      MARTIN DOES NOT ADMIT THAT, DOES HE, THAT HE AND DIANE HAD SEX?

A.      I DON'T BELIEVE SO.

Q.      DIANE DOES NOT SAY THAT, DOES SHE?

A.      NO.

Q.      THAT'S DAVID'S WORD FOR IT THAT HE SAW THAT, RIGHT?

A.      CORRECT.

Q.      AND JOHNNY HAMMER, I'M SURE YOU KNOW FROM JILL MILLER'S NOTES AND REPORTS, DENIES ANY OF IT HAPPENING, CORRECT?

A.      CORRECT.

Q.      WHICH BRINGS US TO MR. HAMMER HIMSELF.  YOU INTERVIEWED MR. HAMMER ONE TIME ON JULY 29TH, RIGHT?

A.      RIGHT.

Q.      DURING THAT INTERVIEW, MR. HAMMER TOLD YOU THAT HIS MOTHER USED TO DRESS HIM UP LIKE A LITTLE GIRL, RIGHT?

A.      YES.

Q.      HE SAID SOMETHING SIMILAR TO THAT TO JILL MILLER, CORRECT?

A.      I BELIEVE THAT'S RIGHT, YES.

Q.      IN FACT, WHAT HE SAID TO JILL MILLER WAS A BIT MORE SPECIFIC.  HE SAID THAT SHE WOULD -- HIS MOTHER WOULD PUT MAKEUP ON HIM, TELL HIM HE LOOKED PRETTY, RIGHT?

A.      I DON'T REMEMBER SPECIFICS, BUT I REMEMBER HIM

DESCRIBING SOMETHING LIKE THAT, YEAH.

Q.    DO YOU STILL HAVE JM 5 IN FRONT OF YOU?

A.    YES.

Q.    NOPE, THAT IS NOT IT.

A.    NO?  THIS IS HER SUPPLEMENTAL REPORT.

Q.    JM 5, IT LOOKS -- THAT'S IT, PAGE TWO.  YOU SEE WHERE JILL MILLER WROTE THAT MR. HAMMER CONFIDED IN HER THAT HE WOULD BE MADE TO DRESS UP LIKE A GIRL FROM THE AGES OF 7 TO 13 ABOUT, THAT HIS MOTHER WOULD PUT MAKEUP ON HIM AND THAT HE WAS TOLD THAT HE LOOKED PRETTY, DO YOU SEE WHERE HE TOLD THAT TO JILL MILLER?  THAT IS SIMILAR TO WHAT HE TOLD YOU, RIGHT?

A.    YES.

Q.    AND HE ALSO REPORTED THAT HIS MOTHER CALLED HIM THE NAME TAMMY WHEN HE WAS DRESSED UP LIKE A GIRL, RIGHT?

A.    THAT'S WHAT IT SAYS.

Q.    THEN IT GOES ON TO SAY THAT TAMMY IS ONE OF HIS ALTER PERSONALITIES, RIGHT?

A.    THAT'S WHAT IT SAYS HERE.

Q.    AND THAT HE DEVELOPED THE ALTER PERSONALITY TAMMY FROM THIS EXPERIENCE WITH HIS MOTHER TREATING HIM LIKE A GIRL, THAT IS WHAT JILL MILLER REPORTED, RIGHT?

A.    CORRECT.

Q.    YOU MIGHT RECALL FROM READING MISS MILLER'S

REPORTS THAT WHEN SHE WAS CONDUCTING HER INTERVIEWS THAT IS WHAT SHE WAS TRYING TO FIND, BEHAVIORS OF MR. HAMMER'S THAT WERE CONSISTENT WITH HAVING MULTIPLE PERSONALITIES, RIGHT?

A.      I DON'T KNOW THAT WAS THE GOAL OF HER QUESTIONS, I CAN'T ANSWER THAT QUESTION, I DON'T KNOW WHAT WAS IN HER MIND.

Q.      IT WAS IN HER REPORT.  DID YOU SEE THAT IN HER REPORT, THAT HER GOAL WAS TO FIND BEHAVIORS THAT WERE CONSISTENT WITH MULTIPLE PERSONALITY DISORDER?

A.      I DON'T REMEMBER READING THAT SPECIFICALLY.

Q.      SHOWING YOU WHAT'S BEEN MARKED AS DEFENDANT'S EXHIBIT JM 2.  HANDED YOU DEFENSE EXHIBIT JM 2, THE FIRST PARAGRAPH THAT IS TABBED, DO YOU SEE THAT HER AGENDA OR HER GOAL WAS TO FIND BEHAVIORS THAT WERE CONSISTENT WITH -- I THINK SHE CALLS IT DISSOCIATIVE IDENTITY DISORDER?

A.      IT'S IN THE FIRST PARAGRAPH?  LET ME SEE. SYMPTOMS, BEHAVIORS THAT MIGHT BE CONSISTENT WITH OR CORROBORATIVE OF A DIAGNOSIS OF DISSOCIATIVE DISORDER.

Q.      THAT IS WHAT WAS HER GOAL WHEN SHE WAS CONDUCTING THESE INTERVIEWS, ACCORDING TO HER REPORT?

A.      YES.

Q.      AND ONE OF THE THINGS, GETTING BACK TO THE TOPIC, IS THAT MR. HAMMER HAD THIS PERSONALITY TAMMY

THAT STEMMED FROM HIS MOTHER TREATING HIM LIKE A GIRL, CORRECT?

A.      THAT'S WHAT SHE SAID IN THAT SECTION.

Q.      NOW, BECAUSE YOU HAVE READ THE TESTIMONY OF DOCTORS WOLFSON -- NO, DR. MITCHELL AND EVEN DR. BLUMBERG, YOU KNOW THAT THEY FOUND MR. HAMMER WAS MALINGERING WITH RESPECT TO HAVING THESE ALTER PERSONALITIES, CORRECT?

MR. MORENO:  I'M GOING TO OBJECT ON THAT DR. BLUMBERG.  HE DID NOT STATE THAT HE FOUND DAVID TO BE MALINGERING, HE FOUND THAT HE DID NOT REACH THE DIAGNOSIS OF DID.  HE NEVER TESTIFIED THAT HE FOUND HIM TO BE MALINGERING.

THE COURT:  OVERRULED.

THE WITNESS:  THAT IS MY RECOLLECTION, THAT HE KIND OF -- HE DIDN'T DISPUTE IT OR AGREE WITH IT.  DR.  WOLFSON, I GUESS I DO REMEMBER DR. WOLFSON DISAGREEING WITH THE DIAGNOSIS.

BY MS. HAINES:

Q.      AND DR. MITCHELL, CORRECT?  DR. MITCHELL TESTIFIED THAT HE FOUND THAT TO BE MALINGERING, CORRECT?

A.      I DON'T REMEMBER SPECIFICALLY, BUT IT DOESN'T SURPRISE ME.

Q.      SO AT LEAST TWO DOCTORS, WE'LL SAY DR. WOLFSON

AND DR. MITCHELL, MAYBE DR. BLUMBERG WAS ON THE FENCE, THINKS THAT THIS TAMMY PERSONALITY WAS A MALINGERED THING BY MR. HAMMER, RIGHT?

A.    SOUNDS LIKE IT.

Q.    ALL RIGHT.  DID YOU EVER QUESTION WHETHER, BECAUSE HE -- I'M GOING TO USE MADE UP OR MADE UP TAMMY THAT MAYBE THE REST OF THIS WAS NOT 100 PERCENT TRUE?

A.    WELL, I ALWAYS WEIGH ALL KINDS OF FACTORS IN ASSESSING THE CREDIBILITY OF SOMEBODY'S DISCLOSURE.  I DON'T WANT TO RESTATE A LOT OF THE DIRECT TESTIMONY THAT I GAVE THIS MORNING ALREADY, BUT THERE IS A GREAT DEAL OF CORROBORATIVE INFORMATION IN THIS CASE, INCLUDING THE ASSESSMENTS AS WE WENT OVER OF OTHER CLINICIANS WHO FOUND THAT HE WAS NOT MALINGERING AND THAT HIS RESPONSES AND SO FORTH WERE GENUINE.  THAT WAS CERTAINLY MY CONCLUSION AS WELL SPECIFIC TO THE INCIDENTS OF SEXUAL ABUSE THAT HE EXPERIENCED.

Q.    JUST WITH RESPECT TO THIS ONE POINT, DID YOU EVER ASK MR. HAMMER, YOU KNOW, TAMMY -- WELL, YOU NEVER SAW ANY EVIDENCE OF A TAMMY, DID YOU?

A.    NOPE.

Q.    TAMMY, MAYBE THAT DOES NOT REALLY EXIST, WAS THE EPISODE BEHIND TAMMY, DID THAT REALLY HAPPEN?  DID YOU EVER ASK MR. HAMMER THAT QUESTION?

A.    NO.

Q.        WOULD YOU AGREE THAT THE NUMBER OF PEOPLE MR. HAMMER HAS ACCUSED OF ABUSING HIM SEXUALLY HAS CERTAINLY MUSHROOMED OVER TIME?

A.        WELL, I DON'T THINK -- THERE IS AN IMPLICATION BEHIND YOUR USE OF THE WORD MUSHROOM.

THAT IS A TYPICAL WAY FOR DISCLOSURES TO HAPPEN, AND VERY OFTEN WHEN PEOPLE MAKE -- DO ASSESSMENTS OF SEXUAL ABUSE, THEY ASSESS IN WAYS THAT REALLY MITIGATE AGAINST GETTING FULL DISCLOSURE.  SO WHEN I ASKED MR. HAMMER ABOUT -- I DID NOT ASK HIM ABOUT, YOU KNOW, WERE YOU EVER SEXUALLY ABUSED, I ASKED HIM TO TALK TO ME ABOUT EVERY SEXUAL EXPERIENCE HE HAS HAD.

MANY OF THESE EXPERIENCES I DON'T THINK HE EVEN THOUGHT OF IN HIS OWN MIND CATEGORIZED AS SEXUAL ABUSE.

Q.        BUT YOU WOULD ASSUME THAT JILL MILLER, WHO IS A DEFENSE MITIGATION SPECIALIST, THAT SHE ALSO WANTED TO OBTAIN AS MANY AS DETAILS ABOUT THE SEXUAL ABUSE FROM MR. HAMMER AS POSSIBLE, CORRECT?

A.        YES, BUT HOW SHE GOES ABOUT DOING IT IS REALLY THE DETERMINING FACTOR IN HOW MUCH DISCLOSURE SHE GETS, AND ALSO THE EXTENT TO WHICH MR. HAMMER IS PREPARED TO DISCLOSE.

Q.        THE SAME THINGS WITH DR. BLUMBERG, WHO IS A

DEFENSE EXPERT, CORRECT, AND DR. MITCHELL, WHO WAS MR. HAMMER'S DOCTOR, YOU WOULD ASSUME THAT BOTH OF THOSE GENTLEMEN WERE TRYING TO ELICIT FULL AND COMPLETE HISTORIES ABOUT MR. HAMMER'S SEXUAL ABUSE, CORRECT?

A.      PROBABLY, BUT AGAIN, IT DEPENDS ON HOW THEY GO ABOUT DOING IT.

Q.      AND CERTAINLY WHEN MR. HAMMER WROTE HIS BOOK, THE FINAL ESCAPE, HE HAD AN OPPORTUNITY -- WITHOUT ANYBODY TRYING TO ELICIT ANYTHING FROM HIM, HE HAD AN OPPORTUNITY TO POUR HIS HEART OUT, RIGHT?

A.      IF HE WAS PREPARED TO AND WANTED TO THAT, YEAH.

Q.      HE WROTE THE BOOK IN 2004, CORRECT?

A.      YES.

Q.      NOW, MR. HAMMER TOLD YOU THAT HE WAS FIRST SEXUALLY ABUSED BY A LITTLE GIRL, RIGHT, WHO WAS 7 OR 8 YEARS OLD WHEN HE WAS 5?

A.      YES.

Q.      ANY DOUBT ABOUT THAT?

A.      I WAS JUST TRYING TO REMEMBER WHAT AGE HE WAS.

Q.      AND HE SAID, AND I DON'T MEAN TO BE DISGUSTING, BUT HE SAID THE GIRL PLAYED WITH HIS PENIS UNDER A BLANKET IN THE BACK YARD, RIGHT?

A.      I THINK THAT'S RIGHT, YES.

Q.      HE TOLD YOU THE LITTLE GIRL SAID TO HIM THAT MR. HAMMER'S PENIS WAS NOT AS BIG AS HER DADDY'S,

CORRECT?

A.      CORRECT.

Q.      IMPLYING THAT SHE WAS BEING ABUSED AS WELL, RIGHT?

A.      WELL, I DON'T KNOW.  THAT COULD BE A REFERENCE TO ABUSE OR COULD BE A REFERENCE TO SIMPLY THE FACT THAT SHE SAW HER FATHER NAKED.

Q.      AND MR. HAMMER SAID THAT THIS SEXUAL ABUSE FROM THE LITTLE GIRL NEXT DOOR HAPPENED A FEW TIMES, RIGHT?

A.      I DON'T REMEMBER WHETHER IT WAS -- I DON'T REMEMBER WHETHER IT WAS MORE THAN ONCE.  IF IT'S IN MY NOTES THEN.

Q.      WOULD YOU ACCEPT MY REPRESENTATION THAT IT'S IN YOUR NOTES?

A.      YES.

Q.      BUT OF COURSE TO YOUR KNOWLEDGE HE NEVER TOLD ANYTHING LIKE THAT TO DR. WOLFSON, DID HE?

A.      I DON'T BELIEVE SO, NO.

Q.      DID HE TELL THAT TO JILL MILLER?

A.      I DON'T KNOW, I DON'T REMEMBER SPECIFICALLY, BUT IT WOULDN'T BE SURPRISING IF HE DIDN'T.

Q.      WELL, SPECIFICALLY WHAT HE TOLD EVERYBODY ELSE TO INCLUDE DR. MITCHELL AND DR. BLUMBERG AND HIS BOOK WAS THAT THE FIRST PERSON WHO SEXUALLY ABUSED HIM WAS RON MILLER, CORRECT?

A.      I BELIEVE THAT'S RIGHT, AND HE ACTUALLY -- WHEN HE DESCRIBED THIS TO ME, I BELIEVE HE TOLD ME ABOUT RON FIRST AND THEN RECALLED THIS INCIDENT WITH THE GIRL AND IT WAS HIS RECOLLECTION THAT IT ACTUALLY HAD OCCURRED BEFORE THE ABUSE BY RON.

Q.      SO WHAT HE TOLD YOU WAS DIFFERENT THAN WHAT HE TOLD JILL MILLER, DR. MITCHELL, DR. BLUMBERG AND WHAT HE WROTE IN HIS BOOK, IS THAT CORRECT?

A.      CORRECT.

Q.      HE SAID -- THERE IS NO RECORD TO SUPPORT THIS ABUSE BY THE LITTLE GIRL, FAIR TO SAY?

A.      I WOULD DOUBT THERE IS ANY RECORDS.

Q.      BECAUSE THE ONLY RECORD, AND YOU KNOW ABOUT THE RECORD, IS GOVERNMENT EXHIBIT GC 20, CORRECT?  LET ME SHOW YOU WHAT HAS BEEN MARKED AS GOVERNMENT EXHIBIT GC 20.

        DR. LISAK, HAVE YOU SEEN THIS HOSPITAL RECORD BEFORE?  AND I'M DIRECTING YOU TO PAGE 24 IN PARTICULAR.

A.      YOU ARE GOING TO HAVE TO JOG MY MEMORY AS TO WHETHER I HAVE SEEN THIS BEFORE.

Q.      WELL, YOU HAVE READ DR. BLUMBERG'S TESTIMONY, RIGHT?

A.      FROM WHEN?

Q.      FROM THE 2255?

A.     YES.

Q.     AND DO YOU RECALL HIM BEING ASKED A SERIES OF QUESTIONS ABOUT THESE HOSPITAL RECORDS?

A.     I DON'T REMEMBER SPECIFICALLY, BUT I'M TRYING -- YOU ASKED ME WHETHER I HAD SEEN THESE RECORDS MYSELF.

Q.     LET ME BACK UP.  HAVE YOU SEEN THESE RECORDS YOURSELF?

A.     THEY DON'T RING A BELL AND I DON'T SEE THEM ON THE LIST, SO I MAY NOT HAVE.

Q.     ALL RIGHT.  BUT DO YOU RECALL IN DR. BLUMBERG'S TESTIMONY THAT HE WAS ASKED ABOUT THE HOSPITAL RECORDS THAT YOU NOW HAVE IN YOUR HAND?

A.     DO I RECALL THAT, NO.

Q.     DO YOU RECALL THERE BEING A SERIES OF QUESTIONS BETWEEN DR. BLUMBERG AND I THINK IT WAS THE PROSECUTOR ABOUT THE FACT THAT AS OF MAY 11, 1973, THE ONLY SEXUAL ABUSE MR. HAMMER EVER REPORTED WAS A SINGLE EPISODE INVOLVING AN OLDER MAN WHO TOOK HIM FISHING, DO YOU RECALL?

A.     YES, I REMEMBER A REFERENCE TO THAT.

Q.     IS IT YOUR UNDERSTANDING THAT THE STATE OF THE RECORDS THAT BETWEEN -- SINCE HIS DATE OF BIRTH UNTIL THE 1995 NOTES THAT YOU TALKED ABOUT FROM DR. MITCHELL, THIS IS THE ONLY REFERENCE TO ANY SEXUAL ABUSE IN ANY RECORD, CORRECT?

A.        SO THERE WAS THE -- THIS MEDICAL RECORD YOU ARE REFERRING TO IS WHEN HE WAS 14 YEARS OLD, IS THAT CORRECT?

Q.        THE BEST I CAN DO TO ANSWER YOUR QUESTION IS THE PAGE PRECEDING 24, PAGE 23 OF THE RECORD, INDICATES IT WAS TAKEN ON MAY 11 OF 1973.

A.        WELL, MY RECOLLECTION IS THAT HE MADE A PARTIAL DISCLOSURE WHEN HE WAS 14 YEARS OLD AND HE SOUGHT OUT HELP AT -- FROM EITHER A PSYCHOLOGIST -- I GUESS IT WAS A PSYCHOLOGIST WHO THEN TRIED TO GET HIS MOTHER TO BRING HIM FOR FOLLOW UP TREATMENT.

Q.        IS THIS THE INCIDENT THAT YOU RECALL WHERE HE SAID THE OLDER MAN TOOK HIM FISHING AND THEN HE TRIED TO PERFORM ORAL SEX AND MR. HAMMER WOKE UP AND HIT THE MAN, IS THAT WHAT YOU ARE TALKING ABOUT, THAT IS THE ONE INCIDENT FROM HIS BIRTH TO THE 1995 NOTES BY DR. MITCHELL THAT TALKS ABOUT ANY SEXUAL ABUSE?

A.        IT MAY BE.  I DON'T REMEMBER -- I DON'T KNOW FOR SURE WHETHER WE ARE TALKING ABOUT THE SAME INCIDENT, BUT I CAN ACCEPT IT IF WE WERE.

Q.        DID YOU SEE WHERE DR. BLUMBERG WAS ASKED THESE SAME QUESTIONS AND INDICATED THIS WAS THE ONLY RECORD THAT HE WAS FAMILIAR WITH?

A.        I MAY HAVE, BUT I JUST DON'T REMEMBER EVERY LINE OF THE TESTIMONY.

Q.      DID YOU AND MR. HAMMER TALK ABOUT THIS INCIDENT?

A.      I ASKED HIM MY OWN QUESTIONS ABOUT HIS SEXUAL HISTORY STARTING FROM THE BEGINNING, WHAT HE COULD REMEMBER.  AND I DIDN'T ASK HIM SPECIFICALLY ABOUT THIS INCIDENT.  I DON'T THINK I EVEN KNEW ABOUT THIS RECORD.

Q.      ALL RIGHT.  AND DR. MITCHELL'S NOTES, DO YOU STILL HAVE DEFENSE EXHIBIT 503 IN FRONT OF YOU?

A.      YES.

Q.      IF YOU CAN TAKE A LOOK AT THAT, THAT IS THE NEXT RECORD OF ANY SEXUAL ABUSE AS FAR AS MEDICAL RECORDS, PSYCHIATRIC RECORDS, HOSPITAL RECORDS.  THE FIRST PAGE OF THAT EXHIBIT MAKES NO REFERENCE TO SEXUAL ABUSE AT ALL, CORRECT?

A.      IT REFERS JUST TO ABUSE IN GENERAL.

Q.      SO WE DON'T KNOW IF DR. MITCHELL WAS TALKING ABOUT PHYSICAL ABUSE OR SEXUAL ABUSE OR A COMBINATION OF THE TWO, CORRECT?

A.      CORRECT.

Q.      THE SECOND PAGE TALKS ABOUT SEXUAL ABUSE AT THE HANDS OF FAMILY MEMBERS, CORRECT?

A.      CORRECT.

Q.      BUT WE DON'T KNOW WHO THOSE FAMILY MEMBERS ARE, DO WE?

A.      RIGHT.

Q.      COULD BE RON MILLER, RIGHT?

A.      COULD BE RON MILLER.

Q.      BECAUSE IT DOES NOT SAY ANYTHING ABOUT HAVING SEXUAL RELATIONS WITH HIS SISTER, RIGHT?

A.      NO, ALTHOUGH FAMILY MEMBERS SUGGESTED IT COULD NOT -- IT WAS UNLIKELY TO BE JUST RON MILLER, IF THAT IS WHAT HE WAS REFERRING TO.

Q.      COULD HAVE BEEN SOME OF THE UNCLES HE HAS TALKED ABOUT, CORRECT?

A.      THERE WAS ANOTHER UNCLE.

Q.      HIS COUSINS, HE HAS TALKED ABOUT THEM TO YOU, RIGHT?

A.      YES.

Q.      IT COULD BE ANY OF THOSE PEOPLE, WE JUST DON'T KNOW, RIGHT?

A.      CORRECT.

Q.      BUT IT DOES NOT SAY ANYTHING ABOUT MY MOTHER MADE ME HAVE SEXUAL INTERCOURSE WITH HER, RIGHT?

A.      WELL, HE NEVER MADE THAT ASSERTION TO ME EITHER.

Q.      WELL, DIDN'T HE SAY -- I GUESS THEY HAD ORAL SEX, CORRECT?

A.      AGAIN, I DON'T LIKE DESCRIBING IT THAT WAY WHEN IT'S SEXUAL ABUSE OF A CHILD.  SO IT WAS SHE ORALLY STIMULATED HIM AND SHE MADE HIM ORALLY STIMULATE HER.

Q.      DOES IT SAY ANYTHING REMOTELY LIKE THAT IN DR. MITCHELL'S RECORD?

A.      NO.

Q.      DOES IT SAY ANYTHING ABOUT THE INCEST WITH HIS SISTER?

A.      NO.

Q.      AND WHEN HE WAS TALKING TO YOU AND MR. HAMMER WAS TALKING TO YOU, THE NEXT INCIDENT HE TOLD YOU ABOUT AFTER THE LITTLE GIRL AND UNCLE RON WAS ANOTHER INCIDENT WHERE HE WAS NINE, CORRECT, AND THIS HAPPENED IN 1967, DO YOU REMEMBER THAT?

A.      HANG ON A SECOND, LET ME GO TO THAT LIST.

Q.      TO JOG YOUR MEMORY IF IT HELPS, HE SAID HE WENT TO STAY WITH HIS MOTHER'S SISTER AND THERE WERE TWO FEMALE COUSINS?

A.      YES.

Q.      DID HE TELL YOU WHICH SISTER HE STAYED WITH?

A.      NO.

Q.      DID YOU ASK HIM WHO ARE YOU TALKING ABOUT?

A.      I MAY HAVE, I DON'T REMEMBER.

Q.      DID YOU THINK IT WAS IMPORTANT SO THAT YOU COULD CORROBORATE WHAT HE IS SAYING TO KNOW THE NAME OF THE SISTER THAT HE SAID HE WENT AND STAYED WITH?

A.      YEAH, IT WOULD HAVE BEEN A GOOD IDEA.

Q.      HOW ABOUT THE TWO FEMALE COUSINS, DO WE KNOW WHO THEY ARE?

A.      NO, I DON'T.

Q.     DID HE EVER TELL YOU?

A.     I DON'T THINK SO.

Q.     SO AGAIN, I GUESS WE CAN'T GO TO THE COUSINS AND ASK THEM DID THIS HAPPEN?

A.     CORRECT.

Q.     AND HE TOLD YOU THAT THESE TWO FEMALE COUSINS WHO WE DON'T KNOW, THEY ARE ANONYMOUS TO US, THEY TRIED TO GET HIM TO HAVE INTERCOURSE WITH THEM, RIGHT?

A.     CORRECT.

Q.     HE DID NOT TELL THAT TO DR. BLUMBERG, DID HE?

A.     NOT THAT I KNOW.

Q.     BECAUSE HE TOLD DR. BLUMBERG THAT HE WAS ABUSED BY THREE PEOPLE IN HIS CHILDHOOD, THEY WERE ALL MEN, RIGHT?

A.     I DON'T REMEMBER WHETHER HE DESCRIBED THEM AS MEN.

Q.     I'M GOING TO SHOW YOU DR. BLUMBERG'S TESTIMONY AND SEE IF THAT REFRESHES YOUR RECOLLECTION.  THIS WOULD BE GOVERNMENT EXHIBIT GC 24.

        YOU CAN TAKE A LOOK AT THAT, DR. LISAK, SEE IF THIS REFRESHES YOUR RECOLLECTION, PAGE 95 STARTING AT LINE 10.  DOES THIS HELP YOU RECALL THAT WHAT DR. BLUMBERG WAS MADE AWARE OF WAS THAT THERE WERE THREE PEOPLE WHO SEXUALLY ABUSED MR. HAMMER DURING HIS CHILDHOOD, A MATERNAL UNCLE, WHO I ASSUME IS RONNIE

MILLER, RIGHT?

A.        THAT SOUNDS LIKE IT, YES.

Q.        ANOTHER MATERNAL UNCLE WHO WE DON'T KNOW WHAT HIS NAME IS?

A.        CORRECT.

Q.        AND A FRIEND OF THE UNCLES WHO WE ALSO DON'T KNOW WHAT HIS NAME WAS?

A.        CORRECT.

Q.        SO IT DOES NOT APPEAR THAT MR. --  THAT DR. BLUMBERG WAS AWARE ABOUT THE FEMALE COUSINS, RIGHT?

A.        CORRECT.

Q.        THAT IS NOT IN JILL MILLER'S REPORT?

A.        CORRECT.

Q.        OR IN MR. HAMMER'S BOOK?

A.        CORRECT.

Q.        ARE YOU AWARE OF WHO MR. HAMMER REPORTED TO DR. WOLFSON AS BEING THE PEOPLE THAT ABUSED HIM?

A.        I DON'T REMEMBER SPECIFICALLY, NO.

Q.        IF I JOG YOUR MEMORY, HE TOLD DR. WOLFSON, UNCLE RONNIE, CORRECT?

A.        I THINK SO, YES.

Q.        HE ALSO MENTIONED A COUSIN BY THE NAME OF LARRY, DO YOU RECALL THAT?

A.        I THINK SO.

Q.        AND A MAN BY THE NAME OF RAY SHERIDAN, CORRECT?

A.      YES.

Q.      OF COURSE HIS SISTER, RIGHT?

A.      YES.

Q.      DID HE TELL YOU ABOUT COUSIN LARRY?

A.      I REMEMBER THE NAME LARRY, SO HE MAY HAVE.  I DON'T REMEMBER WHETHER I PUT IT IN MY NOTES, BUT I DEFINITELY REMEMBER HIM MENTIONING LARRY.

Q.      WOULD YOU ACCEPT MY PROFFER THAT IT'S NOT IN YOUR NOTES BUT HE TOLD YOU ABOUT COUSIN LARRY?

A.      SURE.

Q.      DO YOU RECALL IN JILL MILLER'S REPORT THAT LARRY WAS ACTUALLY INTERVIEWED, RIGHT?

A.      I DON'T REMEMBER SPECIFICALLY, BUT I WILL TAKE YOUR WORD FOR IT.

Q.      OKAY, YOU CAN SAVE ME THE WALK.

AND WHEN LARRY WAS INTERVIEWED BY JILL MILLER, DO YOU RECALL SEEING ANYTHING ABOUT LARRY EVEN BEING CONFRONTED WITH THE FACT THAT, WELL, MR. HAMMER SAID YOU MOLESTED HIM FOR A GOOD 10 YEARS, DO YOU REMEMBER SEEING ANYTHING LIKE THAT?

A.      NO.

Q.      SO I THINK TO RECAP, BY THE AGE OF 10 MR. HAMMER HAD TOLD YOU THAT HE WAS ABUSED BY SIX DIFFERENT PEOPLE, IS THAT FAIR TO SAY?

I CAN MAKE YOUR LIFE A LITTLE EASIER, IF

YOU CAN GET THE ELMO UP.  DO YOU SEE THE LIST, DR. LISAK, YOU WOULD AGREE THAT THE LITTLE GIRL IS THE FIRST ONE, RIGHT?

A.      YES.

Q.      UNCLE RONNIE WAS NEXT, RIGHT?

A.      YES.

Q.      THERE IS THE MATERNAL UNCLE THAT DR. BLUMBERG MENTIONED, WE DON'T KNOW WHO THAT IS, RIGHT?

A.      YES.

Q.      THERE'S THE UNCLE'S FRIEND THAT DR. BLUMBERG MENTIONED, WE DON'T KNOW WHO THAT IS, RIGHT?

A.      YES.

Q.      THERE'S TWO FEMALE COUSINS, WE DON'T KNOW WHO THEY ARE, RIGHT?

A.      CORRECT.

Q.      AND THEN MR. HAMMER -- I THINK NOW WE ARE GETTING INTO ABOUT AGE 10 OR 11, RIGHT?  UNCLE ALBERT, HE TOLD YOU ABOUT UNCLE ALBERT, RIGHT?

A.      HE DID NOT NAME ALBERT, BUT I RECOGNIZE THAT.

Q.      HE DID NOT TELL YOU THAT UNCLE ALBERT HAD ANALLY SODOMIZED HIM AND EJACULATED IN HIS FACE, THAT IS NOT IN YOUR NOTES?

A.      IT IS, BUT I MAY JUST BE FORGETTING THE NAME.

Q.      HE TOLD YOU ABOUT A FRATERNAL UNCLE, UNCLE ALBERT, CORRECT?

A.    YES.

Q.    WHO ANALLY SODOMIZED HIM, FORCED HIM TO HAVE ORAL SEX AND EJACULATED IN HIS FACE, RIGHT?

A.    CORRECT.

Q.    HIS MOTHER DURING THIS TIME PERIOD WAS DOING MORE THAN THE ENEMAS, RIGHT?

A.    YES.

Q.    THERE'S A MAN NAMED EDWIN, RIGHT?

A.    YES.

Q.    EDWIN WAS A 50-YEAR-OLD MAN WHO PAID MR. HAMMER FOR ORAL SEX AND MASTURBATION, RIGHT?

A.    THAT'S CORRECT.

Q.    AND ANALLY RAPED HIM NUMEROUS TIMES, ACCORDING TO MR. HAMMER?

A.    THAT'S RIGHT.

Q.    WHICH AGAIN, THAT IS NOT IN JILL MILLER'S REPORT, DR. BLUMBERG'S TESTIMONY OR MR. HAMMER'S BOOK, ANYTHING ABOUT EDWIN, IS THERE?

A.    I WILL TAKE YOUR WORD FOR IT.

Q.    ALL RIGHT.  RAY SHERIDAN?

A.    YES.

Q.    MR. HAMMER SAID THAT LASTED FOR A LONG TIME, THAT WAS SEXUAL ABUSE UNTIL HE WAS 18, RIGHT?

A.    CORRECT.

Q.    HE SAID THERE WAS A GUY -- A JANITOR NAMED JACK,

RIGHT?

A.       YES.

Q.       WHO MADE HIM PERFORM ORAL SEX?

A.       THAT'S RIGHT.

Q.       HE EXPLAINED TO YOU THAT THAT ABUSE HAPPENED SIX
TIMES WITHIN FOUR MONTHS, RIGHT?

A.       IF THAT IS IN MY NOTES.

Q.       IN THE BASEMENT OF THE SCHOOL OR IN THE
JANITOR'S CAR, CORRECT?

A.       THAT'S RIGHT.

Q.       HE DID NOT SAY ANYTHING ABOUT JANITOR JACK TO
THE OTHER DOCTORS OR IN HIS BOOK, DID HE?

A.       I WILL TAKE YOUR WORD FOR IT.

Q.       OR JILL MILLER?

A.       CORRECT.

Q.       AND THEN EDWIN LATHAM, THAT IS WHAT HE TOLD YOU,
THIS IS ANOTHER MAN WHO FORCED HIM TO PERFORM ORAL SEX
FOR MONEY?

A.       YES.

Q.       AGAIN, I BELIEVE THAT YOU ARE THE ONLY PERSON HE
EVER MENTIONED EDWIN LATHAM TO, RIGHT?

A.       I WILL TAKE YOUR WORD FOR IT.

Q.       DO YOU RECALL SEEING ANY OTHER REPORTS, RECORDS?

A.       NO.

Q.       LARRY DALE, THAT IS THE ONE THAT YOU VAGUELY

REMEMBER, BUT YOU ARE WILLING TO ACCEPT MY PROFFER THAT
HE MENTIONED THAT TO DR. WOLFSON, CORRECT?

A.      OKAY.

Q.      HIS SISTER, RIGHT?

A.      YES.

Q.      THERE IS THE MAN WHO TOOK HIM FISHING FROM THE
OKLAHOMA RECORDS THAT WE TALKED ABOUT, CORRECT?

A.      WELL, I THINK IT IS LIKELY THAT THAT IS ONE OF
THESE OTHER INDIVIDUALS THAT HE'S -- IT'S KIND OF A
MASKED DISCLOSURE.

Q.      BUT THESE OTHER INDIVIDUALS HE SAID HE ACTUALLY
WAS FORCED TO HAVE SEX WHEREAS THE MAN IN THE FISHING
BOAT HE SAID HE WAS ABLE TO PUNCH HIM AND THAT ENDED
THAT, RIGHT?

A.      RIGHT, AND THAT IS A VERY TYPICAL WAY FOR
ESPECIALLY A MALE TO MAKE AN INITIAL DISCLOSURE ABOUT
SEXUAL ABUSE, TO BOTH MINIMIZE WHAT HAPPENED AND ALSO TO
PORTRAY HIMSELF AS HAVING HAD MORE CONTROL, MORE POWER
OVER THE SITUATION THAN HE ACTUALLY DID.  SO IT'S NOT AT
ALL AN UNUSUAL WAY OF, ESPECIALLY AT THAT AGE, FOR
SOMEBODY THAT MAKE THAT KIND OF DISCLOSURE.

Q.      SO IF WE TAKE THE FISHING MAN OFF OF THIS, WE
ARE LEFT WITH 15 PEOPLE THAT MR. HAMMER HAS DESCRIBED IN
FAIRLY GRAPHIC DETAIL ABUSED HIM DURING A TEN-YEAR
PERIOD, IS THAT ABOUT RIGHT?

A.    I WILL TAKE YOUR WORD FOR THE MATH.  IT WAS AN AWFUL LOT OF PEOPLE.

Q.    RIGHT, IT'S A LOT OF PEOPLE, RIGHT?

A.    YES.

Q.    THESE ARE NOT ONE TIME INCIDENTS, ACCORDING TO HIM, RIGHT?

A.    MOST OF THEM ARE REPEATED.

Q.    FOR YEARS ACCORDING TO HIM, RIGHT?

A.    SOME OF THEM.

Q.    A LOT OF THEM.  UNCLE ALBERT WAS FOR YEARS, RIGHT?

A.    BUT THEY WERE -- SOME OF THESE WERE DURING THE SUMMER, FOR EXAMPLE, THEY WOULD BE IN PROXIMITY AND SO HE WOULD BE ABUSED FOR A PERIOD OF TIME DURING THE SUMMER OR DURING A PART OF THE YEAR, SO IT WAS NOT CONTINUOUS OVER 12 MONTHS OF THE YEAR.

Q.    BUT STILL, THEY WERE ONGOING, UNCLE ALBERT WAS ONGOING, RIGHT?

A.    YES.

Q.    RAY SHERIDAN WAS ONGOING, ACCORDING TO MR. HAMMER?

A.    YES.

Q.    HIS SISTER WAS ONGOING?

A.    YES.

Q.    HIS MOTHER WAS ONGOING?

A.        FOR A PERIOD OF TIME UNTIL HE WAS 11.

Q.        WE ARE NOT TALKING ABOUT INSIGNIFICANT
INCIDENTS, ARE WE, ACCORDING TO MR. HAMMER?

A.        NO.

Q.        WE ARE TALK ABOUT FULL-BLOWN RAPE IN A LOT OF
THESE CASES, RIGHT?

A.        YES.

Q.        ORAL SEX, RIGHT?  INCEST, RIGHT?

A.        YES.

Q.        THESE ARE NOT JUST MINOR FONDLINGS AND THEN HE
IS GIVEN A LOLLIPOP AND HE GOES HOME, RIGHT?

A.        RIGHT.

Q.        ACCORDING TO WHAT HE HAS TOLD YOU?

A.        YES.

Q.        NOW, THE SEX WITH HIS MOTHER, THAT FIRST
MANIFESTED ITSELF IN 2004 WHEN HE WAS TALKING TO DR.
BLUMBERG, CORRECT?

A.        I BELIEVE THAT'S RIGHT.

Q.        YOU WOULD AGREE WITH DR. BLUMBERG THAT THERE IS
NO RECORD ANYWHERE OF THAT CLAIM BEFORE 2004?

A.        NOT SPECIFICALLY.  THERE IS THE ALLUSION OF
COURSE FROM 1995 THAT THERE HAD BEEN SEXUAL ABUSE, BUT
IT'S NOT SPECIFIC.

Q.        MR. HAMMER AT THE SAME TIME THAT HE WAS SAYING
THAT HE WAS SEXUALLY ABUSED BY HIS MOTHER WAS ALSO

ARGUING THAT HE HAD POST-TRAUMATIC STRESS DISORDER AT THE TIME HE TOOK HIS GUILTY PLEA, DID YOU SEE THAT?

A.    I THINK SO.  I DON'T REMEMBER THAT.

Q.    DO YOU REMEMBER WHEN YOU WERE READING DR. BLUMBERG AND DR. MITCHELL'S TESTIMONY THAT THEY WERE TESTIFYING ABOUT WHETHER MR. HAMMER WAS COMPETENT TO TAKE HIS GUILTY PLEA, YOU SAW THAT, RIGHT?

A.    YES.

Q.    MR. HAMMER'S ARGUMENT WAS THAT HE WAS NOT BECAUSE HE WAS SUFFERING FROM POST-TRAUMATIC STRESS DISORDER, RIGHT?

A.    I BELIEVE THAT'S RIGHT.

Q.    HE SAID THAT THE PTSD WAS TRIGGERED BY BEING IN THE COURTROOM WATCHING ALL OF THE TESTIMONY AND HAVING THESE FLASHBACKS ABOUT HIS MOTHER, RIGHT?

A.    I DON'T REMEMBER SPECIFICALLY.  THIS IS QUITE A WHILE AGO AND IT WAS NOT ALL THAT DIRECTLY RELATED TO WHAT I WAS EVALUATING, SO I DON'T REMEMBER THE SPECIFICS.

Q.    WELL, YOU KNOW THAT HE HAS NEVER SAID ONE WORD ABOUT THIS TO DR. WOLFSON, CORRECT?

A.    ONE WORD OF?

Q.    BEING SEXUALLY ABUSED BY HIS MOTHER OTHER THAN THE ENEMAS, THE SEXUAL ABUSE THAT YOU DESCRIBED, THE LICKING AND THE FONDLING AND THE PENETRATION, NEVER SAID

ANYTHING ABOUT THAT TO DR. WOLFSON?

A.      I DON'T BELIEVE SO.

Q.      DESPITE THE FACT THAT DR. WOLFSON SPENT A MONTH-AND-A-HALF WITH HIM, CORRECT?

A.      I DON'T REMEMBER HOW LONG DR. WOLFSON SPENT WITH HIM.

Q.      HE SAID NOTHING ABOUT THIS ABUSE TO HIS OWN MITIGATION SPECIALIST, JILL MILLER, RIGHT?

A.      CORRECT.

Q.      DESPITE THE FACT THAT MS. MILLER INTERVIEWED HIM FOR 16 HOURS, CORRECT?

A.      CORRECT.

Q.      AND NO WITNESS, NONE OF THE 44 WITNESSES THAT MISS MILLER INTERVIEWED CORROBORATED THIS, DID THEY?

A.      WELL, NOBODY OBSERVED HIM, IT WOULD BE VERY DIFFICULT FOR SOMEBODY TO CORROBORATE THAT.

Q.      NOBODY HAS WITNESSED THIS -- UNLIKE WHAT YOU DESCRIBED WITH DIANE, NOBODY HAS WITNESSED THIS, HAVE THEY?

A.      IF THEY DID, THEY HAVE NOT COME FORWARD.

Q.      AND THE PEOPLE THAT HAVE BEEN INTERVIEWED, ALL OF HIS CLOSEST FAMILY MEMBERS, MEMBERS OF HIS EXTENDED FAMILY, THEY DON'T KNOW ANYTHING ABOUT THIS, DO THEY?

A.      OTHER THAN DIANE REPORTING WHAT SHE HEARD FROM HIS SECOND WIFE.

Q.      HE DID NOT WRITE A SINGLE WORD ABOUT THIS IN HIS BOOK, DID HE?

A.      I DON'T BELIEVE SO, NO.

Q.      DID YOU ASK MR. HAMMER ABOUT THIS, SIR, WHY DID YOU WAIT UNTIL 2004 WHEN YOU WERE CHALLENGING YOUR GUILTY PLEA TO COME FORWARD WITH THIS ABUSE?

A.      NO, BECAUSE NONE OF THIS IS THE SLIGHTEST BIT SURPRISING, THE KIND OF DISCLOSURE THAT WE ARE TALKING ABOUT.  TO DISCLOSE MATERNAL INCEST IS USUALLY ALMOST UNIVERSALLY EXPERIENCED BY ESPECIALLY MALES AS THE MOST HUMILIATING KIND OF SEXUAL ABUSE TO DISCLOSE, AND AS WE DISCUSSED DURING THE DIRECT, THERE IS SO MUCH CONFLICT AROUND THIS THAT IN ADDITION TO THE SHAME AND THE HUMILIATION THAT HE IS TRYING TO PROTECT HIMSELF FROM, HE IS ALSO STILL ACTUALLY PROTECTING HIS MOTHER.  HE DOES NOT WANT TO DISCLOSE AND ESSENTIALLY POINT THE FINGER AT HIS MOTHER, SO IT'S NOT AT ALL SURPRISING THAT THIS WOULD BE ONE OF THE LAST THINGS THAT HE WOULD DISCLOSE.

Q.      AND YOU WOULD AGREE TO THAT STATEMENT EVEN THOUGH BY 1997 WHEN HE WAS FIGHTING FOR HIS LIFE HERE IN COURT, HIS MOTHER HAD BEEN DEAD FOR A LONG TIME AT THAT POINT, RIGHT?

A.      SHE DIED IN '80 SOMETHING, I BELIEVE.

Q.      RIGHT.  IN 1997 HE SAID NOTHING ABOUT THIS

THOUGH, DID HE?

A.       ACTUALLY, MY EXPERIENCE -- I HAVE WORKED ON CASES WHERE WE HAVE ACTUALLY VERY SOLID EVIDENCE OF SEXUAL ABUSE AND STEADFAST DENIAL FROM THE DEFENDANT IN CAPITAL CASES WHO ARE FACING THE DEATH PENALTY, WHO WOULD RATHER FACE THE DEATH PENALTY THAN ACKNOWLEDGE OR DISCLOSE THE ABUSE, SO THAT IS NOT THAT SURPRISING.

Q.       WELL, HE WAS DISCLOSING OTHER TYPES OF ABUSE, WASN'T HE?

A.       THAT'S CORRECT.

Q.       AT THE HANDS OF HIS MOTHER, RIGHT?

A.       THAT'S CORRECT.

Q.       HE JUST DID NOT SAY ANYTHING ABOUT THIS TYPE OF ABUSE?

A.       THE THING ABOUT THE ABUSE THAT YOU ARE REFERRING TO, THE RAPE BY ENEMA, I DON'T THINK HE RECOGNIZED THAT OR PERCEIVED THAT AS SEXUAL ABUSE.  HE -- OBVIOUSLY IT WAS A TRAUMATIC EXPERIENCE TO HIM, BUT THAT IS ONE OF THOSE THINGS THAT HE WOULD NOT HAVE PUT INTO THE CATEGORY OF SEXUAL ABUSE ON HIS OWN.

Q.       NOW, I COUNTED YOUR NOTES AND THERE ARE ABOUT 25 PAGES OF NOTES.  WOULD YOU ACCEPT MY COUNT?

A.       SURE.

Q.       DID MR. HAMMER EVER TELL YOU THAT HE HAD ABUSED HIS BROTHER MARTIN?

A.      NO.

Q.      AND I'M SURE YOU ARE AWARE, BECAUSE IT HAS BEEN WRITTEN IN OTHER REPORTS, THAT MR. HAMMER HAS A LENGTHY HISTORY OF DECEPTION.  IN FACT, HAS LIED TO DOCTORS IN THE PAST, YOU KNOW THAT, RIGHT?

A.      YES.

Q.      DID YOU TAKE THAT INTO ACCOUNT WHEN YOU WERE ASSESSING HIS CREDIBILITY?

A.      YES.

MS. HAINES:  I HAVE NOTHING FURTHER, YOUR HONOR.

THE COURT:  ANY REDIRECT?

MR. MORENO:  YES, YOUR HONOR.  DO YOU WANT TO DO IT NOW?  MR. HAMMER HAS INDICATED HE WOULD LIKE TO SPEAK WITH ME.  MAYBE WE CAN TAKE A LUNCH BREAK AND I WILL HAVE A SHORT REDIRECT.

THE COURT:  ALL RIGHT.  WILL THAT CONCLUDE THE TESTIMONY OF THE DEFENSE?

MR. MORENO:  YES.

THE COURT:  IT'S JUST SHORT REDIRECT AND THEN THAT WILL CONCLUDE THE TESTIMONY OF THE DEFENSE NOW.  WHAT'S GOING TO HAPPEN THEREAFTER, ARE WE GOING TO HAVE CLOSINGS?

MR. MORENO:  YOUR HONOR, WE DO HAVE A VIDEO WE ARE GOING TO PLAY.  WE THOUGHT WE HAD A

STIPULATION WITH THE GOVERNMENT AS TO A FACT.  WE ARE GOING TO PLAY A VIDEO, VERY BRIEFLY, FOUR MINUTES.  THEN WE HAVE SOME STIPULATIONS.

THE COURT:  THEN THAT WILL CONCLUDE YOUR TESTIMONY?

MR. MORENO:  THE GOVERNMENT HAS -- YOU HAVE ONE WITNESS, CORRECT?

MS. HAINES:  WE HAVE ONE REBUTTAL WITNESS, YOUR HONOR, SHORT.

THE COURT:  IS THAT DR. AGUIRAE, IS THAT THE SUBJECT OF THIS MOTION?

MS. HAINES:  NO, YOUR HONOR.  THE MOTION IS MOOT.  WE ARE NOT CALLING DR. AGUIRAE.

THE COURT:  OH, OKAY.

WHY DON'T WE RECESS NOW AND COME BACK AT QUARTER TO TWO, 1:45.  ALL RIGHT.  WE WILL STAND IN RECESS.

THE COURT:  PLEASE BE SEATED.

MR. MORENO:  GOOD AFTERNOON, YOUR HONOR.

REDIRECT EXAMINATION

BY MR. MORENO:

Q.     GOOD AFTERNOON, DOCTOR.

A.     GOOD AFTERNOON.

Q.     NOW, ON CROSS EXAMINATION I WANT TO ADDRESS A COUPLE OF THE POINTS MADE -- THAT WERE ATTEMPTED TO BE

MADE ON CROSS EXAMINATION.  ONE THING I WANT TO ASK YOU IS, YOU WERE SHOWN A LIST OF PEOPLE THAT THE GOVERNMENT CLAIMS DAVID HAS ALLEGED ABUSED HIM OVER TIME.

A.     YES.

Q.     IN YOUR -- I THINK YOU SAID ON DIRECT OR MAYBE IT WAS ON CROSS THAT IN YOUR INTERVIEW WITH DAVID HE NEVER ASCRIBED SEXUAL ABUSE TO MOST OF THE PEOPLE WHOSE SEXUAL ENCOUNTERS HE DESCRIBED TO YOU.

A.     CORRECT.

Q.     THE PEOPLE HE WAS DESCRIBING SEXUAL ENCOUNTERS WITH, HE DID NOT CLASSIFY IT AS SEXUAL ABUSE?

A.     THAT'S CORRECT.

Q.     AND IN FACT, WHEN WE TALK ABOUT THE LITTLE GIRLS --

A.     YES.

Q.     -- WHEN DAVID WAS YOUNG, DID DAVID CHARACTERIZE THAT MORE AS SORT OF EXPERIMENTATION OR --

A.     NOT SPECIFICALLY AS EXPERIMENTATION, BUT CERTAINLY NOT AS ABUSE.

Q.     HE DID NOT SEE THAT AS ABUSE?

A.     NO.

Q.     HOW ABOUT THE COUSIN?  THERE WAS MENTION OF A COUSIN.

A.     YES.

Q.     DAVID REFERRED TO THAT MORE AS EXPERIMENTATION

WITH HIM AND HIS COUSIN, CORRECT?

A.        AGAIN, I DON'T REMEMBER HIM USING THAT TERM, BUT THAT WAS THE OVERALL GESTALT OF WHAT HE WAS DESCRIBING, CERTAINLY NOT AS ABUSE.

Q.        WHEN WE ARE LOOKING AT THE UNIVERSE OF ABUSERS IN THIS CASE, IT'S NOT THIS INFINITE NUMBER IN TERMS OF WHAT HE HAS REPORTED CONSISTENTLY OVER TIME?

A.        NO.  IT IS A LARGE NUMBER, BUT THAT IS NOT -- FOR SOMEBODY WHO GROWS UP IN A HOME AS SHATTERED AS HIS WHERE HE IS NOT BEING SUPERVISED OR HE'S BEING NEGLECTED, IT'S NOT UNUSUAL.  SEXUAL PREDATORS ZERO IN ON THOSE KIDS.  SO IN MY EXPERIENCE, I HAVE EVALUATED MEN WITH EVERY BIT AS MANY AND MORE PERPETRATORS OF SEXUAL ABUSE AS HE DESCRIBED.

Q.        IS IT LESS UNUSUAL THAT THERE COULD BE THIS MANY, GIVEN THE ENVIRONMENT YOU WERE JUST DISCUSSING AND THE FACT THAT THE FAMILY CONSTANTLY MOVED?

A.        THAT IS ANOTHER FACTOR.  SO HE IS CONSTANTLY IN NEW ENVIRONMENTS AND AGAIN WITH SO LITTLE SUPERVISION.

Q.        NOW, WHAT I THOUGHT WAS INTERESTING ABOUT THE LIST WAS, TWO PERPETRATORS WHO WERE NOT LISTED WERE MOM AND DAD.  WOULD YOU CONSIDER THEM TO BE THE SIGNIFICANT ABUSERS IN THIS CASE?

A.        IN TERMS OF THE PSYCHOLOGICAL AND PSYCHIATRIC LONG-TERM DAMAGE TO HIM, ABSOLUTELY HIS MOTHER AND

FATHER WERE THE MOST SERIOUS PERPETRATORS.

Q.    NOW LARRY MILLER, HE WAS DAVID'S UNCLE, CORRECT?

A.    CORRECT.

Q.    NOW, YOU WERE ASKED QUESTIONS ABOUT THE FACT THAT DIANE HAMMER NEVER REPORTED ANYTHING BETWEEN -- THAT SHE NOTICED ANYTHING BETWEEN UNCLE RON AND DAVID?

A.    YES.

Q.    SO I BELIEVE DAVID IS TWO YEARS OLDER THAN HIS SISTER DIANE.  DO YOU RECALL WHAT AGE DAVID WAS AT WHEN HE FIRST RELATED -- HOW OLD HE WAS WHEN THE INCIDENT IN THE BACK OF THE CAR, THE FONDLING IN THE BACK OF THE CAR, TOOK PLACE?

A.    I THINK HE THOUGHT IT WAS RIGHT AROUND 5, AGE 5. SO DIANE WOULD HAVE BEEN IN THE NEIGHBORHOOD OF 3.

Q.    WOULD IT SURPRISE YOU THAT DIANE WOULD HAVE NO SUCH MEMORIES?

A.    NO.  OBVIOUSLY, HER AGE, BUT ALSO IT WOULD NOT SURPRISE ME EVEN IF SHE WAS OLDER THAT SHE WOULD NOT HAVE MEMORIES OF THIS OR NOT HAVE OBSERVED IT OR HAVE OBSERVED SOMETHING, BUT NOT REMEMBERED IT.  SO IT'S NOT AT ALL SURPRISING.

Q.    AND WHY IS THAT?

A.    YOU KNOW, THESE ARE THE KINDS OF MEMORIES THAT MANY PEOPLE -- THEY SUPPRESS, THEY REPRESS.  AND IN THIS CASE, IN AN ENVIRONMENT WHERE THERE IS SO MUCH INCEST

AND SO MUCH SEXUAL ABUSE, IT TAKES A LOT FOR SOMETHING TO STAND OUT.  AND FOR HER TO HAVE OBSERVED SOMETHING AND REMEMBER IT, YOU KNOW, 40 YEARS LATER OR WHATEVER IT IS, I WOULDN'T EXPECT IT, CERTAINLY.

Q.     NOW, YOU WERE ASKED SOME QUESTIONS ABOUT WHAT MARTIN HAMMER HAS REPORTED OVER TIME.  AND I THINK YOU WERE QUESTIONED, AND CORRECT ME IF I'M WRONG, ABOUT THE FACT THAT HE HAD NOT SAID ANYTHING ABOUT HIM HAVING SEX WITH HIS SISTER?

A.     CORRECT.

Q.     AND YOU HAD AN OPPORTUNITY, I THINK YOU TESTIFIED EARLIER ON DIRECT, TO REVIEW HIS TESTIMONY DURING THIS CASE?

A.     YES.

          MR. MORENO:  YOUR HONOR, I'M GOING TO REFER THE WITNESS TO A TRANSCRIPT FROM JUNE 10TH OF THIS YEAR, 2014.  IT WAS DURING THESE PROCEEDINGS, DAY 6. AND IT IS THE TESTIMONY OF MARTIN HAMMER ON PAGE 132.  I WOULD JUST LIKE HIM TO -- I'D LIKE TO QUESTION HIM ABOUT A SECTION THAT I WOULD LIKE HIM TO READ.  SO MAY I APPROACH THE WITNESS?

          THE COURT:  YES.

BY MR. MORENO:

Q.     DOCTOR, I'M SHOWING YOU A TRANSCRIPT, PAGE 132, FROM THE HEARING IN THIS CASE DATED JUNE 10TH, 2014.

THERE IS A SECTION THERE THAT IS HIGHLIGHTED.  WOULD YOU PLEASE READ THAT FOR US.

A.      CERTAINLY.

QUESTION:  CAN YOU TELL US WHETHER OR NOT YOU AND DIANE ALSO HAD A SEXUAL RELATIONSHIP?

ANSWER:  YES, WE DID BECAUSE I THOUGHT IT WAS RIGHT BECAUSE MY DAD DID IT AND MY BROTHER DID IT AND AT THAT TIME I THOUGHT IT WAS ALL RIGHT.

QUESTION:  AND HOW OLD WERE YOU AND DIANE WHEN THAT HAPPENED?

ANSWER:  SHE WAS ABOUT 14 AND SHE IS TWO YEARS OLDER THAN ME.

Q.      ALL RIGHT.  SO MARTIN HAMMER HAS INDEED REPORTED IN THESE PROCEEDINGS THAT HE ENGAGED IN SEX WITH HIS SISTER?

A.      RIGHT.

Q.      ARE YOU -- OBVIOUSLY, THAT IS NOT NORMAL.  ARE YOU SURPRISED IN THIS INSTANCE THAT MARTIN WOULD THINK IT WAS OKAY?

A.      NO.  AND I THINK HE SAYS IT FAIRLY PLAINLY.  HE GREW UP IN AN ENVIRONMENT WHERE AGAIN THERE WAS SO MUCH INCEST THAT THAT BECOMES THE NORM FOR THESE KIDS.  AND THAT IS -- ONE OF THE LONG-TERM REPERCUSSIONS OF COURSE IS THE DISTORTION THAT THIS INSTILLS IN THESE INDIVIDUALS AS THEY GET OLDER, WHERE THEY ARE GOING TO

LEARN WHAT NORMAL BOUNDARIES ARE, WHAT NORMAL RELATIONSHIPS ARE, AMONG FAMILY MEMBERS.  AND SO IT'S NOT AT ALL SURPRISING.

I WILL ADD JUST FOR CLARITY, AFTER A WHILE WHAT DAVID REPORTED TO ME, AND ACTUALLY DIANE DID AS WELL, THAT THE SEXUAL ABUSE BEGAN WITH THEIR FATHER FORCING THEM AND FORCING DAVID, COACHING DAVID, COERCING DAVID.  EVENTUALLY THEY MAINTAINED A SEXUAL RELATIONSHIP ON THEIR OWN AND THEY WERE OPEN ABOUT THAT.

Q.    THAT WAS ABOUT UNTIL ABOUT THE TIME THEY LEFT THE HOUSE?

A.    YES.  BECAUSE SHE LEFT THE HOUSE -- DIANE LEFT THE HOUSE APPROXIMATELY 14 YEARS OLD.

Q.    AND DAVID AS WELL?

A.    YES.  I'M SORRY, THAT WAS DAVID.  SHE WAS 15, HE WAS 14.

Q.    NOW, YOU WERE ASKED A LOT OF QUESTIONS ABOUT THE FACT THAT DAVID FIRST REPORTED THE INCESTUOUS RELATIONSHIP WITH HIS MOTHER TO DR. BLUMBERG BACK IN 2004, AS CONTAINED IN DR. BLUMBERG'S REPORT AND HE TESTIFIED ABOUT IT.

A.    YES.

Q.    IN YOUR INTERVIEW WITH RON MILLER, TELL US ABOUT HOW HE CAME TO TELL YOU -- YOU MENTIONED IT WAS AT THE END OF THE INTERVIEW AND THERE WERE QUESTIONS, YOU KNOW,

ABOUT -- WELL, ANYWAY.  SO HE SAID IT AT THE END OF THE INTERVIEW.  HOW OLD WAS RON MILLER WHEN YOU INTERVIEWED HIM, WHEN HE FINALLY DISCLOSED THAT TO YOU?

A.      WELL --

Q.      ABOUT 60 MAYBE?

A.      I WAS GOING TO SAY HE WAS A MIDDLE-AGED MAN, SO YES, IF THAT IS STILL MIDDLE AGED.

Q.      WOULD THAT BE SURPRISING OR UNUSUAL IN THESE TYPE OF SITUATIONS FOR SOMEONE TO HOLD THAT INFORMATION FOR ALL THOSE YEARS?

A.      NO.  THAT IS THE NORM, ESPECIALLY FOR MEN.  YOU ASKED ME EARLIER ABOUT THE BRISTLECONE PROJECT.  AGAIN, THIS IS THE FUNDAMENTAL PURPOSE OF THAT PROJECT IS TO TRY TO DESTIGMATIZE THIS ENOUGH SO THAT MEN WILL START TO REPORT AND DISCLOSE SEXUAL ABUSE EXPERIENCES EARLIER THAN WHEN THEY'RE IN THEIR 40'S AND 50'S AND 60'S.

Q.      NOW, IS THERE A CORRELATION -- NOT A CORRELATION, BUT A SIMILARITY IN YOUR MIND BETWEEN WHAT RON DISCLOSED TO YOU AND WHAT DAVID DISCLOSED TO DR. BLUMBERG IN TERMS OF THE ASSAULTS, THE SEXUAL ASSAULTS BY DAVID'S MOTHER?

A.      YES.  ACTUALLY, PART OF WHAT -- THERE WERE A SEQUENCE OF THINGS THAT DAVID'S MOTHER FORCED HIM TO DO, SORT OF A GRADUATED WAY AND IT INCLUDED GETTING HIM TO PENETRATE HER VAGINA WITH HIS FINGER.  AND THAT IS

EXACTLY WHAT RON DESCRIBED TO ME, THAT WHEN HIS SISTER WAS 16 AND HE WAS I THINK WAS 9, SHE GOT INTO BED WITH HIM AND I BELIEVE HE SAID SHE FONDLED HIM, BUT THEN BASICALLY WHAT SHE DID IS HAD -- TOOK HIS HAND AND HAD HIM MASTURBATE HER AND INSERT HIS FINGER IN HER VAGINA.

Q.      AND THAT IS SIMILAR TO -- AS DAVID'S -- THE INCESTUOUS RELATIONSHIP WITH HIS MOTHER PROGRESSED, AS TO WHAT HAPPENED WITH HIM AND HIS MOTHER AS WELL?

A.      YES.

Q.      WAS THERE A SIMILARITY IN TERMS OF THE SENSE OF REVULSION BOTH OF THEM HAD ABOUT THAT PARTICULAR EXPERIENCE, THE PENETRATION WITH THE FINGER THAT YOU WERE REFERRING TO?

A.      YES.  BOTH OF THEM DESCRIBED OBVIOUSLY SEPARATELY BEING REPULSED BY THE SMELLS THAT THEY RECALLED.

Q.      YOU WERE SHOWN AN EXHIBIT DURING YOUR DIRECT EXAMINATION -- I BELIEVE IT'S EXHIBIT JM 5.

MR. MORENO:  YOUR HONOR, MAY I APPROACH THE WITNESS?

THE COURT:  YES.

BY MR. MORENO:

Q.      THIS IS THE MEMORANDUM OF SUPPLEMENTAL INTERVIEWS BY JILL MILLER.  IT'S DATED MAY 22, 1998.  IF YOU CAN TURN TO PAGE 5 OF THIS EXHIBIT.  NOW, YOU WERE

QUESTIONED ABOUT MARTIN HAMMER'S REPORTING OVER THE YEARS?

A.    YES.

Q.    AND ON PAGE 5 OF THIS REPORT, MARTIN HAMMER TOLD JILL MILLER -- YOU CAN SEE THE HIGHLIGHTED SECTION?

A.    YES.

Q.    CAN YOU READ THAT FOR US?

A.    HE WITNESSED HIS FATHER HAVING SEX WITH HIS SISTER WHEN DIANE WAS ABOUT 13 YEARS OLD.

Q.    SO THAT IS CONSISTENT WITH WHAT HE TOLD YOU?

A.    YES.

Q.    NOW, IF YOU COULD TURN TO PAGE 12 OF THIS DOCUMENT, JILL MILLER INTERVIEWED A MAN NAMED VINCE PARSONS.  VINCE PARSONS WAS, I BELIEVE -- WELL, HE WAS THE RECREATION DIRECTOR AT THE OKLAHOMA STATE PENITENTIARY AND HAD DONE WORK WITH DAVID.

      DO YOU SEE THE SECTION THAT SAYS HE ALSO?

A.    YES.

Q.    COULD YOU READ THAT FOR US, PLEASE.

A.    HE ALSO -- AND I WANT TO MAKE SURE.  "HE" HERE REFERS TO DAVID, I SUPPOSE --

Q.    DAVID, YES.

A.    -- FROM THE PREVIOUS SENTENCE.

      HE ALSO TOLD PARSONS THAT HE HAD SEX WITH HIS SISTER WHEN THEY WERE YOUNG.  PARSONS HAD THE

IMPRESSION THAT DAVID WAS FORCED INTO THIS BEHAVIOR, BUT HE DID NOT KNOW WHO HAD DONE THIS.

Q.    AND HE NOTED THAT DAVID SEEMED --

A.    HE NOTED THAT DAVID SEEMED TO HAVE A LOT OF INTERNAL TURMOIL ABOUT THIS BEHAVIOR.

Q.    IS THIS CONSISTENT WITH SORT OF THE PIECEMEAL TYPE OF DISCLOSURES THAT PEOPLE MAKE OVER TIME?

A.    YES.  IT'S AGAIN VERY, VERY TYPICAL FOR ABUSE SURVIVORS, MALE AND FEMALE, BUT ESPECIALLY WITH MALE, TO -- FOR THEM TO REPORT OR DISCLOSE IN ONE CONTEXT SORT OF ONE LITTLE BIT OF WHAT HAPPENED TO THEM.  AND IT MAY DEPEND ON WHO THIS PERSON IS.  HE MAY HAVE BEEN IN THE PROCESS OF DEVELOPING A LITTLE BIT OF A TRUSTING RELATIONSHIP WITH THIS INDIVIDUAL.  SO THIS WAS LIKE ALMOST LIKE TESTING THE WATERS, TELLING HIM ABOUT SOME ASPECT OF HIS EXPERIENCE.  BUT THAT IS -- IN A SENSE, IT'S REALLY THE NORM.  IT'S EXTREMELY RARE FOR A CHILD ABUSE SURVIVOR AS AN ADULT TO JUST SPONTANEOUSLY DISCLOSE EVERYTHING.

Q.    NOW, YOU WERE QUESTIONED ABOUT DR. MITCHELL'S LITTLE SUMMARIES.  THEY WERE NOT COMPREHENSIVE NOTES OF HIS INTERVIEWS WITH MR. HAMMER, WERE THEY?

A.    NO.  THOSE WERE -- I RECALL FROM WHEN I WAS DOING CLINICAL WORK, YOU WRITE VERY, VERY SHORT ESSENTIALLY NOTES THAT JOG YOUR MEMORY.  AND SO THERE

ARE FEW DETAILS USUALLY INCLUDED IN THEM.

Q.        YOU WERE ASKED A SERIES OF QUESTIONS ABOUT, WE DON'T KNOW WHO HE IS REFERRING TO, WE DON'T KNOW WHO HE IS TALKING ABOUT.  DO YOU RECALL THOSE?

A.        YES.

Q.        DO YOU ALSO RECALL -- AND I THINK YOU TESTIFIED ON DIRECT THAT DR. MITCHELL TESTIFIED AT TRIAL AND AT THE 2255 WITH SOME SPECIFICITY ABOUT WHAT DAVID TOLD HIM, DIDN'T HE?

A.        YES.

Q.        AND DO YOU RECALL IF HE RELATED TO DR. MITCHELL ABOUT THE INCESTUOUS SEX AT THE HANDS -- FORCED BY HIS FATHER?

A.        THAT'S MY RECOLLECTION, YES.

Q.        DID HE TALK TO DR. MITCHELL ABOUT THE RAPES BY HIS MOTHER WITH THE ENEMAS?

A.        YES, THAT'S MY RECOLLECTION.

Q.        SO THAT WAS PRETTY SPECIFIC WHAT HE TOLD DR. MITCHELL?

A.        YES.

Q.        BACK IN 1995?

A.        YES.

                    THE COURT:  IS THAT IT?

                    MR. MORENO:  JUST ABOUT, YOUR HONOR.

BY MR. MORENO:

Q.      NOW MS. HAINES WENT THROUGH A SERIES OF QUESTIONS ABOUT HOW THERE WERE NO REPORTS, NOTHING AT ALL FROM BIRTH TO AGE 14 AND THEN NOT AGAIN UNTIL 1995 WITH DR. MITCHELL.  DO YOU RECALL THOSE SERIES OF QUESTIONS?

A.      YES.

Q.      IS IT UNUSUAL TO HAVE THIS DEARTH OF RECORDS CONCERNING THIS TYPE OF SEXUAL TRAUMATIZATION?

A.      USUALLY THERE ARE ABSOLUTELY NO RECORDS WHATSOEVER.  IT'S ACTUALLY UNUSUAL TO HAVE ANY KIND OF RECORDS -- ESPECIALLY ACTUALLY FROM THE AGE OF 14, THAT IS EXTREMELY UNUSUAL.

Q.      THE FACT THAT MR. HAMMER REPORTED SOMETHING WHEN HE WAS 14, DOES IT IN ANY WAY DIMINISH THE CREDIBILITY OF THE OVERALL STORY IN THIS CASE BY THE FACT THAT HE TOLD ONLY ONE INCIDENT WHEN HE WAS 14 TO A COMPLETE STRANGER IN AN EMERGENCY ROOM?

A.      AGAIN, THAT IS A TYPICAL THING FOR ESPECIALLY A 14-YEAR OLD BOY.  YOU WOULD NOT EXPECT HIM TO WALK IN AND JUST SORT OF DISCLOSE EVERYTHING.  AT THE MOST YOU MIGHT GET ONE BIT.  AND EVEN THAT IS UNUSUAL TO HAVE A DOCUMENTARY RECORD OF IT.

Q.      NOW, YOU WERE ALSO QUESTIONED ABOUT THE FACT THAT MARTIN AND DIANE AND DAVID MIGHT NOT HAVE TOLD THE SAME EVALUATORS OVER TIME THE SAME STORIES.  IS THAT

UNUSUAL?

A.      NO.  THESE ARE ALL --

ALL THREE OF THEM ARE ABUSE SURVIVORS. AND THEY ARE EACH RECOUNTING IN THEIR OWN VERY SORT OF IDIOSYNCRATIC WAYS AND ALSO RESPONDING TO THESE INDIVIDUALS IN IDIOSYNCRATIC WAYS WHICH DETERMINES HOW MUCH THEY SAY, WHAT THEY SAY.  SO THE FACT THAT THERE ARE APPARENT DISCREPANCIES IN WHAT THEY SAY IS I FIND TO BE OF NO CONSEQUENCE.

Q.      IT DOES NOT IN ANY WAY -- OR DOES IT IN ANY WAY CHANGE YOUR OPINIONS IN THIS CASE?

A.      NO.

Q.      NOW, FINALLY, YOU WERE ASKED QUESTIONS ABOUT DR. WOLFSON'S INTERVIEW WITH DIANE AND SORT OF THE VANILLA REPORT SHE GAVE HIM.  DO YOU RECALL THAT?

A.      YES.

Q.      DID YOU KNOW THAT DR. WOLFSON INTERVIEWED HER BY TELEPHONE?

A.      I SEEM TO RECALL IT NOW.  I'M NOT SURE WHY OR HOW I KNEW THAT, BUT, YES, I RECALL NOW.

Q.      WOULD IT SURPRISE YOU THAT DIANE HAMMER, AND YOU MET HER --

A.      YES.

Q.      -- WOULD GET A PHONE CALL FROM A STRANGER FROM A CORRECTIONAL INSTITUTE WHERE HER BROTHER WAS HOUSED WHO

WANTED TO DISCUSS WITH HER HIS HISTORY AND THEIR HISTORY?  DOES IT SURPRISE YOU THAT SHE WOULD NOT REVEAL A LOT TO A TOTAL STRANGER OVER THE TELEPHONE?

A.      NO.   THAT IS CERTAINLY NOT AN OPTIMAL CIRCUMSTANCE TO GET ANY KIND OF MEANINGFUL DISCLOSURE.

MR. MORENO:  I HAVE NOTHING FURTHER, YOUR HONOR.  THANK YOU.

THE COURT:  ANY REDIRECT?

I HAVE JUST ONE QUESTION:  YOU SAID DIANE WAS SCHIZOPHRENIC?

THE WITNESS:  I UNDERSTAND THAT SHE WAS DIAGNOSED AT SOME POINT WITH SCHIZOPHRENIA.

THE COURT:  JUST FOR THE RECORD, WHY DON'T YOU DEFINE WHAT THAT TERM IS.

THE WITNESS:  WELL, SCHIZOPHRENIA IS A MAJOR MENTAL DISORDER INVOLVING USUALLY DELUSIONS, PSYCHOTIC FEATURES.  AND IT'S USUALLY THOUGHT OF AS SORT OF A LONG TERM WITHOUT TREATMENT CERTAINLY OF MEDICATION DEGENERATIVE PSYCHOTIC DISORDER.

NOW, THE REASON I EXPRESSED IT AS -- I KNOW SHE WAS DIAGNOSED THAT.  I'M NOT SURE THAT THE DIAGNOSIS IS ACCURATE.  MANY INDIVIDUALS WITH EXTENSIVE TRAUMA HISTORIES, YOU SEE OVER TIME THEY GET ALL KINDS OF DIAGNOSES, INCLUDING QUITE SEVERE ONES LIKE SCHIZOPHRENIA OR BIPOLAR, AND QUITE OFTEN THEY ARE NOT

ACCURATE.  AND SHE DIDN'T APPEAR TO ME -- SHE DID NOT STRIKE ME AS SOMEBODY WHO WAS SCHIZOPHRENIC.

THE COURT:  ANY QUESTIONS BASED ON MY QUESTIONS?

MS. HAINES:  NO, YOUR HONOR.

MR. MORENO:  NO, YOUR HONOR.

THE COURT:  YOU MAY STEP DOWN.

(WITNESS EXCUSED.)

MS. HAINES:  YOUR HONOR, IF I CAN ALSO MOVE IN SOME EXHIBITS.

THE COURT:  YES.

MS. HAINES:  GC 21, 22, 24, AND GC 20.

THE COURT:  WHAT ABOUT GC 23?  NO?

INTERVIEW OF DIANE HAMMER, 1/12/2012.

MS. HAINES:  GC 23?

THE COURT:  YES.

MS. HAINES:  AND A DEFENSE EXHIBIT MARKED JIM 5.

THE COURT:  ALL RIGHT.  ANY OBJECTION?

MR. MORENO:  NO, YOUR HONOR.

THE COURT:  THOSE WILL BE RECEIVED INTO EVIDENCE.

(GOVERNMENT EXHIBIT NUMBERS GC 20, 21, 22, 23, 24, AND DEFENSE EXHIBIT JM 5, ADMITTED INTO EVIDENCE.)

THE COURT:  WITH THAT, THERE IS A VIDEO NOW THAT HAS TO BE PLAYED?

MR. MCHUGH:  YES, YOUR HONOR.  AT THIS TIME WE ARE GOING TO ATTEMPT TO PLAY A VIDEO.  BY STIPULATION THIS IS AN INDIVIDUAL BY THE NAME OF SARAH GRAY.  SHE IS GOING TO BE DISCUSSING SOME OF THE HAITI WORK THAT THIS IS FUNDED BY THE CHRISTMAS CARD PROJECT BY DAVID HAMMER.

THE COURT:  ALL RIGHT.

MR. GURGANUS:  WE ARE AGREEABLE TO HAVING THE VIDEO PLAYED AS FAR AS THAT GOES.

(VIDEOTAPE OF SARAH GRAY PLAYED AT THIS TIME.)

MR. MCHUGH:  AT THIS TIME, YOUR HONOR, WE ARE GOING TO OFFER DEFENDANT'S EXHIBIT 505, WHICH ARE CERTIFICATES -- I BELIEVE BY STIPULATION WE ARE OFFERING THIS, YOUR HONOR, CERTIFICATES THAT DAVID PAUL HAMMER HAS EARNED WHILE AT USP TERRE HAUTE.

THE COURT:  HEARING NO OBJECTION, D 505 WILL BE ADMITTED INTO EVIDENCE.

DO I HAVE ORIGINALS OR COPIES?

MR. MCHUGH:  THOSE THAT YOU HAVE ARE THE ORIGINALS.

(DEFENSE EXHIBIT 505 ADMITTED INTO EVIDENCE.)

THE COURT:  DO YOU WANT TO GIVE ME A SET OF COPIES AND LET MR. HAMMER MAINTAIN THE ORIGINALS?

MR. MCHUGH:  OH, SURE.

THE COURT:  ALL RIGHT.

MR. TRAVIS:  WITH THAT, YOUR HONOR, THE DEFENSE RESTS.

THE COURT:  ALL RIGHT.  BEFORE YOU REST, CAN SOMEONE COLLOQUY MR. HAMMER?

MR. TRAVIS:  I FORGOT ABOUT THAT, YOUR HONOR.

GOOD AFTERNOON, DAVID.  CAN YOU HEAR ME?

THE DEFENDANT:  GOOD AFTERNOON.  YES.

MR. TRAVIS:  WE ARE AT THE PROCESS, WE ARE AT THE POINT WHERE WE ARE ABOUT TO REST IN THE DEFENSE CASE.  OBVIOUSLY YOU HAVE A RIGHT TO TESTIFY IF YOU ELECT TO TESTIFY.  LAST I TALKED TO YOU ON THE SUBJECT MATTER YOU HAD INDICATED TO ME THAT YOU DID NOT WANT TO TESTIFY.  IS THAT CORRECT?

THE DEFENDANT:  YES, WITH AN EXPLANATION.  IT IS ON THE STRENUOUS OBJECTIONS OF MY ATTORNEYS TO MY WANTING TO TESTIFY THAT I HAVE DECIDED TO ADHERE TO THEIR ADVICE AND NOT DO SO.

MR. TRAVIS:  IS THE DECISION NOT TO TESTIFY A DECISION THAT YOU HAVE MADE?

THE DEFENDANT:  YES.

MR. TRAVIS:  AND HAVE YOU MADE THAT DECISION KNOWINGLY?

THE DEFENDANT:  YES.

MR. TRAVIS:  HAVE YOU MADE THAT DECISION INTELLIGENTLY?

THE DEFENDANT:  I THINK SO.

MR. TRAVIS:  AND HAVE YOU MADE THAT DECISION VOLUNTARILY?

THE DEFENDANT:  YES.

MR. TRAVIS:  THE COURT HAS HEARD THAT YOU HAVE RECEIVED ADVICE FROM ALL COUNSEL NOT TO TESTIFY AND YOU HAVE AGREED TO ACCEPT THAT ADVICE, IS THAT CORRECT?

THE DEFENDANT:  THAT'S CORRECT, YES.

MR. TRAVIS:  AND YOU DO THAT VOLUNTARILY, ACCEPT THE ADVICE, CORRECT?

THE DEFENDANT:  YES.

MR. TRAVIS:  I HAVE NO OTHER QUESTIONS FOR HIM, YOUR HONOR.

THE COURT:  MR. HAMMER, DID ANYBODY MAKE ANY PROMISES TO YOU OR GUARANTEES TO YOU TO GET YOU TO NOT TESTIFY IN THIS CASE?

THE DEFENDANT:  NO, SIR, THEY DIDN'T.

THE COURT:  AND YOUR DECISION NOT TO TESTIFY IS BEING MADE OF YOUR OWN FREE WILL?

THE DEFENDANT:  YES, SIR.

THE COURT: ALL RIGHT. I HAVE NO FURTHER. ANY QUESTIONS?

MR. GURGANUS: NO ONE HAS THREATENED HIM?

THE COURT: NO ONE HAS THREATENED YOU OR FORCED YOU TO GIVE UP YOUR RIGHT, TO NOT TESTIFY IN THE CASE?

THE DEFENDANT: NO, SIR, NO ONE HAS.

THE COURT: ALL RIGHT. ANYTHING FURTHER?

MR. GURGANUS: NO, YOUR HONOR.

THE COURT: ALL RIGHT.

WITH THAT, YOU REST?

MR. TRAVIS: YES, YOUR HONOR, WITH THAT WE REST.

THE COURT: ALL RIGHT. ANY REBUTTAL.

MS. HAINES: WE HAVE ONE REBUTTAL WITNESS, YOUR HONOR.

THE COURT: OKAY. LET'S CALL THE WITNESS.

DANNY MOORE, GOVERNMENT WITNESS, SWORN.

THE CLERK: STATE AND SPELL YOUR FULL NAME FOR THE RECORD, PLEASE.

THE WITNESS: MY FULL NAME IS DANNY MOORE, D-A-N-N-Y M-O-O-R-E.

MS. HAINES: MAY I PROCEED, YOUR HONOR?

THE COURT:  YES.

DIRECT EXAMINATION

BY MS. HAINES:

Q.      GOOD AFTERNOON, MR. MOORE.

A.      GOOD AFTERNOON.

Q.      WHERE ARE YOU FROM THESE DAYS?

A.      I'M RETIRED FROM THE FEDERAL BUREAU OF PRISONS.
I LIVE IN INDIANA.

Q.      WHEN DID YOU RETIRE FROM THE BUREAU OF PRISONS?

A.      APPROXIMATELY DECEMBER 2010.

Q.      BEFORE YOU RETIRED, WHAT DID YOU DO FOR A
LIVING?

A.      I WAS A SENIOR OFFICER SPECIALIST, CORRECTIONAL
OFFICER, AND THEN LATER I TRANSFERRED INTO THE SPECIAL
INVESTIGATIONS OFFICE WHERE I WAS AN INVESTIGATIVE
TECHNICIAN.

Q.      IN WHAT FACILITY?

A.      FEDERAL CORRECTIONAL COMPLEX AT TERRE HAUTE,
INDIANA.

Q.      I CAN HEAR YOU JUST FINE, BUT CAN YOU JUST LEAN
INTO THE MICROPHONE A LITTLE BIT MORE?

A.      YES.

Q.      THANK YOU.

HOW MANY YEARS DID YOU WORK FOR THE
BUREAU OF PRISONS?

A.    20 YEARS.

Q.    HOW MANY YEARS AT TERRE HAUTE?

A.    20 YEARS.

Q.    AND HOW MANY YEARS ON DEATH ROW, AS WE CALL IT?

A.    I WORKED THERE VARIOUS TIMES THROUGHOUT MY CAREER.

Q.    DO YOU KNOW SOMEONE NAMED DAVID HAMMER?

A.    YES, I DO.

Q.    HOW DO YOU KNOW MR. HAMMER?

A.    HE WAS AN INMATE ON THE SPECIAL CONFINEMENT UNIT WHERE I WORKED AND ALSO I MONITORED HIS PHONE AND TELEPHONE CALLS WHEN I WAS IN THE INVESTIGATIONS OFFICE.

Q.    AND DO YOU REMEMBER APPROXIMATELY WHEN YOU FIRST BECAME AWARE OF MR. HAMMER?

A.    IT WAS WHEN THEY OPENED IT.  I WAS AT THE AIRPORT WHEN THEY UNLOADED THE INMATES WHEN THEY FIRST OPENED THE SPECIAL CONFINEMENT UNIT, FROM THAT DAY ON UNTIL I RETIRED.

Q.    DO YOU KNOW WHAT YEAR THAT IS?

A.    I'M GOING TO GUESS, MAYBE 1994 OR SO.

Q.    ALL RIGHT.  AND ARE YOU FAMILIAR -- HOW OFTEN DURING THE WEEK ON A TYPICAL WEEK WOULD YOU SEE MR. HAMMER?

A.    WELL, IF I WAS WORKING ON THE UNIT AS AN OFFICER, I WOULD SEE HIM FIVE DAYS A WEEK.

Q.      DID YOU EVER COME TO LEARN ABOUT SOMETHING KNOWN AS THE CHRISTMAS CARD PROJECT?

A.      YES.

Q.      AND HOW DO YOU KNOW ABOUT THAT PROJECT?

A.      WELL, READING HIS MAIL AND STUFF I WOULD SEE FLYERS GO OUT ABOUT IT AND EVERYTHING.  I WOULD SEE PICTURES THAT THEY WOULD SEND OUT TO THE NUNS TO MAKE THE CHRISTMAS CARDS FROM.

Q.      WHEN YOU SAY HIS MAIL, WHO ARE YOU TALKING ABOUT?

A.      DAVID HAMMER'S.

Q.      DID YOU EVER SEE YOURSELF WITH YOUR OWN EYES MR. HAMMER CREATING ANY ART WORK?

A.      NEVER.

Q.      HAVE YOU EVER SEEN HIM STANDING AT AN EASEL OR ANYTHING LIKE THAT, DRAWING?

A.      NO, NEVER.

Q.      HAVE YOU HAD OTHER -- HAVE YOU HAD CONVERSATIONS WITH OTHER STAFF ABOUT WHETHER THEY HAVE EVER SEEN MR. HAMMER CREATING ANY ART WORK?

A.      YES.  I HAD SEVERAL CONVERSATIONS ABOUT IT.  IT WAS KIND OF A RUNNING JOKE ON THE UNIT.

                MR. MCHUGH:  OBJECTION.

                THE COURT:  SUSTAINED.  I'M GOING TO SUSTAIN THAT OBJECTION.

MS. HAINES:  MAY I ASK, YOUR HONOR, WHETHER HE HAS EVER HEARD ANYONE ELSE -- MAY I ASK WHETHER HE HAS EVER HEARD ANYONE ELSE SAY THAT THEY HAVE SEEN HIM DRAW?

MR. MCHUGH:  SAME OBJECTION, YOUR HONOR.

THE COURT:  I'M GOING TO SUSTAIN THE OBJECTION.  IT'S HEARSAY.  IT MAY BE UNRELIABLE.

BY MS. HAINES:

Q.     HAVE YOU -- ARE YOU FAMILIAR WITH SOME OF THE ART WORK THAT MR. HAMMER SUPPOSEDLY GENERATED?

A.     YES.

Q.     AND ARE YOU FAMILIAR WITH THE ART WORK THAT WAS ALSO USED ON THE CHRISTMAS CARDS?

A.     YES.

Q.     AND WHEN DO YOU RECALL OR HOW WERE YOU ABLE TO SEE THE ART WORK IN THE CHRISTMAS CARD FORM?

A.     THEY HAD A BROCHURE, A FLIER THAT THEY MADE UP, THE ORGANIZATION THAT WAS SELLING THE CARDS.  AND I HAVE SEEN SEVERAL OF THEM GO IN AND OUT OF THE MAIL.  IT WOULD HAVE THE PICTURES ON THEM WITH HAMMER'S NAME ON THE PICTURES.

Q.     AND WHEN YOU SAW THE PICTURES I ASSUME YOU MEAN SOME SORT OF ART WORK?

A.     YES.  PAINTINGS.

Q.     WHEN YOU SAW THE PAINTINGS THAT WERE DEPICTED IN

THE CARDS, DID YOU RECOGNIZE ANY OF THOSE PAINTING?

A.      YES.  AT TIMES I HAVE, YES.

Q.      AND HOW YOU DID YOU RECOGNIZE THEM?

A.      WELL, I RECOGNIZED SOME OF THEM THAT HAD HAMMER'S NAME ON THEM THAT HAD -- I HAD PREVIOUSLY SEEN DONE BY ANOTHER INMATE.

Q.      HOW HAD YOU PREVIOUSLY SEEN A DIFFERENT INMATE CREATING THAT ART WORK?

A.      HE WOULD HAVE AN EASEL IN HIS CELL AND HE WOULD BE WORKING ON THE PROJECT AS I WALKED BY IT.

Q.      DO YOU REMEMBER WHO THAT INMATE WAS?

A.      YES.  ONE OF THE INMATES WAS BILLY ALLEN.

Q.      NOW, IF YOU LEARNED THAT THERE WERE SOME RECORDS IN EVIDENCE IN THIS CASE THAT SHOWED THAT MR. HAMMER HAD PURCHASED ART SUPPLIES FROM 2001 TO 2009, WOULD THAT CHANGE YOUR OPINION AS TO WHETHER HE WAS ABLE TO DRAW?

A.      ABSOLUTELY NOT.

Q.      WHY IS THAT?

A.      WELL, HE COULD HAVE PURCHASED THESE THINGS AND THEN HAD THEM PASSED TO ONE OF THE INMATES WHO WAS PAINTING THE PICTURE FOR HIM.

Q.      DID YOU EVER WITH YOUR EYES SEE HIM PERSONALLY USING ANY SORT OF ART SUPPLIES?

A.      NEVER.

Q.      AND WERE YOU EVER PRESENT WHEN MR. HAMMER WAS

CONFRONTED ABOUT THE FACT THAT HE WAS NOT CREATING THE ART WORK?

A.      I WAS PRESENT AT A CONVERSATION WHERE ANOTHER OFFICER ASKED HAMMER IF HE FELT BAD ABOUT SCAMMING THE THE NUNS.

                MR. MCHUGH:  OBJECTION.

                THE COURT:  OVERRULED.

BY MS. HAINES:

Q.      HOW DID MR. HAMMER RESPOND TO THAT QUESTION?

A.      HE RESPONDED:  SOMEBODY'S GOT TO DO IT.

Q.      WHAT WAS HIS DEMEANOR WHEN HE GAVE THAT RESPONSE?

A.      FLIPPANT.

                MS. HAINES:  NOTHING FURTHER, YOUR HONOR.

                      CROSS EXAMINATION

BY MR. MCHUGH:

Q.      GOOD AFTERNOON, MR. MOORE.

A.      GOOD AFTERNOON.

Q.      YOU JUST TALKED ABOUT THIS INCIDENT WHERE YOU -- LET'S BACK UP A LITTLE BIT.  YOU'RE IN SIS, IS THAT RIGHT?

A.      CORRECT.

Q.      IS THAT HOW YOU RETIRED?

A.      YES.

Q.      WHEN DID YOU BECOME SIS?

A.    I WORKED IN THE OFFICE -- BEFORE I WENT THERE FULL-TIME, I WORKED IN THEIR OFFICE, THE CUSTODY ROSTER. THERE WERE NUMEROUS TIMES I WORKED IN THERE BEFORE BEING PERMANENTLY ASSIGNED THERE.

Q.    YOU STARTED OFF AT -- WAS YOUR FIRST DAY ON THE JOB AT USP TERRE HAUTE?

A.    AS A CORRECTIONAL OFFICER.

Q.    YES.

A.    YES.

Q.    WAS IT ON THE DEATH ROW UNIT?

A.    AT THE TIME I STARTED THAT UNIT WAS NOT OPEN YET.

Q.    WHEN WAS THAT?

A.    I BELIEVE IT WAS AROUND 1994, IF I REMEMBER CORRECTLY.

Q.    THAT YOU STARTED?

A.    NO, THAT THE UNIT OPENED.

Q.    AND WHEN DID YOU START?

A.    I STARTED IN OCTOBER OF 1990.

Q.    1990.  SO YOU WENT FROM '90 TO 2010?

A.    YES.

Q.    WHEN DID YOU MOVE TO THE DEATH ROW UNIT?

A.    AFTER IT OPENED, I WORKED -- I'M NOT SURE EXACTLY HOW MANY ROSTERS AND A ROSTER IS A THREE-MONTH PERIOD.  I WOULD WORK AS AN OFFICER DOWN THERE FOR THREE

MONTHS AT A TIME.  PROBABLY DID TWO OR THREE ROSTERS DOWN THERE.

Q.    YOU WORKED THERE FOR TWO OR THREE MONTHS TWO OR THREE TIMES?

A.    YES.

Q.    AND AFTER THAT HOW MANY TIMES DID YOU WORK AT THE DEATH ROW UNIT?

A.    I MAY HAVE BEEN PULLED IN THERE ON SICK AND ANNUAL RELIEF FOR MAYBE GUYS ON VACATION FOR A WEEK.  IF YOU ARE SICK AND ANNUAL RELIEF, THEY WILL PUT YOU IN THERE FOR A WEEK.  OTHER TIMES ALSO.

Q.    SO IF I HAVE THIS CORRECT, YOU WERE ASSIGNED TO THE DEATH ROW UNIT TWO OR THREE TIMES FOR TWO OR THREE MONTHS FROM 1994 TO 2010?

A.    YES.

Q.    SO WE ARE TALKING TOTAL AMOUNT OF TIME WOULD HAVE BEEN ABOUT SIX MONTHS ASSIGNED TO THAT UNIT?

A.    ABOUT NINE.

Q.    NINE MONTHS?

A.    YES.

Q.    SO THAT WOULD HAVE LEFT 15 PLUS YEARS THAT YOU WERE NOT ASSIGNED TO THAT UNIT, IS THAT RIGHT?

A.    YES.

Q.    WHERE WERE YOU ASSIGNED IN THOSE OTHER TIMES?

A.    OTHER UNITS, I COULD BE ANYWHERE IN THE PRISON.

WHEN I BECAME FULL-TIME IN SPECIAL INVESTIGATIVE OFFICE, I WAS STILL AWARE OF HAMMER BECAUSE HE WAS REQUIRED MONITORING AND I HAD TO MONITOR ALL OF HIS PHONE CALLS AND READ ALL HIS MAIL, EXCEPT HIS LEGAL MAIL, OF COURSE.

Q.    BUY AS FAR AS BEING ON THE UNIT TO OBSERVE WHETHER HE WAS DOING ART WORK OR NOT, YOU WERE ONLY ON THAT UNIT FOR NINE MONTHS OUT OF 16 YEARS?

A.    YES.

Q.    AND THE OTHER TIMES YOU WERE ANYWHERE ELSE IN THIS COMPLEX, IS THAT RIGHT?

A.    YES.

Q.    SO THIS COMPLEX IS NOT JUST ONE PRISON, IS IT?

A.    NO, IT'S THREE.

Q.    SO THERE IS USP TERRE HAUTE, RIGHT?

A.    YES.

Q.    THAT IS WHERE THE SCU UNIT IS, RIGHT?

A.    YES.

Q.    THEN THERE'S FCI TERRE HAUTE, IS THAT RIGHT?

A.    YES.

Q.    AND WHAT ELSE IS THERE, A THIRD BUILDING?

A.    THERE IS THE FEDERAL PRISON CAMP.

Q.    SO THERE IS A CAMP.  SO OUT OF THOSE YEARS HOW MANY OF THEM WERE YOU NOT EVEN IN THE USP TERRE HAUTE?

A.    ALMOST ALWAYS IN THE USP.  I ALMOST SELDOM EVER WORKED IN THE CAMP OR FCI.

Q.      BUT OF THAT TIME YOU WERE NOT ON THE SCU BUT FOR NINE MONTHS?

A.      CORRECT.

Q.      YOU SAY YOUR TIME THERE YOU NEVER SAW MR. HAMMER DO ANY ART WORK, IS THAT RIGHT?

A.      CORRECT.

Q.      I'M GOING TO SHOW YOU WHAT HAS JUST BEEN MARKED AS DEFENDANT'S EXHIBIT 505.  AND MR. MOORE, CAN YOU DESCRIBE FOR US WHAT IS THE VERY FIRST DOCUMENT IN DEFENDANT'S EXHIBIT 505?

A.      IT SAYS IT'S A CERTIFICATE OF COMPLETION.

Q.      AND WHO RECEIVED IT?

A.      DAVID HAMMER.

Q.      WHAT DID HE GET THAT CERTIFICATE FOR?

A.      IT SAYS:  HAS SUCCESSFULLY MET ALL THE REQUIREMENTS FOR COMPLETION OF THE DRAWING AND ART CLASS AT FCC TERRE HAUTE.

Q.      AND WERE YOU AWARE THAT HE HAD TAKEN THIS CLASS?

A.      NO.

Q.      WERE YOU AWARE THAT HE COMPLETED IT?

A.      NO.

Q.      WELL, THAT E. TYLER, REC SPECIALIST, DO YOU KNOW THAT PERSON?

A.      YES, I DO.

Q.      WHO IS THAT?

A.      HE IS A REC SPECIALIST AT FCC TERRE HAUTE.

Q.      HE IS A REAL PERSON, RIGHT, THAT WORKS THERE?

A.      YES.

Q.      HOW ABOUT K. DOUPES, SUPERVISOR OF RECREATION?

A.      HE IS THE RECREATION SUPERVISOR, WAS, I BELIEVE HE IS RETIRED NOW, ALSO.

Q.      SO IT WOULD INDICATE HERE THAT MR. HAMMER WHILE AT HIS TIME AT TERRE HAUTE TOOK A WHOLE CLASS ON ART AND DRAWING, IS THAT RIGHT?

A.      THAT'S WHAT THIS SAYS, YES.

Q.      BUT I GUESS THAT WAS PROBABLY ONE OF THOSE TIMES WHEN YOU WERE NOT ASSIGNED TO THE SCU UNIT?

A.      I DON'T KNOW WHAT -- THERE IS NO DATE ON IT.  I HAVE NO IDEA WHEN HE DONE IT.

Q.      IT'S CLEAR THAT IT'S FCC TERRE HAUTE, IS THAT RIGHT?

A.      YES, THAT'S WHAT IT SAYS.

Q.      YOU SAID YOU WERE THERE AT THE AIRPORT WHEN HE GOT THERE, RIGHT?

A.      YES.

Q.      AND WHEN WAS THAT?

A.      I BELIEVE THEY OPENED THE UNIT IN '94.

Q.      SO IT WAS SOMETIME BETWEEN '94 AND TODAY, I GUESS, IS THAT FAIR TO SAY?

A.      I WOULD GUESS.

Q.    BUT YOU WERE UNAWARE OF THAT?

A.    YES, I WAS UNAWARE OF THAT.

Q.    NOW, YOU TALK ABOUT THE FACT THAT YOU OVERHEARD THIS CONVERSATION OF MR. HAMMER, IS THAT RIGHT?

A.    YES.

Q.    WHERE DID THAT CONVERSATION TAKE PLACE?

A.    IN THE KITCHEN OF THE OLD SPECIAL CONFINEMENT UNIT AT THE OLD USP TERRE HAUTE.

Q.    THE OLD USP TERRE HAUTE?

A.    YES.

Q.    WHEN DID THEY MOVE TO THE NEW USP TERRE HAUTE?

A.    APPROXIMATELY 2005.

Q.    AND WHEN DID YOU HEAR THIS CONVERSATION?

A.    IT WAS PRIOR TO MOVING TO THE NEW UNIT.

Q.    WELL, WHEN WAS IT?

A.    I CAN'T RECALL THE EXACT DATE.

Q.    DID YOU REVIEW YOUR REPORT CONCERNING THIS?

A.    I NEVER MADE A REPORT OF THIS.

Q.    YOU NEVER MADE A REPORT OF THIS?

A.    NO.

Q.    YOU HEARD MR. HAMMER MAKE THESE STATEMENTS CONCERNING SCAMMING NUNS AND YOU DID NOT MAKE A REPORT?

A.    NO.

Q.    WHAT WAS YOUR DUTY?  WHAT WAS YOUR ASSIGNMENT THAT DAY?

A.        CORRECTIONAL OFFICER.

Q.        ISN'T IT YOUR DUTY IF YOU ARE AWARE OF A SCAM TO
REPORT IT?

A.        IS IT MY DUTY TO REPORT A SCAM?

Q.        YES.

A.        I HAVE REPORTED NUMEROUS SCAMS ON HAMMER, YES.

Q.        WE ARE TALKING ABOUT THIS ONE WHERE YOU
OVERHEARD MR. HAMMER MAKE AN ADMISSION?

A.        HE STATED -- HE WAS NOT TALKING TO ME, NUMBER
ONE, I OVERHEARD IT.

Q.        SO YOU PASSED THE BUCK?

A.        NO, I DID NOT PASS THE BUCK.  I DIDN'T HAVE ANY
PART OF THAT CONVERSATION.

Q.        WHO WAS HE TALKING TO?

A.        HE WAS TALKING TO ANOTHER CORRECTIONAL OFFICER.

Q.        WHAT'S HIS NAME?

A.        I DON'T RECALL WHO THE OFFICER WAS THERE THAT
DAY.

Q.        SO YOU DON'T REMEMBER THE NAME OF THIS PERSON?

A.        NO.

Q.        AND YOU DON'T REMEMBER WHEN IT WAS.  WELL,
APPROXIMATELY, DO YOU KNOW WHAT YEAR IT HAPPENED?

A.        IT HAPPENED BETWEEN 1994 WHEN THEY OPENED THE
SPECIAL CONFINEMENT UNIT UNTIL BEFORE THEY TRANSFERRED
OVER TO THE NEW UNIT IN THE NEW USP.

Q.    SO SOMETIME BETWEEN 1994 AND 2005 YOU OVERHEARD THIS STATEMENT?

A.    YES.

Q.    AND HE WAS TALKING ABOUT A NUN?

A.    YES.

Q.    WAS HE TALKING ABOUT A SPECIFIC NUN?

A.    I WAS ASSUMING THEY WERE REFERRING TO THE NUN HE HAD JUST VISITED WITH.  IT WAS RIGHT AT THE END OF A VISIT WHEN THE CONVERSATION TOOK PLACE.

Q.    WHAT DID SHE SAY WHEN YOU TOLD HER ABOUT THIS?

A.    I DID NOT TELL HER ABOUT THIS.

Q.    SO YOU DID NOT TELL THE NUN THAT YOU KNEW THAT DAVID WAS MAKING THESE CONVERSATIONS ABOUT IT?

A.    NO.

Q.    SO YOU DID NOT WRITE A REPORT.

A.    NO.

Q.    YOU DON'T REMEMBER THE NAME OF THE PERSON.

A.    NO.

Q.    YOU DID NOT TELL THE NUN?

A.    NO.

Q.    WHAT DID YOU TELL YOUR SUPERVISOR?

A.    I DID NOT TELL HIM ANYTHING, I DIDN'T HAVE ANYTHING TO TELL HIM.

Q.    SO YOU DIDN'T TELL YOUR SUPERVISOR.

A.    JUST BECAUSE AN INMATE ADMITS TO BEING IN A

SCAM, DOES NOT --

Q.      YOU DID NOT TAKE IT SERIOUSLY, DID YOU?

A.      DID I TAKE IT SERIOUSLY?  I BELIEVED WHAT HE SAID, BUT I DON'T KNOW WHAT, YOU KNOW, AS FAR AS THE PICTURES AND ALL THAT STUFF, THAT HAS BEEN GOING ON FOR YEARS.

Q.      THE FACT THAT HE HAS NOT PAINTED, IS THAT RIGHT?

A.      YES.

Q.      BUT YET WE DO AGREE THAT YOU WERE NOT AWARE OF THIS ART CLASS HE COMPLETED SUCCESSFULLY?

A.      YES, AND I'M NOT AWARE OF WHAT THAT ART CLASS CONSISTS OF.

Q.      LET'S TALK ABOUT THAT.  YOU HAVE BEEN IN THAT PRISON FOR 20 YEARS, RIGHT?

A.      UM-HUM.

Q.      YOU KNOW WHAT THE REC DEPARTMENT IS, RIGHT?

A.      YES, I DO.

Q.      ARE YOU AWARE THAT THEY HAVE EASELS?

A.      YES.

Q.      ARE YOU AWARE THAT ON THE SCU THAT THEY WENT INTO THE INSIDE REC AREA TO TAKE THE ART CLASS?

A.      NO.

Q.      YOU ARE AWARE THAT --

A.      NO, THAT MUST HAVE BEEN AFTER I WAS IN THE UNIT. I DON'T RECALL EVER SEEING THAT WHILE I WAS THERE.

Q.    WHEN WERE THESE TIMES THAT YOU WERE IN THE UNIT, THE NINE MONTHS, CAN YOU TELL US THE DATES?

A.    I DON'T HAVE THE DATES, NO.  I WOULD HAVE TO LOOK AT THE SCHEDULES FROM BACK IN THE EARLY YEARS WHEN THIS FIRST STARTED.  I KNOW IT WAS WHEN -- I DID WORK DOWN THERE WHEN THEY VERY FIRST STARTED THE CHRISTMAS CARD PROJECT.

Q.    DO YOU REMEMBER WHEN THAT WAS?

A.    NO.

Q.    SO YOU DON'T KNOW WHEN YOU EVEN WORKED IN THE SCU, WHAT DATES, YOU CAN'T GIVE US THE DATES?

A.    NO, I DON'T HAVE THE EXACT DATES.

Q.    WAS THE OFFICER A MALE OR A FEMALE?

A.    IT WAS A MALE.

Q.    AND YOU DON'T KNOW THEIR NAME?

A.    I'M NOT SURE.  I BELIEVE IT MIGHT HAVE BEEN MICHAEL WITECKI, I'M NOT SURE.

Q.    AND YOU DID NOT MAKE A REPORT OF IT?

A.    NO.

Q.    YOU DID NOT REVIEW ANY REPORT THAT MICHAEL WITECKI MADE OF IT, DID YOU?

A.    NO.

Q.    YOU DID NOT TELL YOUR SUPERVISOR?

A.    NO.

Q.    YOU DID NOT TELL SISTER RITA?

A.    NO.

Q.    WHEN DID YOU TELL THE PROSECUTION ABOUT THIS?

A.    WHEN THEY ASKED ME ABOUT HAMMER.

Q.    WHEN WAS THAT?

A.    WHEN THEY CALLED ME ON THE PHONE AND ASKED ME TO TESTIFY.

Q.    WHEN WAS THAT?

A.    LAST WEEK, MAYBE.

Q.    SO YOU HAVE NOT TOLD ANYBODY UNTIL LAST WEEK ABOUT THIS SO-CALLED SCAM?

A.    NO.

Q.    YOU JUST KEPT IT INSIDE OF YOU?

A.    NO.  I HAVE NOT TOLD ANYBODY.

Q.    YOU HAVE NOT TOLD ANYBODY UNTIL TODAY?

A.    NO, IT WAS DISCUSSED CONSTANTLY DURING -- OFF BY MYSELF AND OTHER OFFICERS.

Q.    WHO DID YOU TELL ABOUT THIS SO-CALLED ADMISSION?

A.    THAT SPECIFIC ADMISSION I TOLD NO ONE.

Q.    YOU TOLD NO ONE UNTIL TODAY -- OR UNTIL LAST WEEK?

A.    RIGHT.  I TOLD NO ONE AT THE PRISON IS WHAT I'M SAYING.  I DID NOT TELL A SUPERVISOR, I DID NOT WRITE AN INCIDENT REPORT.  I WOULDN'T HAVE HAD ANYTHING TO WRITE.

Q.    BUT IF YOU THOUGHT THAT THERE WAS A CREDIBLE -- THAT YOU HAD CREDIBLE EVIDENCE OF A SCAM BEING RUN

AGAINST NUNS, IT WAS YOUR DUTY TO FILE A REPORT, CORRECT?

A.    NO.

Q.    IT'S NOT YOUR DUTY TO FILE A REPORT?

A.    NOT TO THE NUNS, NO.

Q.    NOT TO THE NUNS, I'M TALKING TO YOUR BOSSES?

A.    I MADE MANY --

Q.    THIS INCIDENT WHERE YOU CAME IN HERE AND TESTIFIED ABOUT A STATEMENT YOU HEARD?

A.    YES.

Q.    IS THAT RIGHT?

A.    THAT IS A STATEMENT I HAVE HEARD, YES.

Q.    YOU WOULD AGREE WITH ME -- YOU ARE IN SIS, RIGHT, THAT IS SPECIAL INVESTIGATIONS?

A.    THAT'S CORRECT.

Q.    BY THE TIME YOU RETIRE, YOU KNEW THE RULES WELL, RIGHT?

A.    YES.

Q.    YOU WOULD AGREE WITH ME THAT AS A CO OR AN SIS, IT IS YOUR DUTY IF YOU HAVE CREDIBLE EVIDENCE OF A PRISONER RUNNING A SCAM THAT YOU ARE TO REPORT IT?

A.    I HAVE REPORTED THEM, YES.

Q.    THIS INCIDENT YOU DID NOT REPORT?

A.    NO.  THERE WAS NO CRIME COMMITTED IN FRONT OF ME.  I MEAN I HEARD A CONVERSATION WHERE A GUY SAID,

SOMEBODY HAS TO DO IT, THAT WAS HIS RESPONSE.  I HAD NOTHING TO REPORT.

Q.      YOU DID NOT TELL ANYBODY ABOUT IT?

A.      NO.

THE COURT:  IT'S GETTING REDUNDANT.

THE WITNESS:  NOT THAT ANSWER, NO, I DID NOT.

MR. MCHUGH:  IF I MAY JUST HAVE A MOMENT, YOUR HONOR.

(PAUSE.)

MR. MCHUGH:  THAT'S ALL I HAVE.

IF I MAY JUST CHECK, YOUR HONOR, IF I MAY INQUIRE.

BY MR. MCHUGH:

Q.      YOU TALKED ABOUT THOSE SPO'S, IS THAT RIGHT, THE SPECIAL PURCHASE ORDERS?

A.      NO, I DIDN'T TALK ABOUT THEM.

Q.      YOU WEREN'T ASKED ABOUT THAT?

A.      PURCHASE ORDERS.

Q.      ARE YOU AWARE THAT ART SUPPLIES HAVE TO BE BOUGHT WITH AN SPO?

A.      YES.

Q.      AND YOU TESTIFIED HERE THAT MR. HAMMER COULD HAVE JUST GIVEN THOSE OUT?

A.      SURE.

Q.      WELL, HE IS SINGLE CELLED, RIGHT?

A.      YES.

Q.      HE IS NOT ALLOWED TO PASS ITEMS TO OTHER

INMATES, IS HE?

A.      OFFICERS DO PASS ITEMS FROM ONE INMATE TO

OTHERS.

Q.      IS THAT PERMITTED?

A.      I DO NOT MYSELF PERSONALLY DO IT, BUT SOME

OFFICERS DO.  I HAVE SEEN IT DONE, YES.

Q.      BUT YOU DID NOT SEE ANYBODY PASS FROM

MR. HAMMER TO THE OTHER --

A.      I HAVE SEEN A LOT OF THINGS PASSED BACK AND

FORTH BETWEEN HAMMER AND OTHER INMATES.

Q.      I'M TALKING ABOUT ART SUPPLIES, SIR.  BILLY

ALLEN, DID YOU EVER HEAR ABOUT A WRITEUP THAT BILLY GOT

OF RECEIVING ART SUPPLIES FROM MR. HAMMER?

A.      NO.

Q.      DID YOU EVER SEE MR. HAMMER IN THE NINE MONTHS

OUT OF THE 16 YEARS YOU WERE NOT IN THE SCU THAT

MR. HAMMER PASSED ART SUPPLIES TO BILLY ALLEN?

A.      DID I PERSONALLY SEE HIM DO IT, NO.

Q.      BUT THERE IS SOME TYPE OF RUMOR THAT BILLY ALLEN

WAS DOING PAINTING?

A.      WELL, IT WAS NOT A RUMOR, I SAW THE PAINTING,

HIM WORKING ON THE PAINTING AND IT LATER GOING OUT WITH

HAMMER'S NAME ON IT.

Q.      YOU SAW THAT.  DID YOU MAKE A REPORT OF THAT?

A.      YES, I HAVE MADE REPORTS ON THINGS, YES.

Q.      DID YOU MAKE A REPORT OF THIS SO-CALLED BILLY ALLEN PAINTING A PAINTING WITH DAVID HAMMER'S NAME ON IT?

A.      NO.

Q.      YOU DID NOT MAKE A REPORT OF THAT EITHER?

A.      NO.

Q.      DID YOU TELL YOUR SUPERVISOR?

A.      NO.

Q.      DID YOU TELL ANYBODY BEFORE A WEEK AGO ABOUT THIS?

A.      I TOLD PEOPLE ABOUT IT WHEN THEY ASKED ABOUT IT, YES.

Q.      SOMEBODY ASKED YOU SPECIFICALLY ABOUT BILLY ALLEN PAINTING A CARD?

A.      NO, THEY HAVE ASKED ME ABOUT THE CARDS IN THE PAST.

Q.      WE ARE TALKING AGAIN ABOUT THIS INCIDENT WITH BILLY ALLEN.  HAVE YOU TOLD ANYBODY SPECIFICALLY AT THE HIERARCHY OF THE BOP BESIDES A WEEK AGO?

A.      I HAVE TOLD SEVERAL PEOPLE.

Q.      AND THEY JUST DIDN'T DO ANYTHING ABOUT IT?

A.      I WROTE UP INCIDENT REPORTS, I WROTE MEMOS TO

OTHER PEOPLE.

Q.      ABOUT THIS BILLY ALLEN?

A.      ABOUT THE CHRISTMAS CARD SCAM, YES.

Q.      YOU WROTE REPORTS ABOUT THAT AND JUST NO ONE LISTENED TO YOU?

A.      CORRECT.

Q.      DO YOU UNDERSTAND, SIR, THAT THIS PROGRAM STILL GOES ON TODAY?

A.      I UNDERSTAND THAT.

Q.      YOU UNDERSTAND THAT NUMEROUS SISTERS HAVE COME IN HERE AND TESTIFIED UNDER OATH THAT THEY HAVE RECEIVED SIGNIFICANT FUNDS CONCERNING THIS PROGRAM?

A.      NO, I'M NOT AWARE OF THAT.

Q.      ARE YOU AWARE THAT NOT A SINGLE BOP EMPLOYEE HAS COME IN HERE AND TESTIFIED THAT THERE IS SOMEHOW -- THIS IS AN ONGOING SCAM THAT THE BOP IS ALLOWING TO HAPPEN RIGHT NOW?

A.      NO, I'M NOT AWARE OF THAT.

                MR. MCHUGH:  IF I MAY INQUIRE, YOUR HONOR?

                (PAUSE.)

BY MR. MCHUGH:

Q.      WHEN DID YOU SEE MR. HAMMER GET OFF THE BUS, I MISSED THAT?

A.      THE DAY THEY OPENED THE SPECIAL CONFINEMENT

UNIT.

Q.      WHEN WAS THAT?

A.      I DON'T KNOW THE EXACT DATE, I HONESTLY DON'T.

Q.      1994 IS WHEN YOU STARTED?

A.      NO, I STARTED IN 1990.

Q.      YOU TOLD US SOMETHING ABOUT '94, WHAT WAS '94?

A.      I BELIEVE YOU ASKED ME THE DATE I SAID I BELIEVE THAT IS THE APPROXIMATE DATE THAT THE SPECIAL CONFINEMENT UNIT WAS OPENED.

Q.      THAT IS THE DAY YOU THINK YOU SAW DAVID HAMMER GET OFF THE BUS?

A.      THE FIRST TIME I SAW HIM, YES.

Q.      THE SPECIAL CONFINEMENT UNIT IS DEATH ROW, IS THAT RIGHT?

A.      YES.

Q.      ARE YOU AWARE THAT THE MURDER IN THIS CASE DID NOT EVEN HAPPEN UNTIL 1996?

A.      WELL, THEN I'M WRONG ON THE DATE WHEN IT WAS OPENED.

Q.      ARE YOU AWARE THE TRIAL IN THIS CASE DIDN'T HAPPEN UNTIL '98?  SO YOU ARE WRONG ABOUT THOSE DATES, I GUESS.

A.      WELL, I'M WRONG.  EVIDENTLY IF THAT'S WHAT YOU ARE TELLING ME.  I DON'T KNOW THE EXACT DATE IT WAS OPENED.  I TOLD YOU THAT.

THE COURT:  ANY REDIRECT?

MS. HAINES:  YES, YOUR HONOR.

REDIRECT EXAMINATION

BY MS. HAINES:

Q.      HI, MR MOORE.

A.      HELLO.

Q.      YOU INDICATED THAT YOU WERE ONLY TECHNICALLY ASSIGNED TO THE SPECIAL CONFINEMENT UNIT FOR NINE MONTHS?

A.      YES.

Q.      HOW FAMILIAR ARE YOU WITH MR. HAMMER?

A.      VERY.

Q.      WHY DO YOU SAY YOU ARE VERY FAMILIAR WITH HIM?

A.      BECAUSE I HAD A LOT OF INTERACTION WITH HIM WHEN I WORKED THERE.  I WOULD SEE HIM DAILY WHEN I DID WORK THERE.  I MONITORED ALL OF HIS PHONE CALLS.  I READ HIS MAIL WHEN I WAS IN THE SPECIAL INVESTIGATION OFFICE.

Q.      AND EVEN IF YOU ARE NOT ASSIGNED TO THE UNIT, DO YOU GO ON THE UNIT?

A.      SOMETIMES, YES.

Q.      HOW OFTEN HAVE YOU INVESTIGATED MR. HAMMER FOR SCAMS?

MR. MCHUGH:  OBJECTION, BEYOND THE SCOPE.

THE COURT:  OVERRULED.

THE WITNESS:  NUMEROUS TIMES.

BY MS. HAINES:

Q.      IN THE SCHEME OF THINGS, THINKING ABOUT THE UNIVERSE OF SCAMS THAT HE HAS BEEN INVESTIGATED FOR, HOW DID THE ART PROJECT RATE IN YOUR MIND AS TO HOW SERIOUS IT WAS?

A.      NOT VERY SERIOUS.

Q.      BECAUSE MR. HAMMER HAS BEEN INVESTIGATED FOR LOTS OF SERIOUS THINGS, RIGHT?

MR. MCHUGH:  OBJECTION, YOUR HONOR, BEYOND THE SCOPE.

THE WITNESS:  YES, HE HAS.

THE COURT:  I'M GOING TO OVERRULE THE OBJECTION.

BY MS. HAINES:

Q.      HASN'T HE BEEN INVESTIGATED FOR SOME VERY SERIOUS THINGS?

MR. MCHUGH:  OBJECTION, YOUR HONOR, TO COUNSEL'S CHARACTERIZATIONS.  IT'S IMPROPER REDIRECT.

THE COURT:  WELL, HE IS BEING ASKED HIS OPINION NOW.  I'M GOING TO SUSTAIN THE OBJECTION.

BY MS. HAINES:

Q.      WELL, MR. MOORE, WHEN YOU DECIDED THAT THIS PARTICULAR MATTER, THE FACT THAT HE DID NOT DRAW THESE PAINTINGS WAS NOT WORTH REALLY PURSUING, WHY DID YOU MAKE THAT DECISION?

A.       HE HAD A LOT OF OTHER THINGS GOING ON THAT WAS MORE SERIOUS THAN THE ART.

MR. MCHUGH:  OBJECTION, BEYOND THE SCOPE. IMPROPER REDIRECT.

THE COURT:  OVERRULED.

BY MS. HAINES:

Q.       CAN YOU GIVE US AN EXAMPLE OF SOMETHING THAT WAS MORE SERIOUS THAN THE ART WORK TO YOU?

MR. MCHUGH:  OBJECTION, YOUR HONOR.

THE COURT:  OVERRULED.

THE WITNESS:  YES.  HE HAD ONE WHERE HE WAS WRITING TO A MAN ON THE STREET WHERE HE ACTUALLY HAD UNDERCLOTHES MAILED OUT TO A MAN PURPORTING THEM TO BE THE PROPERTY OF TIMOTHY MCVEIGH AND LATER THE MAN SENT HIM MONEY INTO THE PRISON AND HE RECEIVED AN INCIDENT REPORT FOR THAT AND THE MONEY WAS TURNED AROUND AND REJECTED.

BY MS. HAINES:

Q.       NOW, IN REVIEWING MR. HAMMER'S MAIL, DID ANYTHING IN HIS MAIL MATTER LEAD YOU TO BELIEVE THAT HE WAS ACTUALLY DOING THESE DRAWINGS?

A.       NO.

Q.       HOW ABOUT IN THE PHONE CALLS THAT YOU MONITORED, ANYTHING IN THOSE PHONE CALLS LEAD YOU TO BELIEVE HE WAS ACTUALLY DOING THESE DRAWINGS?

A.      NO.

Q.      DID YOU EVER HEAR ANYBODY SAY THAT THEY SAW MR. HAMMER DOING THESE DRAWINGS?

A.      NO, I HAVEN'T.  MANY PEOPLE TOLD ME THEY DID NOT SEE HIM DO IT.

                MR. MCHUGH:  OBJECTION.

                THE COURT:  SUSTAINED.

BY MS. HAINES:

Q.      YOU SAID YOU NEVER REPORTED THIS TO THE BUREAU OF PRISONS.  DO YOU RECALL TELLING ANOTHER PROSECUTOR, FRED MARTIN, ABOUT THIS?

                MR. MCHUGH:  OBJECTION.

                THE COURT:  OVERRULED.

                THE WITNESS:  YES.

BY MR. MCHUGH:

Q.      THAT WOULD HAVE BEEN SEVERAL YEARS AGO, I BELIEVE?

A.      YES.

Q.      AND YOU WERE SHOWN A CERTIFICATE FROM A DRAWING AND ART CLASS.  DO YOU KNOW WHETHER THAT IS A CORRESPONDENCE CLASS?

A.      I HAVE NO IDEA.  I HAVE NEVER SEEN ONE OF THESE BEFORE, SO I REALLY DON'T KNOW.

Q.      BUT PEOPLE WHO ARE SINGLE CELLED, THEY TAKE CORRESPONDENCE CLASSES, CORRECT?

A.        SOMETIMES, YES.

Q.        THEY ARE NOT IN A CLASSROOM WITH OTHER PEOPLE, RIGHT?

A.        NO, NOT NORMALLY, NO.

Q.        AND IF MR. HAMMER WAS ON SINGLE CELL STATUS, HE WOULD NOT BE IN AN ART STUDIO DRAWING WITH OTHER STUDENTS AND STAFF, WOULD HE?

A.        NOT THAT I HAVE EVER SEEN, NO.

Q.        AND FINALLY, MR. MOORE, DO YOU STAND ANYTHING TO GAIN BY TESTIFYING HERE TODAY?

A.        NOTHING.

          MS. HAINES:  I HAVE NOTHING FURTHER, YOUR HONOR.

          THE COURT:  RECROSS.

          RECROSS EXAMINATION

BY MR. MCHUGH:

Q.        SO YOU REVIEWED HIS MAIL, IS THAT RIGHT?

A.        YES.

Q.        ARE YOU AWARE THAT THE ART WORK WENT OUT IN THE MAIL TO THE SISTERS?

A.        YES.

Q.        AND IT WAS MAILED BY DAVID, IS THAT RIGHT?

A.        YES.

Q.        NOW, YOU ARE NOT AWARE THAT HE GOT THESE ART SUPPLIES, SO THAT MAIL YOU DON'T REVIEW?

A.       EXCUSE ME?

Q.       IN OTHER WORDS, THE ART SUPPLIES ARE OBVIOUSLY MAILED TO THE PRISON, IS THAT RIGHT?

A.       THEY ARE MAILED TO THE RECREATION DEPARTMENT, IT'S ALL HANDLED BY THEM.

Q.       AS A MATTER OF FACT, IT'S SUPERVISED, THERE ARE A NUMBER OF SUPERVISORS THAT HAVE TO SIGN OFF BEFORE THESE ART SUPPLIES GO TO THE PRISONER, IS THAT RIGHT?

A.       I DON'T KNOW, I HAVE NEVER DONE THE PROCESS, I DON'T KNOW.

Q.       SO YOU ARE NOT AWARE THAT THE REC SUPERVISOR HAS TO LOOK AT IT, THEN THE UNIT MANAGER HAS TO LOOK AT IT AND ALL OF THESE HAVE TO BE APPROVED BEFORE THE ART SUPPLIES WOULD GO TO THE NAMED INDIVIDUAL, IS THAT RIGHT?

A.       I DON'T KNOW.

Q.       SO YOU DON'T KNOW ANYTHING ABOUT --

A.       I HAVE NEVER DONE THAT PROCESS, I'VE NEVER DONE IT.

Q.       NOW, I'M NOT SURE WHAT COUNSEL WAS ASKING YOU BUT LET'S LOOK AT DEFENDANT'S EXHIBIT 505.  DO YOU HAVE THAT IN FRONT OF YOU?

A.       YES.

Q.       DO YOU HAVE ANY INDICATION THAT THIS IS A CORRESPONDENCE COURSE?

A.        NO, I DON'T HAVE ANY INDICATION THAT -- WHAT KIND OF COURSE IT IS.  IT JUST SAYS --

Q.        WHAT ABOUT DRAWING AND ART WHERE IT IS TITLED. DO YOU SEE THAT?

A.        YES.

Q.        AND THE REC SPECIALISTS, THEY RUN ART CLASSES IN THE PRISON, CORRECT?

A.        YOU WOULD HAVE TO ASK THEM THAT, I'M NOT SURE.

Q.        YOU ARE NOT FAMILIAR WITH THE REC DEPARTMENT RUNNING ART CLASSES?

A.        NO, THEY HAVE MANY, MANY DIFFERENT THINGS THEY DO.  I DON'T WORK IN RECREATION SO I'M REALLY NOT AWARE OF ALL OF IT.

Q.        AND THIS INDICATES THAT HE COMPLETED THIS CLASS AT FCC TERRE HAUTE, RIGHT, AT FCC TERRE HAUTE, DO YOU SEE THE LAST SENTENCE?

A.        THAT'S WHAT IT SAYS, YES.

Q.        SO YOU HAVE NO EVIDENCE OR ANY KNOWLEDGE THAT THIS WAS A CORRESPONDENCE CLASS, IS THAT RIGHT?

A.        NO, I DON'T.

                    MS. HAINES:  NOTHING FURTHER, YOUR HONOR.

                    THE COURT:  ARE YOU DONE, MR. MCHUGH?

                    MR. MCHUGH:  YES, YOUR HONOR.

                    THE COURT:  ALL RIGHT, YOU MAY STEP DOWN.

                    (WITNESS EXCUSED.)

MR. GURGANUS:  YOUR HONOR, THE LAST THING WE ARE OFFERING IS GOVERNMENT EXHIBIT R1, SOME EXCERPTS FROM "THE FINAL ESCAPE."  THEY HAVE BEEN PROVIDED TO COUNSEL AND THESE EXCERPTS DEAL WITH MR. HAMMER'S ADMISSIONS TO ENGAGING IN FRAUDULENT ACTIVITY AND IT IS LIMITED TO THOSE PARTS OF THE BOOK, SOME OF THE FRAUDULENT ACTIVITIES THAT HE ADMITTEDLY ADMITS TO.

ITS PURPOSE UNDER RULE 806 FOR CREDIBILITY ASSESSMENTS, THERE HAS BEEN A LOT OF HEARSAY IN THIS CASE DEALING WITH MR. HAMMER'S STATEMENTS TO OTHER PEOPLE AND FOR THOSE REASONS IT'S PROPER TO OFFER THESE STATEMENTS UNDER THAT RULE AND THE OTHER, SO WE ARE OFFERING THOSE PORTIONS OF THE BOOK THAT DETAIL SCAMS THAT WERE ENGAGED IN, MAIL FRAUD SCHEMES AND THE LIKE.

MR. MCHUGH:  WE ARE GOING TO OBJECT. YOUR HONOR, MAY WE HAVE A MOMENT, MR. HAMMER HAS PUT UP THE RED CARD?

THE COURT:  YES.

MR. MCHUGH:  SO BEFORE IT IS CONSIDERED BY THE COURT, WE DO HAVE AN OBJECTION WE WOULD LIKE TO PLACE ON THE RECORD, BUT IF WE COULD TALK TO MR. HAMMER FIRST.

THE COURT:  I'M NOT GOING TO LOOK AT IT AT ALL UNTIL YOU SPEAK TO MR. HAMMER, SO LET'S TAKE A

FIVE-MINUTE RECESS.

MR. MCHUGH:  THANK YOU.

(RECESS TAKEN.)

MR. MCHUGH:  IF I MAY, YOUR HONOR, STATE OUR OBJECTION.

YOUR HONOR, IT APPEARS THAT --

THE COURT:  YOU CAN SIT AND SPEAK INTO THE MIKE.

MR. MCHUGH:  IT WOULD APPEAR THAT THIS SECTION, THE SEGMENTS OF THE BOOK THEY HAVE PULLED OUT COVER A PERIOD FROM 1986 TO 1993.  COUNSEL HAS STATED THAT IT'S BEING OFFERED PURSUANT TO, I BELIEVE, FEDERAL RULE OF EVIDENCE 806.

FIRST OF ALL, OUR OBJECTION WOULD BE THE RULES OF EVIDENCE DO NOT APPLY TO THIS PROCEEDING. NOTHING THAT WE HAVE PRESENTED IN THIS PROCEEDING GOES TO -- THIS IS NOT REBUTTING ANYTHING THAT WE HAVE PRESENTED IN THIS PROCEEDING.  IT GOES TO BAD ACTS THAT MR. HAMMER ADMITS TO IN HIS BOOK BETWEEN 1986 AND 1993.

IF YOU WILL RECALL, YOUR HONOR, ANY OF WHAT WE'LL CALL THE GOOD CHARACTER TESTIMONY THAT WE PUT ON CONCERNING MR. HAMMER CAME AFTER SR. CAMILLE STARTED THE CHRISTMAS CARD PROJECT WHICH SHE POINTED OUT THE TIME FRAME OF AFTER TIMOTHY MCVEIGH'S EXECUTION WHICH WAS IN JUNE OF 2001.  SO THIS IS CLEARLY IMPROPER

REBUTTAL CONCERNING A TIME FRAME THAT WAS NEVER IN QUESTION, 1986 TO 1993.

ALSO, YOUR HONOR, THE STIPULATION THAT WE HAVE CONCERNING THE BOOK IS THAT IT IS A TRUE AND ACCURATE COPY OF THE BOOK.  THERE IS NOTHING THAT WE HAVE STIPULATED TO THAT SAYS THAT THIS BOOK AND EVERYTHING THAT IS CONTAINED IN IT IS TRUE AND CORRECT AS BEING A TRUTHFUL REPORTING.

SO WITH THAT, YOUR HONOR, WE WOULD OBJECT.  THIS IS IMPROPER REBUTTAL.  IT DOES NOT COVER A TIME FRAME THAT WAS EVER IN QUESTION AS FAR AS THE DEFENSE CASE WAS CONCERNED.

I HAVE ONE OTHER STATEMENT TO MAKE, YOUR HONOR.  IT ALSO DOES NOT MEET THE RULE THAT WE ARE OPERATING UNDER HERE FOR A FEDERAL CAPITAL PROCEEDING, WHICH IS THAT THE EVIDENCE MUST BE STRIKINGLY HIGH LEVEL OF RELEVANCE AND RELIABILITY.

THE COURT:  EVEN THOUGH THE RULES OF EVIDENCE ARE NOT APPLICABLE, I'M LOOKING AT RULE 806.  AND IT SAYS WHEN A HEARSAY STATEMENT OR A STATEMENT DESCRIBED IN 801(D)(2)(C), -- 801(D)(2)(C) PROVIDES FOR THE DEFINITION OF HEARSAY.

(D)(2)(C) PROVIDES THAT THE STATEMENT IS OFFERED AGAINST AN OPPOSING PARTY AND WAS MADE BY A PERSON WHOM THE PARTY AUTHORIZED -- WAS MADE BY A PERSON

WHOM THE PARTY AUTHORIZED TO MAKE A STATEMENT ON THE SUBJECT -- WAS MADE BY A PERSON WHOM THE PARTY AUTHORIZED TO MAKE THE STATEMENT ON THE SUBJECT.  THAT WOULD NOT APPLY HERE BECAUSE WE ARE DEALING WITH MR. HAMMER'S TESTIMONY.

MR. GURGANUS:  YOUR HONOR, WE ARE TALKING ABOUT ALL THE TESTIMONY THAT HAS COME INTO EVIDENCE THROUGH THESE MITIGATION SPECIALISTS TALKING ABOUT HIS BACKGROUND.  IT PUTS HIS TRUTHFULNESS INTO QUESTION.  AND IF MR. HAMMER SAID IT, WE WOULD -- OR A WITNESS WAS TO -- BEING REPORTED LIKE THAT, WE WOULD HAVE AN OPPORTUNITY TO QUESTION THEM ABOUT SPECIFIC INSTANCES OF MISCONDUCT THAT DEALT WITH FRAUD, AND THAT IS WHAT WE ARE TALKING ABOUT HERE.

WE HAVE HEARD SO MUCH INFORMATION THAT CAME FROM MR. HAMMER THROUGH HIS MITIGATION SPECIALISTS THAT ARE TESTIFYING AND PROVIDING THIS INFORMATION TO THE COURT.  AND THEREFORE WE SHOULD BE ABLE TO SHOW THAT ON PRIOR OCCASIONS OR ON HIS OWN ADMISSIONS --

THE COURT:  I'M LOOKING TO SEE UNDER WHICH PROVISION THE -- ATTACKING THE CREDIBILITY OF A HEARSAY DECLARANT WOULD BE ADMISSIBLE.  IT LOOKS LIKE (C) WOULD BE THE -- I MISSPOKE.  IT LOOKS LIKE (C) WOULD BE THE APPROPRIATE ONE.  THE STATEMENT IS OFFERED AGAINST AN OPPOSING PARTY AND WAS MADE BY A PERSON WHOM

THE PARTY AUTHORIZED TO MAKE THE STATEMENT ON THE SUBJECT.  TO THE EXTENT THAT MR. HAMMER IS INTERVIEWED BY THESE OTHER PERSONS, HE IS AUTHORIZING THEM TO MAKE STATEMENTS OR REPEAT STATEMENTS THAT HE SAID.  806 SAYS: WHEN A HEARSAY STATEMENT, AND I'M LEAVING OUT THE SECTION NOW, HAS BEEN ADMITTED INTO EVIDENCE, THE DECLARANT'S CREDIBILITY MAY BE ATTACKED AND THEN SUPPORTED BY ANY EVIDENCE THAT WOULD BE ADMISSIBLE FOR THOSE PURPOSES IF THE DECLARANT HAD TESTIFIED AS A WITNESS.  NOW THEN IT SAYS:  THE COURT MAY ADMIT EVIDENCE OF THE DECLARANT'S INCONSISTENT STATEMENT OR CONDUCT REGARDLESS OF WHEN IT OCCURRED OR WHETHER THE DECLARANT HAD AN OPPORTUNITY TO EXPLAIN OR DENY IT.  IF THE PARTY AGAINST WHOM THE STATEMENT WAS ADMITTED CALLS THE DECLARANT AS A WITNESS, THE PARTY MAY CROSS EXAMINE THE DECLARANT ON THIS STATEMENT AS IF ON CROSS EXAMINATION.

SO THAT THERE HAS BEEN A LOT OF TESTIMONY THAT MR. HAMMER -- AS TO STATEMENTS MADE BY MR. HAMMER AND THE GOVERNMENT IS OFFERING WHAT APPEARS TO BE MR. HAMMER'S -- EXCERPTS FROM MR. HAMMER'S BOOK, WHICH IS WHAT MR. HAMMER WROTE, WHICH IS AS RELIABLE AS IT GETS IN TERMS OF HIS PRIOR CONDUCT.

SO I WILL ADMIT GOVERNMENT EXHIBIT R1, WHICH CONTAINS EXCERPTS FROM THE BOOK.  AND I'M NOT

GOING TO READ IT NOW, BUT I'LL READ IT ON ANOTHER OCCASION AFTER THE HEARING.  ALL RIGHT.

ANYTHING FURTHER?

MR. GURGANUS:  NO, YOUR HONOR.  THANK YOU.

THE COURT:  ALL RIGHT.

MR. GURGANUS:  THAT IS GOING BE ALL WE HAVE AT THIS TIME, AND THE GOVERNMENT WILL REST.

THE COURT:  ALL RIGHT.  AND GR 1 WILL BE RECEIVED INTO EVIDENCE.

(GOVERNMENT EXHIBIT GR 1 ADMITTED INTO EVIDENCE.)

THE COURT:  ANYTHING FURTHER?  NO FURTHER EVIDENCE?

NOW IT'S NOW A LITTLE AFTER 3 O'CLOCK. AND I SAID I WOULD ALLOW 45 MINUTES EACH SIDE.  BUT MY STAFF HAS BEEN NOTIFIED THAT MR. HAMMER IS AVAILABLE TO BE ON VIDEO UNTIL 5:30.  ALL RIGHT?

SO I HAVE A MATTER AT 3:45, WHICH SHOULD NOT TAKE LONG.  WE MAY HAVE TO JUST TAKE A SHORT BREAK, BUT LET'S GET THE CLOSING ARGUMENTS IN.

THE GOVERNMENT BEGINS.

MR. TRAVIS:  YOUR HONOR, BEFORE WE START THE CLOSING ARGUMENTS, THERE IS A LEGAL MATTER THAT WE HAVE TO AT LEAST PUT ON THE RECORD AND GET STRAIGHT.  I

TALKED TO MR. GURGANUS OVER LUNCH, AND HE BELIEVES THAT WE MAY HAVE BRIEFED THIS.  FRANKLY, I DON'T REMEMBER IF WE DID OR DIDN'T.  WE WANT TO MAKE CLEAR TO THE COURT THAT OUR POSITION IS THAT IF THE COURT REACHES THE WEIGHING STAGE, THAT WE ADVOCATE THAT THE SUFFICIENCY STANDARD TO FIND THAT AGGRAVATING OUTWEIGHS THE MITIGATING CIRCUMSTANCES, SHOULD BE A BEYOND A REASONABLE DOUBT STANDARD.  IN OTHER WORDS, IF YOU FIND X AGGRAVATORS AND Y MITIGATORS WHEN YOU GO THROUGH THE WEIGHING PROCESS, THAT YOU SHOULD MAKE A DETERMINATION BEYOND A REASONABLE DOUBT.

MR. GURGANUS, AS I SAY, HE THINKS THAT WE BRIEFED THIS EARLIER.  I'M NOT SURE THAT WE HAVE.  I JUST WANT TO MAKE SURE THAT WE HAVE PRESERVED THE ISSUE IF IT'S NECESSARY TO TAKE AN APPEAL.

THE COURT:  WHICH REMINDS ME.  I DON'T HAVE A VERDICT SLIP YET.  DO YOU HAVE A COPY OF THE VERDICT SLIP?

MS. SAUNDERS:  YOUR HONOR, WE HAVE PROPOSED A VERDICT SLIP.  APPARENTLY THE GOVERNMENT IS OBJECTING TO IT BEING TOO LONG.  WE HAVE A VERDICT SLIP THAT IS DESIGNED AFTER THE NORTHINGTON VERDICT SLIP THAT WE HAVE LISTED OUR SEPARATE MITIGATING FACTORS.  I HAVE A COPY I CAN PROFFER TO THE COURT IF THE COURT WOULD LIKE.

BUT IT'S OUR POSITION THAT THE VERDICT CERTAINLY COMPLIES WITH THIS CASE AS WELL AS -- THE NEEDS OF THIS CASE AS WELL AS WHAT HAS BEEN DONE IN OTHER CASES.  OTHER CASES HAVE HAD MITIGATING FACTORS AS LONG AS 149 OR 160 SO...

THE COURT:  HOW MANY MITIGATING FACTORS IS THERE IN THIS ONE?

MS. SAUNDERS:  172.

MR. GURGANUS:  YOUR HONOR, WE REQUEST THAT THAT IS JUST TOO MANY.  THEY SHOULD BE RECAST INTO SOMETHING.  WHAT THEY ARE REQUESTING AS MITIGATING FACTORS ARE INDIVIDUAL FACTS THAT JUST GO WELL BEYOND THE PALE HERE.  AND THERE IS A CASE CALLED UNITED STATES VERSUS RON L. WILSON THAT -- WHERE THE COURT DID THAT. IT RECAST THE MITIGATING FACTORS AND CUT DOWN WHAT WAS IN THAT CASE 52 AND RECAST THEM TO I THINK 22.  HERE WE ARE TALKING 170 MITIGATING FACTORS AND WE HAVE --

THE COURT:  I THOUGHT YOU SAID 20 SOMETHING MITIGATING FACTORS.

MS. SAUNDERS:  YOUR HONOR --

MR. GURGANUS:  IN THIS CASE THEY RECAST IT -- THE COURT RECAST IT TO 22.

THEY ARE PROPOSING 178 AND WE JUST SUBMIT THAT THAT IS --

THE COURT:  I GOT TO TELL BOTH SIDES, I'M

A LITTLE DISAPPOINTED.  FOR THREE WEEKS NOW I HAVE BEEN ASKING FOR A VERDICT SLIP.  I WAS TOLD THAT I WOULD GET IT AND IT WOULD BE BY AGREEMENT.  THAT IS MY UNDERSTANDING.  AND NOW I AM CONFRONTED AT THE VERY LAST DAY WITH THE FACT THAT I DON'T HAVE A VERDICT SLIP AND THERE IS NO AGREEMENT.  I THINK COUNSEL SHOULD HAVE BROUGHT THIS TO MY ATTENTION A LITTLE EARLIER IN THIS PROCEEDING, GIVEN MY REQUESTS.

LET ME SEE THE VERDICT SLIP YOU HAVE.

DOES THE GOVERNMENT HAVE A FORM VERDICT SLIP THEY WANT ME TO CONSIDER?

MR. GURGANUS:  YOUR HONOR, WE WERE REQUESTING --

THE COURT:  YES OR NO?

MR. GURGANUS:  NO, YOUR HONOR.

THE COURT.  NOW HOW DO WE RESOLVE THIS, COUNSEL?

MR. GURGANUS:  YOUR HONOR, THERE WERE 15 PROPOSED IN THE ORIGINAL.  THAT IS WHAT I REQUESTED THE DEFENSE TO TRY TO DO.

THE COURT:  THAT IS SOME OTHER CASE. THAT IS SOME OTHER DECISION THAT WAS MADE BY A JURY. THIS IS A JUDGE MAKING A DECISION.

MS. SAUNDERS:  YOUR HONOR, JUST SO THAT I COULD NOTE THAT WE HAD ORIGINALLY SENT ONE TO THE

GOVERNMENT THAT WAS MUCH LONGER.  THEY ASKED US TO PARE IT DOWN.

THE COURT:  WHEN?

MS. SAUNDERS:  A COUPLE OF WEEKS AGO, I BELIEVE.  THEY ASKED US TO PARE IT DOWN.  WE HAVE -- WE HAD ENDEAVORED TO DO THAT.

THE COURT:  WHEN DID YOU GET THEM THIS ONE?

MS. SAUNDERS:  IN ALL HONESTY, YOUR HONOR, NOT UNTIL YESTERDAY EVENING.

MR. GURGANUS:  LAST NIGHT.

MS. SAUNDERS:  I WILL SAY, YOUR HONOR, THAT AT THIS POINT, I DON'T BELIEVE WE HAVE EVER RECEIVED ANY SPECIFIC OBJECTIONS TO ANY PARTICULAR MITIGATING FACTORS, WHICH MIGHT HAVE BEEN A LITTLE MORE HELPFUL.  AT THIS POINT WE BELIEVE THESE ARE THE MITIGATORS THAT WE HAVE PROVEN THAT ARE RELEVANT TO THIS COURT'S CONSIDERATION OF TO WHETHER OUR CLIENT SHOULD LIVE OR DIE.  THERE HAVE BEEN OTHER VERDICT FORMS THAT HAVE BEEN 150, 150 MITIGATING FACTORS, 160 MITIGATING FACTORS.  I BELIEVE THIS IS THE CASE THAT FALLS WELL WITHIN THAT PARTICULAR -- I MEAN, OTHER COURTS HAVE FOUND THOSE NUMBERS APPROPRIATE.  ONE WAS UNITED STATES VERSUS WILLIAMS, THE HAWAII CASE THAT WAS JUST RECENTLY DECIDED.  ANOTHER WAS UNITED STATES VERSUS MCCLOSKEY,

THAT WAS I BELIEVE IN 2013.

AND YOU KNOW, I MEAN, IF THE GOVERNMENT CAN PROVIDE ME SPECIFIC OBJECTIONS FOR WHY THEY THINK CERTAIN MITIGATORS SHOULD BE EXCLUDED, I'M HAPPY TO TALK ABOUT THAT, BUT THAT IS NOT WHAT HAS BEEN DONE UP UNTIL THIS POINT.

THE COURT:  THIS IS WHAT WE ARE GOING TO DO.  I WILL GIVE THE GOVERNMENT THE OPPORTUNITY TO PREPARE A SPECIAL VERDICT FORM FOR THE PENALTY PHASE. IF YOU WANT TO SUBMIT IT, SUBMIT IT.  IF YOU CAN AGREE ON A VERDICT SLIP, THEN SUBMIT THAT.  AND LET ME KNOW IT IS AN AGREED VERDICT SLIP AND I'M NOT GOING TO RENDER A VERDICT UNTIL I HAVE A PROPER VERDICT SLIP IN FRONT OF ME.  IF YOU CAN'T AGREE ON A VERDICT SLIP, THEN I WILL FORMULATE THE VERDICT SLIP AND RENDER A DECISION BASED ON THAT VERDICT SLIP.

SO HOW MUCH TIME WOULD YOU NEED, MR. GURGANUS?

MR. GURGANUS:  ONE DAY IF THEY -- WHY DON'T WE MAKE IT TWO DAYS.  THAT WAY --

THE COURT:  TODAY IS MONDAY.  I WILL GIVE YOU UNTIL WEDNESDAY AT THE CLOSE OF THE DAY AT 5 O'CLOCK EITHER TO FILE A VERDICT SLIP THAT YOU WANT ME TO CONSIDER OR AN AGREED UPON VERDICT SLIP.

IF YOU AGREE TO MODIFY THIS IN ANY WAY,

EVEN THOUGH IT DOES NOT AGREE WITH THE GOVERNMENT'S VERDICT SLIP, FILE THAT AND SO INDICATE.  AND THEN FROM YOUR MODIFIED SLIP OR THIS VERDICT SLIP THAT I HAVE IN FRONT OF ME AND THE GOVERNMENT'S I WILL FORMULATE AN APPROPRIATE VERDICT SLIP IN THE CASE.

BUT I WOULD BE REMISS IF I DID NOT SAY I'M DISAPPOINTED AT THIS LATE DATE THAT WE HAVE TO DEAL WITH THIS WHEN I HAVE BEEN ASKING FOR THIS FOR WEEKS.

ALL RIGHT.

LET'S -- THE GOVERNMENT, I WILL HEAR FROM THE GOVERNMENT.

MS. HAINES:  THANK YOU, YOUR HONOR.

MAY IT PLEASE THE COURT, COUNSEL, MR. HAMMER.  YOUR HONOR, AT THIS STAGE OF THE PROCEEDINGS YOU ARE LEFT WITH TWO QUESTIONS.  IS THE DEFENDANT ELIGIBLE FOR THE DEATH PENALTY AND IS THE DEATH PENALTY THE APPROPRIATE RESULT IN THIS CASE.

I'M NOT GOING TO BELABOR WHETHER THE DEFENDANT IS ELIGIBLE.  IT'S QUITE CLEAR THAT HE IS BECAUSE THE GOVERNMENT HAS PROVEN BY WAY OF STIPULATION THAT HE WAS 18 YEARS OLD WHEN HE MURDERED ANDREW MARTI. THERE IS LITTLE DOUBT TO NO DOUBT THAT HE INTENTIONALLY KILLED ANDREW MARTI; OR THE OTHER TWO WAYS IT IS CHARGED, THAT HE INTENTIONALLY INFLICTED SERIOUS BODILY INJURY THAT RESULTED IN THE DEATH OF ANDREW MARTI OR

PARTICIPATED IN AN ACT CONTEMPLATING THAT THE LIFE OF A PERSON WOULD BE TAKEN AND ANDREW MARTI DIED AS A RESULT.

IN ADDITION, THE COURT MUST FIND ONE STATUTORY AGGRAVATOR.  AND HERE, YOUR HONOR, THE GOVERNMENT HAS PROVEN TWO BEYOND A REASONABLE DOUBT. THE FIRST BEING THAT MR. HAMMER WAS PREVIOUSLY CONVICTED OF A CRIME PUNISHABLE BY A PRISON TERM OF MORE THAN ONE YEAR, WHAT WE TYPICALLY CALL A FELONY CONVICTION, INVOLVING THE USE OR ATTEMPTED USE OR THREATENED USE OF A FIREARM.

AND HERE THE COURT HEARD TWO SUCH CONVICTIONS WERE OFFERED AND PROVEN BEYOND A REASONABLE DOUBT, POINTING A WEAPON AT ANOTHER AFTER CONVICTION OF A FELONY.  THAT IS THE BAPTIST HOSPITAL HOSTAGE INCIDENT FROM MAY 31ST OF 1978.  THAT WAS PROVEN BY WAY OF CERTIFIED CONVICTIONS AND LIVE TESTIMONY.

THE COURT HAS A SECOND QUALIFYING CONVICTION, THAT IS SHOOTING WITH INTENT TO KILL, FROM THE SEPTEMBER 10, 1984 SHOOTING OF THOMAS UPTON, WHICH WAS ALSO PROVEN BY MR. UPTON'S TESTIMONY, CERTIFIED CONVICTION AND OTHER DOCUMENTS.

SO AT THAT POINT, YOUR HONOR, MR. HAMMER IS ELIGIBLE FOR THE DEATH PENALTY.  BUT THE GOVERNMENT HAS PROVEN A SECOND AGGRAVATING FACTOR, A SECOND STATUTORY AGGRAVATOR, JUST TO GIVE THE COURT SOME

COMFORT. AND THAT IS THAT THE MURDER WAS COMMITTED AFTER SUBSTANTIAL PLANNING AND PREMEDITATION, WHICH MEANS THAT THIS MURDER WAS COMMITTED AFTER A CONSIDERABLE OR SIGNIFICANT AMOUNT OF PLANNING AND PREMEDITATION.

WELL, HAS THE GOVERNMENT ESTABLISHED THAT? WHEREVER POSSIBLE, YOUR HONOR, I'M GOING TO RELY ON MR. HAMMER'S OWN WORDS BECAUSE I THINK WHEN WE CUT THROUGH THE EXPERTS AND EXHIBITS, HIS OWN WORDS ARE PROBABLY THE BEST PROOF.

IF WE CAN PUBLISH GOVERNMENT EXHIBIT 1001.1. THIS IS MR. HAMMER'S CONFESSION TO THE FBI MADE WITHIN HOURS OF THE MURDER. IN THAT CONFESSION SPECIFICALLY HE TOLD THE FBI AGENTS THAT HE HAD PLANNED THIS MURDER FOR A MONTH. HE TOLD THEM LENNY YAGER KNOWS ABOUT THIS. STEVE CLASSEN KNOWS ABOUT THIS. THEY BOTH KNOW THAT I WAS PLANNING THIS.

AND HOW IS THAT CORROBORATED? WE CAN BRING UP GOVERNMENT EXHIBIT 33.2. DEFENDANT MADE ADDITIONAL ADMISSIONS TO OTHERS, TO HIS CONFIDANTES, TO HIS FRIENDS. THIS IS HIS LETTER TO ROCK WHERE HE WRITES, QUOTE: MY DECISION WAS MADE AFTER CAREFUL CONSIDERATION. HE IS TALKING ABOUT HIS DECISION TO KILL MR. MARTI WAS MADE AFTER CAREFUL CONSIDERATION.

THE FACT THAT THERE WAS SUBSTANTIAL

PLANNING AND PREMEDITATION IS PROVEN BY THE MURDER ITSELF.  THE COURT KNOWS THAT THE GERM OF THIS IDEA STARTED LONG BEFORE THE ACTUAL MURDER.  IT STARTED WHEN MR. HAMMER BELIEVED THAT ANDREW MARTI DISRESPECTED HIM. MR. HAMMER TOLD DR. KARTEN AND WE SEE THAT IN HIS REPORT, GOVERNMENT EXHIBIT R169, AND THE FBI, THAT MARTI DISRESPECTED ME AND MARTI FORGOT, BUT I DIDN'T.

GOVERNMENT EXHIBIT 32-2.  THIS IS HIS SEVEN REASONS FOR KILLING ANDREW MARTI.  HE WROTE: MARTI AND HIS CLIQUE DISRESPECTED ME WHEN I FIRST ARRIVED.  HIS REASONS FOR KILLING ANDREW MARTI WERE LONG FESTERING.  THIS WAS NOT A SPUR OF THE MOMENT CRIME. THIS WAS NOT A CRIME OF IMPULSIVITY.  THIS WAS A CRIME THAT MR. HAMMER MULLED OVER, STEWED ABOUT FOR DAYS AND WEEKS AND THEN HE SET THE PLAN INTO MOTION.

MR. HAMMER CONFESSED TO THE FBI THAT HIS FIRST STEP IN HIS PLAN WAS TO GAIN ACCESS TO MR. MARTI AND HE REQUESTED THAT ACCORDING TO WHAT HE SAID BOTH VERBALLY AND IN WRITTEN FORM.  AND AGAIN, IN DEFENDANT'S OWN WORDS, HE TOLD THE FBI THAT HE KEPT FOLLOWING UP WITH STAFF TO FIND OUT WHEN MARTI WOULD MOVE IN.  HE WAS NOT GOING TO LET THIS DROP.  HE KEPT PESTERING THEM TO MAKE IT HAPPEN.  HE ALSO TOLD STEVE CLASSEN, AND THE COURT HEARD MR. CLASSEN'S TESTIMONY READ INTO THE RECORD, THAT THIS WAS ALL PART OF HIS PLAN.  HE WANTED

MR. MARTI TO MOVE IN NOT SO THAT THEY COULD BE CARD BUDDIES, NOT THAT THEY COULD BE LOVERS.  HE WANTED MR. MARTI TO MOVE IN SO THAT HE COULD KILL HIM.  THAT IS WHAT HE TOLD STEVEN CLASSEN.

ANDREW MARTI MOVED INTO MR. HAMMER'S CELL ON TUESDAY, APRIL 9TH.  HE HAD FOUR DAYS TO LIVE.  ON THURSDAY, APRIL 11TH, TWO DAYS BEFORE MR. MARTI WOULD BE KILLED, MR. HAMMER STARTED WORKING ON HIM TO CONVINCE HIM OF THE HOSTAGE RUSE.  THIS WAS PART OF MR. HAMMER'S PLAN.  HE HAD PLANNED AND FORMULATED A WAY TO MAKE MARTI HIS VICTIM BECAUSE WE KNOW WHAT MR. MARTI DID NOT KNOW.  THERE WAS NO HOSTAGE RUSE.  THERE WAS NO INTENTION OF MARTI TRANSFERRING TO ATLANTA.  THIS WAS ALL MR. HAMMER'S PLAN TO GAIN DOMINANCE OVER MARTI.  BECAUSE ANDREW WAS A MUCH YOUNGER MAN, A MUCH TALLER AND BIGGER MAN, A MUCH STRONGER MAN, AND THE MAN -- AND THE PLAN THAT MR. HAMMER DEVISED AND PERFECTED WAS A WAY TO SAFELY RENDER ANDREW MARTI HELPLESS.

SO PART OF HIS PLAN WAS TO CONVINCE ANDREW TO GO ALONG WITH THIS RIDICULOUS HOSTAGE RUSE AND MR. HAMMER DID THIS BY SEVERAL DIFFERENT MEANS.  HE FIRST OF ALL TOLD MR. MARTI I HAVE CREDENTIALS.  I HAVE DONE THIS BEFORE.  I HAVE TAKEN HOSTAGES.  I'M A MAN OF EXPERIENCE IN THIS ARENA.  I KNOW WHAT I'M DOING.  HE THEN SWEETENED THE POT BY TELLING MR. MARTI THAT HE

WOULD GET HIM A TRANSFER TO ATLANTA, THAT HE WOULD PAY HIM $500.  AND HE EVEN, MR. HAMMER DID, WROTE A LETTER TO MARTIN GUERRERO, WHICH IS IN EVIDENCE, EXHIBIT 128, WHERE HE SAID, THIS IS SOME CARTE BLANCHE THAT HE WAS GIVING ANDREW TO MAKE HIM BELIEVE -- AGAIN SWEETEN THE POT, MAKE ANDREW BELIEVE THAT HE WOULD BE GOING TO ATLANTA AND HE WOULD HAVE A FREE PASS.  HE WOULD BE IN GOOD GRACES WHEN HE GOT THERE.

SO BASED UPON WHAT MR. HAMMER SAID ANDREW MARTI THOUGHT ABOUT IT, AND MR. HAMMER SAID, HE THOUGHT ABOUT IT.  THAT IS THE NATURE AND DEFINITION OF DELIBERATION AND PREMEDITATION.

IT'S NOW FRIDAY APRIL 12TH AND ANDREW MARTI HAS ONE DAY TO LIVE.  WHAT IS MR. HAMMER DOING? HE IS PLANNING.  HE AND MARTI CONTINUE TO TALK ABOUT IT. AND MR. HAMMER STARTS TO ASSEMBLE THE INSTRUMENTS OF THE CRIME, GOVERNMENT EXHIBIT R121, THE BRAIDED LIGATURES; GOVERNMENT EXHIBIT R159, THE NAIL CLIPPERS THAT MR. HAMMER SECURED IN AN OPEN FASHION TO MAKE THEM LOOK LIKE A WEAPON; AND GOVERNMENT EXHIBIT R120, THE SOCK HE USED AS A GAG AND THE STRING TO KEEP THE SOCK IN MR. MARTI'S MOUTH.  MR. HAMMER WAS ASSEMBLING ALL OF THESE THINGS.

IF THERE IS ANY DOUBT WHAT THESE THINGS WERE MEANT FOR, I WOULD ASK THE COURT TO TAKE A LOOK AT

THE BRAIDS AGAIN, BECAUSE THERE HAS BEEN SOME SUGGESTION ALONG THE WAY THAT THIS MIGHT HAVE BEEN FOR SEX.  IF THE COURT EXAMINES THE ROPES, IT WILL SEE THAT THEY ARE TIGHTLY BRAIDED, THAT THEY ARE INCREDIBLY STRONG, THAT THEY ARE VERY INTRICATE AND THAT THEY WERE SO STRONG AND TIGHT THAT BOP STAFF COULD NOT UNDO THEM.  THOSE ARE NOT THE TYPES OF ROPES THAT SOMEBODY WOULD USE TO HAVE CONSENSUAL SEX.  THEY WERE DESIGNED FOR ONE PURPOSE AND ONE PURPOSE ONLY.  AND THAT WAS TO RENDER 200-POUND 6-FOOT-3, 27-YEAR OLD ANDREW MARTI COMPLETELY HELPLESS AS HE WAS FIGHTING FOR HIS LIFE.

THIS WAS NOT A GAME.  THIS WAS NOT ABOUT SEX.  THIS IS SUBSTANTIAL PLANNING AND PREMEDITATION AND MR. HAMMER IS ELIGIBLE FOR THE DEATH PENALTY.

BUT THE SECOND QUESTION IS MORE DIFFICULT AND THAT IS WHETHER THIS IS THE APPROPRIATE SENTENCE THAT THE COURT SHOULD IMPOSE.  AND TO ANSWER THIS, THIS WHERE IS THE COURT MUST WEIGH THE AGGRAVATING FACTORS, INCLUDING THE STATUTORY AND NONSTATUTORY FACTORS THAT I'M GOING TO DESCRIBE, AND THE MITIGATING CIRCUMSTANCES.

THE TWO NONSTATUTORY AGGRAVATORS THAT WE HAVE PROVEN IN THIS CASE ARE VICTIM IMPACT AND FUTURE DANGEROUSNESS.  R3 AND R4, PLEASE, SHOW ANDREW MARTI AND HIS FAMILY.  AND WE HEARD FROM STEVEN MARTI.  NOW HE DID NOT WEEP ON THE STAND.  HE IS NOT A VERY DEMONSTRATIVE

MAN.  THIS IS A VERY PRIVATE FAMILY AND IT'S DIFFICULT FOR HIM TO TALK ABOUT IT.  BUT WE KNOW THAT HIS MOTHER, ANDREW'S MOTHER DIED WITHOUT CLOSURE AND HIS FATHER IS STILL ANGRY, SAD AND CONFUSED BY WHAT HAS HAPPENED TO HIS YOUNGEST SON.  THEY CLEARLY LOVED ANDREW IN SPITE OF HIS FAULTS.

BUT WHAT WE DON'T KNOW ANYTHING ABOUT IS WHAT ANDREW WOULD HAVE DONE.  HE WOULD HAVE BEEN RELEASED FROM PRISON.  THERE IS NO DOUBT ABOUT THAT.  HE WOULD HAVE GONE ON INTO THE WORLD AND LIVED HIS LIFE. BUT HE DIDN'T HAVE THE CHANCE LIKE MR. HAMMER TO HAVE A SON AND A GRANDSON.  HE DIDN'T HAVE THE CHANCE LIKE MR. HAMMER TO FIND RELIGION.  HE DIDN'T HAVE THE CHANCES THAT MR. HAMMER HAD TO TRY TO TURN HIS LIFE AROUND, TO MEET NEW PEOPLE, DEVELOP NEW FRIENDS, BECAUSE MR. HAMMER TOOK THAT AWAY FROM HIM.  VICTIM IMPACT.  THAT IS PROVEN BEYOND A REASONABLE DOUBT.

FUTURE DANGEROUSNESS, THAT IS THE NEXT NONSTATUTORY AGGRAVATOR.  THAT IS BASED UPON THE PROBABILITY THAT THE DEFENDANT WILL COMMIT OTHER CRIMES OF VIOLENCE, NOT NECESSARILY MURDER, BUT OTHER CRIMES OF VIOLENCE THAT WOULD CONSTITUTE A CONTINUING THREAT TO THE LIVES AND SAFETY OF OTHERS.  NOW THE GOVERNMENT ADMITS THAT THE BUREAU OF PRISONS HAS THROUGH A COMBINATION OF SINGLE CELL STATUS, TOTAL SEPARATION, AND

CONSTANT MONITORING, BEEN ABLE TO LARGELY NEUTRALIZE MR. HAMMER OVER THE PAST TWO DECADES, BUT THAT DOES NOT MEAN HE IS NOT A FUTURE DANGER.

THE PAST IS PROLOGUE IN THIS CASE BECAUSE THE FACT OF THE MATTER IS, YOUR HONOR, THAT MR. HAMMER WAS SENT TO PRISON AS PUNISHMENT FOR THE CRIMES HE HAD COMMITTED AND INSTEAD HE COMMITTED WORSE AND MORE SERIOUS CRIMES IN PRISON.  HE COMMITTED THIS MURDER IN PRISON IN THE PRISON, WITHIN THE PRISON WHICH IS THE SPECIAL HOUSING UNIT.  THAT MAKES HIM A DANGER.

THE MURDER WAS SENSELESS, WHICH IS WHAT HE TOLD HIS FRIENDS WHEN HE WROTE THEM, HIS WORDS AGAIN, GOVERNMENT EXHIBIT 54:  IT WAS SENSELESS AND WITHOUT PURPOSE, WHICH MAKES IT DIFFICULT TO PREDICT AND MAKES HIM A DANGER.  HE DESCRIBED HIMSELF, QUOTE, AS A MONSTER WHO CAN KILL FOR NO APPARENT REASON.  AND HE SAID HE WILL KILL AGAIN.  GOVERNMENT EXHIBIT 32-2, THE SECOND PAGE OF THIS EXHIBIT, HIS WORDS:  GIVEN THE OPPORTUNITY, I WILL KILL AGAIN!

AND WHY SHOULD WE BELIEVE HIM?  BECAUSE MR. HAMMER'S DEFAULT MECHANISM, HIS WAY OF COPING WITH DIFFICULT PROBLEMS IN HIS LIFE WHEN HE WANTS ATTENTION OR CAN'T GET HIS OWN WAY, IS TO TAKE PEOPLE HOSTAGE AND THEN LET THE CHIPS FALL WHERE THEY MAY.  AND WE KNOW ABOUT FIVE HOSTAGE SITUATIONS:  BAPTIST HOSPITAL; THE

HUDDLESTONS, WHICH WE REALLY DIDN'T TOUCH UPON, THOSE ARE THE TWO 70-YEAR-OLD PEOPLE; THOMAS UPTON; GLENN BEVINS, ANOTHER MAN WHO WE REALLY DIDN'T HEAR MUCH ABOUT, HE WAS ALSO AN INMATE WHO WAS TAKEN HOSTAGE AND MR. HAMMER THREATENED TO KILL HIM; AND OF COURSE ANDREW MARTI.  SO SHOULD WE BELIEVE WHAT MR. HAMMER SAYS THAT HE WILL KILL AGAIN?  THE GOVERNMENT SAYS YES.  BUT NOT BECAUSE WE SAY SO, BECAUSE THE EXPERTS IN THIS CASE, THE PEOPLE WHO DEAL WITH MR. HAMMER ON A DAY-TO-DAY BASIS, THEY SAY AS FOLLOWS, THIS IS GOVERNMENT EXHIBIT GC 19 AND THIS IS A QUOTE FROM THE BUREAU OF PRISONS:

THAT BASED UPON INMATE HAMMER'S LENGTHY DISCIPLINE HISTORY, COUPLED WITH COMMITTING MURDER IN A CORRECTIONAL ENVIRONMENT, UNIT STAFF BELIEVE THE PROPENSITY FOR VIOLENCE STILL EXISTS.  PLACING INMATE HAMMER ON LESS SECURE CONDITIONS, PHASE TWO, WOULD JEOPARDIZE THE SECURITY OF THE SPECIAL CONFINEMENT UNIT AND THE SAFETY OF STAFF AND INMATES.

THAT IS WHAT THE BUREAU OF PRISONS SAYS TODAY ABOUT MR. HAMMER.  AND WE KNOW THAT HE IS NOT GOING TO STAY ON DEATH ROW.  ACCORDING TO THE DEFENDANT'S OWN EXPERT, TIM GRAVETTE, MR. HAMMER IS GOING BACK TO A U.S. PENITENTIARY AND THEN WHAT?

WHAT HAPPENS WHEN ALL OF US IN THIS ROOM PACK UP OUR BELONGINGS AND GO HOME AND GO ON TO THE NEXT

CASE?  WHAT HAPPENS WHEN THERE IS NO LONGER A SPOTLIGHT ON MR. HAMMER, WHEN HE IS NOT THE DEATH ROW ADVOCATE, NOT A DEATH ROW ARTIST?  HE IS NOT A DEATH ROW ANYTHING. HE IS JUST JOE AVERAGE, SERVING A LIFETIME SENTENCE AT ANONYMOUS USP, ALLENWOOD, LOMPOC, LEAVENWORTH.

DOES ANYTHING IN THIS RECORD, ANYTHING IN MR. HAMMER'S PERSONALITY OR ANYTHING THAT HIS DOCTORS SAY INDICATE THAT HE IS ABLE TO LEAD A LAW-ABIDING LIFE BEHIND PRISON WALLS?  HE HAS NOT ONCE EVER IN HIS LIFE DEMONSTRATED THAT HE CAN LIVE WITHIN THE RULES OF SOCIETY, LET ALONE THE RULES OF A PRISON.  BECAUSE ACCORDING TO MR. HAMMER'S OWN DOCTORS HE IS BROKEN AND CANNOT BE FIXED, NOT BY A LENGTHY LIST OF MEDICATIONS, NOT BY THE POWER OF HALF A DOZEN NUNS PRAYING FOR HIM, NOT THROUGH YEARS AND YEARS OF THERAPY AND TREATMENT.

THE VIOLENCE MAY WANE IN HIM WITH OLD AGE AND ILL HEALTH, BUT IT IS NOT EXTINGUISHED.  AND DESPITE WHAT WE SAW ON THAT VIDEO, HE IS NOT A PUSSYCAT.  THE QUESTION REMAINS, WHAT WILL MR. HAMMER DO IN ORDER TO GET THAT SPOTLIGHT BACK, THE ATTENTION HE CRAVES LIKE A DRUG.  AND BECAUSE WE CANNOT SAY WITH ANY CONFIDENCE WHETHER HIS NEXT STEP WILL BE VIOLENT, HE IS A FUTURE DANGER.

WHICH BRINGS US TO THE DEFENSE MITIGATORS.  AND IT IS FOR THE COURT TO DECIDE WHETHER A

MITIGATOR HAS BEEN PROVEN AND WHAT WEIGHT TO GIVE IT. AS THE COURT HAS HEARD CURRENTLY ON THE TABLE ARE 170 MITIGATORS.  BUT I'M GOING TO GROUP THEM INTO FIVE.

THE FIRST ONE BEING REMORSE, NUMBER ONE. WHEN MR. TRAVIS OPENED, HE TOLD THE COURT THAT MR. HAMMER HAS PLED GUILTY AND ACCEPTED RESPONSIBILITY. AND THOSE ARE VERY PRETTY WORDS.  BUT HAS HE REALLY ACCEPTED RESPONSIBILITY IN HIS HEART AND SOUL? GOVERNMENT EXHIBIT 54, AGAIN MR. HAMMER'S OWN WRITINGS. HE IS SORRY FOR THE FAMILY'S LOSS BUT HE IS NOT SORRY FOR THE KILLING.

AND THIS CASE IS REPLETE WITH SHIFTING BLAME.  THE COURT HAS HEARD THAT THE BUREAU OF PRISONS IS AT FAULT BECAUSE THEY DIDN'T KEEP MR. HAMMER SINGLE CELLED.  HE HAS INDICATED THAT HIS MEDICATIONS ARE TO BLAME BECAUSE HE STOPPED TAKING DEPAKOTE.  HE TOLD SR. CAMILLE IT'S AN ACCIDENT THAT HAPPENED DURING SEX. GOVERNMENT EXHIBIT 36-3, HE TOLD MATTHEW DARBY IN THIS LETTER THAT MARTI WANTED TO DIE BECAUSE HE HAD AIDS. AND OF COURSE HE HAS BLAMED MOMMY DEAREST AND ALL THE MEMBERS OF HIS FAMILY.  BUT THE EVIDENCE SUGGESTS THAT MR. HAMMER HAS NEVER TOLD ANYONE THE SAME REASON OR THE REAL REASON WHY HE KILLED ANDREW MARTI.  AND IT IS SIMPLY COUNTERINTUITIVE TO SAY HE IS TRULY REMORSEFUL WHEN HE HAS NOT COME TO TERMS WITH WHAT HE HAS DONE AND

WHY HE DID IT.

SECOND MITIGATOR IS HIS FAMILY LIFE.  NOW WE DON'T QUESTION THAT MR. HAMMER CAME FROM A FAMILY THAT WAS DIRT POOR, THAT THEY MOVED AROUND A LOT AND THAT HE WAS EXPOSED TO THINGS THAT NO CHILD SHOULD EVER BE EXPOSED TO OR NEVER HAVE TO SEE, AND THESE ARE HORRIBLE THINGS IF THEY ARE TRUE.  BUT UNFORTUNATELY THIS COURT, SITTING IN URBAN PHILADELPHIA, HAS HEARD STORIES LIKE MR. HAMMER'S AND SOME STORIES THAT ARE EVEN WORSE.  EVEN THE PARTIES HERE HEARD ABOUT CHILDREN IN HAITI, NIGERIA AND GHANA WHO BARELY MAKE IT DAY TO DAY, A CHILD WHO HAS TO CRAWL ON HER ANKLES TO SEE A DOCTOR FOR THE FIRST TIME.

AND THAT IS NOT MR. HAMMER'S CHILDHOOD. HE WAS ALWAYS FED.  HE ALWAYS HAD CLOTHES ON HIS BACK. HE ALWAYS MADE TO IT SCHOOL, EVEN IF IT WAS A DOZEN SCHOOLS.  HE WENT TO CHURCH.  THEY CELEBRATED HOLIDAYS AND BIRTHDAYS.  EVEN AS POOR HAS THEY WERE, THEY SCRAPED TOGETHER ENOUGH MONEY TO GET A PRESENT FOR CHRISTMAS AND EVERY BIRTHDAY.  WE HEARD ABOUT BIKES, HORSE RIDES, BASEBALL, CUB SCOUTS, MOVIES, BOOKS.  THE FAMILY MAY HAVE BEEN DYSFUNCTIONAL, BUT WE HAVE TWO PARENTS WHO STAYED TOGETHER.  THEY STAYED MARRIED.  THIS IS NOT A SINGLE PARENT HOUSEHOLD.  THEY WERE NOT PUT INTO FOSTER CARE AND SCATTERED TO THE WINDS.  WE DON'T HAVE A CRACK

ADDICTED MOM AND A FATHER IN JAIL.  THERE IS NO DOUBT THAT MR. HAMMER ALWAYS RECEIVED EXCELLENT MEDICAL CARE. HE WAS ALWAYS TAKEN TO THE HOSPITAL.  AND DESPITE TESTIMONY ABOUT DAY-TO-DAY PHYSICAL ABUSE, THERE IS NOT ONE HOSPITAL RECORD WHICH SHOWS THAT MR. HAMMER WAS ADMITTED FOR BROKEN BONES, FRACTURES, DISLOCATED SHOULDERS, BLACK EYES, BURNS OR ANY OF THE OTHER INJURIES CONNECTED TO WHAT HE DESCRIBES.

BECAUSE AS MARTIN HAMMER SAID, IT WAS NOT ALL BAD.  AS LYNDA SOLDER SAID, THEY MADE THEIR GOOD TIMES.  AND MOST IMPORTANTLY, IT'S THE DEFENDANT'S OWN WITNESSES THAT SHOW THAT DESPITE DYSFUNCTION, THEY HAD A LARGE EXTENDED FAMILY THAT WAS LOVING, CLOSE AND SUPPORTIVE AND DID NOT SEE ANY OF THE THINGS AS FAR AS SEXUAL ABUSE THAT WERE REPORTED TO DR. LISAK.

THE COURT HEARD FIRSTHAND FROM LYNDA SOLDER, BETTY PAYNE, KATHY NICHOLS AND RON MILLER.  AND THAT IS A TREMENDOUS SAFETY NET FOR MR. HAMMER.  THOSE ARE A LOT OF POSITIVE ROLE MODELS.  THESE PEOPLE WERE ALL WORKING, RESPONSIBLE, FRIENDLY, ENGAGING, FINE UPSTANDING CITIZENS AND THEY ALL CAME FROM THE SAME GENE POOL, THE SAME ENVIRONMENT AS DAVID HAMMER.  NO FAULT FOR MR. HAMMER'S BEHAVIOR CAN BE LAID AT THE FEET OF HIS EXTENDED FAMILY.

SO THAT BRINGS US TO HIS NUCLEAR FAMILY.

WELL, WE ONLY HEARD FROM ONE OF THEM.  WE HEARD FROM MARTIN AND HE CLEARLY HAS THE SAME GENETIC BACKGROUND, THE SAME UPBRINGING AND CAME FROM THE SAME ENVIRONMENT, AND HE CLEARLY HAS A LOT OF CHALLENGES.  I BELIEVE HE IS DIAGNOSED WITH BIPOLAR, HE IS TAKING MEDICATION.  BUT HE IS DOING FINE.  HE IS STABLE.  HE IS A FAMILY MAN, HE HAS RAISED KIDS AND GRANDKIDS, HE HAS HAD A JOB AND HE'S NEVER BEEN IN ANY REAL TROUBLE.  SO WHAT DOES MARTIN SAY?  HOW DOES HE EXPLAIN HIS BROTHER DAVID?  WELL, HE SAYS, MAYBE DAVID WAS PUNISHED MORE THAN ME.  BUT WE KNOW THAT MARTIN ADMITS THAT HIS SISTER DIANE SAYS THAT WASN'T THE CASE, THEY WERE ALL PUNISHED THE SAME.  SO LOOKING AT MARTIN, DO WE START TO WONDER WHETHER DAVID'S BEHAVIOR IS JUST THAT, DAVID'S BEHAVIOR, BECAUSE EVERYONE ELSE IN THIS FAMILY HAS MADE IT.  SO MAYBE THIS CASE IS NOT A RESULT OF HIS NUCLEAR FAMILY.

WHICH BRINGS US TO THE THIRD SET OF MITIGATORS, THE SEXUAL ABUSE.  I NEED TO BE VERY CAREFUL HERE, YOUR HONOR, THAT WE SEPARATE FACT FROM FICTION WHEN WE START TALKING AROUND WORDS LIKE PEDOPHILE AND INCEST.

WHAT WAS PROVED HERE IN THIS COURT WAS THAT RON MILLER TOOK THE STAND AND WHEN CONFRONTED BY A LITANY OF HORRORS THAT DAVID HAMMER HAS ACCUSED HIM OF, INDOCTRINATING HIM INTO SEX AT AGE 5, RONNIE, HE DIDN'T

GO AS FAR AS TO CALL DAVID A LIAR BECAUSE HE IS HERE TO HELP DAVID, BUT HE SAID, QUOTE:  I KNOW THOSE THINGS NEVER HAPPENED, ABSOLUTELY NOT.  QUOTE: AGAIN IT'S IN DAVID'S MIND.  HE BELIEVES SOMETHING HAPPENED, BUT IT DIDN'T.

AND WHO SHOULD WE BELIEVE?  MR. HAMMER, WHO HAS BEEN A CON ARTIST, WHO -- HIS WHOLE LIFE, HAS A HISTORY OF DECEPTION AND A MANIPULATION EVEN TO HIS OWN EXPERTS, OR RON MILLER WHO SAID THAT HE WAS HERE TO HELP DAVID, THAT HE WOULD NOT HOLD ANYTHING BACK, THAT HE HAS BEEN COMPLETELY OPEN TO THE LAWYERS ABOUT HIS SEX LIFE, BUT THAT IT DIDN'T HAPPEN.  THAT CREDIBILITY CONTEST IS NO CONTEST, WHICH MAKES ONE WONDER HOW MUCH OF THIS IS JUST IN DAVID'S MIND?

NUMBER FOUR IS HIS ILL HEALTH, AND WE DON'T QUESTION THAT MR. HAMMER HAS TYPE 2 DIABETES AND HEART DISEASE, AS DO MANY AMERICANS.  BUT THIS MITIGATOR BECOMES LESS COMPELLING WHEN YOU CONSIDER THAT HE HAS DONE THAT TO HIMSELF, UNFORTUNATELY.  ALL THE JUNK FOOD, SUGARS, STARCH, CARBS, FATS THAT HE EATS, DR. HYDE SAID HE IS PUTTING POISON INTO HIS SYSTEM.  COUPLED WITH HIS REFUSAL TO TAKE MEDICATIONS, LACK OF EXERCISE AND SMOKING, IF THIS IS AN ATTEMPT TO SHOW THAT MR. HAMMER IS NOT A FUTURE DANGER, I WOULD LIKE TO JUST REMIND THE COURT THAT MR. HAMMER'S CRIMES HAVE NOTHING TO DO WITH

SUPERIOR STRENGTH.  THESE CRIMES, THE MURDER OF ANDREW MARTI, IS NOT ABOUT PHYSICAL DOMINANCE.  IT'S ABOUT MANIPULATION AND GUILE AND MR. HAMMER STILL HAS ALL HIS WITS.

THE FINAL CATEGORY, YOUR HONOR, IS THE GOOD WORKS, AND THE COURT HEARD SEVERAL DAYS OF TESTIMONY DEVOTED TO MR. HAMMER'S ONE GOOD WORK, WHICH IS THE CHRISTMAS CARD PROJECT.  NOW, THE PROJECT WAS AN OPPORTUNITY FOR THIS COURT TO SEE ONE OF MR. HAMMER'S SCAMS IN LIVING TECHNICOLOR AND TO SEE IT UNRAVEL.  BECAUSE THERE IS NO EVIDENCE IN THIS CASE AS WE STAND HERE, THERE IS SIMPLY NO EVIDENCE THAT MR. HAMMER IS ABLE TO DRAW OR DOES DRAW OR PAINT THOSE CHRISTMAS CARDS.  IN FACT, HIS OWN WORDS AGAIN, GOVERNMENT EXHIBIT GC 10, WRITING TO HIS BROTHER:  I CAN'T DRAW.  I COULDN'T DRAW A STICK FIGURE IF YOU GAVE ME THE STICKS.  MY TALENTS LIE ELSEWHERE.  HE CAN'T DRAW.  HE IS NOT AN ARTIST.

AND FOR 13 YEARS HE HAS LOOKED SR. CAMILLE IN THE FACE -- AND SHE TRULY IS AN INSPIRATION, WHAT A WONDERFUL PERSON SHE IS, HOW LUCKY HE IS TO HAVE HER IN HIS LIFE.  BUT HE'S LOOKED HER IN THE FACE AND TOLD HER A LIE.  AND HE HAD NO REASON FOR THAT LIE.  WHY DID HE NEED TO TELL HER THAT HE WAS THE ARTIST?  HE COULD HAVE EASILY SAID, THESE OTHER GUYS, THEY ARE DOING

THE PAINTING, BUT I HELPED WITH THAT.  BUT HE DIDN'T AND HE TRIED TO PERSIST WITH A LIE EVEN WHEN HE IS CAUGHT. IT'S A GRATUITOUS LIE.  HE COULD HAVE READILY ADMITTED IT WASN'T THE TRUTH.  BUT HE DIDN'T BECAUSE THAT'S HIS EGO.  THAT IS NOT MENTAL ILLNESS.  MR. HAMMER ALWAYS NEEDS TO BE THE STAR OF HIS OWN PRODUCTION.  AND IF YOU TAKE THE DRAWINGS AWAY FROM THE CHRISTMAS CARD PROJECT, WHAT DOES HE DO?

YOU HEARD, YOUR HONOR, THAT SR. CAMILLE DOES ALL THE WORK, ALL THE WORK.  IF MR. HAMMER DOES NOT DO THE DRAWINGS, HE DOESN'T DO ANYTHING.  HE DOESN'T EVEN GIVE UP ONE PENNY OF HIS OWN MONEY, NOT ONE MEGA HONEY BUN DOES HE GIVE UP TO GIVE TO THOSE CHARITIES. AND I WOULD SUGGEST THAT FIVE DOLLARS OUT OF HIS OWN COMMISSARY WOULD BE MORE MEANINGFUL THAN THE $92,000 THAT HE HAS NOTHING TO DO WITH.

IF HE IS WILLING TO LIE ABOUT PAINTING THOSE CARDS, WHAT IS HE WILLING TO SAY?  WHAT LIE IS HE WILLING TO TELL TO SAVE HIS OWN LIFE?

FINALLY, YOUR HONOR, IT HAS BEEN A GREAT PLEASURE TO BE HERE IN PHILADELPHIA AND I WANT TO THANK YOU FOR YOUR TREMENDOUS PATIENCE AND YOUR TIME AND ATTENTION.  I KNOW I SPEAK FOR EVERYONE IN THIS COURTROOM WHEN I SAY THAT YOUR JUDGMENT WE KNOW WILL BE VERY JUST.

THANK YOU.

THE COURT:  THANK YOU.

I HAVE ANOTHER MATTER AT 3:45.  I WAS WONDERING, IS THE COURTROOM DEPUTY HERE?  WHETHER WE CAN -- LET'S JUST WAIT ONE SECOND.

LET'S RESUME WITH THE CLOSING ARGUMENT AT 4 O'CLOCK.  I WILL NEED COUNSEL JUST TO CLEAR THE TABLE A BIT.

WE WILL STAND IN RECESS UNTIL 4 O'CLOCK.

(BREAK TAKEN.)

MR. MCHUGH:  YOUR HONOR, IF IT PLEASES THE COURT, I AM GOING TO ADDRESS THE ACCEPTANCE OF RESPONSIBILITY AND REMORSE AND THEN THE ASPECTS OF THE GOVERNMENT'S CASE.  THEN MR. MORENO IS GOING TO ADDRESS THE ASPECTS OF THE DEFENSE CASE.  WE WILL OBVIOUSLY COMPLY WITH THE COURT'S 45-MINUTE TIME REQUIREMENT, BUT WE ARE GOING TO SPLIT UP THE ARGUMENT, IF THAT IS OKAY WITH THE COURT.

THE COURT:  THAT'S FINE.

MR. MCHUGH:  YOUR HONOR, FOR THE FOLLOWING REASONS, THE DEFENSE RESPECTFULLY REQUESTS THAT THE COURT ENTER A SENTENCE OF LIFE IN THIS MATTER.

FROM THE BEGINNING, THE ABSOLUTE BEGINNING OF THIS MATTER, MR. HAMMER HAS ACCEPTED RESPONSIBILITY FOR WHAT HE DID.  IF YOU WILL RECALL THE

TESTIMONY ON THE VERY FIRST DAY OF THIS HEARING FROM TWO DIFFERENT CORRECTIONAL OFFICERS, CORRECTIONAL OFFICER WEAVER AND CORRECTIONAL OFFICER ABRAHAM.  CORRECTIONAL OFFICER ABRAHAM STATED THAT WHEN SHE WAS TAKING -- HE WAS TAKING MR. HAMMER OUT OF THE CELL, AND I'M QUOTING: HE WAS COMPLIANT, NONCONFRONTATIONAL AND FOLLOWED THE INSTRUCTIONS TO THE LETTER.  THEN YOU HAVE, HE IS TAKEN TO A ROOM AND YOU HEAR FROM AGENT RICK THOMPSON, CARLYLE THOMPSON.  HE ALSO TELLS YOU THAT MR. HAMMER WAS COMPLETELY AND FULLY COOPERATIVE.  HE GAVE A FULL CONFESSION, WE KNOW THAT.  BUT WE ALSO KNOW THAT HE WAIVED HIS RIGHT TO COUNSEL AND HE WAIVED HIS RIGHT TO REMAIN SILENT.

AND THEN THIRD, YOUR HONOR, YOU OBVIOUSLY ARE AWARE THAT MR. HAMMER HAS PLED GUILTY.  THIS WAS NOT A COOPERATION PLEA, THIS WAS NOT A C PLEA.  THIS WAS AN OPEN PLEA WITH NO DEAL WHATSOEVER.  MR. HAMMER ENTERED THAT PLEA KNOWING FULL WELL THAT THE ONLY POSSIBLE SENTENCES WERE LIFE WITHOUT PAROLE OR DEATH.

SO I ASK THE COURT TO CONSIDER THOSE THREE FACTORS, FROM THE TIME HE IS TAKEN OUT OF THE CELL TO THE STATEMENT HE GIVES TO AGENT THOMPSON AND TO THE ENTRY OF THE GUILTY PLEA SHOW THAT MR. HAMMER HAS ACCEPTED RESPONSIBILITY FOR HIS ACTIONS.

I ALSO ASK THE COURT TO CONSIDER THE FACT

THAT DAVID IS TRULY REMORSEFUL FOR HIS ACTIONS. THROUGHOUT THESE PROCEEDING WE HAVE SEEN TIME AND TIME AGAIN EVIDENCE OF THIS REMORSE.

IF YOU RECALL, WHEN COUNSEL HAD SPECIAL AGENT MALOCU, THE PROSECUTION HAD SPECIAL AGENT MALOCU READ SOME OF THE LETTERS THAT DAVID HAD WRITTEN JUST WITHIN DAYS WHEN HE WAS STILL AT THE USP ALLENWOOD BEFORE HE HAD BEEN TRANSFERRED ACROSS THE STREET. WITHIN DAYS, WITHIN A COUPLE OF DAYS HE HAD WRITTEN A LETTER TO JESSICA BREWER. I BELIEVE IT WAS MARKED AS GOVERNMENT EXHIBIT 52. AND IN THAT LETTER HE EXPRESSED THAT HE WAS SORRY FOR WHAT HE HAD DONE AND HE ASKED HER TO PRAY FOR ANDREW AND HIS FAMILY. SO WITHIN DAYS OF THE MURDER YOU HEAR HIM EXPRESSING REMORSE.

THEN WHAT ELSE DO YOU HEAR? WITHIN A MONTH OR WITHIN WEEKS OF HIS FINDING OF GUILT, HIS ENTRY OF A GUILTY PLEA AND THE JURY'S VERDICT OF DEATH, AFTER THE SENTENCE OF DEATH HE GOES BEFORE JUDGE MUIR FOR FORMAL SENTENCING. THERE AGAIN WE SEE THE TRANSCRIPT FROM THAT PROCEEDING. AND HE STATES ON THE RECORD THAT HE REGRETS FOR WHAT HE HAD -- HE HAS DONE TO ANDREW AND HE AGAIN STATES -- ACTUALLY IT'S QUOTED, THAT HE FULLY ACCEPTS RESPONSIBILITY FOR HIS ACTIONS. SO AFTER THE DEATH VERDICT HE'S STILL EXPRESSING REMORSE. AND I THINK THAT THAT IS SOMETHING THAT CANNOT BE LOOKED AT

WITH SCRUTINY IN THE SENSE OF, IF YOU WOULD EXPECT SOMEONE NOT TO BE REMORSEFUL, IF THAT WAS THEIR TRUE COLORS, MAYBE IT WOULD COME OUT THEN AFTER THE JURY HAS SENTENCED HIM TO DEATH.  BUT NO, DAVID EXPRESSED HIS REMORSE TO JUDGE MUIR AT THAT FORMAL SENTENCING.

AS THEN AS WE MOVE ALONG IN THIS PROCESS YOU HEAR FROM SR. CAMILLE.  AND SR. CAMILLE, THE WHOLE REASON SHE MET DAVID WAS HE WAS LOOKING FOR A SPIRITUAL ADVISOR BECAUSE HIS EXECUTION WAS IMMINENT.  AS YOU'LL RECALL, YOUR HONOR, HE HAD AN EXECUTION DATE IN JANUARY OF 1999.  RIGHT AT THE END OF 1998 SHE GETS A LETTER FROM DAVID SEEKING A SPIRITUAL ADVISER.  IN THAT LETTER, HIS VERY FIRST LETTER TO SR. CAMILLE WHEN THE EXECUTION IS IMMINENT, HIS EXECUTION IS IMMINENT, HE IN THAT LETTER AGAIN ASKS HER TO PRAY FOR ANDREW MARTI AND HIS FAMILY.

YOU WILL ALSO SEE THAT SHE RESPONDS TO HIM AND THAT HE WRITES BACK.  AGAIN, THESE ARE MARKED AS DEFENSE EXHIBIT 200 AND DEFENSE EXHIBIT 202.1.  IN HIS RETURN CORRESPONDENCE TO SR. CAMILLE, SHE HAD TOLD HIM ABOUT THE CHERISH LIFE CIRCLE AND ABOUT HOW THEY HAD A MASS OR A CEREMONY FOR VICTIMS, MURDER VICTIMS.  IN HIS LETTER BACK TO SR. CAMILLE HE ASKED THAT ANDREW'S NAME BE READ DURING THAT CEREMONY OR RELIGIOUS PROCEEDING. SO WITH HIS EXECUTION IMMINENT HE IS ASKING FOR HER TO

INCLUDE ANDREW'S NAME.

WE ALSO HEARD FROM SR. CAMILLE THAT HE HAD WRITTEN, ATTEMPTED TO WRITE A LETTER TO THE MARTI FAMILY AND IT DID NOT GO THROUGH BECAUSE OF THE FEELINGS THAT THE MARTI FAMILY HAD, WHICH IS TOTALLY UNDERSTANDABLE, BUT HE DID MAKE THAT EFFORT TO SEND A LETTER OF REMORSE TO THE FAMILY.

I SUGGEST TO YOU, YOUR HONOR, WHEN YOU LOOK AT THAT IN COMBINATION, BECAUSE I THINK THEY GO HAND IN HAND, THE ACCEPTANCE OF RESPONSIBILITY AND REMORSE, THAT YOU HAVE SIGNIFICANT EVIDENCE, RELIABLE CREDIBLE EVIDENCE OF TRUE REMORSE AND TRUE ACCEPTANCE OF RESPONSIBILITY.  AND I WOULD SUGGEST TO THE COURT THEY WEIGH -- THAT EVIDENCE WEIGHS HEAVILY AGAINST DAVID BEING PUT TO DEATH BY LETHAL INJECTION.

NOW I WOULD MOVE, YOUR HONOR, TO THE STATUTORY AGGRAVATION OF THE GOVERNMENT'S CASE.  NOW AS THE COURT IS WELL AWARE, THERE ARE 16 STATUTORY AGGRAVATORS FOR A MURDER AND THE GOVERNMENT HAS ATTEMPTED TO PROVE TWO, THE PREVIOUS CONVICTION OF A VIOLENT FELONY AND THE SUBSTANTIAL PLANNING AND PREMEDITATION.

NOW WE UNDERSTAND, YOUR HONOR, THAT THE 1978 BAPTIST HOSPITAL CONVICTION IS NOT CONTESTED IN THIS CASE.  BUT I WOULD RESPECTFULLY ASK THE COURT TO

NOT -- THAT IT SHOULD NOT BE GIVEN GREAT WEIGHT WHEN THE COURT CONSIDERS THE WEIGHT TO BE GIVEN THE 1978 BAPTIST HOSPITAL FOR THE FOLLOWING REASONS.  FIRST AND FOREMOST, YOUR HONOR, THIS INCIDENT OCCURRED, MY UNDERSTANDING WAS, IN JANUARY OF 1978, WHICH IS OVER 35 YEARS AGO. DAVID HAMMER AT THAT TIME WAS 18 YEARS OLD.  TODAY, IN 2014, WHEN WE ARE LOOKING -- WHEN THE COURT HAS TO DECIDE WHAT IS A FAIR AND JUST PUNISHMENT, I ASK THE COURT TO CONSIDER THAT DAVID IS A COMPLETELY DIFFERENT PERSON PHYSICALLY, MENTALLY AND SPIRITUALLY THAN THE DAVID HAMMER THAT COMMITTED THAT CRIME IN 1978.

I ALSO ASK THE COURT TO LOOK AT THE FACTS OF THAT CRIME.  THE COURT IS AWARE, WE HAD ONE WITNESS TESTIFY CONCERNING THE FACTS OF THAT CRIME, A RETIRED OFFICER.  BUT ALSO THE COURT HAS SOME PRELIMINARY HEARING TRANSCRIPTS AND NOTES OF TESTIMONY THAT WERE SUBMITTED BY THE GOVERNMENT.  WHAT THE COURT NEEDS TO KEEP IN MIND AND I WOULD URGE THE COURT TO CONSIDER IS THE FACT THAT HE PLED GUILTY TO THAT OFFENSE.  WHEN HE WAS IN THAT ROOM, THE EVIDENCE, THE WITNESSES TESTIFIED TO HE WAS CRYING.  HE WAS THREATENING TO KILL HIMSELF. HE WAS ASKING TO TALK TO HIS SOCIAL WORKER.  HE EVEN HAD THE CARD, A BUSINESS CARD WITH THE SOCIAL WORKER'S NUMBER IN HIS POCKET.  HE PULLED THAT OUT TO THE PEOPLE THAT HE WAS HOLDING IN THE ROOM, AND SAID I NEED TO

SPEAK TO THIS PERSON.  SO HE WAS ASKING.  AND I BELIEVE ONE OF THE WITNESSES TESTIFIED THAT HE ASKED FOR HIS PSYCHIATRIST AT LEAST TEN TIMES BUT PROBABLY NOT AS MANY AS 20.  SO THIS WAS CLEARLY DAVID HAMMER INAPPROPRIATELY BUT A CRY FOR HELP.  HE ALSO ASKED THAT THE EVIDENCE PRESENTED BY THE GOVERNMENT SHOWS, THAT THE POLICE BE CALLED, THAT HE ACTUALLY ASKED THEM TO CALL THE POLICE.

I ASK THE COURT TO KEEP IN MIND WHEN LOOKING AT THE FACTS THAT NO ONE WAS INJURED.  NOW I UNDERSTAND THAT THIS -- FOR THE INDIVIDUALS INVOLVED IN THIS EVENT IN 1978, THAT THIS IS A TRAUMATIC EVENT.  AS FAR AS PHYSICAL INJURY, THERE WAS NOT A PHYSICAL INJURY. WHAT I FOUND MOST TELLING FROM THAT INCIDENT, YOUR HONOR, WHEN YOU LOOK AT THE EVIDENCE, WHEN YOU READ THE NOTES OF TESTIMONY, IS THAT THE NURSING SUPERVISOR WHO SAID SHE HAD FOUR YEARS AS A NURSE, AND THEN FOUR YEARS AS AN EMERGENCY ROOM SUPERVISOR, SHE WAS BEING QUESTIONED BY ONE OF THE COUNSEL AT THIS HEARING.  AND SHE WAS ASKED HAD SHE EVER SEEN ANYBODY IN HIS CONDITION BEFORE?  LIKE WAS THIS SOMETHING OUT OF THE ORDINARY? HER ANSWER WAS, SHE HAD SEEN PEOPLE IN THAT CONDITION BEFORE BUT THAT THEY WERE USUALLY BROUGHT INTO THE EMERGENCY ROOM BY THEIR FAMILIES.  AND IT JUST STRUCK ME, HAVING HEARD THE EVIDENCE IN THIS CASE, YOU KNOW AS THE COURT IS WELL AWARE THAT DAVID HAD SOUGHT HELP, BUT

DID NOT HAVE THE FAMILY SUPPORT THAT THESE OTHER INDIVIDUALS THAT THIS NURSE WAS REFERRING TO.  SO TECHNICALLY THIS IS AN AGGRAVATOR CASE, BUT THESE MANY MITIGATING FACTS, YOUR HONOR, SUPPORT NOT GIVING IT SIGNIFICANT WEIGHT IN DETERMINING A FAIR AND JUST SENTENCE TODAY IN 2014.

I ALSO WANTED TO TOUCH ON THE UPTON SHOOTING.  THE COURT IS WELL AWARE OF THE SITUATION CONCERNING MR. UPTON, GIVEN HIS RECENT DISCLOSURE OF HIS COMMITTING PERJURY IN THIS MATTER.

NOW, WHAT DO WE KNOW ABOUT THIS CASE ALSO?  WE KNOW THAT THIS CASE IS 31 YEARS OLD.  I BELIEVE IT WAS 1983 OR 1984.  IT'S EITHER 30 OR 31 YEARS OLD.  AGAIN, YOUR HONOR, MR. HAMMER IS NOT THE SAME PERSON PHYSICALLY, MENTALLY AND SPIRITUALLY AS THE PERSON, AS THE DAVID HAMMER THAT COMMITTED THAT CRIME.  YOU KNOW FROM MR. HAMMER'S TESTIMONY -- MR. UPTON'S TESTIMONY IN THIS CASE THAT HE ADMITTED THAT HE HAD PERJURED HIMSELF IN OKLAHOMA AT A PRELIMINARY HEARING AND AT THE TRIAL.  BUT HE ALSO ADMITTED THAT HE HAD PERJURED HIMSELF AT A FEDERAL TRIAL IN FRONT OF JUDGE MUIR IN WILLIAMSPORT, CAPITAL TRIAL WHERE DAVID WAS ON TRIAL FOR HIS LIFE.  AT LEAST IN PART DUE TO THAT PERJURED TESTIMONY DAVID HAMMER HAS BEEN ON DEATH ROW SINCE 1998.

ALSO MR. UPTON TOLD US THAT THE REASON HE HAD LIED WAS BECAUSE OF THE WAY THINGS WERE, THE ENVIRONMENT BACK IN OKLAHOMA IN THE EARLY '80S. THE COURT OBVIOUSLY HAS TO CONSIDER WHAT WEIGHT TO GIVE THAT AND WHAT CREDIBILITY TO GIVE THAT. BUT I ASK THE COURT TO CONSIDER THE FACT THAT MR. UPTON CONTINUED TO LIE IN 1998 IN WILLIAMSPORT AT THE FEDERAL TRIAL. AND EVEN WHEN HE MET WITH FBI AGENT COYLE IN 2014, WHEN HE WAS FIRST INTERVIEWED, HE SAID THE SAME STORY HE HAS BEEN TELLING ALL ALONG, THE LIE. IT WAS NOT UNTIL HE WAS CONFRONTED THAT HE FINALLY CAME CLEAN. SO THE REASON FOR HIS PERJURY, I THINK THE COURT SHOULD -- SHOULD GIVE THIS COURT GREAT PAUSE.

I WOULD NOW LIKE TO ADDRESS THE STATUTORY AGGRAVATOR THAT THE DEFENSE -- THAT WE ABSOLUTELY DO CONTEST. AND THAT IS THE SUBSTANTIAL PLANNING AND PREMEDITATION. I OBVIOUSLY REMIND THE COURT THAT THIS MUST BE PROVEN BY THE GOVERNMENT BEYOND A REASONABLE DOUBT.

I WOULD SUGGEST TO THE COURT THAT I KNOW IN MR. GURGANUS'S OPENING STATEMENT HE SUGGESTED THAT THE REASON THAT THE COURT SHOULD FIND SUBSTANTIAL PLANNING AND PREMEDITATION -- AT LEAST ONE OF THE REASONS WAS THIS BRAIDING OF THE SHEETS TO COMMIT THE MURDER. I WOULD SUGGEST TO YOUR HONOR THERE IS NO

CREDIBLE EVIDENCE THAT WOULD PROVE BEYOND A REASONABLE DOUBT THAT THERE WERE BRAIDED SHEETS FOR THE PURPOSES OF COMMITTING THIS MURDER.

YOU KNOW THAT SPECIAL AGENT MALOCU TESTIFIED IN THESE PROCEEDINGS AND HE HAD -- HE HAD TESTIFIED UNDER OATH PREVIOUSLY, HE WAS THE CASE AGENT, THAT IT WAS NOT UNCOMMON FOR PRISONERS TO HAVE BRAIDED SHEETS IN THEIR CELLS.  THAT WAS NOT UNCOMMON.

SPECIAL AGENT MALOCU ALSO TESTIFIED HERE THAT HE HAD INTERVIEWED OTHER PRISONERS, OTHER INDIVIDUALS THAT -- CONCERNING THIS INCIDENT AND THAT HE WAS AWARE THAT THESE INDIVIDUALS, THESE PRISONERS HAD TOLD HIM THAT MR. HAMMER AND MR. MARTI WERE ENGAGED IN A RELATIONSHIP, A PHYSICAL RELATIONSHIP AND WERE INTO BONDAGE.

ALSO WHEN YOU HEARD MR. HAMMER'S PLEA, WHICH HAS BEEN ENTERED INTO EVIDENCE BY THE GOVERNMENT, MR. HAMMER SPECIFICALLY WENT -- FULLY ADMITTED HIS GUILT BUT DID DISAGREE WITH SOME OF THE FACTS IN SUPPORT AND STATED THAT THE BRAIDED SHEETS, WE USED THEM FOR OTHER PURPOSES.

WHEN AGENT CARLYLE WAS SHOWING THE VIDEO, ACTUALLY HE WAS IN THE VIDEO AND HE WAS ON THE WITNESS STAND, YOU NOTICE HE FOUND TORN SHEETS UNDER MARTI'S PILLOW IN THE CELL.  WHAT DID HE TELL US?  I'M SORRY,

AGENT THOMPSON, CARLYLE THOMPSON.  WHAT DID AGENT THOMPSON TELL US?  HE SAID THOSE WERE USED -- THESE TORN SHEETS WERE USED FOR BRAIDING AND THEY WERE UNDER MARTI'S PILLOW.

ALSO, YOUR HONOR, AGAIN ON THE VERY FIRST DAY YOU HEARD FROM LIEUTENANT DEVANE.  THIS WAS THE INDIVIDUAL WHO WAS, AS YOU WILL RECALL, WAS IN CHARGE OF THE PRISON THAT NIGHT.  ON THE NIGHT SHIFT HE WAS THE MAN IN CHARGE.  HE WENT RIGHT TO THE SCENE OF THE CRIME AND WHAT DID HE DO?  HE TOLD US THAT HE VIEWED THE SCENE OF THE CRIME AND WHEN QUESTIONED BY GOVERNMENT COUNSEL HE SAID MAYBE AT MOST ONE OF THE SHEETS WAS BRAIDED.  MOST WERE JUST TORN.

AND ALSO WE HEARD FROM CORRECTIONAL OFFICER NICOLE WEAVER TADROSS AND SHE SAID SHE WAS NOT SURE IF ONE OF THE ONES THAT TIED HIM DOWN MIGHT HAVE BEEN BRAIDED.

SO, YOUR HONOR, WHEN YOU LOOK AT THIS EVIDENCE, I WOULD SUGGEST TO THE COURT THAT THIS BRAIDING OF THE SHEETS HAS NOT BEEN PROVEN TO BE RELEVANT TO ANYTHING CONCERNING THIS MURDER.

SO THEN YOU LOOK AT THE GOVERNMENT'S -- I WOULD SAY NEXT PRONG OF THIS SUBSTANTIAL PLANNING THEORY.  AND THEY SAY, OKAY, WELL, THERE WAS A HOSTAGE RUSE AND THAT THIS IS SOMEHOW EVIDENCE OF SUBSTANTIAL

PLANNING.  WELL, KEEP IN MIND WHEN YOU LOOK AT MR.

-- AND THE GOVERNMENT WANTS YOU TO RELY ON THE WORDS OF

MR. HAMMER, WHENEVER THEY CAN THEY SAY THEY WANT YOU TO

LOOK AT HIS WORDS.  BUT WHEN YOU READ THAT CONFESSION,

OBVIOUSLY YOU NEED TO KEEP IN MIND, MR. HAMMER IN NO WAY

DISPUTES THAT HE COMMITTED THIS CRIME.  BUT WHEN YOU ARE

GETTING INTO THE FACTS CONCERNING THIS CRIME AND EXACTLY

WHAT THIS WHOLE SITUATION WAS ABOUT, I SUGGEST, YOUR

HONOR, KEEP IN MIND WHAT AGENT MALOCU TESTIFIED TO.

WHAT DID HE TELL US?  THAT MR. HAMMER, HE CONFIRMED, HAS

A HISTORY OF FALSELY CONFESSING TO A WHOLE HOST OF

THINGS, FALSELY CONFESSING TO A WHOLE HOST OF THINGS.

YET THE GOVERNMENT WANTS YOU TO BELIEVE THIS CONFESSION

CHAPTER AND VERSE, LINE FOR LINE AS CREDIBLE EVIDENCE

BEYOND A REASONABLE DOUBT TO PROVE SUBSTANTIAL PLANNING.

WHEN YOU LOOK CLOSELY AT THAT CONFESSION, IT JUST --

THERE ARE SO MANY INCONSISTENCIES I SUGGEST THAT THE

COURT WOULD NOT GIVE IT THAT TYPE OF CREDENCE.

FOR EXAMPLE, THEY TALK ABOUT HOW

MR. HAMMER IS GOING TO DO ANDREW MARTI A FAVOR BY TYING

HIM UP AND MAKING HIM A HOSTAGE SO HE CAN GET

TRANSFERRED.  THEN MR. HAMMER SAYS:  WELL, I'LL SWEETEN

THE POT AND PUT IN EXTRA MONEY IN THE COMMISSARY AND

THINGS OF THAT NATURE.  IT SIMPLY MAKES NO SENSE, WHY IS

MR. HAMMER HAVING TO SWEETEN THE POT IF HE IS THE ONE

DOING MARTI THE FAVOR BY TYING HIM UP?  SO THE

CONFESSION IS CHOCK FULL OF CONTRADICTIONS.

WHEN THE GOVERNMENT WANTS YOU TO RELY ON

THAT CONFESSION I WOULD ASK THE COURT TO KEEP IN MIND AS

AGENT THOMPSON MENTIONED, TWICE AS HE IS DESCRIBING THIS

SO-CALLED PLAN, THIS SO-CALLED INCIDENT IN THE CELL THAT

WHAT HE WAS DESCRIBING WAS, TWICE MR. HAMMER SAYS TO

AGENT THOMPSON THAT NIGHT WHEN HE IS GIVING HIS

CONFESSION, I WASN'T SURE WHAT I WAS GOING TO DO.  I

WASN'T SURE WHAT I WAS GOING TO DO.  AND I WOULD SUGGEST

TO YOUR HONOR IF THEY WANT YOU TO LOOK AT THAT

CONFESSION AND YOU LOOK AT THAT CONFESSION IN ITS

TOTALITY IT DOES NOT SUPPORT SUBSTANTIAL PLANNING OR

PREMEDITATION.

ALSO THE GOVERNMENT I GUESS AS A LINCHPIN

TO THEIR HOSTAGE RUSE, IF THEY WANT YOU TO BELIEVE THAT

AS PART OF THIS SUBSTANTIAL PLANNING THEORY, THEY WANT

YOU TO BELIEVE THAT SOMEHOW MR. HAMMER LURED ANDREW

MARTI INTO THE CELL.  WELL, YOUR HONOR, I WOULD SUGGEST

THAT YOU LOOK AT WHAT IS THE CREDIBLE EVIDENCE IN THIS

CASE, WHICH IS D 15.  D 15 WAS ENTERED INTO EVIDENCE

WITH SPECIAL AGENT MALOCU.  WHAT WE SEE FROM D 15 IS

THAT ANDREW MARTI -- IT'S A MEMO FROM ONE OF THE

OFFICERS.  ANDREW MARTI CAME TO THE OFFICER FIRST ASKING

TO BE MOVED IN WITH MR. HAMMER.  OBVIOUSLY, THE COURT

CAN REVIEW THE DOCUMENT.  HE CAME TO MR. -- TO THE CO, SAYING I WANT TO MOVE IN WITH MR. HAMMER.  IT WASN'T UNTIL LATER THAT THEN MR. HAMMER SIGNS THAT REQUEST AND THAT IS RIGHT IN THAT DOCUMENT AT D 15.  IT DIRECTLY CONTRADICTS THE GOVERNMENT'S THEORY THAT SOMEHOW HE IS LURING HIM INTO THIS CELL TO COMMIT A MURDER UNDER A HOSTAGE RUSE.

THEN WHAT DO WE GET TO, YOUR HONOR, WE GET TO THE LETTERS AND KITES.  WHAT DO WE KNOW ABOUT THE LETTERS AND KITES IN THIS CASE?  EVEN IF THIS COURT WERE TO FULLY ACCEPT EVERYTHING THAT WAS WRITTEN IN THESE LETTERS AND KITES THAT ARE FLOATING AROUND THIS PRISON, IT DOES NOT PROVE SUBSTANTIAL PLANNING AND PREMEDITATION.  WE KNOW THAT NONE OF THESE -- THAT THE GOVERNMENT IN PRESENTING THEIR CASE BEFORE YOUR HONOR DID NOT CALL AGENT -- SIS OFFICER TRAXLER.  HE WAS BASICALLY THE CASE AGENT FOR THE BOP OF THE PRISON. THEY CHOSE NOT TO CALL HIM.  HE WAS AVAILABLE.  THEY ALSO CHOSE NOT TO CALL LEONARD YAGER, WHO WAS ALSO AVAILABLE.

THE GOVERNMENT IN THIS CASE TO LINK UP, AS THE COURT SUGGESTED, THE DOCUMENTS, THE WRITINGS CHOSE TO RELY SOLELY ON THE HANDWRITING EXPERT.  NOW, I WILL GET TO THE HANDWRITING IN A MINUTE.  BUT AS FAR AS RELYING ON TRAXLER AND YAGER, WHAT DO WE HAVE HERE?  WE

HAVE PRINTED AND HANDWRITTEN SIGNED DOCUMENTS FLOATING AROUND A USP WITHIN DAYS OF A MURDER.  WHAT COULD BE MORE OF A FERTILE GROUND FOR INDIVIDUALS, PRISONERS THAT ARE SERVING LENGTHY, LENGTHY SENTENCES THAN TO JUMP ON THIS CASE BY FINDING SOMETHING THAT CAN HELP THEM, SUCH AS A KITE OR A LETTER, AND WE ALL KNOW THAT THAT IS THE TYPE OF THING THAT FLIES THROUGH A USP WHEN OPPORTUNITY LIKE THIS HAPPENS.

SO, YOUR HONOR, I WOULD ASK THE COURT, YOU HAVE TO SCRUTINIZE BECAUSE THESE DOCUMENTS CAME FROM YAGER, A PRISONER, OR TRAXLER, A CO WHO HAS NOT BEEN CALLED.  THAT IS WHERE THEY CAME FROM.  EVEN THE CLASSEN LETTER DID NOT COME FROM CLASSEN, EVEN THOUGH WE HEARD HIS TESTIMONY.  THAT IS THE ONE WHERE HE SAID THE FEDERAL GOVERNMENT GOT IT IN MYSTERIOUS WAYS.

SO WHAT ARE WE LEFT WITH?  I KNOW YOUR HONOR RULED ON JUNE 9TH, 2014 AT THE BEGINNING OF ONE OF OUR DAYS THAT BASED ON THE HANDWRITING EXPERT THE GOVERNMENT HAD LINKED IT UP.  BUT THE COURT STILL LEFT OPEN THE ISSUE OF HOW MUCH WEIGHT TO GIVE THESE WRITINGS AND ALSO COULD THE COURT CONSIDER STRIKING IT.

I WOULD SUGGEST, YOUR HONOR, JUST TWO DAYS LATER ON JUNE 11, 2014, AND IF YOU WILL REMEMBER WHEN I CROSS-EXAMINED MS. BUNCH, THE GOVERNMENT'S FBI EXPERT, I SHOWED HER A TRANSCRIPT FROM THE CHRISTOPHER

MCDANIELS CASE, A SENTENCING IN FRONT OF JUDGE ROBRENO FROM JANUARY OF '14.  SHE SAID, OH, YEAH, THAT WAS MY SUPERVISOR THAT WAS TESTIFYING.  WELL, GUESS WHAT, YOUR HONOR?  ON JUNE 11, TWO DAYS AFTER YOUR HONOR RULED, JUDGE ROBRENO RULED.  AND JUDGE ROBRENO IN THE MCDANIELS CASE STRUCK THE TESTIMONY OF THE HANDWRITING EXPERT, MISS BUNCH'S SUPERVISOR, BASED ON A DAUBERT THEORY. AFTER REVIEWING THE TRANSCRIPT, THE TRANSCRIPT I WAS SHOWING MISS BUNCH, HE STRUCK IT.

NOW THINK ABOUT IT, YOUR HONOR.  JUDGE ROBRENO IS STRIKING THAT TESTIMONY IN A ROBBERY SENTENCING.  ESSENTIALLY WHAT THE GOVERNMENT WAS DOING IN MCDANIELS WAS TRYING TO BRING IN RELEVANT CONDUCT OF OTHER ROBBERIES BASED ON DEMAND NOTES AND HE STRUCK THAT TESTIMONY.  HERE WE ARE IN A CAPITAL PROCEEDING, A CAPITAL SENTENCING.  AND SO I WOULD SUGGEST TO YOUR HONOR THAT THE HEIGHTENED LEVEL OF RELIABILITY THAT WE ARE WORKING ON IN THIS PROCEEDING SHOULD BE INFLUENCED BY JUDGE ROBRENO'S DECISION.

WHAT ALSO DO WE KNOW ABOUT MS. BUNCH? AGAIN, I UNDERSTAND THE COURT'S RULING AND I'M NOT QUIBBLING WITH THE COURT'S RULING AS FAR AS THE LINKING UP, BUT I BELIEVE THE COURT ALLOWED FOR ARGUMENT ON THE WEIGHT TO BE GIVEN TO THESE WRITINGS.  WHAT DO WE KNOW ABOUT MISS BUNCH?  WHEN SHE ORIGINALLY TESTIFIED AT THE

TRIAL IN 1998, SHE SAID THEY WERE PROBABLY THE HANDWRITING OF MR. HAMMER.  BUT NOW WE KNOW, I DON'T WANT TO CALL IT SCIENCE BECAUSE HER SUPERVISOR DID NOT CALL IT SCIENCE, BUT AS THIS AREA OF EXPERTISE, WE WILL CALL IT, HAS EVOLVED, THEY DON'T USE THAT.  THEY NOW HAVE A LOWER STANDARD BECAUSE PROBABLY WAS NOT SUFFICIENT.  IT WAS NOT SOMETHING THAT COULD BE RELIED ON IN COURT.  SO WHAT IS THE STANDARD NOW?  MAYBE.  ON CROSS EXAMINATION SHE CAME FORWARD AND SAID YEAH, THE STANDARD HAS CHANGED EVEN THOUGH SHE IS TESTIFYING IN 2014.  SO, AGAIN, IS MAYBE SOMETHING THAT IS A STRIKINGLY HIGH LEVEL OF RELEVANCE AND RELIABILITY, THE RULE THAT WE WORK UNDER IN THESE PROCEEDINGS?  SHE ALSO TESTIFIED TO A COMPLETELY DIFFERENT STANDARD THAN HER BOSS.  SHE TELLS YOUR HONOR THAT THIS IS A SCIENTIFIC CERTAINTY, WHEREAS HER BOSS WOULD NOT GO THAT FAR IN THE MCDANIELS CASE.

WHAT DO WE KNOW, SHE SAID, SHE DID CONCEDE THAT THIS IS SUBJECTIVE AND THAT SHE COULD NOT PROVIDE US AN ERROR RATE.  AND WHAT DO WE KNOW THAT THE DNA EXPERT SAID WITHIN A COUPLE OF HOURS OF MISS BUNCH, MAYBE THE NEXT DAY, I'M NOT SURE.  HE TESTIFIED OBVIOUSLY HOW SCIENCE IS -- DNA IS SCIENCE BECAUSE THERE CAN BE AN ERROR RATE, THINGS LIKE THAT.  THERE'S EMPIRICAL DATA TO SUPPORT IT.  HE MADE A VERY

INTERESTING COMMENT.  HE SAID HUMANS MAKE ERRORS.  AND THAT IS THE DIFFERENCE BETWEEN DNA AND SOMETHING ELSE. I WOULD SUGGEST TO YOUR HONOR HE WAS RIGHT ON THE MONEY WHEN HE WAS TALKING ABOUT WHAT IS RELIABLE AND MAYBE WHAT'S NOT RELIABLE FOR A CAPITAL PROCEEDING.

WE ALSO KNOW FROM SPECIAL AGENT MALOCU THAT THERE WERE NO DAVID HAMMER FINGERPRINTS ON ANY OF THESE WRITINGS AND THERE WAS NO DNA OF DAVID HAMMER ON ANY OF THESE WRITINGS.

WE ALSO KNOW THAT THE GOVERNMENT WANTS YOU TO TAKE THE TESTIMONY THAT THEY READ IN FROM MR. CLASSEN.  WHAT DO WE KNOW ABOUT MR. CLASSEN?  WE KNOW HE IS ESSENTIALLY SOMEBODY WHO YOU SHOULD TAKE HIS TESTIMONY WITH CAUTION.  THAT IS BECAUSE NOT ONLY WAS HE PROMISED BUT IF HE RECEIVED A REDUCTION IN HIS SENTENCE FOR HIS TESTIMONY AGAINST MR. HAMMER.

YOUR HONOR, I SUGGEST TO THE COURT THAT THE GOVERNMENT HAS NOT PROVEN THE STATUTORY AGGRAVATOR OF SUBSTANTIAL PLANNING AND PREMEDITATION.  WE KNOW FROM CAPITAL CONSTITUTIONAL LAW THAT TO BE CONSTITUTIONAL AN AGGRAVATOR MUST NARROW THE CLASS OF PERSONS THAT ARE ELIGIBLE FOR DEATH SIGNIFICANTLY.

THINK ABOUT THIS AGGRAVATING FACTOR, YOUR HONOR.  IT SIMPLY TOUCHES ON THE ELEMENTS OF MURDER. PLANNING AND PREMEDITATION.  SO FOR THAT -- WE ARE NOT

QUIBBLING WITH THE CONSTITUTIONALITY OF THE AGGRAVATOR. WHAT I'M GETTING AT, YOUR HONOR, IS FOR THIS TO BE CONSTITUTIONAL IT MUST -- SUBSTANTIAL MUST MEAN SUBSTANTIAL.  I KNOW THERE IS A 5TH CIRCUIT CASE THAT TALKS ABOUT A HIGH MAGNITUDE.  BUT WHAT I'M GETTING AT, YOUR HONOR, IS WHEN YOU LOOK AT THE FACTS OF THIS CASE, EVEN IF YOU CONCEDE ALL OF THE PROBLEMS -- OR OVERLOOK ALL THE PROBLEMS WITH THE GOVERNMENT'S PROOF, THIS CASE IS NOT -- DOES NOT FIT SUBSTANTIAL PLANNING AND SUBSTANTIAL PREMEDITATION.

FINALLY YOUR HONOR, ON THAT POINT, IF THE COURT WERE TO FIND THAT THE GOVERNMENT PROVED THIS BEYOND A REASONABLE DOUBT, I WOULD RESPECTFULLY ASK THE COURT TO GIVE IT VERY, VERY LITTLE WEIGHT IN THIS MATTER.

SO NOW, YOUR HONOR, I'M GOING TO MOVE ON TO FUTURE DANGEROUSNESS, THE NONSTATUTORY AG.  AGAIN, I WOULD SUGGEST TO THE COURT THAT THIS NONSTATUTORY AGGRAVATING FACTOR, WHICH MUST BE PROVEN BEYOND A REASONABLE DOUBT BY THE GOVERNMENT, HAS NOT BEEN PROVEN AND THEY HAVE NOT MET THEIR BURDEN.

WHAT DOES THE GOVERNMENT CITE TO?  THEY CITE TO TWO ESCAPES, ONE FROM 1983 AND ONE FROM 1981, OVER 30 YEARS OLD.  AND THESE ESCAPES IF -- I READ THE TRANSCRIPT FROM THE ESCAPE FROM GRANITE, IT WAS A PRISON

THAT WAS BUILT IN THE 1800S, THE OKLAHOMA PRISON IN GRANITE.  THE JOSEPH HARP PRISON WAS ONE THAT HAD A MENTAL HEALTH WING TO IT.  NOT ONLY WERE THESE ESCAPES 30 YEARS OLD, BUT THEY WERE NOT FROM A MAXIMUM FEDERAL PRISON.  THEY WERE FROM OKLAHOMA PRISONS THAT WERE BUILT IN THE 1800S.

WE ALSO KNOW WHEN WE ARE LOOKING AT FUTURE DANGEROUSNESS THAT FROM THE TESTIMONY IN THIS CASE THAT MR. HAMMER HAS NO ESCAPES OR ESCAPE ATTEMPTS IN OVER 30 YEARS.  YOU HEARD FROM MR. GRAVETTE, THE BOP EXPERT, THAT MR. HAMMER HAS BEEN TRANSPORTED NUMEROUS TIME FOR NUMEROUS COURT HEARINGS, MEDICAL APPOINTMENTS, NOT ONLY ARE THERE NO ESCAPES, THERE ARE NO ESCAPE ATTEMPTS.

WE ALSO KNOW THAT MR. HAMMER HAS NOT HAD A CRIME OF VIOLENCE SINCE THIS CASE IN 1996.

I SUGGEST TO THE COURT THAT THE COURT SHOULD ALSO LOOK AT -- COUNSEL TOUCHED ON THE HUDDLESTON, WHICH WAS ONE OF THE CRIMES THAT OCCURRED WHILE ON ESCAPE.  I WANTED TO TOUCH ON THE FACTS OF THAT AND ASK THE COURT TO CONSIDER TO GIVE THOSE FACTS LITTLE WEIGHT.  NOT THAT THESE ARE NOT SERIOUS MATTERS, BUT WE ARE LOOKING AT A SENTENCING IN 2014 AND WHAT IS A FAIR AND JUST SENTENCE.  THIS MATTER OCCURRED 33 YEARS AGO. MR. HAMMER WENT INTO THE HOUSE, ELDERLY COUPLE.  HE

PICKED UP A FIREPLACE POKER.  HE THEN PUT IT DOWN.  HE SAT DOWN.  THEY HAD A TALK.  WE KNOW AT THE END OF THE TALK THERE WAS A HUG, THEY SAID A PRAYER TOGETHER AND HE LEFT.  DO I SUGGEST THAT IN ANY WAY WAS APPROPRIATE CONDUCT?  NO.  BUT I WANT THE COURT TO REALIZE THE FACTS THAT OCCURRED IN THIS CASE.  I ALSO WOULD REMIND THE COURT THAT ALTHOUGH OBVIOUSLY THIS WAS A SIGNIFICANT INCIDENT FOR THE HUDDLESTONS, THERE WERE NO PHYSICAL INJURIES IN THIS MATTER.

I ALSO WOULD TURN THE COURT NOW TO THE LOMPOC MATTER.  YOU HEARD COUNSEL TALK ABOUT HOW MR. BEVINS WAS TAKEN VICTIM.  HE WAS MR. HAMMER'S CELLMATE.  WHAT COUNSEL FAILED TO MENTION, YOUR HONOR, AND THIS WAS BORNE OUT BY THE PAPERWORK, HAD THROWN HOT WATER ON A GUARD.  YOU WILL SEE IN THE STIPULATION, ESSENTIALLY THIS MATTER WENT TO YOU BY WAY OF STIPULATION, THAT MR. HAMMER SAID HE WAS BRAGGING ABOUT HAVING DONE THIS COWARDLY ACT AND HE DID NOT WANT HIM IN HIS CELL.  WHAT DO WE KNOW?  WHEN THE CORRECTIONAL OFFICERS CAME, THE LIEUTENANT CAME, HE AGREED TO LET MR. BEVINS GO.  WE KNOW THAT MR. BEVINS DID NOT RECEIVE AN INJURY.  I THINK THEY SAID MAYBE A SUPERFICIAL ABRASION.  WE ALSO KNOW THAT THE FBI DECLINED PROSECUTION.  AND WE ALSO KNOW THAT THE BOP DOWNGRADED THE CHARGES BECAUSE THE PERSON WHO WAS HEARING IT, THE

DISCIPLINARY HEARING OFFICER, DID NOT FEEL THAT THIS WAS A HOSTAGE-TAKING SITUATION.

SO WHEN YOU LOOK AT THOSE PRIOR CONDUCTS BY MR. HAMMER, I WOULD SUGGEST TO THE COURT, I AM IN NO WAY MINIMIZING THAT THIS IS SOMEHOW EXCUSABLE CONDUCT. I'M JUST ASKING THE COURT TO PUT IT IN THE CONTEXT AS FAR AS THE SENTENCING FOR PURPOSES OF TODAY.

ALSO I WANTED TO TOUCH ON DR. HYDE'S TESTIMONY CONCERNING MR. HAMMER'S PHYSICAL CONDITION. DR. HYDE'S TESTIMONY WAS UNREBUTTED AND IT ALMOST RELIED PRIMARILY ON BOP RECORDS, BOP DOCUMENTS. WHAT DO WE KNOW FROM DR. HYDE? WE KNOW DAVID HAMMER IS 55 GOING ON 85. WE KNOW THAT THE BOP, THE FEDERAL BUREAU OF PRISONS UNDERNEATH THE REALM OF THE DEPARTMENT OF JUSTICE, CONSIDERS DAVID HAMMER A CARE LEVEL 3. THE FIRST THING WE KNOW ABOUT CARE LEVEL 3, THEY ARE CONSIDERED FRAGILE INMATES. THAT IS HOW DAVID IS CHARACTERIZED BY THE BUREAU OF PRISONS. WE ALSO KNOW FROM DR. HYDE'S UNREBUTTED TESTIMONY THAT DAVID HAS CHRONIC, IRREVERSIBLE, PROGRESSIVE AND PERMANENT HEART DISEASE. DR. HYDE TESTIFIED IT WAS IN THE LEFT ANTERIOR ARTERY, WHICH IS THE WIDOW MAKER. HE HAS DEGENERATIVE LUMBAR DISC, ARTHRITIS, BACK SPASMS. HE HAS SEVERE ADULT ONSET DIABETES. THE DIABETES HAS LED TO NEUROPATHY AND RETINOPATHY AND EDEMA. ALL OF WHICH HE SAID IS CHRONIC,

IRREVERSIBLE, PROGRESSIVE AND PERMANENT FROM THE BOP RECORDS.

WE KNOW FROM THESE RECORDS AND FROM THE EXPERT TESTIMONY THAT MR. HAMMER IS LOSING HIS ABILITY TO SEE AND HIS ABILITY TO WALK. WE KNOW THAT HE HAS TO HAVE WORN DIABETIC SHOES IN THE PAST AND HAS EVEN HAD TO RESORT TO A WHEELCHAIR. WE AGREE WITH THE GOVERNMENT ON THIS POINT, YOUR HONOR. MR. HAMMER IS NOT TAKING CARE OF HIMSELF. HIS DIET IS HORRENDOUS AND WE ARE NOT ASKING THE COURT TO SOMEHOW GIVE HIM A BREAK BECAUSE OF THAT. WHAT I'M SAYING TO THE COURT IS GIVEN THAT DIET, HIS CONDITION AS DR. HYDE TESTIFIED IS ONLY GOING TO GET SIGNIFICANTLY WORSE.

FINALLY, YOUR HONOR, I JUST MOVE ON TO THE TESTIMONY OF -- THAT WAS UNREBUTTED CONCERNING THE BOP EXPERT. WHAT DO WE KNOW IN 2012? WE KNOW THAT THE BUREAU OF PRISONS' UNREBUTTED REPORT DESCRIBES MR. HAMMER AS A LOW RISK TO OTHERS. THEY INDICATE THAT THEY LOOKED AT HIS HISTORY. THEY KNOW THAT THIS CAN BE MODIFIED OVER TIME. THAT IS DEFENSE EXHIBIT 360 TO 363. THE BUREAU OF PRISONS CONSIDERS MR. HAMMER TO BE A LOW RISK OF HARM TO OTHERS.

WITH THAT, YOUR HONOR, I WOULD ASK THE COURT TO CONSIDER THE ARGUMENTS THAT I'VE MADE. AND AT THIS TIME I WILL TURN OVER THE PODIUM TO MR. MORENO.

THANK YOU, YOUR HONOR.  I JOIN IN COUNSEL'S COMMENTS CONCERNING YOUR HONOR AND THANKING YOU FOR THE PROCEEDINGS.

MR. MORENO:  GOOD AFTERNOON, YOUR HONOR. I REALIZE WE DON'T HAVE A LOT OF TIME LEFT.

WHAT I WOULD LIKE TO DO IS SUMMARIZE FOR THE COURT WHY WE BELIEVE THE MITIGATION THAT IS PRESENTED OVER THE PAST THREE WEEKS COMPELS A SENTENCE OF LIFE IN PRISON WITHOUT POSSIBILITY OF PAROLE.

WE ARE NOT SEEKING TO PROVIDE EXCUSES FOR MR. HAMMER'S CONDUCT.  WE ARE NOT SHIFTING BLAME.  BUT AT THE SAME TIME ONE CANNOT DENY THAT THERE IS A LOT OF MITIGATING EVIDENCE.  IT PROVIDES EVIDENCE IN THIS CASE OF A DISABILITY, A CONDITION, A SET OF LIFE EXPERIENCES THAT INSPIRED COMPASSION, INDEED MERCY AND UNDERSTANDING.  WHEN MR. HAMMER WAS IN THAT CELL THAT NIGHT HE WAS A PROFOUNDLY DAMAGED INDIVIDUAL WHOSE LIFE WAS RUINED BEFORE IT EVER HAD A CHANCE TO START.

I'M REALLY NOT SURE WHAT TESTIMONY MS. HAINES HEARD BUT I DID NOT HEAR TESTIMONY OF PEOPLE FROM MR. HAMMER'S FAMILY WHO MADE IT.  WHAT I HEARD WAS A SERIES OF WITNESSES AND RECORDS AND TESTIMONY ABOUT DEVASTATION AND DYSFUNCTION AND THE INABILITY TO GET THEIR LIVES TOGETHER.  I HEARD STORIES OF ANGER ON THE PART OR -- MR. HAMMER, MARTIN HAMMER WAS TREATED FOR

ANGER AND STRESS AND ANXIETY AND DEPRESSION.  HE DIDN'T FUNCTION WELL FOR YEARS AND YEARS AND YEARS.  AND ONLY AS HE TESTIFIED JUST RECENTLY DID HE GET A PART-TIME JOB.  HE IS PROUD OF THAT JOB AND HE SHOULD BE, BUT TO THINK THAT ANYONE COULD LISTEN TO THE EVIDENCE THAT HAS BEEN HELD OVER THE LAST THREE WEEKS AND THINK THAT THE HAMMER FAMILY WAS IN ANY WAY A HAPPY GO LUCKY GOOD PLACE TO BE RAISED, WITH PEOPLE WHO MADE IT, IS DELUSIONAL.

NOW THE UNITED STATES SUPREME COURT HAS HELD THAT THE DEATH PENALTY IS RESERVED FOR THE WORST OF THE WORST.  AND IN THIS CASE I THINK THE EVIDENCE MAKES CLEAR THAT WHILE HE COMMITTED A TERRIBLE ACT FOR WHICH HE TAKES FULL RESPONSIBILITY, HE IS NOT THE WORST OF THE WORSE.  HE WASN'T IN 1996.  HE IS NOT TODAY.

THE DAVID HAMMER PRESENT IN THAT CELL IN 1996, HE WAS SUFFERING FROM BRAIN DAMAGE.  THAT EVIDENCE IS UNCONTESTED.  HE SUFFERED FROM POST-TRAUMATIC STRESS DISORDER.  THAT EVIDENCE IN UNCONTESTED.  HE SUFFERED FROM BORDERLINE PERSONALITY DISORDER.  THAT EVIDENCE IS UNCONTESTED.  EVERY MENTAL HEALTH EXPERT WHO HAS EVALUATED MR. HAMMER HAS COME TO THOSE CONCLUSIONS, GOVERNMENT AND DEFENSE EXPERTS ALIKE.  THERE IS NO DISPUTE.  WE THINK THAT THOSE ARE FACTORS THAT THE COURT SHOULD GIVE GREAT WEIGHT TO, PARTICULARLY WHEN CONSIDERING IS MR. HAMMER THE WORST OF THE WORST?  IS

THIS A CASE WHERE DEATH IS WARRANTED?  WE THINK NOT.

NOW THE CONSTELLATION OF MENTAL ILLNESSES I WAS JUST DISCUSSING OR NAMING BRIEFLY, THAT HE LABORED UNDER AT THE TIME OF THE MURDER, THEY ARE THE PRODUCT OF HIS PROFOUND HISTORY, HIS UNDENIABLE HISTORY OF SEXUAL VICTIMIZATION AT THE HANDS OF BOTH PARENTS.  IT'S THE RESULT OF THE EXTREME VIOLENCE HE FACED IN THE HOME GROWING UP, THE NEGLECT, THE EMOTIONAL ABUSE, THE CRUELTY.  THIS EVIDENCE, I SUGGEST -- OR WE SUGGEST TO THE COURT IS PRETTY MUCH UNCONTRADICTED.

NOW, AS DR. LISAK TESTIFIED TO, STORIES ARE NOT ALWAYS THE SAME.  THEY ARE NOT GOING TO BE FROM STORY TO STORY EXACTLY THE SAME.  BUT WHAT WE HAVE IN THIS CASE IS A PRETTY CONSISTENT THEME ACROSS MULTIPLE GENERATIONS.  AND IN MR. HAMMER'S FAMILY WE HAVE ALMOST EVERY REPORTER WHO HAS TESTIFIED HERE GIVING US THE SAME FLAVOR.  WE HAVE AN UNPREDICTABLE AND ANGRY MOTHER.  WE HAVE A MOTHER WHO LASHES OUT AT THE KIDS FOR NO GOOD REASON OR AT LEAST NO REASON THAT THE KIDS CAN PREDICTABLY RELY UPON.  WE HAVE VIOLENCE THAT OCCURS THAT IS EXTREME.  IT'S NOT MERELY DISCIPLINE.  IT'S BEATINGS, BEATINGS TO THE POINT OF WELTS AND BRUISES AND AT TIMES EVEN BLEEDING.  IT'S BEATINGS WITH ALL SORTS OF OBJECTS.  IT'S BEATINGS OUT OF THE BLUE AND IT WENT ON FOR YEARS AND YEARS.  AND EVERY SINGLE CHILD IN THAT

FAMILY, FROM DAVID TO MARTIN TO DIANE, IS DAMAGED GOODS. THEY ARE IMPAIRED. THEY SUFFERED TREMENDOUSLY AS A RESULT OF THE UPBRINGING THAT THEY ENDURED.

NOW GOING BACK TO APRIL OF 1996. IT IS IN FACT TRUE THAT THE BOP SHOULD NOT HAVE HAD MR. HAMMER AND MR. MARTI CELL TOGETHER. THE EVIDENCE ON THAT IS ABSOLUTELY UNEQUIVOCAL AND UNREBUTTED. IT CAME TO THIS COURT THROUGH THE TESTIMONY OF A GOVERNMENT WITNESS, A DR. STEVEN KARTEN, WHO AT THE TIME OF THE MURDER IN THIS CASE WAS THE CHIEF PSYCHOLOGIST AT THE U.S. PRISON IN ALLENWOOD. HE TOLD US THAT WHEN MR. HAMMER ARRIVED AT THE PRISON, HE DIAGNOSED MR. HAMMER AS HAVING INTERMITTENT EXPLOSIVE DISORDER. THE PSYCHOLOGICAL SERVICE AT ALLENWOOD CONCLUDED THAT MR. HAMMER WAS A MAN WHO HAD SIGNIFICANT MENTAL HEALTH PROBLEMS THAT WARRANTED PSYCHOLOGICAL INTERVENTION. THERE WAS A SPECIFIC CATEGORY FOR THAT. MR. HAMMER WAS DESIGNATED IN THAT CATEGORY.

WE ALSO KNOW FROM DR. KARTEN THAT ON MARCH 4TH, 1996, MR. HAMMER WAS DESIGNATED -- HE WAS PLACED ON PSYCH SINGLE CELL STATUS. DR. KARTEN TOLD US THAT UNDER BOP POLICY, THE ONLY WAY YOU GET ON PSYCH SINGLE CELL STATUS IS IF YOU PRESENT YOURSELF AS A THREAT TO OTHERS, OR THAT YOU COULD BE VICTIMIZED BY OTHERS AS A RESULT OF YOUR MENTAL HEALTH PROBLEMS.

WE ALSO KNOW THAT ON MARCH 20TH, TWO WEEKS LATER, DAVID'S COUNSELOR JOHN MITCHELL, DR. MITCHELL, HAD REQUESTED THE CONTRACT PSYCHIATRIST TO SEE IF MEDICATION WAS APPROPRIATE TO HELP DAVID WITH THE MOOD SWINGS HE WAS EXPERIENCING AND THE DEPRESSION.  WE KNOW HE WAS PRESCRIBED DEPAKOTE, 250 MILLIGRAMS A DAY.  IT'S A MOOD STABILIZER.  HE TOOK IT FOR CLOSE TO 20 DAYS BEFORE STOPPING IT A FEW DAYS BEFORE THE MURDER.  AS THE COURT KNOWS FROM DR. KARTEN THE UNCONTRADICTED EVIDENCE IS THAT ON APRIL 13TH, 1996, MR. HAMMER WAS ON PSYCH SINGLE CELL STATUS.

DR. KARTEN ALSO TOLD US THAT PSYCH SINGLE CELL STATUS, WHEN YOU ARE IN THAT STATUS YOU CANNOT REQUEST A CELLMATE.  IF YOU DO REQUEST IT, IT SHOULD BE DENIED.  THERE IS A REASON THEY PUT YOU ON THAT.  THEY PUT YOU THERE FOR THE PROTECTION OF YOURSELF AND OTHERS.  THAT'S WHAT THEY DID TO MR. HAMMER.  THEY PUT HIM ON THAT WATCH SO THEY HE WOULD NOT HARM OTHERS AND OTHERS WOULD NOT BE ABLE TO HARM HIM, GIVEN HIS MENTAL INFIRMITIES AT THAT TIME.

DR. KARTEN ALSO TOLD THIS COURT UNEQUIVOCALLY THAT IT WAS AN INSTITUTIONAL FAILURE FOR MR. HAMMER TO BE WITH MR. MARTI ON APRIL 13TH, 1996.  THAT IS WHAT HE SAID.  HE SAID THIS NEVER SHOULD HAVE HAPPENED AND IT SHOULDN'T HAVE.  NOW THAT DOES NOT

EXCUSE MR. HAMMER'S CONDUCT, BUT IT PUTS THINGS INTO CONTEXT, AS DOES THE FACT THAT NOT ONLY SHOULD HE NOT HAVE BEEN THERE BECAUSE OF THE SINGLE CELL PSYCH STATUS, BUT AT THE TIME MR. HAMMER WAS ON ADMINISTRATIVE DETENTION AND MR. MARTI WAS ON DISCIPLINARY SEGREGATION. THE GOVERNMENT'S OWN WITNESS, I BELIEVE AT THE TIME HE HAD BEEN A LIEUTENANT AT THE PRISON, DEVANE, TESTIFIED THAT PRISONERS WHO WERE ON DISCIPLINARY SEGREGATION ARE NOT ALLOWED TO HOUSE WITH INMATES WHO ARE ON ADMINISTRATIVE DETENTION. AND AT THE END OF THE DAY, IT'S PRETTY -- IT'S UNCONTRADICTED THAT MR. HAMMER AND MR. MARTI FOR THOSE REASONS ALSO SHOULD NOT HAVE BEEN CELLED TOGETHER.

NOW, YOU KNOW, NOT ONLY SHOULD THEY HAVE NOT BEEN CELLED TOGETHER, BUT DR. KARTEN PAINTED A PICTURE OF THE PSYCHIATRIC AND PSYCHOLOGICAL CARE AVAILABLE AT THE USP ALLENWOOD WHEN MR. HAMMER WAS THERE AS VERY DISMAL. THEY HAD TWO PSYCHOLOGISTS FOR 1100 INMATES. TWO. THEY HAD ONE CONTRACT PSYCHIATRIST TO MANAGE THE MEDICATION FOR ALL THE MENTALLY ILL INMATES AT THE INSTITUTION WHO NEEDED MEDICATION. HE APPEARED AT THE PRISON ONCE A MONTH. DR. KARTEN SAID THAT THIS WAS NOT BEST PRACTICE AND HE ADMITTED THAT THE CARE WAS LESS THAN OPTIMAL.

IT'S NOT AS IF DAVID GOT -- HIS CARE WAS

ANY BETTER WHEN HE WAS IN OKLAHOMA.  WE HEARD FROM ATTORNEY BULLOCK WHO TESTIFIED LAST WEEK AND TOLD US ABOUT THE CLASS ACTION LAWSUIT HE WAS INVOLVED IN.  AND INTERESTINGLY, SOME OF HIS CO-COUNSEL IN THAT CASE WERE LAWYERS FROM THE DEPARTMENT OF JUSTICE.  THEY SUED THE STATE OF OKLAHOMA, PARTICULARLY THE DEPARTMENT OF CORRECTIONS, FOR THE LACK OF MEDICAL AND PSYCHOLOGICAL PSYCHIATRIC CARE AT THAT PRISON, AS WELL AS THE CONDITIONS.  AND A FEDERAL DISTRICT JUDGE FOUND THAT THE OKLAHOMA DEPARTMENT OF CORRECTIONS HAD VIOLATED THE 8TH AMENDMENT'S PRESCRIPTION AGAINST CRUEL AND UNUSUAL PUNISHMENT IN PART BECAUSE OF THEIR INADEQUATE MENTAL HEALTH TREATMENT AND THE MANNER IN WHICH IT HOUSED ITS MENTALLY ILL INMATES.

IT WAS NOT ANY BETTER FOR DAVID WHEN HE WAS ON THE STREET FOR THE BRIEF TIME THAT HE WAS BEFORE HE ENDED UP IN PRISON.  DAVID KNEW HE HAD PROBLEMS.  HE SHOWED UP AT A HOSPITAL IN MAY OF 1973.  HE WAS 14 YEARS OLD.  HE REPORTED TO THE CLINICAL PSYCHOLOGIST THAT HE THOUGHT HIS HEAD WAS GOING TO EXPLODE, THOUGHT HE WAS GOING CRAZY.  HE TALKED ABOUT AN INCIDENT OF SEXUAL ABUSE BY AN OLDER MAN.  HE WAS IN SUCH DISARRAY AND WAS SO DISTRAUGHT THAT THE DOCTOR, ARLENE SCHAEFER, AND WE INTRODUCED THIS LETTER EARLIER IN THE PROCEEDINGS, WROTE A LETTER TO DAVID'S PARENTS REQUESTING THAT THEY HELP

HIM GET THE TREATMENT HE NEEDS, TELLING THEM THAT HE HAD SERIOUS MENTAL HEALTH ISSUES.

THE COURT:  YOU HAVE LESS THAN FOUR MINUTES NOW.

MR. MORENO:  I HAVE TALKED ABOUT BRIEFLY THE MENTAL DISABILITIES MR. HAMMER HAD, POST-TRAUMATIC STRESS, THE BORDERLINE PERSONALITY DISORDER.  THOSE DON'T OCCUR IN A VACUUM.  THEY OCCURRED AND THEY ARE THE PRODUCT OF THE ABUSIVE BACKGROUND THAT MR. HAMMER ENDURED.  THEY ARE -- EVERY EXPERT WHO HAS TESTIFIED HAS AGREED THAT BORDERLINE PERSONALITY DISORDER, PERSONALITY DISORDER ARE FEATURES OF THE UPBRINGING THAT MR. HAMMER SUFFERED.

THE EVIDENCE OF BRAIN DAMAGE AGAIN IS UNREBUTTED.

NOW, IT'S OUR OPINION THAT THE ABUSE, THE SEXUAL ABUSE THAT WENT ON IN THE FAMILY BETWEEN THE MOTHER AND DAVID, DAVID AND THE FATHER, AND DAVID AND HIS SISTER, IS NOTHING SHORT OF DEPRAVED.  THERE IS NO OTHER WAY TO PUT IT.  I THINK THAT THE EVIDENCE IS UNEQUIVOCAL ON THAT.  THERE WERE MULTIPLE PLACES IN THE RECORDS WHERE THESE ABUSES WERE DISCUSSED.  WE HEARD ABOUT IT FROM RON MILLER.  WE HEARD ABOUT THE VIOLENCE FROM KATHY NICHOLS.  WE HEARD ABOUT IT FROM BETTY PAYNE. WE HEARD ABOUT IT FROM MARTIN HAMMER.

YOU KNOW, THE GOVERNMENT WANTS TO -- LIKES TO BANG ON ABOUT THE SUPPOSED SCAMS THAT MR. HAMMER HAS BEEN INVOLVED IN OVER THE YEARS. CERTAINLY HE HAS BEEN INVOLVED IN SOME, BUT LET'S NOT FORGET WHERE HE LEARNED THAT. HIS PARENTS HAD HIM AND HIS SIBLINGS OUT COLLECTING FALSELY FOR CHARITIES WHEN THEY WERE 9 YEARS OLD. THEY HAD DAVID STEALING FROM MAILBOXES. HE LEARNED THESE ANTISOCIAL BEHAVIORS AT THE HANDS OF HIS PARENTS.

HE ATTENDED 20 DIFFERENT SCHOOLS. MS. HAINES MADE IT SOUND LIKE HE HAD A GREAT EDUCATIONAL OPPORTUNITY. HE DIDN'T HAVE A SINGLE FRIEND. LOUISE LUCK TESTIFIED SHE COULD NOT FIND A SINGLE FRIEND FROM HIS CHILDHOOD GROWING UP WHO SHE COULD INTERVIEW, BECAUSE HE NEVER HAD THE STABILITY OF GOING TO THE SAME SCHOOL YEAR AFTER YEAR AFTER YEAR.

THEY ALSO WANT TO MAKE IT SOUND AS IF THE CHRISTMAS CARD PROJECT IS A FRAUD. AND FRANKLY I THINK THE EVIDENCE THEY PRESENTED ON THAT IS A COMPLETE RED HERRING. SR. CAMILLE TESTIFIED THAT DAVID SECURES THESE PAINTINGS, MAY PAINT SOME OF THEM. SHE TESTIFIED OTHER PEOPLE PAINT SOME OF THEM AS WELL. WE SEE THAT DAVID BUYS ART SUPPLIES AND $90,000 HAVE BEEN MADE. NUNS WHO ARE THE BENEFICIARIES WHO RUN INCREDIBLE CHARITIES ALL OVER THE WORLD WHO HAVE RECEIVED MONEY FROM THIS

CHRISTMAS CARD PROJECT, CAME IN HERE, DID NOT TESTIFY THAT THEY WERE SCAMMED.  ON THE CONTRARY, THEY TESTIFIED THAT WHAT DAVID'S CHARITY DOES IS PROVIDE THEM THE TOOLS AND THE MONEY TO DO GREAT THINGS FOR UNDERPRIVILEGED KIDS.  THERE IS NO FRAUD HERE.  THERE IS ABSOLUTELY NO FRAUD.  THAT IS A REAL CHARITY.  DAVID DOES REAL WORK FOR IT.  IT GAVE HIM -- SR. CAMILLE SUGGESTED IT TO HIM.  AS YOU RECALL SHE TESTIFIED TO THAT.  IT HAS GIVEN DAVID A CHANCE TO DO SOMETHING HE FEELS GOOD ABOUT.  IT IMPROVES HIS SELF-ESTEEM, WHICH DR. LISAK TESTIFIED WAS NEAR NOTHING.  IT GIVES HIM AN OPPORTUNITY TO DO SOMETHING POSITIVE.

DAVID IS A CHANGED MAN.  IS HE COMPLETELY CHANGED?  NO.  NO ONE IS.  AS SR. CAMILLE NOTED, EVERYONE FALLS FROM GRACE, INCLUDING HER, INCLUDING ME, AND INCLUDING EVERYONE IN THIS ROOM.  BUT DAVID'S CHARITY IS REAL.

AND WE FEEL THAT THIS IS NOT A CASE THAT CALLS FOR EXECUTION.  AS MR. MCHUGH NOTED, MR. HAMMER CAN BE ABLY HOUSED BY THE BUREAU OF PRISONS.  HE RIGHT NOW IS CONSIDERED A LOW SECURITY RISK.

I WOULD ASK THAT IN THE -- THAT WHEN THE COURT CONSIDERS ALL OF THE EVIDENCE, IT GIVES GREAT WEIGHT TO THIS MITIGATING EVIDENCE, TO THE ABUSE AND THE MENTAL ILLNESS, AND ALSO TO THE IMPACT THAT THE

EXECUTION WOULD HAVE ON DAVID'S FAMILY.  DAVID, HIS BROTHER MARTIN, RON MILLER, KATHY NICHOLS, BETTY PAYNE, AND EVEN SR. CAMILLE AND SR. RITA HAVE STATED THAT THEY WOULD BE DEVASTATED BY DAVID'S EXECUTION.

FINALLY, YOUR HONOR, I WOULD NOTE IF THE COURT WILL ALLOW ME THAT A SUPREME COURT JUSTICE ONCE NOTED THAT THE FATAL INFIRMITY OF CAPITAL PUNISHMENT IS THAT IT TREATS MEMBERS OF THE HUMAN RACE AS NONHUMANS, AS OBJECTS TO BE TOYED WITH AND DISCARDED.  AND THAT IS WHAT THE GOVERNMENT WOULD LIKE YOU TO DO WITH MR. HAMMER.  THEY WOULD LIKE YOU TO DISCARD HIM.

WE THINK THE EVIDENCE WE HAVE PRESENTED IN THIS CASE OVERWHELMINGLY PROVES WELL BEYOND A PREPONDERANCE OF THE EVIDENCE THAT MR. HAMMER IS ENTITLED OR SHOULD RECEIVE A SENTENCE OF LIFE WITHOUT POSSIBILITY OF PAROLE AND NOT BE EXECUTED BY LETHAL INJECTION.

THANK YOU.

THE COURT:  MS. HAINES, A SHORT REBUTTAL?

MS. HAINES:  NO, YOUR HONOR.

THE COURT:  ALL RIGHT.  ALL RIGHT.

I'M GOING TO TAKE THIS MATTER UNDER ADVISEMENT AND THE VERDICT WILL BE RENDERED WHEN I FILE A VERDICT SLIP.  SO LOOK FOR IT ON THE DOCKET.  I CAN'T SAY WHEN.  WHEN IT HITS THE DOCKET THAT WILL BE THE

VERDICT OF THE COURT.

NOW YOU ARE GOING TO GET ME A VERDICT SLIP OR AN AGREED UPON VERDICT SLIP BY THE CLOSE OF BUSINESS ON WEDNESDAY. IF YOU CAN'T AGREE ON ONE, FILE ONE OR I WILL PREPARE MY OWN VERDICT SLIP.

WE WILL STAND IN RECESS.

ALL COUNSEL: THANK YOU, YOUR HONOR.

(HEARING CONCLUDED AT 4:50 P.M.)

I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

DATE                         OFFICIAL COURT REPORTER

                             SUZANNE R. WHITE

INDEX


WITNESS                  DIRECT    CROSS    REDIRECT    RECROSS


DR. DAVID LISAK

  BY MR. MORENO

    (QUALIFICATIONS)    3         --       128         --

                        10

  BY MS. HAINES         --        65


VIDEOTAPE OF SARAH GRAY                          PAGE 144

DANNY MOORE

  BY MS. HAINES         148       --       171         --

    BY MR. MCHUGH       --        153      --          175


GOVERNMENT EXHIBITS                              ADMITTED

GC 20 THROUGH 24                                  144

GR 1                                              183


DEFENSE EXHIBITS                                 ADMITTED

500 TO 504                                        65

JM-5                                              144

505                                               145

## $

**$500** [1] - 194:2
**$90,000** [1] - 238:23
**$92,000** [1] - 206:15

## '

**'14** [1] - 222:2
**'80** [1] - 125:24
**'80S** [1] - 215:3
**'90** [1] - 154:20
**'94** [4] - 158:22, 158:23, 170:6
**'95** [1] - 69:22
**'97** [1] - 27:24
**'98** [3] - 77:20, 77:21, 170:21

## 1

**1** [4] - 5:18, 183:9, 183:11, 242:18
**1/12/2012** [1] - 143:14
**10** [8] - 49:9, 114:22, 116:19, 116:22, 117:17, 190:19, 205:15, 242:8
**10-YEAR** [1] - 38:19
**100** [2] - 2:7, 104:7
**1001.1** [1] - 191:12
**103** [1] - 65:3
**109** [1] - 76:12
**10TH** [3] - 54:16, 132:16, 132:25
**11** [8] - 48:11, 63:23, 109:16, 110:6, 117:17, 122:1, 221:23, 222:4
**1100** [1] - 235:18
**11TH** [2] - 82:14, 193:7
**12** [6] - 1:12, 17:17, 26:3, 49:9, 121:16, 137:12
**128** [2] - 194:3, 242:7
**12TH** [1] - 194:13
**13** [4] - 51:3, 101:9, 137:9, 205:19
**130** [10] - 71:24, 72:24, 73:10, 73:21, 76:11, 77:8, 77:22, 77:23, 78:16, 78:17
**132** [2] - 132:18, 132:24
**1331** [1] - 2:4
**13TH** [3] - 65:2, 234:10, 234:23
**14** [14] - 32:1, 51:5, 52:5, 60:15, 110:2,

110:8, 133:11, 134:13, 134:16, 140:3, 140:11, 140:14, 140:16, 236:18
**14-YEAR** [2] - 51:5, 140:19
**143** [1] - 76:6
**144** [3] - 242:11, 242:17, 242:22
**145** [2] - 91:5, 242:23
**145-PAGE** [1] - 77:14
**148** [1] - 242:13
**149** [1] - 185:5
**15** [10] - 17:7, 26:3, 120:23, 134:15, 155:21, 186:18, 219:21, 219:22, 220:4
**150** [2] - 187:20
**150-PAGE** [1] - 72:9
**153** [1] - 242:14
**15B** [1] - 1:8
**16** [6] - 39:22, 124:11, 136:2, 156:7, 167:19, 211:18
**160** [2] - 185:5, 187:20
**161** [1] - 2:10
**170** [2] - 185:17, 200:2
**171** [1] - 242:13
**172** [1] - 185:8
**175** [1] - 242:14
**17101** [1] - 2:7
**17703-0215** [1] - 2:11
**178** [1] - 185:23
**18** [3] - 118:23, 189:21, 212:6
**1800S** [2] - 226:1, 226:6
**183** [1] - 242:18
**18501** [1] - 1:17
**19** [4] - 72:3, 73:12, 77:7, 198:10
**19106** [3] - 1:9, 1:20, 2:14
**192** [1] - 54:17
**193** [1] - 54:17
**1967** [1] - 113:8
**1973** [3] - 109:16, 110:6, 236:18
**1978** [6] - 190:15, 211:24, 212:2, 212:5, 212:11, 213:11
**1981** [1] - 225:23
**1983** [2] - 214:13, 225:23
**1984** [2] - 190:19, 214:13
**1986** [3] - 179:11,

179:19, 180:2
**1990** [4] - 4:25, 154:19, 154:20, 170:5
**1992** [3] - 82:3, 82:22, 83:6
**1993** [3] - 179:11, 179:19, 180:2
**1994** [6] - 149:20, 154:14, 155:14, 160:23, 161:1, 170:4
**1995** [13] - 28:22, 29:1, 29:16, 29:22, 31:13, 32:17, 69:19, 109:23, 110:16, 122:22, 139:21, 140:3
**1996** [10] - 27:24, 65:2, 170:17, 226:16, 231:14, 231:16, 233:4, 233:20, 234:10, 234:23
**1997** [7] - 72:3, 73:1, 73:13, 77:7, 77:17, 125:21, 125:25
**1998** [15] - 69:10, 69:11, 69:15, 69:16, 72:3, 74:2, 74:14, 74:16, 75:8, 92:25, 136:24, 210:11, 214:25, 215:7, 223:1
**1999** [1] - 210:11
**19TH** [1] - 73:1
**1:45** [1] - 128:16

## 2

**2** [4] - 5:18, 102:13, 204:16
**20** [12] - 108:14, 108:16, 143:12, 143:23, 149:1, 149:3, 162:14, 185:18, 213:4, 234:7, 238:10, 242:17
**200** [1] - 210:19
**200-POUND** [1] - 195:9
**2000** [2] - 82:10, 83:6
**2001** [2] - 152:15, 179:25
**2004** [5] - 106:12, 122:16, 122:20, 125:5, 134:20
**2005** [3] - 34:12, 159:12, 161:1
**2009** [1] - 152:15
**2010** [3] - 148:10, 154:20, 155:14

**2012** [2] - 82:14, 229:16
**2013** [7] - 4:25, 12:14, 26:12, 67:6, 67:21, 71:1, 188:1
**2014** [10] - 54:16, 132:17, 132:25, 212:7, 214:6, 215:8, 221:17, 221:23, 223:11, 226:23
**202.1** [1] - 210:19
**20530** [1] - 2:4
**20TH** [1] - 234:1
**21** [4] - 82:24, 82:25, 143:12, 143:23
**215** [1] - 2:10
**215)627-1882** [1] - 1:21
**22** [8] - 82:24, 82:25, 92:25, 136:24, 143:12, 143:24, 185:16, 185:22
**2255** [7] - 32:9, 33:20, 34:25, 66:17, 66:19, 108:25, 139:8
**23** [5] - 97:1, 110:5, 143:13, 143:15, 143:24
**235** [1] - 1:16
**23RD** [2] - 72:3, 74:2
**24** [6] - 108:18, 110:5, 114:19, 143:12, 143:24, 242:17
**25** [2] - 15:3, 126:22
**250** [1] - 234:6
**27-YEAR** [1] - 195:10
**28TH** [1] - 74:8
**29TH** [3] - 69:11, 69:16, 100:12

## 3

**3** [10] - 11:12, 66:9, 69:14, 89:8, 89:9, 131:14, 183:15, 228:15, 228:16, 242:7
**30** [5] - 25:8, 214:13, 225:24, 226:4, 226:10
**300** [1] - 2:7
**309** [1] - 1:16
**30TH** [1] - 67:21
**31** [4] - 29:1, 69:19, 214:12, 214:13
**311** [1] - 1:16
**31ST** [2] - 28:21, 190:15
**32-2** [2] - 192:8, 197:17

**33** [1] - 226:24
**33.2** [1] - 191:19
**35** [1] - 212:5
**36-3** [1] - 200:18
**360** [1] - 229:20
**363** [1] - 229:20
**3:45** [2] - 183:19, 207:3
**3RD** [3] - 69:10, 69:15, 77:2

## 4

**4** [2] - 207:7, 207:9
**40** [1] - 132:3
**40'S** [1] - 135:16
**44** [1] - 124:13
**45** [1] - 183:16
**45-MINUTE** [1] - 207:16
**4:50** [1] - 241:8
**4:96-CR-239** [1] - 1:6
**4TH** [1] - 233:20

## 5

**5** [19] - 5:23, 37:8, 53:11, 53:12, 53:18, 93:1, 93:10, 101:2, 101:6, 106:16, 131:13, 136:18, 136:25, 137:4, 143:18, 143:24, 188:22, 203:25
**50'S** [1] - 135:16
**50-YEAR-OLD** [1] - 118:10
**500** [4] - 3:21, 65:12, 65:18, 242:21
**501** [1] - 11:6
**502** [1] - 26:19
**503** [2] - 28:20, 111:7
**504** [3] - 65:12, 65:18, 242:21
**505** [7] - 144:15, 144:19, 144:24, 157:8, 157:10, 176:21, 242:23
**52** [2] - 185:16, 209:11
**54** [2] - 197:13, 200:9
**540** [1] - 2:14
**55** [1] - 228:12
**5:30** [1] - 183:18
**5TH** [1] - 225:4

## 6

**6** [3] - 27:3, 91:13, 132:17
**6-30-14** [1] - 1:8

**6-FOOT-3** [1] - 195:10
**60** [2] - 9:22, 135:5
**60'S** [1] - 135:16
**601** [1] - 1:20
**65** [2] - 242:9, 242:21

## 7

**7** [7] - 17:15, 17:16, 46:25, 48:11, 49:9, 101:9, 106:15
**70-YEAR-OLD** [1] - 198:2
**7TH** [3] - 29:22, 34:12, 69:19

## 8

**8** [4] - 17:15, 38:19, 49:9, 106:16
**801(D)(2)(C** [2] - 180:21
**806** [4] - 178:8, 179:13, 180:19, 182:4
**85** [1] - 228:13
**8TH** [1] - 236:10

## 9

**9** [5] - 17:15, 38:19, 49:9, 136:2, 238:7
**90** [1] - 76:24
**95** [1] - 114:21
**9TH** [5] - 12:13, 12:14, 71:1, 193:6, 221:17

## A

**ABIDING** [1] - 199:8
**ABILITY** [4] - 58:19, 58:23, 229:4, 229:5
**ABLE** [14] - 25:15, 26:7, 29:5, 41:2, 86:7, 99:13, 120:13, 151:15, 152:16, 181:18, 197:1, 199:8, 205:13, 234:19
**ABLY** [1] - 239:20
**ABOVE-ENTITLED** [1] - 241:12
**ABRAHAM** [2] - 208:3, 208:4
**ABRASION** [1] - 227:23
**ABSENT** [1] - 36:22
**ABSOLUTE** [2] - 88:5, 207:23
**ABSOLUTELY** [13] -

14:9, 15:19, 58:22, 63:20, 65:5, 88:13, 130:25, 140:9, 152:17, 204:3, 215:15, 233:7, 239:5
**ABSTAIN** [1] - 29:6
**ABUSE** [161] - 5:6, 6:5, 9:5, 9:20, 10:3, 10:10, 12:23, 13:2, 13:5, 13:11, 13:13, 13:16, 13:17, 13:18, 14:14, 15:22, 16:6, 16:8, 17:12, 17:14, 17:16, 18:1, 18:5, 18:7, 18:15, 19:9, 19:11, 19:14, 19:20, 22:1, 22:6, 22:14, 22:18, 22:22, 23:4, 23:13, 24:19, 25:1, 26:1, 26:11, 27:7, 29:12, 29:17, 30:8, 31:16, 31:25, 32:14, 32:19, 33:7, 35:25, 36:10, 36:15, 37:1, 37:18, 37:19, 37:21, 39:7, 39:17, 40:2, 40:6, 40:12, 41:25, 42:1, 42:4, 44:3, 44:4, 44:9, 44:12, 45:2, 46:17, 49:1, 49:3, 49:4, 52:5, 54:5, 54:14, 55:12, 55:25, 57:4, 57:8, 57:25, 59:22, 60:8, 60:11, 61:25, 62:1, 64:25, 70:12, 70:19, 81:17, 81:24, 82:3, 83:20, 86:21, 86:23, 87:3, 87:5, 87:11, 87:16, 87:18, 90:20, 94:11, 96:19, 99:3, 104:17, 105:8, 105:16, 105:19, 106:4, 107:6, 107:8, 108:5, 108:11, 109:17, 109:24, 110:17, 111:10, 111:12, 111:14, 111:16, 111:19, 112:22, 118:23, 119:5, 120:17, 122:22, 123:24, 124:7, 125:6, 125:11, 126:4, 126:7, 126:8, 126:14, 126:15, 126:17, 126:20, 129:7, 129:11, 129:19, 129:20, 130:4, 130:14, 132:1, 134:6,

135:15, 138:8, 138:18, 141:3, 202:4, 202:15, 203:18, 232:8, 236:22, 237:16, 237:17, 239:24
**ABUSED** [65] - 9:1, 15:8, 16:10, 18:22, 30:3, 30:24, 36:3, 36:4, 36:5, 36:7, 36:12, 36:20, 39:23, 39:24, 40:9, 51:1, 51:8, 53:10, 54:2, 54:6, 54:8, 55:11, 57:17, 59:5, 61:11, 83:7, 83:12, 83:17, 83:21, 84:3, 84:8, 84:17, 85:1, 85:20, 85:21, 86:12, 87:23, 90:22, 93:16, 94:4, 94:5, 94:7, 94:13, 94:22, 95:5, 96:18, 96:19, 97:20, 98:12, 98:13, 105:11, 106:15, 107:3, 107:24, 114:12, 114:24, 115:17, 116:23, 120:24, 121:14, 122:25, 123:23, 126:24, 129:3
**ABUSERS** [2] - 130:5, 130:23
**ABUSES** [2] - 16:22, 237:22
**ABUSING** [3] - 40:1, 56:4, 105:2
**ABUSIVE** [2] - 46:1, 237:9
**ACCEPT** [11] - 51:7, 76:9, 98:25, 107:13, 110:20, 116:8, 120:1, 126:22, 146:12, 146:15, 220:11
**ACCEPTANCE** [3] - 207:12, 211:10, 211:12
**ACCEPTED** [4] - 200:6, 200:8, 207:24, 208:24
**ACCEPTS** [1] - 209:23
**ACCESS** [2] - 60:23, 192:17
**ACCIDENT** [1] - 200:17
**ACCOMPANIED** [1] - 52:9
**ACCOMPLISHING** [1] - 58:18

**ACCORDING** [12] - 71:7, 89:8, 102:22, 118:13, 121:5, 121:8, 121:20, 122:3, 122:13, 192:18, 198:21, 199:12
**ACCOUNT** [4] - 20:21, 21:4, 22:10, 127:7
**ACCOUNTS** [1] - 50:17
**ACCURACY** [1] - 22:9
**ACCURATE** [3] - 142:22, 143:1, 180:5
**ACCUSED** [2] - 105:2, 203:24
**ACKNOWLEDGE** [1] - 126:6
**ACKNOWLEDGED** [1] - 77:6
**ACT** [7] - 16:5, 16:6, 16:16, 36:10, 190:1, 227:18, 231:12
**ACTION** [1] - 236:3
**ACTIONS** [3] - 208:24, 209:1, 209:23
**ACTIVATED** [1] - 59:20
**ACTIVITIES** [1] - 178:7
**ACTIVITY** [2] - 83:24, 178:5
**ACTOR** [1] - 16:8
**ACTS** [4] - 23:13, 37:22, 53:7, 179:18
**ACTUAL** [2] - 97:21, 192:3
**ADD** [1] - 134:4
**ADDICTED** [1] - 202:1
**ADDITION** [3] - 83:20, 125:13, 190:3
**ADDITIONAL** [4] - 11:15, 67:10, 67:16, 191:20
**ADDITIONALLY** [1] - 53:22
**ADDRESS** [8] - 10:18, 19:22, 29:17, 53:24, 128:24, 207:12, 207:14, 215:14
**ADDS** [1] - 28:4
**ADHERE** [1] - 145:21
**ADHESIONS** [1] - 63:3
**ADJECTIVE** [1] - 13:12
**ADMINISTERED** [1] - 79:5
**ADMINISTRATIVE** [2] - 235:4, 235:10
**ADMINISTRATORS**

[1] - 6:18
**ADMISSIBLE** [2] - 181:22, 182:8
**ADMISSION** [4] - 10:2, 160:8, 164:17, 164:18
**ADMISSIONS** [3] - 178:5, 181:19, 191:20
**ADMIT** [3] - 99:24, 182:10, 182:24
**ADMITS** [5] - 161:25, 178:7, 179:19, 196:24, 203:11
**ADMITTED** [17] - 65:16, 65:19, 77:3, 143:24, 144:20, 144:24, 182:6, 182:14, 183:11, 202:6, 206:3, 214:18, 214:20, 216:18, 235:23, 242:16, 242:20
**ADMITTEDLY** [1] - 178:7
**ADOLESCENCE** [4] - 13:20, 50:23, 50:25, 51:12
**ADOLESCENT** [2] - 30:3, 39:3
**ADRENALINE** [1] - 59:7
**ADULT** [5] - 39:4, 42:23, 60:3, 138:18, 228:23
**ADULTHOOD** [1] - 51:13
**ADVANTAGE** [1] - 76:21
**ADVICE** [4] - 145:22, 146:11, 146:12, 146:15
**ADVISEMENT** [1] - 240:23
**ADVISER** [1] - 210:12
**ADVISOR** [1] - 210:9
**ADVOCATE** [2] - 184:5, 199:2
**AFFECTED** [1] - 30:16
**AFFLICTED** [1] - 50:19
**AFGHANISTAN** [1] - 42:18
**AFTERNOON** [10] - 128:19, 128:22, 128:23, 145:11, 145:12, 148:4, 148:5, 153:17, 153:18, 230:4
**AG** [1] - 225:17

**AGE** [19] - 26:3, 32:1, 48:11, 51:3, 51:4, 57:14, 58:6, 106:19, 116:22, 117:17, 120:20, 131:9, 131:13, 131:17, 140:3, 140:11, 199:16, 203:25
**AGED** [3] - 36:21, 135:6, 135:7
**AGENCIES** [2] - 6:20, 6:21
**AGENDA** [1] - 102:15
**AGENT** [18] - 208:8, 208:22, 209:5, 215:8, 216:4, 216:6, 216:9, 216:22, 217:1, 218:9, 219:5, 219:8, 219:22, 220:16, 220:17, 224:6
**AGENTS** [1] - 191:14
**AGES** [1] - 101:9
**AGGRAVATING** [5] - 184:6, 190:24, 195:18, 224:23, 225:19
**AGGRAVATION** [1] - 211:17
**AGGRAVATOR** [8] - 190:4, 190:25, 196:19, 214:3, 215:15, 224:18, 224:21, 225:1
**AGGRAVATORS** [3] - 184:9, 195:21, 211:19
**AGO** [10] - 10:20, 32:10, 80:25, 123:17, 168:12, 168:22, 174:16, 187:4, 212:5, 226:24
**AGREE** [16] - 70:13, 70:18, 103:16, 105:1, 117:2, 122:19, 125:20, 162:9, 165:13, 165:19, 188:10, 188:14, 188:25, 189:1, 229:7, 241:4
**AGREEABLE** [1] - 144:10
**AGREED** [6] - 146:12, 188:12, 188:24, 227:20, 237:11, 241:3
**AGREEMENT** [2] - 186:3, 186:6
**AGUIRAE** [2] - 128:10, 128:13

**AHEAD** [4] - 25:18, 48:6, 78:25
**AIDED** [1] - 1:23
**AIDS** [1] - 200:19
**AILMENTS** [2] - 63:7, 63:12
**AIR** [1] - 7:22
**AIRPORT** [2] - 149:16, 158:18
**ALBERT** [7] - 117:17, 117:18, 117:19, 117:20, 117:25, 121:10, 121:17
**ALBUQUERQUE** [2] - 4:9, 10:14
**ALIKE** [2] - 37:10, 231:22
**ALLEGATION** [1] - 56:8
**ALLEGATIONS** [4] - 33:15, 90:19, 90:21, 90:23
**ALLEGED** [1] - 129:3
**ALLEN** [8] - 152:12, 167:15, 167:20, 167:22, 168:5, 168:17, 168:21, 169:2
**ALLENWOOD** [6] - 28:13, 199:5, 209:7, 233:11, 233:14, 235:17
**ALLOW** [2] - 183:16, 240:6
**ALLOWED** [4] - 75:10, 167:3, 222:23, 235:9
**ALLOWING** [1] - 169:16
**ALLUDED** [2] - 29:12, 53:8
**ALLUDES** [1] - 30:23
**ALLUDING** [2] - 53:4, 98:15
**ALLUSION** [4] - 31:2, 31:25, 81:14, 122:21
**ALMOST** [16] - 16:4, 16:13, 18:7, 21:5, 21:10, 25:8, 36:7, 40:14, 45:23, 51:4, 125:9, 138:15, 156:24, 228:10, 232:15
**ALONE** [3] - 20:5, 52:11, 199:11
**ALTER** [3] - 101:19, 101:21, 103:7
**ALTERNATIVES** [1] - 37:5
**ALTERS** [1] - 20:7
**AMANDA** [1] - 2:2

**AMBIVALENCE** [1] - 30:25
**AMBIVALENT** [1] - 99:6
**AMENDMENT'S** [1] - 236:11
**AMERICA** [1] - 1:3
**AMERICAN** [2] - 5:4, 5:8
**AMERICANS** [1] - 204:17
**AMOUNT** [6] - 16:10, 36:9, 70:13, 70:17, 155:16, 191:4
**AMYGDALA** [3] - 20:25, 42:9, 42:15
**ANALLY** [3] - 117:20, 118:2, 118:13
**ANDREW** [30] - 65:3, 189:21, 189:23, 189:25, 190:2, 192:4, 192:9, 192:11, 193:5, 193:15, 193:18, 193:20, 194:5, 194:6, 194:9, 194:13, 195:10, 195:23, 196:5, 196:8, 198:5, 200:23, 205:1, 209:13, 209:21, 210:15, 218:20, 219:18, 219:23, 219:24
**ANDREW'S** [3] - 196:3, 210:23, 211:1
**ANGER** [3] - 45:6, 230:24, 231:1
**ANGRY** [2] - 196:4, 232:17
**ANKLES** [1] - 201:12
**ANNE** [1] - 2:5
**ANNUAL** [2] - 155:9, 155:10
**ANONYMOUS** [2] - 114:7, 199:5
**ANSWER** [11] - 24:1, 31:19, 80:8, 99:13, 102:6, 110:4, 133:6, 133:11, 166:6, 195:17, 213:21
**ANTERIOR** [1] - 228:21
**ANTISOCIAL** [1] - 238:8
**ANXIETY** [1] - 231:1
**ANYWAY** [1] - 135:1
**APART** [2] - 94:16, 94:17
**APPARENT** [2] -

141:8, 197:16
**APPEAL** [2] - 75:11, 184:15
**APPEALS** [1] - 75:4
**APPEAR** [4] - 41:7, 115:9, 143:1, 179:9
**APPEARANCES** [2] - 1:13, 2:1
**APPEARED** [2] - 86:17, 235:21
**APPENDECTOMY** [1] - 62:25
**APPLICABLE** [1] - 180:19
**APPLICATIONS** [1] - 7:8
**APPLIES** [1] - 9:6
**APPLY** [3] - 47:17, 179:15, 181:4
**APPOINTMENTS** [1] - 226:12
**APPROACH** [7] - 3:16, 11:1, 26:14, 28:15, 68:8, 132:21, 136:19
**APPROPRIATE** [8] - 41:2, 181:24, 187:23, 189:5, 189:17, 195:16, 227:4, 234:4
**APPROVED** [1] - 176:13
**APPROXIMATE** [1] - 170:8
**APRIL** [7] - 65:2, 193:6, 193:7, 194:13, 233:4, 234:10, 234:23
**AREA** [4] - 29:13, 37:10, 162:21, 223:4
**AREAS** [1] - 41:14
**ARENA** [1] - 193:24
**ARGUING** [1] - 123:1
**ARGUMENT** [4] - 123:9, 207:6, 207:17, 222:23
**ARGUMENTS** [3] - 183:21, 183:24, 229:24
**ARLENE** [1] - 236:23
**ARMY** [1] - 7:22
**AROUSED** [2] - 39:12, 39:15
**ARRESTED** [1] - 61:6
**ARRIVED** [2] - 192:11, 233:11
**ART** [35] - 150:13, 150:20, 151:10, 151:12, 151:16, 151:23, 152:8, 152:15, 152:23,

153:2, 156:6, 157:5, 157:16, 158:8, 162:10, 162:11, 162:21, 166:20, 167:14, 167:16, 167:20, 172:4, 173:2, 173:8, 174:20, 175:6, 175:19, 175:24, 176:2, 176:8, 176:13, 177:3, 177:6, 177:10, 238:23
**ARTERY** [1] - 228:21
**ARTHRITIS** [1] - 228:23
**ARTIST** [4] - 199:3, 204:7, 205:18, 205:24
**ASCRIBED** [1] - 129:7
**ASHAMED** [1] - 41:5
**ASIDE** [3] - 46:20, 94:15, 95:2
**ASPECT** [4] - 25:23, 35:5, 88:21, 138:16
**ASPECTS** [3] - 21:21, 207:13, 207:15
**ASSAULT** [5] - 5:17, 6:16, 7:14, 23:13, 24:20
**ASSAULTS** [3] - 6:24, 135:20, 135:21
**ASSEMBLE** [1] - 194:16
**ASSEMBLING** [1] - 194:22
**ASSERTION** [1] - 112:18
**ASSESS** [3] - 25:5, 25:7, 105:8
**ASSESSING** [4] - 24:24, 33:14, 104:9, 127:8
**ASSESSMENT** [1] - 39:11
**ASSESSMENTS** [4] - 35:19, 104:13, 105:8, 178:9
**ASSIGNED** [8] - 154:4, 155:12, 155:17, 155:22, 155:24, 158:12, 171:8, 171:18
**ASSIGNMENT** [1] - 159:24
**ASSISTANT** [1] - 4:22
**ASSOCIATED** [1] - 6:23
**ASSOCIATES** [1] - 34:5

**ASSOCIATING** [1] - 50:4

**ASSOCIATION** [3] - 5:5, 5:8, 61:25

**ASSUALT** [2] - 7:3, 24:10

**ASSUME** [7] - 37:11, 71:4, 90:8, 105:17, 106:2, 114:25, 151:22

**ASSUMING** [1] - 161:7

**ASSUMPTION** [1] - 92:11

**ATLANTA** [3] - 193:13, 194:1, 194:7

**ATTACHMENT** [2] - 15:16, 15:17

**ATTACKED** [1] - 182:7

**ATTACKING** [1] - 181:21

**ATTEMPT** [2] - 144:4, 204:23

**ATTEMPTED** [5] - 62:2, 128:25, 190:9, 211:3, 211:20

**ATTEMPTS** [4] - 61:16, 61:21, 226:9, 226:14

**ATTENDED** [1] - 238:10

**ATTENTION** [23] - 21:20, 47:7, 48:21, 48:23, 59:15, 78:5, 78:7, 78:12, 79:16, 79:21, 80:1, 80:10, 81:1, 83:4, 89:17, 91:7, 91:10, 96:9, 97:19, 186:7, 197:22, 199:20, 206:23

**ATTORNEY** [1] - 236:2

**ATTORNEYS** [4] - 1:15, 38:7, 75:11, 145:20

**AUDIENCE** [3] - 6:10, 6:17, 7:1

**AUGUST** [7] - 28:21, 29:1, 69:10, 69:15, 69:19, 82:3, 82:22

**AUTHOR** [1] - 28:24

**AUTHORIZED** [4] - 180:25, 181:1, 181:3, 182:1

**AUTHORIZING** [1] - 182:3

**AUTOBIOGRAPHY** [1] - 66:21

**AVAILABLE** [10] - 60:22, 75:14, 75:25,

86:5, 86:8, 86:9, 183:17, 220:18, 220:20, 235:17

**AVERAGE** [1] - 199:4

**AWARE** [44] - 36:15, 49:22, 53:25, 74:19, 81:23, 82:2, 82:5, 82:6, 82:9, 82:13, 83:8, 83:9, 83:11, 96:17, 114:23, 115:10, 115:16, 127:2, 149:14, 156:2, 157:18, 157:20, 160:2, 162:9, 162:11, 162:18, 162:20, 162:23, 166:20, 169:13, 169:14, 169:18, 170:16, 170:20, 175:19, 175:24, 176:11, 177:12, 208:15, 211:18, 212:13, 213:25, 214:8, 216:12

**AWARENESS** [1] - 8:25

**AWFUL** [1] - 121:2

# B

**BACHELOR'S** [1] - 4:12

**BACKGROUND** [8] - 4:11, 14:1, 29:10, 39:18, 60:12, 181:9, 203:2, 237:9

**BACKTRACK** [1] - 42:2

**BAD** [7] - 57:22, 57:23, 58:11, 68:14, 153:4, 179:18, 202:10

**BADLY** [1] - 57:22

**BALANCE** [1] - 88:6

**BANG** [1] - 238:2

**BAPTIST** [4] - 190:14, 197:25, 211:24, 212:2

**BARELY** [1] - 201:11

**BASE** [1] - 7:8

**BASEBALL** [1] - 201:21

**BASED** [14] - 4:8, 10:14, 15:3, 55:2, 70:7, 76:3, 143:3, 188:15, 194:9, 196:19, 198:12, 221:18, 222:7, 222:14

**BASELINE** [2] - 59:13, 59:21

**BASEMENT** [1] - 119:8

**BASIC** [2] - 7:3, 35:25

**BASIS** [5] - 14:8, 81:18, 92:12, 97:11, 198:9

**BATH** [1] - 38:19

**BATHROOM** [1] - 47:2

**BATHTUB** [1] - 47:2

**BATTLE** [1] - 35:20

**BEAT** [1] - 44:14

**BEATER** [1] - 44:16

**BEATINGS** [8] - 30:4, 44:18, 44:20, 44:22, 232:22, 232:23, 232:24

**BECAME** [2] - 149:14, 156:1

**BECOME** [1] - 153:25

**BECOMES** [4] - 40:14, 59:2, 133:22, 204:18

**BED** [3] - 27:13, 53:15, 136:2

**BEDROOM** [1] - 47:5

**BEGAN** [4] - 14:21, 46:24, 47:1, 134:6

**BEGIN** [1] - 41:13

**BEGINNING** [6] - 5:23, 47:12, 111:3, 207:23, 207:24, 221:17

**BEGINS** [1] - 183:22

**BEGUN** [3] - 14:22, 26:2, 29:17

**BEHAVES** [1] - 64:22

**BEHAVIOR** [8] - 37:22, 50:24, 96:3, 138:1, 138:5, 202:23, 203:14

**BEHAVIORS** [8] - 30:17, 50:25, 94:19, 102:2, 102:9, 102:15, 102:19, 238:8

**BEHIND** [4] - 27:17, 104:23, 105:5, 199:9

**BELABOR** [1] - 189:18

**BELIE** [1] - 98:21

**BELIEVES** [2] - 184:1, 204:4

**BELL** [1] - 109:8

**BELLEVUE** [1] - 4:18

**BELONGINGS** [1] - 198:25

**BENEFICIARIES** [1] - 238:24

**BENEFITS** [1] - 82:11

**BEST** [5] - 17:13, 46:25, 110:4, 191:10, 235:23

**BETTER** [3] - 68:14, 236:1, 236:15

**BETTY** [5] - 11:22, 46:11, 202:17, 237:24, 240:2

**BETWEEN** [21] - 53:17, 54:21, 55:4, 55:15, 61:25, 70:14, 70:19, 80:19, 88:18, 109:15, 109:22, 131:5, 131:6, 135:18, 158:23, 160:23, 161:1, 167:13, 179:19, 224:2, 237:17

**BEVINS** [4] - 198:3, 227:12, 227:21

**BEYOND** [19] - 25:13, 47:21, 58:7, 98:14, 171:23, 172:10, 173:3, 184:7, 184:11, 185:12, 190:5, 190:12, 196:17, 215:18, 216:1, 218:15, 225:13, 225:19, 240:13

**BIG** [2] - 72:9, 106:25

**BIGGER** [1] - 193:15

**BIKES** [1] - 201:20

**BILLY** [9] - 152:12, 167:14, 167:15, 167:20, 167:22, 168:4, 168:16, 168:21, 169:2

**BIOLOGICAL** [1] - 43:4

**BIPOLAR** [2] - 142:25, 203:5

**BIRTH** [3] - 109:22, 110:16, 140:3

**BIRTHDAY** [1] - 201:20

**BIRTHDAYS** [1] - 201:18

**BIT** [13] - 36:11, 45:3, 53:23, 56:5, 100:21, 125:7, 130:13, 138:11, 138:13, 140:21, 148:21, 153:20, 207:8

**BLACK** [1] - 202:7

**BLAME** [4] - 16:11, 200:13, 200:16, 230:11

**BLAMED** [1] - 200:20

**BLANCHE** [1] - 194:4

**BLANKET** [1] - 106:22

**BLEEDING** [1] - 232:23

**BLOW** [1] - 59:4

**BLOWN** [1] - 122:5

**BLUE** [1] - 232:24

**BLUMBERG** [21] - 11:20, 62:6, 103:6, 103:10, 104:1, 105:25, 107:23, 108:7, 109:15, 110:21, 114:10, 114:12, 114:23, 115:10, 117:7, 117:10, 122:17, 122:19, 123:5, 134:19, 135:20

**BLUMBERG'S** [6] - 66:19, 108:22, 109:10, 114:17, 118:17, 134:20

**BOARDS** [1] - 5:5

**BOAT** [1] - 120:13

**BODILY** [1] - 189:24

**BODY** [8] - 42:22, 42:24, 42:25, 43:2, 43:6, 47:3, 59:5, 63:17

**BOND** [2] - 49:5, 49:6

**BONDAGE** [1] - 216:15

**BONE** [1] - 58:6

**BONES** [1] - 202:6

**BOOK** [17] - 106:7, 106:12, 107:23, 108:8, 115:14, 118:17, 119:12, 125:2, 178:6, 178:13, 179:10, 179:19, 180:4, 180:5, 180:6, 182:21, 182:25

**BOOKS** [1] - 201:21

**BOP** [14] - 168:22, 169:14, 169:16, 195:6, 220:17, 226:10, 227:24, 228:11, 228:13, 229:1, 229:16, 233:5, 233:22

**BORDERLINE** [8] - 49:23, 50:3, 50:5, 51:19, 62:15, 231:19, 237:7, 237:11

**BORNE** [1] - 227:14

**BOSS** [3] - 59:19, 223:15, 223:16

**BOSSES** [1] - 165:6

**BOSTON** [3] - 4:23,

4:24

**BOTTOM** [1] - 91:17
**BOUGHT** [1] - 166:21
**BOUNDARIES** [1] - 134:1
**BOX** [2] - 1:16, 2:10
**BOY** [1] - 140:19
**BOYS** [1] - 18:8
**BRA** [1] - 47:6
**BRAGGING** [1] - 227:17
**BRAIDED** [7] - 194:17, 195:4, 216:2, 216:7, 216:20, 217:12, 217:17
**BRAIDING** [3] - 215:24, 217:3, 217:20
**BRAIDS** [1] - 195:1
**BRAIN** [8] - 14:5, 20:10, 20:12, 21:1, 42:8, 59:6, 231:16, 237:14
**BRAIN'S** [1] - 20:8
**BREAK** [8] - 48:3, 65:9, 65:21, 127:15, 183:20, 207:10, 229:10
**BREASTS** [7] - 27:17, 47:8, 47:9, 47:11, 47:13, 94:19
**BREWER** [1] - 209:10
**BRIEF** [2] - 28:10, 236:16
**BRIEFED** [2] - 184:2, 184:13
**BRIEFLY** [6] - 3:17, 11:9, 37:15, 128:2, 232:3, 237:5
**BRING** [9] - 52:22, 73:5, 83:4, 91:7, 96:9, 97:18, 110:10, 191:19, 222:13
**BRINGING** [2] - 36:16, 60:25
**BRINGS** [5] - 52:24, 100:11, 199:24, 202:25, 203:17
**BRISTLE** [1] - 44:14
**BRISTLECONE** [4] - 8:21, 8:24, 9:10, 135:12
**BROACH** [1] - 41:13
**BROCHURE** [1] - 151:17
**BROKE** [1] - 41:3
**BROKEN** [2] - 199:12, 202:6
**BROTHER** [22] - 12:8, 18:24, 25:15, 39:20,

54:15, 55:5, 71:9, 79:7, 80:12, 83:7, 83:17, 84:16, 85:21, 88:3, 90:6, 90:9, 126:25, 133:7, 141:25, 203:9, 205:15, 240:2
**BROUGHT** [10] - 78:5, 78:7, 79:15, 79:21, 80:1, 80:10, 80:25, 91:9, 186:7, 213:22
**BRUISES** [2] - 44:18, 232:22
**BRUNT** [1] - 71:15
**BRUSHES** [1] - 44:15
**BUCK** [2] - 160:11, 160:12
**BUD** [1] - 39:25
**BUDDIES** [1] - 193:2
**BUFFER** [2] - 44:3, 58:15
**BUILDING** [1] - 156:20
**BUILT** [2] - 226:1, 226:5
**BULLET** [1] - 97:13
**BULLOCK** [1] - 236:2
**BUN** [1] - 206:13
**BUNCH** [5] - 221:24, 222:9, 222:20, 222:25, 223:21
**BUNCH'S** [1] - 222:7
**BURDEN** [1] - 225:21
**BUREAU** [13] - 148:7, 148:9, 148:25, 174:9, 196:24, 198:11, 198:19, 200:13, 228:13, 228:18, 229:17, 229:21, 239:20
**BURNS** [1] - 202:7
**BURST** [1] - 43:12
**BUS** [2] - 169:23, 170:11
**BUSINESS** [2] - 212:23, 241:4
**BUST** [1] - 43:12
**BUTLER** [1] - 12:1
**BUTTOCKS** [1] - 53:17
**BUY** [1] - 156:5
**BUYS** [1] - 238:23

---

## C

**CAMILLE** [14] - 179:22, 200:17, 205:20, 206:9, 210:7, 210:13, 210:20, 210:23, 211:2, 238:20,

239:7, 239:14, 240:3
**CAMP** [3] - 156:21, 156:22, 156:25
**CANNOT** [5] - 199:13, 199:21, 209:25, 230:12, 234:13
**CAPABLE** [1] - 58:17
**CAPACITY** [3] - 7:13, 59:6, 59:7
**CAPITAL** [14] - 2:3, 8:2, 8:5, 8:10, 8:15, 24:8, 126:5, 180:15, 214:22, 222:15, 222:16, 224:5, 224:20, 240:7
**CAPTURES** [1] - 13:21
**CAR** [5] - 53:13, 96:4, 119:9, 131:11, 131:12
**CARBS** [1] - 204:20
**CARD** [15] - 144:7, 150:2, 151:16, 163:7, 168:17, 169:3, 178:18, 179:23, 193:1, 205:8, 206:7, 212:23, 238:18, 239:1
**CARDS** [7] - 150:8, 151:13, 151:18, 152:1, 168:18, 205:14, 206:18
**CARE** [9] - 201:25, 202:2, 228:15, 228:16, 229:8, 235:16, 235:23, 235:25, 236:8
**CAREER** [2] - 7:12, 149:6
**CAREFUL** [3] - 191:22, 191:24, 203:18
**CAREFULLY** [1] - 25:5
**CARETAKERS** [1] - 57:17
**CARLYLE** [3] - 208:8, 216:22, 217:1
**CARS** [2] - 96:2, 96:3
**CARTE** [1] - 194:4
**CASE** [105] - 7:19, 8:15, 10:23, 11:10, 12:7, 12:16, 13:13, 13:15, 14:8, 18:24, 22:24, 24:14, 24:15, 24:24, 25:14, 25:22, 26:12, 26:23, 28:9, 31:21, 33:15, 35:15, 35:19, 36:1, 36:9,

38:2, 38:4, 40:9, 43:24, 46:7, 49:22, 50:6, 60:23, 62:9, 77:2, 90:13, 104:12, 130:6, 130:23, 131:25, 132:13, 132:25, 140:15, 141:11, 145:15, 146:21, 147:6, 152:14, 170:16, 170:20, 178:10, 180:12, 185:2, 185:3, 185:13, 185:16, 185:21, 186:21, 187:21, 187:24, 189:5, 189:17, 195:22, 197:4, 198:8, 199:1, 200:12, 203:12, 203:16, 205:11, 207:14, 207:15, 211:17, 211:25, 213:24, 214:3, 214:11, 214:12, 214:18, 216:6, 219:21, 220:10, 220:15, 220:17, 220:21, 221:5, 222:1, 222:6, 223:17, 225:4, 225:6, 225:8, 226:9, 226:16, 227:6, 230:13, 231:11, 232:1, 232:14, 233:10, 236:4, 239:18, 240:13
**CASE-BY-CASE** [1] - 14:8
**CASES** [29] - 7:9, 7:10, 7:14, 7:22, 7:25, 8:2, 8:5, 8:10, 17:22, 22:5, 23:3, 23:4, 23:20, 23:21, 24:7, 24:8, 24:10, 24:12, 24:15, 24:20, 34:1, 37:14, 43:18, 47:10, 122:6, 126:3, 126:5, 185:4
**CATASTROPHIC** [3] - 35:24, 37:6, 53:3
**CATASTROPHICALLY** [1] - 19:6
**CATEGORIZED** [1] - 105:15
**CATEGORY** [5] - 16:2, 126:20, 205:5, 233:17, 233:18
**CAUGHT** [2] - 18:14, 206:2
**CAUSED** [1] - 45:9

**CAUTION** [1] - 224:14
**CELEBRATED** [1] - 201:17
**CELL** [20] - 65:3, 152:9, 175:5, 193:5, 196:25, 208:5, 208:21, 216:25, 219:6, 219:19, 220:6, 227:19, 230:16, 231:15, 233:6, 233:21, 233:23, 234:11, 234:13, 235:3
**CELLED** [5] - 167:1, 174:24, 200:15, 235:13, 235:15
**CELLMATE** [2] - 227:13, 234:14
**CELLS** [1] - 216:8
**CEMENTS** [1] - 17:5
**CENTER** [1] - 2:14
**CEREMONY** [2] - 210:22, 210:24
**CERTAIN** [4] - 23:17, 88:25, 99:7, 188:4
**CERTAINLY** [18] - 14:3, 28:2, 33:16, 39:13, 60:1, 75:18, 75:25, 104:15, 105:3, 106:7, 129:19, 130:4, 132:4, 133:3, 142:4, 142:18, 185:2, 238:4
**CERTAINTY** [3] - 12:21, 13:4, 223:16
**CERTIFICATE** [3] - 157:11, 157:14, 174:19
**CERTIFICATES** [2] - 144:16, 144:17
**CERTIFIED** [2] - 190:16, 190:20
**CERTIFY** [1] - 241:10
**CHALLENGE** [1] - 31:19
**CHALLENGES** [2] - 22:13, 203:4
**CHALLENGING** [3] - 22:9, 22:15, 125:5
**CHANCE** [4] - 196:11, 196:12, 230:18, 239:9
**CHANCES** [1] - 196:13
**CHANGE** [3] - 14:6, 141:11, 152:16
**CHANGED** [4] - 70:7, 223:10, 239:13, 239:14
**CHAPTER** [1] - 218:14

**CHARACTER** [1] - 179:21

**CHARACTERISTICS** [1] - 6:3

**CHARACTERIZATIO NS** [1] - 172:18

**CHARACTERIZE** [2] - 70:16, 129:16

**CHARACTERIZED** [2] - 29:10, 228:17

**CHARACTERIZING** [1] - 56:25

**CHARGE** [2] - 217:7, 217:9

**CHARGED** [1] - 189:24

**CHARGES** [1] - 227:25

**CHARITIES** [3] - 206:13, 238:6, 238:24

**CHARITY** [3] - 239:3, 239:6, 239:17

**CHECK** [1] - 166:12

**CHERISH** [1] - 210:21

**CHESTNUT** [1] - 2:7

**CHIEF** [1] - 233:10

**CHILD** [43] - 5:6, 15:11, 15:20, 16:5, 16:9, 16:15, 16:21, 16:24, 18:17, 18:20, 18:22, 29:12, 30:2, 36:20, 39:3, 39:21, 43:17, 44:4, 44:8, 45:5, 45:8, 45:11, 45:12, 45:25, 46:2, 48:24, 49:8, 49:9, 49:18, 51:12, 57:17, 57:20, 57:25, 58:12, 59:12, 59:15, 99:3, 112:22, 138:17, 201:5, 201:12, 232:25

**CHILD'S** [1] - 49:4

**CHILDHOOD** [17] - 6:5, 9:20, 12:22, 13:1, 13:20, 22:14, 23:2, 30:15, 36:6, 37:18, 37:19, 56:15, 61:25, 114:13, 114:25, 201:14, 238:14

**CHILDHOODS** [1] - 13:25

**CHILDREN** [14] - 9:1, 15:15, 15:25, 16:9, 16:14, 18:7, 18:11, 18:12, 18:13, 18:20, 57:15, 71:14, 79:5, 201:10

**CHIPS** [1] - 197:24

**CHOCK** [1] - 219:2

**CHOOSE** [1] - 86:4

**CHOSE** [3] - 220:18, 220:19, 220:23

**CHRISTMAS** [14] - 144:7, 150:2, 150:8, 151:13, 151:16, 163:6, 169:3, 179:23, 201:19, 205:8, 205:13, 206:7, 238:18, 239:1

**CHRISTOPHER** [1] - 221:25

**CHRONIC** [5] - 59:1, 59:22, 61:6, 228:19, 228:25

**CHURCH** [1] - 201:17

**CID** [1] - 6:20

**CIRCLE** [1] - 210:21

**CIRCUIT** [2] - 77:2, 225:4

**CIRCULATE** [1] - 20:10

**CIRCUMSTANCE** [1] - 142:5

**CIRCUMSTANCES** [5] - 20:22, 25:10, 25:12, 184:7, 195:20

**CITE** [2] - 225:22, 225:23

**CITIZENS** [1] - 202:21

**CLAIM** [2] - 94:12, 122:20

**CLAIMED** [1] - 97:19

**CLAIMS** [2] - 87:5, 129:3

**CLARITY** [1] - 134:4

**CLASS** [13] - 59:14, 157:16, 157:18, 158:8, 162:10, 162:11, 162:21, 174:20, 174:21, 177:14, 177:19, 224:21, 236:3

**CLASSEN** [7] - 191:16, 192:23, 193:4, 221:12, 221:13, 224:12

**CLASSEN'S** [1] - 192:24

**CLASSES** [3] - 174:25, 177:6, 177:10

**CLASSIC** [2] - 46:23, 48:23

**CLASSIFY** [1] - 129:11

**CLASSROOM** [3] - 59:9, 59:10, 175:2

**CLEAN** [1] - 215:11

**CLEANSE** [1] - 17:2

**CLEAR** [9] - 36:13, 38:4, 74:4, 86:6, 158:15, 184:3, 189:19, 207:7, 231:12

**CLEARLY** [13] - 14:20, 16:17, 18:22, 19:4, 31:22, 40:1, 52:16, 57:1, 179:25, 196:5, 203:2, 203:4, 213:4

**CLERK** [3] - 3:1, 3:8, 147:20

**CLIENT** [1] - 187:18

**CLINICAL** [12] - 4:5, 4:6, 4:14, 4:17, 5:2, 9:19, 10:2, 10:6, 34:18, 52:13, 138:24, 236:19

**CLINICIANS** [1] - 104:13

**CLIPPERS** [1] - 194:18

**CLIQUE** [1] - 192:10

**CLOSE** [4] - 188:22, 202:13, 234:7, 241:3

**CLOSED** [1] - 86:18

**CLOSELY** [1] - 218:16

**CLOSEST** [2] - 49:5, 124:22

**CLOSING** [3] - 183:21, 183:24, 207:6

**CLOSINGS** [1] - 127:23

**CLOSURE** [1] - 196:3

**CLOTHES** [1] - 201:15

**CM** [1] - 1:18

**CO** [4] - 165:19, 220:1, 221:11, 236:4

**CO-COUNSEL** [1] - 236:4

**COA** [1] - 77:1

**COACHING** [1] - 134:7

**COERCING** [1] - 134:7

**COHERENT** [2] - 20:15, 21:3

**COLLAPSE** [2] - 35:24, 37:7

**COLLECTING** [1] - 238:6

**COLLOQUY** [1] - 145:8

**COLOR** [1] - 30:16

**COLORS** [1] - 210:3

**COMBAT** [1] - 45:16

**COMBINATION** [3] - 111:16, 196:25, 211:9

**COMBINED** [1] - 13:22

**COMFORT** [1] - 191:1

**COMING** [3] - 35:21, 41:11, 42:18

**COMMENT** [1] - 224:1

**COMMENTS** [1] - 230:2

**COMMISSARY** [2] - 206:15, 218:23

**COMMIT** [4] - 16:6, 196:20, 215:24, 220:6

**COMMITTED** [12] - 53:7, 76:22, 165:24, 191:1, 191:3, 197:7, 197:8, 212:11, 214:16, 218:6, 231:12

**COMMITTING** [3] - 198:13, 214:10, 216:3

**COMMON** [10] - 16:13, 17:21, 18:6, 18:8, 21:9, 31:3, 43:18, 51:9, 61:8, 62:11

**COMMUNICATION** [1] - 52:19

**COMMUNITY** [1] - 2:13

**COMPASSION** [1] - 230:15

**COMPELLING** [1] - 204:18

**COMPELS** [1] - 230:8

**COMPETENCY** [3] - 74:24, 75:2, 75:4

**COMPETENT** [1] - 123:6

**COMPILED** [1] - 68:21

**COMPLAINTS** [1] - 63:12

**COMPLETE** [7] - 23:14, 41:13, 59:16, 64:2, 106:3, 140:16, 238:19

**COMPLETED** [5] - 4:17, 62:2, 157:20, 162:10, 177:14

**COMPLETELY** [11] - 17:5, 44:13, 45:4, 49:12, 49:18, 195:10, 204:11, 208:10, 212:9, 223:14, 239:13

**COMPLETION** [2] - 157:11, 157:16

**COMPLEX** [3] - 148:18, 156:10, 156:12

**COMPLIANT** [1] -

208:6

**COMPLICIT** [1] - 17:4

**COMPLICITY** [1] - 16:17

**COMPLIES** [1] - 185:2

**COMPLY** [1] - 207:16

**COMPREHENSIVE** [1] - 138:21

**COMPROMISED** [1] - 95:10

**COMPULSION** [1] - 16:7

**COMPUTER** [2] - 1:23, 1:23

**COMPUTER-AIDED** [1] - 1:23

**CON** [1] - 204:7

**CONCEDE** [2] - 223:19, 225:7

**CONCENTRATIONS** [1] - 20:9

**CONCERNED** [4] - 28:1, 52:16, 76:20, 180:12

**CONCERNING** [19] - 12:7, 12:21, 52:12, 59:24, 140:8, 159:17, 159:22, 169:12, 179:22, 180:1, 180:4, 212:14, 214:9, 216:11, 217:21, 218:7, 228:9, 229:15, 230:2

**CONCERNS** [1] - 17:19

**CONCLUDE** [3] - 127:18, 127:21, 128:4

**CONCLUDED** [3] - 35:6, 233:14, 241:8

**CONCLUSION** [4] - 24:3, 29:3, 35:21, 104:16

**CONCLUSIONS** [2] - 35:14, 231:21

**CONDITION** [5] - 213:19, 213:21, 228:9, 229:12, 230:14

**CONDITIONS** [5] - 40:22, 95:19, 95:21, 198:16, 236:9

**CONDUCT** [7] - 182:12, 182:23, 222:13, 227:5, 228:5, 230:11, 235:1

**CONDUCTED** [1] - 75:9

**CONDUCTING** [2] -

102:1, 102:22
**CONDUCTS** [1] - 228:3
**CONFESSED** [1] - 192:16
**CONFESSING** [2] - 218:11, 218:12
**CONFESSION** [11] - 191:12, 191:13, 208:11, 218:4, 218:13, 218:16, 219:2, 219:4, 219:9, 219:12
**CONFIDANTES** [1] - 191:20
**CONFIDED** [1] - 101:7
**CONFIDENCE** [1] - 199:21
**CONFINEMENT** [9] - 149:10, 149:17, 159:7, 160:24, 169:25, 170:9, 170:13, 171:8, 198:17
**CONFIRMED** [1] - 218:10
**CONFLICT** [6] - 15:19, 49:11, 49:13, 50:10, 59:18, 125:12
**CONFLICTED** [1] - 48:17
**CONFLICTS** [1] - 21:12
**CONFLICTUAL** [3] - 30:8, 30:22, 30:25
**CONFRONT** [2] - 80:16, 81:2
**CONFRONTATION** [1] - 59:19
**CONFRONTED** [5] - 116:18, 153:1, 186:4, 203:23, 215:11
**CONFUSED** [2] - 77:16, 196:4
**CONNECTED** [1] - 202:8
**CONNECTION** [1] - 63:18
**CONSENSUAL** [1] - 195:8
**CONSEQUENCE** [1] - 141:9
**CONSEQUENCES** [8] - 13:7, 14:13, 14:15, 16:18, 29:8, 56:16, 59:22, 61:23
**CONSIDER** [13] - 130:22, 186:11, 188:24, 204:18,

208:20, 208:25, 212:9, 212:18, 215:4, 215:6, 221:21, 226:21, 229:24
**CONSIDERABLE** [1] - 191:4
**CONSIDERATION** [3] - 187:18, 191:23, 191:24
**CONSIDERED** [4] - 49:2, 178:20, 228:16, 239:21
**CONSIDERING** [1] - 231:25
**CONSIDERS** [4] - 212:2, 228:15, 229:21, 239:23
**CONSISTENCIES** [1] - 70:18
**CONSISTENCY** [1] - 33:13
**CONSISTENT** [12] - 25:11, 28:3, 28:4, 60:2, 64:24, 102:3, 102:10, 102:16, 102:19, 137:10, 138:6, 232:14
**CONSISTENTLY** [1] - 130:7
**CONSISTS** [1] - 162:12
**CONSTANT** [1] - 197:1
**CONSTANTLY** [4] - 59:3, 130:17, 130:18, 164:15
**CONSTELLATION** [1] - 232:2
**CONSTITUTE** [1] - 196:22
**CONSTITUTIONAL** [3] - 224:20, 225:3
**CONSTITUTIONALITY** [1] - 225:1
**CONSULTANT** [1] - 4:7
**CONSULTATION** [1] - 7:20
**CONSULTED** [1] - 8:6
**CONSULTING** [2] - 6:16, 7:22
**CONTACT** [5] - 29:2, 29:21, 41:2, 41:4, 41:6
**CONTAIN** [1] - 97:2
**CONTAINED** [2] - 134:20, 180:7
**CONTAINS** [1] - 182:25

**CONTEMPLATING** [1] - 190:1
**CONTEST** [3] - 204:12, 204:13, 215:16
**CONTESTED** [1] - 211:24
**CONTEXT** [8] - 30:19, 34:8, 35:11, 92:8, 99:8, 138:10, 228:6, 235:2
**CONTEXTS** [1] - 25:9
**CONTEXTUAL** [2] - 20:14, 20:18
**CONTINUE** [3] - 30:15, 48:12, 194:15
**CONTINUED** [2] - 2:1, 215:6
**CONTINUING** [1] - 196:22
**CONTINUOUS** [2] - 51:14, 121:16
**CONTINUUM** [1] - 15:4
**CONTRACT** [2] - 234:3, 235:19
**CONTRADICTIONS** [1] - 219:2
**CONTRADICTORY** [1] - 70:21
**CONTRADICTS** [1] - 220:5
**CONTRARY** [2] - 74:17, 239:2
**CONTRIBUTIONS** [1] - 5:16
**CONTROL** [4] - 30:13, 31:7, 45:4, 120:18
**CONVENTION** [1] - 38:13
**CONVERSATION** [8] - 61:15, 153:3, 159:4, 159:6, 159:13, 160:13, 161:9, 165:25
**CONVERSATIONS** [3] - 150:18, 150:21, 161:13
**CONVEY** [1] - 6:22
**CONVEYED** [1] - 33:6
**CONVICTED** [1] - 190:6
**CONVICTION** [6] - 190:8, 190:13, 190:18, 190:21, 211:20, 211:24
**CONVICTIONS** [2] - 190:12, 190:16
**CONVINCE** [2] - 193:8, 193:19

**COOPERATION** [1] - 208:16
**COOPERATIVE** [2] - 40:25, 208:10
**COPIES** [2] - 144:21, 145:2
**COPING** [1] - 197:21
**COPY** [4] - 73:2, 180:5, 184:17, 184:24
**CORDS** [1] - 44:14
**CORE** [3] - 23:19, 49:19, 50:12
**CORNER** [1] - 93:8
**CORPS** [2] - 6:19, 7:6
**CORRECT** [146] - 8:21, 9:13, 10:16, 11:12, 11:13, 13:11, 15:22, 15:23, 17:8, 26:12, 26:13, 31:13, 31:14, 57:11, 66:10, 70:5, 70:22, 71:2, 71:11, 71:20, 72:1, 73:14, 74:12, 77:18, 77:24, 85:3, 85:8, 85:12, 85:13, 86:1, 86:13, 86:14, 87:6, 87:12, 87:14, 88:9, 88:19, 89:5, 89:18, 89:20, 89:25, 90:3, 90:6, 90:16, 91:23, 91:24, 91:25, 92:1, 92:6, 92:15, 93:5, 93:9, 93:12, 93:14, 93:16, 94:13, 94:22, 94:23, 95:7, 95:10, 95:11, 95:18, 96:1, 96:13, 98:22, 99:14, 99:16, 100:6, 100:9, 100:10, 100:19, 101:24, 103:2, 103:8, 103:20, 103:22, 105:20, 106:1, 106:4, 106:12, 107:1, 107:2, 107:25, 108:8, 108:9, 108:14, 109:25, 110:3, 111:13, 111:17, 111:18, 111:20, 111:21, 112:8, 112:15, 112:20, 113:8, 114:5, 114:9, 115:5, 115:8, 115:11, 115:13, 115:15, 115:20, 115:25, 117:15, 117:25, 118:4, 118:12, 118:24, 119:9,

119:15, 120:2, 120:7, 122:17, 123:21, 124:4, 124:9, 124:11, 124:12, 126:10, 126:12, 128:7, 129:9, 129:12, 130:1, 131:2, 131:3, 132:7, 132:10, 145:18, 146:12, 146:13, 146:15, 153:22, 155:12, 157:3, 157:6, 165:2, 165:15, 169:6, 174:25, 177:7, 180:7, 241:10
**CORRECTIONAL** [13] - 141:25, 148:13, 148:18, 154:7, 160:1, 160:15, 198:14, 208:2, 208:3, 217:14, 227:19
**CORRECTIONS** [3] - 6:14, 236:7, 236:10
**CORRECTLY** [3] - 31:24, 46:9, 154:15
**CORRELATION** [2] - 135:17, 135:18
**CORRESPONDENCE** [5] - 174:21, 174:25, 176:25, 177:19, 210:20
**CORROBORATE** [5] - 23:16, 23:18, 84:14, 113:20, 124:16
**CORROBORATED** [3] - 46:5, 124:14, 191:18
**CORROBORATION** [16] - 22:23, 23:9, 23:10, 24:11, 24:18, 24:23, 26:8, 27:23, 28:5, 28:6, 29:15, 30:18, 46:4, 46:7, 46:10, 87:4
**CORROBORATIVE** [4] - 33:13, 96:12, 102:20, 104:12
**COUNSEL** [19] - 3:3, 97:5, 146:11, 176:20, 178:4, 179:11, 186:6, 186:17, 189:13, 207:7, 208:12, 209:4, 213:18, 217:11, 226:18, 227:11, 227:13, 236:4, 241:7
**COUNSEL'S** [2] -

172:18, 230:2
**COUNSELING** [1] - 28:10
**COUNSELOR** [1] - 234:2
**COUNT** [1] - 126:22
**COUNTED** [1] - 126:21
**COUNTERINTUITIVE** [1] - 200:24
**COUNTRY** [2] - 7:18, 9:14
**COUPLE** [6] - 4:1, 128:25, 187:4, 209:9, 223:21, 226:25
**COUPLED** [2] - 198:13, 204:21
**COURSE** [25] - 7:11, 13:19, 14:18, 25:3, 25:14, 25:25, 36:6, 40:8, 42:17, 49:15, 51:1, 53:1, 53:19, 62:3, 88:24, 98:10, 107:16, 116:2, 122:22, 133:23, 156:4, 176:25, 177:2, 198:5, 200:20
**COURT** [237] - 1:1, 1:19, 3:1, 3:2, 3:4, 3:18, 7:23, 9:18, 9:24, 10:5, 10:8, 10:11, 10:17, 11:3, 26:16, 28:17, 38:25, 48:1, 63:23, 64:2, 65:8, 65:13, 65:16, 65:20, 65:22, 67:12, 68:3, 72:12, 72:15, 72:19, 73:7, 73:12, 74:10, 74:14, 74:24, 75:1, 75:4, 75:6, 75:12, 75:13, 75:14, 75:20, 75:24, 76:4, 77:4, 77:11, 77:15, 77:19, 77:21, 77:25, 78:6, 78:10, 78:14, 78:16, 78:23, 79:9, 79:17, 80:6, 80:23, 97:2, 97:5, 97:10, 97:15, 98:1, 98:5, 103:14, 125:22, 127:12, 127:17, 127:20, 128:4, 128:10, 128:14, 128:18, 132:22, 136:21, 139:23, 142:8, 142:13, 143:3, 143:7, 143:11, 143:13, 143:16, 143:19,

143:21, 144:1, 144:9, 144:19, 145:1, 145:4, 145:7, 146:10, 146:19, 146:23, 147:1, 147:4, 147:8, 147:10, 147:14, 147:17, 148:1, 150:24, 151:6, 153:7, 166:5, 171:1, 171:24, 172:12, 172:19, 173:5, 173:10, 174:7, 174:13, 175:14, 177:22, 177:24, 178:19, 178:21, 178:24, 179:7, 180:18, 181:18, 181:20, 182:10, 183:6, 183:9, 183:13, 184:3, 184:4, 184:16, 184:24, 185:6, 185:14, 185:18, 185:22, 185:25, 186:14, 186:16, 186:21, 187:3, 187:7, 188:7, 188:21, 189:13, 190:3, 190:11, 190:17, 190:25, 192:2, 192:24, 194:25, 195:3, 195:17, 195:18, 199:25, 200:2, 200:5, 200:13, 201:8, 202:16, 203:22, 204:25, 205:6, 205:9, 207:2, 207:12, 207:18, 207:19, 207:22, 208:20, 208:25, 211:13, 211:18, 211:25, 212:2, 212:7, 212:9, 212:12, 212:13, 212:15, 212:17, 212:18, 213:8, 213:25, 214:8, 215:4, 215:5, 215:12, 215:13, 215:17, 215:20, 215:22, 217:19, 218:18, 219:4, 219:25, 220:10, 220:22, 221:9, 221:19, 221:21, 222:23, 223:8, 224:17, 225:12, 225:14, 225:18, 226:12, 226:17,

226:21, 227:5, 227:7, 227:10, 228:4, 228:6, 229:10, 229:11, 229:24, 230:7, 231:9, 231:23, 232:10, 233:8, 234:9, 234:21, 237:3, 239:23, 240:6, 240:19, 240:21, 241:1, 241:16
**COURT'S** [4] - 187:18, 207:16, 222:21, 222:22
**COURTHOUSE** [1] - 1:19
**COURTROOM** [4] - 1:8, 123:14, 206:24, 207:4
**COURTS** [1] - 187:22
**COUSIN** [6] - 115:22, 116:4, 116:9, 129:22, 129:23, 130:1
**COUSINS** [7] - 112:10, 113:13, 113:23, 114:3, 114:6, 115:10, 117:13
**COVER** [2] - 179:11, 180:10
**COWARDLY** [1] - 227:18
**COYLE** [1] - 215:8
**CRACK** [1] - 201:25
**CRAVES** [1] - 199:20
**CRAWL** [1] - 201:12
**CRAZY** [1] - 236:21
**CREATES** [4] - 15:19, 16:16, 30:25, 42:5
**CREATING** [5] - 20:13, 150:13, 150:20, 152:8, 153:1
**CREDENCE** [3] - 55:6, 55:18, 218:18
**CREDENTIALS** [1] - 193:22
**CREDIBILITY** [15] - 22:10, 22:13, 24:25, 28:4, 33:15, 35:11, 88:17, 104:9, 127:8, 140:14, 178:9, 181:21, 182:7, 204:12, 215:5
**CREDIBLE** [11] - 23:3, 86:15, 86:22, 88:20, 164:24, 164:25, 165:20, 211:12, 216:1, 218:14, 219:20

**CRIME** [15] - 165:24, 190:7, 192:12, 192:13, 194:17, 212:11, 212:13, 212:14, 214:16, 217:9, 217:11, 218:6, 218:7, 226:16
**CRIMES** [8] - 2:3, 196:20, 196:21, 197:6, 197:8, 204:25, 205:1, 226:19
**CRIMINAL** [5] - 1:3, 2:3, 6:13, 7:25, 83:24
**CRITICIZES** [1] - 59:20
**CROSS** [13] - 17:18, 65:24, 67:12, 77:25, 128:24, 129:1, 129:6, 153:15, 182:15, 182:16, 221:24, 223:9, 242:3
**CROSS-EXAMINED** [2] - 77:25, 221:24
**CRUEL** [1] - 236:11
**CRUELTY** [1] - 232:9
**CRY** [1] - 213:5
**CRYING** [1] - 212:21
**CUB** [1] - 201:21
**CURRENT** [2] - 3:25, 24:20
**CURTIS** [1] - 2:14
**CUSTODY** [2] - 76:24, 154:2
**CUT** [2] - 185:15, 191:8
**CUTS** [1] - 44:18
**CV** [6] - 3:23, 3:25, 5:18, 5:21, 10:17, 10:20

## D

**D)(2)(C** [1] - 180:23
**D.C** [1] - 2:4
**DAD** [7] - 27:12, 27:15, 27:18, 27:19, 50:8, 130:22, 133:7
**DADDY'S** [1] - 106:25
**DAILY** [1] - 171:15
**DALE** [1] - 119:25
**DAMAGE** [5] - 45:5, 45:9, 130:25, 231:16, 237:14
**DAMAGED** [3] - 65:4, 230:17, 233:1
**DANGER** [5] - 197:3, 197:10, 197:15, 199:23, 204:24

**DANGEROUSNESS** [4] - 195:23, 196:18, 225:17, 226:8
**DANNY** [4] - 147:19, 147:22, 147:23, 242:12
**DARBY** [1] - 200:18
**DATA** [3] - 24:2, 88:25, 223:25
**DATE** [20] - 4:1, 29:1, 29:5, 30:2, 54:16, 72:2, 72:19, 72:20, 72:21, 109:22, 158:13, 159:16, 170:3, 170:7, 170:8, 170:18, 170:24, 189:7, 210:10, 241:16
**DATED** [11] - 28:21, 29:22, 31:13, 67:21, 69:15, 69:18, 72:25, 73:12, 74:16, 132:25, 136:24
**DATES** [10] - 69:13, 74:5, 77:16, 84:18, 163:2, 163:3, 163:11, 163:12, 170:21
**DAUBERT** [1] - 222:7
**DAVID** [184] - 1:6, 3:6, 3:7, 3:10, 3:11, 12:6, 12:19, 12:22, 13:5, 13:24, 14:12, 15:22, 15:24, 16:8, 16:17, 16:20, 16:22, 17:25, 19:18, 21:13, 23:2, 24:25, 26:5, 27:17, 27:18, 27:19, 27:20, 27:21, 29:1, 29:16, 30:21, 31:16, 32:13, 32:16, 33:6, 33:10, 34:13, 34:14, 34:20, 34:21, 35:4, 35:7, 35:13, 40:4, 40:9, 40:15, 40:16, 41:9, 41:14, 42:5, 44:8, 48:2, 49:22, 50:6, 52:5, 52:8, 52:13, 53:7, 53:9, 53:25, 54:2, 54:24, 55:5, 56:14, 57:8, 59:1, 59:24, 60:5, 61:15, 62:7, 62:14, 65:2, 70:14, 71:8, 71:14, 79:22, 80:12, 80:17, 80:18, 81:11, 81:15, 81:19, 83:7, 83:13, 83:16, 85:21, 88:13, 89:21, 92:3, 92:18, 93:19, 94:22, 95:4,

95:9, 95:12, 95:17, 96:8, 96:15, 99:15, 99:17, 99:19, 103:10, 129:3, 129:6, 129:16, 129:25, 131:6, 131:8, 131:9, 134:5, 134:7, 134:8, 134:14, 134:15, 134:18, 135:19, 137:16, 137:21, 137:22, 138:1, 138:3, 138:4, 139:8, 140:24, 144:8, 144:17, 145:11, 149:7, 150:11, 157:13, 161:13, 168:5, 170:10, 175:22, 202:22, 203:9, 203:10, 203:24, 204:1, 204:2, 204:10, 209:1, 209:6, 210:4, 210:8, 210:12, 211:14, 212:6, 212:9, 212:11, 213:4, 213:25, 214:16, 214:22, 214:24, 224:7, 224:8, 228:12, 228:15, 228:17, 228:19, 231:15, 233:1, 234:4, 235:25, 236:15, 236:17, 237:18, 238:7, 238:20, 238:22, 239:6, 239:8, 239:13, 240:1, 242:5

**DAVID'S** [31] - 13:15, 15:2, 22:19, 28:12, 30:24, 35:2, 41:12, 42:1, 43:21, 46:18, 52:14, 54:1, 55:6, 62:19, 64:5, 86:12, 100:4, 131:2, 135:21, 135:23, 136:6, 203:13, 203:14, 204:4, 204:14, 234:2, 236:25, 239:3, 239:16, 240:1, 240:4

**DAY-TO-DAY** [2] - 198:9, 202:4

**DAYS** [18] - 76:24, 148:6, 149:25, 188:20, 192:14, 193:6, 193:7, 205:6, 209:7, 209:9, 209:13, 221:2, 221:18, 221:23,

222:4, 234:7, 234:8
**DEAD** [1] - 125:22
**DEAL** [8] - 21:1, 30:12, 58:20, 104:11, 178:4, 189:7, 198:9, 208:17
**DEALING** [4] - 37:18, 61:13, 178:10, 181:4
**DEALT** [1] - 181:13
**DEAN** [1] - 39:22
**DEAREST** [1] - 200:20
**DEARTH** [1] - 140:7
**DEATH** [30] - 24:7, 31:17, 90:13, 126:5, 126:6, 149:4, 154:10, 154:22, 155:7, 155:13, 170:13, 189:16, 189:17, 189:25, 190:23, 195:14, 198:21, 199:2, 199:3, 208:19, 209:17, 209:18, 209:24, 210:4, 211:15, 214:24, 224:22, 231:10, 232:1
**DEAUTHORIZATION** [2] - 68:1, 68:2
**DECADES** [2] - 19:16, 197:2
**DECEMBER** [5] - 72:3, 73:1, 73:12, 77:7, 148:10
**DECEPTION** [2] - 127:4, 204:8
**DECIDE** [2] - 199:25, 212:8
**DECIDED** [5] - 86:25, 92:10, 145:21, 172:22, 187:25
**DECISION** [13] - 145:23, 145:24, 146:2, 146:4, 146:8, 146:23, 172:25, 186:22, 186:23, 188:15, 191:22, 191:23, 222:19
**DECLARANT** [5] - 181:22, 182:9, 182:13, 182:15, 182:16
**DECLARANT'S** [2] - 182:7, 182:11
**DECLINED** [1] - 227:23
**DECREASES** [1] - 44:1
**DEEP** [4] - 57:23, 58:5, 58:12, 58:24

**DEFAULT** [1] - 197:21
**DEFENDANT** [22] - 2:5, 2:8, 2:12, 48:5, 74:11, 75:3, 126:4, 145:12, 145:19, 145:25, 146:3, 146:6, 146:9, 146:13, 146:16, 146:22, 146:25, 147:7, 189:16, 189:19, 191:19, 196:20
**DEFENDANT'S** [11] - 11:6, 26:19, 28:20, 102:12, 144:15, 157:8, 157:10, 176:21, 192:19, 198:22, 202:11
**DEFENDER** [2] - 2:6, 2:13
**DEFENSE** [38] - 3:6, 3:7, 3:21, 8:9, 22:9, 22:15, 65:18, 68:12, 74:1, 75:12, 75:15, 76:24, 76:25, 78:9, 82:7, 93:1, 102:13, 105:18, 106:1, 111:7, 127:18, 127:21, 143:17, 143:24, 144:24, 145:6, 145:15, 180:12, 186:20, 199:24, 207:15, 207:21, 210:19, 215:15, 229:20, 231:22, 242:20
**DEFINE** [1] - 142:14
**DEFINITELY** [1] - 116:7
**DEFINITION** [2] - 180:22, 194:11
**DEGENERATIVE** [2] - 142:19, 228:22
**DEGREE** [4] - 4:12, 12:21, 13:4, 14:11
**DELIBERATELY** [1] - 18:12
**DELIBERATION** [1] - 194:12
**DELUSIONAL** [1] - 231:8
**DELUSIONS** [1] - 142:16
**DEMAND** [1] - 222:14
**DEMEANOR** [1] - 153:11
**DEMON** [1] - 17:1
**DEMONSTRATED** [1] - 199:10
**DEMONSTRATIVE** [1]

- 195:25
**DENIAL** [4] - 56:4, 56:8, 87:25, 126:4
**DENIED** [3] - 54:1, 56:3, 234:15
**DENIES** [2] - 98:10, 100:8
**DENY** [5] - 54:8, 56:9, 182:13, 230:12
**DEPAKOTE** [2] - 200:16, 234:6
**DEPARTMENT** [8] - 2:2, 162:16, 176:4, 177:9, 228:14, 236:5, 236:6, 236:10
**DEPICTED** [1] - 151:25
**DEPRAVED** [1] - 237:19
**DEPRESSION** [5] - 49:15, 60:19, 64:14, 231:1, 234:5
**DEPRESSIONS** [1] - 56:20
**DEPUTY** [1] - 207:4
**DERAILS** [1] - 49:18
**DERIVE** [1] - 14:25
**DESCRIBE** [4] - 14:22, 44:9, 157:9, 195:20
**DESCRIBED** [27] - 26:4, 38:16, 39:6, 43:10, 44:11, 44:13, 44:19, 44:21, 46:23, 48:16, 53:10, 53:16, 54:25, 56:20, 61:3, 87:23, 108:2, 114:15, 120:23, 123:24, 124:18, 129:8, 130:14, 136:1, 136:14, 180:21, 197:15
**DESCRIBES** [3] - 23:17, 202:8, 229:17
**DESCRIBING** [9] - 34:17, 84:21, 92:9, 101:1, 112:21, 129:10, 130:3, 219:5, 219:7
**DESIGNATED** [2] - 233:17, 233:20
**DESIGNED** [2] - 184:22, 195:8
**DESPERATE** [1] - 48:20
**DESPITE** [5] - 124:3, 124:10, 199:17, 202:3, 202:12
**DESTABILIZES** [1] - 49:18

**DESTIGMATIZE** [2] - 9:5, 135:14
**DESTROYED** [1] - 57:14
**DESTRUCTIVE** [1] - 64:22
**DETAIL** [9] - 20:19, 20:20, 26:4, 31:9, 33:6, 87:23, 92:10, 120:24, 178:13
**DETAILS** [7] - 12:18, 32:15, 84:10, 84:17, 84:23, 105:19, 139:1
**DETENTION** [2] - 235:5, 235:10
**DETERMINATION** [2] - 75:9, 184:10
**DETERMINATIVE** [1] - 56:12
**DETERMINES** [1] - 141:6
**DETERMINING** [2] - 105:22, 214:5
**DEVANE** [2] - 217:6, 235:7
**DEVASTATED** [1] - 240:4
**DEVASTATING** [3] - 15:10, 15:14, 16:2
**DEVASTATION** [1] - 230:23
**DEVELOP** [1] - 196:15
**DEVELOPED** [1] - 101:21
**DEVELOPING** [1] - 138:13
**DEVELOPMENT** [5] - 49:13, 49:19, 50:3, 51:12, 51:18
**DEVISED** [1] - 193:17
**DEVOTED** [1] - 205:7
**DIABETES** [3] - 204:16, 228:24
**DIABETIC** [1] - 229:6
**DIABOLICAL** [1] - 49:3
**DIAGNOSE** [1] - 39:10
**DIAGNOSED** [8] - 49:23, 62:7, 62:15, 90:2, 142:12, 142:21, 203:5, 233:12
**DIAGNOSES** [1] - 142:24
**DIAGNOSIS** [7] - 62:8, 62:11, 63:12, 102:20, 103:12, 103:18, 142:22
**DIALOGUE** [1] - 95:3
**DIANE** [75] - 12:9,

15:25, 18:25, 25:15, 25:20, 25:25, 26:1, 26:10, 26:11, 27:23, 44:19, 46:5, 56:14, 56:20, 70:14, 71:19, 78:9, 79:3, 79:22, 80:2, 80:10, 80:17, 81:1, 81:9, 81:19, 85:4, 89:3, 89:9, 89:19, 89:20, 89:24, 90:25, 91:8, 91:22, 92:2, 92:14, 93:11, 93:13, 93:18, 93:19, 93:25, 94:4, 94:9, 94:12, 94:21, 95:8, 95:9, 95:12, 95:14, 96:6, 96:17, 97:19, 98:7, 99:15, 99:20, 99:25, 100:2, 124:18, 124:24, 131:5, 131:9, 131:14, 131:15, 133:5, 133:9, 134:5, 134:12, 137:9, 140:24, 141:14, 141:21, 142:9, 143:14, 203:11, 233:1

**DIANE'S** [1] - 25:22

**DIE** [2] - 187:19, 200:19

**DIED** [3] - 125:24, 190:2, 196:3

**DIET** [2] - 229:9, 229:11

**DIETZ** [1] - 34:4

**DIFFERENCE** [1] - 224:2

**DIFFERENT** [23] - 14:7, 16:3, 16:4, 21:1, 21:7, 21:17, 21:18, 21:21, 24:12, 42:9, 67:25, 69:20, 92:2, 108:6, 116:23, 152:7, 177:11, 193:21, 208:2, 212:9, 223:14, 238:10

**DIFFERENTLY** [1] - 21:19

**DIFFICULT** [5] - 124:16, 195:15, 196:1, 197:14, 197:22

**DIFFICULTIES** [1] - 37:9

**DIFFICULTY** [2] - 56:21, 56:22

**DIMINISH** [1] - 140:14

**DIRE** [1] - 52:17

**DIRECT** [14] - 3:12, 10:21, 63:24, 67:9, 88:2, 97:5, 104:10, 125:12, 129:5, 132:12, 136:17, 139:7, 148:2, 242:3

**DIRECTED** [1] - 89:17

**DIRECTING** [2] - 78:12, 108:18

**DIRECTION** [1] - 16:7

**DIRECTLY** [3] - 80:20, 123:17, 220:4

**DIRECTOR** [1] - 137:15

**DIRT** [1] - 201:4

**DISABILITIES** [1] - 237:6

**DISABILITY** [3] - 57:3, 57:4, 230:14

**DISAGREE** [1] - 216:19

**DISAGREEING** [1] - 103:18

**DISAGREES** [1] - 71:19

**DISAPPOINTED** [2] - 186:1, 189:7

**DISARRAY** [1] - 236:22

**DISC** [1] - 228:23

**DISCARD** [1] - 240:11

**DISCARDED** [1] - 240:9

**DISCIPLINARY** [3] - 228:1, 235:5, 235:8

**DISCIPLINE** [3] - 45:3, 198:13, 232:21

**DISCLOSE** [20] - 18:12, 18:20, 19:11, 31:12, 40:13, 41:18, 84:20, 85:9, 86:25, 105:24, 125:9, 125:11, 125:16, 125:19, 126:7, 135:15, 138:10, 138:19, 140:20

**DISCLOSED** [10] - 25:21, 26:2, 31:17, 39:20, 40:15, 86:21, 86:23, 135:3, 135:19

**DISCLOSING** [5] - 18:23, 19:4, 84:13, 99:6, 126:8

**DISCLOSURE** [19] - 18:18, 19:12, 25:3, 25:4, 25:6, 31:5, 31:8, 34:19, 86:16, 104:9, 105:9, 105:22, 110:8, 120:10, 120:16,

120:21, 125:8, 142:5, 214:9

**DISCLOSURES** [4] - 31:22, 99:9, 105:6, 138:7

**DISCOVERED** [1] - 61:3

**DISCREPANCIES** [1] - 141:8

**DISCUSS** [4] - 29:13, 37:8, 41:12, 142:1

**DISCUSSED** [8] - 29:9, 30:2, 32:25, 34:13, 88:2, 125:12, 164:15, 237:22

**DISCUSSING** [8] - 30:23, 34:22, 37:10, 50:1, 50:11, 130:16, 144:6, 232:3

**DISCUSSION** [1] - 46:20

**DISEASE** [2] - 204:17, 228:20

**DISGUSTING** [2] - 54:22, 106:20

**DISLOCATED** [1] - 202:6

**DISMAL** [1] - 235:18

**DISORDER** [20] - 49:23, 50:3, 50:5, 51:19, 57:6, 62:8, 62:15, 102:10, 102:17, 102:20, 123:1, 123:11, 142:16, 142:19, 231:18, 231:19, 233:13, 237:7, 237:11, 237:12

**DISORDERS** [2] - 49:21, 51:20

**DISPLAYED** [2] - 34:13, 34:14

**DISPUTE** [2] - 103:16, 231:23

**DISPUTES** [1] - 218:6

**DISRESPECTED** [3] - 192:4, 192:7, 192:10

**DISRUPTION** [1] - 59:10

**DISSOCIATIVE** [2] - 102:16, 102:20

**DISTORTION** [1] - 133:24

**DISTRAUGHT** [1] - 236:23

**DISTRICT** [6] - 1:1, 1:2, 1:15, 2:6, 2:13, 236:9

**DISTURBANCE** [1] - 50:12

**DIVISION** [1] - 2:3

**DNA** [4] - 223:21, 223:23, 224:2, 224:8

**DOCKET** [2] - 240:24, 240:25

**DOCTOR** [13] - 3:20, 11:5, 26:18, 41:22, 67:9, 82:25, 84:14, 97:8, 106:2, 128:22, 132:24, 201:12, 236:23

**DOCTORS** [6] - 103:5, 103:25, 119:12, 127:4, 199:7, 199:12

**DOCUMENT** [14] - 3:21, 11:7, 29:16, 29:20, 80:22, 92:13, 96:24, 97:2, 97:6, 97:9, 137:13, 157:9, 220:1, 220:4

**DOCUMENTARY** [1] - 140:22

**DOCUMENTATION** [1] - 52:12

**DOCUMENTS** [7] - 78:2, 83:8, 190:21, 220:22, 221:1, 221:10, 228:11

**DOLLARS** [1] - 206:14

**DOMINANCE** [2] - 193:14, 205:2

**DONE** [22] - 24:4, 25:21, 25:22, 55:14, 137:16, 138:2, 152:6, 158:14, 167:9, 176:9, 176:18, 177:22, 185:3, 188:5, 193:23, 196:8, 200:25, 204:19, 209:12, 209:21, 227:18

**DOOR** [3] - 27:18, 107:9

**DOPAMINE** [1] - 20:9

**DOUBT** [18] - 88:22, 106:18, 108:12, 184:8, 184:11, 189:22, 190:5, 190:13, 194:24, 196:9, 196:17, 202:1, 215:19, 216:2, 218:15, 225:13, 225:20

**DOUPES** [1] - 158:4

**DOWN** [14] - 9:12, 59:7, 59:13, 143:7, 154:25, 155:2, 163:6, 177:24, 185:15, 187:2,

187:5, 217:16, 227:1, 227:2

**DOWNGRADED** [1] - 227:24

**DOZEN** [2] - 199:14, 201:16

**DR** [140] - 3:6, 3:14, 10:2, 10:11, 10:23, 11:20, 28:11, 28:19, 29:21, 31:10, 32:6, 32:12, 32:17, 33:1, 33:5, 33:18, 33:22, 34:11, 34:24, 35:4, 35:7, 62:6, 64:5, 65:11, 66:1, 66:15, 66:17, 66:19, 67:3, 67:17, 68:10, 69:10, 71:18, 71:25, 72:1, 72:7, 72:13, 72:16, 72:25, 73:15, 73:18, 73:21, 74:2, 74:5, 74:6, 74:13, 74:18, 76:7, 76:16, 76:18, 79:21, 81:8, 91:4, 91:8, 97:18, 98:7, 103:5, 103:6, 103:10, 103:17, 103:20, 103:25, 104:1, 105:25, 106:1, 107:17, 107:23, 108:7, 108:17, 108:22, 109:10, 109:15, 109:23, 110:17, 110:21, 111:6, 111:15, 112:25, 114:10, 114:12, 114:17, 114:20, 114:23, 115:9, 115:17, 115:19, 117:1, 117:7, 117:10, 118:17, 120:2, 122:16, 122:19, 123:5, 123:21, 124:1, 124:3, 124:5, 128:10, 128:13, 134:19, 134:20, 135:20, 138:20, 139:7, 139:11, 139:15, 139:19, 140:4, 141:14, 141:17, 192:5, 202:15, 204:20, 228:8, 228:10, 228:12, 228:18, 228:21, 229:12, 232:11, 233:9, 233:19, 233:21, 234:3, 234:9, 234:12, 234:21,

235:15, 235:22, 239:10, 242:5

**DRAMATIC** [1] - 55:15
**DRAW** [8] - 151:4, 152:16, 172:23, 205:13, 205:15, 205:16, 205:17
**DRAWING** [8] - 47:7, 150:16, 157:16, 158:9, 174:19, 175:6, 177:3
**DRAWINGS** [5] - 173:21, 173:25, 174:3, 206:7, 206:11
**DRESS** [2] - 100:15, 101:8
**DRESSED** [2] - 47:5, 101:15
**DROP** [1] - 192:22
**DRUG** [2] - 61:5, 199:21
**DRUGS** [6] - 50:21, 50:23, 60:6, 60:17, 60:21, 60:22
**DUE** [1] - 214:23
**DUKE** [2] - 4:14, 4:23
**DURATION** [1] - 51:21
**DURING** [24] - 7:11, 14:18, 34:14, 35:2, 35:5, 53:13, 54:1, 54:11, 54:13, 100:14, 114:24, 118:5, 120:24, 121:12, 121:14, 121:15, 125:12, 132:13, 132:17, 136:17, 149:22, 164:15, 200:17, 210:24
**DUTY** [6] - 159:24, 160:2, 160:4, 165:1, 165:4, 165:20
**DYSFUNCTION** [2] - 202:12, 230:23
**DYSFUNCTIONAL** [3] - 13:21, 19:7, 201:22
**DYSREGULATED** [2] - 59:2, 59:12

---

## E

**EARLY** [5] - 13:20, 27:24, 31:4, 163:4, 215:3
**EARNED** [1] - 144:18
**EASEL** [2] - 150:15, 152:9
**EASELS** [1] - 162:18
**EASIER** [1] - 116:25
**EASILY** [1] - 205:25

**EASTERN** [1] - 2:13
**EATS** [1] - 204:20
**ED** [1] - 98:8
**EDEMA** [1] - 228:25
**EDGE** [1] - 59:3
**EDUCATION** [2] - 4:15, 6:17
**EDUCATIONAL** [2] - 4:10, 238:11
**EDWIN** [5] - 118:8, 118:10, 118:18, 119:16, 119:21
**EFFECT** [3] - 36:19, 52:25, 61:4
**EFFECTIVE** [1] - 29:8
**EFFECTIVELY** [2] - 58:20, 59:8
**EFFORT** [1] - 211:6
**EFFORTS** [1] - 30:13
**EGO** [1] - 206:5
**EITHER** [15] - 5:2, 7:19, 24:3, 51:8, 83:23, 84:19, 85:11, 93:3, 99:5, 99:9, 110:9, 112:18, 168:8, 188:23, 214:13
**EJACULATE** [1] - 54:22
**EJACULATED** [2] - 117:21, 118:3
**EJACULATING** [1] - 53:17
**ELABORATE** [1] - 36:1
**ELDERLY** [1] - 226:25
**ELECT** [1] - 145:16
**ELEMENTS** [1] - 224:24
**ELICIT** [2] - 106:3, 106:9
**ELIGIBLE** [5] - 189:16, 189:19, 190:23, 195:14, 224:22
**ELMO** [1] - 117:1
**ELSEWHERE** [1] - 205:17
**EMBLEMATIC** [1] - 53:3
**EMERGENCY** [5] - 52:6, 52:9, 140:17, 213:17, 213:23
**EMOTION** [2] - 34:13, 35:15
**EMOTIONAL** [5] - 25:6, 35:2, 44:8, 59:25, 232:8
**EMOTIONS** [1] - 34:19
**EMPIRICAL** [1] -

223:25

**EMPLOYED** [2] - 4:3, 4:4
**EMPLOYEE** [1] - 169:14
**EMPTY** [1] - 44:24
**ENCODE** [1] - 42:9
**ENCODED** [3] - 43:3, 43:5, 43:16
**ENCOUNTER** [1] - 41:20
**ENCOUNTERED** [5] - 18:9, 34:1, 34:8, 42:5, 44:25
**ENCOUNTERING** [1] - 22:7
**ENCOUNTERS** [4] - 30:5, 51:17, 129:8, 129:10
**END** [9] - 15:7, 52:2, 87:1, 134:25, 135:1, 161:8, 210:11, 227:2, 235:10
**ENDEAVORED** [1] - 187:6
**ENDED** [2] - 120:13, 236:17
**ENDURE** [1] - 15:11
**ENDURED** [5] - 44:8, 54:14, 57:9, 233:3, 237:10
**ENDURES** [1] - 59:17
**ENEMA** [8] - 25:20, 38:12, 38:15, 63:17, 85:6, 94:10, 98:1, 126:16
**ENEMAS** [15] - 32:25, 38:8, 46:21, 94:15, 94:17, 95:1, 95:2, 96:19, 97:20, 97:23, 97:25, 118:6, 123:24, 139:16
**ENEMY** [1] - 45:21
**ENFORCEMENT** [1] - 6:14
**ENGAGED** [6] - 15:21, 41:7, 83:25, 133:14, 178:14, 216:13
**ENGAGING** [2] - 178:5, 202:20
**ENORMOUS** [1] - 58:16
**ENTAILED** [1] - 98:14
**ENTER** [1] - 207:22
**ENTERED** [3] - 208:17, 216:17, 219:21
**ENTIRE** [2] - 50:13, 50:14
**ENTITLED** [2] -

240:15, 241:12

**ENTRY** [2] - 208:23, 209:16
**ENVIRONMENT** [7] - 130:16, 131:25, 133:21, 198:14, 202:22, 203:3, 215:3
**ENVIRONMENTS** [1] - 130:19
**EPISODE** [3] - 59:4, 104:23, 109:17
**EQUATE** [1] - 51:22
**EQUIVOCAL** [3] - 56:5, 88:1, 88:11
**ERADICATE** [1] - 58:5
**ERECTION** [1] - 54:20
**ERROR** [2] - 223:20, 223:24
**ERRORS** [1] - 224:1
**ESCALATED** [1] - 47:12
**ESCAPE** [7] - 66:23, 106:8, 178:3, 225:25, 226:9, 226:13, 226:20
**ESCAPES** [5] - 225:23, 225:24, 226:3, 226:9, 226:13
**ESCAPING** [1] - 46:13
**ESPECIALLY** [22] - 9:6, 18:8, 31:4, 37:18, 41:4, 45:2, 45:14, 55:25, 57:20, 60:12, 61:10, 61:25, 65:1, 99:3, 120:16, 120:20, 125:10, 135:11, 138:9, 140:11, 140:18
**ESQUIRE** [6] - 1:14, 2:2, 2:5, 2:8, 2:12, 2:12
**ESSENTIA** [1] - 43:5
**ESSENTIALLY** [22] - 16:6, 16:23, 16:24, 20:15, 23:23, 24:8, 35:17, 36:13, 43:16, 49:3, 49:6, 51:7, 53:16, 57:16, 59:2, 59:16, 63:16, 125:16, 138:25, 222:12, 224:13, 227:16
**ESTABLISHED** [1] - 191:6
**ESTABLISHING** [1] - 97:10
**ESTEEM** [3] - 57:10, 57:14, 239:10
**ESTEEMED** [1] - 5:11
**EUPHEMISMS** [1] -

37:20

**EVALUATE** [2] - 83:23, 83:25
**EVALUATED** [7] - 14:24, 22:18, 25:8, 35:13, 63:11, 130:12, 231:21
**EVALUATING** [6] - 12:16, 35:11, 55:2, 55:3, 87:21, 123:18
**EVALUATION** [10] - 12:19, 14:12, 30:19, 35:2, 35:5, 42:22, 43:8, 74:12, 75:8, 76:23
**EVALUATIONS** [2] - 24:4, 45:1
**EVALUATORS** [2] - 83:10, 140:25
**EVENING** [1] - 187:10
**EVENT** [6] - 20:1, 21:17, 21:22, 55:21, 213:11
**EVENTUALLY** [1] - 134:8
**EVIDENCE** [68] - 39:13, 55:17, 59:23, 62:9, 65:17, 65:19, 72:17, 72:18, 77:3, 80:8, 88:4, 104:20, 126:3, 143:22, 143:25, 144:20, 144:25, 152:14, 164:25, 165:20, 177:18, 179:13, 179:15, 180:16, 180:19, 181:7, 182:6, 182:8, 182:11, 183:10, 183:12, 183:14, 194:3, 200:21, 205:11, 205:12, 209:3, 211:11, 211:12, 211:14, 212:20, 213:5, 213:14, 213:24, 216:1, 216:17, 217:19, 217:25, 218:14, 219:20, 219:21, 230:13, 231:5, 231:11, 231:16, 231:18, 231:19, 232:9, 233:6, 234:9, 237:14, 237:20, 238:19, 239:23, 239:24, 240:12, 240:14
**EVIDENTLY** [1] - 170:23

**EVIL** [3] - 16:24, 17:1, 17:6
**EVOLVED** [1] - 223:5
**EXACERBATE** [1] - 51:18
**EXACT** [5] - 19:1, 159:16, 163:12, 170:3, 170:24
**EXACTLY** [17] - 19:20, 31:11, 33:4, 35:1, 43:3, 43:4, 49:4, 53:5, 74:23, 79:12, 79:24, 80:4, 81:13, 136:1, 154:24, 218:7, 232:13
**EXAM** [1] - 73:6
**EXAMINATION** [15] - 3:12, 10:21, 17:19, 65:24, 67:13, 128:20, 128:24, 129:1, 136:18, 148:2, 153:15, 171:3, 175:15, 182:17, 223:9
**EXAMINE** [1] - 182:15
**EXAMINED** [3] - 77:25, 78:1, 221:24
**EXAMINES** [1] - 195:3
**EXAMPLE** [9] - 23:16, 24:18, 25:19, 38:3, 38:4, 43:13, 121:13, 173:7, 218:19
**EXCELLENT** [1] - 202:2
**EXCEPT** [2] - 71:25, 156:4
**EXCERPT** [1] - 76:10
**EXCERPTED** [1] - 77:22
**EXCERPTS** [7] - 32:6, 33:17, 34:10, 178:2, 178:4, 182:21, 182:25
**EXCHANGE** [1] - 51:8
**EXCITED** [3] - 59:11, 59:12, 59:13
**EXCLUDE** [1] - 76:16
**EXCLUDED** [1] - 188:4
**EXCUSABLE** [1] - 228:5
**EXCUSE** [4] - 56:14, 74:11, 176:1, 235:1
**EXCUSED** [2] - 143:8, 177:25
**EXCUSES** [1] - 230:10
**EXECUTED** [3] - 90:6, 90:9, 240:16
**EXECUTION** [9] - 179:24, 210:9,

210:10, 210:13, 210:14, 210:25, 239:19, 240:1, 240:4
**EXERCISE** [1] - 204:22
**EXHIBIT** [53] - 3:21, 11:6, 26:19, 28:20, 29:21, 71:24, 72:24, 73:10, 76:11, 77:8, 82:23, 89:12, 93:1, 102:13, 108:14, 108:15, 111:7, 111:12, 114:19, 136:17, 136:18, 136:25, 143:17, 143:23, 143:24, 144:15, 144:24, 157:8, 157:10, 176:21, 178:2, 182:24, 183:11, 191:12, 191:19, 192:6, 192:8, 194:3, 194:17, 194:18, 194:20, 197:13, 197:17, 197:18, 198:10, 200:9, 200:18, 205:14, 209:11, 210:19, 229:20
**EXHIBITED** [1] - 14:19
**EXHIBITIONS** [1] - 9:4
**EXHIBITS** [6] - 65:11, 65:18, 143:10, 191:9, 242:16, 242:20
**EXHORTED** [1] - 52:21
**EXIST** [1] - 104:22
**EXISTS** [1] - 198:15
**EXPECT** [3] - 132:4, 140:19, 210:1
**EXPERIENCE** [24] - 15:3, 15:12, 15:13, 20:7, 22:11, 34:18, 39:5, 42:4, 49:25, 55:2, 56:9, 60:7, 60:10, 61:9, 61:11, 90:10, 101:22, 105:12, 126:2, 126:18, 130:12, 136:12, 138:16, 193:24
**EXPERIENCED** [6] - 15:1, 41:19, 48:14, 58:14, 104:17, 125:10
**EXPERIENCES** [16] - 14:7, 14:22, 16:22, 20:3, 21:11, 21:18, 21:19, 30:2, 30:9,

30:16, 37:22, 50:1, 105:14, 135:15, 230:14
**EXPERIENCING** [5] - 21:17, 43:14, 44:5, 59:1, 234:5
**EXPERIMENTATION** [3] - 129:17, 129:18, 129:25
**EXPERT** [18] - 7:13, 9:18, 10:2, 22:17, 23:4, 27:1, 106:1, 198:22, 220:23, 221:18, 221:25, 222:6, 223:21, 226:11, 229:4, 229:16, 231:20, 237:10
**EXPERTISE** [1] - 223:4
**EXPERTS** [11] - 14:23, 15:14, 35:12, 35:13, 38:5, 38:6, 76:25, 191:9, 198:8, 204:9, 231:22
**EXPLAIN** [3] - 84:5, 182:13, 203:9
**EXPLAINED** [1] - 119:5
**EXPLANATION** [1] - 145:19
**EXPLICIT** [1] - 42:11
**EXPLODE** [2] - 38:24, 236:20
**EXPLORE** [1] - 30:15
**EXPLOSIVE** [1] - 233:13
**EXPOSED** [2] - 201:5, 201:6
**EXPRESS** [2] - 30:8, 90:12
**EXPRESSED** [3] - 142:20, 209:11, 210:4
**EXPRESSES** [1] - 30:22
**EXPRESSING** [2] - 209:14, 209:24
**EXPRESSION** [1] - 35:15
**EXTENDED** [6] - 19:8, 37:2, 86:3, 124:22, 202:13, 202:24
**EXTENSION** [1] - 44:14
**EXTENSIVE** [2] - 55:2, 142:22
**EXTENT** [6] - 19:4, 41:17, 43:15, 89:1, 105:23, 182:2

**EXTINGUISHED** [1] - 199:17
**EXTRA** [1] - 218:23
**EXTREME** [3] - 65:1, 232:7, 232:21
**EXTREMELY** [7] - 20:4, 41:18, 41:19, 43:1, 99:5, 138:17, 140:12
**EYE** [3] - 41:2, 41:3, 41:6
**EYES** [3] - 150:12, 152:22, 202:7

**F**

**F-U-C-K-ED** [1] - 98:8
**FACE** [8] - 17:21, 44:21, 49:10, 117:21, 118:3, 126:6, 205:20, 205:22
**FACED** [2] - 45:25, 232:7
**FACILITY** [1] - 148:17
**FACING** [1] - 126:5
**FACT** [64] - 15:7, 18:8, 18:24, 20:2, 21:9, 21:25, 22:18, 23:19, 26:8, 27:23, 31:2, 31:23, 36:15, 36:25, 38:13, 38:14, 48:12, 48:18, 50:4, 52:4, 52:22, 52:23, 56:3, 58:22, 60:11, 60:14, 76:20, 86:6, 86:16, 86:18, 87:2, 93:24, 100:21, 107:6, 109:16, 116:18, 124:3, 124:10, 127:4, 128:1, 129:13, 130:17, 131:4, 132:8, 134:18, 140:13, 140:15, 140:23, 141:7, 153:1, 159:3, 162:7, 172:23, 176:6, 186:5, 191:25, 197:5, 203:19, 205:14, 208:25, 212:19, 215:6, 233:5, 235:2
**FACTOR** [8] - 23:22, 33:14, 56:12, 105:22, 130:18, 190:24, 224:23, 225:19
**FACTORS** [19] - 37:4, 44:2, 50:2, 58:23, 104:8, 184:23,

185:4, 185:6, 185:12, 185:15, 185:17, 185:19, 187:15, 187:20, 187:21, 195:18, 195:19, 208:21, 231:23
**FACTS** [16] - 24:2, 32:13, 33:6, 33:10, 185:12, 212:12, 212:14, 213:9, 214:4, 216:19, 218:7, 225:6, 226:20, 226:21, 227:5
**FAILED** [1] - 227:13
**FAILURE** [2] - 53:4, 234:22
**FAIR** [18] - 56:24, 67:24, 70:13, 70:15, 70:16, 88:15, 90:9, 90:10, 91:4, 92:18, 96:25, 99:12, 108:11, 116:24, 158:24, 212:8, 214:5, 226:23
**FAIRLY** [11] - 14:6, 20:8, 40:2, 46:23, 55:15, 56:7, 56:25, 84:15, 92:15, 120:24, 133:20
**FALL** [4] - 15:6, 16:1, 52:1, 197:24
**FALLS** [4] - 15:4, 52:2, 187:21, 239:15
**FALSELY** [3] - 218:11, 218:12, 238:6
**FAMILIAL** [1] - 39:18
**FAMILIAR** [7] - 110:23, 149:21, 151:9, 151:12, 171:11, 171:13, 177:9
**FAMILIES** [1] - 213:23
**FAMILY** [60] - 13:20, 19:7, 19:8, 29:9, 30:6, 35:25, 36:8, 36:12, 37:2, 37:3, 37:7, 39:19, 39:24, 40:1, 40:2, 40:7, 40:14, 43:20, 43:21, 44:3, 53:4, 54:5, 81:24, 82:4, 84:23, 86:3, 86:4, 91:9, 111:20, 111:22, 112:4, 124:22, 124:23, 130:17, 134:2, 195:24, 196:1, 200:21, 201:2, 201:3,

201:21, 202:13, 202:24, 202:25, 203:6, 203:15, 203:16, 209:13, 210:16, 211:4, 211:5, 211:7, 214:1, 230:21, 231:7, 232:15, 233:1, 237:17, 240:1

**FAMILY'S** [1] - 200:10

**FAR** [16] - 27:25, 30:11, 71:8, 91:22, 111:10, 144:11, 156:5, 162:4, 180:11, 202:14, 204:1, 213:12, 220:24, 222:22, 223:16, 228:7

**FASHION** [1] - 194:19

**FASTEN** [1] - 47:6

**FATAL** [1] - 240:7

**FATHER** [33] - 13:17, 15:21, 15:24, 16:8, 17:5, 17:16, 18:25, 26:1, 26:2, 26:5, 26:10, 27:8, 30:4, 32:19, 32:21, 32:22, 40:10, 51:15, 56:23, 61:8, 85:16, 90:22, 91:25, 93:16, 94:2, 107:7, 131:1, 134:6, 137:8, 139:13, 196:3, 202:1, 237:18

**FATS** [1] - 204:20

**FAULT** [4] - 16:11, 81:11, 200:14, 202:22

**FAULTS** [1] - 196:6

**FAVOR** [2] - 218:20, 219:1

**FBI** [8] - 191:13, 191:14, 192:6, 192:16, 192:20, 215:8, 221:24, 227:23

**FCC** [5] - 157:17, 158:1, 158:15, 177:15

**FCI** [2] - 156:18, 156:25

**FCRR** [1] - 1:18

**FEAR** [1] - 61:12

**FEATURES** [2] - 142:17, 237:12

**FEBRUARY** [2] - 8:16, 8:17

**FED** [1] - 201:15

**FEDERAL** [14] - 2:6, 2:13, 9:18, 148:7, 148:18, 156:21,

179:12, 180:15, 214:21, 215:7, 221:15, 226:4, 228:13, 236:9

**FEELINGS** [6] - 30:8, 30:22, 31:1, 48:17, 98:12, 211:4

**FEET** [1] - 202:23

**FELLOW** [3] - 5:4, 5:7, 5:9

**FELONY** [3] - 190:8, 190:14, 211:21

**FELT** [2] - 43:11, 153:4

**FEMALE** [8] - 18:13, 113:13, 113:23, 114:6, 115:10, 117:13, 138:9, 163:13

**FENCE** [1] - 104:1

**FERTILE** [1] - 221:3

**FESTERING** [1] - 192:12

**FEW** [6] - 23:8, 28:10, 44:7, 107:9, 139:1, 234:8

**FICTION** [1] - 203:19

**FIELD** [2] - 5:17, 15:4

**FIFTH** [1] - 93:3

**FIGHTING** [2] - 125:21, 195:11

**FIGURE** [2] - 15:17, 205:16

**FILE** [6] - 165:1, 165:4, 188:23, 189:2, 240:23, 241:4

**FILED** [5] - 74:13, 75:16, 75:18, 75:20, 76:15

**FILING** [3] - 9:9, 9:13, 9:16

**FILTHY** [1] - 38:20

**FINAL** [5] - 66:23, 97:5, 106:8, 178:3, 205:5

**FINALLY** [8] - 135:3, 141:13, 175:9, 206:20, 215:11, 225:11, 229:14, 240:5

**FINE** [5] - 73:6, 148:20, 202:20, 203:6, 207:19

**FINGER** [4] - 125:17, 135:25, 136:5, 136:12

**FINGERPRINTS** [1] - 224:7

**FINGERS** [1] - 47:21

**FINISHED** [2] - 4:15,

4:20

**FIRE** [1] - 75:11

**FIREARM** [1] - 190:10

**FIREPLACE** [1] - 227:1

**FIRST** [42] - 1:19, 21:7, 28:21, 31:24, 51:3, 76:12, 78:13, 78:24, 97:7, 97:10, 102:14, 102:18, 106:14, 107:24, 108:3, 111:11, 117:2, 122:15, 131:10, 134:18, 149:13, 149:16, 154:5, 157:9, 163:5, 163:6, 170:12, 178:23, 179:14, 190:6, 192:10, 192:17, 193:22, 200:4, 201:13, 208:1, 210:13, 212:3, 215:9, 217:5, 219:24, 228:15

**FIRSTHAND** [2] - 94:21, 202:16

**FISHING** [5] - 109:18, 110:13, 120:6, 120:12, 120:22

**FISTS** [1] - 44:17

**FIT** [2] - 25:7, 225:9

**FIVE** [7] - 40:21, 48:4, 149:25, 179:1, 197:25, 200:3, 206:14

**FIVE-MINUTE** [1] - 179:1

**FIXED** [1] - 199:13

**FLASHBACKS** [4] - 61:18, 63:17, 64:16, 123:15

**FLAVOR** [1] - 232:17

**FLIER** [1] - 151:17

**FLIES** [1] - 221:7

**FLIPPANT** [1] - 153:13

**FLOATING** [2] - 220:12, 221:1

**FLOOR** [1] - 1:19

**FLY** [1] - 76:14

**FLYERS** [1] - 150:6

**FOCUS** [2] - 5:25, 6:2

**FOCUSED** [2] - 21:20, 23:12

**FOCUSING** [1] - 94:11

**FOLD** [1] - 6:2

**FOLLOW** [4] - 60:15, 84:7, 84:9, 110:11

**FOLLOWED** [1] - 208:6

**FOLLOWING** [3] -

192:20, 207:21, 212:3

**FOLLOWS** [1] - 198:10

**FOLLOWUP** [1] - 53:1

**FONDLE** [2] - 47:9, 47:12

**FONDLED** [1] - 136:3

**FONDLING** [3] - 53:13, 123:25, 131:11

**FONDLINGS** [1] - 122:10

**FOOD** [2] - 51:8, 204:19

**FORCE** [2] - 7:22, 16:5

**FORCED** [16] - 17:4, 51:7, 85:4, 85:5, 85:7, 85:15, 85:16, 94:18, 95:1, 118:2, 119:17, 120:12, 135:23, 138:1, 139:12, 147:5

**FORCING** [6] - 15:24, 26:5, 47:22, 51:15, 134:7

**FOREGOING** [1] - 241:10

**FOREMOST** [1] - 212:3

**FORENSIC** [7] - 4:6, 4:18, 5:3, 23:9, 31:15, 33:24, 62:7

**FORGET** [1] - 238:5

**FORGETTING** [1] - 117:23

**FORGOT** [2] - 145:9, 192:7

**FORM** [9] - 15:11, 15:14, 39:8, 39:15, 49:3, 151:16, 186:10, 188:9, 192:19

**FORMAL** [2] - 209:19, 210:5

**FORMALLY** [1] - 39:10

**FORMS** [1] - 187:19

**FORMULATE** [2] - 188:15, 189:4

**FORMULATED** [1] - 193:10

**FORTH** [4] - 37:21, 49:16, 104:15, 167:13

**FORTUNATELY** [1] - 14:6

**FORWARD** [4] - 9:7, 124:20, 125:6, 223:9

**FOSTER** [1] - 201:24

**FOUR** [9] - 20:5, 92:13, 119:6, 128:2, 193:6, 204:15, 213:16, 237:3

**FRACTURED** [1] - 56:2

**FRACTURES** [1] - 202:6

**FRAGILE** [3] - 57:1, 57:7, 228:16

**FRAGMENTED** [3] - 20:24, 42:15, 55:22

**FRAGMENTS** [2] - 21:2, 21:5

**FRAME** [3] - 179:24, 180:1, 180:11

**FRAMINGHAM** [1] - 10:18

**FRANKLY** [2] - 184:2, 238:18

**FRATERNAL** [1] - 117:24

**FRAUD** [5] - 178:14, 181:13, 238:18, 239:5, 239:6

**FRAUDULENT** [2] - 178:5, 178:7

**FRED** [1] - 174:11

**FREE** [2] - 146:24, 194:7

**FREQUENT** [1] - 21:14

**FREQUENTLY** [2] - 19:21, 44:25

**FRIDAY** [1] - 194:13

**FRIEND** [4] - 115:6, 117:10, 238:12, 238:13

**FRIENDLY** [1] - 202:20

**FRIENDS** [3] - 191:21, 196:15, 197:12

**FRONT** [10] - 33:4, 89:3, 101:2, 111:7, 165:24, 176:22, 188:13, 189:4, 214:21, 222:1

**FRUSTRATION** [1] - 45:6

**FULL** [12] - 3:8, 105:9, 106:3, 122:5, 147:20, 147:22, 154:2, 156:1, 208:10, 208:18, 219:2, 231:13

**FULL-BLOWN** [1] - 122:5

**FULL-TIME** [2] - 154:2, 156:1

**FULLY** [4] - 208:10, 209:22, 216:18, 220:11
**FUNCTION** [4] - 58:3, 58:17, 58:20, 231:2
**FUNCTIONING** [3] - 20:11, 20:23, 36:8
**FUNDAMENTAL** [2] - 49:17, 135:13
**FUNDED** [1] - 144:7
**FUNDS** [1] - 169:12
**FUTURE** [7] - 195:22, 196:18, 197:3, 199:22, 204:24, 225:17, 226:8

## G

**GAG** [1] - 194:21
**GAIN** [4] - 41:16, 175:10, 192:17, 193:14
**GALLERY** [2] - 9:2, 9:3
**GALLONS** [1] - 38:10
**GAME** [3] - 67:24, 96:25, 195:12
**GATHER** [2] - 71:13, 86:15
**GC** [17] - 71:24, 82:24, 82:25, 97:1, 108:14, 108:15, 114:19, 143:12, 143:13, 143:15, 143:23, 198:10, 205:15, 242:17
**GENE** [1] - 202:21
**GENERAL** [4] - 35:24, 81:17, 99:10, 111:14
**GENERALLY** [2] - 6:9, 24:21
**GENERATED** [1] - 151:10
**GENERATIONS** [1] - 232:15
**GENETIC** [1] - 203:2
**GENEVA** [1] - 38:13
**GENITALS** [1] - 47:22
**GENTLEMEN** [1] - 106:3
**GENUINE** [5] - 34:19, 34:20, 35:3, 35:15, 104:15
**GENUINENESS** [1] - 25:5
**GERM** [1] - 192:2
**GESTALT** [1] - 130:3
**GHANA** [1] - 201:11
**GIRL** [13] - 100:15, 101:8, 101:15, 101:23, 103:1, 106:15, 106:21, 106:24, 107:9, 108:3, 108:11, 113:7, 117:2
**GIRLS** [1] - 129:13
**GIVEN** [15] - 6:6, 64:5, 70:3, 122:11, 130:16, 166:24, 186:8, 197:18, 212:1, 212:2, 214:9, 222:24, 229:11, 234:19, 239:8
**GLENN** [3] - 54:15, 54:19, 198:2
**GLENNIS** [1] - 54:15
**GOAL** [5] - 83:22, 102:5, 102:9, 102:15, 102:21
**GOODS** [1] - 233:1
**GOVERNMENT** [88] - 1:14, 2:2, 22:12, 22:17, 22:20, 23:4, 35:13, 68:2, 72:6, 72:24, 73:10, 74:6, 74:9, 75:13, 75:25, 76:11, 76:20, 76:23, 77:7, 82:23, 108:14, 108:15, 114:19, 128:1, 128:6, 129:2, 143:23, 147:19, 178:2, 182:20, 182:24, 183:8, 183:11, 183:22, 184:20, 186:10, 187:1, 188:2, 188:8, 189:10, 189:11, 189:20, 190:5, 190:23, 191:6, 191:11, 191:19, 192:6, 192:8, 194:17, 194:18, 194:20, 196:23, 197:13, 197:17, 198:7, 198:10, 200:9, 200:18, 205:14, 209:11, 211:19, 212:17, 213:6, 215:18, 216:17, 217:11, 218:2, 218:13, 219:3, 219:15, 220:15, 220:21, 221:15, 221:19, 222:12, 224:10, 224:18, 225:12, 225:20, 225:22, 229:7, 231:22, 233:8, 238:1, 240:10, 242:16

**GOVERNMENT'S** [10] - 71:24, 189:1, 189:4, 207:14, 211:17, 217:22, 220:5, 221:24, 225:8, 235:6
**GR** [3] - 183:9, 183:11, 242:18
**GRAB** [1] - 47:10
**GRABBED** [1] - 43:13
**GRACE** [1] - 239:15
**GRACES** [1] - 194:8
**GRADUATED** [1] - 135:24
**GRANDKIDS** [1] - 203:7
**GRANDSON** [1] - 196:12
**GRANITE** [2] - 225:25, 226:2
**GRANTED** [1] - 77:1
**GRANTS** [1] - 5:13
**GRAPHIC** [1] - 120:24
**GRATIFY** [1] - 45:6
**GRATUITOUS** [1] - 206:3
**GRAVETTE** [2] - 198:22, 226:10
**GRAY** [3] - 144:6, 144:12, 242:11
**GREAT** [10] - 21:1, 30:13, 104:11, 206:20, 212:1, 215:13, 231:24, 238:11, 239:4, 239:23
**GREW** [2] - 13:20, 133:21
**GROOMING** [3] - 17:13, 46:24, 48:10
**GROUND** [1] - 221:3
**GROUP** [1] - 200:3
**GROWING** [4] - 9:3, 30:5, 232:8, 238:14
**GROWS** [1] - 130:9
**GUARANTEES** [1] - 146:20
**GUARD** [1] - 227:15
**GUERRERO** [1] - 194:3
**GUESS** [16] - 5:16, 56:24, 69:6, 84:4, 96:5, 103:17, 110:9, 112:19, 114:3, 149:20, 158:11, 158:24, 158:25, 170:22, 219:15, 222:3
**GUILE** [1] - 205:3
**GUILT** [3] - 16:16,

209:16, 216:18
**GUILTY** [10] - 74:25, 75:2, 123:2, 123:7, 125:6, 200:6, 208:15, 208:23, 209:17, 212:19
**GURGANUS** [18] - 1:14, 144:10, 147:3, 147:9, 178:1, 181:6, 183:4, 183:7, 184:1, 184:12, 185:9, 185:21, 186:12, 186:15, 186:18, 187:11, 188:18, 188:19
**GURGANUS'S** [1] - 215:21
**GUY** [2] - 118:25, 165:25
**GUYS** [2] - 155:9, 205:25

## H

**HAINES** [74] - 2:2, 10:4, 65:15, 65:23, 65:25, 66:3, 67:14, 68:4, 68:8, 68:9, 72:4, 72:23, 73:4, 73:9, 73:14, 73:17, 73:25, 74:17, 76:1, 76:5, 77:13, 78:2, 78:3, 78:8, 78:11, 78:15, 78:17, 79:1, 79:2, 79:14, 79:20, 80:9, 81:7, 97:1, 97:4, 97:13, 97:17, 97:24, 98:3, 98:6, 103:19, 127:10, 128:8, 128:12, 140:1, 143:5, 143:9, 143:12, 143:15, 143:17, 147:15, 147:24, 148:3, 151:1, 151:8, 153:8, 153:14, 171:2, 171:4, 172:1, 172:14, 172:21, 173:6, 173:18, 174:8, 175:12, 177:21, 189:12, 230:20, 238:11, 240:19, 240:20, 242:9, 242:13
**HAIR** [2] - 48:19
**HAITI** [2] - 144:6, 201:11
**HALF** [2] - 124:4, 199:14
**HAMMER** [270] - 1:6,

12:3, 12:22, 16:8, 25:14, 26:11, 28:25, 30:11, 36:4, 37:3, 43:8, 47:25, 48:12, 50:13, 53:18, 56:4, 70:25, 71:1, 71:11, 71:19, 74:18, 74:23, 75:10, 76:22, 76:24, 78:9, 79:3, 79:22, 80:2, 80:11, 81:19, 83:11, 83:13, 83:17, 83:20, 83:25, 84:2, 84:15, 86:1, 86:3, 87:22, 88:18, 88:20, 89:9, 89:19, 89:24, 90:13, 90:25, 91:8, 91:22, 92:14, 93:18, 93:19, 93:25, 96:7, 100:7, 100:11, 100:12, 100:14, 101:7, 102:25, 103:6, 104:3, 104:19, 104:24, 105:2, 105:10, 105:20, 105:23, 106:7, 106:14, 107:8, 109:17, 110:14, 111:1, 113:5, 114:24, 115:16, 116:18, 116:22, 117:16, 118:10, 118:14, 118:22, 120:23, 121:21, 122:3, 122:24, 123:6, 125:4, 126:24, 127:3, 127:14, 131:5, 132:6, 132:18, 133:13, 137:4, 138:22, 140:13, 141:21, 143:14, 144:8, 144:17, 145:2, 145:8, 146:19, 149:7, 149:9, 149:14, 149:23, 150:13, 150:20, 151:10, 152:14, 152:25, 153:4, 153:9, 156:2, 157:4, 157:13, 158:7, 159:4, 159:21, 160:6, 160:8, 164:3, 166:23, 167:11, 167:13, 167:16, 167:18, 167:20, 169:23, 170:10, 171:11, 171:21, 172:7, 174:3, 175:5, 178:17, 178:22, 178:25, 179:19,

179:22, 181:10, 181:16, 182:2, 182:19, 182:22, 183:17, 189:14, 190:6, 190:22, 192:4, 192:5, 192:14, 192:16, 193:8, 193:17, 193:21, 194:2, 194:9, 194:10, 194:14, 194:16, 194:19, 194:22, 195:14, 196:11, 196:13, 196:14, 196:15, 197:2, 197:5, 198:5, 198:6, 198:9, 198:16, 198:20, 198:22, 199:2, 199:19, 200:6, 200:14, 200:22, 201:3, 202:2, 202:5, 202:9, 202:18, 202:22, 203:24, 204:6, 204:16, 204:23, 205:3, 205:12, 206:5, 206:10, 207:24, 208:5, 208:9, 208:15, 208:17, 208:23, 212:6, 212:11, 213:4, 214:14, 214:16, 214:24, 216:13, 216:18, 218:3, 218:5, 218:10, 218:20, 218:22, 218:25, 219:7, 219:18, 219:25, 220:2, 220:3, 223:2, 224:7, 224:8, 224:16, 226:9, 226:11, 226:15, 226:25, 227:17, 228:4, 228:12, 228:15, 229:4, 229:8, 229:18, 229:21, 230:16, 230:25, 231:7, 231:15, 231:21, 231:25, 233:5, 233:11, 233:12, 233:14, 233:17, 233:20, 234:10, 234:17, 234:23, 235:4, 235:11, 235:17, 237:6, 237:9, 237:12, 237:25, 238:3, 239:19, 240:11, 240:14
**HAMMER'S** [50] -

38:6, 39:20, 55:18, 66:21, 87:5, 89:3, 98:16, 102:3, 106:2, 106:4, 106:25, 115:14, 118:17, 123:9, 137:1, 150:11, 151:20, 152:5, 168:1, 168:5, 173:19, 178:4, 178:10, 181:5, 182:21, 191:8, 191:12, 193:5, 193:9, 193:14, 197:21, 198:12, 199:7, 199:12, 200:9, 201:9, 201:14, 202:23, 204:25, 205:7, 205:9, 214:17, 216:16, 227:12, 228:9, 230:11, 230:21, 232:15, 235:1
**HAND** [9] - 43:1, 47:19, 67:20, 72:23, 82:23, 109:12, 136:4, 211:10
**HANDED** [5] - 68:12, 69:18, 72:25, 76:10, 102:13
**HANDLE** [1] - 60:20
**HANDLED** [1] - 176:5
**HANDS** [8] - 13:6, 44:17, 54:15, 111:20, 126:11, 139:12, 232:6, 238:9
**HANDWRITING** [5] - 220:23, 220:24, 221:18, 222:6, 223:2
**HANDWRITTEN** [2] - 26:19, 221:1
**HANG** [1] - 113:10
**HANGING** [1] - 44:16
**HAPPY** [2] - 188:4, 231:7
**HARDER** [1] - 71:10
**HARDEST** [1] - 58:3
**HARDLY** [1] - 13:21
**HARM** [4] - 15:18, 229:22, 234:18, 234:19
**HARP** [1] - 226:2
**HARRIS** [1] - 2:9
**HARRISBURG** [1] - 2:7
**HAUTE** [17] - 40:17, 144:18, 148:18, 149:2, 154:6, 156:14, 156:18, 156:23, 157:17,

158:1, 158:8, 158:15, 159:8, 159:9, 159:11, 177:15
**HAWAII** [1] - 187:24
**HEAD** [3] - 47:11, 236:20
**HEADERS** [1] - 29:24
**HEALTH** [8] - 199:17, 204:15, 226:3, 231:20, 233:15, 233:25, 236:13, 237:2
**HEALTHY** [1] - 30:17
**HEAR** [16] - 17:18, 20:20, 75:6, 78:24, 145:11, 148:20, 159:13, 167:15, 174:2, 189:10, 198:3, 208:8, 209:14, 209:15, 210:7, 230:20
**HEARD** [41] - 25:11, 44:6, 78:21, 124:24, 146:10, 151:2, 151:3, 159:21, 165:9, 165:12, 165:25, 181:15, 190:11, 192:24, 195:24, 200:2, 200:13, 201:8, 201:10, 201:20, 202:16, 203:1, 205:6, 206:9, 211:2, 213:24, 216:16, 217:6, 217:14, 221:13, 226:10, 227:11, 230:20, 230:21, 230:24, 236:1, 237:22, 237:23, 237:24, 237:25
**HEARING** [18] - 1:12, 25:11, 32:10, 33:20, 34:25, 65:13, 74:8, 88:18, 132:25, 144:19, 183:2, 208:1, 212:16, 213:18, 214:19, 227:25, 228:1, 241:8
**HEARINGS** [2] - 72:10, 226:12
**HEARSAY** [6] - 151:7, 178:9, 180:20, 180:22, 181:22, 182:5
**HEART** [4] - 106:10, 200:8, 204:17, 228:20
**HEAVILY** [1] - 211:14

**HEIGHTENED** [1] - 222:17
**HELD** [2] - 231:6, 231:10
**HELLO** [1] - 171:6
**HELP** [12] - 6:23, 9:7, 52:17, 110:9, 114:22, 204:2, 204:9, 213:5, 213:25, 221:5, 234:4, 236:25
**HELPED** [1] - 206:1
**HELPFUL** [1] - 187:16
**HELPLESS** [2] - 193:18, 195:10
**HELPS** [1] - 113:11
**HEROIN** [1] - 29:6
**HERRING** [1] - 238:20
**HESITATING** [1] - 86:22
**HI** [1] - 171:5
**HIERARCHY** [1] - 168:22
**HIGH** [4] - 20:9, 180:16, 223:12, 225:5
**HIGHER** [4] - 6:17, 47:19, 62:1
**HIGHLIGHTED** [4] - 27:4, 27:10, 133:1, 137:5
**HIMSELF** [15] - 16:23, 30:7, 30:21, 31:3, 43:13, 54:6, 100:11, 120:18, 125:14, 197:15, 204:19, 212:21, 214:19, 214:21, 229:9
**HIPPOCAMPUS** [4] - 20:11, 20:23, 42:8, 42:10
**HIRED** [1] - 38:6
**HISTORICAL** [1] - 24:16
**HISTORIES** [2] - 106:4, 142:23
**HISTORY** [21] - 15:2, 25:1, 35:8, 39:17, 42:1, 43:20, 54:5, 57:25, 61:15, 64:5, 84:1, 111:3, 127:4, 142:1, 142:2, 198:13, 204:8, 218:11, 229:19, 232:5
**HIT** [1] - 110:14
**HITS** [1] - 240:25
**HOLD** [2] - 135:9, 204:10
**HOLDING** [1] - 212:25

**HOLIDAYS** [1] - 201:17
**HOME** [10] - 27:12, 39:22, 46:6, 51:2, 60:6, 60:25, 122:11, 130:9, 198:25, 232:7
**HOMES** [2] - 12:11, 51:10
**HOMICIDE** [1] - 31:23
**HONEST** [1] - 41:21
**HONESTLY** [2] - 73:23, 170:3
**HONESTY** [1] - 187:9
**HONEY** [1] - 206:13
**HONOR** [148] - 3:3, 3:5, 3:16, 10:1, 11:1, 26:15, 28:15, 47:24, 48:7, 65:6, 65:10, 68:8, 72:4, 72:9, 72:22, 72:24, 72:25, 73:25, 74:4, 74:9, 74:17, 75:7, 75:17, 76:2, 76:14, 77:9, 77:13, 78:3, 78:8, 78:19, 79:1, 79:13, 79:15, 80:3, 80:21, 97:4, 97:23, 127:11, 127:13, 127:24, 128:9, 128:12, 128:19, 132:15, 136:19, 139:24, 142:7, 143:5, 143:6, 143:9, 143:20, 144:3, 144:14, 144:17, 145:5, 145:10, 146:18, 147:9, 147:12, 147:16, 147:25, 151:1, 151:5, 153:14, 166:9, 166:12, 169:20, 171:2, 172:9, 172:17, 173:9, 175:13, 177:21, 177:23, 178:1, 178:17, 179:4, 179:6, 179:20, 180:3, 180:9, 180:14, 181:6, 183:4, 183:23, 184:19, 185:9, 185:20, 186:12, 186:15, 186:18, 186:24, 187:10, 187:12, 189:12, 189:14, 190:4, 190:22, 191:7, 197:5, 203:19, 205:5, 206:9, 206:20, 207:11,

207:20, 208:14, 210:10, 211:8, 211:16, 211:23, 212:4, 213:14, 214:4, 214:14, 215:25, 217:5, 217:18, 218:9, 219:11, 219:19, 220:8, 220:15, 221:9, 221:17, 221:22, 222:4, 222:10, 222:17, 223:15, 224:3, 224:17, 224:24, 225:2, 225:6, 225:11, 225:16, 227:13, 229:8, 229:14, 229:23, 230:1, 230:2, 230:4, 240:5, 240:20, 241:7

**HONORABLE** [1] - 1:10

**HONORS** [2] - 5:13, 5:15

**HOPED** [1] - 90:12

**HOPEFULLY** [1] - 66:3

**HORRENDOUS** [1] - 229:9

**HORRIBLE** [1] - 201:7

**HORRIFIC** [1] - 49:11

**HORRORS** [1] - 203:24

**HORSE** [1] - 201:20

**HOSPITAL** [16] - 4:18, 32:2, 63:11, 68:19, 68:24, 108:17, 109:3, 109:11, 111:11, 190:14, 197:25, 202:3, 202:5, 211:24, 212:3, 236:18

**HOSPITALIZATIONS** [2] - 63:6, 68:20

**HOSPITALIZED** [2] - 62:22, 63:10

**HOST** [2] - 218:11, 218:12

**HOSTAGE** [12] - 190:14, 193:9, 193:12, 193:20, 197:23, 197:25, 198:4, 217:24, 218:21, 219:16, 220:7, 228:2

**HOSTAGE-TAKING** [1] - 228:2

**HOSTAGES** [1] - 193:23

**HOT** [5] - 25:23,

25:24, 38:11, 38:23, 227:14

**HOURS** [4] - 40:21, 124:11, 191:13, 223:21

**HOUSE** [6] - 26:4, 134:11, 134:12, 134:13, 226:25, 235:9

**HOUSED** [3] - 141:25, 236:13, 239:20

**HOUSEHOLD** [2] - 36:24, 201:24

**HOUSES** [1] - 95:23

**HOUSING** [1] - 197:10

**HOUSTON** [2] - 8:18, 8:19

**HUDDLESTON** [1] - 226:19

**HUDDLESTONS** [2] - 198:1, 227:8

**HUG** [1] - 227:3

**HUM** [1] - 162:15

**HUMAN** [4] - 41:21, 41:23, 65:4, 240:8

**HUMANS** [1] - 224:1

**HUMILIATING** [2] - 41:20, 125:11

**HUMILIATION** [1] - 125:14

**HUMPHREY** [1] - 2:9

**HUNDRED** [2] - 8:7, 8:8

**HUNDREDS** [3] - 24:10, 25:9

**HUSTLER** [1] - 27:14

**HYDE** [4] - 204:20, 228:12, 228:21, 229:12

**HYDE'S** [3] - 228:8, 228:10, 228:18

**HYPERALERT** [2] - 45:18, 45:19

**HYPERSTATE** [1] - 59:16

**HYPERVIGILANCE** [2] - 45:13, 46:3

**HYPERVIGILANT** [1] - 59:16

---

**I**

**IDEA** [5] - 53:19, 113:22, 158:14, 174:22, 192:2

**IDEATION** [1] - 62:2

**IDENTIFIED** [2] - 29:8, 29:13

**IDENTIFY** [2] - 23:19, 63:14

**IDENTITY** [2] - 17:6, 102:17

**IDIOSYNCRATIC** [2] - 141:5, 141:6

**ILL** [4] - 199:17, 204:15, 235:20, 236:14

**ILLNESS** [6] - 19:8, 37:1, 43:21, 49:14, 206:5, 239:25

**ILLNESSES** [1] - 232:2

**IMAGINE** [1] - 58:8

**IMMEDIATE** [2] - 19:7, 37:2

**IMMINENT** [4] - 210:9, 210:14, 210:25

**IMMUTABLE** [1] - 14:10

**IMPACT** [12] - 6:4, 7:3, 9:19, 10:3, 10:9, 37:24, 58:2, 58:16, 58:19, 195:22, 196:16, 239:25

**IMPACTS** [1] - 57:10

**IMPAIRED** [3] - 14:2, 64:8, 233:2

**IMPAIRMENTS** [1] - 14:4

**IMPEDE** [1] - 20:11

**IMPINGE** [1] - 58:23

**IMPLICATION** [1] - 105:4

**IMPLICATIONS** [1] - 7:7

**IMPLICIT** [2] - 42:5, 42:14

**IMPLYING** [1] - 107:3

**IMPORT** [4] - 23:10, 35:12, 40:3, 57:13

**IMPORTANT** [7] - 29:13, 29:15, 35:16, 35:22, 38:2, 43:23, 113:19

**IMPORTANTLY** [1] - 202:11

**IMPOSE** [1] - 195:17

**IMPRESSION** [1] - 138:1

**IMPROPER** [4] - 172:18, 173:4, 179:25, 180:10

**IMPROVES** [1] - 239:10

**IMPULSIVITY** [4] - 13:14, 13:23, 64:6, 192:13

**INABILITY** [2] - 64:20, 230:23

**INADEQUATE** [1] -

236:12

**INAPPROPRIATE** [1] - 98:18

**INAPPROPRIATELY** [1] - 213:4

**INCEST** [20] - 15:14, 48:24, 49:2, 50:5, 84:24, 85:2, 85:3, 91:9, 91:23, 92:17, 93:15, 93:21, 94:1, 99:4, 113:2, 122:8, 125:9, 131:25, 133:22, 203:21

**INCESTUOUS** [5] - 51:16, 51:17, 134:18, 136:7, 139:12

**INCIDENT** [28] - 21:14, 92:9, 92:10, 92:18, 108:3, 110:12, 110:16, 110:19, 111:1, 111:5, 113:6, 113:7, 131:10, 140:16, 153:19, 164:23, 165:8, 165:23, 168:20, 168:25, 173:15, 190:14, 212:4, 213:13, 216:11, 219:6, 227:8, 236:21

**INCIDENTS** [4] - 55:15, 104:16, 121:5, 122:3

**INCLUDE** [5] - 9:21, 66:12, 67:16, 107:23, 211:1

**INCLUDED** [3] - 91:5, 135:24, 139:1

**INCLUDES** [1] - 25:6

**INCLUDING** [9] - 35:13, 78:9, 96:7, 104:12, 142:24, 195:19, 239:15, 239:16

**INCONSISTENCIES** [2] - 81:5, 218:17

**INCONSISTENCY** [3] - 70:13, 70:17, 80:19

**INCONSISTENT** [1] - 182:11

**INCORRECT** [1] - 13:12

**INCREASES** [1] - 40:7

**INCREDIBLE** [3] - 16:10, 45:16, 238:24

**INCREDIBLY** [1] - 195:4

**INDEED** [2] - 133:13, 230:15

**INDEPENDENT** [1] -

80:7

**INDEX** [1] - 242:1

**INDIANA** [2] - 148:8, 148:19

**INDICATE** [8] - 67:15, 68:18, 68:23, 69:21, 158:7, 189:2, 199:8, 229:18

**INDICATED** [9] - 69:1, 69:9, 69:14, 83:12, 110:22, 127:14, 145:17, 171:7, 200:15

**INDICATES** [3] - 85:10, 110:5, 177:14

**INDICATING** [2] - 29:16, 36:19

**INDICATION** [3] - 36:22, 176:24, 177:1

**INDIRECT** [3] - 23:25, 24:2, 24:18

**INDIVIDUAL** [8] - 24:18, 57:1, 138:14, 144:5, 176:14, 185:12, 217:7, 230:17

**INDIVIDUALS** [17] - 13:24, 35:18, 46:12, 51:2, 55:11, 55:24, 57:24, 120:9, 120:11, 133:25, 141:6, 142:22, 213:10, 214:2, 216:11, 216:12, 221:3

**INDOCTRINATING** [1] - 203:25

**INEVITABLY** [1] - 16:10

**INFANCY** [1] - 49:8

**INFER** [1] - 92:8

**INFERIOR** [1] - 58:10

**INFERIORITY** [1] - 61:12

**INFINITE** [1] - 130:6

**INFIRMITIES** [1] - 234:20

**INFIRMITY** [1] - 240:7

**INFLICT** [1] - 38:25

**INFLICTED** [5] - 13:17, 17:17, 23:2, 43:10, 189:24

**INFLICTING** [3] - 15:18, 44:22, 45:5

**INFLUENCE** [1] - 61:5

**INFLUENCED** [1] - 222:18

**INFORMATION** [12] - 17:19, 27:25, 68:11, 78:4, 78:21, 79:15,

97:3, 99:13, 104:12, 135:9, 181:15, 181:17
**INFORMED** [1] - 17:20
**INITIAL** [3] - 17:14, 48:10, 120:16
**INJECTION** [2] - 211:15, 240:17
**INJURED** [1] - 213:9
**INJURIES** [2] - 202:8, 227:9
**INJURY** [4] - 189:25, 213:12, 227:22
**INMATE** [13] - 29:4, 29:11, 30:1, 30:6, 149:10, 152:6, 152:7, 152:11, 161:25, 167:5, 198:4, 198:12, 198:15
**INMATES** [11] - 149:16, 152:12, 152:20, 167:4, 167:13, 198:18, 228:17, 235:9, 235:19, 235:20, 236:14
**INQUIRE** [2] - 166:13, 169:19
**INQUIRY** [2] - 18:2, 21:15
**INSERT** [2] - 47:21, 136:5
**INSERTED** [1] - 38:10
**INSIDE** [2] - 162:21, 164:12
**INSIDES** [2] - 38:24, 43:11
**INSIGNIFICANT** [1] - 122:2
**INSPIRATION** [1] - 205:20
**INSPIRED** [1] - 230:15
**INSTABILITY** [1] - 29:11
**INSTANCE** [7] - 30:25, 32:25, 39:6, 43:7, 53:22, 54:14, 133:18
**INSTANCES** [4] - 14:21, 53:25, 55:3, 181:12
**INSTEAD** [1] - 197:7
**INSTILLS** [1] - 133:24
**INSTITUTE** [2] - 4:19, 141:25
**INSTITUTION** [1] - 235:21
**INSTITUTIONAL** [1] - 234:22
**INSTRUCTIONS** [1] -

208:7
**INSTRUMENTS** [1] - 194:16
**INTACT** [1] - 36:8
**INTELLIGENTLY** [1] - 146:5
**INTENT** [1] - 190:18
**INTENTION** [1] - 193:12
**INTENTIONALLY** [2] - 189:22, 189:24
**INTER** [1] - 35:17
**INTER-RATER** [1] - 35:17
**INTERACTION** [1] - 171:14
**INTERCOURSE** [4] - 96:20, 96:23, 112:17, 114:8
**INTERESTING** [2] - 130:20, 224:1
**INTERESTINGLY** [1] - 236:4
**INTERFAMILIAL** [1] - 19:12
**INTERMITTENT** [1] - 233:13
**INTERNAL** [1] - 138:5
**INTERNALIZATION** [2] - 16:13, 58:12
**INTERNALIZE** [1] - 57:15
**INTERNALIZES** [1] - 57:21
**INTERNSHIP** [3] - 4:17, 4:20
**INTERPERSONAL** [1] - 29:7
**INTERPRETATION** [1] - 31:6
**INTERVENTION** [1] - 233:16
**INTERVIEW** [21] - 8:25, 12:6, 12:10, 14:19, 25:16, 71:5, 82:22, 86:4, 89:3, 89:19, 92:14, 93:11, 95:8, 100:14, 129:6, 134:23, 134:25, 135:2, 141:14, 143:14, 238:14
**INTERVIEWED** [28] - 12:8, 56:3, 70:8, 71:1, 71:7, 80:15, 81:24, 82:2, 82:6, 82:9, 82:13, 83:5, 85:25, 86:1, 89:24, 90:15, 100:12, 116:12, 116:16, 124:10, 124:14,

124:21, 135:2, 137:13, 141:17, 182:2, 215:9, 216:10
**INTERVIEWS** [9] - 9:2, 9:3, 9:15, 34:14, 56:13, 102:1, 102:22, 136:24, 138:22
**INTESTINES** [1] - 43:15
**INTIMACY** [1] - 29:11
**INTIMATE** [1] - 56:21
**INTRICATE** [1] - 195:5
**INTRODUCED** [2] - 72:18, 236:24
**INVARIABLE** [1] - 21:6
**INVESTIGATED** [4] - 171:21, 172:3, 172:7, 172:15
**INVESTIGATING** [1] - 7:9
**INVESTIGATION** [1] - 171:17
**INVESTIGATIONS** [3] - 148:15, 149:12, 165:14
**INVESTIGATIVE** [5] - 6:19, 6:21, 7:6, 148:15, 156:1
**INVESTIGATOR** [1] - 86:10
**INVOLUNTARILY** [1] - 76:22
**INVOLVED** [6] - 8:2, 8:20, 213:10, 236:3, 238:3, 238:4
**INVOLVEMENT** [1] - 23:21
**INVOLVING** [3] - 109:18, 142:16, 190:9
**IRAQ** [1] - 42:18
**IRRESOLVABLE** [2] - 15:19, 49:12
**IRREVERSIBLE** [2] - 228:20, 229:1
**ISOLATE** [1] - 45:16
**ISSUE** [6] - 19:12, 23:16, 23:20, 77:1, 184:14, 221:20
**ISSUED** [2] - 70:1, 76:22
**ISSUES** [4] - 6:16, 7:19, 29:17, 237:2
**ITEMS** [6] - 67:7, 67:10, 67:11, 67:16, 167:3, 167:5
**ITSELF** [4] - 25:4, 56:11, 122:16, 192:2

## J

**JACK** [2] - 118:25, 119:11
**JAG** [2] - 6:19, 7:6
**JAIL** [1] - 202:1
**JAMES** [3] - 2:12, 2:12, 66:15
**JANITOR** [2] - 118:25, 119:11
**JANITOR'S** [1] - 119:9
**JANUARY** [4] - 82:14, 210:10, 212:5, 222:2
**JEOPARDIZE** [1] - 198:17
**JESSICA** [1] - 209:10
**JILL** [39] - 26:20, 26:22, 27:7, 66:12, 68:19, 68:21, 69:6, 82:7, 89:2, 89:4, 89:8, 89:19, 89:20, 91:12, 91:14, 91:22, 92:9, 92:13, 93:12, 93:22, 93:25, 100:7, 100:18, 100:21, 101:7, 101:11, 101:23, 105:17, 107:19, 108:7, 115:12, 116:11, 116:16, 118:16, 119:14, 124:8, 136:24, 137:5, 137:13
**JIM** [1] - 143:18
**JM** [7] - 93:1, 101:2, 101:6, 102:13, 136:18, 143:24
**JM-5** [1] - 242:22
**JOB** [4] - 154:6, 203:7, 231:4
**JOE** [1] - 199:4
**JOEL** [1] - 1:10
**JOG** [4] - 108:20, 113:11, 115:19, 138:25
**JOHN** [4] - 1:14, 28:24, 66:17, 234:2
**JOHNNY** [1] - 100:7
**JOIN** [1] - 230:1
**JOKE** [1] - 150:22
**JOSEPH** [1] - 226:2
**JR** [1] - 1:14
**JUDGE** [12] - 12:19, 62:6, 186:23, 209:18, 210:5, 214:21, 222:1, 222:5, 222:10, 222:19, 236:9
**JUDGES** [1] - 6:14
**JUDGMENT** [5] - 14:2,

34:18, 64:8, 88:6, 206:24
**JULY** [2] - 34:12, 100:12
**JUMP** [1] - 221:4
**JUNE** [7] - 54:16, 132:16, 132:25, 179:25, 221:17, 221:23, 222:4
**JUNK** [1] - 204:19
**JURISDICTIONS** [2] - 7:16, 7:17
**JURY** [2] - 186:22, 210:3
**JURY'S** [1] - 209:17
**JUSTICE** [5] - 2:2, 6:13, 228:14, 236:5, 240:6

## K

**KARTEN** [9] - 192:5, 233:9, 233:19, 233:21, 234:9, 234:12, 234:21, 235:15, 235:22
**KATHY** [6] - 11:24, 46:14, 46:15, 202:17, 237:24, 240:2
**KEEP** [8] - 194:21, 200:14, 212:18, 213:8, 218:1, 218:5, 218:9, 219:4
**KEPT** [3] - 164:12, 192:20, 192:22
**KID** [3] - 38:19, 51:5, 58:25
**KIDS** [8] - 51:10, 59:11, 130:12, 133:22, 203:7, 232:18, 232:19, 239:5
**KILL** [9] - 190:18, 191:23, 193:3, 197:16, 197:17, 197:19, 198:5, 198:7, 212:21
**KILLED** [3] - 189:23, 193:8, 200:23
**KILLERS** [1] - 60:25
**KILLING** [3] - 192:9, 192:11, 200:11
**KIND** [41] - 13:23, 14:1, 15:18, 16:3, 16:5, 16:15, 20:14, 21:3, 23:22, 24:17, 36:23, 38:21, 38:23, 39:7, 39:13, 42:12, 44:23, 49:1, 49:25,

54:4, 54:22, 57:25, 58:15, 59:18, 59:19, 59:22, 60:8, 60:16, 95:10, 95:19, 103:16, 120:9, 120:21, 125:8, 125:11, 140:10, 142:5, 150:22, 177:2

**KINDS** [21] - 13:25, 16:22, 20:3, 23:20, 24:21, 24:23, 35:18, 42:9, 44:25, 50:21, 51:10, 58:1, 60:18, 61:1, 63:11, 63:16, 81:4, 104:8, 131:23, 142:23

**KIRBY** [2] - 4:18, 4:20
**KISS** [2] - 47:9
**KISSING** [1] - 47:13
**KITCHEN** [1] - 159:7
**KITE** [1] - 221:6
**KITES** [3] - 220:9, 220:10, 220:12
**KNITTING** [1] - 21:2
**KNOWING** [4] - 45:10, 92:7, 99:8, 208:18
**KNOWINGLY** [1] - 146:2
**KNOWLEDGE** [6] - 7:8, 89:21, 90:18, 94:22, 107:16, 177:18
**KNOWN** [1] - 150:1
**KNOWS** [8] - 74:6, 74:9, 74:21, 98:14, 191:15, 191:16, 192:2, 234:9

## L

**L-I-S-A-K** [1] - 3:11
**LABORED** [1] - 232:3
**LACED** [1] - 38:22
**LACK** [3] - 29:11, 204:22, 236:7
**LAID** [1] - 202:23
**LARGE** [2] - 130:8, 202:13
**LARGELY** [1] - 197:1
**LARRY** [10] - 115:22, 116:4, 116:5, 116:7, 116:9, 116:11, 116:16, 116:17, 119:25, 131:2
**LASHES** [1] - 232:18
**LAST** [15] - 8:14, 45:15, 97:13, 125:18, 145:16, 164:8, 164:9, 164:19, 177:16,

178:1, 186:4, 187:11, 231:6, 236:2
**LASTED** [1] - 118:22
**LATE** [1] - 189:7
**LATHAM** [2] - 119:16, 119:21
**LAUNCH** [1] - 45:22
**LAW** [3] - 6:13, 199:8, 224:20
**LAW-ABIDING** [1] - 199:8
**LAWSUIT** [1] - 236:3
**LAWYERS** [2] - 204:11, 236:5
**LAY** [1] - 37:9
**LAYING** [1] - 27:13
**LEAD** [8] - 13:14, 13:23, 14:1, 49:13, 50:2, 173:20, 173:24, 199:8
**LEADERSHIP** [2] - 6:19, 7:2
**LEADS** [1] - 35:25
**LEAN** [1] - 148:20
**LEANING** [1] - 88:19
**LEARN** [3] - 25:18, 134:1, 150:1
**LEARNED** [5] - 41:15, 56:18, 152:13, 238:5, 238:8
**LEAST** [13] - 9:22, 23:20, 27:24, 31:24, 36:14, 47:14, 53:12, 103:25, 183:25, 213:3, 214:23, 215:23, 232:19
**LEAVE** [4] - 20:19, 46:20, 86:19, 95:2
**LEAVENWORTH** [1] - 199:5
**LEAVING** [2] - 94:15, 182:5
**LED** [2] - 13:6, 228:24
**LEFT** [17] - 26:4, 39:22, 46:2, 51:2, 63:14, 93:8, 120:23, 134:10, 134:12, 155:21, 189:15, 221:16, 221:19, 227:4, 228:21, 230:5
**LEGAL** [3] - 35:20, 156:4, 183:24
**LEGS** [2] - 47:18, 54:21
**LEND** [2] - 55:6, 55:18
**LENGTHY** [7] - 92:15, 92:16, 127:3, 198:12, 199:13, 221:4
**LENNY** [1] - 191:15

**LEONARD** [1] - 220:19
**LESS** [12] - 18:11, 18:18, 19:13, 22:23, 23:2, 23:5, 58:10, 130:15, 198:16, 204:18, 235:24, 237:3
**LETHAL** [2] - 211:15, 240:16
**LETTER** [21] - 52:18, 52:20, 52:21, 68:6, 191:21, 194:2, 200:19, 208:7, 209:10, 209:11, 210:11, 210:12, 210:13, 210:15, 210:23, 211:3, 211:7, 221:6, 221:13, 236:24, 236:25
**LETTERS** [4] - 209:6, 220:9, 220:10, 220:12
**LEVEL** [10] - 16:16, 40:12, 43:4, 65:1, 180:16, 222:17, 223:12, 228:15, 228:16
**LIAR** [1] - 204:1
**LICK** [3] - 47:22, 94:18
**LICKING** [1] - 123:25
**LIE** [9] - 205:17, 205:23, 206:2, 206:3, 206:17, 206:18, 215:6, 215:10
**LIED** [2] - 127:4, 215:2
**LIES** [1] - 49:19
**LIEUTENANT** [3] - 217:6, 227:20, 235:7
**LIFE** [39] - 13:7, 14:4, 14:5, 21:18, 49:7, 50:13, 50:15, 50:19, 56:21, 56:25, 58:18, 58:20, 58:21, 59:8, 59:17, 99:7, 99:8, 116:25, 125:21, 190:1, 195:11, 196:10, 196:14, 197:22, 199:8, 199:9, 201:2, 204:7, 204:11, 205:22, 206:19, 207:22, 208:19, 210:21, 214:23, 230:9, 230:14, 230:17, 240:15
**LIFE-LONG** [3] - 13:7, 14:4, 14:5

**LIFETIME** [2] - 19:16, 199:4
**LIGATURES** [1] - 194:17
**LIGHT** [1] - 62:9
**LIKELIHOOD** [3] - 40:7, 44:1, 50:11
**LIKELY** [6] - 18:11, 18:18, 19:13, 21:19, 88:6, 120:8
**LIMINE** [3] - 76:16, 76:18, 76:20
**LIMITED** [1] - 178:6
**LINCHPIN** [1] - 219:15
**LINE** [4] - 110:24, 114:22, 218:14
**LINES** [3] - 22:5, 80:15, 81:10
**LINK** [2] - 49:6, 220:21
**LINKED** [1] - 221:19
**LINKING** [1] - 222:22
**LISAK** [27] - 3:6, 3:7, 3:10, 3:14, 10:2, 10:12, 10:24, 28:19, 64:5, 65:11, 66:1, 68:10, 71:25, 73:15, 73:18, 74:5, 79:21, 81:8, 97:18, 98:7, 108:17, 114:20, 117:2, 202:15, 232:11, 239:10, 242:5
**LIST** [8] - 66:9, 66:12, 109:9, 113:10, 117:1, 129:2, 130:21, 199:13
**LISTED** [4] - 5:18, 5:21, 130:21, 184:23
**LISTEN** [2] - 41:23, 231:5
**LISTENED** [1] - 169:5
**LITANY** [1] - 203:24
**LITERALLY** [5] - 16:4, 42:21, 43:2, 43:12, 57:23
**LIVE** [8] - 4:9, 9:21, 148:8, 187:19, 190:16, 193:6, 194:14, 199:10
**LIVED** [5] - 56:24, 95:19, 96:2, 96:3, 196:10
**LIVES** [2] - 196:23, 230:24
**LIVING** [2] - 148:12, 205:10
**LOB** [1] - 45:22
**LOCAL** [2] - 7:17, 7:18
**LOLLIPOP** [1] - 122:11

**LOMPOC** [2] - 199:5, 227:11
**LONG-TERM** [4] - 56:16, 59:21, 130:25, 133:23
**LOOK** [32] - 16:19, 23:22, 24:1, 24:22, 33:14, 44:23, 54:10, 78:20, 111:9, 114:20, 163:4, 176:12, 176:21, 178:24, 194:19, 194:25, 211:9, 212:12, 213:14, 217:18, 217:22, 218:1, 218:4, 218:16, 219:11, 219:12, 219:20, 225:6, 226:18, 228:3, 240:24
**LOOKED** [8] - 24:17, 92:22, 100:23, 101:10, 205:19, 205:22, 209:25, 229:19
**LOOKING** [16] - 15:2, 23:25, 24:2, 24:16, 33:2, 40:3, 43:23, 130:5, 180:19, 181:20, 203:13, 210:8, 212:7, 213:9, 226:7, 226:23
**LOOKS** [4] - 27:15, 101:6, 181:22, 181:23
**LOSES** [2] - 59:6
**LOSING** [1] - 229:4
**LOSS** [1] - 200:10
**LOTION** [2] - 47:17, 47:20
**LOUISE** [4] - 11:18, 82:13, 96:7, 238:12
**LOVE** [1] - 48:21
**LOVED** [1] - 196:5
**LOVERS** [1] - 193:2
**LOVING** [1] - 202:13
**LOW** [3] - 229:18, 229:21, 239:21
**LOWER** [1] - 223:6
**LUCK** [4] - 11:18, 82:14, 96:7, 238:13
**LUCK'S** [1] - 82:16
**LUCKY** [2] - 205:21, 231:7
**LUMBAR** [1] - 228:22
**LUNCH** [2] - 127:15, 184:1
**LURED** [1] - 219:18
**LURING** [1] - 220:6
**LY** [1] - 43:5

**LYNDA** [2] - 202:10, 202:16

## M

**M-O-O-R-E** [1] - 147:23
**MAGNITUDE** [1] - 225:5
**MAIL** [12] - 150:5, 150:9, 151:19, 156:4, 171:17, 173:19, 173:20, 175:17, 175:20, 175:25, 178:14
**MAILBOXES** [1] - 238:8
**MAILED** [4] - 173:13, 175:22, 176:3, 176:4
**MAIN** [2] - 9:7, 44:11
**MAINTAIN** [2] - 31:7, 145:2
**MAINTAINED** [1] - 134:8
**MAJOR** [1] - 142:16
**MAJORITY** [1] - 15:15
**MAKER** [1] - 228:22
**MAKEUP** [2] - 100:23, 101:9
**MALE** [7] - 18:11, 18:12, 120:16, 138:9, 163:13, 163:14
**MALES** [1] - 125:10
**MALINGERED** [1] - 104:2
**MALINGERING** [8] - 35:5, 35:6, 35:8, 103:7, 103:11, 103:13, 103:21, 104:14
**MALOCU** [7] - 209:5, 216:4, 216:9, 218:9, 219:22, 224:6
**MAN** [28] - 36:21, 109:18, 110:13, 110:14, 115:25, 118:8, 118:10, 119:17, 120:6, 120:12, 120:22, 135:6, 137:13, 173:12, 173:13, 173:14, 193:15, 193:16, 193:23, 196:1, 198:3, 203:6, 217:9, 233:14, 236:22, 239:13
**MANAGE** [1] - 235:20
**MANAGER** [1] - 176:12

**MANAGING** [1] - 58:17
**MANHATTAN** [1] - 4:19
**MANIFESTATION** [1] - 61:22
**MANIFESTED** [3] - 50:13, 50:14, 122:16
**MANIPULATION** [2] - 204:8, 205:3
**MANNER** [4] - 19:20, 25:4, 64:22, 236:13
**MARCH** [2] - 233:20, 234:1
**MARGIN** [2] - 88:21, 88:22
**MARGINAL** [1] - 56:25
**MARKED** [15] - 3:20, 11:5, 26:18, 28:19, 71:23, 73:8, 76:11, 82:23, 93:1, 102:12, 108:15, 143:17, 157:7, 209:10, 210:18
**MARKET** [1] - 1:20
**MARRIED** [1] - 201:23
**MARROW** [2] - 57:23, 58:6
**MARTI** [49] - 31:18, 65:3, 189:21, 189:23, 189:25, 190:2, 191:24, 192:4, 192:6, 192:7, 192:9, 192:10, 192:11, 192:17, 192:21, 193:1, 193:3, 193:5, 193:7, 193:10, 193:11, 193:13, 193:14, 193:18, 193:22, 193:25, 194:10, 194:14, 194:15, 195:10, 195:23, 195:24, 198:6, 200:19, 200:23, 205:2, 210:15, 211:3, 211:5, 216:13, 218:20, 219:1, 219:19, 219:23, 219:24, 233:6, 234:23, 235:5, 235:12
**MARTI'S** [3] - 194:22, 216:24, 217:4
**MARTIALS** [1] - 7:23
**MARTIN** [60] - 12:3, 12:8, 18:24, 25:15, 25:20, 26:8, 44:19, 46:5, 56:14, 57:2, 70:14, 70:25, 71:1,

71:7, 71:11, 80:12, 80:16, 81:2, 81:10, 81:16, 81:21, 81:23, 82:9, 83:5, 83:11, 84:2, 85:2, 86:1, 94:18, 95:14, 96:8, 96:12, 96:18, 97:19, 98:8, 98:10, 98:16, 99:15, 99:20, 99:24, 126:25, 132:6, 132:18, 133:13, 133:18, 137:1, 137:4, 140:24, 174:11, 194:3, 202:9, 203:2, 203:8, 203:11, 203:13, 230:25, 233:1, 237:25, 240:2
**MARTIN'S** [1] - 95:5
**MARYLAND** [1] - 9:13
**MASKED** [1] - 120:10
**MASS** [1] - 210:22
**MASSACHUSETTS** [2] - 4:24, 10:18
**MASTER'S** [1] - 4:13
**MASTURBATE** [2] - 47:20, 136:5
**MASTURBATED** [1] - 16:1
**MASTURBATION** [1] - 118:11
**MATERIALS** [5] - 11:15, 12:15, 28:9, 70:4, 73:23
**MATERNAL** [7] - 15:14, 46:17, 49:2, 114:25, 115:3, 117:7, 125:9
**MATH** [1] - 121:1
**MATTER** [18] - 145:17, 172:23, 173:20, 176:6, 183:19, 183:24, 197:5, 207:3, 207:22, 207:24, 214:10, 225:15, 226:24, 227:9, 227:11, 227:16, 240:22, 241:12
**MATTERS** [1] - 226:22
**MATTHEW** [1] - 200:18
**MATTHEWS** [4] - 33:18, 33:22, 34:24, 35:7
**MATTHEWS'S** [2] - 67:3, 67:17
**MAXIMUM** [1] - 226:4
**MCCLOSKEY** [1] - 187:25

**MCDANIELS** [4] - 222:1, 222:5, 222:13, 223:17
**MCHUGH** [34] - 2:12, 144:3, 144:14, 144:22, 145:3, 150:23, 151:5, 153:6, 153:16, 166:8, 166:11, 166:14, 169:19, 169:22, 171:23, 172:9, 172:17, 173:3, 173:9, 174:6, 174:12, 174:15, 175:16, 177:22, 177:23, 178:16, 178:20, 179:2, 179:4, 179:9, 207:11, 207:20, 239:19, 242:14
**MCVEIGH** [1] - 173:14
**MCVEIGH'S** [1] - 179:24
**MEAN** [13] - 31:8, 50:15, 84:7, 89:10, 90:21, 94:7, 106:20, 151:22, 165:25, 187:22, 188:2, 197:3, 225:3
**MEANING** [1] - 97:20
**MEANINGFUL** [2] - 142:5, 206:15
**MEANS** [11] - 5:7, 5:9, 20:3, 42:6, 52:19, 57:17, 57:21, 58:12, 59:8, 191:3, 193:21
**MEANT** [5] - 37:3, 37:6, 84:4, 84:5, 194:25
**MEASURE** [1] - 15:6
**MECHANISM** [1] - 197:21
**MEDIATED** [2] - 20:25, 42:14
**MEDICAL** [13] - 62:19, 62:21, 63:15, 68:20, 68:25, 69:2, 69:4, 69:7, 110:1, 111:10, 202:2, 226:12, 236:7
**MEDICATING** [1] - 60:21
**MEDICATION** [6] - 50:20, 142:18, 203:5, 234:4, 235:20, 235:21
**MEDICATIONS** [5] - 57:5, 60:24, 199:13, 200:15, 204:22
**MEDS** [1] - 61:2
**MEET** [5] - 40:17,

40:20, 86:7, 180:14, 196:15
**MEGA** [1] - 206:12
**MEMBER** [3] - 5:1, 5:4, 44:3
**MEMBERS** [11] - 30:6, 36:12, 40:1, 111:20, 111:22, 112:4, 124:22, 134:2, 200:21, 240:8
**MEMO** [1] - 219:23
**MEMORANDUM** [1] - 136:23
**MEMORIES** [14] - 20:18, 20:25, 42:5, 42:9, 42:16, 42:21, 42:22, 63:17, 84:21, 131:16, 131:19, 131:23
**MEMORY** [19] - 20:13, 20:14, 20:15, 21:3, 42:6, 42:11, 42:12, 42:14, 43:3, 43:5, 47:15, 55:21, 62:17, 84:3, 108:20, 113:11, 115:19, 138:25
**MEMOS** [1] - 168:25
**MEN** [17] - 6:5, 8:25, 9:6, 9:14, 25:9, 31:4, 36:16, 51:2, 51:8, 61:10, 62:1, 114:13, 114:16, 130:13, 135:11, 135:14
**MENTAL** [16] - 19:8, 37:1, 43:21, 49:14, 142:16, 206:5, 226:3, 231:20, 232:2, 233:15, 233:25, 234:19, 236:12, 237:2, 237:6, 239:25
**MENTALLY** [4] - 212:10, 214:15, 235:20, 236:14
**MENTION** [5] - 52:23, 67:7, 93:25, 129:22, 227:13
**MENTIONED** [11] - 35:23, 46:5, 52:4, 60:6, 115:22, 117:8, 117:11, 119:21, 120:2, 134:24, 219:5
**MENTIONING** [1] - 116:7
**MERCY** [1] - 230:15
**MERELY** [1] - 232:21
**MESSING** [1] - 96:8
**MET** [8] - 40:16, 40:17, 41:9, 141:22,

157:15, 210:8, 215:8, 225:21
**METH** [1] - 61:12
**METHAMPHETAMIN ES** [1] - 61:10
**METING** [1] - 81:18
**MEXICO** [2] - 4:9, 10:15
**MICHAEL** [2] - 163:17, 163:20
**MICROPHONE** [1] - 148:21
**MID** [1] - 64:3
**MID-MORNING** [1] - 64:3
**MIDDLE** [7] - 1:2, 1:15, 2:6, 36:21, 58:6, 135:6, 135:7
**MIDDLE-AGED** [2] - 36:21, 135:6
**MIGHT** [14] - 17:24, 19:17, 19:19, 20:19, 98:14, 101:25, 102:19, 140:21, 140:24, 163:16, 187:15, 195:2, 217:16
**MIKE** [1] - 179:8
**MILD** [1] - 56:8
**MILITARY** [4] - 6:16, 6:18, 6:21, 7:21
**MILLER** [49] - 11:16, 26:20, 26:22, 27:7, 68:21, 82:7, 85:24, 85:25, 86:4, 86:9, 86:11, 87:10, 88:18, 89:8, 89:20, 91:14, 91:22, 92:10, 93:12, 93:20, 100:19, 100:21, 101:7, 101:11, 101:23, 105:17, 107:19, 107:25, 108:7, 111:25, 112:1, 112:5, 115:1, 116:17, 119:14, 124:8, 124:10, 124:14, 131:2, 134:23, 135:2, 136:24, 137:5, 137:13, 202:17, 203:23, 204:9, 237:23, 240:2
**MILLER'S** [17] - 66:12, 68:19, 69:6, 88:9, 89:2, 89:4, 89:19, 91:12, 92:14, 92:23, 93:23, 93:25, 100:8, 101:25, 115:12, 116:11, 118:16

**MILLIGRAMS** [1] - 234:6
**MIND** [13] - 88:23, 102:7, 105:15, 135:18, 172:4, 204:4, 204:14, 212:18, 213:8, 218:1, 218:5, 218:9, 219:4
**MINE** [1] - 91:17
**MINIMIZE** [1] - 120:17
**MINIMIZING** [1] - 228:5
**MINOR** [2] - 52:23, 122:10
**MINUTE** [3] - 42:2, 179:1, 220:24
**MINUTES** [7] - 23:8, 48:4, 64:1, 128:2, 183:16, 237:4
**MISCONDUCT** [1] - 181:13
**MISS** [9] - 79:3, 92:22, 93:20, 101:25, 124:14, 222:7, 222:9, 222:25, 223:21
**MISSED** [1] - 169:24
**MISSPOKE** [1] - 181:23
**MISTAKE** [1] - 74:5
**MITCHELL** [29] - 28:11, 28:24, 29:21, 31:10, 32:6, 32:12, 32:17, 33:1, 33:5, 33:18, 34:11, 35:4, 103:5, 103:20, 104:1, 106:1, 107:23, 108:7, 109:23, 110:17, 111:15, 139:7, 139:11, 139:15, 139:19, 140:4, 234:2, 234:3
**MITCHELL'S** [6] - 66:17, 69:10, 111:6, 112:25, 123:5, 138:20
**MITIGATE** [2] - 44:3, 105:9
**MITIGATED** [1] - 14:10
**MITIGATING** [15] - 184:7, 184:23, 185:4, 185:6, 185:11, 185:15, 185:17, 185:19, 187:15, 187:20, 195:20, 214:4, 230:13, 239:24

**MITIGATION** [7] - 27:1, 82:7, 105:18, 124:8, 181:8, 181:16, 230:7
**MITIGATOR** [3] - 200:1, 201:2, 204:17
**MITIGATORS** [6] - 184:9, 187:17, 188:4, 199:25, 200:3, 203:18
**MODELS** [1] - 202:19
**MODIFIED** [2] - 189:3, 229:20
**MODIFY** [1] - 188:25
**MOLESTED** [1] - 116:19
**MOM** [4] - 15:21, 50:8, 130:21, 202:1
**MOM'S** [1] - 45:10
**MOMENT** [9] - 39:4, 46:16, 53:24, 59:12, 70:23, 80:25, 166:8, 178:17, 192:12
**MOMENTS** [1] - 45:17
**MOMMY** [1] - 200:20
**MONDAY** [2] - 1:8, 188:21
**MONEY** [11] - 36:16, 51:8, 119:18, 173:15, 173:16, 201:19, 206:12, 218:23, 224:3, 238:25, 239:4
**MONITOR** [1] - 156:3
**MONITORED** [3] - 149:11, 171:16, 173:23
**MONITORING** [2] - 156:3, 197:1
**MONSTER** [1] - 197:15
**MONTH** [5] - 124:4, 154:24, 191:15, 209:16, 235:22
**MONTH-AND-A-HALF** [1] - 124:4
**MONTHS** [14] - 4:1, 10:20, 119:6, 121:16, 155:1, 155:3, 155:14, 155:17, 155:19, 156:7, 157:2, 163:2, 167:18, 171:9
**MOOD** [5] - 57:6, 64:10, 64:12, 234:5, 234:7
**MOORE** [9] - 147:19, 147:23, 148:4, 153:17, 157:8, 171:5, 172:22,

175:9, 242:12
**MOOT** [2] - 76:18, 128:13
**MORENO** [69] - 2:12, 3:5, 3:13, 3:16, 3:19, 10:1, 10:7, 10:9, 10:22, 11:1, 11:4, 26:14, 26:17, 28:15, 28:18, 47:24, 48:2, 48:7, 48:8, 63:25, 64:4, 65:6, 65:10, 67:8, 67:23, 72:8, 72:14, 72:17, 72:20, 73:2, 73:5, 74:4, 74:20, 76:14, 77:9, 77:18, 77:24, 78:18, 79:8, 79:12, 80:3, 80:21, 96:22, 97:7, 97:12, 97:22, 97:25, 98:2, 103:9, 127:13, 127:19, 127:24, 128:6, 128:19, 128:21, 132:15, 132:23, 136:19, 136:22, 139:24, 139:25, 142:6, 143:6, 143:20, 207:14, 229:25, 230:4, 237:5, 242:6
**MORNING** [7] - 3:3, 3:14, 3:15, 64:3, 66:1, 66:2, 104:11
**MORTAR** [1] - 45:22
**MOST** [16] - 15:10, 15:14, 44:11, 49:3, 49:20, 56:21, 60:11, 121:7, 125:10, 129:7, 131:1, 140:20, 202:11, 213:13, 217:12, 217:13
**MOSTLY** [4] - 5:6, 32:21, 41:5, 50:22
**MOTHER** [80] - 13:17, 16:25, 17:12, 19:1, 25:21, 25:22, 30:4, 30:24, 32:19, 36:14, 36:17, 38:7, 38:14, 38:20, 39:9, 39:10, 40:10, 43:10, 44:12, 46:18, 47:1, 48:15, 49:5, 50:22, 51:15, 52:22, 60:15, 60:25, 61:7, 71:9, 81:18, 85:8, 85:11, 85:15, 86:12, 94:4, 94:5, 94:12, 94:17, 94:22, 95:10, 95:17, 96:19, 96:20, 96:24, 97:20, 98:8, 98:18, 98:21,

100:15, 100:22, 101:9, 101:14, 101:22, 103:1, 110:10, 112:16, 118:5, 121:25, 122:15, 122:25, 123:15, 123:23, 125:15, 125:17, 125:22, 126:11, 130:25, 134:19, 135:21, 135:23, 136:7, 136:8, 139:16, 196:2, 196:3, 232:17, 232:18, 237:18
**MOTHER'S** [5] - 44:21, 46:11, 48:21, 71:15, 113:12
**MOTHERS** [1] - 15:16
**MOTION** [6] - 76:15, 76:17, 76:19, 128:11, 128:12, 192:15
**MOTIVES** [1] - 6:3
**MOUTH** [1] - 194:22
**MOVE** [14] - 10:1, 12:18, 65:11, 143:10, 154:22, 159:11, 192:21, 193:1, 193:3, 210:6, 211:16, 220:2, 225:16, 229:14
**MOVED** [9] - 4:23, 10:20, 47:4, 47:8, 47:14, 130:17, 193:5, 201:4, 219:25
**MOVIES** [1] - 201:21
**MOVING** [1] - 159:14
**MUIR** [4] - 62:6, 209:18, 210:5, 214:22
**MULLED** [1] - 192:14
**MULTIPLE** [8] - 35:18, 36:3, 39:6, 40:8, 102:3, 102:10, 232:14, 237:21
**MULTITUDE** [1] - 30:5
**MURDER** [25] - 28:11, 170:16, 191:1, 191:3, 191:13, 191:15, 192:1, 192:3, 196:21, 197:8, 197:11, 198:13, 205:1, 209:14, 210:22, 211:19, 215:25, 216:3, 217:21, 220:6, 221:2, 224:24, 232:4, 233:9, 234:8

**MURDERED** [1] - 189:21
**MUSHROOM** [1] - 105:5
**MUSHROOMED** [1] - 105:3
**MUST** [9] - 162:24, 180:16, 190:3, 195:18, 215:18, 224:21, 225:3, 225:19
**MYSTERIOUS** [1] - 221:15
**MYTHS** [1] - 6:25

## N

**N.W** [1] - 2:4
**NAIL** [1] - 194:18
**NAKED** [3] - 47:3, 47:5, 107:7
**NAME** [24] - 3:9, 3:10, 101:15, 113:20, 115:4, 115:7, 115:22, 115:25, 116:5, 117:19, 117:23, 144:5, 147:21, 147:22, 151:20, 152:5, 160:16, 160:19, 161:17, 163:15, 168:1, 168:5, 210:23, 211:1
**NAMED** [5] - 118:8, 118:25, 137:13, 149:7, 176:14
**NAMES** [2] - 46:12, 84:17
**NAMING** [1] - 232:3
**NARROW** [1] - 224:21
**NATURE** [6] - 20:2, 24:12, 51:14, 61:18, 194:11, 218:24
**NCIS** [1] - 6:20
**NEAR** [2] - 10:14, 239:11
**NEARBY** [1] - 86:6
**NECESSARILY** [3] - 51:22, 84:19, 196:21
**NECESSARY** [1] - 184:15
**NEED** [11] - 30:9, 48:2, 52:17, 73:6, 86:20, 188:17, 203:18, 205:24, 207:7, 212:25, 218:5
**NEEDED** [1] - 235:21
**NEEDS** [4] - 185:3, 206:6, 212:17, 237:1
**NEGLECT** [3] - 13:18,

36:9, 232:8
**NEGLECTED** [2] - 67:2, 130:11
**NEIGHBORHOOD** [2] - 36:13, 131:14
**NEIL** [1] - 11:20
**NEPHEW** [1] - 87:19
**NERVOUS** [1] - 59:2
**NET** [1] - 202:18
**NEUROCHEMICALS** [1] - 20:10
**NEUROCHEMISTRY** [1] - 20:8
**NEUROPATHY** [1] - 228:24
**NEUTRALIZE** [1] - 197:1
**NEVER** [58] - 19:3, 30:14, 36:7, 41:9, 56:6, 58:5, 60:16, 69:25, 72:18, 77:10, 77:14, 77:22, 78:2, 78:6, 78:7, 78:19, 78:20, 79:11, 79:18, 80:22, 80:25, 85:2, 85:3, 85:7, 88:14, 90:18, 90:21, 94:4, 94:5, 95:9, 98:18, 103:12, 104:19, 107:16, 112:18, 123:20, 123:25, 129:7, 131:5, 150:14, 150:17, 152:24, 157:4, 159:18, 159:19, 174:9, 174:22, 176:9, 176:18, 180:1, 200:22, 201:6, 203:8, 204:3, 234:24, 238:15
**NEW** [10] - 4:9, 10:14, 14:7, 130:19, 159:11, 159:14, 160:25, 196:15
**NEXT** [20] - 3:4, 4:21, 21:4, 25:17, 29:13, 29:14, 29:20, 39:14, 59:4, 97:15, 107:9, 111:9, 113:6, 117:5, 196:18, 198:25, 199:22, 217:23, 223:22
**NICHOLS** [6] - 11:24, 46:14, 46:15, 202:17, 237:24, 240:2
**NICOLE** [1] - 217:15
**NIGERIA** [1] - 201:11
**NIGHT** [5] - 187:11, 217:8, 219:8, 230:17

**NIGHTMARES** [1] - 64:18
**NINE** [10] - 10:20, 39:21, 113:8, 155:18, 155:19, 156:7, 157:2, 163:2, 167:18, 171:8
**NIPPLES** [1] - 47:10
**NOBODY** [9] - 19:10, 37:3, 60:13, 85:8, 95:17, 124:15, 124:17, 124:18
**NONCONFRONTATI ONAL** [1] - 208:6
**NONDISCLOSURES** [1] - 99:9
**NONE** [3] - 124:13, 125:7, 220:14
**NONETHELESS** [1] - 22:19
**NONHUMANS** [1] - 240:8
**NONSTATUTORY** [5] - 195:19, 195:21, 196:19, 225:17, 225:18
**NONSTRANGER** [1] - 6:4
**NOREPINEPHRINE** [1] - 20:9
**NORM** [3] - 133:22, 135:11, 138:17
**NORMAL** [7] - 20:13, 21:10, 36:23, 42:12, 133:17, 134:1
**NORMALLY** [1] - 175:4
**NORTHINGTON** [1] - 184:22
**NOTE** [12] - 28:21, 29:2, 29:3, 29:4, 31:13, 43:20, 50:10, 62:21, 63:5, 63:13, 186:25, 240:5
**NOTEBOOK** [1] - 86:18
**NOTED** [8] - 11:11, 14:24, 42:3, 138:3, 138:4, 239:14, 239:19, 240:7
**NOTES** [43] - 26:19, 27:6, 27:11, 30:21, 68:19, 69:10, 69:11, 69:15, 69:18, 69:20, 69:22, 69:23, 71:8, 82:16, 82:19, 89:2, 89:4, 89:5, 89:11, 89:19, 91:12, 92:14, 92:20, 99:19, 99:22, 100:8, 107:12,

107:14, 109:23, 110:16, 111:6, 116:6, 116:9, 117:22, 119:7, 126:21, 126:22, 138:21, 138:25, 212:16, 213:15, 222:14
**NOTETAKING** [1] - 92:8
**NOTHING** [18] - 65:6, 93:15, 124:7, 125:25, 127:10, 140:2, 142:6, 153:14, 166:2, 175:11, 175:12, 177:21, 179:16, 180:5, 204:25, 206:16, 237:19, 239:11
**NOTICE** [2] - 61:14, 216:24
**NOTICED** [1] - 131:6
**NOTIFIED** [1] - 183:17
**NUCLEAR** [2] - 202:25, 203:16
**NUMBER** [19] - 1:3, 5:20, 14:19, 14:21, 28:2, 32:10, 47:10, 63:9, 67:4, 75:18, 89:12, 105:1, 130:6, 130:8, 160:9, 176:7, 200:4, 204:15, 212:24
**NUMBERS** [6] - 89:10, 89:14, 93:2, 93:6, 143:23, 187:23
**NUMEROUS** [8] - 18:10, 118:13, 154:3, 160:6, 169:10, 171:25, 226:11, 226:12
**NUN** [5] - 161:4, 161:6, 161:7, 161:12, 161:19
**NUNS** [8] - 150:7, 153:5, 159:22, 165:1, 165:5, 165:6, 199:14, 238:23
**NURSE** [2] - 213:16, 214:2
**NURSING** [1] - 213:15

## O

**O'CLOCK** [5] - 63:23, 183:15, 188:22, 207:7, 207:9
**OATH** [3] - 98:18, 169:11, 216:6

**OBJECT** [7] - 67:8, 67:23, 78:18, 78:22, 103:9, 178:16, 180:10
**OBJECTING** [2] - 80:3, 184:21
**OBJECTION** [26] - 10:4, 10:11, 65:14, 65:15, 76:19, 79:8, 79:10, 143:19, 144:19, 150:23, 150:25, 151:5, 151:7, 153:6, 171:23, 172:9, 172:13, 172:17, 172:20, 173:3, 173:9, 174:6, 174:12, 178:21, 179:5, 179:14
**OBJECTIONS** [3] - 145:20, 187:14, 188:3
**OBJECTS** [2] - 232:24, 240:9
**OBLIQUE** [1] - 31:25
**OBSERVATIONS** [1] - 34:21
**OBSERVE** [1] - 156:5
**OBSERVED** [4] - 124:15, 131:19, 131:20, 132:2
**OBTAIN** [2] - 82:11, 105:19
**OBVIOUS** [1] - 18:19
**OBVIOUSLY** [27] - 21:16, 24:15, 35:16, 39:7, 40:18, 46:4, 47:2, 47:7, 49:7, 55:8, 56:8, 58:13, 83:9, 126:17, 131:17, 133:17, 136:14, 145:15, 176:2, 207:15, 208:14, 215:4, 215:17, 218:5, 219:25, 223:23, 227:7
**OCCASION** [4] - 21:16, 26:10, 78:1, 183:2
**OCCASIONS** [5] - 14:20, 18:10, 36:15, 96:18, 181:19
**OCCUR** [2] - 23:13, 237:8
**OCCURRED** [10] - 31:10, 53:13, 99:10, 108:4, 182:12, 212:4, 226:19, 226:24, 227:6, 237:8

**OCCURRENCE** [1] - 92:5
**OCCURS** [1] - 232:20
**OCTOBER** [8] - 12:13, 12:14, 67:6, 67:21, 71:1, 82:10, 154:19
**ODDS** [1] - 18:13
**OFFENDERS** [5] - 6:3, 7:4, 7:5, 40:8
**OFFENSE** [1] - 212:19
**OFFENSES** [1] - 24:13
**OFFER** [2] - 144:15, 178:11
**OFFERED** [5] - 60:14, 179:12, 180:24, 181:24, 190:12
**OFFERING** [5] - 60:13, 144:16, 178:2, 178:13, 182:20
**OFFICE** [7] - 1:15, 148:15, 149:12, 154:1, 154:2, 156:1, 171:17
**OFFICER** [18] - 148:13, 148:14, 149:25, 153:4, 154:7, 154:25, 160:1, 160:15, 160:17, 163:13, 208:2, 208:3, 208:4, 212:15, 217:15, 219:24, 220:16, 228:1
**OFFICERS** [7] - 6:14, 164:16, 167:5, 167:9, 208:2, 219:24, 227:20
**OFFICIAL** [2] - 1:19, 241:16
**OFTEN** [14] - 18:21, 23:24, 24:13, 37:9, 37:12, 41:19, 42:3, 42:23, 55:13, 56:2, 105:7, 142:25, 149:21, 171:21
**OINTMENT** [1] - 76:15
**OKLAHOMA** [10] - 12:11, 120:7, 137:15, 214:19, 215:3, 226:1, 226:5, 236:1, 236:6, 236:10
**OLD** [31] - 10:19, 17:15, 38:19, 39:21, 46:25, 51:5, 53:11, 53:12, 53:18, 106:16, 110:2, 110:8, 131:10, 133:9, 134:13, 135:2, 137:9,

140:19, 159:7, 159:8, 159:9, 189:21, 195:10, 199:16, 212:6, 214:12, 214:14, 225:24, 226:4, 236:19, 238:7
**OLDER** [10] - 36:11, 49:9, 51:8, 109:18, 110:13, 131:8, 131:18, 133:12, 133:25, 236:22
**ONCE** [4] - 107:11, 199:9, 235:22, 240:6
**ONE** [135] - 6:2, 10:5, 10:13, 15:25, 16:24, 17:18, 18:19, 20:5, 21:3, 23:23, 24:3, 26:9, 27:4, 27:12, 32:2, 36:14, 36:16, 37:16, 38:8, 39:6, 39:19, 40:5, 40:7, 43:7, 45:13, 45:15, 45:20, 45:21, 50:2, 51:22, 51:25, 53:22, 53:23, 55:6, 55:10, 58:25, 59:21, 63:13, 68:16, 72:3, 74:6, 74:22, 78:21, 86:19, 88:21, 88:25, 90:8, 92:5, 92:9, 92:10, 92:18, 95:22, 100:12, 101:18, 102:24, 104:18, 110:15, 117:3, 119:25, 120:8, 121:5, 123:20, 123:22, 125:18, 126:18, 128:7, 128:8, 129:1, 133:23, 138:10, 138:11, 140:16, 140:21, 142:9, 147:3, 147:4, 147:7, 147:15, 152:12, 152:20, 156:12, 158:11, 160:7, 160:10, 164:18, 164:19, 164:21, 167:5, 169:4, 173:11, 174:22, 180:13, 181:24, 185:7, 186:25, 187:8, 187:23, 188:19, 190:3, 190:7, 194:14, 195:8, 195:9, 200:4, 202:5, 203:1, 204:13, 205:7, 205:9, 206:12, 207:5, 212:13,

213:2, 213:9, 213:18, 215:23, 217:12, 217:16, 218:25, 219:23, 221:14, 221:17, 225:23, 226:2, 226:19, 230:12, 235:19, 239:14, 241:4, 241:5
**ONE-IN-ONE** [1] - 51:22
**ONE-TIME** [1] - 92:5
**ONES** [2] - 142:24, 217:16
**ONGOING** [10] - 14:14, 18:2, 18:5, 18:17, 121:17, 121:18, 121:20, 121:23, 121:25, 169:16
**ONSET** [1] - 228:23
**OPEN** [6] - 134:9, 154:11, 194:19, 204:11, 208:17, 221:20
**OPENED** [12] - 27:18, 149:15, 149:17, 154:17, 154:23, 158:22, 160:23, 169:25, 170:9, 170:19, 170:25, 200:5
**OPENING** [1] - 215:21
**OPENLY** [1] - 26:2
**OPENS** [1] - 3:1
**OPERATING** [1] - 180:15
**OPINION** [15] - 12:20, 12:25, 13:3, 13:9, 14:13, 15:10, 15:12, 17:20, 23:1, 56:15, 65:2, 70:7, 152:16, 172:20, 237:16
**OPINIONS** [1] - 141:11
**OPPORTUNITY** [19] - 7:12, 11:14, 12:6, 32:5, 40:13, 54:10, 62:18, 76:25, 106:8, 106:10, 132:11, 181:12, 182:13, 188:8, 197:18, 205:9, 221:7, 238:12, 239:11
**OPPOSING** [2] - 180:24, 181:25
**OPPOSITE** [2] - 18:6, 35:20
**OPTIMAL** [2] - 142:4, 235:24

**OPTION** [1] - 19:5
**ORAL** [8] - 9:21, 110:14, 112:19, 118:3, 118:11, 119:3, 119:17, 122:8
**ORALLY** [3] - 47:23, 112:22, 112:23
**ORDER** [2] - 16:3, 199:19
**ORDERED** [2] - 75:12, 75:13
**ORDERS** [2] - 166:16, 166:19
**ORDINARY** [1] - 213:20
**ORGAN** [1] - 14:6
**ORGANIZATION** [2] - 34:6, 151:18
**ORGANIZATIONS** [2] - 5:2, 5:6
**ORIGINAL** [2] - 27:2, 186:19
**ORIGINALLY** [3] - 52:1, 186:25, 222:25
**ORIGINALS** [3] - 144:21, 144:23, 145:2
**OSI** [1] - 6:20
**OTHERWISE** [1] - 4:2
**OUTCOME** [2] - 51:9, 51:23
**OUTSIDE** [1] - 4:9
**OUTWEIGHS** [1] - 184:6
**OVERALL** [8] - 33:14, 34:9, 35:24, 40:4, 43:24, 50:1, 130:3, 140:15
**OVERBOARD** [1] - 45:3
**OVERCOME** [1] - 58:8
**OVERHEARD** [4] - 159:3, 160:8, 160:10, 161:1
**OVERLOOK** [1] - 225:7
**OVERRULE** [1] - 172:12
**OVERRULED** [11] - 67:12, 68:3, 78:25, 80:23, 98:5, 103:14, 153:7, 171:24, 173:5, 173:10, 174:13
**OVERWHELMING** [1] - 13:6
**OVERWHELMINGLY** [1] - 240:13
**OWN** [33] - 13:16, 13:17, 16:7, 38:20,

45:6, 51:5, 56:1, 87:16, 105:15, 111:2, 124:7, 126:20, 134:9, 141:4, 146:24, 150:12, 181:19, 191:8, 191:9, 192:20, 197:23, 198:22, 199:12, 200:9, 202:11, 204:8, 205:14, 206:6, 206:12, 206:14, 206:19, 235:6, 241:5

## P

**P.M** [1] - 241:8
**PACK** [1] - 198:25
**PADDLE** [2] - 44:15, 44:17
**PAGE** [40] - 5:18, 5:23, 11:12, 27:3, 33:3, 37:8, 66:9, 69:14, 76:6, 76:12, 76:13, 78:13, 89:8, 89:9, 89:11, 89:15, 91:5, 91:13, 91:19, 91:20, 93:2, 93:3, 93:6, 93:10, 97:5, 97:13, 101:6, 108:18, 110:5, 111:11, 111:19, 114:21, 132:18, 132:24, 136:25, 137:4, 137:12, 197:18, 242:11
**PAGES** [3] - 28:20, 54:17, 126:22
**PAID** [1] - 118:10
**PAIN** [2] - 41:4, 60:25
**PAINFUL** [1] - 41:19
**PAINS** [1] - 62:23
**PAINT** [3] - 205:13, 238:21, 238:22
**PAINTED** [2] - 162:7, 235:15
**PAINTING** [10] - 152:1, 152:21, 167:23, 167:24, 167:25, 168:5, 168:17, 206:1, 206:17
**PAINTINGS** [4] - 151:24, 151:25, 172:24, 238:21
**PALE** [1] - 185:13
**PAPERWORK** [1] - 227:14
**PARAGRAPH** [4] -

76:13, 89:18, 102:14, 102:18

**PARAPHRASING** [1] - 52:15

**PARCEL** [1] - 76:17

**PARE** [2] - 187:1, 187:5

**PARENT** [8] - 18:16, 45:2, 45:25, 52:9, 52:24, 57:20, 99:4, 201:24

**PARENTING** [2] - 36:23, 36:24

**PARENTS** [17] - 13:6, 13:18, 15:8, 18:1, 18:21, 18:23, 19:5, 36:5, 51:1, 52:14, 57:16, 201:22, 232:6, 236:25, 238:5, 238:9

**PARK** [1] - 34:4

**PAROLE** [3] - 208:19, 230:9, 240:16

**PARSONS** [4] - 137:14, 137:24, 137:25

**PART** [25] - 18:16, 19:9, 20:12, 21:1, 28:7, 31:10, 39:8, 42:25, 43:2, 48:17, 76:13, 76:17, 91:14, 91:18, 121:15, 135:22, 160:13, 192:25, 193:9, 193:19, 214:23, 219:17, 230:25, 231:3, 236:12

**PART-TIME** [1] - 231:3

**PARTIAL** [2] - 99:9, 110:7

**PARTICIPATE** [2] - 16:5, 26:5

**PARTICIPATED** [1] - 190:1

**PARTICULAR** [5] - 108:19, 136:11, 172:23, 187:14, 187:22

**PARTICULARLY** [2] - 231:24, 236:6

**PARTIES** [1] - 201:10

**PARTS** [3] - 42:8, 42:24, 178:6

**PARTY** [8] - 180:24, 180:25, 181:1, 181:2, 181:25, 182:1, 182:14, 182:15

**PASS** [5] - 160:12, 167:3, 167:5,

167:10, 194:7

**PASSED** [4] - 152:20, 160:11, 167:12, 167:20

**PAST** [8] - 41:13, 44:7, 127:5, 168:19, 197:2, 197:4, 229:6, 230:8

**PATIENCE** [1] - 206:22

**PATIENT** [2] - 41:22, 41:23

**PATTERNS** [1] - 22:18

**PAUL** [2] - 1:6, 144:17

**PAUSE** [3] - 166:10, 169:21, 215:13

**PAY** [1] - 194:1

**PAYING** [3] - 21:20, 36:16, 59:14

**PAYNE** [5] - 11:22, 46:11, 202:17, 237:24, 240:2

**PCP** [7] - 50:23, 60:7, 60:9, 60:10, 61:3, 61:4, 61:9

**PEDOPHILE** [1] - 203:20

**PEDOPHILES** [1] - 36:13

**PEE** [1] - 53:21

**PEJORATIVE** [1] - 98:4

**PENALTY** [10] - 24:7, 90:13, 126:5, 126:6, 188:9, 189:16, 189:17, 190:23, 195:14, 231:10

**PENETRATE** [1] - 135:25

**PENETRATION** [2] - 123:25, 136:12

**PENIS** [7] - 27:21, 47:12, 47:23, 53:16, 54:21, 106:21, 106:25

**PENITENTIARY** [3] - 28:13, 137:16, 198:23

**PENNSYLVANIA** [4] - 1:2, 1:15, 2:6, 2:13

**PENNY** [1] - 206:12

**PEOPLE** [48] - 14:23, 21:10, 21:16, 23:14, 31:11, 37:9, 38:18, 42:4, 53:6, 56:9, 57:7, 58:6, 62:18, 96:7, 99:1, 105:1, 105:7, 112:13, 114:13, 114:24, 115:17, 116:23,

120:23, 121:2, 121:3, 124:21, 129:2, 129:7, 129:10, 131:24, 138:7, 168:14, 168:23, 169:1, 174:4, 174:24, 175:2, 178:11, 196:15, 197:23, 198:2, 198:9, 202:19, 212:24, 213:21, 230:20, 231:8, 238:22

**PERCEIVED** [1] - 126:17

**PERCENT** [1] - 104:7

**PERCEPTION** [1] - 71:16

**PERENNIAL** [1] - 45:12

**PERFECTED** [1] - 193:17

**PERFORM** [3] - 110:14, 119:3, 119:17

**PERHAPS** [1] - 57:10

**PERIOD** [8] - 22:1, 50:18, 118:5, 120:25, 121:14, 122:1, 154:25, 179:11

**PERJURED** [3] - 214:19, 214:21, 214:24

**PERJURY** [2] - 214:10, 215:12

**PERMANENT** [3] - 14:9, 228:20, 229:1

**PERMANENTLY** [2] - 51:4, 154:4

**PERMITTED** [1] - 167:7

**PERPETRATE** [2] - 16:15, 55:12

**PERPETRATED** [2] - 44:12, 99:4

**PERPETRATING** [1] - 55:25

**PERPETRATION** [1] - 83:23

**PERPETRATOR** [2] - 23:15, 53:22

**PERPETRATORS** [6] - 13:19, 36:6, 55:4, 130:13, 130:21, 131:1

**PERSIST** [1] - 206:2

**PERSON** [28] - 15:17, 15:18, 17:6, 18:4, 49:10, 57:18, 57:19,

83:6, 83:12, 85:23, 107:24, 119:20, 138:12, 157:23, 158:2, 160:19, 161:17, 180:25, 181:2, 181:25, 190:2, 205:21, 212:10, 213:1, 214:15, 214:16, 227:25

**PERSONALITIES** [3] - 101:19, 102:4, 103:8

**PERSONALITY** [16] - 49:20, 49:23, 50:3, 50:5, 51:19, 51:20, 62:15, 101:21, 102:10, 102:25, 104:2, 199:7, 231:19, 237:7, 237:11

**PERSONALLY** [3] - 152:22, 167:8, 167:21

**PERSONS** [2] - 182:3, 224:21

**PERSPECTIVES** [1] - 21:18

**PERVASIVE** [1] - 38:1

**PESTERING** [1] - 192:22

**PH.D** [1] - 4:13

**PHASE** [4] - 47:14, 47:15, 188:9, 198:16

**PHENOMENA** [1] - 43:18

**PHILADELPHIA** [5] - 1:9, 1:20, 2:14, 201:8, 206:21

**PHONE** [8] - 52:18, 141:24, 149:11, 156:3, 164:5, 171:16, 173:23, 173:24

**PHYSICAL** [20] - 13:18, 32:14, 42:6, 42:22, 44:4, 44:7, 44:9, 44:12, 45:1, 45:5, 62:17, 81:17, 111:16, 202:4, 205:2, 213:12, 216:14, 227:8, 228:9

**PHYSICALLY** [7] - 15:8, 30:3, 36:7, 43:12, 46:1, 212:10, 214:15

**PICKED** [1] - 227:1

**PICTURE** [4] - 40:4, 43:24, 152:21, 235:16

**PICTURES** [5] - 150:7,

151:20, 151:21, 151:22, 162:5

**PIECE** [4] - 27:25, 28:6, 30:18, 88:4

**PIECEMEAL** [2] - 22:1, 138:6

**PILLOW** [2] - 216:25, 217:4

**PILLS** [1] - 50:21

**PIPE** [1] - 38:10

**PLACE** [8] - 51:9, 54:21, 96:4, 131:12, 159:6, 161:9, 178:22, 231:7

**PLACED** [1] - 233:21

**PLACES** [2] - 84:17, 237:21

**PLACING** [1] - 198:15

**PLAINLY** [1] - 133:20

**PLAN** [8] - 192:15, 192:17, 192:25, 193:10, 193:14, 193:16, 193:19, 219:6

**PLANNED** [2] - 191:14, 193:10

**PLANNING** [18] - 191:2, 191:4, 191:17, 192:1, 194:15, 195:13, 211:21, 215:16, 215:23, 217:23, 218:1, 218:15, 219:13, 219:17, 220:13, 224:19, 224:25, 225:9

**PLASTIC** [1] - 14:6

**PLAY** [3] - 127:25, 128:2, 144:4

**PLAYBOY** [1] - 27:13

**PLAYED** [5] - 27:17, 106:21, 144:2, 144:11, 144:12

**PLEA** [10] - 123:2, 123:7, 125:6, 208:16, 208:17, 208:18, 208:23, 209:17, 216:16

**PLEAD** [2] - 74:25, 75:2

**PLEADED** [1] - 52:21

**PLEASES** [1] - 207:11

**PLEASURE** [1] - 206:21

**PLED** [3] - 200:6, 208:15, 212:19

**PLUMBING** [1] - 95:25

**PLUS** [1] - 155:21

**PO** [2] - 1:16, 2:10

**POCKET** [1] - 212:24

PODIUM [1] - 229:25
POINT [19] - 25:7,
38:2, 67:2, 79:10,
86:15, 98:24, 99:7,
104:18, 125:16,
125:23, 142:12,
145:14, 187:13,
187:16, 188:6,
190:22, 225:11,
229:8, 232:22
POINTED [1] - 179:23
POINTING [1] - 190:13
POINTS [3] - 97:14,
99:7, 128:25
POISON [1] - 204:21
POKER [1] - 227:1
POLICE [3] - 48:13,
213:6, 213:7
POLICY [1] - 233:22
POOL [1] - 202:22
POOR [2] - 201:4,
201:18
PORTION [3] - 27:4,
27:10, 91:21
PORTIONS [1] -
178:13
PORTRAITS [2] - 9:1,
9:3
PORTRAY [1] - 120:18
POSITION [3] - 95:10,
184:4, 185:1
POSITIVE [3] - 55:9,
202:19, 239:12
POSSIBILITY [2] -
230:9, 240:16
POSSIBLE [6] - 19:3,
23:22, 31:20,
105:20, 191:7,
208:18
POST [9] - 14:20,
49:16, 62:8, 74:14,
74:15, 123:1,
123:10, 231:17,
237:6
POST-TRAUMATIC
[7] - 14:20, 49:16,
62:8, 123:1, 123:10,
231:17, 237:6
POST-TRIAL [1] -
74:14
POST-VERDICT [1] -
74:15
POT [4] - 193:25,
194:6, 218:23,
218:25
POTENTIALLY [1] -
14:2
POUR [1] - 106:10
POW [1] - 38:9
POWER [2] - 120:18,

199:14
PRACTICAL [1] - 7:7
PRACTICE [2] - 34:9,
235:23
PRAY [2] - 209:13,
210:15
PRAYER [1] - 227:3
PRAYING [1] - 199:14
PRECEDING [1] -
110:5
PREDATORS [3] -
18:9, 18:10, 130:11
PREDICT [3] - 45:11,
45:23, 197:14
PREDICTABLY [1] -
232:20
PREDICTING [1] -
46:2
PRELIMINARY [2] -
212:15, 214:19
PREMEDITATION [13]
- 191:2, 191:5,
192:1, 194:12,
195:13, 211:22,
215:17, 215:23,
219:14, 220:14,
224:19, 224:25,
225:10
PREPARE [3] - 10:23,
188:9, 241:5
PREPARED [4] -
28:11, 84:20,
105:23, 106:11
PREPARING [3] -
12:5, 66:6, 86:19
PREPONDERANCE
[1] - 240:14
PREPOSTEROUS [1]
- 40:14
PRESCRIBED [1] -
234:6
PRESCRIPTION [2] -
50:21, 236:11
PRESENT [8] - 14:25,
23:15, 24:22,
152:25, 153:3,
201:19, 231:15,
233:23
PRESENTATIONS [2]
- 6:6, 6:11
PRESENTED [6] -
179:16, 179:18,
213:6, 230:8,
238:19, 240:12
PRESENTING [1] -
220:15
PRESERVED [1] -
184:14
PRESSURES [1] -
58:21

PRETTY [12] - 6:12,
14:24, 20:20, 35:1,
64:24, 100:23,
101:10, 139:18,
200:7, 232:10,
232:14, 235:11
PREVENTION [1] -
29:9
PREVIOUS [3] -
24:19, 137:23,
211:20
PREVIOUSLY [11] -
73:7, 73:9, 73:11,
79:22, 80:11, 90:16,
93:1, 152:5, 152:7,
190:6, 216:6
PRIDE [1] - 30:12
PRIMARILY [6] - 6:4,
6:5, 7:21, 24:7, 34:6,
228:11
PRIMARY [4] - 5:25,
6:2, 15:16, 15:17
PRINTED [1] - 221:1
PRISON [31] - 155:25,
156:12, 156:21,
162:14, 164:21,
173:15, 176:3,
177:7, 190:7, 196:9,
197:6, 197:8, 197:9,
199:9, 199:11,
217:8, 220:12,
220:17, 225:25,
226:1, 226:2, 226:5,
230:9, 233:10,
233:12, 235:7,
235:22, 236:8,
236:17
PRISONER [3] -
165:21, 176:8,
221:11
PRISONERS [5] -
216:7, 216:10,
216:12, 221:3, 235:8
PRISONS [13] - 148:7,
148:9, 148:25,
174:10, 196:24,
198:11, 198:19,
200:13, 226:5,
228:13, 228:18,
229:21, 239:20
PRISONS' [1] - 229:17
PRIVACY [1] - 23:14
PRIVATE [2] - 40:23,
196:1
PRO [1] - 75:5
PROBABILITY [1] -
196:20
PROBATION [1] - 6:14
PROBLEM [1] - 19:10
PROBLEMS [9] -

13:23, 57:4, 64:10,
197:22, 225:7,
225:8, 233:15,
233:25, 236:17
PROCEDURE [1] -
63:2
PROCEED [2] - 75:5,
147:24
PROCEEDING [12] -
70:5, 179:15,
179:16, 179:18,
180:15, 186:8,
209:2, 209:20,
210:24, 222:15,
222:18, 224:5
PROCEEDINGS [19] -
1:23, 54:1, 54:11,
54:13, 62:5, 62:6,
67:24, 75:19, 76:17,
88:9, 98:17, 132:17,
133:14, 189:15,
216:5, 223:13,
230:3, 236:24,
241:11
PROCESS [11] -
16:12, 17:14, 31:5,
48:10, 68:2, 138:13,
145:13, 176:9,
176:18, 184:10,
210:6
PRODUCED [1] - 1:23
PRODUCT [2] - 232:4,
237:9
PRODUCTION [1] -
206:6
PROFESSIONAL [2] -
5:2, 6:6
PROFESSIONALS [2]
- 37:9, 37:20
PROFESSIONS [1] -
6:12
PROFESSOR [1] -
4:23
PROFFER [4] - 96:22,
116:8, 120:1, 184:24
PROFOUND [5] -
12:22, 13:11, 13:13,
60:19, 232:5
PROFOUNDLY [2] -
13:21, 230:17
PROGRAM [2] -
169:7, 169:12
PROGRESSED [1] -
136:7
PROGRESSIVE [2] -
228:20, 229:1
PROJECT [18] - 8:21,
8:24, 8:25, 9:10,
135:12, 135:13,
144:7, 150:2, 150:4,

152:10, 163:7,
172:4, 179:23,
205:8, 206:7,
238:18, 239:1
PROLOGUE [1] -
197:4
PROMISED [1] -
224:15
PROMISES [1] -
146:20
PRONG [1] - 217:23
PROOF [2] - 191:10,
225:8
PROPENSITY [1] -
198:15
PROPER [2] - 178:11,
188:13
PROPERTY [1] -
173:14
PROPOSED [2] -
184:20, 186:19
PROPOSING [1] -
185:23
PROSECUTING [1] -
7:9
PROSECUTION [10] -
7:13, 7:25, 8:12,
8:15, 22:8, 24:9,
34:7, 164:2, 209:5,
227:24
PROSECUTOR [2] -
109:15, 174:10
PROSECUTORS [2] -
6:13, 7:18
PROTECT [2] - 37:23,
125:14
PROTECTING [1] -
125:15
PROTECTION [1] -
234:16
PROTECTIVE [3] -
36:23, 37:4, 44:2
PROTECTS [1] - 38:17
PROUD [1] - 231:4
PROVE [4] - 211:20,
216:1, 218:15,
220:13
PROVED [2] - 203:22,
225:12
PROVEN [16] -
187:17, 189:20,
190:5, 190:12,
190:15, 190:20,
190:24, 192:1,
195:22, 196:16,
200:1, 215:18,
217:20, 224:18,
225:19, 225:20
PROVES [1] - 240:13
PROVIDE [6] - 26:7,

74:1, 188:3, 223:20, 230:10, 239:3
**PROVIDED** [4] - 11:15, 72:5, 82:20, 178:3
**PROVIDES** [3] - 180:21, 180:23, 230:13
**PROVIDING** [1] - 181:17
**PROVISION** [1] - 181:21
**PROXIMITY** [1] - 121:13
**PSEUDOPSYCHIAT RIC** [1] - 61:2
**PSY.D** [1] - 28:25
**PSYCH** [5] - 233:21, 233:22, 234:10, 234:12, 235:3
**PSYCHIATRIC** [9] - 4:19, 50:12, 57:3, 57:5, 60:24, 111:11, 130:24, 235:16, 236:8
**PSYCHIATRIST** [8] - 33:24, 33:25, 62:7, 82:3, 83:5, 213:3, 234:3, 235:19
**PSYCHOLOGICAL** [11] - 5:5, 5:8, 12:21, 13:4, 16:18, 61:22, 130:24, 233:13, 233:16, 235:16, 236:7
**PSYCHOLOGICALL Y** [1] - 65:4
**PSYCHOLOGIST** [13] - 4:5, 4:6, 28:12, 28:25, 33:24, 34:1, 52:13, 82:10, 83:6, 110:9, 110:10, 233:10, 236:19
**PSYCHOLOGISTS** [1] - 235:18
**PSYCHOLOGY** [9] - 4:14, 5:2, 5:3, 9:19, 10:3, 10:7, 10:8, 29:5, 30:1
**PSYCHOTIC** [2] - 142:17, 142:19
**PTSD** [1] - 123:13
**PUBIC** [2] - 48:18, 48:19
**PUBLIC** [3] - 2:6, 8:24, 9:4
**PUBLICATIONS** [1] - 5:20
**PUBLISH** [1] - 191:11
**PULLED** [3] - 155:8,

179:10, 212:24
**PUMPED** [2] - 17:2, 38:10
**PUMPING** [1] - 38:22
**PUNCH** [1] - 120:13
**PUNISHABLE** [1] - 190:7
**PUNISHED** [11] - 71:9, 79:23, 80:12, 80:17, 80:18, 81:10, 81:15, 81:16, 81:20, 203:10, 203:12
**PUNISHMENT** [7] - 71:15, 79:4, 79:23, 197:6, 212:8, 236:12, 240:7
**PURCHASE** [2] - 166:16, 166:19
**PURCHASED** [2] - 152:15, 152:19
**PURPORTING** [1] - 173:13
**PURPOSE** [9] - 9:5, 9:8, 71:5, 83:22, 135:13, 178:8, 195:8, 195:9, 197:14
**PURPOSES** [6] - 68:1, 95:3, 182:9, 216:2, 216:21, 228:7
**PURSUANT** [1] - 179:12
**PURSUE** [1] - 75:10
**PURSUING** [1] - 172:24
**PUSSYCAT** [1] - 199:18
**PUT** [20] - 27:21, 84:17, 84:22, 100:23, 101:9, 116:6, 126:19, 155:10, 178:17, 179:21, 183:25, 201:24, 211:15, 218:23, 227:1, 228:6, 234:15, 234:16, 234:17, 237:20
**PUTS** [2] - 181:9, 235:1
**PUTTING** [2] - 55:17, 204:21
**PUZZLE** [1] - 88:5

---

## Q

**QUALIFICATIONS** [2] - 3:12, 242:7
**QUALIFIED** [1] - 10:12
**QUALIFY** [1] - 9:24
**QUALIFYING** [1] -

190:17
**QUARTER** [1] - 128:16
**QUEER** [1] - 36:18
**QUESTIONED** [10] - 17:25, 19:17, 22:4, 97:8, 132:7, 137:1, 138:20, 140:23, 213:18, 217:11
**QUESTIONS** [24] - 17:18, 22:8, 43:9, 74:21, 80:5, 84:9, 102:5, 109:3, 109:14, 110:22, 111:2, 131:4, 132:5, 134:17, 134:25, 139:2, 140:2, 140:5, 141:13, 143:3, 143:4, 146:17, 147:2, 189:15
**QUIBBLING** [2] - 222:22, 225:1
**QUITE** [9] - 18:6, 35:22, 40:24, 52:16, 90:11, 123:16, 142:24, 142:25, 189:19
**QUOTE** [10] - 30:7, 30:9, 30:14, 54:18, 87:3, 191:22, 197:15, 198:11, 204:2, 204:3
**QUOTED** [2] - 79:4, 209:22
**QUOTES** [1] - 79:4
**QUOTING** [2] - 87:2, 208:5

---

## R

**R1** [2] - 178:2, 182:24
**R120** [1] - 194:20
**R121** [1] - 194:17
**R159** [1] - 194:18
**R169** [1] - 192:6
**R3** [1] - 195:23
**R4** [1] - 195:23
**RACE** [1] - 240:8
**RAGE** [2] - 44:23, 45:10
**RAISED** [2] - 203:7, 231:8
**RAMPANT** [1] - 40:6
**RAN** [2] - 51:3, 60:6
**RAPE** [11] - 6:25, 12:23, 13:5, 32:25, 42:4, 42:23, 48:15, 94:10, 122:5, 126:16
**RAPED** [4] - 53:6, 59:5, 94:1, 118:13

**RAPES** [9] - 13:16, 25:20, 43:9, 43:17, 46:21, 51:14, 63:17, 85:6, 139:15
**RAPING** [5] - 17:1, 18:25, 26:2, 26:10, 91:25
**RAPIST** [1] - 43:1
**RAPISTS** [1] - 6:4
**RARE** [1] - 138:17
**RATE** [3] - 172:4, 223:20, 223:24
**RATER** [1] - 35:17
**RATHER** [2] - 18:13, 126:6
**RAY** [3] - 115:25, 118:20, 121:20
**REACH** [2] - 86:7, 103:11
**REACHED** [2] - 12:20, 13:3
**REACHES** [1] - 184:4
**REACTION** [1] - 36:21
**REACTIVE** [2] - 42:19, 43:1
**REACTIVITY** [1] - 60:1
**READ** [28] - 27:10, 28:22, 29:22, 54:18, 80:4, 88:2, 88:8, 91:18, 91:21, 98:16, 103:4, 108:22, 132:20, 133:2, 137:7, 137:19, 156:4, 171:16, 183:1, 192:24, 209:6, 210:24, 213:14, 218:4, 224:11, 225:24
**READILY** [1] - 206:3
**READING** [9] - 33:17, 38:5, 78:18, 78:22, 79:10, 101:25, 102:11, 123:4, 150:5
**READINGS** [1] - 50:17
**REAL** [8] - 56:21, 56:22, 158:2, 200:23, 203:8, 239:6, 239:17
**REALIZE** [2] - 227:5, 230:5
**REALLY** [34] - 14:21, 16:16, 19:6, 19:11, 20:11, 20:24, 21:4, 23:21, 37:3, 37:23, 37:24, 39:4, 45:5, 48:16, 49:18, 50:18, 51:11, 57:6, 57:21, 57:23, 58:8, 87:20, 104:22, 104:23, 105:9, 105:21,

138:17, 172:24, 174:23, 177:12, 198:1, 198:3, 200:7, 230:19
**REALM** [2] - 23:11, 228:14
**REASON** [13] - 82:18, 142:20, 197:16, 200:22, 200:23, 205:23, 210:8, 215:1, 215:11, 215:22, 232:19, 234:15
**REASONABLE** [12] - 12:20, 13:3, 184:8, 184:11, 190:5, 190:12, 196:17, 215:18, 216:1, 218:15, 225:13, 225:20
**REASONS** [11] - 18:19, 20:6, 45:21, 51:25, 178:11, 192:9, 192:11, 207:21, 212:3, 215:24, 235:12
**REBUTTAL** [6] - 128:8, 147:14, 147:15, 180:1, 180:10, 240:19
**REBUTTING** [1] - 179:17
**REC** [7] - 157:22, 158:1, 162:16, 162:21, 176:11, 177:6, 177:9
**RECALLED** [4] - 36:17, 48:12, 108:3, 136:16
**RECALLING** [1] - 21:5
**RECAP** [1] - 116:22
**RECAST** [5] - 185:10, 185:15, 185:16, 185:21, 185:22
**RECEIVE** [2] - 227:21, 240:15
**RECEIVED** [13] - 4:12, 5:13, 5:15, 143:21, 146:11, 157:12, 169:11, 173:15, 183:10, 187:14, 202:2, 224:15, 238:25
**RECEIVING** [1] - 167:16
**RECENT** [1] - 214:9
**RECENTLY** [8] - 9:9, 11:15, 69:24, 70:9, 92:23, 92:24, 187:24, 231:3

**RECESS** [9] - 64:3, 65:8, 65:20, 128:15, 128:17, 179:1, 179:3, 207:9, 241:6

**RECOGNIZE** [7] - 3:21, 6:24, 11:6, 73:20, 117:19, 152:1, 152:3

**RECOGNIZED** [2] - 126:16, 152:4

**RECOLLECTION** [17] - 17:13, 27:2, 33:9, 47:1, 52:15, 55:19, 63:9, 80:19, 92:2, 96:10, 103:15, 108:4, 110:7, 114:18, 114:21, 139:14, 139:17

**RECOMMENDED** [1] - 52:14

**RECONCILE** [1] - 21:12

**RECORD** [32] - 3:9, 72:24, 75:16, 75:20, 78:19, 78:22, 80:5, 85:10, 91:18, 91:21, 108:10, 108:13, 108:14, 108:18, 109:25, 110:1, 110:5, 110:22, 111:5, 111:10, 112:25, 122:20, 140:22, 142:13, 147:21, 178:22, 183:25, 192:25, 199:6, 202:5, 209:20, 241:11

**RECORDED** [1] - 1:23

**RECORDS** [35] - 11:11, 24:13, 24:17, 24:21, 59:23, 61:14, 62:19, 62:21, 63:5, 68:19, 68:24, 68:25, 69:2, 69:4, 69:7, 108:12, 109:3, 109:5, 109:6, 109:11, 109:22, 111:10, 111:11, 119:23, 120:7, 140:7, 140:9, 140:11, 152:13, 228:11, 229:2, 229:3, 230:22, 237:22

**RECOUNT** [2] - 21:11, 21:19

**RECOUNTED** [2] - 20:4, 54:17

**RECOUNTING** [1] - 141:4

**RECREATION** [5] - 137:15, 158:4, 158:5, 176:4, 177:12

**RECROSS** [3] - 175:14, 175:15, 242:3

**RECTUM** [2] - 38:10, 38:22

**RECURRING** [1] - 63:6

**RED** [2] - 178:18, 238:19

**REDIRECT** [10] - 127:12, 127:16, 127:20, 128:20, 142:8, 171:1, 171:3, 172:18, 173:4, 242:3

**REDUCE** [1] - 18:13

**REDUCTION** [1] - 224:15

**REDUNDANT** [1] - 166:5

**REENACT** [1] - 55:14

**REENACTMENT** [1] - 56:1

**REFER** [5] - 37:21, 37:22, 38:12, 132:16

**REFERENCE** [7] - 59:25, 92:17, 107:5, 107:6, 109:20, 109:24, 111:12

**REFERENCED** [1] - 75:18

**REFERENCES** [2] - 61:20, 92:21

**REFERENCING** [1] - 74:7

**REFERRED** [4] - 38:7, 42:11, 73:10, 129:25

**REFERRING** [14] - 37:5, 50:15, 51:20, 68:22, 74:23, 79:18, 99:3, 110:2, 112:6, 126:15, 136:13, 139:3, 161:7, 214:2

**REFERS** [2] - 111:14, 137:21

**REFLECTED** [1] - 69:25

**REFRESHES** [2] - 114:18, 114:21

**REFUSAL** [1] - 204:22

**REFUSED** [2] - 9:24, 48:12

**REGARD** [2] - 25:19, 26:1

**REGARDING** [1] - 22:18

**REGARDLESS** [1] - 182:12

**REGRETS** [1] - 209:21

**REGULAR** [1] - 81:18

**REGULATING** [1] - 64:10

**REIDERS** [1] - 2:9

**REJECTED** [1] - 173:17

**RELAPSE** [1] - 29:8

**RELATED** [4] - 5:6, 123:17, 131:10, 139:11

**RELATIONS** [2] - 98:22, 112:3

**RELATIONSHIP** [10] - 51:17, 51:23, 56:23, 133:5, 134:8, 134:19, 136:7, 138:14, 216:14

**RELATIONSHIPS** [2] - 56:22, 134:2

**RELATIVES** [1] - 46:8

**RELAXED** [1] - 40:24

**RELEASE** [1] - 63:2

**RELEASED** [1] - 196:9

**RELEVANCE** [2] - 180:17, 223:12

**RELEVANT** [6] - 5:1, 24:22, 81:5, 187:17, 217:21, 222:13

**RELIABILITY** [7] - 17:19, 24:25, 35:12, 35:17, 180:17, 222:17, 223:12

**RELIABLE** [4] - 182:22, 211:11, 224:4, 224:5

**RELIED** [2] - 223:7, 228:10

**RELIEF** [3] - 61:12, 155:9, 155:10

**RELIGION** [1] - 196:13

**RELIGIOUS** [1] - 210:24

**RELIVE** [1] - 14:21

**RELY** [7] - 12:16, 20:15, 191:7, 218:2, 219:3, 220:23, 232:20

**RELYING** [1] - 220:25

**REMAIN** [1] - 208:13

**REMAINS** [1] - 199:19

**REMEDIATION** [1] - 58:15

**REMEMBER** [69] - 17:15, 19:1, 20:17, 31:24, 32:15, 33:4, 33:25, 34:17, 46:9, 52:19, 52:22, 53:14, 61:20, 63:4, 63:8, 63:13, 68:25, 69:5,

69:6, 69:8, 81:13, 82:5, 83:14, 84:12, 91:1, 92:19, 92:21, 96:11, 100:25, 102:11, 103:17, 103:23, 106:19, 107:10, 107:11, 107:20, 109:4, 109:20, 110:18, 110:24, 111:4, 113:9, 113:18, 114:15, 115:18, 116:5, 116:6, 116:7, 116:13, 116:20, 120:1, 123:3, 123:4, 123:16, 123:18, 124:5, 130:2, 132:3, 149:13, 152:11, 154:14, 160:19, 160:21, 161:17, 163:8, 184:2, 221:23

**REMEMBERED** [1] - 131:20

**REMEMBERING** [1] - 33:2

**REMEMBERS** [1] - 53:20

**REMIND** [3] - 204:24, 215:17, 227:6

**REMINDS** [1] - 184:16

**REMISS** [1] - 189:6

**REMORSE** [9] - 200:4, 207:13, 209:3, 209:14, 209:24, 210:5, 211:7, 211:11, 211:12

**REMORSEFUL** [3] - 200:24, 209:1, 210:2

**REMOTELY** [1] - 112:24

**RENDER** [4] - 188:12, 188:15, 193:18, 195:9

**RENDERED** [1] - 240:23

**REPEAT** [2] - 69:13, 182:4

**REPEATED** [1] - 121:7

**REPEATEDLY** [1] - 16:25

**REPERCUSSIONS** [1] - 133:23

**REPLETE** [1] - 200:12

**REPORT** [123] - 10:23, 11:10, 11:12, 12:5, 18:4, 18:7, 18:17, 28:25, 32:17, 37:8, 42:3, 50:10, 66:6, 66:7, 66:15, 67:5, 67:6, 67:16, 67:18,

67:19, 67:20, 67:24, 68:10, 68:11, 68:13, 68:16, 68:18, 69:1, 69:9, 69:14, 69:24, 70:1, 70:4, 71:19, 71:22, 72:1, 72:2, 72:5, 72:6, 72:8, 72:9, 72:12, 72:15, 72:21, 72:25, 73:15, 73:18, 73:21, 74:1, 74:2, 74:6, 74:7, 74:8, 74:13, 74:16, 74:18, 74:21, 74:23, 74:24, 75:1, 75:3, 75:7, 75:8, 75:11, 75:23, 76:6, 76:16, 76:21, 77:3, 77:7, 77:14, 77:19, 77:21, 78:13, 78:14, 79:18, 79:19, 80:7, 83:16, 83:22, 87:2, 89:7, 91:6, 92:22, 92:23, 92:25, 93:4, 93:20, 93:23, 101:5, 102:8, 102:9, 102:22, 115:12, 116:11, 118:17, 134:20, 135:15, 137:4, 138:10, 141:15, 159:17, 159:18, 159:19, 159:22, 160:3, 160:4, 161:15, 163:18, 163:20, 164:23, 165:1, 165:4, 165:21, 165:23, 166:2, 168:2, 168:4, 168:8, 173:16, 192:6, 229:17

**REPORTED** [31] - 18:14, 21:13, 24:19, 27:7, 32:12, 32:18, 38:9, 52:5, 70:12, 70:14, 70:19, 93:11, 93:19, 93:20, 101:14, 101:23, 109:17, 115:16, 130:7, 131:5, 132:6, 133:13, 134:5, 134:18, 140:13, 160:6, 165:22, 174:9, 181:11, 202:15, 236:19

**REPORTER** [3] - 1:19, 232:16, 241:16

**REPORTING** [6] - 27:24, 31:16, 33:13, 124:24, 137:1, 180:8

**REPORTS** [19] - 19:2, 21:13, 23:17, 28:3, 28:4, 38:5, 66:12,

68:21, 70:11, 93:2, 93:25, 100:8, 102:1, 119:23, 127:3, 140:2, 168:3, 168:25, 169:4

**REPRESENTATION** [2] - 76:10, 107:13

**REPRESENTATIONS** [1] - 98:25

**REPRESS** [2] - 30:12, 131:24

**REPULSED** [2] - 48:17, 136:15

**REQUEST** [6] - 72:4, 73:25, 185:9, 220:3, 234:14

**REQUESTED** [3] - 186:19, 192:18, 234:3

**REQUESTING** [3] - 185:11, 186:13, 236:25

**REQUESTS** [2] - 186:8, 207:21

**REQUIRED** [1] - 156:2

**REQUIREMENT** [1] - 207:16

**REQUIREMENTS** [1] - 157:16

**RESEARCH** [5] - 5:16, 7:8, 50:4, 61:24

**RESERVED** [1] - 231:10

**RESIDUE** [1] - 49:8

**RESILIENCY** [1] - 30:13

**RESOLVE** [2] - 30:9, 186:16

**RESORT** [1] - 229:7

**RESOURCES** [1] - 51:6

**RESPECT** [4] - 87:16, 92:4, 103:7, 104:18

**RESPECTFULLY** [3] - 207:21, 211:25, 225:13

**RESPOND** [3] - 58:23, 84:11, 153:9

**RESPONDED** [1] - 153:10

**RESPONDING** [1] - 141:5

**RESPONDS** [1] - 210:17

**RESPONSE** [9] - 25:6, 35:2, 48:24, 50:20, 53:2, 59:7, 62:3, 153:12, 166:1

**RESPONSES** [1] - 104:14

**RESPONSIBILITY** [9] - 200:6, 200:8, 207:13, 207:25, 208:24, 209:23, 211:10, 211:13, 231:13

**RESPONSIBLE** [3] - 20:12, 42:10, 202:20

**REST** [7] - 59:14, 104:7, 145:7, 145:14, 147:11, 147:13, 183:8

**RESTATE** [1] - 104:10

**RESTS** [1] - 145:6

**RESULT** [9] - 44:18, 49:6, 56:15, 189:17, 190:2, 203:16, 232:7, 233:3, 233:25

**RESULTED** [1] - 189:25

**RESULTS** [1] - 49:11

**RESUME** [1] - 207:6

**RETICENT** [1] - 86:17

**RETINOPATHY** [1] - 228:25

**RETIRE** [2] - 148:9, 165:16

**RETIRED** [6] - 148:7, 148:11, 149:18, 153:23, 158:6, 212:14

**RETURN** [2] - 59:21, 210:20

**RETURNING** [1] - 42:17

**REVEAL** [3] - 30:5, 30:11, 142:2

**REVEALED** [1] - 22:1

**REVIEW** [16] - 11:14, 28:9, 28:10, 32:6, 46:6, 61:14, 62:19, 82:16, 82:18, 90:24, 91:3, 132:12, 159:17, 163:20, 175:25, 220:1

**REVIEWED** [35] - 11:11, 17:20, 27:6, 34:11, 59:24, 66:6, 66:10, 66:25, 67:3, 67:4, 67:7, 67:10, 67:11, 67:16, 68:19, 68:24, 69:2, 69:4, 69:10, 69:12, 69:21, 69:23, 70:3, 70:8, 70:11, 71:18, 72:1, 73:15, 73:23, 77:7, 82:20, 89:5, 93:4, 95:9, 175:17

**REVIEWING** [3] - 91:12, 173:19, 222:8

**REVISED** [1] - 69:25

**REVULSION** [2] - 48:18, 136:11

**RICK** [1] - 208:8

**RIDE** [1] - 53:13

**RIDES** [1] - 201:20

**RIDICULOUS** [1] - 193:20

**RIFE** [2] - 19:8, 40:2

**RING** [1] - 109:8

**RISK** [4] - 62:1, 229:18, 229:22, 239:21

**RITA** [2] - 163:25, 240:3

**ROBBERIES** [1] - 222:14

**ROBBERY** [1] - 222:11

**ROBRENO** [4] - 222:1, 222:5, 222:11

**ROBRENO'S** [1] - 222:19

**ROCK** [1] - 191:21

**ROLE** [3] - 22:17, 22:22, 202:19

**RON** [35] - 11:16, 39:20, 39:23, 46:10, 53:11, 54:1, 54:13, 54:17, 55:4, 55:5, 56:3, 85:23, 85:25, 86:4, 86:11, 87:10, 87:23, 107:25, 108:2, 108:5, 111:25, 112:1, 112:5, 113:7, 131:6, 134:23, 135:2, 135:19, 136:1, 185:14, 202:17, 203:23, 204:9, 237:23, 240:2

**RON'S** [2] - 54:10, 87:24

**RONALD** [1] - 2:8

**RONNIE** [6] - 89:18, 89:21, 114:25, 115:20, 117:5, 203:25

**ROOM** [13] - 26:9, 40:23, 52:6, 52:10, 95:22, 140:17, 198:24, 208:8, 212:20, 212:25, 213:17, 213:23, 239:16

**ROOMS** [1] - 95:23

**ROPES** [2] - 195:3, 195:7

**ROSTER** [2] - 154:2, 154:24

**ROSTERS** [2] - 154:24, 155:1

**ROUGHLY** [1] - 8:5

**ROW** [11] - 149:4, 154:10, 154:22, 155:7, 155:13, 170:13, 198:21, 199:2, 199:3, 214:24

**RPR** [1] - 1:18

**RUBBING** [1] - 53:16

**RUINED** [1] - 230:18

**RULE** [6] - 178:8, 178:12, 179:13, 180:14, 180:19, 223:13

**RULED** [3] - 221:17, 222:4, 222:5

**RULES** [5] - 165:16, 179:15, 180:18, 199:10, 199:11

**RULING** [2] - 222:21, 222:22

**RUMOR** [2] - 167:22, 167:24

**RUN** [5] - 51:4, 62:11, 164:25, 177:6, 238:24

**RUNNING** [3] - 150:22, 165:21, 177:10

**RUSE** [6] - 193:9, 193:12, 193:20, 217:25, 219:16, 220:7

## S

**SAD** [1] - 196:4

**SADISM** [2] - 39:8, 39:11

**SAFELY** [1] - 193:18

**SAFETY** [3] - 196:23, 198:18, 202:18

**SALIENT** [1] - 81:5

**SARAH** [3] - 144:5, 144:12, 242:11

**SAT** [1] - 227:2

**SAUCE** [3] - 25:23, 38:11, 38:23

**SAUNDERS** [9] - 2:5, 75:17, 184:19, 185:8, 185:20, 186:24, 187:4, 187:9, 187:12

**SAVE** [2] - 116:15, 206:19

**SAW** [21] - 27:19, 52:13, 52:16, 77:14, 78:19, 98:17, 99:15, 99:20, 100:4,

104:20, 107:7, 123:7, 151:22, 151:25, 157:4, 167:24, 168:2, 170:10, 170:12, 174:2, 199:18

**SCALDING** [2] - 17:2, 38:22

**SCALE** [2] - 15:4, 55:17

**SCALES** [1] - 23:24

**SCAM** [8] - 160:2, 160:4, 162:1, 164:10, 164:25, 165:21, 169:3, 169:16

**SCAMMED** [1] - 239:2

**SCAMMING** [2] - 153:4, 159:22

**SCAMS** [6] - 160:6, 171:22, 172:3, 178:14, 205:10, 238:2

**SCATTERED** [1] - 201:25

**SCENE** [2] - 217:9, 217:10

**SCHAEFER** [1] - 236:23

**SCHEDULES** [1] - 163:4

**SCHEME** [1] - 172:2

**SCHEMES** [1] - 178:14

**SCHIZOPHRENIA** [4] - 90:2, 142:12, 142:15, 142:25

**SCHIZOPHRENIC** [2] - 142:10, 143:2

**SCHOOL** [5] - 27:12, 59:9, 119:8, 201:16, 238:16

**SCHOOLS** [2] - 201:17, 238:10

**SCIENCE** [4] - 223:3, 223:4, 223:23

**SCIENTIFIC** [1] - 223:15

**SCOPE** [3] - 171:23, 172:10, 173:3

**SCOTT** [1] - 12:1

**SCOUTS** [1] - 201:21

**SCRANTON** [1] - 1:17

**SCRAPED** [1] - 201:18

**SCREAMING** [2] - 38:20, 38:21

**SCRIBBLES** [1] - 73:20

**SCRUTINIZE** [1] - 221:10

**SCRUTINY** [1] - 210:1
**SCU** [6] - 156:16, 157:1, 158:12, 162:20, 163:11, 167:19
**SE** [1] - 75:5
**SEATED** [3] - 3:2, 65:22, 128:18
**SECOND** [14] - 21:8, 74:13, 74:16, 95:5, 111:19, 113:10, 124:25, 190:17, 190:24, 195:15, 197:17, 201:2, 207:5
**SECTION** [11] - 2:3, 93:13, 93:17, 93:18, 103:3, 132:20, 133:1, 137:5, 137:17, 179:10, 182:6
**SECURE** [1] - 198:16
**SECURED** [1] - 194:19
**SECURES** [1] - 238:20
**SECURITY** [3] - 82:11, 198:17, 239:21
**SEE** [74] - 13:24, 27:3, 28:2, 30:7, 30:21, 31:3, 32:20, 33:4, 35:25, 46:7, 57:18, 59:23, 67:21, 67:22, 68:5, 68:6, 71:9, 76:13, 79:3, 79:5, 89:15, 89:22, 90:5, 90:8, 91:16, 91:17, 99:22, 101:6, 101:11, 102:8, 102:14, 102:18, 109:8, 110:21, 114:18, 114:21, 117:1, 123:2, 129:20, 137:5, 137:17, 142:23, 149:22, 149:25, 150:5, 150:6, 150:12, 151:16, 152:22, 167:10, 167:18, 167:21, 169:23, 171:15, 174:5, 177:4, 177:16, 181:20, 186:9, 192:5, 195:3, 201:6, 201:12, 202:14, 205:9, 205:10, 209:19, 210:17, 219:22, 227:15, 229:5, 234:4, 238:22
**SEEING** [7] - 25:10, 91:14, 98:19, 116:17, 116:20,

119:23, 162:25
**SEEK** [2] - 9:7, 46:4
**SEEKING** [3] - 63:15, 210:12, 230:10
**SEEM** [2] - 63:8, 141:19
**SEGMENTS** [1] - 179:10
**SEGREGATION** [2] - 235:5, 235:8
**SELDOM** [1] - 156:24
**SELF** [9] - 4:4, 16:11, 17:6, 50:20, 57:10, 57:14, 64:22, 70:21, 239:10
**SELF-BLAME** [1] - 16:11
**SELF-CONTRADICTORY** [1] - 70:21
**SELF-DESTRUCTIVE** [1] - 64:22
**SELF-EMPLOYED** [1] - 4:4
**SELF-ESTEEM** [3] - 57:10, 57:14, 239:10
**SELLING** [1] - 151:18
**SEND** [2] - 150:7, 211:6
**SENIOR** [3] - 6:18, 7:2, 148:13
**SENSATIONS** [1] - 43:15
**SENSE** [8] - 43:25, 58:9, 60:19, 62:4, 136:10, 138:16, 210:1, 218:24
**SENSELESS** [2] - 197:11, 197:13
**SENSORY** [1] - 42:16
**SENT** [4] - 74:12, 173:14, 186:25, 197:6
**SENTENCE** [11] - 137:23, 177:16, 195:16, 199:4, 207:22, 209:18, 214:6, 224:15, 226:24, 230:8, 240:15
**SENTENCED** [1] - 210:4
**SENTENCES** [2] - 208:19, 221:4
**SENTENCING** [9] - 1:12, 74:15, 209:19, 210:5, 222:1, 222:12, 222:16, 226:23, 228:7

**SEPARATE** [3] - 47:15, 184:23, 203:19
**SEPARATELY** [2] - 32:18, 136:15
**SEPARATION** [1] - 196:25
**SEPTEMBER** [12] - 29:22, 69:11, 69:15, 69:19, 72:3, 74:2, 74:8, 74:14, 74:16, 75:8, 77:17, 190:19
**SEQUENCE** [3] - 21:7, 46:24, 135:23
**SEQUENTIAL** [2] - 20:13, 20:18
**SERIES** [6] - 109:2, 109:14, 139:2, 140:1, 140:4, 230:22
**SERIOUS** [12] - 56:8, 131:1, 172:4, 172:6, 172:8, 172:16, 173:2, 173:8, 189:24, 197:8, 226:22, 237:2
**SERIOUSLY** [2] - 162:2, 162:3
**SERVE** [1] - 6:21
**SERVES** [1] - 31:19
**SERVICE** [4] - 29:5, 30:1, 31:21, 233:14
**SERVICES** [2] - 6:21, 7:21
**SERVING** [2] - 199:4, 221:4
**SESSION** [2] - 29:2, 29:14
**SESSIONS** [1] - 30:11
**SET** [4] - 145:1, 192:15, 203:17, 230:14
**SETTING** [3] - 23:9, 31:16, 40:24
**SEVEN** [1] - 192:9
**SEVERAL** [9] - 5:6, 81:24, 90:15, 150:21, 151:19, 168:23, 174:16, 193:21, 205:6
**SEVERE** [12] - 13:1, 13:16, 14:24, 15:7, 22:19, 45:1, 49:20, 50:12, 51:24, 52:2, 142:24, 228:23
**SEVERELY** [1] - 65:3
**SEVERITY** [2] - 51:18, 51:23
**SEX** [33] - 6:3, 15:25, 85:4, 85:5, 85:7, 85:11, 85:15, 85:16,

94:18, 96:15, 99:16, 99:20, 99:25, 110:14, 112:20, 118:3, 118:11, 119:3, 119:17, 120:12, 122:8, 122:15, 132:8, 133:14, 137:8, 137:24, 139:12, 195:2, 195:8, 195:13, 200:17, 203:25, 204:11
**SEXUAL** [129] - 5:17, 6:5, 6:16, 6:24, 7:3, 7:14, 9:5, 9:20, 10:3, 10:9, 12:23, 13:1, 13:5, 13:16, 13:17, 13:18, 16:6, 17:12, 17:16, 18:1, 18:5, 18:7, 18:9, 18:15, 19:9, 19:11, 19:14, 21:25, 22:14, 22:18, 23:1, 23:4, 23:11, 23:13, 24:9, 24:19, 24:20, 25:1, 26:1, 27:7, 29:17, 30:5, 30:7, 31:16, 31:25, 32:14, 32:19, 33:7, 37:1, 37:19, 37:21, 39:8, 39:11, 39:17, 40:2, 40:6, 40:12, 41:25, 42:1, 42:4, 44:4, 44:7, 46:17, 49:1, 49:4, 52:5, 53:7, 54:5, 54:14, 55:12, 55:25, 56:22, 60:8, 62:1, 64:24, 81:24, 82:3, 86:21, 87:5, 90:20, 90:23, 94:11, 96:19, 98:21, 104:16, 105:8, 105:12, 105:15, 105:19, 106:4, 107:8, 109:16, 109:24, 110:17, 111:2, 111:10, 111:12, 111:16, 111:19, 112:3, 112:17, 112:22, 118:23, 120:17, 122:22, 123:24, 125:11, 126:4, 126:17, 126:20, 129:7, 129:8, 129:10, 129:11, 130:11, 130:14, 132:1, 133:5, 134:6, 134:8, 135:15, 135:20, 140:8, 202:15, 203:18, 232:5, 236:21,

237:17
**SEXUALLY** [49] - 9:1, 15:8, 16:9, 18:22, 36:4, 36:5, 36:12, 36:20, 39:12, 39:15, 39:23, 39:24, 39:25, 40:9, 50:25, 51:1, 51:7, 53:10, 54:2, 54:5, 54:8, 55:11, 56:3, 83:7, 83:12, 83:17, 84:3, 84:8, 84:16, 84:25, 85:19, 87:18, 87:23, 90:22, 93:16, 94:7, 94:13, 95:4, 96:19, 97:19, 98:12, 98:13, 105:2, 105:11, 106:15, 107:24, 114:24, 122:25, 123:23
**SHACKS** [1] - 95:22
**SHAME** [2] - 41:19, 125:13
**SHAMEFUL** [1] - 41:20
**SHAPED** [2] - 50:24, 51:11
**SHARE** [1] - 96:6
**SHARED** [2] - 90:19, 90:21
**SHATTERED** [1] - 130:9
**SHEETS** [8] - 215:24, 216:2, 216:8, 216:20, 216:24, 217:3, 217:12, 217:20
**SHELLS** [1] - 45:22
**SHERIDAN** [3] - 115:25, 118:20, 121:20
**SHIFT** [1] - 217:8
**SHIFTING** [2] - 200:12, 230:11
**SHOES** [1] - 229:6
**SHOOTING** [3] - 190:18, 190:19, 214:8
**SHORT** [7] - 127:16, 127:20, 128:9, 138:24, 183:20, 237:19, 240:19
**SHOULDERS** [1] - 202:7
**SHOVE** [1] - 47:11
**SHOVING** [1] - 38:21
**SHOW** [13] - 71:23, 73:18, 82:22, 89:16, 92:25, 108:15, 114:17, 157:7, 181:18, 195:23,

202:12, 204:23, 208:23

**SHOWED** [3] - 152:14, 221:25, 236:18

**SHOWING** [8] - 3:20, 11:5, 26:18, 28:19, 102:12, 132:24, 216:22, 222:9

**SHOWN** [4] - 90:24, 129:2, 136:17, 174:19

**SHOWS** [2] - 202:5, 213:6

**SHUT** [2] - 27:18, 59:7

**SIBLING** [1] - 83:21

**SIBLINGS** [7] - 19:18, 25:14, 26:7, 70:19, 80:20, 81:5, 238:6

**SICK** [2] - 155:8, 155:10

**SIDE** [6] - 23:23, 44:14, 55:18, 88:19, 183:16

**SIDES** [3] - 17:4, 35:20, 185:25

**SIGHTS** [1] - 42:16

**SIGN** [1] - 176:7

**SIGNED** [1] - 221:1

**SIGNIFICANT** [13] - 27:25, 28:6, 31:15, 83:19, 84:16, 87:4, 130:22, 169:12, 191:4, 211:11, 214:5, 227:7, 233:15

**SIGNIFICANTLY** [3] - 20:8, 224:22, 229:13

**SIGNS** [2] - 6:24, 220:3

**SILENT** [1] - 208:13

**SILLY** [1] - 57:9

**SIMILAR** [7] - 33:10, 33:12, 34:21, 61:10, 100:18, 101:12, 136:6

**SIMILARITIES** [1] - 55:4

**SIMILARITY** [3] - 55:15, 135:18, 136:10

**SIMPLE** [1] - 90:11

**SIMPLY** [11] - 15:7, 15:15, 18:13, 63:10, 74:3, 86:25, 107:6, 200:24, 205:12, 218:24, 224:24

**SIMULTANEOUSLY** [1] - 48:20

**SINGLE** [17] - 109:17, 125:1, 167:1, 169:14, 174:24,

175:5, 196:25, 200:14, 201:24, 232:25, 233:21, 233:23, 234:11, 234:12, 235:3, 238:12, 238:13

**SINGLED** [1] - 79:23

**SIS** [5] - 153:20, 153:25, 165:13, 165:19, 220:16

**SISTER** [30] - 12:9, 15:24, 16:7, 18:25, 25:14, 46:11, 51:16, 85:4, 85:5, 85:11, 85:15, 86:12, 86:21, 112:3, 113:3, 113:12, 113:15, 113:21, 116:2, 120:4, 121:23, 131:9, 132:9, 133:15, 136:1, 137:9, 137:25, 163:25, 203:11, 237:19

**SISTERS** [2] - 169:10, 175:20

**SIT** [1] - 179:7

**SITTING** [2] - 68:5, 201:8

**SITUATION** [5] - 41:11, 120:19, 214:8, 218:8, 228:2

**SITUATIONS** [2] - 135:9, 197:25

**SIX** [5] - 91:16, 91:17, 116:23, 119:5, 155:17

**SKIM** [1] - 93:14

**SLEEP** [1] - 53:15

**SLIGHTEST** [1] - 125:7

**SLIP** [25] - 184:17, 184:18, 184:20, 184:21, 184:22, 186:2, 186:5, 186:9, 186:11, 188:11, 188:12, 188:13, 188:14, 188:15, 188:16, 188:23, 188:24, 189:2, 189:3, 189:5, 240:24, 241:3, 241:5

**SLOMSKY** [1] - 1:10

**SMALL** [4] - 88:4, 88:21, 88:22, 95:22

**SMELLS** [3] - 42:16, 42:19, 136:15

**SMOKING** [1] - 204:23

**SO-CALLED** [6] - 46:21, 164:10,

164:17, 168:4, 219:6

**SO..** [1] - 185:5

**SOCIAL** [3] - 82:11, 212:22, 212:23

**SOCIETY** [1] - 199:11

**SOCK** [2] - 194:20, 194:21

**SODOMIZED** [2] - 117:21, 118:2

**SOLDER** [2] - 202:10, 202:17

**SOLDIERS** [3] - 38:8, 42:18, 45:14

**SOLELY** [1] - 220:23

**SOLID** [1] - 126:3

**SOMEONE** [8] - 54:4, 54:8, 55:21, 55:23, 135:9, 145:8, 149:7, 210:2

**SOMETIME** [2] - 158:23, 161:1

**SOMETIMES** [14] - 21:25, 24:15, 24:16, 44:18, 55:20, 55:24, 80:17, 81:14, 90:11, 95:25, 96:2, 96:3, 171:20, 175:1

**SOMEWHAT** [3] - 10:19, 83:19, 87:25

**SOMEWHERE** [1] - 48:11

**SON** [2] - 196:5, 196:12

**SORRY** [14] - 38:25, 47:15, 69:13, 72:14, 72:22, 77:22, 78:15, 94:25, 97:12, 134:15, 200:10, 209:12, 216:25

**SORT** [42] - 7:3, 17:13, 19:8, 21:2, 21:3, 25:6, 30:23, 31:7, 31:21, 37:6, 40:5, 40:6, 40:14, 40:24, 42:12, 44:22, 49:17, 51:22, 53:3, 55:16, 56:11, 58:2, 60:14, 61:1, 63:13, 80:18, 81:17, 88:3, 88:4, 92:7, 92:11, 99:10, 129:17, 135:24, 138:6, 138:10, 140:20, 141:4, 141:14, 142:17, 151:23, 152:23

**SORTS** [1] - 232:23

**SOUGHT** [2] - 110:8, 213:25

**SOUL** [1] - 200:8

**SOUND** [3] - 54:24,

238:11, 238:17

**SOUNDED** [1] - 86:24

**SOUNDPROOF** [1] - 40:23

**SOUNDS** [4] - 42:17, 42:20, 104:4, 115:2

**SOURCE** [1] - 87:4

**SPAN** [1] - 28:3

**SPASMS** [1] - 228:23

**SPEAKING** [2] - 24:21, 89:24

**SPECIAL** [22] - 148:14, 149:10, 149:17, 156:1, 159:7, 160:24, 165:14, 166:16, 169:25, 170:8, 170:13, 171:8, 171:17, 188:9, 197:10, 198:17, 209:4, 209:5, 216:4, 216:9, 219:22, 224:6

**SPECIALIST** [6] - 82:7, 105:18, 124:8, 148:13, 157:22, 158:1

**SPECIALISTS** [3] - 177:6, 181:8, 181:16

**SPECIFIC** [14] - 42:19, 42:20, 42:24, 84:12, 100:22, 104:16, 122:23, 139:18, 161:6, 164:18, 181:12, 187:14, 188:3, 233:17

**SPECIFICALLY** [16] - 71:21, 102:11, 103:23, 107:20, 107:22, 109:4, 111:4, 115:18, 116:13, 122:21, 123:16, 129:18, 168:16, 168:21, 191:14, 216:18

**SPECIFICITY** [1] - 139:8

**SPECIFICS** [2] - 100:25, 123:19

**SPECIFY** [1] - 98:13

**SPECTRUM** [2] - 52:1, 52:2

**SPELL** [2] - 3:8, 147:20

**SPENT** [2] - 124:3, 124:5

**SPIKED** [1] - 38:11

**SPIRITUAL** [2] - 210:8, 210:12

**SPIRITUALLY** [2] - 212:10, 214:15

**SPITE** [1] - 196:5

**SPLIT** [1] - 207:17

**SPO** [1] - 166:21

**SPO'S** [1] - 166:15

**SPONTANEOUSLY** [1] - 138:18

**SPOTLIGHT** [2] - 199:1, 199:20

**SPRINGFIELD** [3] - 74:12, 75:9, 76:23

**SPUR** [1] - 192:12

**SQUARES** [1] - 92:13

**SR** [15] - 179:22, 200:16, 205:19, 206:9, 210:7, 210:13, 210:20, 210:23, 211:2, 238:20, 239:7, 239:14, 240:3

**STABILITY** [1] - 238:15

**STABILIZER** [1] - 234:7

**STABLE** [1] - 203:6

**STAFF** [9] - 6:15, 28:25, 150:19, 175:7, 183:17, 192:21, 195:6, 198:14, 198:18

**STAGE** [2] - 184:5, 189:14

**STAND** [11] - 65:8, 65:20, 128:16, 132:2, 175:9, 195:25, 203:23, 205:11, 207:9, 216:24, 241:6

**STANDARD** [6] - 184:6, 184:8, 223:6, 223:8, 223:10, 223:14

**STANDING** [2] - 38:19, 150:15

**STAR** [1] - 206:6

**STARCH** [1] - 204:20

**START** [9] - 25:3, 31:12, 70:25, 135:14, 154:18, 183:23, 203:13, 203:20, 230:18

**STARTED** [21] - 17:11, 17:14, 17:17, 26:5, 38:4, 48:11, 48:25, 53:12, 61:2, 154:5, 154:11, 154:16, 154:19, 163:5, 163:6, 170:4, 170:5, 179:22, 192:3, 193:8

**STARTING** [3] - 11:12, 111:3, 114:22

**STARTS** [2] - 49:7, 194:16

**STATE** [11] - 3:8, 9:18, 45:12, 46:3, 56:2, 103:10, 109:21, 137:15, 147:20, 179:4, 236:6

**STATEMENT** [21] - 30:14, 71:20, 81:1, 125:20, 161:2, 165:9, 165:12, 180:13, 180:20, 180:23, 181:1, 181:3, 181:24, 182:1, 182:5, 182:11, 182:14, 182:16, 208:22, 215:21

**STATEMENTS** [11] - 81:17, 83:10, 87:3, 87:25, 99:11, 159:21, 178:10, 178:12, 182:4, 182:19

**STATES** [11] - 1:1, 1:3, 1:15, 2:2, 28:12, 185:13, 187:23, 187:25, 209:20, 209:22, 231:9

**STATUS** [8] - 175:5, 196:25, 233:21, 233:23, 234:11, 234:13, 235:3

**STATUTORY** [7] - 190:4, 190:25, 195:19, 211:17, 211:18, 215:14, 224:18

**STAY** [4] - 30:13, 51:9, 113:12, 198:21

**STAYED** [4] - 113:15, 113:21, 201:23

**STEADFAST** [1] - 126:4

**STEALING** [1] - 238:7

**STEMMED** [1] - 103:1

**STENOTYPE** [1] - 1:23

**STENOTYPE-COMPUTER** [1] - 1:23

**STEP** [6] - 31:7, 39:14, 143:7, 177:24, 192:17, 199:22

**STEVE** [2] - 191:16, 192:23

**STEVEN** [3] - 193:4, 195:24, 233:9

**STEWED** [1] - 192:14

**STICK** [1] - 205:16

**STICKS** [1] - 205:16

**STILL** [25] - 14:14, 14:16, 14:18, 14:24, 15:25, 31:6, 34:5, 49:8, 58:9, 59:15, 66:6, 89:2, 101:2, 111:7, 121:17, 125:15, 135:7, 156:2, 169:7, 196:4, 198:15, 205:3, 209:7, 209:24, 221:19

**STIMULATE** [1] - 112:23

**STIMULATED** [2] - 47:23, 112:23

**STIPULATED** [1] - 180:6

**STIPULATION** [7] - 128:1, 144:5, 144:16, 180:3, 189:20, 227:15, 227:17

**STIPULATIONS** [1] - 128:3

**STOMACH** [3] - 62:23, 63:7, 63:11

**STOP** [1] - 39:4

**STOPPED** [1] - 200:16

**STOPPING** [2] - 38:18, 234:8

**STORIES** [5] - 140:25, 201:9, 230:24, 232:11

**STORY** [9] - 19:20, 19:25, 20:16, 22:6, 55:7, 140:15, 215:9, 232:13

**STRAIGHT** [1] - 183:25

**STRANGER** [4] - 41:13, 140:17, 141:24, 142:3

**STRATEGIES** [1] - 29:9

**STREET** [9] - 1:16, 1:20, 2:4, 2:7, 2:10, 60:21, 173:12, 209:8, 236:16

**STRENGTH** [1] - 205:1

**STRENUOUS** [1] - 145:20

**STRESS** [9] - 45:16, 49:16, 58:24, 62:8, 123:1, 123:10, 231:1, 231:17, 237:7

**STRESSES** [1] - 58:21

**STRIKE** [1] - 143:2

**STRIKING** [2] -

221:21, 222:11

**STRIKINGLY** [3] - 57:7, 180:16, 223:12

**STRING** [1] - 194:21

**STROKE** [1] - 27:16

**STRONG** [2] - 195:4, 195:5

**STRONGER** [1] - 193:16

**STRUCK** [4] - 213:23, 222:6, 222:9, 222:14

**STRUGGLE** [1] - 37:17

**STRUGGLED** [1] - 57:4

**STRUGGLING** [1] - 58:9

**STUDENTS** [1] - 175:7

**STUDIO** [1] - 175:6

**STUFF** [2] - 150:5, 162:5

**SUBJECT** [8] - 21:14, 34:25, 37:10, 128:11, 145:17, 181:2, 181:3, 182:2

**SUBJECTED** [4] - 43:17, 85:3, 85:6, 94:9

**SUBJECTIVE** [1] - 223:19

**SUBJECTS** [1] - 6:7

**SUBMIT** [5] - 67:18, 185:23, 188:10, 188:11

**SUBMITTED** [3] - 67:19, 68:1, 212:17

**SUBSEQUENT** [3] - 67:5, 69:23, 83:24

**SUBSTANCE** [3] - 19:9, 37:1, 57:4

**SUBSTANTIAL** [18] - 26:8, 191:2, 191:25, 195:13, 211:21, 215:16, 215:22, 217:23, 217:25, 218:15, 219:13, 219:17, 220:13, 224:19, 225:3, 225:4, 225:9, 225:10

**SUCCESSFULLY** [4] - 41:14, 41:16, 157:15, 162:10

**SUDDEN** [1] - 45:23

**SUED** [1] - 236:5

**SUFFER** [2] - 13:1, 56:15

**SUFFERED** [14] - 13:5, 13:15, 13:25, 14:14, 16:17, 22:23, 29:12, 33:7, 44:10,

61:23, 231:17, 231:18, 233:2, 237:13

**SUFFERING** [5] - 14:16, 15:20, 56:20, 123:10, 231:16

**SUFFERS** [1] - 64:6

**SUFFICIENCY** [1] - 184:5

**SUFFICIENT** [1] - 223:7

**SUGARS** [1] - 204:20

**SUGGEST** [20] - 206:14, 211:8, 211:13, 215:20, 215:25, 217:19, 218:8, 218:17, 219:10, 219:19, 221:22, 222:16, 224:3, 224:17, 225:18, 226:17, 227:4, 228:4, 232:9

**SUGGESTED** [5] - 86:9, 112:4, 215:21, 220:22, 239:7

**SUGGESTION** [1] - 195:1

**SUGGESTIVE** [2] - 55:9, 55:16

**SUGGESTS** [1] - 200:21

**SUICIDAL** [1] - 62:2

**SUICIDALITY** [1] - 61:21

**SUICIDE** [4] - 61:15, 61:20, 62:1, 62:3

**SUITE** [3] - 1:16, 2:7, 2:14

**SUMMARIES** [2] - 28:10, 138:21

**SUMMARIZE** [2] - 71:13, 230:6

**SUMMARY** [4] - 28:21, 31:13, 68:20, 69:6

**SUMMER** [2] - 121:13, 121:15

**SUPERFICIAL** [1] - 227:22

**SUPERIOR** [2] - 59:19, 205:1

**SUPERVISED** [2] - 130:10, 176:6

**SUPERVISION** [1] - 130:19

**SUPERVISOR** [13] - 158:4, 158:5, 161:21, 161:24, 163:23, 164:22, 168:10, 176:11, 213:15, 213:17,

222:3, 222:7, 223:3

**SUPERVISORS** [1] - 176:7

**SUPPLEMENTAL** [5] - 67:15, 67:18, 70:1, 101:5, 136:23

**SUPPLIES** [11] - 152:15, 152:23, 166:20, 167:14, 167:16, 167:20, 175:25, 176:2, 176:8, 176:14, 238:23

**SUPPORT** [10] - 23:24, 23:25, 24:3, 29:7, 108:10, 214:1, 214:4, 216:19, 219:13, 223:25

**SUPPORTED** [1] - 182:8

**SUPPORTIVE** [1] - 202:14

**SUPPOSE** [1] - 137:21

**SUPPOSED** [1] - 238:2

**SUPPOSEDLY** [1] - 151:10

**SUPPRESS** [1] - 131:24

**SUPREME** [2] - 231:9, 240:6

**SURPRISE** [8] - 62:9, 93:24, 94:3, 103:24, 131:15, 131:18, 141:21, 142:2

**SURPRISED** [3] - 64:6, 64:23, 133:18

**SURPRISING** [12] - 19:24, 21:23, 62:14, 84:24, 84:25, 107:21, 125:8, 125:17, 126:7, 131:21, 134:3, 135:8

**SURVIVAL** [1] - 49:7

**SURVIVE** [1] - 45:15

**SURVIVING** [1] - 51:6

**SURVIVOR** [1] - 138:18

**SURVIVORS** [4] - 60:11, 99:3, 138:9, 141:3

**SUSPECT** [2] - 19:17, 31:9

**SUSTAIN** [4] - 79:9, 150:25, 151:6, 172:20

**SUSTAINED** [2] - 150:24, 174:7

**SUZANNE** [2] - 1:18, 241:17

**SWEETEN** [3] - 194:5, 218:22, 218:25
**SWEETENED** [1] - 193:25
**SWINGS** [2] - 64:12, 234:5
**SWORN** [2] - 3:7, 147:19
**SYMPTOMS** [9] - 14:20, 14:25, 49:16, 50:19, 50:20, 58:1, 60:18, 62:3, 102:19
**SYSTEM** [3] - 6:13, 59:2, 204:21

## T

**TAB** [2] - 27:4, 91:19
**TABASCO** [1] - 38:11
**TABBED** [1] - 102:14
**TABLE** [2] - 200:2, 207:7
**TADROSS** [1] - 217:15
**TAKING** [6] - 200:16, 203:5, 208:4, 208:5, 228:2, 229:8
**TALENTS** [1] - 205:17
**TALIBAN** [1] - 38:10
**TALKS** [4] - 92:5, 110:17, 111:19, 225:5
**TALLER** [1] - 193:15
**TAMMY** [10] - 101:15, 101:18, 101:22, 102:25, 104:2, 104:6, 104:19, 104:20, 104:22, 104:23
**TARGET** [1] - 18:12
**TAUGHT** [2] - 4:22, 4:23
**TEACH** [1] - 27:16
**TEACHER** [1] - 59:15
**TECHNICALLY** [2] - 171:7, 214:3
**TECHNICIAN** [1] - 148:16
**TECHNICOLOR** [1] - 205:10
**TEENAGER** [1] - 32:1
**TELEPHONE** [3] - 141:18, 142:3, 149:12
**TEMPTED** [1] - 29:6
**TEN** [3] - 45:15, 120:24, 213:3
**TEN-YEAR** [1] - 120:24
**TEND** [1] - 23:24
**TENDENCY** [3] -

37:19, 55:11, 55:13
**TENDS** [3] - 13:22, 30:12, 31:11
**TERM** [9] - 37:6, 56:16, 59:21, 130:2, 130:25, 133:23, 142:14, 142:18, 190:7
**TERMINOLOGY** [1] - 37:11
**TERMS** [13] - 27:23, 29:15, 30:17, 35:14, 37:20, 40:3, 44:9, 130:6, 130:24, 135:20, 136:10, 182:23, 200:25
**TERRE** [17] - 40:17, 144:18, 148:18, 149:2, 154:6, 156:14, 156:18, 156:23, 157:17, 158:1, 158:8, 158:15, 159:8, 159:9, 159:11, 177:15
**TERRIBLE** [3] - 15:20, 41:12, 231:12
**TESTIFIED** [49] - 7:24, 7:25, 9:18, 22:20, 22:22, 23:4, 32:7, 32:9, 33:5, 34:12, 54:13, 80:22, 90:18, 90:23, 98:17, 103:12, 103:21, 132:12, 134:21, 139:6, 139:7, 165:9, 166:23, 169:11, 169:15, 182:9, 212:20, 213:2, 216:5, 216:6, 216:9, 218:9, 222:25, 223:14, 223:22, 228:21, 229:12, 231:3, 232:11, 232:16, 235:7, 236:2, 237:10, 238:13, 238:20, 238:21, 239:2, 239:8, 239:10
**TESTIFIES** [1] - 34:6
**TESTIFY** [13] - 21:15, 145:15, 145:16, 145:18, 145:21, 145:24, 146:11, 146:21, 146:24, 147:5, 164:6, 212:14, 239:1
**TESTIFYING** [6] - 7:23, 123:6, 175:10, 181:17, 222:3,

223:10
**TESTIMONY** [66] - 9:22, 11:16, 38:5, 44:6, 46:7, 54:11, 66:13, 66:17, 66:19, 67:3, 67:17, 70:5, 88:2, 88:8, 88:9, 89:6, 90:24, 91:1, 98:16, 103:4, 104:10, 108:22, 109:11, 110:25, 114:17, 118:17, 123:5, 123:14, 127:18, 127:21, 128:5, 132:12, 132:18, 179:21, 181:5, 181:7, 182:18, 190:16, 190:20, 192:24, 202:4, 205:7, 208:1, 212:16, 213:15, 214:17, 214:18, 214:24, 221:14, 222:6, 222:11, 222:15, 224:11, 224:14, 224:16, 226:8, 228:9, 228:10, 228:19, 229:4, 229:15, 230:19, 230:20, 230:22, 233:8
**TESTING** [2] - 22:8, 138:15
**TEXAS** [2] - 8:18, 8:19
**THANKING** [1] - 230:2
**THEME** [2] - 22:5, 232:14
**THEMSELVES** [2] - 55:12, 56:2
**THEORY** [4] - 217:24, 219:17, 220:5, 222:7
**THERAPIST** [1] - 29:18
**THERAPY** [1] - 199:15
**THERE** [206] - 6:17, 6:25, 7:19, 10:11, 14:15, 14:24, 17:1, 19:10, 20:20, 23:14, 23:25, 24:13, 24:17, 27:3, 28:20, 29:16, 31:22, 36:9, 36:22, 36:25, 37:3, 37:4, 37:19, 38:3, 39:17, 39:19, 39:24, 39:25, 40:1, 40:8, 41:3, 42:23, 43:7, 43:14, 43:20, 43:22, 44:1, 44:2, 44:15, 46:1, 46:9, 46:10, 46:12, 47:4, 50:4, 50:18,

51:6, 51:21, 52:23, 53:1, 53:6, 53:12, 55:8, 55:10, 55:13, 57:18, 58:22, 59:10, 59:25, 61:20, 61:24, 63:5, 63:9, 63:12, 63:13, 66:7, 67:4, 70:13, 70:18, 71:5, 74:8, 74:15, 74:21, 81:1, 82:18, 84:23, 86:16, 86:19, 88:22, 89:10, 91:8, 92:17, 92:21, 93:13, 93:14, 93:15, 93:24, 94:11, 96:24, 96:25, 104:11, 105:4, 108:10, 108:12, 109:14, 110:1, 112:9, 113:12, 114:23, 117:7, 118:18, 118:25, 120:6, 122:19, 122:21, 122:22, 125:12, 126:21, 129:22, 130:15, 131:25, 133:1, 133:21, 134:25, 135:17, 135:22, 136:10, 138:25, 140:2, 140:9, 141:7, 144:1, 149:5, 152:13, 154:1, 154:3, 154:4, 154:25, 155:2, 155:3, 155:8, 155:11, 156:14, 156:20, 156:21, 156:22, 157:4, 158:2, 158:13, 158:18, 158:19, 160:17, 162:25, 163:6, 164:24, 165:24, 167:22, 169:15, 171:15, 171:16, 176:6, 178:9, 180:5, 182:18, 183:24, 185:7, 185:13, 186:6, 186:18, 187:19, 189:22, 191:25, 193:12, 194:8, 194:24, 195:1, 196:9, 199:1, 202:1, 202:4, 205:11, 205:12, 209:19, 211:18, 213:12, 215:25, 216:2, 217:24, 218:17, 223:23, 224:7, 224:8, 225:4, 226:13, 227:3,

227:8, 230:12, 231:22, 233:16, 234:15, 234:16, 235:3, 235:17, 237:19, 237:21, 239:5
**THERE'S** [7] - 45:1, 89:15, 117:10, 117:13, 118:8, 156:18, 223:24
**THEREAFTER** [1] - 127:22
**THEREFORE** [2] - 21:21, 181:18
**THEY'RE** [1] - 135:16
**THINKING** [2] - 29:7, 172:2
**THINKS** [6] - 84:3, 84:4, 84:16, 85:19, 104:2, 184:12
**THIRD** [5] - 2:10, 89:10, 156:20, 203:17, 208:14
**THOMAS** [2] - 190:19, 198:2
**THOMPSON** [8] - 208:8, 208:9, 208:22, 217:1, 217:2, 219:5, 219:8
**THREAT** [2] - 196:22, 233:24
**THREATENED** [4] - 147:3, 147:4, 190:9, 198:5
**THREATENING** [2] - 48:13, 212:21
**THREE** [23] - 6:20, 20:5, 64:1, 70:19, 71:14, 79:5, 89:13, 89:15, 114:13, 114:24, 141:3, 154:24, 154:25, 155:1, 155:3, 155:4, 155:13, 156:13, 186:1, 208:21, 230:8, 231:6
**THREE-MONTH** [1] - 154:24
**THROUGHOUT** [7] - 13:19, 23:2, 40:7, 72:10, 74:7, 149:5, 209:2
**THROWN** [1] - 227:14
**THURSDAY** [1] - 193:7
**TIED** [1] - 217:16
**TIGHT** [1] - 195:6
**TIGHTLY** [1] - 195:4
**TIM** [1] - 198:22
**TIMOTHY** [2] - 173:14,

179:24
**TITLED** [1] - 177:3
**TODAY** [15] - 30:16, 69:18, 87:19, 89:6, 158:23, 164:14, 164:19, 169:8, 175:10, 188:21, 198:20, 212:6, 214:6, 228:7, 231:14
**TOGETHER** [8] - 21:2, 201:19, 201:23, 227:3, 230:24, 233:6, 235:13, 235:15
**TOOK** [12] - 47:19, 109:18, 110:13, 120:6, 123:2, 131:12, 136:4, 158:8, 161:9, 196:16, 203:23, 234:7
**TOOLS** [1] - 239:3
**TOP** [6] - 16:14, 27:20, 50:2, 89:12, 91:16, 93:8
**TOPIC** [1] - 102:25
**TORN** [3] - 216:24, 217:2, 217:13
**TORTURE** [1] - 38:13
**TOTAL** [3] - 142:3, 155:16, 196:25
**TOTALITY** [1] - 219:13
**TOTALLY** [1] - 211:5
**TOUCH** [5] - 54:20, 198:1, 214:7, 226:20, 228:8
**TOUCHED** [3] - 45:7, 46:17, 226:18
**TOUCHES** [2] - 42:25, 224:24
**TOWARDS** [1] - 31:8
**TOYED** [1] - 240:9
**TRAINED** [1] - 35:18
**TRAINING** [2] - 6:15, 7:2
**TRAININGS** [1] - 6:11
**TRANSCRIPT** [12] - 1:23, 32:6, 33:17, 34:10, 132:16, 132:24, 209:19, 221:25, 222:8, 225:25, 241:11
**TRANSCRIPTION** [1] - 1:23
**TRANSCRIPTS** [1] - 212:16
**TRANSFER** [1] - 194:1
**TRANSFERRED** [4] - 148:14, 160:24, 209:8, 218:22

**TRANSFERRING** [1] - 193:13
**TRANSFORM** [1] - 16:19
**TRANSPORTED** [1] - 226:11
**TRAUMA** [19] - 6:23, 9:19, 10:3, 10:7, 10:8, 13:7, 15:5, 15:11, 15:13, 15:15, 16:2, 20:24, 22:23, 51:21, 51:24, 59:1, 61:23, 83:25, 142:23
**TRAUMAS** [1] - 14:25
**TRAUMATIC** [14] - 14:20, 20:3, 20:7, 20:22, 23:3, 23:5, 49:16, 62:8, 123:1, 123:10, 126:18, 213:11, 231:17, 237:6
**TRAUMATIZATION** [1] - 140:8
**TRAUMATIZED** [2] - 20:7, 21:11
**TRAVIS** [18] - 2:8, 2:9, 75:6, 75:7, 75:16, 145:5, 145:9, 145:13, 145:23, 146:1, 146:4, 146:7, 146:10, 146:14, 146:17, 147:12, 183:23, 200:5
**TRAXLER** [3] - 220:16, 220:25, 221:11
**TREAT** [4] - 41:21, 57:24, 58:1
**TREATED** [4] - 57:5, 57:16, 57:22, 230:25
**TREATING** [3] - 28:12, 101:22, 103:1
**TREATMENT** [11] - 58:7, 58:14, 60:13, 60:14, 60:16, 63:16, 110:11, 142:18, 199:15, 236:13, 237:1
**TREATS** [1] - 240:8
**TREMENDOUS** [3] - 36:9, 202:18, 206:22
**TREMENDOUSLY** [1] - 233:2
**TRIAL** [11] - 27:2, 32:7, 74:14, 139:7, 170:20, 214:20, 214:21, 214:22, 214:23, 215:7, 223:1
**TRIED** [4] - 110:10, 110:13, 114:7, 206:2

**TRIGGER** [1] - 45:10
**TRIGGERED** [1] - 123:13
**TROUBLE** [2] - 21:2, 203:8
**TRUE** [10] - 22:6, 95:20, 104:7, 180:4, 180:7, 201:7, 210:2, 211:12, 233:5
**TRULY** [3] - 200:24, 205:20, 209:1
**TRUST** [2] - 41:17, 64:20
**TRUSTING** [1] - 138:13
**TRUTH** [2] - 87:20, 206:4
**TRUTHFUL** [2] - 87:10, 180:8
**TRUTHFULNESS** [1] - 181:9
**TRY** [8] - 9:5, 25:5, 25:6, 45:14, 45:16, 135:14, 186:20, 196:14
**TRYING** [14] - 6:22, 6:23, 31:5, 31:6, 39:1, 82:10, 84:14, 102:2, 106:3, 106:9, 106:19, 109:4, 125:14, 222:13
**TUB** [1] - 38:20
**TUBE** [1] - 43:10
**TUESDAY** [1] - 193:6
**TURMOIL** [1] - 138:5
**TURN** [10] - 29:20, 54:20, 60:8, 60:16, 76:12, 136:25, 137:12, 196:14, 227:10, 229:25
**TURNED** [1] - 173:16
**TURNING** [1] - 27:3
**TWICE** [3] - 50:6, 219:5, 219:7
**TWIST** [2] - 16:4
**TWO** [51] - 6:2, 20:5, 21:16, 23:14, 25:14, 28:20, 36:14, 40:5, 40:10, 42:8, 46:12, 55:15, 63:25, 80:19, 82:23, 97:13, 101:6, 103:25, 111:17, 113:12, 113:23, 114:6, 117:13, 128:16, 130:21, 131:8, 133:11, 155:1, 155:3, 155:13, 188:20, 189:15, 189:23, 190:5, 190:11,

193:7, 195:21, 197:2, 198:2, 198:16, 201:22, 208:1, 211:20, 221:22, 222:4, 225:23, 234:1, 235:18, 235:19
**TWO-FOLD** [1] - 6:2
**TYING** [2] - 218:20, 219:1
**TYLER** [1] - 157:22
**TYPE** [17] - 12:15, 13:11, 13:13, 17:21, 19:21, 24:11, 50:2, 55:3, 63:18, 126:13, 135:9, 138:7, 140:8, 167:22, 204:16, 218:18, 221:7
**TYPES** [5] - 22:7, 44:20, 94:19, 126:8, 195:7
**TYPICAL** [7] - 18:7, 23:12, 105:6, 120:15, 138:8, 140:18, 149:22
**TYPICALLY** [6] - 12:16, 22:7, 23:14, 58:4, 61:13, 190:8

## U

**U.S** [3] - 6:16, 198:23, 233:10
**ULTIMATE** [1] - 24:1
**ULTIMATELY** [2] - 31:17, 60:16
**UM** [1] - 162:15
**UM-HUM** [1] - 162:15
**UMASS** [1] - 4:24
**UNAWARE** [2] - 159:1, 159:2
**UNCERTAIN** [1] - 86:24
**UNCHANGED** [1] - 14:10
**UNCLE** [25] - 39:20, 39:25, 46:10, 53:10, 53:15, 53:16, 53:20, 54:1, 54:25, 112:9, 113:7, 114:25, 115:3, 115:19, 117:5, 117:7, 117:17, 117:18, 117:20, 117:24, 121:10, 121:17, 131:2, 131:6
**UNCLE'S** [1] - 117:10
**UNCLES** [3] - 40:10, 112:7, 115:6
**UNCOMMON** [6] -

54:4, 54:9, 60:7, 63:21, 216:7, 216:8
**UNCONTESTED** [3] - 231:17, 231:18, 231:20
**UNCONTRADICTED** [3] - 232:10, 234:9, 235:11
**UNDENIABLE** [1] - 232:5
**UNDER** [20] - 16:2, 16:7, 20:22, 61:5, 61:11, 98:17, 106:21, 169:11, 178:8, 178:12, 180:15, 181:20, 216:6, 216:24, 217:3, 220:6, 223:13, 232:4, 233:22, 240:22
**UNDERCLOTHES** [1] - 173:13
**UNDERDOG** [1] - 30:15
**UNDERNEATH** [1] - 228:14
**UNDERPRIVILEGED** [1] - 239:4
**UNDERSTANDABLE** [1] - 211:6
**UNDO** [2] - 6:24, 195:6
**UNEQUIVOCAL** [2] - 233:7, 237:21
**UNEQUIVOCALLY** [3] - 56:10, 87:22, 234:22
**UNFAIR** [1] - 76:21
**UNFORTUNATELY** [4] - 53:1, 93:2, 201:7, 204:19
**UNHEALTHY** [1] - 30:17
**UNIT** [34] - 35:25, 149:10, 149:17, 149:24, 150:22, 154:10, 154:11, 154:17, 154:22, 155:7, 155:13, 155:17, 155:22, 156:5, 156:7, 156:16, 158:12, 158:22, 159:8, 159:14, 160:24, 160:25, 162:24, 163:1, 170:1, 170:9, 170:13, 171:8, 171:18, 171:19, 176:12, 197:10, 198:14, 198:17

**UNITED** [9] - 1:1, 1:3, 1:15, 2:2, 28:12, 185:13, 187:23, 187:25, 231:9
**UNITS** [2] - 45:22, 155:25
**UNIVERSAL** [1] - 16:14
**UNIVERSALLY** [1] - 125:10
**UNIVERSE** [2] - 130:5, 172:3
**UNIVERSITY** [3] - 4:13, 4:14, 4:24
**UNLIKE** [1] - 124:17
**UNLIKELY** [2] - 20:4, 112:5
**UNLOADED** [1] - 149:16
**UNPREDICTABILITY** [3] - 45:7, 45:9, 45:20
**UNPREDICTABLE** [2] - 44:13, 232:17
**UNRAVEL** [1] - 205:10
**UNREBUTTED** [6] - 228:10, 228:19, 229:15, 229:17, 233:7, 237:15
**UNRELIABLE** [1] - 151:7
**UNREPORTED** [2] - 19:15, 24:13
**UNRESOLVED** [1] - 63:7
**UNTENABLE** [1] - 16:16
**UNUSUAL** [22] - 17:24, 18:2, 18:3, 18:4, 18:16, 19:14, 19:24, 20:2, 22:2, 22:3, 99:5, 120:20, 130:11, 130:15, 135:8, 140:7, 140:10, 140:12, 140:21, 141:1, 236:11
**UP** [45] - 13:20, 26:3, 30:6, 31:21, 32:10, 38:14, 66:7, 67:20, 72:23, 82:23, 84:7, 84:9, 100:15, 101:8, 101:15, 104:6, 109:6, 110:11, 110:14, 117:1, 130:9, 133:21, 147:5, 151:17, 153:20, 168:25, 178:17, 188:5, 191:19, 192:20, 198:25, 206:12,

206:13, 207:17, 218:21, 219:1, 220:21, 221:19, 222:23, 227:1, 232:8, 236:17, 236:18, 238:14
**UPBRINGING** [3] - 203:3, 233:3, 237:12
**UPDATED** [1] - 67:6
**UPSTANDING** [1] - 202:21
**UPTON** [6] - 190:19, 198:2, 214:7, 214:9, 215:1, 215:6
**UPTON'S** [2] - 190:20, 214:17
**URBAN** [1] - 201:8
**URGE** [1] - 212:18
**USEFUL** [1] - 30:19
**USP** [14] - 144:18, 154:6, 156:14, 156:23, 156:24, 159:8, 159:9, 159:11, 160:25, 199:5, 209:7, 221:2, 221:7, 235:17
**UTILIZING** [1] - 29:7

---

**V**

**VACATION** [1] - 155:9
**VACUUM** [1] - 237:8
**VAGINA** [4] - 47:20, 47:22, 135:25, 136:5
**VAGUE** [2] - 84:21, 96:10
**VAGUELY** [1] - 119:25
**VANILLA** [1] - 141:15
**VARIES** [1] - 24:14
**VARIETY** [2] - 6:12, 95:21
**VARIOUS** [5] - 25:9, 50:21, 61:1, 95:23, 149:5
**VARY** [1] - 16:21
**VAST** [1] - 15:15
**VEHEMENTLY** [1] - 56:10
**VERACITY** [1] - 22:13
**VERB** [1] - 13:12
**VERBALLY** [1] - 192:19
**VERDICT** [33] - 74:15, 184:17, 184:18, 184:20, 184:21, 184:22, 185:1, 186:2, 186:5, 186:9, 186:10, 187:19, 188:9, 188:11, 188:12, 188:13,

188:14, 188:15, 188:16, 188:23, 188:24, 189:2, 189:3, 189:5, 209:17, 209:24, 240:23, 240:24, 241:1, 241:2, 241:3, 241:5
**VERSA** [1] - 21:8
**VERSE** [1] - 218:14
**VERSUS** [5] - 21:13, 42:8, 185:14, 187:24, 187:25
**VICE** [1] - 21:8
**VICIOUS** [1] - 44:11
**VICTIM** [19] - 12:22, 20:23, 22:6, 22:10, 22:13, 22:23, 23:15, 23:17, 30:7, 30:22, 31:3, 42:23, 83:20, 93:21, 193:11, 195:22, 196:16, 227:12
**VICTIMIZATION** [3] - 56:1, 60:8, 232:6
**VICTIMIZED** [2] - 55:21, 233:24
**VICTIMIZER** [1] - 55:23
**VICTIMS** [9] - 6:25, 7:4, 55:3, 55:14, 60:7, 62:12, 64:24, 210:22
**VIDEO** [9] - 127:25, 128:2, 144:1, 144:4, 144:11, 183:18, 199:18, 216:22, 216:23
**VIDEOTAPE** [4] - 9:2, 24:1, 144:12, 242:11
**VIEW** [1] - 77:2
**VIEWED** [2] - 35:2, 217:10
**VIEWS** [1] - 16:23
**VINCE** [2] - 137:13, 137:14
**VIOLATED** [1] - 236:10
**VIOLENCE** [17] - 9:20, 13:13, 23:1, 23:11, 40:12, 44:8, 45:8, 46:6, 53:7, 196:21, 196:22, 198:15, 199:16, 226:16, 232:7, 232:20, 237:23
**VIOLENT** [2] - 199:22, 211:21
**VIRGINIA** [1] - 4:13
**VIRTUALLY** [3] -

19:10, 50:13, 50:14
**VIRTUE** [1] - 15:7
**VISIT** [2] - 9:14, 161:9
**VISITED** [2] - 53:14, 161:8
**VISITING** [2] - 4:22, 53:14
**VIVID** [2] - 20:24, 21:5
**VOLATILITY** [1] - 60:1
**VOLUNTARILY** [2] - 146:8, 146:14

---

**W**

**WAFFENSCHMIDT** [1] - 2:9
**WAIT** [2] - 125:5, 207:5
**WAITING** [2] - 59:4
**WAIVE** [1] - 75:4
**WAIVED** [2] - 208:12
**WALK** [3] - 116:15, 140:19, 229:5
**WALKED** [6] - 26:9, 95:9, 95:12, 95:14, 95:17, 152:10
**WALL** [1] - 44:16
**WALLS** [1] - 199:9
**WANE** [1] - 199:16
**WANTS** [7] - 78:20, 197:22, 218:2, 218:13, 219:3, 224:10, 238:1
**WARMTH** [1] - 29:11
**WARNING** [1] - 45:24
**WARRANTED** [2] - 232:1, 233:16
**WASH** [1] - 47:3
**WASHINGTON** [2] - 1:16, 2:4
**WATCH** [1] - 234:18
**WATCHED** [1] - 16:1
**WATCHING** [1] - 123:14
**WATER** [6] - 17:3, 25:24, 38:11, 38:22, 227:15
**WATERS** [2] - 2:9, 138:15
**WAVING** [1] - 72:10
**WAYS** [7] - 36:3, 45:15, 105:8, 141:5, 141:6, 189:23, 221:15
**WEALTH** [1] - 70:4
**WEAPON** [2] - 190:13, 194:20
**WEAVER** [2] - 208:3, 217:15
**WEBSITE** [1] - 9:4

**WEDDING** [2] - 20:16, 20:17
**WEDNESDAY** [2] - 188:22, 241:4
**WEEK** [13] - 29:14, 29:25, 149:22, 149:25, 155:9, 155:11, 164:8, 164:9, 164:20, 168:12, 168:22, 236:2
**WEEKS** [9] - 44:7, 186:1, 187:4, 189:8, 192:15, 209:16, 230:8, 231:6, 234:2
**WEEP** [1] - 195:25
**WEIGH** [5] - 87:24, 88:1, 104:8, 195:18, 211:14
**WEIGHING** [4] - 88:17, 88:25, 184:5, 184:10
**WEIGHS** [3] - 23:23, 88:5, 211:14
**WEIGHT** [11] - 200:1, 212:1, 212:2, 214:5, 215:4, 221:20, 222:24, 225:14, 226:22, 231:24, 239:24
**WELL-BEING** [1] - 58:2
**WELTS** [2] - 44:18, 232:22
**WEST** [1] - 2:10
**WET** [1] - 54:23
**WHATSOEVER** [2] - 140:10, 208:17
**WHEELCHAIR** [1] - 229:7
**WHEREAS** [2] - 120:12, 223:16
**WHEREVER** [1] - 191:7
**WHITE** [2] - 1:18, 241:17
**WHOLE** [6] - 158:8, 204:7, 210:7, 218:8, 218:11, 218:12
**WIDE** [1] - 6:12
**WIDOW** [1] - 228:22
**WIFE** [3] - 44:16, 95:5, 124:25
**WILLIAMS** [1] - 187:24
**WILLIAMSPORT** [4] - 2:11, 32:10, 214:22, 215:7
**WILLING** [6] - 9:7, 41:18, 120:1,

206:17, 206:18, 206:19

**WILMA** [2] - 39:22, 86:12

**WILSON** [1] - 185:14

**WINDS** [1] - 201:25

**WING** [1] - 226:3

**WINTER** [1] - 8:16

**WISH** [1] - 90:10

**WITECKI** [2] - 163:17, 163:21

**WITNESS** [46] - 3:4, 3:7, 3:10, 3:17, 7:13, 10:16, 10:19, 11:2, 21:13, 26:14, 28:16, 75:22, 76:19, 77:6, 77:20, 78:19, 80:21, 80:24, 103:15, 124:13, 128:7, 128:9, 132:16, 132:21, 136:20, 142:11, 142:15, 143:8, 147:16, 147:18, 147:19, 147:22, 166:6, 171:25, 172:11, 173:11, 174:14, 177:25, 181:10, 182:10, 182:15, 212:13, 216:23, 233:8, 235:6, 242:3

**WITNESS'** [1] - 80:8

**WITNESSED** [7] - 18:25, 26:9, 44:19, 96:8, 124:17, 124:18, 137:8

**WITNESSES** [5] - 124:13, 202:12, 212:20, 213:2, 230:22

**WITNESSING** [2] - 34:20, 44:20

**WITS** [1] - 205:4

**WOKE** [1] - 110:14

**WOLFSON** [28] - 72:7, 72:13, 72:16, 72:25, 73:15, 73:21, 74:2, 74:6, 74:13, 74:18, 76:7, 76:16, 76:18, 91:4, 91:8, 103:5, 103:17, 103:25, 107:17, 115:17, 115:19, 120:2, 123:21, 124:1, 124:3, 124:5, 141:17

**WOLFSON'S** [4] - 66:15, 71:18, 72:1, 141:14

**WOMEN'S** [1] - 48:19

**WONDER** [2] - 203:13,

204:13

**WONDERFUL** [1] - 205:21

**WONDERING** [2] - 63:15, 207:4

**WOODEN** [1] - 44:16

**WOODS** [1] - 58:24

**WORD** [12] - 56:5, 58:5, 100:4, 105:5, 116:14, 118:19, 119:13, 119:22, 121:1, 123:20, 123:22, 125:1

**WORDS** [16] - 19:1, 31:22, 43:11, 84:12, 176:2, 184:8, 191:8, 191:9, 192:20, 197:12, 197:18, 200:7, 203:20, 205:14, 218:2, 218:4

**WORKER** [1] - 212:22

**WORKER'S** [1] - 212:23

**WORKS** [3] - 34:3, 158:2, 205:6

**WORLD** [3] - 9:15, 196:10, 238:25

**WORN** [1] - 229:6

**WORSE** [4] - 197:7, 201:10, 229:13, 231:14

**WORST** [8] - 45:20, 45:21, 49:1, 231:10, 231:11, 231:13, 231:25

**WORTH** [1] - 172:24

**WORTHLESS** [4] - 16:24, 17:6, 61:4, 61:6

**WORTHLESSNESS** [2] - 60:20, 62:4

**WRESTLE** [1] - 16:10

**WRITE** [6] - 125:1, 138:24, 161:15, 164:22, 164:23, 211:3

**WRITES** [3] - 29:3, 191:22, 210:18

**WRITEUP** [1] - 167:15

**WRITING** [3] - 52:18, 173:12, 205:15

**WRITINGS** [7] - 6:1, 200:9, 220:22, 221:20, 222:24, 224:8, 224:9

**WRITTEN** [9] - 9:21, 68:16, 87:9, 127:3, 192:19, 209:6, 209:9, 211:3, 220:11

**WROTE** [17] - 11:10,

70:4, 87:3, 89:8, 89:20, 101:7, 106:7, 106:12, 108:8, 168:25, 169:4, 182:22, 192:9, 194:2, 197:12, 236:24

## Y

**YAGER** [4] - 191:15, 220:19, 220:25, 221:11

**YARD** [1] - 106:22

**YEAR** [11] - 4:22, 120:24, 121:15, 121:16, 132:17, 149:19, 160:22, 190:8, 238:16

**YEARS** [63] - 5:15, 8:3, 15:3, 17:15, 24:5, 25:8, 28:3, 32:10, 34:2, 39:21, 45:15, 46:25, 53:11, 53:12, 53:18, 106:16, 110:2, 110:8, 116:19, 121:8, 121:10, 131:8, 132:3, 133:12, 134:13, 135:10, 137:2, 137:9, 148:24, 149:1, 149:2, 149:3, 149:4, 155:21, 156:7, 156:22, 162:6, 162:14, 163:4, 167:19, 174:16, 189:21, 199:15, 205:19, 212:5, 212:6, 213:16, 214:12, 214:13, 225:24, 226:4, 226:10, 226:24, 231:2, 232:25, 236:18, 238:3, 238:7

**YESTERDAY** [1] - 187:10

**YOUNG** [5] - 17:10, 51:13, 57:14, 129:16, 137:25

**YOUNGER** [2] - 62:22, 193:15

**YOUNGEST** [1] - 196:5

**YOURSELF** [4] - 109:7, 150:12, 233:23, 234:16

**YUP** [2] - 66:16, 66:18

## Z

**ZERO** [1] - 130:11