UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF PENNSYLVANIA


UNITED STATES OF AMERICA          :   CRIMINAL NUMBER


                 V.


DAVID PAUL HAMMER                 :   4:96-CR-239


                              THURSDAY, 6-12-14
                              COURTROOM 16B
                              PHILADELPHIA, PA 19106


_____
      BEFORE THE HONORABLE JOEL H. SLOMSKY, J.
_____

                        DAY 8
                  SENTENCING HEARING


_____

APPEARANCES:

JOHN C. GURGANUS, JR., ESQUIRE      FOR THE GOVERNMENT
UNITED STATES ATTORNEYS OFFICE
MIDDLE DISTRICT OF PENNSYLVANIA
235 N. WASHINGTON STREET, SUITE 311
PO BOX 309
SCRANTON, PA 18501


          SUZANNE R. WHITE, RPR, FCRR, CM
             OFFICIAL COURT REPORTER
           FIRST FLOOR U. S. COURTHOUSE
              601 MARKET STREET
            PHILADELPHIA, PA 19106
              (215)627-1882


PROCEEDINGS RECORDED BY STENOTYPE-COMPUTER,
TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

CONTINUED APPEARANCES:

AMANDA HAINES, ESQUIRE                    FOR THE GOVERNMENT
UNITED STATES DEPARTMENT OF JUSTICE
CRIMINAL DIVISION
CAPITAL CRIMES SECTION
1331 F. STREET, N.W.
WASHINGTON, D.C. 20530

ANNE SAUNDERS, ESQUIRE                    FOR THE DEFENDANT
FEDERAL PUBLIC DEFENDER
MIDDLE DISTRICT OF PENNSYLVANIA
100 CHESTNUT STREET, SUITE 300
HARRISBURG, PA 17101

RONALD C. TRAVIS, ESQUIRE                 FOR THE DEFENDANT
REIDERS, TRAVIS, HUMPHREY,
HARRIS, WATERS & WAFFENSCHMIDT
161 WEST THIRD STREET
PO BOX 215
WILLIAMSPORT, PA 17703-0215

JAMES MORENO, ESQUIRE                     FOR THE DEFENDANT
JAMES MCHUGH, ESQUIRE
FEDERAL COMMUNITY DEFENDER
EASTERN DISTRICT OF PENNSYLVANIA
SUITE 540 - THE CURTIS CENTER
PHILADELPHIA, PA 19106

(THE CLERK OPENS COURT.)

MS. SAUNDERS: YOUR HONOR, I APOLOGIZE. AT THE CLOSE TODAY -- YESTERDAY I SHOULD HAVE INFORMED THE COURT THAT DR. GUR HAS A SPEAKING ENGAGEMENT THIS MORNING AT 9:30. SO WE WILL BE CALLING A DIFFERENT WITNESS FOR NOW.

THE COURT: OKAY.

MR. MORENO: WE ARE RECALLING MS. LUCK, WHO IS ON CROSS EXAMINATION.

THE COURT: OKAY.

MS. SAUNDERS: YOUR HONOR, AS I UNDERSTAND IT, DR. GUR WILL BE HERE AROUND 11 O'CLOCK.

LOUISE LUCK, DEFENSE WITNESS, PREVIOUSLY SWORN, RETAKES THE STAND.

THE WITNESS: GOOD MORNING.

MR. GURGANUS: YOUR HONOR, MAY I PROCEED?

CROSS EXAMINATION

BY MR. GURGANUS:

Q.     GOOD MORNING. MY NAME IS JOHN GURGANUS, AND I'M AN ASSISTANT U.S. ATTORNEY. AND I WILL BE ASKING YOU A FEW QUESTIONS TODAY, ALL RIGHT?

A.     FINE.

Q.     AND IF THERE IS ANY POINT YOU DON'T UNDERSTAND A QUESTION, JUST ASK ME TO REPEAT IT. AND IF YOU CAN'T FINISH YOUR ANSWER, RAISE YOUR HAND AND I WILL TRY TO

ACCOMMODATE YOU.  ALL RIGHT?

A.      THANK YOU.

Q.      OKAY.  JUST AGAIN, YOU WERE HERE A COUPLE OF DAYS AGO, ISN'T THAT RIGHT?

A.      YES.

Q.      AND YOUR NAME IS LOUISE LUCK, CORRECT?

A.      YES.

Q.      AND YOU WENT THROUGH SOME OF YOUR EDUCATIONAL BACKGROUND AND YOU HAVE A BACHELOR'S IN PSYCHOLOGY AND A MASTER OF ARTS IN COMMUNITY PSYCHOLOGY FROM MARIST COLLEGE, IS THAT RIGHT?

A.      YES, IT IS.

Q.      AND I THINK YOU HAD SOME WORK EXPERIENCE, IS THAT CORRECT, WITH -- INCLUDING CORRECTIONAL, CORRECTIONS COUNSELOR, YOU WERE A PAROLE OFFICER AT ONE POINT, IS THAT RIGHT?

A.      THAT'S CORRECT.

Q.      YOU WERE A PROBATION OFFICER FOR ADULT AND JUVENILE DIVISION, IS THAT RIGHT?

A.      YES.

Q.      WHEN DID YOU -- AND IF I UNDERSTAND IT, THEN YOU STARTED WORK, AT SOME POINT, WITH THE COURT CONSULTATION SERVICES FIRM.  IS THAT RIGHT?

A.      YES.

Q.      AND WHEN WAS IT THAT YOU -- JUST TO REFRESH OUR

RECOLLECTION -- STARTED WORK WITH THAT COMPANY OR BUSINESS?

A.    1996 -- '86, SORRY.

Q.    1986?

A.    '86, YES.

Q.    OKAY.  SO YOU HAVE BEEN WITH THEM QUITE SOME TIME THEN, RIGHT?

A.    IT'S MY COMPANY, YES.

Q.    IT'S YOUR COMPANY, OKAY.

A.    YES.

Q.    AND DO I UNDERSTAND IT CORRECT THAT YOU PROVIDE PRINCIPALLY ASSISTANCE TO DEFENSE COUNSELORS AND THEIR CLIENTS IN THE AREAS OF THE NORTHEAST, WE WILL SAY?

A.    YES.

Q.    AND AS PART OF THAT, YOU ENGAGE IN CAPITAL MITIGATION WORK, ISN'T THAT RIGHT?

A.    THAT'S CORRECT.

Q.    AND MA'AM, HOW MUCH OF YOUR WORK, THE WORK YOU DO, IS FOCUSING THESE DAYS ON CAPITAL MITIGATION?

A.    THE MAJORITY OF MY WORK.

Q.    THE MAJORITY?

A.    YES, OF MY PERSONAL WORK.  THERE ARE OTHER PEOPLE WORKING AT THE OFFICE, AS WELL.

Q.    AND THAT IS STRICTLY DEFENSE WORK, AM I RIGHT ON THAT?

A.      THE CAPITAL MITIGATION WORK?

Q.      YES.

A.      YES.

Q.      AND I THINK YOUR -- I LOOKED AT YOUR WEB PAGE AND IT INDICATES THAT WHAT YOU SEEK TO DO IS TO LOOK FOR THE MYRIAD -- I'M QUOTING FROM YOUR WEB PAGE, AND TELL ME IF I'M RIGHT -- THE MYRIAD OF EVENTS OR EXPERIENCES THAT CONSTITUTE THE LIVES OF OUR CLIENTS.  IS THAT RIGHT?

A.      YES.

Q.      AND COMPOSING WHAT HAS BEEN CALLED THE DIVERSE FRAILTIES OF HUMANKIND, IS THAT RIGHT?

A.      THAT'S CORRECT.

Q.      AND WHAT YOUR -- YOU SEE YOUR JOB IS, AT LEAST ON YOUR WEB PAGE, IT'S THE OBLIGATION AND THE MANDATE OF A DEFENSE TEAM TO UNCOVER THROUGH COMPREHENSIVE INVESTIGATION AND ONGOING CLINICAL INTERVIEWING ANY AND ALL POSSIBLE MITIGATING FACTORS.  IS THAT TRUE?

A.      THAT'S TRUE.

Q.      AND YOU FURTHER STATE THAT IT'S IMPERATIVE TO UNDERSTAND, WE, BEING YOUR FIRM AND THE DEFENSE COUNSEL AND THE COURTS, ARE OFTEN REPRESENTING SOCIALLY, EMOTIONALLY AND PSYCHOLOGICALLY VULNERABLE CLIENTS, RIGHT?

A.      THAT'S CORRECT.

Q.      AND YOU SEE YOURSELF AS A SPECIALIST, ACCORDING TO YOUR WEB PAGE, AS PART OF THE CORE DEFENSE TEAM, TRUE?

A.      YES.

Q.      AND TO ACT AS A ZEALOUS ADVOCATE ON BEHALF OF OUR CLIENTS -- I'M SORRY, ADVOCATES ON OUR CLIENTS' BEHALF WITH THE ULTIMATE GOAL OF SAVING THEIR LIVES.

A.      YES.

Q.      OR THEIR LIFE, RIGHT?

A.      YES.

Q.      AND YOU -- AS PART OF THAT, YOU WORK CLOSELY WITH THE ATTORNEYS, AND THERE IS A TEAM APPROACH ESSENTIALLY, THEN, IN THIS KIND OF ENDEAVOR?

A.      YES.

Q.      IS THAT RIGHT?

A.      THAT'S TRUE.

Q.      AND AS I UNDERSTAND IT, YOU DO EXTENSIVE INTERVIEWS OF THE CLIENT TO START WITH, IS THAT RIGHT?

A.      THAT'S TRUE.

Q.      AND YOU LOOK TO THE IMMEDIATE AND EXTENDED FAMILY, YOU WANT TO TALK TO THEM, CORRECT?

A.      YES.

Q.      AND YOU GATHER AND YOU REVIEW ANY AND ALL AVAILABLE RECORDS AND PREPARE TO PRESENT A HISTORY IN A COHERENT FASHION, RIGHT?

A.      THAT'S CORRECT.

Q.      AND IN A CONCISE MANNER, IF YOU CAN, RIGHT?

A.      YES.

Q.      SOMETIMES IT'S NOT EASY.

A.      NOT TOO CONCISE.  SOMETIMES IT'S TOO LONG.

Q.      BUT YOU WANT TO TELL YOUR CLIENTS' UNIQUE LIFE HISTORY, ISN'T THAT RIGHT?

A.      THAT'S CORRECT.

Q.      AND WHAT -- WHEN YOU -- FOR A PERSON TO BECOME A MITIGATION SPECIALIST, IS THERE ANY LICENSING REQUIREMENTS, MA'AM?

A.      NO, THERE IS NOT.

Q.      ANY TESTS THAT NEED TO BE PASSED THEN?

A.      NO.

Q.      ANY PARTICULAR TYPE DEGREE THAT IS REQUIRED?

A.      MOST OF THE PEOPLE IN MY FIELD THAT ARE INVOLVED WITH OUR ORGANIZATION ARE USUALLY MASTER'S LEVEL PEOPLE, SOCIAL WORKERS, PSYCHOLOGISTS.  THERE ARE SOME PH.D.'S AND J.D.'S.

Q.      BUT AS A REQUIREMENT, THAT IS NOT NECESSARILY REQUIRED, TRUE?

A.      NO.  BUT WE HAVE DISCUSSED THIS WITHIN OUR ORGANIZATION, AND WE HAVE EXTENSIVE TRAINING THROUGH NASAMS.

Q.      ALL RIGHT.  AND YOU ARE PAID BY THE HOUR FOR

YOUR WORK, IS THAT RIGHT?

A.    YES.

Q.    AND AS I UNDERSTAND IT, YOUR GOAL IS KIND OF TO KNOW THE FULL PERSON AND NOT LOOK TO JUST THE FEW MINUTES OF THE CRIME, BUT TO GET AT EVERYTHING IN HIS BACKGROUND, ISN'T THAT RIGHT?

A.    THAT'S TRUE.

Q.    AND YOU LOOK, AS I UNDERSTAND IT, TO GO AND FIND INFORMATION THAT WOULD PERSUADE A JURY OR A FACT-FINDER NOT TO IMPOSE A DEATH PENALTY, ISN'T THAT RIGHT?

A.    AS PART OF THAT SOCIAL HISTORY.

Q.    SO YOUR JOB IS TO LOOK FOR THAT KIND OF EVIDENCE SO TO TRY TO HELP PERSUADE THE COURT NOT TO IMPOSE A DEATH PENALTY?

A.    YES, THAT'S FAIR TO SAY.

Q.    AND AS PART OF THAT, YOU LOOK FOR -- I MEAN, THERE ARE IMPORTANT THINGS THAT YOU LOOK FOR, TRUE, LOOK FOR SEXUAL ABUSE?

A.    YES.

Q.    YOU DO THAT IN ALL OF YOUR CASES, RIGHT?

A.    IN THE COURSE OF YOUR INTERVIEWS, YES.

Q.    PHYSICAL VIOLENCE, RIGHT?

A.    YES.

Q.    DOMESTIC VIOLENCE, RIGHT?

A.    YES.

Q.    HEAD TRAUMA?

A.    YES.

Q.    THINGS OF THAT NATURE.  POVERTY, RIGHT?

A.    YES, THAT'S TRUE.

Q.    DRUG HISTORY?

A.    CORRECT.

Q.    THESE ARE ALL THINGS YOU GO OUT AND YOU TRY TO FIND, TRUE?

A.    YES.

Q.    AND YOU ALSO LOOK AT THE PERSON'S BACKGROUND, THEIR CRIMINAL BACKGROUND, RIGHT?

A.    YES.

Q.    AND THEIR BACKGROUND AND REPUTATION FOR TRUTHFULNESS AND THINGS LIKE THAT, RIGHT?

A.    YES.

Q.    AND YOU TRY TO LOOK AT THE WHOLE PICTURE AND GET A SENSE FOR THOSE PEOPLE THAT YOU ARE INTERVIEWING, RIGHT?

A.    YES.  I DO THE SOCIAL HISTORY, YES.

Q.    ALL RIGHT.  AND AS PART OF THAT, I TAKE IT THAT YOU WOULD GO OUT AND YOU GATHER ALL KINDS OF RECORDS, TOO?

A.    THAT'S CORRECT.

Q.    BECAUSE YOU WANT TO CORROBORATE THE POSITION AND THE STATEMENTS THAT THE WITNESSES MAKE, RIGHT?

A.      THAT'S CORRECT.

Q.      INCLUDING THE DEFENDANT, TRUE?

A.      THAT'S TRUE.

Q.      BECAUSE A LOT OF TIMES YOU ARE GOING WAY BACK IN TIME, ISN'T THAT RIGHT?

A.      THAT'S CORRECT.

Q.      AND MEMORY -- MEMORY CAN BE FALLIBLE, WOULD YOU AGREE WITH THAT?

A.      YES, IT CAN.

Q.      I MEAN, MEMORY A LOT OF TIMES YOU JUST HAVE A LITTLE GLIMPSE, A LITTLE SNAPSHOT THAT PEOPLE REMEMBER, TRUE?

A.      ON OCCASION THAT CAN BE TRUE, YES.

Q.      I MEAN THINKING BACK SOMETIMES 30 SOME YEARS, 40 YEARS, IT'S HARD TO REMEMBER THINGS, WOULDN'T YOU AGREE WITH ME?

A.      MEMORIES STAY WITH US IF WE HAVE A STRONG EMOTION ATTACHED TO IT, EITHER A VERY HAPPY EMOTION OR A VERY TRAUMATIC EMOTION.  OUR DAY-TO-DAY EXISTENCE WE KIND OF FORGET, BUT WE DON'T FORGET THE MEMORABLE MOMENTS IN OUR LIFE, THE GOOD AND THE BAD.

Q.      SOMETIMES YOU DO, THOUGH, RIGHT?

A.      FOR THE MOST PART, THOSE MEMORIES STAY WITH US, THE TRAUMATIC MEMORIES AND THE MEMORIES OF HAPPINESS. WE REMEMBER THE DAYS WE FIRST HAD OUR CHILDREN.  WE

REMEMBER THE DAY THAT WE GOT MARRIED.  WE REMEMBER SOMETHING IF WE WERE IN A VERY HORRIBLE CAR ACCIDENT.

Q.    I WOULD AGREE WITH YOU ON THAT.  BUT AS FAR AS A LOT OF THE DETAILS, THERE ARE -- A LOT OF TIMES THEY ARE NOT THERE, WOULDN'T YOU AGREE WITH ME?  EVEN ON THOSE BIG EVENTS, TRUE, LIKE A CHILDBIRTH?  SOMETIMES YOU DON'T REMEMBER WHAT CAR YOU WENT WITH, WHO SHOWED UP, THINGS OF THAT NATURE.  ISN'T THAT FAIR TO SAY?

A.    THE SMALL, MOST MINUTE OF DETAILS POSSIBLY, BUT STUDIES HAVE SHOWN WHEN YOU HAVE EMOTION INVOLVED, THAT PROMOTES MEMORY OF AN EVENT, A STRONG EMOTION.

Q.    WHEN IT'S RELATED TO YOURSELF, CORRECT?

A.    YES.  OR IF, BECAUSE YOU ARE VERY ATTACHED TO SOMEONE AND THEY HAD A VERY TRAUMATIC SITUATION, YOU WOULD REMEMBER THAT AS WELL, BECAUSE IT WAS IMPORTANT TO YOU.

Q.    BUT BECAUSE OF -- AND AGAIN, WE WILL AGREE THAT SOMETIMES MEMORY CAN BE FALLIBLE, EVEN WITH EMOTIONAL THINGS, TRUE?

A.    POSSIBLY.  BUT MOST LIKELY ON THOSE OCCASIONS, LIKE I SAID, YOU WOULD REMEMBER THINGS THAT WERE TRAUMATIC AND THINGS THAT WERE VERY HAPPY FOR YOU THAT WERE SIGNIFICANT IN YOUR LIFE.

Q.    SIGNIFICANT THINGS?

A.    THAT YOU CARRIED EMOTION WITH.

Q.      BUT THE RECORDS, A LOT OF TIMES RECORDS ARE GOOD BECAUSE THEY DOCUMENT THESE THINGS, TRUE?

A.      TO SOME EXTENT.

Q.      SOMETIMES IT CAPTURES EXACTLY WHAT A PERSON SAYS, TRUE?

A.      TO THAT PARTICULAR PERSON.  IT MIGHT NOT BE THE WHOLE PICTURE.  THERE ARE MANY THINGS INVOLVED IN RECORD INVOLVEMENT, TOO.

Q.      BUT YOU AGREE WITH ME THAT --

A.      IF YOU HAVE RECORDS TO BACK UP WHAT SOMEONE HAD SAID, THAT IS SO MUCH THE BETTER, YES.

Q.      THAT IS SO MUCH THE BETTER, RIGHT?

A.      YES.

Q.      OKAY.  AND IN THIS CASE, THERE WAS A LOT OF RECORDS THAT WERE GATHERED, ISN'T THAT RIGHT?

A.      YES.

Q.      ALL OF MR. HAMMER'S MEDICAL RECORDS, TRUE?

A.      I'M NOT SURE IF THEY WERE ABLE TO OBTAIN ALL OF HIS MEDICAL RECORDS.

Q.      DID YOU PARTICIPATE IN GATHERING RECORDS?

A.      IN PART.  BUT I THINK THERE ARE QUITE A BIT OF RECORDS THAT WE WERE UNABLE TO OBTAIN MEDICALLY.

Q.      WELL, THERE WAS -- HOW MANY HOSPITALIZATIONS DO YOU RECALL REVIEWING BETWEEN THE YEARS WHEN MR. HAMMER WAS FIVE OR SIX TO THE POINT THAT HE WENT TO PRISON AT

BAPTIST, DO YOU RECALL?

A.        THERE WAS NUMEROUS.  BUT THERE WAS ALSO NUMEROUS RECORDS THAT WE WERE UNABLE TO OBTAIN.  USUALLY WHEN I WORK ON A CASE, I DO THE ENTIRE RECORD COLLECTION MYSELF.  I HAD WORKED WITH THE PUBLIC DEFENDER'S OFFICE AND THEY DID A LOT OF THE RECORD COLLECTION, TOO.  THAT WAS KIND OF UNIQUE FOR ME, BECAUSE I USUALLY DO THE WHOLE THING.  BUT THERE WAS A NUMBER OF RECORDS I KNOW THAT THEY WERE UNABLE TO RECEIVE, MAYBE BECAUSE THEY WERE NO LONGER AVAILABLE, THAT THEY ONLY KEPT RECORDS FOR A CERTAIN AMOUNT OF YEARS, THIS WAS A VERY OLD CASE, BUT I KNOW THERE WAS A NUMBER OF HOSPITAL RECORDS THAT WE WERE NOT ABLE TO RECEIVE.

Q.        WHICH ONES WERE THEY?

A.        OFF THE TOP OF MY HEAD, I DON'T REMEMBER, BUT I KNOW THERE WAS A NUMBER.

Q.        BUT YOU KNOW THAT THERE WAS A LOT OF THEM ACTUALLY OBTAINED, ISN'T THAT RIGHT?

A.        YES, THAT'S CORRECT.

Q.        AND A LIST OF THEM?

A.        YES, THEY WERE VERY DILIGENT IN TRYING TO OBTAIN THOSE RECORDS.

Q.        AND DID YOU REVIEW ALL THOSE RECORDS YOURSELF, MA'AM?

A.        THE HOSPITAL RECORDS, YES, I WENT THROUGH THOSE.

Q.      DID YOU ALSO REVIEW THE PSYCHIATRIC RECORDS?

A.      FOR THE MOST PART, YES.

Q.      NOW, WHEN YOU GO AND YOU INTERVIEW PEOPLE, WHEN YOU DO THAT HOW DO YOU GO ABOUT IT?  DO YOU DO IT OVER THE PHONE, IN PERSON?  EITHER WAY, DO YOU RECORD IT? WHAT DO YOU DO?

A.      I DON'T USE A RECORDER.  I DO THE INTERVIEWS -- ALL THESE INTERVIEWS THAT I HAVE DONE IN THIS CASE WERE ALL DONE IN PERSON.  THERE MAY HAVE BEEN ONE INTERVIEW, A FORMER GIRLFRIEND, THAT I WAS ABLE TO LOCATE THAT I DID OVER THE PHONE, BUT EVERYBODY ELSE WAS IN PERSON.

Q.      AND WHEN YOU DO THIS, DO YOU TAKE ROUGH NOTES, DO YOU TYPE, DO YOU -- HOW DO YOU KEEP TRACK OF WHAT IS BEING SAID?

A.      I WRITE IT.

Q.      YOU WRITE IT?

A.      YES.

Q.      AND DO YOU TAKE THOSE NOTES AND THEN YOURSELF TYPE THEM UP, OR DO YOU HAVE SOMEONE ELSE?

A.      MY OFFICE WILL TYPE THEM.

Q.      PARDON?

A.      MY OFFICE WILL TYPE THEM.

Q.      OKAY.  BUT YOU DON'T DO IT YOURSELF?

A.      FOR THE MOST PART, NO.

Q.      YOU HAVE SOMEONE ELSE DO IT?

A.    YES.

Q.    NOW, WHEN YOU INTERVIEW THESE PEOPLE, ARE THEY PUT UNDER OATH?

A.    NO.

Q.    NO?

A.    NO.

Q.    AND --

A.    I DO EXPLAIN TO THEM THE IMPORTANCE OF BEING TRUTHFUL AND, YOU KNOW, THAT WE HAVE TO KNOW -- EVEN IF IT'S SOMETHING THAT YOU DON'T THINK IS POSITIVE FOR US TO KNOW, PLEASE SHARE WITH US, BECAUSE I REALLY WANT TO HAVE THE ENTIRE PICTURE OF MY CLIENT.

Q.    BUT YOU ARE, THOUGH, STRICTLY WORKING FOR THE DEFENSE IN THESE CASES, TRUE?

A.    YES.

Q.    AND IF THERE IS SOMETHING THAT IS INCONSISTENT WITH THE DEFENSE THAT YOU UNCOVER, YOU DON'T FORWARD IT IMMEDIATELY TO THE GOVERNMENT, DO YOU?  DO YOU KNOW WHAT I MEAN?

A.    NO, I DON'T SHARE MY RECORDS THAT WAY.

Q.    YOU KNOW THE CONCEPT OF A BRADY VIOLATION, FOR EXAMPLE?

MR. MORENO:  I'M GOING TO OBJECT.  THAT WOULD CERTAINLY BE BEYOND ANYTHING THAT MS. LUCK WOULD BE REQUIRED TO BE AWARE OF OR DO.

THE COURT:  OVERRULED.

BY MR. GURGANUS:

Q.      AND IF THE GOVERNMENT FINDS OUT SOMETHING THAT IS INCONSISTENT, THEY ARE OBLIGATED UNDER THE LAW TO PROVIDE IT TO THE DEFENDANT.  ARE YOU AWARE OF THAT?

A.      NO, I'M NOT.

Q.      NO.  AFTER ALL YOUR YEARS AND EXPERIENCE, YOU DON'T --

A.      I'M SORRY.  WOULD YOU SAY THAT AGAIN?

Q.      YES.  I WILL REPEAT IT.

A.      YES.

Q.      ARE YOU AWARE OF THE FACT THAT THE GOVERNMENT, IF IT FINDS SOMETHING THAT'S EXCULPATORY OR GOES AGAINST THEIR CASE, RIGHT, THE GOVERNMENT IS REQUIRED TO TURN THAT OVER, TO NOTIFY THE DEFENSE OF THAT AND PROVIDE THAT INFORMATION TO THEM?

A.      IN TERMS OF MITIGATION, I COULD NOT SEE THE SITUATION THAT THAT WOULD HAPPEN.

Q.      WELL, YES, IF IT'S MITIGATION OR SOMETHING THAT WOULD CALL INTO QUESTION A WITNESS' VERACITY, IT WOULD HAVE TO BE TURNED OVER.  ARE YOU AWARE OF THAT, MA'AM?

A.      NO.

Q.      NO.  OKAY.  THERE IS NO OBLIGATION ON YOUR PART, IF SOMETHING GOES AGAINST THE CASE THAT YOU ARE TRYING TO COME UP WITH, TO NOTIFY THE GOVERNMENT OF THAT, WOULD

YOU AGREE?

A.      I HAVE NO INDICATION, YOU KNOW, OF THAT AT ALL.

Q.      DO YOU KNOW WHAT I'M SAYING HERE?  IN OTHER WORDS --

A.      HOW ABOUT IF YOU GIVE ME AN EXAMPLE.

Q.      SOMEONE SAYS -- CLIENT SAYS MR. X RAPED ME, AND THEN YOU TALK TO MR. X AND MR. X SAYS, I DIDN'T RAPE THAT PERSON, AND THAT GOES AGAINST YOUR CASE.  YOU DON'T TURN AROUND AND NOTIFY THE GOVERNMENT OF THAT, DO YOU?

A.      I'M NOT SO SURE.  I'M NOT HIRED ON A RAPE CASE. ARE YOU TALKING ABOUT UNREPORTED RAPE OR --

Q.      LET ME ASK YOU THIS.  HAVE YOU EVER NOTIFIED THE GOVERNMENT THAT YOU FOUND SOMETHING OUT THAT WAS INCONSISTENT --

A.      IN TERMS OF MITIGATION?

Q.      YES, WITH YOUR THEORY OF MITIGATION IN THE CASE?

A.      NO.

Q.      NO?

A.      NO.

Q.      SO IN THIS CASE, FOR INSTANCE, YOUR DEFENSE, ONE OF THE THINGS YOU ARE TRYING TO PRESENT AS A MITIGATING FACTOR IS THAT THIS WAS -- I THINK YOUR WORDS WERE A HORRIFIC CHILDHOOD FOR MR. HAMMER.

A.      IT WAS MOST HORRIFIC.

Q.      RIGHT.  BUT IF SOMEONE SAID, FOR INSTANCE, THAT

IS NOT TRUE, YOU WOULD NOT BE REPORTING THAT TO THE GOVERNMENT SAYING YOU WANT TO GO INTERVIEW THIS PERSON BECAUSE IT'S INCONSISTENT WITH OUR DEFENSE.  WOULD YOU AGREE WITH THAT?

A.      I NEVER HEARD OF ANYBODY DO THAT BEFORE.  IN A PROFESSIONAL OPINION IN ANY TYPE OF FIELD, AND THIS, TOO, YOU GO WITH THE PREPONDERANCE OF RECORDS AND INTERVIEWS AND PEOPLE HAVE MEMORIES THAT MAY -- THAT THEY MAY NOT REMEMBER THINGS MANY YEARS LATER, BUT IF YOU -- IF YOU CONSISTENTLY --

Q.      SOMETIMES THEY COULD BE LYING, TOO, RIGHT?

MR. MORENO:  I'M GOING TO OBJECT AGAIN TO THIS LINE OF QUESTIONING BECAUSE THIS IS NOT HER BAILIWICK.  SHE GIVES THE INFORMATION TO ATTORNEYS --

MR. GURGANUS:  I THINK THE --

MR. MORENO:  SHE DOES NOT HAVE AN OBLIGATION TO CALL THE GOVERNMENT AND SAY HEY, I JUST FOUND OUT SOMETHING THAT -- I MEAN --

MR. GURGANUS:  I THINK THE POINT IS MADE, YOUR HONOR.  I WILL MOVE ON.  I CAN MOVE ON.

THE COURT:  SO I WILL SUSTAIN THE OBJECTION.  MOVE ON.

BY MR. GURGANUS:

Q.      NOW, YOU BECAME INVOLVED IN THIS CASE IN APPROXIMATELY WHAT YEAR?

A.      I WOULD SAY ABOUT THREE YEARS AGO.

Q.      THREE YEARS AGO.  AND WHAT DID YOU -- WHAT ALL DID YOU REVIEW THEN?  WE TALKED ABOUT THE MEDICAL RECORDS, RIGHT?

A.      YES.

Q.      DID YOU REVIEW THE WORK OF JILL MILLER?

A.      YES, I DID.

Q.      AND WHO IS JILL MILLER?

A.      JILL MILLER WAS THE FORMER MITIGATION SPECIALIST ON THIS CASE.

Q.      AND WHAT ELSE DID YOU REVIEW?  YOU SPOKE WITH MR. HAMMER A NUMBER OF TIMES?

A.      YES.  SOME PENALTY PHASE TESTIMONY, AS IT PERTAINED TO THE PEOPLE I INTERVIEWED.

Q.      HOW ABOUT MR. HAMMER'S BACKGROUND AND HIS LIFE AS FAR AS --

A.      HIS SCHOOL?

Q.      AS FAR AS HIS CRIMINAL HISTORY.

A.      NOT EXTENSIVELY.  THE FOCUS WAS -- FOR ME WAS PRIMARILY ON THE EARLY SOCIAL HISTORY.

Q.      AND YOU ARE AWARE THAT THERE WAS AN EXTENSIVE SOCIAL HISTORY PREPARED BY JILL MILLER, ISN'T THAT RIGHT?

A.      THAT'S CORRECT.

Q.      AND DR. WOLFSON ALSO, ARE YOU AWARE OF THAT?

A.      YES.

Q.      DID YOU REVIEW DR. WOLFSON'S REPORT?

A.      YES.

Q.      AND THAT WAS QUITE EXTENSIVE, ISN'T THAT RIGHT?

A.      YES.

Q.      AND IT WENT FULLY INTO DAVID HAMMER'S
BACKGROUND, CORRECT?

A.      YES.

Q.      AND IT WAS AS A RESULT OF A COURT-ORDERED STUDY
FOR THE COURT, ISN'T THAT RIGHT?

A.      I BELIEVE SO, YES.

Q.      DO YOU REMEMBER HOW LONG A REPORT THAT WAS?

A.      IT WAS QUITE LENGTHY.

Q.      NOW, YOU ALSO REVIEWED JILL MILLER'S REPORTS,
ISN'T THAT RIGHT?

A.      YES.

Q.      AND HOW MANY TIMES DID YOU REVIEW HER REPORT?

A.      A FEW TIMES.  I THINK AN INITIAL, AND I BELIEVE
SEVERAL SUPPLEMENTAL REPORTS.

Q.      AND AS PART OF THAT, THERE WAS A HISTORY THAT
SHE PUT TOGETHER THAT LISTED ALL OF THE
HOSPITALIZATIONS, ISN'T THAT RIGHT?

A.      YES.

Q.      A MEMORANDUM?

A.      YES.

Q.    DO YOU RECALL THAT?

NOW, DID YOU REVIEW THAT?

A.    YES.

Q.    DID YOU REVIEW ALSO THE NUMBER -- THE PEOPLE THAT SHE INTERVIEWED?

A.    YES.

Q.    AS PART OF HER REPORT?

A.    YES.

Q.    DID YOU --

A.    AND HER NOTES.

Q.    DID YOU PUT TOGETHER A SIMILAR REPORT AS HERS?

A.    NO, I DIDN'T.  LIKE I SAID, THIS WAS KIND OF UNCOMMON FOR ME, BECAUSE I USUALLY DO THE WHOLE CASE MYSELF.  THIS IS THE FIRST TIME THAT DIDN'T HAPPEN.

Q.    SO YOU DID NOT HAVE AN ACTUAL FINAL REPORT IN THIS CASE THEN?

A.    NO.  NO.  TRADITIONALLY, I ALWAYS DO.

Q.    BUT HERE, THERE WAS NO LIST OF PEOPLE THAT YOU TALKED TO, RIGHT?

A.    I DID PUT A LIST OF PEOPLE THAT I INTERVIEWED.

Q.    DID YOU LIST OUT ALL OF THE DOCUMENTS AND THINGS THAT YOU REVIEWED?

A.    NO, BECAUSE I DID NOT PREPARE A REPORT.

Q.    WELL, ANYWAY, MS. MILLER, DO YOU KNOW WHY SHE IS NO LONGER THE MITIGATION SPECIALIST IN THIS CASE?

A.      BECAUSE THIS IS THE SECOND TEAM OF ATTORNEYS, SO TRADITIONALLY YOU PUT A NEW PERSON ON AT THAT POINT.

Q.      RIGHT.  NEW FOCUS ALSO?

A.      I DON'T KNOW IF I WOULD SAY THAT, BUT --

Q.      WOULD YOU AGREE WITH ME THAT THIS WAS A NEW FOCUS FOR YOU WHEN YOU GOT INVOLVED IN THE CASE?

A.      NO.  THIS IS A TRADITIONAL FOCUS.  THIS IS WHAT I DO ON THE CASES.

Q.      WELL, WHEN YOU WERE INVOLVED IN THE CASE WERE YOU SEEKING OUT AND FOCUSING ON WHETHER THERE WERE -- MR. HAMMER SUFFERED FROM MULTIPLE PERSONALITIES?

A.      NO, I DIDN'T.

Q.      THAT WAS NOT A PART OF YOUR JOB HERE?

A.      I DIDN'T GO INTO THAT.

Q.      AND YOU KNOW THAT PREVIOUSLY THAT WAS ONE OF THE THEMES OR FOCUSES OF JILL MILLER, RIGHT?

A.      I BELIEVE THAT'S CORRECT.

Q.      BUT YOU WERE NOT SEEKING OUT ANY INFORMATION ABOUT A JOCKO, RIGHT?

A.      I THINK THAT THE SOCIAL HISTORY HERE, APART FROM THAT, WAS SO TRAUMATIC, THE SEXUAL ABUSE, THE PHYSICAL ABUSE, THE LIFESTYLE, EVERYTHING HE WENT THROUGH, THAT WE HAD SO MUCH MITIGATION THAT IS SO COMPLETELY VERIFIED, THAT THE EVIDENCE OF WHAT I WAS DOING.

Q.      WELL, JILL MILLER WAS LOOKING FOR THAT ALSO,

WASN'T SHE?

A.      YES.

Q.      THAT WAS A PRIMARY FOCUS OF HERS, RIGHT?

A.      I'M SURE IT WAS AS WELL.

Q.      SEXUAL ABUSE ALLEGATIONS, TRUE?

A.      YES.

Q.      NOW, IT'S TRUE THAT THERE HAS BEEN -- IT HAS BEEN A LONG LITIGATION.  I MEAN, THIS HAS LASTED FOR 18 YEARS, ISN'T THAT RIGHT, JUST THIS CASE?

A.      THAT SOUNDS RIGHT.

Q.      AND SO THERE HAS BEEN A LOT OF MATERIAL TO GENERATE IN THE CASE?

A.      YES.

Q.      NOW, I GUESS WE HAVE SEEN HERE, THEN, THAT YOU ARE NOT LOOKING FOR ANY INFORMATION ABOUT A JOCKO, JASPER, WILBUR, ANY OF THAT, RIGHT?

A.      NO.

Q.      AND YOU SAW NO EVIDENCE OF A MULTIPLE PERSONALITY OF DAVID HAMMER, WOULD YOU AGREE?

A.      NO, I COULDN'T AGREE WITH THAT.  I JUST DID NOT ASSESS FOR THAT PER SE.

Q.      ARE YOU SAYING THAT YOU SAW --

A.      I DIDN'T DELVE INTO THAT IN DEPTH.

Q.      AND IN YOUR CONVERSATIONS WITH DAVID PAUL HAMMER, NO INDICATION THAT HE SUFFERED FROM MULTIPLE

PERSONALITY DISORDER, WOULD YOU AGREE?

A.      I CAN'T SAY THAT.  I CAN'T NECESSARILY AGREE WITH THAT.

Q.      YOU CAN'T?

A.      NO, I CAN'T NECESSARILY AGREE WITH THAT.

Q.      WELL, WHAT IS IT THAT YOU SAW THAT YOU --

A.      I DIDN'T GO THROUGH THAT ASSESSMENT.  I WAS FOCUSING ON THE SOCIAL HISTORY.  THIS CASE HAS BEEN A LITTLE BIT -- WE HAVE DIFFERENT COMPARTMENTS THAT WE WORK ON, AND MINE WAS THE EARLY SOCIAL HISTORY.

Q.      WELL, YOU HAVE PORTRAYED MR. HAMMER AND AN UPBRINGING THAT, YOU KNOW, HE HAD NO CARING IN HIS LIFE, IS THAT RIGHT?  NO ONE CARED FOR HIM?

A.      HE HAD A VERY, VERY, VERY TRAUMATIC UPBRINGING.

Q.      NO PARENT CARED ABOUT HIM.  HIS MOM DIDN'T LOVE HIM.  HIS DAD DIDN'T LOVE HIM.

A.      THAT'S HOW -- I DON'T KNOW HOW YOU DEFINE LOVE, BUT WHAT HE WENT THROUGH WAS HORRIFIC.

Q.      DID YOU READ BY ANY CHANCE THE BOOK THAT HE WROTE?

A.      I DID.

Q.      YOU DID?

A.      YEAH.

Q.      AND IN THAT BOOK HE DOES TALK ABOUT BEING ON A SPORTS TEAM, RIGHT, TRUE?

A.      I DON'T RECALL.  I THINK HE DID PLAY BASKETBALL. I DON'T REMEMBER HIM BEING ON ANY TEAM.

Q.      DO YOU REMEMBER HIS DAD GOING OUT AND BUYING HIM A NICE BASEBALL GLOVE.  REMEMBER THAT?

A.      I REMEMBER THE BASEBALL GLOVE STORY.  THAT WAS A VERY, VERY, VERY SIGNIFICANTLY POSITIVE THING FOR HIM, BECAUSE IT WAS NOT SOMETHING THAT WOULD HAPPEN IN THAT HOUSEHOLD.  I DON'T THINK MOST OF US REMEMBER THE LITTLE THINGS OUR PARENTS DO FOR US.  BUT IF YOU HAVE SO MUCH TRAUMA AND SOMETHING POSITIVE HAPPENS, YOU DO RECALL THAT.

Q.      DO YOU REMEMBER HOW HE WOULD TALK ABOUT THE TIMES AT CHRISTMAS, THINGS WERE GOOD AND HAPPY?

A.      IN COMPARISON TO THE REST OF OUR LIVES -- CHILDREN THAT HAVE TRAUMA --

Q.      I'M ASKING YOU ABOUT THE BOOK NOW.

A.      OH, I THOUGHT YOU WERE ASKING ME A QUESTION ABOUT CHRISTMAS SO --

Q.      WHAT YOU SAID YESTERDAY --- I MEAN TWO DAYS AGO, THERE WAS -- IT APPEARED THAT THERE WAS NONE OF THAT IN HIS LIFE.

A.      NOTHING IN LIFE --

Q.      HIS BOOK STATED IT DIFFERENTLY.

A.      OUR LIVES ARE NOT TOTAL BLACK AND WHITE.

Q.      TRUE.

A.      HE HAD SO MUCH TRAUMA AND SUCH A HORRIFIC UPBRINGING WHAT LITTLE TINY HAPPINESS THAT HE HAD HE HELD ON TO.  IT'S NOT UNCOMMON AT ALL FOR CHILDREN THAT HAVE TRAUMA TO RECOLLECT AND TRY TO THINK OF THE HAPPIEST OCCASIONS.  THERE WAS A DEATH PENALTY CASE THAT I HAD DONE NOT --

Q.      WELL, IF I CAN JUST CUT YOU OFF.

A.      I WAS GOING TO TALK ABOUT TRAUMA, AND I THINK -- I THOUGHT IT KIND OF PERTAINED.

Q.      TALKING ABOUT --

MR. MORENO:  I WOULD ASK THAT THE WITNESS BE ALLOWED TO FINISH.

THE COURT:  FINISH YOUR ANSWER.

THE WITNESS:  IT WAS A YOUNG MAN IN HIS EARLY TWENTIES AND HE WAS PHYSICALLY ABUSED.  AND WE HAVE MANY -- MULTIPLE RECORDS.  AND HE WAS A YOUNG MAN SO WE WERE ABLE TO OBTAIN THOSE RECORDS.  AND HE WAS LOCKED IN A CLOSET THE WHOLE SUMMER LONG.  AND WAS ABLE -- HAD TO EAT AND HAVE ALL HIS MEALS IN A CLOSET.  AND HIS MOTHER, HE SAID THAT IF YOU EVER SAY TO ANYBODY THAT I WAS ABUSED, I WILL STAND UP AND SAY IT WAS A LIE, BECAUSE HE LOVED HIS MOTHER SO, SO, SO MUCH IN SPITE OF THE ABUSE, BECAUSE THEY WANT TO BE LOVED.  SO IT'S NOT UNCOMMON.  IT'S NOT CONTRADICTORY TO SEE THIS EXTENSIVE ABUSE BUT YET WANT TO HOLD ON TO ANY NICE MINUTE YOU

HAVE AND HOPE FOR LOVE FROM YOUR PARENTS.  I SEE IT TIME AND TIME AGAIN AND MORE OFTEN THAN NOT IN PEOPLE THAT ARE VERY SEVERELY ABUSED.

Q.      AND THE ABUSE, AS YOU UNDERSTAND IT, STARTED WITH UNCLE RON MILLER, ISN'T THAT RIGHT?

A.      YES.

Q.      AND UNCLE RON, HE WAS A NURSE FOR A WHILE, ISN'T THAT RIGHT, FOR MANY YEARS?

A.      THAT'S CORRECT.

Q.      AND HE WAS WILMA DEAN'S BROTHER, ISN'T THAT RIGHT?

A.      THAT'S CORRECT.

Q.      AND HE WAS THE FIRST PERSON THAT SEXUALLY ABUSED DAVID HAMMER, IS THAT WHAT YOUR INVESTIGATION SHOWED?

A.      YES.

Q.      AND YOU BASE THAT ON THE WORD OF DAVID HAMMER, ISN'T THAT RIGHT?

A.      I SPOKE TO UNCLE RON AS WELL.

Q.      AND DID UNCLE RON ADMIT THAT TO YOU?

A.      HE SAID THAT IF DAVID SAID I DID IT, THEN MAYBE I DID.

Q.      AND THAT WAS NOT IN YOUR TYPED NOTES?

A.      NO.

Q.      WHY IS THAT?

A.      CAN I EXPLAIN THAT TO YOU, WHY?

Q.     YES.

A.     I'M MORE THAN HAPPY TO.

Q.     THAT I'M INTERESTED IN.

A.     I'M VERY HAPPY TO EXPLAIN THAT AS WELL.

Q.     ALL RIGHT.

A.     THIS WAS A VERY, VERY TRAUMATIC THING FOR UNCLE RON TO ADMIT THAT THIS HAD FINALLY HAPPENED.

HE HAD BEEN WITH HIS PARTNER AND I DON'T THINK HE EVER WANTED TO ADMIT THAT HE WAS A PEDOPHILE. WHEN YOU HAVE VERY, VERY SENSITIVE CONVERSATIONS WITH PEOPLE, IT'S VERY DIFFICULT TO BE TAKING NOTES AND WRITING THINGS DOWN WHILE YOU ARE TALKING TO THEM ABOUT SOMETHING.  HIS EYES WERE WELLING UP.  IT WAS VERY DIFFICULT FOR HIM TO TALK ABOUT THAT, AND TALK ABOUT HIS SEXUAL ABUSE BY HIS BROTHER GLENNIS.  SO AS SOON AS I WAS DONE WITH THE INTERVIEW -- I DROPPED MY PENCIL DOWN. YOU CAN'T HAVE EYE CONTACT AND SOMEBODY IS CRYING AND HERE YOU ARE WRITING DOWN THEIR STORY IN FRONT OF THEM. IT'S REALLY INAPPROPRIATE BUT IT'S PART OF INTERVIEWING.

Q.     BUT YOU RECORDED IT IN YOUR WRITTEN NOTES, DIDN'T YOU?

A.     YES.  WHEN I LEFT AND, IN FACT, I ACTUALLY -- WHEN I GOT INTO THE CAR AND WROTE IT IN THE CAR, I INITIALLY GRABBED OUT THE WRONG SHEET AND I WROTE IT ON GLENNIS', AND THEN I WROTE IT RIGHT DOWN ON RON'S

INTERVIEW NOTE, TOO.

Q.      BUT IT WAS WRITTEN ON RON'S INTERVIEW NOTE?

A.      YEAH.  AND IT WAS ALSO ON GLENNIS', BECAUSE I HAD -- I WAS -- I TOOK IT RIGHT OUT OF THE FOLDER AND I JOTTED IT DOWN, AND I WROTE IT RIGHT ON RON'S NOTE.

Q.      BUT WHEN YOU TYPED THAT UP IT WASN'T -- OR YOU HAD IT TYPED UP, IT WASN'T IN THE TYPEWRITTEN.

A.      MAYBE THE GIRLS GOT CONFUSED BECAUSE I DID PUT AN X OVER ON GLENNIS' BUT IT SHOULD HAVE BEEN IN THERE AS WELL.  I DID IT IN THE CAR.

Q.      AND DIDN'T IT SAY SOMETHING TO THE EFFECT THAT HE DIDN'T REMEMBER ANYTHING LIKE THAT?

A.      IF HE SAID IT HAPPENED, IT DID THEN.  THAT WAS -- THAT IS WHAT HE HAD SAID.

Q.      NOW, HE TESTIFIED UNDER OATH HERE.

A.      YES.

Q.      GOT ON THE STAND UNDER OATH, AND IN NO UNCERTAIN TERMS SAID THAT DID NOT HAPPEN, THAT HE HAD BARED WHAT HAD HAPPENED TO HIM WITH HIS ABUSE, BUT THAT HE DID NOT MOLEST DAVID HAMMER.  DID YOU KNOW THAT?

A.      NO, I DIDN'T.

Q.      UNDER OATH.

A.      YOU KNOW, THAT WOULD NOT NECESSARILY BE ALL THAT SURPRISING.

Q.      BUT YOU WERE NOT WATCHING HIS DEMEANOR HERE,

WERE YOU, MA'AM?

A.      NO, I WAS NOT HERE THAT DAY.

Q.      AND YOU KNOW THAT HE HAS TALKED TO DAVID ABOUT THAT AND TOLD DAVID IT DIDN'T HAPPEN.  RIGHT?

A.      IN THE PAST.  I HAVE BEEN NOT REALLY WORKING ON THE CASE NOW FOR TWO YEARS.  THERE WAS SOME, YOU KNOW, BUDGETARY ISSUES.  BUT I DID INTERVIEW HIM.  AND THAT IS WHAT HE DID TELL ME.  AND IT WAS VERY DIFFICULT FOR HIM TO EVEN TALK ABOUT THAT.  IT'S VERY EMBARRASSING.  IT'S NOT AT ALL UNCOMMON FOR PEDOPHILES NOT TO ADMIT WHAT THEY DO AND HAVE A DIFFICULT TIME TALKING ABOUT IT.  THE MAJORITY DON'T.

Q.      BUT THAT DID NOT MAKE IT INTO YOUR TYPEWRITTEN NOTES FOR SOME REASON.

A.      THAT IT WAS DIFFICULT?  I KNOW IT WAS DIFFICULT.

Q.      NO, NOT THAT IT WAS DIFFICULT, THAT HE COULD NOT -- HE COULD NOT SAY THAT HAPPENED, WORDS TO THAT EFFECT.

A.      HE SAID, IF DAVID SAID IT HAPPENED, I COULDN'T SAY IT DIDN'T HAPPEN.

                WHY WOULD YOU SAY IT DIDN'T HAPPEN THEN? I MEAN, YOU KNOW, IT GAVE ME THE IMPRESSION THAT HE SAID IT --

Q.      THAT WAS YOUR IMPRESSION.  HE DID NOT GO INTO DETAILS?

A.      HE WAS CRYING.

Q.      YOU JUST TALKED ABOUT HIM BEING ABUSED BY SOMEONE ELSE, RIGHT?

A.      HE WAS CRYING WHEN HE WAS TALKING ABOUT DAVID.

Q.      HE DOES NOT WANT DAVID TO GET THE DEATH PENALTY EITHER, DOES HE?

A.      NO, BUT I DON'T THINK HE WOULD GO INTO THAT.

Q.      ALL RIGHT.

A.      IT WAS DIFFICULT FOR HIM TO RECALL HIS ABUSE OF HIM.

Q.      NOW, YOU WILL AGREE THAT DAVID WOULD FREQUENTLY GO TO THE RESIDENCES OF OTHER MEMBERS OF THAT EXTENDED FAMILY, TRUE?

A.      YES.

Q.      AND YOU PAINTED THAT EXTENDED FAMILY AS A TRAIN WRECK ALSO?

A.      A LOT OF THE FAMILY WAS VERY DYSFUNCTIONAL. HOYT, WE DIDN'T GET INTO THAT, BUT HIS GRANDFATHER COMMITTED SUICIDE.  THE MATERNAL GRANDFATHER WAS ALSO IN A PSYCHIATRIC HOSPITAL.

Q.      WELL, THE SUICIDE HAPPENED WHEN HE WAS MUCH OLDER AND VERY ILL, DIDN'T IT?

A.      HE WAS OLDER AND ILL.

Q.      ILL.

A.      BUT HE WAS ALSO IN A MENTAL INSTITUTION AND WAS

SEVERELY ABUSIVE TO THE CHILDREN, SEVERELY ABUSIVE TO THEM.

Q.        BUT HE WAS -- WELL --

A.        I MEAN, HE HAD A HISTORY OF ANGER ISSUES AND MENTAL DISORDER, TOO.

Q.        AND THE ONE OCCASION -- YOU MENTIONED AN OCCASION WHEN YOU TESTIFIED ABOUT HOYT PULLING A GUN, AND I THINK WHAT YOU SAID WAS, HE WOULD HAVE SHOT THOSE PEOPLE IF HE HAD NOT PASSED OUT, IS THAT RIGHT?

A.        YES.  YES.

Q.        BUT WE HEARD THE PERSON WHO STOOD IN FRONT OF THE DAD IN THIS INSTANCE, AND WOULD YOU AGREE THAT WAS A ONE-TIME OCCASION THAT HAPPENED?

A.        THAT HE TRIED TO SHOOT THE CHILDREN?  YES.  BUT HE TERRORIZED THEM THEIR WHOLE LIVES.

Q.        HE WAS TRYING TO SHOOT THE CHILDREN?

A.        HE TIED SEVERAL OF THE CHILDREN UP AND WAS GOING TO SHOOT THEM.

Q.        OH, OKAY.  ALL RIGHT.  AND THAT IS WHAT YOU GOT FROM YOUR INTERVIEWS?

A.        YES.  AND JILL MILLER'S INTERVIEWS, TOO.

Q.        WHAT OTHER ROLE MODELS WERE THERE IN DAVID'S LIFE?  HE HAD -- THERE WAS ARCHIE, RIGHT?  DID YOU KNOW ARCHIE, ONE OF HIS SISTERS' HUSBANDS?

A.        YEAH.

Q.      THEY WOULD TAKE HIM TO MCDONALD'S, HE WOULD STAY WITH THEM, THINGS OF THAT NATURE.  I UNDERSTAND IT'S SOME TIME.

A.      YEAH, IT HAS BEEN SOME TIME.

Q.      I UNDERSTAND.  IT'S HARD TO REMEMBER -- YOU CAN BE STUDYING THIS AND THERE ARE SO MANY PEOPLE.  THAT WAS AN EXTENDED FAMILY.  TRUE?

A.      YES.  AND QUITE A FEW FAMILY MEMBERS FELT UNCOMFORTABLE HAVING DAVID AND HIS FAMILY AROUND BECAUSE OF EVERYTHING THAT WAS HAPPENING.  SO HE REALLY DIDN'T HAVE ANYBODY TO GO TO FOR ANY EXTENDED PERIODS OF TIME. THERE WAS EVEN -- THERE WAS A PERIOD OF TIME HIS MOTHER, WHEN HE WAS ABOUT 7 OR 8 YEARS OLD, DECIDED SHE DIDN'T WANT HIM AND TRIED TO GIVE HIM TO GLENNIS OR HINT THAT SHE WANTED HIM TO LIVE AT GLENNIS' AND GLENNIS DID NOT TAKE HIM IN.  SO THERE WAS REALLY NOBODY.  THERE WAS NO ONE THERE FOR HIM.

Q.      NOW, MR. HAMMER, HE WAS AN ENTERPRISING YOUNG MAN, WASN'T HE?

A.      I'M NOT SURE WHAT YOU MEAN BY THAT.  I KNOW --

Q.      HE HAD NUMEROUS JOBS, ISN'T THAT RIGHT?  WAS ABLE TO HOLD -- GO FROM JOB TO JOB AND MAKE MONEY AS A KID.  ARE YOU FAMILIAR WITH THAT?

A.      YOU MEAN THE SCAMS THAT HIS PARENTS PUT HIM UP TO LEARNING?

Q.      NO.  I'M TALKING ABOUT WHEN HE WAS A LITTLE OLDER.

A.      ALL RIGHT.

Q.      WORKED AT MCDONALD'S, RIGHT?

A.      YES.

Q.      SUNSET CAFE, TRUE?

A.      YES.

Q.      RED LOBSTER, RIGHT?

A.      YES.

Q.      DON QUIXOTE APARTMENT COMPLEX, RIGHT?

A.      THAT ALL SOUNDS RIGHT.

Q.      HE WORKED AT THE OKLAHOMA STATE FAIR, WAS ABLE TO DO THAT, TRUE?

A.      THAT SOUNDS RIGHT.

Q.      LEE'S MAGNAVOX, HE WORKED THERE?  ALL IN 1974, IN OKLAHOMA CITY.  RIGHT?

A.      IT DOES NOT APPEAR THAT HE IS BEING VERY SUCCESSFUL IF HE IS GOING THROUGH SO MANY JOBS.  HE HAD SO MUCH TRAUMA IN HIS LIFE, HE WAS VERY ILL-PREPARED TO DEAL WITH ADULT FUNCTIONS IN HIS LIFE.

Q.      AND THAT WAS IT.  OKAY.  AND HOW ABOUT KIRBY VACUUM CLEANERS.  HE WORKED FOR THEM?

A.      THAT JUST PROVES THE POINT, HOW ILL-EQUIPPED HE WAS, HE COULD NOT HOLD ON TO A JOB BECAUSE OF ALL OF THE PROBLEMS.

Q.      DID YOU TALK TO HIM ABOUT THAT, ABOUT HIS JOBS?

A.      HE WAS NOT ABLE TO MAINTAIN ANY JOBS.

Q.      BUT DID YOU TALK TO HIM ABOUT THAT?

A.      IN PART, YES.

Q.      SO AS YOU ARE TALKING HERE, YOU ARE KIND OF GOING -- MAKING IT UP AS YOU GO ALONG?

A.      MAKING WHAT UP?

Q.      YOU ARE SAYING THAT HE COULD NOT HOLD DOWN A JOB BECAUSE OF THE TRAUMA, BUT YOU DON'T KNOW WHY HE WENT THROUGH A NUMBER OF JOBS, DO YOU?

A.      HE WAS ABUSING DRUGS, HE WAS ON HIS OWN.  HE WAS VERY ILL-PREPARED, IN LIGHT OF EVERYTHING THAT HAD HAPPENED TO HIM, TO EFFICIENTLY DEAL WITH THE SITUATION.

Q.      HE ALSO WORKED WITH HIS MOM AS A NURSING ASSISTANT, ISN'T THAT RIGHT?

A.      I BELIEVE FOR A SHORT PERIOD OF TIME.

Q.      AT ST. ANTHONY'S HOSPITAL.

A.      I BELIEVE FOR A SHORT PERIOD OF TIME.

Q.      CORRECT?

AND THE PARENTS ALWAYS WORKED, DIDN'T THEY, OR WERE TRYING TO WORK?

A.      NO.  IT WAS SPORADIC.  THE FATHER, THERE WAS OFTEN LONG TIMES THAT HE WAS UNEMPLOYED.  HE WOULD GO FROM JOB TO JOB.  THERE WAS LONG PERIODS OF TIME THAT THEY WOULD NOT WORK.  THERE WAS TIMES THAT THEY HAD TO

EAT ONE CAN OF BEANS FOR THE WHOLE FAMILY OVER BY THE LAKE, BECAUSE THE FATHER WOULD NOT HAVE A POSITION YET. THEY HAD A VERY EXTREMELY DIFFICULT LIFE.

Q.    AND THEN THEY WOULD START MAKING MONEY, RIGHT, OVER THERE AND THEN THEY WOULD GO TO THE MOVIES, TRUE?

A.    VERY LITTLE MONEY.

Q.    THE MONEY WOULD START COMING IN AND THEY WOULD DO THINGS AS A FAMILY, CORRECT?

A.    ON OCCASION, THEY WENT TO THE MOVIES.

Q.    YOU READ THAT IN HIS BOOK, RIGHT?

A.    ON OCCASION THEY WENT TO THE MOVIES.

Q.    NOW, THERE WERE RECORDS AGAIN THAT YOU REVIEWED, RIGHT?  AND THE FIRST PSYCHIATRIC RECORD FOR MR. HAMMER, WAS IT SOMETIME IN MAY OF 1973?  DO YOU REMEMBER THAT?

A.    THAT'S CORRECT.

Q.    THIS WAS ALSO IN DR. WOLFSON'S REPORT.  WOULD THIS HELP YOU?  LET ME SHOW YOU GOVERNMENT EXHIBIT 130. LOOK AT PAGE 36.

A.    YES.

Q.    CAN YOU FIND PAGE 36 ON THAT, MA'AM?

A.    YES.

Q.    I THINK YOU SHOWED US THIS, AND YOU DISCUSSED THIS INTAKE NOTE FROM I THINK MAY 11, WHEN HE WAS 14 YEARS OF AGE.

A.    YES.

Q.      IT WAS ONE OF YOUR EXHIBITS?

A.      YES.

Q.      HE INDICATED HE WAS HAVING PROBLEMS, HE COULDN'T FIGHT LIKE THE OTHER BOYS?

A.      YES.

Q.      HE THEN ALSO TALKED ABOUT HIS SCHOOL WORK.  IT DETERIORATED FROM A'S AND B'S.  RIGHT?

A.      YES.

Q.      AND HE WAS FAILING AT THE TIME?

A.      YES.

Q.      AND HE ALSO LOST INTEREST IN GIRLS, RIGHT?

A.      YES.

Q.      NOW, HE MENTIONED AT THAT TIME THAT -- AND THIS WAS A SIGNIFICANT THING IN THE RECORDS -- THAT HE RELATED THAT AN OLDER MAN WITH WHOM HE WAS FISHING AT THE LAKE TRIED TO GET THE DEFENDANT TO ENGAGE IN ORAL SEX, IS THAT RIGHT?

A.      THAT'S CORRECT.

Q.      AFTER HE HAD FALLEN ASLEEP.  DO YOU REMEMBER THAT?

A.      YES.

Q.      AND DID HE ALSO SAY IN THAT NOTE THAT -- AND I DON'T THINK WE GOT -- YOU GOT INTO THAT, BUT THAT HE HAD PUNCHED THE MAN, HE GOT ANGRY AND PUNCHED THE MAN?

                LET ME SHOW YOU THE NOTE AGAIN.  I THINK

THIS WAS THE --

MR. GURGANUS:  MAY I APPROACH?

THE COURT:  YOU HAVE GOT TO SPEAK INTO THE MICROPHONE.

MR. GURGANUS:  YES, THANK YOU.

BY MR. GURGANUS:

Q.      THIS WAS THAT RECORD THAT YOU WERE -- YOU WERE UTILIZING.  CAN YOU TAKE A LOOK?

A.      SURE.

Q.      CAN YOU PLEASE READ THAT ALOUD?

A.      OKAY.  SEXUALLY IMMATURE.  GETS ERECTIONS SOMETIMES.  STOPPED MASTURBATING AND HAVING WET DREAMS.

I CAN'T READ THE REST.

WE -- WAS OUT AT THE LAKE WITH OLDER MAN TO FISH, FELL ASLEEP, AND WOKE UP FOUND MAN TRYING TO MAKE HIM SUCK HIM.  GOT ANGRY AND PUNCHED HIM IN THE FACE.  TOLD PARENTS.  NO REACTION OTHER THAN TELLING HIM TO STAY AWAY FROM MAN.

Q.      WHEN YOU TESTIFIED THE OTHER DAY ABOUT THAT RECORD, YOU DID NOT GO INTO THAT, THE PUNCHING IN THE FACE, DID YOU?

A.      NO.  THAT WOULD SEEM LIKE A POSITIVE THING TO DO.

Q.      YOU DIDN'T GO INTO THAT, THOUGH?

A.      I'M NOT SURE WHERE I WAS READING UP TO.  I WAS

READING WHAT WAS HIGHLIGHTED.

Q.      WELL, WHILE YOU HAVE THOSE RECORDS, THOSE ARE A LOT OF THE RECORDS THAT WERE UNCOVERED BY THE DEFENSE IN THIS CASE.  IN FACT, IT WAS THE DEFENSE -- THE DEFENSE EXHIBITS, AM I CORRECT?

A.      I DIDN'T GO THROUGH ALL THIS.  I'M NOT TOO SURE WHAT IT IS.

Q.      WELL, YOU WENT THROUGH ALL OF THE MEDICAL RECORDS, TRUE?

A.      I DON'T KNOW WHAT IS IN THIS BOOK, THOUGH.  THAT IS ALL I'M SAYING.

Q.      WELL, THAT IS THE DEFENSE RECORDS FROM THE FIRST TRIAL.  IF YOU LOOK AT THE FRONT, I THINK THE FRONT MAY SAY THAT.

A.      OKAY.

Q.      OTHER THAN THAT PARTICULAR RECORD, WHERE THERE IS AN INDICATION OF A MAN TRYING TO MOLEST DAVID HAMMER, IN ALL THE RECORDS THAT YOU REVIEWED IN THIS CASE, ALL THE MEDICAL RECORDS, DID YOU FIND ANY OTHER NOTATION LIKE THAT IN THOSE RECORDS?

A.      NO.  BECAUSE IT'S REALLY NOT LONG, ONGOING THERAPY.  IT'S MOSTLY A TRAUMA.  HE IS THERE FOR A PERIOD OF TIME, AND HE IS OUT.  THEY ARE DEALING WITH A LOT OF THE SITUATIONS AS CRISIS SITUATIONS; NOT THERAPEUTIC RELATIONSHIPS.

Q.        MY QUESTION WAS, WAS THERE ANY OTHER NOTATION IN ALL THESE RECORDS THAT YOU FOUND?

A.        BECAUSE HE WAS NOT IN A THERAPEUTIC RELATIONSHIP, THESE ARE CRISIS SITUATIONS.  HE IS IN AND OUT OF HOSPITAL FOR DRUG OVERDOSES, SUICIDE ATTEMPTS.  THEY ARE NOT DOING THERAPY.  THAT IS NOT THE TYPE OF THING THAT WOULD COME OUT IN A CRISIS --

Q.        HE WAS ALSO IN THE HOSPITAL A LOT OF TIMES BECAUSE OF PROBLEMS WITH HIS BOWELS, RIGHT?

A.        YES, THAT'S CORRECT.

Q.        HE HAD VERY BAD STOMACH ISSUES?

A.        THAT'S CORRECT.

Q.        AND ON NUMEROUS OF THOSE MEDICAL -- HE WAS GETTING MEDICAL TREATMENT, DID YOU NOTICE IN THE NOTATIONS THAT THEY WOULD GIVE HIM ENEMAS AT THE HOSPITAL?

A.        I DIDN'T NOTICE THAT.

Q.        YOU DID NOT NOTICE THAT?

LET ME GIVE YOU JILL MILLER'S REPORT.  LET ME REFER YOU TO A MEMORANDUM BY MISS MILLER OF JUNE 11TH, 1998.

DO YOU SEE IN THOSE NOTES WHERE THE DEFENDANT HAD SIGNIFICANT ISSUES WITH HIS STOMACH.  WE ARE TALKING 1965, 1966.  HE HAD APPENDICITIS.  1966, AGAIN, NOVEMBER 11TH, HE WENT IN AND WAS TREATED FOR

ABDOMINAL ADHESIONS.  DO YOU KNOW WHAT ABDOMINAL ADHESIONS ARE?

A.    ADHESIONS IN THE ABDOMINAL AREA, MOST LIKELY FROM SURGERY.

Q.    HE PRESENTED WITH COMPLAINTS OF ABDOMINAL PAIN, THE TESTS WERE NEGATIVE, IS THAT RIGHT?

A.    YES.

Q.    AT THAT POINT HE WAS LIVING IN THE FORT COBB AREA?

A.    YES.

Q.    AND THAT IS THE THIRD TIME MISS MILLER LISTS A HOSPITAL STAY, RIGHT?

A.    YES.

Q.    THE FIRST BEING AT AGE SIX, WHERE HE WENT IN BECAUSE HE WAS HAVING SOME VISION PROBLEMS, CORRECT?

A.    YES.

Q.    AND WE WILL MOVE ON TO 1971.  AGAIN, HE HAS COMPLAINTS OF ABDOMINAL PAIN, IS THAT RIGHT?

A.    YES.

Q.    THE DIAGNOSIS WAS ADHESIONS WITH POSSIBLE BOWEL OBSTRUCTION, ISN'T THAT RIGHT?

A.    YES.

Q.    HE WAS 12 YEARS OLD AT THE TIME, IS THAT CORRECT?

A.    WHICH ONE NOW?  I'M SORRY.

Q.      WE ARE ON NUMBER 4.

A.      OKAY.

Q.      THEN WE GO TO THE NEXT ONE, 1972, DAVID WAS ADMITTED ON SEPTEMBER 13TH WITH COMPLAINTS OF ABDOMINAL PAIN.  AT THAT POINT THEY WERE LIVING IN SEMINOLE, TEXAS, RIGHT?

A.      YES.

Q.      AND THESE ARE RECORDS FROM THE MEMORIAL HOSPITAL IN SEMINOLE, TEXAS, RIGHT, IN-PATIENT RECORDS?

A.      YES.

Q.      AND SHE IN THE SUMMARY SAID THAT RECORDS NOTE A HISTORY OF REPEATED EPISODES OF SEVERE ABDOMINAL PAIN.

A.      YES.

Q.      RIGHT?  DIAGNOSIS WAS INTESTINAL OBSTRUCTION DUE TO ADHESIONS.  AND HOW DID THEY TREAT HIM THERE?

A.      IT SAID ENEMAS WERE GIVEN IN THE HOSPITAL.

Q.      AND DAVID WAS DISCHARGED, RIGHT?

A.      YES.

Q.      AND HE WAS TREATED A NUMBER OF TIMES AT THE HOSPITAL WITH ENEMAS, ISN'T THAT RIGHT?

A.      I SEE THE NEXT ONE AT MEMORIAL HOSPITAL AS WELL.

Q.      BUT YOU WILL AGREE THAT HE HAD STOMACH ISSUES AND ONE OF THE METHODS THAT THEY WOULD DEAL WITH THESE STOMACH ISSUES WERE ENEMAS, TRUE?

A.      I SEE THAT.

Q.      OKAY.  AND AGAIN, JUST SO WE ARE CLEAR HERE, IN ALL OF THESE MEDICAL RECORDS THAT YOU REVIEWED, THE ONLY TIME THAT THERE WAS A MENTION OF POTENTIAL MOLESTATION WAS IN THAT EARLIER ONE, ISN'T THAT RIGHT?

A.      YES.

Q.      AND THAT IS WHERE HE PUNCHED THE MAN, CORRECT?

A.      YES.

Q.      NOW, FROM MR. HAMMER'S BOOK AND THROUGH THE WOLFSON REPORT, THERE WAS INDICATIONS THAT DAVID WOULD SOMETIMES EXPERIMENT WITH A COUSIN, ISN'T THAT RIGHT?

A.      I BELIEVE SO.

Q.      AND IN THOSE INSTANCES, THAT WAS MORE TWO KIDS, TWO YOUNG PEOPLE FOOLING AROUND WITH EACH OTHER, ISN'T THAT RIGHT?

A.      YES.  HE HAD SEVERE, SEVERE SEXUAL TRAUMA.

Q.      I'M TALKING ABOUT THE INSTANCES WITH HIS COUSIN, LARRY.  AND DIDN'T DAVID EVEN SEE THAT AS NOT A BIG DEAL, THAT WAS JUST EXPERIMENTING?

A.      HE HAD BEEN SEXUALLY ABUSED SO MUCH IN THE PAST THAT SEX BECAME NOT AS SIGNIFICANT TO HIM IN TERMS OF HOW HE FELT.  IN SOME CASES, IT WAS THE ONLY TIME HE HAD ANYONE TO HOLD HIM AND TOUCH HIM.  IT REALLY WARPS YOUR SELF-PERCEPTIONS OF SEXUALITY.

Q.      AND HOW ABOUT THE, LET'S TURN THEN TO THE PSYCH REPORTS FROM PRISON.  THERE WERE THOSE, ALSO, WASN'T

THERE?

ARE YOU FAMILIAR WITH A PERSON BY THE NAME OF JESSICA BREWER?

A.    YES.

Q.    THAT WAS A PSYCHOLOGIST THAT HE BECAME KIND OF CLOSE TO?

A.    YES.

Q.    DO YOU REMEMBER THAT?

A.    YES.

Q.    WHEN HE WAS IN THE DEPARTMENT OF CORRECTIONS AT THE OKLAHOMA STATE PENITENTIARY?

A.    YES.  I WAS FOCUSING ON THE EARLIER SOCIAL HISTORY UP UNTIL THE TIME THAT HE BECAME INCARCERATED, SO THAT WAS MY MAIN FOCUS.

Q.    WELL, WOULDN'T YOU ALSO FOCUS ON STATEMENTS HE MADE ABOUT HIS FAMILY HISTORY AS HE WENT ALONG? WOULDN'T THAT BE IMPORTANT?

A.    YES.  IS THERE SOMETHING YOU WANT TO SHOW ME?

Q.    I'M JUST ASKING YOU.  WHEN YOU SAY YOU WERE FOCUSING ON THE EARLY FAMILY HISTORY, DOESN'T THAT INCLUDE WHAT HE SAID ABOUT THE EARLY FAMILY HISTORY IN THE LATER INTERVIEWS?

A.    YES.

Q.    DID YOU REVIEW THOSE PSYCHIATRIC REPORTS --

A.    YES.

Q.      -- ABOUT THAT?

A.      YES.  IT HAS BEEN SOME TIME.  IF YOU WANT TO SHOW IT TO ME AGAIN, I WILL BE HAPPY TO TAKE A LOOK AT IT.

Q.      I WOULD JUST LIKE YOU TO -- IF YOU CAN GO TO THE SECOND AND THIRD PARAGRAPHS OF THIS.

AND FOR THE RECORD, THIS WAS DEFENDANT'S EXHIBIT 100.29 AND IT WAS DATED APRIL 9, 1990.

LOOK AT THE FIRST TWO PAGES.

A.      OKAY.

Q.      CAN YOU READ THE SECOND AND THIRD PARAGRAPHS? YOU CAN READ THEM IN.

A.      DAVID WAS MARRIED BRIEFLY TO HIS CHILDHOOD SWEETHEART PRIOR TO INCARCERATION, AND ONCE AGAIN MARRIED SUBSEQUENT TO INCARCERATION TO AN OLDER FEMALE FRIEND HE MET THROUGH CORRESPONDENCE.  BOTH MARRIAGES ENDED IN DIVORCE AND THERE ARE NO CHILDREN FROM EITHER UNION.  THE FIRST MARRIAGE APPEARED TO BE ILL-FATED DUE TO THE TENDER AGES OF BOTH PARTIES AND SUBSEQUENT IMMATURITY AND UNREALISTIC EXPECTATIONS THAT GENERALLY ACCOMPANY A TEENAGE MARRIAGE.  THE SECOND MARRIAGE WAS NEVER CONSUMMATED AND A JOINT DECISION TO TERMINATE WAS WITHOUT ANIMOSITY FROM EITHER PARTY.

MR. HAMMER IS THE OLDEST OF THREE BIOLOGICAL SIBLINGS, HAVING BOTH A YOUNGER BROTHER AND

SISTER.  CLOSENESS OF THE THREE IS PERCEIVED THROUGH FAMILIAL STORIES SHARED BY DAVID.  FAMILY TRAGEDY WAS THE PRIMARY FOCUS FOR YOUNG DAVID.  MEMORIES SHARED BY DAVID CENTRALIZED ON HIS MOTHER BEING THE PRIMARY CAREGIVER IN MOST OF THE SITUATIONS, EVEN ILLNESS BY OTHER IMMEDIATE FAMILY MEMBERS.  MRS. HAMMER WAS A VICTIM OF CANCER IN 1989, AND THE EVENT OF HER DEATH WAS THE FIRST OCCASION THIS EVALUATOR CAME TO KNOW DAVID. THE GRIEF WAS GENUINE.  THE BOUTS OF DEPRESSION STILL PLAGUE HIM, SIGNIFICANTLY IN DATES OF CLOSE PROXIMITY TO THE ANNIVERSARY OF THAT TIME.

AN ADDITIONAL FACTOR IN DAVID'S GRIEF APPEARS TO BE THE DISSOLUTION OF HIS FAMILY AS HE KNEW IT DUE TO THE MAKEUP OF FAMILY DYNAMICS BEING MORE MATRIARCHAL IN NATURE.  BOTH PARENTS WERE HARD WORKING AND RELIGIOUS.  AND AS WAS THE CASE WITH MANY FOLKS IN OKLAHOMA DURING THAT PERIOD OF TIME, THE FAMILY TRAVELED TO WORK SITES FREQUENTLY.  HOWEVER, A TRANSIENT LIFESTYLE SOMETIMES STRENGTHENS THE NORMAL PRETEEN AND TEENAGE THOUGHTS OF NOT BEING LIKE EVERYONE ELSE FOR DAVID.  THIS APPEARS TO BE A PREDOMINANT IN HIS UNCONSCIOUS NEED TO BE THE BEST OR TO OUTDO EVERYONE ELSE BEHAVIOR THAT CONTRIBUTED TO DAVID'S PRESENT SITUATION.

Q.      THANK YOU.

SO HE CHARACTERIZED HIS PARENTS AS "WERE HARD WORKING AND RELIGIOUS." CORRECT?

A.      HIS FATHER WAS NOT RELIGIOUS AT ALL. HIS FATHER HAD ACTUALLY A FEAR OF MINISTERS. THERE WAS A TIME THAT A MINISTER HAD COME TO THE HOUSE AND HE ACTUALLY HID IN THE CLOSET SHAKING. HE WAS NOT RELIGIOUS. THE MOTHER --

Q.      IS THAT WHAT DAVID SAID?

A.      YEAH.

Q.      IN THIS OCCASION --

MR. MORENO:  YOUR HONOR, I WOULD ASK THAT SHE BE ALLOWED TO FINISH HER ANSWER.

THE COURT:  YOU MAY FINISH YOUR ANSWER.

THE WITNESS:  THE MOTHER OCCASIONALLY ATTENDS SERVICES, BUT THE FATHER WAS CLEARLY NOT RELIGIOUS.

BY MR. GURGANUS:

Q.      OCCASIONALLY?

A.      OCCASIONALLY.

Q.      DIDN'T THEY GO ALL THE TIME? DIDN'T SHE GO ALL THE TIME?

A.      OCCASIONALLY. THERE WAS PERIODS OF TIME THAT I UNDERSTAND SHE WAS NOT THAT INVOLVED WITH THE CHURCH.

Q.      BUT HE GOES TO SAY, BOTH PARENTS HARD WORKING AND RELIGIOUS. AS WAS THE CASE WITH MANY FOLKS IN

OKLAHOMA DURING THAT TIME PERIOD, THE FAMILY TRAVELED TO WORK SITES FREQUENTLY.  IS THAT RIGHT?

A.      IT WAS BRIEF PERIODS OF TIME OF UNEMPLOYMENT, AND HE -- JOHNNY HAMMER HAD A VERY, VERY DIFFICULT TIME BEING ABLE TO HOLD A JOB.  HE WAS VERY ARGUMENTATIVE WITH EMPLOYERS.  IF THEY SAID SOMETHING HE DIDN'T LIKE, HE WOULD UP AND QUIT.  HE WASN'T A DEPENDABLE WORKER, NOT SOMEONE THE CHILDREN IN THE FAMILY COULD DEPEND ON BY ANY MEANS FINANCIALLY.

Q.      NOW, MS. BREWER ALSO ADMINISTERED DAVID AN IQ TEST, RIGHT?

A.      REFRESH MY MEMORY ON THAT AS WELL.

Q.      LET ME SHOW YOU, FROM THE SAME RECORDS FROM THE OKLAHOMA DEPARTMENT OF CORRECTIONS.  THIS WAS MARKED AT THE TIME DEFENDANT'S EXHIBIT 100.30.

CAN YOU READ WHAT THAT DOCUMENT SAYS INSOFAR AS HER TESTING MR. HAMMER WITH AN IQ TEST?

A.      INMATE HAMMER HAS BEEN CONTINUOUSLY INCARCERATED SINCE 1978.  HE HAD VERY LITTLE FORMAL EDUCATION BUT HAS SATISFACTORILY EDUCATED HIMSELF, AS EVIDENT IN THE RESULTS OF HIS MOST RECENT WECHSLER INTELLIGENCE SCALE WITH AN OVERALL IQ OF 136, WHICH IS IN THE GENIUS RANGE.

Q.      SO VERY SMART.  AT LEAST THAT TEST SHOWS HIM TO BE VERY SMART.

A.      THAT PARTICULAR TEST.  I THOUGHT I HAD SEEN AN

EARLIER IQ INDICATING AN 89, WHEN HE WAS IN SCHOOL.  BUT I DID SAY HE WAS INTELLIGENT.  I SCORED HIM AS INTELLIGENT ON MY PROTECTIVE FACTORS, TOO.

Q.    VERY INTELLIGENT?

A.    ACCORDING TO THIS TEST.

Q.    SO IF HE WANTS -- IF HE IS INTERESTED IN TAKING AN INTELLIGENCE TEST AND TRYING TO EXCEL, HE CAN DO QUITE WELL, TRUE?

A.    ACCORDING TO THIS, YES.  I DIDN'T SEE THE TEST.

Q.    ALL RIGHT.

NOW, YOU WERE TALKING ABOUT A LOT OF SEXUAL ABUSE THAT HAPPENED IN THIS FAMILY.  RIGHT?

A.    YES.

Q.    AND DURING THE COURSE OF YOUR INTERVIEWS ONE OF THE PEOPLE YOU INTERVIEWED WAS MARTIN HAMMER, IS THAT RIGHT?

A.    YES.

Q.    DID YOU ASK MARTIN HAMMER WHETHER DAVID HAMMER HAD SEXUALLY ABUSED HIM?

A.    I WAS EXPECTING TO ASK HIM -- I DON'T THINK I DID.  I WAS EXPECTING TO HAVE CONTINUING INTERVIEWS WITH HIM.  I WASN'T CONTINUALLY INVOLVED.  I SAW THAT VIA THE RECORDS.

Q.    BUT YOU DID NOT ASK HIM?

A.    I THOUGHT THAT I HAD MORE ONGOING INTERVIEWS

WITH HIM.

Q.      AND THAT IS NOT IN YOUR REPORT.  TRUE?

A.      I DIDN'T WRITE A REPORT.

Q.      REPORT OF INTERVIEW.

A.      I DIDN'T THINK -- I THOUGHT I WOULD HAVE MORE INTERVIEWS WITH MY CLIENT -- WITH THE FAMILY MEMBERS, I'M SORRY.

Q.      YET YOU KNEW THAT THERE WAS DOCUMENTATION GOING BACK TO 1992 AND 2000.  RIGHT?

A.      PART OF WHEN YOU WORK WITH CLIENTS IS RELATIONSHIP BUILDING.  AND SOME OF THIS TRAUMA, SINCE I FELT I WOULD HAVE MORE EXTENDED INTERVIEWS, I DID NOT WANT, ON THE FIRST TIME I MEET WITH SOMEONE, BRING THEM THROUGH EVERY TRAUMA THEY HAD.  I TRY TO GRADUALLY TALK TO THEM AND DEVELOP A RELATIONSHIP.

THAT IS PART OF INTERVIEWING, BUT I DID SEE THAT IN THE RECORD.

Q.      YOU KNEW ABOUT THAT?

A.      I SAW IT IN THE RECORD.

Q.      THESE ARE RECORDS FROM OAK CREST HOSPITAL, COMPREHENSIVE PSYCHIATRIC ASSESSMENT, RIGHT?

A.      YES.

Q.      AND THESE ARE RECORDS THAT THE DEFENSE TEAM OBTAINED ON MARTIN HAMMER, ISN'T THAT RIGHT?

A.      I BELIEVE SO.

Q.      AND THERE WAS -- I HAVE HERE, DATE 8/24/92 AND DATE 10/10 -- I'M SORRY, DATE OF EXAMINATION, 10/3 OF 2000.  SO THESE ARE TWO REPORTS, THE FIRST ONE BEING 1992, WHICH PRECEDES THE HOMICIDE IN THIS CASE, TRUE?

A.      THAT'S TRUE.

Q.      AND ARE YOU FAMILIAR WITH THIS RECORD?

A.      DO YOU WANT TO BRING IT UP TO ME?

Q.      NOW, THIS DOCUMENT FROM -- THAT WE HAVE BEEN TALKING ABOUT, FROM 1992, ROUGHLY FOUR YEARS PRECEDING THE HOMICIDE IN THIS CASE, MARTIN HAMMER WAS INTERVIEWED BY GENOVA STEARNS, A PSYCHIATRIST, ISN'T THAT RIGHT?

A.      YES.

Q.      AND IN THIS REPORT, HE SAID, HE DID GIVE THE THERAPIST A HISTORY OF HIS BEING SEXUALLY ABUSED BY HIS OLDER BROTHER FROM THE AGES OF 12 TO 14.  TRUE?

A.      YES.

Q.      ALTHOUGH HE WAS NOT ASKED SPECIFICALLY ABOUT HIS CHILDHOOD AND TEENAGE YEARS, HE DID NOT SPONTANEOUSLY GIVE THIS HISTORY AT THIS EVALUATION.  HE DOES ACKNOWLEDGE THAT HE FEELS THAT HIS FAMILY IS DYSFUNCTIONAL, BUT CANNOT ELABORATE AND STATES THAT HE LEARNED THIS IN TREATMENT.

DOWN BELOW, IT FURTHER SAYS, HE GIVES A FAMILY HISTORY OF HIS OLDER BROTHER HAVING DEPRESSION. HE WOULD NOT ELABORATE AND DENIES ANY OTHER FAMILY

PROBLEMS.

THAT WAS FROM AUGUST OF '92, RIGHT?

A.      YES.

Q.      NOW, THE NEXT ONE WAS FROM OCTOBER 3RD OF 2000.

IS THAT RIGHT?

IN THE FAMILY HISTORY SECTION, IT STATED:

HE DESCRIBES HIS CHILDHOOD BEING A LOT OF ANGER IN THE

HOME.  THERE WAS A LOT OF PHYSICAL ABUSE.  I WAS

SEXUALLY ABUSED BY MY OLDER BROTHER.  MY FATHER AND I

GET ALONG WITH -- IF WE DON'T TALK FOR VERY LONG.  I

HAVE NOT SEEN MY BROTHER FOR THREE YEARS.  I GET ALONG

GOOD WITH MY SISTER NOW.  HE WAS REARED WITH HIS SISTER,

BROTHER, MOTHER AND FATHER.  HE SAID HIS BROTHER AND

SISTER WAS TAKEN FROM THE HOME DUE TO ABUSE.  HE

REMAINED IN THE HOME.

IS THAT WHAT IT SAYS?

A.      YES.

Q.      AND THAT WAS ALSO SIGNED -- THAT WAS SIGNED BY

J. RONALD CRUSE, PH.D. HEALTH SERVICE PSYCHOLOGIST, IS

THAT RIGHT?

A.      YES.

Q.      AND THIS IS A COUPLE OF YEARS AFTER THE FIRST

TRIAL IN THIS CASE THAT WE ARE IN ON NOW, RIGHT?

A.      YES.

Q.      AND THAT WAS MARTIN HAMMER SAYING HE WAS ABUSED

BUT THE PERSON THAT ABUSED HIM WAS DAVID HAMMER, CORRECT?

MR. MORENO:  YOUR HONOR, I'M GOING TO OBJECT.  IT SAYS HE WAS ABUSED PHYSICALLY BY --

THE COURT:  YOU GOT TO SPEAK INTO THE MIC.

MR. MORENO:  I'M SORRY, YOUR HONOR.  I'M GOING TO OBJECT, AND I DON'T THINK THAT IS A FAIR CHARACTERIZATION.  THE RECORD TALKS ABOUT DAVID SEXUALLY ABUSING HIM, BUT IT TALKS ABOUT PHYSICAL ABUSE AT THE HANDS OF THE PARENTS, I BELIEVE.  I DON'T THINK THAT IS A FAIR CHARACTERIZATION OF THAT RECORD.

MR. GURGANUS:  I'M SORRY.

BY MR. GURGANUS:

Q.     IT READS:  THERE WAS A LOT OF PHYSICAL ABUSE.  I WAS SEXUALLY ABUSED BY MY OLDER BROTHER.

SO HE IS AGAIN IDENTIFYING HIS OLDER BROTHER AS THE PERSON THAT SEXUALLY ABUSED HIM, CORRECT?

A.     HE SAID HIS OLDER BROTHER IN THAT REPORT.

THE COURT:  I THINK THAT CLARIFIED IT.

BY MR. GURGANUS:

Q.     NOW, AS FOR -- LET'S TALK ABOUT PATRICIA DIANE HAMMER.  SHE IS NOT TESTIFYING IN THIS CASE, IS THAT RIGHT?

A.     NO.

Q.      WHEN SHE WAS INTERVIEWED BY JILL MILLER, BEFORE THE FIRST TRIAL IN 1997, SHE DID NOT SAY THAT SHE WAS SEXUALLY ABUSED BY ANYONE, DID SHE?

A.      POSSIBLY NOT.

Q.      AND AS FOR ENEMAS, SHE DID NOT WITNESS HER MOTHER GIVING ENEMAS TO EITHER DAVID OR MARTIN, ISN'T THAT RIGHT?

MR. MORENO:  I'M GOING TO OBJECT.  IF HE WANTS TO SHOW HER A DOCUMENT THAT SAYS THAT FROM MS. MILLER.

THE WITNESS:  I WOULD RATHER YOU SHOW ME.

BY MR. GURGANUS:

Q.      MISS MILLER'S INTERVIEW NOTES ARE BEFORE YOU, OKAY?

MR. MORENO:  MAY WE HAVE A COPY?

THE DEFENDANT:  EXCUSE ME, YOUR HONOR.  I NEED TO TAKE A BREAK.

THE COURT:  WHY DON'T WE DO THIS.  IT'S NOW 10 TO 11 OUR TIME.  WHY DON'T WE TAKE A FIVE-MINUTE RECESS AT THIS POINT.  AND DO YOU HAVE MUCH MORE, MR. GURGANUS, OF THIS WITNESS?

MR. GURGANUS:  NO, NOT THAT MUCH MORE.

THE COURT:  DR. GUR WILL BE HERE AT 11.

MS. SAUNDERS:  HE HAS ARRIVED, YOUR HONOR.

THE COURT:  ALL RIGHT.  WHY DON'T WE TAKE A FIVE-MINUTE RECESS AT THIS POINT.

THE DEFENDANT:  THANK YOU, SIR.

ALL COUNSEL:  THANK YOU, YOUR HONOR.

(BREAK TAKEN.)

THE COURT:  LET'S PROCEED WITH THE CROSS.

BY MR. GURGANUS:

Q.     PATRICIA DIANE HAMMER, SHE WAS INTERVIEWED BY JILL MILLER, IS THAT RIGHT?

A.     THAT'S CORRECT.

Q.     SHE WAS INTERVIEWED BEFORE THE TRIAL I THINK IT WAS PROBABLY IN 1997 SHE WAS INTERVIEWED, IS THAT RIGHT?

A.     YES.

Q.     WHAT DO JILL MILLER'S NOTES INDICATE THAT SHE SAID ABOUT THE FAMILY SITUATION?

A.     THIS I DON'T THINK IS HER NOTES, RIGHT?  THIS IS A MEMO THAT IS WRITTEN BY SOMEONE ELSE.

Q.     A MEMO THAT SHE --

A.     YES.  I DON'T THINK THIS IS PART -- THIS IS A MEMORANDUM OF SUPPLEMENTAL INTERVIEWS.  THIS IS NOT ACTUALLY THE INTERVIEW OF DIANE HAMMER.  THIS IS JUST --

Q.     BUT THE MEMORANDUM IS THE INTERVIEW SHE DID?

A.     IT IS A MEMO, BUT NOT THE INTERVIEW NOTES ITSELF.

Q.     DO YOU HAVE THE INTERVIEW NOTES?

A.      I DO.

Q.      WELL, I DON'T.

A.      I DO.

Q.      WELL, CAN YOU READ WHAT THAT SAYS AND PERHAPS AFTERWARDS IF IT'S NOT CONSISTENT YOU CAN PROVIDE US --

A.      SURE.

Q.      I'M TALKING ABOUT JILL MILLER'S INTERVIEW NOTES, NOT YOURS.

A.      YES, JILL MILLER'S.  WOULD YOU LIKE ME TO READ THAT?

Q.      SURE.  THAT IS HER REPORT, ISN'T IT?

A.      THIS IS A MEMO REGARDING SOME OF THE INTERVIEWS. IT DOES NOT MEAN IT'S GOING TO CONTAIN ALL OF THE INFORMATION THAT SHE DID ON HER INTERVIEW.

Q.      WHAT DOES IT MAINTAIN?

A.      WOULD YOU LIKE ME TO READ IT?

Q.      SURE.

A.      SURE.

PATRICIA DIANE HAMMER, SISTER.  WHILE DIANE DID NOT WITNESS HER MOTHER GIVING ENEMAS TO EITHER DAVE OR MARTIN, SHE DID REPORT THAT HER MOTHER GAVE ENEMAS TO HER.  SHE THOUGHT THAT SHE HAD OR WAS TOLD THAT SHE HAD SOME TYPE OF INTESTINAL PROBLEM THAT MADE IT NECESSARY.  DIANE DID CONFIRM AND DAVID WAS SENT OUT TO COLLECT MONEY FOR CHARITY AND THE MONEY THEY

COLLECTED WAS USED FOR THE FAMILY.  SHE RECALLED THAT HER PARENTS WOULD SELL POSSESSIONS TO GET MONEY FOR FOOD.  SHE SAID DAVID DID SELL FAMILY POSSESSIONS FOR FOOD MONEY.

Q.    DO YOU KNOW THEN -- DID PATRICIA DIANE HAMMER, THE SISTER, PROVIDE INFORMATION IN THOSE EARLY INTERVIEWS IN 1997 THAT DAVID HAMMER OR ANYONE SEXUALLY MOLESTED HER?

A.    YES.

Q.    SHE DID?

A.    SHE DID.

Q.    WHY WASN'T IT IN ANY OF THE NOTES?

A.    IT'S IN MY NOTES.

Q.    IT'S IN YOUR NOTES?

A.    THE ATTORNEY'S OFFICE PROVIDED ME WITH JILL MILLER'S NOTES.

Q.    WAS THERE ANY TESTIMONY AT THE ORIGINAL TRIAL ABOUT SUCH --

A.    I'M NOT SURE.

Q.    -- SUCH A THING?

A.    I'M NOT SURE.

Q.    OKAY.

NOW, THERE WERE NOTES FROM 2007 WHEN SHE APPLIED FOR SOCIAL SECURITY BENEFITS.

A.    YES.

Q.      WHERE SHE WAS MAKING THOSE CLAIMS, ISN'T THAT RIGHT?

A.      YES.

Q.      BUT BEFORE '97 AT LEAST THE REPORT -- THE REPORTS THAT WE HAVE DO NOT INDICATE ANYTHING LIKE THAT.

A.      I DON'T KNOW, BUT THE NOTES THAT I HAVE FROM JILL MILLER AT THAT TIME DO INDICATE THAT.  AND I HAVE THEM HERE WITH ME TODAY.

Q.      WHAT DO THEY INDICATE?

A.      MAY I READ IT?

Q.      WELL, YOU DON'T HAVE THEM WITH YOU HERE?

A.      I DO.

Q.      HOW LONG WOULD THEY TAKE?

A.      JUST A FEW MINUTES.

            MR. GURGANUS:  IT'S UP TO THE COURT.  SHE WANTS TO OBTAIN NOTES THAT WE HAD ASKED FOR PREVIOUSLY, SUPPOSEDLY JILL MILLER'S NOTES, YOUR HONOR.

            THE COURT:  DO YOU WANT HER TO READ THEM?

            THE WITNESS:  THAT --

            MR. GURGANUS:  WHY DON'T YOU GIVE THEM TO ME AFTER WE FINISH.  OKAY?  THEN WE CAN FOLLOW UP WITH THAT IF THE NOTES SAY WHAT YOU SAY.  WE WILL GET THOSE INTO THE RECORD.  OKAY?

            THE WITNESS:  THAT'S FINE.  THANK YOU.

BY MR. GURGANUS:

Q.       NOW, IS THERE ANYTHING -- DO YOU KNOW OF ANY
RECORD THAT PREDATES THE MURDER IN THIS CASE WHERE DAVID
HAMMER OR DAVID HAMMER CLAIMS THAT HE WAS SEXUALLY
ABUSED BY HIS PARENTS?

A.       NOT THAT I RECALL.

Q.       SO BEFORE THE FIRST TRIAL, THAT WAS NOT AN
ALLEGATION?

A.       BEFORE THE FIRST TRIAL?

Q.       YES.

A.       I'M NOT SURE.  I'M NOT ACTUALLY A THERAPIST.

Q.       SEXUALLY ABUSED BY THE FATHER OR THE MOTHER
PRECEDING THE TRIAL IN THIS CASE, THE ORIGINAL TRIAL?

A.       I'M NOT TOO SURE HOW FAR THAT WAS INVESTIGATED.

Q.       HOW ABOUT ANYTHING ABOUT MARTIN PRECEDING THE
FIRST TRIAL, THAT HE WAS SEXUALLY ABUSED BY EITHER
PARENT?

A.       I WOULD HAVE TO GO THROUGH MY -- YOU KNOW, GO
THROUGH JILL MILLER'S NOTES AGAIN.

Q.       IN THE BOOK, CAN YOU POINT TO ANY CLAIM OF
SEXUAL ABUSE BY HAMMER'S PARENTS, BY HAMMER'S MOTHER
OTHER THAN THIS CLAIM ABOUT THE ENEMAS?

A.       I DON'T RECALL.

Q.       SO NOW THE CLAIM IS -- BY DAVID HAMMER THAT HIS
MOM ENGAGED IN SEX WITH HIM, DIFFERENT TYPES OF SEX,
TRUE?

A.    I CAN'T COMMENT ON WHAT THE PREVIOUS TEAM INVESTIGATED.

Q.    WOULD YOU AGREE THAT A LOT OF THIS COMES DOWN NOW TO WHAT DAVID HAMMER SAYS ABOUT THE PARENTS AS IT RELATES TO SEX?

A.    WHEN YOU ARE WORKING WITH VICTIMS OF TRAUMA, THEY ARE NOT ALWAYS READY AT CERTAIN TIMES TO GO AND DELVE INTO SOME THINGS THAT WERE SO PAINFUL FOR THEM. THE MAJORITY OF SEXUAL ABUSE, AS I'M SURE YOU ARE AWARE, TOO, GOES UNREPORTED.

Q.    THIS IS A DEFENDANT, THOUGH, THAT WAS FACING THE DEATH PENALTY, CORRECT?

A.    YES.

Q.    AND HAD FACED HUGE SENTENCES PRECEDING THAT, CORRECT?

A.    YES.

Q.    AND IN ALL OF THOSE PRIOR OCCASIONS HE NEVER RAISED THESE TYPE CLAIMS, DID HE?

A.    IT'S NOT UNCOMMON FOR THE SEXUAL TRAUMA TO BE THE MOST HORRIFIC THING THAT SOMEONE CAN ENDURE, TO HAVE TO EXPLAIN THAT AT ANY POINT IN YOUR LIFE.  SOMETIMES IT'S MUCH EASIER FOR DEFENDANTS TO SPEAK ABOUT THE CRIMES THEY DO THAN WHAT THEY WERE SUBJECTED TO.

Q.    DAVID HAMMER -- MARTIN HAMMER EXPLAINED IT ABOUT WHAT DAVID DID TO HIM, TRUE?

A.      YES.

Q.      BUT HE DIDN'T SAY ABOUT HIS PARENTS, TRUE?

A.      IN MANY CASES THAT IS EVEN MUCH MORE UGLY AND MUCH MORE HORRIBLE TO REPORT AND THAT IS NOT UNCOMMON AS WELL.

Q.      NOW, YOU WILL AGREE THOUGH THAT A LOT OF WHAT YOU ARE SAYING, A LOT OF IT IS BASED ON WHAT DAVID TELLS YOU, CORRECT?

A.      AND OTHER INTERVIEWS AS WELL.

Q.      BUT IT'S DAVID'S WORDS IN LARGE MEASURE, TRUE?

A.      WHEN A WOMAN REPORTS A RAPE, IT'S ONLY HERSELF AND THE PERPETRATOR THAT ARE THERE.  SO IT'S NOT UNCOMMON IN SEXUAL ABUSE CASES THAT THERE ARE NOT GOING TO BE WITNESSES.

Q.      YOU INTERVIEWED JOHNNY HAMMER, RIGHT?

A.      NO.  JOHNNY HAMMER REFUSED AN INTERVIEW.

Q.      DID MISS MILLER INTERVIEW HIM, JILL MILLER?

A.      YES.

Q.      AND HE DENIED THESE ALLEGATIONS, TRUE?

A.      I WOULD HAVE TO GO THROUGH THOSE NOTES AGAIN.  I DID NOT --

Q.      HE DENIED ANY ALLEGATIONS OF SEXUAL MISCONDUCT --

A.      HE CLOSED THE DOOR WHEN JANEL TRIVELPIECE AND I FOUND HIM.  HE WAS IN HIDING FROM HIS FAMILY.  WHEN WE

FOUND HIM AND WAITED FOR HIM OVER AN HOUR IN AN
APARTMENT THAT WE THOUGHT HE MIGHT BE IN, WHEN HE SAW
US, THEY CLOSED THE DOOR IN OUR FACE.  HE DID NOT WANT
TO INTERVIEW.

Q.      AND AS FOR MR. HAMMER IN REPORTING TO
DR. WOLFSON HOW HE CHARACTERIZED SEXUAL CONDUCT WITH
OTHER PEOPLE IN THESE KIND OF ISSUES, HE DID NOT SEE IT
AS CONSTITUTING ABUSE, DID HE?

A.      THAT IS SO COMMON WITH ABUSED.

Q.      BUT HE DID NOT SEE IT AS ABUSE, CORRECT?

A.      IT IS SO COMMON WITH ABUSED CHILDREN THAT THEY
ARE GROOMED AND BROUGHT INTO IT.  I EVEN WORKED WITH THE
STATE POLICE IN NEW YORK STATE CASES WHERE I HAVE SEEN
THE PROGRESSION OF SEXUAL ABUSE ON ONE VICTIM OVER A
LONG PERIOD OF TIME.  THE PERPETRATOR VIDEOTAPED MUCH OF
IT AND IT'S SO COMMON THAT LATER ON THEY NO LONGER
CONSIDER IT ABUSE.  SHE EVEN CALLED HER FRIENDS TO BE
ABUSED BY THE SAME PERPETRATOR.  THEY DON'T VIEW IT AS
ABUSE ANYMORE, THE TRAUMA IS SO DEEP.

Q.      YOU DON'T HAVE A VIDEOTAPE, DO YOU?

A.      NO.

Q.      THIS IS --

A.      NO.  IN THE MAJORITY OF CASES, THEY WERE
ACTUALLY USING IT AS AN INSTRUCTIONAL TOOL IN NEW YORK
STATE.

Q.    AND HERE THOUGH THERE IS -- A LOT OF IT COMES DOWN TO DAVID?

A.    IN A VAST MAJORITY OF ALL SEXUAL ABUSE CASES IT COMES DOWN TO THE PERPETRATOR OR --

Q.    THE VAST MAJORITY OF THEM, THE REPUTATION FOR HONESTY AND TRUTHFULNESS OF THE PERSON IS NOT SO MUCH IN QUESTION AS IT IS HERE.  WOULD YOU AGREE WITH ME?

A.    THIS IS MANY YEARS LATER AND THINGS HAVE HAPPENED AS A RESULT OF THAT TRAUMA.

Q.    THIS IS THE DEFENDANT, THOUGH?

A.    THIS IS NOT THAT A CHILD THAT ANYBODY EVER HELPED OUT.  WE LOOK AT A CHILD THAT HAS SO MANY MOVES, A CHILD THAT IS ABSENT FROM SCHOOL FOR LONG PERIODS OF TIME WITH SCARS.  NOBODY INTERVENED WITH THIS CHILD.  WE HAD SO MANY RED FLAGS IN THIS SITUATION AND THE SYSTEM REALLY FAILED HIM.

Q.    THE DEFENDANT HAS GOT A VERY BAD REPUTATION AS FAR AS TRUTHFULNESS, WOULD YOU AGREE?

A.    IN HIS ADULT LIFE, YES.

Q.    WELL, IN HIS CHILDHOOD LIFE TOO, RIGHT?

A.    YES.  HE WAS TAUGHT THIS BY HIS PARENTS FROM THE EARLY STAGE.

Q.    EARLY STAGE.  AND HE STARTED SCAMMING ALL HIS LIFE, WOULDN'T YOU AGREE?

A.    HE WAS TAUGHT THIS BY HIS PARENTS AT THE

EARLIEST OF AGES.

Q.    BUT THE SCAMS CONTINUED ALL THROUGH HIS LIFE, CORRECT?

A.    THIS IS HOW HE WAS INSTRUCTED.

Q.    WHILE IN PRISON?

A.    WE ARE A PRODUCT OF THE WAY WE ARE RAISED.

Q.    AND HE LEFT HOME AT AROUND 13, RIGHT?

A.    YES.

Q.    AND THE FRAUDULENT ACTIVITIES CONTINUED FOR YEARS AND YEARS, ISN'T THAT RIGHT?

A.    THIS IS ALL HE KNEW.  THIS IS THE ONLY WAY HE COULD SURVIVE.

Q.    WHY WOULD IT BE NECESSARY TO CLAIM THAT YOU WERE INVOLVED IN THE KAREN SILKWOOD MURDER TO SURVIVE?

            MR. MORENO:  I OBJECT.

            THE COURT:  I DON'T UNDERSTAND THE QUESTION.  WHAT IS THE QUESTION?

BY MR. GURGANUS:

Q.    WELL, YOU ARE AWARE THAT MR. HAMMER CLAIMED THAT HE WAS INVOLVED WITH THE KAREN SILKWOOD MURDER.  THAT WAS A LIE, CORRECT?

            MR. MORENO:  I OBJECT.

            THE COURT:  I WILL OVERRULE THAT OBJECTION.

BY MR. GURGANUS:

Q.      YOU ARE AWARE OF THAT, RIGHT?

A.      VERY, VERY VAGUELY.

Q.      ALSO ANOTHER MURDER THAT HE CLAIMED THAT HE COMMITTED OR WAS INVOLVED IN, A KENNETH KENNER, THAT WASN'T TRUE?  WHAT DOES HE NEED TO DO THAT FOR TO SURVIVE?

A.      FOR ATTENTION.  MAYBE SOMEBODY TO LISTEN TO HIM.  NO ONE LISTENED TO HIM HIS WHOLE LIFE.

Q.      UNABOMBER, HE HAD INFORMATION ON THE UNABOMBER?

MR. MORENO:  I'M GOING TO OBJECT.  THESE ARE NOT SCAMS WHICH IS WHAT HE WAS INITIALLY QUESTIONING HER ON.  THESE ARE FALSE CONFESSIONS.

MR. GURGANUS:  THESE ARE LIES.

THE COURT:  I'M GOING TO OVERRULE THE OBJECTION.  I THINK IT'S LEGITIMATE CROSS EXAMINATION.

MR. MORENO:  OKAY.

BY MR. GURGANUS:

Q.      DID YOU READ THE ARTICLE STORY OF A MASTER CON ARTIST?  HAVE YOU EVER SEEN THIS, THIS ARTICLE?

A.      I DON'T RECALL THAT ONE.

Q.      SHOWING YOU GOVERNMENT EXHIBIT 4010.1.

HAVE YOU EVER SEEN THAT?

A.      NOT PRIOR.

Q.      NO?

A.      NO.

Q.    WERE YOU AWARE THAT MR. HAMMER HAD -- WOULD FREQUENTLY PUT ADVERTISEMENTS IN THE PAPER TO TRY TO GET HOMOSEXUAL MEN TO SEND HIM MONEY?

A.    YES.

Q.    AND HE SCAMMED MANY PEOPLE THAT WAY, TRUE?

A.    YES, THAT MIGHT BE TRUE.

Q.    WHILE IN PRISON?

A.    YES.

Q.    AND HE INDICATED THAT HE WOULD BE GETTING OUT OF PRISON SOON TO THOSE PEOPLE, CORRECT?

A.    YES.

Q.    SO AGAIN, A LOT OF DIFFERENT SCAMS, BUT THIS FOR MONEY, THOUGH?

A.    THIS IS WHAT HE WAS TAUGHT FROM THE TIME HE WAS A CHILD.  UNCLE LARRY SAID HE WAS AS YOUNG AS 4 AND 5 YEARS OLD, WHEN THE CAN WAS IN HIS HAND, THAT HIS PARENTS WOULD TAKE HIM OUT -- SEND HIM OUT TO COLLECT FUNDS.

Q.    HIS BROTHER, HIS BROTHER DOES NOT ENGAGE IN THIS TYPE OF ACTIVITY, DOES HE?

A.    NOT THAT I'M AWARE OF.

MR. MORENO:  I'M GOING TO OBJECT AS TO WHAT TYPE OF ACTIVITY.  I THINK MR. MARTIN HAMMER TESTIFIED THAT HE DID ENGAGE IN THE ACTIVITIES HIS PARENTS FORCED THEM TO DO.

MR. GURGANUS:  NO.  FRAUDULENT ACTIVITY.

THE COURT:  I TAKE IT YOU MEAN IN MORE RECENT YEARS.

BY MR. GURGANUS:

Q.    YES.  IN RECENT YEARS, FRAUDULENT ACTIVITIES.

A.    I'M NOT SURE.  I THINK HE MIGHT HAVE HAD SEVERAL ARRESTS.  I'M NOT POSITIVE.

Q.    FOR FRAUD?

A.    I'M NOT SURE.

Q.    ARE YOU AWARE THAT DAVID PAUL HAMMER BRIBED SOMEONE TO TRY TO GET A CONVICTION OVERTURNED, A MR. FULLERTON?

A.    I'M NOT AWARE OF THAT.

Q.    THE FACT THAT MR. HAMMER WOULD BRIBE SOMEONE, OFFER SOMEONE MONEY TO FALSELY CLAIM THAT THEY HAD COMMITTED A CRIME THAT HE HAD BEEN CONVICTED OF, DOES THAT CAUSE YOU ANY CONCERN IN ASSESSING HIS CREDIBILITY?

A.    I THINK IN LIGHT OF ALL OF THE SCAMS THAT HIS PARENTS BROUGHT HIM TO DO AT A YOUNG AGE, HE LEARNED THIS FROM THE TIME HE WAS IN THE CRADLE TO DO THIS.  WE DON'T CHOOSE WHO WE ARE BORN TO.  WE DON'T CHOOSE WHAT ENVIRONMENT THAT WE ARE PUT INTO.  THAT WAS HIS CASE.

Q.    AND SCAMS, HE HAS BEEN A SCAMMER ALL HIS LIFE, RIGHT?

A.    HE WAS TAUGHT THIS FROM THE TIME HE WAS 4 AND

5 YEARS OLD, MAYBE EVEN EARLIER THAN THAT.

Q.      SO THE SCAM OF JOCKO, WILBUR, TAMMY, THE MULTIPLE PERSONALITY THING, THAT'S ALL --

        MR. MORENO:  I OBJECT TO THAT CHARACTERIZATION.  I'M NOT SURE THERE HAS EVER BEEN A CHARACTERIZATION THAT THAT WAS A SCAM.

        THE COURT:  I WILL OVERRULE THE OBJECTION.

BY MR. GURGANUS:

Q.      IT'S ALL PART OF HIS PRIOR HISTORY, RIGHT?

A.      IN LIGHT OF ALL OF THE TRAUMA THAT HE HAD, I'M NOT SURPRISED THAT HE WOULD HAVE DISSOCIATIVE DISORDER.

Q.      HE COULD ALSO BE LYING ABOUT THIS TOO, CORRECT?

A.      I WOULD SAY IN LIGHT OF EVERYTHING THAT HE WENT THROUGH, THAT MIGHT HAVE BEEN ONE OF THE ONLY REASONS HE WAS ABLE TO SUCCESSFULLY SURVIVE.

        MR. GURGANUS:  YOUR HONOR, NO FURTHER QUESTIONS.

        THE COURT:  ANY REDIRECT?

        MR. MORENO:  JUST VERY BRIEFLY, IF I MAY.

                REDIRECT EXAMINATION

BY MR. MORENO:

Q.      GOOD MORNING, MS. LUCK.

A.      GOOD MORNING, MR. MORENO.

Q.      MS. LUCK, IS IT UNCOMMON FOR SOMEONE WHO HAS

BEEN ABUSED BY A PARENT TO NONETHELESS REALLY LOVE THAT PARENT AND WANT LOVE FROM THEM?

A.      IT IS EXTREMELY COMMON.

Q.      DO YOU RECALL WHEN YOU WERE HERE ON TUESDAY THAT YOU WERE ACTUALLY QUESTIONED ON DIRECT ABOUT THE FACT THAT THERE WERE RECORDS INDICATING THAT DAVID HAD IN FACT ABUSED HIS BROTHER MARTIN.  DO YOU RECALL TESTIFYING TO THAT ON DIRECT?

A.      YES, I DO.

Q.      NOW, SOMEONE WHO HAS BEEN ABUSED IN THE WAYS IN WHICH DAVID HAS BEEN, BOTH PHYSICALLY, VERBALLY, EMOTIONALLY AND SEXUALLY, DO YOU FIND IT UNCOMMON THAT THEY WOULD LOOK FOR WAYS TO SEEK ATTENTION?

A.      NO, VERY --

Q.      WHY WOULD THAT BE?

A.      BECAUSE THEY WOULD WANT TO GET ANY KIND OF ATTENTION, ANY KIND OF SHOW THAT THEIR PARENT MIGHT BE INTERESTED IN THEM.

Q.      INDEPENDENT OF WHAT DAVID HAS TOLD YOU, DID YOU FIND CORROBORATION IN YOUR INTERVIEWS OF PHYSICAL ABUSE OF DAVID GROWING UP?

A.      YES.

Q.      WAS THAT CORROBORATION OF EXTREME PHYSICAL ABUSE OF DAVID GROWING UP?

A.      YES.

Q.      DID YOU FIND CORROBORATION INTERVIEWS OF EXTREME VERBAL ABUSE OF DAVID GROWING UP?

A.      YES.

Q.      WAS IT FROM MORE THAN ONE SOURCE?

A.      YES, MULTIPLE.

Q.      DID YOU FIND CORROBORATION IN THE INTERVIEWS YOU DID OF SEXUAL ABUSE OF DAVID?

A.      YES.

Q.      WAS THAT BY MULTIPLE SOURCES?

A.      YES.

Q.      DID YOU FIND -- I THINK I ALREADY SAID -- DID YOU FIND EVIDENCE -- CORROBORATION OF EMOTIONAL ABUSE?

A.      YES.

Q.      DESPITE INCONSISTENCIES THAT DAVID MAY HAVE SAID OVER THE YEARS, HAS ANYTHING MR. GURGANUS SAID TODAY IN TERMS OF BRINGING OUT THE DIFFERENT STORIES DAVID HAS TOLD, THE SCAMS THAT HE HAS ALLEGEDLY RUN OVER THE YEARS, IN ANY WAY CHANGE YOUR ASSESSMENT OF THE SOCIAL HISTORY OF DAVID HAMMER?

A.      IN NO WAY.

                MR. MORENO:  I HAVE NOTHING FURTHER.

                MR. GURGANUS:  NO QUESTIONS, YOUR HONOR.

                THE COURT:  ALL RIGHT, YOU MAY STEP DOWN.

                LET'S BRING IN DR. GUR.

                (WITNESS EXCUSED.)

(RUBEN GUR RETAKES THE STAND ON CROSS EXAMINATION.)

MS. HAINES:  MAY I INQUIRE, YOUR HONOR?

THE COURT:  YES.

MS. HAINES:  THANK YOU.

CONTINUED CROSS EXAMINATION

BY MS. HAINES:

Q.      GOOD MORNING AGAIN, DR. GUR.

A.      GOOD MORNING.

Q.      I BELIEVE WE LEFT OFF YESTERDAY TALKING ABOUT ANTIDEPRESSANTS AND THE EFFECT THAT MIGHT HAVE ON THESE SCANS.  DO YOU RECALL THAT QUESTION?

A.      YES.

Q.      AND I MIGHT BE INCORRECT, BUT I THOUGHT YOU SAID YOU DIDN'T THINK IT WOULD HAVE ANY EFFECT?

A.      I COULD HAVE SAID THAT.  THE TESTS DETECTS SOME SMALL EFFECTS THAT ARE PRETTY WELL ESTABLISHED.

Q.      DID YOU INCLUDE THAT WHEN YOU WERE ANALYZING MR. HAMMER'S BRAIN SCANS AGAINST THE CONTROL SAMPLE?

A.      YES.

Q.      WHERE IS THAT IN YOUR REPORT THAT YOU FACTORED IN WHAT MEDICATIONS HE WAS ON?

A.      IT WAS NOT IN THE REPORT, BUT WHEN I LOOK AT THE RESULTS, IT'S THE -- THE SIZE OF THE EFFECT IS WAY BEYOND ANYTHING YOU GET FROM MEDICATION, ANY MEDICATION.

Q.      ALL RIGHT.  BUT YOU ARE COMPARING MR. HAMMER AGAINST A SAMPLE OF PEOPLE WHO ARE NOT ON ANTIDEPRESSANTS, CORRECT?

A.      YES, OF COURSE.

Q.      WHAT ANTIDEPRESSANTS WAS MR. HAMMER ON AT THE TIME OF THE SCANS?

A.      I DON'T REMEMBER.

Q.      DO YOU REMEMBER EVEN HAVING A LIST OF WHAT MEDICATION HE WAS TAKING?

A.      OH, YES.

Q.      WHERE DID YOU OBTAIN THAT LIST?

A.      I BELIEVE WHEN HE TOOK THE SCAN, A LIST WAS OBTAINED.  AND I DON'T REMEMBER EXACTLY HOW WE CONSIDERED, BUT WE KNEW HE WAS ON ANTIDEPRESSANTS.

MS. HAINES:  YOUR HONOR, I WOULD ASK THAT THAT BE PROVIDED TO THE GOVERNMENT.

BY MS. HAINES:

Q.      NOW, THIS IS ACTUALLY A LITTLE BIT MORE OF A SIGNIFICANT ISSUE THAN YOU HAVE ADMITTED.

THE COURT:  WAIT A MINUTE.  YOU SAID YOU WANTED SOMETHING PROVIDED TO THE GOVERNMENT.

MS. HAINES:  YES, YOUR HONOR.  HE SAID HE RELIED UPON A LIST OF MEDICATIONS.  I HAVE NEVER SEEN THAT LIST OR WHAT HE WAS RELYING UPON.

THE COURT:  IS THERE SUCH A LIST?

MS. SAUNDERS:  I DID NOT GENERATE A LIST OF MEDICATIONS FOR DR. GUR BEFORE HE EVALUATED MR. HAMMER.  AND AS -- I DID NOT GENERATE A LIST.

THE COURT:  ALL RIGHT.

WHAT LIST DO YOU THINK YOU ARE REFERRING TO?

THE WITNESS:  WHEN HE WAS SENT TO SCANNING, I'M NOT EVEN SURE WHETHER IT WAS DONE BY WRITING OR BY PHONE CALL, BUT I REMEMBER KNOWING THAT HE WAS ON MEDICATION.  AND OUR ONLY CONCERN WAS THAT HE WILL NOT BE IN A DIABETIC COMA WHEN HE IS STUDIED.  SO THAT IS THE ONLY THING THAT WOULD AFFECT THE PET RESULTS ENOUGH FOR US TO WORRY ABOUT.  SO MEDICATION, ANTIDEPRESSANTS OR PSYCHOTIC, THEY -- OF COURSE THEY HAVE AN EFFECT ON GLUCOSE METABOLISM, BUT THE EFFECTS ARE VERY SUBTLE AND ARE SEEN IN SPECIFIC REGIONS AND THE EFFECTS THAT WE SEE IN MR. HAMMER'S BRAIN ARE WAY OUT OF LEAGUE, COMPARED TO THOSE KINDS OF EFFECTS.  SO THERE IS NOTHING THAT I FELT THE NEED TO WORRY ABOUT.

THE COURT:  WELL, WHEN YOU SAID YOU SAW A LIST, WAS IT A -- SOMETHING YOU WERE TOLD OR SOMETHING --

THE WITNESS:  I BELIEVE IT MAY HAVE BEEN BY A PHONE CONVERSATION WITH THE TECHNOLOGIST.  I HAD A CONVERSATION WITH A TECHNOLOGIST BEFORE THE SCAN WAS

DONE TO MAKE SURE THAT THEY FOLLOW THE PROCEDURE.  HE SAID WELL, THE PATIENT, APPARENTLY HE IS ON SOME MEDICATION.  I DON'T REMEMBER WHO I TALKED TO.  I ASKED WHAT KIND OF MEDICATION?  I GOT A GENERAL LIST, THAT THESE WOULD BE SOME ANTIDEPRESSANTS, MAYBE SOME ANXIOLYTIC.  SO I DID NOT THINK IT WAS ANYTHING TO BE CONCERNED ABOUT.  IF THERE WERE EFFECTS OF MEDICATION, I WOULD HAVE SEEN SOME, FOR EXAMPLE, INCREASED METABOLISM IN BASAL GANGLIA.  THEN I COULD HAVE SAID IT COULD BE MEDICATION AND I WOULD HAVE TRIED TO LEARN MORE ABOUT EXACTLY WHAT MEDICATIONS WERE THERE.  BUT THE ABNORMALITIES ON HIS PET ARE MORE LIKE WHAT YOU SEE IN A SEIZURE DISORDER.  IT'S NOT SOMETHING THAT CAN BE PRODUCED OR AFFECTED BY PSYCHOACTIVE MEDICATIONS.

BY MS. HAINES:

Q.    SO I ASSUME, DR. GUR, YOU SAID YOU DON'T RECOLLECT WHAT MEDICATIONS MR. HAMMER WAS ON, DO YOU?

A.    NO, NOT THE SPECIFIC MEDICATIONS, NO.

Q.    IN FACT, THIS EXACT ISSUE CAME UP BEFORE IN YOUR WORK, HASN'T IT, DR. GUR?

A.    YES.

Q.    IN FACT, IN THE LISA MONTGOMERY CASE THAT WE WERE DISCUSSING YESTERDAY, THE FACT THAT YOU FAILED TO TAKE INTO ACCOUNT THE ANTIDEPRESSANTS THAT THAT DEFENDANT WAS ON OR NOTE THEM IN YOUR REPORT WAS

CRITICIZED, ISN'T THAT CORRECT?

A.      I DON'T KNOW.

Q.      ALL RIGHT.  LET ME SHOW YOU AN EXCERPT OF THAT TRANSCRIPT THAT HAS BEEN MARKED AS GOVERNMENT EXHIBIT GC 5.

NOW DR. GUR, YOU ARE AWARE WHO DOCTOR HELEN MAYBERG IS, AREN'T YOU?

A.      YES.

Q.      SHE IS A PROFESSOR OF PSYCHIATRY AND BEHAVIORAL SCIENCE AND A PROFESSOR OF NEUROLOGY IN THE SCHOOL OF MEDICINE AT EMORY UNIVERSITY, CORRECT?

A.      TO THE BEST OF MY KNOWLEDGE, YES.

Q.      SHE ALSO RUNS A RESEARCH PROGRAM WHERE SHE STUDIES DEPRESSION USING FUNCTIONAL BRAIN IMAGING, CORRECT?

A.      YES.

Q.      SHE HAS ALSO DEVELOPED A NEW TREATMENT FOR DEPRESSION USING ELECTRODES, IS THAT RIGHT?

A.      YES.

Q.      AND SHE TESTIFIED AT THE LISA MONTGOMERY CASE AS WELL.  DO YOU RECALL THAT?

A.      YES.

Q.      ALL RIGHT.  SO I WANT TO TURN YOUR ATTENTION TO PAGE 14 OF THE GOVERNMENT'S EXHIBIT.

MS. SAUNDERS:  YOUR HONOR, I'M NOT CLEAR

WHETHER THIS IS DR. GUR'S TESTIMONY THAT SHE IS ATTEMPTING TO IMPEACH DR. GUR WITH OR DR. MAYBERG'S TESTIMONY.  IF IT'S DR. MAYBERG'S, I WOULD OBJECT BECAUSE IT'S NOT DR. GUR'S TESTIMONY.

THE COURT:  I TAKE IT FROM WHAT I'M LOOKING AT IN GC 5 IT'S A COMBINATION OF BOTH.

MS. HAINES:  YOUR HONOR, I HAVE PROVIDED DEFENSE COUNSEL WITH THIS ENTIRE TRANSCRIPT.  THIS IS --

THE COURT:  ANSWER MY QUESTION.

MS. HAINES:  I'M SORRY.  THIS IS DR. MAYBERG'S TESTIMONY.

THE COURT:  THIS IS ALL DR. MAYBERG'S?

MS. HAINES:  RESPONDING TO DR. GUR'S TEST RESULTS WITH RESPECT TO ANTIDEPRESSANTS.

THE COURT:  ALL RIGHT.  SO IT'S NOT BOTH.  IT'S ONLY A FEW PAGES FROM DR. MONTGOMERY'S TESTIMONY.

MS. HAINES:  FROM DR. MAYBERG'S, YES, YOUR HONOR.

THE COURT:  DR. MAYBERG'S.  MISS MONTGOMERY BEING THE DEFENDANT.

MS. HAINES:  THAT'S CORRECT, YOUR HONOR.

THE COURT:  ALL RIGHT.  YOU MAY CROSS EXAMINE.  I WILL OVERRULE THE OBJECTION.

MS. HAINES:  THANK YOU.

BY MS. HAINES:

Q.      NOW I'M JUST GOING TO ASK YOU -- I'M GOING TO READ INTO THE RECORD THE HIGHLIGHTED PARTS OF THIS TESTIMONY AND THEN ASK YOU WHETHER YOU AGREE OR DISAGREE WITH DR. MAYBERG.  ALL RIGHT, DR. GUR?

A.      SURE.

Q.      NOW SHE WAS ASKED THE FOLLOWING QUESTION ON PAGE 14:  DID THE FACT THAT MISS MONTGOMERY, THE DEFENDANT IN THAT CASE, WAS TAKING PRESCRIBED ANTIDEPRESSANTS MEAN ANYTHING TO YOU?

AND SHE ANSWERED:  YES, IT DID.  THAT IS LINE 5 THROUGH 7.

DROPPING DOWN TO LINE 25.

QUESTION:  COULD THESE PRESCRIPTION DRUGS AFFECT THE SCAN THAT DR. GUR LOOKED AT?

HER ANSWER I BELIEVE IS LINE 2 PAGE 15:  I THINK THAT'S CERTAINLY THE OBVIOUS EXPECTATION.

AND THEN SHE GOES ON TO EXPLAIN WHY.  BUT THEN SKIPPING TO PAGE 16, LINE 5, THE QUESTION WAS ASKED: DID YOU FIND IT NOTEWORTHY DR. GUR HAD NOT MADE MENTION OF THESE MEDICATIONS IN HIS REPORT?

AND HER ANSWER WAS: I DID FIND THAT NOTEWORTHY.  I THINK THAT IS SUCH A CRITICAL ISSUE OF BASICALLY COMPARING THAT DEFENDANT, MISS MONTGOMERY'S BRAIN TO A GROUP OF HEALTHY VOLUNTEERS THAT PRESUMABLY ARE NOT TAKING ANY MEDICATION, DON'T HAVE ANY DIAGNOSIS,

THAT THE IMPACT OF MEDICATION BECOMES A CRITICAL, EVEN IF IT'S JUST A CONFOUND, CRITICAL CONFOUND CONSIDERING WHY HER BRAIN MAY BE DIFFERENT FROM THE HEALTHY VOLUNTEERS' BRAIN.  IT MAY BE RELEVANT, IT MAY NOT, BUT IT ACTUALLY NEEDS TO BE INCLUDED, BUT IT'S CERTAINLY IS AN ISSUE HERE.

DO YOU SEE WHERE DR. MAYBERG GAVE THOSE ANSWERS TO THOSE QUESTIONS IN THAT CASE?

A.      YES.

Q.      AND IN THIS CASE, YOU ALSO DID NOT INCLUDE IN YOUR REPORT THE FACT THAT MR. HAMMER WAS TAKING ANTIDEPRESSANTS.  ISN'T THAT TRUE?

A.      YES.

Q.      THIS IS NOT MENTIONED IN YOUR REPORT HERE EITHER?

A.      CORRECT.

Q.      NOW, TURNING TO THE PET SCAN FOR A MINUTE. THERE IS A DOCTOR IN THIS CASE THAT ACTUALLY REVIEWED THE PET SCAN THAT YOU REVIEWED.  IS THAT FAIR TO SAY?

A.      ARE YOU ASKING A QUESTION TO ME FROM THIS WHAT YOU READ OR JUST READING IT TO.  I THOUGHT YOU WERE GOING TO ASK FOR MY -- WHETHER I AGREE OR DISAGREE WITH HER STATEMENT, BUT YOU ARE NOT GOING TO ASK THAT.

Q.      WHAT I ASKED YOU, DOCTOR, WAS WHETHER IN THIS CASE ALSO, JUST AS IN LISA MONTGOMERY, YOU FAILED TO DO

WHAT DR. MAYBERG WAS COMMENTING UPON?

A.       THAT IS CORRECT.

THE COURT:  DO YOU WANT TO GIVE AN EXPLANATION?

THE WITNESS:  WELL, I THOUGHT THE WHOLE CONTEXT OF THIS WAS THAT SHE WAS GOING TO ASK ME WHETHER OR NOT I AGREED WITH WHAT DR. MAYBERG SAYS HERE AND SHE DIDN'T ASK ME.

THE COURT:  DO YOU WANT TO COMPLETE YOUR ANSWER AND GIVE AN EXPLANATION?

THE WITNESS:  SHE DID NOT ASK IT.

THE COURT:  COMPLETE YOUR ANSWER AND GIVE AN EXPLANATION.

THE WITNESS:  OKAY.  WELL, I STRONGLY DISAGREE WITH DR. MAYBERG.  OF COURSE, THAT WAS HER OPINION.  SHE IS CORRECT IN SAYING THAT MEDICATION HAS SOME EFFECTS, BUT SHE KNOWS FULL WELL WHAT THESE EFFECTS ARE, AND I KNOW WHAT THESE EFFECTS ARE.  AND THESE EFFECTS ARE VERY SUBTLE AND REALLY ARE NOT OF A MAJOR CONSIDERATION IN A CASE LIKE THAT.  NONE OF THE FINDINGS THAT WE HAVE EITHER IN MONTGOMERY OR IN THIS CASE COULD BE EXPLAINED BY MEDICATION.  MEDICATION HAS A VERY SUBTLE EFFECT.  YOU GET SOMETHING LIKE BETWEEN -- IF YOU GET A WHOLE PERCENT CHANGE, IT MEANS IT'S HUGE, A WHOLE ONE PERCENT.  WE ARE NOT TALKING ABOUT THOSE KINDS OF

ABNORMALITIES IN THIS PET SCAN.  AND THAT WAS -- I MEAN, LISA MONTGOMERY'S PET SCAN LOOKED A LOT MORE -- WAS A LOT MORE NORMAL THAN MR. HAMMER'S.  THERE IS NO COMPARISON.  THE ABNORMALITIES THERE WERE LESS ROBUST. SO -- BUT AGAIN, THEY TOO COULD NOT BE EXPLAINED BY MEDICATION.  SO I THINK THE ISSUE OF MEDICATION HERE IS A RED HERRING.  IT HAS NOTHING TO DO WITH OUR FINDINGS.

BY MS. HAINES:

Q.     BUT IT IS TRUE, SIR, THAT WHEN YOU WERE COMPARING MR. HAMMER'S BRAIN TO THE NORM THAT YOU SET UP, NONE OF THOSE PEOPLE WERE TAKING ANTIDEPRESSANTS AS HE WAS, ISN'T THAT CORRECT?

A.     THAT IS EXACTLY RIGHT AND THAT IS HOW A CONTROL GROUP SHOULD BE.

Q.     THAT IS YOUR OPINION, ISN'T THAT RIGHT?

A.     THAT IS MY OPINION, YES.

Q.     NOW, THERE WAS A DOCTOR IN THIS CASE WHO REVIEWED THE PET SCANS, IS THAT CORRECT?

A.     AGAIN, WHOEVER READS THE PET SCANS CLINICALLY IS NOT USUALLY RELEVANT IN SITUATIONS LIKE THAT.  AND I'M SURE THERE WAS A DOCTOR.  EVERY TIME YOU DO A PET SCAN, YOU HAVE A RADIOLOGIST GIVE IT THE CLINICAL READING. BUT THIS WAS NOT A CLINICAL EVALUATION.  THIS IS A FORENSIC EVALUATION.  AND IN THIS CONTEXT, THE CLINICAL READING IS IMPORTANT TO TELL YOU IF THERE IS A TUMOR, IF

THERE IS A STROKE, IF THERE IS MULTIPLE SCLEROSIS, IF THERE IS AN ARTERIAL VENOUS MALFORMATION.  ALL THOSE THINGS ARE VERY RELIABLY DIAGNOSED BY RADIOLOGISTS LOOKING AT THE SCAN.  BUT NONE OF THE STUFF THAT WE ARE INTERESTED IN WOULD BE NORMALLY VISUALIZED BY A CLINICIAN LOOKING AT A SCAN.  SO HOW IT WAS READ, BY WHOM, IS REALLY NOT THAT IMPORTANT.

Q.      BUT, DOCTOR, YOU INCLUDED THAT INFORMATION IN YOUR REPORT WHO READ THE SCAN AND WHAT IT SAID, IS THAT CORRECT?  JUST YES OR NO.

A.      I DON'T REMEMBER BUT --

Q.      ALL RIGHT.

A.      -- IT'S POSSIBLE.  SOMETIMES I INCLUDE, SOMETIMES I DON'T.

MS. HAINES:  I DON'T KNOW IF I HAVE AN EXTRA COPY, YOUR HONOR, SO I WILL HAVE TO SHOW HIM MINE.

THE COURT:  YES.

THE WITNESS:  AH, DR. NEWBERG I ALWAYS -- IF DR. NEWBERG READS A SCAN, I LOOK VERY CAREFULLY.  DR. NEWBERG IS AMONG THE WORLD'S MOST EXPERIENCED PET CLINICIANS WHO -- THAT IS WHAT THEY DO.  AND IF I GET A PET SCAN FROM ANYWHERE ELSE, I WOULD ASK HIM TO LOOK AT IT AND READ IT.  AND IF IT'S DR. NEWBERG'S READING, I ALWAYS QUOTE.

BY MS. HAINES:

Q.      SO, SIR, ARE YOU CHANGING YOUR ANSWER THAT IN THIS CASE YOU ACTUALLY DID CONSIDER DR. NEWBERG'S READING OF THE PET SCAN AND RELIED UPON IT?

A.      I DON'T THINK THAT I ANSWERED THAT I DIDN'T.  I SAID THAT I DIDN'T REMEMBER WHO READ IT.  AND THEN I SAID IN GENERAL THE CLINICAL READING IS OF VERY LITTLE RELEVANCE TO WHAT I HAVE TO DO WITH A PET SCAN, UNLESS OF COURSE THERE'S A TUMOR OR THERE IS SOMETHING THAT CAN BE CLEARLY VISUALIZED.  AND THAT I WOULD LIKE TO KNOW.  BUT TYPICALLY THE CLINICAL READING HAS VERY, VERY LITTLE INFORMATION.  SO I DON'T -- I MAY OR MAY NOT REFER TO IT IN MY REPORT.  I WOULD REFER TO IT IF IT FOUND SOMETHING, BUT I IGNORE IT WHEN IT DOESN'T BECAUSE I DON'T EXPECT IT TO FIND SOMETHING.  THE EXCEPTION IS DR. NEWBERG.  I FOUND HIM OVER THE YEARS, MORE THAN -- I WOULD SAY ALMOST 30 YEARS OF WORKING WITH HIM, THAT HE IS A SUPERB READER OF PET SCANS.

Q.      AND DID YOU HAVE YOUR CONVERSATION WITH DR. NEWBERG OVER THE PHONE OR DID HE ISSUE A REPORT TO YOU ABOUT HIS INTERPRETATION OF THE PET SCAN?

A.      I DON'T -- I THINK THE CALL I HAD WAS WITH THE PERSON WHO WAS RUNNING THE SCAN, WAS THE OPERATOR.

Q.      SO DR. GUR, HOW DID YOU --

A.      ARE YOU TALKING ABOUT HAMMER OR TALKING ABOUT MONTGOMERY?

Q.          NO.  I'M FOCUSING ON MR. HAMMER'S CASE NOW, THE REPORT THAT IS IN FRONT OF YOU.  DID YOU ACTUALLY --

A.          THE REPORT IN FRONT --

Q.          SIR.  MY QUESTION -- I'M NOT TRYING TO CONFUSE YOU.  MY QUESTION IS, DID YOU GET A REPORT FROM DR. NEWBERG OR DID YOU TALK TO HIM ON THE PHONE ABOUT THIS?

A.          BOTH.

Q.          ALL RIGHT.  DID YOU TURN YOUR REPORT OVER TO -- DID YOU TURN DR. NEWBERG'S REPORT OVER TO THE DEFENSE?

A.          YES.

MS. HAINES:  YOUR HONOR, I ASK THAT WE BE GIVEN A COPY OF DR. NEWBERG'S REPORT.

THE WITNESS:  IT WAS AN E-MAIL.  I QUOTED IT IN MY REPORT.

MS. SAUNDERS:  IN ALL HONESTY, YOUR HONOR, I SAW AN E-MAIL AND I DID NOT REALIZE IT WAS A REPORT.  I DON'T HAVE IT HERE WITH ME, BUT I WILL BE HAPPY TO GET A COPY OF THE E-MAIL.  IT WAS WHAT WAS -- WHAT WAS IN THE E-MAIL WAS IN THE REPORT.  SO FRANKLY I DIDN'T REALIZE IT WAS A REPORT.

THE COURT:  WHY DON'T YOU TURN OVER A COPY OF THE E-MAIL AFTER THE -- OVER THE LUNCH HOUR OR THE END OF THE DAY, IF THERE'S ANYTHING THAT IS DIFFERENT THAT NEEDS TO BE GONE OVER, WE WILL DEAL WITH

IT AT THAT POINT.

MS. HAINES:  THANK YOU, YOUR HONOR.

BY MS. HAINES:

Q.     DR. GUR, DR. NEWBERG WHEN HE LOOKED AT THE PET
SCAN ACCORDING TO YOUR REPORT, YOUR REPORT, HE FOUND A
DECREASE IN UPTAKE ACTIVITY, CORRECT?

A.     YES.

Q.     WHEN YOU PERFORMED YOUR QUANTITATIVE ANALYSIS OF
THE PET SCAN AGAINST THE 41 HEALTHY PEOPLE, YOU ACTUALLY
FOUND THAT THERE WAS INCREASED ACTIVITY IN MR. HAMMER'S
BRAIN, CORRECT?

A.     41 -- YOU ARE CONFUSING, I THINK, BETWEEN THE
PET SCAN AND THE MRI.  THE PET SCAN WAS NOT 41.

Q.     WAS THE PET SCAN 16?

A.     YES.

Q.     I STAND CORRECTED.  THANK YOU, SIR.

A.     THE ANALYSIS THAT WE DID IS EXACTLY WHAT DR.
NEWBERG REPORTED, WHICH WAS MOSTLY AREAS OF DECREASED
METABOLISM IN THE ENTIRE CORTEX WITH ABNORMALLY
INCREASED METABOLISM IN THE BASAL -- IN THE LIMBIC
SYSTEM.  THAT IS WHAT HE READ AND THAT IS WHAT -- THAT
IS WHAT ANALYSIS SHOWS.

Q.     BUT DR. NEWBERG, ACCORDING TO WHAT YOU REPORTED,
DID NOT FIND ANY INCREASED ACTIVITY.  HE ONLY, ACCORDING
TO YOU, REPORTED DECREASED ACTIVITY.  DO YOU REMEMBER

THAT?

A.       WELL, HE CAN'T KNOW WHAT IS INCREASED BECAUSE WHEN YOU LOOK AT AN IMAGE, YOU HAVE TO LOOK AT RELATIVE -- EVERYTHING IS RELATIVE.  YOU COMPARE LEFT, RIGHT, UP, DOWN.  YOU DON'T ACTUALLY HAVE THE NUMBERS. SO YOU DON'T KNOW WHETHER REGION A IS DECREASED RELATIVE TO REGION B OR WHETHER THAT IS THE REVERSE, REGION B IS INCREASED RELATIVE TO REGION A.  YOU CAN'T RESOLVE THAT BY LOOKING AT THE PET SCAN.  SO THE QUANTITATIVE ANALYSIS GIVES YOU THAT ANSWER.

Q.       AND THAT WAS MY QUESTION, DOCTOR, THAT COMPARED TO DR. NEWBERG'S FINDINGS, YOU FOUND INCREASED ACTIVITY IN SPOTS THAT HE DID NOT OR WASN'T ABLE, ACCORDING TO YOU, TO DETERMINE.  IS THAT FAIR TO SAY?

A.       I THOUGHT HE DID MENTION -- IF YOU CAN SHOW ME THE REPORT AGAIN, I THOUGHT HE ACTUALLY DID SEE ABNORMALLY INCREASED LIMBIC ACTIVITY.

                 YEAH.  HE DIDN'T SPOT THE INCREASE IN THE AMYGDALA.  YEAH.  I MEAN THAT IS NOT UNUSUAL.  THE AMYGDALA IS A VERY SMALL STRUCTURE.  AND WHEN YOU SEE IT, YOU ARE HAPPY.  SO HE JUST DIDN'T NOTE IT, BUT IT'S THERE IN THE DATA.  IT HAPPENS A LOT WITH CLINICAL READING.  YOU CAN'T REALLY COMMENT ON EVERY REGION.

Q.       AFTER THE MRI AND THE PET SCAN WERE COMPLETED, LET ME ASK YOU THIS, DID YOU WAIT FOR THE RESULTS OF THE

Q.   PET SCAN AND MRI BEFORE YOU CONDUCTED YOUR METHODOLOGY, YOUR BEHAVIORAL IMAGING?

A.   NO.  BEHAVIORAL IMAGING WAS DONE AT AROUND THE SAME TIME, MAY HAVE EVEN BEEN DONE BEFORE.  I DID WAIT FOR THE RESULTS BEFORE I DID THE COMPUTERIZED TESTING.

Q.   AND AT THE END OF ALL THAT, I BELIEVE YOUR CONCLUSION IS THAT MR. HAMMER SUFFERS FROM MODERATE TO SEVERE BRAIN DAMAGE DIRECTLY RELEVANT TO ISSUES OF IMPULSE REGULATION, JUDGMENT AND SOCIAL INTERACTIONS.  THAT WAS YOUR ULTIMATE CONCLUSION, CORRECT?

A.   YES.

Q.   AND IN SEVERAL PLACES IN YOUR REPORT, I KNOW YOU DON'T HAVE IT IN FRONT OF YOU, BUT PERHAPS YOU CAN RECALL, YOU INDICATED THAT THE PERCEIVED ABNORMALITIES IN THE MRI AND PET SCANS WOULD LEAD TO IMPULSE CONTROL PROBLEMS.  DO YOU REMEMBER SAYING THAT?

A.   YES.

Q.   YOU SAID THAT JUST ABOUT EVERY PAGE, MULTIPLE TIMES, CORRECT?

A.   YES.

Q.   AND YOU ALSO SAID THAT THESE ABNORMALITIES THAT YOU SAW WOULD LEAD TO DIMINISHED ABILITY TO PLAN.  DO YOU RECALL SAYING THAT?

A.   YES.

Q.   BUT DR. GUR, ISN'T IT TRUE THAT AT THE END OF

THE DAY, IT'S MR. HAMMER'S BEHAVIOR THAT ACTUALLY DETERMINES WHETHER HE HAS IMPULSE CONTROL DEFICITS?

A.      IMPULSE CONTROL DEFICITS ARE MANIFESTED IN BEHAVIOR, BUT IT'S NOT BEHAVIOR THAT DETERMINES WHETHER HE HAS THEM.  I MAY NOT UNDERSTAND YOUR QUESTION.

Q.      YOU HAVE HEARD THE EXPRESSION PERHAPS THAT ACTIONS SPEAK LOUDER THAN IMAGES?

A.      YES.

Q.      AND WHAT DOES THAT MEAN TO YOU, SIR?

A.      I DON'T PARTICULARLY THINK THIS IS A VERY PROFOUND PROVERB.  I PREFER THE VERSION THAT SAYS, ACTION SPEAKS LOUDER THAN WORDS.  AND I THINK THAT IS THE ONE THAT IS USUALLY USED.  IN FACT, I THINK ACTIONS SPEAK LOUDER THAN IMAGES I HEARD FOR THE FIRST TIME FROM YOU TODAY.  IT MAY BE A COMMON.  I JUST NEVER HEARD IT BEFORE.

Q.      IN YOUR PRIOR TESTIMONY, SIR, YOU'VE NEVER BEEN ASKED QUESTIONS ABOUT WHETHER IT'S ACTUALLY BEHAVIOR THAT DETERMINES WHETHER SOMEBODY HAS IMPULSE CONTROL DEFICITS?

A.      NO.  NOBODY ASKED ME THAT QUESTION.

Q.      YOU DON'T RECALL A SERIES OF QUESTIONS IN, I BELIEVE IT'S THE EICHINGER CASE, WHERE YOU WERE ASKED ABOUT ALL SORTS OF BEHAVIOR?

A.      ABOUT WHAT?

Q.      BEHAVIOR, BEHAVIOR DEMONSTRATING WHETHER SOMEBODY ACTUALLY HAS IMPULSE CONTROL?

A.      OKAY.  THAT IS EITHER -- OF COURSE IT'S EITHER VERY TRIVIAL STATEMENT OR PROFOUNDLY WRONG.  IMPULSE -- BEHAVIOR IS WHAT -- IS THE PRODUCT OF BRAIN PROCESSES. SO IF -- LOSS OF IMPULSE CONTROL IS A BEHAVIOR.  IT'S NOT THAT BEHAVIOR CAUSES LOSS OF IMPULSE CONTROL.  THE BEHAVIOR IS THE MANIFESTATION.  SO I DON'T KNOW HOW ANYBODY CAN DISAGREE WITH IT.  THIS IS HOW WE DEFINE IMPULSE CONTROL AS A BEHAVIOR.  I MEAN --

Q.      LET ME ASK IT TO YOU A DIFFERENT WAY, IF I'M NOT BEING CLEAR.  HAS MR. HAMMER EVER DEMONSTRATED TO YOUR KNOWLEDGE -- OR JUST LOOKING AT THE FACTS OF THIS CASE, ARE YOU FAMILIAR WITH THE FACTS OF THIS CASE?

A.      YES.

Q.      HAS MR. HAMMER DEMONSTRATED IN THE FACTS OF THIS CASE, AND I'M SPECIFICALLY REFERENCING TO THE MURDER, HAS HE DEMONSTRATED IMPULSE CONTROL DEFICITS?

A.      I CAN'T SAY FOR SURE.  I DEFINITELY HAVE SEEN A LOT OF EVIDENCE OF IMPULSE CONTROL DEFICIT IN THE TESTING AND IN THE -- IN HIS LIFE STORY AND HIS HISTORY.

HE IS IMPULSIVE.  HE MAKES ONE DECISION ONE DAY.  HE CHANGES HIS MIND.  AND THAT IS WHAT YOU EXPECT FROM SOMEONE WITH FRONTAL LOBE DAMAGE.  HE SHOWS THE TYPICAL FRONTAL BEHAVIOR.  BUT THE MURDER ITSELF, I

DON'T THINK -- I DON'T THINK ANYBODY KNOWS EXACTLY WHAT HAPPENED AND TO WHAT EXTENT IT WAS AN ISSUE OF IMPULSE CONTROL.

Q.      WELL, LET ME POSE TO YOU SOME SPECIFIC FACTS ABOUT THIS CASE AND THEN WE WILL TALK ABOUT WHETHER THEY DEMONSTRATE IMPULSE CONTROL, ALL RIGHT?

A.      SURE.

Q.      ALL RIGHT.  SO YOU SAY YOU KNOW ABOUT SOME OF THE FACTS OF THIS CASE.  SO ARE YOU AWARE THAT WHEN MR. HAMMER WAS FIRST INTERVIEWED BY THE FBI, HE TOLD THE FBI AGENTS THAT HE HAD MADE PLANS TO KILL MR. MARTI FOR SEVERAL WEEKS IN ADVANCE.  ARE YOU AWARE OF THAT FACT?

A.      YES, I'M AWARE OF THAT.

Q.      YOU'RE PROBABLY ALSO AWARE THAT HE TOLD AT LEAST ONE WITNESS IN THIS CASE THAT HE HAD ACTUALLY PLANNED MR. MARTI'S MURDER FOR OVER A MONTH.  ARE YOU AWARE OF THAT?

A.      YES.

MS. SAUNDERS:  YOUR HONOR, THESE ARE DISPUTED FACTS.  I'M NOT SURE -- THAT IS THE FIRST OBJECTION.  THE OTHER OBJECTION IS, IS THAT DR. GUR IS NOT HERE TO OFFER AN OPINION ABOUT A DIAGNOSIS OF MR. HAMMER AT THE TIME OF THE OFFENSE.  HE IS HERE TO TESTIFY ABOUT THE NATURE AND EXTENT OF MR. HAMMER'S BRAIN DAMAGE AND WHAT, YOU KNOW, WHAT MAY OR MAY NOT

HAVE SPECIFICALLY OCCURRED ON THE DAY OF THE OFFENSE

DOES NOT AFFECT THAT.

THE COURT:  I THINK IT HAS RELEVANCE.  I

WILL OVERRULE THE OBJECTION.

MS. HAINES:  THANK YOU, YOUR HONOR.

BY MS. HAINES:

Q.      SIR, ARE YOU ALSO AWARE THAT THERE IS EVIDENCE

IN THIS CASE THAT MR. HAMMER ORCHESTRATED HAVING

MR. MARTI MOVE INTO THE CELL WITH HIM?

A.      I'M AWARE OF THAT.

Q.      AND I SUPPOSE YOU ALSO KNOW, BECAUSE YOU ARE

FAMILIAR WITH THIS CASE, THAT MR. HAMMER CONVINCED

MR. MARTI TO AGREE TO BE A WILLING HOSTAGE VICTIM.  YOU

KNOW THAT TOO?

A.      THAT IS MY UNDERSTANDING, YES.

Q.      AND THAT MR. HAMMER PLANNED ALL THIS SO THAT

MR. MARTI WOULD AGREE TO BE TIED DOWN, CORRECT?

A.      YES.

Q.      AND YOU ARE ALSO AWARE, I'M SURE, THAT THIS

HOSTAGE SITUATION WAS REALLY JUST A RUSE IN ORDER FOR

MR. HAMMER TO RENDER MR. MARTI HELPLESS.  YOU KNOW THAT?

A.      FROM MY RECOLLECTION, THAT IS DISPUTED.  AT SOME

POINT HE SAID IT WAS A RUSE.  AT SOME POINT HE SAID IT

WAS NOT.

Q.      BUT ARE YOU WILLING TO AGREE THAT THERE IS AT

LEAST SOME EVIDENCE IN THIS CASE THAT MR. HAMMER TIED MR. MARTI DOWN IN ORDER TO RENDER HIM HELPLESS?

A.    YES.

Q.    THERE WAS NO ACTUAL HOSTAGE SITUATION GOING ON THAT NIGHT, CORRECT?

A.    YES.

Q.    AND YOU ALSO, I'M SURE, KNOW THAT OVER THE COURSE OF TIME, MR. HAMMER ASSEMBLED SOME IMPLEMENTS TO HELP HIM WITH THIS CRIME, INCLUDING BRAIDED ROPES AND NAIL CLIPPERS?  YOU KNOW THAT?

A.    YES.

Q.    AND THAT HE WAITED -- MR. HAMMER WAITED THAT NIGHT UNTIL THE LIGHTS WERE OUT AND IT WAS COUNT TIME IN ORDER TO COMMIT THE MURDER.  IS THAT FAIR TO SAY?

A.    YES.

Q.    ASSUMING THAT THESE FACTS ARE TRUE OR AT LEAST IN EVIDENCE, THIS SHOWS THAT MR. HAMMER'S ABLE TO FORMULATE A GOAL, CORRECT?

A.    WELL, YES.

Q.    ALL RIGHT.  AND THEY SHOW THAT HE DIDN'T ACTUALLY RUSH OUT AT THE FIRST OPPORTUNITY AND IMPULSIVELY KILL MR. MARTI, DID HE?

A.    IT DEMONSTRATES THAT HE IS CAPABLE OF PLANNING AND THAT THE WHOLE SITUATION DIDN'T START AS AN IMPULSE.

Q.    IT'S NOT THE FIGHT OR FLIGHT SITUATION EITHER

THAT YOU TALKED ABOUT IN YOUR DIRECT, CORRECT?

A.      WELL, I DON'T KNOW.  I REALLY DON'T KNOW.  AT SOME POINT, IT COULD HAVE HAPPENED, BUT I DON'T KNOW.

Q.      WELL, CERTAINLY HE WAS ABLE TO PUT THE BRAKES ON KILLING MR. MARTI.  HE WAITED, IS THAT CORRECT?

A.      WELL, THE FACT THAT A PERSON WITH BRAIN DAMAGE CAN ACT NORMALLY IS NOT SURPRISING AT ALL.  MOST PEOPLE WITH BRAIN DAMAGE ACT NORMALLY MOST OF THE TIME.

Q.      SO YOU ARE SAYING THAT THIS MURDER WAS A NORMAL ACT ON HIS PART?

A.      NO, NO, NO, NO.  I'M SORRY.  THAT IS NOT WHAT I MEANT TO SAY.  WHAT I MEANT TO SAY IS THAT PEOPLE WITH FRONTAL LOBE DAMAGE ARE CAPABLE OF CONSIDERABLE PLANNING, EXCEPT BECAUSE OF THE DAMAGE THE PLANNING AND THE WHOLE MOTIVATION AROUND IT CAN BE CORRUPT.

PARKINSONIAN PATIENTS, FOR EXAMPLE, WHO LIVED THEIR WHOLE LIFE STRAIGHT AND NARROW SNEAK OUT OF THE HOUSE AND TAKE A BUS TO ATLANTIC CITY AND GAMBLE THE FAMILY FORTUNE AWAY.  TOTALLY UNCHARACTERISTIC OF THEM. BUT STILL IT REQUIRES PLANNING.  THEY KNOW THEY ARE DOING SOMETHING WRONG.  THEY SNEAK OUT OF THE HOUSE, THEY FIND A BUS, THEY FIND THEIR WAY TO THE CASINO. THEY ARE ABLE TO -- THEY ARE ENOUGH WITH IT TO BE ABLE TO GAMBLE.  AND THEN THEY LOSE ALL THE MONEY THEY MADE OVER A LONG LIFE OF HARD WORK.

SO, YES, THAT IS HOW BRAIN DAMAGE IS. IT'S LIKE WHEN -- DURING A BREAK YESTERDAY THEY WERE TALKING NEWS ABOUT THE GM RECALL OF SEVERAL MILLION CARS THAT ARE RUNNING ON THE ROADS.  AND THEY APPARENTLY CAN'T PRODUCE THE PART THAT NEEDS TO BE REPLACED FAST ENOUGH, SO THEY LET THEM CONTINUE TO RUN.  AND THAT -- EACH ONE OF THOSE CARS CAN BE DEADLY, BECAUSE WHEN YOU WIGGLE THE KEY CHAIN IF YOUR KEY IS ATTACHED TO A CHAIN, IT WILL STOP.  HERE AGAIN, IF IT HAPPENS JUST AS YOU ARE PULLING OUT OF YOUR PARKING SPOT, NO BIG DEAL.  YOU RESTART THE ENGINE AND YOU GO.  BUT IF IT HAPPENS WHEN YOU ARE ON THE HIGHWAY GOING 60 MILES AN HOUR, YOU CAN BE DEAD.  SO -- OR IT MAY NEVER HAPPEN.  SO THERE ARE CERTAIN CONDITIONS IN WHICH THAT FAULT SHOWS UP.  I THINK THE BEST ANALOGY FOR BRAIN DAMAGE IS SOMETHING LIKE THAT.

Q.    MR. HAMMER DOES NOT HAVE PARKINSON'S DISEASE, DOES HE?  THAT'S A YES OR NO, DOES HE HAVE PARKINSON'S?

A.    NO.

Q.    IT IS YOUR CONCLUSION THAT THE ABNORMALITIES YOU SAW IN HIS BRAIN WOULD LEAD TO REDUCED IMPULSE CONTROL AND DIMINISHED ABILITY TO PLAN, CORRECT?  THAT IS YOUR WRITING FROM YOUR REPORT, PAGE 5, CORRECT?

A.    YES.  PEOPLE WHO HAVE THAT KIND OF BRAIN DAMAGE WOULD HAVE THAT KIND OF DEFICIT, YES.

Q.      YOU ARE AWARE OF OTHER INCIDENCES, I'M SURE, WHERE MR. HAMMER WAS ABLE TO PUT THE BRAKE ON HIS BEHAVIOR, CORRECT?

A.      I'M SURE THERE ARE MANY INCIDENTS AND HOPEFULLY MOST OF THE TIME HE IS ABLE TO PUT THE BRAKE ON HIS BEHAVIOR.

Q.      IN FACT THERE WAS AN INCIDENT AT A PRISON IN CALIFORNIA, LOMPOC, WHERE MR. HAMMER TOOK ANOTHER PERSON HOSTAGE.  DO YOU REMEMBER THAT INCIDENT?

A.      THIS, I HAVE NOT HEARD OF IT, NO.

Q.      DO YOU KNOW ABOUT THE TWO SUCCESSFUL ESCAPE ATTEMPTS THAT HE WAS ABLE TO PLAN AND EFFECTIVELY ACCOMPLISH?  HE WAS ABLE TO ESCAPE TWICE.

A.      I DON'T KNOW ABOUT THEM, BUT IT DOES NOT SURPRISE ME.  HE IS A SMART GUY.  HE IS ABLE TO PLAN, ABSOLUTELY.

MS. HAINES:  NOTHING FURTHER, YOUR HONOR.

THE COURT:  REDIRECT?

MS. SAUNDERS:  YES, YOUR HONOR, BUT MY CLIENT WISHES TO SPEAK WITH US, IF WE MAY TAKE JUST A BRIEF RECESS TO DO THAT.

THE COURT:  WE WILL TAKE A FIVE-MINUTE RECESS.

(BREAK TAKEN.)

THE COURT:  PLEASE BE SEATED.

LET'S SEE.  WE HAD A BREAK SO THAT MR. HAMMER COULD CONSULT WITH COUNSEL.

MS. SAUNDERS:  THANK YOU, YOUR HONOR.

THE COURT:  YOU HAVE COMPLETED THAT?

MS. SAUNDERS:  YES, YOUR HONOR.  THANK YOU VERY MUCH.

THE COURT:  AND REDIRECT.

REDIRECT EXAMINATION

BY MS. SAUNDERS:

Q.    DR. GUR, DO YOU HAVE IN FRONT OF YOU GC 4, WHICH IS THE MRI READ BY DR. WOO, OR DO I NEED TO HAND IT UP TO YOU?

A.    I REMEMBER IT.

Q.    WELL, LET ME SHOW IT TO YOU BECAUSE I WANT YOU TO READ FROM IT.  OKAY?

I HIGHLIGHTED THE LINE THAT MS. HAINES WAS REFERRING TO AND ASKING YOU WHETHER OR NOT THE RESULTS INDICATED THAT MR. HAMMER'S BRAIN IS A NORMAL SIZE.  DO YOU SEE THAT LINE THAT I'VE HIGHLIGHTED?

A.    YES.

Q.    WHAT DOES THAT SENTENCE ACTUALLY SAY?

A.    BASICALLY SAYS THAT THE --

Q.    WHY DON'T YOU READ THE SENTENCE FIRST, DOCTOR?

A.    THE SENTENCE SAYS:  THE VENTRICLES AND SULCI ARE NORMAL IN SIZE AND APPEARANCE.

Q.       NOW IS A SULCI THE ENTIRE BRAIN?

A.       NO, NO.

Q.       AND IF YOU COULD PULL UP THE 14 FOR ME.

MS. SAUNDERS:  YOUR HONOR, WHAT IS UP ON THE SCREEN IS DEFENDANT'S EXHIBIT 106.  I'M ALSO PROVIDING A COPY TO THE COURT.

BY MS. SAUNDERS:

Q.       DOCTOR, ON THIS 106 CAN YOU POINT TO WHAT IS THE SULCI OR SULCUS.

A.       THE SULCI ARE THE FISSURES BETWEEN THE REGIONS OF THE BRAIN.

Q.       OKAY.  SO THAT RED LINE BETWEEN THE FRONTAL LOBE AND THE PARIETAL LOBE, THAT IS AN SULCI.

A.       THAT IS A SULCUS.  SINGLE IS THE SULCUS.

Q.       THERE IS ANOTHER RED LINE THAT APPARENTLY WRAPS FROM THE SIDE BETWEEN THE OCCIPITAL AND THE TEMPORAL LOBE AND THEN AROUND --

A.       THAT IS A FISSURE.

Q.       THAT IS ANOTHER SULCUS?

A.       SULCUS.

Q.       AND SULCUS ARE SIMILAR TO FISSURES, RIGHT?  THEY ARE INDENTATIONS?

A.       YES.

Q.       AND BETWEEN -- THEY ARE INDENTATIONS BETWEEN, ARE THEY GYRUS, IS THAT WHAT YOU CALLED THE PUFFY PARTS

OF THE BRAIN?

A.      GYRI IS THE TISSUE AND SULCI ARE THE FISSURES SEPARATING --

Q.      SO WHAT THIS REPORT SAYS ACTUALLY IS THAT THESE LITTLE LINES ARE OF NORMAL SIZE, RIGHT?

A.      YEAH, I MEAN BASICALLY I CAN EXPLAIN.  WHAT HAPPENS IS THAT IF YOU HAVE LOSS OF TISSUE, AS I MENTIONED, EVERY TIME A BRAIN CELL DIES ITS PLACE IS TAKEN UP BY FLUID.  SO IF CELLS DIE IN THE MIDDLE OF THE BRAIN, THEN YOU GET INCREASED VENTRICLES.  IF CELLS DIE ON THE OUTER LAYERS OF THE BRAIN OR THE CORTEX, THEN YOU GET INCREASED SULCI BECAUSE SULCI IS THE FLUID.  YOU SEE WHAT'S CALLED SULCO CSF INCREASE.

Q.      THE FACT OF THE MATTER IS, THE SULCUS IS CLEARLY NOT THE ENTIRE BRAIN?

A.      NO, OF COURSE NOT.

Q.      SO IF SOMEONE SAYS THAT THE SULCUS IS OF NORMAL SIZE, THAT CERTAINLY DOES NOT MEAN THAT THE ENTIRE BRAIN IS OF NORMAL SIZE, DOES IT?

A.      OF COURSE.

MS. SAUNDERS:  COURT'S INDULGENCE.

(PAUSE.)

BY MS. SAUNDERS:

Q.      I'M SHOWING DR. GUR WHAT HAS BEEN MARKED AS DEFENDANT'S EXHIBIT 107.  DR. GUR, THAT IS THE MRI

REPORT OF DR. CHRISTOS DAVATZIKOS, RIGHT?

A.      YES.

Q.      DID I SAY THAT RIGHT?

A.      YES, YOU DID.

Q.      YEAH, FINALLY.

THE REPORT THAT THE GOVERNMENT GAVE YOU -- NOW IF YOU CAN GO TO THAT SLIDE 4.

THE REPORT THAT THE GOVERNMENT GAVE YOU, YOU TESTIFIED ON DIRECT THAT THIS SHOWS THE DIFFERENCE BETWEEN MRI -- STRUCTURAL MRI TYPE PICTURE AND THE STANDARD MRI TYPE PICTURE, IS THAT ACCURATE?  AM I ACCURATE THERE?

A.      NOT EXACTLY.

THE RIGHT COLUMNS IN EACH PANEL SHOW THE MRI AS A CLINICIAN WILL SEE IT.

Q.      OKAY.

A.      THE LEFT SIDE SHOWS THE SEGMENTED MRI.

Q.      OKAY.  THAT WOULD BE MY POINT.  SO IN DR. DAVATZIKOS' REPORT HE TALKS ABOUT THE SIZE OF THE VENTRICLES AND THE VOLUME OF THE BRAIN, IS THAT RIGHT?

A.      YES.

Q.      HE HAS DOWN AT THE BOTTOM OF THE FIRST PAGE, FIGURE 2.  DO YOU SEE THAT?

A.      YES.

Q.      AND HE IS COMPARING MR. HAMMER'S -- I AM

PRESUMING THIS IS A CLINICAL MRI AS OPPOSED TO WHAT YOU AND HE WERE DOING WITH THE VOLUMETRICS CALCULATION, RIGHT?

A.    YES.

Q.    WITH THAT OF A 65-YEAR OLD MALE, RIGHT?

A.    YES.

Q.    AND HE AGREED THAT -- YOU KNOW, THAT THERE WERE -- THERE WAS NO ISSUE WITH THE VENTRICLES.  HIS CONCERN WAS THE BRAIN VOLUME, IS THAT RIGHT?

A.    YES.

Q.    AND THE REASON WAS IT MADE NO SENSE FOR SOMEONE TO HAVE WHAT APPEARED TO BE A NORMAL -- THE COMPARISON HE MADE HERE, LET ME START WITH THAT, I'M SORRY, WITHDRAW THAT.

THE COMPARISON HE MADE IS WITH SOMEONE WHO IS 65 YEARS OLD AND HAD THE LARGER VENTRICLES, RIGHT?

A.    YES.

Q.    AS YOU TALKED ABOUT ON DIRECT, ABOUT HOW, AS YOU AGE, THE ATROPHY SETS IN AND THEN THE VENTRICLES GET LARGER?

A.    YES.

Q.    SO WHEN --

A.    AND THE SULCI GET LARGER.

Q.    HE IS COMPARING THAT TO SHOW -- NOT TO SAY THAT

MR. HAMMER'S VENTRICLES ARE ABNORMALLY SMALL, BUT TO SAY THAT THEY ARE ABOUT NORMAL SIZE AND SO THEREFORE THE VOLUME SEEMED ODD, THE LOW VOLUME SEEMED ODD TO HIM.  IS THAT FAIR TO SAY?

A.      YES, THAT IS EXACTLY WHAT HE IS TRYING TO SAY HERE.

Q.      THAT IS WHAT YOU WERE TALKING ABOUT ON DIRECT WHEN YOU WERE TALKING ABOUT THE SMALL BRAIN, RIGHT?

A.      YES.

Q.      SO THERE IS REALLY NOTHING INCONSISTENT BETWEEN WHAT DR. WOO CONCLUDED AND WHAT DR. -- I'M SORRY.

A.      DAVATZIKOS.

Q.      YES, AND YOU CONCLUDE?  IS THAT FAIR TO SAY?

A.      YES, THERE IS NOTHING --

Q.      MS. HAINES ASKED YOU ABOUT THE TIMING OF YOUR TESTING, WHICH, TO REFRESH YOUR RECOLLECTION, WAS DONE IN NOVEMBER OF 2004, VERSUS THE TIME OF THE INCIDENT FOR WHICH WE ARE HERE.  DO YOU RECALL THOSE QUESTIONS?

A.      YES.

                    MS. SAUNDERS:  COURT'S INDULGENCE.

                    (PAUSE.)

BY MS. SAUNDERS:

Q.      I AM SHOWING YOU WHAT HAS BEEN MARKED AS DEFENSE EXHIBIT 108.  DO YOU SEE THAT?

A.      YES.

Q.      ARE YOU FAMILIAR WITH THAT?

A.      YES.

Q.      WHOSE REPORT IS THAT?

A.      THAT IS DR. MICHAEL GELBORT'S REPORT.

Q.      WHAT DATE DOES IT STATE THAT HE CONDUCTED HIS NEUROPSYCHOLOGICAL TESTING?

A.      ON SEPTEMBER 10, 1997.

Q.      THAT IS ABOUT 18 MONTHS AFTER APRIL 13TH, 1996, IS IT NOT?

A.      YES.

Q.      THIS TESTING INDICATED BRAIN DAMAGE, DID IT NOT?

A.      YES.

Q.      IN FACT, THIS TESTING YOU FOUND WAS CONSISTENT WITH THE TEST RESULTS THAT YOU CONDUCTED.  RIGHT?

A.      YES.

Q.      HE ALSO FOUND FRONTAL LOBE DAMAGE?

A.      YES.

Q.      HE ALSO FOUND IMPAIRMENTS IN VISUAL, SPATIAL ATTENTION AND PROCESSING STIMULI, DID HE NOT?

A.      YES.

Q.      MS. HAINES ALSO ASKED YOU ON CROSS EXAMINATION ABOUT YOUR TESTIMONY IN A CASE OF JOHN EICHINGER.  DO YOU REMEMBER THAT QUESTIONING?

A.      YES.

Q.      AND WHEN SHE WAS ASKING --

THE COURT:  CAN WE TAKE DOWN THE EXHIBIT ON THE SCREEN.

MS. SAUNDERS:  I'M SORRY.  I APOLOGIZE.

BY MS. SAUNDERS:

Q.     WHEN SHE WAS ASKING YOU THOSE QUESTIONS, DR. GUR, IT'S TRUE, IS IT NOT, THAT -- SHE WAS ASKING YOU QUESTIONS -- SHE WAS READING TO YOU TESTIMONY ABOUT WHETHER OR NOT YOU KNEW IF ANY OTHER NEUROPSYCHOLOGIST USED YOUR BEHAVIOR IMAGING SOFTWARE.  DO YOU REMEMBER THAT LINE OF QUESTIONS?

A.     YES.

Q.     WELL, IN THAT VERY HEARING YOU TESTIFIED, DID YOU NOT, THAT BOTH DR. RAGLAND AND DR. BIGLER, YOU KNEW THAT THEY ACTUALLY USED THAT SOFTWARE?

A.     YES.

Q.     AND REGARDLESS OF HOW MANY OR WHO OR IF YOU KNOW HOW MANY USED THE SOFTWARE, WHAT -- THE METHODS THAT YOU USED TO DEVELOP THE BEHAVIORAL IMAGING WAS PEER REVIEWED, WAS IT NOT?

A.     YES.

Q.     THAT IS THE STEP YOU TAKE BEFORE YOU DETERMINE WHETHER OR NOT IT IS SOMETHING YOU MIGHT WANT TO USE IN AN EVALUATION.  IS THAT FAIR TO SAY?

A.     ABSOLUTELY.

Q.     IF YOU CAN PUT UP SLIDE 6, PLEASE.  ONE MORE

DOWN, ONE MORE DOWN.  THAT IS IT, THANK YOU.

THIS WAS THE RESULTS OF THE MRI THAT YOU HAD CONDUCTED, IS THAT CORRECT?

A.    YES.

Q.    THAT BEING THE VOLUMETRIC ONE AS OPPOSED TO THE CLINICAL ONE, RIGHT?

A.    YES.

Q.    AT THE TOP OF THIS LITTLE GRAPH THERE IS A .5 AND THEN THERE'S A ZERO AND THEN THERE IS A MINUS 1, RIGHT?

A.    YES.

Q.    AND THEN A 2.2 AND 2.5.  ARE THESE THE STANDARDS OF DEVIATION?  IS THAT WHAT YOU ARE MEASURING?

A.    YES.

Q.    IN MR. HAMMER'S CASE YOU FOUND THAT HE HAD FRONTAL AND TEMPORAL AND EVEN PARIETAL DAMAGE BECAUSE IT WAS MORE THAN ONE STANDARD DEVIATION, IS THAT CORRECT?

A.    YES.

Q.    MS. HAINES QUESTIONED YOU A GREAT DEAL ABOUT A CASE, UNITED STATES VERSUS MONTGOMERY.  DO YOU REMEMBER THAT?

A.    YES.

Q.    AND SHE INDICATED OR INTIMATED THAT --

MS. HAINES:  OBJECTION.

BY MS. SAUNDERS:

Q.        DURING CROSS EXAMINATION THERE WAS A QUESTION OF WHETHER OR NOT AN ISSUE REGARDING YOUR TESTING HAD BEEN RENDERED HARMLESS BY THE 8TH CIRCUIT.  DO YOU RECALL THAT, THAT EXCHANGE BETWEEN YOU AND MS. HAINES?

A.        YES.

Q.        FIRST OFF, THE MONTGOMERY CASE IS A VERY DIFFERENT CASE THAN MR. HAMMER'S CASE, IS THAT RIGHT?

A.        MANY WAYS.

Q.        IT WAS -- IT INVOLVED -- HOW IS THAT -- WHAT IS THE NAME OF THAT DISEASE?

A.        PSEUDOCYESIS.

Q.        IT INVOLVED BOTH A CHALLENGE TO THE DEFENDANT'S INTENT AS A RESULT OF THAT ILLNESS AT THE GUILT PHASE AS WELL AS THE PENALTY PHASE, RIGHT?

A.        RIGHT.

Q.        IT INVOLVED A NUMBER OF PRETRIAL CHALLENGES BY THE GOVERNMENT WITH REGARD TO EXPERT TESTIMONY.  IS THAT FAIR TO SAY?

A.        YES.

Q.        AND THERE WERE ISSUES OF WHETHER OR NOT YOU HAD PROVIDED THE APPROPRIATE DISCOVERY AND THAT KIND OF THING, IS THAT RIGHT?

A.        YES.  WHAT HAPPENED WAS THAT IT WAS IN AUGUST WHEN EVERYBODY WAS GONE.  AND THE PROSECUTION EXPERT WANTED TO GET A COPY OF THE ORIGINAL SCANS OF THE 69

CONTROLS THAT WERE STUDIED ABOUT EIGHT, NINE YEARS EARLIER.

Q.      RIGHT.

A.      SO WE HAD TO -- WE HAD TO FORM MOTHBALLED COMPUTERS AND ACTUALLY USE THE MUSEUM TO READ THE CDS AND WE DID PRODUCE ALL THESE DATA, BUT IT WAS ABOUT A WEEK AFTER THE DEADLINE THAT THE JUDGE SET.

Q.      AND THE ISSUE OF COURSE -- MY POINT BEING, HOWEVER, IS THAT IT WAS VERY COMPLEX.  IT INVOLVED A NUMBER OF DIFFERENT AND A VARIETY OF COMPLEX ISSUES THAT FRANKLY ARE NOT RELEVANT HERE, IS THAT RIGHT?

A.      YEAH, OF COURSE.

Q.      NEVERTHELESS, THE 8TH CIRCUIT OF APPEALS ACTUALLY FOUND THAT THE DEFENSE HAD ACTUALLY COMPLIED WITH THE DISCOVERY REQUEST WITH REGARD TO THE PET.  IS THAT FAIR TO SAY?

A.      YES.

Q.      AS FOR THE HARMLESS ERROR ISSUE, THE ISSUE WAS WHETHER OR NOT THE ADMISSION OF THE PET SCAN DURING THE PENALTY PHASE, NOT THE GUILT PHASE, DURING THE PENALTY PHASE, HAD BEEN APPROPRIATE.  AND THE COURT FOUND THAT FOR ONE THING, THAT THERE IS A DIFFERENT STANDARD WITH REGARD TO THOSE THINGS, BUT ALSO FOUND THAT ANY ERROR WAS HARMLESS, RIGHT?

A.      THAT IS WHAT I --

Q.      THAT IS WHAT YOU UNDERSTOOD?

A.      THAT IS WHAT I UNDERSTOOD, YES.

Q.      THE DISAGREEMENT WITH THE MRI AS FAR AS -- AS FAR AS THE MONTGOMERY CASE HAD TO DO WITH THE EXPERTS THAT WERE HIRED BY THE GOVERNMENT DISAGREED WITH THE CONCLUSIONS THAT YOU RAISED WITH REGARD TO THE BRAIN DAMAGE BASED ON THE NUMBER OF STANDARDS OF DEVIATION, RIGHT?

A.      YES.

Q.      THEY CRITIQUED YOU FOR CONCLUDING THAT THERE IS BRAIN DAMAGE WHEN INDIVIDUALS -- WHEN MISS MONTGOMERY'S RESULTS SHOWED THAT THEY WERE NOT MORE THAN ONE STANDARD DEVIATION.  IS THAT FAIR TO SAY?

A.      THAT IS ABOUT RIGHT.

Q.      ALL RIGHT.

        IN THIS CASE, IN MR. HAMMER'S CASE, YOU ARE NOT SAYING ANY DAMAGE OCCURS UNLESS IT IS MORE THAN ONE STANDARD DEVIATION, IS THAT RIGHT?

A.      THAT'S RIGHT.

Q.      SINCE MONTGOMERY YOU HAVE BEEN CALLED TO TESTIFY AND TESTIFIED ABOUT YOUR TESTING WITH REGARDS TO THE PET, WITH REGARD TO THE MRI, AND YOUR COMPUTERIZED TESTING, IS THAT RIGHT?

A.      YES.

Q.      IN FACT, JUST A YEAR AGO, YOU TESTIFIED IN

UNITED STATES VERSUS NORTHINGTON?

A.      YES.

Q.      YOU WERE ACCEPTED AS AN EXPERT?

A.      YES.

Q.      YOU PRESENTED YOUR TESTIMONY AND YOUR RESULTS, RIGHT?

A.      YES.

Q.      AND EVEN IN THIS CASE THEY HAVE NOT CHALLENGED YOUR EXPERTISE, RIGHT?  NOBODY -- NOBODY GOT UP AFTER I STARTED TO QUALIFY YOU, RIGHT?

            MS. HAINES:  I'M GOING TO OBJECT TO THAT. THAT WAS NOT A CONCESSION THAT THIS MAN -- THAT WE AGREE WITH HIS METHODOLOGY.  WE WERE TRYING TO STREAMLINE THE TIMING OF THIS.

            THE COURT:  I WILL OVERRULE THE OBJECTION BECAUSE THERE WAS SOME CROSS EXAMINATION QUESTIONING.

            THE WITNESS:  THAT WAS MY UNDERSTANDING OF WHAT HAPPENED.

            MS. SAUNDERS:  COURT'S INDULGENCE.

            (PAUSE.)

BY MS. SAUNDERS:

Q.      AND THE CASE IN WHICH YOU TESTIFIED WHERE MR. NORTHINGTON'S CASE WAS HELD -- CONDUCTED HERE BEFORE JUDGE SURRICK IN THIS COURTHOUSE, RIGHT?

A.      YES.

Q.    BUT THAT IS NOT THE ONLY CASE YOU HAVE TESTIFIED IN SINCE YOUR JOURNEY THROUGH THE MONTGOMERY CASE, IS IT?

A.    THAT'S CORRECT.

Q.    IN FACT YOU TESTIFIED IN A POWELL CASE IN DELAWARE, DID YOU NOT?

A.    YES.

Q.    YOU WERE AGAIN ACCEPTED BY THAT STATE COURT AS AN EXPERT.  YOU WERE ACCEPTED AND YOU TESTIFIED ABOUT YOUR TESTING RESULTS, RIGHT?

A.    YES.

Q.    YOU TESTIFIED IN THE CENTRAL DISTRICT OF CALIFORNIA RECENTLY, DID YOU NOT, OR WITHIN -- AFTER THE MONTGOMERY -- AFTER THE MONTGOMERY INCIDENT?

A.    YES.

Q.    BECAUSE THE GOVERNMENT ACTUALLY TRIED TO RAISE MONTGOMERY IN THAT CASE AS WELL, DID THEY NOT?

A.    YES.

Q.    AND THE COURT ACCEPTED YOUR TESTIMONY, ACCEPTED YOUR TESTING AND IN FACT, I BELIEVE, CREDITED SOME -- MOST -- ALL OF YOUR TESTING, BUT ALSO SOME OF YOUR CONCLUSIONS WITH REGARD TO BRAIN DAMAGE, IS THAT CORRECT?

A.    YEAH.  I THINK YOU ARE TALKING ABOUT THE DHONG CASE?

Q.      RIGHT.   THE ONE WHERE MICHAEL BURT WAS THE ATTORNEY, IF THAT RINGS A BELL, B-U-R-T.

NO, I'M ACTUALLY TALKING ABOUT THE MCCLOSKEY CASE.

A.      MCCLOSKEY, RIGHT.  BUT IT'S TRUE WHAT YOU SAID.

Q.      THERE ARE NUMBER OF CASES WHICH YOU HAVE TESTIFIED SINCE THE MONTGOMERY CASE AND BEEN ACCEPTED AND USED YOUR METHODS AND TESTIFIED ABOUT THOSE AND THEY HAVE BEEN CREDITED, IS THAT FAIR TO SAY?

A.      YES.

Q.      AND YOU TESTIFIED ON CROSS EXAMINATION THAT PROBABLY YOU HAVE DONE 77 CASES BY NOW.  IS THAT FAIR TO SAY WHAT YOU SAID?

A.      I DON'T THINK I MENTIONED 77, BUT PROBABLY -- I MUST HAVE MORE THAN 70.

Q.      SO ONE CASE WHERE THEY MAY HAVE HAD QUESTIONS VERSUS THE 77 IS A PRETTY GOOD AVERAGE.  WOULD YOU AGREE WITH ME ON THAT?

MS. HAINES:  I'M GOING TO OBJECT TO THAT CHARACTERIZATION.  THERE IS NO EVIDENCE IN THE RECORD AS TO ALL THESE CASES AND WHAT THE JURY FOUND.

THE COURT:  I WILL SUSTAIN THE OBJECTION. THAT IS A QUESTION.

MS. SAUNDERS:  I WILL MOVE ON, YOUR HONOR.

BY MS. SAUNDERS:

Q.      ABOVE AND BEYOND YOUR TESTIMONY IN THESE FEDERAL CASES AND IN STATE CASES WHERE YOU HAVE BEEN ACCEPTED AS EXPERT, YOU ALSO ARE DOING, AS YOU SAID BEFORE, DOING WORK FOR NASA, IS THAT RIGHT?

A.      YES.

Q.      AND YOU ARE USING THE EXACT -- YOU ARE USING THE SAME METHODS AND THE SAME CALCULATIONS AND THE SAME NORMS FOR NASA, RIGHT?

A.      YES.

Q.      THEY'VE GOT A LOT OF SCIENTISTS THERE, DON'T THEY?

A.      YES.

Q.      YOU ARE DOING IT -- YOU ARE USING THE SAME METHOD AND THE SAME TYPE OF PET SCAN, THE SAME TYPE OF MRI IN CONDUCTING THE TESTING YOU ARE DOING FOR THE ARMY, RIGHT?

A.      WE DON'T DO PET SCANS IN THAT STUDY.

Q.      YOU ARE DOING THE MRI SCAN?

A.      YES.  WE ARE DOING THE MRI AND WE'RE DOING THE NEUROCOGNITIVE BATTERY.

Q.      YOU ARE DOING THE SAME TYPE OF TESTING FOR THE MARINES, RIGHT?

A.      YES.

Q.      ABOVE AND BEYOND ALL OF THAT, DR. GUR, YOU ALSO

REVIEWED THE PEN AND PENCIL TESTS OF DR. MARTELL AND DR. GELBORT AS WELL, RIGHT?

A.     YES.

Q.     YOUR TESTING, DR. GELBORT'S TESTING, AND DR. MARTELL'S TESTING, THE GOVERNMENT'S EXPERT IN THE 2255, ALL SHOWED SIMILAR RESULTS, IS THAT RIGHT?

A.     YES.

MS. SAUNDERS:  I HAVE NOTHING FURTHER.

THE COURT:  ANY --

MS. HAINES:  NO, YOUR HONOR.

THE COURT:  I HAVE A FEW QUESTIONS FOR CLARIFICATION.

YOU HAVE USED THE WORD "IMPULSIVE."  WHAT IS YOUR DEFINITION OF IMPULSIVE?  IS IT THE COMMON DICTIONARY DEFINITION OR DOES IT HAVE A SCIENTIFIC DEFINITION?

THE WITNESS:  I BELIEVE IN PSYCHOLOGY WE USE IT IN THE WAY WE USE IT IN THE ENGLISH LANGUAGE, MORE LIKE THE DICTIONARY DEFINITION.  BUT WE DEFINE IT OPERATIONALLY AS PROVIDING RESPONSES THAT ARE INCORRECT IN A SHORT PERIOD OF TIME.  SO IMPULSIVENESS, THE WAY WE MEASURE IT IN THE STARS, ARMY STARS STUDY, WE LOOK AT HOW MANY TIMES IN AN ATTENTION TEST YOU PUSH THAT YOU SAW A TARGET WHEN THERE WASN'T A TARGET AND YOU DID IT FAST, FASTER THAN NORMAL.  AND THAT ACTUALLY IS THE

VARIABLE THAT IS MOST HIGHLY PREDICTIVE OF SUICIDALITY.

I DON'T KNOW IF I'M ANSWERING.  I MEAN, PSYCHOLOGY USES ENGLISH.  SO IMPULSE CONTROL IS AN ENGLISH WORD AND THAT IS WHAT WE ARE TRYING TO EXPLAIN. DIFFERENT FIELDS MAY DEFINE IT OPERATIONALLY WHICH IS HOW DO YOU MEASURE IT, HOW DO YOU MAKE IT HAPPEN IN THE LAB SO YOU CAN MEASURE IT.  THAT IS WHAT PSYCHOLOGISTS ARE CONCERNED ABOUT.

THE COURT:  I UNDERSTAND.

THE LAST QUESTION I HAVE IS WHETHER IMPULSIVE BEHAVIOR -- HAVE THERE BEEN ANY STUDIES AS TO WHETHER IMPULSIVE BEHAVIOR WOULD COME BEFORE OR AFTER OR BE A PRODUCT OF PLANNING?

THE WITNESS:  THAT IS A VERY INTERESTING QUESTION, AND I'M AFRAID I DON'T KNOW THE ANSWER.  I'M TRYING TO THINK OF STUFF THAT I DO KNOW.  BUT YOU ARE ASKING SPECIFICALLY WHETHER THERE WERE STUDIES THAT SHOWED THAT YOU CAN BE IMPULSIVE EVEN AFTER YOU HAVE PLANNED A PARTICULAR ACT.

THE COURT:  DO YOU HAVE AN OPINION?

THE WITNESS:  YEAH.  PEOPLE CAN PLAN AND YET STILL BE IMPULSIVE.  I MEAN, I BELIEVE IT WAS EISENHOWER WHO SAID, NOTHING HAPPENS ACCORDING TO PLAN BUT PLANNING IS EVERYTHING.  THAT IS PART OF THE RECOGNITION THAT YOU CAN PLAN VERY CAREFULLY FOR

SOMETHING, BUT ONCE SOMETHING STARTS HAPPENING, YOU ALMOST NEVER CAN GO EXACTLY BY PLAN.  YOU JUST HAVE TO KEEP THE GENERAL IDEA IN MIND, BUT A LOT OF YOUR ACTIONS WILL HAVE TO BE FROM THE GUT, HAVE TO BE IMPULSIVE.

THE COURT:  DOES ANYBODY HAVE ANY QUESTIONS BASED UPON MY QUESTIONS?

MS. SAUNDERS:  NO, YOUR HONOR.

MS. HAINES:  NO, YOUR HONOR.

THE COURT:  ALL RIGHT.  YOU MAY STEP DOWN.

(WITNESS EXCUSED.)

THE COURT:  ALL RIGHT.  LET'S TAKE OUR LUNCH BREAK NOW AND WE WILL RESUME AT QUARTER TO 2.

MS. SAUNDERS:  THANK YOU, YOUR HONOR.

THE COURT:  WE WILL STAND IN RECESS.

MS. SAUNDERS:  I FORGOT TO MOVE MY EXHIBITS IN.  I APOLOGIZE.

THE COURT:  THERE WERE SOME GOVERNMENT EXHIBITS MARKED ALSO.  LET'S SEE.  WE HAVE GOVERNMENT EXHIBIT GC 1.

MS. HAINES:  I BELIEVE THAT IS THE PHOTOGRAPH OF EINSTEIN.  WE DON'T NEED TO MOVE THAT IN, YOUR HONOR.  THE ONLY ONE WE WOULD SEEK TO MOVE IN IS THE GC 4, WHICH WAS THE MRI REPORT.

THE COURT:  WHAT ABOUT G 130?

MS. HAINES:  I BELIEVE PARTS OF THAT HAVE BEEN READ INTO THE RECORD.  WE ARE NOT SEEKING TO INTRODUCE THAT AT THIS TIME.

THE COURT:  GC 5 IS A TRANSCRIPT AND GC 4010.1.  LET'S SEE.  THAT IS THE NEWSPAPER ARTICLE.

MR. GURGANUS:  YES, YOUR HONOR.  MOVE THAT IN.

THE COURT:  MOVE THAT INTO EVIDENCE.

ANY OBJECTION?

MR. MORENO:  NO OBJECTION, YOUR HONOR.

THE COURT:  THAT WILL BE RECEIVED.

(GOVERNMENT EXHIBIT NUMBER 4010.1 ADMITTED INTO EVIDENCE.)

THE COURT:  WHAT IS THE OTHER ONE YOU SAID YOU MOVING INTO EVIDENCE, GC --

MS. HAINES:  4.

THE COURT:  WHAT WAS THAT?

MS. HAINES:  THE MRI REPORT FROM DR. WOO.

THE COURT:  THAT WILL BE RECEIVED, HEARING NO OBJECTION.

(GOVERNMENT EXHIBIT GC 4 ADMITTED INTO EVIDENCE.)

THE COURT:  AND THE DEFENSE EXHIBITS ARE D 106, 107 AND 108?

MS. SAUNDERS:  YES, YOUR HONOR.

THE COURT:  HEARING NO OBJECTION, THOSE WILL BE ADMITTED INTO EVIDENCE.

(DEFENSE EXHIBITS 106, 107 AND 108 ADMITTED INTO EVIDENCE.)

MS. SAUNDERS:  THANK YOU, YOUR HONOR. LET'S TAKE OUR BREAK AND RESUME AT QUARTER TO TWO.

ALL COUNSEL:  THANK YOU, YOUR HONOR.

(LUNCHEON BREAK TAKEN.)

THE COURT:  PLEASE BE SEATED.

ALL COUNSEL:  GOOD AFTERNOON.

THE COURT:  COUNSEL, IS IT POSSIBLE TO GIVE ME SOME GUIDANCE ON HOW LONG THE DEFENSE CASE WILL TAKE?

MR. MORENO:  CERTAINLY.

THE COURT:  NOW, WE ARE NOT SITTING NEXT WEEK.

MR. MORENO:  THAT'S CORRECT.

THE COURT:  WE ARE GOING TO COME BACK --

MR. MORENO:  THE 23RD.

THE COURT:  JUNE 23RD TO CONTINUE.

MR. MORENO:  WE HAVE WITNESSES LINED UP FOR THE 23RD.  I DON'T KNOW IF IT WILL BE A FULL DAY. WE HAVE A NUMBER OF WITNESSES ON THE 24TH, MOST OF WHO SHOULD NOT BE TOO LONG; THERE MAY BE SOME.  WE HAVE TWO WITNESSES ON THE 25TH THAT WE THINK WILL PROBABLY TAKE

UP THE WHOLE DAY.  AND THEN ON THE 26TH WE HAVE A WITNESS, A TENTATIVE WITNESS RIGHT NOW.  WE MAY MOVE SOMEBODY WHO WAS ONLY AVAILABLE ON THE 30TH, MONDAY THE 30TH, TO THE 26TH, IF WE CAN, IF THAT AVAILABILITY HAS OPENED UP.  AND I THINK WE WOULD HAVE ONE WITNESS ON THE 30TH, AND WE WOULD BE DONE.

THE COURT:  ALL RIGHT.  AND HAVE YOU AGREED ON A VERDICT SHEET?

MR. MORENO:  NOT YET, YOUR HONOR.  WE WILL TALK ABOUT THAT THIS WEEK.

IS THAT SATISFACTORY FOR THE COURT?

THE COURT:  YES.  THAT IS GOOD INFORMATION FOR SCHEDULING PURPOSES.

THE DEFENDANT:  EXCUSE ME, YOUR HONOR, BUT I NEED TO CORRECT SOMETHING.  I MAY AS WELL TELL EVERYBODY NOW, I HAVE ALREADY TOLD MY COUNSEL AND I WILL TELL THE GOVERNMENT SO THEY WILL BE PREPARED.  I AM GOING TO TESTIFY AND I WILL BE THE LAST WITNESS IN THE CASE, SO YOU NEED TO INCLUDE THAT IN YOUR SCHEDULING.

THE COURT:  ALL RIGHT.  AGAIN, THAT IS A DECISION THAT YOU HAVE TO MAKE IN CONSULTATION WITH YOUR COUNSEL, AND CERTAINLY YOU WILL HAVE AN OPPORTUNITY TO DO THAT.  AND --

MR. MORENO:  WE ARE PREPARED FOR OUR NEXT WITNESS, YOUR HONOR.

THE COURT:  OKAY.  LET'S CALL THE NEXT WITNESS.

MR. MORENO:  WE WILL CALL DR. NEIL BLUMBERG.

NEIL BLUMBERG, DEFENSE WITNESS, SWORN

THE CLERK:  STATE AND SPELL YOUR FULL NAME FOR THE RECORD, PLEASE.

THE WITNESS:  MY NAME IS NEIL, N-E-I-L, HOWARD, H-O-W-A-R-D, BLUMBERG, B-L-U-M-B-E-R-G.

MR. MORENO:  YOUR HONOR, MAY I APPROACH THE WITNESS BRIEFLY FOR A MOMENT?

THE COURT:  YES.

DIRECT EXAMINATION

BY MR. MORENO:

Q.     DR. BLUMBERG, I HAVE JUST SHOWN YOU WHAT HAS BEEN MARKED AS DEFENDANT'S EXHIBIT 59.  THAT IS A COPY OF YOUR CV, CORRECT?

A.     YES.

Q.     AND IT'S AN ACCURATE AND UPDATED COPY AS BEST YOU KNOW?

A.     YES.

Q.     NOW, HOW ARE YOU CURRENTLY EMPLOYED?

A.     I'M IN FULL-TIME PRIVATE PRACTICE.

Q.     AND WHAT DOES YOUR PRACTICE ENTAIL?

A.     WELL, I'M A PHYSICIAN SPECIALIZING IN PSYCHIATRY

WITH A SUBSPECIALTY IN FORENSIC PSYCHIATRY.

Q.      AND HOW LONG HAVE YOU BEEN A FORENSIC PSYCHIATRIST?

A.      IT WILL BE 33 YEARS.

Q.      AND CAN YOU TELL US A LITTLE ABOUT YOUR EDUCATIONAL BACKGROUND?

A.      I DID MY UNDERGRADUATE WORK AT EMORY UNIVERSITY AND RECEIVED A BACHELOR'S DEGREE IN PSYCHOLOGY IN 1973. I GRADUATED WITH HIGHEST HONORS IN PSYCHOLOGY, AND WAS A MEMBER OF PHI BETA KAPPA.  I THEN ATTENDED THE GEORGE WASHINGTON UNIVERSITY SCHOOL OF MEDICINE IN WASHINGTON, D.C., AND RECEIVED MY MEDICAL DEGREE IN 1977.  I THEN DID MY PSYCHIATRIC RESIDENCY OR SPECIALTY TRAINING IN PSYCHIATRY AT THE SHEPPARD PRATT HOSPITAL IN TOWSON, MARYLAND FROM '77 TO '80, AND THEN A ONE-YEAR FELLOWSHIP OR A SUBSPECIALTY TRAINING IN THE AREA OF FORENSIC PSYCHIATRY AT THE UNIVERSITY OF MARYLAND SCHOOL OF MEDICINE.

Q.      NOW, AFTER YOU LEFT YOUR -- THE RESIDENCY, WHAT DID YOU DO NEXT?

A.      WELL, AFTER I COMPLETED THE RESIDENCY, I THEN DID THE FELLOWSHIP IN FORENSIC PSYCHIATRY.

Q.      RIGHT.

A.      WELL, AFTER THAT I DID A COUPLE OF THINGS. FIRST OF ALL, I STARTED A PRIVATE PRACTICE OF GENERAL

AND FORENSIC PSYCHIATRY.  AND BY GENERAL PSYCHIATRY MEANING I TREATED PATIENTS ON AN OUTPATIENT BASIS CONSISTENTLY FROM THAT TIME UP UNTIL ABOUT A YEAR AGO. I HAVE ALSO HAD A PRIVATE FORENSIC CONSULTATION PRACTICE, IN WHICH I HAVE DONE LEGAL PSYCHIATRIC CONSULTATIONS WITH ATTORNEYS AND COURT SYSTEMS AND VARIOUS AGENCIES.

BUT INITIALLY, I HELD A POSITION AT THE MARYLAND STATE MAXIMUM SECURITY HOSPITAL CALLED THE CLIFTON T. PERKINS HOSPITAL CENTER IN JESSUP, MARYLAND. AND PERKINS, AGAIN, IS -- WAS THE MAXIMUM SECURITY STATE HOSPITAL AND AT THAT TIME THEY EVALUATED AND TREATED MEN WHO WERE CHARGED WITH SERIOUS CRIMES, COMPETENCY, CRIMINAL RESPONSIBILITY, AS WELL AS TREATING INDIVIDUALS WHO WERE EITHER INCOMPETENT OR HAD BEEN FOUND NOT GUILTY BY REASON OF INSANITY.

WE ALSO WERE RESPONSIBLE FOR TREATING THE PATIENTS WHO WERE TOO VIOLENT TO BE MAINTAINED IN THE REGIONAL HOSPITAL SYSTEM, AS WELL AS PATIENTS WHO HAD BEEN IN PRISON BUT WERE TOO MENTALLY ILL TO BE MAINTAINED IN PRISON.

DURING THE LAST NINE MONTHS THERE I WAS THE CHIEF OF FORENSIC EVALUATION AND STAYED ON THE STAFF THERE UNTIL '84.  AT THAT POINT, I WENT INTO FULL-TIME PRIVATE PRACTICE OF BOTH GENERAL AND FORENSIC

PSYCHIATRY, UNTIL JANUARY OF '96.  AT THAT TIME I TOOK A PART-TIME POSITION AS THE CHIEF OF FORENSIC -- WELL, FORENSIC -- EXCUSE ME, THE DIRECTOR OF FORENSIC EVALUATION AT THE SPRING GROVE HOSPITAL CENTER IN CATONSVILLE, MARYLAND.  SPRING GROVE IS ONE OF THE REGIONAL STATE HOSPITALS.  AND IN THAT POSITION, I WAS RESPONSIBLE FOR PERFORMING AND SUPERVISING THE PRETRIAL EVALUATIONS FOR COMPETENCY AND CRIMINAL RESPONSIBILITY THAT WERE REFERRED BY THE COURT FROM BALTIMORE COUNTY AND HARFORD COUNTY, MARYLAND.  WAS ALSO RESPONSIBLE FOR OVERSEEING THE CARE AND TREATMENT OF INDIVIDUALS FOUND EITHER INCOMPETENT OR NOT CRIMINALLY RESPONSIBLE.  AND THAT WAS THE NEW TERM FOR NOT GUILTY BY REASON OF INSANITY IN MARYLAND.  FROM THOSE JURISIDICTIONS, AS WELL AS BALTIMORE CITY, AND AGAIN THE REGIONAL HOSPITAL DID THE LESS SERIOUS CRIMES THAT DID NOT REQUIRE A MAXIMUM SECURITY SETTING.

I STAYED IN THAT POSITION UNTIL JULY OF '99, WENT BACK IN A FULL-TIME PRIVATE PRACTICE UNTIL JANUARY OF 2000, AT WHICH POINT I TOOK A POSITION, PART TIME, AS THE FORENSIC CONSULTANT TO THE CIRCUIT AND DISTRICT COURTS OF BALTIMORE COUNTY.

I REMAINED IN THAT POSITION UNTIL JANUARY OF 2003.  AND IN THAT POSITION I DID SCREENING EVALUATIONS FOR COMPETENCY AND CRIMINAL RESPONSIBILITY

THAT WERE ORDERED BY BOTH THE CIRCUIT AND DISTRICT COURTS, AS WELL AS PROVIDING PRESENTENCE EVALUATIONS FOR THE DISTRICT COURT, WHICH IN MARYLAND IS OUR LOWER-LEVEL COURT.

AGAIN, BACK IN FULL-TIME PRIVATE PRACTICE IN JANUARY OF 2003 UNTIL FEBRUARY OF 2009.  SORT OF IN THE INTERIM, BETWEEN THE FIRST TIME I WAS AT SPRING GROVE AND THEN IN FEBRUARY OF 2009, I RETURNED TO SPRING GROVE BUT AS THE CHIEF OF FORENSIC SERVICES.  AND THERE HAD BEEN A CHANGE IN THE STATE HOSPITAL SYSTEM.  SEVERAL STATE HOSPITALS HAD BEEN ELIMINATED.  SPRING GROVE BECAME THE LARGEST STATE HOSPITAL IN MARYLAND.  AND WE WERE RESPONSIBLE NOW FOR DOING THE PRETRIAL EVALUATIONS NOT ONLY FOR BALTIMORE AND HARFORD COUNTIES, BUT ALSO FOR BALTIMORE CITY AND THEN THREE SOUTHERN MARYLAND COUNTIES.  IN THAT CAPACITY, I HAD A STAFF OF PSYCHOLOGISTS AND OTHER MENTAL HEALTH PROFESSIONALS THAT I SUPERVISED AND WE DID ALL OF THE EVALUATIONS FOR THOSE JURISDICTIONS.  I BOTH PERFORMED THE EVALUATIONS AS WELL AS SUPERVISED THE ONES THAT I DIDN'T PERFORM PERSONALLY.

I ALSO WAS INVOLVED AND RESPONSIBLE FOR SUPERVISING THE CARE AND TREATMENT OF INDIVIDUALS FOUND EITHER INCOMPETENT OR NOT CRIMINALLY RESPONSIBLE FROM THOSE JURISDICTIONS.

AND, AGAIN, WE PROBABLY -- WE HAD ALL BUT

THE MOST SERIOUS OF THE CRIMINAL OFFENSES THAT WENT TO OUR HOSPITAL.  THOSE STILL WENT TO THE CLIFTON T. PERKINS, WHICH IS THE MAXIMUM SECURITY HOSPITAL.

I REMAINED IN THAT POSITION, ALTHOUGH I GUESS IN THE LAST SIX MONTHS THERE I BECAME THE ASSOCIATE CHIEF OF FORENSIC SERVICES WHEN THE DEPARTMENT OF HEALTH AND MENTAL HYGIENE DETERMINED THAT A CHIEF OF FORENSIC SERVICES IN ANY OF THE HOSPITALS NEEDED TO BE A FULL-TIME EMPLOYEE, AND I WAS IN A HALF-TIME CAPACITY AND CHOSE NOT TO GO FULL TIME.

THEN IN MAY OF 2009 UNTIL LAST YEAR I WAS ABLE TO RETIRE FROM MY POSITION AT SPRING GROVE, AND HAVE BEEN IN THE FULL-TIME PRIVATE PRACTICE OF FORENSIC PSYCHIATRY SINCE THEN.

Q.    NOW, ARE YOU BOARD CERTIFIED IN FORENSIC PSYCHIATRY?

A.    I AM.  WELL, I'M BOARD CERTIFIED IN PSYCHIATRY BY THE AMERICAN BOARD OF PSYCHIATRY AND NEUROLOGY, AND RECEIVED THAT CERTIFICATION IN 1983.  AND I'M ALSO BOARD CERTIFIED IN FORENSIC PSYCHIATRY BY THE AMERICAN BOARD OF FORENSIC PSYCHIATRY, AND RECEIVED THAT CERTIFICATION IN 1986.

Q.    DO YOU KNOW THE PERCENTAGE OF PSYCHIATRISTS, FORENSIC PSYCHIATRISTS, WHO ARE BOARD CERTIFIED?

A.    WELL, IN FORENSIC PSYCHIATRY, IT'S LESS THAN ONE

PERCENT.

Q.      NOW, WHERE ARE YOU LICENSED TO PRACTICE?

A.      I'M LICENSED TO PRACTICE MEDICINE IN MARYLAND, PENNSYLVANIA, VIRGINIA AND FLORIDA.

Q.      NOW, DO YOU HAVE A NUMBER OF PUBLICATIONS RELEVANT TO FORENSIC PSYCHIATRY?

A.      WELL, I HAVE GOT SEVERAL PUBLICATIONS IN FORENSIC PSYCHIATRY, BUT MANY MORE PRESENTATIONS ON A WIDE VARIETY OF TOPICS.

Q.      AND THOSE ARE LISTED ON PAGES 7 AND 8 OF YOUR CV?

A.      WELL, 7 HAS THE PUBLICATIONS AND 8 THROUGH 13 HAVE THE PRESENTATIONS.

Q.      OKAY.  NOW, ARE YOU A MEMBER OF ANY RELEVANT PROFESSIONAL ORGANIZATIONS?

A.      I AM.  I'M A DISTINGUISHED LIFE FELLOW IN THE AMERICAN PSYCHIATRIC ASSOCIATION, WHICH IS THE APA'S HIGHEST HONOR, AS WELL AS HOLDING THAT DISTINCTION IN THE MARYLAND PSYCHIATRIC SOCIETY, WHICH IS THE LOCAL PSYCHIATRIC SOCIETY.  I'M ALSO A MEMBER OF THE AMERICAN ACADEMY OF PSYCHIATRY AND LAW, WHICH IS A NATIONAL ORGANIZATION FOR FORENSIC PSYCHIATRISTS.  AND ALSO A MEMBER OF THE AMERICAN ACADEMY OF FORENSIC SCIENCES, WHICH IS A MORE BROAD-BASED FORENSIC ORGANIZATION.

Q.      NOW, HOW DO YOU BECOME A FELLOW?

A.    WELL, YOU HAVE TO BE NOMINATED BY YOUR PEERS AS HAVING DONE SOMETHING OUT OF THE ORDINARY, IN TERMS OF CONTRIBUTION, EITHER TO THE TEACHING OR RESEARCH, ON A STATE OR LOCAL LEVEL.

Q.    NOW, DO YOU CURRENTLY HOLD ANY TEACHING POSITIONS?

A.    I DO.  I HAVE BEEN ON THE CLINICAL FACULTY AT THE UNIVERSITY OF MARYLAND SCHOOL OF MEDICINE SINCE COMPLETING MY FORENSIC FELLOWSHIP.  AND I'M A CLINICAL ASSOCIATE PROFESSOR OF PSYCHIATRY.  AND WHAT I DO IS, I'M HELPING TO TRAIN FORENSIC PSYCHIATRISTS WHO ARE GOING THROUGH A FORENSIC FELLOWSHIP PROGRAM, AS WELL AS WE HAVE RESIDENTS FROM JOHNS HOPKINS, SHEPPARD PRATT, AND THE UNIVERSITY OF MARYLAND THAT GO THROUGH A FORENSIC PSYCHIATRY ROTATION.  AND I'M INVOLVED IN HELPING TO TRAIN THEM, TOO.

Q.    NOW, ROUGHLY HOW MANY FORENSIC PSYCHIATRIC EVALUATIONS HAVE YOU CONDUCTED AT THIS POINT?

A.    WELL, AT THIS POINT, IT'S PROBABLY AROUND 6,000.

Q.    AND HOW MANY TIMES HAVE YOU BEEN QUALIFIED BY EITHER A STATE COURT OR FEDERAL COURT JUDGE AS AN EXPERT IN FORENSIC -- PSYCHIATRY AND FORENSIC PSYCHIATRY?

A.    WELL, IF YOU ARE INCLUDING DEPOSITIONS ALSO, PROBABLY AROUND 600.

Q.    HAS A COURT EVER REFUSED TO QUALIFY YOU AS AN

EXPERT?

A.        NOT IN PSYCHIATRY AND FORENSIC PSYCHIATRY.

Q.        HAVE YOU EVER BEEN HIRED BY THE UNITED STATES ATTORNEY'S OFFICE?

A.        YES.

Q.        IN CAPITAL CASES?

A.        YES.

Q.        AND WHERE WOULD THAT HAVE BEEN?

A.        IT WOULD HAVE BEEN IN MARYLAND, AS WELL AS -- I'M TRYING TO THINK WHETHER IT WAS THE EASTERN DISTRICT -- NO, IT WAS JUST IN MARYLAND.

Q.        AND HAVE YOU EVER BEEN HIRED BY THE U.S. ATTORNEY'S OFFICE IN A NONCAPITAL CASE?

A.        YES.

Q.        HAVE YOU BEEN RETAINED BY THE PROSECUTION IN A STATE CAPITAL CASE?

A.        I HAVE.

Q.        AND WHERE WOULD THAT HAVE BEEN?

A.        WELL, THAT WOULD HAVE BEEN IN MARYLAND, AS WELL AS -- WELL, I WAS A PROSECUTION EXPERT IN -- THE INDIVIDUAL WAS ACTUALLY CHARGED IN TWO SEPARATE CAPITAL CASES.  AND I SERVED AS AN EXPERT FOR THE PROSECUTION. AND THAT WAS IN BALTIMORE COUNTY, MARYLAND, WOUND UP BEING THE FIRST INDIVIDUAL EXECUTED SINCE THE 1970'S.

                    I HAVE ALSO CONSULTED WITH SEVERAL

DIFFERENT PROSECUTORS' OFFICES IN PENNSYLVANIA.

Q.      ON CAPITAL CASES?

A.      ON CAPITAL CASES.

Q.      NOW, HAVE YOU EVER BEEN RETAINED BY THE PROSECUTION IN A CAPITAL CASE AND TOLD THEM THAT YOU CAN'T HELP THEM OUT, THAT IN FACT THERE IS MITIGATION?

A.      WELL, I TOLD THEM THAT THERE IS MITIGATION BUT OFTENTIMES THERE ARE SOME THINGS THAT YOU CAN STILL CONSULT ON AS A PROSECUTION EXPERT AND ASSIST IN HELPING TO EXPLAIN INFORMATION, AND PERHAPS IF THERE IS SOME AREAS THAT MIGHT BE CRITICIZED.  SO I WOULD NOT SAY I HAVE NEVER DECLINED TO ASSIST.  THERE IS USUALLY SOMETHING -- SOME HELP THAT I CAN PROVIDE.  BUT, YOU KNOW, ACKNOWLEDGE THAT THERE ARE CERTAIN CASES IN WHICH THERE WAS SUBSTANTIAL MITIGATION.

Q.      IN TERMS OF ON THE FLIP SIDE OF THE COIN, HAVE YOU EVER BEEN RETAINED BY THE DEFENSE AND HAD TO TELL THEM THAT THERE REALLY WAS NOT MUCH YOU COULD DO FOR THEM, AFTER YOUR EVALUATION?

A.      YES.  AND IN PARTICULAR THE SECOND AND THIRD INDIVIDUALS WHO WERE EXECUTED IN THE STATE OF MARYLAND, I HAD BEEN A DEFENSE EXPERT AND SAID I DIDN'T REALLY HAVE MUCH TO SAY THAT WOULD HAVE BEEN HELPFUL.  THERE HAVE BEEN OTHER CASES IN WHICH THERE WAS NOT SIGNIFICANT MITIGATION THAT WOULD WARRANT MY COMING TO COURT TO

TESTIFY.

Q.    AND APPROXIMATELY HOW MANY CAPITAL CASES COMBINED, BOTH STATE AND FEDERAL AND DEFENSE AND PROSECUTION, HAVE YOU BEEN INVOLVED IN OVER THE YEARS?

A.    I HAVE BEEN INVOLVED IN AROUND 190 CAPITAL CASES.

Q.    IN HOW MANY HAVE YOU TESTIFIED?

A.    I THINK PROBABLY ABOUT SOMEWHERE BETWEEN 30 AND 40.

Q.    NOW --

A.    WELL, OF THAT, I THINK EIGHT OF THEM WERE AS A PROSECUTION EXPERT.

Q.    AND THE OTHERS WERE AS A DEFENSE EXPERT?

A.    YES.

Q.    NOW, YOU HAVE BEEN RETAINED BY MY OFFICE IN THE PAST, IS THAT CORRECT?

A.    YES.

MR. MORENO:  I WOULD MOVE, YOUR HONOR, AT THIS TIME, PENDING ANY QUESTIONS ON QUALIFICATIONS BY THE GOVERNMENT, FOR ADMISSION OF DR. BLUMBERG AS AN EXPERT IN PSYCHIATRY AND FORENSIC PSYCHIATRY.

THE COURT:  ANY VOIR DIRE?

MR. GURGANUS:  NO, YOUR HONOR.

THE COURT:  ALL RIGHT.  WE WILL FIND HIM SO QUALIFIED.

MR. MORENO:  THANK YOU.

THE COURT:  AND YOU MOVE HIS CV, D 59, INTO EVIDENCE?

MR. MORENO:  YES, PLEASE.

THE COURT:  THAT WILL BE ACCEPTED.

(EXHIBIT NUMBER D 59 ADMITTED INTO EVIDENCE.)

MR. MORENO:  THANK YOU.

BY MR. MORENO:

Q.     NOW, DR. BLUMBERG, YOU TESTIFIED ON MR. HAMMER'S BEHALF IN 2005 DURING THE SECTION 2255 PROCEEDINGS, IS THAT CORRECT?

A.     YES.

Q.     NOW, PRIOR TO TESTIFYING IN THAT PROCEEDING, DID YOU HAVE AN OPPORTUNITY TO REVIEW MR. HAMMER'S MEDICAL AND PSYCHIATRIC RECORDS?

A.     YES.

Q.     AND INCLUDING THE ONES UP TO THAT POINT IN TIME FROM OKLAHOMA DEPARTMENT OF CORRECTIONS AND BUREAU OF PRISONS?

A.     YES.

Q.     DID YOU ALSO HAVE AN OPPORTUNITY TO REVIEW THE TRIAL TRANSCRIPTS FROM THE 1998 TRIAL?

A.     YES.

Q.     AND DID YOU REVIEW THE PENALTY PHASE TRANSCRIPTS

AS WELL?

A.        YES.

Q.        DID YOU HAVE AN OPPORTUNITY TO REVIEW THE REPORT OF THE GOVERNMENT'S EXPERT FROM THE 2255 HEARING, DR. DANIEL MARTELL, THE NEUROPSYCHIATRIST -- PSYCHOLOGIST, EXCUSE ME?

A.        YES, I DID.

Q.        AND HOW ABOUT DR. DARYL MATTHEWS, WHO IS THE GOVERNMENT'S EXPERT AS A FORENSIC PSYCHIATRIST?

A.        YES.

Q.        AND YOU HAD AN OPPORTUNITY ALSO TO REVIEW SOME OF THE DEFENSE EXPERTS' AFFIDAVITS, SUCH AS DR. GELBORT?

A.        YES.

Q.        AND DR. SADOFF AT THE TIME OF TRIAL?

A.        YES.

Q.        OKAY.  AND DID YOU HAVE AN OPPORTUNITY TO REVIEW DR. DAVID LISAK'S REPORT WHICH WAS PREPARED FOR THESE PROCEEDINGS?

A.        YES, I THINK I SAW AN AFFIDAVIT AS WELL AS A REPORT.

Q.        AND YOU HAD AN OPPORTUNITY TO REVIEW A SOCIAL HISTORY THAT WAS DEVELOPED FOR PURPOSES OF THIS SENTENCING HEARING?

A.        YES.

Q.        NOW, PRIOR TO YOUR TESTIMONY IN 2005, DID YOU

CONDUCT A FORENSIC PSYCHIATRIC EVALUATION OF MR. HAMMER?

A.      I DID.

Q.      WHERE DID THAT TAKE PLACE?

A.      THAT TOOK PLACE AT THE UNITED STATES FEDERAL PENITENTIARY IN LEWISBURG, PENNSYLVANIA.

Q.      AND HOW LONG DID YOU MEET WITH HIM FOR?

A.      I MET WITH MR. HAMMER FOR THREE HOURS AND 35 MINUTES AND THAT WAS ON OCTOBER 21ST OF 2004.

Q.      NOW, IN PREPARATION FOR THESE PROCEEDINGS, HAVE YOU HAD ANOTHER OPPORTUNITY TO EVALUATE MR. HAMMER?

A.      YES.

Q.      AND WHEN DID THAT TAKE PLACE?

A.      THAT TOOK PLACE ON MAY 16TH OF 2014.

Q.      AND HOW WAS THAT ACCOMPLISHED, WHERE DID THAT TAKE PLACE?

A.      WELL, IT WAS A VIDEO CONFERENCE AND IT TOOK PLACE WITH ME AT THE UNITED STATES COURTHOUSE IN HARRISBURG, PENNSYLVANIA, AND MR. HAMMER WAS AT THE UNITED STATES PENITENTIARY IN TERRE HAUTE.

Q.      AND WAS IT JUST YOU AND MR. HAMMER IN THE ROOM BY VIDEO CONFERENCING?

A.      YES.  I BELIEVE THAT THE ATTORNEYS, INCLUDING YOU, MAY HAVE SPOKEN WITH HIM BEFOREHAND.  BUT THEN WHEN I INTERVIEWED HIM, IT WAS ALONE.  I THINK THAT TOOK PLACE FOR ABOUT AN HOUR AND 25 MINUTES.

Q.    ALL RIGHT.  AND YOU ARE AWARE THAT MR. HAMMER HAS PLED GUILTY TO FIRST DEGREE MURDER IN THIS CASE.

A.    YES.

Q.    DO YOU REMEMBER THAT FROM THE TIME OF THE TRIAL?

A.    YES.

Q.    ALL RIGHT.  AND YOU UNDERSTAND THAT BY HAVING DONE THAT HE ACCEPTED RESPONSIBILITY?

A.    YES.

Q.    NOW, I WANT TO ASK YOU IF YOU HAVE REACHED ANY PSYCHIATRIC CONCLUSIONS AND/OR OPINIONS TO A REASONABLE DEGREE OF SCIENTIFIC AND MEDICAL CERTAINTY IN THIS CASE. AND WE ARE GOING TO DISCUSS THEM IN GREATER DETAIL, BUT I JUST WANT TO LAY OUT UP FRONT AND FIND IF YOU'VE REACHED ANY SUCH DIAGNOSES?

A.    I HAVE, BUT I NEED TO MENTION ONE OTHER THING. IN MY MOST RECENT EXAMINATION, I DID ALSO ADMINISTER TWO PSYCHOLOGICAL MEASURES.

Q.    AND I WAS GOING TO GET THERE, BUT GO AHEAD. WHAT PSYCHOLOGICAL MEASURES DID YOU --

A.    WELL, ONE IS CALLED THE M-FAST, WHICH IS A SCREENING TEST FOR MALINGERING OF PSYCHOPATHOLOGY, AND THE OTHER ONE IS THE TRAUMA SYMPTOM INVENTORY THAT'S IN A SECOND EDITION, AND THAT IS A TEST OF POTENTIALLY POST-TRAUMATIC SYMPTOMS.

Q.    AND ON THE MALINGERING TEST, HOW DID MR. HAMMER

SCORE?

A.      HE DID NOT ENDORSE ANY ITEMS THAT WOULD SUGGEST MALINGERING.

Q.      NOW, WE WILL DISCUSS THE TRAUMA SYMPTOM INVENTORY RESULTS IN A FEW MOMENTS WHEN WE GET TO THAT PARTICULAR DIAGNOSES.  BUT CAN YOU TELL US WHAT OTHER DIAGNOSES BESIDES POST-TRAUMATIC STRESS DISORDER THAT YOU REACHED IN THIS CASE?

A.      WELL, I DID DIAGNOSE HIM WITH POST-TRAUMATIC STRESS DISORDER.  AND I ALSO DIAGNOSED HIM WITH A BORDERLINE PERSONALITY DISORDER AND AN ANTISOCIAL PERSONALITY DISORDER.  AND BACK IN 2005, COGNITIVE DISORDER, NOT OTHERWISE SPECIFIED, ALTHOUGH OUR NOMENCLATURE HAS CHANGED SINCE THEN.  AND ALTHOUGH IT'S BASICALLY THE SAME THING, IT'S NOW CALLED A MILD NEUROCOGNITIVE DISORDER DUE TO MULTIPLE ETIOLOGIES.

Q.      AND THAT IS IN THE NEW DIAGNOSTIC AND THE STATISTICAL MANUAL FOR MENTAL DISORDERS AND DISEASES, FIFTH EDITION?

A.      YES, SURE, DSM 5.

Q.      DSM 5.  OKAY.  AND THAT JUST RECENTLY CAME OUT, CORRECT?

A.      I BELIEVE IT WAS IN MAY OF 2013.

Q.      OKAY.

                NOW, IN TERMS OF THE CHANGE IN THE DSM TO

THE DSM 5, DID YOU ALSO REFERENCE YOUR PRIOR DIAGNOSES AND CROSS COMPARE THEM TO ANY CHANGES THAT MAY HAVE TAKEN PLACE FOR EITHER POST-TRAUMATIC STRESS DISORDER OR BORDERLINE PERSONALITY DISORDER?

A.      YES.  I MEAN, THE CRITERIA FOR THE BORDERLINE AND ANTISOCIAL PERSONALITY DISORDERS, YOU KNOW, IS ESSENTIALLY UNCHANGED.  THE DIAGNOSIS OF THE COGNITIVE DISORDER NOT OTHERWISE SPECIFIED IS BASICALLY THE SAME AS THE MILD NEUROCOGNITIVE DISORDER.

THERE HAS BEEN SOME CHANGE IN THE DIAGNOSTIC CRITERIA OVER THE YEARS FOR POST-TRAUMATIC STRESS DISORDER OR WHAT WE CALL PTSD, BUT REGARDLESS OF, YOU KNOW, WHICH CRITERIA YOU ARE USING, HE MET THE CRITERIA, IN MY OPINION, BACK AT THE TIME OF THE OFFENSE.

Q.      ALL RIGHT.

NOW --

A.      AND ALSO AT THE TIME OF MY INITIAL EVALUATION OF HIM.

Q.      IS IT FAIR TO SAY THAT THEY HAVE DROPPED THE MODIFIER CHRONIC.  THAT IS NO LONGER USED, POST-TRAUMATIC STRESS DISORDER CHRONIC?

A.      THAT'S CORRECT.

Q.      NOW, BEFORE WE DISCUSS THE BASIS FOR YOUR OPINIONS, I WANT TO ASK YOU A FEW QUESTIONS ABOUT HOW

YOU GO ABOUT ASSESSING INFORMATION IN THE CONTEXT OF FORENSIC PSYCHIATRIC EVALUATION.

WHEN YOU INTERVIEWED DAVID IN THIS CASE, WERE YOU CONCERNED ABOUT POTENTIAL MALINGERING OR IS THAT A CONCERN THAT IS ALWAYS PRESENT WHEN YOU ARE DOING A FORENSIC EVALUATION?

A.    WELL, IT'S SOMETHING THAT YOU ARE ALWAYS CONCERNED ABOUT, AND IT'S SOMETHING THAT YOU HAVE TO ADDRESS IN ANY TYPE OF LEGAL PSYCHIATRIC MATTER.

Q.    AND THINKING BACK TO YOUR EVALUATION PRIOR TO THE 2255, AND PROBABLY IN 2004, WHAT DO YOU DO WHEN YOU ARE SITTING DOWN WITH SOMEONE TO SORT OF ASSESS MALINGERING, CREDIBILITY, THINGS OF THAT NATURE?

A.    WELL, THE PRIMARY THING -- WELL, THERE ARE SEVERAL THINGS.  FIRST OF ALL, IT'S ESSENTIAL IN ANY TYPE OF MEDICAL/LEGAL OR LEGAL PSYCHIATRIC CASE TO RELY IN PART ON OTHER SOURCES OF INFORMATION.  SO -- AND IN THIS CASE, THERE WAS AN EXTENSIVE DATABASE OF OBSERVATIONS OF OTHER PEOPLE, EARLIER MENTAL HEALTH RECORDS, MEDICAL RECORDS, CRIMINAL HISTORY RECORDS, RECORDS OF HIS BEHAVIOR, DEMEANOR, AND MENTAL HEALTH ISSUES DURING HIS INCARCERATIONS.  THERE WAS INPUT FROM DIFFERENT, OTHER INDIVIDUALS, FAMILY MEMBERS.  WE HAVE THE MITIGATION SPECIALISTS, OR SOCIAL WORKER, OR FORENSIC SOCIAL WORKER OBTAINED INFORMATION FROM MANY

OTHER INDIVIDUALS TO KIND OF FLUSH OUT A PRIOR HISTORY.

SO I WAS ABLE TO COMPARE AND CONTRAST WHAT MR. HAMMER

TOLD ME WITH WHAT WAS AVAILABLE FROM OTHER SOURCES.

THAT IS ONE WAY TO SORT OF CHECK IT, CHECK THE VERACITY.

HOPEFULLY, IT JIBES.  YOU KNOW, IF IT DOESN'T, THEN YOU

HAVE GOT SOME QUESTIONS ABOUT WHETHER THE PERSON IS

BEING STRAIGHTFORWARD OR NOT.

THERE IS ALSO, WHETHER THERE IS AN

INTERNAL CONSISTENCY BETWEEN THE KIND OF SYMPTOMS THAT

ARE DESCRIBED AND ALSO DURING THE COURSE OF THE

INTERVIEW, THE DIFFERENT EMOTIONAL RESPONSES OR THE

MENTAL STATUS EXAMINATION THAT IS OBSERVABLE.  AND SO

ONE LOOKS AT THAT.  AND HIS RESPONSES DURING THAT

INITIAL EVALUATION WERE ENTIRELY CONSISTENT ULTIMATELY

WITH WHAT I DIAGNOSED AND THE INFORMATION THAT WAS

PROVIDED BY OTHER SOURCES, ESPECIALLY IN VIEW OF THE

EXTENSIVE HISTORY OF TRAUMA AND ABUSE THAT HE HAD

SUSTAINED THROUGHOUT HIS CHILDHOOD.

Q.    SO DID YOU FIND CORROBORATIVE EVIDENCE IN THE

MATERIALS THAT YOU REVIEWED OBVIOUSLY TO SUPPORT YOUR

DIAGNOSIS?

A.    YES.

Q.    AND HOW ABOUT, DID YOU FIND CORROBORATIVE

EVIDENCE IN THE MATERIALS YOU REVIEWED CONCERNING

WHETHER OR NOT DAVID WAS SEXUALLY ABUSED AS A CHILD?

A.    YES.

Q.    AND WAS THERE CORROBORATIVE EVIDENCE REGARDING THE PHYSICAL AND VERBAL ABUSE THAT HE TOLD YOU ABOUT?

A.    YES, THERE WAS.  AND JUST -- THE ADDITIONAL PART OF THAT IS, WHEN HE DESCRIBED MANY OF THE ABUSIVE INCIDENTS, THERE WAS A RATHER DRAMATIC AND NOTICEABLE CHANGE IN HIS DEMEANOR.  AT TIMES HE BECAME TEARFUL.  AT TIMES HE BECAME RATHER AGITATED AND UPSET, AND AGAIN THAT WOULD BE CONSISTENT WITH SOMEONE WHO IS HAVING A GENUINE REACTION AND WHO LIKELY EXPERIENCED THOSE THINGS.

Q.    NOW, AS PART OF THE MATERIALS THAT YOU REVIEWED PRIOR TO THE 2255 PROCEEDINGS, DID YOU ALSO HAVE AN OPPORTUNITY TO WATCH THE VIDEOTAPE EVALUATION OF DAVID BY DRS. MATTHEWS AND MARTELL?

A.    YES.

Q.    WHAT DID YOU OBSERVE ABOUT DAVID, HIS DEMEANOR, WHEN HE WAS DISCUSSING THE TRAUMA?

A.    WELL, IT WAS THE SAME AS IT WAS WITH ME.  IT WAS VERY DISTRESSED IN DISCUSSING THAT, TEARFUL, AGITATED.  YOU KNOW, THE KIND OF -- AND ACTUALLY THAT KIND OF REACTION IS ONE OF THE DIAGNOSTIC CRITERIA FOR POST-TRAUMATIC STRESS DISORDER.  THAT IS, THE INDIVIDUAL MAY EXPERIENCE INTENSE EITHER PSYCHOLOGICAL OR PHYSIOLOGICAL REACTIVITY WHEN EXPOSED TO EVENTS THAT

REMIND THEM OF THE PRIOR TRAUMA.

Q.     AND DO YOU RECALL THAT DR. MATTHEWS AND MARTELL BOTH TESTIFIED THAT THEY FOUND HIS EXPRESSION OF EMOTION ON THOSE ISSUES TO BE GENUINE?

A.     YES.

Q.     NOW, LET'S TALK ABOUT WHAT THE FACTUAL PREDICATE IS FOR YOUR CONCLUSION THAT AT THE TIME OF THE MURDER IN THIS -- WELL, LET ME ASK YOU.  I DIDN'T ASK YOU THIS. AT THE TIME OF THE MURDER IN THIS CASE, AT THE TIME OF THE DEATH OF MR. MARTI, DO YOU HAVE AN OPINION TO A REASONABLE DEGREE OF MEDICAL AND SCIENTIFIC CERTAINTY AS TO WHETHER OR NOT MR. HAMMER SUFFERED FROM BORDERLINE PERSONALITY DISORDER?

A.     I DO.

Q.     AND?

A.     HE DID.

Q.     AND HOW ABOUT FOR POST-TRAUMATIC STRESS DISORDER AT THE TIME OF THE MURDER?

A.     I DO.

Q.     AND?

A.     HE DID.

Q.     SO NOW LET'S TURN TO WHAT THE FACTUAL PREDICATE FOR YOUR CONCLUSION ABOUT THE DIAGNOSES YOU REACHED, WHAT IS THE FACTUAL PREDICATE FOR THAT, IF YOU CAN GIVE US A RUNDOWN ON WHAT YOU FOUND THAT SUPPORTS IT?

A.    WELL, IN TERMS OF THE POST-TRAUMATIC STRESS DISORDER, THERE WAS AN EXTENSIVE HISTORY OF PHYSICAL ABUSE, SEXUAL ABUSE, NEGLECT, CHAOTIC HOME ENVIRONMENT, SEXUAL ABUSE THAT INVOLVED BOTH FORCED, COERCED, AS WELL AS EVEN, I GUESS, WHAT WOULD BE DESCRIBED AS SORT OF A SEXUAL TORTURE.

HE, I THINK IT HAS BEEN DESCRIBED AS HAVING BEEN GIVEN ENEMAS WITH VERY HOT WATER, SOMETIMES WITH TABASCO OR ANOTHER BURNING AGENT THAT WAS ADMINISTERED TO HIM BY HIS MOTHER.  HIS MOTHER WAS THE PRIMARY ASSAILANT PHYSICALLY, AS WELL AS, VERBALLY, EMOTIONALLY, AND FOR A PERIOD OF TIME BETWEEN I BELIEVE TEN AND ABOUT 13 OR 14, SEXUALLY.

THERE WERE OTHER PERPETRATORS OF SEXUAL ABUSE, UNCLE, STRANGER, COUSINS.  HIS FATHER WAS NOT DESCRIBED AS PHYSICALLY ABUSIVE, BUT HE DIDN'T INTERVENE IN PROTECTING DAVID FROM THE ABUSE BY HIS MOTHER OR ANY OF THE OTHER PEOPLE.  AND IN FACT AT ONE POINT ORCHESTRATED AN INCESTUOUS RELATIONSHIP BETWEEN DAVID AND HIS SISTER.  DAVID WITNESSED HIS FATHER MOLESTING AND HAVING IN FACT SEXUAL INTERCOURSE WITH HIS SISTER.

THERE WERE BEATINGS BY HIS MOTHER, WHO USED BASICALLY ANYTHING THAT SHE COULD GET HER HANDS ON IN ORDER TO DISCIPLINE.  BUT HE EVEN DESCRIBED, THOUGH, THAT THE WORST OF THE ABUSES WAS THE VERBAL ABUSE, WHERE

SHE WOULD TYPICALLY BERATE HIM, CALL HIM STUPID, BITCH, AND OTHER REALLY DEMEANING KINDS OF THINGS THAT HE FOUND EVEN MORE HURTFUL THAN SOME OF THE PHYSICAL ABUSE THAT HE WAS EXPOSED TO.

Q.    WAS THE PHYSICAL ABUSE SOMETHING THAT WAS ONGOING IN HIS LIFE WHILE HE WAS GROWING UP?

A.    WELL, IT WAS ONGOING.  IT WAS ONGOING, AND IT WAS VERY UNPREDICTABLE.  ANYTHING SEEMED TO SET HIS MOTHER OFF.  AND HE NEVER KNEW WHEN IT WAS GOING TO HAPPEN, WHICH ADDED EVEN MORE TO THE OVERALL ANXIETY AND DEPRESSION THAT HE EXPERIENCED DURING HIS GROWING UP YEARS.

Q.    SO THE UNPREDICTABILITY OF WHAT WOULD TRIGGER HIS MOTHER WOULD BE OBVIOUSLY ANXIETY-PRODUCING AND DAMAGING TO A CHILD?

A.    YES.  I MEAN, AMONG OTHER THINGS, ALSO.  I MEAN, HE DESCRIBED ONE INCIDENT WHERE I THINK IT WAS HIS SIBLING'S DOG GOT RUN OVER AND HIS MOTHER BLAMED HIM, SO SHE BEAT HIS PUPPY WITH A SHOVEL AND THEN MADE HIM THROW SEVERAL DOGS INTO THE WATER.  HE WAS FORCED TO SHOOT HIS OWN DOG AT SOME POINT BECAUSE IT WAS BARKING TOO MUCH.  AND AGAIN, SORT OF A WIDE VARIETY OF INCREDIBLY SADISTIC BEHAVIORS THAT HE WAS EXPOSED TO.

Q.    NOW, IN ADDITION TO THE SADISTIC BEHAVIORS, THE BEATINGS, THE ENEMAS -- WELL, LET ME BACK UP FOR A

MINUTE.  THE ENEMAS, DO YOU KNOW HOW LONG THAT WENT ON FOR?  IF YOU DON'T, THAT IS FINE.  WAS IT A NUMBER OF YEARS?

A.      IT WENT ON FOR A NUMBER OF YEARS.  AND IT'S MY RECOLLECTION THAT THIS WAS A FORM OF, QUOTE, DISCIPLINE, BUT I THINK MORE TORTURE.  IT WAS ALSO ADMINISTERED TO HIS BROTHER.  SO THERE IS SOME CONFIRMATION THAT THIS WAS NOT JUST, YOU KNOW, HIM MAKING UP A STORY THAT, YOU KNOW, IN HIS OWN -- FOR HIS OWN BENEFIT.

Q.      NOW, DID YOU HAVE ANY INDICATION IN WHAT DAVID REPORTED TO YOU OR WHAT YOU READ ANYWHERE THAT THESE ENEMAS WERE FOR MEDICINAL PURPOSES IN ANY WAY?

A.      NO.  NO, THEY WERE NOT.  THEY WERE TO BURN THE EVIL OUT OF HIM, BURN THE DEVIL OUT OF HIM.  CLEARLY TO PUNISH HIM.

I THINK I SAW IN ONE REPORT THERE WAS AN INDICATION THAT THIS MAY HAVE STARTED WHEN HE INITIALLY RESISTED ENGAGING IN SOME TYPE OF SEXUAL ACTIVITY WITH HIS MOTHER.

Q.      NOW, SINCE TESTIFYING IN 2005, HAVE YOU SEEN EVIDENCE RELATED TO MR. HAMMER'S FAMILY HISTORY OF SEXUAL ABUSE?

A.      YES.

Q.      AND WHAT IS THE IMPORT OF THAT, AS YOU CONSIDER HIS HISTORY AND YOUR DIAGNOSES?

A.       WELL, THIS IS A MULTI-GENERATIONAL HISTORY OF SEVERE DYSFUNCTION, ABUSE, BOUNDARY VIOLATIONS, INCEST AMONG A VARIETY OF RELATIVES, AND BOTH ON THE FATHER'S SIDE AS WELL AS THE MOTHER'S SIDE.  AND THERE IS JUST A TREMENDOUS HISTORY OF PSYCHOPATHOLOGY.  YOU KNOW, SOME OF WHICH LIKELY HAS A GENETIC PREDISPOSING COMPONENT AS IS A HISTORY OF DEPRESSION, THERE IS A HISTORY OF PSYCHOSIS, MAKING DAVID MORE VULNERABLE TO DEVELOPING SIMILAR KINDS OF SYMPTOMS.  THAT IS COMBINED WITH EXTENSIVE HISTORIES ON BOTH SIDES OF THE FAMILY OF SEVERE ABUSE, AGAIN, PHYSICAL, VERBAL, AS WELL AS SEXUAL.

Q.       NOW, SO YOU NOTE HE HAD A FAMILY HISTORY ALSO OF THE MENTAL ILLNESS, WHICH YOU ARE TALKING ABOUT HAS A POTENTIAL GENETIC LOAD?

A.       YES.

Q.       DID YOU NOTICE WHETHER OR NOT HE HAD -- THERE IS A FAMILY HISTORY REGARDING DRUGS OR ALCOHOL?

A.       AGAIN, THERE IS AN EXTENSIVE HISTORY OF BOTH DRUG AND ALCOHOL ABUSE IN A VARIETY OF RELATIVES.  AND AGAIN, IT MAY BE SORT OF GENETIC LOAD IN AND OF ITSELF, BUT IT MAY ALSO BE THAT THE INDIVIDUALS WHO HAVE BEEN EXPOSED TO TRAUMA.  THAT ENDS UP BEING ONE OF THE COPING MECHANISMS.  IT CERTAINLY WAS IN DAVID'S CASE EARLIER ON WHEN HE WAS HEAVILY ABUSING A VARIETY OF DRUGS,

BASICALLY IN AN ATTEMPT TO SELF-MEDICATE.  SO, YOU KNOW, HE HAS PROBABLY GOT A GENETIC SUSCEPTIBILITY TO DEVELOPING PROBLEMS WITH SUBSTANCE ABUSE, BUT ALSO HAVING AN ENVIRONMENTAL EXPOSURE THAT WOULD MAKE IT ONE AVENUE THAT WOULD HELP HIM TO COPE WITH OVERWHELMING FEELINGS.

Q.      NOW, ARE THERE LONG TERM, INTO ADULTHOOD LONG TERM, PSYCHIATRIC CONSEQUENCES A CHILD CARRIES WITH HIM OR HER FOR THE REST OF THEIR LIVES AS A RESULT OF THE PHYSICAL, VERBAL AND SEXUAL ABUSE THAT YOU AND OTHERS HAVE DESCRIBED HERE?

A.      WELL, YOU KNOW, IF YOU ARE LOOKING FOR A BLUEPRINT FOR THE DEVELOPMENT OF POST-TRAUMATIC STRESS DISORDER AND PERSONALITY DISORDERS, ESPECIALLY BORDERLINE, AND IN MEN ANTISOCIAL, THEN THIS IS THE WAY TO DO IT.

YOU KNOW, THE HISTORY OF SEVERE ABUSE, THE HISTORY OF NEGLECT, ALL OF THESE CAN SEVERELY DISRUPT AN INDIVIDUAL'S ABILITY TO FORM A NORMAL CHARACTER STRUCTURE OR PERSONALITY.  AND, YOU KNOW, HE CLEARLY HAD ONGOING DIFFICULTIES WITH MOOD REGULATION, WITH ANXIETY, WITH DEVELOPING HEALTHY RELATIONSHIPS WITH OTHER INDIVIDUALS.  I MEAN, YOU LEARN HOW TO DO THAT INITIALLY BY YOUR INTERACTION WITH YOUR PARENTS.  AND TO THE EXTENT THAT THAT IS PROBLEMATIC, DIFFICULT,

UNHEALTHY, THAT CAN CERTAINLY SCAR YOU FOR LIFE.

AND BASICALLY ALL OF THE DISORDERS THAT I HAVE MENTIONED, THE PTSD, BORDERLINE ANTISOCIAL PERSONALITY DISORDERS, YOU KNOW, ARE A CONSEQUENCE OF THE SEVERE ABUSE THAT HE SUSTAINED AND THE NEGLECT IN GROWING UP IN THIS EXTREMELY DYSFUNCTIONAL ENVIRONMENT.

Q.    SO AS PART OF THIS CONSTELLATION OF CONSEQUENCES THAT COME WITH THIS KIND OF BACKGROUND, DOES IT IMPACT THE DEVELOPMENT OF A HEALTHY SELF-ESTEEM?

A.    ABSOLUTELY.

Q.    AND DO YOU HAVE AN OPINION AS TO WHETHER OR NOT, BASED ON YOUR RECORDS REVIEW AND INTERVIEW WITH DAVID, IF HE HAS A LACK OF SELF-ESTEEM AND, IF SO, WHAT IS THE IMPACT OF THAT?

A.    WELL, THAT HAS BEEN PERSISTENT EVER SINCE HE WAS A LITTLE KID.  YOU KNOW, IF YOU GROW UP IN A SITUATION IN WHICH YOU ARE TOLD YOU ARE ROTTEN, YOU ARE EVIL AND YOU ARE BEATEN CONSISTENT WITH THAT, AND YOU ARE STARVING FOR LOVE AND LOOKING FOR SOMEONE, YOU KNOW, TO JUST KIND OF APPRECIATE YOU, YOU ARE GOING TO HAVE MAJOR DIFFICULTIES IN THINKING MUCH OF YOURSELF.

Q.    AND DID YOU NOTICE ANYTHING IN THE RECORDS INDICATING DAVID HAVING TROUBLE WITH INTERPERSONAL RELATIONSHIPS GROWING UP?

A.    WELL, THAT WAS PRETTY EVIDENT FROM, YOU KNOW,

THE SEVERELY DISRUPTED RELATIONSHIP THAT HE HAD WITH HIS PARENTS, WITH HIS SISTER, AND THEN, YOU KNOW, DEVELOPING -- HE GOT MARRIED VERY EARLY ON AND THERE WERE MAJOR DIFFICULTIES IN HIS MARITAL RELATIONSHIP, YOU KNOW, AND THEN ONGOING DIFFICULTIES FROM THAT POINT.

Q.    HOW ABOUT IN TERMS OF THE ABILITY TO DEVELOP TRUSTING RELATIONSHIPS, WHICH IS IMPORTANT FOR A HEALTHY ADULT?

A.    WELL, AGAIN -- AGAIN, I WOULD AGREE.  TRUST IS ESSENTIAL TO BEING ABLE TO DEVELOP A HEALTHY RELATIONSHIP WITH SOMEONE.  AND AGAIN, THAT -- WHERE DOES THAT START?  IT STARTS IN YOUR RELATIONSHIP WITH YOUR, YOU KNOW, IMMEDIATE FAMILY MEMBERS.

YOU KNOW, TO THE EXTENT THAT YOU ARE ABUSED, YOU ARE MANIPULATED, YOU ARE MISUSED, ALL OF THAT IS GOING TO IMPACT ON YOUR ABILITY TO FORM A TRUSTING RELATIONSHIP WITH SOMEBODY ELSE.

Q.    NOW, DID YOU SEE ANY EVIDENCE IN THE RECORDS, SPEAKING OF A TRUSTING RELATIONSHIP WITH ANYBODY ELSE, WHERE DAVID SORT OF SOUGHT HIS OWN CRISIS INTERVENTION?

A.    YES.  IN FACT, THAT HAPPENED PRETTY EARLY ON.  I THINK HE DESCRIBED BASICALLY BEING ON HIS OWN FROM THE AGE OF 13 ON.  AND I THINK THAT MY RECOLLECTION IS THAT HE DID PRESENT HIMSELF TO A HOSPITAL IN ORDER TO OBTAIN SOME TYPE OF MENTAL HEALTH SERVICES BACK IN '73 WHEN HE

WAS 14.

Q.      HOW ABOUT MAY OF '73?

A.      YES.  MAY OF '73, AND THAT WAS IN THE OUTPATIENT CLINIC AT OKLAHOMA GENERAL HOSPITAL.  THE RECORD THERE IS RELEVANT AND DESCRIBED HIM.  EVEN AT THAT POINT, HE WAS TENSE, NERVOUS, HE WAS FAILING SCHOOL, UNABLE TO CONCENTRATE.  AND EVEN THEN HE RECENTLY HAD BEEN SEXUALLY ABUSED BY AN OLDER MAN.  AT THAT POINT HE HAD TRIED TO KILL HIMSELF BY TURNING ON THE GAS, CUTTING HIMSELF WITH A RAZOR.  AND HE DESCRIBED A FEAR OF GOING CRAZY, GIVEN HIS FAMILY HISTORY OF MENTAL ILLNESS.

Q.      AND AT THAT TIME THAT HE SHOWED UP AT THE HOSPITAL AT THE AGE OF 14, WAS HE ACCOMPANIED BY A PARENT?

A.      I DON'T BELIEVE SO.  AND IN FACT, WHEN THE RECOMMENDATION WAS MADE FOR OBTAINING SERVICES, THE PARENTS WOULD NOT HELP TO GET HIM THERE.  I THINK THERE WAS AN ATTEMPT MADE TO ENLIST THEIR SUPPORT IN GETTING HIM THE HELP.

Q.      I THINK YOU ARE REFERRING TO THE LETTER WRITTEN TO DAVID'S MOTHER BY HIS THEN THERAPIST, ARLENE SCHAEFER?

A.      YES.

Q.      DOES THAT RING A BELL, DR. SCHAEFER?

A.      YES.

Q.        AND THAT'S WHERE SHE STATED, SINCE ANY CONTACT BETWEEN A PATIENT AND DOCTOR IS CONFIDENTIAL, I CANNOT TELL YOU THE DETAILS OF OUR MEETING.  I WOULD LIKE TO MAKE CLEAR, HOWEVER, THAT I FEEL DAVID'S PROBLEMS ARE SERIOUS AND SHOULD BE TREATED.  IS THAT THE LETTER YOU ARE REFERRING TO?

A.        YES.

Q.        AND TO THE BEST OF YOUR KNOWLEDGE, DID MRS. HAMMER FOLLOW UP ON THAT?

A.        NO.

Q.        DID DAVID'S PARENTS TAKE HIM TO ANY COUNSELING AFTER THAT LETTER?

A.        NO.

Q.        NOW, AFTER DAVID WAS A LITTLE OLDER, DID YOU FIND ANY NOTATIONS IN THE RECORD WHERE HE CONTINUED TO SEEK HELP ON HIS OWN, WHEN HE WAS 17 OR 18 YEARS OLD?

A.        YES.  THE RECORDS I REVIEWED INDICATED THAT HE DID SEEK OUTPATIENT MENTAL HEALTH TREATMENT BETWEEN FEBRUARY AND APRIL OF 1976, AND THE RECORD INDICATED THAT HE WAS MARRIED FOR 14 MONTHS.  HE WAS HAVING DIFFICULTIES FINANCIALLY.  HE WAS UNHAPPY IN HIS MARRIAGE.  HE WAS ARGUING A LOT WITH HIS WIFE.  THERE HAD BEEN AN INCIDENT WHERE HE BECAME UPSET WITH HER, TRIED TO CHOKE HER, AND FELT EXTREMELY GUILTY AFTER THE FACT, WAS DISTRESSED BY HIS ACTIONS AND SO WAS SEEKING

TREATMENT.  AND THE RECORD INDICATED THAT HIS WIFE HAD A RECENT MISCARRIAGE.  AGAIN, THERE WERE PROBLEMS WITH UNEMPLOYMENT, THE ABSENCE OF SUPPORTIVE ADULTS IN HIS LIFE, AND COMING FROM A VERY MATERIALLY AND EMOTIONALLY DEPRIVED CHILDHOOD.

HE WAS ALSO ABUSING ALCOHOL AND DRUGS AT THAT TIME AND HAD BEEN ACTING OUT IN A DELINQUENT WAY.

Q.    NOW, DURING THE COURSE OF YOUR RECORDS REVIEW, INCLUDING SOME OF THE RECORDS YOU REVIEWED FROM THE PSYCHIATRIC -- DAVID'S PSYCHIATRIC RECORDS FROM PRISON, BETWEEN '74 -- 1974 AND -- '73 WHEN HE FIRST SHOWS UP AT THE HOSPITAL, TO 1996, HAS HE BEEN PRESCRIBED A SERIES OF MEDICATIONS OVER THE YEARS?

A.    YES, HE HAS.

MR. MORENO:  YOUR HONOR, MAY I APPROACH THE WITNESS?

THE COURT:  YES.

BY MR. MORENO:

Q.    DOCTOR, I'M SHOWING YOU WHAT HAS BEEN MARKED AS DEFENDANT'S EXHIBIT 60.  DO YOU RECOGNIZE THAT DOCUMENT?

A.    I DO.

Q.    AND THIS DOCUMENT LISTS MEDICATIONS THAT HAVE BEEN PRESCRIBED OVER THE YEARS, FROM '74 TO '96, TO MR. HAMMER, IS THAT CORRECT?

A.    YES.

Q.      ALL RIGHT.  AND THERE APPEAR TO BE A NUMBER OF ANTIPSYCHOTIC MEDICATIONS PRESCRIBED OVER THE YEARS, CORRECT?

A.      YES.

Q.      ANTIDEPRESSANTS?

A.      YES.

Q.      TRANQUILIZERS?

A.      YES.

Q.      SLEEP AIDS?

A.      YES.

Q.      MOOD STABILIZERS?

A.      YES.

Q.      WHAT IS THE FIRST DRUG LISTED AS TRANXENE?

A.      TRANXENE IS A MINOR TRANQUILIZER OR ANTIANXIETY MEDICATION.

Q.      AND HOW ABOUT STELAZINE?

A.      STELAZINE, IT'S ONE OF THE EARLIER ANTI-PSYCHOTIC MEDICATIONS.  IT'S USED IN THE TREATMENT OF SCHIZOPHRENIA AND BIPOLAR DISORDERS IN WHICH THERE IS A PSYCHOTIC COMPONENT.

Q.      AND HOW ABOUT TRILAFON?

A.      TRILAFON AGAIN IS AN EARLIER ANTIPSYCHOTIC AGENT ALSO.

Q.      AND MOBAN?

A.      SAME THING.  ANOTHER EARLIER ANTIPSYCHOTIC

MEDICATION.

Q.    ARE ANY OF THESE ANTIPSYCHOTIC MEDICATIONS STILL IN USE TODAY?

A.    ACTUALLY, THE STELAZINE AND TRILAFON ARE.  I HAVE NOT SEEN MOBAN AROUND FOR A LONG TIME.

Q.    DALMANE IS A SLEEP AID?

A.    YES.  AGAIN, IT'S IN THE VALIUM OR ANTIANXIETY CATEGORY, BUT IT'S USED PRIMARILY AS A SLEEP AID.

Q.    IT'S NOT AS POWERFUL AS VALIUM?

A.    WELL, IT'S LONGER ACTING, WHICH IS WHY IT IS USED MORE IN -- LESS ANTIANXIETY BUT MORE SEDATING.  SO IT IS USED FOR -- WAS USED AS A SLEEP AID.

Q.    NOW, THORAZINE, THAT IS AN ANTIPSYCHOTIC, CORRECT?

A.    IT IS.  ACTUALLY THORAZINE IS, I THINK, THE FIRST ANTIPSYCHOTIC MEDICATION THAT WAS DISCOVERED AND USED FOR THE TREATMENT OF DIFFERENT PSYCHOTIC STATES.

Q.    THORAZINE IS A PRETTY POWERFUL MEDICATION?

A.    WELL, ALL OF THE ANTIPSYCHOTIC MEDICATIONS ARE, BUT THORAZINE IS A VERY SEDATING ANTIPSYCHOTIC MEDICATION, YES.

Q.    AND HOW ABOUT MELLARIL?

A.    MELLARIL AGAIN IS ONE OF THE FIRST GENERATION ANTIPSYCHOTIC MEDICATIONS.

Q.    AND DILANTIN WAS FOR SEIZURE CONTROL?

A.      RIGHT.   I THINK THAT THE RECORD HAD INDICATED THAT -- I THINK THEY DESCRIBED HIM AS HAVING AN EPILEPTICAL PERSONALITY DISORDER.  BACK WHEN THESE DIAGNOSES WERE MADE, WE WERE BACK IN -- OUR DIAGNOSTIC MANUAL WAS NUMBER 2 AT THE TIME.  AND IT WAS CONSIDERABLY LESS PRECISE.  ACTUALLY THE SYMPTOMS THAT ARE DESCRIBED IN THAT KIND OF PERSONALITY DISORDER BACK THEN ARE CONSISTENT WITH THE BORDERLINE PERSONALITY DISORDER, CONSIDERABLE IMPULSIVITY, OUTBURSTS, SOME MAY BE AGGRESSIVE, SOME MAY BE SELF-DESTRUCTIVE, AND THOUGHT TO HAVE SOME BRAIN DYSFUNCTION, WHICH IS WHY THE CHOICE OF THE SEIZURE MEDICATION.

Q.      NOW, HOW ABOUT TOFRANIL, THAT IS ALSO AN ANTIDEPRESSANT?

A.      WELL, ARE YOU GOING TO TRIAVIL?

Q.      OH, I MISSED TRIAVIL.  OKAY.  TRIAVIL.

A.      TRIAVIL IS A COMBINATION OF TOFRANIL, WHICH IS AN ANTIDEPRESSANT, AND TRILAFON.  SO IT WAS IN -- THEY GOT DIFFERENT COMBINATION DOSAGES BUT IT'S ONE PILL THAT HAS BOTH MEDICATIONS IN IT.

Q.      OKAY.

A.      BOTH AN ANTIDEPRESSANT AND AN ANTIPSYCHOTIC.

Q.      TOFRANIL?

A.      TOFRANIL IS AN ANTIDEPRESSANT.  AGAIN IT'S ONE OF THE TRICYCLIC ANTIDEPRESSANTS OR THE FIRST

GENERATION.

Q.      AND HOW ABOUT VALIUM?

A.      VALIUM IS A MINOR TRANQUILIZER OR ANTIANXIETY MEDICATION.

Q.      ELAVIL?

A.      ELAVIL IS AGAIN AN EARLIER TRICYCLIC ANTIDEPRESSANT.

Q.      AND HOW ABOUT HALDOL?

A.      HALDOL IS ONE OF THE EARLIER ANTIPSYCHOTIC MEDICATIONS.  IT IS STILL REGULARLY USED.  IT IS DIFFERENT CHEMICALLY FROM THE THORAZINE, STELAZINE, AND TRILAFON.

Q.      XANAX IS AN ANTIANXIETY?

A.      YES.

Q.      PROZAC ALSO AN ANTIDEPRESSANT?

A.      YES.

Q.      DEPAKOTE IS THE MOOD STABILIZER?

A.      YES.  DEPAKOTE IS ACTUALLY AN ANTISEIZURE MEDICATION THAT HAS BEEN FOUND TO BE USEFUL IN MOOD STABILIZATION IN BIPOLAR DISORDER, AND ALSO USEFUL IN PEOPLE WHO HAVE BIPOLAR DISORDER AND MAY HAVE DIFFICULTIES WITH IMPULSIVE OR AGGRESSIVE BEHAVIOR.

Q.      AND THEN THE LAST MEDICATION LISTED HERE IS ZOLOFT?

A.      YES, AND THAT IS AN ANTIDEPRESSANT.

Q.    THIS IS QUITE A LAUNDRY LIST OF DIFFERENT MEDICATIONS.  WHAT DOES THIS, IF ANYTHING, FROM A FORENSIC STANDPOINT, TELL YOU ABOUT DAVID?

A.    WELL, IT TELLS ME THAT THE MEDICAL PROFESSIONALS THAT HAVE SEEN HIM DURING HIS TIME FRAME HAVE THOUGHT THAT HE HAS GOT SOME SIGNIFICANT MENTAL HEALTH PROBLEMS. ASSUMING THAT THEY ARE PRESCRIBED APPROPRIATELY, IT WOULD INDICATE PROBLEMS WITH DEPRESSION, PROBLEMS WITH MOOD STABILIZATION, POSSIBLE PSYCHOTIC SYMPTOMS AT TIMES, AND CERTAINLY ALSO PROBLEMS WITH ANXIETY.

Q.    AND IS THAT CONSISTENT WITH WHAT YOU'VE SEEN ABOUT DAVID IN THE RECORDS AND AS BEST YOU CAN FROM YOUR INTERVIEWS WITH HIM?

A.    YES.  AND ACTUALLY, YOU KNOW, THESE ARE THE KINDS OF MEDICATIONS -- THERE HAVE BEEN TIMES WHEN HE HAS PSYCHOTIC SYMPTOMS THAT WOULD WARRANT THOSE MEDICATIONS.  BUT GIVEN THE POST-TRAUMATIC STRESS DISORDER AND GIVEN THE BORDERLINE PERSONALITY DISORDER AND THE COGNITIVE IMPAIRMENT, WHICH CAN MAKE PEOPLE BE MUCH MORE IMPULSIVE, HAVE POOR JUDGMENT, THE ANTIDEPRESSANTS, THE MOOD STABILIZER, THE ANTIANXIETY MEDICATIONS WOULD ALL BE APPROPRIATE FOR THOSE CONDITIONS.

Q.    ALL RIGHT.  LET'S TALK FOR A FEW MINUTES ABOUT THE DIAGNOSIS OF PTSD.

NOW, CAN YOU TELL THE COURT WHAT PTSD IS? I'M SURE THE COURT HAS AN IDEA, BUT IF YOU CAN JUST FOR THE RECORD TELL US WHAT IS POST-TRAUMATIC STRESS DISORDER, HOW YOU WOULD DEFINE THAT?

A.      WELL, IT IS A SYNDROME THAT DEVELOPS AFTER SOMEBODY HAS BEEN EXPOSED TO EITHER A OR A VARIETY OF TRAUMATIC EVENTS THAT ARE USUALLY OF A LIFE-THREATENING NATURE.

AND FOLLOWING THE EXPOSURE TO THOSE TRAUMATIC EVENTS, THERE ARE THREE, YOU KNOW, THREE CLUSTERS OF SYMPTOMS THAT TYPICALLY DEVELOP.

ONE OF THOSE CLUSTERS OF SYMPTOMS IS WHAT IS REFERRED TO AS RE-EXPERIENCING PHENOMENA.  THESE WERE WHEN INDIVIDUALS HAVE RECURRENT DISTRESSING RECOLLECTIONS OF THE TRAUMATIC EVENTS.  NIGHTMARES, FLASHBACKS, INTENSE DISTRESS IF THEY ARE EXPOSED TO EVENTS THAT REMIND THEM OF THE TRAUMATIC EVENT.  THERE IS PSYCHOLOGICAL DISTRESS OR EVEN PHYSIOLOGICAL DISTRESS.

THE SECOND CLUSTER OF SYMPTOMS, ACTUALLY IN THE DSM 5, THEY HAVE SEPARATED IT OUT, BUT IT'S PERSISTENT AVOIDANCE AND NUMBING OF RESPONSIVENESS THAT OCCURS SOMETIME AFTER THE TRAUMATIC EVENT.  THINGS LIKE DELIBERATELY ATTEMPTING TO AVOID THINKING ABOUT THE TRAUMATIC EVENT, AVOIDING PLACES OR ACTIVITIES THAT

AROUSE RECOLLECTIONS OF THE EVENT, INABILITY TO REMEMBER ASPECTS OF THE TRAUMATIC EVENTS, DIMINISHED INTEREST OR PARTICIPATION IN SIGNIFICANT ACTIVITIES, FEELINGS OF DETACHMENT OR ESTRANGEMENT FROM OTHERS, RESTRICTED RANGE OF AFFECT, A SENSE OF A FORESHORTENED FUTURE.

AND THE THIRD CLUSTER OF SYMPTOMS ARE THE AROUSAL OR HYPERAROUSAL SYMPTOMS THAT HAPPEN AFTER THE TRAUMATIC EVENTS. DIFFICULTY FALLING OR STAYING ASLEEP, IRRITABILITY OR ANGER OUTBURSTS, DIFFICULTY CONCENTRATING, HYPERVIGILANCE. THAT IS YOUR -- IT'S KIND OF A MINOR VERSION OF PARANOIA, WHERE YOU ARE ON GUARD, YOU'RE LOOKING OVER YOUR SHOULDER, AN EXAGGERATED STARTLE RESPONSE. AND WHEN THE SYMPTOMS -- YOU DON'T HAVE TO HAVE ALL OF THEM IN EACH CLUSTER, BUT IF YOU HAVE A CERTAIN NUMBER OF THOSE SYMPTOMS AND THEY PERSIST FOR A MONTH OR LONGER AND THEY CAUSE SIGNIFICANT IMPAIRMENT OR DISTRESS, THEN YOU MAKE A DIAGNOSIS OF POST-TRAUMATIC STRESS DISORDER.

Q.      NOW, DO YOU HAVE AN OPINION TO A REASONABLE DEGREE OF MEDICAL AND PSYCHIATRIC CERTAINTY AS TO WHETHER OR NOT AT THE TIME OF THE OFFENSE IN THIS CASE MR. HAMMER HAD PTSD?

A.      YES.

Q.      WHAT?

A.      IT IS MY OPINION THAT TO A REASONABLE DEGREE OF

MEDICAL CERTAINTY THAT HE DID.

Q.      OKAY.  NOW, AT THE TIME THAT YOU EVALUATED HIM FIRST IN 2005, CAN YOU TELL THE COURT WHETHER OR NOT HE WAS STILL SYMPTOMATIC?

A.      HE WAS.

Q.      TELL US ABOUT THAT, IF YOU WOULD BRIEFLY.

A.      WELL, DURING THE COURSE OF THE EVALUATION, WHEN DISCUSSING MANY OF THE DIFFERENT TRAUMAS THAT HE WAS EXPOSED TO, THE SEVERE ABUSE, THE PHYSICAL ABUSE, THE VERBAL, THE EMOTIONAL, THE SEXUAL ABUSE, HE WAS TEARFUL, BECAME AGITATED.  IT WAS, YOU KNOW, QUITE CONSISTENT WITH WHAT ONE WOULD EXPECT.  AND IN FACT, YOU KNOW, WHEN HE WOULD HEAR ABOUT THE ABUSE FROM OTHERS, HE DEMONSTRATED THAT REACTION.

Q.      SO IN ORDER TO REACH THIS DIAGNOSIS, THE SYMPTOMATOLOGY HAS TO CAUSE A SIGNIFICANT IMPAIRMENT IN OVERALL FUNCTIONING IN SOME WAY, IS THAT CORRECT?

A.      YES.  IT CAUSES AGAIN SIGNIFICANT DISTRESS OR IMPAIRMENT IN SOCIAL, INTERPERSONAL OR ANY OTHER IMPORTANT AREAS OF FUNCTIONING.

Q.      AND DAVID -- IN YOUR OPINION DID DAVID MEET THAT CRITERIA?

A.      YEAH.

Q.      NOW, DOES THIS TYPE OF IMPAIRMENT, AND I'M NOW TALKING ABOUT POST-TRAUMATIC STRESS DISORDER, DOES IT

HAVE AN IMPACT ON IMPULSIVITY?

A.        ABSOLUTELY.

Q.        CAN YOU TELL US ABOUT THAT.

A.        YEAH, PEOPLE WITH PTSD ALONE MAY BECOME EASILY IRRITATED.  THEY MAY ACT IMPULSIVELY.  YOU KNOW, ESPECIALLY WHEN THEY ARE EXPOSED OR RE-EXPOSED TO STRESSORS OR RE-EXPERIENCING THE DISTRESSING RECOLLECTIONS OF WHAT THEY HAVE BEEN THROUGH, THEY ARE GOING TO BE IMPAIRED IN THEIR ABILITY TO CONTROL THEMSELVES AT TIMES.

Q.        NOW, IS IT SIGNIFICANT THAT MR. HAMMER EXHIBITED THOSE MANIFESTATIONS OF PTSD WHEN YOU SAW HIM, IN 2004 I THINK IT WAS, THAT MANY YEARS REMOVED FROM THE TRAUMA OF HIS CHILDHOOD?

A.        WELL, IT WAS INDICATIVE THAT THE DISORDER IS STILL IN EXISTENCE.  AND IN FACT, IT'S NOT UNCOMMON TO HAVE A VERY PROLONGED POST-TRAUMATIC STRESS DISORDER, ESPECIALLY WHEN THERE HAS BEEN SEVERE CHILDHOOD TRAUMA, BOTH PHYSICAL AND SEXUAL.

ALSO, YOU KNOW, SOME OF THE THINGS THAT MIGHT MEDIATE AGAINST DEVELOPING SYMPTOMS, OR MIGHT LESSEN THE SEVERITY OF THE SYMPTOMS, IS IF YOU HAVE A SUPPORTIVE FAMILY ENVIRONMENT, IF YOU GET INVOLVED IN TREATMENT.  YOU KNOW, THOSE KINDS OF THINGS CAN LESSEN THE IMPACT THAT IT MIGHT HAVE.

SO, YOU KNOW, THOSE ARE POTENTIALLY MODIFYING, POSITIVELY MODIFYING EVENTS THAT HE NEVER HAD THE OPPORTUNITY TO GET.  THE TIMES THAT HE DID PRESENT FOR TREATMENT, IT WAS MUCH MORE OF SORT OF A CRISIS INTERVENTION AS OPPOSED TO HIS BEING ABLE TO GET INVOLVED IN ANY, YOU KNOW, LONG-TERM REGULAR PSYCHOTHERAPY.

Q.    LET'S TALK NOW FOR A FEW MOMENTS ABOUT THE DIAGNOSIS OF BORDERLINE PERSONALITY DISORDER.  AND IF YOU COULD TELL US, IF YOU COULD DEFINE FOR US WHAT THAT IS.

A.    WELL, THIS CONDITION HAS BEEN RECOGNIZED FOR A LONG TIME, BUT IT USED TO BE CALLED BORDERLINE SCHIZOPHRENIA.  AND HISTORICALLY IT WAS THOUGHT TO BE SORT OF A CLUSTER OF SYMPTOMS THAT AT TIMES LOOKED LIKE PSYCHOTIC ILLNESS, LIKE SCHIZOPHRENIA, BUT AT OTHER TIMES LOOKED LIKE A NEUROTIC OR ANXIETY OR DEPRESSIVE CONDITION.  OVER TIME, THOUGH, IT WAS RECOGNIZED THAT THIS WAS I GUESS WHAT I WOULD CALL A STABLY UNSTABLE PERSONALITY STRUCTURE.  AND IT DID NOT REACH THE LEVEL OF THE PERSISTENT PSYCHOTIC SYMPTOMS, HALLUCINATIONS AND DELUSIONS THAT ARE SEEN IN SCHIZOPHRENIA OR NECESSARILY THE PERSISTENT MOOD DISORDER.

BUT THE DIAGNOSIS OF A BORDERLINE PERSONALITY DISORDER IS MADE WHEN THERE IS INSTABILITY

OF INTERPERSONAL RELATIONSHIPS, SELF-IMAGE AND AFFECT OR DIFFERENT EMOTIONAL RESPONSES AND MARKED IMPULSIVITY THAT BEGINS BY EARLY ADULTHOOD.  AND IT IS PRESENT IN A VARIETY OF CONTEXTS.  TYPICALLY INDIVIDUALS WITH A BORDERLINE PERSONALITY DISORDER MAKE FRANTIC EFFORTS TO AVOID A REAL OR IMAGINED ABANDONMENT.  THEY ARE SUPERSENSITIVE TO THE PERCEPTION OF BEING ABANDONED.

THERE IS A PATTERN OF UNSTABLE AND INTENSE INTERPERSONAL RELATIONSHIPS.  OFTEN THEY VIEW PEOPLE AS ALL GOOD OR ALL BAD.  THERE IS IDENTITY DISTURBANCE, AN UNSTABLE SENSE OF SELF-IMAGE AND A SENSE OF SELF.  THERE IS A HISTORY OF IMPULSIVITY IN AT LEAST TWO AREAS THAT ARE POTENTIALLY SELF DAMAGING, SEX, SUBSTANCE ABUSE, THINGS LIKE THAT.

Q.     AND ARE THEY PRESENT IN DAVID?

A.     OH, YEAH, SURE.  THE HISTORY WAS -- I MEAN, HE HAS IMPULSIVITY IN HIS SEXUAL ACTIVITIES, IN HIS AGGRESSIVE BEHAVIOR, IN HIS EXTENSIVE HISTORY OF ACTING OUT THROUGHOUT HIS CHILDHOOD, ADOLESCENCE AND EVEN HIS ADULTHOOD.  AND IMPULSIVITY IS -- IT'S AN INTERESTING CONCEPT BECAUSE, YOU KNOW, ONE FORM OF IMPULSIVITY MIGHT BE WHAT YOU THINK OF AS SORT OF A KNEE-JERK REACTION, AN IMMEDIATE RESPONSE WITHOUT ANY THINKING AT ALL.  BUT THE KIND OF IMPULSIVITY THAT YOU SEE IN THE BORDERLINE STATE IS SORT OF BEING DRIVEN TO ACT IN A WAY WHERE YOU ACT

WITHOUT THINKING THROUGH THE CONSEQUENCES OF THE ACTION. SO YOU KNOW, THERE CAN BE PLANNING, THERE CAN BE SOME FORETHOUGHT, BUT THERE IS THIS PRESSURE TO ACT, YOU KNOW, WITHOUT BEING ABLE TO CONSIDER THE RAMIFICATIONS OF WHAT YOU ARE DOING.  AND SO IT'S KIND OF A CHARACTEROLOGIC IMPULSIVITY AGAIN AS OPPOSED TO JUST A KNEE-JERK REACTION, ALTHOUGH THAT CAN CERTAINLY TAKE PLACE TOO.

OTHER SYMPTOMS THAT ARE SEEN IN THE BORDERLINE PERSONALITY DISORDER WOULD BE RECURRENT SUICIDAL THOUGHTS, BEHAVIORS, GESTURES.

Q.    HAVE WE SEEN THAT IN THIS CASE?

A.    YEAH.  OH, THERE IS AGAIN AN EXTENSIVE HISTORY OF SELF-DESTRUCTIVE BEHAVIOR.

THERE IS AFFECTIVE INSTABILITY, THAT IS MOODINESS OR WHAT WE CALL LABILE AFFECT.  AND THERE'S A LOT OF DIFFICULTY REGULATING THAT.  AND SOMETIMES ASSOCIATED, YOU CAN SEE PERIODS -- PEOPLE GO THROUGH PERIODS OF DEPRESSION AS WELL AS AN AGITATED STATE.  BUT THE BOTTOM LINE IS THAT THE MOOD REMAINS UNSTABLE.

OFTEN THESE PEOPLE END UP HAVING CHRONIC FEELINGS OF EMPTINESS.  THEY MAY HAVE INAPPROPRIATE INTENSE ANGER OR DIFFICULTY CONTROLLING ANGER.  AND UNDER STRESS THEY ARE PRONE TO DEVELOP STRESS-RELATED PARANOID THINKING OR EVEN DISSOCIATIVE SYMPTOMS.  THAT

IS WHERE THEY FEEL UNREAL, WHERE THEY FEEL THAT THERE IS SOME IMPAIRMENT IN THEIR ABILITY TO FEEL LIKE THEY ARE IN THE MOMENT.

AGAIN, YOU DON'T HAVE TO HAVE EVERY ONE OF THESE SYMPTOMS, BUT THESE ARE SYMPTOMS THAT ARE SEEN IN THE BORDERLINE PERSONALITY DISORDER.  AND SO YOU DON'T HAVE TO HAVE EVERY ONE OF THESE SYMPTOMS, BUT, YOU KNOW, HISTORICALLY AND BASED ON THE EVALUATION THAT I DID, YEAH, I THINK MR. HAMMER HAS MOST -- HAS HAD MOST IF NOT ALL OF THEM AT VARIOUS POINTS IN HIS LIFE.

Q.    DOES BORDERLINE PERSONALITY DISORDER, IT SOUNDS LIKE IT IMPAIRS BEHAVIORAL CONTROLS ACROSS A WIDE SPECTRUM, IS THAT FAIR?

A.    YES.  AS A RESULT OF THE COMBINATION OF THE MOOD LABILITY, THE IMPULSIVITY, YOU KNOW, THEY FEEL BAD. THEY MAY BE PRONE TO IMPULSIVE SUICIDAL GESTURES.  THEY GET OVERWHELMED WITH THEIR EMOTIONS.  SO THESE ARE, YOU KNOW, VERY UNSTABLE INDIVIDUALS.

Q.    AND DOES IT IMPACT JUDGMENT?

A.    WELL, SURE.  IF YOU ARE OVERWHELMED WITH YOUR EMOTIONS AND FEELING SELF-DESTRUCTIVE, YOU ARE NOT ABLE TO, YOU KNOW, CONSIDER REASONABLE OR RATIONAL OPTIONS. YOUR ACTIONS ARE DICTATED BY HOW YOU ARE FEELING.

Q.    NOW, DO YOU CONSIDER THIS TO BE A DEBILITATING MENTAL ILLNESS?

A.    WELL, IT CAN BE.  I MEAN, LIKE ANYTHING ELSE, YOU KNOW, THERE IS BORDERLINE AND THEN THERE IS BORDERLINE IN BOLD PRINT.  SO THERE ARE VARYING DEGREES OF PERSONALITY DISORDERS BUT I WOULD SAY THAT CERTAINLY THROUGHOUT MUCH OF HIS LIVE, THROUGH AT LEAST THE TIME OF THE OFFENSE, HIS WOULD HAVE BEEN SEVERE.  THAT IS, HE WOULD HAVE HAD MOST IF NOT ALL OF THE SYMPTOMS OF THE BORDERLINE PERSONALITY DISORDER.

Q.    NOW, YOU ALSO FOUND THAT HE HAD MILD NEUROCOGNITIVE DISORDER DUE TO MULTIPLE ETIOLOGIES, IS THAT RIGHT?

A.    YES.

Q.    AND IS THAT BASED IN PART ON THE TESTING OF DR. MARTELL AND GELBORT AND GUR?

A.    YES.  YOU KNOW, IN SOME CASES, I'LL DO MY OWN SCREENING TESTS, BUT HE HAD ALREADY HAD FORMAL NEUROPSYCHOLOGICAL TESTING THAT INDICATED DEFICITS IN A VARIETY OF COGNITIVE AREAS.  AGAIN, HE IS GENERALLY CAPABLE OF HIS OWN SELF-CARE, WHICH THEN DOES NOT PUT HIM IN THE CATEGORY OF A MAJOR NEUROCOGNITIVE DISORDER.  YOU KNOW, BUT HIS DEFICITS ARE SIGNIFICANT AND WARRANT THE DIAGNOSIS OF MILD NEUROCOGNITIVE DISORDER, WHICH IS CORRESPONDING TO THE COGNITIVE DISORDER NOT OTHERWISE SPECIFIED.  FOR REASONS THAT ARE UNCLEAR TO ME, THE PSYCHIATRIC PROFESSION HAS GOTTEN RID OF THE TERM

DEMENTIA.  SOMEHOW WE DON'T USE THAT ANYMORE, EVEN THOUGH THE NEUROLOGISTS AND EVERYBODY ELSE IN THE MEDICAL PROFESSION DOES, BUT WE LIKE THE FIFTY-CENT WORD.

Q.    AND WHAT -- ON TOP OF THE IMPULSIVITY AND IMPAIRED JUDGMENT THAT DAVID SUFFERS AS A RESULT OF BORDERLINE PERSONALITY DISORDER AND HIS POST-TRAUMATIC STRESS DISORDER, DOES THIS JUST SORT OF THROW GAS ON THAT FIRE, IN TERMS OF ITS IMPACTING HIS IMPULSIVITY AND POOR JUDGMENT?

A.    YES, IT DOES.  THE SHORT ANSWER IS YES, IT DOES.

NORMALLY PEOPLE ARE GOING TO BE IMPULSIVE, MOODY, HAVE POOR JUDGMENT WITH BORDERLINE PERSONALITY DISORDER WITH A NORMAL BRAIN.  IF YOU END UP, YOU KNOW, HAVING IMPAIRMENT IN YOUR BRAIN FUNCTION TO BEGIN WITH, THOSE PROBLEMS ARE LIKELY TO BECOME EVEN MORE PRONOUNCED.

Q.    AND YOU ALSO FOUND THAT DAVID HAS ANTISOCIAL PERSONALITY DISORDER AND THAT IN PART IS A DIAGNOSIS BY HISTORY, CORRECT?

A.    YES.  I MEAN, SURE, THAT HISTORICALLY HE ENDED UP HAVING THE EVIDENCE OF A CONDUCT DISORDER PRIOR TO THE AGE OF 15.  AND THEN, AS WE KNOW BY HIS CRIMINAL HISTORY, HAS ENGAGED IN VARIOUS ANTISOCIAL ACTS FROM THAT POINT FORWARD.

Q.      NOW, GIVEN WHAT YOU HAVE ALREADY TOLD US ABOUT DAVID'S HISTORY GROWING UP, IS IT A SURPRISE, FROM A FORENSIC STANDPOINT, THAT DAVID DEVELOPED THIS DISORDER AS WELL?

A.      NO.  I THINK THAT MOST PEOPLE, INCLUDING MYSELF, VIEW THE PERSONALITY DISORDERS AS COMING FROM A COMBINATION OF THE INDIVIDUAL'S INNATE TEMPERAMENT OR GENETIC HISTORY AND HOW THEY ADAPT TO THEIR ENVIRONMENT. AND FRANKLY, IF YOU GREW UP IN AN ENVIRONMENT IN WHICH YOU ARE EXPOSED TO CHAOTIC HOME SITUATION, POVERTY, ABUSE, NEGLECT, INSTABILITY IN VIRTUALLY ALL AREAS, YOU KNOW, THE CHILD TRIES TO COPE WITH THAT THE BEST THEY CAN.  OBVIOUSLY WITH THE BORDERLINE PERSONALITY DISORDER THERE ARE ONGOING PROBLEMS RELATED TO WHAT WE HAVE TALKED ABOUT.

BUT ANOTHER ADAPTIVE MECHANISM IS -- ESPECIALLY FOR YOUNG MEN -- IS TO, YOU KNOW, REALIZE THAT WELL, THERE IS NO ONE THAT IS GOING TO TAKE CARE OF YOU EXCEPT YOU, AND YOU DO WHAT YOU NEED TO DO IN ORDER TO TAKE CARE OF YOURSELF.  TO THE EXTENT THAT HE SAW BOTH PARENTS ENGAGING IN A VARIETY OF ILLEGAL ACTIVITIES AND THAT SEEMED TO BE THE NORM FOR THE FAMILY, YOU KNOW, HE VERY MUCH ADOPTED THAT ATTITUDE TOO.

Q.      NOW, IS THIS SOMETHING, ALONG WITH VIOLENT BEHAVIOR, THAT SORT OF WANES AS A PERSON GETS OLDER?

A.      WELL, I DON'T KNOW THAT ANYBODY HAS SAID WITH THE PARTICULAR DISORDER THAT IT WANES.  BUT THE LITERATURE ON VIOLENCE SUGGESTS THAT THERE IS A STATISTICAL DECREASE IN THE INCIDENCE OF VIOLENCE AFTER AGE 40.  SO WHETHER THAT IS BECAUSE PEOPLE EVENTUALLY LEARN, OR THAT ESPECIALLY AS THEY LEAVE ADOLESCENCE, THERE IS SOME MATURATION OF THE CENTRAL NERVOUS SYSTEM, IT'S UNCLEAR.  BUT THERE IS IMPROVEMENT IN THE INCIDENCE OF VIOLENCE OVER TIME, ESPECIALLY AFTER AGE 40.

Q.      AND DAVID IS 55 TODAY, IS THAT CORRECT?

A.      YES.

Q.      NOW, ON APRIL 13TH, 1996, WHEN DAVID WAS IN CELL 103 WITH ANDREW MARTI, WAS HE A SEVERELY DAMAGED INDIVIDUAL FOR ALL THE REASONS YOU DISCUSSED HERE TODAY?

A.      IN MY OPINION, HE WAS.

                MR. MORENO:  MAY I HAVE A MOMENT, YOUR HONOR?

                THE COURT:  YES.

                MR. MORENO:  I HAVE NOTHING FURTHER, YOUR HONOR.

                THE COURT:  CROSS EXAMINE.

                MR. GURGANUS:  SURE.  I THINK WE WILL BE ABLE TO GET IT ALL DONE ALSO.

                THE COURT:  OKAY.

                        CROSS EXAMINATION

BY MR. GURGANUS:

Q.      GOOD AFTERNOON.

A.      GOOD AFTERNOON.

Q.      MY NAME IS JOHN GURGANUS.  I WILL HAVE A FEW QUESTIONS FOR YOU.  OKAY.

THE LAST ONE YOU WERE TALKING ABOUT, WERE YOU TALKING ABOUT ANTISOCIAL PERSONALITY DISORDER OR BORDERLINE PERSONALITY DISORDER?

A.      I'M SORRY, THE LAST WHAT?

Q.      YOU MADE A DIAGNOSIS.  YOU WERE TALKING ABOUT HOW PEOPLE ADAPT TO THE ENVIRONMENT, THEIR INNATE TEMPERAMENT, THINGS OF THAT NATURE.

A.      I WAS TALKING ABOUT BOTH OF THEM, ACTUALLY.

Q.      ANTISOCIAL?

A.      AND BORDERLINE.

Q.      THEY ARE SIMILAR?

A.      WELL, ACTUALLY THEY ARE IN THE SAME WHAT WE CALL CLUSTER OF PERSONALITY DISORDERS.  THEY ARE DIFFERENT, BUT THEY DO HAVE SOME SIMILARITIES.  I MEAN, PEOPLE WITH THESE DISORDERS DO TEND TO BE IMPULSIVE.  THEY DO TEND TO BE PREOCCUPIED AT TIMES WITH THEMSELVES, THEY TEND TO BE MOODY, THEY TEND TO BE IRRITABLE.

Q.      AND A LOT OF THEM TEND TO BE IN PRISON, WOULD YOU AGREE WITH THAT?

A.      WELL, I WOULD SAY THAT A LOT OF THE ANTISOCIAL

INDIVIDUALS ARE IN PRISON.  I WOULD SAY THAT THERE ARE LIKELY MANY MORE PEOPLE WITH BORDERLINE PERSONALITY DISORDERS OUT IN THE COMMUNITY THAN ACTUALLY IN PRISON, ALTHOUGH IT'S NOT UNCOMMON IN A PRISON POPULATION TOO.

Q.      NOW, WITH RESPECT TO YOUR DIAGNOSES, RIGHT, THEY ARE IN PART BASED UPON ALL THIS INFORMATION THAT YOU RECEIVED FROM THE INTERVIEWS OF PEOPLE LIKE JILL MILLER, IS THAT RIGHT?

A.      YES.

Q.      AND LOUISE LUCK, IS THAT RIGHT?

A.      YES.

Q.      THE ONLY PERSON THAT YOU INTERVIEWED IN THIS CASE WAS DAVID HAMMER, IS THAT RIGHT?

A.      THAT'S CORRECT.

Q.      AND YOU INTERVIEWED DAVID HAMMER FOR THREE AND-A-HALF HOURS BACK IN 2004?

A.      YES.

Q.      AND YOU INTERVIEWED HIM FOR HOW LONG THIS LAST TIME?

A.      ABOUT AN HOUR AND 25 MINUTES.

Q.      AND A LOT OF THAT WAS TAKEN UP WITH ADMINISTERING A TEST OR NOT?

A.      WELL, ACTUALLY THE TESTING WAS RELATIVELY BRIEF. THE BULK OF THAT WAS REALLY KIND OF CATCHING UP WITH HIM TO FIND OUT WHAT HAD BEEN GOING ON SINCE I SAW HIM, YOU

KNOW, NINE YEARS EARLIER.

Q.        AND WHEN YOU SAY THE TESTING WAS RELATIVELY
BRIEF, IT WAS -- THAT WAS THE TEST TO SEE WHAT, IF HE
WAS POSSIBLY MALINGERING?

A.        WELL, I ADMINISTERED A SCREENING TEST FOR
MALINGERING.  THAT ONLY TOOK I THINK ABOUT FIVE MINUTES.

Q.        THAT'S ALL?  YOU CAN TELL IT FROM FIVE MINUTES,
THAT QUICKLY IT CAN BE --

A.        YEAH.  AND ACTUALLY USUALLY IT TAKES, YOU KNOW,
SOMEWHERE BETWEEN 5 AND 10 MINUTES.

Q.        OKAY.

A.        IT'S A SERIES OF 25 QUESTIONS THAT THE PERSON
RESPONDS TO.  YOU HAVE A POSSIBLE SCORE OF 25, AND
SCORES OF SIX OR ABOVE, THAT IS WHERE THE PERSON HAS
ENDORSED SIX OF THESE ITEMS OR MORE, RAISE A QUESTION
ABOUT MALINGERING.  AND IF YOU HAVE A SCORE LIKE THAT,
THEN YOU GENERALLY PROCEED TO A MORE DETAILED ASSESSMENT
OF MALINGERING.  HE HAD A SCORE OF ZERO ON THAT, SO IT'S
RELATIVELY EASY TO GO THROUGH IN A PRETTY QUICK MANNER.

Q.        SO THIS TIME WHEN YOU WERE TESTING HIM -- YOU
DID NOT TEST FOR MALINGERING THE PREVIOUS ONE, A TEST
LIKE THIS, CORRECT?

A.        I DIDN'T.

Q.        BUT THIS ONE YOU DID?

A.        I DID.

Q.      IS THAT RIGHT?

A.      I DID.

Q.      AND YOU WERE AWARE THAT BACK IN 1998, WHEN DR. WOLFSON TESTED HIM, THAT WAS AN EXTENSIVE STUDY OF DAVID PAUL HAMMER, WASN'T IT?

A.      YES.

Q.      DID YOU READ THAT REPORT, SIR?

A.      I DID.  MY RECOLLECTION, IT WAS ABOUT 150 OR SOME ODD PAGES.  IT WAS VERY DETAILED.

Q.      I THINK YOU ARE RIGHT, AROUND 150 PAGES.  AND THAT WAS -- WENT THROUGH HIS WHOLE LIFE, DIDN'T IT?

A.      YES.

Q.      AND THAT PARTICULAR EXAM WAS LOOKING AT THINGS SUCH AS WHETHER HE HAD DID, DISSOCIATIVE IDENTITY DISORDER?

A.      YES.

Q.      AND DR. WOLFSON FOUND IN THAT CASE AFTER HIS LONG STUDY, IT WAS OVER A PERIOD OF HOW LONG?  DO YOU RECALL HOW LONG?

A.      I DON'T RECALL.

Q.      IT WAS EXTENSIVE, THOUGH, A FEW MONTHS?

A.      I THINK IT WAS.  HE WAS AT SPRINGFIELD FOR A PERIOD OF TIME, SO IT WOULD HAVE TAKEN PLACE OVER AN EXTENDED PERIOD OF TIME.

Q.      AND WITH RESPECT TO THAT, THAT WHOLE QUESTION OF

WHETHER DAVID PAUL HAMMER HAD MULTIPLE PERSONALITIES,
DISSOCIATIVE IDENTITY DISORDER, DR. WOLFSON FOUND THAT
HE WAS MALINGERING, ISN'T THAT RIGHT?

A.      YES, ALTHOUGH IT ONLY TOOK ME THREE AND-A-HALF
HOURS TO FIGURE OUT THAT HE DID NOT HAVE DID.

Q.      YOU FIGURED IT OUT THAT QUICKLY?

A.      YEAH.

Q.      DID YOU FLAT OUT PUT THAT IN YOUR AFFIDAVIT OR
DID YOU HEDGE A LITTLE BIT ON IT?

A.      I DIDN'T MAKE THE DIAGNOSIS OF DISSOCIATIVE
IDENTITY DISORDER, AND I LEFT IT TO THE DISCRETION OF
OTHER FOLKS TO ADDRESS THAT.  BUT THAT WAS NOT PART OF
MY DIAGNOSTIC ASSESSMENT.  IT'S ON PAGE NINE OF MY
AFFIDAVIT, NUMBER 34.

Q.      NUMBER 34?

A.      YES.

Q.      IT SAYS, I'M AWARE THAT AT LEAST ONE OTHER
DEFENSE EXPERT HAS DIAGNOSED MR. HAMMER AS SUFFERING
FROM DISSOCIATIVE IDENTITY DISORDER.  ALTHOUGH I DID NOT
MAKE THAT DIAGNOSIS MYSELF, DID GENERALLY DEVELOPS AS A
RESULT OF SEVERE EMOTIONAL, PHYSICAL AND SEXUAL ABUSE
DURING CHILDHOOD AND REPRESENTS THE MOST SEVERE
DISRUPTION IN AN INDIVIDUAL'S PERSONALITY STRUCTURE.

                AND YOU CONTINUED, SEVERE TRAUMA THAT
MR. HAMMER SUSTAINED DURING HIS CHILDHOOD AND

ADOLESCENCE COULD CAUSE A DISINTEGRATION OF HIS PSYCHE TO THE EXTENT THAT SEPARATE AND DISTINCT OTHER PERSONALITIES MAY HAVE DEVELOPED.

THEN YOU CONTINUE, HOWEVER, REGARDLESS OF THE EXACT DIAGNOSTIC LABEL APPLIED TO MR. HAMMER, HIS CHARACTER STRUCTURE WAS IRREVOCABLY DAMAGED BY THE SEVERE TRAUMA THAT HE SUSTAINED DURING HIS CHILDHOOD AND ADOLESCENCE, LEADING TO MY CONCLUSION THAT HE SUFFERS FROM POST-TRAUMATIC STRESS DISORDER CHRONIC, BORDERLINE PERSONALITY DISORDER, AND ANTISOCIAL PERSONALITY DISORDER, IS THAT RIGHT?

A.    RIGHT.

Q.    AND THAT, IN YOUR VIEW, YOU WERE RULING OUT DISSOCIATIVE IDENTITY DISORDER FLAT OUT IN THAT?

A.    NO.  IN MY MIND, I WAS NOT MAKING THE DIAGNOSIS OF DISSOCIATIVE IDENTITY DISORDER AND DIDN'T VIEW IT AS BEING NECESSARY AS A DEFENSE EXPERT TO BE A PROSECUTION EXPERT AGAINST THE OTHER DEFENSE EXPERTS IN THAT REGARD.

Q.    BUT YOU DID, AFTER WHAT -- YOU SAID THREE AND-A-HALF HOURS, YOU HAD RULED IT OUT?

A.    I DID NOT BELIEVE THAT HE HAD MULTIPLE PERSONALITY DISORDER OR WHAT WAS THEN CALLED A DID.

Q.    AND IN ORDER -- AND SO HE WAS MALINGERING THAT, WOULDN'T YOU AGREE?

A.    PROBABLE --

MR. MORENO:  YOUR HONOR, I OBJECT JUST THAT HE WAS NOT AT THAT EVALUATION.  HE WOULD HAVE NO WAY OF KNOWING.

THE COURT:  WELL, I WILL OVERRULE THE OBJECTION.  LET HIM GIVE HIS OPINIONS.

THE WITNESS:  I DID NOT FIND HIS REPORT OF THE DIFFERENT PERSONALITIES THAT HE PREVIOUSLY DESCRIBED AS PERSUASIVE OF HIS HAVING A MULTIPLE PERSONALITY DISORDER.

BY MR. GURGANUS:

Q.    NOW, SIR, DID YOU WATCH THE VIDEO THAT DR. SADOFF DID?

A.    I DID.

Q.    AND IN THAT VIDEO, JOCKO CAME OUT, SUPPOSEDLY?

A.    SUPPOSEDLY.

MR. MORENO:  I'M GOING TO OBJECT, YOUR HONOR.  I DID NOT ASK HIM ANY QUESTIONS ABOUT THE DR. SADOFF VIDEO.  I'M NOT SURE WHERE THIS LINE OF QUESTIONING IS GOING.

THE COURT:  AGAIN, HE IS AN EXPERT WITNESS.  HE CAN BE CROSS EXAMINED ABOUT ANY FACTS WHICH HE VIEWED.

BY MR. GURGANUS:

Q.    SO IN THAT VIDEO WOULD YOU AGREE THAT DAVID HAMMER WAS ACTING OUT, FAKING, IN OTHER WORDS, A JOCKO

IN THIS MULTIPLE PERSONALITY?  IT WAS PRETTY OBVIOUS, WASN'T IT?

A.      I WOULD AGREE WITH THAT, YES.

Q.      YET HE WAS CONVINCING ENOUGH TO PERSUADE DR. SADOFF THAT HE HAD IT?

A.      I GUESS YOU WOULD HAVE TO RELY ON WHAT DR. SADOFF SAYS HERE.

Q.      OKAY.  BUT DR. SADOFF WAS SOMEONE WHO IS RECOGNIZED IN THE FIELD?

A.      HE IS A WELL-KNOWN FORENSIC PSYCHIATRIST. ALTHOUGH ACTUALLY IN ONE OF MY FIRST CASES WITH HIM, WE DISAGREED IN A CASE ON AN ISSUE OF MALINGERING IN A BATTERED WOMAN SYNDROME AND HE EVENTUALLY ACKNOWLEDGED THAT HE HAD MISSED THE DIAGNOSIS OF MALINGERING.

Q.      OKAY.  SO HE IS PRONE TO MAKE MISTAKES THEN?

A.      I WOULDN'T SAY HE WAS PRONE TO MAKE MISTAKES, BUT I WOULD DISAGREE WITH HIM.  I DISAGREED WITH HIM ON THAT OTHER CASE.  AND I DISAGREE WITH HIM, YOU KNOW, ON HIS DIAGNOSIS OF THE MULTIPLE PERSONALITY DISORDER.

Q.      NOW, DID YOU REVIEW THE FACTS IN THIS CASE FROM THE BUREAU OF PRISONS, DAVID PAUL HAMMER'S CONFESSION, ET CETERA?

A.      YES.

Q.      AND WOULD YOU AGREE THAT HIS GUILTY PLEA TO THE CRIME THAT HE INTENTIONALLY KILLED ANDREW MARTI HAD A

FACTUAL BASIS?

A.      YES.

Q.      THE CRIME HERE THAT WAS PROVEN -- WE SUBMIT THAT WAS PROVEN SHOWED LENGTHY PLANNING BY DAVID PAUL HAMMER TO KILL ANDREW MARTI.  WOULD YOU AGREE WITH THAT?

A.      WELL, THERE WERE VARIOUS VERSIONS THAT THE DEFENDANT HAS PROVIDED.  SOME OF THEM SHOW LENGTHY PLANNING, SOME OF THEM WOULD DESCRIBE IT AS AN IMPULSIVE ACT.

Q.      SOME OF THEM, WOULD YOU SUBMIT, WOULD YOU AGREE WITH ME ARE A LITTLE BIT FARFETCHED?

A.      I'M NOT SURE WHICH ONES YOU ARE REFERRING TO.

Q.      EROTIC ASPHYXIATION WOULD HAVE BEEN FARFETCHED?

A.      I DON'T THINK SO.

Q.      NO?

A.      NO, THAT WAS SOMETHING THAT HE HAD DESCRIBED AT LEAST PARTICIPATING IN WITH MR. MARTI.

Q.      THAT IS WHAT DAVID HAMMER SAID, THOUGH?

A.      YES.  I DID NOT FIND THAT FARFETCHED AT ALL, GIVEN AGAIN THE ENVIRONMENT THAT HE GREW UP IN AND, YOU KNOW, KNOWING THAT THIS IS A PRACTICE THAT IS SOMETIMES USED BY A VARIETY OF INDIVIDUALS.

Q.      DID YOU REVIEW THE AUTOPSY REPORT?

A.      I THINK THAT I DID SEE THAT.  I'M PRETTY SURE I DID SEE THAT.

Q.      DID YOU ALSO SEE DR. FUNKE'S TESTIMONY AT THE LATER 2255 HEARING?

A.      I DON'T THINK THAT I DID.

Q.      BUT YOU WOULD AGREE THAT WHEN YOU ARE MAKING THESE DIAGNOSES, THE TRUTHFULNESS OF THE INFORMATION YOU HAVE IS OF PARAMOUNT IMPORTANCE?

A.      EXACTLY.  AND THAT IS WHY IT IS SO IMPORTANT TO TAKE INTO ACCOUNT ALL OF THESE OTHER SOURCES OF INFORMATION, SO THAT, YOU KNOW, YOU ARE NOT JUST RELYING ON WHAT A CRIMINAL DEFENDANT MIGHT BE TELLING YOU.  SO IN THIS CASE, YOU KNOW, THERE ARE A VARIETY OF RENDITIONS IN PARTICULAR ABOUT THE OFFENSE ITSELF.

Q.      RIGHT.

A.      YOU KNOW, BUT I THINK THAT THE THINGS THAT HAVE BEEN CONFIRMED BY OTHER INDIVIDUALS ARE THINGS THAT ARE REALLY THE BASIS FOR MY DIAGNOSES.

Q.      NOW, THE BASES -- PART OF IT IS THE SEXUAL ABUSE FROM A MATERNAL UNCLE THAT STARTED AT AGE FIVE, IS THAT RIGHT?

A.      I THINK THAT THAT WAS THE INITIAL REPORTED EVENT.

Q.      AND THAT WOULD HAVE BEEN VERY TRAUMATIC FOR A FIVE-YEAR OLD TO HAVE BEEN AT SOME POINT EVEN SODOMIZED BY HIS MATERNAL UNCLE, WOULD YOU AGREE?

A.      YES.

Q.    YOUR POST-TRAUMATIC STRESS DISORDER DIAGNOSIS, AS HE SITS HERE TODAY, RIGHT, HAS THAT WANED TO THE POINT WHERE HE DOES NOT ACTUALLY HAVE IT?  I THINK THAT IS WHAT YOUR REPORT SEEMED TO SUGGEST.

A.    YES.  HE CONTINUES TO HAVE SOME SYMPTOMS OF IT, BUT HE, IN MY OPINION, DOES NOT MEET THE FULL DIAGNOSTIC CRITERIA TODAY FOR POST-TRAUMATIC STRESS DISORDER.

Q.    BUT YOU ARE SAYING YEARS AGO THAT HE DID?

A.    YES.

Q.    AND YOU'RE ALSO SAYING THAT BASED UPON SOME STRESSORS THAT HE COULD ENCOUNTER, IT COULD BECOME FULL-BLOWN AGAIN?

A.    YES.  IT WOULD NOT SURPRISE ME IF, AFTER LISTENING TO THE TESTIMONY ABOUT THE ABUSE THAT HE HAD BEEN THROUGH, THAT HE MAY BECOME MORE SYMPTOMATIC.

Q.    AND WOULD YOU AGREE THAT PEOPLE WITH BORDERLINE PERSONALITY DISORDER AND THESE ANTISOCIAL PERSONALITY DISORDERS ARE MORE DANGEROUS THAN PEOPLE THAT DO NOT HAVE THOSE DISORDERS?

A.    YES.  I THINK THEY ARE AT A RISK, AN INCREASED RISK FOR VIOLENCE IN COMPARISON TO SOMEBODY WHO DOES NOT HAVE A MENTAL DISORDER.

          MR. GURGANUS:  YOUR HONOR, I HAVE NO FURTHER QUESTIONS AT THIS TIME.

          THE COURT:  ANY REDIRECT?

MR. MORENO:  VERY BRIEFLY, YOUR HONOR.

REDIRECT EXAMINATION

BY MR. MORENO:

Q.    DR. BLUMBERG, YOU WERE ASKED A QUESTION CONCERNING DR. WOLFSON'S EVALUATION AND THAT HE FOUND MR. HAMMER TO BE MALINGERING.  DO YOU REMEMBER THAT?

A.    YES.

Q.    DO YOU RECALL THAT DR. WOLFSON ONLY FOUND MR. HAMMER TO BE MALINGERING WHEN IT CAME TO DID; HE DID NOT FIND HE WAS MALINGERING IN ANY OTHER ASPECT OF HIS EVALUATION.  IS THAT YOUR RECOLLECTION?

A.    YOU KNOW, I DID NOT REMEMBER THAT BUT IF THAT IN FACT IS WHAT HE SAID -- I MEAN, I DO REMEMBER THE ISSUE OF MALINGERING WITH THE DID, YOU KNOW.  BUT FRANKLY I THINK HIS OTHER DIAGNOSIS WAS ANTISOCIAL PERSONALITY DISORDER, AND I DON'T BELIEVE HE FOUND HE WAS MALINGERING IN THE ANTISOCIAL PERSONALITY DISORDER.

Q.    OR BORDERLINE DISORDER?

A.    OR BORDERLINE.

MR. MORENO:  I HAVE NO FURTHER QUESTIONS.

MR. GURGANUS:  ONE MOMENT, YOUR HONOR.

RECROSS EXAMINATION

BY MR. GURGANUS:

Q.    IT'S A LONG REPORT.

NOW, WERE YOU THERE TO HEAR DR. WOLFSON'S

TESTIMONY?

A.      NO.

Q.      I'M JUST LOOKING AT WHAT THE DIAGNOSIS WAS WITH RESPECT TO HIS REPORT.  MALINGERING, A CLAIMED DISSOCIATIVE IDENTITY DISORDER (MULTIPLE PERSONALITY DISORDER, DOUBTFUL VALIDITY.)

HE ALSO FOUND MAJOR -- QUERY MAJOR DEPRESSION IN REMISSION, ANTISOCIAL PERSONALITY DISORDER, AND THEN MATTERS OF AXIS 3, HYPERTHYROIDISM, HEPATITIS B, HEPATITIS C, STATUS POST-APPENDECTOMY AND MULTIPLE ABDOMINAL SURGERIES, HISTORY OF SHOULDER INJURY, LARGELY RECOVERED, AND REPORTED CHRONIC DIARRHEA.

BUT THE MALINGERING WENT TO THIS DISSOCIATIVE IDENTITY DISORDER.  RIGHT?

A.      YES.  AND AGAIN, I'M AT LEAST IN PARTIAL AGREEMENT THAT I DON'T BELIEVE THAT HE HAS IT.

MR. GURGANUS:  OKAY.  THANK YOU, YOUR HONOR.

MR. MORENO:  YOUR HONOR, WE WOULD JUST MOVE IN THE EXHIBITS THAT WE USED.  I BELIEVE THE ONE THAT REMAINS IS EXHIBIT --

THE COURT:  D 60 WILL BE RECEIVED INTO EVIDENCE.

(EXHIBIT D 60 ADMITTED INTO EVIDENCE.)

THE COURT:  I JUST HAVE ONE QUESTION ABOUT D 60.

WHAT WAS THE YOUNGEST AGE AT WHICH HE WAS GIVEN AN ANTIPSYCHOTIC MEDICINE, DO YOU KNOW?

THE WITNESS:  IF I CAN JUST CHECK MY NOTES, I CAN FIND THAT.

YOUR HONOR, MY NOTES REFLECT THAT HE RECEIVED THE ANTIPSYCHOTIC MEDICATION MELLARIL ON FEBRUARY 13TH, 1976.  SO THAT IS WHEN HE WAS MARRIED AND PRESENTING IN ACUTE DISTRESS WITH SOME SUICIDAL THOUGHTS AND HE RECEIVED A DOSAGE OF 15 MILLIGRAMS.

THE COURT:  ANY QUESTIONS BASED ON THAT?

MR. GURGANUS:  MAY I FOLLOW UP, YOUR HONOR?

THE COURT:  YES.

BY MR. GURGANUS:

Q.    IF SOMEONE IS USING PCP OR OTHER DRUGS LIKE THAT, COULD YOU PRESENT AS SOMEONE THAT IS LOSING TOUCH WITH REALITY?

A.    ABSOLUTELY.  IN FACT, YOU MIGHT TREAT A DRUG-INDUCED PSYCHOTIC DISORDER WITH AN ANTIPSYCHOTIC, BUT HE WAS NOT ON DRUGS AT THE TIME THAT HE WAS PRESCRIBED THAT.  THAT WAS THE FIRST PRESENTATION.  HE WAS NOT PSYCHOTIC, BUT HE WAS GIVEN AN ANTIPSYCHOTIC MEDICATION.

Q.      ARE THEY SOMETIMES USED FOR REASONS OTHER THAN PSYCHOSIS?

A.      SOMETIMES THEY ARE, IN TERMS OF SEDATION AND BEHAVIORAL CONTROL.

Q.      SO THE FACT THAT YOU GAVE AN ANTIPSYCHOTIC MEDICATION, IT COULD JUST BE TO CALM A PERSON DOWN EVEN THOUGH THERE ARE NO PSYCHOTIC SYMPTOMS?

A.      WELL, TO CALM HIM DOWN, BUT EVEN THEIR DIAGNOSIS OF THE DEPRESSION, INADEQUATE POSSIBLY EXPLOSIVE OR EPILEPTICAL PERSONALITY DISORDER, THAT WOULD SUGGEST THAT HE WAS EXPERIENCING PRETTY SEVERE DISTRESS.

Q.      BUT NOT PSYCHOSIS, DOCTOR?

A.      I DON'T SEE AN INDICATION OF PSYCHOSIS AT THAT TIME.

            MR. GURGANUS:  I HAVE NO FURTHER QUESTIONS.  THANK YOU, YOUR HONOR.

            MR. MORENO:  NOTHING MORE, YOUR HONOR.

            THE COURT:  ALL RIGHT.  YOU MAY STEP DOWN.

            THE WITNESS:  THANK YOU.

            (WITNESS EXCUSED).

            MR. MORENO:  YOUR HONOR, THAT CONCLUDES OUR WITNESSES FOR TODAY.

            THE COURT:  THEN WE WILL RECESS AT THIS POINT.

MR. TRAVIS:  YOUR HONOR, BEFORE WE RECESS --

THE COURT:  YOU HAVE TO SPEAK INTO A MIC, MR. TRAVIS.

MR. TRAVIS:  BEFORE WE RECESS, MY CLIENT SEEMS TO BELIEVE THAT ONE OF THE EXHIBITS THAT THE GOVERNMENT MOVED INTO EVIDENCE WAS EXHIBIT 40.  AND QUITE FRANKLY, I MISSED THAT.  COULD THE COURT TELL ME WHETHER IT'S CORRECT THAT EXHIBIT 40 WAS OFFERED.

THE COURT:  G 40?

MR. TRAVIS:  G 40.  IT WOULD BE G 40, I BELIEVE.

THE COURT:  G 40.  THERE WAS A GOVERNMENT EXHIBIT 4010.1.  THAT IS THE NEWSPAPER ARTICLE.

MR. TRAVIS:  OH, OKAY.  THAT IS THE ONE I'M REFERRING TO.

THE COURT:  THAT WAS ADMITTED.

MR. TRAVIS:  IF I MIGHT, YOUR HONOR, I WOULD LIKE TO REVISIT THAT ISSUE.

MY RECOLLECTION IS THAT THAT ARTICLE WAS SHOWN TO MS. LUCK.  MS. LUCK INDICATED THAT SHE HAD NEVER SEEN IT BEFORE AND HAD NO KNOWLEDGE OF IT.

SECONDLY, MY RECOLLECTION OF THE CONTENT OF THAT ARTICLE IS NOT RELEVANT TO ANY ISSUE THAT IS BEFORE THIS COURT WITH RESPECT TO ANY OF THE STATUTORY

OR NONSTATUTORY AGGRAVATING FACTORS.

THE COURT:  AGAIN, MY SENSE FROM THE QUESTIONING WAS THAT IT WAS A NEWSPAPER THAT MAY HAVE CONTAINED SOME KIND OF REQUEST FOR A GAY MAN TO SEND MR. HAMMER MONEY UNDER FALSE PRETENSES.  BUT OBVIOUSLY THE WITNESS DID NOT -- AT LEAST THAT IS THE SENSE I GOT FROM THE TESTIMONY, BUT THE WITNESS OBVIOUSLY DID NOT ACKNOWLEDGE THAT AT ALL.  SO I DON'T KNOW.

MR. GURGANUS:  YEAH, IT WAS AN ARTICLE --

THE COURT:  IT WAS IN THE NEWSPAPER.

MR. GURGANUS:  WELL, IT WAS AN ARTICLE THAT DISCUSSED ABOUT ALL THE CONS THAT MR. HAMMER WAS INVOLVED IN.

THE COURT:  IT WAS NOT AN ADVERTISEMENT. IT WAS AN ARTICLE DISCUSSING --

MR. GURGANUS:  IT WAS AN ARTICLE, YES, YOUR HONOR, WHERE MR. HAMMER WAS INTERVIEWED AND HE WENT INTO MANY OF THE THINGS THAT I WAS QUESTIONING HER ABOUT, INCLUDING THE KENNER -- KENNETH KENNER MURDER.

THE COURT:  NOW, WHAT IS THE RELEVANCY OF IT?

MR. GURGANUS:  AGAIN JUDGE, JUST TO GO TO HIS CREDIBILITY AS A -- BECAUSE SHE, AS A WITNESS, WAS GIVING -- WAS RELYING ON MUCH OF WHAT HE SAID.  AND IT IS TO SHOW THAT HE IS NOT SOMEONE IN THE PAST THAT HAS

BEEN TRUTHFUL ON MANY THINGS.  AND THAT ARTICLE DEMONSTRATED IT VERY CLEARLY.

THE COURT:  ANY RESPONSE TO THAT, MR. TRAVIS?

MR. TRAVIS:  YES, YOUR HONOR.  FIRST, MS. LUCK SAID SHE HAD NEVER SEEN IT BEFORE AND HAD NOT READ IT.  TO THE EXTENT THAT THE GOVERNMENT THINKS IT IS APPROPRIATE THAT HE MADE FALSE CONFESSIONS TO KILLING MR. KENNER AND WAS INVOLVED WITH KAREN SILKWOOD AND SO ON AND SO FORTH, THEY ALREADY HAVE THAT IN THE RECORD. SO THEY DON'T NEED THAT ARTICLE WHICH MAY HAVE OTHER MATERIAL OR INFORMATION, I DON'T IMMEDIATELY HAVE IT IN FRONT OF ME, THAT SHOULD NOT BE IN EVIDENCE.

THE ONLY REASON 40, WHATEVER THE NUMBER IS, WAS OFFERED WAS TO SHOW THAT IN THE PAST MR. HAMMER HAS MADE CLAIMS THAT WERE PROVEN TO BE FALSE.  MS. LUCK ACKNOWLEDGED THAT.  AND YOU DON'T NEED THE NEWSPAPER ARTICLE TO SUPPORT THAT.

THE COURT:  AGAIN, IF SOMETHING IS IN EVIDENCE, THERE IS A PRESUMPTION THAT THE TRIER OF FACT, WHICH IS ME, WILL SOMEHOW CONSIDER IT.  AND IT IS A NEWSPAPER ARTICLE, WHICH IS WRITTEN BY A NEWSPAPER REPORTER, I'M ASSUMING.

MR. GURGANUS:  AND YOUR HONOR, SO THE COURT UNDERSTANDS, THE HEADLINE IS, STORY OF A MASTER

CON ARTIST IN DEPTH.

THE COURT:  ALL RIGHT.  YOU KNOW, WHAT'S CONTAINED IN A NEWSPAPER ARTICLE LIKE THAT, IT'S ALL HEARSAY.

NOW, THE RULES OF EVIDENCE DON'T APPLY HERE, BUT I HAVE TO CONSIDER WHETHER OR NOT EVIDENCE SHOULD BE EXCLUDED BECAUSE ITS PROBATIVE VALUE IS OUTWEIGHED BY THE DANGER OF CREATING AN UNFAIR PREJUDICE, CONFUSING THE ISSUES OR MISLEADING THE JURY, WHICH WOULD BE THE TRIER OF FACT.  I DON'T THINK THIS WOULD FALL UNDER CONFUSING THE ISSUES OR MISLEADING THE JURY, BUT IT COULD BE UNFAIRLY PREJUDICIAL FOR THE COURT TO CONSIDER AT THIS HEARING AN ARTICLE THAT WAS WRITTEN BY A THIRD PARTY THAT JUST SUMMARIZES INFORMATION THAT MAY OR MAY NOT BE A SOURCE FROM OFFICIAL RECORDS.

MR. GURGANUS:  IT'S ACTUALLY SOURCED FROM MR. HAMMER.  HE IS RIGHT ON THE FRONT, AND IT WAS AN INTERVIEW OF HIM.

THE COURT:  WELL, YOU KNOW, AGAIN, I THINK YOU HAVE -- YOU HAVE MADE YOUR RECORD.  AND IF YOU HAVE NOT MADE YOUR RECORD ALREADY, YOU WILL CONTINUE TO MAKE YOUR RECORD THAT MR. HAMMER DID ENGAGE IN THE KIND OF CONDUCT THAT IS DESCRIBED IN THE ARTICLE WITH RESPECT TO THESE ALLEGED SCAMS THAT YOU ARE REFERRING TO.  I EVEN GET THE SENSE IT IS NOT EVEN BEING DISPUTED THAT IN

HIS YOUNGER DAYS HE ENGAGED IN THAT CONDUCT.  BUT I THINK THAT FOR PURPOSES OF FAIRNESS WE SHOULD NOT RELY UPON A NEWSPAPER ARTICLE THAT WAS WRITTEN BY A REPORTER, EVEN IF THE ARTICLE SAYS THAT THIS IS WHERE I GOT THE INFORMATION FROM.

MR. HAMMER HAS INDICATED HE MAY TESTIFY. OBVIOUSLY IF HE DOES, YOU CAN CROSS-EXAMINE HIM ON ANYTHING THAT WOULD AFFECT HIS ABILITY TO BE TRUTHFUL. BUT I THINK THERE IS ALREADY ADMISSIONS FROM WITNESSES AS TO WHAT MAY BE THE CONTENT OF THAT NEWSPAPER.

SO I WILL GRANT THE MOTION FOR RECONSIDERATION AND EXCLUDE AND NOT ADMIT GOVERNMENT EXHIBIT G 4010.1.  ALL RIGHT.

MR. TRAVIS:  THANK YOU, YOUR HONOR.

MR. GURGANUS:  THANK YOU, YOUR HONOR.

THE COURT:  ANYTHING FURTHER?

MR. MORENO:  NOTHING, YOUR HONOR.

MR. TRAVIS:  YOUR HONOR, ONE OTHER SMALL HOUSEKEEPING MATTER.  I HAVE NOT SEEN MY COMPUTER TODAY, SO MAYBE I'M TALKING ABOUT SOMETHING THAT IS ALREADY MOOT.

THE MOTION WITH RESPECT TO MR. DONATELLI IS STILL OUT THERE, AND WE WOULD -- IF ALLOWED, WE WOULD BE CALLING HIM DURING THE WEEK OF THE 23RD SO --

THE COURT:  HAS A RESPONSE BEEN FILED?

MR. TRAVIS:  I HAVE NO ADDITIONAL RESPONSE BEYOND WHAT WAS IN THE ORIGINAL BRIEF WHICH I SUBMITTED, YOUR HONOR.

THE COURT:  LET ME JUST LOOK AT WHAT I HAVE.  I BELIEVE IT HAS BEEN RESPONDED TO.  I BELIEVE THAT YOU FILED THE MOTION AND THE GOVERNMENT RESPONDED TO IT.  THAT IS MY RECOLLECTION.

MS. SAUNDERS:  YES, YOUR HONOR.  I BELIEVE THE GOVERNMENT DID RESPOND.  THE OTHER DAY THERE WAS AN ARGUMENT IN COURT.

THE COURT:  THE OTHER MOTION WAS NOT RESPONDED TO AND THAT HAS ALREADY BEEN DEALT WITH.

MS. SAUNDERS:  I RESPONDED TO THAT ON MONDAY.

THE COURT:  AND THAT HAS BEEN DEALT WITH.

MS. SAUNDERS:  THAT HAS BEEN DEALT WITH. THIS ONE, THERE WAS A LITTLE BIT OF ARGUMENT AND MR. TRAVIS HAD INDICATED THAT IF HE FOUND SOMETHING TO RESPOND TO THE COURT'S QUESTION HE WOULD LET THE COURT KNOW.

THE COURT:  THERE IS AN OFFER OF PROOF IN THE FRONT OF THE MOTION AND HE IS GOING TO TESTIFY TO A STATISTICAL SUMMARY OF THE NUMBER OF FEDERAL DEATH-ELIGIBLE CASES AS COMPARED TO THE SMALL NUMBER OF CASES IN WHICH IT HAS ACTUALLY BEEN IMPOSED.  THAT IS

NUMBER ONE.

NUMBER TWO, AN ANALYSIS OF THE SENTENCES IMPOSED IN THE 114 PRISON MURDERS WHICH OCCURRED FROM DECEMBER 14TH, 2001 THROUGH OCTOBER 1, 2013, IDENTIFYING THOSE IN WHICH A NOTICE OF INTENT TO SEEK A SENTENCE OF DEATH WAS FILED.

AND A SUMMARY OF WHAT OCCURRED IN THIS JURISDICTION INVOLVING PRISON MURDERS.

I MEAN, LET'S ASSUME, FOR THE SAKE OF ARGUMENT, THAT OVER THE LAST TEN YEARS OR 15 YEARS OR 20 YEARS, THERE HAVE BEEN 200 PRISON MURDERS.  AND LET'S ASSUME THAT THE GOVERNMENT MADE A DECISION ONLY IN ONE CASE TO SEEK THE DEATH PENALTY AND FILED A NOTICE OF INTENT.  ISN'T THAT THE GOVERNMENT'S PREROGATIVE, AS LONG AS THEY ARE NOT MOTIVATED BY AN IMPROPER REASON? AND THAT WOULD BE RACIAL PREJUDICE AND ALL OF THE OTHER FACTORS THAT ARE WELL-KNOWN TO US THAT WOULD BE IMPROPER MOTIVATIONS FOR SEEKING A SPECIFIC SENTENCE.

ISN'T THAT THE GOVERNMENT'S PREROGATIVE? ISN'T THAT A DECISION OF THE EXECUTIVE BRANCH OF GOVERNMENT?

MR. TRAVIS:  I DON'T DISAGREE WITH YOUR LOGIC, YOUR HONOR.

BUT I THINK TWO THINGS.  ONE, UNDER SECTION 3553(A), UNDER 18 U.S.C. 3553(A) --

MS. SAUNDERS:  YOUR HONOR, WE HAVE BEEN DISCONNECTED.

THE COURT:  ALL RIGHT.  WE LOST MR. HAMMER, BUT I'M GOING TO ASK YOU TO CONTINUE.  I DON'T THINK WE NEED MR. HAMMER FOR A LEGAL ARGUMENT LIKE THIS.

MR. TRAVIS:  NO PROBLEM.  UNDER 3553(A), IN A NONCAPITAL CASE, ONE OF THE FACTORS THE COURT HASN'T TAKEN AWAY IN DETERMINING THE SENTENCE WHICH IS APPROPRIATE IS TO TRY TO AVOID SENTENCE DISPARITIES.

IT SEEMS TO ME THAT IF THAT IS PERMISSIBLE IN A NONCAPITAL FORUM, IT SURELY SHOULD BE PERMISSIBLE IN A CAPITAL FORUM, FOR THE PERSON OR THE GROUP OF PEOPLE IMPOSING THE SENTENCE TO BE ABLE TO LOOK AT THE CRIME AND LOOK AT THE BROAD SCOPE OF SIMILAR TYPE OF CRIME AND MAKE A DETERMINATION OF WHETHER DEATH IS A JUSTIFIED SENTENCE IN THIS CASE.

THE COURT:  ALL RIGHT.  NOW, WITH RESPECT TO WHAT YOU JUST SAID, AND I COULD BE WRONG BUT I WOULD LIKE COUNSEL TO RESEARCH IT.  OBVIOUSLY I SAID I HAVE 43 YEARS IN THE CRIMINAL JUSTICE SYSTEM IN THE FEDERAL COURT, BUT I BELIEVE THAT THE LAW IS THAT WE DON'T LOOK TO THE UNIVERSE OF CASES OUTSIDE OF THE IMMEDIATE CASE.

IN OTHER WORDS, LET'S ASSUME YOU HAVE A FIVE-CODEFENDANT CASE, YOU LOOK AT PARITY WITHIN THE

CASE, NOT PARITY ACROSS THE NATION IN OTHER CASES.  NOW,

I COULD BE WRONG BUT I HAVE SOME RECOLLECTION.  IT MAY

BE THE OTHER WAY AROUND.

MR. GURGANUS:  YOUR HONOR, I THINK IT

MIGHT BE THE OTHER WAY AROUND.  BUT THIS IS A DEATH

PENALTY CASE WHERE THERE IS INDIVIDUAL -- INDIVIDUALIZED

ATTENTION PAID TO THIS VERY PERSON.  AND IF WE WERE TO

OPEN THIS THING UP TO EVERY OTHER CASE, WE COULD BE HERE

FOR TEN YEARS TRYING ALL OF THOSE CASES TO END THE

DISTINCTIONS THAT WOULD EXIST.  IT WOULD JUST -- THAT IS

NOT THE WAY THE DEATH PENALTY STATUTE HAS BEEN

STRUCTURED.  AND THEY ARE TRYING TO BRING INTO ACCOUNT A

STATUTE THAT, YOU KNOW, IS NOT APPLICABLE.

THE COURT:  IF IT IS THE OTHER WAY, THAT

ARGUMENT WOULD APPLY IN NONDEATH PENALTY CASES TOO.  AND

IF IT'S ADMISSIBLE IN THAT SITUATION, IT MOST SURELY

SHOULD BE ADMISSIBLE IN A DEATH PENALTY CASE.

MR. GURGANUS:  WE SUBMIT THAT THE

STATUTORY STRUCTURE THAT CONGRESS HAS ENACTED IS

SPECIFIC TO THE DEATH PENALTY.  THEY HAVE COME UP WITH A

SPECIFIC STATUTORY STRUCTURE FOR THE DEATH PENALTY WHICH

IS DIFFERENT THAN 3553.

THE COURT:  WELL, THE QUESTION IS -- AND

AGAIN I SAID THIS THE OTHER WAY.  THERE MAY BE MERIT TO

WHAT MR. GURGANUS IS SAYING, ONLY BECAUSE THE STATUTE,

IN TERMS OF THE MITIGATING FACTORS, SAYS OTHER FACTORS IN THE DEFENDANT'S BACKGROUND, RECORD, OR CHARACTER, OR ANY OTHER CIRCUMSTANCE OF THE OFFENSE THAT MITIGATES AGAINST THE IMPOSITION OF A DEATH SENTENCE.  IN OTHER WORDS, THIS IS MORE LIMITING THAN 3553(A) TO SOME EXTENT IN THAT REGARD.

MR. TRAVIS:  AND I UNDERSTAND THAT, YOUR HONOR, AND THAT IS WHY, WHEN I FASHIONED THE MOTION, INSTEAD OF TRYING TO DO A MOTION THAT HAS BEEN USED IN OTHER CASES, WHERE THEY WANT TO TALK ABOUT ALL DEATH PENALTY, ALL POTENTIAL DEATH PENALTY CASES, I SPECIFICALLY LIMITED IT TO WHAT MR. DONATELLI WOULD TALK ABOUT TO THE 114 CASES IDENTIFIED BY THE GOVERNMENT IN A FILING IN THE UNITED STATES VERSUS MCCLOSKEY, THE CASE THAT THE COURT INDICATED THE OTHER DAY IT HAD REVIEWED AND FOUND PERSUASIVE.

THEY SUBMITTED AN EXHIBIT IN THAT CASE THAT IDENTIFIES 114 PRISON MURDER CASES.  AND THAT IS WHAT I WAS GOING TO HAVE MR. DONATELLI TALK ABOUT, IF THE COURT PERMITS IT.  AND THERE CAN'T BE A DISPUTE.  WE ARE NOT GOING TO HAVE TO HAVE A MINITRIAL.  IT'S THEIR LIST OF CASES.  THEY DESCRIBED THE CASE.

IF YOU LOOK AT THE SAMSON DECISION, ONE OF THE PROBLEMS THAT THE COURT HAD IN SAMSON WAS THAT WHAT WAS BEING USED WAS A LIST OF CASES THAT WAS DRAWN

UP BY FEDERAL RESOURCE COUNSEL.  AND THE COURT WAS CONCERNED, WE ARE GOING TO HAVE TO HAVE MINI TRIALS TO DETERMINE WHAT THE FACTS WERE.

WE HAVE 114 CASES THAT THE UNITED STATES REPRESENTED -- AND THE DISTRICT COURT IN NEW MEXICO IS FACTUALLY ACCURATE.  THIS IS WHAT HAPPENED.  WE DON'T DISPUTE IT.

THE COURT:  LET ME ASK THIS QUESTION.  IT WOULD SEEM TO ME THAT MR. -- WHEN IT SAYS A STATISTICAL SUMMARY, THAT IS THE FIRST PROFFER, IN ONE CATEGORY OF EVIDENCE.  THE SECOND CATEGORY OF EVIDENCE IS AN ANALYSIS OF THE SENTENCES.

THE THIRD CATEGORY OF EVIDENCE IN THE PROFFER IS A SUMMARY OF, IN QUOTES, "WHAT OCCURRED" IN CASES IN THIS JURISDICTION INVOLVING PRISON MURDERS. NOW, WHEN YOU SAY IN THIS JURISDICTION, ARE WE TALKING ABOUT THE MIDDLE DISTRICT OF PENNSYLVANIA?

MR. TRAVIS:  I WAS TALKING ABOUT THE MIDDLE DISTRICT OF PENNSYLVANIA, BECAUSE EVEN THOUGH IT'S BEING TRIED, THE CASE IS BEING TRIED --

THE COURT:  THAT IS WHERE THE FEDERAL PRISONS ARE.

MR. TRAVIS:  YES.  AND THAT IS WHERE THE CASE ORIGINATED.  AND THE STATISTICAL POOL THAT I WANT TO USE ARE 114 CASES AS IDENTIFIED BY THE BUREAU OF

PRISONS IN MCCLOSKEY.  THAT IS THE POOL.

THE COURT:  NOW, WHAT KIND OF ANALYSIS WOULD HE TESTIFY TO IN THE SENTENCES IMPOSED IN 114 PRISON MURDERS IDENTIFYING THOSE IN WHICH A NOTICE OF INTENT TO SEEK THE DEATH SENTENCE WAS FILED?  WHAT KIND OF ANALYSIS WILL HE GIVE US?

MR. TRAVIS:  HE WOULD TAKE THE CASES WHERE A NOTICE WAS FILED.  AND I DON'T THINK A NOTICE WAS FILED IN ALL 114.  AND HE WOULD TELL US -- I DON'T HAVE THE FINAL BREAKDOWN, SO I'M JUST GOING TO MAKE NUMBERS UP IN MY HEAD.  114 CASES.  I KNOW THAT 19 OF THE CASES ARE BOGUS IN THE SENSE THAT THEY ARE NOT AN INMATE KILLING AN INMATE.  IT'S SOMEBODY LIVING IN A HALFWAY HOUSE BEING SHOT ON THE STREET.  SO NOW WE ARE DOWN TO 95.  IN THOSE 95 CASES, OF THE 95 CASES HOW MANY DID YOU FILE A NOTICE OF INTENT?  LET'S SAY 25.  OF THE 25 WHERE THEY FILED A NOTICE OF INTENT AND THE 70 THEY DIDN'T, WHAT HAPPENED TO THOSE 25?  20 OF THEM, THE NOTICE WAS WITHDRAWN.  THREE OF THEM WENT TO TRIAL. THIS WAS THE VERDICT.  THIS WAS THE RESULT.

THAT IS HOW I ENVISION.

THE COURT:  WHAT IS THE RELEVANCY?  WHAT ARGUMENT ARE YOU GOING TO MAKE FROM THAT?

MR. TRAVIS:  THE RELEVANCE IS, IF I'M CORRECT, THAT TO TRY TO AVOID DISPARITY, I THINK THAT WE

HAVE TO SEE WHAT IS HAPPENING, BECAUSE THE FEDERAL DEATH PENALTY IS SUPPOSED TO HAVE A NATIONWIDE STANDARD.  AND I UNDERSTAND IT'S IN THEIR RULES AND THEIR PROTOCOL, AND I DON'T HAVE ANY STANDING TO RAISE THAT.  BUT IT'S SUPPOSED TO BE A NATIONWIDE STANDARD SO THAT A KILLING IN THE MIDDLE DISTRICT OF PENNSYLVANIA OF ONE INMATE BY ANOTHER INMATE SHOULD BE TREATED THE SAME IN UTAH.

THE COURT:  HOW DOES THAT -- WHAT YOU JUST SAID -- PROVE THAT?

MR. TRAVIS:  WELL, IT WILL PROVE THAT BY SHOWING, BY COMPARING HOW THE CASE WAS HANDLED IN UTAH VERSUS THE MIDDLE DISTRICT OF PENNSYLVANIA.

THE COURT:  BUT THEN YOU ARE GETTING INTO SUBJECTIVE CATEGORIZATION OF HOW PROSECUTORS MAKE DECISIONS, HOW PROSECUTORS PROSECUTE CASES.  AND AGAIN, I JUST FEEL IT'S A DECISION THAT IS MADE BY THE EXECUTIVE BRANCH OF GOVERNMENT.

MR. TRAVIS:  I UNDERSTAND, YOUR HONOR.

THE COURT:  NO, I UNDERSTAND.  IT'S -- A LOT OF PEOPLE MAYBE ARE EITHER AGAINST THE DEATH PENALTY OR THEY DON'T LIKE THE WAY IT IS ADMINISTERED.  YOU KNOW, THAT KIND OF PUBLICITY IS NATIONWIDE.  BUT MY JOB IS TO FOLLOW THE LAW.  AND THE LAW IS, WE DO HAVE A FEDERAL DEATH PENALTY STATUTE, AND IT'S VERY SPECIFIC AS TO WHAT MITIGATING EVIDENCE CAN BE PRESENTED BY A

DEFENDANT.  AND, YOU KNOW, FROM WHAT I'M READING IN TERMS OF THE PROFFER AND ALL OF THESE STATISTICS, ALL IT DOES IS AMOUNT TO A CRITICISM AS TO THE DECISION-MAKING PROCESS BY THE EXECUTIVE BRANCH OF GOVERNMENT IN THESE CASES.

MR. TRAVIS:  I WISH I HAD A DISTRICT COURT OPINION OR A CIRCUIT COURT OPINION THAT I COULD OFFER TO THE COURT TO SUPPORT MY POSITION.  I DON'T.  I HAD ONE IN SAMSON.  THE DISTRICT COURT INITIALLY WAS GOING TO ALLOW IT, THE FIRST CIRCUIT REVERSED THAT.  AND I UNDERSTAND WHAT THE COURT IS SAYING.  I'M JUST TRYING TO MAKE MY RECORD, MAKE MY ARGUMENT, AND THE COURT WILL MAKE THEIR DECISION AND, YOU KNOW, WE WILL GO FORWARD. I WAS JUST TRYING TO --

THE COURT:  NO, I UNDERSTAND.  I'M NOT CRITICIZING ANYBODY FOR OFFERING WHAT THEY BELIEVE IN GOOD FAITH IS RELEVANT EVIDENCE IN A CASE OF THIS MAGNITUDE.

I HAVE READ THE MCCLOSKEY OPINION.  AND APPARENTLY THE FIRST CIRCUIT AGREES WITH THE LOGIC.  I SAID THE OTHER DAY THAT IN READING THIS OPINION AND STUDYING THE STATUTE THAT I DISAGREE WITH THE JUDGE WHO WROTE THAT OPINION.  HE WROTE A THOROUGH OPINION.  I HAVE READ THE FEDERAL DEATH PENALTY ACT IN 18 U.S.C. SECTION 1351 ET SEQ MANY TIMES OVER THE LAST THREE

YEARS.

AND THE ONLY THING THAT CATCHES MY EYE IN TERMS OF PARITY AS A MITIGATING FACTOR, NUMBER FOUR, EQUALLY CULPABLE DEFENDANTS.  ANOTHER DEFENDANT OR DEFENDANTS EQUALLY CULPABLE IN THE CRIME WILL NOT BE PUNISHED BY DEATH, AND WE DON'T EVEN HAVE THAT HERE.  WE ONLY HAVE ONE DEFENDANT IN THIS CASE.  OBVIOUSLY THAT WAS NOT AN ARGUMENT.

AND I DON'T SEE A REFERENCE IN THE FEDERAL DEATH PENALTY STATUTE THAT WOULD GO BACK TO 3553(A) FACTORS.  WHEN WE ARE DEALING WITH THE DEATH PENALTY, IT'S STRICTLY ELIGIBILITY AND THEN MITIGATING AND AGGRAVATING FACTORS.

SO I THINK FOR ALL THE REASONS I HAVE ALREADY SAID ON THE RECORD, I'M GOING TO DENY THE MOTION TO -- LET ME JUST FIND IT ONE MORE TIME.

MR. TRAVIS:  IT WAS A MOTION IN LIMINE TO ALLOW US TO CALL MARK DONATELLI, YOUR HONOR.

THE COURT:  IT'S DEFENDANT HAMMER'S MOTION IN LIMINE TO ADMIT THE TESTIMONY AT TRIAL OF MARK DONATELLI, AND THIS IS DOCUMENT NUMBER 1697 IN THE RECORD.  SO I WILL DENY THAT MOTION.  ALL RIGHT.

MR. TRAVIS:  THANK YOU, YOUR HONOR.  I WILL TELL MR. DONATELLI.

THE COURT:  ALL RIGHT.  AND WE CAN PUT

THAT ON THE RECORD SO MR. HAMMER KNOWS FIRST THING.

MR. TRAVIS:  I WILL TELL HIM.

THE COURT:  JUNE 23RD.  EVERYONE SHOULD HAVE A GOOD WEEK.  AND WE WILL SEE YOU BACK HERE ON JUNE 23RD.  THANK YOU.

MR. MORENO:  THANK YOU, YOUR HONOR.

(COURT ADJOURNED AT 3:40 P.M.)

I N D E X

| DEFENSE WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| LOUISE LUCK (RECALLED) | | | | |
| BY MR. GURGANUS | -- | 3 | -- | -- |
| BY MR. MORENO | -- | -- | 69 | -- |
| | | | | |
| RUBEN GUR (RECALLED) | | | | |
| BY MS. HAINES | -- | 72 | -- | -- |
| BY MS. SAUNDERS | -- | -- | 96 | -- |
| | | | | |
| NEIL BLUMBERG | | | | |
| BY MR. MORENO | 118 | -- | 177 | -- |
| BY MR. GURGANUS | -- | 166 | -- | 177 |

- - -

| EXHIBITS ADMITTED | PAGE NO. |
|---|---|
| G 4010.1 | 115 |
| GC 4 | 115 |
| | |
| D 106, 107 AND 108 | 116 |
| D 59 | 129 |
| D 60 | 178 |

I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

DATE                              OFFICIAL COURT REPORTER

                                  SUZANNE R. WHITE

**'**

**'73** [4] - 145:25, 146:2, 146:3, 148:11
**'74** [2] - 148:11, 148:23
**'77** [1] - 119:15
**'80** [1] - 119:15
**'84** [1] - 120:24
**'86** [2] - 5:3, 5:5
**'92** [1] - 53:2
**'96** [2] - 121:1, 148:23
**'97** [1] - 59:4
**'99** [1] - 121:19

**1**

**1** [3] - 104:9, 114:20, 187:4
**10** [3] - 55:19, 102:7, 168:10
**10/10** [1] - 52:2
**10/3** [1] - 52:2
**100** [1] - 2:7
**100.29** [1] - 46:8
**100.30** [1] - 49:15
**103** [1] - 165:13
**106** [5] - 97:5, 97:8, 115:24, 116:3, 197:19
**107** [4] - 98:25, 115:24, 116:3, 197:19
**108** [4] - 101:24, 115:24, 116:3, 197:19
**11** [4] - 3:12, 37:23, 55:19, 55:23
**114** [8] - 187:3, 190:13, 190:18, 191:4, 191:25, 192:3, 192:9, 192:11
**115** [2] - 197:16, 197:17
**116** [1] - 197:19
**118** [1] - 197:12
**11TH** [2] - 41:21, 41:25
**12** [2] - 42:23, 52:15
**129** [1] - 197:20
**13** [4] - 65:7, 124:12, 139:13, 145:23
**130** [2] - 37:17, 114:25
**1331** [1] - 2:4
**1351** [1] - 194:25
**136** [1] - 49:22
**13TH** [4] - 43:4, 102:8, 165:12, 179:9
**14** [9] - 37:24, 52:15, 76:24, 78:7, 97:3,

139:13, 146:1, 146:13, 147:20
**14TH** [1] - 187:4
**15** [4] - 78:15, 163:23, 179:11, 187:10
**150** [2] - 169:8, 169:10
**16** [2] - 78:18, 85:14
**161** [1] - 2:10
**166** [1] - 197:13
**1697** [1] - 195:21
**16B** [1] - 1:8
**16TH** [1] - 131:13
**17** [1] - 147:16
**17101** [1] - 2:7
**177** [2] - 197:12, 197:13
**17703-0215** [1] - 2:11
**178** [1] - 197:21
**18** [5] - 24:9, 102:8, 147:16, 187:25, 194:24
**18501** [1] - 1:18
**19** [1] - 192:11
**190** [1] - 128:5
**19106** [3] - 1:9, 1:21, 2:14
**1965** [1] - 41:24
**1966** [2] - 41:24
**1970'S** [1] - 126:24
**1971** [1] - 42:17
**1972** [1] - 43:3
**1973** [2] - 37:14, 119:8
**1974** [2] - 35:15, 148:11
**1976** [2] - 147:19, 179:9
**1977** [1] - 119:12
**1978** [1] - 49:19
**1983** [1] - 123:19
**1986** [2] - 5:4, 123:22
**1989** [1] - 47:7
**1990** [1] - 46:8
**1992** [3] - 51:9, 52:4, 52:9
**1996** [4] - 5:3, 102:8, 148:12, 165:12
**1997** [4] - 55:2, 56:12, 58:7, 102:7
**1998** [3] - 41:21, 129:23, 169:3

**2**

**2** [4] - 78:15, 99:23, 114:13, 151:5
**2.2** [1] - 104:12
**2.5** [1] - 104:12
**20** [2] - 187:11, 192:18
**200** [1] - 187:11
**2000** [4] - 51:9, 52:3,

53:4, 121:20
**2001** [1] - 187:4
**2003** [2] - 121:24, 122:6
**2004** [5] - 101:17, 131:8, 135:11, 157:12, 167:16
**2005** [5] - 129:11, 130:25, 133:12, 141:20, 156:3
**2007** [1] - 58:23
**2009** [3] - 122:6, 122:8, 123:11
**2013** [2] - 133:23, 187:4
**2014** [1] - 131:13
**20530** [1] - 2:4
**215** [1] - 2:10
**215)627-1882** [1] - 1:22
**21ST** [1] - 131:8
**2255** [6] - 112:5, 129:11, 130:4, 135:11, 137:13, 175:2
**235** [1] - 1:17
**23RD** [6] - 116:19, 116:20, 116:22, 185:24, 196:3, 196:5
**24TH** [1] - 116:23
**25** [8] - 78:12, 131:25, 167:20, 168:12, 168:13, 192:16, 192:17, 192:18
**25TH** [1] - 116:25
**26TH** [2] - 117:1, 117:4

**3**

**3** [2] - 178:9, 197:4
**30** [3] - 11:14, 83:16, 128:8
**300** [1] - 2:7
**309** [1] - 1:17
**30TH** [3] - 117:3, 117:4, 117:6
**311** [1] - 1:17
**33** [1] - 119:4
**34** [2] - 170:14, 170:15
**35** [1] - 131:8
**3553** [1] - 189:22
**3553(A** [5] - 187:25, 188:7, 190:5, 195:11
**36** [2] - 37:18, 37:20
**3:40** [1] - 196:7
**3RD** [1] - 53:4

**4**

**4** [9] - 43:1, 67:15, 68:25, 96:10, 99:7, 114:24, 115:16, 115:21, 197:17
**40** [11] - 11:15, 128:9, 165:5, 165:9, 181:7, 181:9, 181:10, 181:11, 181:13, 183:14
**4010.1** [6] - 66:21, 115:5, 115:12, 181:14, 185:13, 197:16
**41** [3] - 85:9, 85:12, 85:13
**43** [1] - 188:21
**4:96-CR-239** [1] - 1:6

**5**

**5** [14] - 67:16, 69:1, 76:5, 77:6, 78:11, 78:18, 94:23, 104:8, 115:4, 133:20, 133:21, 134:1, 154:21, 168:10
**540** [1] - 2:14
**55** [1] - 165:10
**59** [4] - 118:16, 129:2, 129:6, 197:20

**6**

**6** [1] - 103:25
**6,000** [1] - 125:19
**6-12-14** [1] - 1:8
**60** [6] - 94:12, 148:20, 178:23, 178:25, 179:2, 197:21
**600** [1] - 125:24
**601** [1] - 1:21
**65** [1] - 100:16
**65-YEAR** [1] - 100:5
**69** [2] - 105:25, 197:5

**7**

**7** [4] - 34:13, 78:11, 124:10, 124:12
**70** [2] - 110:15, 192:17
**72** [1] - 197:8
**77** [3] - 110:12, 110:14, 110:17

**8**

**8** [4] - 1:12, 34:13, 124:10, 124:12

**8/24/92** [1] - 52:1
**89** [1] - 50:1
**8TH** [2] - 105:3, 106:13

**9**

**9** [1] - 46:8
**95** [3] - 192:15
**96** [1] - 197:9
**9:30** [1] - 3:5

**A**

**A'S** [1] - 38:7
**ABANDONED** [1] - 159:7
**ABANDONMENT** [1] - 159:6
**ABDOMINAL** [8] - 42:1, 42:3, 42:5, 42:18, 43:4, 43:12, 178:11
**ABILITY** [8] - 87:22, 94:22, 143:19, 145:6, 145:16, 157:9, 161:2, 185:8
**ABLE** [28] - 13:18, 14:13, 15:10, 27:17, 27:19, 34:22, 35:12, 36:2, 49:5, 69:16, 86:13, 92:17, 93:4, 93:23, 95:2, 95:5, 95:12, 95:13, 95:15, 123:12, 136:2, 145:10, 158:5, 160:4, 161:21, 165:23, 188:14
**ABNORMALITIES** [6] - 75:12, 81:1, 81:4, 87:14, 87:21, 94:20
**ABNORMALLY** [3] - 85:19, 86:17, 101:1
**ABOVE-ENTITLED** [1] - 198:7
**ABSENCE** [1] - 148:3
**ABSENT** [1] - 64:13
**ABSOLUTELY** [5] - 95:16, 103:24, 144:10, 157:2, 179:20
**ABUSE** [56] - 9:18, 23:21, 23:22, 24:5, 27:23, 27:25, 28:4, 29:15, 30:19, 32:9, 50:12, 53:8, 53:14, 54:10, 54:15, 60:20, 61:9, 62:13, 63:8, 63:10, 63:14, 63:17, 63:19, 64:3, 70:20,

70:23, 71:2, 71:7, 71:12, 136:17, 137:3, 139:3, 139:4, 139:15, 139:17, 139:25, 140:3, 140:5, 141:22, 142:2, 142:11, 142:20, 143:3, 143:10, 143:17, 144:5, 156:9, 156:10, 156:13, 159:14, 164:11, 170:21, 175:17, 176:14

**ABUSED** [27] - 27:15, 27:21, 28:3, 28:13, 32:2, 44:19, 50:19, 52:14, 53:9, 53:25, 54:1, 54:4, 54:16, 54:18, 55:3, 60:4, 60:11, 60:15, 63:9, 63:11, 63:18, 70:1, 70:7, 70:10, 136:25, 145:15, 146:8

**ABUSES** [1] - 139:25

**ABUSING** [4] - 36:11, 54:10, 142:25, 148:6

**ABUSIVE** [4] - 33:1, 137:5, 139:16

**ACADEMY** [2] - 124:21, 124:23

**ACCEPTED** [9] - 108:3, 109:8, 109:9, 109:19, 110:7, 111:3, 129:5, 132:7

**ACCIDENT** [1] - 12:2

**ACCOMMODATE** [1] - 4:1

**ACCOMPANIED** [1] - 146:13

**ACCOMPANY** [1] - 46:21

**ACCOMPLISH** [1] - 95:13

**ACCOMPLISHED** [1] - 131:14

**ACCORDING** [8] - 7:1, 50:5, 50:9, 85:5, 85:23, 85:24, 86:13, 113:23

**ACCOUNT** [3] - 75:24, 175:8, 189:12

**ACCURATE** [4] - 99:11, 99:12, 118:19, 191:6

**ACKNOWLEDGE** [3] - 52:20, 127:14, 182:8

**ACKNOWLEDGED** [2] - 173:13, 183:17

**ACT** [11] - 7:5, 93:7,

93:8, 93:10, 113:19, 157:5, 159:25, 160:3, 174:9, 194:24

**ACTING** [4] - 148:7, 150:10, 159:18, 172:25

**ACTION** [2] - 88:12, 160:1

**ACTIONS** [5] - 88:7, 88:13, 114:3, 147:25, 161:23

**ACTIVITIES** [7] - 65:9, 67:24, 68:5, 154:25, 155:3, 159:17, 164:21

**ACTIVITY** [10] - 67:20, 67:23, 68:1, 85:6, 85:10, 85:24, 85:25, 86:12, 86:17, 141:18

**ACTS** [1] - 163:24

**ACTUAL** [2] - 22:15, 92:4

**ACUTE** [1] - 179:10

**ADAPT** [2] - 164:8, 166:11

**ADAPTIVE** [1] - 164:16

**ADDED** [1] - 140:10

**ADDITION** [1] - 140:24

**ADDITIONAL** [3] - 47:12, 137:4, 186:1

**ADDRESS** [2] - 135:9, 170:12

**ADHESIONS** [5] - 42:1, 42:2, 42:3, 42:20, 43:15

**ADJOURNED** [1] - 196:7

**ADMINISTER** [1] - 132:16

**ADMINISTERED** [5] - 49:10, 139:10, 141:6, 168:5, 193:21

**ADMINISTERING** [1] - 167:22

**ADMISSIBLE** [2] - 189:16, 189:17

**ADMISSION** [2] - 106:19, 128:20

**ADMISSIONS** [1] - 185:9

**ADMIT** [6] - 28:19, 29:7, 29:9, 31:10, 185:12, 195:20

**ADMITTED** [10] - 43:4, 73:19, 115:13, 115:21, 116:2, 116:4, 129:6, 178:25, 181:17, 197:15

**ADOLESCENCE** [4] - 159:19, 165:6, 171:1, 171:8

**ADOPTED** [1] - 164:23

**ADULT** [4] - 4:18, 35:20, 64:19, 145:8

**ADULTHOOD** [3] - 143:7, 159:3, 159:20

**ADULTS** [1] - 148:3

**ADVANCE** [1] - 90:12

**ADVERTISEMENT** [1] - 182:14

**ADVERTISEMENTS** [1] - 67:2

**ADVOCATE** [1] - 7:5

**ADVOCATES** [1] - 7:6

**AFFECT** [7] - 74:12, 78:14, 91:2, 155:5, 159:1, 160:16, 185:8

**AFFECTED** [1] - 75:14

**AFFECTIVE** [1] - 160:15

**AFFIDAVIT** [3] - 130:19, 170:8, 170:14

**AFFIDAVITS** [1] - 130:12

**AFRAID** [1] - 113:15

**AFTERNOON** [3] - 116:10, 166:2, 166:3

**AFTERWARDS** [1] - 57:5

**AGE** [11] - 37:24, 42:14, 68:19, 100:20, 145:23, 146:13, 163:23, 165:5, 165:9, 175:18, 179:3

**AGENCIES** [1] - 120:7

**AGENT** [2] - 139:9, 149:22

**AGENTS** [1] - 90:11

**AGES** [3] - 46:19, 52:15, 65:1

**AGGRAVATING** [2] - 182:1, 195:13

**AGGRESSIVE** [3] - 151:10, 152:22, 159:18

**AGITATED** [4] - 137:8, 137:20, 156:11, 160:19

**AGO** [7] - 4:4, 20:1, 20:2, 26:19, 107:25, 120:3, 176:8

**AGREE** [40] - 11:8, 11:16, 12:3, 12:5, 12:17, 13:9, 18:1, 19:4, 23:5, 24:19, 24:20, 25:1, 25:2,

25:5, 32:11, 33:12, 43:22, 61:3, 62:6, 64:7, 64:18, 64:24, 78:3, 79:22, 91:13, 91:17, 91:25, 108:12, 110:17, 145:9, 166:24, 171:24, 172:24, 173:3, 173:24, 174:5, 174:10, 175:4, 175:24, 176:16

**AGREED** [3] - 80:7, 100:7, 117:8

**AGREEMENT** [1] - 178:17

**AGREES** [1] - 194:20

**AH** [1] - 82:18

**AHEAD** [1] - 132:18

**AID** [3] - 150:6, 150:8, 150:12

**AIDED** [1] - 1:24

**AIDS** [1] - 149:9

**ALCOHOL** [3] - 142:18, 142:20, 148:6

**ALLEGATION** [1] - 60:7

**ALLEGATIONS** [3] - 24:5, 62:19, 62:22

**ALLEGED** [1] - 184:24

**ALLEGEDLY** [1] - 71:17

**ALLOW** [2] - 194:10, 195:18

**ALLOWED** [3] - 27:12, 48:12, 185:23

**ALMOST** [2] - 83:16, 114:2

**ALONE** [2] - 131:24, 157:4

**ALOUD** [1] - 39:10

**AMANDA** [1] - 2:2

**AMERICA** [1] - 1:3

**AMERICAN** [5] - 123:18, 123:20, 124:17, 124:20, 124:23

**AMOUNT** [2] - 14:11, 194:3

**AMYGDALA** [2] - 86:19, 86:20

**ANALOGY** [1] - 94:15

**ANALYSIS** [8] - 85:8, 85:17, 85:22, 86:10, 187:2, 191:12, 192:2, 192:6

**ANALYZING** [1] - 72:18

**AND-A-HALF** [3] -

167:16, 170:4, 171:20

**ANDREW** [3] - 165:13, 173:25, 174:5

**ANGER** [5] - 33:4, 53:7, 155:9, 160:23

**ANGRY** [2] - 38:24, 39:16

**ANIMOSITY** [1] - 46:23

**ANNE** [1] - 2:5

**ANNIVERSARY** [1] - 47:11

**ANSWER** [13] - 3:25, 27:13, 48:12, 48:13, 77:9, 78:15, 78:21, 80:10, 80:12, 83:1, 86:10, 113:15, 163:11

**ANSWERED** [2] - 78:10, 83:4

**ANSWERING** [1] - 113:2

**ANSWERS** [1] - 79:8

**ANTHONY'S** [1] - 36:17

**ANTI** [1] - 149:18

**ANTI-PSYCHOTIC** [1] - 149:18

**ANTIANXIETY** [6] - 149:14, 150:7, 150:11, 152:3, 152:13, 153:21

**ANTIDEPRESSANT** [7] - 151:14, 151:18, 151:22, 151:24, 152:7, 152:15, 152:25

**ANTIDEPRESSANTS** [14] - 72:11, 73:3, 73:5, 73:14, 74:14, 75:5, 75:24, 77:14, 78:8, 79:12, 81:11, 149:5, 151:25, 153:21

**ANTIPSYCHOTIC** [16] - 149:2, 149:22, 149:25, 150:2, 150:13, 150:16, 150:19, 150:20, 150:24, 151:22, 152:9, 179:4, 179:8, 179:21, 179:24, 180:5

**ANTISEIZURE** [1] - 152:18

**ANTISOCIAL** [14] - 133:11, 134:6, 143:15, 144:3, 163:18, 163:24,

166:7, 166:14, 166:25, 171:10, 176:17, 177:15, 177:17, 178:8
**ANXIETY** [5] - 140:10, 140:14, 143:22, 153:10, 158:17
**ANXIETY-PRODUCING** [1] - 140:14
**ANXIOLYTIC** [1] - 75:6
**ANYWAY** [1] - 22:24
**APA'S** [1] - 124:17
**APART** [1] - 23:20
**APARTMENT** [2] - 35:10, 63:2
**APOLOGIZE** [3] - 3:2, 103:3, 114:17
**APPEALS** [1] - 106:13
**APPEAR** [2] - 35:17, 149:1
**APPEARANCE** [1] - 96:25
**APPEARANCES** [2] - 1:14, 2:1
**APPEARED** [3] - 26:20, 46:18, 100:12
**APPENDECTOMY** [1] - 178:10
**APPENDICITIS** [1] - 41:24
**APPLICABLE** [1] - 189:13
**APPLIED** [2] - 58:24, 171:5
**APPLY** [2] - 184:5, 189:15
**APPRECIATE** [1] - 144:20
**APPROACH** [4] - 7:12, 39:2, 118:10, 148:15
**APPROPRIATE** [5] - 105:21, 106:21, 153:22, 183:8, 188:10
**APPROPRIATELY** [1] - 153:7
**APRIL** [4] - 46:8, 102:8, 147:19, 165:12
**ARCHIE** [2] - 33:23, 33:24
**AREA** [3] - 42:3, 42:9, 119:16
**AREAS** [7] - 5:13, 85:18, 127:11, 156:20, 159:13, 162:18, 164:11
**ARGUING** [1] - 147:22

**ARGUMENT** [8] - 186:10, 186:17, 187:10, 188:5, 189:15, 192:23, 194:12, 195:8
**ARGUMENTATIVE** [1] - 49:5
**ARLENE** [1] - 146:21
**ARMY** [2] - 111:17, 112:22
**AROUSAL** [1] - 155:7
**AROUSE** [1] - 155:1
**ARRESTS** [1] - 68:7
**ARRIVED** [1] - 55:24
**ARTERIAL** [1] - 82:2
**ARTICLE** [19] - 66:18, 66:19, 115:5, 181:14, 181:20, 181:24, 182:9, 182:11, 182:15, 182:16, 183:1, 183:11, 183:18, 183:22, 184:3, 184:13, 184:23, 185:3, 185:4
**ARTIST** [2] - 66:19, 184:1
**ARTS** [1] - 4:10
**ASLEEP** [3] - 38:19, 39:15, 155:8
**ASPECT** [1] - 177:10
**ASPECTS** [1] - 155:2
**ASPHYXIATION** [1] - 174:13
**ASSAILANT** [1] - 139:11
**ASSEMBLED** [1] - 92:8
**ASSESS** [2] - 24:21, 135:12
**ASSESSING** [2] - 68:17, 135:1
**ASSESSMENT** [5] - 25:7, 51:21, 71:18, 168:17, 170:13
**ASSIST** [2] - 127:9, 127:12
**ASSISTANCE** [1] - 5:12
**ASSISTANT** [2] - 3:20, 36:15
**ASSOCIATE** [2] - 123:6, 125:10
**ASSOCIATED** [1] - 160:18
**ASSOCIATION** [1] - 124:17
**ASSUME** [4] - 75:16, 187:9, 187:12, 188:24

**ASSUMING** [3] - 92:16, 153:7, 183:23
**ATLANTIC** [1] - 93:18
**ATROPHY** [1] - 100:20
**ATTACHED** [3] - 11:18, 12:13, 94:8
**ATTEMPT** [2] - 143:1, 146:18
**ATTEMPTING** [2] - 77:2, 154:24
**ATTEMPTS** [2] - 41:5, 95:12
**ATTENDED** [1] - 119:10
**ATTENDS** [1] - 48:15
**ATTENTION** [7] - 66:7, 70:13, 70:17, 76:23, 102:19, 112:23, 189:7
**ATTITUDE** [1] - 164:23
**ATTORNEY** [2] - 3:20, 110:2
**ATTORNEY'S** [3] - 58:15, 126:4, 126:13
**ATTORNEYS** [6] - 1:16, 7:12, 19:14, 23:1, 120:6, 131:22
**AUGUST** [2] - 53:2, 105:23
**AUTOPSY** [1] - 174:23
**AVAILABILITY** [1] - 117:4
**AVAILABLE** [4] - 7:24, 14:10, 117:3, 136:3
**AVENUE** [1] - 143:5
**AVERAGE** [1] - 110:17
**AVOID** [4] - 154:24, 159:6, 188:10, 192:25
**AVOIDANCE** [1] - 154:22
**AVOIDING** [1] - 154:25
**AWARE** [26] - 16:25, 17:5, 17:12, 17:21, 20:21, 20:25, 61:9, 65:19, 66:1, 67:1, 67:21, 68:10, 68:13, 76:6, 90:9, 90:12, 90:13, 90:14, 90:16, 91:7, 91:10, 91:19, 95:1, 132:1, 169:3, 170:17
**AXIS** [1] - 178:9

## B

**B'S** [1] - 38:7
**B-L-U-M-B-E-R-G** [1] -

118:9
**B-U-R-T** [1] - 110:2
**BACHELOR'S** [2] - 4:9, 119:8
**BACKGROUND** [10] - 4:9, 9:6, 10:10, 10:11, 10:13, 20:15, 21:7, 119:6, 144:8, 190:2
**BAD** [5] - 11:21, 41:11, 64:17, 159:10, 161:15
**BAILIWICK** [1] - 19:14
**BALTIMORE** [6] - 121:9, 121:15, 121:22, 122:14, 122:15, 126:23
**BAPTIST** [1] - 14:1
**BARED** [1] - 30:18
**BARKING** [1] - 140:21
**BASAL** [2] - 75:9, 85:20
**BASE** [1] - 28:16
**BASEBALL** [2] - 26:4, 26:5
**BASED** [10] - 62:7, 107:7, 114:6, 124:24, 144:12, 161:8, 162:13, 167:6, 176:10, 179:12
**BASES** [1] - 175:17
**BASIS** [4] - 120:2, 134:24, 174:1, 175:16
**BASKETBALL** [1] - 26:1
**BATTERED** [1] - 173:13
**BATTERY** [1] - 111:21
**BEANS** [1] - 37:1
**BEAT** [1] - 140:19
**BEATEN** [1] - 144:18
**BEATINGS** [2] - 139:22, 140:25
**BECAME** [10] - 19:24, 44:20, 45:5, 45:13, 122:12, 123:5, 137:7, 137:8, 147:23, 156:11
**BECOME** [6] - 8:9, 124:25, 157:4, 163:16, 176:11, 176:15
**BECOMES** [1] - 79:1
**BEFOREHAND** [1] - 131:23
**BEGIN** [1] - 163:16
**BEGINS** [1] - 159:3
**BEHALF** [3] - 7:5, 7:7,

129:11
**BEHAVIOR** [24] - 47:23, 88:1, 88:4, 88:18, 88:24, 89:1, 89:5, 89:6, 89:7, 89:8, 89:10, 89:25, 95:3, 95:6, 103:9, 113:11, 113:12, 135:21, 152:22, 159:18, 160:14, 164:25
**BEHAVIORAL** [6] - 76:9, 87:2, 87:3, 103:18, 161:12, 180:4
**BEHAVIORS** [3] - 140:23, 140:24, 160:11
**BELL** [2] - 110:2, 146:24
**BELOW** [1] - 52:23
**BENEFIT** [1] - 141:9
**BENEFITS** [1] - 58:24
**BERATE** [1] - 140:1
**BEST** [7] - 47:22, 76:12, 94:15, 118:19, 147:8, 153:12, 164:12
**BETA** [1] - 119:10
**BETTER** [2] - 13:11, 13:12
**BETWEEN** [20] - 13:24, 80:23, 85:12, 97:10, 97:12, 97:16, 97:24, 99:10, 101:10, 105:4, 122:7, 128:8, 136:9, 139:12, 139:19, 147:2, 147:18, 148:11, 168:10
**BEYOND** [5] - 16:24, 72:25, 111:2, 111:25, 186:2
**BIG** [3] - 12:6, 44:17, 94:10
**BIGLER** [1] - 103:13
**BIOLOGICAL** [1] - 46:25
**BIPOLAR** [3] - 149:19, 152:20, 152:21
**BIT** [6] - 13:21, 25:9, 73:18, 170:9, 174:11, 186:17
**BITCH** [1] - 140:1
**BLACK** [1] - 26:24
**BLAMED** [1] - 140:18
**BLOWN** [1] - 176:12
**BLUEPRINT** [1] - 143:13
**BLUMBERG** [8] -

118:4, 118:5, 118:9, 118:15, 128:20, 129:10, 177:4, 197:11

**BOARD** [6] - 123:15, 123:17, 123:18, 123:19, 123:20, 123:24

**BOGUS** [1] - 192:12

**BOLD** [1] - 162:3

**BOOK** [8] - 25:19, 25:24, 26:16, 26:23, 37:10, 40:10, 44:8, 60:19

**BORDERLINE** [29] - 133:11, 134:4, 134:5, 138:12, 143:15, 144:3, 151:8, 153:18, 158:9, 158:13, 158:24, 159:5, 159:24, 160:10, 161:6, 161:11, 162:2, 162:3, 162:8, 163:7, 163:13, 164:13, 166:8, 166:15, 167:2, 171:9, 176:16, 177:18, 177:19

**BORN** [1] - 68:21

**BOTTOM** [2] - 99:22, 160:20

**BOUNDARY** [1] - 142:2

**BOUTS** [1] - 47:9

**BOWEL** [1] - 42:20

**BOWELS** [1] - 41:9

**BOX** [2] - 1:17, 2:10

**BOYS** [1] - 38:4

**BRADY** [1] - 16:21

**BRAIDED** [1] - 92:9

**BRAIN** [36] - 72:19, 74:17, 76:14, 78:24, 79:3, 79:4, 81:10, 85:11, 87:8, 89:5, 90:25, 93:6, 93:8, 94:1, 94:15, 94:21, 94:24, 96:18, 97:1, 97:11, 98:1, 98:8, 98:10, 98:11, 98:15, 98:18, 99:20, 100:9, 101:8, 102:11, 107:6, 107:11, 109:22, 151:11, 163:14, 163:15

**BRAKE** [2] - 95:2, 95:5

**BRAKES** [1] - 93:4

**BRANCH** [3] - 187:20, 193:17, 194:4

**BREAK** [8] - 55:17, 56:5, 94:2, 95:24, 96:1, 114:13, 116:6, 116:8

**BREAKDOWN** [1] - 192:10

**BREWER** [2] - 45:3, 49:10

**BRIBE** [1] - 68:14

**BRIBED** [1] - 68:10

**BRIEF** [5] - 49:3, 95:21, 167:23, 168:3, 186:2

**BRIEFLY** [5] - 46:13, 69:20, 118:11, 156:6, 177:1

**BRING** [4] - 51:13, 52:7, 71:24, 189:12

**BRINGING** [1] - 71:16

**BROAD** [2] - 124:24, 188:15

**BROAD-BASED** [1] - 124:24

**BROTHER** [16] - 28:10, 29:15, 46:25, 52:15, 52:24, 53:9, 53:11, 53:13, 54:16, 54:18, 54:19, 67:19, 70:7, 141:7

**BROUGHT** [2] - 63:12, 68:19

**BUDGETARY** [1] - 31:7

**BUILDING** [1] - 51:11

**BULK** [1] - 167:24

**BUREAU** [3] - 129:19, 173:21, 191:25

**BURN** [2] - 141:13, 141:14

**BURNING** [1] - 139:9

**BURT** [1] - 110:1

**BUS** [2] - 93:18, 93:22

**BUSINESS** [1] - 5:2

**BUYING** [1] - 26:3

---

# C

**CAFE** [1] - 35:6

**CALCULATION** [1] - 100:2

**CALCULATIONS** [1] - 111:8

**CALIFORNIA** [2] - 95:8, 109:13

**CALM** [2] - 180:6, 180:8

**CANCER** [1] - 47:7

**CANNOT** [2] - 52:21, 147:2

**CAPABLE** [3] - 92:23,

93:13, 162:19

**CAPACITY** [2] - 122:16, 123:9

**CAPITAL** [13] - 2:3, 5:15, 5:19, 6:1, 126:6, 126:16, 126:21, 127:2, 127:3, 127:5, 128:2, 128:5, 188:13

**CAPTURES** [1] - 13:4

**CAR** [5] - 12:2, 12:7, 29:23, 30:10

**CARE** [5] - 121:11, 122:22, 162:19, 164:18, 164:20

**CARED** [2] - 25:13, 25:15

**CAREFULLY** [2] - 82:19, 113:25

**CAREGIVER** [1] - 47:5

**CARING** [1] - 25:12

**CARRIED** [1] - 12:25

**CARRIES** [1] - 143:8

**CARS** [2] - 94:3, 94:7

**CASE** [113] - 13:14, 14:4, 14:11, 15:8, 17:14, 17:24, 18:8, 18:10, 18:16, 18:20, 19:24, 20:10, 22:13, 22:16, 22:25, 23:6, 23:9, 24:9, 24:12, 25:8, 27:5, 31:6, 40:4, 40:18, 47:16, 48:25, 52:4, 52:10, 53:23, 54:23, 60:2, 60:12, 68:22, 75:22, 76:20, 78:8, 79:8, 79:10, 79:18, 79:25, 80:20, 80:21, 81:17, 83:2, 84:1, 88:23, 89:13, 89:14, 89:17, 90:5, 90:9, 90:15, 91:8, 91:12, 92:1, 102:22, 104:15, 104:20, 105:6, 105:7, 107:4, 107:16, 108:8, 108:22, 108:23, 109:1, 109:2, 109:5, 109:17, 109:25, 110:4, 110:7, 110:16, 116:12, 117:19, 126:13, 126:16, 127:5, 132:2, 132:11, 133:8, 135:3, 135:16, 135:18, 138:9, 142:24, 155:21, 160:12, 167:13, 169:17,

173:12, 173:18, 173:20, 175:11, 187:13, 188:8, 188:17, 188:23, 188:25, 189:1, 189:6, 189:8, 189:17, 190:14, 190:17, 190:22, 191:20, 191:24, 193:11, 194:17, 195:7

**CASES** [46] - 9:20, 16:14, 23:8, 44:21, 62:3, 62:13, 63:13, 63:23, 64:3, 110:6, 110:12, 110:21, 111:3, 126:6, 126:22, 127:2, 127:3, 127:14, 127:24, 128:2, 128:6, 162:15, 173:11, 186:24, 186:25, 188:23, 189:1, 189:9, 189:15, 190:10, 190:11, 190:13, 190:18, 190:22, 190:25, 191:4, 191:15, 191:25, 192:7, 192:11, 192:12, 192:15, 193:15, 194:5

**CASINO** [1] - 93:22

**CATCHES** [1] - 195:2

**CATCHING** [1] - 167:24

**CATEGORIZATION** [1] - 193:14

**CATEGORY** [5] - 150:8, 162:20, 191:10, 191:11, 191:13

**CATONSVILLE** [1] - 121:5

**CAUSES** [2] - 89:7, 156:18

**CDS** [1] - 106:5

**CELL** [3] - 91:9, 98:8, 165:12

**CELLS** [2] - 98:9, 98:10

**CENT** [1] - 163:3

**CENTER** [3] - 2:14, 120:10, 121:4

**CENTRAL** [2] - 109:12, 165:7

**CENTRALIZED** [1] - 47:4

**CERTAIN** [5] - 14:11, 61:7, 94:14, 127:14,

155:15

**CERTAINLY** [12] - 16:24, 78:16, 79:5, 93:4, 98:18, 116:14, 117:22, 142:24, 144:1, 153:10, 160:7, 162:4

**CERTAINTY** [4] - 132:11, 138:11, 155:20, 156:1

**CERTIFICATION** [2] - 123:19, 123:21

**CERTIFIED** [4] - 123:15, 123:17, 123:20, 123:24

**CERTIFY** [1] - 198:5

**CETERA** [1] - 173:22

**CHAIN** [2] - 94:8

**CHALLENGE** [1] - 105:12

**CHALLENGED** [1] - 108:8

**CHALLENGES** [1] - 105:16

**CHANCE** [1] - 25:19

**CHANGE** [6] - 71:18, 80:24, 122:10, 133:25, 134:10, 137:7

**CHANGED** [1] - 133:14

**CHANGES** [2] - 89:23, 134:2

**CHANGING** [1] - 83:1

**CHAOTIC** [2] - 139:3, 164:10

**CHARACTER** [3] - 143:20, 171:6, 190:2

**CHARACTERIZATION** [5] - 54:9, 54:12, 69:5, 69:6, 110:20

**CHARACTERIZED** [2] - 48:1, 63:6

**CHARACTEROLOGIC** [1] - 160:6

**CHARGED** [2] - 120:13, 126:21

**CHARITY** [1] - 57:25

**CHECK** [3] - 136:4, 179:5

**CHEMICALLY** [1] - 152:11

**CHESTNUT** [1] - 2:7

**CHIEF** [5] - 120:23, 121:2, 122:9, 123:6, 123:7

**CHILD** [9] - 64:11, 64:12, 64:13, 64:14, 67:15, 136:25, 140:15, 143:8,

164:12

**CHILDBIRTH** [1] - 12:6

**CHILDHOOD** [13] - 18:23, 46:13, 52:18, 53:7, 64:20, 136:18, 148:5, 157:14, 157:18, 159:19, 170:22, 170:25, 171:7

**CHILDREN** [10] - 11:25, 26:15, 27:3, 33:1, 33:14, 33:16, 33:17, 46:17, 49:8, 63:11

**CHOICE** [1] - 151:11

**CHOKE** [1] - 147:24

**CHOOSE** [2] - 68:21

**CHOSE** [1] - 123:10

**CHRISTMAS** [2] - 26:13, 26:18

**CHRISTOS** [1] - 99:1

**CHRONIC** [5] - 134:21, 134:22, 160:21, 171:9, 178:12

**CHURCH** [1] - 48:23

**CIRCUIT** [7] - 105:3, 106:13, 121:21, 122:1, 194:7, 194:10, 194:20

**CIRCUMSTANCE** [1] - 190:3

**CITY** [4] - 35:16, 93:18, 121:15, 122:15

**CLAIM** [5] - 60:19, 60:21, 60:23, 65:13, 68:15

**CLAIMED** [3] - 65:19, 66:3, 178:4

**CLAIMS** [4] - 59:1, 60:3, 61:18, 183:16

**CLARIFICATION** [1] - 112:12

**CLARIFIED** [1] - 54:20

**CLEANERS** [1] - 35:22

**CLEAR** [4] - 44:1, 76:25, 89:12, 147:4

**CLEARLY** [6] - 48:15, 83:9, 98:14, 141:14, 143:21, 183:2

**CLERK** [2] - 3:1, 118:6

**CLIENT** [6] - 7:18, 16:12, 18:6, 51:6, 95:20, 181:5

**CLIENTS** [5] - 5:13, 6:8, 6:23, 7:6, 51:10

**CLIENTS'** [2] - 7:6, 8:6

**CLIFTON** [2] - 120:10, 123:2

**CLINIC** [1] - 146:4

**CLINICAL** [11] - 6:17, 81:22, 81:23, 81:24, 83:6, 83:10, 86:22, 100:1, 104:6, 125:7, 125:9

**CLINICALLY** [1] - 81:19

**CLINICIAN** [2] - 82:6, 99:15

**CLINICIANS** [1] - 82:21

**CLIPPERS** [1] - 92:10

**CLOSE** [3] - 3:3, 45:6, 47:10

**CLOSED** [2] - 62:24, 63:3

**CLOSELY** [1] - 7:11

**CLOSENESS** [1] - 47:1

**CLOSET** [3] - 27:18, 27:19, 48:6

**CLUSTER** [5] - 154:20, 155:6, 155:14, 158:15, 166:18

**CLUSTERS** [2] - 154:11, 154:12

**CM** [1] - 1:19

**COBB** [1] - 42:8

**CODEFENDANT** [1] - 188:25

**COERCED** [1] - 139:4

**COGNITIVE** [5] - 133:12, 134:7, 153:19, 162:18, 162:23

**COHERENT** [1] - 7:25

**COIN** [1] - 127:16

**COLLECT** [2] - 57:25, 67:17

**COLLECTED** [1] - 58:1

**COLLECTION** [2] - 14:4, 14:6

**COLLEGE** [1] - 4:11

**COLUMNS** [1] - 99:14

**COMA** [1] - 74:11

**COMBINATION** [5] - 77:6, 151:17, 151:19, 161:14, 164:7

**COMBINED** [2] - 128:3, 142:9

**COMING** [4] - 37:7, 127:25, 148:4, 164:6

**COMMENT** [2] - 61:1, 86:23

**COMMENTING** [1] - 80:1

**COMMIT** [1] - 92:14

**COMMITTED** [3] - 32:19, 66:4, 68:16

**COMMON** [6] - 63:9, 63:11, 63:16, 70:3, 88:15, 112:14

**COMMUNITY** [3] - 2:13, 4:10, 167:3

**COMPANY** [3] - 5:1, 5:8, 5:9

**COMPARE** [3] - 86:4, 134:2, 136:2

**COMPARED** [3] - 74:18, 86:11, 186:24

**COMPARING** [6] - 73:1, 78:23, 81:10, 99:25, 100:25, 193:11

**COMPARISON** [5] - 26:14, 81:4, 100:12, 100:15, 176:21

**COMPARTMENTS** [1] - 25:9

**COMPETENCY** [3] - 120:13, 121:8, 121:25

**COMPLAINTS** [3] - 42:5, 42:18, 43:4

**COMPLETE** [2] - 80:9, 80:12

**COMPLETED** [3] - 86:24, 96:4, 119:21

**COMPLETELY** [1] - 23:23

**COMPLETING** [1] - 125:9

**COMPLEX** [3] - 35:10, 106:9, 106:10

**COMPLIED** [1] - 106:14

**COMPONENT** [2] - 142:6, 149:20

**COMPOSING** [1] - 6:11

**COMPREHENSIVE** [2] - 6:16, 51:21

**COMPUTER** [3] - 1:24, 1:24, 185:19

**COMPUTER-AIDED** [1] - 1:24

**COMPUTERIZED** [2] - 87:5, 107:22

**COMPUTERS** [1] - 106:5

**CON** [2] - 66:18, 184:1

**CONCENTRATE** [1] - 146:7

**CONCENTRATING** [1]

- 155:10

**CONCEPT** [2] - 16:21, 159:21

**CONCERN** [4] - 68:17, 74:10, 100:9, 135:5

**CONCERNED** [5] - 75:7, 113:8, 135:4, 135:8, 191:2

**CONCERNING** [2] - 136:24, 177:5

**CONCESSION** [1] - 108:12

**CONCISE** [2] - 8:2, 8:5

**CONCLUDE** [1] - 101:13

**CONCLUDED** [1] - 101:11

**CONCLUDES** [1] - 180:22

**CONCLUDING** [1] - 107:10

**CONCLUSION** [6] - 87:7, 87:10, 94:20, 138:7, 138:23, 171:8

**CONCLUSIONS** [3] - 107:6, 109:22, 132:10

**CONDITION** [2] - 158:12, 158:18

**CONDITIONS** [2] - 94:14, 153:23

**CONDUCT** [5] - 63:6, 131:1, 163:22, 184:23, 185:1

**CONDUCTED** [6] - 87:1, 102:5, 102:14, 104:3, 108:23, 125:18

**CONDUCTING** [1] - 111:16

**CONFERENCE** [1] - 131:16

**CONFERENCING** [1] - 131:21

**CONFESSION** [1] - 173:21

**CONFESSIONS** [2] - 66:12, 183:8

**CONFIDENTIAL** [1] - 147:2

**CONFIRM** [1] - 57:24

**CONFIRMATION** [1] - 141:7

**CONFIRMED** [1] - 175:15

**CONFOUND** [2] - 79:2

**CONFUSE** [1] - 84:4

**CONFUSED** [1] - 30:8

**CONFUSING** [3] - 85:12, 184:9, 184:11

**CONGRESS** [1] - 189:19

**CONS** [1] - 182:12

**CONSEQUENCE** [1] - 144:4

**CONSEQUENCES** [3] - 143:8, 144:7, 160:1

**CONSIDER** [9] - 63:17, 83:2, 141:24, 160:4, 161:22, 161:24, 183:21, 184:6, 184:13

**CONSIDERABLE** [2] - 93:13, 151:9

**CONSIDERABLY** [1] - 151:6

**CONSIDERATION** [1] - 80:20

**CONSIDERED** [1] - 73:14

**CONSIDERING** [1] - 79:2

**CONSISTENCY** [1] - 136:9

**CONSISTENT** [8] - 57:5, 102:13, 136:14, 137:9, 144:18, 151:8, 153:11, 156:11

**CONSISTENTLY** [2] - 19:10, 120:3

**CONSTELLATION** [1] - 144:7

**CONSTITUTE** [1] - 6:8

**CONSTITUTING** [1] - 63:8

**CONSULT** [2] - 96:2, 127:9

**CONSULTANT** [1] - 121:21

**CONSULTATION** [3] - 4:22, 117:21, 120:4

**CONSULTATIONS** [1] - 120:6

**CONSULTED** [1] - 126:25

**CONSUMMATED** [1] - 46:22

**CONTACT** [2] - 29:17, 147:1

**CONTAIN** [1] - 57:13

**CONTAINED** [2] - 182:4, 184:3

**CONTENT** [2] - 181:23, 185:10

**CONTEXT** [3] - 80:6, 81:24, 135:1

**CONTEXTS** [1] - 159:4

**CONTINUALLY** [1] - 50:22

**CONTINUE** [5] - 94:6, 116:20, 171:4, 184:21, 188:4

**CONTINUED** [6] - 2:1, 65:2, 65:9, 72:6, 147:15, 170:24

**CONTINUES** [1] - 176:5

**CONTINUING** [1] - 50:21

**CONTINUOUSLY** [1] - 49:18

**CONTRADICTORY** [1] - 27:24

**CONTRAST** [1] - 136:2

**CONTRIBUTED** [1] - 47:23

**CONTRIBUTION** [1] - 125:3

**CONTROL** [19] - 72:19, 81:13, 87:15, 88:2, 88:3, 88:19, 89:2, 89:6, 89:7, 89:10, 89:18, 89:20, 90:3, 90:6, 94:21, 113:3, 150:25, 157:9, 180:4

**CONTROLLING** [1] - 160:23

**CONTROLS** [2] - 106:1, 161:12

**CONVERSATION** [3] - 74:24, 74:25, 83:18

**CONVERSATIONS** [2] - 24:24, 29:10

**CONVICTED** [1] - 68:16

**CONVICTION** [1] - 68:11

**CONVINCED** [1] - 91:12

**CONVINCING** [1] - 173:4

**COPE** [2] - 143:5, 164:12

**COPING** [1] - 142:23

**COPY** [9] - 55:15, 82:16, 84:13, 84:19, 84:23, 97:6, 105:25, 118:16, 118:19

**CORE** [1] - 7:2

**CORRECT** [88] - 4:6, 4:14, 4:17, 5:11, 5:17, 6:13, 6:25, 7:21, 8:1, 8:8, 10:6, 10:23, 11:1, 11:6, 12:12, 14:19, 20:24, 21:7, 23:17, 28:9, 28:12, 36:19, 37:8,

37:15, 38:18, 40:5, 41:10, 41:12, 42:15, 42:24, 44:6, 48:2, 54:2, 54:18, 56:10, 61:12, 61:15, 62:8, 63:10, 65:3, 65:21, 67:10, 69:13, 73:3, 76:1, 76:11, 76:15, 77:21, 79:16, 80:2, 80:16, 81:12, 81:18, 82:10, 85:6, 85:11, 87:10, 87:19, 91:17, 92:5, 92:18, 93:1, 93:5, 94:22, 94:23, 95:3, 104:3, 104:17, 109:4, 109:23, 116:17, 117:15, 118:17, 128:16, 129:12, 133:22, 134:23, 148:24, 149:3, 150:14, 156:17, 163:20, 165:10, 167:14, 168:22, 181:9, 192:25, 198:5

**CORRECTED** [1] - 85:16

**CORRECTIONAL** [1] - 4:14

**CORRECTIONS** [4] - 4:15, 45:10, 49:14, 129:19

**CORRESPONDENCE** [1] - 46:16

**CORRESPONDING** [1] - 162:23

**CORROBORATE** [1] - 10:24

**CORROBORATION** [5] - 70:20, 70:23, 71:1, 71:6, 71:12

**CORROBORATIVE** [3] - 136:19, 136:23, 137:2

**CORRUPT** [1] - 93:15

**CORTEX** [2] - 85:19, 98:11

**COUNSEL** [11] - 6:21, 56:4, 77:8, 96:2, 116:7, 116:10, 116:11, 117:16, 117:22, 188:20, 191:1

**COUNSELING** [1] - 147:11

**COUNSELOR** [1] - 4:15

**COUNSELORS** [1] - 5:12

**COUNT** [1] - 92:13

**COUNTIES** [2] - 122:14, 122:16

**COUNTY** [4] - 121:9, 121:10, 121:22, 126:23

**COUPLE** [3] - 4:3, 53:22, 119:24

**COURSE** [15] - 9:21, 50:14, 73:4, 74:14, 80:15, 83:8, 89:3, 92:8, 98:16, 98:20, 106:8, 106:12, 136:10, 148:8, 156:7

**COURT** [170] - 1:1, 1:20, 3:1, 3:4, 3:7, 3:10, 4:22, 9:13, 17:1, 19:21, 21:9, 21:10, 27:13, 39:3, 48:13, 54:5, 54:20, 55:18, 55:23, 56:1, 56:6, 59:15, 59:18, 65:16, 65:23, 66:14, 68:2, 69:7, 69:19, 71:23, 72:4, 73:20, 73:25, 74:4, 74:20, 77:5, 77:9, 77:12, 77:15, 77:19, 77:22, 80:3, 80:9, 80:12, 82:17, 84:22, 91:3, 95:18, 95:22, 95:25, 96:4, 96:7, 97:6, 103:1, 106:21, 108:15, 109:8, 109:19, 110:22, 112:9, 112:11, 113:9, 113:20, 114:5, 114:9, 114:12, 114:15, 114:18, 114:25, 115:4, 115:8, 115:11, 115:14, 115:17, 115:19, 115:23, 116:1, 116:9, 116:11, 116:15, 116:18, 116:20, 117:7, 117:11, 117:12, 117:20, 118:1, 118:12, 120:6, 121:9, 122:3, 122:4, 125:21, 125:25, 127:25, 128:22, 128:24, 129:2, 129:5, 148:17, 154:1, 154:2, 156:3, 165:18, 165:21, 165:24, 172:4, 172:20, 176:25, 178:23, 179:1, 179:12, 179:15,

180:18, 180:24, 181:3, 181:8, 181:10, 181:13, 181:17, 181:25, 182:2, 182:10, 182:14, 182:20, 183:3, 183:19, 183:25, 184:2, 184:12, 184:19, 185:16, 185:25, 186:4, 186:10, 186:11, 186:15, 186:19, 186:21, 188:3, 188:8, 188:18, 188:22, 189:14, 189:23, 190:15, 190:20, 190:24, 191:1, 191:5, 191:8, 191:21, 192:2, 192:22, 193:8, 193:13, 193:19, 194:7, 194:8, 194:9, 194:11, 194:12, 194:15, 195:19, 195:25, 196:3, 196:7, 198:11

**COURT'S** [4] - 98:21, 101:20, 108:19, 186:19

**COURT-ORDERED** [1] - 21:9

**COURTHOUSE** [3] - 1:20, 108:24, 131:17

**COURTROOM** [1] - 1:8

**COURTS** [3] - 6:22, 121:22, 122:2

**COUSIN** [2] - 44:10, 44:16

**COUSINS** [1] - 139:15

**CRADLE** [1] - 68:20

**CRAZY** [1] - 146:11

**CREATING** [1] - 184:8

**CREDIBILITY** [3] - 68:17, 135:13, 182:23

**CREDITED** [2] - 109:20, 110:9

**CREST** [1] - 51:20

**CRIME** [8] - 9:5, 68:16, 92:9, 173:25, 174:3, 188:15, 188:16, 195:5

**CRIMES** [4] - 2:3, 61:23, 120:13, 121:16

**CRIMINAL** [12] - 1:3, 2:3, 10:11, 20:18, 120:14, 121:8,

121:25, 123:1, 135:20, 163:23, 175:10, 188:21

**CRIMINALLY** [2] - 121:12, 122:23

**CRISIS** [5] - 40:24, 41:4, 41:7, 145:20, 158:4

**CRITERIA** [7] - 134:5, 134:11, 134:13, 134:14, 137:22, 156:22, 176:7

**CRITICAL** [3] - 78:22, 79:1, 79:2

**CRITICISM** [1] - 194:3

**CRITICIZED** [2] - 76:1, 127:11

**CRITICIZING** [1] - 194:16

**CRITIQUED** [1] - 107:10

**CROSS** [17] - 3:9, 3:17, 56:6, 66:15, 72:1, 72:6, 77:22, 102:21, 105:1, 108:16, 110:11, 134:2, 165:21, 165:25, 172:21, 185:7, 197:2

**CROSS-EXAMINE** [1] - 185:7

**CRUSE** [1] - 53:19

**CRYING** [3] - 29:17, 32:1, 32:4

**CSF** [1] - 98:13

**CULPABLE** [2] - 195:4, 195:5

**CURTIS** [1] - 2:14

**CUT** [1] - 27:7

**CUTTING** [1] - 146:9

**CV** [3] - 118:17, 124:11, 129:2

**D**

**D.C** [2] - 2:4, 119:12

**DAD** [3] - 25:16, 26:3, 33:12

**DALMANE** [1] - 150:6

**DAMAGE** [17] - 87:8, 89:24, 90:25, 93:6, 93:8, 93:13, 93:14, 94:1, 94:15, 94:24, 102:11, 102:16, 104:16, 107:7, 107:11, 107:17, 109:22

**DAMAGED** [2] - 165:13, 171:6

**DAMAGING** [2] -

140:15, 159:13
**DANGER** [1] - 184:8
**DANGEROUS** [1] - 176:18
**DANIEL** [1] - 130:5
**DARYL** [1] - 130:8
**DATA** [2] - 86:22, 106:6
**DATABASE** [1] - 135:18
**DATE** [5] - 52:1, 52:2, 102:5, 198:11
**DATED** [1] - 46:8
**DATES** [1] - 47:10
**DAVATZIKOS** [2] - 99:1, 101:12
**DAVATZIKOS'** [1] - 99:19
**DAVE** [1] - 57:21
**DAVID** [86] - 1:6, 21:6, 24:19, 24:24, 28:14, 28:16, 28:20, 30:20, 31:3, 31:4, 31:19, 32:4, 32:5, 32:11, 34:9, 40:17, 43:3, 43:17, 44:9, 44:17, 46:13, 47:2, 47:3, 47:4, 47:8, 47:21, 48:8, 49:10, 50:18, 54:1, 54:9, 55:6, 57:24, 58:3, 58:7, 60:2, 60:3, 60:23, 61:4, 61:24, 61:25, 62:7, 64:2, 68:10, 70:6, 70:11, 70:19, 70:21, 70:24, 71:2, 71:7, 71:14, 71:16, 71:19, 130:17, 135:3, 136:25, 137:14, 137:17, 139:17, 139:19, 139:20, 141:10, 142:8, 144:12, 144:23, 145:20, 147:14, 153:3, 153:12, 156:21, 159:15, 163:6, 163:18, 164:3, 165:10, 165:12, 167:13, 167:15, 169:5, 170:1, 172:24, 173:21, 174:4, 174:18
**DAVID'S** [10] - 33:22, 47:12, 47:23, 62:10, 142:24, 146:21, 147:4, 147:11, 148:10, 164:2
**DAY-TO-DAY** [1] - 11:19

**DAYS** [5] - 4:4, 5:19, 11:25, 26:19, 185:1
**DEAD** [1] - 94:13
**DEADLINE** [1] - 106:7
**DEADLY** [1] - 94:7
**DEAL** [7] - 35:20, 36:13, 43:23, 44:18, 84:25, 94:10, 104:19
**DEALING** [2] - 40:23, 195:11
**DEALT** [3] - 186:12, 186:15, 186:16
**DEAN'S** [1] - 28:10
**DEATH** [27] - 9:10, 9:14, 27:5, 32:5, 47:7, 61:12, 138:10, 186:24, 187:6, 187:13, 188:16, 189:5, 189:11, 189:17, 189:20, 189:21, 190:4, 190:10, 190:11, 192:5, 193:1, 193:20, 193:24, 194:24, 195:6, 195:10, 195:11
**DEATH-ELIGIBLE** [1] - 186:24
**DEBILITATING** [1] - 161:24
**DECEMBER** [1] - 187:4
**DECIDED** [1] - 34:13
**DECISION** [9] - 46:22, 89:22, 117:21, 187:12, 187:20, 190:23, 193:16, 194:3, 194:13
**DECISION-MAKING** [1] - 194:3
**DECISIONS** [1] - 193:15
**DECLINED** [1] - 127:12
**DECREASE** [2] - 85:6, 165:4
**DECREASED** [3] - 85:18, 85:25, 86:6
**DEEP** [1] - 63:19
**DEFENDANT** [23] - 2:5, 2:8, 2:12, 11:2, 17:5, 38:16, 41:23, 55:16, 56:3, 61:11, 64:10, 64:17, 75:25, 77:20, 78:7, 78:23, 117:14, 174:7, 175:10, 194:1, 195:4, 195:7, 195:19
**DEFENDANT'S** [8] - 46:7, 49:15, 97:5,

98:25, 105:12, 118:16, 148:20, 190:2
**DEFENDANTS** [3] - 61:22, 195:4, 195:5
**DEFENDER** [2] - 2:6, 2:13
**DEFENDER'S** [1] - 14:5
**DEFENSE** [33] - 3:13, 5:12, 5:24, 6:16, 6:21, 7:2, 16:14, 16:17, 17:15, 18:20, 19:3, 40:3, 40:4, 40:12, 51:23, 77:8, 84:10, 101:23, 106:14, 115:23, 116:3, 116:12, 118:5, 127:17, 127:22, 128:3, 128:13, 130:12, 170:18, 171:17, 171:18, 197:2
**DEFICIT** [2] - 89:20, 94:25
**DEFICITS** [6] - 88:2, 88:3, 88:20, 89:18, 162:17, 162:21
**DEFINE** [6] - 25:17, 89:9, 112:19, 113:5, 154:4, 158:10
**DEFINITELY** [1] - 89:19
**DEFINITION** [4] - 112:14, 112:15, 112:16, 112:19
**DEGREE** [8] - 8:15, 119:8, 119:12, 132:2, 132:11, 138:11, 155:20, 155:25
**DEGREES** [1] - 162:3
**DELAWARE** [1] - 109:6
**DELIBERATELY** [1] - 154:24
**DELINQUENT** [1] - 148:7
**DELUSIONS** [1] - 158:22
**DELVE** [2] - 24:23, 61:8
**DEMEANING** [1] - 140:2
**DEMEANOR** [4] - 30:25, 135:21, 137:7, 137:17
**DEMENTIA** [1] - 163:1
**DEMONSTRATE** [1] - 90:6

**DEMONSTRATED** [5] - 89:12, 89:16, 89:18, 156:14, 183:2
**DEMONSTRATES** [1] - 92:23
**DEMONSTRATING** [1] - 89:1
**DENIED** [2] - 62:19, 62:22
**DENIES** [1] - 52:25
**DENY** [2] - 195:15, 195:22
**DEPAKOTE** [2] - 152:17, 152:18
**DEPARTMENT** [5] - 2:2, 45:10, 49:14, 123:6, 129:19
**DEPENDABLE** [1] - 49:7
**DEPOSITIONS** [1] - 125:23
**DEPRESSION** [10] - 47:9, 52:24, 76:14, 76:18, 140:11, 142:7, 153:8, 160:19, 178:8, 180:9
**DEPRESSIVE** [1] - 158:17
**DEPRIVED** [1] - 148:5
**DEPTH** [2] - 24:23, 184:1
**DESCRIBE** [1] - 174:8
**DESCRIBED** [17] - 136:10, 137:5, 139:5, 139:7, 139:16, 139:24, 140:17, 143:11, 145:22, 146:5, 146:10, 151:2, 151:7, 172:8, 174:16, 184:23, 190:22
**DESCRIBES** [1] - 53:7
**DESPITE** [1] - 71:14
**DESTRUCTIVE** [3] - 151:10, 160:14, 161:21
**DETACHMENT** [1] - 155:4
**DETAIL** [1] - 132:12
**DETAILED** [2] - 168:17, 169:9
**DETAILS** [4] - 12:4, 12:9, 31:25, 147:3
**DETECTS** [1] - 72:16
**DETERIORATED** [1] - 38:7
**DETERMINATION** [1] - 188:16
**DETERMINE** [3] -

86:14, 103:21, 191:3
**DETERMINED** [1] - 123:7
**DETERMINES** [3] - 88:2, 88:4, 88:19
**DETERMINING** [1] - 188:9
**DEVELOP** [6] - 51:15, 103:18, 145:6, 145:10, 154:11, 160:24
**DEVELOPED** [4] - 76:17, 130:22, 164:3, 171:3
**DEVELOPING** [5] - 142:8, 143:3, 143:22, 145:2, 157:21
**DEVELOPMENT** [2] - 143:13, 144:9
**DEVELOPS** [2] - 154:5, 170:20
**DEVIATION** [5] - 104:13, 104:17, 107:7, 107:13, 107:18
**DEVIL** [1] - 141:14
**DHONG** [1] - 109:24
**DIABETIC** [1] - 74:11
**DIAGNOSE** [1] - 133:9
**DIAGNOSED** [4] - 82:3, 133:10, 136:15, 170:18
**DIAGNOSES** [10] - 132:14, 133:6, 133:7, 134:1, 138:23, 141:25, 151:4, 167:5, 175:5, 175:16
**DIAGNOSIS** [23] - 42:20, 43:14, 78:25, 90:22, 134:7, 136:21, 153:25, 155:17, 156:15, 158:9, 158:24, 162:22, 163:19, 166:10, 170:10, 170:20, 171:15, 173:14, 173:19, 176:1, 177:15, 178:3, 180:8
**DIAGNOSTIC** [7] - 133:17, 134:11, 137:22, 151:4, 170:13, 171:5, 176:6
**DIANE** [7] - 54:22, 56:8, 56:21, 57:19, 57:20, 57:24, 58:5
**DIARRHEA** [1] - 178:13

**DICTATED** [1] - 161:23
**DICTIONARY** [2] - 112:15, 112:19
**DIE** [2] - 98:9, 98:10
**DIES** [1] - 98:8
**DIFFERENCE** [1] - 99:9
**DIFFERENT** [24] - 3:5, 25:9, 60:24, 67:12, 71:16, 79:3, 84:25, 89:11, 105:7, 106:10, 106:22, 113:5, 127:1, 135:23, 136:11, 150:17, 151:19, 152:11, 153:1, 156:8, 159:2, 166:18, 172:7, 189:22
**DIFFERENTLY** [1] - 26:23
**DIFFICULT** [11] - 29:11, 29:14, 31:8, 31:11, 31:15, 31:16, 32:9, 37:3, 49:4, 143:25
**DIFFICULTIES** [6] - 143:21, 144:21, 145:4, 145:5, 147:21, 152:22
**DIFFICULTY** [4] - 155:8, 155:9, 160:17, 160:23
**DILANTIN** [1] - 150:25
**DILIGENT** [1] - 14:21
**DIMINISHED** [3] - 87:22, 94:22, 155:2
**DIRE** [1] - 128:22
**DIRECT** [8] - 70:5, 70:8, 93:1, 99:9, 100:19, 101:7, 118:13, 197:2
**DIRECTLY** [1] - 87:8
**DIRECTOR** [1] - 121:3
**DISAGREE** [8] - 78:3, 79:22, 80:15, 89:9, 173:17, 173:18, 187:22, 194:22
**DISAGREED** [3] - 107:5, 173:12, 173:17
**DISAGREEMENT** [1] - 107:3
**DISCHARGED** [1] - 43:17
**DISCIPLINE** [2] - 139:24, 141:5
**DISCONNECTED** [1] - 188:2

**DISCOVERED** [1] - 150:16
**DISCOVERY** [2] - 105:21, 106:15
**DISCRETION** [1] - 170:11
**DISCUSS** [3] - 132:12, 133:4, 134:24
**DISCUSSED** [4] - 8:22, 37:22, 165:14, 182:12
**DISCUSSING** [5] - 75:23, 137:18, 137:20, 156:8, 182:15
**DISEASE** [2] - 94:17, 105:10
**DISEASES** [1] - 133:18
**DISINTEGRATION** [1] - 171:1
**DISORDER** [80] - 25:1, 33:5, 69:12, 75:13, 133:7, 133:10, 133:11, 133:12, 133:13, 133:16, 134:3, 134:4, 134:8, 134:9, 134:12, 134:22, 137:23, 138:13, 138:17, 139:2, 143:14, 151:3, 151:7, 151:9, 152:20, 152:21, 153:18, 154:4, 155:18, 156:25, 157:15, 157:17, 158:9, 158:23, 158:25, 159:5, 160:10, 161:6, 161:11, 162:8, 162:10, 162:20, 162:22, 162:23, 163:7, 163:8, 163:14, 163:19, 163:22, 164:3, 164:13, 165:2, 166:7, 166:8, 169:15, 170:2, 170:11, 170:19, 171:9, 171:10, 171:11, 171:14, 171:16, 171:22, 172:9, 173:19, 176:1, 176:7, 176:17, 176:22, 177:16, 177:17, 177:18, 178:5, 178:6, 178:9, 178:15, 179:21, 180:10

**DISORDERS** [13] - 133:18, 134:6, 143:14, 144:2, 144:4, 149:19, 162:4, 164:6, 166:18, 166:20, 167:3, 176:18, 176:19
**DISPARITIES** [1] - 188:10
**DISPARITY** [1] - 192:25
**DISPUTE** [2] - 190:20, 191:7
**DISPUTED** [3] - 90:20, 91:22, 184:25
**DISRUPT** [1] - 143:19
**DISRUPTED** [1] - 145:1
**DISRUPTION** [1] - 170:23
**DISSOCIATIVE** [10] - 69:12, 160:25, 169:14, 170:2, 170:10, 170:19, 171:14, 171:16, 178:5, 178:15
**DISSOLUTION** [1] - 47:13
**DISTINCT** [1] - 171:2
**DISTINCTION** [1] - 124:18
**DISTINCTIONS** [1] - 189:10
**DISTINGUISHED** [1] - 124:16
**DISTRESS** [7] - 154:16, 154:18, 154:19, 155:17, 156:18, 179:10, 180:11
**DISTRESSED** [2] - 137:20, 147:25
**DISTRESSING** [2] - 154:14, 157:7
**DISTRICT** [17] - 1:1, 1:2, 1:16, 2:6, 2:13, 109:12, 121:22, 122:1, 122:3, 126:11, 191:5, 191:17, 191:19, 193:6, 193:12, 194:6, 194:9
**DISTURBANCE** [1] - 159:11
**DIVERSE** [1] - 6:11
**DIVISION** [2] - 2:3, 4:19
**DIVORCE** [1] - 46:17
**DOCTOR** [12] - 76:6,

79:18, 79:24, 81:17, 81:21, 82:8, 86:11, 96:23, 97:8, 147:2, 148:19, 180:12
**DOCUMENT** [7] - 13:2, 49:16, 52:8, 55:9, 148:20, 148:22, 195:21
**DOCUMENTATION** [1] - 51:8
**DOCUMENTS** [1] - 22:21
**DOG** [2] - 140:18, 140:21
**DOGS** [1] - 140:20
**DOMESTIC** [1] - 9:24
**DON** [1] - 35:10
**DONATELLI** [6] - 185:22, 190:12, 190:19, 195:18, 195:21, 195:24
**DONE** [15] - 15:8, 15:9, 27:6, 29:16, 74:8, 75:1, 87:3, 87:4, 101:16, 110:12, 117:6, 120:5, 125:2, 132:7, 165:23
**DOOR** [2] - 62:24, 63:3
**DOSAGE** [1] - 179:11
**DOSAGES** [1] - 151:19
**DOUBTFUL** [1] - 178:6
**DOWN** [25] - 29:12, 29:16, 29:18, 29:25, 30:5, 36:8, 52:23, 61:3, 64:2, 64:4, 71:23, 78:12, 86:5, 91:17, 92:2, 99:22, 103:1, 104:1, 114:10, 135:12, 180:6, 180:8, 180:19, 192:15
**DR** [93] - 3:4, 3:12, 20:25, 21:2, 37:16, 55:23, 63:6, 71:24, 72:8, 74:2, 75:16, 75:20, 76:6, 77:1, 77:2, 77:3, 77:4, 77:11, 77:12, 77:13, 77:16, 77:17, 77:19, 78:4, 78:14, 78:19, 79:7, 80:1, 80:7, 80:15, 82:18, 82:19, 82:23, 83:2, 83:14, 83:18, 83:23, 84:5, 84:9, 84:13, 85:4, 85:17, 85:23, 86:12,

87:25, 90:21, 96:10, 96:11, 98:24, 98:25, 99:1, 99:18, 101:11, 102:4, 103:6, 103:13, 111:25, 112:1, 112:4, 115:18, 118:3, 118:15, 128:20, 129:10, 130:4, 130:8, 130:12, 130:14, 130:17, 138:2, 146:24, 162:14, 169:4, 169:17, 170:2, 172:11, 172:17, 173:4, 173:6, 173:8, 175:1, 177:4, 177:5, 177:8, 177:25
**DRAMATIC** [1] - 137:6
**DRAWN** [1] - 190:25
**DREAMS** [1] - 39:12
**DRIVEN** [1] - 159:25
**DROPPED** [2] - 29:16, 134:20
**DROPPING** [1] - 78:12
**DRS** [1] - 137:15
**DRUG** [5] - 10:5, 41:5, 142:20, 149:13, 179:21
**DRUG-INDUCED** [1] - 179:21
**DRUGS** [7] - 36:11, 78:13, 142:18, 142:25, 148:6, 179:17, 179:22
**DSM** [5] - 133:20, 133:21, 133:25, 134:1, 154:21
**DUE** [6] - 43:14, 46:18, 47:14, 53:14, 133:16, 162:10
**DURING** [20] - 47:17, 49:1, 50:14, 94:2, 105:1, 106:19, 106:20, 120:22, 129:11, 135:22, 136:10, 136:13, 140:11, 148:8, 153:5, 156:7, 170:22, 170:25, 171:7, 185:24
**DYNAMICS** [1] - 47:14
**DYSFUNCTION** [2] - 142:2, 151:11
**DYSFUNCTIONAL** [3] - 32:17, 52:21, 144:6

---

**E**

**E-MAIL** [5] - 84:14,

84:17, 84:19, 84:20, 84:23

**EARLIEST** [1] - 65:1

**EARLY** [11] - 20:20, 25:10, 27:15, 45:20, 45:21, 58:6, 64:22, 64:23, 145:3, 145:21, 159:3

**EASIER** [1] - 61:22

**EASILY** [1] - 157:4

**EASTERN** [2] - 2:13, 126:10

**EASY** [2] - 8:4, 168:19

**EAT** [2] - 27:19, 37:1

**EDITION** [2] - 132:23, 133:19

**EDUCATED** [1] - 49:20

**EDUCATION** [1] - 49:19

**EDUCATIONAL** [2] - 4:8, 119:6

**EFFECT** [7] - 30:11, 31:18, 72:11, 72:15, 72:24, 74:15, 80:23

**EFFECTIVELY** [1] - 95:12

**EFFECTS** [9] - 72:17, 74:15, 74:17, 74:18, 75:7, 80:17, 80:18, 80:19

**EFFICIENTLY** [1] - 36:13

**EFFORTS** [1] - 159:5

**EICHINGER** [2] - 88:23, 102:22

**EIGHT** [2] - 106:1, 128:11

**EINSTEIN** [1] - 114:22

**EISENHOWER** [1] - 113:23

**EITHER** [22] - 11:18, 15:5, 32:6, 46:17, 46:23, 55:6, 57:20, 60:15, 79:15, 80:21, 89:3, 92:25, 120:15, 121:12, 122:23, 125:3, 125:21, 134:3, 137:24, 154:6, 193:20

**ELABORATE** [2] - 52:21, 52:25

**ELAVIL** [2] - 152:5, 152:6

**ELECTRODES** [1] - 76:18

**ELIGIBILITY** [1] - 195:12

**ELIGIBLE** [1] - 186:24

**ELIMINATED** [1] -

122:11

**EMBARRASSING** [1] - 31:9

**EMORY** [2] - 76:11, 119:7

**EMOTION** [7] - 11:18, 11:19, 12:10, 12:11, 12:25, 138:3

**EMOTIONAL** [6] - 12:18, 71:12, 136:11, 156:10, 159:2, 170:21

**EMOTIONALLY** [4] - 6:23, 70:12, 139:12, 148:4

**EMOTIONS** [2] - 161:17, 161:21

**EMPLOYED** [1] - 118:22

**EMPLOYEE** [1] - 123:9

**EMPLOYERS** [1] - 49:6

**EMPTINESS** [1] - 160:22

**ENACTED** [1] - 189:19

**ENCOUNTER** [1] - 176:11

**END** [6] - 84:24, 87:6, 87:25, 160:21, 163:14, 189:9

**ENDEAVOR** [1] - 7:13

**ENDED** [2] - 46:17, 163:21

**ENDORSE** [1] - 133:2

**ENDORSED** [1] - 168:15

**ENDS** [1] - 142:23

**ENDURE** [1] - 61:20

**ENEMAS** [13] - 41:15, 43:16, 43:20, 43:24, 55:5, 55:6, 57:20, 57:22, 60:21, 139:8, 140:25, 141:1, 141:12

**ENGAGE** [5] - 5:15, 38:16, 67:19, 67:24, 184:22

**ENGAGED** [3] - 60:24, 163:24, 185:1

**ENGAGEMENT** [1] - 3:4

**ENGAGING** [2] - 141:18, 164:21

**ENGINE** [1] - 94:11

**ENGLISH** [3] - 112:18, 113:3, 113:4

**ENLIST** [1] - 146:18

**ENTAIL** [1] - 118:24

**ENTERPRISING** [1] -

34:18

**ENTIRE** [7] - 14:4, 16:12, 77:8, 85:19, 97:1, 98:15, 98:18

**ENTIRELY** [1] - 136:14

**ENTITLED** [1] - 198:7

**ENVIRONMENT** [8] - 68:22, 139:3, 144:6, 157:23, 164:8, 164:9, 166:11, 174:20

**ENVIRONMENTAL** [1] - 143:4

**ENVISION** [1] - 192:21

**EPILEPTICAL** [2] - 151:3, 180:10

**EPISODES** [1] - 43:12

**EQUALLY** [2] - 195:4, 195:5

**EQUIPPED** [1] - 35:23

**ERECTIONS** [1] - 39:11

**EROTIC** [1] - 174:13

**ERROR** [2] - 106:18, 106:23

**ESCAPE** [2] - 95:11, 95:13

**ESPECIALLY** [7] - 136:16, 143:14, 157:6, 157:18, 164:17, 165:6, 165:9

**ESQUIRE** [6] - 1:15, 2:2, 2:5, 2:8, 2:12, 2:12

**ESSENTIAL** [2] - 135:15, 145:10

**ESSENTIALLY** [2] - 7:13, 134:7

**ESTABLISHED** [1] - 72:17

**ESTEEM** [2] - 144:9, 144:13

**ESTRANGEMENT** [1] - 155:4

**ET** [2] - 173:22, 194:25

**ETIOLOGIES** [2] - 133:16, 162:10

**EVALUATE** [1] - 131:10

**EVALUATED** [3] - 74:2, 120:12, 156:2

**EVALUATION** [19] - 52:19, 81:23, 81:24, 103:23, 120:23, 121:4, 127:19, 131:1, 134:18, 135:2, 135:6, 135:10, 136:14, 137:14, 156:7,

161:8, 172:2, 177:5, 177:11

**EVALUATIONS** [7] - 121:8, 121:25, 122:2, 122:13, 122:18, 122:19, 125:18

**EVALUATOR** [1] - 47:8

**EVENT** [7] - 12:11, 47:7, 154:17, 154:23, 154:25, 155:1, 175:21

**EVENTS** [10] - 6:7, 12:6, 137:25, 154:7, 154:10, 154:15, 154:17, 155:2, 155:8, 158:2

**EVENTUALLY** [2] - 165:5, 173:13

**EVIDENCE** [35] - 9:12, 23:24, 24:18, 71:12, 89:20, 91:7, 92:1, 92:17, 110:20, 115:8, 115:13, 115:15, 115:22, 116:2, 116:4, 129:3, 129:7, 136:19, 136:24, 137:2, 141:21, 145:18, 163:22, 178:24, 178:25, 181:7, 183:13, 183:20, 184:5, 184:6, 191:11, 191:13, 193:25, 194:17

**EVIDENT** [2] - 49:20, 144:25

**EVIL** [2] - 141:14, 144:17

**EXACT** [3] - 75:19, 111:7, 171:5

**EXACTLY** [10] - 13:4, 73:13, 75:11, 81:13, 85:17, 90:1, 99:13, 101:5, 114:2, 175:7

**EXAGGERATED** [1] - 155:12

**EXAM** [1] - 169:13

**EXAMINATION** [18] - 3:9, 3:17, 52:2, 66:15, 69:21, 72:2, 72:6, 96:8, 102:21, 105:1, 108:16, 110:11, 118:13, 132:16, 136:12, 165:25, 177:2, 177:22

**EXAMINE** [3] - 77:23, 165:21, 185:7

**EXAMINED** [1] - 172:21

**EXAMPLE** [4] - 16:22, 18:5, 75:8, 93:16

**EXCEL** [1] - 50:7

**EXCEPT** [2] - 93:14, 164:19

**EXCEPTION** [1] - 83:14

**EXCERPT** [1] - 76:3

**EXCHANGE** [1] - 105:4

**EXCLUDE** [1] - 185:12

**EXCLUDED** [1] - 184:7

**EXCULPATORY** [1] - 17:13

**EXCUSE** [4] - 55:16, 117:14, 121:3, 130:6

**EXCUSED** [2] - 71:25, 114:11

**EXCUSED)** [1] - 180:21

**EXECUTED** [2] - 126:24, 127:21

**EXECUTIVE** [3] - 187:20, 193:17, 194:4

**EXHIBIT** [23] - 37:17, 46:8, 49:15, 66:21, 76:4, 76:24, 97:5, 98:25, 101:24, 103:1, 114:20, 115:12, 115:21, 118:16, 129:6, 148:20, 178:22, 178:25, 181:7, 181:9, 181:14, 185:13, 190:17

**EXHIBITED** [1] - 157:11

**EXHIBITS** [9] - 38:1, 40:5, 114:17, 114:19, 115:23, 116:3, 178:21, 181:6, 197:15

**EXIST** [1] - 189:10

**EXISTENCE** [2] - 11:19, 157:16

**EXPECT** [3] - 83:14, 89:24, 156:12

**EXPECTATION** [1] - 78:16

**EXPECTATIONS** [1] - 46:20

**EXPECTING** [2] - 50:20, 50:21

**EXPERIENCE** [3] - 4:13, 17:7, 137:24

**EXPERIENCED** [3] -

82:20, 137:10, 140:11

**EXPERIENCES** [1] - 6:7

**EXPERIENCING** [3] - 154:13, 157:7, 180:11

**EXPERIMENT** [1] - 44:10

**EXPERIMENTING** [1] - 44:18

**EXPERT** [21] - 105:17, 105:24, 108:3, 109:9, 111:4, 112:5, 125:21, 126:1, 126:20, 126:22, 127:9, 127:22, 128:12, 128:13, 128:21, 130:4, 130:9, 170:18, 171:17, 171:18, 172:20

**EXPERTISE** [1] - 108:9

**EXPERTS** [2] - 107:4, 171:18

**EXPERTS'** [1] - 130:12

**EXPLAIN** [8] - 16:8, 28:25, 29:4, 61:21, 78:17, 98:6, 113:4, 127:10

**EXPLAINED** [3] - 61:24, 80:22, 81:5

**EXPLANATION** [3] - 80:4, 80:10, 80:13

**EXPLOSIVE** [1] - 180:9

**EXPOSED** [10] - 137:25, 140:4, 140:23, 142:23, 154:6, 154:16, 156:9, 157:6, 164:10

**EXPOSURE** [2] - 143:4, 154:9

**EXPRESSION** [2] - 88:6, 138:3

**EXTENDED** [7] - 7:20, 32:12, 32:15, 34:7, 34:11, 51:12, 169:24

**EXTENSIVE** [14] - 7:17, 8:23, 20:21, 21:4, 27:24, 135:18, 136:17, 139:2, 142:10, 142:19, 159:18, 160:13, 169:4, 169:21

**EXTENSIVELY** [1] - 20:19

**EXTENT** [9] - 13:3, 90:2, 90:24, 143:25,

145:14, 164:20, 171:2, 183:7, 190:5

**EXTRA** [1] - 82:16

**EXTREME** [2] - 70:23, 71:1

**EXTREMELY** [4] - 37:3, 70:3, 144:6, 147:24

**EYE** [2] - 29:17, 195:2

**EYES** [1] - 29:13

---

## F

**FACE** [3] - 39:17, 39:21, 63:3

**FACED** [1] - 61:14

**FACING** [1] - 61:11

**FACT** [34] - 9:9, 17:12, 29:22, 40:4, 68:14, 70:5, 70:7, 75:19, 75:22, 75:23, 78:7, 79:11, 88:13, 90:12, 93:6, 95:7, 98:14, 102:13, 107:25, 109:5, 109:20, 127:6, 139:18, 139:21, 145:21, 146:15, 147:25, 156:12, 157:16, 177:13, 179:20, 180:5, 183:20, 184:10

**FACT-FINDER** [1] - 9:9

**FACTOR** [3] - 18:22, 47:12, 195:3

**FACTORED** [1] - 72:21

**FACTORS** [9] - 6:18, 50:3, 182:1, 187:17, 188:8, 190:1, 195:11, 195:13

**FACTS** [10] - 89:13, 89:14, 89:16, 90:4, 90:9, 90:20, 92:16, 172:21, 173:20, 191:3

**FACTUAL** [4] - 138:6, 138:22, 138:24, 174:1

**FACTUALLY** [1] - 191:6

**FACULTY** [1] - 125:7

**FAILED** [3] - 64:16, 75:23, 79:25

**FAILING** [2] - 38:9, 146:6

**FAIR** [18] - 9:15, 12:8, 35:12, 54:8, 54:12, 79:19, 86:14, 92:14,

101:4, 101:13, 103:23, 105:18, 106:16, 107:13, 110:9, 110:12, 134:20, 161:13

**FAIRNESS** [1] - 185:2

**FAITH** [1] - 194:17

**FAKING** [1] - 172:25

**FALL** [1] - 184:11

**FALLEN** [1] - 38:19

**FALLIBLE** [2] - 11:7, 12:18

**FALLING** [1] - 155:8

**FALSE** [4] - 66:12, 182:5, 183:8, 183:16

**FALSELY** [1] - 68:15

**FAMILIAL** [1] - 47:2

**FAMILIAR** [6] - 34:23, 45:2, 52:6, 89:14, 91:12, 102:1

**FAMILY** [39] - 7:21, 32:13, 32:15, 32:17, 34:7, 34:8, 34:9, 37:1, 37:8, 45:16, 45:20, 45:21, 47:2, 47:6, 47:13, 47:14, 47:17, 49:1, 49:8, 50:12, 51:6, 52:20, 52:24, 52:25, 53:6, 56:15, 58:1, 58:3, 62:25, 93:19, 135:23, 141:21, 142:10, 142:13, 142:18, 145:13, 146:11, 157:23, 164:22

**FAR** [7] - 12:3, 20:16, 20:18, 60:13, 64:18, 107:3, 107:4

**FARFETCHED** [3] - 174:11, 174:13, 174:19

**FASHION** [1] - 7:25

**FASHIONED** [1] - 190:8

**FAST** [3] - 94:5, 112:25, 132:20

**FASTER** [1] - 112:25

**FATED** [1] - 46:18

**FATHER** [10] - 36:22, 37:2, 48:3, 48:15, 53:9, 53:13, 60:11, 139:15, 139:20

**FATHER'S** [1] - 142:3

**FAULT** [1] - 94:14

**FBI** [2] - 90:10, 90:11

**FCRR** [1] - 1:19

**FEAR** [2] - 48:4, 146:10

**FEBRUARY** [4] -

122:6, 122:8, 147:19, 179:9

**FEDERAL** [14] - 2:6, 2:13, 111:2, 125:21, 128:3, 131:4, 186:23, 188:21, 191:1, 191:21, 193:1, 193:24, 194:24, 195:10

**FEELINGS** [3] - 143:6, 155:3, 160:22

**FELL** [1] - 39:15

**FELLOW** [2] - 124:16, 124:25

**FELLOWSHIP** [4] - 119:15, 119:22, 125:9, 125:12

**FELT** [5] - 34:8, 44:21, 51:12, 74:19, 147:24

**FEMALE** [1] - 46:15

**FEW** [13] - 3:21, 9:4, 21:18, 34:8, 59:14, 77:16, 112:11, 133:5, 134:25, 153:24, 158:8, 166:4, 169:21

**FIELD** [3] - 8:16, 19:6, 173:9

**FIELDS** [1] - 113:5

**FIFTH** [1] - 133:19

**FIFTY** [1] - 163:3

**FIFTY-CENT** [1] - 163:3

**FIGHT** [2] - 38:4, 92:25

**FIGURE** [2] - 99:23, 170:5

**FIGURED** [1] - 170:6

**FILE** [1] - 192:16

**FILED** [8] - 185:25, 186:6, 187:6, 187:13, 192:5, 192:8, 192:9, 192:17

**FILING** [1] - 190:14

**FINAL** [2] - 22:15, 192:10

**FINALLY** [2] - 29:7, 99:5

**FINANCIALLY** [2] - 49:9, 147:21

**FINDER** [1] - 9:9

**FINDINGS** [3] - 80:20, 81:7, 86:12

**FINE** [3] - 3:22, 59:24, 141:2

**FINISH** [6] - 3:25, 27:12, 27:13, 48:12, 48:13, 59:21

**FIRE** [1] - 163:9

**FIRM** [2] - 4:23, 6:21

**FIRST** [42] - 1:20, 11:25, 22:14, 28:13, 37:13, 40:12, 42:14, 46:9, 46:18, 47:8, 51:13, 52:3, 53:22, 55:2, 60:6, 60:8, 60:15, 88:14, 90:10, 90:20, 92:21, 96:23, 99:22, 105:6, 119:25, 122:7, 126:24, 132:2, 135:15, 148:11, 149:13, 150:16, 150:23, 151:25, 156:3, 173:11, 179:23, 183:5, 191:10, 194:10, 194:20, 196:1

**FISH** [1] - 39:15

**FISHING** [1] - 38:15

**FISSURE** [1] - 97:18

**FISSURES** [3] - 97:10, 97:21, 98:2

**FIVE** [9] - 13:25, 55:19, 56:2, 95:22, 168:6, 168:7, 175:18, 175:23, 188:25

**FIVE-CODEFENDANT** [1] - 188:25

**FIVE-MINUTE** [3] - 55:19, 56:2, 95:22

**FIVE-YEAR** [1] - 175:23

**FLAGS** [1] - 64:15

**FLASHBACKS** [1] - 154:16

**FLAT** [2] - 170:8, 171:14

**FLIGHT** [1] - 92:25

**FLIP** [1] - 127:16

**FLOOR** [1] - 1:20

**FLORIDA** [1] - 124:4

**FLUID** [2] - 98:9, 98:12

**FLUSH** [1] - 136:1

**FOCUS** [8] - 20:19, 23:3, 23:6, 23:7, 24:3, 45:14, 45:15, 47:3

**FOCUSES** [1] - 23:16

**FOCUSING** [6] - 5:19, 23:10, 25:8, 45:12, 45:20, 84:1

**FOLDER** [1] - 30:4

**FOLKS** [3] - 47:16, 48:25, 170:12

**FOLLOW** [5] - 59:21, 75:1, 147:9, 179:13,

193:23
**FOLLOWING** [2] - 78:6, 154:9
**FOOD** [2] - 58:3, 58:4
**FOOLING** [1] - 44:13
**FORCED** [3] - 67:25, 139:4, 140:20
**FOREGOING** [1] - 198:5
**FORENSIC** [44] - 81:24, 119:1, 119:2, 119:16, 119:22, 120:1, 120:4, 120:23, 120:25, 121:2, 121:3, 121:21, 122:9, 123:6, 123:8, 123:13, 123:15, 123:20, 123:21, 123:24, 123:25, 124:6, 124:8, 124:22, 124:23, 124:24, 125:9, 125:11, 125:12, 125:15, 125:17, 125:22, 126:2, 128:21, 130:9, 131:1, 135:2, 135:6, 135:25, 153:3, 164:3, 173:10
**FORESHORTENED** [1] - 155:5
**FORETHOUGHT** [1] - 160:3
**FORGET** [2] - 11:20
**FORGOT** [1] - 114:16
**FORM** [5] - 106:4, 141:5, 143:19, 145:16, 159:21
**FORMAL** [2] - 49:19, 162:16
**FORMER** [2] - 15:10, 20:9
**FORMULATE** [1] - 92:18
**FORT** [1] - 42:8
**FORTH** [1] - 183:10
**FORTUNE** [1] - 93:19
**FORUM** [2] - 188:12, 188:13
**FORWARD** [3] - 16:17, 163:25, 194:13
**FOUR** [2] - 52:9, 195:3
**FRAILTIES** [1] - 6:12
**FRAME** [1] - 153:5
**FRANKLY** [5] - 84:20, 106:11, 164:9, 177:14, 181:8
**FRANTIC** [1] - 159:5

**FRAUD** [1] - 68:8
**FRAUDULENT** [3] - 65:9, 68:1, 68:5
**FREQUENTLY** [4] - 32:11, 47:18, 49:2, 67:2
**FRIEND** [1] - 46:16
**FRIENDS** [1] - 63:17
**FRONT** [12] - 29:18, 33:11, 40:13, 84:2, 84:3, 87:13, 96:10, 132:13, 183:13, 184:17, 186:22
**FRONTAL** [6] - 89:24, 89:25, 93:13, 97:12, 102:16, 104:16
**FULL** [13] - 9:4, 80:17, 116:22, 118:6, 118:23, 120:24, 121:19, 122:5, 123:9, 123:10, 123:13, 176:6, 176:12
**FULL-BLOWN** [1] - 176:12
**FULL-TIME** [6] - 118:23, 120:24, 121:19, 122:5, 123:9, 123:13
**FULLERTON** [1] - 68:12
**FULLY** [1] - 21:6
**FUNCTION** [1] - 163:15
**FUNCTIONAL** [1] - 76:14
**FUNCTIONING** [2] - 156:17, 156:20
**FUNCTIONS** [1] - 35:20
**FUNDS** [1] - 67:18
**FUNKE'S** [1] - 175:1
**FUTURE** [1] - 155:5

## G

**GAMBLE** [2] - 93:18, 93:24
**GANGLIA** [1] - 75:9
**GAS** [2] - 146:9, 163:8
**GATHER** [2] - 7:23, 10:21
**GATHERED** [1] - 13:15
**GATHERING** [1] - 13:20
**GAY** [1] - 182:4
**GC** [10] - 76:4, 77:6, 96:10, 114:20, 114:24, 115:4,

115:15, 115:21, 197:17
**GELBORT** [3] - 112:2, 130:12, 162:14
**GELBORT'S** [2] - 102:4, 112:4
**GENERAL** [7] - 75:4, 83:6, 114:3, 119:25, 120:1, 120:25, 146:4
**GENERALLY** [4] - 46:20, 162:18, 168:17, 170:20
**GENERATE** [3] - 24:12, 74:1, 74:3
**GENERATION** [2] - 150:23, 152:1
**GENERATIONAL** [1] - 142:1
**GENETIC** [5] - 142:6, 142:15, 142:21, 143:2, 164:8
**GENIUS** [1] - 49:22
**GENOVA** [1] - 52:11
**GENUINE** [3] - 47:9, 137:10, 138:4
**GEORGE** [1] - 119:10
**GESTURES** [2] - 160:11, 161:16
**GIRLFRIEND** [1] - 15:10
**GIRLS** [2] - 30:8, 38:11
**GIVEN** [10] - 43:16, 84:13, 139:8, 146:11, 153:17, 153:18, 164:1, 174:20, 179:4, 179:24
**GLENNIS** [3] - 29:15, 34:14, 34:15
**GLENNIS'** [4] - 29:25, 30:3, 30:9, 34:15
**GLIMPSE** [1] - 11:11
**GLOVE** [2] - 26:4, 26:5
**GLUCOSE** [1] - 74:15
**GM** [1] - 94:3
**GOAL** [3] - 7:7, 9:3, 92:18
**GOVERNMENT** [38] - 1:15, 2:2, 16:18, 17:3, 17:12, 17:14, 17:25, 18:9, 18:13, 19:2, 19:17, 37:17, 66:21, 73:16, 73:21, 76:4, 99:6, 99:8, 105:17, 107:5, 109:16, 114:18, 114:19, 115:12, 115:21, 117:17,

128:20, 181:7, 181:13, 183:7, 185:12, 186:6, 186:9, 187:12, 187:21, 190:13, 193:17, 194:4
**GOVERNMENT'S** [6] - 76:24, 112:5, 130:4, 130:9, 187:14, 187:19
**GRABBED** [1] - 29:24
**GRADUALLY** [1] - 51:14
**GRADUATED** [1] - 119:9
**GRANT** [1] - 185:11
**GRAPH** [1] - 104:8
**GREAT** [1] - 104:19
**GREATER** [1] - 132:12
**GREW** [2] - 164:9, 174:20
**GRIEF** [2] - 47:9, 47:12
**GROOMED** [1] - 63:12
**GROUP** [3] - 78:24, 81:14, 188:14
**GROVE** [6] - 121:4, 121:5, 122:8, 122:9, 122:11, 123:12
**GROW** [1] - 144:16
**GROWING** [8] - 70:21, 70:24, 71:2, 140:6, 140:11, 144:6, 144:24, 164:2
**GUARD** [1] - 155:12
**GUESS** [5] - 24:14, 123:5, 139:5, 158:19, 173:6
**GUIDANCE** [1] - 116:12
**GUILT** [2] - 105:13, 106:20
**GUILTY** [5] - 120:15, 121:13, 132:2, 147:24, 173:24
**GUN** [1] - 33:7
**GUR** [25] - 3:4, 3:12, 55:23, 71:24, 72:1, 72:8, 74:2, 75:16, 75:20, 76:6, 77:2, 78:4, 78:14, 78:19, 83:23, 85:4, 87:25, 90:21, 96:10, 98:24, 98:25, 103:6, 111:25, 162:14, 197:7
**GUR'S** [3] - 77:1, 77:4, 77:13

**GURGANUS** [58] - 1:15, 3:16, 3:18, 3:19, 17:2, 19:15, 19:19, 19:23, 39:2, 39:5, 39:6, 48:17, 54:13, 54:14, 54:21, 55:12, 55:21, 55:22, 56:7, 59:15, 59:20, 59:25, 65:18, 65:25, 66:13, 66:17, 68:1, 68:4, 69:9, 69:17, 71:15, 71:22, 115:6, 128:23, 165:22, 166:1, 166:4, 172:10, 172:23, 176:23, 177:21, 177:23, 178:18, 179:13, 179:16, 180:15, 182:9, 182:11, 182:16, 182:22, 183:24, 184:16, 185:15, 189:4, 189:18, 189:25, 197:4, 197:13
**GUT** [1] - 114:4
**GUY** [1] - 95:15
**GYRI** [1] - 98:2
**GYRUS** [1] - 97:25

## H

**HAINES** [39] - 2:2, 72:3, 72:5, 72:7, 73:15, 73:17, 73:22, 75:15, 77:7, 77:10, 77:13, 77:17, 77:21, 77:24, 77:25, 81:8, 82:15, 82:25, 84:12, 85:2, 85:3, 91:5, 91:6, 95:17, 96:16, 101:15, 102:21, 104:19, 104:24, 105:4, 108:11, 110:19, 112:10, 114:8, 114:21, 115:1, 115:16, 115:18, 197:8
**HALDOL** [2] - 152:8, 152:9
**HALF** [4] - 123:9, 167:16, 170:4, 171:20
**HALF-TIME** [1] - 123:9
**HALFWAY** [1] - 192:14
**HALLUCINATIONS** [1] - 158:21
**HAMMER** [105] - 1:6, 13:24, 18:23, 20:12,

23:11, 24:19, 24:25, 25:11, 28:14, 28:16, 30:20, 34:18, 37:13, 40:17, 46:24, 47:6, 49:4, 49:17, 49:18, 50:15, 50:18, 51:24, 52:10, 53:25, 54:1, 54:23, 56:8, 56:21, 57:19, 58:5, 58:7, 60:3, 60:23, 61:4, 61:24, 62:15, 62:16, 63:5, 65:19, 67:1, 67:23, 68:10, 68:14, 71:19, 73:1, 73:5, 74:3, 75:17, 79:11, 83:24, 87:7, 89:12, 89:16, 90:10, 90:23, 91:8, 91:12, 91:16, 91:21, 92:1, 92:8, 92:12, 94:17, 95:2, 95:8, 96:2, 131:1, 131:7, 131:10, 131:18, 131:20, 132:1, 132:25, 136:2, 138:12, 147:9, 148:24, 155:22, 157:11, 161:9, 167:13, 167:15, 169:5, 170:1, 170:18, 170:25, 171:5, 172:25, 174:4, 174:18, 177:6, 177:9, 182:5, 182:12, 182:17, 183:15, 184:17, 184:22, 185:6, 188:4, 188:5, 196:1

**HAMMER'S** [26] - 13:17, 20:15, 21:6, 44:8, 60:20, 72:19, 74:17, 81:3, 81:10, 84:1, 85:10, 88:1, 90:24, 92:17, 96:18, 99:25, 101:1, 104:15, 105:7, 107:16, 129:10, 129:15, 141:21, 173:21, 195:19
**HAND** [3] - 3:25, 67:16, 96:11
**HANDLED** [1] - 193:11
**HANDS** [2] - 54:11, 139:23
**HAPPIEST** [1] - 27:5
**HAPPINESS** [2] - 11:24, 27:2
**HAPPY** [8] - 11:18, 12:22, 26:13, 29:2, 29:4, 46:3, 84:19,

86:21
**HARD** [6] - 11:15, 34:5, 47:15, 48:2, 48:24, 93:25
**HARFORD** [2] - 121:10, 122:14
**HARMLESS** [3] - 105:3, 106:18, 106:24
**HARRIS** [1] - 2:9
**HARRISBURG** [2] - 2:7, 131:18
**HAUTE** [1] - 131:19
**HEAD** [3] - 10:1, 14:15, 192:11
**HEADLINE** [1] - 183:25
**HEALTH** [8] - 53:19, 122:17, 123:7, 135:19, 135:21, 145:25, 147:18, 153:6
**HEALTHY** [7] - 78:24, 79:3, 85:9, 143:22, 144:9, 145:7, 145:10
**HEAR** [2] - 156:13, 177:25
**HEARD** [6] - 19:5, 33:11, 88:6, 88:14, 88:15, 95:10
**HEARING** [8] - 1:12, 103:12, 115:20, 116:1, 130:4, 130:23, 175:2, 184:13
**HEARSAY** [1] - 184:4
**HEAVILY** [1] - 142:25
**HEDGE** [1] - 170:9
**HELD** [3] - 27:3, 108:23, 120:8
**HELEN** [1] - 76:7
**HELP** [9] - 9:13, 37:17, 92:9, 127:6, 127:13, 143:5, 146:17, 146:19, 147:16
**HELPED** [1] - 64:12
**HELPFUL** [1] - 127:23
**HELPING** [3] - 125:11, 125:16, 127:9
**HELPLESS** [2] - 91:21, 92:2
**HEPATITIS** [2] - 178:10
**HERRING** [1] - 81:7
**HERSELF** [1] - 62:11
**HID** [1] - 48:5
**HIDING** [1] - 62:25
**HIGHEST** [2] - 119:9, 124:18

**HIGHLIGHTED** [4] - 40:1, 78:2, 96:16, 96:19
**HIGHLY** [1] - 113:1
**HIGHWAY** [1] - 94:12
**HIMSELF** [4] - 49:20, 145:24, 146:9, 146:10
**HINT** [1] - 34:14
**HIRED** [4] - 18:10, 107:5, 126:3, 126:12
**HISTORICALLY** [3] - 158:14, 161:8, 163:21
**HISTORIES** [1] - 142:10
**HISTORY** [51] - 7:24, 8:7, 9:11, 10:5, 10:19, 20:18, 20:20, 20:22, 21:20, 23:20, 25:8, 25:10, 33:4, 43:12, 45:13, 45:16, 45:20, 45:21, 52:14, 52:19, 52:24, 53:6, 69:10, 71:19, 89:21, 130:22, 135:20, 136:1, 136:17, 139:2, 141:21, 141:25, 142:1, 142:5, 142:7, 142:13, 142:18, 142:19, 143:17, 143:18, 146:11, 159:12, 159:16, 159:18, 160:13, 163:20, 163:24, 164:2, 164:8, 178:11
**HOLD** [7] - 27:25, 34:22, 35:24, 36:8, 44:22, 49:5, 125:5
**HOLDING** [1] - 124:18
**HOME** [6] - 53:8, 53:14, 53:15, 65:7, 139:3, 164:10
**HOMICIDE** [2] - 52:4, 52:10
**HOMOSEXUAL** [1] - 67:3
**HONESTY** [2] - 64:6, 84:16
**HONOR** [83] - 3:2, 3:11, 3:16, 19:20, 48:11, 54:3, 54:7, 55:16, 55:25, 56:4, 59:17, 69:17, 71:22, 72:3, 73:15, 73:22, 76:25, 77:7, 77:18, 77:21, 82:16, 84:12, 84:17, 85:2, 90:19, 91:5, 95:17, 95:19,

96:3, 96:5, 97:4, 110:25, 112:10, 114:7, 114:8, 114:14, 114:23, 115:6, 115:10, 115:25, 116:5, 116:7, 117:9, 117:14, 117:25, 118:10, 124:18, 128:18, 128:23, 148:15, 165:17, 165:20, 172:1, 172:17, 176:23, 177:1, 177:21, 178:19, 178:20, 179:7, 179:14, 180:16, 180:17, 180:22, 181:1, 181:18, 182:17, 183:5, 183:24, 185:14, 185:15, 185:17, 185:18, 186:3, 186:8, 187:23, 188:1, 189:4, 190:8, 193:18, 195:18, 195:23, 196:6
**HONORABLE** [1] - 1:10
**HONORS** [1] - 119:9
**HOPE** [1] - 28:1
**HOPEFULLY** [2] - 95:4, 136:5
**HOPKINS** [1] - 125:13
**HORRIBLE** [2] - 12:2, 62:4
**HORRIFIC** [5] - 18:23, 18:24, 25:18, 27:1, 61:20
**HOSPITAL** [28] - 14:12, 14:25, 32:20, 36:17, 41:5, 41:8, 41:16, 42:12, 43:8, 43:16, 43:20, 43:21, 51:20, 119:14, 120:9, 120:10, 120:12, 120:19, 121:4, 121:15, 122:10, 122:12, 123:2, 123:3, 145:24, 146:4, 146:13, 148:12
**HOSPITALIZATIONS** [2] - 13:23, 21:22
**HOSPITALS** [3] - 121:6, 122:11, 123:8
**HOSTAGE** [4] - 91:13, 91:20, 92:4, 95:9
**HOT** [1] - 139:8
**HOUR** [6] - 8:25, 63:1,

84:23, 94:12, 131:25, 167:20
**HOURS** [4] - 131:7, 167:16, 170:5, 171:20
**HOUSE** [4] - 48:5, 93:18, 93:21, 192:14
**HOUSEHOLD** [1] - 26:8
**HOUSEKEEPING** [1] - 185:19
**HOWARD** [2] - 118:9
**HOYT** [2] - 32:18, 33:7
**HUGE** [2] - 61:14, 80:24
**HUMANKIND** [1] - 6:12
**HUMPHREY** [1] - 2:9
**HURTFUL** [1] - 140:3
**HUSBANDS** [1] - 33:24
**HYGIENE** [1] - 123:7
**HYPERAROUSAL** [1] - 155:7
**HYPERTHYROIDISM** [1] - 178:9
**HYPERVIGILANCE** [1] - 155:10

## I

**IDEA** [2] - 114:3, 154:2
**IDENTIFIED** [2] - 190:13, 191:25
**IDENTIFIES** [1] - 190:18
**IDENTIFYING** [3] - 54:17, 187:4, 192:4
**IDENTITY** [9] - 159:10, 169:14, 170:2, 170:11, 170:19, 171:14, 171:16, 178:5, 178:15
**IGNORE** [1] - 83:13
**ILL** [8] - 32:22, 32:23, 32:24, 35:19, 35:23, 36:12, 46:18, 120:20
**ILL-EQUIPPED** [1] - 35:23
**ILL-FATED** [1] - 46:18
**ILL-PREPARED** [2] - 35:19, 36:12
**ILLEGAL** [1] - 164:21
**ILLNESS** [6] - 47:5, 105:13, 142:14, 146:11, 158:16, 161:25
**IMAGE** [3] - 86:3, 159:1, 159:11
**IMAGES** [2] - 88:7,

88:14
**IMAGINED** [1] - 159:6
**IMAGING** [5] - 76:14, 87:2, 87:3, 103:9, 103:18
**IMMATURE** [1] - 39:11
**IMMATURITY** [1] - 46:20
**IMMEDIATE** [5] - 7:20, 47:6, 145:13, 159:23, 188:23
**IMMEDIATELY** [2] - 16:18, 183:12
**IMPACT** [7] - 79:1, 144:8, 144:14, 145:16, 157:1, 157:25, 161:19
**IMPACTING** [1] - 163:9
**IMPAIRED** [2] - 157:9, 163:6
**IMPAIRMENT** [7] - 153:19, 155:17, 156:16, 156:19, 156:24, 161:2, 163:15
**IMPAIRMENTS** [1] - 102:18
**IMPAIRS** [1] - 161:12
**IMPEACH** [1] - 77:2
**IMPERATIVE** [1] - 6:20
**IMPLEMENTS** [1] - 92:8
**IMPORT** [1] - 141:24
**IMPORTANCE** [2] - 16:8, 175:6
**IMPORTANT** [8] - 9:17, 12:15, 45:17, 81:25, 82:7, 145:7, 156:20, 175:7
**IMPOSE** [2] - 9:10, 9:13
**IMPOSED** [3] - 186:25, 187:3, 192:3
**IMPOSING** [1] - 188:14
**IMPOSITION** [1] - 190:4
**IMPRESSION** [2] - 31:22, 31:24
**IMPROPER** [2] - 187:15, 187:17
**IMPROVEMENT** [1] - 165:8
**IMPULSE** [17] - 87:9, 87:15, 88:2, 88:3, 88:19, 89:2, 89:4, 89:6, 89:7, 89:10, 89:18, 89:20, 90:2,

90:6, 92:24, 94:21, 113:3
**IMPULSIVE** [14] - 89:22, 112:13, 112:14, 113:11, 113:12, 113:18, 113:22, 114:4, 152:22, 153:20, 161:16, 163:13, 166:20, 174:8
**IMPULSIVELY** [2] - 92:22, 157:5
**IMPULSIVENESS** [1] - 112:21
**IMPULSIVITY** [12] - 151:9, 157:1, 159:2, 159:12, 159:17, 159:20, 159:21, 159:24, 160:6, 161:15, 163:5, 163:9
**IN-PATIENT** [1] - 43:9
**INABILITY** [1] - 155:1
**INADEQUATE** [1] - 180:9
**INAPPROPRIATE** [2] - 29:19, 160:22
**INCARCERATED** [2] - 45:13, 49:18
**INCARCERATION** [2] - 46:14, 46:15
**INCARCERATIONS** [1] - 135:22
**INCEST** [1] - 142:2
**INCESTUOUS** [1] - 139:19
**INCIDENCE** [2] - 165:4, 165:8
**INCIDENCES** [1] - 95:1
**INCIDENT** [6] - 95:7, 95:9, 101:17, 109:14, 140:17, 147:23
**INCIDENTS** [2] - 95:4, 137:6
**INCLUDE** [5] - 45:21, 72:18, 79:10, 82:13, 117:19
**INCLUDED** [2] - 79:5, 82:8
**INCLUDING** [9] - 4:14, 11:2, 92:9, 125:23, 129:18, 131:22, 148:9, 164:5, 182:19
**INCOMPETENT** [3] - 120:15, 121:12, 122:23
**INCONSISTENCIES** [1] - 71:14
**INCONSISTENT** [5] -

16:16, 17:4, 18:14, 19:3, 101:10
**INCORRECT** [2] - 72:14, 112:20
**INCREASE** [2] - 86:18, 98:13
**INCREASED** [11] - 75:8, 85:10, 85:20, 85:24, 86:2, 86:8, 86:12, 86:17, 98:10, 98:12, 176:20
**INCREDIBLY** [1] - 140:22
**INDENTATIONS** [2] - 97:22, 97:24
**INDEPENDENT** [1] - 70:19
**INDICATE** [5] - 56:14, 59:5, 59:7, 59:9, 153:8
**INDICATED** [15] - 38:3, 67:9, 87:14, 96:18, 102:11, 104:23, 147:17, 147:19, 148:1, 151:1, 162:17, 181:21, 185:6, 186:18, 190:15
**INDICATES** [1] - 6:5
**INDICATING** [3] - 50:1, 70:6, 144:23
**INDICATION** [6] - 18:2, 24:25, 40:17, 141:10, 141:17, 180:13
**INDICATIONS** [1] - 44:9
**INDICATIVE** [1] - 157:15
**INDIVIDUAL** [5] - 126:21, 126:24, 137:23, 165:14, 189:6
**INDIVIDUAL'S** [3] - 143:19, 164:7, 170:23
**INDIVIDUALIZED** [1] - 189:6
**INDIVIDUALS** [15] - 107:11, 120:14, 121:11, 122:22, 127:21, 135:23, 136:1, 142:22, 143:23, 154:14, 159:4, 161:18, 167:1, 174:22, 175:15
**INDUCED** [1] - 179:21
**INDULGENCE** [3] - 98:21, 101:20,

108:19
**INFORMATION** [22] - 9:9, 17:16, 19:14, 23:18, 24:15, 57:14, 58:6, 66:9, 82:8, 83:11, 117:13, 127:10, 135:1, 135:17, 135:25, 136:15, 167:6, 175:5, 175:9, 183:12, 184:14, 185:5
**INFORMED** [1] - 3:3
**INITIAL** [4] - 21:18, 134:18, 136:14, 175:20
**INJURY** [1] - 178:12
**INMATE** [5] - 49:18, 192:13, 193:6, 193:7
**INNATE** [2] - 164:7, 166:11
**INPUT** [1] - 135:22
**INQUIRE** [1] - 72:3
**INSANITY** [2] - 120:16, 121:14
**INSOFAR** [1] - 49:17
**INSTABILITY** [3] - 158:25, 160:15, 164:11
**INSTANCE** [3] - 18:20, 18:25, 33:12
**INSTANCES** [2] - 44:12, 44:16
**INSTEAD** [1] - 190:9
**INSTITUTION** [1] - 32:25
**INSTRUCTED** [1] - 65:4
**INSTRUCTIONAL** [1] - 63:24
**INTAKE** [1] - 37:23
**INTELLIGENCE** [2] - 49:21, 50:7
**INTELLIGENT** [3] - 50:2, 50:3, 50:4
**INTENSE** [4] - 137:24, 154:16, 159:9, 160:23
**INTENT** [6] - 105:13, 187:5, 187:14, 192:5, 192:16, 192:17
**INTENTIONALLY** [1] - 173:25
**INTERACTION** [1] - 143:24
**INTERACTIONS** [1] - 87:9
**INTERCOURSE** [1] - 139:21

**INTEREST** [2] - 38:11, 155:2
**INTERESTED** [4] - 29:3, 50:6, 70:18, 82:5
**INTERESTING** [2] - 113:14, 159:20
**INTERIM** [1] - 122:7
**INTERNAL** [1] - 136:9
**INTERPERSONAL** [4] - 144:23, 156:19, 159:1, 159:9
**INTERPRETATION** [1] - 83:20
**INTERVENE** [1] - 139:16
**INTERVENED** [1] - 64:14
**INTERVENTION** [2] - 145:20, 158:5
**INTERVIEW** [22] - 15:3, 15:9, 16:2, 19:2, 29:16, 30:1, 30:2, 31:7, 51:4, 55:13, 56:21, 56:22, 56:23, 56:25, 57:7, 57:14, 62:16, 62:17, 63:4, 136:11, 144:12, 184:18
**INTERVIEWED** [17] - 20:14, 22:5, 22:20, 50:15, 52:10, 55:1, 56:8, 56:11, 56:12, 62:15, 90:10, 131:24, 135:3, 167:12, 167:15, 167:18, 182:17
**INTERVIEWING** [4] - 6:17, 10:17, 29:19, 51:16
**INTERVIEWS** [22] - 7:18, 9:21, 15:7, 15:8, 19:8, 33:20, 33:21, 45:22, 50:14, 50:21, 50:25, 51:6, 51:12, 56:20, 57:12, 58:7, 62:9, 70:20, 71:1, 71:6, 153:13, 167:7
**INTESTINAL** [2] - 43:14, 57:23
**INTIMATED** [1] - 104:23
**INTRODUCE** [1] - 115:3
**INVENTORY** [2] - 132:22, 133:5
**INVESTIGATED** [2] - 60:13, 61:2
**INVESTIGATION** [2] -

6:17, 28:14
**INVOLVED** [24] - 8:16, 12:10, 13:7, 19:24, 23:6, 23:9, 48:23, 50:22, 65:14, 65:20, 66:4, 105:9, 105:12, 105:16, 106:9, 122:21, 125:15, 128:4, 128:5, 139:4, 157:23, 158:6, 182:13, 183:9
**INVOLVEMENT** [1] - 13:8
**INVOLVING** [2] - 187:8, 191:15
**IQ** [4] - 49:10, 49:17, 49:22, 50:1
**IRREVOCABLY** [1] - 171:6
**IRRITABILITY** [1] - 155:9
**IRRITABLE** [1] - 166:22
**IRRITATED** [1] - 157:5
**ISSUE** [16] - 73:19, 75:19, 78:22, 79:6, 81:6, 83:19, 90:2, 100:8, 105:2, 106:8, 106:18, 173:12, 177:13, 181:19, 181:24
**ISSUES** [14] - 31:7, 33:4, 41:11, 41:23, 43:22, 43:24, 63:7, 87:8, 105:20, 106:10, 135:22, 138:4, 184:9, 184:11
**ITEMS** [2] - 133:2, 168:15
**ITSELF** [4] - 56:24, 89:25, 142:21, 175:12

## J

**J.D.'S** [1] - 8:19
**JAMES** [2] - 2:12, 2:12
**JANEL** [1] - 62:24
**JANUARY** [4] - 121:1, 121:20, 121:23, 122:6
**JASPER** [1] - 24:16
**JERK** [2] - 159:22, 160:7
**JESSICA** [1] - 45:3
**JESSUP** [1] - 120:10
**JIBES** [1] - 136:5
**JILL** [20] - 20:6, 20:8, 20:9, 20:22, 21:14, 23:16, 23:25, 33:21,

41:19, 55:1, 56:9, 56:14, 57:7, 57:9, 58:15, 59:7, 59:17, 60:18, 62:17, 167:7
**JOB** [11] - 6:14, 9:12, 23:13, 34:22, 35:24, 36:8, 36:24, 49:5, 193:22
**JOBS** [5] - 34:21, 35:18, 36:1, 36:2, 36:10
**JOCKO** [5] - 23:19, 24:15, 69:2, 172:14, 172:25
**JOEL** [1] - 1:10
**JOHN** [4] - 1:15, 3:19, 102:22, 166:4
**JOHNNY** [3] - 49:4, 62:15, 62:16
**JOHNS** [1] - 125:13
**JOINT** [1] - 46:22
**JOTTED** [1] - 30:5
**JOURNEY** [1] - 109:2
**JR** [1] - 1:15
**JUDGE** [5] - 106:7, 108:24, 125:21, 182:22, 194:22
**JUDGMENT** [6] - 87:9, 153:20, 161:19, 163:6, 163:10, 163:13
**JULY** [1] - 121:18
**JUNE** [4] - 41:21, 116:20, 196:3, 196:5
**JURISDICTION** [3] - 187:8, 191:15, 191:16
**JURISDICTIONS** [2] - 122:19, 122:24
**JURISIDICTIONS** [1] - 121:14
**JURY** [4] - 9:9, 110:21, 184:9, 184:12
**JUSTICE** [2] - 2:2, 188:21
**JUSTIFIED** [1] - 188:17
**JUVENILE** [1] - 4:19

## K

**KAPPA** [1] - 119:10
**KAREN** [3] - 65:14, 65:20, 183:9
**KEEP** [2] - 15:13, 114:3
**KENNER** [4] - 66:4, 182:19, 183:9
**KENNETH** [2] - 66:4,

182:19
**KEPT** [1] - 14:10
**KEY** [2] - 94:8
**KID** [2] - 34:23, 144:16
**KIDS** [1] - 44:12
**KILL** [4] - 90:11, 92:22, 146:9, 174:5
**KILLED** [1] - 173:25
**KILLING** [4] - 93:5, 183:8, 192:13, 193:5
**KIND** [32] - 7:13, 9:3, 9:12, 11:20, 14:7, 22:12, 27:9, 36:5, 45:5, 63:7, 70:16, 70:17, 75:4, 94:24, 94:25, 105:21, 136:1, 136:9, 137:21, 144:8, 144:20, 151:7, 155:11, 159:24, 160:5, 167:24, 182:4, 184:22, 192:2, 192:5, 193:22
**KINDS** [7] - 10:21, 74:18, 80:25, 140:2, 142:9, 153:15, 157:24
**KIRBY** [1] - 35:21
**KNEE** [2] - 159:22, 160:7
**KNEE-JERK** [2] - 159:22, 160:7
**KNOWING** [3] - 74:9, 172:3, 174:21
**KNOWLEDGE** [4] - 76:12, 89:13, 147:8, 181:22
**KNOWN** [2] - 173:10, 187:17
**KNOWS** [3] - 80:17, 90:1, 196:1

## L

**LAB** [1] - 113:7
**LABEL** [1] - 171:5
**LABILE** [1] - 160:16
**LABILITY** [1] - 161:15
**LACK** [1] - 144:13
**LAKE** [3] - 37:2, 38:16, 39:14
**LANGUAGE** [1] - 112:18
**LARGE** [1] - 62:10
**LARGELY** [1] - 178:12
**LARGER** [3] - 100:16, 100:21, 100:24
**LARGEST** [1] - 122:12
**LARRY** [2] - 44:17, 67:15

**LAST** [11] - 113:10, 117:18, 120:22, 123:5, 123:11, 152:23, 166:6, 166:9, 167:18, 187:10, 194:25
**LASTED** [1] - 24:8
**LAUNDRY** [1] - 153:1
**LAW** [5] - 17:4, 124:21, 188:22, 193:23
**LAY** [1] - 132:13
**LAYERS** [1] - 98:11
**LEAD** [3] - 87:15, 87:22, 94:21
**LEADING** [1] - 171:8
**LEAGUE** [1] - 74:18
**LEARN** [3] - 75:10, 143:23, 165:6
**LEARNED** [2] - 52:22, 68:19
**LEARNING** [1] - 34:25
**LEAST** [12] - 6:14, 49:23, 59:4, 90:14, 92:1, 92:16, 159:12, 162:5, 170:17, 174:17, 178:16, 182:6
**LEAVE** [1] - 165:6
**LEE'S** [1] - 35:15
**LEFT** [7] - 29:22, 65:7, 72:10, 86:4, 99:17, 119:19, 170:11
**LEGAL** [4] - 120:5, 135:9, 135:16, 188:5
**LEGITIMATE** [1] - 66:15
**LENGTHY** [3] - 21:13, 174:4, 174:7
**LESS** [5] - 81:4, 121:16, 123:25, 150:11, 151:6
**LESSEN** [2] - 157:22, 157:24
**LETTER** [3] - 146:20, 147:5, 147:12
**LEVEL** [4] - 8:17, 122:3, 125:4, 158:20
**LEWISBURG** [1] - 131:5
**LICENSED** [2] - 124:2, 124:3
**LICENSING** [1] - 8:10
**LIE** [2] - 27:21, 65:21
**LIES** [1] - 66:13
**LIFE** [29] - 7:9, 8:6, 11:21, 12:23, 20:15, 25:12, 26:21, 26:22, 33:23, 35:19, 35:20, 37:3, 61:21, 64:19,

64:20, 64:24, 65:2, 66:8, 68:23, 89:21, 93:17, 93:25, 124:16, 140:6, 144:1, 148:4, 154:7, 161:10, 169:11
**LIFE-THREATENING** [1] - 154:7
**LIFESTYLE** [2] - 23:22, 47:19
**LIGHT** [4] - 36:12, 68:18, 69:11, 69:14
**LIGHTS** [1] - 92:13
**LIKELY** [6] - 12:20, 42:3, 137:10, 142:6, 163:16, 167:2
**LIMBIC** [2] - 85:20, 86:17
**LIMINE** [2] - 195:17, 195:20
**LIMITED** [1] - 190:12
**LIMITING** [1] - 190:5
**LINE** [12] - 19:13, 78:11, 78:12, 78:15, 78:18, 96:16, 96:19, 97:12, 97:15, 103:10, 160:20, 172:18
**LINED** [1] - 116:21
**LINES** [1] - 98:5
**LISA** [4] - 75:22, 76:20, 79:25, 81:2
**LISAK'S** [1] - 130:17
**LIST** [18] - 14:20, 22:18, 22:20, 22:21, 73:8, 73:11, 73:12, 73:23, 73:24, 73:25, 74:1, 74:3, 74:5, 74:21, 75:4, 153:1, 190:22, 190:25
**LISTED** [4] - 21:21, 124:10, 149:13, 152:23
**LISTEN** [1] - 66:7
**LISTENED** [1] - 66:8
**LISTENING** [1] - 176:14
**LISTS** [2] - 42:11, 148:22
**LITERATURE** [1] - 165:3
**LITIGATION** [1] - 24:8
**LIVE** [2] - 34:15, 162:5
**LIVED** [1] - 93:17
**LIVES** [6] - 6:8, 7:7, 26:14, 26:24, 33:15, 143:9
**LIVING** [3] - 42:8, 43:5, 192:13
**LOAD** [2] - 142:15,

142:21

**LOBE** [6] - 89:24, 93:13, 97:12, 97:13, 97:17, 102:16

**LOBSTER** [1] - 35:8

**LOCAL** [2] - 124:19, 125:4

**LOCATE** [1] - 15:10

**LOCKED** [1] - 27:18

**LOGIC** [2] - 187:23, 194:20

**LOMPOC** [1] - 95:8

**LONG-TERM** [1] - 158:6

**LOOK** [29] - 6:5, 7:20, 9:4, 9:8, 9:12, 9:16, 9:17, 10:10, 10:16, 37:18, 39:8, 40:13, 46:3, 46:9, 64:12, 70:13, 72:23, 82:19, 82:22, 86:3, 112:22, 186:4, 188:14, 188:15, 188:22, 188:25, 190:23

**LOOKED** [6] - 6:4, 78:14, 81:2, 85:4, 158:15, 158:17

**LOOKING** [12] - 23:25, 24:15, 77:6, 82:4, 82:6, 86:9, 89:13, 143:12, 144:19, 155:12, 169:13, 178:3

**LOOKS** [1] - 136:13

**LOSE** [1] - 93:24

**LOSING** [1] - 179:18

**LOSS** [3] - 89:6, 89:7, 98:7

**LOST** [2] - 38:11, 188:3

**LOUDER** [3] - 88:7, 88:12, 88:14

**LOUISE** [4] - 3:13, 4:6, 167:10, 197:3

**LOVE** [7] - 25:15, 25:16, 25:17, 28:1, 70:1, 70:2, 144:19

**LOVED** [2] - 27:22, 27:23

**LOW** [1] - 101:3

**LOWER** [1] - 122:3

**LOWER-LEVEL** [1] - 122:3

**LUCK** [12] - 3:8, 3:13, 4:6, 16:24, 69:23, 69:25, 167:10, 181:21, 183:6, 183:16, 197:3

**LUNCH** [2] - 84:23, 114:13

**LUNCHEON** [1] - 116:8

**LYING** [2] - 19:11, 69:13

## M

**M-FAST** [1] - 132:20

**MA'AM** [6] - 5:18, 8:11, 14:24, 17:21, 31:1, 37:20

**MAGNAVOX** [1] - 35:15

**MAGNITUDE** [1] - 194:18

**MAIL** [5] - 84:14, 84:17, 84:19, 84:20, 84:23

**MAIN** [1] - 45:14

**MAINTAIN** [2] - 36:2, 57:15

**MAINTAINED** [2] - 120:18, 120:21

**MAJOR** [6] - 80:19, 144:20, 145:3, 162:20, 178:7

**MAJORITY** [7] - 5:20, 5:21, 31:12, 61:9, 63:23, 64:3, 64:5

**MAKEUP** [1] - 47:14

**MALE** [1] - 100:5

**MALFORMATION** [1] - 82:2

**MALINGERING** [21] - 132:21, 132:25, 133:3, 135:4, 135:13, 168:4, 168:6, 168:16, 168:18, 168:21, 170:3, 171:23, 173:12, 173:14, 177:6, 177:9, 177:10, 177:14, 177:17, 178:4, 178:14

**MAN** [14] - 27:14, 27:16, 34:19, 38:15, 38:24, 39:14, 39:15, 39:18, 40:17, 44:6, 108:12, 146:8, 182:4

**MANDATE** [1] - 6:15

**MANIFESTATION** [1] - 89:8

**MANIFESTATIONS** [1] - 157:12

**MANIFESTED** [1] - 88:3

**MANIPULATED** [1] - 145:15

**MANNER** [2] - 8:2, 168:19

**MANUAL** [2] - 133:18, 151:5

**MARINES** [1] - 111:23

**MARIST** [1] - 4:10

**MARITAL** [1] - 145:4

**MARK** [2] - 195:18, 195:20

**MARKED** [8] - 49:14, 76:4, 98:24, 101:23, 114:19, 118:16, 148:19, 159:2

**MARKET** [1] - 1:21

**MARRIAGE** [4] - 46:18, 46:21, 147:22

**MARRIAGES** [1] - 46:16

**MARRIED** [6] - 12:1, 46:13, 46:15, 145:3, 147:20, 179:9

**MARTELL** [5] - 112:1, 130:5, 137:15, 138:2, 162:14

**MARTELL'S** [1] - 112:5

**MARTI** [13] - 90:11, 91:9, 91:13, 91:17, 91:21, 92:2, 92:22, 93:5, 138:10, 165:13, 173:25, 174:5, 174:17

**MARTI'S** [1] - 90:16

**MARTIN** [11] - 50:15, 50:18, 51:24, 52:10, 53:25, 55:6, 57:21, 60:14, 61:24, 67:23, 70:7

**MARYLAND** [19] - 119:15, 119:17, 120:9, 120:10, 121:5, 121:10, 121:14, 122:3, 122:12, 122:15, 124:3, 124:19, 125:8, 125:14, 126:9, 126:11, 126:19, 126:23, 127:21

**MASTER** [3] - 4:10, 66:18, 183:25

**MASTER'S** [1] - 8:17

**MASTURBATING** [1] - 39:12

**MATERIAL** [2] - 24:11, 183:12

**MATERIALLY** [1] - 148:4

**MATERIALS** [3] - 136:20, 136:24, 137:12

**MATERNAL** [3] - 32:19, 175:18, 175:24

**MATRIARCHAL** [1] - 47:15

**MATTER** [4] - 98:14, 135:9, 185:19, 198:7

**MATTERS** [1] - 178:9

**MATTHEWS** [3] - 130:8, 137:15, 138:2

**MATURATION** [1] - 165:7

**MAXIMUM** [4] - 120:9, 120:11, 121:17, 123:3

**MAYBERG** [6] - 76:7, 78:4, 79:7, 80:1, 80:7, 80:15

**MAYBERG'S** [6] - 77:2, 77:3, 77:11, 77:12, 77:17, 77:19

**MCCLOSKEY** [5] - 110:4, 110:5, 190:14, 192:1, 194:19

**MCDONALD'S** [2] - 34:1, 35:4

**MCHUGH** [1] - 2:12

**MEALS** [1] - 27:19

**MEAN** [32] - 9:16, 11:10, 11:14, 16:19, 19:18, 24:8, 26:19, 31:22, 33:4, 34:20, 34:24, 57:13, 68:2, 78:8, 81:1, 86:19, 88:9, 89:10, 98:6, 98:18, 113:2, 113:22, 134:5, 140:16, 143:23, 159:16, 162:1, 163:21, 166:19, 177:13, 187:9

**MEANING** [1] - 120:2

**MEANS** [2] - 49:9, 80:24

**MEANT** [2] - 93:12

**MEASURE** [4] - 62:10, 112:22, 113:6, 113:7

**MEASURES** [2] - 132:17, 132:19

**MEASURING** [1] - 104:13

**MECHANISM** [1] - 164:16

**MECHANISMS** [1] - 142:24

**MEDIATE** [1] - 157:21

**MEDICAL** [17] - 13:17, 13:19, 20:3, 40:8, 40:19, 41:13, 41:14, 44:2, 119:12, 129:15, 132:11, 135:20, 138:11, 153:4, 155:20, 156:1, 163:3

**MEDICAL/LEGAL** [1] - 135:16

**MEDICALLY** [1] - 13:22

**MEDICATE** [1] - 143:1

**MEDICATION** [28] - 72:25, 73:9, 74:10, 74:13, 75:3, 75:4, 75:7, 75:10, 78:25, 79:1, 80:16, 80:22, 81:6, 149:15, 150:1, 150:16, 150:18, 150:21, 151:12, 152:4, 152:19, 152:23, 179:8, 179:25, 180:6

**MEDICATIONS** [21] - 72:22, 73:23, 74:2, 75:11, 75:14, 75:17, 75:18, 78:20, 148:13, 148:22, 149:2, 149:18, 150:2, 150:19, 150:24, 151:20, 152:10, 153:2, 153:15, 153:17, 153:22

**MEDICINAL** [1] - 141:12

**MEDICINE** [6] - 76:11, 119:11, 119:18, 124:3, 125:8, 179:4

**MEET** [4] - 51:13, 131:6, 156:21, 176:6

**MEETING** [1] - 147:3

**MELLARIL** [3] - 150:22, 150:23, 179:8

**MEMBER** [4] - 119:10, 124:14, 124:20, 124:23

**MEMBERS** [6] - 32:12, 34:8, 47:6, 51:6, 135:23, 145:13

**MEMO** [4] - 56:17, 56:18, 56:23, 57:12

**MEMORABLE** [1] - 11:20

**MEMORANDUM** [4] - 21:24, 41:20, 56:20, 56:22

**MEMORIAL** [2] - 43:8, 43:21

**MEMORIES** [6] - 11:17, 11:23, 11:24,

19:8, 47:3
**MEMORY** [6] - 11:7, 11:10, 12:11, 12:18, 49:12
**MEN** [4] - 67:3, 120:12, 143:15, 164:17
**MENTAL** [15] - 32:25, 33:5, 122:17, 123:7, 133:18, 135:19, 135:21, 136:12, 142:14, 145:25, 146:11, 147:18, 153:6, 161:25, 176:22
**MENTALLY** [1] - 120:20
**MENTION** [4] - 44:3, 78:20, 86:15, 132:15
**MENTIONED** [6] - 33:6, 38:13, 79:14, 98:8, 110:14, 144:3
**MERIT** [1] - 189:24
**MET** [3] - 46:16, 131:7, 134:13
**METABOLISM** [4] - 74:15, 75:8, 85:19, 85:20
**METHOD** [1] - 111:15
**METHODOLOGY** [2] - 87:1, 108:13
**METHODS** [4] - 43:23, 103:17, 110:8, 111:8
**MEXICO** [1] - 191:5
**MIC** [2] - 54:6, 181:3
**MICHAEL** [2] - 102:4, 110:1
**MICROPHONE** [1] - 39:4
**MIDDLE** [8] - 1:2, 1:16, 2:6, 98:9, 191:17, 191:19, 193:6, 193:12
**MIGHT** [18] - 13:6, 63:2, 67:6, 68:6, 69:15, 70:17, 72:11, 72:14, 103:22, 127:11, 157:21, 157:25, 159:21, 175:10, 179:20, 181:18, 189:5
**MILD** [4] - 133:15, 134:9, 162:9, 162:22
**MILES** [1] - 94:12
**MILLER** [17] - 20:6, 20:8, 20:9, 20:22, 22:24, 23:16, 23:25, 28:5, 41:20, 42:11, 55:1, 55:10, 56:9, 59:7, 62:17, 167:7

**MILLER'S** [10] - 21:14, 33:21, 41:19, 55:13, 56:14, 57:7, 57:9, 58:16, 59:17, 60:18
**MILLIGRAMS** [1] - 179:11
**MILLION** [1] - 94:3
**MIND** [3] - 89:23, 114:3, 171:15
**MINE** [2] - 25:10, 82:16
**MINI** [1] - 191:2
**MINISTER** [1] - 48:5
**MINISTERS** [1] - 48:4
**MINITRIAL** [1] - 190:21
**MINOR** [3] - 149:14, 152:3, 155:11
**MINUS** [1] - 104:9
**MINUTE** [8] - 12:9, 27:25, 55:19, 56:2, 73:20, 79:17, 95:22, 141:1
**MINUTES** [9] - 9:5, 59:14, 131:8, 131:25, 153:24, 167:20, 168:6, 168:7, 168:10
**MISCARRIAGE** [1] - 148:2
**MISCONDUCT** [1] - 62:23
**MISLEADING** [2] - 184:9, 184:11
**MISS** [8] - 41:20, 42:11, 55:13, 62:17, 77:19, 78:7, 78:23, 107:11
**MISSED** [3] - 151:16, 173:14, 181:8
**MISTAKES** [2] - 173:15, 173:16
**MISUSED** [1] - 145:15
**MITIGATES** [1] - 190:3
**MITIGATING** [6] - 6:18, 18:21, 190:1, 193:25, 195:3, 195:12
**MITIGATION** [16] - 5:16, 5:19, 6:1, 8:10, 17:17, 17:19, 18:15, 18:16, 20:9, 22:25, 23:23, 127:6, 127:7, 127:15, 127:25, 135:24
**MOBAN** [2] - 149:24, 150:5
**MODELS** [1] - 33:22
**MODERATE** [1] - 87:7
**MODIFIER** [1] -

134:21
**MODIFYING** [2] - 158:2
**MOLEST** [2] - 30:20, 40:17
**MOLESTATION** [1] - 44:3
**MOLESTED** [1] - 58:8
**MOLESTING** [1] - 139:20
**MOM** [3] - 25:15, 36:14, 60:24
**MOMENT** [4] - 118:11, 161:3, 165:16, 177:21
**MOMENTS** [3] - 11:21, 133:5, 158:8
**MONDAY** [2] - 117:3, 186:14
**MONEY** [13] - 34:22, 37:4, 37:6, 37:7, 57:25, 58:2, 58:4, 67:3, 67:13, 68:15, 93:24, 182:5
**MONTGOMERY** [16] - 75:22, 76:20, 77:20, 78:7, 79:25, 80:21, 83:25, 104:20, 105:6, 107:4, 107:20, 109:2, 109:14, 109:17, 110:7
**MONTGOMERY'S** [4] - 77:16, 78:23, 81:2, 107:11
**MONTH** [2] - 90:16, 155:16
**MONTHS** [5] - 102:8, 120:22, 123:5, 147:20, 169:21
**MOOD** [9] - 143:21, 149:11, 152:17, 152:19, 153:9, 153:21, 158:23, 160:20, 161:14
**MOODINESS** [1] - 160:16
**MOODY** [2] - 163:13, 166:22
**MOOT** [1] - 185:21
**MORENO** [52] - 2:12, 3:8, 16:23, 19:12, 19:16, 27:11, 48:11, 54:3, 54:7, 55:8, 55:15, 65:15, 65:22, 66:10, 66:16, 67:22, 69:4, 69:20, 69:22, 69:24, 71:21, 115:10, 116:14, 116:17, 116:19,

116:21, 117:9, 117:24, 118:3, 118:10, 118:14, 128:18, 129:1, 129:4, 129:8, 129:9, 148:15, 148:18, 165:16, 165:19, 172:1, 172:16, 177:1, 177:3, 177:20, 178:20, 180:17, 180:22, 185:17, 196:6, 197:5, 197:12
**MORNING** [7] - 3:5, 3:15, 3:19, 69:23, 69:24, 72:8, 72:9
**MOST** [27] - 8:16, 11:23, 12:9, 12:20, 15:2, 15:24, 18:24, 26:8, 42:3, 47:5, 49:21, 61:20, 82:20, 93:7, 93:8, 95:5, 109:21, 113:1, 116:23, 123:1, 132:16, 161:9, 162:7, 164:5, 170:22, 189:16
**MOSTLY** [2] - 40:22, 85:18
**MOTHBALLED** [1] - 106:4
**MOTHER** [21] - 27:20, 27:22, 34:12, 47:4, 48:7, 48:14, 53:13, 55:6, 57:20, 57:21, 60:11, 60:20, 139:10, 139:17, 139:22, 140:9, 140:14, 140:18, 141:19, 146:21
**MOTHER'S** [1] - 142:4
**MOTION** [11] - 185:11, 185:22, 186:6, 186:11, 186:22, 190:8, 190:9, 195:15, 195:17, 195:20, 195:22
**MOTIVATED** [1] - 187:15
**MOTIVATION** [1] - 93:15
**MOTIVATIONS** [1] - 187:18
**MOVE** [15] - 19:20, 19:22, 42:17, 91:9, 110:24, 114:16, 114:22, 114:23, 115:6, 115:8, 117:2, 128:18, 129:2, 178:21

**MOVED** [1] - 181:7
**MOVES** [1] - 64:12
**MOVIES** [3] - 37:5, 37:9, 37:11
**MOVING** [1] - 115:15
**MRI** [20] - 85:13, 86:24, 87:1, 87:15, 96:11, 98:25, 99:10, 99:11, 99:15, 99:17, 100:1, 104:2, 107:3, 107:22, 111:16, 111:19, 111:20, 114:24, 115:18
**MULTI** [1] - 142:1
**MULTI-GENERATIONAL** [1] - 142:1
**MULTIPLE** [18] - 23:11, 24:18, 24:25, 27:16, 69:3, 71:5, 71:9, 82:1, 87:18, 133:16, 162:10, 170:1, 171:21, 172:8, 173:1, 173:19, 178:5, 178:11
**MURDER** [15] - 60:2, 65:14, 65:20, 66:3, 89:17, 89:25, 90:16, 92:14, 93:9, 132:2, 138:7, 138:9, 138:18, 182:19, 190:18
**MURDERS** [5] - 187:3, 187:8, 187:11, 191:15, 192:4
**MUSEUM** [1] - 106:5
**MUST** [1] - 110:15
**MYRIAD** [2] - 6:6, 6:7

## N

**N.W** [1] - 2:4
**NAIL** [1] - 92:10
**NAME** [7] - 3:19, 4:6, 45:3, 105:10, 118:7, 118:8, 166:4
**NARROW** [1] - 93:17
**NASA** [2] - 111:5, 111:9
**NASAMS** [1] - 8:24
**NATION** [1] - 189:1
**NATIONAL** [1] - 124:21
**NATIONWIDE** [3] - 193:2, 193:5, 193:22
**NATURE** [8] - 10:3, 12:8, 34:2, 47:15, 90:24, 135:13, 154:8, 166:12

**NECESSARILY** [5] - 8:20, 25:2, 25:5, 30:23, 158:22
**NECESSARY** [3] - 57:24, 65:13, 171:17
**NEED** [14] - 8:13, 47:22, 55:17, 66:5, 74:19, 96:11, 114:22, 117:15, 117:19, 132:15, 164:19, 183:11, 183:17, 188:5
**NEEDED** [1] - 123:8
**NEEDS** [3] - 79:5, 84:25, 94:5
**NEGATIVE** [1] - 42:6
**NEGLECT** [4] - 139:3, 143:18, 144:5, 164:11
**NEIL** [5] - 118:3, 118:5, 118:8, 197:11
**NERVOUS** [2] - 146:6, 165:7
**NEUROCOGNITIVE** [6] - 111:21, 133:16, 134:9, 162:10, 162:20, 162:22
**NEUROLOGISTS** [1] - 163:2
**NEUROLOGY** [2] - 76:10, 123:18
**NEUROPSYCHIATRIST** [1] - 130:5
**NEUROPSYCHOLOGICAL** [2] - 102:6, 162:17
**NEUROPSYCHOLOGIST** [1] - 103:8
**NEUROTIC** [1] - 158:17
**NEVER** [13] - 19:5, 46:22, 61:17, 73:23, 88:15, 88:17, 94:13, 114:2, 127:12, 140:9, 158:2, 181:22, 183:6
**NEVERTHELESS** [1] - 106:13
**NEW** [9] - 23:2, 23:3, 23:5, 63:13, 63:24, 76:17, 121:13, 133:17, 191:5
**NEWBERG** [9] - 82:18, 82:19, 82:20, 83:15, 83:19, 84:6, 85:4, 85:18, 85:23
**NEWBERG'S** [5] - 82:23, 83:2, 84:9, 84:13, 86:12
**NEWS** [1] - 94:3

**NEWSPAPER** [10] - 115:5, 181:14, 182:3, 182:10, 183:17, 183:22, 184:3, 185:3, 185:10
**NEXT** [7] - 43:3, 43:21, 53:4, 116:15, 117:24, 118:1, 119:20
**NICE** [2] - 26:4, 27:25
**NIGHT** [2] - 92:5, 92:13
**NIGHTMARES** [1] - 154:15
**NINE** [4] - 106:1, 120:22, 168:1, 170:13
**NOBODY** [5] - 34:16, 64:14, 88:21, 108:9
**NOMENCLATURE** [1] - 133:14
**NOMINATED** [1] - 125:1
**NONCAPITAL** [3] - 126:13, 188:8, 188:12
**NONDEATH** [1] - 189:15
**NONE** [4] - 26:20, 80:20, 81:11, 82:4
**NONETHELESS** [1] - 70:1
**NONSTATUTORY** [1] - 182:1
**NORM** [2] - 81:10, 164:22
**NORMAL** [13] - 47:19, 81:3, 93:9, 96:18, 96:25, 98:5, 98:17, 98:19, 100:12, 101:2, 112:25, 143:19, 163:14
**NORMALLY** [4] - 82:5, 93:7, 93:8, 163:12
**NORMS** [1] - 111:9
**NORTHEAST** [1] - 5:13
**NORTHINGTON** [1] - 108:1
**NORTHINGTON'S** [1] - 108:23
**NOTATION** [2] - 40:19, 41:1
**NOTATIONS** [2] - 41:15, 147:15
**NOTE** [10] - 30:1, 30:2, 30:5, 37:23, 38:22, 38:25, 43:11, 75:25, 86:21, 142:13
**NOTES** [27] - 15:12,

15:18, 22:10, 28:22, 29:11, 29:20, 31:14, 41:22, 55:13, 56:14, 56:16, 56:23, 56:25, 57:7, 58:12, 58:13, 58:14, 58:16, 58:23, 59:6, 59:16, 59:17, 59:22, 60:18, 62:20, 179:6, 179:7
**NOTEWORTHY** [2] - 78:19, 78:22
**NOTHING** [12] - 26:22, 71:21, 74:19, 81:7, 95:17, 101:10, 101:14, 112:8, 113:23, 165:19, 180:17, 185:17
**NOTICE** [13] - 41:14, 41:17, 41:18, 142:17, 144:22, 187:5, 187:13, 192:4, 192:8, 192:16, 192:17, 192:19
**NOTICEABLE** [1] - 137:6
**NOTIFIED** [1] - 18:12
**NOTIFY** [3] - 17:15, 17:25, 18:9
**NOVEMBER** [2] - 41:25, 101:17
**NUMBER** [31] - 1:3, 14:8, 14:12, 14:16, 20:12, 22:4, 36:10, 43:1, 43:19, 105:16, 106:10, 107:7, 110:6, 115:12, 116:23, 124:5, 129:6, 141:2, 141:4, 149:1, 151:5, 155:15, 170:14, 170:15, 183:14, 186:23, 186:24, 187:1, 187:2, 195:3, 195:21
**NUMBERS** [2] - 86:5, 192:11
**NUMBING** [1] - 154:22
**NUMEROUS** [4] - 14:2, 34:21, 41:13
**NURSE** [1] - 28:7
**NURSING** [1] - 36:14

## O

**O'CLOCK** [1] - 3:12
**OAK** [1] - 51:20
**OATH** [4] - 16:3, 30:15, 30:17, 30:22
**OBJECT** [15] - 16:23,

19:12, 54:4, 54:8, 55:8, 65:15, 65:22, 66:10, 67:22, 69:4, 77:3, 108:11, 110:19, 172:1, 172:16
**OBJECTION** [16] - 19:22, 65:24, 66:15, 69:8, 77:23, 90:21, 91:4, 104:24, 108:15, 110:22, 115:9, 115:10, 115:20, 116:1, 172:5
**OBLIGATED** [1] - 17:4
**OBLIGATION** [3] - 6:15, 17:23, 19:17
**OBSERVABLE** [1] - 136:12
**OBSERVATIONS** [1] - 135:19
**OBSERVE** [1] - 137:17
**OBSTRUCTION** [2] - 42:21, 43:14
**OBTAIN** [8] - 13:18, 13:22, 14:3, 14:21, 27:17, 59:16, 73:11, 145:24
**OBTAINED** [4] - 14:18, 51:24, 73:13, 135:25
**OBTAINING** [1] - 146:16
**OBVIOUS** [2] - 78:16, 173:1
**OBVIOUSLY** [8] - 136:20, 140:14, 164:13, 182:5, 182:7, 185:7, 188:20, 195:7
**OCCASION** [8] - 11:13, 33:6, 33:7, 33:13, 37:9, 37:11, 47:8, 48:10
**OCCASIONALLY** [4] - 48:14, 48:18, 48:19, 48:22
**OCCASIONS** [3] - 12:20, 27:5, 61:17
**OCCIPITAL** [1] - 97:16
**OCCURRED** [4] - 91:1, 187:3, 187:7, 191:14
**OCCURS** [2] - 107:17, 154:23
**OCTOBER** [3] - 53:4, 131:8, 187:4
**ODD** [3] - 101:3, 169:9
**OFFENSE** [7] - 90:23, 91:1, 134:15,

155:21, 162:6, 175:12, 190:3
**OFFENSES** [1] - 123:1
**OFFER** [4] - 68:15, 90:22, 186:21, 194:8
**OFFERED** [2] - 181:9, 183:15
**OFFERING** [1] - 194:16
**OFFICE** [9] - 1:16, 5:23, 14:5, 15:20, 15:22, 58:15, 126:4, 126:13, 128:15
**OFFICER** [2] - 4:15, 4:18
**OFFICES** [1] - 127:1
**OFFICIAL** [3] - 1:20, 184:15, 198:11
**OFTEN** [5] - 6:22, 28:2, 36:23, 159:9, 160:21
**OFTENTIMES** [1] - 127:8
**OKLAHOMA** [8] - 35:12, 35:16, 45:11, 47:17, 49:1, 49:14, 129:19, 146:4
**OLD** [9] - 14:11, 34:13, 42:23, 67:16, 69:1, 100:5, 100:16, 147:16, 175:23
**OLDER** [15] - 32:22, 32:23, 35:2, 38:15, 39:14, 46:15, 52:15, 52:24, 53:9, 54:16, 54:17, 54:19, 146:8, 147:14, 164:25
**OLDEST** [1] - 46:24
**ONCE** [2] - 46:14, 114:1
**ONE** [90] - 4:15, 15:9, 18:20, 23:15, 25:13, 33:6, 33:13, 33:24, 34:17, 37:1, 38:1, 42:25, 43:3, 43:21, 43:23, 44:4, 50:14, 52:3, 53:4, 63:14, 66:8, 66:20, 69:15, 71:4, 80:25, 88:13, 89:22, 89:23, 90:15, 94:7, 103:25, 104:1, 104:5, 104:6, 104:17, 106:22, 107:12, 107:18, 110:1, 110:16, 114:23, 115:14, 117:5, 119:15, 121:5, 123:25, 132:15, 132:20, 132:22, 136:4,

136:13, 137:22, 139:18, 140:17, 141:16, 142:23, 143:4, 149:17, 150:23, 151:19, 151:24, 152:9, 154:12, 156:12, 159:21, 161:4, 161:7, 164:18, 166:6, 168:21, 168:24, 170:17, 173:11, 177:21, 178:21, 179:1, 181:6, 181:15, 185:18, 186:17, 187:1, 187:12, 187:24, 188:8, 190:23, 191:10, 193:6, 194:9, 195:7, 195:16

ONE-TIME [1] - 33:13

ONE-YEAR [1] - 119:15

ONES [4] - 14:14, 122:20, 129:18, 174:12

ONGOING [9] - 6:17, 40:21, 50:25, 140:6, 140:7, 143:21, 145:5, 164:14

OPEN [1] - 189:8

OPENED [1] - 117:5

OPENS [1] - 3:1

OPERATIONALLY [2] - 112:20, 113:5

OPERATOR [1] - 83:22

OPINION [20] - 19:6, 80:16, 81:15, 81:16, 90:22, 113:20, 134:14, 138:10, 144:11, 155:19, 155:25, 156:21, 165:15, 176:6, 194:7, 194:19, 194:21, 194:23

OPINIONS [3] - 132:10, 134:25, 172:5

OPPORTUNITY [11] - 92:21, 117:22, 129:15, 129:22, 130:3, 130:11, 130:16, 130:21, 131:10, 137:14, 158:3

OPPOSED [4] - 100:1, 104:5, 158:5, 160:6

OPTIONS [1] - 161:22

ORAL [1] - 38:16

ORCHESTRATED [2] - 91:8, 139:19

ORDER [8] - 91:20, 92:2, 92:14, 139:24, 145:24, 156:15, 164:19, 171:23

ORDERED [2] - 21:9, 122:1

ORDINARY [1] - 125:2

ORGANIZATION [4] - 8:17, 8:23, 124:22, 124:24

ORGANIZATIONS [1] - 124:15

ORIGINAL [4] - 58:17, 60:12, 105:25, 186:2

ORIGINATED [1] - 191:24

OTHERWISE [3] - 133:13, 134:8, 162:23

OUTBURSTS [2] - 151:9, 155:9

OUTDO [1] - 47:22

OUTER [1] - 98:11

OUTPATIENT [3] - 120:2, 146:3, 147:18

OUTSIDE [1] - 188:23

OUTWEIGHED [1] - 184:8

OVERALL [3] - 49:22, 140:10, 156:17

OVERDOSES [1] - 41:5

OVERRULE [7] - 65:23, 66:14, 69:7, 77:23, 91:4, 108:15, 172:4

OVERRULED [1] - 17:1

OVERSEEING [1] - 121:11

OVERTURNED [1] - 68:11

OVERWHELMED [2] - 161:17, 161:20

OVERWHELMING [1] - 143:5

OWN [9] - 36:11, 140:21, 141:9, 145:20, 145:22, 147:16, 162:15, 162:19

## P

P.M [1] - 196:7

PAGE [15] - 6:4, 6:6, 6:15, 7:2, 37:18, 37:20, 76:24, 78:6, 78:15, 78:18, 87:18, 94:23, 99:22, 170:13, 197:15

PAGES [5] - 46:9, 77:16, 124:10, 169:9, 169:10

PAID [2] - 8:25, 189:7

PAIN [4] - 42:5, 42:18, 43:5, 43:12

PAINFUL [1] - 61:8

PAINTED [1] - 32:15

PANEL [1] - 99:14

PAPER [1] - 67:2

PARAGRAPHS [2] - 46:6, 46:11

PARAMOUNT [1] - 175:6

PARANOIA [1] - 155:11

PARANOID [1] - 160:25

PARDON [1] - 15:21

PARENT [6] - 25:15, 60:16, 70:1, 70:2, 70:17, 146:14

PARENTS [24] - 26:9, 28:1, 34:24, 36:20, 39:17, 47:15, 48:1, 48:24, 54:11, 58:2, 60:4, 60:20, 61:4, 62:2, 64:21, 64:25, 67:17, 67:25, 68:19, 143:24, 145:2, 146:17, 147:11, 164:21

PARIETAL [2] - 97:13, 104:16

PARITY [3] - 188:25, 189:1, 195:3

PARKING [1] - 94:10

PARKINSON'S [2] - 94:17, 94:18

PARKINSONIAN [1] - 93:16

PAROLE [1] - 4:15

PART [34] - 5:15, 7:2, 7:11, 9:11, 9:16, 10:20, 11:23, 13:21, 15:2, 15:24, 17:23, 21:20, 22:7, 23:13, 29:19, 36:4, 51:10, 51:16, 56:19, 69:10, 93:10, 94:5, 113:24, 121:2, 121:20, 135:17, 137:4, 137:12, 144:7, 162:13, 163:19, 167:6, 170:12, 175:17

PART-TIME [1] - 121:2

PARTIAL [1] - 178:16

PARTICIPATE [1] - 13:20

PARTICIPATING [1] - 174:17

PARTICIPATION [1] - 155:3

PARTICULAR [10] - 8:15, 13:6, 40:16, 49:25, 113:19, 127:20, 133:6, 165:2, 169:13, 175:12

PARTICULARLY [1] - 88:10

PARTIES [1] - 46:19

PARTNER [1] - 29:8

PARTS [3] - 78:2, 97:25, 115:1

PARTY [2] - 46:23, 184:14

PASSED [2] - 8:13, 33:9

PAST [5] - 31:5, 44:19, 128:16, 182:25, 183:15

PATIENT [3] - 43:9, 75:2, 147:2

PATIENTS [4] - 93:16, 120:2, 120:18, 120:19

PATRICIA [4] - 54:22, 56:8, 57:19, 58:5

PATTERN [1] - 159:8

PAUL [7] - 1:6, 24:24, 68:10, 169:5, 170:1, 173:21, 174:4

PAUSE [3] - 98:22, 101:21, 108:20

PCP [1] - 179:17

PEDOPHILE [1] - 29:9

PEDOPHILES [1] - 31:10

PEER [1] - 103:18

PEERS [1] - 125:1

PEN [1] - 112:1

PENALTY [25] - 9:10, 9:14, 20:13, 27:5, 32:5, 61:12, 105:14, 106:20, 129:25, 187:13, 189:6, 189:11, 189:15, 189:17, 189:20, 189:21, 190:11, 193:2, 193:20, 193:24, 194:24, 195:10, 195:12

PENCIL [2] - 29:16, 112:1

PENDING [1] - 128:19

PENITENTIARY [3] - 45:11, 131:5, 131:19

PENNSYLVANIA [12] - 1:2, 1:16, 2:6, 2:13, 124:4, 127:1, 131:5, 131:18, 191:17, 191:19, 193:6, 193:12

PEOPLE [47] - 5:23, 8:16, 8:17, 10:17, 11:11, 15:3, 16:2, 19:8, 20:14, 22:4, 22:18, 22:20, 28:2, 29:11, 33:9, 34:6, 44:13, 50:15, 63:7, 67:5, 67:10, 73:2, 81:11, 85:9, 93:7, 93:12, 94:24, 113:21, 135:19, 139:18, 152:21, 153:19, 157:4, 159:10, 160:18, 160:21, 163:12, 164:5, 165:5, 166:11, 166:19, 167:2, 167:7, 176:16, 176:18, 188:14, 193:20

PER [1] - 24:21

PERCEIVED [2] - 47:1, 87:14

PERCENT [3] - 80:24, 80:25, 124:1

PERCENTAGE [1] - 123:23

PERCEPTION [1] - 159:7

PERCEPTIONS [1] - 44:23

PERFORM [1] - 122:20

PERFORMED [2] - 85:8, 122:19

PERFORMING [1] - 121:7

PERHAPS [4] - 57:4, 87:13, 88:6, 127:10

PERIOD [12] - 34:12, 36:16, 36:18, 40:23, 47:17, 49:1, 63:15, 112:21, 139:12, 169:18, 169:23, 169:24

PERIODS [7] - 34:11, 36:24, 48:22, 49:3, 64:13, 160:18, 160:19

PERKINS [3] - 120:10, 120:11, 123:3

PERMISSIBLE [2] -

188:12, 188:13
**PERMITS** [1] - 190:20
**PERPETRATOR** [4] - 62:12, 63:15, 63:18, 64:4
**PERPETRATORS** [1] - 139:14
**PERSIST** [1] - 155:15
**PERSISTENT** [4] - 144:15, 154:22, 158:21, 158:23
**PERSON** [27] - 8:9, 9:4, 13:4, 13:6, 15:5, 15:9, 15:11, 18:8, 19:2, 23:2, 28:13, 33:11, 45:2, 54:1, 54:18, 64:6, 83:22, 93:6, 95:8, 136:6, 164:25, 167:12, 168:12, 168:14, 180:6, 188:13, 189:7
**PERSON'S** [1] - 10:10
**PERSONAL** [1] - 5:22
**PERSONALITIES** [4] - 23:11, 170:1, 171:3, 172:7
**PERSONALITY** [47] - 24:19, 25:1, 69:3, 133:11, 133:12, 134:4, 134:6, 138:13, 143:14, 143:20, 144:4, 151:3, 151:7, 151:8, 153:18, 158:9, 158:20, 158:25, 159:5, 160:10, 161:6, 161:11, 162:4, 162:8, 163:7, 163:14, 163:19, 164:6, 164:13, 166:7, 166:8, 166:18, 167:2, 170:23, 171:10, 171:22, 172:9, 173:1, 173:19, 176:17, 177:15, 177:17, 178:5, 178:8, 180:10
**PERSONALLY** [1] - 122:20
**PERSUADE** [3] - 9:9, 9:13, 173:4
**PERSUASIVE** [2] - 172:8, 190:16
**PERTAINED** [2] - 20:14, 27:9
**PET** [29] - 74:12, 75:12, 79:17, 79:19, 81:1, 81:2, 81:18, 81:19, 81:21, 82:20,

82:22, 83:3, 83:7, 83:17, 83:20, 85:4, 85:9, 85:13, 85:14, 86:9, 86:24, 87:1, 87:15, 106:15, 106:19, 107:22, 111:15, 111:18
**PH.D** [1] - 53:19
**PH.D.'S** [1] - 8:18
**PHASE** [7] - 20:13, 105:13, 105:14, 106:20, 106:21, 129:25
**PHENOMENA** [1] - 154:13
**PHI** [1] - 119:10
**PHILADELPHIA** [3] - 1:9, 1:21, 2:14
**PHONE** [6] - 15:5, 15:11, 74:9, 74:24, 83:19, 84:6
**PHOTOGRAPH** [1] - 114:22
**PHYSICAL** [16] - 9:22, 23:21, 53:8, 54:10, 54:15, 70:20, 70:23, 137:3, 139:2, 140:3, 140:5, 142:11, 143:10, 156:9, 157:19, 170:21
**PHYSICALLY** [5] - 27:15, 54:4, 70:11, 139:11, 139:16
**PHYSICIAN** [1] - 118:25
**PHYSIOLOGICAL** [2] - 137:25, 154:18
**PICTURE** [5] - 10:16, 13:7, 16:12, 99:10, 99:11
**PILL** [1] - 151:19
**PLACE** [11] - 98:8, 131:3, 131:4, 131:12, 131:13, 131:15, 131:17, 131:25, 134:3, 160:8, 169:23
**PLACES** [2] - 87:12, 154:25
**PLAGUE** [1] - 47:10
**PLAN** [8] - 87:22, 94:22, 95:12, 95:15, 113:21, 113:23, 113:25, 114:2
**PLANNED** [3] - 90:15, 91:16, 113:19
**PLANNING** [9] - 92:23, 93:14, 93:20, 113:13, 113:24, 160:2, 174:4, 174:8

**PLANS** [1] - 90:11
**PLAY** [1] - 26:1
**PLEA** [1] - 173:24
**PLED** [1] - 132:2
**PO** [2] - 1:17, 2:10
**POINT** [34] - 3:23, 4:16, 4:22, 13:25, 19:19, 23:2, 35:23, 42:8, 43:5, 55:20, 56:2, 60:19, 61:21, 85:1, 91:23, 93:3, 97:8, 99:18, 106:8, 120:24, 121:20, 125:18, 125:19, 129:18, 139:18, 140:21, 145:5, 146:5, 146:8, 163:25, 175:23, 176:3, 180:25
**POINTS** [1] - 161:10
**POLICE** [1] - 63:13
**POOL** [2] - 191:24, 192:1
**POOR** [3] - 153:20, 163:10, 163:13
**POPULATION** [1] - 167:4
**PORTRAYED** [1] - 25:11
**POSE** [1] - 90:4
**POSITION** [12] - 10:24, 37:2, 120:8, 121:2, 121:6, 121:18, 121:20, 121:23, 121:24, 123:4, 123:12, 194:8
**POSITIONS** [1] - 125:6
**POSITIVE** [5] - 16:10, 26:6, 26:10, 39:22, 68:7
**POSITIVELY** [1] - 158:2
**POSSESSIONS** [2] - 58:2, 58:3
**POSSIBLE** [6] - 6:18, 42:20, 82:13, 116:11, 153:9, 168:13
**POSSIBLY** [5] - 12:9, 12:20, 55:4, 168:4, 180:9
**POST** [20] - 132:24, 133:7, 133:9, 134:3, 134:11, 134:22, 137:23, 138:17, 139:1, 143:13, 153:17, 154:3, 155:18, 156:25, 157:17, 163:7,

171:9, 176:1, 176:7, 178:10
**POST-APPENDECTOMY** [1] - 178:10
**POST-TRAUMATIC** [19] - 132:24, 133:7, 133:9, 134:3, 134:11, 134:22, 137:23, 138:17, 139:1, 143:13, 153:17, 154:3, 155:18, 156:25, 157:17, 163:7, 171:9, 176:1, 176:7
**POTENTIAL** [4] - 44:3, 135:4, 142:15, 190:11
**POTENTIALLY** [3] - 132:23, 158:1, 159:13
**POVERTY** [2] - 10:3, 164:10
**POWELL** [1] - 109:5
**POWERFUL** [2] - 150:9, 150:18
**PRACTICE** [11] - 118:23, 118:24, 119:25, 120:5, 120:25, 121:19, 122:5, 123:13, 124:2, 124:3, 174:21
**PRATT** [2] - 119:14, 125:13
**PRECEDES** [1] - 52:4
**PRECEDING** [4] - 52:9, 60:12, 60:14, 61:14
**PRECISE** [1] - 151:6
**PREDATES** [1] - 60:2
**PREDICATE** [3] - 138:6, 138:22, 138:24
**PREDICTIVE** [1] - 113:1
**PREDISPOSING** [1] - 142:6
**PREDOMINANT** [1] - 47:21
**PREFER** [1] - 88:11
**PREJUDICE** [2] - 184:9, 187:16
**PREJUDICIAL** [1] - 184:12
**PREOCCUPIED** [1] - 166:21
**PREPARATION** [1] - 131:9
**PREPARE** [2] - 7:24, 22:23

**PREPARED** [6] - 20:22, 35:19, 36:12, 117:17, 117:24, 130:17
**PREPONDERANCE** [1] - 19:7
**PREROGATIVE** [2] - 187:14, 187:19
**PRESCRIBED** [6] - 78:8, 148:12, 148:23, 149:2, 153:7, 179:23
**PRESCRIPTION** [1] - 78:13
**PRESENT** [9] - 7:24, 18:21, 47:23, 135:5, 145:24, 158:3, 159:3, 159:15, 179:18
**PRESENTATION** [1] - 179:23
**PRESENTATIONS** [2] - 124:8, 124:13
**PRESENTED** [3] - 42:5, 108:5, 193:25
**PRESENTENCE** [1] - 122:2
**PRESENTING** [1] - 179:10
**PRESSURE** [1] - 160:3
**PRESUMABLY** [1] - 78:24
**PRESUMING** [1] - 100:1
**PRESUMPTION** [1] - 183:20
**PRETEEN** [1] - 47:19
**PRETENSES** [1] - 182:5
**PRETRIAL** [3] - 105:16, 121:7, 122:13
**PRETTY** [9] - 72:17, 110:17, 144:25, 145:21, 150:18, 168:19, 173:1, 174:24, 180:11
**PREVIOUS** [2] - 61:1, 168:21
**PREVIOUSLY** [4] - 3:13, 23:15, 59:16, 172:7
**PRIMARILY** [2] - 20:20, 150:8
**PRIMARY** [5] - 24:3, 47:3, 47:4, 135:14, 139:11
**PRINCIPALLY** [1] - 5:12

PRINT [1] - 162:3
PRISON [19] - 13:25,
44:25, 65:5, 67:7,
67:10, 95:7, 120:20,
120:21, 148:10,
166:23, 167:1,
167:3, 167:4, 187:3,
187:8, 187:11,
190:18, 191:15,
192:4
PRISONS [4] - 129:20,
173:21, 191:22,
192:1
PRIVATE [7] - 118:23,
119:25, 120:4,
120:25, 121:19,
122:5, 123:13
PROBABLE [1] -
171:25
PROBATION [1] - 4:18
PROBATIVE [1] -
184:7
PROBLEM [2] - 57:23,
188:7
PROBLEMATIC [1] -
143:25
PROBLEMS [16] -
35:25, 38:3, 41:9,
42:15, 53:1, 87:16,
143:3, 147:4, 148:2,
153:6, 153:8,
153:10, 163:16,
164:14, 190:24
PROCEDURE [1] -
75:1
PROCEED [3] - 3:16,
56:6, 168:17
PROCEEDING [1] -
129:14
PROCEEDINGS [6] -
1:24, 129:11,
130:18, 131:9,
137:13, 198:6
PROCESS [1] - 194:4
PROCESSES [1] -
89:5
PROCESSING [1] -
102:19
PRODUCE [2] - 94:5,
106:6
PRODUCED [2] -
1:24, 75:14
PRODUCING [1] -
140:14
PRODUCT [3] - 65:6,
89:5, 113:13
PROFESSION [2] -
162:25, 163:3
PROFESSIONAL [2] -
19:6, 124:15

PROFESSIONALS [2]
- 122:17, 153:4
PROFESSOR [3] -
76:9, 76:10, 125:10
PROFFER [3] -
191:10, 191:14,
194:2
PROFOUND [1] -
88:11
PROFOUNDLY [1] -
89:4
PROGRAM [2] -
76:13, 125:12
PROGRESSION [1] -
63:14
PROLONGED [1] -
157:17
PROMOTES [1] -
12:11
PRONE [4] - 160:24,
161:16, 173:15,
173:16
PRONOUNCED [1] -
163:17
PROOF [1] - 186:21
PROSECUTE [1] -
193:15
PROSECUTION [9] -
105:24, 126:15,
126:20, 126:22,
127:5, 127:9, 128:4,
128:12, 171:17
PROSECUTORS [2] -
193:14, 193:15
PROSECUTORS' [1] -
127:1
PROTECTING [1] -
139:17
PROTECTIVE [1] -
50:3
PROTOCOL [1] -
193:3
PROVE [2] - 193:9,
193:10
PROVEN [3] - 174:3,
174:4, 183:16
PROVERB [1] - 88:11
PROVES [1] - 35:23
PROVIDE [6] - 5:11,
17:5, 17:15, 57:5,
58:6, 127:13
PROVIDED [7] -
58:15, 73:16, 73:21,
77:7, 105:21,
136:16, 174:7
PROVIDING [3] - 97:6,
112:20, 122:2
PROXIMITY [1] -
47:10
PROZAC [1] - 152:15

PSEUDOCYESIS [1] -
105:11
PSYCH [1] - 44:24
PSYCHE [1] - 171:1
PSYCHIATRIC [22] -
15:1, 32:20, 37:13,
45:24, 51:21,
119:13, 120:5,
124:17, 124:19,
124:20, 125:17,
129:16, 131:1,
132:10, 135:2,
135:9, 135:16,
143:8, 148:10,
155:20, 162:25
PSYCHIATRIST [4] -
52:11, 119:3, 130:9,
173:10
PSYCHIATRISTS [4] -
123:23, 123:24,
124:22, 125:11
PSYCHIATRY [27] -
76:9, 118:25, 119:1,
119:14, 119:17,
119:22, 120:1,
121:1, 123:14,
123:16, 123:17,
123:18, 123:20,
123:21, 123:25,
124:6, 124:8,
124:21, 125:10,
125:15, 125:22,
126:2, 128:21
PSYCHOACTIVE [1] -
75:14
PSYCHOLOGICAL [4]
- 132:17, 132:19,
137:24, 154:18
PSYCHOLOGICALL
Y [1] - 6:23
PSYCHOLOGIST [3] -
45:5, 53:19, 130:5
PSYCHOLOGISTS [3]
- 8:18, 113:7, 122:17
PSYCHOLOGY [6] -
4:9, 4:10, 112:17,
113:3, 119:8, 119:9
PSYCHOPATHOLOG
Y [2] - 132:21, 142:5
PSYCHOSIS [4] -
142:8, 180:2,
180:12, 180:13
PSYCHOTHERAPY
[1] - 158:7
PSYCHOTIC [11] -
74:14, 149:18,
149:20, 150:17,
153:9, 153:16,
158:16, 158:21,
179:21, 179:24,

180:7
PTSD [7] - 134:12,
144:3, 153:25,
154:1, 155:22,
157:4, 157:12
PUBLIC [2] - 2:6, 14:5
PUBLICATIONS [3] -
124:5, 124:7, 124:12
PUBLICITY [1] -
193:22
PUFFY [1] - 97:25
PULL [1] - 97:3
PULLING [2] - 33:7,
94:10
PUNCHED [4] - 38:24,
39:16, 44:6
PUNCHING [1] - 39:20
PUNISH [1] - 141:15
PUNISHED [1] - 195:6
PUPPY [1] - 140:19
PURPOSES [4] -
117:13, 130:22,
141:12, 185:2
PUSH [1] - 112:23
PUT [16] - 16:3, 21:21,
22:11, 22:20, 23:2,
30:8, 34:24, 67:2,
68:22, 93:4, 95:2,
95:5, 103:25,
162:19, 170:8,
195:25

**Q**

QUALIFICATIONS [1]
- 128:19
QUALIFIED [2] -
125:20, 128:25
QUALIFY [2] - 108:10,
125:25
QUANTITATIVE [2] -
85:8, 86:9
QUARTER [2] -
114:13, 116:6
QUERY [1] - 178:7
QUESTIONED [2] -
70:5, 104:19
QUESTIONING [7] -
19:13, 66:11,
102:23, 108:16,
172:19, 182:3,
182:18
QUESTIONS [24] -
3:21, 69:18, 71:22,
79:8, 88:18, 88:22,
101:18, 103:5,
103:7, 103:10,
110:16, 112:11,
114:6, 128:19,
134:25, 136:6,

166:5, 168:12,
172:17, 176:24,
177:20, 179:12,
180:16
QUICK [1] - 168:19
QUICKLY [2] - 168:8,
170:6
QUIT [1] - 49:7
QUITE [9] - 5:6, 13:21,
21:4, 21:13, 34:8,
50:8, 153:1, 156:11,
181:8
QUIXOTE [1] - 35:10
QUOTE [2] - 82:24,
141:5
QUOTED [1] - 84:14
QUOTES [1] - 191:14
QUOTING [1] - 6:6

**R**

RACIAL [1] - 187:16
RADIOLOGIST [1] -
81:22
RADIOLOGISTS [1] -
82:3
RAGLAND [1] -
103:13
RAISE [4] - 3:25,
109:16, 168:15,
193:4
RAISED [3] - 61:18,
65:6, 107:6
RAMIFICATIONS [1] -
160:4
RANGE [2] - 49:22,
155:4
RAPE [4] - 18:7,
18:10, 18:11, 62:11
RAPED [1] - 18:6
RATHER [3] - 55:11,
137:6, 137:8
RATIONAL [1] -
161:22
RAZOR [1] - 146:10
RE [3] - 154:13, 157:6,
157:7
RE-EXPERIENCING
[2] - 154:13, 157:7
RE-EXPOSED [1] -
157:6
REACH [2] - 156:15,
158:20
REACHED [4] - 132:9,
132:14, 133:8,
138:23
REACTION [6] -
39:17, 137:10,
137:22, 156:14,
159:22, 160:7

**REACTIVITY** [1] - 137:25
**READ** [30] - 25:19, 37:10, 39:10, 39:13, 46:11, 46:12, 49:16, 57:4, 57:9, 57:16, 59:10, 59:18, 66:18, 78:2, 79:21, 82:6, 82:9, 82:23, 83:5, 85:21, 96:11, 96:15, 96:23, 106:5, 115:2, 141:11, 169:7, 183:7, 194:19, 194:24
**READER** [1] - 83:17
**READING** [13] - 39:25, 40:1, 79:21, 81:22, 81:25, 82:23, 83:3, 83:6, 83:10, 86:23, 103:7, 194:1, 194:21
**READS** [3] - 54:15, 81:19, 82:19
**READY** [1] - 61:7
**REAL** [1] - 159:6
**REALITY** [1] - 179:19
**REALIZE** [3] - 84:17, 84:21, 164:17
**REALLY** [20] - 16:11, 29:19, 31:5, 34:10, 34:16, 40:21, 44:22, 64:16, 70:1, 80:19, 82:7, 86:23, 91:20, 93:2, 101:10, 127:18, 127:22, 140:2, 167:24, 175:16
**REARED** [1] - 53:12
**REASON** [6] - 31:14, 100:11, 120:16, 121:13, 183:14, 187:15
**REASONABLE** [5] - 132:10, 138:11, 155:19, 155:25, 161:22
**REASONS** [5] - 69:15, 162:24, 165:14, 180:1, 195:14
**RECALLED** [3] - 58:1, 197:3, 197:7
**RECALLING** [1] - 3:8
**RECEIVE** [2] - 14:9, 14:13
**RECEIVED** [10] - 115:11, 115:19, 119:8, 119:12, 123:19, 123:21, 167:7, 178:23, 179:8, 179:11
**RECENT** [5] - 49:21,

68:3, 68:5, 132:16, 148:2
**RECENTLY** [3] - 109:13, 133:21, 146:7
**RECESS** [8] - 55:20, 56:2, 95:21, 95:23, 114:15, 180:24, 181:2, 181:5
**RECOGNITION** [1] - 113:25
**RECOGNIZE** [1] - 148:20
**RECOGNIZED** [3] - 158:12, 158:18, 173:9
**RECOLLECT** [2] - 27:4, 75:17
**RECOLLECTION** [11] - 5:1, 91:22, 101:16, 141:5, 145:23, 169:8, 177:11, 181:20, 181:23, 186:7, 189:2
**RECOLLECTIONS** [3] - 154:15, 155:1, 157:8
**RECOMMENDATION** [1] - 146:16
**RECONSIDERATION** [1] - 185:12
**RECORD** [36] - 13:7, 14:4, 14:6, 15:5, 37:13, 39:7, 39:20, 40:16, 46:7, 51:17, 51:19, 52:6, 54:9, 54:12, 59:23, 60:2, 78:2, 110:20, 115:2, 118:7, 146:4, 147:15, 147:19, 148:1, 151:1, 154:3, 183:10, 184:20, 184:21, 184:22, 190:2, 194:12, 195:15, 195:22, 196:1, 198:6
**RECORDED** [2] - 1:24, 29:20
**RECORDER** [1] - 15:7
**RECORDS** [56] - 7:24, 10:21, 13:1, 13:10, 13:15, 13:17, 13:19, 13:20, 13:22, 14:3, 14:8, 14:10, 14:12, 14:22, 14:23, 14:25, 15:1, 16:20, 19:7, 20:4, 27:16, 27:17, 37:12, 38:14, 40:2, 40:3, 40:9, 40:12, 40:18, 40:19, 40:20,

41:2, 43:8, 43:9, 43:11, 44:2, 49:13, 50:23, 51:20, 51:23, 70:6, 129:16, 135:20, 135:21, 144:12, 144:22, 145:18, 147:17, 148:8, 148:9, 148:10, 153:12, 184:15
**RECOVERED** [1] - 178:12
**RECROSS** [2] - 177:22, 197:2
**RECURRENT** [2] - 154:14, 160:10
**RED** [5] - 35:8, 64:15, 81:7, 97:12, 97:15
**REDIRECT** [8] - 69:19, 69:21, 95:18, 96:7, 96:8, 176:25, 177:2, 197:2
**REDUCED** [1] - 94:21
**REFER** [3] - 41:20, 83:11, 83:12
**REFERENCE** [2] - 134:1, 195:9
**REFERENCING** [1] - 89:17
**REFERRED** [2] - 121:9, 154:13
**REFERRING** [7] - 74:5, 96:17, 146:20, 147:6, 174:12, 181:16, 184:24
**REFLECT** [1] - 179:7
**REFRESH** [3] - 4:25, 49:12, 101:16
**REFUSED** [2] - 62:16, 125:25
**REGARD** [8] - 105:17, 106:15, 106:23, 107:6, 107:22, 109:22, 171:18, 190:6
**REGARDING** [4] - 57:12, 105:2, 137:2, 142:18
**REGARDLESS** [3] - 103:16, 134:12, 171:4
**REGARDS** [1] - 107:21
**REGION** [5] - 86:6, 86:7, 86:8, 86:23
**REGIONAL** [3] - 120:19, 121:6, 121:15
**REGIONS** [2] - 74:16, 97:10

**REGULAR** [1] - 158:6
**REGULARLY** [1] - 152:10
**REGULATING** [1] - 160:17
**REGULATION** [2] - 87:9, 143:21
**REIDERS** [1] - 2:9
**RELATED** [5] - 12:12, 38:15, 141:21, 160:24, 164:14
**RELATES** [1] - 61:5
**RELATIONSHIP** [10] - 41:4, 51:11, 51:15, 139:19, 145:1, 145:4, 145:11, 145:12, 145:17, 145:19
**RELATIONSHIPS** [6] - 40:25, 143:22, 144:24, 145:7, 159:1, 159:9
**RELATIVE** [4] - 86:4, 86:6, 86:8
**RELATIVELY** [3] - 167:23, 168:2, 168:19
**RELATIVES** [2] - 142:3, 142:20
**RELEVANCE** [3] - 83:7, 91:3, 192:24
**RELEVANCY** [2] - 182:20, 192:22
**RELEVANT** [9] - 79:4, 81:20, 87:8, 106:11, 124:6, 124:14, 146:5, 181:24, 194:17
**RELIABLY** [1] - 82:3
**RELIED** [2] - 73:23, 83:3
**RELIGIOUS** [6] - 47:16, 48:2, 48:3, 48:6, 48:16, 48:25
**RELY** [3] - 135:16, 173:6, 185:2
**RELYING** [3] - 73:24, 175:9, 182:24
**REMAINED** [3] - 53:15, 121:23, 123:4
**REMAINS** [2] - 160:20, 178:22
**REMEMBER** [41] - 11:11, 11:15, 11:25, 12:1, 12:7, 12:15, 12:21, 14:15, 19:9, 21:12, 26:2, 26:3, 26:4, 26:5, 26:8, 26:12, 30:12, 34:5, 37:14, 38:19, 45:8,

73:7, 73:8, 73:13, 74:9, 75:3, 82:11, 83:5, 85:25, 87:16, 95:9, 96:13, 102:23, 103:9, 104:20, 132:4, 155:1, 177:6, 177:12, 177:13
**REMIND** [2] - 138:1, 154:17
**REMISSION** [1] - 178:8
**REMOVED** [1] - 157:13
**RENDER** [2] - 91:21, 92:2
**RENDERED** [1] - 105:3
**RENDITIONS** [1] - 175:12
**REPEAT** [2] - 3:24, 17:10
**REPEATED** [1] - 43:12
**REPLACED** [1] - 94:5
**REPORT** [62] - 21:2, 21:12, 21:17, 22:7, 22:11, 22:15, 22:23, 37:16, 41:19, 44:9, 51:2, 51:3, 51:4, 52:13, 54:19, 57:11, 57:21, 59:4, 62:4, 72:21, 72:23, 75:25, 78:20, 79:11, 79:14, 82:9, 83:12, 83:19, 84:2, 84:3, 84:5, 84:8, 84:9, 84:13, 84:15, 84:18, 84:20, 84:21, 85:5, 86:16, 87:12, 94:23, 98:4, 99:1, 99:6, 99:8, 99:19, 102:3, 102:4, 114:24, 115:18, 130:3, 130:17, 130:20, 141:16, 169:7, 172:6, 174:23, 176:4, 177:24, 178:4
**REPORTED** [6] - 85:18, 85:23, 85:25, 141:11, 175:20, 178:12
**REPORTER** [4] - 1:20, 183:23, 185:3, 198:11
**REPORTING** [2] - 19:1, 63:5
**REPORTS** [7] - 21:14, 21:19, 44:25, 45:24, 52:3, 59:5, 62:11
**REPRESENTED** [1] - 191:5

**REPRESENTING** [1] - 6:22

**REPRESENTS** [1] - 170:22

**REPUTATION** [3] - 10:13, 64:5, 64:17

**REQUEST** [2] - 106:15, 182:4

**REQUIRE** [1] - 121:16

**REQUIRED** [4] - 8:15, 8:21, 16:25, 17:14

**REQUIREMENT** [1] - 8:20

**REQUIREMENTS** [1] - 8:11

**REQUIRES** [1] - 93:20

**RESEARCH** [3] - 76:13, 125:3, 188:20

**RESIDENCES** [1] - 32:12

**RESIDENCY** [3] - 119:13, 119:19, 119:21

**RESIDENTS** [1] - 125:13

**RESISTED** [1] - 141:18

**RESOLVE** [1] - 86:8

**RESOURCE** [1] - 191:1

**RESPECT** [8] - 77:14, 167:5, 169:25, 178:4, 181:25, 184:23, 185:22, 188:18

**RESPOND** [2] - 186:9, 186:19

**RESPONDED** [4] - 186:5, 186:6, 186:12, 186:13

**RESPONDING** [1] - 77:13

**RESPONDS** [1] - 168:13

**RESPONSE** [5] - 155:13, 159:23, 183:3, 185:25, 186:2

**RESPONSES** [4] - 112:20, 136:11, 136:13, 159:2

**RESPONSIBILITY** [4] - 120:14, 121:8, 121:25, 132:7

**RESPONSIBLE** [7] - 120:17, 121:7, 121:10, 121:12, 122:13, 122:21, 122:23

**RESPONSIVENESS** [1] - 154:22

**REST** [3] - 26:14, 39:13, 143:9

**RESTART** [1] - 94:11

**RESTRICTED** [1] - 155:4

**RESULT** [8] - 21:9, 64:9, 105:13, 143:9, 161:14, 163:6, 170:21, 192:20

**RESULTS** [14] - 49:21, 72:24, 74:12, 77:14, 86:25, 87:5, 96:18, 102:14, 104:2, 107:12, 108:5, 109:10, 112:6, 133:5

**RESUME** [2] - 114:13, 116:6

**RETAINED** [4] - 126:15, 127:4, 127:17, 128:15

**RETAKES** [2] - 3:14, 72:1

**RETIRE** [1] - 123:12

**RETURNED** [1] - 122:8

**REVERSE** [1] - 86:7

**REVERSED** [1] - 194:10

**REVIEW** [22] - 7:23, 14:23, 15:1, 20:3, 20:6, 20:11, 21:2, 21:17, 22:2, 22:4, 45:24, 129:15, 129:22, 129:25, 130:3, 130:11, 130:16, 130:21, 144:12, 148:8, 173:20, 174:23

**REVIEWED** [16] - 21:14, 22:22, 37:12, 40:18, 44:2, 79:18, 79:19, 81:18, 103:19, 112:1, 136:20, 136:24, 137:12, 147:17, 148:9, 190:15

**REVIEWING** [1] - 13:24

**REVISIT** [1] - 181:19

**RID** [1] - 162:25

**RING** [1] - 146:24

**RINGS** [1] - 110:2

**RISK** [2] - 176:20, 176:21

**ROADS** [1] - 94:4

**ROBUST** [1] - 81:4

**ROLE** [1] - 33:22

**RON** [5] - 28:5, 28:7, 28:18, 28:19, 29:7

**RON'S** [3] - 29:25, 30:2, 30:5

**RONALD** [2] - 2:8, 53:19

**ROOM** [1] - 131:20

**ROPES** [1] - 92:9

**ROTATION** [1] - 125:15

**ROTTEN** [1] - 144:17

**ROUGH** [1] - 15:12

**ROUGHLY** [2] - 52:9, 125:17

**RPR** [1] - 1:19

**RUBEN** [2] - 72:1, 197:7

**RULED** [1] - 171:20

**RULES** [2] - 184:5, 193:3

**RULING** [1] - 171:13

**RUN** [3] - 71:17, 94:6, 140:18

**RUNDOWN** [1] - 138:25

**RUNNING** [2] - 83:22, 94:4

**RUNS** [1] - 76:13

**RUSE** [2] - 91:20, 91:23

**RUSH** [1] - 92:21

## S

**SADISTIC** [2] - 140:22, 140:24

**SADOFF** [6] - 130:14, 172:12, 172:18, 173:5, 173:7, 173:8

**SAKE** [1] - 187:9

**SAMPLE** [2] - 72:19, 73:2

**SAMSON** [3] - 190:23, 190:24, 194:9

**SATISFACTORILY** [1] - 49:20

**SATISFACTORY** [1] - 117:11

**SAUNDERS** [36] - 2:5, 3:2, 3:11, 55:24, 74:1, 76:25, 84:16, 90:19, 95:19, 96:3, 96:5, 96:9, 97:4, 97:7, 98:21, 98:23, 101:20, 101:22, 103:3, 103:4, 104:25, 108:19, 108:21, 110:24, 111:1, 112:8, 114:7, 114:14, 114:16, 115:25, 116:5, 186:8, 186:13, 186:16, 188:1, 197:9

**SAVING** [1] - 7:7

**SAW** [16] - 24:18, 24:22, 25:6, 50:22, 51:19, 63:2, 74:20, 84:17, 87:22, 94:21, 112:24, 130:19, 141:16, 157:12, 164:20, 167:25

**SCALE** [1] - 49:21

**SCAM** [2] - 69:2, 69:6

**SCAMMED** [1] - 67:5

**SCAMMER** [1] - 68:23

**SCAMMING** [1] - 64:23

**SCAMS** [8] - 34:24, 65:2, 66:11, 67:12, 68:18, 68:23, 71:17, 184:24

**SCAN** [28] - 73:12, 74:25, 78:14, 79:17, 79:19, 81:1, 81:2, 81:21, 82:4, 82:6, 82:9, 82:19, 82:22, 83:3, 83:7, 83:20, 83:22, 85:5, 85:9, 85:13, 85:14, 86:9, 86:24, 87:1, 106:19, 111:15, 111:19

**SCANNING** [1] - 74:8

**SCANS** [9] - 72:12, 72:19, 73:6, 81:18, 81:19, 83:17, 87:15, 105:25, 111:18

**SCAR** [1] - 144:1

**SCARS** [1] - 64:14

**SCHAEFER** [2] - 146:22, 146:24

**SCHEDULING** [2] - 117:13, 117:19

**SCHIZOPHRENIA** [4] - 149:19, 158:14, 158:16, 158:22

**SCHOOL** [9] - 20:17, 38:6, 50:1, 64:13, 76:10, 119:11, 119:17, 125:8, 146:6

**SCIENCE** [1] - 76:10

**SCIENCES** [1] - 124:23

**SCIENTIFIC** [3] - 112:15, 132:11, 138:11

**SCIENTISTS** [1] - 111:11

**SCLEROSIS** [1] - 82:1

**SCOPE** [1] - 188:15

**SCORE** [4] - 133:1, 168:13, 168:16, 168:18

**SCORED** [1] - 50:2

**SCORES** [1] - 168:14

**SCRANTON** [1] - 1:18

**SCREEN** [2] - 97:5, 103:2

**SCREENING** [4] - 121:24, 132:21, 162:16, 168:5

**SE** [1] - 24:21

**SEATED** [2] - 95:25, 116:9

**SECOND** [8] - 23:1, 46:6, 46:11, 46:21, 127:20, 132:23, 154:20, 191:11

**SECONDLY** [1] - 181:23

**SECTION** [5] - 2:3, 53:6, 129:11, 187:25, 194:25

**SECURITY** [5] - 58:24, 120:9, 120:11, 121:17, 123:3

**SEDATING** [2] - 150:11, 150:20

**SEDATION** [1] - 180:3

**SEE** [37] - 6:14, 7:1, 17:17, 27:24, 28:1, 41:22, 43:21, 43:25, 44:17, 50:9, 51:17, 63:7, 63:10, 74:17, 75:12, 79:7, 86:16, 86:20, 96:1, 96:19, 98:12, 99:15, 99:23, 101:24, 114:19, 115:5, 145:18, 159:24, 160:18, 168:3, 174:24, 174:25, 175:1, 180:13, 193:1, 195:9, 196:4

**SEEK** [8] - 6:5, 70:13, 114:23, 147:16, 147:18, 187:5, 187:13, 192:5

**SEEKING** [5] - 23:10, 23:18, 115:2, 147:25, 187:18

**SEEM** [2] - 39:22, 191:9

**SEGMENTED** [1] - 99:17

**SEIZURE** [3] - 75:13, 150:25, 151:12

**SELF** [12] - 44:23, 143:1, 144:9, 144:13, 151:10, 159:1, 159:11, 159:12, 159:13, 160:14, 161:21, 162:19

**SELF-CARE** [1] - 162:19
**SELF-DESTRUCTIVE** [3] - 151:10, 160:14, 161:21
**SELF-ESTEEM** [2] - 144:9, 144:13
**SELF-IMAGE** [2] - 159:1, 159:11
**SELF-MEDICATE** [1] - 143:1
**SELF-PERCEPTIONS** [1] - 44:23
**SELL** [2] - 58:2, 58:3
**SEMINOLE** [2] - 43:5, 43:9
**SEND** [3] - 67:3, 67:17, 182:4
**SENSE** [9] - 10:17, 100:11, 155:5, 159:11, 182:2, 182:6, 184:25, 192:12
**SENSITIVE** [1] - 29:10
**SENT** [2] - 57:24, 74:7
**SENTENCE** [11] - 96:21, 96:23, 96:24, 187:5, 187:18, 188:9, 188:10, 188:14, 188:17, 190:4, 192:5
**SENTENCES** [4] - 61:14, 187:2, 191:12, 192:3
**SENTENCING** [2] - 1:12, 130:23
**SEPARATE** [2] - 126:21, 171:2
**SEPARATED** [1] - 154:21
**SEPARATING** [1] - 98:3
**SEPTEMBER** [2] - 43:4, 102:7
**SEQ** [1] - 194:25
**SERIES** [3] - 88:22, 148:12, 168:12
**SERIOUS** [4] - 120:13, 121:16, 123:1, 147:5
**SERVED** [1] - 126:22
**SERVICE** [1] - 53:19
**SERVICES** [7] - 4:23, 48:15, 122:9, 123:6, 123:8, 145:25, 146:16
**SET** [3] - 81:10, 106:7, 140:8
**SETS** [1] - 100:20

**SETTING** [1] - 121:17
**SEVERAL** [11] - 21:19, 33:17, 68:6, 87:12, 90:12, 94:3, 122:10, 124:7, 126:25, 135:15, 140:20
**SEVERE** [16] - 43:12, 44:15, 87:8, 142:2, 142:11, 143:17, 144:5, 156:9, 157:18, 162:6, 170:21, 170:22, 170:24, 171:7, 180:11
**SEVERELY** [6] - 28:3, 33:1, 143:18, 145:1, 165:13
**SEVERITY** [1] - 157:22
**SEX** [6] - 38:17, 44:20, 60:24, 61:5, 159:13
**SEXUAL** [29] - 9:18, 23:21, 24:5, 29:15, 44:15, 50:12, 60:20, 61:9, 61:19, 62:13, 62:22, 63:6, 63:14, 64:3, 71:7, 139:3, 139:4, 139:6, 139:14, 139:21, 141:18, 141:22, 142:12, 143:10, 156:10, 157:19, 159:17, 170:21, 175:17
**SEXUALITY** [1] - 44:23
**SEXUALLY** [18] - 28:13, 39:11, 44:19, 50:19, 52:14, 53:9, 54:9, 54:16, 54:18, 55:3, 58:7, 60:3, 60:11, 60:15, 70:12, 136:25, 139:13, 146:8
**SHAKING** [1] - 48:6
**SHARE** [2] - 16:11, 16:20
**SHARED** [2] - 47:2, 47:3
**SHEET** [2] - 29:24, 117:8
**SHEPPARD** [2] - 119:14, 125:13
**SHOOT** [4] - 33:14, 33:16, 33:18, 140:20
**SHORT** [4] - 36:16, 36:18, 112:21, 163:11
**SHOT** [2] - 33:8, 192:14

**SHOULDER** [2] - 155:12, 178:11
**SHOVEL** [1] - 140:19
**SHOW** [18] - 37:17, 38:25, 45:18, 46:3, 49:13, 55:9, 55:11, 70:17, 76:3, 82:16, 86:15, 92:20, 96:14, 99:14, 100:25, 174:7, 182:25, 183:15
**SHOWED** [8] - 12:7, 28:14, 37:22, 107:12, 112:6, 113:18, 146:12, 174:4
**SHOWING** [5] - 66:21, 98:24, 101:23, 148:19, 193:11
**SHOWN** [3] - 12:10, 118:15, 181:21
**SHOWS** [8] - 49:23, 85:22, 89:24, 92:17, 94:14, 99:9, 99:17, 148:11
**SIBLING'S** [1] - 140:18
**SIBLINGS** [1] - 46:25
**SIDE** [5] - 97:16, 99:17, 127:16, 142:4
**SIDES** [1] - 142:10
**SIGNED** [2] - 53:18
**SIGNIFICANT** [14] - 12:23, 12:24, 38:14, 41:23, 44:20, 73:19, 127:24, 153:6, 155:3, 155:16, 156:16, 156:18, 157:11, 162:21
**SIGNIFICANTLY** [2] - 26:6, 47:10
**SILKWOOD** [3] - 65:14, 65:20, 183:9
**SIMILAR** [6] - 22:11, 97:21, 112:6, 142:9, 166:16, 188:15
**SIMILARITIES** [1] - 166:19
**SINGLE** [1] - 97:14
**SISTER** [9] - 47:1, 53:12, 53:14, 57:19, 58:6, 139:20, 139:21, 145:2
**SISTERS'** [1] - 33:24
**SITES** [2] - 47:18, 49:2
**SITS** [1] - 176:2
**SITTING** [2] - 116:15, 135:12
**SITUATION** [13] - 12:14, 17:18, 36:13,

47:24, 56:15, 64:15, 91:20, 92:4, 92:24, 92:25, 144:16, 164:10, 189:16
**SITUATIONS** [5] - 40:24, 41:4, 47:5, 81:20
**SIX** [5] - 13:25, 42:14, 123:5, 168:14, 168:15
**SIZE** [8] - 72:24, 96:19, 96:25, 98:5, 98:18, 98:19, 99:19, 101:2
**SKIPPING** [1] - 78:18
**SLEEP** [4] - 149:9, 150:6, 150:8, 150:12
**SLIDE** [2] - 99:7, 103:25
**SLOMSKY** [1] - 1:10
**SMALL** [7] - 12:9, 72:17, 86:20, 101:1, 101:8, 185:18, 186:24
**SMART** [3] - 49:23, 49:24, 95:15
**SNAPSHOT** [1] - 11:11
**SNEAK** [2] - 93:17, 93:21
**SOCIAL** [16] - 8:18, 9:11, 10:19, 20:20, 20:22, 23:20, 25:8, 25:10, 45:12, 58:24, 71:18, 87:9, 130:21, 135:24, 135:25, 156:19
**SOCIALLY** [1] - 6:22
**SOCIETY** [2] - 124:19, 124:20
**SODOMIZED** [1] - 175:23
**SOFTWARE** [3] - 103:9, 103:14, 103:17
**SOMEONE** [28] - 12:14, 13:10, 15:19, 15:25, 18:6, 18:25, 32:3, 49:8, 51:13, 56:17, 61:20, 68:11, 68:14, 68:15, 69:25, 70:10, 89:24, 98:17, 100:11, 100:15, 135:12, 137:9, 144:19, 145:11, 173:8, 179:17, 179:18, 182:25
**SOMETIME** [2] - 37:14, 154:23
**SOMETIMES** [19] -

8:4, 8:5, 11:14, 11:22, 12:6, 12:18, 13:4, 19:11, 39:12, 44:10, 47:19, 61:21, 82:13, 82:14, 139:8, 160:17, 174:21, 180:1, 180:3
**SOMEWHERE** [2] - 128:8, 168:10
**SOON** [2] - 29:15, 67:10
**SORRY** [14] - 5:3, 7:6, 17:9, 42:25, 51:7, 52:2, 54:7, 54:13, 77:10, 93:11, 100:13, 101:11, 103:3, 166:9
**SORT** [13] - 122:6, 135:12, 136:4, 139:5, 140:22, 142:21, 145:20, 158:4, 158:15, 159:22, 159:25, 163:8, 164:25
**SORTS** [1] - 88:24
**SOUGHT** [1] - 145:20
**SOUNDS** [4] - 24:10, 35:11, 35:14, 161:11
**SOURCE** [2] - 71:4, 184:15
**SOURCED** [1] - 184:16
**SOURCES** [5] - 71:9, 135:17, 136:3, 136:16, 175:8
**SOUTHERN** [1] - 122:15
**SPATIAL** [1] - 102:18
**SPEAKING** [2] - 3:4, 145:19
**SPEAKS** [1] - 88:12
**SPECIALIST** [4] - 7:1, 8:10, 20:9, 22:25
**SPECIALISTS** [1] - 135:24
**SPECIALIZING** [1] - 118:25
**SPECIALTY** [1] - 119:13
**SPECIFIC** [7] - 74:16, 75:18, 90:4, 187:18, 189:20, 189:21, 193:24
**SPECIFICALLY** [5] - 52:17, 89:17, 91:1, 113:17, 190:12
**SPECIFIED** [3] - 133:13, 134:8, 162:24
**SPECTRUM** [1] -

161:13

**SPELL** [1] - 118:6

**SPITE** [1] - 27:22

**SPOKEN** [1] - 131:23

**SPONTANEOUSLY** [1] - 52:18

**SPORADIC** [1] - 36:22

**SPORTS** [1] - 25:25

**SPOT** [2] - 86:18, 94:10

**SPOTS** [1] - 86:13

**SPRING** [6] - 121:4, 121:5, 122:7, 122:8, 122:11, 123:12

**SPRINGFIELD** [1] - 169:22

**ST** [1] - 36:17

**STABILIZATION** [2] - 152:20, 153:9

**STABILIZER** [2] - 152:17, 153:21

**STABILIZERS** [1] - 149:11

**STABLY** [1] - 158:19

**STAFF** [2] - 120:23, 122:16

**STAGE** [2] - 64:22, 64:23

**STAND** [6] - 3:14, 27:21, 30:17, 72:1, 85:16, 114:15

**STANDARD** [7] - 99:11, 104:17, 106:22, 107:12, 107:18, 193:2, 193:5

**STANDARDS** [2] - 104:12, 107:7

**STANDING** [1] - 193:4

**STANDPOINT** [2] - 153:3, 164:3

**STARS** [2] - 112:22

**START** [6] - 7:18, 37:4, 37:7, 92:24, 100:13, 145:12

**STARTED** [8] - 4:22, 5:1, 28:4, 64:23, 108:10, 119:25, 141:17, 175:18

**STARTLE** [1] - 155:13

**STARTS** [2] - 114:1, 145:12

**STARVING** [1] - 144:19

**STATE** [23] - 6:20, 35:12, 45:11, 63:13, 63:25, 102:5, 109:8, 111:3, 118:6, 120:9, 120:11, 121:6, 122:10, 122:11, 122:12, 125:4,

125:21, 126:16, 127:21, 128:3, 159:24, 160:19

**STATEMENT** [2] - 79:23, 89:4

**STATEMENTS** [2] - 10:25, 45:15

**STATES** [14] - 1:1, 1:3, 1:16, 2:2, 52:21, 104:20, 108:1, 126:3, 131:4, 131:17, 131:19, 150:17, 190:14, 191:4

**STATISTICAL** [5] - 133:18, 165:4, 186:23, 191:9, 191:24

**STATISTICS** [1] - 194:2

**STATUS** [2] - 136:12, 178:10

**STATUTE** [6] - 189:11, 189:13, 189:25, 193:24, 194:22, 195:10

**STATUTORY** [3] - 181:25, 189:19, 189:21

**STAY** [5] - 11:17, 11:23, 34:1, 39:18, 42:12

**STAYED** [2] - 120:23, 121:18

**STAYING** [1] - 155:8

**STEARNS** [1] - 52:11

**STELAZINE** [4] - 149:16, 149:17, 150:4, 152:11

**STENOTYPE** [1] - 1:24

**STENOTYPE- COMPUTER** [1] - 1:24

**STEP** [4] - 71:23, 103:21, 114:9, 180:18

**STILL** [10] - 47:9, 93:20, 113:22, 123:2, 127:8, 150:2, 152:10, 156:4, 157:16, 185:23

**STIMULI** [1] - 102:19

**STOMACH** [4] - 41:11, 41:23, 43:22, 43:24

**STOOD** [1] - 33:11

**STOP** [1] - 94:9

**STOPPED** [1] - 39:12

**STORIES** [2] - 47:2, 71:16

**STORY** [6] - 26:5, 29:18, 66:18, 89:21, 141:8, 183:25

**STRAIGHT** [1] - 93:17

**STRAIGHTFORWAR D** [1] - 136:7

**STRANGER** [1] - 139:15

**STREAMLINE** [1] - 108:13

**STREET** [6] - 1:17, 1:21, 2:4, 2:7, 2:10, 192:14

**STRENGTHENS** [1] - 47:19

**STRESS** [20] - 133:7, 133:10, 134:3, 134:12, 134:22, 137:23, 138:17, 139:1, 143:13, 153:17, 154:3, 155:18, 156:25, 157:17, 160:24, 163:8, 171:9, 176:1, 176:7

**STRESS-RELATED** [1] - 160:24

**STRESSORS** [2] - 157:7, 176:11

**STRICTLY** [3] - 5:24, 16:13, 195:12

**STROKE** [1] - 82:1

**STRONG** [2] - 11:17, 12:11

**STRONGLY** [1] - 80:14

**STRUCTURAL** [1] - 99:10

**STRUCTURE** [7] - 86:20, 143:20, 158:20, 170:23, 171:6, 189:19, 189:21

**STRUCTURED** [1] - 189:12

**STUDIED** [2] - 74:11, 106:1

**STUDIES** [4] - 12:10, 76:14, 113:11, 113:17

**STUDY** [5] - 21:9, 111:18, 112:22, 169:4, 169:18

**STUDYING** [2] - 34:6, 194:22

**STUFF** [2] - 82:4, 113:16

**STUPID** [1] - 140:1

**SUBJECTED** [1] - 61:23

**SUBJECTIVE** [1] - 193:14

**SUBMIT** [3] - 174:3, 174:10, 189:18

**SUBMITTED** [2] - 186:3, 190:17

**SUBSEQUENT** [2] - 46:15, 46:19

**SUBSPECIALTY** [2] - 119:1, 119:16

**SUBSTANCE** [2] - 143:3, 159:14

**SUBSTANTIAL** [1] - 127:15

**SUBTLE** [3] - 74:16, 80:19, 80:23

**SUCCESSFUL** [2] - 35:18, 95:11

**SUCCESSFULLY** [1] - 69:16

**SUCK** [1] - 39:16

**SUFFERED** [3] - 23:11, 24:25, 138:12

**SUFFERING** [1] - 170:18

**SUFFERS** [3] - 87:7, 163:6, 171:8

**SUGGEST** [3] - 133:2, 176:4, 180:10

**SUGGESTS** [1] - 165:3

**SUICIDAL** [3] - 160:11, 161:16, 179:10

**SUICIDALITY** [1] - 113:1

**SUICIDE** [3] - 32:19, 32:21, 41:5

**SUITE** [3] - 1:17, 2:7, 2:14

**SULCI** [9] - 96:24, 97:1, 97:9, 97:10, 97:13, 98:2, 98:12, 100:24

**SULCO** [1] - 98:13

**SULCUS** [8] - 97:9, 97:14, 97:19, 97:20, 97:21, 98:14, 98:17

**SUMMARIZES** [1] - 184:14

**SUMMARY** [5] - 43:11, 186:23, 187:7, 191:10, 191:14

**SUMMER** [1] - 27:18

**SUNSET** [1] - 35:6

**SUPERB** [1] - 83:17

**SUPERSENSITIVE** [1] - 159:7

**SUPERVISED** [2] - 122:18, 122:20

**SUPERVISING** [2] - 121:7, 122:22

**SUPPLEMENTAL** [2] - 21:19, 56:20

**SUPPORT** [4] - 136:20, 146:18, 183:18, 194:8

**SUPPORTIVE** [2] - 148:3, 157:23

**SUPPORTS** [1] - 138:25

**SUPPOSE** [1] - 91:11

**SUPPOSED** [2] - 193:2, 193:5

**SUPPOSEDLY** [3] - 59:17, 172:14, 172:15

**SURELY** [2] - 188:12, 189:16

**SURGERIES** [1] - 178:11

**SURGERY** [1] - 42:4

**SURPRISE** [3] - 95:15, 164:2, 176:13

**SURPRISED** [1] - 69:12

**SURPRISING** [2] - 30:24, 93:7

**SURRICK** [1] - 108:24

**SURVIVE** [4] - 65:12, 65:14, 66:6, 69:16

**SUSCEPTIBILITY** [1] - 143:2

**SUSTAIN** [2] - 19:21, 110:22

**SUSTAINED** [4] - 136:18, 144:5, 170:25, 171:7

**SUZANNE** [2] - 1:19, 198:12

**SWEETHEART** [1] - 46:14

**SWORN** [2] - 3:14, 118:5

**SYMPTOM** [2] - 132:22, 133:4

**SYMPTOMATIC** [2] - 156:4, 176:15

**SYMPTOMATOLOG Y** [1] - 156:16

**SYMPTOMS** [25] - 132:24, 136:9, 142:9, 151:6, 153:9, 153:16, 154:11, 154:12, 154:20, 155:6, 155:7, 155:13, 155:15, 157:21, 157:22, 158:15, 158:21, 160:9, 160:25,

161:5, 161:7, 162:7, 176:5, 180:7
**SYNDROME** [2] - 154:5, 173:13
**SYSTEM** [6] - 64:15, 85:21, 120:19, 122:10, 165:7, 188:21
**SYSTEMS** [1] - 120:6

## T

**TABASCO** [1] - 139:9
**TAKING** [7] - 29:11, 50:6, 73:9, 78:8, 78:25, 79:11, 81:11
**TALKS** [3] - 54:9, 54:10, 99:19
**TAMMY** [1] - 69:2
**TARGET** [2] - 112:24
**TAUGHT** [4] - 64:21, 64:25, 67:14, 68:25
**TEACHING** [2] - 125:3, 125:5
**TEAM** [8] - 6:16, 7:2, 7:12, 23:1, 25:25, 26:2, 51:23, 61:1
**TEARFUL** [3] - 137:7, 137:20, 156:10
**TECHNOLOGIST** [2] - 74:24, 74:25
**TEENAGE** [3] - 46:21, 47:20, 52:18
**TEMPERAMENT** [2] - 164:7, 166:12
**TEMPORAL** [2] - 97:16, 104:16
**TEN** [3] - 139:13, 187:10, 189:9
**TEND** [5] - 166:20, 166:21, 166:22, 166:23
**TENDER** [1] - 46:19
**TENSE** [1] - 146:6
**TENTATIVE** [1] - 117:2
**TERM** [5] - 121:13, 143:7, 143:8, 158:6, 162:25
**TERMINATE** [1] - 46:22
**TERMS** [15] - 17:17, 18:15, 30:18, 44:20, 71:16, 125:2, 127:16, 133:25, 139:1, 145:6, 163:9, 180:3, 190:1, 194:2, 195:3
**TERRE** [1] - 131:19
**TERRORIZED** [1] -

33:15
**TEST** [18] - 49:11, 49:17, 49:23, 49:25, 50:5, 50:7, 50:9, 77:13, 102:14, 112:23, 132:21, 132:23, 132:25, 167:22, 168:3, 168:5, 168:21
**TESTED** [1] - 169:4
**TESTIFIED** [20] - 30:15, 33:7, 39:19, 67:24, 76:20, 99:9, 103:12, 107:21, 107:25, 108:22, 109:1, 109:5, 109:9, 109:12, 110:7, 110:8, 110:11, 128:7, 129:10, 138:3
**TESTIFY** [7] - 90:24, 107:20, 117:18, 128:1, 185:6, 186:22, 192:3
**TESTIFYING** [4] - 54:23, 70:8, 129:14, 141:20
**TESTIMONY** [21] - 20:13, 58:17, 77:1, 77:3, 77:4, 77:11, 77:16, 78:3, 88:17, 102:22, 103:7, 105:17, 108:5, 109:19, 111:2, 130:25, 175:1, 176:14, 178:1, 182:7, 195:20
**TESTING** [23] - 49:17, 87:5, 89:21, 101:16, 102:6, 102:11, 102:13, 105:2, 107:21, 107:23, 109:10, 109:20, 109:21, 111:16, 111:22, 112:4, 112:5, 162:13, 162:17, 167:23, 168:2, 168:20
**TESTS** [5] - 8:13, 42:6, 72:16, 112:1, 162:16
**TEXAS** [2] - 43:6, 43:9
**THEMES** [1] - 23:16
**THEMSELVES** [2] - 157:10, 166:21
**THEORY** [1] - 18:16
**THERAPEUTIC** [2] - 40:25, 41:3
**THERAPIST** [3] - 52:14, 60:10, 146:21
**THERAPY** [2] - 40:22, 41:6

**THERE** [194] - 3:23, 5:22, 7:12, 8:10, 8:12, 8:18, 9:17, 12:4, 12:5, 13:7, 13:14, 13:21, 13:23, 14:2, 14:8, 14:12, 14:16, 14:17, 15:9, 16:16, 17:23, 20:21, 21:20, 22:18, 23:10, 24:7, 24:11, 26:20, 27:5, 30:9, 31:6, 33:22, 33:23, 34:6, 34:12, 34:16, 34:17, 35:15, 36:22, 36:24, 36:25, 37:5, 37:12, 40:16, 40:22, 41:1, 43:15, 44:3, 44:9, 44:25, 45:1, 45:18, 46:17, 48:4, 48:22, 51:8, 52:1, 53:8, 54:15, 58:17, 58:23, 60:1, 62:12, 62:13, 64:1, 69:5, 70:6, 73:25, 74:18, 75:7, 75:11, 79:18, 81:3, 81:4, 81:17, 81:21, 81:25, 82:1, 82:2, 83:8, 85:10, 86:22, 91:7, 91:25, 92:4, 94:13, 95:4, 95:7, 97:15, 99:12, 100:7, 100:8, 101:10, 101:14, 104:8, 104:9, 105:1, 105:20, 106:22, 107:10, 108:16, 110:6, 110:20, 111:11, 112:24, 113:11, 113:17, 114:18, 116:24, 120:22, 120:24, 122:9, 123:5, 127:6, 127:7, 127:8, 127:10, 127:12, 127:14, 127:15, 127:18, 127:23, 127:24, 132:18, 134:10, 135:14, 135:18, 135:22, 136:8, 137:2, 137:4, 137:6, 139:2, 139:14, 139:22, 141:7, 141:16, 142:4, 142:7, 142:17, 142:19, 143:7, 145:3, 146:4, 146:17, 147:22, 148:2, 149:1, 149:19, 153:15, 154:10, 154:17, 157:18, 158:25,

159:8, 159:10, 159:12, 160:2, 160:3, 160:13, 160:15, 161:1, 162:2, 162:3, 164:14, 164:18, 165:3, 165:7, 165:8, 167:1, 174:6, 175:11, 177:25, 180:7, 181:13, 183:20, 185:9, 185:23, 186:9, 186:17, 186:21, 187:11, 189:6, 189:24, 190:20
**THERE'S** [4] - 83:8, 84:24, 104:9, 160:16
**THEREFORE** [1] - 101:2
**THEY'VE** [1] - 111:11
**THINKING** [7] - 11:14, 135:10, 144:21, 154:24, 159:23, 160:1, 160:25
**THINKS** [1] - 183:7
**THIRD** [8] - 2:10, 42:11, 46:6, 46:11, 127:20, 155:6, 184:14, 191:13
**THORAZINE** [5] - 150:13, 150:15, 150:18, 150:20, 152:11
**THOROUGH** [1] - 194:23
**THOUGHTS** [3] - 47:20, 160:11, 179:10
**THREATENING** [1] - 154:7
**THREE** [14] - 20:1, 20:2, 46:24, 47:1, 53:11, 122:15, 131:7, 154:10, 167:15, 170:4, 171:19, 192:19, 194:25
**THROUGHOUT** [3] - 136:18, 159:19, 162:5
**THROW** [2] - 140:19, 163:8
**THURSDAY** [1] - 1:8
**TIED** [3] - 33:17, 91:17, 92:1
**TIMING** [2] - 101:15, 108:14
**TINY** [1] - 27:2
**TISSUE** [2] - 98:2, 98:7

**TODAY** [12] - 3:3, 3:21, 59:8, 71:15, 88:15, 150:3, 165:10, 165:14, 176:2, 176:7, 180:23, 185:19
**TOFRANIL** [4] - 151:13, 151:17, 151:23, 151:24
**TOGETHER** [2] - 21:21, 22:11
**TOOK** [11] - 30:4, 73:12, 95:8, 121:1, 121:20, 131:4, 131:13, 131:16, 131:24, 168:6, 170:4
**TOOL** [1] - 63:24
**TOP** [3] - 14:15, 104:8, 163:5
**TOPICS** [1] - 124:9
**TORTURE** [2] - 139:6, 141:6
**TOTAL** [1] - 26:24
**TOTALLY** [1] - 93:19
**TOUCH** [2] - 44:22, 179:18
**TOWSON** [1] - 119:14
**TRACK** [1] - 15:13
**TRADITIONAL** [1] - 23:7
**TRADITIONALLY** [2] - 22:17, 23:2
**TRAGEDY** [1] - 47:2
**TRAIN** [3] - 32:15, 125:11, 125:16
**TRAINING** [3] - 8:23, 119:13, 119:16
**TRANQUILIZER** [2] - 149:14, 152:3
**TRANQUILIZERS** [1] - 149:7
**TRANSCRIPT** [5] - 1:24, 76:4, 77:8, 115:4, 198:6
**TRANSCRIPTION** [1] - 1:24
**TRANSCRIPTS** [2] - 129:23, 129:25
**TRANSIENT** [1] - 47:18
**TRANXENE** [2] - 149:13, 149:14
**TRAUMA** [27] - 10:1, 26:10, 26:15, 27:1, 27:4, 27:8, 35:19, 36:9, 40:22, 44:15, 51:11, 51:14, 61:6, 61:19, 63:19, 64:9, 69:11, 132:22, 133:4, 136:17,

137:18, 138:1, 142:23, 157:13, 157:18, 170:24, 171:7

**TRAUMAS** [1] - 156:8

**TRAUMATIC** [35] - 11:19, 11:24, 12:14, 12:22, 23:21, 25:14, 29:6, 132:24, 133:7, 133:9, 134:3, 134:11, 134:22, 137:23, 138:17, 139:1, 143:13, 153:17, 154:3, 154:7, 154:10, 154:15, 154:17, 154:23, 154:25, 155:2, 155:8, 155:18, 156:25, 157:17, 163:7, 171:9, 175:22, 176:1, 176:7

**TRAVELED** [2] - 47:17, 49:1

**TRAVIS** [27] - 2:8, 2:9, 181:1, 181:4, 181:5, 181:11, 181:15, 181:18, 183:4, 183:5, 185:14, 185:18, 186:1, 186:18, 187:22, 188:7, 190:7, 191:18, 191:23, 192:7, 192:24, 193:10, 193:18, 194:6, 195:17, 195:23, 196:2

**TREAT** [2] - 43:15, 179:20

**TREATED** [6] - 41:25, 43:19, 120:2, 120:12, 147:5, 193:7

**TREATING** [2] - 120:14, 120:17

**TREATMENT** [11] - 41:14, 52:22, 76:17, 121:11, 122:22, 147:18, 148:1, 149:18, 150:17, 157:24, 158:4

**TREMENDOUS** [1] - 142:5

**TRIAL** [16] - 40:13, 53:23, 55:2, 56:11, 58:17, 60:6, 60:8, 60:12, 60:15, 129:23, 130:14, 132:4, 192:19, 195:20

**TRIALS** [1] - 191:2

**TRIAVIL** [4] - 151:15, 151:16, 151:17

**TRICYCLIC** [2] - 151:25, 152:6

**TRIED** [9] - 33:14, 34:14, 38:16, 75:10, 109:16, 146:9, 147:24, 191:20

**TRIER** [2] - 183:20, 184:10

**TRIES** [1] - 164:12

**TRIGGER** [1] - 140:13

**TRILAFON** [5] - 149:21, 149:22, 150:4, 151:18, 152:12

**TRIVELPIECE** [1] - 62:24

**TRIVIAL** [1] - 89:4

**TROUBLE** [1] - 144:23

**TRUE** [51] - 6:18, 6:19, 7:3, 7:16, 7:19, 8:21, 9:7, 9:17, 10:4, 10:8, 11:2, 11:3, 11:12, 11:13, 12:6, 12:19, 13:2, 13:5, 13:17, 16:14, 19:1, 24:5, 24:7, 25:25, 26:25, 32:13, 34:7, 35:6, 35:13, 37:5, 40:9, 43:24, 50:8, 51:2, 52:4, 52:5, 52:15, 60:25, 61:25, 62:2, 62:10, 62:19, 66:5, 67:5, 67:6, 79:12, 81:9, 87:25, 92:16, 103:6, 110:5

**TRUST** [1] - 145:9

**TRUSTING** [3] - 145:7, 145:17, 145:19

**TRUTHFUL** [3] - 16:9, 183:1, 185:8

**TRUTHFULNESS** [4] - 10:14, 64:6, 64:18, 175:5

**TRY** [10] - 3:25, 9:13, 10:7, 10:16, 27:4, 51:14, 67:2, 68:11, 188:10, 192:25

**TRYING** [19] - 14:21, 17:24, 18:21, 33:16, 36:21, 39:15, 40:17, 50:7, 84:4, 101:5, 108:13, 113:4, 113:16, 126:10, 189:9, 189:12, 190:9, 194:11, 194:14

**TUESDAY** [1] - 70:4

**TUMOR** [2] - 81:25,

83:8

**TURN** [8] - 17:14, 18:9, 44:24, 76:23, 84:8, 84:9, 84:22, 138:22

**TURNED** [1] - 17:21

**TURNING** [2] - 79:17, 146:9

**TWENTIES** [1] - 27:15

**TWICE** [1] - 95:13

**TWO** [14] - 26:19, 31:6, 44:12, 44:13, 46:9, 52:3, 95:11, 116:6, 116:24, 126:21, 132:16, 159:13, 187:2, 187:24

**TYPE** [22] - 8:15, 15:13, 15:19, 15:20, 15:22, 19:6, 41:6, 57:23, 61:18, 67:20, 67:23, 99:10, 99:11, 111:15, 111:22, 135:9, 135:16, 141:18, 145:25, 156:24, 188:15

**TYPED** [3] - 28:22, 30:6, 30:7

**TYPES** [1] - 60:24

**TYPEWRITTEN** [2] - 30:7, 31:13

**TYPICAL** [1] - 89:25

**TYPICALLY** [4] - 83:10, 140:1, 154:11, 159:4

# U

**U.S** [2] - 3:20, 126:12

**U.S.C** [2] - 187:25, 194:24

**UGLY** [1] - 62:3

**ULTIMATE** [2] - 7:7, 87:10

**ULTIMATELY** [1] - 136:14

**UNABLE** [4] - 13:22, 14:3, 14:9, 146:6

**UNABOMBER** [2] - 66:9

**UNCERTAIN** [1] - 30:17

**UNCHANGED** [1] - 134:7

**UNCHARACTERISTIC** [1] - 93:19

**UNCLE** [9] - 28:5, 28:7, 28:18, 28:19, 29:6, 67:15, 139:15, 175:18, 175:24

**UNCLEAR** [2] - 162:24, 165:8

**UNCOMFORTABLE** [1] - 34:9

**UNCOMMON** [11] - 22:13, 27:3, 27:24, 31:10, 61:19, 62:4, 62:13, 69:25, 70:12, 157:16, 167:4

**UNCONSCIOUS** [1] - 47:22

**UNCOVER** [2] - 6:16, 16:17

**UNCOVERED** [1] - 40:3

**UNDER** [11] - 16:3, 17:4, 30:15, 30:17, 30:22, 160:24, 182:5, 184:11, 187:24, 187:25, 188:7

**UNDERGRADUATE** [1] - 119:7

**UNDERSTOOD** [2] - 107:1, 107:2

**UNEMPLOYED** [1] - 36:23

**UNEMPLOYMENT** [2] - 49:3, 148:3

**UNFAIR** [1] - 184:8

**UNFAIRLY** [1] - 184:12

**UNHAPPY** [1] - 147:21

**UNHEALTHY** [1] - 144:1

**UNION** [1] - 46:18

**UNIQUE** [2] - 8:6, 14:7

**UNITED** [12] - 1:1, 1:3, 1:16, 2:2, 104:20, 108:1, 126:3, 131:4, 131:17, 131:19, 190:14, 191:4

**UNIVERSE** [1] - 188:23

**UNIVERSITY** [6] - 76:11, 119:7, 119:11, 119:17, 125:8, 125:14

**UNLESS** [2] - 83:7, 107:17

**UNPREDICTABILITY** [1] - 140:13

**UNPREDICTABLE** [1] - 140:8

**UNREAL** [1] - 161:1

**UNREALISTIC** [1] - 46:20

**UNREPORTED** [2] - 18:11, 61:10

**UNSTABLE** [5] -

158:19, 159:8, 159:11, 160:20, 161:18

**UNUSUAL** [1] - 86:19

**UP** [63] - 12:7, 13:10, 15:19, 17:25, 27:21, 29:13, 30:6, 30:7, 33:17, 34:24, 36:6, 36:7, 39:15, 39:25, 45:13, 49:7, 52:7, 59:15, 59:21, 70:21, 70:24, 71:2, 75:19, 81:11, 86:5, 94:14, 96:11, 97:3, 97:4, 98:9, 103:25, 108:9, 116:21, 117:1, 117:5, 120:3, 126:23, 129:18, 132:13, 140:6, 140:11, 140:25, 141:8, 142:23, 144:6, 144:16, 144:24, 146:12, 147:9, 148:11, 160:21, 163:15, 163:22, 164:2, 164:9, 167:21, 167:24, 174:20, 179:13, 189:8, 189:20, 191:1, 192:11

**UPBRINGING** [3] - 25:12, 25:14, 27:2

**UPDATED** [1] - 118:19

**UPSET** [2] - 137:8, 147:23

**UPTAKE** [1] - 85:6

**USEFUL** [2] - 152:19, 152:20

**USES** [1] - 113:3

**UTAH** [2] - 193:7, 193:11

**UTILIZING** [1] - 39:8

# V

**VACUUM** [1] - 35:22

**VAGUELY** [1] - 66:2

**VALIDITY** [1] - 178:6

**VALIUM** [4] - 150:7, 150:9, 152:2, 152:3

**VALUE** [1] - 184:7

**VARIABLE** [1] - 113:1

**VARIETY** [12] - 106:10, 124:9, 140:22, 142:3, 142:20, 142:25, 154:6, 159:4, 162:18, 164:21, 174:22, 175:11

**VARIOUS** [4] - 120:7, 161:10, 163:24, 174:6
**VARYING** [1] - 162:3
**VAST** [2] - 64:3, 64:5
**VENOUS** [1] - 82:2
**VENTRICLES** [7] - 96:24, 98:10, 99:20, 100:8, 100:16, 100:20, 101:1
**VERACITY** [2] - 17:20, 136:4
**VERBAL** [6] - 71:2, 137:3, 139:25, 142:11, 143:10, 156:10
**VERBALLY** [2] - 70:11, 139:11
**VERDICT** [2] - 117:8, 192:20
**VERIFIED** [1] - 23:24
**VERSION** [2] - 88:11, 155:11
**VERSIONS** [1] - 174:6
**VERSUS** [6] - 101:17, 104:20, 108:1, 110:17, 190:14, 193:12
**VIA** [1] - 50:22
**VICTIM** [3] - 47:7, 63:14, 91:13
**VICTIMS** [1] - 61:6
**VIDEO** [6] - 131:16, 131:21, 172:11, 172:14, 172:18, 172:24
**VIDEOTAPE** [2] - 63:20, 137:14
**VIDEOTAPED** [1] - 63:15
**VIEW** [6] - 63:18, 136:16, 159:9, 164:6, 171:13, 171:16
**VIEWED** [1] - 172:22
**VIOLATION** [1] - 16:21
**VIOLATIONS** [1] - 142:2
**VIOLENCE** [6] - 9:22, 9:24, 165:3, 165:4, 165:9, 176:21
**VIOLENT** [2] - 120:18, 164:24
**VIRGINIA** [1] - 124:4
**VIRTUALLY** [1] - 164:11
**VISION** [1] - 42:15
**VISUAL** [1] - 102:18
**VISUALIZED** [2] - 82:5, 83:9

**VOIR** [1] - 128:22
**VOLUME** [4] - 99:20, 100:9, 101:3
**VOLUMETRIC** [1] - 104:5
**VOLUMETRICS** [1] - 100:2
**VOLUNTEERS** [1] - 78:24
**VOLUNTEERS'** [1] - 79:4
**VULNERABLE** [2] - 6:23, 142:8

## W

**WAFFENSCHMIDT** [1] - 2:9
**WAIT** [3] - 73:20, 86:25, 87:4
**WAITED** [4] - 63:1, 92:12, 93:5
**WANED** [1] - 176:2
**WANES** [2] - 164:25, 165:2
**WANTS** [3] - 50:6, 55:9, 59:16
**WARPS** [1] - 44:22
**WARRANT** [3] - 127:25, 153:16, 162:21
**WASHINGTON** [4] - 1:17, 2:4, 119:11
**WATCH** [2] - 137:14, 172:11
**WATCHING** [1] - 30:25
**WATER** [2] - 139:8, 140:20
**WATERS** [1] - 2:9
**WAYS** [3] - 70:10, 70:13, 105:8
**WEB** [4] - 6:4, 6:6, 6:15, 7:2
**WECHSLER** [1] - 49:21
**WEEK** [5] - 106:7, 116:16, 117:10, 185:24, 196:4
**WEEKS** [1] - 90:12
**WELL-KNOWN** [2] - 173:10, 187:17
**WELLING** [1] - 29:13
**WEST** [1] - 2:10
**WET** [1] - 39:12
**WHITE** [3] - 1:19, 26:24, 198:12
**WHOLE** [17] - 10:16, 13:7, 14:8, 22:13, 27:18, 33:15, 37:1,

66:8, 80:5, 80:24, 92:24, 93:15, 93:17, 117:1, 169:11, 169:25
**WIDE** [3] - 124:9, 140:22, 161:12
**WIFE** [2] - 147:22, 148:1
**WIGGLE** [1] - 94:8
**WILBUR** [2] - 24:16, 69:2
**WILLIAMSPORT** [1] - 2:11
**WILLING** [2] - 91:13, 91:25
**WILMA** [1] - 28:10
**WISH** [1] - 194:6
**WISHES** [1] - 95:20
**WITHDRAW** [1] - 100:14
**WITHDRAWN** [1] - 192:19
**WITNESS** [45] - 3:6, 3:13, 3:15, 27:11, 27:14, 48:14, 55:5, 55:11, 55:21, 57:20, 59:19, 59:24, 71:25, 74:7, 74:23, 80:5, 80:11, 80:14, 82:18, 84:14, 90:15, 108:17, 112:17, 113:14, 113:21, 114:11, 117:2, 117:5, 117:18, 117:25, 118:2, 118:5, 118:8, 118:11, 148:16, 172:6, 172:21, 179:5, 180:20, 180:21, 182:6, 182:7, 182:23, 197:2
**WITNESS'** [1] - 17:20
**WITNESSED** [1] - 139:20
**WITNESSES** [7] - 10:25, 62:14, 116:21, 116:23, 116:25, 180:23, 185:9
**WOKE** [1] - 39:15
**WOLFSON** [7] - 20:25, 44:9, 63:6, 169:4, 169:17, 170:2, 177:8
**WOLFSON'S** [4] - 21:2, 37:16, 177:5, 177:25
**WOMAN** [2] - 62:11, 173:13
**WOO** [3] - 96:11, 101:11, 115:18

**WORD** [4] - 28:16, 112:13, 113:4, 163:4
**WORDS** [8] - 18:4, 18:22, 31:17, 62:10, 88:12, 172:25, 188:24, 190:5
**WORKER** [3] - 49:7, 135:24, 135:25
**WORKERS** [1] - 8:18
**WORLD'S** [1] - 82:20
**WORRY** [2] - 74:13, 74:19
**WORST** [1] - 139:25
**WOUND** [1] - 126:23
**WRAPS** [1] - 97:15
**WRECK** [1] - 32:16
**WRITE** [3] - 15:15, 15:16, 51:3
**WRITING** [4] - 29:12, 29:18, 74:9, 94:23
**WRITTEN** [7] - 29:20, 30:2, 56:17, 146:20, 183:22, 184:13, 185:3
**WROTE** [7] - 25:20, 29:23, 29:24, 29:25, 30:5, 194:23

## X

**XANAX** [1] - 152:13

## Y

**YEAR** [6] - 19:25, 107:25, 119:15, 120:3, 123:11, 175:23
**YEARS** [50] - 11:14, 11:15, 13:24, 14:11, 17:7, 19:9, 20:1, 20:2, 24:9, 28:8, 31:6, 34:13, 37:24, 42:23, 52:9, 52:18, 53:11, 53:22, 64:8, 65:10, 67:16, 68:3, 68:5, 69:1, 71:15, 71:18, 83:15, 83:16, 100:16, 106:1, 119:4, 128:4, 134:11, 140:12, 141:3, 141:4, 147:16, 148:13, 148:23, 149:2, 157:13, 168:1, 176:8, 187:10, 187:11, 188:21, 189:9, 195:1
**YESTERDAY** [5] - 3:3, 26:19, 72:10, 75:23,

94:2
**YORK** [2] - 63:13, 63:24
**YOUNG** [8] - 27:14, 27:16, 34:18, 44:13, 47:3, 67:15, 68:19, 164:17
**YOUNGER** [2] - 46:25, 185:1
**YOUNGEST** [1] - 179:3
**YOURSELF** [7] - 7:1, 12:12, 14:23, 15:18, 15:23, 144:21, 164:20

## Z

**ZEALOUS** [1] - 7:5
**ZERO** [2] - 104:9, 168:18
**ZOLOFT** [1] - 152:24