**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA,             :
                                      :       No. 4:96-CR-00239
              v.                      :
                                      :       JUDGE SLOMSKY
DAVID HAMMER,                         :
                                      :       Capital Case
              Defendant               :

**DEFENDANT'S BRIEF IN SUPPORT OF THE GRANT OF A CERTIFICATE OF APPEALABILITY**

Defendant, David Hammer, through counsel, submits his *Brief in Support of the Grant of a Certificate of Appealability*, and in support thereof, states the following:

**A.      BACKGROUND**

David Hammer has been incarcerated on federal death row for nearly two decades. This Court (per Judge Muir) reversed his death sentence in December 2005, finding violations of *Brady v. Maryland* and unconstitutional impairments in the jury's consideration of mitigating evidence.  The Court of Appeals remanded to this Court in 2009 to conduct a resentencing proceeding, at which, earlier this year, the Court imposed a life sentence.  The Government is appealing the initial grant of relief that led to Mr. Hammer's life sentence.  Mr. Hammer is appealing the denial of guilt relief and the penalty issues as to which relief has been denied.

Mr. Hammer's case has tread a circuitous path.  On September 18, 1996, the Grand Jury returned an Indictment on two counts of intentional murder arising from the death of Andrew Marti.  Doc. 1.  On April 9, 1997, the government filed its Notice of Intent to seek a death sentence.  Doc. 93.  Mr. Hammer's capital trial began on May 5, 1998.  On June 22, 1998, after the defense had rested and while the government was

presenting its rebuttal case, Mr. Hammer entered a plea of guilty to the murder charge. NT 6/22/98 at 111-113.  The penalty phase began on June 30, 1998.  In support of death, the government pursued two statutory aggravating factors – that the defendant committed the murder after substantial planning and premeditation, 18 U.S.C. § 3592(c)(9), and that the defendant had previously been convicted of a state or federal offense punishable by a term of imprisonment of more than one year that involved the use, or attempted or threatened  use, of a firearm against another person, 18 U.S.C. § 3592(c)(2) – and non-statutory aggravation.

One of the two convictions relied upon by the government in support of the prior firearm conviction aggravator under Section 3592(c)(2) was State v. Hammer, CRF-84-1310 (hereinafter "Upton case").  That incident involved charges of kidnapping, robbery with a firearm, and shooting with intent to kill and resulted in an aggregate sentence of 1200 years.  On July 24, 1998 the jury returned a verdict of death.

In September 2002, Mr. Hammer filed a collateral attack of his conviction and sentence pursuant to 28 U.S.C. § 2255.  The Court conducted an evidentiary hearing from July 14, 2005 through September 29, 2005.  On the twenty-ninth day of the hearing, the government provided the defense with thirty-three previously undisclosed FBI 302 statements that summarized interviews with various prison inmates.

On December 27, 2005, the Court issued its decision vacating the 1998 death sentence.  The Court found relief was required for two reasons.  First, the Court found that the FBI 302 statements of Albert Ray Johnson, Royce Lee Fowler, Gaylon Don Ball and Martin Guerrero that were "relevant and material" to the jury's penalty determination

and the government's failure to disclose those statements violated Brady v. Maryland, 373 U.S. 83 (1963), rendering "the penalty phase of the trial defective." United States v. Hammer, 404 F. Supp. 2d 676, 801 (M.D. Pa. 2006) (Muir, J.). Second, the Court found that "many of the jury's findings relating to mitigating circumstances" were defective, including: (1) the entire jury's failure to find that Mr. Hammer "suffer[ed] from a major mental disease or defect" at the time of trial; (2) eleven jurors failure to find that Mr. Hammer "suffer[ed] from cognitive deficits"; and six jurors failure to find that Mr. Hammer was "the victim of [childhood] sexual abuse." Id. at 800.

Cross-appeals were timely filed. On February 8, 2006, the Court issued an order denying a Certificate of Appealability ("COA"). DOC. 1229. The Third Circuit granted Mr. Hammer's request for a COA on three claims: (1) "whether counsel were ineffective for failing to challenge or correct the effect of the District Court's pretrial order committing Hammer to long-term in-patient evaluation, and whether this claim is time-barred; (2) whether counsel were ineffective for failing to investigate and present Hammer's history of false confessions and other mendacity; and (3) whether counsel were ineffective for failing to investigate and present the defense of erotic asphyxiation." United States v. Hammer, CA No. 06-9000, (3d Cir. Order, 12/21/2006); Doc. 1242. Following briefing and oral argument, the Circuit dismissed the appeals for lack of jurisdiction. United States v. Hammer, CA Nos. 06-9000, 06-9001 (3d Cir. Order, May 11, 2009).

During the resentencing proceedings, the government made additional disclosures of exculpatory evidence. These included evidence that Thomas Upton had lied about

material aspects of the facts underlying Mr. Hammer's convictions and sentences in the Upton case and statements by Leonard Yager indicating that he had been deployed by law enforcement to obtain inculpatory statements and evidence from Mr. Hammer after Mr. Hammer had invoked his right to counsel.

On April 2, 2014, Mr. Hammer filed his *Consolidated Fifth Amended/Supplemental Motion Pursuant to 28 U.S. C. § 2255 and Brief in Support.* Doc. 1642. On May 29, 2014, this Court issued a Memorandum Opinion and Order summarily denying Mr. Hammer's Motion. Doc. 1711 at 32. In reaching its determination, the Court concluded that Mr. Hammer's "new claims do not allege supportable constitutional violations." Id. at 18. On July 17, 2014, this Court issued its verdict of life without parole. Doc. 1770 at 18. Formal sentencing occurred on August 20, 2014. Mr. Hammer timely appealed.

**B.    THE STANDARD FOR GRANTING A CERTIFICATE OF APPEALABILITY.**

Under 28 U.S.C. § 2255 and Rule 22(b) of the Federal Rules of Appellate Procedure, as amended by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a Section 2255 petitioner who wishes to appeal must obtain a certificate of appealability ("COA") for each claim he wishes to present to the Court of Appeals. "Except for substituting the word 'constitutional' for the word 'federal,'" AEDPA's COA requirement is merely "a codification of" the pre-AEDPA standard for granting a certificate of probable cause ("CPC"), as "announced in Barefoot v. Estelle, [463 U.S. 880, 894 (1983)]." Slack v. McDaniel, 529 U.S. 473, 483 (2000). Thus, as before AEDPA, the purpose of the COA requirement remains simply "to prevent frivolous

4

appeals." <u>Barefoot</u> 463 U.S. at 893.

A COA must be granted if the issue is "debatable among jurists of reason"; "a court could resolve the issue[] [in a different manner]"; or "the question[] [is] adequate to deserve encouragement to proceed further." <u>Id.</u> at 893 n.4. As the Supreme Court explained:

> Under the controlling standard, a petitioner must "sho[w] that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" [<u>Slack,</u>] 529 U.S., at 484 (quoting Barefoot, [463 U.S.] at 893, n. 4).

<u>Miller-El v. Cockrell</u>, 537 U.S. 322, 336 (2003); <u>see also</u> <u>Tennard v. Dretke</u>, 542 U.S. 274, 282 (2004); <u>Banks v. Dretke</u>, 540 U.S. 668, 705 (2004).

"[A] COA does not require a showing that the appeal will succeed. Accordingly, a court . . . should not decline the application for a COA merely because it believes the applicant will not demonstrate an entitlement to relief." <u>Miller-El</u>, 537 U.S. at 337. The Court should resolve any doubts "in favor of the petitioner." <u>Jones v. Warden</u>, 402 F.2d 776 (5th Cir. 1968); <u>accord</u> <u>Whitehead v. Johnson</u>, 157 F.3d 384, 386 (5th Cir. 1998). "In a capital case, the nature of the penalty is a proper consideration" to weigh in granting a COA. <u>Barefoot</u> 463 U.S. at 893.

This standard also applies to the Court's analysis of the limitations on relief set forth in AEDPA:

> We look to the District Court's application of AEDPA to petitioner's constitutional claims and ask whether that resolution was debatable amongst jurists of reason. This threshold inquiry does not require full consideration of the factual or legal bases adduced in support of the claims. In fact, the statute forbids it.

Miller-El, 537 U.S. at 336.   The same "threshold inquiry" applies in a COA analysis of claims for which the court denied relief on procedural grounds without reaching the merits of the underlying constitutional claim.   Gerber v. Varano, 512 Fed. Appx. 131, 133-34 (3d Cir. 2013) (per curiam).   As to such claims, "a COA should issue when . . . jurists of reason would find it debatable whether the district court was correct in its procedural ruling."   Slack, 529 U.S. at 484; Gonzalez v. Thaler, 132 S.Ct. 641, 648 (2012); United States v. Cepero, 224 F.3d 256, 262 (3d Cir. 2000) (en banc).

