UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA


UNITED STATES OF AMERICA          :
                                  :
        -vs-                      :
                                  :       NO.  4:CR-96-239
DAVID PAUL HAMMER,                :
                                  :
        Defendant                 :


## GOVERNMENT'S OPPOSITION TO DAVID PAUL HAMMER'S REQUEST FOR A CERTIFICATE OF APPEALABILITY

Now comes the United States of America and files this response in opposition to Defendant David Paul Hammer's Request for Certificate of Appealability.  Hammer requests this Court to grant a certificate of appealability (COA) from all adverse rulings by the District Court (Muir, J.) on December 27, 2005, and all adverse rulings in the Court's May 29, 2014 Opinion.  For the reasons set forth below, the government respectfully requests that defendant's motion be denied.

## STATEMENT OF THE CASE

By way of brief background, defendant David Paul Hammer was a contract prisoner incarcerated at the special housing unit of the USP-Allenwood, serving a 1,200 year sentence imposed in Oklahoma, who

murdered his cell mate, Andrew Marti, on April 13, 1996.  Interviewed by law enforcement in the hours after the murder, Hammer admitted that he killed Marti by binding him to his bunk and strangling him. Hammer also told law enforcement that he had solicited Marti as a cell mate and convinced him to participate in a staged hostage scenario, whereby Marti would allow himself to be tied to the bed in an attempt to get transferred to another federal institution, enabling Hammer to easily effectuate the murder plan.  Hammer confessed that he had confided in two inmates, Leonard Yager and Stephen Classen, that he intended to kill Marti.  Hammer's confession was corroborated in significant respects by his own writings, statements of fellow inmates and correction staff, and physical evidence.

### Guilt/innocence Trial and Guilty Plea

Hammer's trial commenced with jury selection on May 5, 1998. On June 22, 1998, in the government's rebuttal case, Hammer decided to plead guilty to first degree murder within the special territorial jurisdiction of the United States, in violation of 18 U.S.C. § 1111.  After Hammer stated that he intended to plead guilty, the Court (Muir, J.) held an evidentiary hearing to assess Hammer's competence.  The Court

also conducted a colloquy with Hammer to confirm that the plea was knowingly, voluntarily, and intelligently made.  During the colloquy, defendant acknowledged that he had discussed the elements of first-degree murder with counsel "extensively" and that he understood them. He also acknowledged that by pleading guilty he was relieving the government of proving premeditation and other elements of murder beyond a reasonable doubt and waiving his right to appeal all defenses. Following the prosecutor's factual proffer, defendant responded that he agreed with the proffer "in substance," but clarified that contrary to his confession, he did not orchestrate Marti's move into his cell for the purpose of killing him nor did he create the braided ligatures, which restrained Marti during his murder, for that specific purpose.   After Hammer reiterated that he was guilty of first-degree murder as charged, the Court accepted the plea.

### The 1998 Capital Sentencing Hearing and Post Verdict Litigation

A capital sentencing hearing followed Hammer's guilty plea, in which on July 24, 1998, a jury returned a verdict directing that Hammer be sentenced to death.  At the hearing, the government proved, among other aggravating factors, that Hammer had previously been convicted of

a state or federal offense punishable by a term of imprisonment for more than one year, involving the use or threatened use of a firearm (18 U.S.C. § 3592(c)(2)), specifically: (1) a 1978 Oklahoma State conviction for pointing a weapon at another after having previously been convicted of a firearm offense (the Baptist Hospital Incident); and (2) a 1984 Oklahoma State conviction for kidnapping, robbery with a firearm and shooting with intent to kill (the Thomas Upton incident). At the conclusion of the sentencing hearing, Hammer's penalty phase jury unanimously found that Hammer intentionally killed Marti, both of the two statutory aggravating factors (two previous convictions for felony offenses involving the use of a firearm and substantial planning and premeditation) and both of the non-statutory aggravating factors (future dangerousness and victim impact), and recommended that defendant be sentenced to death. Hammer filed a timely appeal.

Following the death verdict, at Hammer's urging, the Third Circuit granted defendant's motions to fire his appellate lawyers and abandon his direct appeal, s*ee United States v. Hammer*, 226 F.3d 229 (3d Cir. 2000), *cert. denied*, 532 U.S. 959 (2001), and denied a rehearing petition seeking reinstatement of the appeal. *See United States v.*

4

*Hammer*, 239 F.3d 302 (3d Cir.), *cert. denied*, 534 U.S. 831 (2001). Thereafter, defendant filed a plethora of post-verdict motions, often vacillating about pursuing his claims, but ultimately filing a motion for post conviction relief under 28 U.S.C. § 2255.

During the Summer of 2005, the district court conducted a lengthy hearing on Hammer's Section 2255 motion, during which the judge directed the government to release a number of FBI reports, which memorialized inmate interviews regarding Hammer's sexual proclivities, including homosexual bondage. Hammer then amended his Section 2255 motion to include a claim that the government's failure to disclose these reports previously violated *Brady v. Maryland*, 373 U.S. 83 (1963).

At the conclusion of the hearing, on December 27, 2005, the Court granted relief insofar as it vacated Hammer's death sentence, but refused to set aside his guilty plea. *See United States v. Hammer*, 404 F. Supp. 2d 676 (M.D. Pa. 2005). Specifically, the Court rejected the defendant's claim that the delayed disclosure of the FBI reports warranted setting aside his guilty plea, noting that Hammer's plea to first-degree murder was supported by an adequate factual basis. *Id.* at 795-98. In the Court's view, the reports merely cast doubt on the

government's factual assertion that (1) Hammer orchestrated rooming with the victim in order to murder him; and (2) the rope-like restraints were part of the preconceived murder plot rather than for Hammer and his victim's mutual sexual gratification. *Id.* As the Court explained, as Hammer raised these same points at the time of his plea, but nevertheless, voluntarily proceeded with the plea, the government's delayed disclosure of the reports did not affect defendant's decision to plead guilty. *Id.*

With regard to the death sentence, however, the Court concluded that the suppressed information raised doubts as to whether the jury would have found the statutory aggravating factor of substantial planning and premeditation in that the reports suggested that Hammer did not act with a preconceived plan to kill Marti when he induced him to share the cell and convinced him to be tied down. *Hammer*, 404 F. Supp. 2d at 798-99. Thus, the Court reasoned that *Brady* (as well as the jury's findings as to some of the mitigating factors) required vacating the death sentence.

Thereafter, the government filed a motion to alter or amend the judgment, pursuant to Fed. R. Civ. P. 59(e), which the Court denied.

