IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA

v.

DAVID PAUL HAMMER,

Defendant.

CRIMINAL ACTION
NO. 4:96-CR-0239

## OPINION

**Slomsky, J.**                                                    **July 23, 2015**

## I.   INTRODUCTION

Before the Court is Defendant David Paul Hammer's Request for a Certificate of Appealability ("COA"). (Doc. No. 1801.) On June 22, 1998, Defendant entered a guilty plea to first degree murder in the death of Andrew Marti. On July 24, 1998, after hearing evidence on whether the death penalty should be imposed, a jury returned a sentence of death. Thereafter, this sentence was imposed by District Court Judge Malcolm Muir after he denied Defendant's Motion for a New Trial on November 4, 1998.

On December 27, 2005, following a lengthy hearing on an Amended Habeas Petition filed by Defendant pursuant to 28 U.S.C. § 2255, Judge Muir overturned the death sentence and granted Defendant a new penalty phase hearing. He refused, however, to permit Defendant to withdraw his guilty plea. On January 12, 2011, this case was transferred from the docket of Judge Muir to this Court. The new penalty phase hearing was held in June 2014. The sentence of death was not reimposed. Instead, on July 17, 2014, this Court sentenced Defendant to a term of life imprisonment without the possibility of parole.

1

On September 2, 2014, Defendant filed a Notice of Appeal to the Third Circuit Court of Appeals. (Doc. No. 1785.) On September 10, 2014, the Third Circuit remanded the case in order for this Court to determine whether a COA should issue pursuant to 28 U.S.C. § 2253. (Doc. No. 1786.) For reasons that follow, the Court will not issue a COA and will deny Defendant's Request for a Certificate of Appealability (Doc. No. 1801).

## II.   BACKGROUND

### A.   Defendant's Trial for the First Degree Murder of Andrew Marti

On September 18, 1996, a Grand Jury returned an indictment against Defendant David Paul Hammer. (Doc. No. 1.) He was charged with killing his cellmate Andrew Marti on April 13, 1996 by binding him to a bed with braided sheets and strangling him while the two men were in their cell together. (Id.) On April 9, 1997, the Government filed a notice of its intent to seek the death penalty against Defendant for the killing of Andrew Marti. (Doc. No. 93.)

Defendant was incarcerated at the Allenwood Federal Correctional Complex in White Deer, Pennsylvania ("Allenwood") after he was convicted in Oklahoma state court in the case State v. Hammer, CRF-84-1310. In the Oklahoma case, he was convicted of kidnapping, robbing, and shooting Thomas Upton with intent to kill. (Doc. No. 1684 at 39-40.) The Oklahoma authorities had him transferred to Allenwood to serve his state sentence.

On June 2, 1998 trial began in the federal case for the killing of Andrew Marti. Among the witnesses called by the Government in their case in chief were Leonard Yager and Stephen Classen, two of Defendant's former cellmates. In the hours after Marti's death, Defendant confessed to the murder to law enforcement and also informed the investigators that he had confided in Yager and Classen about his desire to kill Marti.

On June 22, 1998, in the midst of trial, Defendant withdrew his not guilty plea, entered a plea of guilty, and admitted to killing Marti with premeditation and malice aforethought. (Doc. Nos. 448, 489-503, 504.) Specifically, Defendant testified, "[t]he bottom line is I did in fact with these hands kill Andrew Marti." (Doc. 488, Tr. Vol. 14, 113-14.) The court conducted a colloquy with Defendant to confirm that the plea was knowingly, voluntarily, and intelligently made. (Doc. No. 1684 at 5.) The court found Defendant competent, and accepted his guilty plea. (Id. at 7.)

After the guilty plea, the penalty phase of the trial commenced on June 30, 1998. (Doc. No. 553.) During the penalty phase hearing, the Government called several witnesses, including Thomas Upton, the victim of the crime Defendant committed in Oklahoma that led to his incarceration at Allenwood. On July 23, 1998, the jury began its deliberations regarding whether the death penalty should be imposed, and on July 24, 1998, the jury returned a sentence of death. (Doc. No. 572.) On November 4, 1998, after denying motions for a new trial, District Court Judge Malcolm Muir imposed a sentence of death. (Doc. No. 648.)

B.    **Defendant's Appeal and Habeas Petitions Pursuant to 28 U.S.C. § 2255**

On November 12, 1998, Defendant filed an appeal. United States v. Hammer, 226 F.3d 229, 230 (3d Cir. 2000). On July 11, 2000, the Third Circuit received a letter from Defendant stating that he wanted the appeal dismissed, and during oral argument held on July 18, 2000, Defendant expressed his intent "to be executed as promptly as possible." Id. at 233. On August 31, 2000, the Third Circuit granted Defendant's motion for voluntary dismissal of his direct appeal, United States v. Hammer, 226 F.3d 229 (3d Cir. 2000), cert. denied, 532 U.S. 959 (2001). Defendant filed a petition to reinstate his direct appeal, which the Third Circuit denied on

January 5, 2001.  See United States v. Hammer, 239 F.3d 302 (3d Cir. 2001), cert. denied, 534 U.S. 831 (2001).

On March 29, 2002, Defendant filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2255, seeking to vacate and set aside his conviction and sentence.[1]  (Doc. No. 767.)  On September 30, 2002, Defendant filed an "Amended Motion to Vacate and Set Aside Conviction and Sentence Pursuant to 28 U.S.C. § 2255 by a Person in Federal Custody."  (Doc. No. 785.) Thereafter, on July 9, 2003, Defendant filed a Second Amended Motion pursuant to 28 U.S.C. § 2255 (Doc. No. 817), and on January 27, 2005, Judge Muir permitted Defendant to file a Third Amended Motion (Doc. No. 1042).