C.    **MR. HAMMER IS ENTITLED TO A COA.**

1.    **A COA is Warranted on the Court's Summary Denial of His Claim that His Mid-Trial Guilty Plea was Constitutionally Invalid as a Result of the Government's Failure to Disclose Exculpatory Evidence, Its Use of an Inmate-Agent to Obtain Inculpatory Statements in Violation of Mr. Hammer's Invocation of His Right to Counsel, and Its Reliance on Materially Misleading and Perjured Testimony.**

Mr. Hammer entered his guilty plea mid-trial, after the prosecution had presented its case-in-chief, after the defense case and after the government had begun its rebuttal.   See NT 6/22/98 at 111-13.   During the course of the post-trial, prior Section 2255, and resentencing proceedings, a number of instances of constitutional error came to light that have a direct impact on the validity of Mr. Hammer's guilty plea.   These included:

- The government's failure to disclose Bureau of Prison (BOP) documents indicating that it was Mr. Marti who had requested to cell

with Mr. Hammer and undermining the prosecution's trial and sentencing theory of intent and premeditation that Mr. Hammer had lured Mr. Marti into becoming his cell-mate for purposes of killing him;

- The government's failure to disclose FBI 302 statements of Albert Ray Johnson, Royce Lee Fowler, and Gaylon Ball that contradicted the government's trial theory of intent with regard to the purpose behind braiding ropes and supported Mr. Hammer's contention that the sheets were braided for the purpose consensual sexual activity, see 404 F. Supp. 2d at 790;

- The government's failure to disclose an FBI 302 statement of Martin Guerrero contradicting the government's at-trial hostage ruse theory of intent and premeditation, see 404 F. Supp. 2d at 790;

- Evidence that the government utilized inmate Leonard Yager as its agent to obtain inculpatory evidence and circumvent Mr. Hammer's clear and unequivocal invocation of his right to counsel, and failed to disclose these facts pretrial, see Doc. 1642, Claim II;

- Evidence that the arrangement between Stephen Classen and the government was more extensive than what had been provided to the defense and presented to the jury during Mr. Hammer's trial and sentencing hearing, see Doc. 1642, Claim IV; and

- Evidence that the government relied on materially misleading and perjured testimony from Upton and Yager in obtaining the indictment and at trial, see Doc. 1642 Claims I, IV,V, VI, VII.

Individually and collectively, these constitutional errors went to the heart of the prosecution's case against Mr. Hammer. Individually and collectively, these constitutional errors had a direct impact on Mr. Hammer's guilty plea, rendering it involuntary.

7

### a.    The Law

A guilty plea is a "grave and solemn act." Brady v. United States, 397 U.S. 742, 748 (1970).  It is "more than an admission of past conduct" but represents as well the "defendants consent that judgement of conviction may be entered without a trial." Brady v. United States, 397 U.S. at 748.  It constitutes a waiver of the fundamental rights to a jury trial, Duncan v. Louisiana, 391 U.S. 145 (1968), to confront one's accusers, Pointer v. Texas, 380 U.S. 400 (1965), the right to present witnesses in one's defense, Washington v. Texas, 388 U.S. 14 (1967), and the right to put the prosecution to its proofs. In re Winship, 397 U.S. 358 (1970).

A waiver of a constitutional right may not stand absent a showing that the right was surrendered in a knowing, intelligent, and voluntary manner.  See Johnson v. Zerbst, 304 U.S. 458 (1938); North Carolina v. Alford, 400 U.S. 25, 31 (1970).  A guilty plea is not voluntary and intelligent if it resulted from "impermissible conduct by state agents." Brady v. United States, 397 U.S. 742, 757 (1970); see also Ferrara v. United States, 456 F.3d 278, 291 (1st Cir. 2006) ("Under limited circumstances, however – everything depends on the context – the prosecution's failure to disclose evidence may be sufficiently outrageous to constitute the sort of impermissible conduct that is needed to challenge the validity of a guilty plea"). As the Second Circuit has explained:

> Since a defendant's decision whether or not to plead guilty is often heavily influenced by his appraisal of the prosecution's case, and of information that may be available to cast doubt on the fact or degree

of his culpability, we conclude that even a guilty plea that was "knowing" and "intelligent" may be vulnerable to challenge if it was entered without knowledge of material evidence withheld by the prosecution.

Miller v. Angliker, 848 F.2d 1312 (2d Cir. 1988). Assessing the evidence objectively,

> The elementary question is whether a reasonable defendant standing in the petitioner's shoes would likely have altered his decision to plead guilty had the prosecution made a clean breast of the evidence in its possession.

Ferrara v. United States, 456 F.3d at 294. Prejudice is demonstrated where "[t]he totality of the circumstances discloses a reasonable probability that the defendant would not have pleaded guilty absent the misconduct." Ferrara 456 F.3d at 294; see also Hill v. Lockhart, 474 U.S. 52, 59 (1985) (the defendant demonstrates prejudice where there is "a reasonable probability that, but for [the misconduct], he would not have pleaded guilty and would have insisted on going to trial").

> **b.    The Constitutional Errors Rendered Mr. Hammer's Plea Involuntary**

As the evidence finally disclosed during Judge Muir's hearing and the more recently disclosed evidence demonstrates, Mr. Hammer entered his plea under a number of false impressions, all of which rest in the lap of the government. He was under the false impression there was no extrinsic evidence supporting his at-plea statement that the ropes were used for other purposes and not indicative of any intent to kill. But the government had in its possession FBI-302s that definitively

9

established that to be the case, failed to disclose that evidence, and then faulted the defense for failing to present that evidence, knowing all the while that the defense could not do so precisely because the government had withheld it.

Mr. Hammer was under the false impression that there was little evidence to support his at-plea statement that Mr. Marti's move into his cell was at his request, not Mr. Hammer's. But the government had in its possession prison documentation demonstrating that this, too, was the case and still argued that it was Mr. Hammer's desire for Mr. Marti to move into his cell in order to effectuate his plan to kill him.

Mr. Hammer was under the false impression that there were no legal bases to challenge Yager's testimony. But the government knew of – and suppressed evidence of – a number of bases for such challenges, not the least of which involved the government's complete disregard for Mr. Hammer's clear and unequivocal invocation of his right to counsel and deployment of Yager as its agent to obtain purported inculpatory evidence. Mr. Hammer was also under the false impression that there was little he could do to challenge Classen's credibility, but the government knew that Classen's expectations for leniency and assistance from the government in exchange for his testimony were materially broader than what it had disclosed at trial.

Mr. Hammer was under the false impression that there was no basis to challenge false testimony by Upton that formed the basis for the Oklahoma

kidnapping, robbery, and shooting convictions considered by the Grand Jury in reaching its indictment determination. But, as the resentencing disclosures demonstrated, Upton's testimony was perjured.

The evidence Mr. Hammer did not know – as a direct result of prosecutorial misconduct and suppression – changes the entire context of the defense case and its ability to raise reasonable doubt on the accuracy, veracity, and reliability of the government's guilt-phase case. Armed with this evidence, Mr. Hammer would have been able to raise a strong reasonable doubt defense as to his guilt of first degree murder. And, armed with this information, Mr. Hammer would not have pled guilty. In short, "[t]he totality of the circumstances discloses a reasonable probability that the defendant would not have pleaded guilty absent the misconduct." Ferrara 456 F.3d at 294.

### c. Mr. Hammer is Entitled to a COA

During the prior Section 2255 proceedings, Mr. Hammer raised a claim that his guilty plea was rendered constitutionally invalid as a result of the government's failure to disclose material exculpatory evidence contained in the FBI 302s. The Court correctly held that these Brady violations were material to Mr. Hammer's penalty phase in several respects, and required vacation of the death sentence. Hammer, 404 F. Supp. 2d at 798-99. The Court found that the withheld evidence was material because it related to the government's contention that Mr. Hammer engaged in substantial planning and premeditation (an aggravating circumstance).

11

In short, the government argued that Mr. Hammer's braiding of the sheets demonstrated substantial planning and premeditation for the murder, while the Brady documents showed that Mr. Hammer had a history of braiding sheets for use in consensual sexual activity. Id.

Applying a subjective analysis, the Court found that, although the suppression of these documents required a new sentencing because they materially affected the government's intent and premeditation case, the contents of the withheld materials would not have influenced Petitioner's decision to enter a guilty plea. Id. at 797. As noted above, the subjective standard applied by the Court was clearly erroneous and contrary to controlling Supreme Court precedent. At a minimum, reasonable jurists would disagree with the Court's application of the subjective standard and find under the proper objective standard that the government's non-disclosure rendered Mr. Hammer's plea involuntary, entitling Mr. Hammer to a COA.