Hammer and the government filed timely notices of appeal.[1]   On February 8, 2006, the Court denied Hammer a COA.

Following the Court's denial of the certificate, Hammer then requested on May 8, 2006, that the Third Circuit grant him a COA to review a number of issues, including the district court's decision that the *Brady* claim did not warrant setting aside his guilty plea to murder.   In support of his request then, as he does again here, Hammer argued that the district court improperly applied a "subjective standard" in assessing *Brady* claims, and that, under the appropriate "objective standard," the district court was precluded from relying on defendant's remarks during the plea colloquy as evidence that the FBI reports would not have affected his decision to plead guilty.

Hammer's request to appeal the *Brady* claim based on the withholding of the FBI reports was denied by the Third Circuit on December 21, 2006.  Specifically, the court granted permission to appeal

---

[1] Although Hammer argued on direct appeal that his guilty plea was fatally flawed because it was not supported by a sufficient factual basis, this issue was never reached by the Third Circuit because it granted Hammer's motion for voluntary dismissal. *See Hammer*, 226 F.3d at 237.  Hammer then raised this and other direct appeal claims in his first Section 2255 motion, asserting that the claims were not validly waived, because he was incompetent.  The district court denied relief on this claim. *See Hammer*, 404 F. Supp. 2d at 682-83, 801.

only three claims, exclusively pertaining to counsel ineffectiveness,[2] but did not grant a COA with regard to any claim that Hammer's guilty plea was invalid. *See United States v. Hammer*, CA No. 06-9000 (3d Cir. Order, December 21, 2006). On January 4, 2007, defendant sought reconsideration of the denial of permission to appeal the *Brady* claim related to the guilt phase. The defendant's motion for reconsideration of the denial of a COA regarding his *Brady* guilt-phase claim was denied on December 21, 2006. *United States v. Hammer*, No. 06-9000 (3d Cir. Order, December 21, 2006).

On May 11, 2009, following briefing and oral argument, the Third Circuit dismissed all appeals for lack of jurisdiction given the fact that there was no final judgment, and the case was remanded to the district court. *United States v. Hammer*, 564 F.3d 628, 634-35 (3d Cir. 2009). In

---

[2] The Third Circuit's prior COA order limited review to the following defense claims:
1. Whether counsel were ineffective for failing to challenge or correct the effect of the district court's pretrial order committing Hammer to long-term in-patient evaluation, and whether this claim is time-barred;
2. Whether counsel were ineffective for failing to investigate and present Hammer's history of false confessions and other mendacity; and
3. Whether counsel were ineffective for failing to investigate and present the defense of erotic asphyxiation.

light of the Third Circuit's dismissal, the government gave notice that it would proceed with a new capital sentencing hearing.

### Disclosures as to Thomas Upton, Leonard Yager, and Stephen Classen

The resentencing hearing was scheduled to commence on June 2, 2014. In the weeks preceding the hearing, the government re-interviewed witnesses and made disclosures to defense counsel regarding recantations by penalty-phase witness, Thomas Upton, which mirrored passages in Hammer's autobiography, *The Final Escape*, and cast doubt on one of the felony convictions presented as a statutory aggravator. The government also disclosed that a guilt-phase witness, Leonard Yager, was unable to remember with any consistency why and how he obtained an incriminating piece of defendant's writing, and stated, apropos of nothing, that he had been acting as a government agent when he recovered that particular piece of evidence. And finally, the government provided discovery to defense counsel regarding guilt-phase witness Stephen Classen, which included correspondence between Classen and the former prosecutor regarding scheduling, housing, and a sentencing reduction. Each of these witnesses is discussed more fully as follows:

9

1. <u>Thomas Upton</u>

Thomas Upton was the victim of the October 1983 kidnapping, carjacking and shooting in Oklahoma City which resulted in defendant's 1,200 year conviction and sentence.  In March 2014, Upton revealed for the first time that contrary to his prior testimony in 1984 and at Hammer's 1998 penalty hearing, his initial encounter with defendant began consensually.  At some point in time according to Upton, as he has always maintained, the encounter became violent.  Upton stated that as the evening progressed, Hammer sexually assaulted him at gunpoint, pistol whipped him, forced him to drive at gunpoint to a remote location, and shot him multiple times.  Upon also admitted that he never previously disclosed how he met Hammer, because he was a closeted homosexual man and concerned about being discriminated against by law enforcement.  The facts regarding how Upton met Hammer, which were largely consistent with passages in defendant's 2004 autobiography, were disclosed to defense counsel, who immediately moved to preclude the government from admitting evidence of the Upton conviction or calling Upton as a witness at the resentencing hearing.

This request was denied by the Court, and Upton testified consistently with his 2014 version of events.

## 2. Leonard Yager

In 1996, Leonard Yager was Hammer's cellmate in the Special Housing Unit at Allenwood.   At the first trial, during the guilt phase, Yager testified that Hammer was obsessed with Andrew Marti, would watch him on the recreation yard, and talked daily about his desire to engage Marti in a sexual relationship.  According to Yager, he delivered messages between Hammer and Marti.  Yager also testified that once Marti moved into the cell, Yager observed Hammer weaving ropes from torn bed sheets, which Hammer implied would be used to kill Marti. Yager testified that Hammer expressed to him his intent to murder Marti before the crime, and after the murder, handed him a note which listed his motives for killing Marti.  The note, which was confirmed to be in Hammer's handwriting, was introduced at trial as evidence.  In the years following 1996, Yager was consistent that defendant initiated the contact that resulted in Yager obtaining the incriminating note.  *See* Testimony of Leonard Yager, dated June 8, 1998, at 96 (describing how Hammer instructed him to tell the truth to the FBI); *id.* at 97 (stating

11

that it was Hammer who requested a pencil and paper); *id.* at 102 (explaining that Hammer slid the incriminating note through his cell door to satisfy Yager's curiosity); *id.* at 146, 168 (expressing his hesitancy to provide the letter to law enforcement).

In February 2014, and admittedly suffering from the effects of recent heroin use, long term addiction, and serious health problems, Yager was unable to authenticate the note he received from Hammer in 1996 and now claimed, for the first time, that the FBI "sent him in" to talk to the defendant after murder. Two months later, upon being re-interviewed, Yager denied that he was directed by the FBI, the Bureau of Prisons, or anyone else to obtain information from Hammer regarding the Marti murder, and denied that he had ever made any such representation. Instead, Yager asserted that he was not enlisted by law enforcement to obtain information in the case, and that defendant voluntarily provided him with the incriminating note.