### C.      The Government's Release of Previously Undisclosed FBI 302 Statements

Thereafter, on July 14, 2005, Judge Muir held an evidentiary hearing on Defendant's Third Amended Section 2255 Motion.  (Doc. No. 1094.)  The hearing was held intermittently until September 29, 2005.   On September 22, 2005, before the hearing concluded, the Government provided counsel for Defendant with thirty-three previously undisclosed FBI 302 statements,[2] which summarized interviews with prison inmates.  (Doc. No. 1684 at 30-31.) Some statements indicated that Defendant had previously braided bed sheets into ropes for use during sex rather than to perform the homicide—a fact Defendant contended was exculpatory because it involved the amount of planning by Defendant before he killed Andrew Marti with the braided ropes.  As a result of the withholding of this Brady material, Judge Muir granted

---

[1] This Petition was filed within the one-year statute of limitations period measured from the United States Supreme Court's denial of certiorari on October 1, 2001.

[2] In his Request for a COA, Defendant relies on the FBI 302 statements of the following inmates: Albert Ray Johnson, Royce Lee Fowler, Gaylon Ball, and Martin Guerrero.  (See Doc. No. 1801 at 6-7, 20-22.)

Defendant an opportunity on October 19, 2005 to file a Fourth Amended Motion pursuant to Section 2255. (Doc. No. 1207.)

### D.      Judge Muir's Opinion on Defendant's Fourth Amended Habeas Petition

On December 27, 2005, Judge Muir denied in part and granted in part Defendant's Fourth Amended Motion pursuant to Section 2255. (Doc. No. 1216.) Specifically, Judge Muir denied Defendant's request to withdraw his guilty plea, but did grant a new penalty phase hearing. United States v. Hammer, 404 F. Supp. 2d 676 (M.D. Pa. 2005). With respect to the guilty plea, Judge Muir in his opinion stated the following:

> In determining whether the Brady violations impact [Defendant's] guilty plea, the standard of review is whether there is a reasonable probability that but for the failure to disclose the Brady material, [Defendant] would have refused to plead guilty and instead would have proceeded with the guilt-phase of the trial. See Kyles v. Whitley, 514 U.S. at 435; United States v. Nagra, 147 F.3d 875, 881 (9th Cir. 1998).
>
> \*\*\*
>
> The bulk of the information which the Government failed to turn over relates to [Defendant's] reason for braiding sheets into ropes and the truthfulness of [Defendant's] story that he convinced [Marti] to engage in a hostage ruse so that [Marti] could be transferred to the United States Penitentiary, Atlanta, Georgia.
>
> The information from Albert Ray Johnson, Royce Lee Fowler and Gaylon Ball would have supported [Defendant's] contention that the sheets were braided into ropes for the purposes of being used as part of consensual sexual activity involving bondage. . . . The testimony of Martin Guerrero would have bolstered Mr. Hammer's position that the hostage scenario was untrue.
>
> \*\*\*
>
> The information which the Government failed to disclose does not appear to have any relevance to [Defendant's] decision to plead guilty to first degree murder. During the change of plea proceeding on June 22, 1998, [Defendant] denied the accuracy of the hostage ruse and indicated that the sheets braided into ropes were used for other purposes. Consequently, information suggesting that the hostage ruse was untrue or that the ropes were used for other purposes would not have deterred [Defendant] from entering a plea of guilty.
>
> \*\*\*
>
> It is also alleged that the Government failed to provide the defense with a Bureau of Prisons ["BOP"] document [] indicating that [Marti] had gang related problems and as a result of these problems it was [Marti] who had requested to cell with [Defendant].

***

During the trial evidence was presented that both [Defendant] and [Marti] requested to be housed together. The individual who drafted the BOP document may have overlooked information indicating that both [Defendant] and [Marti] requested to cell together or the author may have decided it was not relevant for the purpose of summarizing a homicide incident. We are not convinced that the BOP document would have deterred [Defendant] from entering a plea of guilty to first degree murder. Nor are we convinced that the documents relating to Johnson, Fowler, Ball and Guerrero and the BOP document [] as a whole would have deterred [Defendant] from entering a plea of guilty to first degree murder.

(Doc. No. 1216 at 265-70.)

With respect to the penalty phase, Judge Muir concluded as follows:

In assessing the impact of <u>Brady</u> violations on the penalty-phase proceedings, the question is whether the withheld evidence would have had an effect on even a single juror because the vote for one single juror in the sentencing phase of a capital trial results in the imposition of a life sentence.
***
The Government in this case failed to disclose evidence from third parties regarding [Defendant's] history of engaging in sexual bondage, including evidence that in the past he had braided sheets into ropes to be used in consensual aberrant sexual activity.

With respect to the aggravating circumstance of substantial planning and premeditation, [Defendant's] history of sexual bondage became relevant when the prosecutor during his penalty-phase opening statement emphasized the braiding of the sheets into ropes. . . . Also, the prosecutor during his closing argument contended that the braiding of the sheets into ropes was evidence of substantial planning and premeditation.
***
The <u>Brady</u> violations in this case taint the jury's determination that [Defendant] committed the offense after substantial planning and premeditation. The failure of the Government to disclose the 302 statements undermines our confidence in the jury's determination that [Defendant] engaged in substantial planning and premeditation and the jury's sentencing recommendation. [Defendant's] death sentence will be vacated on that basis.

(Doc. No. 1216 at 265, 270-73.)

On July 9, 2009, Judge Muir ordered the Government to file a motion to have the penalty phase rehearing placed on a trial list within sixty days. (Doc. No. 1245.) Thereafter, Defendant submitted to the Department of Justice a request that it reconsider the decision to continue to

seek the death penalty. On January 6, 2011, then Attorney General Eric Holder authorized the prosecution to seek the death penalty against Defendant. (Doc. No. 1300.) Following this decision, the case was reassigned to this Court on January 12, 2011. (Doc. No. 1301.)