As described above and in Doc. 1642, during the resentencing proceedings, even more exculpatory evidence came to light that had a direct impact on Mr. Hammer's decision to enter a guilty plea. Mr. Hammer argued that these additional disclosures – combined with those uncovered during the previous proceedings – rendered Mr. Hammer's guilty plea involuntary. This Court summarily denied Mr. Hammer's challenge to the constitutional validity of his guilty plea. Doc. 1711 at 18-19 n.3. At a minimum, reasonable jurists would

12

disagree with regard to the question of whether "[t]he totality of the circumstances" arising from the government's (1) failure to disclose documentary evidence undermining the prosecution's theory that Mr. Hammer lured Mr. Marti into becoming his cellmate; (2) failure to disclose evidence contradicting the prosecution theory that the ropes were braided for the sole purpose of intent and premeditation; (3) deployment of Yager as its agent to circumvent Mr. Hammer's right to counsel in collecting inculpatory statements and evidence; and (4) its reliance on perjured testimony collectively establish "a reasonable probability that the defendant would not have pleaded guilty absent"-these factors.  Ferrara 456 F.3d at 294.

### d.   At a Minimum, An Evidentiary Hearing was Required.

Section 2255 requires an evidentiary hearing "[u]nless the motion and the files and record of the case conclusively show that the prisoner is entitled to no relief."  28 U.S.C. § 2255(b).  Mr. Hammer proffered facts that, if proven at an evidentiary hearing, would have required relief.  Throughout its Brief in Opposition ("BIO"), the government proffered information it characterized as "facts" that were not part of the record – and in some cases were not "facts" at all – and asked that the Court deny relief on the basis of these purported "facts."  Doc. 1684 at 43-54; 74-75; 76-77.  But the law requires an evidentiary hearing under these circumstances, even if the purported "facts" were presented in an affidavit – and they were not.  Walker v. Johnston, 321 U.S. 275, 286-87 (1941) ("Not by the

13

pleadings and the affidavits, but by the whole of the testimony, must it be determined whether the petitioner has carried his burden of proof and shown his right to a discharge"); see also Machibroda v. United States, 368 U.S. 487, 494-95 (1962); United States v. Costanzo, 625 F.2d 465, 470 (3d Cir. 1980) ("Government affidavits filed in opposition to a § 2255 motion for postconviction relief are not part of the "files and records" of the case and are not conclusive against the movant").

Even if this Court gave due consideration to the government's properly pleaded facts (and even its unsupported non-record assertions), at a minimum, an evidentiary hearing was required. See Fontaine v. United States, 411 U.S. 213, 214-16 (1977) (remand for an evidentiary hearing on the petitioner's claim that his guilty plea was involuntary was required where the Court could not "conclude with the assurance required by the statutory standard 'conclusively show' that under no circumstances could the petitioner establish facts warranting relief under § 2255"); United States v. McCoy, 410 F.3d 124, 134 (3d Cir. 2005) ("If [the] petition alleges any facts warranting relief under § 2255 that are not clearly resolved by the record, the District Court was obliged to follow the statutory mandate to hold an evidentiary hearing"); United States v. Booth, 432 F.3d 542, 545-546 (3d Cir. 2005); United States v. Burrows, 872 F.2d 915, (3d Cir. 1989) ("An evidentiary hearing is usually required if the motion states a claim based on matters outside the record or events outside the courtroom"). Because reasonable jurists would

14

resolve "in a different manner" the issue of whether there is a reasonable probability that an evidentiary hearing was required and "the question[] [is] adequate to deserve encouragement to proceed further, Barefoot, 463 U.S. at 893 n.4, grant of a COA is appropriate.

2.     **Mr. Hammer's Claim Arising from The Government's Use of Inmate Yager as Its Agent to Circumvent Mr. Hammer's Unequivocal Invocation of His Right to Counsel Meets the Standard for a COA.**

At or around 6:24 am on April 13, 1996, Mr. Hammer was interrogated by FBI Special Agent Carlyle Thompson and BOP investigative personnel. Doc. Exh. 5. Although he initially waived his right to counsel and provided a statement, Mr. Hammer subsequently indicated that he "had better get me a lawyer," and the interrogation was terminated. Id. Mr. Hammer was moved to a separate, empty cell with no supplies. NT Vol. 4 at 97-98. On April 16, 1996, the prison transferred Mr. Hammer from the Allenwood SHU to the Medical Unit and on April 17, 1996, moved him from the Medical Unit to Allenwood FCI.

Shortly after they interrogated Mr. Hammer, FBI and BOP investigators questioned inmate Leonard Yager – an inmate orderly and BOP informant. Doc. Exh. 6. Subsequently, Yager approached Mr. Hammer on a number of occasions, asking him more than once why he killed Mr. Marti; providing Mr. Hammer with pencil and paper; and retrieving a document purporting to articulate the reasons why Mr. Hammer killed Mr. Marti. NT Vol. 4 at 97-98, 102-03. At trial, the

government had Yager read to the jury various portions of that document (Exhibit 32.1) as support for its theory of intent and premeditation for first degree murder. Id. at 105-09; see also NT 7/24/96 at 25-27.

The government also relied for proof of intent and premeditation upon another letter that it contended inmate Classen received under the door of his cell, which purported to articulate reasons for killing Mr. Marti. NT 8/28/96 at 14; NT Vol. 6 at 17. That document would have been delivered by the inmate orderly, i.e., Yager. Classen did not immediately read the note and, when he did, only read part of it before flushing it down the toilet. NT 8/28/96 at 14-15; NT Vol. 6 at 17-18. He did not mention receiving the letter during his interview with law enforcement. Classen was surprised when AUSA Martin showed him a document purporting to be a copy of the letter during the grand jury proceedings, NT 8/28/96 at 15, and did not identify the document as the letter he had received under his cell door at trial. NT Vol. 6 at 19; id. at 32.

On March 14, 2014, the government disclosed for the first time that, "at the time of the offense, the FBI 'sent [Yager] in' to talk to Mr. Hammer." Doc. 1642, Exh. 3.

   a.    **The Government's Use of Yager as Its Agent to Circumvent Mr. Hammer's Invocation of His Right to Counsel Violated the Fifth and Eighth Amendments.**

Mr. Hammer's indication that he "had better get me a lawyer" was a clear and unambiguous invocation of his right to counsel requiring that law enforcement

16

cease all interrogation, see Miranda v. Arizona, 384 U.S. 436, 474 (1966), because it was a "statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." McNeil v. Wisconsin, 501 U.S. 171, 178 (1991). Indeed, the investigators understood it as an invocation of the right to counsel because they terminated the interview at that point. Doc. 1642, Ex. 5. Also at that point, the government was precluded from subjecting Mr. Hammer to "further interrogation" unless Mr. Hammer indicated his desire to speak with investigators without counsel. Edwards v. Arizona, 451 U.S. 477, 484 (1981).    Rather than "scrupulously honoring" Mr. Hammer's invocation of his right to counsel, Michigan v. Mosley, 423 U.S. 96, 104 (1975), the government sent Yager in as its agent to conduct further interrogation and obtain inculpatory evidence from Mr. Hammer. Yager initiated the contact; Yager asked Mr. Hammer specific questions about the death of Mr. Marti; Yager provided Mr. Hammer – whom the BOP had strategically isolated in an empty cell – with pencil and paper to facilitate obtaining further incriminatory statements; Yager delivered notes to the government that purportedly had been generated by Mr. Hammer. In short, in every way, Yager was acting as an agent of the government. All evidence obtained by Yager, including the document Classen purportedly received under his cell door – and delivered by Yager – was inadmissible under the Fifth and Eighth Amendments.

### b.    Mr. Hammer is Entitled to a COA

This Court found no constitutional violation. First, relying on Davis v.

17

United States, 512 U.S. 452 (1994), the Court concluded that Mr. Hammer's statement was not an invocation of his right to counsel. Second, relying on government proffers in its *BIO* that FBI Agents Thompson and Malocu denied sending Yager in to collect evidence from Mr. Hammer – without benefit of an evidentiary hearing – the Court concluded that Yager was not acting as an agent for the government. Doc. 1711 at 23.