The government interviewed all of the FBI agents associated with the case, as well as the former prosecutor, and was unable to locate a single witness or report which supported Yager's fleeting February 2014 claim that law enforcement directed him to obtain incriminating

information from Hammer.[3]   This information was disclosed in its entirety to defense counsel, who immediately moved to preclude the government from sponsoring Yager, or any of the evidence he recovered, at the resentencing hearing.  Given that Yager's sister died the week he was scheduled to testify, the government opted not to call Yager as a witness, rendering defendant's motion to preclude his testimony largely moot.

### 3. Stephen Classen

After Yager moved out of Hammer's cell, Stephen Classen became Hammer's cellmate.  According to Classen's trial testimony during the guilt phase, Hammer orchestrated Marti's move into the cell.  Like Leonard Yager, Stephen Classen claimed that Hammer told him that he intended to murder Marti.  Classen also received, or was the intended recipient of, notes from Hammer pertaining to the murder, including one, verified to be in Hammer's handwriting, which was introduced at

---

[3] Although defendant reads some significance into the government's failure to interview all BOP personnel regarding this issue, *see* COA Mot. at 18, Yager, himself, claimed that it was the FBI which "sent him" back to talk to Hammer.  In addition, the government can make no absolute representations as to BOP personnel's actions given that Yager's handler, Lt. John Bell, is deceased.  But the fact still remains that the government has found no corroboration among BOP personnel or otherwise for Yager's off-hand remark.

trial and stated "I'm sure you were surprised to learn that I had done what I told you I was going to do to Marti."[4]

At the grand jury proceedings and at trial, Classen testified that he expected a letter of cooperation from the government in support of a Rule 35 reduction and a recommendation to the Bureau of Prisons that he be housed in an institution other than a penitentiary. In 2012, the government also disclosed correspondence from Classen asking the prosecutor as to scheduling matters and complaining about his housing situation. The correspondence also revealed that as promised, following the trial, the government sent a letter requesting a sentencing reduction and sought to assist Classen with obtaining an earlier release date to a halfway house or home confinement, consistent with Classen's testimony at trial as to his expectations. Although Classen died before the resentencing hearing, his prior sworn testimony was made part of the record in 2014.

[4] With respect to the note introduced at trial, Government Exhibit 35.2, defendant attempts to muddy the record by arguing, as he did at the resentencing hearing, that this letter was received and destroyed by Classen giving rise to "questionable circumstances." COA Mot. at 16, 30. The government continues to maintain that there were actually two notes: one that Classen received, read in part, and destroyed; and one that was intercepted before Classen received it, verified to be written in David Hammer's handwriting, and introduced at trial.

## Resentencing Hearing

On May 12, 2014, Hammer filed various motions seeking to preclude the government from seeking the death penalty, based on the Upton, Yager, and Classen disclosures, including (1) a Motion to Supplement/Amend his Motion to Vacate, Set Aside or Correct the Judgment and Sentence Pursuant to 28 U.S.C. § 2255 in Light of Recent Disclosures by the Government (Doc. Nos. 1640, 1641, 1642); (2) Motion in Limine to Preclude the Government from Seeking Death on the Basis of Prior Conviction and Other Evidence that Was the Product of Perjured Testimony (Doc. Nos. 1643, 1644); and (3) various motions to preclude the testimony of the two inmate witnesses, Leonard Yager and Stephen Classen (Doc. Nos. 1645, 1646, 1647, 1648).  In essence, defendant sought to amend his Section 2255 motion on the ground that the recent disclosures with respect to Upton, Yager and Classen showed violations his constitutional rights.

On May 29, 2014, this Court issued a Memorandum Opinion and Order denying defendant's motion.  Doc. 1711.  In reaching its opinion, the Court concluded that defendant's new claims "do not demonstrate constitutional violations or a fundamental defect that results in a

miscarriage of justice." *Id.* at 17. Specifically, with respect to penalty-phase witness Thomas Upton, the Court held that defendant's conviction for the Upton shooting, even if based on perjured testimony, was not open to collateral attack as defendant did not claim actual innocence of the shooting and knew that Upton had committed perjury years before that fact was revealed to the government. *Id.* at 18. With respect to the two guilt-phase witnesses, Leonard Yager and Stephen Classen, the Court similarly held that defendant could not properly amend his Section 2255 petition as he was unable to show supportable constitutional violations. As defendant had not invoked his right to counsel at the time that Yager spoke with him, any allegation that Yager was acting as a government agent, speculative though it was, failed to establish a constitutional violation. *Id.* Likewise, with respect to the second guilt-phase witness, Stephen Classen, defendant was unable to show any information in correspondence between Classen and the government which materially undermined his testimony. *Id.* The Court also held that to the extent defendant was once again challenging his plea, "the reasons advanced do not warrant withdrawal of the guilty plea." *Id.* at n.3.

On June 2, 2014, the Court began hearing testimony relating to the question of penalty. The case was concluded on June 30, 2014, and submitted for consideration on July 2, 2104. On July 17, 2014, this Court rendered its verdict finding that the appropriate sentence was life without the possibility of parole. In reaching its decision, the Court found that the government had proven the following statutory aggravating factors: (1) that Hammer intentionally killed Marti and that he did so after substantial planning and premeditation; and (2) that he had been previously convicted of one or more state or federal offenses, involving the use of a firearm. The Court also found the following non-statutory aggravating factor: that Hammer caused harm to the Marti family as a result of the murder. In contrast to the verdict of the 1998 jury, however, the Court did not find that Hammer represented a continuing danger to the lives and safety of others because he was likely to commit criminal acts of violence. The Court then found that Hammer had proved 73 mitigating factors, leading to the conclusion that multiple circumstances warranted a sentence of life imprisonment without the possibility of parole. The Court imposed sentence on August 20, 2014.

On September 2, 2014, defendant filed a notice of appeal from all adverse rulings by Judge Muir of the Motion to Vacate, Set Aside or Correct Judgment of Sentence Pursuant to 28 U.S.C. § 2255 issued on December 27, 2005, Doc. 1216, and all adverse rulings by this Court on May 29, 2014, Doc. 1711.   On September 10, 2014, the Third Circuit issued an order staying the appeal and remanding the case to this Court for the sole purpose of either issuing a COA or stating reasons why a COA should not issue.