### E.    Disclosures with Respect to Upton, Yager, and Classen

#### 1.    Disclosures regarding Upton

On March 11, 2014, counsel for Defendant was notified by the Government that it had recently learned that Thomas Upton had testified falsely against Defendant in 1984 in State v. Hammer, CRF 84-1310 and in 1998 during the penalty phase of the hearing involving the death of Andrew Marti. (Doc. No. 1684 at 47.) Upton revealed that contrary to his earlier testimony that Defendant had carjacked and kidnapped him, Upton had willingly accompanied Defendant to a motel to have sex with him. (Id. at 46.) Upton also had previously testified that Defendant had locked him in the bathroom of the motel, but now stated that he had gone to the bathroom voluntarily. (Id.) Moreover, Upton's earlier testimony was that a weapon was used during the carjacking. (Id.) In his new statement, he said that Defendant did not brandish a weapon until Upton told Defendant that he recognized Defendant as a prison escapee while in the motel. (Id.) The balance of Upton's testimony was consistent with his prior testimony—particularly with regard to the events after the men left the hotel and leading up to Defendant shooting him. (Id.)

#### 2.    Disclosures regarding Yager

On March 14, 2014, the Government disclosed newly discovered information concerning Leonard Yager, who testified for the Government during Defendant's actual trial in 1998. Yager was Defendant's first cellmate at the Allenwood Federal Correctional Complex. (Doc. No. 1684 at 9.) When Defendant confessed to the murder of Andrew Marti on April 13, 1996 to FBI Special Agent Carlyle Rick Thompson, he also admitted that he had told Yager about his plans to

murder Marti. Yager confirmed to Thompson that Defendant had told Yager about this plan. (Id. at 10.) In the days following the murder, Defendant provided Yager with a note listing seven reasons for the killing. At all times, Yager maintained that Defendant had initiated contact with him. (Id. at 11.)

On February 24, 2014, Yager was interviewed in preparation for the resentencing hearing by FBI Special Agent Thomas Herbst and Prosecutor Amanda Haines. (Doc. No. 1684 at 50.) During the interview, Yager stated that the FBI had "sent [him] in" to speak with Defendant. Yager also claimed that he did not recognize the note that he had previously authenticated. Significantly, during the interview in February 2014, Yager was not sober. Indeed, Yager later admitted that at the time of the interview he was under the influence of heroin which he had recently ingested. (Id.)

On April 1, 2014, Yager was interviewed a second time for the resentencing hearing, in part to clarify the statements he had made on February 24, 2014. (Id. at 51.) Yager recanted the version of events he gave at the interview held on February 24, 2014, stating that he was not directed by anyone to seek information from Defendant, and that Defendant had always initiated the contact with him. Yager also denied that he had ever stated otherwise to Herbst and Haines. (Id.) He affirmed that Defendant had given him the note listing the seven reasons why he killed Marti to satisfy his curiousity. (Id.)

### 3.    Disclosures regarding Classen

Stephen Classen was Defendant's cellmate after Yager moved out. Like Yager, Classen testified at Defendant's trial that Defendant had shared his plans to kill Marti with him. A note written by Defendant and intended for Classen was intercepted by prison personnel and

8

presented at trial. (Doc. No. 1684 at 52.) The note stated in part: "I'm sure you were surprised to learn that I had done what I told you I was going to do to Marti." (Id.)

At trial, Classen testified that he expected a letter of cooperation from the Government in support of a reduced sentence in a prosecution in Oregon, and a recommendation to the BOP that he be housed in an institution other than a penitentiary. (Doc. No. 1642 at 25.) In 2012, in response to discovery requests, the Government disclosed correspondence between Classen and the prosecutor in Defendant's 1998 trial. In the letters, Classen asked when trial would start and complained about his placement in a county prison while waiting to testify. The correspondence showed that following his testimony, the Government sent a letter to the Assistant United States Attorney in the District of Oregon requesting a sentence reduction and sought to assist Classen with obtaining an earlier release date to a halfway house. (Id.; Doc. No. 1642, Ex. 8 at 74-77) Classen is now deceased. (Id.)

### F.    Defendant's Fifth Amended Motion Pursuant to 28 U.S.C. § 2255 in Light of the Disclosures Involving Upton, Yager, and Classen, and Other Matters

On April 2, 2014, Defendant filed his Fifth Amended Motion pursuant to 28 U.S.C. § 2255. (Doc. No. 1642.) In his Motion, Defendant argues that the disclosures concerning Upton, Yager, and Classen rendered his guilty plea unconstitutional, and also violated his Fifth, Sixth, and Eighth Amendment rights. (Doc. No. 1642 at 11-13.) On May 29, 2014, this Court denied Defendant's Fifth Amended Motion.[3] (Doc. No. 1711.)

---

[3] On May 29, 2014, this Court denied Defendant's Fifth Motion to Amend his Section 2255 Petition. The Court concluded that the disclosures with respect to Upton, Yager, and Classen "do not demonstrate constitutional violations or a fundamental defect that results in a miscarriage of justice." Thus, "[a]lllowing Defendant to amend his petition at this time would not be consistent with the overall framework of habeas corpus because his new claims do not allege supportable constitutional violations." (Doc. No. 1711 at 17-18.)

The resentencing hearing before this Court began on June 2, 2014 and continued intermittently until June 30, 2014. (Doc. Nos. 1765-69.) As noted, the Court sentenced Defendant to life imprisonment without the possibility of parole. (Doc. No. 1771 at 1.)

On September 9, 2014, Defendant filed a notice of appeal to the Third Circuit. (Doc. No. 1785.) On September 10, 2014, the Third Circuit remanded the case in order for this Court to determine whether a COA should issue pursuant to 28 U.S.C. § 2253, and stayed Defendant's appeal pending this Court's determination. (Doc. no. 1786.) On October 27, 2014, Defendant filed a Brief in Support of the Issuance of a COA. (Doc. No. 1806.) On November 17, 2014, the Government filed a Response in Opposition. (Doc. No. 1806.) On December 31, 2014, Defendant filed a Reply. (Doc. No. 1813.)