In Davis, during the interrogation, the defendant said "Maybe I should talk to a lawyer." Davis, 512 U.S. at 455. The investigators then inquired further to clarify whether the defendant was invoking his right to counsel, indicating that if he wanted counsel, they would end the interrogation. Id. When the defendant stated he was not asking for a lawyer, the interrogation continued. They took a break and resumed until the defendant stated "I think I want a lawyer before I say anything else." Id. At that point, interrogation ended without further inquiry. Id. Reasonable jurists would disagree regarding whether Mr. Hammer's statement that he "had better get me a lawyer" was similar to Davis' first statement or more like Davis' second statement, particularly where, as here, the investigators terminated the interrogation after Mr. Hammer made that statement, just as the investigators in Davis terminated the interrogation once the defendant made the second statement.

While the government did proffer in its *BIO* that FBI Agents Thompson and Malocu would testify that they did not send Yager in to collect inculpatory evidence from Mr. Hammer, it was strikingly silent as to the BOP investigators

who were working in-concert with the FBI on this investigation. United States v. Risha, 445 F. 3d 298, 305 (3d Cir. 2006). The government did, however, disclose statements by BOP investigators indicating that the BOP was using Yager as an informant at and around the time of this offense. *BIO* at 48-50. Reasonable jurists would disagree regarding limiting the question of government action to FBI agents for purposes of the constitutional violations where, as here, the BOP investigators were working in-concert with the FBI.

As noted previously, an evidentiary hearing is required "[u]nless the motion and the files and record of the case conclusively show that the prisoner is entitled to no relief," 28 U.S.C. § 2255(b), even if the government proffers facts or evidence in opposition to allegations presented by a petition. Walker, 321 U.S. at 286-87; Machibroda, 368 U.S. at 494-95; Costanzo, 625 F.2d at 470. This Court relied on government proffers in reaching its conclusion that the government did not send Yager in as its agent to obtain inculpatory evidence from Mr. Hammer. Reasonable jurists would disagree regarding whether controlling precedent required an evidentiary hearing to resolve the disputed facts.

Because reasonable jurists would resolve each of these issues differently "'the questions are adequate to deserve encouragement to proceed further,'" Barefoot, 463 U.S. at 893 n.4, and a COA is warranted.

3.    **THE GOVERNMENT'S FAILURE TO DISCLOSE MATERIAL EXCULPATORY EVIDENCE AND ITS RELIANCE ON MATERIALLY MISLEADING AND FALSE TESTIMONY VIOLATED THE FIFTH, SIXTH AND EIGHTH AMENDMENTS.**

Throughout the pretrial, trial and even during the Section 2255 proceedings prior to the hearing conducted by Judge Muir, the government assured the defense that it had provided all materials required under Brady and its progeny. Judge Muir relied on the government's (mis)representations in denying Mr. Hammer's pre-hearing motion for discovery. See Hammer, 404 F. Supp. 2d at 781 ("There is no indication that the Government has not complied with the requirements of *Brady* or its progeny"). As became evident during the closing days of the 2255 hearing, and as became even more clear during the resentencing proceedings, those assurances were far from true.

a.    **Relevant Facts**

During the closing days of the prior Section 2255 evidentiary hearing, the government disclosed thirty-two previously withheld FBI 302s. The Court found that four of those FBI 302s contained information that was material and exculpatory and that the government's failure to disclose those statements violated Brady v. Maryland, 373 U.S. 83 (1963). Hammer, 404 F. Supp. 2d at 799. The Court made the following findings:

- "The bulk of the information which the Government failed to turn over relates to Mr. Hammer's reason for braiding sheets into ropes and the truthfulness of Mr. Hammer's story that he convinced Mr. Marti to engage in a hostage ruse so that Mr. Marti could be

transferred to the United States Penitentiary, Atlanta, Georgia"

- "The information from Albert Ray Johnson, Royce Lee Fowler and Gaylon Ball would have supported Mr. Hammer's contention that the sheets were braided into ropes for the purpose of being used as part of a consensual sexual activity involving bondage. *See* Findings of Fact Nos. 1595 through 1696. The testimony of Martin Guerrero would have bolstered Mr. Hammer's position that the hostage scenario was untrue."

Id. at 796.

But the government's pattern of non-disclosure did not end with these FBI 302s. As noted in Claim 2, there was much more. Long after trial, counsel discovered through a Freedom of Information Act response that the government had also failed to disclose documents from the BOP indicating that it was Mr. Marti, not Mr. Hammer, who had requested the cell change so that the two could be cell-mates. 2255 Def. Exh. 197 at 15. This document directly contradicted both Mr. Hammer's statement to investigators and the prosecution's trial theory that Mr. Hammer lured Mr. Marti into his cell with the intent to commit murder; supported the defense theory; and substantiated Mr. Hammer's guilty plea statement disagreeing with the government's factual proffer, see NT 6/22/98 at 112-13. As this evidence was relevant and material to attack a critical aspect of the prosecution's theory and support the defense theory, the non-disclosure violated due process.

But the pattern of non-disclosure does not even end there. During the

resentencing proceedings, the government provided a number of additional disclosures of previously withheld material exculpatory evidence. As noted previously, see Claim 3, the government used inmate Yager as its agent to circumvent Mr. Hammer's invocation of his right to counsel by deploying Yager to surreptitiously interrogate Mr. Hammer and collect incriminating evidence on its behalf.

In response to Mr. Hammer's first discovery motion in the resentencing proceedings, the government also disclosed for the first time various letters between Classen and AUSA Martin, some of which had been sent prior to and others after Mr. Hammer's initial trial. Doc. 1642, Exh. 8. The previously suppressed correspondence provides a clearer picture of Classen's expectations as to the assistance he would receive from the government (and specifically from Mr. Martin) in obtaining a reduction of sentence and establishes that Classen affirmatively sought, and apparently received, Mr. Martin's assistance both before and after Mr. Hammer's trial as to where Classen would be housed. Mr. Martin not only provided Classen assistance in obtaining a shorter sentence, but also intervened to expedite Classen's release to a halfway house. In short, the correspondence demonstrates that Mr. Martin provided much more to Classen than what the jury was told.

The government relied on Mr. Hammer's prior conviction in the Upton case as one of two convictions supporting the Section 3592(c)(2) aggravating factor.

Mr. Upton testified at two preliminary hearings and trial in that case. The circumstances of the Upton case and the sentences imposed (all based primarily on Upton's testimony) were presented to the Grand Jury in support of the indictment in this case and Mr. Upton testified during the initial sentencing hearing. As the 2014 disclosure by the government demonstrates, a great deal of Mr. Upton's testimony regarding key aspects of the facts providing the basis for these convictions and the sentences was false and the government prosecutor knew or should have known it was false but nevertheless relied on that false testimony in support of the Grand Jury indictment and in support of the death sentence. See Doc. 1642, Claim I.

> **b.    The Government's Failure to Disclose This Material Favorable Evidence Violated the Fifth, Sixth, and Eighth Amendments.**

Due Process requires a prosecutor to disclose to the accused favorable evidence that is material to either guilt or punishment. Brady v. Maryland, 373 U.S. 83, 87 (1963); Giglio v. United States, 405 U.S. 150, 153-56 (1972); United States v. Bagley, 473 U.S. 667, 676 (1985); Kyles v. Whitley, 514 U.S. 419, 437 (1995). A prosecutor's duty to disclose is especially important in a capital case. Kyles, 514 U.S. at 422. The duty to disclose continues past a defendant's conviction. Imbler v. Pachtman, 424 U.S. 409, 427 n.25 (1976). "Favorable evidence" includes evidence that impeaches the prosecution's theory or witnesses. Bagley, 473 U.S. at 676; Napue v. Illinois, 360 U.S. 264, 269 (1959); see also

Breakiron v. Horn, 642 F.3d 126, 133-34 (3d Cir. 2011); Simmons v. Beard, 590 F.3d 223, 235 (3d Cir. 2009); Wilson v. Beard, 589 F.3d 651, 662 (3d Cir. 2009) (same).

Favorable evidence is material, and its non-disclosure prejudicial, "when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." Cone v. Bell, 556 U.S. 449, 469-70 (2009).   When there is a reasonable probability that the withheld evidence, if presented, could have provided a "reasonable doubt" about Petitioner's guilt, he is entitled to relief. Kyles, 514 U.S. at 434; United States v. Agurs, 427 U.S. 97, 112 (1976); California v. Trombetta, 467 U. S. 479, 485 (1984); see also Hinton v. Alabama, 134 S. Ct. 1081, 1089 (2014) (per curiam) (describing the identical standard applicable in cases of ineffective assistance of counsel). In assessing materiality, the Court must consider "any adverse effect" the prosecution's non-disclosure had on the defendant's ability to prepare for trial or present a defense. Bagley, 473 U.S. at 683; United States v. Perdomo, 929 F.2d 967, 972 (3d Cir. 1991).