## ARGUMENT

Given that Hammer's claims are all barred by multiple procedural defenses and do not involve any cognizable question of constitutional dimension, the government requests that this Court deny the COA motion.   Orders denying relief under Section 2255 are not appealable unless a court issues a COA.  28 U.S.C. § 2253(c)(1); *Gonzalez v. Thaler,* ___ U.S. ___, 132 S.Ct. 641 (2012); *United States v. Cepero*, 224 F.3d 256, 262 (3d Cir. 2000) (*en banc*), *cert. denied*, 531 U.S. 1114 (2001).  A COA will not issue absent "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2); *Gonzalez v. Thaler*, 132 S.Ct. at 646, 648.  A petitioner satisfies this standard by (1) making a

"substantial showing of the denial of a constitutional right" and (2) demonstrating "that reasonable jurists would find the denial of the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 483 (2000); *United States v. Cepero*, 224 F.3d at 262.

In seeking to relitigate the issue of whether a COA should issue for review of Judge Muir's 2005 decision partially granting and partially denying Section 2255 relief, Hammer necessarily plows fields which are, in large measure, already thoroughly tilled.  As noted, Judge Muir denied a COA outright, and the Third Circuit, while granting COA to allow an appeal of three specific claims of ineffective assistance of defense counsel, rebuffed Hammer's repeated entreaties to expand the COA to encompass his claim that *Brady* violations rendered his guilty plea constitutionally infirm.  Still undeterred, Hammer maintains that COA should now issue to allow review of the following claims;

1. Hammer's mid-trial guilty plea was constitutionally invalid due to the alleged *Brady* violation, alleged use of inmate Leonard Yager as a government agent to bypass Hammer's Sixth Amendment counsel right, and reliance on perjured testimony by Thomas Upton and Leonard Yager.

19

2. The prosecution's alleged use of inmate Leonard Yager as a government agent to collect evidence violated Hammer's Sixth Amendment counsel right.

3. The prosecution violated the Fifth, Sixth, and Eighth Amendments through the alleged *Brady* violation, alleged use of inmate Leonard Yager as a government agent to bypass Hammer's counsel right, and reliance on perjured testimony by Thomas Upton.

4. Before the grand jury, the prosecution violated the Fifth and Eighth Amendments by failing to disclose the alleged use of Leonard Yager as a government agent to bypass Hammer's counsel right and by relying on perjured testimony by Thomas Upton.

5. The jury's consideration at the penalty phase of perjured testimony by Thomas Upton violated the Fifth, Sixth, and Eighth Amendments.

Despite the multiple argument headings, Hammer actually recycles for each of these five claims a common set of underlying factual allegations, repeated in chorus-like refrains as support for the five claims. Those underlying factual grounds are (a) the alleged *Brady* violations that led Judge Muir to grant a new sentencing hearing (but not a new guilt determination), (b) further evidence regarding Classen's previously-disclosed expectation of sentencing consideration for his cooperation in this prosecution, (c) the alleged use of inmate Leonard Yager as a government agent, and (d) the reliance on perjured testimony by Thomas Upton. Recycling this common set of factual grounds, Hammer seeks to

invalidate the grand jury's indictment, his guilty plea, and the now-vacated death sentence.

As explained below, the Court properly denied Hammer's motion to amend his 2255 motion to encompass his five claims, so no COA should issue. Indeed, numerous procedural rules, including the Section 2255 statute of limitations, the procedural default doctrine, and the non-retroactivity doctrine, among others, preclude any possibility of Hammer's securing relief on the merits of his claims.

## A. The Section 2255 statute of limitations forecloses relief on some of Hammer's COA requests.

In 1996, in adopting the Anti-terrorism and Effective Death Penalty Act (AEDPA), Congress imposed a strict one-year limitation period for the filing of claims under § 2255. A claim raised in a motion to amend a Section 2255 motion filed after the expiration of the one-year limitation period is deemed to have been filed within the one-year period only if the claim "relates back" to the prisoner's original Section 2255 motion under Fed. R. Civ. P. 15(c). *Mayle v. Felix*, 125 S.Ct. 2562, 2569 (2005)  Thus, Section 2255's one-year statute of limitations bars amendments to Section 2255 motions that present new, untimely claims

21

for relief, as opposed to a clarification or factual supplementation of an existing, timely-filed claim. *United States v. Thomas*, 221 F.3d 430, 438 (3d Cir. 2000); *United States v. Duffus*, 174 F.3d 333, 337 (3d Cir. 1999).

As detailed above, the resentencing that occurred before this Court followed a lengthy Section 2255 proceeding in which Hammer's motion to vacate his conviction was denied, but his sentence was vacated. The Court of Appeals refused to issue a certificate of appealability with respect to the voluntariness of Hammer's guilty plea.

As the parties prepared for the resentencing hearing, the government made certain disclosures to the defense. In May 2014, Hammer filed a motion to amend his Section 2255 petition. In that motion to amend, Hammer claimed that error had occurred because Upton had testified untruthfully as it related to how the encounter began. Hammer, however, clearly knew of that Upton had not been untruthful as to certain aspects of his claims and his testimony starting in 1984. Certainly, at the time the Upton testimony was offered in 1998, Hammer knew that Upton was not truthful as to how the encounter began. Thus, Hammer's motion to amend his Section 2255 petition as it relates to Upton's false testimony is untimely.

Likewise, the claims concerning Classen are untimely.  In 2012, in response to a request, the government disclosed correspondence from Classen asking the prosecutor as to scheduling matters and complaining about his housing situation.  The correspondence also revealed that as promised, following the trial, the government sent a letter requesting a sentencing reduction and sought to assist Classen with obtaining an earlier release date to a halfway house or home confinement, consistent with Classen's testimony at trial as to his expectations.  Hammer's May 2014 motion to amend his Section 2255 petition was filed more than a year after he received those documents and that information.  Thus, Hammer's claims as they relate to Classen are untimely.

**B.  <u>Hammer's specific claims are barred by the procedural default and non-retroactivity doctrines and fail on their merits</u>.**

1.  <u>No Denial of a Constitutional Right or Reasonably Debatable Issue Exists Concerning the Viability of Hammer's Guilty Plea</u>

Hammer seeks a COA to challenge once again this Court's decision and the decision of Judge Muir (and, by implication, the decision of Third Circuit) that Hammer's *Brady* claim did not warrant setting aside his guilty plea to murder.  He attempts to breathe new life into this oft-

23

repeated claim by supplementing it with his more recent allegations of false testimony or other new information affecting Classen, Yager, and Upton. However, as explained below, Hammer's *Brady* claim involves information well known to the defendant himself at the time of trial. This Court reached the same conclusion with regard to Upton's false testimony. Doc. 1711, at 18. Similarly, this Court concluded the additional information relating to Yager and Classen provided no basis for relief because the information affecting Classen was simply confirmatory of material previously known to the defense, and Yager's contacts with Hammer occurred before Hammer's right to counsel attached. *Id.* Accordingly, these claims are all barred by not only the procedural default doctrine but also the non-retroactivity doctrine, especially given the current state of the law that *Brady* does not apply to information previously known by the defendant. For essentially the same reasons, the claims all fail on their merits to state a basis for Section 2255 relief as well.