## III.    STANDARD OF REVIEW

A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). An applicant can satisfy this inquiry if he can demonstrate "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." U.S. v. Tabas, 45 F. App'x 113, 114 (3d Cir. 2002) (citing Slack v. McDaniel, 592 U.S. 473, 484 (2000)). "Where a plain procedural bar is present and the district court is correct to invoke it to dispose of the case, a reasonable jurist could not conclude either that the district court erred in dismissing the petition or that the petitioner should be allowed to proceed further." Slack, 529 U.S. at 484.

## III.    ANALYSIS

Defendant maintains that the Court should issue a COA to permit review of the following claims: (1) Defendant's mid-trial guilty plea on June 22, 1998 was constitutionally invalid; (2) the Government violated Defendant's Sixth Amendment Right to counsel based on the

alleged use of Leonard Yager as a government agent; (3) the Government violated Defendant's Fifth, Sixth, and Eighth Amendment rights; (4) the Government violated Defendant's Fifth and Eighth Amendment rights by relying on perjured testimony before the grand jury; and (5) the Government violated Defendant's Fifth, Sixth, and Eighth Amendment rights by permitting the jury at the penalty hearing to consider the perjured testimony of Thomas Upton. (Doc. No. 1801.)

As noted by the Government, the claims Defendant intends to present on appeal rest on the following five factual grounds: (1) the Brady violations identified by Judge Muir with respect to the previously undisclosed FBI 302 inmate statements; (2) the Bureau of Prisons ("BOP") document noting that Marti had requested to cell with Defendant; (3) Upton's admission that he had testified falsely; (4) Yager's statement that he had been directed by the Government to speak with Defendant; and (5) the letters between Classen and the prosecutor revealing that Classen received a sentence reduction and expected to obtain an earlier release date.

For reasons that follow, the Court will not issue a COA because the claims with respect to Upton and Classen are barred by the statute of limitations, and Defendant has failed to make a substantial showing of the denial of a constitutional right with respect to the remaining claims. Given the overlapping nature of the arguments, the Court will discuss the arguments out of turn to facilitate the analysis of Defendant's claims.

### A.    Defendant's COA Request will be Denied Regarding his Claims that Involve Thomas Upton and Stephen Classen

The Court will not grant a COA with respect to any of Defendant's claims relating to Upton or Classen's testimony because "a plain procedural bar is present" and thus, a reasonable jurist could not conclude that the district court erred in dismissing the Fifth Amended Habeas Petition. Slack, 529 U.S. at 484. Pursuant to the Antiterrorism and Effective Death Penalty Act

("AEDPA"), a one-year statute of limitations applies to motions brought pursuant to 28 U.S.C. § 2255. The statute provides that the limitation period runs from the latest of:

(1)  the date on which the judgment of conviction becomes final;

(2)  the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United states is removed, if the movant was prevented from making a motion by such governmental action;

(3)  the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(4)  the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2255(f). A prisoner may amend a Section 2255 motion and the claims will be considered timely so long as the claims "relate[] back" to the claims raised in the original motion. It follows then that an attempt to amend a Section 2255 motion with new claims asserted beyond the one-year statute of limitations will be considered time-barred.

Here, Plaintiff's claims concerning the use of Thomas Upton's testimony underlie in whole or in part his arguments numbered 1, 3, 4, and 5 above. However, these claims are time-barred. Defendant's conviction was final on October 1, 2001, the date the United States Supreme Court denied Defendant's petition for writ of certiorari. In his original habeas petition filed on March 29, 2002, Defendant did not include any arguments concerning Upton's perjured testimony. It was not until May 2014 that Defendant attempted to amend his Section 2255 petition to include this information. Although Upton did not reveal to the Government until February 2014 that he had testified falsely, Defendant was aware that Upton was testifying falsely in 1984 and 1998. As the only other witness to the events that occurred in 1983 with Upton, Defendant knew that he had not carjacked and kidnapped Upton as Upton had testified.

12

This knowledge is further supported by the fact that Defendant published an autobiographical book in 2004 titled "The Final Escape," which described in detail that he met Upton at a gay bar and brought him back to his motel room. See David Paul Hammer, The Final Escape, 116-19 (2004).

Accordingly, because Defendant knew that Upton had testified falsely in 1984 and 1998, but failed to include any claims in a Section 2255 motion with respect to the false testimony within the one-year statute of limitation, Defendant is barred from using Upton's false testimony as a ground for relief. As noted above, 28 U.S.C. § 2255(f)(4) provides that the one-year statute of limitations runs from "the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence." Thus, because a "plain procedural bar is present," here in the form of the one-year statute of limitations, a reasonable jurist could not conclude that this Court erred in dismissing this claim. Slack, 529 U.S. at 484. As such, the entirety of Defendant's fifth argument is barred, as well as allegations concerning Upton's testimony in arguments numbered 1, 3, and 4.