Moreover, the courts are required to consider the "cumulative effect of all such evidence suppressed by the government." Kyles 514 U.S. at 421; see also Simmons, 590 F.3d at 234 (quoting Kyles, 514 U.S. at 436); Wilson, 589 F. 3d at 659 ("the impact of the suppressed evidence must be considered cumulatively, not individually").

### 1.    The Undisclosed Evidence About Yager.

At trial, Yager portrayed himself as a confident of Mr. Hammer, who – by mere coincidence – happened to come across the information that the government presented in support of its theory of premeditation for murder.  As the new evidence demonstrates, that is simply not true.  Armed with this suppressed evidence, Mr. Hammer's counsel would have been able to confront Yager with evidence of his actual role and the obvious biases inherent in that role, and would have been able to paint a materially different picture of his credibility to the jury. Counsel also would have been able to use the withheld evidence about Yager's status and the government's misconduct to challenge the genesis and reliability of government Exhibit 35.2, the purported "letter" Classen received.  Had the jury heard the actual circumstances of Yager's involvement, there is a reasonable probability that it would have rejected his testimony and the government's contentions regarding Exhibit 35.2.    The government's misconduct relating to the Yager evidence also infected Mr. Hammer's decision to plead guilty and materially impaired the preparation of his defense.  Had Mr. Hammer been aware of the significant challenges to the key witnesses supporting the prosecution's guilt-theory, there is a reasonable probability that he would not have entered a guilty plea. See Claim 2.

2. *The Undisclosed Evidence Regarding the True Nature and Extent of Classen's Expectations for Benefits in Exchange for His Cooperation.*

As the previously undisclosed correspondence between Mr. Martin and Classen demonstrate, the nature and extent of Classen's expectations from the government in exchange for his testimony was much more than what the government presented at trial. See Doc. 1642, Claim IV. Classen's testimony was critical to the government's theory of intent to commit murder as well as the prosecution's theory regarding the gateway intent factor and aggravation. Had the jury learned the true nature and extent of the benefits Classen expected in exchange for his testimony, there is a reasonable probability that it would have rejected his testimony and reached a different result.

In addition, the government's suppression of exculpatory evidence that undermined the reliability of Classen's testimony and the inferences the government sought to draw from that evidence wrongfully induced Mr. Hammer's decision to plead guilty and materially and adversely affected the preparation of his defense. Had Mr. Hammer been aware of these significant challenges to the key witnesses supporting the prosecution's guilt theory, he would not have entered a guilty plea. See Claim 2.

3. *The Undisclosed Evidence Regarding Upton's Perjury.*

Also as noted above, the government relied heavily on Mr. Upton's perjured

description of that incident as support for the indictment and aggravation during the penalty hearing. Evidence contradicting Mr. Upton's version of events and undermining the reliability of the Oklahoma convictions was clearly exculpatory. Had Mr. Hammer known pretrial that Upton had admitted that the version of events he provided regarding the Oklahoma incident was false, he would have moved pretrial to challenge the indictment and preclude the government from presenting evidence of, or relying on, those convictions. Had the Grand Jury learned that these convictions and sentences were based on perjury, there is a reasonable probability that the indictment determination would have been different. See Claim 5. Had Mr. Hammer known of these additional challenges to the presentation of the witnesses and evidence of these convictions, he would have reached a different determination regarding entering a guilty plea. See Claim 2.

4.    *The Cumulative Impact.*

As noted previously, in determining materiality/prejudice, the courts are required to consider the "cumulative effect of all such evidence suppressed by the government." Kyles 514 U.S. at 421; Simmons, 590 F.3d at 234; Wilson, 589 F.3d at 659. The history of this case reveals a troubling pattern of prosecutorial misconduct and non-disclosure.

The Court vacated Mr. Hammer's death sentence and ordered a resentencing hearing on the basis of the government's failure to disclose FBI 302 witness statements that "were material, relevant and critical to counter the Government's

argument concerning substantial planning and premeditation during the penalty phase of this case." Hammer, 404 F. Supp. 2d at 789. Government counsel have now disclosed even more evidence that had previously been suppressed that is "material, relevant and critical to counter the Government's argument concerning substantial planning and premeditation," as well as the gateway intent factors for a capital sentencing determination. But, these additional disclosures are also "material, relevant and critical to counter" the prosecution's case for intentional murder. The cumulative impact of the government's patent disregard for its obligations to disclose favorable evidence demonstrates that Mr. Hammer was not only entitled to a new penalty hearing, but to a new trial as well.

<blockquote>
<strong>c.</strong>   <strong>The Prosecution's Presentation of Materially False and/or Misleading Testimony and Argument Violated the Fifth, Sixth, and Eighth Amendments.</strong>
</blockquote>

The Government's "interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done. . . . It is as much [the prosecutor's] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." Berger v. United States, 295 U.S. 78, 88 (1935). The use of false, inaccurate, or misleading prosecutorial testimony violates due process and denies a defendant a fair trial whenever "the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury." Napue v. Illinois, 360 U.S. 264, 271 (1959); Giglio v. United States, 405 U.S. 150 (1972). Likewise, a verdict that is the product of a

material misapprehension of law or fact violates due process. Townsend v. Burke, 334 U.S. 736, 741 (1948); Roberts v. United States, 445 U.S. 552, 556 (1980); United States v. Tucker, 404 U.S. 443, 447 (1972).

Moreover, the Supreme Court has long recognized that, because of its unparalleled severity and irrevocability, death differs fundamentally from any other punishment. See Ford v. Wainwright, 477 U.S. 399, 411 (1986); Woodson v. North Carolina, 428 U.S. 280, 305 (1976). It also "has repeatedly said that under the Eighth Amendment 'the qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination.'" Caldwell v. Mississippi, 472 U.S. 320, 328-29 (1985) (citation omitted); Eddings v. Oklahoma, 455 U.S. 104, 118 (1982) (O'Connor, J., concurring) (because of the exceptional and irrevocable nature of the death penalty, due process and the Eighth Amendment require "extraordinary measures" to ensure the reliability of capital proceedings). This proposition, which applies equally to the guilt and penalty phases of a capital trial, see, e.g., Beck v. Alabama, 447 U.S. 625, 637-38 (1980) (guilt); Lockett v. Ohio, 438 U.S. 586, 604 (1978) (penalty), is one of the most clearly established principles of Eighth Amendment law. See also Gardner v. Florida, 430 U.S. 349, 357-58 (1977) (plurality opinion); id. at 363-64 (White, J., concurring); Lockett, 438 U.S. at 604; Godfrey v. Georgia, 446 U.S. 420, 427-28 (1980); Beck, 447 U.S. at 637-38; Zant v. Stephens, 462 U.S. 862, 884-85 (1983); California v. Ramos, 463 U.S. 992, 998-99 & n.9 (1983);

Caldwell v. Mississippi, 472 U.S. 320, 328-29 (1985); Turner v. Murray, 476 U.S. 28, 36-37 (1986); Ford v. Wainwright, 477 U.S. 399, 411 (1986); Mills v. Maryland, 486 U.S. 367, 383-84 (1988); Johnson v. Mississippi, 486 U.S. 578, 584-85 (1988).

The recent disclosures demonstrate that the government relied on materially misleading testimony and argument that painted a picture of Yager as having obtained information by happenstance when, in fact, he had actually been secretly deployed as an agent of the government for the specific purpose of eliciting incriminating evidence from Mr. Hammer. The government relied on that materially misleading picture in arguing that the jury should credit Yager's testimony as support for its theory of intentional murder and its theory of aggravation in support of a death sentence. The government did so, knowing that it was suppressing evidence that could rebut those assertions and knowing that the defense had no way of presenting that evidence because the government had concealed it.

The government also argued that the jury should credit Classen's testimony and the government's Exhibit 35.2 (purporting to be a letter Classen received from Mr. Hammer) in support of its theory of intentional murder and aggravation, knowing full well that the jury was unaware of the nature and extent of Classen's expectations for benefits in exchange for his testimony and of the questionable circumstances surrounding the purported letter. Likewise, the government made

these arguments knowing that the defense was powerless to present evidence attacking them because the government had withheld that evidence.

Finally, the government argued that the Grand Jury should rely on the Upton convictions that were the product of perjury in reaching its indictment determination and also argued to the jury that it should credit Mr. Upton's perjured testimony as support for the intent factors and aggravation knowing that Upton's testimony was materially false, that the Upton conviction was unreliable, and that as a result it was presenting a materially false depiction of Mr. Hammer's criminal record, and also knowing that the defense was powerless to prove any of this false because the government had withheld that evidence.