### a. Multiple Procedural Hurdles Foreclose Further Review of Hammer's Claims Regarding his Plea

The procedural default doctrine bars reviews of claims that defendant could have, but did not, raise at an earlier stage of review

unless the defendant shows "cause" and "actual prejudice" or the failure to review the claim would amount to a "fundamental miscarriage of justice." *Bousley v. United States*, 523 U.S. 614, 623 (1998) (finding a procedural default where a federal prisoner failed to challenge the voluntariness of his guilty plea on direct appeal).   This "cause and prejudice" standard requires Hammer to show, not only that "some objective factor external to the defense" impeded his efforts to raise the issue as required by each relevant procedural rule, *Coleman v. Thompson*, 501 U.S. 722, 753 (1991), but also that the error he alleges "worked to his actual and substantial disadvantage, infecting his entire trial with error." *United States v. Frady*, 456 U.S. 152, 170 (1982). Significantly, whatever else "cause and prejudice" means, it raises "a significantly higher hurdle" than the plain-error standard. *Id.* at 166.  If defendant cannot show "cause" and "actual prejudice," he cannot have his claim considered unless he shows "actual innocence," which is certainly not the case here as Hammer has never denied strangling Marti.[5]  *Id.* at 623.

---

[5] It bears noting that in the context of a guilty plea, "actual innocence" means "factual innocence," not merely legal insufficiency. *Bousley*, 523 U.S. at 622-23.

Hammer fails to establish either "cause" or "actual prejudice" for failing to pursue his claims on direct appeal.   Without mentioning the procedural bar, he simply ignores the fact that he withdrew his direct appeal and that both Judge Muir and this Court rejected any attempt to collaterally attack his guilty plea.   Moreover, the Third Circuit, having granted Hammer's dismissal of his direct appeal, refused to grant him a COA as to this claim.   Accordingly, as Hammer could have, but failed to, challenge his guilty plea on direct appeal, there is no "cause" for his procedural default.

As a result, defendant must attempt to qualify for the miscarriage of justice exception, which means that he must show either that no reasonable juror would have convicted him in light of the newly-presented evidence, or that, but for a constitutional error, no reasonable juror would have found him eligible for the death penalty. *See House v. Bell*, 547 U.S. 518, 536 (2006).   Again, defendant cannot satisfy this standard as the nondisclosures with respect to Thomas Upton have nothing to do with Hammer's guilt or innocence, but rather, pertain only to the penalty.   Recent disclosures regarding Yager and Classen are largely duplicative of impeachment material which was available to the

defense at trial (Yager's role as an informant; Classen's status as a cooperator) and are collateral to defendant's actual innocence. Nor, as will be discussed below, has defendant demonstrated a constitutional error. In addition, defendant has never been found ineligible for the death penalty: either at the 1998 hearing, or again in 2014, and despite the fact that this Court was aware of all of the *Brady* information at issue. As a result, given Hammer's affirmative abandonment of the claim that his guilty plea was invalid, any attempt to revive this argument is barred by the procedural default doctrine.

Hammer is further hamstrung by the fact that his guilty plea precludes this Court from considering any purported errors which preceded that act. Generally speaking, a "voluntary and intelligent plea of guilt made by an accused person who has been advised by competent counsel, may not be collaterally attacked," *see Mabry v. Johnson*, 467 U.S. 504, 508 (1984), unless (1) the plea was not voluntary and intelligent or (2) the petitioner received ineffective assistance of counsel. *Tollett v. Henderson*, 411 U.S. 258, 266 (1973). As will be demonstrated below, Hammer cannot show that his plea was anything but voluntary and intelligent; nor does he even allege that his counsel was ineffective.

27

Accordingly, any errors that occurred before June 22, 1998, are not subject to collateral attack.

### b.  Hammer's Alleged Constitutional Errors Do Not Provide a Basis to Challenge his Guilty Plea

Even assuming that the claim was not procedurally barred, Hammer's collateral attack upon his guilty plea does not present a cognizable basis for Section 2255 relief, and granting relief would amount to an extension of the law barred by the *Teague v. Lane*, 489 U.S. 288 (1989), non-retroactivity doctrine.  Hammer effectively proposes retroactivity-barred new constitutional rules of criminal procedure in the following arguments, among others: (a) he emphasizes that an "objective standard" is used in assessing *Brady* claims, and Judge Muir was therefore precluded from relying on his remarks during the plea colloquy as evidence that the FBI 302 reports would not have affected his decision to plead; (b) he asserts that *Brady* requires the government to disclose even that information which is already known to the defendant personally; and (c) he contends that a constitutional violation occurs when a jury receives false testimony from a witness, whether or not the government was aware of the information's falsity at the time the testimony was offered.

In a nutshell, Hammer references four instances where the government failed to disclose information that he argues had "a direct impact on the validity of his guilty plea," including (1) the FBI Reports relating to Hammer's sexual bondage proclivities, which were already rejected by this Court and the court of appeals as an avenue of unraveling defendant's guilty plea; (2) unsubstantiated and inconsistent statements by Leonard Yager that the FBI directed him to obtain incriminating evidence against defendant; (3) communications between the government and witness Stephen Classen which pertain mostly to scheduling and safety concerns and in no way materially alter information disclosed to Hammer at trial; and (4) post trial disclosures regarding Thomas Upton, who was not a guilt phase witness, and which defendant knew in any event. Although Hammer, as he does elsewhere, attempts to cast his argument as "misinformation of a constitutional magnitude," COA Mot. at 31, such is not the case.

As an initial matter, to the extent Judge Muir found limited *Brady* violations, these violations were fully adjudicated previously, resulting in a new sentencing hearing, which is "all of the relief to which [defendant] is entitled." *See* Doc. 1711 at 30. Accordingly, to the extent

Hammer attempts to revisit rulings regarding the non-disclosure of certain FBI reports, this is old ground where "relief has already been granted" and additional rulings are not appropriate.  *Id.*

Whatever the merit of Hammer's characterization of *Brady* as an "objective" rule, this much remains clear.  No rule has ever precluded, as Hammer argues, a court from relying on matters of record relevant to the question of whether the defendant's plea was entered knowingly, intelligently, and voluntarily, which is the only conceivably relevant inquiry in assessing Hammer's challenge.  Acceptance of Hammer's claim would amount to adoption of a new constitutional rule of criminal procedure that is barred by the *Teague* non-retroactivity doctrine.