Defendant's claims relating to Stephen Classen[4] will also be dismissed as barred by the statute of limitations under 28 U.S.C. § 2255(f)(4). In 2012, in response to discovery requests, the Government provided Defendant with letters between Classen and the prosecutor in Defendant's 1998 trial. The letters discuss the benefits Classen expected to receive as a result of his cooperation against Defendant at the 1998 trial. Defendant's claims regarding these letters

---

[4] In its Opinion of May 29, 2014, this Court did not discuss the statute of limitations barring Defendant's claims against Stephen Classen, but rather dismissed the claims as meritless. Specifically, this Court stated, "[t]here is no material difference between the benefits noted in Classen's prior testimony and those revealed in the correspondence [released in 2012]." (Doc. No. 1711 at 18.) While the Court concludes here that Defendant's claims against Classen are time-barred, they are also without merit.

were raised for the first time on April 2, 2014 when Defendant filed a Fifth Motion to Amend the Section 2255 Petition. This Motion was filed more than one year after he received the letters. Consequently, Defendant's claims relating to Stephen Classen as included in arguments 1, 3, and 4 are untimely under 28 U.S.C. § 2255's one year statute of limitations.[5]

---

[5] Defendant contends that the Government waived its statute of limitations argument regarding Upton and Classen. (Doc. No. 1813.) As noted by the Third Circuit, "affirmative defenses under AEDPA should be treated the same as affirmative defenses in other contexts, and, if not pleaded in the answer, they must be raised at the earliest practicable moment thereafter." Robinson v. Johnson, 313 F.3d 128, 134 (3d Cir. 2002). Defendant argues that the "earliest practicable moment" that the Government could have raised a statute of limitations defense was in its Response to Defendant's April 2014 Fifth Motion to Amend his Section 2255 Petition. However, in accordance with the Third Circuit's decision in Robinson, the Government did not waive its right to rely on a statute of limitations defense.

In Robinson, the Third Circuit considered whether the government had waived a statute of limitations defense after failing to raise it in response to petitioner's habeas petition. 313 F.3d at 128. The government had argued that the petition was not properly before the district court because it was a second or successive habeas petition but made no mention of the statute of limitations. Id. at 139. The court concluded, however, that the government had not waived a statute of limitations defense because it challenged the petition on successiveness grounds. The initial challenge may require the district court as a threshold matter to determine whether it was a second or successive petition that could preclude review by the district court. Id. at 139-40 ("[A] district court, faced with an unapproved second or successive habeas petition, must either dismiss it or transfer it to the appropriate court of appeals.") Accordingly, the court determined that until a district court determines that the petition is not a second or successive petition, "[d]efenses such as the statute of limitations would be premature . . . ." Id. at 140.

Here, the Government in its May 13, 2014 Response to Defendant's Fifth Motion to Amend his Section 2255 Petition argued that the Motion should be dismissed as a successor petition among other reasons. (Doc. No. 1684 at 55-56.) Thus, pursuant to Robinson, the Government did not waive the statute of limitations defense by failing to raise it in its Response to the Motion to Amend. The Court subsequently declined to permit Defendant to Amend his Petition finding that the facts alleged in Defendant's Petition did not give rise to constitutional violations or a fundamental defect in his trial demonstrating a miscarriage of justice. (Doc. No. 1711.)

After the Third Circuit remanded this case to determine whether a COA should issue, the Government filed a Response to Defendant's Brief noting that the statute of limitations would preclude the Third Circuit's review of some of Defendant's claims. This argument was raised timely under Robinson, and accordingly, Defendant's argument that the Government waived the statute of limitations defense is without merit.

14

**B.      Defendant's COA Request Will Be Denied Regarding His Claim That the Events Involving Yager Violated His Sixth Amendment Right to Counsel**

Defendant's second claim for relief is that "[t]he Government's use of inmate Yager as its agent to circumvent Mr. Hammer's unequivocal invocation of his right to counsel meets the standard for a COA." (Doc. No. 1801 at 15.) In making this claim, Defendant relies upon the February 24, 2014 interview of Yager by FBI Agent Herbst and Prosecutor Haines in preparation for the resentencing hearing. (Doc. No. 1684 at 50.) In that interview, Yager stated that the FBI had "sent [him] in" to speak with Defendant. (Id.) Yager also claimed that he did not recognize the note authored by Defendant listing the seven reasons he killed Marti that Yager had authenticated at trial. Defendant contends that based on the content of this interview, Yager was acting on behalf of the Government when he elicited evidence from Defendant in violation of his Sixth Amendment right to counsel.

Importantly, Yager was not sober during the interview held on February 24, 2014. (Id.) In fact, Yager admitted that at the time of the interview he was under the influence of heroin which he had recently ingested. On March 14, 2014, Herbst and Haines interviewed Yager once again. During the interview, Yager recanted the statements he had made in the previous interview—a fact that Defendant does not acknowledge. (Doc. No. 1684 at 51.) Yager affirmed that Defendant had given him the note listing the seven reasons why he killed Marti. (Id.) He also stressed that he had never been directed by anyone to seek information from Defendant who had always initiated contact with him.

As will be discussed below, the Court does not credit Yager's one-time, self-recanted statement regarding his alleged status as an "agent" for the Government as an accurate version of events. Nevertheless, even if Yager had been acting as a Government agent, Plaintiff has not

made a "substantial showing" that his Sixth Amendment right to counsel was violated because he

had not invoked his right to counsel before meeting with Yager. See 28 U.S.C. § 2253(c)(2).

This issue was fully covered and found to be without merit in this Court's previous

Opinion of May 29, 2014. (Doc. No. 1711.) The pertinent portion of the Opinion is adopted

here and set forth below:

> Pursuant to the Sixth Amendment, the right to counsel arises at the initiation of adversarial judicial proceedings against a defendant. See Kirby v. Illinois, 406 U.S. 682 (1972). Judicial proceedings against an accused include the "formal charge, preliminary hearing, indictment, information, or arraignment." Id. at 688-89. Thus, when formal criminal charges are brought against an accused, the Sixth Amendment establishes the defendant's right to have an attorney to assist in his defense.
>
> In Massiah v. United States, the Supreme Court held that the Sixth Amendment right to counsel is violated if a confidential government agent deliberately elicits information from a defendant who has been formally charged, in absence of the defendant's counsel. 377 U.S. at 206. In order for a Massiah violation to exist, however, three factors must be present: (1) the right to counsel must have attached; (2) the informant must have been acting as a government agent; and (3) the informant must have deliberately elicited the information in question. See West v. United States, 866 A.2d 74, 84 (D.C. 2005).
>
> Here, Defendant was not under indictment on the morning of April 13, 1996 when he was interviewed by law enforcement personnel and stated that he better get a lawyer. Thus, Massiah does not apply. It is well established that the right to counsel does not attach until charges are filed or until adversary judicial proceedings have begun. Kirby, 406 U.S. at 688-90. For example, in United States v. Gouveia, the Supreme Court held that the defendant, who were suspected of murder in prison, did not have right to counsel while in administrative segregation prior to indictment since "[t]he right to counsel does not attach until after the initiation of adversary judicial proceedings." 467 U.S. 180, 187 (1984). While Defendant had confessed to the murder in response to questioning by law enforcement personnel, at that point no adversarial judicial proceeding against him had commenced because he had not been arrested, indicted, or arraigned.
>
> Further, Defendant's statement that he "had better get me a lawyer" did not constitute a clear or unequivocal invocation of his right to counsel. In Davis v. United States, the Supreme Court held that the suspect's statement "Maybe I should talk to a lawyer" during a police interview was too ambiguous to invoke his right to counsel. 512 U.S. 452 (1994). Likewise, Defendant's statement here

16

was too ambiguous to invoke his right to counsel. Considering Defendant had just confessed to the murder of Marti, his remark could be construed as a comment on the damaging nature of his confession.

Even if Defendant did invoke his right to counsel, the Government denies that any law enforcement agent instructed Yager to interrogate Defendant as an agent of the Government. If called to testify, the Government submits that both Agents would "strenuously affirm that they did not instruct anyone to obtain a confession from [Defendant]." (Doc. No. 1684 at 76.) In fact, Special Agent Malocu, an assigned case agent, did not meet with Yager until two days after [Defendant] wrote [the seven reasons note]. (Id. at 77.) Thus, Agent Malocu could not have instructed Yager to induce Defendant to confess to the murder or to write the note intended for Yager. It is also not clear that Yager did anything more than serve as a "listening post." Where a prisoner makes incriminating statements to a passive listener—a "listening post"—the informant's presence does not constitute an interrogation and the right to counsel is not violated. Kuhlmann v. Wilson, 477 U.S. 436, 459 (1986).

(Doc. No. 1711 at 23-23.)

Thus, Defendant's Sixth Amendment claim fails for the reasons given in the Opinion of May 29, 2014 and a COA will not be issued on this claim.

### C.   Defendant's COA Request Will Be Denied with Respect to Argument Four Regarding Testimony Presented to the Grand Jury

Defendant's fourth reason as to why a COA should issue is based on the Government's presentation of the testimony of Upton, Classen, and Yager before the grand jury that indicted him. With respect to Upton and Classen, the claim that the return of indictment was tainted by Upton and Classen's testimony fails because it was not timely raised by Defendant. As noted previously, a one-year statute of limitations applies to claims under 28 U.S.C. § 2255 and Defendant did not raise claims concerning Upton and Classen's testimony before the grand jury within this deadline. Therefore, Defendant's only argument for issuing a COA relating to the grand jury proceeding is based on Yager's alleged failure at trial to "mention [] the true nature of [his] status as an agent for the [G]overnment," which "violated the Fifth Amendment." (Doc. No. 1801 at 33, 39.) This claim fails for two reasons.

17

First, the Court does not agree that the Government failed to disclose the "true nature" of Yager's status. The Government in its Response to Defendant's Brief stated the following: "[d]espite diligent inquiry, the [G]overnment could find no support for Yager's vacillating claim that the FBI directed him to obtain additional incriminating evidence on the heels of [D]efendant's lengthy confession." (Doc. No. 1806 at 40.) Furthermore, during his interview on April 1, 2014—notably held when he was not under the influence of heroin—Yager himself recanted his testimony that he had been sent in by the FBI to obtain inculpatory evidence from Defendant. Accordingly, the Court does not find that Yager failed to "mention [] the true nature of [his] status as an agent for the [G]overnment."

Second, not every violation of a constitutional right before a grand jury will lead to dismissal of an indictment or the right to withdraw a guilty plea. For example, the United States Supreme Court has held that the Government may present evidence to the grand jury that was obtained in violation of the Fifth Amendment. In United States v. Calandra, the Supreme Court stated as follows:

> The grand jury's sources of information are widely drawn, and the validity of an indictment is not affected by the character of the evidence considered. Thus, an indictment valid on its fact is not subject to challenge on the ground that the grand jury acted on the basis of inadequate or incompetent evidence, or even on the basis of information obtained in violation of a defendant's Fifth Amendment privilege against self-incrimination.

414 U.S. 338, 344-45 (1974); see also Calandra, 414 U.S. at 346 ("[A]n indictment based on evidence obtained in violation of a defendant's Fifth Amendment privilege is nevertheless valid.") In contrast, where "what was transpiring before the grand jury would itself violate a constitutional privilege," the indictment may be dismissed depending on the severity of the violation. United States v. Helstoski, 635 F.2d 200, 203-204 (1980) (discussing United States v. Calandra).

18

Here, Defendant only argues that the Government presented incomplete testimony to the grand jury that failed to disclose the "true nature" of Yager's status as an agent for the Government. In accordance with United States v. Calandra, the presentation of this allegedly incomplete evidence, even if obtained in violation of the Fifth Amendment, is not a valid ground to challenge the indictment. In any event, the claim that Yager acted as a Government agent has been refuted not only by him, but by the agents assigned to this case. Accordingly, Defendant has failed to make a substantial showing that the presentation of Yager's testimony violated his constitutional rights, and a COA will not be issued on this claim.