There is a reasonable likelihood for *each* of these instances, that "the false testimony could . . . have affected the judgment of the jury," Napue, 360 U.S. at 271, as to guilt, as to the gateway determination of death-eligibility, as to the jury's finding of aggravation and rebuttal of mitigation, and as to the jury's ultimate determination that aggravating circumstances outweighed mitigating circumstances. Collectively, there can be no doubt that the jury's judgment would have been affected.

There is an unacceptable risk for *each* of these instances that Mr. Hammer's decision to enter a guilty plea and the penalty verdict were "imposed on the basis of 'misinformation of constitutional magnitude.'" Roberts, 445 U.S. at 556. This is particularly so with respect to the government's exploitation of Upton's perjury,

31

which caused the jury to sentence Mr. Hammer "on the basis of assumptions concerning his criminal record which were materially untrue." See also Tucker, 404 U.S. at 447.

Collectively, there can be little doubt that Mr. Hammer's guilty plea and sentencing verdict was the direct by-product of a jury that was operating under broad misapprehensions of material fact. The jury's exposure to this evidence not only violated due process, but the Eighth Amendment, because it resulted in "a death sentence imposed by a jury that was allowed to consider materially inaccurate evidence." Tuggle v. Netherland, 516 U.S. 10, 14 (1995) (per curiam) (citing Johnson v. Mississippi, 486 U.S. at 590). Finally, the government's misconduct violated Mr. Hammer's Sixth Amendment rights to effective assistance of counsel and confrontation, as well as his Fifth and Sixth Amendment rights to present a defense. Individually and cumulatively, the instances of the government's reliance on materially misleading and/or false testimony and argument violated the Fifth, Sixth, and Eighth Amendments.

### d.   Mr. Hammer is Entitled to a COA.

As described above, the government's misconduct and non-disclosure is much more pervasive than that considered by the Court during the initial Section 2255 proceedings. Considered cumulatively, as the Court must under controlling precedent, there is no question that reasonable jurists would resolve "in a different manner" the issue of whether there is a reasonable probability that the multiple

instances of prosecutorial misconduct and non-disclosure establish prejudicial constitutional errors requiring relief. Accordingly, each of these issues are "'adequate to deserve encouragement to proceed further,'" <u>Barefoot</u>, 463 U.S. at 893 n.4, and a COA is appropriate.

### e.    At a Minimum, An Evidentiary Hearing was Required.

As the motion, files, and record do not conclusively show that no relief is required, Mr. Hammer was at least entitled to an evidentiary hearing. 28 U.S.C. § 2255(b). Mr. Hammer proffered facts which, if proven at an evidentiary hearing, would have required relief. Throughout its *BIO*, the government proffered purported facts in support of its contention that summary denial was appropriate. Doc. 1684 at 43-54; 74-75; 76-77. The Court relied on a number of the government's proffered facts in concluding that relief was not required. <u>See e.g.</u>, Doc. 1711 at 6-8; 20-21; 23-24. Because reasonable jurists would resolve the propriety of an evidentiary hearing under these circumstances differently "the question[] [is] adequate to deserve encouragement to proceed further,'" <u>Barefoot</u>, 463 U.S. at 893 n.4, and a COA is warranted.

4.    THE GOVERNMENT'S PRESENTATION OF CONVICTIONS AND SENTENCES THAT WERE THE PRODUCT OF PERJURY AND MATERIALLY FALSE/ MISLEADING EVIDENCE TO THE GRAND JURY AND ITS FAILURE TO INFORM THE GRAND JURY OF YAGER'S STATUS AS ITS AGENT DEPLOYED FOR THE PURPOSE OF CIRCUMVENTING MR. HAMMER'S RIGHT TO COUNSEL VIOLATED THE FIFTH AND EIGHTH AMENDMENTS.

The government pursued and obtained an indictment on a count involving a

violation of 18 U.S.C. § 1118, which requires proof that the accused was "under a sentence for a term of life imprisonment" at the time of the murder. 18 U.S.C. § 1118(a). In support of that count, the government presented evidence of the Upton case convictions and 1200-year sentence. During FBI Special Agent Malocu's initial Grand Jury appearance, AUSA Martin elicited testimony that Mr. Hammer was serving a "significant amount of time for offenses in jail." NT 7/24/96 at 29. One or more jurors expressed an interest in knowing the nature of the convictions and whether there was any violence in Mr. Hammer's background. Id. at 31-32. Agent Malocu returned and AUSA Martin elicited testimony that Mr. Hammer was serving a 1232-year sentence at the time of Mr. Marti's death and that the sentence arose from Oklahoma convictions. NT 9/18/96 at 5. While AUSA Martin also indicated that he was not going to inform the jurors of the nature of the convictions, id., he had said the same thing about the length of Mr. Hammer's sentence during Agent Malocu's prior appearance and subsequently provided that information to the Grand Jury. Thus, AUSA Martin's statement that he would not provide the jurors information on the facts underlying the convictions cannot be considered the final word on this matter.

Other than Agent Malocu's testimony, Mr. Hammer has not been provided any of the Grand Jury transcripts or exhibits relating to the evidence the

government presented as to the underlying facts in the Upton case.[1]  However, it is clear from Agent Malocu's testimony and the government's subsequent Motion to Dismiss Count Two of the Indictment, see Doc. 97, that the Grand Jury was presented with, and relied upon, perjured testimony or, at a minimum, sentencing outcomes that were the product of perjured testimony.

The government also called Leonard Yager at the Grand Jury in support of the intentional murder counts.  As he did during trial, Yager described how his contacts with Mr. Hammer and how he obtained alleged inculpatory evidence from Mr. Hammer after Mr. Marti's death.  NT 9/18/96 at 25-34.  As occurred at trial, there was no mention of the true nature of Yager's status as an agent for the government.  See Claim 2.

The government also called Stephen Classen at the Grand Jury in support of the intentional murder counts.  Classen testified about the note he received and expressed surprise that the government had what purported to be a copy.  Id. at 14-15.  AUSA Martin responded that "[w]e work in strange and mysterious ways."  Id. at 15.  Although AUSA Martin elicited Grand Jury testimony from Classen concerning *some* of the benefits he expected in exchange for his cooperation with the government, correspondence that was withheld by the government until the

---

[1] Mr. Hammer requested disclosure of these materials to determine whether or not additional claims arising from the government's presentation of evidence tainted by Upton's perjury existed.  Doc. 1642 at 23 n. 3.

resentencing proceedings demonstrates that Classen's actual expectations went far beyond what the Grand Jury was told. <u>See</u> Claim 2.

        **a.**      **The Grand Jury's Consideration of, and Reliance On, Evidence that was the Product of Perjury Violated the Fifth Amendment.**

The Grand Jury has "served for centuries both as a body of accusers sworn to discover and present for trial persons suspected of criminal wrongdoing and as a protector of citizens against arbitrary and oppressive governmental action." <u>United States v. Callandra</u>, 414 U.S. 338, 343 (1974). While "certain constitutional protections afforded defendants in criminal proceedings have no application before [the Grand Jury]" <u>United States v. Williams</u>, 504 U.S. 36, 39 (1992), that does not mean that Grand Jury proceedings are entirely insulated from judicial review. False and/or perjured evidence goes to the very heart of the reliability of the Grand Jury's determination. If material evidence, like that considered by the Grand Jury here, is demonstrably false, there can be no confidence that the accused was provided the longstanding protection against arbitrary and oppressive governmental action that forms the foundation for the Grand Jury under the Fifth Amendment. <u>See</u> <u>United States v. Basurto</u>, 497 F.2d 781, 786 (9th Cir. 1974) (noting that the consequences of presenting perjury to the grand jury were likely more severe than perjury at trial because "The defendant has no effective means of cross-examining or rebutting perjured testimony given before the grand jury, as he might in court").

As the recent disclosures make clear, the convictions that resulted in the 1200-year sentence were procured by perjury and are constitutionally invalid. The Grand Jury definitely heard evidence about the constitutionally invalid 1200-year sentence and may also have heard other information about the constitutionally invalid convictions.

While the count for which the 1200-year sentence was purportedly presented to the Grand Jury was ultimately dismissed, that does not cure the errors arising from the jury's consideration of false evidence. Indeed, the limited record available to Mr. Hammer demonstrates that one or more jurors found the circumstances of the case involving the 1200-year sentence relevant to intent and premeditation. See NT 7/24/96 at 32 (grand juror responding to Mr. Martin's comment that the nature of the convictions was irrelevant to the murder counts that "[a]ctually it isn't" because it was relevant to whether or not Mr. Hammer "had that kind of instinct . . . a desire to kill"). Although Mr. Martin told the jurors that, because of the age of the convictions, they were "probably not all that probative," he did not specifically instruct the jurors that they could only consider the evidence in connection with whether Mr. Hammer had been serving a life sentence at the time of Mr. Marti's death. Thus, the jurors would reasonably believe that they could consider both the sentence and all the information concerning the Upton case for any matter to which they believed it was relevant, including intent and premeditation.