*Teague* generally precludes that application of a new constitutional rule of criminal procedure in a Section 2255 proceeding, unless the proposed rule falls within an exception to non-retroactivity.  *See Bousley*, 523 U.S. at 620-21 (recognizing *Teague* in the context of a Section 2255 motion but finding it inapplicable on the distinct ground that Bousley's argument did not propose a new procedural rule).  The Supreme Court has explained that "[t]he *Teague* inquiry is conducted in three steps."  *O'Dell v. Netherland*, 521 U.S. 151, 155 (1997).  "First, the

30

date on which the defendant's conviction became final is determined."
*O'Dell*, 521 U.S. at 156.  "Next, the habeas court considers whether a . . .
court considering the defendant's claim at the time his conviction
became final would have felt compelled by existing precedent to conclude
that the rule he seeks was required.  *Id*. (alterations and internal
quotations omitted).  The third inquiry concerns *Teague*'s two narrow
exceptions.

The first *Teague* exception is "for new rules forbidding criminal
punishment of certain primary conduct and rules prohibiting a certain
category of punishment for a class of defendants because of their status
or offense."  *Id*. at 157 (alterations and internal quotations omitted).
This first exception involves constitutional prohibitions on punishment.
The second *Teague* exception, which is "even more circumscribed" than
the first, is for "watershed rules of criminal procedure implicating the
fundamental fairness and accuracy of the criminal proceeding."  *O'Dell*,
521 U.S. at 157.  The example used by the Court to illustrate what this
second exception means is *Gideon v. Wainwright*, 372 U.S. 335 (1963),
the decision that gave indigent felony defendants the right to counsel.

The exception is reserved for genuine "bedrock" rules that are essential to basic fairness. *O'Dell*, 521 U.S. at 167.

As the Supreme Court made clear in *United States v. Ruiz*, 536 U.S. 622 (2002), *Brady*'s applicability is narrowly circumscribed in the guilty plea context. A defendant who, like Hammer, elects to enter a guilty plea "foregoes not only a fair trial, but also other accompanying constitutional guarantees."[6]  536 U.S. at 629. Thus, where the defendant has pleaded guilty, he gives up his *Brady* right to discovery of impeachment evidence *and exculpatory evidence*, at least with regard to affirmative defenses, such as alibi or insanity. *See Ruiz*, 536 U.S. at 628-33. *Ruiz* did not decide the question of whether a guilty plea also forfeited the *Brady* right to disclosure of exculpatory evidence separate from affirmative defenses, i.e., evidence that the defendant was otherwise innocent of the offense. *See id.* Given that *Ruiz* did not decide this ultimate question, any rule requiring construing *Brady* to require disclosure of all exculpatory evidence prior to entry of a guilty plea would

---

[6] Hammer makes no mention of *Ruiz* in his present application, but he previously distinguished it as applying only in the context of a plea pursuant to a plea agreement. That attempted distinction was clearly unfounded given that Ruiz in fact entered a "straight up" guilty plea, not pursuant to a plea agreement. 536 U.S. at 625-26.

32

constitute a new constitutional rule of criminal procedure barred by *Teague*, and neither of the two exceptions to *Teague* non-retroactivity would apply.

Even if *Brady* were extended to require pre-guilty plea discovery of exculpatory evidence, moreover, the purpose of such a requirement would *not* be to ensure the "fairness of the defendant's trial," as Hammer has previously asserted, but rather to confirm that his guilty plea was entered knowingly, intelligently, and voluntarily. *Ruiz*, 536 U.S. at 629-30, 633. And, the voluntariness of a defendant's plea "can be determined only by considering all of the relevant circumstances surrounding it," including the defendant's personal statements in connection with entry of his plea. *Brady v. United States*, 397 U.S. 742, 749, 756 (1970); *see United States v. Brown*, 250 F.3d 811, 816-18 (3d Cir. 2001) (rejecting Brown's claim that violations of *Brady v. Maryland* rendered her guilty plea involuntary). Hammer's contrary assertion that the Court was precluded from considering his state of mind as manifested in his remarks at the plea once again proposes a new constitutional rule of criminal procedure that is barred by *Teague*, and neither of the two exceptions to *Teague* non-retroactivity apply.

Further, Hammer's *Brady* claim fails for the additional reason that he had full access to all of the information contained in the FBI 302 reports, and granting relief despite his equal access would amount to an extension of the law barred by *Teague*. Case law in effect at the time when Hammer's death sentence became final on direct review makes clear that "[e]vidence is not considered to be suppressed if the defendant either knew or should have known of the essential facts permitting him to take advantage of any exculpatory evidence." *United States v. Perdomo*, 929 F.2d 967, 973 (3d Cir. 1991). And, more specifically, the Government has had no obligation to disclose to defense counsel documents setting forth facts that the defendant himself knew or had reason to know. *United States v. Diaz*, 922 F.2d 998, 1007 (2d Cir. 1990) (holding that the Government did not improperly fail to disclose a witness's account that Diaz was not present at a meeting to set up a drug transaction; "[i]f in fact . . . Diaz was not in [the witness's] apartment during the transaction, Diaz knew that fact"); *United States v. Zuazo*, 243 F.3d 428, 431 (8th Cir. 2001) ("Having spent two days together with [the witness whose statements were not disclosed], Salaiza Zuazo was well aware of [the witness] and his potential testimony");

*Fullwood v. Lee*, 290 F.3d 663, 686 (4th Cir. 2002) ("the state did not suppress the information that came out during Fullwood's conversation with Detective Robertson because Fullwood, better than anyone, knew about his cocaine use on the night prior to the stabbing and knew that he recounted that fact to Detective Robertson"); *West v. Johnson*, 92 F.3d 1385, 1399 (5th Cir. 1996) ("Certainly West knew whether or not had taken the necklace [as he had confessed], and necessarily knew that better than the prosecution could have"); *see United States v. Pellulo*, 399 F.3d 197, 216 (3d Cir. 2005).