### D. Defendant's COA Request Will Be Denied Regarding His Claim That Had Certain Information Been Timely Revealed He Would Not Have Entered a Guilty Plea

Defendant's first argument on why the Court should issue a COA is that his guilty plea was constitutionally invalid for the following reasons:[6] (1) the Government's failure to disclose that Marti requested to cell with Defendant; (2) the Government's failure to disclose the FBI 302 statements of Albert Ray Johnson, Royce Lee Fowler, Gaylon Ball, and Martin Guerrero; and (3) the Government's failure to disclose the status of Leonard Yager as an alleged government agent which violated Defendant's 6th Amendment right to counsel. (Doc. No. 1801 at 6-7.) A guilty plea that conforms with "constitutional safeguards" must be knowing, voluntary, and intelligent. Jamison v. Klem, 544 F.3d 266, 274 (3d Cir. 2008) (citing Boykin v. Alabama, 395 U.S. 238, 244 (1969). Defendant states that "the[] constitutional errors [listed above] went to the heart of the prosecution's case against Mr. Hammer. Individually and collectively, these

---

[6] Although Defendant also included Upton and Classen's testimony as evidence that his guilty plea was involuntary, as described above, the statute of limitations bars the Court's consideration of this evidence.

constitutional errors had direct impact on Mr. Hammer's guilty plea, rendering it involuntary." (Doc. No. 1801 at 7.)

With respect to the government's failure to disclose the above information, the government's "impermissible conduct" is "a necessary but not a sufficient condition for the success of an involuntariness argument. The [defendant] must also show a 'reasonable probability that, but for the misconduct, he would not have pleaded guilty and would have insisted on going to trial.'" Ferrara v. United States, 456 F.3d 278, 293-94 (1st Cir. 2006) (quoting Hill v. Lockhart, 474 U.S. 52, 59 (1985) (internal alterations omitted)). Defendant has not made such a showing here and each example of alleged "impermissible conduct" will be discussed in turn.

### 1. Defendant would have pled guilty even if he had access to documents noting that Marti requested to cell with Defendant

Defendant first contends that his guilty plea was involuntary because he was under the "false impression" that there was little evidence to support that Marti requested to move in with Defendant. (Doc. No. 1801 at 10.) After the trial, Defendant learned that a BOP document noted that Marti had requested to cell with Defendant due to gang-related problems. Here, Defendant has not shown a reasonable probability that had the Government disclosed the BOP document, he would not have pled guilty. Judge Muir in his extensive opinion stated the following with respect to the BOP document:

> It is also alleged that the Government failed to provide the defense with a Bureau of Prisons ["BOP"] document [] indicating that [Marti] had gang[-]related problems and as a result of these problems it was [Marti] who had requested to cell with [Defendant].
>
> ***
>
> During the trial evidence was presented that both [Defendant] and [Marti] requested to be housed together. The individual who drafted the BOP document may have overlooked information indicating that both [Defendant] and [Marti] requested to cell together or the author may have decided it was not relevant for

the purpose of summarizing a homicide incident. We are not convinced that the BOP document would have deterred [Defendant] from entering a plea of guilty to first degree murder. . . .

(Doc. No. 1216 at 269, 270.) The Court agrees with Judge Muir's findings. Defendant has not shown with a reasonable probability that the BOP document would have convinced him not to plead guilty considering it contained information already presented to the trial jury that both Marti and Defendant had requested to cell together. Defendant's guilty plea occurred after this testimony was elicited.

> ### 2. Defendant would have pled guilty even if he had access to FBI 302 statements discussing the use of braided ropes for sexual purposes

The same is true for the previously undisclosed FBI 302 statements of Albert Ray Johnson, Royce Lee Fowler, Gaylon Ball, and Martin Guerrero. Judge Muir stated the following regarding these FBI 302 statements:

> The information from Albert Ray Johnson, Royce Lee Fowler and Gaylon Ball would have supported [Defendant's] contention that the sheets were braided into ropes for the purposes of being used as part of consensual sexual activity involving bondage. . . . The testimony of Martin Guerrero would have bolstered Mr. Hammer's position that the hostage scenario was untrue.
>
> ***
>
> The information which the Government failed to disclose does not appear to have any relevance to [Defendant's] decision to plead guilty to first degree murder. During the change of plea proceeding on June 22, 1998, [Defendant] denied the accuracy of the hostage ruse and indicated that the sheets braided into ropes were used for other purposes. Consequently, information suggesting that the hostage ruse was untrue or that the ropes were used for other purposes would not have deterred [Defendant] from entering a plea of guilty.

(Doc. No. 1216 at 266, 267-68.) As discussed by Judge Muir, Defendant has not shown with a reasonable probability that access to the FBI 302 statements would have led him not to plead guilty. Accordingly, this claim also fails.

21

### 3.    Defendant would have pled guilty even if he had access to Yager's statements made in February 2014

Finally, Defendant's claim that he would not have pled guilty with respect to the disclosures about Leonard Yager is similarly without merit. Defendant states the following in support of this argument: "the [G]overnment knew of [] and suppressed evidence of [] a number of bases [to challenge Yager's testimony], not the least of which involved the [G]overnment's complete disregard for Mr. Hammer's clear and unequivocal invocation of his right to counsel and deployment of Yager as its agent to obtain purported inculpatory evidence." (Doc. No. 1801 at 10.)

As discussed above, Defendant's right to counsel had not attached when Yager spoke with him, and therefore, no constitutional violation occurred. Accordingly, Defendant's argument that he would not have pled guilty had he known that Yager had violated his Sixth Amendment right to counsel is without merit.

The Court is similarly unconvinced that Defendant would not have pled guilty based on the content of Yager's February 25, 2014 interview with Prosecutor Haines and FBI Special Agent Thomas Herbst. As noted, the Court gives more weight to Yager's consistent account that Defendant voluntarily shared information relating to Marti's murder, compared to Yager's one-time, self-recanted statement that he was an agent of the Government that he made when was under the influence of heroin.