Even without the clearly expressed view of one juror that this evidence was relevant to the issue of premeditation and intent, there would have been a reasonable probability that the jury would have considered the 1200-year sentence and/or the other information presented regarding the Upton incident in their determination of intent and premeditation for Counts One and Two of the indictment. Based upon the known comments of one juror, it is a near certainty that at least one juror – and most probably numerous jurors – considered perjured evidence and/or a sentence tainted by that perjury as a basis to indict Mr. Hammer on Counts One and Two in violation of the Fifth Amendment.

Prejudice is proven when "'the violation substantially influenced the grand jury's decision to indict' or . . . there is 'grave doubt' that the decision to indict was free from the substantial influence of such violations." Bank of Nova Scotia, 487 U.S. 250, 256 (1988) (quoting United States v. Mechanik, 475 U.S. 66, 78 (1986)); see also United States v. Soberon, 929 F.2d 935, 939-40 (3d Cir. 1991). One or more grand jurors found the circumstances underlying the convictions relevant to intent and premeditation. Thus, the jurors' consideration of this false evidence "substantially influenced" the indictment decision. At a minimum, in light of the available evidence, there is "grave doubt" that the indictment was "free from the substantial influence" of the false evidence. Thus, prejudice is proven.

> **b.** **The Presentation of Evidence Obtained Through the Government's Deployment of Yager as Its Agent to Circumvent Mr. Hammer's Invocation of His Right to Counsel and Materially Misleading Testimony Regarding Yager and Classen's Expectations in Exchange for Their Cooperation Violated the Fifth Amendment.**

The government presented Yager as a prisoner who fortuitously obtained statements and evidence from Mr. Hammer by happenstance. That, however, was not true. Instead, the government deliberately deployed Yager as an agent who would have a pretext for having contact with Mr. Hammer, and orchestrated the events to obtain statements and evidence it could use against him. The government also failed to disclose its use of Yager as an agent pretrial, at trial, and post-trial. Because the government engaged in a pattern of deception and concealment over the course of seventeen years, the circumstances in this case are distinguishable from those in which the courts have found that the admission of evidence procured in violation of a constitutional right did not invalidate an indictment. See e.g. Callandra, 414 U.S. at 343.

The government also presented testimony from Yager regarding his arrangement with the government and misrepresented that this was the complete arrangement between Yager and the government. NT 7/24/96 at 5. The resentencing disclosures demonstrates that this was simply not true. By presenting this false testimony, the government manipulated the Grand Jury's findings to avoid any Grand Jury determination that Yager's testimony was incredible in light

of his motive as an agent seeking favorable treatment for his assistance.

For each of these reasons, the government's failure to inform the Grand Jury of the true nature of its relationship with Yager involves more than a simple failure to present exculpatory evidence to the Grand Jury. Cf. United States v. Williams, 504 U.S. 36, 52 (1992). Here, the government also affirmatively presented materially misleading testimony whose falsity is established by the resentencing disclosure.

Finally, the government also affirmatively misled the Grand Jury with regard to its arrangements with Classen. Having elected to present testimony about the benefits the government afforded Classen in exchange for his cooperation, the government was charged with a duty and obligation to present truthful testimony. It did not.

The Grand Jury's assessment of Yager's and Classen's testimony was critical to the government's case for indictment. Thus, the jurors' consideration of materially misleading and false evidence relating to their reliability and credibility "substantially influenced" the indictment decision. At a minimum, in light of the record evidence available, there is "grave doubt" that the indictment was "free from the substantial influence" of this materially misleading and false evidence.

c.    **The Grand Jury's Exposure to the Constitutionally Tainted Evidence Rendered the Grand Jury Proceedings in this Capital Prosecution Inherently Unreliable in Violation of the Fifth and Eighth Amendments.**

The Supreme Court "has repeatedly said that under the Eighth Amendment 'the qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination.'" Caldwell v. Mississippi, 472 U.S. 320, 328-29 (1985) (citation omitted); Woodson, 428 U.S. at 305; Eddings, 455 U.S. at 118 (1982) (O'Connor, J., concurring). This proposition applies equally to the guilt and penalty phases of a capital trial. See, e.g., Beck v. Alabama, 447 U.S. 625, 637-38 (1980) (guilt); Lockett v. Ohio, 438 U.S. 586, 604 (1978) (penalty).

The recent disclosures demonstrate that the government relied on evidence that was the product of perjury; materially misleading testimony and argument that painted a picture of Yager as having obtained information by happenstance when, in fact, he had actually been secretly deployed as an agent of the government for the specific purpose of eliciting incriminating evidence from Mr. Hammer in violation of his right to counsel; and materially misleading and false testimony regarding the nature and extent of both Yager's and Classen's biases and motives to testify favorably for the government.

These disclosures demonstrate that the integrity and reliability of the Grand Jury proceedings were compromised. An indictment based, in whole or in part, on

41

perjured and materially false and misleading evidence such as that presented by the government to the Grand Jury in this case not only fails to satisfy the requirement of heightened reliability mandated by the Eighth Amendment, it fails to satisfy any standard of reliability.

### d. The Combined Errors Affected the Integrity and Reliability of the Grand Jury's Determination

The Grand Jury relied on perjured evidence, false evidence, materially misleading evidence, and evidence obtained through the government's secret deployment of an agent to circumvent Mr. Hammer's invocation of his right to counsel. Even if the errors described above do not individually require relief (and they do), the combined impact on the integrity and reliability of the Grand Jury proceedings does. The multiple instances of misconduct, deception, and concealment require relief.

### e. Mr. Hammer is Entitled to a COA

As Mr. Hammer has demonstrated his entitlement to relief on the basis of the constitutional violations described above, reasonable jurists would resolve these issues "in a different manner"and "'the questions are adequate to deserve encouragement to proceed further,'" Barefoot, 463 U.S. at 893 n.4. A COA is warranted.

This Court relied on a number of factual proffers contained in the government's *BIO* as a basis for finding no constitutional violation. Doc. 1711 at

19-24. Because reasonable jurists would resolve the question of whether or not an evidentiary hearing was required under these circumstances, this issue "[is] adequate to deserve encouragement to proceed further,'" Barefoot, 463 U.S. at 893 n.4, and a COA regarding the propriety of denying relief without an evidentiary hearing is warranted.

**5.  THE JURY'S CONSIDERATION OF CONVICTIONS AND EVIDENCE THAT WERE THE PRODUCT OF PERJURY IN REACHING ITS SENTENCING DETERMINATION VIOLATED THE FIFTH, SIXTH AND EIGHTH AMENDMENTS.**

During the prior penalty hearing, the government relied on perjured testimony surrounding the Upton case as support for aggravation. The jury's consideration of the constitutionally invalid convictions and Mr. Upton's false and misleading testimony in reaching its sentencing determination violated the Fifth, Sixth, and Eighth Amendments.[2]

During the resentencing proceedings Upton admitted committing perjury, but continued to maintain that the portion of his testimony regarding the shooting itself was truthful. That, however, does not diminish the constitutional violations arising from the jury's reliance upon the convictions and Mr. Upton's tainted testimony as grounds to take Mr. Hammer's life. First, Mr. Upton's admitted perjury with respect to substantial, critical aspects of this incident rendered the

---

[2] Although that sentence was ultimately vacated by Judge Muir, the government recently filed its notice of appeal of that decision. Doc. 1795.

remainder of his testimony, including the version of the shooting to which he testified, constitutionally unreliable. Second, the government's evidentiary presentation and argument was not limited solely to the fact that Mr. Hammer was convicted of the shooting. Instead, the government elicited, and the jury considered, the convictions for kidnapping and robbery that were a direct product of Mr. Upton's false testimony. NT Vol. 16 at 66.