*Brady*'s disclosure requirement focuses specifically on usable, admissible exculpatory evidence, *Wood v. Batholomew*, 516 U.S. 1, 5 (1995) (per curiam); *United States v. Perez*, 280 F.3d 318, 349 (3rd Cir. 2002), and "[e]vidence is not considered to be suppressed if the defendant either knew or should have known of the *essential facts permitting him to take advantage of any exculpatory evidence.*" *Perdomo*, 929 F.2d at 973 (emphasis added). Hammer clearly knew about all of the basic facts reported by the various inmates identified in the FBI 302 reports, because the inmates reported conversations and acts that Hammer knew from his own direct involvement what the witnesses observed. The mere

fact that the inmates subsequently provided accounts to investigators did not, in and of itself, provide additional, admissible exculpatory information.[7]  The fact that, at the 2014 resentencing hearing, Hammer elected not to call any of the inmate witnesses named in the FBI reports clearly shows that the inmates could not provide additional, admissible exculpatory information that would "undermine confidence" in the jury's finding of substantial planning and premeditation and its imposition of a death sentence, in accordance with the standard of *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

In *West*, 92 F.3d at 1399, the Fifth Circuit held that the *Teague* non-retroactivity doctrine precluded a grant of *Brady* relief under these circumstances.  Here, similarly, as previously discussed, existing law at time when Hammer's sentence became final on direct review made clear that his *Brady* claim must be assessed in light what he personally knew or had reason to know, and a court certainly would not have "felt compelled by existing precedent" to conclude that only defense counsel's

---

[7] Hammer's prior knowledge additionally shows that he had full ability to raise his claim as part of his original Section 2255 motion.  Thus, as discussed *supra*, his claim is also barred by the one-year statute of limitations under Section 2255 and the procedural default doctrine.

36

knowledge is relevant in assessing the *Brady* claim. *O'Dell*, 521 U.S. at 156.

For similar reasons, Hammer's argument is also retroactivity-barred insofar as he seeks a COA to challenge the Court's rejection of his claims regarding post-trial disclosures as to Upton, Yager and Classen. Given that *Ruiz* did not decide whether a defendant who pleads guilty also forfeits the right to disclosure of evidence separate from affirmative defenses, any rule construing *Brady* to require disclosure of all exculpatory evidence prior to entry of a guilty plea would constitute a new constitutional rule of criminal procedure which is barred by *Teague*. Although Hammer seeks to recast his plea as neither voluntary nor intelligent because the withheld material gave him a false impression of the strength of the government's case, COA Mot. at 8-9, his claim fails for the simple reason that to the extent the information even existed in 1998, he knew it. *See Perdomo,* 929 F.2d at 973 ("[e]vidence is not considered to be suppressed if the defendant either knew or should have known of the essential facts permitting him to take advantage of any exculpatory evidence"); *see also Maynard v. Government of the Virgin Islands,* 392 Fed. Appx. 105, 120 (3d Cir. 2010) (the government did not

37

violate *Brady* by failing to provide evidence which the defendant could have known through due diligence).

Specifically, to the extent Thomas Upton's testimony had any bearing on defendant's guilty plea, which it did not, no *Brady* violation occurred as the government had no obligation to disclose information which it did not know, but was known to the defense.[8]  In fact, although defendant was well aware of Upton's perjury in 1998, the government remained ignorant of the false statements until 2014, when Upton admitted the perjury for the first time.  As soon as the government learned of inconsistencies in Upton's statements, it immediately provided that information to the defense.  There is simply no basis to claim, as Hammer cavalierly does, that AUSA Fred Martin "knew" in seeking an indictment that Upton's prior testimony was false, *see* COA Mot. at 23, that the government violated *Brady*  by failing to disclose "pretrial," that "Upton had admitted that the version of events he

---

[8] Hammer's fifth claim takes issue with the government's reliance upon Upton's testimony at the initial penalty phase in securing a death penalty verdict.  COA Mot. at 43-49.  To the extent any error occurred, the error was cured by Judge Muir's decision to vacate the death verdict and conduct a new sentencing hearing.  Accordingly, defendant's complaints about alleged errors that occurred at his first penalty hearing, resulting in a death verdict, are irrelevant.

provided regarding the Oklahoma incident was false," *id.* at 27, or that the prosecutor violated *Napue* by knowingly sponsoring perjured testimony at trial, *id.* at 28. To the contrary, as this Court found, there was no *Brady* violation as to Thomas Upton, because Hammer always knew that parts of his testimony were false. Doc. 1711 at 18. To the extent that Hammer maintains that the Constitution requires disclosure of information already known to the defendant personally, and to the extent he seeks to extend the rule of *Napue* to bar all false testimony by a witness, even where the prosecutor lacks knowledge of the falsity at the time of presentation, Hammer seeks to apply new constitutional rules which are barred by the *Teague* non-retroactivity rule in this collateral proceeding.

Similar problems lie with Hammer's argument regarding Stephen Classen, as this Court found no *Brady* violation. Specifically, this Court concluded that the correspondence between Classen and the former prosecutor reveals nothing new or "material[ly] different between the benefits noted in Classen's prior testimony and those revealed in the correspondence." *See* Doc. 1711 at 18, 25. As Hammer has demonstrated no material difference between the benefits mentioned in

Classen's testimony, any assertion that the Constitution nevertheless required disclosure of the correspondence represents an extension of existing law barred by *Teague* in this proceeding.

Likewise, Hammer's arguments regarding Leonard Yager entitle him to no relief.   Replete throughout the motion are claims that the government failed to disclose information that Yager was "deployed as an agent of the government for the specific purpose of eliciting incriminating evidence."  COA Mot. at 30.  Again, and despite the fact that the defense was well aware that Yager was an informant, the government first learned in 2014, not pretrial, that Yager incredibly stated, and then denied stating, that he was acting as a government agent "for the FBI."  Indeed, the Court found "notable" that in a second, subsequent interview, "Yager denied being enlisted by law enforcement to obtain information from Defendant . . . contradicting his statements at the prior interview."  Doc. 1711 at 24.  Despite diligent inquiry, the government could find no support for Yager's vacillating claim that the FBI directed him to obtain additional incriminating evidence on the heels of defendant's lengthy confession.  But regardless of the factual basis of this argument, or lack thereof, Hammer has failed to identify

either a *Brady* violation, or any other constitutional violation, with respect to the government's disclosures regarding Leonard Yager.[9]  To the extent he maintains the Constitution was nevertheless violated, he urges a proposed new rule barred by *Teague*.

Accordingly, and under the prevailing jurisprudence, this Court had no alternative in denying Section 2255 relief with respect to defendant's claims as to Upton, Classen and Yager.  As Hammer does not identify any flaw in the Court's reasoning, he cannot show that he is entitled to a COA to challenge his guilty plea.