Nevertheless, given the totality of the information provided by Yager of which Defendant had knowledge, Defendant has not established with a reasonable probability that he would not have pled guilty. Defendant knew that the jury would have learned that on April 13, 1996, the FBI interviewed Yager who said that Defendant had approached him and confided his intent to kill Marti. (Doc. No. 1684 at 15.) The jury also would have heard that during Defendant's

confession, he revealed that Yager had known about his plan to kill Marti. (Id. at 48.) The jury would have heard Yager authenticate the note authored by Defendant that detailed seven reasons why he killed Marti, and also would have heard Yager explain that he gave the note to the FBI on April 17, 1996. (Doc. No. 1684 at 49.) The jury would then learn that eighteen years later, while under the influence of heroin, Yager told Prosecutor Haines and FBI Special Agent Herbst that he did not recognize the note and claimed that Defendant had not approached Yager about Marti, but that Yager had been "sent [] in" to speak with him. (Id. at 50.) Importantly, the jury would hear that weeks later, when he was not under the influence of heroin, Yager returned to his original version of events and had no memory of ever stating otherwise. (Id. at 51.) And finally, the Government would present evidence that "[d]espite diligent inquiry, [it] could find no support for Yager's vacillating claim that the FBI directed him to obtain additional incriminating evidence." (Doc. No. 1806 at 40.)

Considering all of the above and the fact that Defendant acknowledged during his confession that he had told Yager about his intent to kill Marti, Defendant has not shown with a reasonable probability that he would not have pled guilty had he been aware of the statements Yager made during his interview in February 2014. Based on the foregoing, the Court is satisfied that Defendant has failed to make a substantial showing that his guilty plea was constitutionally invalid, and therefore a COA will not issue with respect to this claim.

### E.    Defendant's COA Request Will Be Denied with Respect to His Third Claim

Defendant's third argument in favor of the Court issuing a COA is that "[t]he Government's failure to disclose material exculpatory evidence and its reliance on materially misleading and false testimony violated the Fifth, Sixth, and Eighth Amendments." (Doc. No. 1801 at 20.) In support of this argument, Defendant once again raises claims that were the

subject of the Brady violation identified by Judge Muir in his opinion of December 2005 including: (1) the government's failure to disclose that Marti requested to cell with Defendant; (2) the government's failure to disclose the FBI 302 statements of Albert Ray Johnson, Royce Lee Fowler, Gaylon Ball, and Martin Guerrero; and (3) the status of Leonard Yager as an alleged government agent. Defendant contends that the Government's failure to disclose this evidence violated his Fifth, Sixth,[7] and Eighth Amendment[8] rights. The Court will only discuss Defendant's argument with respect to the Fifth Amendment. (Id. at 20-22.)

Defendant argues that the Government violated his Fifth Amendment due process rights by presenting "materially false and/or misleading testimony and argument" during trial. (Doc. No. 1801 at 28.) Citing to the case Napue v. Illnois, Defendant argues that due process is violated where false testimony is presented and "in any reasonable likelihood [it could] have affected the judgment of the jury." 360 U.S. 264, 271 (1959).

---

[7] In this section, Defendant does not address the Sixth Amendment at all, only the Fifth Amendment and Eighth Amendment. (See Doc. No. 1801 at 20-33.) As a result of Defendant's failure to introduce any evidence that the above non-disclosures violated the Sixth Amendment, the Court will not issue a COA with respect to this claim because Defendant has not made a "substantial showing" that the Government violated this right.

[8] The Court will also not issue a COA with respect to Defendant's Eighth Amendment claim. In support of his Eighth Amendment claim, Defendant discusses the "greater degree of scrutiny" applied to capital sentencing determinations. (Doc. No. 1801 at 29.) Defendant argues that the Government violated the Eighth Amendment because it exposed the jury to materially false and misleading testimony that resulted in a "death sentence imposed by a jury that was allowed to consider materially inaccurate evidence." (Doc. No. 1801 at 32 citing Tuggle v. Netherland, 516 U.S. 10, 14 (1995).) However, Defendant does not explain why an Eighth Amendment inquiry is appropriate here, where the Court resentenced Defendant after a lengthy sentencing hearing to life imprisonment, thus rendering moot any violations that occurred during Defendant's initial sentencing hearing. Because Defendant has failed to make a substantial showing that he sustained an Eighth Amendment violation, the Court will not issue a COA on this claim.

24

This citation precludes application of two out of the three bases for relief listed by Defendant. Specifically, Defendant's argument that: (1) the Government's failure to disclose that Mr. Marti requested to cell with Defendant; and (2) the Government's failure to disclose the FBI 302 statements of Albert Ray Johnson, Royce Lee Fowler, Gaylon Ball, and Martin Guerrero. Both arguments rely on the Government's failure to disclose information, not on the Government's presentation of false testimony. Because Defendant has not provided any other argument why the Government's failure to disclose this information violated his due process rights, a COA will not issue with respect to these claims.

To the extent that Defendant contends that Yager's failure to disclose his true status as a Government agent constituted "false testimony," Defendant has not established a "reasonable likelihood" that Yager's testimony in February 2014 could have affected the judgment of the jury for all the reasons discussed supra. See U.S. v. Keogh, 391 F.2d 138, 147 (2d Cir. 1968) (refusing to find a due process violation where a "combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict"). Thus, Defendant has failed to make a substantial showing that his Fifth, Sixth, and Eighth Amendment rights were violated. For this reason, a COA will not issue on this claim.

## V.    CONCLUSION

For all the foregoing reasons, Defendant has not made a substantial showing that his constitutional rights were violated and has failed to demonstrate that reasonable jurists would disagree with this assessment. Accordingly, pursuant to 28 U.S.C. § 2253(c)(2), the Court will not issue a COA. An appropriate Order follows.