Nor (even assuming the validity of these convictions) did the government confine its presentation of evidence and argument to the fact that Mr. Hammer had been convicted of all these charges. Instead, the government presented Upton's prior (perjured) testimony that falsely described the circumstances leading up to the shooting. Then it argued that the jury should consider purported similarities between those circumstances and the government's theory with regard to the circumstances of the death of Mr. Marti. For example, the government invoked Upton's false testimony regarding Mr. Hammer's purported kidnapping and confinement of Mr. Upton to argue that the two cases shared a "hostage theme" that was prevalent in Mr. Marti's death. Id. at 67 ("[I]t's always nice to have a hostage around. Again, you'll hear this hostage theme repeated, repeated and repeated"). The government then invoked more of Upton's false testimony to tell the jury that Mr. Hammer had used "deceit" and "lulled" Mr. Upton into believing he would not be hurt, so as to get Mr. Upton to remove his clothes. Id. at 67-68. The prosecutor then employed the very same terms to describe what the

government contended Mr. Hammer had done with Mr. Marti. Id. at 85.    The prosecution's reliance on any aspect of Mr. Upton's perjured testimony as evidence of what Mr. Hammer purportedly did in this case, its reliance on any aspect of his perjured testimony as evidence of Mr. Hammer's death-eligibility or death-worthiness, its reliance on any aspect of his perjured testimony to rebut Mr. Hammer's mitigating evidence, and its reliance on any aspect of his perjured testimony to find that reasons for death outweighed reasons for life each violated the Fifth and Eighth Amendments.    And given his pervasive perjury, the jury's reliance on not just Mr. Upton's admitted perjuries, but any of his testimony regarding this incident violated the Fifth and Eighth Amendments.

> **a.    The Sentencing Jury's Consideration of Convictions and Evidence that were the Product of Perjury Violated the Fifth and Eighth Amendments.**

For a number of reasons, the sentencing jury's consideration of convictions and evidence that were the product of perjury violated the Fifth and Eighth Amendments.    It violated the Eighth Amendment prohibition against a death sentence based in whole or part on an invalid conviction. Johnson v. Mississippi, 486 U.S. 578, 586 (1988) (where petitioner's death sentence was based in part on reversed conviction, death sentence vacated because the prior conviction "provided no legitimate support for the death sentence"); see also Duest v. Singletary, 967 F.2d 472, 480 (11th Cir.) (sentencer's consideration of a vacated conviction in support of Florida prior conviction of violent felony aggravating factor was Eighth

Amendment error), *vacated on other grounds*, 507 U.S. 1048 (1992), *after remand*, 997 F.2d 1336 (11th Cir. 1993); Harris ex rel. Ramseyer v. Blodgett, 853 F. Supp. 1239, 1277 (W.D. Wash. 1994) (sentence vacated where aggravating circumstance was supported by conviction that had been dismissed prior to sentencing proceedings), *aff'd on other grounds*, 64 F.3d 1432 (9th Cir. 1995); Ward v. State, 827 S.W.2d 110, 114-15 (Ark. 1992) (introduction of unsubstantiated allegations of prior offenses invalidated previous conviction aggravating factor).

Second, it violated the Fifth and Eighth Amendment prohibition against a sentencing verdict based on false, materially misleading and/or inaccurate testimony. Johnson v. Mississippi, *supra*; Tuggle v. Netherland, 516 U.S. 10, 14 (1995) (per curiam) ("a death sentence imposed by a jury that was allowed to consider materially inaccurate evidence" violates the Eighth Amendment, citing Johnson); Clemons v. Mississippi, 494 U.S. 738, 754 n.5 (1990) (explaining Johnson as finding Eighth Amendment error where the jury was permitted "to consider evidence that [was] revealed to be materially inaccurate" (quoting Johnson, 486 U.S. at 590)); Townsend v. Burke, 334 U.S. 736, 741 (1948) (due process violated when "prisoner was sentenced on the basis of assumptions concerning his criminal record which were materially untrue"); United States v. Tucker, 404 U.S. 443, 447 (1972)); Roberts v. United States, 445 U.S. 552, 556 (1980) (reaffirming that due process precludes "sentences imposed on the basis of

46

'misinformation of constitutional magnitude'");[3] see also United States v. Levy, 865 F.2d 551, 559-60 (3d Cir. 1989) (en banc) (vacating sentence imposed because "sentencing on the basis of materially untrue assumptions violates due process"), aff'd after remand sub nom. Gozlon-Peretz v. United States, 498 U.S. 395 (1991); United States v. Kerley, 838 F.2d 932, 940 (7th Cir. 1988) (Posner, J.) ("a sentence predicated on misinformation cannot stand"); King v. Hoke, 825 F.2d 720, 724 (2d Cir. 1987) ("It is well established that . . . material false assumptions as to any facts relevant to sentencing, renders the entire sentencing procedure invalid as a violation of due process."); United States v. Ruster, 712 F.2d 409, 412 (9th Cir. 1983) (due process violated when sentencer "relies on materially false or unreliable information in sentencing a defendant").    It violated Mr. Hammer's Fifth and Sixth rights to a verdict based on competent, reliable evidence. See Chandler v. Florida, 449 U.S. 560, 574 (1981); Irvin v. Dowd, 366 U.S. 717, 722 (1961); United States v. Gaudin, 515 U.S. 506, 514 (1995).

It also violated the Eighth Amendment requirement that the government "channel the sentencer's discretion by 'clear and objective standards' that provide 'specific and detailed guidance,' and that 'make rationally reviewable the process for imposing a sentence of death.'" Godfrey v. Georgia, 446 U.S. 420, 428 (1980).

---

[3]    There is no question that perjury qualifies as "misinformation of constitutional magnitude." See, e.g., Imbler v. Pachtman, 424 U.S. 409, 431 n.34 (1976) (citing cases discussing, inter alia, the constitutional prohibition against using perjured testimony).

Because the government "has a constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty," id., a death sentence that is based on the consideration of perjured and/or materially misleading or false testimony or arguments that are outside the scope of the applicable law is unconstitutionally arbitrary and capricious.

Finally, it violated the heightened reliability requirements of the Fifth and Eighth Amendments. See Ford v. Wainwright, 477 U.S. 399, 411 (1986); Woodson v. North Carolina, 428 U.S. 280, 305 (1976); Beck v. Alabama, 447 U.S. 625, 637-38 (1980); Lockett v. Ohio, 438 U.S. 586, 604 (1978); Godfrey v. Georgia, 446 U.S. 420, 427-28 (1980). A death sentence based, in whole or in part, on perjured testimony not only fails to meet the heightened reliability standards, it fails to meet any reliability standard. The jury's consideration of Mr. Upton's perjured testimony, the constitutionally invalid convictions, and the materially misleading evidence regarding the circumstances of the Upton case in sentencing Mr. Hammer to death violated the Fifth, Sixth and Eight Amendments.

### b.    Mr. Hammer is Entitled to a COA

The Court did not specifically address this issue in its opinion. It did, however, deny Mr. Hammer's Motion in Limine to preclude consideration of the Upton case during the resentencing hearing. Doc. 1171 at 21. In reaching that conclusion, the Court relied in large part on the fact that the Court was aware of Upton's admitted perjury and that counsel would be able to challenge Upton's

testimony in light of his admitted perjury on cross-examination. Id. Each of these factors were missing in the initial sentencing hearing. As Mr. Hammer has demonstrated his entitlement to relief on the basis of the constitutional violations described above, this issue is "debatable among jurists of reason"; "a court could resolve the issue[] [in a different manner]"; and "the question[] [is] adequate to deserve encouragement to proceed further." Id. at 893 n.4. Accordingly, a COA is warranted.

This Court relied on a number of factual proffers contained in the government's *BIO* as a basis for finding no constitutional violation. Doc. 1711 at 19-21. Because reasonable jurists would resolve the question of whether or not an evidentiary hearing was required under these circumstances, this issue "[is] adequate to deserve encouragement to proceed further,'" Barefoot, 463 U.S. at 893 n.4, and a COA regarding the propriety of denying relief without an evidentiary hearing is warranted.

**D.    Conclusion**

For the reasons described above and in the prior submissions, Mr. Hammer is entitled to a COA.

Respectfully submitted,


/s/ RONALD C. TRAVIS
Ronald C. Travis
Rieders, Travis, Humphrey, Harris,
Waters & Waffenschmidt
161 West Third Street
PO Box 215
Williamsport, PA  17703-0215
570-323-8711 (telephone)
570-323-4192 (facsimile)
rtravis@riederstravis.com



Dated: October 27, 2014

## CERTIFICATE OF SERVICE

I, Ronald Travis, do hereby certify that on this date I served a copy of the foregoing by Electronic Case Filing, or by placing a copy in the United States mail, first class addressed to the following:

John C. Gurganus, Jr. Esquire
United States Attorneys' Office
Middle District of Pennsylvania
235 N. Washington Street, Suite 311
PO Box 309
Scranton, PA. 18501

Amanda Haines, Esquire
United States Department of Justice
Criminal Division
1331 F. Street, N.W.
Washington, D.C. 20530

/s/ RONALD C. TRAVIS
Ronald C. Travis

Dated: October 27, 2014