## 2, 3 & 5.  No Denial of a Constitutional Right or Reasonably Debatable Issue Exists Concerning the Prior Penalty Phase

Simply restating allegations regarding the validity of his guilty plea, Hammer seeks a COA to add additional grounds attacking his

---

[9] In addition to a somewhat tortured *Brady* claim, defendant also objects to this Court's ruling that (assuming Yager was a government agent), no constitutional violation occurred when Yager and Hammer spoke as Hammer had not invoked his right to counsel.  Defendant claims that had the jury heard "the actual circumstances of Yager's involvement," "it would have rejected his testimony" and reached a different result.  COA Mot. at 28-30.  Not only is there scant reason to believe that the jury heard anything but a full and accurate recitation of Yager's involvement, but the jury actually reached no result as a consequence of Hammer pleading guilty.  To the extent the jury relied upon Yager's testimony in imposing the death penalty, this finding was reversed and Yager did not testify again.

death sentence, which has been vacated, and which the government now seeks to reinstate.  For the reasons set forth *supra*, Hammer's assertions are barred by the procedural default and non-retroactivity doctrines, and fail on their merits.

4. <u>No Denial of a Constitutional Right or Reasonably Debatable Issue Exists Concerning Hammer's Indictment</u>

Again simply restating allegations regarding the validity of his guilty plea, Hammer seeks a COA to challenge the validity of the indictment.  In essence, defendant claims that the grand jury improperly credited Upton's perjured testimony to find the statutory aggravator, *i.e.*, that Hammer had previously been convicted of a state or federal offense punishable by a term of imprisonment for more than one year, involving the use or threatened use of a firearm.  Defendant also contends that the indictment was fatally flawed by the former prosecutor's failure to (1) elicit Yager's status as a government agent and (2) give a full recitation of Classen's expected benefits.  In view of the procedural bars to this argument, which Hammer fails to even mention, and the factual inaccuracies, which Hammer glosses over, a COA is not warranted. Indeed, the procedural posture of this claim, as discussed previously

with respect to challenges to Hammer's guilty plea, automatically precludes review.

In seeking relief based on evidence presented to the grand jury, Hammer clearly pursues a new constitutional rule of criminal procedure barred by *Teague*.  Such claims have long been held non-cognizable on Section 2255 review (and, for that matter, at trial and on direct appeal). As the Supreme Court observed:

> The grand jury's sources of information are widely drawn, and the validity of an indictment is not affected by the character of the evidence considered.  Thus, an indictment valid on its face is not subject to challenge on the ground that the grand jury acted on the basis of inadequate or incompetent evidence, or even on the basis of information obtained in violation of a defendant's Fifth Amendment privilege against self-incrimination.

*United States v. Calandra*, 414 U.S. 338, 344-45 (1974) (citations omitted).  Further, once the defendant has been convicted, any procedural errors occurring during the conduct of proceedings before the grand jury are rendered harmless beyond a reasonable doubt as a matter of law.  *United States v. Mechanik*, 475 U.S. 66, 72-73 (1986).  Clearly, in light of this precedent, Hammer's claim that he is entitled to relief based on allegedly improper evidence considered by the grand jury represents a departure – indeed an extreme departure – from existing law, which is

barred from application here by the *Teague* non-retroactivity doctrine. His claim is also barred by the procedural default doctrine for the reasons set forth previously in connection with Hammer's challenge to his guilty plea.

Further, insofar as Hammer attacks the indictment based on the presented evidence of the Upton conviction and the testimony of Classen and Yager, that claim is barred by the *Teague* and procedural default doctrines and fails on its merits, for the reasons discussed above with regard to Hammer's challenge to his guilty plea.

**6.  No Denial of a Constitutional Right or Reasonably Debatable Issue Exists Concerning the Court's Failure to Conduct an Evidentiary Hearing**

Finally, Hammer seeks a COA to challenge this Court's refusal to hold an evidentiary hearing in the 2255 litigation.  Judge Muir, of course, held an extensive evidentiary hearing encompassing an essentially unrestricted range of Section 2255 issues.  Without elaborating further or naming the issues that he believes required evidentiary development, defendant argues that reasonable jurists could debate whether the Court had an obligation to grant an evidentiary hearing as to his claims.  *See* COA Mot. at 14-15.  Hammer makes a

44

generalized argument, premised on his interpretation of Section 2225, that the statutory scheme prefers an evidentiary hearing in habeas proceedings, particularly in regard to claims of an involuntary guilty plea. Certainly, Hammer's complaint does not raise an issue under the Constitution and therefore, provides no relief. *See Alix v. Quarterman,* 309 Fed. Appx. 875, 878 (5th Cir. 2009) (holding that complaints about the denial of evidentiary hearings, untethered to substantive claims of constitutional error, are unappealable). Accordingly, Hammer's claim regarding the necessity for an evidentiary hearing cannot support a COA given that it does not involve a question of constitutional dimension.

But even if his claim were amenable to appeal, which it is not, Hammer has not identified any legal support for his position, or any facts for that matter, that might support debate among reasonable jurists. Contrary to Hammer's characterization of the record, the Court did not merely wholesale adopt a government proffer of purported facts, but rather relied upon the extensive record before Judge Muir and his findings, prior trial transcripts, excerpts from Hammer's own autobiography, detailed FBI reports, and later, the live testimony of numerous witnesses at the resentencing hearing, including Thomas

45

Upton, himself. Accordingly, no reasonable jurists could begin to debate whether a hearing might have provided any particular benefit to the extensive record before this Court.

## CONCLUSION

Based on the foregoing reasoning and authority, the government respectfully urges this Court to deny the Request for a Certificate of Appealability.

PETER J. SMITH
UNITED STATES ATTORNEY


/s/ John C. Gurganus, Jr.

JOHN C. GURGANUS, JR.
Assistant United States Attorney

AMANDA HAINES
Trial Attorney For the
Capital Case Section
1331 F Street, N.W.
Washington, D.C. 20530

<u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on this 17th day of November

2014, he served a true and correct copy of the foregoing

<u>**GOVERNMENT'S OPPOSITION TO DAVID PAUL HAMMER'S**</u>
<u>**REQUEST FOR A CERTIFICATE OF APPEALABILITY**</u>

via electronic filing:

ADDRESSEES:

Ronald C. Travis, Esquire
rtravis@riederstravis.com

James J. McHugh, Jr., Esquire
James_McHugh@fd.org

James Moreno, Esquire
James_Moreno@fd.org

Anne Saunders, Esquire
Anne_Saunders@fd.org

<u>/s/ John C. Gurganus, Jr.</u>

JOHN C. GURGANUS, JR.
Assistant United States Attorney